E-FILED
Thursday, 19 August, 2021  11:37:43 AM
Clerk, U.S. District Court, ILCD

# Exhibit 3

1          IN THE UNITED STATES DISTRICT CIRCUIT

2           FOR THE CENTRAL DISTRICT OF ILLINOIS

3

4  JENNIFER J. MILLER, DARIN E. MILLER,
    SECOND AMENDMENT FOUNDATION, INC.,

5  ILLINOIS STATE RIFLE ASSOCIATION
    and ILLINOIS CARRY,

6                    Corrected Transcript

                         3/11/21

7            Plaintiffs,

8  vs                 Case No. 18 CV 3085

9                     **CERTIFIED COPY**

10  MARC D. SMITH, in his official
    capacity as Acting Director of the

11  Illinois Department of Children
    and Family Services, and KWAME RAOUL,

12  in his official capacity as Attorney
    General of the State of Illinois,

13

14             Defendants.

15  _____

16

17        ZOOM DEPOSITION OF MARTY HAYES

18          February 8, 2020

19           7:30 a.m. PST

20        Spokane, Washington 99212

21

22  ATKINSON BAKER INC.
    (800) 288.3376

23  www.depo.com

24  REPORTED BY:  JAN W. SERRA, WA. CSR 3378

25  FILE NO. AF00C62

Atkinson Baker, a Veritext Company
www.depo.com

1              N THE UNITED STATES DISTRICT CIRCUIT

2                 FOR THE CENTRAL DISTRICT OF ILLINOIS

3

4   JENNIFER J. MILLER, DARIN E. MILLER,
    SECOND AMENDMENT FOUNDATION, INC.,
5   ILLINOIS STATE RIFLE ASSOCIATION
    and ILLINOIS CARRY,
6

7                      Plaintiffs,

8   vs                                Case No. 18 CV 3085

9

10  MARC D. SMITH, in his official
    capacity as Acting Director of the
11  Illinois Department of Children
    and Family Services, and KWAME RAOUL,
12  in his official capacity as Attorney
    General of the State of Illinois,

13

14                     Defendants.

15  _____

16

17

18           VIDEOCONFERENCE DEPOSITION OF MARY HAYES, was

19  taken on behalf of the Defendants on Monday, February 8,

20  2220, commencing at 7:30 a.m., PST at Spokane, Washington

21  99212 before Jan W. Serra, CSR 3378.

22

23

24

25

```
1   A P P E A R A N C E S

2

3   For the Plaintiffs:

4

5   ATTORNEY GENERAL OF THE STATE OF ILLINOIS

6   BY:  AARON P. WENZLOFF, ESQ.

7   GRETCHEN HELFRICH, ESQ.

8   MATT CHIMIENTI, ESQ.

9   ASSISTANTS ATTORNEY GENERAL

10  100 West Randolph Street, 11th FL

11  Chicago, Illinois  60601

12  T (312) 814-1136

13  ghelfrich@atg.state.il.us

14

15  For the Defendants:

16

17  LAW FIRM OF DAVID SIGALE P.C.

18  BY:  DAVID SIGALE, ESQ.

19  430 West Roosevelt Road

20  Wheaton, Illinois 60187

21  T (630) 452-4547

22  dsigale@sigalelaw.com

23

24

25
```

Atkinson Baker, a Veritext Company
www.depo.com

```
1              INDEX OF EXAMINATIONS

2

3                                              PAGE

4   BY MR. WENZLOFF ..........................  5, 193

5   BY MR. SIGALE ............................  174

6                   --oOo--

7

8              INDEX OF EXHIBITS

9

10  Exhibit 1 - Curriculum Vitae              12

11  Exhibit 2 - Witness Report                13

12  Exhibit 3 - House Bill 1122               97

13  Exhibit 8 - Brochure Project ChildSafe    166

14  Exhibit A - Substitute House Bill 1122    175

15  read first time 2/17/17

16  Exhibit B - Substitute House Bill 1122    175

17  read first time 1/22/18

18  Exhibit C - FBI Expanded Homicide 2019    176

19  Crime in the United States

20

21                  --oOo--

22

23

24

25
```

Atkinson Baker, a Veritext Company
www.depo.com

1      Q    Did you conduct any independent research in

2  connection with your report?

3           MR. SIGALE:  Object as to form.  You can answer.

4           THE WITNESS:  I'll have to skim through the

5  report.

6           MR. WENZLOFF:  You may.

7      A    I did do some Internet research regarding

8  shootings at or around day care centers.  And that's the

9  only independent research outside of reviewing the discovery

10 that I conducted that I recall.

11          MR. WENZLOFF:  Thank you.

12 BY MR. WENZLOFF:

13     Q    Did you request any additional materials from

14 Mr. Sigale besides those that you list in the report?

15     A    No.

16     Q    How long after being retained did you reach your

17 conclusions?

18     A    I would say I reached my conclusions after reading

19 through the discovery and the pertinent Illinois laws.  And

20 I don't know how long that would have been in time, but

21 perhaps seven hours after I reviewed discovery.

22     Q    Who drafted your report?

23     A    I did.

24     Q    Were there any subjects you were asked to opine on

25 but declined to do so?

1  development?

2      A    Yes.

3      Q    Do you have an educational background in childcare?

4      A    No.

5      Q    Do you have an educational background in social

6  work?

7      A    No.

8      Q    Do you have an educational background in

9  criminology?

10     A    No.

11     Q    Do you have an educational background in forensic

12  science?

13     A    Yes.

14          MR. WENZLOFF:  Thank you.

15  BY MR. WENZLOFF:

16     Q    So I just listed off a series of topics and

17  subjects and asked you several questions about whether you

18  had any education in those topics.  I want to return to the

19  ones I listed where you said you did have some background in

20  those areas.

21          To begin, a few moments ago you told me that you

22  had an educational background in medicine.  Can you explain

23  to me briefly your educational background in medicine.

24     A    I have taken several training courses taught by

25  doctors, forensic pathologists, homicide detectives,

Atkinson Baker, a Veritext Company
www.depo.com

1  sounds unusual, but I also had my own business from 1990 on.

2  And so I did not work full-time as a patrol officer with the

3  exception of about, I believe, four years or so centered

4  around 1998 to 2001 perhaps.

5      Q    You worked full-time as a patrol officer from 1998

6  until approximately 2001?

7      A    Yes.  And then I worked full-time as a patrol

8  officer in 1978 for about a year.  And then in 1980 to 1983.

9      Q    You also served as a firearms instructor for

10  various police departments as well, correct?

11      A    Correct.

12      Q    Aside from serving as a patrol officer and a police

13  firearms instructor, what other roles did you serve in when

14  you were employed by a police department or law enforcement

15  agency?

16      A    The only other official role was the Town Marshal

17  of the town of PeEll.

18      Q    What was that role?

19      A    Town Marshal.

20      Q    For what years did you serve as Town Marshal?

21      A    I served only for about a year, about the year

22  2000.

23      Q    When you served as a patrol officer did you respond

24  to crimes?

25      A    Yes.

Atkinson Baker, a Veritext Company
www.depo.com

```
 1        Q    Did you investigate crimes?

 2        A    Yes.

 3        Q    Did you make arrests?

 4        A    Yes.

 5        Q    Did you respond to burglaries?

 6        A    Yes.

 7        Q    Did you investigate burglaries?

 8        A    Yes.

 9        Q    Did you respond to crimes of sexual assault or

10   rape?

11        A    No, I don't remember any.

12        Q    Did you ever investigate any crimes of sexual

13   assault or rape?

14        A    No, not that I recall.

15        Q    Did you serve in the role of detective?

16        A    Not formally.  Although when you're a small town

17   cop you basically serve as the detective on the case along

18   with the responding officer.

19        Q    So to be clear.  In your employment at any police

20   department or law enforcement agency did you ever serve in

21   the role or title of detective?

22        A    No.

23        Q    Do you recall the last year in which you served

24   either part-time or full-time as a patrol officer?

25        A    I do not recall.  The best I could do would be to
```

1   accurate?

2       A    Yes.

3       Q    When you served as a patrol officer for the Vadar

4   Police Department was that as full-time?

5       A    (No audible response)

6       Q    When you served as a patrol officer did all of your

7   work involve responding to criminal violations or the

8   apprehension of individuals suspected of committing criminal

9   violations?

10      A    No.

11      Q    Over the course of your law enforcement career as a

12  patrol officer do you recall how many burglaries you have

13  responded to?

14      A    You would have to separate that into burglaries in

15  progress versus burglaries after the fact.

16      Q    Can you tell me how many burglaries did you respond

17  to?

18      A    I don't recall.  It was not a lot.

19      Q    Can you recall how many burglaries in process you

20  responded to over the course of your law enforcement career?

21      A    Perhaps no more than five.

22      Q    Do you recall how many burglaries you responded to

23  in the course of your law enforcement career where you

24  responded after the burglary was completed?

25      A    I would estimate perhaps 20 to 30, maybe a few

Atkinson Baker, a Veritext Company
www.depo.com

1  more, but I do not recall specifically.

2      Q    Do you recall the last time that you responded to a

3  burglary of any kind as a law enforcement officer?

4      A    No, I do not recall.

5      Q    How many homicides did you respond to in the course

6  of your law enforcement career?

7      A    I do not believe I responded to any homicides.

8  With "homicide" being the definition of one person killing

9  another.

10      Q    Are there any other criminal incidents where

11  someone intentionally killed another person that you

12  responded to in your law enforcement career?

13      A    I do not recall.  I do not believe so.

14      Q    Did you ever respond in the course of your law

15  enforcement career to any child neglect situations?

16      A    I do not believe so.

17      Q    Did you ever conduct any child abuse investigations

18  during your law enforcement career?

19      A    I do not believe so.

20      Q    Did you ever conduct any investigations related to

21  child safety during your law enforcement career?

22      A    I am unclear on your definition of "child safety",

23  so I can't answer that question.

24      Q    What percentage of your time when you served as a

25  police officer did you spend engaged in investigating

1  investigate a burglary involving the loss of multiple

2  millions of dollars in value of property and safe cracking?

3      A    No.

4      Q    In your position as a law enforcement officer did

5  you ever have job duties that included analyzing laws to

6  assess the impacts of those laws on public safety?

7      A    No.

8      Q    In your career as a law enforcement officer did

9  your job duties include conducting studies to determine the

10  causes of death or injury in children?

11      A    I do not believe so.

12      Q    Much of your law enforcement career was as a Police

13  Firearms Instructor, correct?

14      A    Correct.

15      Q    In your position as a Police Firearms Instructor

16  were you responsible for investigating crimes?

17      A    No.

18      Q    Did your job duties as a firearms instructor

19  include apprehending criminal suspects?

20      A    No.

21      Q    Did your job duties include analyzing laws to

22  assess their impact on public safety?

23      A    No.

24      Q    You currently serve as a staff instructor for the

25  Massad Ayoob Group, correct?

Atkinson Baker, a Veritext Company
www.depo.com

1      A    I will respond with the same answer then.  Not

2  directly.

3      Q    What do you mean by "not directly"?

4      A    Most of what was covered in the different

5  certification courses et cetera I already knew.  But the

6  information was affirmed by the content of the courses.  For

7  example, the line item following the Force Science Certified

8  Analyst, the Airsoft Force on Force Instructor training by

9  (KR training) dealt with two days of participating in and

10  observing replicated criminal attacks.  And how to set them

11  up, what to expect from the participants, including how

12  quickly people react to being threatened with criminal

13  violence or faux criminal violence.  None of it directly

14  related to my forming the opinions I formed here.  But it

15  certainly validates the opinions that I have given here.

16      Q    Have any of your trainings you've listed on your CV

17  involved opening gun storage devices under conditions of

18  stress?

19      A    Not that I can recall.

20      Q    Your CV provides a list of court cases for which

21  you served as either a legal consultant or an expert witness,

22  right?

23      A    Correct.

24          MR. WENZLOFF:  I'm again showing you Exhibit 1.

25  And I'm showing you pages bottom of page 2, page 3, page 4

1  about exactly what your opinions are in this expert report.

2  So I'm going to try to list all of the provisions in your

3  report that appear to be your opinions.  And then confirm

4  whether those are your opinions in this case.  So please

5  listen carefully.

6  BY MR. WENZLOFF:

7      Q    First, as a foster care Rule, your report states

8  your opinion is that IDCFS Rule 402.8(o) would create an

9  unreasonable and unnecessarily restrictive burden to the

10  lawful use of firearms in self-defense.  That can be found on

11  page 44.

12          In your report you also opine that IDCFS Rule

13  402.8(o) "results in the exact opposite of its intended

14  purpose, that being to make the foster children feel less

15  safe, as opposed to more safe".  And that statement can be

16  found on page 5.

17          In your report with respect to the day care home,

18  "the day care provider is rendered helpless against an

19  individual who is bent on attacking any child in the day

20  care facility".  That's on page 5.

21          You a also opine that "if a person were to desire

22  to have a gun accessible for defense of self or others in a

23  day care setting, that firearm should be a handgun, carried

24  in a secure holster and concealed on their person.  And when

25  the gun is taken off, that it be allowed to remain loaded

Atkinson Baker, a Veritext Company
www.depo.com

1  and be stored in a biometric gun safe, which would allow

2  access immediately within five seconds or so if necessary".

3  That language can be found on page 6.

4           Finally, in your report you also opine that "the

5  Illinois law regarding "no firearms allowed during operating

6  hours" places both the operators and the clients of the day

7  care in a severely disadvantaged position in the event

8  violence comes to that day care during operating hours".

9  Page 7.

10          Have I listed all of your opinions in this case?

11      A    I believe so.

12          MR. WENZLOFF:  Thank you.

13  BY MR. WENZLOFF:

14      Q    Now I'm going to ask you more specific questions on

15  each of the opinions I just listed and the basis you provide

16  in your report for those opinions.

17          First, again you state that "ICDSF 402.8(o)(which

18  applies to foster parents) would create an unreasonable and

19  unnecessarily restrictive burden to the lawful use of

20  firearms in self-defense".  This language can be found top

21  of page 4.  I'll give you a moment to find that language.

22      A    Okay, I found it.

23      Q    Is it true that you do not offer any quantitative

24  standards for how you determined that the foster home

25  regulation creates an unreasonable burden?

1      A    Would you define "quantitative standards" for me.

2      Q    What do you believe "quantitative standards" means?

3      A    I do not know what that means.

4      Q    It's also true you do not offer any quantitative

5   standards for how you determined your regulation creates a

6   unnecessarily restrictive burden, right?

7           MR. SIGALE:  Objection as to form.  You can

8   answer.

9      A    Again, the same answer.  Until I see a definition

10  of "quantitative standards", and understand what you're

11  referring to, I really can't answer the question.

12     Q    Do you have any understanding of what "quantitative

13  standards" might mean?

14     A    No.

15     Q    Is it true that you drew your standard for what is

16  "unreasonable" in forming this opinion about the foster home

17  rule based on your training and experience?

18     A    Yes.

19     Q    Similarly, did you draw your standard for what is

20  unnecessarily restrictive about the foster home rule based on

21  your training and experience?

22     A    Yes.

23     Q    Did Mr. Sigale instruct you to apply the

24  unreasonable and unnecessarily restrictive burden standard?

25     A    No, not that I recall.

1    Q    As a person with a law degree, are you familiar

2  with the idea of a standard of proof in an legal case?

3    A    Yes.

4    Q    So, for example, in criminal cases the facts have

5  to be proved beyond a reasonable doubt, right?

6    A    In order to obtain a conviction, yes.

7    Q    Another standard of proof used in some forms of

8  litigation is "clear and convincing evidence", correct?

9    A    I'm not aware of that standard of proof in

10  litigation.

11    Q    And another standard is "preponderance of the

12  evidence", or "more likely than not", correct?

13    A    Correct.

14    Q    Were you applying any of the standards I just

15  listed when you reached your opinion that the foster care

16  regulation would create an unreasonable and unnecessarily

17  restrictive burden?

18    A    Not specifically applying the Rule to -- and I'm

19  not analyzing it by virtue of the "clear and convincing

20  evidence" or the "preponderance of evidence" or "proof

21  beyond a reasonable doubt" standards.

22    Q    So what standard did you use to determine that the

23  foster home rule creates an unreasonable and unnecessarily

24  restrictive burden?

25    A    Probably the standard of common sense.

1          How do you go about analyzing any regulation

2    related to firearms to determine whether that firearm

3    regulation's unreasonable and unnecessarily restrictive to

4    the burden of self-defense?

5         A    I would look at the issue involved, the

6    regulation, and I would ascertain based upon my training and

7    experience, primarily my experience, as to whether or not

8    the regulation would unreasonably prohibit someone from

9    being able to reasonably defend themselves in the home.

10        Q    When you say "unreasonable", what do you mean?

11        A    "Unreasonable" would be that it would not be

12   reasonable.  I think unreasonable is the definition of

13   itself.

14        Q    Is your standard for analyzing a firearm regulation

15   to determine whether it's unreasonable and unnecessarily

16   restrictive, is that standard something that other experts in

17   the filed of firearms use and firearms safety can apply

18   exactly the same as you?

19        A    I do not know.

20        Q    Is your approach to analyzing firearms regulations,

21   including those in this case, to determine whether they are

22   reasonable or unreasonable unique to you?

23        A    I would expect that any person of my background

24   and experience and training would analyze a regulatory

25   statute in pretty much the same manner.

1      Q     Is the unreasonable and unnecessarily restrictive

2  burden a standard that you offer as an opinion published in

3  any literature in the area of firearm use and firearm

4  storage?

5      A     Not that I'm aware of.

6      Q     Do you test whether a regulation creates an

7  unreasonable and unnecessarily restrictive burden to the

8  lawful use of firearms in self-defense?

9      A     I believe you could formulate testifying protocols

10  which would result in a reasonable and prudent person coming

11  to the understanding that the protocols would either be

12  reasonable or unreasonable.

13      Q     Did you apply any such testing protocols to your

14  analysis of the regulations at issue in this case to form

15  your opinions?

16      A     No.

17      Q     If you were to design testing protocols to assess

18  whether a firearm regulation was unreasonable and an

19  unnecessarily restrictive burden, what data would you collect

20  and review?

21      A     I do not know.  I would have to spend a lot more

22  time thinking that through.

23      Q     Do you know how you would ensure your testing

24  protocols are valid?

25      A     Same answer.  I'm not sure.

Atkinson Baker, a Veritext Company
www.depo.com

1      Q     Do you know how you would design a test to analyze

2   a firearm regulation to ensure that the results from the test

3   are reliable?

4      A     Without giving that more thought, I can't really

5   answer that.

6      Q     Are there accepted standards in the area of

7   firearms use and firearms storage that other experts would

8   rely on in forming opinions about whether a regulation

9   creates an unreasonable and unnecessarily restrictive burden?

10     A     Not to my knowledge.

11     Q     Why did you chose this formulation of analysis?

12  Why did you use this form of analysis to study whether a

13  firearm regulation creates an unreasonable and unnecessarily

14  restrictive burden?

15          MR. SIGALE:  Object as a form.  But you can

16  answer.

17     A     Well, I know from my experiences, my research that

18  a criminal attack in the home can happen very quickly,

19  within a few seconds.  And I know that attempting to get a

20  firearm out of a locked container, and then get ammunition

21  out of another locked container, and then having to load

22  that firearm, all the while you're subject to criminal

23  attack, would be unnecessarily restrictive to the ability

24  for that person to use a firearm reasonably in self-defense.

25     Q     Is the unreasonable and unnecessarily restrictive

Atkinson Baker, a Veritext Company
www.depo.com

1  burden standard that you applied here in forming your opinion

2  an objective standard or a subjective standard?

3      A    I always have trouble with those two words, the

4  difference.  Can you explain the difference between the two.

5      Q    Objective standard is something that exists outside

6  of yourself.  It could be written down.  It could be shared

7  amongst a group of people as a shared understanding of what

8  the standard is.

9          A subjective standard is something that comes from

10  within that you draw from your own perspective and

11  understanding of the problem.  Does that help?

12     A    Yes.  Thank you.

13         To answer your question then I would say that my

14  opinion would be more of a subjective standard than an

15  objective standard.

16     Q    Can you identify an example of a law, either real

17  or hypothetical, that in your opinion would create a

18  reasonable or unnecessarily restrictive burden to the lawful

19  use of firearms in self-defense?

20     A    There was a law recently that was struck down by

21  the United States Supreme Court in the District of Colombia

22  vs Heller that required the homeowner to keep any firearms

23  unloaded, and I believe also disassembled and/or locked up.

24  And that was found by the court to be unconstitutional

25  vis-a-vis the Second Amendment; the right to keep and bear

Atkinson Baker, a Veritext Company
www.depo.com

1   I analyzed it with those, that specific question, I'm not

2   sure.  But I would agree that a firearm could injure another

3   person.

4        Q    Did the fact that a firearm could injure another

5   person inform your opinion in any fashion?

6        A    If it did it was to discount that potential

7   possibility in consideration of the need to use the firearm

8   in self-defense during a criminal attack.  It's an analysis

9   that every person who uses a firearm in self-defense needs

10  to go through based upon the totality of the circumstances

11  at the time of the incident.

12       Q    Did you attempt to quantify the balancing that you

13  undertook to form your opinion related to the possibility

14  that someone else might be injured when a firearm is used in

15  self-defense?

16       A    Again, with the caveat that I'm not quite

17  understanding the usage of the term "quantify", I do

18  understand that in each particular situation that an

19  individual needs to do a risk/benefit analysis of his or her

20  actions.  And then take the appropriate course based upon

21  their analysis.

22       Q    Did you attempt to determine the number of

23  incidences where individuals were injured during an event

24  where a person was using a firearm in self-defense and the

25  person injured was not the intended target?

Atkinson Baker, a Veritext Company
www.depo.com

1      A    Not for this specific analysis.  I'm aware of

2   instances where that occurs.

3      Q    Did you consider the possibility that the foster

4   home rule 402.8(o) might affect the likelihood of members in

5   the household dieing from suicide by firearm?

6      A    I know that is a possibility.  But then again, you

7   have the risk/benefit analysis of having a firearm in the

8   home available for self-defense.  And you have to weigh the

9   possibility that someone in the home could gain access to

10  the firearm and kill themselves, with the more likelihood

11  that a person may need to use that firearm in self-defense.

12     Q    When you say "you have to conduct that risk/benefit

13  analysis", how do you or how does anyone conduct that

14  analysis?

15     A    Well, they would conduct it based upon their

16  unique individual circumstances.  And combine that with

17  their knowledge of their potential for being criminally

18  attached and their willingness to learn how to use the

19  firearm safely and competently for self-defense.  After they

20  weighed that risk/benefit analysis, then they should

21  logically make a decision on whether or not that firearm

22  should be present in the home or if present, locked up in

23  the home, or if present, carried on their person in the

24  home.

25     Q    Mr. Hayes, did you conduct any kind of risk/benefit

Atkinson Baker, a Veritext Company
www.depo.com

1  analysis in evaluating the foster home rule?

2      A    Not as I have described because I don't know the

3  particular circumstances of any given foster home, the

4  likelihood of there being a criminal attack at that foster

5  home.  Nor do I know the skill, training and expertise of

6  the individuals living in the foster home who might want to

7  chose to be harmed.  Or the method of them keeping the guns

8  secured when they're not in control of the firearm.  So, no,

9  I didn't do that.  Each risk/benefit analysis would need to

10  be done for each individual specific instance.

11      Q    So is it your opinion that to conduct a

12  risk/benefit analysis of the Rule, you would have to know the

13  individual unique circumstances of every household that is

14  subject to the rule, is that correct?

15      A    I don't think you could do a risk/benefit analysis

16  of a Rule.  And that's not what I've done in this report, in

17  this opinion.

18      Q    In the middle of the page 4 of your report you say

19  "this regulation" -- meaning the foster care regulation --

20  "negates the ability of a foster parent to reasonably protect

21  his family, including the foster child or children".  Do you

22  see that in your report?

23      A    Yes.

24      Q    What do you mean by "negates the ability"?

25      A    If a foster parent was going to be able to

1    invasion where a criminal suspect or suspect should break

2    through a door or perhaps even enter without breaking it,

3    and quickly assault the subjects of the building versus

4    someone outside pounding on the door wanting to get in, and

5    having the door stop them from getting through into their

6    home.  So there is too many ways to carry out a criminal

7    attack to say that one regulation fits all eventualities or

8    all possibilities.

9        Q    Are you able to measure the amount of ability that

10   the regulation reduces related to reasonably protecting the

11   family?  Can you express your opinion in numbers,

12   percentages?

13       A    No.

14       Q    Would you analyze any data about the frequency with

15   which types of criminal attacks that affect, or might affect

16   foster homes, and how those data relate to the Rule?

17       A    No.

18       Q    Did you assess the effects of other home protection

19   strategies other than using a firearm for self-defense?

20       A    No.

21       Q    So for example, did you review any data or consider

22   any analysis related to alarms, door locks, window bars,

23   video surveillance or other types of measures that some

24   households use to prevent crime?

25       A    No, I did not conduct that analysis.

1      Q    The middle of page 4 you write my life long study
2  of criminal behavior leads to the undeniable truth that
3  criminal attacks can happen in a matter of seconds.  I just
4  paraphrased a sentence from your report in the middle of
5  page 4.  Do you see that?
6      A    Yes.
7      Q    So your assertion about the undeniable truth that
8  criminal attacks can happen in a matter of seconds, is that
9  assertion based solely on your training and experience?
10     A    If you include experience as what I read in
11 newspapers, see on TV, and I have red in police reports, the
12 whole gamut of my exposure to the discipline of criminal
13 attack, then that would be based upon my training and
14 experience.
15     Q    So you didn't conduct any tests in order to make
16 this assertion in the report?
17     A    I did not.
18     Q    You didn't conduct any criminological studies, did
19 you?
20     A    I did not.
21          MR. SIGALE:  Objection to form.
22 BY MR. WENZLOFF:
23     Q    Away from this assertion, you're not relying on any
24 surveys of victims of crimes that you conducted, correct?
25          MR. SIGALE:  Objection as to form.  Answer if you

1  reasonable.  I'm having on hard time trying to define what I

2  mean by "severely".  I just use it in the common vernacular

3  of severely hampers.

4      Q    Also on page 4 in the second to the last paragraph

5  you wrote:  "According to the FBI there were an estimated one

6  million one hundred and seventeen thousand six hundred and

7  ninety-six burglaries committed in the United States in 2019.

8  In Illinois alone that figure was thirty-four thousand four

9  hundred thirty-three burglars, correct?

10     A    I wrote that, yes.

11     Q    What database did those figures come from?

12     A    My access to FBI crime information section.  I

13  don't know exactly which one it is, but it's readily

14  available on the FBI website.

15     Q    Did they come from the FBI Unform Crime Reporting

16  Program?

17     A    I believe they did.

18     Q    Can you describe the methodology by which the FBI

19  derives figures for estimated burglaries in the Unform Crime

20  Reporting Program?

21     A    I believe I can.

22     Q    Would you please describe the methodology.

23     A    Each law enforcement agency at the end of the year

24  compiles a report that they send to the FBI detailing the

25  criminal activity within their jurisdiction.  I had to

Atkinson Baker, a Veritext Company
www.depo.com

1  prepare one of these reports while I was Town Marshal of the

2  town of PeEll.  So as of, I think it was 1999 or 2000 I knew

3  exactly what or how FBI compiled these statistics.  On the

4  one hand I would say that these figures are probably low

5  because I doubt if every jurisdiction in the country

6  actually filled out this report and sent it in.

7          It is required for an agency to keep up with these

8  reports if they want to have access to government grants.

9  So that is the "stick" that is used to get the agencies to

10  comply.

11      Q    So is it the case that not all law enforcement

12  agencies participate in the FBI reporting program?

13      A    I would expect that is the case.

14      Q    Do you know if the FBI makes any adjustments to the

15  data to reflect the fact that not all law enforcement

16  agencies participate?

17      A    I do not know.

18      Q    Do you know how the FBI's Unform Crime Reporting

19  Program defines "burglary"?

20      A    I do not.

21      Q    Doesn't the FBI's definition of burglary for this

22  data base also include property crimes against commercial

23  properties?

24      A    I suspect it does.

25      Q    Doesn't it also include property crimes when a

1   household occupant was not home?

2       A    Yes, I'm sure it does.

3       Q    So the figures you cite are for the total number of

4   burglaries in the United States and Illinois in 2019,

5   including burglaries committed where the household occupant

6   was not home, and burglaries of commercial properties, isn't

7   that right?

8       A    Yes, I would say so.

9       Q    If that is so, how were those figures relevant to

10  forming your opinion about the reasonableness of the foster

11  home regulation?

12      A    I use those -- Simply put the issue into context

13  showing exactly or showing to the best of my ability how

14  many burglaries occur on an annual basis.  Specifically

15  related to this report, every one of those burglaries had a

16  burglar attached.  In other words, there are that many

17  criminals out there perpetuating the crime of burglary.

18      Q    Just so I understand.  Are you saying that there is

19  a separate individual for each of these estimated burglaries

20  such that there were a minimum one hundred and seventeen

21  thousand six hundred and ninety-six burglars in the United

22  States in 2019?

23      A    If I was to hypothesize how many burglars there

24  are, I would say that the figure is low.  I'd say there is

25  more than that because not all crimes are committed by a

Atkinson Baker, a Veritext Company
www.depo.com

1  behalf of the United States Justice Department, Bureau of

2  Justice Statistics?

3      A    I didn't hear that in the form of a question.

4      Q    You're not aware -- Or are you aware that the

5  National Crime Victimization Survey is conducted by the

6  United States Census Bureau on behalf of the Justice

7  Department's Bureau of Justice Statistics?

8      A    I was not aware of that.

9      Q    You use the term "home invasion" in your report.

10  Can you define that term?

11      A    Generally speaking a home invasion is when one or

12  more people enter the home with violence to quickly overtake

13  any human inhabitants of the home.  And then after they have

14  overtaken and controlled those human inhabitants, then they

15  are able to perpetuate whatever criminal activity they want

16  to perpetuate.

17      Q    How many of the burglaries within the figures you

18  reference in your report from the FBI Uniform Crime Report

19  were home invasions as you define it?

20      A    I do not know.

21      Q    Isn't it true that the FBI Uniform Crime Report

22  does not use the term "home invasion" to track crimes?

23      A    I do not know that either.

24      Q    How are you able to obtain figures about the

25  numbers, rates of home invasions in the United States if at

1    all?

2         A    I am not able to access those figures.  I only

3    know of them by reading the news, hearing accounts of a home

4    invasion that occurred.  Hearing that from specific

5    individuals who were victim of specific home-invasion type

6    burglaries.

7              Additionally, a home invasion is also by

8    definition a robbery because they are taking material,

9    taking something by force.  So how the FBI classifies, or

10   any government agency classifies whether something is a

11   burglary, I don't know how they are comparing that with

12   a robbery, whether or not they're taking the "home

13   invasion/robbery/burglary" and just classifying it as

14   either a robbery or burglary.

15        Q    Would you agree that even the figures you relied on

16   related to the frequency of violent crimes occurring as a

17   result of a burglary or home invasion show that such events

18   are very rare in the United States?

19        A    I do not agree that they are very rare.

20        Q    Would you agree that the chances of having to use a

21   firearm in self-defense related to one of these events is

22   unlikely?

23        A    Absolutely not.

24        Q    You believe it is likely?

25        A    I believe that if a person is home and they have

1    takes to access a firearm and have it ready for use in

2    self-defense?

3        A    I used my own experience in shooting hundreds,

4    likely thousands, of events where we had to manipulate

5    different circumstances to get to the firearm.  I have

6    watched thousands of people pick up firearms, load them and

7    use them for self-defense.  I know how long it takes to

8    access a firearm locked in a safe, whether that be a quick

9    biometric gun safe or a gun locker with a padlock on it or a

10   combination safe, whether it's a dial combination or an

11   electronic key pad combination.  I use basically my

12   experience in teaching people to use guns and my experience

13   as a competitive shooter using firearms in simulated real

14   life type of encounters to draw these estimates from.

15       Q    In deriving these figures did you time anyone

16   opening a safe?

17       A    No.

18       Q    In deriving these figures about the time it takes

19   to access a firearm, have it ready for self-defense, did you

20   conduct any tests of individuals attempting to open a firearm

21   storage device?

22       A    No.

23       Q    Are your figures reflective of the absolute minimum

24   amount of time for each of these steps, or do they reflect

25   some kind of average or typical amount of time related to

1      Q     When you prepared your expert report, you reviewed

2   the deposition transcripts for the individual Plaintiffs in

3   this case, correct?

4      A     Correct.

5      Q     In those depositions both of the Millers described

6   the firearms that are present in their household and the

7   storage devices they use for those firearms, correct?

8      A     I do not recall that.

9      Q     Did you attempt to develop your estimates for the

10   time required to gain access to a firearm used in

11   self-defense based on the actual firearms and storage devices

12   that the Millers have in their household?

13      A     No, I did not.

14      Q     Have you ever conducted a test, even outside of the

15   context of this case, to determine the amount of time it

16   would take for an individual to access a firearm for

17   self-defense purposes under the very best conditions?

18      A     No.

19      Q     What are the very best quick lock boxes, gun safes,

20   ammunition safes that you reference on page 4 of your report?

21      A     There are a number of different gun safes

22   available now.  Some of them are opened by using

23   fingerprints or a thumbprint.  Some of them have a push

24   button combination.  Some of them require you insert your

25   whole hand into a device, and all of your fingerprints are

Atkinson Baker, a Veritext Company
www.depo.com

1  read or you push numbers of different pads inside the

2  device.  Any of which then opens up or unlocks the device

3  after which you then have to open it up and get access to

4  the firearm.

5      Q    So is there a specific standard that you were using

6  in referencing the very best and quick lock boxes, gun safes

7  and ammunition safes?

8      A    No.  Because I don't know which are the very best.

9  I know of the existence of these types of gun storage

10  devices.  We have a couple at our house.  But I don't keep

11  up on the very best what's available out there at any given

12  time.

13     Q    Based on your report would another expert be able

14  to replicate the analysis that you've undertaken to arrive at

15  the very same conclusion about the time it takes for an

16  individual to gain access to a firearm for self-defense

17  purposes?

18     A    I don't know what another expert would be able to

19  do.

20     Q    In your report you talk about an "average person"

21  in the context of what an average person would likely take

22  time to gain access to a firearm for self-defense purposes.

23  When you say "an average person", what do you mean?

24     A    It is my belief that the average gun owner is

25  relatively untrained, does not practice often with their

Atkinson Baker, a Veritext Company
www.depo.com

1  the gun, unlock another device to grab the ammunition, and

2  to load the gun.  And then use it in self-defense versus the

3  time to immediately grab the gun, identify the target, and

4  shoot.

5      Q    So what I'm hearing.  Your opinion depends on the

6  difference in the time between having a loaded gun within

7  arms' reach and the time it takes to access a gun for

8  self-defense purposes from a storage device, right?

9      A    Yes.

10     Q    Do you have any way to measure what that difference

11 in time is?

12     A    No.  Because the difference in the time will

13 depend on the variables I've already discussed that the

14 attacker possessed.

15     Q    Was it possible that it might take more than 18

16 seconds for a homeowner to gain access to a loaded firearm

17 within arms' reach?

18     A    I don't believe that's possible with the exception

19 that the homeowner may be in a sleep befuddled state and

20 didn't know what really was going on, hadn't figured out

21 that they were under attack.  But I believe that most people

22 who suddenly realize they were under attack, or were about

23 to be attacked, would be able to access that firearm fairly

24 quickly.

25     Q    But a critical component of your analysis is the

1  have a specific number in mind.  Are you able to answer that

2  question with a quantifiable amount of time?

3      A    No, because the variables are too different as I

4  stated earlier.

5      Q    So is it possible that the amount of time it takes

6  you to employ a loaded firearm for self-defense purposes

7  where the firearm was loaded and in arms' reach exactly the

8  same, or more time than it takes to access a firearm for

9  self-defense purposes when it's stored according to the

10  requirements of the foster care rule?

11      A    No.  It would be much less time to access a

12  unstowed firearm available to you than the stored firearm.

13  That's the crux of my expert opinion.

14      Q    I understand.  So how much less time?

15      A    I don't know because there would be too many

16  variables in place.  The variables I'm speaking of from the

17  standpoint of the attacker, to be able to put an exact time

18  on it.  The time that a person would take to access all of

19  the lock boxes et cetera, is also variable depending on how

20  the attack was taking place.  But it's common sense to

21  believe that it would take much longer to go through the

22  machinations required by the Illinois Rule than to simply be

23  able to access a firearm and use it, and have it available

24  to use in self-defense.

25      Q    Is it possible that the difference in time could be

1  zero?

2         MR. SIGALE:  Object as to form.  Answer if you

3  can.

4      A    I don't believe that is the case, no.

5  BY MR. WENZLOFF:

6      Q    Is it possible that the difference in time between

7  the loaded arms' length gun and the firearm access in the

8  rule could be a difference of one second?

9      A    I don't believe so.

10     Q    Is it possible?

11     A    No, I don't -- Not under normal conditions.

12  Anything is possible, but I think we're dealing with common

13  sense.  The ability to reach a gun within arms' reach would

14  certainly be quicker than the ability to find your lock

15  boxes, and get them unlocked, and load the gun, et cetera.

16     Q    But you have no way to quantify the difference

17  either in theory or practice?

18     A    If we wanted to study that particular scenario, we

19  could use ten people who would be able to reach out and grab

20  a gun and use it from supine position in their bed versus

21  somebody who had to get out of bed and get to the lockboxes,

22  and unlock them, and load the gun, and then use it.  That

23  would be possible to do.  But it still wouldn't address the

24  most important variable and that is the nature of the

25  attack.  Depending on the nature of the attack, the time

1   or any surveys of victims of crimes or review any studies

2   from criminologists or collect and analyze any crime reports

3   for purposes of forming your opinion in this case, right?

4        A    That is correct.

5        Q    The last time you served as a sworn police officer

6   was 2008, correct?

7        A    I believe that is correct.

8        Q    I believe you testified earlier that you, in your

9   law enforcement career, responded to no more than five

10  burglaries that were in process and around 20 to 30

11  burglaries after the fact, right?

12       A    I think so.  That would be reasonable, yes.

13       Q    Of those burglaries that you responded to in your

14  law enforcement career, how many involved a home invader who

15  moved quickly through the home, killed the occupants outright

16  or gathered them up in a central location for being tied up?

17       A    None.

18       Q    In the same paragraph of your report on page 5 you

19  write "ONLY a person who is carrying the gun on his body or

20  has immediate access to one within arms' reach would have a

21  reasonable chance to protect the family, (including the very

22  same foster children this law is meant to protect)".  Do you

23  see that language?

24       A    I do.

25       Q    Again, can you define "reasonable chance" for me as

1  it operates in your report?

2       A    I guess I cannot define that other than just the

3  common vernacular of the English language.

4       Q    What is the meaning of "the common vernacular of

5  the English language"?

6       A    Something that is reasonable to that would occur.

7       Q    I don't know what that means.  Well, can you define

8  it anymore precisely than "a reasonable chance"?

9       A    No.

10       Q    Is a 1 percent chance a reasonable chance?

11       A    They may have only a 1 percent chance to protect

12  the family?

13       Q    Right.

14       A    I think the chance would be much greater than not

15  having a firearm available to them.

16       Q    Can you express "reasonable chance" in percentage

17  or odds terms?

18       A    No.

19       Q    Are you confident that a 1 percent chance is not a

20  reasonable chance?

21       A    I do not believe it's a reasonable chance.  I

22  think the likelihood that a person could protect themselves

23  during a home invasion would be much higher than 1 percent

24  if they had their gun on their person or within arms' reach.

25       Q    Can you express -- Do you have more to say?

1  kept under lock -- with the gun of course unloaded.  I don't

2  think there is much difference between that and not having

3  guns in the home.  The likelihood of a child getting ahold

4  of the gun under those circumstances is obviously quite

5  remote.  I can't opine whether or not the likelihood of an

6  individual who has access to the firearm would or would not

7  commit suicide.

8       Q    But did you analyze whether the foster home rule

9  reduces the chances of a child being accidentally injured or

10 killed by a firearm compared to a foster home where the Rule

11 did not apply?

12      A    I didn't make that specific analysis, no.

13      Q    In forming your opinion did you consider whether

14 Rule 402.8(o) promotes the safety of children by reducing the

15 chances of suicides caused by a firearm?

16      A    I did not conduct that analysis.

17      Q    In forming your opinion did you consider whether

18 Rule 402.8(o) promotes the safety of children by reducing the

19 probability of potential harm caused by a firearm to

20 individuals other than home intruders, burglars, mass

21 shooters or active shooters?

22      A    I did not make that analysis, no.

23      Q    Earlier you testified that one of your opinions

24 related to the day care home regulations was found on page 5,

25 and that your opinion is quote "the result of this day care

1  or outside the day care center other than the use of or

2  threat of the use of a firearm.

3      Q    Can you explain what method you used to arrive at

4  your opinion about the day care home regulation?

5      A    The method would have been the same as I used for

6  foster care; just a good application of common sense in the

7  understanding of violent criminal attack and how quickly

8  they occur.  And in order to stop that violent criminal

9  attack, how there needs to be a person who has access to a

10  firearm and the ability to effectively use it to stop the

11  attack.

12      Q    Did you review any data about the frequency of

13  criminal attacks on day care homes when you formed your

14  opinion?

15      A    No, I did not.

16      Q    Isn't it true that criminal attacks may vary

17  substantially based on the environment, time of day, many

18  other factors?

19      A    Was that a question?  I didn't quite understand it

20  is as one.

21          MR. WENZLOFF:  I'll repeat.

22  BY MR. WENZLOFF:

23      Q    Isn't it true that a criminal attack may vary

24  substantially based on the environment, time of day, and

25  other factors associated with that criminal attack?

1      A    No.

2      Q    On page 5 of your report you write that "a simple

3 Internet search of "shooting in day care" will result in a

4 plethora of returns identifying cases where an individual

5 brought a gun to the facility and started shooting".  Do you

6 see that sentence in your report?

7      A    I do.

8      Q    Did you undertake an Internet search of the phrase

9 "shooting in a day care" to conduct your research for your

10 report?

11      A    Yes --

12      Q    What did you find?

13      A    -- or words to that affect.  I'm not quite sure

14 exactly what words I used, but I think it was those.

15      Q    Did you take notes of your Internet searches that

16 you rely on in forming your opinions about this case?

17      A    No.

18      Q    Are you confident that the results you received

19 from your Internet search relate to day care day care homes

20 exclusively, or was it possible they also relate to other

21 forms of day care facilities?

22      A    They could certainly pertain to other forms of day

23 care facilities.  It wasn't specific for the "day care

24 home".

25           MR. WENZLOFF:  Thank you.

Atkinson Baker, a Veritext Company
www.depo.com

1  BY MR. WENZLOFF:

2      Q    Which Internet search engine did you use to conduct

3  your Internet search?

4      A    I think by default my search is DuckDuckGo.

5      Q    So you didn't use Google or Bing, you used

6  DuckDuckGo?

7      A    I believe so.

8      Q    How did you determine that all of the results you

9  obtained from your Internet search were accurate and

10  Reliable?

11      A    I did not.

12      Q    Did you total up or count the number of independent

13  results of separate incidents of shootings in day care

14  facilities that were returned by your Internet search?

15      A    I did not.

16      Q    So do you know how many incidents of shootings at

17  day care facilities you found through your Internet search?

18      A    I do not.

19      Q    When you say in your report that a plethora of

20  returns can be made on such Internet search, what do you mean

21  by "a plethora of returns"?

22      A    Perhaps several pages, a number of them.  I did

23  not have to search very hard to find incidents of shootings

24  at day care centers.

25      Q    How many of the results of your Internet search did

Atkinson Baker, a Veritext Company
www.depo.com

1  you look into further by clicking on the results and reading

2  the website that, that result took you to?

3      A    Perhaps up to ten.  And I chose these three as

4  being good examples of shootings in day care facilities or

5  at day care facilities.

6      Q    When you say you "chose them as good examples of

7  shootings at day care facilities", what do you mean?  What

8  makes them good examples?

9      A    Because it would be where an individual from

10  outside the day care came specifically to the day care and

11  shot at one or more people.

12      Q    Is it your understanding that those three specific

13  instances that came from your Internet search which you list

14  in your report are representative of the full population of

15  day care shooting incidents in the United States?

16      A    No.

17      Q    You don't believe they are representative?

18      A    I don't know if they are representative.  To

19  answer your question I would have to have seen the whole

20  body of day care shooting reports.  I did not do that.

21      Q    Did you attempt to find data that shows the total

22  number of day care shooting incidents?

23      A    No.

24      Q    So what factors affected your choice to include

25  these three articles about day care shooting incidents in

1   your expert report?

2        A    I added those three instances to show generally

3   that shootings do you happen at day care centers.  And that

4   there are more than just these three that I mentioned.  It

5   happens on a somewhat regular basis.

6        Q    When you say "it happens on a somewhat regular

7   basis", what evidence do you have that, that's true?

8        A    I'm not sure I have any evidence regarding that

9   other than I believe that these examples happened in recent

10  history.  I don't see dates on them.  But if one

11  extrapolated regarding how many instances are reported over

12  the last say ten years, and compared that to the number of

13  incidents over the last 50 years, I think it would be

14  reasonable to conclude that shootings at daycares happen on

15  a somewhat regular basis.

16       Q    So have you found data that shows how many day care

17  shootings have happened over the last ten years and compared

18  that data to data on the number of day care shootings that

19  have happened in the last 50 years?

20       A    No.

21       Q    Do you know the year when these incidents listed in

22  your report took place?

23       A    No.

24       Q    Do you have any reason to believe today that these

25  incidents listed in your report happened in the last five

1    years?

2        A    No.

3        Q    On page 6 of your report in the third full

4    paragraph you write that you had personally trained with

5    Col. Ed Monk, a retired Army Colonel who has spent the last

6    13 years studying and analyzing active shooter incidents, and

7    who now conducts user and instructor training regarding how

8    to respond to an active shooter, through his company; Last

9    Resort Training.  You further write that you talked to

10   Mr. Monk on the day that you prepared this report and that

11   Mr. Monk explains that "in an average active shooter

12   scenario, a person dies every 10 seconds, and for the first

13   several victims, that time frame is condensed to 4-5

14   seconds".  Do you see that information in your report that I

15   just either quoted or paraphrased?

16       A    Yes, I do.

17       Q    Did you take any notes from your conversation with

18   Mr. Monk with respect to preparing your expert report?

19       A    No.

20       Q    Do you know what is the basis for Mr. Monk's

21   assertion about the timeframe in which a person dies every 10

22   seconds, and for the first several victims that timeframe is

23   condensed to 4-5 seconds in an average active shooter

24   scenario?

25       A    Yes.  I've taken training from Colonel Monk for

1  the last ten years or so -- I'm not sure exactly how many

2  years it has been -- and he has been compiling instances and

3  references to active shooter situations.  And so out of his

4  studies these are the conclusions that he has drawn.

5      Q    So have you studied and analyzed active shooter

6  incidents?

7      A    Not purposefully or specifically.  I have

8  certainly been aware of them by watching general news.  And

9  I have, again, trained with Colonel Monk and allowed him to

10  paraphrase or to combine all of these instances into a

11  digestible chunk of material.

12      Q    So have you reviewed Mr. Monk's methodology for

13  arriving at his opinion about the average active shooter

14  scenario?

15      A    No.

16      Q    Can you describe his methodology?

17      A    No.

18      Q    Have you attempted to independently verify

19  Mr. Monk's data?

20      A    No.

21      Q    Have you ever investigated an active shooter crime

22  scene?

23      A    No.

24      Q    Have you ever responded as a police officer to an

25  active shooter crime scene?

1        A     No.

2        Q     Have you ever interviewed any survivors of active

3    shooter crimes?

4        A     Yes.

5        Q     And also please describe generally what you learned

6    from your interview.

7        A     I have interviewed Airman Andy Brown who was on

8    the Fairchild Air Force Base in 1994 when an active shooter

9    came onto the base and started killing people in the

10   Fairchild Air Force Base Hospital.  He had responded to the

11   incident as part of his duties, and was able to stop that

12   active shooter by engaging him with his Beretta 9-millimeter

13   handgun he had on his person.  I actually have that

14   interview on videotape, and I use it in our teaching of

15   active shooter interdiction courses.

16           Additionally, I have interviewed Pastor David

17   George who, I believe in 2018, was involved in an incident

18   at a Walmart in Tumwater where an individual came into the

19   store and started shooting after, I believe, shooting one or

20   two people outside in the parking lot.  He then came into

21   the store and broke into the ammunition case to get more

22   ammunition for his gun.  And then he went back out of the

23   store in order to continue his killing or his attempted

24   killing.  David George then interdicted him and shot him

25   dead.

1          I also have that interview videotaped, and use it

2     for our instructional purposes at the academy.

3          Q    The incident involving Airman Brown occurred on

4     which Air Force Base?

5          A    Fairchild Air Force Base.  I'm pretty sure the

6     date was 1994.

7          Q    The incident in which Pastor David George was

8     involved in 2018 at a Walmart, do you have the name of the

9     city and state where that incident took place?

10         A    Tumwater, Washington.

11         Q    Tumwater is spelled T-u-m water?

12         A    Correct.

13         Q    In offering your opinion regarding the average

14    active shooter scenario that you learned from Mr. Monk, did

15    you make your own independent appraisal of data or evidence

16    from Mr. Monk to be able to include those figures in your

17    report?

18         A    No.

19         Q    Is it true to say that you are repeating assertion

20    of facts that you heard from Mr. Monk?

21         A    I believe that is what I said in my report; that I

22    was referring to his teaching.  But, yes, I am stating in my

23    report what he told me.

24         Q    Also on page 6 of your report about halfway down

25    the page you write "in my opinion if a person were to desire

Atkinson Baker, a Veritext Company
www.depo.com

1      A     Not particularly.  We would have to go over each

2  of those positions for me to be able to say whether I agree

3  to it or not.  For example, the first paragraph you read, or

4  had me read, talked about storing unloaded firearms in a

5  locked container.  I agree with that.

6           But I don't agree that you shouldn't store a

7  loaded firearm in a locked container or gun safe either.  I

8  think that is reasonable to do.

9      Q     Mr. Hayes, do you have any children?

10     A     No.

11     Q     Do you believe that child safety is important?

12     A     Yes, I believe it is very important.

13     Q     Do you believe that child safety is an important

14  government interest?

15           MR. SIGALE:  I'll object as to calling for a legal

16  conclusion, and outside the scope of his expert's

17  disclosures.  If you can answer, go ahead and answer.

18     A     I do not believe that child safety is an important

19  government -- whatever the rest you said --

20     Q     -- important government interest.  Do you believe

21  that child safety --

22     A     -- correct.

23           I do not believe it is up to the government to

24  attempt to keep children safe.  It is up to the parents to

25  keep their children safe.

```
 1   STATE OF WASHINGTON )

 2                        ss:   REPORTER'S CERTIFICATE

 3   COUNTY OF SPOKANE    )

 4

 5           I, JAN K. SERRA, a Certified Shorthand Reporter in

 6   and for the State of Washington, residing in Spokane, do

 7   hereby certify that I reported the foregoing deposition;

 8   said deposition being taken before me on the date herein set

 9   forth; that pursuant to RCW 5.28.010 the witness first duly

10   affirmed to tell the truth, the whole truth and nothing but

11   the truth and did thereafter make answers as appear herein;

12   that the foregoing is a true and correc transcription of my

13   shorthand notes of the requested deposition, including all

14   questions, answers and objections, if any, transcribed by me

15   or under my direction;

16

17           I further certify that I am not a relative or

18   Employee of any client privileged or counsel of any of the

19   parties, nor am I financially interested in the outcome of

20   the cause.

21   IN WITNESS WHEREOF, have hereunto set my hand and seal this

22   date: _____

23

24           Jan Serra

25   JAN K. SERRA, WASHINGTON CSR NO. 3378
```

1  CHANGES IN FORM AND SUBSTANCE REQUESTED BY MADE IN THE

2  FOREGOING ORAL EXAMINATION:

3

4  (NOTE: if no changes desired, please sign and date where
   indicated below.)

5

6  PAGE      LINE            CORRECTION AND REASON

7

8

9

10

11

12

13      I, MARTY HAYES, hereby declare under penalty of

14  perjury that I have read the foregoing deposition and that

15  the testimony contained therein is a true and correct

16  transcript of my testimony, noting the corrections above.

17                      _____

18                      MARTY HAYES

19                 Date signed: _____

20   See:  Wash. Reports 34A, Rule 30(3) USCA 28, Rule 30(e)

21          PLEASE RETURN TO:  CRUMB COURT REPORTING

22          127 EAST AUGUSTA AVENUE, SPOKANE, WA. 99207

23          Date of Deposition: _____

24

25