E-FILED
Friday, 12 November, 2021  03:35:13 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| JENNIFER J. MILLER, *et al*., | Case No. 18 cv 3085 |
| Plaintiffs, | Hon. Sue E. Myerscough<br>Presiding Judge |
| v. | Hon. Tom Schanzle-Haskins<br>Magistrate Judge |
| MARC D. SMITH, *et al*., | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT UNDER FED. R. CIV. P. 56**

Gretchen Helfrich, #6300004
Matthew V. Chimienti, #6312531
Aaron P. Wenzloff, #6329093
Assistant Attorneys General
Office of the Illinois Attorney General
Special Litigation Bureau
100 W. Randolph St., 11th Floor
Chicago, Illinois 60601
(312) 814-3000
Gretchen.Helfrich@ilag.gov
Matthew.Chimienti@ilag.gov
Aaron.Wenzloff@ilag.gov

*Attorneys for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ................................................ 4

    Illinois tasks DCFS with protecting children. ................................................... 4

    The Millers agreed to make their home safer to become licensed. ...................... 9

    The Millers' interest in firearms. ..................................................................... 15

    The Organizational Plaintiffs do not bring claims independent of the Millers' claims. ... 16

    States historically have regulated firearm and ammunition storage and use by and
    around children. ............................................................................................... 18

    Unsecured firearms pose significant dangers to children. ................................. 20

    Gun owners do not appreciate the risks associated with firearms and frequently
    do not implement safe practices. ...................................................................... 24

    The Attorney General has not enforced or threatened to enforce the Rules. ................... 25

    Procedural facts. .............................................................................................. 26

ARGUMENT ................................................................................................................ 26

I.   The Millers waived any rights they may have to keep loaded, unlocked firearms
    at home. ........................................................................................................... 27

  A.   Constitutional rights can be waived. ......................................................... 27

  B.   The Millers made a knowing and voluntary waiver of rights when they applied for
     a foster caregiver license. ....................................................................... 28

    1.   The foster licensing process creates a contractual relationship. ................ 28

    2.   The Millers knowingly, voluntarily, and temporarily waived rights in order to be
      foster care licensees. ............................................................................. 29

  C.   Jennifer Miller made a knowing and voluntary waiver of rights when she applied
     to operate a day care in her home. ........................................................... 30

    1.   DCFS licenses and regulates day care homes to ensure the health, safety, and
      well-being of children. ........................................................................... 31

    2.   Jennifer Miller knowingly, voluntarily, and temporarily waived rights in order
      to operate a day care in her home. .......................................................... 31

  D.   The Millers' waivers are enforceable. ...................................................... 33

II.  The DCFS Rules fall outside the scope of the Second Amendment as a matter of
    history and tradition. ........................................................................................ 34

  A.   Some firearms regulations do not fall within the scope of the Second Amendment. .. 34

  B.   Regulations of the storage of firearms and ammunition to protect safety and
     prevent children's access to them fall outside the scope of the Second Amendment. 36

1.  The Founding-Era public understanding of the scope of the Second Amendment permitted states and local governments broad authority to regulate firearms and ammunition under the police power. .......................... 37

2.  States and municipalities have long regulated children's access to firearms and ammunition. .................................................. 39

III. The DCFS Rules also fall outside the scope of the Second Amendment because they are presumptively lawful regulations. .............................. 41

A.   The Day Care Home Rule is a "sensitive place" regulation under *Heller*. ................ 42

B.   The Foster Home Rule is a lawful exercise of the state's freedom to control contracts that carry out government functions. ......................... 43

IV. The DCFS Rules survive Second Amendment scrutiny. .................................. 46

A.   The Rules are subject to less rigorous scrutiny because they create minor burdens. .................................................. 46

B.   The DCFS Rules are substantially related to an important governmental objective. .................................................. 48

1.  Protecting children from firearm injury and death is a strong public interest objective. .................................................. 48

2.  There is a close fit between the Rules and the interest they serve. ......................... 49

a.   Fatal firearm injuries are a leading cause of death among children. .................. 50

b.   Access to firearms increases risk of death and injury, but safe storage reduces that risk. .................................................. 51

c.   Firearms do not protect children. ................................ 52

d.   Gun owners misjudge the safety of their storage practices. ......................... 52

e.   The Rules are necessary. ...................................... 53

V.  The Organizational Plaintiffs' claims fail with the Millers' claims. ................... 55

VI. Defendant Raoul is not a proper party. .......................................... 56

CONCLUSION .................................................................. 57

# INTRODUCTION

Protecting our children from danger is among the most important obligations we have as a society. We require parents to buckle kids in car seats on every drive. We require businesses to label toys with warnings about choking hazards. We ask caregivers to store toxic cleaning supplies and medication out of children's reach. We require drivers to slow down when passing schools and playgrounds. We ask the State to find safe homes for children who experience neglect or abuse.

Because the people of Illinois cherish the safety of our children, the General Assembly enacts laws to promote child safety and has tasked a state agency—the Department of Children and Family Services ("DCFS")[1]—to carry out the mission of protecting children. To that end, DCFS creates rules to ensure that caregivers—including foster families and operators of day care homes—protect children from known dangers inside the home. These include two rules Plaintiffs challenge in this case: The "Foster Home Rule" (89 Ill. Admin. Code § 402.8(o)), which prohibits loaded guns in foster homes and requires that any and all firearms be stored locked, unloaded, inaccessible to children, and separately from ammunition, which must also be stored locked and inaccessible; and the "Day Care Home Rule" (89 Ill. Admin. Code §§ 406.8(a)(17) and (18), as mandated by section 225 ILCS 10/7(13)–(15) of the Child Care Act of 1969), which prohibits handguns on the premises of a day care home, requires that all other firearms be kept disassembled, unloaded, and locked in storage inaccessible to children, and which requires that ammunition be stored in a locked location separate from the firearms.[2]

---

[1] Plaintiffs have named Marc D. Smith as a defendant in his official capacity as Acting Director of the Department of Children and Family Services. They have also named the Illinois Attorney General in his official capacity.

[2] In this brief, Defendants use the term "Day Care Home Rule" to refer to both the statutory provision and the regulation. The Day Care Home Rule and the Foster Home Rule shall be referred to collectively as the "DCFS Rules" or the "Rules."

Every year, firearm injury is the second or third leading cause of death among American children. The vast majority of these deaths occur within the home. The mere presence of firearms in a home more than triples the risk of death by suicide for teenagers. But safe storage practices, including the kind of storage required by the DCFS Rules, have been shown to reduce the risk of death and injury to minors. Requiring caregivers of young children and vulnerable youth to safely store firearms, as the DCFS Rules do, saves lives and prevents injuries.

Plaintiffs ask this Court to eliminate these commonsense requirements and expose foster children and children in day care homes to heightened risk of injury and death. The two individual plaintiffs, Jennifer Miller and Darin Miller, have opted to be DCFS-licensed foster caregivers, and Jennifer Miller has also chosen to be a DCFS-licensed day care home operator. The Millers are members of the Illinois State Rifle Association, Illinois Carry, and the Second Amendment Foundation (the "Organizational Plaintiffs"), and together they argue that safe storage requirements aimed at protecting children in their care violate their federal constitutional right to bear arms under the Second Amendment.

The material facts are not in dispute, and Plaintiffs' claims fail as a matter of law for four independent reasons. *First*, the Millers knowingly and voluntarily waived any rights they may have had to keep and store firearms in a manner inconsistent with the DCFS Rules when they applied to become foster caregivers and a day care home operator. Courts both recognize that states may set conditions on foster caregivers and day care home operators, and enforce waivers of constitutional rights in these contexts. If the Millers wish to regain full exercise of their Second Amendment rights in their home, they may do so by relinquishing the benefits conferred on them by DCFS. They have not, and so the Millers' waivers are enforceable, and summary judgment for Defendants is proper on that basis alone.

*Second*, Plaintiffs' claims fail because they ask this Court to invalidate these regulations in service to an ahistorical conception of individual liberty that has never existed in Illinois or the United States. For hundreds of years, states and localities have regulated the safe storage of firearms and ammunition in homes as well as children's access to them. DCFS may continue to do so here. *Third*, the DCFS Rules are presumptively lawful regulations beyond the scope of the Second Amendment. States may prohibit guns in schools and other "sensitive places" where children gather—like day care homes. And states have long required those it tasks with carrying out governmental functions—such as foster families caring for foster children—to perform those tasks according to the state's established rules, like safe gun storage, as a condition of participation in government programs. *Fourth*, even if the Rules were subject to Second Amendment scrutiny (they are not), they would survive this review because they are substantially related to the important government interest in protecting children. Uncontradicted evidence shows the DCFS Rules reduce risks of harm to children and save lives.

Plaintiffs ignore not only their own choice to limit their rights, but also historical traditions of protecting children from firearms, the well-established authority of the state to regulate firearms in sensitive places and to direct those who carry out government functions, and evidence that safe storage protects children from death and injury. Simply put, the Second Amendment does not permit Plaintiffs to make up their own rules about how to keep foster and day care children safe. Thus, the Plaintiffs cannot demonstrate that the DCFS Rules violate their constitutional rights. Accordingly, Defendants respectfully request summary judgment in their favor.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### Illinois tasks DCFS with protecting children.

1.      DCFS was created for the purpose of providing social services to children and their families, to operate children's institutions, and to provide other rehabilitative and residential services related to children and their families. 20 ILCS 505/1.

2.      Children can be placed in DCFS's custody and care in a number of ways. For example, a child's parents may consent to DCFS's temporary custody. 20 ILCS 505/5(m)(1). Additionally, DCFS may assume the temporary custody of a child found within the state whose parent or guardian cannot be located. 20 ILCS 505/5(m)(2). Alternatively, a court may order a child placed in DCFS's custody and care if the child is adjudicated abused, neglected, or dependent. 20 ILCS 505/5(k); 705 ILCS 405/2-27(1)(d).

3.      When DCFS is awarded guardianship of a child, DCFS is given the rights and responsibilities of legal custody and is required to act in the child's best interests. 705 ILCS 405/1-3(8).

4.      One of DCFS's critical child care service programs is the foster care program, which the Illinois legislature has mandated must meet the goal of ensuring child safety and protection. 20 ILCS 505/5(g).

5.      DCFS may place children in its care in a licensed child care facility, such as a foster home. 20 ILCS 505/5(n); 225 ILCS 10/2.05.

6.      Legal custody of children in a foster home remains with the DCFS Guardian, who has a continuing obligation to act in the child's best interests. 705 ILCS 405/1-3(8); 89 Ill. Admin. Code § 327.2 (defining the "guardianship administrator" as the individual who serves as the guardian or custodian of children accepted by DCFS).

7.     DCFS subsidizes the foster parents' expenses incurred in caring for a foster child. 20 ILCS 505/5(n).

8.     Foster homes (including foster parents themselves) must be licensed by DCFS. 225 ILCS 10/3(a); 225 ILCS 10/2.05.

9.     The Illinois legislature authorized DCFS to create and publish minimum licensing standards for foster homes. 225 ILCS 10/7(a).

10.     Consistent with the legislature's mandate that DCFS ensure the safety of children in its care, DCFS's licensing standards for foster homes must provide for the well-being of children living there. 225 ILCS 10/7(a)(5).

11.     Rule 402 describes how an individual must apply for a foster care license, and the minimum standards with which licensees must comply. 89 Ill. Admin. Code §§ 402.1, 402.8.

12.     Among other requirements, foster care licensees must agree to store tools and other dangerous household supplies away from children, must agree to refrain from smoking, and must agree that their home will be subject to inspection by DCFS to ensure compliance with all of the licensing requirements. 89 Ill. Admin. Code §§ 402.8(i), (m), 402.27; DCFS000036, attached in **Group Ex. 1**.

13.     DCFS utilizes several forms during the foster care licensing process. On these forms, applicants acknowledge and agree to comply with the rules for foster care licensure by signing or initialing the forms. *E.g.*, DCFS000033–36; DCFS000193, DCFS000195, attached in **Group Ex 1**.

14.     Foster caregivers must agree to abide by the Foster Home Rule. 89 Ill. Admin. Code §§ 402.8(o), 402.27; ECF 19, at ¶ 39.

15.     The Foster Home Rule provides that "[a]ny and all firearms and ammunition shall be stored and locked up separately at all times and kept in places inaccessible to children." The Foster Home Rule further provides that "[l]oaded guns shall not be kept in a foster home," subject to certain exceptions not at issue here. 89 Ill. Admin. Code § 402.8(o).

16.     DCFS crafted the Foster Home Rule to increase the health and safety of foster children by protecting them from injury and death from firearms. Dep. of M. Jorgensen, at 25:9–26:20, 110:19–111:22, attached as **Ex. 2**.; Defendant Smith's Answer to Interrogatory #1, attached as **Ex. 3**.

17.     Foster licensees must also sign Form CFS 452-A, known as the Acknowledgement of Compliance, Part 402 Licensing Standards for Foster Family Homes. ECF 19 ¶¶ 37, 39; ECF 19-1. Foster licensees must also fill out and sign Form CFS 452-2, known as the Foster Family Firearms Agreement, if they have firearms in their home. ECF 19 ¶¶ 38–39; ECF 19-2.

18.     Form CFS 452-A has a section entitled, "SECTION VI. SIGNATURES" which reads: "I HAVE READ SECTIONS I TROUGH (sic) V OF THIS ACKNOWLEDGEMENT AND I FULLY UNDERSTAND ITS CONTENTS AND ITS MEANING, AND I HAVE INITIALED AND SIGNED IT OF MY FREE WILL ON MY OWN BEHALF." ECF 19-1.

19.     The purpose of forms 452-A and 452-2 is to ensure the licensee's understanding of the foster home rules, and to ensure that the licensees are in compliance with the rules. Dep. of M. Jorgensen, at 29:15–24; 31:11–15; 32:19–33:5, 35:2–14; Defendant Smith's Answer to Interrogatory #1.

20.     Ensuring that foster licensees are aware of and compliant with the rules is consistent with the firearm and ammunition rule's purpose to protect the health and safety of children. Dep. of M. Jorgensen, at 110:19–111:22.

21.     Foster licensees agree that their home will be subject to inspection by DCFS to determine compliance with the foster home licensing rules. DCFS000033–36; 89 Ill. Admin. Code § 402.27.

22.     In addition to foster homes, DCFS is required to license day care homes. 225 ILCS 10/3(c).

23.     Day care homes are businesses, run out of the licensee's home, where parents of other children pay the day care licensee for child care services. Dep. of D. Miller, at 217:13–17, attached as **Ex. 4**; 225 ILCS 10/2.18.

24.     In order to operate their businesses, day care home operators need a license. Dep. of J. Miller, at 154:20–22, attached as **Ex. 5**.

25.     DCFS's obligation to protect the safety of children extends to day care homes.  325 ILCS 5/2(a); 325 ILCS 5/4(a)(6) (making all child care personnel mandatory reporters of child abuse or neglect); DCFS000300, attached in **Group Ex. 1**.

26.     Consistent with the legislature's grant of licensing authority, DCFS has created minimum licensing standards for day care homes, found in Rule 406. 89 Ill. Admin. Code § 406.

27.     The physical facility of the day care home is required to meet certain requirements for the safety of children. 89 Ill. Admin. Code § 406.8(a).

28.     These licensing standards and requirements include storing knives, medication, scissors, and hazardous materials in places inaccessible to children (89 Ill. Admin. Code § 406.8(a)(14)); ensuring the home is free from lead paint (*id.* § 406.8(a)(11)); refraining from smoking while children are present (*id.* § 406.8(l)); ensuring that there is an outdoor space that is safe for children to play (*id.* § 406.8(m)); ensuring swimming pools are inaccessible to children (*id.* § 406.8(a)(24) and (25)); ensuring that the day care space is kept at a certain temperature,

depending on the time of the year (*id.* § 406.8(a)(7)); following guidelines for disciplining children (*id.* § 406.15); taking steps to meet the dietary needs of children (*id.* § 406.17); and following requirements for transporting children off-premises (*id.* § 406.18).

29.     Day care home licensees must allow DCFS to inspect their home to determine compliance with the licensing standards at any time during operating hours, but no less than once a year. *Id.* § 406.26; *see also* 225 ILCS 10/5(h); Dep. of M. Jorgensen, at 58:22–23, 59:17–18; 59:24–60:1; 61:9–10; 63:10–12.

30.     Day care home licensees must also agree to follow the rule regarding firearms and ammunition in the day care home. 89 Ill. Admin. Code § 406.8(a)(17) and (18).

31.     The day care home rule regarding firearms and ammunition (the "Day Care Home Rule") provides that "[h]andguns are prohibited on the premises of the day care home." The Day Care Home Rule further requires licensees to "post a 'no firearms' sign . . . in a visible location where parents pick up children" as described in Section 65(d) of the Firearm Concealed Carry Act (430 ILCS 66/65(d)). In addition, under the rule "[a]ny firearm . . . shall be kept in a disassembled state, without ammunition, in locked storage in a closet, cabinet, or other locked storage facility inaccessible to children. Ammunition for such firearms shall be kept in locked storage separate from that of the disassembled firearms, inaccessible to children. The operator of the home shall notify the parents or guardian of any child accepted for care that firearms and ammunition are stored on the premises. The operator shall also notify the parents or guardian that such firearms and ammunition are locked in storage inaccessible to children." The Day Care Home Rule is subject to exceptions not at issue here. 89 Ill. Admin. Code § 406.8(a)(17) and (18).

32.     The rule regarding firearms (including handguns) and ammunition, like all other day care home rules, only applies during operating hours of the day care home. Dep. of M. Jorgensen, at 58:22–23, 59:17–18; 59:24–60:1; 61:9–10; 63:10–12.

33.     The Illinois legislature mandated that DCFS enact the firearm and ammunition rule for day care homes. 225 ILCS 10/7(a)(13)–(15); Dep. of M. Jorgensen, at 20:14–16.

34.     The purpose of the day care home rule regarding firearms (including handguns) and ammunition is to protect the health and safety of children by preventing death, injury, and suicide by firearms. Dep. of M. Jorgensen, at 21:1–15; 110:1–14.

**The Millers agreed to make their home safer to become licensed.**

35.     Jennifer and Darin Miller are DCFS-licensed foster caregivers. DCFS000002, DCFS002223, attached in **Group Ex. 1**.

36.     In 2016, when applying for their foster caregivers' license, Jennifer and Darin Miller filled out and signed a form entitled "Application for Foster Family Home License for Relative Caregivers." DCFS000033–36, attached in **Group Ex. 1**.

37.     Within the "Application for Foster Family Home License for Relative Caregivers" is a certification which states:

> "I (WE), the undersigned, hereby apply for a license to operate a foster family home under the Child Care Act of 1969 as amended. I (WE) declare that, I (WE): (1) Have received a copy of the standards for foster family homes, have read them and are familiar with them. (2) Will be subject to and cooperate with the supervising agency in the licensing process to determine my/our compliance with licensing standards. (3) Will be subject to supervision in terms of conformance with minimum standards upon issuance of a license. (4) Affirm that the information provided above is true. I (WE) understand that making materially false statements in order to obtain a license or permit constitutes a Class A misdemeanor and that I (WE) may be prosecuted for such misconduct."

DCFS000036.

38.     When applying for their license, the Millers also filled out the form entitled "Acknowledgement of Compliance, Part 402 Licensing Standards for Foster Family Homes." DCFS000195, attached in **Group Ex. 1**.

39.     When applying for their foster caregivers' license, the Millers signed Form CFS 452-A, entitled "Acknowledgment of Compliance, Part 402 Licensing Standards for Foster Family Homes." ECF 19, at ¶ 39.

40.     The "Acknowledgement of Compliance" that the Millers filled out contains a restatement of the Foster Home Rule in effect at the time the Millers filled out the form. Defendant Smith's Answer to Interrogatory #1, ECF 19-1.

41.     In the "Acknowledgement of Compliance," the Millers checked a box next to a paragraph stating, "Check here, and complete form CFS 452-2, Foster Family Firearms Arrangement, if there are currently firearms on the premises." DCFS000195.

42.     In 2016, when applying for their foster caregivers' license, the Millers filled out and signed Form 452-2, entitled "Foster Family Firearms Agreement." DCFS000193, attached in **Group Ex. 1**.

43.     Form 452-2 contains a restatement of the rule regarding firearms and ammunition in foster homes that was in place at the time the Millers signed it. DCFS000193. The text of the rule has been amended in the time since the Millers signed the form; the form the Millers signed required them to acknowledge the rule as it was drafted at the time they signed it. Defendant Smith's Answers to Interrogatory #1.

44.     Becoming foster caregivers was the Millers' voluntary choice. Dep. of J. Miller, at 181:9–16.

45.     The Millers have fostered two children. They fostered a newborn girl for approximately one year from April 2016 to April 2017. Dep. of J. Miller, at 179:5–12. Then, beginning in August 2018, they fostered a newborn boy whom they adopted in 2021. *See* Dep. of J. Miller at 181:20–25; 184:13–17; 12:19–25; Decl. of Beth I. Solomon, attached as **Ex. 6.**

46.     The Millers currently have no foster children placed in their home. Decl. of Beth I. Solomon.

47.     The Millers acknowledge that that when the State places a foster child in their home, the State has a responsibility for that child and is in fact the child's legal guardian. Dep. of J. Miller, at 183:15–184:11; Dep. of D. Miller, at 238:3–9.

48.     The Millers understand that they must defer to the State's decisions on medical care for the foster children. Dep. of J. Miller, at 185:23–186:12.

49.     The Millers also implemented certain safety measures in their home for the safety of the foster child that they would not have to follow if there were no children in their home. Dep. of J. Miller, at 188:24–189:7. These include: setting the water temperature to a certain maximum level, locking up medication and cleaning supplies, and ensuring that doors are locked. *Id.* at 188:15–189:7.

50.     The Millers also know that the State can inspect their home without a warrant to ensure compliance with the licensing standards, and that they give up some of their privacy when taking in a foster child. Dep. of J. Miller, at 188:5–14; Dep. of D. Miller, at 240:7–14.

51.     DCFS provides the Millers with funds to offset expenses incurred for the care of children placed with them. Dep. of J. Miller, 183:1–14.

52.     The Millers became licensed foster parents in part to obtain the financial assistance offered by DCFS. Dep. of J. Miller, 183:1–14.

53.     The Millers are in compliance with the Foster Home Rule. *See* ECF 19, at ¶¶ 39, 41.

54.     Jennifer Miller is a DCFS-licensed day care home operator. Her license was initially issued in 2017; she renewed her license in 2019, and her current day care home license is valid from April 2020 until April 2023. DCFS000283, DCFS002027, DCFS002224, attached in **Group Ex. 1**.

55.     Darin Miller helps in the day care home, but he is not the licensee. DCFS000283, DCFS002224, Dep. of J. Miller, at 161:15–18.

56.     Jennifer Miller's day care home license allows her to care for children as young as infants. DCFS000283 (indicating that the "Ages of Children Served" is "06W[eeks] TO 12Y[ears]"), DCFS0002224 (indicating that the "Ages of Children Served" is "00 TO 12Y").

57.     As part of her day care home license application in 2017, Jennifer Miller filled out and signed a document entitled, "Application for Day Care/Group Day Care Home License." DCFS000408–411, attached in **Group Ex. 1**.

58.     Within the "Application for Day Care/Group Day Care Home License" is a certification which states:

> "I/We, the undersigned, representing the home-based day care business described above, hereby apply for a license to operate a child care facility under the Child Care Act of 1969, as amended. I/We declare and certify that: (1) I/We live in the "home" where I/We will operate my/our day care business; (2) I/We have received a copy of the appellate licensing standards, have read the standards, and are familiar with the standards; (3) I/We will be subject to investigation to determine my/our compliance with licensing standards, upon application; (4) I/We will fully cooperate with the licensing agency during the licensing process and after the permit and/or license is issued; (5) I/We will comply with all requirements for licensure after the permit and/or license is issued; and (6) I/We are aware that operating a child care facility without a license or permit constitutes a Class A misdemeanor and that I/We may be prosecuted for such misconduct. I/We understand that by signing this affidavit and application, I am certifying that the information provided above is true and correct. I/We furthermore understand that

making materially false statements in order to obtain a license or permit constitutes a Class A misdemeanor and may be prosecuted for such misconduct and that enforcement action may be initiated to revoke my day care home license."

DCFS000411.

59.     In 2019, Jennifer Miller applied to renew her day care home license, and filled out and signed another form entitled "Application for Day Care/Group Day Care Home License." DCFS002115, attached in **Group Ex. 1**.

60.     Included in the 2019 "Application for Group Day Care/Group Day Care Home License" was a section entitled "Certifications" which read:

> "I/We, the undersigned, hereby apply to renew the license for the home-based day care business referenced above. I/We declare and certify that: (1) I/We live in the home where day care business operates; (2) I/We have listed all of the persons who live in the home where the day care business operates; (3) I/We will be subject to investigation to determine my/our on-going compliance with licensing standards; (4) I/We will fully cooperate with the licensing agency during the licensing renewal process; and (5) I/We will comply with all license requirements after the license is renewed. (6) Affirm that the information provided above is true. I/We understand that making materially false statements in order to obtain a license or permit constitutes a Class A misdemeanor and that I /We may be prosecuted for such misconduct."

DCFS002115.

61.     In 2019, Jennifer Miller also filled out and signed a form entitled "Firearms Agreement." DCFS002067, attached in **Group Ex. 1**.

62.     The Firearms Agreement restates in full the day care home licensing requirements related to firearms (i.e., the "Day Care Home Rule"). DCFS002067.

63.     In filling out and signing the Firearms Agreement, Jennifer Miller stated that she had read the Day Care Home Rule, and certified that she was in compliance with it. DCFS002067.

64.     Jennifer Miller signed a document acknowledging that her status as a day care home provider qualified her as a mandated reporter of child abuse and neglect. DCFS000300, attached in **Group Ex. 1**.

13

65.     Jennifer Miller chose to obtain a day care home license. Dep. of J. Miller, at 154:6–10.

66.     Jennifer charges the parents of the day care children for her child care services; the day care home is her business. Dep. of J. Miller, at 160:6–16; Dep. of D. Miller, at 217:13–17.

67.     It makes financial sense for Jennifer to run her business at home, and she has chosen to accept that there are certain things that she cannot do in her own home and still have a day care. Dep. of J. Miller, at 176:10–15.

68.     Jennifer recognizes that in having children from other families in her home, she has made some changes to the way she might otherwise do things or store things to protect the safety of those children. Dep. of J. Miller, at 161:9–14.

69.     Among the safety requirements that Jennifer must follow, she has a CPR and first aid certification, she follows State nutrition requirements, she has age-appropriate toys, and she must ensure proper sanitation. Dep. of J. Miller, at 159:14–160:5.

70.     Jennifer has also installed cabinet locks and outlet covers, even though installing the equipment creates burdens on her and her family. Dep. of J. Miller, at 170:4–20, 171:4–172:7.

71.     Jennifer agrees that reducing children's access to firearms increases the children's safety. Dep. of J. Miller, at 151:10–13.

72.     There are certain things that Jennifer can do while working at home that she would not be able to do if she were working elsewhere, but there are certain requirements that she has to live with in order to have her business in her home. Dep. of J. Miller, at 174:13–24.

73.     The Millers are in compliance with the Day Care Home Rule. ECF 19, at ¶¶ 31, 32.

**The Millers' interest in firearms.**

74.     Darin Miller has been using firearms since he was a child. Dep. of D. Miller, 32:21–33:7.

75.     Jennifer Miller became interested in firearms years ago while she was dating her husband. Dep. of J. Miller, at 31:15–32:11.

76.     The Millers are both Illinois Firearm Owner's Identification (FOID) card holders. Dep. of D. Miller, at 42:16–43:8; Dep of J. Miller, at 55:10–13.

77.     The Millers are both Concealed Carry Permit holders. Dep. of J. Miller, at 59:6–8; Dep. of D. Miller, at 43:9–44:19.

78.     The Millers took a 16-hour class in order to obtain their Concealed Carry Permits. Dep. of J. Miller, at 36:17–37:7.

79.     The Millers enjoy hunting. Dep. of J. Miller, at 35:25–36:3. They have taken their biological children to hunters' safety classes. Dep. of J. Miller, at 37:20–38:1.

80.     The Millers teach their children that guns are weapons, not toys, and there are no second chances with firearms. Dep. of J. Miller, at 71:25–72:4; Dep. of D. Miller, at 243:23–244:4.

81.     Darin Miller believes that his family, including his foster son (whom he has now adopted, *see* ¶ 45, *supra*), "absolutely" would be safer if Darin were allowed to have a loaded firearm in his home. Dep. of D. Miller, at 92:5–12.

82.     In the absence of the Rules, Jennifer Miller would like to store a loaded handgun locked in a safe. Dep. of J. Miller, at 212:6–9.

83.     In the absence of the Rules, Darin Miller would like to be able to store multiple firearms loaded in a locked safe. Dep. of D. Miller, at 29:1–14.

84.  Darin Miller also wishes to be able to concealed-carry a loaded firearm on his person in his home, including during day care hours. Dep. of D. Miller, at 24:9–18.

85.  Additionally, Darin Miller wishes to have the option to carry at least two loaded handguns on his person. Dep. of D. Miller, at 25:20–22. One of those handguns would be in a holster on his waist; one would be in a holster on his ankle. *Id.* at 28:2–14.

86.  Darin also wishes to have the option to keep his remaining three handguns locked and loaded in a safe. *Id.* at 26:6–27:4.

87.  Darin also wishes to have the option to keep a loaded long gun, specifically an Olympic Arms AR-15, in the safe as well. *Id.* at 52:9–13.

88.  Jennifer understands that this lawsuit is asking for the Day Care Home Rule and Foster Home Rule to be eliminated completely, for all foster caretakers and day care home operators across the State. Dep. of J. Miller, at 212:10–20.

89.  Jennifer Miller believes that, without the Rules, how firearms and ammunition are stored would be left to the discretion of each licensee. Dep. of J. Miller, at 222:2–7 ("[Storage] would be up to probably the situation and the environment that [other licensees are] in.").

**The Organizational Plaintiffs do not bring claims independent of the Millers' claims.**

90.  Darin and Jennifer Miller claim to be individual members of the three Organizational Plaintiffs in this lawsuit: the Second Amendment Foundation ("SAF"), the Illinois State Rifle Association ("ISRA"), and Illinois Carry ("IC"). ECF 19, at ¶ 23

91.  The Organizational Plaintiffs promote awareness of the Second Amendment. Dep. of V. Rowe, at 141:17–24, 167:21–168:8, attached as **Ex. 7**; Dep. of R. Pearson, at 41:12–13, 88:1– 3, attached as **Ex. 8**; Dep. of J. Versnel, at 39:7–11, attached as **Ex. 9**.

16

92.     The Organizational Plaintiffs did not allege facts showing a direct injury to themselves as a result of the enactment or implementation of the DCFS Rules. ECF 19.

93.     In response to the Defendants' request, ISRA and IC identified no members other than the Millers who are licensed foster caregivers. IC Answer to Interrogatory No. 2, attached as **Ex. 10**; ISRA Answer to Interrogatory No. 2, attached as **Ex. 11**.

94.     In response to the Defendants' request, ISRA and IC identified no members other than the Millers who are day care home licensees. IC Answer to Interrogatory No. 2; ISRA Answer to Interrogatory No. 2.

95.     In response to the Defendants' request, SAF identified only Kenneth and Colleen Shults as members of SAF aside from the Millers who may have been potentially affected by the DCFS Rules. SAF Answer to Interrogatory No. 2, attached as **Ex. 12**.

96.     The Shultses filed a previous lawsuit challenging the Foster Home Rule at issue in this case; the Shultses were voluntarily dismissed from that lawsuit after they voluntarily relinquished their foster home licenses in January 2018. *Second Amend. Found. v. Walker*, No. 2:16-cv-02214-CSB-EIL, ECF 40 at p. 3 (C.D. Ill. April 1, 2019), attached as **Ex. 13**.

97.     SAF's Rule 30(b)(6) witness could not identify any members other than the Millers who is a day care home operator or foster parent in Illinois. Dep. of J. Versnel, at 92:11–17; 93:16–94:1.

98.     None of the Organizational Plaintiffs own or operate a licensed foster home or licensed day care home. ECF 19; Dep. of J. Versnel, at 64:16–65:2; Dep. of R. Pearson, at 76:7–14.

99.     ISRA admits that people can choose to be foster parents, and that they do not have to be foster parents. Dep. of R. Pearson, at 132:17–21.

100.    ISRA admits that people can choose to be day care providers, and that they do not have to be day care providers. Dep. of R. Pearson, at 132:22–133:1.

101.    SAF admits that foster parenting is voluntary. Dep. of J. Versnel, at 122:11–20.

102.    SAF admits that operating a day care home is voluntary. Dep. of J. Versnel, at 133:19–21.

103.    IC admits that being a foster parent is completely voluntary. Dep. of V. Rowe, at 193:5–7.

104.    IC admits that being a day care home provider is completely voluntary. Dep. of V. Rowe, at 193:8–10.

105.    SAF takes the position that under the Second Amendment, a day care home operator has a right to leave a loaded firearm on the coffee table. Dep. of J. Versnel, at 141:9–17.

### States historically have regulated firearm and ammunition storage and use by and around children.

106.    Defendants' Expert Saul Cornell conducted an historical analysis of the scope of the Second Amendment and its relationship to the Rules in the context of historical firearm regulations. *See* Decl. of Saul Cornell and Expert Report of Saul Cornell (hereafter "Cornell Report"), attached as **Ex. 14**. A list of the statutes, ordinances, and other legal history materials that address the public understanding of the scope of the Second Amendment is provided in Appendices 1, 2, 3, and 4 to Saul Cornell's Report.

107.    In his report, Cornell stated that the Rules are consistent with the historical power and tradition of state regulation of firearms and gunpowder. Cornell further stated that regulations of gunpowder and firearms were at the very core of state police power. Cornell summarized: "Given . . . the long history of regulating firearms in sensitive places, including locations where children gather and are educated, the decision of the people of Illinois to tightly regulate firearms

18

possession in day care homes and foster homes is well within the scope of traditional police power regulations exercised by states since the beginning of the republic." Cornell Report at 3. [3]

108.    The Founding-Era conception of the police power—that is, "the power of the people, acting through their government to enact and enforce laws to protect public health, safety, and welfare"—was both "foundational to virtually every feature of Anglo-American law" and included at its "very core" the power to regulate firearms and gunpowder. *Id.* at 8–9.

109.    Numerous statutes and ordinances in America from colonial times through the nineteenth century relied on the police power to regulate the storage and possession of gunpowder and firearms. *Id.* at 10; *see also* Appendix 2 of Cornell Report (listing state and local statutes regulating the inspection, sale, and storage of gunpowder and firearms, including in Massachusetts, New Hampshire, New Jersey, New York, and various municipalities in New England). Among others, these statutes included a Massachusetts law enacted in 1783 prohibiting storing a loaded firearm in a home, *id.* at 10, n.47, and a 1793 New York City law allowing government officials to search any building for gunpowder and transfer it to the public magazine for storage. *Id.* at 10, n.48.

110.    Throughout the nineteenth century and into the twentieth, states exercised their police power to regulate firearms and ammunition in addressing changing circumstances and problems. Such new regulations included laws limiting the public carry of handguns, the discharge of firearms, the possession of firearms in certain locations (such as on election day or near a polling place), licensing requirements for the purchase or possession of firearms, as well as restrictions on the possession, sale, and manufacture of machine guns. *Id.* at 10–16.

---

[3] For ease of reference, the page numbers are references to the pages of the expert report, which is an exhibit to the Declaration.

111.    Cornell also stated that, during the debate over the Federal Constitution, "one area in which [Federalists and their Anti-Federalist opponents] were not divided was the continuing importance of state police power." *Id.* at 19–20; *see also* Appendix 2.

112.    Laws restricting children's access to firearms, particularly in schools and other places where children gather, have also long been part of American legal history, with roots dating back to English common law. *Id.* at 18, *see also* Appendix 4 (listing dozens of firearms statutes and ordinances related to minors from the nineteenth and early twentieth centuries).

113.    States regulated children's access to firearms and ammunition beginning in the mid-nineteenth and continuing into the twentieth century. *Id.* at 17. These laws included mid-1800s restrictions on the purchase of firearms by minors, and laws later in the century prohibiting minors from gaining access to firearms or ammunition. *Id.* This includes Chicago's ban on possession or use of firearms by minors in 1873. *Id.* Also included are post-Civil War age-based restrictions on transfer of firearms to, or use of firearms by, minors. *Id.* at 19. These restrictions were more common than limits imposed on possession of firearms by felons. *Id.*

**Unsecured firearms pose significant dangers to children.**

114.    Defendants' Experts Dr. Matthew Miller and Dr. Deborah Azrael analyzed the relationship between the presence and storage of firearms in a household and child safety. Decl. of Dr. Matthew Miller and Expert Report of Dr. Matthew Miller and Dr. Deborah Azrael, attached as **Ex. 15**; Decl. of Dr. Deborah Azrael and Expert Report of Dr. Matthew Miller and Dr. Deborah Azrael, attached as **Ex. 16** (collectively and hereafter, "Miller & Azrael Report").

115.    Drs. Miller and Azrael co-authored the report that is attached to their declarations. *See* Miller & Azrael Report; *see also* Stipulation Regarding Defendants' Expert Dr. Deborah Azrael, attached as **Ex. 17**.

20

116.   In conducting their analysis, Drs. Miller and Azrael cited to and relied on those studies that have appeared in peer-reviewed public health and epidemiological literature, and employ sound epidemiologic research designs and methods. Miller & Azrael Report at 3.[4]

117.   In their report, Drs. Miller and Azrael stated that "[a]lthough studies have focused on the risk posed by household firearm ownership, the fundamental relationship that is being explored [by the studies cited] is between children's exposure to firearms, wherever that exposure occurs, and risk of firearms injury and mortality." *Id.* at 13–14.

118.   For this reason, Drs. Miller and Azrael stated, "it is our opinion that the findings of the studies we cite apply equally to households in which children live and households in which children spend time." *Id.* at 14.

119.   In their report, Drs. Miller and Azrael stated, "fewer children attending in-home day care and/or housed in foster homes in Illinois will die or be injured by gunfire if the Foster Home Rule (Rule 402.8(o)) and the Day Care Home Rule (Rule 406.8(a)(17) and (18)) are in effect, compared to what would be the case if these regulations were not in place or relaxed." *Id.* at 2.

120.   In each year of the last decade for which data is available (2009 to 2019), "firearm injury was the second or third leading cause of death among US children aged 1 to 17." *Id.* at 3.

121.   "Risk of firearm death varies by age and by whether the death is a suicide, homicide or unintentional death. Overall, the risk of firearm death is higher for older (15–17 and 10–14 year olds) than younger (0–9 year olds) children. Rates of accidental firearm death vary less across age groups than rates of firearm suicide and firearm homicide." *Id.* at 4.

---

[4] The pages cited are those of the expert report, which is an exhibit to Drs. Miller and Azrael's declarations.

122.    "The large majority of all firearm deaths of younger children (homicides, suicides and unintentional deaths among children aged 0–14) occur in a home." *Id.*

123.    "Most firearm suicides among children …, like most firearm suicides in general …, take place in the decedents' home; most of the firearms used in the former are owned by the decedent's parents or a family member." *Id.*

124.    For homicides, the pattern is different. While firearm homicides of younger children often occur as part of incidents of intimate partner violence, firearm homicides of older children are more likely to be linked to other criminal activity and to occur outside the home. *Id.*

125.    Approximately 100 children aged 0–17 are killed by a firearm each year in Illinois, and another 300–500 are injured by a firearm and survive. *Id.*

126.    Peer-reviewed, epidemiological literature establishes the strong association between the presence of firearms in the home and the risk of suicide. *Id.* at 5.

127.    A meta-analysis of 14 case-control studies estimated that the odds of suicide were more than three times higher for people, including children, who lived in homes with firearms, compared to those who lived in homes without firearms. *Id.* at 5.

128.    One of the studies included in the meta-analysis showed a three-fold increase in the risk of suicide specifically for adolescents living in a home with a firearms, compared to those living in a home with no firearm. *Id*. at 5–6.

129.    The same study demonstrated that the association between handguns and suicide was stronger than for the association between any gun and suicide; the presence of a handgun in a home is associated with an almost five-fold increase in the odds of suicide. *Id.* at 6.

130.    Epidemiological research underscores the causal role that firearms play in increasing the risk of dying by suicide by demonstrating that besides the presence of guns in the

home, "no other well-established suicide risk factor was meaningfully more common among members of households with, compared to without, firearms." *Id.* & n.7.

131.    Thus, "access to firearms is not merely a proxy for an unmeasured predisposition to suicide, but instead having a gun in the home increases suicide risk by making it more likely that suicidal acts will involve firearms and therefore will be more likely to result in death." *Id*. at 7.

132.    Studies demonstrate that "[s]toring firearms unloaded (compared with loaded), locked (compared with unlocked), and with ammunition stored separately from the firearms (compared with together with firearms) decreases children's risk of intentional firearm injury and suicide." *Id.* at 7–8.

133.    "Each barrier to access (locking guns, storing guns unloaded, storing ammunition separate from guns), independently reduces the risk." *Id.* at 8. This suggests that combining "multiple barriers to access will reduce risk more than will a single barrier." *Id*.

134.    Additional epidemiologic studies find that "[a] gun in the household increases the risk of homicide victimization for household members." *Id.* at 8–9.

135.    A case-control study found that adults living in homes with firearms were almost four times more likely to die of an unintentional firearm injury than those living in homes without guns. *Id.* at 9. Drs. Miller and Azrael state "there is no reason to believe that the same relationship does not hold for those younger than 18 in such households." *Id*. at 10.

136.    Another study comparing "firearm storage practices in relation to unintentional injuries among children and youth found that firearms used in unintentional injuries, compared to firearms from control households where no firearm injuries occurred, were substantially less likely to be stored unloaded (compared with loaded), unlocked (compared with locked), or with the ammunition stored separately (compared with together with firearms)." *Id.* at 9–10.

137. "In households with guns, as is true for suicide, barriers to firearm access, including locking guns, storing guns unloaded, and storing ammunition separate from firearms, reduce risk of unintentional injury and death." *Id.* at 10.

**Gun owners do not appreciate the risks associated with firearms and frequently do not implement safe practices.**

138. A study using the 2015 National Firearms Survey found that only 3% of gun owners thought having a gun in the home made the home more dangerous; 58% of gun owners said that guns in the home make it a safer place to be. *Id.* at 11.

139. Only 10% of gun owners with children believe that the presence of a firearm in the home increases suicide risk. *Id.*

140. There are no epidemiologic studies in the peer-reviewed literature showing any "countervailing mortality benefit to children if they live in a household where firearms are present and/or accessible." *Id.* at 2–3.

141. A 2018 study examining firearm storage in households with children found that "approximately two in ten such households stored at least one firearm loaded and unlocked (the least safe way with regard to locking and loading), while only three in ten stored all household firearms unloaded and locked up." *Id.* at 10. Additionally, data show that households with older children were more likely to store a firearm unsafely compared to households with younger children. *Id.*

142. This 2018 study also demonstrates that in households with children and in households without children, "adult gun owners who own handguns or long guns for protection are more likely to store at least one gun loaded and unlocked (i.e., accessible to household members), compared to those who own firearms for reasons not including protection, such as hunting." *Id.*

24

143.    Another study among younger children found that "many parents think their children do not know about and/or cannot access household firearms. But, when the child was asked about whether they knew the location of the household guns and when asked if they had ever accessed and handled a firearm," a substantial percentage of children contradicted their parents. "For example, 39% of parents who reported that their children did not know the storage location of the household guns, and 22% of parents who reported their children had never handled a household gun were contradicted by their children's reports." *Id.* at 11.

144.    Yet another more recent study of adolescent-parent pairs found that in at least one third of gun owning households with an adolescent age 13–17, the adolescent could access a loaded firearm in their home in under five minutes, with half reporting they could do so within an hour. "[W]hile unlocked firearm storage correlated with adolescent access, one in four homes where all guns were locked had an adolescent who reported that they could access a loaded firearm in under 5 minutes. Among the 72% of households where parents do not believe their child could access a household firearm, more than one in five had an adolescent who reported being able to access a loaded household firearm within five minutes (37% within an hour)." *Id.* at 11–12.

145.    Drs. Miller and Azrael further stated that "[s]ince many parents not subject to this regulation store firearms unlocked, loaded, or both, and many children absent these regulations can gain access to a loaded firearm in less than 5 minutes, regulations that stipulate how firearms must be stored can be expected to make household firearms less accessible to children (i.e. compared with access in the absence of such regulation)." *Id.* at 12–13.

**The Attorney General has not enforced or threatened to enforce the Rules.**

146.    In response to a question of whether he was "aware of any instances where the . . . Attorney General's office has taken action to enforce any of the rules or policies" at issue in this

25

case, the Attorney General's Rule 30(b)(6) witness testified that he was "not aware of any such effort by the Office of the Attorney General." Dep. of D. Buysse, at 71:7–13, attached as **Ex. 18**.

### Procedural facts.

147.    The parties have stipulated that Dr. Azrael would offer identical testimony to Dr. Miller. Stipulation Regarding Defendants' Expert Dr. Deborah Azrael, attached as **Ex. 17**.

148.    The parties have also stipulated to the authenticity of certain documents. Stipulation Regarding Documents, attached as **Ex. 19**.

### ARGUMENT

Plaintiffs' challenge to the DCFS Rules fails for four independent reasons. *First*, the Millers waived any Second Amendment right they may have had to store firearms as they choose when they applied for DCFS licenses to become foster caregivers and to operate a day care home. *Second*, even if the Millers had not waived their constitutional rights (they have), the DCFS Rules do not fall within the scope of the Second Amendment as a matter of history and tradition: Laws regulating the storage of firearms and regulating children's access to them have long been permissible exercises of the states' police powers and thus do not implicate the Second Amendment at all. *Third*, the Rules plainly qualify as the type of presumptively lawful regulatory measures permitted by *Heller*, which include those that forbid the carrying of firearms in sensitive places, and—with respect to the Foster Home Rule—those that exert the State's contractual power to control how public services are carried out. *Fourth*, even if the DCFS Rules were subject to the Second Amendment (they are not), the Rules survive constitutional scrutiny because they are not a severe burden on the "core" of the Second Amendment and are substantially related to the important government purpose of protecting children's safety.

I.  **The Millers waived any rights they may have to keep loaded, unlocked firearms at home.**

Undisputed facts show that the Millers waived any rights they may have under the Second Amendment to store firearms and ammunition as they please. The Millers waived these rights when they agreed to abide by DCFS's licensing requirements for foster homes and day care homes. Their waivers were knowing and voluntary, as well as temporary: The Millers can choose to end their agreements with DCFS to foster children and operate a day care in their home at any time. For these reasons, the waivers are enforceable, and the Millers cannot challenge the DCFS Rules on Second Amendment grounds.

A.  **Constitutional rights can be waived.**

It is well established that constitutional rights can be waived. *D. H. Overmyer Co. Inc., of Ohio v. Frick Co*., 405 U.S. 174, 187 (1972). Rights can be waived in many contexts, including by contract or as part of a licensing process. *See, e.g.*, *Medlock v. Trustees of Indiana Univ.*, 738 F.3d 867, 872 (7th Cir. 2013) (contracting parties may consent to warrantless searches); *Van Dyke v. Fultz*, No. 13 C 5971, 2018 WL 1535141, at *4 (N.D. Ill. Mar. 29, 2018) (no violation of Fourth Amendment where foster parent signed agreement acknowledging State had right to remove foster child from home); *Hall v. Sweet*, 666 Fed. App'x 469, 476–77 (6th Cir. 2016) (no Fourth Amendment violation where day care home operator consented to searches of home as condition of day care home license). Indeed, at least one court has specifically addressed whether foster caregivers may waive their Second Amendment rights related to storage of firearms in a foster home; the court held that they may. *Lafferty v. Amundson*, No. 20CV346, ECF 77 (Wis. Cir. Ct. Washington Cnty., Sept. 30, 2021) (attached as **Ex. 20**).

So long as the waiver is knowing and voluntary, it is valid and enforceable. *Domka v. Portage Cnty.*, 523 F.3d 776, 781 (7th Cir. 2008). "A waiver is voluntary in the absence of coercion

27

. . . and is knowing if made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Krilich*, 159 F.3d 1020, 1026 (7th Cir. 1998) (cleaned up). Knowledge need not be perfect: A party's "understanding of the rights being relinquished, not all possible consequences of the relinquishment," makes the waiver knowing. *Id.*

## B. The Millers made a knowing and voluntary waiver of rights when they applied for a foster caregiver license.

The Millers waived their rights to keep a loaded gun in their home and to store firearms loaded or unlocked when they applied for a foster family license.

### 1. The foster licensing process creates a contractual relationship.

Illinois law requires that foster homes be licensed and empowers DCFS to create minimum licensing standards for foster homes to ensure the safety of the children in its care. SUMF ¶¶ 4, 8–10. DCFS's minimum standards include, among other things, that foster families agree to store dangerous household supplies away from children, agree to refrain from smoking, and agree that the foster home will be subject to inspection by DCFS to ensure compliance. SUMF ¶¶ 11–12. They also require that firearms and ammunition be secured and stored separately. SUMF ¶¶ 14–15. The licensing process requires foster care applicants to acknowledge and agree to comply with these rules, both during the application process and after licensure. SUMF ¶¶ 13–14, 37, 50, 53. Applicants express their acknowledgement by signing or initialing several forms. SUMF ¶¶ 13, 17–18, 36–37. In exchange for the applicant's agreement to comply with the rules, DCFS issues a license, places a child in the home, and subsidizes the expenses incurred in caring for the child. SUMF ¶¶ 5, 7, 11, 35, 51. The relationship thus created between DCFS and licensed foster caregivers like the Millers is contractual in nature. *Dupuy v. Samuels*, 397 F.3d 493, 514 (7th Cir.

2005); *see also Smith v. Org. of Foster Families for Equality & Reform*, 431 U.S. 816, 845 (1977) (foster relationship based on "state law and contractual arrangements").

### 2. The Millers knowingly, voluntarily, and temporarily waived rights in order to be foster care licensees.

It is undisputed that the Millers applied for and received a license to be foster caregivers. SUMF ¶¶ 35, 44. As part of the process of entering into this contractual relationship with DCFS, the Millers signed the "Application for Foster Family Home License for Relative Caregivers." SUMF ¶ 36. In doing so, they confirmed that they understood the minimum standards for foster family homes, agreed that they would be subject to the licensing process, and agreed to be subject to supervision to ensure conformance with those standards after their license was issued. *Id.* Additionally, the Millers filled out and signed a form entitled "Acknowledgement of Compliance, Part 402, Licensing Standards for Foster Family Homes," and signed the Foster Family Firearms Agreement, both of which explicitly stated the requirements for firearm storage in their home. SUMF ¶¶ 17–18, 38–43. In exchange for their agreement to comply with the rule, DCFS issued the Millers a foster license, as well as reimbursements for expenses incurred in caring for the children placed in their home. SUMF ¶¶ 35, 51–52.

The Millers' signatures and initials on the various forms demonstrate that their agreement to abide by the Foster Home Rule was knowing. But in addition to the evidence provided by the forms, the Millers' own testimony shows that they unquestionably understand that when the state places a foster child in their care, the state has a responsibility for that child and is in fact the child's legal guardian. SUMF ¶¶ 3, 6. To be foster caregivers—that is, to be allowed to care for a child for whom the State is responsible—the Millers know they must adhere to requirements imposed by the State. SUMF ¶¶ 47–50. As a result, they have implemented safety measures that they would

not be required to implement if no foster children were in their home, including the Foster Home Rule regarding firearms. SUMF ¶ 49.

Moreover, the Millers are familiar with their Second Amendment rights. They are avid firearms users and hunters, and have been for some time. SUMF ¶ 79. They are FOID card and Concealed Carry Permit holders. SUMF ¶¶ 76–77. They have taken firearms-related classes and have taken their children to hunting safety classes. SUMF ¶¶ 78–79. And they are members of three organizations (the Organizational Plaintiffs) that promote awareness of the Second Amendment. SUMF ¶¶ 90–91. The Millers understood "both the nature of the right being abandoned and the consequences of the decision to abandon it." *Krilich*, 159 F.3d at 1026. This makes their waiver knowing.

The Millers' waiver was also voluntary. The Millers voluntarily agreed to become foster caregivers and to follow DCFS's requirements.[5] SUMF ¶¶ 36–44. Moreover, there is no evidence in the record that the Millers were coerced into becoming foster caregivers or agreeing to abide by DCFS's licensing standards. Therefore, their waiver was voluntary. *See Krilich*, 159 F.3d at 1026 ("A waiver is voluntary in the absence of coercion . . . .").

**C. Jennifer Miller made a knowing and voluntary waiver of rights when she applied to operate a day care in her home.**

Similarly, Jennifer Miller made a knowing and voluntary waiver of any rights to possess a handgun on the premises of a day care (during operating hours) or to stores firearms and ammunition in a manner inconsistent with the Day Care Home Rule when she applied for a day care home operator's license.

---

[5] The Organizational Plaintiffs also agree that becoming a foster caregiver is a voluntary choice. SUMF ¶¶ 99, 101, 103.

### 1. DCFS licenses and regulates day care homes to ensure the health, safety, and well-being of children.

Illinois law requires day care home operators to obtain a license. SUMF ¶¶ 22, 24, 54. DCFS has promulgated rules setting forth minimum licensing standards for day care homes in order to protect children's safety. SUMF ¶¶ 25–28; *accord Dupuy*, 397 F.3d at 496 (noting that licensing achieves mandate of protecting the safety and best interests of the child). Day care home providers must agree to comply with each safety measure in order to obtain a license. SUMF ¶¶ 27–31. Among the safety measures licensees must follow is the Day Care Home Rule—which is mandated by the Child Care Act of 1969—requiring day care home operators to keep any handgun they own off the day care premises and to store other firearms locked and separate from ammunition. SUMF ¶¶ 30–31. In exchange for their agreement to comply with the licensing standards, successful applicants are allowed to operate a day care business out of their home. SUMF ¶¶ 23, 54, 66.

### 2. Jennifer Miller knowingly, voluntarily, and temporarily waived rights in order to operate a day care in her home.

It is undisputed that Jennifer Miller applied for and received a license in 2017 to operate a day care in her home.[6] SUMF ¶¶ 54, 57, 59. She renewed her day care home license in 2019, which is valid from April 2020 until April 2023. SUMF ¶¶ 54, 59. As part of the application process, Jennifer signed a form titled "Application for Day Care/Group Day Care Home License." SUMF ¶¶ 57–58. In so doing, she declared and certified that she had received a copy of the Day Care Home licensing standards, that she had read them, and that she was familiar with them. SUMF ¶ 58. She signed a similar certification when renewed her license in 2019. SUMF ¶¶ 59, 60. Both when she initially applied for her day care home license and when she renewed it, she agreed that

---

[6] Jennifer's husband, Darin Miller, helps in the day care home, but is not the licensee. SUMF ¶ 55.

31

she would be subject to inspection to determine her compliance with the standards, both as a prerequisite to and as a continuing condition of keeping her day care home operator's license. SUMF ¶¶ 58, 60. She also specifically agreed to comply with all requirements for licensure, including the Day Care Home Rule, after the license was issued and upon renewal. *Id.* Jennifer also signed a document in 2019 titled "Firearms Agreement," certifying that she was familiar with the relevant firearm and ammunition storage rules, and that she was in compliance with those rules. SUMF ¶¶ 61–63.

These actions by Jennifer Miller, which are not disputed, show that her agreement to abide by the Day Car Home Rule—that is, her waiver—was knowing. Her testimony confirms this. Jennifer admits that the day care home is a business. SUMF ¶ 66. She also understands that, although running a business out of her home is difficult, there are advantages to it, and there are certain requirements that she must accept to obtain those advantages. SUMF ¶¶ 67, 72. She understands that having other families' children in her home requires her to do many things differently (including, in addition to complying with the Day Care Home Rule, having a CPR and first aid certification, appropriately handling food, having age-appropriate toys, and sanitizing properly—to protect those children's safety). SUMF ¶¶ 68–69.

And Jennifer has voluntarily taken these steps, even though they create burdens on her and her family. SUMF ¶ 70. Jennifer admits that she freely chose to become a day care home licensee.[7] SUMF ¶ 65. Nor is there any evidence that Jennifer Miller was coerced to agree to abide by the

---

[7] The Organizational Plaintiffs also agree that operating a day care home is a voluntary choice. SUMF ¶¶ 100, 102, 104.

Day Care Home Rule. Her waiver of rights is therefore both knowing and voluntary. *See Krilich*, 159 F.3d at 1026.

### D.  The Millers' waivers are enforceable.

Because they are knowing and voluntary, the Millers' waivers are enforceable. That the Millers gave up a constitutional right as a condition of receiving a benefit or privilege does not vitiate the waiver. In *Hall*, the Sixth Circuit upheld a home day care operator's waiver of her constitutional rights in exchange for the benefit of a day care license. 666 Fed. App'x at 470–71. After a warrantless search found violations of Michigan day care licensing standards, the operator sued, claiming that her Fourth Amendment rights were violated. *Id.* at 471. The Sixth Circuit held that the plaintiff waived her constitutional rights, explaining that "it cannot be said that the consent provision was invalid simply because agreeing to its terms may have been a condition of receiving the child care operating license." *Id.* at 476. Conditions can be lawfully imposed on the receipt of a benefit, including the surrender of a constitutional right, provided the conditions are reasonable. *Id.* (citing *Burgess v. Lowery*, 201 F.3d 942, 947 (7th Cir. 2000)). The surrender of constitutional rights was reasonable in *Hall* because the state "has an overwhelming justification in ensuring child wellbeing is adequately protected at the locations it licenses for child care." *Id.* at 477.

DCFS has the same justification here. As discussed in greater detail below, the DCFS Rules lower the risk of injury and death to children in foster care and in day care homes. *See infra*, Part IV.B. In *Lafferty*, a Wisconsin state court held that foster caregivers waived any Second Amendment rights they may have had when they agreed to comply with a firearm storage rule nearly identical to Illinois' Foster Home Rule. *Lafferty*, No. 20CV346, slip op. at 2. In addition to finding that the waiver was knowing and voluntary, the court determined that the surrender of rights was "rationally related to the benefit received" because it advanced "the State and County's

legitimate interest in meeting their legal obligations under the Due Process Clause of the Fourteenth Amendment, and under common law negligence law, to place foster children in safe and secure homes." *Id*. at 13. This reasoning applies with equal force here.

Further, in finding the waiver enforceable, the Court in Lafferty emphasized both the narrowness of the restriction and the "significan[ce]" of the plaintiffs' ability "at any time to unilaterally cancel the firearm and ammunition restrictions by choosing not to be foster [caregivers]." *Id*. at 12–13. Both are true here as well. The DCFS Rules are not bans, but rather limited restrictions that apply only so long as the Milers continue—voluntarily—to be foster caregivers and to operate a day care home. Should they choose to cease these activities, they can resume exercising the full scope of their rights under the Second Amendment.

The Millers' waivers were knowing, voluntary, narrow, and reversible. And they are reasonable in that they are related to the paramount goal of ensuring the safety of children in foster care and day care. The waivers are therefore enforceable, and the Millers may not now challenge the DCFS Rules on the ground that they violate the Second Amendment.

## II. The DCFS Rules fall outside the scope of the Second Amendment as a matter of history and tradition.

Even if the Millers had not validly waived any Second Amendment right to store their firearms and ammunition as they see fit, their challenge to the DCFS Rules under the Second Amendment must fail because the Rules are outside the scope of the federal right to keep and bear arms. The Rules regulate children's access to firearms and ammunition which, as a matter of history and tradition, is categorically unprotected by the Second Amendment from state regulation.

### A. Some firearms regulations do not fall within the scope of the Second Amendment.

The Second Amendment to the United States Constitution states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall

34

not be infringed." U.S. Const. amend. II. The Second Amendment is "fully applicable" to the States. *McDonald v. City of* Chicago, 561 U.S. 742, 750 (2010). The right secured by the Second Amendment, however, "is not unlimited" and does not guarantee the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008); *see also McDonald*, 561 U.S. at 786 (Second Amendment "does not imperil every law regulating firearms").

The Seventh Circuit has adopted a two-step test to analyze Second Amendment challenges to gun regulations. *Ezell v. City of Chicago*, 651 F.3d 684, 702–03 (7th Cir. 2011) ("*Ezell I*"). In step one, the court analyzes whether the regulated activity falls within the scope of the Second Amendment as a matter of textual and historical inquiry. *Ezell v. City of Chicago*, 846 F.3d 888, 892 (7th Cir. 2017) ("*Ezell II*"). "[I]f the government can establish that the challenged law regulates activity falling outside the scope of the right as originally understood, then 'the regulated activity is categorically unprotected'" by the Second Amendment. *Id.* But, "if the historical evidence is inconclusive or suggests that the regulated activity is *not* categorically unprotected," then the court proceeds to step two, which is a heightened scrutiny analysis of the government's justification for regulating the exercise of Second Amendment rights. *Id.*; *see also* Part IV, *infra*.

Courts may rely on a wide array of historical materials to conduct the analysis at step one. *Nat'l Rifle Ass'n of Am., Inc. v. Bur. of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012) (citing *Heller* as relying on courts, legislators, and scholars from before ratification through the late 19th century to interpret the Second Amendment); *see also Young v. Hawaii*, 992 F.3d 765, 786–813 (9th Cir. 2021) (reviewing statutes, cases, and legal treatises from more than 700 years of English and American legal history); *United States v. Rene E.*, 583 F.3d 8,

13–16 (1st Cir. 2009) (relying on wide-ranging materials, including late 19th- and early 20th-century cases, to uphold federal ban on juvenile handgun possession).

A precise historical analogue to a challenged regulation is not required to show that the regulation is part of a longstanding, historical tradition. *See Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 410 (7th Cir. 2015) (federal firearms restrictions "need not mirror restrictions that were on the books in 1791" to survive scrutiny); *see also United States v. Greeno*, 679 F.3d 510, 519 (6th Cir. 2012) ("mere fact" that a law was "not enacted until recently does not automatically render [the prohibited conduct] within the scope of the Second Amendment right as historically understood"). In conducting historical analysis of the Second Amendment, courts assess both new and updated historical sources in light of the most recent available scholarship. *See, e.g.*, *Jones v. Becerra,* Order, No. 20-56174, Dkt. Entry 50 (9th Cir. Mar. 26, 2021) (directing the parties to address how "the tool of corpus linguistics help[s] inform the determination of the original public meaning of ["A well regulated Militia"; "the right of the people"; and "shall not be infringed"]?").

Here, the historical record demonstrates that the regulation of children's access to firearms and ammunition has long been a subject of regulation in American history—from the Founding Era to the present day. Consequently, the DCFS regulations here do not fall within the scope of the Second Amendment as a matter of historical inquiry.

**B. Regulations of the storage of firearms and ammunition to protect safety and prevent children's access to them fall outside the scope of the Second Amendment.**

Neither the Foster Home Rule nor the Day Care Home Rule falls within the scope of the Second Amendment because both are consistent with a long history of regulations aimed at ensuring safe storage of firearms and ammunition and protecting children from accessing them. SUMF ¶¶ 106–07. As Saul Cornell summarizes in his report: "Given . . . the long history of

36

regulating firearms in sensitive places, including locations where children gather and are educated, [the regulation of] firearms possession in day care homes and foster homes is well within the scope of traditional police power regulations exercised by states since the beginning of the republic." SUMF ¶ 107.

> ### 1. The Founding-Era public understanding of the scope of the Second Amendment permitted states and local governments broad authority to regulate firearms and ammunition under the police power.

The Founding-Era conception of the police power—that is, "the power of the people, acting through their government to enact and enforce laws to protect public health, safety, and welfare"— was both "foundational to virtually every feature of Anglo-American law" and included as its "very core" the power to regulate firearms and gunpowder. SUMF ¶ 108. Numerous statutes and municipal ordinances in America from colonial times through the nineteenth century relied on the police power to regulate the storage and possession of gunpowder—the historical antecedent to modern ammunition.[8] SUMF ¶ 109.

In particular, Massachusetts enacted a law in 1783 that prohibited storing a loaded firearm in a home. *Id.* In 1793, New York City enacted an ordinance allowing government officials to issue warrants to search any building for gunpowder and then transfer it to the public magazine for safe storage. *Id.* Likewise, in 1762, Rhode Island passed a statute requiring, "[e]very person who shall import gunpowder into the town of Newport … shall cause the same to be conveyed immediately to the powder house…." 1762 R.I. Pub. Laws 132. An 1806 Kentucky law permitted the trustees of the town of Lexington "to make such regulations as they may deem necessary and proper

---

[8] The significance of numerous historical gunpowder regulations and such laws' relevance to modern laws that require the safe storage of firearms and ammunition should not be underappreciated: Early firearms in the colonial era and early republic operated with the addition of loose gunpowder, which means firearms and gunpowder were "inextricably linked." Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55, 74 (2017).

relative to the keeping of gunpowder." 1806 Ky. Acts 122. In 1821, Maine permitted town selectmen of any town to "enter any building, or other place, in such town, to search for gunpowder, which they may have reason to suppose to be concealed or kept, contrary to the rules and regulations which shall be established in such town…." 1821 Me. Laws 98. In 1827, Chief Justice John Marshall, in a case involving the constitutionality of a state statute regarding import licenses, observed that "[t]he power to direct the removal of gunpowder is a branch of the police power, which unquestionably remains, and ought to remain, with the States." *Brown v. Maryland,* 25 U.S. 419, 443 (1827).

In short, during the time immediately before and after the ratification of the Second Amendment in 1791, states routinely exercised their police powers to regulate the safe storage of gunpowder and firearms. SUMF ¶ 109. The DCFS Rules at issue in this case are "lineal descendants" of such safe storage requirements: They correspondingly require the safe storage of firearms and ammunition to maintain safety in the home. *Cf.* Tr. of Oral Argument at 77, *Heller*, 554 U.S. 570 (No. 07-290) (Chief Justice Roberts: "[W]e are talking about lineal descendants of the arms but presumably there are lineal descendants of the restrictions as well.").

Moreover, it was widely recognized throughout the nineteenth century and into the twentieth that states, including Illinois, could exercise the police power to pass a wide array of regulations of firearms and ammunition to address changing circumstances and problems. SUMF ¶ 110; *see also United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (legislative role in regulating firearms "did not end in 1791"). Such new regulations included laws limiting the public carry of handguns, the discharge of firearms, the possession of firearms in certain locations (such as on election day or near a polling place), licensing or permitting requirements for the

purchase or possession of firearms, as well as restrictions on the possession, sale, and manufacture of machine guns. SUMF ¶ 110.

In sum, the historical record is clear that the regulation of the storage of gunpowder and even loaded firearms were well within the state police power at the time of the ratification of the Second Amendment in 1791. SUMF ¶¶ 106–107, 111. It is also clear that the public understanding of the Second Amendment at the time of its ratification allowed for states to exercise robust police power authority to enact wide-ranging regulations of firearms and ammunition for public safety. SUMF ¶¶ 109–111.

### 2. States and municipalities have long regulated children's access to firearms and ammunition.

Laws specifically restricting children's access to firearms, particularly in schools and other places where children gather, have also long been part of American legal history, with the earliest iterations of such regulations tracing back to English common law. SUMF ¶ 112.

Beginning in the mid-nineteenth century and into the twentieth, state and municipal governments regularly exercised their police powers to regulate children's access to firearms and ammunition. SUMF ¶ 113. Laws passed in the mid-1800s frequently addressed restrictions on the purchase or use of firearms by minors. *Id*. Later in the century, states and municipalities passed broader laws prohibiting minors from gaining access to firearms or ammunition. *Id*. For example, Chicago banned possession and use of firearms by minors in 1873. *Id*. In particular, in the period after the Civil War, many states passed age-based restrictions on the transfer of firearms to minors or on minors' possession or use of firearms. *Id*. Such restrictions were more common than laws imposing limits on possession of firearms by convicted felons. *Id*. "[B]y the end of the 19th century, nineteen States and the District of Columbia had enacted laws expressly restricting the ability of persons under 21 to purchase or use particular firearms, or restricting the ability of

'minors' to purchase or use particular firearms while the state age of majority was set at age 21."
*Nat'l Rifle Ass'n of Am.*, 700 F.3d at 202.

Furthermore, these statutes did not merely languish on the books; they were enforced, which underscores their importance to public safety. *See, e.g.*, *Coleman v. State*, 32 Ala. 581 (Ala. 1858) (upholding conviction for transferring firearm to a minor); *State v. Allen*, 94 Ind. 441 (Ind. 1884) (reversing lower court that had quashed indictment against defendant who sold a deadly weapon to a minor). Additionally, both courts and commentators—notably, Thomas Cooley—maintained that such age-based restrictions on firearms were constitutional. *State v. Callicutt*, 69 Tenn. 714 (Tenn. 1878) (upholding constitutionality of Tennessee statute making it a misdemeanor to give a dangerous weapon to a minor); Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883) (citing *Callicutt*).[9]

Finally, the proliferation of state and local laws restricting minors' access to firearms and ammunition continued into the twentieth century. By 1923, at least thirty-one states—including Alabama, California, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Mississippi, Nebraska, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, Wisconsin, and Wyoming—either regulated or prohibited the sale or transfer of firearms to minors.[10]

---

[9] The *Heller* decision singled out Thomas Cooley as a prominent legal scholar and writer of a "massively popular" 1868 legal treatise, whose commentaries on the scope of the Second Amendment carried significant weight. *See Heller*, 554 U.S. at 616.

[10] Act of February 2nd, 1856, Pamphlet Acts of 1855–56, at 17 (Alabama); 1859 Ky. Acts 245, "An Act to Amend An Act Entitled 'An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg,'" § 23 (Kentucky); Offences Against Public Policy and Economy, § 4864 (1870–71)(Tennessee); Offenses Against Lives and Persons of Individuals, § 4397 (1878) (Wisconsin); 1878 Miss. Laws 175, An Act to Prevent The Carrying of Concealed Weapons And For Other Purposes, §§ 2–3 (Mississippi); Section 1886 R.S. 1881 (Indiana); Act of June 10, 1881, § 1 (Pennsylvania); 1881 Fla. Laws 87, chap. 3285, § 1–2 (Florida); Deadly Weapons: Selling or Giving to Minor, § 54b (1882) (Illinois); Of

In sum, there is "considerable historical evidence of age- and safety-based restrictions on the ability to access guns." *Nat'l Rifle Ass'n of Am.*, 700 F.3d at 203–04; *see also* SUMF ¶¶ 112–13. In light of this record, the Second Amendment does not apply to the DCFS Rules at issue in this case. Because the DCFS Rules fall "outside the scope" of the Second Amendment as a matter of history and tradition, they are "not subject to further Second Amendment review." *Ezell*, 651 F.3d at 703.

## III.   The DCFS Rules also fall outside the scope of the Second Amendment because they are presumptively lawful regulations.

The DCFS Rules clearly fall outside the scope of the Second Amendment for another reason: They are among the "presumptively lawful regulatory measures" under *Heller*. *Heller*, 554 U.S. at 626 & n.26. When the Supreme Court recognized individuals' right to possess firearms in *Heller*, it also cautioned that its holding should not "cast doubt on longstanding prohibitions on

---

Explosive Compounds; Penalty for Selling Guns, Pistols, Cartridges, etc. to children, § 1 (1882) (Massachusetts); 1183 Mich. Pub. Acts 144, § 1 (Michigan); 1883 Kan. Sess. Laws 159, §§ 1–2 (Kansas); 1885 N.J. Laws 52, § 2 (New Jersey); Making Selling, Etc., Dangerous Weapons, § 409 (1885) (New York); 1890 La. Acts 39, "An Act Making It A Misdemeanor For Any Person To Sell, Give Or Lease, To Any Minor, Any Pistol, Bowie-Knife, Dirk Or Any Weapons, intended To Be Carried Or Used As A Concealed Weapon," § 1 (Louisiana); "Possession by, use of, and Sales to Minors and Others Deemed Irresponsible" (1891) (Oklahoma); Nuisances, § 4 (1892) (Maine); 1895 Neb. Laws 237, "Statutes Relating To The government Of The City Of Lincoln," Art.. XXVI, §§ 2 (Nebraska); Misdemeanors, § 53 (1896) (California); "Sale of Toy Pistols to Children" (1896) (Washington); "Selling Firearms to Minors," § 5004 (1897) (Iowa); 1897 Tex. Gen. Laws 221, "An Act To Prevent The Barter, Sale And Gift Of Any Pistol, Dirk, Dagger, Slung Shot, Sword Cane, Spear, Or Knuckles Made Of Any Metal Or Hard Substance To Any Minor (1897) (Texas); "Furnishing Deadly Weapons to Minor," § 5052 (1899) (Wyoming); 1909 Idaho Sess. Laws 6, "An Act To Regulate The Use and Carrying of Concealed Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a Penalty for the Violation for the Violation of the Provisions of this Act, and to Exempt Certain Persons" (Idaho); Penal Code 1234 § 340 (1910) (Georgia); 1903 Or. Laws 309, "An Act to regulate and prohibit the sale, barter, exchange, or gift of explosives, firearms or other articles of a like kind, to children under the age of fourteen years, and to punish the violation of the provisions of this act," §§ 1–2 (Oregon); 1903 S.D. Sess. Laws 168, "Prohibiting the use of fire arms by persons under fifteen years of age," §§ 1–3. (South Dakota); 1905 Utah Laws 60, "To prohibit sale and carrying of firearms by minors," §§ 1–2 (Utah); 1912 Vt. Acts and Resolves 306, "An Act . . . Relating to firearms," §§ 1–2 (Vermont); 1913 N.C. Sess. Laws 57, "An Act to prevent the use of firearms by children," § 1 (North Carolina); 1913 vol. 103 Ohio Laws 906, "Offenses against minors and females between eighteen and Twenty-one," § 12966 (Ohio); 1923 S.C. Acts 221 (South Carolina).

the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . ." *Id.* at 626–27. Day care homes are "sensitive places." Moreover, the foster care regulations are also presumptively lawful under the well-established authority of the government to dictate the conditions under which contractors carry out government functions—like child welfare placements in foster homes. *See Atkin v. State of Kansas*, 191 U.S. 207, 222 (1903) ("It cannot be deemed a part of the liberty of any contractor that *he* be allowed to do public work in any mode he may choose to adopt, without regard to the wishes of the state.").

### A. The Day Care Home Rule is a "sensitive place" regulation under *Heller*.

In *Heller*, the United States Supreme Court explained that "not all regulations of firearm possession, even of handguns in the home, are invalid." *Horsley v. Trame*, 808 F.3d 1126, 1131 (7th Cir. 2015). Rather, *Heller* identified a non-exhaustive list of "presumptively lawful" regulations, including restrictions on firearms in sensitive places. *Heller*, 554 U.S. at 626–27. "From the examples of sensitive places—schools and government buildings—courts have tried to discern the rationale for the category, and the traits that underlie the designation seem to be gatherings of large groups of people or performance of government functions. *Solomon v. Cook Cnty. Bd. of Commissioners*, No. 17-CV-6144, 2021 WL 4147167, at *13 (N.D. Ill. Sept. 13, 2021); *see also Nordyke v. King*, 563 F.3d 439, 459 (9th Cir. 2009), *vacated*, 611 F.3d 1015 (9th Cir. 2010) ("The Court listed schools and government buildings as examples, presumably because possessing firearms in such places risks harm to great numbers of defenseless people (*e.g.*, children)."); *Hall v. Garcia*, No. C 10-03799 RS, 2011 WL 995933, at *4 (N.D. Cal. Mar. 17, 2011) (upholding Gun-Free School Zone Act as constitutionally permissible because such zones are sensitive places under

*Heller* due to the "presence of large numbers of children"); *DiGiacinto v. Rector & Visitors of George Mason Univ.*, 281 Va. 127, 136 (2011) (upholding firearms restrictions on college campus).

Day care homes closely resemble schools for purposes of the "sensitive places" doctrine. Just as with schools, children are present, mostly in groups, and are of the same ages (or younger) as school-aged children. SUMF ¶¶ 54, 56. Indeed, in the Millers' case, the day care children are younger than school-age, and thus even more dependent on adults to meet their basic needs and ensure their safety. *Id*. Although day care homes operate, by definition, inside the same building as the operator's home, their existence is also defined by a high degree of governmental involvement through DCFS's comprehensive regulations, which require day care home operators to comply with a host of safety provisions while caring for other people's children. *See* Part I.C.1., *supra.* In this way, day care homes are much more like schools than like ordinary homes. Thus, day care homes easily qualify as a sensitive place under *Heller*, which forecloses Plaintiffs' challenge to the Day Care Home Rule.

### B. The Foster Home Rule is a lawful exercise of the state's freedom to control contracts that carry out government functions.

The Foster Home Rule also stands outside the Second Amendment according to the longstanding principle that the government has broad powers over employees and contractors who carry out governmental functions. Courts have consistently held that in government contracting the "government enjoys a broad freedom to deal with whom it chooses on such terms as it chooses." *Coyne-Delany Co. v. Cap. Dev. Bd. of State of Ill.*, 616 F.2d 341, 342 (7th Cir. 1980). The government can, for example, require background checks of contractors without violating their constitutional rights to privacy. *See NASA v. Nelson*, 562 U.S. 134, 150 (2011). It can limit the free speech rights of a CIA employee. *See Snepp v. United States*, 444 U.S. 507, 510 (1980). It

can even impose restrictions on firearms in a post office parking lot. *See Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126–27 (10th Cir. 2015).

This wide latitude stems from the government's need to direct the activities of its contractors in the course of providing contracted services. *See id.* (government "has broad discretion to govern its business operations according to the rules it deems appropriate"). Requirements like the Foster Home Rule thus "do[] not infringe any liberties the [contractor] might have enjoyed as a private citizen" but "simply reflect[] the exercise of . . . control over what the [government] itself has commissioned or created." *Garcetti v. Ceballos*, 547 U.S. 410, 421–22 (2006) (citing *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995)); *see also Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668, 677–678 (1996) (adopting "framework for government employee cases to independent contractors").

As explained in Part I.B, *supra*, the relationship between foster caregivers and the State is contractual. *Dupuy*, 397 F.3d at 514; *Smith*, 431 U.S. at 845 (1977). Fundamentally, foster caregivers are government contractors, who, of course, play a vitally important role in protecting and caring for children who are the legal responsibility of the State. But, as government contractors, foster caregivers' constitutional rights are diminished while carrying out the government's foster care program. *See Smith*, 431 U.S. at 846 ("In this case, … [the] statutes and the contracts executed by the foster parents argue against any but the most limited constitutional 'liberty' in the foster family."); *Kyees v. Cnty. Dep't of Pub. Welfare*, 600 F.2d 693, 698 (7th Cir. 1979) (contractual and statutory nature of foster relationship significantly limits foster families' liberty interests). As such, there is no constitutional right to be a foster caregiver. *Procopio v. Johnson*, 994 F.2d 325, 330 (7th Cir. 1993) (under Illinois law, "the foster family's existence is subject to the state's determination that it should continue . . . ."); *see also Wildauer v. Frederick*

*Cnty.*, 993 F.2d 369, 373 (4th Cir. 1993) (collecting cases holding that foster parents do not have a constitutionally protected liberty interest in relationship with foster child). In contrast, the State has an affirmative constitutional obligation to ensure the safety of children placed into foster care, "as the state at that point is still legally the children's guardian." *Lewis v. Anderson*, 308 F.3d 768, 773–74 (7th Cir. 2002); *see also K.H. v. Morgan*, 914 F.2d 846, 849 (7th Cir. 1990). As a consequence, foster caregivers cannot pick and choose the rules they wish to follow when carrying out the government's foster care program; if they agree to become foster caregivers they must follow the terms of the program even when those terms impose limitations on the rights they would otherwise possess. *See Garcetti*, 547 U.S. at 418 ("When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom."). Anything less would threaten the State's ability to safeguard its "transcendent interest in protecting the welfare of children." *Ginsberg v. New York*, 390 U.S. 629, 640 (1968) (quotation omitted).

Thus, while Plaintiffs are entitled to the protection of the Second Amendment when residing in their homes as wholly private citizens, that protection does not "invest them with a right to perform their jobs however they see fit," such that they may exempt themselves from the Foster Care Rule when they are serving in the role of foster caregivers—even though the services they provide take place in the home. *Garcetti*, 547 U.S. at 422. Otherwise, foster families would be able to avoid *any* foster care rule that might conflict with their constitutional rights as private citizens. A foster family could, for example, assert a Fourth Amendment right to exclude DCFS caseworkers conducting home inspections to ensure the safety of the foster child. *See* 89 Ill. Admin. Code § 402.27 (home inspections). Or a Substantive Due Process right to allow a registered sex offender to move into the household without a background check. *See id*. at § 402.12(b) (background checks). Or, according to one of the Plaintiffs, they could even assert a right to leave a loaded gun

on the coffee table when children are present. SUMF ¶ 105. But that is not the law. Plaintiffs cannot insist that individuals participating in Illinois' foster care program, such as the Millers, have a Second Amendment right to ignore specific DCFS Rules designed to keep children safe from firearms in their home. Thus, this Court should reject Plaintiffs' claims.

## IV.    The DCFS Rules survive Second Amendment scrutiny.

### A.  The Rules are subject to less rigorous scrutiny because they create minor burdens.

If the Court concludes that the DCFS Rules do not clearly fall outside the historical scope of the Second Amendment and that they are not presumptively lawful regulations, then it must proceed to Step Two and conduct an "inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019). That is, it must "evaluate 'the regulatory means the government has chosen and the public-benefits end it seeks to achieve." *Id*. (quoting *Ezell I*, 651 F.3d at 703). This evaluation is not the same in every case:

> The rigor of the review is dependent on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right. Severe burdens on this core right require a very strong public-interest justification and a close means end fit; lesser burdens, and burdens on activity lying closer to the margins of the right, are more easily justified.

*Id*. at 441–42 (cleaned up); *see also Ezell I*, 651 F.3d at 703 ("[T]he rigor of this judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right.").

Here, less rigor is warranted because neither of the DCFS Rules constitutes a severe burden. A rule that is "neither designed to nor has the effect of prohibiting the possession of any class of firearms" is "more accurately characterized as a regulation of the manner in which persons may lawfully exercise their Second Amendment rights." *United States v. Marzzarella*, 614 F.3d 85,

46

97 (3d Cir. 2010) (regulation prohibiting obliterated serial numbers "does not severely limit the possession of firearms" because "[i]t leaves a person free to possess any otherwise lawful firearm he chooses"). Less exacting scrutiny of such a rule is appropriate. *Id*. ("less stringent standard" applied to regulation); *see also Heller v. District of Columbia*, 670 F.3d 1244, 1258 (D.C. Cir. 2011) (more lax review of registration requirements appropriate because they do not "prevent[] an individual from possessing a firearm in his home or elsewhere"); 1262 (same for ban on semi-automatic rifles and large-capacity magazines because they did not "effectively disarm individuals or substantially affect their ability to defend themselves").

Neither Rule is a total ban on possession of any class of firearms. Indeed, under either Rule, the Millers and other foster caregivers and day care home operators can own any firearm they like (subject to any other laws). The Foster Home Rule simply requires them to store the firearms unloaded in a locked container and store ammunition separately to protect the foster children in their care. SUMF ¶ 15. This is not a severe burden because "a modern gun safe may be opened quickly" and a stored firearm "may be readily accessed in case of an emergency." *See Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 964 (9th Cir. 2014) (requirement of locked storage "burdens only the manner in which persons may exercise their Second Amendment rights"). Even the Day Care Home Rule is not a ban. The Millers are not permitted to have a handgun on the premises of the day care, and must store other firearms locked and separate from ammunition. SUMF ¶ 31. But these provisions apply *only during the operating hours of the day care*. SUMF ¶ 32. Outside of operating hours, a day care home operator (who is not also a foster caregiver) is subject to no restrictions at all. *See id*.

Moreover, in contrast to the ban on public carrying at issue in *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), the Rules here do not affect "the entire law-abiding adult population of

Illinois." *Id*. at 940. They affect only the subset of people who *choose* to become foster parents and day care home operators. Such people "can preserve an undiminished right of self-defense by not" taking on those roles. *Id*. And "since that's a lesser burden, the state doesn't need to prove so strong a need." *Id*.; *see also Marszalek v. Kelly*, No. 20-CV-04270, 2021 WL 2350913, at *7–8 (N.D. Ill. June 9, 2021) (less rigorous scrutiny applied to delay in issuing concealed carry licenses because delay "is probably more fairly equated with a select prohibition" rather than a ban).

In short, the Rules are merely a "regulation of the manner in which persons may lawfully exercise their Second Amendment rights." *Marzzarella*, 614 F.3d at 97. They should be accorded greater deference as a result.

**B.   The DCFS Rules are substantially related to an important governmental objective.**

Even under the stronger but "not quite 'strict scrutiny'" reserved for the most severe burdens on the Second Amendment, the DCFS Rules would survive. *Ezell I*, 651 F.3d at 708. Under such review, the State "bears the burden of establishing a strong public-interest justification" for the Rules, and "must establish a close fit between" the Rules and "the actual public interests" they serve. *Id*. at 708–09. The Rules meet these standards.

**1.   Protecting children from firearm injury and death is a strong public interest objective.**

DCFS crafted the Rules to protect foster children and children in day care homes from injury and death from firearms. SUMF ¶¶ 16, 34. It is beyond dispute that the government has a "compelling interest in protecting the physical . . . well-being of minors." *Sable Commc'ns of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989). The Seventh Circuit has explicitly recognized "the compelling governmental interest in the protection of children[.]" *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1019 (7th Cir. 2000) (citing *Croft v. Westmoreland Cnty. Children and Youth Svcs.*, 103 F.3d 1123, 1125 (3d Cir. 1997)); *Brunken v. Lance*, 807 F.2d 1325, 1330 (7th Cir. 1986) (state has

48

a "very strong interest in the health and welfare of the child"). It is likewise beyond doubt that this interest is strong enough that it can, it certain circumstances, justify limitations on fundamental rights. *See, e.g.*, *Doe v. Heck*, 327 F.3d 492, 520 (7th Cir. 2003) ("liberty interest in familial privacy and integrity is limited by the compelling governmental interest in the protection of children" (cleaned up)).

The State also has a constitutional obligation to protect foster children from harm, for "[o]nce the state assumes custody of a person, it owes him a rudimentary duty of safekeeping no matter how perilous his circumstances when he was free." *K.H.*, 914 F.2d at 849 (holding that a foster child could bring a due process claim under Section 1983 against State officials for abuse suffered in foster care). The State of Illinois has a statutory responsibility for the child as well: The DCFS Guardian has legal custody of children in foster care. SUMF ¶ 3, 6.[11]

Protecting children from harm—and protecting foster children's constitutional right to be safe in a foster home— is undeniably a strong public interest justification.

### 2. There is a close fit between the Rules and the interest they serve.

To survive step two of the *Ezell* analysis, the State must show that its Rules "relate[] directly to the State's important interest in promoting" child safety. *Culp v. Raoul*, 921 F.3d 646, 655 (7th Cir. 2019) (citing *Ezell I*, 651 F.3d at 708). The DCFS Rules meet this standard.

As Dr. Millers and Azrael opined in their report, "fewer children attending in-home day care and/or housed in foster homes in Illinois will die or be injured by gunfire if the Foster Home

---

[11] Relatedly, states have an "unqualified interest in the preservation of human life." *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997). For that reason, preventing the "serious public-health problem" of suicide is an "unquestionably important" government interest. *Id.* at 730, 735. The Seventh Circuit has not explicitly identified suicide prevention as a compelling interest, but other circuits have done so. *See, e.g.*, *Grand Jury Subpoena John Doe v. United States*, 150 F.3d 170, 172 (2d Cir. 1998) (noting "compelling governmental interests, such as the preservation of life, prevention of suicide"). *See also Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 718 (6th Cir. 2016) (Moore, J. dissenting) (preventing "firearm-related suicide" a "compelling" interest).

Rule (Rule 402.8(o)) and the Day Care Home Rule (Rule 406.8(a)(17) and (18)) are in effect, compared to what would be the case if these regulations were not in place or relaxed." SUMF ¶ 119. In short, the Rules are preventing injuries to children and saving their lives.

This opinion is based a number of epidemiological findings primarily from studies of homes where children live. However, as Drs. Miller and Azrael explain, "the fundamental relationship that is being explored is between children's *exposure to firearms*, wherever that exposure occurs, and risk of firearms injury and mortality." SUMF ¶ 117. (emphasis added). Accordingly, "the findings . . . apply equally to households . . . in which children spend time[,]" such as day care homes. SUMF ¶ 118.

### a.  Fatal firearm injuries are a leading cause of death among children.

According to Drs. Miller and Azrael, for the past decade for which data is available, "firearm injury was the second or third leading cause of death among U.S. children aged 1 to 17." SUMF ¶ 120. They explain that:

> Risk of firearm death varies by age and by whether the death is a suicide, homicide or unintentional death. Overall, the risk of firearm death is higher for older (15-17 and 10-14 year-olds) than younger (0-9 year-olds) children. Rates of accidental firearm death vary less across age groups than rates of firearm suicide and firearm homicide.

SUMF ¶ 121. Perhaps surprisingly, "[t]he large majority of all firearm deaths of younger children (homicides, suicides, and unintentional deaths among children aged 0-14) occur in a home." SUMF ¶ 122. Likewise, "[m]ost firearm suicides among children . . . like most firearm suicides in general . . . take place in the decedents' home" and most of the firearms used by children to commit suicide are owned by the child's parents or a family member. SUMF ¶ 123.[12] In Illinois,

---

[12] For homicides, the pattern is different. While firearm homicides of younger children often occur as part of incidents of domestic violence, firearm homicides of older children are more likely to be linked to other criminal activity and to occur outside the home. SUMF ¶ 124.

approximately 100 children aged 0–17 are killed by a firearm each year, and another 300–500 are injured by a firearm and survive. SUMF ¶ 125.

### b. Access to firearms increases risk of death and injury, but safe storage reduces that risk.

The presence of a gun in a household increases the risk of death by suicide among household members. SUMF ¶¶ 126–27. Adolescents in particular are at risk: In one study, the odds of suicide were more than three times higher for adolescents who lived in homes with firearms, compared to their peers in homes without firearms. SUMF ¶ 128. The association between suicide and the presence of a firearm is even stronger for handguns. SUMF ¶ 129. The best explanation for the association between household firearms and suicide is a causal one: "no other well established suicide risk factor was meaningfully more common among members of households with, compared to without, firearms." SUMF ¶ 130.

Critically, storage practices can reduce the risk. Epidemiologic data demonstrates that "[s]toring firearms unloaded (compared with loaded), locked (compared with unlocked), and with ammunition stored separately from firearms (compared with together with firearms) decreases children's risk of intentional firearm injury and suicide." SUMF ¶ 132. Importantly, research demonstrates that each of these practices—storing unloaded, locking, and storing ammunition separately—*independently* reduces risk. SUMF ¶ 133. This finding suggests that implementing these strategies together will have a cumulative effect on risk reduction. *Id.*

The same relationship holds true for non-suicide deaths and injuries. For instance, "[a] gun in the household increases the risk of homicide victimization for household members" including children. SUMF ¶ 134. Similarly, living in a household with firearms quadruples the risk of dying

from an unintentional firearm injury. SUMF ¶ 135.[13] But again, storage practices have been shown to mitigate these risks. "In households with guns, as is true for suicide, barriers to firearm access, including locking guns, storing guns unloaded, and storing ammunition separate from firearms, reduce risk of unintentional injury and death." SUMF ¶ 137.

### c.  Firearms do not protect children.

Gun owners do not recognize these risks. One recent study showed that only 3% of gun owners thought that the presence of a gun in the home made the home more dangerous. SUMF ¶ 138. Similarly, only 10% of gun owners with children believe that the presence of a firearm in the home increases suicide risk. SUMF ¶ 139. Instead, 58% of gun owners said that a gun makes a home safer. SUMF ¶ 138.

Darin Miller shares this view. He testified that he "absolutely" believes his family, and specifically his foster son, would be safer if he were allowed to have a loaded firearm in his home. SUMF ¶ 81. But these beliefs are simply not supported by evidence. There is no peer-reviewed epidemiological data showing any "countervailing mortality benefit to children if they live in a household where firearms are present and/or accessible." SUMF ¶ 140. In other words, there is no data to support the hypothesis that children are safer in a home with firearms—the data all points in the opposite direction.

### d.  Gun owners misjudge the safety of their storage practices.

In addition to these erroneous beliefs about safety, data shows that gun owners overestimate the security—and underestimate the accessibility—of their firearms. To begin with, many firearms owners living with children will, if left to their own devices, store their firearms in ways that are

---

[13] The data supporting this statement included only adults, but "there is no reason to believe that the same relationship does not hold for those younger than 18 in such households." SUMF ¶ 135.

likely to increase risk. A 2018 study showed that "approximately two in ten such households stored at least one firearm loaded and unlocked (the least safe way with regard to locking and loading), while only three in ten stored all household firearms unloaded and locked up." SUMF ¶ 141. And in households with older children—the cohort most vulnerable to firearms suicide—the rate of unsafe storage was even higher. *Id*. Moreover, gun owners (both with and without children) who keep firearms for self-defense (in contrast to those who own firearms for reasons not related to protection, such as hunting) are more likely to store their firearms loaded and unlocked—the least safe alternative. SUMF ¶ 142.

Even more troubling, many gun owners underestimate the risks associated with their storage practices. In a study that asked both parents and children about accessibility, 39% percent of parents who reported that their children did not know the storage location of household guns, and 22% of parents who reported that their children had never handled a household gun, were contradicted by their children. SUMF ¶ 143. Another study revealed that in one third of gun owning households with an adolescent 13 to 17 years old, the child reported being able to access a loaded firearm in the home in under five minutes (half of children in such households reported being able to do so in under an hour). SUMF ¶ 144. Even in households where all guns were locked, the rate was one in four. *Id*. Most surprisingly, among the 72% of households where parents do not believe their child could access a household firearm, more than one in five had an adolescent who reported being able to access a loaded household firearm within five minutes (37% within an hour). *Id*.

### e.  The Rules are necessary.

The misperceptions that gun owners have about both the heightened risk created by the presence of a firearm and the safety of their storage practices shows why rules are needed, and

why any argument that the Millers are "responsible gun owners" who should be allowed to make their own decisions misses the point. First, the record demonstrates that if the Rules were relaxed, the Millers would not choose the safest manner of storage (i.e., unloaded and locked separately from the ammunition) and instead would choose to increase the risk to children in their home by storing multiple firearms loaded. SUMF ¶¶ 82–83.[14] Second, the data demonstrates that other foster or day care home licensees might choose to store their firearms in an even less safe manner. Even the Millers recognize this. SUMF ¶ 89.

"Since many parents not subject to this regulation store firearms unlocked, loaded, or both, and many children absent these regulations can gain access to a loaded firearm in less than 5 minutes, regulations that stipulate how firearms must be stored can be expected to make household firearms less accessible to children (i.e., compared with access in the absence of such regulation)." SUMF ¶ 145. This is true in both the foster home and the day care context. "Although studies have focused on the risk posed by household firearm ownership, the fundamental relationship that is being explored is between children's *exposure to firearms*, wherever that exposure occurs, and risk of firearms injury and mortality." SUMF ¶ 117 (emphasis added). Thus, "the findings of the studies [cited] apply equally to households in which children live and household in which children spend time." SUMF ¶ 118.

The above evidence—which is not contradicted—shows that the DCFS Rules, and the Child Care Act Provisions on which the Day Care Home Rules are based, are directly and

---

[14] To be sure, Darin Miller wishes to have the option to maintain a personal arsenal of loaded firearms. Specifically, Darin wants to have the ability to conceal carry a loaded firearm on his person in his home during day care operating hours. SUMF ¶ 84. Additionally, Darin wants to carry at least two loaded handguns on his person, one in a holster on his waist and one in a holster on his ankle. SUMF ¶ 85. He also wants the option of keeping his remaining three handguns locked and loaded in a safe and would keep an AR-15 loaded in the safe as well. SUMF ¶¶ 86–87.

substantially related to the State's important interest in protecting children. The DCFS Rules pass

Second Amendment scrutiny and Plaintiffs' claims fail as a matter of law.

## V.     The Organizational Plaintiffs' claims fail with the Millers' claims.

The Claims of the Organizational Plaintiffs fail for all the reasons that the Millers' Second

Amendment challenge fails.

It is undisputed that the Organizational Plaintiffs have no claim of their own. They do not

claim to have foster caregiver licenses or to operate licensed day care homes themselves. SUMF

¶ 98. Nor have the Organizational Plaintiffs alleged any harm to the organizations as a result of the

challenged provisions, SUMF ¶ 92, and therefore cannot sue on their own behalf. *See Milwaukee*

*Police Ass'n v. Bd. of Fire & Police Comm'rs of City of Milwaukee*, 708 F.3d 921, 926–27 (7th

Cir. 2013) (to sue on its own behalf, an organization must suffer a concrete and particularized

injury); *see also Second Amend. Found. v. Walker*, No. 2:16-cv-02214-CSB-EIL, ECF 40 at *10

(C.D. Ill. April 1, 2019) (holding that membership organizations SAF and ISRA lack standing to

challenge Illinois foster care rules on their own behalf) (attached as **Ex. 13**).

To prevail, then, the Organizational Plaintiffs must show that one of their members' claims

prevails. *See Disability Rts. Wisconsin, Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796,

801 (7th Cir. 2008) (An organization may sue on behalf of its members if the members would have

standing to sue in their own right.).. The only members of the Organizational Plaintiffs that they

know to be foster caregivers or day care home operators are Darin and Jennifer Miller. SUMF

¶¶ 93–97.[15] But the Millers have waived their rights, and the regulations about which they

---

[15] SAF identified Kenneth and Colleen Shults as potentially affected members. SUMF ¶ 95. The Shultses filed a lawsuit challenging the foster rules at issue, but were voluntarily dismissed from that lawsuit because they relinquished their foster licenses. SUMF ¶ 96. There is no evidence in the record that they have obtained a new license.

complain pass Second Amendment scrutiny. Because the Millers' claims fail, the Organizational Plaintiffs' claims must also fail.

## VI.     Defendant Raoul is not a proper party.

All claims against Attorney General Raoul fail because he is not a proper party. The Eleventh Amendment generally immunizes state officials from suit in federal court. *Kroll v. Bd. of Trs. of Univ. of Ill.*, 934 F.2d 904, 907 (7th Cir. 1991). Under the exception established in *Ex Parte Young*, 209 U.S. 123 (1908), a party may bring suit against a state official in their official capacity for solely prospective injunctive relief. *Kashani v. Purdue Univ.*, 813 F.2d 843, 848 (7th Cir. 1987). However, *Young* does not permit suits against any state official a party wishes to sue. In particular, "[a]n attorney general cannot be sued simply because of his duty to support the constitutionality of a challenged state statute . . . . Instead, in order for a plaintiff to overcome the Eleventh Amendment, the attorney general must play some role in enforcing (not just defending) the complained-of statute." *Doe v. Holcomb*, 883 F.3d 971, 976–77 (7th Cir. 2018). Here, the Attorney General plays no such role.

Plaintiffs have alleged that the Attorney General "is responsible for executing and administering the laws of the State of Illinois, including 225 ILCS 10/7." ECF 19 at ¶ 25. But a general obligation to enforce the law is not sufficient; if it were, "then the constitutionality of every act passed by the legislature could be tested by a suit against the governor and the attorney general." *Young*, 209 U.S. at 157 (1908). *Young* requires more: The named official "must have some connection with the enforcement" of the challenged provision. *Id.*

Plaintiffs conclusorily allege that the Attorney General "has enforced . . . and is in fact presently enforcing the challenged laws, customs and practices against Plaintiffs." ECF 19 at ¶ 25. But the only evidence in the record on this issue shows that the Attorney General is not enforcing

and has not threatened to enforce the DCFS Rules. *See* SUMF ¶ 146. The Attorney General has done nothing other than defend state officers in court, in accordance with the statutory duties of his office. That is an insufficient basis to overcome the Eleventh Amendment. *Holcomb*, 883 F.3d at 976–77; *Children's Healthcare is a Legal Duty v. Deters*, 92 F.3d 1412, 1415 (6th Cir. 1996) ("*Young* does not apply when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional state statute."). Accordingly, all claims against the Attorney General fail.

## CONCLUSION

For the foregoing reasons, there is no genuine dispute at to any material fact and Defendants are entitled to judgment as a matter of law on all of Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 56.

Dated: November 12, 2021     Respectfully submitted,

             KWAME RAOUL
             Illinois Attorney General

     By:  /s/ Matthew V. Chimienti____
             Gretchen Helfrich, #6300004
             Matthew V. Chimienti, #6312531
             Aaron P. Wenzloff, #6329093
             Assistant Attorneys General
             100 W. Randolph St., 11th Floor
             Chicago, Illinois 60601
             (312) 814-3000
             Gretchen.Helfrich@ilag.gov
             Matthew.Chimienti@ilag.gov
             Aaron.Wenzloff@ilag.gov

             *Attorneys for Defendants*

## **INDEX OF EXHIBITS**

1.  Group Exhibit of DCFS Documents (filed under seal)
2.  Deposition of Meaghan Jorgensen, DCFS Rule 30(b)(6) Witness
3.  Defendant Smith's Answers to Interrogatories
4.  Deposition of Darin Miller
5.  Deposition of Jennifer Miller
6.  Declaration of Beth I. Solomon
7.  Deposition of Valinda Rowe, Illinois Carry Rule 30(b)(6) Witness
8.  Deposition of Richard Pearson, Illinois State Rifle Association Rule 30(b)(6) Witness
9.  Deposition of Julianne Versnel, Second Amendment Foundation Rule 30(b)(6) Witness
10. Illinois Carry's Answers to Interrogatories
11. Illinois State Rifle Association's Answers to Interrogatories
12. Second Amendment Foundation's Answers to Interrogatories
13. *Second Amendment Foundation v. Walker* Dismissal Order
14. Declaration of Saul Cornell
15. Declaration of Dr. Matthew Miller
16. Declaration of Dr. Deborah Azrael
17. Stipulation Regarding Defendants' Expert Dr. Deborah Azrael
18. Deposition of David Buysse, Office of the Illinois Attorney General's Rule 30(b)(6) Witness
19. Joint Stipulation Regarding Certain Documents, Writings, and Records Produced in Discovery
20. *Lafferty v. Amundson* Order on Summary Judgment

## <u>CERTIFICATE OF SERVICE</u>

I, Matthew V. Chimienti, an attorney, certify that on November 12, 2021, I caused the foregoing **<u>Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment</u>** to be electronically filed via the Court's CM/ECF system and thereby served on all counsel of record.

<u>/s/ Matthew V. Chimienti__</u>

Assistant Attorney General
