E-FILED
Friday, 12 November, 2021  03:35:14 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 2
# Deposition of Meaghan Jorgensen

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2
   JENNIFER J. MILLER, DARIN    )
 3 E. MILLER, SECOND AMENDMENT  )
   FOUNDATION, INC., ILLINOIS   )
 4 STATE RIFLE ASSOCIATION, and )
   ILLINOIS CARRY,              )
 5                              )
                   Plaintiffs,  )
 6                              )
              -vs-              )  Case No.:  3:18-CV-3085
 7                              )
   MARC D. SMITH, in his        )
 8 official capacity as Acting  )
   Director of the Illinois     )
 9 Department of Children and   )
   Family Services, and KWAME   )
10 RAOUL, in his official       )
   capacity as Attorney General )
11 of the State of Illinois,    )
                                )
12                 Defendants.  )

13

14          The discovery deposition of MEAGHAN

15 JORGENSEN, called by the Plaintiffs for examination,

16 taken in the above-entitled cause before Marina

17 Mogilevsky, a Certified Shorthand Reporter, with

18 Meaghan Jorgensen being located separate and apart from

19 the Reporter and participating remotely via Zoom, on

20 Friday, October 16th, 2020, at the hour of 10:00

21 o'clock a.m., pursuant to the Federal Rules of Civil

22 Procedure for the United States District Courts

23 pertaining to the taking of depositions.

24 REPORTED BY:  Marina Mogilevsky, C.S.R.
   LICENSE No.:  084-004103      JOB NO.:  (AE07292)
```

Atkinson-Baker, Inc.
www.depo.com

**Page 2**

```
 1       There were present at the taking of this deposition
 2  the following counsel:
 3
 4      LAW FIRM OF DAVID G. SIGALE, P.C. by
        MR. DAVID G. SIGALE, Esquire
 5      430 West Roosevelt Road
        Wheaton, Illinois  60187
 6      Phone:  (630) 452-4547
        E-mail:  dsigale@sigalelaw.com
 7
            Appeared via Zoom on behalf of the Plaintiffs;
 8
 9      OFFICE OF THE ILLINOIS ATTORNEY GENERAL by
        MR. MATTHEW CHIMIENTI, Esquire
10      MS. GRETCHEN E. HELFRICH, Esquire
        ASSISTANT ATTORNEY GENERAL
11      100 West Randolph Street, 11th Floor
        Chicago, Illinois  60601
12      Phone:  (312) 814-3000
        E-mail:  m.chimienti@atg.state.il.us
13               g.helfrich@atg.state.il.us
14          Appeared via Zoom on behalf of the Defendants;
15
16      ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY
        SERVICES by
17      MS. BETH SOLOMON, Esquire
        Senior Litigation Counsel
18      100 West Randolph Street
        Chicago, Illinois  60601
19      Phone:  (312) 814-6800
20      E-mail:  Beth.Solomon@illinois.gov
            Appeared via Zoom on behalf of the Illinois
21          Department of Children and Family Services.
22
23  ALSO PRESENT:
24      Ms. Amanda Wolfman - Illinois DCFS General Counsel.
```

**Page 3**

```
 1                  ZOOM DEPOSITION OF
                     Meaghan Jorgensen
 2
                     October 16, 2020
 3
 4  EXAMINATION BY:                                   PAGE
 5  Mr. David G. Sigale                            06, 116
    Mr. Matthew Chimienti                              108
 6
 7
 8               * * * * * *
 9               EXHIBITS PREVIOUSLY MARKED
10                                                   PAGE
11  Jorgensen Deposition Exhibit 1                      14
    (Plaintiffs' Amended Notice of R.R. Civ. P.
12  30(b)(6) Deposition to Defendant Marc Smith)
    Jorgensen Deposition Exhibit 2                      15
13  (Illinois Compiled Statute 225 ILCS 10/7(a)(13),
    (14), and (15))
14  Jorgensen Deposition Exhibit 3                      25
15  (JCAR 402.8 General Requirements for the Foster Home)
16
17  Jorgensen Deposition Exhibit 4                      74
    (Defendant Marc Smith's Answers and Objections to
18  Plaintiffs' Rule 33 Interrogatories)
19  Jorgensen Deposition Exhibit 5                      32
    (Foster Family Firearms Agreement - 402.8(g)/402.8(o)
20  (redacted)
21  Jorgensen Deposition Exhibit 6                      29
    (Acknowledgment of Compliance Part 402 Licensing
22  Standards for Foster Family Homes)
23  Jorgensen Deposition Exhibit 7                      18
    (JCAR Title 89, Section 406.8(a)(17) and (18))
24
```

**Page 4**

```
 1           - EXHIBIT INDEX CONTINUED -
 2                                                   PAGE
 3  Jorgensen Deposition Exhibit 8                     102
    (430 ILCS 66/65 Firearms Concealed Carry Act)
 4
    Jorgensen Deposition Exhibit 10                     78
 5  (Office of the Inspector General - Report to the
    Governor and General Assembly January 2020)
 6
 7
 8
 9
10
11
12               * * o o o * *
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 5**

```
 1       THE COURT REPORTER:  Good morning.  My name
 2  is Marina Mogilevsky.  I am a Certified Stenographic
 3  Reporter.
 4       Today's date is October 16th, 2020,
 5  and the time is approximately 10:03 a.m., as
 6  indicated on my computer screen.
 7       This is the deposition of Meaghan
 8  Jorgensen in the matter of Jennifer J. Miller, et
 9  al., versus Marc D. Smith, et al., in the United
10  States District for the Central District of Illinois.
11  The Case Number is 3:18-cv-3085.
12       At this time, I will ask counsel to
13  identify yourselves and whom you represent, and agree
14  on the record that there is no objection to this
15  deposition officer administering a binding oath to
16  the witness via Zoom.
17       Please state your agreement on the
18  record, starting with the noticing attorney.
19       MR. SIGALE:  Good morning.  My name is
20  David Sigale.  And, as you can see, it's spelled
21  S-I-G-A-L-E.  I represent the Plaintiffs in this
22  case.  And I have no objection to you administering
23  oaths via Zoom.
24       MR. CHIMIENTI:  Good morning.  This is
```

Page 6

1  Matthew Chimienti, as indicated on my screen.  The
2  last C-H-I-M-I-E-N-T-I.  I'm from the Office of the
3  Illinois Attorney General representing both
4  Defendants in this case.  And on behalf of both
5  Defendants, we have no objection to the court
6  reporter administering oaths via Zoom.
7      MS. HELFRICH:  I'm Gretchen Helfrich.  And
8  that's spelled H-E-L-F-R-I-C-H, as on my screen.  I'm
9  also with the Office of the Illinois Attorney
10  General.  And I agree with what Mr. Chimienti said.
11      MS. SOLOMON:  And my name is Beth Solomon,
12  S-O-L-O-M-O-N.  And I am litigation counsel for the
13  Department of Children and Family Services.
14      (WITNESS SWORN.)
15          MEAGHAN JORGENSEN,
16  called as a witness herein, having been first duly
17  sworn, was examined upon oral interrogatories and
18  testified as follows:
19          EXAMINATION
20      by Mr. Sigale:
21      MR. SIGALE:  Q  All right.  Well, good
22  morning, Ms. Jorgensen.  Can you state your name
23  and -- I know it's on your screen there.  But just
24  for the record, can you state your name and spell

Page 7

1  your last name for the record.
2      A  Yes.  My name is Meaghan Jorgensen.  Last
3  name is J-O-R-G-E-N-S-E-N.
4      MR. SIGALE:  All right.  Let the record
5  reflect this is Federal Rule 30(b)(6) deposition of
6  Marc Smith and the Illinois Department of Children
7  and Family Services, with its designated
8  representative today Meaghan Jorgensen.
9          This deposition is taken pursuant to
10  all applicable rules the Federal Rules of Civil
11  Procedure and any local rules of the Central District
12  of Illinois.
13      Q  Ms. Jorgensen, have you ever given a
14  deposition before?
15      A  I have not.
16      Q  Okay.  Let me give you a couple ground
17  rules to hopefully make this go a little faster and a
18  little smoother.  Okay?
19          Marina is here, sort of, taking down
20  everything everybody says.  She can only take down,
21  especially in this context, she can only take down
22  out loud verbal responses.  She cannot take down any
23  nonverbal responses, such as head shaking and hand
24  gestures, and maybe the biggest culprit uh-huh or

Page 8

1  unh-unh.  So please make all your responses out loud
2  and verbal.  Okay?
3      A  Understood.
4      Q  Thanks.
5          It's also very difficult for Marina to
6  take down more than one person talking at a time,
7  especially in this context, I know that it sometimes
8  happens, but I'm going to ask that you wait until I'm
9  done asking my question before you answer.  I in turn
10  will try to wait until you're done answering before
11  asking my next question.  Okay?
12      A  Understood.
13      Q  All right.  If you answer a question that I
14  ask you here today, it's going to be presumed, for
15  purposes of the record that is being made, that you
16  understood the question that I asked you; and that
17  that is the question you are answering.
18          So if for any reason you do not
19  understand a question that I'm asking you today,
20  please let me know.  And I will rephrase it.  Okay?
21      A  Okay.
22      Q  Okay.  And if you need to take a break, let
23  me know.
24      A  Okay.

Page 9

1      Q  All right.  Ms. Jorgensen, are you
2  currently employed?
3      A  I am.
4      Q  And who would that be by?
5      A  I am employed by the Illinois Department of
6  Children and Family Services.
7      Q  And what is your position at -- Can I call
8  it DCFS?  And we'll know that we're talking about the
9  same thing?
10      A  Yes, you may.
11      Q  Okay.  What is your job title at DCFS?
12      A  I am Deputy Director of Legislative
13  Affairs.
14      Q  How long have you held that position?
15      A  Since July of 2019.
16      Q  And what are your job responsibilities as
17  Deputy Director of Legislative Affairs?
18      A  So I handle all monitoring and tracking of
19  legislation.  I handle all interactions with
20  legislators.  And I also, as of January of this year,
21  oversee the Office of Children and Family Policy, who
22  writes rules and procedures.
23      Q  I'm sorry, I missed that.  As of January
24  you oversee the office of what?

Page 10

1    A   The Office of Children and Family Policy.
2    Q   And what is that again?
3    A   So they write rule and procedure for the
4  Department.
5    Q   Okay.  I want to ask you just a few
6  background questions here before we kind of get into
7  the meat of this.
8         How long have you worked for DCFS?
9    A   I've worked here since July of 2019.
10   Q   Okay.  And prior to that, where were you
11  working?
12   A   I was with the DuPage County State's
13  Attorney's Office.
14   Q   Okay.  From when to when?  Well, strike
15  that.
16         From when to when?
17   A   I started there in November of 2018, end of
18  November, until I came to DCFS.
19   Q   Okay.  What were you doing over at the
20  DuPage County State's Attorney?
21   A   I worked in the civil division.  So I
22  handled the health department, I handled dog bite
23  cases, and I handled FOID card objections.
24   Q   Just as an aside, Ms. Jorgensen, I know

Page 11

1  that you've got quite the family name in DuPage
2  County.  Have you and I crossed paths before?  Have
3  we met before on one of those FOID cases, or no?  If
4  you remember.
5    A   I believe we briefly did once.
6    Q   Okay.  Prior to DuPage County State's
7  Attorney, where, if anywhere, were you employed?
8    A   Would you like everywhere I was employed,
9  or just immediately before that?
10   Q   If you don't mind just running the list, it
11  would save me the trouble of just asking and then and
12  then and then.  So...
13   A   Okay.  So I did political consulting for a
14  company called Core Strategies.  Before that, I had
15  my own consulting company; and I also was general
16  counsel for Patriot Ambulance Service.  Prior to
17  that, I worked for Superior Ambulance.  And I did
18  legislative affairs for Superior Ambulance.
19   Q   Okay.  Let me just run through the timeline
20  real quick.
21         So Superior Ambulance was from when to
22  when?
23   A   Oh, boy.  So that was --
24   Q   Would it help to go the other way?

Page 12

1    A   No, I can -- I'm just trying to think when
2  I graduated law school.
3         So Superior Ambulance would have been
4  May or June after law school.  So 2011.  I worked
5  there for about two-and-a-half, three years.  Then I
6  left there, and that's when I started my own
7  political consulting and I started working for
8  Patriot.  I did those simultaneously.  And then I
9  went to Core Strategies in 2018.
10   Q   And stayed there until November of 2018,
11  when you joined the State's Attorney's Office?
12   A   Correct.
13   Q   Okay.  When you handled legislative affairs
14  for Superior Ambulance, what sort of job
15  responsibilities did that encompass?
16   A   So, again, dealing with legislators, a lot
17  of Medicaid issues, rate increases, lots more
18  entertaining of legislators, but mostly that.
19         They're the third largest ambulance
20  provider.  So there were lots of issues.
21   Q   Okay.  As Deputy Director of Legislative
22  Affairs for DCFS now, are there specific discreet
23  issues that you generally work on; or is it basically
24  everything that -- anything legislative that might

Page 13

1  affect the agency?
2    A   I'm not sure what you mean by "separate
3  discreet issues," but any legislation that comes that
4  has to do with DCFS.
5    Q   Okay.  You said you graduated law school in
6  2011?
7    A   Correct.
8    Q   Okay.  From where?
9    A   Northern Illinois.
10   Q   Okay.  And your undergraduate degree you received
11  when?
12   A   2008.
13   Q   Okay.  From where?
14   A   University of Iowa.
15   Q   Go Hawkeyes.
16         And what was your major?
17   A   I was a history major.
18   Q   So that was a BA that you received?
19   A   Correct.
20   Q   Okay.  Ms. Jorgensen, I am going to attempt
21  to share my screen.
22         Does everyone see the page with the
23  caption there?
24   A   Yes.

Page 14

1    Q   Okay.  This is a document that I have
2  marked, you can see there in the bottom right corner,
3  as Jorgensen Deposition Exhibit 1.
4          (Jorgensen Deposition Exhibit 1
5          previously marked and screen shared.)
6      MR. SIGALE:  Q   And, Ms. Jorgensen, I'd
7  like you to take a look at this for a moment.  But if
8  I just show you the title of it, is that a document
9  that you've seen before?
10   A   Yes, I've seen this before.
11    Q   Okay.  So Amended Notice of Federal Rule
12  30(b)(6) Deposition to Defendant Marc Smith for
13  today, right now.  And then if I scroll down, we've
14  got some definitions and the meat that I referred to
15  earlier, the Matters for Examination.  This is page 5
16  of the document.  And on page 5 and 6 are 14 topics.
17  And it is being represented to me that you are the
18  person most knowledgeable in the DCFS to testify
19  about all the matters that are listed on these two
20  pages.
21      MR. CHIMIENTI:  I'm going to object, David.
22  She is the witness that's been provided pursuant to
23  Federal Rule of Civil Procedure 30(b)(6).  She's
24  prepared to testify about all these topics.  The

Page 15

1  rules do not require the person most knowledgeable on
2  each of these topics.
3      So she is the 30(b)(6) representative
4  of the Department.  And she's prepared to testify
5  about these topics.
6      MR. SIGALE:  Q   Ms. Jorgensen, is that
7  your understanding, that you are the designated
8  representative to testify about all these topics here
9  today?
10   A   Correct, that is my understanding.
11    Q   Okay.  Well, let's start with No. 1, which
12  is the bases for the Illinois Compiled Statute 225
13  ILCS 10/7(a) sub (13), (14), and (15).  And I'm going
14  to show you this document.  You can see that it's
15  marked Jorgensen Deposition Exhibit 2.
16          (Jorgensen Deposition Exhibit 2
17          previously marked and screen shared.)
18      MR. SIGALE:  Q   This is off of Lexis.  The
19  statute that is Topic No. 1.
20      Are you familiar with this statute?
21   A   The Child Care Act?  Yes, I'm familiar with
22  it.
23    Q   Okay.  So we're looking at 13, 14, and 15.
24  So let's start with 13.

Page 16

1      In fact, I'm sorry.  Before I even do
2  that, I'm going to go up.  Because I want to read the
3  part before the subparts that says, this is (a), "The
4  Department must prescribe and publish minimum
5  standards for licensing that apply to the various
6  types of facilities for child care defined in this
7  Act and that are equally applicable to like
8  institutions under the control of the Department and
9  to foster family homes used by and under the direct
10  supervision of the Department.  The Department shall
11  seek the advice and assistance of persons
12  representative of the various types of child care
13  facilities in establishing such standards.  The
14  standards prescribed and published under this Act
15  take effect as provided in the Illinois
16  Administrative Procedure Act, and are restricted to
17  regulations pertaining to the following matters and
18  to any rules and regulations required or permitted by
19  any other Section of this Act:"  And then we get to
20  the subparts.
21      So sub 13 says, "Provisions
22  prohibiting handguns on day care home premises except
23  in the possession of peace offices or other adults
24  who must possess a handgun as a condition of

Page 17

1  employment and who reside on the premises of a day
2  care home."
3      First of all, did I read sub 13
4  correctly?
5   A   You did.
6    Q   All right.  So Topic No. 1 asks for the
7  testimony regarding the bases regarding -- the bases
8  for the Act's subparagraphs there.
9      So I'll ask you.  What are the bases
10  for that subparagraph?
11   A   I could not tell you that.  This was
12  something that was passed by the legislature, and I
13  don't have the capability to get inside their head.
14    Q   If I were to ask you the same exact
15  question for sub 14 and sub 15, would your answer be
16  the same?
17   A   It would.
18    Q   Topic No. 2 asks for -- Well, before I get
19  to that, notwithstanding the fact that you are the
20  designated representative, is there someone at DCFS
21  that does know the answer to the question of the
22  bases for 225 ILCS 10/7(a)(13), (14), and (15)?
23      MR. CHIMIENTI:  Objection.  Form.
24      She is the 30(b)(6) witness, David.

Page 18

1  It's irrelevant.

2         But go ahead, Meaghan.

3         THE WITNESS:  I don't know the answer to

4  that.

5         MR. SIGALE:  Q   Okay.

6         All right.  Topic No. 2 asks for the

7  bases for JCAR, Joint Committee on Administrative

8  Rules, Title 89, Section 406.8(a)(17) and (18).

9         So I'm going to stop sharing my screen

10  for a second, and I'm going to go find that document.

11  Give me a second.

12         All right.  Ms. Jorgensen, I am

13  showing you a document that has been marked as

14  Jorgensen Deposition Exhibit 7.

15         (Jorgensen Deposition Exhibit 7

16         previously marked and screen shared.)

17         MR. SIGALE:  Q   Do you recognize -- You

18  might not recognize this exact printout, which is

19  actually off the Illinois General Assembly web page,

20  but are you familiar with the rule that is on your

21  screen right now?

22     A   I am.

23     **Q   Okay.  Now, this is specifically Section**

24  **406.8 titled General Requirements for Day Care Homes.**

Page 19

1  **And it states there in (a), "The physical facilities**

2  **of the home, both indoors and outdoors, shall meet**

3  **the following requirements for safety to children."**

4  **And, specifically, I want to refer to 17 and 18,**

5  **which I can't get all on one screen.  So I'll have to**

6  **go up and down a little bit.**

7         **So 17 reads, "Handguns are prohibited**

8  **on the premises of the day care home except in the**

9  **possession of peace offices or other adults who must**

10  **possess a handgun as a condition of employment and**

11  **who reside in the day care home.  The licensee shall**

12  **post a "no firearms" sign, as described in Section**

13  **65(d) of the Firearm Concealed Carry Act, which is at**

14  **430 ILCS 66/65(d), in a visible location where**

15  **parents pick up children."**

16         **Ms. Jorgensen, did I read that**

17  **correctly?**

18     A   You did.

19     **Q   All right.  Topic No. 2 that is in the**

20  **Matters for Examination is the bases for those**

21  **subparagraphs of this Rule 406.8(a).**

22         **So I'll ask you, do you know the bases**

23  **for this subparagraph 17 of Rule 406.8(a)?**

24         MR. CHIMIENTI:  Objection.  Vague as to

Page 20

1  bases.

2         Meaghan, if you understand, you may

3  answer.

4         THE WITNESS:  Can you rephrase the

5  question?

6         MR. SIGALE:  Q   Sure.

7         If I go back to Exhibit 1, Definition

8  No. 8 on page 5, "basis or bases shall be considered

9  synonymous with justifications and/or reasons."

10         So I'll rephrase it and ask if you

11  know the reason for the enactment of 406.8(a), sub

12  (17).  I'll stick with this one for right now.

13     A   I do.

14     **Q   Okay.  What is it?**

15     A   We were ordered to do so by statute.  The

16  Child Care Act directed us to enact rules.

17     **Q   Is that it, is that the only reason why**

18  **this rule is in place, this subparagraph is in place?**

19     A   We enacted this rule because we were

20  ordered to do so by statute.

21     **Q   Okay.  I just want to make sure I'm -- I**

22  **just want to clarify it here, because this is my only**

23  **chance to talk to you, Ms. Jorgensen.**

24         **Is that the only reason why this rule**

Page 21

1  **was enacted, because the statute said to do it?**

2     A   At the Department, we were supportive of

3  this rule, as it protects children.  But we were

4  ordered by statute to create this rule.

5     **Q   How does it protect children?**

6         **Again, I'm just -- And, Ms. Jorgensen,**

7  **I'm sorry.  I'm going to even back up half a step.**

8         **Right now I'm focused here on**

9  **subparagraph 17.  And I'm only focused on the first**

10  **sentence, which happens to be the part of the rule**

11  **that's in italics.  Okay?**

12     A   Okay.

13     **Q   Okay.  So how does it protect children?**

14     A   Reducing access to firearms and ammunition

15  prevents death, serious injury, and suicide.

16     **Q   As you sit here today, are you aware of any**

17  **empirical data to support that?**

18     A   I am aware that there is evidence out

19  there.

20     **Q   I'm sorry, were you done; or were you in**

21  **the middle of a sentence?**

22     A   Yeah.

23     **Q   Okay.  But as you sit here right now, can**

24  **you name any of it or cite to any of it?**

Page 22

1    MR. CHIMIENTI:  I'm going to object to the
2  extent that this question calls for expert testimony,
3  and expert discovery is forthcoming in this case.
4  And DCFS reserves the right to proffer expert
5  testimony on this subject.
6        But subject to that, Meaghan, you may
7  answer.
8    THE WITNESS:  I am aware that there is
9  evidence that exists.  But I cannot cite to it.
10   MR. SIGALE:  Q   Let's move on to
11  subparagraph 18.  So 406.8(a)18.  And it reads, "Any
12  firearm, other than a handgun in the possession of a
13  peace officer or other person as provided in
14  subsection (a)(17), shall be kept in a disassembled
15  state, without ammunition, in locked storage in a
16  closet, cabinet, or other locked storage facility
17  inaccessible to children."
18        And then it's got a sub-subparagraph,
19  capital A.  "A)  Ammunition for such firearms shall
20  be kept in locked storage separate from that of the
21  disassembled firearms, inaccessible to children.  B)
22  The operator of the home shall notify the parents or
23  guardian of any child accepted for care that firearms
24  and ammunition are stored on the premises.  The

Page 23

1  operator shall also notify the parents or guardian
2  that such firearms and ammunition are locked in
3  storage inaccessible to children.  Section 7 of the
4  Child Care Act of 1969 (225 ILCS 10/7).  The
5  notification need not disclose the location where the
6  firearms and ammunition are stored."
7        So, first of all, Ms. Jorgensen, did I
8  read subparagraph 18 correctly?
9   A   You did.
10   Q   All right.  I want to -- Since it's
11  basically three parts, I just want to go through each
12  one.
13        So sub 18, the first paragraph before
14  the capital letter sub-subparagraphs, are you aware
15  of the basis or bases, which is synonymous for reason
16  or reasons or justification or justifications, for
17  that portion of the rule, sub 18?
18   A   I am.
19   Q   Okay.  And what is it slash them?
20   A   We were ordered by the Child Care Act to
21  implement these rules.
22   Q   Anything else?
23   A   No.
24   Q   Okay.  So then we get to 18(A), the capital

Page 24

1  A underneath it.  "A)  Ammunition for such firearms
2  shall be kept in locked storage separate from that of
3  the disassembled firearms, inaccessible to children."
4        If I were to ask you the same question
5  about bases slash reasons slash justifications, would
6  your answer be the exact same?
7   A   It would.
8   Q   Anything to add beyond that regarding this
9  18 sub (A), capital A?
10   A   No.
11   Q   And, in fact, no one is challenging 18 sub
12  (B).  So I don't need to ask you about that.
13        Okay.  Ms. Jorgensen, I am going back
14  to the Matters for Examination.  And No. 3 lists,
15  "The bases for Rule 402.8(o) (previously 402.8(g)) of
16  the Licensing Standards for Foster Family Homes."
17  And it was established in earlier depositions that
18  that sub (o), that's a recent change.  It was
19  previously a different subparagraph.  I'm sure you're
20  well aware of that, actually.
21        So I want to show you a document that
22  I am marking as Jorgensen Deposition Exhibit 3.  You
23  can see that in the bottom right corner there.
24

Page 25

1        (Jorgensen Deposition Exhibit 3
2        previously marked and screen shared.)
3     MR. SIGALE:  Q   And, again, while you
4  might not be familiar with this exact printout from
5  the IllinoisGeneralAssembly.gov, I will ask you if
6  you remember familiar with the rule that is
7  represented there on the screen?
8   A   I am.
9   Q   Okay.  So 402.8 is General Requirements for
10  the Foster Home, which it says twice, and we skip
11  down to letter O.  And I'm skipping past things like
12  working kitchen, working bathroom, water hazard
13  protection, swimming pools and hot tubs, tobacco,
14  alcohol, dangerous household supplies, and then we
15  get down to letter O.  Which states, "Any and all
16  firearms and ammunition shall be stored and locked up
17  separately at all times and kept in places
18  inaccessible to children.  No firearms possessed in
19  violation of a state or federal law or a local
20  government ordinance shall be present in the home at
21  any time.  Loaded guns shall not be kept in a foster
22  home unless required by law enforcement officers and
23  in accordance with their law enforcement agency's
24  safety procedures."

Page 26

1            Did I read that correctly?

2    A  You did.

3    Q  All right.  So there are three sentences in
4 this subparagraphs O.  And the only ones we're going
5 to talk about are the first and the third.  I don't
6 care about the second one.

7          So the first one, "Any and all
8 firearms and ammunition shall be stored and locked up
9 separately at all times and kept in places
10 inaccessible to children."  If I go back to Exhibit
11 1, the bases slash justifications slash reasons for
12 enacting this part of the rule, are you aware of
13 them?

14    A  I am.

15    Q  Okay.  And what is it slash they or them?

16    A  This rule is consistent with the
17 Department's mandate to protect children.
18 Restricting children's access to firearms and
19 ammunition protects against death, serious injury,
20 and suicide.

21    Q  Is that it?

22    A  Yes.

23    Q  Okay.  Similar to what I asked you before,
24 are you aware of any empirical evidence to support

Page 27

1 that reason that you just gave?

2          MR. CHIMIENTI:  Objection to the extent
3 that it calls for forthcoming expert testimony.

4          But subject to that, Meaghan, you may
5 answer.

6          THE WITNESS:  Can you clarify the question?

7          MR. SIGALE:  Q   You just gave me the
8 reason about -- and I'm going to paraphrase a little
9 bit, but you just said it's consistent with the
10 Department's mandate to protect children against
11 death and serious injury and suicide.  And I'm asking
12 now if you are aware of any empirical evidence to
13 support that conclusion, that bases.

14          MR. CHIMIENTI:  Objection to the extent it
15 misstates her prior testimony, and to the extent it
16 calls for expert testimony.

17          But go ahead, Meaghan.

18          THE WITNESS:  There is well-documented
19 evidence out there that does exist.

20          MR. SIGALE:  Q   As you sit here today, are
21 you able to cite any of it to me?

22          MR. CHIMIENTI:  Same objections with
23 respect to experts.

24          Go ahead, Meaghan.

Page 28

1          THE WITNESS:  I am not able to specifically
2 cite it.

3          MR. SIGALE:  Q   If I were to ask you the
4 same exact questions regarding the third sentence
5 that starts with "Loaded guns shall not be kept,"
6 dot, dot, dot, would your answers be exactly the
7 same; or would you have anything to change or add to
8 that?

9          MR. CHIMIENTI:  And I would again add an
10 objection to the extent that that question calls for
11 potential forthcoming expert testimony.

12          But to the extent you understand the
13 question, Meaghan, you may answer.

14          THE WITNESS:  Yes, it would be the same.

15          MR. SIGALE:  Q   Okay.  All right.  So the
16 next topic or the next Matter for Examination is
17 No. 4, which is "The bases for Section 3 of the Form
18 CFS 402-A" that has that certification.  But I'm
19 going to pause for a second and pull up an exhibit to
20 share.  Okay?

21    A  Okay.

22    Q  All right.  Ms. Jorgensen, I'm showing a
23 document that's been marked as Jorgensen Deposition
24 Exhibit 6.

Page 29

1          (Jorgensen Deposition Exhibit 6
2          previously marked and screen shared.)

3          MR. SIGALE:  Q   Also for purposes of --
4 Since it's right there on the screen, it's also a
5 document provided by DCFS Bates stamped as No. 195.
6 And, as you can see, it's redacted to exclude any
7 personal information from the Millers.

8          So are you familiar, in general, with
9 this form?

10    A  I am.

11    Q  Okay.  Just for -- Are you familiar with
12 the exact form that the Millers have signed, or are
13 you just familiar with this form in general?

14    A  I'm familiar with the form in general.

15    Q  Okay.  So it's titled Acknowledgment of
16 Compliance Part 402 Licensing Standards for Foster
17 Family Homes.  And I'm going to scroll down to --
18 Well, first of all, what's the purpose of this form,
19 in general?

20    A  This is a recordkeeping form for DCFS
21 licensing representatives.

22    Q  I'm sorry, recordkeeping for what?

23    A  So that licensing reps are aware that
24 foster parents understand the rules they must follow.

Page 30

1    Q   Okay.  Now, this says, "Section III.
2  Firearms."  And it references Rule 402.8(g), which I
3  believe at least counsel and I, and I assume you,
4  Ms. Jorgensen, know is now 402.8(o).  But as of at
5  least a couple weeks ago, this form still is the same
6  and still says 402.8(g).
7           But, at any rate, it states, "Any and
8  all firearms and ammunition shall be locked up at all
9  times and kept in places inaccessible to children.
10  No firearms possessed in violation of a State or
11  Federal law or a local government ordinance shall be
12  present in the home at any time.  Loaded guns shall
13  not be kept in a foster home unless required by law
14  enforcement officers and in accordance with their law
15  enforcement agency's safety procedures."
16           And then it says underneath it, "I
17  certify that there are no firearms on the premises,
18  but will immediately notify the Licensing
19  Representative and complete form CFS 452-2, Foster
20  Family Firearms Arrangement, if I, or any member of
21  the foster family home, acquires a firearm."  And
22  then there's places for initials, presumably by the
23  would-be foster parents.
24           Are you aware of the basis or bases,

Page 31

1  synonymous with reason or justification, why this
2  section is on this document?
3    A   You cut out a little bit.  Can you repeat
4  the question for me?
5    Q   Sure.
6           I read that Section III, Firearms,
7  that is on this Exhibit 6, this Acknowledgment of
8  Compliance for foster family homes, correct?  I read
9  it correctly?
10  A   Yes.
11  Q   Okay.  My question to you is, if you are
12  aware of the reason why this Section III is on this
13  form?
14  A   It's on here to ensure that foster parents
15  are aware of the rule.
16  Q   Anything else?
17  A   No.
18  Q   All right.  Moving right along.
19           The next topic, which is Topic
20  No. 6 -- Nope, it is not.  It is No. 5.  "The bases
21  for CFS 452-2, entitled Foster Family Firearms
22  Agreement."  Which, as you can see in Matter No. 4,
23  that when I recited what was in that section on the
24  form, it refers to 452-2.  And so now I want to ask

Page 32

1  you about Form CFS 452-2.  And it's cut off a little
2  bit, but I'll represent to you that that's what that
3  states.
4           This is a document that is redacted.
5  It is marked as Jorgensen Deposition Exhibit 5.  And
6  it comes from DCFS in this case, and it is Bates
7  stamped 193.  But I redacted the personal
8  information, as you can see.
9        (Jorgensen Deposition Exhibit 5
10          previously marked and screen shared.)
11        MR. SIGALE:  Q   And so, Ms. Jorgensen, are
12  you familiar with this form, in general?
13  A   I am.
14  Q   Okay.  Did you review specifically the
15  Millers' form in this case, so the unredacted version
16  of this document; or are you just familiar with it in
17  general?
18  A   I am familiar with the form in general.
19  Q   Okay.  And it recites at the top -- Well,
20  it's titled Foster Family Firearms Agreement.  It
21  cites that, in quotes, that Rule 402.8(g) again, now
22  with a slight modification.  It's actually 402.8(o),
23  but the form is still the same.
24           And so let me ask you, what is the

Page 33

1  basis for requiring this document of foster parents?
2  And I'll scroll down a little bit, if you need me to.
3    A   So this is a DCFS recordkeeping form for
4  our licensing reps, to ensure that the foster family
5  understands and is aware of the corresponding rule.
6    Q   Is there anything else regarding this
7  document?
8    A   No.
9    Q   Okay.  So why is it that the foster family
10  has to disclose information on it instead of just
11  saying, here is the rule, be aware of it?
12        MR. CHIMIENTI:  Objection.  Form.  Vague.
13  Calls for speculation.
14        Meaghan, if you understand the
15  question, you may answer.
16        THE WITNESS:  I would ask that you be more
17  specific in your question.
18        MR. SIGALE:  Q   Sure.
19           You said -- and forgive me if I
20  misheard you, so you'll correct me -- that it's a
21  recordkeeping form so that the foster family
22  understands the corresponding rule.  Is that what you
23  said, or am I misunderstanding?
24    A   That's correct.

Atkinson-Baker, Inc.
www.depo.com

Page 34

1    Q    Okay.  But it's not just a form that says,
2    here is the rule, sign here that you understand it.
3    It requires information about firearm location,
4    ammunition location, and I guess that's mostly it.
5         So if it's just to make sure that they
6    understand the rule, why are they asked to provide
7    this information?
8         MR. CHIMIENTI:  Objection.  Compound.  Form
9    of the question.  Counsel is testifying.  Misstates
10   her prior testimony.
11        Go ahead, Meaghan.
12        THE WITNESS:  Licensing representatives are
13   also tasked with monitoring foster homes.  And this
14   outlines if there's a firearm present or not.
15        MR. SIGALE:  Q  So it's not just to make
16   sure the foster family understands the rule?
17        MR. CHIMIENTI:  Objection.  Misstates.
18        Go ahead, Meaghan.
19        THE WITNESS:  You asked me what is the
20   basis.
21        MR. SIGALE:  Q  Correct.
22   A    The basis is, so that the foster family
23   understands and is aware of the rule.
24        Q    Okay.  Then I'm sorry.  Because I'm

Page 35

1    misunderstanding you.
2         If that's the basis, then why require
3    the foster parent to provide information --
4         MR. CHIMIENTI:  Asked and answered.
5         Go ahead, Meaghan.
6         MR. SIGALE:  Q -- instead of just checking
7    the box that, yes, I understand?
8         MR. CHIMIENTI:  Asked and answered multiple
9    times.
10        Go ahead, Meaghan.
11        THE WITNESS:  The Department is also tasked
12   with monitoring foster homes.  So this makes us aware
13   if there is one or not, and we can check for
14   compliance.
15        MR. SIGALE:  Q  Is there anything else
16   that you have to add about this form?
17   A    There is not.
18        MR. CHIMIENTI:  Objection.  Vague.
19        Sorry.  Go ahead, Meaghan.
20        THE WITNESS:  There is not.
21        MR. SIGALE:  Q  All right.  No. 6 of the
22   Matters for Examination.  "The enforcement of the
23   rules and/or policies referenced in Numbers 1 through
24   5 above."  So all the rules and statutes and forms

Page 36

1    that we've been discussing up until now, I want to
2    talk to you about the enforcement of them by DCFS.
3         But before I do that, I see that we've
4    been going for an hour.  So maybe this is a good time
5    to take a brief break?
6    A    Yes, please.
7         Q    Okay.  Do you want to say 10 minutes, come
8    back at 11:12?
9    A    Perfect.
10        Q    Okay.  Very good.  See you then.
11        We'll go off the record now.
12        (short break taken 11:02 a.m.)
13        MR. SIGALE:  Q  All right.  Let's go back
14   on.
15        Ms. Jorgensen, where we left off was
16   Topic No. 5 -- sorry, Topic No. 6, "The enforcement
17   of the rules and/or policies referenced in Numbers 1
18   to 5 above."
19   A    Correct.
20        Q    And let me ask you a more open-ended
21   question first.  Which is, do you have any knowledge
22   regarding the enforcement of the policies we've been
23   discussing?
24   A    I have knowledge of the enforcement of the

Page 37

1    rules we're discussing, and enforcement of rules as a
2    whole in the Department.
3         Q    Well, let's stick to the rules we've been
4    discussing.  And -- Well, generally speaking, how
5    does enforcement of the rules work at DCFS?
6         MR. CHIMIENTI:  I'm going to object as to
7    vague.
8         David, are you just talking about the
9    rules?  Are you talking about the statute and the
10   forms?  Which ones are you talking about?
11        MR. SIGALE:  Q  Well, I can keep it, for
12   the moment, to the rules, which is the Topics 2 and
13   3.  So 406.8(a)(17) and (18) and 402.8(o).
14        So how does DCFS enforce those rules?
15   A    Are you wanting to know the process of
16   enforcement?
17   Q    Yes.
18   A    So the process of enforcing these rules is
19   the same process of enforcing any rule.  It's a very
20   long process.
21        First, we receive some awareness of a
22   rule violation.  There is what we call an intake.
23   Then there is an investigation.  Then there's a
24   corrective action plan or a protective plan.  There's

Page 38

1  an opportunity to comply and get the rule violation
2  corrected.  Then there is a supervisory review, if it
3  progresses through.  There's an informal review.
4  There's a notice of the intent to revoke.  There's a
5  notice of right to appeal.  Then there's an
6  administrative order of closure.
7      Q   All right.  So let me stick then with the
8  hypothetical that a foster parent has -- DCFS hears
9  that a foster parent, a licensed foster parent, has a
10  firearm in a safe that's loaded.  That would, under
11  the rules that we've been -- the rules and statutes
12  and forms that we've been discussing, that would be a
13  violation of the rules, correct?
14      MR. CHIMIENTI: Objection.  Incomplete
15  hypothetical.  Calls for speculation.
16      Go ahead, Meaghan.
17      THE WITNESS: Can you repeat the scenario?
18      MR. SIGALE:  Q   A foster parent who is not
19  a law enforcement officer, so who doesn't fall under
20  any exceptions, DCFS hears that that foster parent
21  has a loaded firearm that they keep in a safe in
22  their bedroom.  Would that be a violation of the DCFS
23  rules that we've been discussing up until now?
24      MR. CHIMIENTI:  Same objections.

Page 39

1      Go ahead, Meaghan.
2      THE WITNESS:  If you're asking me something
3  that specific, we would have to go out and
4  investigate.
5      MR. SIGALE:  Q   Well, I think that's what
6  I'm getting at.
7      So what is the intake -- You said the
8  first thing was intake.  So what's the intake portion
9  of this process?  What does that entail?
10      A   Someone notifies us, we find out about it
11  when we're out doing a visit.  It could be varying
12  ways.
13      Q   Okay.  So then there is an investigation.
14  Which, you're the one in the hot seat, so I'll ask
15  you what that entails.
16      A   Our licensing rep would go to the home and
17  see if that is -- whatever we're called about, see if
18  that's an actual rule violation.
19      Q   I suppose if the licensing rep says that
20  there isn't a rule violation, then this all ends
21  right there.
22      So let's assume, for purposes of this
23  talk, that there is a rule violation; or the
24  licensing representative concludes there is a rule

Page 40

1  violation.  So then you said the next step would be a
2  corrective action plan.  Can you describe that?
3      Not the specific one, but can you
4  describe, in general, what that is?
5      A   So we would give the individuals the option
6  to correct it on the spot.  If not, there would
7  either be a corrective action plan or a protective
8  plan.
9      A corrective action plan is something
10  that's drawn up between the licensing rep -- and
11  using a foster family, because that's what you posed
12  in your question -- and the foster family put
13  together, in conjunction.  And it's how the foster
14  family plans to correct the rule violation.  And they
15  outline a certain amount of time they have, et
16  cetera.
17      Q   And the next thing you said was opportunity
18  to comply.  And I imagine that that kind of goes hand
19  in hand with that corrective action plan you just
20  described?
21      A   Not necessarily.  They could correct before
22  a corrective action plan, and there would be no
23  corrective action plan.  Or they could correct during
24  the time the corrective action plan was being like

Page 41

1  set forth, whatever the time frame was.
2      Q   Oh, so maybe there's an opportunity to
3  comply before a corrective action plan is written up?
4      A   Correct.  They can correct at any time.
5      Q   Okay.  Then the next thing you said was, I
6  think, and correct me if I'm wrong, please, a
7  supervisory review?
8      A   Correct.
9      Q   What's that?
10      A   So that would be a meeting with the
11  licensing rep, the foster family, and the supervisor,
12  the immediate supervisor.
13      Q   Okay.  I'm sorry if it sounds elementary,
14  but what would happen at the supervisory review
15  meeting?
16      A   We would walk them through the rule, ask
17  them if they're going to comply, if there's something
18  that stands in their way of complying, and then try
19  to enter into a corrective action plan.  And also
20  give them an opportunity to correct the violation.
21      Q   And then I think the next thing you said
22  was informal review.  Did I jump steps, or is that
23  what happens next?
24      A   That's correct, that's what happens next.

Atkinson-Baker, Inc.
www.depo.com

Page 42

1    Q   Okay.  So what's in the informal review?
2    A   So that would be the foster family, the
3  licensing rep, the immediate supervisor, and then the
4  area administrator of licensing, we call them.  They
5  would have a meeting, similar to the supervisory
6  review, and explain the importance of compliance; and
7  give them an opportunity to enter into a corrective
8  action plan.
9    Q   And then after that, you said there is a
10  notice -- if there's not compliance, of course, a
11  notice of intent to revoke.  What's that?
12    A   So that's a notice that would be sent in
13  the mail, along with a right to appeal, saying the
14  Department intends to revoke your license.
15    Q   I'm sorry, does that actually serve as a
16  revocation of the license?  Or is it a notice and
17  there's going to be a hearing date, or you have 30
18  days to respond to this and have a hearing; or
19  something of that sort?
20    A   It is not an actual revocation of the
21  license.
22    Q   So if it's not an actual revocation,
23  what -- Does it set out any future dates or anything
24  like that, or is it just -- Well, I'll just ask you.

Page 43

1  What's it do if it's not an actual revocation?
2    A   It notifies that that's our intent, and it
3  notifies of the right to appeal.
4    Q   Okay.  And forgive me.  I'm sorry, perhaps
5  I'm asking badly.  But if it's not an actual
6  revocation, then what are they appealing?
7    A   A rule violation.
8    Q   Okay.  So when you had said earlier when
9  you were giving me kind of the timeline or the
10  chronology, for lack of a better word, and you said
11  notice of right to appeal, that's what you were
12  referring to also?
13    A   Correct.  And then if they say they want to
14  do an appeal as well.
15    Q   Say that one more time.
16    A   I said, yes, correct, it would be in that
17  same information.  And then they can appeal.
18    Q   Okay.  And then the last thing you had said
19  in your list was an administrative order of closure.
20  What's that mean?
21    A   So an appeal would go before an ALJ.  And
22  an ALJ would make a determination if there was a rule
23  violation or not.  And then following that would be a
24  order of closure.

Page 44

1    Q   Is the administrative order of closure the
2  revocation?  Does the ALJ do the revocation?  I'm
3  sorry, I'm getting lost on when actually the person's
4  license would be revoked.
5    A   The license would be revoked with the
6  administrative order of closure.
7    Q   Okay.  So let's apply this, if we can, to
8  the specifics regarding the rules that are the
9  subject of this case.
10        So sticking for a second with foster
11  homes -- Actually, Strike that.  I'm sorry,
12  Ms. Jorgensen.
13        So you've been referencing foster
14  families, right, in this whole procedure that you're
15  talking about from intake all the way to
16  administrative order of closure?  That's the
17  chronology for the violations of rules by a foster
18  home, correct?
19    A   Foster home, and it would be day care home
20  as well.  The enforcement proceedings are the same.
21    Q   Okay.
22    A   We would just switch out foster family with
23  day care.
24    Q   Okay.  Thank you for that.

Page 45

1        So looking at 402.8(o), that says "Any
2  and all firearms and ammunition" -- This is the first
3  sentence.  "Any and all firearms and ammunition shall
4  be stored and locked up separately at all times and
5  kept in places inaccessible to children."  And then
6  the third sentence says, "Loaded guns shall not be
7  kept in a foster family unless required by law
8  enforcement officers in accordance with the law
9  enforcement agency's safety procedures."
10        So I want you to presume that in the
11  scenario I'm going to describe, that in the foster
12  home or day care home, that there is not a law
13  enforcement officer living there.  So that exception
14  in the third sentence does not apply.  Okay?
15    A   Understood.
16    Q   Okay.  So through one mechanism or another,
17  or through one means or another, DCFS gets intake
18  that a foster family has a loaded gun on the
19  premises, which would violate, at least on paper, the
20  language in the third sentence of 402.8(o).  That's
21  something that will cause DCFS to go through these
22  enforcement steps, as you've described them, correct?
23        MR. CHIMIENTI:  Objection.  Incomplete
24  hypothetical.  Compound.  Calls for speculation.  And

Meaghan Jorgensen
October 16, 2020

Atkinson-Baker, Inc.
www.depo.com

Page 46

1   vague.
2        Go ahead, Meaghan.
3        THE WITNESS:  Any intake on a rule
4   violation would cause us to go through enforcement
5   measures.
6        MR. SIGALE:  Q   Including a violation of
7   Rule 402.8(o); is that correct?
8     A   Any violation of a rule.
9     **Q   Okay.  So intake gets word that someone is**
10  **violating Rule 402.8(o), the third sentence**
11  **specifically, that they have a loaded gun on the**
12  **premises.  There's an investigation.  The licensing**
13  **rep would go -- goes and talks to the family.  And**
14  **they say, it's just for protection.  We want to have**
15  **a loaded firearm.  It's in a safe.  No one can get to**
16  **it but me.  I'm the only one with the combination.**
17  **And it's just in case there is a break-in.**
18  **         Will DCFS in that scenario say, oh.**
19  **Well, that's a good reason.  We can close the**
20  **investigation on this.  Or would they continue with**
21  **the other enforcement steps, as you've described**
22  **them?**
23       MR. CHIMIENTI:  I'm going to object that
24  it's an in complete hypothetical.  It calls for

Page 47

1   inspection.  It's vague.  It's compound.  And it
2   calls for a legal conclusion.
3        Meaghan, if you understand the
4   question, you can answer it.
5        THE WITNESS:  Any rule violation that is
6   not corrected, we will proceed with enforcement.
7        MR. SIGALE:  Q   Okay.  So the persons --
8   Strike that.
9        The foster family's reason for
10  violating the rule does not affect that enforcement
11  procedures will proceed; is that correct?
12       MR. CHIMIENTI:  Objection.  Vague.
13  Incomplete hypothetical.  Calls for speculation.
14  Calls for a legal conclusion.
15       Meaghan, if you understand, you may
16  answer.
17       THE WITNESS:  If there is a rule violation
18  and it is not corrected, we will proceed with
19  enforcement.
20       MR. SIGALE:  Q   Regardless of what excuses
21  or justifications they give you for why it's okay
22  that they're breaking the rule?
23       MR. CHIMIENTI:  Objection again.  Vague.
24  Incomplete hypothetical.  Calls for speculation.  And

Page 48

1   calls for a legal conclusion.
2        Go ahead, Meaghan.
3        THE WITNESS:  If someone is not in
4   compliance with a rule, we will proceed with
5   enforcement.
6        MR. SIGALE:  Q   Okay.  But what I'm just
7   really asking for is a yes or a no.
8        Does it matter what their reason is
9   for violating the rule, the 402.8(o) that we're
10  talking about?  Or it's a bright-line rule.  That if
11  they're violating the rule, then the enforcement will
12  proceed?
13       MR. CHIMIENTI:  David, you have asked that
14  question three separate times, and she has answered
15  it each time.  Asked and answered.
16       MR. SIGALE:  Okay.  I hear your objection,
17  but she hasn't answered my question.
18       MR. CHIMIENTI:  She has answered the
19  question.  She told you exactly what the issue is.
20       Go ahead, Meaghan.
21       THE WITNESS:  If someone is not in
22  compliance with a rule, we will proceed to
23  enforcement.
24       MR. SIGALE:  Q   So, yes -- And, I'm sorry,

Page 49

1   I'm really just trying to get this, and then I can
2   move on.  Okay?
3        So yes or no.  Does their reason for
4   the rule violation matter?
5        MR. CHIMIENTI:  Asked and answered for the
6   fourth time.
7        Go ahead, Meaghan.
8        THE WITNESS:  If someone is not in
9   compliance with a rule, we are going to move to
10  enforcement.
11       MR. SIGALE:  Q   Okay.  And if that person
12  says, well, I have this firearm in a safe for
13  protection.  And it has to be loaded, because that's
14  how I need it to be available for protection.  And
15  DCFS continues with the enforcement process anyway,
16  then you're saying they will continue with the
17  enforcement process all the way into the
18  administrative order of closure, correct?
19       MR. CHIMIENTI:  Objection.  Assumes facts
20  not in evidence.  Incomplete hypothetical.  Calls for
21  speculation.  And vague.  And misstates her prior
22  testimony.  She's testified about opportunities to
23  correct on multiple occasions.
24       Go ahead, Meaghan.

Atkinson-Baker, Inc.
www.depo.com

1    MR. SIGALE:  Q  So they don't correct.
2  They say, we need this for protection.  We're not
3  changing.  So there is no correction.  DCFS will
4  continue with enforcement all the way through the
5  steps that you've described to administrative order
6  of closure; is that correct?
7    MR. CHIMIENTI:  Same objections.
8    Go ahead, Meaghan.
9    THE WITNESS:  Anyone who does not correct a
10  rule violation, we will move through the enforcement
11  process.
12    MR. SIGALE:  Q  Up to and including the
13  last step that you described, which you said was
14  called an administrative order of closure; is that
15  correct?
16    MR. CHIMIENTI:  Objection.  Asked and
17  answered.
18    Go ahead, Meaghan.
19    THE WITNESS:  Correct.
20    MR. SIGALE:  Q  Okay.  And everything that
21  you said, all the testimony that you just gave, that
22  all applies equally to a home day care facility and
23  to a foster family; is that correct?
24    A  Correct, the enforcement process for both

1  is the same.
2    **Q  Okay.  So let's say that a couple starts**
3  **the process of becoming a foster family.  Okay?**
4    A  Okay.
5    **Q  I'm sorry?**
6    A  Okay.
7    MR. CHIMIENTI:  First of all, I know where
8  you're going, David.  And this is unnecessarily going
9  to call for speculation.  So I'll just object.
10    But go ahead.
11    MR. SIGALE:  Q  And this foster family is
12  informed of Rule 402 -- this would-be foster family
13  is informed of Rule 402.8(o); and they're told that
14  they've to sign the Foster Family Firearms Agreement,
15  which is CFS 452-2; the Acknowledgment of Compliance,
16  which is CFS 452-A; and they say, for whatever
17  reason, no, we're not going to do that.  We keep our
18  loaded guns in a safe.  No one will be able to get at
19  them.  Will their application for having a foster
20  license be approved?
21    MR. CHIMIENTI:  Objection.  Incomplete
22  hypothetical.  Calls for speculation.  Vague.
23    Go ahead, Meaghan.
24    THE WITNESS:  In any licensing

1  circumstance, if someone is not going to comply with
2  the rule, they would not be issued a license.
3    MR. SIGALE:  Q  And that answer that you
4  just gave, that's true for both foster families and
5  for day care homes?
6    A  It is.
7    **Q  And in the circumstance where the foster**
8  **family or the day care home provider says that they**
9  **are not going to comply with that rule, but they**
10  **offer what they think are very good reasons for not**
11  **doing so, that would not change the general statement**
12  **that you just said earlier, right, that if they're**
13  **not going to comply, they will not get a license?**
14    MR. CHIMIENTI:  Objection.  Vague.
15  Incomplete hypothetical.  Calls for speculation.
16    Go ahead, Meaghan.
17    THE WITNESS:  In order for a license to be
18  issued, there must be compliance with all rules.
19    MR. SIGALE:  Q  So, just to clarify, why
20  the foster family or why the would-be foster family
21  or day care home doesn't want to comply doesn't
22  matter in terms of that ultimate result?  If they
23  don't want to comply, or if they're not going to
24  comply, they're not going to get the license

1  regardless of why they're not going to comply; is
2  that correct?
3    MR. CHIMIENTI:  Objection.  It's been asked
4  and answered on multiple occasions.
5    Go ahead, Meaghan.
6    THE WITNESS:  Compliance with any rule is
7  required for a license to be issued.
8    MR. SIGALE:  Q  Ms. Jorgensen, are you
9  familiar with instances in real life where the
10  applicant, maybe it's not about firearms, but it's
11  about other things, where the applicant says, well, I
12  shouldn't have to comply with that; or I can't comply
13  with that requirement?
14    MR. CHIMIENTI:  Objection.  That is so far
15  beyond the scope of her notice.  She wasn't prepared
16  to testify on that particular subject, David.  And
17  that's an incomplete hypothetical.
18    Meaghan, if you understand that
19  question, you can answer.  But that's not something
20  you were prepared to testify about today.  And it
21  wasn't noticed by counsel.
22    MR. SIGALE:  Well, I'm glad that you said
23  at the end of that that she can answer, but I think
24  it's squarely within the topic of enforcement of the

Atkinson-Baker, Inc.
www.depo.com

Page 54

1  rules.  I'm asking if she's aware of any real-world
2  examples of enforcement of the rules.
3       MR. CHIMIENTI:  And your question was about
4  real-world examples of enforcement of the rules that
5  are not at issue here.
6       So if you have questions about
7  real-world enforcement of the rules at issue, go
8  ahead and ask her.  But you didn't notice up topics
9  about real-world enforcement of other rules.
10       As you can tell, there's Rules 401
11  through 410.  There's a number of different rules
12  that could be enforced.  You're talking about two
13  firearm rules in question, not the entire universe of
14  DCFS rules.  She's only prepared to testify about
15  what you noticed, David.
16       MR. SIGALE:  Q  All right.  Are you aware
17  of real-world examples of an applicant for a foster
18  family or a day care home saying they can't comply
19  with the -- they can't or won't comply with the
20  firearm requirements that we've been discussing
21  today?
22     A  I am personally not aware.
23     Q  Okay.  Do you read Rule 402.8(o) -- Well,
24  give me a second, because I'll share the screen and

Page 55

1  I'll pull it up.
2       So this is 402.8(o).  This is the
3  Exhibit 3.  Do you have an understanding of Rule
4  402.8(o), where a foster family that does not have a
5  law enforcement officer in it, would be allowed in
6  any circumstance to keep a loaded firearm in a safe
7  for protection?
8       MR. CHIMIENTI:  Objection.  Vague.  Overly
9  broad.  Calls for speculation.  Incomplete
10  hypothetical.
11       Meaghan, if you understood the
12  question, you may answer it.
13       THE WITNESS:  Can you repeat your question?
14       MR. SIGALE:  Q  Let me ask the court
15  reporter to read it back.
16       (From the record above, the reporter
17       read the following:
18       "Q:  So this is 402.8(o).  This is the
19       Exhibit 3.  Do you have an
20       understanding of Rule 402.8(o), where
21       a foster family that does not have a
22       law enforcement officer in it, would
23       be allowed in any circumstance to keep
24       a loaded firearm in a safe for

Page 56

1       protection?")
2       MR. CHIMIENTI:  Same objections.
3       Go ahead, Meaghan.
4       THE WITNESS:  I am not personally aware of
5  any.
6       MR. SIGALE:  Q  I'm going to ask you the
7  same question with regard to the day care rule, which
8  is 406.8(a)(17) and (18).  And this is Deposition
9  Exhibit 7 I'm referring back to.
10       Do you read section 17 -- subsection
11  17 here -- subparagraph 17, I should say, when an
12  adult in a day care home who is not a peace officer
13  or who doesn't have to have a handgun as a condition
14  of employment, so those two exceptions don't apply,
15  are you aware of any circumstance where that resident
16  of a day care home would nonetheless be allowed to
17  possess a handgun in the day care home?
18       MR. CHIMIENTI:  Same objections as there
19  were to the previous hypothetical.
20       Go ahead, Meaghan.
21       THE WITNESS:  I am not aware of any.
22       MR. SIGALE:  Q  Okay.  And then going down
23  to section (18) and (18)(A), because that's all that
24  is really at issue here, do you read this

Page 57

1  subparagraph and sub-subparagraph to allow, in any
2  circumstance, a day care home provider or resident of
3  the day care home to be allowed to have a loaded
4  firearm, even one that isn't a handgun, in any
5  circumstance?
6       MR. CHIMIENTI:  Same objections.
7       Go ahead, Meaghan.
8       THE WITNESS:  Can you repeat that question?
9       MR. SIGALE:  Q  Looking at subparagraph
10  (18) and (18)(A) that is on the screen there.
11     A  Yes.
12     Q  And assuming, again, that there is not
13  a -- that this isn't about a peace officer or other
14  person who needs a firearm for their employment.  So
15  those exceptions don't apply.  Do you read this rule
16  where there is any circumstance where a day care home
17  resident is allowed to keep a loaded firearm in the
18  day care home?
19       MR. CHIMIENTI:  Same objections.
20       Go ahead, Meaghan.
21       THE WITNESS:  No.  I mean, yes.
22       MR. SIGALE:  Q  I'm sorry, go ahead.
23     A  Loaded handguns or loaded firearms should
24  not be kept in a day care home.

Atkinson-Baker, Inc.
www.depo.com

Page 58

1    Q   Okay.  So even if there are no day care
2  kids in the home at the time, that rule still
3  applies?
4        MR. CHIMIENTI:  Objection.  Calls for a
5  legal conclusion.
6            Meaghan, if you understand, you may
7  answer.
8        THE WITNESS:  We only have authority in day
9  care homes during operating hours.
10       MR. SIGALE:  Q   Are there standard
11  operating hours, or is it just whatever operating
12  hours of the individual day care home owner?
13    A   I am not aware if there are standard
14  operating hours, but day care homes are required to
15  notify us of their operating hours.
16    Q   Okay.  So is it your testimony that outside
17  of those operating hours, these restrictions, this
18  sub (17) and sub (18), do not apply?
19       MR. CHIMIENTI:  Misstates her prior
20  testimony.
21           Go ahead, Meaghan.
22       THE WITNESS:  We have authority to enforce
23  rules in day care homes during operating hours.
24       MR. SIGALE:  Q   Okay.  So what I'm asking

Page 59

1  you specifically then is, this sub (17) and sub (18),
2  do they apply to day care homes outside of those
3  operating hours?
4        MR. CHIMIENTI:  Objection.  Asked and
5  answered.
6            Go ahead, Meaghan.
7        THE WITNESS:  All rules apply during
8  operating hours.
9        MR. SIGALE:  Q   So if the operating hours
10  that were provided by the day care home are, say,
11  8:00 to 4:30, is it your testimony that at 4:31 they
12  could bring handguns into the home?
13       MR. CHIMIENTI:  Objection.  Incomplete
14  hypothetical.  Calls for speculation and a legal
15  conclusion.
16           Go ahead, Meaghan.
17       THE WITNESS:  My testimony is that our
18  rules apply during operating hours.
19       MR. SIGALE:  Q   And, therefore, do not
20  apply outside of operating hours.  Is that fair?
21       MR. CHIMIENTI:  Objection.  Asked and
22  answered.
23           Go ahead, Meaghan.
24       THE WITNESS:  We can only enforce the rules

Page 60

1  during operating hours.
2        MR. SIGALE:  Q   I'm sorry, when you say
3  you can only enforce during operating hours, do you
4  mean like you can only physically go to the home
5  during the operating hours; or are you saying that
6  you can only enforce violations that might occur
7  during those operating hours?
8    A   We can only enforce violations during
9  operating hours.
10    Q   So sticking with these rules here that are
11  on the screen, if you got a call, if DCFS got a call,
12  an intake, and it says, I was at so and so's house
13  last night at 9:00 o'clock p.m., and they showed me a
14  handgun.  And I know they run a day care home, go do
15  something about it.  Is that something DCFS would
16  investigate?
17       MR. CHIMIENTI:  Objection.  Calls for
18  speculation.  Incomplete hypothetical.  Vague.
19  Compound.
20           Meaghan, if you understand it, you may
21  answer.
22       THE WITNESS:  You're asking a very
23  fact-specific question.  If we received a call that
24  there was any rule violation during operating hours,

Page 61

1  we would investigate.
2        MR. SIGALE:  Q   Right.  So what if you get
3  a call that, based on the call, the alleged rule
4  violation happened outside of operating hours?
5        MR. CHIMIENTI:  Objection.  Vague.
6  Incomplete hypothetical.  Asked and answered.  Calls
7  for speculation.
8            Go ahead, Meaghan.
9        THE WITNESS:  There could not be a rule
10  violation outside of hours.
11       MR. SIGALE:  Q   Ms. Jorgensen, I'm sorry,
12  I just want to be sure I understand.
13           So there's a home day care provider.
14  And, for whatever reason, DCFS happens to knock on
15  their door at 10:00 p.m., which is not, in this case,
16  operating hours.  So DCFS knocks on the door, the
17  licensing rep shows up at the door at 10:00 p.m. and
18  sees in the house a handgun.  Maybe the guy is
19  cleaning it or something like that.  Is it your
20  testimony that that licensing rep would not consider
21  that a rule violation, because it's outside of
22  operating hours?
23       MR. CHIMIENTI:  Objection.  Incomplete
24  hypothetical.  Vague.  Calls for speculation.  Calls

Page 62

1  for a legal conclusion.  And misstates her prior
2  testimony.
3        Go ahead, Meaghan.  If you understand,
4  you can answer.
5        THE WITNESS:  Rule violations can only
6  occur during operating hours.
7        MR. SIGALE:  Q   Which means, logically,
8  therefore, something that would be a violation during
9  operating hours -- Strike that.
10        Ms. Jorgensen, I'm sorry.  You're the
11  designated representative here.  So I'm really just
12  trying to get at this.  So let me ask you a yes/no
13  question.  Okay?
14        If a day care provider has a handgun
15  on the premises outside of operating hours, are they
16  violating this rule?
17        MR. CHIMIENTI:  Objection.  Incomplete
18  hypothetical.  Calls for speculation.  Asked and
19  answered for the fourth time.
20        Go ahead, Meaghan.
21        MR. SIGALE:  I'm just asking for a yes or
22  no.  And it has not been answered.
23        MR. CHIMIENTI:  You've asked this question
24  multiple times, David.

Page 63

1        MR. SIGALE:  Oh, I've asked it.  Yes, I
2  have asked it.
3     Q   So, please, Ms. Jorgensen, yes or no.
4        If a day care home family has a
5  handgun on the premises and it's outside of operating
6  hours, is that day care home provider in violation of
7  that rule?
8        MR. CHIMIENTI:  Same objections.
9        Go ahead, Meaghan.
10        THE WITNESS:  No, they would not be in
11  violation of a rule if it was outside of operating
12  hours.
13        MR. SIGALE:  Q   Okay.  Thank you.
14        What if it's operating hours, but
15  there's no day care children in the home?  You know,
16  like now we have the coronavirus, and no one is
17  bringing their kids over.  But it's during operating
18  hours, there just aren't any day care kids there.  Do
19  the rules still apply; or do they not, if there's not
20  actually any day care kids present?
21        MR. CHIMIENTI:  Objection.  Calls for
22  speculation.  Incomplete hypothetical.
23        Go ahead, Meaghan.
24        THE WITNESS:  Day care rules apply during

Page 64

1  operating hours.
2        MR. SIGALE:  Q   Regardless if there's zero
3  kids or 8 kids?
4        MR. CHIMIENTI:  Asked and answered.
5        Go ahead, Meaghan.
6        THE WITNESS:  Our authority extends during
7  operating hours.
8        MR. SIGALE:  Q   And just a yes or no.
9  Does it matter if there's zero kids or 8 kids on the
10  premises at that time?
11        MR. CHIMIENTI:  Objection.  Asked and
12  answered.  Calls for speculation.
13        Go ahead, Meaghan.
14        THE WITNESS:  No.  It applies during
15  operating hours.
16        MR. SIGALE:  Q   Okay.  What about with
17  regard to foster families?  Is there a time when
18  there's a foster family -- assuming there's a
19  placement -- You know what, Strike that.
20        The rule with regard to foster
21  families, 402.8(o), does that apply to them if
22  there's not actually a foster placement in the home?
23        MR. CHIMIENTI:  Objection.  Calls for
24  speculation.

Page 65

1        Go ahead, Meaghan.
2        THE WITNESS:  Foster license rules apply at
3  all times.
4        MR. SIGALE:  Q   What if there's not a
5  foster kid actually placed in the home?
6        MR. CHIMIENTI:  Asked and answered.
7        Go ahead, Meaghan.
8        THE WITNESS:  If someone has a foster
9  license, the rules apply at all times.
10        MR. SIGALE:  Q   What's the reason for
11  that?  What's the reason for DCFS's application of
12  the rule in that manner?  I mean, why -- Strike that.
13        Why does DCFS enforce that rule even
14  if there's not actually a foster child placed in the
15  home?
16        MR. CHIMIENTI:  Objection.  Misstates the
17  prior testimony.
18        Go ahead, Meaghan.
19        THE WITNESS:  So you're saying enforce.  We
20  apply that rule, I guess is a better word, in all
21  circumstances, any time in a foster home, because a
22  foster child could come into care of a foster family
23  at any moment.
24        MR. SIGALE:  All right.  I need to take a

1 5-minute break. So let's do that. We'll come
2 back -- Let's just make it even and call it a
3 7-minute break, and we'll come back at 12:15.
4        And, really, I don't know how much
5 longer we'll be going. So, you know, if somebody
6 needs to break for lunch or something like that. I
7 mean, I need the break now, but I'm happy to
8 otherwise go straight through.
9        Do you all feel the same, or do you
10 need a different arrangement?
11        MR. CHIMIENTI: Do you have an estimate,
12 David, of about how much longer you've got? I mean,
13 it's up to Meaghan. But I guess that would be
14 helpful.
15        MR. SIGALE: Well, I've got 14 topics. And
16 I'm on No. 7, I guess. So I don't know that that's
17 indicative that we'll be going until 2:30 or -- I
18 mean, I could say that.
19        MR. CHIMIENTI: Okay. Meaghan, it's up to
20 you.
21        MR. SIGALE: Yeah, I say that with no
22 confidence, but it's as good a guess as anything.
23        THE WITNESS: If the estimate is 2:30, I'm
24 fine with going through.

1        MR. SIGALE: Okay. So let's break for 5
2 minutes. Unless someone needs more?
3        MR. CHIMIENTI: No, 5 sounds good.
4        MR. SIGALE: All right. Off the record.
5        (short break taken 12:10 p.m.)
6        MR. SIGALE: Q  All right. I guess we're
7 ready to go back on.
8        Ms. Jorgensen, just a couple questions
9 that I meant to ask, or that I should have asked at
10 the beginning and didn't. What's your office
11 address? Are you out of downtown or a different
12 address?
13     A  Normally, I'm downtown. So 100 West
14 Randolph.
15     **Q  All right. Did you review any documents to**
16 **prepare for today?**
17     A  Yes. I reviewed the statute and the rules
18 as well, 402, 406, and the forms.
19     **Q  Pretty much exactly what I showed you?**
20     A  Correct.
21     **Q  Okay. Any additional materials that you**
22 **reviewed that I didn't happen to sort of**
23 **coincidentally show you?**
24     A  Paper documents, no.

1        Well, I mean, like I didn't -- did
2 I -- No. But, I mean, the Concealed Carry Act was on
3 there.
4     **Q  Okay. But like did you read a copy of the**
5 **complaint?**
6     A  Oh, yes. Yes, yes, yes, yes. That was
7 referenced in there.
8     **Q  Okay. Anything else that you reviewed to**
9 **prepare for today?**
10     A  No.
11     **Q  Okay. We are on Topic No. 7. And I'll**
12 **share the -- Do you a copy of this document, by the**
13 **way, in front of you? This document being Exhibit 1,**
14 **which is the Notice of Deposition with all the topics**
15 **on it.**
16     A  I don't have anything in front of me.
17     **Q  Got it. Okay. So I will share the screen**
18 **so that you can see it.**
19        **So No. 7 of the Matters for**
20 **Examination. "The empirical evidence relied upon by**
21 **you as bases for enacting the challenged rules and/or**
22 **policies (in Plaintiffs' pending complaint) for day**
23 **care homes and foster homes, as referenced in Numbers**
24 **1 through 5 above." And because it already seems**

1 **like yesterday, two days ago or something, 1 through**
2 **5 was the Child Care Statute, the JCAR rules, and the**
3 **two forms. That's 1 through 5.**
4        **Now, I asked you some questions**
5 **regarding if you were aware of empirical evidence for**
6 **the various things. And I asked you that question**
7 **for each individual item as we were going through it,**
8 **and you answered. And I'm not going to rehash that,**
9 **unless you need me to, because it was so long ago**
10 **that you don't remember what you said, but I'm just**
11 **going to ask, now that this is the topic, if you have**
12 **any additional information to add, beyond what you've**
13 **already testified to, as to anything in numbers 1**
14 **through 5?**
15        MR. CHIMIENTI: And I'm objecting again to
16 the extent that it calls for expert testimony.
17        But go ahead, Meaghan.
18        THE WITNESS: I'm not sure if you're asking
19 me if this relates specifically to these rules or
20 empirical evidence in general.
21        MR. SIGALE: Q  I'm sorry, I missed the
22 last few words you said.
23     A  I guess you need to restate specifically
24 what you're asking me.

Atkinson-Baker, Inc.
www.depo.com

Page 70

1 Q Okay. When we went through Topics 1
2 through 5, the statute, the two JCAR rules, the two
3 forms, I asked you after each one if you had any
4 empirical evidence for the basis or bases that you
5 gave me. And you answered. You said something to
6 the effect of, and I'm paraphrasing, that you're
7 aware of studies, but you can't cite to them. Or
8 basically that.
9 So what I'm asking you, now that this
10 is a actual topic, No. 7, "The empirical evidence
11 relied upon by you as bases for enacting the
12 challenged rules and/or policies (in Plaintiffs'
13 pending complaint) for day care homes an foster homes
14 as referenced in Numbers 1 through 5 above," if I
15 asked you that specifically, would your answers be
16 the same as you gave earlier?
17 MR. CHIMIENTI: Same objection regarding
18 the experts.
19 Go ahead, Meaghan.
20 THE WITNESS: I would say that DCFS
21 generally relies on evidence. There is nothing to
22 show we would deviate from that in this situation,
23 but I didn't come across anything specific that we
24 relied on for these challenged rules.

Page 71

1 MR. SIGALE: Q Okay. So much as you
2 testified earlier when we were going line by line,
3 you can't cite to me as you sit here any empirical
4 evidence regarding any of those rules or statutes or
5 forms, correct?
6 MR. CHIMIENTI: Same objection regarding
7 experts.
8 Go ahead, Meaghan.
9 THE WITNESS: I can't cite to you
10 specifics, but I know it's all there. And a simple
11 Google search will return evidence.
12 MR. SIGALE: Q Okay. And just to
13 clarify, you didn't do that Google search before
14 showing up here today, correct?
15 A I personally did not.
16 Q Okay. So let's move on then to No. 8.
17 "The occurrence of firearm-related crime in and
18 around day care homes and foster homes in Illinois."
19 Do you, as you sit here today, or as you sit on the
20 other side of the screen today, have any information
21 regarding that topic?
22 A That's a broad question. We don't have a
23 database that will keep track of firearm-related
24 crime.

Page 72

1 Q Okay. So let's break that topic down then.
2 The occurrence of firearm-related
3 crime in day care homes in Illinois. Would you have
4 information regarding that?
5 A Specific crime, no.
6 Q I'm sorry, I don't know how to -- I don't
7 know the opposite of -- How about general firearm
8 crime in day care homes, does DCFS have information
9 about that? Do you, as the representative for DCFS,
10 have information regarding that?
11 A The only -- We may, in certain files. But
12 there is no overarching incidence, where I could find
13 crime in and around every day care home and foster
14 home in Illinois. It would have to be on an
15 individual basis. Each file could potentially have
16 something.
17 Q Okay. You mentioned foster homes. And in
18 particular with that last question, I was trying to
19 exclude that. So let me rephrase it.
20 Do you, as you sit here, have any
21 information regarding the occurrence of
22 firearm-related crime in day care homes in Illinois?
23 MR. CHIMIENTI: Objection. Vague.
24 Go ahead, Meaghan.

Page 73

1 THE WITNESS: I do not.
2 MR. SIGALE: Q Okay. Do you have any
3 information, as you sit here, regarding the
4 occurrence of firearm-related crime in foster homes
5 in Illinois?
6 MR. CHIMIENTI: Objection. Vague.
7 But go ahead, Meaghan.
8 THE WITNESS: In regards -- No, I do not.
9 MR. SIGALE: Q Do you have any
10 information regarding the occurrence of
11 firearm-related crime around day care homes in
12 Illinois? And I'm going to define around, and I'm
13 going to defer to whatever definition the Department
14 would find significant enough to take down the
15 information.
16 So, in other words, if DCFS say were
17 to think it's significant enough to notate that
18 something happened two blocks away, that would be
19 around. If it's -- And, I mean, I think that there's
20 logical limits. You know, 10 miles away isn't going
21 to count. But I don't know how DCFS would -- or what
22 vicinity would be enough for DCFS to mark it down.
23 So either you know or you don't.
24 Do you have any information regarding

Meaghan Jorgensen
October 16, 2020

Page 74

1  the occurrence of firearm-related crime around day
2  care homes in Illinois?
3      MR. CHIMIENTI: Objection. Form. Vague.
4      Go ahead, Meaghan.
5      THE WITNESS: I don't have any information
6  around the occurrence of firearm-related crime around
7  day care homes that would be specific.
8      MR. SIGALE: Q  Okay. Same question, but
9  substitute foster homes for day care homes.
10     MR. CHIMIENTI: Again, object to form.
11  Vague and confusing as to the format of the question.
12     But go ahead, Meaghan.
13     THE WITNESS: It would be the same answer.
14  I don't have any knowledge of occurrence of
15  firearm-related crime around foster homes that's
16  specific.
17     MR. SIGALE: Q  Okay. Ms. Jorgensen, I am
18  showing you Jorgensen Deposition Exhibit 4.
19         (Jorgensen Deposition Exhibit 4
20          previously marked and screen shared.)
21     THE WITNESS: I see it.
22     MR. SIGALE: Q  Okay. You can see the
23  caption of this case, and it is Defendant Marc
24  Smith's Answers and Objections to Plaintiffs' Rule 33

Page 75

1  Interrogatories.
2      Now, you'll have to forgive me. I
3  don't know how much time you might have spent in
4  federal court with the State's Attorney's Office or
5  with DCFS. So I don't want to presume you know Rule
6  33. But I know that in the civil division of the
7  DuPage State's Attorney, you know interrogatories.
8  So these are Marc Smith's, as acting director,
9  answers to Plaintiffs' interrogatories in this case.
10  And I'm actually going to stop sharing for a second
11  so I can find what I'm looking for. Give me a
12  second.
13     But let me ask you, while I'm going
14  through this on my end, have you seen that document
15  before?
16     A  I have.
17     Q  You have. Okay.
18         So let me ask you again, are there
19  documents that you've looked through that you haven't
20  mentioned?
21     A  I apologize if I left that one out. I
22  looked at that. I looked at the complaint, the
23  notice. But I think that's everything I can recall
24  at this moment.

Page 76

1      Q  Okay. Sure. It's really not a gotcha
2  thing. Just, you know, as long as you said it, I
3  figured I'd ask if there was anything else.
4         So I'm going to go back to sharing.
5  And you've seen this before. And I don't know that
6  I've actually had this happen before, Ms. Jorgensen,
7  what I'm about to tell you. But this is page 3. And
8  when I go to the verification here, and that's not
9  you. You didn't sign this, correct?
10     A  Correct.
11     Q  Okay. And, in fact, the legal counsel in
12  the deposition here, who might very well be putting
13  herself as a witness, quite possibly, signed this.
14         But you did review this before showing
15  up here today, correct?
16     MR. CHIMIENTI: And I'd object to that
17  characterization, whether she's even putting herself
18  in question as a witness. But go ahead, you can ask
19  your question.
20     MR. SIGALE: Q  Question No. 3 here is,
21  "Identify all information in your possession
22  regarding a link (negative or positive) between the
23  existence of firearm possession by foster parents and
24  firearm violence, including self-defense defensive

Page 77

1  gun uses."
2      Okay. Did I read that question
3  correctly?
4      A  You did.
5      Q  All right. And we go through a number of
6  objections and reservations, and then we get here.
7  "The Office of the Inspector General for DCFS
8  provides annual summaries of reports and
9  investigations made during the prior fiscal year,"
10  citing to a statute. "These annual reports include
11  examinations of the deaths or serious injuries of all
12  Illinois children who were involved in the child
13  welfare system in the preceding 12 months, and causes
14  thereof, including firearms. The annual reports are
15  publically available at," and there's a website that
16  it lists. And then it says, "Investigation
17  continues."
18         Do you see that answer there, or that
19  part of the answer?
20     A  I do.
21     Q  Okay. As you sit here today, have you
22  reviewed the information that's available on that
23  website?
24     A  I don't know exactly where that website

Page 78

1  takes you.  I've seen the OIG report.

2  **Q  You've seen the OIG report.  Lots of them,**

3  **one of them?**

4  A  No.  I mean, I've only been here when one

5  OIG report has been released.

6  **Q  Okay.  So you've seen, what, the most**

7  **recent?**

8  A  Yes.

9  (Whereupon, Jorgensen Deposition

10  Exhibit 10 was screen shared.)

11  MR. SIGALE:  Q  Okay.  Ms. Jorgensen, I'm

12  going to mark this later as -- and you'll see I

13  didn't do it yet -- as Exhibit No. 10.  Okay?

14  A  Okay.

15  **Q  This document is entitled -- And, by the**

16  **way, just so you know, I did get it off that website.**

17  **And this is the report to the Governor and the**

18  **General Assembly by the Office of the Inspector at**

19  **IDCFS on January 2020.**

20  **As you sit here, do you recall if this**

21  **is the form that you have seen?**

22  A  If this is the OIG report from 2020, I've

23  seen this.

24  **Q  Okay.  I'll stop sharing for one second.**

Page 79

1  **Can you describe for me what this report is?**

2  A  Yes.  It's an annual report that's put

3  together by the Office of the Inspector General.

4  Normally, it's issued in January.  And they review

5  all deaths where there was involvement with the

6  Department in the previous year.

7  **Q  All right.  This is page 178 of this**

8  **report, and you can see it says 178.**

9  **Now, let me pause for a second here**

10  **and let me ask counsel, because I'm not -- I can**

11  **e-mail this over -- If you want me to pause this for**

12  **a couple minutes, I'll be happy to e-mail you a copy,**

13  **because I didn't know I was using it.  In fact, I**

14  **didn't know I was using it until she mentioned it.**

15  **So do you want me to do that?**

16  MR. CHIMIENTI:  I mean, David, you can do

17  what you've been -- I mean, you can e-mail it to me

18  like on the next break.  That's fine.

19  MR. SIGALE:  Okay.

20  MR. CHIMIENTI:  Yeah, feel free to just

21  continue and you can e-mail me on the next break.

22  MR. SIGALE:  Okay.  That sounds like a plan

23  to me.

24  **Q  This is page 178 of the form.  So I want**

Page 80

1  **to -- Well, it was page 178 of the form.  Hold on.**

2  **I'll get there.**

3  **This is from that January 2020 report.**

4  **And let me ask you this question.  Do you have any**

5  **independent recollection, Ms. Jorgensen, of the**

6  **contents of that report?**

7  A  The specifics, no.

8  **Q  Okay.  So this is -- Again, it's page 178.**

9  **And hopefully it's not going to just jump to the next**

10  **page.  But this is a Twenty-Year Death Retrospective.**

11  **So this is data from the OIG from 2000 through 2019.**

12  **Now, on the very left-hand column, the**

13  **one that says "Case Status," are you familiar with**

14  **the various categories of -- Well, are you familiar**

15  **with the various categories that are listed there?**

16  A  Yes.

17  **Q  Okay.  So where would foster kids, what are**

18  **colloquially referred to as foster kids, where are**

19  **they represented on this left-hand column?**

20  MR. CHIMIENTI:  I'm going to object that

21  this is beyond the scope of her deposition and that

22  she lacks foundation to answer it, because she's not

23  a member of the OIG.

24  But go ahead, Meaghan.

Page 81

1  THE WITNESS:  They could be in various

2  places.  Children can be in multiple of those

3  categories.

4  MR. SIGALE:  Q  Well, I know children

5  could be, but I'm asking about foster children.

6  A  Foster children.  My apologies.  They could

7  be in multiple categories.

8  **Q  Okay.  So foster children are not**

9  **represented in the "Youth in Care" category?**

10  A  No, they are.

11  MR. CHIMIENTI:  Objection.  Misstates.

12  MR. SIGALE:  Q  Let me rephrase.

13  Foster children are not solely

14  represented in the Youth in Care category?

15  A  Foster children are represented in the

16  Youth in Care.  They could also be represented in

17  other categories, but that would be me speculating as

18  to their individual situations that would put them in

19  a different category.

20  **Q  Okay.  What does -- If you know, what does**

21  **DCP mean?**

22  A  That means an investigation.  Division of

23  Child Protection.

24  **Q  Okay.  So the total -- These are all the**

Page 82

1  child deaths over -- Well, if you know,
2  Ms. Jorgensen, what does this represent, this table
3  on page 178 here?  If you know.
4        MR. CHIMIENTI:  Objection.  Calls for
5  speculation.  Lacks foundation.
6        Go ahead, Meaghan.
7        THE WITNESS:  I don't have any information
8  that -- you know, enough that I would say represents
9  the Twenty-Year Death Retrospective.  I would assume
10  it's of the cases that the OIG reviewed, since it's
11  in the OIG report, but I don't know.
12        MR. SIGALE:  Q  Okay.  And, basically,
13  what you just said, that you -- I have the same
14  information as you looking at these charts -- would
15  your answer basically be the same regarding the next
16  table on page 179 and 180 -- Well, for all the tables
17  on the Twenty-Year Death Retrospective, would your
18  answer be the same; that you're just looking at it
19  right here, and so you have what I have?
20  A    Correct.
21        MR. CHIMIENTI:  And objection to form.
22        MR. SIGALE:  Q  Okay.  So let me move to
23  Topic No. 9, which is similar, only instead of
24  firearm-related crime in and around day care homes

Page 83

1  and foster homes in Illinois, I want to ask you about
2  the firearm-related injuries and/or death in and
3  around day care homes and foster homes in Illinois.
4  So broader than No. 8.  But I'll do what I did
5  before.  I'll break it down into various little
6  chunks.
7        So as you sit here today, do you have
8  any information regarding the occurrence of
9  firearm-related injuries and/or death in day care
10  homes in Illinois?
11        MR. CHIMIENTI:  Objection.  Vague.  And
12  overbroad.
13        Go ahead, Meaghan.
14        THE WITNESS:  I do not have any knowledge
15  of specific occurrences of firearm-related injuries
16  or death.
17        MR. SIGALE:  Q  Okay.  And let me clarify
18  that.
19        In addition to asking if you're
20  familiar with say a specific instance, I would also
21  be asking if you're aware of, you know, specific
22  data.  You know, hypothetically speaking, say you
23  read something that said it happened 10 times or 5
24  percent of the time or some other hypothetical

Page 84

1  number.  So I'm not just asking if you know of a
2  specific instance, but also if there's any
3  information regarding quantifying it.  And so let me
4  ask it again, just so I'm clear about that.
5        Do you have any information regarding
6  the occurrence of firearm-related injuries and/or
7  deaths in day care homes in Illinois?
8        MR. CHIMIENTI:  And I'm going to object.  I
9  mean, that's a compound question eight different
10  ways, David.  I mean, you're just putting different
11  qualifiers into the same question, and you're asking
12  it very broadly.  So I'm going to object that it's
13  compound.
14        Meaghan, if you understand, you can
15  answer it.  But there's a lot in there.
16        THE WITNESS:  I wouldn't be aware of a
17  number or data or of a specific occurrence of
18  firearm-related injuries or death in a day care home.
19        MR. SIGALE:  Q  Okay.  What if I asked you
20  that same question, but substitute foster homes for
21  day care homes.  Do you have any information then?
22        MR. CHIMIENTI:  Same objections.
23        THE WITNESS:  I do.
24        MR. SIGALE:  Q  Okay.  What information do

Page 85

1  you have?
2  A    I know that in the last six months, there
3  were two deaths in a foster home related to firearms.
4  Q    One incident or two incidents?
5  A    Two incidents that I have knowledge of.
6  Q    Okay.  Well, that's all I can ask.
7        So tell me about the first one.
8        MR. CHIMIENTI:  And I'm going to just put
9  an objection on the record here.
10        And, Meaghan, I'll advise you not to
11  answer as to confidential investigations that are
12  still ongoing that are protected by statute.  Other
13  than that, you can answer.
14        THE WITNESS:  There was an occurrence in
15  April of this year in a foster home, where a child of
16  the age of 4, I believe, suffered a single gunshot
17  wound to the head.
18        MR. SIGALE:  Q  Do you know any details
19  that -- And I'm not looking for any confidential
20  information or anything, although I believe
21  everything that would be disclosed in that regard
22  would be subject to any confidentiality order.  But
23  do you have any more details of what happened in that
24  incident?

Atkinson-Baker, Inc.
www.depo.com

Page 86

1      MR. CHIMIENTI:  Same admonition and
2  objection as to confidential information, Meaghan.
3  But go ahead.
4      THE WITNESS:  I think it was five children
5  all under the age of 6 playing together unsupervised.
6      MR. SIGALE:  Q  Are you able to say what
7  city or county this happened in?
8      MR. CHIMIENTI:  I think we're encroaching
9  on confidential information here, Meaghan.  And so I
10  would advise you to be careful here.  But to the
11  extent that you can give information without
12  violating confidentiality, you can.
13      THE WITNESS:  I want to be careful on the
14  confidentiality of that.
15      MR. SIGALE:  Q  Okay.  Do you know where
16  the firearm came from in that case?
17      MR. CHIMIENTI:  Same objection.
18      THE WITNESS:  I do not.
19      MR. SIGALE:  Q  What was the other
20  incident you referred to?
21      A    The other incident was in May of this year,
22  May 2020.  It involved an 8-year-old and a 9-year-old
23  in a foster home.  And the 8-year-old died of a
24  single gunshot wound to the chest.

Page 87

1      MR. SIGALE:  Q  Do you know where the
2  firearm came from in that case?
3      MR. CHIMIENTI:  Same objection.
4      THE WITNESS:  I do not.
5      MR. SIGALE:  Q  Do you happen to know if
6  anyone was charged in either of those two deaths?
7  Because if they were, that should be public.
8      A    I do not.  I do not know.
9      **Q    Just to be a little bit more specific,**
10  **Ms. Jorgensen, do you have any information that**
11  **either of the firearms used in those cases was the**
12  **foster parent's firearm that had been kept in a safe?**
13      MR. CHIMIENTI:  Objection.  Vague.
14  Incomplete hypothetical.
15      Go ahead, Meaghan.
16      THE WITNESS:  I don't have facts on where
17  it was kept.
18      MR. SIGALE:  Q  Okay.  So no information
19  regarding the firearms at all other than the
20  incidents happened involving a firearm?
21      MR. CHIMIENTI:  Objection.  Misstates.
22      But you may answer, Meaghan.
23      THE WITNESS:  I don't, personally.  And
24  it's under investigation.  So I don't even know that

Page 88

1  there's a conclusion on our end.
2      MR. SIGALE:  Q  Okay.  So now let me look
3  at -- I'm sorry, any other information regarding
4  firearm-related injuries and/or death in foster homes
5  in Illinois?
6      MR. CHIMIENTI:  Objection.  Vague and
7  overbroad.
8      Go ahead, Meaghan.
9      THE WITNESS:  Those are the only two that
10  I'm aware of, that I have specific knowledge to.
11      MR. SIGALE:  Q  Okay.  And then if I
12  broaden it and ask about data, stats, percentages,
13  anything, you don't have any information regarding
14  that, correct?
15      MR. CHIMIENTI:  Objection.  Vague.  Data,
16  stats, percentages as to what?
17      MR. SIGALE:  The occurrence of
18  firearm-related injuries and/or death in foster homes
19  in Illinois.
20      MR. CHIMIENTI:  It's still vague.  Data,
21  percentages of what?  It's a vague question.
22      Meaghan, if you understand, go ahead
23  and answer.
24      THE WITNESS:  I don't have any info related

Page 89

1  to data put together on those stats.
2      MR. SIGALE:  Q  Okay.  So let me move to
3  Topic No. 10.  "The number and circumstances of
4  Illinois day care home licensees with whom failure to
5  comply with the challenged rules and/or policies
6  negatively affected their day care home licenses."
7      Do you have any information regarding
8  that topic?
9      MR. CHIMIENTI:  Objection.  Overbroad.
10      Go ahead, Meaghan.
11      THE WITNESS:  Yes.
12      MR. SIGALE:  Q  Okay.  What information do
13  you have?
14      A    I would have information on the number of
15  violations.
16      **Q    All right.  What -- I guess tell me the**
17  **number, and then we'll break down what that means.**
18      A    Oh, excuse me.  I actually wouldn't know
19  how it affected their license.
20      **Q    Okay.  Well, then let me ask it this way.**
21      **Are you aware, as you sit here, of**
22  **Illinois day care home licensees who did not comply**
23  **with the rules and policies regarding firearms that**
24  **we have discussed that have lost their day care home**

Atkinson-Baker, Inc.
www.depo.com

Page 90

1   licenses?
2       A   I would not have information as to losing a
3   license.
4       Q   Are you familiar with Illinois day care
5   home licensees who did not comply with the firearms
6   rules and policies that we've been talking about that
7   went through the enforcement process, as you
8   described it earlier?
9       A   Yes.  And there's a public database, the
10  Sunshine website, where you can see if there was a
11  violation.  But there would be no way to determine
12  from there how far through the enforcement process it
13  went.
14      Q   I'm sorry, did you say a Sunshine website?
15      A   Yes.
16      Q   What is that website?
17      A   It's the DCFS Sunshine website.  It's the
18  sister website to our main website in that it's for
19  day care providers.
20      Q   Oh, so it's not a public database.  It's --
21      A   No, it is.
22      Q   Oh, it is.  Okay.  So do you happen to know
23  the URL for it?
24      A   Not off the top of my head.

Page 91

1       Q   Is that something that if I go to the DCFS
2   website I should be able to find like right there on
3   the front page?
4       A   I don't know if it's like directly on the
5   front page.  But you can put in DCFS Sunshine, and it
6   will take you to it.
7       Q   Okay.  I'm going to ask you if you could
8   please find that URL, and give it to your attorneys.
9   Okay?
10      A   Okay.
11      Q   Thank you.
12          And this Sunshine website will
13  specifically tell me what?
14      A   You can look up a specific provider, you'd
15  have to look up a specific provider, and determine if
16  they had any rule violations.
17      Q   So this website doesn't have like data
18  compilations or something, like number of day care
19  home providers that violated in a given fiscal year
20  or something like that.  This is just, you can go
21  look up a specific provider to see if -- like if you
22  want to do a check on them before you go hire them,
23  that kind of thing?
24      A   Correct.

Page 92

1       Q   Okay.
2           MR. CHIMIENTI:  And, David, if you would
3   like the URL, I can read it into the record.  I have
4   it.
5           MR. SIGALE:  Okay.  I'll take it.  I don't
6   know that it's as useful as for a second I thought it
7   might be.  But, yeah, what is it?
8           MR. CHIMIENTI:  It's
9   Sunshine.DCFS.Illinois.gov.
10          MR. SIGALE:  Sounds like it delivers what
11  it promises.
12      Q   All right.  And if I went to this website,
13  I would be searching by name, correct?  I would not
14  be searching for day care providers that got
15  disciplined for firearm violations, correct?
16      A   You search for a name.
17      Q   Okay.  How many licensed day care home
18  providers are in the State of Illinois?
19      A   I believe it's around 5,000.
20      Q   Okay.  So looking at No. 10, I just want to
21  make sure I've asked this to make sure the record is
22  complete.
23          Are you aware of any specific
24  instances of Illinois day care home licensees who did

Page 93

1   not comply with the firearm regulations and lost
2   their day care home licenses as a result?
3       A   I'm not familiar with a specific instance
4   or the number that lost their license as a result.
5       Q   Okay.  And if I were to just jump to Topic
6   No. 11 and substitute foster care for day care home
7   licensees, would your answer be the same?
8       A   It would.
9       Q   Is there somewhere within DCFS that that
10  information is kept that could be obtained?
11          MR. CHIMIENTI:  I'm going to object.  Are
12  you talking about lost licenses, David?
13          MR. SIGALE:  Yeah, yeah, lost licenses,
14  foster or day care.
15      Q   Is there something within DCFS that I could
16  go look at where that information could be looked up?
17      A   You would have to go into each individual
18  file.
19      Q   Okay.  That's the same for Topic 10 and
20  Topic 11, day care home and foster kids?
21      A   Correct.
22      Q   All right.  So Topics 12 and 13 are
23  basically the flip side of that coin, where instead
24  of people -- instead of foster parents and day care

Atkinson-Baker, Inc.
www.depo.com

Page 94

1 home providers who lost their licenses as a result of
2 failure to comply with the firearm regulations, 12
3 and 13 ask about the number and circumstances of
4 would-be or perspective day care or foster parent
5 licensees who were denied their respective license
6 because of a failure to comply with that -- with the
7 firearm requirements.
8        Do you have any information regarding
9 those topics?
10       MR. CHIMIENTI:  I'm going to object as
11 overbroad and vague.
12        But go ahead, Meaghan.
13       THE WITNESS:  I would think it would be in
14 each individual circumstance.  There's no compilation
15 of where you could find those circumstances.
16       MR. SIGALE:  Q  Okay.  Are you aware as
17 you sit here of any specific circumstances?
18    A  I am not.
19    Q  Okay.  And let me just break the
20 question -- So 12 and 13, day care and foster, unless
21 you tell me that's too unwieldy, I'll just ask you
22 for both.  The number and circumstances of would-be
23 or perspective day care or foster care licensees who
24 didn't fail to comply with the rules, necessarily,

Page 95

1 but said we're not going to comply with this.  We're
2 not going to sign that form, that 452 form.  We're
3 not willing to do this.  Are you aware of specific
4 instances where people like that were denied
5 licenses?
6        MR. CHIMIENTI:  I'm going to object to the
7 form of the question.
8        Go ahead, Meaghan, if you understand.
9       THE WITNESS:  I am not.
10       MR. SIGALE:  Q  Okay.  And if I were to
11 ask you again if that was something that was compiled
12 somewhere, you would tell me that I'd have to look in
13 each individual applicant's file; is that correct?
14    A  Yes, correct.
15    Q  Okay.  And really for 10, 11, 12, and 13, I
16 just want to clarify.  There's no one that compiles
17 that data, not OIG or anyone else?  Whoever was
18 asking the question, it would have to be through the
19 individual files?
20       MR. CHIMIENTI:  That's really overbroad and
21 vague, David.  You just lumped in four different
22 things.  You've talked about lost licenses -- Are you
23 referring strictly to lost licenses and denied
24 applications?

Page 96

1        MR. SIGALE:  Well, yeah, but I'll clarify
2 it with just lost licenses first.  So 10 and 11.
3    Q  Is there anyone, and it might not
4 specifically be DCFS, that compiles that data that I
5 could look to, OIG or any other agency?
6    A  Not that I'm aware of.
7    Q  Same question for 12 and 13.  And that
8 would be for the denied licenses.
9    A  Not that I'm aware of, no.
10    Q  All right.  Well, another hour has gone by.
11 I am getting towards the end, and I want to review
12 things.  So let's take a 10-minute break.
13        It's 1:13.  Let's say be back at 1:23.
14       MR. CHIMIENTI:  Sounds good.
15       MR. SIGALE:  All right.
16        (short break taken 1:13 p.m.)
17       MR. SIGALE:  Q  Okay.  Let's go back on.
18        Ms. Jorgensen, the information that is
19 in the OIG reports, that link that was sent to me and
20 that the reports are on the website, do you have any
21 reason where you would say, oh, those people, their
22 data is off and wrong; or they don't know what
23 they're doing or anything like that?
24       MR. CHIMIENTI:  Object to the form of the

Page 97

1 question.
2        Meaghan, if you understand it, you may
3 answer.
4       THE WITNESS:  I can't answer that, because
5 I don't know what you're relying to; and I don't know
6 the basis on what their data is in there.  Like I
7 don't know specifically what you're referring to.
8       MR. SIGALE:  Q  Well, I showed you briefly
9 that there was a table there.  And if it had a number
10 in there that said, and I'm making it up, but I think
11 one of the numbers in there was Youth in Care was
12 350.  But for whatever information is in those
13 tables, you would defer to those tables, correct, for
14 the information?  You wouldn't be -- You wouldn't
15 have a reason to disagree with OIG's findings?
16       MR. CHIMIENTI:  Object to the form.  And
17 vague.
18        But go ahead, Meaghan, if you
19 understand.
20       THE WITNESS:  I would have no reason to
21 believe that the information in there is inaccurate.
22       MR. SIGALE:  Q  Okay.  The last thing
23 is -- And, Matt, this is going to of course draw an
24 objection, but we'll have to figure out what to do.

Meaghan Jorgensen
October 16, 2020

Atkinson-Baker, Inc.
www.depo.com

Page 98

1        Ms. Jorgensen, I need to know, and I
2  hope you understand, I need you to know that, you
3  know, I'm not going to wind up with those two in
4  incidents that you mentioned in April and May.  You
5  know, the nonlegal term we use is sandbagging.  So
6  I'm going to -- Not that I'm accusing anyone of
7  anything or anything, I'm just trying to cover my
8  bases.
9        So how would I find out, in a
10  confidential, you know, protective order sort of
11  manner, and I'm asking you and counsel, to find out
12  what happened in those instances?  Whether or not,
13  you know, there's 6 kids playing and someone snuck a
14  gun in from outside, you know, from an older brother
15  or something like that?  Because I can tell you that
16  in those OIG reports, that happened a few times.  Or
17  something else.  Versus the issue in the case, which
18  is a loaded firearm, but locked in a safe that nobody
19  else has the combination to.
20        So how would I find out, in a
21  confidential, protective order type manner, what
22  happened in those incidents?  So I know whether they
23  have any relevance to what we're dealing with here.
24        MR. CHIMIENTI:  From Counsel's perspective,

Page 99

1  the answer is, you ask Ms. Jorgensen.  Certain of
2  that information, to the extent that it's still in
3  process and under investigation, specifics are
4  legally confidential, not subject to discovery, not
5  subject to disclosure.  The documents are protected.
6  Ms. Jorgensen is speaking in very, very broad terms,
7  because some of that information is just not
8  discoverable.
9        So you can ask Ms. Jorgensen the
10  questions about what she knows generally about them.
11  But in terms of confidential, protective order, just
12  because you've sued to challenge a rule does not
13  automatically mean you suddenly get this information
14  that's protected by a statute.
15        So that would be my response to that.
16        MR. SIGALE:  Q  Ms. Jorgensen, I already
17  asked you generally what you know, correct?  We
18  talked about it.
19        Do you know what stage of
20  investigation those instances are in, or even if they
21  are still being investigated?
22     A   I can't say with certainty.  I believe one
23  is for certain, but I can't answer as to both of them
24  with certainty.

Page 100

**1     Q  Okay.  I'm going to ask you then to go --**
**2  Obviously I don't know these two incidents --**
3        MR. CHIMIENTI:  Well, David, I'm going to
4  pause you.  You don't ask her to do anything.  You
5  can ask us.  Okay?  She's not going to do your
6  homework for you.  Ask counsel, don't ask the
7  witness.  It's not her responsibility.
8        MR. SIGALE:  Well, she might be the only
9  one that knows the -- is able to find out the answer.
10  And I was going to ask her to tell you the
11  information.  But that's fine.
12        Counsel, I'm going to ask you to ask
13  the witness here to find out the status of those two
14  incidents.  And to the extent that you're not legally
15  prohibited, to let me know the information of the
16  circumstances of those two incidents.
17        MR. CHIMIENTI:  Okay.
18        MR. SIGALE:  Q  And with that,
19  Ms. Jorgensen, let me just ask you what I generally
20  refer to as my catch-all question.
21        We've talked about a lot of material
22  today.  Is there any information that you've
23  remembered over the course this deposition today that
24  you didn't say at the time or whatever, but

Page 101

1  something's triggered your memory and you have any
2  information to add, beyond what you've already
3  testified to, on any of the topics that we've talked
4  about?
5        MR. CHIMIENTI:  I object to the form of
6  that question.  And it's overbroad and vague.
7        But, Meaghan, go ahead.
8        THE WITNESS:  I have nothing further to
9  add.
10        MR. SIGALE:  Q  Okay.  Well, thanks for
11  appearing.  Your counsel might have questions for
12  you.
13        MR. CHIMIENTI:  I do.  But I need to go
14  through my notes here.
15        Can we take another 10, David, and
16  come back at 1:45?  I don't have that much, but I
17  just need to check my notes.
18        MR. SIGALE:  Okay.  We'll break for 10
19  minutes.  Off the record.
20        MR. CHIMIENTI:  Thank you.
21        (short break taken 1:35 p.m.)
22        MR. SIGALE:  Q  All right.  Ms. Jorgensen,
23  sorry to get you all brimmed up with hope that I was
24  done asking questions, and then yank the rug.  I

Atkinson-Baker, Inc.
www.depo.com

Page 102

1  didn't mean to do that.  But you did say you looked
2  at this.
3          (Jorgensen Deposition Exhibit 8
4          previously marked and screen shared.)
5      MR. SIGALE:  Q  This is a Lexis printout,
6  and this is Exhibit No. 8.  And there it is,
7  Jorgensen Dep Exhibit No. 8.  This is a Lexis
8  printout of Statute 430 ILCS 66/65.  I will represent
9  to you that it is part of -- or I don't need to, it's
10  right there -- the Firearm Concealed Carry Act.
11          Is this what you referenced earlier
12  that you had reviewed?
13      A  Yes.
14      Q  Okay.  Specifically this section of the
15  act, or a different part of it?
16      A  Only the section that you referenced.  I
17  forget if it was in the complaint or in the -- I
18  forget where it was referenced.
19      Q  Okay.  Then it probably was this.
20          So let me scoot down just a little bit
21  here, and you'll see (a).  "A licensee under this Act
22  shall not knowingly carry a firearm on or into:"  And
23  it lists 23 things.  So it's got 23 different places
24  that are not allowed, and I want to focus on No. 2.

Page 103

1  "Any building, real property, and parking area under
2  the control of a preschool or child care facility,
3  including any room or portion of a building under the
4  control of a preschool or child care facility.
5  Nothing in this paragraph shall prevent the operator
6  of a child care facility in a family home from owning
7  or possessing a firearm in the home or license under
8  this Act, if no child under child care at the home is
9  present in the home or the firearm in the home is
10  stored in a locked container when a child under child
11  care at the home is present in the home."
12          Now, that differs from Rule 406.8;
13  isn't that correct?
14      MR. CHIMIENTI:  Objection.  Form of the
15  question.
16          Go ahead, Meaghan.  And calls for a
17  legal conclusion.
18      THE WITNESS:  We do not get authority from
19  the Concealed Carry Act.  So I don't -- The
20  Department has no real position on specific sections
21  of that Act.
22      MR. SIGALE:  Q  So as far as DCFS is
23  concerned, if there's a contradiction between the
24  Firearm Concealed Carry Act and the JCAR rules for --

Page 104

1  regarding firearms, the DCFS rules control; is that
2  correct?
3      MR. CHIMIENTI:  Objection.  Misstates the
4  testimony.  And calls for a legal conclusion.
5          Meaghan, if you understand, you may
6  answer.
7      THE WITNESS:  So we get our authority from
8  the Child Care Act, for which we write rules.  We
9  don't get authority from the Concealed Carry Act.
10      MR. SIGALE:  Q  Okay.  So let me rephrase
11  my question.
12          If there is a contradiction between
13  the Child Care Act and the Concealed Carry Act, you
14  will follow the Child Care Act; is that correct?
15      MR. CHIMIENTI:  I'm going to object in that
16  it assumes there's a contradiction.
17          But you may answer, Meaghan.
18      THE WITNESS:  We only have authority to
19  enforce what's in our rules that come from the Child
20  Care Act.
21      MR. SIGALE:  Q  Well, I'm not really
22  asking you what you have the authority to enforce.
23  I'm asking you what rules apply, that later you might
24  enforce if say there was a violation.  But I'm trying

Page 105

1  to get at what rule applies.
2          So the Concealed Carry Act says that a
3  licensee -- if someone has a concealed carry license,
4  they can have a firearm in a day care home, if no
5  child under child care at the home is present; or if
6  the firearm is stored in a locked container.
7          Now, that is the polar opposite of the
8  rules regarding day care homes, which say handguns
9  are prohibited on the premises of the day care home.
10          So I'm trying to -- My question to you
11  is not what you have the authority to enforce.  I'm
12  asking you what rules apply.  So if a day care home
13  operator has a concealed carry license, which rule do
14  they have to follow; the day care rule that says
15  handguns are prohibited, or the concealed carry rule
16  that says they can have it, if it's locked up or
17  there's no children present?
18      MR. CHIMIENTI:  So that question is
19  compound.  And I'm objecting to your characterization
20  that the rules are, quote, polar opposites.
21          But, Meaghan, if you understand the
22  question, you can answer it.
23      THE WITNESS:  So licensed day care homes
24  must follow our rules.

Atkinson-Baker, Inc.
www.depo.com

Page 106

1    MR. SIGALE:  Q   Is there any reason, that
2  you're aware of, why a -- other than they must follow
3  our rules, is there any reason why the day care home
4  operator who has a concealed carry license is not
5  allowed to follow the -- basically the exception here
6  under 430 ILCS 66/65?
7    MR. CHIMIENTI:  Object to the form.  Calls
8  for a legal conclusion.  And calls for speculation.
9    Meaghan, if you understand.
10    THE WITNESS:  At the Department, we have no
11  legal opinion or position on this Act.
12    MR. SIGALE:  Q   Okay.  But if a day care
13  home licensee has a -- Let's say a would-be day care
14  home licensee, so an applicant, says, well, the Rule
15  406 says that I'm not allowed to have a handgun in
16  the home; but it's okay because I have a concealed
17  carry license, and that says I can do it as long as
18  there's no kids present in the home or I keep it
19  locked up.  Your answer to that would be, you still
20  have to follow the DCFS rules?
21    MR. CHIMIENTI:  Objection.  Form.  Calls
22  for a legal conclusion.  Asked and answered.
23    Go ahead, Meaghan.
24    THE WITNESS:  In order to become licensed,

Page 107

1  a day care home must follow our rules.
2    MR. SIGALE:  Q   With no exception for
3  concealed carry license holders, correct?
4    MR. CHIMIENTI:  Objection.  Again, asked
5  and answered.  Calls for speculation.  Calls for a
6  legal conclusion.
7    Go ahead, Meaghan.
8    THE WITNESS:  An applicant for a day care
9  home license must follow our rules.
10    MR. SIGALE:  Q   Right.  But I'm just
11  looking for a yes or no answer with this.
12    So is there any exception for -- With
13  regard to the requirement that handguns are
14  prohibited on the premises of the day care home,
15  assuming, again, not a peace officer, not someone
16  that needs it for their employment, is there an
17  exception, yes or no, to the requirement that
18  handguns are prohibited on the premises of the day
19  care home, if the would-be applicant has a concealed
20  carry license?
21    MR. CHIMIENTI:  Objection.  Asked and
22  answered.  Form of the question.  Calls for
23  speculation.  And calls for a legal conclusion.
24    Go ahead, Meaghan.

Page 108

1    THE WITNESS:  There is no exception in our
2  rule.
3    MR. SIGALE:  Okay.  I do not have anything
4  else.  Ms. Jorgensen, thank you for your time today.
5  And, again, counsel probably has some questions for
6  you.
7    THE WITNESS:  Thank you.
8    MR. CHIMIENTI:  You can leave that up for
9  now, David, just for a second.
10    EXAMINATION
11    by Mr. Chimienti:
12    MR. CHIMIENTI:  Q   Ms. Jorgensen, we're
13  still looking at the Concealed Carry Act here,
14  Ms. Jorgensen.  And I'm not going to ask you for some
15  sort of legal interpretation or DCFS's position.  At
16  the very top it says, "A licensee under this Act
17  shall not knowingly carry a firearm on or into."
18    Do you see that?
19    A   I do.
20    **Q   And, Ms. Jorgensen, is it your**
21  **understanding that a handgun is a type of firearm?**
22    A   It is.
23    **Q   And are there more types of firearms than**
24  **handguns?**

Page 109

1    A   There are.
2    **Q   If you look at the section that Mr. Sigale**
3  **was asking you about, Section 2, nowhere in that**
4  **section does it mention anything about -- Well,**
5  **strike that.**
6    **David, you can take that down.**
7    **You were asked earlier about Rule 406,**
8  **the day care home rules.  And I'm going to share my**
9  **screen with you to show you what was previously**
10  **entered as Exhibit 7 to your deposition.**
11    **Do you remember looking at this**
12  **document?**
13    A   I do.
14    **Q   And if we scroll down here to Rule 406(a),**
15  **subparagraphs (17) and (18), which are spread across**
16  **page 3 and 4 of the document, do you remember looking**
17  **at these earlier in the deposition?**
18    A   I do.
19    **Q   Earlier in the deposition you testified**
20  **that the basis or purpose or reasons for these rules**
21  **that DCFS enacted was because they were mandated to**
22  **do so by the Child Care Act.  Do you remember that**
23  **testimony?**
24    A   I do.

Meaghan Jorgensen
October 16, 2020

Atkinson-Baker, Inc.
www.depo.com

Page 110

1    Q    Okay.  Even though DCFS was ordered to
2  implement these rules by the Child Care Act, are
3  these two rules, (17) and (18) and (18) sub (A) and
4  (18) sub (B), are they consistent with DCFS's mandate
5  to protect the safety and health of children?
6    A    They are, as the Department's mandate is to
7  protect the safety and well-being of children.  And
8  we know that restricting access to firearms and
9  ammunition prevents death, serious injury, and
10  suicide.
11    Q    And so is it fair to say then that
12  protecting the health and safety of children is yet
13  another purpose of these rules here?
14    A    It is.
15    Q    Okay.  Earlier you were also asked about a
16  couple of forms that foster parents have to fill out
17  regarding firearms.  Do you remember those forms?
18    A    I do.
19    Q    And you testified earlier that one of the
20  purposes of those forms is to make sure that the
21  foster parents are aware of the rules.  Do you
22  remember that?
23    A    Yes, I do.
24    Q    Is it the Department's position that

Page 111

1  increased awareness of these rules is consistent with
2  the rule's purpose to protect the health and safety
3  of children?
4    A    Yes, of course.  We want everyone to be
5  aware and understand that restricting access to
6  firearms and ammunition does prevent suicide, serious
7  injury, and death.
8    Q    And the one form that Mr. Sigale showed
9  you, where the family, if they have the firearms, is
10  required to list their firearms, I believe that was
11  Exhibit 5, the Foster Family Firearms Arrangement,
12  you had testified that that -- Well, you actually
13  testified that both of the forms that you looked at
14  for Exhibit 5 and Exhibit 6 were also for -- the
15  purpose was also for compliance.  Do you recall that?
16    A    I do.
17    Q    And ensuring compliance with these rules,
18  is that also consistent with the rules' aim to
19  protect the health and safety of children?
20    A    Yes, it's essential.  That's the main
21  mandate of the Department, to protect the safety of
22  children.  And compliance is essential to that.
23    Q    Okay.  You were asked some questions about
24  day care home operating hours and whether violations

Page 112

1  could take place in and around -- inside or outside
2  of operating hours.
3        Can you describe, generally, what the
4  operating hours of a day care home licensed by the
5  Illinois Department of Children and Family Services
6  could be?
7    A    Essentially, anything.  We have day care
8  providers that operate 6:00 a.m. to 5:00 p.m.  We
9  have day care homes that operate at night.  We have
10  day care homes that operate during the day and at
11  night.  It can totally vary depending on the home.
12    Q    And Mr. Sigale used the example earlier of
13  someone at the day care home, you know, after
14  operating hours, at 9:00 o'clock at night, and they
15  notice that there's a firearm in the home.  Is
16  DCFS -- Regardless of the circumstances or the
17  allegation of when the incident took place in the day
18  care home, would DCFS still investigate the alleged
19  violation?
20    A    They would look into what the operating
21  hours were to determine if the investigation needed
22  to proceed.
23    Q    Okay.  And, again, to determine the
24  specific circumstances surrounding each of these

Page 113

1  violations, that is a labor-intensive review of each
2  individual file, correct?
3    A    Correct.
4    Q    You were asked some questions about firearm
5  crime in and around day care and foster homes.  And
6  you testified about not having any information with
7  you today.  Is the Department ever made aware of
8  crime in and around day care and foster homes,
9  generally?
10    A    We could be, yes.  Someone could -- Someone
11  would have to make us aware.  We would have to get
12  some type of reported information.
13    Q    And when a report like that is made to the
14  Department, what ends up happening?
15    A    It is filled out, the information is taken,
16  and it would depend exactly on the circumstance; but,
17  in general, it would be placed in the file.
18    Q    Okay.  And to determine the circumstances
19  surrounding each one of those potential crimes, again
20  is a labor-intensive review of the file, correct?
21    A    Correct.
22    Q    Okay.  You were asked some questions about
23  the 2020 OIG report that Mr. Sigale put up on the
24  screen, and he asked you if you would defer to the

Atkinson-Baker, Inc.
www.depo.com

Page 114

1  table in terms of what numbers were there, if you had
2  any reason to dispute them.  Do you remember that?
3      A   I do.
4      Q   Now, there's a bunch of tables in there.
5  And I can put it up on the screen, just for
6  completeness sake, so we're looking at the same
7  thing.  So I'm going to share my screen, and I'll
8  show you what Mr. Sigale will eventually mark as
9  Exhibit 10, I believe, to your deposition.
10          And we're on -- We're looking at page
11  185 of the PDF.  And that is, if we look at the
12  bottom of the page, 179 of the Twenty-Year Death
13  Retrospective.  But it's 185 of the PDF.  And if you
14  look at some of these numbers here, looking at this
15  first top line, do you see where it says "Total
16  Deaths" and then it says "Youth in Care"?  Do you see
17  that?
18      A   Yes.
19      Q   And then if we scroll down here to the
20  fourth line under that, it says "Suicide."  Do you
21  see that?
22      A   I do.
23      Q   And it tabulates the numbers.  You know, in
24  2014 it looks like there was one suicide.  In '15

Page 115

1  there was one.  In '16 there was two.  In '17 there
2  was three.  But in '18 and '19 there were none.  Do
3  you see that?
4      A   I do.
5      Q   To the extent that these numbers are low or
6  are zero or it shows that in the past there was even
7  one, is even one at any point in time -- even one
8  child death at any point in time significant to the
9  Department?
10      A   Every single death is important to us.  And
11  we want to do everything in our capability to prevent
12  any death of a child from happening.
13      Q   And are these rules regarding foster home
14  and day care home firearm and ammunition storage
15  designed for that purpose?
16      A   They are.  Because we know that restricting
17  access to firearms and ammunition does prevent from
18  death, serious injury, and suicide.
19      Q   Okay.  I'll stop sharing my screen, and I
20  have one more question for you.
21          You talked about the two incidents
22  recently, in recent memory for DCFS.  One which
23  occurred in April of 2020, and one which occurred in
24  May of 2020.  And without getting into specific

Page 116

1  details of each incident, is it fair to say that,
2  broadly, these incidents were cases where children
3  had access to a loaded firearm and harmed one
4  another?
5      A   Yes, that's fair to say.
6      MR. CHIMIENTI:  Okay.  I don't have any
7  more questions for you, Ms. Jorgensen.  Mr. Sigale
8  might have a few more.
9      MR. SIGALE:  Yeah, I do.
10          FURTHER EXAMINATION
11          by Mr. Sigale:
12      MR. SIGALE:  Q   Let me go back to the
13  Exhibit 10.  And, Ms. Jorgensen, I really don't want
14  to belabor this, because I asked you, and correct me
15  if I'm wrong, where foster kids were represented in
16  this information.  I'm going back to this page 178.
17  And I asked you where, in all of this, foster care
18  kids were represented.  And you said it could be in
19  multiple of these categories, correct?
20      A   Correct.
21      Q   Okay.  So in terms of you being able to
22  really speak to this data, you really can't.  Is that
23  fair to say?
24      MR. CHIMIENTI:  Objection.  Form.

Page 117

1          Go ahead, Meaghan.
2      THE WITNESS:  Speak to the data as a whole,
3  no.
4      MR. SIGALE:  Q   Okay.  So when we go down
5  to -- Oh, what page was it?  185, I think.
6          So this is the page, I think, that
7  counsel just showed you a few minutes ago.  And he
8  mentioned to you about the suicides and how from 2000
9  to 2019 there were 24 of them.  I'm just looking at
10  the numbers, again, the same as you would be doing,
11  as you testified earlier.  And it looked like for the
12  first 13 years, there were 17.  And then one, one,
13  two, three, zero, zero.
14          And of course we all share that even
15  one is terrible, is tragic.  But by sitting here
16  looking at this number, you can't tell me how these
17  children committed suicide, correct?
18      A   I cannot, just looking at this page.
19      Q   Right, right.  Which is why I asked you if
20  you would defer to the information in the report.
21          But just by looking at this, of course
22  DCFS takes it all very seriously, as it should, but
23  in terms of how many of these were foster kids and
24  how many of them died by firearm versus hanging or

Meaghan Jorgensen
October 16, 2020

Page 118

1 overdose or anything else, you can't speak to that by
2 looking at this, correct?
3     A   I cannot speak to that by looking at this
4 specific page.
5     Q   Okay.  And for anything -- And if there was
6 a suicide say regarding a firearm, you can't speak
7 to -- Again, the number could be zero, but if there
8 were any suicides by firearm, there's certainly no
9 information here about where the firearm might have
10 come from, correct?
11         MR. CHIMIENTI:  Objection.  Are you ta king
12 about the table, or are you talking about the
13 document as a whole?
14         MR. SIGALE:  I'm talking about the table
15 that you showed her.
16         THE WITNESS:  On the table, it doesn't
17 appear.  But I can't speak to this document as a
18 whole.
19         MR. SIGALE:  Q   Okay.  Because you
20 didn't -- Obviously you didn't review all 384 pages
21 of it, correct?
22     A   Correct.
23     Q   Okay.  Just for curiosity, did you review
24 all 384 pages of it at the time?

Page 119

1     A   I don't believe I reviewed every single
2 page.  I probably looked at it at different times
3 throughout the year.
4     Q   Okay.
5     A   Some areas get into specifics, like some
6 deaths are outlined very specifically, some are not.
7 So...
8     Q   So, generally speaking, is it fair that the
9 information that's contained in this report, you
10 personally would have no reason to disagree with the
11 information in the report?
12     A   I would have no reason to disagree.
13     Q   And if you wanted the information regarding
14 what's in here, you would defer to OIG's report and
15 OIG's findings, correct?
16     A   I'm not --
17         MR. CHIMIENTI:  Objection as to form.
18         Go ahead, Meaghan.
19         THE WITNESS:  I'm not sure what you mean I
20 would defer to it.  They might not necessarily
21 include every fact in this.
22         MR. SIGALE:  Q   Okay.  But the information
23 that is in here, like, for example, I'm just going to
24 go down a couple pages here to this is page 181, and

Page 120

1 it's -- You know what, hold the phone.  I'm going to
2 stop sharing for one second and take a second.
3         Ms. Jorgensen, believe me when I tell
4 you that I picked this at random.  I just want to
5 move on with this line of questioning, and we can all
6 go home.
7         This is Child No. 108, who has -- This
8 is page 174 of the PDF, and it's page 168 of the
9 document.  And it's under the "Undetermined"
10 category.  This was a two-month old infant who was
11 found unresponsive and whatnot.  I'm just going to
12 use this as an example.
13         There's a bunch of detail regarding
14 what happened to this child, correct?  It's a pretty
15 lengthy explanation.  Is that fair to say?
16         MR. CHIMIENTI:  Object to the form.
17         Meaghan, go ahead.
18         THE WITNESS:  I would probably say it's
19 actually not lengthy at all.
20         MR. SIGALE:  Q   Okay.
21     A   If you want my honest opinion, I don't
22 think it's lengthy for a circumstance of a child
23 passing away.
24     Q   I only meant in the context of these --

Page 121

1 It's like a summary.  I'm sure there's an actual file
2 that's much longer.  Is that probably true?
3     A   Yes, of course.
4     Q   Okay.  So I'm just saying, these are
5 summaries, basically, for the report.  Is that fair?
6     A   Yes.
7     Q   Okay.  And some are longer than others?
8     A   And I don't believe that they summarize
9 each death.
10     Q   I'm sorry, can you explain that?
11     A   I don't think in every OIG report they
12 summarize every death in this detail.
13     Q   Okay.  But sticking with this 108, my
14 question to you basically is, just picking this one
15 at random, but I'll scroll to any page that you want,
16 do you have any reason, as you sit there, to dispute
17 the information that would be in this summary?
18         MR. CHIMIENTI:  Object to the form.
19         Go ahead, Meaghan.
20         THE WITNESS:  Anything that's in here, I
21 wouldn't dispute the accuracy of it.  I just don't
22 know that it's all inclusive of the circumstance.
23 But I couldn't make that call based on looking at
24 something like this.

Atkinson-Baker, Inc.
www.depo.com

Page 122

1    MR. SIGALE:  Q  Okay.  Okay.

2        So I will leave it there.  And I do

3  not have anything else, unless counsel does.

4    MR. CHIMIENTI:  I don't.

5        We will reserve signature, David.

6    MR. SIGALE:  Okay.  I will order this.

7  Thank you.  And I will send the exhibits to that

8  e-mail address, Marina, that you gave me earlier.

9    THE COURT REPORTER:  Perfect.  Thank you so

10  much.

11        Counsel, did you want a copy?

12    MR. CHIMIENTI:  Yes, we will take a copy.

13  E-tran, please.  And obviously we're going to need it

14  to read and sign.  But, yeah, e-tran is fine.

15    MR. SIGALE:  Yeah, same here.

16    THE COURT REPORTER:  Okay.  Perfect.  Thank

17  you so much, Counsels.

18        (Whereupon, the Zoom deposition of

19        Meaghan Jorgensen concluded at 2:20

20        p.m. on October 16th, 2020.)

21        (Signature reserved.)

22

23        * * o O o * *

24

Page 123

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE CENTRAL DISTRICT OF ILLINOIS

2

3  JENNIFER J. MILLER, DARIN E.    )
   MILLER, SECOND AMENDMENT        )
4  FOUNDATION, INC., ILLINOIS STATE)
   RIFLE ASSOCIATION, and ILLINOIS )
5  CARRY,                          )
                                   )
6          Plaintiffs,             )
                                   )
7          -vs-                    )  No. 3:18-CV-3085
                                   )
8  MARC D. SMITH, in his official  )
   capacity as Acting Director of  )
9  the Illinois Department of      )
   Children and Family Services, and)
10  KWAME RAOUL, in his official    )
   capacity as Attorney General of )
11  the State of Illinois,          )
                                   )
12          Defendants.            )
13
14      I, MEAGHAN JORGENSEN, being first duly sworn,
15  on oath say that I am the deponent in the aforesaid
16  deposition taken on October 16th,  2020; that I have
17  read the foregoing transcript of my deposition,
18  consisting of Pages 1 through 123.
19
20      _____
          MEAGHAN JORGENSEN
21
   SUBSCRIBED AND SWORN TO
22  before me this _____ day
   of _____, A.D. 2020.
23
24      _____
          Notary Public

Page 124

1            REPORTER'S CERTIFICATE

2

3      The foregoing deposition of MEAGHAN JORGENSEN

4  was taken via Zoom, with the Deponent being located at

5  her place of employment, before MARINA MOGILEVSKY,

6  Certified Shorthand Reporter, commencing at 10:03 a.m.

7  on the 16th day of October, 2020.

8        Said witness was first duly sworn by me and

9  then examined upon oral interrogatories.  The questions

10  and answers were taken via machine shorthand by the

11  undersigned and reduced to computerized transcription.

12  The foregoing is an accurate and complete record of

13  said deposition.

14        The certificate annexed hereto applies only

15  to the original transcript or copies signed and

16  certified by me.  I assume no responsibility for copies

17  reproduced beyond my direction or control.

18        The signature of the witness was reserved,

19  and the transcript was submitted to the deponent as per

20  copy of the attached letter.

21        Pursuant to Rule 30(e) of the Federal Rules

22  of Civil Procedure, if the Witness does not read and

23  sign the transcript within 30 days or make other

24  arrangements for reading and signing, the transcript

Page 125

1  may be used as fully as though signed, and this

2  certificate will then evidence such failure to appear

3  as the reason for signature being waived.

4        The undersigned is not interested in the case

5  nor is of kin or counsel to any of the parties herein.

6        IN WITNESS WHEREOF, I hereunto affix my hand

7  as Certified Shorthand Reporter in and for the State of

8  Illinois on December 9th, 2020.

9

10

11

12      _____

          MARINA MOGILEVSKY, C.S.R.,
13        CSR No. 084-004103

14

15

16

17

18

19

20

21

22

23

24

AE07292                                    DECEMBER 14, 2020

LETTER TO DEPOSITION OFFICER/ERRATA SHEET

DEPOSITION OF:                             MEAGHAN JORGENSEN

DATE OF DEPOSITION:                        OCTOBER 16, 2020

CASE:                                      JENNIFER J. MILLER, ET AL. VS. MARC D.
                                           SMITH, ET AL.

THE FOLLOWING ARE THE CORRECTIONS WHICH I HAVE MADE TO MY TRANSCRIPT:

| PAGE# | LINE# | CORRECTION | REASON FOR CORRECTION |
|-------|-------|------------|------------------------|
| 10 | 3 | Change "rule" to "rules" | Wrong singular form of word |
| 10 | 3 | Change "procedure" to "procedures" | Wrong singular form of word |
| 13 | 3 | Change "discreet" to "discrete" | Wrong word |
| 97 | 5 | Change "relying" to "referring" | Wrong word |

Please sign your name and date it on the below line. As needed, use additional paper to note corrections, dating and signing each page. If you have no corrections, please write the word "None" above and sign, date, and return this page.

EXECUTED this ___12th___ day of ___January___, 20_21_,

at ___Springfield___, ___Illinois___,
        (City)                    (State)

s/ Meaghan Jorgensen redacted pursuant to Local Rule 5.11

                    (Signature)

Atkinson-Baker, Inc.
www.depo.com

AE07292

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE CENTRAL DISTRICT OF ILLINOIS
 2

 3   JENNIFER J. MILLER, DARIN E.      )
     MILLER, SECOND AMENDMENT          )
 4   FOUNDATION, INC., ILLINOIS STATE  )
     RIFLE ASSOCIATION, and ILLINOIS   )
 5   CARRY,                            )
                                       )
 6              Plaintiffs,            )
                                       )
 7              -vs-                   )   No. 3:18-CV-3085
                                       )
 8   MARC D. SMITH, in his official    )
     capacity as Acting Director of    )
 9   the Illinois Department of        )
     Children and Family Services, and )
10   KWAME RAOUL, in his official      )
     capacity as Attorney General of   )
11   the State of Illinois,            )
                                       )
12              Defendants.            )

13

14            I, MEAGHAN JORGENSEN, being first duly sworn,

15   on oath say that I am the deponent in the aforesaid

16   deposition taken on October 16th, 2020; that I have

17   read the foregoing transcript of my deposition,

18   consisting of Pages 1 through 123.

19                              s/ Meghan Jorgensen redacted pursuant to Local Rule 5.11

20
                                MEAGHAN JORGENSEN
21
     SUBSCRIBED AND SWORN TO
22   before me this  12  day
     of January , A.D. 2020.
23   s/ Kelly Ann Beauchamp redacted pursuant to Local Rule 5.11          Official Seal
                                                 Kelly Ann Beauchamp
24                                          Notary Public State of Illinois
          Notary Public                   My Commission Expires 11/28/2021
```