E-FILED
Friday, 12 November, 2021  03:35:14 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 4
# Deposition of Darin Miller

```
 1            IN THE UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF ILLINOIS

 3                     EASTERN DIVISION

 4   JENNIFER J. MILLER, et        )

 5   al.,                          )

 6                 Plaintiffs,     )

 7      -vs-                       ) No. 18 CV 3085

 8   MARC D. SMITH, in his         )

 9   official capacity as          )

10   Acting Director of the        )

11   Illinois Department of        )

12   Children and Family           )

13   Services, et al.,             )

14                 Defendants.     )

15           The VIDEOCONFERENCE deposition of DARIN

16   E. MILLER, called for examination, taken pursuant

17   to the Federal Rules of Civil Procedure of the

18   United States District Courts pertaining to the

19   taking of depositions, taken before GAIL LIVIGNI,

20   CSR No. 84-1965, a Notary Public within and for the

21   County of Will, State of Illinois, and a Certified

22   Shorthand Reporter of said state, at Shelbyville,

23   Illinois, on the 5th day of November, A.D. 2020,

24   commencing at 9:00 o'clock a.m.
```



```
 1   PRESENT VIA ZOOM:

 2        LAW FIRM OF DAVID SIGALE, P.C.,

 3        (430 West Roosevelt Road,

 4        Wheaton, Illinois 60187,

 5        (630-452-4543), by:

 6        MR. DAVID SIGALE,

 7             appeared on behalf of the Plaintiffs;

 8

 9        OFFICE OF THE ATTORNEY GENERAL,

10        (100 West Randolph Street, 11th Floor,

11        Chicago, Illinois 60601,

12        (312) 814-1136), by:

13        MS. GRETCHEN E. HELFRICH,

14        MR. MATTHEW V. CHIMIENTI,

15             appeared on behalf of the Defendants.

16

17

18

19

20

21

22

23   REPORTED BY:   GAIL LIVIGNI, CSR

24                  CSR No. 84-1965.
```



```
 1                    (WHEREUPON, the witness was duly

 2                     sworn.)

 3                       DARIN E. MILLER,

 4   called as a witness herein, having been first duly

 5   sworn, was examined and testified as follows:

 6                    DIRECT EXAMINATION

 7   BY MS. HELFRICH:

 8       Q.    This is the Rule 30(b)(6) deposition of

 9   Plaintiff Darin Miller taken pursuant to notice

10   given on November 5th, 2020.

11            Good morning, Mr. Miller, thank you for

12   being here today.  I'm Gretchen Helfrich, and I'm

13   with the Office of the Illinois Attorney General,

14   and I represent the Department of Children and

15   Family Services in this case, and I also represent

16   the Attorney General who as you know is also a

17   party.

18            The case is Miller v. Smith, and let me

19   start by asking whether you've ever given a

20   deposition before?

21       A.    I think so.  It's been years ago.  Yes,

22   I actually have.  It was against a hospital here in

23   town.

24       Q.    Okay.  I'm going to ask you some more
```



1    questions about that in a second; but before we go

2    any further, I want to go over some ground rules or

3    conditions for how we're going to proceed with this

4    deposition.

5              As you can see, we're doing this by

6    Zoom, and that's because of the COVID-29

7    restriction.  We still have a Court Reporter,

8    though, as you can see on your screen, Gail.  She

9    is taking down everything we say.  She's making a

10   record of everything we say.

11             In order to make that easy for her, what

12   we're going to do is try really hard not to talk

13   over each other.  So, for example, if I ask a

14   question, I would like you to wait until I'm

15   entirely done with the question before you answer

16   it, and likewise I will try to wait until you are

17   entirely done with your answer before I start my

18   next question.  Is that clear?

19        A.    Yes.

20        Q.    The second thing is whatever answers you

21   give, they need to be out loud, and they need to be

22   in words.  So if you just shake your head or

23   something, Gail can't take that down.  If you say

24   uh-huh, uh-uh, it's tough for her to take it down,



1  so I would ask that you give your answers out and

2  in words, okay?

3          A.    Okay.

4          Q.    And I'll tell you right now, we'll break

5  all these rules, but we'll try to keep reminding

6  each other and do our best to stay on track, and

7  Gail may jump in from time to time and say I can't

8  understand what you're saying, stop talking over

9  each other.

10          A couple other things, if I ask you a

11  question and you don't understand what I'm asking,

12  please ask me to clarify.  I don't want you to

13  answer a question if you haven't understood it,

14  okay?

15          A.    Okay.

16          Q.    And, relatedly, if I ask a question and

17  you answer it, I'm going to assume that you

18  understood it, okay?

19          A.    Okay.

20          Q.    Your attorney, Mr. Sigale, may object to

21  some of my questions, and that's fine, but unlike

22  what you see on TV, if he objects, you're still

23  going to answer the question.  He'll say what his

24  objection is, and then you'll answer it, okay?



1      A.    Yes.

2      Q.    The exception to this is if he

3  specifically instructs you not to answer; but if he

4  just objects, you'll go ahead and answer, okay?

5      A.    Okay.

6      Q.    You can take a break any time you want

7  with one small exception, and that is if I've asked

8  a question and you haven't answered it yet, you

9  need to answer it before we take a break; but,

10  otherwise, any time you need a break, you need to

11  use the bathroom, you need to get some water, you

12  just need to clear your mind, it's fine, we're

13  happy to do it.  We're not here to torture you,

14  okay?

15      A.    Okay.

16      Q.    Do you have any questions about the

17  rules that I've just laid out?

18      A.    No.

19      Q.    And do you understand that you're under

20  oath?

21      A.    Yes.

22      Q.    And you understand that that's the same

23  oath you would take if you were in a courtroom in

24  front of a judge?



1        A.    Yes.

2        Q.    As you sit here today, are you under the

3    influence of any substance, any medication that

4    would impair your ability to give truthful

5    testimony or to remember things accurately?

6        A.    No.

7        Q.    Is there any other condition that exists

8    today that would impair your ability to tell the

9    truth or to remember things accurately?

10       A.    No.

11       Q.    Okay, great.  So let's go back to that

12   other deposition.  You said it was against the

13   hospital here in town?

14       A.    Yes.

15       Q.    And do you remember the name of the

16   hospital?

17       A.    It was Shelby Memorial at the time.

18       Q.    I'm sorry, I couldn't understand.

19       A.    Shelby Memorial Hospital.  It's since

20   changed names.

21       Q.    What's it called now?

22       A.    HSHS Good Shepherd.

23       Q.    Okay.  And you gave a deposition in a

24   lawsuit against the hospital?



1        A.      Yes.

2        Q.      Were you a party to the lawsuit?  Were

3   you the plaintiff?

4        A.      My wife was.

5        Q.      Okay.  And what was the nature of the

6   suit?

7        A.      Negligence.

8        Q.      Did you testify in court?

9        A.      No, it was just a deposition.

10       Q.      And, if you remember, was that in state

11  court or federal court?

12       A.      State.

13       Q.      Did the case get resolved?

14       A.      Yes.

15       Q.      How did it get resolved?

16       A.      Dropped, I guess, for lack of technical

17  term.

18       Q.      Dropped by your wife?

19       A.      No, by -- dismissed, I guess, would that

20  be the proper term?

21       Q.      Okay.  If the court dismissed it, then

22  yes, that would be the term.  So it wasn't

23  voluntary on your part to drop it?

24       A.      Correct.



1       Q.    Okay, got it.  Have you given any other

2  depositions?

3       A.    I'm not sure.  I mean I can't think of

4  any.

5       MS. HELFRICH:  Okay.  David, we did have

6  either a log or an RSP about other depositions, so

7  if he remembers, will you let us know?

8       MR. SIGALE:  Yes.

9  BY MS. HELFRICH:

10      Q.    One last question about that deposition,

11  approximately when was that?

12      A.    I'm not sure.  It's been a few years at

13  least.  More than 10, 10 years.

14      Q.    Have you ever given testimony in court?

15      A.    No.

16      Q.    Have you ever given testimony under oath

17  in any other kind of proceeding?

18      A.    I'm not sure.

19      MR. HELFRICH:  Okay, if he remembers that,

20  will you let us know, Mr. Sigale?

21      MR. SIGALE:  Yes.

22  BY MS. HELFRICH:

23      Q.    All right.  Did you do anything to

24  prepare for your deposition today?



DARIN E. MILLER                                    November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                            10

1        A.    Yes.

2        Q.    What did you do?

3        A.    Just spoke with my attorney last night

4   and a few other times.

5        Q.    Okay.  Without telling me the substance

6   of the conversations, how many times did you speak

7   with Mr. Sigale about your deposition?

8        A.    Technically once, I guess.

9        Q.    And that was last night?

10       A.    Yes.

11       Q.    And how long did you speak?

12       A.    A couple hours approximately.

13       Q.    Did you look at any documents as part of

14   your preparation for today?

15       A.    No.

16       Q.    Did you talk with your wife about your

17   deposition?

18       A.    No.

19       Q.    Okay.  Let me ask some background about

20   you.  How old are you?

21       A.    I'm 41.

22       Q.    And you're married, correct?

23       A.    Yes.

24       Q.    How long have you been married?



1      A.     Since 1997, March 15, 1997.  23 years.

2      Q.     That's a long time, congratulations.

3      A.     Thank you.

4      Q.     Just to be clear, you've been married to

5  Jennifer Miller during that time?

6      A.     Yes.

7      Q.     And were you ever married before?

8      A.     No.

9      Q.     I'm sorry, I think you said no, but I

10 didn't hear you.

11     A.     No.

12     Q.     And do you and Jennifer Miller have

13 children?

14     A.     Yes.

15     Q.     Can you tell me their names and ages?

16     A.     Colton is 23, Collin is 21, and Cyra is

17 17, and our foster son is 2, C████.

18     Q.     Do you have any other children?

19     A.     No.

20     Q.     Do you live in Shelbyville, Illinois?

21     A.     Yes.

22     Q.     How long have you lived if Illinois?

23     A.     My whole life, 41 years.

24     Q.     Were you born in Shelbyville?



1      A.    No.

2      Q.    Where were you born?

3      A.    Mattoon, Illinois.

4      Q.    Okay.  Can you tell me roughly -- and I

5  don't need specifics -- but can you tell me where

6  in Illinois you've lived; for example, from birth

7  to age three, I lived in X, just that way?

8      A.    I'm not very good with math.  We lived

9  in our current address for seven years, and prior

10 to that I want to say five years and that was still

11 in Shelbyville, so we're at 12.  And the five years

12 before that we lived in Herrick, and before that it

13 was all Shelbyville, so I guess all but five years

14 I've lived in Shelbyville, not at the same address

15 but actually Shelbyville.

16     Q.    How old were you when you first moved to

17 Shelbyville?

18     A.    I lived in Shelbyville when I was born.

19     Q.    Oh, I see, you were technically born in

20 Mattoon, but you lived in Shelbyville at the time.

21     A.    Right, that's where the nearest hospital

22 for delivering babies was.

23     Q.    I got you, okay.

24     A.    So my whole life all but five years, I



1    lived at an address in Shelbyville.

2         Q.    All right.  Where do you currently work?

3         A.    At Graphic Packaging International or

4    Graphic Package International.

5         Q.    And do you refer to it as GPI?

6         A.    Yes.

7         Q.    Okay.  How long have you worked at GPI?

8         A.    I guess over 23 years, since July

9    of 1997.

10        Q.    What do you do there currently?

11        A.    Special equipment operator.

12        Q.    What does that mean specifically?  Day

13   to day what do you do?

14        A.    I drive a carton clamp truck, it's like

15   a fork truck, and load trailers, semi trailers.

16        Q.    Okay.  And I assume GPI makes packaging?

17        A.    Fast food, paper cups and different

18   things of that sort for fast food restaurants and

19   movie theaters.

20        Q.    Okay.  Have you always been a special

21   equipment operator there?

22        A.    All but three years.

23        Q.    And what did you do for those three

24   years?

1      A.    A looper.  I removed finished goods from

2    a conveyor and stacked them.

3      Q.    And how much do you earn?

4      MR. SIGALE:  I'll object as irrelevant, but,

5    Darin, you can answer.

6    BY THE WITNESS:

7      A.    It's 18 something an hour.

8    BY MS. HELFRICH:

9      Q.    What does that come out to a year?

10     A.    I'm not sure.  It varies depending on

11   overtime.

12     Q.    Okay.  Do you work 40 hours a week?

13     A.    The schedule is 36 one week and 48 the

14   next.  It's a 2/2/3 schedule.

15     Q.    And is that steady across the year?

16     A.    Yes.  It's never ever less than that.

17   It's usually 60 hours a week or up to 60 per

18   overtime.

19     Q.    Okay.  What days of the week do you

20   work?

21     A.    It alternates.  It's a 2/2/3 schedule,

22   work two, off two, work three.

23     Q.    So I know in scheduling this deposition,

24   we had to wait to get your schedule, so sometimes



1   you work the days in between, is that right?

2       A.    Yes.  I work two days, then off two

3   days, then work three days, and off two days, work

4   two days, and off three days.

5       Q.    Okay.  On the days that you are off, do

6   you work anywhere else?

7       A.    Wife's day care.

8       Q.    And do you work there everyday that

9   you're off or on an as-needed basis?

10      A.    As needed.

11      Q.    And do you work for a salary there or a

12  wage?

13      A.    No.  I mean we have the same bank

14  account.

15      Q.    Before you worked at GPI -- so by my

16  calculations, you would have been 18 when you

17  started at GPI?

18      A.    Yes.

19      Q.    Did you work anywhere before that?

20      A.    A few places, yes.

21      Q.    Can you tell me what the places were?

22      A.    GSI in Assumption, Illinois.

23      Q.    What is that?

24      A.    Grain Systems, Incorporated, I believe.



1        Q.    Sorry, grain or green?

2        A.    Grain.

3        Q.    Okay.

4        A.    As in agriculture.

5        Q.    What did you do there?

6        A.    I packaged grain bin stairs, I believe.

7        Q.    How long did you work there?

8        A.    Approximately one month.

9        Q.    Where else did you work before GPI?

10       A.    A tree farm off and on.  Let's see,

11  McDonald's fast food and Hardy's fast food.  Those

12  are all when I was in high school.

13       Q.    Okay.  Did you graduate from high

14  school?

15       A.    GED.

16       Q.    When did you get that?

17       A.    It was the last quarter of my senior

18  year.

19       Q.    So right around the time you would have

20  graduated?

21       A.    Correct.

22       Q.    Got you.  And did that come from

23  Shelbyville High School?

24       A.    I'm not sure how the process went.  I



1   know I went to Mattoon to take the test.

2        Q.    I'm sorry, you went where?

3        A.    Mattoon, Illinois.

4        Q.    So did you attend Shelbyville High

5   School?

6        A.    Yes.

7        Q.    How long did you attend Shelbyville High

8   School?

9        A.    For four years.

10       Q.    So you said that you got your GED around

11  the last quarter of your senior year?

12       A.    Yes.

13       Q.    Did you go to school all four years,

14  though?

15       A.    Yes.

16       Q.    All right.  Do you have any other formal

17  education beyond the GED?

18       A.    No.

19       Q.    Even just courses here and there like

20  any college courses?

21       A.    I did do an online class, I believe, and

22  I ended up dropping it.

23       Q.    What was that class in?

24       A.    It was Lakeland Community College in



1  Mattoon.  I can't remember the name of the class.

2       Q.    What was the subject?

3       A.    I'm not sure.

4       Q.    Okay.  Do you have any professional

5  training; like, for example, do you have a

6  certificate to operate the equipment you operate?

7       A.    Yes.

8       Q.    Can you describe what training or what

9  certificates you have?

10      A.    The special equipment operator's

11  license, then I'm also certified in first aid, CPR.

12      Q.    Was that in connection with your work at

13  the day care?

14      A.    Actually, it initially started from my

15  work.  I'm like a first aid/first responder type

16  person at work.

17      Q.    Okay.  The special equipment operator

18  license, is that a license from the State of

19  Illinois?

20      A.    No, through my work.

21      Q.    Okay.  Any other licenses or training or

22  certificates?

23      A.    No.

24      Q.    Have you ever had a job that required



1  you to carry a firearm?

2       A.    No.

3       Q.    Have you ever served in the U.S.

4  military?

5       A.    No.

6       Q.    Have you ever served in any military?

7       A.    No.

8       Q.    Have you ever applied to serve in the

9  military?

10      A.    I was going to enlist when I was 18 in

11 the U.S. Marine Corps, but I backed out.

12      Q.    Did you apply?

13      A.    I was in the process of doing it, and

14 then I backed out since my wife was pregnant.

15      Q.    So the Marine Corps didn't turn you

16 down.  You just decided this is not the route I

17 need to go?

18      A.    Correct.

19      Q.    Have you ever applied for a job that

20 required you to carry a weapon?

21      A.    No.

22      Q.    You mentioned the lawsuit involving the

23 hospital.  Have you ever been involved in any other

24 lawsuit besides that one and this one?



DARIN E. MILLER                                   November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                            20

1        A.    Yes, with an ex-landlord.

2        Q.    Were you a party there?

3        A.    I guess I'd be the -- my wife and

4    I -- the landlord was suing us for alleged damages

5    to the rental property.

6        Q.    Approximately when was this?

7        A.    Seven to eight years ago.

8        Q.    Was it your last residence?

9        A.    Yes.

10       Q.    Did you give any testimony in that case,

11   a deposition or in court?

12       A.    There wasn't no deposition.  I can't

13   remember if I spoke in court or not.

14       Q.    How did the case get resolved?

15       A.    Ended up being settled.

16       Q.    And what was the name of the landlord?

17       A.    David McClain.  I guess it would have

18   been David and Nancy, his wife.

19       Q.    And was this in state court?

20       A.    County, Shelby County.

21       Q.    Any other lawsuits that you've been

22   involved in?

23       A.    Not that I can remember.

24       Q.    And just to be clear, that includes even



```
 1  as a witness, have you ever been a witness in a
 2  lawsuit?
 3       A.   Not that I can remember.
 4       Q.   Okay.  So I want to ask you some
 5  questions about this lawsuit.  I want to show you a
 6  document.  What I'm going to do is I'm going to
 7  share my screen, and I'm going to show you a
 8  document and just ask you a few questions about it,
 9  okay?
10       A.   Okay.
11       Q.   Okay.  Can you see a document on your
12  screen?
13       A.   Yes.
14       Q.   Can you see my cursor moving?
15       A.   Yes.
16       Q.   So it says in the United States District
17  Court for the Central District of Illinois?
18       A.   Yes.
19       Q.   And you'll see that I've marked it at
20  the bottom D. Miller Dep Exhibit 1, can everyone
21  see that?
22       A.   Yes.
23       Q.   I'm Going to scroll through it slowly.
24  If you want me to go real slow so you can read it,
```



1  that's fine, but I just want you to sort of look at

2  it because I'm going to ask you if you recognize

3  it, okay?

4       A.    Okay.

5       Q.    Okay.  So back to the first page, do you

6  recognize this document?

7       A.    Yes.

8       Q.    And is it the Amended Complaint in the

9  lawsuit in which you are a Plaintiff?

10      A.    Yes.

11      Q.    So I want to ask you some questions

12 about what it says here.  I want you to look, if

13 you would -- and I can make it bigger if you can't

14 see, so let me know and I'll zoom in.  I want you

15 to look at paragraph 16, okay?

16      A.    Okay.

17      Q.    The first part of paragraph 16 says,

18 "The Millers would possess and carry loaded and

19 functional handguns for self-defense and defense of

20 family, but refrain from doing so because they fear

21 Jennifer's day care home license being taken away

22 from them by the State, and/or being prohibited

23 from maintaining a day care home license in the

24 future."  Did I read that correctly?



DARIN E. MILLER                                        November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                                   23

1        A.    Yes.

2        Q.    And then it says, "They also fear their

3   foster children being taken away from them by the

4   State, and/or being prohibited from being foster

5   parents in the future, all due to Illinois

6   statutes, JCAR rules and IDCFS policies complained

7   of herein."  Did I read that correctly?

8        A.    Yes.

9        Q.    I want to focus on the very first part.

10  It says, "The Millers would possess and carry

11  loaded and functional handguns for self-defense and

12  defense of family," all right.  What does that

13  mean?  So this is your Complaint.  What do you mean

14  when you say that you would possess and carry

15  loaded and functional handguns for self-defense and

16  defense of family?  Do you understand what I'm

17  asking you?

18       A.    I'm not sure.

19       Q.    Okay.  What I'm asking is if you -- I'm

20  asking you what you would like to be able to do if

21  you win this lawsuit.  So what do you want to be

22  able to do that you're not allowed to do now?

23       A.    To be able to conceal carry in my home.

24       Q.    What else?  Anything else?



1     A.    To be able to have handguns in my home

2  as well during the day care hours.

3     Q.    Okay.  So let me just ask you some more

4  questions about that.  First of all, is there

5  anything else?  Is there anything else you want to

6  be able to do that you're not currently allowed to

7  do?

8     A.    I'm not sure.

9     Q.    We'll ask you some more questions about

10  what you said so far.  So you said you'd like to be

11  able to conceal carry in your home?

12     A.    Yes.

13     Q.    Would that mean during day care hours?

14     A.    Yes.

15     Q.    Just so I'm absolutely clear, by conceal

16  carry, do you mean carry a loaded handgun on your

17  person?

18     A.    Yes.

19     Q.    And you are not asking -- if I

20  understand you, you are not asking to be allowed to

21  carry a loaded long gun on your person, a shotgun

22  or a rifle?

23     A.    No.

24     Q.    So it would be just the handgun that is



1   permitted under your concealed carry license or

2   covered by your concealed carry license?

3       A.   Yes.

4       Q.   All right.  And obviously if you're

5   carrying it on you, you would want it to be loaded?

6       A.   Yes.

7       Q.   All right.  Now, do you want to be

8   allowed or are you asking in this lawsuit to be

9   allowed to have just that one handgun or to be able

10  to have all your handguns in the home?

11      A.   All of them.

12      Q.   Okay.  Now, I assume -- correct me if

13  I'm wrong -- but I assume you can only carry one

14  handgun at a time with your concealed carry

15  license, right?

16      A.   No, you could have a backup, I'm sure.

17      Q.   You mean on your person, loaded on your

18  person?

19      A.   Yes.

20      Q.   Okay.  So you would be asking then to be

21  able to carry at least two loaded handguns on you?

22      A.   Yes.

23      Q.   Okay.  Now, in terms of any other

24  handguns you own -- and we'll get to the handguns



1   you own, but I think you own five, is that right?

2        A.    I think so, yes.

3        Q.    And when I say that, I mean including

4   your wife, you own five?

5        A.    Yes, combined there is five total.

6        Q.    So you're asking to be allowed -- and

7   I'm not saying this is exactly what you're going to

8   do, but I'm asking what you want the court to

9   decide to allow you to do.  You want to be able to

10  carry at least two loaded handguns, so that leaves

11  three handguns.  What do you want to be allowed to

12  do with those handguns?

13       A.    Have them in the safe in my home.

14       Q.    Locked in a safe?

15       A.    Yes, unloaded and locked in the safe.

16       Q.    Okay.  So you are not asking the court

17  to say you can keep those other handguns loaded

18  somewhere else?

19       A.    Kind of half and half, yes and no.

20       Q.    Can you explain that?

21       A.    I mean as long as they was locked in the

22  safe, I wouldn't see a problem with them being

23  loaded.

24       Q.    Well, okay, I understand that, but are



1  you asking the court to say you can keep additional

2  loaded handguns beyond the ones you're carrying

3  locked in a safe, stored in a safe?

4       A.    Yes.

5       Q.    Are you asking the court to allow you to

6  keep any long guns -- strike that.

7             Are you asking the court to change

8  anything about the way you are currently required

9  to keep long guns?

10      A.    I'd say yes.  I'm not sure on the

11 details of the lawsuit, though.

12      Q.    Well, okay, it's your lawsuit, so what

13 would you like to be allowed to do with your long

14 guns that you're not currently allowed to do?

15      A.    Yes, keep them -- not all, but, you

16 know, one loaded.

17      Q.    One?

18      A.    Yes.

19      Q.    So you're looking to be -- if I

20 understand you, and correct me if I'm wrong, I mean

21 it's your lawsuit, I'm not trying to tell you what

22 you want, I'm trying to understand -- you would

23 like to be able to keep a handgun and a backup

24 loaded on your person, right?



DARIN E. MILLER                                    November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              28

1        A.    Yes.

2        Q.    Before we leave that subject, tell me

3   how you would keep them, how would you carry them?

4        A.    In a holster specifically made for the

5   handguns.

6        Q.    And I guess specifically where on your

7   person, where would the holster be or holsters be?

8        A.    On my waist.

9        Q.    So both on your waist?

10        A.    Waist and then like a backup on the

11   ankle.

12        Q.    So you're thinking one on the waist, one

13   on the ankle?

14        A.    Yes.

15        Q.    Now, are you asking the court to allow

16   you to have a loaded handgun that is not locked up

17   and that is not on you?

18        A.    No.

19        Q.    Okay.

20        A.    And I understand you said not locked up,

21   correct?

22        Q.    That's correct.

23        A.    That would be a definite no.

24        Q.    So the only handgun -- strike that.



1              If you get what you want, you would be

2     allowed to have two handguns that were not locked

3     in a safe and all the other guns would have to be

4     locked in the safe?

5          A.    Yes.

6          Q.    And those two handguns that are not

7     locked in the safe would be carried by you at all

8     times?

9          A.    Yes.

10         Q.    Okay.  What about at night, what do you

11    want to be able to do at night?

12         A.    Loaded and locked in the safe.

13         Q.    Same safe as the other guns?

14         A.    Yes.

15         Q.    Okay.  Now, you also said you would like

16    to be able to keep one long gun loaded?

17         A.    Yes.

18         Q.    But am I right that you're only asking

19    that you be allowed to keep it loaded in the safe?

20         A.    Yes, in the safe loaded, locked in the

21    safe.

22         Q.    Okay, locked in the safe loaded.  Okay,

23    I think I've got it.  Now, let me ask you -- I'm

24    thinking of the guns in different categories, and I



1   want to ask you what you want to be able to do with

2   them.  So for the two loaded handguns that are on

3   your person, what do you want to be able to do with

4   them?

5        MR. SIGALE:  Object as to the form of the

6   question.

7   BY MS. HELFRICH:

8        Q.    Okay, I want to rephrase anyway.  Why do

9   you want to be able to carry two loaded handguns on

10  your person?

11       A.    Personal protection.

12       Q.    And explain a little more what you mean

13  by that.  I understand under a concealed carry

14  license when you're out what it means.  What do you

15  mean by that when you're in your home?

16       A.    Somebody breaks into my house.

17       Q.    You would be able to use your weapon

18  against them?

19       A.    Correct, if they've threatened my life

20  or my family's life or well-being.

21       Q.    Okay.  And why do you want to keep three

22  other handguns loaded in the safe?

23       A.    So they're ready to go if for some

24  reason I would need them.



1      Q.    So going back for a moment to this

2   paragraph 16, it says possess and carry loaded and

3   functional handguns for self-defense and defense of

4   family.  That phrase, "possess and carry loaded and

5   functional handguns," would you say that that also

6   refers to the three loaded handguns that you would

7   keep in the safe?

8      A.    Not sure.  I mean I would assume yes.

9      Q.    Okay.  And tell me why you want to keep

10  a loaded long gun in the safe?

11     A.    For personal protection, self-defense,

12  you know, my life and my family's life.

13     Q.    And, again, if you've already got the

14  handguns loaded, why do you need a loaded long gun,

15  why would you like to be able to have a loaded long

16  gun locked in the safe?

17     A.    A long gun would be more accurate.

18     Q.    And to be clear -- and I'm sorry if I

19  already asked this, but I just want to be clear.

20  You are not asking to be allowed to carry a loaded

21  long gun?

22     A.    Correct, yes.

23     Q.    Okay, thank you.  And to clarify one

24  more thing, are you asking to be allowed -- strike



1   that.

2            As I understand what you're saying,

3   you're asking to be allowed to do all those things?

4   In other words, you're asking to be allowed to

5   carry two handguns and to have your other handguns

6   in the safe and to have the loaded long gun?  It's

7   not like you're saying let me choose one of these

8   three and I'll do one of those three things?

9        A.    Yes.

10       Q.    Yes, you're asking for all of the

11  things?

12       A.    Correct.

13       Q.    Okay, got it.  And you understand that

14  this is a lawsuit that would affect other foster

15  parents and other operators of day care homes?

16       A.    Yes, I do.

17       Q.    So are you asking that the rule you

18  would like to see applied is the same rule for

19  everybody?

20       A.    Yes.

21       Q.    So let me ask you some questions about

22  your own personal firearms background.  When did

23  you become interested in firearms?

24       A.    I was pretty young.  I mean probably



1  most of my life.

2      Q.    Do you remember how old you were when

3  you first handled a firearm?

4      A.    Do BB guns count, or are you asking --

5      Q.    Yes, let's ask about BB guns.

6      A.    Probably eight years old, something like

7  that would be my guess.

8      Q.    And did this BB belong to you?

9      A.    Christmas present.

10     Q.    From your parents?

11     A.    Yes.

12     Q.    Okay.  Do you think -- as you look back

13  now, do you think you were old enough, responsible

14  enough to handle a BB gun at eight years old?

15     A.    Yes.

16     Q.    And would you give -- I know your

17  children are older, but would you have given them

18  BB guns when they were eight?  Would you have

19  thought it was okay to give them BB guns when they

20  were eight?

21     A.    It all depends on the individual kid.

22     Q.    Okay.

23     A.    Depends on the maturity level.

24     Q.    So when you say you were responsible



1  enough, you don't mean that any eight-year-old

2  would be responsible enough?

3       A.    Correct.

4       Q.    Okay.  What did you do with the BB gun?

5       A.    Target practice.

6       Q.    Was it supervised or unsupervised?

7       A.    It started out supervised, and when I

8  got older and, you know, more responsible, then it

9  was unsupervised.

10      Q.    Okay.  Around what age was that?

11      A.    I'm not sure.

12      Q.    Was it like around 10, or was it around

13 17?

14      A.    I guess 9.

15      Q.    Okay.  When did you handle firearms that

16 shoot bullets?

17      A.    I'm not sure.  I mean probably around

18 that same age.

19      Q.    And do you remember the circumstances

20 when you first handled that kind of a firearm, not

21 a BB gun?

22      A.    I'm not sure what you're asking.

23      Q.    Okay.  Do you remember the first time

24 you shot a firearm that shoots bullets?



DARIN E. MILLER                                    November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                          35

1      A.    Not really, that's been years ago.

2      Q.    Okay.  Again, I didn't say this upfront

3  and I should have.  If you don't remember something

4  or don't know the answer to a question, that is a

5  perfectly fine answer, just say you don't know or

6  don't remember.  You know, I don't want you to give

7  me answers that you're not sure of.

8            So when you were a child let's say under

9  10, did you handle firearms, and I'm going to say

10 firearms not to refer to BB guns anymore?

11     A.    Could you ask that again?

12     Q.    When you were under 10, did you on any

13 occasion handle a firearm?

14     A.    I'm sure I did.  I mean I'm not

15 sure -- I'm going to say yes.

16     Q.    I'm really just kind of trying to get a

17 sense of what your experience is with firearms, you

18 know, how you learned to handle them, those sorts

19 of things, so that's what I'm aiming for here.  Did

20 your parents keep firearms in the home?

21     A.    Yes.

22     Q.    Did you live with both your parents

23 growing up?

24     A.    Yes.



1     Q.    All right.  What kind of firearms did

2   they keep in their home?

3     A.    I think my dad had -- I know he had a 22

4   rifle.  I'm not sure what else he had.

5     Q.    To your knowledge, did he have any

6   handguns?

7     A.    No.

8     Q.    And did your mother have any guns?

9     A.    No.

10     Q.    So did your mother or father teach you

11   about firearms?

12     A.    Yes, my father.

13     Q.    Tell me how he did that, tell me what

14   that education was like.

15     A.    Proper handling and the rights and

16   wrongs, safety rules, what not to do.

17     Q.    As best you can remember, can you tell

18   me specifically what he taught you?  What are the

19   safety rules or what safety rules did he teach you?

20     A.    Never point a gun at anything you don't

21   wish to shoot, proper carrying and handling and how

22   to take apart a gun, clean it, lubricate it,

23   respect.

24     Q.    Did he teach you anything -- go ahead,



1   please finish your answer.

2       A.    Just to respect it.  It can be

3   dangerous.

4       Q.    Did he teach you anything specific about

5   how to store guns?

6       A.    Not sure.

7       Q.    Do you remember how he stored his guns?

8       A.    No, not at the beginning, but I know he

9   had a safe later on that he stored it in.

10      Q.    Are you saying you don't remember if he

11  had the safe when you were younger?

12      A.    I'm not sure at what point he got the

13  safe.  I don't think he -- he originally wouldn't

14  have had the safe, but later on he got a safe.

15      Q.    Did he teach you specifically how to

16  shoot or how to use a firearm?

17      A.    Yes.

18      Q.    And was it the 22 rifle that he taught

19  you or other firearms as well?

20      A.    The 22 rifle.

21      Q.    Okay.  What did he teach you?

22      MR. SIGALE:  I'll object as to the form, but,

23  Darin, if you understand, you can answer.

24  BY MS. HELFRICH:



DARIN E. MILLER                                    November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                            38

1        Q.    I'll rephrase.  Describe to me how he

2    taught you how to use the 22 rifle.

3        A.    How to handle it, load it, unload it,

4    how to aim it, how to carry it.

5        Q.    I guess what I'm asking is did he take

6    you for target practice, did he take you hunting?

7    What sort of actual shooting did he teach you how

8    to do?

9        A.    Target practice, squirrel hunting,

10   rabbit hunting.

11       Q.    At about what age did you start doing

12   those things?

13       A.    Approximately 9.

14       Q.    And, again, in your view looking back,

15   were you mature enough, responsible enough to be

16   using a firearm in that way at that time?

17       A.    Yes.

18       Q.    So would you say that any child at about

19   that age is mature enough and responsible enough to

20   handle a firearm in that way?

21       MR. SIGALE:  Objection as to foundation and

22   speculation.  To the extent you can answer, Darin,

23   go ahead.

24   BY THE WITNESS:



1        A.    I'm going to answer no.

2   BY MS. HELFRICH:

3        Q.    I'm sorry, go ahead and finish your

4   answer.

5        A.    I mean age has nothing to do.  It's

6   maturity level.  Each individual person is going to

7   be different.

8        Q.    Okay.  Have you had any formal firearms

9   training?

10       A.    Yes.

11       Q.    Tell me all the firearms training,

12  formal firearms training you've had?

13       A.    In 1992, I had my hunter safety

14  education course, and then I cannot remember the

15  dates, but I had -- of course I had my concealed

16  carry the initial 16-hour course, and then this

17  January I had my recertification training course

18  which was three hours, I believe.

19       Q.    Recertification for your --

20       A.    Concealed carry.

21       Q.    Okay.

22       A.    And then I've had with a firearms

23  instructor, Shane Wright, I've had probably 20

24  hours classroom training, like basic handgun



 1  training.

 2       Q.    Sorry, I think she wanted to know what

 3  you said.  I think you said classes and training,

 4  20 hours of classes and training?

 5       A.    Yes.  I think he classified it as basics

 6  handgun training.

 7       Q.    And what did he cover in the basic

 8  handgun training?

 9       A.    Safe handling, the concealed carry.

10  It's kind of hard to explain.

11       Q.    Did he give you any training on how

12  specifically --

13       A.    Malfunction drills and -- I'm sorry?

14       Q.    I didn't hear the last thing you said.

15       A.    What to do in case of malfunctions,

16  those type of drills.

17       Q.    Oh, okay.  Did he give you -- and I'm

18  talking about just Shane Wright here -- did he give

19  you any training specific to the situation of an

20  intruder breaking into your home?

21       A.    Yes.

22       Q.    Can you describe that training?

23       A.    Just being aware of what's on the other

24  side of the wall, a bullet can pass through the



1   walls and that sort of thing, being aware of your

2   surroundings and where your family members are.

3       Q.    Did you do any practical training in

4   that regard like, you know, practicing shooting at

5   an intruder -- or I assume an imaginary intruder?

6       A.    Yes, paper targets.

7       Q.    Okay.  Other than with Shane Wright,

8   have you had any other training regarding how to

9   respond to the situation of an intruder in your

10  home?

11      A.    No.

12      Q.    Is that true even in your concealed

13  carry training?

14      A.    I'm not sure what you're asking.

15      Q.    Did your concealed carry training

16  include any training regarding a situation of an

17  intruder in your home?

18      A.    I don't think so.  I'm not sure.

19      Q.    Have you ever encountered an intruder in

20  your home?

21      A.    No.

22      Q.    I'm going to show you another exhibit.

23  Now, the exhibits are going to go out of order.

24  That's one of the things that happens when you're



1  on Zoom, so let me share my screen.

2            Okay.  Do you see the photographs, some

3  photographs of licenses on the screen?

4       A.   Yes.

5       Q.   Do you see down here in the lower right

6  corner, it says D. Miller Dep Exhibit 6?

7       A.   Yes.

8       Q.   So this is Exhibit 6.  So down here the

9  license that's in the lower left, is that your

10 firearm owner's identification card?

11      A.   Yes.

12      Q.   Okay.  So this particular card says it

13 was issued February 1st, 2019.  Do you see that

14 where my cursor is?

15      A.   Yes.

16      Q.   Was that the first time you got a FOID

17 card?

18      A.   No.

19      Q.   When did you first get a FOID card?

20      A.   I'm not sure of the date.  I want to say

21 prior to 1992 because I know 1992 is when I had my

22 hunter safety education course.

23      Q.   Okay.  I think you would have been young

24 then, right?  You would have been under 21?



1        A.    Under 12, 12 or 13.

2        Q.    Okay.  And you think you had a firearm

3   owner's ID card then?

4        A.    I'm sure I did.  I'm not sure what -- I

5   mean I know I would have had to.

6        Q.    Okay.  Have you had one continuously

7   since then?

8        A.    Yes.

9        Q.    All right.  So there is also a license

10  on the bottom right, and it says at the top State

11  of Illinois Concealed Carry License, Miller Darin

12  Earl.  Is that your concealed carry license?

13       A.    Yes.

14       Q.    I'm not trying to trick you up here, but

15  I see here that it says it expires on 6/14/2020?

16       A.    Yes.

17       Q.    Have you applied to renew this license?

18       A.    April 1st, 2020 I submitted my renewal.

19  I believe January is when I took the refresher

20  concealed carry course.

21       Q.    And when you filed on April 1st, 2020,

22  was that on time to renew it?

23       A.    Yes.

24       Q.    So what's the status now of your



1   concealed carry license?

2       A.    COVID-29.

3       Q.    I understand.  I understand what you're

4   trying to say.  But for the record, you applied on

5   April 1st.  Have you heard anything back yet?

6       A.    No, it just says under review on the

7   website and then COVID-29.

8       Q.    Does it actually say that on the

9   website, COVID-29?

10      A.    Yes, for the expiration date, I think.

11      Q.    And this application is with the

12  Illinois State Police?

13      A.    Yes.

14      Q.    Do they give you anything in the

15  meantime like a temporary card?

16      A.    Just the COVID-29 rules.  You

17  have -- I'm not sure on the exact time, so many

18  months after the COVID-29 is called off, for lack

19  of proper words, to get it renewed.

20      Q.    Oh, I see.  So if you were stopped

21  somewhere and let's say a police officer was

22  looking at your concealed carry license, this would

23  not be considered -- the one we're looking at here

24  on the screen would not be considered expired right



1   now because of COVID-29?

2        A.    Correct.

3        Q.    I got it, okay.

4        A.    And that applies with the FOID card.

5        Q.    Okay.  So your FOID is good for a long

6   time.  You got nine more years.

7        A.    Yes.

8        Q.    Did your wife apply to renew her

9   concealed carry license?

10       A.    Yes, I believe that we done it the same

11  day.  I know we took the class together the same

12  day.

13       Q.    Now, here on your license, it says

14  issued 6/14/2015, do you see that?

15       A.    Yes.

16       Q.    Was that the first time you received a

17  concealed carry license?

18       A.    Yes.

19       Q.    So that would be not long after the law

20  went into effect, right?

21       A.    Correct.

22       Q.    Were you required to do training to

23  become a FOID card holder?

24       A.    No.



DARIN E. MILLER                                    November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              46

1      Q.    Were there other requirements that you
2  had to meet to obtain a FOID card?
3      A.    I'm sure background checks.  I mean if
4  you're asking me -- I'm not sure exactly what
5  you're asking.
6      Q.    So in order to -- I'm trying to think
7  how to phrase it more clearly.
8            What qualifications or standards did you
9  have to meet in order to get a FOID card?
10     A.    Clean background, I'm sure, no felonies
11  or anything of that sort.
12     Q.    But there were no training requirements,
13  no range time requirements?
14     A.    No.
15     Q.    Okay.  Do you plan to renew your FOID
16  card when it expires?
17     A.    Yes.
18     Q.    As far as you know right now, are you
19  eligible to renew your FOID card?
20     A.    Yes.
21     Q.    You know, let me just quickly ask you,
22  have you ever been convicted of a felony?
23     A.    No.
24     Q.    Have you ever been convicted of a



1  misdemeanor?

2       A.    No.

3       Q.    Have you ever been arrested?

4       A.    No.

5       Q.    I want to talk a little bit more about

6  your concealed carry license.  What are you allowed

7  to do with a concealed carry license that you

8  wouldn't be allowed to do without it?

9       A.    Carry a concealed handgun in public.

10       Q.    Loaded, correct?

11       A.    Yes.

12       Q.    And only a handgun, correct, not a long

13  gun?

14       A.    Yes.

15       Q.    What was your reason for getting a

16  concealed carry license in the first place?

17       A.    Personal protection.

18       Q.    Was there any particular incident or

19  situation that prompted it?

20       A.    No.

21       Q.    So in 2015, that was before you had any

22  foster children in your home, right?

23       A.    Yes.

24       Q.    Okay.  Now, at that time, did you keep a



1   loaded handgun in your home?

2       A.    At what time?

3       Q.    Around the time you got your concealed

4   carry license.

5       A.    Yes.

6       Q.    How did you keep it?

7       A.    Locked in the safe.

8       Q.    So locked in a safe loaded?

9       A.    Yes.

10      Q.    Did you carry it on your person in your

11  home?

12      A.    You're saying after I got my license,

13  correct?

14      Q.    Well, yes, after you got your license.

15  After you got your concealed carry license but

16  before you had a foster child in your home, did you

17  carry a loaded weapon on your person in your home?

18      A.    Yes.

19      Q.    Okay.  Did you do that before you got

20  your concealed carry license?

21      A.    No.

22      Q.    Now, when you say that you did

23  it -- strike that.  Let me start again.

24            When you say that in that period between



1   when you got your license and when you became a

2   foster parent, you would carry a loaded gun on your

3   person in your home, was that something you did

4   frequently, something you did all the time, or

5   something you did occasionally?

6        A.    All the time.

7        Q.    Did you carry a backup?

8        A.    No.

9        Q.    Before you became a foster parent, did

10  you keep your other handguns -- strike that.  I

11  want to back up a second.

12            Under your concealed carry license, does

13  that license apply to a specific handgun; in other

14  words, are you licensed to carry a specific handgun

15  or any handgun assuming you own it legally?

16       A.    Any handgun.

17       Q.    Okay.  So of your five handguns, you

18  could carry any of them?

19       A.    Four of them -- well, I guess five, but

20  it wouldn't be able to be concealed.

21       Q.    Why not?

22       A.    Because it's larger than the other, it's

23  not designed for concealed carry.

24       Q.    Oh, are there specific parameters or



1  specific sizes that a concealed carry weapon has to

2  be?

3      A.    I mean no.

4      Q.    It's just if you could conceal it?

5      A.    Correct.

6      Q.    So one of them is too large for you to

7  conceal?

8      A.    Correct.

9      Q.    But of the other four, you could use any

10  of those under your license?

11      A.    Yes.

12      Q.    Okay, I got it.  So in that period

13  between when you got your concealed carry license

14  and you became a foster parent, in that period did

15  you keep more than one loaded handgun in your home?

16      A.    Yes, in the safe.

17      Q.    Okay.  So you would carry one on your

18  person and the others would be in the safe, locked

19  in the safe loaded?

20      A.    Yes.

21      Q.    In that time between when you got your

22  license and when you became a foster parent, did

23  you keep your long guns loaded?

24      A.    One.



DARIN E. MILLER                                    November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                            51

1      Q.    One, only one?

2      A.    Yes, locked in the safe.

3      Q.    Understood.  Was there one in particular

4   that you always kept loaded, or did it vary?

5      A.    The one in particular.

6      Q.    And which one was that?

7      A.    The AR-15.

8      Q.    Okay.  Have you ever been licensed to

9   own a firearm in another state?

10     A.    No.

11     Q.    Have you ever used a gun to defend

12  yourself?

13     A.    No.

14     MS. HELFRICH:  David, why don't we take a

15  break.

16     MR. SIGALE:  Sure.

17     MS. HELFRICH:  It's 10:23.  Why don't we come

18  back at 10:30.

19     MR. SIGALE:  That's fine.

20           (WHEREUPON, a short break was had.)

21  BY MS. HELFRICH:

22     Q.    Mr. Miller, I want to ask you a few more

23  questions about the lawsuit, what you're trying to

24  accomplish with the lawsuit.  You stated that



1  before you were a foster parent when you had a

2  concealed carry license, you kept an AR-15 in your

3  gun safe and it was loaded?

4      A.    Yes.

5      Q.    And you said that, if you get what you

6  want in this lawsuit, you want to be able to keep

7  one loaded long gun locked in the safe, correct?

8      A.    Yes.

9      Q.    And if the rule was changed to say that,

10  to say that you could keep one loaded long gun,

11  would you keep that AR-15 loaded, or would it be a

12  different one, different long gun?

13      A.    It would be the Olympic Arms AR-15.

14      Q.    And if you were allowed to carry a

15  handgun on you, is there a specific handgun that

16  you would choose to carry?

17      A.    Yes.

18      Q.    Which one would that be?

19      A.    The Springfield Hellcat 9 millimeter.

20      Q.    Is there a specific one that would be

21  your backup?

22      A.    The Ruger LCP II 380.

23      Q.    Just to be absolutely clear, if the

24  rules get changed to the rules that you want, is it



1  your intention to actually carry handguns in your

2  home and keep handguns loaded in your safe and keep

3  a long gun loaded in your safe?

4      A.    Yes.

5      Q.    Okay.  So it's not that you want to be

6  able to do it.  You will actually do it if you can?

7      A.    Yes.

8      Q.    To the best of your knowledge or

9  understanding, does your wife intend to carry a

10  loaded handgun in the home?

11      A.    No.

12      Q.    So it would be just you?

13      A.    Yes.

14      Q.    All right.  Let me ask you just a couple

15  more questions about these guns before we go there.

16  The Springfield Hellcat 9 millimeter, why is that

17  the handgun that you would choose to carry?

18      A.    Because it's very concealable and

19  comfortable to carry.

20      Q.    So why does it need to be concealed when

21  you're inside your house?

22      A.    That's the whole purpose of it, you

23  don't want nobody to know you have it.

24      Q.    So even inside your house?

1      A.    I wear T-shirts, and I don't tuck my

2  shirts in, so that's just how it would go.

3      Q.    You would just cover it with the

4  T-shirt?

5      A.    Yes, because I don't tuck my shirts in,

6  so it just automatically covers it.

7      Q.    Okay.  Why would you choose the Ruger

8  LCP as your backup?

9      A.    I guess it would be classified as a

10  micro compact pistol, it's very small in size.

11      Q.    And so it would be concealable, is that

12  what you mean?

13      A.    Yes, it would be like for ankle carry.

14  I've never carried a backup gun, but, you know, at

15  some point I may want to, but as of now I never

16  have carried a backup.

17      Q.    And the Olympic Arms AR-15, why is that

18  the long gun you would choose to keep loaded?

19      A.    Because it's the only caliber I have

20  that would be for self-defense because you wouldn't

21  want to use a 22 long rifle for concealed carry.

22      Q.    Is the AR-15 concealable?

23      A.    I mean not concealed carry.  I mean for

24  personal defense.

1      Q.    Okay.  Let's hold that thought.  When we

2  get to talking about the guns, I'm going to ask you

3  about the specifics about what the characteristics

4  are of the guns.

5            But let me show you another exhibit,

6  this will be Exhibit 2.  Can you see a document

7  that at the top says, "United States District Court

8  for the Central District of Illinois?"

9      A.    Yes.

10     Q.    And if we scroll down, it says D. Miller

11 Dep Exhibit 2, do you see that?

12     A.    Yes.

13     Q.    Okay.  I'm going to scroll through this

14 so that you can see it, and then tell me if you

15 recognize this document, okay?  If at any time you

16 want me to slow down, I will.

17           So do you recognize it?

18     A.    Yes.

19     Q.    And here this page that's added, is that

20 your signature right here on the line above where

21 it says Darin E. Miller?

22     A.    Yes.

23     Q.    Just to be clear, do you understand that

24 by signing this you're verifying that the answers



1  are true to the best of your knowledge?

2      A.    Yes.

3      Q.    So here No. 6 -- you remember before we

4  talked about that paragraph in the Complaint, so

5  here No. 6 says, "Describe in detail what conduct

6  is contemplated by the phrase possess and carry

7  loaded and functional handguns for self-defense and

8  defense of family as used in paragraph 16 of the

9  Amended Complaint."  Did I read that correctly?

10     A.    Yes.

11     Q.    Okay.  And then it says, "In particular,

12 describe what conduct you would engage in when

13 foster children or day care clients are in the

14 home."  Did I read that correctly?

15     A.    Yes.

16     Q.    So we talked a bit about that, and I'm

17 asking some clarifying questions now.  So your

18 answer says, "Nothing other than as described

19 above, except the ability to keep a handgun loaded

20 on Plaintiffs' persons or in a locked safe in case

21 of a self-defense emergency, or consistent with

22 Darin's concealed carry license, but not carrying

23 in the home when day care children are present."

24 Do you see that?



DARIN E. MILLER                                November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                          57

1        A.    Yes.

2        Q.    So you testified earlier, and I just

3   want to clarify what your position is now, you

4   testified earlier, if I understood you correctly,

5   that you want to be able to carry loaded weapons on

6   you even when day care kids are there, is that

7   right?

8        A.    Well, the concealed carry law says that

9   I can't; you know, they have to be locked up when

10  day care kids are present.

11       Q.    So you don't want to be able to do -- so

12  did you misspeak when you testified earlier that

13  you want to be able to carry weapons while day care

14  children are in the home?

15       A.    I mean if the law wasn't the way it was,

16  I would like to, yes.  The concealed carry law says

17  I can't, so I wouldn't, but, yes, it would be nice

18  to.

19       Q.    So if you could get the exact outcome

20  you wanted, you would be able to carry while the

21  day care children are in the home?

22       A.    Yes.

23       Q.    I get you.  But so long as the concealed

24  carry law is in place, you are not allowed to?



1    A.    Correct.

2    Q.    I understand.  Thank you.  Now, this

3  also says, "Except the ability to keep a handgun

4  loaded on Plaintiffs' persons or locked in a safe

5  in case of a self-defense emergency."

6         Now, you testified earlier that you

7  would actually like to be able to keep two

8  handguns, a handgun and a backup, right?

9    A.    Yes, but that doesn't mean I would.  I

10  would just, you know, if I had the option open

11  where if I wanted to.  Like I stated earlier, I

12  never have carried a backup, you know, two handguns

13  at once.

14    Q.    I understand, but you want to be allowed

15  to carry two?

16    A.    Yes.

17    Q.    You also want to be allowed -- okay,

18  well, actually, that's an important thing.  Would

19  you carry a backup?

20    A.    I mean as of now, I don't see the need

21  to, but that could change in the future.

22    Q.    What would make that change?

23    MR. SIGALE:  I'll object as to speculation,

24  but if you can answer, answer.



```
 1  BY THE WITNESS:

 2       A.    I'm not sure.

 3  BY MS. HELFRICH:

 4       Q.    Well, let me ask it this way.  Are there

 5  specific facts or specific circumstances that you

 6  know of that would make you feel that you would

 7  need a backup gun?

 8       A.    If the community I live in went like

 9  downhill, you know, unsafe, you know, crime got

10  really bad.

11       Q.    Okay.  And the last thing in addition

12  to -- so as compared to what's written here in your

13  answer, you want the ability to keep more than one

14  loaded handgun, and you want to be able to keep

15  additional handguns loaded locked in a safe,

16  correct?

17       A.    The handgun and then I mean of course my

18  concealed carry, you know, I'd want to keep it

19  loaded in the safe, that way it's ready to go when

20  I leave or what not to go out, and I'd like to have

21  one like a home defense pistol, you know, because a

22  concealed carry pistol is a lot shorter barrel,

23  like a 3-inch barrel, you know, more compact to

24  carry; whereas like a home defense pistol would be,
```



1  you know, a 4 or 5-inch barrel, a longer barrel.

2  It would be more accurate.

3      Q.    Okay, so more accurate.  I was going to

4  say a longer barrel generally means more accurate,

5  right?

6      A.    Yes, and it fits your hand better;

7  whereas a concealed carry it's not a full grip on

8  the pistol grip.  It's shorter on a concealed

9  carry.

10     Q.    I understand.  So you want to have

11  available a handgun and a backup that you could

12  carry that are consistent with your concealed carry

13  license, basically concealed, in other words; but

14  then you also want to have handguns and you want to

15  have handguns loaded and locked in a safe that are

16  bigger and maybe better; even though they're still

17  handguns, they're easier to use, they're better,

18  they're more accurate, so for those reasons you

19  want to have additional handguns loaded in the

20  safe?

21     A.    Yes, like one additional.

22     Q.    I just want to make a clear record here.

23  Are you asking to be allowed to keep all your

24  handguns loaded in a safe, or are you asking to



1  have it limited to one additional handgun?

2      A.    No, not all of them.  Like I said, just

3  the additional home defense style.

4      Q.    Okay, I'm sorry, I'm not clear.  I'm not

5  trying to harass you or anything.  I'm just trying

6  to get a clear understanding.

7           So in this lawsuit, are you seeking to

8  be allowed to keep all of your handguns in your

9  home loaded?

10     A.    No.  I stated earlier I would, but that

11 wasn't my intention, you know, for like -- I would

12 keep all of them loaded, whereas if I wanted to, I

13 could, but I mean that doesn't necessarily mean I

14 would.

15     Q.    I'm not asking you what you would do.

16 I'm not asking what you would do right now.  I will

17 ask you that later.  But what I'm asking right now

18 is what do you want to be allowed to do?

19     A.    You know, my concealed carry, of course,

20 locked and loaded in the safe, and then a home

21 defense pistol, you know, locked and loaded in the

22 safe.  Like the 22 pistol I wouldn't want to keep

23 it loaded because it's just a range gun, a plinking

24 gun.



1      Q.    So is that the rule that you want to be

2   applied to all foster families and day care home

3   families?

4      A.    Yes.

5      Q.    And just to be clear, I understand it to

6   be a little bit different from what you testified

7   before, so I want to get clarity in the record.

8   You want to be able to carry two handguns loaded;

9   you want to have one additional loaded handgun for

10  self-defense, and then one loaded long gun for

11  self-defense?

12     A.    I think so.

13     Q.    Okay.

14     A.    And where I could have the option where,

15  you know, you got to keep the others unloaded, you

16  know, that's what I was getting at earlier.  I want

17  the option to where if I wanted to keep them

18  loaded, I could, but not that I would.  As far as

19  need to keep loaded, you know, just concealed carry

20  and then home defense.

21     Q.    Okay.

22     A.    So I guess it would be two handguns.

23     Q.    I'm sorry to keep harping on this, but

24  it's really important that I understand because,



1  you know, in this lawsuit you're going to be asking

2  a judge or a jury maybe to change the rule from

3  what it is now and to put in place a new rule or

4  either just get rid of the whole rule, put in a new

5  rule.  So I'm asking basically what do you want the

6  new rule to be?  So what do you want to be allowed

7  to do, what options do you want to have?  Do you

8  see what I'm saying?

9          A.     Right.

10         Q.     So as I understand what you're telling

11 me, you want the rule to say that you can carry a

12 handgun consistent with your concealed carry

13 license, that you can carry a backup handgun

14 consistent with your concealed carry license, but

15 you want the option to keep your other handguns

16 loaded in the safe and to keep one long gun loaded

17 in the safe?

18         A.     Yes.

19         Q.     Okay.  And you might not do all of that,

20 but you want those options?

21         A.     Yes.

22         Q.     And you want every other foster family

23 and every other day home care family to have those

24 same options?



1        A.    Yes.

2        Q.    Okay.  Now, I'd like to know

3   whether -- oh, I'll stop sharing the screen.

4             So under the rule that you have just

5   told me you want and the options you want people to

6   have, do you think that if a person lived in a day

7   care home, you know, like let's say the father of

8   another day care home family and he wants to keep

9   weapons -- he wants to keep firearms on him in his

10  home, he would also need to have a concealed carry

11  license?

12       A.    No, just a FOID card.

13       Q.    So even if he's carrying in his home

14  when the day care kids are there, so let's take

15  that part of the concealed carry -- strike that.

16            Let's do it one step at a time.  If

17  father No. 2, we'll call him, wants to carry loaded

18  weapons in his home, you don't think he needs a

19  concealed carry license?  You're not asking that he

20  be required to have a concealed carry license to do

21  that?

22       A.    No, not if he's in his own home, the

23  FOID card would cover him there.

24       Q.    Okay.  And even if father No. 2 is in a



 1   day care home, same thing?

 2        A.    I mean the state law, the concealed

 3   carry law would be -- I'm not sure how to answer

 4   that.

 5        Q.    And, again, I'm not trying to be tricky.

 6   I'm just asking are you saying that you want a rule

 7   where foster parents and day care parents who have

 8   a concealed carry license can do these things or

 9   all of them can do these things?

10        A.    Well, if it's going to be in the home, I

11   mean that's what your FOID card -- you know, you

12   can have it in your home or transported to the

13   range, buy ammunition and that sort of thing,

14   purchase guns with a FOID card.  Yes, because right

15   now day care says you can't have any handguns in

16   the home, so it wouldn't matter with concealed

17   carry or no concealed carry, the day care law says

18   no handguns in the home.

19        Q.    Right, I understand that.  But you're

20   not asking for the judge or the jury to impose a

21   rule that says everybody who wants to carry in this

22   way in a foster home or day care home has to have a

23   concealed carry license, you're not asking for that

24   rule, right?



1      A.    No.

2      Q.    Okay, that's what I wanted to make

3   clear, thank you.  And if I understand your

4   testimony so far, your wife isn't really going to

5   do anything different if you get the rule that you

6   want?  She's not planning to carry, she's not

7   planning on storing her weapons any differently, is

8   that right?

9      A.    I mean she wants to be able to have a

10  loaded handgun in the safe, locked away in a safe.

11  That way if somebody would break in or try to cause

12  harm, it's there and ready to go in the safe.

13     Q.    Okay.

14     A.    Whereas now we can't have a handgun in

15  the home at all.

16     Q.    So other than the changes that you've

17  described, you're fine, I think, with DCFS having a

18  rule that says all the rest of those long guns you

19  have to keep unloaded locked in a safe stored

20  separately from ammunition other than the one that

21  you keep loaded for self-defense?

22     A.    Right.

23     Q.    Okay.  I'm going to ask you some

24  questions about how you currently store firearms in



1  your home.  Let me just get to that section.

2      A.    Okay.

3      Q.    As we sit here now, how are your guns

4  stored in your home, the guns that you keep in your

5  home, how do you store them?

6      A.    They're locked in the gun safe, and the

7  ammunition is in the ammo crate with two pad locks

8  on it.

9      Q.    And the guns that are in the gun safe

10  are unloaded, is that correct?

11      A.    Yes.

12      Q.    How many guns are you keeping in your

13  home right now?

14      A.    I'm not sure how many long guns are

15  actually in the safe without actually going and

16  counting them.

17      Q.    Well, where else would they be if

18  they're not in the safe?

19      A.    Yeah, I mean they're in the safe, locked

20  in the safe, but I'm just not -- as a head count,

21  I'm not sure how many I actually own, that's what

22  I'm getting at.

23      Q.    Okay.  Well, we're going to go through

24  the guns, and we'll figure it out then, okay?  Can



1  you describe the gun safe that you own?

2       A.    It's a Stack-On brand, it's black, has a

3  key lock on it, has one shelf in it.  I think it's

4  a 14-gun safe.

5       Q.    I'm going to share my screen again.  Can

6  you see a photograph?

7       A.    Yes.

8       Q.    Okay.  I'm going to scroll so you can

9  see the whole thing.  And you can see at the

10  bottom, it says Exhibit 7, you can see where it

11  says Exhibit 7?

12       A.    Yes.

13       Q.    And I hope you'll all trust me that it

14  says D. Miller Dep Exhibit 7.  Is this a photograph

15  of your gun safe?

16       A.    Yes.

17       Q.    About how tall is this?

18       A.    I'm not sure.  Five foot maybe.

19       Q.    Like three or four feet?

20       A.    Probably five, guessing.

21       Q.    Shorter than you?

22       A.    Yes.

23       Q.    Shorter than your wife?

24       A.    Yes.



1        Q.    But maybe not by a lot?

2        A.    Probably not.  It probably comes up to

3    my shoulders.

4        Q.    So you said it comes up to about your

5    shoulders?

6        A.    Yes.

7        Q.    And that would make it maybe 18 inches

8    wide?

9        A.    I'm not sure.  At least maybe 24 inches.

10       Q.    Okay.  Can you see my cursor moving

11   around?

12       A.    Yes.

13       Q.    Is that Cyra?

14       A.    Yep.

15       Q.    We met her.  She's very nice.  So this

16   here is the lock where I'm circling, is that

17   correct?

18       A.    Yes, that's where the key goes.

19       Q.    And that is above a sticker that says

20   BCM and has a little icon, I can't see what that

21   icon is.  Just so that it's clear in the record, we

22   see the lock on the left side above the sticker

23   that says BCM.

24            Now, is there only one key to that lock?



1        A.    There is two.

2        Q.    Same key, though, copies, two copies of

3   the same key?

4        A.    Correct.

5        Q.    And who has those keys?

6        A.    Myself and my wife has the other.

7        Q.    Okay.  And where do you keep those keys?

8        A.    My key is on my truck key chain, my

9   house key in my pocket.

10        Q.    And where do you keep your house -- so

11   that's on a key ring with your other keys?

12        A.    Correct.

13        Q.    When you come home from work at the end

14   of the day, where do you keep those keys?

15        A.    In my pocket.

16        Q.    How about when you go to bed at night?

17        A.    On my dresser in a little wooden box

18   with my wallet.

19        Q.    This dresser?

20        A.    Yes.

21        Q.    I'm indicating what appears to be a

22   dresser to the right of the safe in the picture.

23   How long have you had this?

24        A.    The safe?



1        MR. SIGALE:  Object as to form.

2   BY MS. HELFRICH:

3        Q.    How long have you had the safe in this

4   picture in Exhibit 7?

5        A.    A long time.  I'm not sure on a date.

6   I'm going to guess 20 years, roughly.

7        Q.    Oh, a very long time?

8        A.    Yes.

9        Q.    Okay.  And where is it located in your

10  home?

11       A.    In the master bedroom, my bedroom or my

12  wife's bedroom, too.

13       Q.    And do you keep it locked 24/7?

14       A.    Yes.

15       Q.    On what occasions do you open it?

16       A.    To get a long gun out if I'm going to go

17  to the range and target practice, train.

18       Q.    Okay.  Do your children know where you

19  keep the key?

20       MR. SIGALE:  Object as to speculation, but you

21  can answer.

22  BY MS. HELFRICH:

23       Q.    If you know.  To the best of your

24  knowledge, do your children know where you keep the



1  keys?

2      A.    I would guess yes.  I mean I assume they

3  know it's on my key chain.

4      Q.    Okay.  What about your foster son?

5      A.    No, he's only two.

6      Q.    Now, your wife testified -- and, Dave,

7  you can correct me if I'm wrong -- she testified

8  that the master bedroom is kept locked while the

9  day care kids are there, is that right?

10     A.    Yes.

11     Q.    Is it kept locked at other times?

12     A.    If I'm in there, you know, sleeping or

13 something during the day, I like to keep it locked.

14     Q.    But if you're just at home in the

15 evening with your family, would you keep it locked?

16     A.    I did before our foster son was able to

17 get out of bed, I kept it locked at now.  Now he's

18 in a big boy bed, so I keep it unlocked and usually

19 open so he can come in in the middle of the night.

20     Q.    If he's scared of stuff, you mean?

21     A.    Yes, he usually crawls in bed with us in

22 the middle of the night.

23     Q.    I'm going to open another Exhibit, give

24 me a second.



1           Can you see another photograph on the

2    screen?

3         A.    Yes.

4         Q.    And you see at the bottom, it says D.

5    Miller Dep Exhibit 8.  Is this a picture of the

6    crate where you keep your ammunition?

7         A.    Yes.

8         Q.    And I'm going to point to two corners,

9    they're the lower right and left corners in this

10   photograph at the bottom of the photograph.  Are

11   those two pad locks?

12        A.    Yes.

13        Q.    And are those two pad locks the only

14   locks on the crate?

15        A.    Yes.

16        Q.    Okay.  So no other locks.  We can see

17   all the locks here?

18        A.    Yes.

19        Q.    About how deep is this crate?

20        A.    16 inches, 18 inches maybe.

21        Q.    And who has the key to these pad locks?

22        A.    Myself.

23        Q.    What about your wife?

24        A.    They're stored inside of the gun safe on



1   a hook that's kind of hidden.  You can't see it.

2        Q.   So if she wanted to assess this

3   crate safe -- I'm sorry, go ahead.

4        A.   Yes, the key is inside of the gun safe

5   on like a stick-on hook.

6        Q.   Got it.  Okay, I can picture that.  So

7   do you carry the key to these locks on your key

8   ring?

9        A.   Not to the ammo crate, no.

10       Q.   I'm sorry, Mr. Miller, you froze for a

11  moment.

12            Gail, could you read back my question?

13              (WHEREUPON, the record was read

14               as requested.)

15  BY MS. HELFRICH:

16       Q.   Let me ask a new question.  You do not

17  keep the keys to these locks on your key ring?

18       A.   No, I do not.

19       Q.   And the only keys to these locks are

20  inside the gun safe?

21       A.   Yes.

22       Q.   All right.  So if your wife wanted to

23  access this ammo crate, she would have to open the

24  gun safe, get the keys, and then open the ammo

DARIN E. MILLER                                    November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                          75

1  crate?

2       A.    Yes.

3       Q.    And it's your testimony that she has a

4  key to the gun safe, correct?

5       A.    Yes.

6       Q.    Okay.  Does anyone else have keys to the

7  ammo crate?

8       A.    No.

9       Q.    I think I asked you this, but I'll ask

10 you again.  Does anyone else besides you and your

11 wife have keys to the gun safe?

12      A.    No, there is only two keys.

13      Q.    Does anyone else know where the keys to

14 the ammo crate are?

15      A.    No.

16      MR. SIGALE:  Object as to speculation, but you

17 can answer, Darin, if you know.

18 BY MS. HELFRICH:

19      Q.    If you know, does anyone else know where

20 the keys are?

21      A.    No.

22      Q.    I'm going to show you what's been marked

23 as Exhibit 10.  Can you see a photograph?

24      A.    Yes.



1        Q.    And can you see at the bottom it says D.
2   Miller Dep Exhibit 10?

3        A.    Yes.

4        Q.    And is it a photograph of the interior
5   of the ammo crate?

6        A.    Yes.

7        Q.    And how long have you had this ammo
8   crate?

9        A.    Probably over a year.

10       Q.    How did you store your ammunition before
11   you had this ammo crate?

12       A.    I had another lock box.

13       Q.    How long did you have that lock box?

14       A.    Probably 20 years.

15       Q.    Okay.  Where is this ammo crate kept?

16       A.    This one, underneath the bed, my bed and
17   my wife's bed.

18       Q.    In the master bedroom?

19       A.    Yes.

20       Q.    And where was the previous one kept, the
21   lock box?

22       A.    Closet in the master bedroom.

23       Q.    Okay.  If you remember, did anyone from
24   DCFS ever buy a locking ammo crate or ammo box for



1  you and your wife?

2      A.    I got a little cash box.  I don't even

3  know if it locked or not.  They brought it to us

4  right at the beginning when we was getting our

5  license.  I don't even know -- I don't even

6  think -- I'm not sure if it even had a lock on it.

7  It just said cash box on it.

8      Q.    Okay.  Was it metal?

9      A.    I assume.  I can't remember.  That's

10  been a while.

11      Q.    All right, fair enough.  This one here

12  that we're looking at in Exhibit 10 is plastic,

13  right?

14      A.    Yes, I guess.

15      Q.    At the time that the person from DCFS

16  brought you that cash box, how were you storing

17  your ammunition at that time?

18      A.    I had most of it in the old lock box in

19  the closet.  I think I had some boxes of little

20  22s, like the ones in the bottom right picture

21  here, I think I had them just in the window laying

22  there.

23      Q.    Like on the window sill?

24      A.    Yes, I think so.  It's been a while.



1    Q.    Okay.  In the time you've lived in the

2    house you live in currently, where else have you

3    stored ammunition other than under your bed in this

4    box, in the lock box in the closet, and on the

5    window sill, any other locations?

6    A.    Prior to the day care deal, I would have

7    had it, you know, in the gun safe as well, some of

8    it.

9    Q.    Okay.  I want to show you some other

10   photos and ask you about them.

11          All right.  Can you see a photo of a

12   black square that looks like it has four fingers on

13   it?

14   A.    Yes.

15   Q.    Down in the corner it says D. Miller Dep

16   Exhibit 11?

17   A.    Yes.

18   Q.    Can you tell me what this is a photo of?

19   A.    It's a handgun save.  It's like a mobile

20   one that has a cable lock on it for like

21   automobiles or travel.

22   Q.    So it's a safe that you would keep a

23   handgun in in a vehicle?

24   A.    Yes.  I was going to say it holds two



1   handguns.

2          Q.    Okay.  And you said it has a cable lock.

3   Is the cable this thing that we see in the upper

4   right corner?

5          A.    Yes.

6          Q.    And what does that attach to?

7          A.    You see that rusty kind of metal there,

8   it's attached to one --

9          Q.    Up here in the upper left?

10         A.    Yes, like the seat -- like what the seat

11  is attached to that it bolts to the floor of the

12  truck, it's wrapped around that on the other side.

13         Q.    Okay.  So is this, as we see it here, is

14  this sitting on the floor of your truck?

15         A.    Yes, that's on the passenger -- I don't

16  know if it's the passenger or the driver's side in

17  that picture.  I can't remember because it's

18  usually stored under the seat.  I push it up under

19  the seats.

20         Q.    Okay.  Do you keep it in your truck

21  currently?

22         A.    Actually this safe right now my wife has

23  it in North Carolina, then I have another safe as

24  well in my truck.



DARIN E. MILLER
JENNIFER J. MILLER vs MARC D. SMITH

November 05, 2020
80

1     Q.    Okay.  Your wife is on vacation in North
2  Carolina, right?
3     A.    Yes.
4     Q.    So she took firearms with her in this
5  safe?
6     A.    Yes.
7     Q.    Is that what you're saying?
8     A.    Yes.
9     Q.    Okay.  But ordinarily this would be in
10  your truck, right?
11     A.    Yes, I have two safes in my truck.
12     Q.    We're going to look at the other one in
13  a second.  Does this one ordinarily have two
14  handguns in it?
15     A.    Yes.
16     Q.    I can't actually tell what I'm circling
17  here, which is this blue circle in the middle of
18  the black square or the upper edge of the black
19  square, is that a key lock?
20     A.    Yes, it's actually a stainless steel
21  collar.
22     Q.    Okay.  Who has the keys to this safe?
23     A.    My wife has one, and I have the other.
24     Q.    And where do you keep your key?



1          A.     On my key chain.

2          Q.     Where does your wife keep her key, if

3     you know?

4          A.     On her key chain as well, her car key

5     chain.

6          Q.     Okay.  To your knowledge, does anyone

7     else know where the keys to this safe are?

8          A.     I mean I'm going to say no, but I'm not

9     sure.

10         Q.     That's fine, just if you know.

11                Just for the record, is it correct that

12    this is an ordinary key, you put it in the lock,

13    you turn it?

14         A.     Yes.

15         Q.     And is the same true for the gun safe

16    and the pad locks on the ammo crate?

17         A.     Yes, a normal key.

18         Q.     So no kind of weird digital key or

19    anything like that?

20         A.     No.

21         Q.     All right.

22         MR. SIGALE:  I'm sorry, is it me?  You froze

23    up, like the whole thing just froze up.  It is me.

24    We need to take a break.  I need to log out and get



1   back in.

2        MS. HELFRICH:  Okay.  It's 11:20.  Can you

3   hear me?

4        MR. SIGALE:  Yes, I do.

5        MS. HELFRICH:  Let's take a break until 11:30.

6        MR. SIGALE:  If you're just doing that -- are

7   you just doing that because I just said that, or

8   are you doing that because -- you were glitching up

9   before, but it might have been me, but you seem to

10  be fine now.  So if the only reason you want to

11  take a break --

12       MS. HELFRICH:  It's because of you.

13       MR. SIGALE:  I think whatever it was cleared

14  up, so we can go on, but I might have -- can I ask

15  the Court Reporter to read back the last questions

16  and answers because I think I missed them?

17                 (WHEREUPON, the record was read

18                  as requested.)

19       MS. HELFRICH:  Just so you know, I think we'll

20  probably take a break around noon for lunch.

21       MR. SIGALE:  All right, that's fine.

22       MS. HELFRICH:  So if you're cool with it, I'll

23  just go up to noon.

24       MR. SIGALE:  Yes, I mean unless Darin has a



1  problem with that, I'm fine.

2      THE WITNESS:  No, I'm good.

3  BY MS. HELFRICH:

4      Q.    So what I wanted to ask next is on what

5  occasions do you open this black safe that we're

6  looking at?

7      A.    To get my concealed carry gun out when I

8  leave my house -- I mean when I get in my truck to

9  leave to go somewhere.

10     Q.    So this is where you are currently

11  storing your concealed carry weapon?

12     A.    Yes.

13     Q.    And that's the Springfield Hellcat?

14     A.    Yes.

15     Q.    Do you also keep the Ruger LCP in there?

16     A.    Yes.

17     Q.    Is that the only time that you open this

18  safe?

19     A.    Yes, unless I happen to be shooting at

20  the range, you know.  Of course I would already

21  have it out and on me.

22     Q.    Okay.  I assume you occasionally open it

23  when you have to clean the guns?

24     A.    Yes.



 1      Q.    Or maintain them?

 2      A.    Yes.

 3      Q.    So cleaning, accessing them for

 4  concealed carry, accessing them maybe at the range.

 5  Anything else?

 6      A.    No.

 7      Q.    Can anyone else access this safe to your

 8  knowledge?

 9      A.    Just my wife.

10      Q.    To your knowledge, no one other than you

11  and your wife?

12      A.    No, I mean there is only two keys.  It

13  would be impossible unless somebody broke in my

14  truck and stole it.

15      Q.    All right.  One more picture I want to

16  show you.  My guess is you know what it is.  Can

17  you see a photograph of a silver box, kind of looks

18  like a bathroom scale?

19      A.    Yes.

20      Q.    And down in the corner, it says

21  D. Miller Dep Exhibit 12?

22      A.    Yes.

23      Q.    What is this a photograph of?

24      A.    That's my other safe.  It's a Hornet



1 | brand safe, handgun safe.

2 |      Q.    And is this kept in your truck?

3 |      A.    Yes.

4 |      Q.    How many handguns can this hold?

5 |      A.    I've got the other three in it

6 | currently.

7 |      Q.    Sorry?

8 |      A.    I've got the other three in that safe.

9 | Three is probably about it.

10 |      Q.    So it can hold three?

11 |      A.    Yes.

12 |      Q.    Can it hold more than three?

13 |      A.    I've never tried.  I mean it would be

14 | pretty tight.  It depends on what size the guns

15 | were, I suppose.

16 |      Q.    Okay.  And are these firearms that you

17 | keep in here, are they kept loaded?

18 |      A.    No.

19 |      Q.    So they're unloaded in your car?

20 |      A.    Truck, yes.

21 |      Q.    When did you start storing these

22 | handguns in your truck?

23 |      A.    When the day care said that I couldn't

24 | have them in my home anymore.

1      Q.    And prior to that, did you store them in

2   your home?

3      A.    Yes.

4      Q.    Where in your home did you store them?

5      A.    In the safe.

6      Q.    And did you keep them loaded or

7   unloaded?

8      A.    Unloaded and then the concealed carry

9   was loaded.

10      Q.    The Hellcat?

11      A.    Yes.  Well, actually, I don't think I

12   had it then.  It would have been probably the

13   Springfield XD Mod 2 9 millimeter.

14      Q.    How does this safe open, what kind of

15   mechanism?

16      A.    It's got a touch key pad that you put in

17   a sequence, and it's got a key, and it's also got

18   an Rfid chip, a little band you can wear on your

19   wrist that opens it as well, you swipe it across

20   the pad there, the number pad.

21      Q.    So it has a key sequence.  So I can see

22   in this picture a 2 and a 4 on the top of the box.

23   Because of the glare, I can't really make it out,

24   but I assume there is a 1 and a 3 on the other side



1   of that rectangle on the top of the box?

2        A.    Yes.  It's a number sequence, you push

3   certain numbers like a combination, and that

4   unlocks it.  It's got a battery in it.

5        Q.    Okay.  And in order to access it, do you

6   have to use -- you described three methods, the

7   code, the number code, the key, and the band, the

8   RF band?

9        A.    Correct.

10       Q.    Do you have to use all three together to

11  access it?

12       A.    No, any one of the three.  Of course, if

13  the battery is dead, only the key would work.

14       Q.    Got it.  So you could use the key or the

15  code or the bracelet?

16       A.    Correct.

17       Q.    I understand.  Who has the key to this?

18       A.    Just myself, and the other key is in the

19  gun safe.

20       Q.    So, to your knowledge, does your wife

21  know where the key to this safe is?

22       A.    I'm not sure because she's never even

23  messed with this safe.  I mean I've told her it's

24  with the other keys hanging on the little hidden

DARIN E. MILLER                                    November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                          88

 1  hook, the ammo crate key is.

 2       Q.    Okay.  And who knows the code to this

 3  safe?

 4       A.    Just myself.

 5       Q.    Your wife doesn't know the code?

 6       A.    No.

 7       Q.    And, to your knowledge, does anyone else

 8  know the code besides you?

 9       A.    No.

10       Q.    And who has the bracelet or the chip

11  necessary to open it via the RF mechanism?

12       A.    I do.

13       Q.    Only you?

14       A.    Yes.  It's actually in the gun safe.  I

15  don't use it.

16       Q.    Okay.  But your wife could access it

17  from the gun safe?

18       A.    I'm sorry, you broke up.

19       Q.    Your wife could access it from the gun

20  safe?

21       A.    Yes.  I mean that's where the key is as

22  well, so, yes, she could go there.

23       Q.    Okay.  How long have you had this

24  device, the fob?



DARIN E. MILLER                                    November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              89

```
1        A.    I'm not sure exactly.

2        Q.    More than a year?

3        A.    Yes.

4        Q.    More than two years?

5        A.    Yes, it would be more than two, but

6   probably not three.  I'm not sure exactly.

7        Q.    Okay.  So ballpark two to three years?

8        A.    Yes.

9        Q.    And ballpark is fine.  I want to talk

10  briefly about the DCFS rules that apply to you.

11  Can you tell me, as you understand them, what are

12  the rules that you have to follow as licensed

13  foster parents and day care home operators

14  regarding firearms, let me be clear, just regarding

15  firearms?

16       A.    The day care we cannot have handguns in

17  the home during operating hours, and then per the

18  foster we can't have loaded -- I mean that would

19  apply to the DC -- the day care as well and the

20  foster we can't have loaded long guns or handguns

21  in the home.

22       Q.    Okay.  And what about rules regarding

23  how you store your firearms?

24       A.    They have to be unloaded and the ammo
```



 1 | separately in a lock box and then the firearms

 2 | locked up as well in a safe.

 3 |     Q.    Do you have an understanding of why DCFS

 4 | has those rules?

 5 |     A.    I assume to protect children.

 6 |     Q.    Okay.  And why would those rules protect

 7 | children?

 8 |     MR. SIGALE:  Well, object as to form and

 9 | foundation and speculation, but, Darin, if you can

10 | answer, you can answer.

11 | BY THE WITNESS:

12 |     A.    To keep firearms out of the children's

13 | hands.

14 | BY MS. HELFRICH:

15 |     Q.    And would you agree that firearms in

16 | children's hands can be dangerous?

17 |     A.    Yes.

18 |     Q.    So would you agree that children need to

19 | be protected from firearms?

20 |     A.    Yes.

21 |     Q.    And do you think it's unreasonable for

22 | DCFS to have these rules?

23 |     MR. SIGALE:  Let me object as to form and

24 | foundation and speculation and to the extent it



1   calls for a legal conclusion.  Darin, if you can

2   answer, you can answer.

3   BY THE WITNESS:

4        A.   No, I can't answer.

5   BY MS. HELFRICH:

6        Q.   You don't have an opinion on whether

7   these rules are reasonable or not?  And I'm not

8   asking for a legal conclusion.  I'm asking you just

9   as an ordinary person do you have an opinion as to

10  whether these rules are reasonable?

11       MR. SIGALE:  Same objections, but, Darin, same

12  thing, you can answer if you can answer.

13  BY THE WITNESS:

14       A.   I don't think so, no.

15  BY MS. HELFRICH:

16       Q.   Okay.  In your opinion, and we're just

17  talking about your opinion now, what's unreasonable

18  about them?

19       A.   I mean it puts, you know -- poses a

20  safety risk to my life and my family's life that I

21  don't have access to a loaded firearm.  Because as

22  of now I would have to -- in the need of an

23  emergency when seconds matter, I would have to

24  unlock the gun safe, get the gun out, and then



DARIN E. MILLER                                November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                          92

1   unlock the ammo crate, and then load a magazine,
2   and then load the firearm; and when somebody is
3   breaking into your home, you don't have minutes
4   when it takes seconds for them to break in.
5        Q.    Okay.  So are you saying that you think
6   your family would be safer if you were able to have
7   a loaded firearm in your home -- if you were to
8   have ready access to a firearm?
9        A.    Yes, absolutely.
10       Q.    And do you think that your foster son
11  would be safer?
12       A.    Yes.
13       Q.    And do you agree that the safety of your
14  foster son is of paramount importance?
15       A.    Absolutely.
16       Q.    All right.  I want to switch gears.  I
17  want to talk about the other Plaintiffs in this
18  lawsuit.  Mr. Miller, do you know who the other
19  Plaintiffs in the lawsuit are other than you and
20  your wife?
21       A.    Yes.
22       Q.    Who are they?
23       A.    Second Amendment Foundation, Illinois
24  Carry, and Illinois State Rifle Association.



1      Q.    Okay.  Let's start with the Illinois

2  State Rifle Association.  Are you a member of the

3  Illinois State Rifle Association?

4      A.    Yes.

5      Q.    When did you become a member?

6      A.    In the last couple years probably.

7      Q.    Was it around the time you filed this

8  lawsuit?

9      A.    I think so.  I think I had been a member

10  years ago, and I kind of always wanted to become a

11  member again.

12      Q.    Okay.  What is the ISRA?

13      A.    Illinois State Rifle Association.

14      Q.    I'm sorry, I mean what kind of an

15  organization is it, what does it do, what it's

16  about?

17      A.    They help out in training and have a lot

18  of children's programs on gun safety.

19      Q.    Okay.  At the time that you became a

20  member around the time you filed this lawsuit, how

21  did that happen?  Tell me did you go online and

22  fill out a form, did you mail something in, did you

23  call someone, how did you become a member?

24      A.    I spoke with Dave that I wanted to



1  become a member again.

2       Q.    Let me stop you.  Do you mean Dave

3  Sigale?

4       A.    Yes, David Sigale.

5       Q.    Okay.  You don't need to tell me about

6  conversations you had with your Counsel.  So

7  without telling me about conversations you had with

8  your Counsel, just tell me what happened and how

9  the process happened that you became a member.  You

10  can tell me you had a conversation with your

11  Counsel, just don't tell me what you said to each

12  other.

13       A.    I'm not sure how to answer that.

14       Q.    Okay.

15       A.    It's kind of confusing.

16       Q.    I understand, it is confusing.  Did you

17  speak to anyone at the Illinois State Rifle

18  Association about becoming a member at that time?

19       A.    Yes.

20       Q.    Who did you speak to there?

21       A.    David Sigale.

22       Q.    Well, I don't think David Sigale is at

23  the Illinois State Rifle Association, but, David,

24  correct me if I'm wrong.



```
 1        MR. SIGALE:  I'm the general counsel.  I don't

 2   know if that answers your -- I don't know if that's

 3   a clarification.

 4   BY MS. HELFRICH:

 5        Q.    Okay, that answers my question.  So

 6   would it be correct to say that you became a member

 7   of the Illinois State Rifle Association by talking

 8   with Mr. Sigale?

 9        A.    Yes.

10        Q.    Did you speak to anyone else at the

11   Illinois State Rifle Association?

12        A.    No.

13        Q.    Have you ever spoken with anyone else at

14   the Illinois State Rifle Association?

15        A.    It's been years ago.

16        Q.    Do you mean you did speak to someone

17   years ago?

18        A.    Oh, I'm sure I did because I'm pretty

19   sure I used to be a member.  I know I was a member

20   of the National Rifle Association.

21        Q.    Are you a member of the NRS now?

22        A.    No, not currently.

23        Q.    Okay.  Just referring to the time around

24   the time the lawsuit was filed, did you speak to
```



1  anyone at ISRA other than Mr. Sigale?

2      A.    No.

3      Q.    Did you pay any money, any dues,

4  membership fee, to become a member of ISRA around

5  the time you filed the lawsuit?

6      A.    No.

7      Q.    Did you receive any letters, emails,

8  other kinds of communications from the ISRA about

9  becoming a member around the time that you filed

10  the lawsuit?

11      A.    I guess so, yes.

12      Q.    Like what, can you describe them?

13      A.    I mean I currently receive stuff through

14  the mail and emails from them, the monthly

15  newsletters and stuff.

16      Q.    Did you receive any individual

17  communications, communications just with you or

18  with your wife, not communications that go to all

19  members, but just communications with you about

20  membership or about the lawsuit at the time you

21  filed the lawsuit?

22      A.    No.

23      Q.    So this lawsuit was filed in 2018,

24  correct?



1    A.    I think so, April or May 2018.

2    Q.    Okay.  Between that time and now, have

3  you ever done anything -- well, let me put it this

4  way:  So you became a member of the ISRA around the

5  time you filed the lawsuit, correct?

6    A.    Yes.

7    Q.    And did you ask to be a member?

8    A.    Yes.

9    Q.    Did anyone ask you to be a member?

10    A.    I don't think so.

11    Q.    And how long was that initial membership

12  good for?

13    A.    I'm not sure exactly.

14    Q.    Have you done anything between 2018 and

15  now to renew your membership in the ISRA?

16    A.    I know it's still valid.  I still have a

17  membership.

18    Q.    How do you know it's still valid?

19    A.    Because of what I've received in the

20  mail, my card.

21    Q.    You have a membership card?

22    A.    Yes, a card stating my membership.

23    Q.    And does the card -- do you have that

24  card on you?



1        A.     I think so -- no, I don't have my wallet

2    on me.  It's on my dresser.  It's in my wallet.

3        Q.     Maybe at the lunch break you could get

4    that card and we can talk about it.

5        MS. HELFRICH:  David, I think that should have

6    been produced.  I think we asked for documents

7    relating to his membership.

8        MR. SIGALE:  We'll get that at lunchtime and

9    we'll produce it.

10       MS. HELFRICH:  Okay, thank you.

11   BY MS. HELFRICH:

12       Q.     Mr. Miller, do you attend any meetings

13   held by the ISRA?

14       A.     No, I haven't due to COVID.

15       Q.     Did you attend meetings before COVID?

16       A.     No.

17       Q.     Do you provide any input to the ISRA?

18   Do you ever communicate your thoughts, your

19   opinions about the organization, do you vote for

20   things?

21       A.     No.

22       Q.     Do you ever attend any events put on by

23   the ISRA?

24       A.     I wanted to, but, like I said, it

1  usually never works out with my work schedule, and

2  then recently we've had the COVID restrictions.

3      Q.    So you have never attended any events

4  since you became a member in 2018?

5      A.    No.

6      Q.    All right.  Do you read the materials

7  that they send to you?

8      A.    Usually.

9      Q.    What kind of things do those materials

10  include?

11      A.    There is like a newspaper that I

12  receive, you know, different articles related to

13  shooting and legislation action and different

14  things like that, new laws and what not.

15      Q.    Okay.  Have you received any

16  communications -- strike that.

17          In the materials that the ISRA sends to

18  you, have any of them ever included information

19  about this lawsuit?

20      A.    Not that I'm aware of.

21      Q.    All right.  Do you know any other

22  members of the ISRA?

23      A.    I'm sure I do.  It's not something

24  people advertise, hey, I'm a member, but I'm sure I



1   do know people.  I know for sure a few people.

2       Q.    You do know a few people who are members

3   of ISRA who you know for sure are members?

4       A.    Yes.

5       Q.    Okay.  So if I understand what you're

6   saying, in addition to those people, you are pretty

7   sure that you must know other people who are

8   members, but they just don't talk about it?

9       A.    Right, yes.

10      Q.    How many people do you know for sure who

11  are members of the ISRA?

12      A.    Two that I can confirm for sure.

13      Q.    Did you say two?

14      A.    Yes, that I know for sure.

15      Q.    Okay.  And who are they, and I'm not

16  asking for their names, just what is their

17  connection to you, how do you know them?

18      A.    One is an uncle and one is a friend.

19      Q.    Okay.  Do you ever talk with them about

20  the ISRA?

21      A.    No.

22      Q.    How do you know their members?

23      A.    Just because I've seen the sticker

24  before, like a window decal.



1    Q.    Did you speak to anyone at the ISRA

2    other than Mr. Sigale about this lawsuit?

3    A.    No.

4    Q.    So what's your understanding of why the

5    ISRA is a Plaintiff in this lawsuit?

6    A.    Because it affects their members as

7    well.

8    Q.    Anything else?

9    A.    No.

10   Q.    So I think you said you have never

11   attended any meetings of ISRA, correct?

12   A.    No.  I attended a banquet I think like

13   with my grandpa.

14   Q.    When was that?

15   A.    He passed away in 2001, so it would have

16   been prior to that, so it's been a few years.

17   Q.    Okay.  So not since you became a member

18   in 2018 or around the time this lawsuit was filed?

19   A.    No.

20   Q.    Got it.  And if I asked you this

21   already, I'm sorry, have you ever voted on any

22   issue or in any election put on by the ISRA?

23   A.    Not yet.  I haven't seen material to do

24   so.  I mean when the time comes, I would.



DARIN E. MILLER                              November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                      102

1     Q.    But you haven't been sent a ballot or
2   nobody has asked you to vote for whatever, the
3   officers or vote on some rule change or something
4   like that, that's not happened?
5     A.    No, I haven't seen anything in the mail
6   yet.  I'm not saying I didn't and my wife thought
7   it was junk male and threw it away, but I
8   definitely would vote.
9     Q.    Okay.  Is your wife a member?
10    A.    Yes.
11    Q.    All right.  I want to show you -- I want
12  to go back to Exhibit 2 for a moment.  I'm going to
13  share my screen.
14          Can you see a document, and it says
15  No. 11?
16    A.    Yes.
17    Q.    I'm actually going to scroll up to the
18  page before.  You see this is D. Miller Exhibit 2.
19  So question No. 10 says when, under what
20  circumstances, and why did you become a member of,
21  and it says Illinois State Rifle Association, The
22  Second Amendment Foundation, Illinois Carry, and
23  any other organization related in any way to
24  firearms or the Second Amendment.  Do you see that



1    question?

2         A.    Yes.

3         Q.    Did I read it right?

4         A.    Yes.

5         Q.    And here's the answer you gave:  "Darin

6    has been a member of Illinois State Rifle

7    Association off and on for many years, does not

8    remember how many, due to his interests in firearm

9    issues and policy.  Jennifer wished to be a member

10   of ISRA, and they both asked to be a member of the

11   other organizations when those groups expressed

12   interest and support in the Plaintiffs' dispute

13   with the Defendant."  Did I read that right?

14        A.    Yes.

15        Q.    Okay.  Now, here it says they both asked

16   to be a member of the other organizations.

17        A.    Yes.

18        Q.    Who did you ask?

19        A.    I had spoke with David Sigale about it,

20   about what I needed to do to become a member again.

21        Q.    Okay.  Again, I don't want to go too far

22   into what your conversations with Mr. Sigale were.

23   Did you speak to anyone at the other organizations

24   other than Mr. Sigale?

1      A.    I know I spoke with the lady from

2   Illinois Carry a few times, but as far as the

3   others, no.

4      Q.    So you didn't speak to anyone at Second

5   Amendment Foundation?

6      A.    No.

7      Q.    Okay.  Let's talk about Illinois Carry,

8   and then when we're done talking about Illinois

9   Carry, we'll take a break for lunch, okay, and

10  we'll do Second Amendment Foundation afterwards.

11         You understand that Illinois Carry is a

12  Plaintiff in this lawsuit?

13     A.    Yes.

14     Q.    What is your understanding of why

15  Illinois Carry chose to become a Plaintiff?

16     A.    Because they have members that this

17  lawsuit affects as well.

18     Q.    Do you know of any members other than

19  yourself and your wife that this lawsuit affects

20  members of Illinois Carry?

21     A.    I'm not sure.

22     Q.    You're not sure whether they have any

23  other members other than you and your wife

24  affected?



1    A.    That I know.  I mean I don't personally

2  know my friends and family if they're members or

3  not.  Whether they have other members, yes, I'm

4  sure they do.

5    Q.    Right, understood, of course they have

6  other members.  Do you know whether they have any

7  other members who are foster parents or day care

8  home operators other than you and your wife?

9    A.    I don't personally know.  I'm sure they

10  do.

11    Q.    So tell me what Illinois Carry is.

12    A.    Mainly it's a website and a forum, you

13  know.  I've used it for many years to get answers

14  and things like that to firearms-related questions.

15    Q.    Answers about what?

16    A.    Firearms-related questions, like

17  questions about laws and things like that.

18    Q.    Does Illinois Carry do firearms

19  training?

20    A.    That I'm not sure.

21    Q.    Okay.  Does it do any other kind of

22  firearms education?

23    A.    I'm not sure.  I don't know.

24    Q.    And, again, I'm only asking what you



1  know; so if you don't know, you don't know.  So is

2  your interaction with them primarily through their

3  website?

4       A.    Yes.

5       Q.    How did you learn about Illinois Carry?

6       A.    When I was looking into getting my

7  concealed carry license.

8       Q.    What happened, how did you hear about

9  them?

10       A.    Just online searches, you know,

11  searching.

12       Q.    You found them by searching online?

13       A.    Yes, searching like for questions and

14  stuff, and their website would pop up, and I'd read

15  forums to get answers to different questions I had.

16       Q.    And are you a member of Illinois Carry?

17       A.    Yes.

18       Q.    When did you become a member?

19       A.    In probably around -- right before the

20  lawsuit.

21       Q.    I'm sorry, I couldn't hear you, when?

22       A.    Probably around a little before with the

23  lawsuit because without being a member, I couldn't

24  like ask questions and things on the forum, so I



1   went ahead and became a member so I could actually

2   participate more on it; whereas before it was more

3   of a resource where I could get answers.  But when

4   I became a member, I could actually correspond, you

5   know, with the stuff on the website.

6          Q.    So did you become -- just to be clear,

7   you said it was before the lawsuit.  Was it

8   separate from the lawsuit?  I mean was it just

9   before, or was this just a separate thing where you

10  looked them up, you saw their forum, you liked

11  them, you became a member?

12         A.    I'm sure it was -- I'm sure I became a

13  member around the time of the lawsuit just so I

14  could actually engage more in their website, I

15  could do more things with their website to get

16  answers and ask questions and that sort of thing.

17         Q.    Okay.  How did you become a member?

18  What was involved in becoming a member?

19         A.    Just signing up online, I believe,

20  getting a user name and password.

21         Q.    Did you have any conversations with

22  anyone from Illinois Carry about becoming a member?

23         A.    I'm not sure.

24         Q.    Okay.  You said before that you had some



1   conversations with the lady from Illinois Carry?

2       A.    Yes.

3       Q.    Does the name Valinda Rowe sound

4   familiar?

5       A.    Yes, that's her name, yes.

6       Q.    So what conversations did you have with

7   Valinda Rowe?

8       A.    I'm sure we had at least a couple

9   telephone conversations.

10      Q.    When were those?

11      A.    They would have been before the lawsuit

12  was filed.

13      Q.    And what did you talk about?

14      A.    Different questions and kind of what I

15  could do with the matter, you know, regarding

16  concealed carry and all that.

17      Q.    I'm afraid I don't understand.  When you

18  say what you could do about the matter, what's the

19  matter?

20      A.    With the day care and all that with

21  concealed carry.

22      Q.    So you talked to her about what you

23  could do about the day care home rules?

24      A.    Yes, advice.



1        Q.    How many times did you speak with her?

2        A.    I think two.

3        Q.    And did you talk about this lawsuit?

4        A.    That would have been before the lawsuit.

5        Q.    Did you talk about possibly filing a

6   lawsuit?

7        A.    Well, yeah, I mean what my options were

8   and what I could do.

9        Q.    Did she tell you that one of your

10  options was to file a lawsuit?

11       A.    I don't remember.

12       Q.    Did you talk about a lawsuit as an

13  option with her?

14       A.    That I don't remember.  I talked to so

15  many people and that's been so long ago.

16       Q.    Okay.  Was that the only time you have

17  spoken directly with Valinda Rowe?

18       A.    Yeah, it would have been those two

19  different times.

20       Q.    What's your understanding of what

21  Illinois Carry's goals are in general, not just in

22  this lawsuit, but in general?

23       A.    Helping empower people with knowledge.

24       Q.    Related to firearms?



1      A.    Yes, concealed carry.

2      Q.    Did you pay any money to be a member of

3   Illinois Carry?

4      A.    No.

5      Q.    When you became a member, which you said

6   was before this lawsuit was filed if I understood

7   you correctly, how long did or does that membership

8   last?

9      A.    I assume until you would cancel it, so I

10   would assume indefinitely.

11      Q.    So have you ever done anything to renew

12   your membership?

13      A.    No.  I don't think you do have to.  I

14   think it's just until you cancel it.

15      Q.    Do you have a user name for the Illinois

16   Carry website?

17      A.    Yes.

18      Q.    What is that user name?

19      A.    I'm not sure what I put in.  It's saved

20   in my computer.  When I go to log in, it pops up.

21      Q.    So as we're sitting here, you don't

22   know?

23      A.    No, I'm not sure.  I have so many

24   different logins to so many different websites and



1  passwords.  I just save them all to the computer,

2  and it remembers them.  When I go to their website

3  to log in, it pops up.

4       Q.    I know how that works.  Do you know

5  whether you have to have a user name in order to be

6  an Illinois Carry member?

7       A.    I would assume so.  That was part of

8  signing up.

9       Q.    Do you know whether you can be an

10  Illinois Carry member without a user name?

11       A.    I would say no.

12       Q.    All right.  Do you currently receive

13  communications from Illinois Carry?

14       A.    It would by email if I did.  I'm sure I

15  do.

16       Q.    Do you read those communications?

17       A.    Sometimes.

18       Q.    Okay.  But you know you get them?

19       A.    Yes.

20       Q.    Do you ever get any communications that

21  are directly to you or your wife as opposed to all

22  Illinois Carry members?

23       A.    No.

24       Q.    Have you ever gotten communications like



1  that?

2      A.    No.

3      Q.    Other than Mr. Sigale, have you ever

4  spoken to anyone at Illinois Carry about this

5  lawsuit or about the possibility of filing a

6  lawsuit?

7      MR. SIGALE:  I'm just going to object as asked

8  and answered, but you can go ahead and answer,

9  Darin.

10  BY THE WITNESS:

11      A.    The only one from there I would have

12  talked to would have been Valinda Rowe.

13  BY MS. HELFRICH:

14      Q.    Have you ever talked to anyone other

15  than Valinda Rowe or Mr. Sigale about

16  anything -- sorry, strike that.

17      Other than Valinda Rowe and Mr. Sigale,

18  have you ever talked to anyone at Illinois Carry?

19      A.    No.

20      Q.    All right.  Do you attend any meetings

21  at Illinois Carry if they have meetings?

22      A.    I'm not sure that they do.  I don't

23  think they do.  I think it's all online.

24      Q.    And you've never attended one?



1    A.    No.  I mean I would assume they would

2  attend like rallies and things like that, but it

3  wouldn't be just for them.

4    Q.    I see, okay.  So let me ask my next

5  question.  Have you ever attended any event that

6  involved Illinois Carry or that were sponsored by

7  Illinois Carry, so, like you just mentioned,

8  rallies, things like that?

9    A.    No.

10    Q.    Okay.  Do you ever provide any input to

11  Illinois Carry?  Do you make your opinion known to

12  the organization about the organization?

13    A.    No.

14    Q.    Have you ever voted in any election or

15  in any proposition within Illinois Carry?

16    A.    No.

17    Q.    Do you know any other members of

18  Illinois Carry?

19    MR. SIGALE:  Objection, asked and answered,

20  but you can answer again.

21  BY THE WITNESS:

22    A.    I don't know.  I mean other than my

23  wife.

24  BY MS. HELFRICH:



1      Q.    Right, other than your wife.  Does she
2  have a separate user name?
3      A.    I would assume so.  She would have to.
4      Q.    You don't know for sure?  Why would she
5  have to?
6      A.    I mean I assume so.  I mean in order to
7  be -- she couldn't have the same one as me because
8  that would be a different account, so she would
9  have to have her own.
10     Q.    Okay.  But other than your wife, you
11  don't know anyone who is a member of Illinois
12  Carry?
13     A.    I'm sure I do know somebody that is.  I
14  just don't know whether or not they're a member or
15  not, you know, like advertise on their shirt I'm a
16  member of Illinois Carry.
17     Q.    Understood.  But you don't know anyone
18  who you know is a member of Illinois Carry?
19     A.    Yes.
20     Q.    Got it, okay.  What is your
21  understanding of why Illinois Carry is involved in
22  this lawsuit?
23     MR. SIGALE:  Objection, asked and answered,
24  but go ahead, Darin, you can answer.

1    BY THE WITNESS:

2        A.    Because they have members that this

3    affects.

4    BY MS. HELFRICH:

5        Q.    Okay.  So I want to ask basically the

6    same questions about Second Amendment Foundation.

7    We can take a break now and do it after lunch, or I

8    can do that and then we can take lunch.

9        A.    Whatever you guys want to do.

10       Q.    Okay.  Well, let's do Second Amendment

11   Foundation, then we'll have a clean break, have

12   lunch and then start with something new.

13             Are you a member of the Second Amendment

14   Foundation?

15       A.    Yes.

16       Q.    Tell me what the Second Amendment

17   Foundation is.

18       A.    They help people I mean with things like

19   the lawsuits and things like that to fight and

20   stand up for our rights.

21       Q.    Do you know anything else that they do?

22   Do you know if they do anything else?

23       A.    I'm sure they have different programs

24   and things like that.



1      Q.    I just want to know what you know, just

2   specific things that you actually are sure about.

3   Is there anything else that you know of that they

4   do?

5      A.    No.

6      Q.    Okay.  How did you find out about the

7   Second Amendment Foundation?

8      A.    I'm not sure how it's been so long ago.

9      Q.    Well, let me ask you this:  When did you

10  become a member of the Second Amendment Foundation?

11     A.    I'm not sure on the exact date.

12     Q.    Was it around the time of the filing of

13  this lawsuit?

14     A.    I would say yes.

15     Q.    Was it in connection with the filing of

16  this lawsuit?

17     MR. SIGALE:  Object as to form of the

18  question.  If you understand, you can answer,

19  Darin.

20  BY THE WITNESS:

21     A.    I'm not sure.

22  BY MS. HELFRICH:

23     Q.    Well, did you become a member of the

24  Second Amendment Foundation in connection with your



DARIN E. MILLER                          November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                   117

1  decision to become a Plaintiff in this lawsuit?

2      MR. SIGALE:  Same objection.  You can answer,

3  Darin.

4  BY THE WITNESS:

5      A.    I'd say half and half, somewhat.  That

6  was part of the reason but not all of the reason.

7  BY MS. HELFRICH:

8      Q.    What was the rest of the reason?

9      A.    Just I believe in what they stood for

10  and what they were about.

11      Q.    Okay.  Is there any other reasons why

12  you became a member of the Second Amendment

13  Foundation?

14      A.    I had heard good things about them when

15  I found out about them.  I felt it was something --

16      Q.    Who did you find out about them from?

17  I'm sorry, go ahead.

18      A.    Probably online and people I talk to

19  kind of finding out about them, discovering them

20  kind of.  I liked what they stood for and I wanted

21  to be a part of it.

22      Q.    Did you know about the Second Amendment

23  Foundation before you began considering this

24  lawsuit?



1      A.    I'm sure I had heard of them, but I
2    didn't know a whole lot about them.
3      Q.    Okay.  What was the process -- you're a
4    member of the Second Amendment Foundation now?
5      A.    Yes.
6      Q.    What was the process by which you became
7    a member?
8      A.    I just spoke with David Sigale about,
9    you know, I'd like to become a member, I liked what
10   they stood for, and he said he'd see what he could
11   do then.
12     Q.    And what happened as a result of that
13   conversation?
14     A.    He got me where I was a member then.
15     Q.    Did you speak to anyone other than
16   Mr. Sigale at the Second Amendment Foundation?
17     A.    I don't believe so.
18     Q.    Have you ever spoken to anyone at the
19   Second Amendment Foundation?
20     A.    No.
21     Q.    What's your understanding of why the
22   Second Amendment Foundation is a Plaintiff in this
23   lawsuit?
24     A.    Because they have members that this



 1  affects as well.

 2       Q.    Any other reasons?

 3       A.    Not sure.

 4       Q.    Do you know whether the Second Amendment

 5  Foundation has any members affected by this lawsuit

 6  other than you and your wife?

 7       A.    I'm not sure.  I don't personally know.

 8       Q.    Did you pay any money to be a member of

 9  SAF?

10       A.    No.

11       Q.    When you became a member around the time

12  of the filing of this lawsuit, how long did your

13  membership last?

14       A.    I'm not sure.

15       Q.    Have you ever done anything to renew

16  your membership?

17       A.    I don't think so.  I know I get stuff in

18  the mail.

19       Q.    And, to your recollection, you didn't

20  pay any money to become a member?

21       A.    No.

22       Q.    Do you ever attend any meetings of the

23  Second Amendment Foundation?

24       A.    No.



```
1         Q.    Have you ever done so?

2         A.    No, I said.

3         Q.    Okay.  Have you ever provided any input

4    to the Second Amendment Foundation about the

5    organization itself?

6         A.    I don't think so.

7         Q.    Have you ever voted in any election or

8    on any measure, any policy or rule change proposed

9    or put on by the Second Amendment Foundation?

10        A.    No.

11        Q.    Do you currently receive communications

12   from Second Amendment Foundation?

13        A.    Yes.

14        Q.    And do you receive any communications

15   targeted directly at you and your wife, or are you

16   referring to communications that they send

17   generally to their members?

18        A.    Just in general the members, emails and

19   letters.

20        Q.    Roughly what's the substance of those

21   communications?

22        A.    Just news and updates.

23        Q.    Policy news?

24        A.    Just updates on different lawsuits that
```



1   they've got filed and new rules, legislation.

2       Q.    Okay.  Have you ever read any

3   publications put out by the Second Amendment

4   Foundation?

5       A.    As in a book, or what are you talking

6   about?  I'm not sure what you're asking.

7       Q.    A book, a magazine, a journal, including

8   like an online journal.

9       A.    I mean I get emails and read -- there is

10  like articles you can read.

11      Q.    Okay.  Other than those emails, have you

12  ever read any publications put out by the Second

13  Amendment Foundation?

14      A.    They'd be online like magazine articles

15  or newspaper articles or whatever you would call

16  them.

17      Q.    And you read those?

18      A.    Yes.

19      Q.    Do you know anyone else who is a member

20  of the Second Amendment Foundation?

21      A.    Again, I don't specifically know, but

22  I'm sure there is people that I know are members.

23  I just don't specifically know who is and who

24  isn't.



1      Q.    So same as with the other two

2    organizations, Illinois Carry and Illinois State

3    Rifle Association -- well, no, sorry, you do know

4    people who are definitely of ISRA.  So same as

5    Illinois Carry, you probably know people, but you

6    don't specifically know anyone that you can say for

7    sure is a member of the Second Amendment

8    Foundation?

9      A.    Yes, other than my wife, I know she is.

10     Q.    Other than your wife, okay.  Have you

11   had any communications, either in person or by

12   email or by letter, whatever, with the Second

13   Amendment Foundation about this lawsuit?

14     A.    Nobody other than David Sigale.

15     Q.    And no emails, no letters, nothing like

16   that?  And I'm talking about personal

17   communications, not an email block that includes a

18   reference to the lawsuit.  I'm talking about

19   somebody talking to you, Darin Miller, or your

20   wife, Jennifer Miller, about the lawsuit.

21     A.    No.

22     Q.    Okay.  Now, I want to go back to

23   Exhibit 2, and to be clear we're back here, this is

24   question No. 10, answer No. 10, and I'm looking at



1  this second sentence, and it says, "Jennifer wished

2  to be a member of ISRA, and they both asked to be a

3  member of the other organizations when those groups

4  expressed interest and support in the Plaintiffs'

5  dispute with Defendant."

6       MR. SIGALE:  That's not what's on the screen.

7  BY MS. HELFRICH:

8       Q.    Sorry.  How about now, are you seeing it

9  now?

10      A.    Yes.

11      Q.    Okay.  So here is question No. 10, and

12 then your answer here it says, "Jennifer wished to

13 be a member of ISRA, and they both asked to be a

14 member of the other organizations when those groups

15 expressed interest and support in the Plaintiffs'

16 dispute with the Defendant."

17           Now, where it says they both asked to be

18 a member of the other organizations, who did you

19 ask, tell me everybody you asked to be a member of

20 the Second Amendment Foundation?

21      A.    I asked David Sigale what I needed to do

22 to become a member.

23      Q.    Did you ask anyone else?

24      A.    No.



DARIN E. MILLER                                    November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                            124

1       Q.    And for Illinois Carry, did you ask

2    anyone about how to become a member?

3       A.    I think I just did it online.  I don't

4    think I asked anybody how to become a member.  I

5    think I just signed up online.

6       Q.    Okay.  And I think for ISRA you

7    testified that you asked Mr. Sigale.  Did you ask

8    anyone else about becoming a member of ISRA?

9       A.    Nobody else, no.

10       MS. HELFRICH:  Okay.  Let's take a break now.

11            (WHEREUPON, a short break was had.)

12    BY MS. HELFRICH:

13       Q.    Mr. Miller, we're back on the record,

14    and just to remind you you're still under oath, the

15    same oath you took this morning.  Do you understand

16    that?

17       A.    Yes.

18       Q.    One sort of cleanup question, do you

19    have any plans at the moment to leave your current

20    job?

21       A.    No.

22       Q.    I'm going to switch gears a little bit.

23    We learned from your wife's deposition that -- I'm

24    sort of paraphrasing here -- that you were the one



1   who got her into guns.  Is that a fair

2   characterization?

3       A.    Yes.

4       Q.    She had some bad experiences with guns

5   when she was a young child, is that right?

6       A.    Yeah, from what's she's told me.  I mean

7   not actually physically confrontations, but, you

8   know, just raised -- her family wasn't, you know,

9   the perfect type of people.

10      Q.    Understood, and I'm not here to

11  criticize your wife's family or to go into personal

12  stuff, but I just want to understand how you all

13  think about guns.

14          So when you met her or when you first

15  got married, was she reluctant to be around

16  firearms, or did she have any concerns about you

17  having firearms in the house?

18      A.    Not concerns about me.  She was just

19  reluctant to handle them because she wasn't

20  educated on them, you know.

21      Q.    Okay.  And you convinced her to start

22  handling them and become a FOID card holder, is

23  that right?

24      A.    Yes.



DARIN E. MILLER
JENNIFER J. MILLER vs MARC D. SMITH

November 05, 2020
126

```
1         Q.     And why did you do that?  Why did you
2     think that was important to do?
3         A.     If she was going to be married to me,
4     she was going to have to accept it, learn to like
5     it, I guess.
6         Q.     Any other reasons?
7         A.     I'm not sure.
8         Q.     And to clarify one thing we talked about
9     earlier, I know you currently have a concealed
10    carry license.  Generally speaking do you carry a
11    firearm when you are out in public?
12        A.     Yes.
13        Q.     Would you, Mr. Miller, consider yourself
14    a responsible gun owner?
15        A.     Yes.
16        Q.     And what makes you a responsible gun
17    owner?
18        A.     I follow all the laws, and I practice,
19    you know, safe keeping, handling, storage.
20        Q.     Let me be a little more specific.  What
21    specific things do you do that you think are the
22    things a responsible gun owner needs to do?
23        A.     Kind of hard to kind of get the right
24    words I guess to explain it.  Like being the safest
```



1  you can be, you know, whether it's handling at the

2  range, you know, your 10 commandments of gun safety

3  rules.

4      Q.    What are those?

5      A.    You know, always treat a gun as if it

6  was loaded, never point a gun at anything you don't

7  intend to destroy, shoot, always keep a gun pointed

8  in a safe direction.

9      Q.    How about around your house, what are

10  the things you do around the house that you think

11  are the things that make you a responsible gun

12  owner?

13      A.    I always taught my kids, you know, about

14  safe handling, what to do, like when they were

15  little, what to do if you'd be at a friend's house

16  and find a gun laying around, you know, what to do,

17  or if one of your friends gets a gun out, you know,

18  what you should do and not do.

19      Q.    And what did you teach about them what

20  they should do if they find a firearm?

21      A.    You know, give them what kind of

22  situation, I mean if they was flopping one around

23  and being unsafe, I told them just go away, get out

24  of the house, you know, or find an adult, you know,



1  not to touch it, and assume it's loaded, any gun,

2  just assume it's loaded.

3      Q.    Okay.  How about storage of firearms,

4  and for this question, let's imagine that the

5  foster home rules, the day care home rules don't

6  apply to you.  So we can talk about -- let me do it

7  a different way, sorry, to make it less confusing.

8          Were you a responsible gun owner before

9  you became a foster parent?

10      A.    Yes, absolutely.

11      Q.    So in that period of time before you

12  became a foster parent, what were the things you

13  did at home that made you a responsible gun owner?

14      A.    I kept them locked up in the safe, you

15  know, unless I was carrying.  It was either on me,

16  on my waist, or locked in the safe.  There was

17  never any in between.  It was either one or the

18  other.

19      Q.    And if they were locked in the safe,

20  were they loaded or unloaded?

21      A.    Concealed carry, yes, and home defense,

22  yes, but otherwise general hunting rifles were

23  unloaded.

24      Q.    And did you store ammunition separately



1  or in the safe?

2      A.    In the safe for the most part.  I mean

3  some of it might have been laying on the gun rack

4  or I guess the window sill.

5      Q.    But what else about your practices at

6  home, what else did you do at home that you think

7  made you a responsible gun owner?

8      A.    I mean the guns were always locked in

9  the safe.

10     Q.    Is that the main thing, do you think?

11     A.    I guess that would be really the only

12 thing it could be to be responsible.

13     Q.    Okay.  You said that you taught your

14 children about gun safety, right, am I correct?

15     A.    Yes.

16     Q.    Did you teach them -- strike that, let's

17 take one kid at time.  Let's take Colton first.

18 Did you train him to use firearms?

19     A.    Yes.

20     Q.    How did you do that?

21     A.    Just showed him how to handle one, how

22 to operate them, how to load, unload, how to handle

23 them safely.

24     Q.    Where did you do this training?



1        A.      Generally when we'd go outside, you

2    know, shooting, target practice.  And of course the

3    handling of stuff would have been some of it at

4    home, you know, this is how you hold it.  Of course

5    it would have been unloaded and all that, just kind

6    of basics, basic etiquette.

7        Q.      So you went target shooting with him.

8    How old was he when you first started teaching him

9    how to handle firearms?

10       A.      Probably like three or four to like

11   eight, these are guns, this is what they do, don't

12   touch them; you know, if you see one laying around,

13   don't touch it, get an adult.  As they got older, I

14   would have started taking them and training them

15   actually hands on how to handle one, and then

16   shooting, you know.

17       Q.      About what age would you start -- just

18   stick with Colton -- about what age did you start

19   doing hands-on education with him?

20       A.      I'm sure probably six, seven, maybe

21   eight years old actually going shooting, somewhere

22   around there.  It's been a long time ago.  I can't

23   remember the actual age.

24       Q.      But possibly six, possibly eight?



1       A.     Somewhere in that range.  That's just an

2   estimation.

3       Q.     Understood.  Did you ever take him

4   hunting?

5       A.     Yes.

6       Q.     At what age did you take him hunting?

7       A.     Probably more that he'd tag along.

8   Whether he was actually hunting or tagging along,

9   him not carrying a gun and just me having --

10      Q.     Okay, good question.  How old did you

11  start with him just having him taking along?

12      A.     Probably six, pretty young.  It was kind

13  of just a little bit here and there, you know, tag

14  along with dad, that's cool.

15      Q.     At what age would he go hunting with you

16  and actually carry and handle a gun?

17      A.     I'm sure that was probably 10, 11 maybe.

18      Q.     And is this deer hunting?

19      A.     No, squirrel hunting.

20      Q.     Do you go deer hunting?

21      A.     Yes.

22      Q.     But you took your son squirrel hunting,

23  not deer hunting?

24      A.     He had been bow hunting, archery, for



1  dear.  But as far as gun hunting for deer, no.

2       Q.    Okay.  Was there a reason why not?

3       A.    I don't know if he really ever expressed

4  in it.  I always let them, you know, kind of bow

5  hunt because the seasons are a lot longer, and

6  spending the money for the licenses.  We kind of

7  invested in archery so we had more opportunities to

8  go; whereas gun season you have a total of seven

9  days, and with my work schedule, that would leave

10  maybe three or four, and them being in school, so

11  we just never really invested the money to do that

12  type of hunting.

13       Q.    I see.  And do you need a permit or

14  license, whatever, to squirrel hunt?

15       A.    Just a general hunting license and

16  habitat stamp.

17       Q.    Okay.  Did you teach them about how guns

18  ought to be stored?

19       A.    Yes.

20       Q.    What did you teach them?

21       A.    Just locked up in a safe and out of

22  reach where somebody couldn't break in your home

23  and steal them or other kids get in the home and

24  get to them.



1    Q.    And did you have that gun safe when your

2  children, your boys, your older boys were at home?

3    A.    Yes, because I mean the oldest is, what,

4  20 -- '98, January 5th, '98.

5    Q.    You said 23.

6    A.    Or he'll be 23.  Is it 22?  He was born

7  January 5th, 1998.

8    Q.    I think that makes him 22.

9    A.    Yeah, okay.

10   Q.    At least you know his birthdate, that

11  covers you.

12   A.    I can't keep track of my own age.

13   Q.    So when Colton and Collin were living at

14  home, you had that gun safe, right, for at least

15  part of that time?

16   A.    Yes.  If he's 23 or 22 and I probably

17  had that 20 years, so he would have been a baby,

18  you know, before I got it.

19   Q.    So you've had that gun safe most of

20  their lives, most of your kids' lives, the boys?

21   A.    Yes.

22   Q.    And when they were in your home, living

23  in your home, did they understand that that is

24  where the guns were kept?



1     A.    I'm sure, yes.

2     Q.    And did they understand that you had the

3  key?

4     A.    Yes.

5     Q.    Did they ever access the safe while they

6  lived there?

7     A.    No.

8     Q.    And I'm including without your

9  permission.

10    A.    No.

11    Q.    I'm sorry, you froze for a moment.  Is

12  your whole answer no?

13    A.    No.  Yes, correct, the answer is no.

14    Q.    Okay.  Now, what about Collin, let's

15  talk about the training you gave him.  Did you

16  teach him to use a firearm?

17    A.    Yes, it would have been the same as

18  Colton.

19    Q.    At what age did you first begin to give

20  him hands-on training?

21    A.    I'm sure the same.

22    Q.    So about eight, maybe six, maybe eight?

23    A.    Yeah, six to eight range.

24    Q.    And how did you start him, what was the



1   first hands-on training?

2        A.    Just basic, you know, gun safety and

3   etiquette I mean in the home, just like with

4   Colton.  And then we would have later on as he got

5   more mature and I thought he was ready, we would

6   have went target practicing at the range.

7        Q.    Okay.  Did you go hunting with Collin?

8        A.    Yes.

9        Q.    What kind of hunting?

10       A.    The squirrel with 22 rifles and then

11  archery for deer as well.

12       Q.    But not deer hunting with firearms?

13       A.    No.

14       Q.    For the same reason?

15       A.    Yes, correct.

16       Q.    About how often would you go target

17  shooting with Collin?

18       A.    I'm not sure.  Maybe once or twice a

19  year probably.

20       Q.    How about Colton?

21       A.    They probably would have went the same

22  day.  I mean I always took them all.

23       Q.    Cyra, too?

24       A.    Eventually when she got older, yes.



1     Q.    There is a bit of a gap there.  I know

2   she's, what, four years younger than Collin?

3     A.    She is 17 going on 18, and he just

4   turned 21.

5     Q.    Three or four years.  Let's talk about

6   Cyra, did you train or educate Cyra regarding

7   firearms?

8     A.    Yes, the same as her brothers, probably

9   the same ages.

10    Q.    So you began by -- in terms of handling,

11  you began showing her how it works, how you load

12  it, how to keep it safe, where to point it, those

13  sorts of things, right?

14    A.    Yes.

15    Q.    And then did you take her target

16  shooting?

17    A.    Yes, when she got a little older, I'm

18  sure.

19    Q.    What kind of a firearm do you use for

20  that?

21    A.    Just a 22 rifle, long rifle.

22    Q.    Did you take her hunting?

23    A.    We do archery hunting, but I don't think

24  she ever -- I know she never carried a rifle



1   squirrel hunting.  I don't know if she ever -- she

2   might have tagged along, I can't remember.

3        Q.    But you don't think she ever --

4        A.    Actually carried the rifle, no.

5        Q.    Okay.  Just to make sure I got this

6   point, when you started having her actually fire a

7   weapon, that would be at target practice, right?

8        A.    Correct.

9        Q.    And what age was she when that happened?

10  Is that that six to eight range?

11       A.    Probably eight years old.

12       Q.    Why did you think it was important to

13  teach your kids about firearms?

14       A.    There is many reasons.  I mean for one,

15  you know, safe handling, and, two, for

16  self-defense, I mean when they get older, they'll

17  be able to protect themselves and their families.

18       Q.    What other reasons, or are there any

19  other reasons?

20       A.    I mean the recreation of it.  It's fun

21  to do as a family, family outings.

22       Q.    Have you ever done an outing with all

23  five of you?

24       A.    Actually they were all -- I know I've



1   had all three kids with me, but I don't know if

2   Jennifer was there at that time or not.  As they

3   got older and in sports and chasing girlfriends,

4   they kind of dwindled off and they lost interest

5   kind of.  They're still interested and like it,

6   but, you know, the time, and now they all have jobs

7   and their lives.

8        Q.    So have you given any training or

9   education to your foster son?

10       A.    No.

11       Q.    And why is that?

12       A.    He's only two.

13       Q.    So he's too young?

14       A.    Correct.

15       Q.    It's your plan to adopt him, right?

16       A.    Yes.

17       Q.    And I understand that you don't

18   necessarily have total control over that, but

19   assuming that happens, is it your intention to give

20   him education about firearms?

21       A.    Yes, absolutely.

22       Q.    When do you think you will start that?

23       A.    I'm sure probably around the three or

24   four years old like, you know, don't touch this,



1  that's mommy and daddy only, you know, stay away

2  from them.

3      Q.    To go back to your older kids for a

4  second, when Collin and Cyra -- strike that.

5          When Collin was at home, did he know

6  that the guns were kept in a gun safe -- sorry,

7  when Collin lived at home, did he know that there

8  was a gun safe in your home that contained guns?

9      A.    Yes.

10     Q.    And did he know that you had the key?

11     A.    Yes.

12     Q.    And does Cyra know that the guns are

13  kept in a gun safe?

14     A.    Yes.

15     Q.    And does she know that you have the key?

16     A.    Yes.

17     Q.    Does your foster son know that the guns

18  are kept in a gun safe?

19     A.    I don't think he has any

20  comprehensiveness of that, I mean what even that is

21  with his age.

22     Q.    Fine, that makes sense.  Have you given

23  any training or education related to firearms to

24  any of the children who have been in the day care



DARIN E. MILLER
November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH
140

1  program?

2      A.    No, not the day care children, no.

3      Q.    I want to talk a bit about the guns that

4  you own.  Now, you've purchased several guns over

5  the years, right?

6      A.    Yes.

7      Q.    And is it correct that every gun that

8  you purchase comes with an instruction manual?

9      A.    Yes.

10      Q.    And do you read the instruction manuals

11  when you buy a gun?

12      A.    Yes.

13      Q.    Do you know what the instruction manuals

14  say about -- strike that.  I want to ask you a

15  different question.

16          You keep the instruction manuals that

17  come with the guns, right?

18      A.    Most of them.  I mean some of them got

19  lost over the years.

20      Q.    Okay.  Generally you keep them.  Can I

21  ask you why you keep them, is there a particular

22  reason?

23      A.    Because they have a parts diagram in

24  them where if parts break, you can go find the



1   specific part you need and order it, and it shows

2   how to tear them apart.  I mean every gun is

3   different how to break them down for cleaning and

4   maintenance, so you got to have instructions to

5   show and tell you how to do that.

6       Q.    Okay.  And do the manuals talk about

7   safety?

8       A.    Yes.

9       Q.    Do you know what they say about storage?

10      A.    I'm sure probably store them locked and

11  away from children, I'm sure.

12      Q.    Do you follow or do you believe you

13  follow all the safety instructions that are in the

14  manual?

15      A.    Yes.

16      Q.    Do you think that a responsible gun

17  owner should follow the safety instructions that

18  come with a weapon, firearm?

19      A.    Yes, for the most part.

20      Q.    What do you mean for the most part?  Are

21  there things they shouldn't follow?

22      A.    I guess it depends.

23      Q.    Can you tell me what it depends on?

24      MR. SIGALE:  I'm going to object as to form



1  and foundation.  Darin, if you understand, you can

2  answer the question.

3  BY THE witness:

4      A.   No, not really.

5  BY MS. HELFRICH:

6      Q.   Okay.  So you said that a responsible

7  gun owner should follow the safety instructions for

8  the most part, and I'm trying to understand what

9  that for the most part means.  Why shouldn't they

10 follow them all the time?

11     A.   Yes, I'm going to change it to yes, I

12 mean they should follow the instructions.

13     Q.   Okay.  I'm going to put up an Exhibit,

14 and I'm going to share my screen.  Can you see a

15 photograph of five handguns?

16     A.   Yes.

17     Q.   Does it say D. Miller Dep Exhibit 13?

18     A.   Yes.

19     Q.   Are these the five handguns that you

20 own?

21     A.   Yes, except for the top right one I

22 since traded it for another manufacturer but the

23 same caliber and same style handgun.

24     MS. HELFRICH:  Okay.  Could we get updated



1   information, please, David?

2       MR. SIGALE:  Yeah, that's fine.  Darin and I

3   will chat about it later, but if you have a manual

4   for that information, we'll have to get that over.

5       THE WITNESS:  All right, that's fine, no

6   problem.

7   BY MS. HELFRICH:

8       Q.   Let's talk about the handgun you traded

9   this one in for.  What is the new one, what kind of

10  gun?

11      A.   The one in the picture, my old one, is a

12  Smith & Wesson M&P 22, it's a 22-caliber

13  semi-automatic.

14      Q.   Okay, hang on.  Let's talk about the one

15  you replaced it with.  What's that?

16      A.   Oh, it's a Taurus model TX22, and it's a

17  22-caliber semi-automatic handgun.  It's basically

18  the same thing in the picture, but it's just a

19  different manufacturer.

20      Q.   Okay.  Why did you trade it?

21      A.   Because I liked the feel and the

22  features of the Taurus better.

23      Q.   What features?

24      A.   Just ergonomics, and it was more



1   accurate, more of a target -- like a competition

2   handgun.

3        Q.    Do you compete in shooting competitions?

4        A.    Just with buddies.

5        Q.    Okay.  You said Taurus is the

6   manufacturer?

7        A.    Yes.

8        Q.    Is that Taurus like the zodiac sign?

9        A.    Yes, I believe the spelling is the same,

10  T-a-u-r-u-s, I believe.

11       Q.    So thinking about that gun, when did

12  you -- that belongs to you as opposed to your wife?

13  It belongs to you?

14       A.    Yes.

15       Q.    And when did you trade it in?

16       A.    I'm not sure.  I would have to try to

17  find the receipt.  It's been within the last -- I

18  think it was this year, early this year, I believe.

19  I'm not sure.

20       Q.    Would you say you've had it less than a

21  year?

22       A.    Yes, definitely.

23       Q.    Okay.  And who uses that gun, the

24  Taurus?



1        A.    I'm the only one so far.

2        Q.    Your wife has not used it?

3        A.    I mean she will, but we just haven't had

4   the opportunity.

5        Q.    Did you get it for her?

6        A.    I got it for me, both of us.  I mean

7   it's plinking, you know, training.

8        Q.    So that's my next question is what is it

9   for; it's for plinking training, target practice?

10       A.    Yes.

11       Q.    Is it a self-defense weapon?

12       A.    No.  I mean it could be if that's all

13  you had, but it's not the ideal caliber for that.

14       Q.    Just so we make a clear record, why is

15  it not an ideal self-defense weapon?

16       A.    Because it's 22 long rifle caliber.

17       Q.    And pardon me for not understanding, but

18  why is that not a good caliber for self-defense?

19       A.    That's the smallest caliber that's

20  manufactured.

21       Q.    Okay.  And how is this handgun, the

22  Taurus, currently stored?

23       A.    In that lock box in the truck.

24       Q.    Which one?



DARIN E. MILLER                                     November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                            146

```
 1        A.    The one with the three lock options or
 2   key and three options.
 3        Q.    Is it loaded?
 4        A.    No.
 5        Q.    Has it always been stored there since
 6   you acquired it?
 7        A.    Yes.
 8        Q.    I think I saw that, you know, you gave
 9   us a receipt for most of the guns that you
10   purchased.  Is it common to trade guns in when you
11   get a new one?
12        MR. SIGALE:  I'll object as to speculation and
13   foundation, but you can answer, Darin.
14   BY MS. HELFRICH:
15        Q.    Okay.
16        A.    Could you ask the question again?
17        Q.    I'm asking out of curiosity really, is
18   it common that when you go and get a new gun, you
19   trade your old one in?
20        MR. SIGALE:  Same objection.  You can answer.
21   BY THE WITNESS:
22        A.    I mean if you're -- yes, when they come
23   out with newer stuff and you upgrade, so to speak.
24   BY MS. HELFRICH:
```



1      Q.    Would you say typically if someone is a
2  gun seller, they'll take a trade-in like a car
3  dealer would?
4      A.    Yes.
5      Q.    So how often do you use the Taurus?
6      A.    It varies.
7      Q.    On average, once a month, once a week?
8      A.    Probably 20 times this year.
9      Q.    Okay.  And always for target practice or
10  plinking?
11      A.    Yes.
12      Q.    And has it always been stored in that
13  silver box?
14      A.    Yes.
15      Q.    Did it come with an owner's manual?
16      A.    Yes.
17      Q.    Did you read the owner's manual?
18      A.    Yes.
19      Q.    Okay.  And what's the capacity of that
20  gun, magazine capacity?
21      A.    I think 16 rounds in the magazine.
22      Q.    Do you have any accessories that go with
23  that gun; in other words, like an extended
24  magazine, anything else?



DARIN E. MILLER                                    November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                            148

1        A.    No, just a magazine loader that
2   helps make it easier to load the magazine.
3        Q.    Did the gun come with a trigger lock?
4        A.    Yes.
5        Q.    Do you use the trigger lock?
6        A.    No, I mean it's in a locked box, so no.
7        Q.    Okay.  So let's talk now about the
8   Smith & Wesson M&P 22 LR.  That's this one that's
9   in the upper right of the photo, is that correct?
10       A.    Yes.
11       Q.    Okay.  So that's a 22?
12       A.    Yes, 22 long rifle.
13       Q.    And what kind of action is that?
14       A.    I'm sorry?
15       Q.    What kind of action?
16       A.    What do you mean action?  It's a
17   semi-automatic.
18       Q.    That's what I mean.
19       A.    Okay.
20       Q.    What's the capacity of the magazine?
21       A.    I think it was a 12-round magazine.
22       Q.    And did you have any accessories that
23   went with that one?
24       A.    No.



1    Q.    Who did that weapon belong to, you or

2  your wife or anyone else?

3    A.    My wife -- I'm sorry, myself, I

4  purchased it.

5    Q.    And how long did you own it?

6    A.    I'm not sure without looking at the

7  receipt.  It's been a few years.

8    Q.    Okay.  When you owned it, who used it?

9  Was it you exclusively, or did anyone else use it?

10   A.    The whole family when we go to the

11  range.

12   Q.    Okay.  And what do you use it for?

13   A.    Just training and plinking.

14   Q.    Would you describe it as a self-defense

15  weapon?

16   A.    No.

17   Q.    You said already that's because of its

18  small caliber, right, it's not ideal in

19  self-defense?

20   A.    Correct, the same as the Taurus.

21   Q.    Okay.  At the time -- wait, now I'm

22  confused.  So why did you trade it in for the

23  Taurus?

24   A.    I like the ergonomics, the feel and the



1  fit of the Taurus better.

2      Q.   But the Taurus is also not an ideal

3  self-defense weapon?

4      A.   Right, they're the same caliber.

5      Q.   Got it, okay.  So I forgot to ask you

6  about this, do you ever carry the Taurus which I

7  mean under your concealed carry license; is it ever

8  the handgun that you carry as a CCL owner?

9      A.   No.

10     Q.   What about the Smith & Wesson that we're

11 looking at in the upper right?

12     A.   No.

13     Q.   Where did you store the Smith & Wesson

14 when you owned it?

15     A.   In the same -- I'm sorry, go ahead.

16     Q.   So if you owned it for five years.  At

17 the time you traded it in, where was it regularly

18 stored?

19     A.   In the lock box in the truck.

20     Q.   And did you ever store it in the house?

21     A.   Yes, I would have because actually I'm

22 sure I had it more than five years because I know I

23 had it when we lived at the other residence seven

24 years ago; so without looking at the receipt, I



1  don't know the exact date.  But, yes, it would have

2  been in the house.

3      Q.    This specific weapon, did you keep it

4  loaded in the silver box?

5      A.    No.

6      Q.    Did you keep it loaded when you kept it

7  in the house?

8      A.    No.

9      Q.    I'm going to open another Exhibit.  Can

10 you see the first page of the safety manual?

11     A.    Yes.

12     Q.    And it says Darin Miller Dep Exhibit 14?

13     A.    Yes.

14     Q.    Is this the safety manual that goes with

15 the Smith & Wesson 22 LR?

16     A.    Yes.

17     Q.    Did you read this owner's manual when

18 you bought this?

19     A.    Yes.

20     Q.    I want to show you some things that it

21 says.  It's a little screwy, but I hope you'll bear

22 with me.  Just a second, I will find the part I

23 want to show you.

24           Okay, here down at the bottom, there is



1    a paragraph that starts "firearm security is your

2    responsibility," do you see that?

3         A.   Yes.

4         Q.   And it says, the second sentence --

5    well, the first sentence says, "You must secure

6    firearms safely from children and/or unauthorized

7    users."  Do you see that?

8         A.   Yes.

9         Q.   Do you agree with that?

10        A.   Yes.

11        Q.   Then it says, "Your firearm should

12   always be kept unloaded and locked when not in

13   use."  Do you agree with that?

14        A.   Yes.

15        Q.   Did you follow that rule with this

16   firearm?

17        A.   Yes, because that's not a concealed

18   carry firearm.

19        Q.   Your last comment does that mean -- can

20   you explain your last comment?

21        A.   It's not a concealed carry firearm, so

22   it would be kept unloaded.

23        Q.   If it were a concealed carry firearm,

24   you would keep it loaded?



1        A.    Yes, it's ready to use.

2        Q.    Even if you weren't using it, even if it

3    was locked in the safe, you'd still keep it loaded?

4        A.    Well, yes, that's where it would have to

5    be locked in the safe to be legal with the law, the

6    concealed carry law.

7        Q.    It says here, "A lock has been provided

8    for this purpose."  Do you recall this firearm

9    coming with a lock?

10       A.    They all come with a cable lock.

11       Q.    Did you use the lock for this?

12       A.    No, I didn't need it because I had the

13   gun safe.

14       Q.    Okay.  Do you see right here where my

15   cursor is on the right-hand side of the page about

16   a third of the way down, it says, "Never keep

17   ammunition in the same location as the firearm," do

18   you see that?

19       A.    Yes.

20       Q.    Do you agree with that?

21       A.    No.

22       Q.    You don't.  Why not?

23       A.    Not if it's in a locked safe, I don't.

24       Q.    "Store each in a separate and secure



1  place."  So you don't agree with that either?

2      A.    No.  I mean a secure place but not

3  separate.

4      Q.    Okay.  Just above in the paragraph

5  above, it says, "Always safely store and secure

6  your firearm," do you see that?

7      A.    Uh-huh, yes.

8      Q.    And then it says, "Safe and secure

9  storage of your firearm is one of your most

10  important responsibilities," do you see that?

11      A.    Yes.

12      Q.    Do you agree with that?

13      A.    Yes.

14      Q.    It is a full-time responsibility, do you

15  agree with that?

16      A.    Yes.

17      Q.    "You must always secure your firearm and

18  ammunition separately so that they are not

19  accessible to children and/or unauthorized

20  persons," do you see agree with that?

21      A.    No.

22      Q.    What do you disagree with?

23      A.    The separate part.

24      Q.    So you think you're a responsible gun



1  owner if you -- strike that.

2          You think a responsible gun owner could

3  store their firearms and their ammunitions in the

4  same place and that that would be appropriate?

5      A.   Yes, if it's a locked place.

6      Q.   Okay.

7      A.   Not just out on the dresser, absolutely

8  not, that would not be responsible.

9      Q.   Okay, I understand.  I'm going to close

10  that Exhibit, and we're going to go back to the

11  photographs.  Can you indicate to me which of these

12  handguns is a Springfield XP MOD 22 29

13  millimeter -- MOD2 9 millimeter, there we go?

14      A.   It would be the top left.

15      Q.   Where my cursor is?

16      A.   Yes.

17      Q.   So this is a 9 millimeter I gather from

18  the name, right?

19      A.   Yes.

20      Q.   Is it a semi-automatic?

21      A.   Yes.

22      Q.   What's the size of the magazine?

23      A.   It varies.  There is different

24  capacities.  I know one is a 13, one is a 16.  I



1  think that's the two sizes, I think, that I know

2  for sure.  I don't know if there is a third or not.

3      Q.    But when you say those are the two

4  sizes, you have those two sizes?

5      A.    Yes, those are the two sizes that I

6  have.

7      Q.    Okay.  Do you have any accessories or

8  modifications for it?

9      A.    No.

10      Q.    All right.  Who does this weapon belong

11  to?

12      A.    Myself.

13      Q.    How long have you owned it?

14      A.    I'm not sure, a few years, without

15  looking back.

16      Q.    More than two?

17      A.    Yes, more than two.

18      Q.    Do you know -- as you sit here today, do

19  you know if you had that weapon before you became a

20  foster parent?

21      A.    I'm not sure.

22      Q.    Okay.  What is it used for?

23      A.    It's a concealed carry.

24      Q.    So that's your preferred --



1       A.    That used to be my primary concealed

2    carry before I got the Hellcat.

3       Q.    Oh, I see, okay.  So it's for concealed

4    carry.  It's also for range shooting, is that

5    right?

6       A.    Yes, and training.

7       Q.    By training, do you mean range practice?

8       A.    Yes.

9       Q.    Any other uses, any other ways you use

10   it?

11      A.    No.

12      Q.    Where is it stored currently?

13      A.    In the safe in the truck.

14      Q.    The black one or the silver one?

15      A.    I guess it would be the bigger one, the

16   silver one.

17      Q.    Okay.  Is it loaded?  Do you store it

18   loaded?

19      A.    No.

20      Q.    You said it used to be your preferred

21   carry weapon, is that right?

22      A.    Yes.

23      Q.    Do you carry it anymore?

24      A.    No.



1    Q.    Prior to storing it in the truck, did

2    you store it in the house?

3    A.    If I had it -- I wish I could remember

4    how long I've had it.  I'm going to say yes.  I'm

5    thinking I've had it -- I know I've had it longer

6    than the two years like we stated earlier, but I

7    just don't know if it's three or four years I've

8    had it.

9    Q.    Okay, that's fine.  Let me ask you

10   something to clarify.  I don't think we clarified

11   this before.  The safe that you have in your truck,

12   the lock boxes that you have in your truck, did you

13   acquire those when you were told by DCFS that you

14   needed to keep your handguns out of the house?

15   A.    The third one, yes, I did.  The

16   first -- the black one, the smaller one, I had it

17   prior -- I got that when I started concealing

18   carrying so I had a place to put it in when I go

19   into gun free zones in my secure place in my truck.

20   Q.    So you started concealed carrying in

21   2015?

22   A.    Yes, five and a half years ago.

23   Q.    Okay.  So you acquired the silver one,

24   the silver lock box, when you were told by DCFS



1   that you had to keep the handguns out of the house?

2       A.    Correct, yes.

3       Q.    Did you ever keep the handguns at your

4   father's house?

5       A.    I think I might have.

6       Q.    You don't remember?

7       A.    No, I do not.

8       Q.    Does your wife know that you keep the

9   handguns in your car?

10      A.    Yeah, I would assume so because that's

11  where hers is at except for right now.

12      Q.    Okay.  And if I did the math right,

13  those two safes that are in your truck can

14  hold -- or currently between them they hold five

15  handguns, right?

16      A.    Yes.

17      Q.    And is that these five handguns we see

18  in the picture?

19      A.    Yes, minus that top right one that's now

20  the Taurus.

21      Q.    And the Taurus is in the safe in the

22  truck now?

23      A.    Yes, the three one.

24      Q.    Got it, understood.  So going back to



1 | the 9 millimeter, this one up here, upper left in

2 | this photo, if I understood you correctly, you

3 | don't recall whether you ever stored it in the

4 | house?

5 |     A.   If I had -- I know I've had it longer

6 | than two years, so I'm sure I did, yes.  I just

7 | don't know for sure how long I've owned it without

8 | looking at the receipt.

9 |     Q.   I understand.  So this upper left 9

10 | millimeter, is that a suitable self-defense weapon?

11 |     A.   Yes.

12 |     Q.   And you said it was your preferred carry

13 | weapon before you got the Hellcat, right?

14 |     A.   Yes.

15 |     Q.   So when you stored it in the house, did

16 | you store it loaded?

17 |     A.   Yes, I mean if I was concealed carrying

18 | it, it would have been loaded, yes.

19 |     Q.   Locked in the safe?

20 |     A.   Yes, absolutely.

21 |     Q.   Okay.  But to be clear, sometimes you

22 | would carry in the house?

23 |     A.   Yes.

24 |     Q.   All right.  Did you read the owner's pan



1  manual for this gun?

2      A.    I'm sure I did.

3      Q.    Let's open another Exhibit.  Did Exhibit

4  15 just pop up on your screen?

5      A.    Yes.

6      Q.    And this says in big letters XP, right?

7      A.    Yes.

8      Q.    So this is the owner's manual for the 9

9  millimeter we've been talking about?

10      A.    Yes.

11      Q.    I'd like to take you to page 10.  So up

12  here, it says, "Be a safe firearm owner," do you

13  see that?

14      A.    That's the only thing I can read there.

15      Q.    Yes, me, too.  I'm going to make it

16  bigger.  Would you consider yourself a safe firearm

17  owner?

18      A.    Yes.

19      Q.    Is it big enough now even though the

20  words disappeared?

21      A.    Yes, I can read it.

22      Q.    Can you read it?

23      A.    Yes.

24      Q.    So I want to look at the Important



1  Warning.  It says, "There is no safe way to

2  discharge a firearm in a home or apartment.

3  Bullets will go through walls, floors, furniture,

4  and appliances and still cause serious injury or

5  death to persons in the house, next-door, or

6  outside.  Accidental discharges indoors always

7  result in property damage or personal injury."

8         Did I read that correctly?

9  A.    Yes.

10 Q.    Do you agree with that?

11 A.    Yes.

12 Q.    So would you agree then that, if you had

13 to discharge your firearm inside your home, that

14 would be a dangerous thing to do?

15 A.    Yes.

16 Q.    Okay.  I want to go back to the picture,

17 and I would like to ask you one of these is a

18 Glock, right?  I think only one, is that correct?

19 A.    Yes.

20 Q.    Which one is the Glock, please?

21 A.    The purple one.

22 Q.    Okay.  And this is -- if I'm reading

23 this right, and I might not be, it's a G42.380, how

24 do you say it?



1      A.    It's a Glock, and then G42 is the model

2   and .308 is the caliber.

3      Q.    Oh, 308, not 380?

4      A.    Well, 380.

5      Q.    So the 380 is the caliber.  Is it a

6   semi-automatic?

7      A.    Yes.

8      Q.    And what is the capacity of the magazine

9   for this gun?

10      A.    I think there is a 6-round and a 7-round

11   magazine.

12      Q.    And you have both of those?

13      A.    I don't.  My wife does.

14      Q.    Okay.  Sorry if this is a dumb question,

15   but I'll just reveal my ignorance.  The magazine is

16   the thing you push in the bottom, right?

17      A.    Yes, it holds the ammunition, the

18   bullets.

19      Q.    And you store the magazine in the ammo

20   crate or where?

21      A.    The magazines are all stored -- you

22   know, except for the ones for my concealed carry in

23   the truck in the box, I mean they're all stored

24   empty in the actual gun safe.



1     Q.    So the magazines are just stored in the

2  gun, you know, or are they separate pieces, are

3  they stored as separate pieces?

4     MR. SIGALE:  I'm going to object as to form,

5  but you can answer, Darin.

6  BY MS. HELFRICH:

7     Q.    Do you understand what I'm asking?

8     A.    Yes.  I mean there is several magazines,

9  each has extras.

10    Q.    Oh, I see.

11    A.    Most guns when you purchase them, they

12 usually come with two from the factory, and I've

13 purchased extra for some of them.

14    Q.    Okay.  Ordinarily would you store a

15 handgun with an empty magazine in it?  Assuming

16 you're storing it unloaded, would you store it with

17 an empty magazine in it?

18    A.    Yes, some of them, like the guns I take

19 just to the range I keep the magazine in them so I

20 don't lose them.

21    Q.    Okay, thank you for explaining that.  I

22 have some more questions about the Glock.  Do you

23 have any accessories that go with it?

24    A.    No.



1      Q.     Did it come with a lock?

2      A.     Yes, cable lock.

3      Q.     A cable lock?

4      A.     That's what they all come with, a cable

5  lock.

6      Q.     Okay.  Do you use the cable lock?

7      A.     No.

8      Q.     So this is your wife's handgun.  How

9  long has she owned it?

10     A.     I'm not sure because she had the same

11  exact model in black, and then she had seen they

12  had it in purple, so she had to have the purple

13  one, so we traded the black one for the purple one.

14  Same exact everything, just the colors were

15  different.

16     Q.     Yes, she told us she liked the purple

17  one.  Is she the only one who uses it?

18     A.     I've shot it before at the range, but,

19  yes, that's her concealed carry gun.

20     Q.     Okay.  I understand it's her concealed

21  carry gun.  What does she actually use it for

22  because it's my understanding that she doesn't

23  carry, but maybe she does sometimes?

24     A.     Target practice at the range.



1      Q.    How often does she use it?

2      A.    A few times a year.

3      Q.    And does she use it for anything other

4  than target practice?

5      A.    No.

6      Q.    Where is this gun currently stored?

7      A.    It's in the black lock box with her.

8      Q.    In North Carolina?

9      A.    Yes.  I took that lock box out and

10  locked it into her car.

11      Q.    Okay.  When she's at home, where do you

12  store this?

13      A.    In the three gun lock box.

14      Q.    And do you store it loaded?

15      A.    No.

16      Q.    If you get what you want out of this

17  lawsuit and DCFS or the judge changes the rules,

18  where would you store it?

19      MR. SIGALE:  I'm going to object as to the

20  form.

21  BY MS. HELFRICH:

22      Q.    Do you understand what I'm asking?

23      A.    Yes.  I mean it would depend on whether

24  she's going to conceal carry or not; otherwise it



1   would be, you know, in the safe in the house

2   unloaded.

3        Q.   And if she were going to conceal carry,

4   where would you store it?

5        A.   In the safe in the house.

6        Q.   Loaded?

7        A.   Yes, if she was going to conceal it,

8   conceal carry it.

9        Q.   Same question about the other two that I

10  didn't ask but I'll ask now.  So this 9 millimeter,

11  this one up here on the left.

12       A.   Yes.

13       Q.   Where would you store it --

14       A.   In the house -- I'm sorry, go ahead.

15       MR. SIGALE:  Yes, Darin, let her finish the

16  question.

17  BY MS. HELFRICH:

18       Q.   So if the lawsuit comes out the way you

19  want to and the rules get changed to what you want

20  to be allowed to do, where would you store this 9

21  millimeter?

22       MR. SIGALE:  For the record, this 9 millimeter

23  is the one in the top left corner of the photo.

24  BY MS. HELFRICH:



DARIN E. MILLER                                          November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              168

1        Q.    That's right, thank you.

2        A.    In the house locked in the safe.

3        Q.    Loaded or unloaded?

4        A.    Loaded.

5        Q.    Okay.  And the 22, the Taurus, if you

6    get what you want and you're allowed to do the

7    things you said you wanted to do, where will you

8    store this Taurus?

9        A.    Locked in the safe in the bedroom.

10       Q.    Loaded or unloaded?

11       A.    Unloaded.

12       Q.    Unloaded, okay.  So going back to the

13   purple Glock, did you review the owner's manual

14   that came with it?

15       A.    I think so.

16       Q.    I'm going to open another Exhibit.  This

17   is Deposition Exhibit 16.  Can you see, Mr. Miller,

18   this is the first page of an owner's manual for a

19   Glock?

20       A.    Yes.

21       Q.    Is this the manual for the purple

22   handgun that we've been talking about?

23       A.    Yes.

24       Q.    I'm taking you to page 3.  Can you read



1   that okay?  Can you see it?

2        A.    Yes.

3        Q.    You see down here, the third from the

4   bottom, it says, "To store your Glock pistol, first

5   unload it as described in Chapter 8.  Then after

6   checking to make sure that it is unloaded, magazine

7   removed, and chamber empty, place it in the

8   included pistol case or another suitable locked

9   container," do you see that?

10       A.    Yes.

11       Q.    Do you agree that that's the appropriate

12  way to store this handgun?

13       A.    Not if it's concealed carry.

14       Q.    Explain what you mean by that.

15       A.    If it's used for concealed carry, no, I

16  do not agree with storing it unloaded.

17       Q.    Let me see if I understand because I

18  just realized I might not understand something.  I

19  understand that if you're carrying a handgun on you

20  for concealed carry purposes, it needs to be

21  loaded, right?

22       A.    Yes.

23       Q.    That seems obvious.  But are you saying

24  that if you come home at night, you're not carrying



1   anymore, you do not think you should unload the

2   weapon when you store it in the safe?

3       A.    No, because if you need it in an

4   emergency like a break-in or what not, you want it

5   to be loaded, open the safe, and it's ready to go.

6       Q.    Okay.  Below that, it says, "Always

7   store and transport your Glock pistol unloaded and

8   locked in a suitable container such as the included

9   pistol case out of the reach and sight of children

10  or other unauthorized persons."  Do you agree with

11  that?

12      A.    There is two different scenarios, you

13  got store and then the transport.

14      Q.    All right, let's do the store.

15      A.    If that's meaning stored as you're

16  transporting, then, yes, I do agree with that.  If

17  it's stored in a case for transportation and you're

18  carrying it out of your house and putting it in

19  your truck, yes, it should be unloaded and

20  locked -- or not locked but just unloaded in the

21  case like if you're taking it to the range.

22      Q.    And do you agree that if you're storing

23  it to transport it, it should be out of the reach

24  and sight of children or other unauthorized



1  persons?

2      A.    Yes.

3      Q.    Do you agree generally, including when

4  you're storing things at home, that they should be

5  out of the reach and sight of children or other

6  unauthorized persons?

7      A.    Yes.

8      Q.    Okay.  Now, the last thing on page 3

9  says, "Never store or transport ammunition in the

10  same container as your Glock pistol."  So let's

11  take out transport and just talk about store.

12  Would you agree with that?

13      A.    No -- well, I mean in the same

14  container.  So you're not saying in the locked

15  safe.

16      Q.    Well, I think a lock safe would be a

17  container.

18      A.    Then I wouldn't agree with it.  But if

19  you're talking about like the case you put it in to

20  take it to the range, I mean I call that more of a

21  container like what the pistols come in when you

22  buy them, either a plastic container, a hard

23  container, or a cardboard box.

24      Q.    So you're saying it's okay to store the



1  firearm and the ammunition together in a gun case?

2      A.    Yes.

3      Q.    Now let's talk about the Hellcat.  Which

4  one is the Hellcat?

5      A.    That would be the one between the

6  Smith & Wesson and the purple Glock on the right,

7  middle right.

8      Q.    Okay.  So in the middle column of

9  handguns on the right of Exhibit 13 for the record.

10  And this is a 9 millimeter, correct?

11      A.    Yes.

12      Q.    Semi-automatic, correct?

13      A.    Yes.

14      Q.    And what's the capacity, magazine

15  capacity of this handgun?

16      A.    There is a 13-round magazine and an

17  11-round magazine.

18      Q.    Okay.  And do you have any accessories

19  for it, or did you make any modifications to it?

20      A.    No.

21      Q.    Who does this weapon belong to?

22      A.    Myself.

23      Q.    How long have you owned it?

24      A.    I think over a year now.



1      Q.    All right.  And is this your preferred

2   concealed carry weapon?

3      A.    Yes.

4      Q.    And if this lawsuit comes out the way

5   you want it and you're allowed to do the things

6   that you described earlier, is this a weapon that

7   you would carry on your person in your home?

8      A.    Yes.

9      Q.    Loaded, just to be clear?

10     A.    Yes.

11     Q.    If the lawsuit came out the way you want

12   it and you were allowed to do the things that you

13   earlier said you want to be able to do, how would

14   you store this weapon when you weren't carrying it

15   on your person?

16     A.    Locked in the safe.

17     Q.    Loaded or unloaded?

18     A.    Loaded.

19     Q.    Okay.  Do you use it -- you currently

20   use it for concealed carry, right?

21     A.    Yes.

22     Q.    And where do you store it currently?

23     A.    In the two case locked box in the truck.

24     Q.    The black one?



1     A.    Yes.

2     Q.    That we looked at earlier?

3     A.    Yes, just the single lock.

4     Q.    Okay.  Have you read the owner's manual

5  that came with this firearm?

6     A.    Yes.

7     Q.    I'm going to show you what's been marked

8  as Exhibit 17, D. Miller Deposition Exhibit 17, and

9  give me a moment and I'll rotate the view.

10         You can see the first page here, it says

11  Springfield Armory Hellcat.  Is this the owner's

12  manual for your Hellcat 9 millimeter?

13     A.    Yes.

14     Q.    Would you like to take a break?

15     A.    No, I'm fine.

16     MR. SIGALE:  Gretchen, I'll suggest in about

17  15 minutes, we've been going for an hour and a

18  half, maybe that would be a good time to take 10

19  minutes or something.

20     MS. HELFRICH:  Sure.  If I don't remember,

21  feel free to remind me.

22     MR. SIGALE:  Oh, I will.

23  BY MS. HELFRICH:

24     Q.    You see here it says, "Store firearms



1  safely in the home?"  We're on page 3.  "Store

2  firearms safely in the home," do you see that?

3       A.    Yes.

4       Q.    It says, "Store firearms unloaded,

5  locked and in a secure place."  Do you agree with

6  that?

7       A.    No.

8       Q.    It says, "Obey firearm storage laws," do

9  you agree with that?

10       A.    Yes.

11       Q.    It says, "Store firearms and ammunition

12  separately," do you agree with that?

13       A.    No.

14       MR. SIGALE:  Gretchen, before you click

15  out -- well, you clicked out of it.

16       MS. HELFRICH:  I can open it back up.

17       MR. SIGALE:  I didn't realize -- I don't know

18  if we need to go off the record for a second, but I

19  noticed that Darin's phone number is in that

20  Exhibit, and I'm not sure that's a proper -- so

21  before that becomes like the official Exhibit in

22  the record, can we have that blacked out?

23       MS. HELFRICH:  I'm fine with that.

24       MR. SIGALE:  Unless Darin is going to say that



1  wasn't his phone number anymore.

2      THE WITNESS:  Yes, that is my phone number,

3  and if it could be removed, then I would like that.

4      MS. HELFRICH:  Okay, I'm happy to agree.

5  Let's just stipulate that we will send an Exhibit

6  to the Court Reporter that has that blacked out.

7      MR. SIGALE:  And I'll make that same

8  request -- I didn't notice in any of the other

9  manuals, but if you happen to see it or if we see

10  it later, I'd like the same thing remove

11  any -- what do they call it, PPI?

12      MS. HELFRICH:  Yep.

13      MR. SIGALE:  From the Exhibits.

14      MS. HELFRICH:  Yes, I'm fine with that, sure,

15  David.

16  BY MS. HELFRICH:

17      Q.    And last but not least we have a Ruger,

18  correct, is that in the bottom left?

19      A.    Yes.

20      Q.    And this is a .380?

21      A.    Yes.

22      Q.    Is it a semi-automatic?

23      A.    Yes.

24      Q.    And what's the capacity of the magazine



1 | for this weapon?

2 |     A.    I think there is a 6-round and a 7-round

3 | magazine.

4 |     Q.    Okay.  Do you have any

5 | modifications -- have you made any modifications to

6 | it?

7 |     A.    No.

8 |     Q.    Do you have any accessories for it?

9 |     A.    No.

10 |    Q.    And it came with a lock, a cable lock,

11 | correct?

12 |    A.    Yes.

13 |    Q.    Do you use the cable lock?

14 |    A.    No.

15 |    Q.    Who does this handgun belong to?

16 |    A.    Myself.

17 |    Q.    And how long have you owned it?

18 |    A.    I'm not sure without finding the relate.

19 | Less than two years, I would say.

20 |    Q.    Less than two years, did you say?

21 |    A.    Yes.

22 |    Q.    All right.  What is it used for?

23 |    A.    Concealed carry.

24 |    Q.    Do you actually carry it?



1       A.    Occasionally.

2       Q.    Like how often?

3       A.    It just depends on where I'm going and

4    what I'm dressed in.  Like if I'm going to the gym

5    or something, I would take that because I'd be in

6    gym shorts.  I have a pocket carry holster for it

7    that's designed to carry inside the pocket; whereas

8    the other one has a belt holster inside the

9    waistband, holster that requires a belt, so with

10   gym shorts I couldn't carry that.

11      Q.    Okay, got it.  Is it used for anything

12   else?

13      A.    Just target -- just practice

14   occasionally, not very often.

15      Q.    Okay.  How often do you do target

16   practice?

17      A.    Probably 25 times total this last year.

18      Q.    What about other kinds of just target

19   shooting, if you consider that different from

20   target practice, how many times have you been

21   target shooting?

22      A.    I classify them the same.  I mean I

23   always do like different drills and training

24   exercises when I go to the range.



1    Q.    Okay.  How about plinking, would that go

2    in the same category?

3    A.    I mean kind of, but, yeah, like if I was

4    with my kids, it would just be -- the kids would

5    just be like plinking, they wouldn't be doing any

6    training exercises or running any drills or things

7    like that.

8    Q.    But all of those things, plinking,

9    target shooting, target practice, all together

10   you've done that about 25 times in the last year?

11   A.    Approximately, maybe more.

12   Q.    Okay.  You know, I didn't ask you this

13   before, so let me ask you before I forget.  Did you

14   give any of your children training with handguns?

15   A.    Yes.

16   Q.    Which children?

17   A.    As far as showing them how they operate,

18   how to hold them, how to work them, all of them.

19   As far as shooting, I know for sure that my two

20   sons have.  I'm not -- I can't remember with my

21   daughter if she shot anything or not.

22   Q.    Back to the Ruger, where is the

23   Ruger -- just to wrap up the last question, you use

24   it for concealed carry sometimes, and you sometimes



1  use it for target practice?

2      A.   Yes.

3      Q.   Any other uses?

4      A.   No.

5      Q.   Where is it currently stored?

6      A.   In the case in my truck or the safe in

7  my truck.

8      Q.   The black one or the silver one?

9      A.   The black one.  I have it and the

10 Hellcat together.

11     Q.   And is it stored loaded?

12     A.   No.  There is a magazine in there with

13 it just sitting next to it.

14     Q.   But you do store the Hellcat loaded,

15 right?

16     A.   Yes.

17     Q.   If you can get the rules changed the way

18 you want, the way you described earlier, where

19 would you store this Ruger?

20     A.   In the safe in the house.

21     Q.   Would you store it loaded or unloaded?

22     A.   It would depend on how often I was using

23 it for concealed carry.

24     Q.   Okay.  But you would sometimes want to



DARIN E. MILLER                                    November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              181

1  store it loaded, is that correct?

2      A.   Yes, possibly.

3      Q.   Have you read the owner's manual that

4  comes with this firearm?

5      A.   Yes.

6      Q.   Okay.  I'm putting up on the screen

7  Exhibit 18.  Do you see it?

8      A.   Yes.

9      Q.   Is this the owner's manual for the Ruger

10  we have just been talking about?

11      A.   Yes.

12      Q.   Can you read this?  Can you see it and

13  read it, or should I make it better?

14      A.   I can see it, but it's not legible.

15      Q.   How about now?

16      A.   Not really.  It's a little bigger.

17      Q.   How is this?

18      A.   Yes.

19      Q.   Okay.  So here it says, "For increased

20  safety, firearms should be stored unloaded in a

21  location that is both separate from their

22  ammunition and inaccessible to children and any

23  other unauthorized persons," do you see that?

24      A.   Now I do.



1    Q.    Here I'll make it bigger.  How about

2  now?

3    A.    Yes.

4    Q.    Did I read it correctly?

5    A.    Yes.

6    Q.    Do you agree with this statement?

7    A.    No.

8    Q.    Because you think that sometimes a

9  firearm should be stored loaded, correct?

10    A.    Correct.

11    Q.    Now, let me ask you this:  This warning

12  is a little different from the other warning.  It

13  says for increased safety, firearms should be

14  stored unloaded in a location that is both separate

15  from their ammunition and inaccessible to children.

16       Now, you have said that a responsible

17  gun owner can store a firearm loaded and can store

18  a firearm with ammunition so long as it's in a

19  locked safe, is that right?

20    A.    Yes.

21    Q.    Would you agree that there would be an

22  increase in safety if you stored the firearm

23  unloaded and the ammunition separate?

24    MR. SIGALE:  I'm going to object as to



1  foundation and speculation.  Darin, if you have an

2  answer, you can answer.

3  BY THE WITNESS:

4      A.    I would say no.  I mean it can't get any

5  safer than locked in a safe.

6  BY MS. HELFRICH:

7      Q.    So there is no increase beyond locked in

8  a safe, no increase in safety?

9      A.    I'm going to say no.

10     Q.    Okay.  I'm going to press on that point

11  a little bit.  If you were worried about -- and I

12  assume you are worried about protecting children

13  from getting unauthorized access to firearms -- I

14  assume you are concerned about that, is that right?

15     A.    Yes.

16     Q.    Are you saying that you think the most

17  you can do, the best you can do is to store

18  everything in a locked safe, lock it?  There is

19  nothing more you can do?

20     A.    Well, if it was on my person, that would

21  be safer in the safe because there is no way they

22  could get it off of me.

23     Q.    Okay.  But obviously we're talking about

24  multiple firearms here and you're not going to



1  carry them all.  So if we're talking about firearms

2  that are stored and if you were trying to figure

3  out the absolute safest thing you could do to keep

4  those children from getting access to and hurting

5  themselves with a firearm, is there anything you

6  could do beyond locking the firearms and the

7  ammunition in a safe and keeping the key?

8       Do you understand my question?

9    A.    Yes, I understand it.  I'm just not sure

10  how to answer it.  I mean I still say no.  It's

11  locked in a safe and the key is in my pocket, so I

12  mean --

13    Q.    So you're saying if you've done that,

14  even if the weapon is in there loaded and the

15  ammunition is in there with the firearms, if you've

16  locked them in the safe, you have done your very

17  best to keep those firearms away from children and

18  to ensure that children are not going to get

19  injured by those firearms?

20    A.    Absolutely --

21    MR. SIGALE:  Object as to the form of the

22  question, but you can answer, Darin.

23  BY THE WITNESS:

24    A.    Yeah, I mean there is no way they could



DARIN E. MILLER                                    November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                             185

1  retrieve the key out of my pocket and then unlock

2  the locked bedroom door and then unlock the safe;

3  so, yes, it's the safest -- I feel that's extremely

4  safe.

5       Q.   Okay.  I'm going to stop screen sharing.

6  I want to ask you some questions about your long

7  guns, and I don't have pictures of these.

8       MR. SIGALE:  Gretchen, I don't remember how

9  long ago I said in 15 minutes let's take a

10 10-minute break.

11      MS. HELFRICH:  Let's do it now.

12      MR. SIGALE:  So it's 2:15.  Do you want to

13 take till 2:25?

14      MS. HELFRICH:  Sounds good.

15           (WHEREUPON, a short break was had.)

16 BY MS. HELFRICH:

17      Q.   Mr. Miller, again I'll remind you that

18 you're still under oath, the same oath that you

19 took this morning.  I want to ask you about the

20 long guns that you have in your home, and I think

21 that this will go faster.

22           So you own a Savage 220 20-gauge

23 shotgun?

24      A.   Yes.



1        Q.    And is that a pump action?

2        A.    That's a bolt action.

3        Q.    What's the capacity?

4        A.    I believe three.

5        Q.    And have you made any modifications to

6   it, or do you have any accessories for it?

7        A.    Just the scope on it.

8        Q.    Did you put that scope on?

9        A.    No, it was installed when I purchased

10  it.

11       Q.    And does that rifle belong to you?

12       A.    Yes.

13       Q.    How long have you had it?

14       A.    Probably a little over a year.

15       Q.    Who uses it?

16       A.    Myself.

17       Q.    Only exclusively?

18       A.    Yes.

19       Q.    Did it come with an owner's manual?

20       A.    Yes.

21       Q.    Did you read the owner's manual?

22       A.    Yes.

23       Q.    What do you use this firearm for?

24       A.    That's for deer shotgun season.



1      Q.    And is that the season that's only seven

2    days long?

3      A.    Yes.

4      Q.    So have you used it for that?

5      A.    Yes, last year was my first year.

6      Q.    Do you use it for anything else?

7      A.    Other than to sight it in, no.

8      Q.    Is this a weapon that would be suitable

9    for self-defense in a home?

10     A.    No.

11     Q.    Where is this weapon stored currently?

12     A.    In the safe in the bedroom.

13     Q.    The large safe we looked at before with

14   all the stickers on it?

15     A.    Yes.

16     Q.    Is it stored loaded or unloaded?

17     A.    Unloaded.

18     Q.    If you could get the rules to change the

19   way you want them to and if you were allowed to do

20   all the things you want to be able to do that

21   you've testified here today, how would you store

22   this shotgun?

23     A.    Locked in the case -- or in the safe.

24     Q.    So the same as now?



1       A.    Yes, unloaded.

2       Q.    So nothing would change regarding this

3   shotgun?

4       A.    Correct.

5       Q.    Would you ever consider using it for

6   self-defense in the home?

7       A.    Only if there was a grizzly was coming

8   through my door.

9       Q.    Are there grizzly bears in Shelbyville?

10      A.    I sure hope not.

11      Q.    But you intend to keep it locked up

12  unloaded?

13      A.    Yes.

14      Q.    Okay.  You have a Ruger 22 LR rifle?

15      A.    Model 10/22, is that the one you're

16  talking about.

17      Q.    Yes.

18      A.    Yes.

19      Q.    Okay.  What kind of action is that?

20      A.    Semi-automatic.

21      Q.    And what's the capacity?

22      A.    I think the magazines are 10 rounds, and

23  I have some I believe 25-magazines.

24      Q.    And have you made any modifications to



1  it?

2       A.    No.

3       Q.    Do you have any accessories for it?

4       A.    No.

5       Q.    Who does this weapon belong to?

6       A.    Myself.

7       Q.    How long have you had it?

8       A.    A long time.

9       Q.    Two years, five years, ten years?

10      A.    More than ten years.

11      Q.    Okay.  Who uses this firearm?

12      A.    We use it -- that's usually the one I

13  let one of my boys use when we went squirrel

14  hunting, and I have another 22 rifle that I would

15  carry.

16      Q.    Do you have that other rifle still?

17      A.    Yes.

18      Q.    Okay, we'll get to it.  So you use this,

19  your boys have used it.  Does your wife use it?

20      A.    I'm sure she shot it at target -- or

21  plinking at the range.

22      Q.    Okay.  How about your daughter Cyra?

23      A.    I think she shot the other one.  I don't

24  think she shot this one because the other one is



DARIN E. MILLER                                      November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              190

1  lighter weight.

2      Q.    Did it come with an owner's manual?

3      A.    I do not remember because I believe I

4  bought that one used.

5      Q.    Okay.  So you don't know if you've read

6  the owner's manual that comes with it?

7      A.    I don't know if I got one or not.

8      Q.    All right.  You mentioned squirrel

9  hunting, plinking.  What else is this firearm used

10 for?

11     A.    You broke up on me.

12     Q.    What else is this firearm used for?  You

13 mentioned squirrel hunting and plinking.  Is it

14 used for anything?

15     A.    Small game hunting, squirrel, rabbit.

16     Q.    Where is it currently stored?

17     A.    In the big black safe in the bedroom.

18     Q.    Unloaded or loaded?

19     A.    Unloaded.

20     Q.    If you were to win this lawsuit and get

21 the rules changed and you were allowed to do the

22 things you want to be able to do as you described

23 earlier today, what would change about the way you

24 store this weapon?



1      A.    Nothing.

2      Q.    So you would continue to store it locked

3  in the safe unloaded?

4      A.    Yes.

5      Q.    Is this a firearm that you would use for

6  self-defense?

7      A.    No.

8      Q.    Could you use it for self-defense if you

9  had to?

10      A.    Yes, if that's all you had, but like

11  with the 22 handguns, it's just not the preferred

12  caliber.

13      Q.    Is it correct to say you have no

14  intention of using it for self-defense in the home?

15      A.    No, not long as I have the others, other

16  guns.

17      Q.    All right.  You have a Mossberg model

18  500 20-gauge?

19      A.    Yes, that's my wife's -- no, that's

20  actually my wife's, that's her shotgun.

21      Q.    Okay.  Is that a bolt or a pump?

22      A.    It's a pump.

23      Q.    And what's the capacity of that shotgun?

24      A.    I would assume three because I got a



1  plug in it because you can only have three shells

2  in a shotgun for hunting deer and other game per

3  DNR rules.

4       Q.    Okay.  Did you say per DNR rules?

5       A.    Yes, per the DNR rules and regulations,

6  hunting regulations.

7       Q.    Okay.  Have any modifications been made

8  to this gun?

9       A.    It came with two barrel shoot.  The one

10 barrel that's probably on it now is for deer

11 hunting for slugs -- you know, to shoot slugs out

12 of it for deer, shotgun deer season, and the other

13 one would be a bird shot barrel for upland game,

14 squirrel, rabbit.

15      Q.    Do you have any accessories for the gun?

16      A.    No, just the other barrel for it.

17      Q.    You said this weapon belongs to your

18 wife?

19      A.    Yes.

20      Q.    How long has she had it?

21      A.    I'm not sure.  I'm sure more than five

22 years, I would guess.

23      Q.    And does anyone else use it besides her?

24      A.    My daughter could use if she ever takes



DARIN E. MILLER                                         November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                             193

1   up shotgun deer hunting.

2        Q.    To your knowledge, has she ever used it?

3        A.    No, she never has currently, no.

4        Q.    Okay.  How about you, did you ever use

5   it?

6        A.    I sighted it in for her for the slugs

7   for shotgun deer hunting.  I cited the scope in for

8   her.

9        Q.    Anyone else who uses it besides the

10  people you mentioned?

11       A.    No.

12       Q.    Did it come with an owner's manual?

13       A.    Yes.

14       Q.    Have you read the owner's manual that

15  came with it?

16       A.    I assume I did.  It's been a while.

17       Q.    But you don't specifically remember

18  reading it?

19       A.    Generally all pump shotguns are

20  disassembled the same way.

21       Q.    Okay.  You said your wife uses it for

22  dear hunting.

23       A.    Yes.

24       Q.    What else does she use it for?



1        A.    That particular one I think that's all

2   she's used it for.

3        Q.    Where is it currently stored?

4        A.    In the big, tall, black gun safe in the

5   bedroom.

6        Q.    Is it stored loaded or unloaded?

7        A.    Unloaded.

8        Q.    And if you were to get what you want in

9   this lawsuit and be allowed to do the things that

10  you would like to be able to do as you have

11  testified here today, would anything change about

12  the way you store this firearm?

13       A.    No.

14       Q.    Is this a firearm that you would ever

15  use for self-defense in the home?

16       A.    Yes, you could.

17       Q.    What makes it a potential self-defense

18  weapon?

19       A.    I mean it's powerful, powerful gun.  If

20  I had the shot shell barrel on it, it could be used

21  for self-defense.

22       Q.    Okay.  Do you currently have any

23  intention of using it for self-defense?

24       A.    No.



DARIN E. MILLER                                    November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              195

1      Q.    If you were going to use it for
2  self-defense, would you store it differently from
3  the way you've described, assuming you won the
4  lawsuit -- strike that.  Let me clean up the
5  question.
6            You testified that assuming you won the
7  lawsuit, you would store it the same way you store
8  it now, correct?
9      A.    Yes.
10     Q.    If you won the lawsuit and you decided
11 to use it for self-defense, how would you store it?
12     A.    If it was for self-defense, I would
13 store it loaded.
14     Q.    Okay.
15     A.    But I don't have any intentions of using
16 it for self-defense unless something happens to the
17 other guns.
18     Q.    Got it.  You also own a Smith & Wesson
19 M&P 15-22?
20     A.    Yes, that's the other 22 I was talking
21 about that we squirrel hunt with when I take the
22 boys.
23     Q.    And is that a semi-automatic?
24     A.    Yes.



1      Q.    What's the capacity of that weapon?

2      A.    I think that magazine holds 25 rounds.

3      Q.    Okay.  And have you made any

4   modifications to it?

5      A.    No.

6      Q.    Does it have any accessories?

7      A.    I guess I put a sling on it, I think

8   that has a sling on it, a shoulder sling to carry

9   it on your shoulder.

10      Q.    And is that for carrying?

11      A.    Yes.

12      Q.    Who does this firearm belong to?

13      A.    Myself.

14      Q.    How long have you owned it?

15      A.    Probably more than 12 -- 10, 12 years I

16   would guess.  I'm not sure without looking at the

17   receipt.

18      Q.    Is it the one you've owned the longest?

19      A.    No.

20      Q.    Which firearm have you owned the

21   longest?

22      A.    The Marlin Model 60 .22, that was the

23   first rifle I got when I was a kid.

24      Q.    Okay, that's coming up on my list, we'll



1  get there.  Who uses this rifle?

2       A.    That's the one all my kids have shot it.

3  It's really lightweight.  That's the one that Cyra

4  shot for plinking, all the kids have target shot or

5  plinked with it.

6       Q.    And has your wife ever used it?

7       A.    I'm not sure.  She may have.

8       Q.    Did this firearm come with an owner's

9  manual?

10      A.    Yes.

11      Q.    Did you read the owner's manual?

12      A.    Yes.

13      Q.    You mentioned your kids have used this

14  for plinking.  What else is this firearm used for?

15      A.    Small game hunting.

16      Q.    So that would be squirrel and rabbit?

17      A.    Yes.

18      Q.    Anything else?

19      A.    No.

20      Q.    Is it a firearm that you would ever use

21  for self-defense in the home?

22      A.    Only in a last resort.

23      Q.    Okay.  Do you have any intention of

24  using it for self-defense in the home?



1      A.     No.

2      Q.     But it could be used?

3      A.     Yes.

4      Q.     You said before that -- just to back up

5   a second.  Your Savage 220 you said you wouldn't

6   use this in the home unless a grizzly bear was

7   coming through the door.

8      A.     Right.

9      Q.     Is it something you would use as a last

10  resort for self-defense?

11     A.     If I had to, yes.  I mean any firearm

12  could be used for self-defense.

13     Q.     Okay.  So back to the Smith & Wesson M&P

14  15-22.  Where is it stored currently?

15     A.     In the black, tall gun safe in the

16  bedroom.

17     Q.     Loaded or unloaded?

18     A.     Unloaded.

19     Q.     And if you were to be successful in this

20  lawsuit and you were allowed to do the things that

21  you want to be allowed to do as you've described

22  today, would anything change about the way you

23  store this weapon?

24     A.     No.



1    Q.    And if it became a weapon that you

2    intended to use for self-defense, would you store

3    it the same way?

4    A.    Yes.

5    Q.    You would still store it unloaded?

6    A.    I mean if -- if that's all I had, yes,

7    then I would store it loaded for self-defense.

8    Q.    Okay.  You have an Olympic Arms modern

9    sporting arm .223?

10   A.    Yes.

11   Q.    And that is a semi-automatic?

12   A.    Yes.

13   Q.    What's the capacity?

14   A.    I have a 10-round magazine and 30-round

15   magazines for it.

16   Q.    Okay.  Any modifications to it?

17   A.    I don't think so.  I mean I've added --

18   Q.    Any accessories?

19   A.    I mean I've changed parts on it before.

20   I mean I haven't, the gunsmith has.

21   Q.    Just replacements or souping it up,

22   let's put it that way, for lack of a better term?

23   A.    Comfort type features.

24   Q.    So modifications for comfort?



DARIN E. MILLER                                    November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                            200

1       A.    Yes.

2       Q.    Does it have any accessories?

3       A.    I mean just what's on it, what you see

4   in the picture.

5       Q.    So what comes with it?

6       A.    Yes.

7       Q.    Who does this rifle belong to?

8       A.    Myself.

9       Q.    How long have you had it?

10      A.    More than 10 years.

11      Q.    And who uses it?

12      A.    My kids -- my two sons have shot it and

13  then myself.

14      Q.    Your wife?

15      A.    I don't think she shot it.

16      Q.    Your daughter?

17      A.    No.

18      Q.    Did it come with an owner's manual?

19      A.    Yes.

20      Q.    Did you read the owner's manual?

21      A.    Yes.

22      Q.    And what do you use this rifle for?

23      A.    Home defense, and then coyote hunting

24  and then training and target practice.



1    Q.    What about squirrel and rabbit hunting?

2    A.    No.

3    Q.    Why not?

4    A.    It's a larger bullet.  You wouldn't want

5    to use a larger bullet on small game.

6    Q.    Okay.  How is it currently stored?

7    A.    In the black, tall gun safe in the

8    bedroom.

9    Q.    Okay.  Is it stored unloaded?

10   A.    Yes, unloaded.

11   Q.    And if you won this lawsuit and you

12   could do the things that you say you want to be

13   allowed to do as you've testified today, what would

14   change, if anything, about how you store this

15   firearm?

16   A.    It would be loaded and locked in the

17   safe.

18   Q.    And is that because it's a firearm that

19   you consider a self-defense firearm?

20   A.    Yes.

21   Q.    You said earlier you talked about an

22   AR-15 that you would use for self-defense.  Is this

23   the one you were talking about?

24   A.    Yes.



1      Q.    Okay.  Just a few more to go.  You have

2    a Marlin Model 60 22-caliber rifle?

3      A.    Yes.

4      Q.    Is that a semi-automatic?

5      A.    Yes.

6      Q.    And what's the capacity for that rifle?

7      A.    I think it holds 17, 16 or 17.

8      Q.    Any modifications or accessories?

9      A.    No.

10      Q.    And who does this weapon belong to?

11      A.    Myself.

12      Q.    How long have you owned it?

13      A.    That was my first rifle when I was a

14    kid.

15      Q.    So 35 years?

16      A.    Not quite that long.

17      Q.    Is that is a ballpark?

18      A.    Yeah.

19      Q.    Did you read the owner's manual that

20    came with that rifle?

21      A.    I'm sure I did.

22      Q.    What do you use this rifle for?

23      A.    Now it's just more of an heirloom, I

24    guess, kind of a keepsake.  I don't really want to



DARIN E. MILLER
JENNIFER J. MILLER vs MARC D. SMITH

November 05, 2020
203

1    use it if anything happened to it now since it was

2    my Dad's, it has sentimental value.

3         Q.    Okay.  How is it stored currently?

4         A.    In the gun safe, the black, tall gun

5    safe in the bedroom.

6         Q.    Unloaded?

7         A.    Yes.

8         Q.    If you were to win this lawsuit and you

9    were allowed to do all the things that you say you

10   want to be allowed to do as you've testified today,

11   would anything change about the way you store this

12   rifle?

13        A.    No.

14        Q.    Would you ever use this rifle for

15   self-defense?

16        A.    No.

17        Q.    You have a Remington Fieldmaster Model

18   572 22-caliber LR?

19        A.    Yes.

20        Q.    And is that a semi-automatic?

21        A.    No, it's a pump action.

22        Q.    Okay.  What's the capacity for that gun?

23        A.    I don't know.  I haven't shot it.  I

24   inherited that from my grandpa.  I don't shoot it.



1  It just sits in the gun safe for memory, keepsake.

2      Q.    Okay.  Any modifications to it or

3  accessories?

4      A.    No.

5      Q.    And that belongs to you, correct?

6      A.    Yes.

7      Q.    When did you inherit it?

8      A.    It would have been April of 2001 when my

9  grandpa passed away.

10     Q.    And you said you do not use it

11 currently?

12     A.    No.

13     Q.    Does anyone use it?

14     A.    No.

15     Q.    Did you ever have an owner's manual for

16 that firearm?

17     A.    No.  I'm sure it's over 50 years old.

18     Q.    Okay.  Where is it stored currently?

19     A.    In the black, tall gun safe in the

20 bedroom.

21     Q.    Unloaded?

22     A.    Yes.

23     Q.    And if you were to win this lawsuit and

24 you were allowed to do the things that you say you



1  want to be allowed to do as you've testified today,

2  would anything change about the way you store this

3  weapon?

4      A.   No.

5      Q.   Is this a weapon you would ever use for

6  self-defense?

7      A.   No.

8      Q.   Only two more.  You have a Ruger M77

9  Mock 2?

10     A.   Yes.

11     Q.   And that's a 243-caliber?

12     A.   Yes.

13     MR. SIGALE:  Gretchen, you can keep going.  I

14  just need to step away for like 20 seconds.  You

15  can keep going.  I'll be right back.

16     MS. HELFRICH:  You sure?

17     MR. SIGALE:  Fine.  If you don't mind, let's

18  break for 20 seconds, okay?

19     MS. HELFRICH:  Yep.

20     MR. SIGALE:  I'm good.

21  BY MS. HELFRICH:

22     Q.   We were talking about the Ruger M77 Mark

23  2.  What type of action is that?

24     A.   Bolt action.



DARIN E. MILLER                                     November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              206

1       Q.    And the capacity?

2       A.    I don't remember exactly.  I'll guess

3   four or five maybe.

4       Q.    Okay.  Any modifications or accessories?

5       A.    No, just the scope on it.

6       Q.    And does this weapon belong to you?

7       A.    Yes.

8       Q.    How long have you owned it?

9       A.    Probably more than 25 years.  It was a

10  gift from my dad.

11      Q.    Who uses it currently?

12      A.    Just myself.  It hasn't been used in

13  several years, though.

14      Q.    What do you use it for?

15      A.    It was a varmint hunting gun.

16      Q.    Does that mean squirrel and rabbit?

17      A.    Coyote.

18      Q.    Anything else you used it for?

19      A.    At the range a few times.

20      Q.    Did it come with an owner's manual?

21      A.    Yes.

22      Q.    Did you read the owner's manual?

23      A.    I'm sure I did.

24      Q.    Where and how is it stored currently?



1    A.    Unloaded in the tall, black gun safe in

2  the bedroom.

3    Q.    And if you were to win this lawsuit and

4  you were allowed to do the things that you say you

5  want to be allowed to do, would anything change

6  about the way you store this firearm?

7    A.    No.

8    Q.    Would you ever use it for self-defense?

9    A.    No.

10    Q.    Okay.  We're on the last one.

11  Winchester Model 1300, 12-guage?

12    A.    Yes.

13    Q.    You own a Winchester Model 1300

14  12-guarge, just to be clear what I'm asking?

15    A.    Yes, I understood.

16    Q.    Got it.  And is this a pump action?

17    A.    Yes.

18    Q.    And what's the capacity?

19    A.    Three, I believe.

20    Q.    Any modifications or accessories?

21    A.    No.

22    Q.    Does this belong to you?

23    A.    Yes.

24    Q.    How long have you owned it?



```
 1        A.    Oh, probably almost as long as the
 2   Marlin Model 60, my grandpa -- my other grandpa had
 3   bought it for me when I was little or bought it for
 4   my dad to give to me.
 5        Q.    So like 30 years, that's the ballpark?
 6        A.    Probably, yes.
 7        Q.    Who uses it currently?
 8        A.    Myself.
 9        Q.    Anyone else?
10        A.    No.
11        Q.    Did it come with an owner's manual?
12        A.    I'm sure it did.
13        Q.    Do you recall whether you read the
14   owner's manual?
15        A.    I would assume I did.
16        Q.    What is it used for?
17        A.    Mainly just squirrel, rabbit, pheasant,
18   quail, that type of small game, upland game
19   hunting?
20        Q.    Anything else?
21        A.    I used to use it as a deer slug gun
22   before I got other more modern slug guns.
23        Q.    Any other things you use it for?
24        A.    I had used it for clay pigeons years
```



1   ago, shooting clay pigeons, sporting clays.

2        Q.    How is it stored currently?

3        A.    Unloaded in the tall, black gun safe in

4   the bedroom.

5        Q.    If you were to win this lawsuit and you

6   were allowed to do the things that you say you'd

7   like to be allowed to do as you've testified today,

8   would anything change about the way you store this

9   firearm?

10       A.    No.

11       Q.    Would you ever consider using this

12  firearm for self-defense?

13       A.    If I had no others, I could, but

14  intentionally no.

15       Q.    Would you consider it a self-defense

16  firearm?

17       A.    Yes.  Like I said, any gun can be used

18  in self-defense.

19       Q.    Okay.  Do you have any intention of

20  using it for self-defense?

21       A.    No.

22       Q.    Do you own any other firearms that we

23  have not talked about today?

24       A.    I mean just that Taurus or whatever that



DARIN E. MILLER                                    November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                            210

1   I traded.

2        Q.    I haven't left anything off the list;

3   there is nothing else that I missed that you own

4   currently?

5        A.    I don't think so.  I think that covered

6   all of them.

7        Q.    All right.  Are there any other firearms

8   in your home that don't belong to you?

9        A.    No.

10       Q.    And do you have other weapons in your

11   home other than firearms?

12       A.    There is four compound bows, one

13   longbow, and two crossbows.

14       Q.    And how are those stored?

15       A.    Couple BB guns.

16       Q.    I'm sorry?

17       A.    And a couple BB guns if that classifies

18   as a weapon.

19       Q.    Where are the BB guns stored?

20       A.    In the closet with a trigger lock on

21   them.

22       Q.    Which closet?

23       A.    The master bedroom, my closet.

24       Q.    With trigger locks on them?



1       A.    Yes.  They're both broken, they don't

2    operate.  They're just keepsakes.  One of them was

3    her Dad's first BB gun when he was a little kid and

4    then one was mine.

5       Q.    When you say her, do you mean your wife?

6       A.    Yes, Jennifer Miller's Dad.

7       Q.    Where are the bows stored?

8       A.    On bow racks in the bedroom.

9       Q.    Out, not locked up or anything?

10       A.    The one in my bedroom has a lock on it

11    for mine and my wife's bow.  Then the kids' bows

12    are all stored in safes.

13       Q.    In safes?

14       A.    Not safe.  Cases, I'm sorry, cases.

15       Q.    Okay.  What about the arrows, where are

16    the arrows stored?

17       A.    In the garage mainly.  Some of them are

18    in the closet.  All the field points and everything

19    has been removed off of them.

20       Q.    Okay.  So they don't have points on

21    them?

22       A.    Right.

23       Q.    They're just essentially sticks?

24       A.    Yes.



1    Q.    Okay.  The BB guns you said are not

2  operable?

3    A.    Correct.

4    Q.    I'm going to switch gears a little bit

5  because I want to talk about day care, foster care,

6  your roles, and some foster parenting questions a

7  little bit differently.

8          So you testified that you work in your

9  wife's day care, is that right?

10    A.    Yes.

11    Q.    And you work there on the days when

12  you're not working at GPI?

13    A.    Yes.

14    Q.    Do you work in the evenings after you've

15  worked at GPI?

16    A.    I work 7:00 a.m. to 7:00 p.m. and all

17  the kids go home around 5:00 now.  She doesn't have

18  anybody later than 5:00 currently.

19    Q.    Okay.  And are you on the day care

20  license?  Are you the licensee or one of the

21  licensees?

22    A.    I don't know if I'm an assistant or how

23  that's word on there, but Jennifer is the primary.

24    Q.    Okay.  And do you know when she got



1  licensed?

2      A.    I'm not sure.  I'm not sure how long

3  we've been doing it in our home.

4      Q.    Tell me what your responsibilities are

5  when you are working at the day care.

6      A.    I just kind of help out wherever needed.

7  She's only maybe got just our foster son and right

8  now there is just two other boys, so there is not

9  really a lot to do.  I'll help clean up, pick up

10  after them, maybe get lunch ready.

11      Q.    When there is more kids around, what

12  sorts of things do you do?

13      A.    Of course pick up more toys and clean

14  up, prepare snacks, maybe help if they're playing

15  outside on the playground, kind of supervise.

16      Q.    What ages of children are in the day

17  care?

18      A.    Right now during school hours, of course

19  our foster son he's two, and then there is one he's

20  around a year -- over a year, I'm not sure exactly

21  how many months, and the other one he's just maybe

22  a month younger than our foster son, not quite.

23  He's around two as well.

24      Q.    So pretty little kids, toddlers?



1        A.    Yes.

2        Q.    Okay.  And your wife's license to

3    operate a day care came from DCFS, correct?

4        A.    Yes.

5        Q.    And you were already foster parents when

6    she got a day care license, right?

7        A.    Yes.

8        Q.    So when you went from just being foster

9    parents to being foster parents and operators of

10   the day care home, what changed in your home?  Now,

11   let's start with the firearms.  What changed about

12   how you stored and kept your firearms?

13       A.    With the day care I could no longer have

14   handguns in the house, and then of course with the

15   foster I had to have, of course, everything locked

16   up and had to be unloaded.

17       Q.    But the only change when you became day

18   care operators was that you couldn't have handguns

19   in the home?

20       A.    Correct, or loaded long guns.

21       Q.    Okay.  But wasn't it true that you

22   already couldn't have loaded long guns?

23       A.    Well, yes, that would apply with the

24   foster license.



1      Q.    So that's what I'm asking, what was the

2   change from foster to day care, what's the change?

3      A.    Just the handguns could not be in the

4   home during operating hours.

5      Q.    And so you put them in those two cases

6   in your vehicle?

7      A.    Yes.

8      Q.    The handguns.  I asked you if you ever

9   stored them at your father's.  Did you ever store

10  them at your father-inlaw's?

11     A.    I don't have a father-in-law.

12     Q.    Okay.

13     A.    He's deceased.

14     Q.    Understood.

15     A.    30 years ago or so.

16     Q.    Okay.  What else changed in your home

17  when your wife began operating a day care?  Were

18  there modifications you had to make?

19     A.    Of course we already had a baby gate

20  from when we had our first foster daughter, and I

21  mean just like things plugged into outlets, you

22  know, that were out in the open like night lights

23  and stuff like that where they could mess with

24  those got replaced with the childproof covers in



1   the outlets.  Other than that -- baby-proofing

2   steps, but other than that, no.

3        Q.    And that's for the safety of the

4   children, right?

5        A.    Yes.

6        Q.    And did you find any of those

7   requirements to be unreasonable?

8        A.    No.

9        Q.    Your wife voluntarily applied for a day

10  care license, right?  I mean she wanted to operate

11  a day care home, she chose to do that?

12       A.    I guess -- I mean yes and no.  She had

13  been doing a day care out of her grandma's house

14  after she had passed away, and she didn't realize

15  she had to be licensed.  So Julie had come in and

16  told her she had to shut down, and then she helped

17  her get her license and everything, so it was a

18  win-win situation, so, yes, she volunteered to do

19  it then.

20       Q.    Okay.  And the children in the day

21  care -- I know that your foster daughter is in the

22  day care or at least sometimes is in the day care,

23  but mainly the children are not related to you,

24  right?



1    A.    No.  I mean we used to have my wife's

2    nephew's kids, they were regulars for a while, but

3    they're all in school now, so we don't have them on

4    a regular basis anymore.

5    Q.    Let me ask it a different way.  Your

6    wife is allowed under her license to have kids in

7    the day care who aren't related to her, right?

8    A.    I'm not sure.  Could you rephrase that?

9    Q.    Yes, sure.  So what I'm asking is she's

10   not limited to only having kids she's related to in

11   the day care?

12   A.    Oh, no.

13   Q.    Okay.  Yeah, that's what I was asking.

14   And the parents of the children in the day care,

15   they pay your wife to take care of the children,

16   right?  This is your wife's business?

17   A.    Yes.

18   Q.    And how much income does she earn from

19   the business?

20   A.    I'm not sure.

21   Q.    Do you know how much she charges for day

22   care kids?

23   A.    It just went up per the DCFS

24   requirements, and then it varies if you have like



1  multiple kids of the same family.  I mean just a

2  guess, let's say $15 a day.

3       MR. SIGALE:  Darin, don't guess.  If you don't

4  know, that's okay.

5  BY THE WITNESS:

6       A.    Well, I don't know then for sure.

7  BY MS. HELFRICH:

8       Q.    Okay, that's fine.  So when the day care

9  is operating, other than the day care kids, who is

10  in the house?

11       A.    Just our foster son and then Cyra if

12  she's not in school.

13       Q.    What about your older boys?

14       A.    I don't see them too much.  It's usually

15  evenings if they come around.

16       Q.    Okay.  Do you or your wife provide any

17  education or training to the day care kids

18  regarding firearms?

19       A.    No.

20       Q.    By that I include firearm storage,

21  firearm safety, any education or training on any of

22  those subjects?

23       A.    No.

24       Q.    Do you know whether those kids have



1  received any education or training regarding

2  firearms, firearms storage, firearm safety from

3  their own parents or from anywhere else?

4      A.   I know some of them have because we know

5  the parents and they've told us they have.

6      Q.   But some of them you don't know?

7      A.   I do not know, correct.

8      Q.   Do you or your wife make a point of

9  asking the kids what they know about firearms or

10  what they've been taught about firearms?

11      A.   No.  I mean because most of them are

12  little, like right now they're two and younger than

13  two.

14      Q.   Okay.  Do you inform the parents of the

15  day care children that you have firearms present in

16  the house?

17      A.   Yes, absolutely.

18      MR. SIGALE:  I was objecting as to form, but

19  he answered, that's fine.

20  BY MS. HELFRICH:

21      Q.   And how do you do that, how do you

22  inform them?

23      MR. SIGALE:  Same objection.  You can answer,

24  Darin.



```
 1   BY THE WITNESS:
 2        A.   We just always make them aware, we tell
 3   them are you okay that we have firearms stored in
 4   our house, you know, locked up in a safe, and
 5   nobody has ever -- go ahead, I'm sorry.
 6        Q.   Go ahead and finish, please.
 7        A.   I don't remember where I was going with
 8   it.
 9        Q.   You said nobody has ever?
10        A.   Nobody has ever contested it or had a
11   problem with it.
12        Q.   Okay.  So you tell them how they're
13   stored?
14        A.   Absolutely, yes.
15        Q.   Do you tell the children that there are
16   firearms in the house?
17        A.   No.
18        Q.   If you know, do any of them know that
19   there are firearms in the house?
20        A.   I don't see how they would, so no.
21        Q.   Do you ever go into the master bedroom
22   when the day care children are present?
23        A.   Yes.
24        Q.   So sometimes that master bedroom door is
```



1  unlocked when the day care children are present?

2      A.    If I'm in there, yes.

3      Q.    And what would cause you to go in there

4  while the day care children are present?

5      A.    Just a break, peace and quiet, watch TV,

6  lay down, rest.

7      Q.    Did you have to undergo any training to

8  become a day care home employee?

9      A.    Yes.

10      Q.    What training?

11      A.    It was all online.  I had to watch

12  videos and answer questions.

13      Q.    What kind of subjects were involved?

14      A.    Just how to handle different scenarios,

15  shaken baby syndrome, and how to handle certain

16  situations, what not to do, what to do.

17      Q.    What kinds of situations?

18      A.    You know, discipline and different

19  things like that, what to feed them, you know, your

20  different food groups.  They have to have so many

21  servings of fruits, vegetables, grains, dairy.

22      Q.    Was there stuff that you didn't know?  I

23  mean you've raised three kids of your own.  Was

24  there stuff in there you didn't know?



1    A.    It was all common sense most of it.

2    Some of it might have been, you know, learn

3    something new.

4    Q.    Did you get any certificates as a result

5    of that training?

6    A.    On the license or whatever.

7    Q.    Sorry, what?

8    A.    The day care license.

9    Q.    Did you say, no, you didn't get any

10   certificates?

11   A.    Yes, I did, my license or whatever

12   approved through DCFS to do it.  I had to do the

13   online classes, so to speak, to get my license.

14   Q.    Are you talking about your license to be

15   a day care employee or your license -- the license

16   that your wife got?

17   A.    To be on the license as an assistant or

18   what not, whatever I'm classified as.

19   Q.    I see, okay, got you.  As a result of

20   your wife being a day care home operator, are you,

21   your family, subject to monitoring or inspections

22   of your home?

23   A.    Yes.

24   Q.    And can those happen at any time?  Can



1  DCFS just show up and say we're here to inspect?

2      A.    Yes.

3      Q.    And has that ever happened to you where

4  they've shown up unannounced?

5      A.    Yes.

6      Q.    What kind of things do they look at?

7      A.    They inspect the house, and they want

8  usually want to request to look in the safe and

9  make sure there is no handguns in there.  And I

10 can't remember if the foster people that come in or

11 DCFS for the day care that usually check the water

12 temperature and the smoke detectors, that they all

13 work correctly.

14     Q.    And, again, those requirements, the

15 water temperature, the smoke detectors, those are

16 all for the safety of the children in the day care?

17     A.    Yes.

18     Q.    And would you agree that the safety of

19 those children is of paramount importance?

20     A.    Absolutely, yes.

21     Q.    Have you or your wife ever been found --

22 I'm not trying to ask this in a "got you" way.

23           Have you ever been told that you were

24 violating any of the licensing requirements?



1        MR. SIGALE:  I'm going to object as to form

2   and vagueness.  Can you be more specific which

3   license you're talking about?

4   BY MS. HELFRICH:

5        Q.    The day care license, I'm talking about

6   the day care license.  Have you or your wife ever

7   been told that you were in violation of the day

8   care license?

9        A.    I believe my wife had -- like her

10  numbers of her children she might have been over

11  one time.  I'm not absolutely sure, but that would

12  have been probably the only thing I could remember.

13       Q.    Well, correct me if I'm wrong, but isn't

14  it true that you were keeping handguns in your home

15  even after you were licensed as a day care home?

16       A.    Yes, that's before we knew we couldn't

17  have them there, when Julie had found out we had a

18  concealed carry license and I guess assumed that we

19  had handguns in the home, and I said yes, and she

20  said we have to remove them, which I did

21  immediately.

22       Q.    Do you know how long after you had got

23  the license that that happened?

24       A.    You mean the original license?



1      Q.    The day care license.

2      A.    I know the license was good for a year,

3  so I would assume a year.

4      Q.    So it was when the license was being

5  renewed that this came up?

6      A.    I believe so, yes.

7      Q.    I understand, okay.  And your testimony

8  is that you didn't know that there was a rule

9  against having a handgun in your home at that time?

10     A.    Yes, I did not know.

11     Q.    Were the handguns that you were keeping

12 in your home loaded?

13     A.    I don't believe so.

14     Q.    Do you know how long you plan or your

15 wife plans to continue operating a day care?

16     A.    I don't know.

17     Q.    Changing gears a little bit, do you know

18 anyone who has committed suicide?

19     A.    I've known people around that have

20 committed suicide, but actually anybody that was a

21 close acquaintance, no.

22     Q.    Okay.  Do you have any understanding of

23 whether there are warning signs that a person might

24 be considering suicide?



1     A.    I mean probably -- I mean maybe signs of

2   extreme depression.  As far knowing all the signs,

3   no, I don't.

4     Q.    It's not a test.  I'm just asking if you

5   have any knowledge of what -- to your knowledge,

6   are there signs that a person might be considering

7   suicide, what do you know those signs to be, if

8   any?

9     MR. SIGALE:  I'll object as to foundation and

10  speculation, but, Darin, you can answer to the

11  extent you can answer.

12  BY THE WITNESS:

13    A.    I'm not sure other than what I already

14  said.

15  BY MS. HELFRICH:

16    Q.    Just signs of extreme depression?

17    A.    Yes, maybe talking to you like -- you

18  know, just what they say may be indications.

19    Q.    Do you want to add something?

20    A.    No, no.  I was just thinking out loud.

21    Q.    And, again, this is not a test.  I'm

22  just asking what you know.  Do you think that if

23  you -- if someone in your home was exhibiting those

24  warning signs, so if somebody in your home was



DARIN E. MILLER
JENNIFER J. MILLER vs MARC D. SMITH

November 05, 2020
227

1   extremely depressed or was talking in a way that

2   concerned you, would you store your firearms any

3   differently?

4       MR. SIGALE:  Objection, speculation,

5   incomplete hypothetical.  You can answer if you

6   can.

7   BY THE WITNESS:

8       A.   No, I don't think I would.

9   BY MS. HELFRICH:

10      Q.   All right.  Do you agree that people who

11  might be thinking about suicide should not have

12  access to firearms?

13      A.   Yes.

14      Q.   You've stated already that guns can be

15  dangerous, right?

16      A.   Yes.

17      Q.   Do you believe that guns in a home can

18  present a safety risk to children?

19      MR. SIGALE:  Object as to foundation and

20  speculation and incomplete hypothetical, but,

21  Darin, to the extent you can answer, go ahead and

22  answer.

23  BY THE WITNESS:

24      A.   Can you -- I'm not sure.



1   BY MS. HELFRICH:

2       Q.    Well, let me ask you this:  You keep

3   your guns locked in a safe, right?

4       A.    Yes.

5       Q.    And I think you testified that even if

6   you -- even before you were subject to the foster

7   care rules, you still kept your guns locked in the

8   safe, right?

9       A.    Yes.

10      Q.    Why?

11      A.    Just I mean so they don't get stolen or

12  they don't get into -- I mean I always had kids, so

13  I had to keep them locked up from the kids.

14      Q.    So if they weren't locked up, they might

15  pose a risk to your children, right?

16      A.    Yes.

17      Q.    Okay.  That's what I'm asking, that's

18  what I'm asking.  So you take steps to keep them

19  away from your children or you took steps when your

20  children were younger to keep them away; you locked

21  them in a safe, correct?

22      A.    Yes.

23      Q.    Do you believe that children should ever

24  be allowed to handle a gun without supervision?



1      A.    Yes.

2      MR. SIGALE:  I'm just going to object as to

3  form.

4      MS. HELFRICH:  Well, he's already answered.

5  He said yes.

6      MR. SIGALE:  He answered, that's fine.

7  BY MS. HELFRICH:

8      Q.    So you think children should be able --

9  you think children are able to handle a gun without

10  supervision?

11      MR. SIGALE:  Same objection.  You can answer

12  if you can.

13  BY THE WITNESS:

14      A.    Yes, I mean if they're -- like I was

15  when I was a kid, I went hunting by myself and all

16  that.

17  BY MS. HELFRICH:

18      Q.    Okay.  At what age do you think children

19  might be able to handle a gun without supervision?

20  And I understand that you said before it varies

21  from child to child, but is there a minimum age

22  before you think?

23      MR. SIGALE:  I'm going to object as to

24  foundation, incomplete hypothetical and



1  speculation.

2  BY MS. HELFRICH:

3      Q.    Let me rephrase.  I'm going to rephrase.

4  I'm going to withdraw that question.

5           You said that you went hunting by

6  yourself when you were a kid, and I think you said

7  that you started doing that when you were about 10,

8  is that right?

9      A.    Yeah, I can't remember what I said.  I

10  mean, yes, I was young.

11      Q.    Is 10 roughly correct for you?

12      A.    Yes, maybe earlier.

13      Q.    Maybe earlier, okay.  But some

14  10-year-olds would not be okay handling a gun

15  unsupervised?

16      A.    Some 30-year-olds wouldn't be capable or

17  trusting or shouldn't have a gun.

18      Q.    Fair enough.  But certainly some

19  10-year-olds would not be mature enough,

20  responsible enough to handle a gun unsupervised,

21  right?

22      A.    Yes.

23      MR. SIGALE:  Objection as to speculation,

24  incomplete hypothetical and foundation, but, Darin,



DARIN E. MILLER                                    November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                            231

1  you can answer if you can.

2  BY THE WITNESS:

3       A.    Yes.

4  BY MS. HELFRICH:

5       Q.    So in your opinion then and in your

6  experience, is there a minimum age that a child

7  needs to be before you would possibly consider them

8  old enough to handle a firearm unsupervised?

9       A.    There is really no way I can answer

10  that.  I mean it's got to be the individual kid.

11      Q.    I understand that.  But I mean

12  presumably -- correct me if I'm wrong, but

13  presumably there is no three-year-old in the world

14  that you think would be able to handle a firearm

15  unsupervised?

16      A.    Correct, yes.

17      Q.    Okay.  So there is some point below

18  which you're not going to go.  I'm trying to

19  understand where you think it's going to be.  In

20  other words, some 10-year-olds, yes; no

21  three-year-olds, but where in between do you

22  think -- is there an age that is just too young no

23  matter the kid?

24      MR. SIGALE:  Objection as to foundation and



1  speculation and incomplete hypothetical.  But to

2  the extent you can answer, Darin, go ahead and

3  answer.

4  BY THE WITNESS:

5      A.    I just can't really answer that, you

6  know.

7  BY MS. HELFRICH:

8      Q.    I'm just asking for your opinion.  I'm

9  not asking you to say this is the rule.  I'm just

10  asking for your opinion about this issue.

11      MR. SIGALE:  I'm just going to make the same

12  objections, but, again, you can answer if you can,

13  Darin.

14  BY THE WITNESS:

15      A.    I just don't really know.

16  BY MS. HELFRICH:

17      Q.    I think this is the last thing I'm going

18  to ask you about.  Before I say that, let me make

19  sure I'm telling you the truth.  I don't want to

20  come back and say, oh, there is a whole other big

21  topic I want to talk about.

22          What I want to talk about is your foster

23  care and family's involvement with foster care.

24  When did you become licensed foster parents, you



1  and your wife?

2      A.   Our foster daughter was born April 4th,

3  2016, so it would been right around that area or

4  around that time.

5      Q.   Okay.  So spring, summer of 2016 maybe?

6      A.   Yes.  I know it was April -- no, she was

7  born April 19th I'm sorry, so it would have been

8  after April 19th.

9      Q.   If I understand correctly, she came to

10  you very shortly after she was born, is that right?

11      A.   As soon as she was released from the

12  hospital because she was two or three days old,

13  three days old maybe.

14      Q.   Okay.  And you weren't licensed

15  immediately.  It took a little while to get the

16  license, is that right?

17      A.   Because we were family, it was processed

18  differently, quicker.

19      Q.   But when she came to you, you didn't

20  already have a license?

21      A.   No.

22      Q.   All right.  Did you ever have any foster

23  license prior to the middle of 2016?

24      A.   No.



1   Q.    Did you ever have a foster care license

2   in any other state other than Illinois?

3   A.    No.

4   Q.    I couldn't hear you.

5   A.    No.

6   Q.    I can't hear you.  I can see you saying

7   no, but I can't hear you.  Can everyone else hear

8   him?

9   A.    Can you hear me?

10   MR. SIGALE:  You're a little bit soft.  I

11   don't know if you need to turn your microphone up a

12   little bit or if for some reason you have the

13   computer far away, but you're coming off a little

14   bit soft sometimes.  There is no one else in the

15   house, right, Darin, so just make sure you speak

16   up.

17   BY THE WITNESS:

18   A.    My answer was no.

19   BY MS. HELFRICH:

20   Q.    I'm going to ask the question again just

21   so we get a clear record.  Have you or your wife

22   ever been licensed as foster parents in a state

23   other than Illinois?

24   A.    No.



1      Q.    I want to show you an Exhibit.  Can you

2    see something that says on the side D. Miller Dep

3    Exhibit 4?

4      A.    Yes.

5      Q.    Okay.  Is this your foster home license?

6      A.    Yes.

7      Q.    Now, here it says that it's effective

8    until July 6th, 2020.  Obviously we're past July 6,

9    2020.  Have you applied to have your license

10   renewed?

11     A.    Yes.

12     Q.    And what is the status of that renewal?

13     A.    COVID has delayed it.

14     Q.    Okay.

15     A.    It was submitted by us.  We're just

16   waiting on the agency.

17     Q.    As you understand it, though, are you in

18   good standing with DCFS in terms of your license to

19   be a foster parent?

20     A.    Yes.

21     Q.    Now, you said before it's your plan to

22   adopt the foster son you have now, right?

23     A.    Yes.

24     Q.    Do you have any idea when that might



 1  | happen?

 2  |      A.    We were told the beginning of next year.

 3  |      Q.    Beginning of 2021?

 4  |      A.    Yes.

 5  |      Q.    Okay.  That's right around the corner.

 6  | That's exciting.

 7  |      A.    Yes.

 8  |      Q.    Assuming you're able to adopt him, is it

 9  | your plan to continue to be foster parents?

10  |      A.    Yes.

11  |      Q.    So you anticipate in the future having

12  | your foster son, who will then be your son, and

13  | then another foster child in your home, right?

14  |      A.    Yes, if it's presented to us.

15  |      Q.    Now, you had a foster daughter in 2016,

16  | you said, right?

17  |      A.    Yes.

18  |      Q.    And she was a relative, right?

19  |      A.    Yes.

20  |      Q.    As you said, you were not licensed when

21  | she first came to you, and then it was a sort of

22  | quicker process because you were relatives?

23  |      A.    Right.

24  |      Q.    That's what you said?



1      A.    Yes.

2      Q.    Can you talk to me about the process?

3  What did you have to do in order to get licensed as

4  foster parents?

5      A.    So many hours of the online training,

6  and then of course -- I think we had to be -- I

7  know for day care we had to be CPR trained and all

8  that.  I can't remember if we had to for the day

9  care or not -- I mean for the foster or not.

10     Q.    Anything else besides training?  Did you

11 have to make any changes to your home?

12     A.    Like the child-proofing and that sort of

13 thing, water temperature and all that, smoke

14 detectors all had to be inspected.

15     Q.    And, again, that's for the safety of the

16 foster child?

17     A.    And with the firearms they couldn't be

18 no longer loaded.

19     Q.    Okay.  And those requirements to get the

20 license, those are for the safety of the foster

21 child, right?

22     A.    Yes.

23     Q.    And you understand, right, that the

24 child who is placed with you is not your child,



1  correct?

2       A.    Yes.

3       Q.    And that the child has been placed in

4  the care of the State, you understand that?

5       A.    Yes.

6       Q.    So the State has a responsibility for

7  the well-being of that child, right, you understand

8  that?

9       A.    Yes.

10      Q.    So you clearly have a responsibility as

11 a foster parent, right?

12      A.    Yes.

13      Q.    And the State also has a responsibility

14 for the safety of that child, correct?

15      A.    Yes.

16      Q.    Now, because you're a relative, is it

17 correct that you didn't actually have to get

18 licensed?

19      A.    I know there was a lot less hours that

20 we had to do since we were relatives.  That's been

21 too far ago that I can't remember exactly how it

22 all went.

23      Q.    Okay.  Do you remember whether you had

24 to get a license or whether you could have



```
1   continued to care for your foster daughter without

2   being licensed?

3        A.    We had to get a license, yes, I do know

4   that.

5        Q.    You had to, that's your understanding?

6        A.    Yes, but I know there was less hours

7   that we had to do like on online and stuff with the

8   classes since they were family to get the license.

9   I don't remember what the technical term was called

10  for that type being family.

11       Q.    Okay.  The training that you did, the

12  courses online and stuff that you did to become

13  foster parents, did any of that include training

14  related to firearms, firearm storage, or firearm

15  safety?

16       A.    I don't remember.

17       Q.    Do you receive payments from the State

18  of Illinois for serving as a foster parent?

19       A.    Yes.

20       Q.    How much do you get paid, or how much do

21  you receive from the State?

22       A.    I believe $1,400 a month.

23       Q.    Is that for your current foster child?

24       A.    Yes.
```



DARIN E. MILLER                                    November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                            240

1      Q.    Do you know what you received for your

2   foster daughter?

3      A.    400 some dollars a month.

4      Q.    And is that different because your

5   current foster child has special needs?

6      A.    Yes, he's specialized.

7      Q.    As a foster parent, are you required to

8   allow DCFS to come to your home whenever it wants

9   and inspect and monitor?

10      A.    Yes.

11      Q.    So you give up a certain amount of

12   privacy when you take a foster child into your

13   home, is that right?

14      A.    Yes.

15      Q.    Have you -- I think you said no before,

16   but I'm not sure.  Have you provided any firearms

17   training or education at all to your foster son?

18      A.    No.

19      Q.    How about to your foster daughter?

20      A.    No, she don't live here no more.

21      Q.    And she was very small when she lived

22   there, right?

23      A.    Yes.  We had her for the first year of

24   her life.  It was almost exactly 365 days.



1     Q.    How long do you plan to continue being

2   foster parents, do you think?

3     A.    I don't know.

4     Q.    So looking again at your foster license,

5   it says type of facility, foster home; area used

6   for children, entire home.  Is that still correct?

7     A.    Yes.

8     Q.    Does that mean that your foster son has

9   access to the master bedroom?

10    A.    Yes.

11    Q.    Now, when you had your foster

12  daughter -- when she first came to you, was your

13  understanding that the goal was to try to get her

14  reunited with her mother?

15    A.    Yes.

16    Q.    So from the beginning, you knew that she

17  was likely to go back and live with her mother,

18  right?

19    A.    Yes.

20    Q.    And when the time came for her to go

21  back, my understanding is that was really difficult

22  for your family, right?

23    A.    Absolutely.

24    Q.    Because she lived with you for a year,



1  you got very attached to her, right?

2       A.    Yes.

3       Q.    And from what I've heard from other

4  people in your family, you're all still very

5  attached to her, right?

6       A.    Absolutely.

7       Q.    So being a foster parent is emotionally

8  difficult sometimes?

9       A.    Yes, very much so.

10      Q.    When your foster daughter went back to

11  her mother, was that difficult for you personally?

12      A.    Absolutely.

13      Q.    How did you respond to it?  I mean were

14  you sad, were you angry?  What would you say was

15  your reaction?

16      A.    Very sad, heartbroken.

17      Q.    Were you angry at the mother?

18      A.    No.

19      Q.    Were you angry at DCFS?

20      A.    Some.

21      Q.    Did you ever lash out at anyone because

22  of it?

23      MR. SIGALE:  Object as to form.

24  BY MS. HELFRICH:



1      Q.    Do you know what I mean by lash out?

2      A.    No, I never did that, no.

3      MS. HELFRICH:  Okay, David, why don't we take

4   a five-minute break, and I'll see what I have left,

5   okay?

6      MR. SIGALE:  Sure.

7               (WHEREUPON, a short break was had.)

8   BY MS. HELFRICH:

9      Q.    Mr. Miller, I just have one more thing I

10  want to ask you about, and then I'll be done, and

11  then your Counsel may want to ask you some

12  questions, and if he does that, I might have a

13  question or two after him, and then we'll be done,

14  so it shouldn't be much longer.  And I want to

15  thank you for your patience and your cooperation

16  today.

17               What I want to ask you about is

18  something we heard from one of your sons, and I

19  think it was Colton, but I'm not sure.  He was

20  talking about some of the things you taught them

21  about gun safety, and I'm trying to -- I want to

22  verify that this is what you taught them.

23               They said that one of the things you

24  repeated a lot when you would teach them about gun



1  safety is that there are no second chances with

2  firearms.  Is that right, did you teach them that?

3      A.    Yeah, probably, it sounds like something

4  I would say.

5      Q.    Okay.  So you would have no reason to

6  dispute them if they said that's what you said?

7      A.    No.

8      Q.    And do you still agree with that?

9      A.    Absolutely.

10      MS. HELFRICH:  Okay, that's all I had.  David,

11  if you have questions, go ahead.

12      MR. SIGALE:  You know what, this reminds me of

13  the football game where you come out of a timeout,

14  you have one play, and then it goes back to a

15  commercial, so I'm going to ask to let's take like

16  five minutes, I'm going to go through what you

17  said, and I'll see if I have any questions.

18      MS. HELFRICH:  Okay.

19      MR. SIGALE:  Let's come back at 3:58.

20      MS. HELFRICH:  That's fine.  Okay, off the

21  record.

22              (WHEREUPON, a short break was had.)

23                CROSS EXAMINATION

24  BY MR. SIGALE:



1      Q.    Darin, I just wanted to clear something

2  up.  Ms. Helfrich asked you a number of times, and

3  I'm going to one as an example, and I'm going to be

4  paraphrasing it because I'm not going to ask Gail

5  to go find the exact, but it involved Jennifer and

6  about Jennifer's concealed carry, carrying a

7  handgun, and where would she store it if she wasn't

8  carrying it on her person.  Your answer was in the

9  safe, and the question was loaded or unloaded, and

10  you said loaded, and Ms. Helfrich asked why if she

11  wasn't actually concealing carry it, and your

12  answer was for defense, for protection in case

13  there was a intruder or something.

14         There was a number of times today that

15  you referred to keeping a gun in a safe loaded for

16  the reason of concealed carry.  My question is,

17  with all that as background, were you combining the

18  concept of concealed carry versus a self-defense

19  firearm, or were you misspeaking?  I just want to

20  make sure it's clear, Darin.

21      A.    Yeah, I mean kind of the two go hand in

22  hand, so I guess I was kind of talking about the

23  same thing, self-defense and concealed carry.  Her

24  concealed carry would be her own personal defense



1    as well since that's her gun.

2         Q.    Okay.

3         A.    She'd be more familiar with it.

4         Q.    So in your particular case with the

5    handguns that you have, would the handgun that you

6    would be using for concealed carry -- what kind was

7    that, the Springfield Arms?

8         A.    Springfield Armory Hellcat.

9         Q.    The Hellcat.  Would that be the same

10   firearm that you would be using say if someone

11   broke in at 2:00 a.m.?

12        A.    Probably, yes.

13        Q.    Okay.  So when you are exercising

14   concealed carry, that firearm would be concealed on

15   your person, correct?

16        A.    Yes.

17        Q.    And what would be the purpose of

18   carrying it concealed on your person?

19        A.    For personal protection, protection of

20   my family.

21        Q.    Okay.  So when you come home and you're

22   no longer outside, you're no longer off your

23   property, at that point, concealed carry -- at that

24   point, you're not concealed carry in the way that



DARIN E. MILLER                                    November 05, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              247

1    the concealed carry statute is talking about,

2    right, because now you're at home, correct?

3        A.    Right, right.

4        Q.    And that would be where your FOID card

5    with kick in, correct?

6        A.    Yes.

7        Q.    Okay.  So when you're not going outside

8    anymore in the evening and that firearm goes in the

9    safe and that same firearm is your 2:00 a.m.

10   firearm, just to clarify, are you saying that

11   you're keeping it loaded because you're going to

12   conceal carry it later, or are you -- has that

13   firearm now being used for home self-defense?

14       A.    Yes and yes.

15       Q.    Okay.  But the reason that that firearm

16   at that moment is loaded in the safe in the home is

17   in case there is a self-defense need while you're

18   at home, correct?

19       A.    Yes.

20       Q.    Okay.  Ms. Helfrich asked you a number

21   of questions today involving the storage of a

22   firearm.  If the firearm, let's say the Hellcat, is

23   your 2:00 a.m. self-defense someone breaks into the

24   home firearm, do you consider that you're storing



1  that weapon?

2       A.    No.

3       Q.    Why not, what's the difference?

4       A.    Storing would be, you know, putting it

5  away for said period amount of time.

6       Q.    So even if you're not actively firing it

7  at someone or something at that moment, do you

8  consider that you're still using that firearm?

9       A.    Yes.

10      Q.    Using it for what?

11      A.    Personal protection, you know.

12      Q.    To be prepared?

13      A.    Right, yes.

14      Q.    You were shown an Exhibit, Darin, I

15  believe it was Exhibit 15 which was the XD 9

16  millimeter firearm manual -- I'm sorry, Darin,

17  refresh me, which firearm was the one that would

18  have said on the manual XD 9 millimeter?

19      A.    That would have been the Springfield

20  Armory XD Mod 2.

21      Q.    Okay.  And there was a line in there

22  about that it's dangerous to discharge a firearm in

23  a home, and in general would you agree with that

24  statement?



1    A.    Yes.

2    Q.    Are there situations where say it might

3 be more dangerous not to discharge a firearm in the

4 home?

5    A.    Yes.

6    Q.    Like what?

7    A.    If somebody was breaking into my house

8 or trying to cause harm to me or my family.

9    Q.    Okay.  I just wanted to clarify one

10 other thing, Darin, then I believe I'm done with

11 questions for you.

12          You mentioned that your day care license

13 required you to get your handguns out of the home,

14 is that right?

15    A.    Yes.

16    Q.    Is it more than just out of the home?

17    A.    I'm not sure I understand what you're

18 saying.

19    Q.    Sure.  Were you required at some point

20 to move your truck from a point A to a point B

21 because it had firearms in it?

22    A.    Yes, it had to be in the street.  It

23 could not be in our driveway.

24    Q.    Okay.  In fact, you're not allowed to



1   have handguns on your property at all, correct, not

2   just in your home?

3        A.    Yes.

4        Q.    Okay.  So the firearms that are in the

5   locked safes, two of them, in the truck, you're

6   forced to leave them out on the street?

7        A.    Exactly, yes.

8        Q.    Okay.

9        A.    And my wife's she can't -- hers has got

10  to be in my truck because she can't have hers

11  stored in her vehicle since she parks in the

12  driveway.  So if she would want to conceal carry,

13  she'd have to drive to my work, unlock my truck,

14  and take the key and get her gun.

15       MR. SIGALE:  Okay.  I don't think I have

16  anything further.  Thanks, Darin.

17                    REDIRECT EXAMINATION

18  BY MS. HELFRICH:

19       Q.    I just have one followup based on what

20  Mr. Sigale was just asking you.  So you do not park

21  your truck in your driveway, is that correct?

22       A.    No, it's alongside of the road in the

23  street.

24       Q.    Like at the curb in front of your house?



```
 1        A.    Yes.
 2        MS. HELFRICH:  Okay.  I just wanted to be
 3   clear about that.  I have nothing further.
 4        MR. SIGALE:  Okay.
 5        MS. HELFRICH:  Do you want to waive or
 6   reserve?
 7        MR. SIGALE:  I think I'm going to have to
 8   reserve.  There was just too much cross-talking and
 9   cutting out and glitches and stuff, so no offense,
10   Gail, but I'm going to need to reserve signature.
11               (Deposition concluded at 4:17 p.m.)
12                FURTHER DEPONENT SAITH NOT.
13
14
15
16
17
18
19
20
21
22
23
24
```



```
 1   STATE OF ILLINOIS    )

 2                        )  SS:

 3   COUNTY OF W I L L    )

 4              I, GAIL LIVIGNI, CSR No. 84-1965, a

 5   Notary Public within and for the County of Will,

 6   State of Illinois, and a Certified Shorthand

 7   Reporter of said state, do hereby certify:

 8              That previous to the commencement of the

 9   examination of the witness, the witness was duly

10   sworn to testify the whole truth concerning the

11   matters herein;

12              That the foregoing deposition transcript

13   was reported stenographically by me, was thereafter

14   reduced to typewriting under my personal direction

15   and constitutes a true record of the testimony

16   given and the proceedings had;

17              That the said deposition was taken

18   before me at the time and place specified;

19              That I am not a relative or employee or

20   attorney or counsel, nor a relative or employee of

21   such attorney or counsel for any of the parties

22   hereto, nor interested directly or indirectly in

23   the outcome of this action.

24
```



1          IN WITNESS WHEREOF, I do hereunto set my

2    hand of office at Chicago, Illinois, this 16th day

3    of November, 2020.

4

5                    s/ Gail Livigni redacted pursuant to Local Rule 5.11

6

7

8              Notary Public, Will County, Illinois.

9              My commission expires 06/25/24

10

11   GAIL LIVIGNI, CSR No. 84-1965

12

13

14

15

16

17

18

19

20

21

22

23

24



DARIN E. MILLER
JENNIFER J. MILLER vs MARC D. SMITH

November 05, 2020
254

```
 1                 I N D E X

 2   WITNESS                            EXAMINATION

 3   Direct by Ms. Helfrich               3-244

 4   Cross by Mr. Sigale                 245-150

 5   Redirect by Ms. Helfrich           250-251

 6

 7              E X H I B I T S

 8   NUMBER                               PAGE

 9   D. Miller Deposition Exhibit 1        21

10   D. Miller Deposition Exhibit 2        55

11   D. Miller Deposition Exhibit 4       235

12   D. Miller Deposition Exhibit 6        42

13   D. Miller Deposition Exhibit 7        68

14   D. Miller Deposition Exhibit 8        73

15   D. Miller Deposition Exhibit 10       75

16   D. Miller Deposition Exhibit 11       78

17   D. Miller Deposition Exhibit 12       84

18   D. Miller Deposition Exhibit 13      142

19   D. Miller Deposition Exhibit 14      151

20   D. Miller Deposition Exhibit 15      161

21   D. Miller Deposition Exhibit 16      168

22   D. Miller Deposition Exhibit 17      174

23   D. Miller Deposition Exhibit 18      181

24
```



1  DEPOSITION ERRATA SHEET

2  Our Assignment No. J6151339

3

4  JENNIFER J. MILLER, et          )

5  al.,                            )

6                 Plaintiffs,      )

7      -vs-                        ) No. 18 CV 3085

8  MARC D. SMITH, et al.,          )

9                 Defendants.      )

10

11         DECLARATION UNDER PENALTY OF PERJURY

12       I declare under penalty of perjury that I

13  have read the entire transcript of my deposition

14  taken in the above-captioned matter or the same has

15  been read to me and the same is true and accurate,

16  save and except for changes and/or corrections, if

17  any, as indicated by me on the DEPOSITION ERRATA

18  SHEET hereof, with the understanding that I offer

19  these changes as if still under oath.  Signed on

20  the _____ day of _____, 20___.

21

22  _____

23  DARIN E. MILLER

24



1  DEPOSITION ERRATA SHEET

2  Page No._____Line No._____Change to:_____

3  _____

4  Reason for change:_____

5  page No._____Line No._____Change to:_____

6  _____

7  Reason for change:_____

8  page No._____Line No._____Change to:_____

9  _____

10 Reason for change:_____

11 page No._____Line No._____Change to:_____

12 _____

13 Reason for change:_____

14 page No._____Line No._____Change to:_____

15 _____

16 Reason for change:_____

17 page No._____Line No._____Change to:_____

18 _____

19 Reason for change:_____

20 SIGNATURE:_____DATE:_____

21          DARIN E. MILLER

22

23

24



```
 1   DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   SIGNATURE:_____DATE:_____

21            DARIN E. MILLER

22

23

24
```

