E-FILED
Friday, 12 November, 2021  03:35:15 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 5
# Deposition of Jennifer Miller

```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                      URBANA DIVISION

 3    JENNIFER J. MILLER, DARIN E.)
      MILLER, SECOND AMENDMENT   )
 4    FOUNDATION, INC.; ILLINOIS )
      STATE RIFLE ASSOCIATION, and)
 5    ILLINOIS CARRY,            )
                                 )
 6                   Plaintiffs,  )
                                 )
 7              -vs-             )No. 18-cv-3085
                                 )
 8    MARC D. SMITH, in his      )
      official capacity as Acting )
 9    Director of the Illinois   )
      Department of Children and  )
10    Family Services, and KWAME )
      RAOUL, in his official     )
11    capacity as Attorney General)
      of the State of Illinois,  )
12                               )
                     Defendants.  )
13

14

15

16
                   REMOTE VIDEO CONFERENCE
17         DEPOSITION OF JENNIFER J. MILLER
                    October 23, 2020
18                    9:00 A.M.

19

20

21
              Debra L. Brehm:  CSR No. 084-002690
22

23

24

25
```



```
 1                        APPEARANCES
                   (Via video conference)
 2

 3
    For the Plaintiffs:
 4
         MR. DAVID SIGALE, ESQ.
 5       Law Firm of David Sigale, P.C.
         Attorneys at Law
 6       430 West Roosevelt Road
         Wheaton, Illinois  60187
 7       dsigale@sigalelaw.com

 8
    For the Defendants:
 9
         MR. AARON P. WENZLOFF, ESQ.
10       MS. GRETCHEN E. HELFRICH, ESQ.
         MR. MATTHEW V. CHIMIENTI, ESQ.
11       Assistant Attorney Generals
         100 W. Randolph Street, 11th Floor
12       Chicago, Illinois  60601
         312-814-1136
13       awenzloff@atg.state.il.us

14

15                          INDEX
16

17  EXAMINATION BY:

18       Mr. Wenzloff....................    5
         Mr. Sigale......................  223
19

20

21

22

23

24

25
```



1   EXHIBITS:

2

3   Exhibit 2 (photo of handguns)........    82

4   Exhibit 5 (photo)....................    94

5   Exhibit 8 (ammo box photo)...........   114

6   Exhibit 9 (gun safe photo)...........   116

7   Exhibit 11 (inside vehicle photo)....   118

8   Exhibit 10 (photo)...................   121

9   Exhibit 12 (license)................   156

10   Exhibit 18 (foster care license).....   177

11   Exhibit 19 (report)..................   193

12   Exhibit 23 (Complaint)...............   204

13

14

15

16

17

18

19

20

21

22

23

24

25



1                          STIPULATION

2

3

4          IT IS HEREBY EXPRESSLY STIPULATED AND

5   AGREED by and between the parties that the

6   deposition of JENNIFER J. MILLER may be taken via

7   remote video conference on October 23, 2020,

8   pursuant to the Rules of the Federal Court and the

9   Rules of Federal Procedure governing said

10  depositions.

11

12

13          IT IS FURTHER STIPULATED that the

14  necessity for calling the Court Reporter for

15  impeachment purposes is waived.

16

17

18

19

20

21

22

23

24

25



```
 1              (Whereupon the deposition commenced at

 2         9:02 a.m.)

 3              (Whereupon it was stipulated between all

 4         parties that the deponent could be remotely

 5         sworn.)

 6                   JENNIFER J. MILLER,

 7    called as a witness, having been first duly sworn,

 8    was examined and testified as follows:

 9                     EXAMINATION

10              BY MR. WENZLOFF:

11    Q.    Good morning.

12    A.    Good morning.

13         MR. WENZLOFF:  This is the Rule 30(b)

14    deposition of Plaintiff, Jennifer Miller, taken

15    pursuant to the order given on October 4, 2020.

16         My name is Aaron Wenzloff.  I'm

17    Assistant Attorney General with the Illinois

18    Attorney General's Office.  I represent the

19    Defendants.

20    BY MR. WENZLOFF:

21    Q.    First, I just want to ask, Ms. Miller,

22    have you ever given a deposition before?

23    A.    No.

24    Q.    So I'm going to begin by giving you some

25    explanation of how this will work.  There are a
```



1  couple of ground rules to keep in mind so the

2  deposition goes smoothly and so we all have the

3  same understanding.  Does that sound fair to you?

4     A.    Yes, sir.

5     Q.    We're taking this deposition via the

6  Internet through Zoom, as I'm sure you understand,

7  because of the COVID-19 pandemic.  But even though

8  we're doing it through the Internet, there is a

9  court reporter here.  I don't know if you can see

10  her on the screen or not.  Her name is Debbie and

11  she's going to be taking down everything that we

12  say.  My questions and your answers will be

13  recorded by the court reporter, and she'll

14  complete a transcript at the end of the deposition

15  of everything that was said.

16          So with that understanding, you need to

17  speak up and answer so the court reporter can

18  actually hear you when you give answers.

19     A.    Yes.

20     Q.    She won't be able to record you shaking

21  your head no or yes or if you use words like

22  uh-huh or um.  None of that will be easy to

23  understand in the transcript.  So you need to

24  speak up and also give words in your answer.  Do

25  you understand that?



1    A.    Yes, sir.

2    Q.    The court reporter can't get us both

3    down if we talk over each other.  So it's very

4    important to wait until I finish my question

5    before you begin speaking, even if you think you

6    know what the rest of the question will be.  Do

7    you understand that?

8    A.    Yes, sir.

9    Q.    You just took an oath that you will tell

10    the truth, the whole truth and nothing but the

11    truth.  That's the same oath that you would take

12    if you were in court.  Do you understand that?

13    A.    Yes, sir.

14    Q.    Okay.  Occasionally I might say

15    something that you don't understand.  It's my job

16    to try to ask understandable questions.  If you

17    don't understand the question let me know.

18    A.    Okay.

19    MR. WENZLOFF:  So this is similar to the

20    issue we had yesterday in the deposition.  Off the

21    record.

22    (Whereupon discussion was held off the

23        record.)

24    MR. WENZLOFF:  Back on the record.

25    Okay.  Hopefully the issues got resolved.



1  BY MR. WENZLOFF:

2     Q.    So as I was saying, Ms. Miller, if I ask

3  you a question that you don't understand, I just

4  ask that you let me know that you don't understand

5  the question.  Will you do that?

6     A.    Yes, sir.

7     Q.    And if you don't tell me that you don't

8  understand a question or if you don't ask me to

9  rephrase the question, I'll assume that you

10  understood it.  Okay?

11     A.    Yes.

12     Q.    As you probably know, the defendants in

13  this case are the Director of the Department of

14  Children and Family Services and the Attorney

15  General.  Throughout the deposition I will

16  probably call the Department of Children and

17  Family Services DCFS, and I might refer to the

18  Attorney General as AG.  Or I might call DCFS the

19  Department.  I just wanted to flag that up so you

20  understood.  When I use terms like that those are

21  the entities I'm referring to.  Does that make

22  sense to you?

23     A.    Absolutely.

24     Q.    If you need a break at any time for any

25  reason, you just should tell me or tell your



```
 1   attorney and we can take a break.  The only thing
 2   I ask is if I'm in the middle of a question, I ask
 3   that you finish answering the question before we
 4   take a break.  Does that make sense?
 5        A.    Yes.
 6        Q.    And again, if you need a break for any
 7   reason that's okay.  This isn't designed to be
 8   torture or a totally miserable experience.  We'll
 9   take the time that you need.  Okay?
10        A.    Yes, sir.
11        Q.    Your attorney probably went over this,
12   but let me reinforce it.  If you want to talk to
13   your attorney that's fine.  I just ask that if
14   you're in the middle of a question that you finish
15   answering the question before you talk to your
16   attorney.  Is that okay with you?
17        A.    Yes, sir.
18        Q.    Your attorney will probably state
19   objections to some of the questions that I ask.
20   That's perfectly fine.  That's something that we
21   do under the rules.  So don't be surprised by
22   that.  But under the rules of depositions unless
23   your lawyer expressly tells you not to answer one
24   of my questions, you still have to answer the
25   question.  A court or a judge will later decide
```



1  whether your attorney's objections are valid or

2  not.  Do you understand that?

3      A.    Yes.

4      Q.    The other thing I would say is we're

5  going to go through a lot of questions and you'll

6  do your best to give an answer as best you can.

7  But sometimes you might remember later on that you

8  want to either add more to the answer you gave

9  before or modify the answer that you gave before,

10  and that might happen 5 minutes later, that might

11  happen an hour later.  If that happens to you,

12  please tell me that you would like to add

13  something to your answer from earlier and we'll do

14  that right now while it's on your mind.  Do you

15  understand that?

16      A.    Yes, sir.

17      Q.    So because we need to have your full,

18  complete and accurate answers, I have to ask you

19  today whether you're taking any medication or

20  drugs or alcohol or any substance that would make

21  it difficult for you to understand and answer my

22  questions today.  Is that true?  Have you taken

23  anything that would make it difficult for you to

24  answer my questions?

25      A.    No, sir.



1        Q.    Is there any reason why you can't give

2   full, complete, accurate testimony today?

3        A.    No, sir.

4        Q.    Great.  What did you do to prepare for

5   today's deposition?

6        A.    I met with my lawyer and we discussed

7   things to better accommodate the answers and

8   questions.

9        Q.    And without telling me what you said to

10  your lawyer or what your lawyer said to you, can

11  you just tell me, when did you meet with your

12  lawyer?

13       A.    A few days ago and then yesterday.

14       Q.    And for how long did you meet each time?

15       A.    About an hour.

16       Q.    And did you look at any documents to

17  prepare for today's deposition?

18       A.    The documents to questions that

19  I answered before that were sent out to ask and

20  I just ran over them to refresh my memory.

21       Q.    I see.  And by the questions that we

22  sent out to you before to ask, are you talking

23  about interrogatories that were sent to you?

24       A.    Sorry.  Yes, sir.

25       Q.    Great.  I just wanted to make that as



1  clear as possible.  Thank you.  So for the record

2  can you state your full name?

3      A.    Jennifer Jo Lee, L-e-e, Miller.

4      Q.    And how old are you, Ms. Miller?

5      A.    44.

6      Q.    Sorry.  I have to get all the basic

7  facts.  Sometimes things can get a little awkward.

8  What's your address where you live right now?

9      A.    ████████████████████  in Shelbyville,

10  Illinois.

11      Q.    And are you married, Ms. Miller?

12      A.    Yes.

13      Q.    How long have you been married?

14      A.    Be almost 24 years.

15      Q.    And have you ever been married before?

16      A.    No, sir.

17      Q.    And you have some children, right?

18      A.    Yes.

19      Q.    How many children do you have, what are

20  their names and what are their ages?

21      A.    I have three biological children.

22  Coltin Miller, he's almost 23.  And Collin Miller,

23  he just turned 21 yesterday.  And Cyra is 17.  And

24  then we have one foster in the process of

25  adoption.  A two-year old.



1      Q.     Great.  Do any of those children live
2    with you right now?
3      A.     The two youngest.
4      Q.     Cyra and the foster child?
5      A.     Yes.
6      Q.     Just for ease of conversation, we'll
7    call the foster child J to make it -- make it easy
8    to talk about that child.  Does that sound fair to
9    you?
10     A.     Okay.
11     Q.     So, Ms. Miller, are you a plaintiff in
12   this lawsuit?
13     A.     Yes.
14     Q.     And where were you born?
15     A.     Right here in Shelbyville, Illinois.
16     Q.     And have you lived in Illinois your
17   entire life?
18     A.     Yes, sir.
19     Q.     And have you lived in Shelbyville that
20   entire time?
21     A.     No.
22     Q.     Where else have you lived?
23     A.     I lived in Pana Illinois, I lived in
24   Rantoul, Illinois, I lived in Assumption,
25   Illinois.  Off the top of my head that's about it.



1      Q.    How long have you been in your current
2   residence in Shelbyville?
3      A.    We have been living at this address for
4   I believe 7 years.
5      Q.    Okay.  And what is your current
6   employment?
7      A.    I'm a full -- I'm self-employed
8   full-time licensed daycare.
9      Q.    And do you have any other employment?
10     A.    No.
11     Q.    And how long have you been doing that?
12     A.    Almost five years.
13     Q.    And before that what was your
14   employment?
15     A.    I was a stay-at-home mom and when the
16   children got older I went back to school and got a
17   teaching degree.  I'm a certified teacher as well.
18   In the schools.
19     Q.    Okay.  So immediately before you began
20   running a daycare home what were you employed
21   doing?
22     A.    I was finishing up my schooling, and
23   then I ended up subbing for the Shelbyville
24   schools and Assumption schools.  I also took care
25   of my grandmother for 12 years.



1      Q.     So -- I'm sorry.

2      A.     After my grandfather died.

3      Q.     I see.  And so how long were you

4  substitute teaching for various public schools?

5      A.     Sorry.  About four years.

6      Q.     Before you were doing that and getting a

7  teaching certificate did you have other jobs

8  before that?

9      A.     Before I started -- when we first got

10 married I was employed at McDonald's as a manager.

11 And then after our second son was -- our first son

12 was 11 months old, I went and worked at Dairy

13 Queen for a part-time job to get out of the house.

14 And then when I was pregnant with our third child

15 I was working at the post office as a rural

16 carrier and had to quit with complications with

17 pregnancy.

18     Q.     I see.  So about 23 years ago you were

19 working various restaurant-type jobs and then as a

20 mail carrier about 17 years ago or so, and then

21 you stopped working and became a stay-at-home

22 parent for several years.  Is that accurate?

23     A.     Very much so, yes, thank you.

24     Q.     Okay.  Did any of your prior jobs ever

25 involve the use of firearms in any way?



1    A.    No, sir.

2    Q.    Okay.  Before you were teaching as a

3  substitute teacher can you tell me what grades or

4  what years of students you were teaching?

5    A.    They had you doing everything as far as

6  being an aide to a one-on-one to teaching various

7  grade levels to concentration on individual

8  courses where I was.

9    Q.    Was that at elementary school level or

10  high school or something else?

11    A.    All of the above.  Everything.

12  Preschool through 12th grade.

13    Q.    I see.  Do you still have your teaching

14  certificate?

15    A.    I am not licensed, but I do have my

16  diploma.

17    Q.    I see.  So do you know whether you could

18  reapply to get your teaching license and then

19  obtain a job as a teacher in a school still?

20    A.    Yes, I can still do that, yes.

21    Q.    Okay.  Why did you decide to open a

22  daycare home?

23    A.    It's a little emotional story.  Like

24  I said, my grandparents raised me from the age of

25  10 years old.  And so I told my grandpa that



1 | I would take care of my grandmother.  And I took

2 | care of her for 12 years.  And when she died

3 | I just felt a void there.  And my kids were in

4 | school, so there was a need for daycare in our

5 | area.  So it just fell into place to where

6 | I became a licensed daycare worker.

7 |     Q.    And, I'm sorry.  What year did you open

8 | your daycare home?

9 |     A.    Oh.  It was five years ago.  So it would

10 | have been in 2015.  I started in 2014 and got

11 | licensed in 2015.

12 |     Q.    I see.  And the daycare that you've

13 | operated, has that always been out of your home?

14 |     A.    The licensed daycare, yes.  I did small

15 | bits of watching small amounts of kids in my

16 | grandmother's home, so I could keep it separated,

17 | and then we sold my grandmother's home.

18 |     Q.    I see.  So before you had the daycare

19 | license you were doing daycare work in your

20 | grandmother's home for some time?

21 |     A.    Right, correct.

22 |     Q.    And for how long did you do that?

23 |     A.    It was about less than a year.

24 |     Q.    Okay.  And for the daycare home that

25 | you operate now, is there any kind of formal



1  business structure or organization that you have
2  created for that business?
3       A.    As far as?  Could you explain further,
4  please?
5       Q.    Sure.  What I mean is have you created a
6  corporation or a limited liability corporation or
7  some other corporate entity for that business?
8       A.    I have an EIN number.  I work as
9  self-employment.  I do have our living room and
10  one of the bedrooms set up as designated daycare.
11       Q.    Okay.  So I guess what I'm hearing,
12  I guess what I can understand is that it sounds
13  like the business is essentially, it's just a sole
14  proprietorship.  You control the business, but
15  essentially you are the business, there is no
16  separate organization that you manage to run the
17  daycare.  Is that right?
18       A.    Yes.  That's correct.
19       Q.    Okay.  And how much do you earn in
20  income from your work operating the daycare home?
21       A.    Last year it was 68,000, I believe.
22  That is including the food program and private pay
23  and state pay.
24       Q.    And you said food program.  Can you
25  explain that a little bit more for me?



1     A.    I'm sorry.  Yes.  For every child the

2  state has a program that they reimburse for the

3  child that has attended for that meal.  I serve

4  breakfast, I serve lunch, I serve P. M snack,

5  I serve dinner, and I serve evening snack.  They

6  only allow three meals a day, two meals and one

7  snack, or two snacks and one meal.  And I have to

8  enter it into the computer.  And periodically an

9  employee from the food program checks on me, comes

10  in and makes sure I'm serving the proper nutrition

11  for the children, doing it the proper way, and the

12  children are happy and healthy.  And I get

13  reimbursed every -- at the end of every month for

14  that month.

15     Q.    And you also mentioned there's a private

16  pay and state pay.  Can you explain those terms

17  just briefly a bit more for me?

18     A.    Private pay is parents that pay directly

19  out of their pocket.  And state pay is there's --

20  Eastern Illinois has an increment program that the

21  state has that the parents' income, they get

22  assistance from the state to get paid for daycare,

23  and then there is another part of the state pays

24  for foster children.  I do have foster children in

25  my daycare that foster parents have that are still

1   working and I get reimbursed for daycare for them.

2        Q.    I see.  Besides the income you receive

3   from the daycare home, does your household receive

4   other income?

5        A.    Yes.  My husband works.

6        Q.    And roughly speaking, how much does he

7   earn in income?

8        A.    I think last year --

9             MR. SIGALE:  I'm going to object as to

10  relevance of any questions about their income.

11  I can't possibly see what that has to do with

12  anything.  Jennifer, if you can answer go ahead

13  and answer.

14             THE WITNESS:  If I don't have to I don't

15  want to, I agree.

16  BY MR. WENZLOFF:

17       Q.    Roughly speaking, how much does your

18  husband earn per year?

19             MR. SIGALE:  I don't see the relevance

20  of asking any questions like that.  Where is that

21  going?  Why are we delving into things like that?

22             MR. WENZLOFF:  Ms. Miller, can you just

23  answer the question, please, if you understand it.

24             THE WITNESS:  He, last year his W-2 was

25  around 34,000.



1  BY MR. WENZLOFF:

2      Q.    $34,000 for the year?

3      A.    Yes.

4      Q.    And do you receive any other payments,

5  income of other kinds from other sources other

6  than your husband's job and your daycare?

7          MR. SIGALE:  Same objection.  This whole

8  line is irrelevant.  Jennifer, you can answer.

9          THE WITNESS:  I don't know.  Forgive me

10  for the lack of knowledge.  But as far as working

11  income, that's all the income that comes in.  We

12  do have a foster child that we have to take care

13  of.  And the state provides a stipend.

14  BY MR. WENZLOFF:

15      Q.    I see.  So what is the compensation for

16  the foster care work that you do?

17      A.    He is disabled, so it is a little bit

18  more and it varies from month to month.  It's

19  about $1400 a month.

20      Q.    I see.  Thank you.  I want to ask a few

21  questions about your educational background.  Did

22  you graduate from high school?

23      A.    Yes, sir.

24      Q.    And where did you get your high school

25  diploma?



1      A.     Shelbyville, Illinois.

2      Q.     Do you have any education after high

3   school?

4      A.     Yes.  I have an accounting degree, a

5   general diploma accounting degree, I'm not CPA

6   certified, from Sparks College.  And it has since

7   closed down, but it was here in Shelbyville,

8   Illinois.  And like I said, for years I stayed

9   home.  And I went back and did a whole four years

10  of college through Lakeland and Eastern slash

11  Millikin University for my teaching degree.  For

12  my Bachelor's.

13     Q.     And the bachelor's degree in teaching,

14  that's Bachelor's in Education?

15     A.     Education and I have a concentration in

16  social science and reading.

17     Q.     And that degree in education, did that

18  include any education or training around firearms

19  and the impact of firearms on children?

20     A.     No.

21     Q.     Do you have any other formal education

22  besides what you just listed?

23     A.     No, sir.

24     Q.     And I know you said before you have a

25  teaching certificate.  Do you have other forms of



1   professional training that you've received?

2        A.    No.

3        Q.    Do you have any other -- so just so

4   I can be clear, it's a certificate in teaching, is

5   that what it's called?

6        A.    I went and got an associate's and a

7   bachelor's.  And it's called Associate's in

8   Science and Bachelor's in Science.  For education.

9        Q.    I see.  So when you say a teaching

10  certificate, that's based on the college education

11  you received in getting your degree in education;

12  is that right?

13       A.    Absolutely.

14       Q.    Do you have any other occupational

15  licenses of any kind?

16       A.    No.

17       Q.    Any other certifications?

18       A.    I'm CPR certified for state certified.

19       Q.    Any other trainings you've gone to about

20  anything related to your employment?

21       A.    I have to do 15 hours every year for

22  that in various -- the program offers classes that

23  I attend.  It can be some brochure that I have to

24  read about whole grain or whatever and answer

25  questions.  And then the person that comes in and



1   oversees me then signs and gives me credit for

2   those hours and I can go on gateways and get hours

3   of certification.  I'm a mandated reporter since

4   shaken baby.  I have a food handling certificate.

5   There's a lot involved in daycare.

6        Q.    Sounds like it.  A lot of different

7   training programs.

8        A.    Yes.

9        Q.    Have you ever received any professional

10  training in the use of firearms?

11       A.    The term professional.  We do take

12  classes from a gentleman that is a police officer

13  by the name of Shane Wright.  I do that personally

14  for me to feel comfortable as far as education.

15  I'm always eager to learn education.  And you can

16  never learn too much and for safety.

17       Q.    And have you ever served in the

18  military?

19       A.    No, sir.

20       Q.    Have you ever applied to serve in the

21  military?

22       A.    No, sir.

23       Q.    Okay.  Have you ever had a job where you

24  were required to carry a firearm?

25       A.    No, sir.



1      Q.    And have you ever been -- this is

2  switching gears a little bit -- have you ever been

3  involved in a lawsuit, other than the one in which

4  you've giving testimony at this deposition today?

5      A.    As far as this type of lawsuit, no.  But

6  we have had a rental disagreement and had a

7  lawsuit on that matter.

8      Q.    Tell me more about that.  When that

9  happened.

10      A.    Oh, gosh.  It happened about eight,

11  nine -- right before we moved in here.  They sued

12  us for damages.  Then the judge found that we

13  barely had to pay minimal.  A water heater was

14  improperly put on and supports caved in, caused

15  mold, and now I have lung damage because of the

16  mold.

17      Q.    I see.  I'm sorry to hear that.  So when

18  you say they sued you, are you referring to your

19  former landlords?

20      A.    Yes.  I'm sorry.

21      Q.    And do you happen to have the docket

22  number for that court case?

23      A.    I supplied it.  It's under Shelby

24  County.

25      Q.    Do you remember the name of the court?



1      A.    It was Shelby County court.  I'm trying

2  to look it up right now on my phone if that's

3  okay.

4      Q.    If you can do it in just a few minutes

5  that's fine.  Otherwise we can always ask your

6  attorney for the details later.

7      A.    It was in 2014.  It was a small claims.

8  It's 2014-SC-126.

9      Q.    Thank you.  Is that the only other

10  lawsuit you have been involved in other than this

11  one?

12      A.    Correct.

13      Q.    Just for clarity, I know you said you

14  have a foster child in your home now.  Are you

15  involved in any lawsuit related to the foster

16  child?

17           MR. SIGALE:  Object to the form of the

18  question.  Jennifer, if you understand it you can

19  answer.

20           THE WITNESS:  I understand as far as

21  with this one.  Other than this, no.

22  BY MR. WENZLOFF:

23      Q.    I'm sorry.  When you say this.  You mean

24  this lawsuit against DCFS related --

25      A.    Yes, correct.



1      Q.    Okay.  There's a lawsuit involving J,

2  the foster child, currently pending; is that

3  right?

4      A.    No.

5      Q.    There's no lawsuit?

6      A.    No.  In general there is.  I mean, I'm a

7  representative for the fostering part of it.

8      Q.    So you go to court every once in a while

9  to talk to the judge about your foster child?  Or

10  no?

11      A.    Yes.  We just went yesterday.  As far as

12  for the process of fostering him, yes.

13      Q.    I see.  Okay.  So there is a lawsuit of

14  some kind, and you do occasionally talk to the

15  judge and other people associated with that

16  lawsuit; is that right?

17      A.    Let me clarify.  The lawsuit is not a

18  lawsuit.  J was taken from the parents at birth

19  and was placed with us.  So there is the court

20  proceeding and process that the parents have not

21  done and we are now in the ending process and

22  starting adoption.  As far as a lawsuit, there is

23  none.  As far as what my knowledge of this process

24  is.

25      Q.    Okay.  And then before J was a foster



1  child in your home did you have other foster

2  children in your home that you were caring for as

3  a foster care parent?

4      A.    Yes.  I had my niece I cared for just

5  shy of a year.

6      Q.    And roughly what were the dates she was

7  in your care?

8      A.    She was born April 6 of 2015 and she

9  went back in April of 2016.

10     Q.    And during that time, again, was there a

11  court case pending in which you were involved in

12  some way?  Not necessarily as a party, but as

13  someone who would speak to officials from the

14  court about that case?

15     A.    Yes.  The GAL and I would have

16  discussions, as well as the caseworker and things

17  of that nature.  I never had to testify or

18  anything like that.

19     Q.    Okay.  All right.  Ms. Miller, you own

20  one or more guns; is that right?

21     A.    Yes.

22     Q.    Can you please list for me all of the

23  firearms that you or your husband own?

24     A.    The only knowledge that I have of one is

25  my shotgun, and it's a 20-gauge and I can't even



1  tell you the name of it.

2      Q.    So you own a 20-gauge shotgun yourself?

3      A.    Correct.  My husband deals with all the

4  rest.

5      Q.    Okay.  How many guns are in your

6  household?

7      A.    I don't know.  Because I do not get in

8  the gun safe for anything.  I can say that there

9  is approximately four, maybe six.

10      Q.    And the 20-gauge shotgun, is that -- I'm

11  sorry.  You didn't recall the brand or the make or

12  model of that gun?

13      A.    No.  That's terrible.  I'm sorry.

14      Q.    I understand.  Could it possibly be a

15  Mossberg?  M-o-s-s-b-e-r-g.

16      A.    I'm not sure.

17      Q.    A Savage shotgun?

18      A.    I don't think that's it.  I don't recall

19  that.

20      Q.    Okay.  That's the only gun you own?

21      A.    Yes.  That we have here.  I do have a

22  handgun that had to be removed.

23      Q.    And do you recall the make and model of

24  the handgun?

25      A.    I haven't dealt with it in a few years



1   so no.

2       Q.    When is the last time you used the

3   handgun?

4       A.    One more time.  You froze.

5       Q.    Sorry.  When is the last time you used

6   the handgun?

7       A.    It's been about two years ago.

8       Q.    And where is it currently stored?

9       A.    My husband took it to my father-in-law's

10  is all I know.

11      Q.    And when is the last time you used the

12  shotgun?

13      A.    Last fall.

14      Q.    And what did you use the shotgun for?

15      A.    To shoot, to hunt deer for deer meat to

16  feed the family.

17      Q.    So you go deer hunting with the 20-gauge

18  shotgun?

19      A.    Yes.

20      Q.    And can you tell me what kind of action

21  does that shotgun have?  Is it a semi-automatic

22  shotgun, is it brake action, pump action?  Do you

23  know?

24      A.    It's pump.

25      Q.    It's a pump action?



1       A.     Yes, sir.

2       Q.     Okay.

3              MR. WENZLOFF:   Why don't we take about a

4    five-minute break?   If that's all right with

5    everyone.

6              MR. SIGALE:   Sure.

7              THE WITNESS:   Do we pause it or what?

8              MR. SIGALE:   Close your video and come

9    back at 9:50.

10             (A break was taken from 9:44 to

11         9:52 A.M., and the deposition continued as

12         follows:)

13   BY MR. WENZLOFF:

14      Q.     Okay, we are back.

15             Ms. Miller, I'm going to ask some

16   questions just to get a sense of your background

17   with firearms.  At what age did you first handle a

18   firearm?

19      A.     I would say I was about 21 years of age.

20      Q.     Do you remember how that went?   Why you

21   were handling a firearm?   What it was all about.

22      A.     In dating my husband and getting engaged

23   and marrying him, his whole family is hunters.

24   And his uncle owns various gun shops and things

25   like that.  So in all honesty, I have -- I was



1  raised poorly around handguns, just guns in

2  general, because before the first ten years of my

3  life I was raised by my lovely mother.  And police

4  were at our house very often.  And so I had a bad,

5  bad image of that.

6          And with that and meeting my husband, he

7  slowly pushed -- not pushed me, but encouraged me

8  that it wasn't a bad thing, it was a good thing.

9  And then four years into our marriage I went

10  shotgun hunting and loved it.  So a complete 180

11  turnaround.

12      Q.    So did you meet your husband when you

13  were 21?

14      A.    We went to school together.  He was --

15  I married a young one.  He's two years younger

16  than I.  We married when he was 18 and I was 20.

17  And we dated about a couple of years before that.

18  But we have been married since after high school.

19      Q.    Did you meet in high school?

20      A.    Yes.

21      Q.    Oh.  That's great.  And you have been

22  married ever since?

23      A.    Absolutely.

24      Q.    And so but you had encountered firearms

25  before you met your husband; is that right?



JENNIFER J. MILLER                                    October 23, 2020
MILLER vs SMITH                                                    33

1     A.    My family did not have firearms, but the

2   police did.  And were very much a part of my life.

3   I'd just like to leave it like that.

4     Q.    I'm sorry to hear that.  Before you met

5   your husband and learned more about guns had a gun

6   ever been pointed at you?

7     A.    In the air and my brother being, gun

8   pointed down, and my mom having to be pulled away.

9   Yeah, I mean, the gun was present, yes.

10     Q.    It sounds like it must have been very

11   intense.

12     A.    (Witness nods head).  Yes.  DCFS did not

13   do their job in my instance.

14     Q.    At what age were you when this incident

15   you just described happen?

16     A.    I went to go live -- well, it would have

17   to be before the age of 8.  My memory, I have

18   blocked a lot out because of the trauma.  This is

19   memories that I have acquired as an adult.  And my

20   dad died in February of '87 and I was 10, and then

21   I turned 11 that June and in October I went to go

22   live with my grandparents.

23     Q.    And did your grandparents own guns?

24     A.    No.  They were up in age.  My father

25   was -- before he died he hunted rabbit and



1  squirrel and stuff like that.

2      Q.    I see.  But you didn't live with your

3  dad?

4      A.    No.

5      Q.    You had guns in your home with your mom,

6  right?

7      A.    Not that I can recall, no.

8      Q.    But your dad did have guns in his home?

9      A.    Yes.

10     Q.    Do you recall how many guns he had?

11     A.    No, I don't.  I don't even want to

12 guess.  I don't know.

13     Q.    Okay.  And the trauma that you

14 experienced seeing and being exposed to guns as a

15 child, just so I'm clear, that's something that

16 happened primarily because there were police

17 officers brandishing guns in your presence and the

18 presence of your siblings; is that right?

19     A.    Yes.  Yes.

20     Q.    And that was very scary and has stayed

21 with you ever since?

22     A.    Yeah.

23     Q.    And have you -- I won't get into the

24 details, but have you had any counseling or

25 therapy in the years since --



1      A.      Yes.

2      Q.      -- those experiences?

3      A.      Absolutely.  Absolutely.

4      Q.      Okay.  Can you tell me, after you met

5   your husband and you had handled a shotgun at the

6   age of 21, tell me a little bit more about your

7   increasing exposure to using firearms after that

8   point.

9      A.      As you can only imagine, a stay-at-home

10  mom's work is never done.  So getting away from

11  the children was our outlet.  The shotgun season

12  to go out and spend time as a couple, we went out

13  as a couple for the first few years to feel

14  comfortable.  And he will even tell you, these

15  last later years, I'm the one getting up at 4:30

16  in the morning and going and doing my thing and

17  he's still asleep in the bed.

18          It's -- nature is a beautiful thing.

19  And it's not just about killing an animal and

20  feeding your family, which is very important for

21  us, but it's just seeing nature.  Being out there

22  in the fresh air, not the chaos.  And being able

23  to clear your mind and reset yourself and

24  everything.  It's awesome.

25      Q.    So it sounds like you started hunting



1  with your husband when you were in your early

2  20's.  Do you go hunting every year since then?

3      A.    Yes.  Every season.

4      Q.    It sounds like it's only deer hunting

5  that you do?

6      A.    Correct.  Sorry about that.  I do, yes.

7  My husband does other hunting.

8      Q.    What other sorts of things does he hunt?

9      A.    Primarily the other is squirrel.  His

10  grandfather always told him not to hit it in the

11  head because he liked the brains.  That just

12  grossed me out.

13      Q.    And so when did you get your -- I'm

14  sorry?

15      A.    I'm sure he has gone coyote hunting in

16  the past.

17      Q.    Thank you for that clarification.  Okay.

18  And so tell me about what training have you had in

19  handling guns?

20      A.    My husband is very knowledgeable.  He

21  doesn't consider himself an expert, but don't tell

22  him I said this, he is very knowledgeable and he's

23  a very -- a very source of information.  He reads

24  up on things, he gets information when he doesn't

25  know the answer, and through the years he's been



1  very knowledgeable.  With that being said, we did

2  take concealed carry classes.  Which is about 16

3  hours.  We had to recertify just recently.  And

4  the state is slowly getting them out because of

5  the COVID.  We have not gotten our license yet,

6  renewal yet.  And Shane Wright has done courses

7  with us.

8      Q.    So when was the first training you

9  received about firearms apart from your husband?

10  Some kind of training from a business or an

11  organization that does training on firearms?

12      A.    Our children was wanting to get into

13  hunting.  Well, they decided they didn't like it.

14  Our daughter was about 4 or 5 years of age, so

15  that's about 13 years ago.  I took them on a

16  Friday evening and an all day Saturday gun course.

17  Because if you were born before, I believe, 198 --

18  or after 1985, excuse me, you had to have a hunter

19  safety course.

20      Q.    So you took all three of your children,

21  your biological children, to a hunters' safety

22  course that included training on firearms; is that

23  right?

24      A.    Safety, yeah.  Firearms.  How to handle

25  a gun, how to unload the gun, practice in shooting



```
 1  the gun, cleaning the gun, yes.
 2      Q.    I see.  And is that the first training
 3  that you obtained outside of your husband
 4  explaining them to you?
 5      A.    Yes.
 6      Q.    That was about 13 years ago?
 7      A.    Yes.
 8      Q.    When was the first time you owned your
 9  own gun?
10      A.    We were so poor back in the day.  We
11  shared guns.  I used to -- I would say about that
12  time period.  About 15 years ago or so.
13      Q.    And that's the first time, about 15
14  years ago, that's the first time you got your very
15  own firearm for yourself?
16      A.    I believe so.
17      Q.    And do you remember what kind of firearm
18  it was?
19      A.    It was a 20-gauge and it was black and
20  didn't shoot worth a darn so we traded it.  It was
21  very inaccurate.  We couldn't get it sighted up.
22  It was a very cheap one.  I can't remember which
23  one it was.  I'm sorry.
24      Q.    All right.  About how long did you have
25  that gun?
```



1     A.     Just probably a couple of years.

2     Q.     Did you get that gun for hunting

3  purposes?

4     A.     Absolutely.

5     Q.     And do you remember what kind of --

6  other than being a 20-gauge shotgun, what kind of

7  action that gun had?  Was it semi-automatic,

8  something else?

9     A.     It was not -- you can't hunt with a

10  semi-automatic.  It was a pump.

11     Q.     When you say you can't hunt with a

12  semi-automatic, tell me more about that.  What's

13  your understanding about that?

14     A.     Rifle guns, everything is highly illegal

15  in the State of Illinois, as far as deer hunting.

16  And that's only my knowledge.  Now, I think with

17  cougars and different things like that, hogs and

18  different things like that, there's different

19  rules.  But I'm not aware of any of that.

20     Q.     I see.  So it's your understanding that

21  it's illegal to use a semi-automatic shotgun to

22  hunt deer in the State of Illinois?

23     A.     Right.

24     Q.     Can you use a semi-automatic shotgun for

25  hunting other types of animals, like pheasants or



1  things like that?

2      A.    I'm not knowledgeable on that.  I can't

3  answer that.  I'm sorry.

4      Q.    That's fine.  I understand.  So the

5  first training you received formally from someone

6  other than your husband about guns happened about

7  13 years ago.  What was the next time that you got

8  any training on firearms?

9      A.    Probably about five years -- about five

10  or six years ago when we started considering

11  concealed carry.

12      Q.    And what training was it that you

13  received then?

14      A.    It's a 16-hour course, two-day course

15  they had to do.  And had to pass the written and

16  the manual shooting of a target, passing so many

17  times, you had to shoot so many times in a certain

18  area at the target to be able to pass for a

19  certification of that gun.

20      Q.    So to be clear, that second time you

21  received training about firearms other than from

22  your husband was the CCL classes that you took, or

23  the classes that you took to obtain a concealed

24  carry license; is that right?

25      A.    Yes.



1      Q.    And that was a 16-hour class that you

2   took with your husband about five to six years

3   ago?

4      A.    Yes.

5      Q.    And was that 16-hour class focused on

6   the use of handguns or other types of guns?

7      A.    Handguns.

8      Q.    So was the training exclusively about

9   handguns or did it talk about guns other than

10  handguns or guns generally?

11     A.    It does briefly talk about it, but the

12  concentration is -- for concealed carry is the

13  handgun for protection and defense.

14     Q.    I actually want to go back --

15  I apologize -- to the hunter safety course that

16  you took your children to about 13 years ago.  Can

17  you tell me a little bit more what you remember

18  that course covered as topics?

19     A.    It was so long ago and I had three

20  children.  It pertained, again, to how to handle a

21  gun, never point a gun at somebody, hang it down

22  over the shoulder away.  Unloading a gun when

23  crossing roads or shoot across the field, across

24  the road.  It talked about how to clean a gun, how

25  to load a gun.  And they actually went out and



1  practiced with them.

2      Q.    And the guns that you were being trained

3  to handle, what kind of guns were these?

4      A.    I don't recall.  It's ones they have

5  there.

6      Q.    Were they long guns or handguns?

7      A.    Long guns.

8      Q.    So they might have been shotguns or

9  rifles?

10     A.    Correct.

11     Q.    And did they teach you to load and

12  unload both rifles and shotguns?

13     A.    Yes.

14     Q.    And they taught you how to know whether

15  a gun was loaded or whether it was unloaded?

16     A.    Yes.

17     Q.    And did they cover the topic of how to

18  properly store a firearm?

19     A.    Yes.

20     Q.    Tell me what you recall they taught you

21  about storage of firearms.

22     A.    You always when unloading make sure it's

23  unloaded.  You cock the barrel, open the chamber,

24  make sure there's no other ammunition in there.

25  And in that instance, then you store it in a



1   locked, either you have a locked -- on the trigger

2   you have a lock key system or a gun safe and

3   ammunition is separated from that.

4        Q.    So the hunter safety course taught you

5   that to safely store a firearm, the firearm should

6   be unloaded, stored in a locked container or with

7   a trigger lock and separate from ammunition.  Is

8   that --

9        A.    Yes.

10       Q.    Did they provide any training about

11  storage of firearms where children are present in

12  the household?

13       A.    What we were doing with children, and

14  that's the reason they specifically -- a lot of

15  the kids -- I don't want to be -- a lot of the

16  kids in our area, it's a rural area.  So we are

17  primarily a shotgun deer hunting community.  And

18  most of the training are concentrated for the

19  children.  Because like I said, they did not have

20  to have -- they did not have to have a hunter

21  safety course if you were born before 1985.  And

22  so they really were very cautious of how the kids

23  were handling.  They even showed them the proper

24  technique of handing the gun off, making sure that

25  the chamber was open, and you could visually see

1    that the handgun was unloaded and different things

2    like that.

3         Q.    So the training that you were describing

4    which included your children taught the children

5    how to safely handle firearms?

6         A.    Yes.

7         Q.    Again, how old were your children at the

8    time you were going to this training?

9         A.    My daughter was about five.  So that

10   would have made them about eight and ten years of

11   age.

12        Q.    And did your daughter go to this

13   training too?

14        A.    She did not want to, but I forced her to

15   go.

16        Q.    Did the trainers teach your daughter how

17   to handle guns as a five-year old?

18        A.    She was very timid.  And she took the

19   test and did not pass.  So at that time she did

20   not do well.

21        Q.    And did she get to fire a gun at the

22   training course?

23        A.    No.  She would not.

24        Q.    She refused, but she had the opportunity

25   to?



1      A.    Yes.

2      Q.    And did your two sons shoot guns?

3      A.    I believe so.

4      Q.    And what did the trainers teach you as a

5   parent about gun safety around children?

6      A.    The main thing that sticks out is always

7   assume the gun is loaded.  You always practice

8   safe handling, safe angling of the gun, never

9   point it at anybody.  You carry it with the

10  chamber open to where there's no contact when

11  crossing a road or anything like that.  We've

12  always emphasized safety part with our children.

13     Q.    And did the trainers provide any

14  training about whether children can use or have

15  access to firearms while they are not supervised

16  by their parents?

17     A.    I don't recall, but as a parent I do

18  not.

19     Q.    As a parent you do not what?

20     A.    I do not let them without supervision.

21     Q.    And a few minutes ago you talked about

22  how the hunter safety course explained the safe

23  storage of firearms.  Do you recall if that

24  training discussed how to store firearms safely

25  where children are in the household?



1      A.    I don't recall.

2      Q.    For example, was there any training

3   about how to prevent children gaining access to

4   firearms that are stored?

5      A.    Again, I do not recall.  It's been so

6   long ago.

7      Q.    Okay.  So you took the hunter safety

8   course.  Did you pass the course?

9      A.    I did.

10      Q.    And your two sons, did they pass the

11   course?

12      A.    Yes.

13      Q.    And does that course -- is that a

14   one-time thing or do you have to renew it

15   periodically?

16      A.    No.  It's just a one-time course.

17      Q.    And if you pass the course is that a

18   prerequisite to getting a hunting license?  Or is

19   there something that you would benefit from taking

20   the course other than just more knowledge?

21      A.    Absolutely.  It's a requirement to get a

22   hunting license, yes.

23      Q.    Did you have a hunting license before

24   you took the course?

25      A.    I did, yes.



JENNIFER J. MILLER                                October 23, 2020
MILLER vs SMITH                                                47

1    Q.    Okay.  Did that hunter safety course

2    address as a topic self-defense?

3    A.    No.  Not that I'm aware of.

4    Q.    And since you took that training and

5    learned about the safe storage of firearms, have

6    you stored the firearms in your household

7    according to the guidelines you learned in that

8    course?

9    A.    It has since been updated and

10   requirements are a little bit different.  Before

11   you didn't have to have the ammunition separated,

12   now you do.  And we abide by the laws that we have

13   to, yes.

14   Q.    I guess the question is, the hunter

15   safety course, a minute ago you described they

16   taught you safe storage techniques.

17   A.    Yes.

18   Q.    Okay.  And those safe storage techniques

19   included storing guns unloaded in a locked

20   container or with the trigger locked and separate

21   from ammunition.  Right?

22   A.    Not being loaded is what I meant.  As

23   far as what I knew, is they didn't require

24   ammunition separate.  I mean, you could still

25   store it in a locked container.  But now they are



1   requiring it to be absolutely separate from the

2   guns.

3        Q.    And when you say they, who are you

4   referring to?

5        A.    Sorry.  The State of Illinois laws,

6   regulations.

7        Q.    So the hunter safety course that you

8   took 13 years ago, was it training you about safe

9   storage techniques to comply with state law?  Or

10  was it just about safe techniques to store your

11  guns as a responsible gun owner?

12       A.    They have to, as a requirement, state

13  that, at that time what the State requirements.

14  And they have changed a bit in the years to come

15  since concealed carry has come to play and

16  everything in our state.

17       Q.    Do you know if it's a requirement that

18  children not have access to firearms in a

19  household?

20            MR. SIGALE:  I'm going to object as to

21  form of the question, but if you can answer,

22  Jennifer, go ahead.

23            THE WITNESS:  Could you repeat that?

24  I apologize.

25  BY MR. WENZLOFF:



1       Q.    No problem.  Do you know, is it a state

2    requirement that guns stored in the household be

3    inaccessible to children?

4       A.    I am not 100 percent sure, but it is in

5    our household a requirement.

6       Q.    And when you say it's in your household

7    a requirement, is that a house rule that you've

8    established or are you saying it's a requirement

9    for some other reason?

10      A.    That we've established.  And we've taken

11   precautions in safety ourselves, yes.

12      Q.    Are you familiar with the term FOID

13   card?

14      A.    Yes.

15      Q.    What is a FOID card?

16      A.    It's a card that is accessed to purchase

17   guns, ammunition.  And you have to have a

18   background check to apply for that and pass it.

19   To get it you send off for it.  It's a process

20   again.  And with that FOID card you, I guess, to

21   store it safely requires that you are a legal

22   abiding gun holder.  That they know that you have

23   passed a background check and they can safely sell

24   you guns and ammunition.  You have to provide that

25   FOID card and place it on the counter before you



```
 1   even touch one of their guns if you want to
 2   purchase it.
 3       Q.    I want to return to the subject of FOID
 4   card.  I should close the loop.  I know you said
 5   you took a hunter safety course 13 years ago, then
 6   you took concealed carry classes for 16 hours
 7   about five or six years ago.  Since then has there
 8   been any other training that you received about
 9   handling or storing firearms?
10       A.    We have to refresh our concealed carry
11   class, which is another 16 hours, I believe, yes.
12       Q.    When did you take that?
13       A.    About a year ago.
14       Q.    And you passed that class as well?
15       A.    Absolutely.
16       Q.    And the topics covered in the concealed
17   carry classes, can you explain to me what those
18   topics are?
19       A.    Proper defense, how to be aware of your
20   surroundings, never put your back against an open
21   door, place strategic -- place yourself to where
22   you can observe the whole area, surroundings,
23   safety of the gun, how to load the gun, how to
24   clean the gun.  Different types of guns, handguns.
25   And how to properly shoot a gun.
```



1      Q.    You -- I'm sorry.

2      A.    Sorry.

3      Q.    Go ahead.

4      A.    Oh.   And the laws, the current laws, if

5   anything had changed or anything for the State of

6   Illinois.

7      Q.    And did those classes cover the topic of

8   safe storage of firearms?

9      A.    Yes.

10     Q.    And what did you learn about the safe

11  storage of firearms in those classes?

12     A.    Always handle a gun as if it was loaded.

13  Double-check, triple check to make sure the hammer

14  is locked, safety is on, guns are stored safely in

15  a locked container away from ammunition again.

16  But at this time we are not allowed to have

17  handguns on our property.

18     Q.    I'm sorry.  Is that something you

19  learned in a concealed carry class?

20     A.    No.  We found that out later.  Sorry.

21     Q.    I see.  So the concealed carry class

22  covered safe storage and it trained you to store

23  firearms unloaded in a locked container separate

24  from ammunition; is that right?

25     A.    Correct.



1      Q.    And did it teach you to keep the

2  ammunition in a locked container as well?

3      A.    Yes.

4      Q.    Did those concealed carry classes also

5  teach you to make sure that the firearms are

6  inaccessible to people who are not permitted to

7  use them?

8      A.    Yes.

9      Q.    And that would include children who are

10 not permitted to use firearms?

11     A.    Absolutely.

12     Q.    And do you follow those guidelines that

13 you learned in that class?

14     A.    Absolutely.

15     Q.    And do you feel like those requirements

16 are reasonable requirements for gun safety?

17     A.    Sorry for the pause.  But I'm processing

18 how I want to say.

19     Q.    Let me ask a different question.

20     A.    Okay.

21     Q.    Did you learn a lot in those classes?

22     A.    Oh, yes.

23     Q.    Do you feel like you are better equipped

24 to handle and store firearms from taking all the

25 trainings that you've taken?



1      A.    Absolutely.

2      Q.    Do you trust the instructors who

3  provided training on concealed carry classes, both

4  sets of classes?  Do you trust them to provide you

5  accurate information?

6      A.    Absolutely.  He's a State Trooper and

7  FBI agent, so I assume that he would give us the

8  proper training.

9      Q.    And this was a State Trooper who taught

10  you in the concealed carry class that you took

11  about a year ago; is that right?

12     A.    He was the same gentleman that did both

13  classes, yes.  The initial.

14     Q.    Can I ask what his name was?

15     A.    I don't recall it.  I'm sorry.  My

16  husband knows that.

17     Q.    You found him to be trustworthy and

18  providing accurate information?

19     A.    A lot of information, yes.

20     Q.    And do you feel that you are a more

21  responsible, safe gun owner for having taken those

22  classes?

23     A.    Absolutely.

24     Q.    Is there anything that you learned in

25  those classes that you disagree with or think is



1  not appropriate for gun owners to follow?

2      A.    Can you -- I have to agree with them.

3  I will say that the intent to have a concealed

4  carry license is to protect myself.  And as far as

5  not being able to have a gun not at my disposal,

6  but as a safety precaution right, I should have

7  that right.

8      Q.    So the concealed carry classes that you

9  took taught you about proper self-defense with a

10  firearm, right?

11      A.    Correct.

12      Q.    And they taught you all kinds of things

13  about how to use firearms to protect yourself,

14  your family and your household while using a

15  firearm, right?

16      A.    Yes.

17      Q.    And the instructor who taught you all of

18  these things was doing this, to your knowledge, to

19  impart information about how to properly and

20  safely protect yourself with a firearm, right?

21      A.    Correct.

22      Q.    And it was your testimony a minute ago

23  that you trusted what the instructor told you and

24  felt that it was accurate; is that right?

25      A.    Yes.



1       Q.    Is there anything that the instructor

2   guided you to do or instructed you to do about

3   safe self-defense with a firearm that you feel is

4   inaccurate?

5       A.    No.

6       Q.    Was there anything that he taught you

7   that you believe would make you less safe as a gun

8   owner?

9       A.    No.

10      Q.    I want to go back to the FOID card.  The

11  topic of the FOID card.  You described what a FOID

12  card was.  Do you have a FOID card?

13      A.    Yes.

14      Q.    And when did you get your FOID card?

15      A.    Years ago.  Probably 14 -- 13, 14, 15

16  years ago, roughly.  I'm guessing on that.

17      Q.    That's when you first applied for a FOID

18  card, was about 13 or 15 years ago?

19      A.    It might be a little less than that.

20  Because I got it and it was for four years and

21  then they changed it to ten years, and I don't

22  think it -- so, yeah, it's about 12, 13 years.

23      Q.    And have you ever renewed your FOID

24  card?

25      A.    Yes.



1    Q.    Do you remember when you renewed your

2  FOID card?

3    A.    It was about six years ago or so.  Seven

4  years ago.  It's a ten-year card now.

5    Q.    So you renewed it about six or seven

6  years ago?

7    A.    Yes.

8    Q.    And was there any training that you had

9  to undergo to obtain a FOID card?

10    A.    No.

11    Q.    And I know you mentioned that you had to

12  undergo a background check.  Can you explain for

13  me as best you can what are the requirements you

14  have to meet to get a FOID card?

15    A.    As my knowledge, you can't have any

16  danger -- felonies, mental admissions, medications

17  that are psychotic medication, you know, being --

18  schizophrenia is a word that pops up.  As far as

19  having been not incarcerated but admitted into the

20  psych ward or whatever.  Deemed unreliable and

21  everything.

22    Q.    Okay.  So you said there were certain

23  criminal convictions that would preclude you from

24  getting a FOID card, right?

25    A.    Correct.  You sound so much better than



1   I did.

2       Q.    I have had a little training.  And if

3   I were going to explain this to a 5-year-old I'm

4   sure I'd be much worse than you, with a teaching

5   background with children.  So certain convictions

6   keep you from getting a FOID card, if you're

7   taking certain medications you're not allowed to

8   have a FOID card, right?

9       A.    As far as I know, yes.

10      Q.    And if you have been admitted to certain

11  mental health institutions for certain reasons you

12  also aren't able to get a FOID card, right?

13      A.    As of right now, yes.

14      Q.    Are there any other requirements that

15  you know of?

16      A.    Not that I'm aware of.

17      Q.    And to your understanding the duration

18  of a FOID card today is ten years.  If you get a

19  FOID card it lasts ten years and then you have to

20  renew it, right?

21      A.    I believe it's ten years, yes.

22      Q.    Okay.  And what does a FOID card let you

23  do?

24      A.    Again, it lets you purchase guns,

25  purchase ammunitions.  Even to look at a gun you



1  have to provide a FOID card.  In any store.

2      Q.    Do you know, do you need a FOID card to

3  purchase a gun from a neighbor or a friend?

4      A.    Legally, yes.  It is required.  You have

5  to supply either your FOID card number or your

6  concealed carry number.

7      Q.    And do you know, do you need a FOID card

8  if you just want to borrow a gun from a neighbor

9  or a friend or a relative?

10     A.    For one down here we don't.  I mean,

11 yes, we borrow a shotgun from his dad.  But as far

12 as I know, it is illegal for anyone to handle a

13 gun that does not have a FOID card, yes.

14     Q.    I see.  Do you know people who possess

15 guns but don't have a FOID card?

16         MR. SIGALE:  I'm going to object.

17         THE WITNESS:  Sorry.

18         MR. SIGALE:  I was going to object as to

19 relevance, but you answered, so that's fine.

20         THE WITNESS:  No, I don't.

21 BY MR. WENZLOFF:

22     Q.    Do you plan to renew your FOID card when

23 it expires?

24     A.    Absolutely.

25     Q.    And do you know whether you're eligible



JENNIFER J. MILLER                                          October 23, 2020
MILLER vs SMITH                                                          59

```
 1    to renew your FOID card?
 2         A.    I haven't done anything wrong, so yes.
 3         Q.    You don't know of anything that would
 4    prevent you from renewing your FOID card?
 5         A.    Nothing to prevent it, no.
 6         Q.    And you have a concealed carry license,
 7    right?
 8         A.    Yes.
 9         Q.    And I probably know the answer to this,
10    but when did you first become a concealed carry
11    licensee?
12         A.    About five, six years ago, roughly.
13         Q.    And you've maintained your concealed
14    carry license since then?
15         A.    Yes.
16         Q.    In fact, you've renewed it at least
17    once?
18         A.    Last year, yes.
19         Q.    And have you received the renewed
20    license yet?
21         A.    No, sir.
22         Q.    When did you --
23         A.    Sorry.  I'm sorry.  We applied last,
24    I want to say it was around my birthday last June.
25    And it takes, I don't know, but they have been
```



1   backed up and since COVID has happened there's

2   been a lot more applications for concealed carry

3   license so they are swamped.

4        Q.    And when you say last June, are you

5   meaning June of 2020?

6        A.    '19 I believe.

7        Q.    You believe that you've --

8        A.    I can go get my license because this is

9   off the top of my head.  We did it early to be

10  able to have it back in time.  Hold on just a

11  moment.

12            (Pause in the proceedings).

13            I'm sorry.  It expired June 17 of 2020.

14  BY MR. WENZLOFF:

15       Q.    So your concealed carry license expired

16  on June 7?

17       A.    17.  17.

18       Q.    Your concealed carry license expired

19  June 17, 2020?

20       A.    Right.  Correct.

21       Q.    And when did you apply for a renewal?

22       A.    It was last year.  June, July, August.

23  I can't remember.  We did it early.  We did the

24  classes last year to have them done.  And then we

25  had to send it in.  You had to do the classes



 1  first and then you sign the certificate to send

 2  in.  And we did it online and sent it in and then

 3  COVID happened.  That's all I can say.

 4      Q.    I understand.  So your recollection is

 5  that you applied to renew your concealed carry

 6  license sometime in the spring or summer of 2019;

 7  is that right?

 8      A.    About summertime, yes.

 9      Q.    And you're still waiting to see if your

10  license will be renewed?

11      A.    It is pending.  It just hasn't been

12  processed.  So it will be issued.

13          MR. SIGALE:  I'm just going to object as

14  to foundation and speculation and the fact that

15  the State Police has said that all concealed carry

16  licenses and FOID cards that are expiring during

17  the pandemic are being considered still valid.

18          MR. WENZLOFF:  There's no question

19  pending so I don't know what you're objecting to.

20  BY MR. WENZLOFF:

21      Q.    What does being a concealed carry

22  license holder allow you to do?

23      A.    To possess and protect.  Handgun, it did

24  before we fostered in daycare was able to have a

25  loaded handgun in our home.  But now we have to



1   have it off the premises.  And it allowed us to

2   protect our family, to carry it with us in the

3   State of Illinois, as well as neighboring states.

4        Q.    Okay.  Just so I'm understanding fully,

5   what does a concealed -- so separate from any

6   regulations related to your daycare home or your

7   foster care license, what does a concealed carry

8   license allow you to do?

9        A.    To have a loaded handgun in your home

10  and use it to protect and defend your family.

11       Q.    And if you don't have a concealed carry

12  license you can't do that?

13       A.    There's all sorts of legalities that

14  would be required, I assume, with it.

15       Q.    What does that mean?

16       A.    Well, I mean, lawsuits and everything if

17  something went awry.

18       Q.    To your understanding it's illegal to

19  possess a loaded handgun in your home without a

20  concealed carry license?

21       A.    With a FOID card you are able to have a

22  handgun, but not just loaded and used as defense.

23  But with a concealed carry you'd be able to take

24  it one step further.

25       Q.    And that one step further is what?



1      A.    To have it loaded and protect your

2    family.

3      Q.    I see.  And does the concealed carry

4    license allow you to do anything else?

5      A.    For me, no.

6      Q.    Does it allow other people who have such

7    a license to do anything else?

8      A.    I want to say I don't believe so.

9      Q.    Why did you obtain a concealed carry

10    license?

11      A.    I obtained it in order -- concealed

12    carry became legal in the State of Illinois, and

13    I felt that I could have a concealed carry, would

14    be my right if ever I needed to use it.

15      Q.    I see.  So concealed carry became a new

16    legal option in Illinois at some point in the last

17    ten years and you wanted to take advantage of that

18    new legal right.  Is that accurate?

19      A.    Correct.

20      Q.    Do you carry a gun on your person at

21    times?

22      A.    No, I do not.

23      Q.    Have you ever carried a gun on your

24    person?  Meaning in a holster when you're out

25    already.  I'm excluding hunting, for example.



1     A.    No.

2     Q.    Go ahead.  I'm sorry.

3     A.    I'm sorry.  I do not.  I personally want

4  more training.

5     Q.    So you've never taken a handgun with you

6  to a store or someplace in public?

7     A.    With any concealed carry you're not

8  supposed to know it if I do, but, no, I do not.

9     Q.    Have you never carried a handgun under

10  your concealed carry license on your person?

11     A.    I have not been able to even if I wanted

12  to because we are foster parents.

13     Q.    How about before you were -- before you

14  had a foster care license or before you had a

15  foster child in your home?  Did you ever carry a

16  firearm on your person?

17     A.    There's been a couple of instances that

18  I have, yes.

19     Q.    Do you remember when those were?

20     A.    The one that sticks out is when we went

21  to St. Louis in the inner city.

22     Q.    And when was that?

23     A.    Oh, goodness.  It was before we

24  fostered, so about five years ago.

25     Q.    Maybe shortly after you got your



1   concealed carry license?

2       A.    Correct.

3       Q.    And you went to St. Louis and were

4   carrying a firearm with you?

5       A.    Correct.

6       Q.    And were there other times?

7       A.    Not that I can recall.

8       Q.    Have you ever carried a firearm on your

9   person in your home?

10      A.    No.

11      Q.    When you went to St. Louis when you were

12  carrying a firearm who did you go with?

13      A.    Myself and my children to -- my best

14  friend lives there.

15      Q.    Did you ever keep handguns in your home?

16      A.    As when?  Can you specify?

17      Q.    Ever.  Have you ever kept handguns in

18  your home?

19      A.    Yes.

20      Q.    Okay.  And when did you keep handguns in

21  your home?

22      A.    Before I started daycare.

23      Q.    And was it -- go ahead.

24      A.    Sorry.  Before daycare and fostering.

25      Q.    Okay.  And so --



JENNIFER J. MILLER                              October 23, 2020
MILLER vs SMITH                                              66

1      A.    Can I interrupt?  About a year into my
2    licensing with daycare we found out we weren't
3    allowed to have any guns.
4      Q.    I see.  So before your daycare home
5    license you had at least one handgun in your home,
6    right?
7      A.    Correct.
8      Q.    Did you keep more than one handgun in
9    your home?
10     A.    I mean, we both have concealed carry, so
11   we each had one, yes.
12     Q.    So you kept at least two guns in your
13   home before the daycare home license, right?
14     A.    Correct.
15     Q.    And after you got the daycare home
16   license you continued to keep those two handguns
17   in your home for about a year.  Is that accurate?
18     A.    Yes.  After the daycare.  You said
19   daycare, correct?
20     Q.    Yes.  Daycare.
21     A.    Yes.
22     Q.    And did you keep those handguns loaded?
23     A.    They were in the gun safe.
24     Q.    Okay.  All handguns were stored in the
25   gun safe?



1      A.     Yes.

2      Q.     And the gun safe was locked?

3      A.     Correct.

4      Q.     And were the handguns loaded?

5      A.     Mine was not.  I can't speak for my

6    husband's.

7      Q.     Why was yours unloaded?

8      A.     Because I was still -- we would go out

9    and get more comfortable with the gun.

10     Q.     So you felt uncomfortable storing it

11   loaded in the gun safe?

12     A.     No.  I wouldn't say uncomfortable,

13   I just wanted more training.

14     Q.     You felt you needed more training?

15     A.     More knowledge, yes.

16     Q.     In order to store the gun loaded in the

17   gun safe?

18     A.     Yes.

19     Q.     And a few minutes ago you were

20   testifying about the concealed carry license

21   classes that you took.  Remind me again, what did

22   they teach you about storing guns?  How they are

23   to be stored.

24     A.     We always kept them locked away in the

25   gun safe.  Now I know there can be, a police



1  officer and things like that, he would have them

2  stored in his nightstand or whatever for quick

3  access or whatever, but we did not.

4      Q.    I'm sorry.  Who were you talking about?

5      A.    The instructor.  Sorry.

6      Q.    I see.  Have you ever been licensed to

7  own a firearm in a different state?

8      A.    No.

9      Q.    Have you ever used a gun to defend

10  yourself in your home?

11      A.    No.

12      Q.    Do you know if your husband has ever

13  used a gun to defend himself in his home?

14      A.    No.

15      Q.    You don't know or he's never?

16      A.    Not that I'm aware of.

17      Q.    You're not aware of a time when he's

18  used a gun to defend himself in his home?

19      A.    No.

20      Q.    I know you testified a few minutes ago,

21  maybe longer at this point, about your children

22  taking a hunter safety course with you about 13

23  years ago, right?

24      A.    Yes.

25      Q.    Have your children received any other



1  training about guns?

2     A.    No.  My oldest has applied for a FOID

3  card, but with the pandemic it's in processing.

4  And as far as --

5     Q.    I'm sorry.  Go ahead.  I shouldn't have

6  jumped ahead.

7     A.    My husband, like I said, is very

8  knowledgeable and has always taken them out to

9  teach them a lot of information.

10    Q.    And when you say them, you mean all

11 three of your biological children?

12    A.    Yes.

13    Q.    And do you know what he taught them

14 about guns?

15    A.    I'm guessing probably the same thing he

16 has taught me, as far as how to handle a gun, the

17 proper -- where to shoot a gun, how to shoot the

18 gun, how to load the gun, everything.  Reiterate

19 what the gun safety class taught them.  Only in

20 live.

21    Q.    And I think you testified that you

22 received a course focused on long guns and not

23 handguns, right?

24    A.    At that time, yeah.  Concealed carry was

25 not even a thought, yeah.



JENNIFER J. MILLER                                    October 23, 2020
MILLER vs SMITH                                                    70

1       Q.    Have your children received any training
2   about handguns at all?
3       A.    Just from my husband.
4       Q.    What has your husband taught them about
5   handguns?
6       A.    The mechanics of them, how to clean
7   them, how to properly handle them, store them,
8   load them, clear them.
9       Q.    And has your husband taught your
10  children anything about safe storage of firearms?
11      A.    Our children do not have access to the
12  gun safe, do not know how to attack to get in the
13  gun safe, and they do not know when -- we're very
14  protective of that.  Because of them being
15  children, my husband always gets in the gun safe,
16  locks our bedroom door.  And if anybody attempts
17  to come, he locks the gun safe and then answers
18  the door.
19      Q.    Is the gun safe usually locked or
20  unlocked?
21      A.    It is absolutely always locked.
22      Q.    I see.  But then sometimes your husband
23  will also lock the bedroom door because the gun
24  safe is inside the bedroom and that's an extra
25  layer of protection?  Or help me understand.  You



JENNIFER J. MILLER                          October 23, 2020
MILLER vs SMITH                                          71

1  mentioned --

2      A.    He gets into the gun safe in order to

3  check -- you have to clean the guns every so

4  often.  There are other things in the gun safe, as

5  far as like money, my wedding ring, checks, you

6  know, he has to get in for cash or whatever.  And,

7  you know, but whenever he does get into there he

8  does lock the bedroom door before he even attempts

9  to unlock the gun safe.

10     Q.    And so in terms of what your husband

11 taught the children, it sounds like safe storage

12 is not a topic that he covered in teaching them;

13 is that right?

14     A.    They know what safe storage is.  He

15 verbally told them what safe storage is, yes.

16     Q.    What has he told them that safe storage

17 is?

18     A.    To store them -- after firing the gun

19 you always have to clean it to make sure the

20 mechanics of it works the next time.  And then

21 making sure that it's stored not loaded.

22     Q.    Anything else?

23     A.    Not that I can recall.  I mean, he's

24 better equipped to tell you what he's taught them.

25     Q.    Sure.  Did he mention -- did he tell the



1  children that guns should be locked in the gun

2  safe?

3      A.    Yes.  It's not a toy.  It's a weapon.

4  There's no second chances.

5      Q.    So that makes it sound like it's really

6  important, a really important topic that your

7  husband told your children, that guns must be

8  locked, unloaded in the gun safe; is that right?

9      A.    Correct.

10     Q.    And have you taught your children

11  anything about guns?

12     A.    That is my husband's expertise.  I teach

13  them how to cook, clean and raise a family.

14     Q.    Understood.  Has your husband taught the

15  children what to do if they were to see a gun that

16  was not locked up?

17     A.    I'm almost confident that he has.

18  I don't know a hundred percent, so I don't know

19  that I can answer that question properly.

20     Q.    What would you do if you saw a gun that

21  was unlocked?

22          MR. SIGALE:  Object as to form.  If you

23  can answer go ahead and answer.

24          THE WITNESS:  It depends on the

25  scenario, honestly.  If it's in the middle of a



1  street in a garbage can or something, the proper

2  thing is to guard it, call law enforcement to come

3  and retrieve it.  If it's somebody's gun that

4  they're showing you, they are to show that it's

5  unloaded and everything else and make sure of

6  safety.

7  BY MR. WENZLOFF:

8    Q.    If you were at a friend's house and that

9  friend's house had children in the household and

10  you saw a gun that was not locked up, but just in

11  the living room what would you do?

12          MR. SIGALE:  Objection to speculation.

13  Go ahead and answer if you can.

14          THE WITNESS:  I would leave the house.

15  BY MR. WENZLOFF:

16    Q.    You would leave the house?

17    A.    Absolutely.

18    Q.    Would you say anything to your friend?

19    A.    Absolutely.

20    Q.    What would you say?

21    A.    That the gun is not safe to stay in

22  there with young children.

23    Q.    Have you or your husband provided any

24  training for the daycare children who are in your

25  care under the daycare home?



1        A.    No.

2        Q.    And by training I mean training about

3    firearms?

4        A.    No.  That's not my job.

5        Q.    Do you know if the parents of the

6    children who are in your care provide training to

7    their children about guns and gun safety?

8        A.    I'm sure they do.  We have a court and

9    another officer, we have people in my daycare that

10   their parents are, have concealed carry.  So I'm

11   sure.  Like I said, we are a rural community and

12   it's pretty -- everybody has guns.

13       Q.    So when you say you're sure, what makes

14   you sure?

15       A.    I guess nothing makes me sure.  I guess

16   like a -- I do know that whenever I bring on a new

17   client for daycare they are perfectly aware of

18   that we are avid deer hunters and things like

19   that.  It's pretty evident when you walk into my

20   house that we are avid deer hunters.

21       Q.    So do you tell the parents of the

22   children that you care for that there are guns in

23   the household?

24       A.    Absolutely.

25       Q.    And do you ask those parents whether



1    their children know what to do if they see a gun?

2        A.    No.   That is just my job to inform them

3    of what is present at my house.

4        Q.    Do you ask the parents if their children

5    know that guns can present a safety risk to

6    children?  That guns are not a toy, for example.

7             MR. SIGALE:  Object as to form of the

8    question.  Jennifer, if you can answer go ahead

9    and answer.

10            THE WITNESS:  Can you ask that again?

11   I apologize.

12   BY MR. WENZLOFF:

13       Q.    That was a badly worded question.  That

14   was my fault.  Do you tell -- I'm sorry.  Let me

15   back up.  Do you know if the parents of the

16   children in the daycare home are -- have taught

17   their children that guns are dangerous?

18       A.    I do not know that answer.

19       Q.    Do you have conversations with the other

20   parents about gun safety?

21       A.    No.

22       Q.    So aside from telling them that you have

23   guns in the household, have you had any further

24   conversations with any of the parents whose

25   children you care for about guns?



 1      A.    About guns?  No.  Requesting time off to
 2  go hunting, yes.  Toy guns are not allowed in my
 3  house because we do take it very seriously because
 4  that's just my personal preference.  Guns and fake
 5  knives are not permitted in the house.
 6      Q.    And how do you inform the parents of the
 7  children in your care that there are guns in the
 8  house?
 9      A.    I verbally tell them the moment they
10  come for the interview.
11      Q.    I see.  And do you say anything further
12  about guns or is that the extent of it?
13      A.    That's the extent of it.
14      Q.    Okay.  When you buy a gun do you know
15  whether it usually comes with an instruction
16  manual?
17      A.    Yes, it does.
18      Q.    Do you have instruction manuals for the
19  guns that are kept in your house?
20      A.    My husband has them put up somewhere,
21  yes.
22      Q.    And do you believe a responsible gun
23  owner should read the instruction manual that
24  comes with the gun that they purchase?
25      A.    Yes.



1     Q.    Do you think it's important for a

2   responsible gun user to have read the instruction

3   manual for the gun they are going to use?

4     A.    Yes.

5     Q.    Have you read the manuals for the guns

6   in your home?

7     A.    The ones I use, yes.

8     Q.    And what do the manuals say?  What kind

9   of information do they have?

10    A.    They have an array of information.  They

11  have the labeling of every part of the gun.  The

12  correct way to clean it, the correct way to

13  disassemble it and reassemble it, and how to load

14  guns.  There's a number of questions.  There's a

15  website to go on that talks about safety with your

16  children.  An array of things.

17    Q.    Do you know if the gun manuals you've

18  read for your guns have safety information in

19  them?

20    A.    Yes.

21    Q.    Do you know if they have information

22  about how to safely store your guns?

23    A.    I'm not sure 100 percent on that.

24    Q.    Do you think it's important for a

25  responsible gun owner to follow the safety



1   instructions in the gun manual when they're

2   storing that gun?

3        A.    Yes.

4        Q.    Do you think there's anything in the

5   safety manuals or the instruction manuals that a

6   responsible gun owner can ignore or not follow and

7   still be safe with that gun?

8             MR. SIGALE:  Objection.  Foundation,

9   speculation, form of the question.  Jennifer, if

10  you can answer, you can answer.

11            THE WITNESS:  I honestly don't have an

12  answer to that.  I apologize.

13  BY MR. WENZLOFF:

14       Q.    Let me just rephrase it.  Is there

15  anything in the gun manuals that you ignore when

16  it comes to safety of the guns?

17       A.    I don't believe so.

18       Q.    You try to follow what those instruction

19  manuals say should be done to keep you and your

20  family safe with those guns?

21       A.    In accordance with the law, yes.

22       Q.    Is there anything in the safety manuals

23  or instruction manuals for the guns that you have

24  that you believe are unreasonable or burdensome?

25            MR. SIGALE:  Objection as to form of the



JENNIFER J. MILLER                    October 23, 2020
MILLER vs SMITH                                      79

1 | question.  If you can answer go ahead.

2 |         MR. WENZLOFF:  Let me restate.

3 | BY MR. WENZLOFF:

4 |    Q.    Is there anything in the gun manuals

5 | that you read about your guns that you believe is

6 | unreasonable?

7 |    A.    It's been a while since I have read

8 | them, so I don't know that I can properly answer

9 | that question.

10 |    Q.    But is it true that you try to follow

11 | the instructions contained in those manuals?

12 |    A.    In accordance with the law, yes,

13 | absolutely.

14 |    Q.    What does that mean?  In accordance with

15 | the law.

16 |    A.    Well, I mean, you have to have --

17 | I mean, a gun has to be clean and stored and

18 | carried, transferred properly.  I mean, it can't

19 | be -- you just can't carry a gun out in the middle

20 | of the road.  I mean, it's stupidity.  You have to

21 | have it in a gun case and careful that way.

22 |    Q.    And is it your understanding that the

23 | gun manual that comes with a gun, in fact the gun

24 | manuals that you have for your guns, those are

25 | published by the manufacturer of the gun, right?



1        A.    Correct.

2        Q.    And the manufacturer includes in those

3    manuals instructions about how to safely use and

4    store the gun, right?

5        A.    I believe so.

6        Q.    And those are guidelines that the

7    manufacturer lays out as important for gun owners

8    to use their guns properly, right?

9        A.    Correct.

10       Q.    So when you say -- let me back up.

11    Sorry.  So to your knowledge are there any safety

12    guidelines or safety instructions, any content

13    within those gun manuals that you feel is

14    unreasonable, even if it's not illegal?

15            MR. SIGALE:  Object as to foundation,

16    speculation and form of the question.  Jennifer,

17    if you can answer, go ahead and answer.

18            THE WITNESS:  Like I said, it's been a

19    while since I've read the manual.  And probably

20    since then it has been updated, so I can't

21    properly answer that I don't think.

22            MR. WENZLOFF:  You know what?  Let's go

23    off the record for a second.

24            (Whereupon discussion was held off the

25        record.)



```
 1              (A lunch break was taken from 11:11 to
 2              11:46 A.M., and the deposition continued
 3              as follows:)
 4              MR. WENZLOFF:  Back on the record now.
 5              THE WITNESS:  Can everybody hear me?  It
 6   keeps freezing on my end.  What I said, with the
 7   FOID card, it allows you to have a loaded gun in
 8   your house, but the concealed carry lets you carry
 9   it outside of your home and into the public.
10   I don't know the difference in that, but I said it
11   wrong, mis-worded it.
12              MR. WENZLOFF:  I understand.  So you
13   wanted to make that clarification to your
14   earlier --
15              THE WITNESS:  What I said earlier, yeah.
16   BY MR. WENZLOFF:
17       Q.    Thank you for that, Ms. Miller.  Let's
18   get back started.  I want to ask you some specific
19   questions about guns that you own.  I believe
20   earlier you testified that you own yourself two
21   guns; is that right?
22       A.    Correct.
23       Q.    And one of those is a 20-gauge shotgun?
24       A.    Uh-huh.
25       Q.    And the other is a handgun; is that
```



JENNIFER J. MILLER                    October 23, 2020
MILLER vs SMITH                                     82

1  right?

2      A.    Yes.

3      Q.    I'm going to try to show you a picture.

4  Hopefully this works.  Do you see on your screen a

5  picture of some handguns?

6      A.    Yes.

7      Q.    Now, do you recognize these guns?

8      A.    Familiar, yes.

9      Q.    How do you recognize them?

10     A.    The bottom one looks like -- similar to

11 my gun.  I believe mine is a Glock.

12     Q.    For the record, what I'm showing

13 Ms. Miller is Exhibit 2.  What's been premarked as

14 Exhibit 2, which is a photograph of several

15 handguns on a flat surface.

16           So, Ms. Miller, you say the gun that's

17 on the bottom of the screen, that light gray

18 color, I believe -- you recognize that gun?

19     A.    Yes.

20     Q.    Is that your gun?

21     A.    Yes.

22     Q.    And do you know the make and model of

23 your gun?

24     A.    It's a Glock.

25     Q.    Is it a Glock?



```
1        A.    42, I believe.  42, I believe.

2        Q.    That model of gun is a Glock 42?

3        A.    Yes.

4        Q.    And do you know what caliber that pistol

5    is?

6        A.    I want to say it's a 38.

7        Q.    And do you know, is it a single action

8    pistol or a double action pistol?  Can you tell me

9    more about the characteristics of this gun?

10       A.    It's just a single bullet.  I mean, as

11   many times as you pull the trigger it pulls the

12   gun.

13       Q.    So if you pull the trigger it fires a

14   round?

15       A.    Correct.

16       Q.    Do you know how many bullets are able to

17   fit into the magazine?

18       A.    I think ten.  It depends on which stock

19   you have in there.

20       Q.    How long have you owned that gun?

21       A.    My husband knows dates.  I would say a

22   couple of years.

23       Q.    And are you the only person that uses

24   it?

25       A.    For the most part, yes.
```



 1      Q.    If you need to look at it again just let
 2   me know.  I thought it might be easier not to
 3   stare at that picture.  When you say for the most
 4   part yes, what do you mean?
 5      A.    My husband informs me that he does some
 6   adjustments and things like for me.
 7      Q.    How do you use that gun?
 8      A.    Right now it's just target practice.
 9      Q.    You take it to go target practice?
10      A.    Correct.
11      Q.    When is the last time you used it?
12      A.    About six months.
13      Q.    And are you able to estimate how many
14   times you've fired that gun?
15      A.    I went out with it probably a dozen
16   times.
17      Q.    And where is it now?
18      A.    I believe it's in my husband's truck.
19      Q.    And how is it stored in his truck?
20      A.    He's got a safe, a locked safe in his
21   truck in the console, I believe.
22      Q.    So you believe that that gun is locked
23   in a console in your husband's truck, right?
24      A.    Yes.
25      Q.    Why haven't you used it in the past six



1 | months?

2 | A.    I work from sunup to sundown and I was

3 | working 7 days a week.  And there's absolutely no

4 | time.  I mean, when I get done with the day

5 | dealing with, you know, how many kids and I have 5

6 | to 6 kids during the day and I want to hit my head

7 | to the pillow.

8 | Q.    I hear you.  So you said before that you

9 | used the gun for target practice.  Do you use it

10 | for any other reason?

11 | A.    No.

12 | Q.    Before -- well, so you've owned this gun

13 | since you obtained a daycare home license, right?

14 | A.    Yes.

15 | Q.    In other words, you didn't own this gun

16 | before you had a daycare home license?

17 | A.    I had another previous gun before that

18 | and then I traded it in for the Glock.

19 | Q.    I see.  So what gun did you have before

20 | the Glock?

21 | A.    I can't remember.  I don't remember.

22 | Q.    Was it a handgun?

23 | A.    Yes.  It was a handgun.  But I can't

24 | remember what he traded it with.  That would be my

25 | husband a question.



1     Q.    What do you mean you don't remember what
2   he traded it in for?
3     A.    I think he traded one of his guns in for
4   it.
5     Q.    I see.  And how long did you have that
6   gun before you traded it in for the Glock?
7     A.    A year.  Year or two.
8     Q.    And before that did you have any
9   handguns?
10    A.    No, sir.
11    Q.    So the first handgun you owned was the
12  one right before you obtained the Glock pistol,
13  right?
14    A.    Correct.
15    Q.    So did you ever have a handgun before
16  you had a daycare home license?
17    A.    No.
18    Q.    Have you ever stored that Glock handgun
19  or any other handgun anywhere other than in your
20  husband's truck?
21    A.    Before we did daycare we had it in the
22  safe, yes.  Until we found out that it was not
23  permitable and we had to pull them.
24    Q.    Tell me more about that.  I'm not sure I
25  understand.



1       A.    What do you mean?

2       Q.    You testified a few minutes ago that you

3    first got a handgun before the Glock pistol, and

4    that was -- you had the Glock pistol about two

5    years, right?

6       A.    Right.

7       Q.    And you had a prior handgun before that

8    that you had for, I'm sorry, I don't recall.  You

9    said you had it for about a year?

10      A.    Couple of years, yeah.

11      Q.    So you've owned a handgun for about four

12   years.  Is that accurate?

13      A.    Yes.  As well as using my husband's, you

14   know.

15      Q.    Okay.  So you've never owned a handgun

16   prior to having a daycare home license?

17      A.    Not in my name, no.

18      Q.    Okay.  But your husband had a handgun

19   before you had the daycare home license, right?

20      A.    Correct.

21      Q.    And how was that handgun stored before

22   you had the license?

23      A.    It was loaded in the gun safe.

24      Q.    It was loaded and stored in the locked

25   gun safe; is that right?



1      A.     Yes.

2      Q.     And then when you got the daycare home

3  license it was still stored the same way for a

4  period of time; is that right?

5      A.     Correct.

6      Q.     And then about a year, I think you

7  testified to this before, about a year after you

8  obtained the daycare home license something

9  changed.  Can you explain that again?

10      A.     The licensing agent found out we had

11  concealed carry and then that's when it was

12  brought to our attention that we could not have

13  handguns on the premises.

14      Q.     I see.  And then what happened?

15      A.     We had to pull them.

16      Q.     And when you say pull them, what do you

17  mean?

18      A.     Remove them from the property.

19      Q.     And when you say them, what do you mean?

20      A.     The handguns.  I'm sorry.

21      Q.     And are you referring to all the

22  handguns in your home?

23      A.     Yes.

24      Q.     And let me show you a picture of the

25  handguns again.  You testified -- again, we're



1  looking at Exhibit 2 here.  You testified before

2  that the gun at the bottom of the picture, the

3  light gray gun, is your handgun.  Do you recognize

4  these other handguns?

5     A.    Yes.  I couldn't tell you the make,

6  model or anything of that nature.

7     Q.    Do you know who these handguns belong

8  to?

9     A.    They look like my husband's.

10    Q.    And so one second.  I apologize.  Do you

11 know that your husband has other handguns?

12         MR. SIGALE:  Object to the form of the

13 question.  If you understand you can answer.

14 BY MR. WENZLOFF:

15    Q.    Let me rephrase.  Does your husband

16 continue to -- does your husband own handguns?

17    A.    Yes.

18    Q.    Do you know how many handguns he owns?

19    A.    I do not.

20    Q.    Do you believe he owns four handguns?

21    A.    There's a picture of them and

22 I recognize them.  I would assume so, yes.

23    Q.    Do you know if he owns more than four

24 handguns?

25    A.    No, I don't.



1      Q.    So to your knowledge this picture

2   appears to be a picture of the handguns owned by

3   your husband.  You're not sure.  Is that accurate?

4      A.    I would say they appear to be my

5   husband's, yes.

6      Q.    And you're also not sure if your husband

7   owns other handguns besides these guns that are

8   pictured here?

9      A.    I think those are all he owns.

10      Q.    And do you know how long he's had these

11   handguns?

12      A.    I do not.

13      Q.    Do you know if he owned handguns

14   before -- I think you testified to this -- he

15   owned handguns before you had a daycare home

16   license, right?

17      A.    Yes.

18      Q.    And were all those handguns stored

19   loaded in the gun safe?

20      A.    I don't believe all of them were, no.

21   Not that I -- I can't answer that 100 percent.

22      Q.    So at least one handgun was stored

23   loaded in the gun safe, which was locked, before

24   you had the daycare home license.  Is that true?

25      A.    Correct.



1      Q.     And your husband at the same time also

2    owned other handguns as well, right?

3      A.     Correct.

4      Q.     And do you know where those other

5    handguns were stored?

6      A.     I assume they were in the gun safe.

7      Q.     Why do you say you assume?

8      A.     Because they weren't laying around the

9    house.

10      Q.     Were they possibly stored in his truck

11    or in another location?

12      A.     I mean, they could have been worked on

13    at his uncle's house, or business.  I mean, he

14    would have them in the truck, yes.  That would be

15    something to ask him.

16      Q.     So when the licensing worker for the

17    daycare home license found out you and your

18    husband had concealed carry licenses, she asked

19    you about whether you had handguns in the home.

20    Is that right?

21      A.     After she found out we had concealed

22    carry, yes.

23      Q.     And I believe you testified that at that

24    point you had to pull them and remove them from

25    the house, right?



JENNIFER J. MILLER                                    October 23, 2020
MILLER vs SMITH                                                    92

1      A.    Correct.

2      Q.    So how many handguns were removed from

3  the house?  Did you remove from the house at that

4  time?

5      A.    My husband did that.  I don't know.

6  I know mine was and I know his was, but I can't

7  recall a number.  I believe that we needed to be

8  in compliance and he needed to take them

9  elsewhere.

10     Q.    And you weren't sure the exact number of

11 guns in the house at that time?

12     A.    No.

13     Q.    The exact number of handguns in the

14 house at that time.  You didn't know?

15     A.    No.

16     Q.    And you weren't sure exactly where they

17 were stored, either; is that right?

18     A.    I'd say --

19           MR. SIGALE:  I'm going to object as to

20 form.  Jennifer, if you can answer go ahead and

21 answer.

22           THE WITNESS:  They either had to be in

23 the gun safe or off the property.

24 BY MR. WENZLOFF:

25     Q.    Do you ever access the gun safe?



1       A.      I have maybe once.

2       Q.      Do you remember when?

3       A.      It was to get money out, yes.

4       Q.      And when was that?

5       A.      About six months ago.

6       Q.      How do you access the gun safe?

7       A.      I have my husband unlock it.

8       Q.      Do you have a key to the gun safe?

9       A.      I do, but it's put up.

10      Q.      What does that mean?

11      A.      It is put up in my closet away from

12   everything to where it's not easy access.

13      Q.      I see.  But you have your own key to the

14   gun safe?

15      A.      I do, yes.

16      Q.      And your key is currently stored in a

17   closet in a place that is hard for you to access;

18   is that right?

19      A.      It's stored up in the closet, yes.

20      Q.      Does your husband know where the key is?

21      A.      Yes.

22      Q.      Do your children know where that key is?

23      A.      Nope.  No.  I'm sorry.

24      Q.      Let's go back to the pistol that you

25   own, the Glock pistol 42.  Have you read the



```
 1   owners manual that came with that firearm?
 2        A.    Not in its entirety probably, no.
 3        Q.    But your recollection is that you have
 4   read the owners manual?
 5        A.    Not all of it, no.
 6        Q.    Let me share with you another exhibit.
 7   Can you see on your screen the picture, what
 8   I have marked as Exhibit 5?
 9        A.    Yes.
10        Q.    What do you see there?
11        A.    A gun and a warning.
12        Q.    Does this look like the instruction
13   manual for your gun?
14        A.    It says Glock Safe Action Pistol, so
15   I assume so, because I'm the only one that has a
16   Glock.
17        Q.    You don't recall whether this is the
18   manual that you have for your gun precisely?
19        A.    No, I don't.
20        Q.    Do you remember reading this?  I have
21   moved to the second page.  Do you remember reading
22   this part of the manual that says firearm safety
23   rules?
24        A.    Some of it.
25        Q.    You remember reading some of it?
```



1        A.    Correct.

2        Q.    I'm going to show you page 3.  I'm going

3    to turn it around so that it can be read.  On page

4    3 what do you see here?

5        A.    Warnings.

6        Q.    You see a list of warnings.  Do you

7    remember having read these warnings before?

8        A.    I'm sure I have.

9        Q.    And if you look down, the third warning

10   from the bottom, can you read what it says there?

11        It says:  To store your Glock pistol

12   first unload it as described in chapter 8.  Then

13   after checking to make sure that it is unloaded,

14   magazine removed and chamber empty, place it in

15   the included pistol case or another suitable

16   locked container.

17        Do you recall having read that part of

18   the manual before?

19        A.    Yes.

20        Q.    And further down it says:  Always store

21   and transport your Glock pistol unloaded and

22   locked in a suitable container, such as the

23   included pistol case, out of the reach and sight

24   of children or other unauthorized persons.  Is

25   that an accurate reading of the warning there?



1     A.     Yes.

2     Q.     And do you recall having read that

3   before?

4     A.     Yes.

5     Q.     And then one more warning down it says:

6   Never store or transport ammunition in the same

7   container as your Glock pistol.  Have you seen

8   that warning in the past?

9     A.     Yes.  And the keyword is store.

10     Q.     And what do you mean by that?

11     A.     Store means to store it in a period of

12   time.  If you're using it for your protection, the

13   concealed -- the FOID card says you can.  Store

14   means unloaded.  It is against the law to

15   transport in a moving vehicle to any location with

16   a loaded gun.  So store is key.  Store means

17   store.

18     Q.     So do you disagree with any of these

19   warnings that I have just read for you?

20     A.     I don't disagree.  They're warnings.

21   I disagree with your interpretation and my

22   interpretation.

23     Q.     And I'm sorry.  What is my

24   interpretation?

25     A.     I assume -- I assume you're just -- my



1  interpretation is to store it.

2      Q.    I'm sorry.  You said you disagree with

3  your interpretation?

4      A.    No.

5      Q.    I'm sorry.  I'm not understanding

6  exactly.  You said you agree with these statements

7  as warnings.  Is there something else you want to

8  share about your understanding of these?

9      A.    The warning is to store.  And that's all

10  I have to say.

11      Q.    Do you store your firearms in accordance

12  with the warnings that are provided in the

13  instruction manual?

14          MR. SIGALE:  I'm going to object as to

15  the form of the question, but if you can answer,

16  Jennifer, go ahead.

17          THE WITNESS:  I apologize.  I'm a little

18  bit flustered.

19          MR. WENZLOFF:  Do you want to take a

20  break?  I don't want you to answer -- I want you

21  to be able to answer accurately and truthfully.

22  So take the time you need.

23          THE WITNESS:  Can you repeat the

24  question, please?

25  BY MR. WENZLOFF:



1      Q.    Do you store your Glock pistol that you

2   own in accordance with the warnings that are

3   contained in the instruction manual?

4      A.    Yes.  And as with the concealed carry

5   provisions too.

6      Q.    So you store the firearm, that Glock

7   pistol, in the way that the instruction manual

8   recommends it be stored?

9      A.    Yes.

10      Q.    And when you say and in accordance with

11   the concealed carry license provisions, what do

12   you mean?

13      A.    The concealed carry, as well as the

14   FOID, says that we can have loaded guns locked in

15   a secure place.

16      Q.    So I'm going to show you the warnings

17   again for the Glock pistol.  And if you recall,

18   you said that I had accurately read these

19   warnings.  I'm again showing Ms. Miller Exhibit

20   2 -- I'm sorry -- Exhibit 5, page 3, and the

21   warnings say:  To store your Glock pistol first

22   unload it, as described in chapter 8, then after

23   checking to make sure that it is unloaded,

24   magazine removed, and chamber empty, place it in

25   included pistol case or another suitable locked

1  container.  Always store and transport your Glock
2  pistol unloaded and locked in a suitable
3  container, such as the included pistol case, out
4  of the reach and sight of children or other
5  unauthorized persons.  Never store or transport
6  ammunition in the same container as your Glock
7  pistol.
8          You heard those warnings before.  You
9  said you recalled reading them and you said you
10  store your Glock pistol in accordance with those
11  warnings; is that right?
12      A.    Yes.
13      Q.    And so that means that you store your
14  Glock pistol unloaded and locked in a suitable
15  container.  Am I describing that --
16      A.    Yes.  Yes.
17      Q.    Okay.  So then beyond that you said you
18  also store your Glock pistol in accordance with
19  the concealed carry license rules, right?  You
20  said that?
21      A.    Yes.
22      Q.    And you explained to me that concealed
23  carry license rules allow you to store a pistol
24  loaded in your home; is that right?
25      A.    Yes.



1    Q.    So which is it?  Do you store the Glock

2    pistol in your home loaded or do you store it in a

3    suitable locked container unloaded?

4    A.    At this moment being in daycare I do

5    not.

6    Q.    You do not what?

7    A.    Have it loaded and stored.  I cannot

8    have the gun on my premises.  So there -- sorry.

9    Q.    Was there something you wanted to add?

10   I'm sorry.

11   A.    No.  I'm sorry.

12   Q.    Okay.  So you said before that you don't

13   disagree with the warnings included in the

14   instruction manual for your pistol; correct?

15   A.    Correct.

16   Q.    So is there anything that you find

17   unreasonable about those warnings?

18   A.    I wouldn't say so.

19   Q.    And is it your understanding that those

20   warnings are included to promote the safe and

21   responsible use and storage of firearms?  Right?

22   A.    Of course, yes.

23   Q.    And the manufacturer provided those

24   warnings to the people that purchase guns of that

25   kind, right?



JENNIFER J. MILLER                                      October 23, 2020
MILLER vs SMITH                                                      101

1      A.    Correct.

2      Q.    You also testified before that you own a

3   20-gauge shotgun; is that right?

4      A.    Yes.

5      Q.    Can you describe for me any further what

6   that shotgun is?

7      A.    It's -- ask my husband.  It's a Moss --

8      Q.    Go ahead.

9      A.    It's pink.

10     Q.    And then the manufacturer is called

11  Moss?

12     A.    Mossberg, yeah.

13     Q.    Mossberg?

14     A.    Uh-huh.

15     Q.    And is it a model 500 shotgun?

16     A.    I can't -- I don't know that for sure.

17     Q.    Sure.  But you understand it to be a

18  Mossberg?

19     A.    Yes.

20     Q.    How long have you owned that shotgun?

21     A.    I can't recall.  Several years.

22     Q.    More than a couple?

23     A.    I would say so, yes.

24     Q.    Did you pick it up yourself?

25     A.    Yes.



1      Q.    Did you consider other guns when you

2  were buying that gun?  And if so, why did you

3  choose the Mossberg 20-gauge shotgun?

4      A.    I took into consideration, first of all,

5  I'm a female and I wanted a pink gun.  And second

6  of all, I took in consideration my husband.  He

7  didn't want me to have a 12-gauge, he wanted me to

8  have a 20-gauge.  That wouldn't kick as much for

9  me and be more secure for me.

10     Q.    Meaning when you shoot the gun the

11 recoil is less significant?

12     A.    Correct.

13     Q.    And that would make it a little easier

14 for you to fire as a female new gun owner, right?

15     A.    Yes.

16     Q.    And what do you use that gun for?

17     A.    To shoot deer.

18     Q.    And so that was the purpose for you

19 buying the gun, is you wanted the gun to take deer

20 hunting?

21     A.    Correct.

22     Q.    And I think you said this before, but

23 just to double-check; what kind of action is that

24 shotgun?

25     A.    It's a pump action.



1      Q.      And do you know how big the magazine is?
2   How many shells fit in the shotgun at one time?
3      A.      Three.
4      Q.      And are you the only person who uses the
5   shotgun?
6      A.      Yes.  I mean, my husband has shot it and
7   of course it's a new gun.  So he's got to plank
8   it.
9      Q.      I'm sorry.  He's got to plank it?  What
10  does that mean?
11     A.      Shoot target practice.  Make sure it's
12  accurate and everything.
13     Q.      I see.  So he helps you make sure that
14  it's still firing accurately by taking it to
15  target practice, that sort of thing?
16     A.      Yes.
17     Q.      And how do you store that shotgun?
18     A.      Unloaded in the gun safe.
19     Q.      Where do you store the ammunition?
20     A.      In a locked box separate.
21     Q.      And did you -- do you put that shotgun
22  in the gun safe and take it out?  Are you the
23  person who does that?
24     A.      No.  My husband does.
25     Q.      I see.  Do you know how many guns are in



1   the gun safe?

2        A.    No, I don't.

3        Q.    Do you ever use that gun for any other

4   purpose other than hunting?

5        A.    No.

6        Q.    Do you take it target practicing?

7        A.    I don't, no.  It's too expensive.

8        Q.    What do you mean?

9        A.    The shotgun shells are too expensive.

10       Q.    I see.  So to save money you don't take

11   it out for practice shooting?

12       A.    Correct.

13       Q.    Have you ever used it for self-defense?

14       A.    No.

15       Q.    Would you ever use it for self-defense?

16             MR. SIGALE:  Objection as to

17   speculation.  But if you can answer, answer.

18             THE WITNESS:  I never even thought about

19   it.  So I don't know if I would or not.

20   BY MR. WENZLOFF:

21       Q.    If you had to use it for self-defense

22   would you be able to?

23             MR. SIGALE:  Objection to the form of

24   the question.  Speculation.  But you can answer if

25   you can.



1          THE WITNESS:  I'm able to shoot it.

2     Whether I'm able to do it at that time I don't

3     know.

4     BY MR. WENZLOFF:

5          Q.     If the daycare home rules and foster

6     care license rules didn't exist, how would you

7     store that shotgun?

8          A.     The same way I do.

9          Q.     You wouldn't change the way you store

10    it?

11         A.     No, sir.

12         Q.     Have you read the owners manual for that

13    firearm as well?

14         A.     I don't believe I have.

15         Q.     Do you still have the owners manual for

16    it?

17         A.     I'm sure my husband does.  He collects

18    everything.

19         Q.     And the Glock pistol that you own, which

20    is currently in yours husband's truck, right?

21         A.     I believe so, yes.

22         Q.     So if the rules about storage for

23    daycare home licenses and foster care licenses

24    didn't exist, would you change the way you store

25    that pistol?



1      A.     Yes.

2      Q.     How would you change the way you store

3  it?

4      A.     I would store it in the gun safe.

5      Q.     How would you store it in the gun safe?

6      A.     Probably the clip beside it ready to

7  load.

8      Q.     So you would keep it unloaded in the

9  locked gun safe with the ammunition also in the

10  locked gun safe?

11     A.     Yes.

12     Q.     And why would you keep it that way?

13     A.     For the purpose of safety for my family

14  and myself.

15     Q.     And what do you mean for the purpose of

16  safety?

17     A.     You're not going to tell a person that's

18  coming to rape you or break into your home and

19  kill you, wait a minute, let me go and go get the

20  gun and wait a minute, let me go to another spot

21  and get my ammunition.

22     Q.     So in other words, you would store your

23  Glock pistol unloaded, locked in the safe with the

24  ammunition also locked in the safe in order to

25  protect -- for self-defense purposes?



1        A.    Correct.

2        Q.    And remind me again, do you have access

3    to the safe?

4        A.    I have a key, but it's stored up in the

5    closet.

6        Q.    Okay.  And your husband has the other

7    key, right?

8        A.    Correct.

9        Q.    And would you feel comfortable storing

10   your firearm, your Glock pistol in the safe with

11   the ammunition next to it?

12       A.    Yes.

13       Q.    Is there a reason why you wouldn't store

14   it with it loaded in the gun safe?

15       A.    That's my preference.  It's right there.

16   All you have to do is smack it in and cock it and

17   you're ready to roll.

18       Q.    I see.  That's your preference.  Can you

19   tell me more why that difference matters to you?

20   Either keeping the ammunition next to the Glock

21   pistol locked in the safe, versus keeping the

22   Glock pistol loaded and locked in the safe.

23   What's the difference there that makes you -- why

24   do you prefer one over the other?

25       A.    It's just preference for me.



1    Q.    Okay.  Other than the Glock pistol and

2  the shotgun that you own, can you describe any of

3  the other guns that are in your house?

4    A.    I don't mess with them.  No.  I'm only

5  comfortable with the guns that I have been trained

6  and licensed with.

7    Q.    And you know that there are other guns?

8    A.    Absolutely, yes.

9    Q.    And do you know how many guns there are

10  in the house?

11        MR. SIGALE:  Objection.  It's been asked

12  and answered many times.  But go ahead, Jennifer.

13  If you know.

14        THE WITNESS:  I'm not sure how much is

15  in -- how much guns are in the safe.

16  BY MR. WENZLOFF:

17    Q.    I think you did answer this, but are

18  there any guns stored in the house that are not in

19  the safe?

20    A.    No.

21    Q.    Would you ever feel comfortable storing

22  guns outside of the safe?

23    A.    Outside of daycare hours, yes.

24        Can I take a break?  I have to go to the

25  restroom.



 1            MR. WENZLOFF:  Absolutely.  We'll take

 2     five minutes.

 3            THE WITNESS:  Thank you.

 4            (A break was taken from 12:28 to

 5        12:34 P.M., and the deposition continued as

 6        follows:)

 7            MR. WENZLOFF:  Back on the record.

 8     BY MR. WENZLOFF:

 9        Q.    So, Ms. Miller, we were just talking

10     about your preference in storing your Glock

11     pistol.  I believe you testified that you would

12     prefer to store it in the locked gun safe with the

13     ammunition for the pistol in the magazine in the

14     clip next to the pistol in the same safe.  Is that

15     right?

16        A.    Correct.

17        Q.    I just want to circle back; earlier in

18     your testimony you acknowledged that you agreed

19     with some of the warnings in the instruction

20     manual for your pistol that advises the owner of

21     the pistol to store the ammunition separately from

22     the pistol, right?

23        A.    Correct.

24        Q.    And earlier this morning you also

25     testified that you obtained some training from



JENNIFER J. MILLER                              October 23, 2020
MILLER vs SMITH                                              110

```
 1   your concealed carry license classes, and that
 2   training also told you to store your handgun
 3   unloaded in a locked container separate from the
 4   ammunition, right?
 5             MR. SIGALE:  Objection.
 6             THE WITNESS:  Correct.
 7   BY MR. WENZLOFF:
 8        Q.    So I guess my question is, is your
 9   preference to store your Glock pistol with the
10   magazine next to the pistol in the same locked
11   safe, is that inconsistent with your prior
12   training and the instruction manual?
13        A.    I guess the interpretation of storing
14   meaning that you're not going to use it or you're
15   putting it away and not looking at it for a while,
16   that's what I mean by stored.  Now, if it's a --
17   if you're actively using it, you have it loaded
18   and ready to use.  If you're carrying it on your
19   body or, you know, wherever.
20        Q.    So if you're carrying a pistol, your
21   concealed carry class advised you that it was safe
22   or could be safe to have the pistol loaded.
23   That's what I'm hearing.  Is that what you're
24   saying?
25        A.    Yes.
```



JENNIFER J. MILLER                          October 23, 2020
MILLER vs SMITH                                          111

1      Q.    Okay.  So then when the gun is stored,

2   not being used because it's not being carried on

3   your person, isn't it accurate that your training

4   told you to keep the ammunition separate from the

5   pistol?

6      A.    Unless you're -- yes.  Unless you're

7   ready to use it.  I mean, I don't know how else to

8   explain it.  Stored, you can have it loaded and be

9   ready to use it at any point in concealed carry

10  classes.  You don't ever want to be unarmed.  You

11  want to -- safety is key too.

12     Q.    Well, I guess I'm not understanding.

13  Are you suggesting that it's okay for a gun to be

14  loaded and locked in a storage container when

15  you're not carrying it, when you're not taking it

16  to the gun range?  Is that what you're saying?

17     A.    I'm saying that the concealed carry

18  course demonstrated safety, as well as protecting

19  yourself.  Carrying it on yourself as protection.

20  Concealed carry, nobody is supposed to know that

21  you have even got it on yourself, for that matter.

22  Because -- and as far as it being loaded in the

23  gun safe ready to use, yes, but you have to safely

24  have it unloaded at times to clean it and properly

25  store it.  You have several -- not several, I have



1  one, but people do have guns that they don't

2  necessarily carry with all the time or use, it's

3  just they have as a collection.  That's stored.

4  In my interpretation.  What I'm trying to explain.

5  But if you're actively using it, you're actively

6  trying to defend yourself with it.

7      Q.    So is it your belief that having the gun

8  locked in a safe with the magazine clip filled

9  with ammunition also in the same safe, that you're

10  actively using the gun?

11      A.    Yes.  In consideration of preparedness,

12  yes.

13      Q.    So that means that -- your understanding

14  of your training is that it's proper for the

15  handgun to be loaded as well and locked in a safe

16  because it's in active use?

17      A.    Correct.

18      Q.    And it's in active use -- I'm sorry.

19  I'm not understanding why it's being used if it's

20  stored in a locked container.

21      A.    You don't know when you're going to have

22  to use it.  You don't know when somebody is going

23  to be breaking in your front door.  Or there's

24  going to be an altercation situation that someone

25  on the street is going to be raped, that you're



1   going to have to use it.  That's what I mean.  But

2   there's situations arise that you're going to have

3   to make a decision.

4        Q.    You've never carried your pistol on your

5   person, have you?

6            MR. SIGALE:  Objection.  Asked and

7   answered.  You can answer, Jennifer.

8            THE WITNESS:  Once that I recall I did.

9   BY MR. WENZLOFF:

10       Q.    Oh, that's right.  When you went to

11  St. Louis, right?

12       A.    Yes.

13       Q.    Is it your understanding that it would

14  be consistent with your training and the owners

15  manual to have your Glock pistol loaded and not

16  stored in a locked container, but just in your

17  home, maybe on your nightstand or somewhere else

18  in the home unlocked?

19       A.    Can you say that one more time?  Because

20  you froze halfway through.

21       Q.    I'm sorry.  Is it consistent with your

22  training and with the instruction manual for your

23  Glock pistol for you to have the pistol -- locked

24  container.

25            (Frozen screen.)



1              MR. WENZLOFF:  It's not my Internet.

2    I don't think.

3              (Whereupon the requested portion of the

4       record was read by the reporter.)

5    BY MR. WENZLOFF:

6        Q.    We can go back on the record.

7    Ms. Miller, did you hear what the reporter just

8    read back?

9        A.    Yes.

10       Q.    Are you able to answer the question or

11   would you like me to rephrase it?

12       A.    I would never have my gun on the

13   nightstand loaded.  Being for the chance of

14   anybody getting ahold of it accidentally.

15       Q.    Okay.  I'm going to show you some more

16   pictures.  If you give me a moment.  I am now

17   showing you what's been marked as Exhibit 8.

18   I can zoom out a little bit.  This is a

19   photograph.  Ms. Miller, do you recognize this

20   picture?

21       A.    Yes.  It's where we store the ammo.

22       Q.    That's an ammo crate utility box?

23       A.    Yes.

24       Q.    And what's stored in it other than ammo?

25       A.    Nothing that I'm aware of.



1      Q.    And is all of the ammunition for all of

2   the guns stored in your home stored in this

3   container?

4      A.    Yes.

5      Q.    Do you recall when you obtained this

6   container?

7      A.    No, I do not.

8      Q.    Do you know where it's located in your

9   house?

10     A.    It was in the closet.

11     Q.    Where is it now?

12     A.    It's in the closet.

13     Q.    And is it locked?

14     A.    The guns?  You see two locks on it right

15   there.

16     Q.    Yep, you're right.  There are two --

17   yes.  You call those padlocks?

18     A.    Yes.

19     Q.    And so are those the only locks on the

20   container?

21     A.    There's clips on the side and

22   everything.  Other than that.

23     Q.    And is it one key or two keys to open

24   those padlocks?

25     A.    One on each side.  One key on each side.



1      Q.    Same key or different?

2      A.    Different.

3      Q.    And who has access to those keys?

4      A.    Darin does.

5      Q.    Do you have those keys?

6      A.    No, I do not.

7      Q.    So do you have access to the inside of

8   this container?

9      A.    No, I do not.

10      Q.    Where are the keys kept?

11      A.    I do not know.

12      Q.    Is Darin the only person who has access

13   to those keys?

14      A.    Yes.

15      Q.    Is he the only one who knows where the

16   keys are?

17      A.    Yes.

18            MR. SIGALE:  Objection as to

19   speculation, but you answered it.

20            THE WITNESS:  Sorry.

21   BY MR. WENZLOFF:

22      Q.    Okay.  I'm going to show you a different

23   picture.  I'm showing you another photograph.

24   This is marked as Exhibit 9.  Ms. Miller, do you

25   recognize this?  What's in this picture?



1      A.     Yes.

2      Q.     What is that?

3      A.     That's the gun safe.

4      Q.     And what's inside there?

5      A.     Guns.

6      Q.     Anything else?

7      A.     My wedding ring, money, titles to our

8   vehicles, whatnot.

9      Q.     And do you remember when you got this

10   container?

11      A.     We've had it for quite some time.

12   I can't recall.  We got it at Walmart, I believe.

13      Q.     And I assume it's locked, but I'll ask;

14   is it locked?

15      A.     Yes, sir.

16      Q.     And tell me how you operate this gun

17   safe.  How does it work?

18      A.     There's a key there on the left middle

19   side that you insert and turn.

20      Q.     Then you open the door?

21      A.     Yes.

22      Q.     And you, I think, answered this at least

23   in part before, but who has access to this gun

24   safe?

25      A.     Darin has the key.  I have mine put up.



1    Q.    And are you the only two that have keys
2  to this gun safe?
3    A.    Yes, sir.
4    Q.    Where does Darin keep his key?
5    A.    I'm not sure.  You'd have to ask him.
6    Q.    Does he store it in the house or on his
7  person?
8         MR. SIGALE:  Objection as to speculation
9  and foundation.  Jennifer, you can go ahead and
10  answer if you can.
11         THE WITNESS:  I can't answer.  I'm
12  unsure.  I don't know.
13  BY MR. WENZLOFF:
14    Q.    And do your children or anyone else have
15  access to your key?
16    A.    No.
17    Q.    No one else but you knows where your key
18  is?
19    A.    Right.
20    Q.    Does Darin know where your key is?
21    A.    No.
22    Q.    Okay.  Let me show you a different
23  picture.  I am now showing you what's been marked
24  as Exhibit 11.  I'll zoom out a little bit more so
25  you can see it.  This is a photograph.



1   Ms. Miller, can you tell me what this photograph

2   shows?

3        A.   I believe it's in his vehicle.

4        Q.   I'm sorry.  Whose vehicle?

5        A.   Darin's.  His truck.

6        Q.   And what is that?

7        A.   His safe.

8        Q.   It's a safe that's in his truck?

9        A.   Uh-huh.  Yes.  Sorry.

10       Q.   And what's in the safe?

11       A.   He stores his handgun, I believe.

12       Q.   He stores his handgun.  Does he store

13   other things?

14            MR. SIGALE:  Objection to foundation,

15   speculation.  But if you know, Jennifer, you can

16   answer.

17            THE WITNESS:  I know at some point in

18   time my gun has been in there.  As of right this

19   second I couldn't tell you if my gun was in there

20   or not.

21   BY MR. WENZLOFF:

22       Q.   By your gun, you mean your Glock pistol,

23   right?

24       A.   The purple one, yes.

25       Q.   I'm sorry.  I called it light gray



1  earlier.

2      A.    Purple.

3      Q.    My apologies.  It's hard to tell in

4  photographs at times.  Do you know where your

5  Glock pistol is now?

6      A.    Not as we speak, no.

7      Q.    And who has access to this safe that's

8  pictured in this photograph?

9      A.    Who has access to this?

10     Q.    Yeah.

11     A.    My husband does.  I don't even know the

12  pass code on it.

13     Q.    It requires a pass code?

14     A.    I think it's a finger, digital.

15     Q.    Tell me how it works.  What I see, I see

16  something that looks like a key.  Tell me how it

17  works.

18     A.    I believe it's a key.  But you have to

19  push on it to pop it open.

20     Q.    And is there anything besides a key

21  required?

22     A.    I don't think so.  I don't believe so.

23  I don't operate it, so.

24     Q.    So you don't have access to this safe?

25     A.    No.



JENNIFER J. MILLER                    October 23, 2020
MILLER vs SMITH                                     121

1        Q.    If there is a key do you know where the
2    key is?
3        A.    I do not.
4        Q.    Does Darin have the key?
5        A.    I'm sure he does.  I assume so.
6        Q.    Do you know where he keeps the key?
7        A.    No, I do not.
8        Q.    So if your Glock pistol was in the safe
9    you wouldn't have access to it?
10        A.    Nope.  Right at this moment with having
11    a foster child and daycare, I want it that way.
12    I've chosen that way.
13        Q.    Okay.  I think there might be one more.
14    Yeah.  I'm going to show you another picture here.
15    This is Exhibit 10.  Let me zoom out a little bit
16    more again.  Can you describe for me what is in
17    this photograph?
18        A.    No.
19        Q.    I'm sorry.  You don't know?
20        A.    Huh-uh.
21        Q.    You don't recognize this photograph at
22    all?
23        A.    No.  I assume it's in his truck.  It
24    looks like his truck.  Like I said, I do not go in
25    his truck.  His truck is his truck, my car is my



1  | car.

2  |     Q.    Okay.  So you don't -- you think this

3  | might be some kind of container in his truck, but

4  | you don't know anything about it, you're not sure

5  | anything about it at all?

6  |          MR. SIGALE:  Objection.

7  | Mischaracterizes what she said.

8  |          MR. WENZLOFF:  You can answer if you

9  | can.

10 |          THE WITNESS:  All I know is it looks

11 | like it's in his truck and it's a container,

12 | correct.

13 | BY MR. WENZLOFF:

14 |     Q.    You don't know what's in it?

15 |     A.    No, I sure don't.  Sorry.

16 |     Q.    And you don't know how to access the

17 | inside?

18 |     A.    No.

19 |     Q.    And you don't know if there's a key?

20 |     A.    No.

21 |     Q.    And if there is a key, you wouldn't know

22 | where it would be or is?

23 |     A.    Correct.

24 |     Q.    All right.  I'm going to turn to a new

25 | subject now.  Are you a member of the Illinois



1   State Rifle Association?

2        A.    I didn't know until my husband told me

3   the other day that we are.

4        Q.    So you are a member?

5        A.    I think it was in the midst of our

6   lawsuit that they gave us a lifetime membership,

7   if I'm not quoting it correctly.

8        Q.    So what do you know about the Illinois

9   State Rifle Association?

10       A.    Um, that it's a program that helps --

11  it's an association for members to exercise their

12  rights.  I don't get too much involved in it.

13  That's my husband's deal.

14       Q.    So when did you learn about the Illinois

15  State Rifle Association?

16       A.    I know of them, but I can't tell you ins

17  and outs of them.

18       Q.    When did you find out about them?

19       A.    A couple of years ago.

20       Q.    And do you know when you became a

21  member?

22       A.    I do not.  I think my husband has been

23  off and on throughout the years.

24       Q.    Did you ever apply to become a member?

25       A.    To my recollection I think it was --



1  they guaranteed us a lifetime membership.

2      Q.    Have you ever spoken to anybody at the

3  Illinois State Rifle Association?

4      A.    What do you -- can you -- what do you

5  mean?

6      Q.    Have you ever spoken to anybody who

7  works for or is with the Illinois State Rifle

8  Association?

9      A.    No.  My husband does all that stuff.

10      Q.    So when did you find out you were a

11  member?

12      A.    I don't recall when I did.  I know that

13  my husband mentioned that we were.  And we get

14  stuff in the mail that we are.  And I just hand it

15  over to him to deal with.

16      Q.    Have you ever read any of the things you

17  got in the mail from the Illinois State Rifle

18  Association?

19      A.    No.

20      Q.    Do you know why you became a member?

21      A.    It's my husband's deal.  I mean, as far

22  as -- no.  I don't know.  Sorry.

23      Q.    Did you want to become a member of the

24  Illinois State Rifle Association?

25      A.    I support my husband, yes.  I mean, it's



1  something we can do as a -- together what we do.

2      Q.    What do you do together with respect to

3  the Illinois State Rifle Association?

4      A.    It's a membership that you -- I don't

5  know how to answer that.  I'm sorry.

6      Q.    Well, what do you do with your husband

7  with the Illinois State Rifle Association?

8      A.    We pretty much don't do anything but get

9  stuff in the mail and he gets on the computer and

10  does stuff.  And he gets phone calls from them.

11  But I don't have any dealings with it.

12      Q.    Okay.  And were you a member before you

13  filed this lawsuit?

14      A.    I don't recall I was.

15      Q.    Did you and your husband join -- first

16  of all, did your husband join the Illinois State

17  Rifle Association?

18      A.    I think he's been off and on a member.

19      Q.    Is he currently a member?

20      A.    I believe so, yes.

21      Q.    And did you join because of this

22  lawsuit?

23      A.    Yes.

24      Q.    So if you hadn't filed this lawsuit

25  would you have become a member?



1     A.    I probably would have eventually, yes.

2   But at that time we weren't financially secure

3   or -- to do the family membership or whatever.

4     Q.    And so when you say you joined because

5   of this lawsuit, why did you join because of this

6   lawsuit?

7     A.    It was an incentive they gave out to us.

8     Q.    Well, how did they find out you filed a

9   lawsuit?

10    A.    I think my husband contacted them in

11  regards to their assistance of how we could find a

12  resolution for --

13    Q.    So -- sorry.

14    A.    I think it was my husband tried to call

15  everybody that he knew to contact to find a

16  resolution of how we could protect our rights and

17  run a business at the same time.

18    Q.    And so did you talk to somebody?  When

19  you said they contacted you because you filed the

20  lawsuit to offer you a membership as an incentive,

21  did anybody from the Illinois State Rifle

22  Association speak with you directly?

23    A.    Me personally, no.  My husband they did,

24  yes.

25    Q.    And do you pay money to be members?



1       A.    I don't know what my husband pays on

2   that.  He has access to the checking account, as

3   well as I do.  So I don't know.

4       Q.    Have you ever wrote a check?

5       A.    I didn't.

6       Q.    To the Illinois State Rifle Association?

7       A.    I haven't personally, no.

8       Q.    And you've never sent in money or gave

9   them your credit card or anything like that to pay

10  money to the Illinois State Rifle Association,

11  have you?

12      A.    I have not.

13      Q.    Have you ever attended a meeting of the

14  Illinois State Rifle Association?

15      A.    I have not, no.

16      Q.    Do you know any other members of the

17  Illinois State Rifle Association other than your

18  husband?

19      A.    No.

20      Q.    Have you ever talked to anybody at the

21  Illinois State Rifle Association about this

22  lawsuit?

23      A.    I have not, no.

24      Q.    Have you ever voted in any election held

25  by the Illinois State Rifle Association for their



1   board or other aspects of the organization?

2        A.    I have not, no.

3        Q.    Have you ever provided any kind of input

4   to the Illinois State Rifle Association about how

5   they -- their mission?

6        A.    I have not, no.

7        Q.    What is your understanding of the

8   Illinois State Rifle Association's involvement

9   with your lawsuit?

10       A.    My understanding is my husband reached

11  out to them for assistance of how to, again,

12  resolve this issue of our rights and running a

13  business.  Sorry.  I hear background noise in the

14  other room.  I apologize.

15       Q.    I've got background noise going on too.

16  My one-year-old is sometimes noisy.  Such is life.

17            So do you know what the Illinois State

18  Rifle Association's decision is on how this

19  lawsuit should turn out?  Do you know what they're

20  seeking in the lawsuit?

21            Actually, let me back up.  Do you know

22  that the Illinois State Rifle Association is also

23  a plaintiff in your lawsuit?

24       A.    Yes.

25       Q.    Okay.  And do you know what they are



1   seeking as a remedy for filing this suit?

2       A.    The remedy is, for my understanding, is

3   for everybody to abide by the state law in regards

4   to when the state became concealed carry.

5       Q.    So it's your understanding -- well, do

6   you share the same goals as the Illinois State

7   Rifle Association in this lawsuit?

8       A.    I do.

9       Q.    And again, what are those goals?

10      A.    As far as for our right to be able to

11  protect ourselves and for concealed carry people

12  to have the rights by the law that was written

13  when concealed carry came into the effect of the

14  State of Illinois.

15      Q.    And you said before you have never

16  spoken to anybody at the Illinois State Rifle

17  Association about this lawsuit or otherwise,

18  you've never attended a meeting, you don't know

19  any other members other than your husband, you've

20  never spoken to them about this lawsuit, you've

21  never voted in any election held by the Illinois

22  State Rifle Association, and you only found out

23  you became a member fairly recently.  Is that all

24  accurate?

25      A.    Correct.



1       Q.     So how do you know that you share the
2   same goals as the Illinois State Rifle
3   Association?
4       A.     My husband and I have had conversations.
5       Q.     And he told you what their goals are?
6       A.     Yes.  For the most part, yes.
7       Q.     What do you mean for the most part?
8       A.     Well, I mean when you and your wife
9   talk, you talk and get interrupted by children and
10  whatnot.  And you may not get it all told per se.
11      Q.     I hear you.  Yeah.  So everything you
12  know about the Illinois State Rifle Association is
13  from what your husband has told you?
14      A.     Correct.
15      Q.     Okay.  Are you a member of Illinois
16  Carry?
17      A.     I think we are, yes.
18      Q.     What is Illinois Carry?
19      A.     Again, that's my husband's deal.  He
20  deals with all that.  Memberships and everything.
21  He indulges in all that.  I think he, again,
22  contacted them in regards to the upcoming -- this
23  situation we're in, concealed carry laws and DCFS
24  and everything.  He was trying to find a
25  resolution and I think they were one that he had



1   contacted.

2        Q.    Sorry.  I have another question about

3   the Illinois State Rifle Association.  I may have

4   asked this before, but did you want to be a member

5   of the Illinois State Rifle Association?

6              MR. SIGALE:  It was asked and answered.

7   So I will object.  But you can answer, Jennifer.

8              THE WITNESS:  I said yes, to support my

9   husband.  It's a good program, of my

10  understanding.

11  BY MR. WENZLOFF:

12       Q.    I see.  And did you ever ask to be a

13  member of the Illinois State Rifle Association?

14       A.    I don't believe so.

15       Q.    So I understand fully, would you say --

16  is it fair to say that you and your husband both

17  asked to be a member of the Illinois State Rifle

18  Association?

19       A.    My husband did for both of us,

20  I believe, yes.

21       Q.    I see.  Okay.  Back to Illinois Carry.

22  Are you familiar with the goals of Illinois Carry?

23       A.    Sadly, I am not.  I'm sorry.

24       Q.    I understand.  I'm looking for truthful

25  answers and so I appreciate that.  Have you ever



1  contacted anybody at Illinois Carry about being a

2  member?

3      A.    No.

4      Q.    Did you ever ask to be a member of

5  Illinois Carry?

6      A.    No.  Like I said, I think my husband had

7  involvement in that.

8      Q.    Have you ever met anybody in Illinois

9  Carry?

10     A.    Not for me personally.

11     Q.    Do you have a user name for the Illinois

12 Carry website?

13     A.    If I do my husband created it.

14     Q.    I see.  You didn't create it yourself?

15     A.    No.

16     Q.    So you don't know what it is if you have

17 one?

18     A.    No.

19     Q.    Do you know if he used your name to be a

20 member of Illinois Carry?

21     A.    I do not know.

22     Q.    Do you know if Illinois Carry has

23 meetings?

24     A.    I'm sure they do.

25     Q.    Have you ever been to one?



1      A.    I have not.

2      Q.    Do you know any other members of

3  Illinois Carry besides your husband?

4      A.    No.  I live a sheltered life.

5      Q.    Have you ever had an opportunity to vote

6  on any Illinois Carry election for any purpose?

7      A.    No, I have not.

8      Q.    Do you know if Illinois Carry is a

9  membership organization?

10      A.    I'm sure it is.

11      Q.    Do you know if they have a board of

12  directors?

13      A.    Every organization does, so I assume so.

14      Q.    Do you receive any communications from

15  Illinois Carry?

16      A.    I know my husband has.

17      Q.    And how does he receive those

18  communications?

19      A.    I think he's had phone calls and then

20  some mail.

21      Q.    They sent mail to your husband?

22      A.    Yeah.  In his name and my name, and

23  I just give it to him because he knows all the ins

24  and outs of it.

25      Q.    So you remember seeing letters from



1  Illinois Carry?

2       A.    Absolutely, yes.

3       Q.    And then you just pass those on to your

4  husband?

5       A.    Yes.  Yes.

6       Q.    And you remember him having phone calls

7  with somebody at Illinois Carry?

8       A.    I have not, no.

9       Q.    I know you haven't.  You said you

10  haven't.  I think you said you recall your husband

11  having telephone conversations with somebody at

12  Illinois Carry; is that right?

13      A.    Yeah.  He's talked to a lot of people,

14  yes.

15      Q.    Do you know who he talks to at Illinois

16  Carry?

17      A.    No, I sure don't.

18      Q.    Do you recall how many times, maybe,

19  he's talked to somebody at Illinois Carry on the

20  phone?

21      A.    No.

22      Q.    Do you remember how much mail you might

23  have gotten from Illinois Carry?

24      A.    I know we've gotten a couple of pieces

25  of mail.



1    Q.    Okay.  And do you know how you became a
2  member of Illinois Carry?
3    A.    No, I do not.
4    Q.    Do you know if you have to renew your
5  membership periodically?
6    A.    No.  My husband deals with all that.
7    Q.    I see.  So do you know if you're still a
8  member?
9    A.    As far as I know we are, yes.
10    Q.    Okay.  Do you know what Illinois Carry's
11  involvement is in this lawsuit?
12    A.    No, I do not.
13    Q.    Do you know whether they're involved in
14  this lawsuit at all?
15    A.    Yes.  I know they are involved, but I
16  don't know to what extent.
17    Q.    Do you know -- well, what can you tell
18  me about their involvement?  As much as you know.
19  What can you tell me?
20    A.    All I know is they are involved.  My
21  husband has contacted them and they have joined
22  forces, and -- for lack of a better word, I'm
23  sorry, I don't mean it to sound intimidating --
24  but to reach the common goal of improving state
25  law regulations.



1    Q.    I see.  Okay.  Do you know if there are

2   other Illinois Carry members who are daycare home

3   operators?

4    A.    I don't know.  I don't know if they are

5   members or not.  But since the lawsuit I have had

6   people reach out to us that are daycare providers

7   and wanting us to keep them informed of how the

8   lawsuit is going and whatnot.

9    Q.    People have reached out to you who have

10  heard about the lawsuit?

11   A.    Yes.

12   Q.    How many people have reached out to you?

13   A.    I know one in particular for myself has

14  reached out.

15   Q.    What's that person's name?

16   A.    Excuse me while I look it up.  It's

17  storming and raining, oh, my goodness.  He lives

18  up north past Decatur.  I think Clinton,

19  I believe.  I can't think of his name right off

20  the top of my head.  I haven't touched base with

21  him in quite some time.

22   Q.    And this person's name is Clinton?

23   A.    No.  He lives in Clinton.  It's like

24  Liburt, the last name, or something like that.  It

25  starts with L-i-b something.



1      Q.    And have you spoken with this person on

2   the phone?

3      A.    Through Facebook Messenger.  He found me

4   on Facebook Messenger.  Which is kind of scary.

5      Q.    He contacted you through Facebook?

6      A.    Correct.

7      Q.    What did he ask about?

8      A.    He just asked what the status was and

9   that if he needed to be involved he was willing to

10  share whatever.  And he was telling me how his

11  wife wasn't able to get licensed with the

12  concealed carry.  They weren't licensing her

13  daycare license because of the guns and

14  everything.

15     Q.    I see.  And were there any others who

16  contacted you about this lawsuit?

17     A.    Not for me personally, no.

18     Q.    So just this Mr. Liburt from Clinton?

19     A.    I think it's Liburt.  I'm sorry if it's

20  not.  Don't hold me to that one.

21     Q.    I understand.  Have any other people

22  contacted you who are foster caregivers who are

23  interested in your lawsuit or want to know about

24  it?

25     A.    I have a friend that is a daycare



JENNIFER J. MILLER                          October 23, 2020
MILLER vs SMITH                                          138

 1 | provider, but not foster, that she's curious too
 2 | because she's in the same situation.  They have
 3 | had their guns off the premises and everything.
 4 |     Q.    What's your friend's name?
 5 |     A.    Her first name is Christy.
 6 |     Q.    And how do you know her?
 7 |     A.    It's a small town.  I know people.  Her
 8 | sister and I went to school together, graduated
 9 | together.
10 |     Q.    So she also lives in Shelbyville?
11 |     A.    Yes.
12 |     Q.    And she runs a daycare?
13 |     A.    Yes.  Yes.
14 |     Q.    She's talked to you once or twice?  Or
15 | how many times has she talked to you about this
16 | lawsuit?
17 |     A.    We talk to her -- we talk all the time
18 | as daycare professionals and acquaintances.  And
19 | occasionally it will be brought up.  Maybe a
20 | handful of times.
21 |     Q.    And she's concerned that she isn't able
22 | to -- what is it that she can't do?
23 |     A.    She was not a licensed daycare provider
24 | and she got shut down.  And she -- her husband
25 | didn't want her to get a license because of what



1  we're having to go through and what we're having

2  to do as far as the guns being removed and

3  everything.  And her husband finally caved and

4  allowed her -- conceded and moved his guns and

5  stuff and allowed her to become a daycare

6  provider.

7      Q.    I see.  By removing his guns and stuff,

8  you mean removed his handguns from their home?

9      A.    Absolutely, yes.

10     Q.    Do they still have long guns in their

11 home?

12     A.    I don't know.  They're hunters, so.

13     Q.    Sure.  Do you know what Illinois Carry's

14 goals are in this lawsuit?  In your lawsuit?

15     A.    My understanding is it's the goal to get

16 the department to go by the state laws of the

17 state of Illinois when concealed carry came into

18 effect.

19     Q.    Okay.  Do you share their goals?

20     A.    I do.

21     Q.    And again, you know about their goals

22 because your husband told you what they are; is

23 that right?

24     A.    Correct.

25     Q.    You've never spoken to anybody at



1  Illinois Carry about it, right?

2      A.    No, sir.

3      Q.    Okay.  Are you a member of the Second

4  Amendment Foundation?

5      A.    My husband tells me I am, yes.

6      Q.    I'm sure the answers are very similar

7  and that's fine, but I have to ask.  What is the

8  Second Amendment Foundation?

9      A.    I am -- the Second Amendment Foundation,

10  the right to bear arms, the whole constitution.

11  Self-explanatory in my opinion.  I know you have

12  to ask.

13      Q.    But what's the organization?  Do you

14  know where they're located?

15      A.    I do not.

16      Q.    When did you find out about the Second

17  Amendment Foundation?

18      A.    My husband has told me about it.  We've

19  talked about them periodically and it's been a

20  conversation even before this lawsuit.

21      Q.    What did you talk to your husband about

22  the Second Amendment Foundation?

23      A.    Well, he wanted to become -- be a member

24  and everything like that.  And how they're a good

25  organization, and just, again, at that time our



1  finances weren't the best so we couldn't join

2  every organization we wanted to.

3      Q.    So do you know when you joined?

4      A.    I do not, no.  I'm sorry.  My husband --

5      Q.    Do you know how --

6            MR. SIGALE:  I didn't hear the last

7  question.

8            MR. WENZLOFF:  I said do you know how

9  you joined?

10           THE WITNESS:  My husband deals with all

11 that.

12 BY MR. WENZLOFF:

13     Q.    Do you know if you had to pay a

14 membership fee or dues to join?

15     A.    If he did I did not know about it.

16     Q.    Do you know if you're a member or just

17 Darin is a member or both of you are members?

18     A.    I'm unsure.

19     Q.    I'm sure what?

20     A.    I'm unsure.  Unsure.  Sorry.

21     Q.    Okay.  Have you ever talked to anybody

22 at the Second Amendment Foundation?

23     A.    I have not.

24     Q.    Do you know if you renewed your

25 membership with the Second Amendment Foundation?



1      A.    No, I have not -- I don't know.  My

2   husband has all them dates I think written down

3   and everything.  He knows the ins and outs.

4      Q.    So you're not sure today whether you are

5   a member of the Second Amendment Foundation?

6      A.    He said a couple of days ago we were.

7   So I assume we still are.  I mean, he would have

8   brought it to my attention if we weren't, I'm

9   sure.

10     Q.    Do you get mail from the Second

11  Amendment Foundation?

12     A.    I think we have.  I think we have.  Like

13  I said, I hand it straight over to him even though

14  it's got my name on it.

15     Q.    Do you know how much mail you get from

16  the Second Amendment Foundation?

17     A.    We've gotten two or three pieces of

18  mail.  Just so you know, it's storming really bad

19  here.  So just a forewarning if we cut out.

20     Q.    If you drop off we'll wait until you get

21  back on.

22     A.    Okay.

23     Q.    Do you know if the Second Amendment

24  Foundation has any meetings?

25     A.    I assume they do.



1        Q.    I'm guessing you have never attended a

2    meeting of the Second Amendment Foundation?

3        A.    No.

4        Q.    Do you know any other members besides

5    your husband?

6        A.    I do not.

7        Q.    Have you ever talked to another member?

8        A.    Not that I'm aware of.  I talk to a lot

9    of people.  But I don't go around asking them --

10   they might be and I don't even know it.

11       Q.    Sure.  Have you ever voted in a Second

12   Amendment Foundation election?

13       A.    No.

14       Q.    Have you ever provided any input to the

15   Second Amendment Foundation about their mission?

16       A.    I have not, no.

17       Q.    Do you know if other members of the

18   Second Amendment Foundation have daycare homes in

19   Illinois?

20       A.    I don't know of anybody else so I

21   couldn't answer that.  I'm sorry.

22       Q.    Sure.  What's your understanding of the

23   Second Amendment Foundation's involvement in this

24   lawsuit?

25       A.    The same aspect of Second Amendment



1    rights.  Right to bear arms and for everybody to

2    abide by the state laws and regulations as it

3    pertains to when concealed carry came into effect.

4        Q.    And you learned about those goals from

5    your husband?

6        A.    Yes.

7        Q.    And so basically what your husband has

8    told you, you agree with those same goals?

9        A.    Yes.  Yes.

10       Q.    If it turned out that they had different

11   goals than what you just described, do you think

12   it would affect your opinion of their involvement

13   in this lawsuit?

14       A.    That's a wide range of speculation.

15   I would have to be presented with the issue to be

16   able to decide that.

17       Q.    Sure.  I understand.

18            MR. WENZLOFF:  It's about 1:30.  I think

19   we might want to take a ten-minute break, if

20   that's all right?

21            THE WITNESS:  Okay.

22            MR. SIGALE:  That's fine.

23            MR. WENZLOFF:  Come back at 1:40.

24            (A break was taken from 1:30 to

25        1:40 P.M., and the deposition continued as



JENNIFER J. MILLER                                          October 23, 2020
MILLER vs SMITH                                                         145

```
 1      follows:)
 2             MR. WENZLOFF:  Okay.  We're back from
 3    the break.
 4             THE WITNESS:  Can you hear me?  I'm so
 5    sorry.  There's a lot going on.
 6             MR. WENZLOFF:  I understand.  Do you
 7    feel it would be dangerous --
 8             Go off the record.
 9             (Whereupon discussion was held off the
10       record.)
11             THE WITNESS:  Sorry.  He's getting
12    tired.
13             MR. WENZLOFF:  Let's go back on the
14    record.
15    BY MR. WENZLOFF:
16        Q.    Are you ready, Ms. Miller?
17        A.    Yes.
18        Q.    As always, if you have things you need,
19    let us know, we'll take the time you need to take.
20    Okay?
21        A.    All right.
22        Q.    I will ask the question again.  Do you
23    believe that guns can be dangerous?
24        A.    Yes.
25        Q.    And can you explain to me why guns are
```



1   dangerous?

2       A.      I think education is key.  If you're not

3   educated they can be dangerous.  They are

4   dangerous in the wrong hands of people that use

5   them inappropriately.

6       Q.      So if guns are handled improperly they

7   can be dangerous, right?

8       A.      Correct.

9       Q.      If guns are handled by somebody that

10  doesn't know how to use them, they can also be

11  dangerous, right?

12      A.      Absolutely.

13      Q.      And if guns are accessed by people who

14  want to use the gun for something that it

15  shouldn't be used for, they can also cause

16  injuries that -- other tragic outcomes, right?

17      A.      Yes.

18      Q.      You're aware that suicide is a major

19  risk related to guns, right?

20      A.      I didn't know the statistics.

21      Q.      Well, I'm not asking you the statistics.

22  Were you aware that suicide can result from

23  firearms?  Right?

24      A.      Correct, yes.

25      Q.      So tell me, what are some of the risks



1  of guns if they are handled improperly or accessed

2  by unauthorized people?

3        MR. SIGALE:  Object as to foundation and

4  speculation.  But to the extent you can answer,

5  Jennifer, go ahead.

6        THE WITNESS:  I think the way a person,

7  again, is uneducated and uninformed and like

8  I expressed before, I was raised in a quite

9  different scenario of being educated and the gun

10 was represented as not the problem, it was the

11 people behind the gun.

12 BY MR. WENZLOFF:

13    Q.    But is it also the case that sometimes

14 people who have been trained to use guns can also

15 use those guns inappropriately?

16    A.    Absolutely.

17        MR. SIGALE:  I object.  Foundation,

18 speculation.  Jennifer, I don't know if you can

19 answer, but you can answer if you can.

20        THE WITNESS:  If the situation arose,

21 yes.

22 BY MR. WENZLOFF:

23    Q.    And in fact, you testified earlier today

24 about your own childhood, where you've had some

25 traumatic experiences with police officers



 1 | brandishing firearms in your presence and that
 2 | trauma has lasted with you today, right?
 3 |     A.    Correct.
 4 |     Q.    And those police officers receive
 5 | training related to firearms, right?
 6 |     A.    Correct.
 7 |     Q.    What makes a firearm owner a responsible
 8 | gun owner?
 9 |           MR. SIGALE:  Object as to form of the
10 | question.  But if you can answer, Jennifer, go
11 | ahead.
12 |           THE WITNESS:  As far as for myself,
13 | education, training, and being open in discussions
14 | with the whole scenario and being as safe as
15 | possible as we can.
16 | BY MR. WENZLOFF:
17 |     Q.    Do you think that is true for anyone who
18 | becomes a gun owner?
19 |           MR. SIGALE:  Objection.  Foundation,
20 | speculation.  To the extent you can answer,
21 | Jennifer, you can answer.
22 |           THE WITNESS:  That would be for them to
23 | say, but for myself, yes.
24 | BY MR. WENZLOFF:
25 |     Q.    Well, what are some steps that a



1   responsible gun owner can take to ensure that

2   their guns aren't mishandled or used in dangerous

3   ways?

4       A.    I think --

5           MR. SIGALE:  Object as to form of the

6   question and speculation.  Jennifer, if you can

7   answer, go ahead and answer.

8           THE WITNESS:  I think collaboratively

9   people probably would have to come up with the

10  idea.  But I'm all the time, education is key.

11  And training.

12  BY MR. WENZLOFF:

13      Q.    Well, so earlier you testified that you

14  don't keep your firearms in your home outside of a

15  locked container, right?

16      A.    Correct.

17      Q.    Do you do that because you feel that

18  doing so would be a safety risk for the children

19  in your home?

20      A.    I don't know if it's a safety risk, but

21  I don't ever want to hold my family liable for

22  something that can -- we have to take every

23  precaution.

24      Q.    I see.  So it's a precautionary step

25  that you take?



1        A.     Yes.

2        Q.     To store your guns locked in a locked

3    safe?

4        A.     Yes.

5        Q.     And are there other basic safety rules

6    that you follow to keep you and your family safe

7    from guns?

8        A.     I know for myself, I know you don't know

9    the layout of my home, but the way the guns are

10   stored is in the back bedroom, our bedroom.  It's

11   in the back, way back of the house.  And so I have

12   a baby gate and I know they can knock it down

13   because they have before, but it can slow them

14   down.  We also have the door locked and the gun

15   safe locked.  So we try as much as possible to cut

16   every, lack of a better word, escape for them to

17   get into danger.  Because the daycare, as you can

18   hear, is in the front of the house.  So.

19       Q.     And when you say them, you're talking

20   about the kids?

21       A.     Absolutely.

22       Q.     So you've set up multiple barriers

23   between the children in your home that you care

24   for and the guns that you store in your home,

25   right?



1        A.      Absolutely.

2        Q.      So I heard there was a baby gate, a

3   locked door, a locked safe, right?

4        A.      Correct.

5        Q.      So each of those things is one more

6   barrier that prevents unauthorized access to those

7   guns by the children, right?

8        A.      Correct.  Thanks for the better word.

9   I couldn't think of it earlier.

10       Q.      So would you agree that reducing access

11  to firearms by the children, reducing the

12  children's access to firearms increases safety?

13       A.      I could agree with that, yes.

14       Q.      Do you believe that children can handle

15  a gun without supervision?

16       A.      Kids at what age?

17       Q.      Well, I guess I ask that to you.  Do you

18  think there is an age where children, and by

19  children I mean really individuals who are not yet

20  18 years old.  Is there an age where a child could

21  handle a gun without supervision?

22       A.      To generalize it, you may know as well

23  as I do, every child develops maturity-wise

24  differently, so that would be an open-ended

25  question.  But I will say when we were growing up



1   in school it was not uncommon to have the shotgun

2   hanging in the back window of the Ford pickup

3   truck.  And then after school the guys would go

4   hunting and whatnot.  And nowadays you absolutely

5   can't have a firearm.  So if they were, again,

6   taught and explained and maturity, I mean, we have

7   a whole bunch of factors in to answering that.

8        Q.    I see.  So it sounds like what you're

9   saying is different households with children are

10  different.  So there's no set age in which it's

11  clear that the child could use a gun unsupervised

12  or be around a gun unsupervised, it depends on a

13  lot of factors; is that right?

14       A.    I would say so, yes.

15       Q.    So it might be that there is a

16  17-year-old child who shouldn't be given access to

17  a firearm without the owner or the responsible

18  adult owner or someone else supervising, right?

19       A.    Correct.

20            MR. SIGALE:  Object to speculation, but

21  she answered it.

22            MR. WENZLOFF:  I'm sorry.  Would you say

23  the answer again?

24            THE WITNESS:  I said -- sorry.  I said

25  yes.



1  BY MR. WENZLOFF:

2      Q.    Okay.

3      A.    There also is down here in our area,

4  rural area, there are 12 and 13-year-olds

5  responsible for a full size tractor and producing

6  crops.  I mean, it just depends on how they were

7  raised and everything, in my opinion.

8      Q.    I understand.  When did you become --

9  I think you answered this at the beginning, but

10 I'll cover some of the same terrain and try to

11 move fast -- when did you become a licensed

12 daycare home operator?

13     A.    It was April 6 of 2015, I believe.

14     Q.    Did you have any licenses before

15 April of 2017?

16     A.    As far as daycare, no.

17         MR. SIGALE:  Just -- didn't get a

18 chance, but you said '17 and I think she said '15.

19         MR. WENZLOFF:  I'm sorry.  You said you

20 got your daycare home license in April 2015; is

21 that right?

22         THE WITNESS:  Yes.  Sorry.

23 BY MR. WENZLOFF:

24     Q.    Thank you for that clarification.  So

25 did you ever have a daycare home license before



1  April of 2015?

2       A.    No, sir.

3       Q.    Have you ever been licensed in any other

4  state other than Illinois?

5       A.    No, sir.

6       Q.    And this is -- it was your choice to

7  obtain a daycare home license, right?

8       A.    I was an unlicensed daycare provider and

9  then had to be licensed, yes.  So to answer that

10  question, yes.

11       Q.    So in order to operate the business you

12  have to maintain a daycare home the way you want

13  to maintain it in your house, you need a license;

14  is that right?

15       A.    Let me explain.  I had the daycare in my

16  grandmother's home and for it to be a home daycare

17  it had to be in my home, my residence.  And that's

18  why they shut me down.  And I had to get licensed

19  in my home.

20       Q.    I see.  And you need that license to

21  operate your business?

22       A.    Yes, sir.

23       Q.    The choice to open up a daycare home,

24  was that your choice and only your choice or were

25  there other folks who wanted you to have a daycare



```
 1   home?

 2        A.     Everybody, all my friends said I should.

 3   And there was a much needed need for daycare in

 4   our town for people.  They said I'm good with kids

 5   and I have a background and why not.

 6        Q.     Sure.  Is there any reason why you

 7   decided to open up that kind of business, rather

 8   than go into teaching which you have education

 9   for, right?

10        A.     Yes.  There's a big number one reason

11   and that is money.  Income.  I make twice as much

12   as what I would as starting pay as -- and there

13   was not any openings at the time for teaching.

14        Q.     I see.  So you saw the daycare home

15   business as a better choice because you would earn

16   more money from that than a different career

17   choice?

18        A.     Correct.

19        Q.     I'm going to show you a picture as part

20   of this deposition.  Can you see what's on the

21   screen in front of you?

22        A.     Yes.

23        Q.     What is that?

24        A.     That's my daycare license.

25        Q.     And did you renew this license?
```



1    A.    Yes, I have.  But with COVID I have done

2   everything and turned in everything and done my

3   background and the agent -- they have renewed it,

4   yes.  With COVID it states I can only have ten

5   kids total.  I can go get it if you like to show

6   you the updated one.

7    Q.    So you have an updated certificate?

8    A.    Yes, sir.

9    Q.    And do you know when that one expires?

10    A.    In four years from that date.

11    Q.    And are there any other -- are there any

12   differences between the renewed license and this

13   one that you see in front of you?  Just to be

14   clear for the record, we're looking at Exhibit 12.

15    A.    Nothing other than the extended is

16   two -- I believe day is 8 and night is 4.

17   I believe.  And other than that because of the

18   COVID.

19    Q.    So those numbers you just said relate to

20   the capacity of -- in other words, the number of

21   children that you can have at your daycare home at

22   one time, right?

23    A.    Correct.

24    Q.    So can you explain this term to me

25   extended, day, night?  What does that all mean?



1      A.    Day is where you have, for instance,
2  like 8:00 to 3:00.  And extended is after school.
3  And then night is evening shift.  I'm open until
4  10:00 P.M.
5      Q.    I see.  So extended day is after school
6  from what?  3:00 'til?
7      A.    3:00 to 6:00.
8      Q.    So these numbers are the maximum number
9  of children you're able to have in your care, the
10  daycare home during those periods?
11      A.    School-age children, yes.  On the
12  extension.
13      Q.    School-age children meaning children who
14  are like 5 years old and up?
15      A.    Yes.
16      Q.    So are there limits on non-school-age
17  children in the daycare home?
18      A.    Yes.  It gets complicated.  During the
19  day I can have three under 2, 2 to 5, and then
20  three 5 and above throughout the day.  Or I can
21  have two babies under 2 1/2, four 2 1/2 to 5, and
22  two 5 and above throughout the day.
23      Q.    I see.  That does sound complicated.
24      A.    Or 18-year-old assistants and I can have
25  more kids.  It's just complicated.

1      Q.    And is the area used for the children

2    still the entire home, excluding the master

3    bedroom?  Or is it something different?

4      A.    No.  We use the entire home.  We use

5    both bathrooms for sure.  The laundry room.  And

6    my daughter's room is not used quite as much, but

7    it still is used.  And then the front room and

8    then the front bedroom.  And the kitchen, of

9    course.

10     Q.    Okay.  And right now during -- for your

11   business can you explain to me how many children

12   you have of each age during business -- during the

13   time you're running the daycare home?

14     A.    Right now I have a year and a half old

15   and two two-year-olds.  And then I have a

16   9-month-old that he's not here this week, thank

17   goodness, with this deposition.  And then off the

18   buses is where it gets crazy.  After school I have

19   five kids that get off the bus.  So and then

20   I have a newborn coming come December.

21     Q.    I see.  And do you have any children

22   that take advantage of the nighttime daycare

23   hours?

24     A.    I have two nieces and a nephew that do

25   the evening shift.  That's why I extended the



JENNIFER J. MILLER                                      October 23, 2020
MILLER vs SMITH                                                     159

 1   hours.  Because one of the nieces is the one
 2   I fostered.  So she's like a daughter to me.
 3        Q.    I see.  Okay.  Why don't you tell me,
 4   what are some of the responsibilities that you
 5   have in operating this daycare home?
 6        A.    I have to be disciplinarian, I have to
 7   be motherly, I have to be nutritionist, I have to
 8   be P.E. teacher, I have to be authoritarian at
 9   times.  I have to help with homework.  With COVID
10   we help everybody, have to do home schooling.  So
11   I explained to you that I use my teaching license.
12   And I don't know what all I said.  But I have to
13   be all that.
14        Q.    What are some of the safety requirements
15   that you have to follow in your daycare home?
16        A.    I have to be CPR and first aid
17   certified.  State requirement says as far as
18   nutrition, I have to make sure sizes, proportions
19   are cut up to designate for the child's age,
20   proportions-wise too.  As far as play, I have to
21   make sure the toys are appropriate and the
22   equipment is appropriate for the child's age.
23   Changing station, I have to make sure it's private
24   and secure.  Sanitary-wise, I have to wipe -- and
25   with COVID now, especially, it has to be wiped



1  down 3 to 4 times a day.  I have to be housekeeper

2  with that.  And linens have to be changed for each

3  child.  With COVID I have to change clothes every

4  time a child spits or slobbers or sneezes all over

5  me.  So a lot of rules and regulations.

6      Q.    And do you charge for these children you

7  care for?

8      A.    Yes.

9      Q.    What do you charge?

10     A.    State rate.  State rate for age 2 and

11  under is $33 a day.  And for 2 years of age is

12  $28 -- or $30 a day.  And for 3 and above is $28 a

13  day.  And that is five hours or more.  And under

14  five hours is $15 flat rate a day for all ages.

15  And then after school if it's just for a couple of

16  hours after school, I charge a $10 charge.

17     Q.    And from all the safety requirements you

18  listed, it sounds like there are many things that

19  you have to do in the daycare home that you

20  wouldn't necessarily do if you had no children in

21  your home; is that right?

22     A.    That's probably accurate, yes.

23     Q.    I mean, if you didn't have the daycare

24  home you could store all the hazardous cleaning

25  solutions that you have however you want.  Right?



1      A.    If I didn't have a foster child, yes.

2      Q.    Oh, right.  Well, let's say if you

3  didn't have a foster child in your home or the

4  daycare home, you could store things that are

5  hazardous however you please, right?

6      A.    You could.  But for me I've always done

7  what I'm doing now because I did have small

8  children of my own.

9      Q.    Right.  So you recognize that in having

10  children in your home from other families, you

11  made some changes to the way you might otherwise

12  store things or do things in your home to protect

13  their safety, right?

14      A.    Yes.

15      Q.    How many employees do you have?

16      A.    My husband helps.  He's a certified

17  assistant.  So he can man the fort and my daughter

18  is a helper too.

19      Q.    And are they always present during

20  daycare hours?

21      A.    My husband is two to three days a week.

22  He works outside the home.

23      Q.    So he's helping in the daycare, working

24  the daycare two or three full days each week?

25      A.    For the most part, yes.  Unless it's



1  hunting season.

2       Q.     And your daughter is also an employee at

3  the daycare?

4       A.     Yes.

5       Q.     And how often does she work?

6       A.     Every evening.  She gets out of school

7  at 2:00 and then she works until all the kids go

8  home.

9       Q.     So she works from 2:00 P.M. until when?

10      A.     Usually 'til 6:00.  It's mainly weekends

11  that we work late.  But if it's -- if there's a

12  day that she has homework, I let her have that.

13  Her schoolwork comes first.

14      Q.     I see.  So you run the daycare home

15  seven days a week?

16      A.     Yes, sir.

17      Q.     So there are all days children in your

18  home?

19      A.     Absolutely.

20      Q.     Almost all the time?

21      A.     Absolutely.

22      Q.     Other than, I guess, your foster child,

23  foster child lives there all the time, but there

24  are other children from other families in your

25  home from 7:00 A.M. until 6:00 P.M. or later every



1   day?

2        A.    Yes.

3        Q.    You must love children.

4        A.    Everybody thinks I'm crazy.

5        Q.    Have you ever had other employees

6   besides your husband and your daughter?

7        A.    No.

8        Q.    What are some of the things that

9   children do when they're at your daycare home?

10       A.    We pretty much, except for today, run it

11   like a preschool program.  We have a set schedule.

12   But we have circle time, we have meal time, we

13   have nap times.  Johnny on the spot will tell you

14   here, they know exactly what time within a

15   15-minute time-frame of everything.  But they are

16   definitely not too critical because I have had

17   many preschool teachers tell me that my kids are

18   well prepared for preschool.

19       Q.    What about the children after school?

20   Are they older children?

21       A.    Yeah.  I have a range between 5 years of

22   age to 9 years of age.

23       Q.    And what are things that they do?

24       A.    We, when they get off the bus they

25   usually have a snack and then we work on homework.



1      Q.    And do you ever have children who are

2   older than 9 years old in your home?

3      A.    No.

4      Q.    Is that your preference or you just

5   haven't had them?

6      A.    We just haven't had them.

7      Q.    So if there were somebody that wanted a

8   12-year-old to stay with you after school, you

9   would accept a 12-year-old in your program?

10     A.    I'm licensed up to 12, yes.

11     Q.    So 12 is the maximum that you can have?

12     A.    Legally in the State of Illinois they

13  can stay at home by themselves then, is the way

14  they look at it.

15     Q.    I see.  Thank you.  Are you always in

16  the presence of all of the children in your

17  daycare home?  Or are there times when you are not

18  physically near every single child?

19     A.    For the most part I am there.  I don't

20  know if you have the pleasure or not, but let's

21  say you have to go to the bathroom, all the

22  children go to the bathroom with you and party in

23  the bathroom while you go to the bathroom.  So

24  I would say 99 percent of the time the kids are

25  with you.



1      Q.    Is that also the case for the older
2  children too?
3      A.    No.  They don't party in the bathroom
4  with me.
5      Q.    So you might keep them separate from the
6  younger children and they might not be in your
7  eyesight at all times?
8      A.    Either my daughter or myself are helping
9  them with homework or outside playing with them or
10  whatever.
11      Q.    I see.  So if you're not watching over
12  all the children, you make sure that somebody else
13  is watching the children?
14      A.    Absolutely.
15      Q.    Do you ever provide any education or
16  training to any of the children in your care about
17  gun safety?
18      A.    No, I do not.
19      Q.    About gun storage?
20      A.    No, I do not.
21      Q.    Do you ever talk about guns at all?
22      A.    There's mention of, for instance, that
23  my dad went hunting today and got a deer, you
24  know.  Other than that, no.
25      Q.    Do the children in your home that you



1  care for know that there are guns in the home?

2      A.    I know a couple of the older ones do.

3  And being such a close knit community, the older

4  children are actually my husband's cousins.  So

5  hence, they already know.

6      Q.    So some of the older children know there

7  are guns in the house?

8      A.    Yes.

9      Q.    Do you know how old they are?

10      A.    How old the children are?  They are 5 --

11  no, they're 3, 6 and 9.

12      Q.    The 3-year old and 6-year-old --

13      A.    There's a 9-year-old too.

14      Q.    The 6 and 9-year-old both know there are

15  guns in the house?

16      A.    Yes.

17      Q.    Do they know where they are?

18      A.    No.

19      Q.    And again, the guns are stored in the

20  gun safe in your bedroom?

21      A.    Yes.

22      Q.    And is the gun safe always locked?

23      A.    Yes.

24      Q.    And what about the bedroom door?

25      A.    Always locked.



1    Q.    So while there are daycare home children

2    in the home the bedroom door is always locked?

3    A.    Absolutely.

4    Q.    Do you ever go in to the bedroom at the

5    time when there are children in the home?

6    A.    No, I do not.

7    Q.    Does your husband ever go in to the

8    bedroom?

9    A.    He sometimes is sleeping, yes.

10   Q.    So he might go into the bedroom during

11   daycare hours?

12   A.    But the door is always locked behind

13   him, yes.

14   Q.    He locks the door behind him so he's

15   locked in and the children are locked out?

16   A.    Correct.

17   Q.    Does your husband ever access the gun

18   safe during daycare home hours?

19   A.    Not that I'm aware of.

20   Q.    Did you go through any training to

21   become a daycare home operator?

22   A.    If you go by teaching degree, four years

23   of long schooling-wise, I baby-sat as a teenager.

24   Like I said, CPR, first aid, nutrition classes.

25   I had to get a food handler certification,



JENNIFER J. MILLER                          October 23, 2020
MILLER vs SMITH                                          168

1  background checks for every member of the

2  household.  We have to have 15 hours of PSR, we

3  have to have shaken baby.  There's a lot going

4  into it.

5       Q.    Did you finish your answer?

6       A.    I said we had to have a lot of testing.

7  We had to have the gas -- the ion gas tested and

8  everything too so.

9       Q.    Did your husband go through all of the

10 very same training you did?

11      A.    Yes.

12      Q.    And has your daughter gone through that

13 same training?

14      A.    CPR and first aid she doesn't until she

15 turns 18 and that will be in December.

16      Q.    And then she will go through both those

17 trainings?

18      A.    Yes, sir.

19      Q.    And all of that is necessary in order to

20 work in a daycare home?

21      A.    Yes, sir.

22      Q.    Did any of that training involve gun

23 safety?

24      A.    No.

25      Q.    Before you had your daycare home license



1    -- I'm sorry.  I'll start again.  Did you have to

2    change the way you stored your firearms when you

3    obtained your daycare home license?

4        A.    As far as where they were stored, no.

5    But what was stored, yes.  As far as the handguns

6    had to be removed from the home.

7        Q.    I see.  So before the license you had in

8    your household, you chose to store your firearms

9    in the gun safe locked, separate from ammunition,

10   unloaded, right?

11       A.    Correct.

12       Q.    And the handguns were stored also

13   unloaded in a locked safe separate from the

14   ammunition, right?

15       A.    Correct.

16       Q.    And then after you obtained the daycare

17   home license the one thing that changed in terms

18   of your firearm storage was you removed the

19   handguns from your home and no longer stored them

20   in your home at all, right?

21       A.    Correct.

22       Q.    But otherwise, nothing else changed in

23   terms of keeping your long guns in your home?

24       A.    No.

25       Q.    Did you have to make any other changes



1    to your home to comply with daycare home licensing

2    requirements?

3        A.    No.

4        Q.    Were there childproof locks that you had

5    to install in your kitchen area?

6        A.    We have outlet covers on every outlet

7    that's not being used.  We have cabinet locks, we

8    have stove locks, we have refrigerator locks.  We

9    have cabinet locks.  We don't have it on the

10   toilet yet.  Haven't had an issue with that.

11   Toilet locks, when you really have to go to the

12   bathroom you can't get that thing unlocked.

13       Q.    I guess I would have to agree with that.

14       A.    But we have locks on the front door and

15   the outside door, the garage door, the back door

16   and the front door.  Because the kids know how to

17   unlock so they won't escape.  So we have a clamp

18   on the handle.  And we have a clamp that you have

19   to flip up to where -- it's complicated, but it

20   works.  And we do it.  Kids are smart.

21       Q.    It sounds like it.  Without all of that

22   safety and equipment they might end up in harm's

23   way; is that right?

24       A.    Quite possibly, yes.

25       Q.    And did you install all of those locks



1   and other equipment you just described, was that

2   all installed in order to run the daycare home?

3       A.    And a foster, yes.

4       Q.    Are those things required by the

5   licensing departments for daycare homes and foster

6   homes?

7       A.    Outlet covers and cabinet locks are,

8   yes.

9       Q.    And the other things besides the cabinet

10  locks and, I'm sorry.  You just said two items

11  that you had to install for the licensing process.

12  What were those again?

13      A.    Outlet covers and cabinet locks.

14      Q.    And the other equipment that you have

15  installed, is that something you had just

16  installed because you felt it was a good thing to

17  do, but you weren't actually required to do those

18  things?

19      A.    Correct.

20      Q.    And did you have all of this equipment

21  installed when you were operating the unlicensed

22  daycare home?

23      A.    Yes.

24      Q.    Okay.  So you feel like all of these

25  things are important equipment to keep the kids



1   safe?

2       A.     Absolutely.

3       Q.     And would you say that the equipment

4   that's been installed creates some burdens on you

5   and your family, but you voluntarily take it on as

6   important safety equipment?

7       A.     Yes.

8       Q.     How long do you plan to continue

9   operating a daycare home?

10      A.     As long as my body will handle it.

11      Q.     I know you said before that for a period

12  of time you had an unlicensed daycare home.

13  Remind me again, when was that?

14      A.     It was right before I got licensed.

15      Q.     So --

16      A.     Latter part of 2014.

17      Q.     And why did you not have a license at

18  that time?

19      A.     Because I was under the child limit and

20  I was working out of my grandmother's -- my -- the

21  home I grew up in since my grandma passed away,

22  and to keep the business away from the home.

23  I could leave and go to work and come back.  And

24  it just -- it had to be a center and there was too

25  many requirements and things I had to adjust.



1  Outlets had to be so high and just had to

2  reconstruct the whole house.  It wasn't feasible,

3  for the spreadsheet of my accounting background,

4  it was not feasible for the outcome of it.  So we

5  just decided to do a home daycare then.

6      Q.   I see.  And did you know that you needed

7  a license?  Or no?

8      A.   If you're under so many kids you don't

9  have to.  But the criteria, it had to be in your

10  home.  Not in a home.  In your home.

11      Q.   And how -- is that something that

12  Department of Children and Family Services

13  notified you about?

14      A.   Oh, yeah.

15      Q.   For it to be in the home?

16      A.   Yes.

17      Q.   And how did that happen?

18      A.   They showed up at the door and shut me

19  down.

20      Q.   Oh.

21      A.   And gave me the paperwork to get

22  licensed in my home.

23      Q.   I see.  Do you know how they found out

24  to go to your home?

25      A.   No.



1    Q.    And when they showed up at the door they
2  said you can't operate here anymore?
3    A.    Correct.
4    Q.    And then did they help you get licensed
5  in your home?
6    A.    Yes.
7    Q.    I see.  And if you had the opportunity
8  to move the daycare home into a daycare center
9  outside the home, would you do that?
10    A.    It was something I thought about.  But
11  actually, all my parents do not want me to.  They
12  like the home environment.
13    Q.    I see.  What would your preference be?
14    A.    I'm on the fence.  I like the home
15  environment, being home and being able to throw a
16  load of laundry in, throw stuff in the crock-pot
17  ready for supper.  If you weren't working from
18  home you couldn't do that, you'd have to do it in
19  the morning and evening.  Yet it is sometimes hard
20  having your business in your home.
21    Q.    And there are certain requirements
22  related to having it in your home you have to live
23  with, right?
24    A.    Correct.
25    Q.    If you had the daycare outside of your



1  home you wouldn't have to follow those kinds of

2  rules in your home, right?

3      A.    Correct.  It's just -- but it's just not

4  feasible here to have a center with the type of

5  building -- you would have to construct a building

6  and the finances to the facility of how many it

7  can hold and everything else.  We've tried to get

8  a group of us together to open up a center and

9  it's just unfeasible thing for us, unfortunately,

10 to do.

11     Q.    When you say us, are you talking about

12 you and your husband or you and others?

13     A.    Other daycare providers.  A couple of

14 other daycare providers and I have talked and

15 tossed the idea around and checked into things and

16 how much things would cost to do and everything.

17 And the employees that we would have to hire and

18 the pay and the insurance and the building

19 payments and everything, it just was not feasible

20 for us.  In what we're making now.

21     Q.    Even with the costs you have in your

22 home?

23     A.    What we're making now.  And we wouldn't

24 have all the headache of running the center and

25 doing payroll and all that rigamarole.



JENNIFER J. MILLER                                October 23, 2020
MILLER vs SMITH                                                  176

1      Q.    I see.  Have you ever considered working
2  at an established daycare center with the skills
3  you have and training you've gone through, rather
4  than running it through your home?
5      A.    That is not feasible here either.
6  Because the nearest daycare center is probably 45
7  minutes away.
8      Q.    Wow.
9      A.    We're very rural around here.
10      Q.    So you've chosen to accept that there
11  are certain things you can't do in your own home
12  and still have a daycare, but financially it makes
13  more sense for you to run that at home; is that
14  right?
15      A.    Yes.  Correct.
16      Q.    And when did you become a licensed
17  foster caregiver?
18      A.    July of 2015, I believe.
19      Q.    July of 2015?
20      A.    I'm thinking.  She's five years old.
21  Yes.
22      Q.    Have you ever had a foster care license
23  in a different state?
24      A.    No.
25      Q.    Let me see if I can show you another



1  picture.  Bear with me.  Can you see a picture on

2  your screen?

3       A.    Yes.

4       Q.    And what do you see there?

5       A.    It was 2016, wasn't it?  That's my

6  foster license.

7       Q.    This is your foster license.  And for

8  the record we're looking at Exhibit 18.  This is

9  your foster care foster home license; is that

10 right?

11      A.    Yes.  Correct.

12      Q.    And it says here that it's effective

13 from July 6, 2016 until July 6 of 2020; is that

14 right?

15      A.    Correct.

16      Q.    And have you renewed this license?

17      A.    Like I explained, with the COVID

18 happening and one, not having a license agent and

19 having the license agent to have to be pulled from

20 where I get licensed from to another facility,

21 they are very behind in recertifying.  I am in the

22 pending process of that, so I am still licensed

23 and everything.  But I don't have an actual

24 printout license.  They have a year from July 6 of

25 2020 to correct their actions and they know that.



1  So all I have to do is file the paperwork and

2  I have a whole year to get all the other paperwork

3  in line.

4      Q.    I see.  And when you renewed your

5  license did anything change with respect to the

6  pending license?

7      A.    No.

8      Q.    So, for example, Exhibit 18 shows the

9  area used for children is the entire home.  Is

10  that still the same with your license renewal?

11     A.    Yes.

12     Q.    Also, this license was issued to both

13  you and Darin.  Is that still the case?

14     A.    Yes.

15     Q.    And you are still licensed to provide

16  care for children from zero to 18 years old?

17     A.    Correct.

18     Q.    How many children have you provided

19  foster care for?

20     A.    This is our second one.

21     Q.    And your first child, the first foster

22  child, that child was related to you; is that

23  right?

24     A.    Yes.  It would be my sister's

25  granddaughter.  My great niece.



1    Q.    So you provided foster care for your

2  great niece?

3    A.    Correct.

4    Q.    And when was that?

5    A.    I keep thinking she's 5, but she's 4.

6  Her brother is 5.  She's in her last year of

7  preschool.  She was born April 6 and she came to

8  me -- she had to stay in the hospital for a few

9  days.  But she came directly from the hospital to

10  us in 2016.  And then she was with us for about a

11  year, just shy of a year.  And she returned home.

12  And now she's in my daycare.

13    Q.    As a daycare child?

14    A.    Yes.

15    Q.    So she's under the care of her mother?

16    A.    Correct.

17    Q.    And can you tell me more about the

18  circumstances that led to you becoming a foster

19  caretaker for that child?

20    A.    At the time I promised my grandpa that

21  I would take care of my grandmother.  And she was

22  the Energizer bunny.  She kept going and going.

23  She lived until she was 98 years old, so I took

24  care of her for 12 years.  And with her passing,

25  she was my main number one, she was my mother.



1  I mean, she was not just a grandmother, she was my

2  mother, my best friend, and with that void being

3  there, everybody kept saying I needed to do

4  something, I needed to do something.  And she died

5  in October.

6          And then I got wind that my sister's son

7  was -- they were expecting their third child, and

8  the other two children had been taken into foster

9  care.  And those two children were under her

10 mother's care.  And the mother told -- would be

11 the grandmother of the children, told her that if

12 she got pregnant again, she would not take the

13 next one.  And that became the child that

14 I received.  And everybody came to me and asked me

15 to do this.  And it was all new.  I didn't know

16 what I was in for and everything.  Got attached

17 too quickly and our loss when she left.

18     Q.    What do you mean you got attached too

19 quickly?

20     A.    She was a newborn.  I took care of her

21 every need.  I got emotionally invested.

22     Q.    I see.  And why wasn't the child able to

23 go home with her mother at first?

24     A.    Drugs.

25     Q.    I see.  Her mother was using drugs?



```
 1        A.    (Witness nods head).
 2        Q.    And so the department believed it wasn't
 3   safe for her to stay with her mother and found a
 4   foster care place with you; is that right?
 5        A.    Correct.
 6        Q.    And you cared for that child for about a
 7   year; correct?
 8        A.    Yes.
 9        Q.    And you chose to do that?  You
10   might hear some noise in the background.  I have
11   other kids in my house.  One of them is not happy.
12   You chose -- you decided to become a foster
13   caretaker for that child voluntarily, right?
14        A.    Yes.
15        Q.    And was Darin part of that decision?
16        A.    Absolutely.
17        Q.    And after that child returned to her
18   mother did you still have a foster care license?
19        A.    I left it open, yes.
20        Q.    And then now you have another foster
21   child in your home, right?
22        A.    Yes.
23        Q.    And when did that child come into your
24   home?
25        A.    August of 2018.
```



1      Q.    So that was about a year after the first

2    foster child returned to her mother?

3      A.    Correct.

4      Q.    So there was about a year in there where

5    there wasn't a foster child in your home, but you

6    still had a license, right?

7      A.    Correct.

8      Q.    When you first became a foster caretaker

9    did you have a license?

10     A.    No.  I acquired it once -- once she was

11   placed with me they helped me acquire what's

12   called next of kin.

13     Q.    Next of kin to get a license?

14     A.    Placement.  It's a less invasive license

15   that is a licensed foster parent, but it's not

16   a -- I don't know how I would say it.  Less

17   requirements if you're related or a family friend

18   or know the family.

19     Q.    So when the child first came to your

20   home you didn't have a license.  But the

21   department placed the child with you without a

22   license.  And that was fine, right?

23     A.    Yes.  And then helped me acquire a

24   license.  She was placed in April with me and we

25   were -- we acquired a license then that July.



1      Q.    Is there a reason you decided to acquire

2    the license?

3      A.    To help -- bottom line is the stipend to

4    help.  At the time I wasn't as financially

5    stabilized as we are now.  And it helped suit our

6    needs financially.  Being licensed, it pays a lot

7    more.

8      Q.    I see.  So getting a license helps you

9    financially to support the foster child and your

10   family with those payments?

11     A.    Correct.

12     Q.    And the State makes those payments,

13   right?

14     A.    Correct.

15     Q.    And when the State places a foster child

16   in your home, the State still has responsibility

17   for that child, right?

18     A.    Yes.

19     Q.    And in fact, the State of Illinois was

20   the legal guardian of those children in your care,

21   right?

22     A.    Say that again because you froze.

23     Q.    Sorry.  The State of Illinois -- let's

24   start with one child at a time.  For the foster

25   child who was in your home in 2016, the State of



1   Illinois was, legally speaking, the guardian of

2   that child in your care while she was removed from

3   her mother, right?

4           MR. SIGALE:  I will object to

5   foundation.

6           THE WITNESS:  Right.

7           MR. SIGALE:  I object to foundation.

8   She answered.  That's fine.

9           MR. WENZLOFF:  I'm sorry.  You said

10  correct?

11          THE WITNESS:  Yes.

12  BY MR. WENZLOFF:

13      Q.    And the child who is in your care now

14  came to you in August of 2018?

15      A.    Yes.

16      Q.    And how old was that child then?

17      A.    11 days old.

18      Q.    And he's been in your care this entire

19  time since then, right?

20      A.    Yes.

21      Q.    And the foster child, J, is now about

22  two years old?

23      A.    Yes.

24      Q.    So can you tell me, what are some of

25  the -- or what are the responsibilities that you



 1   have as a foster caretaker?

 2       A.    With the current child?

 3       Q.    Well, if there are differences let's

 4   talk about those.  But maybe start with the first

 5   child and then if there is anything different let

 6   me know about the second child.

 7       A.    With the first child really you're

 8   responsible all together with the medical needs.

 9   Every day, daily feeding, clothing, diaper

10   changing, WIC appointments, shots.  The normal

11   duties of a parent, just not the say-so in it.

12   She did not have any limit, physical and

13   everything as far as extra things we had to do

14   with her, unlike the foster child we have now.  He

15   requires many therapies, hearing aid, ankle

16   braces.  And no involvement with family or

17   whatever.  So there's two totally flip sides to

18   scenarios.

19            So, in essence, that's another reason

20   I continued daycare, is for his needs, being here,

21   being able to have people come in the home for

22   therapies and things.

23       Q.    And are the things that you do to care

24   for those children things that the State tells you

25   to do?



JENNIFER J. MILLER                            October 23, 2020
MILLER vs SMITH                                           186

1        A.    Testing-wise, yeah.  Yes.  They test to
2    where they need the therapies and see whatever
3    needs to be fit.  He fits in the specialized child
4    in the eyes of them.
5        Q.    The second child?
6        A.    Correct.
7        Q.    So, for example, you don't have the
8    legal right as a foster caretaker to refuse
9    certain medical treatments you don't agree with,
10   that's the State's decision to make, not yours; is
11   that right?
12       A.    Correct.
13       Q.    Similarly, if you wanted to raise the
14   foster child or children in a particular religious
15   upbringing, do you get to decide that or is that
16   something the State decides?
17       A.    That's actually parental discretion.
18   Religion and hair, haircut, whatever, is the two
19   controls that the current parents have.
20       Q.    The biological parents?
21       A.    Correct.
22       Q.    So if you -- if the biological parent of
23   J wanted to have that child raised in the Jewish
24   faith and you disagreed with that, you don't get
25   to decide as a foster caretaker that the child



JENNIFER J. MILLER                                    October 23, 2020
MILLER vs SMITH                                                     187

 1  should be raised in a different faith; is that
 2  right?
 3        A.    In my perspec -- speaking, yes.  But at
 4  this point, no.  They don't have no say.
 5        Q.    Why do you say that?
 6        A.    We are relinquishing rights.  So the
 7  foster agency has relinquished the rights of the
 8  haircut.  The Court has appointed the control of
 9  religion and haircutting to the agency.
10        Q.    Because the parents' parental rights
11  have been terminated?
12        A.    Not yet, but they are in limbo now.
13  Within the next 60 days probably.
14        Q.    So, for example, with the first child
15  who returns to its mother, if there was a
16  disagreement between you and the mother about the
17  child's religious upbringing, you don't have the
18  legal right to impose your beliefs on the child
19  instead of the mother.  Is that accurate?
20        A.    I don't have -- yes.  I don't have the
21  right to impose.  But I don't have to encourage
22  another religion.
23        Q.    Okay.  When you agree to be a foster
24  caretaker, are you also agreeing that your home
25  can be subject to certain inspections and



JENNIFER J. MILLER                      October 23, 2020
MILLER vs SMITH                                      188

1  investigations by the State?

2      A.    I didn't have any idea of what I was in

3  for at the beginning.  No.  But now in retrospect,

4  yes.

5      Q.    So just to be clear, is it the case the

6  State can do inspections in your home?

7      A.    Yes.

8      Q.    With a foster child?

9      A.    Yes.

10     Q.    So they don't need to get a warrant or a

11 special subpoena or something in order to take a

12 look around your home related to the foster care

13 child, right?

14     A.    Correct.

15     Q.    What are some of the safety precautions

16 that you follow as a foster caretaker?

17     A.    As I would with my own children and any

18 child in this.  Medicines are kept up and locked.

19 The temperature on the hot water is set to a

20 certain degree.  There are locks on the cleaning

21 supplies.  There's locks on the doors so they

22 can't escape.  Pretty much what any parent would

23 do.

24     Q.    And, of course, if you didn't have

25 children in your home you could do something



1   completely different with respect to those issues,

2   right?

3       A.    Correct.

4       Q.    You could set the water temperature to

5   whatever you want the water temperature to be,

6   right?

7       A.    Yes.

8       Q.    Does the State of Illinois pay for

9   health insurance for the foster children or do you

10  pay for that?

11      A.    They do.

12      Q.    And that's true for both children you've

13  had in your home?

14      A.    Correct.

15      Q.    And the second child has some

16  disabilities that might increase the cost of

17  health insurance?

18      A.    Yes.

19      Q.    And the State takes care of all of that,

20  right?

21      A.    Eventually, yes.

22      Q.    I'm sorry?

23      A.    The hearing aid is a process to be

24  approved, that was a process to be approved, took

25  about 6 months.  The leg braces took about 3



1   months.

2        Q.    There's some delays?

3        A.    Yes.

4        Q.    Did you have to pay anything

5   out-of-pocket for those items?

6        A.    No.

7        Q.    This might be a silly question, given

8   the ages of the children in your home, but have

9   you ever provided any education or training about

10  guns to the children you've cared for and the

11  foster children you've cared for?

12       A.    No.

13       Q.    Have you ever allowed the foster

14  children to handle a gun?

15       A.    No.

16       Q.    Before you became a foster caregiver the

17  first time how did you store your firearms?

18       A.    Pretty much the same as what we do now,

19  other than we were able to store handguns.

20       Q.    Did you ever get any guidance from DCFS

21  about how to store guns or firearms related to the

22  foster care license?

23       A.    No.

24             MR. SIGALE:  Can we take five?

25             MR. WENZLOFF:  Yes.  It's 2:55, we'll



1  return at 3:00.

2            MR. SIGALE:  Thanks.

3            (A break was taken from 2:55 to

4       3:03 P.M., and the deposition continued as

5       follows:)

6  BY MR. WENZLOFF:

7       Q.    Ms. Miller, the last question was have

8  you ever received any guidance from DCFS on how to

9  store your firearms or your ammunition with

10  respect to the foster care license.  Can you

11  answer that question again for me?

12       A.    No, I have not.

13       Q.    There was never a license worker who

14  told you what needs to be done to safely store

15  firearms or ammunition?

16       A.    No.

17       Q.    Okay.  You agree with that?

18       A.    We signed forms acknowledging we had

19  guns in the house and everything else.  They were

20  fully aware of it.

21       Q.    Sure.  I guess what I'm wondering is,

22  have you ever -- do you remember ever having a

23  conversation with a licensing representative from

24  DCFS about how guns or ammunition should be stored

25  in the home when there is a foster child present?



1      A.     With foster or daycare?

2      Q.     Foster.

3      A.     With foster, no.  Daycare, yes.

4      Q.     Sorry.  Remind me again, when did you

5   get the daycare home license?  That was 20 --

6      A.     I get them mixed up.  It was 2016,

7   I believe.

8      Q.     You have a container where you store

9   ammunition.  Do you remember where that came from?

10      A.     No.

11          MR. SIGALE:  I'm going to object as to

12   form.  She answered it anyway.

13   BY MR. WENZLOFF:

14      Q.     Are you able to answer the question?

15      A.     I don't know where it came from, no.

16      Q.     Give me a second here.  I'm going to

17   share my screen with you.  Are you able to see

18   this picture on the screen?

19      A.     Yes.

20      Q.     This is Exhibit 12.  I think you've seen

21   this before.  This is your daycare home license,

22   right?

23      A.     Correct.

24      Q.     And did you first get that license in

25   2017 or did you have one before this?



1      A.    No.  It's '17.  This is still.

2      Q.    That's when you got your daycare home

3   license, was in 2017?

4      A.    Right.

5      Q.    Okay.  So before that you were not a

6   licensed daycare home?

7      A.    Correct.  I get them mixed up.  The

8   foster and the daycare.

9      Q.    Okay.  Let me show you another item.

10  Have you ever seen -- what I'm going to showing

11  you now is Exhibit 19.  Are you familiar with this

12  document?  Have you seen this before?  The report.

13  I'll try to zoom.  At the top it says service

14  contact documentation.  You can see on the left

15  there is a date of contact listed as April 27,

16  2016.  Do you see that?

17     A.    Yes.

18           MR. SIGALE:  What's the Bates stamp

19  number on the bottom?

20           MR. WENZLOFF:  Bates stamp number is

21  DCFS 000056.

22           MR. SIGALE:  Thank you.

23  BY MR. WENZLOFF:

24     Q.    And, Jennifer, I'm going to have you go

25  ahead and just read out loud what this says in the



1  text, the box in the middle of the document.  Are

2  you able to see the text there?  It starts with

3  arrived at the foster home visit.

4       A.    Yes.

5       Q.    Can you read that whole -- there's three

6  paragraphs, two short ones and one long one.  Read

7  all those paragraphs out loud for me.

8       A.    Arrived at the foster home visit for

9  initial licensing visit, introducing myself to

10  Jennifer.  The birth parents of the placed infant

11  were at the foster home for a parent/child visit.

12  The couple sat near each other and took turns

13  holding, slept throughout my home visit.

14          I reviewed the licensing folder with

15  Jennifer.  She and her husband have already been

16  fingerprinted for OSU and have returned the

17  printing paperwork, reviewing the application for

18  licensure.  Jennifer provided with physical forms

19  for the family and additional rules, policies.

20  Discussed the licensing process.

21          Toured the home with Jennifer.  Shares a

22  bedroom with Jennifer's young daughter, has a new

23  crib which meets federal standards.  Jennifer

24  shared that she has paperwork on the crib and will

25  locate it and mail it to me.  Jennifer and Darin



1  have guns and ammo in their room.  Guns are locked

2  in a gun safe.  She reports that they have trigger

3  locks on them, but her husband has the key.  She

4  will have the key at my next home visit.  Ammo is

5  sitting in the windowsill.  I explained that ammo

6  has to be in a locked container separate from the

7  guns.  She does not have a locking container.

8  Will send a locking ammo container with Heather

9  next time she comes to the home.  There are BB

10  guns on display in a gun rack on the wall -- which

11  there is not -- explained that these need to be in

12  a gun safe as well with trigger locks.

13  Additionally, the family has a large quantity of

14  arrows for bows.  Discussed finding a place to

15  lock the arrows.  Jennifer agreed to work on this

16  over --

17     Q.    You can stop there.  That's fine.  Does

18  that help refresh your recollection about any

19  conversations you might have had with the

20  Licensing Board at DCFS?

21     A.    I don't remember this.  I'm being

22  truthful and honest.  I don't remember this.

23  I will say that now that I read this, Heather did,

24  which is the caseworker, this was with the first

25  child, gave us a simple small box.  It wasn't the



1  container that we have now.  And the BB gun was a

2  fake -- it had nerve guns on the end of it.  That

3  wasn't a BB gun.  The arrows were put up and dealt

4  with.

5      Q.    So you don't remember that conversation?

6      A.    No.

7      Q.    Precisely; is that right?

8      A.    I sure don't.  I'm sorry.

9      Q.    Do you remember whether you did store

10  ammunition on a windowsill?  Is that accurate?

11      A.    I don't remember that at all.  Because

12  we've never -- on my windowsill I don't put

13  knickknacks.  So I don't know.  I don't know.

14      Q.    Do you think it's a good idea to keep

15  ammunition on a windowsill?

16      A.    Oh, no.

17      Q.    Would keeping ammunition on a windowsill

18  be a safe thing to do?

19      A.    Absolutely not.

20      Q.    So from that conversation it sounds like

21  the placement worker told you that the ammunition

22  has to be locked, right?

23      A.    I don't recall.  I mean, I can't answer

24  that if I don't remember the conversation.

25      Q.    Sure.  I understand.  Do you agree that



1  ammunition should be locked?

2      A.    To a certain extent, yes.  I mean, yes,

3  you have to have safety, yes.

4      Q.    And if you don't have the ammunition

5  locked, you would be in violation of the licensing

6  rules, right?

7            MR. SIGALE:  Object.

8            THE WITNESS:  Correct.

9            MR. SIGALE:  What's that?

10            THE WITNESS:  I don't know whether to go

11  off the record.  I need to speak with you on this

12  particular document.

13            MR. WENZLOFF:  I don't have a question

14  pending.  So if you want to talk to your lawyer we

15  can stop and you can talk to your lawyer.

16            MR. SIGALE:  Want to take five minutes,

17  Jennifer?

18            THE WITNESS:  Yes.

19            MR. WENZLOFF:  Let's come back at --

20  it's 3:14.  Let's come back at 3:20.

21            THE WITNESS:  Thank you.

22            (A break was taken from 3:13 to

23      3:19 P.M., and the deposition continued as

24      follows:)

25            MR. SIGALE:  Let's go back on the



1  record.  Aaron, I believe Ms. Miller wanted to

2  further clarify, let's say, some of her statements

3  from a little bit ago.

4  BY MS. WENZLOFF:

5      Q.   Okay.  Ms. Miller, go ahead and provide

6  the clarification that you want to make.

7      A.   Okay.  I don't recall the whole

8  conversation or whatever or anything of that sort.

9  But as far as ammunition being put on the

10 windowsill, whatever, I'm not that careless, for

11 one.  And for two, if you knew an inspection is

12 going to happen you would definitely put them up.

13 And I think what they're talking about is my

14 husband had three empty shell casings in the

15 windowsill that he got at a gun slinging show.

16 And they are back here on our shelving thing right

17 back here.  I can show it to you, dust on it and

18 everything.  It hasn't been used in a long time.

19 So I think that's what they're talking about.

20     Q.   What's a gun slinging show?

21     A.   Gun show.  Like they toss so many things

22 up in the air, they shoot it, and it's Tom

23 Wopat -- I can't think of the last name.  But he's

24 gone now.  But he was in our local town and does

25 tricks of the trade with the guns, shooting behind



1  his back and, you know, things thrown out, and it

2  was gun shells that he gave out to people that he

3  had used a shotgun.  So that's where that came

4  from.

5          Q.    So is it your understanding that --

6          A.    That's the only thing I can think of,

7  that that's what they're talking about.

8          Q.    So just to be clear, you don't remember

9  the conversation with this caseworker, the

10  licensing worker?

11          A.    Correct.

12          Q.    But after having read the notes from

13  that conversation, you think the discussion

14  referred to an ammunition decoration item on your

15  shelf?

16          A.    Yes.  I don't know if you want to

17  classify it as a decoration, but it was an ammo

18  shell.

19          Q.    What does that mean exactly?

20          A.    It's one of the rounds that's been fired

21  out of the gun.  The shell casing.

22          Q.    A spent casing.  A casing that's not

23  live?

24          A.    Right.  Correct.

25          Q.    Do you remember that licensing worker



1   provided you with a container to store ammunition

2   locked?

3        A.    I remember the container being sent with

4   the caseworker, and it did not have any locking

5   mechanism to it.  It was like a filing container.

6   And then I had to ask a couple of times to get it

7   because she kept forgetting to get it for me.

8        Q.    So just so I'm clear, the licensing

9   worker provided you with a file box that did not

10  lock as a place to store ammunition?

11       A.    Yes, sir.

12       Q.    And do you have any recollection as to

13  why they would have provided you with a nonlocking

14  filing cabinet or filing container?

15       A.    Other than what I was told, it had to be

16  stored in a separate spot than what the guns were.

17       Q.    And so do you believe that the notes

18  from the conversation are inaccurate as to the --

19  well, do you believe that they're inaccurate in

20  some way?

21       A.    From what I remember, yes.  Because we

22  never owned, to my recollection I don't remember

23  BB guns.

24       Q.    Do you remember where you stored

25  ammunition before you had the foster care license?



1    A.    We stored them in the closet.  Just

2  sitting in the closet.  Not stored in a box.

3    Q.    I see.  And since the time that the

4  licensing worker provided a container to store

5  ammunition, you've gotten a different container

6  since then, right?

7    A.    Yes.

8    Q.    Do you remember when you got that

9  container?

10    A.    I don't remember when he got it, but he

11  got a different one because it was -- the one she

12  got was a small container which fit most of the

13  ammunition at the time, but we had to get a bigger

14  one.

15    Q.    I see.  And your recollection is that

16  the caseworker or licensing worker observed or

17  discovered that you didn't have a separate storage

18  container for the ammunition, and then took it

19  upon themselves to come back and provide you with

20  a storage container; is that right?

21    A.    Yes, correct.

22    Q.    And that storage container was not a

23  lockbox?

24    A.    No.

25    Q.    You're sure about that?  It wasn't a



1  lockbox of some kind?

2     A.    I am almost positive it was not because

3  it wouldn't hold -- or there was no lock.  It

4  was -- my husband and I had a conversation of

5  what's the difference in, you know.

6     Q.    I see.  You remember the conversation

7  you had with your husband about the storage

8  container at that time period; is that right?

9     A.    Yes.

10    Q.    But you don't remember the conversation

11 with the licensing worker?

12    A.    No.  I just remember them bringing the

13 lockbox.

14    Q.    I'm sorry?

15    A.    I remember them saying they were going

16 to bring a lockbox for ammunition to be stored in

17 one place.  And then, I'm sorry, something in my

18 throat.  And so I had to remind her a couple of

19 different instances.  Do we need to go buy one or

20 are you going to supply one?  And she said she

21 keeps forgetting it and she finally brought it.

22    Q.    And the one she brought was not a

23 locking container?

24    A.    No.  It was from Walmart.  She got it

25 off the shelf.  It was literally like a small,



1  like little money thing, you know, that has a

2  little flip latch.  There's no way to lock it,

3  with a little handle.

4      Q.    It wasn't made for ammunition?

5      A.    No.

6      Q.    And it didn't lock?

7      A.    No.

8      Q.    But do you disagree with the notes that

9  said that she told you that ammunition needed to

10  be stored in a lockbox?

11      A.    The caseworker told me, yes.  We didn't

12  know it at the time, of course.  But.

13      Q.    Let me just share the exhibit again.

14  This is Exhibit 19.  And in that paragraph you

15  read before, the last full paragraph, it said.  I,

16  meaning the licensing worker, explained that ammo

17  has to be in a locked container separate from the

18  guns.  She does not have a locking container.

19  Will send a locking ammo container with Heather

20  next time she comes to the home.

21          Now, do you disagree that that

22  conversation happened?

23      A.    I don't remember that conversation.

24  What I can tell you is, again, that it was not a

25  locked ammo container.  It was a container that



1 | had a flip latch with a handle.
2 |     Q.    Okay.  So you're confident that you
3 | wouldn't ever describe it as a --
4 |     A.    Not what we've got now, no.
5 |     Q.    You wouldn't describe what was brought
6 | to your home as a lockbox?
7 |     A.    No.
8 |     Q.    Okay.  Let me show you another -- finish
9 | your thought.
10 |    A.    No.  Go ahead.  That's fine.
11 |    Q.    I'm going to show you a different
12 | document.  I'm showing you what's been marked as
13 | Exhibit 23.  Do you recognize this document,
14 | Ms. Miller?
15 |    A.    Yes.
16 |    Q.    And what's the title of this document?
17 | Halfway down the page.
18 |    A.    Amended Complaint for Declaratory and
19 | Injunctive Relief.
20 |    Q.    Is it your understanding that this
21 | document is the Complaint that you and your
22 | husband filed against the defendants in this case?
23 |    A.    I believe so.
24 |    Q.    And this contains the factual
25 | allegations that you are making against the



1  defendants, right?

2      A.    Yes.  Best as I understand the question.

3      Q.    And the facts that are contained in this

4  complaint, they are facts that you believe are

5  accurate?

6      A.    As far as I know, yes.

7      Q.    Your lawyer, Mr. Sigale, he helped to

8  write this Complaint and he got his information

9  about your household and your experiences with

10 DCFS, he got that from you, right?  You and your

11 husband, right?

12     A.    Yes.

13     Q.    And you, of course, would have given

14 Mr. Sigale truthful and accurate information in

15 order to file this Complaint, right?

16     A.    Yes.

17     Q.    I'm just going to direct your attention

18 to a paragraph farther down.  Bear with me while

19 I find it.  Okay.  Take a look at what is

20 paragraph 40.  This is on page 13 of the exhibit.

21 Paragraph 40, which says:  In addition, when being

22 inspected and approved to be a foster home, the

23 caseworker, upon seeing there was not a separate

24 lockbox for ammunition in the home, stopped the

25 inspection to go out and buy one for them and upon



1   returning told the Millers that the ammunition had

2   to be stored in the lockbox to be in compliance

3   with the applicable rules.  Is that an accurate

4   recitation of that paragraph, Ms. Miller?

5       A.    They did not stop the inspection, as far

6   as what I remember.  If that's what my husband

7   says, that's what he remembers.

8       Q.    So let me just be clear.  Is this -- is

9   that paragraph that I just read, is that paragraph

10  an accurate reflection of the facts, to your

11  knowledge?

12      A.    I remember her buying a box that was not

13  a lockbox.

14      Q.    So --

15      A.    They did not remove the child, they did

16  not stop the inspection, to my knowledge.

17      Q.    So is your answer that that paragraph is

18  not completely true?

19      A.    As best as what I remember, yes.

20  I remember her bringing it back on a visit.

21      Q.    So just to be clear, yes, the paragraph

22  is not true?

23      A.    If that's what my husband says.  My

24  husband -- or maybe there is a misunderstanding.

25  I don't know.





1    Q.    So it's not -- to your knowledge, that
2    paragraph is not accurate?
3    A.    I would say it's inaccurate.
4    Q.    Thank you.  Ms. Miller, do you think
5    there might be other inaccuracies in the
6    Complaint?
7    A.    I can't answer that 100 percent.
8    Q.    Earlier you testified that a Court may
9    be preparing to terminate the parental rights of
10   the foster -- of the parent or parents of the
11   foster child who is currently living in your home.
12   Is that your understanding?
13   A.    Yes.
14   Q.    And do you know when that might happen?
15   A.    No.  They said they're hoping within the
16   next 30 to 60 days.
17   Q.    And after the parental rights have
18   terminated, you and your husband are seeking to
19   adopt the foster child, right?
20   A.    Yes.
21   Q.    Do you have any sense as to when that
22   process might be finished?
23   A.    It's on the Court's time.  No.
24   Q.    If you are able to adopt J and the Court
25   approves that adoption, will you continue to



1  maintain your foster care license?

2      A.    Yes.

3      Q.    So how long do you plan to continue to

4  have a foster care license?

5      A.    I don't know the answer to that.

6  I don't know.  Whenever we sit and agree that it's

7  time to relinquish it.

8      Q.    I see.  And you might not relinquish the

9  foster care license after any adoption process is

10 finished with J?

11     A.    Correct.

12     Q.    Earlier today I believe you said that

13 you don't carry a firearm on your person in your

14 home or out in the community, other than one time

15 when you went to St. Louis.  Right?

16     A.    Correct.

17     Q.    And I believe you testified that you

18 didn't feel you had enough training to carry a

19 firearm on your person regularly, that you wanted

20 more training before you would do that.  Is that

21 accurate?

22     A.    Yes.  I'm not big, but I'm not small,

23 but I'm a smaller framed person.  To find

24 something that worked to conceal carry and to be

25 comfortable I have yet to find.  So that's another



1  issue too.

2       Q.    So if you were allowed to have your

3  Glock installed in your home and still maintain

4  your daycare home license, your foster care

5  license, would you carry a firearm in your home?

6       A.    Not during daycare hours, no.

7       Q.    And again, daycare hours, those can

8  range from 7:00 A.M. all the way until well into

9  the evening, like 10:00 P.M.?

10      A.    They can, yes.

11      Q.    So you are confident you wouldn't carry

12  a pistol if the rules were changed today?

13      A.    No.

14      Q.    You wouldn't do that, right?

15      A.    No.

16      Q.    Would you carry your Glock pistol on

17  your person outside of daycare hours?

18      A.    I would consider it.

19      Q.    And what factors would you consider

20  before you did that?

21      A.    Who I was going with, where I was going,

22  for how long I was going.

23      Q.    I see.  So you would consider carrying a

24  firearm on your person outside the home, outside

25  of daycare?



1          A.     Yes.

2          Q.     Depending on some factors?

3          A.     Correct.

4          Q.     And one of those factors might be that

5     you want more training?

6          A.     Nobody can get too much training.

7          Q.     Would you consider -- or would you carry

8     a firearm on your person in your house outside of

9     daycare hours?

10         A.     I don't believe I would.

11         Q.     A few minutes ago I showed you an

12    exhibit of the Complaint in this lawsuit.  Do you

13    remember that?

14         A.     Yes.

15         Q.     And you testified that you were one of

16    the plaintiffs in this lawsuit, right?

17         A.     Correct.

18         Q.     Can you explain to me as best you can,

19    what are you trying to achieve through this

20    lawsuit?

21         A.     I would like for it to be DCFS match

22    state laws when concealed carry came into effect.

23    Because --

24         Q.     I'm sorry.  Go ahead.  I cut you off.

25         A.     No.  Go ahead.



1    Q.    So just so I am clear, what is your

2    understanding of what the foster care rules and

3    the daycare home licensing rules keep you from

4    doing right now?

5    A.    To even having handguns on the premises.

6    And with concealed carry laws, states that if we

7    have a concealed carry license, we are by law able

8    to have handguns on the premises locked away.

9    Q.    So is it fair to say that your goal with

10   this lawsuit is to be able to have a handgun in

11   your home and continue to operate a daycare home?

12   A.    Yes.

13   Q.    And is it fair to say that you want to

14   achieve with this lawsuit the ability to have a

15   handgun that's unlocked or loaded?  Tell me more.

16   Are your rules more specific than that?  Or are

17   they just having a handgun in your home, but --

18   I'll stop there.

19   A.    What's the question?

20   Q.    Sorry.  With this lawsuit you want to be

21   able to have a handgun in your home, right?

22   A.    Correct.

23   Q.    And still operate a daycare home, right?

24   A.    Yes.

25   Q.    And would you want the rules to allow



1  you to keep that handgun unlocked?

2      A.    Not during daycare hours, no.

3      Q.    And would you want the lawsuit to allow

4  you to keep a loaded handgun in your home?

5      A.    Locked away, yes.

6      Q.    You want to be able to keep a loaded

7  handgun in a locked gun safe in your home.  That's

8  what you want?

9      A.    Correct.

10     Q.    Now, you understand that your lawsuit is

11  challenging these rules, not just for you and your

12  husband, your household, but also for all daycare

13  home operators and foster caretakers across the

14  State of Illinois, right?

15     A.    Yes.

16     Q.    So you understand that your Complaint is

17  asking that those rules be eliminated completely,

18  not just for you or your husband, but for

19  everyone.  Do you understand that?

20     A.    Yes.

21     Q.    And is that your intent?

22     A.    The rules to match state regulations and

23  law, yes.

24     Q.    And also to be clear, your lawsuit is

25  asking as its written to just eliminate the rules



1  completely.  Did you know that?

2      A.    Yes.

3            MR. SIGALE:  I'm going to object as to

4  the form of that question and calling for a legal

5  conclusion.  Her answer can stand.

6  BY MR. WENZLOFF:

7      Q.    Just so I'm clear as well, what do you

8  want the rules to allow you to do after this

9  lawsuit if you're successful?  If there are no

10 daycare kids in your home.

11     A.    As far as being able to conceal carry at

12 any point given time.  Would be an accurate

13 statement for myself.

14     Q.    And do you want to achieve something

15 with this lawsuit to allow foster care parents to

16 do something different than the rules currently

17 require?

18     A.    What do you mean?

19     Q.    Well, so what's your understanding of

20 what the foster care rules require you to do in

21 storing firearms?  Not the daycare home rules, but

22 the foster care rules.

23     A.    That the ammunition has to be separate

24 from the guns.

25     Q.    And is it your understanding that you



1   can't have a handgun in your home under the foster

2   care rules?  Or can you?

3       A.    No.  It's never been an issue, to my

4   knowledge, except for daycare.

5       Q.    Okay.  So it's your understanding that

6   you could, if you didn't run a daycare home, but

7   continued to have a foster care license, you would

8   be able to have a handgun in your home if it's

9   stored properly; is that right?

10      A.    Yes.

11      Q.    And do you find that the foster care

12  rules as they are currently written to be

13  unreasonable, even though they allow you to have a

14  handgun in your home stored in a specific way?

15      A.    With the new concealed carry laws, yes.

16      Q.    How so?

17      A.    With the FOID card you're, and actually

18  concealed carry, you're able to have a loaded

19  firearm locked in a gun safe.

20      Q.    So you feel that it would be a good

21  outcome if you were able to store a handgun loaded

22  in a gun safe in your home?

23      A.    Yes.

24      Q.    And am I understanding correctly that

25  you have that belief, even though it is not



1  consistent with the training you received in your

2  concealed carry classes and the information in the

3  gun instruction manuals you have for your guns?

4         MR. SIGALE:  I'm going to object.

5  Sorry.  I didn't mean to step on your question.

6  But I'll object as to misstating prior testimony,

7  and as to form of the question, and as to

8  speculation.  Jennifer, if you can answer, go

9  ahead and answer.

10         THE WITNESS:  Can you repeat the

11  question?

12  BY MR. WENZLOFF:

13     Q.    So you are hoping to achieve through

14  this lawsuit that you can store a handgun loaded

15  in a locked container in your home, right?

16     A.    Yes.

17     Q.    Currently the daycare home rules and the

18  foster care rules don't allow you to do that,

19  right?

20     A.    Correct.

21     Q.    Isn't it also true that the training you

22  received from a concealed carry licensed trainer

23  told you that guns should be stored unloaded,

24  including handguns, unloaded in a locked container

25  separate from the ammunition?  Isn't that what you



1  said before that you were told?

2      A.    Yes.  But I did then say that store

3  meant for a period of time.  Not for carrying and

4  for protecting services.

5      Q.    So what did you mean by a period of

6  time?  What does that mean?

7      A.    Some people store the handguns for

8  having a handgun -- or having a gun, per se, or

9  whatever, stored means it has to be cleared and

10  safely put back.  When it's stored in a case it's

11  got to be unloaded.  When you have it on yourself

12  it can be loaded.

13      Q.    But we're talking about when the gun is

14  in a container, not on your person, right?

15      A.    In a container, yes.  But not in a safe.

16  It can be loaded in a safe.

17      Q.    Is that something that you were taught

18  in your concealed carry class?

19      A.    To my understanding, yes.

20      Q.    And your interpretation of the

21  instruction manuals is that you can keep a gun

22  loaded if it's in a safe, but not if it's in a

23  different container?

24      A.    Yes.

25      Q.    If these rules didn't exist, is there



1  anything that you would do differently in storing

2  your guns?

3      A.    As far as right now what we're being

4  forced to do?  Like what's your question?  As far

5  as what scenario?

6      Q.    I'm saying if the rules didn't exist

7  about gun storage with daycare homes and foster

8  care homes, if those rules didn't apply, didn't

9  exist, they disappeared, what would you personally

10  do different with respect to how you store your

11  guns?

12      A.    Well, I would conceal carry, carry a

13  gun, as we done the training for and everything,

14  and there would probably be a loaded handgun in

15  the safe.

16      Q.    Okay.

17          MR. WENZLOFF:  Let's take five minutes

18  and then I think I just have maybe another five

19  minutes of questions after that.  Take a

20  five-minute break, and then I think I will be done

21  very shortly after.  I just want to confer with my

22  colleagues one last time.

23          MR. SIGALE:  Five minutes.  3:55, so

24  4:00?

25          MR. WENZLOFF:  Sounds great.



1              (A break was taken from 3:55 to

2         4:00 P.M., and the deposition continued as

3         follows:)

4    BY MR. WENZLOFF:

5         Q.    Let's go ahead and get started.  Let's

6    go back on the record.

7              Ms. Miller, if the daycare home rules

8    and foster care license rules about gun storage

9    didn't exist, would your husband carry a handgun

10   in the house on his person?

11             MR. SIGALE:  I'll just object as to

12   foundation and speculation.  But, Jennifer, if you

13   know the answer to that question, go ahead and

14   answer that question.

15             THE WITNESS:  I think that would be a

16   question for him to answer.

17   BY MR. WENZLOFF:

18        Q.    You don't have an answer to that

19   question?

20        A.    It would only be, like he said,

21   speculation.

22        Q.    You've never talked to your husband

23   about that?

24        A.    I mean, we talked about, you know,

25   carrying and everything else, but it's always been



1   not a concrete conversation.

2       Q.    Is that one of the goals of the lawsuit?

3   For Darin to be able to carry a gun in the house

4   on his person?

5       A.    I am speculating again.  I would lean

6   towards the side of probably an accurate

7   statement, yes.

8       Q.    I'm sorry.  Probably accurate or

9   inaccurate?

10      A.    Accurate.

11      Q.    A true statement?

12      A.    True.  Yes.

13      Q.    Okay.  To the best of your knowledge?

14      A.    Yes.

15      Q.    Okay.  I want to return again to

16  something you said earlier today; that a gun

17  that's being kept for self-defense is not to be

18  stored.  Is that your understanding?

19      A.    Yes.

20      Q.    And so just to be clear, it's your view

21  that if you are keeping a gun for self-defense in

22  your home it's not being stored?

23      A.    Correct.

24      Q.    And so that also then means that the

25  safety rules that you learned in your concealed





1  carry class about storing firearms safely don't

2  apply if the gun is being kept in self-defense.

3  Is that your understanding?

4      A.    A gun being stored is something that

5  hasn't been looked at or touched for quite some

6  time.  A self-defense gun that you would want to

7  conceal carry would be in the respect of a, like a

8  police officer carrying, that's not stored, he's

9  carrying.  And it's put in a safe place, it's

10 always active.  I don't know how else to explain

11 what I mean.

12     Q.    So let's talk about it.  If you want to

13 keep your Glock pistol for self-defense, does that

14 then mean you are not storing that Glock pistol?

15 Do I understand that?

16     A.    I am anticipating -- yes.  I am

17 anticipating any time to be able to use it.

18     Q.    So you were taught about how to safely

19 store a gun.  It's your view that those gun rules

20 about safe storage aren't applicable to a

21 situation where you're keeping a gun for

22 self-defense; is that right?

23     A.    Yes.

24     Q.    So if you keep a gun for self-defense in

25 your home from now until the day you retire, that



1   whole time the gun is not being stored.  That's

2   your contention?

3       A.    Yes.

4       Q.    So what, then, are the safety rules that

5   apply, if any, to a gun that's being kept for

6   self-defense?

7       A.    Safety rules would be training and

8   knowledge and aware of your surroundings.  And if

9   it's not on you, it has to be in a safe place and

10  away from potential individuals that could use it

11  in a negative way.

12      Q.    So if you're keeping a gun for

13  self-defense but it's not on your person, your

14  belief is that it should be kept in a safe place

15  away from people who might gain unauthorized

16  access to it.  Is that accurate?

17      A.    Yes.

18      Q.    And is it also true that that safe place

19  is not -- it doesn't have to be a locked gun safe?

20      A.    In instances, yes.

21      Q.    So it could be someplace other than a

22  locked gun safe?

23      A.    Yes.

24      Q.    And do you believe that that's something

25  that you or your husband would want to do if the



1 | rules didn't exist as they currently are written?

2 |     A.    No.  If we would not be carrying we

3 | would be putting it up into a locked container.

4 |     Q.    I see.  And then would that also be the

5 | case for other gun owners across the state?

6 |     A.    That would be up to probably the

7 | situation and the environment that they're in.

8 |     Q.    You don't think that that would be

9 | unsafe?  If the rules didn't exist in other

10 | daycare homes, you don't believe it would be

11 | unsafe for those households to keep guns unlocked?

12 |     MR. SIGALE:  I'm going to object as to

13 | foundation and speculation.  Jennifer, if you can

14 | answer, go ahead and answer.

15 |     THE WITNESS:  I don't think I can answer

16 | in regards to another household.  I would only be

17 | able to answer in regards to my household.

18 | BY MR. WENZLOFF:

19 |     Q.    Well, do you think it's unsafe to keep

20 | guns unlocked and not on your person in a

21 | household with children?

22 |     A.    It can be unsafe, most definitely, yes.

23 |     Q.    So do you think the Department of

24 | Children and Family Services is being unreasonable

25 | in trying to protect children's safety by



1  requiring guns to be locked in a gun safe away

2  from ammunition?

3        A.    Away from ammunition, yes.  In a locked

4  safe, no.

5        Q.    It's not unreasonable for DCFS to

6  require daycare operators and foster care

7  licensees to keep guns in a locked safe?

8        A.    Correct.

9        Q.    To keep handguns in a locked safe?

10       A.    Correct.

11             MR. WENZLOFF:  I think I'm all set.

12             MR. SIGALE:  Okay.  I just have a few.

13                    EXAMINATION

14                  BY MR. SIGALE:

15       Q.    Jennifer, from your understanding of

16  this lawsuit, are you suing for the right to leave

17  loaded guns lying around wherever you feel like

18  it?

19       A.    No.

20       Q.    Now, if you know, let's say that someone

21  with the law, okay?  And they felt like leaving

22  the, let's say they wanted a loaded handgun for

23  protection and they felt like leaving it on the

24  nightstand next to them, would that --

25             MR. WENZLOFF:  Object to the form of the



1   question.

2           MR. SIGALE:  I haven't finished it yet,

3   Aaron.

4   BY MR. SIGALE:

5       Q.    Would what I just described be the same

6   or a different situation from the same person who

7   wanted to leave that loaded handgun on the

8   nightstand, except that there are small kids in

9   the house?

10          MR. WENZLOFF:  Objection as to the form

11  of the question.

12          MR. SIGALE:  You can answer, Jennifer.

13          THE WITNESS:  It's a single person

14  taking responsibility for themselves so it would

15  be two completely different scenarios.

16  BY MR. SIGALE:

17      Q.    Okay.  To be clear, because you are a

18  licensed daycare operator and a licensed foster

19  parent, and you have kids, and this lawsuit is not

20  about -- you are not suing for the right to leave

21  a loaded gun on the nightstand; correct?

22      A.    Correct.

23      Q.    I want to just go back briefly to

24  something that Mr. Wenzloff was asking you about.

25  He was asking you about your concealed carry



1 | class.  And you were describing earlier a few
2 | times the difference between a gun that's in
3 | storage versus a gun you're using for self-defense
4 | purposes.  Do you recall those discussions today?
5 |     A.    Yes.
6 |     Q.    Okay.  And is it your understanding that
7 | a gun that is being used for self-defense purposes
8 | is not a gun in storage?
9 |     A.    Correct.
10 |     Q.    So describe for me the difference --
11 | strike that.  A person that has a concealed carry
12 | license, okay?  The only thing they use their gun
13 | for, their concealed carry weapon for, is
14 | sometimes to wear it outside of the home?
15 |          MR. WENZLOFF:  Objection as to form.
16 |          MR. SIGALE:  That person, when they come
17 | home and take that firearm off to put it away,
18 | would you consider they're putting it in storage?
19 |          THE WITNESS:  No.
20 | BY MR. SIGALE:
21 |     Q.    Okay.  What if that person had a
22 | separate firearm that they kept in a locked safe
23 | that they considered a self-defense weapon?  And
24 | then they had also their concealed carry weapon.
25 | When they took that concealed carry weapon off and



```
 1   put it away for however long, would that firearm
 2   then be concealed carry?
 3       A.    No.
 4             MR. WENZLOFF:  Objection as to form.
 5   Compound question, vague, incomplete hypothetical.
 6             MR. SIGALE:  That's fine.
 7   BY MR. SIGALE:
 8       Q.    Your understanding of the State
 9   regulations, the daycare rules is that not only
10   you, but Darin, is not allowed to have a handgun
11   in the home; is that correct?
12       A.    Correct.
13       Q.    Even if he were to carry it on his
14   person at all times and nobody could get at it,
15   would he still be prohibited under the rules?
16             MR. WENZLOFF:  Objection as to form,
17   foundation, incomplete hypothetical, calls for a
18   legal conclusion.
19             MR. SIGALE:  You can answer, Jennifer.
20             THE WITNESS:  Yeah.  He wouldn't be able
21   to, no.
22   BY MR. SIGALE:
23       Q.    So the rule affects not just you, but it
24   affects any concealed carry license holder in your
25   home; correct?
```



1      A.    Correct.

2      Q.    Just the same as the foster care rule

3  affects all FOID card holders in your home;

4  correct?

5      A.    Correct.

6      Q.    You testified that you personally

7  probably wouldn't carry a firearm while operating

8  the daycare, even if you were allowed to, but you

9  would have a handgun in a safe in case it was

10  needed?

11      A.    Yes.

12          MR. SIGALE:  I don't have any other

13  questions.

14          MR. WENZLOFF:  Okay.  We're done.

15          MR. SIGALE:  We'll reserve signature.

16          (Whereupon the deposition concluded at

17      4:20 p.m.)

18

19

20

21

22

23

24

25



```
 1   STATE OF ILLINOIS )
                       ) SS
 2   COUNTY OF MACON   )

 3

 4
          I, DEBRA L. BREHM, CSR in and for the State
 5   of Illinois, do hereby certify that JENNIFER J.
     MILLER, the deponent herein, was by me first duly
 6   sworn to tell the truth, the whole truth and
     nothing but the truth, in the aforementioned cause
 7   of action.

 8        That the foregoing deposition was taken on
     behalf of the Defendants, on the 23rd day of
 9   October, 2020.

10        That said deposition was taken down in
     stenograph notes, afterwards reduced to
11   typewriting by me, and is a true and accurate
     transcription of the testimony; and that it was
12   agreed by and between the witness and attorneys
     that said signature on said deposition would not
13   be waived.

14        I do hereby certify that I am a disinterested
     person in this cause of action; that I am not a
15   relative of any party or any attorney of record in
     this cause, or an attorney for any party herein,
16   or otherwise interested in the event of this
     action, and am not in the employ of the attorneys
17   for either party.

18        IN WITNESS WHEREOF, I have hereunto set my
     hand this 30th day of October, 2020.
19
                    s/ Debra L. Brehm redacted pursuant to Local Rule 5.11
20

21

22

23                  DEBRA L. BREHM, CSR

24

25
```



```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                       URBANA DIVISION

 3   JENNIFER J. MILLER, DARIN E.)
     MILLER, SECOND AMENDMENT   )
 4   FOUNDATION, INC.; ILLINOIS )
     STATE RIFLE ASSOCIATION, and)
 5   Illinois Carry,            )
                                )
 6                   Plaintiffs, )
                                )
 7            -vs-              )No. 18-cv-3085
                                )
 8   MARC D. SMITH, in his      )
     official capacity as Acting )
 9   Director of the Illinois   )
     Department of Children and  )
10   Family Services, and KWAME )
     RAOUL, in his official      )
11   capacity as Attorney General)
     of the State of Illinois,   )
12                              )
                     Defendants.  )
13
          This is to certify that I have read the
14   transcript of my deposition taken in the
     above-entitled cause, and that the foregoing
15   transcript taken on October 23, 2020, accurately
     states the questions asked and the answers given
16   by me, with the exception of the corrections
     noted, if any, on the attached errata sheet(s).
17

18

19                    JENNIFER J. MILLER

20   Subscribed and Sworn before
     me this        day of
21                    , 2020.

22

23
     Notary Public
24

25
```



JENNIFER J. MILLER                              October 23, 2020
MILLER vs SMITH                                           230

```
 1   Reference No.: 6109529

 2

 3   Case:  MILLER vs SMITH

 4

         DECLARATION UNDER PENALTY OF PERJURY
 5
         I declare under penalty of perjury that
 6   I have read the entire transcript of my Depo-
     sition taken in the captioned matter or the
 7   same has been read to me, and the same is
     true and accurate, save and except for
 8   changes and/or corrections, if any, as indi-
     cated by me on the DEPOSITION ERRATA SHEET
 9   hereof, with the understanding that I offer
     these changes as if still under oath.
10

11       _____

12         Jennifer J. Miller

13

14         NOTARIZATION OF CHANGES

15              (If Required)

16

17   Subscribed and sworn to on the _____ day of

18

19   _____, 20_____ before me,

20

21   (Notary Sign)_____

22

23   (Print Name)                    Notary Public,

24

25   in and for the State of _____
```



JENNIFER J. MILLER                          October 23, 2020
MILLER vs SMITH                                          231

```
 1   Reference No.: 6109529
     Case:  MILLER vs SMITH
 2

 3   Page No._____Line No._____Change to:_____

 4   _____

 5   Reason for change:_____

 6   Page No._____Line No._____Change to:_____

 7   _____

 8   Reason for change:_____

 9   Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24
     SIGNATURE:_____DATE:_____
25   Jennifer J. Miller
```



```
 1   Reference No.: 6109529
     Case:  MILLER vs SMITH
 2

 3   Page No._____Line No._____Change to:_____

 4   _____

 5   Reason for change:_____

 6   Page No._____Line No._____Change to:_____

 7   _____

 8   Reason for change:_____

 9   Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24
     SIGNATURE:_____DATE:_____
25   Jennifer J. Miller
```

