E-FILED
Friday, 12 November, 2021  03:35:15 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 7
# Deposition of Valinda Rowe

1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE CENTRAL DISTRICT OF ILLINOIS

3

4   JENNIFER J. MILLER, DARIN    )
    E. MILLER, SECOND            )
5   AMENDMENT FOUNDATION,        )
    INC., ILLINOIS STATE RIFLE   )
6   ASSOCIATION and ILLINOIS     )
    CARRY,                       )
7                                )
                   Plaintiffs,   )
8                                )
           vs.                   ) No. 18 cv 3085
9                                )
    MARC D. SMITH, in his        )
10  official capacity as         )
    Acting Director of the       )
11  Illinois Department of       )
    Children and Family          )
12  Services, and KWAME RAOUL,   )
    in his official capacity     )
13  as Attorney General of the   )
    State of Illinois,           )
14                               )
                   Defendants.   )
15

16           The Rule 30(b)(6) deposition of ILLINOIS

17   CARRY through VALINDA ROWE, called as a witness for

18   examination, taken via videoteleconference pursuant

19   to the Federal Rules of Civil Procedure of the

20   United States District Courts pertaining to the

21   taking of depositions, taken before VICTORIA C.

22   CHRISTIANSEN, a Certified Shorthand Reporter of the

23   State of Illinois, CSR No. 84-3192, on the 7th day

24   of August, A.D. 2020, at 9:00 a.m.



1  PRESENT:

2       LAW FIRM OF DAVID G. SIGALE, P.C.,

3       (430 Roosevelt Road,

4       Wheaton, Illinois 60187,

5       630-452-4547), by:

6       MR. DAVID G. SIGALE,

7       dsigale@sigalelaw.com,

8            appeared via videoteleconference on

9            behalf of the Plaintiffs;

10      OFFICE OF THE ILLINOIS ATTORNEY GENERAL,

11      (100 West Randolph Street, 13th Floor,

12      Chicago, Illinois 60601,

13      312-814-3000), by:

14      MR. MATTHEW CHIMIENTI,

15      mchimienti@atg.state.il.us, and

16      MS. GRETCHEN E. HELFRICH,

17      ghelfrich@atg.state.il.us,

18      ASSISTANT ATTORNEYS GENERAL,

19      SPECIAL LITIGATION BUREAU,

20           appeared via videoteleconference on

21           behalf of the Defendants.

22

23  REPORTED BY:  VICTORIA C. CHRISTIANSEN, RPR, CRR,

24               Illinois CSR No. 84-3192.



1   THIS DEPOSITION IS BEING HELD VIA VIDEOCONFERENCING

2   EQUIPMENT.  THE WITNESS AND REPORTER ARE NOT IN THE

3   SAME ROOM.  THE WITNESS WILL BE SWORN IN REMOTELY

4   PURSUANT TO AGREEMENT OF ALL PARTIES.  THE PARTIES

5   STIPULATE THAT THE TESTIMONY IS BEING GIVEN AS IF

6   THE WITNESS WAS SWORN IN IN PERSON.

7        MR. CHIMIENTI:  This is the Rule 30(b)(6)

8   deposition of IllinoisCarry taken pursuant to

9   notice given on July 21, 2020 in the matter of

10  Miller v. Smith, et al.

11            David, who has the organization produced

12  to testify about the list of topics on the notice?

13       MR. SIGALE:  I'm going to answer the question,

14  and it's Valinda Rowe, Valinda with a V, Rowe with

15  an E at the end, but you froze up again, so I'm --

16  I'm fearing that this -- this is going to be a

17  recurring thing.  I hope not, but I'm just letting

18  you know it happened again.

19       MR. CHIMIENTI:  Okay.  Thank you.  I

20  appreciate that.  We'll try our best here.

21            Before we --

22       MS. HELFRICH:  Should you try reconnecting?

23  Would that help?

24       MR. CHIMIENTI:  Yeah, let's go off the record



1  for a second.

2                    (WHEREUPON, discussion was had off

3                     the record.)

4     MR. CHIMIENTI:  Before I get started, I just

5  have one thing for the record.

6              Defendants propounded discovery on

7  plaintiffs in October.  Plaintiffs initially

8  produced documents in January and then again over

9  the course of the spring pursuant to multiple court

10  orders on multiple motions to compel filed by

11  defendants.

12              Now less than 24 hours before the start

13  of this deposition, IllinoisCarry, through counsel,

14  Mr. Sigale, produced additional documents, one set

15  around noon yesterday and one set after 9:00 p.m.

16  last night, less than 12 hours before this dep was

17  scheduled to begin.

18              Included in the late-night production

19  was an 81-page manual on concealed carry along with

20  a 2018 supplement.  These documents were responsive

21  and existed well before defendants requested them.

22              Because of the court's scheduling order,

23  defendants intend to proceed with the deposition

24  today, but because we have not been able to conduct



1  a full review of the documents, defendants reserve

2  the right to reopen this deposition after that

3  review.

4          Additionally, we have two more 30(b)(6)

5  witnesses coming up in the next two weeks.  We

6  would ask that counsel produce supplemental

7  responsive material well in advance of those

8  depositions as opposed to the day before.

9          That's my spiel for the record.  The

10  court reporter can swear in the witness.

11              (WHEREUPON, the witness was duly

12              sworn.)

13              VALINDA ROWE,

14  called as a witness herein, having been first duly

15  sworn, was examined and testified as follows:

16              EXAMINATION

17  BY MR. CHIMIENTI:

18      Q.    Good morning, Ms. Rowe.  How are you?

19      A.    Good morning.  How are you?

20      Q.    Doing well.  Thanks.

21          Have you ever given a deposition before?

22      A.    I have not.

23      Q.    Okay.  So just before we get started

24  here, just a couple of ground rules.



1              As the court reporter mentioned, we are

2    conducting this deposition via Zoom because of the

3    COVID-19 pandemic, but our court reporter is still

4    here, and she's taking down everything we say.  As

5    a general matter, the court reporter can't take

6    down shakes of the head, "uh-huh," "uh-uh," you

7    know, non-verbal answers like that, so just keep

8    that in mind as we go forward today.  And I

9    apologize in advance if I correct you on that and

10   just ask for a verbal answer.  I mean no offense.

11   It's just for our court reporter's benefit.

12             At the same time we want to make sure

13   the record is clear, so we need to try to avoid

14   talking over one another.  There's a possibility

15   today that we may get fairly conversational in our

16   back and forth, and particularly over Zoom, I want

17   to make sure that she has time to take down

18   everything we say.  So I'm going to do my best to

19   wait until you finish an answer before I ask

20   another question, and I would ask that you wait

21   until I finish my question before you begin your

22   answer.

23             Does that sound okay?

24        A.    Sounds fine.



1      Q.    Okay.  We can take a break at any time.

2  The only exception is that if there is a question

3  pending, we'd ask for an answer before we take a

4  break.  But other than that, we can take a break

5  whenever you'd like one.

6            Is that okay?

7      A.    That's okay.

8      Q.    Okay.  So there are going to be some

9  points in time, including right now, where I'm

10  going to share my screen and put up some exhibits,

11  some documents that I'm going to show you, and this

12  will be the first one.

13           All right.  So I'm showing you what I

14  have marked as Exhibit 1 to your deposition.

15           Have you ever seen this document before?

16     A.    Yes, I believe so.

17     Q.    Okay.  This is -- this is the 30(b)(6)

18  notice of deposition to IllinoisCarry.

19     MR. SIGALE:  I just want to point out, I'm

20  sorry to interrupt, this is -- you're sharing on

21  your screen, Matt, which means that the witness

22  can't scroll down or review or anything, so if the

23  witness -- I'm just telling the witness that if she

24  needs you to scroll down so that she can say, for



 1   example, has she seen the document that she should

 2   do that.

 3        MR. CHIMIENTI:  Okay.  Fair enough, David.  I

 4   apologize.

 5   BY MR. CHIMIENTI:

 6        Q.    I'll scroll down here so you can see the

 7   whole thing, and feel free to tell me to stop or

 8   slow down, Ms. Rowe.

 9             Okay.  So I'll ask again:  Have you ever

10   seen this document before?

11        A.    Yes, I have.

12        Q.    Okay.  And just so we get this off the

13   screen and I can -- now, you understand under that

14   notice, Ms. Rowe, you're here testifying on behalf

15   of the organization IllinoisCarry, correct?

16        A.    Correct.

17        Q.    And you understand that the organization

18   has testified -- or, sorry, do you understand that

19   the organization has designated you to testify as

20   to all of the topics on that notice?

21        A.    Yes.

22        Q.    Okay.  And you understand that you

23   are -- your answers bind IllinoisCarry?

24        A.    Yes.



1       Q.    Okay.  You said you'd never given a

2    deposition before in any case, is that right?

3       A.    Correct.

4       Q.    Do you know if anyone has ever testified

5    in a deposition like this on behalf of

6    IllinoisCarry?

7       A.    Not to my knowledge.

8       Q.    So how I'd like to start here, Ms. Rowe,

9    I'd just like to get a little bit of background

10    information about you and then we'll talk a little

11    bit about the organization and then we'll talk

12    about the substantive stuff that's going on in this

13    case, if that's okay.

14       A.    Okay.

15       Q.    Could you give us a thumbnail sketch of

16    your educational background starting with high

17    school?

18       A.    I graduated high school with a diploma

19    and graduated from junior college with an

20    associate's degree.

21       Q.    What was that associate's degree in?

22       A.    It's been so long ago.  It was I believe

23    an associate's in science.

24       Q.    Okay.  Do you have any formal education



1  related to child care?

2      A.    Formal education?  I don't believe so.

3      Q.    Can we -- let's shift a little bit and

4  talk about your job history.

5            Starting with I guess let's say your

6  first job out of high school, can you kind of walk

7  us through your professional history?

8      A.    The first job out of high school?  I

9  worked at the textbook center of the junior college

10 I attended, and then I went to work for a -- it was

11 Wabash Area Development, Incorporated, an agency

12 for our county -- it was like a water district sort

13 of government office -- and then I went to work for

14 a supermarket chain as an advertising manager.

15           From there my husband and I were

16 employed as house parents at a children's home, a

17 residential facility, and then -- that was for

18 about three years, I believe, and then we opened

19 our own business, a portrait studio.

20     Q.    Okay.  Just to dive into that just a

21 little bit, the development company, the job that

22 you had after the textbook company, what were you

23 doing for the development -- what were you doing

24 for that development company?



1      A.    I was just secretarial, clerical

2   assistant.

3      Q.    Okay.  And I should have asked this

4   earlier.  Which college did you get your

5   associate's degree from?

6      A.    Wabash Valley Junior College in Mount

7   Carmel, Illinois.

8      Q.    You had mentioned that there was a

9   period of time that you and your husband worked in

10   a children's home, correct?

11      A.    Correct.

12      Q.    When approximately was that?

13      A.    I believe it was sometime in 1985 to the

14   spring of 1988, I believe.

15      Q.    What was the name of this facility?

16      A.    Baptist Children's Home.

17      Q.    And what -- could you describe a little

18   bit what this -- what service this home provided?

19      A.    It was a residential facility that had

20   several cottages where children came to live.

21      Q.    For what reason?  Why would the children

22   come there?

23      A.    Different reasons.  Some their parents

24   in some way were incapacitated or they were having



1  difficulty at home or at school or possibly legal

2  difficulties and needed to be outside the home for

3  a period of time.

4      Q.   Was this home -- sorry.  I'll ask it a

5  different way.

6           Do you know if this home was licensed by

7  the State of Illinois as a child care facility?

8      A.   I believe it was.

9      Q.   Do you know what type of child care

10 facility it was, whether it was a foster home, a

11 group care home, a day care home, something along

12 those lines?

13     A.   It was -- I believe it would be

14 considered a group-type home.  There were like five

15 different cottages, I believe.

16     Q.   What was your responsibility or role at

17 this facility?

18     A.   My husband and I were house parents.

19     Q.   And what did that entail?

20     A.   Our duties were to supervise the

21 children that were placed in that particular

22 cottage and to prepare meals, to supervise their

23 school work, do the shopping for the cottage.

24     Q.   Did you live on site?



1        A.    It was a five days on/two days off work

2   schedule.  The five days on we were in the cottage

3   with the girls.

4        Q.    So the role that you just described in

5   terms of your responsibilities, those are

6   responsibilities that both you and your husband

7   would carry out?

8        A.    Correct.

9        Q.    Were firearms allowed at Baptist

10  Children's Home?

11       A.    I don't believe so.  I don't know that

12  the issue ever came up.

13       Q.    Okay.  Let me ask it a different way.

14             When you were living on site, did you

15  have firearms present in your cottage?

16       A.    No.

17       Q.    Why not?

18       A.    It just was not something that came up.

19       Q.    Did you ever have any discussions with

20  the staff at the home as to whether firearms would

21  be allowed on the premises?

22       A.    Not that I recall.

23       Q.    Did you ever ask whether you could have

24  a firearm on the premises?



1       A.    No.

2       Q.    You had mentioned that currently -- or

3  the most recent job that you described to us was

4  that you and your husband have a photography

5  studio?

6       A.    We had a photography studio.

7       Q.    During what time frame?

8       A.    We opened in 1986 and closed the

9  business in 2006.

10      Q.    Are you currently employed?

11      A.    I am retired.

12      Q.    Okay.  Fair enough.

13            Did you retire in '06?

14      A.    Correct.

15      Q.    Is your husband also retired?

16      A.    Correct.

17      Q.    Jumping back really quickly to the

18  Baptist Children's Home -- I apologize to hop

19  around on you here -- before you started working at

20  that home, did you have to undergo any sort of

21  training -- any training before you could work at

22  the home?

23      A.    No.

24      Q.    Shifting gears slightly, specifically



1    with respect to firearms, I was wondering if you

2    could kind of describe for us your own -- any

3    training that you've personally had with respect to

4    handling firearms.

5         A.    The first training that I probably had

6    was as a sophomore in high school.  Hunter safety

7    was a part of our physical education curriculum,

8    and I don't believe I had any further what I would

9    call official training until sometime late '90s,

10   1990, somewhere in there, I took an NRA course.

11        Q.    Which course was that?

12        A.    It was the -- I'm trying to think of the

13   name of it.  They don't -- they don't -- it's not

14   on their curriculum now.  It was a short four-hour

15   firearms safety course.

16             From there I took the NRA instructor

17   training course sometime after that, and then I

18   have taken the NRA personal protection in the home

19   course.

20        Q.    Any other training materials -- or,

21   sorry, any other training courses that you've

22   taken?

23        A.    I can't think of any at this time.

24        Q.    Before we jump into those, really



1  quickly to get this out of the way, are you a FOID

2  card holder?

3      A.    I am.

4      Q.    Are you a concealed carry license

5  holder?

6      A.    I am.

7      Q.    When did you receive your FOID card?

8      A.    I would have to look at the card.  I

9  don't remember.

10     Q.    Ballpark.  Even a, you know, decade is

11  fine.  Like late '80s, early '90s, something along

12  those lines?

13     A.    I couldn't begin to guess.

14     Q.    The same question for concealed carry.

15           Do you remember when you received that?

16     A.    2014.

17     Q.    So jumping a little bit about the NRA --

18  the various courses that you sort of went through

19  from high school to present, did the hunter safety

20  course, if you remember, cover anything about

21  proper storage of firearms?

22     A.    Possibly the transporting it, storing it

23  in a case unloaded.

24     Q.    When you say "transporting," you mean



1  getting it, you know, from your home or wherever

2  you're starting to wherever you're going hunting?

3      A.    Correct, and then back again.

4      Q.    Okay.  The NRA course that you took in

5  the '90s, the NRA safety course, did that course

6  cover anything about firearms storage?

7      A.    Yes.

8      Q.    What specifically did you learn about

9  firearms storage from that NRA course that you took

10  in the '90s?

11     A.    That firearms should be stored in a

12  manner that they would not be accessible to

13  unauthorized persons.

14     Q.    Did the NRA describe who would qualify

15  as an unauthorized person?

16     A.    I don't know that the NRA did, but the

17  instructor did.

18     Q.    Fair enough.

19           What did the instructor say about who

20  qualifies as an unauthorized person?

21     A.    Someone who would not have the authority

22  or knowledge or ability to handle a firearm safely.

23     Q.    And as far as you are concerned, who

24  falls into that category?



1      A.    In my opinion, it would be someone who

2    does not know the firearms safety rules or does not

3    know how to handle a firearm safely, someone who

4    knows both of those things but might be careless

5    and someone with criminal intent or a mental issue

6    that might cause them to be irresponsible or

7    dangerous.

8      Q.    Setting aside the -- I suppose the

9    criminal aspect that you mentioned at the very end,

10   is it possible that children might fall into the

11   category of individuals who might not be properly

12   trained on how to handle a firearm?

13     A.    Yes, in my opinion.

14     Q.    The NRA instructor course that you took,

15   what was the purpose of that course?

16     A.    It was the -- the first course or the

17   second course.

18     Q.    You told me about the NRA safety course,

19   the NRA instructor course and then the NRA personal

20   protection in the home course, so this one's the

21   middle one, the NRA instructor course.

22          What was the purpose of that one?

23     A.    That is a course that certifies us on

24   successful completion of the course you can be



1  certified to teach the NRA basic pistol course.

2       Q.   Have you taught the basic NRA pistol

3  course since completing that instructor program?

4       A.   I have.

5       Q.   Again, I'm not looking for an exact

6  number but a ballpark, how many times about would

7  you say?

8       A.   The first course I taught was in 2004,

9  and I have probably instructed or helped instruct

10 two to four classes per year since then.

11      Q.   And you're still -- you're still

12 teaching these today?

13      A.   Correct.

14      Q.   Just out of curiosity, has the pandemic

15 affected your ability to teach these courses at

16 all?

17      A.   It has.

18      Q.   What do you teach -- well, sorry.  Let

19 me strike that and ask a different question.

20           When you teach these courses, do you

21 instruct your students on proper firearm storage?

22      A.   That is part of the curriculum, yes.

23      Q.   What do you typically instruct your

24 students about how they should store their firearm?



1   A.   They should be stored in a manner that

2   the firearms and ammunition are not accessible to

3   unauthorized persons.

4   Q.   Do you instruct your students that they

5   should store their firearms unloaded?

6   A.   It depends on the purpose of the

7   firearm.

8   Q.   What do you mean by that?

9   A.   That if a firearm is not going to be

10  used for a period of time that it should be

11  unloaded.  If the firearm's purpose is for

12  self-defense in the home or to carry on their

13  person, then it should be stored in a manner that

14  is not accessible to unauthorized persons.

15  Q.   Do you instruct your students to store

16  ammunition separately from their firearms?

17  A.   If they are -- if the ammunition and

18  firearms are not under lock and key, then they

19  should be stored separately so that if one is

20  discovered, the other is not.

21  Q.   Just to sort of jump off, one of the

22  things that you had mentioned in a previous answer

23  was you talked about a firearm being on someone's

24  person -- and I'm paraphrasing here, so I



1  apologize, a firearm being on someone's person

2  versus sort of in the home for, you know,

3  self-defense purposes.

4         When you say a firearm in the home for

5  self-defense purposes, can you kind of describe

6  what you mean by that if it's not on -- if the

7  firearm is not on the individual person?

8     A.    I'm not sure I understand your question.

9     Q.    Yeah, and I apologize.  Maybe I should

10  ask it a different way.

11         If the firearm's not on the individual's

12  person and it's being used for home defense, where

13  and how should that firearm be kept?

14     A.    First and foremost, it should be stored

15  in a manner that is not accessible to unauthorized

16  persons.  There are different methods I believe

17  that that can be done safely.  One is in a locked

18  safe.

19     Q.    Is it your -- do you think or do you

20  believe that firearms for self-defense purposes

21  should be allowed to be stored loaded in that

22  situation?

23     A.    Could you repeat the question, please?

24     Q.    Yeah.  I'm sorry.  I'm tripping over



 1   myself a little bit here.

 2          In a situation like that where a firearm

 3   is stored away from unauthorized persons, should

 4   the owner or operator be allowed to keep the

 5   firearm loaded while it's in storage?

 6      A.    Correct, as well as it's not accessible

 7   to an unauthorized person but ready to use in a

 8   case of self-defense.

 9      Q.    Okay.  Other than firearms that are

10   being used for self-defense purposes, do you

11   believe that those firearms should be stored

12   unloaded?

13      A.    Could you repeat that, please?

14      Q.    Other than these firearms that are being

15   used for self-defense and defense of the home,

16   should firearms be stored unloaded?

17      A.    That is part of the training information

18   that firearms should be stored unloaded until ready

19   to use.  In the case of self-defense, then they

20   need to be ready to use at a moment's notice.

21      Q.    This idea of being ready to use, is

22   it -- do you think that a firearm that is stored

23   loaded for self-defense purposes qualifies as a

24   firearm that is in use?



1          MR. SIGALE:   I'll just object as to form of

2     the question.

3               If you understand it, go ahead and

4     answer.

5     BY THE WITNESS:

6          A.    I'm not sure I understand.

7     BY MR. CHIMIENTI:

8          Q.    Sure.  A firearm that is loaded, stored

9     locked, ready for self-defense or home defense

10    purposes, do you believe that qualifies as a

11    firearm that is in use?

12         A.    It's ready to use.

13         Q.    Is that something different than a

14    firearm that is in use?

15         A.    I don't know.

16         Q.    What to you qualifies as a firearm that

17    is in use?

18         A.    Possibly a firearm that is loaded,

19    easily accessible, ready to use in the case of

20    self-defense or other lawful purposes or on your

21    person.

22         Q.    And so your definition or your

23    interpretation of that, what is that based on?

24         A.    Probably based on the personal



1  protection in the home training course and the

2  Illinois Firearm Conceal Carry Act that talks about

3  carrying on or about your person.

4        Q.    Let's talk really quickly about the

5  personal protection in the home course.

6              This may sound like an obvious question,

7  but I'll ask it anyway:  What was the purpose of

8  the personal protection in the home course?

9        A.    To instruct people on the safe and

10  responsible use of a firearm in the home.

11        Q.    Did that personal protection course

12  discuss anything about firearm storage?

13        A.    Yes.

14        Q.    What specifically did that course cover?

15        A.    That firearms should be stored in a

16  manner that they are not accessible to unauthorized

17  persons.

18        Q.    Did any of these courses, whether it's

19  the safety course in the '90s, the instructor

20  course in the early 2000s or this personal

21  protection in the home course that you took most

22  recently -- did any of these courses discuss

23  firearms with respect to children?

24        A.    Yes, if the child was considered an



1    unauthorized person.

2        Q.    Based on your attending these courses --

3    I'm sorry.  Strike that.

4              Did any of these courses discuss when a

5    child qualifies as an unauthorized person?

6        A.    As an unauthorized person?

7        Q.    Yes.

8        A.    In general discussion, I don't know that

9    it was part of the class material itself, but in --

10   in discussion, I believe the instructor talked

11   about children who were too young to understand

12   firearm safety and how firearms work, they would be

13   unauthorized without adult supervision.  It's in

14   most cases until they are old enough, because I

15   think Illinois goes all the way up to 21 years of

16   age I believe before someone can purchase a

17   handgun.

18       Q.    In --

19       A.    Does that answer the question?

20       Q.    No, no.  I'll ask another one.  I

21   appreciate that.

22             You mentioned that -- just to clarify,

23   what the instructor had said was that -- did the

24   instructor describe or mention anything about



1  children who are too young to understand how a

2  firearm works, those individuals being unauthorized

3  persons who should not have access to firearms?

4      A.    Children could be included in that group

5  of unauthorized persons.

6      Q.    Do you teach -- in your courses when

7  you're instructing the NRA courses, do you teach

8  anything to your students about rules or

9  restrictions or guidance on how to address firearms

10  with children?

11      A.    In the class that I teach, we cover that

12  firearms and ammunition should be stored in a

13  manner that is inaccessible to unauthorized

14  persons.  We have discussions about if there are

15  children in the home --

16      Q.    What do --

17      A.    -- and how that could be done.

18      Q.    I'm sorry.  I didn't mean to cut you

19  off.

20            What do the discussions about children

21  in the home entail?

22      A.    That firearms should be stored in a

23  manner that they are not accessible to those

24  unauthorized persons.



1       Q.     Including children?

2       A.     If they are an unauthorized person.

3       Q.     And just so the record's clear, what

4   would make a child an unauthorized person?

5       A.     If they did not have the authorization

6   of their parents to be in possession, if they did

7   not have the knowledge or skill to handle a firearm

8   safely.

9       Q.     Okay.  Was the hunter safety course that

10  you took in PE in high school the first time you

11  ever personally handled a firearm?

12      A.     I believe so.

13      Q.     Any particular reason for that being the

14  first time?

15      A.     Growing up, we did not have firearms in

16  my household.

17      Q.     The courses that you teach, if you know,

18  is there an age limit for who has to -- do you have

19  to be a certain age to attend the course?

20      A.     I don't think so.

21      Q.     If you recall, what's the youngest

22  person who's ever attended one of your courses?

23      A.     I believe 16.

24      Q.     Following up on something you mentioned



1  just a moment ago, that firearms were not in your

2  home growing up, is there any particular reason for

3  that?

4      A.    I was raised in a single-parent home,

5  and my mother just had no interest in firearms.

6  She -- we didn't have them.

7      Q.    Okay.  Do you and your husband have

8  children?

9      A.    No, we do not.

10     Q.    Okay.  Other than the Baptist Children's

11  Home that you and your husband worked at, have you

12  ever lived with children in your home?

13     A.    Yes.

14     Q.    When was that?

15     A.    I'm thinking 1988.

16     Q.    So that was right after the time you

17  guys got done with the Baptist Children's Home?

18     A.    Correct.

19     Q.    How long were the children living in

20  your home?

21     A.    From as short as maybe six months to a

22  year or two.

23     Q.    During that time, did you and your

24  husband own firearms?

1      A.    Yes.

2      Q.    During that time, how were those

3  firearms stored, if you recall?

4      A.    So that they were not accessible to

5  unauthorized persons.

6      Q.    Did you consider the children that you

7  were living with at the time to be unauthorized

8  persons?

9      A.    I would think so.

10     Q.    And so did you take steps to make sure

11 that those children did not have access to the

12 firearms?

13     A.    Correct.

14     Q.    And why would you not want those

15 children to have access to the firearms?

16     A.    Because our policy is that the firearms

17 should not be accessible to unauthorized persons.

18     Q.    What results could have happened if

19 those children had access to the firearms?

20     MR. SIGALE:  I'll just object as to

21 speculation.

22          If you have an answer, you can answer.

23 BY THE WITNESS:

24     A.    Could you repeat the question?



1   BY MR. CHIMIENTI:

2       Q.    Sure.   What results could have happened

3   if those children had access to the firearms?

4       MR. SIGALE:  Same objection.

5   BY THE WITNESS:

6       A.    That's kind of speculating; it's kind of

7   guessing.  There is a reason that the -- that it is

8   taught in the courses, you know, for people --

9   unauthorized people not to have access to firearms,

10  because they could be unsafe, an accident could

11  happen.

12  BY MR. CHIMIENTI:

13      Q.    An accident like what?

14      MR. SIGALE:  Same objection.

15  BY MR. CHIMIENTI:

16      Q.    Let me rephrase the question.

17          What types of accidents are taught in

18  those courses that could result?

19      A.    I am trying to think of the word.

20  Negligent discharge of a firearm, accidental

21  discharge of a firearm.

22      Q.    Does that mean the firearm goes off

23  unintentionally?  Is that what that means?

24      A.    Well, the firearm can't go off.  The



1  person handling the firearm does something,

2  manipulates the firearm in some way that it goes

3  off when it's not intended to go off.

4      Q.   Okay.  Just to confirm, Ms. Rowe, are

5  you an Illinois DCFS-licensed foster parent?

6      A.   No.

7      Q.   Are you an Illinois DCFS-licensed day

8  care home provider?

9      A.   No.

10      Q.   We've been going for about 50 minutes

11  and this is probably a logical spot to take a

12  break, Ms. Rowe, if you'd like, but I'm happy to

13  keep going if you want to keep going.  It's up to

14  you.

15      A.   I'm fine currently if everyone else is.

16      Q.   All right.  We'll keep on going, then.

17           You are currently -- I don't know what

18  the right word is -- affiliated with IllinoisCarry,

19  correct?

20      A.   Correct.

21      Q.   What is your current position at

22  IllinoisCarry?

23      A.   Spokesperson.

24      Q.   How long have you been spokesperson?



1        A.     I believe since 2006.

2        Q.     Have you held any other positions at

3    IllinoisCarry besides spokesperson?

4        A.     No.

5        Q.     Why did you become spokesperson?

6        A.     The organization needed someone who

7    could speak on behalf of the organization for media

8    requests and someone who could take phone calls and

9    e-mails from membership and the general public.

10        Q.     Is it fair to say that you have sort of

11    a public relations role with IllinoisCarry?

12        A.     I think that would be accurate.

13        Q.     And what specific, you know, tasks does

14    that require you to perform?

15        A.     Answer phone calls, reply to e-mails,

16    speak with the media if they are seeking

17    information.

18        Q.     Have you ever responded to a member

19    e-mail regarding foster care?

20        A.     I don't recall.

21        Q.     Have you ever responded to a member

22    e-mail regarding day care?

23        A.     Yes.

24        Q.     Okay.  When was that?



1        A.    That was with Darin Miller.

2        Q.    Okay.  Any other communications about

3    day care aside from that with Darin Miller?

4        A.    I don't follow the question.

5        Q.    Sure.  Aside from that e-mail that you

6    just mentioned about day care that you had with

7    Darin Miller, have you responded to any other

8    e-mails from other members regarding day care?

9        A.    Not that I recall.

10        Q.    Have you responded or fielded any phone

11    calls regarding foster care?

12        A.    I may have, but I'm not recalling any

13    specifics.

14        Q.    Okay.  Have you responded to or fielded

15    any phone calls regarding day care?

16        A.    Yes.

17        Q.    With whom?

18        A.    Darin Miller.

19        Q.    Okay.  Aside from phone calls that

20    you've had with Darin Miller, have you fielded any

21    other phone calls about day care?

22        A.    Not that I recall.

23        Q.    Do you supervise anybody in your role as

24    spokesperson?



1       A.    I'm not sure I understand.

2       Q.    Sure.  Does anybody report to you?

3       A.    No.

4       Q.    Do you report to anyone?

5       A.    Just to our board.

6       Q.    Okay.  And we'll get to the makeup of

7    the board a little bit later.

8             Do you have any -- in your position

9    at -- well, sorry, are you also a board member?

10      A.    Yes.

11      Q.    How long have you been a board member at

12   IllinoisCarry?

13      A.    I believe since 2009.

14      Q.    How did you gain that position of board

15   member?

16      A.    That's when we incorporated, and a group

17   of us volunteered.

18      Q.    Was there any -- strike that.

19            Are you -- what sorts of duties do you

20   have as a board member?

21      A.    My position on the board is as the

22   spokesperson.

23      Q.    So there are no separate or additional

24   responsibilities you have as a board member aside



ILLINOIS CARRY 30B6                                    August 07, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              35

1   from those as spokesperson?

2       A.    No.

3       Q.    Do you have any responsibility with

4   respect to authorizing lawsuits or litigation?

5       A.    Could you repeat the question, please?

6       Q.    Sure.  Do you have any responsibilities

7   with respect to authorizing lawsuits --

8       A.    Not --

9       Q.    -- that would be filed on behalf of

10  IllinoisCarry?

11      A.    Not a specific responsibility or

12  authority.

13      Q.    Okay.  Do you have any input on that

14  process?

15      A.    Yes.

16      Q.    What sorts of input do you have on that

17  process?

18      A.    If the information becomes available to

19  me to share it with the other board members.

20      Q.    How did you become involved with

21  IllinoisCarry?

22      A.    Back in 2004 I was searching for

23  information on concealed carry in the State of

24  Illinois, and I discovered the forum on-line.



1      Q.    When did you first become a member?

2      A.    In 2004.

3      Q.    And I may have asked this already and I

4   apologize if I did, but I'll ask it a different

5   way, I guess.

6           How did you go from everyday member to

7   spokesperson?

8      A.    We were a very small group in 2004, and

9   as 2006 -- you know, a couple years later, the --

10  the group was growing and needed a centralized

11  person that could be spokesperson.

12     Q.    Did you volunteer for that position or

13  did somebody ask you to be spokesperson?

14     A.    I think it all just kind of came about

15  at one time.  "We're needing someone."  "I can do

16  it."  It was just kind of a mutual agreement, I

17  think.

18     Q.    Okay.  Are you paid for your work as

19  spokesperson?

20     A.    No.  IllinoisCarry is an all-volunteer

21  organization.

22     Q.    How many hours a week would you say you

23  spend on IllinoisCarry-related work?

24     A.    I would estimate a minimum probably of 8



1   to 10 hours a day.

2       Q.    Okay.  And does that work largely

3   revolve around duties and responsibilities you

4   described to us earlier as spokesperson?

5       A.    Correct.

6       Q.    Do you have any lobbying function as

7   spokesperson?

8       A.    Not currently I do not.

9       Q.    Okay.  Did you at one point?

10      A.    Yes, for a couple of years.

11      Q.    Is somebody else lobbying on behalf of

12  IllinoisCarry at the moment?

13      A.    No.

14      Q.    Does IllinoisCarry do any lobbying at

15  all?

16      A.    As an organization?  Currently we do not

17  have a registered lobbyist.

18      Q.    What -- during what time frame were you

19  the registered lobbyist?

20      A.    Hmm.  I believe it was for a period of

21  two years, maybe three.

22      Q.    Do you know about what year that might

23  have been or years?

24      A.    I'm trying to think.  I'm guessing, I



1   don't know specifically, but -- let's see.  This is

2   2020.  I would say 2016 maybe to 2018?  I'm not

3   sure.

4        Q.    And when you were a lobbyist, what was

5   your -- what were your responsibilities at that

6   time?

7        A.    To keep up on legislation that was

8   proposed, to attend committee hearings and at times

9   to testify in committee if it was a topic that was

10  germane to our group.

11       Q.    Did you ever do any lobbying with

12  respect to foster home regulations?

13       A.    No.

14       Q.    Did you ever do any lobbying with

15  respect --

16       MR. SIGALE:  Counsel, counsel, I'm sorry to

17  interrupt your question there.  I'm going to hop

18  off video.  I am still going to be here.  You don't

19  have to take a break or anything.  I just wanted to

20  let you know I'm going to do that.

21       MR. CHIMIENTI:  Sure.

22  BY MR. CHIMIENTI:

23       Q.    Did you ever do any lobbying --

24       MR. CHIMIENTI:  Hold on.  David, quite

1   frankly, I prefer if you stay on video because I

2   see Ms. Rowe consistently looking off camera at you

3   and I saw you handing her some --

4       MR. SIGALE:  I only waved my hand at her

5   because I was trying to interrupt you to tell you I

6   was going off video so no one would have to watch

7   me eat, but then you asked your question, so I was

8   waving at her to go ahead and answer your question.

9       MR. CHIMIENTI:  Okay.

10      MR. SIGALE:  I'll do it how you want.  I'm

11  still sitting in the same spot.  I just figured as

12  a courtesy you guys wouldn't want to watch me.

13      MR. CHIMIENTI:  Well, we'll let you enjoy your

14  breakfast, lunch, whatever it is off camera, but

15  we'd appreciate it when you're done if you could

16  join us once again.

17      MR. SIGALE:  Yeah, of course.

18  BY MR. CHIMIENTI:

19      Q.   Ms. Rowe, I apologize, but have you ever

20  done any lobbying with respect to day care home

21  regulations?

22      A.   No.

23      Q.   Have you ever done any lobbying with

24  respect to the Child Care Act?



1       A.    I don't believe so.

2       Q.    Okay.  In terms of today's deposition --

3  and I don't want to know the contents of any

4  conversations you may have had with Mr. Sigale, but

5  what did you do to prepare for today's deposition?

6       A.    I reviewed the information that I was

7  asked to supply.

8       Q.    Meaning what?

9       A.    In the requests that your office made

10  for information.

11       Q.    Are you referring to the notice of

12  deposition that I showed you earlier?

13       A.    Yes.

14       Q.    Did you meet with or speak to

15  Mr. Sigale?

16       A.    Yes.

17       Q.    How many times did you speak to him?

18       A.    Over the course of when?

19       Q.    In preparation for this deposition.

20       A.    Oh, we spoke last night to answer

21  questions I had about being deposed.

22       Q.    Was that conversation over the phone?

23       A.    No.

24       Q.    It was in person?



1    A.    Yes.

2    Q.    How long did that conversation last?

3    A.    Well, part of our being together was

4    social, so I'm not sure.  I don't know.  About an

5    hour or so?  I'm not sure.

6    Q.    Okay.  Aside from that, aside from

7    meeting with Mr. Sigale, aside from reviewing the

8    notice, did you review any other materials in

9    preparation for today?

10   A.    Yes.

11   Q.    What materials did you review?

12   A.    I don't know what the names of the

13   documents are, but they were the answers to the

14   interrogatories I believe is the name.

15   Q.    Okay.  Anything else besides the answers

16   to interrogatories that you reviewed in preparation

17   for today?

18   A.    I can't think of anything.

19   MR. CHIMIENTI:  Okay.  Let's take a quick

20   break.  We'll been going a little over an hour.

21   Let's take a quick restroom break and allow David

22   to finish his meal.  It's 10:05 now.  Let's hop

23   back on at 10:15.

24   MR. SIGALE:  Okay.



```
 1                    (WHEREUPON, the deposition was

 2                    recessed from 10:06 to 10:15 a.m.)

 3   BY MR. CHIMIENTI:

 4        Q.    All right.  Ms. Rowe, we're back after a

 5   short break.  I wanted to clarify one thing that

 6   you had mentioned earlier.

 7              The children that you and your husband

 8   had lived with in your own home after the time that

 9   you were at the Baptist Children's Home, were those

10   in foster children, by chance?

11        A.    They were children that wanted to come

12   live with us for a period of time to finish school

13   and that sort of thing, but we were not licensed

14   foster care.

15        Q.    Okay.  Let's shift gears really quickly

16   to IllinoisCarry itself just to get a little bit of

17   background information on the organization, and you

18   alluded to this by talking about your position, so

19   I apologize for retreading ground here, but I do

20   want the record to be clear.

21              When was IllinoisCarry founded?

22        A.    In 2004.

23        Q.    Who founded IllinoisCarry?

24        A.    A gentleman by the name of Ray Leubert.
```



1      Q.    Can you spell "Leubert"?

2      A.    L-e-u-b-e-r-t.   Maybe two Ts.

3      Q.    Is Mr. Leubert still associated with

4   IllinoisCarry?

5      A.    He is a member.

6      Q.    Is he a member of the board?

7      A.    No, he is not.

8      Q.    Why did Mr. Leubert start IllinoisCarry?

9      A.    I think for the same reason that I was

10  looking for information on-line, he was also

11  looking for information and a way for Illinois to

12  pass concealed carry like other states had been

13  doing.

14     Q.    Okay.  Was concealed carry on the books

15  as a law when IllinoisCarry was founded?

16     A.    Not in Illinois.

17     Q.    When did that happen?

18     A.    In 2013 I believe they passed the

19  Concealed Carry Act.

20     Q.    Was the initial goal of the organization

21  to seek the passage of concealed carry, or were

22  there other goals in addition to that?

23     A.    I think that was the main goal.

24     Q.    After concealed carry was passed in



1  2013, how, if at all, did the organization's goals

2  shift?

3       A.    Our goal was to shift to an

4  informational format for providing information to

5  its members and the public.

6       Q.    About what?

7       A.    About the lawful acquisition, possession

8  and carry of firearms.

9       Q.    Is that the same goal that the

10  organization has today?

11       A.    I believe so.

12       Q.    Are there any other goals or missions of

13  the organization that we haven't talked about

14  yesterday?

15       A.    I can't think of any at this time.

16       Q.    Let's talk about really quickly first

17  the pre-2013 years.

18            How did the organization sort of strive

19  to achieve the passage of concealed carry?

20       A.    It was basically through education.

21       Q.    And how would the organization educate

22  interested people?

23       A.    By information posted on our discussion

24  forums about efforts in other states, how concealed



 1  carry was passing from state to state and also

 2  through town hall meetings conducted throughout the

 3  state on what concealed carry was and how other

 4  states were passing it.

 5      Q.    In the post-2013 era for IllinoisCarry,

 6  how does IllinoisCarry achieve its current mission?

 7      A.    We have discussion forums on our website

 8  that -- one is listed on how to apply for a FOID

 9  card, how to apply for a concealed carry license.

10  Another forum talks about instructional training

11  that is available throughout the state.

12  Instructors are welcome to post about their

13  courses --

14      Q.    Are --

15      A.    -- that they offer.

16      Q.    I'm sorry.  I apologize if I cut you off

17  there.

18           Are there still town hall meetings?

19      A.    Not about passing concealed carry.

20      Q.    Are there town hall meetings about any

21  topic?

22      A.    Occasionally there will be one if there

23  is an area where, you know, there is concern.

24      Q.    Has the organization held any town halls



1   about foster care?

2        A.    No.

3        Q.    Has the organization held any town halls

4   about day care?

5        A.    No.

6        Q.    I'm going to share my screen here and

7   show you what I have marked as Exhibit 2 to your

8   deposition.

9             Do you recognize this, Ms. Rowe?

10       A.    Yes.

11       Q.    This is the -- it's a printout, but is

12   it the IllinoisCarry.com home page?

13       A.    It appears to be.

14       Q.    And on the right-hand side here, you --

15   I think these are the things you had mentioned

16   earlier.

17             "How to Apply for Illinois Concealed

18   Carry," correct?

19       A.    Correct.

20       Q.    The training courses, I think this is

21   where people can post their training courses,

22   correct?

23       A.    Correct.

24       Q.    Okay.  And then you have an entry down



1  here where I've got my cursor here,

2  "Second Amendment Judicial Cases."

3      A.    Yes.

4      Q.    Is that -- I assume, but can you

5  confirm:  Is that a link that goes to a page that

6  discusses the ongoing litigation that IllinoisCarry

7  is involved in?

8      A.    Not just cases that IllinoisCarry is

9  involved in.  It's any Second Amendment case that

10  we're aware of that our members might find useful

11  or informational.

12      Q.    Thank you for that.

13            And then at the bottom here, you know,

14  we have banners here, Illinois State Rifle

15  Association, SAF, NRA and Gun Facts.

16            We'll get into ISRA and SAF a little bit

17  later, but just so I can clarify, the NRA -- does

18  IllinoisCarry have any affiliation with the NRA?

19      A.    No.

20      Q.    What is the reason why there's an NRA

21  banner here on the home page?

22      A.    Because they offer a lot of information

23  about what's going on in the country concerning

24  firearm rights and because they offer a lot of



1  training and information.

2       Q.    And knowing full well that you are an

3  NRA-licensed instructor and have gone through the

4  courses, is the NRA training something that you

5  find is a useful item to your members?

6       A.    Yes.

7       MS. HELFRICH:  I need to take a second to plug

8  in my laptop.  You can keep on going without me,

9  but that's what I'm going to be doing.

10      MR. CHIMIENTI:   Okay.

11 BY MR. CHIMIENTI:

12      Q.    So I'm just taking the home page off the

13 screen here.  Let's talk about the organization's

14 sort of makeup.  Let's talk about the membership.

15           Do you know how many members

16 IllinoisCarry has currently?

17      A.    Approximately 13,000.

18      Q.    Do you know how many members the

19 organization had on April 16th of 2018, which is

20 the date this lawsuit was initially filed?

21      A.    Hmm, no, I do not.

22      Q.    How does the organization keep track of

23 its members?

24      A.    Our membership is an on-line



1   registration on the -- there is a link on the home
2   page and on our forum pages where they can register
3   an account.
4       Q.    When someone registers an account, do
5   they have to -- strike that.
6            When you -- let's say I went to the page
7   today and I wanted to sign up.  What information
8   would I have to give to have an account?
9       A.    You would have to offer a screen name,
10  which could be your formal name or it could be a
11  nickname, a screen name, and an e-mail address.
12      Q.    Would I have to give my full name, my
13  legal name --
14      A.    No.
15      Q.    -- at any point?
16           We'll look at Mr. Miller's member page
17  here in a little bit, but is there a -- other than
18  being able to pull up user names on the website, is
19  there any sort of master list of membership?
20      A.    No.
21           What -- what do you mean by "master
22  list"?
23      Q.    Let me ask it a different way.
24           Is there a way for you to see a full



1  list of your members?

2      A.    The admin capabilities for the website,

3  you can go to a list of members.

4      Q.    And when you see a list of members,

5  would you only be able to see their screen name and

6  e-mail address?

7      A.    Correct.

8      Q.    Does the organization track or ask for

9  whether the person is an Illinois resident?

10      A.    No.

11      Q.    Do you know how many of your members are

12  Illinois residents?

13      A.    A specific number, no.

14      Q.    Does the organization collect or track

15  whether the person signing up -- sorry.  Strike

16  that.  Let me start over.

17          Does the organization collect or track

18  whether the members are foster parents?

19      A.    No.

20      Q.    Does the organization know how many of

21  its members are foster parents?

22      A.    No.

23      Q.    Does the organization collect or track

24  whether its members are day care home providers?



ILLINOIS CARRY 30B6                                    August 07, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              51

1      A.    No.

2      Q.    Does the organization know how many of

3    its members are day care home providers?

4      A.    I know of two.

5      Q.    Who are those individuals?

6      A.    Darin Miller and his wife and a

7    gentleman who was asking questions under the screen

8    name of -- hmm, I'm having trouble recalling his

9    screen name, but back in 2016 he was asking

10   questions because his wife had a day care license.

11     Q.    Okay.  Let's see if we can --

12     A.    Something --

13     Q.    I think I know who you're talking about.

14   I'm going to show it to you, and let's see if we

15   can go through it here.

16           I am going to share my screen and show

17   you what is marked as Exhibit 18 to your

18   deposition, and I apologize if these are out of

19   order.  I know we're just looking at the top here,

20   but do you recognize this document?

21     A.    Okay.  That was back in 2013.  It looks

22   like that was from the IllinoisCarry discussion

23   forum page.

24     Q.    Okay.  And it says -- I'll direct you



1    here to this person whose screen name is -- and I'm

2    going to spell it, G-R-E-B-E-N-O-T-S, and this

3    first post here at the top, this person is asking

4    about DCF-licensed day care in Illinois and the

5    reg- -- and a regulation that this person says

6    "directly affects me."

7              Is this the other member who you were

8    referring to earlier who is a day care home?

9         A.   No, it does not appear to be the one

10   that I recalled -- the other one that I recalled.

11        Q.   Okay.  So there's another one in

12   addition to this that you recall?

13        A.   Correct, and it was from 2016.

14        MR. SIGALE:  He's just talking -- I just want

15   to advise and make sure you let him finish the

16   question before you answer.

17        THE WITNESS:  Oh, I'm sorry.

18        MR. SIGALE:  Just so we have a clear record,

19   smoother deposition.

20   BY MR. CHIMIENTI:

21        Q.   Just so I'm clear, there is the Millers,

22   there is the person from 2016 and then there's

23   apparently this person who's asking about day care,

24   is that correct --



1        A.    That appears to be --

2        Q.    -- in terms of who -- I'm sorry.  Those

3    three groups of people are people who would be the

4    day care home providers that you're aware of?

5        A.    That would appear to be correct.

6        Q.    And the person in 2016, is it similar to

7    something like this where they're posting in the

8    forum under a screen name like this?

9        A.    Correct.

10        Q.    And if they -- strike that.

11              It's possible that you wouldn't even

12    have a first and last name for this person; you

13    just have the screen name and the e-mail address?

14        A.    Correct.

15        Q.    Does the organization track whether its

16    members have children who are living in a foster

17    home?

18        A.    No.

19        Q.    Does the organization know how many of

20    its members have children living in a foster home?

21        A.    No.

22        Q.    Does the organization track whether its

23    members have children attending a day care home?

24        A.    No.



1      Q.    Does the organization know how many of

2  its members have children attending a day care

3  home?

4      A.    No.

5      Q.    Does the organization track whether its

6  members are concealed carry permit holders?

7      A.    No.

8      Q.    Does the organization know how many of

9  its members are concealed carry permit holders?

10      A.    No.

11      Q.    I apologize for hopping around on you.

12            To jump back to the day care home issue,

13  for the user from 2016, have you had any

14  interaction with that user about day care home

15  issues?

16      A.    Only in that discussion thread.  No

17  individual or separate communication that I am

18  aware of.

19      Q.    The individual -- sorry.

20            Did the individual reach out to you

21  separately via phone or e-mail?

22      A.    Not that I know of.

23      Q.    Other than -- strike that.

24            Let's talk about the administration of



1   IllinoisCarry.  You had mentioned earlier that

2   there's a board of directors?

3       A.    Correct.

4       Q.    Okay.  How many people sit on the board?

5       A.    I believe there are six.

6       Q.    Do you know their names, the current --

7   sorry.

8             Can you give me the names of the people

9   currently on the board?

10      A.    Yes.

11      Q.    Who are those people?

12      A.    Tim Boyer, Lou Berardi, Chris Connolly,

13  Don Glenn, Mike Rowe, Valinda Rowe.

14      Q.    Do those -- so you had mentioned that

15  you are spokesperson.

16            Do those individuals have titles in

17  addition to being a board member?

18      A.    Tim Boyer is the president, Mike Rowe is

19  the treasurer.

20      Q.    So Lou, Chris and Don are just board

21  members; they don't have additional titles?

22      A.    Correct.

23      Q.    How are board members chosen?

24      A.    Originally volunteer.



1        Q.    How are they currently chosen?

2        A.    We haven't had a need to replace anyone

3   at this time.

4        Q.    When was the last time you replaced

5   somebody on the board?

6        A.    I don't know that we have.

7        Q.    So this group of six has been the board

8   since the organization incorporated?

9        A.    I believe so.

10       Q.    And remind me again, when did the

11  organization incorporate?

12       A.    2009.

13       Q.    And you mentioned that these individuals

14  volunteered.

15             How did that happen?  Was there like

16  a -- was there like a call for volunteers or did it

17  just happen some other way?

18       A.    Back then it was a very small

19  organization, and that was kind of the core group

20  that was most active and agreed to being members.

21       Q.    If someone chose to step down tomorrow,

22  is there a procedure in place for how that person

23  would be replaced?

24       A.    I believe the board members would



ILLINOIS CARRY 30B6                                August 07, 2020
JENNIFER J. MILLER vs MARC D. SMITH                          57

```
 1   nominate.
 2        Q.    And if the board members nominate, how
 3   is that person confirmed?
 4        A.    I would have to review our bylaws.
 5        Q.    Let me ask it this way:  Do the members,
 6   meaning the users on the forum and the folks who
 7   have registered user names and e-mails, have any
 8   ability to select the board members?
 9        A.    I believe they can suggest nominations
10   to the board members.  I'm not sure.
11        Q.    Does the board meet in person?
12        A.    We have in the past.
13        Q.    When was the last time the board met in
14   person?
15        A.    I don't recall the date or the year, but
16   with the advent of on-line communication, since our
17   members are spread throughout the state, we meet
18   electronically.
19        Q.    Is that something like this, like a Zoom
20   call or something like that?
21        A.    Or conference call or e-mail.
22        Q.    How often is there a conference call
23   where folks are speaking to each other live?
24        A.    We don't have a regular schedule for
```



ILLINOIS CARRY 30B6                                    August 07, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              58

1   something like that.

2       Q.    When the board meets, are there minutes

3   of board meetings created?

4       A.    I don't believe so.

5       Q.    Can you kind of describe for us the

6   decision-making authority in the organization?  You

7   had mentioned that there's a president, treasurer

8   and spokesperson.  Can you sort of describe how the

9   organization makes a decision on major initiatives?

10      A.    Either a conference call where we

11  discuss it or we send out a group e-mail message

12  and everyone responds.

13      Q.    In terms of authorizing litigation such

14  as this case, how does that happen for the

15  organization?

16      A.    The notice that we can be a party to a

17  case is shared with the board members, and then

18  they would respond whether they were for or against

19  it.

20      Q.    Is there a formal vote amongst the board

21  members as to whether to join into litigation?

22      A.    I'm not sure what you mean by "formal

23  vote."

24      Q.    So do you -- is it a situation where you



1  sort of ask, "All those in favor of joining this

2  litigation say so," or is it something else?

3      A.   I think if I recall correctly, it would

4  be, "We have an opportunity to be party to a case.

5  Does anyone have a problem with this?"

6      Q.   Okay.  And who lets the board members

7  know of the opportunity to be a party to a case?

8      A.   Usually it's me as the spokesperson

9  because I would be aware of it -- I would be the

10 one that is contacted -- but it could be the

11 president or any of the board members.

12     Q.   And how do you become aware of

13 opportunities to become involved in cases?

14     A.   If I am contacted and asked would

15 IllinoisCarry as an organization want to be a party

16 in a case.

17     Q.   Who contacts you with that message

18 typically?

19     A.   Usually an attorney or it could possibly

20 be one of the other major organizations.

21     Q.   Such as?

22     A.   The ones that are listed on our home

23 page.

24     Q.   Has IllinoisCarry itself ever initiated



1  litigation on its own?

2       A.    Not that I recall.

3       Q.    So IllinoisCarry's always sort of

4  partnered with these other organizations in

5  litigation?

6       A.    Correct.

7       Q.    Is there a particular reason for that?

8       A.    Hmm, being a small organization that's

9  all volunteer, probably financial.  You know, the

10  cost of doing something like that is quite a bit.

11       Q.    Does IllinoisCarry have funds available

12  to commit to litigation cases?

13       A.    I'm not sure what that amount of funds

14  would be.

15       Q.    But there are funds available to support

16  litigation?

17       A.    Depending on the cost.

18       Q.    Is it fair to say that the other

19  organizations bear the majority of the financial

20  burden of litigation that IllinoisCarry is involved

21  in?

22       A.    Correct.

23       Q.    You mentioned that in order to be a

24  member, you could sign up on-line, you give a user



1  name and an e-mail address.

2          Are there any membership dues for

3  members?

4      A.    No.

5      Q.    Other than a user name and e-mail

6  address, are there any other requirements to become

7  a member?

8      A.    No.

9      Q.    Is there any sort of vetting process for

10  members, or is it just if I sign up on -- anybody

11  who can, you know, put in a user name and e-mail

12  address can be a member?

13      A.    There is a vetting process.  We do

14  screen for bots, spam accounts, that sort of thing.

15      Q.    Okay.  Is that something you do

16  internally, or do you use like other software to

17  handle that for you?

18      A.    I believe it's a combination of both.

19      Q.    And is it just a matter of keeping your

20  eye on the message board for something that looks

21  like spam?

22      A.    It's more than that.

23      Q.    Okay.  When you sign up for a

24  membership, is there a -- or how long does a



1   membership last?

2        A.    There is no expiration unless someone

3   requests.

4        Q.    Is there anything that somebody needs to

5   do to maintain their membership status, or is

6   signing up enough?

7        A.    Signing up is enough.

8        Q.    Okay.  Are members eligible to serve on

9   the organization's board?

10       A.    If they were nominated.  That's where we

11  get our -- in the past, that's where we have gotten

12  our board members from.

13       Q.    Okay.  And that hasn't happened since

14  the organization incorporated, correct?

15       A.    Correct.

16       Q.    Since the member -- strike that.

17             You had mentioned that the -- there is

18  no membership dues but there is, you know, funds

19  available somewhere.

20             Where does the organization's funding

21  come from?

22       A.    Our funding comes from donations.  It

23  comes from -- on our discussion forum, there is a

24  subscription, an annual fee of $25 that someone can



1  subscribe to the discussion forum that has -- that

2  provides them with extra -- I don't know if you

3  want to say benefits but extra features on the

4  discussion forum.

5          Q.    What are those extra features?

6          A.    One of them is the ability to edit their

7  post if they made a mistake or something and want

8  to go back and rephrase something.  Another feature

9  is -- there is a private message feature to the

10  forum, and without a subscription, there's a

11  certain size inbox that you can have and with the

12  subscription you get a larger inbox.

13          Q.    Have the Millers paid the $25 to have

14  this extra feature?

15          A.    Not that I'm aware of.

16          Q.    How many members, if you know, have paid

17  this extra $25?

18          A.    I would say average -- it varies from

19  year to year.  Average 200 to 300.

20          Q.    And do those finances -- and I think you

21  kind of mentioned this before, but I'll ask it

22  again just so the record's clear.

23               Do those finances go to support

24  IllinoisCarry's litigation initiatives?



 1        A.    I'm not sure I understand the question.

 2   Do you mean to pay attorneys, filing fees or --

 3        Q.    Any funds that could be used to litigate

 4   either this case or any others.

 5        A.    Not that I know of.

 6        Q.    Okay.  Do the members have any

 7   opportunity to influence the organization's

 8   positions in litigation?

 9        MR. SIGALE:  I'll object as to the form of the

10   question.

11             But if you understand, you can answer.

12   BY THE WITNESS:

13        A.    Could you rephrase the question?

14   BY MR. CHIMIENTI:

15        Q.    Sure.  You had mentioned earlier that

16   the board is made aware of various potential

17   litigations that IllinoisCarry could be involved

18   in.

19             Do the members ever have any say over

20   whether IllinoisCarry gets involved in a lawsuit or

21   not, or is that strictly the purview of the board?

22        A.    They're welcome to offer opinions and

23   information, but the board ultimately decides.

24        Q.    Has the organization communicated with



1  its members about this particular lawsuit?

2      A.    I believe the case was announced in our

3  Second Amendment Judicial Cases forum.

4      Q.    And was the purpose of that

5  communication just to make the membership aware

6  that the litigation had started?

7      A.    Correct.

8      Q.    Have any members communicated to the

9  organization about this lawsuit aside from the

10  Millers?

11      A.    Not that I'm aware of.

12      Q.    It sounds like in general the primary

13  mode of communication for the organization is the

14  message board, is that correct?

15      A.    Correct.

16      Q.    Okay.  Can you kind of -- and I've poked

17  around a little bit just to familiarize myself with

18  it, but you probably know it a heck of a lot better

19  than I do.

20          Can you kind of describe how the message

21  board is organized and laid out?

22      A.    It's laid out with -- I'd have to go

23  back to count -- five or six discussion forums, one

24  related to the right to carry in the State of



1  Illinois, one related to training, one related to

2  Illinois politics, national politics and judicial

3  cases.

4      Q.    Who is allowed to author posts on the

5  message board?

6      A.    The members.

7      Q.    The administrative members such as board

8  of director members, do they ever comment on the

9  message board in their official capacity?

10     A.    Sometimes I think they do.

11     Q.    To your knowledge, have any of the --

12 have any of the board members commented about this

13 case?

14     MR. SIGALE:  I'm just going to object as to

15 form.  You mean commented on the message board or

16 commented in some other format?

17     MR. CHIMIENTI:  I'll rephrase.

18 BY MR. CHIMIENTI:

19     Q.    Have any of the board members commented

20 on the message board with respect to this case?

21     A.    I'm sorry.  I -- I was listening so

22 intently, I missed the first part.

23           Who is -- can you ask me --

24     Q.    Okay.  I'll repeat the question.  I'm



1    sorry.

2                 Have any of the board members commented

3    about this case on the message board?

4         A.    I would have to go back to those three

5    discussion threads, but I believe I commented in

6    one or two of those, but I'd have to check.  I'd

7    have to refresh my memory, go back and look at it

8    to see if other board members did.

9         Q.    And aside from the board members, are

10   there any other officers of the organization?

11        A.    No.

12        Q.    You had mentioned that there are various

13   topics on the board -- on the message boards.

14                 How are those topics -- or how are posts

15   approved or reviewed?

16        A.    A topic can be started by anyone that is

17   a registered member.

18        Q.    Are there any posts specifically on the

19   subject of foster parenting that you're aware of?

20        A.    Just those that we have been made aware

21   of for this.

22        Q.    And those have to do with the firearm

23   storage regulations as they relate to foster homes?

24        A.    Correct.



1      Q.    Other than those types of posts, are you

2  aware of any posts on the board related to

3  day care?

4      A.    Just the ones that we have already

5  viewed.

6      Q.    Is there a place in the board where

7  folks can post about firearm safety?

8      A.    I believe so.  In the discussion forums,

9  a subject like that would be appropriate.

10     Q.    Do you know how often that topic comes

11  up on the board?

12     A.    I do not.

13     Q.    Is there a place on the board where

14  people can post about firearm storage?

15     A.    In the discussion forums, people can

16  post topics concerning that or respond to other

17  topics that are already started.

18     Q.    Do you know how often the topic of

19  firearm storage comes up on the board?

20     A.    I do not.

21     Q.    The same question:  Is there a place on

22  the board where people can post about storing

23  ammunition?

24     A.    Okay.  A bit of that got clipped out.



1     Q.    I'm sorry.  I'll repeat it.

2           Is there a place on the board where

3   folks can post about ammunition storage?

4     A.    Yes.  I believe that that topic would be

5   appropriate under several of the different forums

6   and topics that are already posted or they could

7   start their own.

8     Q.    Do you know how often the topic of

9   ammunition storage comes up on the board?

10    A.    I do not.

11    Q.    Okay.  Other than the board postings,

12  does the organization communicate with its members

13  in any other way?

14    A.    Members can subscribe to our e-mail

15  alerts.

16    Q.    How can you subscribe to an e-mail

17  alert?

18    A.    On the home page there is a signup link

19  you can click on and enter your e-mail address.

20    Q.    Do you know if the Millers have signed

21  up for e-mail alerts?

22    A.    I do not know.

23    Q.    I'm going to show you another exhibit

24  here.  This one was just produced yesterday, and



1  I'll put it up on the screen.  It's been marked as
2  Exhibit 20 to your deposition, and I'll say here at
3  the top, it's, you know, an e-mail from your
4  attorney to Gretchen about supplement interrogatory
5  responses, but if we scroll down here a little bit,
6  it says here the following e-mail is a supplemental
7  response, and if we look here it says from
8  IllinoisCarry.com to Valinda Rowe and the subject
9  says, "Urgent!  In search of Foster Parent
10  Witnesses/Co-Plaintiffs," and this is dated
11  September 25, 2018 at 8:05 p.m.
12          Do you see that?
13      A.    Yes.
14      Q.    Okay.  Do you know who authored this
15  e-mail?
16      A.    That would be myself.
17      Q.    Okay.  Did you send it at or about 8:05
18  p.m. on Tuesday, September 25, 2018?
19      A.    I would assume by the timestamp there
20  that's correct.
21      Q.    It says here, "Are you an IL Foster
22  Parent?  Are You Willing To Be A
23  Witness/Co-Plaintiff in A Second Amendment Lawsuit?
24  Please contact IllinoisCarry spokesperson Valinda



1  Rowe immediately by sending an e-mail to," and then

2  it has your e-mail address.

3          Do you recall why this e-mail was sent?

4      A.   Yes.

5      Q.   Why?

6      A.   I believe there was an ongoing foster

7  care case, and for some reason they were needing

8  additional witnesses or co-plaintiffs.

9      Q.   Did you ever receive any responses to

10 this e-mail?

11     A.   I -- off the top of my head, I don't

12 recall a specific response.  Maybe a phone call.

13     Q.   Okay.  Do you recall who called you?

14     A.   I don't.  The topic was, if I'm

15 remembering correctly, someone who had formerly

16 been a foster parent and was asking questions.

17     Q.   Do you remember that person's name?

18     A.   I do not.  I'm sorry.

19     MR. CHIMIENTI:  I'll just make a formal

20 request on the record here, David, to the extent

21 there are responses to this e-mail, we would like

22 to see them.

23     MR. SIGALE:  Okay.  Understood.

24     MR. CHIMIENTI:  And we'll keep track of this



1   just so we can send you sort of an

2   all-encompassing, you know, list at the end.

3   BY MR. CHIMIENTI:

4        Q.    Who was -- Ms. Rowe, who was this e-mail

5   sent to?

6        A.    The e-mail subscribers.

7        Q.    Okay.  I'll take this down.

8              Do you -- and I know you said you don't

9   really recall who called you or how many responses,

10  but if you remember, do you remember what you did

11  after you received a response from that e-mail?

12       A.    I would have just referred the person to

13  contact the attorney.

14       Q.    Okay.  I am going to show you what I've

15  marked as Exhibit 6 to your deposition.

16             Do you recognize this document?

17       A.    That looks like a screen shot or

18  something from a post on IllinoisCarry.

19       Q.    And this post is titled "In Search of IL

20  Foster Parents," correct?

21       A.    Correct.

22       Q.    And it is dated September 25, 2018 at

23  6:28 p.m., correct?

24       A.    Correct.



1      Q.    And it's posted by Molly B.

2            Who's Molly B?

3      A.    I am Molly B.

4      Q.    Okay.  And it says, "Are you an IL

5    foster parent or know someone who is who is willing

6    to be a witness/co-plaintiff in a Second Amendment

7    case?  Message me."

8            Did I read that correctly?

9      A.    Correct.

10     Q.    Okay.  Did you receive any responses to

11   this post?

12     A.    Not that I recall.

13     Q.    Okay.  How would -- I'll ask it:  Who

14   would this have gone out to, this post?

15     A.    When we post -- when we send out an

16   e-mail alert, we usually post a corresponding topic

17   on IllinoisCarry.  So this would --

18     Q.    Is that for folks who -- oh, I'm sorry.

19   Please finish.

20     A.    For the individuals -- the members who

21   are not signed up to be subscribers to the e-mails.

22     Q.    You read my mind.  That was going to be

23   my next question.  Thank you for that.  I'll take

24   this off.



1              And similar question as to the e-mail:
2  Why was that blog posted?
3      A.    Why was that topic posted on the
4  discussion forum?
5      Q.    Yes.
6      A.    I think it's stated in the e-mail -- I
7  mean in the -- yeah, in the e-mail which that is an
8  accompaniment to.
9      Q.    When e-mail -- when the e-mails are sent
10 out to the service -- I'm sorry.  Strike that.
11             When the organization sends out e-mails
12 to folks who are on its e-mail Listserv, for lack
13 of a better term, does it always post an
14 accompanying blog post on the forum?
15     A.    I wouldn't say always.  I would say
16 usually.
17     Q.    Okay.  Does the organization ever
18 communicate with its members with respect to
19 legislative matters?
20     A.    Yes.
21     Q.    Okay.  Are those sent out via e-mail?
22     A.    Correct.
23     Q.    I'm going to show you, let's see,
24 another exhibit here that has been marked as



1  Exhibit 19 to your deposition.  As you can see,

2  this is a -- at the top here is an e-mail from

3  David to Gretchen, but further on down the line

4  here, there's an e-mail from IllinoisCarry.com sent

5  Sunday, February 12, 2017 at 6:54 p.m.

6          Do you see that?

7      A.    Yes.

8      Q.    Okay.  And the subject here is "Call to

9  Action 2/12/2017 - Witness Slips Needed!"

10          Do you see that?

11     A.    Correct.

12     Q.    Okay.  So what are witness slips?

13     A.    When a bill is scheduled to be heard in

14  committee, the Illinois General Assembly, there is

15  an opportunity for input from I guess anyone that's

16  interested to file a witness slip either supporting

17  the bill, opposing the bill or neutral on the bill.

18     Q.    And I apologize for the scrolling here,

19  but down here at the bottom of Page 4 of this pdf,

20  do you see it says, "HB749 Child Day Care Homes

21  Guns"?  Do you see that?

22     A.    Correct.

23     Q.    And then it has a link here right next

24  to it, correct?



1       A.    Correct.

2       Q.    And as a general matter, if you click on

3   the link, does that take you to where you need to

4   fill out the witness slips?

5       A.    Correct.

6       Q.    Do you know if any of your members

7   responded to this particular HB749 entry?

8       A.    I do not.

9       Q.    I've removed that from the screen.

10            Those witness slip e-mails, do they go

11  out to folks on your e-mail list?

12      A.    Sometimes.

13      Q.    Do they go out to anybody else?

14      A.    They're posted on our forum usually.

15      Q.    Okay.  Do you know if Darin Miller was

16  ever sent any of those witness slip e-mails?

17      A.    I don't know that he is a subscriber to

18  our e-mails.

19      Q.    At any point -- strike that.

20            Ms. Rowe, at any point in the last six

21  or eight months have you run any searches for

22  documents responsive -- sorry, have you run any

23  searches for documents relating to the Millers?

24      A.    Yes.  I was requested to do that.



1        Q.    When -- I'm sorry.  What did you say

2    there?  I missed it.

3        A.    Yes.

4        Q.    When did those searches take place?

5        A.    After the time -- that time period.

6        Q.    I'll ask a better question.

7              We received IllinoisCarry's responses to

8    interrogatories and requests for production in

9    January of 2020.  Prior to January of 2020, did you

10   run any searches for responsive documents related

11   to the Millers?

12       A.    Could you repeat the first part?

13       Q.    Sure.  You know what?  In fact, I'll

14   show you on the screen.  I apologize.  I'm

15   navigating multiple screens here.

16             All right.  Ms. Rowe, I'm showing you on

17   the screen now what I've marked as Exhibit 3 to

18   your deposition.  This document is entitled

19   "Plaintiff IllinoisCarry's Responses to Defendant's

20   First Set of Requests for Production to

21   IllinoisCarry."

22             Do you see that?

23       A.    Yes.

24       Q.    Have you ever seen this document before?



1   And I can scroll down, and as I'm scrolling through

2   here, please feel free to stop me, but at the end

3   this is dated -- and you can see here we're at the

4   very last page.  It's Page 8 of the pdf.  It's

5   dated January 9, 2020.

6            Do you see that?

7       A.   Correct.

8       Q.   And it has Mr. Sigale's signature next

9   to that.

10           Do you see that?

11      A.   Correct.

12      Q.   Okay.  And on the same day, I am showing

13  you now what's been marked as Exhibit 4 to your

14  deposition.  This document is entitled "Plaintiffs'

15  IllinoisCarry's Answers to Defendants Marc D. Smith

16  and Kwame Raoul's First Set of Interrogatories to

17  Plaintiff IllinoisCarry."

18           Do you see that?

19      A.   Yes.

20      Q.   Okay.  And again I'll -- have you ever

21  seen this document before?

22      A.   I --

23      Q.   I'll tell you it's 12 pages long.

24      A.   It appears to look like a document I



1  have seen before.

2      Q.   Okay.  I'll scroll all the way to the

3  end here.  Page 12 of the pdf, it's dated the 9th

4  of January 2020.

5           Do you see that?

6      A.   Yes.

7      Q.   And that's your signature there, isn't

8  it?

9      A.   Correct.

10     Q.   Okay.  So before this date, January 9th

11 of 2020, did you run any searches for documents

12 related to the Millers?

13     A.   Yes, because I would have received a

14 request for information in order to respond to

15 this.

16     Q.   Okay.  Did you determine at that time

17 whether Darin Miller was a member of your e-mail

18 list?

19     A.   I believe I checked and did not see the

20 e-mail address I was familiar with on the list.

21     Q.   Okay.  Ms. Rowe, in the last ten days,

22 have you run additional searches for documents

23 related to the Millers?

24     A.   Yes.



1      Q.    Why?

2      A.    To -- to try to be sure that I had

3    supplied everything that I had.

4      Q.    And the last -- or the e-mail exhibit

5    that we just saw which I'll put back up on the

6    screen here -- we're looking back at Exhibit 19

7    again, this e-mail that you had sent to your

8    members that is dated February 12th of 2017.

9            Did you only find this e-mail within the

10   last ten days or so?

11     A.    I would have submitted it whenever I

12   found it.

13     Q.    Okay.  Do you know when you found it?

14     A.    I -- I don't.  I've looked through so

15   much information, I can't remember.

16     Q.    Do you know why this e-mail that's over

17   three years old is something that we received less

18   than 24 hours before your deposition?

19     A.    Because it didn't -- it would not have

20   turned up in any of the searches that I did.

21     Q.    Okay.  And did you search for items

22   related to "day care"?

23     A.    I searched under several different

24   search terms.



1    Q.    When you searched in the last ten days,
2  what did you find?
3    A.    Whatever I would have submitted since
4  that time.
5    Q.    Did you -- we received this e-mail, we
6  received a number of communications between you and
7  Darin Miller.  We also received a concealed carry
8  manual.
9         Are those things that you've found in
10  the last ten days?
11    A.    Addressing the training manual --
12  concealed carry training manual, I was under the
13  impression I was to look for information that was
14  available to the public or communications between
15  myself and the Millers, and it did not occur to me
16  that the curriculum might be something that I would
17  need to submit until -- let's see.  This is -- what
18  day is this?  Is this Friday?
19         Wednesday I was preparing curriculum to
20  put in the mail, and I thought, well, there is
21  references to the FOID act, the Concealed Carry
22  Act, storage, firearm safety in this curriculum,
23  but it's not available to our members, it's not
24  available publicly, so it hadn't occurred to me



1  that it might be material that needed to be

2  submitted, and so I brought it to Mr. Sigale's

3  attention as, "Is this something that we should

4  have submitted?"

5      Q.    When did you find the concealed carry

6  manual?

7      A.    When did I find it?  I was --

8      Q.    I'm sorry.  It's a two-part question.

9            When did you find it and forward it to

10  Mr. Sigale?

11     A.    I brought it with me yesterday.

12     Q.    I'm going to show you another exhibit

13  here.  This is what's been marked as Exhibit 21 to

14  your deposition.  At the very top it's an e-mail

15  from Mr. Sigale at 9:04 p.m. last night, less than

16  12 hours before your deposition, it's to Gretchen,

17  my co-counsel, saying to see one more e-mail

18  located below, and if we scroll down here, do you

19  see here where it says, "From:  Valinda Rowe"?  Do

20  you see that?

21     A.    Correct.

22     Q.    It was sent Sunday, April 15, 2018 at

23  10:32 p.m.

24            Do you see that?



1        A.    Correct.

2        Q.    And it's sent to Darin Miller?

3        A.    Correct.

4        Q.    And the subject is "Daycare and CCL,"

5   correct?

6        A.    Correct.

7        Q.    Now, this e-mail -- based on the "From"

8   line of this e-mail, this is an e-mail you sent,

9   correct?

10       A.    Correct.

11       Q.    And you sent it to Mr. Miller on Sunday,

12  April 15, 2018, correct?

13       A.    Correct.

14       Q.    Is there a reason why you didn't find

15  this e-mail before yesterday?

16       A.    I believe this is an e-mail I had

17  already sent to Mr. Sigale.

18       Q.    Oh, when did you send this e-mail to

19  Mr. Sigale?

20       A.    I do not recall.

21       Q.    Was it more than a month ago?

22       A.    I -- I couldn't say without seeing a

23  timestamp on it.

24       Q.    Okay.  And I'll just note for the record



1  here that Mr. Sigale's forwarding of this e-mail

2  does not have a timestamp when it was submitted to

3  him.

4          This is a -- do you know whether this

5  was sent in your initial search back in -- before

6  January of 2020?

7      A.    I believe it -- I -- I can't say.  I --

8  I can't say.  I thought it was an e-mail that I had

9  already submitted.

10     Q.    Okay.  Thank you, Ms. Rowe.

11         I would ask just for clarification of

12  the record, Ms. Rowe, if you could double-check

13  whether Mr. Miller is a member of this e-mail

14  Listserv.

15     MR. CHIMIENTI:  And, David, if he'd been

16  receiving those last e-mails, we'd like to see

17  them.

18     MR. SIGALE:  Okay.

19     MR. CHIMIENTI:  If he's not a member of the

20  Listserv, obviously we understand after that

21  explanation, but if he is, we'd like to see the

22  blast e-mails.

23     MR. SIGALE:  Okay.  You said you're going to

24  be compiling a list of questions, so just add that



1  to the list and send it over and we'll check it

2  out.

3      MR. CHIMIENTI:  Okay.

4      MR. SIGALE:  By the way, not that this really

5  makes things much better, but I actually tried

6  sending that e-mail probably between 7:00 and 7:30,

7  and it wasn't going through.  So sorry that it

8  arrived at 10:00 p.m.  I understand it's not much

9  of a difference, but I was trying to send it a

10  little bit earlier than that yesterday.

11          I think you're muted.

12      MR. CHIMIENTI:  Am I muted again?  Can you

13  hear me now?

14      MS. HELFRICH:  Yes, we can.

15      MR. CHIMIENTI:  Okay.

16  BY MR. CHIMIENTI:

17      Q.    Shifting gears, Ms. Rowe, I'd like to

18  talk about the lawsuit that -- this lawsuit that

19  IllinoisCarry is a plaintiff in.  I'm going to show

20  you -- I'm going to share my screen here and show

21  you what I've marked as Exhibit 5 to your

22  deposition.

23          Do you recognize this document?

24      A.    I have seen this document before.



1      Q.    This document is entitled "Amended

2  Complaint for Declaratory and Injunctive Relief,"

3  correct?

4      A.    Correct.

5      Q.    And it shows that at the top here the

6  plaintiffs in this case are Jennifer J. Miller,

7  Darin E. Miller, the Second Amendment Foundation,

8  Inc., Illinois State Rifle Association and

9  IllinoisCarry, correct?

10     A.    Correct.

11     Q.    And the defendants are Marc D. Smith, in

12  his official capacity as acting director of the

13  Illinois Department of Children and Family

14  Services, and Kwame Raoul, in his official capacity

15  as Attorney General of the State of Illinois,

16  correct?

17     A.    Correct.

18     Q.    Okay.  And so IllinoisCarry is a

19  plaintiff in this case, correct?

20     A.    Correct.

21     Q.    Can you describe how IllinoisCarry has

22  been harmed by Defendant Smith in his official

23  capacity as acting director of DCFS?

24     MR. SIGALE:  Object to the extent that that



1  calls for a legal conclusion.

2          But if you understand the question, go

3  ahead and answer.

4  BY THE WITNESS:

5      A.   As a representative of our members, I

6  think we have members who have been harmed.

7  BY MR. CHIMIENTI:

8      Q.   In what way?

9      A.    In that if they have a day care

10  center -- in-home day care center or are foster

11  parents, they're deprived of their Second Amendment

12  right to keep and bear arms in their homes.

13      Q.   Okay.  Any other way that this -- that

14  Defendant Smith as director -- acting director of

15  DCFS has harmed IllinoisCarry?

16      A.    In the Firearm Concealed Carry Act,

17  there is a provision in the prohibited places list,

18  and in-home day care centers and other day care

19  centers are listed as prohibited locations;

20  however, there is provision in the statute that

21  provides for an exemption for day care -- in-home

22  day care individuals that have a concealed carry

23  license, and DC- -- DCFS is ignoring that

24  provision.



1      Q.    Let's talk about the Attorney General.

2            How has IllinoisCarry been harmed by the

3   Attorney General in this case?

4      MR. SIGALE:  Objection, that calls for a legal

5   conclusion.

6            You can answer if you can.

7   BY THE WITNESS:

8      A.    I'm not sure this answers the question,

9   but I believe he represents the Attorney General

10  Office and the person in that office at the time

11  represents the State in matters like this.

12  BY MR. CHIMIENTI:

13     Q.    Is it your understanding that the

14  Attorney General represents --

15     A.    The DCFS.

16     Q.    Okay.  And you're suing him because he's

17  DCFS's lawyer?

18     A.    That I don't know.

19     Q.    What is the organization's understanding

20  of what this lawsuit is challenging?

21     A.    The ban on having a firearm, a handgun

22  in the home that would be accessible in a timely

23  manner to use in a case of a need for self-defense.

24     Q.    Does the organization have an



1  understanding of how that rule applies in foster

2  homes?

3      A.    I believe the same ban exists in foster

4  homes.

5      Q.    And is -- let me share the screen again.

6            We're looking at Exhibit 5 again, and

7  I'll scroll through here to get -- so here it looks

8  like in this complaint there's a citation to the

9  Illinois Child Care Act of 1969.

10            Do you see that?

11      A.    Yes.

12      Q.    That's on Page 8, and then if we scroll

13  again, there are references to Section 406.8(a) of

14  JCAR, J-C-A-R.

15            Do you see that?

16      A.    Yes.

17      Q.    Okay.  And this references handguns in

18  day care homes, correct?

19      A.    It's kind of small, but I think it does.

20      Q.    I can zoom in a little.

21      A.    Yes, it does.

22      Q.    Okay.  And then this next portion of the

23  page also on Page 10 of the pdf also references

24  day care homes, correct?



1      MR. SIGALE:  I'll just object in that you

2   can't see it from -- it's out of context because

3   you can't see the preceding paragraphs.

4      MR. CHIMIENTI:  Is that better?

5      MR. SIGALE:  If it's better for the witness.

6   BY THE WITNESS:

7      A.    You said in reference to in-home

8   day care centers?  I don't see that.

9   BY MR. CHIMIENTI:

10     Q.    Okay.

11     A.    I see in 17 it's mentioned, "day care

12   home," but in 18 I don't see it.

13     MR. SIGALE:  Counsel, scroll up a tiny bit

14   more above 17.

15   BY MR. CHIMIENTI:

16     Q.    Ms. Rowe, have you ever looked at --

17   I'll represent that 17 and 18 are the JCAR rules

18   that have to do with day cares -- firearms in

19   day care homes.

20          Had you ever reviewed those provisions

21   before filing this lawsuit?

22     A.    Yes, I believe so.

23     Q.    Okay.  And in day care homes, what is

24   your understanding of what the rule means?



1        MR. SIGALE:  I'll just object as to the form
2   of the question.
3   BY MR. CHIMIENTI:
4        Q.    Let me rephrase.
5             What do you understand this rule to
6   require in day care homes?
7        MR. SIGALE:  Object as to form.
8             I'm sorry.  If you scroll up, is that
9   the whole 406.8?  Is that 406.8(a)?  I'm sorry.  Is
10  that what your question is, counsel?
11  BY MR. CHIMIENTI:
12       Q.    406.8(a), Paragraphs 17 and 18,
13  Ms. Rowe, is this your understanding of what these
14  rules require in day care homes?
15       A.    My understanding in 17 is that peace
16  officers or other adults who must possess a handgun
17  on condition of their employment, there are
18  provisions for them, but there are not provisions
19  for someone who is not a peace officer or required
20  to have a firearm for their employment -- in the
21  case of the condition of their employment.
22       Q.    Paragraph 18 here, it says, "Any
23  firearm, other than a handgun in the possession of
24  a peace officer...shall be kept in a disassembled



1    state, without ammunition, in locked storage in a

2    closet, cabinet, or other locked storage facility

3    inaccessible to children."

4            Do you see that?

5        A.    I do see that.

6        Q.    Setting aside Paragraph 17, should

7    firearms be kept in a disassembled state without

8    ammunition in a locked storage cabinet or closet

9    inaccessible to children?

10       A.    In my opinion on the basis of Supreme

11   Court rulings on the Second Amendment right itself,

12   this would be a deprivation of rights for someone

13   who is not a peace officer or required to have a

14   firearm on the condition of their employment.

15           There seems to be -- to my

16   understanding, they can't have a handgun, and then

17   this says that any firearm other than a handgun

18   would have to be disassembled without ammunition,

19   locked in a storage cabinet, which would deprive

20   them of their right to have a firearm ready in a

21   reasonable amount of time to use in the case of

22   self-defense, if that was the only type of firearm

23   they had.

24       Q.    Okay.  We're on Page 11 of this



1 | document.  It says, "State Law (Foster Care)."

2 |          Do you see that?

3 |    A.    Yes.

4 |    Q.    If we scroll down here, Paragraph 36 on

5 | Page 12, it cites DCFS Rule 402.8(i).

6 |          Do you see that?

7 |    A.    Yes.

8 |    Q.    Okay.  What is your understanding of

9 | what this rule requires in foster homes?

10 |    A.    It would require all firearms and

11 | ammunition to be locked up and kept in places

12 | inaccessible to children.  A loaded gun could not

13 | be kept in a foster home unless required by law

14 | enforcement officers in accordance with a law

15 | enforcement agency.

16 |          So if you're not a law enforcement

17 | officer, you cannot have a firearm that could be

18 | stored in a safe manner and yet accessible to use

19 | in the case of self-defense should that arise.

20 |    Q.    Okay.  Ms. Rowe, how did the

21 | organization become aware of the DCFS rules in

22 | question here?

23 |    A.    In familiarizing ourself with the

24 | Illinois Compiled Statutes from way back when and



1  JCAR rules and regs, I think we've been aware of it

2  for a long time and considered that the provision

3  in the Firearm Concealed Carry Act when it was

4  passed would rectify part of this problem of being

5  deprived --

6       Q.    And when -- I'm sorry.

7             When did the organization first become

8  aware of these rules?

9       A.    That I don't know.

10      Q.    Has it been a number of years, though?

11      A.    Yes.  We try to follow them as we go.

12      Q.    Would you say that the organization was

13  aware of the rules before 2018?

14      A.    Yes.

15      Q.    Before 2016?

16      A.    Yes.

17      Q.    Before 2015?

18      A.    I -- you know, I would assume so.

19      Q.    In any period of time before filing

20  suit, did the organization make any effort to

21  consult DCFS or any other governmental agency about

22  the rules?

23      A.    I don't know.

24      Q.    Did this particular -- these particular



1  rules or the Illinois Child Care Act ever come up

2  in your lobbying efforts?

3      A.    Not that I recall.

4      Q.    How did the organization in this case

5  ultimately decide to sue?

6      A.    There had been previous inquiries from

7  members and then the inquiry from Mr. Miller that

8  led us to believe this was still an ongoing issue

9  that was not remedied by the Firearm Concealed

10  Carry Act provision, and so Mr. Miller was referred

11  to the attorney.

12      Q.    And so to be clear, the previous

13  consultations with members that you're referring

14  to, were those posts on the message boards about

15  day care?

16      A.    Correct.

17      Q.    And those are individuals that you don't

18  necessarily know their names, correct?

19      A.    Correct.

20      Q.    Okay.  And is it fair to say, Ms. Rowe,

21  that the Millers are the only foster parents that

22  IllinoisCarry is basing its claims on?

23      A.    They're the named plaintiff in the case.

24      Q.    Okay.  Let me put it this way:  Is



1   IllinoisCarry aware of any other foster parents on

2   which -- I'm sorry.

3            Is IllinoisCarry aware of any other

4   foster parent members on which it can base its

5   claims?

6        A.    Not by name.

7        Q.    Okay.  Is IllinoisCarry aware of any

8   day care home licensed members other than the

9   Millers on which it can base its claims?

10       A.    The other two individual conversations

11  that took place on IllinoisCarry asking about the

12  day care situation -- licensing situation.

13       Q.    Okay.  And again, you don't know either

14  of those individual's names?

15       A.    No.

16       Q.    Other than the Millers, did the

17  organization consult with any of its other foster

18  parent members before filing this lawsuit?

19       A.    No, not that I know of.

20       Q.    And other than those two -- the Millers

21  and the two unknown individuals that we've referred

22  to from the message board, did the organization

23  consult with any of its day care licensee members

24  before filing the lawsuit?



1       A.    No, not that I know of.

2       Q.    What outcome does IllinoisCarry hope to

3  achieve through this lawsuit?

4       A.    We would hope that the result would be a

5  ruling that would provide for in-home day care

6  operators and foster parents to have a means to

7  safely store a firearm in their home loaded ready

8  to use in the case of a self-defense situation

9  should it arise.

10      Q.    Does the type of firearm matter?

11      MR. SIGALE:  I'll object as to form.

12          You can answer if you can.

13      MR. CHIMIENTI:  I'll rephrase it.

14  BY MR. CHIMIENTI:

15      Q.    Ms. Rowe, you mentioned that one of the

16  outcomes you wish to achieve is you want -- and

17  again, I'm paraphrasing, you want folks to be able

18  to have a firearm loaded and ready to use in case a

19  self-defense need arises.

20          Does the type of firearm matter to

21  IllinoisCarry?

22      A.    I think our position would be that it

23  should be up to the individual in the home to

24  determine what type or which firearm would be best



1  for them.

2      Q.    Is IllinoisCarry seeking to have these

3  regulations that we looked at earlier struck down

4  or eliminated entirely?

5      A.    That's a legal question I'm not sure I

6  know how to answer.

7      Q.    Well, let me ask you a different

8  question, Ms. Rowe.

9          What should the rule be for firearm

10  storage in foster homes?

11     A.    Okay.  That I can answer, I believe.

12         Firearms should be stored in a manner

13  that they are not accessible to unauthorized

14  persons.

15     Q.    What about ammunition storage and

16  firearm -- I'm sorry.

17         What should the rule be regarding

18  ammunition storage in foster homes?

19     A.    I think it should be the same, in a

20  manner that it's not accessible to unauthorized

21  persons.

22     Q.    What sorts -- I'll ask you this.  Strike

23  that.

24         What should the rule be regarding



1  firearm storage in day care homes?

2      A.    The same, stored in a manner that is not

3  accessible to unauthorized persons.

4      Q.    And what does IllinoisCarry believe the

5  rule should be about ammunition storage in day care

6  homes?

7      A.    The same, stored in a manner that it's

8  not accessible to unauthorized persons.

9      Q.    You say "not accessible to unauthorized

10 persons."

11           Does that include locking the firearm in

12 a safe or storage container?

13     A.    That could be one manner.

14     Q.    Does it include locking the ammunition

15 in a storage container?

16     A.    That could be a manner.

17     Q.    I'm going to -- we're going to flip back

18 to the complaint here.  Well, before we flip back

19 to the complaint, you told me what you think the

20 rules should be.

21           At any point -- aside from filing this

22 lawsuit, at any point has IllinoisCarry made DCFS

23 or the State aware of what it thinks the rules

24 should be?



ILLINOIS CARRY 30B6                                  August 07, 2020
JENNIFER J. MILLER vs MARC D. SMITH                            100

1    A.    I don't think so.

2    Q.    Okay.  I'm going to flip back to the

3 complaint here.  We already looked at this briefly

4 earlier.  We're back on Exhibit 5 to your

5 deposition.  This is the complaint, and I'm going

6 to scroll up to a specific paragraph.  So we're

7 looking at Paragraph 22 here.

8         Do you see Paragraph 22, Ms. Rowe?

9    A.    I do.

10   Q.    Okay.  It says, "Members --" and we're

11 on Page 7 of the pdf.  It says, "Members of IC who

12 are day care home licensees and/or foster parents

13 in Illinois would possess and carry loaded and

14 functional handguns for self-defense, but refrain

15 from doing so because they fear that their day care

16 home licenses and/or foster care licenses being

17 denied and/or revoked by the State."

18         What I want to focus here is on "would

19 possess and carry loaded and functional handguns

20 for self-defense."

21         What does that mean?

22   A.    Well, let's see.  Would possess -- would

23 have in their possession in their home and carry

24 loaded and functional handguns for self-defense.



1  I'm going to assume that means carry on their

2  person.

3        Q.    Okay.

4        A.    A functional handgun would be one that

5  is ready to use, not locked up in a separate

6  location, not a trigger lock, something of that

7  sort.

8        Q.    Okay.  What is the organization's

9  position on how foster parents should keep foster

10 children safe from gun injuries?

11       MR. SIGALE:  I'm sorry.  I didn't hear the

12 question.

13 BY MR. CHIMIENTI:

14       Q.    Sure.  What is the organization's

15 position on how foster parents should keep foster

16 children safe from gun injuries?

17       A.    I believe that goes back to our position

18 that firearms should be stored in a manner that

19 they are inaccessible to unauthorized persons.

20       Q.    Okay.  Should foster parents obtain

21 permission from the biological parents of the child

22 to instruct the foster child about firearms?

23       A.    I don't have a position or background

24 in -- I don't think I can answer that.



1      Q.    Should a biological parent be allowed to

2  refuse placement of their child into a foster home

3  where parents are carrying loaded firearms?

4      MR. SIGALE:  I'll object as beyond the scope

5  of this witness's knowledge.

6            But if you can, go ahead and answer.

7  BY THE WITNESS:

8      A.    I can offer an opinion, but that's all I

9  can do.

10  BY MR. CHIMIENTI:

11      Q.    Please do.

12      A.    Could you repeat the question, please?

13      Q.    Yes.  Should biological parents be

14  allowed to refuse placement of their child into a

15  foster home where the foster parents are carrying

16  loaded firearms?

17      A.    In my opinion, that should be left up to

18  the -- possibly left up to the placement agency.

19      Q.    So the placement agency should be

20  allowed to refuse to put somebody -- to put a child

21  into a home where there are loaded firearms.

22            Is that what you're saying?

23      A.    No.

24      Q.    Can you explain what you meant by that?



1    A.    About whether a parent can -- I'm going

2  back to whether a parent can -- the first part of

3  your question, should a parent be able to, so that

4  would be something between a parent and the agency.

5         I'm just not sure.  That's just outside

6  of my purview.

7    Q.    Sure.  You're saying that the -- that's

8  an issue between the biological parent and the

9  placement agency, not between the placement agency

10  and the foster parent, correct?

11    A.    Correct.

12    Q.    Okay.  What is the organization's

13  position on how day care licensees should keep

14  children safe from gun injuries?

15    A.    They should store the firearms in a

16  manner that they're not accessible to unauthorized

17  persons.

18    Q.    Okay.  Is it the responsibility of a

19  day care home provider to train the children in

20  their care about firearms?

21    A.    Is it their place?

22    Q.    Is it their responsibility.

23    A.    Is it their responsibility.  I don't

24  know.



ILLINOIS CARRY 30B6                                   August 07, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              104

1        Q.    Should they be required to obtain

2   parents' permission to train those children on

3   firearms?

4        MR. SIGALE:  I'm just going to object as to

5   speculation, assuming facts not in evidence.

6              You can answer if you can.

7   BY THE WITNESS:

8        A.    I've -- I don't have an answer.  That

9   seems to be outside my...

10  BY MR. CHIMIENTI:

11       Q.    Okay.  Other than the folks who pay 25

12  bucks -- is it annually for the e-mail?

13       A.    No.  There is no fee for the --

14  subscribing to the e-mails.

15       Q.    The $25 is for people who want advanced

16  message board capabilities?

17       A.    Correct.

18       Q.    And that's a yearly subscription?

19       A.    Correct.

20       Q.    Other than those folks who are paying

21  that $25 a year, does the organization have any

22  donors?

23       A.    Yes.

24       Q.    How do folks make donations to the



ILLINOIS CARRY 30B6                                    August 07, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              105

1  organization?

2      A.    There is a link on our home page that

3  says "Sign Up" or "Donate," I believe, and they can

4  click on the "Donate" link.

5      Q.    Okay.  Did you consult any of your

6  donors before filing this lawsuit?

7      A.    I don't believe so.

8      Q.    Are any -- are donations being used to

9  support this lawsuit?

10     A.    I don't believe so.

11     MR. SIGALE:  Matt, is this a good place to ask

12  to take five?

13     MR. CHIMIENTI:  If you give me five more

14  minutes --

15     MR. SIGALE:  I need to ask to take five.

16     MR. CHIMIENTI:  You need to take five?

17     MR. SIGALE:  Yeah.

18     MR. CHIMIENTI:  Okay.  I'm happy to take five.

19  If you want to take a lunch here, David, it's noon,

20  I don't know.

21     MR. SIGALE:  I think -- Valinda, do you prefer

22  to keep on going or do you prefer to take a

23  lengthier break?

24     THE WITNESS:  Do we know how much longer?



1        MR. SIGALE:  I guess I can ask that.

2               Do you have any idea, Matt?

3        MR. CHIMIENTI:  We've covered some of the

4    stuff.  I'm guessing we're probably about halfway

5    home, so probably another couple hours.

6        MR. SIGALE:  About two.

7        THE WITNESS:  We need to take a break -- a

8    lunch break.

9        MR. SIGALE:  Okay.

10       MR. CHIMIENTI:  Do you want to do 12:30,

11   David?

12       MR. SIGALE:  Is that enough time for you?  All

13   right.  12:30.

14       MR. CHIMIENTI:  All right.  Thank you.

15       MR. SIGALE:  Sure.

16                   (WHEREUPON, the deposition was

17                    recessed for lunch from 11:58 to

18                    12:33 p.m.)

19   BY MR. CHIMIENTI:

20       Q.    All right.  Ms. Rowe, we are back on the

21   record after a lunch break.  Just one clarification

22   question from earlier, and then we can kind of move

23   forward.

24               We talked earlier about searches for



1   documents.  Do you know if anybody else in

2   IllinoisCarry searched for responsive documents in

3   this case?

4        A.    I don't think so.

5        Q.    Okay.  To your knowledge, nobody else

6   did any searches for documents from IllinoisCarry

7   besides you?

8        A.    Correct.

9        Q.    As of the date of filing of this

10  lawsuit, which was April 16th of 2018, do you know

11  how many of your members were foster parents in

12  Illinois?

13       A.    No.

14       Q.    Do you know that number today?

15       A.    No.

16       Q.    Did you ever try to find out how many of

17  them were?

18       A.    No.

19       Q.    Do you know how many members of

20  IllinoisCarry were day care home operators as of

21  April 16th of 2018?

22       A.    No.

23       Q.    Do you know how many are today?

24       A.    No.



1      Q.    Did you ever try to find out?

2      A.    No.

3      Q.    As of April 16th of 2018, do you know

4   how many of your members had children in foster

5   care in Illinois?

6      A.    No.

7      Q.    Do you know how many of them do today?

8      A.    No.

9      Q.    Did you ever try to find out?

10     A.    No.

11     Q.    As of April 16th of 2018, were any of

12  your members -- did any of your members have

13  parents -- sorry.  Let me start over.

14          As of April 16th of 2018, did any of

15  your members have children in a day care home in

16  Illinois?

17     A.    I don't know.

18     Q.    Do you know how many of them do today?

19     A.    I do not.

20     Q.    Did you ever try to find out?

21     A.    No.

22     Q.    Are you aware of any specific examples

23  of a foster parent not being able to defend

24  themselves because of this rule?



```
 1        A.    Not off the top of my head.
 2        Q.    Are you aware of any examples of any
 3   day care home providers not being able to defend
 4   themselves because of the rule?
 5        MR. SIGALE:  I'm going to object as to vague
 6   and form of the question.
 7              Are you referring to like some specific
 8   incident where someone wasn't -- there was a
 9   break-in or are you talking about the general
10   Second Amendment right that they're not able to
11   defend themself?
12        MR. CHIMIENTI:  I'm sorry.  Your objection was
13   vague or -- because that was a speaking objection.
14        MR. SIGALE:  Object to the form of the
15   question.
16        MR. CHIMIENTI:  Okay.  Thank you.
17   BY MR. CHIMIENTI:
18        Q.    Ms. Rowe, I'll ask the question again.
19              Are you aware of any specific examples
20   of any day care home providers not being able to
21   defend themselves because of the rule in question?
22        MR. SIGALE:  Same objections.
23   BY THE WITNESS:
24        A.    I'm trying to interpret your question
```



1    still.  I know they're prohibited from having a

2    firearm readily accessible in their home to use in

3    self-defense under the current statutes and rules

4    and regs.

5    BY MR. CHIMIENTI:

6         Q.    Okay.  And are you aware of any examples

7    where they weren't able to actually defend

8    themselves because of this rule?

9         A.    Not off the top of my head.

10        Q.    Okay.  Other than the blog or the

11   website, does the organization have any

12   publications?

13        A.    Could you defined "publications"?

14        Q.    Newsletters.

15        A.    Just the e-mail alert.

16        Q.    Okay.  The e-mail alert, the message

17   boards.

18              Does it have a monthly newsletter?

19        A.    No.

20        Q.    Does it have like a quarterly or annual

21   report that it sends out?

22        A.    No.

23        Q.    Any other articles or blogs or any other

24   public documents other than the e-mail alerts or



1   the message board?

2         A.    Not that I'm aware of.

3         Q.    Okay.  Let's talk about the Millers

4   really quickly.

5               Who are Jennifer and Darin Miller?

6         A.    As I know them, a couple who have an

7   in-home day care in southern/central Illinois.

8         Q.    Do you understand them both to be foster

9   parents?

10        A.    I believe that happened later after I

11  became aware of them being an in-home day care.

12        Q.    Okay.  And is it your understanding that

13  both of them have day care licenses?

14        A.    That I don't know.

15        Q.    Are they members of IllinoisCarry?

16        A.    I know that Darin Miller is.

17        Q.    Okay.  Is Jennifer Miller a member of

18  IllinoisCarry?

19        A.    My -- I'm not sure on that.

20        Q.    How do you know that Jennifer -- how do

21  you know that Darin Miller is a member of

22  IllinoisCarry?

23        A.    Because he registered an account on our

24  forum.



1      Q.    Okay.  Did Jennifer ever register an

2  account on your forum?

3      A.    I don't know.  She may have, but since

4  we don't ask for a name, only an e-mail and screen

5  name, I don't know.

6      Q.    So you -- just so I'm clear, you have no

7  way of knowing whether Jennifer Miller is a member

8  or not?

9      A.    Not at this point.

10      Q.    Okay.  When did Darin become a member?

11      A.    I have the screen shot -- I believe you

12  have a copy of the screen shot that shows over on

13  the right-hand side, I believe, the date and time.

14      Q.    And let's pull that up.  I'm going to

15  show you, Ms. Rowe, what I've marked as Exhibit 7

16  to your deposition.  And I apologize in advance.

17  This is probably going to be smaller type here.  So

18  up on the screen now we have Exhibit 7 to your

19  deposition, Ms. Rowe.

20          Do you recognize this?

21      A.    Yes.

22      Q.    Okay.  And what -- what is this page

23  showing?

24      A.    This is showing the membership for Darin



1  Miller on IllinoisCarry.

2      Q.    And how -- I mean, first of all, how do

3  you know it's Darin Miller?

4      A.    Because of the e-mail address,

5  darinmiller at -- the name -- display name that he

6  chose.

7      Q.    Okay.  And it looks like here on the

8  right-hand side, it shows -- it says "Joined" here

9  on the right-hand side, correct?

10     A.    Correct.

11     Q.    And it says April 16, 2018 at 8:20 a.m.?

12     A.    Correct.

13     Q.    Is that the period of time when Darin

14  would have had to complete the on-line signup?

15     A.    He could have done it at any time, I

16  believe.

17     Q.    But I guess does this "Joined" stamp

18  here indicate that he -- the time when he was sort

19  of accepted as a member?

20     A.    That shows the time that he registered

21  and I believe was approved.

22     Q.    Okay.  And how -- you might have

23  mentioned this earlier, but how does somebody get

24  approved as a member?



1      A.    We vet the e-mail address and the user

2    ID for any kind of spam elements and also the --

3    the IP address.

4      Q.    Okay.  I'm going to show you a different

5    exhibit here.  I think we already -- I think we've

6    already looked at this one.  Yeah, we already have.

7            So I'm showing you Exhibit 21 again.

8    This is the e-mail from you to Darin on Sunday,

9    April 15, 2018, correct?

10     A.    Correct.

11     Q.    And it says the first line, "Darin, The

12   complaint states that you are a member of

13   IllinoisCarry.  If you are not, it's very easy to

14   do and there is no membership fee."

15           Did I read that correctly?

16     A.    Correct.

17     Q.    And based on -- based on the membership

18   page we just saw, it looks like Darin was approved

19   as a member after you sent this e-mail, correct?

20     A.    Correct.

21     Q.    Do you know why -- if you remember, do

22   you know why you were checking with Darin to see if

23   he was a member or not?

24     A.    Because I had read a copy of the



1  complaint that said he was a member, and I was

2  checking to make sure that was factual.

3      Q.   Okay.  And based on this, did you

4  determine whether he was or was not a member at

5  that point when you sent this e-mail?

6      A.   I could not determine that because of

7  the -- they don't use their actual name and their

8  actual e-mail address.  So I was just saying, "If

9  you are not already, this is how it's done."

10     Q.   Okay.  You were not -- were you able to

11 find his e-mail address in your membership base at

12 this point, if you remember?

13     A.   I -- I don't know that I even checked.

14 I think I just sent this out as a double-check for

15 the factual content.

16     Q.   Do you know why Darin Miller became a

17 member of IllinoisCarry?

18     A.   No.

19     Q.   Let's shift gears here slightly,

20 Ms. Rowe.

21          What is your understanding of what

22 foster parenting entails?

23     A.   Do you mean in becoming a foster parent

24 or actually after being licensed as a foster



1   parent?  It's kind of a broad question.

2       Q.    Sure.  Let's start with:  What is your

3   understanding of what's required to become a foster

4   parent?

5       A.    My understanding is that you apply with

6   the State to be licensed, and then once that

7   process is completed, then foster children may be

8   placed in your care.

9       Q.    Now, you mentioned that you apply to the

10  State for a license.

11          Do you know -- do you know whether -- do

12  you agree that DCFS is the agency that they

13  apply -- that foster parents apply to for

14  licensing?

15      A.    That's my understanding.

16      Q.    Okay.  And they are -- is it your

17  understanding that DCFS is the organization that

18  oversees foster parents in the State of Illinois?

19      A.    That is my understanding.

20      Q.    You mentioned that you understand that

21  there's this application process.

22          Do you know what's involved in the

23  application and licensing process?

24      A.    Only what I've been told anecdotally



1   from other people that have applied.

2        Q.    Okay.  And what is your understanding of

3   what's involved based on those conversations?

4        A.    You fill out an application, you have to

5   stipulate to certain conditions in your home, I

6   believe, and then if you make it through that part

7   of the -- that step of the process, then there's

8   like home visits, home -- I don't know what the

9   word is, inspections maybe or something along that

10  before they are approved.

11       Q.    It's your understanding that -- it

12  sounds like you understand that there's some

13  paperwork involved, correct?

14       A.    Correct.

15       Q.    And then there's some home inspections

16  that are involved of the actual premises where the

17  child will be staying?

18       A.    Correct.

19       Q.    Are you aware of any DCFS-approved

20  training that prospective foster parents have to go

21  through?

22       A.    I'm not familiar with that part of the

23  process.

24       Q.    Are you aware of whether DCFS foster



1   parents have to undergo criminal background checks?

2        A.    I would assume they would.

3        Q.    Do you know whether DCFS foster parents

4   have to undergo health screenings?

5        A.    I would assume that as a matter of

6   course.

7        Q.    And this licensing process, is it --

8   would you agree that the purpose of the licensing

9   process is to make sure that these prospective

10  foster parents are capable of overseeing the health

11  and safety of the child?

12       A.    I would assume, yes.

13       Q.    Once you become -- so earlier you

14  said -- you know, we broke down the question, and I

15  asked you what you thought was involved in

16  applying, so let's talk about:  What do you think

17  is involved once you're licensed and you're

18  actually a foster parent?

19       A.    That foster parents would be involved in

20  the day-to-day care and supervision of the

21  children.

22       Q.    And these are children that are not

23  their own, correct?

24       A.    Correct, children that are placed in



1  their care.

2      Q.    Okay.  And the children are placed in

3  foster parents' care by the State of Illinois,

4  correct?

5      A.    I would assume that.

6      Q.    Okay.  Do you know whether the State is

7  also responsible for the health of these children,

8  the foster children?

9      A.    I do not.

10     Q.    Okay.  Does IllinoisCarry have any

11  licensing function for foster care?

12     A.    We do not.

13     Q.    Does IllinoisCarry have any oversight or

14  monitoring ability or responsibility for foster

15  care?

16     A.    We do not.

17     Q.    Does IllinoisCarry have any

18  responsibility or ability to make up the regulatory

19  framework that sort of governs foster care?

20     A.    We do not.

21     Q.    Would you agree that Illinois DCFS is in

22  a better position to do all of those things than

23  IllinoisCarry?

24     MR. SIGALE:  Object to the form of the



1  question, also calls for a legal conclusion and

2  it's not within her knowledge.

3          But to the extent you can answer, go

4  ahead.

5  BY THE WITNESS:

6      A.    Could you repeat the question, please?

7  BY MR. CHIMIENTI:

8      Q.    Do you agree, Ms. Rowe, that Illinois

9  DCFS is in a better position than IllinoisCarry for

10  oversight, licensing and regulatory functions for

11  foster homes?

12      MR. SIGALE:  Same objections.

13          You can answer.

14  BY THE WITNESS:

15      A.    Only that it's -- pertaining to my

16  knowledge, that is their function as established by

17  law and rule.

18  BY MR. CHIMIENTI:

19      Q.    Okay.  And would you also agree that

20  throughout the foster parenting process, whether

21  it's licensing or actually caring for the children,

22  that the health and safety of the foster children

23  is the most important issue?

24      A.    It should be.



ILLINOIS CARRY 30B6                                    August 07, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              121

1      Q.    In your conversations with other folks
2   who have applied or at least from your general
3   knowledge, are you aware of consequences for
4   violating various licensing rules?
5      A.    I would assume it would be revocation of
6   the license or some sort of reprimand.  I don't
7   know.
8      Q.    Are you aware of whether there's any
9   warnings or corrective plans that happen before a
10  loss of license?
11     A.    I don't know.
12     Q.    Okay.  And these children coming into a
13  foster home could be anywhere from infants to under
14  18 years of age, correct?
15     MR. SIGALE:  Objection as to outside the scope
16  of her knowledge.
17          But if you can answer, answer.
18  BY THE WITNESS:
19     A.    I wouldn't know that.
20  BY MR. CHIMIENTI:
21     Q.    Okay.  Is it possible, Ms. Rowe, that a
22  foster child coming into a foster home might have
23  zero training on firearms?
24     A.    I would say that is possible.



1        Q.    Is it possible that a foster child

2   coming into a foster home might not even know what

3   a firearm is?

4        MR. SIGALE:  Objection to speculation.

5             You can answer if you can.

6   BY THE WITNESS:

7        A.    I would imagine infants and, you know,

8   very young who might not know.

9   BY MR. CHIMIENTI:

10       Q.    Is it possible that these foster

11  children might not know how to react when they see

12  a firearm?

13       MR. SIGALE:  Objection as to speculation and

14  foundation.

15            But if you can answer, answer.

16  BY THE WITNESS:

17       A.    Could you rephrase the -- the question?

18  BY MR. CHIMIENTI:

19       Q.    Sure.  Is it possible that a foster

20  child coming into a foster home might not know the

21  appropriate way to react when they see a firearm?

22       MR. SIGALE:  Same objections.

23            Go ahead, if you can.

24  BY THE WITNESS:



1     A.    I could assume that would be possible.

2  BY MR. CHIMIENTI:

3     Q.    Okay.  And these foster parents when

4  they're accepting the foster children into their

5  home, is it possible that they might not have

6  complete knowledge of the foster child's experience

7  with firearms?

8     MR. SIGALE:  Objection as to foundation and

9  speculation.

10          You can answer if you can.

11 BY THE WITNESS:

12    A.    I wouldn't know.

13 BY MR. CHIMIENTI:

14    Q.    Okay.  Do you know whether the Millers

15 have ever violated any of the licensing rules?

16    A.    No, I do not.

17    Q.    Okay.  Shifting gears here again, let's

18 talk about day care homes.  We can break it down

19 like we did for foster homes, but what is your

20 understanding of, first of all, what a day care

21 home is, and we can go from there.

22    A.    My understanding of a day care home is a

23 home that supervises and takes care of children

24 while their parents are either at work or

ILLINOIS CARRY 30B6                                    August 07, 2020
JENNIFER J. MILLER vs MARC D. SMITH                            124

1   indisposed; you know, they need child care for

2   their child while they're doing something else.

3        Q.    Do you know if there are any limits on

4   how many children a day care home can care for at a

5   time?

6        A.    I may have heard references to that

7   somewhere along the way.  I know during the

8   COVID-19, there were, you know, different

9   restrictions and rules and things that were out,

10  but I don't know specifically.

11            In generality, I may have heard

12  something along those lines.

13       Q.    Do you know if there are any age

14  restrictions on the children in day care homes,

15  like they have to be of a certain age?

16       A.    I do not know.

17       Q.    Let's talk about licensing.

18            What is your understanding of how

19  someone becomes a day care home licensee?

20       A.    I'm assuming it's along the same

21  procedures as we mentioned before, applying for a

22  license, you know, inspections, approval by the

23  State.

24       Q.    So again, the prospective licensee would



1   need to apply for the position?

2        A.    To be a licensed in-home day care, I

3   would assume so.

4        Q.    And is DCFS the organization that these

5   prospective day care licensees apply to?

6        A.    That's my understanding.

7        Q.    You had mentioned also there's some

8   paperwork involved, correct?

9        A.    Correct.

10       Q.    Home inspections, correct?

11       A.    I would assume so, yes.

12       Q.    Do you know whether day care home

13  licensees need to go through DCFS-approved training

14  in order to get their license?

15       A.    I do not know.

16       Q.    Okay.  Let's shift gears in terms of

17  talking about the actual day-to-day in a day care

18  home, and I think you had mentioned this earlier.

19            When I asked you what a day care home

20  was, you said you thought it was caring for

21  children whose parents are unavailable or

22  indisposed, correct?

23       A.    Correct.

24       Q.    Is it your understanding that day care



1 | home providers are running a business in their

2 | home?

3 |     A.    Correct.

4 |     Q.    And that these parents are paying the

5 | day care home provider for the child care?

6 |     A.    That would be my understanding.

7 |     Q.    Okay.  And again, would you agree that

8 | throughout this licensing process through DCFS that

9 | the health and safety of the children in the day

10 | care home is the most important issue?

11 |     A.    Yes.

12 |     Q.    You mentioned this earlier, and I'll ask

13 | you just to clear up the record:  Do you know if

14 | Jennifer and Darin Miller are licensed day care

15 | home providers?

16 |     A.    That is my understanding.

17 |     Q.    Your understanding is that they are?

18 |     A.    Correct.

19 |     Q.    And again, are you aware of what might

20 | happen if a day care home provider violates the

21 | licensing rules?

22 |     A.    I would assume their license would be

23 | revoked.

24 |     Q.    Are you aware of any immediate steps



1  that might happen such as a warning?

2      A.    I don't know the process.

3      Q.    Okay.  And similarly with these day care

4  homes, they might be accepting children from a

5  number of different families at one time, correct?

6      A.    I would assume so.

7      Q.    Okay.  And some of these children coming

8  into a day care home might have no training on

9  firearms, correct?

10     MR. SIGALE:  Objection as to foundation and

11  speculation.

12          You can answer.

13     THE WITNESS:  Oh, I thought we were on to the

14  next question.

15  BY THE WITNESS:

16     A.    I would assume that could be a

17  possibility.

18  BY MR. CHIMIENTI:

19     Q.    Is it also possible that some of those

20  children might not even know what a firearm is?

21     MR. SIGALE:  Same objections.

22          Answer if you can.

23  BY THE WITNESS:

24     A.    You know, if there is a very, very young



1   child, you know, a baby, an infant, it would be

2   safe to assume they wouldn't know.

3   BY MR. CHIMIENTI:

4       Q.    It's also possible that these children

5   in the day care homes might not know how to react

6   when they see a firearm?

7       MR. SIGALE:  Same objections.

8            You can answer.

9   BY THE WITNESS:

10      A.    As with any situation where there were

11  children, I would assume that's possible.

12  BY MR. CHIMIENTI:

13      Q.    And then again, because we talked about

14  it's possible that multiple families are sending

15  their children to one day care home, it's possible

16  that the day care home provider might not be aware

17  of what these parents taught their children about

18  firearms, correct?

19      MR. SIGALE:  Same objections.

20  BY THE WITNESS:

21      A.    I imagine it would be possible.

22  BY MR. CHIMIENTI:

23      Q.    We had submitted on your notice,

24  Ms. Rowe, a number of sort of substantive topics in



1   bullet point format that we anticipated asking you

2   questions about, and some of them -- I'm going to

3   shift to those now, and I'll let you know when

4   we're going from one topic to the next, and we'll

5   start with firearm safety.

6           We talked a little bit about this, about

7   your personal experience early on in the

8   deposition, but, you know, for purposes of the

9   organization, can you describe to me when I -- what

10  does the organization believe that the term

11  "firearm safety" means?

12      A.    That is the safe and responsible storage

13  and use of a firearm.

14      Q.    So safety encompasses both storage and

15  use?

16      A.    It could.

17      Q.    Under what circumstances does it --

18  well, strike that.

19          Does the organization encourage its

20  members to practice firearm safety?

21      A.    Yes.

22      Q.    How do they do that?

23      A.    Well, one is that as a responsible

24  firearm owner they store their firearms in a manner



1   that they would not be accessible to unauthorized

2   persons; when they are handling a firearm, they

3   follow the basic rules of firearm safety.

4        Q.    What are the basic rules of firearm

5   safety?

6        A.    We refer to the rules from the Illinois

7   State Police that are, rule number one, always keep

8   the gun pointed in a safe direction.  Rule number

9   two is always keep your finger off the trigger

10  until you're ready to shoot.  Do not press or pull

11  the trigger until you are ready.  Treat all

12  firearms as though they were loaded and know your

13  target and what is beyond your target.

14       Q.    I'm going to show you something else

15  here that I've marked as Exhibit 8 to your

16  deposition.  I just shared my screen.  I'm showing

17  you what's been marked as Exhibit 8 to your

18  deposition.  I'll represent that this is a printout

19  of a website, and the first -- the title of it is

20  "NRA Gun Safety Rules."

21            Do you see that, Ms. Rowe?

22       A.    I do.

23       Q.    Have you ever seen the NRA's gun safety

24  rules before?



1        A.    Yes.

2        Q.    Okay.  Are you familiar with them?

3        A.    Yes.

4        Q.    Okay.  I'm going to scroll down here.

5   At the bottom of the first page, it says, "The

6   fundamental NRA rules for safety gun handling are."

7            Do you see that?

8        A.    Yes.

9        Q.    That's at the bottom.  If we go on to

10  Page 2, like you just said, "ALWAYS Keep the Gun

11  Pointed in a Safe Direction," correct?

12       A.    Correct.

13       Q.    Okay.  The next one that bleeds on to

14  Page 3, "ALWAYS Keep Your Finger Off the Trigger

15  Until Ready to Shoot"?  That's something you just

16  said, correct?

17       A.    Correct.

18       Q.    And this is one you didn't mention.  It

19  says, "ALWAYS Keep the Gun Unloaded Until Ready to

20  Use."

21            Do you see that?

22       A.    I do.

23       Q.    Okay.  Is that something that you

24  encourage your members to do?



ILLINOIS CARRY 30B6                                    August 07, 2020
JENNIFER J. MILLER vs MARC D. SMITH                            132

1        A.    Yes.

2        Q.    Okay.  How do you encourage your members

3    to do that?

4        A.    First you need to determine "ready to

5    use."

6        Q.    Okay.

7        A.    Is the firearm to be used for

8    self-defense?  In that case, it needs to be loaded

9    and ready to use.  If it is not going to be used

10   anytime soon, then it's -- you should unload to

11   store.

12       Q.    And how are these messages that you're

13   mentioning here conveyed to the members?

14       A.    I believe they're posted throughout our

15   website in different discussions, different topics.

16       Q.    You had mentioned, you know, in terms of

17   a gun being ready to use for self-defense.

18             For a gun to be ready for use for

19   self-defense, does it always have to be loaded?

20       A.    It's not ready to use if it's not.

21       Q.    Okay.  So that's -- that's a yes to my

22   question?  It always has to be loaded if it's being

23   used for self-defense?

24       A.    There are -- there is the option, I



1  suppose, to have it unloaded, but then the time

2  frame would be critical.  If you are at a -- if a

3  self-defense situation arises, it would be critical

4  the amount of time it would take to access the

5  firearm, load it and have it ready to use.

6      Q.    So it sounds like it's possible to keep

7  the gun unloaded for self-defense purposes, but as

8  you said, the timing becomes important for being

9  able to load the firearm, correct?

10     A.    It would not be considered ready to use.

11     Q.    Has the organization made any public

12 statements other than the message board about

13 firearm safety?

14     A.    Possibly in e-mails.  I don't know.

15     Q.    Okay.  Other than e-mails and the

16 message boards -- I mean, in your experience as

17 spokesperson, have you ever publicly made any

18 statements about gun safety?

19     A.    I believe we always encourage people to

20 be responsible gun owners, and that is to, you

21 know, handle firearms safely, store in a manner

22 that they're not accessible to unauthorized

23 persons.

24     Q.    All right.  And just so -- just so the



1  record's clear, could you define what you mean when

2  you say "responsible gun owner"?

3       A.    Someone that maintains their firearm in

4  a safe manner and also maintains their firearms in

5  a manner that they're not accessible to

6  unauthorized persons.

7       Q.    Are all of your members responsible gun

8  owners?

9       A.    I would hope so.

10      Q.    Do you know one way or the other?

11      A.    I don't know each one of them

12  personally, so I would not have that information.

13      Q.    Okay.  You mentioned earlier when we

14  were talking about the message board the training

15  programs that folks can post on the message boards.

16           Do you remember that?

17      A.    Yes.

18      Q.    Okay.  Are any of those trainings gun

19  safety related?

20      A.    Firearm instructors are -- that are

21  members -- who are members are welcome to post

22  their training schedule and the different topics

23  that their class would entail.

24      Q.    Let me ask it this way:  Does



1  IllinoisCarry itself host any training programs?

2      A.    We do not.

3      Q.    And the -- whether a training program

4  includes elements like safety or storage or

5  anything like that, that's up to the member who's

6  running the program.

7            Is that fair?

8      A.    The particular instructor that's

9  conducting the class, the content of the class

10  would be up to the instructor.

11      Q.    Does IllinoisCarry endorse or encourage

12  members to seek out particular instructors?

13      A.    I think members can recommend

14  instructors that they've had, you know, a good

15  experience with, but I don't know that

16  IllinoisCarry itself -- I don't think that they --

17  that we recommend or -- you know, we might have a

18  listing or direct someone to the listing.

19      Q.    Okay.  Let's shift topics from gun

20  safety to gun storage.

21            Does the organization encourage its

22  members to safely store their firearms?

23      A.    Yes.

24      Q.    How does the organization do that?



1        A.    In our discussions and topics on the

2    forum.

3        Q.    What is the organization's position on

4    what constitutes safe firearm storage?

5        A.    Would you repeat the first part, please?

6        Q.    Sure.  What is IllinoisCarry's position

7    on what constitutes safe firearm storage?

8        A.    The same that I have shared earlier,

9    that firearms be maintained in a manner that

10   they're not accessible to unauthorized persons.

11       Q.    Are there any particular methods that

12   IllinoisCarry believes help achieve that result?

13       A.    Methods of storage?  One method would be

14   on your person so that you have control of the

15   firearm.  Another would be locked in a case or in a

16   safe in some -- some manner or a room.

17       Q.    When you say on someone's person, what

18   do you mean by that?

19       A.    As in concealed carry, you know, carried

20   on your -- on your body that you have control of

21   the firearm and it's not just laying loose

22   somewhere.

23       Q.    So could that -- that could include

24   being in a holster?



1      A.    Yes.

2      Q.    Could that include like being in a coat

3  pocket or something like that?

4      A.    That could be.

5      Q.    Or in a purse?

6      A.    If it's on your body.

7      Q.    I'm going to show you -- I'm going to

8  share my screen here, Ms. Rowe, and show you what

9  I've marked as Exhibit 9 to your deposition.  I'll

10 represent that this is a document that the Millers

11 actually produced.  It says "Smith & Wesson Safety

12 & Instruction Manual" for a rifle.

13           Do you see that?

14     A.    I do.

15     Q.    I'm going to flip forward in the pdf

16 here.  On the right-hand side, this warning -- this

17 second big paragraph, I'm just going to go through

18 here and I'm going to read off, and I just want to

19 know whether you agree with the statements I'm

20 reading.

21           The first one is "Warning:  Firearms are

22 dangerous when used and stored improperly."

23           Do you agree with that?

24     A.    Correct.



1     Q.    The next sentence, "They pose a risk of

2    serious or fatal injuries."

3          Do you agree with that?

4     A.    They can.

5     Q.    Okay.  "Firearms can be especially

6    dangerous to children when they are stored in an

7    irresponsible and unsafe manner."

8          Do you agree with that?

9     A.    Yes.

10    Q.    "For your safety and the safety of

11   others, it is imperative that you keep your firearm

12   locked and unloaded in a secure place."

13         Do you agree with that?

14    A.    It depends on the purpose of the

15   firearm.

16    Q.    And does that sort of harken back to the

17   discussion we had earlier about self-defense use?

18    A.    Correct.

19    Q.    The next, "The ammunition should be

20   stored in a separate secure location when it is not

21   in use."

22         Do you agree with that?

23    A.    That can be a safe manner, but also it

24   could be locked in a safe that's not in a separate



1  location and still be inaccessible to unauthorized

2  persons.

3      Q.    You're saying sort of like a safe within

4  a safe type of thing?

5      A.    No.  I'm saying -- I'm saying that it

6  could be safe to store them in separate locations

7  or locked in the same manner together, you know, a

8  firearm, box of ammo locked in a safe --

9      Q.    Okay.

10     A.    -- where unauthorized persons don't have

11  access to it.

12     Q.    Okay.  "Safe and secure storage of your

13  firearm is one of the most important rules of

14  firearm safety."

15           Do you agree with that?

16     A.    I agree.

17     Q.    Okay.  The last sentence here says,

18  "Your failure to follow these rules may result in

19  serious injury or death to you or others."

20           Do you agree with that?

21     A.    It's possible.

22     Q.    Has the organization published anything

23  either on-line or in print about firearm storage?

24     A.    Could you repeat that again?

1      Q.    Sure.  Has the -- has IllinoisCarry

2  published anything either on-line or in print about

3  firearm storage?

4      A.    Just according to our discussions on the

5  forum.  I'm not aware of any paper printed.

6      Q.    And those discussions on the forum would

7  have been created by IllinoisCarry members,

8  correct?

9      A.    Correct.

10     Q.    Has the organization made any public

11  statement about firearm storage?

12     A.    I'm sure like at town hall meetings or

13  something like that, it may have been possible to

14  come up in discussion.

15     Q.    When you say "council meetings," what do

16  you mean?

17     A.    Town hall meetings.

18     Q.    Town hall.  I'm sorry.

19            Describe the town hall meetings for us.

20  What are those?

21     A.    When we go around different communities

22  and have a public meeting about firearm-related

23  concerns.

24     Q.    How often do those happen?



1       A.    Not on a regular basis.

2       Q.    When was the last time you attended one?

3       A.    Hmm, this is August of 2020.  Possibly

4   early in the year, late last year.

5       Q.    And what was the subject of that

6   town hall?

7       A.    The Second Amendment and possible

8   changes in Illinois law and how that would affect

9   gun owners.

10      Q.    At that town hall meeting, were any

11  foster care or day care regulations discussed?

12      A.    No.

13      Q.    Did firearm storage come up in the

14  context of that meeting?

15      A.    I -- I don't recall it coming up.

16      Q.    Who organizes these town hall meetings?

17      A.    A variety -- they're organized in a

18  variety of different ways.  Sometimes the

19  community -- a community will organize a town hall

20  and they will contact us and ask for someone to

21  come and speak on the topic.  Sometimes a

22  legislator will organize a meeting and invite us as

23  a Second Amendment advocacy group to come and speak

24  and sometimes we organize them.

1      Q.     When was the last time IllinoisCarry
2    organized its own town hall?
3      A.     It was possibly the last one that I was
4    at.
5      Q.     Has IllinoisCarry ever organized a
6    town hall or attended a town hall where foster care
7    or day care was discussed?
8      A.     Not that I know of.
9      Q.     When the organization is invited to
10   participate in a town hall, does that fall to you
11   as spokesperson?
12     A.     Usually.
13     Q.     Who if anyone else from the organization
14   also participates in the town hall?
15     A.     By participation, what do you mean?
16     Q.     So like if you show up and say, "I am
17   here from IllinoisCarry," does anybody else show up
18   and say, "I'm here on behalf of IllinoisCarry to
19   speak at this town hall about something"?
20     A.     Oh, to speak on behalf of the
21   organization?
22     Q.     Yes.
23     A.     Sometimes if the geographical distance
24   is great we'll have possibly one of our other board



1  members or members speak.

2     Q.    Are your board members located

3  throughout the state?

4     A.    Yes, they are.

5     MR. CHIMIENTI:  Okay.  I apologize.  I need to

6  take five for a restroom break, and this is

7  probably a good logical stopping point.

8          So let's take five off the record and

9  we'll come back in five minutes, if that's okay.

10    MR. SIGALE:  Yeah, that's fine.

11    MR. CHIMIENTI:  All right.  Thank you.

12             (WHEREUPON, the deposition was

13             recessed from 1:24 to 1:31 p.m.)

14  BY MR. CHIMIENTI:

15    Q.    We're back on the record here.

16    A.    May I?

17    Q.    Sure.

18    A.    Before we resume with the questioning --

19  specific questions, I'd like to go back and add

20  something to an earlier point --

21    Q.    Okay.

22    A.    -- whenever that's an appropriate time.

23    Q.    Go ahead.

24    A.    You had asked earlier how many of our



ILLINOIS CARRY 30B6                                        August 07, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              144

1  members reside in Illinois.

2         Q.     Uh-huh.

3         A.     Since we don't get an address from them,

4  we don't know that specifically, but during the

5  vetting process when we check their e-mail address,

6  their screen name and their IP address for any kind

7  of spam alerts, that also shows that -- in that

8  vetting process, we see where the IP address is

9  originating out of, unless they're using a proxy,

10  you know, to -- sometimes you can use a proxy that

11  doesn't have your IP address traced back to your

12  location, it's a general location, and from that we

13  assume that most -- the majority of our members are

14  in Illinois.

15         Q.     Okay.  Thank you for that clarification.

16         When we -- I showed you and I'll show

17  you again, Ms. Rowe, Exhibit 9 to your deposition,

18  which I have on the screen.  This is the Smith &

19  Wesson instruction manual.

20         Do you see that on your screen?

21         A.     I do.

22         Q.     And you had mentioned that there are,

23  you know, different ways to store your firearms

24  based on what they're being used for.



ILLINOIS CARRY 30B6                                    August 07, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              145

1          Do you remember that?

2    A.    Yes.

3    Q.    And you would store something

4    differently if you were using it for self-defense

5    as opposed to something you were using for another

6    purpose, correct?

7    A.    That's possible, correct.

8    Q.    And is this the type of gun -- this

9    rifle with the picture on the screen, is this the

10   type of firearm that should be stored unloaded and

11   locked?

12   A.    I -- I don't know about particular makes

13   and models that individuals might choose for their

14   home defense.

15   Q.    So it's possible that somebody could be

16   using this for self-defense?

17   A.    I -- I would think that would be

18   possible.

19   Q.    We had talked about -- we talked about

20   firearm storage.

21          Touching briefly on ammunition storage,

22   because we have covered at least a little bit

23   already, does the organization encourage its

24   members to safely store its ammunition?



```
 1        A.    Yes.

 2        Q.    How does the organization do that?

 3        A.    Just in our discussions on -- on the

 4   forum.

 5        Q.    What is the organization's position on

 6   what constitutes safe ammunition storage?

 7        A.    That it would be stored in a manner that

 8   it's not accessible to unauthorized individuals.

 9        Q.    And what method should individuals use

10   to make sure that that happens?

11        A.    Just like with firearms, either the

12   ammunition is on your person or stored in a manner

13   that would prevent someone that's unauthorized

14   getting hold of it.

15        Q.    Okay.  Has the organization published

16   anything aside from the message boards about

17   ammunition storage?

18        A.    As far as paper publications?  Is that

19   what you mean, printed?

20        Q.    Yeah, printed, other locations on-line,

21   mailings, newsletters, things like that.

22        A.    For the public, not that I am aware of.

23        Q.    Anything for private or internal

24   consumption?
```



1    A.    There -- there was a curriculum that is

2    not available to the public and is not available on

3    our website and not sent out in our e-mails for

4    registered instructors for the State of Illinois

5    for the concealed carry courses.

6    Q.    Is that the document that was recently

7    produced to us within the last day or two, the

8    concealed carry course?

9    A.    Yes.

10    Q.    Is there information in that document

11    about proper ammunition storage?

12    A.    Because it is required, also, it -- it

13    makes sense, but also because it's required through

14    the Illinois State Police curriculum approval

15    process, that is a topic that must be included.

16    Q.    Do you know the substance of what that

17    document says about ammunition storage?

18    A.    Basically the same I think that I've

19    already mentioned.

20         There's one additional thing that the

21    ISP, the Illinois State Police, requires, and that

22    is public storage.  If you are a concealed carry

23    holder and you enter a location that requires you

24    to store your firearm publicly and not carry it



1   throughout the facility, they have like storage

2   lockers like they have at airports and different

3   places, there are some places that you travel -- I

4   could think of an example like a gym that people go

5   to work out that they would have to store their

6   firearm in their locker, and it's just we're

7   required to instruct on how to do that safely.

8       Q.    And how do you do that if you're going

9   to the gym and you have your -- you're carrying?

10  How are you supposed to store in that particular

11  situation?

12      A.    Following the firearm safety rules that

13  the Illinois State Police require be taught in the

14  curriculum.

15      Q.    Does any part of that curriculum include

16  that in a public place, a gun should be stored

17  unloaded?

18      A.    No, it does not.

19      Q.    Other than this -- how does the

20  organization make this document, this concealed

21  carry training manual, available to its members?

22      A.    It's not available to our members unless

23  they are registered concealed carry instructors

24  with the Illinois State Police.



ILLINOIS CARRY 30B6                                    August 07, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              149

1      Q.    And does a member have to let you know
2  that they meet those qualifications to get this
3  document?
4      A.    Yes.
5      Q.    Do you charge for this document or is it
6  free?
7      A.    We charge a fee, a donation for the
8  curriculum.
9      Q.    And how much do you charge for it?
10     A.    It depends on what format they need.
11     Q.    What are the available formats?
12     A.    An instructor booklet with a DVD that
13  has handouts and a video on it is one price.  If
14  they --
15     Q.    How much?
16     A.    $150.
17     Q.    Okay.
18     A.    And then if they want a USB drive
19  instead of a DVD, it's $160, and if they want both
20  the DVD and the USB drive, it's $170.
21     Q.    Does the organization advertise any
22  particular storage methods on its website?
23     A.    Not that I'm aware of.
24     Q.    I'm going to change topics, Ms. Rowe,



1   from storage here to focus more on children.

2           Does the organization believe

3   that -- well, strike that.  I'll ask it a

4   different way.

5           In the organization's view, should

6   children have access to firearms?

7       A.    There are children who participate in

8   shooting sports, school trap shooting teams, other

9   types of shooting teams.  4H has a program for

10  shooting sports.  I'm sure there are other

11  organizations that do, as well.  I think possibly

12  the Boy Scouts, maybe the Girl Scouts.  I'm not

13  sure.

14          So in those situations, we believe that

15  as soon as a child is mature enough to understand

16  the firearm safety rules and can absorb the

17  information about safely handling a firearm that

18  that can be done under adult supervision.

19      Q.    What age do you believe -- or what age

20  does the organization believe that a child is old

21  enough to handle a firearm?

22      A.    Oh, that varies from child to child, and

23  that is based on their maturity level, not a

24  physical age.



1      Q.    Is there a -- is there a bare minimum

2    age?  I guess I'm trying to figure out if you're

3    saying if we have a super-mature four-year-old that

4    that four-year-old should be allowed to handle a

5    firearm.

6      A.    I -- I can't decide on that.

7      Q.    Okay.  Is there such a thing as being

8    too young to handle a firearm?

9      A.    Well, definitely if you can't physically

10   handle a firearm, that would be too young.

11     Q.    Is there such a thing as -- strike that.

12           You mentioned the 4H clubs, the kids in

13   the shooting programs, the Boy Scouts, et cetera,

14   and those are specific, you know, sort of

15   categories of individuals.  I'll broaden my initial

16   question.

17           Should all children have access to

18   firearms?

19     A.    That goes -- no, I -- you can't make a

20   blanket statement like that because of maturity

21   level, physical ability, knowledge and skill.

22     Q.    Okay.  For a child that lacks the

23   requisite knowledge, ability and skill to handle a

24   firearm or to be around a firearm, anyway, what



1   steps should be taken to ensure that that child

2   does not gain access to the firearm?

3        A.    That goes back to a responsible gun

4   owner maintaining their firearms and storing them

5   in a way that unauthorized persons cannot maintain

6   access to them, which this particular person that

7   you're supposing would I think fall under that

8   unauthorized persons category.

9        Q.    Along the same lines, should children

10  have access to ammunition?

11       A.    If they are like the children that we've

12  talked about that are involved in handling of a

13  firearm, you know, for sports or recreation or

14  whatever, they would have to have access to the

15  ammunition.

16       Q.    But it's not necessarily safe that

17  all children should have access to ammunition,

18  correct?

19       A.    I would agree with that.

20       Q.    Are there any steps that parents should

21  take to ensure that these unauthorized children who

22  lack the maturity level to handle the ammunition

23  don't gain access to it?

24       A.    Yes.  They should store their firearms



1  where they have control of them or in such a manner

2  that they're not accessible to the unauthorized

3  children.

4       Q.    Now, we've talked a little bit about not

5  accessible and you've mentioned safes and storage

6  methods a little earlier.

7            Is there one particular storage method

8  that's better than the others?

9       A.    I think it depends on the -- the

10  environment and the age and so forth.  What might

11  be best in one home situation, another method might

12  be better, more effective.

13      Q.    You had mentioned children meeting sort

14  of a requisite level of maturity and ability to

15  handle firearms at a certain age.

16           Children with emotional problems, those

17  children, should they be allowed access to

18  firearms?

19      MR. SIGALE:  Objection as to foundation and

20  speculation.

21           You can answer if you know.

22  BY THE WITNESS:

23      A.    I'm not an emotional or mental health

24  expert.  I'm not sure what would be categorized



1   as -- you said emotionally -- what was the term you

2   used?

3   BY MR. CHIMIENTI:

4       Q.    Mental health issues, emotional

5   immaturity or other emotional problems, should

6   those children have access to firearms?

7       MR. SIGALE:  Same objections.

8           You can answer.

9   BY THE WITNESS:

10      A.    I think it's determined by their

11  maturity, their capability of handling a firearm in

12  a safe manner.  If they're not going to be safe,

13  then of course they should not have access to

14  firearms.

15  BY MR. CHIMIENTI:

16      Q.    And speaking about the foster care

17  setting here, if this case turns out the way you

18  would like it to, should each foster parent have to

19  decide what is or is not accessible to the

20  children?

21      A.    I would think they would have to

22  determine that.  As far as the requirements, they

23  would have to fulfill the requirements, make sure

24  they're not accessible to unauthorized people.

1      Q.    And should it be up to the foster parent

2    to determine what qualifies as accessible or not?

3      A.    I don't know how to answer that

4    question.

5      Q.    Let me ask it to you this way:  Should

6    it be up to the parents or should it be up to DCFS

7    to determine what "accessible" means?

8      MR. SIGALE:  I'll object to the form of the

9    question.

10          You can answer if you can.

11   BY THE WITNESS:

12     A.    Well, at this point DCFS is making the

13   determination that it's a complete ban, so I don't

14   know -- on having access to firearms in the home,

15   so I -- you know, if they are instructed that there

16   needs to be a manner allowed for access for the use

17   of self-defense where it's readily available, then

18   I would think they could come up with a -- a rule

19   that would be acceptable.

20   BY MR. CHIMIENTI:

21     Q.    Okay.  Are there any -- is that the

22   same -- is your answer there the same regardless

23   whether it's foster or day care?

24     A.    Sure.



1      Q.    Are there any sort of -- we're talking

2    about families or parents or situations with adults

3    sort of introducing the -- sort of introducing the

4    children to handling firearms.

5             Are there any sort of precautionary

6    steps that parents or the supervisory adults should

7    take before allowing the children to handle

8    firearms?

9      A.    Well, I don't believe children or adults

10    or anyone should be handling a firearm until they

11    fully comprehend and can show they comprehend the

12    firearm safety rules and how a firearm works.

13      Q.    And how would one demonstrate that they

14    understand those rules?

15      A.    For me, it's a part of the training

16    process.

17      Q.    Is there a particular training program

18    that parents should use to educate their children

19    about guns?

20      A.    I believe there are several really good

21    training programs available.

22      Q.    If a parent thinks that they can educate

23    the child just fine themselves, should they be

24    allowed to do that?



1      MR. SIGALE:  Objection as to foundation and

2  speculation.

3           You can answer if you know.

4  BY THE WITNESS:

5      A.   I -- I think parents -- there are

6  parents that are very capable of training their

7  children on safe firearm usage.

8           I'm confused a bit because the -- we're

9  talking about how children should be trained, and

10  our topics seem -- I'm just confused as to how that

11  comes into an adult as a foster parent or as a day

12  care licensee should have access to a firearm

13  that's readily available for them to use in case of

14  self-defense.

15           I'm just a little bit confused and I'm

16  just trying to put it together.

17  BY MR. CHIMIENTI:

18      Q.   I understand; I understand.

19      MR. SIGALE:  You just answer the question he's

20  asking.

21      THE WITNESS:  Okay.

22      MR. SIGALE:  Just go ahead and answer.

23      THE WITNESS:  I'll do the best I can.

24  BY MR. CHIMIENTI:



1        Q.    Thank you, Ms. Rowe.

2              Should an adult allow someone else's

3    children to access that adult's firearms?

4        MR. SIGALE:  Foundation, speculation

5    objection.

6              You can answer if you can.

7    BY THE WITNESS:

8        A.    I would think just in my own personal

9    standpoint, you would -- you might need the

10   parents' approval.

11   BY MR. CHIMIENTI:

12       Q.    That's not something that you would do

13   as a matter of course?

14       MR. SIGALE:  Same objections.

15             You can answer.

16   BY THE WITNESS:

17       A.    Me personally?  I wouldn't do that

18   without the parents' knowledge.

19   BY MR. CHIMIENTI:

20       Q.    Okay.  Shifting gears away from the

21   children topic to the self-defense topic, what role

22   does the organization believe firearms play in

23   self-defense?

24       A.    A very important role.



1          Q.    And can you describe that a little bit

2    for us?

3          A.    Firearms can equal out the threat of --

4    I don't know exactly how to say this -- disparate

5    force.

6                Say myself, I am a slight-build person,

7    and if someone 6 foot 2 weighing 350 pounds is

8    wanting to inflict personal harm on me, I'd have

9    very little chance of being able to do that

10   successfully with just my, you know, physical

11   ability, whereas a firearm would give me that --

12   would equal the disparity of force that I could

13   protect myself from harm.

14         Q.    You've described one situation or that

15   situation for self-defense.

16               Are there any other situations where the

17   organization believes firearm use for self-defense

18   is appropriate?

19         A.    We would go back to the Illinois

20   Compiled Statutes.  I believe it's in Section 720.

21   I'm not sure, I'd have to look to make sure, but

22   the justified use of force statute would dictate

23   whether it would be appropriate to use that type of

24   force in a self-defense situation.



```
1        Q.    So you would rely on the statute for
2   those situations, then?
3        A.    Correct.
4        Q.    And we talked a little bit today about
5   statutes and you mentioned a couple times Supreme
6   Court precedent.
7              Ms. Rowe, just for the record, I want to
8   confirm:  Are you an attorney?
9        A.    I am not.
10       Q.    Okay.  Did you attend any part of any
11  legal training, law school or otherwise?
12       A.    I have not.
13       Q.    Okay.  Hopping back to the self-defense
14  issue, should children be allowed to use firearms
15  for self-defense?
16       A.    If the situation warranted, yes.
17       Q.    What types of situations would warrant a
18  child using a firearm for self-defense?
19       A.    I'm just speculating on scenarios.  Is
20  that what you -- if they are threatened with
21  physical harm in their home and there is no adult
22  there to protect them, then there is provision in
23  Illinois statutes that -- that a child can use a
24  firearm for personal protection.
```



1    Q.    And in the scenario you just mentioned

2 where the adult is not home, the child would need

3 access to the firearm to defend himself, correct?

4    A.    Correct.

5    Q.    In that scenario where the child is at

6 home defending itself, does a child need to be of

7 the appropriate age and maturity to use a firearm

8 to defend itself?

9    A.    Correct.  They would not want to be one

10 of those unauthorized persons.

11    Q.    Shifting gears again, Ms. Rowe, to the

12 Second Amendment more broadly, what is

13 IllinoisCarry's position on the meaning of the

14 Second Amendment to the United States Constitution?

15    A.    That it is an individual right, and

16 under Heller vs. D.C., the Supreme Court ruled that

17 we have a right to have -- the residents of D.C.

18 have a right to have a handgun, firearm in their

19 home, and then with McDonald vs. Chicago, the U.S.

20 Supreme Court ruled that that was a right whether

21 you lived in D.C. or someplace else, incorporating

22 that right to the other states, and then with Moore

23 vs. Madigan, the 7th Appellate Court ruled that

24 that right extended outside the home, as well.



1        Q.    So in your -- to tick it off here, does

2    the organization believe that the Second Amendment

3    allows an individual to carry a firearm for

4    self-defense in the home?

5        A.    Yes.

6        Q.    In public?

7        A.    Yes.

8        Q.    At all times?

9        A.    I believe that the U.S. Supreme Court

10   has ruled that there are restrictions that can be

11   instituted in time and manner and place.

12       Q.    Does the organization believe that a

13   person's ability to have a firearm available for

14   self-defense should be preserved even if it

15   increases the risk of harm to children?

16       A.    I -- I can't compute that in my head.

17   I...

18       Q.    So you've told me about situations where

19   the -- where the organization believes that the

20   individual should have a firearm available to

21   protect themselves, correct?

22       A.    Correct.

23       Q.    Should that ability be preserved --

24   should a person be allowed to have a firearm to



1  defend themselves even if having that firearm

2  increases the risk of harm to children?

3       MR. SIGALE:  Objection, foundation,

4  speculation.

5            If you can answer, you can answer.

6  BY THE WITNESS:

7       A.   I go back to maintaining that they

8  should have that right, but then with that right

9  comes the responsibility to maintain their firearms

10 in a manner that would not be accessible and a

11 manner that would not harm children or accessible

12 in a manner that would harm children.

13 BY MR. CHIMIENTI:

14      Q.   Okay.  So is it your position that

15 having the handgun available or having the firearm

16 available to defend yourself is predicated on

17 keeping it away from children?

18      A.   Unauthorized individuals.

19      Q.   We've talked about concealed carry a

20 little bit throughout this deposition.  We've

21 alluded to it.

22            Do you think that somebody needs to be a

23 concealed carry license holder in order to have a

24 firearm in a foster home?



1      A.   Do I believe that a person should be a

2  licensed concealed carry holder in order to have a

3  firearm in their home?

4      Q.   Do you need -- so I'll say it again

5  because I don't want us to get our wires crossed

6  here.

7          Do you think that an individual needs to

8  be a concealed carry license holder in order to

9  have a firearm in a foster home?

10     A.   Not necessarily.

11     Q.   Do you think that a person needs to be a

12  concealed carry license holder to have a firearm in

13  a day care home?

14     A.   Not necessarily.

15     Q.   When you say "not necessarily," can you

16  expound a little bit for both?  If it's the same

17  explanation for both, I figured I'd ask the same

18  question.

19     A.   Thank you.  The concealed carry license

20  is for carrying outside the home and carrying in

21  public, so that's what I'm basing my answer on.

22     Q.   And if I'm not mistaken, there are some

23  exceptions to the concealed carry law, correct?

24     A.   Exceptions to --



1        MR. SIGALE:  Objection, form of the question.

2   BY MR. CHIMIENTI:

3        Q.   Are there places in the concealed

4   carry -- sorry.

5             As far as you know, Ms. Rowe, are there

6   places where concealed carry permit holders are not

7   allowed to conceal carry?

8        A.   Yes.  There are 23 categories of

9   prohibited places in the State of Illinois.

10       Q.   Is a child care facility one of those

11  categories?

12       A.   Yes.

13       Q.   We are -- we are running out of

14  gearshifts here, Ms. Rowe.  I promise I'm getting

15  close to the end here.  I've got two more

16  categories of questions to ask you about.  I'm

17  thinking these should go fairly quickly.  We'll get

18  through these, and then I'm sure David's going to

19  have questions for you -- he may have questions for

20  you after that, and we can figure out whether we're

21  going to take a break.

22            So the second-to-last category that I

23  want to ask you about is the other organizational

24  plaintiffs in this case, Second Amendment

1  Foundation and the Illinois State Rifle

2  Association.

3          What is the relationship of

4  IllinoisCarry to the Second Amendment Foundation?

5      A.    There is no official relationship or

6  affiliation other than just partnering with and

7  participating in events with.

8      Q.    What sorts of events do you participate

9  in with SAF?

10     A.    They have an annual gun rights policy

11  conference that we have attended and occasionally

12  been a speaker at their events.

13     Q.    Have you personally spoken at those

14  events?

15     A.    I have.

16     Q.    On what topic?

17     A.    Mainly the progress of concealed carry

18  in the State of Illinois.

19     Q.    Have any of those conferences touched on

20  foster care or day care?

21     A.    Not that I know of.

22     Q.    Do you -- does IllinoisCarry ever

23  communicate with the Second Amendment Foundation?

24     A.    Yes.



1    Q.    How do the two organizations

2  communicate?

3    A.    Mostly e-mail.

4    Q.    Who are the individuals who are

5  communicating?

6    A.    I believe it would be Alan Gottlieb and

7  I think in making arrangements to be a speaker

8  possibly his wife.

9    Q.    All right.  Who is Alan Gottlieb?

10    A.    Alan Gottlieb is I believe the executive

11  director of the Second Amendment Foundation.

12    Q.    Okay.  And you had mentioned somebody

13  else.  I think you were saying his wife maybe?

14    A.    Right.

15    Q.    Okay.  And who on -- who on

16  IllinoisCarry's end communicates with them?

17    A.    That would be me.

18    Q.    Okay.  Have you ever communicated with

19  Second Amendment Foundation about this lawsuit?

20    A.    I don't believe so.

21    Q.    Are you aware of the organizational

22  goals of the Second Amendment Foundation?

23    A.    Just from having visited their website

24  and participating in events.  I think -- not



1  verbatim but in general.

2       Q.    Okay.  In general, what are they?

3       A.    Protecting and advancing the

4  Second Amendment rights in America.

5       Q.    Do -- other than -- do the goals of the

6  Second Amendment Foundation and IllinoisCarry

7  differ in any way?

8       A.    I -- I think they're fairly similar.

9       Q.    Okay.  Other than this lawsuit, has

10  IllinoisCarry ever collaborated with

11  Second Amendment Foundation on another lawsuit?

12       A.    Yes.

13       Q.    Which one?

14       A.    Moore vs. Madigan and --

15       Q.    And anything -- I'm sorry.

16       A.    -- and Culp vs. ISP I believe it was.

17       Q.    Okay.  Have IllinoisCarry and the

18  Second Amendment Foundation ever collaborated on a

19  publication such as an article or a press release?

20       A.    Not that I'm familiar with, no.

21       Q.    Has IllinoisCarry and Second Amendment

22  Foundation ever collaborated on any public

23  statement?

24       A.    I -- I can't think of one.



1      Q.    Shifting to the Illinois State Rifle

2   Association, what is the relationship of

3   IllinoisCarry to the Illinois State Rifle

4   Association or ISRA or I-S-R-A for short?

5      A.    Similar to the Second Amendment

6   Foundation, we're not an affiliation or an

7   affiliate of the organization; we just partner with

8   events and so forth.

9      Q.    Do the organizations ever communicate?

10      MR. SIGALE:   Objection as to the form of the

11   question.

12   BY MR. CHIMIENTI:

13      Q.    Does IllinoisCarry ever communicate with

14   Illinois State Rifle Association?

15      A.    Not the whole association and all of its

16   members and everything but with the leadership

17   occasionally.

18      Q.    How does the leadership communicate?

19      A.    Phone calls usually.

20      Q.    Who is your point of contact at ISRA?

21      A.    For the most part, it would be -- hang

22   on just a second.  One of those mind freezes.

23   Mr. Pearson, Richard -- Richard Pearson.

24      Q.    And what position does Mr. Pearson have



1  at ISRA?

2     A.   I believe he's the executive director.

3     Q.   Have you ever communicated with

4  Mr. Pearson at ISRA about this lawsuit?

5     A.   I can't recall that we have.

6     Q.   Have you ever communicated with

7  Mr. Pearson at ISRA about foster care or day care?

8     A.   I don't have any recollection of having

9  a conversation of that nature.

10     Q.   Are you aware of the organizational

11  goals of ISRA?

12     A.   In a general manner.

13     Q.   In a general manner, do they differ in

14  any way from the organizational goals of

15  IllinoisCarry?

16     A.   I don't think so.  I think they're

17  pretty similar.

18     Q.   Other than this lawsuit, has

19  IllinoisCarry ever collaborated with ISRA on

20  another lawsuit?

21     A.   I believe they were also involved with

22  Moore vs. Madigan and possibly Culp vs. ISP.

23     Q.   Anything other than those two cases?

24     A.   I can't think of any at this time.



1     Q.    Have IllinoisCarry and ISRA ever

2  collaborated on a publication such as an article or

3  a press release?

4     A.    I can't think of one.

5     Q.    Okay.  Have IllinoisCarry and ISRA ever

6  collaborated on any sort of public statement?

7     A.    I -- I can't -- nothing's coming to

8  mind.

9     Q.    Okay.  Does IllinoisCarry share any

10 board members with ISRA?

11    A.    No, we do not.

12    Q.    Does IllinoisCarry share any board

13 members with the Second Amendment Foundation?

14    A.    No, we do not.

15    Q.    Other than this lawsuit -- we'll lump

16 all three organizations together now -- has

17 IllinoisCarry ever collaborated with both ISRA and

18 SAF on another lawsuit?

19    A.    I believe we were all involved with

20 Moore vs. Madigan and Culp vs. ISP.  I'd have to

21 double-check that, but I believe we were all three

22 together.

23    Q.    Has IllinoisCarry ever collaborated with

24 both ISRA and SAF on any publication such as an



1  article, newsletter or press release?

2       A.    Not that I recall.

3       Q.    Has IllinoisCarry ever collaborated with

4  SAF and ISRA on any sort of public statement?

5       A.    I don't believe so.

6       Q.    Okay.  The three of you are plaintiffs

7  in this particular case.

8             How did you determine -- or how did

9  IllinoisCarry determine that it was appropriate for

10  the organization to join the other two

11  organizations in this case?

12      A.    In that -- we felt it was appropriate

13  because Mr. Miller contacted IllinoisCarry seeking

14  help and suggestions on how to remedy his

15  situation, and he was referred to Mr. Sigale, and

16  we felt like it fell under our goals of advancing

17  the Second Amendment rights in the State of

18  Illinois.

19      Q.    Setting aside any agreements with

20  counsel, during the time --

21      A.    You lost your sound there.

22      Q.    Oops.  Sorry.  Can you hear me now?

23      MS. HELFRICH:  You're going to need to repeat

24  it.



1      MR. CHIMIENTI:  Okay.  I will start over.  I'm

2   sorry.

3   BY MR. CHIMIENTI:

4      Q.    Other than any agreements with counsel,

5   which I don't want to know about, have there been

6   any sort of common interest agreements or other

7   contracts signed between the three organizations as

8   it relates to this case?

9      A.    Not that I'm aware of.

10     Q.    In terms of financial support for the

11  litigation, which organization provides the most

12  financial support to fund the litigation?

13     A.    I don't know that.

14     Q.    Do you know where IllinoisCarry stands

15  in terms of the amount of financial contribution to

16  the litigation?

17     A.    I do know that.  We do not contribute

18  financially.

19     Q.    Okay.  One last gearshift, Ms. Rowe, and

20  then I'll turn it over to David.

21         Besides the other litigation you

22  mentioned, the two other cases that IllinoisCarry

23  has been in, has the organization, IllinoisCarry,

24  ever filed a lawsuit anywhere else based on foster



1   care?

2        A.    No, we have not.

3        Q.    Based on day care?

4        A.    No, we have not.

5        Q.    Based on child care in general?

6        A.    No, we have not.

7        Q.    Based on firearm storage?

8        A.    No, not that I -- no.

9        Q.    Based on ammunition storage?

10       A.    No.

11       Q.    Based on children having access to

12  firearms in any capacity?

13       A.    No.

14       MR. CHIMIENTI:  Okay.  That does it for my

15  list of topics.

16            David, are you going to have questions?

17       MR. SIGALE:  Yeah, I'm going to need a few

18  minutes, but -- so if we want to take five.  But

19  then, yeah, I don't have that many.

20       MR. CHIMIENTI:  Okay.  Do you want ten?  I'm

21  happy to give you ten.  That's fine by me.

22       MR. SIGALE:  We'll take ten because I bet

23  everyone will appreciate it.

24       MR. CHIMIENTI:  Okay.  We'll take ten.  We'll



1  be back here at 2:25.

2                    (WHEREUPON, the deposition was

3                    recessed from 2:15 to 2:27 p.m.)

4      MR. CHIMIENTI:  Hey, David, I've got one more

5  question for her on just the organizational

6  affiliation.

7      MR. SIGALE:  That's fine.  Go ahead.

8  BY MR. CHIMIENTI:

9      Q.    All right.  Ms. Rowe, really quickly

10 before I turn it over to the David, is

11 IllinoisCarry affiliated with any other

12 organizations?

13     A.    No.

14     MR. CHIMIENTI:  Okay.  That's all I have.

15         Go ahead, David.

16                    EXAMINATION

17 BY MR. SIGALE:

18     Q.    All right.  Valinda, very, very early on

19 in the deposition you were asked about

20 IllinoisCarry's organizational purpose.  You talked

21 about education and the -- maintaining the message

22 board for that information, et cetera.

23         Is litigation an organizational purpose

24 if need be?



1       A.    Yes.   Under -- that would come under the

2    advancing the rights of the Second Amendment

3    through that avenue, yes.

4       Q.    Okay.  And if I could ask

5    Mr. Chimienti -- and I probably will at some

6    point -- to pull up one of the exhibits.

7       MR. SIGALE:  Sorry, I'm going to be putting

8    you to work in a little bit.

9    BY MR. SIGALE:

10      Q.    There was a screen shot or printout of

11   the organizational purpose, and like you said,

12   litigation is on there.

13            Does that go along with what you just

14   said?

15      A.    Yes.

16      MR. SIGALE:  This is the where I put you to

17   work part.  Exhibit 18.  Sorry.

18      MR. CHIMIENTI:  Hold on.

19      MR. SIGALE:  Exhibit 18.

20      MR. CHIMIENTI:  Hold on.  Let me share my

21   screen.

22            Okay.  18 is on the screen.

23      MR. SIGALE:  All right.  And, Matt, I might

24   ask you to scroll down later.  You asked Valinda



1   about licensed day care people -- day care home

2   licensees who were members of the -- of

3   IllinoisCarry.

4   BY MR. SIGALE:

5       Q.    You mentioned the Millers and you

6   mentioned someone named -- with "Ice" in the name.

7       A.    Coach Ice.

8       Q.    Coach Ice.  Okay.  Coach Ice.

9             And then we also heard about GREBENOTS,

10  GREBENOTS -- we'll go with GREBENOTS.  I like that

11  best.  You mentioned him or her, and what wasn't

12  mentioned is right underneath that, bigdudez25, and

13  can you read what that comment says from big --

14      A.    "Really?  Where can I find info on this?

15  It will most certainly affect me too."

16      Q.    So as of that same date, July 13, 2013,

17  there was another person that wasn't mentioned that

18  at least on the surface appears to be affected by

19  the day care restrictions, as well?

20      A.    Correct.  And in order to post that, he

21  would have had to have registered as a member.

22      MR. SIGALE:  Okay.  Are you able to please

23  just scroll -- you know what?

24  BY MR. SIGALE:



1      Q.     Can we say that without asking

2   Mr. Chimienti to scroll down seven pages if anyone

3   else in this thread posts that this affects them

4   that, likewise, they would have to be registered

5   members of the organization in order to post

6   anything?

7      A.     Correct.

8      Q.     Okay.  So there could be other members

9   in this seven pages who are affected by this, as

10  well, and if they are, it will be in the document?

11     A.     Correct.

12     Q.     But at least we know of the first two?

13     A.     Correct.

14     Q.     Okay.  Now, if a day care home licensee

15  is not allowed to possess a handgun, then that

16  means -- if they're not allowed to possess a

17  handgun in the home because the rules for day care

18  licensees prohibit it, logically speaking, they

19  would not be allowed to take that firearm -- that

20  handgun and use that as their carry gun, correct?

21     A.     Correct.

22     MR. CHIMIENTI:  Object to the form.

23  BY MR. SIGALE:

24     Q.     So --



 1      MR. CHIMIENTI:  David, do you still need this

 2   exhibit?  I don't mean to cut you off.

 3      MR. SIGALE:  Oh, I'm sorry.  18, yeah, you can

 4   put it down.

 5      MR. CHIMIENTI:  Okay.  Thank you.  I'm taking

 6   it off.

 7   BY MR. SIGALE:

 8      Q.    So someone who is a concealed carry

 9   holder who has a licensed day care or resides on

10   the premises of a licensed home day care would

11   either have to forego having a concealed carry

12   firearm at all or they'd have to store it

13   somewhere --

14      A.    Off site.

15      Q.    -- away from their home, correct?

16      MR. CHIMIENTI:  Objection, form, calls for a

17   legal conclusion, calls for speculation.

18   BY MR. SIGALE:

19      Q.    You can answer.

20      A.    Well, if it's -- the concealed carry

21   license is in order to carry a firearm on your

22   person out in public.

23      Q.    Right.

24      A.    So if it's not accessible in the home,

1   then it -- then that would -- could prevent that

2   person from protecting themselves when they go out

3   in public because they don't have a firearm in the

4   home to leave the home with.

5        Q.   So in that scenario, then, that person

6   might be able to carry if they have a firearm -- if

7   they have a handgun, which is the only carry weapon

8   that's allowed, right?

9        A.    Right.

10       MR. CHIMIENTI:  Objection, calls for

11  speculation.

12  BY MR. SIGALE:

13       Q.    Under the Concealed Carry Act, what

14  kinds of firearms are you allowed to use as a

15  concealed carry weapon?

16       A.    It has to be a firearm in a manner that

17  can be concealed upon a person.

18       Q.    If you wear a long overcoat, can you

19  carry, say, an assault rifle as your carry weapon?

20       A.    No, I don't think so.  We'd have to go

21  back into the carry act and get the complete

22  definitions, but --

23       Q.    Okay.

24       A.    -- it's --



1    Q.    For all practical purposes --

2    A.    -- understood it must be a handgun.

3    Q.    Okay.  So if you're not allowed to have

4  it at home and you want to carry a handgun for --

5  to exercise the concealed carry right, you would

6  have to get that firearm from somewhere else,

7  correct?

8    MR. CHIMIENTI:  Objection, calls for

9  speculation.

10  BY MR. SIGALE:

11    Q.    You can answer.

12    A.    Well, if it's not in the home, it would

13  have to be someplace else.  If you were going to

14  exercise that right, you would have to gain access

15  to it, possession of it from some other location.

16    Q.    Okay.  And so at the very, very least,

17  from the trip from your home to wherever that other

18  location is --

19    A.    You would be without the means to

20  self-defense with a firearm.

21    Q.    And does that concern fit within what

22  IllinoisCarry is about?

23    A.    Yes.

24    MR. CHIMIENTI:  Objection, vague.



1  BY MR. SIGALE:

2      Q.   Does that concern fit within the

3  organizational purposes of IllinoisCarry?

4      A.   Yes.

5      MR. SIGALE:  Matt, the complaint, is that your

6  Exhibit 5?

7      MR. CHIMIENTI:  I can tell you.  Hold on.

8      MR. SIGALE:  Is that the complaint?

9      MR. CHIMIENTI:  Hold on.  I've got to find it.

10  It's here somewhere.

11              (WHEREUPON, there was a short

12                  interruption.)

13      MR. CHIMIENTI:  Yep, got it.  Do you want that

14  up on the screen?

15      MR. SIGALE:  Would you mind?

16      MR. CHIMIENTI:  Sure.  I'm now sharing Exhibit

17  5 on the screen.

18      MR. SIGALE:  All right.  And can we go down

19  to -- you know what?  Matt, this would be a little

20  easier if you're able to either expand the page

21  sharing over to me or turn the sharing over to me.

22      MR. CHIMIENTI:  I mean, I don't -- I don't

23  know how to do that, to be honest with you.

24      MR. SIGALE:  All right.  Fair enough.



1   Otherwise I could just pull up the same document

2   and do this, but if you could scroll down to the

3   bottom of Page 8.  I'm trying to open on my screen

4   the same document.  Sorry, Matt, I'm on Page 9.

5       MR. CHIMIENTI:  No problem.  Do you want the

6   beginning of 10, too?

7       MR. SIGALE:  No, right there is fine.

8       MR. CHIMIENTI:  Okay.  There you go.

9   BY MR. SIGALE:

10      Q.    When Mr. Chimienti had pointed -- you

11  had talked about this JCAR 406.8(a), which is the

12  day care handgun restriction.

13          Do you recall talking about it before?

14      A.    Yes.

15      Q.    Okay.  And this is what -- you were

16  talking about that this is a rule that prohibits

17  handguns on the premises of a day care home,

18  correct, unless you're a law enforcement officer,

19  basically?

20      A.    Correct.

21      Q.    Okay.  And if you scroll down to part --

22  Subsection 18 of this, that is the part that says

23  that any other firearm other than a handgun,

24  et cetera, that's in the possession of a police



1   officer or peace officer -- this is the part that

2   says, "disassembled state without ammunition, in

3   locked storage," et cetera, correct?

4       A.    Correct.

5       Q.    In Subsection b, can you read the first

6   sentence of that paragraph?

7       A.    "The operator of the home shall notify

8   the parents or guardian of any child accepted for

9   care that firearms and ammunition are stored on the

10  premises."  That's Sentence 1.  Sentence No. 2,

11  "The operator shall also notify the parents or

12  guardian that such firearms and ammunition are

13  locked in storage inaccessible to children."

14      Q.    So based on this rule -- based on your

15  understanding of this rule from having read it,

16  this subparagraph, if a day care home operator had

17  firearms on the premises, would the customers, the

18  parents of the children, be without knowledge?

19  Would they know about it, that there were firearms

20  on the premises?

21      MR. CHIMIENTI:  Objection, form, vague.

22  BY THE WITNESS:

23      A.    It says here that that's part of the

24  rules and regulations, that the operator of the



1  home shall notify the parents, so -- or guardian.

2  So from that, parents and guardians would -- they

3  were required to be informed that there are

4  firearms or ammunition on the premises.

5  BY MR. SIGALE:

6      Q.    And from that presumably they could make

7  the choice to keep the child in that day care home

8  or find somewhere else, right?

9      A.    Correct.

10     MR. CHIMIENTI:  Objection, form, calls for

11  speculation.

12  BY MR. SIGALE:

13     Q.    And if -- you're not -- IllinoisCarry is

14  not challenging 18(b), are you?

15     A.    No.

16     Q.    So if a hand- -- if the rule was changed

17  that a person -- a person in a day care home was

18  allowed to either keep a handgun on their person or

19  in a locked safe, the -- locked up in a safe in a

20  locked room away from the children, you're not

21  challenging the requirement that the children's

22  parents still be informed?

23     A.    We're not challenging.

24     MR. CHIMIENTI:  Objection, vague.



1      MR. SIGALE:  Can you scroll down to that

2   Paragraph 30, please?

3      MR. CHIMIENTI:  Sure.

4      MR. SIGALE:  That's fine.  Right there.

5   BY MR. SIGALE:

6      Q.    Do you recognize Section 430 ILCS 66 as

7   the Firearm Concealed Carry Act?

8      A.    Yes.

9      Q.    Are you familiar with Section 65 of the

10   Concealed Carry Act?

11      A.    Yes.

12      Q.    Okay.  Is that the provision that talks

13   about the 23 categories of prohibited places?

14      A.    Correct.

15      Q.    Okay.  So you were asked before whether

16   or not a child care facility was listed as a

17   prohibited place.

18           Do you remember that?

19      A.    Yes.

20      Q.    And you answered yes because it's listed

21   here, correct?

22      A.    Correct.

23      Q.    But I would like you to read starting

24   from Line 3 at the very end of 4350 ILCS



1   66/65(a)(2) which is written here on Page -- in

2   Paragraph 30 of this Exhibit 5.

3           So can you start on -- at the last word

4   of Line 3?

5       A.    Yes.   "Nothing in this paragraph shall

6   prevent the operator of a child care facility in a

7   family home from owning or possessing a firearm in

8   the home or a license under this Act, if no child

9   under child care at the home is present in the home

10  or the firearm in the home is stored in a locked

11  container when a child under child care at the home

12  is present in the home."

13      Q.    Does the -- does this provision of the

14  Concealed Carry Act require that when the firearm

15  is stored in a locked container that it be

16  unloaded?

17      A.    It doesn't.

18      MR. CHIMIENTI:  Objection, calls for legal

19  conclusion.

20  BY MR. SIGALE:

21      Q.    If the rule -- if the JCAR day care rule

22  were changed to match what is in the provision of

23  the Concealed Carry Act that you just read from,

24  would that be acceptable to IllinoisCarry?



ILLINOIS CARRY 30B6                               August 07, 2020
JENNIFER J. MILLER vs MARC D. SMITH                         188

1        A.    Yes.

2        Q.    As far as this -- as far as this

3    restriction is challenged.

4        A.    Correct.

5        Q.    And has IllinoisCarry voiced any

6    opposition in any other context to that portion of

7    the Concealed Carry Act?

8        A.    Not that I'm aware of.

9        Q.    And by "that portion," I mean the

10   portion I just read.

11       A.    No.

12       Q.    Now, if with regard to the foster care

13   requirement the rule were changed such that the

14   Millers were allowed to have a loaded firearm in a

15   locked safe that only they had access to keeping it

16   in such a way to keep it away from unauthorized

17   persons such as foster children, would

18   IllinoisCarry be okay?  Would that be acceptable to

19   IllinoisCarry with regard to that portion of this

20   suit?

21       A.    Yes.

22       Q.    And if that same foster parent -- if the

23   rules were allowed that the foster parent could

24   carry the firearm if it wasn't in a locked safe and



1  had to be on his person or if in a vehicle it had

2  to be on his person or in some locked case such

3  that nobody else could get to it that was not an

4  authorized person, would IllinoisCarry be

5  acceptable -- would that be acceptable to

6  IllinoisCarry?

7        A.    Yes.

8        Q.    So just so we're very, very clear,

9  IllinoisCarry is not sitting here today advocating

10 that if someone wants to leave a loaded handgun on

11 a toybox, it's their Second Amendment right to do

12 so and they should be allowed to do it?

13       A.    No, they're not -- we are not arguing

14 that.

15       Q.    And if someone didn't have a foster kid

16 or a day care child in the home -- let's say that

17 you're talking about a couple that either just has

18 natural children or is childless -- is there a

19 restriction on where they could keep a loaded

20 firearm for self-defense?

21       A.    I don't believe it's stated in the law

22 that there is any restriction.

23       Q.    You might have recommendations, but

24 there's no legal restriction that you're aware of?



1      A.    Not that I'm aware of.

2      MR. CHIMIENTI:  Objection, calls for legal

3   conclusion.

4   BY MR. SIGALE:

5      Q.    And you're not -- and even though

6   someone who doesn't have children or just has

7   natural children or adopted children doesn't have

8   to have the restrictions that IllinoisCarry said

9   that they'd be acceptable with for foster care home

10  and day care homes -- even though those

11  restrictions don't exist with natural or adopted

12  children, you're saying at this time that --

13     MR. CHIMIENTI:  Objection --

14  BY MR. SIGALE:

15     Q.    -- that those restrictions would be

16  acceptable to IllinoisCarry for -- if the rules

17  were changed as we described, IllinoisCarry would

18  still be okay with them for foster and day care

19  homes?

20     A.    Correct.

21     MR. CHIMIENTI:  Objection to form, vague.

22  BY MR. SIGALE:

23     Q.    And just to be clear, I said if the

24  rules were changed for day care homes to conform to



1  that section of the Concealed Carry Act that you

2  read and the foster care rule was changed such that

3  you could have a loaded firearm but it still had to

4  be in a safe, even though those requirements don't

5  exist for parents of natural or adopted children,

6  even though it's more of a restriction for foster

7  and day care homes, IllinoisCarry would still be

8  acceptable to that?

9      A.    Correct.

10     Q.    And I used the toybox example, but just

11  to be clear, any other hypothetical of what a dumb

12  person might do, leave a gun on the couch cushion

13  or even just leave it unloaded -- leave it loaded

14  on the nightstand or something, leave it out, you

15  know, on the nightstand, you're not sitting here

16  today advocating for day care homes and foster

17  homes that they should be allowed to do those

18  things because it's their Second Amendment right?

19     A.    I'm not advocating that.

20     Q.    And is it fair to say that even the

21  things that I said, if the rules were changed and

22  all the things I just said, would IllinoisCarry be

23  okay with that, that all those rule changes would

24  still comport with what you've been describing the



1  entire day as maintaining the firearm in such a

2  manner that unauthorized persons would not be able

3  to get at them?

4      A.   Correct.

5      MR. CHIMIENTI:  Objection, vague.

6      MR. SIGALE:  I don't have anything else.

7                  FURTHER EXAMINATION

8  BY MR. CHIMIENTI:

9      Q.   I have a few, Ms. Rowe, and I am going

10  to take this image down from the screen.

11  Mr. Sigale just asked you about families with

12  adopted children and natural children.

13          Do you remember that?

14      A.   Yes.

15      Q.   And we talked about what foster

16  parenting entailed earlier.

17          Do you remember that?

18      A.   Yes.

19      Q.   And foster parenting, if you recall,

20  entailed individuals taking care of children that

21  are not their own, correct?

22      A.   Correct.

23      Q.   That they have not adopted, correct?

24      A.   Correct.



1       Q.    That are also -- these children are also

2    the responsibility of the State of Illinois,

3    correct?

4       A.    I assume that is the case.

5       Q.    Right.  And being a foster parent is

6    completely voluntary, is it not?

7       A.    Correct.

8       Q.    And being a day care home provider is

9    completely voluntary, is it not?

10      A.    Correct.

11      Q.    These are things that people choose to

12   apply for, sign up for and get vetted for, correct?

13      A.    Correct.

14      Q.    And much like any other profession like

15   lawyers, barbers or truck drivers, there are

16   licensing requirements that they have to abide by,

17   correct?

18      A.    Correct.

19      Q.    Things that are meant to keep the

20   children safe, correct?

21      A.    Correct.

22      Q.    Because in the end, these aren't the

23   foster parents' or day care home providers'

24   children, are they?



1       A.    Correct.

2       Q.    Okay.  You had talked about this exhibit

3  here -- well, I won't even bother to pull it up.

4  You talked about a -- actually, I will pull it up

5  so we have it.  I'll have to fish back through it.

6             I am going to put Exhibit 18 back on the

7  screen.  It's talking about the "Licensed Home

8  daycare DCFS handgun prohibition" blog post.

9             Do you see that?

10      A.    Yes.

11      Q.    Okay.  And you talked about the

12  bigdudez25 and GREBENOTS here at the top, correct?

13      A.    Correct.

14      Q.    And to be clear, you don't know the name

15  of either of these individuals, correct?

16      A.    No, I do not.

17      Q.    You don't know Coach Ice's name?

18      A.    I do not.

19      Q.    And when these folks say that these

20  regulations affect them, you have no idea how these

21  regulations affect them, correct?

22      A.    Other than their statements, no.

23      Q.    Okay.  Specifically you don't have any

24  other information beyond their statement that that



1  affected them, correct?

2       A.    Correct.

3       Q.    You don't know exactly how it affected

4  them, correct?

5       A.    Unless they make a statement explaining,

6  no.

7       Q.    Okay.  These folks on this day care home

8  page other than the Millers, whether it's this

9  GREBENOTS person, bigdudez25 or Coach Ice, do you

10  have any idea whether they are day care home

11  licensees?

12       A.    Other than their statements to the

13  effect of whether they are or not, no.

14       Q.    I'm going to show you the amended

15  complaint again.  I'm going to scroll down.  At the

16  end here -- I'm on Page 16, and do you see in the

17  middle of Page 16 it says, "WHEREFORE, Plaintiffs

18  pray that this Honorable Court?"  Do you see that?

19       A.    Yes.

20       Q.    Right here in the middle of the page

21  (indicating).

22       A.    Yeah, yeah, I see it now.

23       Q.    Okay.  And in these paragraphs, you and

24  your attorney have asked for all sorts of things



1  about what you want to have this case end up as.

2  This is called the prayer for relief, okay?

3       A.    Okay.

4       Q.    Okay.  And in Paragraph 2 -- or

5  Paragraph 1, it says, "Issue preliminary and

6  permanent injunction enjoining the

7  Defendants...from prohibiting firearms possession

8  and carrying by licensed day care home licensees,

9  and/or licensed foster parents residing in

10 Illinois," correct?

11      A.    Correct.

12      Q.    Okay.  In No. 2 it says we want you to

13 enter the following:  "A declaratory

14 judgment...prohibiting handgun possession and

15 carrying to day care home licensees and/or licensed

16 foster parents in Illinois."

17           Do you see that?  And you're asking here

18 on Page 17 that the regulations be declared null

19 and void because they infringe upon the rights to

20 keep and bear arms in violation of the Second and

21 Fourteenth Amendments to the constitution.

22           Do you see that?

23      A.    Yes.

24      Q.    Okay.  You don't say here that you want



1  these rules to be rewritten to be consistent with

2  the Concealed Carry Act, do you?

3       A.    I don't know that it's phrased in there

4  that specific language.

5       Q.    Okay.  But "null and void" means these

6  rules would cease to exist, period, correct?

7       A.    Currently as they are written, yes.

8       Q.    And that's what you and your lawyer are

9  asking for in this lawsuit, correct?

10      A.    In their current form, correct.

11      Q.    Okay.  Now, you mentioned earlier about

12 the gun on the toy chest.  I think Mr. Sigale asked

13 you that question, correct?

14      A.    I recall him mentioning a toybox.

15      Q.    Is there any form of firearm storage --

16 well, strike that.

17           If a person's allowed to carry a handgun

18 on their person and they have to take a shower,

19 what do they do with it?

20      A.    What kind of person?

21      MR. SIGALE:  I'll just object as to the form

22 of the question.

23 BY MR. CHIMIENTI:

24      Q.    Sure.  I'll rephrase.



1      A.    Are you talking about a day care person?

2      Q.    Any person.

3      MR. SIGALE:  Just let him ask the question.

4      THE WITNESS:  Okay.

5  BY MR. CHIMIENTI:

6      Q.    Any person.  If I've got a -- if I'm

7  carrying a weapon on my person -- a handgun on my

8  person and I've got to take a shower, what should I

9  do with the gun while I'm in the shower?

10     A.    I'm with you.  You need to store that

11 gun in a manner that it's not accessible to

12 unauthorized persons.

13     Q.    Yeah, but, Ms. Rowe, it's been a really

14 long day and I just want to get in the shower.

15 What should I do with it?

16     A.    You should store that firearm in a

17 manner that it's not accessible to any unauthorized

18 persons.

19     Q.    And like you said earlier, that's what

20 you would expect from a responsible gun owner,

21 correct?

22     A.    Yes.

23     Q.    And as you also said earlier, you can't

24 definitively say that all IllinoisCarry members are



1   responsible gun owners, correct?

2       A.    Correct.

3       MR. CHIMIENTI:  I don't have anything else,

4   David.

5                    FURTHER EXAMINATION

6   BY MR. SIGALE:

7       Q.    Mr. Chimienti went into great detail

8   earlier talking -- well, some detail talking about

9   the requirements to become a day care home and a

10  foster parent.

11          Do you remember you were talking about

12  that?

13      A.    Yes.

14      Q.    And there's home inspections, there's

15  training, he mentioned a criminal background check.

16          So whatever winds up -- whatever the

17  details are, it's fair to say that before the State

18  allows someone to have a license to take care of

19  children -- someone else's children that they're

20  pretty thoroughly vetted?

21      A.    I -- yes.

22      Q.    To see if they're responsible people?

23      A.    Yes.

24      Q.    That they can maintain -- that they are



1   responsible enough to maintain premises such that

2   children would be safe?

3        A.   Correct.

4        Q.   At all times when the children would be

5   there?

6        A.   Correct.

7        Q.   Now --

8        MR. CHIMIENTI:  Objection, outside of her

9   knowledge, calls for speculation.

10  BY MR. SIGALE:

11       Q.   Not only when they come home when --

12  it's not times when they come home and it's really

13  been a long day and they just want to jump in the

14  shower but all times?

15       A.   Correct.

16       MR. CHIMIENTI:  Objection, calls for

17  speculation.

18       MR. SIGALE:  I don't have anything else.

19       MR. CHIMIENTI:  All right.  Before we go off

20  the record, David, I'm just going to point out that

21  we got e-mails from you yesterday at 9:00 at night,

22  less than 12 hours before the dep started.  We've

23  got two more of these coming up.

24            Can we get some assurance from you on



 1 | the record that we're going to get more than 24 and
 2 | 12 hours' notice if you've got supplemental
 3 | production for SAF and ISRA before their
 4 | depositions?  We would really, really appreciate
 5 | it.
 6 |     MR. SIGALE:  I definitely will.  I will make
 7 | sure to speak with them, notify them over the
 8 | weekend that if they have anything else to -- to do
 9 | another check and make sure, but --
10 |     MR. CHIMIENTI:  And if --
11 |     MR. SIGALE:  -- Matt, I --
12 |     MR. CHIMIENTI:  I don't -- I'm not --
13 |     MR. SIGALE:  That's the only assurance I can
14 | give you.  Sorry.
15 |     MR. CHIMIENTI:  But you didn't tell me that
16 | you'd make sure we got them; you just said you'd
17 | make sure you speak with them.
18 |         I want you to make sure that we get
19 | them, because we've gotten the "I'll speak with
20 | them" before, and this is what happens.  So please
21 | make sure that they --
22 |     MR. SIGALE:  That's fine, yes.
23 |     MR. CHIMIENTI:  Okay.  And I will send you a
24 | list of the stuff that I have here in terms of



1   additional documents.  I think it's just two

2   things.

3             But other than that, Ms. Rowe, thank you

4   so much for your time today.  It has been a really

5   long day.  I appreciate you sitting -- hanging

6   tight with us and answering our questions.

7             David, signature?

8       MR. SIGALE:  Hold on.  We'll go off the record

9   for a second.  I'll talk to her.  Give me a second.

10      MR. CHIMIENTI:  Okay.

11                 (WHEREUPON, there was a conference

12                  between the witness and counsel.)

13      MR. CHIMIENTI:  Vicki, I'll e-mail you the

14  exhibits I have in the next hour or so and we can

15  cross-reference them.

16      THE COURT REPORTER:  Are you ordering the

17  transcript?

18      MR. CHIMIENTI:  Etrans, please.

19                 (WHEREUPON, there was a short

20                  interruption.)

21      MR. SIGALE:  We'll go ahead and waive, and if

22  they -- if they order it, I'll take a copy.

23      THE COURT REPORTER:  He has ordered it, so is

24  an Etrans okay?



1   MR. SIGALE:  Yeah, Etrans is fine.

2   MR. CHIMIENTI:  Thank you again, Ms. Rowe.

3        We're off the record.

4         FURTHER DEPONENT SAITH NOT.

5

6          (TIME NOTED:  3:03 P.M.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



```
 1                    REPORTER'S CERTIFICATE

 2

 3         I, VICTORIA C. CHRISTIANSEN, a Certified

 4   Shorthand Reporter of the State of Illinois, do

 5   hereby certify:

 6              That previous to the commencement of the

 7   examination of the witness, the witness was duly

 8   sworn to testify the whole truth concerning the

 9   matters herein;

10

11              That the foregoing deposition transcript

12   was reported stenographically by me, was thereafter

13   reduced to typewriting under my personal direction

14   and constitutes a true record of the testimony

15   given and the proceedings had;

16

17              That the said deposition was taken

18   before me at the time and place specified;

19

20              That I am not a relative or employee or

21   attorney or counsel, nor a relative or employee of

22   such attorney or counsel for any of the parties

23   hereto, nor interested directly or indirectly in

24   the outcome of this action.
```



1        The witness has not requested a review

2   pursuant to Rule 30(e)(1).

3

4        IN WITNESS WHEREOF, I do hereunto set my

5   hand at Chicago, Illinois, this 17th day of August,

6   2020.          s/ Victoria C. Christiansen redacted pursuant to Local Rule 5.11

7

8                  VICTORIA C. CHRISTIANSEN,

9                  Certified Shorthand Reporter.

10

11

12  C.S.R. Certificate No. 84-3192.

13

14

15

16

17

18

19

20

21

22

23

24



```
 1                      I N D E X

 2

 3    WITNESS                        EXAMINATION

 4    VALINDA ROWE

 5         By Mr. Chimienti...............5, 192

 6         By Mr. Sigale...............175, 199

 7

 8                   E X H I B I T S

 9    NUMBER                      FIRST REFERRED TO

10    Rowe

11     Exhibit No.  1                    7

12     Exhibit No.  2                   46

13     Exhibit No.  3                   77

14     Exhibit No.  4                   78

15     Exhibit No.  5                   85

16     Exhibit No.  6                   72

17     Exhibit No.  7                  112

18     Exhibit No.  8                  130

19     Exhibit No.  9                  137

20     Exhibit No. 18                   51

21     Exhibit No. 19                   75

22     Exhibit No. 20                   70

23     Exhibit No. 21                   82

24
```

