E-FILED
Friday, 12 November, 2021  03:35:16 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 8
# Deposition of Richard Pearson

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE CENTRAL DISTRICT OF ILLINOIS

3

4   JENNIFER J. MILLER, DARIN E.      )
    MILLER, SECOND AMENDMENT          )
5   FOUNDATION, INC., ILLINOIS STATE  )
    RIFLE ASSOCIATION, and ILLINOIS   )
6   CARRY,                            )
               Plaintiffs,            )
7                                     ) No. 18 cv 3085
    MARC D. SMITH, in his official    )
8   capacity as Acting Director of    )
    the Illinois Department of        )
9   Children and Family Services,     )
    and KWAME RAOUL, in his official  )
10  capacity as Attorney General of   )
    the State of Illinois,            )
11             Defendants.            )

12

13             The 30(b)(6) deposition of ILLINOIS

14  STATE RIFLE ASSOCIATION by RICHARD PEARSON, called

15  for examination, taken pursuant to the Federal

16  Rules of Civil Procedure of the United States

17  District Courts pertaining to the taking of

18  depositions, taken before KRISTIN C. BRAJKOVICH, a

19  Certified Shorthand Reporter, CSR. No. 84-3810, of

20  said state, via Zoom, on the 18th day of August,

21  A.D. 2020, at 9:04 a.m.

22

23

24



```
1    PRESENT:

2         THE LAW FIRM OF DAVID G. SIGALE,

3         (430 Roosevelt Road,

4         Wheaton, Illinois 60187,

5         1-630-452-4547), by:

6         MR. DAVID G. SIGALE,

7         dsigale@sigalelaw.com,

8             appeared via Zoom on behalf of

9             Plaintiffs;

10

11        OFFICE OF THE ILLINOIS ATTORNEY GENERAL,

12        ASSISTANT ATTORNEYS GENERAL,

13        SPECIAL LITIGATION BUREAU,

14        (100 West Randolph Street, 11th Floor,

15        Chicago, Illinois 60601,

16        1-312-814-3000), by:

17        MR. MATTHEW CHIMIENTI,

18        mchimienti@atg.state.il.us, and

19        MS. GRETCHEN E. HELFRICH,

20        ghelfrich@atg.state.il.us,

21            appeared via Zoom on behalf of

22            Defendants.

23   REPORTED BY:  KRISTIN C. BRAJKOVICH,

24            CSR No. 84-3810.
```



```
1                     (WHEREUPON, certain documents were

2                     marked Pearson Deposition Exhibit

3                     Nos. 1, 3, 5, 6, 7, 9, 12, for

4                     identification by counsel.)

5         MR. CHIMIENTI:  MR. CHIMIENTI:  Before you

6    swear the witness, Kristin, let's just get on the

7    record real quick.  We are on the record.

8              This is the Rule 30(b)(6) deposition of

9    the Illinois State Rifle Association taken pursuant

10   to notice given on July 21, 2020.  Counsel, who has

11   the organization produced to testify about the list

12   of topics given on the notice?

13        MR. SIGALE:  For the record, Illinois State

14   Rifle Association has designated Richard Pearson,

15   the executive director, as the designee to testify

16   regarding the topics in your notice.

17        MR. CHIMIENTI:  Thank you, David.  Good

18   morning, Mr. Pearson.

19        THE WITNESS:  Good morning.  How are you?

20        MR. CHIMIENTI:  I'm doing well.  How are you?

21        THE WITNESS:  So far so good.

22        MR. CHIMIENTI:  Okay.  Good.  Well, let's have

23   the court reporter swear you in and we can get

24   started.
```



```
 1                        (WHEREUPON, the witness was duly

 2                        sworn.)

 3                        RICHARD PEARSON,

 4    called as a witness herein, having been first duly

 5    sworn, was examined and testified as follows:

 6                        EXAMINATION

 7    BY MR. CHIMIENTI:

 8         Q.    Mr. Pearson, my name is Matt Chimienti.

 9    I'm an assistant attorney general with the Office

10    of the Illinois Attorney General.  I represent the

11    defendants in the Miller case.

12               Have you ever given a deposition before?

13         A.    Yes.

14         Q.    About how many times have you given a

15    deposition before?

16         A.    Three, I think.

17         Q.    Okay.  We'll get to those in a second.

18    Since you have done this before, I'll just cover

19    the ground rules really quickly.  Obviously, this

20    is probably a little bit different than your first

21    couple depositions because we are doing this over

22    the internet because of the COVID-19 pandemic, but

23    we do still have Kristin here, our court reporter.

24    She's on the line and she's taking down everything
```



1  that we say.  She can't take down things like

2  shakes of the heads or uh-huh or uhn-uhn, so please

3  make sure your answers are verbal.

4         Does that sound okay?

5     A.    Yes.

6     Q.    Okay.  We want to make sure the record

7  is clear, and as today goes on, you and I might get

8  into a fairly conversational tone going back and

9  forth, but we need to try to avoid taking over one

10  another.  So I'm going to do my best to wait until

11  you finish an answer before I ask another question,

12  and if you could please wait until I finish a

13  question before you begin your answer, I would

14  appreciate it.  Is that okay?

15     A.    Okay.

16     Q.    And we can take a break at any time, any

17  time you need one.  The only exception is if

18  there's a question pending, we ask that you answer

19  the question before we take a break.  Does that

20  sound okay?

21     A.    Fine.

22     Q.    Okay.  So I'm going to share my screen

23  here in a second, Mr. Pearson, and show you what I

24  have marked as Exhibit 1 to your deposition.



1              I'll just put this on the screen here.

2      I'll represent that this is the Defendant's Amended

3      Notice of Rule 30(b)(6) Deposition of Plaintiff

4      Illinois State Rifle Association, and I'll zoom

5      out.

6              And as you can see at the bottom here, I

7      have marked this Pearson Exhibit 1.  Have you ever

8      seen this document before, Mr. Pearson?

9          A.    Yes.

10         Q.    Okay.  When was the first time you saw

11     it?

12         A.    I printed it off my computer a couple

13     days ago.

14         Q.    And as you can see, this document lists

15     a number of topics here.  There's 13 items,

16     including a couple of subpoints on No. 3.  Do you

17     see that?

18         A.    I do.

19         Q.    Okay.  And I'll take this off the screen

20     so you don't have to all keep looking at it.  Now,

21     you understand, Mr. Pearson, that you are here

22     testifying on behalf of the Illinois State Rifle

23     Association, correct?

24         A.    Correct.



1       Q.      And you understand that the organization

2    has designated you to testify on the topics on that

3    list, correct?

4       A.      I do.

5       Q.      And are you capable of doing that?

6       A.      Yes.

7       Q.      And you understand that your answers

8    bind the Illinois State Rifle Association?

9       A.      Please repeat that.

10      Q.      Do you understand that your answers bind

11   the Illinois State Rifle Association?

12      A.      Yes.

13      Q.      Okay.  So you said before that you have

14   given three depositions.  When did those

15   depositions happen?

16      A.      I gave one about -- a long time ago,

17   1992, in a case against the Chubb Insurance

18   Company.  I gave one -- and I gave one in the Ezell

19   case, and this would be the third one.

20      Q.      The case against the insurance company

21   in '92, did that have anything to do with the

22   Illinois State Rifle Association?

23      A.      No.

24      Q.      The Ezell deposition, you are referring



1  to the case of Ezell, E-z-e-l-l, versus City of

2  Chicago; is that correct?

3      A.    Yes.

4      Q.    And if I'm not mistaken, did you sit for

5  two separate depositions in that case?

6      A.    I don't remember.

7      Q.    Okay.  What generally was the Ezell case

8  about?

9      A.    It was about the ability to establish a

10  shooting range inside the city limits of Chicago.

11      Q.    Okay.  When approximately -- and I don't

12  need an exact date, but when approximately was your

13  testimony in Ezell?

14      A.    I don't remember.  I did that, but I

15  don't remember.

16      Q.    Okay.  Did any of the depositions that

17  you have given, besides today, have anything to do

18  with foster homes?

19      A.    No.

20      Q.    Did any of the depositions that you have

21  given before today have anything to do with daycare

22  homes?

23      A.    No.

24      Q.    Did any of the depositions you have

1  given before today have anything to do with

2  children and firearms?

3       A.    No.

4       Q.    Have any of the depositions that you

5  have given before today had anything to do with

6  firearm storage?

7       A.    Yes.

8       Q.    And which one was that?

9       A.    I was asked about that in the Ezell

10 case, I believe, by an attorney.  That dealt with

11 firearm storage in a gun store.

12      Q.    Okay.  And, similarly, did the Ezell

13 deposition or any other deposition you have given

14 before today have anything to do with firearm

15 safety?

16      A.    No.

17      Q.    Okay.  Really quickly, Mr. Pearson, I

18 want to get just a little bit of background info on

19 you, and then we can kind of talk about the

20 Illinois State Rifle Association generally and then

21 we can kind of move into the specific items that we

22 are talking about in this particular case.  If you

23 could, give us just a thumbnail sketch of your

24 educational background.



1       A.    I have a bachelor's degree and a

2    master's degree in education from Illinois State

3    University in Normal, Illinois.  I have a

4    professional insurance from the insurance councils,

5    and then, of course, I have a high school diploma

6    and that sort of thing.

7       Q.    Your master's degree -- or strike that.

8    Let me start over.

9           Do you have any formal education related

10   to childcare?

11      A.    No.

12      Q.    Do you have any formal education,

13   meaning high school, college, master's program,

14   otherwise related to firearm safety?

15      A.    No.

16      Q.    Do you have any formal education,

17   meaning high school, college, master's program, or

18   otherwise related to firearm storage?

19      A.    No.

20      Q.    Okay.  Starting with -- well, I'll ask

21   this first.

22           Did you go straight through from college

23   to get your master's?

24      A.    No.  I taught for three years and then



```
 1  went back and started my master's degree.  I might
 2  have taken a couple night courses after I
 3  graduated, but I was out for a year or two before I
 4  started that.
 5        Q.    And what year did you graduate
 6  undergraduate?
 7        A.    1966.
 8        Q.    And where did you teach right after
 9  that?
10        A.    I taught at Bradley-Bourbonnais High
11  School.
12        Q.    What subjects did you teach?
13        A.    History, sociology.
14        Q.    What year of students?
15        A.    They were sophomore through senior.
16        Q.    Okay.  Other than that teaching job out
17  of -- right out of college, can you kind of give us
18  a picture of your employment history from then
19  until today?
20        A.    When I went after my master's degree, I
21  was a teaching assistant.  I taught ten hours a
22  week at Illinois State University, and after I
23  graduated or completed that year, I went to work
24  for the Bloomington Area Vocational Center.
```



1        I handled a cooperative work training

2    force, which dealt with children who had -- young

3    people who had certain problems, all kinds of

4    problems.  I worked to get them employment, teach

5    them how to keep a job, and so I did that.

6        Then I -- there was a cutback at the

7    school, and I worked at Bloomington Junior High

8    School teaching 7th and 8th graders until 1978.  I

9    purchased an insurance agency, and I went full-time

10    in the insurance business.

11    Q.    When you left Bloomington Junior High in

12    approximately 1978, did you ever teach again after

13    that?

14    A.    Not in a school.  I taught a lot of

15    classes, firearm classes.  I became a firearms

16    instructor in 1969, and I taught classes on and off

17    until 1987, when I joined the Illinois State Rifle

18    Association.  And then I became an instructor

19    there.  I was coach of the pistol team.  I walked

20    through all of the chairs.  I was a membership

21    chairman of the Illinois State Rifle Association,

22    treasurer for a short time, secretary for a short

23    time, convention chairman for a short time.  Any

24    job that nobody wanted to do, I did.



1      Q.    Okay.  We'll break that down here in

2   just a minute in terms of your roles with the

3   Illinois State Rifle Association.

4           In terms of your formal employment in

5   1978, when you purchased the insurance company, was

6   that your employment -- well, let me ask you.

7           Are you currently retired?

8      A.    From insurance, yes.

9      Q.    When did you retire from insurance?

10     A.    2001.

11     Q.    And from '78 to 2001, were you with that

12  same insurance company that you purchased?

13     A.    Yes.

14     Q.    Did you have -- aside from firearm --

15  any work you had done as a firearm instructor, did

16  you have any employment for pay -- other employment

17  for pay while you were working with the insurance

18  company?

19     A.    No.

20     Q.    Okay.  You had mentioned that you were a

21  teacher or you were an instructor at the

22  Bloomington Area Vocational School and that there

23  were -- I'm paraphrasing here, so I apologize.

24           You were helping children or students



1  with various issues, teaching them how to hold and

2  maintain a job; is that right?

3      A.    Yes.

4      Q.    When you say they had various issues,

5  what sorts of issues did you mean?

6      A.    Well, there were a lot from broken

7  homes, a lot from -- how do I say this -- from

8  unstable families.  Some had drug problems.  Some

9  had maybe a small criminal record, and so just

10  about everything that you can think of.  Some had

11  learning difficulties.  A couple had deafness, that

12  sort of thing.

13      Q.    During your time at Bloomington Area

14  Vocational School, did you ever teach children who

15  had come through the Illinois state foster care

16  system?

17      A.    I don't know.

18      Q.    Okay.  Then Bloomington Junior High

19  School, you said that you were teaching 7th and 8th

20  graders; is that right?

21      A.    Yes.

22      Q.    What subjects?

23      A.    Geography and history.

24      Q.    Okay.  During your time at your first

1  job at Bradley-Bourbonnais High School, when you

2  were straight out of college, did you ever keep a

3  firearm in your classroom?

4       A.    No.

5       Q.    Why not?

6       A.    Well, because it was prohibited, and I

7  didn't need to anyway.

8       Q.    Okay.  How was it prohibited?

9       A.    It was against school principle --

10  school policy to have a firearm in the classroom.

11       Q.    Did you ever question or challenge that

12  school policy while you were there?

13       A.    No.

14       Q.    While you were at Bloomington -- sorry.

15             You said that you did not need one while

16  you were at Bradley-Bourbonnais.  Could you explain

17  what you meant by that?

18       A.    Well, there was -- I'm not exactly a

19  little fellow, and I was a lot younger in those

20  days.  I took away a couple firearms from kids that

21  brought them to school.  I took away bayonets,

22  switchblades, all kinds of things.

23       Q.    When you say you did not need it, you

24  felt that you were physically able to handle the



```
 1   various threats in the classroom without one?

 2        A.   Yes.  I left something out.  I should

 3   tell you, you asked me about another job.  I forgot

 4   one.

 5             I worked at the Kankakee area --

 6   Kankakee Forestry Camp, and it was a juvenile

 7   prison for 15- and 16-year-olds, and I worked there

 8   for a year and a half.

 9        Q.   When was that?

10        A.   I want to say it was from 1968 to

11   mid-1969.

12        Q.   Okay.  What were your responsibilities

13   there?

14        A.   I was supposed to set up a science

15   program for 15- and 16-year-olds throughout the

16   state in Kankakee.  There was one down by Alton and

17   one down by Fort Massac State Park, so I did that.

18             While I was there though, I also acted

19   as a teacher at night, and then I stayed there for

20   maybe about six months because I had replaced a

21   couple of guards who had been murdered.  I was

22   locked in a room with a shotgun, and I was on-duty

23   all night.  I was sleeping, but if things happened,

24   I was to respond.
```



1      Q.    And in that particular role, based on

2   what you just said, you had access to a firearm,

3   given that it was a detention facility?

4      A.    Yes.

5      Q.    Okay.  When you were at Bloomington Area

6   Vocational School, did you ever keep a firearm in

7   your classroom there?

8      A.    No.

9      Q.    Why not?

10     A.    I had one in the car.

11     Q.    Okay.  Were firearms prohibited in the

12  facility?

13     A.    Not always.  They taught hunter safety

14  in the facility, so they were not exactly

15  prohibited.  They had to have a use though, a

16  purpose, such as a certified hunter safety class or

17  something like that.

18     Q.    So a firearm for self-defense uses would

19  not be allowed in the facility?

20     A.    No.  We had a resource officer who

21  worked together -- I worked together with.  He

22  became sheriff of McLean County eventually.  That

23  is when we worked very closely together on certain

24  issues with certain children, I guess.

RICHARD PEARSON  30b6                                    August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                                  18

1       Q.    And that officer who eventually became

2    the sheriff, I presume that he had a firearm on his

3    person?

4       A.    Yes.

5       Q.    Okay.  And then at Bloomington Junior

6    High, while you worked there, did you keep a

7    firearm in your classroom?

8       A.    No.

9       Q.    And why not?

10      A.    They are little kids.  I don't need a

11   firearm.  It was probably prohibited anyway.

12      THE REPORTER:  Can you repeat that?  I

13   couldn't understand.

14   BY THE WITNESS:

15      A.    I said, They are little kids, 7th and

16   8th graders.

17   BY MR. CHIMIENTI:

18      Q.    What do you -- can you expand on that a

19   little bit more when you say -- it sounds like what

20   you are saying is you did not need a firearm

21   because they were kids.  What do you mean by that?

22      A.    Well, they were -- they were children.

23   They were -- you know, and so there were not any

24   issues in the school at least at that time, and



1  that's all.

2      Q.    Were firearms prohibited at Bloomington

3  Junior High School?

4      A.    I never asked.  I assume they would be

5  unless they were there for a special purpose.

6      Q.    Okay.  Let's move -- before we get to

7  your sketch of your history at Illinois State Rifle

8  Association, I want to talk briefly about your

9  specific training related to firearms.  If you

10  could kind of describe for us the various trainings

11  that you have had on firearms, that would be

12  appreciated.

13      A.    Okay.  Well, I started out shooting at

14  about age 7.  My father taught me about firearms

15  and firearm safety.  We had firearms in the house.

16          When I went to Illinois State Rifle

17  Association (sic), we had a rifle team.  I was on

18  the rifle team for two years before I graduated.

19  After I graduated, I just shot recreationally.  In

20  about 1970, I started training for handgun

21  competition with a couple of instructors.  One's

22  name was Gustav Crandell, and I competed in the

23  national championships in 1973 and '74.

24          And then I got married.  I had -- two



1   children came with my wife.  I taught those

2   children to shoot.  In 1985 or '86, I started

3   competing again, and then eventually I won a couple

4   of championships.  I was competing actually in

5   Olympic air pistol, so I won a couple

6   championships.  I won a national championship at

7   Camp Perry, Ohio.

8           And then I went to the Olympic training

9   center, and I trained there for three different

10  times, a week at a time.  Then I also went to an

11  Olympic master's training class, so I was under the

12  tutelage of the national champions and

13  international champions.  We went to training

14  there.

15          And I continued to compete nationally,

16  and I'm the shortest person you have ever met on

17  the U.S. shooting team.  I was there for one day,

18  and they canned the coach and canned the team, so

19  that was the end of that.

20          Anyway, so I came back, and then I

21  started teaching at the national championships.  I

22  competed at the national rifle championships.  I

23  went to the United States Army small arm firing

24  school four different times, two with rifle and



1   many with pistol.  I don't remember how many.

2   Probably ten, I don't know, with pistol.

3              So then I went to some advanced training

4   for handguns, a different type of shooting, Bianchi

5   Cup shooting.  It's not Olympic shooting, but it's

6   Bianchi Cup shooting.  So I went to Columbia,

7   Missouri, with -- I trained under Ray Chapman, and

8   I trained under Massad Ayoob twice, and then I

9   taught many classes.

10             I have taught probably -- a friend of

11  mine and I taught classes together, who recently

12  passed away, but we taught probably 6,000 women.

13  We would teach classes probably about eight times a

14  year specifically for women.

15             Then I became to where I am now, where I

16  set up classes.  I attend most of the classes.  I

17  don't take the classes any more, but I attend the

18  advanced classes and even basic classes.  And so

19  there are literally dozens and dozens and dozens of

20  those.

21      Q.    All right.  I appreciate that history,

22  and rather than sort of going through it all

23  piecemeal, I have a couple specific questions and

24  then a couple general questions.



1       You had mentioned that your father

2   taught you to shoot at age 7.  Do you know whether

3   there's any particular reason why you were taught

4   at age 7?

5       MR. SIGALE:  Object as to form.  If you

6   understand, you can answer.

7   BY THE WITNESS:

8       A.    I wanted to shoot and so he bought me a

9   BB gun.  I started with a BB gun.

10  BY MR. CHIMIENTI:

11      Q.    I'll ask it a different way.  Do you

12  know why your father didn't teach you how to shoot

13  before age 7?

14      A.    The answer is, I was around.  I was --

15  my family were pheasant hunters, and so I would tag

16  along as soon as I could keep up with them, you

17  know, and so my job was to -- I was sort of the

18  dog.  I would pick up shotgun shells after the

19  pheasant flew away and that sort of stuff.

20      You know, it was just part of our

21  culture.  It is just what we did, you know, and

22  opening day was a big day in my life.  It was

23  probably equal to Christmas.  All of my relatives

24  would come up.  We would go pheasant hunting, and



RICHARD PEARSON  30b6                                    August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                            23

1    the kids would tag along and it was a family

2    affair.

3         Q.     And you learned to shoot BB guns at

4    age 7.  At what age were you a full participant in

5    the pheasant hunting?

6         A.     Probably 11, I would guess.

7         Q.     And so up until age 11, you described

8    yourself as the dog or, I guess, the gopher?

9         A.     Yes.

10        Q.     You were picking up the shells and

11   tagging along?

12        A.     Exactly.

13        Q.     Okay.  You said that you taught your own

14   kids how to shoot.  About how old were they when

15   you taught them how to shoot?

16        A.     Well, they were -- I have to think about

17   this here.  Scott was -- well, they were Todd and

18   Scott.  Those are their names, and I married their

19   mother and they were 10 and 12 at the time, so I

20   just started immediately.

21        Q.     Okay.  So you -- the boys were -- just

22   to clarify, the boys were 10 and 12 when you

23   married their mom?

24        A.     Right, when they came into my family or



1   when we became family.

2        Q.    When you taught them how to shoot --

3   strike that.

4              When you married their mom, were you

5   living in the home with the three of them after you

6   got married?

7        A.    Yes.

8        Q.    While you were living in the home with

9   your wife and the boys, how would you store your

10  firearms?

11       A.    I just put them in the gun cabinet that

12  had just a key lock, some were just in the corner.

13  They were instructed not to touch them until I was

14  around, and they followed those rules.

15       Q.    Would you store -- the guns, whether

16  they were in the cabinet or in the corner, would

17  you store them unloaded?

18       A.    Yes.

19       Q.    Why is that?

20       A.    Well, because they were sporting arms

21  and target arms, and if they -- there's no

22  necessary reason to have them loaded.  If you were

23  going out pheasant hunting, but there was very few

24  pheasants in the house, so I did not have them



1  loaded.

2      Q.    Okay.  Other than the sporting arms, was

3  there a firearm that you used for personal

4  protection at that time?

5      A.    Yes.

6      Q.    How would you store that weapon?

7      A.    It was in the safe, and it was loaded

8  and only I had the combination.

9      Q.    You kept that firearm locked away from

10 the boys?

11     A.    Yes.

12     Q.    The boys -- you mentioned the sporting

13 rifles that you stored either in the cabinet or in

14 a corner.  Did the boys ever access those firearms

15 without your permission?

16     A.    Not that I know of.

17     Q.    Okay.  It sounds like you've taught

18 various classes over the years.  You now coordinate

19 these classes.

20          When you teach the classes, how do you

21 instruct your students on how they should store

22 their firearms?

23     A.    Well, you have two classes of firearms.

24 You had supporting arms, and I instruct those to be



1    unloaded and inaccessible to unauthorized people in
2    the family, in the house.
3              You have self-defense firearms, and
4    those are inaccessible to those same people.  I
5    mean, anyone in the house can use them.  For
6    example, my wife and I both have our own
7    self-defense firearms, and we have those both
8    there.  When I'm gone, they are locked away.  When
9    I'm home, they are in a rapid or speed safe, so I
10   can get to them quickly.  In times of sometimes
11   unrest, they are with me.
12        Q.    Are those -- so just to confirm, the
13   sporting arms that you mentioned, you recommend
14   that they be stored unloaded and locked away from
15   unauthorized persons, correct?
16        A.    Yes.
17        Q.    And the self-defense arms, you described
18   how they would be stored if they were not on your
19   person.  When those arms are not on your -- the
20   self-defense arms are not on your person, do you
21   instruct your students to store them loaded or
22   unloaded?
23        A.    I leave that to them, but I recommend
24   they be store loaded and locked away.



1      Q.    Is there a -- this may seem like an

2   obvious question, but I'll ask it anyway.

3            Is there a functional difference when a

4   firearm is stored loaded versus unloaded in terms

5   of self-defense uses?

6      A.    Yes.  If you suffer something like a

7   home invasion, for example, you only have seconds

8   to defend yourself.  And so if they are unloaded,

9   you have to go through the exercise of loading them

10  and making sure that the magazine is seated

11  properly, or else they won't work.  So it's best to

12  do that administratively, which means you are not

13  under pressure before you get to be under pressure,

14  so they are ready for use.

15     Q.    Do you recommend a particular type of

16  safe or storage unit that your students should

17  store -- let's start with the sporting arms in?

18     A.    I recommend that they be -- sporting

19  arms would be generally a safe because they are

20  longer and with a lock on it, of course, a

21  combination lock on it, so that -- which is a

22  changeable combination lock.  So if something

23  happens, you can change the combination.  If the

24  circumstances change somehow in the household, so



1  you can change the combination lock.

2        What was the second part of the

3  question, or was there a second part?

4      Q.   Yeah, there was no second part, but I

5  think you know where I'm going here.  For the

6  self-defense arms, what type of storage do you

7  recommend that your students use?

8      A.   It's generally a lockbox type of

9  situation with a mechanical combination that can be

10  changed.

11      Q.   You had mentioned earlier the idea that

12  you want to keep these firearms, whether they are

13  the self-defense or the sporting arms, away from

14  unauthorized users.  Do you remember that?

15      A.   Yes.

16      Q.   Okay.  Can you describe what you mean by

17  "unauthorized user"?

18      A.   Someone who comes to your home who might

19  be a friend of yours, but that does not mean that

20  they should be tampering with your firearms, unless

21  you invite them.  Young people who might come into

22  the house, for example, so those kind of people.

23  Just someone who comes to your house that is not

24  part of your family that you have not determined --

RICHARD PEARSON  30b6                         August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                        29

1  that you have determined should not be authorized

2  unless you invite them.

3       Q.    Okay.  You mentioned young people who

4  might come to your house.  Why would -- is there a

5  particular reason why a young person might be an

6  unauthorized user of the firearm?

7       A.    Well, certainly.  I don't know who they

8  are, for one thing.  It's a self-defense firearm,

9  so there's no reason that they should have access

10 to that, particularly if I don't know them, you

11 know.  I would not give anyone access to my

12 personal self-defense firearms other than my wife

13 and myself.

14      Q.    So based on that, is it possible that

15 even children in your own home could be

16 unauthorized users of the firearms?

17      A.    Yes.

18      Q.    In your mind, are there any particular

19 considerations or special considerations that you

20 should give in terms of -- or reasons why you would

21 want to keep children, in particular, away from

22 your self-defense firearm?

23      A.    Because it's loaded and ready for

24 action.  That's why.  And they may not have a



1   complete understanding of that.  You know, when you

2   teach children, there are some things you teach,

3   but if they are not in my family, I don't know what

4   they know.  Okay?  If they are in my family, I know

5   what they know.

6        Q.    Okay.  Fair enough.

7              Mr. Pearson, have you ever been an

8   Illinois licensed foster parent?

9        A.    No.

10        Q.    Have you ever been an Illinois licensed

11   daycare home provider?

12        A.    No.

13        Q.    Have you ever had or do you currently

14   have children in a daycare home licensed by

15   Illinois DCFS?

16        A.    Personally?

17        Q.    Yes.

18        A.    No.

19        Q.    Okay.  David mentioned at the beginning

20   of the deposition that you are currently executive

21   director of the Illinois State Rifle Association;

22   is that correct?

23        A.    Yes.

24        Q.    How long have you held that position?



1      A.    2004 I started.

2      Q.    Okay.  How did you get that job?

3      A.    I was president from November 1998 to

4   2004, and the job kept getting bigger and bigger

5   and bigger.  And I said finally, You either have to

6   hire me or I have to go back to the insurance

7   business, one of the two.  I was working part-time

8   for an agent at the time.  I said, you know, I

9   can't do both, the job is too demanding.

10      Q.    And so this executive director position

11   is a full-time job?

12      A.    Yes.

13      Q.    Is it a paid position?

14      A.    Yes.

15      Q.    What -- I guess, can you give us an idea

16   of your responsibilities as executive director?

17      A.    I'll sum it up first and then go into

18   it.  If it needs to be decided upon, I decide on

19   all of the day-to-day activities of the

20   association.  I manage memberships.  I manage the

21   finances.  I manage the classes.  I manage the

22   lobbyists.  I manage -- we have a range.  I manage

23   the range, and I deal with things like this.

24      Q.    "Things like this," meaning the lawsuit?



1        A.      Lawsuits, that sort of thing, yes.

2        Q.      Do you have any responsibility regarding

3   authorizing litigation on behalf of Illinois State

4   Rifle Association?

5        A.      Yes.

6        Q.      What is that responsibility?

7        A.      Well, I have to -- if a suit comes to

8   us, I have to decide if we are going to go it alone

9   or whether we are going to have partners in the

10  suit.  I decide if the suit has merit.  I will

11  confer with the president, but generally my

12  recommendations are followed.

13       Q.      You said your recommendations are

14  followed.  After you conduct that analysis that you

15  just talked about, who do you make the

16  recommendation to?

17       A.      The president and I decide that.

18       Q.      Are you two the only ones who decide

19  whether the organization sues?

20       A.      Say it again, please.

21       Q.      Sure.  Are you and the president the

22  only ones who decide whether the Illinois State

23  Rifle Association will sue?

24       A.      The answer is, we do it -- we report to



1  the board.  If there's no objection from the board,

2  the suit goes forward.

3       Q.    Okay.  But you principally are the one

4  who sort of reviews the suit and does the analysis

5  of whether the organization will join; is that

6  correct?

7       A.    Yes.

8       Q.    In terms of the reporting structure at

9  the organization, do you report to anyone as

10 executive director?

11      A.    I report to the board bimonthly.

12      Q.    How do you make those reports?

13      A.    In person.

14      Q.    Does anybody at the organization report

15 to you?

16      A.    Yes, the employees of the association,

17 the lobbyists for the association, and the

18 instructors that -- I approve their courses, their

19 curriculum, that sort of thing.  The range officers

20 that run the range, the range master that runs the

21 range.  I guess that would be it, yes.

22      Q.    Other than the range personnel that you

23 talked about, you also mentioned lobbyists.  How

24 many lobbyists does the organization have?



1    A.    They have myself.  They have Ed

2    Sullivan.  They have Maureen Mulhall.  They have

3    Coy Pugh, and they have Bill -- William Potts.

4    Q.    So that -- I lost count.  Is that four

5    or five total?

6    A.    It would be five, including me.

7    Q.    And then you said there are employees

8    that you supervise.  Is that a separate group of

9    individuals other than the ones that you just

10   mentioned?

11   A.    They are the internal staff that issue

12   memberships, one that does the accounting.  He does

13   the accounting, the CPA, and audits us once a month

14   to make sure that everything is square.  He's not

15   an employee, but a contractor.

16        Then we have three people that have a

17   membership and handle all of the other details,

18   phone calls, all of those kinds of things that we

19   run into.

20   Q.    Okay.  All of those employees are paid

21   employees; is that correct?

22   A.    Yes.

23   Q.    You said that you became executive

24   director in '04, and prior to that you were



1  president.  How long were you president?

2      A.    From November 1998 until the first of

3  January 2004, I guess.

4      Q.    Were your responsibilities as president

5  different than your responsibilities as executive

6  director?

7      A.    The answer is, yes, in that the job

8  greatly expanded once I became executive director.

9      Q.    Let me ask you this.  Was there an

10 executive director before you, or was that position

11 created for you?

12     A.    It was created.

13     Q.    Before you were -- is it fair to say

14 that you were doing most of the same things as

15 president that you do as executive director just on

16 a slightly smaller scale?

17     A.    Yes.

18     Q.    Before you were president -- I know you

19 mentioned there's a bunch of positions that you

20 did, and they were all of this stuff that nobody

21 wanted to do.

22     A.    Right.

23     Q.    So before you were president, what

24 position did you have before that?



1       A.    Well, I started out as the pistol coach

2    to the national team, and then I became convention

3    chairman for a couple of conventions.  Then briefly

4    I was secretary, when we had the secretary -- moved

5    on to other things, so I became secretary until we

6    appointed one.

7            The same thing with the ranger's job,

8    and -- it went that way, and then the education

9    committee I have always been on.  From day one, I

10   started with membership and education, so I have

11   always had that job.

12           I was vice president of -- there was a

13   second vice president and a first vice president,

14   but we eliminated the second vice president.  So I

15   would sit in those chairs.  There's all kinds of

16   little supervising arranged -- literally anything

17   that anybody -- if it needed to be done, I was

18   going to do it for the association.

19       Q.    If I'm recalling correctly, you became

20   involved in Illinois State Rifle Association during

21   your youth when you were on one of the rifle teams;

22   is that correct?

23       A.    I actually was on one of the pistol

24   teams.  I was not useful to them, but it was in the



1 | 1970s.  I was on the Illinois university rifle team

2 | in the '60s.

3 |     Q.   So the question is, when exactly did you

4 | become involved with the Illinois State Rifle

5 | Association?

6 |     A.   I first joined in 1973.

7 |     Q.   And that was when you were on the pistol

8 | team?

9 |     A.   Right.

10 |     Q.   Is the pistol team the reason why you

11 | became involved, or are there other reasons why you

12 | became involved?

13 |     A.   The pistol team was the original reason

14 | that I became involved.

15 |     Q.   Why did you stay involved?

16 |     A.   Because I found the work to be very

17 | interesting and challenging, and I liked the

18 | people, great people.  And so it was a great

19 | interest to me, and so that is why I stayed

20 | involved.

21 |     Q.   Okay.  We are obviously here for your

22 | deposition today.

23 |     A.   Yes.

24 |     Q.   And I'm going to ask you a question



1  about how you got ready for today.  I'll preface

2  this by saying, to the extent that you had

3  conversations with David, the Illinois State Rifle

4  Association's attorney, I don't want to know the

5  substance of those conversations.

6           But, in general, what did you do to

7  prepare for today's deposition, if anything?

8      A.    I read the court case and the 30(b).

9      Q.    Okay.  When you say "the court case," do

10 you mean the complaint, the initiating document?

11     A.    Yes, the complaint.  I'm sorry.

12     Q.    It's okay.  Did you speak to David at

13 all?

14     A.    Yes.

15     Q.    How many times did you speak to David to

16 prepare for today?

17     A.    Once by phone for a little while and

18 then this morning when I got here.

19     Q.    When was the phone call?

20     A.    I don't know.  Two, three, four days

21 ago.

22     Q.    Okay.  And you said it was for a little

23 while.  Do you know about how long you spoke to him

24 for?



```
1        A.    This morning?

2        Q.    No, that first phone call.

3        A.    Oh, it was probably three hours.  I

4   don't know.

5        Q.    And then you met with him this morning.

6   About how long was that meeting?

7        A.    Five minutes.

8        Q.    Other than the complaint and the

9   30(b)(6) notice, did you review any other documents

10  to prepare for today?

11       A.    No.

12       Q.    Other than speaking to David, did you

13  speak to anybody else at the organization to

14  prepare for today?

15       A.    No.

16       MR. CHIMIENTI:  Okay.  So we have been going

17  for about an hour, and I would personally like to

18  take a restroom break.  Why don't we take five

19  minutes.  Off the record.

20                  (WHEREUPON, a recess was had.)

21       MR. CHIMIENTI:  Let's jump back on the record

22  then.

23  BY MR. CHIMIENTI:

24       Q.    Mr. Pearson, we are back from a short
```



 1  break, and I wanted to switch gears slightly and
 2  talk about the Illinois State Rifle Association in
 3  general and get a little bit of background on the
 4  organization, its history, and its internal makeup,
 5  which you have mentioned a little bit in your
 6  testimony about your history with the organization.
 7              Let's start with the basics.  When was
 8  the Illinois State Rifle Association founded?
 9      A.    June of 1903.
10      Q.    And why was the Illinois State Rifle
11  Association founded?
12      A.    It was originally a department of the
13  United States Army called The Department of
14  Civilian Marksmanship.  It was the duty of the
15  Illinois State Rifle Association to train people
16  prior to going into the United States Army in
17  marksmanship before they reported for duty.
18      Q.    Was the organization founded by the Army
19  itself?
20      A.    It was founded by the Appropriations Act
21  of 1903 actually, at the insistence of President
22  Theodore Roosevelt.  There was to be one
23  association in every state, and Illinois was either
24  the first or one of the first.



1    Q.    You had mentioned the marksmanship

2   training for folks going into the Army.  Is that

3   the same reason why the organization exists today?

4    A.    In part.  We still do that, but our role

5   has greatly expanded.

6    Q.    What are the organization's goals today?

7    A.    Well, first of all, we are still an

8   educational organization.  Originally it was to

9   teach rifle marksmanship.  Now we teach

10  marksmanship for handguns, shotguns, all kinds of

11  things like that.

12        We also have grown into the area of

13  firearm rights.  We lobby.  We don't support

14  candidates.  We are a 501(c)(4), so we can't

15  support candidates, but there are other

16  organizations that do, like the Illinois State

17  Rifle Association Political Victory Fund for state

18  and local, the ISRA FED PAC for congressmen through

19  president.  So we have those two organizations that

20  we have added.  They are Chapter 527s of the IRS

21  code.

22    Q.    You had mentioned that over time the

23  organization has gotten into firearm rights.  Can

24  you sort of describe how and why that happened?



1        A.      Yeah.   It mostly never occurred to
2    anybody until the mayor -- the election of Mayor
3    Richard J. Daley in 1956, and he was a person
4    opposed to firearms.   He eventually got the FOID
5    Card Act passed in 1967, which took effect in 1968,
6    and so we were kind of thrust into that.   No one
7    was prepared for that.   In fact, we didn't do
8    anything hardly with too many local clubs.   All of
9    the local clubs were at that time under the
10   Illinois Wildlife Federation, all of the
11   sportsmen's clubs.
12            And so that happened, and so we became
13   involved at that point.   I was not around then, but
14   my predecessors were.   So that is how we became
15   lobbyists.   With a change in the laws, about 1996
16   we had to form the Political Victory Fund and the
17   FED PAC to speak to certain candidates, so we were
18   restricted simply to the questions of rights and
19   the legislature and local jurisdictions.
20       Q.      So that was going to be my next
21   question.   That is the sort of limitation, sort of
22   the local jurisdictions, the legislation, the
23   regulations.   Is that what -- is that what Illinois
24   State Rifle Association, the 501(c)(4)'s lobbyists



1  are limited to?

2      A.    Well, there are also administrative

3  lobbyists, so we can administer all of the -- they

4  used to be called co-departments, like DNR, like

5  you guys.  We can lobby those people too.

6      Q.    But in terms of local elections, I think

7  you had mentioned that is not a form of lobbying

8  that the Illinois State Rifle Association, the

9  501(c)(4) does?

10     A.    No.  That is a corporate -- it's a

11  separate corporation, the Political Victory Fund.

12     Q.    And we'll get into the Political Victory

13  Fund here in just a second.

14          You had mentioned that, you know, over

15  time, it sounds like -- again, I'm paraphrasing, so

16  I apologize.  That one of the ways that the

17  organization got involved with the issue of firearm

18  rights was through these lobbyists that were added

19  to the organization eventually.

20          When did the organization start getting

21  involved in litigation?

22     A.    I want to say 2006 or '07.  Yeah, about

23  that, yes.

24     Q.    And is there any particular reason why



1   the organization decided to venture into

2   litigation?

3        A.    Well, the legislature was not -- not

4   hearing our message, so if you can't get it done

5   legislatively, you have to do it through

6   litigation, if you have a case.

7        Q.    Okay.  You had mentioned one of the

8   other goals is -- of the organization is education.

9   So how does the organization achieve that goal?

10       A.    Well, we sponsor many classes.  We

11  educate people, particularly with our range and the

12  programs that we teach at other ranges, so firearm

13  safety.  We support hunter safety.  We do all kinds

14  of safety programs.  If anybody asks us for safety

15  literature, we send it to them.  You know,

16  it's just -- it was very important for us to do

17  that, and so we want people to own firearms but we

18  want them to do it safely.

19       Q.    Other than education, the fire -- the

20  issue of firearm rights, the marksmanship program,

21  are there any other purposes of the organization

22  that we have not covered that are, I guess, current

23  purposes of the organization?

24       A.    No.  We support the USA shooting, which



1   is the Olympic team, the NRA programs, the civilian

2   marksmanship program.  Just for clarification, in

3   1992 the Department of Civilian Marksmanship, which

4   we were originally under, became a quasi-government

5   corporation, sort of similar to the post office.

6   It became civilian marksmanship, so that is what is

7   there.  If you see those charts, DCM was before

8   1992.  CMP is after 1992, just for your record.

9          Anyways, we support those, and we still

10  train troops as necessary.  That is one of

11  our purposes we maintain an instructor for,

12  volunteers.  For example, when 9/11 happened, the

13  next two years, we trained troops who were being

14  deployed but no one had time to train them.  So we

15  took them to our ranges, ranges in Rock Island,

16  ranges in Alton, ranges in Peoria, and we trained

17  those people before they reported for duty after

18  9/11.  And we --

19       Q.    Any other goals or objectives of the

20  organization that we have not covered so far?

21       A.    Well, in general I think we have covered

22  the major ones, yes.  Support the Department of

23  Natural Resources, that sort of thing.

24       Q.    I'm going to show you -- I'm going to



1  share my screen here and show you what I have

2  marked as Exhibit 3 to your deposition,

3  Mr. Pearson.  So this document is titled Illinois

4  State Rifle Association Bylaws.  Do you see that?

5       A.   Yes.

6       Q.   And at the bottom here, on page 1, I

7  have marked it Pearson Exhibit 3.  And I'm going to

8  direct your attention here, first question at the

9  top, right under the title here, it says, Restated

10  and adopted April 22, 2001.  Underneath it, it

11  says, Amended through April 9, 2016.  Do you see

12  where that is?

13       A.   Yes.

14       Q.   Okay.  So my first question is, is there

15  a more current version of these bylaws than this

16  version?

17       A.   There is one, and it pertains to adding

18  a commercial membership as a class of membership.

19       Q.   And that is a separate document?

20       A.   It has not been published yet.  It has

21  just been adopted.

22       Q.   Is that something that is forthcoming?

23       A.   Yes.

24       MR. CHIMIENTI:  David, for the record -- and,



1  again, we'll send an e-mail after the fact, but

2  when that is published, we would like a copy.

3      MR. SIGALE:  Okay.  Send me the e-mail as a

4  reminder, and we'll forward it when it exists.

5  BY MR. CHIMIENTI:

6      Q.    Okay.  I'm going to point you here to

7  this middle section.  It says, Article 2, Purposes

8  and Powers.  Do you see where that is in the middle

9  of the page?

10     A.    Yes.

11     Q.    Okay.  And in the second paragraph it

12  says, The objectives of this association shall be

13  consistent with those of the National Rifle

14  Association of America and shall include education

15  of the citizens of Illinois regarding the purchase,

16  possession, and use of firearms.  Do you see where

17  I read that?

18     A.    Yes.

19     Q.    Okay.  So my question is about the NRA.

20  What relationship does the Illinois State Rifle

21  Association have to the NRA?

22     A.    We are merely an affiliate of the NRA.

23     Q.    And what does that mean?

24     A.    That means we send them money and they



1  send us none.

2       Q.    Okay.  Is there -- the purposes and

3  goals of the organization that we covered over the

4  last ten minutes or so, I guess are there any

5  additional goals of the NRA that we did not -- that

6  the NRA might cover that Illinois State Rifle does

7  not cover?

8       MR. SIGALE:  Objection as to foundation.  But

9  if you know, you can answer.

10  BY THE WITNESS:

11       A.    I don't think there are any actually.

12  BY MR. CHIMIENTI:

13       Q.    Okay.  I'm going to take that off the

14  screen.  When did the Illinois State Rifle

15  Association become associated with the National

16  Rifle Association?

17       A.    I do not know actually.  I have not

18  found that.  I would have to go into the history of

19  this for a little while, if you want me to.

20       Q.    That's okay.  If you don't know, that is

21  a perfectly fine answer.

22       My next question is whether the NRA has

23  any involvement in the day-to-day operations of the

24  Illinois State Rifle Association?



1       A.    No.

2       Q.    Does the NRA have any say or authority

3  in terms of authorizing the Illinois State Rifle

4  Association to enter litigation?

5       A.    No.

6       Q.    Again, this is going to be an obvious

7  question, but I'll ask it for the record.

8             Did the NRA have any say over whether

9  the Illinois State Rifle Association filed this

10  case?

11       A.    Say that again, please.

12       Q.    Sure.  Did the Illinois State -- sorry.

13  Let me start over.

14             Did the National Rifle Association have

15  any say or influence over whether the Illinois

16  State Rifle Association filed this lawsuit?

17       A.    No.

18       Q.    Okay.  You had mentioned that there are

19  a number of other organizations that are separate

20  entities that perform different functions.  Can you

21  give us a list of those sort of separate affiliated

22  organizations?

23       A.    You mean like the Illinois State Rifle

24  Association Political Victory Fund, for example?



1      Q.    Sure.

2      A.    That was formed in -- I believe there

3  was a change of law in '96 about how 501(c)(4)s

4  could act, so before that we could endorse

5  candidates or at least we did endorse candidates,

6  and after that it was determined, with the changes

7  in the law, a separate organization with a

8  noninterlocking board had to be formed, so we

9  formed the ISRA Political Victory Fund, so that is

10  when that happened.

11            A similar thing happened with the ISRA

12  FED PAC, which is the federal candidates PAC that

13  came after Michael -- McCain-Feingold, I think.

14            And then we have one other organization,

15  the Legal Assistance Committee, which is a

16  501(c)(3), and it is used to fund cases of

17  significance to Second Amendment Rights roughly.

18      Q.    The Political Victory Fund, is that the

19  organization that, I think you mentioned earlier,

20  supports various political candidates for election?

21      A.    Yes.  Yes.

22      Q.    And then the FED PAC is the organization

23  that is involved with elections on the federal

24  level, I think you had mentioned?



1      A.    Yes.

2      Q.    And then the Legal Assistance Committee,

3   what -- you said that it is involved with cases of

4   Second Amendment significance.  What sort of cases

5   is it involved in?

6      A.    Like the McDonald case, getting

7   concealed carry in Illinois, the Ezell case, this

8   case probably, so we have -- we think this is a

9   significant case or we wouldn't have brought it, so

10  they would be involved in that.  Sometimes the

11  cases aren't ours.  We might give some support to

12  them.  It depends.

13     Q.    Is the Legal Assistance Committee

14  involved in any way in this litigation?

15     A.    I'm sure it will pay part of the bills,

16  yes.

17     Q.    And the Legal Assistance Committee is a

18  separate entity from the Illinois State Rifle

19  Association; is that correct?

20     A.    Yes.

21     Q.    Does the Legal Assistance Committee ever

22  enter a lawsuit or name itself as a plaintiff in a

23  lawsuit, I guess is the right question?

24     A.    No.



RICHARD PEARSON 30b6                                    August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              52

1      Q.    Why not?

2      A.    Because that is not their job.  Their

3  job is to fund lawsuits of significance, not to be

4  part of it.

5      Q.    Okay.  And does the Legal Assistance

6  Committee have separate management from the

7  Illinois State Rifle Association?

8      A.    Yes.

9      Q.    Is there any crossover between the

10  management of the Legal Assistance Committee and

11  the Illinois State Rifle Association?

12      A.    There is some.  They can't have

13  interlocking boards, for example.

14      Q.    Are there individuals who are employed

15  by both or split their employment between the two?

16      A.    No.  The Legal Assistance Committee pays

17  no salaries.

18      Q.    Can you describe the overlap between the

19  two?

20      A.    Sure.  In our office -- it's in one of

21  our buildings, it has an office of its own, which

22  is typical.  It has its own post office box, that

23  sort of thing.

24      Q.    And I should have asked this earlier.



1  Where is Illinois State Rifle Association's office

2  located?

3       A.    The Illinois State Rifle Association

4  office is located at 420 East Locust Street,

5  Chatsworth, Illinois.

6       Q.    And the Legal Assistance Committee's

7  office is at that same location?

8       A.    No.  It's at 422 East Locust.

9       Q.    Does the Political Victory Fund have a

10  physical address?

11       A.    It's also at 422 East Locust in a

12  different office.

13       Q.    Okay.  And what about the FED PAC?

14       A.    Same thing.

15       Q.    422 East Locust?

16       A.    Yeah.  Different P.O. box.

17       Q.    I'm sorry.  Is the FED PAC located at

18  422 East Locust as well?

19       A.    Yes.

20       Q.    Why is the Legal Assistance Committee

21  classified as a 501(c)(3) organization, if you

22  know?

23       A.    Because we applied for that with the

24  Internal Revenue Service, and they granted it.



1    Q.    Okay.  Other than funding, is there any

2   other role that the Legal Assistance Committee

3   plays in this case?

4    A.    No.

5    Q.    Do the -- does the Legal Assistance

6   Committee report in any way to the Illinois State

7   Rifle Association or its board?

8    A.    No.

9    Q.    Does the Legal Assistance Committee

10  solicit its own donations?

11    THE REPORTER:  Sorry.  Your computer froze for

12  a second.

13  BY MR. CHIMIENTI:

14    Q.    Let me try it again.  Does the Legal

15  Assistance Committee solicit its own donations?

16    A.    Yes.

17    Q.    And how do they do that?

18    A.    Generally, by appeals.  Some people just

19  go -- we'll ask for donations and we'll get some,

20  so generally by e-mail.  Send out an e-mail

21  occasionally, and we will get some there.

22    Q.    Do you know if any -- does the Legal

23  Assistance Committee have members?

24    A.    No.



1       Q.    Does it communicate with its donors or

2    others regarding status updates to any litigation

3    that it might be involved in?

4       A.    Status updates are done -- it doesn't

5    have any members, so there's nobody to really send

6    the status update to.

7       Q.    When it solicits donations via e-mail,

8    who is that e-mail to?

9       A.    It goes -- they'll put it on Facebook

10   perhaps, or it just goes to everywhere that it

11   goes.  I don't know.

12      Q.    Are those e-mails sent to Illinois State

13   Rifle Association members?

14      A.    I'm sure they are, yes.  A lot of them

15   are Facebook followers, you know.

16      Q.    If I'm understanding this correctly,

17   even though they fund litigation, they don't

18   necessarily have any say over whether Illinois

19   State Rifle Association will actually litigate?

20      A.    No.

21   THE WITNESS:  I would like to have David --

22   there's something that appeared on the screen, and

23   I don't know what it is, David.  It's a message

24   about something or other.  Okay.  That went away.



1 | BY MR. CHIMIENTI:

2 |     Q.    Let's talk about the administration of

3 | the Illinois State Rifle Association.

4 |     A.    Okay.

5 |     Q.    Can you describe how the administration

6 | is structured?

7 |     A.    Well, we have a board of directors and

8 | an executive director, and that is really the

9 | administration.  That is how it is structured.  I

10 | report to the board.  I make the day-to-day

11 | decisions.  I make recommendations to the board,

12 | just similar to any other executive directorship of

13 | any organization.

14 |     Q.    How many directors are on the board?

15 |     A.    It can have up to 17.  Presently we are

16 | not fully staffed because of retirements and stuff.

17 |     Q.    How many members are on the board at the

18 | present moment?

19 |     A.    I think 15, but I'm not totally sure

20 | because we just had somebody retire.

21 |     Q.    Within the board of directors, are there

22 | specific officer positions?

23 |     A.    President, vice president, secretary,

24 | and treasurer.



1      Q.     Okay.  Let's start with the board

2    generally.  How are board members in general

3    chosen?

4      A.     They can be slated or they can be put on

5    the ballot by petition.

6      Q.     What was the first thing you said, they

7    can be slated?

8      A.     We go through a process of a nominating

9    committee, and the nominating committee will select

10   the members who are -- they believe to be the most

11   qualified, and so that is how you get on by

12   nomination.  You can get on by petition too, but

13   it's -- that's generally down through the

14   nominating committee.

15     Q.     And the nominating committee, is that

16   made up of board members, or is that made up of

17   other members?

18     A.     It's made up of a combination of board

19   members and non-members.  They are ISRA members,

20   but they are not board members.

21     Q.     You mentioned the other way to get on is

22   by petition.  Is that basically like a write-in

23   ballot?

24     A.     Well, you have to have somebody --



RICHARD PEARSON  30b6                                   August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              58

1  signatures on a petition.  It's like running for

2  election or anything else.

3       Q.    How long does a board member serve, or

4  how long is their -- how long are they elected for?

5       A.    They are on three-year rotating terms.

6       Q.    When you say "rotating terms," what do

7  you mean?

8       A.    That means that we try to make a third

9  of the board elected every year, and so it's a

10  three-year term.  I'm sorry.

11       Q.    No, no.  My apologies.  I did not mean

12  to talk over you.

13            Are there any specific requirements or

14  qualifications needed to be a board member?

15       A.    You have to be a member for five years.

16  You have to -- the goal of the nominating

17  committee, which I'm not necessarily privy to --

18  I'm not privy to, is to find people that are

19  qualified to be board members, not just want to be

20  board members.

21       Q.    Other than being a -- when you say that

22  they are qualified to be board members -- I know

23  you said you are not necessarily privy to that

24  meeting, but in your experience, what sorts of



1    qualities does one need to be a board member?

2         A.    Well, we look for other things, like

3    being on other boards.  For example, having board

4    experience someplace else, running your own

5    business or in a labor union.  People run the

6    unions or parts of the unions who have some

7    experience in management of some kind so that

8    they -- they are used to making decisions and

9    handling -- watching finances and things you'd want

10   with any board, school board.

11        Q.    You mentioned that every year you try to

12   elect a third of the board.  Who votes on the board

13   members?

14        A.    If it's a general election, every member

15   has the right to vote.  If there are -- no one is

16   running against the slate, then we have to go

17   through the process of casting a unanimous vote of

18   the board to appoint them.

19        Q.    So if an individual is running

20   unopposed, then it's up to the board to vote on

21   them?

22        A.    Yes.  The board approves the slate.

23        Q.    Is there a term limit for board members?

24        A.    Three years.



1    Q.    No.   I guess what I mean is, is there a

2    limit on the number of terms that somebody can

3    serve?

4    A.    No.

5    Q.    You had mentioned that there are several

6    officers.   How are the officers chosen?

7    A.    They are elected from the board

8    annually.

9    Q.    Who votes on -- who votes on who will be

10   the officers?   Is that just the board?

11   A.    Just the board.   We are nominated from

12   the board, and so they can nominate more than one.

13   As many as they want to, I guess.   Sometimes

14   there's board elections and sometimes there's just

15   a -- so every office is voted on separately, so you

16   might have the president being unopposed but you

17   might have -- for example, the vice president have

18   three candidates or something.   It's all over the

19   place.

20   Q.    Okay.   Are there -- how long does each

21   officer serve in that position?

22   A.    One year.

23   Q.    Is there a limit to the number of

24   one-year terms that someone can serve?



```
1        A.    No.

2        Q.    Your current president, what is that

3   person's name?

4        A.    Doug Mayhall.

5        Q.    How long has -- it's Mayhall,

6   M-a-y-h-a-l-l?

7        A.    Uh-huh, yes.

8        Q.    Sorry.  Is that a yes?

9        A.    That's a yes.  I'm sorry.

10       Q.    Okay.  How long has Mr. Mayhall been

11  president?

12       A.    I think he's in his third term maybe,

13  yeah.

14       Q.    Hopping back really quickly to the board

15  elections.  You said that, you know, if they are

16  contested, it's a general election.  If it's

17  uncontested, the board will approve.  How often

18  would you say those board member elections are

19  contested?

20       A.    About every time.  Maybe not for all

21  positions but at least for one position or two or

22  more.

23       Q.    Okay.  So is it that -- the only way the

24  board votes on it is if all of the positions are
```



1  uncontested?

2      A.    Well, if the position is uncontested,

3  they are elected by acclamation.  If they are

4  contested, then there's a secret ballot, and so the

5  board votes and you have to have, you know, the

6  predominant number of ballots in your favor.

7      Q.    Does the administration -- or does the

8  Illinois State Rifle Association have any internal

9  subcommittees?

10     A.    Yes.

11     Q.    Do you know how many?

12     A.    We have -- they have the nominating

13  committee.  We have education and training.  We

14  have the membership committee.  We have standing

15  committees because we are a competitive

16  organization.  We have competitions, which are the

17  standing committee, and then we have -- then we

18  have the bylaws committee, that has to bring the

19  bylaws -- any changes in bylaws before the board,

20  so we have that.  I can't quite remember them all.

21  We have ad hoc committees to do particular

22  projects, for example.

23     Q.    Let me -- without getting into the

24  nitty-gritty of each of these committees, in



1  general, how does somebody become a member of a

2  subcommittee?

3        A.    They maybe request to be on the

4  subcommittee, or the president may appointment

5  someone with the approval of the -- well, he can

6  just appoint someone.

7        Q.    If someone requests to be on a

8  subcommittee, does that require board approval, or

9  does that just go through?

10       A.    It generally just goes through.

11       Q.    Are there any subcommittees that have

12  any responsibilities related to litigation?

13       A.    No.

14       Q.    Are there any subcommittees that have

15  any responsibilities related to foster care?

16       A.    No.

17       Q.    Are there any subcommittees that have

18  any responsibilities related to day care?

19       A.    No.

20       Q.    Are there any subcommittees that have

21  any responsibilities related to firearm storage?

22       A.    No.

23       Q.    Are there any subcommittees that have

24  any responsibilities related to firearm safety?

1     A.    If we are talking about the education

2   and training committee, generally they do, but

3   specifically, no.

4     Q.    Okay.  I apologize for jumping around on

5   you here, but there's a question that I forgot to

6   ask you about the board.  How often does the board

7   of directors meet?

8     A.    They meet every other month.

9     Q.    I think earlier you said that you report

10  to the board twice a month, or is it once every two

11  months?

12    A.    I meant every other month, six times a

13  year.

14    Q.    Are there meeting minutes of these board

15  meetings?

16    A.    There are.

17    Q.    Do you know whether any of those meeting

18  minutes discuss ongoing litigation?

19    A.    They do not.

20    Q.    Okay.  Is ongoing litigation discussed

21  at the board meetings?

22    A.    In executive session.

23    Q.    Are there meeting minutes of the

24  executive session?



1       A.    No.

2       Q.    Who is involved in the executive

3   session?

4       A.    Whoever the president invites.  The

5   board of directors and other people that are

6   invited to executive session that may have a

7   special knowledge that we need to hear about.

8       Q.    Is there a reason why there are not

9   minutes of the executive session?

10      A.    No one keeps minutes of the executive

11  session.

12      Q.    Hopping back to the subcommittees.  Do

13  the subcommittees report to the board?

14      A.    If they have something to report, yes.

15      Q.    Has any of the subcommittees ever

16  reported to the board on this litigation?

17      A.    No.

18      Q.    Shifting gears slightly away from

19  administration.  I want to talk about membership.

20      A.    Okay.

21      Q.    So how many members does the Illinois

22  State Rifle Association have today, if you know?

23      A.    I can't tell you today, but it was about

24  26,000 plus.



1      Q.    You are going to hear me say the date

2   April 16, 2018, a couple times throughout today.

3   That is the date that this lawsuit was first filed,

4   just for your reference.

5            Do you know how many members the

6   organization had on that date?

7      A.    No.

8      Q.    Okay.  How does the organization keep

9   track of its members?

10     A.    We do it with our computer system.  We

11  have a membership program, and so it determines

12  when the member joined, when they expire, just like

13  any other membership program.

14     Q.    What information does the system collect

15  on the members?

16     A.    Well, name, address, birthday, so forth

17  and so on, the standard stuff.  We sometimes

18  collect occupation, particularly if they are

19  firearm instructors.  We are very interested in

20  that, so we need those.  You know -- the reason I'm

21  stuttering is, we just changed to a new computer

22  system and a process, and I'm not sure what is

23  there anymore.  Anyway, you know, it's a mess, but

24  anyhow, it's the standard sorts of things.  If they



1   made a donation, that sort of business.

2        Q.    Does the organization collect e-mail

3   addresses from its members?

4        A.    We do.

5        Q.    Does the organization track or collect

6   whether its members are Illinois residents?

7        A.    No.

8        Q.    Does the organization know how many of

9   its members are Illinois residents?

10        A.    Yes, but we don't purposely keep track

11   of it.

12        Q.    Do you know about percentage of

13   membership?

14        A.    Probably 95, 98 percent are Illinois

15   residents.  We have a great number of members who

16   have moved to Florida, North Carolina, and Arizona,

17   so they stay members.

18        Q.    Moving on to warmer weather, right?

19        A.    Yes, exactly.

20        Q.    Does the organization collect or track

21   whether its members are foster parents?

22        A.    No.

23        Q.    Does the organization know how many of

24   its members are foster parents?



1        A.    No.

2        Q.    Does the organization collect or track

3   whether its members are day care home providers?

4        A.    No.

5        Q.    Does the organization know how many of

6   its members are day care home providers?

7        A.    No.

8        Q.    Does the organization collect or track

9   whether its members have children who are living in

10  a foster home?

11       A.    No.

12       Q.    Does the organization know how many of

13  its members have children who are living in a

14  foster home?

15       A.    No.

16       Q.    Does the organization collect or track

17  whether its members have children attending a day

18  care home?

19       A.    No.

20       Q.    Does the organization know how many of

21  its members have children attending a day care

22  home?

23       A.    No.

24       Q.    Does the organization collect or track



1  whether its members are concealed carry permit

2  holders?

3       A.    No.

4       Q.    Does the organization know how many of

5  its members are concealed carry permit holders?

6       A.    No.

7       Q.    Okay.  How do you become a member of the

8  Illinois State Rifle Association?

9       A.    Well, you apply.  There's a couple ways.

10 You can apply online or you can fill out a paper

11 application.  We advertise in different

12 publications occasionally and that sort of thing,

13 in our own publications.  Of course, that would be

14 the main ways to become a member.

15      Q.    Are there membership dues?

16      A.    Yes.

17      Q.    How much -- well, let me ask it a

18 different way.  Are there different types of

19 memberships?

20      A.    There are.

21      Q.    Do those memberships cost a different

22 amount?

23      A.    Yes.

24      Q.    How much does a basic level membership



1  cost?

2       A.    $30 per year unless you are a veteran,

3  police officer, fireman, or paramedic, then it's

4  $25.

5       Q.    Is the standard membership length

6  one year?

7       A.    That is one of the standards.  One-,

8  two-, and three-year are the general annual

9  memberships.

10      Q.    Okay.  How much does a two-year

11  membership cost?

12      A.    Regular pay would be $55.

13      Q.    And what about a three-year membership?

14      A.    75.

15      Q.    And if you -- let's say -- just use an

16  example.  Let's say I join the organization today

17  and I pay my $30, and a year from now I forget to

18  pay my membership or I just don't do anything, what

19  happens to my membership then?

20      A.    It lapses.

21      Q.    Okay.  I'm going to show you -- I'm

22  going to share my screen here and show you what I

23  have marked as Exhibit 12, 1-2, to your deposition.

24      A.    Okay.



1      Q.    I apologize for jumping around out of

2    order, but this is just how my numbering system

3    ended up working.

4            I'm going to scroll down here on this

5    first page and show you the label that says,

6    Pearson Exhibit 12.  Do you see that?

7      A.    Hang on.  That little sign came up

8    blocking everything again.  Okay.  There we are.

9    Okay.  So I have to --

10     MR. SIGALE:  You can't do anything with it.

11     THE WITNESS:  I can't do anything with it?

12   Okay.

13     MR. SIGALE:  No.  He's in charge.

14   BY MR. CHIMIENTI:

15     Q.    You see it says, Pearson Exhibit 12?

16     A.    Yes, I do see that.

17     Q.    And so I'm going to rotate this page a

18   second here because it's oriented differently.  It

19   says at the very top here, Illinois State Rifle

20   Association, Member Activity.  Do you see that?

21     A.    Yes.

22     Q.    And then underneath here it looks like

23   it says, Dues - primary three-year, and that is for

24   both Darin E. Miller and Jennifer J. Miller.  Do



1  you see that?

2        A.    Yes.

3        Q.    So is it correct to say that both

4  Millers would have paid $75 each for their

5  memberships for that three-year membership?

6        A.    They could have.  There's one other

7  membership that we have, which is an honorary

8  membership or a complimentary membership, which we

9  award people for doing good works for the cause of

10 firearms, firearm safety, firearm rights, whatever.

11       Q.    And what does a -- so, first of all, how

12 does somebody get one of those memberships?

13       A.    Generally, I or one of the board members

14 recommends that they get that membership.

15       Q.    And doing something for firearm rights,

16 would that include serving as a plaintiff in a

17 lawsuit?

18       A.    It would.

19       Q.    Do you know if Darin and Jennifer

20 Miller's memberships are of that complimentary

21 variety?

22       A.    Yes.

23       Q.    Is that, yes, they are complimentary,

24 or, yes, you know?



1     A.    Yes, I know, and, yes, they are

2   complimentary, to save time.

3     Q.    Thank you.  Okay.  I will take this off

4   the screen.

5           Other than renewing your dues at the

6   beginning of every year or however many years you

7   signed up for, is there anything else that somebody

8   needs to do to maintain their membership?

9     A.    They could become life members.  We have

10  different degrees of life membership, like

11  endowment, patron, benefactor, and so forth.

12    Q.    Okay.  You had mentioned that the

13  Millers have the complimentary level of membership.

14  Do you know who decided to give them that level of

15  membership?

16    A.    Yes.

17    Q.    Who was that?

18    A.    Me.  I did.

19    Q.    Okay.  When did you make that decision?

20    A.    Probably when it was entered, I would

21  guess.

22    Q.    And --

23    A.    The only date that I can tell you would

24  be the date that you showed me.



1       Q.    Why did you decide to give them the
2    complimentary membership?
3       A.    Because they were doing something that
4    we felt was important for firearm rights.
5       Q.    How did you become -- how did you meet
6    the Millers?
7       A.    I don't know that I have ever met the
8    Millers.
9       Q.    Fair point.  How did you become aware of
10   the Millers?
11      A.    We were working on cases, a complaint --
12   I do not remember which one -- about people who had
13   to do special things with their firearms, if they
14   had a day care center or -- what do you call the
15   other one -- day care or a foster home situation.
16   And that was a very long time ago, by the way.
17      Q.    Did the Millers ask for a membership to
18   the organization?
19      A.    No.
20      Q.    How did you approach them about becoming
21   members?
22      A.    I just decided that they deserved to be
23   members.
24      Q.    Did they know you were making them



RICHARD PEARSON 30b6                                      August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                                    75

1  members at the time?  I'm sorry.  Did you tell them

2  that you were making them members at the time?

3       A.    I don't recall actually.

4       Q.    Did anybody else have any input or

5  insight as to whether Jennifer or Darin Miller

6  became members of the organization?

7       A.    No.

8       MR. SIGALE:  I want to object as to form.  You

9  meant the organization?

10 BY MR. CHIMIENTI:

11      Q.    Sorry.  Did Jennifer or Darin -- strike

12 that.  Let me start over.

13            Did anybody else have any input or

14 insight as to whether Jennifer or Darin Miller

15 became members of the Illinois State Rifle

16 Association?

17      MR. SIGALE:  I'm going to object as to form

18 and vagueness.

19 BY MR. CHIMIENTI:

20      Q.    Do you understand my question, sir?

21      A.    Yes.

22      Q.    Okay.

23      A.    I decided alone.

24      Q.    Okay.  Have you ever spoken to either



RICHARD PEARSON 30b6                          August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                        76

1   Darin or Jennifer Miller?

2       A.    Not to my knowledge, no.

3       Q.    Has anyone from the Illinois State Rifle

4   Association ever spoken to Jennifer or Darin

5   Miller?

6       A.    I have no idea.

7       Q.    Shifting gears slightly here.  Has the

8   Illinois State Rifle Association ever applied for a

9   foster parent license in the State of Illinois?

10      A.    No.

11      Q.    Has the Illinois State Rifle Association

12  ever applied for a day care home license in the

13  State of Illinois?

14      A.    No.

15      Q.    Do the members' dues finance the costs

16  of litigation?

17      A.    Probably in some small part, but mostly

18  no.  I mean, it would be a penny or two at most, I

19  suppose.

20      Q.    Even with respect to that penny or two,

21  are the members told that their membership dues

22  might support litigation?

23      A.    Yes.

24      Q.    And how are they told that?



RICHARD PEARSON  30b6                          August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                        77

1        A.    They get a letter, and it's on the

2   website and we publish in a thing called The

3   Thursday Bulletin, constant updates or -- every so

4   many -- we give them an update when something

5   changes in the status of one of the lawsuits.

6        Q.    Do members have any opportunity to stop

7   the organization from litigating?

8        A.    Probably not, no.

9        Q.    Have any of the members communicated to

10  the Illinois State Rifle Association about this

11  lawsuit other than the Millers?

12       A.    I don't think so, but I don't really

13  know.

14       Q.    Has the organization, meaning the

15  Illinois State Rifle Association, sent any

16  communications to its members about this particular

17  lawsuit?

18       A.    It's just in the standard list of

19  lawsuits.

20       Q.    And that is on the website?

21       A.    It's on the website.  It's in the

22  Thursday Bulletin occasionally.

23       MR. CHIMIENTI:  And, David, I'll just make a

24  formal request on the record, to the extent that



1  there are any lists or mentions in the Thursday

2  Bulletins about this lawsuit, we would like to see

3  those.  Again, we'll include that in the e-mail.

4       MR. SIGALE:  I'm sorry.  I did not hear the

5  last couple words.  I did not mean to cut you off.

6       MR. CHIMIENTI:  I said that we'll include that

7  in the e-mail.  I'm just saying it for the record.

8       MR. SIGALE:  You are going to include that in

9  the e-mail, but, for the record, I have turned over

10  every mention in a Thursday e-mail or a Thursday

11  bulletin that referenced anything in your discovery

12  requests, including mentions of this lawsuit, but

13  if something pops up, I will certainly supplement.

14  But I will tell you, we have already done that.

15       MR. CHIMIENTI:  Okay.  Thank you.

16  BY MR. CHIMIENTI:

17       Q.    The Legal Assistance Committee that we

18  talked about earlier, Mr. Pearson, how is that

19  funded?

20       A.    Donations.

21       Q.    And when folks donate to the Legal

22  Assistance Committee, do they know what types of

23  lawsuits their money might end up supporting?

24       A.    No, other than that they are notified



1  occasionally what the lawsuits are.

2      Q.    Okay.  If I donated money today to the

3  Legal Assistance Committee -- strike that.

4      A.    I thought I had a donation coming.

5      Q.    Sorry.  If folks donate to the Legal

6  Assistance Committee, they don't necessarily have

7  any say over what types of litigation those

8  donations are going to support?

9      A.    No.

10      Q.    Okay.  In general -- and we have talked

11  about -- shifting gears slightly to communications

12  with members.  We talked about the Thursday

13  bulletins.  Those are mentioned.  We have mentioned

14  e-mails a couple of times, so I'll just ask this so

15  the record is clear.

16          In general, how does the Illinois State

17  Rifle Association communicate with its members?

18      A.    We have the Thursday bulletin.  We have

19  The Illinois Shooter, which is a quarterly

20  newspaper.  We have a range newsletter called Lands

21  and Grooves, but it only contains range stuff.  And

22  we have e-mails and Facebook, and, you know, I

23  guess some of the Facebook stuff goes to Instagram,

24  but it's the same stuff.



1      Q.    The Thursday bulletin, those are sent

2   out every Thursday?

3      A.    Hopefully, yes.

4      Q.    And how are those sent out?  Are those

5   in paper?  Are they in e-mail or some other format?

6      A.    There's an e-mail.  It's the e-mail, and

7   that e-mail is posted automatically to the website

8   and to the Facebook page.

9      Q.    E-mails, aside from the Thursday

10  bulletins, do you know about how often those go

11  out?

12     A.    It depends on the year, and, you know,

13  in the spring there are a lot of legislative alerts

14  that go out by e-mail except this year because the

15  legislature is not meeting.

16     Q.    It's just -- sorry.

17     A.    State that again so I get the whole

18  question.  I'm not sure I heard it all.

19     Q.    Sure.  The question was sort of other

20  than the -- other than those Thursday bulletins

21  which hopefully go out every Thursday, how often

22  does the organization communicate with its members

23  by other e-mails?

24     A.    Other e-mails.  You mean like an alert



RICHARD PEARSON 30b6                                    August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              81

1  or something like that?

2       Q.    Anything.

3       A.    It depends on the circumstances.

4  There's generally a lot of them during veto

5  session, during the spring sessions, the summer

6  sessions, but there has not been any of that, so,

7  you know, it's been quiet.

8       Q.    Who authors the Thursday bulletins?

9       A.    I do.

10      Q.    Does anybody review your writing before

11 it's sent out?

12      A.    I have the office manager check it for

13 grammar, but that is it.

14      Q.    You alone are responsible for the

15 substance?

16      A.    I am.

17      Q.    When the organization needs to send out

18 another e-mail, like a legislative alert, who is

19 responsible for authoring that communication?

20      A.    Usually, I am, but if I need someone to

21 give me a hand, it would be the legislation staff.

22 I generally ask the lobbyists to review it.

23      Q.    And, again, that review is for grammar

24 and accuracy?



1      A.    Yes.

2      Q.    Who is in charge of running the Facebook

3   account and Instagram account?

4      A.    Travis Akin.

5      Q.    Is Travis also responsible for the

6   Twitter account?

7      A.    Probably.  It goes -- when he posts

8   something, it goes to all of those three

9   automatically.  His job is just to make sure that

10  it's posted really.  That is all he really does.

11     Q.    Does Travis author all of those

12  communications?

13     A.    No.  I author the communications.  He

14  just makes sure that they are posted.

15     Q.    Okay.  In general -- well, strike that.

16           Has the Illinois State Rifle Association

17  ever communicated with its members, either through

18  social media, through these Thursday bulletins, or

19  otherwise, about foster parenting?

20     A.    No, not that I know of.

21     Q.    About day care?

22     A.    No.

23     Q.    About child care generally?

24     A.    No.



RICHARD PEARSON 30b6                                    August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              83

1        Q.    About firearm storage?

2        A.    Probably at some point, you know.  We

3   send out all kinds of literature and things like

4   that from the NRA and the National Shooting Sports

5   Foundation.  I'm sure that's contained in that

6   literature from time to time.  Most of that is on

7   requests --

8        Q.    What about ammunition storage, do you

9   ever communicate with members about that?

10       A.    Yes, that would be included in that

11  communication.

12       Q.    Okay.  Does the same go for firearm

13  safety?

14       A.    Yes.  It is all one communication.

15       MR. CHIMIENTI:  Okay.  So we have been going

16  for about another hour.  This is probably another

17  logical time to take a break, if you want one, but

18  I'm also happy to keep going, Mr. Pearson.  It's up

19  to you.

20       THE WITNESS:  I'm fine.

21  BY MR. CHIMIENTI:

22       Q.    All right.  The Illinois State Rifle

23  Association is a plaintiff in this lawsuit,

24  correct?



```
1        A.    Yes.

2        Q.    And are you aware of who the two

3   defendants are?

4        A.    Yes.

5        Q.    Who are they?

6        A.    Well, Department of Children and Family

7   Services and Kwame Raoul in his position as

8   Attorney General.

9        Q.    How has the Illinois State Rifle

10  Association been harmed by the Department of

11  Children and Family Services?

12       A.    Because of diminishing the rights -- the

13  Second Amendment rights of people who have foster

14  care or day care licenses.

15       Q.    Okay.  And are those people -- so do you

16  know if any of those people are your members?

17       A.    Two are.

18       Q.    Did you say that two are?

19       A.    The Millers.

20       Q.    The Millers.  Other than the Millers, do

21  you know of any other members who have been

22  affected by DCFS's regulations in this case?

23       A.    No.

24       Q.    You also mentioned that the Attorney
```



 1  General is the other defendant.  Can you describe

 2  how the Illinois State Rifle Association has been

 3  harmed by the Attorney General in this case?

 4       A.    The Attorney General is the officer who,

 5  by his position, gets named in the lawsuit.

 6       Q.    What do you mean by that?

 7       A.    Because he's the Attorney General, so we

 8  sue the State of Illinois.  He is the person who

 9  receives the suit.

10       Q.    So is it your understanding that because

11  Illinois State Rifle Association is trying to sue

12  the State in general, it needs to sue the Attorney

13  General?

14       A.    Right, and the head of the Department of

15  Children and Family Services.

16       Q.    Beyond that understanding, is there

17  any -- is there any other reason why the Illinois

18  State Rifle Association named the Attorney General

19  in this lawsuit?

20       MR. SIGALE:  I'm just going to object as to

21  foundation.  Mr. Pearson is not an attorney and

22  doesn't have that -- it's not in his wheel of

23  knowledge.  With that objection, you can answer, if

24  you can.



RICHARD PEARSON  30b6                           August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                          86

```
 1   BY THE WITNESS:
 2       A.    Repeat the question, please.
 3   BY MR. CHIMIENTI:
 4       Q.    Sure.  Is there any other reason why the
 5   Illinois State Rifle Association named the Attorney
 6   General as a defendant in this lawsuit?
 7       MR. SIGALE:  Same objection.  Go ahead.
 8   BY THE WITNESS:
 9       A.    No.
10   BY MR. CHIMIENTI:
11       Q.    Has the organization -- what is your
12   understanding of what this lawsuit is challenging?
13       A.    We are challenging the prohibition of
14   people who have day care or foster care of having
15   firearms to defend themselves or those in their
16   care or their families readily available to them.
17       Q.    When you say "readily available," what
18   do you mean?
19       A.    There's no way that you can -- the
20   requirement -- can I go into this?
21       MR. SIGALE:  You can answer the question to
22   the best of your ability.
23   BY THE WITNESS:
24       A.    The requirement is that they be
```



1  unloaded, taken apart, and stored, inaccessible,

2  and a handgun can't be on the premises at all,

3  unless it's a law enforcement officer.  The

4  ammunition must be separate.

5           There's no reason for that.  We don't

6  really object to the fact that they be locked up,

7  but to take a firearm apart is a -- makes it

8  impossible to put together fast enough if you ever

9  needed it, and besides if you take firearms apart

10 and you try to put them together in a hurry, they

11 are likely not to work or become dangerous because

12 they are not put together right.

13          The fact that the ammunition is separate

14 makes it even more difficult should this -- should

15 someone have to defend those children or

16 themselves, so that is why we are objecting.  We

17 are not objecting necessarily that they be locked.

18 It's just that they be taken apart and unloaded.

19      Q.    Is there something that your

20 organization normally does that it's unable to do

21 as a result of these rules in question?

22      A.    That the organization can't do?

23      Q.    (Nodding head.)

24      A.    We are certainly not fulfilling our



1  ability to defend the rights of gun owners to

2  pursue their Second Amendment rights because that

3  is what we are here for.  That diminishes their

4  Second Amendment rights, and it actually prohibits

5  their Second Amendment rights by having them taken

6  apart and ammunition in a different place.

7        Q.    Again, just to confirm, as far as you

8  are aware, the only members of the organization who

9  are affected by these rules are the Millers,

10  correct?

11        A.    As a member of the organization, that

12  would be true.

13        Q.    Has there been any -- has the

14  organization diverted any funds or resources to

15  address these regulations?

16        A.    Well, the regulations are actually

17  approved by JCAR, and so the only way to change

18  that other than this lawsuit would be to have new

19  regulations submitted to JCAR and have them

20  approved by JCAR, which would be over the

21  objections of DCFS, I'm sure, or have DCFS approach

22  JCAR and say, We want to take this requirement out

23  of the regulations.

24        Q.    Is it your understanding that DCFS is



1  the organization that came up with these

2  regulations?

3      A.    Yes.

4      Q.    During any point in which DCFS either

5  was making these regulations or modifying these

6  regulations at any point, had the Illinois State

7  Rifle Association ever offered any commentary or

8  insight to DCFS other than this lawsuit as to what

9  they think the rules should be?

10     A.    No, I don't think so.

11     Q.    How did --

12     A.    I don't know --

13     Q.    I'm sorry?

14     A.    I don't believe so.  I did call DCFS

15  years ago and object to that, but that is where I

16  left it.

17     Q.    Do you remember who you spoke to?

18     A.    No.  It was like 20 years ago.  I don't

19  remember the member's name at the time.  He has

20  since retired, but I have -- this has been going on

21  for a long time actually.

22     Q.    Other than this phone call to the person

23  whose name you are not sure of, did the Illinois

24  State Rifle Association make any other attempt



1  other than this lawsuit to comment on the rules in

2  question?

3       A.    No, because the comment period on those

4  rules is over.

5       Q.    How did the organization -- how did the

6  Illinois State Rifle Association become aware of

7  the rules in question?

8       A.    Because of complaints of members.

9       Q.    Which members?

10      A.    Well, the Millers would be one, of

11 course, but there have been other complaints, but I

12 don't remember who they were from.  I remember one

13 in the 1990s, his name was Saltreal, but that was

14 30 years ago so...

15      Q.    Can you spell that last name for me?

16      A.    No.  I never could spell the last name.

17      Q.    Okay.  And, you know, at present the

18 only members that you are aware of who this affects

19 is the Millers, correct?

20      A.    As far as I know, yes.

21      Q.    Did the Millers ever reach out to you or

22 the organization to complain about these rules?

23      A.    I personally have never spoken to the

24 Millers.



1      Q.     Do you know if they have contacted

2  anybody else at the organization to complain about

3  these rules specifically?

4      A.     No.

5      Q.     Did anyone at the organization -- strike

6  that.

7             Did anyone at the Illinois State Rifle

8  Association speak to Jennifer or Darin Miller

9  before this lawsuit was filed?

10     A.     I do not know.

11     Q.     What outcome does Illinois State Rifle

12  Association hope to achieve through this lawsuit?

13     A.     The outcome that we would like to see is

14  people who have day care and foster care be able to

15  keep a loaded firearm, particularly a handgun,

16  locked in a safe, loaded, and ready for use should

17  danger arise to themselves or any of the people in

18  their care.

19     Q.     Does that outcome require that these

20  regulations in question be struck down or

21  eliminated entirely?

22     A.     Yes.

23     Q.     I'm going to show you -- I'm going to

24  share my screen here, Mr. Pearson.  Based on our



1   conversation earlier, you have probably seen this

2   document before, but I just put it up on the

3   screen.  And I'll zoom out, so we can see more of

4   the page.

5        A.    Okay.

6        Q.    I have marked this as -- here on the

7   bottom, you'll see it says, Pearson Exhibit 5.  Do

8   you see that?

9        A.    Yes.

10        Q.    And the title of this document is

11   Amended Complaint for Declaratory and Injunctive

12   Relief.  Do you see that?

13        A.    Yes.

14        Q.    When you said earlier that you reviewed

15   the lawsuit, is this the document that you looked

16   at?

17        A.    One of them.

18        Q.    Okay.  I'm going to scroll down here to

19   page 6 of the document, and I'm going to direct

20   your attention here to paragraph 20, and I'll zoom

21   in on it so you can see a little bit better.

22       MR. SIGALE:  Do you have a printout?  Would it

23   be easier for you?

24       THE WITNESS:  I can see it here.

1  BY MR. CHIMIENTI:

2      Q.    If you can follow along me, it says,

3  Members of ISRA who are day care home licensees

4  and/or foster parents in Illinois would possess and

5  carry loaded and functional handguns for

6  self-defense but refrain from doing so because they

7  fear their day care home licenses and/or foster

8  care licenses being denied and/or revoked by the

9  State.  Do you see that?

10     A.    I do.

11     Q.    The thing I want to zero in on here is

12  in the second line, it says that they "would

13  possess and carry loaded and functional handguns

14  for self-defense."  What does that mean?

15     A.    That means that if they had a concealed

16  carry permit, they would carry a firearm concealed

17  on their person while those children were in their

18  care in their home or wherever it is.

19     Q.    How do you know that those members would

20  do that?

21     A.    I don't know that they would do that,

22  but I know they are owed the opportunity to do

23  that.

24     Q.    Do you know -- sorry.



1            Did anyone at the Illinois State Rifle

2    Association ask whether the Millers would, in fact,

3    do that?

4        A.    I don't know.

5        Q.    Do you know one way or the other whether

6    the Millers would, in fact, possession and carry

7    loaded and functional handguns for self-defense?

8        A.    I do not.

9        Q.    I'm sorry.  What was that?  I did not

10   catch that.

11       A.    I do not know if they would.

12       Q.    Okay.  I'm going to take this off the

13   screen.

14            You know, you had mentioned earlier --

15   when we talked about the relief that the

16   organization is seeking, I asked you whether that

17   requires that these rules be eliminated, and you

18   said that they would be.

19            Do you think or does the organization

20   believe that there should be a rule in place

21   governing the storage of firearms in a foster home?

22       A.    There can be, but it can't be so

23   prohibitive that they cannot be used for

24   self-defense.



1      Q.    So that was going to be my next

2   question.   What does the organization believe the

3   rules should be in a foster home?

4      A.    In a foster home or day care, wherever,

5   that they be locked -- be allowed to be loaded,

6   ready for use, but locked in a safe or some

7   security device.

8      Q.    And that is whether it's foster home or

9   day care home, correct?

10     A.    Yes.

11     Q.    What is the organization -- sorry.

12           Is that rule that you just -- that you

13   just described for us, do you believe that is

14   consistent with the Second Amendment?

15     A.    The Second Amendment allows some

16   regulation, but it doesn't allow a prohibition, so

17   that combined with the ability of the foster

18   parents to carry with children at home, if they see

19   fit and with proper training.  That is what we

20   would like to see.

21     Q.    And that sort of scenario that you just

22   described in terms of foster parents and day dare

23   parents being able to carry and store locked and

24   loaded, do you believe that is consistent with what

RICHARD PEARSON 30b6                                August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                           96

1   the Second Amendment allows?

2        A.    I do in this case.  Some regulation is

3   allowed, but that regulation does not have to be

4   exactly the same across the board for every

5   circumstance.

6        Q.    Can there be different rules for foster

7   parents as opposed to regular everyday citizens?

8        A.    Yes, I think so.

9        Q.    Can there be different rules for day

10  care home providers as opposed to regular every day

11  citizens?

12       A.    Yes.

13       Q.    What are you basing that on?

14       MR. SIGALE:  Object as to form, vague.  If you

15  understand, go ahead and answer.

16  BY THE WITNESS:

17       A.    Well, say that again, please.  I'm

18  sorry.  I lost my train of thought.

19  BY MR. CHIMIENTI:

20       Q.    To summarize your last -- our last

21  exchange there, you had answered that you believe

22  that foster parents and day care home parents can

23  be treated differently than everyday regular

24  citizens, and I'm asking you what you are basing



1  that on?

2      A.    Because they have children in their home

3  that are not their own, and so it may require an

4  extra level of care, like locking the firearm, if

5  it's not carried by one of the people, but still

6  loaded and ready for use if the authorized person

7  retrieves it.

8      Q.    And that is, I think you just mentioned,

9  because those children in their care require an

10  extra level of care; is that correct?

11      A.    Well, a different level of care maybe,

12  but maybe an extra level of care.  But, you know --

13      Q.    Okay.

14      A.    That is a yes.

15      Q.    Okay.  What is the organization's

16  position on how foster parents or day care home

17  providers should keep the children safe from gun

18  injuries?

19      A.    Well, they would be safe from gun

20  injuries.  You don't have to take the firearm apart

21  and put ammunition in a separate place to keep them

22  safe from gun injuries.  You just to have to make

23  sure that they are secure, loaded or not loaded,

24  either in a safe or some device.  It doesn't have



RICHARD PEARSON  30b6                          August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                         98

1  to be a safe.  Or on a qualified person's body.

2      Q.    Sorry.  Sir, I'm flipping through my

3  notes here, and I'm trying to find the next portion

4  to save us some time.  Give me one moment.

5      A.    Okay.

6      Q.    Are you aware of any examples of

7  Illinois State Rifle Association members not being

8  able to defend themselves because of these rules?

9      A.    No.

10     Q.    Shifting gears slightly.  You had

11 mentioned earlier that you have got the Thursday

12 bulletins, The Illinois Shooter.  Other than those

13 two, does the organization have any other

14 publications, such as a periodical or a newsletter?

15     A.    Yes.

16     Q.    What is that?

17     A.    It is Lands and Grooves that goes to

18 members of the range.

19     Q.    And how often is that range document

20 sent out?

21     A.    Twice a year hopefully.

22     Q.    Hopefully it is sent out twice a year.

23 Does that document cover anything about foster

24 parents or day care?



```
 1           A.    No.

 2           Q.    Anything about child care?

 3           A.    No.

 4           Q.    Does it discuss firearm safety?

 5           A.    No.

 6           Q.    Does it discuss firearm storage?

 7           A.    No.

 8           Q.    What about ammunition storage?

 9           A.    No.

10           Q.    Who is responsible for writing that

11    range document?

12           A.    Me, Richard Pearson.

13           Q.    Do you have another staff person review

14    it for spelling and grammar?

15           A.    Yes.

16           Q.    But you are responsible for the ultimate

17    content?

18           A.    Yes.

19           Q.    Other than the range document, the

20    Thursday bulletin, and The Illinois Shooter, any

21    other newsletters or periodicals published by the

22    Illinois State Rifle Association?

23           A.    No.

24           Q.    How often does The Illinois Shooter go
```



1  out?

2       A.    Quarterly.

3       Q.    And who writes the articles in The

4  Illinois Shooter?

5       A.    A lot of people.  We have -- we hire

6  some authors.  We pay them to the write an article.

7  We have some volunteer articles.  It's really

8  everywhere.

9       Q.    Is there a vetting process for how those

10  articles get included in the final product?

11       A.    Yes.  I look at them and the editor

12  looks at them, but the editor actually is really

13  the one who does all of that.

14       Q.    What sorts of topics are covered in The

15  Illinois Shooter?

16       A.    Oh, my.  Well, we cover, of course,

17  competition shooting.  We cover often classes.  We

18  cover -- we have an article coming up on women

19  selecting firearms.  We have articles on hunting.

20  We have really articles on every aspect of the

21  shooting world at some time or another probably, or

22  at least we try to, and fishing too.

23       Q.    Fishing too?

24       A.    Yeah.



1    Q.    I assume that The Illinois Shooter does

2    not cover topics like foster care, day care, or

3    child care?

4    A.    No.

5    Q.    And how is The Illinois Shooter sent

6    out, in what format?

7    A.    It's mailed to every member, primary

8    member.

9    Q.    And does it also go on the website?

10    A.    No.  We have tried that.  It's just too

11    big, so it doesn't fit.

12    Q.    Is it available in e-mail format?

13    A.    No.

14    Q.    Just a couple of quick questions about

15    the Millers generally.  I'm going to put the Miller

16    membership pages back on the screen here,

17    Mr. Pearson, just so we can reference them.

18    A.    Okay.

19    Q.    This is Exhibit 12.  I have got, again,

20    up at the upper left-hand corner, Illinois State

21    Rifle Association, Member Activity.  Do you see

22    that?

23    A.    Yep.

24    Q.    And then it says, Start date, 4/16/2018.



1  Do you know whether that represents the date that

2  the Millers became members?

3       A.   Yes, that is the start date.

4       Q.   Do you know if they were members before

5  then?

6       A.   I think they were.

7       Q.   Is there any way that you would be able

8  to confirm that?

9       A.   I don't know how --

10      Q.   Let me ask it a different way.  Sorry.

11  What would you need to do to figure out whether

12  they were members before that?

13      MR. SIGALE:  I'm going to just object to form.

14  Are you asking if the start date was something

15  before that, or are you asking if they were members

16  in the past?  Your question was --

17  BY MR. CHIMIENTI:

18      Q.   I'll ask a different question.

19           Do you know whether they were members

20  before April 16th of 2018?

21      A.   I think they were, but I don't really

22  know.  The problem is it's in the old database that

23  we no longer have, so that is the problem.

24      Q.   Okay.



1    A.    But I'll look.  If I can find it, I'll

2  give it to you.

3    MR. CHIMIENTI:  To the extent -- I mean,

4  David, again, I know this document was produced in

5  response to discovery, but to the extent that there

6  are documents evidencing the Millers' membership

7  pre-4/16/18, we would like to see those too.

8    MR. SIGALE:  Mr. Pearson will check to see if

9  there's a record of it, I believe, and I can't look

10  it up right now because my computer is obviously in

11  use.  But I believe the Millers stated in their

12  interrogatory answers that they have been members

13  in the past, but I don't have that in front of me

14  and I can't look at it right now.

15    MR. CHIMIENTI:  Okay.

16    MR. SIGALE:  So I'm going off Mr. Pearson's

17  answer, which is if he can find something in the

18  database indicating one way or the other, we will

19  turn it over, but understand that it is something

20  that we had checked for originally.

21    MR. CHIMIENTI:  Okay.  Thank you.

22  BY MR. CHIMIENTI:

23    Q.    Taking that off the screen.  Do you know

24  whether the organization has communicated directly



1   with the Millers?

2       A.    I have not.

3       Q.    Has anybody else in the organization?

4       A.    I don't think so, but I truly don't

5   know.

6       Q.    How did the organization become aware

7   that Jennifer and Darin Miller were licensed foster

8   parents?

9       A.    I don't remember really.  I don't

10  remember.

11      Q.    How did they become -- how did the

12  organization -- sorry.

13            How did the Illinois State Rifle

14  Association become aware of the Millers' home

15  license?

16      A.    I don't know that either.

17      MR. CHIMIENTI:  So let's -- so it's

18  about 11:40 -- I'm sorry.  Hold on one second.

19  BY MR. CHIMIENTI:

20      Q.    Is there anybody at the organization who

21  would know how the organization became aware of

22  their foster and day care status?

23      A.    I don't think so.  I don't know.  I

24  mean, I don't know.



RICHARD PEARSON  30b6                                    August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              105

1        MR. CHIMIENTI:  Okay.  So we have been going

2   for about an hour and a half.  There's maybe one

3   more section here that I could probably get through

4   before noon, and then we take a lunch break, if

5   that sounds okay, Mr. Pearson.

6        THE WITNESS:  That's fine.  Where are we

7   going?

8   BY MR. CHIMIENTI:

9        Q.    Let's talk about foster parenting

10  generally.  What is your understanding of what

11  foster parenting entails?

12       A.    Well, my understanding of a foster

13  parent -- I'm not really an expert in this, but

14  they take over the care and raising of children who

15  for some reason are out of their own home.

16       Q.    Okay.  And that requires the foster

17  parents to take in children who are not their own,

18  correct?

19       A.    Yes.

20       Q.    And would you agree that those children

21  have been placed in the care of the State as well?

22       A.    Yes.

23       Q.    Meaning that the State is also

24  responsible for those children, correct?



1        A.      Correct.

2        Q.      And that sometimes foster parenting can

3   lead to adoption, but, otherwise, foster parenting

4   is temporary, correct?

5        A.      Correct.

6        Q.      Would you agree that the Illinois

7   Department of Children and Family Services or DCFS

8   is the organization that oversees foster parents in

9   the State of Illinois?

10       A.      I believe that is true, yes.

11       Q.      Is DCFS in a better position than the

12  Illinois State Rifle Association to create the

13  regulatory framework for foster parenting in

14  Illinois?

15       A.      Yes.

16       Q.      We have mentioned this a couple times,

17  but to make it clear for the record, the Millers

18  are licensed foster parents; is that your

19  understanding?

20       A.      It is.

21       Q.      And do you know whether -- based on what

22  we just said, would you agree that that license was

23  given to them by DCFS?

24       A.      I'm sure it was, yes.



RICHARD PEARSON 30b6                          August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                       107

1        Q.    And in order to get that license, they

2   needed to meet certain requirements and pass

3   certain benchmarks set out by DCFS, correct?

4        A.    Correct.

5        Q.    They needed to undergo home inspections?

6        MR. SIGALE:  I'm sorry.  Are you asking a

7   question?

8   BY MR. CHIMIENTI:

9        Q.    Yes.  Do you know if they had -- they

10  underwent any home inspections?

11       A.    I have no idea, but I'm sure they did.

12       Q.    Or, like, a criminal background check?

13       A.    I'm sure.

14       Q.    A health check?

15       A.    I don't know, but possibly.

16       Q.    DCFS-approved training?

17       A.    I do not know.

18       Q.    Okay.  And these various checks and

19  requirements are things that DCFS does to ensure

20  the safety and health of those foster children;

21  would you agree with that?

22       A.    I'm sure that is their intent, yes.

23       Q.    Okay.  And throughout this foster

24  parenting process, would you agree that the health



1  and safety of the foster children is paramount?

2       A.    Yes.

3       Q.    Do you -- well, I'll just ask it.  Do

4  you know if there are any consequences for

5  violating a licensing rule?

6       A.    I'm sure there are, probably loss of

7  your license.

8       Q.    Well, do you know if there are any --

9  sorry.

10            Do you know if there are any sort of

11  intermediary steps like warnings or corrective

12  action before you lose your license?

13       A.    I would hope there would be, but I don't

14  know that for sure.

15       Q.    And we mentioned that these children

16  coming into a foster home are not the -- they are

17  not the biological children of the foster parents.

18  Do you remember that?

19       A.    Yes.

20       Q.    And would you agree that these children

21  coming into the foster home might have no training

22  on firearms?

23       A.    Yes.

24       MR. SIGALE:  Objection as to speculation.



RICHARD PEARSON 30b6                                  August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                        109

1   BY THE WITNESS:

2        A.    It's speculation, but yes.

3   BY MR. CHIMIENTI:

4        Q.    You would agree that some of those

5   foster children might not even know what a firearm

6   is regardless of how old they are?

7        MR. SIGALE:  Same objection.  Go ahead and

8   answer.

9   BY THE WITNESS:

10       A.    Yes, possibly.

11  BY MR. CHIMIENTI:

12       Q.    You also agree that some of those

13  children might not know what appropriate steps to

14  take when they see a firearm?

15       MR. SIGALE:  Same objection.  You can answer.

16  BY THE WITNESS:

17       A.    Possibly.

18  BY MR. CHIMIENTI:

19       Q.    And you would also agree that the foster

20  parents might have limited knowledge of the extent

21  of firearm training a child received in their

22  previous living situation?

23       MR. SIGALE:  Same objection.

24



1  BY THE WITNESS:

2       A.    Possibly.

3  BY MR. CHIMIENTI:

4       Q.    Okay.  Let's shift gears really quick

5  and talk about day care, day care homes in

6  particular.  What is your understanding of what a

7  day care home is and what a day care home does?

8       A.    Well, I think it takes children of

9  others in for short periods of time, like when the

10 parent is working or something.

11      Q.    So it involves an individual running a

12 child care service out of their home; is that

13 correct?

14      A.    Yes.

15      Q.    And that the person who is running the

16 day care home is caring for children that are not

17 their own children in many cases?

18      A.    Correct.

19      Q.    And that the parents of those children

20 pay the home day care provider for that service,

21 correct?

22      A.    Yes.

23      MR. SIGALE:  Objection, misleading,

24 speculation.  Go ahead.



1  BY THE WITNESS:

2      A.    I assume they do.

3  BY MR. CHIMIENTI:

4      Q.    Would you agree that day care home

5  providers are running a business?

6      A.    Yes, I would guess they are.

7      MR. SIGALE:  I'll object as to -- I'll object

8  as to foundation and speculation, but you can

9  answer.

10  BY MR. CHIMIENTI:

11      Q.    And would you --

12      MR. SIGALE:  Never mind.  Sorry.  Go ahead.

13  BY MR. CHIMIENTI:

14      Q.    Would you agree that the Illinois

15  Department of Children and Family Services is the

16  organization that oversees day care homes in the

17  State of Illinois?

18      A.    They are.

19      Q.    And would you agree that DCFS is in a

20  better position than the Illinois State Rifle

21  Association to create the regulatory framework for

22  day care homes in the state?

23      A.    In some cases.

24      Q.    In what cases is the Illinois State



1  Rifle Association in a better position to create a

2  regulatory framework for day care homes than the

3  Department of Children and Family Services?

4      A.   We have a better understanding of

5  firearms and firearm owners than they do.

6      Q.   Does the Illinois State Rifle

7  Association have any licensing functions for day

8  care in the state?

9      A.   No.

10      Q.   Does the Illinois State Rifle

11  Association have any licensing functions for foster

12  care in the state?

13      A.   No.

14      Q.   Does the Illinois State Rifle

15  Association have any oversight functions for day

16  care in the state?

17      A.   No.

18      Q.   Does the Illinois State Rifle

19  Association have any oversight functions for foster

20  care in the state?

21      A.   No.

22      Q.   With respect to day care, would you

23  agree that the day care providers need to be

24  qualified to care for the children that are



1   entrusted to them?

2       MR. SIGALE:  I'll object as to form and

3   vagueness.  You can answer.

4   BY THE WITNESS:

5       A.   Yes.  There are some requirements, yes,

6   some processing requirements.

7   BY MR. CHIMIENTI:

8       Q.   Do you know whether the Millers have a

9   day care home license?

10      A.   No.

11      Q.   Do you know whether -- we talked about

12  sort of the vetting steps that DCFS takes for

13  foster parents.  Do you know whether there are

14  similar vetting steps that DCFS takes before

15  licensing day care homes?

16      A.   I would guess there would be.

17      Q.   Do you know whether there are home

18  inspections for day care homes?

19      A.   No, I do not.

20      Q.   Do you know whether there are medical

21  examinations required for day care home providers?

22      A.   I do not know that.

23      Q.   Do you know whether there is training

24  required by DCFS?



1       A.    I don't know that either.

2       Q.    Okay.  And, again, would you agree that

3  in the day care home setting, just like in the

4  foster care setting, the safety and health of the

5  children is paramount?

6       A.    Yes.

7       Q.    And, again, in the day care home

8  setting, do you know whether there are consequences

9  for violating licensing rules?

10      A.    I would guess there are.

11      Q.    And do you know what sorts of -- I guess

12  for lack of a better term -- levels of discipline

13  could be involved?

14      A.    I do not know that.

15      Q.    And you don't know whether there are

16  warnings that could be issued?

17      A.    No, I do not.

18      Q.    Or corrective action to rectify the

19  issue?

20      A.    I don't know that.  I would think there

21  would be.

22      Q.    And then ultimately, at the very end,

23  potentially a loss of the license?

24      A.    I would think so, yes.



1    Q.    Now, again, we spoke that -- and I think

2  even you testified earlier that when children who

3  are not your own come into your home, you might not

4  know what familiarity that child has with firearms.

5  Do you remember that testimony?

6    A.    I do.

7    Q.    Okay.  So, similarly, for day care

8  homes, would you agree that it's possible that a

9  child coming into a day care home might have no

10 training on firearms?

11   A.    I do.

12   Q.    Do you agree that it's possible that

13 some of those kids might not even know what a

14 firearm is, regardless of how old they are?

15   A.    It might be possible.

16   Q.    And that they might not know what to do

17 when they see a firearm?

18   A.    That might be possible too.

19   Q.    And that day care home licensees might

20 not have any knowledge of what training the

21 children's parents have given them relating to

22 firearms?

23   A.    That might be true also.

24   MR. CHIMIENTI:  Okay.  So, Mr. Pearson, like I



RICHARD PEARSON  30b6                                    August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              116

1  said, we could run through that list of topics

2  relatively quickly, and we are at a logical

3  breaking point for lunch.  David, it's 11:50.  How

4  does 12:30 sound?

5      MR. SIGALE:  Yeah, that is fine by me.

6      MR. CHIMIENTI:  Okay.  So we'll go off the

7  record, and we'll come back at 12:30.

8                  (WHEREUPON, at 11:50 the deposition

9                  was recessed until 12:30 this date,

10                 08/18/20.)

11     MR. CHIMIENTI:  We are back on the record

12  after our lunch break.

13  BY MR. CHIMIENTI:

14     Q.   Mr. Pearson, welcome back.  Before we

15  jump back into the next section of questions I have

16  for you, I would like to clarify something that you

17  said this morning, and I want to make sure that I

18  heard you right.

19          So when we were talking about what the

20  Illinois State Rifle Association would like the

21  rule or the framework to be for foster parents and

22  day care homeowners, I think I heard you say that

23  you would like them to be able to store their

24  firearms locked and loaded unless they are



1   concealed carry licensees, then they can carry on

2   their person.  Did I mishear that, or is that what

3   you said?

4        A.    That is what I said.

5        Q.    Okay.  Is it necessary for someone to be

6   a concealed carry licensee for them to carry on

7   their person?

8        A.    Not in their own home or premises.

9        Q.    Should that be a requirement if they are

10  going to carry on their person in a foster home or

11  day care home?

12       A.    I don't know.

13       Q.    What is the organization's position on

14  that?

15       A.    I would say that it would be all right

16  to me if that was required, if they have a

17  concealed carry license, if they are going to carry

18  on their person in their day care or foster home.

19       Q.    Okay.  Let's move on to a -- there was a

20  list of topics to your 30(b)(6) notice about the

21  organization's various positions on certain

22  substantive matters related to this lawsuit, and

23  the first topic on that list is gun safety.

24             So what -- in the position of the



1  Illinois State Rifle Association, what does firearm

2  safety mean?

3      A.    It means that everybody should be aware

4  of what firearm safety is.  They should be aware of

5  the general rules of firearm safety, which are

6  several.

7      Q.    What are the general rules of firearm

8  safety?

9      A.    There are three primary rules.  The

10  three primary rules are always keep your firearm

11  pointed in a safe direction, do not have your

12  finger on the trigger, and do not load it until

13  it's ready for use.

14      Q.    And we touched on this, I think, a

15  little bit earlier.  When you say that you don't

16  load it until it's ready for use, what do you mean

17  by that?  I guess when you say "ready for use,"

18  what do you mean by that?

19      A.    In the case of sporting arms, they are

20  stored, and you don't load them until you get it

21  into the field or you get it to the range or

22  wherever.

23          For self-defense firearms, they have to

24  be for use, so they should be loaded for when you



1  want to access them, which should be nearly all of

2  the time.

3      Q.   Does the organization commit these

4  rules, the three gun safety rules, to its

5  membership in some way?

6      A.   They are almost everywhere.  We post

7  them.  I think we sent you a set of range rules

8  that have those general rules in them.  They are

9  generally repeated everyplace.  They go to specific

10 ranges, but in general there are ten rules.

11     Q.   There are ten rules?

12     A.   Right, in general.  Those are the three

13 primary.  Okay?  Do you want the other ones?

14     Q.   I would like all ten, if you have them

15 readily available.

16     A.   First of all, don't use alcohol or drugs

17 while handling any firearm, and that can include

18 things like antihistamines, anything that would --

19 if the label on the drug says, Be careful operating

20 mechanical devices, a firearm is a mechanical

21 device and that should be adhered to.

22          And one of them is, be sure of your

23 target.  Make sure that you store your firearm so

24 it's inaccessible to unauthorized persons.  Wear



RICHARD PEARSON  30b6                          August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                        120

1  ear and eye protection when using your firearms.

2  Let's see.  Make sure you store your ammunition

3  properly in a cool, dry place.  It does not like

4  hot, damp weather.

5         And there are specific areas for

6  different firearms, or different rules may apply,

7  like on ranges, like outdoor ranges or indoor

8  ranges, so those are generally covered under one

9  big giant rule, which then applies specifically.

10  On our range rules, there are examples of that.

11     Q.    You had mentioned earlier that depending

12  on the purpose of the gun -- or depending on the

13  purpose of the firearm is how it should be stored

14  or what constitutes whether it's in use or not.  Is

15  a self-defense firearm limited to a handgun?

16     A.    It's not limited to a handgun, no.

17  Under the Illinois Concealed Carry Act, it is, but

18  it is still a concealable handgun however.

19     Q.    In a general sense, a self-defense

20  firearm can be any form of firearm?

21     A.    In a general sense, yes.

22     Q.    Speaking about these rules that you had

23  just mentioned, you had mentioned that there's

24  three of them, and then you told me the big three



RICHARD PEARSON 30b6                           August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                        121

1   and then you told me the ten.

2            I'm going to share my screen with you

3   and show you what I have marked as Exhibit 7 to

4   your deposition.  This is the full 2014 version of

5   The Illinois Shooter.  Do you see that at the top?

6       A.    Yes.

7       Q.    And then at the very bottom, it says,

8   Pearson Exhibit 7.  Do you see that on the bottom

9   right?

10      A.    Not yet I don't, no.  It is Shooting

11  Safety Rules on the right-hand side.

12      Q.    Yeah.  Then at the bottom here it says,

13  Pearson Exhibit 7?

14      A.    It's still not there.

15      MR. SIGALE:  You need to scroll down further.

16  Either that or it's not there.

17  BY THE WITNESS:

18      A.    There I see it.  I see it now.

19               (WHEREUPON, discussion was had off

20               the record.)

21  BY MR. CHIMIENTI:

22      Q.    So as you mentioned here, on the

23  right-hand side of the document, there's these

24  shooting safety rules.  Do you see where that is?



1        A.    It's going through my screen now, but

2    you have to scroll up to get it.

3        MR. CHIMIENTI:  I think I was just

4    disconnected from the Zoom.  Let's go off the

5    record for second while I try to reconnect.

6                    (WHEREUPON, there was a short

7                    interruption.)

8    BY MR. CHIMIENTI:

9        Q.    Now, Mr. Pearson, do you see on the

10   right-hand side the shooting safety rules?

11       A.    Yes.

12       Q.    And I noticed that the big three -- of

13   the big three that you told me, one of those was to

14   keep your firearms unloaded until they are ready to

15   be used, but I don't see that rule here in what you

16   have published to your membership, and I was

17   wondering if you could tell me why.

18       A.    I have no idea why.  I never saw that

19   before that I can recall.

20       Q.    Okay.  Do you know how else -- I mean,

21   you mentioned the range manual, and we'll get there

22   in a second.  Do you mention -- do you know how

23   else these shooting safety rules are disseminated

24   to your membership?



1     A.    Oh, in brochures, National Shooting

2  Sports Foundation brochures.  We sometimes give

3  them a card.  New shooters, we give them a card

4  that simply states the ten, like I stated the ten,

5  like this states the ten.

6     MR. SIGALE:  Can you scroll down so I can see

7  what the others are?

8     THE WITNESS:  There's only six.

9     MR. SIGALE:  Are there only six?  So I see

10 them all?

11    MR. CHIMIENTI:  It's only six.

12    MR. SIGALE:  Got it.

13 BY MR. CHIMIENTI:

14    Q.    So I'll pull this off the screen really

15 quickly.  You spoke earlier about your range rules.

16 I want to get a little bit of background on the

17 range generally before we discuss the range rules.

18         So where is the range located?

19    A.    It's located in Bonfield, Illinois,

20 which is 7 miles west of Kankakee on Warner Bridge

21 Road, a mile and a half north of Route 17.

22    Q.    You mentioned earlier in the deposition

23 that you are in charge of or oversee range

24 operations; is that correct?



RICHARD PEARSON 30b6                                    August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              124

1        A.    That's correct.

2        Q.    Do you have a range master?

3        A.    We do.

4        Q.    What is that person's name?

5        A.    Jeff Marienthal.

6        Q.    Is that a full-time position, range

7   master?

8        A.    It's a volunteer position.

9        Q.    What is the purpose of the Illinois

10  State Rifle Association range?

11       A.    It's a laboratory that teaches

12  marksmanship.  We use it for training, experiment

13  with new classes that might be of interest to

14  shooters, to ensure that we are competitive, to

15  give the Army a place to train or the Marines or

16  anybody that needs to do it.  If they need a place

17  to train, we have to make it available to them.

18       Q.    Okay.  Can you describe the layout of

19  the range for me?

20       A.    It's consists of 12 ranges.  Ranges 1

21  and 2 are bulls-eye ranges.  Range 3 is a 200- and

22  300-yard high power range.  Range 4 is a 100-yard

23  bench rest range.  Range 5 is a 100-yard utility

24  range.  You can use benches or it can be done with



1  position firing.  Range 6 is a shotgun range with

2  sporting clay type traps.  Range 7 is an archery

3  range.  Range 8 is a 25-yard/25-meter competition

4  training range, and so is Range 9, 10, and 11, and

5  Range 12 is an indoor airgun range.

6      Q.   And you had mentioned earlier that --

7  well, strike that.

8           How does one sign up to use the range?

9      A.   They apply.  We don't take applications

10  online.  They must apply when they pay for the

11  application.  They must have a valid FOID card, if

12  you are a principal member of the range.  You

13  cannot be a prohibited person, and you have to pay

14  a range fee.

15      Q.   So membership at the range is separate

16  and above from membership in the Illinois State

17  Rifle Association?

18      A.   Correct.

19      Q.   About how many members are there at the

20  range?

21      A.   1,886 as of yesterday.

22      Q.   Are there any range members who are not

23  members of the Illinois State Rifle Association?

24      A.   No.



RICHARD PEARSON 30b6                                      August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                                  126

1    Q.    I'm going to show you what I have marked

2    as Exhibit 6 to your deposition.  Do you recognize

3    this document that I have just put on the screen?

4    A.    It's not up here yet.  I don't have

5    anything.  There it is.  Okay.

6    Q.    Do you recognize this?

7    A.    This is a copy of the range rules of

8    some edition.  I don't know which one.

9    Q.    So I'll zoom in here, and down at the

10   very, very bottom here, do you see where it says,

11   October 10, 2018?

12   A.    Yeah.  There may be an updated edition

13   since then.  We probably made a rule change.  We

14   generally update every October.

15   Q.    Is this not the most recent copy of the

16   range rules?

17   A.    I actually don't think so.  I'll get you

18   the most recent copy, but --

19   MR. SIGALE:  It would have been the most

20   recent as of the time --

21   BY THE WITNESS:

22   A.    Oh, yeah, it would be the most recent to

23   the time that we turned it in.  That would be true.

24   MR. SIGALE:  Which I think was January, this



1  past January.

2      THE WITNESS:  Yeah.

3      MR. CHIMIENTI:  To the extent that there's an

4  updated version, we would like to see it.

5  BY MR. CHIMIENTI:

6      Q.    But this is Exhibit 6 to your

7  deposition.  I'm going to scroll to page 5.  On

8  page 5 here is the one, two, three -- so we are on

9  page 5 here.  At the top of the page, do you see it

10  says, Gun Handling Rules?

11      A.    Yes.

12      Q.    And the seventh bullet point down here,

13  starting with, No one.  It says, No one may handle

14  a firearm or ammunition while people are down

15  range.  All firearms must be unloaded, benched,

16  racked, or grounded with the action open, the

17  magazine removed (unless it has a fixed magazine),

18  and the safety in the on position, if the firearm

19  is so equipped.  Do you see that?

20      A.    I do.

21      Q.    And what is the purpose of this rule

22  requiring firearms to be unloaded while people are

23  down range?

24      A.    Because when people are down range



RICHARD PEARSON  30b6                          August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                       128

1  the -- we require them to be unloaded as a safety

2  procedure, so there will be a range safety officer

3  on the line.  He may be a formal one or he may be a

4  volunteer that comes forward to make sure that the

5  firearms are unloaded.  And there is a thing called

6  an empty chamber indicator that we have those put

7  in because we have a lot of very new shooters, so

8  we enforce those rules diligently.

9        Q.    And so this is a safety precaution,

10  correct?

11        A.    Yes.

12        Q.    And it sounds like from when you said,

13  the newer shooters -- the newer shooters are -- you

14  have to keep a closer eye on them?  Does that sound

15  about right?

16        A.    Yes.

17        Q.    Why generally do you have to keep a

18  closer watch over more inexperienced firearm

19  owners?

20        A.    Because of the simple --

21        MR. SIGALE:  I'll object to the

22  mischaracterization of the testimony.  But you can

23  answer.

24



RICHARD PEARSON 30b6                                    August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              129

1  BY THE WITNESS:

2      A.    Because they may not be familiar with

3  everything, and so we want to make sure that they

4  are familiar with everything.  This is a controlled

5  environment range, and so when we go to advanced

6  classes, sometimes the firearms must remain loaded

7  all of the time with advanced shooters because they

8  have to know how to handle them when they are

9  loaded, so they may be going to lunch, going to the

10  bathroom with their firearms loaded.

11      Q.    I'm going to flip ahead here to page 9,

12  and this is Roman No. IV at the top, it says,

13  General Range Rules.  Do you see that?

14      A.    Yes.

15      Q.    And then towards the bottom here it

16  says, All firearms must remain loaded with actions

17  open except when on the firing line and authorized

18  to be loaded.  Do you see that?

19      A.    I do.

20      Q.    And is that rule in place for the same

21  reasons that we just discussed, as a safety

22  precaution?

23      A.    Yes.

24      Q.    Flipping ahead one more page.  Now,



1  about a third of the way down here it says, Rules

2  for holster use on the ISRA range.  Do you see

3  that?

4       A.    Yes.

5       Q.    And then several bullet points down here

6  it says, Open and concealed firearms may only be

7  loaded or unloaded on the firing line or other safe

8  area.  Do you see that?

9       A.    Yes.

10      Q.    Can you describe what that means?

11      A.    Certainly.  When you come to the range

12 and you are going to have a competition -- unless

13 you have a concealed carry permit, but generally

14 these are not concealed carry firearms that we

15 compete with -- the firearm must be transported

16 unloaded, according to the state law, unless you

17 have a concealed carry permit, but that does not

18 apply to rifles, it doesn't apply to shotguns, it

19 does not apply to non-concealable handguns.

20           So we have -- so they are taken to the

21 range -- to the case -- excuse me -- to the firing

22 line, pardon me, uncased, and they are loaded there

23 or on Ranges 8 and 10 -- 8 and 11, we have a safe

24 area in which have a range officer will accompany a



1  person to load or unload their firearm or change it

2  out for a different firearm for a different

3  competition, so that environment is controlled that

4  way.

5      Q.   Okay.  You mentioned concealed carry

6  just a moment ago.  Skipping one bullet point and

7  then going down from that, it says, Concealed

8  and/or open carry may be banned from competition or

9  training at the discretion of the match director or

10  instructor.  Do you see that?

11      A.   I do.

12      Q.   Is it true that -- does this essentially

13  mean that someone at the ISRA range can limit or

14  ban concealed carry on the range?

15      A.   When you are -- particularly, yes, when

16  you are firing from positions because if you are

17  not firing that firearm, which is a handgun, if you

18  are in a rifle competition, you don't want that

19  firearm there because, first of all, it's very

20  uncomfortable and it's just another safety

21  precaution.

22          So we control all of the firearms in a

23  competition.  We may have 30, 40, 50 people in a

24  competition, so that is the way that we control



1   that to make sure that everything is run smoothly.

2        Q.    Have any of your members or other

3   competitors who have come to the range questioned

4   or challenged this rule as an infringement of their

5   Second Amendment rights?

6        A.    No.

7        Q.    Do you believe that the range's ability

8   to limit concealed carry is consistent with the

9   Second Amendment?

10       A.    The answer is yes because it's a choice.

11  You don't have to compete if you don't want to, and

12  you can keep your firearm on you.  But if you

13  choose to compete because of different conditions,

14  then that is one of the rules that we have.  If

15  they don't want to follow that rule, they don't

16  have to compete.

17       Q.    Similarly, people can choose to be

18  foster parents, correct?  They don't have to be

19  foster parents?

20       A.    That's true.  They don't have to be

21  foster parents.

22       Q.    And people can choose to be day care

23  providers, they don't have to be day care

24  providers, correct?



1          A.    That's true.

2          Q.    I'm going to remove that from the

3    screen.  You had mentioned that earlier on -- and

4    I'll bring his name up because I have seen his name

5    on your website, Massad Ayoob, A-y-o-o-b.  Is he

6    affiliated with the Illinois State Rifle

7    Association?

8          A.    Now he's a guest instructor.  That's

9    all.

10         Q.    Is he affiliated with the SAFER,

11   S-A-F-E-R, training program?

12         A.    SAFER, not that I know of.  I mean, I

13   don't know.

14         Q.    Okay.  Let me broaden it out.  The

15   reason why I was asking is because I'm curious what

16   specific training Illinois State Rifle Association

17   offers with respect to firearms, and those were two

18   names -- firearm safety, I should say, and those

19   were two names that I had seen in some of the

20   newsletters?

21         A.    Are you talking about SAFER USA?

22         Q.    That one, yes.

23         A.    SAFER USA is a company that does firearm

24   training and will come in and -- they have become



1   an independent contractor, and they will teach

2   particularly classes -- for example, instructor

3   classes on how to teach firearms in various

4   respects.

5          Q.    Is this a separate entity from the

6   Illinois State Rifle Association?

7          A.    Yes.

8          Q.    But Illinois State Rifle Association

9   will advertise their classes?

10         A.    Yes.

11         Q.    Are there any other courses that the

12  Illinois State Rifle Association offers on firearm

13  safety?

14         A.    The answer is nearly all classes, all

15  classes, and competitions have a firearm safety

16  component in them at some point.

17         Q.    The trainings that the Illinois State

18  Rifle Association offers, how does one sign up for

19  it?

20         A.    There are two ways.  We offer it

21  directly.  You sign up through our office.  If it's

22  an independent person, like Massad Ayoob, for

23  example, or SAFER USA or Midwest Training Group or

24  a number of others that might come, different



1    instructors that teach it, you sign up directly

2    with them.

3          Q.    Do those trainings take place at the

4    range?

5          A.    Please repeat that.

6          Q.    Sure.  Do the firearm safety training

7    courses take place at the Illinois State Rifle

8    Association range?

9          A.    Most of them do but not all.

10         Q.    At these trainings that are put on by

11   the Illinois State Rifle Association, are students

12   taught the rules of gun safety that you mentioned

13   to me earlier?

14         A.    Yes.

15         Q.    Do you have to be a member to sign up

16   for one of these training courses?

17         A.    No, you do not.

18         Q.    Do you have to be a FOID cardholder?

19         A.    You don't have to be a FOID cardholder

20   for a class.  But if you are taking an advanced

21   class, we insist you be a FOID cardholder, but for

22   our first training class or basic training class,

23   you do not have to be a FOID cardholder in the

24   State of Illinois.



1    Q.    Shifting gears slightly.  Let's talk

2   about gun -- firearm storage.  What is the

3   organization's position on what constitutes safe

4   firearm storage?

5    A.    Well, it depends on where you are and

6   what you are doing, but if you are talking about in

7   the home, the state law requires that they be

8   inaccessible to unauthorized persons.  Now, that

9   could mean put on a high shelf or it could mean put

10   in a gun safe or a gun vault, a small handgun

11   vault, or locked in a special room away from

12   everyone else.

13    Q.    In terms of storing firearms in the

14   home, is there a particular method or type of

15   storage that the organization views as the best

16   one?

17    A.    No, we don't take positions over which

18   type of storage is the best one.  Actually, because

19   it has to fit the circumstances of each person.

20    Q.    For a home that has children in it, does

21   the organization have a position on what

22   constitutes the best method of storage?

23    A.    We comply with the state law, which

24   means it must be inaccessible to unauthorized



1   persons in some way or another.  So that -- go

2   ahead.

3        Q.    It sounds like it's your position that

4   it should be up to the individual to determine what

5   the best method of storage is for them based on

6   their circumstances; is that right?

7        A.    Yes.

8        Q.    And as we talked about earlier, part of

9   the storage -- part of the storage -- part of

10  firearm storage that we have mentioned a couple

11  times during this deposition is keeping the

12  firearms unloaded until they are ready to be used,

13  correct?

14       A.    That is correct.

15       Q.    And what "ready to use" means depends on

16  what you are using the firearm for, correct?

17       A.    Correct.

18       Q.    One second.  I'm sorry.  I'm just trying

19  to get my -- I'm going to show you -- Mr. Pearson,

20  I'm going to share my screen here and show you what

21  I have marked as Exhibit 9 to your deposition,

22  which I will represent, now that it's on the

23  screen, is a document that was produced to us by

24  the Millers, and this first page is -- it says,



RICHARD PEARSON  30b6                          August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                        138

1  Smith and Wesson Safety Instruction Manual,

2  M&P 15-22 rifle.  Do you see that?

3       A.    Yeah.  That is known as the 15-22 rifle.

4       Q.    At the bottom, you can see here on the

5  left-hand side, that I have marked it Pearson

6  Exhibit 9?

7       A.    Yeah, I see that.

8       Q.    I'm going to flip ahead to page 11 of

9  the PDF, which is page 7 of the brochure, and here

10 on the right-hand side under Safe Storage and

11 Transportation.  Do you see that?

12      A.    Yes.

13      Q.    The second paragraph down, the second

14 red -- or white exclamation point and a red

15 triangle with the word warning, I'm just going to

16 walk through this and ask you if you agree with

17 some of these statements.

18            First it says, Warning:  Firearms are

19 dangerous when used and stored improperly.  Do you

20 agree with that?

21      A.    I don't see it but I -- oh, I see.

22      Q.    Let me zoom in.

23      A.    I see it, yeah.

24      Q.    So do you agree with that first



 1  sentence, Firearms are dangerous when used and

 2  stored improperly?

 3      A.    In general, yes.

 4      Q.    The next sentence says, They pose a risk

 5  of serious or fatal injuries.  Do you agree with

 6  that?

 7      A.    They do.  I agree.

 8      Q.    And next sentence says, Firearms can be

 9  especially dangerous to children when they are

10  stored in an irresponsible and unsafe manner.  Do

11  you agree with that?

12      A.    Yes.

13      Q.    Next sentence, For your safety and the

14  safety of others, it is imperative that you keep

15  your firearm locked and unloaded in a secure place.

16  Do you agree with that?

17      A.    In certain conditions, I agree with it.

18  In others, I do not.

19      Q.    And the conditions -- not to jump ahead

20  on you, but I would imagine -- and correct me if

21  I'm wrong.  Do the conditions depend on what the

22  gun is used for?

23      A.    Correct.

24      Q.    The next sentence says, The ammunition



1   should be stored in a separate secure location when

2   it is not in use.  Do you agree with that?

3       A.    Sometimes.

4       Q.    Again, does that depend on the use of

5   the firearm?

6       A.    Yes.

7       Q.    The next sentence says, Safe and secure

8   storage of your firearm is one of the most

9   important rules of firearm safety.  Do you agree

10  with that?

11      A.    Yes.

12      Q.    And then the last sentence says, Your

13  failure to follow these rules may result in serious

14  injury or death to you or others.  Do you agree

15  with that?

16      A.    Yes.

17      Q.    Okay.  I'll pull that off the screen.

18            In terms of -- we talked about the

19  various publications that the company -- or that

20  the organization puts out, Illinois State Rifle

21  Association.  Is there anything specific that you

22  can recall that the organization has published on

23  gun storage in particular?

24      A.    No.



1    Q.    Has the organization made any public

2  statements?  And by "public statements," I mean,

3  you know, online, in print, in person about firearm

4  storage?

5    A.    Well, in general terms it's included in

6  every safety briefing or class, but specifically,

7  no.

8    Q.    You said safety briefing.  Do you mean

9  at those trainings sessions that we talked about

10  earlier?

11    A.    Yes.

12    Q.    And so if someone signed up for one of

13  those trainings, they would get some sort of

14  instruction on proper firearm storage?

15    A.    Well, maybe not.  Some, which deal with

16  the casing and uncasing of the firearm, that would

17  be firearm storage, I guess, but, in general, yes,

18  I would say there's that.

19    Q.    And the training that -- at least the

20  organizational sponsored training or

21  organization -- Illinois State Rifle Association

22  provided training that covers firearm storage, does

23  the ISRA instruct its students to store the gun

24  unloaded when it's not in use?



1      A.    Within the general training, but it

2  depends on the purpose of the firearm once again.

3      Q.    Of course.  Shifting gears to ammunition

4  storage.  What is the position of the organization

5  on what constitutes safe storage of ammunition?

6      A.    It should be a cool, dry place.  Okay?

7  Away from any heat source, and that is about it.

8      Q.    Does the organization have a -- take a

9  position on whether ammunition should be locked,

10  inaccessible to unauthorized users?

11      A.    No.

12      Q.    Is there any -- any of the publications

13  that we discussed earlier, is there anything that

14  you can recall specifically that the organization

15  has published regarding appropriate firearm

16  storage?

17      A.    Not specifically.  I mean, It's -- just

18  like the range manual, it's in there as a line item

19  someplace or another.

20      Q.    Is ammunition storage covered in the

21  basic firearms training courses that we have

22  discussed earlier?

23      A.    Yes, basically.

24      Q.    And is it the same lesson essentially



1  that you just told us at the beginning, to store in

2  a cool, dry place?

3       A.    Right.

4       Q.    That is what is taught to the students

5  at those courses about ammunition storage?

6       A.    Yes.

7       Q.    Does the organization advertise or

8  endorse a particular storage method or container

9  for ammunition?

10      A.    No.

11      Q.    Has the organization made any public

12  statements, meaning online, in print, or verbal

13  about ammunition storage that you can recall?

14      A.    Not that I can recall.

15      Q.    Shifting gears to one of the next topics

16  on our 30(b)(6) list, speaking about children and

17  firearms.  Does the organization believe that

18  children should have access to firearms?

19      A.    Not alone.  They must be in the company

20  of an adult, a responsible adult.

21      Q.    Besides being in the company of an

22  adult, are there any other circumstances under

23  which children can access firearms?

24      A.    No, not that I can think of.



1    Q.    What is the organization's position on

2    the earliest age that children should be allowed to

3    handle a firearm?

4    A.    It depends on the maturity of the child

5    and that -- it could be young for some and it could

6    be older for others, and it can actually be never

7    for some.

8    Q.    Under what circumstances would a child

9    never be allowed to handle a firearm?

10   A.    If they have mental difficulties of any

11   kind.

12   Q.    Is there a minimum age in all

13   circumstances at which a -- under which a child

14   should not be handling a firearm?

15   A.    Well, they would have to be physically

16   able to do it.  They would have to be able to

17   follow instructions, so that depends on each child.

18   So sometimes a 6-year-old can do that and sometimes

19   a 10-year-old can't, so you would have to be very

20   careful.  There's no hard and fast rule about that

21   because it's individual.  It also depends on where

22   they are growing up.  It's a lot different if you

23   are on a farm in Southern Illinois than if you are

24   in a suburb in Chicago, Illinois.



1      Q.    Under that circumstance is it possible

2  then for a 2-year-old to be able to handle a

3  firearm?

4      A.    No.

5      Q.    What about a 3-year-old?

6      A.    No.  They should never handle them alone

7  anyway.

8      Q.    I should have made that clear.  This is

9  assuming parent supervision.  It sounds like you

10 are saying 2 is too young but 3 maybe?

11     A.     It depends on the child, you know.  I

12 have a grandson that is 3, and he can talk the

13 language of a second grader by his latest test, yet

14 I would not let him have a firearm because he

15 doesn't have any ability to make judgments, so all

16 of that comes into play with that.

17     Q.    Okay.  I'm going to show you -- I'm

18 going to put another exhibit that we already looked

19 at back up on the screen, and this is not the one

20 that I wanted.  Here we go.  So we are back on

21 Exhibit 6, which is the range rules.  Do you see

22 that on the screen?

23     A.    I do.

24     Q.    And I'm going to skip ahead to page 6,



RICHARD PEARSON 30b6                                    August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                                146

1  and at the top of page 6 it says, General Rules.

2  Do you see that?

3      A.    Yes.

4      Q.    And then the second to last entry on

5  this page, it says, Children under age 7, pregnant

6  women, and others who have concerns should consult

7  a physician before visiting shooting ranges.  Do

8  you see that?  I'm sorry.  Do you see where I read

9  that from, sir?

10     A.    I do, yes.  I see it.

11     Q.    Is there a particular reason why in the

12 Illinois State Rifle Association's range manual it

13 recommends that children under 7 should consult a

14 physician before visit shooting ranges?

15     A.    Well, in the old days, and it's not so

16 prevelant now, there was a lot of lead in

17 ammunition.  That is not so true anymore.

18           So the lead content and having

19 ammunition could be a problem, so that is why we

20 said that for children and for pregnant women, but

21 now very little lead is in ammunition, that you can

22 touch anyway.

23     Q.    So this instruction here in the range

24 manual doesn't have anything to do with the



RICHARD PEARSON  30b6                               August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                             147

1  firearms themselves, it mostly has to do with

2  potential lead concerns from ammunition; is that

3  correct?

4        A.    Yeah, exactly.

5        MR. SIGALE:  Make sure you let him finish the

6  question.  Okay?

7        THE WITNESS:  Okay.  I'm sorry.

8  BY MR. CHIMIENTI:

9        Q.    I'm taking that off the screen.  You had

10  mentioned -- we talked about earlier, you had

11  mentioned generally that the -- that certain

12  children -- certain children, depending on their

13  age and maturity level, whether they have emotional

14  or mental issues should not be allowed to handle

15  firearms, so the question is, for -- in the view of

16  the Illinois State Rifle Association, what methods

17  should individuals take to ensure that children do

18  not have unauthorized access to firearms?

19        A.    They should make sure that they can't

20  get access to the firearm, okay, so in the case of

21  day care centers or foster care centers, I would

22  think that would be in a gun safe.

23        Q.    Are there any additional steps that

24  people should take besides putting firearms in a



1  safe to keep unauthorized children away from them?

2      A.    I don't think that it's necessary that

3  there be any more steps.

4      Q.    Is there a particular type of safe or

5  storage unit that people should use to keep

6  unauthorized children from accessing the firearms?

7      MR. SIGALE:  Object as to the form.  You can

8  answer.

9  BY THE WITNESS:

10     A.    The answer is, there's a lot of very

11  good ones.  Almost all of them out there are very

12  good, so we don't take any position on it.  It's up

13  to the individual.

14  BY MR. CHIMIENTI:

15     Q.    Asking a similar question that I asked

16  earlier.  Should children have -- be allowed to

17  have access to ammunition?

18     A.    Well, there is not much a child can do

19  with ammunition, with just ammunition, but for the

20  most part ammunition is kept locked away in some

21  device.  It doesn't have to be as stringent as a

22  safe or anything else, but yeah.

23     Q.    Are you saying that the storage level

24  for a firearm should be, to use your word, more



1   stringent than the storage level for ammunition?

2        A.    Yes.

3        Q.    Okay.  Is there -- it sounds like you

4   are suggesting that individuals should keep the

5   ammunition locked to ensure that children do not

6   have access to it; is that correct?

7        A.    I wouldn't recommend that, depending on

8   whether you have children in your house or not.

9        Q.    Besides locking up the ammunition, are

10  there any other steps that individuals should take

11  to keep children from accessing it?

12       A.    No.

13       Q.    Are there any -- in general, are there

14  any precautionary steps that parents should take

15  before allowing their children to handle firearms?

16       A.    Oh, yes.

17       Q.    What are those?

18       A.    First of all, they ought to explain the

19  safety rules to the child, and in my own instance,

20  the child cannot handle a firearm until I get the

21  first three safety rules back anywhere, any time,

22  on demand.

23       Q.    Aside from explaining the gun safety

24  rules to children, any other steps that a parent



1  should take before allowing their child to handle a

2  firearm?

3      A.   Well, they should keep control of the

4  firearm.  They always must be in arm's length of

5  the child.  Okay?  The child --

6      THE WITNESS:  Should I go into that.

7      MR. SIGALE:  If he wants you to.

8  BY THE WITNESS:

9      A.   The problem with firearms are --

10     THE REPORTER:  I'm sorry.  I can't understand.

11  Maybe move closer to the microphone.

12     MR. SIGALE:  I'm sorry.  Does he just need to

13  move closer to the microphone?  Does that solve

14  whatever problem there was?

15     THE REPORTER:  I'm pretty sure.  It's been

16  okay, but I couldn't understand that portion.

17  Thank you.

18  BY THE WITNESS:

19     A.   Please repeat the question.

20  BY MR. CHIMIENTI:

21     Q.   Sure.  You had mentioned that -- I think

22  you were about to explain why -- you had mentioned

23  that parents should keep within arm's length of the

24  child when instructing about firearms.  I think you

1  were about to tell us why, so I was hoping that you

2  could do that.

3      MR. SIGALE:  I'm going to object to all of

4  this as to relevance, as it really has nothing to

5  do with the claims in the lawsuit.  But over that

6  objection, Richard, go ahead and answer.

7  BY THE WITNESS:

8      A.    As I was explaining firearms, the way

9  that they are treated today become a prohibited

10  device, and like other prohibitions, children,

11  grown-ups, everyone is curious about them.  So when

12  they become a mysterious item, then children can't

13  wait to get their hands on them, so you must take

14  that away and make them not a mysterious item, just

15  like the kitchen knife in the kitchen drawer or the

16  Clorox bottle underneath the kitchen sink or

17  whatever so they are familiar with them and they

18  are not looked at as a mysterious item and they are

19  looked at as an item that has certain rules and

20  that these are important and this is part of

21  becoming an adult, and teaching the children about

22  them, so they do not use them unwisely if they come

23  across one.

24



1   BY MR. CHIMIENTI:

2       Q.    Excuse me.  You had mentioned this idea

3   of the mysterious item.  Is that why you had

4   mentioned to us earlier that you would not let

5   children who were not your own in your home near

6   your firearms?

7       A.    I did not say that I would not let them

8   near my firearms.  I said I would explain a firearm

9   to them and what it can do and what it can't do and

10  what the safety rules are, and then I would allow

11  them to touch it, to hold it, to do that sort of

12  thing to take the mysteriousness away from the

13  firearm.

14          And then at some point when they are old

15  enough, when I have determined that they are ready,

16  then I would take them out to the range or wherever

17  and let them shoot a couple rounds of the firearm

18  so that they have an understanding of what it is

19  and that it becomes a normal part of life, not

20  something that is different.

21      Q.    Okay.  In general, should an adult allow

22  somebody else's children to access that adult's

23  firearms?

24      MR. SIGALE:  Object as to speculation and form



1  of the question.  If you understood, you can

2  answer.

3  BY THE WITNESS:

4       A.    Well, that is a big question.  Anyway,

5  so if mom and dad said you can go up to Uncle

6  Charlie's house, and Uncle Charlie was going to let

7  you shoot the BB gun today, then that would be

8  okay.  Otherwise, Uncle Charlie and the parents

9  should confer with each other.

10  BY MR. CHIMIENTI:

11       Q.    So absent express permission from the

12  child's parents, other adults should not allow the

13  child to access the firearms?

14       A.    Right.

15       Q.    Shifting gears to a different topic,

16  self-defense.  What role does the organization

17  believe firearms play in self-defense?

18       A.    They play a critical role in

19  self-defense.

20       Q.    And what situation -- I'm sorry.  I did

21  not mean to cut you off.

22            In what situations does the Illinois

23  State Rifle Association believe that firearm use

24  for self-defense is appropriate?



1      A.     Any time a person fears for their own

2   life or their own injury or for the injury of

3   innocent people.

4      Q.     And that type of situation is a

5   different environment for firearm use than shooting

6   on the range; is that correct?

7      A.     That's correct.

8      Q.     Can you explain some of the differences

9   between that type of situation and shooting off

10  of -- you know, bench shooting on the range?

11     A.     Bench shooting on the range is practice,

12  trying to become proficient with a firearm, trying

13  to learn how to handle it properly, that sort of

14  thing.

15         When you get to self-defense though,

16  that is a situation of maybe a home invasion or

17  carjacking or an attack out on the street, and at

18  that point the firearm is the most efficient way

19  for a person to defend themselves.

20     Q.     And I think what I was getting at a

21  little bit more is, when you are shooting on the

22  range, largely you are shooting at a stationary

23  target, correct?

24     A.     Sometimes, not always, but yes.



1    Q.    And in the home invasion situation, that

2  is a different kind of shot, for lack of a better

3  term, correct?

4    A.    It is.  That is why you practice on

5  moving targets and making decisions about moving

6  targets, whether they are a threat or whether they

7  are not.

8    Q.    Okay.  Should children be allowed to use

9  firearms for self-defense?

10    MR. SIGALE:  Object as to foundation and

11  speculation.  If you have an answer, you can

12  answer.  Did you hear me?

13    MR. CHIMIENTI:  Yeah, I can hear you, David.

14    MR. SIGALE:  I wanted to make sure the court

15  reporter, Kristin, heard me since I am off camera.

16  Okay.  If you can answer, if you want to answer,

17  you can answer.

18  BY THE WITNESS:

19    A.    The answer is, it's a big question

20  again, but it takes a while to train and you have

21  to have a lot of judgment to do that, so in general

22  the answer is no.  But there have been cases when a

23  child has done that, and it's turned out all right.

24  But, you know, you should go through training,

RICHARD PEARSON 30b6                           August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                        156

1  particularly concealed carry training, so you start

2  to learn to make those judgment calls because you

3  can't be wrong.

4  BY MR. CHIMIENTI:

5      Q.    And that was going to be my next

6  question.  That training to make those judgment

7  calls that you were describing earlier, about a

8  threat versus not a threat, is that a part of

9  concealed carry training?

10     A.    Yes.

11     Q.    And is it fair to say that not every

12  firearm owner is also a concealed carry holder?

13     A.    That would be correct, yes.

14     Q.    Is that type of threat assessment

15  training part of any sort of application for a FOID

16  card?

17     A.    No.

18     Q.    It is not a prerequisite to obtain a

19  FOID card; is that correct?

20     A.    That is correct.

21     Q.    Okay.  Shifting gears again and talking

22  more broadly about the Second Amendment.

23           What is the Illinois State Rifle

24  Association's position on the meaning of the Second



1  Amendment to the United States Constitution?

2      A.   Exactly what it says, that the people

3  have the right to keep and bear arms.  The only

4  prohibitor with that is if they have a criminal

5  record or mental difficulties or something else, a

6  drug addict, you know, whatever, suicidal, but for

7  the normal person, that is exactly what it means.

8      Q.   Does the organization believe that the

9  Second Amendment allows an individual to carry a

10  firearm for self-defense purposes?

11      A.   Yes.

12      Q.   In what situations does the Second

13  Amendment confer that ability?

14      MR. SIGALE:  I'll object as to the form and

15  vagueness and speculation.  If you can answer,

16  answer.

17  BY THE WITNESS:

18      A.   Well, I think that would be the Heller

19  case and the McDonald case, using the

20  14th Amendment.  I believe it applies to everyone

21  has the right to carry a firearm in some certain

22  way subject to the restrictions of the state, which

23  in the case of the state of Illinois is 16 hours of

24  training, and you must pass a background check



1   literally every day.  Every day you go through a

2   background check if you are a concealed carry

3   holder.

4        Q.   Does the organization -- does the

5   Illinois State Rifle Association believe that this

6   self-defense -- the ability to have a firearm

7   available for self-defense should be preserved even

8   if it increases the risk of harm to children?

9        MR. SIGALE:  Objection as to argumentative and

10  speculative and form of the question.  If you

11  understood, you can answer.

12  BY THE WITNESS:

13       A.   The answer is if you are properly

14  trained, it does not harm children.  It protects

15  children.

16  BY MR. CHIMIENTI:

17       Q.   But are all firearm owners properly

18  trained?

19       A.   Well, in this case we are talking about

20  people with foster care and people with a day care,

21  and they have gone through 16 hours of training and

22  so we are talking about only allowing them to carry

23  the firearm.  So the answer is, yeah, that will do

24  it.



1          You also find the people that take those

2     16 hours of training go back and take more

3     training, and they also have to requalify and be

4     retrained every five years.

5          Q.    Okay.  Not all of those individuals go

6     through additional training; is that true?

7          A.    That's true.

8          Q.    Speaking generally about -- I have a

9     couple more topics to cover here, Mr. Pearson, and

10    then I'll turn you over to Mr. Sigale.  I'm sure he

11    has some questions.

12          I want to talk about the other

13    organizations who are plaintiffs in this case,

14    namely the Second Amendment Foundation and Illinois

15    Carry.  What is the Illinois State Rifle

16    Association's relationship to the Second Amendment

17    Foundation?

18          A.    We are -- we are plaintiffs with them.

19    We support them, but we are not controlled by them

20    by any means.  They are just a sister organization.

21          Q.    When you say that you support them, what

22    do you mean?

23          A.    We support them in their goal of

24    protecting the Second Amendment for the lawful



1  citizens of the United States of America and the

2  use of firearms for self-defense and other

3  purposes.

4      Q.    Do the Illinois State Rifle Association

5  and the Second Amendment Foundation ever

6  communicate?

7      A.    Yes.

8      Q.    How do they communicate?

9      A.    Generally, I am a friend of the -- Alan

10 Gottlieb, the chairman, and I just talk to him on

11 the phone.

12     Q.    Are there any other points of contact

13 between the two organizations?

14     A.    Well, I appear at their annual

15 conference, except there's not going to be one this

16 year, so I do that.  And then there might be an

17 e-mail back and forth about one thing or another or

18 talking about the political situation or something

19 like that, but it's -- that would be it.

20     Q.    Have you and Mr. Gottlieb ever spoken

21 about this particular lawsuit?

22     A.    I would guess we have, but I don't know

23 that for sure.

24     Q.    Do you remember the substance of any of



1   those conversations by chance?

2       A.    No.  I don't even remember doing it, but

3   it's possible that we did.

4       Q.    Has anybody else at the Illinois State

5   Rifle Association communicated with anyone at the

6   Second Amendment Foundation about this lawsuit to

7   your knowledge?

8       A.    No.  I'm the point of contact.

9       Q.    Are the organizational goals of the

10  Illinois State Rifle Association different in any

11  way from the goals of the Second Amendment

12  Foundation?

13      A.    Yes.

14      Q.    How is that?

15      A.    Broadly, the Second Amendment Foundation

16  supports the people's right to keep and bear arms

17  on a national level, and on a state level, the

18  Illinois State Rifle Association does the same

19  thing.  But we dig really hard into training and

20  that sort of stuff that they don't do so much of.

21      Q.    Other than this lawsuit, have the

22  Illinois State Rifle Association and Second

23  Amendment Foundation ever collaborated on another

24  lawsuit?



RICHARD PEARSON  30b6                                    August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              162

1      A.    There are several.  I think you have the
2  list.
3      Q.    Have they ever collaborated on any
4  publications?
5      A.    I'm sorry.  Say that again.
6      Q.    Have SAF and ISRA ever collaborated on
7  any publications?
8      A.    Publication?  You mean like a newspaper
9  or something?
10     Q.    Something like that.
11     A.    Not that I know of, no.  I don't think
12  so. I'm not sure.
13     Q.    To your knowledge, have SAF and ISRA
14  ever collaborated on a press release or other sort
15  of public statement?
16     A.    We have done that in the past, but
17  probably on McDonald and Ezell, I would think.
18     Q.    And McDonald and Ezell, E-z-e-l-l, those
19  are two other court cases that you have
20  collaborated with SAF on?
21     A.    Yes.  It's actually three.  There's
22  Ezell 1 and 2 and McDonald.
23     Q.    Skipping slightly to Illinois Carry.
24  What is the relationship of the Illinois State



1   Rifle Association to Illinois Carry?

2       A.    They are a sister organization.  We are

3   not connected in any other way than we have some

4   similar goals.

5       Q.    What similar goals are those?

6       A.    Well, to keep the right to carry in the

7   State of Illinois to expand the citizens' rights

8   for firearms, law-abiding citizens' rights for

9   firearms.

10      Q.    And do the goals of Illinois Carry and

11  the Illinois State Rifle Association differ in any

12  way?

13      A.    I would say our goals still, once again,

14  deal more with training and education and political

15  items at the state level, so we differ in those

16  ways.

17      Q.    And their goals do not cover those

18  things, is that what you are saying?

19      A.    Not necessarily, no, but I can't really

20  speak for them.

21      Q.    Do -- sorry.  Does Illinois State Rifle

22  Association and Illinois Carry ever communicate?

23      A.    Occasionally, mostly during the

24  legislative session, but there has not been one.



1        Q.    How do the organizations communicate?

2        A.    Well, generally, they are at the

3   capital, and we see them at the capital.

4        Q.    Have you ever communicated -- sorry.

5   Let me start over.

6              Has Illinois State Rifle Association

7   ever communicated with Illinois Carry about this

8   lawsuit?

9        A.    No, not to my knowledge.

10       Q.    Other than this lawsuit, has Illinois

11  Carry and Illinois State Rifle Association ever

12  collaborated on another lawsuit?

13       A.    I believe so.  I can't name them right

14  now, but I believe so.

15       Q.    Have Illinois State Rifle Association

16  and Illinois Carry ever collaborated on a

17  publication, such as a newsletter or an article?

18       A.    No.

19       Q.    Have Illinois Carry and Illinois State

20  Rifle Association ever collaborated on a public

21  statement, such as a press release?

22       A.    That was a very long time ago, but I

23  would think that we might have done that in the

24  past, particularly on the McDonald case.



1        Q.    Anything related to this case?

2        A.    No.

3        Q.    Have you ever collaborated with both

4   Second Amendment Foundation and Illinois Carry on

5   the same lawsuit other than this one?

6        A.    I truly don't remember.  It's certainly

7   possible, but I truly don't remember.

8        Q.    Have you ever collaborated -- sorry.

9   Let me start over.

10           Has Illinois State Rifle Association

11   ever collaborated with both SAF and Illinois Carry

12   on the same publication, such as a newsletter or

13   article?

14        A.    I don't think so.

15        Q.    Has Illinois State Rifle Association

16   ever collaborated with both SAF and Illinois Carry

17   on a public statement, such as a press release or

18   press conference?

19        A.    I have with SAF in the past.  I don't

20   remember what it was about, but I have -- we have

21   talked over a press release, but we didn't issue

22   a -- we didn't issue a joint press release, no.  We

23   never did that.

24        Q.    Nothing related to this case in any



RICHARD PEARSON 30b6                      August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                    166

```
 1   event?

 2        A.    No.

 3        Q.    On what basis did the Illinois State

 4   Rifle Association determine that it was appropriate

 5   to join with SAF and Illinois Carry in this

 6   lawsuit?

 7        A.    Because we felt that this lawsuit would

 8   ensure certain citizens, like those that have day

 9   care centers and are foster care centers, it would

10   make sure that their Second Amendment rights were

11   extended to them.

12        Q.    Did you have any discussions with either

13   organization about that?

14        A.    Repeat that, please.

15        Q.    Right.  You just told us the basis for

16   joining with the other two organizations.  Did you

17   ever discuss that with either one of them?

18        MR. SIGALE:  Object as to form and vagueness.

19   BY THE WITNESS:

20        A.    I actually don't think so, but I don't

21   know.

22   BY MR. CHIMIENTI:

23        Q.    Okay.  Other than this litigation, has

24   the Illinois State Rifle Association ever filed
```



RICHARD PEARSON 30b6                              August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                          167

1  another lawsuit about foster care?

2       A.    I think it was the Shults case.  Did we

3  ever do that one?

4       MR. SIGALE:  I'm not answering.

5       THE WITNESS:  You are not answering.  I am

6  sorry.

7       MR. SIGALE:  He wants to know what you know.

8  BY THE WITNESS:

9       A.    I think we did with the Shults case, I

10  think it was called.

11  BY MR. CHIMIENTI:

12       Q.    And Shults is spelled S-h-u-l-t-s,

13  correct?

14       A.    I don't know.  Probably.

15       Q.    Other than this case and Shults, any

16  other cases that ISRA has filed about foster care?

17       A.    No.

18       Q.    Other than this case, has Illinois State

19  Rifle Association filed any lawsuits about day

20  care?

21       A.    No.

22       Q.    Other than this case, has the Illinois

23  State Rifle Association filed any cases about

24  firearm storage?



1        A.    No.

2        Q.    Other than this case, has the Illinois

3   State Rifle Association filed any lawsuits about

4   ammunition storage?

5        A.    No.

6        Q.    And other than this case, has the

7   Illinois State Rifle Association ever filed any

8   lawsuits about children's access to firearms?

9        A.    No.

10       Q.    In Shults did anyone from the Illinois

11  State Rifle Association offer any testimony,

12  whether by deposition or otherwise?

13       A.    I don't think so.

14       Q.    Let me ask it another way.  Did you

15  testify in the Shults case?

16       A.    I don't think so.

17       MR. CHIMIENTI:  So I'm going to check through

18  my notes, Mr. Pearson.  I think that is all I have

19  for you.  David, I would imagine you have questions

20  for him.  I don't know if you want to take a break

21  before we do that, but that is up to you.

22       MR. SIGALE:  I'll ask him a couple questions

23  while they are fresh in my mind, but then, yeah,

24  I'm going to want to take a break.



1       MR. CHIMIENTI:  Okay.

2       MR. SIGALE:  Am I asking questions now?

3       MR. CHIMIENTI:  You said you wanted to ask a

4  couple while they were fresh.  That is fine by me.

5       MR. SIGALE:  I didn't want to step on your

6  toes.  You said you were looking over notes.  Do

7  you want to ask them now?

8       MR. CHIMIENTI:  Yeah, go for it.  There is not

9  anything that is jumping out to me, so go ahead.

10       MR. SIGALE:  All right.  It's literally just a

11  couple quick ones, and then I'll take a break.

12                     EXAMINATION

13  BY MR. SIGALE:

14       Q.    I just want to follow up on a topic that

15  Mr. Chimienti asked you just a moment ago.  Thus,

16  the "fresh in my mind" part.

17            He asked you a question about whether or

18  not ISRA is involved in any lawsuits involving

19  firearm or ammunition storage?

20       A.    Yes.

21       Q.    Do you recall a lawsuit called

22  BFF Firearms versus Raoul?

23       A.    I do.

24       Q.    Just real brief, if you could explain



1   what that case is?

2       A.    I don't remember.

3       Q.    Okay.  Are you familiar with something

4   called -- with a law called the Firearm Dealer

5   Licensing Certification Act?

6       A.    Oh, yes.

7       Q.    Okay.  Does that refresh your memory one

8   way or another as to the BFF Firearms suit?

9       A.    Yes, it does.

10      Q.    Is ISRA a plaintiff in that lawsuit?

11      A.    I think so.

12      Q.    Okay.  To the best of your knowledge, as

13  you sit here -- and I understand that I'm kind of

14  putting you on the spot there.  Thus, the folly of

15  "fresh in my mind" questions.

16           Could you explain briefly what the

17  BFF Firearms lawsuit is?

18      A.    Well, I think the idea of gun dealer

19  licensing, okay, and all of the regulations and

20  restrictions on firearm dealers, which put over

21  half of them out of business because they couldn't

22  meet all of the regulations for locked, storage,

23  and ammunition and all of that sort of thing.

24      Q.    Just very briefly -- and you probably



RICHARD PEARSON  30b6                              August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                            171

1   understand why I'm asking the question.  Do the

2   issues in the BFF Firearms lawsuit include storage

3   requirements?

4        A.   Yes.

5        Q.   For dealers, for licensed firearm

6   dealers?

7        A.   For dealers.

8        Q.   Okay.  Are you familiar with a -- as you

9   sit here, are you familiar with a lawsuit named

10  Culp versus Raoul, formerly Culp versus Madigan?

11       A.   Yes.

12       Q.   Do you recall, as you sit here, what

13  that lawsuit was?

14       A.   That was a nonresident trying to get an

15  Illinois concealed carry permit.

16       Q.   As you sit here, do you recall if ISRA

17  was a plaintiff in that lawsuit?

18       A.   Yes, we were.

19       Q.   You were.  Do you recall off the top of

20  your head whether or not Second Amendment

21  Foundation and/or Illinois Carry were plaintiffs in

22  that lawsuit along with you?

23       A.   I think they both were actually.

24       MR. SIGALE:  All right.  That concludes the



RICHARD PEARSON 30b6                          August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                        172

1  "fresh in my mind" questioning.  Let me -- Matt, do
2  you have anything else?
3       MR. CHIMIENTI:  No.  No, not at the moment.
4  When we go off to take a break here, I'll
5  double-check.  But how much time do you want,
6  David?
7       MR. SIGALE:  I don't know.  I had to lower the
8  brightness on my screen so I would not kill the
9  battery.  1:54.  I don't know, you want to come
10 back at 10 after 2:00?
11      MR. CHIMIENTI:  Sounds good.
12                  (WHEREUPON, a recess was had.)
13 BY MR. SIGALE:
14      Q.    Richard, are you familiar with the names
15 Jed and Melissa Davis?
16      A.    Vaguely.
17      Q.    Vaguely, from what recollection you
18 have, who are they?
19      A.    They are a couple members.
20      Q.    And why do you vaguely remember that
21 they are a couple members out of 16,000?
22      A.    Well, because at least last year, they
23 did run a day care center.  I don't know if they do
24 today.



RICHARD PEARSON  30b6                           August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                        173

1          Q.    Okay.  I just want to clarify with you,
2     did they run a day care or were they foster
3     parents?
4          A.    I don't know.
5          Q.    But as of -- at some point in the past,
6     one of those two things they did?
7          A.    Yes.
8          Q.    And you don't know as you sit here if
9     they still do?
10         A.    No.
11         Q.    But you know that they are members and
12    they at least were at some time in the past?
13         A.    Yes.
14         Q.    Do you remember why that -- why that
15    comes up?
16         A.    No, I don't actually.
17         Q.    Okay.  You don't know and you don't
18    remember why you know that?
19         A.    No, I don't know why I know that.
20         Q.    Okay.  Can a FOID cardholder safely --
21    strike that.
22              Can a FOID cardholder possess a firearm
23    on their person in such a manner that it is -- that
24    unauthorized users cannot get access to it?



1       A.    Yes.

2       MR. CHIMIENTI:  Objection, form.

3  BY MR. SIGALE:

4       Q.    Describe how that would -- how that

5  would happen.  How would a FOID cardholder have a

6  firearm on their person, on their property, or in

7  their home and maintain it in such a way to prevent

8  unauthorized persons from having access to it?

9       A.    Well, if they carry it on their person,

10  they would have a specific holster that would

11  prevent anybody else from drawing it.

12       Q.    Okay.  Do you need a concealed carry

13  permit to be able to do that?

14       A.    No, not on your own property.

15       Q.    So a FOID cardholder who is a foster

16  parent or a day care provider or the spouse of --

17  someone else who lives in the home of a day care

18  provider who has a FOID card can possess a firearm

19  on their person in a holster and do it in such a

20  way that children or unauthorized persons would not

21  have access to it?

22       A.    Yes, they can.

23       MR. CHIMIENTI:  Object to the form, leading,

24  compound, calls for speculation.



1   BY MR. SIGALE:

2       Q.    Mr. Chimienti asked you if you -- much

3   earlier, if you were aware of an instance when

4   someone was unable to defend themselves as a result

5   of the regulations and laws that are being

6   challenged in this lawsuit.  Do you recall that?

7       A.    I do recall that.

8       Q.    Okay.  I want to break that down a

9   little bit.  Okay?

10           If a person is prohibited from having a

11  firearm that is ready to use in case of

12  self-defense because it's unloaded in a safe and

13  the ammunition is in a second location or the

14  firearm is broken down, or the firearm is just --

15  you are prohibited from having it at all, are you

16  unable to defend yourself?

17      A.    Yes.

18      MR. CHIMIENTI:  Objection to the form, calls

19  for speculation, vague, incomplete hypothetical.

20  BY MR. SIGALE:

21      Q.    Are you aware, as you sit here, of a

22  specific instance where a specific person was

23  injured because someone broke into their home at a

24  certain time and that person did not have a firearm



RICHARD PEARSON  30b6                         August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                      176

1  to defend themselves and that person was injured, a

2  specific scenario like that, are you aware of as

3  you sit here?

4      A.    No.

5      Q.    But if a person is not allowed to have

6  that ready-to-use firearm, even if no one is

7  breaking through the window or the front door at

8  that moment, are they still unable to defend

9  themselves in scenarios --

10     MR. CHIMIENTI:  Objection, form, calls for

11 speculation.

12 BY MR. SIGALE:

13     Q.    You can answer.

14     A.    The answer is, yes, they are unable to

15 defend themselves.

16     Q.    Why is that even if -- why would that

17 be, if no one is breaking down their door at that

18 very moment?

19     A.    Well, the condition of not being able to

20 defend yourself exists whether somebody is breaking

21 in or not because the firearm is taken apart or the

22 pistol is prohibited or whatever.  You couldn't do

23 it anyway.

24     Q.    So is it ISRA's position that the



1  concept of being able to defend one's self is

2  broader than whether or not someone is attacking

3  you at that very moment?

4       A.   Yes.

5       MR. CHIMIENTI:  Objection, form.

6  BY MR. SIGALE:

7       Q.   By the way, you were asked earlier if --

8  if you knew whether or not Jennifer Miller has a

9  day care license.  You said you didn't know.

10      A.   I don't know.

11      Q.   If the Millers allege that in their

12 lawsuit and if the Millers -- Jen Miller actually

13 produced her day care license, would you have any

14 reason to doubt that allegation and that

15 documentation?

16      A.   No.

17      MR. CHIMIENTI:  Objection to form.

18      MR. SIGALE:  Okay.  Matt, are you able to pull

19 up those -- I don't remember what exhibit number it

20 was, but it was The Illinois Shooter issue, and you

21 had pulled up specifically those shooter rules or

22 shooting rules or range rules.

23      MR. CHIMIENTI:  Hold on.  Yes.  Hold on.  I

24 just put Exhibit 7 on the screen.  Is this what you



1   were looking for?

2        MR. SIGALE:  Yeah, yeah.

3   BY MR. SIGALE:

4        Q.    All right.  Richard, do you recall

5   seeing this document, this exhibit --

6        A.    Yes.

7        Q.    -- that is on the screen now, identified

8   as Exhibit 7?

9        A.    Okay.

10        Q.    You were asked about these shooting

11   safety rules, and I'm going to zoom in on my

12   screen, I think.  Maybe.  I'm not.  I'm not going

13   to.

14        MR. CHIMIENTI:  Which one do you need?

15        MR. SIGALE:  I guess just these shooting

16   safety rules.  Yeah.  All right.

17   BY MR. SIGALE:

18        Q.    And you were asked about why the issue

19   of -- the question of unloaded didn't -- even

20   though you said it was one of your three primary

21   rules, did not show up in these rules.  Do you

22   remember?

23        A.    Yes.

24        Q.    All right.  I'm just going to ask you a



RICHARD PEARSON  30b6                                    August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                                  179

1   question, and it looks -- I'm going to ask you to

2   just read the rules, but it looks to me like these

3   rules are specifically for when you are at the

4   range and you're on the firing line?

5        A.    Right.

6        Q.    Is that -- am I reading that right?  Am

7   I interpreting these rules correctly?

8        A.    No, that would be for when you are on

9   the firing line.

10       Q.    Is that -- are these rules then for the

11  firing line, is that why there's no rule about

12  keeping the firearm unloaded?

13       A.    Probably, yeah.

14       Q.    Okay.  Because when you are on the

15  firing line at a firing range, that is a different

16  scenario from when you are in your house, correct?

17       A.    Yes.

18       Q.    Okay.  And along those same lines --

19  Matt, you can take that off.  Thanks.

20            Along those same lines, when you are

21  talking about -- you might have to even help me

22  remember what I'm talking about here, but there

23  was -- it was in the range rules, I believe it was,

24  and it had to do with if you were shooting a rifle



1  in a firing position, that the range could tell you

2  to take your other firearms off, your concealed

3  firearms and whatnot?

4       A.    Yes.

5       Q.    Is that in the range rules?

6       A.    It is.

7       Q.    And you were asked some questions about

8  that.  Do you remember?

9       A.    Yes.

10      Q.    Now, in that scenario whether you are at

11  a competition and you are getting in position to do

12  a -- what did you call it, a bench position, rifle

13  shooting?

14      A.    Or prone position, which means laying

15  down, or kneeling or whatever.

16      Q.    And you say if you have a concealed

17  handgun, take it off, right?  And you said about

18  how you wanted to control the environment, correct?

19      A.    That's correct.

20      Q.    In that scenario, is the person actually

21  disarmed?

22      A.    No.  Generally, they are carrying a much

23  more powerful firearm than a handgun would be.

24      Q.    Okay.  And this might sound elementary,



RICHARD PEARSON 30b6                          August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                       181

1   but if you are at one of those competitions, is

2   there usually more than one person who is armed?

3        A.    Everyone is.

4        Q.    So this is not the scenario of

5   I'm alone -- I'm at home at night with no

6   ready-to-use firearm and no means of armed

7   self-defense?

8        A.    No.

9        Q.    Is that correct?

10       A.    Yes.  Completely different.

11       Q.    So even though going to competitions,

12  say, might be a voluntary thing, when you say, Take

13  away -- put away the concealed handguns, in no way

14  are you taking away anyone's right or ability to

15  defend themselves; is that correct?

16       A.    No.

17       MR. CHIMIENTI:  Objection to form, calls for

18  speculation.

19  BY MR. SIGALE:

20       Q.    To your understanding of what this

21  lawsuit is about, is there anything in this lawsuit

22  that is about letting the children have the

23  firearm?

24       A.    No.



1      Q.    Or is there anything in this lawsuit

2  about the issue being the children engaged in armed

3  self-defense?

4      A.    No.

5      Q.    Is there any circumstances in this

6  lawsuit where ISRA is advocating or envisioning the

7  foster or day care children having access to or

8  using the firearms?

9      A.    No.

10     Q.    Is this lawsuit about the adults being

11  able to defend themselves while simultaneously

12  keeping them away from the children?

13     A.    Yes.

14     MR. CHIMIENTI:  Vague.

15  BY MR. SIGALE:

16     Q.    Is that -- to your understanding, is

17  that what the claim is ultimately in this lawsuit?

18     A.    Repeat it again, please.

19     Q.    To allow the adults, in this case the

20  Millers, or other ISRA members who are foster

21  parents or day care home providers from having a --

22  in order to have a means to defend themselves while

23  at the same time keeping the firearms away from

24  children?



1        A.    Yes.

2        Q.    And you were asked in order -- in order

3    to achieve that, and what we are asking in this

4    lawsuit of the law -- of the regulations being

5    struck down, being eliminated.  Do you recall

6    talking about that?

7        A.    Yes.

8        Q.    If you and the other plaintiffs are

9    successful in this lawsuit and those regulations,

10   to the extent that it applies to State statutes

11   that govern that, are struck down as

12   unconstitutional, are you arguing here, as you sit

13   here, that those regulations can't be rewritten in

14   a constitutional manner?

15       A.    No.

16       MR. CHIMIENTI:  Foundation, calls for

17   speculation.

18   BY THE WITNESS:

19       A.    They can be rewritten.

20   BY MR. SIGALE:

21       Q.    Your point, your goal as you sit here,

22   is that if that happens and they are rewritten,

23   that it be done in a constitutional way?

24       A.    Correct.



1        MR. CHIMIENTI:  Objection, that misstates his

2   prior testimony.  Go ahead.

3   BY MR. SIGALE:

4        Q.    As you sit here now, asking what you

5   are -- what your goal is in this lawsuit, if they

6   are struck down and rewritten, as you say, in a

7   constitutional manner, that would be that the

8   exercise of the Second Amendment right is

9   preserved, correct?

10       A.    Yes.

11       MR. CHIMIENTI:  Objection, form.

12       MR. SIGALE:  I did not hear that, but that is

13  okay.  I don't have anything else.

14                    FURTHER EXAMINATION

15  BY MR. CHIMIENTI:

16       Q.    I have a few, Mr. Pearson, and then

17  hopefully we should be done.

18            Jed and Melissa Davis, you talked about

19  them earlier.  Is it fair to say you don't know

20  whether they were ever day care home operators?

21       A.    I think I know that they were once day

22  care home.  I don't know if they are today.

23       Q.    You don't know whether they were ever

24  foster parents?



```
 1         A.    I don't know.  I don't know what they
 2   did --
 3         Q.    And you don't know --
 4         A.    -- exactly.  I do know they were either
 5   foster care or day care or something, I guess,
 6   but -- I recall that, but it was not foremost in my
 7   mind.
 8         Q.    But you don't know which one they were
 9   at one time either way, correct?  What I said was
10   correct?
11         A.    That I didn't know?  Yes, that's
12   correct.
13         Q.    And to your knowledge, neither of those
14   individuals is currently a foster home operator,
15   correct?
16         A.    No.
17         Q.    What I said was correct?
18         A.    Yes.
19         Q.    To your knowledge, neither of those
20   individuals is currently a day care home operator,
21   correct?
22         A.    I don't know what they are, whether they
23   are or they aren't.
24         Q.    So you don't know whether they are
```



1   currently day care home operators, correct?

2        A.    No, I don't know.

3        Q.    Do you know whether -- at the time of

4   filing the Miller case, did you know at that time

5   whether Jennifer Miller was a day care home

6   licensee?

7        A.    No.

8        Q.    Did you know at the time of filing this

9   lawsuit whether Jennifer Miller was a foster

10  parent?

11       A.    No.

12       Q.    Did you know at the time of filing

13  this lawsuit whether Darin Miller was a foster

14  parent?

15       A.    No.

16       Q.    You had -- David told you a lot

17  about what you wanted in this case, so I'm going

18  to show you the exhibit that we talked about

19  earlier.  This is exhibit -- I have just put on the

20  screen Exhibit 5 to your deposition.  This is

21  the amended complaint.  Do you remember looking at

22  this?

23       A.    Yes.

24       Q.    Okay.  And I am going to go all of the



1  way down to the end, and on page 16 of 17 here, it

2  is in the middle of the page, it reads, Wherefore.

3  Do you see where it says, Wherefore?

4      A.   Yes.

5      Q.   In paragraph 1 it says, Issue

6  preliminary and permanent injunctions enjoining

7  Defendants Mark D. Smith, as acting director of the

8  Illinois Department of Human Services, and Kwame

9  Raoul as Attorney General of the State of Illinois

10  from continuing and enforcing Illinois statutes,

11  JCAR rules, IDCFS policies, and from prohibiting

12  firearms possession and carrying by day care home

13  licensees and/or licensed foster parents residing

14  in Illinois, including against plaintiffs and/or

15  their members.  Do you see that?

16      A.   Yes.

17      Q.   Okay.  And nowhere in that paragraph

18  does it say that you want the rules rewritten in

19  any way, does it?

20      A.   No, it does not.

21      Q.   And No. 2 it says, Enter the following,

22  so you are asking the Court to enter the following.

23  A declaratory judgment that the IDCFS policy of

24  prohibiting handgun possession and carrying to day



RICHARD PEARSON  30b6                                    August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              188

 1  care home licensees and/or licensed foster parents

 2  in Illinois and the Illinois statutory language

 3  which restricts firearms rights and privileges

 4  based on status as a day care home licensee and/or

 5  licensed foster parent such as contained in

 6  225 ILCS 10/7 are null and void because they

 7  infringe on the right of the people to keep and

 8  bear arms in violation of the Second and

 9  14th Amendments to the United States Constitution.

10  Do you see that?

11        A.    I do.

12        Q.    And nowhere in that paragraph does it

13  say that you or ISRA or anybody else wants this

14  rule rewritten, correct?

15        A.    Correct.

16        Q.    And it says you want the rule made null

17  and void, correct?

18        A.    Correct.

19        Q.    That means the rule would cease to exist

20  in its entirety?

21        A.    Correct.

22        Q.    It says, Issue preliminary and permanent

23  injunctions against the defendants and their

24  political subdivisions, including officers, agents,



1   and employees thereof from enforcement of the state

2   statutes, JCAR rules, and IDCFS policies of

3   prohibiting firearms possession and carrying to day

4   care home licensees and/or licensed foster parents

5   in Illinois and the Illinois statutory language

6   which restricts handgun rights and privileges based

7   on status as day care home licensee and/or licensed

8   foster parent, such as contained in 225 ILCS 10/7.

9   Do you see that?

10        A.    I do.

11        Q.    And nowhere in that paragraph does it

12   say that you want this rule rewritten in any way,

13   correct?

14        A.    No, it does not say that.  I mean, I did

15   not say that.

16        Q.    At any point did you tell -- have you

17   had discussions with any other members of Illinois

18   State Rifle Association about any formulation of

19   the relief that your counsel just told you that you

20   wanted in your previous testimony?

21        A.    No.

22        MR. SIGALE:  I'll object as to the form of

23   that.  But you answered, that is fine.

24



1  BY MR. CHIMIENTI:

2      Q.    I'm going to show you another -- I just

3  took that exhibit down, Mr. Pearson.  I'm going to

4  show you another one really quickly.  We talked

5  about this one before.  It's the range rules.  I'm

6  going to put it right back up on the screen right

7  now, and there it is.  It's Exhibit No. 6.  I'll

8  flip up to the top page.  Exhibit 6.  Do you see

9  Range Rules there?

10     MR. SIGALE:  It's not up.

11 BY THE WITNESS:

12     A.    It's not up.

13 BY MR. CHIMIENTI:

14     Q.    It's not up.

15     MS. HELFRICH:  Matt, you might be

16 disconnected.

17     MR. CHIMIENTI:  You can't see me.  Let's go

18 off the record.

19     MS. HELFRICH:  Now we can see you.

20     MR. CHIMIENTI:  Oh, you got me now.

21 BY MR. CHIMIENTI:

22     Q.    Can you see the range rules now,

23 Mr. Pearson?

24     A.    I do.



RICHARD PEARSON  30b6                                    August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              191

```
1        Q.    I am going to flip ahead here to
2   page 10.  Mr. Sigale had asked you about the rule
3   regarding prohibiting concealed carry, and this is
4   the fourth bullet point from the bottom of page 10.
5   And, again, it says, Concealed and/or open carry
6   may be banned from competition or training at the
7   discretion of the match director or instructor.  Do
8   you see that?
9        A.    Yes.
10       Q.    And that rule is not limited to just a
11  competition, is it?
12       A.    No.
13       Q.    In fact --
14       A.    The answer is that if you have a
15  concealed carry permit, you could carry concealed.
16       Q.    But conceivably under this rule, any
17  instructor at any time on the range could ban
18  concealed carry, correct?
19       A.    They could.
20       Q.    And none of your members have challenged
21  this rule as some sort of infringement of Second
22  Amendment rights?
23       A.    No.
24       Q.    Okay.  I'll take that off the screen.
```



RICHARD PEARSON  30b6                        August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                      192

```
 1            You had mentioned earlier that -- you
 2   had mentioned earlier about the idea of FOID
 3   cardholders being allowed to carry a firearm in a
 4   holster that does not allow unauthorized access.
 5   Do you remember that?
 6       A.    I do.
 7       Q.    If that requirement goes into effect,
 8   should DCFS be allowed to inspect the holster to
 9   make sure that foster care children or day care
10   children are not able to have access to the
11   firearm?
12       A.    If DCFS knew what they were doing, yes.
13       Q.    And what makes you think that DCFS
14   doesn't know what they are doing?
15       A.    I don't think they know anything about
16   firearms or very little.
17       Q.    Do you think that DCFS knows anything
18   about child safety?
19       A.    Some things.
20       Q.    Okay.  And how would one determine
21   whether that firearm holster successfully prevented
22   children's access to the firearm?
23       A.    There are several ways that that could
24   be done so that only the user can get the firearm
```



1   out of the holster.

2        Q.    And that is something that should be

3   left up to the individual firearm owner, not DCFS

4   or anybody else?

5        A.    Correct.

6        MR. CHIMIENTI:  Okay.  Let me check here.  I

7   don't think that I have anything else.

8                    FURTHER EXAMINATION

9   BY MR. SIGALE:

10       Q.    Just to clarify a couple things.

11  Richard, are you challenging certain laws and

12  regulations in this lawsuit?

13       A.    Yes.

14       Q.    And I mean by "you," ISRA?

15       A.    Yes.

16       Q.    Why are you challenging these laws and

17  regulations in this lawsuit?

18       A.    Because it takes away people's Second

19  Amendment rights and the ability to defend

20  themselves and others.

21       Q.    Are you asking in this lawsuit that

22  those laws and regulations that are restricting the

23  Second Amendment right be declared

24  unconstitutional?



1        A.    Yes.

2        Q.    And as such be, to use a colloquialism,

3   struck down?

4        A.    Yes.

5        Q.    If that is done, does ISRA care whether

6   the laws are actually rewritten?

7        A.    No, but I imagine they will be.

8        Q.    Does -- if they are struck down, does

9   ISRA actually care if the regulations are

10  rewritten?

11       A.    Not as long as -- as long as it is done

12  in a constitutional manner.

13       Q.    But, I mean, are you suing -- as you

14  understand it, are you actually suing to have a

15  judge force them to rewrite the rules?

16       A.    Right now we are asking that it be

17  struck down, but if a judge asked them to rewrite

18  the rules, we would review it.

19       Q.    Okay.  If the Millers allege in their

20  lawsuit, which is the same lawsuit as the one that

21  you are involved in, that they were day care home

22  operators at the time of filing the lawsuit, do you

23  have any reason to dispute that?

24       A.    No.



1        MR. CHIMIENTI:  Objection, calls for

2   speculation.

3   BY MR. SIGALE:

4        Q.    And if they allege in the amended

5   complaint, the one that we have been -- used as

6   Exhibit 5 throughout this deposition, that they are

7   both foster parent -- day care home operators and

8   foster parents, do you have any reason to dispute

9   that?

10       A.    No.

11       MR. SIGALE:  Okay.  Nothing else.

12       MR. CHIMIENTI:  Okay.  Mr. Pearson, your

13  deposition is concluded.  David, signature?

14       MR. SIGALE:  Let's reserve it.  There was a

15  whole lot of kind of mumble dropping at the end and

16  mumbling and Zoom talking, so let's reserve it.

17       MR. CHIMIENTI:  Okay.  Mr. Pearson, thank you

18  so much for your time today.  I really appreciate

19  you taking some time to chat with us, and David

20  will explain to you, you reserved signature and

21  this will allow you to review the transcript before

22  it's finalized.  You can make changes to it in

23  terms of spellings and things like that, but you

24  can't change substantive answers.



1          But David will explain that process for

2    you when the transcript comes through.  Thank you

3    again for your time.  We appreciate your time

4    today.  And, David, let's go off the record.

5                FURTHER DEPONENT SAITH NOT.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



```
 1   STATE OF ILLINOIS )
 2                     ) SS:
 3   COUNTY OF C O O K )
 4            I, KRISTIN C. BRAJKOVICH, a Certified
 5   Shorthand Reporter of said state, do hereby
 6   certify:
 7            That previous to the commencement of the
 8   examination of the witness, the witness was duly
 9   sworn to testify the whole truth concerning the
10   matters herein;
11            That the foregoing deposition transcript
12   was reported stenographically by me,
13   was thereafter reduced to typewriting under my
14   personal direction and constitutes a true record
15   of the testimony given and the proceedings had;
16            That the said deposition was taken
17   before me at the time and place specified;
18            That I am not a relative or employee
19   or attorney or counsel, nor a relative or
20   employee of such attorney or counsel for any of
21   the parties hereto, nor interested directly or
22   indirectly in the outcome of this action.
23            IN WITNESS WHEREOF, I do hereunto set my
24   hand and affix my seal of office at Chicago,
```



1  Illinois, this 1st day of September 2020.

2

3

4                    s/ Kristin C. Brajkovich redacted pursuant to Local Rule 5.11

5

6

7        C.S.R. Certificate No. 84-3810.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



RICHARD PEARSON  30b6                          August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                     199

```
 1                    I N D E X

 2   WITNESS                      EXAMINATION

 3   RICHARD PEARSON

 4         By Mr. Chimienti          4, 184

 5         By Mr. Sigale          169, 193

 6

 7

 8

 9              E X H I B I T S

10   NUMBER                            PAGE

11   Pearson Deposition

12         Exhibit No. 1                3

13         Exhibit No. 3                3

14         Exhibit No. 5                3

15         Exhibit No. 6                3

16         Exhibit No. 7                3

17         Exhibit No. 9                3

18         Exhibit No. 12               3

19

20

21

22

23

24
```



1                    DEPOSITION ERRATA SHEET

2

3   Our Assignment No. J5903346

4   Case Caption:   Jennifer J. Miller, et al., vs.

5                        Marc D. Smith, et al.

6

7        DECLARATION UNDER PENALTY OF PERJURY

8

9             I declare under penalty of perjury that

10  I have read the entire transcript of my deposition

11  taken in the captioned matter or the same has been

12  read to me, and the same is true and accurate, save

13  and except for changes and/or corrections, if any,

14  as indicated by me on the DEPOSITION ERRATA SHEET

15  hereof, with the understanding that I offer these

16  changes as if still under oath.

17

18        Signed on the _____ day of

19  _____, 20_____.

20

21

22

23  _____

24        RICHARD PEARSON



RICHARD PEARSON  30b6                                      August 18, 2020
JENNIFER J. MILLER vs MARC D. SMITH                                  201

```
 1                    DEPOSITION ERRATA SHEET

 2

 3    Page No. _____Line No._____Change To:_____

 4    Reason for Change:_____

 5    Page No. _____Line No._____Change To:_____

 6    Reason for Change:_____

 7    Page No. _____Line No._____Change To:_____

 8    Reason for Change:_____

 9    Page No. _____Line No._____Change To:_____

10    Reason for Change:_____

11    Page No. _____Line No._____Change To:_____

12    Reason for Change:_____

13    Page No. _____Line No._____Change To:_____

14    Reason for Change:_____

15    Page No. _____Line No._____Change To:_____

16    Reason for Change:_____

17    Page No. _____Line No._____Change To:_____

18    Reason for Change:_____

19    Page No. _____Line No._____Change To:_____

20    Reason for Change:_____

21    Page No. _____Line No._____Change To:_____

22    Reason for Change:_____

23    SIGNATURE:_____DATE:_____

24              RICHARD PEARSON
```



```
1                 DEPOSITION ERRATA SHEET

2

3    Page No. _____Line No._____Change To:_____

4    Reason for Change:_____

5    Page No. _____Line No._____Change To:_____

6    Reason for Change:_____

7    Page No. _____Line No._____Change To:_____

8    Reason for Change:_____

9    Page No. _____Line No._____Change To:_____

10   Reason for Change:_____

11   Page No. _____Line No._____Change To:_____

12   Reason for Change:_____

13   Page No. _____Line No._____Change To:_____

14   Reason for Change:_____

15   Page No. _____Line No._____Change To:_____

16   Reason for Change:_____

17   Page No. _____Line No._____Change To:_____

18   Reason for Change:_____

19   Page No. _____Line No._____Change To:_____

20   Reason for Change:_____

21   Page No. _____Line No._____Change To:_____

22   Reason for Change:_____

23   SIGNATURE:_____DATE:_____

24               RICHARD PEARSON
```

