E-FILED
Friday, 12 November, 2021  03:35:16 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 9
# Deposition of Julianne Versnel

JULIANNE VERSNEL
JENNIFER J. MILLER vs MARC D. SMITH

August 12, 2020
1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE CENTRAL DISTRICT OF ILLINOIS

 3    _____

      JENNIFER J. MILLER, DARIN     )
 4    E. MILLER SECOND AMENDMENT     )
      FOUNDATION, INC. ILLINOIS      )
 5    STATE RIFLE ASSOCIATION,       )
      and ILLINOIS CARRY,            )
 6                                   )
                   Plaintiffs,       )
 7                                   )
                vs.                  )   Case No. 18 cv 3085
 8                                   )
      MARC D. SMITH, in his          )
 9    official capacity as Acting    )
      Director of the Illinois       )
10    Department of Children and     )
      Family Services, and KWAME     )
11    RAOUL, in his official         )
      capacity of Attorney          )
12    General of the State of        )
      Illinois,                      )
13                                   )
                   Defendants.       )
14    _____

15    ZOOM 30(B)(6) DEPOSITION OF SECOND AMENDMENT FOUNDATION

16                   JULIANNE VERSNEL

17                   August 12, 2020

18                     7:03 a.m.

19               Bellevue, Washington
      _____

20

21

22

23    Reported by:

24    JOHANNA CHAPIN BRUNT
      CCR No. 2159
25    Job No. J5903345
```



```
 1                    A-P-P-E-A-R-A-N-C-E-S

 2

     For the Plaintiff Second Amendment Foundation:
 3
                        DAVID SIGALE
 4                      Law Firm of David G. Sigale, P.C.
                        430 West Roosevelt Road,
 5                      Wheaton, Illinois 60187
                        (630) 452-4547
 6                      Dsigale@sigalelaw.com

 7

 8

 9   For the Defendants Illinois Department of Children and
     Family Services and the Attorney General:
10
                        GRETCHEN E. HELFRICH
11                      Office of the Illinois Attorney General
                        100 West Randolph Street, 11th Floor
12                      Chicago, Illinois 60601
                        (312) 814-3000
13                      Ghelfrich@atg.state.il.us

14

15   Also Present:

16                        MATT CHIMIENTI

17                        NICK LEARY BARONY

18

19

20

21

22

23

24

25
```



```
 1              E-X-A-M-I-N-A-T-I-O-N  I-N-D-E-X

 2
         EXAMINATION BY:                               PAGE NO.
 3
         Ms. Helfrich ----------------------------------   5
 4
         Mr. Sigale -----------------------------------
 5

 6

 7

 8

 9

10
                    E-X-H-I-B-I-T  I-N-D-E-X
11

12       EXHIBIT NO.   DESCRIPTION                      PAGE NO.

13       Exhibit 1     Defendants' Amended Notice of        8
                       Rule 30(b)(6) Deposition of Plaintiff
14                     Second Amendment Foundation

15       Exhibit 2     Amended Complaint for Declaratory and 40
                       Injunctive Relief
16
         Exhibit 3     Plaintiff Second Amendment Foundation, 31
17                     Inc.'s Answers to Defendants
                       Marc D. Smith and Kwame Raoul's First
18                     Set of Interrogatories to Plaintiff
                       Second Amendment Foundation, Inc.
19
         Exhibit 6     Document marked 62565MLLR601D         60
20
         Exhibit 8     Safer Homes Suicide Aware            145
21

22

23

24

25
```



```
 1                    BELLEVUE, WASHINGTON

 2                AUGUST 12, 2020; 7:03 A.M.

 3

 4

 5                    JULIANNE VERSNEL,

 6          having been duly sworn, was examined and

 7                  testified as follows:

 8

 9

10                 E-X-A-M-I-N-A-T-I-O-N

11  BY MS. HELFRICH:

12      Q.   For the record, I'm Gretchen Helfrich with the

13  Office of the Illinois Attorney General.  I represent the

14  Attorney General and the head of DCFS in this matter.  This

15  is the Rule 30(b)(6) deposition of the Second Amendment

16  Foundation taken pursuant to notice given on July 21, 2020.

17          Counsel for the SAF is David Sigale.  He is

18  here --

19              (Reporter asks for clarification.)

20          MS. HELFRICH:  Counsel for the SAF is

21  David Sigale.

22          David, who has the organization to produce and

23  testify about the traffic form and notice?

24          MR. SIGALE:  The organization is producing

25  Julianne Versnel, J-U-L-I-A-N-N-E, V as in Victor, E-R-S, N
```



1   as in Nancy, E-L, as the organizational representative with

2   regard to the topics on the notice.

3          MS. HELFRICH:   Thank you.

4

5                       E-X-A-M-I-N-A-T-I-O-N

6   BY MS. HELFRICH:

7      Q.   Ms. Versnel, good morning.  Thank you for joining

8   us this morning.  I know it's early out there in Bellevue.

9   Let me start by asking you whether you have ever given a

10  deposition before?

11     A.   Yes, I have.

12     Q.   Okay.  So you know that there are some ground

13  rules to a deposition.  I'm going to review them quickly

14  with you.  We're conducting this deposition via Zoom

15  because of the COVID-19 pandemic, but, as you've seen, we

16  still have a court reporter on the line and she's taking

17  down everything that we say.

18          The court reporter cannot take down answers if

19  they are too fast, as we've just learned, so we will try to

20  speak slowly, but also the court reporter can't take down

21  nonverbal answers, so shakes of the head, nods of the head,

22  uh-uh, uh-huh, those sorts of responses, she can't take

23  them down.  So I would ask that all of your responses be

24  verbal.  Is that all right?

25     A.   Yes, ma'am.



1     Q.   And I may from time to time prompt you to give a

2   verbal answer if you give a shake of the head or something.

3   I'm not doing that to be rude.  I'm just doing that to make

4   sure that our record is clear, okay?

5     A.   Yes.

6     Q.   All right.  We should -- I will be asking the

7   questions today.  I will do my very best not to talk over

8   you, and I would ask you to wait until I finish the

9   question before you give your answer.  That's actually for

10   a couple of reasons.

11       One of the reasons is so the court reporter

12   doesn't have to take down competing speakers, and the

13   record will be clearer and more accurate.  Secondly, I want

14   to make sure that you've heard the entirety of my question

15   before you answer it.  So to the best of our ability, let's

16   try not to speak over each other, okay?

17     A.   Yes.

18     Q.   You can take a break at any time you if need one.

19   The only condition is that if I've asked a question, we'll

20   need to get your answer before we take a break.  But if you

21   need a break, if you need to just take a breathe, if you

22   need to use the restroom, pretty much anything, just say so

23   and we'll go off the record for a moment and give you a

24   break, okay?

25     A.   Thank you.  May I ask --



1        Q.   If I ask you a question -- go ahead.

2        A.   May I ask who the two gentlemen are who are on my

3    Zoom screen who appear to be muted, please?

4        Q.   Yes, sorry about that.

5             MR. CHIMIENTI:  Hi, Ms. Versnel.  I'll go ahead,

6    Gretchen.  My name is Matt Chimienti.  I'm another attorney

7    for the defendants.  I work with Ms. Helfrich as an

8    assistant Attorney General with the Office of the Illinois

9    Attorney General.

10            And the second individual on our screen here is

11   Nick Leary Barony (phonetic) is our office's -- our

12   bureau's law clerk this summer and he will be observing

13   today's -- at least part of today's deposition.

14            THE WITNESS:  Thank you.

15            MS. HELFRICH:  Sure.

16       Q.   (By Ms. Helfrich)  So I was saying if I ask you a

17   question and you don't understand the question, please let

18   me know that you don't understand it and we'll attempt to

19   figure out the misunderstanding.  I don't want you to

20   answer a question that you don't understand, okay?

21       A.   Yes, ma'am.

22       Q.   If I ask you a question and you don't know the

23   answer, just say you don't know the answer.  Don't guess

24   and don't speculate, okay?

25       A.   Yes, ma'am.



1      Q.   I think your counsel would agree with me on that

2   one.  And then lastly, are you under the influence of any

3   drugs or medication or anything else that would impair your

4   ability to give truthful testimony or to recall things

5   accurately?

6      A.   No, ma'am.

7      Q.   Okay.  Thank you.  I'm going to share a screen

8   right now and show you what I've marked as Exhibit 1.  Can

9   you see a document that says at the top United States

10  District Court for the Central District of Illinois?

11     A.   Yes, ma'am.

12                  (Exhibit No. 1 was marked.)

13     Q.   (By Ms. Helfrich)  Okay.  I am scrolling down to

14  the bottom.  You can see that I've marked it.  There is now

15  Exhibit 1?

16     A.   Yes, ma'am.

17     Q.   Okay.  Have you seen this document before?

18     A.   Yes, ma'am.

19     Q.   All right.  Do you see -- tell me if I'm scrolling

20  too fast.  Do you see this list of topics that begins with

21  Number 1, The purposes of the organization?

22     A.   Yes, ma'am.

23     Q.   And do you understand that you have been

24  designated today to testify on these topics, on all of

25  these topics?



1      A.    Yes, ma'am.

2      Q.    Do you need to review the topics?  Do you want to

3  spend a moment looking at them?

4      A.    Am I allowed -- I have a printed copy.  Am I

5  allowed to have that in front of me?

6      Q.    Sure.

7      A.    Thank you.

8      Q.    Okay.  And do you understand that the answers you

9  give will be binding on the Second Amendment Foundation?

10     A.    Yes, ma'am.

11     Q.    Okay.  You said you've given a deposition before.

12  How many times have you been deposed?

13     A.    I believe it's three times.

14     Q.    Okay.  And can you describe the occasions on which

15  you were deposed?

16     A.    I've been deposed in a case called Ezell v. the

17  City of Chicago.  I believe I was deposed more than one

18  time there.  And I was deposed I believe to the best of my

19  recollection in a case in California.  I believe I was

20  deposed in Pena, a case called Pena.

21     Q.    P-E-N-A; is that right?

22     A.    Yes.

23     Q.    Okay.  And in those instances, were you deposed --

24  in Pena specifically, were you deposed as the

25  representative of the Second Amendment Foundation?



1   A.   Yes.

2   Q.   Okay.  And Ezell you were also speaking on behalf

3   of the Second Amendment Foundation?

4   A.   Yes, ma'am.

5   Q.   Okay.  And it's my understanding that you were

6   deposed twice in Ezell.  Is that your recollection?  Was it

7   more than twice?

8   A.   It was twice.

9   Q.   Okay.  Any other depositions besides those three?

10  A.   Not that I recall.

11  Q.   Okay.  You've never been a witness in a lawsuit

12  or...

13  A.   Not that I recall.

14  Q.   Okay.  I'd like to start by asking you just some

15  questions about your background.  First of all, let's talk

16  about your educational background.  I assume you graduated

17  from high school; is that correct?

18  A.   Yes.

19  Q.   Did you attend college?

20  A.   Yes.

21  Q.   Did you get a degree from any college or

22  university?

23  A.   Yes.

24  Q.   Okay.  And what was that degree in?

25  A.   English with a minor in political science.



1    Q.    Okay.  What college or university was that from?

2    A.    Maryville University.

3    Q.    And do you have any -- sorry, strike that.

4          Was that a bachelor's degree?

5    A.    Yes, ma'am.

6    Q.    Do you have any formal degrees beyond a bachelor's

7    degree?

8    A.    No, ma'am.

9    Q.    Okay.  After your bachelor's degree -- or sorry,

10   in addition to your high school diploma and your bachelor's

11   degree from Maryville College, do you have any other formal

12   education?

13   A.    No, ma'am.

14   Q.    Okay.  Do you have any professional certifications

15   or formalized professional training?

16   A.    No, ma'am.

17   Q.    Does your formal educational background include

18   education related to child care?

19   A.    No, ma'am.

20   Q.    Does your formal educational background include

21   any education related to firearm safety?

22   A.    No, ma'am.

23   Q.    Does it include any education related to firearm

24   storage?

25   A.    No, ma'am.



1      Q.   Were you ever in the military?

2      A.   No, ma'am.

3      Q.   Did you ever apply to be in the military or

4   attempt to be in the military?

5      A.   No, ma'am.

6      Q.   Okay.  I'm going to ask you some questions about

7   your employment background.  You are currently employed by

8   the Second Amendment Foundation?

9      A.   Yes, ma'am.

10     Q.   What is your title there?

11     A.   I'm director of operations.

12     Q.   How long have you held that position?

13     A.   I believe about 20 years.

14     Q.   Prior to taking the position of director of

15   operations at the Second Amendment Foundation, were you

16   employed?

17     A.   Yes, ma'am.

18     Q.   And what was that employment just prior?

19     A.   I was employed by the Second Amendment Foundation.

20     Q.   In what position?

21     A.   I don't believe I had a title.

22     Q.   Okay.  Could you describe your role?

23     A.   It was very similar to the role I play now as

24   director of operations, I just didn't have that title.

25     Q.   And how long did you have that position?



1        A.   I have worked with the Second Amendment Foundation

2   since 1976.

3        Q.   So if I'm counting right, you've been director of

4   operations with that title since about 2000?

5        A.   Correct or perhaps earlier.  I simply don't

6   recall.

7        Q.   But that ballpark within a few years of that,

8   would you say?

9        A.   Yes.

10       Q.   Okay.  I'm not trying to trick you, I'm just

11  trying to establish a relationship with SAF.

12            So prior to that, you've been working with SAF

13  since 1976.  Is that -- between 1976 and when you got the

14  director of ops position -- title, when you got the

15  director of ops title, were you doing the same work?

16       A.   The work evolved as the Second Amendment

17  Foundation grew.

18       Q.   Can you describe for me how your work now is

19  different from your work in 1976?

20       A.   The Second Amendment Foundation is involved in

21  much more litigation then they were in 1976, so I am more

22  involved in litigation.

23       Q.   Okay.  Did you ever hold any positions -- so was

24  there ever a time, for example, where you were clearly in a

25  different position at SAF -- well, first of all, I am going



1    to refer to the Second Amendment Foundation as SAF.  Is

2    that okay with you?

3        A.   Yes, ma'am.

4        Q.   Okay.  At SAF, did you ever have a clearly

5    different position?  Like, for example, were you ever

6    somebody's assistant or an intern or, you know, some

7    clearly different position from the position you're in now?

8        A.   No, ma'am.

9        Q.   All right.  And during the time that you've worked

10   for the Second Amendment Foundation -- so this is, we're

11   talking about 44 years?

12       A.   Yes, ma'am.

13       Q.   That's a long time.  During the 44 years that

14   you've worked with the Second Amendment Foundation, have

15   you had other employment?

16       A.   I have a side business on my own.

17       Q.   And what is that business?

18       A.   I do political consulting and fundraising.

19       Q.   Is that work related -- strike that.

20            Is that work separate from your work at SAF?

21       A.   There is some overlap.

22       Q.   Could you describe the overlap?

23       A.   I help coordinate the fundraising for the Second

24   Amendment Foundation.

25       Q.   And you do that through your other business?



1    A.    Yes.

2    Q.    Okay.  So you have other clients besides SAF?

3    A.    Yes.

4    Q.    Have you ever had any employment related to child

5  care?

6    A.    No, ma'am.

7    Q.    You don't have to ma'am.  You can if you want, but

8  you don't have to.

9    A.    Okay.

10    Q.   Is it correct that you are not a licensed foster

11  parent in Illinois?

12    A.   Yes, ma'am.

13    Q.   Is it correct that you are not a day care home

14  operator licensed in Illinois?

15    A.   Yes, ma'am.

16    Q.   I'd like to understand a little bit of your

17  education or training related to firearms.  Do you have

18  any -- strike that.

19          What formal training have you had in the use or

20  handling of firearms?

21    A.   I have taken classes and had private lessons.

22    Q.   When was the last time you took a class?

23    A.   Approximately 10 years ago.

24    Q.   And the classes and private lessons that you've

25  had, what was the goal of those courses?  In other words,



```
 1    I'm trying to understand, did you have a course on --
 2    related to hunting, a course related to self-defense, a
 3    course related to maybe just getting the minimum you are
 4    required to own a firearm in Washington?  Can you describe
 5    for me the different types of training that you've had?
 6        A.   I've had training in the use and safety of a
 7    firearm.  I've had training in terms of learning to
 8    accurately shoot a firearm.
 9        Q.   Have you ever had any training specifically
10    related to self-defense?
11        A.   No.  May I just add to my answer, please?
12        Q.   Certainly.
13        A.   In the training that I took in terms of firearms
14    safety, the issues of self-defense are covered very
15    clearly.
16        Q.   Can I ask you to elaborate on that?  How are they
17    covered?
18        A.   They are covered in terms of -- I'm trying to find
19    my words here so I can be accurate.  They are covered in
20    terms of legalities, and they are covered in terms of
21    appropriate times when self-defense would be an issue and
22    the psychology of self-defense is covered.
23        Q.   By legality, do you mean the situations under
24    which it would be legal for a person to use a firearm to
25    defend themselves?
```



1    A.   Yes.

2    Q.   Did you ever have any training regarding specific

3  scenarios in which you would need to defend yourself with a

4  firearm?

5    A.   I would need to clarify that answer, please -- or

6  that question, please, excuse me.

7    Q.   Okay.  Did you ever have any training where you

8  were specifically taught in this circumstance, for example,

9  burglar coming in through the window, here is what you

10  should do contracted with I'm on the street and somebody

11  drops a weapon on me, here's what you should do?

12       So did you ever have any training addressing

13  specific scenarios?

14    A.   No, ma'am.

15    Q.   Were you required to get training in connection

16  with any firearms license you may have?

17    A.   No, ma'am.

18    Q.   Do you know when you first operated a firearm?

19    A.   I think I was probably between 8 and 10 years old.

20    Q.   And can you describe the circumstances for me?

21    A.   My father took me out shooting.

22    Q.   Just target shooting, not hunting?

23    A.   Initially target shooting, later hunting.  Also

24  skeet and trap.

25    Q.   And when you were that age, did you actually



1  handle the firearms?

2      A.   Yes, ma'am.

3      Q.   And in your view now as an adult, was that

4  appropriate for an 8-year-old to be handling a firearm --

5  for you as an 8-year-old to be handling a firearm?

6      A.   With my father, yes.

7      Q.   Okay.  And I'm clarifying.  I'm not asking you to

8  say that every 8-year-old should be allowed to handle a

9  firearm.  I'm just asking for you personally in that

10  circumstance, you felt it was appropriate?

11      A.   Yes, ma'am.

12      Q.   Okay.  Did you grow up in a house where firearms

13  were kept?

14      A.   Yes, ma'am.

15      Q.   And how were they kept?

16      A.   They were kept in various manners.  One of the

17  hand guns, a revolver, was kept underneath my father's side

18  of my parent's mattress.  There was also firearms in a

19  closet in our front hall, and there were long guns and shot

20  guns that were kept in an area of our basement.

21      Q.   And were any of these kept under lock and key?

22      A.   No, ma'am.

23      Q.   Okay.  I want to ask you -- I'm not asking you to

24  trash your parents, but I guess I'm asking is the scenario

25  that you just described in terms of how the weapons were



1    kept, would you say that that was a safe way to keep the

2    weapons given that the house had children in it?

3         A.   In the 1960's and '70s, yes, I felt it was

4    appropriate.

5         Q.   Do you think that would be appropriate now?

6         A.   I think that it depends on the --

7         Q.   Let me strike the question because I don't really

8    want this to be about your parents.  What I really want to

9    ask is a different question and I'll tell you what, we'll

10   come back to it when we are talking about the

11   organization's position on safety and storage and that.  So

12   let's leave that.

13            Do you currently live with children?

14        A.   No, ma'am.

15        Q.   Okay.  Did you ever live with children?

16        A.   Yes, ma'am.

17        Q.   Did you keep firearms at the time you lived with

18   children?

19        A.   Yes, ma'am.

20        Q.   How did you keep them?

21        A.   In a lock box.

22        Q.   And were these your own children?

23        A.   Yes, ma'am.

24        Q.   Did you provide them with training or education

25   related to firearms?



1      A.   Yes, ma'am.

2      Q.   What kind of training did you provide them?

3      A.   Provided them with education, safety training,

4  firearm handling and target shooting.

5      Q.   What do you mean by firearm handling specifically?

6      A.   How to safely handle a firearm.

7      Q.   And if you recall, at what age did you allow your

8  children to handle firearms?

9      A.   I believe the first time we took our children to a

10  range to shoot and their first lessons with an actual

11  firearm were probably when they were 6 or 7.

12      Q.   And they actually handled the weapons and fired

13  the weapons at that age?

14      A.   With an instructor right next to them helping them

15  aim the firearm and making sure that the firearm did not

16  have too much recoil for them.

17      Q.   Okay.  So when you say the instructor helping

18  them, do you mean that the instructor, you know, physically

19  like touching them and helping them hold the firearm?

20      A.   I don't know exactly.  All I recall is

21  particularly the instructor was in the lane area right next

22  to them.

23      Q.   In your opinion, is there an age -- strike that.

24  I want to ask it a different way.

25           I understand that children are different and not



1   all children would be ready to handle a firearm at the same

2   age, that it would vary.  Would you agree with that?

3       A.   Yes, ma'am.

4       Q.   Is there an age younger than which no child should

5   handle a firearm?

6       A.   I need to make an assumption or I need to preface

7   every question that you ask me that way.  Which would you

8   prefer me to do?

9       Q.   Tell me what the assumption is that you would have

10  to make.  Before you give me your answer, tell me what the

11  assumption is.

12      A.   The assumption is that the child is not by

13  themselves, they're with a parent or other responsible

14  adult.

15      Q.   Yes, okay.  Let's make that assumption.  Let's

16  make that assumption.  With that assumption, is there still

17  an age younger than which no child should be handling a

18  firearm?

19           MR. SIGALE:  I'll object as to foundation, but if

20  you can answer, go ahead and answer.

21      A.   It would only be a subjective -- a very subjective

22  comment on my part.

23      Q.   (By Ms. Helfrich)  Yeah, that's what I'm asking.

24  In your opinion, based on your experience, is there an age

25  younger than which a child should not be handling a firearm



1  even under the supervision of a responsible parent?

2        MR. SIGALE:  Same objection, but you can answer.

3     A.   If the child is not capable of understanding the

4  firearm is a -- is something that can be dangerous, and if

5  a child does not have the physical capability to hold the

6  firearm.

7     Q.   (By Ms. Helfrich)  And that will vary from child

8  to child, correct?

9     A.   Yes, ma'am.  Yes, ma'am.

10    Q.   Okay.  So what I'm asking is in your opinion is

11 there an age, you know, where you would say no child under

12 2 is capable of understanding and has the physical skills

13 necessary to handle a firearm?

14       MR. SIGALE:  Objection as to foundation and

15 speculation, but you can answer if you can.

16    A.   It would be unlikely that a child of 2 could

17 comprehend the safety lessons and be able to physically

18 handle the firearm; however, I would like to add to that,

19 that a child of 2 should be taught that a firearm that is

20 laying around should not be touched and they should get an

21 adult to secure the firearm.

22    Q.   (By Ms. Helfrich)  Okay.  But in terms of actually

23 handling it, what I am hearing you say is it really depends

24 on the individual child?

25    A.   And the individual parent or adult supervisor.



 1      Q.   Okay.  I want to talk a bit more about your

 2   current position at the Second Amendment Foundation.  Your

 3   title you told me was director of operations.  Can you tell

 4   me what your responsibilities are?

 5      A.   I help -- I help manage the organization.  I

 6   oversee other employees in certain litigations, I am

 7   heavily involved.  I help oversee publications.  I help

 8   organize events.

 9      Q.   Okay.  Are you currently an editor of any of FAS

10   publications?

11      A.   I may be listed on the masthead of the Second

12   Amendment Reporter.  I may be listed on the masthead of

13   TheGunMag.com.

14      Q.   But you're not sure if you are?

15      A.   I supervise the publication of the Second

16   Amendment Reporter.  I do not have anything to do with the

17   day-to-day operations of TheGunMag.com.

18      Q.   Okay.

19      A.   But since I oversee financial obligations, I could

20   be listed as an editor.  I just don't know.

21      Q.   Okay.  I understand, and we're going to talk about

22   some publications later and we'll get some -- I'll ask you

23   some more specific questions about your role with those.

24   But in terms of your position generally, do you have any

25   duties that relate to care of children, day care or foster



1    care?

2        A.   No, ma'am.

3        Q.   Who do you report to at the Second Amendment

4    Foundation, if anyone?

5        A.   I report to the executive vice president.

6        Q.   And who is that?

7        A.   Alan Gottlieb.

8        Q.   And who does Alan Gottlieb report to?

9        A.   He consults with the Board of Trustees on

10   occasion.

11       Q.   And do you have anyone reporting to you?

12       A.   Yes, ma'am.

13       Q.   How many people?

14       A.   Five.

15       Q.   And generally what are those five people's roles?

16       A.   I have three people who report to me as personal

17   assistants.  I have one person who specifically reports to

18   me for a conference that we put on every -- Second

19   Amendment Foundation and its sister organization -- put on

20   every year, and I have one person who reports to me for IT.

21       Q.   Okay.  Does anyone else other than you report to

22   Alan Gottlieb?

23       A.   Directly?

24       Q.   Yes.

25       A.   Two people.



1      Q.   Who are they?

2      A.   One would be Debra Preston who is the accounting

3  director at the Second Amendment Foundation.

4      Q.   Accounting you said?

5      A.   Yes, ma'am.

6      Q.   Okay.  Who's the other person?

7      A.   The other person would be Dave Workman.

8      Q.   Dave Workman?

9      A.   W-O-R-K-M-A-N.

10      Q.   And what is his role?

11      A.   He is -- his role is communications director, I

12  believe.  I know what he does.  I just don't know the

13  formal title.

14      Q.   Okay.  He handles communications?

15      A.   Yes, writing -- yes.

16      Q.   All right.  So Alan Gottlieb sometimes consults

17  with the Board.  If I'm incorrect, please let me know.

18  Executive vice president sometimes consults with the Board.

19  He has three people under him; you, Debra Preston and Dave

20  Workman.  You have five people under you.  Are there more

21  people under Debra Preston and Dave Workman?

22      A.   There are under Debra Preston, yes.

23      Q.   How many people?

24      A.   It varies.

25      Q.   Okay.  More than five?



1    A.   No.

2    Q.   Nobody under Dave Workman?

3    A.   No one on payroll.

4    Q.   Do you have interns?

5    A.   No, ma'am.

6    Q.   Okay.  When you say no one on payroll, are there

7    other people who are not on payroll who are under him?

8    A.   He would supervise contract writers who would

9    write articles.

10   Q.   Okay.  Understood.  Is there anyone else at Alan

11   Gottlieb's level in the organization?

12   A.   No, ma'am.

13   Q.   All right.  And your employment with SAF is

14   full-time employment?

15   A.   Yes, ma'am.

16   Q.   How did you become involved with SAF?

17   A.   The Second Amendment Foundation came into being in

18   1974.  In 1976, it was decided the Second Amendment

19   Foundation would begin to take a larger role and sort of

20   gear up, and I was hired by Alan Gottlieb to facilitate

21   that growth.

22   Q.   Okay.  How did you become aware of the Second

23   Amendment Foundation?

24   A.   I met Mr. Gottlieb at a conference in Washington

25   D.C.



1    Q.    A conference related to Second Amendment issues?

2    A.    No, ma'am.

3    Q.    What was the subject of the conference?

4    A.    It was a political conference.

5    Q.    Okay.  You mentioned before that SAF organizes a

6  conference and I think you said that it organizes it with

7  its sister organization?

8    A.    Yes, ma'am.

9    Q.    Okay.  What is the sister organization?

10   A.    Let me say this very slowly for the court

11 reporter.

12   Q.    Thank you.

13   A.    Citizens, C-I-T-I-Z-E-N-S, Committee for the Right

14 to Keep and Bear Arms.  I don't mean to insult you, ma'am,

15 Ms. Brunt.  I just want to make sure that my diction is

16 adequate.

17   Q.    Is that the only one?

18   A.    Yes, ma'am.

19   Q.    Okay.  How is SAF related to that organization or

20 affiliated with that organization?

21   A.    They are separate organizations, but their

22 interests overlap.

23   Q.    Okay.  I'm curious -- the reason I'm asking is

24 your interests overlap with lots of organizations.  You

25 described this Citizens Committee as a sister organization.



```
 1   Does that mean that you have a particular relationship with
 2   them that's different from the relationship that you might
 3   have with other like-minded organizations?
 4        A.   Yes.
 5        Q.   And how so?
 6        A.   The Citizens Committee was founded in 1971.
 7   Alan Gottlieb became the executive director, I believe, in
 8   1972.
 9        Q.   So Citizens Committee for the Right to Bear Arms
10   is a legally separate entity from SAF?
11        A.   Yes, ma'am.
12        Q.   But you have intersecting officials or
13   intersecting directors?
14        A.   One or two, yes.
15        Q.   Okay.  Would it be fair to say Mr. Gottlieb is the
16   main point of intersection?
17        A.   Yes, ma'am.
18        Q.   Okay.  Thank you.  I think I understand now.
19             What, if anything, did you do to prepare for your
20   deposition today?
21        A.   Excuse me, I just -- I looked over the complaint.
22   I looked over the answers to the interrogatories.  I have a
23   pile here.  Am I allowed to refer to them?  Am I allowed to
24   look at that?
25        Q.   Yeah, tell me what's in the file, and tell me -- I
```



1  would appreciate it if you would tell me when you are

2  looking.

3      A.    All right.  Here's the pile.

4      Q.    Okay.

5      A.    Okay.  This is the Amended Complaint.  This is the

6  Rule 34 responses.  This is the Rule 34 supplemental.

7  These are SAF's answers to its interrogatories.

8      Q.    The what, I'm sorry, I couldn't hear you?

9      A.    The Second Amendment Foundation answers to the

10  interrogatories.

11      Q.    Okay.

12      A.    This is a list of litigation that the Second

13  Amendment Foundation has been involved in.  And this path

14  is the information that you requested from Safer Homes.  I

15  was unable to print it all out because my printer ran out

16  of toner, but this is about 400 pages which I printed out.

17      Q.    Okay.  And those documents that you just

18  described, did you review those in preparation for your

19  deposition?

20      A.    I did nothing more than count -- I looked at the

21  Safer Homes documentation for maybe 15 minutes.

22      Q.    Okay.  I understand.  Are there -- other than

23  what's in your pile, did you look at any other documents in

24  preparation for this deposition?

25      A.    No, ma'am.



1    Q.   Did you meet with Mr. Sigale in preparation for

2  this deposition?  And I don't want to know about the

3  contents of anything you talked about.  I just want to know

4  if you did.

5    A.   Mr. Sigale?

6    Q.   Yes.

7    A.   We spoke on the telephone.

8    Q.   When was that?

9    A.   Last evening.

10   Q.   Is that the only time that you spoke with him

11  regarding preparation for this deposition?

12   A.   We had spoken once before that the deposition was

13  going to come up and that we would need to get together to

14  have a discussion.

15   Q.   Okay.  How long did you speak with him yesterday

16  evening?

17   A.   We started talking and then we got a tornado

18  warning, so then we had to take a break.  And then I

19  don't -- so I don't recall what time the conversation

20  resumed, but it was over by about 5:15 my time.

21   Q.   Okay.  I would like to -- I'm going to ask you

22  about the purposes of the organization.  That's one of the

23  topics on the list.  Before we do that, though, I want to

24  ask you some basic questions about SAF and its views on the

25  Second Amendment.  You know, that's Topic I under Number 3



1   on the notice.

2        A.   Yes, ma'am.

3        Q.   Does the Second Amendment have a statement

4   anywhere that says this is what we think the Second

5   Amendment means?

6        A.   Yes, ma'am.

7        Q.   Where would that be?

8        A.   That is our mission statement.  It is on the

9   website.  It is also located on the back of stationery.

10       Q.   I'm going to share my screen with you.  And I'm

11  showing you a document that I've marked as now Exhibit 3,

12  so we are skipping Exhibit 2 for a second.

13            MR. HELFRICH:  I apologize, Ms. Brunt, but we are

14  going to have to go out of order somehow with the numbers.

15                 (Exhibit No. 3 was marked.)

16       Q.   (By Ms. Helfrich)  So this is Exhibit 3.  Do you

17  recognize this document?

18       A.   This is the Amendment Complaint?

19       Q.   No, this is SAF Answers to Defendant's

20  Interrogatories.

21       A.   Sorry.

22       Q.   No problem.

23       A.   Yes.

24       Q.   Okay.  I'm going to ask you to go to Interrogatory

25  Number 5.



1    A.   Yes, ma'am.

2    Q.   And if you see -- so Interrogatory Number 5 asks:

3  "State with particularity every factual basis for your

4  assertion that the purposes of SAF include education,

5  research, publishing and legal action focusing on the

6  Constitutional right privately to own and possess

7  firearms."  Amended Complaint Paragraph 17.

8        Do you see that?  Did I read that correctly?

9    A.   Yes, ma'am.

10    Q.   And then in your answer, do you see that there is

11  a mission statement?

12    A.   Yes, ma'am.

13    Q.   Is that the mission statement that you were

14  referring to just now when I asked you about where the

15  statement of SAF's position on the Second Amendment would

16  be?

17    A.   Yes, ma'am.

18    Q.   Okay.  Just so I'm clear, the mission statement is

19  this upper part, you can't see me pointing, but the mission

20  statement itself ends with the sentence that says, "To that

21  end we carry on many educational and legal action programs

22  designed to better inform the public about the gun control

23  debate."

24    A.   Yes, ma'am.

25    Q.   Okay.  Thank you.



1          So does the Second Amendment Foundation believe

2     that the rights protected under the Second Amendment are

3     the rights recognized by the United States Supreme Court?

4     In other words, is the view of the scope of the Second

5     Amendment coextensive with what the Supreme Court says it

6     is?

7          A.   Are you referring to the Heller decision?

8          Q.   All the decisions of the Supreme Court.  I'm

9     asking does the Second Amendment Foundation derive its

10    understanding of the Second Amendment from what the Supreme

11    Court says?

12         A.   There have been several Supreme Court cases.  The

13    Second Amendment Foundation was founded in 1974.  We -- the

14    Second Amendment Foundation supports the position starting

15    with Heller.  Second Amendment Foundation filed an amicus

16    in Heller.

17         Q.   Okay.  I think I'm asking the question in a bad

18    way because I think it's simpler than I'm making it seem.

19    The Second Amendment Foundation has a view of what the

20    Second Amendment allows.  Is it true that that view isn't

21    necessarily just what the Supreme Court says the Second

22    Amendment allows.  I mean, if the Supreme Court came up

23    with the decision that said the Second Amendment doesn't

24    allow X, the Second Amendment Foundation might have its own

25    opinion and might think the Supreme Court is incorrect,



1  right?

2      A.   It could.

3      Q.   Okay.  That's what I'm trying to understand.  You

4  have your own basis for determining what you think the

5  Second Amendment allows?

6      A.   Yes, ma'am.

7      Q.   Okay.  Yeah, I guess I asked it in a bad way

8  because I meant for it to be more straight forward.  Sorry.

9           So in the view of SAF, not the view of what the

10  Supreme Court has ruled upon, but in the view of SAF,

11  individuals are allowed to privately own and possess

12  firearms, correct?

13      A.   Yes, ma'am.

14      Q.   Does SAF agree with Heller that the core of the

15  Second Amendment is self-defense in the home?

16           MR. SIGALE:  Just object as to a misstatement of

17  that phrase, but nonetheless, you can answer.

18      A.   We agreed with the Heller decision, that the

19  Second Amendment was an individual right.

20      Q.   (By Ms. Helfrich)  Okay.  I understand that.  The

21  Heller decision and decisions following it talked about the

22  Second Amendment in terms of the core of the right and then

23  things that were maybe further away from the core.  Does

24  the Second Amendment Foundation conceive of the rights that

25  way?



JULIANNE VERSNEL                                          August 12, 2020
JENNIFER J. MILLER vs MARC D. SMITH                                   35

1       A.    I'd have to ask you to rephrase the question.

2       Q.    I'm trying to understand whether in the view of

3  SAF, does the Second Amendment -- are the rights guaranteed

4  under the Second Amendment primarily about having firearms

5  to protect yourself in your home?

6       A.    No.

7       Q.    Okay.  That's what I wanted to know.  It includes

8  others things that are equally important and equally

9  guaranteed by that amendment, correct?

10      A.    You'd have to be more specific as to what you

11  mean.

12      Q.    Okay.  All right.  Let me strike that question

13  then and let me ask a different question.  Sorry, I had to

14  get rid of a phone call.

15          The Heller decision deals with handguns, correct?

16      A.    It deals with the individual right to keep and

17  bear arms.

18      Q.    In the view of the Second Amendment Foundation,

19  does the Second Amendment guarantee the right to keep a

20  rifle or a shotgun in your home for purposes of defense of

21  the home?

22      A.    Yes.  Excuse me, ma'am.  I have a notice on my

23  screen that my Internet connection is unstable.

24      Q.    Okay.  Are you having any trouble hearing me or

25  seeing me?



 1      A.    You've been cutting out for a while.  Your voice

 2   has.

 3      Q.    Okay.  Do you want to drop and reconnect?

 4      A.    Yes.

 5      Q.    I can hear you fine, so you're coming through

 6   okay.

 7      A.    But you are not.

 8      Q.    Okay.  Do you want to try reconnecting?

 9            MR. SIGALE:  Julianne, why don't you disconnect

10   and reconnect?

11            THE WITNESS:  Okay.  I may have to bring somebody

12   in here to make sure that my connection is adequate.  So

13   right now I'm going to leave the Zoom meeting and get

14   someone because I don't -- there are multiple things that

15   are hooked up here and I want to make sure they go back on.

16            MS. HELFRICH:  Okay.  How long do you think you'll

17   need?

18            THE WITNESS:  I need five minutes.

19            MS. HELFRICH:  Okay.  Let's take five minutes off

20   the record.

21                  (Off-the-record discussion.)

22                     (A break was taken.)

23      Q.    (By Ms. Helfrich)  And just to remind you, you're

24   still under oath.  I wanted to ask a couple more questions

25   about SAF's understanding of the Second Amendment.  Within



 1   the organization, who decides what the organization's

 2   position is on what the Second Amendment means?

 3       A.   The Second Amendment Foundation has always

 4   believed that the Second Amendment is an individual right

 5   to keep and bear arms.  Second Amendment Foundation has

 6   always believed that the right to self-defense is a natural

 7   right that precedes the U.S. Constitution.

 8       Q.   So let me ask the question in a different way.

 9   Has SAF's position on what the Second Amendment means

10   changed at all since your position was founded?

11       A.   No, ma'am.

12       Q.   So there's never been an occasion where an issue

13   has come up and you've had to say, huh, what's our position

14   on what the Second Amendment means with regard to that?

15       A.   No, ma'am.

16       Q.   All right.  And I asked you before about defense

17   in the home, and if I'm understanding correctly, is it the

18   correct statement of SAF's position that the Second

19   Amendment guarantees an individual's right to keep a

20   firearm in their home for self-defense, to chose -- all of

21   these things:  To chose the type of firearm they want to

22   use for self-defense and to have that firearm ready for

23   self-defense, loaded and functional?

24       MR. SIGALE:  Object as to form of the question,

25   but you can answer.



1    Q.   (By Ms. Helfrich)  Do you understand the question?

2    A.   Yes, ma'am, I understand the question, but Second

3    Amendment Foundation's belief is that that is just part of

4    the scope of the Second Amendment to the U.S. Constitution.

5    Q.   Okay.  Fair enough.  Would the things that I just

6    mentioned all be included within SAF's view of what rights

7    the Second Amendment protects?

8    A.   Could I ask you to repeat the -- repeat the

9    question, please?

10    Q.   The question I just asked or the prior one?  Okay.

11    Let's do this.  Court reporter, can you read back the

12    question we just asked?

13        (Record read back by reporter.)

14    A.   And those things were?

15    Q.   (By Ms. Helfrich)  Okay.  That's what I wanted to

16    figure out.  Can you read back the prior question?

17        (Record read back by reporter.)

18    A.   It is their right provided it is a legal firearm.

19    Q.   (By Ms. Helfrich)  Okay.  So other than the

20    condition that it be a legal firearm, those other elements

21    are all included within SAF's conception of what the Second

22    Amendment protects?

23    A.   Yes, ma'am.

24    Q.   Okay.  And I understand your concern before, that

25    there are other things SAF views the Second Amendment as



1  protecting other rights besides what I've just described.

2  I understand that.  So I'm not in any way suggesting that

3  that is a full scope of the Second Amendment in SAF's view.

4         I'm going to ask you some questions to get a

5  little bit more background on SAF.  You mentioned that it

6  was founded in 1974.  Why was it founded?

7    A.    It was founded to fill a void that existed.  At

8  that time, there was no entity that was primarily -- there

9  was no entity that was focused on educational and legal

10  issues pertaining to the Second Amendment to the U.S.

11  Constitution.

12    Q.    And at the time the organization was founded, was

13  litigation one of its purposes?

14    A.    Hopefully.

15    Q.    What do you mean by hopefully?

16    A.    There was -- there was no active litigation at

17  that point.  It was -- the hope was to set the ground work

18  for litigation to expand the right.

19    Q.    Okay.  Was it always a purpose of the

20  organization -- strike that.  I'll just leave your answer

21  as is.  I won't try to get anymore.

22         You mentioned earlier that over the time that

23  you've been there, litigation has expanded as a part --

24  percentage, I guess we will put it that way, as to SAF

25  activities; is that right?



1     A.   Yes, ma'am.

2     Q.   And when did that start?

3     A.   It actually started in the early -- the early

4   '80's.

5     Q.   So fairly early in the life of the organization?

6     A.   Yes, ma'am.

7     Q.   Okay.  I'm going to show you Exhibit 2.

8               (Exhibit No. 2 was marked.)

9     Q.   (By Ms. Helfrich)  Can you see Exhibit 2?

10    A.   Yes, ma'am.  May I take out my copy of that?

11    Q.   Certainly.

12    A.   Thank you.

13    Q.   So this is the Amended Complaint for Declaratory

14  and Injunctive Relief marked now as Exhibit 2.

15    A.   Yes, ma'am.

16    Q.   You've seen this document before, right?

17    A.   Yes, ma'am.

18    Q.   Okay.  I want to direct your attention to

19  paragraph 17.  Could you read that paragraph for me?

20    A.   "SAF is a nonprofit membership organization

21  incorporated under the laws of Washington with its

22  principle place of business in Bellevue, Washington.  SAF's

23  membership includes day care home licensees residing in

24  Illinois.  SAF has over 650,000 members and supporters

25  nationwide.  The purposes of SAF include education,



 1  research, publishing and legal action focusing on the

 2  Constitutional right to privately own and possess firearms.

 3  SAF brings this action on behalf of itself and its

 4  members."

 5      Q.   So I'm going to ask you some questions about that

 6  paragraph.  First of all, is everything in that paragraph

 7  still true today as we sit here?

 8      A.   Yes, ma'am.

 9      Q.   All right.  When you say that SAF brings this

10  action on behalf of its self and its members, are you

11  claiming that SAF has been directly injured -- the

12  organization itself has been injured by the statutes and

13  regulations at issue?

14      A.   Our membership has.

15      Q.   Just your membership?

16      A.   SAF's goal is to expand the right to keep and bear

17  arms.

18      Q.   I understand that, and I understand that you're

19  bringing this action on behalf of members.

20      A.   Yes, ma'am.

21      Q.   What it states here is SAF brings this action on

22  behalf of itself, and I'm trying to understand from you

23  what is the harm to SAF from these regulations or statutes?

24      A.   SAF must bring these kinds of actions in order to

25  fulfill its mission statement.



1    Q.   Right.  So bringing this action is a part of what

2    you do, right?

3    A.   Yes, ma'am.

4    Q.   Okay.  So is there something that you would have

5    done differently if these rules didn't exist?

6         MR. SIGALE:  I'll object as to form of the

7    question.  If you understand you can answer.

8    A.   What roles, ma'am?

9    Q.   (By Ms. Helfrich)  The statutes and the rules at

10   issue in this litigation, you're challenging them in this

11   lawsuit, correct?

12   A.   Yes, ma'am, in terms of the -- go ahead.

13   Q.   No, please, finish.

14   A.   Well, could you refer me to -- I'm aware of this,

15   but you're asking me a very -- a very broad -- a very broad

16   question because this is -- this is not -- it is not a --

17   you're asking me a very broad question.

18   Q.   Well, I'm trying to understand if you're bringing

19   this action on behalf of yourself, yourself being the

20   organization SAF, how is the organization injured by the

21   regulations and the statute being challenged in this

22   action?

23   A.   SAF is bringing --

24        (Technological difficulties.)

25   Q.   (By Ms. Helfrich)  I'm sorry, Ms. Versnel.  We're



1   losing you.  Can you give that answer again, please?

2       A.   SAF is bringing this action on behalf of its

3   membership and the other individuals who are not named as

4   plaintiffs in this case.

5       Q.   Okay.  So you're bringing this action on behalf of

6   the Millers, correct, Jennifer and Darin Miller?

7       A.   Yes, ma'am.

8       Q.   And other members of SAF who are day care home

9   licensees and/or foster parents in Illinois?

10      A.   Yes, ma'am.

11      Q.   So is it correct then -- so possibly this is a

12  misstatement.  You're not bringing this action on behalf of

13  SAF itself?

14      A.   We're bringing this on --

15               (Technological difficulties.)

16      A.   We're bringing this on -- SAF is bringing this

17  action on behalf of our members and on behalf of the

18  organization because it is our mission statement to

19  expand -- expand the ability of our members to exercise

20  their constitutional rights.

21      Q.   Okay.  Has the organization itself been injured by

22  the regulation?

23      A.   I'd have to say I just don't understand your

24  question, and I believe I've answered it.

25      Q.   Well, the Millers have claimed in your complaint



 1  that they've been injured by the regulations because their

 2  Second Amendment rights have been infringed.  Do you

 3  understand that?

 4      A.   Yes, ma'am.

 5      Q.   Okay.  So that's their injury.  What is SAF's?

 6      A.   I don't -- I'm afraid I just don't understand your

 7  question.

 8      Q.   Okay.  Maybe we'll come back to it.  Going back to

 9  paragraph 17, which should still be on your screen.

10      A.   Yes, ma'am.

11      Q.   The fourth -- third sentence of the -- no, sorry,

12  the fourth sentence of the paragraph says, "The purposes of

13  SAF include education, research, publishing and legal

14  action focusing on the Constitutional right privately to

15  own and possess firearms."

16          Did I read that correctly?

17      A.   Yes, ma'am.

18      Q.   Does SAF have any other purposes aside from those

19  listed there?

20      A.   No, ma'am.

21      Q.   Okay.  Tell me how SAF achieved its purpose of

22  education.  Describe what types of activity SAF engages in

23  in order to achieve its purpose of education.  And you can

24  speak in broad categories.

25      A.   SAF has -- it has several publications where it



 1  does this, we hold legal scholars conferences, we publish

 2  other work, we finance other people to do other things in

 3  terms of education, we have PSAs, we take out ads in

 4  publication.

 5      Q.   Any other kinds of conferences?

 6      A.   I have one large conference called The Gun Rights

 7  Policy conference every year.

 8      Q.   Okay.  Anything else that SAF does to achieve its

 9  purpose of education?

10      A.   We answer questions every day of people who have

11  issues.  We provide information.

12      Q.   When you say answer questions every day, do people

13  just call the organization with questions?

14      A.   During normal times, they call the organization

15  with questions.  At this point we're in Phase 2 in

16  Washington state which means that we can only have

17  essential staff, so at this point those communications are

18  via email.

19      Q.   And who answers those questions when people call

20  or email?

21      A.   The person who is most knowledgeable about that

22  particular issue.

23      Q.   Okay.  Do you have -- strike that.

24           Okay.  So the second purpose you list is research?

25      A.   Yes, ma'am.



1    Q.   Can you describe for me the activities that SAF

2    engages in in order to further its purpose of research?

3    A.   We support individual researchers, we publish

4    works and disseminate information.

5    Q.   Anything else?

6    A.   No, ma'am.

7    Q.   I want to ask you about one thing.  It's my

8    understanding that SAF established -- I think it's called

9    the center -- sorry, it's in my notes.  It's a research

10   center.  Center for the Study of Firearms and Public

11   Policies.

12   A.   Yes, ma'am.

13   Q.   What is that organization?

14   A.   It is a -- it's not an organization.  It is a

15   project of the Second Amendment projection where --

16        (Technological difficulties.)

17   A.   Project, P-R-O-J-E-C-T.  Was that clearer?

18        COURT REPORTER:  You're breaking up.

19        MS. HELFRICH:  You're crackling a bit.

20   A.   It is a project, P-R-O-J-E-C-T, of the Second

21   Amendment Foundation.  The end goal being to collect

22   scholarly papers on the Second Amendment and Second

23   Amendment rights, and make them available to other

24   scholars, other researchers, other historians and to the

25   general public.



1    Q.   And would it be correct to say that the Center for

2  the Study of Firearms and Public Policies, that that

3  project furthers your purpose of research?

4    A.   Yes, ma'am.

5    Q.   Okay.  So you've mentioned research -- under

6  purpose of research, you support individual researchers.

7  Is that financial support?

8    A.   Sometimes.

9    Q.   You publish and disseminate research?

10    A.   Yes, ma'am.

11    Q.   You have this project, the project, the Center for

12  the Study of Firearms and Public Policies.  Anything else?

13  Any other activities that SAF engages in to further its

14  purpose of research?

15    A.   We have the Second Amendment Reporter, the Gun

16  Mag, the Gun Rights Policy Conference and various other

17  items that we disseminate.

18       MR. SIGALE:  Gretchen, I'm sorry, I know we took a

19  break 30 minutes ago, but I'm going to need a bathroom

20  break here.

21       MS. HELFRICH:  You want it now?

22       MR. SIGALE:  Yeah, please.

23       MS. HELFRICH:  Okay.  All right.  It's 10:33,

24  let's take five.

25       MR. SIGALE:  Julianne, does that work for you?



1            THE WITNESS:  That's fine.  Thank you.

2                     (A break was taken.)

3      Q.   (By Ms. Helfrich)  Again, I'll remind you that

4  you're still under oath.  So you were telling me about the

5  activities that SAF engages in in support of its purpose of

6  research.  I'd like to ask about its purpose of publishing.

7  What activities -- and you've mentioned several, what

8  activities is it involved with or does it engage in to

9  further its purposes of publishing?

10     A.   It publishes the Second Amendment Reporter.  It

11  publishes the Gottlieb Tartaro report.  It publishes

12  TheGunMag.com.  It publishes scholarly articles that have

13  to do with history, legal issues, other items.  It

14  publishes some books that have to do with information

15  concerning gun rights, gun facts, that kind of stuff.

16     Q.   Okay.  Anything else that you can think of?

17     A.   That's what I recall at this moment.

18     Q.   Okay.  And its purpose of legal action focuses on

19  the Constitutional right privately to own and possess

20  firearms.  Tell me what activities it engages in, for

21  instance, in that purpose?

22     A.   Second Amendment Foundation is involved in

23  litigation to have the second -- excuse me, to have the

24  Second Amendment acknowledges an individual right to expand

25  that right through court actions and to make sure that the



 1 │ individual right to keep and bear arms as determined in
 2 │ Heller, McDonald and Moore are respected.
 3 │     Q.   Okay.
 4 │          MR. SIGALE:  Just to clarify, is that Moore with
 5 │ one O or two O's as in the case?
 6 │     A.   As in the case, M-O-O-R-E.  The case was tried I
 7 │ believe also in front of Judge Myerscough.
 8 │     Q.   (By Ms. Helfrich)  Okay.  Anything else that
 9 │ furthers your purpose of legal action?
10 │     A.   Excuse me, we also file amicus briefs in other
11 │ cases.
12 │     Q.   Okay.  Anything else?
13 │     A.   That's all that I can think of at this point.
14 │     Q.   Okay.  So is it correct that the Second Amendment
15 │ Foundation is governed by a Board of Trustees?
16 │     A.   Yes.
17 │     Q.   How are the board members chosen?
18 │     A.   It is a self-perpetuating board.
19 │     Q.   Can you explain what you mean by a
20 │ self-perpetuating board?
21 │     A.   The Board of Directors are chosen.  They were
22 │ initially -- the people started the organization, and then
23 │ over the last 40 some years, people have left the Board,
24 │ people have been added to the Board, but the Board chooses
25 │ its members.



1    Q.   Okay.  That's what you mean by self-perpetuating,

2    it chooses its own members?

3    A.   Yes, ma'am.

4    Q.   Okay.  How often does the Board meet?

5    A.   Annually for a formal meeting and as needed for

6    other items.

7    Q.   And are minutes of the Board meetings kept?

8    A.   Yes, ma'am.

9    Q.   Are there qualifications to be a member of the

10   Board?

11   A.   Only that other Board members choose them.

12   Q.   Okay.  Does the Board of Trustees have to approve

13   litigation that SAF wants to engage in?

14   A.   No.

15   Q.   Who has to approve that?

16   A.   It is -- it is a decision that is -- it is the

17   decision that is made oftentimes in concert with

18   Mr. Gottlieb and me.

19   Q.   Just the two of you?

20   A.   Yes, ma'am.  Excuse me, and with an attorney who

21   could potentially be handling the case.

22   Q.   Okay, but is it correct to say that between you

23   and Mr. Gottlieb, the two of you have the authority to

24   authorize SAF to engage in litigation?

25   A.   Yes, ma'am.



JULIANNE VERSNEL                                        August 12, 2020
JENNIFER J. MILLER vs MARC D. SMITH                                 51

1       Q.    Do you separately have that authority?

2       A.    Yes, ma'am.

3       Q.    And does Mr. Gottlieb separately have that

4    authority?

5       A.    Yes, ma'am.

6       Q.    Do you -- strike that.

7             Are there -- you said that Mr. Gottlieb is the

8    executive vice president.  Does the SAF have other

9    officers?

10      A.    It has a treasurer and at this point the president

11   of the foundation's position is vacant as the president of

12   the foundation unfortunately died in June.

13      Q.    I'm sorry to hear that.  Was that Mr. Tartaro?

14      A.    Yes, ma'am.

15      Q.    Okay.  And who is the treasurer?

16      A.    Bob Wiest.

17      Q.    And is there a secretary?

18      A.    I simply don't recall right now.

19      Q.    Okay.  Do the members have any input into whether

20   SAF will engage in litigation?

21      A.    No, ma'am.

22      Q.    I'm going to ask you some questions about your

23   membership now.  The initial complaint in this case was

24   filed April 16th of 2018.  Do you know how many members SAF

25   had on that date of April 16, 2018?



1      A.    Not an exact number, ma'am.

2      Q.    Can you say more than a certain number?

3      A.    I would say more than 500,000.

4      Q.    Okay.  And today how many members does SAF have?

5      A.    More than 500,000.

6      Q.    Do you know how many members it had in Illinois on

7   April 16, 2018?

8      A.    No, ma'am.  Excuse me for speaking over you.

9      Q.    That's okay.  Do you know how many members in

10  Illinois SAF has today?

11     A.    No, ma'am.

12     Q.    How does the person become a member of SAF?

13     A.    They become a member of SAF by joining the

14  organization.  That is done either via the Internet or via

15  mail.

16     Q.    And what is required of a person who joins --

17  strike that.

18           Do you have to pay money to join the organization?

19     A.    Yes, ma'am.

20     Q.    How much?

21     A.    $15 for a yearly donation -- for a yearly

22  membership.  Let me -- please let me correct myself on

23  that.

24     Q.    Sure.

25     A.    When we say members and supporters, some people



1  are -- prefer to just be supporters as opposed to members.

2       Q.   Okay.  I'm focusing exclusively on members.  If I

3  want to become a member of SAF, what information do I have

4  to give you?

5       A.   Your name.

6       Q.   What else?  Anything else?

7       A.   Generally we receive an address in 99 percent of

8  the cases.

9       Q.   Phone number?

10       A.   In some cases.

11       Q.   Email address?

12       A.   In some cases.

13       Q.   But the only thing a person is required to give is

14  their name; is that correct?

15       A.   We need to have an address from them so that we

16  can send them our publications.  If they prefer not to

17  receive our publications, we note that but we have an

18  address from them.  We do not have just simply names.

19       Q.   Okay.  So the issue is more about supporters.  I

20  want to clarify.  In order to become a member, do I have to

21  pay $15?

22       A.   For a yearly membership, yes.

23       Q.   Okay.  And what do I get for that $15?

24       A.   You get quarterly Second Amendment Reporter.

25       Q.   And is that sent to my house or is that available



1   online?  How would I get it?

2       A.   You would receive it in the mail.

3       Q.   Do all members get that?

4       A.   Yes, ma'am.

5       Q.   Okay.  Any other -- strike that.

6            What else, if anything, do I get for becoming a

7   member?

8       A.   You get to support the Second Amendment right to

9   individual right to keep and bear arms.

10      Q.   Okay.  Hang on one second.  I have a fan blowing

11  on me and I'm freezing.

12           Do I get any other publication?

13      A.   No, ma'am.

14      Q.   Do I get any -- do I get a membership card?

15      A.   Yes, ma'am.

16      Q.   Do I get any discounts any place as a benefit of

17  being a member of SAF?

18      A.   I'm not particularly familiar with that program.

19  I know something existed at one time that I believe you got

20  a discount at Hertz or something, but I'm really not

21  familiar with that.

22      Q.   Okay.  Do I get a vote on any business of SAF?

23      A.   No, ma'am.

24      Q.   Okay.  So the quarterly Second Amendment Reporter

25  goes to all members?



JULIANNE VERSNEL                                        August 12, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              55

1      A.   Yes, ma'am.

2      Q.   So it would go to the Millers?

3      A.   Yes, ma'am.

4           MS. HELFRICH:  Okay.  David, we did ask for

5    communications with the Millers, so I'm going to ask you to

6    produce those.

7           MR. SIGALE:  All right.

8      Q.   (By Ms. Helfrich)  Do you keep any records of

9    whether your members are foster parents?

10     A.   No, ma'am.

11     Q.   Do you keep any records of whether your members

12   are day care home operators?

13     A.   We don't keep any records on any employment or

14   personal issues concerning our members at all.

15     Q.   Okay.  So just for the record, you would not keep

16   any record on whether your members have children living in

17   a foster home?

18     A.   No, ma'am.

19     Q.   And you would not keep any records on whether your

20   members have children attending a day care home?

21     A.   No, ma'am.

22     Q.   All right.  And could you determine based on the

23   records you keep how many members you have in Illinois?

24     A.   Yes, ma'am.

25     Q.   Okay.  Do you keep records on whether any of your



 1  members are concealed carry permit holders in any state?

 2       A.   No, ma'am.

 3       Q.   Do you know as you sit here today how many of your

 4  members are Illinois residents?

 5       A.   I did not prepare for that, no, ma'am.

 6       Q.   Do you know how many are Illinois foster parents?

 7       A.   No, ma'am.

 8       Q.   Do you know how many --

 9       A.   Excuse me, ma'am, but we don't keep that

10  information.

11       Q.   I understand that you don't as a matter of course

12  keep that information.  I'm asking whether you know as you

13  sit here today how many of your members are Illinois foster

14  parents?

15       A.   No, ma'am.

16       Q.   Do you know how many are Illinois day care home

17  providers?

18       A.   No, ma'am.

19       Q.   Is there any vetting process for members?

20       A.   No, ma'am.

21       Q.   Are there any qualifications for becoming a member

22  other than paying a $15?

23       A.   No, ma'am.

24       Q.   And you said that $15 is for one year, correct?

25       A.   Yes, ma'am.



1    Q.   So if a person wanted to remain a member of SAF

2    after one year, would they have to pay another $15?

3    A.   Yes, ma'am.

4    Q.   Do the member's dues finance the organization's

5    activities like litigation?

6    A.   Yes, ma'am.

7    Q.   Do you have other sources of funding other than

8    membership dues?

9    A.   Yes, ma'am.

10   Q.   Without identifying anyone specifically, what are

11   those sources of funding categories?

12   A.   Individual donations.

13   Q.   You mentioned before that you have supporters who

14   are not members; is that correct?

15   A.   Yes, ma'am.

16   Q.   And is it correct that you are not bringing this

17   action on behalf of your supporters?

18   A.   No, ma'am, we are bringing this on behalf of all

19   members and supporters of the Second Amendment Foundation.

20   Q.   Members and supporters?

21   A.   Yes, ma'am.

22   Q.   Okay.  Do you know whether you have any Illinois

23   licensed foster parents among your supporters?

24   A.   No, ma'am.

25   Q.   Supporters who are not --



1          Do you know whether you have Illinois license day

2   care operators among your supporters?

3       A.    No, ma'am.

4       Q.    So you mentioned that you send the quarterly --

5   sorry, just one second.

6          You send the quarterly Second Amendment Reporter

7   to your member.  Do I have any of that right?

8       A.    Yes, ma'am.

9       Q.    Do you regularly send any other communications to

10  your members?

11      A.    Yes, ma'am.

12      Q.    What communications do you regularly send to

13  members?

14      A.    Fundraising appeals.

15      Q.    And how do you send those?

16      A.    In the U.S. mail or sometimes via email.

17      Q.    And if a person -- let me ask this question.  If a

18  person doesn't pay the $15 after a year, does the

19  membership lapse?

20      A.    Their membership lapses, yes, ma'am.

21      Q.    Okay.  So how often do you send fundraising

22  appeals?

23      A.    Approximately every five weeks.

24      Q.    And if the Millers are members of the

25  organization, would they receive those appeals?



1      A.   Yes, ma'am.

2           MS. HELFRICH:   Okay.   David, we would like those

3  as well.   We asked for communications with the Millers.

4      Q.   (By Ms. Helfrich)   Who authors those fundraising

5  appeals?

6      A.   Primarily Mr. Gottlieb.

7      Q.   Okay.   Do you have any role in that?

8      A.   Yes, ma'am.

9      Q.   So sometimes you write those appeals or

10 contributed to writing those appeals?

11     A.   Yes, ma'am.

12     Q.   All right.   Do you send any other communications

13 regularly to your members, aside from fundraising appeals

14 and the Second Amendment quarterly?

15     A.   We also disseminate information to our members and

16 supporters concerning litigation that has been filed for

17 other items that are pertinent to the goals of the Second

18 Amendment Foundation and its role in expanding --

19 maintaining and expanding firearms rights by email.

20     Q.   You send them by email to the members?

21     A.   Yes, ma'am.

22     Q.   Okay.   And if the Millers are members, they would

23 receive those emails?

24     A.   Yes, ma'am.   If we had their emails --

25     Q.   By the --



1           COURT REPORTER:  Hold on.  You cross-talked.

2      Q.   (By Ms. Helfrich)  Go ahead and finish,

3   Ms. Versnel.

4      A.   We can only send it to the Millers if we have

5   their email address and I do not know if we have their

6   email address or not --

7      Q.   Is it a --

8      A.   -- because it is not a requirement.

9           (Reporter asks for clarification.)

10     Q.   (By Ms. Helfrich)  Ms. Versnel, please repeat the

11  last statement you said.

12     A.   I do not know if we have the Miller's email

13  address.

14          MR. SIGALE:  We'll look into it.  If we have their

15  email address and they would have received other stuff,

16  we'll put it together and produce it.

17          MS. HELFRICH:  Okay.  It's responsive to the

18  discovery request we made in October of last year.  I just

19  want to be clear about that.

20     Q.   (By Ms. Helfrich)  I'm going to share a document

21  with you.  I've marked it Exhibit 6.  There's now

22  Exhibit 6.

23               (Exhibit No. 6 was marked.)

24     Q.   (By Ms. Helfrich)  Can you see a document that

25  says across the top 62565MLLR601D?



1    A.   Yes, ma'am.

2    Q.   Okay.  Do you see here where it says Darin and

3  Jennifer Miller?

4    A.   Yes, ma'am.

5    Q.   Okay.  Do you recognize this particular document?

6    A.   Yes, ma'am.  I believe I saw it in some papers

7  that I reviewed.

8    Q.   Okay.  Can you tell me what it is?

9    A.   It is a record that was generated from a search of

10  the Miller's name, but I can't tell the date that it was

11  generated.  It shows that they made a contribution of $15

12  in the month of April 2018 --

13    Q.   Okay.  I'm sorry, I'm going to shrink it

14  because -- no, that's not going to work.  Never mind.  I'm

15  going to put it back where it was.  Go ahead.  I'm sorry I

16  interrupted you.

17    A.   I don't know whether the court reporter got that I

18  said.

19         COURT REPORTER:  Do you want me to read it back?

20         THE WITNESS:  Yes, ma'am.  Thank you.

21           (Record read back by reporter.)

22    A.   Correct, ma'am.

23    Q.   (By Ms. Helfrich)  Okay.  Now I have to shrink it

24  and move it a bit because -- okay, here we go.  Okay.

25         In this $15 that they contributed on 4/1/2018, it



1   says "First."  Is that their membership payment?

2        A.   It appears to be their membership payment for --

3        Q.   Okay.  And you see -- please finish, I'm sorry.

4        A.   I finished my sentence.  Thank you.

5        Q.   Okay.  Can you see it says below their address,

6   there's a box that says SAF and a box that says CCRKBA?

7        A.   Yes, ma'am.

8        Q.   Okay.  I am under SAF.  It says so the line that

9   says First $15 4/1/2018.  Do you see that?

10       A.   Yes, ma'am.

11       Q.   The next line says Recent $15 4/1/2018.

12       A.   Yes, ma'am.

13       Q.   Is that their most recent contribution to SAF?

14       A.   I do not know, ma'am.

15       Q.   Is that what that item is supposed to represent on

16  a document like this?

17       A.   I don't know what this -- ma'am, this was

18  generated on a specific date and I don't know what that

19  specific date was.

20       Q.   Yes, I understand that.  Would this represent

21  their most recent payment as of the date this document was

22  generated?

23       A.   I believe so.

24       Q.   Okay.  And to be clear, in order for the Miller's

25  to be members of SAF right now, they would have had to pay



1   $15 on or around 4/1/2019 and 4/1/2020, correct?

2       A.   No, ma'am.

3       Q.   Well, you told me that to be a member you had to

4   pay $15 and then --

5       A.   They could --

6            MR. SIGALE:  Let her finish the question.

7       A.   I'm sorry.

8       Q.   (By Ms. Helfrich)  You told me that to become a

9   member you have to pay $15 and that gets you a membership

10  for a year and then you would have to pay another $15.  Is

11  that correct?  Am I characterizing what you told me

12  correctly?

13      A.   To be a member, but not a supporter.

14      Q.   Yes, I understand that.  But to be a member, you

15  would have to make -- for the Millers to be a member, they

16  would have to make a $15 contribution on or around 4/1/2019

17  and 4/1/2020; otherwise, their membership would have

18  lapsed?

19      A.   Yes, ma'am, but these are that not --

20      Q.   Is that correct?

21      A.   Yes, ma'am, but these records are not kept for

22  accounting purposes.

23      Q.   I understand that.  What does CCRKBA stand for?

24      A.   Citizens Committee for the Right to Keep and Bear

25  Arms.



1      Q.   And as you understand this document, the lines

2   under that acronym where it says First $15 4/1/2018, is

3   that a separate contribution from the one under SAF?

4      A.   Yes, ma'am.

5      Q.   And, again, is this line, as you understand this

6   document, is this line "Recent" suppose to indicate the

7   most recent contribution that that person has made as of

8   the date the document was generated?

9      A.   Yes, ma'am.

10     Q.   Okay.  I'm going to ask you some questions about

11  this lawsuit specifically.

12     A.   Yes, ma'am.

13     Q.   So you're here because the Second Amendment

14  Foundation is a plaintiff in this lawsuit, correct?

15     A.   Yes, ma'am.

16     Q.   For the record, the Second Amendment Foundation is

17  not and has never applied to be a licensed foster parent in

18  Illinois?

19     A.   No, ma'am.

20     Q.   And SAF doesn't and has not applied to operate a

21  licensed day care home in Illinois?

22     A.   I'm not sure as a corporation we'd even be allowed

23  to do that, but no, ma'am --

24     Q.   I don't know either, but have you done --

25     A.   No, ma'am.  Second Amendment Foundation has not



1  applied to be a licensed day care in Illinois.  It is not a

2  part of our mission statement.

3      Q.   What is SAF's understanding of what this lawsuit

4  is challenging?

5      A.   This lawsuit is challenging the rights of

6  individuals who operate a day care, a child care, or who

7  are foster parents so they have the equal protection under

8  the law as guaranteed under the Heller decision, the Moore

9  decision and the McDonald decision.

10      Q.   Let me ask you specifically whether it is your

11  understanding that the rights of day care home operators

12  and foster parents in Illinois are currently being

13  infringed?

14      A.   Yes, ma'am.

15      Q.   And how are they being infringed?

16      A.   Because they are not allowed to keep a means of

17  self-protection and self-defense readily available to them.

18      Q.   Is that the only way?

19      A.   I need you to be more specific, please.

20          MR. SIGALE:  I'll object as to form.

21          MS. HELFRICH:  Go ahead.  Go ahead and be more

22  specific.

23          MR. SIGALE:  No, she --

24      A.   I'm asking you.

25      Q.   (By Ms. Helfrich)  You are asking me to be more



1  specific?

2      A.   Yes, ma'am.

3      Q.   I see.  Sorry, I thought you wanted to add more to

4  your answer.

5      A.   No, ma'am.

6      Q.   Okay.  So it is your contention that -- correct me

7  if I'm wrong.  It is your contention that the rights of

8  foster parents, day care home operators and child care

9  operators are being infringed because they are not allowed

10 to have the means of self-defense and self-protection

11 readily available?

12     A.   Yes, ma'am.

13     Q.   Are there any other ways in which their rights

14 under the Second Amendment are being infringed?

15     A.   No, ma'am, not to my knowledge.

16     Q.   Okay.  How did the Second Amendment Foundation

17 become aware of the statutes and regulations that are being

18 challenged in this lawsuit?

19     A.   I do not specifically recall.

20     Q.   Did you discuss this lawsuit with Mr. -- before

21 you filed it, did you discuss this lawsuit with

22 Mr. Gottlieb?

23     A.   I do not recall.

24     Q.   Do you recall whether it was you or Mr. Gottlieb

25 or both who decided that SAF should become involved in this



1  litigation?

2      A.   I do not remember.

3      Q.   You know what, I need to back up because I wanted

4  to ask you one more question about members and I didn't do

5  it, so let's back up a second.

6           You mentioned that a person can be a supporter

7  without being a member, correct?

8      A.   Yes, ma'am.

9      Q.   What's the difference between a member and a

10  supporter as you understand it?

11      A.   A member specifically requests a membership.  A

12  supporter can request to be a supporter with or without a

13  financial donation.

14      Q.   So you can be a supporter without making a

15  contribution?

16      A.   Yes, ma'am.

17      Q.   Okay.  If you're a supporter, do you also get a

18  copy of the Second Amendment Reporter?

19      A.   If you made a donation, yes, ma'am.

20      Q.   Okay.  If you did not, you wouldn't get it?

21      A.   No, ma'am.

22      Q.   So what do supporters do that's different than

23  what members do?

24      A.   I'm afraid -- excuse me, I need you to be more

25  specific, please.



1    Q.   Okay.  So a member makes a contribution of $15.  A

2  supporter might do that but doesn't have to.  Is that

3  correct?

4    A.   Yes, ma'am.  The supporter may make a donation --

5  a supporter may make a donation of $500 or $1,000 as well.

6  A supporter may make a donation of $15 and not choose to be

7  a member.

8    Q.   Okay.  And if I'm a supporter but I don't make a

9  donation, how am I a supporter?

10    A.   You support the goals of the organization.  You --

11  we attempt to maintain contact with you via email.  I'm

12  afraid you're losing me there.

13    Q.   Okay.  Well, I'm just trying to understand.

14  Ordinarily I think of supporting an organization as, at a

15  minimum, providing some financial support.  So I'm trying

16  to understand what the relationship is between SAF and its

17  supporters and, in particular, its supporters who don't

18  make a financial contribution.  And you are saying you send

19  some emails to them?  Does a supporter have to provide an a

20  name and address?

21    A.   They have to provide a name and an address to

22  receive certain items.  We have -- we have -- I would say

23  that the bulk of our supporters, we have a mailing address

24  for.

25    Q.   Okay.  And you said, if I understood you



1  correctly, you said you collect the name and address so you

2  can provide them with certain items.  Can you tell me what

3  those items are?

4      A.   In the case of members, they receive the quarterly

5  newsletter.  In the case of -- in the case of supporters,

6  they may receive other mailings.  They may receive request

7  for funds to support the Second Amendment Foundation.  And

8  they may receive requests asking them to become members.

9      Q.   And as you sit here today, you don't know whether

10 any of your supporters who are not members are licensed

11 foster parents in Illinois, correct?

12     A.   No, I do not.

13     Q.   And as you sit here today, you don't know whether

14 any of your supporters who are not members are licensed day

15 care home operators in Illinois, correct?

16     A.   No, ma'am, I do not.

17     Q.   Okay.  All right.  Thank you.

18          I want to go back to the decision within SAF asked

19 to initiate this lawsuit.  If I understood you correctly,

20 you don't recall whether you had any conversations with

21 Mr. Gottlieb about this lawsuit, correct?

22     A.   No, ma'am, I do not.

23     Q.   And forgive me if I asked this already, were you

24 the one who decided that SAF would be involved in this

25 lawsuit?



1    A.   I do not recall.

2    Q.   But based on what you told me before, it would

3  have been either you or Mr. Gottlieb; is that right?

4    A.   Yes, ma'am.

5    Q.   All right.  Do you have any internal policies that

6  you follow in deciding whether to become involved in a

7  lawsuit?

8    A.   We look at the facts before us in terms of the

9  issue involved.  We look at -- we look at various and some

10  new things as to its merits and other items before we

11  decide to file a lawsuit.

12    Q.   Let me ask a slightly different question.  Do you

13  have any internal policies or rules that you are required

14  to follow before SAF decides to become involved in a

15  lawsuit?

16    A.   No, ma'am.

17    Q.   In regard to bringing this lawsuit, did you

18  consult with any of your members about whether to bring

19  this lawsuit?

20    A.   No, ma'am.

21    Q.   How did you learn that this lawsuit existed?

22         MR. SIGALE:  Object as to the form of the

23  question.

24    Q.   (By Ms. Helfrich)  Yeah, let me rephrase.  Was

25  this lawsuit your idea?



1    A.   No, ma'am.

2    Q.   So did someone bring the idea to you?

3    A.   I need you to be more specific, please.

4    Q.   Well, if it wasn't your idea to bring this

5  lawsuit, who's idea was it?

6    A.   I don't know, ma'am.

7    Q.   Okay.  If it wasn't your idea, somebody must have

8  brought the idea to your attention, correct?

9    A.   They could have brought it to Mr. Gottlieb's

10  attention.

11    Q.   Okay.  I mean to SAF's attention, correct?

12    A.   Yes, ma'am.

13    Q.   Do you know who that was?

14    A.   No, ma'am.

15    Q.   So you -- strike that.

16         Aside from this lawsuit, has SAF provided any

17  comments, formal or informal, to the Illinois Department of

18  Children and Family Services about these rules?

19    A.   No, ma'am.

20    Q.   Has the Second Amendment Foundation lobbied or

21  attempted to educate anyone in Springfield -- in Illinois

22  state government to try to influence legislation or

23  rule-making regarding firearms in foster homes or day care

24  homes?

25    A.   The Second Amendment Foundation is a 501(c)(3)



 1  organization.  Was that clear, Ms. Brunt?

 2          MR. SIGALE:  We can hear you.

 3      A.   Okay.  I just wanted to make sure that she -- that

 4  the court reporter had it.  It is a 501(c)(3) organization

 5  under the IRS tax code.  We do not lobby.

 6      Q.   Okay.  Are you allowed to provide educational

 7  materials to legislatures for public officials?

 8      A.   We can in limited circumstances.

 9      Q.   Okay.  To the extent that you are allowed to as a

10  501(c)(3) organization, have you attempted to educate

11  anyone in Illinois state government regarding the issues in

12  this lawsuit -- regarding the rules at issue in this

13  lawsuit?

14      A.   To the best of my knowledge, no.

15      Q.   So tell me what SAF wants the rule for foster

16  homes to be as a result of this lawsuit?  Do you understand

17  my question?

18      A.   Yes, ma'am.  I want the people who are foster

19  parents to have the same equal protection to have a firearm

20  for self-defense readily available in their home as per

21  Heller, McDonald and Moore.

22      Q.   And do you want -- and I'm speaking just about

23  foster parents now.  Do you want them to be able to have a

24  firearm of their choice readily available for defense in

25  the home?



1    A.   Yes, ma'am.

2    Q.   So you want a rule that allows a foster parent to

3    have a handgun, if they choose a handgun, a rifle if they

4    choose a rifle, a shotgun if they choose a shotgun -- I

5    think those are the main categories -- readily available

6    for self-defense in the home?

7    A.   I would like to predicate that for a moment.  I am

8    making the assumption that if someone is allowed to be a

9    foster parent, that they are not, what we would call, a

10   prohibited individual, which is an individual who is not

11   allowed to own a firearm under federal or state law.

12   Q.   Okay.  Let's make a record about that because that

13   will make the question simpler going forward.  Whatever the

14   rule is, anyone possessing a firearm and operating a foster

15   home, would have to be possessing that firearm legally,

16   correct?

17   A.   Yes, ma'am.

18   Q.   Okay.

19   A.   And let me add one more caveat to that.  Since I

20   understand Illinois uses a -- I need to come up with the

21   right words for this.  Illinois believes that a spouse

22   living in the home would have constructive possession if

23   the firearm was in the home, then the spouse in the home

24   would also have to be not a prohibited individual, and

25   assume that if someone -- a couple is allowed to be foster



 1  parents, both of them would not be prohibited individuals

 2  in terms of firearms because then they would have something

 3  that would probably preclude them from being foster

 4  parents.

 5      Q.   Okay.  So let's assume going forward that any

 6  questions I ask you about the rule carry the assumption

 7  that the firearms are legally possessed and that the people

 8  possessing them are -- the day care home operators or their

 9  spouse, or the foster parents or their spouse are allowed

10  to possess them under the law.  Let's make that assumption,

11  okay?

12      A.   Thank you.

13      Q.   Okay.  With that being said, you still want -- and

14  correct me if I'm wrong -- you want a rule that allows --

15  let's just talk about foster parents.  You want a rule that

16  allows a foster parent to have a readily acceptable firearm

17  in their home for defense of the home, correct?

18      A.   No, ma'am, I don't want a rule.  I want them to be

19  treated like every other citizen in the state of Illinois.

20      Q.   So you want no rule with regard to whether a

21  foster parent in Illinois can have a weapon -- a firearm

22  available to them for home defense?

23      A.   No, ma'am, I do not want any rule.  I want them to

24  have the equal protection that the other citizens in

25  Illinois have.



1    Q.   Okay.  And if I understand what you said, you do

2  not want foster parents to be limited to having only a

3  handgun readily available for self-defense, correct?

4    A.   No, ma'am.  I want them to have the same rights as

5  every other citizen in the state of Illinois.

6    Q.   And those rights would include the right to have a

7  rifle or a shotgun for home defense, correct?

8    A.   Yes, ma'am.

9    Q.   And when you say readily accessible -- I think the

10  phrase that you used was readily accessible, does that

11  mean -- can you explicate that phrase for me, what does it

12  mean?

13        MR. SIGALE:  Just object as to

14  mischaracterization.

15        MS. HELFRICH:  Well, I am trying not to

16  mischaracterize so I'm trying to --

17        MR. SIGALE:  I think she said readily available.

18        MS. HELFRICH:  Okay.  All right.

19    Q.   (By Ms. Helfrich)  Readily available.  Can you

20  explain to me what readily available means?

21    A.   It means a firearm that is accessible so that one

22  could use it for self-defense.  It can -- in every case,

23  the person with a firearm that they want to use for

24  self-defense is morally obligated to use prudence in the

25  way that the firearm is kept.



1     Q.   Are they legally obligated to use prudence in the
2  way a firearm is kept?
3     A.   No, ma'am, they're morally obligated.  Under the
4  State of Illinois, I do not believe you have -- I could be
5  incorrect, but I do not believe you have any storage laws
6  in affect except for the specific situations that we are
7  discussing today.
8     Q.   Does the Second Amendment require specific kinds
9  of storage for the firearms that we're talking about,
10  firearms that would be readily available for defense in the
11  home?
12     A.   In terms of the federal law?
13     Q.   In terms of the Constitutional Amendment.  Does
14  the Second Amendment itself impose any requirements about
15  how a firearm used for self-defense in the home should be
16  kept?
17     A.   No, ma'am.
18     Q.   Or must be kept?
19     A.   No, ma'am.
20     Q.   Okay.  So the only obligation is a moral
21  obligation?
22     A.   Yes, ma'am.
23     Q.   Strike that.  Let me make it better.
24     A.   Okay.
25     Q.   The only obligation to maintain or store the



 1  firearm that would be readily available for self-defense,

 2  the only obligation to store that firearm prudently would

 3  be a moral obligation?

 4          MR. SIGALE:  I'm going to object as to form.  If

 5  you understand, Julianne, you can answer.

 6      A.   Perhaps moral is my definition of moral and it is

 7  perhaps not clear.  I believe that a person who has any

 8  firearm or other item that could be dangerous in any manner

 9  has an obligation to safely store items in some fashion so

10  that the people in the home and the people who visit the

11  home are safe.

12      Q.   Okay.  What I would like to understand is whether

13  that obligation exists as a result of the Second Amendment?

14  In other words, does the Second Amendment require --

15      A.   No, ma'am.

16      Q.   -- that an individual -- okay.  That's what I

17  wanted to clarify.

18          So as far as the Second Amendment is concerned, a

19  person who has a self-defense firearm in their home can

20  store it as they please.

21          MR. SIGALE:  I'm going to object as to form.  If

22  you can answer, answer.

23      A.   You're asking me about the actual Second

24  Amendment, the phrasing of the Second Amendment?

25      Q.   (By Ms. Helfrich)  Yes.



 1      A.   There is nothing in the Second Amendment that

 2   talks about anything other than the right to keep and bear

 3   arms.

 4      Q.   So what I'm trying to understand is whether the

 5   Second Amendment allows an individual to store a firearm

 6   that they're keeping in their home for defense in any way

 7   they choose?

 8           MR. SIGALE:  Same objection.  You can answer if

 9   you can.

10      A.   I believe I just stated to you that there are no

11   words in the Second Amendment that discuss firearms storage

12   at all.

13      Q.   (By Ms. Helfrich)  Okay.  So is it, therefore,

14   your position, the position of the SAF, that under the

15   Second Amendment an individual who keeps a firearm in their

16   home for defense of the home is free to store that firearm

17   as they choose?

18           MR. SIGALE:  Objection.  Form, foundation,

19   speculation.

20           If you can answer, go ahead and answer.

21           MS. HELFRICH:  There's no speculation.  It's the

22   Second Amendment Foundation.  They have a position of what

23   the Second Amendment allows and doesn't allow, so I'm

24   asking whether this particular situation --

25           MR. SIGALE:  I made my objections.  I said she



 1    could answer.

 2        A.    The Second Amendment Foundation believes that

 3    there is a natural right to self-defense.  The Second

 4    Amendment Foundation believes that the individual right to

 5    keep and bear arms is guaranteed under the Second

 6    Amendment.  The Second Amendment Foundation never -- never

 7    condones -- I'm sorry, you're trying to put me in a box

 8    that I cannot be put.  I won't be put into.  Because you're

 9    asking me to make a blanket statement that irresponsibility

10    is guaranteed under the Second Amendment and I can't.

11        Q.    Okay.  So is irresponsibility -- if I'm not a

12    foster parent in Illinois, I'm just an individual.  I own a

13    firearm.  I keep it in my home.  I keep it there for

14    defense of my home.  Am I restricted under the Constitution

15    of the United States in how I can store that firearm?

16        A.    No, the Constitution of the United States does

17    not -- the Second Amendment to the U.S. Constitution does

18    not -- again, it does not talk about storage in any fashion

19    or form.

20        Q.    But I want to know whether the Second Amendment

21    Foundation believes that the Constitution of the United

22    States restricts the way in which I, an individual, can

23    store a firearm in my home?

24        A.    No.  We do not believe that the Constitution

25    restricts how you can store a firearm in your home.  It is



1  not simply -- it is not in the verbiage of the Second

2  Amendment.

3      Q.   All right.  I want to ask you about this lawsuit

4  as it relates to day care home operators.  I'm going to ask

5  you some of the same questions.  If you are successful in

6  this lawsuit, what do you want the rules applicable to day

7  care home operators to be?

8      A.   There should be no rules that prohibit day care

9  operators from having equal protection, the right to have

10  firearm available to them, readily available to them for

11  self-defense as guaranteed to them under the Heller,

12  McDonald and Moore decisions.

13      Q.   So there would be no difference between what is

14  permitted to a day care home operator and what is permitted

15  to any citizen?

16      A.   Correct.

17      Q.   Is that correct?

18           All right.  And you understand that the current

19  regulation specifically -- the current regulation

20  applicable to day care homes prohibit handguns in day care

21  home, correct?

22      A.   Yes, ma'am.

23      Q.   Okay.  And you -- and you would want that

24  restriction lifted, correct?

25      A.   Yes, ma'am.



1    Q.   And you would want a day care home operator to

2    have readily available to them a firearm to use for defense

3    in the home, and would that include while the day care home

4    is operating?

5    A.   Yes, ma'am.

6    Q.   And that day care home operator could have a

7    firearm of their choosing, assuming that it's legal and

8    that they're authorized to own it; is that correct?

9    A.   Yes, ma'am.

10   Q.   Are you aware that the regulations that currently

11   apply to day care home operators require them to lock up

12   their firearms and store -- lock up their firearms unloaded

13   with ammunition stored separately?

14   A.   Yes, ma'am.

15   Q.   Would you want that rule lifted as well?

16   A.   Yes, ma'am.

17   Q.   And is the same true for foster homes -- sorry,

18   for foster parents?

19   A.   Yes, ma'am.

20   Q.   So there would be no restrictions applicable to

21   foster parents or day care home operators that wouldn't

22   also be applicable to every other citizen?

23   A.   No, ma'am.

24   Q.   Okay.  I want to show you Exhibit 2.  After all

25   this time, we're getting Exhibit 2.



1    Q.   Okay.  Can you see it, where it says Amended

2    Complaint for Declaratory and Injunctive Relief?

3    A.   May I look at the one that I have on my printout,

4    ma'am?

5    Q.   Yes, you can.

6    A.   Thank you.

7         MS. HELFRICH:  And I'm assuming what you gave her

8    is the Amended Complaint for Declaratory and Injunctive

9    Relief filed May 29, 2019?  I just want to make sure she's

10   looking at the same document I have on my screen.

11        MR. SIGALE:  If you're asking me, I would say

12   you've got to ask her at what she's looking at.  I can't

13   see it.

14        MS. HELFRICH:  Okay.

15   A.   I do not -- I do not have the E-file part on mine,

16   but it says it's the Amended Complaint for Declaratory and

17   Injunctive Relief.

18   Q.   (By Ms. Helfrich)  Okay.  I guess the reason --

19   the reason I'm asking is because the exhibit that is up on

20   my screen, that is the document that controls, so you're

21   free to look at your copy, but if your copy differs from my

22   copy, you have to refer to my copy, okay?

23   A.   Okay.

24   Q.   I don't think that's going to be an issue, but I

25   just want to --



JULIANNE VERSNEL                                    August 12, 2020
JENNIFER J. MILLER vs MARC D. SMITH                          83

1      A.    It appears --

2      Q.    Make sure.  That's why I was asking you.

3      A.    It appears to be the same.

4      Q.    Okay.

5      A.    So far as the first page.

6      Q.    Okay.  Well, let's go to paragraph 18.

7      A.    Yes, ma'am.

8      Q.    Can you read that paragraph for us?

9      A.    "Members of SAF who are day care home licensees

10  and/or foster parents in Illinois would possess and carry

11  loaded and functional handguns for self-defense, but

12  refrain from doing so because they fear their day care home

13  licenses and/or foster care licenses being denied and/or

14  revoked by the state, and/or being prohibited from being

15  day care home licensees and/or foster parents in the

16  future, all due to the statutes, rules, and policies

17  complained of herein."

18      Q.    Okay.  In the second line, it says, "Possess and

19  carry loaded and functional handguns for self-defense."  Do

20  you see that?

21      A.    Yes, ma'am.

22      Q.    Okay.  When I asked you earlier about the relief

23  that you're seeking in this litigation or what you want the

24  rules to be when this litigation is over, your answer was

25  not limited to handguns; is that correct?



1    A.   Correct.

2    Q.   So I'm trying to understand your -- the allegation

3 in the complaint is that the members want to be able to

4 carry a loaded and functional handgun, but you're asking

5 for something broader?

6    A.   No, ma'am.  I'm just asking for them to have the

7 equal protection guaranteed to them by the Second Amendment

8 following up on the Heller decision, McDonald decision and

9 the Moore decision so that they have a firearm of their

10 choosing.

11    Q.   So even though it says handguns here in the

12 complaint --

13    A.   This is for --

14    Q.   Let me finish my question.

15    A.   Go ahead.

16    Q.   Paragraph 18 refers specifically to handguns.

17    A.   Yes, ma'am.

18    Q.   But you just want the entire rule lifted?

19    A.   As I understand the rule, it is handguns that are

20 prohibited, unless one is a peace officer or is required to

21 have a handgun because of their job.  So that is why we are

22 discussing handguns here, I believe.

23    Q.   So is it your understanding --

24    A.   I was speaking in --

25    Q.   Please go ahead.



JULIANNE VERSNEL                                    August 12, 2020
JENNIFER J. MILLER vs MARC D. SMITH                            85

1      A.    I was speaking in terms of individuals having a
2  choice to choose their means of self-defense.
3      Q.    Would you agree or disagree that a rule that
4  limited foster parents or day care home operators to a
5  readily available handgun would be an acceptable rule?
6          MR. SIGALE:   Object as to form.
7      Q.    (By Ms. Helfrich)  Do you understand my question?
8      A.    No, ma'am.
9      Q.    Okay.  So if the rule -- if SAF changed its rules
10 from what they are now to say a foster parent or a day care
11 home operator can possess and carry a loaded and functional
12 handgun, but only a handgun, not any other kind of gun,
13 would you be satisfied with that rule?
14     A.    As I understand the current rules, the rules
15 pertain to handguns, so that is why we are addressing
16 handguns in this lawsuit.  When you are speaking to me in
17 more general terms, I was referring to people having an
18 option to choose, but now we are discussing this
19 specifically, the law -- the regulations as I understand it
20 have to do with handguns.
21     Q.    Okay.  But I'm asking you a very specific
22 question.  It's a yes or -- I will ask it as a yes or no
23 question.
24          Would you be satisfied with the rule that said
25 that foster parents or day care home operators who have a



1  loaded and functional handgun available for self-defense,
2  but that did not allow other types of guns to be readily
3  available for self-defense?
4      A.   No, ma'am.
5      Q.   Okay.  I want to go back to readily available, the
6  phrase "readily available."  Does readily available mean
7  loaded?
8      A.   It could be --
9      Q.   Does it --
10     A.   -- loaded.
11     Q.   Sorry.  Does it necessarily mean loaded?
12     A.   It means -- that would be a subjective decision of
13  the firearms owner; however, I have never heard it
14  suggested that a firearm is a readily available when the
15  ammunition is not in the same readily available location.
16  In other words, they would be stored together.
17     Q.   Okay.
18     A.   If the firearm were not loaded.
19     Q.   For a firearm to be -- strike that.
20          Is it your position that the individual firearm
21  owner gets to decide what makes the firearm readily
22  available to him or her?
23     A.   Yes, ma'am.
24          MR. SIGALE:  Is this a good time to take five?
25  It's almost noon.  Is it a good time to take a lunch?



```
 1           MS. HELFRICH:  Let's go a few more minutes and
 2    then we'll take a lunch.  Okay, David?
 3           MR. SIGALE:  If that's okay with --
 4           MS. HELFRICH:  I think I'm going to be -- yeah, is
 5    that okay with you, Ms. Versnel?
 6           THE WITNESS:  Well, I would like to call Mr. Barr
 7    right now if you wouldn't mind and ask -- excuse me, I'm
 8    trying to be referring to when the Attorney General
 9    requested a break and was told that he just needed to hold
10    on a little while longer.  Obviously -- I don't know if you
11    were aware of that, but Mr. Nadler told him no.  And so I
12    would like to have a break if possible.
13           MS. HELFRICH:  Okay.  If that's the case, then
14    let's take a lunch break now.  Let's break for 30 minutes
15    now and then we'll come back on and we'll power through.
16    Okay?
17           THE WITNESS:  Okay.  Thank you very much.  I
18    appreciate it.  I've been up since 5:30 my time.  Thank
19    you.
20           MS. HELFRICH:  Understood.
21           MR. SIGALE:  Gretchen, do you anticipate that this
22    is going to be roughly the same length as Belinda Rose or
23    much longer or much shorter?
24           MS. HELFRICH:  Yes.
25           MR. SIGALE:  Okay.  Than, yeah, so let's take 30
```



1  and we will come back at 12:25 or 12:26.

2                    (A break was taken.)

3      Q.   (By Ms. Helfrich)  Back on the record again.

4  Ms. Versnel, I'll remind you that you're under oath.  As of

5  this morning when this deposition started, was Darin Miller

6  a member of the Second Amendment Foundation?

7      A.   To the best of my knowledge, yes.

8      Q.   And what is the basis of that answer?

9      A.   My words speak for themselves.

10      Q.   As of this morning was Jennifer Miller a member of

11  the Second Amendment Foundation?

12      A.   To the best of my knowledge, yes.

13      Q.   Do you know whether Jennifer Miller is a member of

14  the Second Amendment Foundation?

15      A.   I believe she is.

16      Q.   Do you know whether Darin Miller is a member of

17  the Second Amendment Foundation?

18      A.   I believe he is.

19      Q.   Do you know whether Darin Miller was a member of

20  the Second Amendment Foundation on the day your Amended

21  Complaint in this litigation was filed?

22      A.   I believe he was.

23      Q.   Do you know whether he was?

24      A.   I have every reason to believe he was.

25      Q.   Do you recall the document we looked at before



 1 | that shows the contributions that he had made?

 2 |    A.   Yes, ma'am.

 3 |    Q.   Okay.  If we were to look at that document today,

 4 | would it show his up-to-date -- would it show up-to-date

 5 | information regarding contributions he had made?

 6 |    A.   I don't know.

 7 |    Q.   Who would know the answer to that?

 8 |    A.   No one would know because that information is not

 9 | kept for financial reasons.

10 |    Q.   Who would know for certain whether Darin Miller is

11 | a member of the Second Amendment Foundation today?

12 |    A.   Mr. Miller.

13 |    Q.   And only Mr. Miller?

14 |    A.   For sure, only Mr. Member.

15 |    Q.   And who would know whether Jennifer Miller is a

16 | member of the Second Amendment Foundation as of today?

17 |    A.   Mrs. Miller.

18 |    Q.   And only Ms. Miller?

19 |    A.   Yes, ma'am.

20 |    Q.   Do you have a record of all contributions made by

21 | Darin Miller or Jennifer Miller to the Second Amendment

22 | Foundation?

23 |    A.   I do not know.

24 |    Q.   Do you keep records of when your members renew

25 | their membership?



JULIANNE VERSNEL                                    August 12, 2020
JENNIFER J. MILLER vs MARC D. SMITH                            90

1      A.   We -- excuse me, we attempt to but our records are
2  not used for financial purposes.
3      Q.   I don't care about financial purposes.  I want to
4  know how you know whether somebody is a member.  You told
5  me to be a member you have to renew your membership every
6  year.  What records do you keep that would show whether
7  someone renewed their membership every year?
8      A.   People in data entry department would enter in the
9  information, but it is not one hundred percent accurate.
10 We do not use it for our --
11     Q.   Is there a -- I understand that you don't use it
12 for financial purposes.  I'm not interested in it for
13 financial purposes.  I'm interested in whether you keep
14 records of when members renew their membership.
15     A.   We attempt to, yes.
16     Q.   Do you have such records with regard to the
17 Millers?
18     A.   I don't know.
19     Q.   Do you know whether the Millers renewed their
20 membership in 2019?
21     A.   I do not know.
22     Q.   Do you know whether the Millers renewed their
23 membership in 2020?
24     A.   I do not know.
25     Q.   Okay.  Then on what basis can you say that you



1  think the Millers are members of SAF?

2     A.   I said to the best of my knowledge that they are

3  because I have no reason to believe that they are not.  You

4  asked me who --

5     Q.   Do you have any reason to believe that they are?

6     A.   Yes.

7     Q.   What is your reason for believing that?

8     A.   Because I believe that they would have renewed

9  their membership.

10     Q.   That they would have?

11     A.   Yes, ma'am.

12     Q.   Do you have any other basis for your statement

13  that to the best of your knowledge the Millers are members

14  of SAF?

15     A.   No.  I told you the only ones that would know for

16  sure to the best of my knowledge are Mr. and Mrs. Miller.

17     Q.   Do you know whether anyone at SAF knew on the date

18  the Amended Complaint was filed whether the Millers were

19  members of SAF?

20     A.   I don't know.

21     Q.   Who else might know the answer to that question

22  other than you?

23     A.   No one.

24     Q.   No one would know other than you, and you don't

25  know?



1    A.   No.  I am assuming that they were members on the

2   date of the Amended Complaint.  Can you give me the date of

3   the Amended Complaint, please?

4    Q.   The Amended Complaint was filed on May 29, 2019.

5    A.   Okay.  I can check that information and get back

6   to you.

7    Q.   But you can't tell me as you sit here today

8   whether anyone at SAF knew on May 29, 2019, whether the

9   Millers were members of SAF?

10    A.   To the best of my knowledge, they were.

11    Q.   Does SAF have any members other than the Millers

12   who are licensed foster parents in Illinois?

13    A.   I have no idea.

14    Q.   Do you know whether SAF has any members other than

15   the Millers who are licensed day care home operators in the

16   state of Illinois?

17    A.   I have no idea.

18    Q.   So your basis for bringing this claim -- strike

19   that.

20         You are bringing this claim so far as you know on

21   behalf of the Millers only?

22    A.   The Millers and any other possible residents of

23   the state of Illinois who have a day care facility, a

24   childcare facility or -- and/or are foster parents --

25   and/or who are foster parents who are members or supporters



 1  of the Second Amendment Foundation.

 2      Q.   And is it your understanding that you are allowed

 3  to bring that claim on behalf of people you cannot

 4  identify?

 5          MR. SIGALE:  Object to foundation, but if you know

 6  you can answer.

 7      Q.   (By Ms. Helfrich)  Do you understand my question?

 8      A.   No, ma'am, I don't.

 9      Q.   Okay.  You brought this case on behalf of the

10  Millers, correct?

11      A.   Yes, ma'am.

12      Q.   You stated that you've also brought it on behalf

13  of possible other members who are foster parents or day

14  care home operators.

15      A.   (Simultaneous crosstalk.)

16      Q.   Fine.  Whatever.  Is it your understanding that

17  the Second Amendment Foundation -- stop.  You told me that

18  you cannot identify anyone other than the Millers who is a

19  day care home operator or a foster parent in Illinois,

20  correct?

21      A.   Yes, ma'am.

22      Q.   Okay.  And I'm not asking you -- to be clear, I'm

23  not asking you to identify them to me.  I'm asking do you

24  know of any, do you know their names, do you know where

25  they are?



1     A.   No, ma'am, I do not.

2     Q.   Is it your understanding that the Second Amendment

3   Foundation can bring claims on behalf of unknown possible

4   foster parents in Illinois?

5     A.   The Millers --

6     Q.   Yes or no, is that your understanding?

7     A.   Yes.

8     Q.   When SAF was first contemplating of first filing

9   this lawsuit, did you inquire -- did you make any inquiries

10   into whether you had members who were foster parents in

11   Illinois or day care home operators in Illinois?

12     A.   No.

13     Q.   Did you take any steps to determine whether your

14   members included foster care -- sorry, foster parents in

15   Illinois or day care home operators in Illinois?

16     A.   No.

17     Q.   How did you know that the Millers were foster

18   parents in Illinois?

19     A.   I do not know how we became aware of that.

20     Q.   Who would know that?

21     A.   The Second Amendment Foundation does not remember

22   who brought this situation to our attention.

23     Q.   So no one at the Second Amendment Foundation can

24   tell me how you determined that the Millers were foster

25   parents in Illinois?



JULIANNE VERSNEL                              August 12, 2020
JENNIFER J. MILLER vs MARC D. SMITH                       95

1    A.   That is correct.

2    Q.   And I assume then that no one can tell me how you

3 determined that the Millers are day care home operators in

4 Illinois?

5    A.   No.  No, I cannot.

6    Q.   How did you determine for purposes of filing this

7 complaint that the Millers were members of SAF?

8    A.   I believe our records were checked.  I don't know.

9    Q.   Who would know that?

10   A.   I don't know.

11   Q.   Did you take any steps to determine whether any

12 members of SAF were parents of children in foster care in

13 Illinois?

14       MR. SIGALE:  Objection as to relevance.

15   A.   You're asking -- just so I'm clear, you're asking

16 me if I looked for any parents who's children were no

17 longer with them and who's children were being taken care

18 of in foster care?

19   Q.   (By Ms. Helfrich)  In Illinois.  I'm asking

20 whether SAF took any steps to determine whether their

21 members included such parents?

22   A.   No, we did not.

23   Q.   And, therefore, I assume you also did not inquire

24 whether if such members exist among your membership,

25 whether they had the same opinion of the rules that applied



1    to foster care that the Millers had?

2        A.    No, we did not.

3        Q.    Did you take any steps to determine whether among

4    your members there are people who's children attend or are

5    taken care of in a day care home in Illinois?

6        A.    No, we did not.

7        Q.    And, therefore, I take it you did not take any

8    steps to determine whether such parents have a different

9    view of the regulations applicable to day care homes than

10   the Millers do?

11       A.    No, we did not.

12       Q.    Do you have any way of knowing that there are no

13   such people among your members?  No such people meaning

14   parents of children in foster care or parents of children

15   in a day care home in Illinois.

16       A.    I have no way of knowing that there are people who

17   have children in foster care in Illinois.  We do not keep

18   any kind of demographic information that way.  Would you

19   repeat the second part of the question, please?

20       Q.    Whether you -- can you say -- I'm sorry.

21   Reporter, can you read the question back, please?

22              (Record read back by reporter.)

23       A.    It seems to me like, if I understand this, you're

24   asking me do I know a negative?

25       Q.    Yes.



 1      A.    No, I don't know a negative.

 2      Q.    All right.

 3      A.    I just want to be really clear, is that I don't

 4   know that there is anyone who doesn't have children in a

 5   day care, and I don't know anyone who doesn't have children

 6   in foster care.

 7      Q.    No, I'm sorry, no.  I'm going to reask the

 8   question.

 9          You told me that you took no steps to determine

10   whether among your members there were parents with children

11   in foster care, correct?

12      A.    Correct.

13      Q.    And you also took no steps to determine whether

14   your membership did not include people with children in

15   foster care in Illinois?

16      A.    Correct.

17      Q.    And the same is true with respect to day care

18   homes?

19      A.    Correct.

20      Q.    Okay.  Thank you.  Is it your view that for under

21   the rules that you want to be in place when this litigation

22   is over -- I'm going to you strike that because you said a

23   couple of times you don't want any rule.

24          Under the legal structure that you want in place

25   when this litigation is over, would a foster parent who has



1   a firearm in their home for defense readily available,

2   would that foster parent also have to be a concealed carry

3   licensee in Illinois?

4       A.   No.

5       Q.   Same question as to day care home operators?

6       A.   No.

7       Q.   To your knowledge, had the Millers ever faced an

8   immediate need for defense of their home that they were not

9   able to meet because of the rules applicable to them as

10  foster parents or day care home operators?

11      A.   I do not know.

12      Q.   To your knowledge, has any of your members in

13  Illinois stated the need, an immediate need for

14  self-defense in their home that they were not able to meet

15  because they were foster parents or day care home operators

16  in Illinois and subject to these restrictions?

17      A.   I do not know.

18      Q.   I'm going to share my screen with you.  Can you

19  see a document -- this is Exhibit 3 again.  The document

20  that says, "Plaintiff's Second Amendment Foundation, Inc's

21  Answers to Defendant's Marc D. Smith and Kwame Raoul's

22  First Set of Interrogatories to the Plaintiff's Second

23  Amendment Foundation"?

24      A.   Yes.

25      Q.   Okay.  And, again, if you have a copy of that



1  document, feel free to look at it but with the caveat that

2  the exhibit that's on the screen is the exhibit that

3  controls.

4       A.   Yes, ma'am.

5       Q.   And I would ask you to look at Interrogatory

6  Response Number 3.  First actually before we get there, I

7  want to scroll to the end of the document.  The last page

8  of the document, do you see this?

9       A.   Yes, ma'am.

10      Q.   Is that your signature?

11      A.   Yes, ma'am.

12      Q.   And you have beautiful handwriting by the way.

13           Do you understand that you verify that the

14  statement in the interrogatory answers were true?

15      A.   Yes, ma'am.

16      Q.   Okay.  Let's go to Number 3.  Number 3 says,

17  "State with particularity every factual basis for your

18  claim that members of the SAF who are day care home

19  licensees and/or foster parents in Illinois would possess

20  and carry loaded and functional handguns for self-defense,

21  but refrain from doing so because they fear their day care

22  home licenses and/or foster care license being denied

23  and/or revoked by the state, and/or prohibited from being

24  day care home licensees and/or foster parents in the future

25  all due to the statutes, rules and policies complained of

```
 1   herein.  Amended Complaint Paragraph 18."
 2         Do you see that?  Did I read that correctly?
 3     A.  Yes, ma'am.
 4         MS. HELFRICH:  I read it a little fast so I
 5   apologize, Ms. Brunt.
 6     Q.  (By Ms. Helfrich)  And then your answer, "These
 7   are the Miller's allegations and they are members of the
 8   SAF."  Do you see that?
 9     A.  Yes, ma'am.
10     Q.  Okay.  Before you certified these interrogatory
11   answers, did you take any steps to determine whether the
12   Millers were members of SAF?
13     A.  I must have.
14     Q.  What were they?
15     A.  I -- at this point, ma'am, I honestly don't know.
16     Q.  But your testimony is that you must have taken
17   steps to determine it.  Do you recall any steps that you
18   took?
19     A.  I probably -- I can only --
20     Q.  I'm not asking for a probably and --
21     A.  Then I don't --
22     Q.  -- I don't want --
23     A.  Then I can't tell you exactly what I did.  That's
24   quite a while ago.
25     Q.  Can you tell me roughly what you did?
```



1      A.   I can only guess, so then I can't answer.

2      Q.   Okay.  So you have no recollection of any steps

3   you took to assure yourself that this statement was true on

4   the date you signed that verification?

5      A.   No, ma'am.

6      Q.   All right.  The first part of your answer, "These

7   are the Miller's allegations," what do you mean by that?

8      A.   The Millers stated that they would have a

9   functional firearm in their home if they were not excluded

10   from having one by the rules that Illinois places on

11   childcare, day care, and foster parents in terms of the

12   firearms they may or may not have.

13      Q.   And you have no knowledge of any members other

14   than the Millers who would possess and carry loaded and

15   functional handguns for self-defense but for these rules?

16      A.   No, I do not.

17      Q.   Okay.  So you have no knowledge of any foster

18   parents or day care home operators who wish to carry a

19   loaded and functional firearm other than a handgun?

20      A.   No, I do not.

21      Q.   All right.  I want to ask you some questions about

22   the organization's publications.  You've mentioned several,

23   so I just want to quickly confirm some titles and see if

24   I'm missing any, okay?  It's my understanding that the

25   Second Amendment Foundation publishes something called,



1    Women and Guns; is that correct?

2        A.   No, ma'am.

3        Q.   Okay.  What's wrong with what I said?

4        A.   Women and Guns ceased publication in, I believe,

5    December of 2018.  We then transferred it over to another

6    nonprofit and they publish it now, but we have no editorial

7    control or anything over it.

8        Q.   Okay.  You published it through 12/18, though, or

9    thereabouts?

10       A.   Yes, ma'am.

11       Q.   Okay.  When -- you also publish something called

12   Gun Mag -- The Gun Mag?

13       A.   Yes, ma'am.

14       Q.   And you still publish that now?

15       A.   Only the online version.

16       Q.   Is there a version that isn't online?

17       A.   There was a printed issue, but that ceased about

18   two years ago.

19       Q.   When it was being printed, did SAF publish it?

20       A.   I don't recall what was in the masthead.  It might

21   function as -- the Gun Mag function is a project of the

22   Second Amendment Foundation, but it maintains separate

23   editorial offices in Buffalo, New York.

24       Q.   Okay.  Do you publish something called the Second

25   Amendment Foundation Reporter?



1       A.    Yes, ma'am.

2       Q.    Do you publish something called the Journal of

3   Firearms and Public Policy?

4       A.    Yes, ma'am.

5       Q.    And you mentioned earlier you published something

6   called the Gottlieb Tartaro Report?

7       A.    Yes, ma'am.

8       Q.    I want to go through these one by one.  I probably

9   have missed some, but we'll get them at the end.  So before

10  Women and Guns ceased publication around December of 2018,

11  how often was it published?

12      A.    It was published -- before it ceased publication,

13  I think it was on -- I can't remember whether it was on a

14  quarterly or by monthly.  I think it was bimonthly.

15      Q.    Okay.  Did it have an online component when you

16  were publishing it?

17      A.    Not really, no, ma'am.

18      Q.    Okay.  So a printed periodical?

19      A.    Yes, ma'am.

20      Q.    All right.  And is that publication -- I'm going

21  to give you several topics and I want you to tell me

22  whether that publication ever published things on those

23  topics, okay?  I'm not asking you to identify specific

24  articles, but whether it was in the scope of what that

25  magazine or publication did.  Did articles in Women and



1    Guns Include articles about firearm safety?

2         A.   Yes, ma'am.

3         Q.   Foster parenting?

4         A.   To the best of my knowledge, no.

5         Q.   Day care?

6         A.   I do not recall.

7         Q.   Childcare more generally?

8         A.   No, ma'am.

9         Q.   Firearm storage?

10        A.   Yes, ma'am.

11        Q.   Ammunition storage?

12        A.   Yes, ma'am.

13        Q.   Okay.  As you sit here today, do you recall any

14   specific articles on those topics?

15        A.   I remember one article that specifically went over

16   various kinds of lock boxes that could be used.  I remember

17   there were numerous articles about youth shooting.  I

18   remember there were articles about competitive shooting

19   with youth.  I remember that there were articles that

20   talked about firearm safety with children in the home.

21        Q.   Okay.  The articles that were published for the

22   Second Amendment Foundation, who wrote those articles?

23        A.   Many different people.

24        Q.   Let me ask it a different way.  Were the people

25   who wrote the articles employed by the Second Amendment



1   Foundation?

2      A.   No.

3      Q.   How did you, the Second Amendment Foundation,

4   identify people to be contributors to Women and Guns?

5      A.   The editor did that.

6      Q.   Who is the editor?

7      A.   Peggy Tartaro.

8      Q.   Okay.

9      A.   Also with --

10      Q.   And would --

11      A.   Go ahead.

12      Q.   No, no, you go ahead.

13      A.   No, go ahead.

14      Q.   All right.  So with regard to Women and Guns, did

15   you publish articles in which -- I think we just lost

16   Mr. Sigale.

17      A.   Yes, we did.

18         MS. HELFRICH:  I would like to stop and go off the

19   record.  I'm not going to question you without your counsel

20   here.

21            (Off-the-record discussion.)

22      Q.   (By Ms. Helfrich)  And Ms. Versnel, I don't

23   believe you said anything while he was gone.  Is that your

24   recollection?

25      A.   That is my recollection.



1          MS. HELFRICH:  Okay.  I just want you to know we

2     weren't questioning your witness without you here, David.

3          MR. SIGALE:  Okay.

4     Q.   (By Ms. Helfrich)  So is Women and Guns, was it a

5     periodical that expressed the views of the Second Amendment

6     Foundation?

7     A.   The Second Amendment Foundation did not -- let me

8     start again.

9          Women and Guns was a publication that was also in

10    the editorial office in Buffalo, New York.  The Second

11    Amendment Foundation bankrolled the publication in terms of

12    providing moneys from subscription shortfalls, but the

13    Second Amendment Foundation did not review the editorial

14    content before it was published.

15    Q.   Okay.  All right.  So let me ask, for The Gun Mag,

16    which is currently published by the Second Amendment

17    Foundation, correct?

18    A.   Yes.

19    Q.   Does the Second Amendment Foundation review the

20    content -- the editorial content before that magazine is

21    published?

22    A.   No, ma'am.

23    Q.   So who -- who has editorial control over The Gun

24    Mag?

25    A.   At this point, it would be Dave Workman.



1     Q.   But he works for you, right?  He works for the
2  Second Amendment Foundation?
3     A.   Yes.
4     Q.   So does he review the content before it's
5  published?
6     A.   Yes.
7     Q.   Okay.  So what I'm trying to understand -- I'm not
8  trying to be tricky.  I'm just trying to understand, do the
9  articles that appear in The Gun Mag represent the views of
10  SAF?
11     A.   The articles that appear in The Gun Mag include
12  everything from a legislative update to a review of a
13  particular firearm.  The Second Amendment Foundation
14  doesn't have an opinion on the handling, the grip, the
15  sights of a particular firearm.
16          The Second Amendment Foundation doesn't -- it
17  doesn't follow certain pieces of the legislation.  This is
18  done by authors who do not work for the Second Amendment
19  Foundation.
20     Q.   Okay.  Does The Gun Mag include articles that a
21  spouse views that are contrary to those of the Second
22  Amendment Foundation?
23     A.   The Second Amendment Foundation -- it is spouse's
24  views that the Second Amendment Foundation doesn't have a
25  view on.



JULIANNE VERSNEL                                        August 12, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              108

1    Q.   Right.  That's not what I'm asking.  I'm asking

2  whether The Gun Mag includes articles that a spouse views

3  that are counter to those of the SAF on issues or matters

4  on which SAF does have a view?

5    A.   To the best of my knowledge, no.

6    Q.   You published the Second Amendment Foundation

7  Reporter?

8    A.   Yes, ma'am.

9    Q.   Can you tell me what that publication is?

10   A.   The publication is an 8-page newsletter that gives

11 information about what the Second Amendment Foundation is

12 doing.  It will oftentimes include an update on current

13 litigation.  It's almost an internal publication.

14   Q.   Okay.  So in contrast, The Gun Mag, for example,

15 the Second Amendment Foundation Reporter does in a sense

16 speak for the Second Amendment Foundation?

17   A.   Yes.

18   Q.   Okay.  Yeah, I'm trying to understand among all

19 these publications what their relationship is, their

20 official position of the Second Amendment Foundation.

21        So is the Second Amendment Foundation Reporter the

22 same as the Second Amendment publication that you send to

23 your members?  To clarify, you told me earlier you send

24 something quarterly to your members.

25   A.   No, it was called the Second Amendment Reporter.



1      Q.    Okay.  So this is what we're talking about here?

2      A.    Yes, ma'am.

3      Q.    Okay.  Thank you for clarifying.

4            Does the Second Amendment Foundation Reporter

5      include articles about firearm safety?

6      A.    No, ma'am.

7      Q.    How about foster parenting?

8      A.    No, ma'am.

9      Q.    Day care?

10     A.    No, ma'am.

11     Q.    Childcare?

12     A.    No, ma'am.

13     Q.    Firearm storage?

14     A.    No, ma'am.

15     Q.    Ammunition storage?

16     A.    No, ma'am.

17     Q.    Okay.  The Journal of Firearms and Public Policy,

18     that's a publication of SAF?

19     A.    Yes, ma'am.

20     Q.    So can you tell me -- describe the publication for

21     me.

22     A.    The publication is a compilation of scholarly and

23     legal articles.  Many of them have been published in other

24     journals previously, but then they were compiled into --

25     into journals.  We would perhaps -- one of them talked



1  about the histography of the Second Amendment.  The other

2  one would talk about -- another one would talk about

3  recent -- there would be a whole journal on perhaps Heller

4  or a whole journal on McDonald.

5          The papers were submitted and -- and everything

6  was -- was what would be termed as a scholarly journal, a

7  scholarly article.  They were not opinion pieces.

8      Q.   Is the research that appears in there sponsored by

9  Second Amendment Foundation?

10     A.   No, ma'am.

11     Q.   None of it or not all of it?

12     A.   None of it.

13     Q.   Okay.  Am I wrong in remembering that you

14  testified earlier that you do sponsor some research?

15     A.   Yes, ma'am.

16     Q.   Okay.  But this journal is not like an outlet for

17  that research?

18     A.   No, ma'am.

19     Q.   Okay.  I understand.  And you were the publisher

20  of that journal for a while?

21     A.   Yes, ma'am.

22     Q.   Are you any longer the publisher of that journal?

23     A.   The publication has gone on hiatus for the last, I

24  think, two years.  All of its articles are available

25  online.  Unfortunately books -- printed books -- have gone



1  the way of printed books.

2      Q.    Yes, indeed.  Did the Journal of Firearms and

3  Public Policy include articles or papers on firearm safety?

4      A.    Only in terms of an analysis of data.

5      Q.    Okay.  Did they include any articles on foster

6  parenting?

7      A.    Only if there was an analysis of data, and I do

8  not recall anything particularly on foster parenting.

9      Q.    How about day care?

10     A.    That may be included in an analysis of data.

11     Q.    And, again, childcare generally?

12     A.    It may have been included in an analysis of data.

13     Q.    How about firearm storage?

14     A.    It may have been included in an analysis of data.

15     Q.    And same for ammunition storage?

16     A.    It may be included in an analysis of data.

17     Q.    How often was the Journal of Firearms and Public

18  Policy Published?

19     A.    Once a year.

20     Q.    Sorry?

21     A.    Once a year.

22     Q.    Okay.  And then you also published something

23  called the Gottlieb Tartaro Report.  I'm not sure if I'm

24  pronouncing that correctly.  Is it Tartaro?

25     A.    Yes, ma'am.



1    Q.    Okay.  What is the Gottlieb Tartaro Report?

2    A.    It is a compilation of news that has to do with

3  firearms litigation, firearms legislation, stories about

4  firearms usage in the news.  It's -- it's not -- in my

5  personal opinion, it's not informational, it's

6  entertaining.

7    Q.    Okay.  Does it address those topics that I

8  mentioned, firearm safety?

9    A.    No, ma'am.  Not to the best of my knowledge.  No,

10  ma'am, not to the best of my knowledge.

11    Q.    Day care?

12    A.    Not to the best of my knowledge.

13    Q.    Childcare?

14    A.    Not to the best of my knowledge.

15    Q.    Firearm storage?

16    A.    Not to the best of my knowledge.

17    Q.    Ammunition storage?

18    A.    Not to the best of my knowledge.

19    Q.    Sorry if I asked you this already.  How often is

20  that report published?

21    A.    Monthly.

22    Q.    And does it go to members?

23    A.    No, ma'am.  It goes to people who specifically

24  subscribe to it.

25    Q.    Can anyone subscribe to it?



1    A.    Yes, ma'am.

2    Q.    Now in the course of this litigation, did you do

3  any searches through these publications looking for

4  articles on any of the topics that I mentioned?

5    A.    There was some looking through some old Women and

6  Gun articles.  There was -- the Second Amendment Reporter

7  has not addressed the issue because it's not a publication

8  that does anything other than talk about what the

9  foundation is doing.  Any mention of childcare or something

10  would have been in regards to a particular lawsuit.

11        So it offered no information other than if the

12  issue were involved in litigation that the Second Amendment

13  Foundation had brought.  The Journal on Firearms, the

14  articles were scholarly in nature, and, again, did not

15  spouse topics or personal -- or personal opinion in terms

16  of -- let me rephrase it.

17        They did not -- they did not provide information

18  rather than analysis.  I cannot -- I do not specifically

19  recall anything that had to do with foster care.  There may

20  have been something about childcare in the Canadian piece

21  but I can't --

22    Q.    Okay.  I'm just asking you specifically if you

23  searched through -- so I'll do it one by one.

24        Did you search through the Gottlieb Tartaro Report

25  as part of this litigation looking for articles or items on



1   the topics I mentioned?

2       A.   No, ma'am.

3       Q.   Same question with regard to the Journal on

4   Firearms and Public Policies?

5       A.   I searched through the article database.  I did

6   not search through the articles.

7       Q.   Okay.  The Second Amendment Foundation Reporter?

8       A.   I did not search through it -- through it because

9   I know what's in it.

10      Q.   Okay.  The Gun Mag?

11      A.   I did not search through The Gun Mag.

12      Q.   And then you said you did some searches through

13  Women and Guns, did I understand that right?

14      A.   Through what was available on the Internet.

15      Q.   But not any of the older publication -- sorry,

16  strike that.

17           You didn't look through any addition of Women and

18  Guns from before December 2018 or whenever it was that the

19  Second Amendment Foundation stopped publishing?

20      A.   No, there was some articles that, as I said, what

21  was available on the Internet and there were some older

22  articles that could be found.  There was a bit of a

23  haphazard website that was kept.

24           Again, Women and Guns was a subscription

25  publication.  Anyone could subscribe to it, but it was not



1    offered to Second Amendment members or supporters as part

2    of their membership or support of the Second Amendment

3    Foundation.

4        Q.   Okay.  So do you know whether anyone else

5    performed searches of any of these publications for

6    articles on the topics I mentioned in connection with this

7    litigation?

8        A.   I need to take a break, please.

9        Q.   Can you answer my question first?  And if it's

10   your counsel, don't tell me, but anyone other than your

11   counsel who did those searches?

12       A.   No.

13       Q.   Okay.  Do you need a break?

14       A.   No.

15       Q.   Okay.  I wanted to ask you some questions about

16   Darin and Jennifer Miller.  Have you personally met Darin

17   or Jennifer Miller?

18       A.   No, ma'am.

19       Q.   Have you personally communicated with either of

20   them?

21       A.   Not to the best of my knowledge.

22       Q.   Do you know whether anyone at SAF has communicated

23   personally with Jennifer or Darin Miller?

24       A.   I'm going to ask you to clarify the question a

25   little bit, please.



1     Q.    What do you not understand about it?

2     A.    They may have been or I may have been copied on an

3  email chain.

4     Q.    Copied on an email that was either to or from the

5  Millers?

6     A.    Involving counsel.

7     Q.    Okay.  Then let's not talk about that.  I should

8  have started this by saying if it's communication by

9  counsel, then don't tell me.  I don't want to know.

10         So have you had any -- outside of counsel's

11 presence or outside of counsel's involvement, do you know

12 whether anyone at SAF has communicated with the Millers?

13    A.    To the best of my knowledge, no.

14    Q.    Okay.  Do you know why the Millers made that

15 April 1, 2018, contribution to the Second Amendment

16 Foundation?

17    A.    No, ma'am, I don't.

18    Q.    Have you had any communications with the

19 Millers -- nonprivileged communication with the Millers

20 about this lawsuit?

21    A.    No, ma'am.

22    Q.    Do you know whether the Millers decided to become

23 plaintiffs before the Second Amendment Foundation decided

24 to become a plaintiff?

25    A.    I have no idea.



1    Q.    Would anyone at the Second Amendment Foundation
2  know that?
3         MR. SIGALE:   Object as to relevance, but you can
4  answer if you know.
5    A.    I have no idea.
6    Q.   (By Ms. Helfrich)  You have no idea if anyone
7  would know?
8    A.    Correct.
9    Q.    Okay.  At the time that you decided you were a
10  plaintiff in this lawsuit, did you know that the Millers
11  were also plaintiffs?
12         MR. SIGALE:   I'm going to object to the extent
13  that it asks for privileged communications.  You can answer
14  outside of the --
15    Q.   (By Ms. Helfrich)  I'm not asking you for
16  privileged communications.  Outside of privileged
17  communications, did you know when you decided to become --
18  I'm not asking who told you.  I'm not asking how you found
19  out.
20         At the time that SAF decided to become a
21  plaintiff, did you know that the Millers were plaintiffs?
22    A.    No.
23    Q.    At the time that you decided to become a
24  plaintiff, what was -- if you didn't know the Millers were
25  plaintiffs, what was your understanding at that time of who



1 | you were bringing the suit on behalf of?

2 |     A.   We were bringing the suit on behalf of individuals

3 | who did not have equal protection because of the

4 | regulations placed upon them by the State of Illinois based

5 | on their licensing provisions for them to be a childcare,

6 | day care or foster care.

7 |     Q.   But at that time that you made that decision, you

8 | could not identify any of those individuals by name; is

9 | that correct?

10 |     A.   Yes.

11 |     Q.   And as you sit here today, other than the Millers,

12 | you know of no other members of SAF who fit into that

13 | category?

14 |     A.   No, ma'am.

15 |     Q.   And I want to go back to a question that I asked

16 | before.  So you're bringing this claim on behalf of the

17 | Millers.  Is it also your position that the organization

18 | itself, not on behalf of the Millers but the organization

19 | itself, has a claim?

20 |     A.   On behalf of --

21 |     Q.   Yeah, I'm saying not on behalf of your membership.

22 | Do you have a separate claim?  I'm not saying you have to,

23 | I'm just asking whether that's your position?

24 |     MR. SIGALE:  Object as asked and answered, and

25 | also to the extent that it calls for a legal conclusion.



1   If you can answer, go ahead.

2       A.   I'm not an attorney, so I can't answer questions

3   as to standing.

4       Q.   (By Ms. Helfrich)  Can you tell me whether the

5   organization itself has been injured by the regulations and

6   the statutes at issue in this litigation?

7       A.   The organization's responsibility, its mission

8   statement is to say expand and maintain the individual

9   right to keep and bear arms.  And its obligation under its

10  mission statement and its obligation as a 501(c)(3)

11  organization per the IRS tax code and under our bylaws and

12  our corporate structure in the State of Washington is to

13  further our mission, and this is part of furthering our

14  mission.

15      Q.   I understand that, but that doesn't answer my

16  question.  My question is whether the organization has been

17  injured as a result of the regulations or statutes that are

18  at issue in this litigation?

19      A.   I feel like I've answered your question.  I don't

20  know another way to answer your question, ma'am.

21      Q.   Well, has there been a financial impact on the

22  organization as a result of the statute other than the cost

23  of pursuing this litigation, which is part of your mission?

24  And I understand that.  I understand that your mission is

25  to bring lawsuits like this.  But other than that, have you



1  been harmed financially?

2      A.   No, ma'am.

3      Q.   Have you been unable to further your other

4  purposes as a result of this -- these regulations?

5      A.   What do you mean by other purposes, please?

6      Q.   The purposes of research, publication and

7  education.

8      A.   Our purposes also are to expand and defend the

9  Second Amendment and to make sure that all individuals have

10  equal protection under the law following along the

11  precedence set by Heller, McDonald and Moore.

12      Q.   I understand that, that's not my question.  My

13  question is have you been hindered in pursuing your other

14  purposes in any way by the regulations and the statutes at

15  issue in this litigation?

16      A.   I feel like I've answered your question, ma'am.

17      Q.   I assure you you have not.  Has your organization

18  been hindered in its ability to pursue its purposes of

19  research, publication or education as a result of the

20  regulations or statutes at issue in this litigation?  If

21  you don't know, you can say I don't know.

22      A.   Okay.  Let's go with I don't know then.

23      Q.   Fine.  I want to ask some questions about foster

24  parenting.  Now you've stated before SAF doesn't have a

25  license to foster parents in Illinois, correct?



1     A.   Correct.

2     Q.   You, yourself, are not a licensed foster parent in

3  Illinois, correct?

4     A.   Correct.

5     Q.   Have you ever been a foster parent?

6     A.   No, ma'am.

7     Q.   Okay.  Does SAF have any, any, licensing or

8  oversight function for foster parents anywhere?

9     A.   No, ma'am.

10    Q.   Aside from this lawsuit, does SAF engage in any

11 other activities related to foster parenting?

12    A.   The Second Amendment Foundation has filed lawsuits

13 in other states covering the same issues.

14    Q.   Okay.  So setting aside those lawsuits -- so

15 lawsuits alike to this one?

16    A.   Yes, ma'am.

17    Q.   Okay.  Setting aside those lawsuits and this one,

18 does the SAF engage in any other activities related to

19 foster parenting?  For example, do you do any education or

20 training related to foster parenting?

21    A.   No, ma'am.

22    Q.   Okay.  And do you agree that the Illinois

23 Department of Children and Family Services is the

24 organization that oversees foster parents in the state of

25 Illinois.



 1      A.   I would be unable to comment on that, ma'am.  I am

 2   not a resident of Illinois.

 3      Q.   So you don't know whether the Illinois Department

 4   of Children and Family Services, which I will call it DCFS,

 5   oversees foster parents in Illinois?

 6      A.   I accept your word on that.  If they are named in

 7   the suit, so let me -- I assume they do.

 8      Q.   Okay.

 9      A.   Based upon information in the complaint, et

10   cetera.

11      Q.   Okay.  And you understand that foster parenting is

12   voluntary?

13      A.   Yes.

14      Q.   In Illinois.  I'll be clear.  When I'm asking

15   these questions, I will be referring to Illinois unless I

16   specifically say some other place, okay?

17      A.   Yes, ma'am.

18      Q.   Okay.  So do you understand that foster parenting

19   is voluntary?

20      A.   Yes, ma'am.

21      Q.   You understand that it involves families taking

22   children into their home who are not their own children?

23      A.   Yes, ma'am.

24      Q.   Okay.  And do you understand that a foster child

25   is under the care of the State?



1      A.   Yes, ma'am.

2      Q.   And that the State is responsible for the

3   well-being of that child?

4      A.   Yes, ma'am.

5      Q.   And you understand that foster parenting is often

6   temporary?

7      A.   Yes, ma'am.

8      Q.   Do you understand that -- strike that.

9           Do you understand that the Millers are licensed

10  foster parents?

11     A.   Yes, ma'am.

12     Q.   Do you understand that their license was given to

13  them by DCFS?

14     A.   Yes, ma'am.

15     Q.   And do you understand that in order to get that

16  license, they had to meet certain requirements, comply with

17  certain rules and regulations, undergo certain

18  examinations.  There was a process that they had to go

19  through in order to be licensed as foster parents.  Do you

20  understand that?

21     A.   Yes, ma'am.

22     Q.   Okay.  And what's your understanding of why

23  there's a licensing process for foster parents?

24     A.   Foster parents take on the role and responsibility

25  for the children that come into their home.  Even though



1  the State might, quote/unquote, be responsible with them,

2  the State is not there on a day-to-day basis to take care

3  of these children who need parents because their own

4  parents are unavailable for some reason.

5      Q.   And you understand that because foster parents

6  need to be vetted before they're allowed to take care of

7  these children, correct?

8      A.   Yes, ma'am.

9      Q.   All right.  And some of the things that happens in

10 the licensing process might be their foster parent is

11 subject to a home inspection?

12     A.   Yes, ma'am.

13     Q.   An assessment of their mental health?

14     A.   Yes, ma'am.

15     Q.   Physical health?

16     A.   Yes, ma'am.

17     Q.   Criminal background check?

18     A.   Oh, yes, ma'am.

19     Q.   Do you know whether they get any training to be a

20 foster parent?

21     A.   Yes, ma'am.

22     Q.   Do you know whether they're financial position is

23 in affect?

24     A.   Yes, ma'am.

25     Q.   And you would agree that the purpose of these



1  checks is to make sure that the people who -- into whose

2  care these children are placed are responsible, trustworthy

3  people?

4      A.   Oh, yes, ma'am.

5      Q.   And would you agree that the safety of the

6  children is the paramount consideration in determining who

7  is going to be licensed as a foster parent?

8      A.   Yes, ma'am.

9      Q.   Okay.  In your -- strike that.  I'll ask another

10 question.

11          And you understand that foster parents have to

12 follow certain rules even after the licensing process, even

13 after they have been given a license, they still have to

14 comply with certain rules?

15     A.   Yes, ma'am.

16     Q.   For example, there are rules against possession of

17 loaded weapons in a foster home.  That's one rule for

18 foster parents, correct?

19     A.   Yes, ma'am.

20     Q.   Okay.  Does the SAF -- I understand very clearly

21 that the SAF views that rule as a violation of the Second

22 Amendment Rights of the foster parent.  Should the SAF

23 advocate that foster parents break the rule?

24     A.   No, ma'am.

25     Q.   Okay.  Would you -- is it correct to say that the



1  SAF advocates that the foster parents abide by the rules

2  they are subject to?

3      A.   Yes, ma'am.

4      Q.   And then meanwhile you have this litigation to try

5  to change those rules?

6      A.   Yes, ma'am.

7      Q.   Okay.  Do you think it would be irresponsible or a

8  sign of irresponsibility if a foster parent broke the

9  rules?

10         MR. SIGALE:  Object as to speculation, but if you

11  can answer, you can answer.

12     A.   Since I don't know all of the specific rules that

13  a foster parent has to follow, I do not know -- I'm not

14  able to answer that question.

15     Q.   (By Ms. Helfrich)  Okay.  Let me ask it more

16  naturally.  That's fair.

17         Would it be irresponsible to break the rules with

18  regard to firearms?

19         MR. SIGALE:  Same objection.  You can answer if

20  you can.

21     A.   I will not use the term irresponsible.  I would

22  say it would not be -- it is not something -- it's not

23  irresponsible.  It's just not something that should be

24  done.

25     Q.   (By Ms. Helfrich)  Okay.  Would it cause you



1  concern about someone who is to be a foster parent if you

2  knew that they broke this rule?

3       MR. SIGALE:  Same objection.

4       A.   The foster parents should adhere by the rules that

5  they have agreed to in terms of the firearms requirements

6  in the home.  The reason that we are bringing this lawsuit

7  is because we believe that the foster parents should have

8  the same rights as any other individual in the state of

9  Illinois under Heller, McDonald and Moore.

10      And that the foster parents as parents have the

11  rights and the responsibilities to defend themselves and

12  very particularly those children who have been placed in

13  their care.

14      Q.   (By Ms. Helfrich)  Okay.  Let me ask a similar

15  question about day care home operators.  Do you know that

16  there is currently a rule that prohibits handguns in a day

17  care home, right?

18      A.   Yes, ma'am.

19      Q.   In your view, would it be irresponsible for a day

20  care home operator to violate that rule?

21      MR. SIGALE:  Same objection.  You can answer.

22      A.   I'm going to tell you it would be illegal for

23  someone to violate the order that they have been given,

24  that they have agreed to.  It would be illegal.

25      Q.   (By Ms. Helfrich)  What I'm asking is:  In your



1  view, would it be irresponsible?

2      A.   I don't like the term irresponsible.

3      Q.   Why not?

4      A.   Because you're asking me if they break the law if

5  is that irresponsible.  No, they just broke the law.

6      Q.   So it might not be irresponsible to do that?

7      A.   No, ma'am.  That's not what I said.  I said they

8  broke the law.

9      Q.   I don't understand.

10     A.   If they have an agreement and they say that they

11  broke -- and if they break the law, they broke the law,

12  okay.  It's not -- they made an agreement to follow the

13  rules.  If they don't follow the rules, they haven't

14  followed the rules.  Irresponsible implies something less

15  than breaking the rules.

16     Q.   Okay.  All right.  I think I understand what

17  you're saying.  Do you know whether foster parents face

18  consequences if they break the rules?

19     A.   I can only assume so.

20     Q.   Okay.  So before we talked about the fact that

21  children come into a foster home and they're not the

22  children of the foster parent, by which I mean they're not

23  the natural or adopted children of the foster parent.  Do

24  you agree that a child can come into a foster home and the

25  foster parents wouldn't know what training or education



JULIANNE VERSNEL                                      August 12, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              129

1  that child has had with regard to firearms?  Would you
2  agree that that's possible?
3      A.   That is possible, yes.
4      Q.   Okay.  And would you agree that the parents
5  wouldn't know as a result whether that child knew how to
6  behave appropriately around a firearm, whether that child
7  was capable of handling a firearm, whether the child
8  understood the danger of a firearm?
9          MR. SIGALE:  Objection to the form of the
10  question, speculation.  If you can answer, you can answer.
11      A.   A foster -- in my opinion, a foster parent has an
12  obligation to make sure that the children under their care
13  learn and are taught all that the things that they need to
14  know to keep them safe.
15      Q.   (By Ms. Helfrich)  Do you think that foster
16  parents -- strike that.
17          As a result of this litigation, what is your
18  understanding of what responsibility a foster parent would
19  have if you get what you want in this litigation?  What
20  responsibility, legal responsibility, would a foster parent
21  have regarding training or education of foster children
22  with regard to firearms?
23          MR. SIGALE:  Objection.  Calls for a legal
24  conclusion, foundation.  You can answer if you know.
25      Q.   (By Ms. Helfrich)  Well, let me rephrase it



 1   because I don't want to call for a legal conclusion.  What

 2   I want to ask is if you get what you want in this lawsuit

 3   and you get the rules changed the way you want them

 4   changed, would foster parents have a legal obligation to

 5   provide education or training to their foster children

 6   regarding firearms?

 7        MR. SIGALE:  Same objections.  You can answer if

 8   you know.

 9        A.   You're asking me whether legally they would have

10   an obligation?

11        Q.   (By Ms. Helfrich)  Yes.

12        A.   I do not know -- unfortunately, I do not know what

13   the specific laws are regarding the legal obligations of

14   parents in Illinois.

15        Q.   Okay.  Let me ask you this then.

16        A.   I'm not talking about foster parents, just

17   parents.

18        Q.   So is it any part of what you're asking for, that

19   foster parents be obligated to train or educate the foster

20   children in their care about firearms, firearms safety,

21   firearm handling?

22        A.   No, it is not my understanding that there would be

23   any legal obligation.

24        Q.   Okay.  So if you get the system you want out of

25   this litigation, foster parents would be under no legal



JULIANNE VERSNEL                                    August 12, 2020
JENNIFER J. MILLER vs MARC D. SMITH                        131

1  obligation that you know of to provide firearms education,

2  safety training to the foster children in their care?

3      A.   If we are successful in this litigation, foster

4  parents would be treated as all other parents.  They would

5  have a full protection under Heller, under McDonald, and

6  under Moore.

7      Q.   Do you agree that the State has a different

8  interest in foster children then it does with regard to

9  children in the care of their own parent?

10     A.   No.

11     Q.   No different?

12     A.   No.

13     Q.   Does it have any extra responsibilities for the

14 children in foster care then it does for the children in

15 the care of their own parents?

16     A.   Yes.

17     Q.   Okay.  Do you know what firearms the Millers keep

18 in their home?

19     A.   I do not recall if I've ever seen or read about

20 what specifically in their home.

21     Q.   Do you know whether they have any firearms in

22 their home?

23     A.   I believe based on something that I read that

24 someone who came into their home to evaluate their

25 suitability as foster parents went and purchased a separate



```
 1  safe for them to keep their ammunition in.
 2       Q.   Okay.  Did you read that in their licensing file?
 3       A.   I don't know what you mean by licensing file.
 4       Q.   Did you read that in documents that were produced
 5  by DCFS in this litigation?
 6       A.   No, ma'am.
 7       Q.   That's not where you read it?
 8       A.   No, ma'am.  I haven't seen those documents.
 9       Q.   Okay.  Do you know where you read that?
10       A.   I'll have to look through what I went through.
11       Q.   Did you read it in preparation for this
12  litigation -- I'm sorry, in preparation for this
13  deposition?
14       A.   Yes, ma'am.
15       Q.   Okay.  That narrows it down.
16       A.   But I would like to reiterate, I've never seen any
17  papers that had to do with anything that came out of any
18  Illinois State agency concerning them.
19       Q.   Okay.  I'm going to ask you some of the same
20  questions that I just asked you but with respect to day
21  care homes.  And so they'll be a little bit repetitive, but
22  we have to make the record.  Does the Second Amendment
23  Foundation have any licensing or oversight functions with
24  respect to day care homes in Illinois or anywhere?
25       A.   No, ma'am.
```



1      Q.    And do you agree that DCFS is the organization

2    that licenses day care homes in Illinois?

3      A.    Yes, ma'am.

4      Q.    Okay.  And do you agree that DCFS has experience

5    and expertise with regard to day care homes?

6      A.    I would hope so.

7      Q.    Would you agree that DCFS is in a better position

8    to decide what regulatory framework day care homes should

9    operate under than SAF?

10           MR. SIGALE:  Object as the form of the question,

11   but you can answer if you can.

12     A.    That's a very, very broad question.

13     Q.    (By Ms. Helfrich)  Do you understand the question?

14     A.    I understand the question, yes, ma'am.

15     Q.    Well, do you agree that DCFS is in a better

16   position than SAF to create a regulatory framework for day

17   care homes in the state of Illinois?

18     A.    In the general framework, I hope so.

19     Q.    Okay.  And do you understand that operating a day

20   care home in Illinois is voluntary?

21     A.    Yes, ma'am.

22     Q.    And do you understand that it involves caring for

23   children in one's own home who are not one's own children?

24     A.    Yes, ma'am.

25     Q.    And that the parents of these children pay the day



1   care for the childcare?

2        A.   Yes, ma'am.

3        Q.   So you understand that running a day care home in

4   Illinois is a business?

5        A.   Yes, ma'am.

6        Q.   And do you agree that businesses in general are

7   subject to regulation by the state that they're located in?

8        A.   As long as offices are treated equally.

9        Q.   So as long as all businesses are treated equally,

10   so you would say that the fact that there are children in a

11   day care business, children for whom the State of Illinois

12   is responsible --

13        A.   I --

14        Q.   Let me finish and then you can tell me whether you

15   agree with what I'm saying or not.  The fact that there are

16   children and the State is responsible in this business

17   doesn't affect how the State should treat the business?

18             MR. SIGALE:  I'm going to object as to the form of

19   the question.  And I believe that mischaracterizes the role

20   of the State in this regard, but you can answer if you can.

21        A.   As I understand the rules and the regulations for

22   day care, all individuals who operate day cares are not

23   treated equally by the rules and regulations that the

24   Illinois Childcare Act has.  There are not -- there are

25   people who are exempt from certain rules.



1    Q.   (By Ms. Helfrich)  What's your understanding of

2  who those people are who are exempt from those rules?

3    A.   Specifically with firearms in terms of having a

4  firearm in a day care, if you're a police officer or

5  officer of the peace or you're required to carry a firearm

6  for your employment, then you can, but another individual

7  is not allowed to have the same equal protection that is

8  guaranteed by Miller, McDonald and Moore that the police

9  officers or peace officers are special somehow.

10   Q.   Okay.  I would like to take about a five-minute

11  break.  Is that all right?

12        MR. SIGALE:  Yeah, that sounds great.

13        MS. HELFRICH:  We've been going a while now.  So

14  why don't we come back -- it's 1:57.  Why don't we come

15  back at 2:03?

16        MR. SIGALE:  Okay.

17                  (A break was taken.)

18   Q.   (By Ms. Helfrich)  Ms. Versnel, I was asking you

19  questions about day care homes and I want to finish that

20  line of questioning and move to some of the general topics

21  that were in our notice deposition.  So with regard to day

22  care homes, you agree that it's important that day care

23  homes -- sorry, would you agree that it's important that

24  the operators of day care homes be qualified to care for

25  the children?



1      A.   Yes.

2      Q.   And would you agree that day care homes -- do you

3   understand that day care home providers in Illinois are

4   licensed by the state?

5      A.   Yes.

6      Q.   And that in the process of getting that license,

7   they undergo home inspections, medical examinations, proof

8   of appropriate education, training approved by DCFS, a

9   variety of things?

10     A.   Yes.

11     Q.   Okay.  And would you agree as with the foster home

12  context that throughout this process, the health and safety

13  of the children is paramount?

14     A.   Yes.

15     Q.   And do you agree that it's important for day care

16  providers to take appropriate steps to keep the children in

17  their care safe?

18     A.   Yes.

19     Q.   Would you agree that it's important to follow, for

20  example, capacity requirements in a day care?

21     A.   Yes.

22     Q.   Would you agree that it's important to have

23  appropriate safety signs in place?

24          MR. SIGALE:  I'm sorry, safety what?

25          MS. HELFRICH:  Safety signs.  Warning signs where



1   there's hazards or dangers.

2       A.   Yes.

3       Q.   (By Ms. Helfrich)  And would you agree that it's

4   important, for example, to have age-appropriate toys so

5   that there aren't choking hazards around for small

6   children?

7       A.   Yes.

8       Q.   Would you agree that children coming into a day

9   care might have no knowledge or education with regard to

10  firearms?

11      A.   Yes.

12      Q.   And would you agree that children coming into a

13  day care might not know the appropriate steps to take if

14  they encounter a firearm, for example?

15      A.   Yes.

16      Q.   And they might not know how to handle a firearm?

17      A.   Yes.

18      Q.   And they might lack the knowledge and skill or

19  even the maturity to handle a firearm or to be exposed to a

20  firearm?

21      A.   Yes.

22      Q.   And would you agree that the operator of a day

23  care home might have no knowledge of what the children know

24  with regard to firearms?

25      A.   Yes.



1    Q.   So how is it -- in your view, how is the day care

2    home operator supposed to keep children safe from firearm

3    injuries?

4    A.   A day care operator has an obligation to keep the

5    children safe from injury caused by firearms or by any

6    other means the same way a parent has an obligation to

7    protect children from injury.

8    Q.   So we agree that the day care home operator has an

9    obligation to protect them.  How is the day care home

10   operator supposed to do that in your view?

11   A.   In regards to safe from what specifically?

12   Q.   Injury from firearms.

13   A.   They need to make sure that children do not have

14   access to the firearms in any way.  I also believe that it

15   is prudent to teach children the roles of what to do if

16   they were to find a firearm, and that would be stop, don't

17   touch and go get an adult.

18   Q.   Do you think that a day care home operator who

19   wants to have a firearm for defense in the home has an

20   obligation to teach the children in the day care how to

21   respond to a firearm they see?

22   A.   Yes.

23   Q.   Should that obligation be legal?  Should they be

24   obligated under the law to provide that instruction to the

25   children?



1      A.   No.

2      Q.   Okay.  So you stated before that a day care home

3  provider should be allowed to have any kind of weapon that

4  they want -- excuse me, any kind of firearm that they want

5  provided that they own it legally for self-defense in their

6  home?

7      A.   Yes.

8      Q.   Okay.  So how in your view do you have a readily

9  available firearm in a day care home while also keeping

10  that firearm inaccessible to children?  How do you do that?

11  Let's start with handguns.  How would you do it with a

12  handgun?

13      A.   My opinion, it would have to be personal.  I would

14  have it stored in a lock box that was not accessible to

15  children.

16      Q.   Is it your view that the day care home operator

17  should be required to throw the handgun in the lock box?

18      A.   No.  They have equal protection just like anybody

19  else.

20      Q.   So the day care home operator can choose for him

21  or herself what to do with their readily accessible

22  firearm?

23      A.   Yes.

24      Q.   Including, to use Mr. Sigale's example from the

25  other day, they can have a loaded handgun on the coffee



1  table?

2      A.   I wasn't there the other day, so I don't know in

3  what context or what you're referring to.

4      Q.   Under the rules as you propose them, could the day

5  care home operator have a loaded handgun on the coffee

6  table?

7      A.   In my personal opinion, I would assume --

8      Q.   No, I'm not asking for your personal opinion.  I'm

9  asking under the rules as you propose them in this lawsuit,

10  could a day care home operator keep a loaded gun on the

11  coffee table, a loaded handgun on the coffee table?

12      A.   I can't answer that question because I don't know

13  what the other rules are that day care providers have to

14  follow in terms of dangerous objects.

15      Q.   Is it your position -- strike that.

16           Under the rules with regard to firearms as you

17  propose them, would there be a specific prohibition on

18  keeping a loaded firearm on the table, a loaded handgun on

19  a coffee table?

20      A.   I'm going to have to say that I do not know what

21  the rules are for day care providers in --

22      Q.   I'm asking you about the rules that you're

23  proposing so you do know.  The rules you are proposing,

24  would they allow a day care home provider to have a loaded

25  gun on the coffee table?



JULIANNE VERSNEL                                              August 12, 2020
JENNIFER J. MILLER vs MARC D. SMITH                                      141

1      A.   Again, I'm going to say that I do not know what

2   the rules -- other rules in terms of keeping dangerous

3   items away from children are in terms of the day care

4   rules.  And I am not going to say that firearms should be

5   treated any different -- excuse me, not firearms, that

6   loaded firearms should be left on a coffee table anymore

7   than an open bottle of a prescription medication should be

8   left on a coffee table.

9      Q.   Under the Second Amendment, does a day care home

10  operator have a right to leave a loaded firearm on the

11  coffee table?

12     A.   Under the Second Amendment, there are no storage

13  requirements.

14     Q.   It's a yes or no question.  Under the Second

15  Amendment, does the day care home operator have a right to

16  leave a loaded firearm on the coffee table?

17     A.   Yes.

18     Q.   Under the Second Amendment, does it matter what

19  type of firearm that is provided it is legally owned?

20     A.   No.

21     Q.   Does the Second Amendment Foundation encourage its

22  members to practice gun safety?

23     A.   Yes.

24     Q.   Okay.  Help me understand what SAF's position is

25  with regard to gun safety.  In other words, within a home,



1   what is a safe way to keep and possess firearms?

2       A.   That is up to each individual to make the

3   decisions that they feel are necessary to keep a firearm

4   for self-defense and to keep it in the manner in which they

5   are most comfortable.

6       Q.   So are there principles that the organization

7   teaches its members or other people that are principles of

8   gun safety as opposed to specific methods?

9       A.   The Second Amendment Foundation is not an

10  organization that offers any firearms training at all.

11  There are other organizations that do that.  We refer

12  people to those other organizations that do that.

13      Q.   Would it be correct to say -- and if it's not let

14  me know -- would it be correct to say that the Second

15  Amendment Foundation doesn't take a position on how guns

16  should be kept in the home?

17      A.   No, we do not take position.  It's not part of our

18  mission.

19      Q.   Okay.  I want to ask you about -- I want to ask

20  you the same question about gun storage more specifically.

21  Does the Second Amendment Foundation take a position on the

22  appropriate -- what is an appropriate method of gun storage

23  in the home?

24      A.   No, we do not.

25      Q.   And is it also correct that you don't do any



1  education or training regarding gun storage?

2       A.   No, we do not.

3       Q.   Okay.  And the Second Amendment Foundation is part

4  of something called the Safer Homes Coalition?

5       A.   Yes.

6       Q.   Is that correct?

7       A.   Yes, ma'am.

8       Q.   Can you explain to me what the Safer Homes

9  Coalition is?  I tried to understand it.  I don't fully

10 understand what kind of an entity is.

11      A.   The Safer Homes Coalition was formed by the

12 Washington State legislature.  It is part of the revised

13 code of Washington.  It is a task force.  I've got some

14 bounce back.  Nobody else does?  Okay.  It was formed, as I

15 said, by the Washington State legislature.  It -- I have a

16 copy of the RCW if you'd like me to share it with you or I

17 won't if you don't want me to.

18      Q.   You have it here right now?

19      A.   Yes, ma'am.  I have a copy of it on my desk.  I'm

20 not referring to it right now because I can only tell you

21 that it lists about 40 different types of individuals

22 representing different types of organizations that will be

23 part of the task force.

24      Q.   So let me ask this:  Is the Second Amendment

25 Foundation specifically required by the statute to be part



1  of the task force?

2      A.    I don't remember off the top of my head.  I'd have

3  to look -- I'd have to look at it.  I do know that there

4  are requirements for there to be veterans organizations.

5  There are requirements for there to be groups that support

6  the right to keep and bear arms.  There are requirements

7  for groups that don't support the right that you can bear

8  arms.  There are requirements for a hunting safety people

9  to be involved.  There are requirements for pharmaceutical

10  organizations to be involved.  It's a very lengthy list.

11      Q.    Okay.

12            MR. SIGALE:  Counsel, do you want the site or just

13  at some point in the future?

14            MS. HELFRICH:  I'm sorry, I didn't hear you.

15            MR. SIGALE:  I asked if you want the site or if

16  you just want to leave it until possibly later.

17            MS. HELFRICH:  We can leave it until later.

18      Q.    (By Ms. Helfrich)  So it's my understanding that

19  the purpose of the task force and the purpose of the

20  coalition as a whole is suicide prevention; is that

21  correct?

22      A.    Suicide prevention and intervention, yes.

23      Q.    Okay.  And is it correct that the focus is on

24  preventing suicide by firearms and suicide by medication

25  drugs?



 1     A.   Yes.

 2     Q.   Okay.  And you're aware that the Safer Home

 3  Coalition or Safer Home has a project called Suicide Aware?

 4     A.   I don't know if -- is that part of -- that might

 5  be part of the Learn program.

 6     Q.   Well, yeah, I'm going to screen share with you.

 7     A.   Okay.

 8     Q.   I'm going to show you what I have marked now as

 9  Exhibit 8.

10     A.   Okay.

11               (Exhibit No. 8 was marked.)

12     Q.   (By Ms. Helfrich)  So can you see the document in

13  the upper left, it says Safer Homes Suicide Aware?

14     A.   Yes.

15     Q.   And you see it says, "Versnel Exhibit 8"?

16     A.   Yes.

17     Q.   Down here in the corner?

18     A.   Yes.

19     Q.   So I'll represent to you that I pulled this from

20  the Safer Homes website.

21     A.   Okay.

22     Q.   But I want to show you down here, this is near the

23  bottom.  It says, "In partnership with forefront suicide

24  prevention," and then Second Amendment Foundation.  That is

25  you, right?



JULIANNE VERSNEL                                    August 12, 2020
JENNIFER J. MILLER vs MARC D. SMITH                          146

1      A.   Yes.

2      Q.   Okay.  So are you familiar with this website?

3      A.   To a certain extent, yes.

4      Q.   Okay.  I want to show you some of the things that

5   it says.  So here it says, What is a Safer Home?

6      A.   Yes.

7      Q.   And it says, "A safer home secures all firearms in

8   locked storage."  Did I read that correctly?

9      A.   Yes, ma'am.

10     Q.   So that's not the rule that you propose for

11  Illinois foster homes or for Illinois day care homes,

12  correct?

13          MR. SIGALE:  Object as to mischaracterization of

14  the testimony, but you can answer.

15     A.   This has to do --

16          MS. HELFRICH:  Let's clarify the testimony, David.

17     Q.   (By Ms. Helfrich)  Do you propose that Illinois

18  day care homes and Illinois foster care homes keep all

19  their firearms in locked storage?

20     A.   Ma'am, you're conflating two things.  Safer Homes

21  Suicide Aware, okay, this is talking about when you have

22  people who are concerned are suicidal in your home.  That's

23  what --

24     Q.   You're saying this is about only when there's

25  someone in the home that you're concerned about?



1     A.   Yes, ma'am.

2     Q.   And how would you know?

3     A.   How would I know what, ma'am?

4     Q.   How would a person know whether they have someone

5  in their home who is potentially suicidal?

6     A.   Well --

7          MR. SIGALE:  Objection.  Foundation, but if you

8  can answer.

9     A.   In the case of Safer Homes Suicide Aware, there is

10  a program that is offered, it's about a two-hour program.

11  It's called Learn.  And that it gives you the signs of when

12  you're dealing with someone who may be suicidal.

13     Q.   (By Ms. Helfrich)  And so you're statement is or

14  your testimony is that --

15     A.   If you -- go ahead.

16     Q.   Down here it says, "basic rules of firearm

17  storage," do you see that?

18     A.   Yes, ma'am.

19     Q.   "Lock up all firearms."  You're saying that is

20  only when you have someone in your home who is potentially

21  suicidal?

22     A.   Yes, ma'am.

23     Q.   You're saying do not allow unauthorized access to

24  children.  Are you saying that is only when there is

25  someone in your home who is suicidal?



1      A.   No, ma'am.  If you go -- you're showing me a

2   different part of this page before and I cannot see the

3   whole page.

4      Q.   Well, so --

5      A.   When it talks about --

6      Q.   This says, "Save a Life, universal rules of safe

7   storage for medications and firearms," universal.

8      A.   And then it says steps to --

9      Q.   Okay.  Steps to prevent suicide and overdose, and

10  then it says basic rules of firearm storage.

11          Is it your testimony that these rules only apply

12  when there's someone in your home who is suicidal -- strike

13  that.

14          Is it your testimony that the intention of Safer

15  Homes is that people follow these rules only when someone

16  in their home is suicidal and that it is not necessary to

17  follow these rules if somebody in your home is not

18  suicidal?

19      A.   It is my contention that the Second Amendment

20  Foundation is on a task force.  We didn't write this.  We

21  didn't produce this.

22      Q.   In partnership with Second Amendment Foundation.

23  Your name is on this.

24      A.   Yes, ma'am.

25      Q.   Are you saying that you don't advocate these



1  rules, these practices?

2      A.   These practices are choices that people can make

3  that have nothing to do with the rights confirmed under

4  Heller, McDonald and Moore.  I'm also telling you that the

5  Second Amendment Foundation did not produce this material.

6  That is what I'm telling you.  I don't know how else to

7  tell you that.

8      Q.   Well, you can tell me this.  These three rules

9  under basic rules of firearm storage, do you think people

10  should follow those rules?  Does the Second Amendment

11  Foundation think people should follow those rules?

12      A.   The Second Amendment Foundation --

13      Q.   It's a yes or no question.

14      A.   It's not a yes or no question.  I'm sorry, it's

15  just not a yes or no question.  In my opinion, it's simply

16  not a yes or no question.

17      Q.   All right.  Go ahead and answer.

18      A.   In terms of the legal issue of Second Amendment,

19  the rights confirmed under Heller, the rights confirmed

20  under McDonald and the rights confirmed under Moore, no,

21  there are no restrictions as to storage.

22      Now, as a prudent person one makes prudent

23  decisions, but there is nothing under Heller, McDonald or

24  Moore that lays out any requirements for storage.

25      Q.   Does the Second Amendment Foundation advocate that



1  people follow these three rules?

2      A.   The Second Amendment Foundation advocates --

3      Q.   That's a yes or no question.

4      A.   No.

5      Q.   All right.  I'm going to ask you some questions

6  about ammunition storage, but I'm going to start with the

7  question of does the Second Amendment Foundation have a

8  position or view on how ammunition should be stored?

9      A.   No.

10     Q.   Does it do any education or training of its

11  members or the public regarding how ammunition should be

12  stored?

13     A.   No.

14     Q.   And is it correct that as with firearm safety

15  generally, you might refer people to other organization for

16  that kind of training?

17     A.   Yes.

18     Q.   Does the Second Amendment Foundation have a

19  position or advocate a view regarding the circumstances

20  under which children should have access to or handle

21  firearms?

22     A.   We do not have an official statement on that, no.

23     Q.   Do you do training or education for your members

24  or the public regarding how children should handle -- have

25  access to or handle firearms?



1    A.   We do not do any firearms safety training.   That

2    is not part of our mission.   We have never done any

3    firearms safety training.

4    Q.   And -- okay.   So to make sure I understand what

5    you just told me, I think I do but I want to make sure, if

6    I were to say at what age is it appropriate for children to

7    begin handling firearms, you would tell me the Second

8    Amendment Foundation does not have a position on that?

9    A.   Correct.

10   Q.   Okay.   Let me take a minute.   I know we just took

11   a break, but let's take five.   Ms. Versnel's answers cut

12   out a lot of my questions and I need to regroup for a

13   second, okay?

14           MR. SIGALE:   Five minutes is fine.

15           MS. HELFRICH:   Yeah, so let's come back at 2:46.

16                  (A break was taken.)

17   Q.   (By Ms. Helfrich)   Okay.   We're back on the

18   record.   Again, I remind you that you're still under oath,

19   Ms. Versnel.   So given your answers just a few minutes ago,

20   I think we're going to skip a bunch of topics, but before

21   we do that, I want to run through them quickly and ask you

22   a bunch of repetitive questions but make a really clear

23   record.

24           Is it correct that the Second Amendment Foundation

25   takes no official position on and has no official view on



1  gun safety?

2       A.    Excuse me.  I need to change my headphones.

3       Q.    Sure.

4             COURT REPORTER:  I can't hear her, so I'm not

5  writing.

6             MR. SIGALE:  Do you need another moment or do you

7  have them there?

8             MS. HELFRICH:  Yeah, let's go off the record.

9  Take a couple of minutes.  Take what you need.

10                      (A break was taken.)

11       Q.   (By Ms. Helfrich)  Again, I want to remind you

12  that you're still under oath.  I want to quickly go through

13  a series of questions just to make a clear record based on

14  your responses before we broke before.  I'll try to do it

15  as just simple yes or no questions.

16             Is it correct to say that the Second Amendment

17  Foundation takes no official position and has no official

18  view on gun safety?

19       A.    The Second Amendment Foundation always promotes

20  responsible firearms ownership.  The Second Amendment

21  Foundation does not support any rules or regulations that

22  infringe on an individual's right to have a firearm for

23  self-defense under Heller, McDonald or Moore.

24       Q.    Please define responsible gun ownership.

25       A.    To practice the rules of firearms safety.



1   Q.   And what are the rules of firearms safety?

2   A.   To check if the firearm is loaded, do not put your

3   finger on the trigger unless you're ready to fire the

4   firearms, to use a safety, to secure your firearm in the

5   manner which you find to be the manner that works for you.

6        I'm extrapolating when I probably shouldn't, but I

7   would have to say it's the same as -- to me, it's similar

8   to a company -- it's similar to people who make bleach.

9   Don't store it in an unsafe place, but they don't go and

10  have rules on where you should store it or how you should

11  store it.

12       There are -- there are obligations -- people have

13  a moral obligation to be responsible human beings.  The

14  Second Amendment Foundation follows the law which is the

15  law.  We follow the law.

16  Q.   And in your view, the law including the

17  Constitution, does not require an individual to be a

18  responsible gun owner; is that correct?

19  A.   No.  The constitution does not require that a

20  firearm be stored in any particular manner.

21  Q.   Does the Constitution require that a firearm be

22  stored safely?

23  A.   No, it does not.

24  Q.   Does the Constitution require that a firearm be

25  kept inaccessible to children.



JULIANNE VERSNEL                                    August 12, 2020
JENNIFER J. MILLER vs MARC D. SMITH                          154

1      A.   No, it does not.

2      Q.   Does it require that a firearms be kept from

3  unauthorized users?

4      A.   No, it does not.  We're talking about the Second

5  Amendment.  The Second Amendment is silent on those points.

6      Q.   So if the state of Illinois requires a foster

7  parent to store their firearm safely, would that be an

8  infringement of their Second Amendment rights?

9      A.   Yes, under Heller and McDonald and Moore.  The

10 second.

11     Q.   Either --

12     A.   Go ahead.

13     Q.   If it imposed any requirements at all regarding

14 the storage of firearms on foster parents or day care home

15 operators, would it be infringing their Second Amendment

16 rights?

17     A.   It would be infringing their Second Amendment

18 rights under equal protection because they have -- because

19 they are not -- they do not have the same rights as other

20 individuals.

21     Q.   Let me unpack that a little bit.  If the state of

22 Illinois imposed an obligation -- imposed a requirement on

23 every firearm owner that they had to store their firearm

24 safely in their home, would that be an infringement of

25 their Second Amendment rights?



1          MR. SIGALE:  I'm just going to object as to the

2     form of the question and vague, but if you can answer, go

3     ahead.

4          A.   Yes.

5          Q.   (By Ms. Helfrich)  Okay.  And just to be clear,

6     it's your view that foster parents and day care home

7     operators in Illinois to be allowed the full scope of their

8     rights under the Second Amendment?

9          A.   Yes.

10         Q.   And you would say the same thing with regard to

11    any other individual in Illinois?

12         A.   So long as they're not a prohibited individual.

13         Q.   So subject to the assumption that any firearm is

14    held lawfully?

15         A.   Yes.

16         Q.   Okay.  Is this correct, the Second Amendment

17    Foundation takes no official position and has no official

18    view on when and under what circumstances children should

19    handle or have access to firearms?

20         A.   Minors, children under the age of 18, are not

21    allowed to purchase firearms.  There are other restrictions

22    on minors that -- on minors with firearms, minors with --

23    children under the age of 18 do not enjoy unfettered

24    constitutional rights.  There are limitations that are

25    placed on minors in many of our constitutional rights.



1      Q.   Does the Second Amendment Foundation have an

2   official position or an official view on the circumstances

3   where the manner in which children should be given access

4   to or should handle firearms?

5      A.   No.

6      Q.   Does it do any education on that subject?

7      A.   No.

8      Q.   Does it do any advocacy on that subject?

9      A.   No.

10      Q.   I'm going to ask you the same three questions

11   about ammunition storage.  Does the Second Amendment

12   Foundation take an official position or have an official

13   view on how ammunition should be stored?

14      A.   No.

15      Q.   Does it do any education on that subject?

16      A.   No.

17      Q.   Does it do any advocacy on that subject?

18      A.   No.

19      Q.   One of the other topics on the list today is

20   self-defense.  Does the Second Amendment Foundation take a

21   position or have an official view on what situation -- on

22   situations in which it would be appropriate to use a

23   firearm for self-defense?

24      A.   To have a right to self-defense and develop a

25   defense of self and family.



JULIANNE VERSNEL                                                      August 12, 2020
JENNIFER J. MILLER vs MARC D. SMITH                                              157

1      Q.   Do they have a right to defend a business?

2      A.   You have a right to defend yourself in that

3  instance if you feel like you're in imminent harm.

4      Q.   Okay.  Let me give you an illustration to sort of

5  give you an idea of what I'm looking at when we spoke to

6  Illinois Carry last week.  Illinois Carry's position as I

7  understood it -- and I'm not -- if I get it wrong then

8  maybe I get it wrong, but my understanding is that they're

9  position was that they advocate for the right to

10  self-defense under Illinois law.

11          In other words, Illinois law sets out the

12  circumstances in which the use of a firearm in self-defense

13  would be legal.  So I'm asking whether the Second Amendment

14  Foundation has any sort of position on whether use of a

15  firearm in self-defense is subject to legal constraints

16  like that or -- that's what I mean by when it's

17  appropriate.

18          Do you understand what I'm saying?

19      A.   Yes.  And the use of self-defense is constrained

20  by the legalities, yes.

21      Q.   Okay.  So would it be correct to say that your

22  right to self-defense under the Second Amendment in

23  Illinois would be subject to the law in Illinois as to when

24  self-defense may be used?

25      A.   Yes.



JULIANNE  VERSNEL                                    August 12, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              158

1    Q.   Okay.  In your view, does this lawsuit

2  implicate -- strike that.  I believe I understand you to

3  have testified today that the restrictions on firearms that

4  apply to parents and day care operators infringe on the

5  right to defense in the home --

6    A.   Yes.

7    Q.   -- under the Second Amendment?

8    A.   Yes.

9    Q.   Okay.  Do these regulations infringe any other

10  rights that a person might have under the Second Amendment?

11   A.   I'm afraid I just don't understand your question.

12   Q.   Well, I'm trying to understand whether in this

13  litigation your claim is that these rules infringe the

14  right just as it relates to defense in the home or if there

15  is some other dimension of the problem here.  Let me try to

16  ask it a little more specifically.

17       Is it your position in this lawsuit that these

18  regulations infringe on the foster parents or day care home

19  operators right under the Second Amendment to carry a

20  weapon in public for self-defense?

21   A.   Well, if you can't have a firearm in your home, I

22  don't know where you would be keeping the firearm that you

23  might be carrying.  And in order to carry outside of the

24  home, you would have to have a concealed carry permit.

25   Q.   But is it your position in this lawsuit that these



1   rules infringe on your right to carry outside the home?

2       A.   No, I'm not discussing outside of the home.

3       Q.   That's what I'm trying to understand.  That's what

4   I'm trying to understand.  Do you think that getting rid of

5   the rules -- strike that.

6           Your testimony today has been, as I understand it,

7   that what you seek in this lawsuit is to have these rules

8   lifted entirely, correct?

9       A.   What we seek in this lawsuit is that the day care

10  license, day care providers, home care providers and foster

11  care providers be treated the same as any other person in

12  the state of Illinois who possesses a legal firearm in that

13  they are able to exercise their rights to self-defense as

14  guaranteed under Heller, McDonald and Moore.

15      Q.   And does that entail lifting the restrictions that

16  are the subject of this challenge?

17      A.   Yes.

18      Q.   Okay.  Is it your position that children in foster

19  care will be safer if these restrictions are lifted?

20      A.   Yes.

21      Q.   Is the safety of children in foster care your

22  paramount concern with regard to the regulatory system

23  that's in place?

24      A.   My concern is that the children are able to be

25  defended by their foster parents in terms of their safety



1   and in terms of the children's safety, just like a parent

2   would be concerned about defending their children, natural

3   or not.

4       Q.   Okay.  I understand that.  And I understand that

5   your view is that children in foster care would be safer

6   without these regulations.  Is it also your view that

7   children in a day care home would be safer without these

8   regulations?

9       A.   Yes.

10      Q.   Okay.  If there were evidence to show that a

11  different rule were safer, would you favor that rule?

12      A.   So long as the rule did not infringe upon the

13  individual's right to self-defense as determined by Heller,

14  McDonald and Moore.

15      Q.   So that's your paramount concern, the infringement

16  of the right for self-defense?

17      A.   Yes.

18      Q.   Not for the safety of children?

19           MR. SIGALE:  Object as to form.

20      A.   I believe children should have equal opportunity

21  to be defended from harm by their parents.  Be they natural

22  or custodial, I believe they have the right to be defended.

23      Q.   (By Ms. Helfrich)  If I understand that, you said

24  that several times but that doesn't answer my question.  My

25  question is, is your paramount concern infringement of the



JULIANNE VERSNEL                                    August 12, 2020
JENNIFER J. MILLER vs MARC D. SMITH                            161

1   Second Amendment rights for the safety of children in
2   foster care and in day care homes?
3        A.   I believe that the foster parents and parent's
4   rights provide for the safety of the children in terms of
5   their security and safety in the home so that the parents
6   can protect the children.
7        Q.   Okay.  I know you believe that.  What if you're
8   wrong?  Is the children, the safety of the foster children
9   and the safety of the children in the day care home, the
10   most important consideration?
11           MR. SIGALE:  I'm going to object as to form and if
12   you can answer.
13       A.   I don't have another answer.  That's the answer
14   that I have.
15       Q.   (By Ms. Helfrich)  So your -- you believe children
16   are safer if their parents are able or foster parents or
17   day care home operator are able to exercise the full scope
18   of their Second Amendment rights?
19       A.   If they choose to do -- if the foster parents or
20   parents choose to do so.
21       Q.   And what I'm asking is if that belief is wrong, do
22   you still want foster parents and day care home operators
23   to be able to exercise the full scope of their Second
24   Amendment rights or if another rule makes children safer,
25   is that the rule that should be in place?



1          MR. SIGALE:  Objection as to form of the question

2    and speculation.

3          Q.   (By Ms. Helfrich)  Let me ask you another way:

4    What's a higher priority for you, the safety of the

5    children or the Second Amendment rights of the parents, the

6    foster parents or the day care home operator.

7          MR. SIGALE:  Objection as to form.

8          A.   You are asking me to make an assumption about the

9    safety of children and agree with an assumption that's been

10   made about the safety of children that I can't agree with.

11         Q.   (By Ms. Helfrich)  I'm not asking you to agree

12   with an assumption.  I'm asking you now what is your higher

13   priority, the rights of the Second Amendment for foster

14   parents and day care home operators or the safety of

15   children in their care?

16         A.   And, again, I will repeat.  I do not think that

17   those two issues are exclusive.  They are not mutually

18   exclusive.

19         Q.   All right.  I'm going to ask you some questions

20   about the other organizational plaintiffs in this case.

21   The Second Amendment Foundation does not have any formal

22   legal relationship with Illinois Carry?

23         A.   No.

24         Q.   Other than in this litigation, does SAF

25   communicate with Illinois Carry?



1    A.    Occasionally.

2    Q.    Generally on SAF side, who do you communicate --

3  who communicates with IP?

4    A.    It would be either Gottlieb or me.

5    Q.    Okay.  Do you recall the last time that you

6  communicated with anyone at Illinois Carry?

7    A.    I believe the last thing that I saw that involved

8  Illinois Carry had to do with being cc'd something on this

9  case.  I think maybe it was the notice of the depositions.

10    Q.    Okay.  And, again, I want to caution, I don't want

11  to know about any privileged communications.  I only want

12  to know about nonprivileged communications.

13        What is your understanding of the -- sorry.  Other

14  than this litigation, what other things do you

15  communicate -- does SAF communicate with Illinois Carry

16  about?

17    A.    We had other cases that we have been a party to

18  that Illinois Carry has been a party to.

19    Q.    Okay.  Do you collaborate on anything other than

20  litigation?

21    A.    No.

22    Q.    So, for example, you don't organize conferences

23  together with Illinois Carry?

24    A.    We've had someone from Illinois Carry be a guest

25  at one of our conferences.



1      Q.    Okay.  Any other forms of collaboration that you
2    can think of?
3      A.    No.
4      Q.    What's your understanding of the organizational
5    goal of the Illinois Carry?
6      A.    They expand the right to carry in the state of
7    Illinois.
8      Q.    And how would you -- if there is a difference
9    between the goals of SAF and the goals of the Illinois
10   Carry, how would you describe that difference?
11     A.    I have no idea if there is any difference or not.
12     Q.    How did you come to the determination -- strike
13   that.
14           Have you ever collaborated with Illinois Carry on
15   any publication?
16     A.    Not to the best of my knowledge.
17     Q.    What about other public statement?
18     A.    To the best of my knowledge, only perhaps if there
19   was a press release that had to do with litigation.
20     Q.    Okay.  And are you -- are you now or have you been
21   involved in other litigation with Illinois Carry?
22     A.    Yes.
23     Q.    What are those cases?
24     A.    I -- Illinois Carry was a party in
25   Moore v. Madigan, which was in front of Judge Myerscough.

JULIANNE VERSNEL                                    August 12, 2020
JENNIFER J. MILLER vs MARC D. SMITH                            165

1   They may -- they might have been a party in Culp.

2       Q.   Is that Culp v. Raoul?

3       A.   Yes.  I didn't look -- we have had them as

4   co-plaintiffs in several cases.  I'm just not remembering

5   them all.

6       Q.   Okay.  So this is not the full list here, Moore

7   and and Culp?

8       A.   And I could be incorrect about Culp.  I would have

9   to -- I would have to check.

10      Q.   Okay.  That's alright.  I understand it's late.

11  So what factors did SAF consider in deciding to become a

12  coplaintiff with Illinois Carry?

13      A.   The issue at hand was a mutual interest.

14      Q.   Did you discuss with them -- strike that.

15          Did you discuss this lawsuit with them before you

16  decided to become a plaintiff?

17      A.   That would infringe upon attorney/client

18  privilege.

19      Q.   Okay.  I want to ask you similar questions about

20  the Illinois State Rifle Association.  Does SAF have any

21  formal legal relationship with ISRA?

22      A.   No.

23      Q.   Okay.  Outside of this lawsuit, does ISRA and SAF

24  ever communicate?

25      A.   Yes.



1      Q.   And generally on your side, who's involved in

2  those communications?

3      A.   Either Alan Gottlieb or me.

4      Q.   Okay.  Do you know what, I forgot to ask you a

5  question about Illinois Carry.  In general, who do you

6  communicate with at Illinois Carry?

7      A.   If there is communication, the only person I

8  really know there is Valinda Rowe, V-A-L --

9      Q.   I know how to spell it.  I got it.

10     A.   The court reporter didn't.

11          COURT REPORTER:  I didn't get that name.  What was

12  the name again?

13          THE WITNESS:  Do you want me to spell it?

14          COURT REPORTER:  Yeah, the full name.  I didn't

15  get it.

16          THE WITNESS:  Valinda, V-A-L-I-N-D-A.  Her last

17  name is Rowe, R-O-W-E.  Did you hear that?

18          COURT REPORTER:  Yes.  Thank you.

19          MS. HELFRICH:  I apologize, Ms. Brunt.  I didn't

20  realize she was spelling it for you.  I thought she was

21  spelling it for me.

22     Q.   (By Ms. Helfrich)  So when you communicate with

23  ISRA, is there one person you generally communicate with?

24     A.   Yes.

25     Q.   Who's that?



1        A.   Richard, last name Pearson, P-E-A-R-S-O-N.  I can

2   see Ms. Brunt's frustration in the back, so that's why I

3   stopped a couple of times.

4        Q.   So what does SAF communicate with ISRA about other

5   than this litigation?

6        A.   Other pieces of litigation.  I believe Alan

7   Gottlieb has gone and spoken at their full meetings, and

8   we've been involved in other litigation with ISRA.

9        Q.   Okay.  Any other collaborations with ISRA that are

10  not SAF litigation?

11       A.   Somebody from ISRA has spoken at our Gun Rights

12  Policy Conference every year.

13       Q.   That's your annual conference?

14       A.   Yes.

15       Q.   Okay.  Have you of ever collaborated with ISRA on

16  any publications?

17       A.   To the best of my knowledge, no.

18       Q.   Any -- other than related to litigation, any

19  public statement?

20       A.   No.

21       Q.   Okay.  Have you -- other than this lawsuit, have

22  you ever collaborated with both Illinois Carry and ISRA on

23  anything?

24       A.   On another lawsuit.

25       Q.   And what suit was that?



1    A.    Moore V. Madigan.  M-O-O-R-E V. Madigan.

2    Q.    And what factors did you consider in deciding to

3  become a plaintiff along with ISRA in this litigation?

4    A.    Attorney/client privilege.

5    Q.    Okay.

6          MR. SIGALE:  I don't think that's the answer.  I

7  think she's saying it is.

8    Q.    (By Ms. Helfrich)  Okay.  What factors did the

9  Second Amendment Foundation consider in deciding to ally

10  with ISRA in this lawsuit?

11   A.    Past relationships.

12   Q.    With ISRA?

13   A.    Yes.

14   Q.    Okay.  What's your understanding of the

15  organizational goals of ISRA?

16   A.    I know that they are involved in legislation.

17  They lobby down in Springfield.  They also operate a range

18  somewhere outside of Chicago, an outdoor range.  They want

19  to expand the rights for citizens in Illinois to have the

20  right to keep and bear arms.

21   Q.    If there are differences between the goals of SAF

22  and ISRA, what are those differences?

23         MR. SIGALE:  Object -- I'll object as to form.

24  You can answer if you know.

25   Q.    (By Ms. Helfrich)  Do you understand my question?



1    A.   Yes, they are separate and distinct organizations.

2    The Second Amendment --

3    Q.   No, no, no -- I -- go ahead.

4    A.   The Second Amendment Foundation is a 501(c)(3)

5    under the IRS tax code.  We do not lobby.  We also do not

6    teach range safety nor do we have youth sporting

7    activities.  That's not part of our mission.

8    Q.   Is it your understanding that ISRA has a

9    relationship with the NRA?

10   A.   I believe that they are their state affiliate.

11   Q.   Is SAF affiliated with the NRA in any way?

12   A.   No.

13   Q.   Okay.  So it is our understanding that Illinois

14   Carry is not providing financial support for this

15   litigation, that would seem to leave SAF and ISRA.  I would

16   like to know whether SAF is -- strike that.

17        SAF and ISRA dividing the talk equally?

18   A.   I do not know.

19   Q.   Do you know who's paying for the litigation?

20   A.   I know that the Second Amendment Foundation has an

21   obligation to pay for some part of this case.  I did not

22   sign the letter of engagement.

23   Q.   Who signed it?

24   A.   Alan Gottlieb signed the letter of engagement.

25   Q.   Okay.  But it's your understanding, if I heard you



1    correctly, it's your understanding that SAF has some

2    obligation to finance this litigation?

3         A.    Yes, ma'am.

4         Q.    Is it your understanding that ISRA has some

5    obligation to finance this litigation?

6         A.    I do not know.

7         Q.    To your knowledge, does anyone else have an

8    obligation to finance this litigation?

9         A.    To my knowledge, no one else has an obligation to

10   finance this litigation.

11        Q.    Let me ask it differently:  To your knowledge, is

12   anyone else financing this litigation?

13        A.    To my knowledge, no one else is financing this

14   litigation.

15        Q.    Okay.  I think I'm done.  I want to just quickly

16   go over my notes and see if I missed anything.  I just need

17   a second.  We don't even need to go off the record.

18             I do have one more question.  Do you know whether

19   anyone else at the Second Amendment Foundation has ever

20   been deposed on behalf of the organization?

21        A.    Yes.

22        Q.    Who is that?

23        A.    Alan Gottlieb.

24        Q.    Is he the only one?

25        A.    To the best of my knowledge, yes.



JULIANNE VERSNEL                                    August 12, 2020
JENNIFER J. MILLER vs MARC D. SMITH                           171

1    Q.   Do you know how many times he's been deposed?

2    A.   No, I do not.

3    Q.   Do you know what cases he was deposed in?

4    A.   No, I do not.

5         MS. HELFRICH:  I think that's it.  David, I

6    imagine you have some questions that you want to ask.

7         MR. SIGALE:  Yeah, but I want to take ten before I

8    do it, so what time is it?

9         MS. HELFRICH:  3:42.

10        MR. SIGALE:  Let's come back on at 3:50, so eight

11   minutes.

12        MS. HELFRICH:  Okay.

13                  (A break was taken.)

14

15                  E-X-A-M-I-N-A-T-I-O-N

16   BY MR.SIGALE:

17   Q.   Julianne, you were asked earlier, way, way

18   earlier, if you would have received any complaints of any

19   of your members in Illinois that were foster care -- foster

20   parents or day care providers -- actually I'm going to

21   strike that and rephrase it.

22        You were asked if you received any complaints from

23   any parents who had kids in foster care that for whatever

24   reason their kids were living in foster homes or parents

25   who put their kids in day care homes, like, for example,



1   when they went to work.  You were asked if you had received

2   any complaints from your members who might be in that

3   position about doing --

4        MS. HELFRICH:  I'm going to object.  That

5   mischaracterizes my question.  Go ahead.

6        Q.   (By Mr. Sigale)  Do you remember discussing that?

7   It was a long time ago.

8        A.   I understood that -- I understood that I was asked

9   if I was aware of any members or supporters who had

10  children in foster care or had children in day care.

11       Q.   Let me rephrase it.  Are you aware of any

12  complaints that SAF received from people -- from members or

13  supporters in those positions that were upset you were

14  doing this lawsuit?

15       A.   No, we didn't receive any that I am aware of.

16       Q.   Okay.  All the questions that you've been asked

17  today, have you answered them solely in your capacity as

18  the director of operations of Second Amendment Foundation?

19       A.   Yes.

20       Q.   And that position has been if the law is silent on

21  an issue regarding firearms, that Second Amendment

22  Foundation does not take a position regarding it.  Is that

23  fair to say?

24       A.   That is correct.

25       MS. HELFRICH:  Objection.  Totally



1  mischaracterizes her testimony.  Huge mischaracterization.

2  Go ahead.

3      Q.   (By Mr. Sigale)  Well, leaving aside any reference

4  to prior testimony, as speaking officially on behalf of the

5  Second Amendment Foundation, if the law is silent as to an

6  issue regarding firearms, does the Second Amendment

7  Foundation take an official position regarding it?

8      A.   No.

9      Q.   So has that been your intent as you've been

10  answering these questions today?

11      A.   My intent is to be answering the questions on

12  behalf of the foundation, which is what I understood the

13  instructions to be was to present the position of the

14  Second Amendment Foundation as an entity based upon its

15  mission.

16      Q.   Okay.  Do you personally have positions regarding

17  these issues that we've been talking about today?

18      A.   Yes.

19      Q.   Okay.  So, I mean, talking about firearms and

20  children, do you have a personal opinion as you sit here

21  today regarding children and safety and firearms?

22      A.   Yes, I do.  I am a parent.  I grew up in a home

23  with firearms.  My children grew up in a home with

24  firearms.  They had friends over.  There were other people

25  who came into our home.  Our choice was to secure our



1  firearms in lock boxes where the children or other people

2  could not get into them.

3       I personally chose to carry a Browning Hi-Power

4  because it is one of the few single-action semi-automatics

5  where if the magazine is disengaged, you can not fire the

6  gun so you can't accidentally discharge it.  So no child,

7  if they could even get into the lock box, could just fire

8  the gun because you are not able to fire that particular

9  firearm without the magazine being engaged.  That was

10 something I chose -- I chose for safety because I have

11 children.

12      We also took our children out and taught them to

13 shoot.  We always encourage everyone to teach other

14 children firearms safety, to be responsible about a

15 firearm.  We never made our firearms accessible to our

16 children without an adult being present.  I never would

17 take anybody out -- any minor out shooting without the

18 expressed permission of their parents and preferably their

19 parents being there as well.

20      Parents, foster parents, Boy Scout leaders,

21 everyone has an obligation to take care of the children and

22 protect the children as best they can.  Anyone who would

23 leave a loaded firearm on a table in my personal

24 position -- opinion does not have the maturity to, one,

25 have the firearm and, two, I hope to God they don't have

1  children.

2          When one chooses to support what I believe to be

3  as a civil right, and in this case the Second Amendment, my

4  personal opinion does not impact where we have to go with

5  this.  I'm going to bring up -- we do pick and choose our

6  cases.

7          I'm going to bring up a case right now where an

8  attorney came to us and said there was a child in foster

9  care who wanted to be emancipated so that he could purchase

10 a firearm.  And I just -- and he had been put into foster

11 care until he was 21, extraordinary unusual.  And I thought

12 to myself, I said, something is wrong about this.

13 Something is really, really wrong about this.  I have to do

14 some more information before we agree to take this case.

15 It turns out --

16         MS. HELFRICH:  David, this is not responsive to

17 your question.  This is just a speech.  This is a

18 deposition, not a speech.  Can you ask questions, please?

19         MR. SIGALE:  Well, I asked her opinions, and so

20 I'll let her --

21         MS. HELFRICH:  And now she's telling a story.

22         MR. SIGALE:  I'll let her finish the sentence and

23 then I'll ask another question.  So go ahead, Julianne,

24 quickly.  Just finish up your sentence there.

25      A.   There was a reason why we didn't take the case and



JULIANNE VERSNEL                                    August 12, 2020
JENNIFER J. MILLER vs MARC D. SMITH                          176

1  we were right not to take the case because there were

2  circumstances where this person didn't -- should not have

3  had, for his own safety, should not have had the right to

4  purchase a firearm.

5      Q.   (By Mr. Sigale)  Okay.  And would you to someone

6  that were to ask you as a person advocate those kind of

7  safety measures for someone else with regards to firearms

8  and safety in children?

9      A.   Firearms safety for children and adults.  I always

10  encourage training.

11     Q.   Okay.  If you are successful in this lawsuit, is

12  it your expectation that the State of Illinois would

13  rewrite its regulations?

14     A.   In terms of foster parents and day care owners

15  being able to have a readily -- a firearm that was readily

16  accessible for self-defense.

17     Q.   But is it your expectation that they would rewrite

18  the regulation?

19         MS. HELFRICH:  Calls for speculation.

20     Q.   (By Mr. Sigale)  You can answer.

21     A.   Yes.

22     Q.   Is the foundation as it sits here today -- this is

23  officially asking you this question -- is the foundation

24  telling the state of Illinois how to rewrite its

25  regulation?



1    A.   No.

2    Q.   So the foundation, if I understand it correctly

3  then, the foundation is taking an official position that

4  the regulations as written are an unconstitutional

5  infringement, period; is that correct?

6    A.   Yes.

7         MR. SIGALE:  I think that's all I have.  Give me

8  one second.

9         Julianne, I won't put Ms. Helfrich to work putting

10 documents back up on the screen or anything like that.

11        MS. HELFRICH:  I don't mind.

12        MR. SIGALE:  It's okay.

13   Q.   (By Mr. Sigale)  This is asking on a personal

14 note.  We understand what you said about the official

15 position of Second Amendment Foundation, but you were shown

16 those screen shots.  I guess they were from Safer Homes and

17 the Firearm Safety Regulations.

18        Do you have an official opin- -- strike that.

19        Do you have a personal opinion regarding those

20 rules, (audio interruption) consent, keep a firearm locked

21 up, keep them away from unauthorized persons and children,

22 and I forget the third one.  Maybe I do need to ask to pull

23 it up.

24        MR. SIGALE:  What document was that, Gretchen?

25        MS. HELFRICH:  Just a second.  It seemed to have



1  disappeared.  Let me find it.

2          It's Exhibit 8.  I'll share my screen.

3          MR. SIGALE:  Okay.  Thanks.

4          MS. HELFRICH:  Can you see it?

5          MR. SIGALE:  Yeah, I can.

6      Q.  (By Mr. Sigale)  So let's stick right here,

7  Julianne, where the screen is.  And it says, "What is a

8  Safer Home."  A Safer Home, which is in capitalized, which

9  means it's got a specific reference here to the -- I assume

10  to the title of the organization -- secures all firearms in

11  locked storage.  Most medications are also locked.

12          As you said earlier, the Second Amendment itself

13  is silent on the issue of firearm storage, correct?

14      A.  Yes.

15      Q.  And perhaps really needing not to say, the Second

16  Amendment says nothing about locking up medication,

17  correct?

18      A.  No, it does not.

19      Q.  So based on that, your testimony, if I understand

20  it correctly, is the Second Amendment Foundation has no

21  official position regarding those topics, correct?

22      A.  Correct.

23      Q.  Sitting here personally, what do you -- do you

24  have an opinion regarding those two sentences?

25      A.  I think they're very -- I think it's very



1  important in terms of Safer Homes, that is something that

2  is personally very important to me, and it is something

3  that I have been involved with both in terms of financial

4  support and actually in terms of more than one time

5  standing out in a field handing out the lock boxes and the

6  medication storage and the medication disposal items.

7          I've also attended on more than one occasion the

8  Learn program, and the Second Amendment Foundation has

9  provided facilities for the Learn program to be offered as

10 a stand-alone at our Gun Rights Policy conferences because

11 we think that these issues are very, very personally

12 important.  However, the Second Amendment is silent on

13 these issues, but the people -- if we didn't care about

14 people, we wouldn't be doing what we were doing in the

15 courtrooms either.

16          MR. SIGALE:  All right.  Can you scroll down

17 Gretchen, please?

18          MS. HELFRICH:  Tell me when to stop.

19          MR. SIGALE:  I will.  Stop, actually a little bit

20 up.  Perfect.

21     Q.   (By Mr. Sigale)  Julianne, the page here has --

22          MR. SIGALE:  Actually probably if you scroll up a

23 tiny bit, there's a picture of a pill bottle or something

24 like that.  Stop.  There we go.

25     Q.   (By Mr. Sigale)  So right there we have the three



1  steps there to prevent suicide and overdose and it has -- I

2  don't know what takebackyourmeds.org is but --

3      A.   It's a place where you can find out where what

4  pharmacy or what hospital will take back your medication

5  that you haven't used because not every place will.

6      Q.   So you have a supply of Vicodin in your house and

7  you want to get rid of it, this is a place to go look to

8  see who will take it rather than flushing it down the

9  toilet?

10     A.   Right.

11     Q.   Okay.  So there's three rules there:  Lock up meds

12 except one-week supply; limit access to one-day dose during

13 a mental health crisis; and then that website.  The Second

14 Amendment doesn't mention anything about any of this,

15 correct?

16     A.   No.

17     Q.   And, therefore, it would take no official position

18 regarding this, correct?

19     A.   No.

20     Q.   On a personal -- I'm asking as a personal opinion,

21 do you have any opinions regarding these three steps here?

22     A.   Yeah, I support it.  I think it's -- suicide is a

23 terrible, terrible problem, and suicide in Washington State

24 is out of proportion to the rest of the country, and it's

25 under addressed.



1      Q.    Okay.  And then with regard to these -- earlier it

2   stated about the Second Amendment is silent about firearm

3   storage and, therefore, SAF has no official position

4   regarding it, but as a personal note, three basic rules

5   here that are listed, do you have an opinion regarding

6   these three rules?

7      A.    I wish that the first -- number 1, was do not

8   allow unauthorized access to children, and locking up all

9   firearms, depending on the firearm, but access -- access

10  should be limited.  And number 3, it's choosing a locking

11  device with fast access only for you, and it's the fast

12  access that is very, very important.  It's the fast access.

13     Q.    In case there's an immediate self-defense need?

14     A.    Yes.

15     Q.    On a personal note as you're sitting here and

16  understanding the allegations in this lawsuit, are you --

17  personally are you advocating for the right for foster

18  parents or day care home parents to be irresponsible?

19     A.    No.

20     Q.    Are you advocating for their right to act stupid?

21  Ms. Helfrich brought up the example I had used the other

22  day.  I'll say it again.  Are you advocating as you sit

23  here for foster parents and day care home providers, leave

24  the loaded firearm on the toy box and say, well, I have a

25  Second Amendment right and I'm going to do that.  Are you



1  advocating for that as you sit here today?

2      A.   No, I am not.

3      Q.   Is the Second Amendment Foundation advocating for

4  that?

5      A.   No.  No, the Second Amendment Foundation does not

6  advocate for irresponsibility and stupidity.

7           MR. SIGALE:  I don't have anything else.  Thank

8  you, Julianne.

9           MS. HELFRICH:  I just have a couple of questions,

10  make five short ones.

11

12                  E-X-A-M-I-N-A-T-I-O-N

13  BY MS. HELFRICH:

14      Q.   First of all, Ms. Versnel, are you personally a

15  plaintiff in this lawsuit?

16      A.   No.

17      Q.   The plaintiff in this lawsuit is the Second

18  Amendment Foundation, the organization, correct?

19      A.   Yes.

20      Q.   Okay.  Mr. Sigale asked you some questions about

21  what happens when the law is silent on certain issues and

22  you testified a couple times today that the Second

23  Amendment is silent about storage of firearms; is that

24  right?

25      A.   Yes.



1    Q.   Does that mean -- in the view of the Second

2  Amendment Foundation, does that mean that the state of

3  Illinois can impose restrictions on foster parents and day

4  care home operators regarding the storage of firearms?

5    A.   Only if they allow them to have equal protection

6  as other Illinois residents have.  In the day care

7  situation, you allow officers of the peace, or police

8  officers, to have a handgun but you do not allow other

9  individuals, so that's not equal.  That's not equal because

10  nobody --

11    Q.   Could the state of Illinois require a firearm

12  owner to keep their self-protection and home-protection

13  firearm in a locked device?

14    A.   If that were the law that was passed in Illinois,

15  that if a firearm could be stored along with its ammunition

16  so that it could be readily used for self-defense, I

17  believe that -- I believe -- I'm not an attorney, but I

18  believe that would pass constitutional muster.

19    Q.   So you're saying that the Second Amendment would

20  allow the state of Illinois to require all firearm owners

21  in the state to keep their self-defense weapon in a locked

22  devise so long as it was stored with the ammunition?

23       MR. SIGALE:  Object as to legal conclusion, which

24  she already commented on before, but you can answer.

25    A.   It would have to -- I'm not a lawyer, but it would



1  have to be considered to be a reasonable restriction which

2  is, I believe, the terminology used in Heller -- or perhaps

3  the term was reasonable regulation in Heller.

4       Q.   (By Ms. Helfrich)  In view of the Second Amendment

5  Foundation, would it be a reasonable regulation to require

6  Illinois firearm owners to keep their self-defense firearms

7  in a locked device?

8       A.   It would entirely depend on the specifics of the

9  regulations.

10      Q.   How?

11      A.   Whether the regulations were reasonable.

12      Q.   I'm asking you whether it would be reasonable to

13 require firearms owners to keep their self-defense firearms

14 in a locked device?  What would make that unreasonable?

15      A.   Depending on what kind of device it was, how

16 accessible it was -- a lot of things.

17      Q.   But are you saying that it's the position of the

18 Second Amendment Foundation?

19      A.   You're asking me a hypothetical on a piece of

20 legislation.

21      Q.   You're posing hypotheticals.  You're posing

22 hypotheticals.  You're saying the state of Illinois can

23 only impose restrictions on foster parents and day care

24 homeowners if they can also impose them on other people.

25 So I'm asking you if they can impose them on other people?



1    A.    That's not -- that's not what I said.

2    Q.    You said you wanted equal treatment?

3    A.    Yes, I want equal treatment.

4    Q.    So I am asking you does the state of Illinois have

5    the ability under the Second Amendment to require firearms

6    owners to lock up their self-defense firearm?

7    A.    And that would be -- that would be a matter for

8    the courts to decide if the restrictions were reasonable or

9    not.

10    Q.    Wait.  You're speaking on behalf of the Second

11    Amendment Foundation and you're saying it's for the courts

12    to decide whether a regulation is reasonable.  I asked you

13    at the outset of this whether this is a decision for the

14    court to determine the position of the Second Amendment

15    Foundation and you told me no.  You told me no on certain

16    terms that they did not and now you're telling me it's up

17    to the court to decide to whether it's a reasonable

18    regulation?

19    A.    I'm sorry.  I'm really sorry because I -- I said

20    to you that we were looking at Heller, McDonald and Moore.

21    And we were following -- and we want people to have the

22    rights guaranteed to them under Heller, McDonald and Moore.

23    Q.    So if in State of Illinois imposed the same

24    restrictions on everyone that it imposed on foster parents,

25    your challenge would go away because you're saying now that



1   it's an equal protection challenge?

2          MR. SIGALE:  Objection.  I did not say equal

3   protection in the 14th Amendment sense.

4      Q.   (By Ms. Helfrich)  Well, in what sense?

5          MR. SIGALE:  She's not an attorney, presumably the

6   lay sense.

7      A.   The Heller decision said that it was possible for

8   there to be reasonable restrictions.  It did not define

9   what reasonable restrictions were.

10     Q.   (By Ms. Helfrich)  I'm asking whether the Second

11  Amendment Foundation thinks that the Second Amendment would

12  allow the State of Illinois to require all firearms owners

13  to keep their self-defense firearm in a locked device.  I'm

14  not asking what Heller allows.  I'm not asking what a court

15  might decide is reasonable.  I'm asking what the position

16  of the Second Amendment Foundation is.

17     A.   Second Amendment Foundation -- we just said the

18  Second Amendment and the Second Amendment Foundation.  The

19  Second Amendment is silent on storage.  It is silent on

20  anything but the right for an individual to keep and bear

21  arms.

22     Q.   Would that right be infringed by a requirement

23  that an individual keep their self-defense firearm in a

24  locked device in their home?

25     A.   Yes.



1    Q.   All right.  Does the State of Illinois -- strike

2  that.

3         Is the State of Illinois allowed to impose

4  regulations on foster parents that in its view promote the

5  safety of foster children?

6    A.   Yes.

7    Q.   Is it allowed to impose regulations on day care

8  home operators that it believes promotes the safety of

9  children in day care homes?

10    A.   Yes.

11    Q.   And it allows you -- am I correct that it is

12  allowed to impose rules that are different from the rules

13  that would apply to a family that does not include foster

14  children or a home that does not include a day care?

15    A.   So long as they're constitutional.

16    Q.   So are you aware that DCFS performs home

17  inspections?

18    A.   Yes.

19    Q.   And are you aware that DCFS is allowed to inspect

20  the foster home without advance warning?

21    A.   Yes.

22    Q.   And do you think that is acceptable and

23  constitutional?

24    A.   Yes.

25    Q.   Okay.  So foster parents don't actually get to



1  exercise all of the constitutional rights that someone who

2  isn't a foster parents gets to exercise?  For example,

3  their home can be searched at any time, right?

4      A.   They have agreed to that when they signed the

5  contract to be foster parents.

6      Q.   Well, they agreed to firearms regulations when

7  they signed the contract, correct?

8      A.   Yes, and we are just asking that that be taken out

9  of the regulations so that the foster parents and the day

10 care people have the same rights to defend themselves and

11 their families as other individuals do.  I'm not saying to

12 take away the rights for the -- for them to check on safety

13 of the home, to check on the mental health and the physical

14 health of people who are day care providers.

15     Q.   Even if those -- even if conducting those

16 inspections and making those checks requires that the

17 rights of foster parents be curtailed -- the constitutional

18 rights of foster parents be curtailed?

19     MR. SIGALE:  I'm going to object.  The witness is

20 not a legal scholar for Fourth Amendment, at least I don't

21 think she is.  Maybe she'll say she is, but I don't believe

22 she is and, therefore, making comparisons that may or may

23 not be an infringement under the Fourth Amendment is an

24 improper question.

25     Q.   (By Ms. Helfrich)  Well, she ask answer if she



1  understands.

2      A.   As I understand what you are saying to me, is that

3  the foster parents give up part of their Fourth Amendment

4  when they become a foster parent.  If somebody wants to

5  bring a case to change that, then somebody can bring a case

6  to change that.  That doesn't have anything to do with me.

7  That has nothing to do with the Second Amendment

8  Foundation.

9      Q.   Final question.  I want to clarify, is it the

10  opinion of the Second Amendment Foundation that if the

11  Second Amendment is silent on a particular subject, the

12  state can impose any regulations it wants on that subject?

13      A.   No.

14      Q.   Okay.  That's my last question.

15          MR. SIGALE:  All right.  We'll -- let me -- well,

16  we can go off the record to do this but I won't.

17          MS. HELFRICH:  While we are on, is there anything

18  else that we need to do on the record?  Do you want to

19  waive signature or reserve?

20          MR. SIGALE:  That's what I was going to go off the

21  record to ask, but then I didn't really see a point to it.

22          Julianne, if this deposition is ordered, you have

23  the right to review the transcript before it becomes

24  official.  You cannot change your answers, you can just

25  make corrections, like I didn't say that, I said bread.



```
 1   Most people waive signature and trust that the court
 2   reporter, like Johanna here, took it down correctly.  It's
 3   totally up to you what you'd like to do.
 4            THE WITNESS:  I'm concerned that there are some
 5   issues of clarity.
 6            MR. SIGALE:  We'll reserve.
 7            MR. CHIMIENTI:  I want to make it clear, though,
 8   before you make that reservation, Ms. Versnel, that you are
 9   not allowed to make substantive changes to your deposition
10   based on your review and signature.  Your review and
11   signature is for misspellings, one or two wrong words, but
12   you are not allowed to substantively change your answers
13   upon review.  I just want to make that clear for the
14   record.
15            MR. SIGALE:  I thought I said that but we will
16   still reserve.
17            MS. HELFRICH:  I don't have anything else.  Thank
18   you.
19                 (The deposition concluded at 2:32 p.m.)
20                 (Signature reserved.)
21
22
23
24
25
```



```
 1                C E R T I F I C A T E
     STATE OF WASHINGTON        )
 2                              ) ss.
     COUNTY OF KING             )
 3          I, the undersigned Washington Certified Court
     Reporter, pursuant to RCW 5.28.010 authorized to administer
 4   oaths and affirmations in and for the State of Washington,
     do hereby certify:
 5
            That the annexed and foregoing deposition testimony
 6   of each witness named herein was taken stenographically
     before me and reduced to a typed format under my direction;
 7
            I further certify that according to CR 30(e) the
 8   witness was given the opportunity to examine, read and sign
     the deposition after the same was transcribed, unless
 9   indicated in the record that the review was waived;

10          I further certify that I am not a relative or
     employee of any such attorney or counsel, and that I am not
11   financially interested in the said action or the outcome
     thereof;
12
            I further certify that the witness before
13   examination was by me duly sworn to testify the truth, the
     whole truth and nothing but the truth;
14
            I further certify that the deposition, as
15   transcribed, is a full, true and correct transcript of the
     testimony, including questions and answers, and all
16   objections, motions and exceptions of counsel made and
     taken at the time of the foregoing examination and was
17   prepared pursuant to Washington Administrative Code
     308-14-135, the transcript preparation format guideline;
18
            I further certify that I am herewith securely
19   sealing the said deposition and promptly delivering the
     same to the appropriate authority;
20
            In WITNESS WHEREOF, I have hereunto set my hand on
21   this 21st day of August, 2020.

22        _____
                      [Johanna Chapin Brunt redacted pursuant to Local Rule 5.11]
23        _____
                   Johanna Chapin Brunt
                Certified Court Reporter No. 2159
24              in and for the State of Washington,
                   residing at Seattle, Washington.
25          My CCR certification expires 07/17/2021
```



1                    DEPOSITION ERRATA SHEET

2

   Deposition of:    Julianne Versnel
3  Date:             August 12, 2020
   Case:             Miller, et al. vs. Smith, et al.
4  Case No.:         18 cv 3085
   Reference No.:    J5903345
5

6

7  Page No._____Line No._____Change to:_____

8  _____

9  Reason for change:_____

10 Page No._____Line No._____Change to:_____

11 _____

12 Reason for change:_____

13 Page No._____Line No._____Change to:_____

14 _____

15 Reason for change:_____

16 Page No._____Line No._____Change to:_____

17 _____

18 Reason for change:_____

19 Page No._____Line No._____Change to:_____

20 _____

21 Reason for change:_____

22 Page No._____Line No._____Change to:_____

23 _____

24   SIGNATURE:_____DATE:_____

25                    JULIANNE VERSNEL



1       DEPOSITION ERRATA SHEET

2

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to: _____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to: _____

22   _____

23      SIGNATURE:_____DATE:_____

24             Julianne Versnel

25



1                DECLARATION UNDER PENALTY OF PERJURY

2

3    Deposition of:    Julianne Versnel
     Date:             August 12, 2020
4    Case:             Miller, et al. vs. Smith, et al.
     Case No.:         18 cv 3085
5

6

7         I, JULIANNE VERSNEL, declare under penalty of

8    perjury that I have read the entire transcript of my

9    deposition taken in the above-captioned matter or the same

10   has been read to me, and the same is true and accurate,

11   save and except for changes and/or corrections, if any, as

12   indicated by me on the DEPOSITION ERRATA SHEET hereof, with

13   the understanding that I offer these changes as if still

14   under oath.

15

16      Signed on the _____ day of _____, 2020.

17

18

19

20      _____

21                     JULIANNE VERSNEL

22

23

24

25



JULIANNE VERSNEL                                    August 12, 2020
JENNIFER J. MILLER vs MARC D. SMITH                           195

```
 1   August 21, 2020

 2

 3

 4   DAVID SIGALE
     Law Firm of David G. Sigale, P.C.
 5   430 West Roosevelt Road,
     Wheaton, Illinois 60187
 6

 7   Deposition of:    Julianne Versnel
     Date:             August 12, 2020
 8   Case:             Miller, et al. vs. Smith, et al.
     Case No.:         18 cv 3085
 9

10   Dear Mr. Sigale,

11   Please be advised that the transcript in the above matter
     is available for reading and signing.  Enclosed you will
12   find a condensed copy of the transcript, a Declaration
     under Penalty of Perjury Certificate and Errata pages to
13   note any necessary changes or corrections to the
     transcript.  The Original transcript has already been
14   released to the custodial party.

15   The witness should complete the following steps within 30
     days of the date of this memorandum:
16
         •   Read the enclosed copy of the transcript of your
17           deposition.
         •   Make any corrections necessary on the Errata page
18           only.  If you do not wish to make changes, write
             "No Changes" on the top of the Errata page.
19       •   If you require additional space to list changes,
             you may use your own paper.  Remember to include
20           witness name, deposition date, or reference number,
             and the page/line location of each change.
21       •   If there are multiple transcript volumes, complete
             Errata pages separately for each volume.
22       •   Sign the bottom of the errata page(s).
         •   Sign and date the Declaration under Penalty of
23           Perjury.
         •   Return only the Declaration under Penalty of
24           Perjury and signed Errata pages.  The condensed
             transcript is yours to keep.
25
```



```
 1          •    Return completed forms to:

 2               Errata Processing Division
                 Esquire Corporate Production Department
 3               Suite 2700, 101 Marietta Street
                 Atlanta, GA 30303
 4
       If electronic documents are permissible in the application
 5     venue for this matter, you may instead submit a scanned
       copy of the Declaration under Penalty of Perjury and signed
 6     Errata pages via E-mail to errata@esquiresolutions.com.

 7     Upon our receipt of completed Errata pages, we will archive
       and make the changes available in electronic form to all
 8     counsel.  After archiving we will forward the original
       Errata pages on to the custodial party, to be reunited with
 9     the original transcript.

10     In the event any of the above instructions differ from a
       stipulation or contradict a previous agreement between
11     counsel regarding witness signature, please disregard the
       letter's details and follow the protocol as agreed upon by
12     and between counsel.

13     If you have any other questions regarding this process,
       please contact Esquire Client Support at 800.211.DEPO
14     (800.211.3376), or ClientCare@esquiresolutions.com.

15     Thank you,

16


17


18
       Corporation Production Department
19     Esquire Deposition Solutions

20
       Enclosures
21


22


23     cc:  GRETCHEN E. HELFRICH

24
       Reporter: Johanna Chapin Brunt, CCR
25     License No.:  2159
```



```
 1   August 21, 2020

 2

 3

 4   GRETCHEN E. HELFRICH
     Office of the Illinois Attorney General
 5   100 West Randolph Street, 11th Floor
     Chicago, Illinois 60601
 6

 7   Case:          Miller, et al. vs. Smith, et al.
     Case No.:      18 cv 3085
 8

 9

10   YOU ARE HEREBY NOTIFIED that the following original
     transcript has been sealed and served upon you for filing:

11   Deposition of:  Julianne Versnel

12   Taken:  August 12, 2020

13   Signature:     Waived     _____

14                  Reserved  __X__
                    Within 30 days or before the trial date, the
15                  witness should forward to you the original
                    signed Correction Sheet, which can be filed
16                  separately at the time of trial.

17                  Do not open the sealed transcript.

18

19

20

21

22

23

24
     cc:   DAVID SIGALE
25
```

