E-FILED
Friday, 12 November, 2021  03:35:18 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 18
# Deposition of David Buysse

1              IN THE UNITED STATES DISTRICT COURT
                 CENTRAL DISTRICT OF ILLINOIS
2
    JENNIFER J. MILLER, DARIN     )
3   E. MILLER, SECOND             )
    AMENDMENT FOUNDATION,         )
4   INC., ILLINOIS STATE          )
    RIFLE ASSOCIATION, and        )
5   ILLINOIS CARRY,               )
                                  )
6             Plaintiffs,         )
                                  )
7        -vs-                     ) Case No.
                                  ) 3:18-CV-3085
8   MARC D. SMITH, in his         )
    official capacity as          )
9   Acting Director of the        )
    Illinois Department of        )
10  Children and Family           )
    Services, and KWAME           )
11  RAOUL, in his official        )
    capacity as Attorney          )
12  General of the State of       )
    Illinois,                     )
13                                )
             Defendants.          )
14

15       The 30(b)(6) videoconference deposition of

16  KWAME RAOUL by DAVID BUYSSE, called for

17  examination, taken pursuant to the Federal Rules of

18  Civil Procedure of the United States District

19  Courts pertaining to the taking of depositions,

20  taken before ALICE M. SCHWINGER, CSR NO. 84-2913, a

21  Certified Shorthand Reporter of the State of

22  Illinois, taken remotely on 14th day of September,

23  A.D. 2020, commencing at 10:04 a.m.

24



800.211.DEPO (3376)
EsquireSolutions.com

1   APPEARANCES:

2        LAW FIRM OF DAVID G. SIGALE, P.C.,

3        (430 West Roosevelt Road,

4        Wheaton, Illinois 60187,

5        630/452-4547), by:

6        MR. DAVID G. SIGALE,

7             appeared on behalf of the Plaintiffs;

8

9        OFFICE OF THE ATTORNEY GENERAL, STATE OF ILLINOIS,

10       (100 West Randolph Street, 11th Floor,

11       Chicago, Illinois 60601,

12       312/814-3000), by:

13       MS. GRETCHEN E. HELFRICH,

14       MR. MATTHEW CHIMIENTI,

15             appeared on behalf of Defendant Kwame

16             Raoul, in his official capacity as

17             Attorney General of the State of

18             Illinois;

19

20

21

22

23

24



```
 1   APPEARANCES (Continued):

 2         DEPARTMENT OF CHILDREN AND FAMILY SERVICES

 3         OFFICE OF LEGAL SERVICES,

 4         (160 North LaSalle Street, 6th Floor,

 5         Chicago, Illinois 60601,

 6         312/814-2481), by:

 7         MS. BETH SOLOMON,

 8         Senior Litigation Counsel,

 9              appeared on behalf of Defendant Marc D.

10              Smith, in his official capacity as

11              Acting Director of the Illinois

12              Department of Children and Family

13              Services;

14

15

16

17

18

19

20

21

22

23   REPORTED BY:  ALICE M. SCHWINGER, CSR

24              CSR No. 84-2913
```



```
 1          THE COURT REPORTER:  My name is Alice
 2   Schwinger, Illinois certified shorthand reporter.
 3   This deposition is being held via videoconferencing
 4   equipment.  The witness and reporter are not in the
 5   same room.  The witness will be sworn in remotely
 6   pursuant to agreement of all parties.  The parties
 7   stipulate that the testimony is being given as if
 8   the witness was sworn in person.
 9                     (WHEREUPON, the witness was duly
10                      sworn.)
11                     DAVID BUYSSE,
12   called as a witness herein, having been first duly
13   sworn, was examined and testified as follows:
14                     EXAMINATION
15   BY MR. SIGALE:
16       Q.    Normally I ask the witness to state his
17   name and spell the last name for the record, but we
18   don't need to do that, do we?
19              Mr. Buysse, my name is David Sigale.
20   Thank you for appearing here today.  As Alice has
21   mentioned, she is taking down everything everyone
22   says.  She can only take down out loud, verbal
23   responses, no "mm-mm's" or "uh-uh's" or head
24   shaking or hand gestures.  Okay?
```



```
 1        A.    Yes.
 2        Q.    As she mentioned -- Alice stole my
 3   thunder there -- it's very difficult for her to
 4   take down one person talking at a time.  Please
 5   wait until I am done asking my question before you
 6   answer.  I, in turn, will try to wait until you're
 7   done answering before asking my next question.
 8   Okay?
 9        A.    Yes.
10        Q.    If you answer a question that I asked
11   you here today, it's going to be presumed for
12   purposes of the record that's being made that you
13   understood the question that I asked you and that
14   that is the question you are answering.  So for any
15   reason you do not understand the question that I
16   ask you, please let me know, and I will rephrase
17   it.  Okay?
18        A.    Yes.
19        Q.    And if you need to take a break, let me
20   know.  Okay?
21        A.    Thank you.
22        Q.    And appreciate you indulging me in that
23   for the record.  I know you're an attorney, and you
24   knew all that already.
```



```
 1                    (WHEREUPON, a certain document was

 2                     marked Buysse Deposition Exhibit

 3                     No. 1, for identification, as of

 4                     September 14, 2020.)

 5   BY MR. SIGALE:

 6       Q.    Mr. Buysse, what -- let me start out by

 7   sharing my screen with you and showing you what has

 8   been marked as Exhibit No. 1.  Okay?

 9       A.    Yes.

10       Q.    But first I'm going to see if I can do

11   it.  Can everyone see that?

12             Most importantly, Mr. Buysse, can you

13   see it?

14       A.    I see what is essentially the caption,

15   and it indicates that there is six pages, so...

16       Q.    You have it right.  You're looking at

17   it.

18             This is Buysse Deposition Exhibit 1.  It

19   is an amended notice of deposition to Kwame Raoul,

20   who is, as you know, the Attorney General of

21   Illinois, and it is a Rule 30(b)(6) deposition

22   notice, and you are the Rule 30(b)(6) designee for

23   the Attorney General's office for today's

24   deposition; is that correct?
```



1        A.    That's correct.

2        Q.    And I'm scrolling through, and if you

3   need me to stop -- have you seen this document

4   before, by the way?

5        A.    Yes, I have.

6        Q.    Well, I don't know if you have it in

7   front of you.  In general, just let me say that if

8   you need to refer to a document today, that is

9   perfectly fine with me.  I just ask that you let me

10  know what it is you're referring to.  Okay?

11       A.    Yes.  My expectation is that I will only

12  be referring to documents that you show on the

13  screen.

14       Q.    Okay.

15       A.    But I appreciate your offer.

16       Q.    Sure.  For example, I didn't know if you

17  might have had this in front of you, so I'm going

18  to scroll through a little bit here, and if you

19  need me to stop because I'm going too fast, for

20  example, let me know; but there was the date and

21  the Zoom location, I guess you could say, the Zoom

22  method.  Here's some depositions.

23             But more to the point, we get down here

24  to page 5, and it says "Matters for Examination,"



1    and there are 15 of them.  And have you had a

2    chance to look at these before appearing here this

3    morning?

4         A.    Yes, I have.

5         Q.    And you are the designee for all 15 of

6    these topics; is that correct?

7         A.    Yes.

8         Q.    I suppose, then, outside of the category

9    of anything could happen, you are being represented

10   today or is being represented that today that you

11   are the person most knowledgeable in the Attorney

12   General's office as to these topics.  Is that fair?

13        MS. HELFRICH:  Objection.  He's a 30(b)(6)

14   witness.  He's appeared to address these topics.

15   That's not to say that there isn't someone more

16   knowledgeable about one particular topic, but he is

17   prepared to address all 15 topics.

18   BY MR. SIGALE:

19        Q.    Okay.  With that said, sir, you can

20   answer.

21        A.    Would you repeat the question, please?

22        Q.    Are you the person most knowledgeable

23   regarding these topics at the Attorney General's

24   office?



1      A.    So I am the 30(b)(6) designee for the

2  Attorney General, and I am prepared to address each

3  of these topics in that capacity.

4      Q.    Okay.  I guess, again, in the category

5  of anything could happen, if we're talking and it

6  turns out there's someone that is more

7  knowledgeable regarding a topic that I should be

8  speaking to, you'll let me know that.

9            So, Mr. Buysse, let me start by getting

10  some information regarding yourself.  What --

11  you're currently employed at the Office of the

12  Attorney General?

13      A.    Yes, I am.

14      Q.    And what is your current title there?

15      A.    I am the deputy chief of the Public

16  Interest Division.

17      Q.    And the Public Interest Division does

18  what?

19      A.    There are certain bureaus that are part

20  of the Public Interest Division.  These bureaus

21  include antitrust, civil rights, disability rights,

22  special litigation, public utilities, workplace

23  rights.  And if I've left out any bureau, I

24  apologize, but that's what I recall at this time.



1  All of those bureaus are part of the Public

2  Interest Division.

3      Q.    And what is -- strike that.

4            What are your job duties regarding those

5  bureaus?

6      A.    So as deputy chief, I am essentially

7  charged with assisting the chief of the division in

8  any way that I can and to assist in any other

9  matters that I'm directed to by my superiors in the

10 office.

11     Q.    What's the name of the division chief?

12     A.    Christopher Wells is the division chief.

13     Q.    Is that Wells, W-e-l-l-s, or is there an

14 "E" at the end?

15     A.    It's W-e-l-l-s.

16     Q.    And the topics that we're here to talk

17 about today, which bureau would that fall under, if

18 any?

19     A.    Well, if you're talking about the topics

20 that are in your notice, is that what you're

21 referring to?

22     Q.    Right.  Yes.

23     A.    I would say specifically the attorneys

24 in the special litigation bureau are representing



1   the Attorney General and DCFS as attorneys.

2        Q.    And what is the special litigation

3   bureau?  Is that some sort of catchall, or is there

4   specific topic subject matters that it covers?

5        A.    So I think that the role of the special

6   litigation bureau from the Office of the Attorney

7   General is varied.  And, for example, its

8   involvement in the prosecution under the False

9   Claims Act is an important part of its role within

10  the office; but, again, any sort of litigation that

11  the office needs particular assistance in, that's a

12  place where you'll find special litigation

13  attorneys involved.

14       Q.    Mr. Buysse, let me just get some

15  information about you.  I know you're an attorney.

16  That means you have an undergraduate degree and a

17  J.D.  So let me ask you about that real quick.

18            Where is your undergraduate degree from?

19       A.    Loyola University, Chicago.

20       Q.    And when did you receive that degree?

21       A.    1976.

22       Q.    And bachelor of arts?  Science?

23       A.    It was -- it was a bachelor of science,

24  summa cum laude, in psychology.



1      Q.    And then where was law school?

2      A.    University of Illinois at

3 Urbana-Champaign.

4      Q.    And what year did you receive your J.D.?

5      A.    1980.

6      Q.    Any other post-high school degrees?

7      A.    No.

8      Q.    How long have you been working for the

9 Office of the Attorney General?

10     A.    Since November 2002.

11     Q.    How long have you been the deputy chief

12 of the Public Interest Division?

13     A.    Since sometime in 2008.

14     Q.    What did you do at the Attorney

15 General's office prior to being the deputy chief of

16 the Public Interest Division?

17     A.    I was an attorney within the special

18 litigation bureau.

19     Q.    And if that ended, let's say, sometime

20 in 2008, when did it start?

21     A.    2002.

22     Q.    Okay.

23     A.    November 2002.

24     Q.    Where did you work prior to that?



1    A.    Do you want me to work backwards or to

2    work forward from when I received my degree?

3    Q.    I guess whichever is easy for you to

4    recount.

5    A.    Okay.  So after receiving my degree, I

6    went to work for a firm in Peoria, Illinois, which

7    was known at the time I started working there as

8    Cassidy, Cassidy, Mueller and Price.  It is

9    currently known as Cassidy & Mueller.  I worked

10   there until the end -- I started there in 2000

11   after receiving my license, and then I worked there

12   until the end of 2005.  And at the time that I

13   left, I was an income partner of the firm.

14         I then went to a firm in Chicago that

15   was known at the time that I started there as

16   Garofalo, Schreiber, Hansen and Banack, and it is

17   currently known as Garofalo, Schreiber & Storm.

18   And I left there essentially in November of 2002

19   when I left to go to the Attorney General's office,

20   and when I left, I was also an income partner.

21   Q.    I think I misheard you, Mr. Buysse.

22   Cassidy Mueller Price, you started there in 1980 --

23   what year did you leave?

24   A.    I'm sorry if I misspoke.  I started



1  there in 1980, and I left there in 1985.  I started

2  at Garofalo at the beginning of 1986, and I left

3  there in 2002.

4           I apologize for any misstatement.

5       Q.    No, I probably misheard you.

6           At Cassidy Mueller, what sort of work

7  did you do?

8       A.    So that firm is -- has been and

9  continues to be primarily an insurance defense

10  firm, and so I -- my role was participating in

11  various activities related to the defense of

12  insureds of insurance companies.

13       Q.    As long as I've got you here, is that

14  like auto defense or construction liability or --

15       A.    So all of those things were matters that

16  the firm dealt with, and other things as well,

17  so -- including, you know, coverage litigation and

18  things of that nature as well.

19       Q.    Sure.  Okay.  What about at Garofalo?

20       A.    Yeah.  So that was also and continues to

21  be primarily an insurance defense firm and so it

22  was the same types of activities, defending various

23  insureds of insurance companies in a variety of

24  capacities.



1      Q.    Okay.  Did any of that work have to do

2  with the Illinois Child Care Act or DCFS

3  regulations?

4      A.    And now you're talking about the private

5  practice that I engaged in from 1980 until the end

6  of 2002?

7      Q.    I am.

8      A.    No, there was no involvement with either

9  of those things.

10     Q.    Okay.  What about when you became an

11  attorney in the special litigation bureau at the

12  Attorney General's office from '02 to '08?  Any

13  work with DCFS regulations or the Child Care Act?

14     A.    To the best of my recollection, no.

15     Q.    What sorts of work did you do in the

16  special litigation bureau as an attorney there that

17  six-year period?

18     A.    Right.  So I was involved in various

19  types of tobacco enforcement for a period of time.

20  I was involved in cases brought under the False

21  Claims Act of the State of Illinois which actually

22  at the time was called the Illinois Whistleblower

23  Reward and Protection Act, and then at some point

24  it changed to the False Claims Act.  So those were

1   the types of things that I was involved in, but I

2   quickly sort of was moved into health-care-related

3   activities and eventually into financial types of

4   activities as well.

5        Q.    I'm sorry.  Financial areas regarding --

6              (WHEREUPON, there was a brief

7              interruption.)

8   BY MR. SIGALE:

9        Q.    Financial activities regarding the

10  health care area or something else?

11       A.    Well, so let's just sort of talk about

12  what I referred to as financial activities.

13            Prior to and in the aftermath of the

14  financial crisis that essentially really started to

15  begin in 2007 and came to a crescendo at the end of

16  2008 and 2009, I was involved in various activities

17  related to various sort of activities by banks and

18  by other financial companies that were problematic.

19            And so, for example, I participated in

20  the joint federal and state task force looking at

21  residential mortgage-backed securities, and that

22  took up a considerable amount of my time for a

23  period of years.

24       Q.    Sure.



1    A.    That's the type of thing that when I

2  refer to financial, that's what I'm talking about.

3          And then as far as health care, the --

4  in 2003, there was an effort by then Attorney

5  General Madigan to look into the problem of the

6  provision of charity care by nonprofit hospitals.

7  And so I participated in a fairly lengthy

8  investigation of nonprofit hospitals, and that

9  obviously did involve financial inquiries about

10 those hospitals and so we also eventually -- it led

11 to certain efforts by the Office of the Attorney

12 General regarding legislation, and I was involved

13 in those actions.

14    Q.    I don't mean this question to sound

15 glib -- if it is, I apologize -- but other than --

16 other than being called to testify here today, what

17 involvement have you had since 2008 when you became

18 deputy chief with DCFS regulations and/or the Child

19 Care Act?

20    A.    To the best of my recollection, this

21 would be the first time that I was involved in the

22 Child Care Act or the activities of DCFS.

23    Q.    Did you review any materials to prepare

24 for today's deposition, Mr. Buysse?



1        A.    Yes, I did.

2        Q.    What did you review?

3        A.    So I basically reviewed the statutory

4    provisions that are noted in your notice,

5    regulatory provisions that are noted in your

6    notice, and certain other statutory provisions as

7    well.

8              I also reviewed the forms that are

9    identified in your notice, and I reviewed those

10   with counsel on Friday.

11       Q.    Okay.  Mr. Buysse, we might as well jump

12   into it, and give me a second while I navigate my

13   way around these exhibits.

14             I'm going to share my screen again in a

15   second, Mr. Buysse, with Exhibit 2.

16                    (WHEREUPON, a certain document was

17                    marked Buysse Deposition Exhibit

18                    No. 2, for identification, as of

19                    September 14, 2020.)

20   BY MR. SIGALE:

21       Q.    Mr. Buysse, do you see that on the

22   screen, 225 ILCS 10/7?

23       A.    Yes.  I would ask you to scroll down,

24   please.



1        Q.    Sure.

2        A.    Thank you.

3        Q.    And you see it's marked Deposition

4   Exhibit 2.

5        A.    Right.

6        Q.    Am I still scrolling for you,

7   Mr. Buysse?

8        A.    Yes.   Thank you.

9        Q.    It is a four-page document, and since

10  I'm sort of at your command here, tell me when to

11  stop scrolling or when to go back or slow down or

12  whatever.

13        A.    I just wanted to see the entire

14  document.

15              (WHEREUPON, a discussion was had off

16              the record.)

17  BY MR. SIGALE:

18        Q.    Mr. Buysse, in your own words, what is

19  this -- what is reflected in this document that is

20  Exhibit 2?

21        A.    Well, when you ask me to say it in my

22  own words, I think what you've shown here is a

23  provision, and it speaks for itself.

24        Q.    Okay.   This is -- this is 225 ILCS 10/7,



1  which is Section 10/7 of the Illinois Child Care

2  Act of 1969; is that correct?

3      A.    That's what it appears to be, yes.

4      MS. HELFRICH:  David, I'm going to ask where

5  you got this document from just because there's

6  lots of different sources for statutory provisions.

7  I'm asking you where you pulled this from.

8      MR. SIGALE:  I downloaded it off Lexis

9  yesterday.

10     MS. HELFRICH:  Lexis.  Okay.  Thank you.

11     MR. SIGALE:  Sure.

12 BY MR. SIGALE:

13     Q.    So, Mr. Buysse, as I just actually

14  stated, I downloaded this off of Lexis yesterday.

15  You said it appears to be the statute Section 10/7.

16  Do you have any reason to believe that this is

17  inaccurate, that this is not 10/7 of the Child Care

18  Act?

19     A.    So I have to admit that I have not

20  reviewed the document that you're showing here as

21  Exhibit 2 in its entirety, but I'm willing to

22  accept your representation that you've downloaded

23  this from Lexis and that it is, in fact,

24  Section 10/7.



1      Q.    Okay.  Can you describe for me --

2  forgive me if this sounds a little elementary,

3  Mr. Buysse, but we'll call it going through the

4  motions -- can you describe for me what the

5  Attorney General's office does?

6      A.    You mean in general?

7      Q.    I do.  I mean in general.

8      A.    So I think that that is a very

9  complicated question because there are different

10  parts of the office, and I'm not familiar with many

11  parts of the office.  I'm basically familiar with

12  those parts of the office with which I've worked

13  over the course of my employment.

14          And so I would respond to your question

15  by saying that the Attorney General and the Office

16  of the Attorney General does many things, and I'm

17  not familiar with everything that it does.

18      Q.    Okay.  In terms of enforcement of state

19  statutes, what is the Attorney General's role?

20      A.    So --

21  MS. HELFRICH:  Objection.  Calls for a legal

22  conclusion.  Foundation.  Beyond the scope.

23          Go ahead.  If you know, David, you can

24  answer.

```
 1   BY THE WITNESS:

 2       A.    Would you repeat your question again,

 3   please?

 4   BY MR. SIGALE:

 5       Q.    What, if anything, is the Attorney

 6   General's role regarding the enforcement of state

 7   statutes?

 8       MS. HELFRICH:  I'm going to object again.

 9   Same objection.  Also vague.

10           Dave, if you know, go ahead.

11   BY THE WITNESS:

12       A.    So I would respond to your question by

13   indicating that that is also a fairly complicated

14   request because the Attorney General is involved in

15   various types of enforcement of state statutes.

16   BY MR. SIGALE:

17       Q.    What about with regard to the statute

18   we're looking at here, Exhibit 2?

19       MS. HELFRICH:  Same objection.  Vague.  Calls

20   for legal conclusion.  Outside the scope.

21           Go ahead, David, if you know the answer.

22   BY THE WITNESS:

23       A.    So I would ask you again to scroll down,

24   please.
```



1  BY MR. SIGALE:

2      Q.    Sure.

3      A.    I apologize, but could you scroll up to

4  the numbered sections under "(a)"?  Thank you.

5            So I would attempt to answer your

6  question by noting that the Child Welfare Act

7  contains a provision, Section 11.1, that addresses

8  enforcement of the Child Welfare Act.

9      Q.    When you say "the Child Welfare Act," is

10  that something different than the Child Care Act of

11  1969?

12      A.    That's a very good question.  And I'm

13  basically indicating that it would be 225 ILCS, the

14  term that you've used, Child Care Act of 1969, is

15  correct, and I think my use of the term Child

16  Welfare Act is somewhat colloquial, but it refers

17  to the same statutory enactment.

18      Q.    Okay.  Based on your earlier answers, if

19  I were to ask you to look at sub A, there's -- the

20  little hand is going, and it says, "The Department

21  must prescribe and publish minimum standards for

22  licensing that apply to the various types of

23  facilities for child care defined in this Act."

24            If I were to ask you regarding the



1  various types of facilities for child care defined

2  in this act, do you have any knowledge or

3  experience regarding those various types of child

4  care facilities --

5      MS. HELFRICH:  Objection.  Vague.  Beyond the

6  scope.

7      MR. SIGALE:  I haven't finished the question.

8      MS. HELFRICH:  Sorry, David.

9  BY MR. SIGALE:

10     Q.    Do you have any knowledge or experience

11  regarding those various types of facilities for

12  child care defined in this act beyond what you've

13  done to prepare for today's deposition?

14     A.    I do not.

15     Q.    And you see here where it -- continuing

16  on in this subparagraph A, "And that are equally

17  applicable to like institutions under the control

18  of the Department and to foster family homes used

19  by and under the direct supervision of the

20  Department."

21            Do you see where I've just read that?

22     A.    I do.

23     Q.    And if I were to ask you does that mean

24  that this sub A applies not only to various types



1  of child care facilities but also to foster homes,

2  would you have any knowledge of that besides what

3  is written on the page?

4      MS. HELFRICH:  Objection.  Calls for a legal

5  conclusion.  Beyond the scope.  The section speaks

6  for itself.

7  BY THE WITNESS:

8      A.    Well, my response would be I believe

9  this section does, in fact, speak for itself.

10 BY MR. SIGALE:

11     Q.    Okay.  Now, consistent with -- going

12 back for a second, the Topic 1 of -- which is "The

13 bases for 225 ILCS 10/7 (a)(13), (14), (15)," and

14 then I cut over back to Exhibit 2, which is, in

15 fact, the statute, and you see where I am on the

16 page, the little plus sign, 13, 14, and 15?  Do you

17 see those?

18     A.    Yes, I do.

19     Q.    So let's start with 13.  It states --

20 I'm sorry.  I'm going to go back up for a second.

21         Where it -- because I want to read

22 before the colon to make sure that we're, excuse

23 the pun, all on the same page.  This is part of sub

24 A, "The Department shall seek the advice and

1    assistance of persons representative of the various

2    types of child care facilities in establishing such

3    standards.  The standards prescribed and published

4    under this Act take effect as provided in the

5    Illinois Administrative Procedure Act, and are

6    restricted to regulations pertaining to the

7    following matters and to any rules and regulations

8    required or permitted by any other Section of this

9    Act."

10            So let's stick for a second to

11   "restricted to regulations pertaining to the

12   following matters."  And then scroll down to 13,

13   14, and 15 as being some of the listed,

14   quote/unquote, "following matters."

15            So 13 states, "Provisions prohibiting

16   handguns on day care home premises except in the

17   possession of peace officers or other adults who

18   must possess a handgun as a condition of employment

19   and who reside on the premises of a day care home."

20            How do -- what do you read this

21   provision to mean?

22       MS. HELFRICH:  Objection.  Calls for a legal

23   conclusion.  The provision speaks for itself.

24   Vague.  Beyond the scope.



1            Dave, if you understand the question,
2    you can answer.
3    BY THE WITNESS:
4        A.    So I have read this provision, and,
5    again, I would say that this provision speaks for
6    itself.
7    BY MR. SIGALE:
8        Q.    So when the -- so the plain language
9    says that -- says under the statute that "The
10   Department shall prescribe and publish minimum
11   standards for licensing," and that one of them
12   says, "Handguns on day care home premises are
13   prohibited except," and then this exception for
14   peace officers or other adults, it is fair for me
15   to interpret that exactly as it's written.  Is
16   that -- is that fair?
17       MS. HELFRICH:  Objection.  Misstates prior
18   testimony.  Vague.  The document speaks for itself.
19   Beyond the scope.
20           Dave, your notice is the bases for these
21   provisions, not the interpretation for these
22   provisions.
23   BY THE WITNESS:
24       A.    So, Mr. Sigale, when I said that I think



1  that the provision speaks for itself, that was the

2  extent of my answer.

3  BY MR. SIGALE:

4      Q.    Okay.  So let's leave out the parts of

5  paragraph 13 -- I'm sorry, the sub 13 that begins

6  with "except" and only focus, then, on the first --

7  one, two, three, four, five, six -- eight words.

8  Okay?

9      A.    Yes.

10     Q.    What is the -- what is the basis or what

11 are the bases for that requirement or that statute?

12     MS. HELFRICH:  Objection.  Vague.

13         Dave, if you can answer.  Go ahead.

14 BY THE WITNESS:

15     A.    So focusing on those first eight words,

16 I think that the idea of bases that you're asking

17 about, that is not something that I can really

18 address other than saying that the provision speaks

19 for itself.

20         If you're interested in bases for an

21 enactment of the General Assembly, you have to look

22 to the General Assembly and not to the Attorney

23 General.

24



1  BY MR. SIGALE:

2       Q.    So is the answer you don't know?

3       A.    I would ask the court reporter to read

4  back my answer.

5                   (WHEREUPON, the record was read

6                    as requested.)

7  BY THE WITNESS:

8       A.    So that was my response.

9  BY MR. SIGALE:

10      Q.    Is that going to be your response if I

11 ask you the bases for subparagraph 14 and

12 subparagraph 15 as well?

13      A.    Assuming that you ask about both of

14 those sub-provisions in the same way, I expect that

15 that would, in fact, be the answer that I would

16 provide.

17      Q.    Are you aware as you sit here regarding

18 any data or statistics regarding firearm injuries

19 in day care homes or in foster homes?

20      MS. HELFRICH:  Objection.  Vague.

21 BY THE WITNESS:

22      A.    I am not.

23 BY MR. SIGALE:

24      Q.    So just so that I'm clear, and then I



1  guess I'll move on, do you have any knowledge or

2  opinions regarding those sub 13, 14, and 15 other

3  than to say the provisions speak for themselves?

4      MS. HELFRICH:  I'm going to object.

5  Mr. Buysse is here as a 30(b)(6) witness, so he can

6  only speak on behalf of the Attorney General; and

7  on behalf of the Attorney General, he said that

8  you need to ask that -- the General Assembly what

9  their justification is.  What individual knowledge

10  or opinions he may have aren't the position of the

11  Attorney General.

12          With that objection, Dave, if you have

13  an answer, go ahead and answer.

14  BY THE WITNESS:

15      A.    So, actually, in terms of the question

16  that you've asked, when you talk about knowledge or

17  opinions, I was essentially going to say that I'm

18  here as a 30(b)(6) witness, and as a 30(b)(6)

19  witness, I would say that I do not have knowledge

20  or opinions of the type that you're asking about.

21  And that would be my answer with respect to 13, 14,

22  and 15.

23  BY MR. SIGALE:

24      Q.    Okay.  Mr. Buysse, just to be clear,



1  despite however I might phrase the question, I'm

2  only asking you any of these questions today in

3  your capacity as a 30(b)(6) witness as the

4  representative of the Attorney General's office.

5  So if you happen individually, let's say, in the

6  course of your work to have knowledge regarding one

7  of the topics that I'm talking to you about, I

8  believe that that would be relevant to answer.

9          Having said that, if there's -- having

10  said that, you're only being asked questions today

11  because you are the designee of the Attorney

12  General's office.  So that is the only capacity

13  that I'm actually asking you anything today.

14          I understand that notwithstanding the

15  fact that I said that there will probably be

16  objections to questions, but at least I'm putting

17  it on the record that I'm not trying to get at

18  whatever outside scope, knowledge you have.  I'm

19  just asking you as the person being presented

20  today.

21          So the next matter for examination,

22  then, would be JCAR, the Joint Committee on

23  Administrative Rules, Title 89,

24  Section 406.8(a)(17) and (18) and the bases



1  therefore.  And I'm going to stop sharing briefly.
2                    (WHEREUPON, a certain document was
3                     marked Buysse Deposition Exhibit
4                     No. 3, for identification, as of
5                     September 14, 2020.)
6  BY MR. SIGALE:
7      Q.    Mr. Buysse, again, I'm just confirming
8  that you can see what I'm trying to display to you
9  on the screen.  It says "Joint Committee on
10  Administrative Rules," and then it says
11  "Administrative Code, Title 89."
12          Do you see it?
13      A.    Yes, I do.
14      MS. HELFRICH:  David, can you tell me again
15  where you got this from?
16      MR. SIGALE:  Sure.  I'll tell you in one
17  second.
18  BY MR. SIGALE:
19      Q.    This is Deposition Exhibit 3 -- you see
20  that there? -- that's been marked for
21  identification.  I will represent, to answer
22  counsel's question, that this was downloaded off
23  the JCAR website on September 10.
24          If I go back to "Matters for



1 | Examination," 406 point -- I'm sorry.  I'm going to
2 | skip ahead.  Hold on one second.
3 |        Now, Mr. Buysse, I apologize.  I suspect
4 | it doesn't matter much to you, but I still
5 | apologize because I'm not trying to be confusing.
6 | But I'm going to jump ahead.  I'm going to skip one
7 | for now to Topic 3.  Okay?
8 |      A.    Yes.
9 |      Q.    "The bases for Rule 402.8(g)(previously
10 | 402.8(i))."  I believe that that's actually
11 | reversed.  I think it was (g) before it was (i),
12 | and it doesn't matter because, as counsel and I
13 | have agreed, it is now as of this date Section O.
14 |      MR. SIGALE:  And, Counsel, we agreed to put
15 | something on the record that due to recent changes
16 | in the administrative code, the DCFS regulations,
17 | that 402.8(i) is now 402.8(o).  Is that accurate?
18 |      MS. HELFRICH:  Well, I'd say the relevant
19 | provision is 402.8(o).  I don't want to say that
20 | (i) is exactly the same as (o).  So this is the
21 | relevant provision, we agree, and we consider this
22 | to be the provision that was in your notice.
23 |      MR. SIGALE:  Okay.
24 |



1  BY MR. SIGALE:

2      Q.    So, Mr. Buysse, this is Section 402.8,

3  which is "General Requirements for the Foster

4  Home."  Do you see where the hand is it says that?

5      A.    I see that that is indicated.

6      Q.    And then it says in full font at the

7  top, "Section 402.8 General Requirements for the

8  Foster Home," and it has, as we scroll slowly, many

9  requirements:  kitchen, bathroom, water supply,

10  water hazards, swimming pools, hot tubs, tobacco,

11  don't drink alcohol in excess, portable space

12  heaters, household supplies, syringes and medical

13  waste.

14          And after we scroll through all of

15  those, we get to sub O.  This states, "Any and all

16  firearms and ammunition shall be stored and locked

17  up separately at all times and kept in places

18  inaccessible to children."

19          Did I read that first sentence

20  accurately of sub O?

21      A.    Yes.

22      Q.    I want to stick with that sentence for a

23  second here.  Do you as the Attorney General's

24  designee today, do you know the bases for that



1  sentence, that part of the rule?

2       A.    So as I had indicated with respect to

3  legislative enactments, I would note that this is a

4  rule promulgated by the Department of Children and

5  Family Services, and any inquiry regarding the

6  bases for subsection O should be properly directed

7  to the Department of Children and Family Services,

8  and not to the Attorney General.

9       Q.    And just so I'm clarifying, Mr. Buysse,

10 because it's one thing to say go talk to DCFS, but

11 I'm asking as the Attorney General's designee, as

12 you sit here, are you aware of any statistics or

13 data that would serve as a bases -- as a basis or

14 bases for the first sentence of sub O?

15      MS. HELFRICH:  Objection.  Vague.  Beyond the

16 scope.

17           Dave, if you can answer, go ahead.

18 BY THE WITNESS:

19      A.    So as I indicated in my prior answer, if

20 you want information about the bases for subsection

21 O, your inquiry is properly with the Department of

22 Children and Family Services, which is the agency

23 which promulgated this rule, and not the Attorney

24 General.



1  BY MR. SIGALE:

2      Q.   Well, I'm going to ask them, but I'm

3  asking you as the Attorney General's designee, do

4  you know?  I get it that you're saying go talk to

5  them and I will, but I'm asking you as the Attorney

6  General's representative, do you know of any bases

7  for that provision?

8      MS. HELFRICH:  Objection.  Asked and answered.

9      MR. SIGALE:  It's been asked.

10  BY THE WITNESS:

11      A.   And it's been answered.

12      MS. HELFRICH:  And answered.

13  BY MR. SIGALE:

14      Q.   I'm trying to -- my question is do you

15  know information that is a bases for this, and

16  you're not saying it because you're saying I'm

17  asking the wrong person, or do you not know and

18  you're saying I'm -- you're the wrong person to

19  ask?

20      MS. HELFRICH:  David, I'm asking you to

21  clarify.  Are you talking about empirical data now

22  or are you talking about the bases?  You've asked

23  the question on empirical data.  I'm confused.

24      MR. SIGALE:  Well, I'm -- I understand that



1  there is topics that is -- covers empirical -- I

2  understand that there are -- there's a topic of

3  bases and there's a topic regarding empirical

4  evidence.  So I guess to the extent that they

5  overlap, I was asking the question I was asking.

6       MS. HELFRICH:  Well, I'm going to object as

7  beyond the scope because your question about

8  empirical data is about empirical data relied on as

9  the bases.  As Mr. Buysse explained, DCFS

10  determines what the basis is, not the AG.  So the

11  AG wasn't -- doesn't have a role in justifying

12  these regulations.

13       MR. SIGALE:  Okay.  I hear what you're saying,

14  and you can see here in the definitions, the basis

15  or bases shall be considered synonymous with

16  justifications and/or reasons.  I'm asking whether

17  or not the witness knows the bases and just isn't

18  saying them because he's saying go ask somebody

19  else or if he's saying I'm not the person to ask so

20  I don't know -- I don't know this information

21  because I'm not the right person to ask.

22            And, respectfully, the answer, if you

23  want to know, talk to DCFS, isn't the answer to the

24  question.



KWAME RAOUL BY DAVID BUYSSE   30b6                September 14, 2020
JENNIFER J. MILLER vs MARC D. SMITH                                  38

```
 1   BY MR. SIGALE:
 2        Q.    So I'm happy to move on, Mr. Buysse,
 3   if -- I don't want to -- I don't want to
 4   deliberately beat a dead horse.  If you don't know
 5   the information, then that's what I'm asking you.
 6        A.    Well, so in terms of my prior response,
 7   if the proper place to inquire about the bases for
 8   subsection O is the Department, I would suggest
 9   that that would also be the proper place to inquire
10   about any information that might support the bases
11   that you're inquiring about; but it is not
12   something that the Attorney General can respond to
13   other than as I have, and as a 30(b)(6) witness for
14   the Attorney General, that is my response.
15        Q.    Then just to make sure that I'm going
16   full circle on this, Mr. Buysse, you as the
17   Attorney General's designee, have you spoken to
18   anyone at DCFS or read any materials from DCFS that
19   would have provided information that is responsive
20   to my question about the bases for the first
21   sentence of sub O?
22        A.    So to answer your question, I would say
23   that I have not.
24        Q.    Okay.  So I want to skip the second
```



1  sentence of sub O and go to the third sentence that

2  says, "Loaded guns shall not be kept in a foster

3  home unless required by law enforcement officers

4  and in accordance with their law enforcement

5  agency's safety procedures."  And you can see

6  that -- that -- well, let's just leave that

7  sentence as that sentence says.

8          Mr. Buysse, all the questions that I

9  asked you before about the -- whether -- about the

10 bases for the first sentence of sub O, are your

11 answers the exact same with regard to the third

12 sentence of sub O?

13    MS. HELFRICH:  Objection.  Vague.  Incomplete

14 hypothetical.

15          Dave, if you understand, you can answer.

16 BY THE WITNESS:

17    A.    So to the extent that you asked me

18 questions, the exact questions that you asked me

19 about the first sentence regarding the third

20 sentence, I expect that my answers would be, in

21 fact, the same, if you asked the same questions.

22 BY MR. SIGALE:

23    Q.    Okay.

24    MS. HELFRICH:  David, may I just ask the



1    witness if he needs a break?

2         MR. SIGALE:  Yeah, sure.

3         MS. HELFRICH:  Dave, do you need a break?

4         THE WITNESS:  Yes, I would appreciate a break

5    very much.

6         MR. SIGALE:  I'm sorry.  Don't be afraid to

7    speak up.  All right.  Let's go off the record.

8    It's 11:06.  Mr. Buysse, ten minutes?  Does that

9    work for you, or do you need more or less?

10        THE WITNESS:  I would say it would be closer

11   to five minutes, and if we just sort of keep the

12   screen up, I'll return and sort of indicate I'm

13   back.

14        MR. SIGALE:  If that works for Alice, that

15   works for me.

16                    (WHEREUPON, a short break was

17                     taken.)

18                    (WHEREUPON, a certain document was

19                     marked Buysse Deposition Exhibit

20                     No. 10, for identification, as of

21                     September 14, 2020.)

22   BY MR. SIGALE:

23        Q.    Mr. Buysse, I'm going to share the

24   screen again.



1      A.    So we are back on the record?

2      Q.    Yeah.  I'm sorry.  I thought we had been

3  back on.

4            So this is Exhibit 10, and you can see

5  where this is the "Joint Committee on

6  Administrative Rules, Section 406.8, General

7  Requirements for Day Care Homes."

8            Do you see that, Mr. Buysse?

9      A.    I do.

10     MR. SIGALE:  And for counsel, I will state

11  that this was downloaded off the JCAR website

12  yesterday.

13     MS. HELFRICH:  Thank you.

14  BY MR. SIGALE:

15     Q.    And we're back to Topic No. 2, "The

16  bases for JCAR Title 89, Section 406.8(a)(17) and

17  (18)."

18     A.    Counsel, what exhibit number is this?

19     Q.    Ten.

20     A.    Thank you.

21     Q.    Topic 2, Exhibit 10.  And we scroll all

22  the way down, you can see -- sorry, go back up.

23  "The physical facilities of the home, both indoors

24  and outdoors, shall meet the following requirements



 1  for safety to children."

 2          And first aid kit, fire extinguisher,

 3  outlets, smoke detectors, carbon monoxide --

 4  scrolling down, just jumping -- space heaters, wood

 5  burning stoves, exits, no lead paint, safe

 6  furniture, tools and gardening equipment, operable

 7  phone.

 8          And then we get to 17 and 18, which I'll

 9  just represent because it confused me when I first

10  looked at it, I did not italicize this, so this is

11  the actual form that it was downloaded in.  So just

12  so everyone knows for the record.

13          And you look to 17, and it states --

14  this is (a)17, "Handguns are prohibited on the

15  premises of the day care home except in the

16  possession of peace officers or other adults who

17  must possess a handgun as a condition of employment

18  and who reside in the day care home."

19          Did I read that sentence accurately,

20  Mr. Buysse?

21      A.   Yes.

22      Q.   The second sentence, "The licensee shall

23  post a," quote/unquote, "'no firearms' sign, as

24  described in Section 65(d) of the Firearm Concealed



1   Carry Act [430 ILCS 66/65(d)], in a visible

2   location where parents pick up children."

3            Let's stick with 17 as part of Topic 2,

4   which is the bases for that section or that rule.

5   Do you as the designee of the Illinois Attorney

6   General know the basis or bases for enacting that

7   rule?

8        A.    So as I have indicated regarding the

9   other regulatory enactment of the Department of

10   Children and Family Services, what you're asking

11   about here, Subsection 17, is also a rule or

12   provision or rule promulgated by the Department,

13   and as such, the Department of Children and Family

14   Services is where inquiry should properly be made

15   regarding the bases for that provision and not the

16   Attorney General.

17        Q.    Notwithstanding that answer, have you as

18   the designee of the Attorney General for purposes

19   of this deposition, have you spoken with anyone at

20   DCFS or read from any DCFS materials any

21   information that would allow you to state the basis

22   or bases for Rule 17?

23        MS. HELFRICH:  Objection.  Vague and beyond

24   the scope.



1          Go ahead, Dave.

2  BY THE WITNESS:

3      A.   So the answer to your question is I have

4  not, but I would note that -- I would note that you

5  would still be asking the question properly of the

6  Department rather than the Attorney General.

7  BY MR. SIGALE:

8      Q.   Scrolling down to 406 -- what was it? --

9  406.8(a), 18, to parts or subparts A and B, and

10 I'll read it for the record:  "Any firearm, other

11 than a handgun in the possession of a peace officer

12 or other person as provided in subsection (a)(17),

13 shall be kept in a disassembled state, without

14 ammunition, in locked storage in a closet, cabinet,

15 or other locked storage facility inaccessible to

16 children."

17          Let me stick with that sentence there,

18 that first part of sub 18.  Okay?

19          Mr. Buysse, if I asked you exactly the

20 same questions that I had just asked you regarding

21 subsection 17, would your answers be the same?

22     A.   If you ask me the same questions that

23 you asked me regarding subsection 17 about this

24 first part of subsection 18, I expect my answers



1   would be the same.

2       Q.    18, as I mentioned, as you can see, has

3   two subparts, A and B.  18A says, "Ammunition for

4   such firearms shall be kept in locked storage

5   separate from that of the disassembled firearms,

6   inaccessible to children."

7            Did I read that accurately?

8       A.    Yes.

9       Q.    If I ask you exactly the same questions

10  regarding the basis or bases for sub-subparagraph

11  18A that I asked you about subparagraph 17, would

12  your answers be the same?

13      A.    If you ask me exactly the same questions

14  that you asked me about 17 about subparagraph 18,

15  capital A, I expect my answers would be the same.

16      Q.    And just reading 18 sub B, "The operator

17  of the home shall notify the parents or guardian of

18  any child accepted for care that firearms and

19  ammunition are stored on the premises.  The

20  operator shall also notify the parents or guardian

21  that such firearms and ammunition are locked in

22  storage inaccessible to children."

23            Then it says, in parentheses,

24  "(Section 7 of the Child Care Act of 1969 [225 ILCS



1  10/7]).  The notification need not disclose the

2  location where the firearms and ammunition are

3  stored."

4          Do you see that sub-sub-18B, Mr. Buysse?

5      A.   Well, I see it, and it appears to me

6  that you've read it correctly.

7      Q.   If I ask you exactly the same questions

8  regarding the basis or bases for sub-subparagraph

9  18B that I asked you about subparagraph 17, would

10  your answers be exactly the same?

11     A.   If you asked me exactly the same

12  questions as you did for subparagraph 17 regarding

13  subparagraph 18, capital B, I expect my answers

14  would be the same.

15     Q.   Let me stop sharing for a second,

16  actually.  Give me a second.  I'm sorry,

17  Mr. Buysse.

18                 (WHEREUPON, a certain document was

19                  marked Buysse Deposition Exhibit

20                  No. 8, for identification, as of

21                  September 14, 2020.)

22  BY MR. SIGALE:

23     Q.   Mr. Buysse, I'm sharing my screen with

24  you again, and this is Deposition Exhibit 8.  It's



1  also a produced document, as you can see, as Bates

2  stamped DCFS 195.  And it is marked "Confidential,"

3  so I guess this part of the deposition -- well, I'm

4  not going to ask you any specifics regarding the

5  plaintiffs in this case, the Millers.  I'm more

6  going to ask you about the form, but we will have

7  to keep this document confidential.

8          This is -- well, strike that.

9          Mr. Buysse, have you seen this document

10 before or one like it that isn't checked off?

11     A.   So I have not seen this particular

12 document filled out with initials and dates and

13 things of that nature, but I have seen a blank copy

14 of this particular document.

15     Q.   Was that in preparation for today?

16     A.   Yes.

17     Q.   Any other reason why you've seen this

18 document before or this form, I should say --

19     A.   No.

20     Q.   -- before?  No?

21     MS. HELFRICH:  Objection.  Vague.

22          Go ahead, Dave.

23 BY THE WITNESS:

24     A.   I would say no.  I saw this only in



1   preparation for the deposition.

2   BY MR. SIGALE:

3       Q.    So this is -- actually, Mr. Buysse, let

4   me ask you your understanding.  What is this

5   document?

6       MS. HELFRICH:  Objection.  Vague.

7           Dave, if you understand, go ahead.

8   BY MR. SIGALE:

9       Q.    In Exhibit 8, can you describe what it

10  is?

11      A.    Is this just a one-page document?

12      Q.    This -- I'll tell you what.  Let's pause

13  one second.  I can try and answer that for you.

14          This is -- I believe this can be used --

15  I believe this can be put in front of foster

16  parents as an individual document, but it might be

17  part of an entire inspection thing.

18          So I'll tell you what.  Why don't we

19  pause for one second, Mr. Buysse, and let me see if

20  I can answer that for you.  Okay?

21      A.    Yes.  Thank you.

22              (Brief pause.)

23  BY MR. SIGALE:

24      Q.    Mr. Buysse, I believe the answer to the



1  question is that there are many consent forms that

2  a foster -- would-be foster parent is required to

3  sign, but I -- from -- everything from infant

4  safety to unsafe children's products to smoke

5  detector inspection, but I just want to talk

6  about -- and this is something that I would

7  probably have to defer to whether DCFS considers it

8  all one big document, one big packet, or whether

9  it's a bunch of individual documents that wind up

10  just getting all put together.

11         And I'm just going to ask you questions

12  regarding this document in a vacuum.  Okay?

13     A.    Yes.  So your questions are limited to

14  this one-page document that you've designated

15  Exhibit 8?

16     Q.    Yes.

17     A.    Thank you.

18     Q.    And this is -- you see at the top, it

19  says "Acknowledgment of Compliance, Part 402

20  Licensing Standards."

21         It says "Section I, Water Quality,"

22  "Section II, Water Temperature," and then

23  "Section III, Firearms," which is the part, no

24  surprise, that I'd like to focus on right now.



1          And says Section 402.8(g) -- or

2    Rule 402.8(g), sorry, "Any and all firearms and

3    ammunition shall be locked up at all times and kept

4    in places inaccessible to children.  No firearms

5    possessed in violation of a State or Federal law or

6    local government ordinance shall be present in the

7    home at any time.  Loaded guns shall not be kept in

8    a foster home unless required by law enforcement

9    officers and in accordance with their law

10   enforcement agency's safety procedures."

11       MS. HELFRICH:  Dave, I'm going to object here

12   because 402.8(g) is not the current rule, as we

13   discussed.  The language is not exactly the same as

14   408(o) and as I sit here, I don't know if there's a

15   more recent version of this form.

16       MR. SIGALE:  I was actually just about to

17   comment on that, that 402.8(g) became (i) and is

18   now (o), and, in fact, is slightly different in

19   that it says --

20       MS. HELFRICH:  Number 3.

21   BY MR. SIGALE:

22       Q.    So, Mr. Buysse, this rule actually,

23   except for being 402.8(o), the second sentence and

24   the third sentence are the same, but the third



1  sentence has changed, whereas here in Exhibit 8 it

2  says, "Any and all firearms and ammunition shall be

3  be locked up at all times and kept in places

4  inaccessible to children," now it says, "Any and

5  all firearms and ammunition shall be stored and

6  locked up separately at all times and kept in

7  places inaccessible to children."

8          So other than that, it's the same.  And

9  in the category of "go ask DCFS," I'll certainly

10  have to -- certainly have to find out whether or

11  not this section really has been altered.

12          So I'm going to ask you -- I'm going to

13  ask you a couple questions on this.  Okay?  Looking

14  at --

15      MS. HELFRICH:  I'm going to have a standing

16  objection that we don't know this is current.  So I

17  want that on the record that this document is not

18  current.  This is the document that the Millers

19  signed, that's certainly true; it's the document

20  that you objected to in your complaint, but it is

21  not a current document.  I'll put that on the

22  record before Mr. Buysse gives any answers.

23  BY MR. SIGALE:

24      Q.    Mr. Buysse, are you -- I'm going to ask



1   you a couple questions.  Okay?  And I'm going to

2   ask you in regards to 402.8(g) as it's written, and

3   then I'd like you to presume that 40- -- that this

4   paragraph has been replaced with the language of

5   402.8(o), and that if I -- someone was being asked

6   to sign this today, that this form would have been

7   updated and reflect the current subsection and the

8   current language.  Okay?  So --

9        MS. HELFRICH:  I'm going to object to that as

10  an incomplete hypothetical.  Go ahead with your

11  question.

12  BY MR. SIGALE:

13       Q.    Okay.  So, Mr. Buysse, as this is

14  written, Section 402.8(g) with the language that

15  has been in use until, I believe, recently, are you

16  aware as -- strike that.

17            Do you know as the designee for the

18  Attorney General's office the basis or bases for

19  including that provision in this form?

20       MS. HELFRICH:  And here I need to add a

21  privilege objection.  So I'm going to object to the

22  extent that any knowledge in the AG's office comes

23  through its privileged representation of DCFS.

24            Outside of that, Dave, go ahead.

KWAME RAOUL BY DAVID BUYSSE   30b6                September 14, 2020
JENNIFER J. MILLER vs MARC D. SMITH                           53

```
 1   BY THE WITNESS:
 2       A.    Yes.  So with respect to the language
 3   that appears here in Exhibit 8, what you're asking
 4   me about is 402.8(g) as it appears in Exhibit 8.
 5   Isn't that true?
 6   BY MR. SIGALE:
 7       Q.    Yes.
 8       A.    So my response is that this appears to
 9   be a document issued by the Department of Children
10   and Family Services, and as such, it's the
11   Department that you should be asking about for the
12   bases for what appears in Exhibit 8 and not the
13   Attorney General.
14       Q.    Notwithstanding that answer, do you
15   have, again, as the designee of the Attorney
16   General's office, have you spoken in a
17   nonprivileged capacity to anyone from DCFS
18   regarding the basis or bases for this provision, or
19   have you read any DCFS materials that provide the
20   basis or bases for this information?
21       MS. HELFRICH:  Objection.  Vague and outside
22   the scope.
23              Dave, go ahead.
24
```



 1 | BY THE WITNESS:

 2 |     A.    So I can say that I have not spoken with

 3 | anyone at DCFS or read any documents from DCFS, and

 4 | I would just reiterate that any information that

 5 | you're seeking regarding the bases for the language

 6 | that appears in Exhibit 8 should be obtained from

 7 | the Department of Children and Family Services and

 8 | not the Attorney General.

 9 | BY MR. SIGALE:

10 |     Q.    So now I want you to for purposes of

11 | this question assume, because if it hasn't

12 | happened, it must be at some point soon, that the

13 | language in this paragraph that quotes the previous

14 | 402.8(g), instead it says 402.8(o), and writes what

15 | is in the rule currently that we discussed

16 | previous.  Do you see it there on the -- this is

17 | Exhibit 3?

18 |         So this sub O, I'd like you to assume

19 | for purposes of this question that it's this

20 | language that was in that paragraph in that form in

21 | that Exhibit 8.  Okay, Mr. Buysse?

22 |     MS. HELFRICH:  I'm going to object that that's

23 | an incomplete hypothetical and calls for

24 | speculation.  Also, vague and outside the scope.



```
 1            Go ahead, Dave, if you understand the

 2   question.

 3   BY THE WITNESS:

 4       A.    So the --

 5   BY MR. SIGALE:

 6       Q.    The truth is, Mr. Buysse, I haven't

 7   actually asked the question yet.  I just wanted --

 8   I was setting it up by saying that I would like you

 9   to assume for purposes of the question that this

10   paragraph O, subparagraph O, this language is in

11   that form instead of subparagraph G that is in that

12   old version of the form.

13            If I were to ask you the questions

14   regarding the bases for including the language in

15   form, the Exhibit 8, would your answers be exactly

16   the same as you just answered about the previous

17   version sub G?

18       MS. HELFRICH:  Same objection.

19   BY THE WITNESS:

20       A.    So to the extent that you ask exactly

21   the same questions about the presumed version of

22   this document, my answers, I expect, would be the

23   same.  But I would just, again, sort of in

24   addition, I would note that what you're asking me
```



1  to do is not offer those answers regarding a

2  document as language actually appears, but you're

3  asking me to presume language that doesn't appear

4  in the exhibit is actually in the exhibit.

5          So I expect my answers would be the same

6  with that proviso, extra proviso, about you're

7  asking me to assume something that's not actually

8  here.

9  BY MR. SIGALE:

10     Q.    Second paragraph of this Section C --

11  Section 3, I apologize, "I certify that there are

12  no firearms on the premises, but will immediately

13  notify the Licensing Representative and complete

14  Form CFS 452-2, Foster Family Firearms Arrangement,

15  if I, or any member of the foster family home,

16  acquires a firearm."

17          If I were to ask you those same exact

18  questions that I asked you regarding the basis or

19  bases for including that provision that I asked you

20  about the paragraph above, would your answers be

21  the same?

22     A.    Well, because of the nature of the

23  paragraph, you're again asking me to assume that

24  you would be able to ask the same types of



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

1 | questions as you did regarding the prior paragraph,

2 | which is 402.8(g) as it appeared in Exhibit 8.  And

3 | so with that proviso, I would indicate that, again,

4 | because this is a document that appears to be

5 | generated by the Department of Children and Family

6 | Services, any questions regarding the bases for

7 | what appears in this exhibit should be sought from

8 | the Department; and, therefore, it would be my

9 | expectation with those provisos that my answers

10 | would be the same as they were with respect to your

11 | questions, the exact questions, about what appears

12 | in Exhibit 8 about Rule 402.8(g).

13 |       MR. SIGALE:  Gretchen, I'm going to take a

14 | five-minute break here, see if I -- I'm going to

15 | take a five-minute break.

16 |       MS. HELFRICH:  So 11:48 come back?

17 |                 (WHEREUPON, a short break was

18 |                  taken.)

19 | BY MR. SIGALE:

20 |       Q.   Mr. Buysse, just so we're clear for the

21 | record here, during that break, I actually went and

22 | looked up the DCFS forms, and they have not -- they

23 | have not updated the form.  So the references to

24 | 402.8(g), for example, notwithstanding the fact



1   that the rule isn't 402.8(g) anymore or that the

2   language is exactly the same, the form is still the

3   same as the previous version.  It has not been

4   updated.  All right?

5        A.    Okay.

6                  (WHEREUPON, a certain document was

7                  marked Buysse Deposition Exhibit

8                  No. 7, for identification, as of

9                  September 14, 2020.)

10  BY MR. SIGALE:

11       Q.    So with that said, I'm going to show you

12  what has been marked as Exhibit No. 7.  This, too,

13  I'm not going to ask you anything specific

14  regarding the Millers, the plaintiffs in this case.

15  There's specific information.  I do want to take a

16  look at the form, and we're going to have the --

17  the form will have to be confidential as it's

18  already marked, actually.

19            So, Mr. Buysse, this Exhibit 7, have you

20  seen this specific form or have you seen this -- a

21  clean version of this form at any time prior to

22  right now?

23       A.    I have not seen the form which you've

24  designated Exhibit 7, but I have seen during



1   preparation for the deposition with counsel a blank

2   copy of this document.

3        Q.    And you see the recitation there --

4   well, first of all, the title of the document,

5   "Foster Family Firearms Agreement"; right?

6        A.    Yes.

7        Q.    And in the top left corner, it's cut

8   off, but you see it says CFS 452-2?  I don't know

9   if you know that, like, from the version that

10  you've seen or you're just taking my word for it?

11       A.    I do not have the version that I've seen

12  previously, so I'm taking your word for how

13  Exhibit 7 appears.

14       Q.    So you see this recitation of 402.8(g),

15  which is, we now know, still the current version of

16  the form but not how the actual rule is labeled or

17  is written anymore.  But if I go to this -- back to

18  Exhibit 8 in this Section 3, you can see it also

19  refers to the previous 402.8(g).

20            And going back now to the -- if I were

21  to ask you questions regarding the basis or bases

22  for including this Rule 402.8(g) in this document,

23  would your answers be exactly the same as they were

24  when I was asking you about Rule 402.8(g) in the

1  earlier document, the Exhibit 8?

2       MS. HELFRICH:  I'm going to state the

3  objection that this does not reflect the current

4  version of the rule.  I do understand that this

5  reflects the current version form, but the 402.8(g)

6  is not the current version of the rule.

7            I'll also object that it's vague.

8            Go ahead, Dave.

9  BY THE WITNESS:

10      A.    Could you repeat the question, sir?

11  BY MR. SIGALE:

12      Q.    The questions that I asked you about

13  Rule 402.8(g) and the bases for including them in

14  this Exhibit 8, if I were to ask you the exact same

15  questions about the basis or bases for including

16  this provision, including this rule in this

17  Exhibit 7, would your answers be the same?

18      A.    So to the extent that you asked me

19  exactly the same questions about the quotation of

20  402.8(g) that appears in Exhibit 7 and the same

21  quotation of Rule 402.8(g) as appears in Exhibit 8,

22  I would expect my answer would be the same; but I

23  would just like to sort of reiterate and make

24  clear, this is also a document generated by the

1  Department of Children and Family Services and that

2  any inquiries regarding the bases for the rule

3  itself or the inclusion of the rule in either

4  Exhibit 7 or Exhibit 8 properly should be an

5  inquiry to the Department and not to the Attorney

6  General.

7       Q.    And like your answer with regard to

8  Exhibit 8, you have not had any conversations of a

9  non-privileged nature with anyone at DCFS nor have

10  you read any materials that would provide

11  information regarding the basis or bases for

12  including this rule in Exhibit 7; is that correct?

13       MS. HELFRICH:  Objection.  Vague and beyond

14  the scope.

15            Go ahead, Dave.

16  BY THE WITNESS:

17       A.    So I could say that I have not had any

18  discussions with persons from the Department of

19  Children and Family Services or reviewed any

20  documents generated by the Department of Children

21  and Family Services, and I would again reiterate

22  that I -- as far as any bases for the rule itself

23  or the inclusion of the rule in any departmental

24  documents, the inquiry about such basis should be



1  made to the Department and not to the Attorney

2  General.

3  BY MR. SIGALE:

4      Q.    If I were to ask you exactly the same

5  questions that I asked you just now about 402.8(g),

6  but I asked you regarding the basis or bases for

7  requiring this agreement at all, would your answers

8  be the same?

9      MS. HELFRICH:  Objection.  Vague.  Beyond the

10  scope.

11          Go ahead.

12  BY THE WITNESS:

13      A.    So this is not something directed to any

14  particular provision of this document?

15  BY MR. SIGALE:

16      Q.    I'm going to -- the bases for Form CFS

17  452-2 entitled "Foster Family Firearms Agreement."

18  So this is actually Topic 5, and I'm just asking

19  you about requiring -- this is -- this is a

20  question regarding the agreement itself.

21      A.    Okay.  So as I've indicated before, this

22  document, which is Exhibit 7, appears to be a

23  document generated by the Department of Children

24  and Family Services, and as such, any inquiry



1   regarding the bases for the existence of the

2   document is properly put to the Department and not

3   to the Attorney General.

4        Q.    And then the question regarding have you

5   had any non-privileged conversations with anyone at

6   DCFS or read any materials from DCFS that would

7   provide information regarding the basis or bases

8   for requiring this Exhibit 7?

9        MS. HELFRICH:  Objection.  Vague and beyond

10  the scope.

11            Go ahead.

12  BY THE WITNESS:

13       A.    So I have not had any non-privileged

14  discussions with anyone from the Department of

15  Children and Family Services or reviewed any

16  documents from the Department of Children and

17  Family Services with respect to the question of

18  bases that you put, and I would again reiterate

19  that any such inquiry should be put to the

20  Department and not to the Attorney General.

21  BY MR. SIGALE:

22       Q.    I'm going to skip for now Topic No. 6,

23  Mr. Buysse, and just as a heads-up, we'll probably

24  at the end of this have to take a break, and then



1   I'll come back to this exhibit -- or Topic 6.

2            So for now, I'm going to jump to Topic

3   7, which says, "The enforcement of the rules and/or

4   policies referenced in Numbers 1 through 6 above,"

5   but because for right now I'm jumping Topic 6, then

6   I'm going to read Topic 7 and say the enforcement

7   of the rules referenced in Numbers 1 through 5.

8            So we've talked about those forms, and

9   we've talked about the JCAR rules and the statute.

10           So let me ask you about Topic No. 1 that

11  would be for 10(a)(13), (14), and (15).  What role,

12  if any, does the Attorney General have in enforcing

13  this statute and these subparagraphs of this

14  statute, 225 ILCS 10/7.

15       MS. HELFRICH:  Object as vague and overbroad.

16           Dave, if you can answer, go ahead.

17  BY THE WITNESS:

18       A.   So I had previously referenced the fact

19  that I had reviewed Section 11.1 of the Act as it

20  addresses potential role of the Attorney General in

21  the enforcement of the provisions of the Act or

22  rules generated pursuant to the Act.  And so I have

23  reviewed that particular statutory enactment, and

24  to the extent that what you're asking about is the



1  role of the Attorney General in such enforcement, I

2  would say that 11.1 speaks for itself.

3  BY MR. SIGALE:

4      Q.    I'm going to stop sharing for one

5  second, then.

6                  (WHEREUPON, a certain document was

7                   marked Buysse Deposition Exhibit

8                   No. 14, for identification, as of

9                   September 14, 2020.)

10  BY MR. SIGALE:

11      Q.    Mr. Buysse, this was pulled off the

12  Illinois General Assembly's website, ILGA.gov

13  website just five seconds ago, and is this the

14  statute you're referring to, 225 ILCS 10/11.1?

15      MS. HELFRICH:  Is this an exhibit?  Are you

16  numbering this as an exhibit?

17      MR. SIGALE:  I wasn't going to.  I was just

18  going to read the statute.  If you'd like me to, I

19  certainly can mark it.  I will have to print it and

20  mark it as 14.

21      MS. HELFRICH:  Just to keep things clear.  I

22  would ask you to do that in order to keep the

23  record clear.

24



1    BY MR. SIGALE:

2         Q.    Mr. Buysse?

3         A.    Yes.

4         Q.    Assume for purposes of this that a PDF

5    version of this page is -- this web page is

6    Exhibit 14.  Okay?

7         A.    Yes.

8         Q.    This is downloaded from the Illinois

9    General Assembly website, ILGA.gov as of now about

10   30 seconds ago, and it is 225 ILCS 10/11.1.

11         Is this the statute to which you were

12   referring a minute ago?

13         A.    Yes.

14         Q.    And so the answer to the question of the

15   Attorney General's -- as to the Attorney General's

16   role in the enforcement of the rules or policies

17   referenced in numbers 1 -- on this case number 1

18   above, your answer would be this paragraph, this

19   statute; is that correct?

20         A.    Yes.  Yes.

21         Q.    So it states, Section (a), "If the

22   Department has reasonable cause to believe that any

23   person, group of persons, corporation, agency,

24   association, organization, institution, center or



1    group is engaged or about to engage in any acts or

2    practices that constitute or will constitute a

3    violation of this Act, the Department shall inform

4    the Attorney General or the State's Attorney of the

5    appropriate county, who may initiate the

6    appropriate civil or criminal proceedings."

7              Did I read that accurate?

8        A.    Yes.

9        Q.    And so then sub B of this 11.1, "If the

10   Department has reasonable cause to believe that any

11   person, group of persons, corporation, agency,

12   association, organization, institution, center, or

13   group is engaged or is about to engage in any act

14   or practice that constitutes or may constitute a

15   violation of any rule adopted under the authority

16   of this Act, the Department may inform the Attorney

17   General or the State's Attorney of the appropriate

18   county, who may initiate the appropriate civil or

19   criminal proceedings."

20             Did I read that sentence correct?

21       A.    Yes.

22       Q.    So Topics 1 through 5 -- well, let me

23   stick to this, Topics 1 through 3.

24             So Topic 1 regards a state statute, and



1   Topics 2 and 3 regard DCFS rules; correct?  And

2   I'll put it back up.

3           Is that correct, Mr. Buysse?

4       A.    I'm sorry.  Were you going to put it

5   back up?

6       Q.    I'm sorry.  I thought I was sharing.

7           Topic 1 is a state statute?

8       A.    That's correct.

9       Q.    Topics 2 and 3 -- Topics 2 and 3 regard

10  DCFS rules?

11      A.    That's correct.

12      Q.    So the authority for the Attorney

13  General to enforce either of Topics 1, 2, or 3, for

14  Topic 1, which is the state statute, I would be

15  looking to sub A; correct?

16      A.    Yes.

17      Q.    And if I was looking to the DCFS rules

18  that are listed in Topics 2 and 3, that would be

19  sub B of this 11.1; correct?

20      MS. HELFRICH:  I'm going to object as vague.

21          Dave, if you understand the question,

22  you can answer.

23  BY THE WITNESS:

24      A.    Yes.



KWAME RAOUL BY DAVID BUYSSE   30b6                    September 14, 2020
JENNIFER J. MILLER vs MARC D. SMITH                                   69

```
 1   BY MR. SIGALE:

 2       Q.    I'm going to go back now to the -- is it

 3   fair to say that if I were to -- as we've been

 4   talking now for, I guess, roughly a couple hours,

 5   and I asked you the bases for the rules and the

 6   forms and whatnot in Topics 1 through 5, and you

 7   gave your answers and they're on the record.

 8            If I move to Topic 8, "The empirical

 9   evidence relied upon by you as bases for enacting

10   the challenged rules and/or policies (in

11   Plaintiffs' pending Complaint) for day care homes

12   and foster homes, as referenced in Numbers 1

13   through 5 above" -- because, like I said, I skipped

14   6 for the moment -- would your answers be exactly

15   the same as the questions that I asked you about

16   the bases?

17       MS. HELFRICH:  Object as vague.  Outside the

18   scope.

19            Go ahead, Dave, if you understand.

20   BY THE WITNESS:

21       A.    So insofar as I've indicated, that if

22   you want any information about the bases for what

23   you've now limited to paragraphs 1 through 5, that

24   such inquiry should be directed to the Department
```



 1   of Children and Family Services.

 2              I would also say that your question

 3   regarding empirical evidence relied upon as bases

 4   for enacting challenged rules and/or policies for

 5   day care homes and foster homes, just as I

 6   indicated that that inquiry as regarding bases is

 7   properly with the Department, any inquiry regarding

 8   evidence relied upon for such bases should also be

 9   directed to the Department and not to the Attorney

10   General.

11   BY MR. SIGALE:

12       Q.    And have you spoken with anyone in a

13   non-privileged manner from DCFS or read any

14   materials from DCFS that would provide any

15   information regarding the evidence relied upon as

16   bases for enacting the rules and policies we've

17   been talking about?

18       MS. HELFRICH:   Objection.  Vague and beyond

19   the scope.

20              Go ahead, Dave.

21   BY THE WITNESS:

22       A.    So as I had indicated previously, I have

23   not had any non-privileged communications with

24   anyone from DCFS or reviewed any documents



1  generated by DCFS and -- regarding the rules that

2  you've asked about or the forms that you've asked

3  about, and I've not had that conversation with

4  respect to any empirical evidence relied upon by

5  the Department for enacting the challenged rules.

6  BY MR. SIGALE:

7      Q.   Are you aware of any instances where the

8  Department -- I'm sorry, where the Attorney

9  General's office has taken action to enforce any of

10  the rules or policies that we've been discussing

11  today?

12     A.   I am not aware of any such effort by the

13  Office of the Attorney General.

14     Q.   Moving along to Topic No. 9, which is --

15  which states, "The occurrence of firearm-related

16  crime in and around day care homes and/or foster

17  homes in Illinois."  What information do you have

18  regarding the -- regarding Topic No. 9?

19     MS. HELFRICH:  Objection.  Vague and

20  overbroad.

21          Go ahead, Dave.

22  BY THE WITNESS:

23     A.   I have no information regarding the

24  occurrence of firearm-related crime in and around



1  day care homes and/or foster homes in Illinois.

2  BY MR. SIGALE:

3      Q.    What about No. 10, "The occurrence of

4  firearm-related injuries and/or death in and around

5  day care homes and/or foster homes in Illinois," do

6  you have any information regarding Topic No. 10?

7      MS. HELFRICH:  Same objection.

8  BY THE WITNESS:

9      A.    I do not have any information regarding

10 the occurrence of firearm-related injuries and/or

11 death in and around day care homes and/or foster

12 homes in Illinois.

13 BY MR. SIGALE:

14     Q.    What role, if any, does the Attorney

15 General's office play with regard to

16 firearm-related crime in Illinois in terms of

17 tracking it, preventing it, solving it?

18     MS. HELFRICH:  I'm going to object.  That's

19 way beyond the scope of the notice.  To expand this

20 to all firearm-related crime, that's not something

21 Mr. Buysse needed to be prepared for today and

22 doesn't need to have answers for.

23          Dave, if you have the answer, go ahead.

24



 1  BY THE WITNESS:

 2      A.    Would you repeat the question, please?

 3  BY MR. SIGALE:

 4      Q.    What role, if any, does the Attorney

 5  General's office have with regard to

 6  firearm-related crime in Illinois?

 7      MS. HELFRICH:  Same objection.

 8  BY THE WITNESS:

 9      A.    So I do not have that information, and I

10  think that the objections made by counsel is

11  certainly the case.

12  BY MR. SIGALE:

13      Q.    What I'm trying to ask you, Mr. Buysse,

14  is with regard to Topics No. 9 and 10, whether

15  there's any reason, any capacity of the Attorney

16  General's office to be keeping track of

17  firearm-related crime or firearm-related injuries

18  or death, generally?

19      MS. HELFRICH:  Objection.  Beyond the scope.

20  There's no basis for Mr. Buysse to have prepared to

21  answer that question today.  Also vague.

22          Go ahead, Dave.

23  BY THE WITNESS:

24      A.    So as I had stated in my prior response



1  to your immediately prior question, I really don't
2  know anything about what you're asking about.  And
3  as I indicated previously, the office does many
4  things, and I'm not involved in or privy to many
5  things that the office does.
6  BY MR. SIGALE:
7      Q.    Number 11 and 12 are similar topics.
8  Number 11 involves day care and No. 12 involves
9  foster.
10          Let me start with No. 11.  "The number
11  and circumstances of Illinois day care home
12  licensees with whom failure to comply with the
13  challenged rules and/or policies negatively
14  affected their day care home licenses."
15          Do you have any information regarding
16  that topic?
17      MS. HELFRICH:  Objection.  Vague and
18  overbroad.
19          Go ahead, Dave.
20  BY THE WITNESS:
21      A.    I do not have any information regarding
22  that topic in paragraph 11.
23  BY MR. SIGALE:
24      Q.    Do you have any information with regard



```
 1   to No. 12, which is to say, do you have any

 2   information with regards to "the number and

 3   circumstances of Illinois foster parents with whom

 4   failure to comply with the challenged rules and/or

 5   policies negatively affected their foster

 6   licenses"?

 7        MS. HELFRICH:  Objection.  Vague and

 8   overbroad.

 9            Go ahead, Dave.

10   BY THE WITNESS:

11        A.    I do not have any information of the

12   type you're seeking in paragraph No. 12.

13   BY MR. SIGALE:

14        Q.    Topic No. 13, do you have any

15   information as to "The number and circumstances of

16   would-be -- would-be or prospective day care --

17   Illinois day care whom -- let me start over with

18   that one.  Strike that.

19            Number 13, do you have any information

20   as to "The number and circumstances of would-be or

21   prospective Illinois day care home licensees with

22   whom failure to comply with the challenged rules

23   and/or policies resulted in the denial of day care

24   home license applications"?
```



1        MS. HELFRICH:  Objection.  Vague and

2   overbroad.

3              Go ahead, Dave.

4   BY THE WITNESS:

5        A.    I do not have any information responsive

6   to your inquiry in No. 13.

7   BY MR. SIGALE:

8        Q.    Number 14, do you have any information

9   regarding "The number and circumstances of would-be

10  or prospective Illinois foster parents with whom

11  failure to comply with the challenged rules and/or

12  policies resulted in the denial of foster care

13  license applications"?

14       MS. HELFRICH:  Objection.  Vague and

15  overbroad.

16             Go ahead, Dave.

17  BY THE WITNESS:

18       A.    I do not have any information responsive

19  to your inquiry in paragraph 14.

20  BY MR. SIGALE:

21       Q.    Well, that leads me back to Topic No. 6,

22  Mr. Buysse, and for that I'm going to need to take

23  a break.

24             So it's 12:22.  Why don't we come back



1   at 12:30.

2                    (WHEREUPON, a short break was

3                     taken.)

4                    (WHEREUPON, a certain document was

5                     marked Buysse Deposition Exhibit

6                     No. 5, for identification, as of

7                     September 14, 2020.)

8   BY MR. SIGALE:

9        Q.    Mr. Buysse, I would like to direct your

10  attention -- this is Exhibit 5.  As you can see,

11  it's got the caption, and it says "Defendant Kwame

12  Raoul's Responses and Objections to Plaintiffs'

13  Federal Rule of Civil Procedure 34 Requests for

14  Production."

15            Do you see that, Mr. Buysse?

16       A.    I do.

17       Q.    Have you seen this document prior to

18  coming here today?

19       A.    Could you repeat the question?  Your

20  voice was breaking up.

21       Q.    Sorry.  Have you seen this document

22  prior to right now this minute?

23       A.    Yes.

24       Q.    Did you review it in preparation for



1  today?

2      A.    Yes.

3      Q.    Any other time?

4      A.    No.

5      Q.    I want to focus on two questions in

6  particular.  Any documents or data -- this is No. 6

7  of the exhibit, "Any documents or data compilations

8  that are in your possession, custody, or control

9  that you may use to support your defenses."

10          And there's a lot of objections.

11          And then it says, "Subject to and

12  without waiving them, Defendant Raoul refers

13  Plaintiffs to his Rule 26 (a)(1) disclosures."

14          Do you see that?

15      A.    I do.

16      Q.    Do you have any reason to deviate from

17  that as you sit here, in other words, besides what

18  is in your -- strike that.

19                  (WHEREUPON, a certain document was

20                  marked Buysse Deposition Exhibit

21                  No. 6, for identification, as of

22                  September 14, 2020.)

23  BY MR. SIGALE:

24      Q.    Let's go to Exhibit 6, I'm marking,



1  which are Defendant's Disclosures Pursuant to

2  Federal Rule of Civil Procedure 26(a)(1).  You can

3  see, "Defendants Marc D. Smith, in his official

4  capacity as Acting Director of Illinois Department

5  of Children and Family Services, and Kwame Raoul in

6  his official capacity as the Attorney General of

7  the State of Illinois, make the following

8  disclosures."

9         So you understand that the office you

10 work for and the DCFS issued this joint Rule

11 26(a)(1) disclosure?

12     MS. HELFRICH:  Objection.  This was prepared

13 by counsel.  This is beyond the scope of his

14 knowledge.

15         Go ahead, Dave.

16 BY THE WITNESS:

17     A.   So as to Exhibit 6, I've never seen that

18 before right now.

19 BY MR. SIGALE:

20     Q.   Okay.  You did not review this in

21 preparation?

22     A.   I did not.

23     Q.   So it's marked as Exhibit 6, like I

24 said, and are you familiar with Rule 26(a)(1)



 1   disclosures generally, Mr. Buysse?

 2        A.    I am.

 3        Q.    So there's four disclosures, and the

 4   first one talks about people that might have

 5   information, might have knowledge, and there's a

 6   whole bunch of -- a number of people listed.

 7             And then it comes to No. 2, which is

 8   "Pursuant to Federal Rule" -- this is what your --

 9   obviously what your -- what your counsel wrote,

10   Mr. Chimienti wrote this back last September,

11   almost a year ago, year and a day.

12             "Defendants disclose the following

13   categories of documents, data compilations, and

14   tangible things that are in their possession,

15   custody, or control and that they may use to

16   support their claims or defenses."

17             Mr. Buysse, is it fair to say that all

18   the documents that were produced -- strike that.

19             I'm going to represent to you that your

20   counsel disclosed a large number of documents in

21   regards to Rule 34 document responses.  Did you

22   review them prior to -- other than the documents

23   you've already described today, did you review, in

24   general, the discovery responses, the document



1   responses that your counsel has turned over to me?

2        A.     I did not.

3        Q.     A copy of the DCFS Foster Home Licensing

4   File pertaining to Plaintiffs Darin and Jennifer

5   Miller, Illinois Administrative Code, Illinois

6   Administrative Part 402, then the Administrative

7   Code 402(e), A through C, DCFS Procedure 402, 402 A

8   through G, then the Day Care Home Licensing File

9   for Jennifer Miller, then the Administrative Code,

10  Administrative Code, DCFS procedure, DCFS

11  procedure.

12           Going back to this Exhibit No. 5, the

13  Rule 34 responses, where I asked for any documents,

14  data complications that are in your possession,

15  custody or control used to support your defenses,

16  you referred -- your office, I should say, referred

17  me to the 26(a)(1) disclosures.

18           So back to the Rule 26(a)(1)

19  disclosures, I'll scroll up or down if you'd like,

20  and I'm going to ask you, as you sit here today,

21  are you aware of any other documents that might

22  support -- you may use to support your claims or

23  defenses that are not listed here?

24       MS. HELFRICH:  Objection.  That calls for a



1  legal conclusion.  That's beyond the scope of the

2  request.  He is here as a fact witness.  He's not

3  here to tell you how we're going to make our case.

4  We will supplement our discovery responses as we

5  are required to do under Rule 26.

6          He's answered your questions about

7  existence of empirical data.

8      THE WITNESS:  So is there a pending question?

9  BY MR. SIGALE:

10     Q.    Beyond what you told me already today,

11 are you aware of any documents or data compilations

12 that go to any of the topics that I've asked you

13 about today --

14     MS. HELFRICH:  Objection.  Asked and answered.

15 BY MR. SIGALE:

16     Q.    -- again, in your capacity as the

17 designee for the Attorney General's office only?

18     MS. HELFRICH:  Objection.  Asked and answered.

19     MR. CHIMIENTI:  And I'll also note for the

20 record, Counsel, that while fact discovery is

21 ongoing, expert discovery is still forthcoming, and

22 Mr. Buysse wouldn't necessarily have any

23 information on that particular item.  Expert

24 discovery is forthcoming.  We reserve the right to



1   disclose that type of information both during fact

2   and expert discovery.

3          Go ahead, Dave.

4   BY THE WITNESS:

5      A.   So I've already indicated that I don't

6   have any information with respect to the items that

7   you've identified, and my answer is no different

8   now.

9   BY MR. SIGALE:

10     Q.   Okay.  And No. 11, "All documents, in

11  any form, regarding any of the issues raised in

12  Plaintiffs' pending Complaint."

13         Have you reviewed Plaintiffs' pending

14  complaint, by the way, Mr. Buysse?

15     A.   I have read the amended complaint.

16     Q.   Okay.  And again, the answer to No. 11

17  here refers me back to the Rule 26(a)(1)

18  disclosures.

19         So just to be thorough, are you aware --

20  to the extent that it wasn't covered by the

21  previous question, are you aware of any documents

22  regarding any of the issues that are raised in that

23  amended complaint that you have not discussed

24  today?



1        MS. HELFRICH:  I'm going to object.  Vague.

2    Overbroad.  It's beyond the scope.

3             We've launched our objections to this

4    request.  You had 60 days to object to our initial

5    response.  We will supplement our discovery request

6    as required.  It's just not something for

7    Mr. Buysse to address.

8             David, if you have an answer, go ahead.

9    You don't need to have an answer.

10   BY THE WITNESS:

11       A.    You know, I've already answered the

12   questions you put to me before, and I have

13   nothing -- in addition to not seeing the 26(a)(1)

14   disclosure until today, I had no role in preparing

15   the response to the request for production either.

16   So I reviewed that, but I had no role in preparing

17   it.

18   BY MR. SIGALE:

19       Q.    I would like to take you back to Topic

20   No. 2.  Topic No. 2, which is the bases for JCAR

21   Title 89, Section 406.8 (a)(17) and (18), and that

22   one was Exhibit 10, and to refresh your memory

23   here, is entitled "General Requirement for Day Care

24   Homes."



```
 1              Do you see -- do you see it?

 2      A.    Yes.

 3      Q.    Scroll back down to 17 and 18, which is

 4  the requirement, and I want to just read them

 5  again.

 6              "Handguns are prohibited on the premises

 7  of the day care home except in the possession of

 8  peace officers or other adults who must possess a

 9  handgun as a condition of employment and who reside

10  in the day care home."  That's italicized, again,

11  not by me, but it works for purposes of this.  So

12  hold that.

13              And then number 18 says -- actually,

14  forget it.  Let's just stick with that one

15  italicized part of No. 17.

16              Now, I've asked you a number of

17  questions regarding that, and your answers are in

18  the record.

19                    (WHEREUPON, a certain document was

20                    marked Buysse Deposition Exhibit

21                    No. 11, for identification, as of

22                    September 14, 2020.)

23  BY MR. SIGALE:

24      Q.    I want to direct your attention to
```



1   Exhibit 11.  Exhibit 11, Mr. Buysse, is also

2   printed out from Lexis yesterday.  It is a copy of

3   the Statute 430 ILCS 66/65, which is part Firearm

4   Concealed Carry Act.

5          Are you familiar with that statute,

6   Mr. Buysse?

7      A.   So I am aware that such a statute

8   exists, but I'm not familiar with its provisions.

9      Q.   I'd like to read one to you and ask you

10  a couple questions about it and see what happens

11  here.

12         So this is 430 ILCS 66/65, which is

13  titled "Prohibited Areas."

14         "(A), a licensee under this Act shall

15  not knowingly carry a firearm on or into," and then

16  you scroll down to -- with your eyes you scroll

17  down right there to sub (2), "Any building, real

18  property, and parking area under the control of a

19  pre-school or child care facility, including any

20  room or portion of a building under the control of

21  a pre-school or child care facility.

22         "Nothing in this paragraph shall prevent

23  the operator of a child care facility in a family

24  home from owning or possessing a firearm in the



1  home or license under this Act, if no child under

2  child care at the home is present in the home or

3  the firearm in the home is stored in a locked

4  container when a child under child care at the home

5  is present in the home."

6         Did I read that accurately?

7    A.    It appears so.

8    Q.    Do you as you sit here as the designee

9  of the Attorney General's office have any knowledge

10  why the DCFS rules prohibit anyone on the premises

11  of the day care home unless there's certain

12  exceptions which don't apply here, while the

13  Concealed Carry Act specifically allows it under

14  those two conditions listed in the statute.

15         Do you have any knowledge as you sit

16  here why the differing provisions?

17    MS. HELFRICH:  Objection.  First of all, it's

18  just an interpretation of the statute that may not

19  be correct; but second of all, it's entirely beyond

20  the scope of the notice.  You didn't notice the

21  Conceal Carry Act.  He's not required to answer any

22  questions about the Conceal Carry Act, and he's

23  certainly not required to give a legal

24  interpretation of the two statutes.



1            Having said that, David, if you have an

2    answer, go ahead.

3    BY THE WITNESS:

4        A.    So subject to the objections by counsel,

5    I have to refer, even though I have not reviewed

6    this provision, this statute that you have -- I'm

7    sorry, what exhibit is this again?  11?

8    BY MR. SIGALE:

9        Q.    Yes, it's 11.

10       A.    So, I, again, have to refer you to --

11   this is an enactment of the General Assembly, so I

12   have to refer you to the General Assembly for any

13   information that you might seek regarding why a

14   statute was enacted.

15       Q.    I'm not asking, sir, why the statute was

16   enacted.  I'm asking if you have any information

17   regarding the contradiction between the statute and

18   the DCFS rule in 406(a)(17)?

19       MS. HELFRICH:  I'll just object again.  You're

20   asking him to draw a legal conclusion about what

21   the statutes mean, which he is not prepared to do,

22   and you're asking him to testify about a statute

23   that wasn't within the notice.

24            So subject to those objections, Dave, if



```
 1  you have an answer, go ahead.

 2  BY THE WITNESS:

 3       A.    I don't.  I don't have any further

 4  answer.

 5       MR. SIGALE:  Can you read back his answer,

 6  please?

 7                  (WHEREUPON, the record was read

 8                   as requested.)

 9  BY MR. SIGALE:

10       Q.    So, Mr. Buysse, are you telling me when

11  I ask you the question, when I ask you why is there

12  an apparent contradiction between the rule -- I'm

13  sorry, between the statute 66/65 and the rule,

14  406(a)(17), your answer would be the same as the

15  question before that?

16       MS. HELFRICH:  Objection.  First of all, vague

17  and form.  And also, it assumes a contradiction.

18  There isn't necessarily a contradiction.  You're

19  asking him to concede to your interpretation of the

20  two provisions.  He doesn't have to do that.  And

21  it's entirely beyond the scope.

22            Dave, go ahead.

23  BY THE WITNESS:

24       A.    As I indicated, I don't have any further
```



 1 | answer to your question.

 2 |     MR. SIGALE:  I'm going to take a couple

 3 | minutes to check some notes.  Let's come back in

 4 | five.  I might be done.

 5 |                 (WHEREUPON, a short break was

 6 |                  taken.)

 7 | BY MR. SIGALE:

 8 |     Q.   Mr. Buysse, is there a bureau at the

 9 | Attorney General's office that deals with firearms,

10 | firearm issues?

11 |     MS. HELFRICH:  Objection.  Beyond the scope.

12 |         Go ahead, Dave.

13 | BY THE WITNESS:

14 |     A.   I really could not answer that question.

15 | I don't know.

16 |     MR. SIGALE:  That's all I have for you today.

17 | I don't know whether your counsel has other

18 | questions for you, but subject to any reply

19 | questions, so to speak, to that, I don't have any

20 | further for you today.  So thank you.

21 |     THE WITNESS:  Thank you, Mr. Sigale.

22 |     MS. HELFRICH:  I just have a couple questions.

23 |                 EXAMINATION

24 | BY MS. HELFRICH:



1      Q.    Mr. Sigale showed you, I think it was

2    Exhibit 1, the notice of deposition, do you recall

3    that document?

4      A.    Yes.

5      MR. SIGALE:  Should I pull it up?

6      MS. HELFRICH:  No, you don't need to.  Thank

7    you.

8    BY MS. HELFRICH:

9      Q.    And it had 15 topics on it?

10     A.    Yes.

11     Q.    Did you make a reasonable effort to

12   inform yourself with respect to the Attorney

13   General's -- the Attorney General office's

14   knowledge -- strike that.  Let me rephrase, please.

15         Did you make a reasonable effort to

16   inform yourself with respect to the knowledge of

17   the Office of the Attorney General with regard to

18   each of the topics on the list?

19     A.    Yes.

20     MS. HELFRICH:  Thank you.  That's all.

21     MR. SIGALE:  Signature?

22     MS. HELFRICH:  We'll reserve:

23     THE COURT REPORTER:  Mr. Sigale, did you want

24   that written?



1        MR. SIGALE:  Yeah.

2        THE COURT REPORTER:  Okay.  So if you could

3  upload, I've got 1, 2, 3, 5, 6, 7, 8, 10, 11, 14,

4  those were used today.  So if you could upload

5  those to Box.com, then I'll attach.

6              Gretchen, did you want a copy?

7        MS. HELFRICH:  Yes.  We're going to have to

8  review it.

9        THE COURT REPORTER:  Beth, copy?

10       MS. SOLOMON:  I don't need one.  Thank you.

11              (WHEREUPON, the deposition concluded

12              at 1:03 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24



KWAME RAOUL BY DAVID BUYSSE   30b6                September 14, 2020
JENNIFER J. MILLER vs MARC D. SMITH                              93

```
 1   STATE OF ILLINOIS    )
 2                        )  SS:
 3   COUNTY OF DUPAGE     )
 4              I, ALICE M. SCHWINGER, CSR No. 84-2913,
 5   a Certified Shorthand Reporter of the State of
 6   Illinois, do hereby certify:
 7              That previous to the commencement of the
 8   examination of the witness, the witness was duly
 9   sworn to testify the whole truth concerning the
10   matters herein;
11              That the foregoing deposition transcript
12   was reported stenographically by me, was thereafter
13   reduced to typewriting under my personal direction
14   and constitutes a true record of the testimony
15   given and the proceedings had;
16              That the said deposition was taken
17   before me at the time and place specified;
18              That I am not a relative or employee or
19   attorney or counsel, nor a relative or employee of
20   such attorney or counsel for any of the parties
21   hereto, nor interested directly or indirectly in
22   the outcome of this action.
23              IN WITNESS WHEREOF, I do hereunto set my
24   hand at Woodridge, Illinois, this 24th day of
```



1    September, A.D. 2020.

2                    s/ Alice M. Schwinger redacted pursuant to Local Rule 5.11

3

4

5

6              Certified Shorthand Reporter

7

8

9    ALICE M. SCHWINGER, CSR No. 84-2913

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



```
 1                    I N D E X

 2    EXAMINATION                                    PAGE

 3    MR. DAVID BUYSSE
      EXAMINATION                                      4
 4    BY MR. SIGALE:
      EXAMINATION                                     90
 5    BY MS. HELFRICH:

 6

 7                  E X H I B I T S

 8

 9    Exhibit No. 1                                    6

10    Exhibit No. 2                                   18

11    Exhibit No. 3                                   32

12    Exhibit No. 5                                   77

13    Exhibit No. 6                                   78

14    Exhibit No. 7                                   58

15    Exhibit No. 8                                   46

16    Exhibit No. 10                                  40

17    Exhibit No. 11                                  85

18    Exhibit No. 14                                  65

19

20

21

22

23

24
```



```
1              DEPOSITION ERRATA SHEET

2    Our Assignment No.  6014224

3    Case Caption:  Miller

4    vs.  Smith, et al.

5         DECLARATION UNDER PENALTY OF PERJURY

6         I declare under penalty of perjury

7    that I have read the entire transcript of

8    my deposition taken in the captioned matter

9    or the same has been read to me, and

10   the same is true and accurate, save and

11   except for changes and/or corrections, if

12   any, as indicated by me on the deposition

13   errata sheet hereof, with the understanding

14   that I offer these changes as if still under

15   oath.

16       Signed on the 26th day of

17   October , 2020.

18
```


s/ David F. Buysse redacted pursuant to Local Rule 5.11

```
19

20        David Buysse

21

22

23

24
```

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

KWAME RAOUL BY DAVID BUYSSE   30b6            September 14, 2020
JENNIFER J. MILLER vs MARC D. SMITH                          97

DEPOSITION ERRATA SHEET

Page No. __84__ Line No. __3__ Change to: ___We've___

lodged our objections to this

Reason for change: ___"launched" to "lodged"(wrong word)___

Page No. __87__ Line No. __21__ Change to: ___Concealed___

Carry Act. He's not required to answer any

Reason for change: "Conceal" to "Concealed" (wrong word)

Page No. __87__ Line No. __22__ Change to: ___questions about___

the Concealed Carry Act, and he's

Reason for change: "Conceal" to "Concealed" (wrong word)

Page No._____ Line No._____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No._____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No._____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No._____ Change to:_____

_____

Reason for change:_____



SIGNATURE:_____ DATE: 10/26/20

David Buysse