E-FILED
Friday, 12 November, 2021  04:09:11 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 14
# Saul Cornell Declaration

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JENNIFER J. MILLER, DARIN E. MILLER SECOND AMENDMENT FOUNDATION, INC. ILLINOIS STATE RIFLE ASSOCIATION, and ILLINOIS CARRY, | ) ) ) ) | |
| | ) | Case No. 18 cv 3085 |
| Plaintiffs, | ) ) | |
| | ) | Hon. Sue E. Myerscough |
| MARC D. SMITH, in his official capacity as | ) | Presiding Judge |
| Acting Director of the Illinois Department of Children and | ) | |
| Family Services, and KWAME RAOUL, in his | ) | Hon. Tom Schanzle-Haskins |
| official capacity as Attorney General of the State of | ) | Magistrate Judge |
| Illinois, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>DECLARATION OF SAUL CORNELL</u>

I, Saul Cornell, declare as follows:

1. I am at least 18 years old and have personal knowledge of the statements contained in this declaration;

2. The statements contained in the expert report I authored in this case, dated March 8, 2021 and attached hereto as Exhibit 1, are true and accurate;

3. If called to testify at trial in this case, I would testify to the matters set forth in my expert report. My testimony would be consistent with all of the statements in the report, which included a description of my qualifications as an expert witness, a complete statement of all opinions I would express, and the basis and reasons for those opinions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____9/2_____, 2021

s/ Saul Cornell redacted pursuant to Local Rule 5.11

Saul Cornell

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| JENNIFER J. MILLER, DARIN E. MILLER | ) | |
| SECOND AMENDMENT FOUNDATION, INC. | ) | |
| ILLINOIS STATE RIFLE ASSOCIATION, and | ) | |
| ILLINOIS CARRY, | ) | |
| | ) | Case No. 18 cv 3085 |
| Plaintiffs, | ) | |
| | ) | Hon. Sue E. Myerscough |
| v. | ) | Presiding Judge |
| | ) | |
| MARC D. SMITH, in his official capacity as | ) | Hon. Tom Schanzle-Haskins |
| Acting Director of the Illinois Department of Children and | ) | Magistrate Judge |
| Family Services, and KWAME RAOUL, in his | ) | |
| official capacity as Attorney General of the State of | ) | |
| Illinois, | ) | |
| | ) | |
| Defendants. | ) | |

## EXPERT REPORT OF SAUL CORNELL

### I.      Assignment

I have been asked to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular emphasis on the regulation of firearms relating to the safety and welfare of minors, including regulation of places such as schools, and other places where minors might gather. I have further been asked to evaluate the statute and regulations at issue in this litigation to assess whether they fall within the scope of firearms regulation revealed by that history.

### II.      Qualifications and Background

I am the Paul and Diane Guenther Chair in American History at Fordham University. The Guenther chair is one of three endowed chairs in the history department at Fordham and the only one in American history. In addition to teaching constitutional history at Fordham University to undergraduates and graduate students, I teach constitutional law at Fordham Law School. I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School. I have given invited lectures, presented papers at faculty workshops, and participated in conferences on the topic of the Second Amendment and the history of gun regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law School, Columbia Law School,

Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.[1]

My writings on the Second Amendment and gun regulation have been widely cited by state and federal courts.[2] My scholarship on this topic has appeared in leading law reviews and top peer reviewed legal history journals. I authored the chapter on the right to bear arms in the *Oxford Companion to the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[3] My co-authored study of American constitutional development from the revolutionary era to the rise of Jacksonian Democracy has become a standard text in the field.[4] Thus, my expertise not only includes the history of gun regulation and the right to keep and bear arms, but also extends to American legal and constitutional history broadly defined.

I have provided expert witness testimony in *Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.), *Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 4018), and *Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.).

## III.    Retention and Compensation

I am being compensated for my time on this case on an hourly basis at the rate of $500/hour for research and writing and $750/hour for testimony and depositions. My compensation is not contingent on the results of my analysis or the substance of any testimony.

## IV.    Basis for Opinion and Materials Considered

The opinion I provide in this report is based on:

- My review of the amended complaint filed in this lawsuit;

---

[1] For a full list of invited presentations and scholarly presentations, *see* Exhibit 1.

[2] For a list of court citations, *see* Exhibit 2.

[3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE US CONSTITUTION 739-59 (Mark Tushnet, *et al.* eds., 2015); Saul Cornell & Gerald Leonard, *Consolidation of the Early Federal System*, *in* CAMBRIDGE HISTORY OF AMERICAN LAW, Chapter 10 (Cambridge Univ. Press 2008); *see in particular*, Saul Cornell, *History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel under Anglo-American Law, 1688–1868*, 83 LAW & CONTEMP. PROBS. 73 (2020) and Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004). For a full list of relevant publications over the last decade, *see* Exhibit 3.

[4] GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780S-1830S (2019). For a symposium on the Partisan Republic that situates it in the historiography of American constitutional studies and contemporary constitutional theory and law, *see* https://balkin.blogspot.com/2020/04/balkinization-symposium-on-gerald.html.

- My review of the Illinois regulations and statutes at issue in this lawsuit;

- My education, expertise, and research in the field of legal history, and;

- My review and analysis of the primary sources, secondary sources, and other materials cited in the footnotes and text of this report and listed in the Appendices.

### V.     Summary of Opinion

It is my opinion that the regulations and statute at issue in this case—namely, Illinois Department of Children and Family Services Rule 402.8(o), Rule 406.8(17) and (18), and Section 10/7 of the Illinois Child Care Act (225 ILCS 10/7)—are consistent with the historical power and tradition of state regulation of firearms and gunpowder. The ability to regulate firearms and gunpowder is of ancient vintage and was central to the conception of ordered liberty that defined American law from its earliest days. At the very core of the early American understanding of the scope of liberty was the right of self-government and the right of the people themselves to regulate their internal police.[5] Regulations of gunpowder and firearms were at the very core of state police power. Given this history, particularly the long history of regulating firearms in sensitive places, including locations where children gather and are educated, the decision of the people of Illinois to tightly regulate firearms possession in day care homes and foster homes is well within the scope of traditional police power regulations exercised by states since the beginning of the republic. States and localities, including Illinois, have exercised their police power authority in this area robustly in accordance with the heightened need to protect minors' interests and safety from possible harm and injury.[6]

### VI.     Materials Reviewed and Methodologies Used

The historical evidence supporting my opinion includes:

- State Laws regulating the storage of gunpowder;[7]

- Laws regulating storing loaded weapons in homes;[8]

- Laws prohibiting arms in sensitive places;[9]

---

[5] John Phillip Reid, *The Authority of Rights at the American Founding*, in THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND 97 (Barry Alan Shain ed., 2007).

[6] *See, e.g.*, LAWS, STATUTES, ORDINANCES, AND CONSTITUTIONS ORDAINED, MADE AND ESTABLISHED, BY THE MAYOR, RECORDER, ALDERMEN, AND ASSISTANTS, OF THE CITY OF NEW-YORK 30 (1749) ("A Law Against Firing Guns, or other Fire-works, in the Streets").

[7] *See, e.g.*, An Act to Incorporate and Establish the City of Dubuque, ch. 123, § 12, 1845 Iowa Laws 119.

[8] *See, e.g.*, LAWS OF THE COMMONWEALTH OF MASSACHUSETTS FROM NOVEMBER 28, 1780 TO FEBRUARY 28, 1807, WITH THE CONSTITUTIONS OF THE UNITED STATES OF AMERICA, AND OF THE COMMONWEALTH, PREFIXED 37-38 (1780-1807) (Act of Mar. 1, 1783, ch. XIII).

[9] *See, e.g.*, PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY OF MARYLAND JANUARY 1637/8 – SEPTEMBER 1664 216 (W.H. Browne, ed. 1883) (1637) (1642 Md. Laws 216, § 6: Orders etc.).

- Bans on public carry;[10]

- Laws banning the discharge of weapons in populous areas;[11]

- Bans on weapons in schools and other places in which children are likely to gather;[12]

- Prohibitions on the sale or possession of arms by minors;[13]

- Legal decisions on the scope of the police power;[14] and

- Legal treatises on the scope of the police power.[15]

My evaluation of these legal historical materials draws on the most recent scholarship in this field and employs the accepted historical and legal methodologies for interpreting such sources, including an analysis of the public meaning of the Second Amendment, various individual state constitutional provisions on the right to keep and bear arms, state statutes, local ordinances, court decisions, and popular and learned legal commentaries.[16] The goal of surveying such a wide range of sources is to ascertain the various public understandings of how these different legal and constitutional texts were interpreted when the Bill of Rights was ratified, when individual laws and ordinances were enacted, and when the Fourteenth Amendment was proposed and adopted.

## VII.   The Historical Inquiry Required by *District of Columbia v. Heller*

The United States Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), directed courts to look to history for guideposts in evaluating the scope of permissible

---

[10] *See, e.g.*, An Act to prevent the Killing of Deer out of Season, and against Carrying of Guns and Hunting by Persons not qualified, Acts Passed by the General Assembly of the province of New-Jersey, held at Perth-Amboy in the fifth year of His Majesty's reign, anno Dom. 1718 (1719).

[11] *See, e.g.*, THE CHARTER GRANTED BY THEIR MAJESTIES KING WILLIAM AND QUEEN MARY, TO THE INHABITANTS OF THE PROVINCE OF THE MASSACHUSETTS-BAY IN NEW ENGLAND 226-27 (An Act To Prohibit Shooting Or Firing Off Guns Near The Road Or Highway On Boston Neck, ch. V, 1713 Acts and Laws passed by the Great and General Court).

[12] *See, e.g.*, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1, 1883 Mo. Laws 76.

[13] *See, e.g.*, THE CHARTER AND GENERAL ORDINANCES OF THE TOWN OF LEXINGTON, VIRGINIA 87 (1892).

[14] *See, e.g.*, Williams v. City Council of Augusta, 4 Ga. 509, 512 (1848).

[15] *See, e.g.*, FRANCIS LIEBER, ENCYCLOPAEDIA AMERICANA 214 (1832).

[16] For a discussion of the minimum standards of research and writing for undergraduate history majors, *see* MARY LYNN RAMPOLLA, A POCKET GUIDE TO WRITING IN HISTORY 18 (8th ed. 2015) and MARTHA HOWELL & WALTER PREVENIER, FROM RELIABLE SOURCES: AN INTRODUCTION TO HISTORICAL METHODS 128 (2001). On the methods of professional legal historians, *see* THE OXFORD HANDBOOK OF LEGAL HISTORY (Markus Dirk Dubber & Christopher L. Tomlins eds., 2018). On the methods of originalism, *see* Keith E. Whittington, *Originalism: A Critical Introduction*, 82 FORDHAM L. REV. 375 (2013).

regulation under the Second Amendment.[17] At the time *Heller* was decided, there was relatively little scholarship on this the history of gun regulation.[18] In the thirteen years since *Heller*, a burgeoning body of scholarship has uncovered a previously hidden history of arms regulation in the Anglo-American legal tradition.[19] Much of this material was largely unavailable to the *Heller* court because the sources were difficult to identify, search, and collect. The creation of powerful searchable digital "archives" has transformed this sub-field and facilitated a more sophisticated understanding of the scope of gun regulation under Anglo-American law.[20] My report draws on this new body of digital sources and the scholarship that it has generated.

The *Heller* decision directed judges to consider history as one part of the analysis necessary to evaluate the constitutional scope of permissible gun regulation. *Heller* did not undertake the task of doing that research, but rather left this project to lower courts. Justice Scalia's characterization of the general contours of the right is instructive in this regard:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.[21]

Justice Scalia also wrote, "Constitutional Rights are enshrined with the scope they were thought to have when the people adopted them."[22] *Heller* itself made clear that the right to keep and bear arms was not absolute. "Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."[23] *Heller* identified an illustrative set of examples of "presumptively lawful regulations."[24] This list was not exhaustive, but only a sketch of the many ways guns and gunpowder have been regulated by government consistent with the Second Amendment.[25]

---

[17] Dist. of Columbia v. Heller, 554 U.S. 570 (2008).

[18] For a notable exception, *see* Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

[19] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 LAW & CONTEMP. PROBS. 1 (2017).

[20] Dennis Baron, *Corpus Evidence Illuminates the Meaning of Bear Arms*, 46 HASTINGS CONST. L.Q. 509 (2019).

[21] Heller at 626-27.

[22] *Id*. at 684.

[23] *Id*. at 626.

[24] *Id*. at 627 n.26.

[25] *Id*. at 626.

Interpreting *Heller's* injunction to look to history for guidance when evaluating modern gun laws requires three closely related inquiries. First, one must gain some familiarity with Founding era rights theory, particularly as it related to the scope of state legislative authority under the police power.[26] Second, one must canvass the history of state and local regulations to establish the scope and types of laws that have been enacted at different moments in American history, recognizing, as *Heller* did, that the protections for the right to keep and bear arms would evolve as firearms technology developed and society changed, leading to novel problems and new legislation crafted to address those concerns. Finally, one must understand and acknowledge the complex role that the Fourteenth Amendment and Reconstruction had on the evolution of this long tradition of police power regulation.

A corollary of these principles is that permissible regulations would necessarily change in response to changes in society that prompted legislatures to exercise their police power to develop novel solutions to new problems.[27] An example cited by *Heller* is illuminating in this regard. *Heller* unambiguously stated that laws prohibiting machine guns were constitutional. These types of firearms first became a problem in the early twentieth century. Laws addressing the new problems posed by these weapons could not have been enacted before the invention of the machine gun. Nor would there have been a need to enact such laws until the machine gun had achieved a level of market penetration sufficient to cause a public safety issue. Finally, the effort to ban machine guns was also connected to the rise of organized crime and the sensationalized coverage of events such as the Saint Valentine's Day Massacre[28]. All of these factors contributed to the movement to ban these types of weapons. Thus, both logic and *Heller* demand that historical evaluations of the scope of the range of permissible regulation not take an antiquarian approach focused exclusively on regulations in the era of the Second Amendment. *Heller* and *McDonald* counsel a more sophisticated approach to history, one that recognizes that longstanding regulations need not be literally rooted in Founding era practice.[29]

*Heller's* history, text, and tradition approach requires judges to investigate the rich history of gun regulation under Anglo-American law. This investigation reveals a dynamic and pragmatic

---

[26] *See* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31 (2020).

[27] Chief Justice John Roberts' important but under-appreciated comment in the Heller oral argument speaks to this point directly: "[W]e are talking about lineal descendants of the arms but presumably there are lineal descendants of the restrictions as well." Transcript of Oral Argument at 77, Heller, 554 U.S. 570 (No. 07-290). A similar view was endorsed by Justice Kavanaugh as Circuit Judge, Heller v. District of Columbia, 670 F.3d 1244, 1274 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). For a helpful summary of the current state of scholarship on Heller, *see* Sanford Levinson, *United States: Assessing Heller*, 7 INT'L J. CONST. L. 316, 319 (2009).

[28] ADAM WINKLER, GUNFIGHT: THE BATTLE OVER THE RIGHT TO BEAR ARMS IN AMERICA (2013).

[29] Darrell A. H. Miller, *Text, History, and Tradition: What the Seventh Amendment Can Teach Us About the Second*, 122 YALE L. J. 852 (2013).

process of adapting gun regulation to the needs of a changing society. Technological change, de-
mographic shifts, consumer behavior, together with more general changes in American law and
society all contributed to this dynamism. Legislative bodies across America took up this challenge
with alacrity and carved out a clear body of law that both protected the right to keep and bear
arms and preserved the peace and well-being of American society. These adaptations to changing
societal needs were clear examples of the flexibility of individual states' and localities' use of the
police power to promote the health and safety of the public.

## VIII.   Analysis and Opinion

My analysis proceeds as follows. Part A reviews the conception of rights and regulation
that predominated in the founding period, a conception that required prudent use of the police
power for the true safekeeping of rights. Part B explores the profound effects of the Reconstruc-
tion era on the development of the police power and firearms regulation. Part C considers firearms
regulation as it unfolded in the twentieth century. Part D focuses specifically on the firearms reg-
ulations related to children, minor and schools. Finally, I conclude that the history and tradition
demonstrate that the Illinois statutes and regulations at issue here are consistent with the historical
use of the police power to regulate firearms for the protection of children.

### A.   Well-Regulated Liberty, the Police Power, and the Authority to Legislate in American Legal History

In modern law, liberty and power are typically cast as antithetical; accordingly, rights in
contemporary law function as trumps, erecting strong barriers against government interference.[30]
For many jurists and lawyers in the Founding era, a properly structured legal system ensured that
liberty and power were not antagonistic concepts.[31] Rather than limit rights, regulation was the
essential means of preserving rights.[32] The most basic right asserted in the struggle for independ-
ence—the right that grounded all others in Founding era constitutional thought—was the right of
the people to pass laws to promote their general welfare.[33]  In the legal traditions familiar to the
Founding generation, unrestrained liberty was a threat, not a guardian of liberty.[34] Members of
the Founding era described this dangerous form of liberty as licentiousness, a word that has vir-
tually disappeared from modern rights discourse.[35] The preservation of liberty, well-regulated

---

[30] Leif Wenar, *Rights* THE STANFORD ENCYCLOPEDIA OF PHILOSOPHY (Edward N. Zalta ed., Spring
2020 ed.), available at https://plato.stanford.edu/archives/spr2020/entries/rights/.
[31] Jonathan Gienapp, *Response: The Foreign Founding: Rights, Fixity, and the Original Constitution*, 97
TEX. L. REV. ONLINE 115 (2019).
[32] QUENTIN SKINNER, LIBERTY BEFORE LIBERALISM (1998).
[33] GORDON S. WOOD, THE CREATION OF THE AMERICAN REPUBLIC, 1776-1787 (1969).
[34] *Id.*
[35] On the difference between liberty and licentiousness in constitutional discourse in this period, *see* Philip
A. Hamburger, *Natural Rights, Natural Law, and American Constitutions*, 102 YALE L.J. 907 (1993);

liberty, meant steering a course between arbitrary power and licentiousness.[36] In a speech to the First Congress occasioned by North Carolina's adoption of the Constitution, President George Washington reminded Congress that America's new experiment in republican government required that its citizens "distinguish between oppression and the necessary exercise of lawful authority," and "discriminate the spirit of liberty from that of licentiousness, cherishing the first, avoiding the last."[37]

In *Heller,* Justice Scalia rejected the application of modern style "free standing interest balancing" to Second Amendment questions.[38] The modern legal metaphor of balancing was not common in the Founding era, but the idea of a well-regulated society, one in which the people's representatives enacted laws to promote the common good was a foundational concept.[39] Regulation was not antithetical to liberty, it was the necessary pre-condition for its exercise and survival. Given this fact, it is hardly surprising that the 1776 Pennsylvania Constitution, the first document to assert a right to bear arms in America, preceded this claim by affirming this more elemental power: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same." [40]

The legal concept of "police"—the power of the people, acting through their government, to enact and enforce laws to protect public health, safety, and welfare—was first conceptualized

---

PHILODEMUS [THOMAS TUDOR TUCKER], CONCILIATORY HINTS, ATTEMPTING, BY A FAIR STATE OF MATTERS, TO REMOVE PARTY PREJUDICE, CHARLESTON, 1784, *reprinted in*, 1 AMERICAN POLITICAL WRITING DURING THE FOUNDING ERA, 1760-1815, 628 (Donald S. Lutz & Charles S. Hyneman eds., 1983).

[36] Although Justice Scalia rejected a "free standing" balancing test in Heller, he implicitly recognized that early American legislatures were free to engage in a variety of forms of balancing exercises when they crafted specific laws limiting aspects of this right. The focus on history and tradition therefore directs judges to canvass the past for precisely these sorts of insights into previous generations' decisions about balancing. *See infra* note 38. On the idea of well-regulated liberty and Founding era conceptions of rights, *see* JOHN J. ZUBLY, THE LAW OF LIBERTY (1775). The corresponding modern legal concept would be "ordered liberty," *see* Palko v. Connecticut 302 US 319 (1937), and for a more recent elaboration of the concept, *see* JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (2013).

[37] Speech from George Washington to the United States Senate and House of Representatives, 8 January 1790, *in* 4 THE PAPERS OF GEORGE WASHINGTON, PRESIDENTIAL SERIES, 8 SEPTEMBER 1789–15 JANUARY 1790, 543 (1993).

[38] Heller, 554 U.S. at 634. The classic account of balancing in modern law is T. A. Aleinikoff, *Constitutional Law in the Age of Balancing*, 96 YALE L.J. 943 (1987). Although Heller precludes "free standing balancing" there is less agreement whether it precludes all forms of balancing, *see* 554 U.S. at 634–35 and Allen Rostron, *Justice Breyer's Triumph in the Third Battle over the Second Amendment*, 80 GEO. WASH. L. REV. 703, 707 (2012).

[39] WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA (1996).

[40] PENN. CONST. of 1776, Declaration of Rights, art. III.

in Anglo-American law by Scottish moral and legal theorists in the eighteenth century.[41] The concept was elaborated by Sir William Blackstone in his influential *Commentaries on the Laws of England*. By the era of the American Revolution, the concept had become foundational to virtually every feature of Anglo-American law.[42] References to the right of the people to regulate their internal police were also included in many of the early state constitutions drafted after the American Revolution.[43] By the antebellum era, the concept of state police power had been further refined by leading jurists and legal theorists. The application of the police power to firearms and ammunition was singled out as the *locus classicus* of state police power by Chief Justice John Marshall in his discussion of laws regulating gunpowder in *Brown v. Maryland.*[44] The power to regulate firearms and gunpowder is therefore at the very core of the police power and inheres in both states and local municipalities. Nor was Marshall unique in highlighting the centrality of this idea to American law. Massachusetts judge Lemuel Shaw, one of the most celebrated state jurists of the pre-Civil War, era elaborated this point in his influential opinion in *Commonwealth v. Alger,* a decision that became a foundational text for lawyers, judges, and legislators looking for guidance on the meaning and scope of the police power. Shaw described the police power in the following manner:

> [T]he power vested in the legislature by the constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power, than to mark its boundaries, or prescribe limits to its exercise. There are many cases in which such a power is exercised by all well-ordered governments, and where its fitness is so obvious, that all well regulated minds will regard it as reasonable. Such are the laws to prohibit the use of warehouses for the storage of gunpowder.[45]

Indeed, the scope of state power to regulate, prohibit, and inspect gunpowder has been among the most far reaching of any exercise of the police power throughout American history.

---

[41] Harry N. Scheiber, *State Police Power*, *in* 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744, 1744 (Leonard W. Levy *et al.* eds., 1986); WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA (1996).

[42] Santiago Legarre, *The Historical Background of the Police Power*, 9 U. PA. J. CONST. L. 745 (2007).

[43] MD. CONST. of 1776, Declaration of Rights, art. II; N.C. CONST. of 1776, Declaration of Rights, art. II, VT. CONST. of 1777, Declaration of Rights, art. IV.

[44] 25 U.S. (12 Wheat.) 419, 442-43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power.").

[45] Commonwealth v. Alger, 61 Mass. (7 Cush.) 53 (1851). For another good discussion of how state jurisprudence treated the concept, *see* Thorpe v. Rutland, 27 Vt. 140, 149 (1855).

The many state laws and local ordinances authorizing government officials to search for gunpowder illustrates the scope of this this authority.[46]

The exercise of state police power in the era of the Second Amendment, particularly when the issue was safe storage of guns or gunpowder, sanctioned a variety of laws. Massachusetts enacted a law that prohibited storing a loaded weapon in a home, a firearms safety law that recognized that the unintended discharge of firearms posed a serious threat to life and limb.[47] New York city granted broad power to the government to search for gunpowder and transfer powder to the public magazine for safe storage:

> [I]t shall and may be lawful for the mayor or recorder, or any two Alderman of the said city, upon application made by any inhabitant or inhabitants of the said city, and upon his or their making oath of reasonable cause of suspicion (of the sufficiency of which the said mayor or recorder, or Aldermen, is and are to be the judge or judges) to issue his or their warrant or warrants, under his or their hand and seal, or hands and seals for searching for such gun powder, in the day time, in any building or place whatsoever.[48]

*Heller* recognized not only Founding era regulations as probative, but also devoted considerable attention to developments during the Jacksonian era, almost fifty years after the Second Amendment.[49] During this period, the market revolution transformed gun culture by making a variety of weapons, including handguns, more common. These new handguns were not only cheaper, but more accurate and more easily concealed.[50] In response to the rise in inter-personal violence caused by the proliferation of these weapons, states enacted new limits on public carry. In some, but certainly not all jurisdictions, challenges to these new laws produced the first state court decisions on the meaning and scope of state constitutional arms bearing provisions.[51] In some parts of the Slave South, an expansive libertarian view of the scope of the right to keep and bear arms emerged.

Nothing better illustrates this principle than the rise of new more aggressive laws banning concealed weapons in public. With the notable exception of Indiana, most of these laws were passed in the Slave South.[52] Indiana's law is illustrative:

---

[46] Appendix 2 contains a broad sample of the range of state and local gun powder regulations.

[47] LAWS OF THE COMMONWEALTH OF MASSACHUSETTS FROM NOVEMBER 28, 1780 TO FEBRUARY 28, 1807, WITH THE CONSTITUTIONS OF THE UNITED STATES OF AMERICA, AND OF THE COMMONWEALTH, PREFIXED 37-38 (1780-1807) (Act of Mar. 1, 1783, ch. XIII, prohibiting loaded firearms in homes).

[48] N.Y. Ordinance Ordained and Established by the Mayor, Aldermen and Commonality of the City of New-York (1793).

[49] Heller at 610-12, 626.

[50] RANDOLPH ROTH, AMERICAN HOMICIDE, 15, 300, 352 (2009).

[51] Saul Cornell, *History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel under Anglo-American Law, 1688–1868*, 83 LAW & CONTEMP. PROBS. 73 (2020).

[52] *Id.*

That every person, not being a traveler, who shall wear or carry a dirk, pistol, sword in a cane, or other dangerous weapon concealed, shall upon conviction thereof, be fined in any sum not exceeding one hundred dollars.[53]

In *State v. Buzzard*, the Arkansas Supreme Court concluded that a law prohibiting concealed carry was a "mere police regulation" and hence not a violation of the state's arms bearing provision.[54] These new laws were uncontroversial in other parts of the nation. Outside of the slave South, a more restrictive model gained ascendency. Leading legal authorities in places such as Massachusetts praised these laws as not only necessary, but the hallmarks of a civilized society. Indeed, Southern gun culture drew criticism for its violence, a quality that many attributed to the institution of slavery.[55]

By the middle of the nineteenth century, a strong consensus in American law had emerged on the broad scope of the police power.[56] Francis Lieber, a leading commentator on American politics and law in the nineteenth century, confidently described its role in Anglo-American law in lucid terms: the police power, he observed, "in the common acceptation of the word, in the United States and England," was "applied to the municipal and officers provided for maintaining order."[57]

No jurisdiction enumerated the full contours of the police power they possessed in a single text or in a single statute or ordinance. Rather, it was well understood that the exercise of this power would need to adapt to changing circumstances and new challenges as they emerged.[58] This conception of law was familiar to most early American lawyers and judges who had been schooled in common law modes of thinking an analysis.[59] Throughout the long arc of Anglo-American legal history, government applications of the police power were marked by flexibility, allowing local communities to adapt to changing circumstances and craft appropriate legislation

---

[53] 1831 Ind. Acts 192. Appendix 3 contains additional examples of state and local laws prohibiting concealed carry of firearms.

[54] *State v. Buzzard*, 4 Ark. 18, 32 (1842).

[55] Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L. J. FORUM 121 (2015).

[56] John L. Brooke, *Patriarchal Magistrates, Associated Improvers, and Monitoring Militias: Visions of Self-Government in the Early American Republic, 1760-1840, in* STATE AND CITIZEN: BRITISH AMERICA AND THE EARLY UNITED STATES (Peter Thompson & Peter S. Onuf eds., 2013).

[57] FRANCIS LIEBER, ENCYCLOPAEDIA AMERICANA 214 (1832).

[58] In the extensive notes he added to James Kent's classic *Commentaries an American Law*, Oliver Wendell Holmes, Jr., wrote that regulation of firearms was the *locus classicus* of the police power. JAMES KENT, 2 COMMENTARIES ON AMERICAN LAW 340 n.2 (Oliver Wendell Holmes, Jr. ed., 12th ed. Boston, 1873).

[59] KUNAL M. PARKER, COMMON LAW, HISTORY, AND DEMOCRACY IN AMERICA, 1790-1900: LEGAL THOUGHT BEFORE MODERNISM (2013); MARKUS DIRK DUBBER, THE POLICE POWER: PATRIARCHY AND THE FOUNDATIONS OF AMERICAN GOVERNMENT (2005).

to deal with the shifting challenges they faced.[60] This longstanding tradition of using police power authority to craft specific laws to meet shifting challenges has continued to the present day. Illinois and its various localities were no exception to this tradition. Beginning in the nineteenth century and continuing to today, cities and towns in Illinois continued to craft a wide range of regulations responsive to local needs as they arose.[61] This expansive vision of the police power was articulated forcefully by the United States Supreme Court in the *License Cases* when Justice McClean wrote this about the scope of state police power:

> It is not susceptible of an exact limitation, but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgences spring up, which require restraints that can only be imposed by new legislative power. When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied.[62]

Among the most common ordinances enacted by towns and cities were regulations of gunpowder and prohibitions on the discharge of a firearms. Illinois towns and cities were no exception to this pattern as the following two ordinances clearly demonstrate. The two ordinances below are illustrative of these types of local ordinances.

> The town council [of Danville] shall have the power to regulate the storage of tar, pitch, rosin, gun-powder and other combustible materials.[63]

> Be it further ordained by the City Council of the City of Quincy, That no person shall, within the limits of said city, fire or discharge any cannon, musket, rifle, fowling piece…[64]

---

[60] William J. Novak, *A State of Legislatures*, 40 POLITY 340 (2008); GARY GERSTLE, LIBERTY AND COERCION: THE PARADOX OF AMERICAN GOVERNMENT FROM THE FOUNDING TO THE PRESENT (2017).

[61] *See, e.g.,* THE REVISED CHARTER AND ORDINANCES OF THE CITY OF CHICAGO: TO WHICH ARE ADDED THE CONSTITUTIONS OF THE UNITED STATES AND STATE OF ILLINOIS 123-25 (George Manierre ed., 1851) (regulating the keeping and conveying of gun powder and gun cotton); An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1-2, 4, 7 1931 Ill. Laws 452-54 (prohibiting possession of machine guns, regulating sale and manufacture, and penalizing use of machine guns in commission of other crimes). The law at issue in this case Section 10/7 of the Illinois Child Care Act (225 ILCS 10/7) is part of this legal tradition.

[62] License Cases (Thurlow v. Massachusetts; Fletcher v. Rhode Island; Peirce v. New Hampshire), 5 How. (46 U.S.) 504, 592 (1847).

[63] An Act To Incorporate the Town of Da[n]ville, § 16, 1855 Ill. Laws. 25–26 (error in original).

[64] THE REVISED ORDINANCES OF THE CITY OF QUINCY, ILL. TO WHICH ARE PREFIXED THE CHARTER OF THE CITY OF QUINCY, AND THE AMENDMENT THERETO 47 (Samuel P. Church ed., 1841) (An Ordinance Regulating the Police of the City of Quincy, § 5).

Towns and cities also expressly reaffirmed their rights to regulate their own internal police. Danville's ordinance was typical of this type of enactment, declaring that the town council had the "power and authority" to "regulate the police of the town."[65]

### B. The Police Power during Reconstruction (1865 – 1877)

The Republicans who wrote the Fourteenth Amendment were among the most ardent champions of state police power. As heirs to the antebellum Whig vision of a well-regulated society, Reconstruction-era Republicans used government power aggressively to protect the rights of recently freed slaves and promote their vision of ordered liberty.[66] Reconstruction witnessed an intensification of firearms regulation. Republicans sought to protect the rights of African Americans to bear arms but were equally insistent on enacting strong racially neutral regulations aimed at public safety.[67] In fact, the passage of such laws was deemed vital to address the threat posed by white supremacist para-military violence in many parts of the South. Republicans during Reconstruction believed it was vital to preserve the peace by restricting permissive carry of weapons. Hence this Texas statute:

> Any person carrying on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purpose of offense or defense, unless be has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense the state, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof, shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person.[68]

Restrictions were also adopted prohibiting guns in locations deemed to be essential to public or civic life. Thus, Texas specifically criminalized carrying weapons on election day or near a polling place.

---

[65] An Act To Incorporate the Town of Da[n]ville, § 20, 1855 Ill. Laws. 25–26 (error in original).

[66] Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187 (2005); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance*, 53 BUFF. L. REV. 1215 (2005).

[67] Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113-17 (2016); Brennan G. Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900*, 121 SOUTHWESTERN HISTORICAL QUARTERLY 284 (2018).

[68] 2 A DIGEST OF THE LAWS OF TEXAS: CONTAINING LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST, 1322 (George Washington Paschal ed., 1873) ("An Act to Prohibit the Keeping and Bearing of Deadly Weapons," Art 6512, prohibiting carrying of pistols).

It shall be unlawful for any person to carry any gun, pistol, bowie knife, or other dangerous weapon, concealed or unconcealed, on any day of election, during the hours the polls are open, within a distance of one half mile of any place of election. (2) Any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine of not less than one hundred dollars, and by imprisonment in the county jail for not less than one month: Provided, that the provisions of this section shall not apply to any officer of the election, police officer, or other person authorized to preserve the peace on the days of election.[69]

Finally, Texas enacted enhanced protections for public safety aimed at limiting the ability of paramilitary groups to intimidate free persons or Republicans by requiring express consent from property owners to carry weapons on to private property.

It shall not be lawful for any person or persons to carry firearms on the enclosed premises or plantation of any citizen, without the consent of the owner or proprietor, other than in the lawful discharge of a civil or military duty, and any person or persons so offending shall be fined a sum not less than one nor more than ten dollars, or imprisonment in the county jail not less than ten days, or both, in the discretion of the court or jury before whom the trial is had.[70]

In the nineteenth century, states also took steps to deal with especially dangerous weapons, most notably the Winchester repeating rifle. Florida enacted a law requiring a license for Winchester and other repeating rifles.[71] This law and the many others enacted during Reconstruction underscore the fact that robust regulation of firearms during Reconstruction was not a novel application of the police power, but simply an example of the flexibility inherent in this legal concept. Moreover, the incorporation of the Second Amendment by the Fourteenth Amendment did not reduce the power of states to regulate firearms. The author of Section One of the Fourteenth Amendment, John Bingham expressly affirmed this point during the public campaign to ratify the amendment, assuring Ohioans in Cincinnati that the states would continue to be responsible for all issues of "local administration and personal security."[72] As long as laws were racially neutral and favored no person over any other, the states were free to enact whatever reasonable measures were necessary to promote public safety and promote the common good.[73]

---

[69] *Id*. at 1317-18 (Art. 6490, prohibiting carrying concealed weapons on election day).

[70] *Id*. at 1321-22 ("An Act to Prohibit the Carrying of Firearms on Premises or Plantations of Any Citizen Without the Consent of the Owner," Art. 6510*)*.

[71] An Act to Regulate the Carrying of Firearms, ch. 4147, §§ 1-4, 1893 Fla. Laws 71-72.

[72] John Bingham, Speech *in* CINCINNATI DAILY GAZETTE, Sept. 2, 1867 as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV.1043, 1058 (2010).

[73] For a more detailed discussion, *see* Laura F. Edwards, *The Reconstruction of Rights: The Fourteenth Amendment and Popular Conceptions of Governance*, 41 JOURNAL OF SUPREME COURT HISTORY 310 (2016). For a discussion of how the courts wrestled with the meaning of the Amendment, *see* WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE (1998).

Given the realities of Reconstruction it is hardly surprising that Christopher G. Tiedeman, one of the era's leading legal commentators, noted that the "police power of the State extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State."[74] Although the Supreme Court during this period often clashed over the interpretation of the meaning of the Fourteenth Amendment, there was little disagreement over the continuing importance of state police power. As John Bingham had made clear during the debate over the Fourteenth Amendment, states would continue to be the primary guardian of personal safety and would continue to use their ample police power to promote the public welfare and safety.[75]

### C.  The Police Power in the Modern Era: Twentieth Century Firearms Regulation

The pace and scope of gun regulation intensified as the social ills generated by new firearms technologies and changes in American society posed unprecedented problems for states and localities. The improvements in semi-automatic and fully automatic weapons increased the lethality of weapons, and the proliferation of easily concealed weapons intensified the long-standing problem posed by these types of guns. Demographic changes, urbanization, and a host of other changes created new problems for states and localities. Although the right to keep and bear arms continued to be a venerated constitutional value, the police power's flexibility continued to provide a foundation for laws aimed at preserving ordered liberty. By the end of the 1920s multiple jurisdictions had banned machines guns and semi-automatic weapons. Political scientist Robert Spitzer's overview of the history of firearms regulation in this area underscores this point:

> So, for example, fully automatic weapons, most famously the Tommy gun, became available for civilian purchase after World War I. But it was only when ownership spread in the civilian population in the mid-to-late 1920s, and the gun became a preferred weapon for gangsters, that states moved to restrict them. The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted.[76]

Michigan's law is illustrative of the development discussed by Spitzer:

---

[74] CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF THE POLICE POWER IN THE UNITED STATES 4-5 (1886), citing Thorpe v. Rutland R.R., 27 Vt. 140, 149-50 (1854).

[75] On Bingham's view *see supra* note 75; Michael Les Benedict, *Preserving Federalism: Reconstruction and the Waite Court*, 1978 SUP.CT.REV. 39, 40-41, 47 (1978); RONALD M. LABBÉ & JONATHAN LURIE, THE SLAUGHTERHOUSE CASES: REGULATION, RECONSTRUCTION, AND THE FOURTEENTH AMENDMENT (2003).

[76] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55 (2017).

It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen (16) times without reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm. [77]

Silencers posed another problem triggered by technological change. Legislatures responded to this new threat by adopting regulations and in some cases complete bans on the use of these accessories.[78]  Minnesota's law banning silencers was typical of the states favoring the comprehensive bans.

§ 1. Use of silencers prohibited. No person shall within the state of Minnesota sell or offer or expose for sale, or have in possession for use upon or in connection with any rifle, shot-gun, revolver, or other firearm or have in possession for purposes of sale any silencer for a shotgun, revolver, rifle or other fire-arm.[79]

A number of other states, including New York and Connecticut passed similar permit schemes.[80]

Localities also enacted more stringent permit schemes for such weapons. Chicago's 1922 Municipal code was among the most comprehensive and established a permitting scheme for sale and the purchase of pistols and other easily concealed weapons.[81] Salt Lake City enacted a similar law.[82]

### D.  Children, Minors, and Schools

One of the most important consequences of the American Revolution was the transformation of traditional English common law ideas into a set of republican legal principles. One area of law that was slowly transformed was family law. The authority of legal guardians under English common law was expansive, but this model was gradually replaced by a republicanized vision of family law in which the safety and well-being of the child became the paramount guiding principle in the law. By 1816, Justice Joseph Story confidently asserted that the authority of parents or

---

[77] An Act to regulate and license the selling, purchasing, possessing and carrying of certain firearms, 1929 Mich. Pub. Acts 529.

[78] For an example of a less restrictive law *see* An Act Providing for the Registration of the Purchasers of Guns, Pistols, Other Fire-arms and Silencers for Fire-arms and Providing a Penalty for Violation, §§ 1-2, 1913 Mich. Pub. Acts 472. The 1929 act quoted in note 82 tightened these restrictions.

[79] An Act to Prevent the Sale, Offering or Exposing for Sale or Having in Possession for the Use or for Purpose of Sale within this State, of Silencer for Shot-gun, Revolver, Rifle or Other Firearm, Defining a Silencer and Providing Penalties for Violation, ch. 64, §§ 1-4, 1913 Minn. Laws 55.

[80] An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons, ch. 195, § 2, 1911 N.Y. Laws 444-45; An Act Concerning the Possession, Sale and Use of Pistols and Revolvers, ch. 252, § 3, 1923 Conn. Pub. Acts 3707.

[81] The Chicago Municipal Code of 1922, ch. XXX, Art IV §1255 (Samuel A. Ettelson, *et. al.*, eds. 1922).

[82] Revised Ordinances of Salt Lake City, Utah, 1920 356 (1920) (§ 1158, requiring a register of sales of firearms).

guardian: "are rights *depending upon the mere municipal rules of the state*, and may be enlarged, restrained, and limited as the wisdom or policy of the times may dictate."[83]

As early as 1803, New York City singled out guardians for punishment for firearms infractions for those under their charge.[84] By mid-century, the problems posed by minors prompted an expansion of government limits on access to firearms. Laws targeted the discharge of arms or the purchase or use of guns by minors. A New London, Connecticut law adopted at mid-century noted that, "the firing of guns and pistols" was "most frequently done by apprentices and minors under age."[85] By the end of the nineteenth century, a number of states and localities had enacted laws aimed at prohibiting minors from obtaining access to guns or ammunition. Some localities allowed an exception for guns used while under the supervision of a parent. Thus, South Dakota's law made it "unlawful for any person under the age of fifteen years to carry, use or discharge any rifle, shot gun, revolver or other firearms except with the consent and knowledge of their parents or guardians."[86] Chicago banned possession and use of guns by minors in 1873: "That no person within said city shall sell to or in any manner furnish any minor with any gun, pistol, revolver, or other firearms."[87] By the start of the twentieth century, additional laws limiting the ability of minors to obtain firearms were adopted.

Schools and other places in which individuals, including minors, gathered were especially vulnerable and new regulations aimed at protecting these public spaces were enacted.

> If any person shall go into any church or religious assembly, any school-room or other place where persons are assembled for educational, literary, or scientific purposes, or into a ball room, social party, or other social gathering, composed of ladies and gentleman, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk, or butcher-knife, or fire-arms, whether known as a six shooter, gun, or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty

---

[83] Story quoted in JEFFREY SHULMAN, THE CONSTITUTIONAL PARENT: RIGHTS, RESPONSIBILITIES, AND THE ENFRANCHISEMENT OF THE CHILD 3 (2014).

[84] LAWS AND ORDINANCES, ORDAINED AND ESTABLISHED BY THE MAYOR, ALDERMEN, AND COMMONALTY OF THE CITY OF NEW-YORK, IN COMMON-COUNCIL CONVENED, FOR THE GOOD RULE AND GOVERNMENT OF THE INHABITANTS AND RESIDENTS OF SAID CITY 83-4 (1803) ("A Law To prevent the Firing of Guns in the City of New York," § 1).

THE BY-LAWS OF THE CITY OF NEW LONDON, WITH THE STATUTE LAWS OF THE STATE OF CONNECTICUT RELATIVE TO SAID CITY 47-48 (1855).

[86] An Act to prohibit the use of fire arms by persons under fifteen years of age, 1903 S.D. Sess. Laws 168-69.

[87] 5 PROCEEDINGS OF THE COMMON COUNCIL OF THE CITY OF CHICAGO FOR THE YEAR MUNICIPAL YEAR 1872-73 BEING FROM DECEMBER 2D, 1872, TO NOVEMBER 24TH, 1873, 140 (1874).

or more than five hundred dollars, at the discretion of the court or jury trying the same.[88]

Individual localities also enacted laws aimed at restricting firearms in "sensitive places," including schools or churches.

> If within the city any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under militia law of the state, having upon or about his person any kind of fire arms, bowie-knife, dirk, dagger, sling-shot, or other deadly weapon[89]

Educational settings and places where children were gathered fell within the long tradition of limiting gun possession and use in sensitive places. Regulations of this sort can be traced back to English common law and the limits on going armed before the "King's ministers" and carrying arms in other sensitive places.[90]

By the start of the twentieth century, additional laws limiting the ability of minors to obtain firearms were adopted. A North Carolina law singled out any "parent or guardian of, or standing in loco parentis to, any child under the age of twelve years who shall knowingly permit such child to have the possession or custody of, or use in any manner whatever, any gun, [or] pistol" for fine or imprisonment.[91] Some states and localities continued to allow an exception for guns used while under the supervision of a parent. Thus, South Dakota's law made it "unlawful for any person under the age of fifteen years to carry, use or discharge any rifle, shot gun, revolver or other firearms except with the consent and knowledge of their parents or guardians."[92] New York

---

[88] 2 A DIGEST OF THE LAWS OF TEXAS: CONTAINING LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST, 1322 (George Washington Paschal ed., 1873) ("An Act Regulating the Right to Keep and Bear Arms," Art. 6511).

[89] THE REVISED ORDINANCES OF THE CITY OF HUNTSVILLE, MISSOURI, OF 1894. COLLATED, REVISED, PRINTED AND PUBLISHED BY AUTHORITY OF THE MAYOR AND BOARD OF ALDERMEN OF THE CITY OF HUNTSVILLE, MISSOURI, UNDER AN ORDINANCE OF THE SAID CITY, ENTITLED: "AN ORDINANCE IN RELATION TO ORDINANCES, AND THE PUBLICATION THEREOF." APPROVED ON THE 11TH DAY OF JUNE, 1894 58-59 (1894).

[90] JOSEPH BLOCHER & DARRELL A. H. MILLER, THE POSITIVE SECOND AMENDMENT: RIGHTS, REGULATION, AND THE FUTURE OF HELLER (2018).

[91] An Act to Prevent the Use of Firearms by Children, ch. 32 § 1, 1913 N.C. Sess. Laws 57.

[92] An Act to prohibit the use of fire arms by persons under fifteen years of age, 1903 S.D. Sess. Laws 168-69.

adopted a similar law, but set the age as sixteen. Other jurisdictions took a more categorical approach banning minors from having or using weapons.[93]

Finally, one additional category of laws merits attention. These laws were aimed specifically at minors: laws prohibiting the sale of toy weapons that could injure or maim children. In contrast to modern toy guns, these weapons contained explosive and combustible materials, posed a serious fire hazard, and were prone to explode. Cities, including Chicago, passed bans on these weapons.[94] A number of other states and localities passed laws similar to Chicago's ordinance.[95]

Political scientist Robert Spitzer has documented a variety of age-based restrictions enacted by states in the period after the Civil War.[96] These laws were not limited to individuals younger than eighteen, but also encompassed individuals between the ages of eighteen and twenty one.[97] In fact, Spitzer's evidence shows that restrictions on minors were more common than laws imposing limits on felons.[98] Concern about the dangers firearms posed to minors did not abate with the dawn of the twentieth century, but intensified. Indeed, the number of such laws increased by almost 50% by the start of the 1930s.[99]

## IX.    Conclusion

The right of self-defense is a core right under Anglo-American law that can be traced back almost eight hundred years.[100] The scope of this ancient right was shaped by the concept of the King's Peace. The first state constitutions recognized this right and defined its scope by enacting a variety of regulations under their police power authority.[101] During the debate over the Federal

---

[93] *See, e.g.*, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons, ch. 195, §§ 1–2, 1911 N.Y. Laws 443; 1 ANNOTATED CODE OF THE STATE OF IOWA CONTAINING ALL THE LAWS OF A GENERAL NATURE ENACTED BY THE TWENTY-SIXTH GENERAL ASSEMBLY AT THE EXTRA SESSION, WHICH ADJOURNED JULY 2, 1897 1955 (1897). Both states have current statues regulating this behavior. *See* N.Y. PENAL § 400.00(1)(a) (McKinney 2021); IOWA CODE § 724.22(2) (2017).

[94] CHICAGO CODE OF 1911 900 (Edward J. Brundage rev., 1911) (ch. 83, art. 2 § 2814 (prohibiting the sale of guns and toy guns to minors).

[95] An Act to Prevent Selling, Trading or Giving Deadly Weapons or Toy Pistols to Minors, and to Provide Punishment Therefor, ch. 106, §§ 1-2, 1883 Kan. Sess. Laws 159; Elliot's Supplement to the Indiana Revised Statutes of 1881 89 (William F. Elliott ed., 1889) (§ 1, Sale of Dangerous Toys Prohibited); An Act To Prevent The Sale And Use Of Toy Pistols, § 1, 1883 Mich. Pub. Acts 144.

[96] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55 (2017).

[97] *Id.*

[98] *Id.*

[99] *Id.*

[100] Statute of Gloucester, 1278, 6 Edw. c. 9 (Eng.). For a brief but illuminating discussion of this ancient English law and its relevance to the history of self-defense, *see* Guyora Binder & Robert Weisberg, *What is Criminal Law About*, 114 MICH. L. REV. 1173, 1183 (2016).

[101] Darrell A. H. Miller, *Self-Defense, Defense of Others, and the State*, 80 LAW & CONTEMP. PROBS. 85 (2017).

Constitution, the Federalist champions of the Constitution and their Anti-Federalist opponents disagreed about many issues, but one area in which they were not divided was the continuing importance of state police power. The Anti-Federalist author who took the pen name Brutus made this point expressly when he wrote, "[I]t ought to be left to the state governments to provide for the protection and defence of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other." [102] Federalist Tench Coxe expressed a similar view reminding Americans that "[t]he states will regulate and administer the criminal law, exclusively of Congress." The police power of the states, he confidently asserted, would not be diminished under the new Constitution: individual states would continue to legislate on all matters "such as unlicensed public houses, nuisances, and many other things of the like nature."[103] Reconstruction did not change this fact. John Bingham, the primary architect of the Fourteenth Amendment also believed that states would continue to legislate in matters related to the health and safety of their citizens.

Given this history, the language of the Illinois Constitution of 1970 linking the right to keep and bear arms and the police power is apposite: "Subject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed."[104] States and localities, including Illinois and its towns and cities, have regulated gunpowder and arms since the earliest days of the American Republic. Concern over the impact of firearms and minors also dates to the early days of the nation's history. The state has always exercised a more robust police power authority when the health and safety of minors were involved. The statutes and regulations at issue in this case are consistent with this historical tradition.

Dated: March 8, 2021

s/ Saul Cornell redacted pursuant to Local Rule 5.11

Saul Cornell

---

[102] BRUTUS, ESSAYS OF BRUTUS VII, *reprinted in* 2 THE COMPLETE ANTI-FEDERALIST 358, 400-05 (Herbert J. Storing ed., 1981).
[103] Tench Coxe, A Freeman, PA. GAZETTE, Jan. 23, 1788, *reprinted in* FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).
[104] ILL. CONST. OF 1970, art. I, § 22.

Invited Lectures:

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

Conference Papers
And Scholarly Presentations:

Historians' Roundtable on History and Second Amendment Jurisprudence in America July 9, 2019 Pembroke College, Oxford University

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

 "Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

1

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:   The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR ,  Philadelphia, Pennsylvania 2011)

Exhibit 2 - Court Citations to Saul Cornell

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom. United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom. United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

2

Book Publications:

 The Partisan Republic:  Democracy, Exclusion, and the Demise of the Founders Constitution:  *New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerry Leonard]

 The Second Amendment On Trial: Critical Essays on District of Columbia v. Heller  (University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

 Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell] (First edition, 2009),( second edition 2013) (third edition, 2016)


Scholarly Articles, Essays, and Book Chapters

 "History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel under Anglo-American Law, 1688–1868," 83 *Law and Contemporary Problems* (2020):  73-95

 "Limits on Armed Travel under Anglo-Amric an Law: Change and Continuity over the Constitutional Longue Durée, 1688-1868," In  Jennifer Tucker et. al. eds., *A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment* (Smithsonian Press, 2019):72-95

 "The Changing Meaning of the Right to Bear Arms, 1688-1788: Neglected Common Law Contexts of the Second Amendment Debate" in Austin Austin Sarat et. al. eds. *Guns in Law* (University of Massachusetts  Press, 2019) :20-47

 "Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

 "Constitutional Mythology and the  Future of Second Amendment Jurisprudence after *Heller*," in Firearms and Freedom: The Second Amendment in the Twenty-First Century Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

 "The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and Keeping the Peace,"  80 Law and Contemporary Problems (2017): 11-54

 "Half Cocked':  The Persistence of Anachronism and Presentism
in the Academic Debate over the Second Amendment,"  107 Northwestern Journal of Criminal Law  107 (2017): 203-218

 "The 1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism,"
Wisconsin Law Review Forward  92  (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional  Language," in special issue on "The Future of Legal History," <u>American</u> <u>Journal of Legal History</u> 56 (2016): 21-29

 "Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," <u>Yale Law Journal  Forum</u> 125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" <u>Fordham Law Review</u> <u>*Res Gestae*</u>  84 (2015):  1-10

"The Right to Bear Arms," <u>The Oxford Handbook of the US Constitution</u>,  eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

 "Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" <u>Constitutional Commentary</u> 29 (2014): 383-409

"Meaning and Understanding in  the History of Constitutional  Ideas: the Intellectual History Alternative to Originalism"  <u>Fordham Law Review</u> 82  (2013):721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities"  <u>Fordham Urban Law Journal</u> 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" <u>William & Mary  Quarterly</u> 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" <u>William & Mary Quarterly</u> 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," <u>Yale Journal of Law and the Humanities</u> 23 (2011): 295-337


Newspapers, Magazines, Webzines, and Podcasts

"Could America's Founders Have Imagined This?"
*The New Republic*, December 20, 2019

"Don't Embrace Originalism to Defend Trump's Impeachment"
*The New Republic*, December 5, 2019

"The Second-Amendment Case for Gun Control"
*The New Republic*, August 4, 2019

"The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.

2

"Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018

"Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017

"The State of the Second Amendment," National Constitution Center, Podcast October, 2017

"Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffaler On-line* October 2017

"Five Types of Gun Laws the Founding Fathers Loved*" Salon* October 22, 2017

"Half Cocked," *Book Forum* April 2016

"Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016

"Guns Have Always Been Regulated," *The Atlantic Online* December 17, 2015

"The Slave-State Origins of Modern Gun Rights" *The Atlantic Online*  30, 2015 [with Eric Ruben]

PBS, "Need to  Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013

"All Guns are not Created Equal"  Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]