# OFFICE OF THE INSPECTOR GENERAL
## ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES

# REPORT TO THE GOVERNOR AND THE GENERAL ASSEMBLY

## JANUARY 2020

**MERYL PANIAK, MSW, J.D.**
**ACTING INSPECTOR GENERAL**

# OFFICE OF THE INSPECTOR GENERAL
## ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES

January 1, 2020

To the Governor and Members of the General Assembly:

Enclosed please find a copy of the Office of the Inspector General's January 2020 Annual Report to the Governor and General Assembly.

As I submit this report, I am disheartened that many of the problems I identify here have been identified before, both by me and my predecessor. I recently reviewed a 2004 article[1] which addressed the same child welfare issues I highlight in this report –

- Children killed after DCFS left them with abusive parents or their partners
- Children taken from their parents to sleep on the floors in DCFS offices[2]
- Children kept beyond medical necessity in psychiatric hospitals. (Even earlier, in 1996, a neglect petition was filed against DCFS for leaving children in psych hospitals when they were ready for discharge.)[3]
- Lack of foster homes and services for children and families whose first language is not English[4]
- Investigators who take shortcuts that lead to tragedy.

*We, Illinois, must do better.* We need to do more to support families early on, before they get into deep trouble. But when families are broken, we need to act decisively to protect children. In FY 2019, the DCFS OIG investigated 123 cases where a child died, although DCFS had contact with the family in the preceding year. This number should be unacceptable to every citizen. Even one child who dies unnecessarily is one too many.

Our child welfare system must begin to analyze families in *totality* and in context, not focusing narrowly on the facts in the most recent hotline report. The death of AJ Freund, like the death of Joseph Wallace which led to the creation of the OIG, is emblematic of DCFS's failure to look beyond the current crisis to consider the entire history of the family. In Wallace, investigators ignored the mother's long history of physical abuse and profound mental illness. In Freund, investigators ignored the parents' long history of addiction, the mother's recent relapse, and the parents' isolation of the children from caring relatives and day care providers. Like Freund and many other cases, the cases in the appendix highlight opportunities DCFS missed to strengthen viable families. The 123 death cases also demonstrate that when families are too broken to quickly repair, ***protecting children must be DCFS's first priority.***

State of the art safety assessments, training focused on lapses identified in this report, strong support and supervision of frontline workers, and manageable caseloads are key. Ongoing, *experiential* training will ensure DCFS correctly makes the two, most critical decisions in the life of a case: (1) Is the home safe? (2) Is it safe to return the children to their parents? As Governor Pritzker has recognized, DCFS must maintain frontline staffing levels which permit sound training of new and existing caseworkers and investigators, and caseloads which allow supervisors to ensure workers make critical decisions to keep children safe.

That said, no single policy change will hit every target needed to reduce the number of children suffering abuse and neglect, or improve the lives and well-being of those who caused the abuse/neglect, but …… a package of the right policies might.

---

[1] *Cut Short,* The Chicago Reporter, by Sarah Karp, June 2004.
[2] *DCFS Vows to End Office Sleepovers*, Chicago Tribune, by Rob Karwath, June 1993
[3] *In re M.K.*, 384 Ill. App. 3d 449 (1st Dist. 1996).
[4] *See* 1977 Burgos Consent Decree and *DCFS May Be Back in Court Over Spanish Services*, Chicago Tribune, by Rob Karwath, September 1992.

This office reviewed over 375 complaints this year, the OIG found that many families in crisis do not have only one concerning issue.  This one issue may have brought them to the attention of DCFS, however, with intense assessments it is clear other issues are contributing factors in the family crisis.  The primary factors we have observed this year, not surprisingly, are substance abuse, domestic violence, behavioral health, paramour involvement, inadequate housing, poverty, chronic neglect, excessive physical discipline and prior involvement with DCFS.

Although this office was created to examine our failings, and this office was born out of tragedy, we are the response to a cry for oversight and improvement of the child welfare system, and it is with the hope of a better future that it endures.  By reviewing hundreds of confidential records from cases all over the State, we have a unique vantage point to act as the 'eyes and ears' of the Governor and members of the General Assembly, who are charged with providing oversight and funding to DCFS.  Let's not continue making the same mistakes which led to the deaths of Joseph Wallace, AJ Freund and so many other children in Illinois.  Let's use what we know to decrease the number of unnecessary deaths of Illinois children in the coming year.

It remains an honor to serve as your Inspector General, and I am grateful for the leadership and dedication of those working to improve the welfare of children and families

Meryl Paniak
Acting, Inspector General






# OFFICE OF THE INSPECTOR GENERAL
# REPORT TO THE GOVERNOR AND THE GENERAL ASSEMBLY

## TABLE OF CONTENTS

**INTRODUCTION** ........................................................................................................ 1

**INVESTIGATIONS** ..................................................................................................... 7

    PART I: DEATH AND SERIOUS INJURY INVESTIGATIONS ................................ 7

    PART II: CHILD DEATH REPORT ............................................................................ 61

        SUMMARY ........................................................................................... 62

        ACCIDENT ........................................................................................... 72

        HOMICIDE .......................................................................................... 103

        NATURAL ........................................................................................... 125

        UNDETERMINED ............................................................................... 156

        SUICIDE ............................................................................................... 177

        TWENTY-YEAR DEATH RETROSPECTIVE ................................... 178

    PART III: GENERAL INVESTIGATIONS ................................................................ 181

**YOUTH IN CARE HOSPITALIZED BEYOND MEDICAL NECESSITY** ............................................. 213

**CHILD WELFARE PRACTICE IMPROVEMENT FOR FY20** ...................................................... 237

**ERROR REDUCTION** ................................................................................................ 239

**LAW ENFORCEMENT AGENCIES DATA SYSTEM (LEADS)** .................................................. 245

**SYSTEMIC RECOMMENDATIONS** ........................................................................ 247

**RECOMMENDATIONS FOR DISCIPLINE** .............................................................. 255

**CHILD WELFARE EMPLOYEE LICENSES** ............................................................ 257

**DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS** .................................. 259

**REJECTED OR UNRESOLVED RECOMMENDATIONS IMPACTING CHILD HEALTH AND SAFETY** ................ 283

**APPENDIX** ................................................................................................................. 287

        PENNY WATSON ............................................................................... A-1

        JAYLYN DASH .................................................................................... B-1

        SPENCE/ROBBINS-INTERIM REPORT ......................................... C-1

        SPENCE/ROBBINS – FINAL REPORT ............................................. D-1

# INTRODUCTION

The Office of the Inspector General of the Department of Children and Family Services was created by unanimous vote of the Illinois General Assembly in June 1993 to reform and strengthen the child welfare system. The mandate of the Office of the Inspector General is to investigate misconduct, misfeasance, malfeasance, and violations of rules, procedures, or laws by Department of Children and Family Services (DCFS) employees, foster parents, service providers and contractors with the Department. *See* 20 ILCS 505/35.5 – 35.7. To that end, this Office conducts investigations and makes recommendations to protect children, uncover wrongdoing, improve practice, and increase professionalism within the Department.

## INVESTIGATION CATEGORIES

*Death and Serious Injury Investigations*

The Office of the Inspector General investigates deaths and serious injuries of Illinois children whose families were involved in the child welfare system within the preceding 12 months. The Inspector General is an *ex officio* member of the Child Death Review Team Executive Council. The Inspector General receives notification from the Illinois State Central Register (SCR) of all child deaths and serious physical injuries where the child was a youth in care, the family is the subject of an open investigation or service case, or the family was the subject of a previous investigation or closed case within the preceding 12 months. The notification of a child death or serious injury generates a review in which the Critical Event Report and other reports are reviewed, and computer databases are searched. When further investigation is warranted, records are impounded, subpoenaed or requested and a review is completed. When necessary, a full investigation, including interviews, is conducted. The Inspector General's Office created and maintains a database of child death statistics and

critical information related to child deaths in Illinois. The following chart summarizes the death cases reviewed in FY 2019:

### FY 19 CHILD DEATH CASES REVIEWED

| | |
|---|---|
| CHILD DEATHS IN FY 19 MEETING THE CRITERIA FOR REVIEW | 123 |
| INVESTIGATORY REVIEWS OF RECORDS | 110 |
| FULL INVESTIGATIONS | 13 |

Summaries of death investigations, with a full investigative report submitted to the Director, are included in the Investigations Section of this Report on page 7. A summary of all child deaths reviewed by the Office of the Inspector General in FY 19 begins on page 62 of this Report.

*General Investigations*

The Office of the Inspector General responds to and investigates complaints filed by the state and local judiciary, Department and Private Agency employees, foster parents, biological parents and the general public. Investigations yield both case-specific recommendations, including disciplinary recommendations, and recommendations for systemic changes within the child welfare system. The Inspector General's Office monitors compliance with all recommendations.

*Child Welfare Employee Licensure Investigations*

In 2000, the General Assembly mandated that the Department of Children and Family Services institute a system for licensing direct service child welfare employees. The Child Welfare Employee License (CWEL) permits centralized monitoring of all persons providing direct child welfare services, whether they are employed with the Department or a private agency. The

employee licensing system seeks to maintain accountability, integrity and honesty of those entrusted with the care of vulnerable children and families.

A child welfare employee license is required for both Department and private agency investigative, child welfare and licensing workers and supervisors. The Department, through the Office of Employee Licensure, administers and issues Child Welfare Employee Licenses.

A committee composed of representatives of the Office of the Inspector General, the Child Welfare Employee Licensure Board and the Department's Office of Employee Licensure screens referrals for CWEL Investigations. The committee reviews complaints to determine whether the allegations meet one or more grounds for licensure action as defined in Department Rule 412.50 (89 Ill. Adm. Code 412.50). The Inspector General investigates and prosecutes CWEL complaints and hearings.

When a CWEL Investigation is completed, the Office of the Inspector General, as the Department's representative, determines whether the findings of the investigation support possible licensure action. Such allegations that could support licensure action include conviction for specified criminal acts, indicated findings of child abuse or neglect, or egregious acts that demonstrate incompetence or a pattern of deviation from a minimum standard of child welfare practice. Department Rule 412.50 (89 Ill. Adm. Code 412.50) specifies the grounds for licensure action. When licensure action is appropriate, the licensee is provided an opportunity for a hearing. An Administrative Law Judge presides over the hearing and reports findings and recommendations to the Child Welfare Employee Licensure Board. The CWEL Board makes the final decision regarding licensure action.

In FY 2019, 24 cases were referred to the Inspector General for Child Welfare Employee License investigations. Detailed information regarding the CWEL licensure actions can be found on page 257 of this Report.

## FY 19 CWEL INVESTIGATION DISPOSITIONS

| NEW CWEL INVESTIGATIONS | 24 |
|---|---|
| CLOSED/NO CHARGES | 3 |
| MONITORING | 12 |
| PENDING INVESTIGATIONS | 4 |
| CHARGES ISSUED | 5 |
| LICENSE REVOCATION | 2 |
| LICENSE RELINQUISHED | 2 |
| PENDING ADMINISTRATIVE HEARING | 1 |

*Criminal Background Investigations and Law Enforcement Liaison*

The Inspector General's Office provides technical assistance to the Department and private agencies in performing and assessing criminal history checks. In FY 19, the Inspector General's Office answered 3,427 case requests for criminal background information from the Law Enforcement Agencies Data System (LEADS). Each case may involve multiple law enforcement database searches and may involve requests on multiple persons. For the 3,427 cases opened in FY 19, the Inspector General's Office conducted 8,452 searches for criminal background information.

In addition, in the course of an investigation, if evidence indicates that a criminal act may have been committed, the Inspector General may notify the Illinois State Police. The Office may also investigate the alleged act for administrative action only.

The Office of the Inspector General assists law enforcement agencies with gathering necessary documents. If law enforcement elects to pursue a criminal investigation and requests that the administrative investigation be put on hold, the Office of the Inspector General will retain the case on monitor status. If law enforcement declines to prosecute, the Inspector General will determine whether further investigation or administrative action is appropriate.

*Referrals from the Office of the Executive Inspector General for the Agencies of the Illinois Governor*

In FY 19, the Office of the Inspector General received 76 referrals for investigation from the Office of the Executive Inspector General for the Agencies of the Illinois Governor. After initial review, a referral may be closed, opened for further investigation, or transferred for further review by Department management, Office of Affirmative Action, Labor Relations, or the Advocacy Office.

### INVESTIGATIVE PROCESS

The Office of the Inspector General's investigative process begins with a Request for Investigation, notification by the State Central Register of a child's death or serious injury, or a referral for a Child Welfare Employee License investigation.   Investigations may also be initiated when the Inspector General learns of a pending criminal or child abuse investigation against a child welfare employee.

In FY 2019, the Office of the Inspector General received 3,758 Requests for Investigation or technical assistance.[5]  Requests for Investigation and notices of deaths or serious injuries are screened to determine whether the facts suggest possible misconduct by a foster parent, Department employee, or private agency employee, or a need for systemic change.  If an allegation is accepted for investigation, the Inspector General's Office will review records and interview relevant witnesses.  The Inspector General reports to the Director of the Department and to the Governor with recommendations for discipline, systemic change, or sanctions against private agencies.  The Office of the Inspector General monitors the implementation of accepted recommendations.

The Office of the Inspector General may also work directly with a private agency and its board of directors to ensure implementation when recommendations pertain to a private agency.  In rare circumstances, when the allegations are serious enough to present a risk to children, the Inspector General may request that an agency's intake for new cases be put on temporary hold, or that an employee be placed on desk duty pending the outcome of the investigation.

The Office of the Inspector General is mandated by statute to be separate from the operations of the Department.  Inspector General files are not accessible to the Department.  The investigations, investigative reports and recommendations are prepared without editorial input from either the Department or any private agency.  Once a Report is completed, the Inspector General will consider comments received and the Report may be revised accordingly.

If a complaint is not appropriate for full investigation by the Office of the Inspector General, the Inspector General may refer the complaint to law enforcement (if criminal acts appear to have been committed), to the Department's Advocacy Office for Children and Families, or to other state regulatory agencies, such as the Department of Financial and Professional Regulation.

*Administrative Rules*

Rules of the Office of the Inspector General are published in the Illinois Register at 89 Ill. Admin. Code 430. The Rules govern intake and investigations of complaints from the general public, child deaths or serious injuries and allegations of misconduct. Rules pertaining to employee licensure action are found at 89 Ill. Admin. Code 412.

*Confidentiality*

A complainant to the Office of the Inspector General, or anyone providing information, may request that their identity be kept confidential. To

---

[5]This includes requests for investigation, notice of child deaths and serious injuries, notification of arrests or pending abuse investigations, and requests for technical assistance and information.

protect the confidentiality of the complainant, the Inspector General will attempt to procure evidence through other means, whenever possible. At the same time, an accused employee needs to have sufficient information to enable that employee to present a defense. The Inspector General and the Department are mandated to ensure that no one will be retaliated against for making a good faith complaint or providing information in good faith to the Inspector General.

Reports issued by the Office of the Inspector General contain information that is confidential pursuant to both state and federal laws. As such, Inspector General Reports are not subject to the Freedom of Information Act. Annually, the Office of the Inspector General prepares several reports deleting confidential information for use as teaching tools for private agency and Department employees.

*Impounding*

The Office of the Inspector General is charged with investigating misconduct "in a manner designed to ensure the preservation of evidence for possible use in a criminal prosecution." 20 ILCS 505/35.5(b). In order to conduct thorough investigations, while at the same time ensuring the integrity of records, investigators may impound files by immediately securing and retrieving original records. When files are impounded, a receipt for impounded files is left with the office or agency from which the files are retrieved. Critical information necessary for ongoing service provision may be copied during the impound in the presence of the Inspector General investigator. Impounded files are returned as soon as practicable. However, in death investigations, the Office of the Inspector General forwards original files to the Department's Office of Legal Services to ensure that the Department maintains a central file.

**REPORTS**

Inspector General Reports are submitted to the Director of DCFS. Specific reports are also shared with the Governor. An Inspector General Report contains a summary of the complaint, a historical perspective on the case, including a case history, and detailed information about prior DCFS or private agency contact(s) with the family. Reports also include an analysis of the findings, along with recommendations.

The Office of the Inspector General uses some reports as training tools to provide a venue for ethical discussion on individual and systemic problems in child welfare practice. The reports are redacted to ensure confidentiality and then distributed to the Department or private agencies as a resource for child welfare professionals. Redacted reports are available on the Office of the Inspector General website or by calling the Office of the Inspector General at (312) 433-3000.

*Recommendations*

The Inspector General may recommend systemic reform or case specific interventions in the investigative reports. Systemic recommendations are designed to strengthen the child welfare system to better serve children and families.

Ideally, discipline should have an accountability component as well as a constructive or didactic one. It should educate an employee on matters related to his/her misconduct while also functioning to hold employees responsible for their conduct. Without the accountability component, there is little to deter misconduct. Without the didactic component, an employee may conclude that s/he has simply violated an arbitrary rule with no rationale behind it.

The Inspector General presents recommendations for discipline to the Director of the Department and, if applicable, to the director and board of the involved private agency. Recommendations for discipline are subject to due process requirements. In addition, the Inspector General will determine whether the facts suggest a systemic problem or an isolated instance of misconduct or bad practice. If the facts suggest a systemic problem, the Inspector General's Office may investigate further to determine appropriate recommendations for systemic reform.

4

INTRODUCTION

When recommendations concern a private agency, appropriate sections of the report are submitted to the agency director and the board of directors of that agency. The agency may submit a response. In addition, the board and agency director are given an opportunity to meet with the Inspector General to discuss the report and recommendations.

In this Annual Report, systemic reform recommendations are organized into a format that allows analysis of recommendations according to the function within the child welfare system that the recommendation is designed to strengthen. The Inspector General's Office is a small office in relation to the child welfare system. Rather than address problems in isolation, the Inspector General's Office views its mandate as strengthening the ability of the Department and private agencies to perform their duties.

The Office of the Inspector General monitors implementation of recommendations made to the Director of DCFS and private agencies. Monitoring may take several forms. The Office of the Inspector General will monitor to ensure that Department or private agency staff implement the recommendations made. The Inspector General may consult with the Department or private agency to assist in the implementation process. The Inspector General may also develop accepted reform initiatives for future integration into the Department.

### ADDITIONAL RESPONSIBILITIES

*Office of the Inspector General Hotline*

Pursuant to statute, the Office of the Inspector General operates a statewide, toll-free telephone number for public access. Foster parents, guardian *ad litem*, judges and others involved in the child welfare system have called the hotline to request assistance in addressing the following concerns:

- Complaints regarding DCFS caseworkers and/or supervisors ranging from breaches of confidentiality to failure of duty;

- Complaints about private agencies or contractors;
- Child Abuse Hotline information;
- Child support information;
- Foster parent board payments;
- Youth in College Fund payments;
- Problems accessing medical cards;
- Licensing questions;
- Ethics questions; and
- General questions about DCFS and the Office of the Inspector General.

The Office of the Inspector General's Hotline is an effective tool that enables the Inspector General to communicate with concerned persons, respond to the needs of Illinois children, and address day-to-day problems related to the delivery of child welfare services. The phone number for the Office of the Inspector General Hotline is (800) 722-9124.

The following chart summarizes the Office of the Inspector General's response to calls received in FY 19:

### CALLS TO THE INSPECTOR GENERAL HOTLINE IN FY 19

| | |
|---|---|
| INFORMATION AND REFERRAL | 721 |
| REFERRED TO SCR HOTLINE | 82 |
| REQUEST FOR OIG INVESTIGATION | 127 |
| TOTAL CALLS | 930 |

6

# INVESTIGATIONS

This annual report covers the time period from July 1, 2018 to June 30, 2019. The Investigations section has three parts. Part I includes summaries of child death and serious injury investigations reported to the Department Director. Part II contains aggregate data and case summaries of child deaths in families who were involved with the Department in the preceding 12 months. Part III contains general investigation summaries conducted in response to complaints filed by the state and local judiciary, foster parents, biological parents and the general public.

Investigation summaries contain sections detailing the allegation, investigation, Inspector General recommendations and the Department response. In the "OIG Recommendation/Department Response" section of each case, Inspector General recommendations are in bold and the Department's responses to the recommendations follow.

## PART I: DEATH AND SERIOUS INJURY INVESTIGATIONS

### DEATH AND SERIOUS INJURY INVESTIGATION 1

**ALLEGATION** A three-year-old child died from cold exposure due to environmental neglect in her mother's home. The child had been returned to her mother's care five months before her death and the placement case was closed two months after she was returned home.

**INVESTIGATION** The child's mother and her boyfriend were investigated and unfounded twice for substantial risk of physical injury/environment injurious when the child was one-year-old. In both investigations, investigators instructed the mother and boyfriend to clean the home and they complied. The reports were unfounded. Intact family services were offered but the mother refused.

A year later, the mother and her paramour were indicated for cuts, welts and bruises and environmental neglect to the then two-year-old child and her one-year-old sibling. The child was placed in her father's care and the sibling was placed with a maternal relative under a safety plan. After an altercation near the father's home, the child and sibling were taken into custody and placed together with a relative. A private agency was assigned the placement case. At the case handoff meeting it was noted that it was not known who had inflicted the physical abuse and there were concerns about the father and his girlfriend as the girlfriend had her own involvement with DCFS. The mother and her boyfriend were not interviewed as part of the integrated assessment (IA) process because of a pending criminal investigation. The service recommendations focused on the environmental neglect. The mother and paramour participated in services.

The mother and her boyfriend were cooperative with parenting classes, substance abuse and mental health assessments, and supervised visits. The father was not assessed for services but did attend weekly supervised visits with the child. While the child protection investigator identified the injuries to the child as abusive, the recommended services did not address abuse. The services offered were minimal and generic. Within three months of case opening, the worker recommended return home because the mother and her boyfriend completed parenting classes and assessments based mainly on self-reported information. The father was not offered services for several months and his live-in girlfriend was not included at all.

Three months later, at the dispositional hearing the caseworker testified that the parents were cooperative with services and the children could return home. The judge ordered the children be made wards of the state but that the children should be returned home. The one-year-old was returned home to his mother and her boyfriend (the one-year-old's father) and the two-year-old was placed with her father and his girlfriend. Following the children being returned to their parents, the agency remained involved with the family for a six month after care period. Shortly after the return to parents a new caseworker was assigned to the case.

The father and his girlfriend, to whom the deceased child had been returned, had three unfounded investigations after reports of domestic violence in the year prior. When the child was placed with her father, the couple had a pending investigation for inadequate supervision after reports of leaving the children alone in the home. The report was unfounded shortly after the placement as the investigator determined the couple was just outside the home, fixing the family car, while an adult cousin was inside the home with the children. When another report was called into the hotline two months later, alleging bruises to the child, the private agency moved the child from the home of her father to a traditional foster home. The investigation was later unfounded as no injuries were found. Another report was called into the hotline the following month alleging domestic violence between the father and his girlfriend. It was later unfounded. A child protection investigator told Inspector General investigators that she advocated for the father to receive anger management and domestic violence services for the couple but was told that those services were not identified in the initial service plan and the father's girlfriend was not part of the placement case. The father was allowed supervised visits with the child, but according to the private agency, the father cancelled many of the visits after the child was returned to the mother.

About a month after the child was moved to a traditional foster home from the father's home, a permanency hearing was held. The worker submitted a report to the court noting that the mother and paramour had completed services and were doing well. The report recommended that because of the investigations pending on the father and his girlfriend the child be returned home to the mother citing no concerns of safety in her home. The agency also requested a hearing to be set for case closure two months later. The court made a finding that it was in the best interest of the child to be returned to the mother's care, joining her younger sibling (child of the mother and the mother's boyfriend). Two days before court, a child protection investigation for substantial risk and inadequate supervision to the younger sibling by the mother and her boyfriend had been initiated after a non-mandated reporter stated that the mother's boyfriend had been arrested for battering a neighbor; the parents were not caring for the baby for almost an hour while the altercation took place; and the baby was in a stroller near the fight. The parents denied problems, the baby was observed to be doing well and responding to the parents. The investigator spoke with the caseworker who reported no concerns and stated that another child was likely returning home soon. The investigation was not mentioned in court.

While that investigation was pending, another child protection investigation for environmental neglect on the mother was initiated after reports of a bad diaper rash on the two-year-old child who had recently been returned home to the mother. The investigation was unfounded after it was determined that the rash was healing and had started before the child was returned to the mother's care.

Within two months of being returned home to the mother, the private agency case was closed. The six-month after care period applied from the time the child was returned to the father. One month after case closure, an early intervention services provider called the hotline to report that the family had withdrawn from services. The hotline classified the call as "mandated caller, no report taken," because there was not enough information for an investigation of child abuse or neglect. No further action was taken.

Inspector General investigators found that the assessment of the parent interaction was mainly based on visits supervised by case aides who had consistent contact with the parents and children and observed the home environments on a regular basis. The four assigned case aides told Inspector General investigators that when assigned to cases they do not always know the reason for case opening or the circumstances of the family. The

case aide supervisor reported that she encouraged caseworkers to share information with case aides, but not all of them do so. Case aides are not included in any critical decisions or any Child and Family Team Meetings. They are only required to document the visits that they supervise.

Five months after being returned home, the almost three-year-old child was found cold and unresponsive in the mother's home. The mother reported she had turned off the home's heat and relied upon space heaters. She reported using two space heaters, one in her bedroom where she slept with her paramour and their two-year-old son and another in the deceased child's room. When the mother's space heater broke, she took the heater from her daughter's room to use in her room. At the time of her death, the three-year-old child weighed only 21 pounds and had a core body temperature that was too low to register. A scene investigation revealed that the home was dirty and littered with garbage. The autopsy determined the cause of death to be "cold exposure due to environmental neglect" and the manner of death was homicide.

The mother pleaded guilty to murder and was sentenced to 20 years. The boyfriend has been charged with murder, felony endangering the life and health of a child, and misdemeanor endangering the life and health of a child.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. For Integrated Assessments in cases with pending criminal investigations, Integrated Assessment interviews with parents should still be conducted to gather basic family information without compromising the criminal investigation.**

The Department agrees. The only exception will be when parents refuse to cooperate, or an attorney informs the caseworker or the Integrated Assessment program that an interview should not take place. When an interview does not occur with a parent then Integrated Assessment will review current records and include the information as to why no interview took place and the information that was available.

**2. This report should be shared with the involved private agency to address the following:**

**a) Supervisors and caseworkers should be re-trained to use evidence-based interventions to target service needs in abuse cases;**

**b) Case aides should have full information as to the reason a placement case was opened to enable them to identify issues that may arise during visits;**

**c) Casework staff should be re-trained on the requirements and importance of conducting Child and Family Team Meetings;**

**d) Observations of the family by case aides should be incorporated into the Child and Family Team Meetings and other critical case decisions.**

The Inspector General shared the report with the private agency. The Inspector General will meet with the agency's administrators and a member of the Board of Directors to discuss the findings and recommendations made in the report.

A Department consulting psychologist will provide training to the private agency. The Department will instruct the private agency that all referrals for case aide assistance must include the reason for involvement and role of the case aide in visits. The casework staff will be trained and reminded of the importance of Child and Family Team Meetings and that the meeting discussions should incorporate the observations of the case aide and recorded information regarding visits.

**3. The State Central Register (SCR) call operators should be further trained on other options and resources available when a hotline call does not rise to the level of initiating a child protection investigation, such as Child Welfare Services referrals and police well-being checks.**

There will be revisions to handling of hotline calls and other options available, based on implementation of HB1551, effective January 1, 2020.  Call floor workers will be further trained as changes are implemented.

**4. Consistent with Public Act 101-0237 that amends the Abused and Neglected Reporting Act, and is effective January 1, 2020, when a report is made by a mandated reporter and there is a prior indicated report or a prior open service case involving any member of the household, the Department must, at a minimum, accept the report as a child welfare services referral.**

The Department agrees to incorporate Public Act requirements.

**5. All placement supervisors and caseworkers must be trained on Policy Guide 2019.04, Requirements for Reunification and After Care Services.**

The Department agrees.   Amended Policy Guide 2019.04 is will be obsolete in the near future.  A new policy guide is being issued to include language contained in HB1551. Caseworkers will be retrained locally on the language in the new policy guide being released.

**6. Policy Guide 2019.04, Requirements for Reunification and After Care Services, should be shared with juvenile court personnel.**

The Department agrees.  The Policy Guide was shared and discussed with juvenile court personnel.   The new Policy Guide will be shared as well.

DEATH AND SERIOUS INJURY INVESTIGATIONS

**DEATH AND SERIOUS INJURY INVESTIGATION 2**

**ALLEGATION**  A four-year-old girl was suffocated by her mentally ill mother. Prior to the death, the mother had been investigated fifteen times in the course of three years. Ten-months prior to the child's death an intact family services case was open and remained open at the time of the death. There were six child protection investigations during the intact family services case.

**INVESTIGATION**  Three years prior to the child's death, the mother moved to Illinois with her then two-year-old daughter and five-year old son to be closer to her older children (ages twelve, fourteen, and seventeen) who lived with their father. Following her move to Illinois, the older children began frequenting the mother's home. There were six unfounded child protection investigations against the mother in the first sixteen months following her return to Illinois. The investigations involved allegations of abuse, neglect, medical neglect, environmental neglect, substance misuse, and reckless driving with children in the car.

Fifteen-months prior to the child's death, a seventh investigation was initiated after the mother was arrested for battering her eighteen-year-old daughter in the presence of her then three-year-old and thirteen-year-old children. A police officer told the investigator that police officers had been to the home every other day for the past two months concerning domestic situations between the mother and her older children. According to medical records, the investigator instructed the mother to get an evaluation to make sure the mother was okay. The mother agreed and went to the local emergency room.  During the evaluation, the mother gave false information about what led to her arrest as well as her mental health treatment. Although the assessment was based solely on self-report and not intended to determine parenting capacity the investigator did not obtain mental health records or talk to the mother's treatment provider. The investigator remained unaware that the mother had been previously diagnosed with bi-polar disorder and depression and was frequently non-compliant with psychotropic medications. The mother was indicated for substantial risk of physical injury by neglect and the investigation was closed.

Less than two months after the seventh investigation closed, an eighth investigation was initiated after an anonymous report was made to the hotline alleging that a child was sitting in a window screaming for help. The reporter stated that the youngest children (then ages four and seven-years-old) in the home are often seen outside wandering around unsupervised late at night. Less than two weeks later a ninth investigation was initiated after police were dispatched to the home. Police officers reported that they could hear the mother screaming and heard glass breaking from things being thrown. The mother told police that she was tired and could not care for the children anymore. Police reported that the mother broke glass and told the children she hoped they would step on the glass and hurt themselves. The mother began making suicidal comments and was taken to the hospital. The following day, a hospital social worker contacted the hotline to report that the mother told her that she was overwhelmed and had not been giving her four-year-old daughter her medication for cystic fibrosis and that the mother admitted to using her money to buy marijuana and had not been buying groceries. The social worker's report was added to the ninth investigation as related information.

The mother's older children told the child protection investigator their mother had pulled pictures off the wall causing them to break and made comments about leaving the home and driving off a cliff.  A safety plan was developed for the four and seven-year-old children to stay with their maternal grandparents, but the safety plan lapsed and the four and seven-year old children returned to their mother's care following the mother's discharge from the hospital.

The child protection investigator obtained partial mental health records from the clinic where the mother had been receiving medication monitoring for her mental health issues. The Integrated Mental Health and Substance

Abuse Assessment received by the investigator was completed two months earlier and stated that the mother had been diagnosed with bi-polar disorder since she was a teenager. The mother reported that she could go two or three days without sleeping and reported racing thoughts, paranoia, loss of appetite, inability to concentrate and focus and low motivation. Had full records been obtained from the clinic the investigator also would have been aware that the mother reported non-compliance with her medication.

The investigator also obtained records from the hospital for the day that the mother was taken by police after making suicidal comments. The record stated that the mother was admitted for suicidal ideation with a plan to overdose on medication or intentionally wreck her car by not wearing a seat belt and running her car into a pillar or off a bridge. The hospital records also detailed prior hospitalizations for suicidal ideation.

During the investigation, the investigator contacted the father of the older three children. The father reported he obtained full custody years ago because their mother "went nuts" and when the children were younger there was an order for only supervised contact with their mother. The father reported that during the summer his children go back and forth between his house and their mother's house, but the children primarily reside with him.

The mother was referred to intact family services and the two pending investigations were closed.  The intact family services case remained open for nine-and-a-half months until the death of the four-year-old. During the nine-and-a-half months of the intact family services case, there were nine additional calls to the hotline, which resulted in six child protection investigations, four of which were indicated. Eight of the calls to the hotline were from mandated reporters.  During the entire intact family services case, the mother exhibited a failure to follow through with service recommendations and failed to maintain consistent medication compliance.

The first investigation during the intact family services case involved the mother reporting to school personnel that she had kicked her sixteen-year-old child out of the home the previous night and an anonymous caller reporting that there was no food in the home. The investigation was unfounded.

A second investigation was initiated during the intact family services case while the first was still pending. The second investigation involved a report that the mother dropped her four and six-year-old off at their maternal grandparent's home for days on end and they are too elderly to care for the children. The mother was later indicated for inadequate supervision. While the first and second investigations were pending, a third investigation was initiated after a school counselor reported that the mother poured water on her 16-year-old son, swung a belt at his head, and punched him in the nose while high. During the investigation, the 16-year-old confirmed the allegation and reported that the altercation started because he refused to share his pizza. The investigation was unfounded.

While the three investigations were pending the investigator faxed the CFS 968-90 form, *Questions for Mental Health Professionals* to the mother's mental health treatment provider. According to the completed questionnaire, the mother was non-compliant with recommended follow-up appointments and her diagnosis was fair to poor regarding prognosis due to non-compliance. The treatment provider noted that the mother's symptoms may place her children at an increase of maltreatment.

While the second and third investigations were pending a fourth investigation was initiated after a teacher went to the mother's home to deliver Christmas gifts and found the seven-year-old outside with no shoes, socks or coat. The seven-year-old told the teacher that he was afraid to go inside because his mom would smack him again and said his mother hits him all the time with a belt and hanger on his butt. The teacher reported that when the seven-year-old took her inside, the home smelled like marijuana, was dirty and the mother was having major emotional swings and appeared intoxicated. The mother told the teacher that she was having a nervous breakdown.

12

DEATH AND SERIOUS INJURY INVESTIGATIONS

While the three investigations were pending, the intact family services worker contacted the mother's mental health treatment provider. The treatment provider reported that the mother had not been medication compliant and noted that the mother was inappropriate in their sessions as the mother is moody and compulsive and was trying to get controlled substances. The treatment provider reported that the mother was referred for individual counseling but never followed through.

At the following home visit, the intact worker asked the mother about her medication compliance and the mother reported that she was medication compliant and had left over medication from when she was previously hospitalized. The mother also reported that she had not signed up for family counseling, anger management or a substance abuse assessment as recommended in the intact service plan.

According to a supervisory contact note, following a phone call, the child protection supervisor and intact supervisor agreed that the latest incident did not rise to the level of imminent risk of harm and there was nothing to take before the court. The child protection supervisor reported that the investigator would look at the mother's most recent mental health issues before making a decision regarding the final finding. The fourth investigation was closed three months prior to the death and the mother was indicated for inadequate supervision and substantial risk of physical injury by neglect.

While the fourth investigation was pending, a fifth investigation was initiated after the mother's four-year-old disclosed to school personnel that her mother was hitting and smacking her. The six-year-old confirmed the account and disclosed that the abuse was ongoing, and he got hit with broken hangers and belts. The seven-year-old reported that he tried to hide in his closet when he knew he was going to get hurt and sat outside until things calmed down. The reporter also stated that there had been issues with the mother picking up her four-year-old from preschool late. Both children were interviewed by a mandated investigator at the school and confirmed the ongoing abuse reported to school personnel. When the assigned investigator went to the home and interviewed the children, both children denied abuse. The fifth investigation resulted in an indicated finding against the mother for inadequate supervision and the allegations of abuse were unfounded based on the children later denying abuse and no injuries observed.

Two months prior to the death, while the fourth and fifth investigations were pending a sixth investigation was initiated after the mother asked another parent of a child in her 4-year-old's classroom to care for her children after school. While her children were at school, the mother was arrested on an outstanding warrant and asked the parent to keep her children overnight. The parent was not comfortable with the arrangement and brought the children back to school. Police officers transported the children to their maternal grandparents' home and the mother picked up the children after being released from jail.

Two weeks prior to the death, the intact family services worker contacted the mother's mental health treatment provider. The treatment provider documented telling the intact worker that at the mother's recent appointment the mother's four-year-old appeared to be afraid of her mother in response to the mother grabbing her. The treatment provider also reported that the mother was noncompliant with taking medications and keeping appointments.

One day prior to the child's fifth birthday, the mother was found naked and sitting on top of her child holding her hand over her child's mouth and nose while saying that she was going to send her child to Jesus. The mother's eight-year-old child was in the same room when the mother was found. The four-year-old was taken to the hospital by ambulance where she was later pronounced deceased. The medical examiner ruled the cause of death asphyxiation by suffocation and neck compression. The mother was charged with first degree murder and indicated by DCFS for death and substantial risk of physical injury.

| **OIG RECOMMENDATIONS /** **DEPARTMENT RESPONSES** | **1.  Whenever serious mental illness raises questions about parenting capacity a parenting capacity assessment must be completed. This should be addressed through training and development of resources.** |

The Psychology and Psychiatry Program is available to assist with questions regarding appropriate referrals and to help facilitate these referrals.  If a caseworker has questions/concerns about parenting capacity, they should have an initial consultation with the Consulting Psychologist assigned to their POS Agency or Field Office to determine if a Parenting Capacity Assessment or referral to a Parenting Assessment Team is appropriate. There are providers throughout the state who can provide Parenting Capacity Assessments.  The Psychology & Psychiatry Program Assistant Program Administrator will also be working to increase the number of providers throughout the state.

Currently, the Parenting Assessment Team program is available within Cook County and the Northern Region. If the caseworker and Consulting Psychologist believe a parent meets criteria for a Parenting Assessment Team referral versus Parenting Capacity Assessment, but they reside outside of Cook County or the Northern Region, the program administrator will work to address these referrals on a case by case basis. The program administrator will work with the Consulting Psychologists of the Psychology & Psychiatry Program to ensure that they are aware of this process and are prepared to educate the caseworkers of their assigned POS Agencies and Field Offices as to the appropriate procedures to follow.   Additionally, the Office of Learning and Professional Development will incorporate and use this redacted case in the <u>Assessment</u> units of all Foundations curricula, where Protective Factors and Error Reduction: Parenting with Mental Illness is discussed.

At this time, the Psychology and Psychiatry program has not sent specific communication to the field regarding the availability of Parenting Assessment Team Evaluations outside of Cook/Northern regions.  This should not pose a barrier to the referral process as the team of Consulting Psychologists has been informed about the possibility of Parenting Assessment Team referrals outside of Cook/Northern regions.  The current protocol is such that the Consulting Psychologist has a consultation with the case worker, learns about the needs of the case and determines which evaluation/assessment type is most appropriate. They are ultimately who recommends the Parenting Assessment Team evaluation and would communicate this information to the program administrator who would then work to secure a Psychologist and Psychiatrist to complete the evaluation.

To facilitate communication with the field, Psychology contact information on the DNet has been updated and includes Consulting Psychologist's contact information, POS and Field Office consultation assignments, descriptions of evaluation/assessment referral types (including PCA and PAT) and a listing of approved providers across the state. An announcement regarding how to access the Psychology and Psychiatry program, available assessments and accessing this information on the DNET will be provided to the field on the D-Net in January 2020.

**2.  Child protection staff should be required to utilize the CFS 968-90, Questions for Mental Health Professionals form when interviewing mental health professionals regarding an alleged perpetrator.**

The Deputy Director of Child Protection is reviewing the use of this form and communicating with the Division of Clinical Services on efficient use to gather the needed information.

**3.  If a subsequent oral report (SOR) of abuse and/or neglect is received on an open Intact Family Services case, the child protection investigator and supervisor, as well as, the Intact Family Services caseworker and supervisor should discuss and document in SACWIS, the case within 2 days of the SOR,**

14

and ensure a method of maintaining ongoing communication is established as required by current procedure, which should include attendance at all Child and Family Team Meetings.

There are already procedures in place requiring a timely discussion between the intact worker and investigator.  There are alerts on desktops for intact and investigations workers and supervisors to alert to an SOR.  Area Administrators are discussing SORs in their weekly calls with supervisors, and all SORs (including discussion) are reviewed by QA/APT/Intact Utilization to ensure quality contact. Contact notes are required to be entered within 48 hours according to current procedures.

*OIG COMMENT: Does the Department have data from Quality Assurance and Agency Performance Team on how this is working? During the weekly calls are investigative tasks or direction for intact noted?*

**4.   With three or more child protection investigations involving the same family, a management review should be conducted to determine if there is a need for court intervention (Recommendation also made in OIG Report #17-2911).**

A memo was sent to all child protection requiring a review by Area Administrators of any family receiving two unfounded and an indicated report to assess for court involvement.  SOR Reviews are also occurring with the Intact Utilization Unit and Quality Assurance on these cases.

*OIG COMMENT: The OIG recommendation does not limit the management review to two unfounded and one indicated cases, but rather that anytime a family with three or more child protection investigations, whether they are indicated or unfounded, should be reviewed by DCFS management. In addition, please provide the OIG with documentation that the stated reviews by the Intact Utilization Unit and Quality Assurance are occurring.*

**5.   Each intact family services case should have a written concurrent plan to identify factors that are critical to ensuring child safety and minimizing risk, and if there is a change in circumstances when court intervention may be necessary.**

The Department agrees. Concurrent planning and the need for possible court intervention is already embedded within current intact procedures.

*OIG COMMENT: Who is responsible for tracking that there is a concurrent plan in intact cases and is it contained in SACWIS and reviewed? Please provide the OIG the data on whether or not concurrent planning is occurring.*

**6.   The Department should consider adding an alternative on the Child Endangerment Risk Assessment (CERAP) to allow a finding of "conditionally safe" – identifying factors where if there is a change in circumstances court intervention may be warranted.**

The Department does not agree to a finding of conditionally safe.  The Department agrees to review the CERAP and ensure it is the proper document to be using and then we will revisit the recommendation.  The CERAP review is ongoing, in consultation with Chapin Hall.

**7.   To avoid the over reliance on a caregiver's self-report in intact family service cases, Procedures 302.388(i)(5), Evaluating Family Progress, should be amended to require that intact family service workers contact service providers at a minimum monthly to assess the level of the family member's engagement with services and the progress of the family on tasks of the Family Service Plan.**

The Department agrees. This expectation is already imbedded within current Intact Procedures.  Currently, this requirement is addressed in Foundations Intact where Procedures 302.388 (i) (5), Evaluating Family Progress is discussed.

*OIG COMMENT: It is insufficient to only discuss the practice of contacting providers monthly during foundation training when investigators are first hired. This requirement should also be included in Procedures. Does the Department have data on whether or not service providers are actually being contacted monthly?*

**8.   Intact family services workers should refer to DCFS Office of Legal Services those intact cases with parental non-compliance over time, risk to children and when the State's Attorney's Office has declined to file a petition.**

Prompted at least in part by a review and report completed by Chapin Hall, the Department is working on a number of initiatives directed at improving practice around child protection and intact family services, improving communication and collaboration between the Department and court stakeholders.  As part of these initiatives, the Department is collaborating with Chapin Hall and a variety of court stakeholders, including, but not limited to, judges, State's Attorney's Offices, guardians ad litem, public defenders, and the Administrative Office of Illinois Courts.  The Department expects this work to lead to, among other things, multidisciplinary trainings; new or amended policies, procedures, and practices; and improved systems of communication.  The Department will consider this OIG recommendation in its ongoing work in this regard.

*OIG COMMENT: Please provide the OIG a plan of how the Department will address the recommendation in the immediacy. Will OLS file petitions in juvenile court when warranted? Per statute, any person, agency/association or the court on its own motion, including DCFS Legal Counsel can file a petition and request orders of protection or supervision.*

**9.   DCFS Office of Legal Services must track cases not accepted for filing of a petition in Juvenile Court. The Department should identify a single contact person to work with each State's Attorney's Office and consider whether to advocate further or file a petition themselves.**

Prompted at least in part by a review and report completed by Chapin Hall in May 2019, the Department is working on a number of initiatives directed at improving practice around child protection and intact family services and improving communication and collaboration between the Department and court stakeholders.  As part of these initiatives, the Department is collaborating with Chapin Hall and a variety of court stakeholders, including, but not limited to, judges, State's Attorney's Offices, guardians ad litem, public defenders, and the Administrative Office of Illinois Courts.  The Department expects this work to lead to, among other things, multidisciplinary trainings; new or amended policies, procedures, and practices; and improved systems of communication.  The Department will consider this OIG recommendation in its ongoing work in this regard.

*OIG COMMENT: Based on OIG investigations, it is clear that the Department continues to struggle to work with families who are refusing services despite significant concerns or are not making progress in services. Not only is it problematic for the Department when a parent demonstrates that they cannot care for their children, and the child protection staff cannot demonstrate urgent and immediate necessity to remove the children, but also when child welfare staff working with families are concerned about safety and attempt to file a petition through the State's Attorney's office only to have the State's attorney decline to file a petition.*

*When a Child Protection investigator/supervisor correctly identifies  heightened safety/risk concerns with families, but do not believe they have enough evidence to support urgent and immediate necessity to take the case to court for temporary custody, they have  expressed that they did not attempt to screen the case for a*

*protective order because the State's Attorney in their county was reluctant to file these types of petitions. This is not the first time that the OIG has heard of the reluctance.*

*The State's Attorney is not the only entity that can file a petition in juvenile court; any person, agency/association or the court on its own motion, including DCFS Legal Counsel can file a petition and request orders of protection or supervision. While any party is able to file the petition, the State's Attorney still has the sole responsibility to prosecute. A 1991 Illinois Supreme Court Case, In re J.J. (566 N.E.2d 1345), ruled that even if the State's Attorney files a motion to dismiss a petition in juvenile court, the court must hear evidence on the petition and determine whether the dismissal is in the best interests of the minors, and if the dismissal is not in the best interest of the minor, the State's motion for dismissal shall be denied.*

*Procedure 300.130 already directs that when services are declined by a family: "...... the Child Protection Specialist and Child Protection Supervisor shall consult to determine whether the case should be screened with the State's Attorney for court ordered services. If a case is screened with the State's Attorney for court ordered services but the State's Attorney declines to file a petition for court ordered services or consideration of a shelter care hearing, then the Child Protection Specialist and Supervisor shall consult with the DCFS Office of Legal Services. In addition, if consultation with another Department division (e.g., the Division of Clinical Practice and Development) is desired, the Child Protection Specialist and Supervisor shall make a request for such consultation thru the Area Administrator. The Area Administrator shall determine if the additional consultation is necessary."*

*In FY 10 the Department agreed to track and maintain data on cases presented to the State's Attorney for filing a petition and are agreeing to do so again. The OIG request any current data tracked over the last nine years, and in addition, based on the Department's current response the OIG would like more information on what specific initiative will address the Departmental tracking/data on cases presented to the State's Attorney and the State's Attorney's response? When does the Department anticipate this work with Chapin Hall to be completed?*

**Department Response:** DCFS is aware of its right to file petitions in juvenile court and is working on a number of levels to improve the present circumstances, including efforts to improve communication and understanding among the various court stakeholders across the State – which is critical to the success of such petitions. Note that State's Attorneys are charged with prosecuting the petitions, and DCFS will continue to work collaboratively with State's Attorneys to ensure that petitions are not only filed, but that all evidentiary issues are addressed – which appears to be the main cause of petitions not being filed by State's Attorneys. DCFS Legal and Operations are working together to analyze cases as they arise in order to advocate as appropriate and will continue to do so alongside DCFS's efforts to address the root causes of the present circumstances across the State. Additionally, DCFS Legal is not currently in a position to track and maintain data on cases presented to State's Attorneys for filing petitions and State's Attorneys responses.

**10. DCFS regional counsel should meet quarterly with local State's Attorneys and other relevant professionals to address any issues regarding the filing of petitions for court involvement.**

The Department agrees. DCFS Legal already has quarterly meetings with State's Attorneys, GALs and Public Defenders to address issues. The filing of petitions can be put on a quarterly meeting agenda.

**11. The Area Administrator should meet with the local mental health treatment provider to develop a system and/or identify a liaison at the clinic to expedite information sharing.**

The Department agrees. This has been completed.

**DEATH AND SERIOUS INJURY INVESTIGATION 3**

| ALLEGATION | A twenty-two-month-old child died after choking on noodles his mother had made for breakfast. The mother had been a former youth in care, aging out of the system 11 months before the child's death. |

| INVESTIGATION | The child's mother had been involved with the Department throughout most of her life. She came into care at two-years-old, after she and her siblings were discovered |
in an abandoned building. She was eventually adopted by her foster mother, though there were numerous unfounded child protection investigations while the mother and her sisters were in the adoptive mother's care. The mother reentered care at the age of twelve after refusing to return home following a psychiatric hospitalization. The mother spent most of her adolescence living in various residential treatment and transitional living facilities, and she experienced several more psychiatric hospitalizations during her time in care.

While pregnant with the deceased, the mother had entered an independent living program for pregnant and parenting youth in care who also had problems with mental illness. She remained in the program until she aged out of care. She gave birth to her first child (the deceased) when she was twenty-years-old. At the independent living program, the mother received guidance and support in learning how to parent the infant. However, prior to aging out of care, the mother was the subject of two unfounded child protection investigations for substantial risk of physical injury/environment injurious to health and welfare by neglect.

Approximately a year after the first child was born, as the mother aged out of care, she was four-and-a-half months pregnant with her second child. She moved to another part of the state for affordable housing and within months was engaged in parenting, prenatal, and doula services with two service providers. The mother regularly met with workers from both agencies and utilized respite care. Five months after moving, the mother had three additional unfounded child protection investigations for substantial risk of physical injury/environment injurious to health and welfare by neglect and environmental neglect.  Intact family services were initiated.

The young mother had a significant history of trauma and mental health issues and had not lived in a home environment since early adolescence. Upon becoming pregnant she was referred for needed services. The agency provided transportation to medical appointments, grocery shopping, and taking the baby to daycare. Staff assisted her in bathing and feeding the baby, cleaning her apartment and provided guidance in structuring her day. The agency also provided therapy and education for the mother while the baby was at daycare. Although enrolled in a supportive parenting program, she did not have support and guidance from family especially in the form of modeling appropriate parenting, long-term support, or prior experience caring for a child. The program provided significant assistance in the parenting of her first child, but they noted she still struggled to parent and upon turning twenty-one their ever-present support was gone. As the mother approached her 21st birthday, staff attempted to mimic the lack of their presence by decreasing their hands-on work. However, the mother did not seem to be able to adequately learn the skills in the time allowed. Staff knew that the mother needed support and arranged for community services in the area she was moving to after aging out of care.

Though the agency arranged for community services in her new home, the services were slow to start. The services eventually culminated in the mother having doula services which included peer parenting groups and individual parenting education, a home visitor parent support person, a private agency intact family worker and two respite care givers. While the services were expansive, no assessment of the mother's ability to independently parent, considering her history of trauma and mental illness, was conducted. The intact worker assigned to the case, upon finding the mother overwhelmed and in tears, considered the need for possible custody or at least an assessment of her parenting capacity, but the assessment was never conducted.

18

Just as the mother's parenting capacity was not fully assessed, neither was her need for treatment of mental illness. The mother was connected with parenting resources but not mental health treatment. Workers noted the mother's lack of participation in therapy, refusal to take medication and use of marijuana. The worker encouraged the mother to engage in treatment, but never specifically connected the lack of treatment of mental illness as a risk to the children.  The mother's acceptance of services was certainly a strength, but service providers' observations of the mother's lack of progress was not operationalized.

These assessments became all the more important when child protection investigations involving bruising to a toddler and reports of domestic violence began. Though the child protection investigators appropriately sought out consultation for the bruising, the cumulative issues should have prompted a more intense scrutiny of the mother's parenting abilities. When looked at as a case with a parent who suffers from mental illness, who uses substances, who lacks an informal support system, whose formal support system expressed concerns, has consistently lacked parenting skills, and who may have been in a violent relationship there was no doubt that a more formalized assessment was needed. Such an assessment would likely have supported court intervention.

During the intact family services case, the toddler was observed with facial bruising on four different occasions, the first being two months after the case opened.  Around this time the mother had a new boyfriend and there were also reports of domestic violence. The bruises resulted in three child protection investigations for cuts welts and bruises by abuse over a five-month period. Two of the investigations were unfounded and the third was posthumously indicated for allegation cuts, welts, bruises, abrasions, and oral injuries by neglect and allegation substantial risk of physical injury/environment injurious to health and welfare by neglect. A child protection investigation was also initiated following the child's death for allegations of death by neglect and substantial risk of physical injury/environment injurious to health and welfare by neglect; the mother and her boyfriend were indicated on both of the allegations.

After the child's death, DCFS took custody of the eight-month-old sibling placing her with a licensed foster family, who had previously provided the mother with respite care. The mother gave birth to a third child 14 months after the death. That child was placed in the same foster home.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  Parenting youth in care with significant mental illness who are aging out of care should have a parenting capacity assessment, and if warranted, be referred to a Parenting Assessment Team.** |

The Department's Psychology and Psychiatry Administrator and Department psychologist will work with TPSN to refer identified youth for a Parenting Capacity Assessment or to the appropriate Parenting Assessment Team.   Department staff have had several meetings with TPSN regarding the process.  Revisions to P302, Appendix J also included language on referring those youth with significant mental illness for a Parenting Capacity Assessment.

**2.  Clinical should appoint a liaison with TPSN to help determine the appropriateness of parent capacity assessments and referrals to parenting capacity team assessments for parenting youth in care.**

The Clinical Division has appointed a liaison, the Psychology and Psychiatry Administrator and a psychologist to be the liaison between Psychology and TPSN.  Several meetings have occurred with the Senior Vice President of TPSN to discuss the OIG recommendations and how the Psychology and Psychiatry Program can be of support.  The TPSN structure and its programming was discussed. TPSN materials were provided and discussed.

**3.  Clinical should regularly train TPSN staff on parenting capacity assessments and parenting capacity teams.**

Department psychologist and liaison to TPSN met with the provider to discuss training needs of TPSN staff and a training plan is being developed.

**4.  As previously recommended, any family with three or more child protection investigations within a year (for one or more persons living in the home) should be reviewed by DCFS management to ensure that underlying issues are being addressed.**

The Department agrees.  A memo was sent to all child protection requiring a review by the Area Administrator of any family receiving two unfounded and an indicated report to assess for court involvement.  SOR Reviews are also occurring with the Intact Utilization Unit and Quality Assurance on these cases.

*OIG COMMENT: The OIG recommendation does not limit the management review to two unfounded and one indicated case, but rather that anytime a family with three or more child protection investigations, whether they are indicated or unfounded, should be reviewed by DCFS management. In addition, please provide the OIG with documentation that the stated reviews by the Intact Utilization Unit and Quality Assurance are occurring, and any outcomes or action steps identified.*

**5.  This report should be shared with the Area Administrator, Regional Administrator, and others they deem appropriate. The DCFS Administrators and the local agency should develop protocol for future communication and collaboration.**

The Regional Administrator shared and discussed the OIG Report with the Area Administrator of the involved field office. The Area Administrator shared the OIG Report with the child protection supervisors as a teaching tool and ensured there is communication/collaboration in the future involving mutual clients.  There is a representative from Child Abuse Council who participates in Quarterly Judge's Meetings and quarterly POS meetings in this area.

**6.  The Department should develop transition procedures and interagency collaboration similar to Procedures 302, Appendix N (Transition Planning for Wards with Developmental Disabilities) for pregnant and parenting youth in care with significant mental illness who are aging out of care. Policy Transmittal 99.14 discusses creating interagency agreements, which might also be helpful with this population.**

The Department agrees. ILCS 505/42 requires an intergovernmental agreement be made with DCFS, DHS, DHFS, ISBE, DJJ, IDPH, and DOC to assist with housing, educational, and employment support.  Part of this intergovernmental agreement deal with the development of transition procedures for our developmentally delayed youth.  Through our data tracking using the Illinois Longitudinal Data System, our DD youth will already be identified and shared with DHS. DCFS agrees with development of an IGA and will work with the other agencies to complete.  DCFS is now a member of the Illinois Longitudinal Data System, which does have the capability of identifying youth with behavioral health issues.

**7.  This report should be shared with independent living organization for educational purposes.**

The Inspector General shared the report with the agency.

**8.  Intact family services providers should have full access to case/family history for families they serve.**

The Department agrees. The ability to do this requires an IT solution, this is currently being discussed with DoIt staff.

20

**DEATH AND SERIOUS INJURY INVESTIGATION 4**

| ALLEGATION | A nine-month old girl died as a result of multiple injuries due to assault by her mother. There was a pending child protection investigation against the mother at the time of the child's death. |
|---|---|

Five weeks prior to the child's death, the hotline was contacted by a mandated reporter regarding the mother's five and six-year-old children whom were living with their paternal grandparents and visiting with their mother occasionally. The reporter alleged that while the five and six-year-old children were visiting their mother, the mother's paramour pushed one of the children to the ground by the neck. At the time of the report, the six-year-old's last name was incorrectly reported to the hotline and the mother and paramour's names were unknown. The reporter was also unaware that the mother had an eight-month old, a two-year-old and three-year-old in her care; therefore, these children were not added to the investigation at the time of the hotline call.

Following assignment, the child protection investigator interviewed the five and six-year-old children at their elementary school. The six-year-old reported that he last visited his mother the previous weekend at the hotel where his mother and her paramour were living. The six-year-old denied ever seeing his mother or her paramour harm his brother but stated that he did see his mother and her paramour argue with one another, but they did not hit each other. During the investigator's interview with the five-year-old, the five-year-old reported that his mother's paramour had pushed him to the ground twice but that he did not know if the paramour was upset or just playing with him. The five-year-old stated that his mother told the paramour not to do that to her son and then told the five-year-old not to tell anyone because it was a secret. In an interview with OIG investigators the child protection investigator reported that neither children reported that there were other children living with their mother.

In an interview with the paternal grandmother, the grandmother reported to the investigator that she had been caring for her five and six-year-old grandchildren for three years so their mother could get a job and secure stable housing. The grandmother provided the mother's name, phone number and address and reported that the mother lived in at a hotel with her paramour. The grandmother reported that the five and six-year-old children reported that their mother got into a verbal argument with her paramour at the last visit but stated that she had never had any concerns following visits with their mother. The grandmother did not report that the mother had other children in her care.

The next day, the investigator left a message for the children's mother and received a return call the following day. The investigator scheduled an interview with the mother at the local DCFS field office. During the interview at the DCFS field office, the mother told the investigator that she lived at a hotel with her boyfriend and her five and six-year-old lived with their paternal grandmother but were visiting her at the hotel the previous weekend. The mother reported that during the visit her boyfriend tripped over a cord and as he fell grabbed her son and both fell. The mother reported that everyone was laughing. The mother denied that she or her boyfriend physically disciplined her sons. According to the investigator, the mother did not report that anyone else lived in the hotel with her therefore the investigator was unaware that she had a two-year-old, three-year-old and eight-month-old also living with the mother and her boyfriend. The investigator was also unaware that the mother had two prior unfounded investigations because the investigations were not linked in SACWIS and investigators only have access to investigations linked to their assigned investigations. The investigator was also unaware that the mother had placed her two-year-old, three-year-old and nine-month-old with the Safe Family's program for four months and the children had returned to her care just two months prior to the hotline call.

One month after the investigator interviewed the mother at the DCFS field office and while the investigation was still pending, the mother's nine-month-old child died as a result of multiple injuries due to assault by her

mother. The child sustained skull fractures, facial bruising, brain hemorrhaging, injury to the liver and fractures in various stages of healing. The child's mother admitted to throwing her daughter against a dresser twice to get her to stop crying. The death was ruled a homicide due to assault and the mother was charged with murder.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. Child protection investigators should have full access to the hotline narratives of expunged-unfounded investigations. Immediate access to this information is critical to the safety of** |

**both children and the workers.**

The Department agrees. Investigators have the ability to review hotline narratives on expunged/unfounded reports. If it is a report not connected to their case, the supervisor and manager have universal access and can provide the information to the worker.

*OIG COMMENT: Although supervisors and managers have universal access to SACWIS the child protection investigators are limited to viewing the expunged/unfounded reports linked to their assigned investigations and yet are responsible for conducting the person search. If the Department fails to address this issue there will continue to be cases like this investigation where child protection investigators were unaware that the family not only have a prior history with DCFS but also have other children that the investigator is unaware of due to the limited access. The oversight ultimately ended in a child's death.*

**2. Front-line workers (child protection, permanency, licensing, and intact family services) need training on conducting a thorough person search in SACWIS and training on how to access and utilize the hotline narratives of expunged-unfounded investigations.**

DNet instructions were issued on how to search and access unfounded expunged cases. This was also a discussion topic at a child protection meeting.

**3. Procedures 300, Reports of Child Abuse and Neglect, should be amended to clarify that observation of the environment and a scene investigation is required for all allegations and should be completed in a timely manner.**

The Department does not agree. Observation of the environment is required for all allegations, but a scene investigation is required only on certain allegations. This is still under review by the Department.

*OIG COMMENT: Procedures 300.60 addresses scene investigations and State's, in part, that the child protection investigator should consult with the child protection supervisor to determine which environments require a scene investigation. In Appendix B required activities include a scene investigation which is to observe and photograph the environment where the harm occurred and create a timeline. In addition to observing the environment, the child protection specialist shall conduct a scene investigation per Procedures 300.60, Scene Investigation.*

DEATH AND SERIOUS INJURY INVESTIGATIONS

**DEATH AND SERIOUS INJURY INVESTIGATION 5**

| | |
|---|---|
| **ALLEGATION** | A three-and-a-half-year-old girl was found seriously injured after witnesses observed a man get out of the car, walk to the rear passenger side door, and reach through, |

beating the girl on the head. The man was later identified as her mother's boyfriend and the father of her younger half-sister (the mother's one-year-old daughter). The girl sustained critical injuries, including two lacerations, a cut lip, a black eye, and swelling around her face. Her mother was found dead, and it was later revealed that the boyfriend had run her over with a car. The family's intact family services case had been closed two months prior to the incident.

| | |
|---|---|
| **INVESTIGATION** | The family's first involvement with the Department was after police reported that the victim, then age one, and her older half-brother and half-sister, then ages nine |

and five, respectively, were left alone in the house for a period longer than 20 minutes. Police had arrived to follow up on a 911 hang up call. Their mother first told police and child protection investigators that she had left to go to the grocery store, then later told the investigator that she was in the garage putting toys away when the police arrived. The mother was indicated for a Lack of Supervision (allegation #74) and was court ordered to complete parenting classes.

A second report was made when the mother's boyfriend (the alleged perpetrator) took their daughter, then five weeks old, and refused to return her. According to the report, the mother and her boyfriend had gotten into a fight, after which he took her car. When he arrived back at the house, they continued to fight, and the boyfriend left again with both the car and the child. Police requested that he bring the child to the station, and the following morning, the boyfriend's mother brought the child in. No charges were filed since the infant was returned to the mother unharmed within 24 hours. The Department determined the allegation was unfounded noting that the infant was unharmed and citing that the father "took the child to spend time with her" despite the mother's claim that he could have taken the child with her permission at any time.

Less than three days after this incident, a third report was made to the Department after the victim's older sister was left behind at a gas station. According to the report, the child was left at a gas station after her mother asked her to get out and open the car's rear hatchback. In a statement to police, the mother said her boyfriend was acting "erratic and foolish," and she asked her daughter to get out and open the hatchback when the mother realized she could not get out. When the child exited the vehicle, the boyfriend drove away. Police reported to the scene, where they called the mother. According to the initial report to the Department, the mother sounded frantic on the phone and said, "let me out, he won't let me out" (indicating the boyfriend). Police determined that the boyfriend had left the child at the gas station purposefully and arrested him. In speaking with the police, the boyfriend stated that he was afraid to leave the mother alone after she had said that morning "I don't want to do this no more," which he thought meant she didn't want to live any more. The mother told police she was fearful of her boyfriend.

Both the mother and boyfriend were indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect. Rationale for the finding included an ongoing pattern of domestic violence in the home, verbal altercations between both parents (as witnessed by the children), and evidence that "both parents displayed a blatant disregard for parental responsibilities." The Child Protection supervisor also stated the mother continued to put the children at risk of harm by allowing the boyfriend into the home.

The investigator never contacted the Department's clinical division or made a referral for a domestic violence consult despite indicators of domestic violence identified in the initial domestic violence screening. In the Inspector General's investigation, the Department's Administrator for Domestic Violence Services noted that the incident between the mother and father was concerning and that this was clearly an escalation from the second report.

The children were also marked safe in the initial CERAP despite three threats being identified. The investigator noted the mother stated she would be seeking an order of protection. It was also noted that the boyfriend was in jail and thus, out of the home. In the follow-up CERAP three weeks later, no safety threats were identified even though the three initial threats were not adequately addressed. The investigator noted that the children did not report any fears or concerns about being in the home, and there were no observable marks or bruises.

Intact services were initiated following the child protection investigation. Services identified included: parenting classes and domestic violence counseling for the mother and anger management for the boyfriend. The family was also referred for in-home family counseling.

The intact worker visited the family weekly throughout the month of August and biweekly from September 2017 to January 2018 after a critical decision was made by the worker and supervisor to decrease visits. During these visits, the boyfriend was also occasionally present. Interviews with both the mother and the children revealed that while he did not live with them, he was over frequently and did sleep over. Early on, the mother also indicated to the intact worker that she never intended to get an order of protection against the boyfriend; she later told the intact worker that she told the investigator that she was intending to file an order of protection against the boyfriend's mother.

The intact worker noted that it was very difficult to engage the family in services. Each time a visit was made, the worker would ask both the mother and boyfriend, when he was present, if they had started their respective services. The mother never completed parenting classes. She did call for a family counseling appointment, but it was soon revealed that the family was taken off their service list after the mother did not return her phone calls. When she was re-referred for counseling, the mother was not at home during her scheduled in-home visit. In November 2017, the mother stated that she no longer wanted to engage in counseling services. The intact worker made a referral for anger management classes for the boyfriend, but he never followed up. He also never provided the worker with his own address, stating that he had recently moved. By January 2018, neither party had engaged in services.

The intact case was closed in late January 2018. Rationale stated was that there were no further incidents of abuse or neglect and the mother had been provided with community resources and referrals for services. In addition, it was the intact worker's understanding that the boyfriend was no longer active in the family per reports from both the children and the mother. At the closing visit, however, a "minor went upstairs" and observed the boyfriend sleeping. It was noted that this was not disclosed to the worker by the mother. The intact case was still closed.

Approximately two months later, the police responded to a hit and run incident. The boyfriend had physically assaulted the mother, gained possession of the car, and ran over her. He then drove off in the car with the victim and her younger half-sister in the back seat. Witnesses saw him physically assaulting the girl. The boyfriend then fled the scene. He was apprehended by police in a neighboring town. The mother was found dead, and the two children were taken to the hospital.

According to the police, the incident began with a domestic dispute between the mother and boyfriend. The mother was taking the boyfriend back to live with his parents. While in route, the boyfriend began physically assaulting the mother. The mother attempted to leave the car but was overpowered. The victim and her younger sister were placed with their maternal grandmother, who had a restraining order against the boyfriend after a previous violent altercation. The older siblings were placed with their biological father.

The boyfriend was indicated with Allegation #11, cuts bruises welts abrasions and oral injuries, and Allegation #10, substantial risk of physical injury/environment injurious to health and welfare. He was charged with first degree murder.

24

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. The Department needs to design a system where it is alerted to an agency's decision to close a case because of parents' non-compliance with services, where critical service objectives remain** |

unmet. The Department would then need to assess the current safety of the children and determine whether a call to the hotline or the State's Attorney was warranted.

Private providers of intact family services must notify the Department of parental non-compliance, to have those cases reviewed for closure.

*OIG COMMENT: Please provide the OIG with the process for reviewing and making a final decision in these cases; the logic set used to close or continue to engage with the family and the next steps when a family refuses services. Also, please provide the point person from the Department to whom notification is made when there is parental non-compliance.*

**2. In cases of violence and risk of violence, the CERAP should include an assessment of the custodial parents' protective capacity, which could change as new facts are learned. In this case, had the mother's protective capacity be noted as positive because of her decision to get an order of protection – backtracking on that decision warranted a reexamination of her protective capacity.**

The Department agrees. Staff will be reminded that assessing safety is ongoing, as new information is received that could impact safety, it needs to be considered. The Deputy of Child Protection holds a weekly call with the Area Administrators where this issue is routinely addressed. The issue will also be addressed in ongoing training occurring in 2020 in all four regions. Revisions to CERAP will place renewed focus on ongoing assessment of parental protective capacity.

**3. The DCFS Supervisor in question should receive non-disciplinary counseling for approving a closing CERAP that failed to identify known safety threats.**

The supervisor was given a non-disciplinary counseling session.

**4. This report should be shared with the involved private agency.**

The Inspector General shared the report with the private agency. The Inspector General met with the agency's administrators and a member of the Board of Directors to discuss the findings and recommendations made in the report.

**DEATH AND SERIOUS INJURY INVESTIGATION 6**

| | |
|---|---|
| **ALLEGATION** | An eight-month-old baby died as a result of asphyxia due to entrapment in a couch while co-sleeping with his mother. At the time of the baby's death, there was an open intact family services case. An investigation for medical neglect and failure to thrive had been pending for ten days prior to the death. |

**INVESTIGATION**  The deceased baby was his single mother's tenth child; her six youngest children were all under the age of six years old. The mother's five youngest children were all born prematurely and had multiple medical issues. When her eighth and ninth children (twins) were nine months old, the mother had her first involvement with the Department. The twins were born prematurely and one of them had significant medical complications. The twin was hospitalized due to new onset seizures and respiratory distress. At discharge, multiple follow-up appointments were set with multiple specialists. The twin missed several of his medical appointments resulting in a report to the hotline for medical neglect. The child protection investigation closed unfounded due to insufficient evidence, after it was determined that the missed appointments were largely due to lack of transportation and mother was referred for transportation service through the hospital.

However, after this investigation closed, the mother continued to miss essential medical appointments for the twin. Seven months later, another investigation was opened against the mother for medical neglect. After picking up his son from his mother's home, the father brought his son to the hospital due to respiratory distress. The hospital social worker reported that the son would have been visibly struggling to breathe which should have been noticed by the mother. The mother was indicated for medical neglect as the treating physician reported that the mother had continuously failed to follow through with specialty medical appointments for her medically complex child.

During that child protection investigation, the mother stated that her sons sometimes slept in bed with her. The child protection investigator cautioned her about safe sleeping practices, stated that the children should not co-sleep with her, and observed appropriate sleeping arrangements for all the children in the home.

A High-Risk Intact Family Services Case was opened with the Department for ongoing support and monitoring of the children's medical appointments. Despite intact involvement, the mother continued to struggle, and the children continued to miss medical appointments. The intact caseworker visited regularly but relied on the mother's self-report that she was taking the children to their appointments. Two months after the intact family services case opened, the mother's oldest three children, all teenagers, went to live with their fathers for summer break. The mother had relied on her teenage children for help caring for the younger siblings. The intact family services worker did not provide the mother with any additional support after the teenagers left the home.

Five months after the intact family services case opened, the primary care doctor called the hotline to report that the children were still missing medical appointments and concerns that the mother had not taken her eight-month-old son for weight checks as he was significantly underweight. A child protection investigation was opened against the mother for medical neglect and failure to thrive. The child protection investigator and intact worker visited the home and observed the house to be clean but there was minimal food and the mother reported she did not have any formula for the baby. The family had been receiving public aid, but it had been cut off recently. The intact family caseworker told the child protection investigator that she was working with the family to re-establish benefits.

Ten days later, the baby died and an investigation for death by neglect was opened against the mother. The investigator and her supervisor went to the mother's home and observed the home to be unclean; there were

few items in the home, minimal food and hundreds of gnats in the kitchen and bathroom. There were no baby items in the home and the bedrooms were empty except for new beds. There were no sheets or clothing and beer cans were in the cabinet in the bathroom. The supervisor noted that the basement was flooded with sewer water and there was no door to the basement that could be closed to stop children from going down, creating a safety hazard due to the ages of the children. Despite this, the intact family caseworker, who had been in the home the day prior, stated she had no concerns.

After the death, the other children were under safety plans with their fathers or relatives and were brought to the pediatrician. A review by a child abuse pediatrician found that the younger children had not been attending their regular appointments and were inadequately cared for because of this. The doctor also noted that the eight-month-old boy did not suffer from medical complications like his older siblings did and thus he was not medically neglected but was failure to thrive. The amount of food the mother reported feeding the boy, between four to six ounces every two to three hours, according to the pediatrician, did not make sense with the minimal amount of weight he had gained. Medical neglect against the mother was indicated for the baby's siblings but unfounded for him, while failure to thrive against the mother was indicated for the baby.

Four of the baby's older siblings, including the three teenage children, reported to the investigator that when they lived in the mother's home their mother slept in the same bed as the twins and the baby. However, they denied ever being without food. The investigator observed an interview of the mother by the police and noted that the mother was slurring her words; she admitted to the police that she had been drinking prior to coming in for her interview. She also admitted to drinking the night before the baby passed away. No breathalyzer was given to the mother the morning after the baby died, but the detective stated that the mother smelled of alcohol that morning. She stated she fell asleep while watching a movie on the couch and woke up at 1 or 2am and put the baby in the pack-n-play. The mother stated that the Department never told her not to sleep with her children despite records showing an investigator cautioning her about safe sleeping practices. After the interview, the mother entered inpatient treatment for alcohol. The child protection investigation was indicated against the mother for death by neglect to her eight-month-old.

| OIG RECOMMENDATIONS /<br>DEPARTMENT RESPONSES | **1. The Office of the Inspector General and DCFS Training will use a redacted version of this case for training purposes, including how to effectively communicate with medical providers and the importance of including all available family members in case planning.** |

The Office of Learning and Professional Development will incorporate and use the redacted case in the <u>Dialoguing with Doctors</u> content of the Child Protection curriculum. The Office of Learning and Professional Development will also incorporate and use this redacted case in the Assessment units of both Intact and Placement Foundations curricula, where child well-being and service planning is discussed.

**2. All high-risk intact family services cases should have the option for the supervisor to request a contracted licensed clinician to conduct the Integrated Assessment as occurs in placement cases. A redacted version of this case will be shared with DCFS Integrated Assessment Coordinator.**

The Department is drafting a letter which will be issued to all POS agencies and Intact Family Services staff.

**3. At the transitional visit, the intact family services worker should obtain general consents to obtain and share information with all providers to the family.**

The Department issued a notice to all POS agencies and Intact Family Services staff about obtaining specific consents, not general consents.

**4.  Due to the complexity of confidentiality and consents, the Department needs to provide clear and specific guidance, beyond written procedures, for Intact Family Services caseworkers to understand what information can be shared and who can share information with providers with and without consents.**

The DCFS Office of Legal Services (OLS) is currently drafting a memorandum providing additional guidance to Intact Family Services regarding confidentiality and consents.  OLS anticipates completing the memorandum by January 2020.   The Office of Learning and Professional Development will also incorporate the language into all Foundations curricula, where Procedures 431, Confidentiality of Personal Information of Persons Served by the Department of Children and Family Services, is discussed. The simulation team will produce a "simulation video" illustrating a conversation between a client and staff highlighting the type of information that can be released and shared.

**5.  The Department should create a form similar to the CFS 600-5 Release of Information for DCP Investigations for Intact Family Service Cases to allow intact family services caseworkers to obtain medical information from medical providers without a consent.**

The DCFS Office of Legal Services (OLS) is reexamining this issue and anticipates completing its analysis by January 2020.  OLS is currently drafting a memorandum providing additional guidance to Intact Family Services regarding confidentiality and consents.  OLS anticipates completing the memorandum by January 2020.  DCFS continues to analyze this issue and will update the form, if necessary, and will consider the applicability of HIPAA, as suggested.

**6.  The DCFS Nurse should be assigned for the duration of intact family services cases involving medically complex children. Their duties should include attending home visits with the intact caseworker to meet with the family, attending medical appointments with the family and the intact service worker, communicating with medical providers, assisting with the medical and health related sections of the integrated assessment, and participating in Child and Family Team Meetings to help the family develop a plan to ensure that the children receive their required medical care.**

The Department agrees. The DCFS Nurses continue to be available to support Intact Family Services, for participation in staffings, CFTMs and CIPPs for medically complex children as part of the clinical team, for nursing consultation and to provide any needed support.   An informational transmittal, which will provide information to the field as to how they can access DCFS Nursing in cases involving medically complex children, was discussed. This transmittal will also include information regarding DCFS Nursing's availability for participation in staffing's for medically complex youth, other recommended staffing participants, and expected outcomes from these staffings.

*OIG COMMENT: The Department update does not address the need for nurses to be available when necessary to meet with the family, attend medical appointments with the family and the intact service worker, communicate with medical providers, and to assist with the medical and health related sections of the integrated assessment.*

**7.  Non-custodial parents of children involved in Intact Family Services must be contacted or attempted to be contacted during the first two weeks of the case and be included in the initial integrated assessment, unless ruled out with management approval.**

The Department is issuing a reminder to the field on the requirement for non-custodial communication that their child is part on an open case.

*OIG COMMENT: The requirement that the Intact Family Services worker must contact or attempt to contact the non-custodial parent during the first two weeks should be incorporated in Procedures.*

**8. Child and Family Team Meetings should be required within the first 14 days and additionally at least once a month for intact family services cases.**

The Department does not agree.  Procedure for CFTM is within the first 45 days.  Intact staff are already reaching out to families earlier and making timely referrals for services. Intact Family Services may not even know all the players in the first fourteen days of a case, hard to pull everyone together in that short of a timeframe.   The Department will make efforts to get families together earlier and set more realistic milestones, but not 14 days. The Department will remind the field that they should hold a CFTM on Intact Family Services cases no later than 45 days from case opening.

*OIG COMMENT: Placement cases require Child and Family Team Meetings occur within the first two weeks of the case opening, then at 40 days and again at least quarterly. Intact cases should be consistent with the same schedule as placement cases. Presumably youth in care are in safe placements, while intact families continue to have a certain level of risk and service needs should be addressed as soon as practicable.  At a minimum, the Department should track Child and Family Team Meetings for Intact Family Services cases and monitor when they occur.*

**9.  A redacted version of this report will be shared with DCFS Nursing Unit.**

The Chief Nurse reviewed relevant issues related to the OIG report with the DCFS Nurses at their departmental meeting.  The Chief Nurse will review and share the redacted report with DCFS Nurses.

**10.   The Inspector General reiterates its recommendation from OIG Report 17-1643 that, at the transitional visit in Intact Family Services cases with a medically complex child, the child protection investigator and the intact family services caseworker should request that the parent sign consents for the worker to communicate with the child's medical home regarding the child's health and medical care management.**

DCFS Procedure 302.388 is currently being revised to make this change, as well as other changes to intact family services.  The Office of Legal Services is working with the Office of Child and Family Policy to ensure the changes are made.

**11.  The Inspector General reiterates its recommendation from OIG Report 17-1643 that in Intact Family Services cases involving medically complex children, the caseworker must convene a staffing, within 30 days of receiving the case, with the health care professionals involved with the family and parent(s) to discuss the child's care and assess parent's needs for tangible and emotional support.**

A CFS109 has been submitted to the Office of Child and Family Policy to add the language to procedures.  A Policy Guide will be issued in the interim.  Updates related to required nursing referrals will also be added to the same policy guide.

**DEATH AND SERIOUS INJURY INVESTIGATION 7**

**ALLEGATION**    Ten children between the ages of three months and fifteen years died as a result of injuries sustained in a house fire. The children were reportedly left alone with no adult supervision and the home had no working smoke detectors. A mother of three of the children that perished in the fire had no prior contact with the Department; a mother of one of the children, had an unfounded report for inadequate supervision. Another mother of one of the children had an unfounded investigation for medical neglect. The mother of five children that perished in the fire had twenty unfounded and one indicated child protection investigations over fourteen years and had her own history of a youth in care.

**INVESTIGATION**    The Inspector General investigation determined that the mother was overwhelmed with the demands of a special need's child, rebellious adolescent boys and stresses of poverty.  Hotline reports on the mother fell into categories of environmental neglect, the autistic child wandering and later school staff concerns.  Early reports to the hotline mainly came from anonymous callers, often it seemed the family had disputes with landlords, and several were unfounded in the initial stage as the family was in the midst of moving and therefore the issue did not remain or was being corrected.  Each investigation, considered on its own, outlined concerns that while perhaps troubling, did not in the assessment of the child protection investigator and supervisor rise to the level of being indicated, except for the single indicated report. That report was indicated after one of the children, who suffered from autism, left the house in the very early hours of the morning and was found wandering by police. The child was taken to the hospital. Eventually a police officer familiar with the family recognized the child and alerted the mother. The mother was indicated for inadequate supervision but installed new locks so the child could not get out and declined intact services.  Many of the unfounded investigations resulted from the mother correcting some problematic conditions prior to the closing of the investigation. However, there was a resumption of the conditions, as evidenced by continued calls for child protection investigations. The mother did not accept the offer of intact family services. The mother voiced that she would accept referrals but never followed up on them. Further the father, though caring for the children at one point, was rarely involved in the later investigations, even as a collateral.

At the time of the fatal fire, all the prior child protection investigations had not been linked to the mother of the five children that died and most of the investigations had been expunged in accordance with the records retention requirements. Prior to August 2017, any information on investigations that had been expunged (whether indicated or unfounded) would not have been available to child protection workers when they conducted a data search.   In August 2017, the Department began the process of keeping the State Central Register number, date, narrative of the call, subjects and allegations of investigations as a record of contact with DCFS.  This information was eventually available to child protection investigators when they were assigned to an investigation. The actual investigation, if expunged, is not available. As of January 1, 2019, the Department must keep unfounded investigations for five years.

The twenty-one-child abuse and neglect reports when viewed together, showed a pattern of unstable housing, inadequate supervision and chronic neglect. As school, behavioral health, and community records indicate, the chronic neglect lead to adolescent boys who were struggling with behaviors, frustration and possible violence. The mother did not participate in the services to which she was referred for herself or her children. The surrounding community, including schools and law enforcement, were aware of this family's struggles and made reports to DCFS to intervene and help, these calls for help were not successful. The family history, alone, if fully available, could have provided the workers and supervisors the information to better identify trends and understand the family to be able to successfully intervene.

DEATH AND SERIOUS INJURY INVESTIGATIONS

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | |
|---|---|

**1. In a previous investigation of the death of a toddler (IG 17-2911) the Inspector General recommended that any family with three or more child protection investigations within a year (for one or more persons living in the home) should be reviewed by DCFS management to ensure that underlying issues are being addressed. The OIG reiterates that recommendation for this report. In addition, the Department should have a system for documentation of that review which includes indicating the tasks to be completed, who will complete them and how the plan will be monitored.**

The Department agrees to consider the recommendation. The Department is revising procedures around SORs (subsequent oral reports), looking at and working with research group on changes to practice and policy.

*OIG COMMENT: The Department's response to this recommendation in the previous report (#17-2911) was as follows:*

> *The Department is already handling this issue with a sequence report along with screening reminders. The Department has alerts in place on SACWIS for any family with an open case who is the subject of a new investigation. This alert is on both the investigator and intact worker's desktop. In addition, a third sequence report is in final development stages and the intent is to also add it to the report manager for SACWIS which can be pulled up at any time to identify families with multiple reports. Additionally, on a daily basis, a report is sent to all child protection and intact management that identifies all currently open intact cases and any new reports associated with that family. Searching capabilities have been expanded and staff are now able to search by address to determine if there may be more subjects or investigations associated with that household that they should be assessing and considering. Finally, the sequencing has been changed to follow along whether an investigation is unfounded or expunged so that staff get a truer "reading" as to families that have come to the attention of the Department multiple times. Area Administrators participate in many of these reviews and understand their role is to review cases with a more critical lens and identify and assess any underlying issues.*

*Has the Department's position changed? Which research group is the Department working with? What is being addressed in the revisions to the procedures for SORs* (subsequent oral reports)*?*

**2. The Department should train supervisors on how to assess the full history of the family and how it can be used in the evaluation of the family. When a child protection investigation commences, a family history should be completed, maintained and updated each time the Department receives a new report. The family history should be available to subsequent investigators/caseworkers.**

The Department agrees to train supervisors on assessment and use of the family history. Training is currently in development. The Child Protection Deputy Director is actively having conversations with Regional Administrators and Area Administrators on their weekly calls. This issue continues to be addressed in quarterly DCP supervisors' meetings while training is being developed.

**3. The Department should evaluate the current Child Welfare Services referral system for efficacy and responsiveness. The evaluation should include reviewing timeframes for a CERAP, a response time frame, and service provision time frames and determine needed improvements.**

The Department agrees. This will be addressed through the implementation of HB1551. Procedures 304 will be updated accordingly.

**4.  The Department should develop a management group that liaisons with other community partners to assist in developing comprehensive plans for families with consistent contact with DCFS, law enforcement and concerns from school and behavioral health providers.**

There are already a number of groups that liaison with other community partners.  The Department has seen success in the 360 model and will continue to expand that model across the state. The goal of the 360 model is to meet the needs of our client population by streamlining a process by which all agencies exchange information, know resources, and can bring case or client challenges to the table to problem solve them.  The parties can talk about service needs that are missing, and jointly problem-solve.  They can refer from one agency to the other. Involved stakeholders include public/ private agencies; community service organizations: substance abuse, homeless shelters, counseling centers; local community action groups; schools/day care/early childhood organizations/crisis nursery and law enforcement.

DEATH AND SERIOUS INJURY INVESTIGATIONS

**DEATH AND SERIOUS INJURY INVESTIGATION 8**

| ALLEGATION | A three-year-old youth in care died in a house fire in his relative foster home. At the time of the fire, the youth's foster mother and his siblings were not at home and the foster mother's roommate was asleep in another room. |
| --- | --- |

| INVESTIGATION | The boy's mother was investigated and unfounded twice prior to her children coming into the Department's care. Three years before the toddler died in the fire, the |
| --- | --- |

Department investigated the mother for cuts welts and bruises after it was reported that the mother's five-year-old said his mother caused the bruise on his forehead. The report was unfounded. A year later, the Department investigated and unfounded the mother for environment injurious after it was reported that one of the children brought a screwdriver to school and reported he had access to needles at home.

Ten months before the fire, the Department received an anonymous report that the mother threatened to kill her children ages one, three, seven and eight. The report also alleged that the seven and eight-year-olds had been expelled from two schools for misconduct and had been psychiatrically hospitalized. After their discharge, the mother failed to obtain prescribed treatment or medication for them. Additionally, the reporter stated that the mother and her paramour beat the older boys, bruising their backs and legs. The Department investigated the mother for substantial risk of harm, environmental neglect, and medical neglect, and investigated the mother's paramour for cuts welts and bruises.  Three weeks into the child protection investigation, the child protection investigator received videos from an anonymous source showing the mother, who was pregnant with her fifth child, choking her eight-year-old, who gasped for breath, and harshly jerking the one-year-old. The mother was charged with two counts of aggravated battery of a child. The Department was granted temporary custody of the mother's four children and placed them in the home of an elderly relative. The child protection investigator failed to assess the home for safety. Two weeks later, another child protection investigator went to the home and determined it was unsafe for the children. That child protection investigator moved the children to the home of a maternal cousin, however background checks of all the adults in the home were not completed.

An assessment of the children recommended full-scale psychiatric evaluations, medication management and individual therapy for the two older boys; a special education re-evaluation for the seven-year-old, a case study evaluation for the three-year-old; and a referral to the DCFS Education Liaison.  The children's caseworker told Inspector General investigators that obtaining medication for youth in care is often frustrating and difficult. Less than three weeks after he was placed with the cousin, the eight-year-old was psychiatrically hospitalized.

Three months after the children were placed with the cousin, the cousin became concerned about the seven-year-old's inappropriate behavior to his one-year-old sibling. The cousin had the seven-year-old assessed at a psychiatric hospital. The Department was notified and opened an investigation against the foster mother for inadequate supervision and substantial risk. After a child protection investigation, the report was unfounded. The seven-year-old was in a partial hospitalization program for just under three weeks before an incident occurred at school leading to a three-week psychiatric hospitalization.

After his brother was hospitalized, the eight-year-old exhibited aggressive behaviors at school, and he was psychiatrically hospitalized for twelve days. Two days after he was discharged, he again became aggressive and was re-hospitalized for another three weeks.

Three months before the fire, a clinical staffing convened. The team, comprised of a facilitator, two consulting psychologists, the foster parents, and the foster care case worker and her supervisor, recommended referring the older boys for specialized foster care. The team recommended that the foster parent/cousin seek a therapeutic day school for the seven-year-old, and that she obtains a specialized foster care license, Intensive Placement

Stabilization services through the Department, and respite care. The team noted the seven-year-old had no psychotherapeutic services or medication follow-up since being discharged from a psychiatric hospital four months earlier. The team recommended a psychological evaluation, a psychiatric assessment and monthly follow-up to the consulting psychologist.

Six weeks before the fire, the older brothers' cases were transferred to a private agency for specialized foster care services. The two younger siblings' cases remained with the Department. The foster mother told the new caseworker that she was having trouble getting the boys' medications. She stated that she was required to contact the hospital and request refills on the last day of the month, and if she failed to do it that day, she had to wait another month to receive the prescriptions. The specialized caseworker told the foster parent to take the boys to the emergency room to get medication if needed.

One month prior to the fire, the team held another clinical staffing. The foster mother reported that she was struggling to get an appointment with the assigned psychiatrist for the boys and continued to struggle getting their medications. The team recommended a different psychiatrist. The foster mother was still not receiving Intensive Placement Stabilization services through the Department. The team insisted it was imperative that the foster parent begin receiving these services immediately.

Two weeks before the fire, the foster parent brought the older boys to the emergency room for medication. The specialized caseworker met them at the hospital and the boys stated they had not been taking their medications for two weeks.  The hospital recommended a partial hospitalization program for the eight-year-old, but the foster parent said this was not feasible, as it was too far from her home. A week later, approximately eight months after the children became youth in care, and at the request of the specialized foster care agency, the older boys were finally accepted into a local trauma center for outpatient psychiatric services.

Three days before the fire, the caseworkers visited the foster home. The caseworkers had to enter through the rear of the apartment building as the foster parent claimed the door was jammed and the landlord needed to fix it. She did not disclose she was served an eviction notice 35 days earlier.

At the time of the fire, the foster parent was still unlicensed. In interviews with Inspector General investigators, it was apparent both caseworkers assumed the other caseworker was responsible for getting the relative foster parent licensed. Neither caseworker determined who else was living in the home with the children. The cousin's paramour, the paramour's cousin and her son, and a roommate were living in the apartment at different times.

On the morning of the fire, the foster parent left the three-year-old sleeping in the apartment while she went to get the older boys from the friend's house. According to the foster parent, she woke up her roommate and told her she was leaving and that the three-year-old was sleeping in the bedroom.  The roommate, however, stated that she was asleep and did not remember the foster parent telling her this. About fifteen minutes after the foster parent left the apartment, the roommate called her to tell her there was a fire. The foster parent asked if she got the three-year-old out of the apartment, but the roommate stated she did not know that he was in the home. The three-year-old was found deceased in the apartment by firefighters.

The other children were removed from the foster mother and placed in another foster home. The day after the fire, the eight-year-old was psychiatrically hospitalized. The seven-year-old was hospitalized a few days later. They were placed in a therapeutic residential treatment facility. The one-year-old sibling was placed in a relative foster home.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  The Department should review this case to determine the appropriate level of discipline for the C-sequence child protection investigator and her supervisor for their failure to: (a) ensure the** |
| --- | --- |

children were in a safe home with either relative; (b) refer this case to the Office of Legal Services and Clinical Division to consider whether the mother committed one or more egregious acts which could be used to terminate her parental rights and next steps to take in that process; and (c) complete the HMR Placement Safety Checklist.

The Department is reviewing the case for appropriate discipline.

**2.   The Department should review this case to determine the appropriate level of discipline for the Department caseworker for her failure to: (a) obtain background checks of the adults in the cousin's home; (b) contact the DCFS Educational Liaison, as recommended by the Integrated Assessment, to ensure the older boy received the therapeutic day school his IEP required and that both boys were not repeatedly and illegally suspended from school based upon their disabilities, and (c)  complete the Home Safety Checklist for the cousin's apartment.**

The Department is reviewing the case for appropriate discipline.

**3.  The Department should review the process for foster parents/relative caregivers to obtain medications for youth in care in a timely manner.  It should not require children, who are known to need psychotropic medication, to wait months to receive it.**

The Department agrees.   However, the procedure for consent for medication once referred by a psychiatrist should not be altered. Rule 325 has created a system which promptly identifies and evaluates the needs of children for psychotropic medications, provides timely access and monitors children on such medication, while recognizing the risks that such medications pose, particularly if they are not prescribed and monitored with care. The two youth in this report have multiple consent approvals for psychotropic medications.  The majority of consents were initiated by hospitals. The issue in this case was linkage to a psychiatrist, not the approval process itself.

Furthermore, this should resolve itself with the Managed Care rollout.

***OIG COMMENT***: *The OIG was not recommending any changes to existing Rule or Procedure 325.  Was there a review of why these youth waited months to receive their medication? How will this issue be resolved through the Managed Care rollout?*

**4.  The Department should require caseworkers to obtain and review psychological evaluations and social work assessments, which schools must obtain before classifying children as disabled and placing them in special education.**

The Department agrees that caseworkers should obtain psychological evaluations and assessments, this is already required in Procedures 314.  The Department will look at the wording in P314 and add more specificity, if needed.

**5.  The Department should ensure POS agencies promptly release the SACWIS credentials of Child Welfare Employees who leave their employment.**

The Department agrees.  APT will ensure that POS agencies understand that when employees leave their agency, they must clear all cases from that employee's name and submit a CYCIS ID form for deactivation to DCFS CYCIS request within 48 hours.

**6.  The Department should ensure DCFS and POS Licensing check the homes of relatives, even when the relative does not want to be licensed, to determine the homes are safe, or make sure the assigned permanency worker does so.**

The Department agrees.

**7. The Department should reinforce and re-train staff regarding the Home Safety Checklist to ensure it is satisfactorily completed at appropriate milestones, and specifically before a child protection investigator or caseworker permits a child to be placed in a home. This reinforcement and retraining should also include obtaining background checks for all the home's adult residents.**

The Department agrees.

**8. This report should be shared with the private agency which is currently assigned this case.**

The Inspector General shared the report with the private agency currently assigned the case.

36

DEATH AND SERIOUS INJURY INVESTIGATIONS

**DEATH AND SERIOUS INJURY INVESTIGATION 9**

| | |
|---|---|
| **ALLEGATION** | An eight-year-old boy and his five-year-old sister died in a fire at their family home. Their mother and one sibling were able to exit the home during the fire and another sibling and the father were not at home. At the time of the fire, the ninth child abuse/neglect investigation was pending against the parents. |

**INVESTIGATION**  This family has an extensive history with the Department. Ten years prior to the deaths, the mother was investigated and indicated for medical neglect after medical staff reported concerns that the mother was not complying with medical treatment recommendations for her four-month-old infant son. Four years later, the mother was investigated and unfounded for medical neglect for failing to take her newborn daughter for follow-up medical appointments for an irregular heartbeat. The mother also continued to smoke around the newborn and the then four-year-old son who had asthma despite medical recommendations that she cease smoking around the children.  Seven months later, the mother was investigated and indicated for inadequate supervision and substantial risk of physical injury/environment injurious to health and welfare by neglect after the police went to the home to execute a search warrant for drugs and found the mother in possession of meth and sleeping on the floor. The mother was arrested for possession of meth. Her children, ages six, four, three-years-old and seven-months-old, were present in the home and were taken into protective custody. The father was in jail during this investigation. The children were placed in foster care for over two years.  The mother complied with her service plan and the children were returned home, a decision based in part on the fact that the father was not residing in the home.

Five weeks after the children were returned to their mother, the Department investigated and unfounded the parents for substantial risk of harm after the parents were involved in a physical altercation and the father broke the windows in the mother's van. The police were called, and the father was arrested. At the time of his arrest, the father told police he was living with his three boys and their mother and that he and the mother had been drinking all day. This investigation was unfounded despite the police officer's statement that it would be dangerous for the children if the dad lived in the home.

Two months later, the police contacted the Hotline after responding to an emergency call at 6 am of three missing children, ages nine, seven, and six. The boys had left the house during the night and were found playing inside an ambulance ten blocks from their home. This was the second time within a month the three boys had left the home in the middle of the night. As the parents took immediate action by calling the police once they realized the boys were gone, and they added locks to the doors, the investigation was unfounded.

Four months later, the mother was investigated and unfounded for inadequate supervision after the school reported mom was looking 'glassy eyed' and school officials suspected she was using meth.  It was also reported that the children's attendance at school was declining. The allegation of inadequate supervision was unfounded based on no evidence that the children were left unsupervised.

Three months later, school personnel contacted the hotline again reporting mom appeared to be using meth as she was skinny, had her teeth were rotting. The father had recently been released from jail and was also skinny and had sores on his face. This investigation was unfounded as the investigator and supervisor determined there was not enough credible evidence that the mother was using illegal drugs, and she appeared stable and able to parent the children appropriately.

Nine months later, school personnel again contacted the Hotline to report suspected drug use by the parents and one of the children reporting there was no heat or running water in the house. This investigation was unfounded for substantial risk of harm and environmental neglect as the investigator observed the home to be clean and

appropriate with electricity and running water.  Both parents submitted to a drug screen which did not detect any drug use.

Two months after the previous investigation was unfounded, the ninth child protection investigation against the parents was initiated for Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare and Head Injury by abuse after school personnel contacted the Hotline, for a third time in a year, to report the eight-year-old son disclosed that he was scared for his five-year-old sister.  He stated their parents had been fighting and their father punched their mother in the eye and made it bleed.  He stated his eleven-year-old brother got into the middle of the fight and their father hit him with a metal pole and the mother hits his brother with a belt. It was further stated, both parents use meth. The paternal grandmother told a school counselor that the father has a $100 a day meth habit, the water and heat had been turned off, the family only have space heaters to heat the upstairs, and food is limited. This child protection investigation was pending at the time of the fire.  Six thirty-day extensions were granted for this investigation, resulting in the investigation continuing for seven months.

Upon assignment to that child protection investigation, the investigator went to the school and observed the three older children. The nine-year-old had a bruise on his leg that he attributed to a fall, dirty ears, eczema on his arm, and a scratch on his nose. The eleven-year-old had a "couple of bruises" but the investigator noted that they appeared to be from "more normal child bruising." The investigator attempted to see the five-year-old at her preschool; however, school staff told the investigator that they had dismissed the child from their program for lack of attendance. The investigator did not ask the children about the allegations because they were scheduled for forensic interviews the next day. The investigator completed the safety assessment, and it was approved by her supervisor, before the children were interviewed.

After unsuccessfully trying to locate the parents, the police took protective custody of the children to drive them to and from their forensic interviews. The seven-year-old stated that he got spanked once with a paddle, his eleven-year-old brother got spanked once with the belt, and that their dad had spanked all the boys.  He stated that the power had been turned off a couple of times and one time they did not have water. He further stated that one time his dad made mom's eye bleed and then they all went to their grandmother's house, because they were scared.  He stated that the five-year-old hides in the corner of the room when the parents fight while he and his brothers protect her. The eleven-year-old reported physical violence between the parents and that mom goes back and forth between dad's house and her boyfriend's house when they fight. He further stated that his glasses were broken once when his dad spanked him and that they used to get spanked with a paddle, but now they get spanked with a belt on the back of their legs.

Three days later the investigator went again to the family home, but the parents would not let the investigator into the house. They did agree to speak with her outside. The five-year-old was observed eating a sandwich and looked clean and dressed appropriately. When the investigator asked the parents about their meth use, both parents got upset and went back into the house, taking the five-year-old with them.

After six weeks with no family contact, the investigator interviewed the eleven-year-old at his school. He told the investigator that the police came to their house and took his father because he threatened to kill himself. The father was psychiatrically hospitalized. He stated that he and the five-year-old were in the room when his father made these statements and they were scared. The investigator did not obtain the police report.

Two months after the investigation was initiated, the investigator went to the home again, to complete her closing safety assessment. Again, the parents would not let her into the house for the required visual inspection; however, they did talk with the investigator outside. The mother said she still did not have identification needed for the drug test.  The investigator then talked to the older boys at their schools. The investigator's case notes of the interviews document no concerns or observed drug use. However, supervisory notes and an Inspector

DEATH AND SERIOUS INJURY INVESTIGATIONS

General interview with the investigator confirmed that the eleven-year-old told the investigator his parents had an argument and the father "jumped on" the mother. He also described items he had seen in the home that resembled drug paraphernalia. The eleven-year-old further told the investigator his mother hit him with a belt on the legs for not listening to her. Noted in the supervisor's notes, the eleven-year-old told the investigator that "it is worse now" than when they first were returned home from foster care because the parents argue all the time and it was scary.

Subsequently, over a five-month period, the investigator was directed by her supervisor to prepare a petition to order the parents to comply with services. This petition was not filed with the court by the investigator until after the death of the two youngest children.

Approximately five months after the investigation was initiated, the mother called the investigator to report that she and the children were moving in with the maternal grandmother as she and the father were not getting along. Up until the time of the fire, the investigator believed the mother and children were living apart from the father at the grandmother's home. However, the investigator never contacted the grandmother or went to that home to verify this information.

The supervisor directed the investigator to refer the mother for intact family services so she would have a service plan to follow, and the goal would be to stabilize the family and get her and the children on a healthy track. The mother agreed to this plan and the case was assigned to an intact family services agency, but case handoff had not occurred at the time of the fire.

Despite the multiple hotline reports of the parents' suspected drug use and a history of drug use, the investigator did not have the parents complete drug testing until six months from the start of the investigation. When the mother was screened, she had amphetamines and meth in her system. In an interview with Inspector General investigators, the investigator stated that in this region the closest drug screening place was approximately forty minutes away which made it difficult to accommodate her schedule.

During the investigation, Inspector General investigators learned the mother was involved in a twelve-step program and her sponsor was the step-daughter of the investigator assigned to the ninth investigation. The investigator did not disclose this possible conflict of interest to the Area Administrator.

While the investigation was pending, the hotline was contacted to report that law enforcement received a 911 call for a house fire.  The mother and her ten-year-old son were the only two family members who were able to get out of the home. Three children were in the upstairs bedroom watching TV and sleeping when the fire started. The ten-year old went downstairs to tell his mother he saw flames and the floor was hot. The mother went to the bedroom and saw flames in the doorway, but it was too hot to enter the room where the five and eight-year old children were. Both children died in the fire. At the time of the fire, the home had no power and there were extension cords running from a neighbor's home with some of the extension cords spliced together. The room where the children were sleeping had a space heater. The condition of the home was poor, as there was garbage throughout the home and the gas oven was open and being used to heat the home. The father was at the store and the eleven-year-old son was at his grandma's house when the fire broke out. The investigation was indicated. The parents have both been sentenced to five years for child endangerment. The two surviving siblings have been placed in foster care.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The area administrator and child protection supervisor in this field office should be disciplined due to their lack of attention to details and follow-up when supervising child protection investigators.** |
|---|---|

DEATH AND SERIOUS INJURY INVESTIGATIONS

The Area Administrator and supervisor received a seven-day suspension.

**2.  Since the investigator involved in this investigation no longer works for DCFS and is employed presently at the Department of Human Services (DHS) office, disciplinary action may not be an option. It is recommended this report be shared with the DHS Secretary and any appropriate supervisory staff for the former investigator.**

The Inspector General shared a redacted report with the Department of Human Services.

**3.  The Department must immediately retrain staff in this region on appropriate responses to parents' refusal to allow entry into the home.**

There was a retraining at the involved field office.  The retraining was mandatory for all child protection staff, and voluntary for Intact and Permanency staff.  This topic was covered as part of the retraining.  This issue will also be addressed statewide at the all DCP supervisors meeting.

**4.  The Department should retrain staff in this field office on adequate completion and use of assessments. (Safety, Risk, Domestic Violence, Substance Abuse, and Home Safety Checklist).**

There was a retraining at the field office.  The retraining was mandatory for all child protection staff, and voluntary for Intact and Permanency staff.  This topic was covered as part of the retraining.

**5.  DCFS Office of Legal Services should retrain child protection staff in this region on use of the CFS 600-5 (Release of Information for Child Protection Investigations) and the CANTS 7 (Administrative Subpoenas).**

In 2020, DCFS Legal will work with DCFS Operations to retrain child protection staff in this region on use of the CFS 600-5 and the CANTS 7 (administrative subpoenas).

**6.  The Department should consider sending this area/region's child protection teams to the Child Welfare Training Academy to be re-trained on Procedure 300, which should include accessing the family home and completing required assessments accurately and in a timely manner.**

The Department agrees.  The Department will consider the feasibility of sending all child protection staff from this office through Foundation/Sim Lab retraining.  If not possible, training specific for this office will be provided locally by child protection staff and can be completed in a shorter timeframe and more expeditiously which is critical for this office.   Upon review, it was determined not feasible to send all the child protection staff through Foundation/Sim Lab training.  There was a retraining at the field office.  The retraining was mandatory for all child protection staff, and voluntary for Intact and Permanency staff.  This topic was covered as part of the retraining.

**7.  All investigations pending more than 60 days in this field office should be reviewed to assure family and child contacts have occurred in a timely manner and the children are safe.  This review should also include looking at assessments to ensure they are timely and properly completed, proper supervision is occurring, and there has been follow up on supervision directives.**

All 60+ pending investigations were reviewed by the Regional Administrator and the Area Administrator.  This review was conducted at the time of the incident.

**8.  All extensions approved by the administrator should be reviewed to assure extensions are warranted.**

DEATH AND SERIOUS INJURY INVESTIGATIONS

All 60+ pending investigations of this administrator were reviewed by the Regional Administrator and the Area Administrator.  This review was conducted at the time of the incident.

**9.  The Department should complete a review of the drug testing process in this region to determine its availability to families and ensure immediate drug testing resources for the area are readily available.**

The Department agrees. This recommendation is currently in process.

***OIG COMMENT:*** *Please provide the OIG with an update as to how the review is being completed and what has been done to address the recommendation.*

**10.  The DCFS Office of Legal Services should review the practice of requesting law enforcement to take protective custody for interviewing purposes and retrain staff accordingly.**

The Department agrees. This recommendation is currently in process.

**11.  The DCFS Ethics Officer and the DCFS Office of Legal Services should ensure child protection staff in this field office understand conflicts of interest and what to do in the event they are assigned an investigation in which they have a personal relationship with a subject of the investigation.**

The DCFS Ethics Officer met with child protection and other division staff in this field office to discuss and explain, among other things, conflicts of interest and what to do in the event they are assigned an investigation in which they have a personal relationship with a subject of the investigation**.**

41

**DEATH AND SERIOUS INJURY INVESTIGATION 10**

| **ALLEGATION** | A nine-month old male died of lymphocytic myocarditis -- a common form of fulminant myocarditis -- after exhibiting seizure-like activity, difficulty breathing, and unresponsiveness. While his death was due to natural causes, there was an unfounded child protection investigation involving possible medical neglect to his older brother within the year preceding the child's death. |
| --- | --- |

**INVESTIGATION**  The family's involvement with the Department began in June 2017 after two hotline reports from a doctor and a social worker. Both parties reported concerns of possible medical neglect for the older brother, who was three years old at the time. The doctor stated that the child was born prematurely in March 2014 and had multiple medical issues that required specialist evaluation. Despite being told that the child needed to consult a specialist shortly after birth, the parents did not bring him in until March 2017. The social worker stated that the child had three complex medical needs and had missed 23 appointments since October 2016. According to the doctor, the child missed appointments with his audiologist, nephrologist, ophthalmologist, gastroenterologist, and kidney specialist. Efforts to positively engage the mother in services proved unsuccessful.

An investigation into medical neglect was opened against both the mother and father and was assigned to a child protection investigator (CPI) who was new to the Department. The CPI noted that an attempt was made to visit the home soon after the investigation was opened in early June 2017. The supervisor instructed the investigator to locate and assess the safety of the minor, ensure the child was taken to the doctor for assessment, complete a DCFS nursing referral for consultation, assess the safety of other children in the home, and ensure that the other children were medically assessed.

The CPI's documentation was inconsistent throughout the investigation. Between early June 2017 and mid-July, there was no documentation of activity. This may have been due to his inexperience as well as his high caseload. Records showed that the investigator was assigned 17 new investigations in May 2017, 18 new investigations in June 2017 (including this investigation), 10 new investigations in July 2017, and 10 in August.

A supervisory note from mid-July 2017 instructed the CPI to update his notes and document efforts to locate the minor. In addition, the supervisor instructed the investigator to visit the address listed in the Child Abuse and Neglect Tracking System (CANTS) and those found in public aid searches. The first in-person visit was documented the day after this meeting. According to the investigator, the mother reported that she had trouble following up with her appointments since the provider did not accept her health insurance. The CPI noted that the mother and child were home and took photos of the child. He did not note if any other children or family members were present in the home. A supervisory note entered shortly after this visit instructed the CPI to contact the gastro intestinal (GI) specialist for insight into the child's recent medical appointment.

The second visit was made in October 2017. Between the July supervisory note and this visit, there were no case notes entered by the CPI. When confronted about the lack of documentation, the investigator stated that he did visit the mother and child; he further stated that the mother reported recently giving birth to another premature newborn. The CPI failed to address the wellbeing of the child and did not assess the home, the other children, or ask questions regarding the medical neglect issue. In addition, medical records later submitted to the Department showed that the child missed medical appointments between the CPI's most recent visits. An appointment with a pediatric gastroenterologist was missed in September 2017 (the maternal grandmother brought the child in later that day), and an appointment with a pediatric nephrology clinic was missed in early October 2017.

42

These lapses caused supervisors to repeatedly approve extension requests. Three extension requests were made between June and October 2017: one in August one in September, and a one in October. The first two requests were for "additional tasks needed," and the last one was due to "medical assessment results needed, child to be located." Documentation from an in-person supervision in November 2017 also noted that the Supervisor instructed the CPI to update his case notes, which had not been updated since July.

The investigator spoke with the mother over the phone in early November. The investigator and mother discussed a recent conversation the mother had with a hospital social worker. The mother reported that the hospital was willing to help her with scheduling and transportation but had not assisted her with her health insurance issues. The investigator also reached out to the hospital to confirm the children's recent wellness check. In a conversation with the doctor who made the original report, the doctor stated that they had made efforts to educate the mother on the consequences of missing appointments. He also said he would make a final call on the medical neglect issue after reviewing the charts. The CPI did not follow-up with the doctor regarding these statements.

The investigator attempted to conduct his final visit to the home in November 2017. The CPI's supervisor determined that a nursing assessment summary and a doctor's assessment of medical neglect were still needed. The supervisor also noted that the mother had not been consistent with meeting the child's medical needs. A fourth extension was requested in early November, noting that the case needed to be opened for intact services and that a medical opinion relative to medical neglect was needed. Investigation extensions continued and another extension was requested and approved in December for "further tasks needed," and a sixth one was approved in January 2018 for "intact services." The seventh extension was requested in February 2018 for "further assessment needed."

A supervisory note from February 2018 showed the CPI was told to see the children, add case notes, submit a final Child Endangerment Risk Assessment Protocol (CERAP), consult the doctor that made the original hotline report, complete a nursing referral, and contact the assigned nurse. The CPI's supervisor changed throughout the case, making it difficult for the CPI to receive needed support and guidance.

Instead of consulting with the doctor that made the original hotline report, the investigator consulted with two other doctors. One doctor stated that he would consider medical negligence but did not feel comfortable since he hadn't seen the child in nearly a year. The other doctor indicated that the child was relatively healthy and would not determine medical negligence for this reason.

The CPI visited the mother, child, and her newborn in late February 2018; he visited the oldest child in school. The investigation was unfounded in March 2018 with the rationale that the doctor did not diagnose medical neglect because the child was growing. This investigation was unfounded against the father despite no contact with him. No nursing referral was completed.

The child's death was reported in July 2018, four months after the Department's investigation was closed. The maternal grandmother was reportedly giving the newborn a bath when she noticed that he became short of breath. According to the grandmother, soon after the infant showed seizure-like symptoms the infant became unresponsive. The autopsy found the cause of death to be lymphocytic myocarditis.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. The Department should amend the unfounded allegation from this investigation to unfound the medical neglect allegation against the mother instead of the father.** |

The correction was completed by the Department's Office of Information and Technology Services.

**2. This report should be shared with the involved area administrator for training purposes regarding extensions of child protection investigations and supervision.**

This Area Administrator is no longer working in child protection; however, the report will be shared.

**3. This report should be shared with the involved child protection investigator for training purposes.**

The report was shared with the child protection investigator.

**4. The Department should reevaluate their extension rule and procedure, develop a new clear procedure instructing supervisors and area administrators on good cause for case extension, and train staff on good cause for case extension.**

Attorneys with the DCFS Office of Legal Services (OLS) have communicated with the Chief Deputy Director of Operations and Deputy Director of Child Protection to reevaluate DCFS Rule 300.110 and DCFS Procedure 300.50 regarding extensions for good cause. With the support of OLS, Operations/Child Protection are considering further instructions and training for Child Protection supervisors and area administrators regarding good cause for case extensions.

***OIG COMMENT****: The Department's response update is nonresponsive. Please provide the OIG with clarification on how the recommendation will be implemented.*

**5. Department management should review all overdue cases exceeding 90 days to ensure all overdue cases are pending for good cause.**

The Department reviewed all cases that went beyond 90 days and reminded Regional Administrators of their need to oversee this process. Each region now has a plan for on-going review of all cases exceeding 90 days.

**DEATH AND SERIOUS INJURY INVESTIGATION 11**

| ALLEGATION | A twelve-year-old medically complex boy died after his health declined and his parents withdrew life support. There was a pending child protection investigation for medical neglect and malnutrition to the boy at the time of his death. |
|---|---|

| INVESTIGATION | The boy had severe developmental delays, seizures, was G-tube dependent and wheel chair bound. |

The boy's parents had been divorced for eight years. The parents had five children together. The boy and two of his siblings lived primarily with their father, while his two other siblings lived primarily with their mother. The children had weekend visits with their non-custodial parent. When the boy was nine years old, his mother was indicated for substantial risk and cuts bruises and welts after the mother admitted to slapping the boy's older sibling and driving under the influence of alcohol.

Two months prior to the boy's death, he was taken by ambulance to the hospital after he started seizing at his father's home. The hospital social worker contacted the hotline after concerns that the boy had been medically neglected and there had been a delay in seeking medical care. A child protection investigation was opened for allegations of medical neglect and malnutrition to the boy by his father. The hospital staff reported that they wanted to conduct discharge planning with the mother since the boy was neglected while in his father's care.

The child protection investigator visited the mother's home and deemed it safe and appropriate for the medically complex boy and his siblings. The home appeared clean and she had set up a space for the medically complex boy's special needs. The child protection investigator spoke with the boy's fifteen-year-old sibling who appeared neat and clean and said he felt safe in his mother's home.

The child protection investigator spoke with the father who stated that the boy had been on the same diet, which had been approved by a doctor, for three years. The father also stated that he had brought the boy to the doctor three times for diarrhea and that his pressure sores had been present for one to two weeks. The father reported not remembering what was talked about regarding the medication as the reason why he has not given it to his son. During this visit, the child protection investigator spoke with the boy's fourteen-year-old and eight-year-old siblings who resided with their father. Both children appeared to be clean and appropriately dressed, and reported their dad takes them to their medical appointments.

Ten days after he was admitted, the boy was discharged from the hospital to his mother. Unbeknownst to the child protection investigator, the boy was re-hospitalized a week later after developing a fever. He was then transferred to a children's hospital. Four days later, the boy was moved to the intensive care unit for difficulty breathing. He was intubated for a week. He was discharged to a rehabilitation center a month later but was readmitted to the hospital the next day due to respiratory distress; he needed a tracheostomy. He continued to decline as his seizures were increasing. A week later, both parents decided to withdraw life support and allow their son to pass peacefully.

At the time of the boy's death, the child protection investigation was still pending from the initial hospitalization. A week after the boy died, the child protection investigator contacted the mother to schedule a visit with her and the boy to close the investigation. At that time, the mother informed the child protection investigator that the boy had been readmitted last month and died last week.

Two months after the death, the child protection investigation for medical neglect and malnutrition was indicated against the father. The Department did not investigate the parents for the death as it was due to natural causes.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  The Department should review this case and take appropriate disciplinary action as to the involved child protection supervisor.** |

The child protection supervisor was served with a seven-day suspension.

**2.  The Department should review this case and take appropriate disciplinary action as to the involved child protection investigator.**

The child protection investigator was issued a written reprimand.

46

**DEATH AND SERIOUS INJURY INVESTIGATION 12**

| ALLEGATION | A two-year-old was found unresponsive and pronounced deceased after being left in the care of his mother's paramour. The two-year-old suffered a lacerated liver, lung |

contusions, broken ribs, abdominal injuries, and bruising. There was an open intact family services case at the time of the death and several unfounded child protection investigations within the year proceeding the death.

The interim report addressed concerns that were raised about two contact notes created and entered into the Statewide Automated Child Welfare Information System (SACWIS) by the private agency intact family services worker documenting her last visit to the family home three days prior to the death.

| INVESTIGATION | Six months prior to the boy's death, the Department investigated the mother for cuts bruises and welts after the reporter observed the child with marks on his bottom. The |

report was ultimately unfounded, but the mother agreed to intact family services during the child protection investigation. A private agency intact family services case was opened five months prior to the boy's death. The intact family services caseworker made regular visits to the mother's home; she documented her last visit to the home three days prior to the boy's death. Two contradictory contact notes purportedly documenting this visit were discovered following the boy's death. According to the first contact note, entered the morning after her final visit, both the boy and his older brother were home at the time of the visit. Hours after the boy's death, the caseworker entered a second note documenting that only the boy's older brother was home during the visit. As a result of the conflicting notes, and at the direction of the Department, the private agency caseworker was placed on administrative duties and was prohibited from being involved in any cases.

The private agency immediately completed its own internal investigation into the conflicting contact notes. The agency president personally conducted the investigation, consisting of interviews with the caseworker and her supervisor, as well as a review of the caseworker's other cases. The private agency's investigation determined that the caseworker conducted two Saturday visits; one ten days before the death and the other three days before the death. The caseworker did not enter her contact note for the first Saturday visit into SACWIS in a timely manner. When the caseworker entered her contact note describing her observations made during the first Saturday visit, she mistakenly dated it for the second Saturday visit. Upon learning of the boy's death, the caseworker reviewed, corrected and entered into SACWIS a contact note about her first Saturday visit, which she previously entered and mistakenly dated as the second Saturday visit. In addition, she entered into SACWIS a new contact note about her second Saturday visit. She did not identify either of the two contact notes as amended, revised or corrected. She informed her supervisor after entering the contact notes. As a result of the internal investigation, the president of the agency determined that while the caseworker did not follow procedure, she did not intentionally falsify contact notes. The president imposed a corrective action plan to address service and documentation issues that the internal investigation identified.

Inspector General investigators reviewed the SACWIS contact notes, the private agency's internal investigation, and conducted interviews with the private agency caseworker, supervisor, and the president. The agency's president described the caseworker as hardworking and one her best workers. She said the possibility of falsification never occurred to her. The president said the caseworker was consistent in her explanation and found her credible.

Six weeks after the caseworker was put on desk duty, she was terminated from the private agency. The president told Inspector General investigators that she was unable to keep the caseworker employed under the restrictions from the Department. She stated that while the caseworker was on desk duty, the intact family services program was understaffed. The president of the agency told Inspector General investigators that if she had not been directed by the Department to put the caseworker on desk duty, this issue would have been addressed with a

corrective action plan. The president stated that if the Inspector General investigation found that the caseworker could resume her duties, and there was an open position at the agency, the president would rehire this caseworker.

The caseworker's supervisor told Inspector General investigators that she learned of the boy's death from the Department's Intact Administrator and then informed the caseworker. Later that day, the caseworker informed her supervisor that she entered the two additional contact notes in an effort to correct her mistake; that she had not seen the boy on her last visit.

The caseworker told Inspector General investigators that she learned of the death from her supervisor by phone. The caseworker stated that her supervisor said it was a good thing she had just seen the boy three days earlier. The caseworker admitted to Inspector General investigators that she was confused by her supervisor's statements because she had not seen the boy at her last visit. She told Inspector General investigators that she looked at SACWIS, realized her mistake, and entered the additional two notes to correct the mistake.

The DCFS Quality Enhancement and APT conducted a field audit of the private agency's intact family services cases. All open cases with children ages birth to three-years-old, as well as all of this caseworker's cases, were reviewed. The audit noted areas for improvement but did not note any issues with possible falsification.

The Inspector General investigation found insufficient evidence to suggest that the caseworker's intentions were to falsify records. Her actions seemed to demonstrate and support that her intent was to correct a mistake.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. This interim report should be shared with the private agency.** |

The Inspector General shared the report with the private agency.  The Inspector General will meet with the agency's administrators and a member of the Board of Directors to discuss the findings and recommendations made in the report.

**2. The private agency should take whatever personnel action it deems appropriate in light of the Office of the Inspector General's investigative findings that the caseworker did not purposely falsify records in this case.**

The Inspector General will meet with the agency's administrators and a member of the Board of Directors to discuss the findings and recommendations made in the report.

DEATH AND SERIOUS INJURY INVESTIGATIONS

**DEATH AND SERIOUS INJURY INVESTIGATION 13**

| **ALLEGATION** | A one-and-a-half-year-old was found by her twenty-two-year-old mother floating face down in a swimming pool at a friend's home where the family was living temporarily. There were three indicated child protection investigations against the mother prior to the death and the intact family services case closed two months prior to the death. |
|---|---|

| **INVESTIGATION** | The mother first came to the attention of the Department when she was four-years-old. She and her older half-brother were in foster care for five months after their parents were indicated for substantial risk of sexual injury to her and for abusing the older half-brother. |
|---|---|

The maternal grandfather died in a motorcycle accident when the mother was eleven. The mother began to drink and smoke cannabis every day, but the maternal grandmother never noticed. At the age of sixteen, the mother overdosed on pills and tried to hang herself. The mother was diagnosed with bi-polar disorder and major depression. By age seventeen, the mother started using methamphetamines and within one month, was a daily user. The mother made another suicide attempt and was admitted to a hospital psychiatric ward. That same year, the mother went into drug treatment for twelve hours.

As a parent, the mother came to the attention of the Department when the mother was investigated and indicated for environment injurious to the health and welfare to the two-month-old, after the hotline was contacted to report that the police were called for an altercation between the mother and her paramour (father of the deceased baby). The mother became upset, left with her two-month-old infant in a vehicle after she had been drinking and was intoxicated; she was also advised not to drive by law enforcement. The mother completed a fifteen-day detox program but was then discharged from residential treatment.

While the first investigation was pending, the Department opened another investigation against the mother for substantial risk of physical injury to her three-month-old infant, after the hotline was contacted to report that the mother was staying in a residence that had methamphetamine and cannabis paraphernalia located in the home. The mother tested positive for methamphetamines and THC. The mother admitted to using meth and reported her last use was the day before. The mother reported to ongoing treatment for substance abuse since the age of twelve. The Department took protective custody of the infant and the infant was eventually placed in traditional foster care. The investigation against the mother was indicated. The mother completed detox, substance abuse and mental health treatment, and all her random urine screens were negative. The now one-year-old was returned to his mother.

Ten months after the child was returned home, the mother was investigated for substantial risk of physical injury/environment injurious to health and welfare by neglect and the paramour was investigated for substantial risk of physical injury/ environment injurious to health and welfare-incidents of violence or intimidation, after the hotline was contacted to report that an altercation had occurred between the mother and her paramour. The mother had reported to law enforcement that she wanted to file a domestic battery report against her paramour for a physical incident.  She told law enforcement that she was holding her infant child as her paramour was hitting her and at one point, he hit the child in the head; she said the child was not hurt. Her brother witnessed the incident. The mother reported breaking up with her paramour and was moving out of the home.  There was a history of domestic violence between the mother and paramour. The mother showed the child protection investigator her bruises and told him she would obtain an Order of Protection. The investigator screened the mother for substance abuse and domestic violence and marked the Child Endangerment Risk Assessment Protocol Safety Determination form as "SAFE." The investigation against the mother's ex-paramour was indicated and the investigation against the mother was unfounded.

An intact family services case was opened for domestic violence education and supportive counseling. Criminal charges were filed against the ex-paramour for domestic battery/bodily harm. At a scheduled home visit to complete a home safety checklist on the mother's new home, the mother said she gave temporary guardianship of her children to the maternal grandmother. The following day, two months after the intact family services case was opened, the case was closed.

Nine months after the intact family services case was closed, the mother was investigated and indicated for substantial risk of physical injury/environment injurious to health and welfare by abuse, after the hotline was contacted to report that the mother had been abusing alcohol and methamphetamines while supervising her two-year-old and one-year-old. The children were placed with the maternal grandmother. The mother admitted to the investigator to random meth use. The mother asked for help to get into treatment, so she could get her children back after she completed an inpatient program. The investigator discussed intact family services and the mother agreed to cooperate with services, counseling and drug testing to keep her children. After conducting substance-abuse and domestic violence screens and walking through the home to complete a home safety check list, the investigator determined, "no children are likely to be in immediate danger of moderate to severe harm." The mother said she planned to live with the maternal grandmother and agreed the maternal grandmother could keep the children indefinitely. The investigator marked the CERAP as SAFE and the supervisor waived weekly monitoring unless circumstances changed.

Two months later the intact worker spoke with the mother who was extremely agitated and wanted services to be over. She also said that her and the kids were moving in with the maternal grandmother and that the grandmother would keep her off drugs. After the intact worker and investigator discussed the case, the investigator suggested the mother first submit for a drug screen before closing the case. The mother agreed and the drug screen was negative. It was recommended the case be closed as the mother was refusing services, had a clean drug screen, and planned to move in with the maternal grandmother.

Less than two months after the last investigation, the mother found the one-and-a-half-year-old floating dead in the pool at a friend's house where she and the children were staying. The mother said she last saw the baby alive at 11:30 p.m., the previous night when she put the children to bed. Around 10:30 a.m. the following morning, the mother checked on the one-and-a-half-year-old and saw a lump in the blankets and assumed the baby was still sleeping; however, she did not check. At some point, the maternal grandmother left the home. The mother thought the one-and-a-half-year-old might have gone with her. As the mother was getting ready to leave, she began looking for the one-and-a-half-year-old and found her in the pool. The one-and-a-half-year-old had drowned in the pool, which had no barrier around it. The police found the ladder next to the pool on the ground. Protective custody was taken of the two-and-a-half-year-old sibling the day his sibling was pronounced deceased. The sibling was placed in a traditional foster home, but then moved to the home of fictive kin.

During an Inspector General interview of the child protection investigator who investigated three of the four reports against the mother before the one-and-a-half-year-old drowned, the investigator was not sure he read his own case notes before investigating the B, C and D sequences against the mother. The investigator referred the mother a second time for intact family services after she admitted to using Meth. The mother refused those services. The investigator asked the intact family services caseworker to drug screen the mother and that one screen came back negative. The investigator agreed to close the mother's intact case for her refusal of services.

Neither the intact family services caseworker, child protection investigator, or his supervisor, asked the State's Attorney's Office to file a petition to seek court involvement to protect the children. In an interview with Inspector General investigators, the child protection investigator and supervisor stated the reason they did not seek court involvement was because intact services are voluntary, and the mother had a right to refuse services without retribution. The investigator and supervisor stated that based upon experience, they believed DCFS

50

DEATH AND SERIOUS INJURY INVESTIGATIONS

Legal would not help them advocate with the State's Attorney to file a petition against the mother and they knew the State's Attorney would not intervene because the mother's last drug screen was clean.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.   The child protection investigator should be re-trained on Procedure 300 with an emphasis on his duties and responsibilities under Section 300.50.**

The child protection investigator will be re-trained.

**2.   The child protection supervisor should be re-trained on her duties to supervise child protection investigators.**

The child protection supervisor will be re-trained.

**3.  The Area Administrator should meet with the local State's Attorney to discuss cases that require court intervention to ensure parents comply with services.**

The Department agrees.   Prompted at least in part by a review and report completed by Chapin Hall in May 2019, the Department is working on a number of initiatives directed at improving practice around child protection and intact family services and improving communication and collaboration between the Department and court stakeholders.  As part of these initiatives, the Department is collaborating with Chapin Hall and a variety of court stakeholders, including, but not limited to, judges, State's Attorney's Offices, guardians ad litem, public defenders, and the Administrative Office of Illinois Courts.  The Department expects this work to lead to, among other things, multidisciplinary trainings; new or amended policies, procedures, and practices; and improved systems of communication.  The Department will consider this OIG recommendation in its ongoing work in this regard.

*OIG COMMENT: How are current cases of non-compliance being addressed as the initiatives are being developed?*

**4.   The involved Department field office should coordinate regular joint meetings with the various professionals involved with child welfare cases, including the State's Attorney's office, local law enforcement, CASA, and private agencies to review cases, procedures, and services and to create a team approach to serving abused/neglected children and their families in the community.**

The Department agrees.   The Department is working on a number of initiatives directed at improving practice around child protection and intact family services and improving communication and collaboration between the Department and court stakeholders.  The 360 model will be rolling out in the near future.

**5.  This report should be shared with the private agency that provided intact family services. The agency should discuss best practices with supervisors, administrators and caseworkers, who should receive training on keeping children safe when caregivers refuse to cooperate with intact family services.**

The Inspector General shared the report with the private agency.  The Inspector General will meet with the agency's administrators and a member of the Board of Directors to discuss the findings and recommendations made in the report.

**DEATH AND SERIOUS INJURY INVESTIGATION 14**

| ALLEGATION | A six-and-a-half-year-old boy died of failure to thrive and extreme malnutrition. At the time of death, the child weighed 17 pounds and was found to have bruising on multiple areas of the body, including the right side of his head, his temple and around his neck as well as abrasions near his hips and large scars on his hands. A prior child protection investigation for inadequate food to the child was unfounded. |

| INVESTIGATION | The father and the biological mother of the deceased child had four children together and were divorced when the deceased child was two-years-old. The mother was reported to have an opioid addiction. The father remarried and maintained custody of their four children, then ages eight, five, three and two. The step-mother's two children from a prior relationship, ages eleven and ten, also lived in the home. The step-mother had a history with the Department involving her two biological children. The Department investigated and indicated the mother for substantial risk of physical injury/environment injurious, after she was found to be manufacturing methamphetamine in the home while the children were present. The investigation was overturned on appeal. |

When the deceased child was five, his teacher contacted the hotline to report concerns about the child's lack of weight gain and strange behaviors with food and eating. The teacher stated that the child seemed consumed with food, eating food off the floor. The teacher further stated that the child's weight when he first began school over eighteen-months ago was 26.12 pounds and he currently weighed only 25.2 pounds. The teacher stated that she and the school nurse met with the child's father multiple times and the father reported that the child had been seen by his pediatrician, who did not have concerns. The father did not provide any details. The child protection investigator contacted the child's doctor's office and the staff informed the investigator that the child was last seen three years earlier for a two-year-old well-visit and there were no concerns at that time. The investigator then contacted the family's new physician and learned that the child was accepted as a new patient but had never been brought in for an appointment.

The investigator met with the five-year-old child and observed him to be very small for his age. She also observed the child to pick at his fingernails. The investigator observed no indicators of abuse. During the interview, the child stated that he is not fearful of anyone in his home and that if he gets in trouble, he is put in time out. When asked, the child stated that he eats regular meals at home. The investigator met with the five siblings/step-siblings whose ages ranged from six-years-old to twelve-years-old. All the children stated that they were not fearful of anyone in the home and stated that if they were bad, they would get a spanking, but were never left with marks. They all reported that the father and step-mother feed them daily. The ten-year-old sibling reported that the father and step-mother feed them every day and depending on how old you are you will have more to eat. She further stated that her younger siblings, ages five and six, sometimes eat crumbs off the floor and are put in time out for it. The investigator went to the home and met with the step-mother who stated that the five-year-old and six-year-old were obsessed with food. The step-mother stated that she does not know if they had this issue prior to her becoming involved with the father and his children, but from what the father told her his children's biological mother often made junk food available to all the children as a means of pacifying them. The step-mother stated that the two younger children, ages five and six, were in counseling. She further stated that the five-year-old constantly wants to eat and stated that neither she nor the father deprive any of the children of food and that all the children are fed regular meals. The investigator observed food in the home.

The parents agreed to have the five-year-old seen by a primary care physician. The investigator contacted the doctor's office and the child was seen and referred to an endocrinologist, as the physician believed that the child may have an endocrine problem. The father cancelled the appointment with the endocrinologist and was

3:18-cv-03085-SEM-TSH   # 62-3   Page 59 of 384

strongly advised to re-schedule. The investigator spoke with the school nurse who reported that the school had a meeting with the father and step-mother. The nurse explained that they had offered their help to the family and asked the father to sign a release to speak with the child's doctor, but the father refused, and the nurse remained concerned. The nurse reported that the father threatened that he was going to pull the five-year-old out of school and that the child has not been back to school since their meeting. The investigator consulted with his supervisor informing the supervisor that the child was seen by the doctor who had no concerns for abuse or neglect, and that the child was referred to an endocrinologist for further evaluation. The investigation for inadequate food was unfounded.

Almost two years later, the then six-and-a-half-year-old child was pronounced deceased when his father brought him to the hospital after finding him unresponsive. The father told hospital staff that the child had been up and moving around in the morning before he left for work. He had left the child and his seven-year-old sibling home alone and when returned home, he found the six-and-a-half-year-old unresponsive in their basement bedroom. The doctors examining the child found bruising on multiple areas of his body including the right side of his head, his temple and around his neck. In addition, they found abrasions near the child's hips and large scabs on his hands. The nurse contacted the child's primary physician who stated that the child had not been seen for over a year-and-a-half, when he was diagnosed with failure to thrive and referred for follow-up care. The coroner determined the child's death was due to starvation and found 24 injuries to the child's body, which were determined to be due to child abuse. During a forensic interview with the children, one of the older boys stated that the father and step-mother would limit the amount of food and water they could have and withheld food for punishment, particularly with the deceased child and the seven-year-old sibling. He further stated that the deceased child and his seven-year-old sibling were taken out of school about one-and-a-half years ago and were "home schooled." The seven-year-old sibling was found to be malnourished and was taken to the hospital. The police reported to DCFS that the basement where the two boys lived looked like a "torture chamber". Feces was scattered throughout the room and it smelled heavily of urine. There was a lock on the door from the outside, so the boys could be locked in. The furniture in the basement consisted of a bunk bed with just the top bunk having a bare mattress. The father and step-mother were interviewed by police and admitted to depriving both the deceased child and his seven-year-old sibling of food. The father and step-mother were arrested and the surviving children were placed in foster care. The parents pleaded guilty to first degree murder. The father was sentenced to 25 years and the mother 20 years.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **This report should be used in training child protection investigators on how to properly and thoroughly investigate an allegation of Inadequate Food.** |
|---|---|

This case will be used as a case example for child protection investigators. The case is being incorporated into training beginning in 2020.

DEATH AND SERIOUS INJURY INVESTIGATIONS

**DEATH AND SERIOUS INJURY INVESTIGATION 15**

| ALLEGATION | A three-month-old infant sustained significant head injuries while both he and his two-year-old sister were in the care of their father. A child protection investigation was |

pending at the time of the injuries and there was an active Order of Protection against the father, in which the children were protected parties.

| INVESTIGATION | Three months before the infant was injured, it was reported to the hotline that both children were improperly dressed for the cold weather, and the residence had a |

broken furnace and no running water. A child protection investigator observed the children and the home. The parents were using jugs of water and space heaters while the residence was undergoing repairs. The investigator found that although the home environment was lacking, it met the Department's minimal standards. The investigation was unfounded. The investigator spoke with the mother about obtaining assistance through DCFS, but the mother declined.

Six days after the first child protection investigation was closed, it was reported to the hotline that the two-year-old child was not properly supervised on two occasions and was injured on the second occasion. The reporter also stated that the father attempted to physically assault the mother with a sledgehammer. The mother and the children left the home to stay with a family friend, and the mother obtained an order of protection against the father. Three weeks after the physical assault, the mother attempted to terminate the order of protection, but the Judge denied this request. The child protection investigator called the mother after she learned that the mother attempted to terminate the order of protection, but the investigator did not document if she had made any in-person visits to ensure that the mother was not violating the court order.

Eighteen days after the mother requested to terminate the order of protection, emergency medical services were called to the father's residence after the father reported finding his three-month-old unresponsive. At the time of the incident, the mother was at work and the children were in their father's care. The father stated that he had changed the baby's diapers, gave him a bottle, and placed him to sleep in his play-pen. When the father later checked on the infant, he noticed that the infant was discolored and having trouble breathing, and the father called 911. This statement conflicts with a witness's account, a paternal uncle who lives in the same building who reported that he ran to the father's apartment after hearing a baby crying and multiple "thud" sounds. He reported that he kicked in the door and saw the father "bounce" the baby's head off the ground about two times. The uncle stated he tackled the father to get him out of the way and grabbed the infant. The uncle noted that the father did not want to call 911 because he had an outstanding warrant. Upon examination at the hospital, medical staff documented bruising on the child's back and bleeding in his right eye. A medical scan revealed both old and new subdural and subarachnoid bleeds, which indicated past and recent abuse. Medical staff reported that the child was in critical condition.

The mother reported that the day before the infant was injured, she was forced to move out of her friend's home as she was unable to pay the rent. The mother admitted that she called the father and went to stay with him in violation of the Order of Protection because she had nowhere else to go. The mother reported that when she left for work that morning, the infant had no injuries.

The two-year-old sibling was taken into protective custody and placed in a traditional foster home. She was extremely dirty, had a foul odor about her body, was treated for lice, and had multiple head sores from scratching. Although medical staff was initially unsure if the three-month-old would survive, he had made slow progress. However, he will likely need medical care for the rest of his life. Both children are currently placed together in a traditional foster home.

54

Almost a month after the three-month-old sustained his significant injuries, the second child protection investigation was indicated against both parents for inadequate supervision of the two-year-old. The father was also indicated for substantial risk of welfare by neglect due to the domestic violence incident.

The father is currently serving ten years in prison for aggravated battery of a child under the age of three. For the third child protection investigation, the father was indicated for causing head injury and bruises to his three-month-old son. Due to the condition of the residence and how dirty the children were, both parents were indicated for environmental neglect of the children. The mother was also indicated for substantial risk to health by neglect for both children since she left them in the care of the father, despite the active order of protection.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** |
|---|

**1.  The DCFS Office of Legal Services should assist with clarifying policies and practices regarding safety plans and orders of protection.  Once developed all staff should be trained accordingly.  Although an order of protection can be considered a mitigating factor in a CERAP, it cannot be the sole reasoning to close an investigation. Safety plans should be considered as a tool that DCFS staff can utilize to better ensure compliance with orders of protection by both the offending and non-offending parents.**

The Department agrees. Prompted at least in part by a review and report completed by Chapin Hall, the Department is working on a number of initiatives directed at improving practice around child protection and intact family services and improving communication and collaboration between the Department and court stakeholders.  As part of these initiatives, the Department is collaborating with Chapin Hall and a variety of court stakeholders, including, but not limited to, judges, State's Attorney's Offices, guardians ad litem, public defenders, and the Administrative Office of Illinois Courts.  The Department expects this work to lead to, among other things, multidisciplinary trainings; new or amended policies, procedures, and practices; and improved systems of communication. The Department will consider this recommendation in its ongoing work in this regard. In the interim there will be training on safety planning.

**2.  Although the involved child protection investigator is no longer in an investigator position, she currently works as a call-taker for the State Central Register (SCR). The employee should be re-trained on Procedures 300, Reports of Child Abuse and Neglect.**

The Department agrees.

**3.  The supervisor should be re-trained on his duties to supervise child protection investigators and the use of safety plans when there is an existing domestic violence order of protection.**

The supervisor is no longer in child protection. If the supervisor returns to child protection, he will be re-retrained.

DEATH AND SERIOUS INJURY INVESTIGATIONS

55

**DEATH AND SERIOUS INJURY INVESTIGATION 16**

**ALLEGATION**    An eleven-year-old child was taken by his mother from a neighboring state to an Illinois facility for hospice services. The out-of-state physicians advised the hospice care facility that the eleven-year-old was not dying. After conferring, the out-of-state physicians and hospice facility physicians concluded the parents had obtained unneeded medical treatment for both of their children, ages, eleven and thirteen, that included medications, surgeries and other invasive procedures which caused some irreversible harm.

**INVESTIGATION**    The Department of Children and Family Services has been aware of these children since 2010 when the hotline was first contacted about the family. Between 2010 and 2017, there were four unfounded reports of abuse or neglect. Although DCFS first became aware of possible Munchausen by Proxy in 2013, the parents were not indicated for abuse and the children were not removed from their parents until 2018.

The family's first contact with the Department occurred in 2010 when a counselor contacted the hotline after the oldest child, a then-four-year-old girl, reported that her father sexually penetrated her. The father was investigated and unfounded for sexual penetration and substantial risk of sexual abuse after the child did not repeat her outcry in a forensic interview. During this investigation, the father reported that both his daughter and his younger child had multiple medical issues.

Three years later the parents were investigated for substantial risk of physical injury/environment injurious after the younger child, then six-years-old, disclosed to his school social worker that his father grabbed the mother's head and shoved it into the wall, causing the wall to crack and grabbed his head and slammed it into the wall. The reporter stated the child said it happened a while ago and they had to repair the wall; the child had no marks or injuries. The reporter also stated the child and his older sibling are considered medically fragile. The investigator spoke to the mother and father, who both denied any domestic violence. The mother stated the six-year-old might be referring to an incident a year earlier when his father punched the wall. The mother further stated that the children were receiving services from a home healthcare agency; however, when the investigator spoke to the agency, they stated that they did not work with children or in the county the family was living in. The eight-year-old daughter also denied domestic violence. The eight-year-old also stated that she had a feeding tube due to celiac disease. The father confirmed the eight-year-old having celiac disease and added two illnesses not previously mentioned in 2010 – cerebral palsy and gastroparesis, a condition that prevents emptying the stomach.

During this investigation, a nurse for an out-of-state physician at a pediatric clinic, expressed concern that the mother might have Munchhausen Syndrome by Proxy. The nurse reported that the younger child was seen by the doctor a week earlier for thrush which is typically treated with oral medication, but the mother demanded IV medication. The nurse told the investigator that two physicians, the head of the special needs team at a children's hospital and a child-abuse pediatrician, were also concerned the mother requested unnecessary medical treatment. The school nurse also expressed concern that the parents involved so many physicians and seemed to move slowly from one facility to the next. The investigator advised the nurse that the physicians needed to call the Illinois hotline if they suspected Munchausen Syndrome by Proxy.

During supervision, the investigator inaccurately reported: "The school has no concerns." The investigator advised the teacher that the report would be unfounded, but also that the parents' requests for excessive treatment were being scrutinized, and any report by the physicians would be investigated. The Department's investigation was unfounded.

While the prior investigation was still pending, an employee from another state child welfare agency called the Illinois hotline with allegations of possible medical neglect by the mother to the younger child. According to the reporter, a children's hospital reported concerns that the mother was insisting on unnecessary medical care for the six-year-old, exaggerating his symptoms, lying to providers, and causing the child to be prescribed medications, including opiate pain medication, that were contraindicated and not needed. The reporter stated that the child has many ongoing medical problems and is diagnosed with Chronic Intestinal Sudo Obstruction and Congenital Posterior Brain Malformation. The older child is also diagnosed with gastric intestinal problems.

An out-of-state physician reported the mother, who could be difficult, insisted on oxygen and continuous IV fluids, which required catheterization, although these interventions were no longer needed. The mother had requested another physician, claiming the other physician had not responded to the family's needs. The children's hospital social worker reported no concerns and described the mother as protective. She also reported ongoing communication problems between the physician and the mother. According to the social worker, the six-year-old had a new pediatrician at the children's hospital who was not reporting any concerns.

The Department referred the case to a Department contracted child abuse specialist to review the medical records and investigative interviews. The physician opined that the mother had not medically neglected the six-year-old and did not have concerns with the six-year-old's past medical procedures or current care. The Department's investigation against the mother for medical child abuse was unfounded, since they were unable to substantiate the allegation.

Almost four years later, the hotline was again contacted when a visiting nurse from a home health care agency reported the children, ages ten and twelve, were routinely catheterized in front of each other despite being able to use the toilet independently; and walked around naked in front of each other and the nurses. The nurse believed the twelve-year-old had repeated urinary tract infections (UTIs) because her vagina was not properly cleaned. The mother told the investigator the children had Mitochondrial Disorder. She put the twelve-year-old on "Depo shots" to stop her period. The mother stated that neither child had bladder control and required catheterization. The twelve-year-old had chronic UTIs because of her medical condition and catheter.

The investigator spoke with the owner of the home health care agency. The mother told this agency the children were terminally ill and receiving hospice. Both had several tubes, including G and J tubes, and central lines for administering medications.

A physician reported daily contact with the parents. He reported conditions for the twelve-year-old that were not reported in 2008, including a skull tumor with resection, ADHD, migraines, tachycardia, sleep apnea, and neurological damage to her bowel and bladder. She needed a walker and wheelchair assistance. She also saw a urologist at a children's hospital. The physician reported additional conditions for the ten-year-old, including a plaque build-up on the walls of his renal artery, osteoporosis, hydrocephalus, factor deficiency (a genetic disorder which prevents blood from clotting), and a history of UTIs due to line infections. He had no concerns about the family. In August 2017, the Department's investigation against the mother for medical neglect and inadequate clothing was unfounded.

Almost one year later, the chief operating officer of a hospice called the hotline to report that the mother had been seeking hospice services for the eleven-year-old though he was not terminally ill. During a staffing amongst providers it became clear the mother was making different statements to different providers. The physicians concluded that the eleven-year-old was not dying nor eligible for hospice. The child was on twenty-six medications including an opiate pain medication. The child improved in the hospital without some of the medications.

During this child protection investigation, the out-of-state physician, who had suspected medical child abuse five years earlier, reported her belief that the mother might have been drugging her then six-year-old with morphine to make it seem he required hospitalization or taking the six-year-old's morphine herself. The mother tried to convince many providers that the six-year-old needed a third central line, which was "unprecedented." The mother insisted the children could not swallow, but the physician overheard the six-year-old ask his mother if they could stop for lunch after the appointment. The physician recommended that the children be admitted to a larger hospital that could treat them long-term. She also thought a psychologist should be involved to determine how far the children had been pulled into their mother's abusive scheme.

The special education teacher and previous reporter reported ongoing, significant concerns about the children's safety. The mother advocated for the children to be removed from school, where they had been successful.

Following this investigation, the parents were indicated for substantial risk of physical injury to health and welfare by abuse to both children. The Department took protective custody of the children and they were hospitalized. The children's lab results were abnormal and prescribed medications were missing. Their potassium and blood sugar levels were significantly elevated; blood sugar normalized upon admission. In September 2018, a physician reported the children were stable at the children's hospital. They were taken off oxygen and several medications without issue but were exhibiting signs of opiate withdrawal.

The Department was aware of these children since 2010. Although the Department first became aware of possible Munchhausen by Proxy in 2013, the children were not removed from their parents until five years later. Appendix L to Procedure 300 provides guidelines for investigating reports of Factitious Disorder by Proxy (FDP)/Munchausen by Proxy (MBP) syndrome/Medical Child Abuse, noting FDP is a complex form of child abuse requiring a carefully coordinated multidisciplinary approach. The Department overlooked many early indicators of MCA and missed the opportunity to utilize such an approach. Appendix L State's: *Most incidents of suspected FDP are based solely on circumstantial evidence. The combination of unique type of evidence gathering and criminal properties of the disorder require a multidisciplinary approach and cooperation between agencies to avoid error or loss of potential evidence.*

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. DCFS should identify child abuse pediatricians who are willing to review medical records in cases of suspected Medical Child Abuse and help develop an investigation procedure/protocol and a stand-alone allegation.**

Appendix L, Factitious Disorder by Proxy (Medical Child Abuse) dictates how to handle these cases. The specific Child Abuse Physician is identified in Appendix L. The Deputy Director of Child Protection will remind the field that Appendix L is to be referred to and followed. The Deputy Director of Child Protection is scheduling quarterly meetings, the first in early 2020 in which the Department will collaborate with the Child Abuse Pediatricians on using their medical expertise on Medical Child Abuse cases.

**2. Hotline call-takers or child protection investigators and supervisors should immediately refer any report or investigation with any evidence of Munchhausen Syndrome by Proxy/Medical Child Abuse to a Child Abuse Pediatrician to create a chart of the date, provider, complaint, and provider comments for all the children's medical treatments, interventions and prescriptions.**

This is completed. The Department shall explore the use of a chart with the CAP physicians.

**3. When the chart is complete, DCFS should convene a multi-disciplinary team to formulate an investigation plan. This team should include law enforcement, state's attorney, a Board-Certified Child-Abuse Pediatrician, hospital legal advisor, child protection investigator/supervisor/area administrator, and DCFS Legal.**

The Deputy Director of Child Protection will collaborate with Child Abuse Pediatrician regarding Appendix L and their documentation of cases brought to them.

**4. Team members should search for discrepancies (e.g., multiple providers who received different information from parents). They should also review public social media to determine whether parents may be using their children's alleged illness for personal gain.**

Appendix L dictates how to handle Munchhausen by Proxy (FDP) cases. However, DCFS staff do not have access to social media accounts, so Department staff will not search social media on parents they are investigating.

***OIG COMMENT****: Staff should have access to social media as it can serve as an investigative tool for gathering evidence.*

**5. DCFS should consider designating an investigative team and supervisor (perhaps in each region) for investigations with an allegation of MCA to ensure appropriate procedures are followed, to participate in the multidisciplinary team, and to ensure court involvement to protect the children when necessary.**

Appendix L dictates how to handle Munchhausen by Proxy (FDP) cases. The Department does not see enough of these cases that would warrant a specialized team in each region.

***OIG COMMENT:*** *The Department could have specialized investigators in each region trained to handle the types of investigations.*

60

DEATH AND SERIOUS INJURY INVESTIGATIONS

## PART II: CHILD DEATH REPORT

Inspector General staff investigate the deaths of children whose families were involved in the Illinois child welfare system within the preceding 12 months. Inspector General staff receive notification of the death of a child from the Illinois State Central Register (SCR), when the death is reported to SCR.[1] Inspector General staff investigate the Department's involvement with the deceased and his or her family when (1) the child was a youth in the care of DCFS; (2) the family is the subject of an open investigation or service case at the time of the child's death; or (3) the family was the subject of an investigation or service case closed within the preceding 12 months. Whenever Inspector General investigators learn of a child death meeting these criteria, the death is investigated.[2]

Notification of a child's death initiates an investigatory review of records. Inspector General investigators review the death reports and information available through the Department's computerized records. The investigator then obtains additional records including the child's autopsy reports.[3] Records may be requested, impounded, or subpoenaed. Then they are reviewed. The majority of cases involve an investigatory review of records, often including social service, medical, police, and school records, in addition to records generated by the Department or its contracted agencies.

When warranted, Inspector General investigators conduct a full investigation, including interviews. A full investigation may result in a report to the Director of DCFS. Individual cases may not rise to a level necessitating a full investigation, but collectively can indicate systemic patterns or problems that require attention. Inspector General staff may address systemic issues through a variety of means, including cluster reports, initiatives, and trainings.

In Fiscal Year 2019 Inspector General staff investigated 123 deaths of children who died between July 1, 2018 and June 30, 2019, meeting criteria for review. A description of each child's death and DCFS involvement is included in this annual report. During this fiscal year, investigatory review of records was conducted in each of the 123 deaths, leading to 13 full investigations. Three of those investigations are pending. Comprehensive summaries of death investigations reported to the Director in FY 19, which may include deaths that occurred in earlier fiscal years, are included in the Investigations section of this annual report.

Eighty-five of the 123 child deaths reviewed by Inspector General staff also underwent a child protection investigation of the death. Forty-five of the deaths (37%) were indicated, 33 (27%) were unfounded and 7 (6%) remain pending. Twenty-four of the deaths were ruled homicide in manner; twenty-one of the deaths had a manner of undetermined; thirty-seven of the deaths had a manner of accident; thirty-four of the deaths had a manner of natural; seven of the deaths had a manner of suicide.

---

[1] SCR relies on coroners, hospitals, medical examiners and law enforcement to notify them of child deaths, even when deaths are not suspicious for abuse or neglect. Some deaths may not be reported. As such statistical analysis of child deaths in Illinois is limited because there is no central repository that includes the total number of children that die in Illinois each year. The Cook County Medical Examiner's policy is to notify the Department of the deaths of all children autopsied at the Medical Examiner's office.

[2] Occasionally SCR will not receive notice of a child death and Inspector General staff learn of it through other means.

[3] The Inspector General wishes to acknowledge all the county coroners and the Cook County Medical Examiner's Office for responding to our requests for autopsy reports.

| SUMMARY |
|---|

Following is a statistical summary of the 123 child deaths investigated by Inspector General staff in FY 19, as well as summaries of the individual cases. The first part of the summary presents child deaths by age and manner of death, case status and manner of death, county and manner of death, and child protection death investigations by result and manner. The second part presents a summary of deaths classified in five manners: homicide, suicide, undetermined, accident, and natural.[4] Please note that the term coroner is used for both coroners and the Cook County Medical Examiner in the individual summaries.

**Key for Case Status at the time of Inspector General investigation:**

| | |
|---|---|
| **Youth in Care:** | Deceased was a Youth in Care. |
| **Unfounded DCP:** | Family had an unfounded child protection investigation within a year of child's death. |
| **Pending DCP:** | Family was involved in a pending child protection investigation at time of child's death. |
| **Indicated DCP:** | Family had an indicated child protection investigation within a year of child's death. |
| **Child of Youth in Care:** | Deceased was the child of a youth in care, but not in care themselves. |
| **Open/Closed Intact:** | Family had an open intact family services case at time of child's death / or within a year of child's death. |
| **Open Placement/Split Custody:** | Deceased, who never went home from hospital and had sibling(s) in foster care or child was in care of parent with siblings in foster care. |
| **Return Home:** | Deceased or sibling(s) returned home to parent(s) from foster care within a year of child's death. |
| **Child Welfare Services Referral:** | A request was made for DCFS to provide services, but no abuse or neglect was alleged. |
| **Preventive Services/Extended Family:** | Intact family services case was opened to assist family, but not as a result of an indicated child protection investigation. |
| **Former Youth in Care:** | Child was a youth in care within a year of his/her death. |

---

[4] The causes and manners of death are determined by hospitals, medical examiners, coroners and coroners' juries.

**TABLE 1: CHILD DEATHS BY AGE AND MANNER OF DEATH**

| CHILD AGE | | HOMICIDE | SUICIDE | UNDETERMINED | ACCIDENT | NATURAL | TOTAL |
|---|---|---|---|---|---|---|---|
| Months of Age | At birth | | | | | 4 | 4 |
| | 0 to 3 | 2 | | 8 | 10 | 10 | 30 |
| | 4 to 6 | 1 | | 5 | 4 | 1 | 11 |
| | 7 to 11 | | | 3 | | 3 | 6 |
| | 12 to 24 | 3 | | 3 | 4 | 3 | 13 |
| Year of Age | 2 | 5 | | | 2 | 1 | 8 |
| | 3 | | | 2 | 3 | 1 | 6 |
| | 4 | 1 | | | | 2 | 3 |
| | 5 | 1 | | | 3 | 1 | 5 |
| | 6 | | | | 1 | 1 | 2 |
| | 7 | | | | | 1 | 1 |
| | 8 | 1 | | | 1 | | 2 |
| | 9 | | 1 | | 2 | | 3 |
| | 10 | | | | | 1 | 1 |
| | 11 | | 1 | | 1 | | 2 |
| | 12 | | 2 | | 1 | 2 | 5 |
| | 13 | 1 | 1 | | 1 | 3 | 6 |
| | 14 | | | | 2 | | 2 |
| | 15 | 2 | | | 1 | | 3 |
| | 16 | 3 | 1 | | 1 | | 5 |
| | 17 | 2 | 1 | | | | 3 |
| | 18 or older | 2 | | | | | 2 |
| | TOTAL | 24 | 7 | 21 | 37 | 34 | 123 |

**TABLE 2: CHILD DEATHS BY CASE STATUS AND MANNER OF DEATH**

| REASON FOR OIG INVESTIGATION* | | HOMICIDE | SUICIDE | UNDETERMINED | ACCIDENT | NATURAL | TOTAL |
|---|---|---|---|---|---|---|---|
| DCP | Pending | 2 | 2 | 4 | 7 | 4 | 19 |
| | Unfounded | 11 | 3 | 9 | 16 | 8 | 47 |
| | Indicated | 1 | 1 | 1 | 3 | 3 | 9 |
| Youth in Care | | 6 | | 2 | 5 | 9 | 22 |
| Former Youth in Care | | | | | | | - |
| Return Home | | 1 | | | 1 | | 2 |
| Open Placement/Split Custody | | 1 | | | 1 | 2 | 4 |
| Open Intact | | 2 | 1 | 3 | | 2 | 8 |
| Closed Intact | | | | | 2 | 5 | 7 |
| Child of a Youth in Care | | | | 1 | | 1 | 2 |
| Child Welfare Services Referral | | | | 1 | 1 | | 2 |
| Child of a Former Youth in Care | | | | | 1 | | 1 |
| TOTAL | | 24 | 7 | 21 | 37 | 34 | 123 |

*\* When more than one reason existed for the OIG investigation, the death was categorized based on primary reason.*

TABLE 3: CHILD DEATHS BY COUNTY OF RESIDENCE AND MANNER OF DEATH

| COUNTY | HOMICIDE | SUICIDE | UNDETERMINED | ACCIDENT | NATURAL | TOTAL |
|---|---|---|---|---|---|---|
| Alton | | | | 1 | | 1 |
| Bond | | | | 1 | | 1 |
| Boone | | | 2 | | | 2 |
| Champaign | 1 | | 1 | 2 | 2 | 6 |
| Clark | | | | | 1 | 1 |
| Clinton | | | 1 | 1 | | 2 |
| Cook | 10 | 3 | 10 | 15 | 11 | 49 |
| DeWitt | | | | | 1 | 1 |
| DuPage | | | 1 | | | 1 |
| Fulton | | | | | 1 | 1 |
| Greene | | | | | 1 | 1 |
| Grundy | 1 | | | | | 1 |
| Jackson | | | | | 1 | 1 |
| Jefferson | | | | | 1 | 1 |
| Kankakee | | | | | 1 | 1 |
| Lake | 1 | | | 1 | 1 | 3 |
| LaSalle | | | | 1 | 2 | 3 |
| Logan | | | | | 1 | 1 |
| Macon | 1 | | | | 1 | 2 |
| Madison | | | | 1 | | 1 |
| Marion | 1 | | | | 1 | 2 |
| Marshall | | | | 1 | | 1 |
| McHenry | 1 | 1 | | | | 2 |
| McLean | 2 | | | | | 2 |
| Montgomery | | | 1 | | | 1 |
| Ogle | | | | | 1 | 1 |
| Peoria | 2 | | | 1 | 1 | 4 |
| Randolph | | | 1 | | | 1 |
| Rock Island | | | 1 | 2 | 1 | 4 |
| Rock, WI | | | | | 1 | 1 |
| Saline | | | | | 1 | 1 |
| Sangamon | | | | 3 | | 3 |
| St. Clair | | 1 | 1 | | 1 | 3 |
| Stephenson | | | | 1 | | 1 |
| Tazewell | | | | 1 | | 1 |
| Vermillion | | | | 1 | | 1 |
| Warren | | | | 1 | | 1 |
| Washington | | 1 | | | | 1 |
| Whiteside | | | | | 1 | 1 |
| Will | | | 2 | | | 2 |
| Williamson | | 1 | | | | 1 |
| Winnebago | 1 | | | 3 | 1 | 5 |
| Woodford | 3 | | | | | 3 |
| TOTAL | 24 | 7 | 21 | 37 | 34 | 123 |

CHILD DEATH REPORT

**TABLE 4: CHILD PROTECTION DEATH INVESTIGATIONS BY RESULT AND MANNER\***

| FINAL FINDING | Homicide | Suicide | Undetermined | Accident | Natural | Total |
|---|---|---|---|---|---|---|
| Indicated | 11 | 1 | 9 | 22 | 2 | 45 |
| Unfounded | 2 | | 10 | 9 | 12 | 33 |
| Pending | 2 | 1 | 1 | 2 | 1 | 7 |
| TOTAL | 15 | 2 | 20 | 33 | 15 | 85 |

*\*Child deaths in which at least one person was indicated or unfounded for death by abuse or death by neglect. Note that persons indicated for death will stay on the State Central Register for 50 years.*

## FY 2019 DEATH CLASSIFICATION BY MANNER OF DEATH

### HOMICIDE
*Twenty-four deaths were classified homicide in manner.*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Blunt trauma due to child abuse | 9 |
| Gunshot wound | 11 |
| Cold exposure/environmental neglect | 1 |
| Carbon monoxide intoxication | 3 |
| TOTAL | 24 |

ALLEGED PERPETRATOR INFORMATION\*

| PERPETRATOR | NUMBER |
|---|---|
| Mother | 2 |
| Father | 3 |
| Mother's Paramour | 2 |
| Father's Paramour | 1 |
| Relative | 4 |
| Unknown/Unsolved | 9 |
| Unrelated peer | 2 |
| Police Officer | 1 |

*\*Some deaths have more than one perpetrator*

### UNDETERMINED
*Twenty-two deaths were classified undetermined in manner.*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Undetermined | 12 |
| Asphyxia | 3 |
| Sudden unexplained infant death | 2 |
| Complications of prematurity | 1 |
| Carbon monoxide toxicity | 1 |
| Pending | 2 |
| TOTAL | 21 |

CHILD DEATH REPORT

## ACCIDENT
*Thirty-seven deaths were classified accident in manner.*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Asphyxia/Suffocation/Sleep-Related | 12 |
| Blunt trauma injuries | 5 |
| Drug overdose | 2 |
| Drowning | 5 |
| Hanging | 1 |
| Gunshot wound | 1 |
| Carbon monoxide intoxication/Thermal injuries | 11 |
| TOTAL | 37 |

## NATURAL
*Thirty-three deaths were classified natural in manner*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Complications Related to Prematurity | 3 |
| Asthma/Respiratory Illness | 9 |
| Pneumonia/Sepsis | 4 |
| Congenital Problems/Heart Disease | 9 |
| Influenza/Viral Illness | 1 |
| Asphyxia | 1 |
| Complications Related to Cerebral Palsy | 1 |
| Complications Related to Pompe Disease | 1 |
| Complications Related to Muscular Dystrophy | 1 |
| Sudden Infant Death | 2 |
| Undetermined Cause/Pending Autopsy | 2 |
| TOTAL | 34 |

## SUICIDE
*Seven deaths were classified suicide in manner*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Hanging | 4 |
| Self-inflicted gunshot would | 3 |
| TOTAL | 7 |

CHILD DEATH REPORT







In FY 2019, the Office of the Inspector General reviewed 123 child death cases for the prevalence of three social issues: Domestic Violence (DV), Mental Health (MH), and Substance Abuse (SA). The presence of DV MH SA was indicated if one of the members of the family was affected by these issues. The OIG acknowledges that these factors are subjective in nature and were determined by individual OIG investigators reviewing the prior history in these children's deaths. The OIG defined Domestic Violence as violence between adult caregivers. Mental Health was defined as a professionally diagnosed disorder, currently or past history, or self-disclosure of a mental health history. Substance Abuse was defined as including a problematic use of drugs or alcohol, both past or present.

| Factors Present | Accident | Homicide | Natural | Suicide | Undetermined | All Deaths |
|---|---|---|---|---|---|---|
| No factors present | 6 | 8 | 12 | 2 | 8 | 36 |
| 1 factor present | 17 | 2 | 12 | 3 | 7 | 41 |
| 2 factors present | 10 | 6 | 5 | 2 | 3 | 26 |
| 3 factors present | 4 | 8 | 5 | 0 | 3 | 20 |
| Total | 37 | 24 | 34 | 7 | 21 | 123 |

| Factors Present | Indicated #1 | | Indicated #51 | | All Indicated Deaths | |
|---|---|---|---|---|---|---|
| No factors present | 4 | 33.33% | 8 | 66.67% | 12 | 100.00% |
| 1 factor present | 1 | 6.67% | 14 | 93.33% | 15 | 100.00% |
| 2 factors present | 1 | 9.09% | 10 | 90.91% | 11 | 100.00% |
| 3 factors present | 1 | 14.29% | 6 | 85.71% | 7 | 100.00% |
| Total | 7 | 15.56% | 38 | 84.44% | 45 | 100.00% |

68

| Factors Present | Non-Homicides | | Homicides | | All Deaths | |
|---|---|---|---|---|---|---|
| No factors present | 28 | 77.78% | 8 | 22.22% | 36 | 100.00% |
| 1 factor present | 39 | 95.12% | 2 | 4.88% | 41 | 100.00% |
| 2 factors present | 20 | 76.92% | 6 | 23.08% | 26 | 100.00% |
| 3 factors present | 12 | 60.00% | 8 | 40.00% | 20 | 100.00% |
| Total | 99 | 80.49% | 24 | 19.51% | 123 | 100.00% |

| Manner | 0 Factors | 1 Factor DV Alone | MH Alone | SA Alone | 2 Factors DV + MH | DV + SA | MH + SA | 3 Factors DV + MH + SA | All Deaths |
|---|---|---|---|---|---|---|---|---|---|
| Accident | 6 | 2 | 7 | 8 | 1 | 6 | 3 | 4 | 37 |
| Natural | 12 | 2 | 2 | 8 | 0 | 3 | 2 | 5 | 34 |
| Homicide | 8 | 1 | 1 | 0 | 1 | 0 | 5 | 8 | 24 |
| Undetermined | 8 | 0 | 2 | 5 | 1 | 1 | 1 | 3 | 21 |
| Suicide | 2 | 1 | 1 | 1 | 0 | 0 | 2 | 0 | 7 |
| **Total** | **36** | **6** | **13** | **22** | **3** | **10** | **13** | **20** | **123** |



Factors Present in Child Deaths
(123 deaths reviewed)

Child Deaths — Number of Factors Present in a Family Case



Factors Present in all Indicated Deaths (#1 and #51)
(45 deaths reviewed)



Factors Present in Child Deaths:
Homicides and Non-Homicides
(123 deaths reviewed)

CHILD DEATH REPORT



CHILD DEATH REPORT

| ACCIDENT |
| --- |

| Child No. 1 | DOB: 6/2018 | DOD: 7/2018 | Accident |
| --- | --- | --- | --- |
| Age at death: | 1 month old | | |
| Cause of death: | Asphyxia due to co-sleeping on an adult bed with an adult | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  One-month-old infant found unresponsive by her mother who was sleeping in an adult bed with the infant. The mother reported that she went to bed with the infant around 1:00 a.m. She breast-fed the infant around 4:00 a.m., then wrapped her in a blanket and held her close on her left side. Her three-year-old was lying in bed with the mother and one-month-old. When the mother awoke around 6:00 a.m., the infant was unresponsive. The mother called 911 and started CPR. An autopsy was performed, and the cause of death was ruled as asphyxia. The Department opened an investigation for death by neglect to the infant, by the mother; and for substantial risk/environment injurious by neglect to the deceased infant's three siblings by the mother. The mother agreed to an in-home safety plan monitored by her mother and all contact with the children was to be monitored by the maternal grandmother until the results of the mother's urine screen came back. The safety plan was terminated approximately three days later, when the mother's urine screen tested negative. In August 2018, the investigation was unfounded.

**Prior History:**  In October 2017, law enforcement contacted the hotline regarding a domestic dispute between the mother and father. The mother was angry at the father, who had been keeping in contact with the mother of one of his other children. The mother wanted the father to leave, but he couldn't due to his probation. The mother and father went outside with the two-month-old infant in a car seat and were screaming, trying to get the attention of neighbors. The police were called. No arrests were made. The Department opened an investigation for substantial risk of physical injury/environment injurious by neglect to the two-month-old infant, by his mother and father. The domestic dispute appeared to be an isolated incident. In November 2017, the investigation against the parents was unfounded.

| Child No. 2 | DOB: 6/2018 | DOD: 7/2018 | Accident |
| --- | --- | --- | --- |
| Age at death: | 1 month | | |
| Cause of death: | Positional asphyxiation unsafe sleeping practices | | |
| Reason for Review: | Pending child protection investigation at the time of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  One-month-old infant found unresponsive by his mother and father after co-sleeping with two adults and two children on an adult-sized mattress. The parents did not have a working phone to call paramedics and transported the infant to the emergency room, where he was pronounced deceased. The Department investigated the parents for the death. An autopsy found that the infant died from overlay and/or bedding asphyxia sustained while co-sleeping on an adult-size mattress with two adults and two children. The parents admitted to co-sleeping with the infant and found him not breathing, with blood coming from his nose. The parents rushed him to the emergency room where they were unable to resuscitate the infant. There was a pack-and-play next to the bed and the parents chose not to place the infant in it, despite having been told the dangers of co-sleeping and having been provided a pack-and-play by the Department. The parents were indicated for death by neglect.

**Prior History:**  The infant was the youngest of six children born to the parents. In 2009 and 2011, the mother was indicated for cuts, welts, and bruises to a niece. In October 2010, the Department received a report that the mother and her son tested positive for marijuana when she gave birth. The Department initiated and unfounded an investigation for substance misuse by neglect, and an intact case was opened for supportive services. In October 2014, the hotline was contacted to report that the mother left her newborn in the hospital with no calls or visits. The Department initiated and unfounded an investigation of abandonment. In June 2018, a physician contacted the hotline to report that the (deceased) infant was born six weeks early with no prenatal care and was born at high risk. The infant was reported to have difficulty eating but was going to be medically ready for discharge. The mother, who had been transferred to another hospital due to high blood pressure after the infant was born, had not been back to the hospital to see her infant son. The hospital was unable to get a hold of the mother after numerous attempts, including sending the police to the mother's home. The mother had not called the hospital to see how the infant was doing or to check and see if he was ready for discharge. The Department initiated an investigation for substantial risk of physical injury/environment injurious by neglect by the parents. The investigator observed the infant in the hospital and met with the mother, father and other children at the home. The investigator observed all the children to be appropriately dressed and had no signs of maltreatment. The investigator explained to the parents that the hospital had been trying to contact them and the parents said they did not have a phone. The investigator explained that their son was ready to come home when the parents could demonstrate an ability and understanding of his feeding schedule. The investigator asked to see where the infant would sleep. The parents said they did not have everything for him yet, including a bed. The investigator told the parents that the infant could not sleep in the same bed as the other children or the parents. The investigator told the parents that the infant was to sleep alone, on his back, with no blankets, and that they needed to practice safe sleep. The parents were advised that they needed to be at the hospital and participating in feedings before the baby could be discharged home. The parents agreed to go to the hospital and learn the feedings. The family was given a pack-and-play. The parents learned the feedings and the infant was discharged home. The home was seen again the day following the infant's discharge and the parents and all children were in the home. The investigator observed the infant asleep in his pack-and-play and the other children were sleeping on the couches. A preventive service case was opened two days before the infant's death. In October 2018, the investigation was unfounded.

| Child No. 3 | DOB: 9/2016 | DOD: 7/2018 | Accident |
|---|---|---|---|
| Age at death: | 22 months | | |
| Cause of death: | Inhalation of products of combustion due to residential house fire | | |
| Reason for Review: | Child returned home within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  Twenty-two-month-old trapped on the second floor of his residence during a fire was found by a firefighter near a window. The toddler was transported to the hospital where he was later pronounced deceased. The mother reported that she had left the home around 9:00 pm, leaving her three children (six months, twenty-two months, and three years old) and another child (seven years old) in the care of a sixteen-year-old babysitter. The babysitter reported that she was on the first floor of the home when the seven-year-old told her that the upstairs was on fire. The seven-year-old reported that she, the toddler and three-year-old were upstairs watching tv on the bed. She looked over and saw the baby's crib on fire; she jumped off the bed, grabbed the three-year-old and ran out; the toddler was still on the bed and would not go with them. The babysitter sent the seven-year-old outside with the three-year-old and newborn while she went upstairs to get the toddler. The babysitter found she was unable to go down the hall once she got up the stairs. The fire investigation did not determine the cause of fire. The Department did not investigate the death.

**Prior History:**  In November 2017, a hospital social worker reported that the twenty-one-year-old mother was seven months pregnant and currently in the hospital after being assaulted by her boyfriend. The boyfriend reportedly did not live in the home and is not the father of the other two children, but he had assaulted the mother before. The mother also said that she lives with her mother and step-father and that they use cocaine. The social worker offered the mother shelter resources, but the mother refused. The social worker believed the mother was overwhelmed and unable to take care of herself or her children without support. The Department investigated the mother for substantial risk of physical injury/environment injurious to health and welfare by neglect. The investigator met with the mother at the home of the maternal grandmother. The investigator observed that the grandmother appeared to be under the influence of substances. The mother stated that she only has her mother and stepfather to watch her children when she goes to work and while she understood that they may not be the best caretakers, she had no other options. The investigator observed a queen-size mattress on the floor of the room where the mother slept with her children. The investigator observed the maternal grandmother and maternal step grandfather's bedroom and observed a plate with what appeared to be drugs. Other drug paraphernalia was observed around the home. The mother still refused to go to a shelter and continued to stay in the home. The Department took protective custody of the children. The mother provided contact information for the paternal grandmother who agreed to take the children. The investigation was indicated against the mother. In December 2017, shortly after the placement case opened, the maternal grandmother and step-grandfather were evicted from their home. The landlord allowed the mother to take over the lease. In January 2018, the mother gave birth to her third child, prompting another investigation. This investigation was unfounded as the mother had a place to live and had found a friend to provide childcare when she went back to work. The baby remained in her care. In February 2018, the court approved for the mother to have extended unsupervised visits over the weekend. In March 2018, the children were returned home. In April 2018, the hotline received a call to report that the mother's two-year-old had sustained a buckle fracture of her tibia. The mother explained that the child had been left with a twenty-year-old babysitter and was playing outside when she fell off a hoverboard. The Department investigated the babysitter for inadequate supervision. The babysitter reported that she told the children to stay off the hoverboard, but she heard a fall when she went to the bathroom. The babysitter immediately called the mother. The investigation was unfounded.

| Child No. 4 | DOB: 11/2008 | DOD: 7/2018 | Accident |
|---|---|---|---|
| Age at death: | 9 years | | |
| Cause of death: | Drowning | | |
| Reason for Review: | Closed Intact Family Services case within a year of the child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  Nine-year-old child pronounced deceased at the hospital after his body was pulled out of the water at a state park. The paramour of the deceased child's mother took the nine-year-old to a state park with his seven-year-old sibling; two cousins, ages ten and eleven; and two friends, ages twelve and eleven. The paramour left the children by the river at the park. As he walked away, he saw the nine-year-old, who did not know how to swim, jump into the water. The paramour was in viewing distance of the children and had gone up a hill to throw away trash. The paramour gave the children instructions to not get into the water. The nine-year-old jumped into water that was approximately eight feet deep; came up for air once, then went back under. The paramour ran to the river and attempted to grab the nine-year-old, even though the paramour was unable to swim well. Another person at the park called 911. Upon EMS arrival, the nine-year-old child was taken out of the water and was non-responsive. He was transported to the hospital where he was pronounced deceased approximately one hour after the incident. The Department investigated and unfounded the paramour for inadequate supervision and death by neglect.

74

ACCIDENT

**Prior History:**  The mother of the deceased child has a history with the Department. In November 2002, the mother was investigated and indicated; the allegation is unavailable. In April 2013, the mother was investigated and unfounded for environmental neglect. This investigation has since been expunged. In May 2013, the mother was investigated by the Department for inadequate supervision following a hotline report that the four-year-old (the deceased child) was outside his house, near a pond. The mother had left the child in a playground by himself while she walked down to a nearby lake to set up fishing gear, so they could fish. While the mother was at the lake, the child left the playground and walked close to the pond, located one-quarter to one-half mile away. Residents near the pond brought the child to their house and called police. The mother denied any wrongdoing and stated that she let the four-year-old stay and play in the playground, she was not gone long, and she looked for the child when she realized he was gone. The investigation of the mother was indicated. In November 2016, the mother and the maternal aunt were investigated by the Department for inadequate shelter and environmental neglect following a hotline report that the house they shared with their five children (ages one, six, eight, nine, and nine) had windows that were broken and a roof that was not structurally sound, and that the children were seen hanging out of the windows. The investigator went to the home and observed the house in bad repair and dirty, with roaches roaming around the kitchen. The investigator also observed a bedroom filled with clutter and a broken window from a door that led to the outside. The mother and maternal aunt were indicated for inadequate shelter and environmental neglect and the family was referred for intact family services to assist in bringing the house to livable conditions. The intact service case remained open until April 2018, after all issues with the home had been addressed and the families were keeping the home adequately clean.

| Child No. 5 | DOB: 11/2005 | DOD: 8/2018 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 12 years |
| Cause of death: | Doxepin Toxicity |
| Reason for Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Twelve-year-old medically complex boy was found unresponsive in his bedroom by his thirty-three-year-old mother. The mother-initiated CPR, while his forty-two-year-old stepfather called 911. First responders arrived on the scene and continued attempts to resuscitate the child while transporting him to the hospital, where he was pronounced deceased. This child had a medical history significant for Megalencephaly (enlarged brain) that contributed to his seizure disorder and other developmental disorders, such as ADHD and Autism. An autopsy was completed, which included a sample of blood. The blood test showed a CYP2D6 Intermediate Metabolizer of Doxepin indicating that the child was a poor metabolizer of the drug. The cause of death was determined to be Doxepin toxicity. Doxepin is a type of medicine called a tricyclic antidepressant (TCA) and is prescribed to treat depression and anxiety. Doxepin overdose occurs when someone takes more than the normal or recommended amount of this medicine, either by accident or on purpose. Toxic level of a TCA can build up in the body if the TCA and other medicines interact. This interaction can affect how well the body can break down the TCA. The Department did not investigate the death.

ACCIDENT

75

**Prior History:**   The mother was involved in three investigations with the Department; two of them have been expunged. In September 2011, the mother was investigated for cuts, bruises, welts, abrasions and oral injuries to her five-year-old son (the deceased child). It was reported that the child had a hematoma on his forehead the size of a golf ball. The mother had reported that the child was bitten by a bug. The mother's story appeared to be inconsistent with the injury. It was further reported that this child was on medication for a seizure disorder and that he had seizures in the past and fell and injured himself. This investigation was unfounded and later expunged. In January 2017, the mother was investigated for substantial risk of physical injury/environment injurious to health and welfare by neglect. It was reported that the mother's nine-year-old daughter reported to the school social worker that her stepfather was a drug dealer and that her mother hands out drugs to people who go to their door. The child wanted to live with her biological father, as he was her support system. The investigation was unfounded and later expunged. In May 2018, the mother was investigated for cuts, bruises, welts, abrasions and oral injuries after it was reported that while the mother was watching her cousin's child, the mother's four-year-old child touched her cousin's child's "pee pee" and was hurting her "pee pee." The mother's cousin took her daughter to the emergency room immediately after her daughter made the allegation. It was also reported that the mother hit her cousin's child on the butt with a belt for pulling her pants down and was shaking her butt at her four-year-old. The mother's cousin admitted to giving the mother permission to "whoop" her child, but not with a belt. The investigator observed no marks on the child's butt. The investigator reviewed the medical records for the cousin's child. The exam of the genitals and rectum was found normal. No bruises were noted. After interviewing all parties, it was determined that there was no evidence to suggest the victim had bruises on her buttocks and the investigation was unfounded against the mother.

| Child No. 6 | DOB: 1/2004 | DOD: 8/2018 | Accident |
|---|---|---|---|
| Age at death: | 14 years | | |
| Cause of death: | Complications of drowning | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**   Fourteen-year-old girl, who was autistic and non-verbal, was found by her forty-year-old father floating face down in a pool at the home where they were staying while on vacation. The teen was admitted to a local hospital and eventually flown to a Children's Hospital for further care. While hospitalized, the teen underwent a brain flow test which revealed no movement and she was pronounced deceased. The Department investigated the father for inadequate supervision and death by neglect. The father stated that the teen was asleep on the couch before he found her floating in the pool. The father stated he awoke at approximately 6 a.m. and the teen was no longer on the couch. He stated that he was yelling the teen's name. He noticed the sliding door was opened to the outside and her found the teen floating in the pool. Law enforcement investigated the incident; no charges were filed, and the investigation was closed. All physicians involved with the teen at the hospital and the medical examiner reported no findings of abuse or neglect. The teen's teachers, community professionals, primary care physician, and all other contacts reported no concerns of abuse and/or neglect with the teen and described the father as nurturing, caring, and emotionally supportive. In December 2018, the investigation against the father was unfounded.

76

ACCIDENT

**Prior History:**  The deceased teen was the only child born to her parents. Her parents had been married for eight years and divorced in 2010. In November 2011, a case was opened for neglect after a child protection investigation in which the mother was indicated for inadequate food to her seven-year-old daughter.  At the time of this report, the father was living out of state and was not aware of the situation involving his daughter and ex-wife. The father appeared in court after the Department opened the case and was given custody of the daughter. In December 2017, a healthcare facility contacted the hotline to report that the father was not compliant with his thirteen-year-old daughter's (the deceased teen) care and treatment. It was reported that the teen was autistic and mostly non-verbal, and she was psychiatrically hospitalized five or six times that year. Following her discharges from the hospital, the father chose not to follow up with after care psychiatry appointments, the teen ran out of her psychotropic medications, she spiraled out of control, and would end up hospitalized again. The Department investigated the father for medical neglect. The investigator met with the father and the teen at their residence and observed the teen to be in good condition with no visible injuries. The father informed the investigator that his daughter had severe behavioral issues that required her to take several medications and admitted that his daughter was hospitalized several times that year. The father stated that he did his best to get his daughter back and forth for all her care and treatment but at times she would become resistant and aggressive, making it difficult for him to transport her. The father signed a release of information so the investigator could follow up with the teen's medical care provider and obtain a copy of her hospital treatment records. The investigator spoke with the teen's medical provider and was informed that the teen was seen in clinic 3 days earlier. The investigator also spoke with the school social worker and case manager. Both stated that the father was doing his best to manage his daughter at home. The father attended all team meetings and was cooperative with all suggestions regarding his daughter's care. They were unaware of any problems the father had in getting the teen medical care and treatment other than at times the teen could be very aggressive, making it difficult for him to get her to appointments. In February 2018, the investigation against the father was unfounded.

| Child No. 7 | DOB:02/2004 | DOD: 8/2018 | Accident |
|---|---|---|---|
| Child No. 8 | DOB:04/2005 | | |
| Child No. 9 | DOB:06/2007 | | |
| Child No. 10 | DOB:02/2013 | | |
| Child No. 11 | DOB:05/2018 | | |

| | |
|---|---|
| Ages at death: | 3 months; 5 years; 11 years; 13 years; 14 years |
| Cause of death: | Carbon monoxide toxicity and thermal injuries due to house fire |
| Reason for Review: | Unfounded child protection investigation within a year of the deaths of the children |
| Action Taken: | Full investigation: Report to Director 6/20/2019 |
| | **See Death and Serious Injury Investigation 7** |

**Narrative:**  Ten children, ages three-months to sixteen-years died as a result of injuries sustained from a house fire.  The four mothers of the ten children left the children home alone at approximately 11:00 p.m. A fire broke out in the home at approximately 4:00 a.m., while the children were still home alone. Eight of the ten children perished in the fire, and two of the children, ages, fourteen and sixteen, died in the following days from injuries sustained in the fire. The investigation into the fire showed code violations including that the home lacked working smoke detectors, poor housekeeping/obstructed egress (rear porch), and dangerous wiring. The fire department investigator concluded that the fire originated in the enclosed rear porch/stairwell, where severely charred remains of structural contents were found. The investigation into the cause of the fire was undetermined and in suspended status until the electrical system and components of the structure were examined. The Department's investigation of death by neglect to all ten children was indicated against the mother of five of the deceased children who lived at the home where the fire occurred. The mother has four children who were not in the home the night of the fire:  two adults, one teen (who lives with an adult sibling), and a three-year-old. The three-year-old entered a safety plan with the paternal grandmother after the fire.

**Prior History:** Prior to the fire, the mother of five of the deceased children was involved in child welfare service referrals and twenty-one investigations with the Department from 2004 through 2018, one of which was indicated. The twenty-one-child abuse and neglect reports when viewed together, show a pattern of unstable housing, possible inadequate supervision and chronic neglect. Often, this family was in the midst of moving during child protection investigations, negating environmental neglect allegations. The mother failed to follow up on service referrals for herself or her children; never accepted intact services; and failed to follow up on referrals for community services and behavior health for herself and children despite claims she would. In May 2019, the mother gave birth. The Department took protective custody of the newborn and her three-year-old sister, who was already in the care of the paternal grandmother.

| Child No. 12 | DOB: 2/2016 | DOD: 9/2018 | Accident |
|---|---|---|---|

| | |
|---:|---|
| Age at death: | 2 ½ years |
| Cause of death: | Anoxic brain injury associated with drowning |
| Reason for Review: | Unfounded child protection investigation within a year of the child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Two-and-a-half-year-old was found by his paternal grandfather in the backyard, submerged, face down in a pool. The grandfather took the toddler out of the pool and the paternal grandmother began CPR on him. EMS arrived on the scene, took over CPR, and transported him to the hospital. The toddler was in full cardiac arrest upon arrival, but the medical staff revived him, and his heart began to beat again. The toddler was diagnosed with brain death due to drowning and was put on a ventilator; he died five days later, when taken off life support. The Department investigated the grandparents who reported that they had been working outside their house with their grandson. The grandmother was in front of the house and at one point the grandfather was in back and had put the ladder down for the pool; he left to go in the house, as he thought the toddler was being watched by the grandmother in front of the house. The grandfather went back outside, and the toddler was not in front by the grandmother. The grandfather began looking for the toddler; he was found face down in the pool. The Department indicated the grandparents for death by neglect and inadequate supervision.

ACCIDENT

**Prior History:**  The paternal grandparents had a prior history with the Department. Their first involvement occurred in October 2008, when the grandfather was investigated; the investigation was unfounded and expunged. In January 2015, the grandmother was investigated for substantial risk of physical injury/environment injurious to health and welfare by neglect to her nine-year-old daughter, and the grandfather was investigated for substantial risk of physical injury/environment injurious to health and welfare to his nine-year-old daughter. The investigation was unfounded. In March 2018, the grandmother was investigated for substantial risk of physical injury/environment injurious to health and welfare by neglect to her eleven-year-old daughter; and the grandfather was investigated for substantial risk of physical injury/environment injurious to health and welfare to his eleven-year-old daughter. The investigation was unfounded and has since been expunged. In May 2018, three months before the death of their grandson, the grandparents were both investigated for substantial risk of physical injury/environment injurious to health and welfare by neglect to their thirteen-year-old-daughter. The investigation was unfounded. After the death of the toddler, the grandparents were investigated by the Department five times and each one was unfounded, with the most recent being April 2019. The mother and father of the deceased toddler were investigated by the Department in May 2016 for substantial risk of physical injury/environment injurious to health and welfare by neglect to their three-month-old and one-and-a-half-year-old children following a report that there was a domestic violence incident between the mother and father, and the father was arrested. The mother met with the child protection investigator and stated that she made up the domestic violence incident and no physical contact had occurred. The investigation was originally indicated but it was overturned on administrative appeal and thus was unfounded. In August 2016, the parents were investigated and indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect and inadequate supervision to both of their children following a report that there was a domestic violence incident. The children were placed with the paternal grandparents under a safety plan. The child protection investigator and child welfare specialist who were still servicing the family from the May investigation monitored the safety plan while the grandparents pursued legal guardianship. In October 2016, the court awarded permanent guardianship of the two children to the paternal grandparents and the safety plan was terminated. In March 2018, the probate court terminated the guardianship of the children and the family court awarded joint custody of the children to the mother and father that same day, since they no longer lived together. The parents were awarded alternating weeks of parenting time with the children. The children continued to live with the paternal grandparents, since the mother and father worked full-time second and third shifts.

| Child No. 13 | DOB: 8/2018 | DOD: 9/2018 | Accident |
|---|---|---|---|
| Age at death: | 1 month | | |
| Cause of death: | Suffocation due to unsafe sleep conditions | | |
| Reason for Review: | Pending child protection investigation at the time of the child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  One-month-old infant was pronounced deceased at the hospital after her father found her unresponsive in the adult bed where she was co-sleeping with him and her mother. The infant was crying and would not sleep in her crib, so the parents placed the infant in bed with them and propped her face up on pillows between them. The infant, mother, and father fell asleep. The father awoke approximately an hour later and found the infant unresponsive. The maternal uncle contacted 911 while the maternal grandmother attempted CPR until paramedics arrived. The infant was transported to the hospital where she was pronounced deceased. The Department investigated and indicated both the mother and father for death by neglect, as the parents received education by the Department three days prior to the infant's death regarding the dangers of co-sleeping. There was a portable crib and a permanent crib in the home.

**Prior History:**  The nineteen-year-old mother had an extensive history with the Department as a child and was part of intact family services from 2007-2008. Five days prior to the infant's death, the hotline received a report that the mother and infant were homeless. The Department initiated an investigation for inadequate shelter. The investigator spoke with the reporter, who provided the mother's last known address and phone number. That day, the investigator contacted the maternal grandmother by phone, who stated that the mother was living with her. The mother confirmed that she and the infant were living with the maternal grandmother. The following day, the investigator met with the mother at the maternal grandmother's home. The mother stated that her paramour also lived in the home, since they were trying to save money for their own apartment. She further stated that her father, brother, and brother's paramour lived in the home. During the visit, the investigator observed the infant sleeping in her pack-and-play. The investigator spoke with the mother about safe sleep. The investigator conducted a home safety checklist as well as a CERAP, and the home was marked as safe. Five days later, the hotline received a report on the death of the infant. The investigation for inadequate shelter was unfounded, as the mother and infant were living with the maternal grandparents at the time of the report.

| Child No. 14 | DOB: 10/2014 | DOD: 10/2018 | Accident |
|---|---|---|---|
| Age at death: | 3 years | | |
| Cause of death: | Multiple blunt force injuries due to motor vehicle collision with fixed object | | |
| Reason for Review: | Indicated child protection investigation within a year of the child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Three-year-old child was involved in a motor vehicle accident with his mother and three siblings, ages five, seven, and nine. The three-year-old was ejected from the vehicle and pronounced deceased at the hospital. The mother was driving with her four children when she struck a pole, lost control of her truck, and the truck flipped on its side. The nine-year-old was in his seatbelt in the front seat. The other three children (ages three, five, and seven) were unrestrained in the back seat. Upon impact, the three-year-old was ejected out of the window of the rear passenger seat. One sibling in the back seat sustained minor injuries. The mother picked up the three-year-old and transported him and his siblings to the hospital where he was pronounced deceased from cardiac arrest secondary to motor vehicle accident. The mother admitted to police that she had been drinking; she tested under the legal limit but was arrested and charged with being impaired while operating a motor vehicle. The mother was initially charged criminally with child endangerment. In April 2019, she was arrested for murder of the three-year-old for driving under the influence. The Department investigation against the mother was indicated for death by neglect; substantial risk of physical injury/environment injurious to health and welfare by neglect and cuts bruises welts abrasions and oral injuries by neglect.

**Prior History:** The mother was investigated in December 2016 for environmental neglect. The investigation was unfounded and has since been expunged. In May 2018, the hotline received a report that the mother's two younger children ages four and three were found unattended outside of the home in the rain, while the older children were at school. The police entered the home but found no adults. The children were observed to be barefoot, dirty, and smelling of urine and feces. The home was in a deplorable condition, with brown "substance" in the refrigerator, maggots and feces in the toilet, and garbage and clutter throughout. The police contacted the mother, who stated the father of the children was supposed to be watching them while she worked. The Department placed all four children under a safety plan and the mother was arrested and charged with child endangerment. The mother was indicated for inadequate supervision and environmental neglect.

ACCIDENT

| Child No. 15 | DOB: 6/2010 | DOD: 10/2018 | Accident |
|---|---|---|---|
| Child No. 16 | DOB: 2/2013 | | |

| | |
|---|---|
| Age at death: | 8 years and 5 years |
| Cause of death: | Carbon monoxide intoxication due to inhalation of smoke and smoke due to house fire |
| Reason for Review: | Pending child protection investigation at the time of the child's death |
| Action Taken: | Full investigation; Report to Director 3/15/2019 |
| | **See Death and Serious Injury Investigation 9** |

**Narrative:**  Eight and five-year-old siblings died in a fire at their family home.  The mother and one of the two siblings, age ten, were able to exit the home during the fire. Their other sibling, age eleven, and the father were not at home at the time of the fire. The two children and their ten-year-old sibling were in the upstairs bedroom watching television and sleeping when the fire stated.  The ten-year-old went downstairs to tell his mother he saw flames and the floor was hot, but he did not wake his two siblings. The mother went to the bedroom and saw flames in the doorway, but it was too hot to enter the room. The children died in the fire. The Department investigated and indicated the parents for inadequate shelter, environmental neglect and death by neglect. The home had no power and the parents were using extension cords from the neighbor's home to supply power. A fire investigation found the cause of the fire to be the use of improper splice connection in the cordage used to supply electrical power to the room of origin. The ignition source for the fire was the heat generated at high resistance connection within the area of origin, which was able to ignite the mattress that was under the children. The parents placed the extension cord under the mattress the children were sleeping on and had a space heater plugged into it along with a lamp and DVD player. The parents were also using a gas stove to heat the home. The home was in deplorable condition with food on the counters and trash throughout the kitchen. The home had various items laying around the home that were hazardous to the children, such as tools, lighters, knives and medications, all within reach of the children. The parents were criminally charged and convicted of endangering the life of a child and have both been sentenced to five years. The two surviving siblings have been placed in foster care.

**Prior History:**   This family had an extensive history with the Department, prior to the deaths of the eight-year-old and five-year-old. The family had been investigated on nine separate occasions, before the deaths of the two children. Six of the nine investigations were unfounded and three were indicated; one of which was indicated after the deaths of the children.  The Department investigated the mother on three separate occasions from March 2009 through September 2013.  As a result of the investigation in September 2013, the mother's four children, ages, six, four and three-years-old; and seven-months-old were taken into protective custody, after the mother was indicated for inadequate supervision and substantial risk of physical injury/environment injurious to health and welfare by neglect (this finding was changed to unfounded on appeal two years later). The father was in jail during this investigation. The children were placed in foster care for over two years.  The case file showed that the mother complied with her service plan, and the children were returned home in February 2016. Starting in April 2016, approximately five weeks after the children were returned to their mother the Department investigated the mother and father on five separate occasions through November 2017, all of which were unfounded.

| Child No. 17 | DOB: 7/2018 | DOD: 11/2018 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 months |
| Cause of death: | Asphyxia due to wedging |
| Reason for Review: | Youth in care |
| Action Taken: | Investigatory review of records |

**Narrative:**  Four-month-old baby was found unresponsive by her thirty-eight-year-old maternal aunt who was the baby's relative foster parent. The baby was sleeping on a twin mattress with her seventy-one-year-old great aunt who was caring for the baby the night before. The Department initiated an investigation into the death. The great aunt reported that she fed the baby at approximately 3:00 a.m. and then placed the baby on her stomach on the twin mattress on the floor. The great aunt later laid beside the baby. At approximately 9:30 a.m., the maternal aunt/relative foster parent awoke and checked on the baby and found her cold and stiff; family called 911. When paramedics arrived on the scene rigor mortis had already set in; EMS contacted a doctor and the baby was pronounced deceased at approximately 10:19 a.m. Family members told police who arrived on the scene that the great aunt is known for taking sleeping pills. The great aunt reported that when the baby would not sleep in the bassinet, she would put her in bed with her. She also reported taking a psychotropic medication before bed to help her sleep. The investigation against the maternal aunt/relative foster parent was unfounded for death by neglect, with the rationale that the maternal aunt/relative foster parent left the baby in the care of the great aunt. The maternal great aunt was indicated for death by neglect with the rationale that she had taken pills prior to going to bed while the baby was in her care and admitted to sleeping with the baby.

**Prior History:** The mother of the deceased baby was investigated by the Department three times, resulting in an intact case being opened and eventual placement of her children. In July 2014, it was reported that the mother had picked up her oldest child from the grandparents, and while the child was with the mother, the mother fainted from a drug reaction. This investigation was unfounded and eventually expunged. The mother gave guardianship of the older siblings (ages six, three, and one) to various relatives. In March 2015, the hotline received a report that the mother gave birth to her fourth child, who tested positive for marijuana and cocaine. The hotline caller added that the mother had mental health issues. The Department indicated the mother for substance misuse and an intact case was opened. In July 2015, the mother successfully completed a residential program and secured housing. Her then five-year-old and eight-year-old children began spending more time with her. By December 2015, the mother had missed visits with her caseworker, did not participate in out-patient services, and tested positive for alcohol. In February 2016, the mother was hospitalized with kidney problems and found out she was pregnant. In March 2016, the mother tested positive for cocaine. The mother denied cocaine use but reported self-medicating with marijuana because of anxiety, nausea, and pain. In July 2016, the Department investigated a report that the mother's paramour hit her five-year-old child with a belt. The Department unfounded the mother's paramour for substantial risk of physical injury/environment injurious to health and welfare-incidents of violence or intimidation. The Department unfounded the mother for substantial risk of physical injury/environment injurious to health and welfare by neglect. This investigation was eventually expunged. In August 2016, the mother gave birth six weeks prematurely to her fifth child. In February 2017, the hotline investigated a report that during an extended visit with the eight-year-old, the mother's paramour physically disciplined the eight-year-old while watching the children. The mother admitted leaving her children in the paramour's care. The mother verbally agreed not to leave her children with the paramour but would not sign a formal safety plan. The mother was not in treatment, had not placed the six-year-old in therapy, had not taken her to the cardiologist to which she had been referred, was using physical punishment on her, and had become less cooperative with the caseworker. The worker sought court intervention. The state's attorney asked for temporary custody, which was granted. The children were placed with maternal aunt and the maternal great aunt moved in to assist. The maternal aunt and the caseworker supervised the mother's visits with the children, which became less consistent, and the mother was not in services. In April 2018, the mother reported she was four months pregnant and in treatment. In July 2018, the mother gave birth to the (now deceased) child five weeks prematurely. The baby remained in the hospital for two weeks; protective custody was taken on July 17, 2018 and the baby was placed with the maternal aunt. The parents were indicated for substantial risk of harm by neglect because they had not participated in their service plan, psychiatric services, substance abuse services and visiting for the children in care and the mother continued to use substances.

82

ACCIDENT

| Child No. 18 | DOB: 10/2015 | DOD: 11/2018 | Accident |
|---|---|---|---|

| | |
|---:|:---|
| Age at death: | 3 years |
| Cause of death: | Thermal burns and smoke inhalation |
| Reason for Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Three-year-old child died during the night in a trailer fire, while in the care of his twenty-five-year-old father. The father escaped the fire with severe burns but was unable to locate the toddler. The mother was not present in the trailer, as she was staying overnight at a nearby hospital with the toddler's six-month-old sibling for an unrelated illness. The toddler was pronounced deceased on the scene. The state Fire Marshall deemed the cause of the fire as undetermined. The Department investigated the parents. Subsequent oral reports alleged that the father was under the influence the night of the fire, that the parents were often too intoxicated with marijuana to care for the surviving sibling, that there were drug distribution materials in the home, and that the parents were selling marijuana from the home. The investigator confirmed these allegations during an unannounced visit. She took protective custody of the surviving sibling and he is currently placed in a traditional foster home. The father was indicated for death by neglect, after he tested positive for un-prescribed opiates and cannabinoids on the night of the fire, plus he had a history of substance use before and after the fire which diminished his capacity to care for the surviving sibling. The mother was unfounded for death by neglect, as hospital medical records confirmed she was not present during the fire. Both parents were indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to the surviving sibling, since the father had three positive drug tests after subsequent reports and drug manufacturing equipment was observed in the home, accessible to the surviving child. Both parents were unfounded for environmental neglect, since the home met the minimal safety standards despite being unclean.

**Prior History:** Both parents were unclean with the Department as children. The mother was the child victim in eight investigations, four indicated and four unfounded. The father was a child victim in three unfounded investigations. In 2011, the father, then eighteen years old, was indicated for cuts, bruises, welts, abrasions, and oral injuries for injuring his younger sibling during an assault and property destruction incident. In July 2017, the mother was investigated for inadequate supervision, after it was reported that the deceased child, who was one-years-old at the time, was observed sitting alone and unsupervised in the car for a long period of time on a hot day. The investigator conducted a scene investigation to confirm that the child was outside the mother's line of sight, despite her claims otherwise. The mother was indicated for inadequate supervision and admonished not to leave her child unsupervised in the car for any amount of time. In December 2017, the mother was investigated for medical neglect after the primary care physician reported that the (deceased) child, who was two years old at the time, had stopped attending early intervention services for speech delay. The investigator reviewed the early intervention paperwork with the mother. The paperwork noted that the child was receiving services for a speech delay and cognitive delays. The mother believed that the child no longer needed speech services because he had tubes placed in his ears, but the investigator provided more information about the cognitive delay services. The mother called the early intervention program immediately and rescheduled appointments. The reporting physician stated that failure to attend the early intervention program for a speech delay did not meet the definition of medical neglect. The investigation was unfounded.

| Child No. 19 | DOB: 8/2018 | DOD: 11/2018 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 months |
| Cause of death: | Asphyxia due to prone and face-down sleeping position on soft bedding |
| Reason for Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Three-month-old medically complex infant was found unresponsive by his twenty-four-year-old mother. The mother was the last person to see the infant alive at approximately 4:00 a.m., when she fed him. After the mother fed him, she swaddled the infant and then placed him on his left side, in a pack-and-play with a folded blanket under his head before she went back to sleep. The mother awoke between 5:30 a.m. and 6:00 a.m., and found the infant was not breathing, with his face in the blanket. The mother attempted CPR and the father drove the mother and infant to the hospital, where he was pronounced deceased. The infant had been born premature with serious medical/health issues. He was diagnosed with Cornelia de Lange Syndrome, which is a genetic disorder; intestinal malrotation; heart murmur; he was missing three fingers on his right hand; and two fingers on his left hand were abnormally short. An autopsy determined that the infant died from asphyxia due to prone and face down sleeping position on soft bedding material. Another significant contributing fact in the infant's death was Cornelia de Lange Syndrome with multiple congenital and growth abnormalities. The Department investigated the parents for death by neglect. The parents denied any wrong doing. The medical professionals advised that the infant had many medical issues that he was being treated for before his death. Law enforcement advised there were no suspicions of abuse with regards to the infant nor was there any suspicion/evidence of either adult using substances; and the parents were not known for either substance usage or domestic violence. In January 2019, the investigation against the parents was unfounded.

**Prior History:** In September 2018, the mother was investigated for medical neglect after a doctor reported that she only brought her newborn, who was born with significant congenital defects, to one medical appointment. The mother had missed appointments with the cardiologist, urologist, and the geneticist. The mother was supposed to bring the newborn in the previous week for a weight check and this week for a one-month check-up. The reporter tried to call all phone numbers they had for the mother and stated that they were either disconnected or went to voicemail. The investigator located the family who had recently moved. The investigator interviewed the mother and observed the child as well as the two siblings; no injuries were observed on any of the children. The two older children did not suffer from any ongoing medical or developmental issues. The investigator observed the infant and noted the infant was very small and had missing fingers. The mother admitted that she did miss doctors' appointments and that she did not reschedule because her phone was broken. The mother showed the investigator paperwork showing that the infant was seen by a doctor ten days prior. The paperwork listed upcoming appointments. The mother reported that she was receiving WIC and was breast feeding and bottle feeding, both formula and breast milk, and was feeding the infant every two to three hours. The mother was advised that she needed to reschedule missed appointments and keep all upcoming appointments. The investigator discussed safe sleep and told the mother that a portable crib would be provided; the investigator returned the same day with the pack-and-play. The mother agreed to reschedule appointments, take care of insurance issues, and find a new primary care physician. In October 2018, it was noted that the infant had been making all doctors' appointments. In November 2018, eleven days before the infant's death, the investigation against the mother was unfounded.

ACCIDENT

| Child No. 20 | DOB: 7/2018 | DOD: 12/2018 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 5 months |
| Cause of death: | Sudden Unexpected Infant Death with co-sleeping |
| Reason for Review: | Youth in care |
| Action Taken: | Investigatory review of records |

**Narrative:** Five-month-old was found cold and unresponsive by his twenty-three-year-old maternal uncle, while the maternal grandmother was on an overnight trip. The uncle rushed to the emergency room. Upon arrival to the emergency room, rigor had already started to set in, and the baby was pronounced deceased. The uncle admitted to co-sleeping with the baby. The uncle gave the baby a bottle the prior evening and the baby went to sleep without any distress. The baby slept until around 6:00 a.m. awoke and fell back asleep. The uncle reported that when he awoke at 8:00 am, he noticed that the baby was not moving or breathing. He stated that he immediately drove the baby to the emergency room. The maternal grandmother arrived at the hospital approximately 30 minutes after the time of death was called. The Department investigated and unfounded the uncle for substantial risk, since the uncle was expedient in seeking medical care and did not test positive for any substances.

**Prior History:** In February 2017, the mother was investigated by the Department for substantial risk of physical injury/environment injurious to health and welfare by neglect to the one-year-old and three-year-old siblings, following a report that there was a narcotics search warrant served on the residence. It was reported that the mother was selling drugs out of the home and there was heroin and cocaine found at the residence, along with firearms. The children were taken into protective custody and the children were placed with the maternal great-aunt. The investigation against the mother was indicated. In July 2018, the twenty-five-year-old mother gave birth to twins (one of which is the deceased baby). The twins were born premature and were kept in the hospital until their due date in August. The two older siblings were already in care of the Department, due to the mother having felony drug charges. The mother and thirty-five-year-old father completed their recommended services and planned for their children to be returned home, but the father was arrested on federal charges of drug trafficking. The Department initiated an investigation for substantial risk of harm by neglect, as the mother was having unsupervised visits with the older children. The investigator learned that the mother was present during a number of the father's drug transactions, which negated her previous statements that she did not know of the father's criminal behavior. In August, the twins were taken into protective custody and placed with the maternal grandmother. In September, the parents were indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to the twins.

| Child No. 21 | DOB: 1/2017 | DOD: 1/2019 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 1 year, 11 months |
| Cause of death: | Multiple blunt force injuries, due to a motor vehicle collision |
| County: | Cook |
| Reason for Review: | Split custody (the mother's older children were youth in care at the time of the child's death) |
| Action Taken: | Investigatory review of records |

**Narrative:** One-year-old was thrown from a vehicle that her twenty-nine-year-old mother was driving. The child was taken to the hospital where she was pronounced deceased. The mother was investigated by the Department for death by neglect. The mother stated that she was hit from behind, causing her to spin out of control, and the child was thrown from the vehicle. The child had a child car seat, but the mother did not strap the child in the car seat; instead she placed the child in a regular seat with a seat belt. The mother admitted to having two drinks earlier in the day. The police administered a breathalyzer and though she was determined to be intoxicated, her blood alcohol was under the legal limit. The mother was charged with driving under the influence and vehicular manslaughter. The father and the mother shared custody. At the time of the child's death, the child resided with her father and was with the mother for a weekend visit. The investigation against the mother was indicated.

ACCIDENT

85

**Prior History:**  The mother has an extensive history with the Department, as both a victim in her youth and a perpetrator. The mother was a youth in care from July 1996 until returning to the maternal grandmother's care in late 1999. In December 2003, at age fifteen, the mother gave birth to her first child. The child has lived in the care of his maternal grandmother since birth. The mother gave birth again in March 2007 and February 2009. From 2007 through 2017, the Department investigated the mother eleven times, nine of which were unfounded and two of which were indicated. In April 2010, the mother gave birth while she was incarcerated. The baby was born with Klippel-Trenaunay-Weber Syndrome a rare congenital disorder involving abnormal development of blood vessels, soft tissues, bones and the lymphatic system. He was released to his maternal grandmother after birth. In August 2010, the hotline received a report that the medically-complex four-month-old missed multiple medical appointments. By this time, the mother was no longer incarcerated. An intact case was opened from August 2010 until April 2011. In October 2011, the hotline received a report when the mother did not return after leaving her children, ages two years and six months, with relatives. The mother's older three children were removed and placed in foster care and the six-month-old went into a traditional foster home. In October 2015, the mother's parental rights for the three children were terminated. In January 2017, the mother gave birth and the newborn (deceased child) was exposed to marijuana. The Department investigated the mother for substantial risk of physical injury/environment injurious to health and welfare by neglect to the newborn. Due to safety concerns of placing the newborn with the mother, the father was willing to take custody of the newborn and both parents signed papers for the father to have legal custody. The Department closed and unfounded the investigation. In September 2017, the four-year-old was adopted. The two older children were most recently placed together in a specialized home in 2016. As of July 2019, their goals are adoption.

| Child No. 22 | DOB: 10/2018 | DOD: 1/2019 | Accident |
|---|---|---|---|
| Age at death: | 3 months | | |
| Cause of death: | Positional asphyxiation due to unsafe sleeping practices | | |
| Reason for Review: | Unfounded child protection investigation within a year of the child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  Three-month-old was found unresponsive by his paternal grandmother; 911 was called; and the infant was transported to the hospital where he was pronounced deceased. At the time of the incident, the paternal grandmother was providing care to her grandchildren, ages, three-months, ten-months, two-years, three-years, five-years, and eight-years-old.  At approximately 2:40 p.m., the paternal grandmother placed the infant down for a nap. She placed him on a bed where there was a "mass amount" of bedding and blankets. Approximately thirty minutes later, the paternal grandmother went to check on the infant and found him unresponsive. The Department investigated and indicated the paternal grandmother for death by neglect.  The grandmother admitted to positioning the blankets as a barrier to lean the infant against to keep him from falling off the bed.

**Prior History**:  In January 2018, the paternal grandmother was investigated for substantial risk of physical injury/environment injurious after law enforcement, while responding to an incident during which a shooter entered the grandmother's home, found a gun and marijuana in the home. At the time of the incident there were several children in the home, including her grandchildren and other children for whom she provided daycare. The paternal grandmother denied knowing about the gun and drugs found in the home. Her adult children and grandchildren lived in the home at the time of the incident. The grandmother subsequently kicked her adult son, who was known to have gang affiliation, out of the home and denied having any further issues. The investigator observed the home to be organized and clean. The minors reported feeling safe in the home. The grandmother submitted to a drug drop that was negative for all substances. In March 2018, the investigation was unfounded.

86

ACCIDENT

| Child No. 23 | DOB: 11/2018 | DOD: 1/2019 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 7 weeks |
| Cause of death: | Asphyxia due to overlay |
| Reason for Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**  Seven-week-old infant was found unresponsive by his eighteen-year-old parents. The parents stated that they placed the infant in bed with them and when they woke up the infant was not breathing. The Department investigated the parents for death by neglect. The mother stated that she put the infant to sleep at approximately 10:00 p.m. in his playpen. The infant woke up for a feeding between 3:00 and 4:00 a.m.; after the feeding, she laid him down in bed next to her. The father and the one-and-a-half-year-old sibling were also in the bed. The mother awoke at approximately 7:00 a.m. and saw the infant laying in the bed on his back next to the father. She also noticed that he had some "stuff" on his nose and discovered he wasn't breathing when she went to wipe his nose. She woke up the father and they contacted 911; the 911 operator talked the mother through CPR, and when police arrived, they took over CPR. The infant was transported to the hospital where he was pronounced deceased. The investigation against the mother and father was unfounded.

**Prior History:**  The mother and the father have a history with the Department as minors. The father was involved in four investigations as a child victim; of those, three were unfounded and one was indicated. The mother was a former youth in care. In June 2003, a case was opened for adoption assistance; the case was closed in August 2011. In February 2018, the mother was involved in an investigation as a child victim, when the Department received a report that her father was wheelchair bound and unable to care for his seventeen-year-old daughter and her six-month-old baby. It was reported that the teen was out of control, disrespectful, and that she got high and steals the car. The Department investigated the father for inadequate supervision. The investigator spoke with the father who stated he goes to dialysis three times a week, has relatives who reside in the home to assist him with his daily care, and he can care for the teen and the baby. He denied that the teen is disrespectful, denied that the teen leaves her baby without making a care plan, and denied the teen's use of marijuana in the home. The investigator met with the teen, who reiterated what her father stated and added that she attends an alternative school program and tries to attend on a regular basis, but at times she does not have anyone to care for the baby. The investigator observed the baby and noted that she was clean and appeared to be well cared for, with no visible signs of abuse or neglect. In April 2018, the investigation was unfounded.

| Child No. 24 | DOB: 7/2015 | DOD: 2/2019 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 years |
| Cause of death: | Thermal injuries and inhalation of products of combustion |
| Reason for Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**  Three-year-old child died in a house fire. His mother and two-year-old sibling escaped the fire; the mother was unable to rescue her three-year-old. The mother and two-year-old sibling were sleeping in the living room and the three-year-old was sleeping in a bedroom attached to the living room. The mother woke up to smoke in the house and the house on fire. The mother attempted to rescue the three-year-old but was unable to get to him because the fire was too strong. The mother and the two-year-old sibling jumped out of a window to escape the fire. The three-year-old was pronounced deceased at the scene. The Department investigated the parents for death to the three-year-old and substantial risk of physical injury/environment injurious by neglect to the two-year-old; burns by neglect were later added to the investigation. The investigation revealed that the furnace had gone out about a week prior to the fire. The family was waiting for their tax return to repair it. The parents used space heaters and when the temperatures plummeted, they used a kerosene heater. The fire in the family home was caused by the kerosene heater. The parents were unfounded for death by abuse but indicated for death by neglect. The parents were also indicated for burns by neglect and for substantial risk of physical injury/environment injurious. The family was offered intact services but refused, and said they were receiving grief counseling.

3:18-cv-03085-SEM-TSH  # 62-3  Page 94 of 384

**Prior History:** In May 2018, law enforcement contacted the hotline after responding to the family's home for a call of an aggressive dog, running at large. As law enforcement responded to the call, the dog was on the front porch. Attempts to contact the mother were made by law enforcement, but her phone was disconnected. The officer on the scene observed a two-year-old (the deceased child) hanging out of the top of a second-floor window. The officer attempted to tell the toddler to get down, but he did not listen. The mother was finally contacted; she had been asleep. The mother was asked to secure her dog and to get the toddler off the window. The mother waved off the officer, saying he does it all the time and that it's not a big deal. The officer asked her again to get her son off the window and she complied. The mother was issued a ticket for the dog and was talked to about the toddler's safety. When the mother brought the toddler out for the officer to see, he had an extremely soiled diaper and feces running down his leg. Law enforcement had been to the home before for the dog chasing people down the road and for a domestic incident in 2016. The Department investigated the mother for inadequate supervision. The mother told the investigator that she laid her children down for their naps and then she and the father of the children both fell asleep. The family agreed to clean the residence, put away all harmful objects, purchase a smoke detector, and purchase alarms for the windows/doors. When the investigator went back to the home approximately a week later, the home was clean and met minimal parenting standards. There was a board over the window in the toddler's room that prevented him from hanging out of it. Another window in the room was locked. The window located downstairs in the living room that the toddler had jumped out of now had an air conditioner unit in it. The investigator also observed working smoke detectors in the home. After this visit, the mother moved out of the residence and was residing with her children at her mother's residence. The maternal grandmother stated that the mother was no longer with the children's father and that is why she moved in with her kids. In June 2018, the investigation was unfounded.

| Child No. 25 | DOB: 1/2019 | DOD: 3/2019 | Accident |
|---|---|---|---|
| Age at death: | 6 weeks | | |
| Cause of death: | Complications of asphyxia due to unsafe sleep | | |
| Reason for Review: | Indicated child protection investigation within a year of the child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Six-week-old was found unresponsive by her twenty-year-old mother in bed next to her. The mother called 911 and performed CPR until paramedics arrived. The ambulance transported the infant to the local hospital where the infant was revived. She was then transported to the children's hospital where she was pronounced deceased two days later. The Department investigated and unfounded the parents for death by neglect; the parents were indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to the deceased for unsafe sleep practices as they reported consistently co-sleeping. An agreed upon safety plan in place for the older sibling was also violated. The Department was granted temporary custody of the sibling and placed her in traditional foster care until July 2019, when she was placed with the maternal great uncle.

ACCIDENT

**Prior History:**  In December 2017, a nurse contacted the hotline to report that the mother had brought her seven-month-old to the hospital because she would not stop crying. An x-ray completed at the hospital showed the baby to have a non-displaced right femur fracture, and the mother had no explanation. The Department investigated the mother for bone fractures. The investigator went to the hospital and spoke with the attending physician who stated that the mother reported noticing the baby had right leg pain and crying but had no explanation.  The physician did a skeletal survey which did not show other injuries. The physician stated that he spoke with an orthopedic physician who opined that such a fracture will take a lot of force; the orthopedic physician consulted did not practice pediatric orthopedics and the physician referred the baby to a children's hospital. The investigator observed the baby and met with the nineteen-year-old mother, who reported that when she and the baby arrived home the other day, she changed the baby and put her in her bassinet before going to the kitchen to prepare a bottle. While she was in the kitchen the baby began crying, she went to check on her finding her on the floor. The mother believed the baby stood up inside the bassinet and then fell. The mother also stated that she and the paternal grandmother had recently been talking about needing a crib for the baby, because she had begun standing up in the bassinet. The mother appeared remorseful, agreed to not use the bassinet anymore and agreed to a safety plan. The investigator developed a safety plan for the mother to stay with a cousin, and for the paternal grandmother to supervise the mother with the baby. When the investigator tried to make numerous contacts with the mother, she was told the mother and baby moved out of state. The investigator contacted other state child welfare agencies and made a report to their hotline. The investigator also contacted law enforcement in the state to which the mother and baby moved to request a welfare check on the baby. In March 2018, the investigation against the mother was eventually closed as indicated.

| Child No. 26 | DOB: 9/2016 | DOD: 3/2019 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 years |
| Cause of death: | Multiple injuries due to motor vehicle crash |
| Reason for Review: | Child of a former youth in care |
| Action Taken: | Investigatory review of records |

**Narrative:**  Two-year-old was thrown from a car driven at high speed by his twenty-one-year-old father, who was fleeing police for a traffic violation. The toddler was unrestrained in the back seat. The twenty-one-year-old, pregnant mother was in the front passenger seat. The father ran a stop sign, collided with another car, hit a tree or pole, and split the car in half. EMS transported the toddler to the hospital, where he was pronounced deceased. The police found no car seat at the scene. They arrested the father after he disclosed that he had a weapon under the driver's seat. They found a semi-automatic pistol with 29 live rounds and one spent cartridge. The father was charged with aggravated unlawful use of a weapon by a felon, reckless homicide, and aggravated reckless driving. He had a pending narcotics charge and was out on bond. Both parents were investigated for death by neglect. The father was indicated. The mother was unfounded because she was not driving, did not know the father had a gun in the car, and pleaded with the father to stop. The mother was indicated for substantial risk/environment injurious by neglect, as she was aware the toddler was not properly restrained in the car.

**Prior History:**  In 1997, the toddler's mother and her siblings were placed in foster care for less than a year before returning to their mother's care. In October 2008, the paternal grandmother was driving with the father and his sibling, when she was killed in a car accident. Both children were hospitalized with skull fractures and other injuries. The father was in the custody of relatives, until he became a youth in care under a dependency petition in 2013. While a youth in care, he was frequently on run or living with his girlfriend's family. He was arrested multiple times for driving without a license and unlawful possession of a weapon. He was a youth in care until he aged out of care in November 2018.

| Child No. 27 | DOB: 5/2003 | DOD: 3/2019 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 15 years |
| Cause of death: | Combined drug and ethanol toxicity |
| Reason for Review: | Unfounded child protection investigation within a year of the child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**  Fifteen-year-old was found unresponsive in a hotel room bed. Emergency responders were contacted, and she was pronounced deceased at the scene. The teen had been reported by her mother as a runaway; she was on run with another fifteen-year-old teen. Both girls were going by different names and claimed to be nineteen-years-old. While on run, the teens met a twenty-eight-year-old male who got a hotel room for him and the teens; alcohol, drug use (cannabis), and sexual activity were alleged. The twenty-eight-year-old male was arrested and charged with providing alcohol to a minor resulting in death. The Department is investigating the twenty-eight-year-old male for substance misuse, human trafficking, death by neglect, and sexual penetration. The investigation is still pending. An autopsy performed found the teen to have drugs other than cannabis and alcohol in her system.

**Prior History**:   In July 2004, the Department investigated and unfounded the mother for substantial risk of physical injury/environment injurious by abuse to her three children ages eleven and fourteen-month old twins (one of which is the deceased teen). In October 2008, the Department investigated and unfounded the mother for inadequate supervision to the twin girls; then age five. These investigations have since been expunged. In June 2018, the Department investigated the mother for substantial risk of physical injury/environment injurious by abuse to the fifteen-year-old (deceased teen), after a hospital social worker contacted the hotline. The teen was brought to the ER by EMS after mother contacted them out of concern for the minor. She was admitted for aggressive behaviors and elopement from home. The minor disclosed to the social worker that she was running away due to the mother being abusive to her at home. The teen stated that her mother hits her in the face and "jumps" on her. The last time the mother hit her in the face was a month ago. The teen stated that the physical abuse from the mother has left bruises before; she feels her mother is emotionally abusive. The investigator went to the hospital and interviewed the teen, who reported that she started running away from home when she was twelve-years-old because she wanted her space and her mother never lets her close her door. The teen denied that the mother jumped on or attacked her, hit her in the face, and denied that her mother was emotionally abusive. The investigator met with the mother in her home. The mother told the investigator that the teen was diagnosed with a mood disorder. She confirmed that the minor started running away at the age of twelve and has run away approximately twenty times. She said the teen runs when she gets mad and does not get her way. The mother reported the teen would be gone for a few days up to two months, and that the police have been called when this occurs. The investigator interviewed the teen's twin who denied physical and verbal abuse by the mother. The teen was discharged home and was referred to a partial hospitalization program. In August 2018, the report was unfounded.

| Child No. 28 | DOB: 10/2009 | DOD: 3/2019 | Accident |
|---|---|---|---|
| Age at death: | 9 years | | |
| Cause of death: | Thermal injuries | | |
| Reason for Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Nine-year-old youth in care was severely burned in a housefire and transported to the hospital where he was pronounced deceased the following day. The youth in care was autistic, essentially non-verbal, and had developmental delays. The youth in care and his sibling were placed with the maternal grandparents. The nine-year-old had a bedroom in the finished basement of his maternal grandparents' home. At the time of the fire, the nine-year-old was in bed asleep and his father was reportedly also in the basement. Though the father was awakened and got out, he attempted to re-enter the basement several times in attempts to rescue the nine-year-old. The nine-year-old was transported to the hospital, had sustained substantial injuries, and was in critical condition. The doctors stated that the injuries were fatal, but they had to wait twenty-four hours before they could pronounce the nine-year-old brain dead. At the time of the fire, the parents were reported to be using meth. During the investigation of the fire there was a meth pipe found in the basement. The cause of the fire is still under investigation. The Department's finding of this investigation is currently undetermined while they wait for the investigation of the fire to be completed.

**Prior History:** In August 2018, the hotline received a report of domestic violence between the parents and of the parents' meth addiction. Since the parents tested positive for drugs, they were both indicated for risk of harm to their children. The parents were referred for intact services but refused to cooperate and the case was closed within a few days. In September 2018, the hotline received another report of domestic violence and the parents' meth addiction. The mother obtained an Order of Protection against the father but was still allowing him into the home. An altercation occurred and mother called the police, which resulted in the call to the hotline. The police reported that there were at least six domestic violence calls in recent months. Because of the continuous domestic violence reports and the drug addiction, the Department took protective custody and eventually was given temporary custody. The children were placed with the maternal grandparents. The parents were indicated for risk of harm to both children. The youth in care that was autistic was a difficult child to handle and would frequently become aggressive, particularly when frustrated. The parents were allowed frequent access to the home of the grandparents to help with the child. Visitation was as often as the parents wanted but it was to be supervised and the parents were not to spend the night in the home of the grandparents. The agency suspected that the parents were effectively living at the home of the grandparents but were unable to prove it. The parents denied they were living there and stated they were only helping because the child was difficult to control.

| Child No. 29 | DOB: 11/2017 | DOD: 4/2019 | Accident |
|---|---|---|---|

| | |
|---:|---|
| Age at death: | 16 months |
| Cause of death: | Multiple injuries due to fall from height |
| Reason for Review: | Unfounded child protection investigation within a year of the child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Sixteen-month-old was in the care of his thirty-six-year-old mother when he fell from a third story window, sustained blunt force trauma to the forehead, and was pronounced deceased. The mother reported that she was in the living room with the toddler and had food cooking on the stove. The mother noticed smoke coming from the kitchen, so she picked up the toddler and put him in a room with his fifteen-year-old sibling. The mother told the toddler to sit in the room with his brother, who was laying across her bed. She did not realize the teen was asleep. The mother opened the living room windows to air out the apartment and went into the kitchen to rinse off the food that she had burnt. After she left the kitchen, the mother noticed the protective screen was gone from the window. She ran over and saw the toddler lying on the sidewalk beneath the window. The mother rushed downstairs, called 911, and performed CPR on the toddler until EMS arrived on the scene. The toddler was transported to the hospital where he was pronounced deceased.

**Prior History:** In December 2003, the Department investigated the maternal grandmother for inadequate supervision and burns by neglect to the seven-month-old sibling, after receiving a report that the grandmother was watching the baby, left him alone sleeping on a bed, and the baby fell and became stuck between the bed and radiator. The baby was transported to the hospital and released with second degree burns. The Department indicated the grandmother for inadequate supervision and unfounded the grandmother for burns by neglect, as it was determined the cause of injury was an accident. In August 2018, the Department investigated the mother for inadequate supervision to the sixteen-year-old sibling, after the teen's boyfriend's step-father reported that he was feeding the teen twice a day and that she reported to him that that she was sleeping in a shipping container. The investigator spoke with the mother, who reported that the teen was at home. The teen confirmed to the investigator that she had previously ran away and the police returned her home; she denied sleeping in shipping containers. The teen reported that she stayed in her boyfriend's house; his mother allowed her to stay, but the mother did not tell her boyfriend's step-father, since he did not want her there. The mother went to the boyfriend's house to try and find the teen, but the teen had slipped out of the back door. The mother filed a missing person report and the teen was eventually returned home. The teen felt safe at home and denied any other attempts to run away. The investigation against the mother was unfounded, as she made reasonable efforts to find her daughter and filed a missing person report.

| Child No. 30 | DOB: 12/2018 | DOD: 4/2019 | Accident |
|---|---|---|---|

| | |
|---:|---|
| Age at death: | 4 months |
| Cause of death: | Asphyxia due to overlying due to co-sleeping |
| Reason for Review: | Youth in care |
| Action Taken: | Investigatory review of records |

**Narrative:** Four-month-old was found unresponsive while co-sleeping with his maternal great-grandmother/foster parent and one-year-old sibling. The infant was found underneath his sleeping one-year-old sibling by his maternal great-grandfather/foster parent. The infant was last seen alive between 2:00 a.m. and 3:00 a.m., when the great-grandmother took the infant out of his crib because he was fussy from teething and put him in bed with her. At approximately 7:00 a.m., the great-grandfather went to check on the infant and noticed he was not in his crib. The great-grandfather looked at the great-grandmother's bed and saw the one-year-old sibling on top of the infant. He woke up the great-grandmother and 911 was contacted. The infant was transported to the hospital where he was pronounced deceased. The Department investigated and unfounded the great-grandparents for death by neglect.

ACCIDENT

**Prior History:**   The deceased's mother had a history with the Department as a child. In 2008, her mother gave guardianship to her paternal grandparents. In 2017, the mother, who was sixteen-years-old and seven months pregnant, was investigated and unfounded for substantial risk of physical injury/environment injurious to health and welfare by neglect to her then eleven-month-old child. The mother was referred to intact family services, for parenting, development screening, individual counseling, and mental health services; however, her case was closed unsatisfactory in December 2017 due to her non-compliance with services. Mother's grandparents, who continued to have guardianship of her, filed for guardianship of her two children, ages three and nineteen-months. In March 2018, the seventeen-year-old mother was investigated for substantial risk of physical injury/environment injurious by neglect to her two children, after the mother got into a physical altercation with a relative and destroyed the home. The investigation revealed that the altercation occurred outside while the children were inside. No arrests were made. In May 2018, the investigation was unfounded with a referral for community-based services. In December 2018, the teen mother was investigated for substance misuse by neglect, after she gave birth and the newborn (deceased infant) tested positive for cocaine. The mother admitted to using within the last 24 hours and two to three times during her pregnancy. The investigation was indicated; the Department took protective custody of the newborn and placed him with the great-grandparents, who agreed to care for all three children.

| Child No. 31 | DOB: 2/2003 | DOD: 4/2019 | Accident |
|---|---|---|---|
| Age at death: | 16 years | | |
| Cause of death: | Gunshot wound | | |
| Reason for Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  Sixteen-year-old youth in care was staying in a respite foster home for the weekend because the foster mother was out of town. The teen and a seventeen-year-old friend reportedly found a gun a few days prior; while handling the gun the youth was shot in the head. It was initially reported that the teen was alone when he was shot; however, the seventeen-year-old admitted to placing the gun next to the youth, so it would appear as though he shot himself. The teen was transported to a local hospital where he died three days later. The Department did not investigate the death. The seventeen-year-old friend pleaded guilty to involuntary manslaughter and obstructing justice; he was sentenced to an indeterminate term in the Department of Juvenile Justice, not to exceed his twenty first birthday, with forty-one-months-probation.

**Prior History:**  The teen came into the custody of the Department on a dependency petition in September 2016. The teen was raised by his grandmother from the age of nine-months; however, in May 2016 the grandmother died. Following her death, the teen lived with relatives. In September 2016, he was in a detention center and there was concern about the relative's supervision. The teen was screened into court and he went to live with another relative. In May 2017, the teen was placed in a traditional foster home until he went on run in July 2018. In August 2018, he was arrested and sent to a juvenile detention facility. Over the next six months the teen cycled between substance abuse treatment, the home of a relative, being on run, and detention. In March 2019, he returned to the traditional foster home in which he had been placed. He remained with that foster parent until his death. The biological mother of the teen, now deceased, had prior Department involvement with her three younger children due to issues of domestic violence and substance abuse. Two of the children were born substance-exposed, and the mother did not cooperate with intact services. In November 2011, at the start of the sixth investigation, the two children in her care were taken into custody and placed with a relative. In March 2013, the mother gave birth to a newborn testing positive for drugs. The newborn was taken into custody and placed with his siblings. The three children have since been adopted. There was a pending child protection report on the foster parent, at the time of the death of the teen. A nine-year-old foster child in the home reported that the foster mother beats him with a belt and older foster siblings hit him. The thirteen-year-old and sixteen-year-old (the deceased) foster children in the home denied that the nine-year-old is hit by them or their foster mother. The teens reported that the nine-year-old was angry and aggressive kicking people and things, putting holes in the wall. The foster mother reported that the nine-year-old does get out of control at times and sometimes she has the sixteen-year-old help to contain him or bring the nine-year-old to her after he runs away. The sixteen-year-old confirmed this. The nine-year-old told the investigator the same story as reported in the narrative. The investigator did not observe any marks on the child. The child's assigned caseworker told the investigator that the child's uncle suspects the child's mother may have told the nine-year-old to say this in order to get a different placement. The uncle repeated this to the investigator.  In May 2019, the investigation was unfounded.

| Child No. 32 | DOB: 11/2017 | DOD: 4/2019 | Accident |
|---|---|---|---|
| Age at death: | 18 months | | |
| Cause of death: | Hypoxic ischemic encephalopathy due to drowning | | |
| Reason for Review: | Pending child protection investigation at the time of the child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  Eighteen-month-old was found unresponsive in the tub by his thirty-two-year-old mother. The mother reported that she left the baby and his three-year-old sibling alone in the tub for approximately one minute. When she returned, she found the eighteen-month-old underwater, limp and not breathing. The mother grabbed him out of the water and began CPR. EMS arrived on the scene and transported the baby to the hospital, where he was put on life support and pronounced deceased one week later. The Department investigated the mother for inadequate supervision and death by neglect. During the investigation, the mother admitted that she left the baby and sibling alone in the tub while she folded laundry in a different room, longer than one minute. In June 2019, the mother was indicated for death by neglect and inadequate supervision of the surviving sibling. The Department opened an intact family services case for the mother and surviving siblings.

94

ACCIDENT

**Prior History:** The Department investigated and unfounded the mother five times between August 2006 and June 2017. In September 2018, the hotline was contacted to report that the thirteen-year-old half-sibling was very dirty and appeared to be wearing the same clothes from the weekend, since they had stains and dirt marks all over them. The thirteen-year-old also told a social worker that his family has maggots in the carpet at home and used baking soda to drown them. The Department investigated the mother and father for environmental neglect. The mother and father reported that they had been away for four-months, caring for the maternal great-grandparents. When they came home, they discovered the roof was leaking and the tub drain was clogged, but both had been fixed. The mother denied any maggots. The mother gave satisfactory responses to the remaining questions. At the end of September 2018, the Department unfounded the parents. In April 2019, the hotline received a report about a lost child (the three-year-old sibling), as she was found standing alone on a major road wearing just a diaper and cowboy boots. While the reporter was waiting for the police to arrive, the mother found the three-year-old child and the reporter, which took approximately thirty minutes. The Department investigated the mother for inadequate supervision. The mother reported that the toddler was in the bedroom with her thirteen-year-old half-sibling playing video games while she was in the living room and the maternal grandmother was in the kitchen. The thirteen-year-old left the room to go the bathroom. A little while later, the thirteen-year-old went to the living room and asked if anyone had seen the toddler, because she was not in the bedroom. The mother got into the car, drove around the block, and found the toddler. After this incident, the mother installed alarms on all the first-floor windows and a safety chain on the front door. In May 2019, the mother was indicated for inadequate supervision.

| Child No. 33 | DOB: 9/2012 | DOD: 5/2019 | Accident |
|---|---|---|---|
| Age at death: | 6 years | | |
| Cause of death: | Craniocerebral blunt trauma | | |
| Reason for Review: | Closed Intact Family Services case closed within a year of the child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Six-year-old was riding in a vehicle with his thirty-three-year-old mother, as she was driving at a high rate of speed and hovering over the road's center line, when she collided head on with a semi-truck. Emergency medical services arrived on the scene to find the six-year-old on the floor board in the back seat of the vehicle. The child was not properly restrained in a booster or child car seat. He was transported by air to a children's hospital in extremely critical condition. The child remained in the hospital with significant head injuries and was pronounced deceased nine days later. The Department investigated and indicated the mother for death by neglect.

ACCIDENT

95

**Prior History:** In 2015, the Department investigated and unfounded the mother for cuts, bruises, welts, abrasions and oral injuries to her two-year-old, after it was reported that the two-year-old was observed to have bruising from the back of his neck to below his bottom. The bruising appeared to have three finger prints and then approximately a four-inch-long line with a curve. The toddler arrived at the father's home two nights prior and the bruises were found after the father gave the toddler a bath. The toddler said "mommy," then started swinging his hands. The mother was reported to be homeless and living with her paramour, who checked himself out of rehab. In August 2018, the Department investigated and unfounded the father for cuts, bruises, welts, abrasions and oral injuries to his three-year-old, after it was reported that the toddler was observed to have bruising on his arms, legs, and forehead after visiting his father. He was also found with a small laceration on the top of his head. The toddler was found with no medical concerns. In January 2018, the Department investigated the mother for substantial risk of physical injury/environment injurious to health and welfare by neglect to her three children, ages eight months, five years and seven years; after law enforcement reported that there was a domestic violence incident between the mother and her paramour, in the presence of her children. The officer added that they have responded to multiple domestic calls at their residence. Law enforcement permitted the mother to bring the children to the residence of the maternal grandmother and then arrested both the mother and paramour. The Department determined that the children were safe because the mother ended her relationship with the paramour and moved in with the maternal grandmother. In February 2018, the mother told the investigator that she wanted to return to her residence with the paramour. The investigator told her that she could not do that with the children, and he would have to take protective custody of the children if she did. The mother ultimately decided against returning to her residence with the paramour because she did not want to lose custody of her children. Due to the mother's history with domestic violence, the investigator convinced her to enroll into intact family services. In March 2018, the investigation against the mother was indicated. The mother was engaged in intact services and met with the caseworker regularly. She went to mental health counseling regularly and addressed her domestic violence issues.  Also, as part of her probation from the altercation with the paramour in January 2018, she was ordered to attend parenting classes. As a result of this continued monitoring, the mother's commitment to counseling and positive feedback from her children, the intact case was closed in August 2018.

ACCIDENT

3085-SEM-TSH

| Child No. 34 | DOB: 3/2019 | DOD: 5/2019 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 5 weeks |
| Cause of death: | Sudden unexpected infant death while co-sleeping |
| Reason for Review: | Pending child protection investigation at the time of the child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Five-week-old infant was discovered unresponsive while sleeping in bed with his fifty-nine-year-old great-aunt. The great-aunt and infant went to bed around 12:00 a.m., after a family gathering. They were sleeping in bed with another child. The infant's parents attended the gathering, but left him in the care of the great-aunt, because they had been drinking. The parents were not present in the home when he was discovered unresponsive. The great-aunt drank a six-pack of beer at the gathering, but the infant's parents were not aware of this and she felt sober enough to care for him. The great-aunt woke up around 6:30 a.m. and discovered the infant not moving or breathing. A family friend called 911 and performed CPR until EMS arrived on the scene. The infant was transported to the emergency room where he was pronounced dead at 7:22 a.m. The Department investigated and indicated the great-aunt for death by neglect. The Department investigated and unfounded the father for death by neglect but indicated the father for inadequate supervision.

**Prior History:** The mother was a victim in five unfounded child protection investigations during her childhood and was a non-involved subject in a sixth investigation. The father was a victim in three indicated child protection investigations during his childhood. He was an unfounded perpetrator in a fourth child protection investigation. He was a non-involved subject in two more investigations from his childhood. The mother's first involvement with the Department as a parent was in October 2016, after the hotline was contacted to report that a neighbor came home from work around 6:00 p.m. and found the one-year-old and two-year-old half-siblings outside in the common area of the third floor. The neighbor took the children to her apartment and contacted the police. The mother's paramour (father to the half-siblings) returned home and took the children back to the mother's apartment. The children had been left unsupervised for at least thirty minutes. The mother stated that she was sleeping in the back with the children and they knew how to open the door. The investigation was unfounded. The mother was instructed to install a new lock on the door. In July 2017, the Department investigated the mother for inadequate supervision to the two half-siblings, ages two and one, after the hotline was contacted to report that two children were found wandering unattended in an apartment complex parking lot, crying. Law enforcement recognized the children. The mother was located, and she claimed to have put them to sleep around 8:00 p.m. It is unknown how long they were outside wandering. The investigation was indicated. In July 2017, four days after the previous hotline call, the Department investigated the mother for substantial risk of physical injury/environment injurious to health and welfare through incidents of violence or intimidation to the half-siblings, ages two and one, after the hotline was contacted to report that the mother repeatedly slapped the one-year-old in the ribs and punched the two-year-old in the chest. The two-year-old had some redness at the time from being slapped. It was further reported that the children had head injuries and black eyes in the past from being abused by the mother. The mother had a history of drinking. The investigation was unfounded. In April 2018, the mother was investigated for cuts, welts, bruises, abrasions, and oral injuries, after the hotline was contacted to report that the mother choked the three-year-old half-sibling and pushed him down, and he hit his head, causing a large knot and bruise on his head. The investigation was unfounded, as there was no photographic evidence of the knot and the child was not taken to the doctor. In June 2018, the Department investigated the mother for cuts, welts, abrasions, and oral injuries to the three-year-old half sibling; and substantial risk of physical injury/environment injurious to health and welfare by neglect to the three and two-year-old half-siblings, after the hotline was contacted to report that the three-year-old was in protective custody of law enforcement, after it was reported that the mother was using excessive force on the three-year-old. Law enforcement watched a surveillance video that showed the mother dragging the child and jamming her knee in his back, causing the child to fall headfirst. The mother and child were seen walking to a nearby field behind a car, which obscured the surveillance camera, but when they returned to the view of the camera, the mother could be seen kicking the child in the upper body. The child had a small cut to his forehead and multiple scrapes on his knee. The father of the half-siblings had obtained an order of protection and filed for full custody. The mother was offered intact family services but refused. The investigation against the mother was indicated.

| Child No. 35 | DOB: 12/2018 | DOD: 5/2019 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 5 months |
| Cause of death: | Hanging |
| Reason for Review: | Closed child welfare services referral within a year of the child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**  Five-month-old was found by her six-year-old sibling unresponsive and hanging, by her shirt, on a hook that was part of a headboard level with a mattress. The six-year-old sibling reported that he lifted the infant up and put her on the bed when he found her. The bed was a full-size day bed with a twin mattress. The baby was transported to the hospital where she was officially pronounced deceased. The twenty-four-year-old mother reported putting the infant to bed at approximately 2:00 a.m. and finding the infant unresponsive in bed at 6:00am. She carried the infant to the kitchen table and ran outside for help. An off-duty police officer who lived nearby went to the home to help and 911 was called. The medical examiner noted that the infant had a mark on the front of her neck which could be consistent with the sibling's description. It was further reported that the bedroom was cluttered, to the point of not being able to open the door all the way; and the rest of the house was cluttered with cigarette ashes, stains and lacked working smoke detectors. There were five cats, and cat feces and urine, and dead cockroaches throughout the home. The Department investigated and indicated the parents for substantial risk of harm and environmental neglect to the siblings, ages, six, five, four and two years, and the mother was indicated for cuts, welts and bruises by neglect and death by neglect to the infant. The siblings were taken into custody.

98

ACCIDENT

**Prior History:** In July 2014, the Department investigated the mother for substantial risk of physical injury/environment injurious to health and welfare by neglect and inadequate supervision to her children, then ages eleven-months and one-year, after it was reported that the mother suffered from mental illness and did not take care of her children. During the investigation, the mother reported that she had been hospitalized as a teen, due to her anger and was diagnosed with episodic mood disorder. The mother was not in therapy and not on medication. Family members reported that the mother does not take care of the children as she should. The mother was indicated for substantial risk of physical injury/environment injurious and an intact family services case was opened. The mother engaged minimally in services. In May 2016, the case closed as the children were living with the maternal grandmother full-time, while the mother lived with another relative. Shortly after the intact case closed, the Department investigated and unfounded the parents for substantial risk of physical injury/environment injurious to health and welfare by neglect to the children, ages, one, two and three; and indicated the mother for inadequate supervision to the two-year-old, after it was reported that the toddler was found outside, without shoes. The father reported that the mother, who had fallen asleep, was supposed to be watching the toddler. The mother was referred for intact family services. In November 2016, the Department investigated the mother for substantial risk of physical injury/environment injurious to health and welfare by neglect to the children, ages, one-month, one-year, three-years, and four years-old, after the intact caseworker reported that the mother had not been cooperative with services. The mother had missed appointments, was not answering her phone or texts and the caseworker had not seen the mother or children, even when the worker went to the home unannounced. The investigator eventually located the mother at the maternal grandmother's home. The mother said she and the father had separated and she moved back in with her mother, leaving the children with their father. The mother reported that she decided she did not want intact services, so she did not return the worker's calls. Shortly after meeting the mother, the investigator saw the children at the father's home. In January 2017, the investigator was informed that the mother went to the father's job and assaulted him, stabbing him in the arm. The mother was arrested and jailed. The children remained with the father. The mother was indicated for risk of harm. In February 2017, the Department indicated the mother for failure to thrive to her three-month-old infant, after it was reported that the infant was below the 3rd percentile for body weight. Though the mother was still incarcerated and the infant and his siblings had been living with the father for three weeks, doctors reported the failure to thrive had predated the move and attributed it to the mother's care. The father reported that he was divorcing the mother and seeking custody. An intact family case was opened, the father received in-home parenting education and was referred for counseling services. The father began missing sessions, and the children went to the maternal grandmother's home under a safety plan. The children remained in the care plan with the grandmother. In June 2017, the mother informed the worker that the grandmother had terminal cancer and could no longer care for the children. She and the children were at a shelter. A month later, shelter staff informed the worker that the mother moved from the shelter. The mother said she was renting a room and had one of the children and the other three were with the father. In July 2017, the family case was closed, noting the parents refused services. In March 2019, the school called the hotline requesting services for the family as the children were often late or absent and the mother seemed to need assistance. The call was taken as a child welfare services referral. Shortly after the case was assigned, the worker spoke to school staff who reported the mother and her children had moved to a neighboring state.

ACCIDENT

| Child No. 36 | DOB: 4/2019 | DOD: 6/2019 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 months |
| Cause of death: | Bedding asphyxia |
| Reason for Review: | Indicated child protection investigation within a year of the child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Two-month-old infant was found unresponsive in an adult bed by her maternal grandmother. The mother was awoken by the maternal grandmother's screaming. The mother took the infant to another room and laid her on the floor to initiate CPR while the maternal grandmother called 911. EMS arrived and transported the infant to the hospital where she was pronounced deceased. The Department investigated the mother for death by neglect to the infant and substantial risk of physical injury/environment injurious health and welfare by neglect to the siblings. The mother reported that she fed the infant at approximately 1:30 am on the living room couch. The mother moved the infant to her bed at approximately 2:30 a.m. The mother reported that it was common for the infant to sleep with her in bed. The mother stated that she laid the infant's head on a pillow and was placed on her belly with her arms up by her head. After the mother laid her down, she went to another room to watch a movie and unintentionally fell asleep. The maternal grandmother reported that she entered the bedroom after 8:00 a.m. to check on the infant when she found her lying face down and blue. The infant was found towards the middle of the bed and was not on a pillow. The infant had a comforter draped above her head and partially across her lower body. The maternal grandmother denied that the comforter appeared to be on the face/head of the infant. The pillow was parallel to the infant's body. The investigator observed a pack-and-play in the bedroom, but it was full of clothing. The investigation against the mother was unfounded.

**Prior History:** In April 2018, the mother was investigated for cuts, bruises, welts, abrasions and oral injuries to the two-year-old sibling after the hotline received a report that the toddler presented with bruises on his buttocks from the mother hitting him with her hand. The investigator observed the toddler within 24 hours of the hotline call and there were no marks or bruises on his bottom. He had a diaper rash and was comfortable with his mother. The mother stated that for punishment, the children are given a time out with occasional spankings with her hand on their bottoms, but she has never spanked them hard enough to leave a mark. The investigator interviewed the mother's friend, a teacher, and the maternal aunt who watched the kids, and none of them had concerns. The investigation against the mom was unfounded. In September 2018, the maternal uncle was investigated for substantial risk of physical injury/environment injurious to health and welfare by neglect to his two-month-old son and two-year-old nephew (sibling to the deceased infant), after a report that the maternal uncle was tearing up the house. Law enforcement was called to the home after a report that the maternal uncle battered the maternal grandmother. The children were present and witnessed most of the event. The mother reported that the maternal uncle was on a bender, as he was taking methamphetamines again. It was reported that this was the first time he had hit the maternal grandmother. The maternal grandmother locked the maternal uncle out of the home, and he broke the window to get back inside. The two-year-old was in another room while this incident occurred. The maternal uncle admitted he was under the influence. He also shared that he had substance abuse and mental health issues that he needs to address. The investigation was indicated as to his two-month-old son and unfounded as to the two-year-old.

| Child No. 37 | DOB: 11/2013 | DOD: 6/2019 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 5 years |
| Cause of death: | Drowning |
| Reason for Review: | Pending child protection investigation at the time of the child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Five-year-old drowned in nine feet of murky water at the bottom of a pool. The thirty-six-year-old father took eight children (the five-year-old; two half-siblings, ages five and nine years old; and five children of a former paramour, ages three, four, six, eleven, and fifteen years old) to swim in the pool at his apartment complex. As the father was rounding up all the children to have dinner in his apartment, the five-year-old needed to use the washroom. The father asked the nine-year-old to take him to the clubhouse. When the father realized the five-year-old was missing, the children stated that the five-year-old was still in the washroom. The father did not find him in the washroom and asked the apartment manager if she had seen the child; she had not. At approximately 4:51 p.m., the father called the mother of the five-year-old to ask if she had picked him up, but she hadn't. At approximately 5:07 p.m., the mother called the police. The father also called police. At approximately 5:12 p.m., the police arrived to join in the search. A child asked the manager if a doll was in the pool. At approximately 5:35 p.m., the police officer jumped into the pool to retrieve the five-year-old's body. The police noted that the water was very murky. Others were swimming but did not see the five-year-old, as he looked like a dark blur at the bottom of the pool. The Department investigated and indicated the father for death by neglect and indicated the father for substantial risk to the other children.

**Prior History:** The father has had a total of ten children by six different mothers.

**Mother #1**: In July 2010 and September 2011, the mother of two of the father's children was investigated by the Department; both investigations have been unfounded due to appeal and expunged. In October 2013 and January 2014, the father was found unfit due to multiple convictions, and his parental rights were terminated of two of his children. The mother of those children was also found to be unfit and the Department was appointed as guardian with the right for placement.

**Mother #2:** In February 2011, the mother of another one of the father's children was investigated and unfounded by the Department; this investigation has since been expunged.

**Mother #3:** In May 2019, the Department investigated the father for substantial risk of physical injury/environment injurious to health and welfare to the seven-year-old. The Department received a report that the mother obtained an order or protection against the father after the father went to the house and threatened to harm the mother and the seven-year-old child in the child's presence because the mother sought child support. The father hit the child with a belt in April and left red marks. The child stated that she had gotten into trouble and the father spanked her on the arms and buttocks with the belt. The father refused to cooperate with the investigation. The investigation was unfounded as there was a large delay in reporting and the incident did not rise to the level of abuse.

**Mother #4:** The mother of the deceased child was in foster care from 1999 until 2010, living with relatives. As a parent, the Department investigated and unfounded the mother of the deceased child in January 2015 and 2016, both investigations have been expunged. In August 2016, the Department investigated the mother for substantial risk of physical injury/environment injurious to health and welfare by neglect and substantial risk of physical injury/environment injurious to health and welfare – incidents of violence or intimidation to the two-year-old (deceased child) following a report that the mother tried to run over the father with her car while the two-year-old was in the mother's vehicle. The child was improperly restrained in the back seat of the car. The mother was arrested for aggravated assault. The incident occurred outside the father's place of employment and there was a witness. The mother accused the father of infidelity; the mother was sending messages to the father about damaging his vehicle. When the father went outside, the mother proceeded to run him over. The mother admitted that she went to the father's workplace to confront him about issues of infidelity. She stated that when he went outside, she chased him around the building with her car but did not hit him. She admitted that it was a very stupid act and that she should have never threatened him, especially with her son present. The investigation against the mother was indicated.

In June 2016, the Department investigated the father's cousin for cuts, bruises, welts, abrasions and oral injuries by neglect and inadequate supervision to the two-year-old (deceased child), after receiving a report that the toddler was struck by a vehicle. The cousin went in the house and left the toddler in an unfenced backyard. The toddler was struck by a car in the alley and suffered a mild concussion and multiple scrapes on his body. The investigation was indicated for inadequate supervision and unfounded for cuts, bruises, welts, abrasions and oral injuries by neglect.

ACCIDENT

| HOMICIDE |
| --- |

| Child No. 38 | DOB: 6/1999 | DOD: 7/2018 | Homicide |
| --- | --- | --- | --- |

| Age at death: | 19 years |
| --- | --- |
| Cause of death: | Multiple gunshot wounds |
| Perpetrator: | Law Enforcement |
| Reason for Review: | Youth in care |
| Action Taken: | Investigatory review of records |

**Narrative:** Nineteen-year-old youth in care was killed in a police-involved shooting. It was reported that the teen had been wanted for questioning regarding a shooting incident. When police conducted a traffic stop, the suspected teen got out of the car and ran. During the pursuit, the youth was shot by an officer. The teen was transported to the hospital and pronounced deceased. A State Police investigation cleared the officer of wrong-doing. The Department did not investigate the death.

**Prior History:** In June 2007, the mother of the deceased teen was investigated and unfounded by the Department for inadequate supervision. Reports indicated that the mother was leaving her children alone and unsupervised. This investigation has since been expunged. In September 2013, the deceased teen, then fourteen-years-old, came into the care of the Department after delinquency court filed a dependency petition. The teen had violated his probation stemming from a charge of residential burglary. The teen was placed in a residential facility and went through several subsequent placements due to his aggressive behavior. The placements included residential care, shelter placements, juvenile detention, his mother's home (on electronic monitoring), and homes of relatives. In August 2016, the worker learned that the teen and his girlfriend were expecting twins, and referred him for parenting services; however, he did not engage at that time and was charged with burglary and unlawful use of a weapon in December 2016. The teen was sent to the Department of Corrections where he remained until October 2017. Upon release, the teen went to live with a sibling. The worker encouraged the teen to get involved with the Teen Parent Service Network. The teen did not participate in services, but the adult sibling did not have concerns. The teen's children were taken into the custody of the Department following an indicated allegation of abuse against the infants' mother. The teen was minimally involved with services and rarely visited his children. Early in July 2018, the teen told his worker he wanted to start services so he could be involved with his children.

| Child No. 39 | DOB: 08/2000 | DOD: 8/2018 | Homicide |
| --- | --- | --- | --- |

| Age at death: | 17 years |
| --- | --- |
| Cause of death: | Gunshot wound |
| Perpetrator: | Unknown |
| Reason for Review: | Youth in care |
| Action Taken: | Investigatory review of records |

**Narrative:** Seventeen-year-old youth in care was shot in the back while riding his bicycle. The teen was on his bike at approximately 4:15 p.m. when he got into an argument with other males on bikes. During this interaction the youth was shot. The teen was taken to the hospital where he was later pronounced deceased. The shooter is unknown to law enforcement. The Department did not investigate the death.

**Prior History:**  The teen became a youth in care through a juvenile court dependency petition in December 2016. At that time, the teen was being detained in a juvenile detention center, due to a violation of probation. The teen had a history of substance use issues and delinquency with robbery charges in 2014, and home invasion and burglary charges in 2015. The teen was on home monitoring, but violated curfew, and did not participate in treatment. The judge allowed him to return home; however, he violated monitoring again, leaving the home and running away in October 2016. The teen was eventually found and placed in detention. The Judge determined that the teen's mother was unable to effectively manage his behaviors, that family preservation services had been unsuccessful, that reasonable efforts had been made to prevent the need for the teen's removal from the home, and that it was in the teen's best interest to be taken into DCFS custody. The teen was transferred to a juvenile justice youth center from the county detention center. He remained there until December 2017, receiving an early release for good behavior. Following his release, the teen was in contact with his mother, he began participating in school, and counseling. He and his mother also participated in family therapy. After the teen's release from the youth center, he moved in with his grandmother who lived on the first floor of a two flat; his mother and siblings lived on the upper floor. The teen was linked with counseling and medication management. He started school in January 2018 but was suspended for being verbally aggressive with a dean. The mother, probation officer, and the teen's youth advocate met with the teen and encouraged him to address his behavior. In the following month's the teen's behavior did improve. In June 2018, the teen completed his junior year. At the time of the teen's death, he had been taking summer classes and waiting to start his senior year of high school.

| Child No. 40 | DOB: 3/2001 | DOD: 8/2018 | Homicide |
|---|---|---|---|
| Age at death: | 17 years | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Unknown | | |
| Reason for Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Seventeen-year-old youth in care was found by police lying face down in an alley with multiple gunshots wounds to the head, chest, and groin area; he was unresponsive with no pulse and pronounced deceased on the scene. Three days earlier, a missing person's report was completed after the youth removed his ankle monitor and went on run from his placement. An arrest warrant was issued, and a report was made to the National Center for Missing and Exploited Children. The Department did not investigate the death.

**Prior History:**  The mother of the deceased teen has a long history with the Department due to ongoing drug use and mental health issues. At the age of two, the deceased was removed from his mother's care for neglect. The youth had multiple placements and was not compliant with prescribed medications or services. In 2017, the youth in care was involved in criminal activities that led to arrests and charges. The youth was charged with aggravated assault and armed robbery, plead guilty, and was given three years of probation and thirty hours of community services. In 2018, the youth's placement was in jeopardy when ammunition, a gun, and drugs were discovered in his belongings by his foster father. A mentor for the youth was put in place as a condition to remaining in placement. In February 2018, the youth got into an altercation with another youth in the home and ran away. A warrant was issued for his arrest. In March 2018, the youth in care was arrested in violation of his probation and was taken to the detention center. A clinical intervention was recommended. The youth in care was placed with a relative while waiting to be matched with residential placement. A month later, the youth in care ran away from this placement. While on run, the youth engaged in gang activities and made related posts on social media. In July 2018, the youth was picked up by police after they responded to a fight at the home in which he was placed. The youth was subsequently placed in detention and was later moved to a shelter where he was put on electronic monitoring. The youth refused to interview with residential facilities and left the shelter several times incurring several violations for continuing to leave the shelter.

| Child No. 41 | DOB: 7/2018 | DOD: 8/2018 | Homicide |
|---|---|---|---|
| Age at death: | 1 month | | |
| Cause of death: | Blunt force head trauma | | |
| Perpetrator: | Father | | |
| Reason for Review: | Unfounded child protection investigation within a year of the child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** One-month-old infant was transported by ambulance to the hospital where he was pronounced deceased. At the time of his death, the infant lived with his eighteen-year-old father and seventeen-year-old mother in a home with multiple people, including the maternal grandfather and his wife. The father reported sleeping on the couch with the baby on his chest. When the father woke up the infant was still on his chest, but not breathing. The Department investigated the death. The infant and the father were the only ones in the home at the time of the incident. The investigator spoke with the maternal grandfather who stated that he and his wife were out of the home at the time of the incident, and when they arrived home his wife went in the house first and stated to him that the baby was not breathing; his wife called 911 and did CPR on the infant. An ambulance arrived and transported the infant to the hospital where he was pronounced deceased. The mother was at school during this time. During the investigation, the father admitted to law enforcement that he threw the infant against the wall several times to stop the infant from crying. The Department's investigation against the father was indicated for death by abuse. The father was arrested and charged with first degree murder and involuntary manslaughter and is awaiting trial.

**Prior History:** The mother has a long history with the Department as a child dating back to 2003. From 2003 through 2017, there were fourteen child protection investigations involving her family. The family also had three open placement cases. The placement cases were open from May 2010 through October 2015, February 2013 through October 2015, and November 2017 through January 2018. The mother and her sibling first came into care in 2010 at the age of ten and eight; they were removed from their biological mother and step-father due to domestic violence and allegations of sexual molestation by the step-father. The children were placed with relatives and in 2011, their biological father got custody of them.  In 2013, the girls were once again placed in substitute care after father was indicated for sexual penetration and cuts, welts and bruises to both girls, ages thirteen and eleven. The father denied sexually abusing the girls, though he admitted to battery, was convicted, and served time. The girls were returned to the father in July 2014. In November 2017, the mother and her sibling went back into care after the hotline was contacted with allegations of sexual penetration to the mother of the deceased at age seventeen. The investigation was unfounded on appeal, and the girls were returned to the father in January 2018. The case was closed after the teen mother recanted her statement.

| Child No. 42 | DOB: 12/2001 | DOD: 9/2018 | Homicide |
|---|---|---|---|
| Age at death: | 16 years | | |
| Cause of death: | Gunshot wound | | |
| Perpetrator: | Relative | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Sixteen-year-old was accidently shot in the chest by her twenty-year-old sibling at the home of a friend. The friend was not home that evening but told police he had allowed friends to be at the home. The twenty-year-old found a shotgun and was moving it to a safer area because a friend of theirs had their small child present in the home. He said he was holding the shotgun in front of him when it went off, striking his sixteen-year-old sister in the chest. He stated to police that it was an accident and that he would never have shot his sister intentionally. The teen died on the scene. The brother was not charged, and the police closed out the case as an accidental shooting. The Department did not investigate the death.

**Prior History:**  The mother of the deceased teen has an extensive history with the Department. The mother has five other children. In November 2006, the mother was indicated, and the stepfather was unfounded for cuts, welts and bruises to the mother's six-year-old child. The investigation has since been expunged. In 2010, there were three more unfounded investigations against the mother. In May 2010, the mother was unfounded for medical neglect, in August 2010, the mother was unfounded for substantial risk of harm, and in December 2010, the mother was unfounded for inadequate clothing. In August 2011, the father was unfounded for sexual molestation to the daughter of his then girlfriend but indicated for substantial risk of harm by abuse to the daughter of his girlfriend and his three children with his wife, after assaulting his girlfriend while the children were present. In November 2012, the stepfather was unfounded for sexual penetration to his twelve-year-old stepdaughter and risk of sexual abuse to his other three children. In October 2013, the grandmother was indicated for inadequate supervision to the mother's thirteen-year-old when it was reported that the teen was cutting herself while under the care of the grandmother. The investigation against the mother was unfounded but prompted the Department to open an intact case with the mother as the thirteen-year-old suffered from extensive behavioral issues; relatives felt they could not help her. In November 2013, the teen became a youth in care; the mother and other children remained in the home. Later the teen was accepted into a transitional living program where staff linked her with health care and assisted her with enrolling in community college. In March 2018, the hotline received an anonymous call with concerns that the mother's eleven and eight-year-old children were often dirty and the eleven-year-old has missed significant periods of school prompting truancy authorities to get involved. The mother investigated the mother for environmental neglect. The mother told the investigator that her children have attention-deficit/ hyperactivity disorder (ADHD) for which she elicits assistance from the children's school. She assured that the 11-year-old takes his medications, and that she washes her children's clothes regularly. The investigator observed that the home was clean, and the children had appropriate sleeping areas. The mother stated that things were improving in the home and she was working at one of the schools in town. The mother denied any issues with substances and domestic violence. The investigation was unfounded.

| Child No. 43 | DOB: 5/2003 | DOD: 9/2018 | Homicide |
|---|---|---|---|
| Age at death: | 15 years | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Unknown | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  Fifteen-year-old was shot multiple times. The police responded to a call of shots fired. The responding officers along with paramedics observed a large crowd gathered around the teen who appeared to be shot and unresponsive, laying face up on the sidewalk with multiple trauma.  The teen was transported to the hospital in serious condition with multiple gunshot wounds to the head, chest, right hand, and back area; he was pronounced deceased in the emergency room.  There were no weapons or drug paraphernalia found at the scene, and no offenders were in custody. The Department did not investigate the death.

106

**Prior History:**  In January 2018, school personnel contacted the hotline to report that the teen (the deceased) was involved in a physical altercation with another student. A teacher reportedly grabbed the teen by his tie and then grabbed the teen by his arm to break-up the fight. The teen stated that he had a bruise on his arm from the incident. The Department initiated an investigation for cuts, bruises, and welts by school staff. The investigator met with the reporter the following day and was informed that the teacher was suspended until the investigation was completed. The teen was consistent in his explanation of the incident, and the teacher admitted grabbing the student although he didn't believe he grabbed the student's arm hard enough to leave a bruise. The teen's mother told the investigator that she did not like the fact that the teacher put his hands on her son. She reported her son's arm had a cast removed four days prior and the teacher was aware of the injury. The mother also reported that in early December 2018, shots were fired at her son and his friend. Her son told her that he was not a target. The investigator met with the teacher who stated that he was officially terminated. He denied grabbing the teen by his tie and bruising his arm. The teacher indicated that the recently removed cast could have bruised the youth's arm. He reported that there were cameras, but the school refused to allow him to view any footage. The investigator met with the teen who admitted that he talked too much and became very angry because the teacher called him out in front of the class. The teen stated that he and the teacher had a good relationship; the teacher was the teen's mentor and helped him out with many issues. The investigator asked if the teacher grabbed his arm; the teen said the teacher reached for him and was not aggressive in his reach. The investigator also interviewed the principal who reported that the teacher always displayed appropriate and professional interaction with the students, and oftentimes went above and beyond to help his students academically. He reported that he was a great teacher. The principal said that discipline was necessary because he touched a student; it did not matter whether he caused harm or was just trying to redirect the student.  In March 2018, the investigation was unfounded.

| Child No. 44 | DOB: 12/2015 | DOD: 10/2018 | Homicide |
|---|---|---|---|
| Age at death: | 2 years | | |
| Cause of death: | Gunshot wound to the neck | | |
| Perpetrator: | Unknown | | |
| Reason for Review: | Pending child protection investigation at the time of the child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  Two-year-old was shot in the neck while attending a family party with his parents. The father reported that on the night of the shooting, he heard shots fired and went outside to check it out. The toddler followed his father outside and was shot in the neck. EMS was called and the toddler received CPR at the scene and in the ambulance on the way to the hospital. Upon arriving to the emergency room, the toddler was pronounced deceased. The father was investigated and unfounded by the Department for death by neglect.

107

**Prior History:** In March 2018, the hotline was contacted by a school social worker to report that the victim's six-year-old sibling told her that his parents fight every day. He further stated that his mother and father hit each other and when he sees this, he runs to his room because he is scared. He stated that his dad has a gun in the home, and that the mother tried to stab the father. The Department investigated the mother and an unknown perpetrator for substantial risk of physical injury and an environment injurious to the health and welfare by neglect of the six-year-old sibling and two-year-old. The investigator met with the school social worker who reported that she saw the six-year-old once a week at school, and that he had previously made outcries of domestic violence in the home, and even drew pictures of his parents fighting. The mother and father denied the allegations, explaining that the six-year-old tended to make up stories. The mother added that since beginning therapy, his behavior problems had improved, and that he had been recently diagnosed with attention-deficit/ hyperactivity disorder (ADHD), but not prescribed medication. The investigator met with the six-year-old who appeared clean with no obvious signs of abuse or neglect. The sibling reported feeling safe at home and denied domestic violence. The investigation was unfounded. In August 2018, the hotline was contacted by an anonymous reporter who indicated that the mother and father were having physical altercations on a frequent basis, in front of the two children. The Department investigated the parents for substantial risk of physical injury and an environment injurious to health and welfare by neglect. The assigned investigator made numerous attempts to locate the family from mid-August through early September but was unsuccessful. In October 2018, after the child was shot, the investigator obtained a new phone number for the family. The father called the investigator and the investigator offered condolences, informed him about the pending investigation, and offered a referral for grief counseling. The investigator spoke with the police who stated that there were no domestic violence calls related to this family. The mother told the investigator that she was involved in a physical altercation with a former tenant in front of the children but denied ongoing domestic violence in the home between her and the father. The father reiterated what the mother stated. In December 2018, the investigation against the mother was indicated for substantial risk of physical injury by neglect. The investigation against the father was unfounded.

| Child No. 45 | DOB: 1/2002 | DOD: 10/2018 | Homicide |
|---|---|---|---|
| Age at death: | 16 years | | |
| Cause of death: | Gunshot wounds | | |
| Perpetrator: | Unknown | | |
| Reason for Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Sixteen-year-old youth in care was walking in an alley with a nineteen-year-old at approximately 2:00 a.m. when someone from a car drove up to them and fired shots. The sixteen-year-old was shot in the chest and shoulder. He was transported to the hospital where he was pronounced deceased. The Department did not investigate the death.

HOMICIDE

**Prior History:** The mother of the deceased teen and his sibling had three unfounded investigations in August and September 2005, which have been expunged. The deceased teen and his sister entered care with the Department after the death of their mother in 2009. In April 2009, law enforcement contacted the hotline to report the stabbing death of the mother of the deceased teen (seven-years-old at the time) and his nine-year-old sibling. Law enforcement reported that they placed the children with a maternal uncle after they were unable to locate their father. The Department initiated an investigation. The investigator spoke to the father, who picked up his children. He reported that his mother and brother were also helping care for the children. The mother's paramour was indicated for substantial risk of harm as the children were in the home at the time of the mother's fatal stabbing. The children were left in the care of their father. In December 2009 and January 2010, the paternal grandmother had three child protection investigations that were unfounded and expunged. In March 2010, law enforcement reported that the paternal grandmother called police because her son had been drinking, slapped her, and threatened her. The paternal grandmother was the main caretaker for the father's children, and the eight-year-old child (deceased) had expressed fear of his father. The Department investigated and indicated the father for substantial risk of physical harm by abuse and neglect. Due to this investigation, the children were taken into custody and the Department opened a family case. The children were placed with an uncle though the father was still involved. The father expressed that he could not handle caring for the children full-time. The children were with the uncle for several years before a family conflict ensued, and the behavioral needs of the children prompted separate specialized placements. By 2017 both children had run from their specialized placements, returning to unauthorized placements with relatives. The deceased teen and his sibling were living with their father in a self-selected, unauthorized placement at the time of his death. The sibling's case remains open, she has a baby, and was referred to the Teen Parent Network. The sibling has expressed that she wants to permanently move out-of-state with her boyfriend (father of the baby) and is requesting closure of her case.

| Child No. 46 | DOB: 8/2018 | DOD: 11/2018 | Homicide |
|---|---|---|---|
| Age at death: | 3 months | | |
| Cause of death: | Closed head injury | | |
| Perpetrator: | Father | | |
| Reason for Review: | Unfounded child protection investigation within one year of the child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Three-month-old baby died in the hospital after he was admitted for a skull fracture. The baby was in the care of his twenty-six-year-old father while the mother was at work. When the thirty-two-year-old mother returned home from work to pick up the baby, she found him to have a bloody nose and bruising on his face near his ear; he also felt limp. The father told the mother that there was nothing wrong with the baby. As the mother was leaving with the baby, she put him in his car seat and the father shoved her to the ground several times before taking the baby. The mother got the baby back and transported him to the hospital. Upon arrival to the emergency room, the baby was in cardiac arrest with no pulse, a skull fracture, and a bruised face. The baby was then transferred to a children's hospital. Upon his arrival to the children's hospital, the baby's pupils were fixed, and he had a subdural bleed. The baby died two days later. The Department investigated and indicated the father for head injuries, cuts, bruises, welts, abrasions, oral injuries, and death. The father was the sole caretaker during the time in which the injuries occurred, and medical staff determined that the injuries were caused by more than accidently dropping the child. The father has been charged with first-degree murder, aggravated domestic battery, and aggravated battery to a child.

**Prior History:**  The mother was involved with the Department as a child victim on four investigations. As a parent, the mother's first involvement with the Department occurred in August 2015, when she was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to her nine-month-old and three-year-old. In September 2015, the mother was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to her three-year-old and nine-year-old. In September 2018, the mother was investigated for inadequate supervision and substantial risk of physical injury/environment injurious to health and welfare by neglect to her one-month-old (deceased). Reports indicated that the mother was outside swaying and appeared to be "completely out of it," while her one-month-old was left in their apartment. It was further reported that the mother's apartment was filled with flies and dirty diapers. The reporter witnessed the mother driving off in her car, not knowing if she left the infant in her apartment. The Department contacted the police for assistance at the mother's residence. No one answered the door, so the officer contacted building maintenance who let the investigator and officer in the apartment. The baby was not at the residence, and the apartment was clean and not in the poor condition described by the reporter. The mother explained that she was never outside the apartment swaying, but she had been awakened by her neighbor, who was trying to see the baby since they returned home from the hospital. The mother stated that she is anti-social and does not visit with her neighbors; however, her neighbor walked into her apartment and later followed her outside to her car when she went to get cigarettes. The investigation was unfounded, since there was no evidence to support the allegations.

| Child No. 47 | DOB: 3/2014 | DOD: 12/2018 | Homicide |
|---|---|---|---|
| Age at death: | 4 years | | |
| Cause of death: | Multiple injuries due to child abuse | | |
| Perpetrator: | Mother's paramour | | |
| Reason for Review: | Open Intact Family Services at the time of the child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  Four-year-old was brought to the emergency room by her twenty-four-year-old mother and her nineteen-year-old paramour. The child was unconscious and placed on a ventilator for a subdural hematoma midline shift with head bleed; she died three days later. The mother's paramour, who was caring for the child while mother was at work, reported that the child fell and hit her head on a door hinge. The explanation was not consistent with the injuries. The Department investigated the child's death. The mother and paramour were interviewed by law enforcement. The paramour admitted to violently shaking the child and kicking her down the hallway. The mother was at work when the paramour shook the child and was not aware. The paramour was a youth in care who was marked a run away from his placement. The paramour was charged with first-degree murder. The mother was not arrested or charged. Following a formal investigation, the paramour was indicated for death by abuse, cuts, bruises, and welts, in addition to head injuries by abuse.

**Prior History:**  In September 2018, the hotline was contacted to report that the mother was arrested for leaving her four-year-old home alone.  The four-year-old left the apartment, knocked on a neighbor's door, and told the neighbor she didn't know where her mother was.  The mother returned to the apartment and told law enforcement that she left the house to go to the store while the child was sleeping because she didn't want to disturb her. Law enforcement arrested the mother.  The mother contacted a male neighbor to watch the child.  When the male neighbor arrived at the mother's apartment, he was holding the mother's phone and shoes.  Law enforcement believes that the mother was at the neighbor's apartment and lied about going to the store.  The Department investigated and indicated the mother for inadequate supervision and substantial risk of physical injury/environment injurious to health and welfare by neglect to the child. The case was referred to intact family services.  The mother was referred for parenting classes and individual therapy; she was reported to be compliant with services.  The mother was offered day care services but preferred to leave the child with the maternal grandmother while at work.  The intact family services case had only been open for two-and-a-half months at the time of the child's death.  Following the child's death, the case was closed, and the mother was offered grief counseling.

HOMICIDE

| Child No. 48 | DOB: 1/2017 | DOD: 12/2018 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 23 months |
| Cause of death: | Closed head injuries due to child abuse |
| Perpetrator: | Unknown |
| Reason for Review: | Split custody |
| Action Taken: | Investigatory review of records |

**Narrative:**  Twenty-three-month-old was found unresponsive in the bathroom by his twenty-four-year-old mother, who called 911. The toddler was transported to the hospital where he was admitted to the ICU with a heartbeat, but no brain activity. The child was diagnosed with a head injury including subdural hemorrhage and diffuse retinal hemorrhages. Eight days later he was pronounced deceased. The mother gave three differing accounts of the injuries that led to the toddler's death, acknowledged one explanation did not match the toddler's injuries, and refused to re-enact the scene. The Medical Examiner found blunt trauma to the toddler's head, displacement of brain tissue, and hemorrhages in the retinas and optic nerves of both his eyes. Other injuries included an abrasion on the infant's face along with abrasions, contusions, and soft tissue hemorrhages on the infant's chest, back, left hip, arms, and legs. The Medical Examiner also found a healing rib fracture. The Medical Examiner opined that the combination of head injuries and eye findings was not consistent with the mother's report and certified the death as a homicide. The mother was arrested but released by the State's Attorney. The Department indicated the mother for death by neglect, head injury by neglect, and inadequate supervision. She was unfounded for substantial risk of physical injury/environment injurious by neglect to the surviving sibling, age eight, since he was not home at the time of the incident.

**Prior History:**   The father had unfounded and expunged investigations in 2003 and 2004. The maternal grandmother had an unfounded and expunged investigation in 2008. The father and his paramour were investigated four times from 2015 to 2018. In January 2014, the mother of the deceased child was investigated and unfounded by the Department, after it was reported that she hit her three-year-old child (half-sibling to the deceased child) on his face at school. This investigation has since been expunged. The father of the deceased child and his paramour had one child together in April 2014; the paramour had three children from a previous relationship. In April 2015, the father and paramour were investigated and indicated by the Department for cuts, bruises, and welts to the four- and one-year-olds, inadequate supervision, substantial risk of physical harm/environment injurious by neglect of all the children. He was also investigated and indicated for tying/close confinement of the one-year-old, after it was reported that the children ages six, four, two, and one-years-old were found home alone and locked in a back bedroom; reports indicated that children were seen hanging from a fifth-floor window and throwing toys. The paramour's four-year-old, who had several bruises on her chest and scars on her back and ears, said the father (paramour to the mother of the deceased child) stepped on her back and poked her chest with scissors because she spilled cereal. The one-year-old child had rope-burn marks on his wrist and a mark on his cheek. The Department took temporary custody of the children and placed them in a foster home. The court allowed supervised visits with the children. In July 2015, the father's paramour was indicated for substantial risk/environment injurious by neglect after she absconded with all four children during a supervised visit. In October 2015, the father and paramour were indicated for inadequate supervision, and the father's fifteen-year-old son was indicated for sexual penetration, to the paramour's five and six-year-old children. The children, ages, five and six-years who were still in foster care, reported sexual abuse by the father's fifteen-year-old child while living with their biological mother. The five and six-year-old were also diagnosed with an STD. In March 2018, the father's paramour was unfounded for sexual molestation and risk of sex abuse to her four-year-old, who had previously reported that his mother put him in a locked room and made him fight an adult, who touched his private parts and hurt him "real bad." Before he was placed in foster care at age two, the child suffered a traumatic brain injury, when he was hit and dragged by a car. A forensic interviewer was unable to engage the four-year-old in an interview.

111

| Child No. 49 | DOB: 9/2018 | DOD: 1/2019 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 months |
| Cause of death: | Hypoxic Ischemic Encephalopathy due to intracranial injuries due to blunt force trauma |
| Perpetrator: | Father |
| Reason for Review: | Open intact family services case at the time of the child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**  Four-month-old was found by his nineteen-year-old mother lying face down, lethargic, and with labored breathing in his pack-n-play. The mother called the maternal grandmother, who instructed her to call 911. Upon EMS arrival, the baby was transported to the emergency room. The baby was found to have a subdural hemorrhage, intraventricular hemorrhage, cerebral edema, and cerebellar edema. The infant also had bilateral retinal hemorrhages, bruising, a right 4th healing rib fracture, and a healing left humerus fracture. The baby was pronounced deceased the following day. The Department investigated the parents for death by abuse, head injuries, and bone fractures. The mother had taken the baby to the pediatrician earlier in the day for a well child check; the baby received two immunization shots. The mother then dropped the baby off at home with the father, while she went to the maternal grandmother's house to do laundry. The father stated that he was holding the baby when the baby "lunged", and he temporarily lost control of the baby causing the baby to hit his head on a door frame. He further stated that the baby did not appear to be injured after the incident, so he laid the baby on his back in the pack-n-play and supported him with pillows**.** A child abuse pediatrician reviewed the records and stated that the history was not consistent with the severe head injury indicated but were consistent with abusive head trauma. The police interviewed the parents and conducted a scene reenactment. The father's account of the incident kept changing. The father was charged with aggravated battery, involuntary manslaughter, and endangering the life of a child. In August 2019, the father pled guilty to involuntary manslaughter and endangering the life of a child. The father was indicated for death by abuse and head trauma; however, the investigation for bone fractures was unfounded, as it could not be determined when the healing rib fracture occurred or who caused it. The mother was unfounded for all allegations, as she was not home at the time of the incident.

**Prior History:**  The mother has a history with the Department as a child. She was a youth in care from 2001 through 2005. The maternal family had two subsequent intact family services cases, one in 2009 and one in 2011. The mother was the alleged victim in four additional investigations from 2011 to 2013. In November 2018, the parents were investigated by the Department for failure to thrive to their two-month-old, after it was diagnosed by the infant's pediatrician. It was reported that the parents were missing the infant's doctor's appointments, and that the infant had lost a significant amount of weight since birth. A feeding plan was provided to the parents; however, the infant had an appointment for a weight check and did not show up. The infant was admitted to the hospital where he started to gain weight. The mother told the investigator that she was diagnosed with post-traumatic stress disorder (PTSD), bipolar disorder, and depression, but stopped taking her medication when she found out she was pregnant. The parents were indicated for failure to thrive and the family was recommended for intact family services to follow up with the infant's doctor appointments and mental health services. The parents agreed to services and started bringing the infant to regular weight checks and well child appointments. The intact case was opened for two months prior to the infant's death. The case closed after the death of the infant, as neither parent had any other children.

| Child No. 50 | DOB: 4/2010 | DOD: 1/2019 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 8 years |
| Cause of death: | Peritonitis due to perforated ileum due to blunt force injury of the abdomen |
| Perpetrator: | Father's paramour |
| Reason for Review: | Unfounded investigations within a year prior to the child's death |
| Action Taken: | Full Investigation, Report to Director, November 25, 2019 |

**Narrative:** Eight-year-old girl was transported to the emergency room with life threatening injuries, including symptoms of abdominal pain and concern for seizures, after collapsing in front of her father's paramour. After she was stabilized, she was transferred to a children's hospital, where she was found to have a large bruise on her belly, a tense belly and was unresponsive. She underwent emergency surgery and died the following morning. An autopsy revealed that the eight-year-old had approximately 30 scars on her back and torso indicative of abuse. She also had scars and abrasions on her face and neck, scarring on her upper left thigh consistent with cigarette burns, and other bruising and scars on her body. The Department investigated and indicated the father's paramour for death, cuts, bruises, welts, abrasions and oral injuries, torture, and internal injuries. The father was indicated for torture, death by neglect, internal injuries by neglect and cuts, bruises, welts, abrasions and oral injuries by neglect. In November 2019, a jury found the father's paramour guilty of first-degree murder, aggravated battery, endangering the life of a child, and three counts of domestic battery.

**Prior History:** While the deceased's mother and father were married, there were four unfounded child protection investigations from 2013 through 2015, all involving the mother's children/half-siblings to the deceased child. In 2015, the parents separated, and the deceased child continued to live with the mother and her half-siblings. In February 2016, the Department investigated and unfounded the mother for mental injury to her children, ages, five (deceased child) and nine-years, after it was reported that the mother sent the father videos of her telling the children that he died in a car accident; and the children were visibly upset. In 2016, there were three additional unfounded investigations against the mother. In September 2016, the mother was arrested for selling drugs with the children present and the father obtained full custody of the deceased child. The father's paramour had a long history with the Department dating back to 2002. There were six child investigations involving the father's paramour prior to the six-year-old living with the father and the paramour, three of which were for cuts, bruises and welts. In July 2017, the Department investigated the father's paramour for substantial risk of physical injury/environment injurious to health and welfare – incidents of violence or intimidation to the seven-year-old (deceased child) after the mother reported to the hotline that the seven-year-old said the father's paramour regularly whips her with a belt; and that the father also hits her. The investigation was unfounded, as no marks were observed on the child, and it appeared the allegations were due to the custody dispute between the parents. This investigation closed one day after opening. In April 2018, the Department investigated the father and the father's paramour for cuts, bruises, welts, abrasions and oral injuries to the eight-year-old (deceased child), after the mother reported to the hotline that the child had injuries to the face and was afraid to go home. The investigator went to the school and was informed that the mother was not supposed to have in person contact with the child; she was only to speak with the child by phone. The mother had gotten into the school by walking in with another mother and signed in under a different name. The investigator met with the child and observed her to have a scab over her eyebrow, a canker sore on her lip and a broken tooth. She stated that she hit her eye on the bathroom counter; and she broke her tooth on a dresser drawer. She denied that anyone was hitting or hurting her at home. The father told the investigator the child was accident prone. In June 2018, the investigation was unfounded. In December 2018, the Department investigated the father and father's paramour for cuts, bruises, welts and oral abrasions to the eight-year-old (deceased child) after a school nurse contacted the hotline to report that the child went to school with two black eyes in various stages of healing. The child had not been in school on Thursday or Friday the prior week. The investigator met with the child, who reported that she hurt her face on the left side by her eye, when she tripped over a toy and accidently fell on a toy box. The investigator noted the child to have bruising under the right eye and the area above the left eye was swollen. The investigator contacted the father and his paramour to take the child to the doctor on the date of the report. The father contacted the investigator a few hours later and reported that they had taken the child to the doctor and there were no concerns. The investigation was unfounded eight days after the hotline call was made.

| Child No. 51 | DOB: 3/2016 | DOD: 2/2019 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 years, 11 months |
| Cause of death: | Cold exposure due to environmental neglect |
| Perpetrator: | Mother (criminal case is pending against the paramour) |
| Reason for Review: | Return home |
| Action Taken: | Full investigation, Report to Director, June 27, 2019 |
| | **See Death and Serious Injury Investigation 1** |

**Narrative:**  Two-year-old was found cold and unresponsive, by her twenty-one-year-old mother, at home. Law enforcement and EMS noted that the temperature in the home was 46° and they described the living conditions as deplorable. The toddler was observed to have marks and/or blood on her face. EMS transported the child to the hospital; she had no heart rate and was not breathing, and she was pronounced deceased. The toddler's core body temperature was so low it could not be read, indicating that she had been deceased for a while. The toddler was noted to have multiple bruises to her body and face. The toddler was covered in debris, toilet paper, dirt and leaves, and smelled of urine. The Department investigated and indicated the mother and paramour for death by abuse; cuts, bruises, welts, to the toddler; and environmental neglect and inadequate shelter to the toddler and one-year-old half-sibling. The mother stated that she turned off the home's heat relying on two space heaters; one in her bedroom where she slept with her paramour and their one-year-old son, and the other in the toddler's room. When the mother's space heater broke, she took the heater from the toddler's room to use in her room. Both the mother and paramour were charged with murder and child endangerment related to the toddler's death. In September 2019, the mother pleaded guilty to first degree murder and is currently serving twenty-years in prison. The paramour's criminal case is still pending.

114

**Prior History:** In 2017, the Department investigated the mother and her paramour three times after reports of drugs, guns and domestic violence. In May 2017, the mother was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to the one-year-old (deceased toddler). In June 2017, the hotline was contacted to report that the paramour pulled a gun on the father of the one-year-old child. The Department unfounded the paramour for substantial risk of physical injury/environment injurious to health and welfare, incidents of violence or intimidation to the one-year-old after the paramour admitted to an altercation but denied brandishing a gun or selling drugs. In December 2017, law enforcement contacted the hotline to report that the father of the one-year-old requested a police escort to pick up the one-year-old due to the mother's paramour allegedly having firearms in the home. When the father returned home with the one-year-old, he noticed she had bug bites all over, a small bruise on her left cheek, and a bump on the back of her head. The father took the one-year-old to the hospital where a physician noted a vertical bruise on her cheek, marks that were "possible bug bites" on both arms, scars "possibly due to sitting in a diaper for too long," and a finger shaped bruise on her bottom, in addition to a small circular scar that "could be from a cigarette burn" on the child's leg. The Department investigated and indicated the mother and paramour for cuts, welts, bruises, abrasions, and oral injuries; and substantial risk of physical injury/environment injurious to health and welfare by neglect; and environmental neglect. The investigator noted that the apartment was strewn with dog feces, trash, alcohol bottles, cigarettes and multiple types of insects. The one-year-old remained in the care of her father until there was a shooting incident involving the mother, the paramour, and the toddler's father. The Department took temporary custody of the one-year-old and her half-sibling. They were placed with a paternal aunt. In February 2018, the mother and paramour contacted the hotline to report that during a visit with the children, they observed the one-year-old with two black eyes, a mark on her face, and new marks and bruises on her buttocks. The Department investigated the paternal aunt for cuts, welts and bruises to the one-year-old, but it was unfounded after the paternal aunt told the investigator that she believed the scratch was self-inflicted. The investigator noted the scratch was superficial. In April 2018, the toddler returned to her father, and her half-sibling was returned home to the mother and paramour. The father and father's paramour had a history of abuse and neglect to the father's paramour's own children and family members. They were investigated by the Department and unfounded four times in 2017 prior to the toddler coming to live with them in April 2018. In June 2018, the hotline was contacted after the toddler was observed at her mother's home during a visit with a diaper rash and possible bruising. The Department investigated the father and his paramour for cuts, welts, bruises and oral injuries to the toddler. The Department removed the toddler from the father's care and placed her in a traditional foster home, pending the outcome of the investigation. The investigator spoke with the reporter, who stated that the marks on the toddler's bottom were not Mongolian spots but bruises, and said they saw other bruises on the toddler's chest, face and arms. The reporter also stated that she read court papers stating that the father's paramour is not supposed to be around other people's children. In August 2018, the Department made a recommendation to the court and the toddler returned to the care of her mother and mother's paramour due to their compliance with services. In August and September 2018, there were two unfounded investigations against the mother for substantial risk, inadequate supervision, and environmental neglect. The placement case closed at the end of October 2018, and the toddler was killed by her mother's paramour just three-and-a-half months later.

| Child No. 52 | DOB: 12/5/2005 | DOD: 3/9/2019 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 13 years |
| Cause of death: | Gunshot wound |
| Perpetrator: | Unrelated peer |
| Reason for Review: | Unfounded child protection investigation within a year of the child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Thirteen-year-old was shot with a single gunshot wound to the chest. The teen was transported to the hospital where he was pronounced deceased. The incident took place in the maternal grandmother's home. There were several people in the home at the time of the occurrence, including a fourteen-year-old family friend who brought the gun into the home; however, no one in the home was aware that a gun had been brought into the home. It was reported that the two teens were in a first-floor bedroom of the home playing with the gun, when family members in the home heard the gunshot. The fourteen-year-old ran out of the home and the thirteen-year-old ran out of the room before collapsing to the floor right outside the bedroom. An ambulance was called, the teen was transported to the hospital where he was pronounced deceased. The mother and father were not in the home at the time of the shooting. The Department investigated and unfounded the father for death and substantial risk of physical injury/environment injurious to health and welfare by neglect to the seventeen-year-old sibling, as the father was not present at the time of the incident; the father was not aware that the teen's friend brought a gun into the home. The fourteen-year-old teen has been charged as a juvenile for involuntary manslaughter.

**Prior History:** The mother had an extensive history with the Department, as she was involved in twenty-eight investigations prior to the death investigation, four of which were indicated and five of which she was a non-involved subject, dating back to 1996. The investigations were for allegations of inadequate supervision, medical neglect, inadequate shelter, substance abuse, substantial risk of physical injury/environment injurious to health and welfare, environmental neglect, and inadequate food. The father had two investigations prior to the death investigation from 2017-2018, both were unfounded. In January 2018, the mother was investigated for medical neglect to the seventeen-year-old sibling and the seventeen-year-old sibling was investigated for substantial risk of physical injury/environment injurious to health and welfare to her twelve-year-old sibling (deceased child), after it was reported that the seventeen-year-old punched the twelve-year-old in the face several times, which resulted in the twelve-year-old grabbing a BB gun and shooting the teen in the chest. The police were contacted, and a Screening, Assessment, Support Services child welfare worker called the home and recommended hospitalization of the teen, due to her violent behavior. The parents agreed. The investigator followed up with the hospital; and the teen never showed. The investigator contacted the teen's primary care physician who stated that the teen was not medically neglected, because she was not transported to the psychiatric hospital and further stated that he never noted any signs of medical neglect. The teen was reassessed, and she did not meet the criteria for psychiatric hospitalization and recommended the teen resume outpatient therapy. The investigator spoke with both children who stated that the teen hit the twelve-year-old in his legs, feet and back and then the twelve-year-old shot the teen with the BB gun. In March 2018, the investigation was unfounded. In February 2018, while the prior investigation was pending, the hotline was contacted to report that the sixteen-year-old sibling was threatening to kill himself and when a community-based program for mental health sent a social worker for evaluation, someone at the home refused the evaluation. It was reported that the teen was unstable and not taking his medications. It was also reported that the teen was having a sexual relationship with a twenty-one-year-old who was living in the home. The mother was battling cancer, unable to speak and unable to take care of her children, ages, seventeen, sixteen and twelve-years. Although the report was about the teen threatening to kill himself; the Department investigated the mother and the twenty-one-year-old for sexual penetration to the sixteen-year-old; and the mother was investigated for inadequate supervision to the seventeen-year-old and sixteen-year-old. The investigator spoke with everyone in the home, including the teen and the twenty-one-year old who all denied that there was a sexual relationship between them. The investigator also spoke with the police who confirmed no report had been received about a sexual relationship. In April 2018, the investigation was unfounded.

| Child No. 53 | DOB: 7/27/2016 | DOD: 3/18/2019 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 years |
| Cause of death: | Multiple injuries due to child abuse |
| Perpetrator: | Mother's paramour |
| Reason for Review: | Open intact family services case at the time of the child's death |
| Action Taken: | Full Investigation, Interim Report to Director, June 11, 2019 and |
| | Final Report to Director, October 30, 2019 |
| | **See Death and Serious Injury Investigation 12** |

**Narrative:** Two-year-old was found unresponsive by his twenty-eight-year-old mother after she left the toddler and his five-year-old sibling in the care of her paramour while she was at work. The toddler was transported to the hospital where he was pronounced deceased. The Department investigated the mother and paramour for death by abuse, cuts, bruises, and welts by abuse, and burns by abuse to the toddler. The mother was investigated for substantial risk of physical injury/environment injurious to health and welfare by neglect to the toddler's five-year-old sibling. Shortly after returning home from work, the mother found the toddler unresponsive with drool coming from his mouth. The toddler suffered a lacerated liver, lung contusions, several broken ribs, abdominal injury, healing and healed bones fractures, and bruising. The paramour admitted to law enforcement that he beat the toddler the day of his death, and for days prior to his death. The mother admitted to law enforcement that she found previous injuries and admitted knowledge of the paramour beating the toddler. The mother continued to leave the child in the care of the paramour. The mother knew of and actively sought to conceal evidence of the paramour's physical abuse to both the toddler and five-year-old sibling. The investigation was indicated for death by abuse, cuts, bruises, and welts by abuse against the mother and the paramour. The mother was also indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to the toddler's five-year-old sibling. The paramour is charged with first-degree murder and the mother was charged with child endangerment.

**Prior History:**  The mother has a history with the Department of Children and Family Services (DCFS) dating back to 2010 which includes her three oldest children being removed from her care; two of whom she never regained custody of. The mother also had a significant and on-going history of domestic violence with multiple partners. In May 2018, the Department investigated the mother and her previous paramour for substantial risk after the hotline was contacted to report a domestic violence incident between the mother and her paramour that occurred in front of the mother's two children. The report alleged that the paramour pushed the five-year-old child during the incident. The mother obtained an Order of Protection and moved into a shelter. The investigation against the mother and paramour was unfounded. In August 2018, the hotline was contacted after the mother took the children to the hospital due to the two-year-old crying because he did not want to go to daycare. He was observed to have swollen welts on his lower-left buttock and upper thigh. The five-year-old had a bite mark on his stomach. The Department investigated and unfounded the daycare for human bites by neglect to the five-year-old after it was determined that staff had observed another child bite the five-year-old. The investigation was also unfounded for cuts, bruises, and welts to the two-year-old by unknown daycare staff. The two-year-old was observed to have a strange red mark on his bottom that could not be explained; however, no evidence to suggest the toddler's mark was the result of abuse or neglect. In October 2018, the child protection investigator assigned to the daycare investigation went to the home to conduct a final Child Endangerment Risk Assessment prior to closing the investigation and heard, through the door, a male voice stating, "lay down" and a hitting sound. When she entered the apartment, the investigator observed linear welts on the toddler's bottom. The mother could not explain the welts. The investigator took photos and instructed the mother to take the toddler to the doctor. That investigator called the hotline to report the incident and the Department investigated the paramour for cuts, bruises, and welts to the toddler. The children were temporarily removed from the home until it was determined safe to return home. The mother agreed to intact family services and not to allow the paramour to watch the children. In December 2018, following a formal investigation the allegations of cuts, bruises, and welts to the toddler by the paramour was unfounded. The rationale was that it could not be substantiated that an incident occurred. An intact family services case was opened for domestic violence services, and assessments for the children. The mother was already engaged in services through a program offered from the shelter in which she previously lived. The intact worker made regular visits to the home, but never documented any concerns about the home or evidence that the paramour was living in the home. The intact services case was open at the time of the toddler's death.

| Child No. 54 | DOB: 5/2003 | DOD: 3/2019 | Homicide |
|---|---|---|---|
| Age at death: | 15 years | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Unknown | | |
| Reason for Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  Fifteen-year-old died from multiple gunshot wounds. The teen was a youth in care on run status since December 2018, when he was shot and killed by an unknown perpetrator. At approximately 11:20 a.m. a man got out of a vehicle and argued with the teen before shooting him. The teen was transported to the hospital where he was pronounced deceased. The Department did not investigate the teen's death.

**Prior History:** The deceased teen was one of seven children born to the mother, none of which were in her care. The mother gave birth to her first child at the age of thirteen. The Department investigated the mother four times; three of the four were unfounded. In August 2018, the mother was indicated for substantial risk/environment injurious to her newborn. The teen and his siblings became involved with the Department in July 2017, when the maternal uncle dropped his nephews and nieces off in the middle of the street because the teen would not give him the family's LINK card. The children were in the uncle's care after the mother was arrested and detained for cutting off her ankle monitor and leaving her home while she was on house arrest. The Department took protective custody of the children. The Department investigated and indicated the uncle for inadequate supervision. In August 2018, one month after the older children came into care, the hotline was contacted to report that the mother had recently given birth; her four older children were in care. The hospital staff was concerned with the mother's ability to care for a newborn. The Department investigated the mother for substantial risk/environment injurious by neglect to the newborn. The mother was not participating in services and had not completed requested toxicology tests; she had an extensive history with crack cocaine usage and homelessness. In October 2018, the mother was indicated. During the seven months that the deceased was in care, he had numerous placements including placement with relatives, fictive kin, traditional foster homes, and shelters. The youth had a history of running away. The worker followed the run protocol, obtained child protective warrants, and contacted family members regarding the teen's whereabouts. In November 2018, the teen was ready to be released from an inpatient program that he was admitted to in October 2018. The teen was approved for residential placement; however, no resource had been identified that agreed to take the teen. A few days later the guardian ad litem (GAL) filed for the teen's release because he was hospitalized beyond medical necessity. The judge granted the motion and ordered the minor be released. The teen was placed with his previous foster parent. Approximately six days later, the foster mother reported that the teen eloped and might have a gun. The foster parent contacted the police and filed a missing person's report. A juvenile warrant was issued by the court. The teen was not located despite diligent efforts and remained on run at the time of his death.

| Child No. 55 | DOB: 5/2016 | DOD: 4/2019 | Homicide |
|---|---|---|---|
| Child No. 56 | DOB: 3/2017 | | |
| Child No. 57 | DOB: 6/2017 | | |

| | |
|---|---|
| Age at death: | 1 year, 2 years, 2 years |
| Cause of death: | Carbon monoxide intoxication due to inhalation of smoke |
| Perpetrator: | Relative |
| Reason for Review: | Unfounded DCP investigation within a year of the child's death |
| Action Taken: | Investigatory Review of Records |

**Narrative:** Three children, a two-year-old and one-year old sibling and their two-year-old cousin died in a house fire. The children were found together in a bedroom of the house along with the father of two of the children who also died in the fire. The mother reported that she was in the tub with her two-year-old niece when she was first alerted to the fire. The mother attempted to escape the home when she passed out. The father removed her from the home leaving her outside and returned inside the home to try and get the three young children out. The mother's grandmother, who also lived in the home, also died in the fire. The mother and her nine-year-old son, who escaped through a bedroom window, were the only survivors. The Department investigated and indicated the mother for death by neglect and inadequate supervision. The nine-year-old was removed from the mother and placed with relatives. A criminal investigation is pending regarding this fire.

**Prior History:**   The mother of the siblings that died in the fire had a history with the Department, as both a child victim and a parent. From 2010 to 2013, the mother had four unfounded investigations for risk of harm and environmental neglect. The mother had one prior indicated report for environmental neglect in October 2014. In May 2016 the mother was investigated for cuts, bruises, welts, abrasions, and oral injuries to her two-week-old son, after it was reported that the two-week-old had unexplained bruising on his forearm.  The investigation was unfounded. Seven months later, the mother and her paramour were investigated and unfounded for environmental neglect. Ten months later, in October 2017, the mother was investigated for substantial risk of harm after it was reported that the mother presented to the hospital multiple times seeking pain pills and psychiatric assistance. The mother had brought the children with her at times and they appeared to be unkempt. The investigation was unfounded. The mother and father of the siblings that died had four child protection investigations in 2018. In February 2018, the Department investigated and unfounded the mother, father and maternal grandfather for environmental neglect and substantial risk of harm. Six months later, in August 2018, the Department investigated the mother and father for inadequate food after it was reported that the parents requested food and money from neighbors. The investigator observed the children to appear healthy and noted plenty of food in the home and the parents denied asking for assistance. The investigation was unfounded.  In September 2018, the Department investigated the father for substantial risk of physical injury to the mother's eight-year-old after reports that he had abused him. The father reported that he restrained the child to keep him from hurting himself as the child was not listening.   The child, who had no marks, corroborated the report and it was unfounded. A month later the Department investigated the parents for environmental neglect after it was reported that the home was filthy with piles of garbage. The investigator noted that there was some garbage and clutter but not rising to the level of neglect and the investigation was unfounded. While that investigation was pending in November 2018, the Department investigated the mother for cuts, bruises, welts, abrasions, and oral injuries to the eight-year-old, after it was reported that the child told a relative that his mother grabbed him causing a long scratch on his arm. The mother denied grabbing the child explaining that the child had been scratched by a cat. The investigator noted the mother had short nails and the scratch was consistent with cat claws. The investigation was unfounded seven days later. The two-year-old cousin's mother and maternal grandparents were unfounded for environmental neglect, inadequate supervision and risk of harm in February 2018.

| Child No. 58 | DOB: 6/1999 | DOD: 4/2019 | Homicide |
|---|---|---|---|
| Age at death: | 19 years | | |
| Cause of death: | Massive brain injury due to gunshot wound to the head | | |
| Perpetrator: | Unknown | | |
| Reason for Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  Nineteen-year-old youth in care was shot in the head by an unknown individual and was pronounced deceased at the hospital. The teen was in a transitional living program at the time of his death. At approximately 11:43 p.m., the teen and a friend asked the residential staff if they could step out front of the facility to smoke a cigarette. The staff responded yes and reminded the youth that their curfew was midnight. At approximately 12:08 a.m., the peer went back into the facility, hysterically relaying that the teen had been shot. The peer reported that he and the teen were walking when an unknown male, wearing a ski mask, approached them and demanded that they empty their pockets. The peer reported that he and the teen turned around and ran before the unknown male started shooting. As he was running, he heard gunshots, but no longer saw the teen in his peripheral view. The teen had been shot in the head. The teen's body was transported by ambulance to the hospital in critical condition with weak vital signs; he later succumbed to his injuries and was pronounced deceased. No one has been arrested in connection with the teen's death. The Department did not investigate the death.

**Prior History:** The family has an extensive history with the Department, dating back to 1998. In 2009, the deceased's eleven-year-old sibling was adjudicated after being charged with arson and two counts of residential burglary. He was placed under the guardianship of the Department and a family case was opened. The ten-year-old (deceased youth) was adjudicated a delinquent after several encounters with the police, including being convicted of two counts of battery. He was also placed under the guardianship of the Department in December 2011. In July 2012, both teens, ages, thirteen and fourteen, were placed in residential programs due to their continued delinquent behavior. In 2015, the goal of independence was established for the fourteen-year-old (deceased youth) and the family case was closed with the Department; however, his child case remained open. He was discharged from the Department of Juvenile Justice and placed at a residential facility in January 2016. The teen completed his parole and was successfully discharged in July 2016. In May 2017, the teen was placed in the transitional living program. The assigned case managers made regular visits to monitor the teen's well-being and progress towards his independence goal. The teen reported that he wanted to join the Navy but needed to pass the entrance exam to be accepted. In March 2019, a month before the teen's death, his service plan stated that the teen had been receiving tutoring and participating in Life Skill classes twice a week, to assist him with developing independent living skills. The teen was compliant and adhered to the residential program rules and regulations.

| Child No. 59 | DOB: 10/2013 | DOD: 4/2019 | Homicide |
|---|---|---|---|
| Age at death: | 5 years | | |
| Cause of death: | Craniocerebral trauma due to multiple blunt force injuries, possible environmental hypothermia | | |
| Perpetrator: | Parents | | |
| Reason for Review: | Unfounded child protection investigation within a year of the child's death | | |
| Action Taken: | Full investigation pending; interim report issued to the Director | | |

**Narrative:** Seven days after the parents reported their five-year-old child missing, the father led law enforcement to a field where he had buried the child. The child suffered craniocerebral trauma due to multiple blunt force injuries and possible environmental hypothermia. The manner of death was homicide. The parents were charged with the child's death. The mother pleaded guilty to first-degree murder and the father is awaiting trial. The Department's investigation into the death is pending.

121

HOMICIDE

**Prior History:** In October 2013, the Department initiated a child protection investigation against the mother after the child (now deceased) tested positive for opiates and benzodiazepines at birth. The Department indicated the mother for substance misuse by neglect. Both parents had histories of substance misuse. The Department took protective custody of the child. A placement case was opened, and the parents cooperated with court mandated services. In December 2014, the mother had another baby who was not substance exposed and remained in the parents' custody. In June 2015, the older child was returned to the parents' care. The case remained open until April 2016. In March 2018, the mother was treated in the emergency department after she was found asleep in her vehicle, intoxicated, with physical indicators of substance use. Both children (then four and three years old) were observed in an emergency department waiting area with their father. The children appeared dirty and fearful of their father. The oldest child appeared to have odd bruising to his face and forehead. The hotline was called. The Department investigated both parents for environment injurious to health and welfare by neglect and environmental neglect. Over one month passed before the investigator's first in-person contact with the children and mother, who refused the investigator access to the home. The investigator observed the children playing outside without physical signs of abuse. Two months after the hotline was called, the investigator met with both parents in their home. The mother reported the children were at home with their father when she relapsed, and she had since enrolled in drug treatment. The father confirmed he was at home with the children when the mother relapsed. He denied a history of substance misuse. In May 2018, the neglect allegations against the parents were unfounded. In December 2018, law enforcement took protective custody of both children (then ages five and three) when the oldest child was observed with suspicious bruising of the lower torso and the home was observed dirty and in disrepair. The Department investigated the mother for cuts, bruises, welts, abrasions and oral injuries by abuse to the five-year-old and environmental neglect to both children. The five-year-old told the investigator that the injury was caused by the family dog. The mother reported the same but agreed to take the child to the emergency department for an exam. The investigator allowed protective custody to lapse. At the emergency department, the child provided inconsistent accounts explaining injury. The child first said the dog injured him, then told the doctor that maybe the mother did not mean to hurt the child with a belt. The physician requested the child be seen by an expert in child abuse. The investigator visited the father and children in the home the following day and determined the home was safe and free of hazards. The abuse and neglect allegations were unfounded in January 2019.

| Child No. 60 | DOB: 5/2003 | DOD: 6/2019 | Homicide |
|---|---|---|---|
| Age at death: | 16 years | | |
| Cause of death: | Gunshot wounds | | |
| Perpetrator: | Two teenagers | | |
| Reason for Review: | Unfounded child protection investigations within a year of the child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  Sixteen-year-old teen was shot and killed by two other juveniles while walking to his cousin's house with his girlfriend. At approximately 4:00 p.m. the teen was shot several times. 911 was contacted and the teen was transported to the hospital where he was pronounced deceased. The police reported that the shooting was the result of an attempted robbery. The Department did not investigate the death.

HOMICIDE

**Prior History:** The mother has an extensive history with the Department, dating back to 2004. The mother was investigated eleven times, four of which were indicated. In November 2004, the mother was indicated for medical neglect to her two-month-old. In December 2004, the mother was indicated for medical neglect to three of her children. In February 2012, the mother was indicated for cuts, welts, and bruises to her seven-year-old. In December 2015, the report for the mother was unfounded for environmental neglect, tying/close confinement, and inadequate shelter to her twelve-year-old (deceased teen). In May 2018, the mother was again investigated for cuts, bruises, welts, abrasions, and oral injuries after reports of a youth in care being hit by the mother, with a telephone cord. The youth was placed at the mother's house for a relative foster care placement. In July 2018, the investigation for cuts, bruises, welts, abrasions, and oral injuries was unfounded with the rationale that there was a denial, and the mark on the youth did not rise to the level of abuse. In August 2018, the mother was investigated and unfounded for substantial risk of physical injury/environment injurious to health and welfare of her thirteen-year-old. The mother was also investigated and indicated for cuts, bruises, welts, abrasions and oral injuries to her thirteen-year-old, after it was reported that the mother hit the teen with a wooden table leg. The mother was offered intact family services but declined. In December 2018, the mother and step-father were investigated for inadequate supervision and medical neglect to their fourteen-year-old, after it was reported that the teen brought a hatchet to school; the teen stated that he was going to use it as self-defense against bullies. The mother refused to take the teen to the hospital. In February 2019, the investigation was unfounded with the rationale that a parent could not supervise a teen closely enough to prevent the teen from sneaking a weapon to school.

| Child No. 61 | DOB: 5/2018 | DOD: 6/2019 | Homicide |
|---|---|---|---|
| Age at death: | 1 year | | |
| Cause of death: | Undetermined | | |
| Perpetrator: | Unknown (criminal investigation pending) | | |
| Reason for Review: | Pending child protection investigation at the time of the child's death | | |
| Action Taken: | Full investigation pending | | |

**Narrative:** One-year-old was found by the mother's twenty-five-year-old paramour sleeping on an air mattress and not breathing adequately. He ran to a neighbor, who was a healthcare worker, then called 911. The mother was not home at the time of the incident. The one-year-old was transported to the hospital in critical condition, as she was in respiratory arrest, breathing only a couple of times a minute and was unresponsive. The one-year-old was found to have lateral retinal hemorrhaging, severe brain bleed, extensive bruising on the face, head, and body, elevated enzymes related to internal organs, and several bone fractures. In addition, the one-year-old had anal tearing consistent with sexual abuse. She was put on life support with a very low expectancy to survive; three days later she was pronounced deceased. The Department is currently investigating the mother and the paramour for death; cuts, bruises, welts, abrasions and oral injuries and human bites to the one-year-old and for substantial risk of physical injury/environment injurious to health and welfare to the five-year-old sibling. There is also a criminal investigation pending.

**Prior History:** In May 2019, the Department initiated an investigation against the mother for cuts, bruises, welts, abrasions and oral injuries to the one-year-old (deceased child), after it was reported that the mother brought the baby to the emergency room because the baby woke up with extensive bruising across the forehead, left ear and behind the left ear. The mother stated that she had no idea what happened. The mother told the investigator that the baby fell off her adult bed two days prior but there were no signs of injury or bruising until now. The baby was examined by a physician the following day and stated the baby likely suffered trauma from a fall off the mother's bed. Approximately, one week later, the baby was admitted to the hospital after she was seen for a well-child check-up and had low hemoglobin level and concerns for anemia. The investigator went to the hospital to observe the baby and found her to be in good spirits and content. The investigator observed a nickel-sized bruise on the baby's left cheek and a lighter, nickel-sized bruise on the forehead. In June 2019, the physician contacted the investigator and stated that the baby's x-rays were concerning but not diagnostic. There was some concern for femur fracture and possible healing fracture in the upper arm. The physician did not know if the definitive diagnosis should be abuse or accidental injury. The baby was being followed for anemia and had a right-side waist abrasion consistent with a rug burn. According to the mother, the baby wanted to take a nap on the floor. In the last documented contact with the mother or baby, the investigator contacted the mother by phone and discussed the mother's attempts to find a daycare for the baby and follow-up on the baby's blood work and doctor's appointments; this contact occurred two days before the hotline call reporting the baby had been hospitalized in critical condition. The investigation is still pending with the Department.

**NATURAL**

| Child No. 62 | DOB: 10/2017 | DOD: 7/2018 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 9 months |
| Cause of death: | Lymphocytic Myocarditis |
| Reason for Review: | Unfounded child protection investigation within a year of the child's death |
| Action Taken: | Full investigation, Report to Director February 6, 2019 |
| | **See Death and Serious Injury Investigation 10** |

**Narrative:** Nine-month-old baby was pronounced deceased at the hospital after having difficulty breathing while being bathed by his grandmother. The grandmother removed the baby from the tub and placed him on a bed where he exhibited seizure-like activity and became unresponsive; 911 was called, cardiopulmonary resuscitation was initiated, and he was transported to the hospital. Upon arrival to the hospital, the hospital staff continued to try and resuscitate the baby for forty minutes before he was pronounced deceased. The baby was born prematurely at twenty-nine-weeks due to his mother having preeclampsia. At birth, he was given supplemental oxygen and steroids for underdeveloped lungs. He was an otherwise normal, healthy nine-month-old. An autopsy performed determined that the baby died from Lymphocytic Myocarditis, which was likely caused by a viral infection The Department did not investigate the death for abuse or neglect. The OIG conducted a full investigation.

**Prior History:** The Department became involved with this family in June 2017, four months before the deceased was born. A hospital physician and social worker contacted the hotline with concerns about medical neglect towards the deceased baby's two-year-old sibling. The toddler was born prematurely and had multiple medical issues requiring evaluations by specialists, but the parents missed follow-up appointments with various specialists. The Department initiated an investigation against the mother and father for medical neglect. The investigator met with the mother and toddler and the mother reported that she had been trying to get her toddler to the doctor, but the hospital did not accept her health insurance. The mother reported that she was changing her insurance, which would become effective in August 2017, and that the toddler had an appointment with a specialist in August 2017. During the in-person home visit in October 2017, it was noted that the mother had just given birth prematurely to the baby (now deceased). In March 2018, the primary care doctor stated that the toddler had been doing better, had been keeping up on the growth curve, and was up to date on most of his shots. He noted that he wouldn't necessarily suggest a diagnosis of medical neglect to the toddler. After almost nine months, the investigation against the father was unfounded as to the allegation of medical neglect, although there was no contact with the father and no attempts to locate the father. The allegation of medical neglect against the mother was removed from the investigation.

| Child No. 63 | DOB: 12/2004 | DOD: 8/2018 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 13 years |
| Cause of death: | Bacterial ventriculitis due to hydrocephalus due to cerebral palsy |
| Reason for Review: | Youth in care |
| Action Taken: | Investigatory review of records |

**Narrative:** Thirteen-year-old medically-complex youth in care died in the hospital after being taken off life support. In May 2018, the child was hospitalized after being diagnosed with meningitis, a vascular brain infection, and pneumonia. The child was living in a specialized foster home due to his medical complexities that included hydrocephalus, cerebral palsy, seizures, and developmental delays, which left him blind and non-verbal with limited mobility. The parents remained actively involved with the child and foster parent. The parents and foster parent were present with the child when he died. The Department did not conduct a child death investigation.

125

**Prior History:** The deceased child was the parents' only child. Both parents have a history of mental health issues and the father has multiple sclerosis. From February through November 2009, the parents had three investigations that had been unfounded and expunged. In February 2009, the father was unfounded for substantial risk of harm when he expressed paranoia about his wife and son. In July 2009, the parents were unfounded for inadequate food. In November 2009, the Department received a report that the parents were not giving the child his medication correctly, not feeding him correctly, and that the mother allowed the father to be alone with the child despite his inability to care for the child. The parents were unfounded for inadequate supervision and the mother was unfounded for medical neglect. In February 2010, while there was an open intact case, a Department worker reported that the child's in-home nurse contacted the Department with concerns that the mother displayed signs of mental illness and diabetes, and the nurse thought the mother had stopped taking her psychotropic and diabetic medication. She reported that the mother was not participating in the child's care. As no home health worker was in the home over the weekend, and the child is totally dependent, there was concern the child would not be taken care of. The Investigator spoke with the home health nurse who shared that the worker from the intact case had advised the mother that she needed to take her medications. The worker confirmed that the mother had not started taking her medication again. The worker was attempting to have the mother keep track of feedings and medical treatment and have her work closely with the nurses. In March 2010, during the investigation, the Department received two more reports alleging that the parents were still not giving the child his medication and that he was having multiple seizures during the day. While the three investigations were pending, the child was admitted to a children's hospital and his medication levels were found to be low, indicating he had not received all of his doses. The Department took custody of the child. The mother was indicated for substantial risk of harm and medical neglect. The child remained at the children's hospital for approximately two weeks before moving to a residential medical facility. The parents visited the child weekly and were noted to be appropriate. The mother performed motion exercises with him, and the father would read stories or talk to him. The parents also participated in a parenting capacity assessment during the case. In November 2012, the goal for the child was changed to long-term foster care because of his medical complexities. The child moved into a specialized home. The foster parent had nursing care in her home to assist with the care of the child and worked with the parents, encouraging them to attend doctor visits. Following the goal change, the biological parents and foster parent remained in contact as the parents continued to visit. The child remained in the care of the foster parent with some brief hospitalizations before his final hospitalization in 2018.

| Child No. 64 | DOB: 12/2016 | DOD: 8/2018 | Natural |
|---|---|---|---|
| Age at death: | 1 ½ years | | |
| Cause of death: | Undetermined | | |
| Reason for Review: | Closed intact family case within a year of the child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** One-and-a-half-year-old found unresponsive by his thirty-nine-year-old father. The father found the baby laying on his back in his pack-n-play. The toddler was blue in color and rigor mortis had set in. The father contacted 911 and put the baby on the kitchen table to attempt CPR. First responders contacted the hospital and a physician pronounced the baby deceased. The father stated that the baby had been fussy during the night; he had last seen the baby alive between 3:00a.m.-4:00 a.m., when he put the child back down to sleep. It was reported that there were no obvious signs of trauma on the baby, and other than the age of the baby, there was no other suspicion about the baby's death. The family resides in the home with another family. The mother and another adult male were at work at the time the baby was found, and another adult female was asleep. The officers on the scene did not observe items in the baby's bed; did not observe any other hazardous items around the house; however, the house was cluttered and there were dirty dishes all over the kitchen. The Department investigated and unfounded the parents for death by neglect but indicated them for environmental neglect.

**Prior History:**   In April 2015, the parents were indicated for failure to thrive on the then four-month-old sibling to the deceased. The newborn had a poor weight gain after birth and was admitted to a children's hospital a week after birth to receive a feeding tube. The parents and grandmother were educated and trained on feeding. Three months later, the baby was diagnosed with malnutrition. The mother told the investigator that she often skipped feedings if the baby did not wake up, believing it meant she was not hungry. The staff had explained that the baby needs to be awakened and fed. The father and maternal grandmother reported that they regularly feed the baby and could describe the process. They also indicated recognizing the mother getting easily frustrated with the baby. The investigator made a referral to the Department's High-Risk Intact Unit and home nursing. From April to September 2015, a Department intact worker assisted the family. The family participated in services and the baby had gained significant weight when the case closed in September 2015.  From June 2015 through November 2015, the father was investigated and unfounded for environmental neglect to his son (half-sibling to the deceased from a previous relationship), substantial risk of harm/neglect to his son (half-sibling to the deceased), and environmental neglect to his nephew, with whom he has legal guardianship; all indications have been expunged. In June 2016, the parents were investigated for medical and environmental neglect when it was reported that the one-and-a-half-year-old sibling to the deceased was seen unbathed and had lice. Mice and cockroaches were reported to infest the home. It was also reported that the parents were not keeping up with the baby's monthly blood work appointments, and the area around the baby's g-tube looked red; possibly infected. The physician reported that he had not seen the baby for her monthly hypothyroidism labs since February. Tests now showed that she had not been getting her medication. The mother reported that she had not refilled the medication for three months, saying she was waiting for a prescription. The investigator indicated the parents for medical neglect and unfounded the parents for environmental neglect. The investigator also enlisted the help of the grandmother and referred the case to the High-Risk Intact Unit. During this investigation, the mother revealed that she was three months pregnant. The second-high risk intact case was opened from June 2017 through October 2017. The worker reported that the family was cooperative with services and keeping the toddler's appointments and medication. In March 2018, the parents were investigated for substantial risk of harm by abuse and substantial risk of harm by neglect to their three-year-old and one-year-old; it was reported that the parents were living with a couple that had a violent relationship and used drugs in the household. The investigator visited the home and observed the children who appeared healthy and appropriately dressed. The parents denied the allegations and agreed to a drug test, which was positive for marijuana only. The other couple denied the allegations also. The investigator observed the home to be acceptable. There have been two more child protection investigations and another intact family case opened, since the conclusion of the death investigation in March 2018.

| Child No. 65 | DOB: 1/2011 | DOD: 8/2018 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 7 years |
| Cause of death: | Bradycardic cardiac arrest; intracranial hypertension; spontaneous cerebellar hemorrhage |
| Reason for Review: | Youth in care |
| Action Taken: | Investigatory review of records |

**Narrative:** Seven-year-old youth in care was found unresponsive by his father. He was transported to the hospital where he was later pronounced deceased. The father stated that he picked up the youth from school and they went for ice cream with the grandmother. The youth later complained that his head hurt. The family returned home, and the youth was too weak to walk. The father carried the youth to the couch and placed a cold washcloth on his forehead. The grandmother called 911; shortly after, the father found the youth collapsed and unresponsive on the floor. EMS arrived on the scene to find the youth unresponsive. He was transported to the hospital where he was stabilized and transferred to the children's hospital, where he underwent a posterior decompressive craniectomy to repair the ruptured aneurysm and reduce the pressure in his brain. He was pronounced deceased later that evening. The Department investigated and unfounded an unknown perpetrator for death and head injuries to the youth; and investigated and indicated the paternal grandmother for inadequate supervision. During the investigation, it was found that the father was staying in the home where the youth resided. The investigator spoke with the caseworker, who stated that the father was not supposed to be living there and the grandmother was aware of this. The grandmother and father confirmed that the father was spending two to three nights a week in the home to help put the youth to bed and spend time with him.

**Prior History:** In December 2012, the Department investigated the mother and father for head injuries, head injuries by neglect, inadequate supervision to the twenty-two-month-old and substantial risk of physical injury/environment injurious to health and welfare by neglect to the siblings, ages, three and seven, after hospital staff reported that the twenty-two-month-old (deceased youth) sustained an acute subdermal hematoma and retinal hemorrhaging.  The father reported that the toddler was sitting in a computer chair with his three-year-old sibling and when the sibling got out of the chair, the toddler fell backwards and hit his head on a carpeted floor. The Department's investigation was indicated for head injuries by neglect to the toddler; indicated for inadequate supervision to the toddler and three-year-old sibling; unfounded for head injuries to the toddler; and unfounded for substantial risk of physical environment injurious to health and welfare by neglect to the siblings. In December 2016, the Department investigated the father for substantial risk of physical injury/environment injurious to health and welfare by neglect to all three children, ages one, five and seven years, after it was reported that the father was using meth while the children were home, and that the father was currently on probation for domestic violence. This investigation was unfounded. In January 2018, the family came to the attention of the Department due to a domestic violence incident between the parents that was witnessed by the children, ages seven, nine, eight, and two. An intact family case was opened, and the court ordered the mother to comply with intact services. From March to May 2018, there were several issues with family compliance with intact services, including missed appointments, failure to complete drug testing, refusal to complete paperwork for the ten-year-old to receive counseling, and reports of children being exposed to a sex offender. In May 2018, the Department investigated and indicated the mother for inadequate food; substantial risk of physical injury/environment injurious to health and welfare by neglect; and substantial risk of sexual abuse – sex offender has access to the children ages two, seven, nine, and twelve, after law enforcement reported that a neighbor witnessed the nine-year-old digging through trash at a store because she said she and her siblings needed food. Law enforcement went to the home and reported that there were several people in and out of the house and there was suspicion of meth use. The mother was not home; however, law enforcement arrested an individual who was not to have contact with any children under the age of eighteen. The Department took protective custody of the children. The maternal grandmother took custody of the ten-year-old and the other three children were placed in a traditional foster home. The seven-year-old was in a traditional foster home for a little over a month prior to being placed with the paternal grandmother until his death.

| Child No. 66 | DOB: 12/2014 | DOD: 8/2018 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 years |
| Cause of death: | Acute and chronic congestive heart failure due to dilated cardiomyopathy |
| Reason for Review: | Open intact family case at the time of the child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Three-year-old medically complex child diagnosed with myasthenia gravis (an autoimmune neuromuscular disease) was transported by ambulance to the hospital after her mother contacted 911 because the child was having difficulty breathing. At the hospital, the toddler was found to be clinically brain dead; she was taken off life support seventeen-days later. The Department investigated the mother and father for death by neglect and substantial risk of physical injury/environment injurious to health and welfare by neglect to the siblings, ages two and six-years-old. The investigation against the mother and father was unfounded, noting that although the mother was an herbalist and did not have confidence in modern medicine, there was not enough credible evidence to support that the child was medically neglected, and the cause of death was ruled natural.

**Prior History:** In May 2018, the Department investigated the mother and father for medical neglect to their three-year-old (deceased child), after it was reported that the parents (who practiced herbal medicine) refused any form of medical treatment for the child. While the investigation was pending, protective custody was taken on two occasions for essential medical treatment to be administered to the minor when parents refused to consent to necessary treatment. The physicians stated that if the child did not get the medicine, she could go into respiratory failure. The parents ultimately agreed to treatment and with DCFS intervention, signed all consents for treatment including blood transfusion, medication, and tracheal tube. Protective custody lapsed. The parents were indicated for medical neglect based on the opinion of various medical doctors that the parents' avoidance of treatment was medical neglect. An intact family services case was opened to ensure the prescribed treatment was followed. The child was hospitalized for a significant period and remained in the hospital at the time of case opening. The intact case remained open at the time of the child's death.

| Child No. 67 | DOB: 7/2018 | DOD: 9/2018 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 1 ½ months |
| Cause of death: | Sudden Infant Death Syndrome |
| Reason for Review: | Child of a youth in care |
| Action Taken: | Investigatory review of records |

**Narrative:** Two-month-old infant was pronounced deceased at the hospital after she was found face down and cold in her crib by her seventeen-year-old mother, who was a youth in care. The youth was living with her three younger half-siblings and their father, who was her foster parent. The Department investigated the youth for death by neglect. The investigator met with the youth, who stated that she fed the infant at approximately 2:00 a.m. and put her back in her crib around 2:30 a.m. She further stated that the only item in the crib was a small blanket over the infant's midsection and legs. When she awoke at 7:00 a.m., she found the infant face down in the crib. The youth's foster parent called 911 and the youth and her foster parent both attempted CPR. The investigator contacted the youth's caseworker who stated that the youth had been doing well and had been focused on being a parent. The investigator also spoke with law enforcement and medical providers, who had no suspicion of abuse or neglect in this case. The medical examiner's report stated the infant died of SIDS. In January 2019, the investigation for death by neglect was unfounded.

**Prior History:**  The deceased's mother was a youth in care due to her mother's mental health issues. In February 2011, the Department investigated the youth's mother after it was reported that she shoved the then ten-year-old youth, causing a black eye. The youth's mother was indicated for substantial risk of physical injury/environment injurious to health and welfare and was unfounded for cuts, bruises, welts, abrasions and oral injuries. Following another investigation in March 2012, now expunged, an intact family services case was opened. The mother was investigated and indicated again in April 2012 and August 2012. The Department was granted custody of the children. The youth and her four half-siblings were placed in relative foster care with the father/ex-stepfather. An order of protection was obtained against the mother to protect the children and the father/ex-stepfather. All her children lived with the father/stepfather since December 2012. In 2013, the caseworker and supervisor determined that visits with her children were no longer healthy due to the youth's mother's delusions and paranoia during visits. The youth's mother had not had contact with her children since 2013. The youth's mother was found deceased in her trailer in March 2018. In April 2018, the youth told her caseworker that she was pregnant and due in July 2018. The youth gave birth in July 2018. In August 2018, the youth enrolled the baby in daycare. The caseworker discussed safe sleep practices with the youth on two occasions.

| Child No. 68 | DOB: 7/2018 | DOD: 10/2018 | Natural |
|---|---|---|---|
| Age at death: | 11 weeks | | |
| Cause of death: | Multiple birth defects | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  Eleven-week-old medically-complex infant was found unresponsive and not breathing by his twenty-seven-year-old mother; CPR was started and 911 was called. The infant was transported by ambulance to the emergency room where he was pronounced deceased. The infant had a medical history of microphallus, small-for-gestational-age, conjugated hyperbilirubinemia, pulmonic stenosis, phocornelia of both upper extremities, Cornelia De Lange syndrome, intraventricular hemorrhage, and ventricular septal defect. The infant also underwent heart surgery to repair some damage to his heart valves. He was discharged approximately three weeks before his death. The Department did not investigate his death.

NATURAL

**Prior History:** In October 2017, an employee from an out-of-state county sheriff's office child protection unit contacted the hotline to report that the mother's seven-year-old daughter, who was living with her father in another state, reported that when she lived with her mother, her mother would give her and her siblings (ages six and one years old) "whoopings" with a belt; the mother would sit on their backs and whoop them with a belt on their bottom, or would hit them with a brush on the knuckles. The seven-year-old also said that her mother would make her, and her siblings wash their own mouths out with soap when they were lying or in trouble. The Department investigated the mother for substantial risk of physical injury/environment injurious to health and welfare-incidents of violence or intimidation to all three children. The investigator interviewed the mother. The mother reported that she never abused her children and her seven-year-old daughter's father kidnapped her and took her out-of-state. She further stated that she just returned from being out-of-state for two weeks as she was trying to get her daughter returned to her. She reported that she had an order of protection, but the other state said that it did not say the father had to return the child, so they did not assist her. The mother produced current orders of protection that were amended to say the father had to turn the minor over immediately to the mother. She told the investigator she planned to get her daughter back as soon as she could. She denied any abuse; denied ever putting soap in her kids' mouths; denied current domestic violence; and denied substance abuse. The one-year-old was observed. The minor's body was checked, including under her clothing, and no marks or bruises were observed. The six-year-old sibling denied being sat on or hit with a belt. He stated that he had gotten "whoopings" before but usually with the hand over the clothes. He said he never had soap put in his mouth and never observed any abuse to his sisters. The investigator had phone contact with the school principal, doctor's office, and paternal grandmother. There were no concerns noted by the principal or doctor's office. The paternal grandmother reported that she never observed any marks or injuries to the seven-year-old prior to the report. There was no evidence that the mother used inappropriate discipline with the children. The report was unfounded.

| Child No. 69 | DOB: 7/2017 | DOD: 10/2018 | Natural |
|---|---|---|---|
| Age at death: | 15 months | | |
| Cause of death: | Acute myocarditis | | |
| Reason for Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Fifteen-month-old was found unresponsive by his twenty-year-old mother early in the morning; he was transported to the hospital via ambulance where he was pronounced deceased. The Department investigated the mother and father for death by neglect. It was reported that the baby was taken to the hospital the day prior to his death for unusual breathing and vomiting. The hospital discharged the baby with a diagnosis of stomach flu. The parents were given a prescription, but they never picked it up because they did not have the co-pay to buy the medication. At around midnight, the baby vomited. The mother laid him down on her bed and patted him as he was still sick, irritable, and crying a lot. At approximately 5:00 a.m., the mother noticed the child became quiet and was not breathing. The mother called for the father who had fallen asleep in another room. They carried the baby to the living room and called 911. The baby was transported by ambulance to the emergency room where he was pronounced deceased. An autopsy revealed that the baby's heart was enlarged. It was determined that the baby had several cardiac abnormalities and that he died from acute myocarditis. The Department unfounded the investigation against the mother and father for death by neglect.

**Prior History:**  The deceased baby was the only child born to the twenty-year-old mother and father. The mother had prior involvement with the Department. In January 2018, law enforcement contacted the hotline for a call they responded to involving four children (nine, six, four and three years of age) wandering the parking lot of an apartment complex, unsupervised. The Department investigated the mother for inadequate supervision to her nieces and nephews. The investigator interviewed the mother of the four children. The mother of the four children told the investigator that she went out to the store with a friend and then went to another state, just over the border from where they lived. She stated that she asked her sister, the mother of the deceased baby, to watch the kids. She stated that within an hour after leaving, her sister called her and told her she had to leave and that she needed to return home. She told her sister she was unable to do so and told her sister to take the kids to their mother's house. The mother of the four children agreed that she would not leave her kids in her sister's care. When the investigator interviewed the mother of the deceased baby, she admitted to leaving the four children and said that her sister told her it was ok for her to leave the children outside by the door, and that their cousin would be coming for the children shortly. The mother of the four children denied making this statement. In March 2018, the investigation against the mother of the deceased baby was indicated for inadequate supervision to her nieces and nephews.

| Child No. 70 | DOB: 10/2018 | DOD: 10/2018 | Natural |
|---|---|---|---|
| Age at death: | 6 days | | |
| Cause of death: | Respiratory failure; pulmonary hypoplasia; bilateral cystic renal disease | | |
| Reason for Review: | Pending child protection investigation at the time of the child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Six-day-old infant died after being born prematurely (at 33 weeks, 4 days gestation) with multiple health complications, including respiratory and kidney failure. The mother did not know she was pregnant until she was at eighteen to nineteen-weeks' gestation and received little prenatal care. Medical records showed the mother had an ultrasound at twenty-seven-weeks, which showed an enlarged cystic right kidney and an abnormally large bladder. The mother admitted to using cocaine the same day she gave birth and to using heroin a few weeks prior to that. The newborn was admitted to the neonatal intensive care unit with plans to transfer to a higher-level care hospital when he stabilized. The mother reported that she had no intentions of raising the child and signed temporary guardianship to the maternal grandmother, who had guardianship of the mother's other child. After learning that the condition was fatal, the family withdrew life support and the infant passed away in the hospital. The doctors determined that the mother's substance abuse could not be linked to the newborn's death. The Department investigated and unfounded the mother for death by neglect and substance misuse. There was no conclusive evidence to support that the mother's drug use caused the kidney disease.

132

NATURAL

**Prior History:** In October 2012, the Department investigated and unfounded the mother for cuts, bruises, and welts to her fourteen-month-old son. This investigation has since been expunged. The mother gave the maternal grandmother guardianship of her son. In October 2018, the mother gave birth to the deceased and the Department received a hotline report that the mother had given birth, had she admitted to using heroin throughout the pregnancy, and had used cocaine the morning she gave birth. The Department investigated her for substantial risk of physical injury/environment injurious to health and welfare by neglect and substance misuse by neglect/controlled substance in a newborn. The newborn was reported to be in critical condition and was placed in the neonatal intensive care unit. The newborn tested positive for heroin and cocaine. The investigator met with the mother who reported that she had quit drinking when she learned she was pregnant, but admitted to using cocaine every other day, and heroin throughout the pregnancy. The mother reported that she never had any intentions of raising the newborn and that the maternal grandmother was raising her seven-year-old son. The investigator contacted the maternal grandmother about the newborn and his health complications. The maternal grandmother confirmed that she was raising the seven-year-old and that she was willing to care for the newborn. The mother signed temporary guardianship paperwork giving the maternal grandmother guardianship of the newborn. A few days later, the investigator received a message from the maternal grandmother stating that the newborn had passed away. The investigation against the mother was indicated because the mother admitted to using drugs during her pregnancy.

| Child No. 71 | DOB: 1/2006 | DOD: 11/2018 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 12 years |
| Cause of death: | Acute chronic respiratory failure due to upper airway obstruction |
| Reason for Review: | Pending child protection investigation at the time of the child's death |
| Action Taken: | Full Investigation; Report to Director 6/5/2019 |
| | **See Death and Serious Injury Investigation 11** |

**Narrative:** Twelve-year-old medically complex child passed away after his parents withdrew life support. He had been hospitalized for over a month. The child suffered from severe developmental delays, seizures, was g-tube dependent, wheelchair bound and was non-verbal. In September 2018, the Department investigated, the father for medical neglect and malnutrition, after the twelve-year-old was hospitalized and was found to have multiple pressure ulcers, as well as being malnourished and dehydrated. The child was discharged approximately ten days later into the care of his mother. He was re-hospitalized less than a week later and transferred to a children's hospital for respiratory issues and seizures. The child continued to decline, and his parents eventually made the decision to withdraw life support. The Department learned of his death when a paralleled investigator contacted the mother to conduct a final CERAP on the pending child protection investigation and the mother notified the investigator that her son had passed away the previous week. The Department did not investigate the death.

**Prior History:**  The family had six prior unfounded reports from 2012 and 2013. All the investigations were on the mother or her paramour (not the father of the deceased). There was one indicated investigation from September 2013 against an uncle for cuts, welts, bruises to the ten-year-old sibling. In June 2015, the Department investigated and indicated the mother for substantial risk of physical injury/environment injurious to health and welfare to her four children/siblings to the deceased, ages, twelve, eleven, six and four, after it was reported that the mother had taken the children camping for the night, slapped the twelve-year-old in the face, then drove the children home while intoxicated. The mother was arrested and charged with five counts of driving under the influence and endangering the life of a child. The children were released into the care of their father. In September 2018, the Department investigated the father for medical neglect and malnutrition to the twelve-year-old (deceased child), after a hospital social worker reported that the medically complex child had been medically neglected and there had been a delay in seeking medical care. The child began seizing the day prior to hospitalization, while at home with his father. The father called 911 and the child was transported to the hospital. The father reported that he stopped giving the child his seizure medication three months ago because he slept better without it. The child presented to the hospital with severe diarrhea, pressure sores, dehydration, and malnutrition. Both parents were at the hospital. The mother reported that two of the five children resided with her and the other three resided with the father. The mother reported to the investigator that she had no idea if the father was giving the twelve-year-old the medication he needed.  The child was discharged to the care of his mother. There was no further contact with the family until a parallel investigator contacted the mother two months later to complete a final CERAP and learned that the child had died two weeks earlier. In January 2019, the investigation against the father was indicated for medical neglect and malnutrition.

| Child No. 72 | DOB: 8/2018 | DOD: 11/2018 | Natural |
|---|---|---|---|
| Age at death: | 3 months | | |
| Cause of death: | Respiratory failure due to pulmonary hypertension | | |
| Reason for Review: | Closed intact family services and pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Three-month-old medically complex infant, who never left the hospital following her birth, was pronounced deceased. The infant was the fifth child born to the mother and father. The mother delivered the infant at thirty-eight-weeks and 5 days gestation. The pregnancy was normal, but the infant was born with a cleft palate, congenital lobar emphysema, dyskinesia, and other medical issues. Since the birth, the infant underwent a lung resection. The Department did not investigate the death.

134

NATURAL

**Prior History:**  In May 2017, the family was court ordered to participate in Intact Family Services with the Department due to truancy issues involving the parent's seven-year-old child. The mother and father were cooperative with services and the case was closed successfully in November 2017. In February 2018, a teacher contacted the hotline to report that the family had no heat in the home after the five-year-old told his teacher that his home did not have any heat and he did not want to go home. The Department investigated the mother and father for inadequate shelter. The investigator went to the home the same day the report was made and found that the home was heated. The five-year-old denied that it is ever cold at his house. The family declined intact family services. In February 2018, the investigation was unfounded. In October 2018, the mother contacted the hotline requesting assistance with a security deposit and first month's rent on an apartment and a Child Welfare Services referral was opened for preventative services for the family. The mother reported that she had to be out of her current home, and she had a newborn that was born in August 2018 with major health problems who was currently in the NICU with no discharge date. Approximately two weeks later, a school social worker contacted the hotline and reported that following an asthma attack, the eight-year-old expressed concern that this parents smoke in the house and it was hard for him to breathe. He further stated there are holes in the floor of the trailer, mice and rats get inside, and the family doesn't have enough money for food. The Department investigated the parents for environmental neglect and medical neglect to the children. This investigation was pending at the time of the infant's death. The parents and the eight-year-old and five-year-old boys were interviewed. The parents admitted to smoking but said they did not smoke around the kids. The eight-year-old told the investigator that when his mom and dad smoke, he goes back to their bedroom or his dad goes outside. The five-year-old stated that his parents go outside to smoke. The home was observed to be clean and appropriate. The investigator contacted the child welfare worker who stated that she was following up with a referral for preventative services for the family. She stated that the family was making plans to be out of the trailer; the family was having issues with the landlord. In December 2018, the investigation was unfounded.

| Child No. 73 | DOB: 6/2008 | DOD: 11/2018 | Natural |
|---|---|---|---|
| Age at death: | 10 years | | |
| Cause of death: | Respiratory arrest due to small bowel distension due to probable bowel obstruction | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  Ten-year-old died while under care of physicians at a children's hospital. The Department was notified of the child's death by a relative. The child had a past medical history of congestive heart failure, cerebral palsy, developmental delays, bronchopulmonary dysplasia, pulmonary hypertension, and needed a g-tube.  The child also had a ventriculoperitoneal shunt on the right side of her head. The Department did not investigate the death.

**Prior History:**  In January 2007, the mother was investigated for environmental neglect, after it was reported that a dozen people were living in the home, and that the home was filthy with a roach infestation. The investigation was unfounded. In July 2009, the mother was investigated for medical neglect and substantial risk of physical injury/environment injurious to health and welfare of the one-year-old (deceased child). A hospital social worker reported that the one-year-old was ready for discharge, but the parents missed three teaching appointments to learn proper care for the one-year-old.  The investigation was indicated, and the Department was granted temporary custody of the one-year-old who remained in the hospital. The siblings remained in the home of the parents. The parents began participating in education sessions and when the one-year-old was ready for discharge in February 2010, the court allowed for her to be returned home to her parents, under an order of protection as the Division of Specialized Care for Children was also involved. In August 2010, the father was indicated for medical neglect and failure to thrive after the two-year-old (deceased child) was found to have been losing weight and was diagnosed with non-organic failure to thrive. There were also eight missed follow up appointments. During this investigation, the toddler was removed from the home and placed in a medical residential facility. In October 2010, the mother was investigated for cuts, bruises, welts, and abrasions after it was reported that the one-and-a-half-year-old sibling had scars on his legs. The investigation was unfounded. While the toddler remained at the medical residential facility, the paternal grandmother, who visited consistently, completed all the medical education. She became a licensed foster parent and the toddler was placed with her. Following the placement there were continued investigations involving the siblings. The mother had unfounded investigations in May 2011, June 2012, June 2013 and October 2014. The father had an unfounded investigation in July 2012. The parents were indicated in December 2011 and again in March 2015. The siblings were eventually placed with the paternal grandmother. In June 2015, the paternal grandmother was investigated for inadequate supervision and medical neglect to the five-year-old sibling after it was reported the child had an open gash on his thumb and hadn't received medical attention. The investigation was unfounded. In March 2016, the paternal grandmother was investigated for inadequate supervision and burns by neglect to the six-year-old sibling who had a burn on his arm. The grandmother reported that she was teaching her grandsons how to iron and the seven-year-old accidently burned the six-year-old, but she did take him to the doctor for care. Though the investigation was unfounded, it was decided to move the siblings to another relative as it appeared to be too many children for the grandmother to care for along with the special needs of the seven-year-old child (deceased child). In June 2018, the paternal grandmother was investigated for environmental neglect to the ten-year-old child after it was reported that the home was cluttered, with rotten food on the stove, mice, roaches, bugs, and bed bugs. The investigator found the home to be messy with old food, piles of clothes, and debris throughout, though the condition did not rise to the level of environmental neglect. No bugs or rodents were observed by the investigator, and the grandmother was in the midst of moving. The investigation was unfounded after the investigator observed the new apartment.

| Child No. 74 | DOB: 8/2018 | DOD: 11/2018 | Natural |
|---|---|---|---|
| Age at death: | 3 months | | |
| Cause of death: | Bacterial pneumonia | | |
| Reason for Review: | Unfounded child protection investigation within a year of the child's death | | |
| Action Taken: | Investigatory review of records | | |

NATURAL

**Narrative:** Three-month-old infant was found unresponsive by his twenty-nine-year-old mother. The mother reported that she fed the infant at 2:00 a.m., swaddled him, and laid the infant down on his back on a mattress as she had been instructed to do by a medical provider. In the morning, she discovered the infant was not breathing, called 911, and started CPR. EMS transported the infant to the hospital where he was pronounced deceased. In the week before his death, the mother had brought the infant to the hospital three times; the infant had been diagnosed and treated for respiratory syncytial virus (RSV). The infant had been born at twenty-eight weeks gestation and was in the NICU until the end of October 2018. Two weeks prior to the infant's birth, the mother had been physically assaulted. As a result of the attack, the mother had a placenta abruption, resulting in the need for a cesarean section. One of the mother's attackers has been convicted of aggravated criminal assault. The Department did not conduct a death investigation.

**Prior History:** In May 2008, the mother first became involved with the Department when she was indicated for inadequate supervision to her two-year-old child. The mother left the toddler with relatives and disappeared for periods of time, without a care plan. In 2009, the mother signed consent for the grandmother to adopt the toddler; it was finalized in June 2010. This investigation has since been expunged. The mother had two other unfounded and expunged investigations related to her job. The father had an unfounded investigation for substantial risk of harm by neglect to an unknown child in January 2018; the father was hospitalized and a girlfriend (not the mother of the deceased) and her baby were visiting. The couple began to argue, and she reportedly threw her phone and other items at the father. He allegedly swung at her as she was leaving. The father told the investigator that he and the woman dated intermittently but he did not know the child she had with her at the time. He said he had told her he did not want her to visit. Upon her arrival to the hospital she threw her phone at him and slapped him before running out. The investigation against the father was unfounded. In July 2018, the hotline received a report that there was recurring domestic violence between the mother and her paramour (father to the deceased infant) while the mother was pregnant with the (now deceased) infant. The Department investigated the paramour for substantial risk of harm. The investigator contacted the mother after she gave birth and reported that the paramour moved, as they were arguing daily. She provided his contact information. The mother denied any violence between them and stated that the only time police came to the house was when the paramour was moving out of the home. In addition, the two-year-old sibling to the deceased was with the grandmother at the time. She denied that he ever threatened her son. The mother was planning to co-parent with the paramour, though they were no longer in a relationship. The investigator contacted the paramour who denied prior incidents of violence and the mother's report that they verbally argued often, and he left the home in June. The investigation was unfounded.

| Child No. 75 | DOB: 10/2018 | DOD: 12/2018 | Natural |
|---|---|---|---|
| Age at death: | 1 ½ months | | |
| Cause of death: | Sudden Unexpected Infant Death | | |
| Reason for Review: | Closed intact family services case within a year of the child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  One-month-old who was having difficulty breathing was transported to the hospital where he was pronounced deceased. The mother reported that the newborn had woken up twice during the mid-afternoon and appeared to have trouble breathing. The mother contacted the pediatrician who advised her to call 911 if it continues. After a third episode of breathing difficulties, the mother called 911. Emergency responders attempted CPR and the newborn was taken to the hospital where hospital staff continued working on the newborn for two hours, before he was pronounced deceased. The Department investigated the mother for death by neglect to the newborn and substantial risk to the two-year-old sibling. The investigator contacted the pediatrician and confirmed the information the mother had given. A safety plan was implemented, and the sibling was placed with the paternal grandmother. While the investigation was pending, the mother fled to another state and stopped engaging in mental health services. The investigation against the mother was unfounded for death by neglect after the autopsy determined the cause of death was Sudden Unexpected Infant Death and the manner was ruled Natural. The investigation for substantial risk to the two-year-old sibling was indicated against the mother because she had stopped engaging in mental health services, fled the state, and appeared to have blatant disregard for caring for herself or her children. The two-year-old remained in the care of the paternal grandparents, who are seeking full custody.

**Prior History:** In February 2017, the Department investigated the mother and father for substantial risk, inadequate clothing and inadequate supervision to their six-month-old, when it received a report that the mother left home and walked with the baby overnight to another state, approximately 32-40 miles, in the cold. She did not tell the father she left or where she was going. The father notified police to search for both the mother and the baby. The mother was reported to have bipolar disorder, postpartum psychosis, and PTSD. The mother had stopped taking her medication while she was pregnant and remained off her medication so that she could breast feed. The mother was reported to be in another state with a friend; the friend brought the mother and baby to their home and took them to the local police department. The mother and baby were taken to the hospital. The mother was discharged from the hospital with a plan to follow up with a psychiatrist and start medication. The Department investigator instructed the father not to leave his wife alone with the baby, but the father admitted to the investigator that he left the mother with the child on at least one occasion. The Department added an allegation against the father for inadequate supervision. The investigator observed the mother caring for the baby and assessed the baby as safe. The parents agreed to participate in intact family services to address the mother's mental health issues, counseling for both parents, and stable housing. The mother was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect. The allegation for inadequate clothing was unfounded, as the baby appeared to be dressed appropriately and bundled. The allegation for inadequate supervision was unfounded, as the mother was with the baby and there was no evidence to suggest the mother left the baby alone at any point of time. The parents participated in intact family services for approximately a year and the mother successfully completed her service plan tasks. The case was closed in February 2018.

| Child No. 76 | DOB: 12/2018 | DOD: 12/2018 | Natural |
|---|---|---|---|
| Age at death: | Newborn | | |
| Cause of death: | Complications due to meconium aspiration | | |
| Reason for Review: | Closed intact family services case and child protection investigation within a year of the child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  A newborn was delivered via cesarean section in distress to his thirty-one-year-old mother; he was not breathing and had fewer than sixty heartbeats per minute. Physicians worked on him for approximately one hour and tried to intubate twice before he was pronounced deceased. The mother tested positive for cocaine and opiates. The doctor gave her fentanyl at the time of birth, which could have caused the positive opiates test. When the mother denied drug use, she was given a second test, which tested positive for cocaine. The mother refused an autopsy and the doctor were unable to determine the exact cause of death; the newborn's distress could have been congenital, or it could have been related to exposure to cocaine *in utero*. The Department investigated and indicated the mother for death by neglect and substantial risk of physical injury/environment injurious by neglect.

**Prior History:**  In February 2014, the mother and father first became involved with the Department when they were investigated and indicated for substantial risk of physical injury and medical neglect to their three-month-old son. The investigation followed a report that the parents were using heroin in front of their medically-complex six-month-old son, who has Downs Syndrome, a tracheotomy, and recently had surgery. It was further reported that there was heroin observed in the parent's bathroom and dirty spoons were found in the home. During the investigation, the parents missed three medical appointments for their three-month-old. The mother's pain doctor reported that she tested positive for cocaine in January 2014 and for Benzodiazepines and opiates in April 2014. In October 2015, the mother was investigated and indicated for substance misuse by neglect when she and her newborn baby tested positive for cocaine at the time of the newborn's birth. The father was also investigated for substance misuse by neglect to the newborn, but that investigation was unfounded for lack of evidence showing the father was responsible for the mother's use of an illegal drug while pregnant. The mother reported that she did not know she was pregnant, even though she gained 40 pounds. She admitted to smoking marijuana. The newborn, who had tested positive for cocaine and opiates, had signs of withdrawal, feeding and respiratory issues, and jaundice. She required oxygen therapy. She was later diagnosed with Autism. The newborn and her two-year-old sibling were placed under a safety plan with their paternal grandmother, who resided in the parent's home, but was directed to supervise all parental contact. The parents agreed to intact family services. In December 2017, the hotline received a report that the father was selling drugs from his mother's home, which was infested with mice and rats. The children visited their father there every other weekend. The Child Protection Investigator never gained access to the home, since the father refused to cooperate. The CPI saw both children in the mother's care and deemed them safe. In February 2018, the investigation was unfounded due to the father's lack of cooperation. In March 2018, the intact family services case was closed.

| Child No. 77 | DOB: 3/2017 | DOD: 12/2018 | Natural |
|---|---|---|---|
| Age at death: | 1 ½ years | | |
| Cause of death: | Subglottic Stenosis due to muscular dystrophy | | |
| Reason for Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** One-and-a-half-year-old medically complex youth in care was found unresponsive by his relative foster parent. The foster parent started CPR and called 911. The baby was taken by ambulance to the hospital where he was pronounced deceased. The baby, who was born seven weeks premature, was living in a specialized foster home with his paternal grandmother and aunt due to his medical complexities that included myotonic dystrophy (a form of muscular dystrophy); Chronic Respiratory Failure; dysphagia; Fanconi anemia; and was dependent on a tracheotomy, ventilator, and g-tube. The hotline was contacted to report the death. It was reported that the paternal aunt informed the reporter that the ventilator did not issue an alarm the morning the baby died. The ventilator alarm is supposed to go off if the baby stops breathing or if the equipment is disconnected. The reporter was concerned that the equipment was turned off, resulting in the lack of an alarm. The family had a previous incident where a nurse in the home discovered the ventilator was off. Without the ventilator, the baby could experience cardiac arrest. The Department investigated the paternal aunt and grandmother for death by neglect. Following the formal investigation, the report was unfounded due to insufficient evidence. The primary care physician had no concerns of abuse or neglect. The baby had a low life expectancy due to his special needs and medically complex condition. Lastly, the primary care physician did not recall information regarding the alarm on ventilator being turned off by caregivers.

**Prior History:** In July 2017, this family came to the Department's attention when a hospital social worker contacted the hotline with concerns about the mother's ability to parent and properly meet the complex medical needs of the (now deceased) baby. The social worker also had concerns that her older children were at risk of harm in her care. The social worker stated that the baby was ready to be moved to transitional care and needed parental permission. The mother visited the baby sporadically, but the mother was absent for appointments to speak about the move. The paternal aunts and grandmother were the major supports for the baby. The father was observed slapping the mother in the face when she was still in the hospital after giving birth. According to a paternal aunt, the mother leaves her six-year-old with whomever she wants and goes out drinking. The mother and six-year-old move from place to place as they have no home of their own and the father is incarcerated. The Department initiated an investigation against the mother for medical neglect to the baby and substantial risk of physical injury/environment injurious by neglect to the mother's nine-year-old and six-year-old children. The Department took temporary custody of the baby and his six-year-old sibling in October 2017; the mother signed guardianship papers so that the nine-year-old could remain with a maternal relative. In October 2017, the investigation against the mother was indicated. A placement case was opened for neglect. In June 2018, the baby was discharged from the hospital and placed in the home of his paternal grandmother, who was also caring for his seven-year-old sibling. Prior to his placement, the paternal grandmother and aunt completed caregiver training to provide for the baby's special needs. At that time, the mother was non-compliant with services and her whereabouts were unknown. The mother's last contact with her children was in July 2018. The baby had five hospitalizations from July 2018 through November 2018. In September 2018, the father was released from prison and started having supervised visits with the baby. In November 2018, the father started individual therapy, but it was discontinued due to the baby's death. The seven-year-old sibling was enrolled in school and receives special education services. She remains in the home with a goal of substitute care pending court determination of termination of parental rights.

| Child No. 78 | DOB: 10/2018 | DOD: 12/2018 | Natural |
|---|---|---|---|
| Age at death: | 2 months | | |
| Cause of death: | Cerebral ischemic infarction due to venous sinus thrombosis due to pseudomonas respiratory tract infection with sepsis | | |
| Reason for Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Two-month-old youth in care died in the hospital after being admitted eight days prior for a high fever, fussiness, lethargy, and moaning. The Department was notified of the hospitalization the following day. The supervisor and caseworker visited the infant in the Pediatric Intensive Care Unit. The physicians advised the Department that the infant had an infection, blood pressure issues and seizures, all of which were resulting in brain damage. The infant was diagnosed with disseminated intravascular coagulation, resulting in strokes. The infant was on life support and the discussion took place regarding do not resuscitate orders between the caseworker, supervisor and attending physicians. The mother was notified at her home that evening. The mother had to decide about a do not resuscitate order since the Department only had temporary custody. The mother decided to remove the infant from life support, and he passed away. The Department did not investigate the death.

140

NATURAL

**Prior History:**  In May 2010, the mother was investigated and indicated for cuts, welts, bruises by neglect following a report that she was driving a motor vehicle when her one-year-old fell out of the moving vehicle. He was not appropriately restrained in his car seat and was sitting next to a door that was known to automatically open at times. Following this incident, the one-year-old and his eight-year-old sibling were placed in relative foster care with the maternal grandparents. In November 2011, the mother was declared to be unfit to parent and she never regained fitness for the children to be returned home. In May 2015 and in May 2016, the mother gave birth to two more children, who remained in her care. In September 2016, the mother and her paramour were investigated for a domestic violence incident. The mother pushed the paramour away and the paramour punched her twice in the face. The children, ages one year and four months, were placed at significant risk of harm when the mother and paramour had a physical altercation in the home. The paramour had a significant history of domestic violence. The Department took protective custody of the children, when the mother refused to get an order of protection and continued to live with the paramour. The children were placed in a licensed foster home. The mother and paramour were indicated for substantial risk of physical injury/environment injurious to health and welfare to their one-year-old son. In January 2017, the mother was engaged in counseling and parenting classes, compliant with drug drops, and visiting the children. By June 2018, she had stopped engaging in services and visiting the children, and the goal was changed to adoption. In October 2018, the mother gave birth to the deceased and was investigated for substantial risk of physical injury/environment injurious to health and welfare by neglect due to her prior history. The investigator took protective custody, and the Department was granted temporary custody of the newborn. The infant was placed with his paternal grandmother.

| Child No. 79 | DOB: 12/2018 | DOD: 12/2018 | Natural |
|---|---|---|---|
| Age at death: | 2 days | | |
| Cause of death: | Respiratory failure due to pulmonary hypertension and acute lung injury | | |
| Reason for Review: | Open placement case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Two-day-old medically complex newborn was pronounced deceased in a children's hospital where she was transferred after her birth due to her extensive medical needs. The newborn was born at 29 weeks and was exposed to cocaine and phenobarbital. The mother had not received prenatal care during her pregnancy and tested positive for cocaine at the time of the newborn's birth. The newborn was reported to have concerned anomalies including a fused mouth, which created an issue with intubation. She was emergently transferred to the children's hospital for specialized treatment after she experienced a seizure that lasted two minutes, shortly after birth. The children's hospital stabilized the newborn, but she had a difficult night that resulted in hospital staff contacting the family to go to the hospital to be with the newborn. The autopsy acknowledged that the newborn had tested positive for cocaine and its metabolites, stating that it is known that "drugs may acutely precipitate respiratory failure by compromising respiratory pump function and or causing pulmonary pathology - which in combination to the previously mentioned congenital anomalies due to prematurity - is likely to lead to death. In summary, acute respiratory failure as a direct consequence of the extreme prematurity was the immediate cause of death." The Department investigated and indicated the mother for death by neglect and substance misuse by neglect. The mother was aware that she was pregnant with this newborn and continued to use cocaine.

**Prior History:**  The mother has a long history with the Department due to a long history of drug abuse and refusal to participate in substance abuse treatment programs. Her children were all removed from her care at birth, or within months after birth in the case of her second child born in January 2013, due to her substance abuse issues. The mother has used cocaine throughout all her pregnancies except for that of her second child, as she was incarcerated shortly after she conceived. The mother's parental rights were terminated for her four oldest children who are now eight, six, four and three years old; these four children have been adopted. The fifth child, who was born in March 2018, has had an open case since birth. In November 2018, the mother and father's rights were terminated; and her goal was changed to adoption. She has since been placed in an adoptive home with her siblings.

| Child No. 80 | DOB: 6/2018 | DOD: 1/2019 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 7 months |
| Cause of death: | Sepsis due to intussusception |
| Reason for Review: | Youth in care |
| Action Taken: | Investigatory review of records |

**Narrative:** Seven-month-old medically complex youth in care was found unresponsive, with no pulse and shallow breathing, by nursing staff at a residential care facility. The nurse-initiated CPR while staff called 911. The nurse continued CPR until paramedics arrived, and paramedics continued CPR during transport to the hospital, where the baby was later pronounced deceased. The baby was born premature, at 27 weeks' gestation. The baby had remained in the hospital for six months after her birth, before moving to the residential care facility in December 2018. The baby had the diagnoses of situs inversus with dextrocardia (abnormal positioning of the heart and other internal organs), periventricular leukomalacia (a brain condition with areas of dead cerebral tissue affecting premature infants), microcephaly with simplified gyral pattern (a congenital malformation of the brain), retinopathy of prematurity (a potentially blinding eye disorder), bronchopulmonary dysplasia (a lung condition requiring oxygen therapy), patent foramen ovale (a hole in the heart), persistent emesis (vomiting), chronic pulmonary aspiration (food and liquid aspiration into the lungs), esophageal reflux, and poor weight gain. She used a gastrointestinal tube. The Department did not investigate the death.

**Prior History:** In April 2011, the mother was investigated for substantial risk of harm by neglect, following a report that the mother was stopped by police and arrested for a DUI while three of her children were in the vehicle, unrestrained, at the time of the traffic stop. This investigation was unfounded due to appeal and has since been expunged. In May 2014, the Department investigated the mother and indicated her for substantial risk of harm by neglect, inadequate shelter and environmental neglect, following a report that she was living in a filthy, abandoned building. A relative who discovered the children's living situation called the father, who had left the mother because of her drinking, to come and get the children. The children confirmed in interviews with police and child protection that they had been living in an abandoned house with no furniture and that the mother drinks regularly. The mother stated that the house was not abandoned and admitted to drinking but maintained that she was not drunk. The mother reported that she planned on leaving the children with the father until she gets herself together. The father told the investigator he wanted custody of his children and the children remained with him. About four years later, in November 2018, the mother was investigated and indicated for substantial risk of neglect and medical neglect, after a hospital social worker reported that staff had concerns about the mother's lack of participation in training on caring for her infant's significant medical needs. The then five-month-old was approaching discharge. Prior to calling the hotline, the social worker asked the mother to call daily, visit twice a week, and participate in training. Though the mother agreed to this, she did not call or visit in the weeks after the discussion. By December 2018, the investigator and supervisor had a staffing with hospital staff, who reported the mother visited on three occasions and had not participated in any training. The baby moved into a residential medical facility while the assigned investigator explored other placements. The baby's maternal aunt and her husband expressed interest in being trained and licensed as foster parents, but the baby died before they could begin.

| Child No. 81 | DOB: 11/2018 | DOD: 1/2019 | Natural |
|---|---|---|---|
| Age at death: | 2 months | | |
| Cause of death: | Congenital diaphragmatic hernia due to congenital anomalies | | |
| Reason for Review: | Pending child protection investigation within a year of the child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Two-month-old medically complex infant died in the hospital where he had been hospitalized since birth. He tested positive at birth for PCP and marijuana, but also had numerous chromosome abnormalities, unrelated to his mother's drug use. The abnormalities included sandal gap, foot deformity, overlapping fingers, bridged palmer crease, depressed nasal bridge, and redundant neck folds. He was treated for atrial septal defect, acute renal failure, anemia of prematurity, congestive heart failure, cardiomyopathy, respiratory distress syndrome, deformity of spine, and seizures. The Department investigated the mother for substance in a newborn and death by neglect. The allegation for substance in a newborn was indicated. The newborn was born with PCP in his system, the mother admitted testing positive for illegal substance while pregnant, and she refused to participate in any recommended services. The allegation for death by neglect was unfounded. The physician who pronounced the infant's death found the death to be related to medical and genetic issues.

**Prior History:** In September 2017, the hotline received a report that the mother was selling drugs from her home, her children were dirty and lived in a dirty house, and her children did not go to school. The report alleged the mother was unable to use her right-hand due to an injury from a gun-shot wound, so she did not change her younger children's diapers. The Department investigated the mother for substantial risk of physical injury/environment injurious to health and welfare by neglect and environmental neglect to her three children ages, six, three and one. The investigator observed the home of relatives, where the mother and children were visiting. She observed the home to be moderately clean. The investigation against the mother was unfounded.

| Child No. 82 | DOB: 12/2006 | DOD: 2/2019 | Natural |
|---|---|---|---|
| Age at death: | 12 years | | |
| Cause of death: | Complications from Ewing's Sarcoma | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** The twelve-year-old medically complex child suffered from Ewing's Sarcoma (a rare type of cancer that occurs in bones or in the soft tissue around the bones) and severe autism that left him non-verbal and low functioning. The twelve-year-old had initially been brought to a hospital for treatment of a right pleural effusion (buildup of excess fluid between the layers of tissue that line the lungs), secondary to a right chest wall mass because of the Ewing's Sarcoma. The child was eventually transferred to a children's hospital where he later died from complications of his illness. No autopsy was completed as the twelve-year-old had been in the hospital receiving treatment for a terminal illness.

143

NATURAL

**Prior History:**  In June 2009, the Department unfounded the mother for medical neglect to her two-and-a-half-year-old toddler (the deceased child), after it was reported that the mother missed medical appointments. In May 2013, the Department investigated and unfounded the mother's paramour for substantial risk of harm, after it was reported that the paramour got into an altercation with the mother of his child, while the child, age five, was present. In March 2016, the mother and paramour were investigated for substantial risk of physical injury/environment injurious to health and welfare by neglect to the children ages ten, eight, and four; law enforcement reported that they conducted a raid finding heroin in the home and two children present. The mother and paramour admitted that they had been using heroin for about six-months, and the paramour had been selling it to select friends. The mother and paramour denied using drugs in front of the children. The family agreed to the opening of a high-risk intact case. The maternal grandparents moved into the home on a safety plan. After the mother and paramour were released from jail, they entered intensive outpatient substance abuse treatment. The intact case remained open for six-months. The mother and paramour successfully completed the treatment program, formulated relapse prevention plans, had clean urine samples, and were involved with the children and their schools. The case was closed in October 2016. Two years later, in September 2018, the Department investigated the mother for cuts, bruises, welts, abrasions, and oral injuries to the eleven-year-old child (deceased), after school reported the child appeared to have bruising on his head and back. The investigator saw the child at school noting that what appeared to be bruising on the temples was hair stubble. The investigator instructed the mother to take the child to the doctor for an examination for the bruising on the back. The doctor noted numerous bug bits on his lower legs and a light green bruise on his lower right back. There were no bruises to the head. There were no concerns of abuse or neglect though the doctor ordered blood work due to concerns for illness. The investigation was unfounded. In November 2018, the Department investigated the mother's paramour for both cuts, bruises, welts, abrasions, and oral injuries, in addition to substantial risk of physical injury/environment injurious to health and welfare to the ten-year-old sibling, after law enforcement responded to a domestic disturbance call. The paramour reportedly slapped the ten-year-old. The paramour admitted to slapping the child because of fighting between step-siblings; he left the home at the direction of the police. The mother was not home during this incident. The investigation was unfounded for cuts, bruises, welts, abrasions, and oral injuries, as the investigator did not observe any marks at the time of her interview with the child; the mother was indicated for substantial risk. In December 2018, the Department investigated and unfounded the mother and paramour for inadequate food for the children, ages four, seven, ten, and twelve. In January 2019, the Department investigated and unfounded the grandmother's paramour for substantial risk of physical injury/environment injurious to health and welfare to the twelve-year-old child, after the child's teacher reported that the child was afraid to go home. The investigator observed the child at his school but was unable to interview him due to his nonverbal communication status. The investigator observed no visible indicators of abuse or neglect. The investigator interviewed the siblings, mother, and paramour confirming several times that they had not observed anyone hitting or hurting the twelve-year-old. The investigation was unfounded.

| Child No. 83 | DOB: 12/2018 | DOD: 2/2019 | Natural |
|---|---|---|---|
| Age at death: | 2 months | | |
| Cause of death: | Viral respiratory tract infection | | |
| Reason for Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Two-month-old infant was found unresponsive by her thirty-six-year-old foster mother after she put her to sleep in her bassinet. The foster mother reported that she put the infant to sleep around 11:00 p.m. Approximately one hour later, she checked on the infant and she was pale, limp and unresponsive. The foster mother ran next door to call 911 while her nine-year-old son performed CPR. The infant was intubated by EMS when they arrived on the scene and about four ounces of formula was removed from her stomach. The infant was transported to the hospital where she was pronounced deceased about an hour later. The medical examiner and law enforcement stated that there was no indication of abuse or neglect. The Department did not investigate the death.

144

**Prior History:** Prior to the infant being taken into protective custody, her mother had two investigations, in 2009 and 2011. The investigation in 2009 was indicated and the investigation in 2011 was unfounded. In December 2018, the hotline was contacted to report that the twenty-nine-year-old mother had given birth (to the now deceased infant) and the umbilical cord tested positive for methadone and tramadol. The infant was transferred to the NICU after showing signs of withdrawal. The Department investigated the mother for substance misuse by neglect to the infant and investigated the mother and father for substantial risk of environment injurious to health of the infant. The investigator interviewed the parents and found that the mother had a history of heroin use and she had been using methadone for the past four months. The mother reported that due to her ongoing heroin use, the siblings, ages seven and nine years old, were adopted by the maternal grandmother. She reported using heroin during her pregnancy. The father reported that he was aware that the mother was using heroin but that she did not do it in front of him. He further reported giving the mother $20.00 per day to buy heroin while she was pregnant. The infant was in the NICU for approximately a month before being discharged. The Department took protective custody and placed the infant with a friend of the mothers. In February 2019, the investigation against the mother for substance misuse by neglect was indicated and the investigation against the mother for substantial risk of environment injurious to health to the infant was unfounded. The investigation against the father for substantial risk of environment injurious to health to the infant was indicated, since he showed a blatant disregard for his parental responsibility when he provided money for the mother to obtain illegal drugs while she was pregnant.

| Child No. 84 | DOB: 9/2005 | DOD: 2/2019 | Natural |
|---|---|---|---|
| Age at death: | 13 years | | |
| Cause of death: | Cardiorespiratory arrest secondary to cardio and skeletal myopathy secondary to Pompe Disease | | |
| Reason for Review: | Indicated child protection investigation within a year of the child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Thirteen-year-old medically complex teen died at her home from Pompe Disease, a neuromuscular disorder that is multi-systemic and progressively fatal. The teen also had cardiac problems. The teen had a trach, g-tube, and was ventilator dependent. There were no suspicions of abuse or neglect and the Department did not investigate the death. It was noted on the death certificate that the mother heard the vent alarm go off, she checked on the teen and started CPR. When medical personnel arrived on the scene, they found the teen to be cold to the touch, with no breath or pulse. The teen was pronounced deceased at home.

**Prior History:**  In June 2017, the Department initiated a child welfare services referral after the hotline received a call stating the mother may need assistance with housing. The mother reportedly needed to leave her home following a dispute with her husband that led to an emergency order of protection.  The mother told the caseworker that she did not need help locating a place to stay, as she was staying with a friend. The mother reported that she would be meeting with a divorce lawyer and declined any assistance from the Department. In March 2018, a medical social worker reported that the mother left the twelve-year-old, medically complex child in the care of her in-home nursing staff, while she went out of state to see her aunt who was dying. The mother did not notify the nursing agency, social worker, or doctors, and had not responded to calls from the nursing agency supervisor in order to develop a plan.   The child's doctor instructed the nursing agency to have an ambulance transport the child to the hospital. The Department investigated the mother for inadequate supervision. The nurses told the investigator that their guidelines state that the parent needs to be accessible. The maternal grandmother was at the house most of the time but was not trained as a caregiver. The maternal grandmother told the investigator that the mother is a good mom and did not abandon her children. She went out of state because her aunt died. The maternal grandmother was being trained at the hospital to act as an additional caregiver for the child. The mother felt that this was a family emergency and the nurses could care for the child; she did not think she needed to be in the home. The investigator spoke with the child's doctor who stated that the mother needs to be physically available and be able to respond within an hour at the most. The doctor and social worker stated they would schedule a staffing to discuss a protocol for when the mother has to go somewhere, including training more people as caregivers for the child. Another nurse manager noted the child had lived longer than many children with the disease do. The Department indicated the investigation against the mother for inadequate supervision. There was no further Department involvement.

| Child No. 85 | DOB: 3/2019 | | DOD: 3/2019 | Natural |
|---|---|---|---|---|
| Age at death: | 2 days | | | |
| Cause of death: | Respiratory distress syndrome and extreme prematurity (22 weeks gestation) | | | |
| Reason for Review: | Indicated child protection investigation within a year of the child's death | | | |
| Action Taken: | Investigatory review of records. | | | |

**Narrative:** The newborn and his twin were born premature, at twenty-two weeks gestation, to their fifteen-year-old mother and eighteen-year-old father. The newborn was born with respiratory distress syndrome (RDS) and extreme prematurity and was pronounced deceased two days later. The Department did not investigate this death.

**Prior History:** The families of both teen parents have an extensive history with the Department dating to early 2000 for findings of abuse/neglect. In September 2018, the Department received a report that the teen mother disclosed to her therapist that she had been sexually abused by her cousin from the age of nine to the age of thirteen. A report was taken for the allegation of sexual molestation to the teen mother by the cousin. During her forensic interview, she described multiple incidents where the cousin touched her inappropriately over her clothing and attempted to kiss her, fondling her genitals, breast, and thighs. Her parents confirmed that the cousin was residing with the family during this timeframe but had no knowledge of the incidents between the cousin and their daughter. Subsequently, the Department indicated the cousin for sexual molestation, finding him to be an eligible perpetrator who resided on the property with the family and was in a caretaker role when the victimization occurred. The cousin later relocated to Kentucky. During an interview, the parents assured the investigator that they would never allow their daughter to have contact with the cousin again. The surviving twin remained in the hospital for five months after birth due to major medical complications also from prematurity and was taken into care following a subsequent report in July 2019.

NATURAL

| Child No. 86 | DOB: 5/2018 | DOD: 3/2019 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 10 months |
| Cause of death: | Autopsy pending |
| Reason for Review: | Unfounded child protection investigation within a year of child's death and open intact family case at the time of the child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Ten-month-old medically complex baby was "not right" when the mother went to change the baby's diaper at approximately 6:30 a.m. The mother was unable to say if the baby was conscious or unresponsive at the time. Emergency services was contacted. Upon paramedics' arrival, the baby was asystole, and a pulse could not be regained. The baby was transported to the hospital, where she was pronounced deceased. The Department initiated an investigation against the mother for death by neglect. The baby had a complex medical history of Dandy-Walker syndrome (congenital malformation that involves cerebellum and 4th ventricle), club feet, microcephaly, contractures, epilepsy, and numerous developmental delays. The mother stated that the previous evening, she did her normal routine with the baby and stated that around 8:00 pm, she gave the baby the first of her evening meds. She stated that she began her g-tube with the new bag of nourishment, as the baby was on a continuous feed all day long. She gave her a sponge bath and after the bath, the baby received more medications. After all medications were given, the mother put the baby down for the night. The following morning, at approximately 6:00 a.m., the mother stated that the machine for the g-tube beeped, letting the mother know it was time to start a new nourishment bag. When the mother went to the room to change the bag, she noticed that the baby did not seem like her normal self. She stated that she touched her feet, but she did not respond. She stated that she then put her hand in the baby's mouth, and she did not bite down using her gums, as she usually did. She stated that this scared her, and she screamed for the siblings to call 911. Paramedics arrived in a matter of minutes to the scene and began emergency services during transport to the hospital, where they continued to work on the baby for at least an hour, before the baby was pronounced deceased at the hospital. The investigation is pending, as the Department is waiting for the autopsy report.

**Prior History:**   In July 2018, the mother was investigated for medical neglect and failure to thrive after it was reported that the infant was born at thirty-six weeks gestation, weighing 5 lbs. and three weeks later, the infant weighed 3 lbs. and was hypothermic. The infant is medically complex, with the diagnosis of epilepsy, congenital brain abnormality (Dandy-Walker variant), dysmorphic features (microcephaly, low set ears, club feet), umbilical hernia, developmental delays, spasms, acute hypoxemic (respiratory failure), severe malnutrition, and failure to thrive. The mother stated that the infant was drinking her formula and breast milk. The infant would spit up a little, but she noticed that the infant was not gaining weight nor losing weight and she let the doctor know. While hospitalized, the infant's weight remained unstable and she required a nasogastric tube. In December 2018, the investigation was unfounded, and the family was referred to intact family services. In October 2018, the mother was investigated for medical neglect after it was reported that the mother and her baby left the children's hospital against medical advice, and the baby needed to be hospitalized. The mother reported that she was going to take the infant back to the hospital, but needed to go home to check on her other children, since she had been at the hospital since 11:00 a.m. The mother took the baby back to the hospital and she was admitted for the proper care. The investigation against the mother was unfounded, since there was no blatant disregard of parental responsibilities. The mother has three other children to provide care for. The mother has little or no family support after the recent death of her mother. The case was referred and opened for intact family services.

| Child No. 87 | DOB: 12/2018 | DOD: 4/2019 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 months |
| Cause of death: | Interstitial pneumonia of the lungs due to a viral illness |
| Reason for Review: | Split custody case within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Three-month-old baby was found not breathing by her twenty-three-year-old father. The father called the mother, who was at work at the time. The mother called 911. The first officers on the scene started CPR; when paramedics arrived, they attempted to perform life saving measures to no avail. The baby was pronounced deceased. The hotline was contacted to report the death; that there was a three-year-old sibling; and that the home was in deplorable conditions, as it was observed to have dirty diapers on the floor, rotting food in the sink, and there was a steak knife, hammer, and a bag of lighters that were accessible to the three-year-old sibling. The Department investigated and unfounded the father for death by neglect, with the rationale that the autopsy report determined the baby died of natural causes; indicated the father for substantial risk of physical injury/environment injurious to health and welfare by neglect to both the baby and sibling, with the rationale that the father admitted that he was under the influence of marijuana when he was caring for both children; and the mother and father were indicated for environmental neglect due to the condition of their residence.

**Prior History:** The father was involved with the Department in March 2012 when he was investigated and indicated for sexual molestation and unfounded for sexual penetration to his father's paramour's daughter. In May 2016, the hotline received a report that the father's paramour at this time, and her newborn, tested positive for cocaine and benzodiazepine. The father of the deceased child was also the father to the child born in 2016. The Department investigated the father's paramour for substance misuse by neglect. The father's paramour admitted to using cocaine and valium the weekend before she gave birth. A safety plan was put in place and the newborn was placed with the maternal grandmother. The father's paramour was referred for intact family services. The Department indicated the father's paramour two weeks later. Her intact worker recommended substance abuse assessment and treatment, random drug drops, parenting classes, and a mental health assessment. In April 2017, the intact services were switched to a placement case. The father's paramour was initially compliant with her intact services, but subsequently she slowly stopped attending her substance abuse treatment and continued to fail her drug screenings. The baby was placed in the care of her maternal aunt. The state is currently working towards the termination of parental rights for the surviving half-sibling.

| Child No. 88 | DOB: 2/2017 | DOD: 4/2019 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 years |
| Cause of death: | Asphyxia and obstruction of airway due to intratracheal granuloma |
| Reason for Review: | Closed intact family services within a year of the child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Two-year-old medically complex toddler was found having trouble breathing and unresponsive by the maternal aunt, who contacted 911. EMS arrived and transported the toddler to the hospital in full cardiac arrest where attempts were made for resuscitation, to no avail, and the toddler was pronounced deceased. The mother reported that she left for work at 6:00 a.m. and left the toddler in the care of the maternal aunt. The toddler had cerebral palsy, a gastronomy feeding tube, tracheostomy tube, and was quadriplegic. He had the diagnosis of upper respiratory tract diseases, congenital malformation of his larynx, epilepsy, and dyspnea. The toddler was receiving home health services due to the seriousness of his medical conditions through the Division of Specialized Care for Children. The Department did not investigate the death for abuse or neglect.

**Prior History:** The baby was born severely medically complex after a placental abruption at thirty-eight weeks' gestation. The baby was diagnosed with multiple issues, including cerebral palsy, and required a feeding tube. In December 2017, the Department investigated the mother for medical neglect and substantial risk to her nine-month-old medically complex baby after hospital staff reported the baby was admitted for epilepsy and the mother was not visiting the baby or participating in discharge planning. Hospital staff also reported the mother got into a physical altercation with her paramour, in the presence of the baby. The mother denied she neglected the baby and stated that she knew how to care for her son, but she had been busy working and caring for her other two children. The investigator went to the home and spoke with the mother's live-in paramour of over two years. The investigator observed a portable crib and adequate medical supplies at the residence. The investigator spoke with a physician who stated he examined the baby recently and felt the mother was complying with medical recommendations. The investigation for medical neglect was unfounded; and the investigation for substantial risk of physical injury/environment injurious to health and welfare by neglect was indicated. The case was open for intact services, as the parents had agreed to engage in services for domestic violence and assist their medically complex child. In April 2018, a hospital social worker called the hotline to report that the baby was hospitalized for a seizure disorder and that the baby had lost two pounds in two months with no organic reason for the weight loss. Hospital staff informed the investigator that once the baby's feedings were adjusted to a different formula, the baby started gaining weight in the hospital. The investigator spoke with the physicians at the children's hospital who confirmed that if the baby was not consistently taking his medications it would be considered medical neglect. During the investigation, the mother admitted to running out of the medications and the baby not having his medication. In June 2018, the mother was indicated for medical neglect and unfounded for malnutrition. In September 2018, the Department investigated an unknown perpetrator for cuts, bruises, welts and abrasions to the one-and-a-half-year-old medically complex toddler, after it was reported by the mother that she did not believe the baby was being adequately cared for at the residential children's hospital he was in. The mother reported that the toddler was found to be in soiled and wet diapers and had bruises on both sides of his neck because the ties of his tracheotomy were too tight. The nurse explained that the marks were common, due to material lying directly on the toddler's skin, and the diaper log showed that he was changed every two hours. The investigation was unfounded due to the lack of evidence that the toddler sustained injuries as a direct action of anyone responsible for his care. The family continued to receive intact family services. The toddler received care through home health nurses and the mother continued to take the toddler to medical appointments. The intact case closed successfully in February 2019.

| Child No. 89 | DOB: 9/2012 | DOD: 4/2019 | Natural |
|---|---|---|---|
| Age at death: | 6 years | | |
| Cause of death: | Congenital heart disease due to seizure disorder | | |
| Reason for Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Six-year-old medically complex child was found on his stomach by his foster mother; she noticed that he did not look well and picked him up, and he began to vomit. The foster mother noticed the child was having a seizure, so she called 911. She noticed he was having difficulty breathing and began to administer CPR. Upon EMS arrival to the scene they continued CPR while transporting the child to the hospital where he was pronounced deceased. The child had been hospitalized several times for his heart condition and seizure disorder. The cause of death was ruled congenital heart disease due to seizure disorder. The child was on medication and receiving medical follow-up. The Department did not investigate the death for abuse or neglect.

**Prior History:** In October 2012, the sixteen-year-old mother, who was a youth in care, gave birth to her second child, who was born with a heart defect. The teen mother needed to receive training on medical procedures prior to the infant being released from the hospital. The Department investigated and unfounded the teen for substantial risk. In February 2013, the mother was indicated for substantial risk to her children after selling heroin to an undercover police officer. The mother was already on probation due to two prior charges of drug trafficking but was cooperative with services in her own case in a teen parenting residential program. In December 2013, the Department investigated the seventeen-year-old mother for inadequate supervision after it was reported that the teen was arrested for possession and selling controlled substances. The mother left her children, ages, one and three, in the care of the maternal grandmother, who was not deemed as an appropriate caregiver. There was also concern that the one-year-old was not receiving the proper medications for his heart condition. The Department was granted temporary custody of the children and the children were eventually placed with a specialized foster parent in January 2014. The foster mother was unfounded in two investigation for substantial risk from 2014 through 2016. In June 2018, the foster parent was investigated and unfounded for inadequate supervision to both foster children, ages, five and seven, after the foster parent found the five-year-old unresponsive in his bedroom. The initial story of how the five-year-old was found changed, resulting in an investigation, but it was determined that the children felt safe at home and there were no concerns. In March 2019, the six-year-old was admitted to the hospital after having a tonic-clonic seizure lasting one and a half minutes at daycare; he died one month later.

| Child No. 90 | DOB: 2/2006 | DOD: 5/2019 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 13 years |
| Cause of death: | Acute asthma exacerbation |
| Reason for Review: | Unfounded child protection investigation within a year of the child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Thirteen-year-old was pronounced deceased at a hospital emergency room. The teen had a history of asthma and had been complaining of shortness of breath. The teen was receiving a nebulizer treatment when she fell over backwards. Her family performed CPR and called 911. The teen was transported by ambulance to the hospital where she was pronounced deceased. The Department did not investigate her death.

**Prior History:** In January 2019, a hospital social worker contacted the hotline after a twelve-year-old youth (the deceased) gave birth to a baby. It was reported that the twelve-year-old youth had significant cognitive delays. The father of the baby was reported to be fifteen-years-old, who previously resided with the family. The twelve-year-old disclosed that she and the teen were playing outside when the teen suggested that they have sex and the twelve-year-old said yes without knowing what sex was. The police were contacted. An allegation of sexual penetration to the twelve-year-old by the teen was taken for investigation. The investigator went to the hospital where she observed the newborn. The investigator spoke with the social worker, who advised the investigator that after she contacted the hotline, she learned that the teen was never a household member. She denied knowing she was pregnant until she went to the hospital to give birth. Her mother told the investigator that the teen male lives with his grandfather. She said it was normal for the teen and her daughter to hang out as they had been raised together. The mother reported not knowing that the twelve-year-old was pregnant. She reported asking the twelve-year-old if she was sexually active, which she denied. She stated that her daughter admitted to her that morning that she had sex with the teen twice. The mother stated that the twelve-year-old went into labor and they called for an ambulance, got to the hospital, and the baby was born quickly. The investigation against the teen was unfounded as he was not a household member or a family member and was therefore not an eligible perpetrator. The baby was placed with the maternal grandmother.

| Child No. 91 | DOB: 12/2018 | DOD: 5/2019 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 ½ months |
| Cause of death: | Bacterial sepsis due to intestinal obstruction and infarct due to torsion and volvulus of the small intestine |
| Reason for Review: | Unfounded child protection investigations within a year of the child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Four-and-a-half-month-old was found in his baby swing by his maternal grandmother with vomit coming out of his mouth and not breathing. EMS transported the baby to the hospital where he was pronounced deceased. The Department investigated the mother and the maternal grandmother for death by neglect to the baby and substantial risk of physical injury/environment injurious to health and welfare by neglect to the one-year-old sibling. At approximately 9:30 a.m., the mother left the baby and sibling with the maternal grandmother. The maternal grandmother stated that she checked on the baby twice between the time the mother left and when she found the baby unresponsive at approximately 12:05 p.m. The maternal grandmother left the baby sleeping in the baby swing upstairs while she was with the sibling downstairs. The autopsy concluded that the baby died due to bacterial sepsis due to intestinal obstruction and infarct due to torsion and volvulus of the small intestine (his small and large intestines were so twisted, they had flipped positions). This condition is one that had developed and was not present at the baby's birth. The investigation was unfounded.

**Prior History:**   The maternal grandmother was involved in nineteen investigations with the Department from February 2004 until January 2019, four of which were indicated. In March 2005, the maternal grandmother was indicated for inadequate supervision to her three children (ages eight, seven and two years) after a report that she left the children unattended while drinking in a tavern. In May 2007, the maternal grandmother was indicated for medical neglect and inadequate food to her ten-year-old child, after a report that she failed to keep up with the ten-year-old's medical appointments and that the child appeared to be emaciated. From this investigation, an intact family services case was opened in May 2007 and closed successfully in January 2009, as all safety goals were satisfied. In March 2011, the maternal grandmother was indicated for medical neglect to her fourteen-year-old son after a report that the teen was admitted to the hospital with low traces of seizure medication in his system, he had been losing weight due to underfeeding, his g-tube was extremely dirty, and his parents failed to take him to several doctor appointments. The Department took custody of the teen in March 2011. Due to the teen's medical complexities, he remained in a medical facility until his death by natural causes in October 2016. The family case was closed in November 2012 for the parents' lack of participation. In December 2013, the maternal grandmother was indicated for inadequate supervision after a report that the maternal grandmother left her children (ages seventeen and eleven) in the shelter because she showed up to the shelter intoxicated, blew over the breathalyzer limit, and was denied access. An intact family case was opened in January 2014 and closed in August 2014. The maternal grandmother completed substance abuse and mental health services. In January 2019, the maternal grandmother was investigated for inadequate supervision after her seventeen-year-old daughter (maternal aunt to the deceased) reported to school personnel that she did not know where she was going after school because her mother (maternal grandmother) was homeless. The counselor contacted the school counselor who informed the investigator that the teen reported that her mother had hit her and pulled her hair. The mother had also been evicted in December and the seventeen-year-old was staying with her sibling (mother of the deceased baby). The teen left the home after being confronted by her mother in the home. The teen went to stay at her boyfriend's house with her father's consent. The father stated that he talks to the teen daily and that he met the family and felt she was safe there. The father further stated that the teen called him, and she could live with him, but he did not have custody. In March 2019, the investigation was unfounded with the rationale that the mother made a care plan for the teen to stay with her sibling after being evicted. The teen left the home on her own and was not asked to leave.

| Child No. 92 | DOB: 12/2014 | DOD: 5/2019 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 years |
| Cause of death: | Right subdural hemorrhage |
| Reason for Review: | Unfounded DCP investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Four-year-old medically complex child was admitted to the hospital in March 2019 where she stayed until her death in May 2019. The child had a history of dextrocardia and transposition of greater vessels; both are congenital conditions. The hospital staff was caring for the child at the time of her death. The Department did not investigate the death.

**Prior History:**  The mother had three unfounded investigations. One was in January 2015 for substance misuse. One was in April 2016 for environment injurious to health and welfare. In September 2018, the Department investigated the mother for substantial risk of physical injury/environment injurious by abuse to her twelve-year-old daughter, after it was reported that the mother was slapping and punching the twelve-year-old. The twelve-year-old told the reporter that she had bruises in the past but did not have any when the report was made against the mother. The investigator met with the twelve-year-old at school, who reported that she and her mother have a strained relationship. She reported feeling safe in the home. She stated that her mother does yell and get angry, but denied her mother getting physical with her. She also reported being depressed. The mother stated that she and her daughter don't have a good relationship because the twelve-year-old thinks she is a grown up. The mother stated that she must yell to get her daughter to do chores. The mother denied being physical with the twelve-year-old. The mother further stated that the twelve-year-old is scheduled to see a counselor. The investigator met with the ten-year-old sibling, who reported feeling safe in the home and denied being physically disciplined by her mother. The ten-year-old stated that the mother makes them go to time out as a form of discipline. The youngest sibling, the (now deceased) three-year-old was not interviewed due to her age. The three-year-old did not appear in any distress. All children were observed to be clean and appropriately dressed. In October 2018, the investigation was unfounded.

| Child No. 93 | DOB: 6/2019 | DOD: 6/2019 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | Newborn |
| Cause of death: | Premature delivery due to uncertain etiology |
| Reason for Review: | Open placement case |
| Action Taken: | Investigatory review of records |

**Narrative:**  A premature infant, born at twenty-two-weeks' gestation, died shortly after his birth. The mother and newborn were transported to the hospital after giving birth to the infant in the toilet. The newborn was pronounced deceased a short time later. Blood and urine tests conducted by the hospital on the mother were positive for cocaine and marijuana. The Department indicated the mother for substance misuse, but unfounded her for death by neglect, as there was insufficient evidence to support that cocaine caused the pre-term labor.

**Prior History:**  The deceased's parents had a history with the Department as children. As a parent, the mother had two unfounded reports of child abuse/neglect from December 2016 to March 2018, and five indicated reports from July 2018 through June 2019. The father had two indicated reports from January 2019 through March 2019. In December 2016, the mother was investigated and indicated for substantial risk of physical injury/environment injurious to health and welfare, and inadequate food. In March 2018, the Department unfounded and closed the investigation against the mother for substantial risk of physical injury/environment injurious to health and welfare, inadequate supervision, and environmental neglect to her one and two-year-old after it was reported the house was in deplorable condition and the children were left without diaper changes. The report indicated that the mother and paramour would leave the children screaming in their bedroom, in the morning. There were no major risk factors identified by the investigator in the home at the time, and the parents were encouraged to keep the home clean. In July 2018, the Department investigated the mother and she was indicated for inadequate supervision to the eleven-month old, one-year-old, and two-year-old, after it was reported that the mother and paramour left the children home alone. The investigator found the minors home alone the day she responded to the report. The minors were confined to a room, so that they couldn't exit when the mother and paramour would leave the home. The investigator requested community-based services for the family. In January 2019, the mother and paramour (father of the deceased newborn) were investigated and indicated for substantial risk of physical injury/environment injurious to health and welfare, environmental neglect, and inadequate supervision, after it was reported that the mother and paramour used marijuana and cocaine in the presence of the children. The children shared a bedroom that had one broken crib for the one-year-old and no beds for the two older children. The children slept on the floor, which was reported to be covered in wet and dry human urine and feces. In March 2019, the hotline was contacted twice regarding this family. The mother was investigated for inadequate food and substantial risk of physical injury/environment injurious to health and welfare to the three, two, and one-year-old after it was first reported that the mother had no money to buy food to feed her children. There were reports of numerous people in and out of the home getting high in the presence of the children. The mother was pregnant when she and her and children were evicted from their apartment. The second report in the same month was due to the mother, paramour (father of the deceased newborn), and unknown male fighting in the presence of the children. The unknown male threw a rock at the vehicle of the mother and paramour, which caused the glass to shatter on one of the children. The children were taken in protective custody, and a placement case was opened on the family. The mother was indicated by the Department for the first investigation in March 2019.  The Department indicated both the mother and paramour for the second investigation for substantial risk of physical injury/environment injurious to health and welfare. The placement case remained open at the time of the newborn's death.

| Child No. 94 | DOB: 11/2014 | DOD: 06/2019 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 years |
| Cause of death: | Brain herniation due to staph aureus meningitis and ventriculitis due to ventriculoperitoneal shunt malfunction and infection and cardiopulmonary arrest |
| Reason for Review: | Youth in care |
| Action Taken: | Investigatory review of records |

**Narrative:**  Four-year-old medically complex youth in care diagnosed with Dandy Walker malformation, hydrocephalus with shunt placement, global developmental delay, blindness, and seizures died after complications related to hospitalization. The child was hospitalized after one of his shunts was found to be infected. During the surgery to replace the shunt, the child coded four times. The child was placed on a ventilator and passed away the following day. The Department did not investigate the child's death.

**Prior History:** In October 2016, the hotline was contacted to report that the mother was consistently missing medical appointments for her then one-year-old medically complex child. The child was admitted to the hospital; he had three seizures in a quick succession and was found to have no detectable levels of his anti-seizure medications. After discharge, the prescriptions were sent to the pharmacy, but the mother never picked them up. The mother was investigated and indicated for medical neglect to the one-year-old, after a physician stated that the mother was medically neglectful by not giving the baby his needed seizure medication as prescribed, missing medical appointments, and not following up with the treatment appointments or plan. In February 2017, the hotline was contacted when the child was admitted to the hospital again for seizures and was diagnosed with non-organic failure to thrive. This was the toddler's third hospital admission for his seizures. The mother was also not taking the toddler or his four-month-old sibling to their medical appointments. The mother was investigated and indicated for medical neglect to the toddler and for substantial risk of physical injury by neglect to the infant sibling. Both minors were taken into protective custody and the Department was granted temporary custody. The infant was placed with a maternal great aunt and the toddler was eventually placed in a traditional foster home. The toddler continued to attend all his scheduled medical appointments and therapies with his foster parent. The mother was compliant with services and had regular visitation with both children. In April 2019, two months prior to the child's death, the two-year-old sibling returned home to mother and she signed consents for the deceased to be adopted. At the time of the child's death the Department was looking for an adoptive home for the child.

| Child No. 95 | DOB: 10/2013 | DOD: 6/2019 | Natural |
|---|---|---|---|
| Age at death: | 5 years | | |
| Cause of death: | Congenital heart disease | | |
| Reason for Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Five-year-old medically complex girl died while in hospice care. In April 2018, the then four-year-old child was admitted to the hospital, as she was on a list for a heart and lung transplant. In May 2018, during this hospital stay, the hotline received a report that the mother was found unconscious in the child's hospital room because of an opiate overdose. The mother admitted to using heroin and told the child protection investigator that she would do whatever was needed to maintain custody of her child. The mother tearfully explained that she was feeling alone and someone, who had befriended her in the hospital several weeks ago offered her heroin. The mother was indicated for inadequate supervision and substantial risk of physical injury/environment injurious to health and welfare by neglect and agreed to intact family services. In June 2018, before the intact case was opened, the mother overdosed a second time. The Department took protective custody of the child. Around this time, the child's health was declining, as her liver function was dropping; she was removed from the transplant list. The hospital ethics board participated in a staffing and determined that the child would receive end of life care. The child was moved to a palliative care facility with the hope that she could go home with her mother before she passed away. The mother was allowed supervised visits with the child, but she did not participate in the mental health and substance abuse services for which the worker had provided referrals. She had some clean drug drops but in March 2019, she dropped positive for methamphetamines. In April 2019, while the child's health was steadily declining, the mother stopped visiting with no notification. In June 2019, the mother reported that she had been arrested and was in jail. The worker contacted the judge to update him about the status of the child's health. The judge granted the mother a week's leave with the option of an extension, if needed. Approximately six days later, the child passed away. The Department did not investigate the death.

**Prior History:** In July 2014, the Department investigated and unfounded the mother for inadequate shelter to her then ten-month-old daughter (the deceased), following a report that the trailer the mom and baby were living in had mold on the walls, floors and ceilings; a floor in one of the bedrooms was completely gone; and the rest of the floors were unsafe to walk on. This was especially problematic for the baby, since she had a heart condition. In August 2015, the Department investigated and unfounded the mother for environmental neglect to the deceased, then one-and-a-half years old, following a report that the mother's home was full of clothing and garbage, including clothes and garbage overflowing in a crib. In July 2017, the Department investigated and unfounded the mother for medical neglect to her then three-year-old daughter, following a report that the child was scheduled for open heart surgery, but the mother and her boyfriend left the hospital. There was concern that the mother was selling her child's heart medication instead of administering it. These investigations have since been expunged.

155

NATURAL

| UNDETERMINED |
| --- |

| Child No. 96 | DOB: 7/2014 | DOD: 7/2018 | Undetermined |
| --- | --- | --- | --- |

| Age at death: | 3 years |
| --- | --- |
| Cause of death: | Carbon monoxide toxicity due to inhalation of products of combustion due to apartment fire |
| Reason for Review: | Youth in care |
| Action Taken: | Full investigation; Report to Director 6/17/2019 |
| | **See Death and Serious Injury Investigation 8** |

**Narrative:**  Three-year-old youth in care died in an apartment fire. The toddler lived with a relative foster parent, a friend (roommate) of the relative foster parent and the toddler's three siblings, ages, two, eight and nine. At the time of the fire the relative foster parent and the three siblings were out of the home. The relative foster parent admitted to leaving the toddler at home, asleep in a bedroom with the door closed. The relative foster parent stated that she did inform the roommate, who was sleeping in another room, that she was leaving the toddler in the bedroom asleep. The roommate awoke to the fire alarms and exited the building. When the roommate called the relative foster parent to report the fire, the relative foster parent asked if the toddler was out of the apartment. The roommate responded she was not aware the toddler was in the apartment. The roommate alerted firefighters and EMS went into the building and recovered the toddler, who was unresponsive. EMS performed CPR and transported the toddler to the hospital where he was pronounced deceased. The Department investigated and unfounded the relative foster parent for death by neglect to the toddler and substantial risk of physical injury/environment injurious to health and welfare by neglect to the siblings. The relative foster parent was indicated for inadequate supervision to the toddler.

**Prior History**:  The toddler's mother was investigated and unfounded twice prior to the children coming into the Department's care. In December 2015, the Department investigated and unfounded the mother for cuts, bruises, and welts, after it was reported that the five-year-old sibling stated that his mother caused a bruise on his forehead. In November 2016, the Department investigated and unfounded the mother for substantial risk of physical injury/environment injurious by neglect to the six-year-old sibling, after it was reported that the child brought a screwdriver to school and reported that he had access to needles at home. In September 2017, the Department investigated the mother for environment injurious, risk of physical injury and neglect to her children, ages, eight, seven, three and one-years-old; medical neglect to the eight-year-old and seven-year-old after it was reported that the mother threatened to kill her children. Additionally, the reporter stated that the mother and her paramour beat the older boys, bruising their backs and legs and the Department investigated the mother's paramour for cuts, welts and bruises.  The reporter had sent two videos to the Department investigator that showed the mother pregnant, choking the eight-year-old, who was gasping for breath. The other showed the mother harshly jerking the one-year-old. The investigator showed the videos to the police and the mother was charged with two counts of aggravated battery.  The investigator placed the children in relative foster care. The toddler's two older brothers had been psychiatrically hospitalized several times. Both brothers had mental health diagnoses and were prescribed multiple medications to manage their behaviors. They continued to have behavioral issues living in their relative foster home and had additional psychiatric hospitalizations. In February 2018, the Department investigated and indicated the mother for substantial risk of physical injury/environment injurious by neglect to the newborn sibling, after it was reported that the mother had given birth. The Department took custody of the newborn, as the mother had not completed services and the four siblings were still in care. In January 2018, the Department investigated and unfounded the relative foster parent for inadequate supervision and substantial risk as to concerns about the seven-year-old's inappropriate behaviors. In May 2018, a clinical staffing determined that the toddler's older siblings needed specialized foster care services and their cases were transferred to a private agency.

| Child No. 97 | DOB: 5/2018 | DOD: 7/2018 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 ½ months |
| Cause of death: | Positional asphyxia |
| Reason for Review: | Indicated child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Two-and-a-half-month-old infant was found unresponsive after co-sleeping with his parents on an adult bed. The father was lying in bed between the mother and father. The father woke up at approximately 6 a.m. and discovered a pillow on top of the infant. The father lifted the pillow and observed the infant to be blue in color and cold to the touch; he started CPR and the mother called 911. The infant was taken by ambulance, to the hospital where he was pronounced deceased. The Department and law enforcement investigated the death of the infant, who was born prematurely, and substance exposed, but had no known medical condition. Law enforcement searched the home and there were no drugs or paraphernalia found in the home. The parents admitted to consuming alcohol before co-sleeping with the infant. Both parents reported smoking marijuana while at a concert the night prior, and then picking their two children up from the grandparent's house. The parents completed a drug test, and both tested positive for THC. The parents were indicated for death by neglect and substantial risk of physical injury/environment injurious to the deceased infant's one-year-old sibling. Dangers of co-sleeping were addressed with the mother in a prior investigation. There were no criminal charges pursued.

**Prior History:** In May 2018, a nurse contacted the hotline to report that the infant was born at 33 weeks; his urine tested positive for opiates, and his cord test was positive for cannabis only. The mother's tests were negative. It was reported that the newborn was doing well but was still hospitalized. The Department investigated the mother for substance misuse and neglect. The newborn was observed in the nursery and did not show any symptoms of withdrawal. The mother told the investigator that she advised the hospital at delivery, that she had taken Tylenol with codeine for a toothache the day before. The investigator asked to see the prescription; the mother said that it wasn't prescribed, and she got it from a friend. The mother also admitted to the use of marijuana during her pregnancy saying that it helped with nausea during pregnancy, but she hadn't used now for a few weeks. She said she had her son 7 weeks early due to placental and urinary tract infections a couple of weeks before delivery. She further indicated that she did not finish the prescribed antibiotics. The mother reported that she was on methadone until a year ago and used it to get off heroin. She said she used off and on for four years, until July 2016. The mother agreed to random drug testing. The investigator observed the mother's one-year-old with no signs of injury or marks. The father stated that he was aware that the mother took some Tylenol with codeine for a bad tooth just before delivery. He was also aware that she smoked marijuana occasionally. The father said that he would divorce the mother if he knew she was using heroin. The father also admitted that he smoked marijuana with a friend on the day his son was born to celebrate. He denied regular use and said he would drop any time. At her last visit, the investigator reminded the mother of risks associated with co-sleeping because the newborn was lying in bed with her when the investigator arrived. His crib was full of items and the investigator offered to help clear them out, but the mother said she was still using the bassinet. The investigator talked to the doctor's office, who reported that the minors were seen regularly since birth; both minors had upcoming appointments. The mother was indicated for neglect by substance abuse.

| Child No. 98 | DOB: 7/2018 | DOD: 7/2018 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 21 days |
| Cause of death: | Undetermined |
| Reason for Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

157

**Narrative:**  Twenty-one-day old infant found unresponsive by his thirty-seven-year-old father after co-sleeping with his eleven-month-old sibling and father on a futon. The father reported that he fed the infant at approximately 1:00 a.m. The father was playing a video game on the futon and placed the infant next to him on his left side, and the eleven-month-old sibling on the other side. The father fell asleep while playing video games and when he woke up at around 6:00 a.m., the father observed the sibling playing with the infant, who was unresponsive. The father awakened the mother who was sleeping in her bedroom, then called 911. EMS arrived and attempted CPR; the infant was transported the hospital where he was pronounced deceased. The father did not reside in the home with the mother and children (eleven-month-old sibling and six-year-old half-sibling) but spent a lot of time in the mother's house, especially to help the mother after the birth of the infant. The Department investigated the father by neglect to the infant, and substantial risk of physical injury/environment injurious by neglect to the eleven-month-old sibling. The emergency room physician stated that the infant had no signs of abuse or neglect and further stated that the parents were appropriate and extremely upset. The infant was seen by the pediatrician 17 days before he died. The pediatrician stated that the baby was well cared for and he had no concerns; there were no concerns with the two siblings. An autopsy was completed, and the cause and manner of death was undetermined. The investigation was unfounded with a referral for community services.

**Prior History:**  In October 2014, law enforcement contacted the hotline to report that the mother's four-year-old was in the care of the mother's paramour (father of the infant and eleven-month-old) from 2:00 p.m. to 11:00 p.m., while she was at work. After the mother returned home from work, she noticed swelling to her daughter's right leg; the mother took her to the hospital where she was found to have an unexplained bone fracture in her shin area, on her right leg.  The Department initiated an investigation for bone fractures and inadequate supervision. The doctor reported that the child would not have been able to walk once the injury occurred. The paramour admitted to leaving the child home alone earlier that day, when he walked to the library. The paramour was indicated for bone fractures and inadequate supervision to the mother's four-year-old daughter. In June 2018, a nurse contacted the hotline to report that the mother's six-year-old daughter told her aunt that the mother's paramour (father of the infant and eleven-month-old) had been touching her bottom; he put his finger in her butt. The aunt called the mother and the mother immediately brought the child in for an exam. There were no signs of injuries or trauma. The paramour did not reside in the home but frequents the home since he is the biological father to the child's siblings. The nurse reported that the child is noted to be developmentally delayed and has difficulty with speech. The Department initiated an investigation for sexual penetration to the six-year-old and substantial risk of sexual abuse to the ten-month-old half-sibling. The doctor examined the entire body and found no genitalia trauma or redness. The doctor stated that when she asked the child what occurred, the child gave several different stories. The doctor stated that the mother was very appropriate and told the child to tell whatever happened. The child never made an outcry of any sex abuse to the nurse, and the mother stated that her child never made an outcry to her; she had no concerns of any sex abuse. The child made no outcry during a forensic interview. The paramour denied that he ever touched the child inappropriately; he stated that he never bathed or dressed her, and that she used the bathroom by herself. The investigation was unfounded.

| Child No. 99 | DOB: 3/2017 | DOD: 8/2018 | Undetermined |
|---|---|---|---|
| Age at death: | 1 year, 4 months | | |
| Cause of death: | Sudden unexcepted death in childhood | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  One-year-old girl was found not breathing by her twenty-eight-year-old mother. When the ambulance arrived, it was clear that the child had been deceased for several hours. The child was transported to the hospital via ambulance where she was pronounced deceased. The mother reported that the child had a temperature of 101° the previous evening; she gave her Tylenol and put her to bed at 10:30 p.m. The mother reported that she checked on the child at 1:00 a.m. and that she was moving, but asleep. At 1:00 p.m. the mother woke up again, got ready for the day, and checked on the child at 1:45 p.m., when she found the child not breathing. The father was not home at the time of the death, as he is an over the road truck driver. The home was reported to be filthy. The Department investigated and indicated the mother for environmental neglect with the rationale that the home was found to be in deplorable conditions. The child's room was cluttered, dusty, and a fan in the room was hazardous. The mother was a stay-at-home mom and primary caretaker of the child. The mother was investigated and indicated for medical neglect with the rationale that the she failed to check on her febrile daughter for 12 hours. The mother was investigated and unfounded for death by neglect. The rationale was that no identified cause supported the death being caused by neglect.

**Prior History:**  The Department hotline was contacted in June 2018 to report that the fourteen-month-old child was seen in the emergency room for a rash around her mouth. There were concerns that there was a lack of medical attention since the child's birth. It was reported that the child did not have a primary care physician, and that the child's parents were not forthcoming with information when they brought her to the emergency room. It was reported that the child never had a follow up appointment with a primary care physician; the mother contributed to this by not having medical insurance. The Department investigated both the mother and father for medical neglect. The child protection investigator met with the parents who insisted that the child was seen by physicians since birth. The investigator confirmed this information with said facilities. The emergency room physician also informed the investigator that the child was in good health and that he did not feel comfortable indicating the family. The family made a follow up visit and indicated a willingness to take the child for medical care. The family also agreed to get medical coverage and set the child up to see a primary care physician. The child was released from the hospital with an antibiotic for the rash. The investigator observed the child in the home, and she appeared to have a bond with her parents. The home was in an appropriate condition. In June 2018, the child was determined to be safe at the time. The investigation against the parents was unfounded for medical neglect.

| Child No. 100 | DOB: 5/2018 | DOD: 9/2018 | Undetermined |
|---|---|---|---|
| Age at death: | 4 months | | |
| Cause of death: | Undetermined | | |
| Reason for Review: | Closed Child Welfare Services Referral within a year of the child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  Four-month-old baby found unresponsive by his fifty-five-year-old great-grandmother at approximately 7:00 a.m. The baby, his one-year-old sibling, and the great-grandmother were sleeping together on a twin-size bed. The great-grandmother stated that the last time she saw the baby alive was at approximately 5:00 a.m. The great-grandmother was caring for the children at her home to help the mother. The Department initiated an investigation against the great-grandmother for death by neglect. An autopsy was performed, and it was reported that the baby had an issue with hydronephrosis, which is a condition that typically occurs when a kidney swells due to urine failing to properly drain from the kidney to the bladder; causes can vary from blockages to problems with the urethra muscle. The baby was medically monitored for this condition which was improving; however, the autopsy found that the baby was still experiencing hydronephrosis of the left kidney. Two fatal complications caused by hydronephrosis were ruled out and the cause of death was undetermined. The Department unfounded the investigation against the great-grandmother.

**Prior History:** At the time of the deceased baby's birth, the mother was seventeen-years-old and had another child who was a year old. In June 2018, a social worker from the hospital called the hotline asking for child welfare services to assist the mother with the baby. The social worker told the Child Welfare Specialist that in May 2018, the renal doctor told the mother to feed the baby 2-3 ounces of formula every two to three hours. The social worker noted that the infant was brought in for a follow-up appointment a week later and had lost weight. Between the time of the call and the discussion, the baby had gone back to the hospital, and had gained weight. The social worker added that the teen mother was meeting with a dietician at the hospital. The Child Welfare Specialist was going to refer the teen mother to a community-based program for community support. The Child Welfare Specialist met with the teen mother and brought a pack-n-play for her one-year-old child; the specialist observed that the infant already had a pack-n-play. The Child Welfare Specialist discussed safe sleep practices with the teen mother. The Child Welfare Specialist also discussed the teen mother's needs. The teen mother shared that the children's father passed away in 2017. She was currently working three days a week and attending college every afternoon. The maternal great-grandmother and the children's paternal grandmother are supportive and care for her children while she works and goes to school. The teen mother explained that she was referred for teen parent services, showing the specialist a letter with an appointment set for August 2018. The mother also showed the Child Welfare Specialist that she had three doctor appointments scheduled for her infant son in August 2018. The Child Welfare Specialist provided mother with information from Child and Family Wellness Center for parenting classes. The home was observed and appeared appropriate. The Child Welfare Specialist checked in with the hospital social worker who reported that the baby had been referred to a renal specialist for kidney issues noted at birth. The mother made a follow-up appointment for the baby for August 2018 and the medical staff did not have any further concern about the baby's weight. Both grandmothers reported that even though the mother was young, she was a good mother and made sure the children had everything they needed. The Child Welfare Specialist observed the children, noting no concerns. The Child Welfare Services referral was closed in July 2018.

| Child No. 101 | DOB: 1/2018 | DOD: 10/2018 | Undetermined |
|---|---|---|---|
| Age at death: | 9 months | | |
| Cause of death: | Asphyxia due to co-sleeping | | |
| Reason for Review: | Pending child protection investigation at the time of the child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Nine-month-old was found unresponsive by his forty-one-year-old father at approximately 2:30 a.m. The baby was co-sleeping in an adult bed with both parents. The father woke the mother and called 911; the infant was transported by ambulance to the hospital where he was pronounced deceased. The Department investigated the parents for death by neglect to the baby and for substantial risk of physical injury/environment injurious to health and welfare by neglect to the two-year-old sibling. It was reported that the baby was sleeping in the middle of the parents. There were several pillows observed on the bed. There were no signs of obvious trauma. Family members reported that the baby and sibling have co-slept with parents since birth; even though a crib and toddler bed were observed in the home. The investigation against the parents was indicated.

UNDETERMINED

**Prior History:** In April 2018, the mother and father were investigated for substantial risk of physical injury and environment injurious to their children (ages two-years and three-months) after it was reported that there had been a domestic violence incident between the parents approximately one week prior.  The paternal grandmother stated that she had concerns about the safety of the children, due to the mother's alcohol consumption. She was concerned about any effects of her drinking and breastfeeding the children. The mother denied fear of the father and further stated that the father is never violent or abusive in any way towards the children. During the incident, the children were downstairs sleeping and when it escalated the mother and father went upstairs, where the paternal grandmother was, and she called 911. The mother stated that she does breastfeed both children, but not when she is intoxicated. The investigator recommended that she does not consume alcohol when she is caring for or breastfeeding her children. The father stated that he did have concerns regarding the mother's recent alcohol consumption. The mother agreed to abstain from alcohol use, agreed to have the children seen by their primary care physician, and have a substance abuse assessment. The father agreed to ensure that the children were not left in the care of the mother if she were intoxicated, and to not allow her to breastfeed the children if she had consumed alcohol. The children were seen by their physician who reported that they were healthy and developmentally on track with no signs of abuse or neglect. Also, there was no evidence that the children had consumed alcohol via breast milk. In June 2018, the investigation against the parents was unfounded. In May 2018, while the first investigation was pending, the hotline was contacted to report that the mother was in the basement with her children, yelling at them while intoxicated. The mother accidentally called 911 and hung up on them. When the police called back, she did not answer the phone. Police arrived on the scene and observed the mother to be very intoxicated. The Department investigated the mother for inadequate supervision.  The mother acknowledged consuming wine while being the sole caregiver for the children, as the father and the paternal grandmother were out for Mother's Day. In July 2018, the investigation against the mother was indicated. In June 2018, while the second investigation was pending, the hotline was contacted to report that there was a domestic violence incident with police response; no arrests were made. The Department investigated the parents for substantial risk of physical injury/environment injurious to health and welfare by neglect. The investigator spoke with police, who confirmed the domestic call. The parents agreed to separate for the night. The children were not present during this altercation, as they were downstairs. In July 2018, the investigation of the parents was unfounded. In September 2018, the hotline was contacted for a fourth time to report the mother's consumption of alcohol. It was reported that she was drinking whiskey every night and breastfeeding her children. The Department investigated the mother for substantial risk of physical injury and environment injurious to health and welfare by neglect. A good-faith attempt to meet the mandate was made; however, no other contacts were made prior to the baby's death in October 2018. In November 2018, the mother was indicated, based on her history of substance use, videos of the her intoxicated, and text messages indicating that she was drunk.

| Child No. 102 | DOB: 6/2018 | DOD: 10/2018 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 months |
| Cause of death: | Sudden Unexpected Infant Death with co-sleeping |
| Reason for Review: | Open Intact Family Services case at the time of the child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**  Four-month-old was found unresponsive by his father; he was transported to the hospital via ambulance where he was pronounced deceased. At approximately 8:00 a.m. the mother laid the baby (who was asleep) on the father's chest while he was lying in bed dozing. The father woke up at approximately 12:00 p.m. and left the room for a few minutes; he returned to the room and the baby was unresponsive. The mother contacted 911 and performed CPR on the baby until police and an ambulance arrived. The baby was transported to the hospital where he was pronounced deceased. An autopsy attributed the death to Sudden Unexpected Death with co-sleeping. Toxicology reports showed that the baby had methamphetamine in his system at the time of his death. The coroner's notes indicated that the presence of methamphetamine could not be affirmed nor ruled out as a contributing factor. The parents admitted to using methamphetamine in the days prior to the baby's death. The mother and father were investigated and indicated for death by neglect to their baby. The three surviving children were taken into protective custody and are currently placed in foster care.

**Prior History:**  In September 2017, the family came to the attention of the Department when the hotline was contacted to report that the mother uses "Meth" and has three children ages ten, eight, and five-months old. The mother's paramour went to the store, leaving the mother at home alone with the children; he returned to find the mother unresponsive from a drug overdose. The mother was hospitalized and admitted to taking an excessive number of pills with the intent to commit suicide. The mother admitted to using "Meth" while parenting her children. The paramour, a recovering addict, lived in the home with the mother and her children. A safety plan was put in place and the family was referred to Intact Family Services. In November 2017, the investigation was indicated. While this investigation was pending, the hotline was contacted by the child protection investigator to report a domestic violence incident between mother and live in paramour. When the investigator went to the home, the mother answered the door crying and stated that the paramour had just beat her up, while her six-month-old was present. There is a history of domestic violence between her and the paramour. The Department investigated the mother and paramour (father to the six-month-old) for substantial risk of physical injury/environment injurious to health and welfare by neglect. The mother filed an Order of Protection but did not follow through with it. The paramour took full responsibility of what took place; he stated that he relapsed and used "Meth" two or three days prior to the incident. In December 2017, the mother was unfounded and the paramour (father to the six-month-old) was indicated. Intact family services began after the first investigation and closed in October 2018, at which time, it was noted that this family had made significant progress in addressing all the issues that brought them to the attention to the Department.

| Child No. 103 | DOB: 9/2018 | DOD: 11/2018 | Undetermined |
|---|---|---|---|

|  | |
|---|---|
| Age at death: | 1 ½ months |
| Cause of death: | Undetermined |
| Reason for Review: | Unfounded child protection investigation within a year of the child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** One-and-a-half-month-old infant was found unresponsive in his pack-n-play by his fifteen-year-old mother. The mother put the infant to bed at approximately 11:30 p.m., she laid him down on his back, swaddled in a pack-n-play. The pack-n-play had two small stuffed animals, head pillow, and two blankets. At 9:00 a.m. the mother woke up to find the infant on his back and unresponsive. The mother yelled to the infant's seventeen-year-old father; who found the infant purplish in color, cold and not breathing. The mother called 911 while the paternal grandfather attempted CPR. EMS arrived on the scene took the infant to the ambulance where CPR was attempted; however, there were no signs of life in the infant and he was pronounced deceased on the scene, at 9:35 a.m. by the Deputy Coroner. The Department investigated the mother for death by neglect. The investigator observed the home to be clean and free of environmental hazards. The coroner noted no abuse or abnormal findings, and listed the cause of death as undetermined, with the death possibly caused by bedside asphyxia. The investigation against the mother was unfounded.

**Prior History:** The families of the minor parents to the deceased infant had a history with the Department. In February 2018, the hotline was contacted to report that the paternal grandfather, while in jail, allowed his sixteen-year-old (father of the decedent) to be unsupervised in the home with his pregnant fifteen-year-old girlfriend (mother of the deceased infant). The Department investigated the paternal grandfather for inadequate supervision and sexual penetration. The investigator confirmed that the paternal grandfather was not in jail. The investigator met with the sixteen-year-old at the home of the paternal grandfather and spoke with him about the allegation of the fifteen-year-old girl living in the home with him and his father. The sixteen-year-old denied the allegations and informed the investigator that while he does date the fifteen-year-old, they only see one another a few times per week. The investigator met with the fifteen-year-old at the home of the maternal grandfather. She stated that she lived with her father, is homeschooled, also pregnant, and the father was the sixteen-year-old. Each time the investigator met with the fifteen-year-old, she was found at the home of her father. The investigation was unfounded; the paternal grandfather was not in jail, and there was no evidence that the fifteen-year-old lived with the sixteen-year-old's family. It was determined the fifteen-year-old lived with her father. Furthermore, from 1999 through 2010, the paternal grandparents were investigated by the Department five times; two investigations were unfounded and four were indicated (one investigation had two allegations and the finding was indicated on one and unfounded on the other). From 2005 through 2007, the maternal grandparents were investigated by the Department five times; one investigation was indicated and four were unfounded.

| Child No. 104 | DOB: 3/2018 | DOD: 11/2018 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 8 months |
| Cause of death: | Undetermined |
| Reason for Review: | Open Intact Family Services case at the time of the child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Eight-month-old was found lying face down and unresponsive in her pack-n-play by her twenty-four-year-old mother. The mother called 911, while the maternal grandmother performed CPR. EMS arrived on the scene and continued to perform CPR with chest compressions and transported the baby to the emergency room where she was pronounced deceased. The mother reported that the baby had a cold but was otherwise healthy. The baby was not sleeping well the night before she was found unresponsive. The mother and father were both up with the baby at 4:30 a.m. The mother went to sleep, after she laid the baby down in her pack-n-play face up. The father stayed up another twenty minutes to be sure the baby was sleeping, and they went to sleep. At approximately 8:00 a.m. when the mother woke up, she found the baby face down and not breathing. Law enforcement observed several blankets; standard size pillow and a sofa pillow in the pack-n-play. The mother reported that she placed the baby on top of the pillow and covered her with one blanket from the waist down. The Department's investigated and unfounded the mother and father for substantial risk of physical injury/environment injurious to health and welfare by neglect and death. The baby's physicians did not express concerns of abuse or neglect and the medical examiner reported that there were no concerns or signs of trauma, abuse or neglect.

**Prior History:** Three months before the baby's death, in August 2018, the hotline was contacted to report that the parents four-month-old, was seen in the clinic three days prior to the report for a rash that included extensive impetigo on the corner of her nose and the entire upper lip was crusted; and a white area under her tongue that appeared to be thrush. The mother was instructed to follow-up in three days. At the follow up appointment, the baby presented with multiple bruises that were not present three days prior. The baby was seen by a child abuse pediatrician who documented the baby to have left eye bruising and swelling, left forehead swelling and tenderness, a bruise under her right eye, a torn frenulum, a bruise on her left upper back and swelling to her right forearm/wrist. The mother told the doctor that the father said, he was changing the baby's diaper and she turned her face and ran into his finger. The doctor found this explanation inconsistent with the injuries. The Department took protective custody and investigated the father for cuts, bruises, welts, abrasions and oral injuries; to the four-month-old and investigated both parents for bone fractures to the four-month-old and substantial risk of physical injury/environment injurious to health and welfare by neglect to the one-year-old. The father told the investigator that he picked up the baby to sniff her diaper, she flopped around, and he accidently poked her in the left eye with his finger. The bone survey revealed a nondisplaced fracture at the distal right radial metadiaphysis, a buckle fracture of the distal right ulnar metadiaphysis, a suspected nondisplaced fracture of the right first digit metacarpal and suspected bucket-handle fracture of the distal left femoral metadiaphysis. Additional x-rays confirmed the nondisplaced fracture of the ulna and buckle fracture of the ulnar. The femur x-rays showed mild cortical irregularity. The investigator confronted the parents with evidence of the baby's fractured forearm, the parents said they allowed the baby to grab their thumbs. They wrapped their hands around her wrist to lift her up on her legs. In addition, they had placed the sibling, age one, in the playpen with the baby, four months, and had seen him step on the baby. The doctor opined that this was a case of child abuse and not accidental. Five days after the baby was placed in protective custody, the court reserved a finding of urgent and immediate necessity until further notice and continued the shelter-care hearing. The Department was ordered to implement a "safety plan," allowing the mother to reside with the children in the maternal grandmother's home, but not to have any unsupervised interactions with them. The investigation against the parents was indicated twenty-one days before the baby's death.

| Child No. 105 | DOB: 8/2018 | DOD: 12/2018 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 months |
| Cause of death: | Undetermined |
| Reason for Review: | Unfounded child protection investigation within a year of the child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Three-month-old was found unresponsive by her thirty-one-year-old mother; the mother administered CPR and called 911. The infant was transported to the hospital where she was pronounced deceased. The Department investigated the mother for death by neglect to the infant and substantial risk of physical injury/environment injurious to health and welfare by neglect to the seven siblings, ages one, two, three, five, eight, ten and sixteen-years. The mother reported that she fed the infant at approximately 3:45 a.m. and put her to sleep, on her back, in a bassinette without bedding, in her bedroom, while she co-slept with the one-year-old sibling in a twin bed beside the bassinette. At approximately 7:45 a.m., the mother woke up to find the infant unresponsive in the bassinette with fluid coming out of her mouth and nose. The mother administered CPR, called 911 and the infant was transported to the hospital where she was pronounced deceased at 8:37 a.m. Law enforcement on the scene found no bassinet; however, when the Department child protective investigator arrived at the home three days later, the mother showed her the bassinet to reenact the scene. The Department unfounded the investigation against the mother.

**Prior History:** In July 2012, the Department investigated the mother and maternal grandmother for death by neglect to a sibling of the deceased, who was two-months-old at the time for substantial risk of physical injury/environment injurious to health and welfare by neglect to the three other siblings to the deceased, ages, two, three and nine years, after it was reported that the grandmother was watching the children and placed the two-month-old into a large bed with the three-year-old and nine-year-old at approximately 11:00 p.m. When the grandmother checked on the children at approximately 4:30 a.m., she found the two-month-old face down on the bed, and his pillow was wet as if he spit up or vomited. The infant was already blue in color. He was transported to the hospital where he was pronounced deceased at 5:18 a.m. The grandmother reported that she gave the infant to her goddaughter to put to bed. The goddaughter reported that she fed the infant and gave her to the nine-year-old at 11:00 p.m. The maternal grandmother found the infant against the wall in bed with the nine-year-old and three-year-old. The nine-year-old reported that her mother was never home and drank every day and that all the children slept in the same bed. She did not know who put the infant in bed with her; she awoke when her grandmother found the infant and screamed. The mother was not home when the infant died. She admitted that she left the children with the maternal grandmother most of the time and slept in bed with all her children. The investigation against the maternal grandmother was indicated for death by neglect and unfounded for substantial risk of physical injury/environment injurious to health and welfare by neglect to the three siblings. The investigation against the mother was unfounded. The mother was offered and agreed to intact family services. In April 2013, the intact case was closed successfully, as the mother complied with all services offered. In November 2017, the Department investigated the mother for cuts, bruises, welts abrasions and oral injuries to the fifteen-year-old sibling to the deceased, after it was reported that the teen told a school social worker that her mother hit her in the face with an open hand and closed fist several times, leaving her upper lip scabbed and both lips swollen. The teen reported that her mother has been physical with her in the past and showed previous marks on her arm where she was hit with an extension cord. The mother denied ever hitting the teen. The mother stated that the teen was not coming home until 11:00 p.m. and leaving the home during the night. Since the teen's father was killed two years earlier, the teen's behavior has gotten worse. The investigator checked with a nurse, who stated that the teen was just seen for contraception management and that the doctor did not note any concerns of any abuse or neglect. In February 2018, the investigation against the mother was unfounded. The mother was referred to community-based services to address the teen's misbehavior.

| Child No. 106 | DOB: 1/2018 | DOD: 12/2018 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 10 months |
| Cause of death: | Undetermined |
| Reason for Review: | Unfounded child protection investigation within a year of the child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**  Ten-month-old was found unresponsive on the couch by his twenty-six-year-old mother when she arrived home.  The mother immediately started CPR and called 911. Paramedics transported the ten-month-old to the hospital where he was pronounced deceased. First responders reported that the home was in "total disarray" and they had to make a path in the home, as there was garbage on the floor. The mother stated that she left the ten-month-old and two-year-old sibling in the care of their nine-year-old sibling for at least an hour. While the mother was gone, all the children were in the family's bedroom playing, the ten-month-old was on the bed. The nine-year-old went to the bathroom and left the two younger siblings in the bedroom. While using the bathroom, the nine-year-old heard a loud "thud." The nine-year-old returned to the bedroom to find the ten-month-old on the floor and unresponsive. It appeared that he fell onto the floor. The nine-year-old brought the ten-month-old to the couch and placed him on his back. The nine-year-old went to the neighbor's home to call 911, but their phone was not working. The mother arrived home and found the baby unresponsive on the couch, called 911, and started CPR immediately. Paramedics arrived on the scene, continued CPR, and attempted to resuscitate, but were unsuccessful; the baby was pronounced deceased upon arrival to the hospital. The Department investigated and indicated the mother for environmental neglect, inadequate supervision, and death by neglect. The family was referred to intensive intact family services.

**Prior History:**   In April 2005, the mother (twelve-years-old) was the victim of substantial risk of sexual abuse-sibling of sexual abuse victim; the indicated perpetrators were her mother and stepfather. In January 2018, the mother was investigated for inadequate shelter and environmental neglect after it was reported that the home smelled of mold because of the leaks in the ceiling. The report also alleged that there were dog feces on the floor. The carpet and kitchen floor were unclean, and there was trash from old food around the home, including pizza boxes. The investigator met with the family at their home. The mother stated that she resided in the home with her three children, ages eight, one, and one month. The investigator observed the children to be clean and well-groomed with no visible injuries. The mother admitted that sometimes the ceiling leaks after a heavy rain, and she puts a bucket underneath to catch the water. The kitchen floor was somewhat dirty though no dog feces were observed, nor was there old food or food containers on the floor. The mother agreed to clear the clutter in the living room. In addition, the mother confirmed that she was co-sleeping with the one-year-old, but there was a pack and play observed. The investigator provided the mother with information on the dangers of co-sleeping and advised that the one-year-old should sleep alone in the pack and play. The following day the investigator contacted the children's primary care physician's office; the doctor had no concerns of abuse or neglect. In March 2018, the investigation against the mother was unfounded. The mother corrected the conditions in the home within twenty-four hours. She washed the dishes, mopped the kitchen floor, and removed much of the clutter from the eight-year-old's room and the living room.

UNDETERMINED

| Child No. 107 | DOB: 1/2017 | DOD: 1/2019 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 23 months |
| Cause of death: | Complications of prematurity |
| Reason for Review: | Youth in care |
| Action Taken: | Investigatory review of records |

**Narrative:** Twenty-three-month-old, medically complex child was found unresponsive by his foster parent. The foster parent placed the child on his stomach, on a u-shaped pillow, for the purpose of promoting neck muscle development. The foster parent then went to the kitchen to prepare the baby's medications. Upon returning the foster parent found the baby face down in the pillow unresponsive. The foster parent contacted 911; EMS arrived and transported the baby to the hospital where he was pronounced deceased. The baby was born at twenty-five-weeks' gestation due to placental abruption. The baby suffered from bronchopulmonary dysplasia, osteopenia, perinatal intraventricular hemorrhage, hydrocephalus, seizures, pulmonary hypertension, and asthma. The baby had home health visits five days a week and outlived his life expectancy. The Department did not investigate the death.

**Prior History:**  The mother of the deceased was a former youth in care adopted as a teen in 2013. The baby's extensive medical needs led to the child remaining in the hospital for six months after birth. In July 2017, as the hospital began to consider discharge, the Department investigated the parents for substantial risk of physical injury/environment injurious to health and welfare by neglect to then six-month-old medically complex baby, after the hospital social worker reported her concerns about the parents ability to care for the baby's special needs; he required oxygen, g-tube feedings, and had a shunt in place for hydrocephalus. The hospital staff spoke to the parents about being trained and able to demonstrate caring for the child, but they came to the hospital inconsistently. They were observed to have issues holding the baby properly due to the shunt, and often fought in the baby's room. The social worker shared that the mother was diagnosed with oppositional defiance disorder (ODD) and has shown poor coping skills including becoming upset and walking away while being taught how to care for the baby and refusing to give the baby a feeding because she didn't like the nurse who was going to give her the formula. The father did not participate in training and the parents said they planned to refuse home health services. The investigator observed the proposed living environment (home of the paternal grandmother), finding the home to be unsanitary and overcrowded with nine people living there, including someone who smoked. The paternal grandmother also had a Department history of her own, prompting the investigator to contact the hotline regarding the children that lived in the home. The parents could not identify any other relatives who could be appropriate caregivers and the investigator took protective custody. The Department was granted temporary custody in August 2017. During the investigation, the mother reported that she was pregnant; she later told the placement worker that she terminated the pregnancy. The medically complex infant (the deceased) was placed in a traditional specialized foster home. The foster parent kept up with all his medical needs and worked with the parents to facilitate visits. In January 2018, the Department investigated the parents for substantial risk of physical injury/environment injurious to health and welfare by neglect to their newborn, after the caseworker contacted the hotline reporting that relatives told hospital staff that the mother had given birth under an assumed name and was involved with the Department. The mother told the investigator that she planned to take the newborn back to the home of the paternal grandmother where she and the father lived.  At this point, the parents had not completed any services, and the newborn was taken into custody; placed in the same home as her brother.

167

UNDETERMINED

| Child No. 108 | DOB: 11/2018 | DOD: 1/2019 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 months |
| Cause of death: | Undetermined |
| Reason for Review: | Unfounded child protection investigation within a year of the child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Two-month-old infant was found unresponsive and not breathing by her maternal grandmother. The mother attempted CPR and called 911. An ambulance transported the infant to the hospital where she was pronounced deceased. The Department investigated the mother for death by neglect and death by abuse to the infant. She was also investigated for substantial risk/environment injurious by neglect to the infant's three-year old half-brother and her seventeen-month-old twins. The mother reported that she gave the infant a bottle, laid her on an adult bed, and placed a pillow between herself and the infant at approximately 3:00 a.m. At approximately 7:45, the maternal grandmother found the infant face down in bed, unresponsive, and blue. The mother said that she usually did not sleep with the infant, but she was very tired. A safety plan was initiated for the siblings. The autopsy found no signs of abuse. The investigation against the mother was unfounded, as there was insufficient evidence to support death by abuse or a blatant disregard of parental responsibilities.

**Prior History:** In March 2017, the Department indicated the mother's paramour for substantial risk/environment injurious by abuse to the mother's one-year-old child. While the mother was hospitalized due to her high-risk pregnancy with twins, she told hospital staff she recently left the paramour because he beat her in front of her one-year-old. He also hit and pushed the baby down as he tried to jump up on her. The paramour admitted this abuse. In November 2018, the mother and her paramour were investigated for substantial risk/environment injurious by abuse to their fifteen-month-old twins and newborn; the report was unfounded. While in the hospital, the mother disclosed her paramour had been aggressive during her pregnancy but had not been violent to the twins. The couple was working to reconcile. The reporter was concerned that the paramour would not allow the mother to take her children to doctors' visits. The mother told the investigator she missed prenatal visits due to lack of transportation. She further indicated that her paramour controlled when she left the house. She and her paramour denied any ongoing domestic violence. The report was unfounded because collateral sources reported the mother could control the paramour's threats and has called police in the past. The children's immunizations were current. Shortly before the infant died, the mother left the paramour and obtained an order of protection.

| Child No. 109 | DOB: 12/2018 | DOD: 3/2019 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 ½ months |
| Cause of death: | Undetermined |
| Reason for Review: | Pending child protection investigation at the time of the child's death |
| Action Taken: | Investigatory records review |

**Narrative:** Two-and-a-half-month-old was found unresponsive in bed with his sixteen-year-old father. The night before, the infant was fed by the paternal grandfather's paramour. The paramour stated that she fed the infant at approximately 10:30 p.m. and gave him back to the father. The father stated that he placed the infant in his twin-size bed, propped him up on a pillow and covered the infant with a blanket. The father watched television in the living room and then joined the infant in the bed at approximately 1:00am. The paternal grandfather's paramour recalled that she checked on the father and infant at approximately 8:00 a.m. and again at 11:00 a.m., when she woke the father. When the father awoke at 11:00 a.m., he discovered that the infant was unresponsive. The paternal grandfather's paramour began CPR, as instructed by 911 dispatch. A physician with the ambulance company arrived on scene and pronounced the infant deceased at 11:57 a.m. The Department investigated and indicated the father for death by neglect.

**Prior History:** In March 2019, eight days before the death of the infant, the hotline was contacted to report that the two-month-old infant presented to the hospital with bruising on his left arm and had a left femur fracture.  The Department investigated the mother for bone fractures and cuts, welts and bruises. The infant had been home alone with his fifteen-year-old mother, while the sixteen-year-old father was at school.   The mother called the father stating the infant was "crying like crazy" and his arm had "purple on it." When the father returned after school, he saw bruising and observed that the infant was not moving the left side of his body. The mother and father took the infant to the hospital. The mother gave different stories to various individuals.  Initially, she told the father that she did not know what happened to the infant.  At the hospital, she reported that the bruising on the infant's arm came from her jerking him up while he was choking while feeding from a propped-up bottle. This part of the story remained consistent throughout the Department's investigation. The mother told the doctor at the hospital that the infant's leg injury was from him getting his leg caught in a baby swing. The mother then told the CPI that the infant fell off the bed. The doctor stated to the investigator that he found the mother's explanation not plausible and inconsistent with the injury. When told that falling off the bed would not have broken the infant's leg, the mother stated the fracture came from her playing with the infant and that she "plays rough" and was moving the infant's legs around and pinned them up to his side when she heard a pop. During this investigation, the infant was placed on a safety plan to reside with the paternal grandfather and his paramour. The investigator noted that safe sleep practices were reviewed with both parents during this investigation. The investigation against the mother was indicated. During the investigation into the infant's death, the mother did reveal a more plausible version of what happened to the infant. The father stated that the mother told him on the day of his injuries the infant would not stop crying. The mother twisted the infant's arm and he still would not stop crying, so she twisted his leg until she heard a pop. The father and mother confided that she was stressed out, mad, did not feel right, and was feeling down and depressed; however, the investigator was unable to add the information to the case notes or revise the previously determined rationale, due to the completed case closure.

| Child No. 110 | DOB: 1/2016 | DOD: 3/2019 | Undetermined |
|---|---|---|---|
| Age at death: | 3 years | | |
| Cause of death: | Autopsy pending | | |
| Reason for Review: | Unfounded child protection investigation within a year of the child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Three-year-old toddler was found face down in the bathtub while taking a bath with his five-year-old sibling. The maternal grandmother had run the boys a bath and then went to her room. The twenty-seven-year-old sibling checked on the boys approximately 10-15 minutes after the boys were placed in the tub. When she checked on them a second time, she discovered the toddler lying face down in the tub. The five-year-old told the older sibling that the toddler had fallen asleep in the tub. The boys had been in the water for approximately 30 minutes. During this time, the mother was on the couch picking out clothes for the boys, and the grandmother was in her room. The twenty-seven-year-old sibling attempted to perform CPR on the toddler before he was transported to the hospital where he was pronounced deceased. When officers arrived at the scene, there was no longer water in the tub, so the depth of the water was unknown when the toddler was found. The twenty-seven-year-old sibling was visiting at the time of the incident. The mother lived in the maternal grandmother's home with her three children, ages three, four, and five-years-old. The Department investigated and indicated the mother for death by neglect and substantial risk of physical injury/environment injurious to health and welfare by neglect to the toddler's four and five-year-old siblings. The mother was referred to and accepted intact family services.

**Prior History:**   The mother had an extensive history with the Department, dating back to 1994. She had several reports, with seven being indicated with her as a perpetrator. Additionally, the mother was the victim of an indicated report with the maternal grandmother being the perpetrator. In May 1994, the mother was indicated for inadequate shelter to her children, ages, one, three-months.  In January 1999, the mother was indicated for inadequate supervision to her children ages one, two, and three-months. In February 1999, the mother was indicated for environmental neglect and substantial risk of harm to her children ages one, two, four, six, and four-months. In January 2002, the mother was indicated for substantial risk of physical injury/environment injurious to health and welfare to her children ages three, four, five, six, seven, nine, and five-months. In July 2004, the mother's paramour was indicated for substantial risk of sexual abuse-sibling sex abuse victim to the mother's children ages two, seven, eight, and nine-years-old. The mother's paramour was indicated for sexual penetration to the mother's children, ages ten and eleven-years-old. In July 2004, the mother was unfounded for inadequate supervision to her children ages eleven, ten, nine, eight, and seven-years-old. In August 2009, the mother was unfounded for neglect by substance misuse to her children ages sixteen, fifteen, fourteen, thirteen, twelve, and ten-years-old. In April 2010, the mother was unfounded for sexual penetration and substantial risk of sexual abuse – sibling of sex abuse victim to her children ages eleven, fourteen, fifteen, sixteen, and eight-years-old; the maternal uncle was indicated for sexual penetration, sexual exploitation, and sexual molestation to the eleven-year-old, and indicated for sexual abuse – sibling of sex abuse victim to the eight, twelve, fourteen, fifteen, and sixteen-years-old. In September 2018, the mother was unfounded for lock-out-correctional facility, after it was reported by a county probation officer that the seventeen-year-old was arrested after a fight with his sister and was in the juvenile detention center. The reporter stated that the mother was refusing to pick up the teen and did not attend court. The investigator spoke with the teen and it was determined that he would be picked up from detention by his girlfriend's mother. At the time, the teen and his girlfriend had one child and the girlfriend was pregnant. The investigator spoke with the girlfriend's mother and asked if she would be willing to be a placement resource for the teen. The girlfriend's mother attended juvenile court and agreed with the teen being placed with her and the girlfriend. The teen successfully completed a therapy program.

| Child No. 111 | DOB: 10/2018 | DOD: 5/2019 | Undetermined |
|---|---|---|---|

| | |
|---:|---|
| Age at death: | 6 months |
| Cause of death: | Undetermined |
| Reason for Review: | Unfounded child protection investigation within a year of the child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Six-month-old was found unresponsive by her mother; she called 911 and met the paramedics outside the home on the curb when EMS arrived. The baby was pronounced deceased on the scene. The mother reported that she last saw the baby alive when she placed her in the queen size bed the night before around 9:00 p.m. The mother admitted that she and three of the five children also slept in the same bed. At the time of the baby's death, she lived in the home with her parents, her nine siblings, and paternal uncle. The Department investigated and indicated the mother for death by neglect to the baby; and substantial risk of physical injury/environment injurious to health and welfare by neglect and environmental neglect to her children. During the investigation the other children were taken into custody and placed with relatives.

170

**Prior History:**  In May 2014, the Department investigated the mother for environmental neglect to her children, ages four, three, two and one, after the children were observed to have bites from bed bugs on most of their bodies.  This investigation was unfounded and has since been expunged.  In July 2014, the Department investigated the mother for substantial risk by abuse and inadequate supervision to the four-year-old; and substantial risk of physical injury by neglect to the other children after it was reported that that mother struck the four-year-old on the side of the head.  There were no injuries or marks observed; the investigation was unfounded and has since been expunged. In August 2017, the Department investigated the mother for environmental neglect to all the children when law enforcement reported that while a search warrant was executed at the home officers found nine dogs, seven children; and the mother currently pregnant with twins. The home was found to be in deplorable condition, with flies, cockroaches, dog feces and urine everywhere and the children dirty. The mother and the children went to a shelter until the home could be cleaned and cleared of safety hazards. The family was referred to intact services for parenting coaching, mental health assessment, counseling and Norman funds and the investigation indicated. In December 2017, the Department investigated the parents for substantial risk by neglect and inadequate shelter to the nine children after it was alleged that the father's adult daughter (from another relationship) was drugged and assaulted in the home.  Allegations of substance use and domestic violence between the parents were also reported. Verbal child victim denied any physical fighting in the home environment and police suspended their investigation due to insufficient evidence and non-cooperation from the victim. This investigation was unfounded. In July 2018, the Department investigated the parents for substantial risk of after it was alleged that there was an infestation of roaches and bed bugs, with dirt and trash throughout the home. The investigator observed the home environment to be acceptable. The mother and father denied the allegations and stated that the father's eldest adult daughter (from a previous relationship) made the report and is extremely angry with her father. This investigation was unfounded.

| Child No. 112 | DOB: 3/2019 | DOD: 5/2019 | Undetermined |
|---|---|---|---|
| Age at death: | 1 ½ months | | |
| Cause of death: | Autopsy pending | | |
| Reason for Review: | Child of a youth in care | | |
| Action Taken: | Full Investigation pending | | |

**Narrative:** One-and-a-half-month-old infant was in the care of her father, when she was found struggling to breath with blood coming from her nose. The twenty-two-year-old father called 911, the infant was transported to the hospital where she was pronounced deceased. Earlier that evening, the father had picked up the baby from the mother.  This was the first time the father had the baby in his care. At the father's home, there were reportedly approximately twelve people, comprised of family and friends. The infant was fussy the entire time and a little before 12:40 a.m. the father called 911, stating the infant was struggling to breathe and had blood coming from her nose.  Police, fire department and EMS arrived on the scene quickly. EMS transported the infant to the hospital where she was pronounced deceased at 1:32 a.m.  An autopsy concluded the infant had a skull fracture and epidural hemorrhage of the spine. The exact cause of death has not been yet been determined. The Department investigation and a criminal investigation is currently pending.  At the time of the infant's death, the eighteen-year-old mother was a youth in care.

**Prior History:**  The mother was taken into custody in June 2015 on a dependency petition following a lock out by her adoptive mother, though the mother remained in contact with her adoptive mother until her death this past year.  The mother struggled with mental health and juvenile justice issues moving between various placements including foster homes, detention, shelters and group homes in between periods of being on run. In August 2018, the mother disclosed to her caseworker that she was pregnant but did not intend to keep the baby as she did not have a relationship with the father. The worker nonetheless referred the mother to the Teen Parent Service Network for pregnant and parenting youth in care. In October 2018, she entered a transitional living program and reported that she wanted to keep the baby.  While there, the mother participated in services, received pre-natal care and spoke positively about having the baby. About a month after the birth the mother was upset with the baby's crying and put the baby, crying, outside of her room voicing her inability to handle the baby. Staff intervened and were concerned about post-partum depression. They called the hotline; the report was taken for information only.

| Child No. 113 | DOB: 8/2017 | DOD: 5/2019 | Undetermined |
|---|---|---|---|
| Age at death: | 1 ½ years | | |
| Cause of death: | Undetermined | | |
| Reason for Review: | Pending DCP investigation at the time of the child's death | | |
| Action Taken: | Full investigation, no report issued | | |

**Narrative:**  One-and-a-half-year-old child, who suffered from Dandy-Walker syndrome, a brain malformation that can cause seizures and developmental delays, was found unresponsive by the parents. The parents transported her to the hospital where she was pronounced deceased. The Department investigated the parents for death by neglect, after it was reported by the hospital that the baby was already deceased when she was brought into the hospital. The siblings reported that they were able to get medicine off the dresser in the parents' room and gave it to the deceased sibling. The eight-year-old reported that his mother and father were upstairs asleep, and his mother told him not to wake her when she is asleep. In October 2019, the Department indicated the parents for death by neglect to deceased child and substantial risk of physical injury/environment injurious to health and welfare by neglect to the siblings, ages, three, eight and four.

172

UNDETERMINED

**Prior History:** The mother had two unfounded and expunged investigations involving her older children from a different relationship. In November 2009, the mother was unfounded for inadequate supervision, after it was reported that the mother had left the children home alone. In August 2011, the mother was unfounded for inadequate supervision, environmental neglect and burns. In March 2018, medical staff contacted the hotline to report the seven-month-old (deceased child) was brought in for a physical examination and weighed only six pounds. Medical staff reported the baby was dehydrated and appeared emaciated. The baby did not wiggle, crawl, or sit-up, and had the appearance of a newborn. The mother told hospital staff that three weeks prior, she took the baby to another hospital and they found nothing wrong with her; however, when hospital staff contacted the other hospital to confirm this, they stated that they had not seen the baby since birth. The Department investigated the mother and father for failure to thrive and substantial risk of harm to the older siblings, ages, two, three and seven-years. The investigator met with the mother, who stated she had taken the baby to the doctor when she was two-weeks-old and had not taken her to the doctor since, as she was waiting on a medical card. The mother noted that the baby was growing slowly but thought she would eventually get better. The mother reported feeding the baby about seven bottles of formula a day. The mother admitted to smoking marijuana about three times a day. The mother and father were referred for counseling services for mental health and a drug and alcohol assessment. The mother tested positive for marijuana and the father tested positive for marijuana and cocaine. In April 2018, the investigator took protective custody of the children, including the baby while she was still in the hospital. While hospitalized, the baby had gained weight and was found to have significant brain abnormalities, failure to thrive, dehydration, missed vaccinations, slow heart rate, and left auditory neuropathy. The investigation was indicated against the mother and father. The children were placed in two separate foster homes. By the end of April 2018, the Judge returned the older siblings to the custody of the parents. The Judge returned the medically complex baby (then nineteen months) to the care of the parents in March 2019. Upon her return to the parents, the baby weighed 19 lbs. 10.6 oz. Less than a month later, in April 2019, the baby weighed 16 lbs. 15.6 oz. In May 2019, medical staff contacted the Department initiating an investigation for medical neglect. The baby died within a week of the hotline call. The parents were indicated for medical neglect after the death investigation.

| Child No. 114 | DOB: 11/2018 | DOD: 5/2019 | Undetermined |
|---|---|---|---|
| Age at death: | 6 months | | |
| Cause of death: | Undetermined | | |
| Reason for Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Full Investigation pending | | |

**Narrative:** Six-month-old was found unresponsive by mother's twenty-year-old paramour; 911 was called; and CPR was attempted until EMS arrived. The infant was transported by ambulance to the hospital, where she was pronounced deceased. The nineteen-year-old mother left for work, leaving the baby and two-year-old sibling in the care of her paramour. The paramour reported that after the mother left, he swaddled the baby in a blanket and began feeding her. She drank approximately 1 oz. before falling asleep. The paramour laid the baby down on her right side and propped the bottle in her mouth; he closed the door and tended to the two-year-old sibling. When the paramour checked on the infant approximately thirty-five minutes later, he found the infant unresponsive. The Department investigated the death. The paramour was indicated for inadequate supervision and unfounded for death by neglect. The mother was indicated for cuts, bruises, welts, abrasions and oral injuries to the two-year-old sibling after unexplained marks to the 2-year-old were observed during the death investigation. The Department took the two-year-old sibling into custody and placed him with his maternal great grandmother.

**Prior History:** In November 2018, the Department investigated the mother for substance misuse by neglect after she and her newborn tested positive for cocaine at birth. The mother, who denied cocaine use, agreed to intact family services; an intact case was opened in April 2019. In May, the mother was indicated for substance misuse and the investigation was closed. Two days after the close of the investigation, a daycare employee contacted the hotline and reported that the two-year-old sibling had what appeared to be a large burn-like injury to his forehead. According to the reporter, this was not the first time the minor was seen with injuries; in the last two months, he had been seen with several injuries on several occasions. Daycare staff did not see the minor for about a week in the month of May. When he returned to the daycare, he had marks on his face and significant swelling. The Department investigated the mother and her paramour for burns by abuse and cuts, bruises, and welts. The investigator contacted the intact worker, who was aware of the report and said she had no concerns about the mother. She said she was going to see the family after the mother returned from the doctor. The investigator met with the mother that evening. Mother reported that the toddler had a tantrum while in timeout and was hitting his head against the wall. She moved him from the wall, but his head was still red. The mother sought medical care for the abrasion once the daycare told her to do so. This investigation was pending at the time of the infant's death. In July 2019 both allegations were unfounded. The child did not have a burn; he did have an abrasion that the mother reported was from him hitting his head on the wall during a timeout.

| Child No. 115 | DOB: 2/2019 | DOD: 6/2019 | Undetermined |
|---|---|---|---|
| Age at death: | 4 months | | |
| Cause of death: | Positional asphyxia due to sleeping prone on the floor with blankets and adjacent to a mattress | | |
| Reason for Review: | Unfounded child protection investigation within a year of the child's death | | |
| Action Taken: | Full investigation; Report to Director 9/24/2019 | | |

**Narrative:** Four-month-old was found unresponsive and blue in color by her father. The mother contacted 911 and CPR was administered by a volunteer firefighter who was the first to arrive on the scene. The baby was transported to the hospital where she was pronounced deceased. The Department investigated the parents for death by neglect, environmental neglect, and substantial risk of physical injury/environment injurious to health and welfare by neglect to the two siblings, ages eight and three. The mother reported that she fed the baby at approximately 4:00 a.m. before putting the baby to sleep on a pallet. The pallet was positioned on the floor next to a mattress on which the mother was sleeping. The three-year-old sibling was sleeping on another mattress, on the floor, on the other side of the room. The father stated that when he found the baby, there was a blanket up to her shoulders, she was on her side, and her face was toward the mattress. The family's home was found to be in disarray. The home was observed to have a crack pipe/spoon, a one hitter, various prescriptions bottles of medication, a bag of pills labeled "diet pills", and syringes. The mother's drug screen tested positive for methamphetamines on the date of the infant's death; the father's screen was negative. The investigation against the parents was indicated.

174

UNDETERMINED

**Prior History:** In September 2014, the Department investigated and unfounded the father for substantial risk of physical injury/environment injurious to health and welfare by neglect to the three-year-old sibling of the deceased. In February 2017, the Department investigated the mother and father for substantial risk of physical injury/environment injurious to health and welfare by neglect to the six-year-old and one-year-old siblings of the deceased, after it was reported by law enforcement that the mother overdosed, passed out, and was revived with Narcan. The mother stated that she had taken a prescription pain medication on an empty stomach, which caused her to pass out. The father was home when the mother passed out and did not call medical services, instead the father called a "friend' who brought over the Narcan to revive the mother. It was then that 911 was contacted. The mother denied treatment from EMS when they arrived; the father fled with the one-year-old child before police arrived. The child protection investigator made two good faith attempts to contact the family after the report was made. The investigator met with the six-year-old at her school, three-days after the report was made. The six-year-old told the investigator that she mostly lives with her paternal grandmother. She stated that an ambulance never came for mom but has come for dad once when he fell on the ground; the child stated that there was a shot, "like at the doctors", on the table near him. The six-year-old believed that incident occurred about a year prior. Later that day, the investigator contacted the father who confirmed that he had previously overdosed, as the six-year-old described. The father also admitted to the investigator that he had a $20 a day (1 gram) habit. The mother stated that she began using heroin in September 2016. A safety plan was enacted where the parents were only to have supervised contact, and both children would stay with their paternal grandmother. In April 2017, the investigation against the parents was indicated. An intact family case was opened from February 2017 through June 2017. In December 2018, the Department investigated the mother for substantial risk of physical injury/environment injurious to health and welfare by neglect to the seven-year-old and two-year-old siblings of the deceased, after it was reported that the mother, who was thirty-weeks pregnant, exhibited drug seeking behaviors. The mother tested positive for cocaine and marijuana in October 2018. In December 2018, she tested "ridiculously high" for a controlled substance, which had not been prescribed to her; she was seeking anxiety medication, which the doctor would not prescribe to her. The investigator later met with the two-year-old and the parents but had no concerns about the two-year-old's physical or emotional well-being. The mother stated that she was unaware that she had tested positive for marijuana and cocaine in October 2018. The mother denied usage and stated that she was in a substance abuse program. Further the mother denied taking medications and stated she was pregnant and wanted to have a healthy baby. The father confirmed the mother being in a substance abuse program. The investigator spoke with the paternal grandmother who also confirmed that the mother was in a substance abuse program and that she had not seen any signs of either parent using. The investigator met with the children at the paternal grandmother's house; they were free of suspicious marks. In March 2019, the Department's investigation against the mother was unfounded.

UNDETERMINED

| Child No. 116 | DOB: 5/2019 | DOD: 6/2019 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 1 month |
| Cause of death: | Undetermined |
| Reason for Review: | Pending child protection investigation at the time of the child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** One-month-old was found unresponsive, sleeping in a bassinet, with a pillow underneath her, by her twenty-seven-year-old mother. The maternal grandmother ran into the room after hearing the mother scream that the infant was not breathing; the grandmother attempted CPR, the mother requested assistance from a neighbor who was a nurse and 911 was called. The infant was transported to the hospital where she was pronounced deceased. The Department investigated the mother for death by neglect to the infant and substantial risk of physical injury/environment injurious to health and welfare by neglect to the siblings, ages two and seven-years-old.  The mother reported that she breastfed the infant and placed her in the bassinet, on a pillow, at approximately 3:00 a.m. When asked why she placed the infant on a pillow in the bassinet, the mother replied that she worried about her children, and the infant liked to hold milk in her mouth before she swallowed it; she didn't want the infant to choke of the milk or her saliva, so she would place her on the pillow to ensure she didn't choke. The emergency room physician who pronounced the infant deceased reported no signs of abuse, neglect or illness. The investigation against the mother was indicated, as the mother failed to follow safe sleeping practices.

**Prior History:** In May 2019, the Department investigated the mother and father for substantial risk of physical injury/environment injurious to health and welfare by neglect; medical neglect; and substantial risk of physical injury/environment injurious to health and welfare to their children, ages two and seven-years, after it was reported that the father was driving the day prior, with the mother, two-year-old, and seven-year old as passengers in a vehicle, and got into an accident, hitting a median on the expressway. The parents did not seek medical attention for the children after the accident. The following day, the father told the paternal grandmother that his intention was to kill everyone when he hit the median. The paternal grandmother called the police, who transported the father to the hospital. The same day, the mother went to the hospital to give birth to the now deceased child. It was further reported that the parents had a history of hitting and throwing the children around, leaving bruises and marks on them; last month the two-year-old had a black eye and would not say how she got it and there were scars on the seven-year-old's back and arm. The investigator created a safety plan for the children to live with the paternal grandmother; and the mother and newborn were to stay with the maternal great-grandmother. Later in the month, at the request of the father, the safety plan was amended to place all the children with the maternal grandmother and the maternal great-grandmother.  The mother could live in the home and the father was able to visit; however, the great-grandmother was to supervise both parents. The caregivers were instructed on sleeping arrangements and specifically that the infant must sleep in her pack-n-play.  The mother reported that she and the father were arguing while driving with the two-year-old. The mother denied that the father threatened to kill her and the two-year-old. The father reported that he was attempting to avoid hitting someone when he hit the median and his tire blew out. While this investigation was pending, the hotline was contacted to report the death of the infant. This investigation against the parents was indicated for medical neglect to the two-year-old and unfounded for medical neglect to the seven-year-old, as she was not in the vehicle at the time of the incident. Both parents were unfounded for substantial risk of physical injury/environment injurious to health and welfare by neglect; medical neglect; and substantial risk of physical injury/environment injurious to health and welfare to both children.

**SUICIDE**

| Child No. 117 | DOB: 12/2005 | DOD: 8/2018 | Suicide |
|---|---|---|---|
| Age at death: | 12 years | | |
| Cause of death: | Anoxic encephalopathy due to hanging | | |
| Reason for Review: | Pending child protection investigation at the time of the child's death | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 118 | DOB: 9/2004 | DOD: 9/2018 | Suicide |
|---|---|---|---|
| Age at death: | 13 years | | |
| Cause of death: | Hanging | | |
| Reason for Review: | Unfounded child protection investigation; closed intact within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 119 | DOB: 9/2001 | DOD: 9/2018 | Suicide |
|---|---|---|---|
| Age at death: | 16 years | | |
| Cause of death: | Gunshot wound of the head | | |
| Reason for Review: | Unfounded child protection investigation; closed intact within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 120 | DOB: 4/2007 | DOD: 9/2018 | Suicide |
|---|---|---|---|
| Age at death: | 10 years | | |
| Cause of death: | Hanging | | |
| Reason for Review: | Pending child protection investigation at the time of the child's death | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 121 | DOB: 10/2006 | DOD: 11/2018 | Suicide |
|---|---|---|---|
| Age at death: | 12 years | | |
| Cause of death: | Self-inflicted gunshot wound to the head | | |
| Reason for Review: | Unfounded child protection investigation within a year of the child's death | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 122 | DOB: 6/2009 | DOD: 3/2019 | Suicide |
|---|---|---|---|
| Age at death: | 9 years | | |
| Cause of death: | Asphyxia due to hanging | | |
| Reason for Review: | Open Intact Family Services case at the time of the child's death | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 123 | DOB: 11//2001 | DOD: 4/2019 | Suicide |
|---|---|---|---|
| Age at death: | 17 years | | |
| Cause of death: | Gunshot wound to the head | | |
| Reason for Review: | Indicated child protection investigation within a year of the child's death | | |
| Action Taken: | Investigatory review of records | | |

**TWENTY-YEAR DEATH RETROSPECTIVE**

| FISCAL YEAR | 2000-13 | | 2014 | | 2015 | | 2016 | | 2017 | | 2018 | | 2019 | | TOTAL | | AVERAGES | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CASE STATUS | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | 00-19 | % |
| Youth in Care | 350 | 23.6% | 19 | 16.1% | 24 | 19.2% | 17 | 25.0% | 20 | 17.0% | 16 | 16.3% | 22 | 17.9% | 468 | 22% | 23 | 22% |
| Unfounded DCP | 295 | 19.9% | 28 | 20.4% | 30 | 28.3% | 23 | 31.3% | 33 | 23.0% | 37 | 37.8% | 47 | 38.2% | 493 | 23% | 25 | 23% |
| Pending DCP | 171 | 11.5% | 16 | 12.9% | 14 | 16.2% | 26 | 14.6% | 22 | 26.0% | 12 | 12.2% | 19 | 15.4% | 280 | 13% | 14 | 13% |
| Indicated DCP | 110 | 7.4% | 6 | 10.8% | 5 | 6.1% | 8 | 5.2% | 8 | 8.0% | 15 | 15.3% | 9 | 7.3% | 161 | 8% | 8 | 8% |
| Child of Youth in Care | 53 | 3.6% | 0 | 0.0% | 1 | 0.0% | 2 | 1.0% | 1 | 2.0% | 1 | 1.0% | 2 | 1.6% | 60 | 3% | 3 | 3% |
| Open Intact | 221 | 14.9% | 10 | 7.5% | 3 | 10.1% | 9 | 3.1% | 15 | 9.0% | 8 | 8.2% | 8 | 6.5% | 274 | 13% | 14 | 13% |
| Closed Intact | 62 | 4.2% | 2 | 8.6% | 9 | 2.0% | 7 | 9.4% | 6 | 7.0% | 3 | 3.1% | 7 | 5.7% | 96 | 5% | 5 | 5% |
| Open Placement/ Split Custody | 88 | 5.9% | 13 | 10.8% | 6 | 13.1% | 3 | 6.3% | 2 | 3.0% | 3 | 3.1% | 4 | 3.3% | 119 | 6% | 6 | 6% |
| Closed Placement/ Return Home | 24 | 1.6% | 0 | 4.3% | 0 | 0.0% | 1 | 0.0% | 0 | 1.0% | 0 | 0.0% | 2 | 1.6% | 27 | 1% | 1 | 1% |
| Others | 107 | 7.2% | 5 | 8.6% | 4 | 5.1% | 4 | 4.2% | 1 | 4.0% | 3 | 3.1% | 3 | 2.4% | 127 | 6% | 6 | 6% |
| TOTAL | 1481 | 100% | 99 | 100% | 96 | 100% | 100 | 100% | 108 | 100% | 98 | 100% | 123 | 100% | 2,105 | 100% | 105 | 100% |

178

TWENTY-YEAR DEATH RETROSPECTIVE

| FISCAL YEAR | 00-13 | 14 | 15 | 16 | 17 | 18 | 19 | Totals |
|---|---|---|---|---|---|---|---|---|
| Total Deaths | 1481 | 99 | 96 | 100 | 108 | 98 | 123 | 2012 |
| Youth in Care | 350 | 19 | 24 | 17 | 20 | 16 | 22 | 468 |
| Natural | 192 | 8 | 10 | 5 | 6 | 5 | 9 | 235 |
| Accident | 50 | 4 | 3 | 2 | 3 | 4 | 5 | 71 |
| Homicide | 72 | 4 | 9 | 7 | 6 | 4 | 6 | 108 |
| Suicide | 17 | 1 | 1 | 2 | 3 | 0 | 0 | 24 |
| Undetermined | 19 | 2 | 1 | 1 | 2 | 3 | 2 | 30 |
| Unfounded Investigation | 295 | 28 | 30 | 23 | 33 | 37 | 47 | 493 |
| Natural | 101 | 5 | 5 | 8 | 8 | 12 | 8 | 147 |
| Accident | 99 | 9 | 12 | 8 | 13 | 11 | 16 | 168 |
| Homicide | 50 | 6 | 4 | 4 | 6 | 4 | 11 | 85 |
| Suicide | 10 | 1 | 2 | 2 | 1 | 0 | 3 | 19 |
| Undetermined | 35 | 7 | 7 | 1 | 5 | 10 | 9 | 74 |
| Pending Investigation | 171 | 16 | 14 | 26 | 22 | 12 | 19 | 280 |
| Natural | 54 | 5 | 3 | 8 | 7 | 2 | 4 | 83 |
| Accident | 48 | 2 | 4 | 3 | 8 | 4 | 7 | 76 |
| Homicide | 36 | 1 | 3 | 3 | 1 | 4 | 2 | 50 |
| Suicide | 3 | 0 | 0 | 2 | 0 | 0 | 2 | 7 |
| Undetermined | 30 | 8 | 4 | 10 | 6 | 2 | 4 | 64 |
| Indicated Investigation | 110 | 6 | 5 | 8 | 8 | 15 | 9 | 161 |
| Natural | 40 | 0 | 1 | 3 | 3 | 4 | 3 | 54 |
| Accident | 40 | 1 | 1 | 3 | 3 | 2 | 3 | 53 |
| Homicide | 14 | 1 | 1 | 1 | 1 | 4 | 1 | 23 |
| Suicide | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 4 |
| Undetermined | 14 | 4 | 2 | 0 | 1 | 5 | 1 | 27 |
| Child of a Youth in Care | 53 | 0 | 1 | 2 | 1 | 1 | 2 | 60 |
| Natural | 23 | 0 | 0 | 0 | 1 | 0 | 1 | 25 |
| Accident | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 12 |
| Homicide | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 10 | 0 | 1 | 2 | 0 | 1 | 1 | 15 |
| Open Intact | 221 | 10 | 3 | 9 | 15 | 8 | 8 | 274 |
| Natural | 104 | 4 | 0 | 2 | 5 | 0 | 2 | 117 |
| Accident | 56 | 3 | 1 | 2 | 4 | 5 | 0 | 71 |
| Homicide | 28 | 2 | 1 | 1 | 2 | 1 | 2 | 37 |
| Suicide | 2 | 0 | 1 | 0 | 0 | 0 | 1 | 4 |
| Undetermined | 31 | 1 | 0 | 4 | 4 | 2 | 3 | 45 |
| Closed Intact | 62 | 2 | 9 | 7 | 6 | 3 | 7 | 96 |

| FISCAL YEAR | 00-13 | 14 | 15 | 16 | 17 | 18 | 19 | Totals |
|---|---|---|---|---|---|---|---|---|
| Natural | 20 | 1 | 3 | 1 | 2 | 1 | 5 | 33 |
| Accident | 22 | 0 | 1 | 2 | 1 | 1 | 2 | 29 |
| Homicide | 12 | 1 | 2 | 1 | 2 | 0 | 0 | 18 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 8 | 0 | 3 | 3 | 1 | 1 | 0 | 16 |
| Open Placement/Split Custody | 88 | 13 | 6 | 3 | 2 | 3 | 4 | 119 |
| Natural | 52 | 10 | 4 | 1 | 2 | 2 | 2 | 73 |
| Accident | 15 | 1 | 1 | 0 | 0 | 0 | 1 | 18 |
| Homicide | 9 | 2 | 0 | 0 | 0 | 1 | 1 | 13 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 12 | 0 | 1 | 2 | 0 | 0 | 0 | 15 |
| Closed Placement | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 12 |
| Natural | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| Accident | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Homicide | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Adopted | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| Former Youth in Care | 16 | 4 | 2 | 1 | 0 | 0 | 0 | 23 |
| Return Home | 22 | 0 | 0 | 1 | 0 | 0 | 2 | 25 |
| Interstate compact | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Preventive services | 35 | 0 | 0 | 0 | 1 | 1 | 0 | 37 |
| Subsidized Guardianship | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Child of former Youth in Care | 4 | 0 | 0 | 0 | 0 | 0 | 1 | 5 |
| Extended family support | 11 | 0 | 2 | 1 | 0 | 0 | 0 | 14 |
| Child Welfare Referral | 22 | 1 | 0 | 2 | 0 | 2 | 2 | 29 |

TWENTY-YEAR DEATH RETROSPECTIVE

## PART III: GENERAL INVESTIGATIONS

**GENERAL INVESTIGATION 1**

**ISSUE**    A mandated reporter attempting to contact the State Central Register child abuse hotline did not receive a return call until three days after the initial attempt to file a report of child neglect.

**DISCUSSION**    A police officer called the DCFS child abuse hotline to report child neglect. The call floor worker informed the mandated reported that due to high call volume she would have to take the mandated reporter's name and phone number and call back. Three days later, the mandated reporter received a voicemail at 1:30am. The next day, the mandated reporter went to the local DCFS office to file the hotline report. Following the report to the hotline, the parents refused access to the home and the children and made plans to flee after finding out about the child protection investigation. Protective custody of the four children (ages one, six, seven and nine) was taken due to the deplorable living conditions the children were found in.

Management must ensure that when a mandated reporter, particularly law enforcement, contacts the State Central Register to report abuse and neglect to a child, the call should be given priority. Without obtaining a brief description of the situation, call floor workers and supervisors cannot adequately prioritize calls to the hotline. The State Central Register should cease the practice of asking a reporter if the call is an emergency as any report of abuse or neglect should be viewed as an emergency or clearly define what constitutes an emergency. In addition, call floor workers should be instructed to ask for specific times when a reporter is available for a call back as most reporters would not anticipate a call back in the middle of the night.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**    **1. During times of high call volume, when a mandated reporter contacts the State Central Register hotline, call floor staff should be instructed to obtain a brief description of the situation in order for management to prioritize the call back.**

The hotline is already undergoing many changes and reforms. The Department will take this OIG recommendation into consideration as part of the overall changes being made to the hotline. Currently, every call floor worker asks every caller their relationship to the child and is there is an immediate safety risk to the child.

**2. Call floor staff should request specific times that the reporter will be available for a callback.**

The hotline is already undergoing many changes and reforms. The Department will take this OIG recommendation into consideration as part of the overall changes being made to the hotline. The call floor staff currently request specific times for a callback.

**3. Anytime law enforcement contacts the hotline to report abuse and neglect the call should be returned as soon as possible but no longer than five hours to ensure a return call occurs during their work shift.**

The hotline is already undergoing many changes and reforms. The Department will take this OIG recommendation into consideration as part of the overall changes being made to the hotline. Anytime law enforcement calls, the call floor staff currently request specific time for a callback.

181

**4.  In cases in which the call floor worker is returning a call, the call floor worker should be instructed to document in the hotline narrative when the initial call was made to the hotline.**

The hotline is already undergoing many changes and reforms. The Department will take this OIG recommendation into consideration as part of the overall changes being made to the hotline.

***OIG COMMENT****: What are the specific changes being made and how will the changes address this recommendation? What is the target completion date?*

**5.  The Department should conduct an Audit of the State Central Register within 30 days as previously requested by the legislature.  The audit should also address staffing needs at the State Central Register**.

The Department agrees.  The audit has been completed.

GENERAL INVESTIGATIONS

**GENERAL INVESTIGATION 2**

| ISSUE | The Office of the Inspector General learned that the United States Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS") had terminated an Illinois hospital's Medicare certification due to uncorrected identified issues deemed an immediate jeopardy to the health and safety of the patients. |
| --- | --- |

| DISCUSSION | Inspector General investigators determined that eighteen Youth in Care were placed at the hospital at the time of the termination of the certification. Three of those 18 children were ready for discharge remaining in the hospital beyond medical necessity. |
| --- | --- |

The Office of the Inspector General has previously addressed concerns with the psychiatric hospitalization of young children. Some recommendations from that report are still pending. Seven of the children hospitalized at the time of the certification termination were age twelve and under, including one four-year-old child. In addition, there were five pending and two recently indicated (September 2018) child protection investigations on the hospital further elevating the need for action.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **Though HHS and CMS may agree to an extension to the certification, the Office of Inspector General has serious concerns and requests that the Department take the following actions to ensure the immediate safety and well-being of the hospitalized Youth in Care:** |
| --- | --- |

**1.  Concurrent planning for alternative placements should begin immediately for each of the Youth in Care in the hospital.**

**2.  The Department must identify a liaison to monitor the hospital's compliance with the Corrective Action Plan and the timelines required under it. The Liaison should visit the hospital daily while the threat of termination of Medicaid or Medicare certification continues. In addition, the Department should consider an independent utilization review as set forth in policy guide 98.4.**

**3.  A representative from DCFS Clinical Division should immediately review the records of each Youth in Care at the hospital and visit with them to ensure their continued safety and well-being. Seven of the Youth in Care 12 and under and should have Clinical staff already assigned. Those Clinical staff must be immediately identified and notified of the issues at the hospital.**

**4.  Given that the termination of certification concerns the hospital's compliance with ligature (suicide) risks, DCFS Clinical should assure that for Youth in Care with elevated risk of suicide the hospital is appropriately addressing suicide risk.**

The prior Administration responded to the Office of the Inspector General by providing daily census information of the hospital, assigning a clinical liaison to be at the hospital, and submitting regular updates to the Court pursuant to the agreement made in *BH v. Smith 88C 5599*.  In addition, the ACLU filed an emergency motion calling for the supervised discharge of DCFS youth at the hospital in light of allegations of physical and sexual abuse of patients by other patients or staff and other safety concerns.

**GENERAL INVESTIGATION 3**

| ALLEGATION | Private agency caseworkers refused to speak with the father of a youth in care if the father's attorney was present or nearby. Racial bias by Department and private agency staff was also alleged. |
|---|---|

| INVESTIGATION | A now four-year-old child was born substance exposed and removed from his mother at birth. |

Prior to the child's birth, his mother, a longtime substance abuser, identified who the child's father was and the father's parenthood was confirmed when the child was two-months-old. The father consistently expressed his desire to parent his son. The father's primary language is Spanish – he speaks English as a second language. The father has never been alleged to have abused or neglected any child; he has no history of drug abuse or criminal activity.

Upon discharge from the hospital (at approximately eight weeks old), the private agency placed the child in a non-English/non-Spanish speaking traditional foster home. The primary language spoken in the foster home is another European language, which was established at the outset of the case. The child remained there for four years, while the goal was Return Home to father, and without ensuring the child was learning English or Spanish. Because of that, as the child grew and his language developed, he was increasingly unable to communicate with his father. When the case came to the attention of the Inspector General's Office, the child was four years old and communicated almost exclusively in another European language.

Over the four years while the child had been in foster care, the father has consistently participated in the services requested of him and has always maintained that he wanted to parent. Although the father had never been an alleged perpetrator of abuse or neglect and had no history of substance abuse, the father complied with the extensive services plans created by the agency including completing parenting classes, parenting coaching, individual counseling, substance abuse assessment, substance abuse counseling, random drug screenings, and child-parent psychotherapy.

The mother had another baby born substance-exposed and it was confirmed that the father of the first child was also the father of the newborn sibling, despite the father's avowals that he was no longer involved with the mother. Upon discharge from the hospital, the newborn sibling was placed with her brother in the same traditional, another European language-speaking foster home. Six months later, the agency deemed the prognosis for the new baby to reunify with the father as poor based on the father not making progress toward reunifying with the four-year-old. At the same time, the child's permanency goal was changed from return home to substitute care pending termination of parental rights at the recommendation of the agency.

The Office of the Inspector General submitted an *Interim Report* based on a case record review which suggested bias against the father by the agency. The Inspector General recommended that the Department conduct an objective clinical review of the case to determine whether case management responsibilities should be removed from the private agency. Based on the Inspector General recommendations, the Department held a clinical staffing of this case. As a result of the staffing, the case was transferred from the private agency to the Department for case management.

A full investigation by the Office of the Inspector General was completed and submitted after a full review and interviews of private agency staff. The OIG determined that the agency violated the Burgos Consent Decree. Burgos Consent Decree creates formal protections specific to Spanish speaking parents. To ensure Burgos rights, parents with Hispanic last names, or who appeared to be Spanish-speaking were required to be asked what language they would prefer. Once Spanish was chosen as the preferred language, various other rights came into play, including a provision or prohibition on their children being placed in a non-Spanish speaking home

184

for more than 80 days. Additionally, the Burgos Consent Decree was based on the premise that it was a violation of a parent's right to take their children and not provide basic care that permits eventual return home. It is an expression of the need to respect ties to families of origin, to facilitate return home. The father spoke both English and Spanish, but Spanish was his primary language; he learned English when he was moved to the United States five years prior. Originally, the father stated he would prefer services in Spanish, however, after learning that the assigned caseworker would no longer be the caseworker if he wanted services in Spanish, he signed a form declining his rights under the Burgos Consent Decree.

The Inspector General investigation found that the agency was biased against the father. The investigation revealed that agency staff consistently interpreted the father's behavior in a negative manner and selectively chose facts to support their conclusions in favor of the foster parents. The agency characterized the father as a "perpetrator" and a willing participant of the child's neglect, even though he was never alleged to have abused or neglected the children, because he continued to financially provide for the drug addicted mother. In one instance, the father leased an apartment with the promise of Norman Funds, but due to the child not returning to his care, he did not receive the funds. The agency caseworker noted that the lack of furniture in the apartment may have been a sign that the father lacked commitment to parenting the child. Additionally, when the child was three years old, the court ordered overnight visits between the father and child. However, the child did not respond well to overnight visits; the child screamed and cried when the father came to get the child and refused to go with the father. The agency responded by engaging the family in Child-Parent Psychotherapy. The therapy, however, was provided by staff at the agency. Because the child only spoke Slovak, the father and the therapist could not communicate with the child, therefore the foster parents were included to interpret. The therapy was unsuccessful in addressing the issues.

Additionally, the Inspector General investigation found that the private agency staff did not respect the father's attorney. The staff described the attorney as aggressive and condescending. The agency staff conferred with the Department's attorney, who advised that no one should speak with the father if his attorney was present unless a Department attorney was also present. The investigation determined that there was a disregard for the father's rights and there were no internal procedures in place that would have caught these failures to provide services to the father to promote reunification.

## OIG RECOMMENDATIONS / DEPARTMENT RESPONSES

### Interim Report

**1. While the Office of the Inspector General investigation is pending, the facts identified thus far suggest serious bias against the natural father and unnecessary delay of permanency on the part of agency staff for both children. As a result, the Office of Inspector General recommends that the Department conduct an objective clinical review of the case and this Interim Report to determine whether the case should be removed from the assigned private agency. The case and this report should also be shared with the Department's Burgos monitor to determine whether violations of the Burgos Consent Decree occurred.**

The Department agrees. A clinical review was conducted, and case management responsibility was transferred to the Department.

### Final Report

**2. The involved private agency should reimburse the Department for all costs associated with toxicology screens that were conducted for the father as part of his service plans.**

The Department agrees.  This is being addressed by Budget and Finance.

**3.  The involved private agency should submit a corrective action plan to the Inspector General to address the pattern of biased decision-making that pervaded in this case.**

The Inspector General shared the report with the private agency.  The Inspector General met with the agency's administrators and a member of the Board of Directors to discuss the findings and recommendations made in the report. The agency shared the Inspector General report with the program manager and a discussion was held regarding his involvement in the case and his role on management team. The report was discussed with the supervisor. The foster parents' license is no longer supervised by the supervisor (who was moved into licensing supervisor position) but is now assigned to a licensing team at a different office. In addition, the agency has taken the following actions in response to the report:

- Revised the agency's foster care Theory of Change to more accurately reflect the agency's commitment to birth parents and reunification;
- Provided training to all direct service staff on fatherhood engagement and child development;
- Developed a fatherhood engagement strategy, including measurable outcomes; and
- Ensured compliance with the agency's permanency consultation program model for all new cases at specific milestones.

GENERAL INVESTIGATIONS

**GENERAL INVESTIGATION 4**

| **ALLEGATION** | A Department caseworker provided false testimony in a court hearing regarding a referral for services. |
| --- | --- |

**INVESTIGATION** The caseworker was called to testify in a dispositional hearing for the mother and permanency hearing for her three children, a sixteen-year-old girl, a six-year-old girl, and a four-month-old girl. During a clinical staffing seven weeks earlier, it was recommended that the caseworker refer the case to the DCFS domestic violence program. During cross-examination, the caseworker testified that she referred the case as recommended about three weeks after the staffing. She named a domestic violence specialist and stated she spoke with the specialist in person. The caseworker also stated that she generated notes that the domestic violence specialist believed the mother could address these issues in her individual counseling.

An attorney with DCFS Office of Legal Services submitted a negative court performance report following the testimony because the named domestic violence specialist, who had been a contractual employee, left employment of the Department at least three weeks before the staffing occurred. The caseworker was removed from the case. The statewide administrator for the domestic violence program reported neither she, nor any other clinical domestic violence specialist, had provided consultation on the case. Following an interview with Office of Inspector General (IG) staff, the administrator wrote by email that the only referral clinical received from the caseworker that year was for the clinical staffing for the family.

In an interview with IG staff, the named domestic violence specialist denied that she had ever provided a formal or informal consultation for the caseworker on this case. The domestic violence specialist stated she worked in the same DCFS office as the caseworker, and they worked one case together. She said she had not consulted with any DCFS or private agency staff following her departure from the Department. She stated she always documented all consultations, including informal consultations where a caseworker walked up to her in the hall or called her on the phone, because she had to bill for the time and submit her recommendations to her supervisor for approval. She said she always requested caseworkers send her SCR numbers and a consultation note when they approached her for an informal consultation.

In an interview with IG staff, the caseworker stated she did not refer the case to the domestic violence program, but that she did speak with the domestic violence specialist informally, at an event held in the DCFS office about three weeks after the staffing. She stated she did not provide case names or details in the conversation but explained that the mother had mental health issues, was involved in therapy, and had some issues with domestic violence. The caseworker said the domestic violence specialist responded that the domestic violence issues could possibly be incorporated into therapy the mother was already receiving, and the caseworker should contact the therapist. The caseworker stated she was aware the domestic violence specialist no longer worked for the Department before she discussed the case with her. She added that she had a lot going on in her personal life at the time, and the case was "complicated" and had her in court two to three times per week. She stated that she requested she be removed from the case because of her personal issues and issues she had with the Guardian Ad Litem.

IG staff contacted the DCFS office to verify if the stated event occurred at the DCFS office. The office associate who receives the requests for room reservations recalled an event with a similar name, but she did not recall there being a flyer for the event and she no longer had the email for the room reservation.

In a follow-up interview with IG staff, the domestic violence specialist stated she had visited the DCFS office since her employment ended to make payments to a club she joined while an employee there but has not attended

any events. She did recall an event that was happening during one such visit and said she "popped in" to say hello to former coworkers. She said she did not recall speaking to the caseworker but that she would have spoken to her if she saw her. She said if the caseworker spoke with her about the case, she would have told the caseworker to do a referral to the team. When asked if it is possible she informally told the caseworker individual counseling could deal with the mother's issues, she said she would not say that "because domestic violence should not be handled in individual counseling" and because domestic violence counselors must have specialized training or experience, and there are many free domestic violence services to which the caseworker could have referred the mother.

The Department issued charges against the caseworker's Child Welfare Employee License (CWEL). Following an administrative hearing, the Administrative Law Judge recommended to the CWEL Board that the caseworker's license be revoked. The CWEL Board revoked the caseworker's employee license.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The Department must ensure that clinical recommendations for critical services, such as domestic violence referrals, are not solely dependent on the receipt of a referral form.** |

The Department agrees The Clinical Division is available to provide assistance and support to child welfare workers and other involved professionals without completion of a clinical referral form. The assigned placement team and/or other involved professionals can contact the identified clinician for assistance without a clinical referral. This information is conveyed to the field by all Clinical regional and specialty staff during training and discussions with staff.

**2.  The caseworker should be disciplined up to and including termination for providing false testimony in court.**

The caseworker separated from the Department with no reinstatement rights,

188

**GENERAL INVESTIGATION 5**

| | |
|---|---|
| **ALLEGATION** | A child protection investigator developed a personal relationship with a father whose children were the subjects of a child abuse/neglect investigation assigned to the investigator. |

**INVESTIGATION**  The child protection investigator was assigned to investigate neglect allegations against the children's mother related to the mother's drug use.  The investigator implemented a safety plan for the children to live with their father in a separate residence.  Phone records revealed the child protection investigator's relationship with the children's father became personal early into the investigation.  The investigator failed to document the father's violation of the safety plan, the father's admitted drug use, and collateral reports about the father's drug use.  The investigator's relationship with the father clouded the investigator's judgment and raised question about the reliability of the investigation record.

The investigator referred the family for intact services but failed to report the father's drug use to the intact family worker.  The investigator allowed the father and his children to move into the investigator's personal residence two months after the close of the investigation.  The investigator, father and children actively hid the relationship and living arrangement from the family's intact worker for months.  Conflicts of interest were identified with the revelation of the investigator's personal relationship with the father and family causing service disruptions for not only the family, but also for members of the father's extended family with open DCFS involvement.

Through the course of the OIG investigation, 18 confidential closed child abuse/neglect investigation records, for which the investigator was responsible, were recovered from the investigator's unsecured garage.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.  The child protection investigator should be disciplined, up to and including discharge, for unethical conduct.**

The child protection investigator was discharged.

**2.  The Department should determine whether confidential DCFS files/records remain at the child protection investigator's home.**

All confidential DCFS files/records were removed from this home.

**3.  In accordance with Procedures 300, Reports of Child Abuse and Neglect, and the model of supervisory practice, the Department should ensure that child protection supervisors review investigative records in their entirety, including SACWIS and hard copy documentation, prior to case closure.**

The Department agrees.  This requirement in Procedures, but Regional Administrators and Area Administrators will be reminded. The Deputy Director of Child Protection reviews practice with the Regional Administrators and Area Administrators on the weekly Area Administrator call.

**GENERAL INVESTIGATION 6**

| ALLEGATION | During an OIG investigation of a child protection investigator who was romantically involved with the subject of a child abuse and neglect investigation, a review of that child protection investigation and the family history with DCFS raised concerns regarding the safety of the subject's children. |

| INVESTIGATION | The alleged perpetrator in the child protection investigation has two daughters, ages four and seven. The mother had a history with the Department as a victim of sexual abuse by her father, a convicted and registered sex offender, and by her stepfather during separate incidents. The mother was also indicated as a perpetrator for allowing her father to babysit her eldest daughter. Following the couple's separation, the father retained custody of the children. |

The Department conducted two child protection investigations on the father after the couple separated. The first investigation alleged that the father hits the children while drunk, coaches the children to lie about the physical abuse, and that there are no beds in the home for the children. The investigation was unfounded.

The second investigation began after the police found the maternal grandfather, a convicted and registered sex offender, babysitting the girls, ages four and seven. The father initially denied knowledge that the grandfather was registered sex offender. Others interviewed dismissed that saying the father was well aware of the grandfather's status. The father eventually admitted knowing the grandfather was a sex offender. During the child protection investigation, the maternal grandparents told the investigator the father frequently allows the children to stay with them and the children had been with them for several weekends over the past year. They added that that father uses cocaine and alcohol and coaches the children to lie about his substance use. When the investigator interviewed the father, the investigator noted that the father was drinking beer during the interview. The children confirmed that their father drinks, though the investigator noted that the children seemed guarded when discussing it. The father was indicated for #22a-Substantial Risk of Sexual Injury - Sex offender has access to a child. However, despite the reports of and the observations of the father's substance use, the investigator never conducted an Adult Substance Abuse Screen and the extent of the father's substance abuse was never assessed. The investigator relied on the substance abuse screen that had been conducted in the prior unfounded investigation. The previous screen consisted only of the father's self-reported denial of substance abuse issues. The collateral report section of the previous substance abuse screen was blank despite the reporter identifying the father's substance use. The second investigation was closed out as "No Services Needed" as the father voiced knowledge of community resources and the father agreed to not allow the maternal grandfather to care for the children.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The SACWIS version of the Adult Substance Abuse Form should be amended so that the collateral section cannot be bypassed without a waiver. The waiver should only be given if there is no indication of substance abuse.** |

The Department agrees. Child protection, DoIT and OCFP are working on this. The Deputy Director of Child Protection is following up and coordinating with the other divisions regarding the implementation of amendments.

**2. This report should be shared with the involved child protection supervisor and investigator for training purposes. Specifically, training should address the failure to respond to additional allegations that arose regarding parental substance abuse and excessive corporal punishment; to review the use of**

Children's Advocacy centers for forensic interviews when an allegation of sexual injury is made; and for the importance of crediting collateral information when there are indications of substance abuse.

This report was shared with the child protection supervisor and child protection investigator by the Regional Administrator.

**GENERAL INVESTIGATION 7**

| | |
|---|---|
| **ALLEGATION** | A Department employee falsely reported no income in order to receive Low Income Home Energy Assistance Program (LIHEAP) benefits. |

**INVESTIGATION**   The Department of Commerce and Economic Opportunity (DCEO) audit found instances in which state workers had been receiving Low Income Home Energy Assistance Program (LIHEAP) assistance despite lacking income eligibility. According to the Community and Economic Development Association of Cook County (CEDA), the organization which administers the LIHEAP program in Cook County, residents can apply for energy assistance programs at multiple community-based intake assistances sites.  This Department employee submitted multiple applications for utility bill assistance. The paperwork included signed affidavits stating lack of income, copies of utility bills and copies of a driver's license and social security card. CEDA documents confirmed that this Department employee applied for and received benefits in 2006, 2014 (twice), 2015 (twice), 2017 and 2018 (twice). Benefits received were direct vendor payments to People's Gas and Com Ed for gas and electric bills.

In addition to LIHEAP applications, the employee applied for People's Gas (Share the Warmth) and Commonwealth Edison (Residential Hardship) sponsored assistance programs in April 2017 and May 2018. Inspector General investigators were unable to confirm if she received any funds from those programs.

In an interview with Inspector General investigators, the employee confirmed that the copies of the driver's license and social security card attached to the applications were hers. She also confirmed that the copies of utility bills and the account numbers match her accounts and that LIHEAP payments had been made to those accounts. The employee denied that the signatures on the applications for utility assistance and furnace repair financial assistance were hers, despite the fact that they appeared similar to signatures in the employees personnel file.  The employee also denied presenting the 'no income' affidavits. However, the employee admitted to receiving benefits. The employee stated that she had applied for benefits at least once, but in other instances the benefits "just came."  The employee also stated that she allowed relatives who lived with her to apply for the assistance using her identification.  The employee, when asked directly, stated that she knew she received money she was not eligible for based on her income which far exceeded the level for assistance eligibility.

The employee retired from the Department following the interview with Inspector General investigators.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.      A copy of this report should be placed in the employee's personnel file.** |

The report will be placed in the employee's personnel file.

**2.  This report should be shared with the Department of Commerce and Economic Opportunity to prevent the employee from receiving future benefits.**

The Inspector General shared a redacted report with the Department of Commerce and Economic Opportunity.

**3.  This report should be shared with Community and Economic Development Association of Cook County (CEDA).**

The Inspector General shared a redacted report with the Community and Economic Development Association of Cook County (CEDA).

**GENERAL INVESTIGATION 8**

| | |
|---|---|
| **ALLEGATION** | A public service administrator misused State resources to harass her former boyfriend. |

**INVESTIGATION**   The public service administrator used a state issued cell phone to take family vacation photos and record non-work-related videos.  Among the videos was an angry confrontation with an ex-boyfriend during which the administrator attempted to extort a large sum of money by threatening the ex-boyfriend's employment.  The public service administrator used the state issued cell phone to research and plot revenge against the ex-boyfriend.  The administrator used the research to file two false complaints against the ex-boyfriend with his employer; the ex-boyfriend worked at another state agency.  Both complaints were investigated and unsubstantiated by the other state agency's Inspector General.

In addition, it was alleged that the public service administrator solicited the ex-boyfriend to sell marijuana.  The Illinois State Police Division of Internal Investigation declined to investigate this allegation.

During an interview with OIG investigators, the public service administrator reported a visual impairment and displayed such a significant lack of ability to read documents that serious questions were raised about the public service administrator's ability to perform basic job functions.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**   **1.  The public service administrator should be disciplined, up to and including discharge, for misuse of State resources and conduct unbecoming a State employee.**

The employee was put on desk duty and subsequently through the disciplinary process she was discharged.  Through the grievance process she was returned to work with a 30-day suspension on her record and served a four-month probationary period in her position as public service administrator.

**2.  In the event the Department does not discharge the public service administrator, the administrator should have an independent medical evaluation to ensure the administrator is physically able to fulfill job duties.**

This recommendation is no longer applicable.

***OIG COMMENT:*** *Given the employee's statements and observed behavior during the OIG interview, the employee should still have an independent medical evaluation if she is expected to read and drive as part of her job duties.*

193

**GENERAL INVESTIGATION 9**

| | |
|---|---|
| **ALLEGATION** | During an administrative expungement hearing of an indicated child abuse/neglect investigation, a child protection investigator provided false testimony and submitted |

false case records concerning case contacts that she did not actually perform during the child abuse/neglect investigation.

| | |
|---|---|
| **INVESTIGATION** | On the day that the child abuse/neglect investigation was approved for case closure, the child protection investigator created notes in the case record documenting in- |

person visits she claimed to have made at the onset of the investigation. At the conclusion of the child abuse/neglect investigation, the involved parent was indicated for neglect. The parent appealed the indicated finding on the grounds that the investigator never talked to the family members she claimed to have spoken to during the investigation. During the expungement hearing, several witnesses testified that they never met with nor talked to the investigator during the child abuse/neglect investigation. The Administrative law judge recommended, and the Director agreed that the indicated finding be expunged.

When interviewed by Inspector General investigators, the child protection investigator confirmed authoring the falsified notes and stated to IG investigators that she did not recall whether the individuals she documented that she met with and spoke to were present during the case contacts. Statements that the investigator made to IG investigators contradicted testimony that the investigator provided during the expungement hearing.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **The Office of the Inspector General issued charges of falsification of case record and court testimony against the investigator's Child Welfare Employee License, pursuant to Administrative** |

**Rule 412. The Administrative Law Judge recommended licensure revocation. The final decision of the Child Welfare Employee Licensure Board is pending.**

**GENERAL INVESTIGATION 10**

| **ALLEGATION** | A child protection investigator falsified several contact notes in the State Automated Child Welfare Information System (SACWIS). |
|---|---|

**INVESTIGATION**   The State Central Register (SCR) received a call that abrasions had been observed on a child. When questioned by school staff, the child indicated that the abrasions were unintentionally obtained; the child fell while corporal punishment was being administered by an adult relative.

The child protection investigator interviewed the child at school and learned that the adult performing corporal punishment at the time the abrasions occurred, was not the adult initially implicated. Shortly after interviewing the child, the investigator spoke with law enforcement personnel who indicated that the police investigation was being closed as the superficial marks, and the circumstances surrounding the incident, did not warrant further police involvement.

Upon reviewing the case, the investigator's supervisor instructed the investigator to interview the alleged perpetrator and all other members of the household. The supervisor noted that the adult initially thought to be the perpetrator, did not live in the household with the victim, and would need to be interviewed separately. Following this directive, the investigator added multiple case notes in SACWIS, indicating that both adults were present during the interview, were issued CANTS 8 letters, and understood DCFS involvement regarding the pending investigation. Another note was entered the same day, indicating that a walkthrough of the home was conducted. The third case note was dated the same as the others but was entered four days later. This case note confirmed that both adults implicated in the initial report were present during the interview.

Approximately one month after the child protection investigator entered the case notes into SACWIS, the adult who was erroneously implicated in the investigation, received a letter citing involvement with an unfounded investigation of child abuse and neglect. Subsequently, the adult sent a letter back to the Department confirming no prior knowledge of any investigation. During the Office of the Inspector General's investigation, the parent/caretaker of the victim maintained that no other adult resided in the household at that time, nor at the time of the initial investigation.

The child protection investigator initially cooperated with the Office of the Inspector General's Investigation, but later failed to attend an in-person, administrative interview.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**   **The Inspector General issued charges against the investigator's Child Welfare Employee License (CWEL) for falsification of case notes and failure to cooperate. The investigator did not file an answer to the charges or appear at the pre-hearing. The Administrative Law Judge granted a finding of Abandonment. The investigator's Child Welfare Employee License was revoked by the CWEL Board.**

195

**GENERAL INVESTIGATION 11**

**ALLEGATION**   A private agency worker failed to make required monthly home visits, and falsified contact notes in the State Automated Child Welfare Information System (SACWIS). The worker also falsified mileage reports submitted to the employing agency.

**INVESTIGATION**   The investigation was initiated after it was alleged that the worker failed to visit foster families. Inspector General Investigators interviewed ten foster parents assigned to the worker, nine of whom indicated that visits did not occur monthly. Only one foster family confirmed consistent monthly visits, while others reported no visits for up to four months. There were several instances in which the worker deceptively reported visiting foster homes with children present. Findings resulting from the investigation verified that these reports were falsified. Several of the foster parents interviewed provided their children's daily itinerary as evidence of the children being unavailable for home visits on the dates and hours reported by the specialist in SACWIS. A few of the foster families informed investigators that they were unaware that monthly visitation was a requirement, and only met the worker upon initial introduction.

The worker claimed mileage expenses for most of the visits documented in the in the State Automated Child Welfare Information System (SACWIS). When scrutinized by Inspector General investigators, many of the claims for mileage reimbursement were also found to be falsified. Further investigation uncovered over fifty mileage claims, submitted for home visits that did not match the notes entered in SACWIS. Eight of the mileage claims detailed dates and times of purported visits for which the foster parents denied contact with the specialist. Only five of the home visits for which mileage reimbursement forms were submitted remained consistence with information gathered from investigation interviews with foster parents.

When confronted with the falsified mileage claims, the worker cited supervisory instruction and policy prohibiting agency employees from exceeding one hundred fifty miles of travel daily. The worker explained that at least two of the agency's supervisors instructed workers to report any mileage exceeding one hundred fifty miles within one day, on a different day to receive compensation. The worker reported traveling over one hundred fifty miles at least four days out of the five-day work week.

A corrective action plan was enforced by the agency employing the worker, just over one month before the employee submitted a resignation. The worker cited dissatisfaction with supervision, and a high caseload volume before submitting a resignation. The resignation came after Inspector General investigators documented over thirty-five occurrences of falsified foster home visits occurring between January 2017 and November 2017.

In an interview with Inspector General investigators, the worker maintained that all monthly visits were conducted, and that all home visit notes were factual, except perhaps the time of contact. When further questioned by Inspector General investigators regarding the conflicts between SACWIS notes and scheduled visits, the worker did not provide a response.

The Office of the Inspector General issued charges against the worker's Child Welfare Employee License. The Administrative Law Judge recommended revocation and the Child Welfare Employee Licensure board revoked the license.

196

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. This report should be shared with the worker's private agency.**

The Inspector General shared the report with the private agency.

**2.  The private agency should issue a letter to the former employee instructing her to cease contacting former clients.**

The private agency will issue a letter to the former employee instructing her to cease contacting former clients.

**GENERAL INVESTIGATION 12**

| **ALLEGATION** | A private agency worker breached professional boundaries with a sixteen-year-old youth in care who was recovering from near-fatal injuries from a motor vehicle accident. |
|---|---|

| **INVESTIGATION** | A sixteen-year-old youth in care, who fractured vertebrae in his back following a motor vehicle accident was taken to the hospital. It was determined he would require surgery. |
|---|---|

Once in the hospital, staff suggested an adult stay overnight. The foster parent and caseworker decided that the caseworker would stay overnight.  A hospital nurse documented in her notes that on the night and early morning one night she found the worker on the youth's hospital bed. The worker was fully clothed; the youth was under the blanket, she was over. The nurse suggested the worker move and she did, though the nurse later reported seeing the worker back on the bed.  The nurse contacted the worker's private agency and reported that though she did not have concerns that anything sexual was occurring, she noted the behavior seemed unusual. The agency temporarily removed the worker from the youth's case to review the allegations and the regional director counseled the worker on setting appropriate boundaries in her professional interactions.

Two weeks after the worker was removed from the case, the foster parent of the youth gave a 14-day notice citing that the worker had been coming to the home daily to assist the youth, bought him clothes and took the youth home with her one weekend. The foster parent reported that she did not think there was anything sexual going on but felt the worker was exhibiting poor boundaries. The agency discharged the worker that day. The regional director reported that though her investigation did not disclose evidence of anything beyond boundary issues and failure to follow rules, the conduct warranted discharge.

The foster parent operated an in-home daycare from 7:00 am to 11:00 pm and worked a second part time job on the weekend and was therefore unable to be at the hospital with the youth. The worker volunteered to stay with him.  In an interview with Inspector General investigators, the worker explained that the night following his surgery the teen was in a lot of pain. They watched a movie together sharing a pair of headphones and he fell asleep. The worker stated she sat on his right side, on top of the blankets. As he had been having trouble sleeping in the hospital, she did not want to wake him by moving so she stayed where she was on the bed. She said she did not sleep much and spent time reading on her phone. She recalled the nurse coming in during the night asking her about moving when they came to take the youth's vital signs.  The worker stated she felt comfortable staying in the hospital because her brother, who had died recently, was diagnosed with cancer around the age of 16 and she had spent a lot of time in the hospital caring for him.

The teen was discharged from the hospital the day the worker was removed from the case, but the worker and foster parent continued to be in contact. The foster parent planned to work a part-time job the weekend following discharge and the worker worried that the teen was going to be left home alone. The worker offered to come to the home to stay with the youth and the foster parent agreed. The worker admitted that she had initially planned to stay with the teen until he fell asleep, but she herself fell asleep and spent the night. The worker reported that the following weekend when the foster parent was again working, the worker took the teen to her home as her own teen children were home and the worker did not think the youth should be alone.

The investigation determined the worker failed to maintain appropriate professional boundaries; however, the worker's conduct was not found to be prurient or otherwise against the best interests of the child.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. This report should be shared with the worker's current supervisor to ensure that the worker is monitored and counseled concerning the importance of maintaining appropriate boundaries with clients.** |
|---|---|

The Inspector General shared the report with the agency where the worker is currently employed.

## GENERAL INVESTIGATION 13

**ALLEGATION**  During a child abuse/neglect investigation, a Facetime call with the child victim was substituted for an in-person contact, after the investigator and supervisor determined the investigation would be closed because of the family's seeming refusal to let the child be seen.

**INVESTIGATION**  The mother and child were evicted following a hotline call on the family's landlord. The investigator on the landlord's case determined the families used the hotline to harass one another. A relative told the investigator the child was residing in the relative's home during the week and was registered in the local school. The relative, however, used delay tactics to prevent the investigator from entering the relative's home. The investigator did not contact the local school district to confirm the child's enrollment or attempt to see the child at the local school. The mother did not respond to the investigator's numerous messages until after the investigator and supervisor decided to close the investigation. When the mother returned the investigator's calls, she said the child was visiting her in a neighboring county. The investigator read the hotline narrative to the mother verbatim and suggested Facetime contact with the child. The investigation was determined unfounded and closed shortly after without the required in-person contact with the child. At the time of the investigation, the Department did not provide guidance for investigative staff regarding the appropriate use of video conferencing tools, such as Facetime.

During a subsequent investigation, another investigator learned the mother and child had lived in the neighboring county since their eviction and the mother and child moved in with a man the mother had not previously known. The mother evaded the investigator. School officials in the neighboring county declined the investigator's attempt to interview the child at the mother's instruction. An in-person contact with the child occurred only after protective custody was discussed during the subsequent investigation.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**  **1.  The Department should research best practices and draft policy for the appropriate use of video conferencing tools (including but not limited to Skype, Facetime, Google Hangout, etc.) in investigations.**

The Office of Child and Family Policy will update Administrative Procedure to reflect that social media contacts with children do not replace in-person contacts.

**2.  Child protection investigators should be trained to analyze situations in which they are informing alleged perpetrators of the allegations against them and assess if it is appropriate to read the narrative word-for-word or provide a summary.**

Child protection investigators are not trained to read the entire CANTs 8 form, nor does the Department want them to. Rather, investigators should cover the important points, answer any questions about the form and read it to someone who cannot read or has developmental disabilities. Once clarification is made on what is to be taught, the Office of Learning and Professional Development will use this redacted case to develop case scenarios for use in Foundations Child Protection and Subsequent Oral Report (SOR) curricula to enhance critical thinking skills.

**3.  The Department should consider strengthening P300.80 when an alleged child victim is inaccessible and ensure investigators are trained accordingly.**

P300.80 is very clear on steps to be taken when an alleged child victim is inaccessible, however, the use of waivers is implied. The Department will clarify the waiver piece by adding a sentence to P300.50. Child

Protection has communicated to the Office of Child and Family Policy that the language in 300.50 refers to 300.80 as it relates to the requirement of PSA/AA waiver and approval.

*OIG COMMENT: The Department should clarify in Procedures 300.80 that video conferencing contact with alleged child-victims does not replace in-person contact.*

**4.  The Department should consider a legislative change to amend ANCRA and the Illinois School Code to require schools to allow child protection investigators to speak with children at school, without notifying the alleged perpetrator.**

The Department agrees.  The DCFS Office of Legal Services has researched this issue and is considering potential legislative solutions. Additionally, the DCFS General Counsel and Deputy Director of Child Protection have met with representatives of the Illinois State Board of Education (ISBE), and ISBE and DCFS have agreed to send a joint letter to school officials across the State to clarify the authority of DCFS child protection investigators to speak with children at school. DCFS will continue its discussions with ISBE about possible legislative changes.

**5.  The Department should develop a method/tool for child protective investigators to quickly reference ANCRA from their Department issued cell phones when they are denied access to a child for an interview so that they may provide the statutory authority allowing access to a child.**

The Department agrees. ISBE and DCFS have agreed to send a joint letter to school officials across the State to clarify the authority of investigators to speak with children at school.  Once finalized and sent, this joint letter will be available for DCFS investigative staff to use as authority.

200

## GENERAL INVESTIGATION 14

**ALLEGATION**   A private agency caseworker provided misleading information in a court report that a school principal expressed concerns about the number of times a parent accessed his daughter's school records through its computer portal program.

**INVESTIGATION**   The child and her older half-sister lived with their mother and the child's father. When the parents divorced, the domestic relations court awarded custody of the girls to their mother. The court restricted visits between the child and her father requiring these visits to be supervised by a third person. This was due to the father's domestic violence to his wife and his excessive drinking. When this family came to the attention of the Department, the father had not seen the child for two years and the mother had moved the girls to their maternal aunt and uncle's home.

This family came to the attention of the Department when the then twelve-year-old's school called the hotline to get services for the family following the mother's mental health crisis. The girls, age twelve, and her older half-sister, age 16, were not with their mother during this time. The mother was involuntarily committed to a mental health facility.

The Department took protective custody of the girls and the girls remained with their aunt and uncle, as a home of relative placement and the placement case was assigned to a private agency. The twelve-year-old's father reengaged with his daughter after the Department became involved. Through a court order, the father was permitted to attend his daughter's school sports and activities but was not allowed to have any unsupervised contact with the minor. In response to a request from the twelve-year-old's school principal for a copy of the court order, the caseworker sent the principal a letter stating that parents may attend school and church events but were not permitted to speak to the minor directly. In response to the letter, the principal called the caseworker to further discuss the access the parents were permitted, specifically if the parents should be allowed access to the school's computer portal program. The principal noted that the father accessed the portal "quite frequently". The caseworker informed the principal that there were no restrictions as to accessing the computer portal, but the agency would monitor the situation and encouraged the principal to contact the agency if there were further concerns.

Subsequently, the caseworker completed a court report in which she stated that the principal expressed concerns about the number of times the father accessed the child's school records through the school's computer portal program. Due to this concern, the caseworker requested that the father's access to the computer portal program be denied, and the school complied. The father then complained to the school, and his access was restored. The principal later testified at a permanency hearing that the employee had lied in a court report about him expressing concern over the father's computer portal program access.

The Inspector General investigators could not find any notes documented in SACWIS regarding the events of this complaint and conducted interviews with the individuals who were involved, including the private agency employee and the principal. The employee stated that she spoke with the principal regarding the father's access to the computer portal program on two different occasions. The employee did admit to Inspector General investigators that although the principal never actually expressed concerns on this issue, she did believe that he was worried by it. The employee conceded that she should have clarified in the court report that the principal never expressed concerns about the computer portal program access, and that the concern was something she perceived from his tone of voice during their conversations.

The principal did adamantly state that he never expressed apprehensions to the private agency employee about the father's computer portal program access. However, he did admit to the Inspector General investigators that

201

he did not believe the employee intentionally misrepresented their conversations. He also stated that he could see how she could have misinterpreted his questions regarding the biological parents' access to the child's school records.

The Inspector General investigators concluded that this was a misunderstanding, and that the actual complaint to the Inspector General could have been avoided if there had been better communication between the private agency and the school.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.  This report should be shared with the involved private agency.**

The Inspector General shared the report with the private agency.  The Inspector General will meet with the agency's administrators and a member of the Board of Directors to discuss the findings and recommendations made in the report.

**2.  The private agency should ensure staff in this region are re-trained on proper documentation of case notes and supervision notes.**

The Department agrees. Agency Performance Team will follow-up to ensure that the agency schedules the training and APT will attend to provide support and expertise.

**3.  The Department's Agency Performance Team monitoring should review the private agency cases in this region to make sure all staff are documenting in SACWIS and doing so in a timely manner. Staff should document all contacts, activity, and supervisory sessions for every case, to ensure an accurate, written record exists in every case.**

The Department agrees.   Agency Performance Team continues to review case records and provide monitoring in this area and discusses concerns with the agency. A formal plan will be requested on how they are going to internally track and show improvement in these areas.

**4.  The private agency should retrain supervisors in this region to ensure that supervision is occurring as set forth in Policy Guide 2018.09, Model of Supervisory Practice. If the supervisor or the caseworker had talked with the school principal, it is likely this issue would have been resolved without it escalating to be heard by the court.**

The Department agrees. Due to the systemic issues occurring at these sites it is recommended that all supervisors complete the Model of Supervisory Practice and provide documentation of such to Agency Performance Team.

**5.  The Department should create clear procedures for workers to have when confronted with an issue pertaining to the ever-growing field of electronic access to school records. Particularly when the Department has custody and guardianship of a minor. Caseworkers should have clear direction as to when it would be appropriate to request a non-custodial parent's access be denied or restricted to school records. Further, the Department should determine whether caseworkers should request that the access be restricted from the school or through a court order. This should be developed in consultation with school districts and/or the Illinois State Board of Education.**

The Department agrees. DCFS legal counsel and ISBE legal counsel have already started discussions pertaining to access of records.  This will be added to the list of ongoing communication with ISBE and the 852 school districts throughout the State.  Online access is given to the individual who had legal custody or guardianship at the time of enrollment.  DCFS and ISBE will have to create a procedure for youth whose custody situation changes after the time of enrollment. Training will be provided as needed.

202

**GENERAL INVESTIGATION 15**

| ALLEGATION | A private agency supervisor demonstrated unethical conduct when she became involved in cases in which her parents were the foster parents. |
|---|---|

| INVESTIGATION | Four young children, all under the age of six, were placed in foster homes when |
|---|---|

removed from the care of their mother. Three years later, after multiple foster home placements, the then seven-year-old was moved to a foster home apart from his younger siblings. The seven-year-old remained in that foster home for six months after which he was moved again and placed with his younger siblings. Approximately, one month after the seven-year-old was placed in the foster home with his siblings, the seven-year-old disclosed to the foster mother that in his previous foster home another child, age twelve, sexually abused him.  The twelve-year-old was a foster child who had been adopted by the former foster parents. Both foster homes involved were licensed by the same private agency. A child protection investigation was initiated that same day against the twelve-year-old for allegedly sexually abusing the seven-year-old.

After the seven-year-old made this disclosure, the current foster parent called the former foster parent and the private agency caseworker to inform them of the sex abuse allegation against the twelve-year-old.  After a report had been made to the Hotline for the alleged sexual abuse, the former foster parent began calling the current foster parent asking questions about the investigation of the sexual abuse. Also, the private agency supervisor, rather than the caseworker, went to the current foster home to "talk to the children". According to the current foster parent, both the former foster parent and the private agency supervisor told her that the seven-year-old was a "liar" when he made the allegations against the twelve-year-old and the private agency supervisor gave notice that she would be removing the children from her home stating that since the children make up a group of four siblings, all of the children would be removed from the current foster home. In an interview with Inspector General investigators, the private agency supervisor denied making these statements.

The private agency supervisor was the daughter of the former foster parents and the adoptive sister to the twelve-year-old. The current foster mother was unaware of the familial relationships between the former foster parent, the twelve-year-old and the private agency supervisor. The current foster parent did not learn of the familial relationship until the detective of the criminal investigation went to her house to interview the seven-year-old and instructed the current foster parent not to talk with the former foster parent or provide any further information about the investigations.

To ensure the safety of the other two children in the former foster home where the twelve-year-old alleged subject lived, the child protection investigator made arrangements for the twelve-year-old to stay with the "back-up caretaker" which was the former foster parent's daughter (the private agency supervisor) during the child protection investigation. Neither the former foster mother nor the private agency supervisor disclosed their familial relationships to the investigator.

When the investigator made another visit to the twelve-year-old's foster home three days later, she found the twelve-year-old there and asked him if he was still staying with the foster mother's daughter. The twelve-year-old reported that he had not stayed with the daughter and that he remained in the foster home.  The foster mother told the investigator she created a safety plan so the twelve-year-old could return home, and that it was approved by a private agency staff person, and subsequently, the twelve-year-old moved back into her home.

The investigator learned about the familial relationships in the twelve-year-old's foster home from the current foster parent. When the investigator asked the private agency supervisor why she did not disclose the personal relationship, the supervisor stated she thought the investigator was already aware. The investigator then informed the supervisor it was a conflict of interest for her to be involved with the children or any part of the

investigation asked the supervisor to have the case reassigned. After discussion, an agreement was reached that an administrator with the private agency would assume responsibility for the private agency child placement case while the child protection investigation was pending and would be the private agency contact person during the sex abuse investigation.

According to private agency licensing staff, the private agency was aware of the personal relationship between the agency supervisor and the former foster parents and, when the supervisor had been a caseworker, had taken steps to ensure the children on her caseload were not placed in her parents' foster home. However, the conflict of interest issues was more complicated when the daughter became a supervisor.

The private agency was in the process of revoking the former foster home's license after sexual abuse allegations when the foster parent informed the private agency licensing unit that she wanted to relinquish her foster home license.

The Office of the Inspector General investigated a separate incident related to the conflict of interest for the private agency supervisor.  An eleven-year-old girl was placed in the supervisor's parents' foster home and ultimately returned home to her mother three years later. After return home, the families stayed in contact and the foster parents provided support to the mother. After the now fourteen-year-old child had been visiting with the foster parents, the foster mother did not want the child to leave. The Department became involved and a child protection investigator arrived at the foster home to find a police officer, who had been called by the foster parent, present in the home. The foster mother prohibited the investigator from speaking with the fourteen-year-old. The police officer took temporary custody of the child and brought her to the police department, where her mother was going to pick her up. The investigator went to the police station with the child to wait for her mother. While they were waiting, the child's phone rang and the caller ID identified the agency supervisor, who was also the foster mother's daughter, as calling.  Shortly thereafter, a young lady walked into the police station, identified herself as the private agency supervisor's daughter and stated she was at the police station because her mother, the private agency supervisor, told her to pick-up the fourteen-year-old, since the child's mother had asked the private agency supervisor to get the child for her. The investigator immediately called the child's mother, who denied telling the private agency supervisor to pick-up her child.  The investigator drove the child home.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The private agency must have a written Ethics Code, which is at a minimum as restrictive as the Code of Ethics for Child Welfare Professionals.** |
|---|---|

The agency has an agency wide Code of Ethics. The agency will specifically adopt and train foster care staff on the restrictions of the Code of Ethics for Child Welfare Professionals. The Department's Agency Performance Team monitor will follow up to ensure the agency has annual training on ethical behavior and conflict of interest.

**2.  The Agency Performance Team (APT) monitor for the private agency should ensure that agency staff and administrators have annual training on ethical behavior, responsibilities as child welfare professionals and conflicts of interest.**

APT will follow up to ensure the agency has annual training on ethical behavior and conflict of interest.

**3.  The APT monitor and the private agency should ensure that private agency's supervisor receives additional training on how to effectively supervise staff.**

204

The agency provided the supervisor with additional training and support. An additional caseworker has been hired to address caseload levels. APT will follow up on possible training for the supervisor in this case.

**4.  Any future consideration of licensing the involved foster home should include a review of this report.**

The Department agrees. The Department placed this foster home on placement hold.  The license expired with no application for renewal. There are no DCFS children in placement, except for three adopted children with a subsidy. This hold will trigger an assessment if they apply for a new license in the future.

**5.  The DCFS Agency Performance Team should complete a case audit and review all cases being presently served by the private agency to determine if the agency's performance is in line with its contract with DCFS and its Agency Program Plan, including but not limited to a review to determine if its staff are serving clients in a manner that serves the children's best interests, and if its staff performance meets the service requirements expected of workers who serve DCFS youth in care.**

APT will follow up on a possible case audit.

**6.  This report should be shared with the private agency.**

The Inspector General shared the report with the private agency.  The Inspector General met with the agency's administrators and a member of the Board of Directors to discuss the findings and recommendations made in the report.

**7.  The private agency should review and consider discipline for the private agency supervisor and administrator based on these ethical violations.**

The private agency did not agree to discipline for either the supervisor or administrator. The private agency submitted a written response contesting portions of the Inspector General's report. The agency's written response was forwarded to the Department.

GENERAL INVESTIGATIONS

**GENERAL INVESTIGATION 16**

| ALLEGATION | A Department employee allegedly falsifying timesheets in order to received temporary assignment pay. |
|---|---|

**INVESTIGATION**  Employees can be temporarily assigned to perform other or additional duties by their supervisor or other person in their chain of command.  When this happens, employees are entitled to an additional twenty dollars per day.  There is no documentation associated with temporary assignment, other than timesheets signed by an individual's supervisor.

The supervisor denied signing timesheets that noted temporary assignment pay the employee received over a two-month period.  However, there was insufficient evidence to determine the staff member falsified the timesheets after they were signed by the supervisor.  While the supervisor steadfastly denied the temporary assignment, notations were on the timesheets at time of signature, the supervisor also overlooked the employee's temporary assignment status on other documentation, suggesting the supervisor may have overlooked the notations on the timesheets as well.  There was no dispute the employee was asked to do additional work that was not in the employee's job description.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**  **1.  The Department should create a process with a form separate from timesheets to formalize and document temporary assignments to avoid future misunderstandings.**

The Department agrees.  This is in the development stage.

206

## GENERAL INVESTIGATION 17

**ALLEGATION**    A former private agency licensing supervisor forged the names of three licensing representatives on twelve different licensing documents without their knowledge and/or permission. The forgeries were discovered after the supervisor resigned from the agency.

**INVESTIGATION**    A review of foster home licensing records and interviews with the licensing representatives named on the twelve documents revealed that the licensing representatives were unaware that the former licensing supervisor had forged their signatures on the documents.

In an interview with Inspector General investigators, the former licensing supervisor acknowledged that she had signed the licensing representatives' names to the documents, in addition to her own, but maintained only signing forms after receiving oral reports on home visits from the licensing representatives. The former supervisor stated that she would complete all necessary paperwork, because the licensing representatives did not like to complete the paperwork and during the time period in question licensing staff were overwhelmed with the quantity of work and paperwork. The former supervisor stated that the licensing representatives she supervised were new to licensing and were unfamiliar with completing forms so she would complete the forms after the representatives reported their observations from visits to foster homes. The former supervisor acknowledged that she should have written her initials next to the licensing representatives' signatures and secured their agreement to sign their names in writing. The supervisor said the licensing representatives and the Program Director were aware of this practice. The former supervisor reported that during the time she was engaged in this practice she was attempting to complete work in two different full-time positions with the agency.

Inspector General investigators through interviews with the supervisor, licensing representatives, foster parents and a review of licensing files, SACWIS contact notes and child protection records were able to verify the visits to the homes prompting the required signatures were completed by licensing staff.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**    1. This report should be shared with the private agency.

The Inspector General shared a redacted report with the private agency.

**2. The private agency should retrain their staff on the importance of accurately documenting signatures on case records.**

The Department's Agency Performance Team monitor will ensure the agency retrains their staff on accurately documenting signatures on case records.

207

**GENERAL INVESTIGATION 18**

| | |
|---|---|
| **ALLEGATION** | A child protection investigator allowed an indicated perpetrator of sexual abuse into a DCFS field office, specifically into the secured area where the child protection investigators worked, to wait for his girlfriend who was a child protection investigator. The child protection investigator also printed out the investigative file on the indicated perpetrator, highlighted certain areas in the file, and gave it to the perpetrator's attorney. |

| | |
|---|---|
| **INVESTIGATION** | There was no dispute that the child protection investigator brought the indicated perpetrator into the secured area at the DCFS field office. In an interview with Inspector General investigators, the investigator explained that she did not think of the man as an indicated perpetrator of abuse. Instead, she viewed him as a "spouse" to her "very good friend" and co-worker. The investigator also considered the boyfriend a good friend as she and her friend's families socialized together in and out of the office. The investigator stated that the indicated perpetrator did not see anything confidential at her cubicle. She denied printing off a copy of the indicated perpetrator's file for him or anyone. She stated that the boyfriend had received a redacted copy of his investigative file from the DCFS administrative hearings unit when he filed an appeal of the indicated findings. The investigator stated the two did not talk about the investigation while in her cubicle but admitted to talking to the indicated perpetrator about the investigative file outside of the office, after work hours. Inspector General investigators could not find any evidence that the investigator either printed or accessed the indicated perpetrator's confidential investigative file on SACWIS. |

During Inspector General interviews, it was further alleged that the investigator attempted to get information about the cases against the indicated perpetrator during casual conversations with assigned investigators and at a multi-disciplinary team meeting at the Child Advocacy Center (CAC). The investigator denied that she ever questioned professionals investigating the case about the status of the investigation and stated that she maintained strict boundaries to avoid mixing her personal and professional roles. The CAC was not notified about the conflict at the outset of the case. Law enforcement personnel expressed frustration about the conflict posed by the investigator attending CAC staffing's while the criminal case was pending and potentially compromising the integrity of other investigations.

During the Inspector General investigation, the area administrator issued a memo to all supervisors in her region directing them to notify all staff in the region that non-employees are prohibited from entering the locked areas of the offices to preserve confidentiality of clients, unless a worker gets approval from a supervisor. Approval will not be permitted for individuals having a serious criminal or DCFS history. Approval for entry into locked areas of DCFS offices is not required for other professionals who are working on DCFS cases with Department employees.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. All staff in the field office should receive a training on confidentiality, personal relationships, and ethical behavior. The training should emphasize the use of the Code of Ethics for Child** |

**Welfare Professionals as a framework for discussion of difficult ethical issues and using the framework to create boundaries and weigh competing interests.**

The Ethics Officer will schedule a training with staff in the involved field office.

**2. The issue as to what a child welfare professional can or cannot do in advising non-professionals under these circumstances should be referred to the Ethics Officer for a determination as to what is permitted or not permitted to be discussed.**

The Ethics Officer will review the child welfare training materials, as well as the Code of Ethics for Child Welfare Professionals, and provide additional guidance to staff regarding this "gray area" of providing expert advice to a friend.

**3.  DCFS Conflict of Interest Protocol should include notifying the Child Advocacy Center (or other departments or agencies) where there are existing conflicts with pending investigations.**

The Department agrees to notify Child Advocacy Centers or other involved agencies of a potential employee conflict, when and if the Department is made aware of a conflict.

**4.  The Department should take appropriate disciplinary action against the child protection investigator for attempting to discuss a case in which she was personally involved with Child Advocacy Center and law enforcement personnel.**

The investigator received a counseling session.

**GENERAL INVESTIGATION 19**

| | |
|---|---|
| **ALLEGATION** | A complaintant alleged child protection investigators improperly unfounded reports of physical and sexual abuse by a father to his three-year-old daughter and eight-year-old stepson. |

| | |
|---|---|
| **INVESTIGATION** | The parents were investigated and unfounded for substantial risk of physical injury/environment injurious to the then five-year-old stepson and seven-month-old |

daughter following a domestic dispute between the parents. After the investigation, the parents separated, and divorce proceedings ensued. Shortly thereafter, the Department initiated a second child protection investigation after the alleged victim, then age five-and-a-half, reported sexual abuse by his stepfather to his therapist and his mother furthered the accusations by adding that both children may have been sexually abused. The investigation was unfounded as the alleged victim did not disclose abuse during the forensic interview and there was no evidence of sexual abuse from the medical exam of either child.

Five weeks later, the Department investigated and unfounded another report of sexual abuse after the babysitter reported that the then six-year-old reported the stepfather had sexually abused him. The investigation was unfounded for insufficient evidence to substantiate the allegations. Child protection investigators began to suspect harassment by the children's mother as the allegations and outcries of abuse corresponded with the impending divorce and several of the reports were made by individuals close to or related to the victim's mother. The reports were retained by the State Central Register for harassment and the police believed the mother was prompting the reports against the father.

Seven months later, a physician contacted the Hotline after the mother told him that the then two-year-old was exhibiting sexualized behaviors. The week prior, the six-year-old had reported to the doctor that the stepfather had annually penetrated him. The alleged victim stated to the investigator that he was fond of the alleged perpetrator and that he never told his mother anything that had previously been reported regarding sexual abuse. The alleged victim's behavior became increasing concerning and his teachers reported outbursts of a sexual nature. Another investigator was assigned after the family pediatrician questioned the legitimacy of the previous investigations. In an interview with the child protection investigator, the family attorney, and the family pediatrician, the alleged victim's mother denied expressing concern about the alleged perpetrator molesting either of the children. A psychosexual evaluation was completed as part of the divorce proceeding and supported that the alleged perpetrator was not a sex offender. The investigation was unfounded. Mandated reporter reviews were requested and the allegation of substantial risk of sex abuse was indicated, based upon the child's sexualized behavior, to an unknown perpetrator.

Six months later, an investigation for substantial risk of physical injury/environment injurious to the three-year-old daughter against the father was initiated after the mother's cousin reported that the child reported that her father pulled down her pants and bit her. A related information call was taken after the mother reported that the eight-year-old son expressed homicidal and suicidal ideations. Another related information caller reported that mother had taken the three-year-old to several hospitals for vaginal examinations reporting sexual abuse. The investigation was unfounded and closed.

The Inspector General investigation did not find malfeasance or malpractice on the part of any child protection investigator or supervisor involved in this case.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **The Department might suggest to the physician to obtain and review a copy of the court transcript where the mother recanted,** |

**and the petition where she withdrew her request for supervised visits between the father and daughter. This would be a public record.**

The Department agrees. As this is a matter of public record, the physician can certainly exercise his right to review the court transcript.

GENERAL INVESTIGATIONS

**GENERAL INVESTIGATION 20**

**ALLEGATION**     A Department employee conducted activities related to secondary employment on state time, misusing state resources such as the telephone, computer and printer for the employee's real estate business.

**INVESTIGATION**     Inspector General investigators conducted multiple interviews, reviewed Outlook Calendars, timesheets and emails, as well as DCFS computer and internet activity. Investigators found that the employee had used the DCFS computer to visit sites related to the employee's secondary employment. Inspector General investigators also found, and the employee admitted, that the employee had used DCFS email, phone and printer for activities related to a real estate business.

Inspector General investigators also determined that the employee had misused benefit time, taking sick days instead of personal or vacation days, when taking time off for secondary employment activities. The supervisor who approved the time, had not questioned the benefit time even though sick time (not for sick appointment) had been requested a month ahead of time.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**     **1.  The employee needs to be directed to keep boundaries with regards to secondary employment and directed to track use of time and ensure it is approved by the employee's supervisor.**

This issue was discussed with the employee and documented in the employee's annual evaluation and supervisory file.

**2.  The employee should be disciplined for misuse of benefit time.**

The employee was suspended for thirty days.  The discipline was reduced to a twenty-day suspension following a grievance.

**3.  The employee should be disciplined for misuse of state resources.**

The employee was suspended for thirty days. The discipline was reduced to a twenty-day suspension following a grievance.

**4.  The supervisor should attend a refresher training through the DCFS Office of Employee Services on the appropriate use and approval of benefit time for his staff.**

The Department agrees.  However, the refresher training should be provided by the Payroll Unit, under the Division of Budget and Finance. The employee was trained by the Payroll Administrator.

## YOUTH IN CARE HOSPITALIZED BEYOND MEDICAL NECESSITY



## EXECUTIVE SUMMARY

This report provides a summary overview of the number of youth in care of the Department of Children and Family Services (DCFS) who were hospitalized beyond medical necessity during fiscal year 2019, and in the first few months of fiscal year 2020.  The data provided for this assessment was collected by the Clinical Assessment and Monitoring Division of DCFS.  When medical staff in psychiatric hospitals determine that a youth is stable enough to be cared for outside of a hospital setting and are ready for discharge, but the Department or guardian charged with their care cannot locate an appropriate placement, the result is known as "beyond medical necessity" (BMN).  This term is used when a youth remains hospitalized beyond the medically recommended length of time; the excess time that the youth is hospitalized is time for which Medicaid cannot be billed.  The Office of the Inspector General (OIG) has compiled DCFS clinical data from fiscal year 2019 and part of fiscal year 2020 in subsequent charts.

213



In fiscal year FY 2019 there were approximately 308 episodes of youth in care being designated as BMN; 11 youths were hospitalized BMN twice within FY 2019.  In comparison, 273 episodes of youth in care were designated BMN in FY 2017, and 329 episodes were reported in FY 2018.  The noted trend shows that the Department continues to lack the capacity it needs, and Illinois has failed to develop community-based services that effectively address the needs of youth with significant behavioral health issues.  The dearth of appropriate placement resources has reached a crisis level.  It is evident that DCFS needs a strategy for developing the capacity required to meet the service and resource needs of these youths.

The Department entered into a new contract with Aunt Martha's for the Interim Care Center (ICC) in FY 2019 and increased that contract from 30 to 33 beds for an Integrated Care Center in FY 2020.  We laud this effort to create a program for children who are no longer a danger to themselves or others but are still too unstable to transfer to a long-term placement.  The ICC may help address the reluctance of hospitals to admit youth in care due to concerns they will be left in the hospitals BMN.  Unfortunately, however; 33 beds are a drop in the bucket, when 297 children who are ready for discharge continue to languish in psychiatric hospitals.

When children are stuck in hospitals, receiving services they no longer need, their mental health often deteriorates.  Further, taxpayers are stuck paying for expensive hospitalizations that children do not

need.  While some hospitalizations are inevitable, hospitals should not be used as repositories for children who have nowhere else to go.  The Department needs to:

- Provide high-quality, individualized services to youth in community-based placements
- Identify, in advance, hospitals with proven track-records of stabilizing youth
- Contemplate return to the youth's prior placement when the crisis is resolved

These criteria should be part of a strategy to determine the range of placements and services required for youth with serious emotional and behavioral issues.  Once those needs are identified, the Department must take sustained action to create or locate resources to address them. Until the Department builds a viable continuum of resources, the crisis in foster care will only get worse.  In FY 19 there were at least 26 youths hospitalized BMN for over 100 days, and as of 11/8/19 in FY 20, there are 13 youths already over 70 days BMN.  Cases in which young children spend weeks in hospitals beyond medical necessity are of particular concern, e.g.  youth as young as 5 years of age that is hospitalized 109 days and is BMN for 55 days, or a 10-year-old hospitalized 243 days and 206 of those days are BMN.  These are the types of BMN episodes that pose a detrimental threat to the development of young children as continuity of care is important during the early years of life.

## TOP 10 LONGEST BMN HOSPITALIZATIONS FY 2019

| AGE at ADMISSION | DAYS HOSPITALIZED BMN | HOSPITAL |
|---|---|---|
| 15 | 279 | Streamwood Behavioral |
| 14 | 218 | Hartgrove Hospital |
| 14 | 202 | UIC CARTS Program |
| 16 | 180 | UIC CARTS Program |
| 16 | 167 | Streamwood Behavioral Hospital |
| 15 | 154 | Chicago Behavioral Hospital |
| 12 | 145 | Hartgrove Hospital |
| 18 | 140 | Hartgrove Hospital |
| 10 | 140 | Streamwood Behavioral Hospital |
| 10 | 134 | Streamwood Behavioral Hospital |

YOUTH IN CARE HOSPITALIZED BEYOND MEDICAL NECESSITY

## TOP 10 LONGEST BMN HOSPITALIZATIONS FY 2020

| AGE at ADMISSION | DAYS HOSPITALIZED BMN | HOSPITAL |
|---|---|---|
| 10 | 120 | Lincoln Prairie Behavioral |
| 15 | 88 | UIC CARTS |
| 11 | 85 | Gateway Regional |
| 13 | 82 | Hartgrove Hospital |
| 13 | 78 | Roseland Community Hospital |
| 17 | 76 | Garfield Park Hospital |
| 13 | 75 | Garfield Park Hospital |
| 15 | 75 | Streamwood Behavioral |
| 9 | 74 | Lincoln Prairie Behavioral |
| 16 | 73 | Hartgrove Hospital |

The child welfare system must be responsive to the needs of children who have been subjected to abuse and/or neglect.  These children and families have unique needs and DCFS must be prepared to response to these needs.  The continuum of services must be vast to meet the individualized needs, including the behavioral health needs, of our children.  Lack of attention to any specific service or placement type will result in the failure and collapse of all.  Each service leans on the other to build a trauma-informed, evidence-based system.  If the leaders of the state child welfare system do not attend to the front-end (basic) needs, ultimately the back-end (most intense services) will ultimately fail.  This has resulted in children being left in the most restrictive and expensive placements i.e. hospitalized beyond medical necessity.  This continues to be a failure for the child welfare system, but more importantly a failure in our care for children.

The OIG has continued to look at how the Department might build a robust and meaningful crisis response system that enables providers to help prevent disruptions in placement, as well as how the Department might focus its efforts on supporting children with significant needs in a more comprehensive and realistic way while building a stronger continuum of care from the bottom up i.e. (relative foster care, fictive kin foster care, therapeutic foster care, traditional foster care, group homes, residential placements, crisis stabilization, etc.).  This needs to occur as the state begins the transition to a system of managed care; a uniform method to ensure the coordination of healthcare services that reach each youth in DCFS care.

Youth who end up hospitalized beyond medical necessity are children for whom crises were to be *expected* and may well require hospitalization in the future. Building a system that recognizes this reality and provides individualized clinical services to youth in their community-based placement, identifies in

YOUTH IN CARE HOSPITALIZED BEYOND MEDICAL NECESSITY

advance where the youth will be cared for if hospitalization becomes necessary, and contemplates return to the youth's prior placement when a crisis passes, are all strategies that need to be explored in depth.



217



## BMN YOUTH HOSPITALIZATIONS (FY 2019)

❖ There were approximately 308 episodes of youth hospitalized Beyond Medical Necessity (BMN) during FY 2019.

❖ 297 individual youths were classified BMN; 11 youths were hospitalized BMN twice during FY 2019.  The figure 297 will be used for demographic data analysis.

❖ Note: These totals include only youths who became classified BMN as of 7/1/2018;  BMN begins the day after the last date covered under Medicaid i.e. "Medicaid Last Certified" 6/30/2018 would qualify the youth to be classified BMN EFF 7/1/2018.



### YOUTH BMN HOSPITALIZATION BY AGE & GENDER (FY 2019)

YOUTH IN CARE HOSPITALIZED BEYOND MEDICAL NECESSITY





YOUTH IN CARE HOSPITALIZED BEYOND MEDICAL NECESSITY

## YOUTH BMN PRE-ADMISSION LOCATION (FY 2019)

❖ Approximately 63% of Youth BMN episodes during FY 2019 involved youth in placements before being hospitalized BMN.

❖ Almost 30% of the Youth BMN episodes during FY 2019 involved youths that lived in the home of a parent before being hospitalized BMN.

　　➢ Youth coming from the home of a parent were not in DCFS care before their hospitalization.

❖ 3.9% of Youth BMN episodes during FY 2019 involved youths hospitalized from inpatient psychiatric hospitals.

　　➢ Youth coming from psychiatric hospitals are sometimes transferred to other hospitals.



## YOUTH COMING FROM HOME OF PARENT – PRE ADMISSION (FY 2019)

Of the 91 youths that were living in the home of a parent before being hospitalized in FY2019...

❖ 51 youths were between ages 13 and 16.

　　➢ This age range represented 56% of youth residing in the home of a parent prior to their hospitalization

❖ 28 were between ages 8 and 12.

　　➢ This age range represents 30% of youth residing in the home of a parent prior to their hospitalization.

220

YOUTH IN CARE HOSPITALIZED BEYOND MEDICAL NECESSITY



YOUTH HOSPITALIZED BMN FROM PLACEMENT (FY 2019)

❖ Approximately 25.7% of Youth BMN episodes (FY 2019), involved youths placed in a Specialized Foster Home prior to hospitalization.

❖ 10.7% of Youth BMN episodes involved youths placed in Traditional Foster Homes prior to hospitalization.

❖ 10.4% of Youth BMN episodes involved youths who lived in the home of a relative prior to hospitalization.

YOUTH IN CARE HOSPITALIZED BEYOND MEDICAL NECESSITY



**YOUTH BMN PRE-ADMISSION PROGRAM BREAKDOWN (FY 2019)**

**YOUTH BMN PRE-ADMISSION PROGRAM DETAILS (FY 2019)**

❖ Approximately 26% of Youth BMN episodes involved youth placed in some form of specialized foster care before being hospitalized BMN during FY 2019.

❖ Approximately 4% lived with Fictive Kin (e.g. godparent or a close friend of the family).

222

YOUTH IN CARE HOSPITALIZED BEYOND MEDICAL NECESSITY



## YOUTH BMN PRE-ADMISSION REGION (FY 2019)



Cook Admin 1%
Unknown 1%
Cook Central 12%
Central Illinois 19%
Cook North 14%
Northern Illinois 20%
Cook South 20%
Southern Illinois 13%

## BMN YOUTH IN PSYCH. HOSPITALS PRE-ADMISSION (FY 2019)

❖ 12 youth BMN episodes during FY 2019 (almost 4% of total BMN episodes) involved youths who were inpatient clients in psychiatric hospitals.

❖ All youths in psychiatric hospitals before their BMN episode were between ages 12 and 17.

 ➢ A slight majority of youths in this category were 14 and 15 years of age.

❖ 11 of the 12 youths hospitalized BMN from psychiatric hospitals were admitted to UIC CARTS.

❖ The average length of stay for the 12 youths in psychiatric hospitals prior to hospitalization was 112.9 days.

223

YOUTH IN CARE HOSPITALIZED BEYOND MEDICAL NECESSITY





YOUTH IN CARE HOSPITALIZED BEYOND MEDICAL NECESSITY



## YOUTH BMN HOSPITAL ADMISSION (FY 2019)

### YOUTH BMN EPISODES at HARTGROVE HOSPITAL (FY 2019)

- 5-7 Years Old 9%
- 8-12 Years Old 39%
- 13-16 Years Old 38%
- 17-19 Years Old 14%

Legend:
- 5-7 Years Old
- 8-12 Years Old
- 13-16 Years Old
- 17-19 Years Old

❖ 66 Youth BMN episodes occurred at Hartgrove Hospital.

  ➢ 21.4% of total BMN episodes FY 2019

❖ 37 males and 29 females.

❖ Ages
  ✓ 6 ages 5-7
  ✓ 26 ages 8-12
  ✓ 25 ages 13-16
  ✓ 9 ages 17-19



## YOUTH BMN HOSPITALIZATIONS-LENGTH OF STAY (FY 2019)

- 241-295 DAYS: 3
- 121-240 DAYS: 40
- 61-120 DAYS: 154
- 31-60 DAYS: 94
- 16-30 DAYS: 12
- 1-15 DAYS: 5

YOUTH IN CARE HOSPITALIZED BEYOND MEDICAL NECESSITY



## YOUTH BMN HOSPITALIZATIONS-LENGTH OF STAY (FY 2019)

❖ 154 youths were hospitalized from 61 – 120 days.

➢ 80 were female.
   ➢ 26% of total BMN Youth FY2019

➢ 74 were males.
   ➢ 24% of total BMN Youth FY 2019

➢ Ages
   ❖ 9 ages 3-7
   ❖ 45 ages 8-12
   ❖ 79 ages 13-16
   ❖ 21 ages 17-19

❖ 94 youths were hospitalized between 31 and 60 days.

➢ Ages
   •  6 ages 3-7
   •  43 ages 8-12
   •  37 ages 13-16
   •  8 age 17-18

➢ 23 were admitted to Streamwood Behavioral Healthcare.
   ➢ 24.5% of the total youth hospitalized between 31-60 days.



❖ 55.8% of Youth BMN episodes involved youths who were discharged to a Private Residential Agency (also referred to as IPA).

❖ 16.8% of Youth BMN episodes involved youths discharged to Specialized Foster Homes.

YOUTH IN CARE HOSPITALIZED BEYOND MEDICAL NECESSITY

## YOUTH BMN DISCHARGE FY 2019

❖ 3 youths were hospitalized BMN for at least 181 days during FY 2019.

➤ 1 was discharged to Aunt Martha's Youth Services Center (Interim Care Center) from Streamwood Behavioral Health Center.

  ➤ Hospitalized for a total of 295 days with 279 not covered by Medicaid.
  ➤ 15 years old at admission
  ➤ Traditional Foster Home Pre-Admission
  ➤ Central Illinois Region

❖ No signification region, race, gender, or age correlations found.

### DAYS NOT COVERED by MEDICAID FY 2019

(bar chart: 1-10 Days = 55, 11-30 Days = 92, 31-60 Days = 92, 61-120 Days = 57, 121-180 Days = 9, 181+ Days = 3)

## YOUTH BMN DISCHARGE FY2019

❖ 54 youths (59% of the 92 youth BMN episodes that were not covered by Medicaid for 11 – 30 days), were discharged to Private Residential Agencies.

❖ 61 youths (66% of the 92 youth BMN episodes that were not covered by Medicaid for 31-60 days), were discharged to Private Residential Agencies.

❖ One youth was placed in Interim Care at Aunt Martha's Youth Services Center.

  ➤ Youth was in detention pre-admission
  ➤ Male
  ➤ 18 days not covered by Medicaid
  ➤ Initially admitted to Streamwood Behavioral Healthcare



### DAYS NOT COVERED by MEDICAID

(bar chart: 1-10 Days = 55, 11-30 Days = 92, 31-60 Days = 92, 61-120 Days = 57, 121-180 Days = 9, 181+ Days = 3)

YOUTH IN CARE HOSPITALIZED BEYOND MEDICAL NECESSITY



YOUTH BMN HOSPITAL DISCHARGE - PRIVATE RESIDENTIAL AGENCY (FY 2019)



YOUTH BMN HOSPITAL DISCHARGE- PRIVATE RESIDENTIAL AGENCY (FY 2019)

❖ 40 youths were discharged to placements with Medicaid Residential Institutions.

➢ Nearly 13% of all Youth BMN episodes FY 2019.

➢ Ages
  ▪ 8 ages 7-10.
  ▪ 13 ages 11-13.
  ▪ 16 ages 14-16.
  ▪ 3 age 17.

YOUTH IN CARE HOSPITALIZED BEYOND MEDICAL NECESSITY



# FY 2020 BMN SNAPSHOT

| Hospitalized Beyond Medical Necessity (Total youth classified as BMN each month) FY 2020 Snapshot (7/1/2019 – 11/8/19) | | | | |
|---|---|---|---|---|
| **July-2019** | **August-2019** | **September-2019** | **October-2019** | **November-2019** |
| 15 | 21 | 21 | 26 | 3 |

- According to the most recent admission data provided 11/8/2019, there are 84 youths who have been hospitalized beyond medical necessity, with at least 1 day not covered by Medicaid.



# FY 2020 BMN SNAPSHOT-DEMOGRAPHICS

## GENDER DEMOGRAPHICS FY2020 SNAPSHOT



❖ According to the most recent admission data provided 11/8/2019...

➢ 52 Female

➢ 32 Male

# FY 2020 BMN SNAPSHOT-DEMOGRAPHICS

YOUTH BMN DCFS-POS REGION (Pre-Admission FY 2020)



- Central Illinois
- Northern Illinois
- Southern Illinois
- Cook South
- Cook North
- Cook Central
- Cook Admin

❖A slight majority of youths (22) reside in the Central Illinois DCFS-POS Region

# FY 2020 BMN SNAPSHOT-DEMOGRAPHICS



❖39.2% of youths hospitalized BMN were between 14 and 16 years of age.

❖29.8% of youths hospitalized BMN were between 11 and 13 years of age.

YOUTH IN CARE HOSPITALIZED BEYOND MEDICAL NECESSITY



## FY 2020 BMN SNAPSHOT

### PRE ADMISSION LOCATION FY 2020 SNAPSHOT

| Location | Value |
|---|---|
| Residential IPA | 10 |
| Traditional Foster Home | 13 |
| Specialized Foster Home | 18 |
| Fictive Kin | 5 |
| Guardian-Subsuduzed | 1 |
| Home of Parent | 19 |
| Psychiatric Hospital | 1 |
| Relative Home | 11 |
| Shelter/ ER Bed | 4 |
| Unknown | 2 |

- The majority of youth hospitalized BMN as of 11/8/2019 resided with a parent or in a specialized, or traditional foster home.

  - 19 (22.6% of total BMN youth) were hospitalized from the home of a parent.
  - 18 (21.4% of total BMN youth) were hospitalized from a specialized foster home.
  - 13 (15.5% of total BMN youth) were hospitalized from a traditional foster home.



## FY 2020 YOUTH BMN SNAPSHOT
### ADMISSION by HOSPITAL

| Hospital | Value |
|---|---|
| Alexian Brothers Behavorial... | 1 |
| Blessing Hospital | 2 |
| Chicago Behavorial Hospital | 4 |
| Garfield Park Hospital | 9 |
| Gateway Regional Medical... | 4 |
| Harsha Behavorial Center | 1 |
| Hartgrove Hospital | 19 |
| Lincoln Prairie Behavorial... | 10 |
| Lutheran General Hospital... | 1 |
| Pavilion Behavorial Health... | 7 |
| Riverside Medical Center | 4 |
| Roseland Community Hospital | 3 |
| St. Mary's Hospital | 1 |
| Streamwood Behavorial... | 14 |
| Trinity Medical Center | 2 |
| UIC CARTS Program | 2 |

YOUTH IN CARE HOSPITALIZED BEYOND MEDICAL NECESSITY

## FY 2020 BMN SNAPSHOT
## HIGHEST YOUTH BMN EPISODES

❖ Similar to FY 2019, Hartgrove Hospital and Streamwood Behavioral Healthcare have the highest number of Youth BMN episodes as of 11/8/2019.

> ➤ Hartgrove Hospital housed 19 BMN youths as of 11/8/2019 (22.6% of total BMN youth so far in FY 2020).

> • 13 Female / 6 Male
> • 10 youths were between ages 13 and 14.
> • 4 youths were between ages 16 and 17.
> • 5 youths were between ages 6 and 12.
> • A slight majority of youth (7) reside in the Cook South DCFS-POS Region.
> • 5 youths reside in the Cook North DCFS-POS Region.
> • A slight majority of youths (6) who became BMN at Hartgrove were placed in specialized foster homes prior to hospitalization.





## FY 2020 BMN SNAPSHOT
## HIGHEST YOUTH BMN EPISODES

❖ Streamwood Behavioral Healthcare housed 14 BMN youths as of 11/8/2019 (16.7% of total BMN Youth FY 2020).

> ➤ 7 Female / 7 Males

> ➤ 2 youths were between ages 6 and 8.

> ➤ 4 youths were between ages 9 and 12.

> ➤ 2 youths were between ages 13 and 14.

> ➤ 6 youths (42.9% of total BMN at Streamwood thus far in FY 2020) were between ages 15 and 17.

> ➤ A slight majority of youths (7) reside in the Northern Illinois DCFS-POS Region.



YOUTH IN CARE HOSPITALIZED BEYOND MEDICAL NECESSITY



# FY 2020 BMN SNAPSHOT



YOUTH BMN - LENGTH OF STAY - FY 2020 SNAPSHOT

| Length of Stay | Count |
| --- | --- |
| 120-198 Days | 8 |
| 91-120 Days | 21 |
| 61-90 Days | 30 |
| 31-60 Days | 17 |
| 1-30 Days | 8 |

# FY 2020 BMN SNAPSHOT

❖ Of the 8 youths hospitalized for the longest amount of time (120-198 days)...

  ➢ 4 Female / 4 Male

  ➢ All between ages 10 and 15

  ➢ A slight majority of 4 reside in the Central Illinois DCFS-POS region.

  ➢ 3 from the home of a parent/ 2 from specialized foster home/ 2 from a relative's home/ 1 from residential IPA

  ➢ 9.5% of total Youth BMN episodes so far in FY 2020

YOUTH IN CARE HOSPITALIZED BEYOND MEDICAL NECESSITY

## FY 2020 YOUTH BMN SNAPSHOT-LENGTH OF STAY



❖ Of the 21 youths hospitalized between 91 and 120 days....

 ➢ 11 Female / 10 Male

 ➢ 3 youths between 5 and 10 years of age.

 ➢ 7 youths between 11 and 13 years of age.

 ➢ A slight majority of 8 youths between 14 and 16 years of age.

 ➢ 3 youths were 17 years of age.

 ➢ 6 youths were in specialized foster home pre-admission.

 ➢ 4 youths were in residential IPA pre-admission.

 ➢ 3 youths resided in the home of a parent pre-admission.

 ➢ 25% of total BMN youth hospitalized BMN FY2020



## FY 2020 YOUTH BMN SNAPSHOT-LENGTH OF STAY



❖ Of the 30 youths hospitalized between 61 and 90 days...

 ➢ 17 Female / 13 Male

 ➢ 4 youths between 7 and 10 years of age.

 ➢ 7 youths between 11 and 13 years old.

 ➢ 12 youths between 14 and 16 years of age.

 ➢ 6 youths were 17 years old.

 ➢ A slight majority of 8 reside in the Central Illinois DCFS-POS region, and Cook South equally (8 Cook South / 8 Central Illinois).

 ➢ A slight majority of youths were living with parents before pre-admission.

 ➢ 35.7% of total BMN youth hospitalized BMN FY2020

YOUTH IN CARE HOSPITALIZED BEYOND MEDICAL NECESSITY



- 21 youths not discharged as of 11/8/19.



- 21 youths not discharged as of 11/8/19.

YOUTH IN CARE HOSPITALIZED BEYOND MEDICAL NECESSITY

# FY 2020 BMN SNAPSHOT

❑ One youth was discharged to Interim Care at Aunt Martha's Youth Services Center from Streamwood Behavioral Healthcare.  This youth was hospitalized for 91 days with 51 not being covered by Medicaid.

YOUTH IN CARE HOSPITALIZED BEYOND MEDICAL NECESSITY

# CHILD WELFARE PRACTICE IMPROVEMENT FOR FY20

Since 1993 a great deal of attention has been focused on policy, practice and program initiatives aimed at improving both the delivery of child welfare services and the outcomes for children who come into contact with the Illinois child welfare system.

This office pursuant to its statutory mandates and existing rules, investigates complaints, writes reports with recommendations for the Director, and monitors implementation of agreed upon recommendations.

In order to ensure the best outcomes for children and their families, the Department and the OIG have agreed to implement a new process to strive for ongoing improvement in the quality of Department programs, practices and services.  This new process exists in the context of, the three principal outcomes that frame child welfare services in response to child abuse and neglect:  *safety* (being safe from further child abuse and neglect); *permanency* (stability when in child welfare care and achieving permanency through reunification, adoption, or guardianship); and ***well-being*** (often characterized as *child* well-being, focused primarily on physical health; behavioral, emotional, and social functioning; and education).

Beginning in FY 20 the OIG and the Department have started a joint effort to quickly find new ways to work together to make improvements within the Department.  This joint effort will address problems at the front-line level and provide a feedback loop on practice issues related to child welfare investigations, policies and procedures within the Department and with the Department's private agencies, in lieu of embedding the issues in a full and final investigative report.

As we examine individual cases, policies, practices, and procedures, based on complaints received and our statutory mandates, we can note practice issues that must be brought to the Department's attention for further review. The OIG's findings and recommendations in these 'practice memos' can be used to improve the Department's performance by looking at case-level practices to provide outcome improvement within the Department.

While caseloads grow in number and complexity, the ranks of the workforce have not kept pace. The result is prescriptive mandates lacking a foundation of good social work practices.

A snapshot of some practice issues identified thus far include:

- A child protection specialist (CPS), supervisor, and area administrator failed to consider and review a Medical Examiner's finding of a child that died of closed head injuries due to child abuse, and the ruling of his death as a homicide.  They accepted one of the mother's numerous explanations which the Medical Examiner explicitly rejected as inconsistent with the child's multiple injuries at different stages of healing.  The CPS, supervisor and area administrator mistakenly indicated the mother for death by neglect and head injuries by neglect, rather than by abuse.

- The supervisor failed to ensure there was an adequate safety plan for the surviving sibling, and the safety plan was not reassessed for more than six months.

237

- The CPS, supervisor and area administrator failed to determine whether the surviving sibling had witnessed his brother's abuse when they unfounded the allegation of substantial risk of physical injury to the surviving sibling by his mother.

- A report to the hotline stated that parents were both taking drugs and the mother was seeking urine to be used to pass a drug screen. The DCFS investigator accepted the parent's self-report, that they had not been taking drugs despite a history of drug use, and unfounded the investigation. The investigation failed to gather independent verification that the parents were free from substances.

- A report to the hotline stated that parents were both taking drugs and the mother was seeking urine to be used to pass a drug screen. The DCFS investigator accepted the parent's self-report, that they had not been taking drugs despite a history of drug use, and unfounded the investigation. The investigation failed to gather independent verification that the parents were free from substances.

- An assigned CPS did not have contact with alleged child victims for almost two months. After approximately seven months of events, reports, and continued concerns from hospital staff and others, DCFS workers continued to find allegations unfounded and continued to return the child victims to their parents. This placed the children at a consistent risk of harm.

- Children were left with a seriously impaired mother, and a father who made excuses for the mother for years.  DCFS and private agencies failed to provide services to the mother in her native language, ensure her mental illness was diagnosed and treated, and find effective drug treatment a reasonable distance from her home.  This situation placed all three children at risk of physical harm and likely compromised their healthy development.

- A CPS did not see children or complete a safety assessment within 24 hours of a report made to the hotline.  The CPS and the supervisor failed to document all investigative activities in a contact or case note within 48 hours.  The CPS went on leave during the investigation and the cases were not reassigned to another CPS.  The CPS failed to follow up with collateral sources.

# ERROR REDUCTION

In 2008, the Illinois General Assembly enacted Error Reduction legislation that required the Office of the Inspector General to develop Error Reduction Implementation Plans intended to remedy repeated child welfare practices errors that compromise or threaten children's safety, based on findings of the Inspector General's investigations and by Child Death Review Teams. 20 ILCS 505/35.7.

As a result of this legislation, over the past decade the OIG has developed extensive Error Reduction Training curricula and provided statewide trainings to over 1,900 DCFS and private agency child welfare workers and administrators, including clinical and legal staff, permanency, intact and child protection workers.

The basis for the error reduction legislation was a recognition that flawed organizational practices can contribute to potentially tragic outcomes for children, including death or serious injury. The Inspector General's training curricula that grew from this legislation introduced the concept of error management – i.e. what can be done to prevent the occurrence of tragic error by applying error reduction methods to child protection investigations involving cuts, welts and bruises, mental health, and egregious acts of physical abuse of children? By using a systems perspective and root cause analysis, the Inspector General has developed and presented numerous field trainings designed to reduce such errors.

### *Error Reduction Trainings – An Historical Perspective*

The initial set of Error Reduction trainings began in 2009 and focused on child protection investigations where an infant or young child suffered instances of bruising. A review by the Inspector General noted a correlation between prior unfounded Cuts, Welts and Bruises allegations, and the subsequent death or serious injury of a child; noting that bruising on children as young as a few months old was often minimized. The Inspector General recognized that a cultural change in investigative practices was required. A critical component of implementing this shift came with the subsequent reviews of child protection cases closed six months after the trainings, conducted by the Inspector General and DCFS' Office of Quality Assurance. The review measured child protection teams' application of the error reduction trainings to their investigations, and DCFS Regions were given region-specific feedback. The Cuts, Welts and Bruises Error Reduction Training curriculum was incorporated into Core Training for new Child Protection Investigators.

In 2010 and 2011, the Inspector General continued to evolve error reduction training, and conducted a second round of trainings focusing on intact families with parental mental illness. In these cases, similar problematic practices became evident that mirrored practices previously identified in Cuts, Welts and Bruises investigations. Intact family services workers were not routinely obtaining relevant records or sharing relevant facts with treating clinicians to close information loopholes. By the end of 2012, the Inspector General's staff had trained DCFS and private agency intact family services staff in the Southern and Central Regions and Cook County. To support these trainings, the Department issued policy guidelines directing child protection investigators to ask parents/caregivers about mental health issues and requiring the investigator to obtain the relevant mental health records (*see* Policy Guide 2011.07, *Obtaining Records of Patients with Mental Illness).* Ultimately, in 2012 the Mental Health Trainings for DCFS Intact Family workers were postponed due to budget cuts, which led to the elimination of DCFS Intact Family Teams.

In 2013, the Department's reorganization/realignment resulted in the creation of High-Risk Intact Specialists. The Division of Training requested assistance from the Inspector General's Office, to train this

new class of workers in Mental Health Error Reduction principles. The Inspector General's staff provided an overview of the mental health training and facilitated discussions on communication with mental health professionals, obtaining relevant documents, and working with families with parental mental illness. The OIG focused on the provision of intact family services to families dealing with a parent's mental illness.

In 2014, the Inspector General conducted five Multi-System Error Reduction Trainings for select private agency and DCFS staff. The training provided an overview of three Error Reduction Initiatives, including Young Parent Training, Bruising Training, and Grief and Loss Training.

The Inspector General's training staff continued to expand its curriculum to inform both administration and front-line staff, and to promote critical thinking and decision-making. Several Inspector General deaths or serious injury investigation(s) involved cases of egregious abuse or torture of young children. The investigations revealed that – despite the gravity of the egregious abuse – the Department had a practice of offering standard parenting services, for which there was no evidence to support the notion that such services could ameliorate the risk of harm for these children. In interviews with the Inspector General, both child protection worker and supervisor expressed their erroneous belief that the local court rarely granted protective orders, and they thereby assumed their best option was to simply accept the mother's refusal of services, advise her to control her behavior, and to "wait and see."

In 2015 and 2016, the Inspector General's Office provided Egregious Acts Training, which centered around a five-topic Error Reduction training curricula: *Lessons Learned from Physical Abuse Fatalities*, and specifically, "Systemic Errors in the Legal System, High Risk Specialized Assessments *(Topic 5)"* Those trainings were presented to 72 clinical staff across Illinois and 300 private agency staff, department child protection, permanency, intact staff supervisors and managers. The training focused on changing practice to ensure that a family is appropriately assessed, with a determination of whether there are any evidence-based services that could realistically alleviate safety threats to a child in that home. To help the field conceptualize the continuum of physical abuse, and where egregious acts fall therein, the Inspector General created and utilized the *Maltreatment Continuum* –a visual tool illustrating the characteristics, spectrum and severity escalation from Minor Assaults to Egregious Acts of Physical Abuse.

In 2017, 2018, and 2019, the Inspector General continued its error reduction implantation efforts by conducted trainings for multi-disciplinary groups of intact family services supervisors, administrators, local State's Attorneys, and DCFS Legal staff in the Southern, Cook, and Central regions in response to a complaint from a State's Attorney (who had collaborated with the Inspector General in Error Reduction Trainings) that the case of a mother who repeatedly hit her daughter in the face, causing severe bruising, was indicated by DCFS but was not screened into court because of the worker's misconception that it would not pass legal screening.

The principles addressed in the training were meant to be used in two types of cases: (1) where the risks are too high to *not* provide services and monitoring, but not high enough to remove children from parents' custody; or (2) in return home cases where the Department requires supportive services and supervision in the transitional period. In the case that prompted the follow-up training, although there was ample evidence to indicate the mother for physical abuse, and police expressed their intention to prosecute her criminally for domestic battery, the mother could refuse voluntary intact family services with no repercussions. She was later prosecuted for the abuse to her daughter.

As in FY 2018, in FY 2019, the Office of the Inspector General anticipated completing a hand-off of the Egregious Acts of Physical Abuse training to the Department's Division of Training and Professional Development, who would incorporate the training into their ongoing training curricula. However, several cases came to the Inspector General's attention, which raised concerns about failures of the clinical and/or legal systems to identify egregious acts of physical abuse at the onset, and to subsequently take timely and

240

ERROR REDUCTION

appropriate clinical and legal actions. It became clear that the clinical and legal systems that had been contemplated to address these rare cases were not functioning practically or efficiently and, most concerning, was the realization that the failures at play were working against the best interest of the children in Department, care who have suffered some of the most extreme harms at the hands of their caregivers.

To that end, the Office of Inspector General suspended trainings on this subject while awaiting an opportunity to collaboration with DCFS Clinical, Child Protection, and Legal staff to examine the shortcomings and develop a system of checks and balances that are practically functional. Furthermore, the IG's training staff dedicated to Error Reduction has been reduced by more than half thus frustrating the Inspector General's efforts for timely collaborations and dissemination of information to the field.

**Current Challenges**

In recognition of the enormous training agenda advanced by the Department's Division of Training and Professional Development in response to Chapin Hall's 2019 Review: Systemic Challenges at Illinois DCFS Contribute to Oversight Lapses in Child Fatality Cases.[1] The Inspector General suspended its planned 2019 Return Home Toolbox trainings. This training focuses on reunification planning as an ongoing process which begins well in advance of the anticipated return home date. To ensure a thorough understanding of the progress of the case and what will set the family up to succeed once reunification occurs, the planning should involve a series of clinical staffing, with key players, at key stages in the progress of the case. The *Toolbox* identifies key issues to consider when reassessing interventions being used with the family. The OIG hopes the training environment in FY 2020 will be conducive for piloting this training.

*Training with Substance - Abusing Parents*

In February 2019 the Office of Inspector General provided Maryville's Mom's Recovery Program with an adapted version of Young Parent Training. Young Parent Training was designed by the Office of Inspector General and the Teen Parent Service Network (TPSN) to reduce the risk of infant mortality and prepare inexperienced parenting youth for the challenges of caring for their infant. Recognizing the difference in maturity and life experiences of the mothers in the Recovery Program, the training was revised to include scenarios that were more relatable to mothers struggling with sobriety and the associated risks to their young children. The training covered:

- Non-violent parenting approaches to address challenging developmental behavior.
- Criteria for identifying nurturing non-violent caregivers.
- The importance of safe sleep practices.
- Activities that enhance a young child's brain development.

The recovery program has incorporated the adapted training into their parenting curriculum presented on a quarterly basis to mother's entering their program.

**Serious Harms to Young Children**

In FY 2009, the Inspector General's Report to the Governor and the General Assembly noted a series of Inspector General investigations into the serious harms of infants found that child welfare investigators and caseworkers were misinformed about the serious risk associated with infant bruising. It is rare for young

---

[1] This Review identified systemic factors that contributed to child deaths and critical incidents among children whose families received Intact Family Services (Intact) from the Illinois Department of Children and Family Services. It identifies opportunities to make structural, procedural and cultural shifts in the delivery of services that aim to prevent foster care placements, and strategic recommendations to IDCFS for the short, medium, and long term to refine programs and policies so they are better aligned with positive outcomes and best practice approaches

241

ERROR REDUCTION

infants to suffer bruises compared to children who are crawling or walking.  Inspector General death investigations had revealed that the field tended to ignore bruises on infants, including small abdominal and facial bruises, even when the bruises could only have been the result of inflicted harm. As part of the Error Reduction Initiative, the Office of the Inspector General developed a curriculum and trained Division of Child Protection investigators, Intact and Permanency workers statewide on bruising of an infant, toddler or young child. The curriculum included academic articles on the prevalence, distribution and location of bruises on children.  A poster illustrating the prevalence and distribution of accidental bruising in infants contrasted high and low suspicion bruising in infants. The poster also contrasted skull and facial injuries from autopsies of non-accidental bruising in infants and children. As a part of the training effort the poster was distributed statewide to DCFS field offices, private agencies and Courts. A companion guide accompanied the poster providing additional information to help professionals effectively utilize the illustrations as teaching tool. The Cuts, Welts and Bruises Error Reduction Training curriculum was incorporated into Core Training for new Child Protection Investigators.

In FY 2019, the Inspector General again noted a correlation between multiple prior unfounded Cuts, Welts and Bruises allegations that included: abdominal injury and facial bruises and the subsequent death or serious injury of children:

> A two-year-old was found by her twenty-one-year-old mother cold and unresponsive at home. The toddler had multiple bruises to her face and body. Before the death investigation of this toddler; this family was involved in five investigations from May 2017 through June 2018; four of which involved the allegation for cuts, welts, bruises and oral injuries and of those three were unfounded and one was indicated

> Another two-year-old was found unresponsive by his twenty-eight-year-old mother after she left the toddler and his five-year-old sibling in the care of her paramour while she was at work. The toddler suffered a lacerated liver, lung contusions, several broken ribs, abdominal injury, healing and healed broken bones and bruising. Before the death investigation of this two-year-old toddler; this family was involved in three investigations from May 2018 through October 2018; two of which involved the allegation for cuts, welts, bruises and oral injuries; both of which were unfounded. An intact services case was opened at the time of the toddler's death

> A five-year-old child was found buried in a field by law enforcement.  The child suffered craniocerebral trauma due to multiple blunt force injuries, possible environmental hypothermia. Before the death investigation of this five-year-old; this family was involved in four investigations; one of which involved the allegation for cuts, welts, bruises and oral injuries that was unfounded, just four-months before the death of this child

> An eight-year-old child with symptoms of abdominal pain and vomiting for two days collapsed and was not breathing. CPR was given, after she was stabilized, she was taken to a hospital. Upon arrival at the hospital, a large bruise was observed on her stomach. She was bleeding in her belly. It was so severe, she underwent surgery. She died the following day. Prior to the death investigation of this eight-year-old child; the family around this child was involved in a total of twenty-four investigations. The mother and step-father were involved in twelve investigations with the Department. The father and his paramour were involved

242

ERROR REDUCTION

in twelve investigations; three of which involved the allegation for cuts, welts, bruises and oral injuries to the deceased child, that were unfounded

In keeping with the Inspector General's Error Reduction mandate to continuously identify and review patterns of problematic practices that compromise or threaten the safety of children, and recognizing the similarity to previously identified practice errors related to the investigation of Cuts, Welts and Bruises allegations it would be prudent to reprise, update and present the full Cuts, Welts and Bruises Error Reduction Training curriculum statewide in FY2020.

244

# LAW ENFORCEMENT AGENCIES DATA SYSTEM (LEADS)

The Department is required by statute to assess relevant criminal history of caretakers prior to placement of children and to accomplish its other statutory duties. (20 ILCS 505/5(v)). Criminal History Record information (CHRI) is generally accessed through fingerprinting. However, the legislature has noted that the Department may need more immediate information to assure the safety of children. "LEADS is a multistate law enforcement, computerized telecommunications system designed to provide services, information, and capabilities to the law enforcement and criminal justice community."[1]

The Office of Inspector General for the Department of Children and Family Services, (DCFS), meets the definition of a criminal justice agency in the Department of Justice Regulations on Criminal Justice Information Systems (Title 28, Code of Federal Regulations, Part 20, Subpart A). Because of its status as a criminal justice agency, the OIG has broader access to obtain Criminal History Record Information (CHRI) than the Department.

**DCFS Administrative Procedure**

DCFS Administrative Procedure 6 (AP #6), specifies the use of the LEADS system for the Department of Children and Family Services. "LEADS information may also be helpful to the Investigation Specialist in assessing risk to him or herself in conducting an investigation, to placing workers when assessing a child's safety in a potential relative home placement, and to child welfare workers when arranging for visits and contact between parents and children and making important case decisions."[2] AP #6 describes people authorized to receive LEADS information as "the Investigation Supervisor and Investigation Specialist investigating a report of child abuse/neglect, the placing worker evaluating the appropriateness of a placement with an unlicensed relative, the child welfare supervisor and child welfare worker assigned to a child welfare case, and the managers in their chains of command."

Workers receiving LEADS responses are cautioned that "LEADS criminal history checks are name based and may not provide an accurate criminal background for the subject. The only way to accurately identify a person's criminal background is through a fingerprint check."[3] LEADS provides summaries, when available, of the following information:

- Pending (unresolved) charges.
- Arrest that did not result in charges.
- Charges that did not result in a conviction.
- Convictions.
- Existing orders of protection, including domestic violence orders of protection.
- Closed orders of protection for two years after expiration date.
- Existing warrants issued.
- Driver's license information.
- Whether the offender was sentenced to imprisonment.

---

[1] Department of State Police, Adopted Rules, Title 20, Chapter II, Part 1240, page 1.
[2] Administrative Procedure #6, Use of Law Enforcement Agencies Data System LEADS, page 3.
[3] Illinois State Police LEADS Daily Briefing 010818.

- Whether the individual is a registered sex offender, child sex offender, or child murderer.

DCFS and Purchase of Service Agency (POS) staff must assess LEADS information to identify its potential impact on child safety.  If there is reason to suspect that the subject has a criminal record outside of Illinois, the staff are required to contact the Office of the Inspector General, Bureau of Investigations by facsimile at 217/557-8843 or 312/433-3245 to request an out-of-state check.

**Placement Clearance Desk Criminal Case Disposition Requests**
When the Placement Clearance Desk is deciding on a non-licensed home for placement and the Illinois LEADS contains an arrest which may pose a safety threat to a child, but there is no disposition information, the OIG provides technical assistance in obtaining the disposition.

**Integrated Assessment Assistance**
OIG provides technical assistance to Integrated Assessment intake coordinators requesting out of state LEADS checks and occasionally out of state child abuse/neglect history of a parent who is participating in an integrated assessment following placement of their children with Illinois DCFS.

**OIG Investigations**
OIG investigators may request a LEADS check on people involved in OIG investigations of misfeasance, malfeasance or child death investigations.

**LEADS Restrictions**
The LEADS system, as dictated by State and Federal law cannot be used to do background checks for employment or licensing purposes. The Illinois Administrative Code restricts the use of the LEADS network and LEADS data for personal purposes.[4] It State's that the information available via LEADS is for criminal justice purposes only and notes that "Violations of the misuse of information from the LEADS system can result in suspension, termination and even a criminal charge."[5]

---

[4] Ill. Admin. Code tit. 20, pt. 1240.
[5] Illinois State Police LEADS Daily Briefing 040418 and 040518.

LAW ENFORCEMENT AGENCIES DATA SYSTEM

# SYSTEMIC RECOMMENDATIONS

The Inspector General's investigative reports contain both systemic and case specific recommendations. The recommendations for systemic reform for Fiscal Year 2019 have been categorized below according to the function that the recommendation is designed to strengthen within the child welfare system. The Office of the Inspector General is a small office in relation to the child welfare system. Rather than address problems in isolation, the Office of the Inspector General views its mandate as strengthening the ability of the Department and private agencies to perform their duties. Recommendation categories are as follows:

- **CHILD PROTECTION**
- **INTACT FAMILY SERVICES**
- **LEGAL**
- **LICENSING**
- **PERSONNEL**
- **SERVICES**
- **STATE CENTRAL REGISTER**
- **TRAINING**

## CHILD PROTECTION
*General*
If a subsequent oral report (SOR) of abuse and/or neglect is received on an open Intact Family Services case, the child protection investigator and supervisor, as well as, the intact family services caseworker and supervisor should discuss and document in SACWIS the case within two days of the SOR and ensure a method of maintaining ongoing communication is established as required by current procedure, which should include attendance at all Child and Family Team Meetings.

In a previous investigation (IG 2017-2911), the Inspector General recommended that any family with three or more child protection investigations within a year (for one or more persons living in the home) should be reviewed by DCFS management to ensure that underlying issues are being addressed. The Inspector General reiterates that recommendation. In addition, the Department should develop and maintain a tracking of that review which includes indicating the tasks to be completed, who will complete them and how the plan will be monitored.

The Department should review the practice of requesting law enforcement to take protective custody of children victims of alleged abuse for interviewing purposes.

Child protection investigators should have full access to the hotline narratives of expunged-unfounded child protection investigations as immediate access to this information is critical to the safety of both children and the workers.

Procedures 300, Reports of Child Abuse and Neglect should be amended to clarify that observation of the environment and a scene investigation are required for all allegations and should be completed in a timely manner.

The Department should research best practices and draft policy for the appropriate use of video conferencing tools (including but not limited to Skype, Facetime, Google Hangout, etc.) in child protection investigations.

Child protection investigators should be trained to analyze situations in which they are informing alleged perpetrators of the allegations against them and assess if it is appropriate to read the allegations word-for-word or provide a summary.

The Department should consider strengthening Procedure 300.80, Child Protection Supervisor/ Administrator Waivers, when an alleged child victim is inaccessible and ensure investigators are trained accordingly.

The Department should develop a method/tool for child protective investigators to quickly reference ANCRA from their Department issued cell phones when they are denied access to a child for an interview so that they may provide the statutory authority allowing access to a child.

*Supervisory*

In accordance with Procedures 300, Reports of Child Abuse and Neglect, and the Model of Supervisory Practice, the Department should that ensure that child protection supervisors review investigative records in their entirety, including both SACWIS and hard copy documentation, prior to case closure.

The Department should reevaluate their child protection investigation extension rule and procedure, develop a new clear procedure instructing supervisors and area administrators on good cause for case extension, and train staff on good cause for case extension.

Department management should review all overdue cases exceeding 90 days to ensure all overdue cases are pending for good cause.

*Mental Health/Medical*

Child protection staff should be required to utilize the CFS 968-90, Questions for Mental Health Professionals, when interviewing mental health professionals regarding an alleged perpetrator.

Hotline call-takers or child protection investigators and supervisors should immediately refer any report or investigation with any evidence of Munchhausen Syndrome by Proxy/Medical Child Abuse to a child abuse pediatrician to create a chart of the date, provider, complaint, and provider comments for all the children's medical treatments, interventions and prescriptions.

*Training*

Child protection investigators should be retrained on how to properly and thoroughly investigate a report with a neglect allegation such as #76 Inadequate Food, often viewed as a low risk or low priority case. In these low priority cases investigators often do not follow carefully all required investigative tasks during the investigation.

Child protection investigators should be trained to analyze situations in which they are informing alleged perpetrators of the allegations against them and assess if it is appropriate to read the allegations word-for-word or provide a summary.

The Department should train supervisors on how to assess the full history of the family and how it can be used in the evaluation of the family. When a child protection investigation commences, a family history should be completed, maintained and updated each time the Department receives a new report. The family history should be available to subsequent investigators/caseworkers.

248

SYSTEMIC RECOMMENDATIONS

## INTACT FAMILY SERVICES

*General*

Non-custodial parents of children involved in Intact Family Services must be contacted or attempted to be contacted during the first two weeks of the case and be included in the initial integrated assessment, unless ruled out with management approval.

Child and Family Team Meetings should be required within the first 14 days of case opening and additionally at least once a month for intact family services cases.

Each intact family services case should have a written concurrent plan to identify factors that are critical to ensuring child safety and minimizing risk, and when court intervention may be necessary if there is a change in circumstances.

To avoid the over reliance on a caregiver's self-report in intact family service cases, Procedures 302.388(i)(5), Evaluating Family Progress, should be amended to require that intact family service workers contact service providers at a minimum monthly to assess the level of the family member's engagement with services and the progress of the family on tasks of the family service plan.

Intact family services providers should have full access to case/family history for families they serve.

*Clinical/Medical*

All high-risk intact family services cases should have the option for the supervisor to request a contracted licensed clinician to conduct the Integrated Assessment as occurs in placement cases.

A DCFS nurse should be assigned for the duration of intact family service cases involving medically complex children. The nurses' duties should include attending home visits with the intact caseworker to meet with the family, attending medical appointments with the family and the intact service worker, communicating with medical providers, assisting with the medical and health related sections of the integrated assessment, and participating in Child and Family Team Meetings to help the family develop a plan to ensure that the children receive their required medical care.

The Inspector General reiterates its recommendation from a previous report (#17-1643), that in intact family services cases involving medically complex children, the caseworker must convene a staffing within 30 days of receiving the case with the involved health providers and parent(s) to discuss the child's care and assess parents' needs for support.

*Consents*

At the transitional visit, the intact family services worker should obtain consents to obtain and share information with all providers to the family.

Due to the complexity of confidentiality and consents, the Department needs to provide clear and specific guidance, beyond written procedures, for intact family services caseworkers to understand what information can be shared and who can share information with providers.

The Department should create a form, similar to the CFS 600-5, Release of Information for DCP Investigations, for intact family service cases to allow intact family services caseworkers to obtain medical information from medical providers without a consent.

The Inspector General reiterates its recommendation from a previous report (#17-1643) that at the transitional visit in intact family services cases with a medically complex child, the child protection investigator and the intact family services caseworker should request that the parent sign consents for the

worker to communicate with the child's healthcare providers regarding the child's health and medical care management.

**LEGAL**
The Department's Office of Legal Services must track cases not accepted for filing of a petition in Juvenile Court. The Department should identify a single contact person to work with each State's Attorney's office and consider whether to advocate further or file a petition themselves.

Department regional counsels should meet quarterly with local State's Attorneys and other relevant professionals to address any issues regarding the filing of petitions for court involvement.

The Department's Office of Legal Services should review the practice of requesting law enforcement to take protective custody for interviewing purposes and retrain staff accordingly.

The Department should consider a legislative change to amend ANCRA and the school code to require schools to allow child protection investigators to speak with children at school, without notifying the alleged perpetrator.

Policy Guide 2019.04, Requirements for Reunification and After Care Services, should be shared with juvenile court personnel.

**LICENSING**
The Department should ensure licensing staff, both Department and POS, assess the homes of relatives, even when the relative does not want to be licensed, to ensure the homes are safe, or ensure the assigned permanency worker do so.

**PERSONNEL**
The Department should create a process with a form separate from timesheets to formalize and document temporary assignments to avoid future misunderstandings.

Department's conflict of interest protocol should include notifying Child Advocacy Centers (or other departments or agencies) involved in a case where there are existing conflicts with pending investigations.

The Department should ensure private agencies promptly release the SACWIS credentials of child welfare who leave their employ.

**SERVICES**
*General*
The Department should consider adding an alternative on the Child Endangerment Risk Assessment (CERAP) to allow a finding of "conditionally safe" – identifying factors where if there is a change in circumstances court intervention may be warranted.

The Department needs to design a system where it is alerted to a private agency's decision to close a case because of parents' non-compliance with services, where critical service objectives remain unmet. The Department would then need to assess the current safety of the children and determine whether a call to the Hotline or the State's Attorney was warranted.

The Department should develop a management group that liaisons with other community partners to assist in developing comprehensive plans for families with consistent contact with DCFS, law enforcement and concerns from school and behavioral health providers.

250
SYSTEMIC RECOMMENDATIONS

For Integrated Assessments in cases with pending criminal investigations, Integrated Assessment interviews with parents should still be conducted to gather basic family information without compromising the criminal investigation.

The Department should create clear procedures for workers to have when confronted with an issue pertaining to the ever-growing field of electronic access to school records, particularly when the Department has custody and guardianship of a minor. Caseworkers should have clear direction as to when it would be appropriate to request a non-custodial parent's access be denied or restricted to school records. Further, the Department should determine whether caseworkers should request that the access be restricted from the school or through a court order. This should be developed in consultation with school districts and/or the Illinois State Board of Education.

The Department should review the process for foster parents/relative caregivers to obtain medications in a timely manner for youth in care.

*Mental Health*
Whenever serious mental illness raises questions about parenting capacity, a parenting capacity assessment must be completed. This should be addressed through training and development of resources.

The Department should require caseworkers to obtain and review psychological evaluations and social work assessments from the child's school.

*Medical Child Abuse*
The Department should identify child abuse pediatricians who are willing to review medical records in cases of suspected Medical Child Abuse and to assist in developing an investigation procedure/protocol for a stand-alone allegation.

Child abuse pediatricians should, with the assistance of child protection, create a chart of the date, provider, complaint, and provider comments for all the children's medical treatments, interventions and prescriptions. When the chart is complete, the Department should convene a multi-disciplinary team to formulate an investigation plan. This team should include representatives from law enforcement, the state's attorney's office, Board-certified child-abuse pediatrician, hospital legal counsel, child protection investigator/administrator, and DCFS legal.

In cases in which medical child abuse is suspected, child protection investigators should look for discrepancies within the case, such as multiple providers who received different information from parents. Investigators should also review public social media to determine whether parents may be using their children's alleged illness for personal gain.

The Department should consider designating an investigative team and supervisor (perhaps in each region) for investigations with an allegation of medical child abuse to ensure appropriate procedures are followed, to participate in the multidisciplinary team, and to ensure court involvement to protect the children when necessary.

*Domestic Violence*
The Department must ensure that clinical recommendations for critical services, such as domestic violence referrals, are not solely dependent on the receipt of a referral form.
In cases of violence and risk of violence, the CERAP should include an assessment of the custodial parents' protective capacity, which could change as new facts are learned. For example, in this case, had the mother's protective capacity been noted as positive because of her decision to get an order of protection, the mother's reversing that decision warranted a reexamination of her protective capacity.

251

SYSTEMIC RECOMMENDATIONS

*Substance Abuse*

The SACWIS version of the Adult Substance Abuse Form should be amended so that the collateral section cannot be bypassed without a waiver. The waiver should only be given if there is no indication of substance abuse.

*Pregnant and Parenting Youth in Care*

Parenting youth in care with significant mental illness who are aging out of care should have a parenting capacity assessment, and if warranted, be referred to a Parenting Assessment Team.

Clinical should appoint a liaison with the Teen Parent Service Network (TPSN) to help determine the appropriateness of parent capacity assessments and referrals to parenting capacity team assessments for parenting youth in care.

The Department's clinical division should regularly train TPSN staff on parenting capacity assessments and parenting capacity teams.

The Department should develop transition procedures and interagency collaboration similar to Procedures 302, Appendix N (Transition Planning for Wards with Developmental Disabilities) for pregnant and parenting youth in care with significant mental illness who are aging out of care.

## STATE CENTRAL REGISTER (SCR)

During times of high call volume, when a mandated reporter contacts the hotline, call floor staff should be instructed to obtain a brief description of the situation in order for management to prioritize the call back.

Call floor staff should request specific times that the reporter will be available for a call back.

Anytime law enforcement contacts the hotline to report abuse and neglect, the call should be returned as soon as possible, but no longer than five hours to ensure a return call occurs during their work shift.

In cases in which the call floor worker is returning a call, the call floor worker should be instructed to document in the hotline narrative when the initial call was made to the hotline.

The Department should conduct an Audit of the State Central Register within 30 days as previously requested by the legislature.  The audit should also address staffing needs at the State Central Register.

SCR call operators should be further trained on other options and resources available when a hotline call does not rise to level of initiating a child protection investigation, such as Child Welfare Services referrals and police well-being checks.

*Child Welfare Service Referrals*

The Department should evaluate the current Child Welfare Services referral system for efficacy and responsiveness. The evaluation should include reviewing timeframes for a CERAP, a response time frame, and service provision time frames and determine needed improvements.

Consistent with Public Act 101-0237 that amends the Abused and Neglected Reporting Act, and is effective January 1, 2020, when a report is made by a mandated reporter and there is a prior indicated report or a prior open service case involving any member of the household, the Department must, at a minimum, accept the report as a child welfare services referral.

SYSTEMIC RECOMMENDATIONS

**TRAINING**

Front-line workers (child protection, permanency, licensing, and intact family services) need training on conducting a thorough person search in SACWIS and training on how to access and utilize the hotline narratives of expunged-unfounded investigations.

The Department should reinforce and re-train staff regarding the Home Safety Checklist to ensure it is satisfactorily completed at appropriate milestones, and specifically before a child protection investigator or caseworker permits the child to be placed in the home. This reinforcement and retraining should also include obtaining background checks for all the adult residents of the home.

All placement supervisors and caseworkers must be trained on Policy Guide 2019.04, Requirements for Reunification and After Care Services.

253

254

# RECOMMENDATIONS FOR DISCIPLINE

In FY 2019, the Inspector General recommended discipline of Department and private agency employees for the conduct detailed below. Discipline recommendations ranged from counseling to discharge.

- A child protection investigator engaged in an inappropriate relationship with the subject of an assigned investigation.

- A child protection investigator used her state-issued cell phone for personal use and used her state-issued cell phone to facilitate two false reports of abuse against a former boyfriend.

- A child welfare specialist provided false testimony to court when she testified that she had referred a family on her caseload for a service that they had not been referred to.

- A child protection investigator attempted to gather information about a child protection investigation that involved a personal friend.

- A child protection supervisor approved a Child Endangerment Risk Assessment Protocol (CERAP) that failed to identify known safety threats.

- An administrator misused benefit time and state equipment (including internet, state email, state phone, state printer) for secondary employment.

- An area administrator approved child protection investigation extension requests without a thorough review of the investigation.

- A child protection supervisor failed to ensure investigative tasks were completed in a timely manner during a child protection investigation, including, interviewing all children in the home, referring the parent for drug testing; referring the family for services, and entering contact notes.

- A private agency director failed to fully address a conflict of interest involving a supervisee's relationship with a family involved with the agency.

- A private agency supervisor engaged in a conflict of interest when she acted as the caseworker on a case not assigned to her and involving a family member.

- A child protection supervisor and investigator failed to ensure children were in a safe home during an investigation; failed to refer the investigation to the Office of Legal Services and Clinical Division due to the egregious acts committed by the caretaker and failed to complete the Home of Relative Placement Safety Checklist.

- A child welfare specialist failed to obtain background checks of adults living in the home of her client; failed to contact the DCFS Education Liaison as recommended in the Integrated Assessment; and failed to complete a Home Safety Checklist.

256

# CHILD WELFARE EMPLOYEE LICENSES

The following cases represent action taken against Child Welfare Employee Licenses (CWEL) in FY 2019.

**License Revocation**
- Three employees had their Child Welfare Employee License revoked for failing to respond to charges of falsification.
- One employee had their Child Welfare Employee License revoked for failing to respond to charges of an inappropriate relationship with a client.
- One employee had their Child Welfare Employee License revoked for providing false testimony in a court hearing.
- One employee had their Child Welfare Employee License revoked for falsification of case records and court testimony.

**License Relinquished**
- One employee relinquished their Child Welfare Employee License after the Inspector General filed charges for falsification.
- One employee relinquished their Child Welfare Employee License after the Inspector General filed charges for soliciting sex from a client.

**Charges Filed**
- Charges were filed against an employee after the employee was named as an indicated perpetrator of child neglect.

## DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS

The Inspector General made the following recommendations in previous Fiscal Years, but the recommendations were not fully implemented before the Annual Report was issued. The current implementation status of these recommendations is detailed below in the following categories.

- **CHILD PROTECTION**
- **CONTRACT MONITORING**
- **DOMESTIC VIOLENCE**
- **FOSTER HOME LICENSING**
- **LAW ENFORCEMENT**
- **MEDICAL**
- **MENTAL HEALTH**
- **OLDER YOUTH IN CARE**
- **PERSONNEL**
- **SERVICES**
- **WORKER SAFETY**

**CHILD PROTECTION**

FY 2018
**Management should conduct an enhanced review of families with investigations over C sequences (the OIG provided a draft tool). The review should evaluate whether chronic issues in the family are being addressed or are capable of being addressed (from OIG FY 18 Annual Report, Death and Serious Investigation 4).**

> *FY 19 Department Update:* With the input of statewide workgroups and the Regional Administrators, Child Protection management developed a Subsequent Oral Report (SOR) Protocol and corresponding practice memo.  This is currently under review in collaboration with the Office of Legal Services and Operations leadership.

*FY 19 OIG Comment:* Please provide the OIG with a copy of the Subsequent Oral Report Protocol and corresponding practice memo.

FY 2015
**Rules and Procedures should be amended to provide that any abuse allegations that can be permissively retained for 20 years should be retained for 20 years when criminal charges have been filed and either resulted in a conviction, or are pending (from OIG FY 15 Annual Report, Death and Serious Investigation 5).**

> *FY 19 Department Update:* The recommendation was incorporated in Procedures 300.150, *Child Abuse and Neglect Investigative File,* which was released via Policy Transmittal 2019.09 on June 11, 2019.

259

FY 2010

**Child protection managers should track and maintain data on cases presented to the State's Attorney's Office for filing of petitions and the State's Attorney's Office's response. Child protection offices should share this information with DCFS Office of Legal Services (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 7).**

> *FY18 Department Update:* Child Protection will identify a liaison at each downstate field office who will provide DCFS Legal with cases presented to the State's Attorney's Office for filing of petitions and the State's Attorney's Office's response. DCFS Legal will track and maintain data on these cases until it can be considered later as part of the Department's redesign of SACWIS, known as CCWIS design.

> *FY 19 Department Update:* Prompted at least in part by a review and report completed by Chapin Hall in May 2019, the Department (including the Operations and Legal divisions of the Department) is working on a number of initiatives directed at improving practice around child protection and intact family services and improving communication and collaboration between the Department and court stakeholders. As part of these initiatives, the Department is collaborating with Chapin Hall and a variety of court stakeholders, including, but not limited to, judges, State's Attorney's Offices, guardians ad litem, public defenders, and the Administrative Office of Illinois Courts. The Department expects this work to lead to, among other things, multidisciplinary trainings; new or amended policies, procedures, and practices; and improved systems of communication. The Department will consider this OIG recommendation in its ongoing work in this regard.

*FY 19 OIG Comment:* Based on OIG investigations, it is clear that the Department continues to struggle to work with families who are refusing services despite significant concerns or are not making progress in services. Not only is it problematic for the Department when a parent demonstrates that they cannot care for their children, and the child protection staff cannot demonstrate urgent and immediate necessity to remove the children, but also when child welfare staff working with families are concerned about safety and attempt to file a petition through the State's Attorney's office only to have the State's attorney decline to file a petition.

When a Child Protection investigator/supervisor correctly identifies heightened safety/risk concerns with families, but do not believe they have enough evidence to support urgent and immediate necessity to take the case to court for temporary custody, they have expressed that they did not attempt to screen the case for a protective order because the State's Attorney in their county was reluctant to file these types of petitions. This is not the first time that the OIG has heard of the reluctance

The State's Attorney is not the only entity that can file a petition in juvenile court; any person, agency/association or the court on its own motion, including DCFS Legal Counsel can file petition and request orders of protection or supervision. While any party is able to file the petition, the State's Attorney still has the sole responsibility to prosecute. A 1991 Illinois Supreme Court Case, *In re J.J.* (566 N.E.2d 1345), ruled that even if the State's Attorney files a motion to dismiss a petition in juvenile court, the court must hear evidence on the petition and determine whether the dismissal is in the best interests of the minors, and if the dismissal is not in the best interest of the minor, the State's motion for dismissal shall be denied.

Procedure 300.130 already directs that when services are declined by a family: *"...... the Child Protection Specialist and Child Protection Supervisor shall consult to determine whether the case should be screened with the State's Attorney for court ordered services. If a case is screened with the State's Attorney for court ordered services but the State's Attorney declines to file a petition for court ordered services or consideration of a shelter care hearing, then the Child Protection Specialist and Supervisor shall consult*

DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS

*with the DCFS Office of Legal Services. In addition, if consultation with another Department division (e.g., the Division of Clinical Practice and Development) is desired, the Child Protection Specialist and Supervisor shall make a request for such consultation thru the Area Administrator. The Area Administrator shall determine if the additional consultation is necessary."*

In FY 10 the Department agreed to track and maintain data on cases presented to the State's Attorney for filing a petition and are agreeing to do so again.  The OIG would like to see any current data tracked over the last 9 years, and in addition, based on the Department's current response the OIG, would like more information on what specific initiative will address the Departmental tracking/data on cases presented to the State's Attorney and the State's Attorney's response.  When does the Department anticipate this work with Chapin Hall to be completed?

## CONTRACT MONITORING

FY 2018
**From OIG FY 18 Annual Report, General Investigation 11:**
    (1) **DCFS Office of Financial Review should conduct full FY16, 17 and 18 audits of the ledger categories of *Staff Development and Training*, *Office Supplies and Equipment*, *Building and Equipment Operations*, *Maintenance* and *Maintenance Service TLP*, to determine whether the agency claimed disallowable expenses. Any funding for Staff. Development and Training must be supported by curriculum and attendance logs. The Office should also conduct an audit of home improvement expenses to determine whether there are any charges not used for Department programs. If any suspected malfeasance is found, such as agency money being spent on the executive director's personal home, this matter shall be referred to the DCFS Office of the Inspector General.**

    (2) **DCFS Office of Financial Review shall seek reimbursement from the contracted agency for any speeding tickets or private social club dues paid with the Department funds (from OIG FY 18 Annual Report, General Investigation 11).**

    *FY 18 Department Response:* The Department agrees. The Auditors have now completed the field-work phase of the audit and are working on reviewing the information retrieved from the Agency and calculating the disallowed costs.  The Auditors are also waiting on additional documentation from the Agency. Once the review is completed, and the disallowed costs have been calculated, a comprehensive audit report will be compiled.

    *FY 19 Department Update:* The comprehensive draft report was compiled and distributed to both the Agency and the OIG in January 2019.  The agency requested and was given an Exit Conference in February 2019.  The agency requested an Administrative Hearing in March 2019, and that process is still ongoing.

*FY 19 OIG Comment:* Please provide the OIG with an anticipated date of completion for the final decision of the Director, as a result of the Administrative Hearing and an update on where they are in the hearing process.

## DOMESTIC VIOLENCE

 FY 2016
**In cases of severe domestic violence, Department procedures should require safety plans that include the involvement of shelter staff or other family support agreeing to contact the Department if the family leaves (from OIG FY 16 Annual Report, General Investigation 4).**

*FY18 Department Update:* The recommendation has been incorporated in draft Procedures 300, Appendix G, *Child Endangerment Risk Assessment*. The anticipated date of completion is Spring 2019.

*FY 19 Department Update:* This remains pending.

FY 2014

**When child protection investigations involve an arrest for domestic violence, investigators should contact pretrial services to obtain bail conditions (from OIG FY 14 Annual Report, General Investigation 1).**

*FY19 Department Update:* The recommendation has been incorporated in Procedures 300.50, *Investigative Process*, which was released via Policy Transmittal 2019.09 on June 11, 2019.

FY 2015

**The Department should develop guidelines identifying behavior that calls into question protective capacity of a non-offending caretaker. When protective capacity issues are identified the Department must review available records and conduct a clinical interview to assess protective capacity. Recommendations from the Assessment must be included in any service plan (from OIG FY 15 Annual Report, Death and Serious Investigation 3).**

*FY19 Department Update:* The recommendation has been incorporated in draft Procedures 300 Appendix J, *Domestic Violence.*

FY 2012

**The Department should examine the continued utility of the Domestic Violence Screen and determine whether the Screen assists in assessing safety and risk to children (from OIG FY 12 Annual Report, General Investigations 1).**

*FY18 Department Update*: The recommendation has been incorporated in draft Procedures 300 Appendix J, *Domestic Violence.* The Office of Child and Family Policy anticipates posting for comment by February 2019. Reference to the use of the domestic violence screen has been removed in the draft of Appendix J. Appendix J provides workers guidance regarding interview questions for children, adult victims, and alleged batters. DCFS Clinical will work with Child Protection staff to address the use of the Child Welfare Violence Screen created by the Inspector General's Office.

*FY 19 Department Update:* The recommendation has been incorporated in draft Procedures 300 Appendix J, *Domestic Violence.*

FY 2012

**The Department should consider requesting the assistance of Child Advocacy Centers (CAC) to interview children in investigations where there is chronic violence in the home and parents have failed in the past to cooperate with services (from OIG FY 12 Annual Report, General Investigations 1).**

*FY 19 Department Update:* DCFS investigators can refer an investigation to the Children's Advocacy Center (CAC) on a case by case basis when there is belief that a forensic or multi-disciplinary setting would be warranted for that interview.

*FY 19 OIG Comment:* Please provide the OIG with the following:

Is the FY 19 update outlined in procedures with identifying factors of what constitutes a "case by case basis"?

More specifically, would the scenario of "where there is chronic violence in the home and parents have failed in the past to cooperate with services" be a qualifier for a CAC interview? If so, is this in procedures?

Lastly, does the CAC program plans allow for investigators to make referrals on any case which meets the factors for 'case-by-case' and will CACs except and provide assistance?

FY 2012
**Policy Transmittal 2010.23, which issues revisions to Procedures 302.260, *Domestic Violence Practice Guide*, and Procedures 300, Appendix J: *Domestic Violence*, provides for batterers to remain in the home with a domestic violence safety plan. This policy should be amended to clarify that when domestic violence has occurred in the home, it is presumed that the home environment is too dangerous for the child to remain, unless the perpetrator of violence is out of the home. Policy Transmittal 2010.23 should make clear that establishing a domestic violence safety plan for children should not preclude taking protective custody (from OIG FY 12 Annual Report, General Investigations 1).**

> *FY 19 Department Update:* The recommendation has been incorporated in draft Procedures 300 Appendix J, *Domestic Violence.*

FY 2011
**The Domestic Violence protocol should be revised to address the cumulative effect of domestic violence and strategies for addressing cases of chaotic family life in which the victim/abuser dynamic results in an incalculable emotional toll to the children, including collaboration with DCFS Clinical and the Office of Legal Services (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 11).**

> *FY19 Department Update*: The recommendation has been incorporated in draft Procedures 300 Appendix J, *Domestic Violence.*

FY 2011
**The Department should integrate into its Domestic Violence protocol the need for increased scrutiny and heightened risk when a person suspected of being a victim of domestic violence has provided false information to protect an abuser of his or her child (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 12).**

> *FY19 Department Update*: The recommendation has been incorporated in draft Procedures 300 Appendix J, *Domestic Violence.*

**FOSTER HOME LICENSING**

FY 2015 **From OIG FY 15 Annual Report, Death and Serious Investigation 8 and 10:**

1. **A foster care license applicant must provide the licensing worker with Consent for Release of Information form for the Social Security Administration (SSA). The Social Security Administration Consent form should be used (from OIG FY 15 Annual Report, Death and Serious Investigation 8 and 10).**

2. **The Department should amend CFS 718-A,** *Authorization for Background Check for Foster Care and Adoption***, to include authorization to determine if the applicant has an active case with the Illinois Department of Rehabilitation Services (from OIG FY 15 Annual Report, Death and Serious Investigation 8 and 10).**

3. **Once the Department obtains the SSA and DHS information, the applicant's potential disability should not necessarily bar the person from providing foster care, but rather the information should be considered for whether the person is physically and mentally capable of caring for children. When there is a significant discrepancy between the DCFS health record and the SSA or DHS, the Department should refer to SSA or DHS for possible fraud and consider revocation for lack of trustworthiness (from OIG FY 15 Annual Report, Death and Serious Investigation 10)**

   *FY18 Department Update:* This recommendation is under review.

   *FY 19 Department Update:* This recommendation is under review.

*FY 19 OIG Comment:* This recommendation has been pending for 4 years. It is critical to child safety that foster parents are fully assessed to ensure that they are physically and mentally capable of caring for children.

FY 2010
**The Department should amend Procedures 301, Appendix E,** *Placement Clearance Process***, to provide guidelines for the monitoring and resolution of involuntary placement holds. These guidelines should include instructions for requesting the removal of an involuntary placement hold. The guidelines should also require that when an involuntary placement hold is placed on a foster home, the licensing worker and licensing supervisor should re-evaluate the placement hold every six months (from OIG FY 10 Annual Report, General Investigation 4).**

   *FY 16 Department Update:* Revisions have been made to Procedure 301-Appendix E to provide guidelines for monitoring and resolution of involuntary placement holds. The Policy Guide with these changes was approved and is currently pending issuance with Office of Child and Family Policy.

   *FY18 Department Update*: Revisions to Procedures 301-Appendix E is in process with the Office of Child and Family Policy. There are also two pending policy releases related to involuntary placement holds, both are in process with the Office of Child and Family Policy. The first policy release reflects the proposed change in the CFS 597-FFH, *Family Foster Home Licensing Monitoring Record*, that would require licensing representatives to address whether the home is on an involuntary placement hold, and the justification for the hold to remain in place. This also applies to voluntary holds. The second policy release is a proposed policy guide to be placed in Rules & Procedures 383 & 402. Rule 402 has been pending due to a court injunction that stopped the process from moving forward. The court issues appear to be resolved and the Department can now move forward with promulgating revisions in Rule 402. Rule 402 are now scheduled to go to 1st Notice in January 2019.

   *FY 19 Department Update:* This project will be revised to implement via policy guide to include Procedures 301, Appendix E (IV)(i) and Rules 402 while the Department pursues Rulemaking for

Rules 402 and Procedure making for Procedures 301. The draft Policy Guide addresses the placement of holds and licensing's plan to address these and document on their Foster Home monitoring forms. This policy guide is to be submitted for approval to post for review by the end of calendar year 2019.

*FY 19 OIG Comment:* The Office of the Inspector General continues to receive complaints from both private agencies and foster parents regarding holds and the difficulty of getting a hold removed once it's been placed. Procedures 301, Appendix E (IV)(i) *Removing a Hold,* does not accurately reflect the current practice for removing holds. According to DCFS licensing, the Department has an internal Procedure to remove a hold that is not found in current Procedures 301, Appendix E. The Department's internal procedure should be incorporated into Procedures. Please provide the OIG with a copy of the policy guide and procedures detailed in the Department's FY 19 update for review.

## LAW ENFORCEMENT

FY 2016

**The Department must review all UIRs involving a youth with a gun or ammunition to ensure that Administrative Procedure 18, requiring notification of law enforcement, has been followed (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

*FY18 Department Update*: The Department has a workgroup in the infancy stage, called the Significant Threats Workgroup. The group consists of DCFS Clinical, Residential Monitoring and Dually Involved staff and law enforcement. The goal is to develop a plan of action and a protocol for youth who appear to pose a serious threat or fit a profile such as potential school shooters, those who make bomb threats, etc. In addition, the Office of Information Technology Services is generating a weekly arrest report drawn from significant event reporting. The regional Dually Involved Specialists are tasked with deep diving into cases with gun charges, significant threats, and/ or youth with frequent arrest incidences in short periods of time. For youth that meet the profile of youth we need to pay close attention to, they flag those cases to the Significant Threats Workgroup. In addition, the Department has a contract with the Youth Advocate Program, which specializes in gang/crisis intervention. The Department can deploy those advocates to follow up on cases and youth which may involve gangs or other crime.

*FY 19 Department Update:* The DCFS Office of Information Technology Services continues to generate a weekly arrest report drawn from significant event reporting, and the regional Dually Involved Specialists continue to be tasked with deep diving into cases with gun charges, significant threats, and/or youth with frequent arrest incidences in short periods of time. The regional Dually Involved Specialists continue to flag cases of youth who need to be monitored closely. Additionally, the Department has a contract with the Youth Advocate Program, which specializes in gang/crisis intervention. The Department can and does deploy those advocates to follow up on cases and youth which may involve gangs or other crimes. The Significant Threats workgroup continued to meet throughout calendar 2018. Youth identified as making significant threats involving weapon violence or significant harm were addressed on a case-by-case basis, bringing representatives to the table to discuss action planning for the youth, and the Department followed Administrative Procedure 18. The Associate Deputy, who organized the task group transitioned the group work to a DCFS Clinical Behavioral Health Specialist. This will reinvigorate the group and bring the protocol development to current status. Additionally, the Department is a member of the recently re-activated Violence Prevention Taskforce led by the Illinois Dept of Public Health.

**MEDICAL**

FY 2018
**The MPEEC Second Opinion Form should be available to the Region's child protection staff (from OIG FY 18 Annual Report, Death and Serious Investigation 3).**

> *FY 19 Department Update:* The Department has collaborated with the Medical Director of MPEEC to ensure cases are accepted for a second opinion and in a timely manner.  As opposed to the use of an additional form, child protection investigators are able to call the coordinator of the MPEEC team and the case is accepted.  The process was explained to staff via a practice memo which was issued to all child protection staff on August 13, 2019.

FY 2016
**The private agency should ensure that their nurse maintains contact with all medical providers for medically complex children. The agency should inform all involved medical providers of their duties to the child and request notification from the medical provider of any concerns regarding the children for whom they provide care (from OIG FY 16 Annual Report, Death and Serious Investigation 8).**

> *FY 16 Department Response:* The Department agrees. This recommendation will be expanded to include all agencies. The redacted report will be shared.

> *FY18 Department Update*: This is still in process.

> *FY 19 Department Update*:  This is still in process.

FY 2015
**The Department should ensure that all reception center staff are made aware that when a youth is taken into protective custody parental consent for medication administration is sufficient. If consent cannot be immediately procured, the youth should be provided with his/her prescription medication on an emergency basis until parental consent can be obtained. The Department should also clarify whose responsibility it is to obtain parental consent for medication when a youth is taken into protective custody (from OIG FY 15 Annual Report, General Investigation 17).**

> *FY 19 Department Update:* The recommendation was incorporated in Procedures 300.120, *Taking Children into Protective Custody,* which was released via policy transmittal 2019.09 on June 11, 2019.

FY 2011
**HealthWorks should obtain the results of newborn genetic metabolic screens on all children, regardless of their age, upon entering Department care. If the results of the genetic screen are unavailable, the Department should ensure that the screen is completed during the HealthWorks comprehensive exam or by the child's primary care physician (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 9).**

> *FY 17 Department Update:* Illinois Department of Public Health is currently sending the new fields to OITS. Additional Birth Data Fields include Birth Weight, Gestational Age, Apgar Score 5, Apgar Score 10, Plurality, Birth Order, Abnormal Conditions, and Congenital Abnormalities. The mapping of the new fields to SACWIS Health Birth Data was completed and tested in August 2017. The program to update the Birth Data in SACWIS was put into production in August 2017. The program that updates the fields in eHealth is currently being tested by Health Service MIS.

*FY18 Department Update:* Other mapping related to health data (including additional birth data) is in process. However, the newborn metabolic screening is not complete. The Department continues to collaborate with the Illinois Department of Public Health on how to access this data and map it to SACWIS.

*FY 19 Department Update:* Health Services re-submitted an electronic service request to OITS for the project in November 2018 for development of the data share. This recommendation remains pending with Office of Information Technology Services (OITS) and is being prioritized with other projects.

FY 2014
**If a Regional Medical Consultant report is pending when custody is taken of a child, the child protection investigator and medical program coordinator should arrange for a phone conference to review their preliminary findings with the placement agency supervisor. The Coordinator should ensure that the agency receives a copy of the report upon completion (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 8).**

*FY 19 Department Update:* The recommendation has been incorporated in Procedures 300.100, *Medical Requirements for Reports of Child Abuse and Neglect* which was released via policy transmittal 2019.09 on June 11, 2019.

**MENTAL HEALTH**

FY 2015
**The Department needs to train foster parents and caseworkers on first-line interventions recommended in the Department's consulting psychiatrist's Schematic Summary (from OIG FY 15 Annual Report, Special Investigations, *Psychotropic Medication and Hospitalizations of 3 and 4 years old)*.**

*FY18 Department Update:* Policy Transmittal 2018.11, *Procedure 325* and Procedures 325.40, *Medication Approval Standards* were both finalized and issued on July 5, 2018. These approval standards apply to administration of psychotropic medications to youth in care 5 years of age or younger. The DCFS Training Department has been working with the University of Illinois at Chicago team on the training module. This module is designed for caseworkers to be trained on the updated Procedure 325.40. It is anticipated to be complete before the end of 2018. On June 29, 2018, the Office of Learning and Professional Development prepared a nearly finalized draft of Part I, Procedure for Consent of Psychotropic Meds for Youth in Care Ages 5 & Under and submitted it to project sponsors for review and approval. This one-hour, self-paced, on-demand course is designed for DCFS and POS caseworkers and supervisors. This course reviews the procedures for obtaining consent, administering and monitoring psychotropic medications prescribed to children under the age of 5 years. The second training module will be designed for caseworkers and foster parents. Part II, Procedure for Consent of Psychotropic Meds for Youth in Care Ages 5 & Under course is under development. On August 5, 2018, the Office of Learning and Professional Development rolled out the Psychotropic Medication Management for Children and Youth in Substitute Care course. This 3-hour self-paced, on-demand course explains the use of psychotropic medication with our youth in care and the appropriate way to receive consent for the use of these medications. 584 staff have completed the course.

*FY 19 Department Update:* This recommendation has been completed.

*FY 19 OIG Comment:* Please provide an update on whether or not both foster parents have received the training.

FY 2012

**Access to means, specifically firearms, is predictive of suicide completion. Research has shown and as noted in two adolescents' deaths, those at risk of suicide will break into locked rooms and locked cabinets to access the firearms. When the Department is placing an adolescent at risk of suicide in a foster home or facilitating a return to the biological home where there is a gun, the Department should conduct a clinical staffing to educate the parents (biological and foster) that the risk of suicide doubles if there is a firearm in the house, even if the gun is locked up. The staffing should utilize the materials developed by The University of Illinois at Chicago Institute for Juvenile Research for their Youth Suicide Prevention program. If the family has firearms, they should be asked to store the guns outside of the home. If the parent will not store the firearm elsewhere, they must store firearms with a trigger lock in a lockbox. The keys should be kept in a secure or supervised setting. In return home situations of a suicidal youth, where the biological parent refuses to store the gun with a trigger lock in a lock box, the caseworker should contact DCFS Legal for assistance in presenting the case in Juvenile court for purpose of obtaining a court order (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).**

> *FY 16 Department Update:* Policy Guide 2015. 08, *Enhanced Firearm Safety in Foster Family Homes* was issued May 1, 2015. In July 2016, a complaint for declaratory and injunctive relief was filed against the Director, challenging various rules and regulations related to firearm safety. At the present time, the Director is conducting a review of 402 Licensing Standards.

> *FY 17 Department Update:* Extensive proposed amendments to Rule 402, *Licensing Standards for Foster Family Homes* are awaiting further review and approval prior to First Notice filing.

> *FY18 Department Update:* The Department is reviewing this recommendation.

> *FY 19 Department Update:* The Department is engaged in rulemaking for Rule 402, Foster Family Homes, pursuant to the provisions of the Family First Preservation Act, to enact the national model Foster Family Home Licensing Standards, which require that weapons and ammunition be stored separately and be locked, unloaded, and inaccessible to children.

*FY 19 OIG Comment:* The Department's FY 19 update only addresses foster parents. How will the following from the recommendation be implemented, "In return home situations of a suicidal youth, where the biological parent refuses to store the gun with a trigger lock in a lock box, the caseworker should contact DCFS Legal for assistance in presenting the case in Juvenile court for purpose of obtaining a court order"?

## OLDER YOUTH IN CARE

FY 2015

**From OIG FY 2015 Annual Report, Special Investigations,** *Shelter and Runaway Report:* **The Shelter System should be revamped to include the following:**

- **The Department should determine the number of older Cook County shelter youth with histories of serious mental illness who cycle in and out of the present Shelter system. The Department should develop a specialized stabilization center for this population of youth.**
- **In addition to clinical services, this stabilization center should have an outreach unit that functions similarly to homeless mental health delivery services.**

268

- **The stabilization center should host supportive NAMI (or similar) groups for relatives or other child centered collateral of the youth who are willing to partner with stabilization efforts.**
- **The Center should tightly coordinate educational services to assure the residents' educational rights are secured. This is crucial for those youth who are eligible or up for redetermination for SSI benefits. The center should also provide alternative educational programming similar to Education Options program at the Madden Center.**
- **The Department should determine the annual number of Cook County shelter youth 15 years old or older who are involved with the Juvenile Justice System or adult probation and who cycle through its Shelter system. The Department should develop a restorative justice stabilizing center for this targeted population, working closely with Juvenile Court personnel and Probation. The staff of the shelter should have the ability to network with the various Detention Alternative programs including Electronic Monitoring and Evening Reporting Centers and substance abuse programs. Clinical services should be provided for those youth who have mental health or adjustment problems.**
- **The Department should develop a violence-free stabilizing center for the older youth (over 17) involved with the criminal court system or dually involved with adult and juvenile courts. The programming of the shelter should model a Safer Foundation approach. The staff should work with Cook County Sheriff, Criminal Court personnel and Probation. The stabilizing center should clearly define a nonviolence contract with each youth who enter the program. If the terms of the center's nonviolence contract are violated the Department should immediately inform the Juvenile Court and Adult probation of the violation and the intention of the Department to request termination of the adult's wardship.**
- **The Department should develop a specialized clinical and educational stabilization/shelter program for female youth who have or are at high risk of being victims of trafficking. The Department should consider the Cook County Sheriff's Office offer of prevention work with potential trafficking victims.**

*FY 18 Department Update:* The Department disagrees with the recommendation to develop specialized stabilization/shelter programs. The Department plans to develop short term Interim Care Unit(s) that have increased clinical and therapeutic capacity which will provide a variety of clinical support or diagnostic services. These Interim Care Unit(s) will provide trauma informed treatment services and will offer family engagement and after care support services. The Interim Care Unit intends to maintain youth at their home school which may require that staff provide transportation to the youths' schools, or to work with the home school district to schedule other forms of transportation services. This program will develop individualized treatment plans to address the specific needs of youth they would serve. The first two programs in current development are Aunt Martha's Youth Services Children's Reception Center (CRC) and Daniel J. Nellum Youth Services. Aunt Martha's has recognized that there is an increasing complexity of the young people served at the CRC, manifested in both physical and mental health conditions. Anticipated to begin in early 2019, Aunt Martha's will enhance its clinical capacity as well as increase overall to serve up to 30 male and female youth. The additional enhanced supports will better support and train staff, improve youth engagement, increase youth access to mental health and substance abuse services, and better ensure youth and staff safety, as well as facility security. Daniel J. Nellum has recognized that the youth they serve come with a history of severe behavioral issues, delinquencies, criminal histories, chronic AWOL behavior and/or poor compliance with services. These youth have experienced traumas ranging from verbal abuse, physical abuse, sexual abuse, medical and educational neglect, and abandonment, which have led to some youth being

269

hyper vigilant, distrustful, exhibiting sexualized problematic behavior, delinquent behaviors and severe anger management issues. The program redesign will provide assessment of the youth's mental health, educational, pre-vocational, vocational, and life skills needs in order to develop a comprehensive plan of treatment to manage trauma related mental health issues and reduce recidivism. They also plan to provide highly structured and well-supervised individual and group programming to address identified needs. They will ensure court appearances and reduce the likelihood of re-arrest while allowing the youth to continue attending school and plan for their future. The plan is for them to serve up to 12 young men in a new location with an evidence-based trauma informed treatment model, with an expected opening in the Spring of 2019.

*FY 19 Department Update:* No update provided

FY 2014
**In fiscal year 2014, the Inspector General's Office made the following recommendations (from OIG FY 14 Annual Report, General Investigation 13):**
- **Colleges and universities offer an orientation week for all incoming students. Similarly, the transitional living program should provide a two-week orientation period for all teen parents. The orientation should focus on building family and community support using a task-centered/ecological approach. During this orientation period, the transitional living program case manager and family support worker will jointly introduce a young parent to community-based resources in the area and begin building the foundation of a support system. (a) Family support worker duties include: introducing a youth and her child to local Head Start programs and supporting progress through monthly visits; introducing a young parent and her child to libraries, WIC offices, park districts; establishing a pediatric medical home for a young parent's child; (b) Case manager duties include: supporting the youth in their educational setting through monthly visits to the young parent's school or job to assist the youth to overcome obstacles that hinder achievement. If the young parent is without a medical home, accompanying them to a local Title X Clinic/medical home; and exploring recreational, physical fitness and arts programs in the community with the youth. The case manager should diligently assist the young parent in maintaining and strengthening their extended support system, including inviting a young parent's family or friends to an orientation meal and visiting with a young parent's emergency caretaker.**
- **When a young parent transitions into a transitional living program, the receiving case manager shall introduce themselves to school staff within the first ten days and ask to be notified via email of any absences. To support the case managers efforts to sustain attendance, case managers must arrange to have access to the applicable education notification system portals for absences or cuts. If the school does not have a portal system (such as the Alternative School Network), the case manager should arrange notification through available mentors or teachers. If a young parent has two consecutive absences from school, the case manager must immediately make in-person contact. The Teen Parent Support Network Education Support Department shall be consulted before absenteeism becomes a chronic issue. This recommendation should be incorporated into Procedures 302,** *Services Delivered by the Department***, Appendix J,** *Pregnant and/or Parenting Program***.**

*FY 19 Department Update:* The recommendation has been incorporated in proposed Procedures 302, Appendix J, *Pregnant and/or Parenting Program.*

270

FY 2014

**Anticipating college enrollment, a case manager should assist a young parent in beginning the application process for grants and federal aid when high school graduation or high school equivalency testing (GED) completion is imminent. Youths in care should not have to confront the daunting and complicated process of applying for Pell grants and federal aid (FAFSA) without hands-on assistance. The Teen Parent Support Network Education Support Department or Youth In College should assist any parenting youth who has completed high school or earned a GED in completing these required applications. This recommendation should be incorporated into the Procedures 302,** *Services Delivered by the Department*, **Appendix J,** *Pregnant and/or Parenting Program* **(from OIG FY 14 Annual Report, General Investigation 13).**

> *FY 19 Department Update:* The recommendation has been incorporated in proposed Procedures 302, Appendix J, *Pregnant and/or Parenting Program* and was posted for Proposed Policy Review on November 19, 2019.

## PERSONNEL

FY 2018

**The Department should explore an agreement with American Federation of State, County and Municipal Employees (AFSCME) to commit new hires to stay in the Office they were hired into for a minimum of 2 years, absent exigent circumstances (from OIG FY 18 Annual Report, General Investigation 1).**

> *FY 18 Department Response:* The Department is currently in negotiations with the union on various proposals which cannot be discussed until and unless agreements are reached.

> *FY 19 Department Update:* The master contract was settled in June 2019, and managements proposal to extend the length of time for job assignments beyond the 12-month time frame did not prevail.

FY 2018

**For high level management hires, the Department must verify prior employment and critical credentials, even if not required by the job description, to ensure that trustworthy individuals are hired (from OIG FY 18 Annual Report, General Investigation 2).**

> *FY 19 Department Update:* The Department continues efforts to improve the agency's ability to scrutinize candidate's employment application prior to hiring.  The process now allows for the interview panel to review the employment application for breaks in service or any additional red flags that may appear on the application.  The interview panel and/or the Office of Employee Services can now question or request further information from the candidate on any discrepancies or areas of concern.   In addition, the Office of Employee Services continues to utilize their practice of checking for other state employment prior to a candidate's hire to ensure accuracy of their employment application and history.

FY 2016

**Employers should get a copy of the Child Protection Investigation Summary along with the Notice of Indicated Child Abuse/Neglect Report when an employee has been indicated (from OIG FY 16 Annual Report, General Investigation 11).**

> *FY18 Department Update*: DCFS Licensing and the Office of Legal Services have been working on addressing this issue. Draft language to the CFS 718-B is pending approval with both offices and will be completed by December 31, 2018.

> *FY 19 Department Update:* The recommendation will be incorporated in Procedures 300.110, *Special Types of Reports*, Procedures 300.160, *Notifications* and 385.50, *Background Checks*. Department Legal staff will review the language being added to the above Procedures to ensure the necessary documents are shared while ensuring confidentiality.

FY 2013

**DCFS must establish guidelines for professional ride-alongs with DCFS staff. Guidelines for medical professionals (e.g., medical residents) should address what are permissible and impermissible tasks (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 12).**

> *FY 18 Department Update:* The recommendation has been incorporated into draft Administrative Procedure #29, *Interns and Shadows*. The anticipated completion date is January 2019. Once the procedures have been fully implemented the Department will have concluded its response to the recommendation.

> *FY 19 Department Update:* Administrative Procedure #29, *Interns and Shadows* was released via policy transmittal 2019.10 on September 13, 2019.

**SERVICES**

FY 2018

**The Department should conduct an audit of split custody cases (i.e. cases in which some of the children are in state care and some are at home). A review should determine if the children at home need more intensive services (from OIG FY 18 Annual Report, Death and Serious Investigation 4).**

> *FY 18 Department Response:* The Department is in discussions with OITS on a report which would give this information. Once the report is finalized, the Department will determine how to review and follow up with the identified families.

> *FY 19 Department Update:* This recommendation is being addressed via a request for the quality assurance review of a sample of children in care and in home of parent. While review is pending a practice reminder will be sent to all casework staff of the requirement to have ongoing contact and assessment of children who remain in the home of parent. This practice reminder will be issued by December 15, 2019 and will include that the assessment of children who are home with parent is outlined in Procedure 315.130 (b)(1)(b). A practice reminder will be sent to all casework staff of the requirement to have ongoing contact and assessment of children who remain in the home of parent.

*FY 19 OIG Comment:* Please provide the OIG with a copy of any results/findings from the review and a copy of the practice reminder.

FY 2018

**Whenever the facts suggest the possibility of significant developmental delays, mental illness or other issues that can affect the caregiver's ability to benefit from standard interventions, management must ensure that the delays are assessed and that referrals address identified delays (from OIG FY 18 Annual Report, Death and Serious Investigation 1).**

*FY 18 Department Response:* The Department agrees. This is part of ongoing supervision. The Department is addressing these issues by developing goals related to serving these families and identifying and monitoring basic tasks to attain the goals. There are also weekly practice reviews between DCP Area Administrators and Supervisors in which all new cases with children under three are discussed, including their needs and any safety issues or family needs.

*FY 18 OIG Response:* It is critical that the Department ensure that parents with limitations can accomplish the goals set for them – both through evidence-based assessments and task-centered services. Supervision provided without this critical direction from management will not address the problems identified in the OIG Report.

*FY 19 Department Update:* The Department will be implementing 360 statewide with roll-out to begin in January 2020. In addition to this being a topic for discussion in regional POS/DCFS field staff meetings, the plan for 360 roll-out includes prioritizing service and community collaboration with DD and MI parent populations among others.

*FY 19 OIG Comment:* Please provide the OIG with a copy of the plan for the 360 statewide roll-out.

FY 2018

**Part of the service plan development process must include consideration of what consents will be necessary to properly serve the family. Workers should make every attempt to obtain informed consent to release of necessary documents at the outset of the service plan process (from OIG FY 18 Annual Report, Death and Serious Investigation 1).**

*FY 18 Department Response:* The Department agrees.

*FY 19 Department Update:* This recommendation is already procedurally based, and a practice reminder will be released to a field, in addition to this being an agenda item in POS and DCFS regional field meetings. This will be completed by the end of March 2020.

*FY 19 OIG Comment:* Please provide the OIG with a copy of the referenced procedure in the FY 19 update, a copy of the practice reminder for review, and implementation date.

FY 2018

**The Department should explore expanding the Child Welfare Training Academy Simulation residential home for intact family workers and supervisors (from OIG FY 18 Annual Report, Death and Serious Investigation 1).**

*FY 18 Department Response:* The Department agrees. However, the primary focus of the Training Academy Simulation is on child protection investigators. Once they have all been through the training, it can be expanded to Intact and Permanency staff.

*FY 19 Department Update:* This recommendation is a continued topic of discussion and planning with the Office of Learning and Professional Development.  A new simulation lab has opened in Chicago, which affords greater opportunity and ability to meet the various geographical need for training of field staff.  Intact Family Services leadership in both DCFS and the POS are collaborating on the needs of serving the intact population and also enhancing the skill set of our intact work force.  This is a topic for POS/DCFS collaboration.  A plan for the needs of the intact work force is forthcoming in the 1st quarter of the new year.

*FY 19 OIG Comment:* Please provide the OIG with a copy of the plan for intact when it becomes available. Will the intact plan include a need for training?

FY 2018

**In return home cases, the Department Office of Legal Services should ensure that an additional condition be incorporated in the Order of Protection requiring that all preschool aged children are enrolled in and actively attending the appropriate State Pre-Kindergarten or Head Start program (from OIG FY 18 Annual Report, Death and Serious Investigation 2).**

*FY 18 Department Response:* The Department has formed a partnership with DHS regarding intact families to ensure we get children to school and into protective daycare.  The agencies are in discussions about an Interagency Agreement regarding upcoming legislation that specifically addresses day care for intact cases to implement PA 100-0860.

*FY 19 Department Update:* The Department provides child care assistance to certain families with children under the age of 5, who have an open intact family services case.  Families receiving such assistance shall remain eligible for child care assistance 6 months after the child's intact family services case is closed through DHS.

*FY 19 OIG Comment:* The Department's FY 19 update is unresponsive. As stated in the recommendation, this was a return home case not an intact family services case. Please provide the OIG with an update to the recommendation.

FY 2018

**In return home cases, 60 days prior to the child's scheduled return home date, the case worker should meet with the parent(s) and school professionals to introduce the parent to the school, begin the registration process, and identify additional community programs that may be available to the family for social engagement of the children (from OIG FY 18 Annual Report, Death and Serious Investigation 2).**

*FY 18 Department Response:* The Department does not agree. An aftercare plan needs to be completed for reunification cases, but it is not intended to be a checklist with specified time frames. The Department will reinforce in training that young children should be engaged in an academic program from school or an early childhood program.

*FY 19 Department Update:* No update provided.

*FY 19 OIG Comment:* Please provide the OIG with an update on how the recommendation was reinforced in training.

FY 2017

**At the transitional visit in Intact Family Services cases with a medically complex child, the child protection investigator and intact family services caseworker should request that the parent sign**

274              DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS

**consents for the worker to communicate with the child's medical home regarding the child's health and medical care management (from OIG FY 17 Annual Report, Death and Serious Injury Investigation 8).**

> *FY18 Department Update:* Procedures 302.388, *Intact Family Services* will be updated to reflect changes. A workgroup from the Child Welfare Advisory Committee Front End will be involved along with Intact Administration for this to be accomplished by the end of 2018. The Department does not support the use of standardized consents but does want caseworkers to seek obtaining a consent for all relevant providers. The Department also encourages staff to be actively involved in attending medical appointments with families and providing transportation if needed. Medically complicated children are a high priority. Expectations include active involvement in supporting the families' accessing medical care and Intact Family Services is to be actively involved. Expectations around medically involved children will be included in updates to Procedures 302.388.

> *FY 19 Department Update:* A recent draft of Procedure 302.388, *Intact Family Services* is pending in the Office of Child and Family Policy. The Department is also implementing "Joint Initiation" roll-out in January 2020. This process involves an investigator and current intact worker initiating a new CA/N report together. The updates to Procedures 302.388 related to this recommendation will be included in the guidelines established for this practice. It will also be used for the transitional visit between the investigator and intact worker. Full implementation is expected by March 2020.

*FY 19 OIG Comment*: Will the intact worker and investigator be required to obtain consents during the "Joint Initiation?"

FY 2017

**In Intact Family Services cases involving medically complex children, the caseworker must convene a staffing, within 30 days of receiving the case, with the medical case manager and parent(s) to discuss the child's care and assess parent's needs for tangible and emotional support (from OIG FY 17 Annual Report, Death and Serious Injury Investigation 8).**

> *FY18 Department Update*: The Department agrees that this is a fundamental practice to address services to medically complex children. During both trainings with Investigation staff and Statewide Intact Provider meetings, contact with medical providers has been stressed, including worker attendance at medical staffing. This will be formalized during the updates to Procedures 302.388, *Intact Family Services*. Child Protection has been encouraged to refer cases to Intact Family Services in these situations as quickly as possible so that if a child is hospitalized, the workers can meet with attending medical staff and attend hospital meetings, training and discharge planning meetings.

> *FY 19 Department Update:* A recent draft of Procedure 302.388, *intact family services* is pending in the Office of Child and Family Policy and it contains the language in this recommendation. This recommendation content will be included in the guidelines to be used for the transitional visit between the investigator and intact worker. It will include addressing the need for this at the transition visit. Full implementation is expected by March 2020.

FY 2017

**Prior to return home, caseworkers must develop a reunification plan that identifies basic necessities that must be in place before return home (food, beds, diapers, etc.); support services that must be in place before return home (homemaker, visiting nurse, counseling, early intervention, Head Start, day care, school, respite care, etc.); and community resources appropriate and available within two miles of the family's home (WIC, food pantry, local library, *etc.…*). The Department must ensure that the**

**family is securely anchored to supportive services (from OIG FY 17 Annual Report, Death and Serious Injury Investigation 2).**

> *FY18 Department Update:* The Department makes every effort to ensure that needs and services are in place prior to return home as part of reunification planning. This is best practice and each case should be assessed and monitored by the caseworker and supervisor to ensure this occurs. This is being addressed further through the coming implementation of the Core Practice Model integrated with the Model of Supervisory Practice.

> *FY 19 Department Update:* Supervisors are a critical part of all case planning for all families. Ongoing development of supervisors beginning with the Model of Supervisory Practice will be a step in ensuring that each plan is comprehensive and suited to the individual family needs. Enhancing the content of notes entered into SACWIS will also demonstrate that this is occurring in supervision.

*FY 19 OIG Comment*: How will the recommendation be addressed in the Model of Supervisory Practice? Will supervisors be trained on developing an effective reunification plan including what basic necessities/support services must be in place *prior* to return home?

FY 2017
**The Department should fund transportation to daycare or Head Start programs in return home cases where there are multiple young children and the parents – because of poverty or increased stress – cannot transport their children (from OIG FY 17 Annual Report, Death and Serious Injury Investigation 2).**

> *FY18 Department Update*: Youth in Care with Individualized Educational Plans have transportation paid for. As of the 2017-2018 school year, youth in care no longer qualify under the McKinney Vento Homeless Assistance Act. DCFS and the Illinois State Board of Education (ISBE) have partnered to share the cost of transportation 50/50. However, this is only for ISBE funded pre-schools and Head Start programs. Any daycare not funded by ISBE does not get transportation reimbursement. Daycare transportation is still a work in progress.

> *FY 19 Department Update:* No update provided.

*FY 19 OIG Comment*: Has the Department looked into funding transportation for day care/Head Start in return home cases?

FY 2017
**Representatives from the Department of Public Health should be invited to a Child Protection Supervisors meeting to discuss the role of APORS (Adverse Pregnancy Outcomes Reporting System) for high-risk infants. In child protection investigations involving a premature infant where it appears that the parent has missed medical appointments including well-child visits, child protection supervisors should be guiding investigators to contact WIC and APORS because a high-risk situation may exist (from OIG FY 17 Annual Report, Death and Serious Injury Investigation 4).**

> *FY18 Department Update:* Cook County Regional Management will coordinate a meeting with the Illinois Department of Public Health and Child Protection Supervisors to discuss and explain the role of APORS for high-risk infants. This meeting will take place the first quarter of 2019.

> *FY 19 Department Update:* Current leadership in Operations is looking at Procedures 300 for revision and consulting with our medical professionals regarding newborns as well as medically

complex infants.  This will include our Director of Nursing and collaboration with DHS on the drafting of policy.

*FY 19 OIG Comment:* Did the meeting scheduled to take place in the first quarter of 2019 between IDPH and Cook County management occur? If so, are there plans to expand the discussion to other areas to ensure all Child Protection Supervisors are aware of the role of APORS for high-risk infants?

FY 2017

**The Department must develop resources including funding for residential treatment centers to develop their own step-down foster homes (from OIG FY 17 Annual Report, Death and Serious Injury Investigation 6).**

> *FY18 Department Update:* The Department currently offers the Foster Care Placement Enhancement/Enhanced Wraparound Program as an incentive to agencies that are willing to develop homes specifically for youth stepping down from residential treatment programs to specialized foster care. Through this program, the agency can receive a financial incentive for each youth they accept that is stepping down from a residential program and for each new foster home they develop that successfully takes a step-down youth. Once the youth has stayed in the home for 30 days, the new foster parent can also receive a financial incentive every month for twelve months for sustainability and support.

> FY 19 Department Update: *No update provided.*

*FY 19 OIG Comment:* Have agencies accepted the incentive and developed the resources? Please provide the OIG with the data.

FY 2016

**The Department should explore collaboration with the Illinois DHS Division of Mental Health, Division of Alcoholism and Substance Abuse, and the Cook County Sherriff's Office to develop a stabilization strategy for DCFS Cook County young adults with mental illness and substance abuse problems who are charged with crimes against a person that exclude them from the criminal mental health court (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

> *FY18 Department Update:* The Department continues to explore collaborations with other state, county and local government agencies. DCFS and the Department of Juvenile Justice meet regularly to improve the process by which youth are discharged and placed in the community, but also are looking at options to develop more in-state placement resources for youth that are severely mentally ill and cannot sustain themselves in a community-based setting. The Department is already working very closely with the Sheriffs' Office on human trafficking issues. The Office of Delinquency Prevention and Restorative Justice envisions youth and young adults, at risk of becoming entrenched in multiple systems, being safely diverted from crime and violence, safely re-entered into their community, and ultimately achieving permanency. Recently, there was a multi-state agency collaboration to develop programming and resources that would address the needs of more at-risk youth and young adults that have the most barriers to achieving permanency and self-sufficiency. In October 2018, 53 dually involved youth engaged in a 2-day summit with the Department of Juvenile Justice, DCFS, Department of Human Services, Illinois State Board of Education and the Governor's Office to dialogue and develop solutions to address the needs of young people that fall into these categories. The involved youth discussed issues affecting their age group such as education, drugs, gangs, and engaged in a discussion to develop solutions.

277

*FY 19 Department Update:*  The Illinois DHS Division of Mental Health, Division of Alcoholism and Substance Abuse (IDHS/DASA) contracts with various treatment providers to assist individuals involved with the Illinois Department of Corrections and Illinois court systems. IDHS/DASA provides funding for alcohol and other drug abuse treatment services for individuals with active DCFS involvement.  Individuals receiving these services are screened and referred by DCFS offices and local service providers.  Treatment providers work collaboratively with DCFS workers to bring individuals into the treatment process and, when needed, provide transportation for individuals and/or their children (to child care) so the individuals may attend treatment. IDHS/DASA continues to expand its system of youth treatment programs.  Youth programs are now developed in non-traditional treatment settings more conducive to youth involvement.  These services integrate early intervention and treatment, are more family-focused, and are promoted in school and community settings.

FY 2016

**Similar to the Rosecrance model, the Department should develop a supportive recovery transitional living program for its young adults in Cook County who are in their early stages of recovery. The program should offer individual, group and family counseling, educational and employment services with incentivized goal setting in these areas (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

*FY18 Department Response*: For any youth who need substance abuse services, the Department will contract with outpatient providers to develop a Transitional Living Program. The Department also has existing providers that have staff who provide substance abuse services and supports or who contract, on their own, with community substance abuse agencies who are willing to come into their programs to provide individual, group and family counseling around substance abuse and recovery issues. For those youth with significant substance abuse issues, the Department also refers youth to inpatient substance abuse programs such as Rosecrance and Gateway.

*FY 19 Department Update:* No update provided.

*FY 19 OIG Comment:* Has the Department contracted with outpatient providers to develop the Transitional Living Program described in the Department's FY 18 response?

FY 2016

**The Department should utilize The Addicted Minor Act to obtain court ordered treatment for dually involved youth who are in need of substance abuse treatment in lieu of violating their delinquency probation (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

*FY18 Department Response:* The Department explored this idea and held several meetings on the use of the Addicted Minor's Act. All parties involved in the discussion agreed it was not feasible. The Assistant State's Attorney never brings petitions under that statute and drug treatment can be mandated by Juvenile Justice or DCFS case plan.

*FY 18 OIG Comment:* The Inspector General's Office agrees that it may be easier to address this issue through delinquency court orders. The practice should be solidified through training and/or policy reform.

*FY 19 Department Update:* The Department's position remains the same as its FY18 response.

*FY 19 OIG Comment:* Is the Department's position that the Department will seek court orders through juvenile justice for substance abuse treatment?

FY 2016

**For effective collaboration Cook County Region DCFS should pursue an agreement with the Cook County Probation Department to cross train the dually involved specialized caseworkers and the youth's assigned probation officers. The training should cover the ins and outs of probation, delinquency court and gang safety and the DCFS related policies and expectations. The trainings should be conducted biannually and include a discussion component provided by experienced caseworkers and probation officers on gang involvement and lessons learned (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

>*FY18 Department Update:* The Department successfully completed Multi-System Collaboration Training and Technical Assistance. The outcome was a joint agency plan to expand the Dually Involved Committee and develop cross-training between DCFS, Department of Juvenile Justice (DJJ) and Cook County Probation. The Dually Involved Committee has a large number of stakeholders and the Department is only a member of the Committee. The Committee is under the purview of the Cook County Chief Juvenile Judge's Office. The involved agencies are currently in the process of developing a survey of each agency's training needs. DCFS will be surveying DCFS front-line workers and those results, along with those from DJJ and Department of Corrections will be assessed, and we will develop training modules based on needs assessment. It is anticipated that the three agencies will launch the needs assessment in December 2018, and training will be implemented during the summer of 2019.

>*FY 19 Department Update:*   In April 2019, the Department collaborated with Cook County Probation, the Cook County Office of the Public Guardian, the Cook County Public Defender, and the Cook County State's Attorney's Office to facilitate a Dually Involved Youth Training.  The training was held at the Cook County Juvenile Court and attended by DCFS attorneys and case workers, the DCFS Dually Involved Specialist, and other juvenile justice stakeholders.  The training agenda included roles and responsibilities of each system interacting with Dually Involved Youth, data on the juvenile justice population, and education on prevention and early intervention services, and was concluded by a panel discussion and audience Q and A.  The DCFS Office of Delinquency Prevention and Restorative Justice is currently planning to partner with Illinois Department of Juvenile Justice, the Illinois Department of Corrections, and the Administrative Office of Illinois Courts Probation Services to conduct a statewide dually involved youth training for case workers and other child welfare/juvenile justice stakeholders.  The Department launched a Dually Involved Youth Questionnaire in December 2018 and collected results in February 2019. The Department will share the results with the DCFS training division and the juvenile justice partners during the training development.  The Department's goal is to launch a statewide training online or in-person between July and September 2020.  The Dually Involved Committee has not implemented the plan to work with other counties to develop a Dually Involved Committee within counties with a growing population of dually involved youth.

FY 2016

**The Department should request that the Office of Administration of the Illinois Court (AOIC) allow the Department to receive all Delinquency court assessments such as the Youth Assessment and Screening Instrument (YASI) and Violence Risk Assessment for youths in care of the Department. For consistency of measurements across agencies the Department should administer the YASI on those dually involved youth who end their probation or parole but continue under the Department's guardianship (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

>*FY18 Department Update*: Cook County Probation is no longer using the Youth Assessment and Screening Instrument (YASI) as their assessment tool. Probation is now using the Ohio Youth

Problems Functioning and Satisfaction Scale. The Office of Information Technology is currently working on a portal with IT staff from Cook County Probation to retrieve probation documents on youth in care. Department staff will be able to go into the portal and access relevant documents such as probation orders, assessments and other documents relevant to youth in care. This is in the early stages of development.

*FY 19 Department Update:*  In addition to the Department's FY 18 update, the Department is working with the Administrative Office of Illinois Courts Probation Services to develop a statewide information sharing process between all probation counties and DCFS.  This is still in the early development stages.

## FY 2016

**When sibling groups are placed in a foster home, the Department should require an assessment of the pragmatic demands of the placement given the developmental and chronological ages and needs of the children and demands on the foster parent. The assessment should identify specific concrete supportive services the caregiver will need to successfully care for the children, such as enrolling preschool age children in a Head Start program, or in the alternative, appropriately accredited childcare center; supportive homemaker services; respite; and assessing the transportation needs related to the children's services (from OIG FY 16 Annual Report, Death and Serious Investigation 7).**

*FY18 Department Update:* The Department will not initiate an additional assessment as described above. The factors raised in this recommendation are standard points of care and best practice.  This is a core component of best practice and each case should be assessed and monitored by the case worker and supervisor as well as incorporated in any required clinical assessment. This issue should be addressed further through the coming implementation of the Core Practice Model integrated with the new Model of Supervisory Practice.

*FY 19 Department Update:* The Model of Supervisor Practice was a first step in establishing a consistent and deliverable supervisory model.  The Department will continue to support the model through regional leadership by reinforcing the elements of the model in the day to day work of direct service supervisors.  One of the components is clinical supervision which would include any issue related to a child's well-being in foster care to include support to foster parents to ensure successful placements.  In addition, this assessment is completed through an integrated assessment of needs of the children and caregivers. Foster parent support will be an item on the agenda of the Foster Care CWAC sub-committee.  Foster parents will be reminded of the ability to request respite, day care, and more frequent visits from a foster parent support specialist or licensing representatives.  Pragmatic needs of the placement will be documented in the placement note made by the worker.

## FY 2014

**Consistent with the intent and spirit of the Division of Mental Health discharge planning (IL Administrative Code Title 59, Section 125.50), Department Rules and Procedures should require DCFS workers to contact staff at psychiatric facilities prior to the discharge of any involved family members to communicate concerns or issues known to the Department and to monitor compliance with discharge recommendations. In cases in which the patient has already been discharged, the Division of Child Protection must obtain complete psychiatric records, including any discharge recommendations, and follow-up with community providers identified. If the facility becomes involved during the pendency of a placement or intact family case, the worker should seek the consent of the involved family member to receive records and monitor compliance with discharge recommendations (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 2).**

DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS

*FY18 Department Response*: In FY 16 the recommendation was incorporated in Procedures 315. The recommendation will also be incorporated into Proposed Procedures 300.50, *Investigative Process* which was released for comment on December 1, 2018.

*FY 19 Department Update:* The recommendation was incorporated in Procedures 300.50, *Investigative Process*, which was released via policy transmittal 2019.09 on June 11, 2019.

FY 2012

**The Department should develop an effective consultation process and procedures specific to failure to thrive investigations and the provision of intact family services in cases with a failure to thrive child (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 4).**

*FY 19 Department Update:* The language is contained in Procedures 300.130, *Referral for Services* and Procedures 300.100, *Medical Requirements,* which was released via policy transmittal 2019.09 on June 11, 2019.  Language will also be incorporated in Procedures 302.88 which remains pending. The DCFS clinical practice nurses remain committed and available to support Intact providers with consultations and guidance specific to the medical concerns of any referral including Failure to Thrive. Nursing remains available to support the "Field" and Intact, according to Procedures 302.388, upon request by completing a CFS 531 as detailed in Procedure 302, Appendix O (1).

FY 2010

**The Department should develop guidelines for when it is appropriate to refer a family to the Extended Family Support Program for consideration of guardianship of a minor through Probate Court and also train them on the differences of guardianship through Probate Court versus referring a case to Juvenile Court. The Short-Term Guardianship Form should never be used when it appears that the problem requiring guardianship will not be resolved within one year (from OIG FY 10 Annual Report, General Investigation 9).**

*FY 19 Department Update:* The recommendation was incorporated in Procedures 300.130, *Referral for Services* and released via policy transmittal on 2019.09 on June 11, 2019.

**WORKER SAFETY**

FY 2014

**When a DCFS worker has a case involving a caretaker who is suspected of anabolic steroid use, the worker should contact the Administrator for Substance Abuse Services for information on the appropriate anabolic steroid screen (from OIG FY 14 Annual Report, General Investigation 1).**

*FY 19 Department Update:* The recommendation was incorporated in Procedures 300.140, *Consultations,* which was released via policy transmittal 2019.09 on June 11, 2019.

FY 2011

**For the safety of the worker and child, the State Central Register should notify local police when allegations include information about a large quantity of illegal drugs (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 15).**

*FY 19 Department Update:* The recommendation was incorporated in Procedures 300.160, *Notifications*, which was released via policy transmittal on 2019.09 on June 11, 2019.

# REJECTED OR UNRESOLVED RECOMMENDATIONS IMPACTING CHILD HEALTH AND SAFETY

The following Office of the Inspector General's recommendations impact child safety and have been either rejected by the Department or pending for at least 4 years without resolution.

FY 2018
**The Department must develop protocol that requires intact workers to identify family needs that are critical and time sensitive and management must track those cases to ensure the needs are met (from OIG FY 18 Annual Report, Death and Serious Injury Investigation 1).**

> *FY 18 Department Response:* The Department will not develop another protocol. The Department has other processes which address this. Identification of family needs is a regular part of supervision. In addition, there are already many other processes implemented to track this. In the local area, a process called 360 has been developed to bring community providers and local agencies together. The purpose is to discuss issues and concerns regarding families they are working with and identify resources available within the community, working together to help vulnerable families. In addition, there is an immediate review of all intact cases with a new investigation to ensure divisions discuss the case and any identified needs/concerns are addressed. General reviews are performed by Quality Assurance, Intact Utilization, and APT to also ensure families' needs are being met and safety addressed. Service plans are reviewed with the family on a regular basis to assess completion and barriers to services and with the core practice model rollout, the emphasis is in conducting Child and Family Team Meetings with the families as active participants in identifying what they need.

*FY 18 OIG Response:* Current practice does not prioritize immediate needs. To implement this recommendation, the Department needs to identify what it is doing to change current practice and ensure that time-critical events, are addressed immediately, such as ensuring that a child has needed medication.

FY 2018
**The Department's child protection investigation into the death should be closed as "undetermined" pending completion of the criminal investigation and the Department should explore further use of the "undetermined" category for cases where there are ongoing criminal investigations or other extenuating circumstances to allow staff to focus on other investigations (from OIG FY 18 Annual Report, Death and Serious Injury Investigation 1).**

> *FY 18 Department Response:* An investigation should not be closed in this manner. Undetermined is statutorily permitted but is not utilized. When a case is placed in undetermined status, it is still pending. The Department cannot hold cases open for years, as it infringes on a person's basic rights. The Department always has the option to open a new investigation if new information comes in.

*FY 18 OIG Response:* The OIG Recommendation was that "Undetermined" should be used instead of leaving a case open indefinitely, which is what happened in this case.

FY 2015
**From OIG FY 2015 Annual Report, Special Investigations, *Shelter and Runaway Report:* The Department should redefine its search procedure including the following:**

- **The Department should amend Rules to eliminate adult youths in care, who are not high risk (developmental disabilities, mental illness, human trafficking, in critical need of medication or bona fide missing) from Rules and Procedures 329.**
- **Adult youths in care without disabilities who chronically absent themselves from voluntary placements should be transitioned out of Department responsibility.**

> *FY18 Department Response*: The Department disagrees with this recommendation. The Department will continue to work with all youth, including older youth, until they have achieved permanency or a permanent connection.

FY 2015

**From OIG FY 2015 Annual Report, Special Investigations,** *Shelter and Runaway Report:* **The duties of the DCFS specialized unit for tracking and locating missing children should be limited to those children under 18 and disabled or Bona Fide missing adults. With lower caseloads, the Unit can provide more technical assistance searching databases and assist in contacting extended family and friends. For frequent runners, shelter staff, in consultation with the Specialized Unit, should complete the De-Briefing Form when a youth in care returns to the shelter system.**

> *FY18 Department Response*: The Department disagrees with this recommendation. The Department will continue to track and locate missing children of all ages, as long as they are under the Departments' care. For frequent runners, shelter staff can assist in completing the De-Briefing form when a youth in care returns to the shelter system.

FY 2017

**The Department and the involved private agency should develop policy for accessing publicly posted social media for information relevant to investigative, intact and/or placement cases (from OIG FY 17 Annual Report, General Investigations 4).**

> *FY18 Department Update:* The Department needs to address how to use social media better, but we must work within the confines of state policies regarding the use of social media. The Department has had numerous conversations with the Illinois Department of Innovation and Technology regarding implementation of the recommendation. Initially the Department was going to have each field office identify a liaison who would have access to all social media for the office, but the plan was rejected by the Illinois Department of Innovation and Technology. There are caseworkers and supervisors who access social media on their own electronic devices, but there is no mechanism to do so Department wide.

FY 2013

**When there is a question about a youth in care having seizures or whether to discontinue a youth in care's seizure medication, the Department should assure that a sleep deprived EEG has been conducted as part of the evaluation (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 3).**

*FY 15 OIG Comment:* This recommendation was made after the Office of the Inspector General investigated the death of a youth in care who died of seizures while in a specialized treatment unit that the Department funds. At the time of his death, the unit had determined that the youth in care could be taken off his anti-seizure medication. Prior to issuing its recommendation the Inspector General consulted with both the Epilepsy Foundation and a leading Ph.D. in the field, both of whom affirmed the need for a sleep-deprived EEG before discontinuing anti-seizure medication. A sleep deprived EEG might have saved the child's life in this Office of the Inspector General Death Investigation. In addition to recommending the sleep-deprived

EEG prior to making such a determination, the Office of the Inspector General recommended that the unit be assessed by an Independent Reviewer. The Independent Review was completed on March 30, 2015.  The Independent Reviewer agreed that "in cases where seizures are being evaluated or seizure treatment is being significantly changed, a sleep-deprived EEG should be obtained if clinically feasible." Given that a youth in care died and that the Department's own contracted experts recommended a sleep deprived study prior to taking a child off anti-seizure medication, the Department needs to find a way to communicate this requirement to providers.

> *FY18 Department Update*: The Department maintains its original and ongoing disagreement on the use of a sleep deprived EEG in every case where anti-seizure medication is being discontinued. An EEG will be done if recommended by the treating physician.  The Department has concluded its response to this recommendation.

FY 2005

**The Child Endangerment Risk Assessment Protocol (CERAP) should be amended to require that workers note when a risk factor cannot be answered because of insufficient information.  Under such circumstances, workers should be required to perform diligent inquiry into relevant facts for assessment within 48 hours.  The Department should develop procedures to ensure that there is follow-up and resolution of unknown variables (from OIG FY 05 Annual Report, Death and Serious Injury Investigation 9).**

> *FY 16 Department Update:* The workgroup continues to review procedures regarding CERAP and technical changes that are deemed appropriate for completion in 2017.

> *FY 17 Department Update:* Same Response provided from fiscal year 2016.

*FY 17 OIG Comment:* Adequate risk assessment must include a mechanism to ensure that the field retrieves critical information.

> *FY18 Department Update*: It is not necessary to amend the CERAP to require that workers note when a risk factor cannot be answered because of insufficient information. Part of an ongoing investigation is to collect information and evidence as it relates to risk and safety. At any time, as safety threats are identified over the life of the investigation, the CERAP can be updated and that information included-there is a milestone within the CERAP that allows this.   Risk and the subset of safety are continually addressed over the course of an investigation.   In addition, if there are service needs related to risk, an intact case can be opened, or referrals made to community services when that risk factor is identified. The Department has concluded its response to this recommendation.

FY 2014, 2010, 2008, 2005, 2001, 1999

**The Department should develop policy to address suspected substance abuse in the workplace (from OIG Recommendations made in 2014, 2005, 2001 and 1999).  In FY 08 and FY 10 the Inspector General also recommended that the Department amend Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* to add "failure to timely comply with an order for drug or alcohol testing after a finding of reasonable suspicion" as a basis for licensure action under Rule 412. 50, *Misconduct* (from OIG FY 10 Annual Report, General Investigation 21 and OIG FY 08 Annual Report, General Investigation 32).**

> *FY 16 Department Update:* Reasonable Suspicion Drug Testing was an item negotiated during the 2015-2016 AFSCME master contract negotiations. The parties reached impasse and this item is reportedly one of the items on the table.  Per the statewide email that was sent out November 16,

2016, by John Terranova, the Governor's Office and CMS will be providing further guidance to all agencies and employees on which provisions will be implemented and when.

*FY18 Department Update*: Reasonable Suspicion Drug Testing was an item negotiated during the 2015-2016 AFSCME Master Contract negotiations.   The State of Illinois and AFSCME are at a stalemate in terms of negotiating.   Since this is a topic covered by a union contract, the Department cannot do anything further on this recommendation.   The Department has concluded its response to this recommendation.

# APPENDIX

PENNY WATSON ........................................................................................................... A-1

JAYLYN DASH ............................................................................................................. B-1

SPENCE/ROBBINS-INTERIM REPORT ........................................................................ C-1

SPENCE/ROBBINS – FINAL REPORT............................................................................ D-1

## APPENDIX A

## OFFICE OF THE INSPECTOR GENERAL
### Department of Children and Family Services

### REDACTED REPORT

*This report is being released by the Office of the Inspector General for teaching/training purposes. To ensure the confidentiality of all persons and service providers involved in the case, identifying information has been changed. All names, except those of professional references, are fictitious.*

**File No: 16-2558**

**Children:**   Penny Watson (DOB: 4-2011 and DOD: 4-2016)
Oscar Watson (DOB: 1-2008)
Nicole Geiger (DOB: 8-2001)
Reed Geiger (DOB: 5-1999)

**SUMMARY OF COMPLAINT**

In April 2016, Penny Watson was suffocated by her mother Sarah Geiger, one day prior to her 5th birthday. Sarah Geiger's paramour came home and found Sarah naked on top of Penny and holding her hand over Penny's nose and mouth while saying "she is going to send Penny to Jesus." A City A Police Officer arrived at the home and the paramour and Police Officer had to wrestle Sarah off Penny. The Officer attempted CPR but was unable to revive Penny. Prior to the death, Sarah Geiger had been investigated fifteen times, dating back to 2013. In June 2015, an intact family services case was opened and remained open until after the death. There were six child protection investigations during the intact family services case. Sarah Geiger had a history of bi-polar disorder and substance use disorder.

Following Penny Watson's death, Sarah Geiger was charged with murder. In June 2017, she was found not guilty by reason of insanity and placed in the care of the Illinois Department of Human Services. Sarah Geiger was indicated for #10 Substantial Risk of Physical Injury and #1 Death.

**INVESTIGATION**
**Family Composition**
During an August 2015, integrated assessment interview, Sarah Geiger reported that she moved in with Troy Geiger in 1994 when they were both fifteen-years-old. Sarah reported that they later married and had three children together, Valerie Geiger (DOB: 8-1996), Reed Geiger (DOB: 5-1999) and Nicole Geiger (DOB: 8-2001). According to County B court records, Sarah and Troy Geiger divorced in April 2004.

Following the divorce Troy Geiger was granted primary custody of their children and Sarah was allowed supervised visitation.

In 2004, after Sarah Geiger's separation from Troy Geiger, she moved to another state with a marijuana dealer.[1] Sarah reported that she later met Oscar's father, Zach Watson, also known as Wes Watson.[2] Sarah stated that Zach Watson was abusive. Sarah reported that she used crack cocaine but stopped once she found out she was pregnant with Oscar. Oscar was born in January 2008. When Oscar was six months old, Sarah left Zach Watson and moved to City C. Sarah reported that while living in City C, she started dating Andres Harris. Sarah stated that after she told Andres Harris that she was pregnant, he disclosed that he was married. Penny Watson was born in April 2011 with cystic fibrosis. Sarah stated that Andres only saw Penny three times. Andres Harris died of leukemia in October 2014. Sarah reported that she moved with Oscar (age 5) and Penny (age 2) to City D, Illinois in late 2013 to be closer to Valerie, Reed, and Nicole.

**History with the Department**
Prior to February 2015, ten hotline calls involving the Geiger-Watson children were taken for investigation but unfounded. The calls included concerns about domestic violence, severe environmental neglect, sexual acting out between the children, lack of supervision, substance abuse, severe mental illness, and medical neglect of a medically complex child. Many of the reports came from the school. The hotline narratives became available in SACWIS on August 6, 2017 with the release of a new SACWIS software update. Prior to this date, investigators would have been unable to access the hotline narratives that are currently in SACWIS.

Sarah Geiger moved back to Illinois in late 2013. Following her return to Illinois, there were six unfounded child protection investigations in the 16 months between November 2013 and February 2015. The investigations were expunged from SACWIS prior to the death of Penny Watson. The investigations in SACWIS would have been available for 1 year from the dates the investigations were closed. The following are summaries of the hotline calls that resulted in the unfounded investigations:

SCR# 1111 A: On November 13, 2013, the hotline was contacted with allegations that Oscar Watson, age 5, came to school with a black eye. The reporter stated that Oscar said the injury occurred when his mother, Sarah Geiger got mad at him because he drank her soda, so she threw a toy at him, striking him in the eye. The hotline narrative also stated that Oscar and his family had just moved to City A within the past two weeks from another state.

SCR# 2222 A: On May 2, 2014, the hotline was contacted with allegations that Oscar (age 6) told the reporter that he did not come to school the previous day because his mother, Sarah Geiger did not get out of bed all day. The narrative also stated that Oscar said that he fed himself and his 3-year-old sister crackers with cream cheese. The reporter was concerned because Penny has cystic fibrosis and would have needed to take enzyme medication while she eats.

---

[1] Information reported by Sarah Geiger during her August 2015 Integrated Assessment interview.

[2] After the death of Penny Watson, Zach Watson reported during an integrated assessment interview in January 2017 that he met Sarah Geiger in 2006 and they dated for a few months and then lived together from 2006 to 2008. Zach Watson stated that he was aware that Sarah Geiger had bi-polar disorder and had lost primary custody of her three older children, Valerie, Reed, and Nicole. Mr. Watson stated that the older children would occasionally visit Sarah Geiger while they were living together. Zach Watson stated that when his relationship ended with Sarah Geiger, he remained a part of her and Oscar's lives. Zach Watson stated that he also assumed a father role to Penny Watson. Zach Watson stated that after Sarah Geiger and Oscar Watson moved to City C, he would visit them for 2-3 days approximately every three weeks.

A-2

SCR# 3333 A: On January 13, 2015, the hotline was contacted alleging that there is black mold in the bedrooms and the kitchen of Troy Geiger's home, and the gas has been turned off. The next day, on January 14th, a second reporter contacted the hotline also alleging that there was no heat or water in the home of Troy Geiger. On January 15th, Sarah Geiger also contacted the hotline with concerns of Troy Geiger's home. Sarah Geiger reported that her children Reed and Nicole have threatened to make false reports against her for obtaining an order of protection against Troy Geiger. Sarah Geiger reported that she lost custody of her children [Valerie, Reed, and Nicole] ten years ago.

SCR# 4444 A: On January 16, 2015, the hotline was contacted alleging that Sarah Geiger smokes marijuana daily with her son Reed. The reporter also stated that Reed told the reporter that when he was 4 or 5 years old his mother beat him until he bled.

SCR# 5555 A: On January 28, 2015, the hotline was contacted alleging that Sarah Geiger told the reporter that she left Oscar and Penny outside of the maternal grandparent's home and without knowing if the grandparents were home. The reporter stated that Sarah Geiger then drove away and called the suicide hotline. The reporter stated that the suicide hotline spoke to Sarah Geiger again later and Sarah reported that everything was better because she had smoked a bowl. The next day on January 29, 2015, police contacted the hotline regarding the incident that occurred the previous day and the report was taken as information related to SCR# 5555 A.[3]

While it is unknown what documents the investigator accessed prior to the investigation being unfounded it is important to note that on January 28, 2015, Sarah Geiger was admitted for suicidal thought with a plan to drive her car off an embankment. She was discharged on February 2, 2015. Sarah Geiger reported to medical staff that her kids feared her and believed that she was delusional and overwhelmed. She also reported using marijuana to relax.[4]

SCR# 4444 B: On February 12, 2015, the hotline was contacted alleging that Sarah Geiger got into a verbal argument with her daughter Nicole Geiger while driving Oscar to school. Nicole showed the reporter a video that showed Sarah driving recklessly and stating that she was going to wreck the car. Nicole told the reporter that Sarah hit Oscar on the back of the head with an open hand.

---

[3] According to City A Police Department records obtained by OIG investigators, on January 28, 2015, police were dispatched to the home of Sarah Geiger. While at the home, Valerie Geiger (age 18) reported that her mother was out of control and she was scared that she was going to harm her and her siblings, Reed Geiger, Nicole Geiger, Oscar Watson, and Penny Watson. Valerie reported that earlier in the day, Sarah Geiger dropped Oscar and Penny off at their grandparent's home, leaving them on the grandparent's front porch with no shoes or coat. Valerie stated that her mother has mental health issues and she is scared that her mother has been smoking crack and could possibly hurt her or the kids. Valerie stated that she wanted to leave the apartment with the kids for the night or wants her mother to leave or go to the hospital for her mental health problems. Sarah Geiger denied the allegations and refused an ambulance. The police officer documented that he told Sarah Geiger that her children do not feel safe being around her while she is acting out of control. The officer observed that Sarah Geiger was overly energetic and could not keep her voice down and continued yelling while not holding a conversation with them. The officer told Sarah Geiger that Valerie was willing to leave so that she could go to bed but wanted to take the kids with her. Sarah Geiger agreed and Valerie took the kids to their grandparent's house. The officer also noted that while inside the family's apartment, he observed clothing, food, and toys scattered all around the apartment and it seemed to have not been cleaned in a while. The officer went back to the Geiger residence later that day and saw that Sarah Geiger's vehicle was gone and Valerie's vehicle was parked. Valerie told the officer that Sarah Geiger called and said that she admitted herself into the psychiatric facility at Alpha Behavioral Health so Valerie returned to the home with the children. Officer Isaacs contacted the DCFS hotline to report Sarah Geiger for neglect.

[4] The medical record for January 28 was retrieved during the February 15 (C Sequence) Investigation.

The reporter stated that Oscar reported that he had a headache from the hit. The reporter stated that Oscar did not have any marks or bruises.

**SCR# 4444 C-** *First Indicated Investigation*
The first indicated investigation of the family was in February 2015. In June 2015, an intact service case was opened. While the intact case was open, there were an additional six child protection investigations of the family. Penny's death was an L sequence investigation, but the sequencing did not include the ten unfounded investigations prior to February 2015. A summary of the investigations from February 2015 through Penny's death follows.

On February 18, 2015, the City A Police Department contacted the hotline to report that Sarah Geiger was arrested for domestic battery for battering her 18-year-old daughter Valerie Geiger in the presence of her other children, Penny (age 4) and Nicole (age 13).

*City A Police Department Records*
Valerie Geiger (age 18) and Nicole Geiger (age 13) told police that when Valerie tried to leave in her car, Sarah Geiger dragged her out of the car. Sarah Geiger denied ever touching Valerie. Police noted that the inside of the apartment was in complete disarray and filthy. Sarah Geiger reported that she is bipolar but takes her medication every day. Sarah Geiger admitted to smoking weed in order to help her relax. Sarah Geiger reported that she has had to do everything for Oscar and Penny since Valerie found out she was pregnant.

Nicole Geiger reported that Sarah Geiger grabbed Valerie Geiger by the arm and dragged her to the front door of the apartment. Valerie tried to get away, but Sarah followed her with a "crazed look" on her face. Valerie reported that she was backing out trying to leave when Sarah jumped on the windshield of the car and then yanked the door open and dragged her out of the car. Valerie reported that Sarah chased her, but she was able to get away and call the police. Valerie stated that Sarah gets violent when she is mad.

Sarah Geiger was arrested for domestic battery and placed on a 48-hour domestic battery hold. She was found guilty on May 14, 2015.

The investigation was assigned to child protection investigator Bella Jenkins. CPI Jenkins was also the investigator on two subsequent investigations involving Sarah Geiger. CPI Jenkins contacted the reporter, Cesar Kline from the City A Police Department, who said that police had been to the home at least every other day for the past two months concerning domestic situations between Sarah and the children.[5] The Officer reported that Diana Geiger (Troy Geiger's ex-wife) was at the police station with Nicole and Penny, and that Sarah made a childcare plan for Reed (age 15), Nicole (age 13), Oscar (age 7), and Penny (age 4) to stay with Diana Geiger while she was in jail.

During the investigation, Sarah Geiger agreed to be assessed at Beta Hospital. It appears that the assessment was generic and not intended to determine Sarah's parenting capacities. The findings from Beta Hospital were:

---

[5] The family's interactions with the City A police included an incident in which Sarah Geiger called accusing Valerie's boyfriend of breaking doors in her home and breaking her car window; Sarah called to request the police check on Reed at his father's because Reed had threatened to 'blow his brains out.' School personnel had called twice – once Reed's principal had called because Sarah came to school and was extremely disruptive, screaming and swearing and had to be asked to leave. This incident resulted in Sarah being issued a citation for disorderly conduct. On another occasion, Nicole's school social worker called after Nicole reported that Sarah was screaming in the morning and hit Reed in the car on the way to school that morning.

A-4

*Pt. is a 35 yr. Old Caucasian Female who came in as a walk-in due to the Children's Division telling her she needed to come in to make sure she is ok. Pt. [patient] And her 18 yr. Old daughter who is Pregnant got into an argument because the daughter said her Mother had her weed pipe. Pt. Said she tried to tell her she did not have it but her daughter did not believe her and took her safe deposit box and her cell phone and would not give it back. Pt. said she wrestled with her then the Daughter called the police and told the police that her mother scratched her. Pt. was put in jail for two days and did not have her medications. Pt. is bi-polar and takes Geodon 40mg. in the morning and 60mg in the evening, Neurontin 100mg, 3x a day, Buspar 75mg 2 times a day, Wellbutrin 75mg two times a day and Trazodone 150mg. Pt said she just was not able to take them while she was in jail. Pt. has a Children's Division worker and she stated that she wanted her to come in for an Evaluation to makes sure she was ok. Pt. is accompanied by her sister whom she is currently staying with who verifies her story. Pt's sister says Pt's oldest 3 children ages 18, 15, and 13 are by her ex-husband and they lived with him for most of their lives and she has a lot of trouble with them and they want to stay with their Father. Pt. says they get into frequent arguments. Pt. says she will now be staying with her sister where there is less stress. Pt. says she was here at Alpha Behavioral Health 3 weeks ago because she was feeling SI [suicidal] because her children were out of control, so she came to check herself in. Pt. says she takes her medications and has no problems with taking her medications she was just not able to get them when she was in jail for two days. Pt. Reports that she is not SI or HI [homicidal], reports that her eating and sleeping are good and that she is going to college and is almost complete in achieving her bachelor's degree in Business. Pt. says she sees Dr. Lang at Delta MH and that she will begin seeing a therapist in the next couple of months to assist her with feelings and problems she is having particularly with her 18-year-old daughter and 15-year-old son.*

The discharge instructions stated, "Dr. Muro has authorized Pt. [patient] to be released to go home accompanied by her sister. Pt. [patient] is encouraged to keep her follow-up appointment with her Psychiatrist at Delta Mental Health Center and to seek out getting a Therapist at Delta Mental Health Center. Pt. [patient] is encouraged to continue taking her medications as prescribed by her Doctor and to feel free to call if she feels that she is in crisis or has any questions."

On March 30, 2015, a hotline call was taken as Related Information from Oscar Watson's counselor, Elias Neal from Delta Health Systems. The narrative stated the following:

*Reporter State's she meets with Oscar Watson, DOB 1-08 at school for counseling. Oscar has an IEP for ADHD and emotional issues. Reporter State's today she asked Oscar if things were going better at home and he said 'no, mom still has drugs'. Reporter asked Oscar what kind of drugs and he replied, 'I'm just kidding'. Reporter State's this morning Oscar was late for school and said he was late because he had to wake his mom up. Reporter State's she told the school SW what Oscar told her; both Reporter and school staff have had concerns for Oscar and are aware that the family has had DCFS intervention.*

According to the SACWIS investigation and hardcopy documents, there was no documented attempt to interview Oscar Watson during the investigation nor was there a child welfare check completed following the March 30th hotline call.

The C-sequence Investigation was closed on April 19, 2015 and Sarah Geiger was indicated for #60-substantial risk of physical injury/environment injurious to health and welfare by neglect. The rationale for the indicated finding stated:

*...Sarah Geiger was arrested and charged with domestic battery of adult daughter, Valerie Geiger. The child, Nicole was present and witnessed the physical altercation. City A Police Officer, Cesar Kline, reported that the police have been dispatched to this home regularly for domestic situations over the past 2 months.*

While they were not retrieved during the investigation, Delta Health Systems records obtained by the Inspector General's Office showed that Sarah Geiger had been involved with Delta since February 2014 and diagnosed with bi-polar disorder and depression. Delta recommended medication management services

and individual therapy, but Sarah never followed through with the recommendation for individual therapy. She attended nine out of twelve monthly medication compliance sessions but was off medication from time to time – including January 9, 2015 through February 18, 2015.

**SCR# 6666 A (unfounded) and SCR# 4444 D (indicated)**
*SCR# 6666*
On June 3, 2015, three months after the C sequence investigation closed, an anonymous reporter contacted the hotline and said that the night before, she saw a little girl sitting in the window of Sarah Geiger's home screaming for help. The reporter stated that she has called the police in the past but all they do is pull up to the home and then leave. The reporter stated that the youngest children in the home are often seen outside wandering around unsupervised late at night.

The investigation (SCR# 6666 A) was assigned to child protection investigator Faith Oakley. On June 4, 2015, CPI Oakley contacted the City A Police Department. Clerical staff at the police station reported that the last documented police call to Sarah Geiger's residence was on April 22, 2015. The allegation of #74-inadequate supervision for SCR# 6666 A was unfounded on July 6, 2015. The rationale for the finding stated, "Sarah Geiger reports she leaves her daughter Penny Watson age 4 and son Oscar Watson age 7 in the care of her son 15-year-old Reed Geiger and daughter 13-year-old Nicole Geiger. The minors have access to a phone to contact relatives or law enforcement in case of emergency. The minor reported she is left in the care of her older brother if her mother is not home."

*SCR# 4444 D*
On June 12, 2015, while SCR# 6666 A was pending, the City A Police Department contacted the hotline to report the following:

> *…When reporter arrived, he could hear Sarah screaming and heard lots of glass breaking and things being thrown. Sarah told reporter she is at her wit's end with the kids. She said she is tired and can't take care of the kids anymore. She started making suicidal comments and she was taken to Beta Hospital in County E. Sarah broke a lot of glass and she was telling the kids she hoped they would step on the glass and hurt themselves. Reporter said Penny has cystic fibrosis. No other diagnosed disabilities known. Sarah had a history of substance abuse but has been clean for quite a while…*

Following the incident, Reed and Nicole were taken to the home of their paternal grandmother, Gemma Pettis. Penny and Oscar were taken to the home of the maternal grandparents, Henry and Isabelle Regis.

Sarah had told the police officer that she wanted to go to the Alpha Center and talk with someone before she hurt herself. Officer Terry interviewed Reed Geiger, Nicole Geiger, Oscar Watson, Penny Watson, and Sarah Geiger's niece, Josie Sawa and documented that the children reported that Sarah Geiger was acting crazy and breaking things. Reed reported that when he woke up that morning, his mother was going crazy and started knocking pictures off the wall upstairs and then went into the kitchen and started breaking glass.[6]

The next day, a hospital social worker from Beta Medical Center contacted the hotline and reported that Sarah told the reporter that she was overwhelmed and had not been giving Penny her morning cystic fibrosis treatments. Sarah also told the reporter that she had been using her money to buy marijuana and had not bought groceries.

---

[6] The hardcopy documents to SCR# 6666 A contained records from the City A Police Department that were printed on June 19, 2015. The records did not contain the incident report from the June 12, 2015 incident. The police records included incident reports from January 12, 2015, February 5, 2015, February 15, 2015 and February 18, 2015 that were also obtained during the C-sequence investigation. In addition to those records, an incident report from January 28, 2015 was also included in the requested records.

A-6

The June 12th and June 13th hotline calls were taken for investigation (SCR# 4444 D) and assigned to CPI Faith Oakley. Nicole reported to CPI Oakley that she "could hear her mother kicking the bathtub making the wall in the kids' room shake. Nicole reported her mother told her to come downstairs to clean because [she] was planning to take a nap. My mom went into her room to lie down then got up and started breaking things. She threw a salt rock lamp toward me and it almost hit Penny. She left her room, walked down the steps and pulled all of the pictures off the wall breaking them"

Nicole informed the CPI that her mother made comments about leaving the home and driving off a cliff. Nicole stated that her mom was screaming in a deep raspy voice and 'freaking out.' Nicole said her mother usually takes her medication but that even when her mother is on her meds she sometimes 'freaks out.' Nicole denied her younger siblings are unsupervised when her mother attends school. Nicole reported she feels safe with her mother and feels her siblings are safe when her mother is normal, however, Nicole expressed concern regarding her mother's anger. She reported when her mother is angry, she threatens [to harm] herself.

This same day, CPI Unsworth contacted Gemma Pettis, the paternal grandmother of Reed and Nicole. Ms. Pettis reported that she has tried to care for Reed and Nicole in the past, but they do not listen, so she does not want to care for them. Ms. Pettis stated that after Sarah went to Beta Hospital, she took Nicole to her father's home.

On June 15, 2015, CPI Oakley's supervisor, Leanna Villa, documented the following in a supervisory note:

> This supervisor questioned if we could take PC or should that [have] been done on Friday. Is mom just sick of her older kids or having a mental break down? Will other family take the kids? Faith stated no. Faith stated mom appears overwhelmed with her older kids. Supervisor will staff with Maggie Wolfe, AA to see if we can open the case for services.

While at the home, CPI Oakley interviewed Sarah's' mother, Isabelle Regis. Ms. Regis reported that Sarah is overwhelmed with Reed and Nicole and reported that they are prescribed psychotropic medication but will not take the medication nor will they attend counseling.

On June 24, 2015 CPI Oakley received an Integrated Mental Health and Substance Abuse Assessment, from Delta Health Systems. The assessment was dated April 23, 2015 and documented Sarah's presenting problems/current emotional and behavioral functioning as the following:

> ...Sarah reports she has been diagnosed with bipolar disorder in the past (since the age of 17). Sarah continues to report having thoughts of grandiosity and sleepless nights. She says that "I could go for 2 or 3 days without sleeping." She further reports racing thoughts, paranoia, loss of appetite, inability to concentrate and focus, and low motivation. Sarah continues to report feelings of helplessness, hopelessness and worthlessness. She reports thoughts of suicide in the past and a recent suicide attempt last year. Sarah could not remember the date. Sarah further reports problems concentrating and focusing, isolation and anhedonia. She reports becoming frustrated easily but feels that she is able to control her impulses...Sarah has been receiving SSI due to mental health diagnosis for approximately 13 years.

When Sarah went to Delta Health Systems on June 19, 2015, she reported that she had not been taking her medications since she was discharged from Beta on June 19, 2015. Sarah attended another appointment at Delta Health Systems on July 17, 2015 and again reported that she was not taking her medication as prescribed because she was confused. Sarah reported that she was not sleeping well and only slept 2 hours the previous night. Sarah also reported that her appetite had increased and that she smokes marijuana daily. This information was not obtained by CPI Oakley.

A-7

PENNY WATSON

On June 23, 2015, CPI Oakley received records from Beta Medical Center for Sarah Geiger's psychiatric hospitalization that occurred June 12, 2015 to June 16, 2015. Sarah Geiger was admitted for suicidal ideation with a plan to overdose on her medications or intentionally wreck her car by not wearing a seat belt and running her car into a pillar or off a bridge. She confirmed that earlier that day she was upset with her children and she began throwing dishes, framed pictures of her children, and a fan. Sarah reported that she feared if she gets angry again and throws things, she could accidentally hurt one of her kids. Sarah also reported that she had not been giving Penny Watson her morning treatments for cystic fibrosis because she was overwhelmed. Sarah admitted that she had not bought groceries in 3 months because she has been buying marijuana. Upon discharge Sarah was given prescriptions for a 30-day supply of Celexa 20mg, Lamictal 25mg, and Geodon 20mg and told to follow-up with Delta Health Systems.[7]

CPI Oakley also obtained historical records from Beta Medical Center.[8] The records detailed Sarah Geiger's prior hospital admissions on January 28, 2015 for suicidal ideation and June 12, 2015. The records also documented the following psychiatric hospital admissions for Sarah Geiger:

*On June 27, 2010 Sarah Geiger was admitted for suicidal ideation but later told hospital staff that she was not suicidal she just said that to get admitted in order to get medication and an updated diagnosis because her SI benefits were denied. While at the hospital Sarah reported feeling jittery, anxious, overwhelmed, having racing thoughts. She feels irritable towards son [Oscar age 2], can't tolerate sons crying. She worries about finances and feels helpless. She denies drug use in the last 4 years. Sarah reported last use of marijuana was 4 years ago, last use of crack cocaine at the age of 28 and last cigarette was 4 years ago." Sarah also reported that she has 3 older children that live with her ex-husband and she is behind on child support. Sarah was discharged from Alpha Behavioral Health with a diagnosis of Malingering. Sarah was instructed to restart Zoloft 50mg and Abilify 5mg every evening and follow-up with Psychiatrist and Primary Health Provider.*

*On September 17, 2010 Sarah Geiger was admitted for two days due to suicidal and homicidal thoughts. Sarah reported that she stopped taking her bi-polar medication 2-weeks ago because she found out she was pregnant and now reports feeling manic. A nursing note stated, "Pt State's she's been HI [homicidal], 'wants to kill her sons' father' Pt State's she's having violent thoughts toward him." The medical record also stated, "Sarah has a history of prostitution, drug use of cocaine and heroin. She reported her boyfriend was not supportive of her emotionally or financially. She denied taking medications because of the current pregnancy. In the past she was taking Abilify 5mg and Zoloft 50mg to control her bipolar, currently she is only taking prenatal vitamins. Sarah wrote the following on her recreational therapy self-assessment, "overwhelmed, angry at son's father. Stressed out. No resources, no family or friends." RN progress note reads, "pt. alert and oriented x3. State's she has no depression or anxiety. Says she just needed a break from her son and boyfriend. Felt overwhelmed at home and now that she's been able to sleep, she feels much better. Denies SI, HI. Pt requesting Vistaril 25mg to aid with sleep." Sarah Geiger was discharged home and instructed to follow up with outpatient therapist Dr. Naomi Zimmerman at Eta Counseling Center and her current psychiatrist. Her discharge medications included Abilify 5mg nightly and Zoloft 50mg daily.*

CPI Oakley contacted the Department of Social Services, Children's Division in another state. She learned that the other state had previously investigated an allegation of sexual abuse of Penny Watson by her father Zach Watson who lives in another state. The social services worker reported that Penny had two Victim Sensitive Interviews and Penny denied sexual contact therefore the report was unsubstantiated. Ms. Avila reported that Sarah Geiger did not agree with the findings and has continued to call in reports against Zach Watson.[9]

---

[7] These were located in the hardcopy documents to the A sequence investigation about the little girl in the window.

[8] These were located in the hardcopy documents to the D sequence investigation called in by the City A police.

[9] According to the Children's Division records, on April 9, 2015 Sarah Geiger contacted the Child Abuse and Neglect hotline to report that Penny Watson disclosed to her that Zach Watson (aka Wes Watson) had tickled her butt. Sarah Geiger stated that when she asked Penny what that meant Penny pointed to her vagina and made a flicking motion with her finger. Sarah reported that she and Zach Watson broke up in November 2013 and from November 2013 to

A-8

CPI Oakley contacted Sarah Geiger by phone. Sarah reported that she saw Oscar "humping" Penny and when she asked Oscar about it and he said it was no big deal. Sarah stated that "Oscar had a smirk on his face and was making kissing noises and aiming them toward her crotch." Sarah reported that she was not going to let the children be around Zach Watson because she believed something happened. Sarah also reported that Reed and Nicole moved back to her home.

CPI Oakley contacted Reed and Nicole's father, Troy Geiger. Mr. Geiger reported that he obtained full custody of Reed and Nicole years ago because Sarah "went nuts." Mr. Geiger reported that previously there was an order for only supervised contact between Sarah and their children, Valerie, Reed, and Nicole. Mr. Geiger stated that during the summer months Reed and Nicole go back and forth between his house and Sarah Geiger's house, but they do not live with Sarah. Troy Geiger requested that his phone number be put on file so that he could be contacted if anything else occurs.

CPI Oakley contacted Gamma Hospital where Penny receives treatment for cystic fibrosis. The nurse reported that Penny has been a patient since May 2011. She stated that "Sarah Geiger appears a little challenged and sometimes asks a lot of questions regarding medical recommendations for Penny. The nurse informed CPI cystic fibrosis care can be difficult and requires a lot of organization but there have not been any immediate concerns that Sarah is not following the recommendations or treatment." The nurse reported that Sarah will call the office when she does not understand what is being asked of her.

SCR# 4444 D was closed on August 11, 2015. Sarah Geiger was indicated for #60 substantial risk of physical injury/environment injurious to health and welfare by neglect and the allegation of medical neglect was unfounded.

**Children's Needs**

Because of Penny's cystic fibrosis, she required treatments every morning as well as ensuring that she ingested an enzyme with every meal. When evaluated at City A Elementary School in April 2014, Penny had limited speech and language skills and was not toilet-trained. The other children presented emotional and behavioral challenges. Nicole, while living with her father most of the time, also suffered from depression and lack of medication compliance.

According to Delta Health Systems records obtained by OIG investigators, Nicole (then age 13) received services through Delta from January 2015 – July 2015. Nicole was diagnosed with oppositional defiant disorder and mood disorder not otherwise specified.[10] Nicole reported that she had lived with her father her entire life and would only see her mom about every two weeks. Nicole reported that she hates her mom and does not want to be around her. In addition to Nicole refusing to take her medications, the assessment also

---

February 2015, Oscar and Penny would visit Zach Watson at his home in another state on Sundays. Sarah reported that she once found pictures of children on Zach Watson's computer and he told her that the pictures were from a previous owner. Sarah reported that after the breakup she found a disk with naked pictures of Penny when she was a baby that she believed Zach had taken. Sarah also stated that she met Zach when she was a prostitute and he was her customer. The report stated that Sarah would not say why she continued to allow Zach access to Penny after she found the pictures. The allegation of Lack of Supervision against Sarah Geiger was added to the investigation. On April 27, 2015, Penny Watson went to Iota Agency for a forensic interview. Penny did not make a disclosure. A second forensic interview was conducted on May 4, 2015. Penny was cooperative with the interview but did not make a disclosure regarding sexual abuse. The sexual abuse allegation against Zach Watson was unsubstantiated on May 29, 2015. The allegation of Lack of Supervision against Sarah Geiger was also unsubstantiated.

[10] According to the *Diagnostic and Statistical Manual of Mental Disorders, DSM-IV-TR*, 4th Edition, mood disorder not otherwise specified "includes disorders with mood symptoms that do not meet the criteria for any specific mood disorder and in which it is difficult to choose between depressive disorder not otherwise specified and bipolar disorder not otherwise specified."

stated that Nicole was very argumentative with her mom throughout the assessment and at one point told her mom to shut up. During the assessment, Sarah Geiger reported that Nicole has posted pictures of cuts and told her that she was going to jump off a cliff.

From February 2015 to July 2015, Nicole met monthly with a counselor from Delta Health Systems at City A Junior-Senior High School. Nicole also attended a support group three days per week from January 2015 to March 2015. According to the record, during individual counseling sessions, Nicole would often talk about conflict with Sarah Geiger. In May 2015 Nicole told the counselor that she had to go to court this day due to her mother assaulting her sister, Valerie Geiger. Nicole stated that her mother is probably upset with her for telling the truth at court. Nicole reported that she does not like her relationship with her mother but has started to realize that she cannot change her mother and make her a better mother. Nicole reported that she only goes to her mother's home to visit her younger siblings. In June 2015, Nicole reported that she never knows what kind of mood her mother will be in and stated that her mother recently spent a week in the hospital because she was throwing things at her younger siblings and talking about suicide. Nicole reported that her mother is verbally abusive, but she gets mad at her father (Troy Geiger) because he has a drug problem and his living space is not suitable to live in.

Oscar had severe Attention Deficit Hyper Disorder (ADHD). and school staff noted his inability to function in school without his medication. According to Delta Health Systems records for Oscar Watson, obtained by OIG investigators, Oscar was also enrolled in the medication program at Delta for ADHD. During a September 2015 visit the nurse practitioner documented that Sarah did not consistently bring Oscar for his appointments. The nurse noted that he was hyperactive and unable to focus. Oscar reported that he had been off his medication but needed it for school. Oscar was prescribed Focalin 5mg, twice daily.

Oscar Watson also met with a counselor from Delta at City A Elementary School almost weekly starting in August 2015. According to the record, during counseling sessions from August 2015 to March 2016 the counselor documented that Oscar was often agitated or hyperactive and had difficulty focusing during the sessions. On October 13, 2015, Oscar reported that his mother struggles with anger and stated that when she takes her pills she doesn't yell. School staff reported that Oscar could do well at school when he had his medication. According to City A Elementary School records, both Oscar and Penny were absent over 30 days in the 2015-2016 school year.

Reed's relationship with his mother was strained and frequently confrontational.

**Intact Family Services**
While both SCR# 6666 A and SCR# 4444 D were pending, an intact family services case was opened on June 24, 2015 and assigned to DCFS intact worker Paige Berrett[11] and supervisor Quinn Carlson. The intact case remained open for 9 ½ months until the death of five-year-old Penny Watson in April 2016. During the 9 ½ months of the intact family services case there were nine additional calls to the hotline, which resulted in six child protection investigations. Eight of the calls to the hotline were from mandated reporters. The following chart provides an overview of child protection's involvement with the family during the intact family services case and prior to Penny Watson's death in April 2016.

---

[11] Paige Barrett began employment with DCFS as a permanency worker in August 2009 and became an intact family services worker in December 2010.

A-10

PENNY WATSON

| SCR # | Hotline Calls | Finding |
|---|---|---|
| 4444 E[12]<br><br>Closed: 12-7-15 | <u>10-8-15:</u> The school principal reported that Reed (16) was not at school and when the principal contacted Reed's mother, she stated that she kicked Reed out of the home, and she did not know where he was.<br><u>10-8-15:</u> An anonymous caller reported that Sarah told the reporter she had no food in the home and the children had lost weight. The reporter alleged that Sarah smokes marijuana with her son Reed and the home was unclean. | #84- Lockout: Unfounded<br><br>#76-Inadequate Food: Unfounded<br><br>#15-Substance Misuse: Unfounded |
| 4444 G<br><br>Closed: 12-27-15 | <u>10-29-15:</u> Police Officer reported that he responded to a domestic disturbance when the maternal grandfather grabbed Oscar by the arm, and both fell. The grandfather told the officer that the mother leaves the children with the elderly grandparents for days at a time because she is bipolar and cannot handle the children. | #74-Inadequate Supervision: Indicated |
| 4444 H<br><br>Closed: 1-11-16 | <u>10-13-15:</u> Reed's school counselor reported that Reed told her that his mother poured water on him, hit him in the head with a belt buckle, and punched him in the nose. Reed had a mark on his head and some redness on the nose. Reed told the reporter that his mother was high at the time of the incident. | #11 Cuts, Bruises, Welts, Abrasions by abuse: Unfounded |
| 4444 I<br><br>Closed: 3-21-16 | <u>12-22-15:</u> School social worker reported that while delivering Christmas gifts to the Geiger family, she observed Oscar outside without shoes, socks or a coat. Oscar told the reporter that he was afraid to go inside because his mother would smack him again; Oscar told the reporter that his mother hits him with a belt and hanger on the butt often leaving marks. The reporter stated that the house was unclean and smelled like marijuana. The reporter stated that the mother (Sarah) is bipolar and reportedly compliant with medication, but she was displaying extreme mood swings, her eyes were red and appeared to be intoxicated.<br><u>1-29-16:</u> Hospital Social Worker reported that Josie's mother reported that Josie stays with her Aunt, Sarah Geiger, who smokes marijuana with the children and has allowed Josie to driver her car without a permit. | #74-Inadequate Supervision: Indicated<br><br>#10-Substantial Risk of Physical Injury: Unfounded<br><br>#15-Substance Misuse: Unfounded |
| 4444 J<br><br>Closed: 3-21-16 | <u>1-28-16:</u> School social worker reported that Penny (age 4) was crying and stated that her mother hit her that morning. Oscar Watson (age 7) confirmed the report and stated that he gets hit with broken hangers and belts, so he hides in the closet or goes outside until things calm down. The reporter also stated that the mother was 55 minutes late picking up Oscar and 90 minutes late picking up Penny.<br><u>2-18-16:</u> A police officer reported that Sarah was arrested on an outstanding warrant. Sarah asked a sitter to keep Penny and Oscar overnight while she was in jail however the sitter contacted the school because this was the first time she had cared for the children and was uncomfortable keeping them overnight. The officer reported that the school staff provided contact information for the maternal grandparents and the officer drove Oscar and Penny to the grandparents' home. | #74- Inadequate Supervision: Indicated<br><br>#11- Cuts, bruises, welts and abrasions: Unfounded<br><br>#10-substantial risk of physical injury: Unfounded |
| 4444 K<br><br>Closed: 4-14-16 | <u>2-18-16:</u> The school social worker also reported that Sarah left Oscar and Penny with a new sitter. Oscar has ADHD and is unable to function without his medication, and Penny also requires medication for cystic fibrosis. The social worker reported that Sarah did not give the sitter any information on caring for Penny's medical condition. The reporter stated that Sarah sent the sitter a text requesting money and asking her to care for Oscar and Penny. The reporter stated that Sarah has a diagnosis of bipolar disorder and does not take her medication. The reporter stated that police said the mother has reported using marijuana around the children and does not see a problem with it. | #74- Inadequate Supervision: Indicated<br><br>#79-Medical Neglect: Unfounded |

During the entire intact services case, Sarah exhibited a failure to follow through with service recommendations and failure to maintain consistent medication compliance. On June 24, 2015, a transitional visit was conducted by CPI Faith Oakley and DCFS intact worker Paige Barrett at the home of Sarah Geiger. Sarah agreed to intact family services and acknowledged that she could use the help. Sarah reported that her house gets messy because of her depression and the kids have to remind her to clean it. Intact worker Paige Barrett informed Sarah that DCFS would monitor her mental health treatment and ensure she was taking her medication for her bipolar and depressive disorders. The intact worker also

---

[12] SCR coded this hotline call as sequence F but the E and F investigations were merged.

recommended protective daycare and parent education. During the transitional visit, Sarah reported that Reed and Nicole were also living in the home.[13]

In an interview with OIG investigators, intact worker Paige Barrett reported that Sarah wanted Oscar and Penny home with her and was not interested in protective daycare. Intact worker Barrett reported that she would count Sarah's pills during home visits to monitor Sarah's medication compliance.

Following the transitional visit, intact worker Barrett conducted both scheduled and unscheduled weekly home visits to Sarah Geiger's home. According to the integrated assessment dated August 15, 2015, intact worker Barrett's integrated assessment interview of Sarah Geiger took several visits to complete due to distractions in the home. Sarah admitted to daily marijuana use because it relaxes her. When asked if marijuana use altered her functioning, Sarah reported that she misplaces things. When asked about her history of mental illness, Sarah reported that she has a diagnosis of bipolar disorder and has a history of psychiatric hospitalizations. Sarah reported that she was feeling overwhelmed with raising her children prior to the hospitalization. Intact worker Barrett documented the following under the section of the integrated assessment titled Family Composition and Prognosis:

> *Prognosis for this family is very guarded. Sarah has difficulty in keeping mental health appointments. She State's she takes her medication as prescribed. However, she has had previous domestic violence with her 18-year-old daughter and continues to have ongoing conflictual relationships with Reed and Nicole. Reed is totally disrespectful to Sarah and has control of the household. Sarah is very ineffective in her efforts to calm and redirect Reed. This relationship needs some serious work and Sarah has to learn methods to gain parental control in her home.*

According to the Service Plan dated August 12, 2015, intact worker Barrett recommended the following services for Sarah Geiger: family counseling, parenting, substance abuse assessment, and anger management. In addition, Sarah Geiger agreed to follow all recommended mental health treatment to address her bi-polar disorder.[14] In addition the service plan State's that Sarah agreed to sign releases of information for herself and her children and agrees to participate in visits with the intact worker. The Service Plan also documented that DCFS agreed to keep in ongoing contact with the counseling, parenting, substance abuse and anger management providers.

On August 14, 2015, supervisor Quinn Carlson documented that the initial Child and Family Team Meeting was held at the home of Sarah Geiger. Quinn Carlson, Paige Barrett, Sarah Geiger, Reed, Penny, Oscar and Nicole were present. Supervisor Carlson documented the following regarding the meeting:

> *Nicole is currently living with her father's ex-wife Diana[15] and her mother, Robin Day. Reed was more than disruptive throughout the meeting. He curses at his mother and interrupts almost every statement she attempts to make. Reed is beyond angry and it is very unreasonable as Sarah has told him that he can go and live with his father if he so desires. He reported the reason for this anger is that he can't stand his mother bad mouthing his father. Ms. Geiger made every effort not to do this by refusing pretty much to even discuss his father. Reed has some mental health issues reported but we are not sure of his diagnosis. We do know that he refuses to take his medication and when I questioned him about this, he stated he is not going to take any medication because Drs [doctors] only give it to people they think are "crazy" and he is not crazy. There was no*

---

[13] During an interview with CPI Oakley on June 15, 2015, Sarah reported that she could not have Reed and Nicole living with her "because it was too much."

[14] According to the financial section of the Service Plan, Penny receives $1173/month in survivor benefits from her father dying and disability from cystic fibrosis and Sarah receives $733 in disability for her mental health and $150 in child support from Oscar's father [Zach Watson] every three months. In addition, Sarah reportedly donates plasma each month and receives $260/month.

[15] According to County B Court records, Diana Geiger was appointed guardian of Nicole Geiger on September 14, 2015.

A-12

*reasoning with him on this subject. Ms. Geiger stated she is very glad that she requested services because she has no one she can talk to about anything and it has made a big difference since Ms. Paige [Barrett] has been coming to the home. She is hopeful that our involvement will help her with managing her children. Although the home is totally chaotic, no safety hazards observed. Worker reports that it is much cleaner and more organized than it has been. All of the children appear healthy and cared for properly however there is some concerns in how Reed relates to the rest of the family. Ms. Geiger [was] encouraged to make sure she follows up on her mental health treatment as well as encourage her son to do the same…*

In an interview with OIG investigators, supervisor Quinn Carlson reported that when the intact family services case was first opened the main focus of the case was Sarah and Reed's negative interactions with one another, as Sarah and Reed would scream at each other. Supervisor Carlson reported that while at the home for the initial Child and Family Team Meeting, she thought Sarah's interaction with Oscar and Penny was more motherly.

On August 20, 2015, intact worker Barrett referred Sarah for homemaker services and on August 24, 2015, intact worker Barrett met with Sarah and the assigned parenting coach, Skyla Enders from Kappa Agency. During the meeting, intact worker Barrett explained that Sarah needed assistance with parenting, budgeting, instruction on how to keep her house clean and organizing mental health appointments.

On September 9, 2015, intact worker Barrett received a return call from Sarah Geiger's Advanced Nurse Practitioner at Delta Health Services where Sarah receives medication management for her bi-polar disorder. Nurse Frascatti reported that she has recommended that Sarah attend individual therapy to address her bi-polar disorder and cannabis dependent diagnosis however Sarah has not followed through.

According to Delta Health Systems records obtained by OIG investigators, Sarah Geiger was required to attend appointments at Delta monthly to receive medication prescriptions for her bi-polar disorder. However, following the July 17, 2015 appointment at Delta Health Systems in which Sarah reported she had not been taking her medication as prescribed, Sarah missed an appointment on August 14, 2015. Sarah attended an appointment on September 3, 2015 at which time Sarah reported that she smokes marijuana and has been taking her medication. Sarah did not attend the required monthly appointments in October or November 2015. Nurse Frascatti also documented that she discussed Sarah's last appointment [September 3, 2015] with a DCFS case manager on September 9, 2015.

Intact worker Barrett spoke to Delta Mental Health Services concerning Reed, Oscar and Nicole. They reported:

*…Oscar's diagnosis is ADHD and conduct disorder. He started coming to Delta in April of 2014. He takes Focalin 5mg in am and at lunch. Sarah is very inconsistent in bringing him. He came January, February, April, July, and September. It's almost been two months since his last appt, and he is out of meds. She does recommend family counseling, but he is not currently seeing a counselor. When Sarah brought him for his last appt she dropped him off and left saying that nothing had changed, and he just needs his meds. She is supposed to be a part of the appt to give a good idea of what is going on with the child and his meds and behavior. Nicole's SASS counselor does not believe that Nicole is getting any medicine. Worker then spoke with Tabitha Gosha who is Reed's prescriber. Reed started coming to Delta 10/7/14 with anger and depression. He reported depression about his stepmother and father divorcing. His current mental health diagnosis is ADHD, PTSD, cannabis abuse, and Bipolar. Reed is taking Adderall XR 30mg which is a medium dose. He was on a higher dose but was taken down due to the rumors that his father was also taking it. Reed also takes Zyprexa 5mg for his mood/bipolar. She has recommended counseling for him but [he] is not seeing anyone. Reed is overall very rude to everyone when he comes into the office. He is talking back to his mom and threatening not to come back if Tabitha did not give him his Adderall. He was very defensive when asked if he takes it every day. Before his appt on 9/3/15 his last refill was March.*

**4444 E[16] (Unfounded), G-sequence (Indicated) and H-sequence (Unfounded)**
*SCR# 4444 E*
On October 8, 2015, 3 ½ months after the intact family services case was opened, the principal at City F School contacted the hotline to report that Reed was not at school and when the principal contacted Sarah Geiger regarding the absence, Sarah reported that she kicked Reed out of her home the previous night and did not know where he was.

Also, on October 8th, an anonymous caller reported that Sarah told the reporter there was no food in the home and the family had been living on peanut butter. The reporter also stated that Sarah had been smoking marijuana with her son Reed around her two younger children [Oscar and Penny]. The reporter stated that the home was dirty and alleged that Sarah recently let Oscar's father, Wes Watson [Zach], spend the night even though there were previous allegations that he had molested Sarah's daughter, Penny.[17]

The day prior to the hotline calls, on October 7, 2015, the City A Police Department was dispatched to Sarah Geiger's home because of a domestic disturbance. Reed told the police that his mother was going crazy again and chased him with a hammer. Reed denied kicking the door to the apartment and stated that he was going to live with his father Troy Geiger. Officer Terry documented the following regarding his interview with Sarah Geiger:

> *...I asked Sarah if she chased her son with a hammer. She stated she did not. She stated she had the hammer to try and fix her door. She kept yelling and screaming and saying her son needed shock therapy. I told her maybe she was the one that needed the shock therapy. She then told me to leave and she did not need the police. Sarah then made a phone call and was telling someone that her and Reed were into it again. She stated he came at her so she chased him across the parking lot with the hammer. When Sarah got off the phone I asked her about chasing Reed with the hammer. She again denied it and stated I was no longer needed there. Reed left and stated he would be staying with his grandparents.*

The child protection investigation (*SCR# 4444 E*) was assigned to child protection investigator Victoria Huisel and supervisor Wendy Irwin.

Following the hotline calls, intact worker Paige Barrett left a phone message for Victoria Huisel. CPI Huisel documented the following regarding the voicemail, "...Paige Barrett stated that she has [the] case and that she believes that alleged perpetrator would let child victim back in. She stated that she went out yesterday and that nobody was home. She stated that child victim attends City F school and that alleged perpetrator [Sarah Geiger] has been participating in parenting. She stated that alleged perpetrator does not follow-up with mental health very well. She stated that child victim [Reed Geiger] is diagnosed bi-polar, cannabis abuse and ADHD."

Also, on the day of the hotline call, CPI Huisel went to the home of Sarah Geiger. Sarah Geiger's niece Josie Sawa (age 15) and Reed Geiger (age 15) were at the home alone. While at the home Josie Sawa reported that Ms. Geiger and Reed got into an argument and Reed made false accusations to the police to make Ms. Geiger go to jail. Josie reported that Ms. Geiger makes sure the kids get what they need. Josie stated that they have eaten peanut butter and jelly sandwiches when there was no money to buy anything else but denied living off peanut butter. Josie reported that she lives with her mother, Yasmin Geiger but her mother lets her frequent Sarah Geiger's home.

---

[16] Two hotline calls were made on October 8, 2015, the first hotline call was given SCR# 4444 E and the second hotline call was assigned SCR# 4444 F. The F sequence was merged into the E sequence investigation.
[17] See footnote #12 for facts related to the unsubstantiated allegations of sexual molestation against Wes Watson (Zach Watson).

A-14

Reed reported that he had a fight with his mom because he did not want to clean the house, so he left on his own. Reed reported that when he came back to the house it was locked so he kicked the door in. Reed reported that he gets enough food and denied living off peanut butter. Reed reported that he stays with his mother, Sarah Geiger. Reed reported that Ms. Geiger, Penny and Oscar are at his grandmother's home.

CPI Huisel interviewed Penny and Oscar at maternal grandmother's home. Penny and Oscar reported feeling safe and not afraid of anyone who lived in or visits their home. Both reported that there was food in the home and denied being hungry.

CPI Huisel next interviewed Sarah Geiger, who affirmed her earlier statements to police. On October 13, 2015, CPI Huisel talked to intact worker Paige Barrett by phone. CPI Huisel documented that Paige Barrett reported that a parenting coach through Kappa Agency has been working with Ms. Geiger for approximately one month. Intact worker Barrett also informed CPI Huisel that Sarah Geiger could not handle Reed Geiger in the home.

Intact worker Barrett contacted the parenting coach Skyla Enders on October 13, 2015 and documented the following concerns:

> …she has concerns about Reed's out of control behavior…Sarah was trying to fix the door and running after Reed with the hammer in her hand (but not trying to hit him with it). Sarah stated that she cannot handle him and he is out of control. She stated Reed went over to his dads that night and tried to blow up the dad's car and the dad got to him before he could do it. Skyla stated Sarah was cussing while she was there and Skyla told her to calm down and she didn't need to be cussing. She believes Sarah does need anger management. She has an appointment on Friday at Delta to set up all needed services. Reed has been out of control and taking the keys to the van after Sarah has said no. Josie who lives there has said that Reed has hit her before. Skyla believes Josie does not need to be living there as Sarah has enough on her plate. Sarah has been keeping the house cleaner. The two little kids have been keeping their toys picked up. Sarah is not watching them when they go outside. Oscar was riding his bike near the street. Skyla stated the dog has snapped at Penny and she told Sarah that Penny needs to sit in time out for messing with the dog and the dog needed to get in trouble too for snapping. Sarah will get a calendar when she gets her school money. Skyla is going to start working with her on the parenting programs. Sarah hasn't been taking her advice regarding the grocery shopping and that there is probably too many extra kids in that home who are eating it all.

The next day, on October 14, 2015, intact worker Barrett conducted a home visit. Barrett told Sarah that she should contact the police anytime she feels that Reed is a danger to himself or others. Intact worker Barrett also gave Sarah the contact information to SASS. While at the home, intact worker Barrett questioned why Oscar's father, Zach Watson, was at the home given that she had accused him of sexually abusing Penny. Sarah reported that Zach Watson spent the day with them and took them grocery shopping and out to eat. Intact worker Barrett told Sarah that she could be putting her children at risk by allowing him around her children. Sarah also reported that she had an appointment on Friday, October 16, 2015, at Delta to initiate family counseling, a substance abuse assessment and anger management classes.

Supervisor Wendy Irwin documented the following regarding a supervision meeting with Victoria Huisel on October 15, 2015:

> CPI has seen all of the kids. CPI has seen the house and Mom. CPI has also seen Grandmother. Reed denies his mother locked him out. He also denies smoking pot or smoking pot with his mom. There was plenty of food in the home. Case is open for intact services and CPI has spoken to the caseworker. There is a parenting coach. Both Ms. Geiger and Reed are on probation for domestic violence to one another. CPI needs to make contact with reporter and school counselor. CPI and PSA discussed the decision to unfound report as minor was not locked out, there was adequate food and minor denies smoking pot with his mother…

On October 23, 2015, intact worker Paige Barrett documented that Sarah reported that Reed moved in with his paternal grandmother and stated that she did not want Reed's behavior to cause her to lose Oscar and Penny. Sarah also reported that Reed took 2 Adderall pills with him but did not take his bipolar medication with him. Sarah told intact worker Barrett that she missed her appointment at Delta Health Systems on October 16, 2015, because she did not have any gas. Intact worker Barrett told Sarah that Reed's school contacted her and asked if she wanted to sign a consent for the intact worker to be able to talk to the school counselor and Sarah stated no and that she would contact the school herself.

Zoey Jacoby then contacted intact family services worker Paige Barrett. Intact worker Barrett documented the following:

> ...Zoey, a school social worker at City F School called and stated that she believed that Reed needed counseling and anger management services. The school social worker also stated he has a temper and will say random things like "I don't have my medication?" She stated that he seems unstable and will say that he has court but isn't sure when and is not sure if he will be going to jail. This worker stated Sarah would not sign a release allowing worker to give information to this school. Worker asked if she had tried to phone Sarah and give her this information. Zoey stated no she is afraid of the kickback. Worker asked if Sarah had tried to call the school and Zoey stated no.

Located in the hardcopy documents to the child protection investigation were the requested records of police contact with the family from February 5th, 12th 15th and 18, 2015 and June 12, 2015 which is detailed earlier in this report, as well as incident reports for September 2, 2015 and October 20, 2015 (see incident report summaries below):

> On September 2, 2015, Officer Cesar Kline was dispatched to Sarah Geiger's home. When Officer Kline arrived, Reed Geiger and Josie Sawa reported that Sarah Geiger is going nuts because they were sitting in the van and accused them of stealing money out of her purse. Reed and Josie reported that Sarah turned over the BBQ grill. When Officer Kline interviewed Sarah Geiger, Sarah reported that Reed was calling her a bitch and she was tired of it. Sarah also reported that Reed was out of his medication.

> On October 20, 2015, Josie Sawa's mother Yasmin Geiger reported to police that her daughter has been staying with Sarah Geiger and has 7 unexcused absences. Officer Kline went to the home of Sarah Geiger with Yasmin Geiger. When they arrived Josie Sawa walked past the Officer and got in her mother's car. Officer Kline told Sarah Geiger that if Josie comes to her home when she is supposed to be at school Sarah could be charged with harboring a runaway.

On December 7, 2015, the child protection investigation (SCR# 4444 E) was closed and the allegations of #84-lock out, #76-inadequate food, and #15-substance misuse were unfounded.

*SCR# 4444 G*
On October 29, 2015, while the E-sequence investigation was pending, an officer from the City G Police Department contacted the hotline to report that police responded to a disturbance involving Oscar Watson and his maternal grandfather Henry Regis. The G-sequence investigation was also assigned to CPI Victoria Huisel. The hotline narrative stated the following:

> ...Reporter explained that Sarah Geiger drops her children off to her parents [Henry and Isabelle Regis] every week for an unspecified amount of days. Reporter stated that Henry had taken his two grandchildren to church. Oscar (age 7) has a lot of behavior problems and that while at church he was throwing candy and was spinning Penny in a swivel chair and made Penny fall. Henry grabbed Oscar by the arm and they both fell. When Henry got up and he grabbed Oscar again and Oscar fell. No injuries or reports were made. When reporter spoke to Henry [he] explained that Sarah is always dropping the children off and he and his wife

A-16

*are too old to care for the children. Reporter stated that Henry was stooped over and weak. Henry reported that Sarah is bi-polar and cannot handle the children either.*

CPI Huisel went to Sarah Geiger's home to meet the mandate on October 29, 2015 and October 30, 2015 but no one answered the door. CPI Huisel documented that on October 30, 2015, she received a voicemail from Sarah Geiger. Sarah Geiger reported that she had been at the hospital with Penny.

*City G Police Department Records*
This same day, a City G Police Officer contacted Sarah Geiger by phone to schedule a time to interview her and Oscar at the police station. While on the phone, Sarah stated the following: "…She thinks her father has Dementia. He has anger issues, yells, and throws things. He starts fights with everyone. He has refused to get a psychological evaluation. She confronts him about it, and they argue. He has been like this for many years. He has thrown a table at Penny when she was a baby. He is literally insane. She was abused by him when she was a kid. She wants him to learn a lesson and have him put away. He has terrorized her. He is now banned from seeing her kids. He also is mean to her mother. She is going to call the Elder Abuse Hotline because for years he has yelled at her and pushed her around." When the Police Officer asked Ms. Geiger why she left her kids with Mr. Regis if he has anger issues, she stated that she had to drop her kids off with her parents over the weekend because she was getting her van fixed. The meeting was scheduled for October 25, 2015 but Sarah did not show up for the meeting and on October 28, 2015, the Police Officer contacted the DCFS hotline to report the incident.

*Penny Watson's Hospital Admission from October 29-November 7, 2015*[18]
On October 29th Penny Watson was hospitalized at Gamma Hospital for a lung infection. She was given a ten-day course of intravenous antibiotics. Penny was discharged on November 7, 2015. While she was hospitalized, several staff commented in the record that she was left alone and that her mother was uninvolved. Staff reached out to Sarah to see whether there was anything they could do to facilitate her visiting her daughter and Sarah said no.

On November 2, 2015, CPI Huisel interviewed Oscar Watson at City A Elementary School and documented the following regarding the interview:

> *...Oscar reported that his paternal grandfather "yanked his right arm and told him to come on. Oscar stated that Mr. Regis tripped on him and that he tripped on Mr. Regis. He stated that Mr. Regis yelled and that he got scared and found a hiding spot between two video games. Oscar indicated that he felt safe at home. He stated that he's afraid of Reed because Reed hits him on the butt. He stated that his mom goes out and gets groceries and that Reed sends him to his room and doesn't let him get out until his mom gets back. He stated that Reed doesn't live with him anymore- he [Reed] lives with Val (adult sister) and Andy (paramour of adult sister). He stated that he doesn't want Josie to live with them anymore because Josie smacks him on different body places. Investigator observed that Oscar was clean, appropriately dressed and well-groomed with no visible evidence of abuse or neglect.*

*Delta Health Systems*
According to the hardcopy documents to SCR# 4444 H, on November 5, 2015 Victoria Huisel received a fax from Delta Health Systems. The fax included the CFS 968-90, *Questions for Mental Health Professionals* which was completed and signed by Brooklyn Frascatti and a patient prescription summary.[19]

---

[18] According to the hardcopy documents to SCR# 4444 E, on November 3, 2015 CPI Huisel faxed a request for Penny Watson's medical records to Gamma Hospital. CPI Huisel also documented in a SACWIS contact note that on November 10, 2015 she contacted Gamma Hospital and requested medical records for Penny Watson.

[19] Located in the hardcopy documents to SCR# 4444 G was a copy of a fax that CPI Huisel sent to Brooklyn Frascatti at Delta Health Systems on November 3, 2015. The fax included a release signed by Sarah Geiger requesting the

According to the completed CFS 968-90 *Questions for Mental Health Professionals* dated November 5, 2015, Sarah Geiger's diagnoses includes: Axis I-Bipolar I Disorder, mixed, Panic/Anxiety/Cannabis Abuse; Axis II-Possibly Borderline; Axis III-Hypertension [High Blood Pressure] and Obesity; Axis IV-Moderate [psychosocial and environmental problems]; Axis V- Global Assessment of Functioning score- 40%. The form also documented that "Sarah is non-compliant with her recommended follow-up appointments. Last seen 9/3/2015." Nurse Frascatti listed Sarah's diagnosis as "fair to poor" and documented the following regarding her prognosis, "Unable to determine at this time although poor if she continues to be non-compliant." Nurse Frascatti documented that Sarah is not compliant with treatment because she "does not take medication as directed." Nurse Frascatti gave the following answers to these questions on the CFS form:

> *Do the client's symptoms of mental illness place the child or children at an increased risk of maltreatment or harm?* "Sarah's symptoms may place her children at an increase of maltreatment."
>
> *Are there long-term effects of the client's mental illness symptoms on the child's or children's well-being that need to be considered in developing a treatment plan?* "Highly possible."
>
> *If the client's current treatment plan is changed, will it likely bring about an improvement in the client's parenting skills?* "Yes, if she is compliant with follow up appointments and medication regimen."
>
> *What would need to be, or could be, added to the client's treatment plan that would improve the client's parenting skills?* "Therapy, skill building, anger management."

According to the patient prescription summary located in the hardcopy documents to SCR# 4444 H, on September 3, 2015 Sarah Geiger was prescribed Wellbutrin 75mg twice a day (Antidepressant), Lamotrigine 50mg every morning (Mood stabilizer, treat depression and mania, used for mixed State's), Geodon 20mg at bedtime (Antipsychotic, used to stabilize mood, maintenance treatment for bipolar disorder, helps with agitation) and Citalopram 20mg one a day (Antidepressant). All medications were prescribed with one refill and given a 30-day supply. In July 2015, Sarah was also prescribed Trazodone 100mg at night and given a 30-day supply with one refill. However, the medication was discontinued with the new prescriptions prescribed September 3, 2015.

In an interview with OIG investigators, intact worker Paige Barrett reported that she could not recall specifically seeing the CFS 968-90 form that OIG investigators found in the intact family services hard copy file.

In an interview with OIG investigators, supervisor Wendy Irwin reported that she had not seen the form prior to the interview with the OIG and stated that had she seen the CFS 968-90 form during the investigation "action" would have been taken.

On November 12, 2015, intact worker Barrett went to the home of Sarah Geiger for an unannounced home visit. Intact worker Barrett documented the following in a SACWIS contact note regarding the home visit:

> *...Worker knocked several times on the door. Worker heard Oscar and Penny laughing upstairs. The window was open and worker yelled for them to come to the window. Penny stated that her mother was down stairs smoking and please don't take my mommy away. Worker knocked on the back door and then heard Sarah yell something about answering the door. Oscar answered the door. Worker walked in and it smelled very strongly of marijuana smoke. Josie was sitting on the couch and stated Sarah was in the bathroom. Sarah came out and stated that Reed was just here and smoking pot. Worker stated she shouldn't allow him to smoke*

---

"Diagnosis, Prognosis and Hx [History]," The fax also included a blank CFS 968-90 (*Questions for Mental Health Professionals)* form.

*in the house. Especially because of Penny's cystic fibrosis (lung condition). Sarah stated that it was her who was smoking pot in the house and that she makes Penny and Oscar stay upstairs. Worker stated she should not be getting high and taking care of her children. Worker was agitated and stated that this case was not seeing any progress. Sarah stated she has been keeping her house cleaner. Worker stated it has been a little bit cleaner. Worker asked if she had made any of her appointments at Delta for family counseling, substance abuse assessment, or anger management. Sarah stated no and asked if worker would call. Worker stated that was a little ridiculous that worker had to make the call since Sarah is fully capable. Worker stated Sarah has Delta's phone number. Sarah stated that there was an incident last Sunday where Reed was asking to take the car, she told him no, and he wouldn't stop asking about it. He then started calling Oscar names and Sarah grabbed a belt and was telling him to get out of the house. She stated she was going to swat him on the butt with it. But he took it away from her and was trying to hit her with it. Worker stated these incidents were the reason for case opening and she is risking losing her other children. She stated she knows this. She stated she is thinking about calling SASS and having them go to Reed's school to evaluate him. She stated she was going to call them the day it happened, but he went over to his dads and SASS won't go there because his dad is not the one that called. Worker recommended that she call and talk to SASS and figure out what the best plan is. Worker asked if she had spoken to the school as worker recommended, she do last week. She stated no she had not called them.*

On November 13, 2015, intact supervisor Quinn Carlson documented in an intact SACWIS contact note that due to Sarah's lack of progress with intact family services if there was not improvement by the end of December, the intact case would be assessed for case closing. Supervisor Carlson noted that Sarah had not engaged in counseling for her family nor had she addressed her children's mental health issues.

On November 13, 2015 at 10:25am CPI Bianca Little went to the home of Sarah Geiger to interview Penny Watson.[20] CPI Little documented in a SACWIS contact note that when she arrived, she observed Penny come out of the apartment and go to the side of the building. CPI Little noted that Penny was dressed in a sleeveless pink ruffle dress, with no shoes, socks or coat and the current temperature was 55 degrees. When Sarah Geiger answered the door, CPI Little asked Ms. Geiger where Penny was, and Sarah yelled for Penny inside the apartment. CPI Little told Ms. Geiger that Penny was outside sitting on the side of the apartment building playing in the dirt. Ms. Geiger yelled for Penny to "get inside." Ms. Geiger stated that she would talk to the landlord about getting a latch for the top of the front door. Ms. Geiger reported that Penny and Oscar both had colds this day, so they did not go to school.

While at the home CPI Little attempted to interview Penny. CPI Little documented that Penny stated, "mom does not spank her butt" and "she gets food to eat." CPI Little documented that Penny "had no visible signs of any old or new injuries."

Also, on November 13th at 2:15pm, CPI Huisel went to the home of the paternal grandfather Henry Regis. Mr. Regis reported the events that happened at church on October 19, 2015. Mr. Regis also reported the following:

> *...stated that he grabbed Oscar and he was going to put Oscar next to Isabelle Regis and he fell. He stated that a plain clothed officer gave him a lecture about how he's not supposed to grab a kid by the arm. He denied that Oscar had any marks or bruises. Mr. Regis stated that he was upset by the incident and that Oscar is unruly...Mr. Regis stated that he and his wife continue to care for the children but that they are too old. He pointed out that his wife walks with a cane and a walker...*

The allegation of #74-inadequate supervision against Sarah Geiger for the G-sequence investigation involving Oscar Watson and his grandfather Henry Regis was indicated against Sarah Geiger and closed on December 28, 2015. The rationale for the indicated finding stated:

---

[20] CPI Bianca Little first went to City A Elementary school at 10:00am to interview Penny Watson for CPI Huisel but was told by the school secretary that Penny was not at school that day.

*...Parent reported that she knew that the caregiver was inappropriate. The alleged perpetrator stated that the caregiver suffers from dementia and is literally insane. The alleged perpetrator stated that the caregiver abused and terrorized her as a child. Because the alleged perpetrator admitted that she left the minors in the care of the caregiver despite having knowledge of the aforementioned limitations, this investigator is recommending that the allegation of Inadequate Supervision be indicated.*

**SCR# 4444 H**

On the evening of November 13, 2015, while the E and G sequence investigations were pending, Dayton Malone, a counselor from Reed's school contacted the hotline to report that Reed stated that on Veteran's Day (November 11th) his mother, Sarah Geiger poured water on him, swung a belt at him and the metal part hit him in the head. Reed also stated that his mother punched him in the nose and was high at the time. The reporter stated that Reed was now at his father's home.

The H-sequence investigation was also assigned to Victoria Huisel. On November 14th, November 18th, and December 5, 2015 CPI Huisel went to the home of Troy Geiger to meet the mandate and interview Reed Geiger. There was no answer at the door and CPI Huisel left her business card. At a later attempted visit in December CPI Huisel documented that the card she left on November 18 had been removed.

On December 2, 2015, supervisor Wendy Irwin documented that CPI Huisel "will reach out to the Intact worker to see if she can get help with us making contact with the family." On December 9, 2015, CPI Huisel documented that she met with intact worker Paige Barrett at the DCFS office and intact worker Barrett "agreed to explore ways she could assist." On December 10, 2015, CPI Huisel documented that intact worker Paige Barrett left a voicemail with the following information, "…Paige Barrett stated that Reed is still living at his father's house and that his father doesn't want anything to do with the Department. She stated that Reed's dad expressed that he doesn't have to let DCFS in or speak with DCFS."

In an interview with OIG investigators, intact worker Paige Barrett reported that she has never met or spoken to Troy Geiger but was told by Sarah Geiger that Troy Geiger wanted nothing to do with DCFS.

On December 11, 2015, CPI Huisel interviewed Reed's school counselor, Dayton Malone, at the High School. Ms. Malone reported that following the incident in which Sarah Geiger hit Reed with a belt and punched him in the nose she observed the side of Reed's face to be red. Ms. Malone also stated that on December 8, 2015, Reed came to school very tired and stated that he was up most of the night due to his mother getting hit by a car. Reed was too tired to concentrate so the school contacted Sarah Geiger to pick him up from school. Ms. Malone stated that Sarah Geiger appeared under the influence of something and had sunglasses on at the time of the pick-up. Ms. Malone reported that Reed was doing very well in school and was making very good grades.

While at the school, CPI Huisel interviewed Reed Geiger. When questioned about the incident that resulted in the November 13th hotline call Reed stated the following:

*…He stated that he was hungry that day, so he made himself a Totina's Pizza, Reed stated his mother wanted to know if he was going to share the pizza and Reed said you know how small a Totina's pizza is no he wasn't going to share it. His mother then grabbed a bottle of water and poured it on Reed's head. She then told him to get the hell out of her house and if you step foot in the house again, she is going to beat Reed's ass. He then came back in the house to get his clothes and he said that his mother grabbed a belt and started hitting him with it, Reed stated that his mother hit him in the head and face with the metal part of the belt. He stated that he was trying to defend himself, so he grabbed the belt and broke it in half and was hitting her with it. Reed stated that he had some red marks on his face, CPI observed no injuries to Reed's face. Reed stated that it did not hurt just made him mad…Reed reported that his mother was high on marijuana at the time this*

*occurred, and he stated that he knew because he had seen her smoking a bowl with his little cousin Josie Sawa who is 15...*

On December 22, 2015 at 12:50pm, CPI Huisel went to the home of Sarah Geiger and interviewed Sarah Geiger, Josie Sawa (Sarah Geiger's niece), and Penny and Oscar Watson. [21] When asked about the incident between Sarah Geiger and Reed, Sarah Geiger stated that she used a belt to threaten Reed but denied punching Reed or hitting him with the belt. Sarah Geiger stated that Reed took the belt from her by sticking his foot on her sternum and ripping it from her. Sarah Geiger stated that Reed raised his fist like he was going to hit her but then went outside and she went back inside. Sarah Geiger stated that Reed is disrespectful, and she is considering getting a restraining order. Sarah Geiger reported that the argument started because Reed put a whole pack of pizza rolls on a tray and refused to share. Sarah Geiger denied pouring water on Reed or throwing objects at Reed and denied being high or smoking marijuana with her niece, Josie Sawa. During CPI Huisel's interview with Penny Watson, Penny reported that she did not feel safe at home because her brother Oscar is always hitting her. CPI Huisel documented in a contact note that Oscar Watson reported that "he does not feel safe at home and stated that his mom beats him with hangers and belts." CPI Huisel documented that no injuries were observed.

Also, while at the home on December 22, 2015, CPI Huisel interviewed Sarah Geiger's niece, Josie Sawa, whom was also living in the home. CPI Huisel documented the following regarding the interview:

> *...She stated that on the day of the incident, Reed was making pizza and he always eats all the food and doesn't leave anything for dinner. She stated that Ms. Geiger got mad and that she and Reed got into a fight. She stated that Reed was calling Oscar gay. She stated that Reed and Ms. Geiger were hitting each other with a belt. She stated that Reed hit Ms. Geiger first but that Ms. Geiger threw water on Reed which started the physical altercation. She stated that Reed and Ms. Geiger were hitting each other as they were going out the door. She stated that the cops showed up after that and Reed walked away from Ms. Geiger. She stated that Reed and Ms. Geiger had marks on them but she didn't remember where the marks were. She stated that both were equally guilty.*

On January 12, 2016, the allegation #11-cuts, bruises, welts abrasions and oral injuries against Sarah Geiger for the H-sequence investigation was unfounded. The rationale for the finding stated:

> *This case was brought to the attention of the Department because it was reported that alleged perpetrator hit 16-year old child victim with a belt buckle and punched teenager in the nose causing injuries. No injuries were observed by adult sibling who picked up child victim from alleged perpetrator's home. Reporter and identified witness observed injuries but non-offending parent did not provide access to child victim so that injuries could be assessed by investigator. Investigator did not observe any injuries. Furthermore, alleged perpetrator denied the allegation. Due to lack of sufficient evidence that the child victim had an injury or that the injury was caused by the direct action of the alleged perpetrator, this investigator is recommending that the allegation of cuts bruises welts and abrasions and oral injuries be unfounded.*

## SCR# 4444 I (Indicated)

On December 22, 2015, while the G and H sequence investigations were pending, and the same day CPI Victoria Huisel conducted a home visit to Sarah Geiger's residence for the H-sequence investigation, school social worker Cassidy Newman from City A High School contacted the hotline with the following information:

> *Reporter State's that reporter went to the home to deliver gifts today. Reporter State's when reporter arrived, Oscar was outside with no shoes or socks and no coat. Reporter State's that Oscar said that he was afraid*

---

[21] CPI Huisel documented in a contact note that the parenting coach was present at the home at the time of the interview with Sarah Geiger on December 22, 2015. There is no contact note regarding an interview with the parenting coach.

*to go inside because his mom will smack him again. Reporter State's that Oscar said that his mom hits him all the time and hits him with a belt and hanger on the butt. Oscar said that his mom has left marks many times. Reporter State's that Oscar took reporter inside the home. Reporter State's that the home smelt [sic] like marijuana. Reporter State's that Sarah started screaming at the top of the stairs and Oscar started trembling and acting scared. Reporter State's that when Sarah noticed the reporter she stopped the screaming and complained about the kids not behaving. Reporter State's that Sarah said that she was having a nervous breakdown. Reporter State's that there was a big dog in a little cage and cats jumping all over the place. Reporter State's that the living room was a mess and dirty all over. Reporter State's that Sarah is Bi- polar and is taking her medication. Reporter State's that Sarah was going from emotional extreme to another. Reporter State's that Sarah appeared to be intoxicated and her eyes were red. Reporter State's that Josie [Sarah's niece] has said that she uses marijuana to treat her anxiety. Reporter State's that Josie also appeared to be intoxicated and her eyes were all red. Reporter State's that Josie has been staying with Sarah for the last 5 months because her home life is worse than being with Sarah. Reporter State's that Sarah is Josie's aunt by marriage. Reporter State's that OPWI (Yasmin Geiger, Josie's mom) has a warrant for her arrest for truancy. Reporter State's that she called the police and City A police officer came to the home. Reporter State's that Sarah was having major emotional swings. Reporter State's that Sarah was very worried about getting arrested. Reporter State's that Oscar has a learning disability and emotional problems.*

Included in City A High School records, obtained by OIG investigators, was a, *Written Confirmation of Suspected Child Abuse/Neglect Report: Mandated Reporters* form completed by school social worker Cassidy Newman and dated December 22, 2015. The form stated the following:

*The child [Oscar Watson] said "My mom hits me all the time, with hanger or whatever she can find." The child was trembling when mom yelled at him. He also started crying and went into fetal position because he was so scared of mom when she was yelling... I talked to Oscar around noon, he was riding a bicycle with no socks or shoes or jacket (short-sleeve shirt) and it was cold outside. I asked Oscar why he didn't have socks/shoes on and he said they were inside and didn't want to go inside because he didn't want to get hit again by his mom. When I first walked into Sarah's apartment, I smelled marijuana smoke. Sarah was screaming at her children from upstairs. She didn't know I was there. Josie let me in... I do not work closely with Oscar or Penny. I was there to see Josie who has been staying with Sarah...I called the police to come talk to Sarah because she was screaming at her kids when I got there. There were cats climbing on counters, cat food on the counters by food products. It smelled like animal urine and feces in the apartment. Sarah's mood swings were very evident (angry, crying, laughing, polite) even though she said she was taking her medication for bipolar disorder Sarah said she didn't have medication for anxiety because they won't prescribe it to her because she was addicted to it...*

The child protection investigation was assigned to CPI Bianca Little and supervisor Wendy Irwin. On December 23, 2015, the day after the hotline call, CPI Little contacted intact family services worker, Paige Barrett. CPI Little documented that Paige Barrett reported that the family has a homemaker. Intact worker Barrett reported that Sarah works in the morning and Sarah's ex-husband's ex-wife, Diana Geiger, watches the children while Sarah Geiger works.

This same day, CPI Little went to the home of Sarah Geiger but no one answered the door. CPI Little left messages for Sarah Geiger, Yasmin Geiger, school social worker/reporter Cassidy Newman, and Valerie Geiger requesting a return call. CPI Little also contacted the maternal grandmother, Isabelle Regis on December 23rd. Ms. Regis reported that her grandchildren are with Diana Geiger but she did not have an address or telephone number for Diana. CPI Little asked Ms. Regis to tell Sarah Geiger to call her.

On December 24, 2015, CPI Little met with CPI Victoria Huisel at the DCFS office to discuss the case. CPI Little documented the following in a contact note:

A-22

*...Victoria CPI has 3 pending investigations on the alleged perpetrator.[22] Victoria CPI stated the following; The babysitters name and telephone number is Diana Day XXX-XXX-XXXX. She received a call from the alleged perpetrator yesterday. She received the babysitter's name and telephone number. She admitted she was at the home on the same day this report was called into the hotline. She denies smelling any Marijuana in the home on 12-23-2015.[23] The Parenting Coach was also in the home when she was there on yesterday. There was nothing stated to her or observed which would indicate the alleged victims were being abused or neglected...*

There are no documented contacts in SACWIS for 31 days from December 25, 2015 to January 24, 2016.[24]

Intact worker Paige Barrett conducted a home visit on December 17, 2015, five days prior to the December 22nd hotline call. Intact worker Barrett documented that Oscar and Penny were observed to be safe and free of signs of child abuse and neglect.

On January 5, 2016, intact worker Paige Barrett interviewed advanced nurse practitioner Brooklyn Frascatti from Delta Health Systems. Nurse Frascatti reported that Sarah Geiger was assigned a new counselor for the medication management program in September and provided Ms. Barrett with contact information for the new counselor, Nurse Freya Olmsted.[25] Nurse Frascatti reported that Sarah has not been medication compliant and stated that Sarah was last seen at Delta on December 29, 2015, however prior to that visit, she was seen on September 3, 2015 and given a prescription for a 1 month supply of medication. Nurse Frascatti reported that Sarah was inappropriate in their sessions and noted that Sarah is moody and impulsive and has tried to get controlled substances. Nurse Frascatti reported that Sarah's diagnosis is Bipolar I disorder and most recently depression. Nurse Frascatti stated that individual counseling has been recommended but Sarah has not followed through on the recommendation.

According to Delta Heath Systems records obtained by OIG investigators, in addition to the information above, Nurse Frascatti recorded that she stated that she felt that Sarah's children should not be exposed to Sarah's behaviors and lifestyle and the DCFS 'social worker' agreed. The notation, however, was entered after Penny Watson's death.

Intact worker Barrett documented that she attempted to visit the family on January 7, 2016 and January 14, 2016 but no one answered the door. Intact worker Barrett documented that during the January 14th attempt Sarah's car was at the home and the upstairs window was open. Intact worker Barrett returned to Sarah Geiger's home on January 22, 2016 and documented the following regarding the home visit:

*Worker conducted scheduled visit for purpose of safety check and case progress. Both kids were observed to be safe and free of signs of CA/N. Oscar was playing video games and Penny kept asking Sarah to get her something to eat. Penny's hair was not combed, and she did not have any pants on. Worker asked if they went to school today. She stated no Penny is on an antibiotic for strep that she got last week. Worker stated she should be okay to go to school if she's been on the antibiotic for more than 24 hours. Sarah stated she and Oscar did not eat much yesterday so she didn't want to send them to school today. Worker stated she*

---

[22] CPI Victoria Huisel had 2 pending investigations involving the family (SCR# 4444 G and H). SCR# 4444 E was closed on December 7, 2015.

[23] According to CPI Victoria Huisel contact notes, CPI Huisel was at the home of Sarah Geiger on the day of the hotline call which was on December 22nd not December 23rd.

[24] In an interview with OIG investigators, CPI Bianca Little reported that she may have been on vacation during that time. According to Bianca Little's Employee Attendance Record, CPI Little worked her scheduled day shift hours 14 out of the 31 days. Of the 17 days not working, 9 of the days off were coded RO (regular off day), 1 day was coded PD (personal day), 4 were coded HO (holiday), 1 was coded SF (sick family) and 2 were coded OC (overtime-comptime used).

[25] According to SACWIS contact notes, intact worker Barrett left a phone message for Nurse Freya Olmsted on March 15, 2016 and March 30, 2016, requesting a return call.

*spoke to Brooklyn Frascatti at Delta (Sarah's old counselor). Worker stated Brooklyn looked into the computer and said that Sarah had an appt in September and then not again until December 29th. Which meant Sarah should've been out of meds for two months. Sarah stated she had a stockpile of medicine for when she was in the hospital. She stated she was taking medicine the whole time. She did say she ran out of one of them (i believe Celexa) for two days but called to get some more. She stated she is now out of her stockpile of medicine. But has the medicine she was prescribed on 12/29/15. Sarah stated she has not yet signed up for family counseling, anger management, or substance abuse assessment. Worker stated she thought Sarah's case may be closing soon. Worker discussed how there has not been a lot of progress in home organization, structure, discipline, or substance abuse, or anger management. Worker stated she has not gotten through much of the parenting program that the parenting coach has to physically help Sarah through the chapters instead of Sarah doing them on her own and then discussing them with coach like most clients. Sarah stated the coach comes on Tuesdays when Sarah is trying to do her homework, so she has the coach read them to her while she is doing her homework. Worker stated Sarah needs more organization and less procrastination. Sarah needs to arrange her priorities. Worker stated she could've arranged the coach to come on another day. Worker also phoned Bianca Little investigator and set up a visit for Bianca to come out on Monday at 3:30 to discuss the most recent investigation. Worker stated Sarah has had several investigations and she is seriously risking losing her children by getting all these investigations. Worker stated if she gets more than one indicated report for the same thing her kids could be taken. Worker advised her to ensure she appropriately supervises her children and not get in any altercations with them. Sarah stated she did not throw anything at Nicole who claimed that. She stated she is doing the best she can considering she has so many kids, goes to school, and was working. She stated her older children have it out for her and kept calling in false DCFS reports on her. Sarah stated when she lived in City C, she didn't have DCFS called on her one time and she had people to help her. She is thinking of moving back there. She is going to keep Reed and Nicole away from her because she does not want any more reports. She stated she is planning on getting another job.*

Intact supervisor Quinn Carlson documented in a supervisory contact note in the intact family services record that on January 25, 2016 she contacted child protection investigator Wendy Irwin by phone to discuss the case. Supervisor Carlson documented the following:

*Phoned Wendy Irwin, CP supervisor to discuss plans for case closure once they complete the pending investigation. We discussed and agreed that this latest incident does not rise to level of imminent risk of harm and there is not anything to take before the court. Wendy stated that they will look at her most recent mental health stuff before making a decision regarding the final finding. Explained all of the services we had provided over the past months and Sarah's lack of change although she did for all practical purposes participate in the service. Advised that worker has consistently spoken with Sarah about her marijuana usage, but Sarah does not see any problem with it. Once they receive the required mental health documentation, she will make a decision and let me know.*

On January 25, 2016, intact worker Barrett documented that she went to Sarah Geiger's home to conduct a home visit and meet CPI Bianca Little. Intact worker Barrett documented that when she arrived at the home, she informed Sarah Geiger that the intact family services case would be closing this week due to lack of progress and she would no longer receive parenting services. Intact worker Barrett also noted that the home smelled like marijuana.

In an interview with OIG investigators, intact worker Paige Barrett reported that during visits she would try to interview Oscar and Penny alone away from Sarah Geiger, but the children would not say much as it appeared the children had been coached.

Also, on January 25, 2016, thirty-four days after CPI Bianca Little's one failed attempt to see the family, CPI Little documented that she returned to Sarah Geiger's home to interview the family. CPI Little documented the following regarding her interview with Sarah Geiger:

A-24

PENNY WATSON

> *...She denied giving Josie (15 years old) Marijuana. She denied allowing her kids to be outside with no shoes, no socks, or coats. She denied smacking Oscar or Penny. She denied hitting the kids with hangers or belts on the butt. She denied smoking Marijuana. She denies screaming at Oscar causing him to be afraid. She admits she is tired of the school calling in on her. She admits she will just move to City C. She admits she has not complied with Parenting, Family Counseling, Anger Management referred by DCFS. She admits she was unable to attend the services as she was working at that time. She admits she is not working at this time. She admits she is Bi-Polar and takes medications. She allowed this CPI to see her medications and make [note] of them in the file. Citatopram 1 every day and Bupropion 75mg twice daily. She admits she has to [pay] 579.00 per month for her van. She admits getting 733.00 per month SSI. She admits she pays 675.00 per month rent. She denies abusing/neglecting her kids. This CPI stated based upon the information received, and her statements, the allegation against Oscar and Penny would be indicated but the allegation towards Josie would be unfounded. The alleged perpetrator stated no one is taking her kids. This ended the interview at this time. She pays 220.00 car Insurance.*

While at the home, CPI Little interviewed Oscar Watson. CPI Little documented that Oscar was playing video games at the time of her interview and would only nod his head to her questioning. CPI Little documented that Oscar, "…nodded his head he was ok when asked. The alleged victim [Oscar] nodded his head he was not afraid of his mother when asked. The alleged victim [Oscar] nodded his head he was not hit with belts and hangers when asked…." CPI Little documented that she did not observe any old or new marks on Oscar. CPI Little attempted to interview Penny Watson while at the home, but Penny was running around playing with the cats in the home and would not answer any questions. CPI Little documented that she did not observe any old or new marks on Penny.

CPI Little also interviewed Sarah's niece, Josie Sawa while at Sarah Geiger's home. Josie admitted that she smokes marijuana with her friend but denied that Sarah Geiger allows her to smoke marijuana or gives her marijuana to smoke. Josie reported that she helps with Oscar and Penny and stated that she liked living with Sarah Geiger. CPI Little documented that there was no smell of marijuana while at the home.

On March 21, 2016, the Sequence I investigation was closed. Allegation #74-inadequate supervision and allegation #60-substantial risk of physical injury by neglect were indicated against Sarah Geiger. The rationale for indicating #74 stated that on December 22, 2015, Sarah was unaware that her son Oscar (age 7) was found outside the family's home alone with no shoes, no socks, and no coat. The rationale for indicating #60 stated, "…Mom was acting erratic when mandated reporter was at the house, mom was yelling and screaming due to being upset. Sarah has a diagnosis of Bipolar and has an open case in which she is supposed to attend Anger management which she has not completed per the caseworker. Caseworker also State's Sarah has not been compliant with counseling or parenting. Due to this, the minor is put at risk by Sarah's mental health issues."

Allegation #15-substance misuse and allegation #10- substantial risk of physical injury were unfounded against Sarah Geiger for the I-sequence investigation. The rationale for unfounding allegation #15-substance misuse stated that the alleged victim Josie Sawa denied that Sarah Geiger gives her marijuana. The rationale for unfounding allegation #10-substantial risk of physical injury stated, "…The alleged victim denied being hit with belts and hangers. The alleged victim denied being scared of the alleged perpetrator. The alleged victim was observed to have no old or new marks on his person…"

**SCR# 4444 J (Indicated)**
On January 28, 2016, while the I-sequence investigation was pending, school social worker Eliza Pena from City A Elementary School contacted the hotline with concerns regarding the care of Oscar and Penny. The hotline narrative stated the following:

> *Reporter State's that on 01/28/16, Penny Watson (age 4) was crying and showed reporter a "mark" on her right lower arm near the wrist and disclosed that it was from mother Sarah Geiger hitting her and smacking*

PENNY WATSON

*her this morning. Oscar Watson (age 7) confirmed this story and disclosed that the abuse is ongoing and he gets hit with broken hangers and belts. Oscar State's that he tries to hide in his closet when he knows he's going to get hurt. Reporter is unaware of current injuries to Oscar. Oscar State's he's so tired of the yelling in the home, so he goes outside and sits outside until things get calm. Reporter State's there are also supervision issues with Sarah. On 01/28/16, Sarah was 90 minutes late picking Penny up and 55 minutes late picking Oscar up. Sarah is diagnosed with Bipolar disorder. Oscar is diagnosed with ADHD. Penny is diagnosed with Cystic Fibrosis. The family has a history of DCFS involvement. Maternal Grandparents are a support system...*

In an interview with OIG investigators, Eliza Pena reported that in January 2016 she was concerned with the lack of response by DCFS, so she began documenting her conversations with Oscar and Penny as well as DCFS staff. Ms. Pena documented the following on January 28, 2016:

*Both kids late today and without breakfast. Both reported mom yelling and smacking on Penny. Josie was there too and was yelling. Penny and Oscar both reported mom smacking her on the leg and arm several times. Oscar said this is our family every morning. Oscar reported that the hanger and belt are the worst. Josie hits them with a broken hanger and mom hits her with a belt. He said that he makes a hiding place in his room with his toy boxes – he use[d] to but no[w] he hides in the closet or goes outside until things are calmed down. When I come back in I can hear Penny crying like crazy and screaming for someone to save her from mom or Josie.*

On January 28, 2016, CPI Gwen Rivas documented that she was initiating the report for the primary investigator, Bianca Little. CPI Gwen Rivas went to City A Elementary School to interview Penny and Oscar Watson. CPI Rivas documented the following regarding her interview with Penny:

*...She [Penny Watson] reported that Josie and her mom smacks her every time and it makes her mad. The minor stated that mom and Josie hits her with a belt or broken hanger. CPI inquired if minor was afraid of anyone in her home and she stated monsters. CPI asked if monsters had a name and she stated "monsters". CPI observed minor to have a small scratch on her hand but no other injuries.*

CPI Rivas documented the following regarding her interview of Oscar Watson at City A Elementary School:

*...CPI observed minor [Oscar Watson] not to have any visible injuries and minor denied being in any pain. The minor stated he lives with his mom, Josie and sister (Penny). The minor stated that mom hits with a belt and Josie hits him with a broken hanger. The minor stated it's a lot of screaming and yelling in the home. He reported that he goes outside to color or draw until it's calm. The minor denied being afraid of anyone in the home. The minor stated his dad (Wes [Zach] Watson), is his favorite person and he lives in City H, Mo. The minor stated he does not see him a lot.*

Following her interviews with Oscar and Penny Watson, CPI Rivas went to the High School to interview Josie Sawa. Josie reported that she is currently living with Sarah Geiger but is tired of watching Oscar and Penny. When asked if she had ever witnessed Sarah hitting Oscar and Penny, Josie stated the following:

*...we don't hit the kids (Penny and Oscar) anymore and minors were only hit with a belt a long time ago...The minor [Josie Sawa] stated that she does scream at minors but it's better than Sarah dealing with minors because she is bipolar and she is easily overwhelmed. The minor stated that Sarah has a hard time dealing with her children and she wants the minors to be safe, so this is why she stays too.*

While at the home, CPI Little attempted to interview Oscar and Penny Watson however both were preoccupied playing with each other. Oscar denied being hit with hangers or belts and Penny was too busy playing to answer questions. CPI Little documented that neither Oscar nor Penny had new or old injuries.

A-26

PENNY WATSON

CPI Little documented that there were 6 cats in the home and 1 dog and that the home smelled somewhat of animals but there was no marijuana smell. CPI Little observed food in the home during the visit.

On February 1, 2016, intact supervisor Quinn Carlson documented in a supervisory contact note in the intact record that the intact case would remain open until the child protection investigation was completed. This same day, intact worker Paige Barrett conducted a home visit to the home of Sarah Geiger. During the home visit Sarah reported that she kicked Josie out of the home and was trying to be the best parent she could be.

Also, on February 4, 2016, supervisor Wendy Irwin received a return a call from school Social Worker Eliza Pena. Supervisor Irwin documented the following regarding the phone call:

> PSA returned a call from Eliza Pena, school social worker. She State's Penny and Oscar have not been back to school since last Friday [January 29th] when DCFS came out and interviewed them about the hotline report she made. She has called Sarah who said they were sick. She went out with the resource person and saw the kids but did not feel like they were sick. Today they are not in school and when she called Sarah she told her she was in City I. She is very concerned because she doesn't have them in school, she yells at them, and they come to school upset stating she hits them. She also discussed the issue of mom not having Oscar's medication for ADHD filled punctually and if he doesn't have his medication he is disruptive. PSA explained that the medication issue should be communicated to the [intact] case in which Eliza responded she doesn't know who the [intact] case worker is as she has only spoke to her one time last year and when she did tell her the concerns she had Eliza felt that she blew her off. PSA gave caseworker Paige Barrett's name to Eliza and her phone number. PSA also discussed that we do not deal with educational neglect. Eliza State's she understands this. PSA then discussed her other concerns about mom yelling and hitting them. PSA explained that we can't do anything about a parent yelling it may not be the best way to parent but it is not abuse/neglect. We then discussed the minors reporting their mother hits them but they do not have any injuries from being hit by mom. PSA explained that based on this, we would not remove the children but discuss this with mom especially since she has a caseworker. PSA explained that CPI Bianca Little and CWS Paige Barrett went out on Monday and talked to mom about this report and that she needs to cooperate with services that her caseworker is offering. Eliza thanked PSA for returning her call and giving her the caseworkers name and number. PSA asked Eliza to let her know if the minors return to school tomorrow or not as Sarah told Eliza she would have them at school tomorrow. Eliza said she would.

Eliza Pena reported to OIG investigators that she had no knowledge that the family was involved in intact family services until she spoke to Wendy Irwin on February 4, 2016.

Eliza Pena documented that on February 5th she left a message for Intact worker Paige Barrett and on February 8th she received a return call. Eliza Pena documented the following regarding her conversation with the intact worker:

> Caseworker called me back and I expressed all the concerns Re: medication, absences, not picking up the children on time, the children being told not to talk about home at school. Both children stating they are scared of mom and don't want to be there. I let her know I am considering writing a letter to the state regarding my concerns.

Intact worker Barrett documented that she explained to Eliza Pena that services had been provided for the family and that "there has to be enough evidence to take the case to court."

There are no documented attempts to see the family until February 9, 2016, when intact worker Barrett attempted to visit the home of Sarah Geiger, but no one was home.

On February 16, 2016. Intact worker Barrett visited Sarah's home and explained to Sarah that the intact case would remain open and the intact worker would assess the safety of the children until the child

protection investigation was closed. Intact worker Barrett documented that she "observed Oscar and Penny to be safe and free of signs of child abuse and neglect."

On February 25th Ms. Pena documented that Oscar reported that DCFS told his mom that if they get another call on her, the kids are going to go into foster care, and she would go to jail. Oscar also reported that they are going to move and not give DCFS their new address so DCFS can't find them.

On March 21, 2016, the Sequence J investigation was closed. Allegation #74-inadequate supervision was indicated against Sarah Geiger. The rationale for the indicated finding stated that Sarah Geiger failed to pick up her children Oscar and Penny on time and school personnel were unable to reach her.

Allegation #11-cuts, bruises, welts, abrasions and oral injuries and allegation #10-substantial risk of physical injury were unfounded against Sarah Geiger. The rationale for the unfounded investigation for allegation #11 stated that on February 2, 2016 the investigator and the intact caseworker, "…visited the home and observed no mark on the alleged victim's [Penny Watson] arm or any old or new injuries. The alleged victim did not disclose any abuse by her mother as she would not talk with the CPI or CWS caseworker as she was preoccupied playing. The alleged perpetrator and Other child [Oscar Watson] in the home denied hitting the alleged victim with belts and broken hangers." The rationale for the unfounded investigation for allegation #10 stated that Oscar Watson denied being whipped with broken hangers and belts by the alleged perpetrator and no old or new injuries were observed.

**SCR# 4444 K (Indicated)**
On February 18, 2016, while the I and J Sequence investigations were pending, the Hotline received two calls concerning the Geiger Family from the City A Police Department and City A School. On February 17th, Sarah Geiger had left her children with a new babysitter. While out, Sarah was arrested for an outstanding warrant. She asked the babysitter to keep Oscar and Penny overnight because she was in jail. The babysitter brought the children back to the school and school personnel contacted the police. Penny needed to have enzymes every time she eats, and Sarah had not provided the enzymes to the babysitter. The babysitter was also not given Oscar's ADHD medication and the school reported that he could not function without it. The maternal grandfather, Henry Regis, agreed to care for the children for the night.

Following the February 18th hotline calls, CPI Bianca Little went to the maternal grandparent's home. Henry Regis reported that Oscar and Penny went home with their mother earlier that day.

After going to the maternal grandparent's home, CPI Little went to the home of Sarah Geiger. While at the home, CPI Little documented that she attempted to interview Penny Watson, but Penny would not talk to the investigator. CPI Little also documented that Oscar did not want to be interviewed because he wanted to go outside to ride his bike. CPI Little documented that there were no signs of any old or new injuries on either Oscar or Penny. This was the last documented in person contact that CPI Little had with the family prior to the death of Penny Watson in April 2016.

In an interview with OIG investigators, CPI Bianca Little reported that she was surprised when she heard about the death of Penny Watson due to Sarah's positive demeanor during the interview on February 18th. CPI Little reported that in past interviews Sarah acted upset that DCFS kept coming to the home and would usually be wearing a robe even though it was the middle of the day "but on this day she [Sarah] seemed happy, she was dressed for the day and the kids were okay."

Located in the hardcopy documents to the K-sequence investigation were incident reports from the City A Police Department for incidents that occurred on September 5, 2015 (see page 27), October 7, 2015 (see page 23), and October 20, 2015 (see page 27).

A-28

PENNY WATSON

Also, on March 21st, CPI Little contacted Oscar's primary care physician's office. An office associate reported that Oscar was last seen for a well-child exam on July 16, 2015 and there were no concerns of abuse or neglect reported in the file.

According to the intact family services record, intact worker Barrett conducted a home visit on March 13, 2016 at Sarah Geiger's home. Intact worker Barrett documented that "…Oscar, Penny and Sarah's 'friend' Hank were at the home." This was the last documented in person contact that intact worker Barrett had with the family prior to Penny Watson's death in April 2016.

On March 15, 2016, intact worker Paige Barrett left phone messages for Sarah's nurse practitioner Freya Olmsted at Delta Health Systems and Oscar's counselor at Delta Health Systems requesting a return call. Intact worker Barrett documented that on March 28, 2016, she interviewed Oscar's counselor. The counselor reported that Sarah was supposed to come to the office for some paperwork and case management, but she did not show up. The counselor reported that he has been meeting with Oscar for 20-minute sessions at City A Elementary School. The counselor reported that school staff do not think Oscar is getting his medication due to his behavioral issues. The counselor reported that family counseling has been recommended but Sarah has not followed through.

On March 28, 2016, CPI Little contacted school social worker, Eliza Pena. Ms. Pena reported that on January 28, 2016, Sarah Geiger was late picking Oscar and Penny up for school and school personnel were unable to reach Sarah Geiger. Ms. Pena stated that Penny was taken to the afternoon preschool classroom to wait. Ms. Pena also reported that this has happened previously.

On March 29, 2016, intact worker Paige Barrett documented that she interviewed Sarah's case manager [Iris Torres] at Delta Health Systems. The case manager reported that Sarah came to Delta to set up individual counseling, but Sarah did not mention family counseling. The case manager reported that Sarah had not been consistent about keeping her appointments. When intact worker asked if Sarah had requested a substance abuse assessment, anger management services and getting her medication prescriptions regularly the case manager reported that the intact worker would have to contact those individual departments to find out that information. Intact worker Barrett documented that she left a message for Freya Olmsted at Delta requesting a return call on March 30, 2016.

According to Delta Heath Systems records obtained by OIG investigators, Sarah Geiger attended a medication management appointment with Advanced Nurse Practitioner Freya Olmsted on March 30, 2016. According to the record, during the appointment Sarah Geiger rated her anxiety as 10 or more out of 10 and depression an 8 out of 10 (10 being the worst). At the appointment, Nurse Olmsted increased the dosage for Wellbutrin (for anxiety and depression) and added Buspar to Sarah's medication regimen. Also included in the records obtained by OIG investigators was a contact note written by Nurse Olmsted on June 3, 2016 (after the death of Penny Watson) regarding phone contact with intact worker Paige Barrett on March 31, 2016:

> . . . I discussed with her what happened with the children at the appointment on 3/30/16. How the young girl [Penny Watson] appeared to be afraid of the mother in response to the mother's grabbing her and how the mother was obnoxious and abrasive toward the children. Also discussed with the DCFS worker that Sarah was noncompliant with taking her medications and keeping her appointment with this provider.

There is no documented contact note in the intact family services record between Paige Barrett and Nurse Olmsted on March 31, 2016. However according to the service plan approved on April 1, 2016, intact worker Barrett documented the following regarding Sarah's *participation in recommended mental health treatment to address her bipolar diagnosis* and rated Sarah's progress as Unsatisfactory:

*Sarah has not been on time for appointments and has missed appointments. She was seen in December, February and March. She has made appts that keep her medicine compliant and has not run out this reporting period. Sarah is still wanting to switch providers and asking for Xanax. Prescribers will not give it to her. Today was her first counseling session with June Selock. She has not initiated family counseling. Diagnosis is Bipolar, Depressed and Cannabis Use. She tested positive for THC [marijuana] on 3/30/16.*

Four days after the death of Penny Watson, the Sequence K investigation was closed, and Sarah Geiger was indicated for #74-inadequate supervision. The rationale for the indicated finding stated that the babysitter reported that she had never met Oscar prior to picking him up from school the day that Sarah was arrested and was unprepared to care for Oscar and Penny following Sarah's arrest.

Allegation #79-medical neglect was unfounded against Sarah Geiger. The rationale for the finding stated that according to the cystic fibrosis clinic at Ksi Hospital, Penny was last seen on February 26, 2016 for a routine check-up and due to Penny's age, there was no way to determine if Penny had been receiving her treatments.

In an interview with OIG investigators, Area Administrator Wendy Irwin (previously child protection supervisor) stated that prior to the death of Penny Watson, she did not believe that the case would have been accepted for screening with the State's Attorney's Office. Ms. Irwin reported that following the death of Penny Watson, DCFS staff met with area judges regarding accepting these types of cases for rules of supervision when a case did not rise to the level of taking protective custody. In separate interviews, Wendy Irwin, Quinn Carlson and Paige Barrett reported that the judges in the local counties are now accepting the cases for orders of supervision.

**Death of Penny Watson**
In April 2016, Officer Lucas Terry from the City A Police Department contacted the DCFS hotline to report the death of Penny Watson. The hotline narrative stated the following:

*...Officer Terry says that an unknown doctor at Beta Medical Center pronounced Penny Watson dead due to homicide, at 3:21 PM today. Penny was going to turn 5 tomorrow. The mother's roommate (Hank Day, not related and not a boyfriend) said that he came home and saw Sarah in the living room sitting on top of her daughter Penny, with Sarah's hand over Penny's nose and mouth, saying that she is going to send Penny to Jesus. Penny wasn't breathing. Oscar (aged 8) was in the living room, watching all of this. The roommate [Hank Day] called 911 at 2:27 PM, within minutes of his arrival. Officer Vincent arrived first and had to fight Sarah in order to have access to Penny. The roommate helped Officer Vincent wrestle with Sarah and the roommate held Sarah to the ground while Officer Vincent carried Penny outside and started CPR. The roommate showed an officer text messages on Sarah's phone, in which she had written that she was going to take Oscar's life also. Sarah was suicidal and was trying to kill herself, so she was transported to Lambda Hospital, where she is now. The child's body is at Beta Medical Center...*

According to Beta Medical Center records, Penny Watson arrived at the hospital, "unresponsive, no obvious hematoma's or lacerations to head/scalp noted. Pupils fixed and dilated, petechia noted to eyelids and area around eyes." Upon arrival Penny was given multiple rounds of medication however Penny remained asystole throughout and was pronounced dead at 4:15pm.

Sarah Geiger was taken to Lambda Hospital on the day of Penny Watson's death accompanied by City A police officers. According to medical records upon admission Sarah displayed bizarre/paranoid behavior and was sexually inappropriate. Shortly after admission Sarah calmed down and was remorseful about her behavior and reported she was no longer suicidal. When staff tried to administer an injection of Haldol and Lorazepam, Sarah had to be placed in a 4-point restraint for the injection. The medical report State's that Sarah was cursing, making racial slurs and was sexually inappropriate.

A-30

PENNY WATSON

According to the Office of the Medical Examiners autopsy report Penny Watson's immediate cause of death was asphyxiation by suffocation and neck compression. The death was ruled a homicide.

The child protection investigation of the death was assigned to CPI Keith Walls. CPI Walls documented the following regarding a forensic interview of Oscar Watson at Mu Agency the day of Penny's death:

> He [Oscar Watson] stated he lives with his mom, sister, Penny and Hank. Oscar said if he lied he would burn in Hell Oscar reports- His mom was humping his sister Penny She had her hand over Penny's mouth (he demonstrated this) He said Penny was on the ground playing with her dolls, his mom "got on her", Penny was laying on her belly and his mom got on her laying the same way. He said his mom was on Penny's head, indicated her chest was on Penny's head. He said his mom's hand was on Penny's mouth and it was tight. Penny didn't make a "peep." and that "she was dead." Hank was not home when Hank got home, he called the police and was crying and talking to Oscar's mom. Oscar reported humping is having the "s" word. He stated it's like "when people suck that" and pointed to his genitalia. He reported during the incident his mom was naked and his sister was clothed.

Located in the child protection hard copy file was a letter authored by clinical psychologist Lewis York, Ph.D. and addressed to Assistant Public Defender Morgan Arzani. According to the letter Pursuant to a court order on December 14, 2016, Clinical Psychologist Lewis York, Ph.D. evaluated Sarah Geiger for the purpose of establishing an opinion as to her sanity at the time of the alleged offense on the day of Penny's death. Dr. York documented the following regarding his assessment of Sarah Geiger:

> ...Sarah Geiger is a 37-year-old, Caucasian, divorced female who is currently charged with First Degree Murder. It is alleged that Sarah Geiger killed her then four-year-old daughter. When Ms. Geiger was asked with what she had been charged, she cried, "My daughter. Had cystic fibrosis. I had to take care of her myself." She began sobbing, "My mom would help me, but DCFS said she couldn't. I trying to do better. My dad's mad. I working at Nu Company. I trying, I trying. DCFS got involved. I giving up. I called for help for my bills. My water being turned off. I would never have done that to my daughter. I love my daughter. Brave, the Disney cartoon was playing and my daughter was penetrated that that man gave me a one hitter. He didn't tell me. I told him that not weed. I puked and I passed out. I kinda remember. I put my head under the faucet. I in a trance state. I the stated I screaming Jesus help me. Kids came to me. I saying help me. I told them I had to leave. In my dream stated I told her she was born on April XX and she had no clothes on. I felt we were lost. If I did, I don't remember."

> ...While no specific delusional thinking could currently [at the time of the interview] be elicited in her thinking, she has been delusional in the past. The Child Death Investigative Task Force Investigative Report indicated that when Ms. Geiger was placed in the ambulance on the day of her daughter's death, she "kept saying that she wanted them to smother her, to cut her heart out and drink her blood. Geiger said something to Nia [ENT] about wanting her to eat her shit. He stated Geiger also kept talking about either an archangel or a dark angel." The police reports noted that in Ms. Geiger's [interview] on the day of Penny's death at 4:06pm she had stated that she suffocated Penny, God told her to do it, and that Penny was the cure for AIDS. When I had seen Ms. Geiger in April 2016, she stated that in the past she had thought she was "special." She had explained, "I felt God made me different than other people. Like what I do can change the world." Her thinking itself was neither loose nor tangential as she could logically and coherently respond to questions.

> ...Her affect was that of an agitated depression. She would often break into tears and wail that no one loved her. She lamented that she will feel worthless and abandoned. She would often lay her head down on the desk and make little eye contact. Ms. Geiger has an extremely low frustration tolerance level and will quickly decompensate when placed under even minimal stress. When she turns this anger inward, she becomes depressed and at times suicidal and self-mutilative. She spoke of how she has attempted suicide three or four times and will often think of "taking too many pills, jump off a bridge." Another time she spoke of how she had become so upset that she repeatedly beat her head against the wall and had to be hospitalized. When she turns this anger outward, she lashes out in rage. This would be consistent with her numerous threats to hurt others. Her June 12, 2015 hospital records from Beta Medical Center noted, "She has been getting out of control, anger and agitation, out of control. Like I said, broke some dishes." Her extremely low frustration

*tolerance level would be consistent with her behavior at the jail and her placements in the Quiet Room. Ms. Geiger had most recently been placed in the Quiet Room in early December 2016. When asked why, she cried, "Last week suicidal thoughts. I have nothing left! I need shock treatment." In addition, Ms. Geiger has had periods of extreme mood swings where she would bounce from depression to mania. During these periods of mania Ms. Geiger stated that she would go days without sleep and feel as if her thoughts were racing.*

*Ms. Geiger is a mentally ill substance abuser. She has repeatedly attempted to self-medicate with drugs as a means of dealing with her severe mood swings. When asked about her alcohol consumption, Ms. Geiger exclaimed, "I don't!" She did admit to a lengthy history of marijuana use. When asked about her marijuana use, she insisted, "Marijuana, but no more. When I had an abortion at 12, I smoked it before. I smoked bongs, joints. Smoked a lot-bongs, one hitters, joints."*

*She does have a lengthy history of mental health treatment. She spoke of how in first grade she had been diagnosed with Attention Deficit Hyperactivity Disorder and was placed on Ritalin. She continued that she continued this medication for a year. Ms. Geiger stated that she was first hospitalized at Omega when she was 12. She cried, "I was raped and someone gave me a coat hanger, drugged me, and gave me an abortion. I tried to kill myself. Well I didn't. I told them at Omega I wouldn't say who raped me. I went to Omega because I was bleeding. She continued that her next mental health treatment was at 13. She exclaimed, "My dad was abusive to me. When I was little, I said I going to kill him. I had a knife. I chased him and they locked me out. They gave me a 45-day evaluation at IYC City J. I got into trouble. I told them I was going to run away, stab someone, and steal their car. They kept me in 45 days. They put me on a lot of medicine. I can't remember." Ms. Geiger stated that after her time at IYC City J she was placed at Omicron, a therapeutic and educational residential facility in City H, MO. She stated that she stayed there "a month or two and went home." At 16 she stated that she was hospitalized at Alpha Center [Beta Medical Center] in City H, MO. She explained, "I was pregnant with my daughter. Me and my ex-husband [Troy Geiger]. We not married then. I got mad because he was mean so I tried to kill myself. They put me in Alpha. I was there about a week." Ms. Geiger continued that she has been hospitalized twice at Phi Hospital and "five to six times" at Alpha Center. She stated that she was last hospitalized in the fall of 2015. She continued, "I banged my head against the wall because I couldn't find my keys. I think I was there a week."*

*Ms. Geiger stated that she has been on psychotropic medication her "whole life. She complained that she had previously been on Buspar 7.5mg, Wellbutrin 150 mg twice a day and Geodon 20 mg and this medication "sent me into a manic phase." While at the jail Ms. Geiger is taking the following psychotropic medication- Haldol 5 mg and Ativan 2 mg twice a day. The diagnosis for Ms. Sarah Geiger based upon my evaluation to date would be the following: Bipolar I Disorder, Most Recent Episode Depressed; Cannabis Use Disorder in a Controlled Environment; Borderline Personality Disorder.*

*It would be my opinion that Ms. Sarah Geiger was suffering from a mental illness (Bipolar I Disorder, Most Recent Episode Depressed, Cannabis Use Disorder in Controlled Environment, and Borderline Personality Disorder) which substantially impaired her ability to appreciate the criminality of her conduct at the time of the alleged offense. She was acutely psychotic at the time of the alleged offense and was not taking her medication as prescribed. She has a lengthy history of mental health treatment with frequent relapses into psychosis. The police reports indicated that she was acutely psychotic when the ambulance came. She was speaking of how God had told her to kill Penny and how Penny was the cure for AIDS. She acted out on her delusions. Her mental illness was the major factor in her actions. Therefore, it is my opinion that Ms. Sarah Geiger was legally insane at the time of the alleged offense...*

According to County A Court records, on the day of Penny Watson's death, Sarah Geiger was arrested and charged with Murder. On June 29, 2017 Sarah Geiger was found not guilty by reason of insanity and remanded to the Department of Mental Health and Developmental Disabilities, where she remains as of August 2018.

On June 21, 2017, the child protection investigation was closed. Sarah Geiger was indicated for #1-death to Penny Watson; #60-Substantial Risk of Physical Injury to Reed Geiger and #10a- Substantial Risk of

A-32

Physical Injury/Environment Injurious to Health and Welfare – Incidents of Violence or Intimidation to Oscar Watson.

*Current Update of Oscar Watson and Reed Geiger*[26]

In April 2016, following the death of Penny Watson, DCFS was granted protective custody of Oscar Watson and Reed Geiger. Oscar Watson was placed with his nineteen-year-old sister, Valerie Geiger and her paramour Andy Bilal. Reed's father, Troy Geiger told DCFS workers that he was unable to care for Reed Geiger due to his substance abuse issues. Reed was then placed with his paternal grandmother, Gemma Pettis, where he remains as of August 2018. Reed's current permanency goal is substitute care pending independence.

On June 25, 2016, Oscar Watson was moved from the home of Andy Bilal and placed with Gemma Pettis, the paternal grandmother of Valerie, Reed, and Nicole Geiger. The move occurred following a hotline call on June 25, 2016, in which Valerie Geiger reported that Andy Bilal "destroyed everything in their trailer-ripped cabinets off the walls, broke windows, punched their tv, busted out their car windows, and put Val's shoes in the toilet and peed on them." Valerie and her infant son also moved in with Gemma Pettis, following the incident, to help with Oscar Watson. Oscar was later placed with Piper Curtis, a former teacher of Oscar Watson, from November 2016 to July 2017. Oscar moved to a traditional licensed foster home in July 2017.

Also following Penny Watson's death, Oscar's biological father whom was living in another state at the time of the death began cooperating with DCFS to gain custody of his son Oscar Watson. Zach Watson moved to City A, IL to expedite the return home and on June 4, 2018 Oscar was placed with his biological father, Zach Watson.

## ANALYSIS

In 2008, the Legislature required the Inspector General's Office to develop Error Reduction Plans to remedy patterns of errors or practice that compromise child safety. In 2011, the OIG analyzed hundreds of cases and outcomes as part of an Error Reduction Plan. The analysis determined that when multiple critical risk factors were present in a single case - danger to children was greatly increased. The following critical risk factors were identified:

- Serious mental health that impacted parenting;
- Domestic violence;
- Significant substance abuse that affected parenting;
- Multiple instances of Police involvement.

Few families in our system present with all the above noted risk factors. The Geiger-Watson family did. Despite the numerous investigators and intact family services staff, as well as their respective supervisors with many years of experience, the Department failed this family. This family required a heightened level of attention, and it should have been apparent that there was an urgency to involve the court to compel compliance and monitor progress with services. Sarah Geiger was investigated 15 times prior to the death of Penny Watson. Six of the investigations were initiated in a span of five months while an intact case was pending.

At the time, the Geiger-Watson family was referred for intact family services, child protection staff had knowledge of the following issues regarding Sarah Geiger:

---

[26] According to County B Court records, Diana Geiger (Troy Geiger's ex-wife) was appointed guardian of Nicole Geiger on September 14, 2015.

- Sarah Geiger had been receiving SSI due to a mental health diagnosis for approximately 13 years;
- Sarah Geiger had 2 psychiatric hospitalizations in the previous 4 months due to suicidal ideation;
- Sarah Geiger admitted to hospital staff that she had not been giving Penny her treatments for cystic fibrosis because she was overwhelmed and had not bought groceries in 3 months because she had been buying marijuana;
- Troy Geiger told CPI that he obtained full custody of Valerie, Reed, and Nicole when they were younger because Sarah Geiger "went nuts" and Sarah was only allowed supervised contact their children when they were young.
- Police reports detailing how Sarah becomes violent during manic episodes, such as when she battered her 18-year old daughter and was arrested and charged with Domestic Battery.

The family was referred to a DCFS high risk intact family services worker, but a clear plan of how to address all the obstacles facing the Geiger-Watson family was never fully developed. A case with such high risk should have had a concurrent plan for providing necessary services, monitoring progress in those services and then how and when it might have been necessary to go to court for additional intervention and oversight if there was a failure to address multiple risk factors.

In fact, when the field determined that Ms. Geiger failed to demonstrate any meaningful change during the intact service case, DCFS intact staff were ready to close out the high-risk case because no progress was being made. This decision was being made without consulting with or alerting DCFS legal staff or the State's Attorney's Office. It is important to note, that under the current intact outcome measures, such a decision could be coded as a 'successful closure.'

*Inadequate Mental Health Assessment*

While Sarah's ability to parent was a question throughout her involvement with the Department, neither investigators nor intact family service workers ensured that her ability to parent was assessed. Following Sarah Geiger's arrest for battering her eighteen-year old daughter, during the C-sequence investigation, the field appeared to place some reliance on Sarah's walk-in assessment at Beta, which was cursory and unrelated to parenting capacity.

Gathering information is critical to any assessment of child safety when the parent has significant mental health issues. Sarah Geiger was enrolled in a medication management program at Delta Health Systems and both investigators and intact workers had a consent signed by Sarah Geiger releasing the "Diagnosis, Prognosis and Hx [History]" from Delta Health Systems but still failed to gather critical information concerning her lack of medication compliance. Procedures 300.50(c)(6)(d)[27], *Obtaining Any Mental Health Records of Parents/Caregivers* State's that:

> *During initial contact with parents/caregivers who are listed as subjects of the report, the Child Protection Specialist shall ask the parents/caregivers about their overall mental health, current and previous medications to treat mental health issues (type, dosage, prescribing doctor, reason, medication compliance, etc.), prior mental health-related hospitalizations (when, where, reason, length of time, etc.), currently involved mental health professionals (name, contact information, last visit, etc.), compliance with treatment and support systems. The Child Protection Specialist shall refer to the* **CFS 440-12, Investigation/Intact Parental Mental Health Case Matrix [See Attachment],** *during the interview as a guide to types of information to be obtained regarding the parents/caregivers' mental health. All information obtained from the parents/caregivers shall be documented in a contact note. When a parent/caregiver discloses, or*

---

[27] In September 2011, policy guide 2011.07, Obtaining Records of Parents with Mental Illness was issued directing the requirements outlined in Procedures 300.50(c)(6)(d), *Obtaining Any Mental Health Records of Parents/Caregivers* and Procedures 300.130(c), *Processing the IFS Referral* which were incorporated into procedures in October 2015.

A-34

PENNY WATSON

*information suggests, that he/she or the other parent/caregiver has a known or suspected mental health issue (including treatment and/or hospitalization), the Child Protection Specialist shall ask the affected parent/caregiver to sign a **CFS 600-3, Consent for Release of Information** authorizing the Child Protection Specialist to obtain his/her mental health records from the identified hospitals, physicians and therapists. If a parent or caregiver refuses to sign a **CFS 600-3**, the Child Protection Specialist shall request an Administrative Subpoena or send a HIPPA Letter (**CFS 600-5, Request for Records**) for these records within **two business days** of the refusal…. Requests for mental health records shall be made within **2 business days** after initial contact with the affected family member whether by a signed **CFS 600-3** or Administrative Subpoena. Upon receipt, records must be reviewed and assessed for any actions needed to ensure safety. Investigations **shall not be approved and closed** until all formal requests for mental health records have been made and the requested or subpoenaed records received and reviewed.*

Although, consents for release of information were signed by Sarah Geiger, neither complete historical nor current mental health information of Sarah Geiger was sought or obtained in any of the child protection investigations. In addition, Procedures 300.130 (c)(2)(B), *Subpoena of Mental Health Records* State's the following:

*At the case hand-off meeting, the Child Protection Specialist shall share all parent/caregiver mental health information and records with the IFS specialist. If mental health records are received by the Child Protection Specialist after the case hand-off meeting, a conference including the Child Protection and IFS Supervisors shall occur immediately to address safety and risk implications noted in subpoenaed records and required protective action, up to and including involvement of juvenile court. The Child Protection Supervisor shall note in a supervisory note if any specific safety decisions were shared with the IFS Supervisor. During the case hand-off meeting, the Child Protection and IFS Supervisors shall use the **CFS 440-12 Investigation/Intact Parental Mental Health Case Matrix** to determine urgent service planning needs for the family. The supervisors shall document, in the investigation and IFS files, the topics on the Matrix checklist reviewed at the meeting, as well as any other relevant topics not listed in the Matrix.*

Located in the Investigations section of the intact family services hard copy file were police records from the City A Police Department, as well as two signed consents, one for Beta Medical Center, and another for Delta Health Systems, both signed by Sarah Geiger and the child protection investigator. However, there were no mental health records located in the file nor was use of the Parental Mental Health Matrix documented by child protection or intact family services staff or their supervisors. The matrix would have assisted the investigator in obtaining a full mental health history, which ultimately could have expedited the delivery of services to the family.

Another tool available to intact family services staff that was not utilized was the CFS 968-90, *Questions for Mental Health Professionals.* Procedures 302.388(h)(2), *Assessments to Develop the Family Service Plan,* requires intact family services workers to utilize the form prior to completing the Initial Family Service Plan. The form would have assisted in the development of an informed service plan.

Although, Procedures 300 does not require investigators to utilize the CFS 968-90 form, 4-months after the intact case was opened CPI Victoria Huisel faxed the form to Delta Health Systems. CPI Huisel received the completed CFS 968-90 via fax from Sarah Geiger's nurse practitioner who prescribed Sarah Geiger's psychotropic medications. The completed questionnaire revealed that Sarah was non-compliant with her medication. The nurse also documented that "Sarah's symptoms may place her children at an increase of maltreatment." The form was in the hardcopy documents to the H-sequence investigation, as well as in the intact family services hard copy file. Despite the nurse practitioner's concerns and three pending child protection investigations, there was no follow-up or action taken by child protection or intact family services workers after receiving the information from Delta.

*Ineffective Intact Family Services*

From the onset, the intact family services case proceeded without a clear plan to gather information or monitor Sarah Geiger's medication compliance, a critical component of helping this family. The Watson-Geiger family had significant barriers to achieving stability, on a short or long-term basis. There is no indication that intact services ever developed a cohesive plan of what was needed or expected for Sarah to function as a parent, and what long term supports she would need to have in place.

On a short-term basis, intact workers ignored Sarah's significant challenges and serviced the case by telling Sarah what services she needed to set up for herself. Sarah needed far more proactive services. Procedures 302.388(g) *Responsibilities of the Assigned Intact Family Service Worker* State's that the Intact Family Services Worker:

> *...is expected to be the agent of change and is expected to utilize services to address specific problems identified in the Family Service Plan. The Intact Family Services Worker's responsibilities include effective family engagement; direct crisis intervention and problem resolution; parenting training with individual parents and their children present; Advocacy with other governmental, medical and community systems; risk monitoring/management; and actively managing and coordinating supportive services.*

Week after week the intact worker went to the Geiger-Watson home, observed the children, and repeatedly asked Sarah Geiger if she had scheduled her appointments for individual therapy, family therapy, and a substance abuse assessment. Even after the Kappa Agency worker assisted Sarah Geiger in scheduling appointments at Delta, the intact worker failed to be proactive in ensuring Sarah Geiger attended the appointment on the scheduled day. The intact worker was aware that Sarah Geiger often had issues with transportation. Providing this service could have ensured Sarah Geiger's enrollment in services.

Another example of the failure to be more proactive, occurred when after talking to Oscar's medication prescriber in October 2015, the intact worker Barrett learned that Oscar had not been seen in almost two months and was out of ADHD medication. There are no documented attempts to ensure that Oscar received his medication. Despite school staff reporting that Oscar needed the medication to focus at school, intact worker Barrett took no action to ensure this was addressed. Intact worker Barrett needed to be more involved in ensuring that Sarah was following up with appointments for herself and her family. Similarly, Penny and Oscar telling mandated reporters that they were afraid was not followed up on by intact workers.

While the intact family services case was opened, there were 6 child protection investigations, as a result of 9 calls to the hotline in a 4 ½ month time period. At the time of the first hotline call, the intact case had been open for three months, and Sarah Geiger had not followed through on any of the service referrals made to address the mental health needs of the family. Despite Sarah Geiger's non-compliance with services and continued numerous calls to the hotline, intact staff intended on closing the case.

*Failure to communicate effectively with Delta Health Systems*

It took intact worker Barrett two months of leaving phone messages with Delta staff at the City K location before she received a return call. The Department should work with Delta to establish a system or liaison at Delta that could help expedite information sharing in these difficult cases. Department staff should also discuss what information would be helpful when Child protection staff or intact workers request records.

*Minimizing the impact of Marijuana Use*

There is a common perception that alcohol and marijuana are benign drugs and the occasional use of marijuana is not problematic. While that may be true in some circumstances, there is growing research that this is not as true for a person with severe mental illness. It has been established that persons with

A-36

schizophrenia have an increased risk for an episode of psychosis when using marijuana[28] and a 2007 study found that marijuana use for persons with bipolar disorder or depression was associated with longer periods of affective (mood) episodes and rapid cycling.[29] A 2014 systemic review and meta-analysis concluded "…that cannabis use may worsen the occurrence of manic symptoms in those diagnosed with bipolar disorder, and may also act as a causal risk factor in the incidence of manic symptoms. This underscores the importance of discouraging cannabis use among youth and those with bipolar disorder to help prevent chronic psychiatric morbidity."[30] In this case it was apparent that Sarah Geiger's habitual use of marijuana was discounted.

## RECOMMENDATIONS

Mental Illness and Substance Use Disorder

1. Whenever serious mental illness raises questions about parenting capacity a parenting capacity assessment must be completed. This should be addressed through training and development of resources.

2. Child Protection staff should be required to utilize the CFS 968-90, *Questions for Mental Health Professionals* form when interviewing mental health professionals regarding an alleged perpetrator.

Subsequent Oral Reports

3. If a subsequent oral report (SOR) of abuse and/or neglect is received on an open Intact Family Services case, the Child Protection Investigator and supervisor, as well as, the Intact Family services caseworker and supervisor should discuss and document in SACWIS, the case within 2 days of the SOR, and ensure a method of maintaining ongoing communication is established as required by current procedure, which should include attendance at all Child and Family Team Meetings.

4. With 3 or more investigations involving the same family, a management review should be conducted to determine if there is a need for court intervention (also recommended in OIG Report #17-2911).

Intact Family Services

5. Each intact family services case should have a written concurrent plan to identify factors that are critical to ensuring child safety and minimizing risk, and if there is a change in circumstances when court intervention may be necessary.

6. The Department should consider adding an alternative on the Child Endangerment Risk Assessment (CERAP) to allow a finding of "conditionally safe" – identifying factors where if there is a change in circumstances court intervention may be warranted.

7. To avoid the over reliance on a caregiver's self-report in intact family service cases, Procedures 302.388(i)(5) *Evaluating Family Progress*, should be amended to require that intact family

---

[28] Moore T., Zammit S., Lingford-Hughes A., Barnes T., Jones P.B., Burke M., Lewis G. Cannabis use and risk of psychotic or affective mental health outcomes: A systematic review. Lancet 2007; 370: 319–28.

[29] Strakowlsi S., DelBello, M., Fleck, D, Caleb, A, Anthenelli, R, Keck, P., Arnold, L., Amicone, J. Effects of Co-ocurring Cannabis Use Disorders on the Course of Bipolar Disorder After a First Hospitalization for Mania. Archives of General Psychiatry 2007; 64: 57-64.

[30] Gibbs, M., Winsper, C., Marwaha, S., Gilbert, E., Broome, M., & Singh, S. (2015). Cannabis Use and Mania Symptoms: A Systematic Review and Meta-analysis. *Journal of Affective Disorders, 171*, 39-47.

service workers contact service providers at a minimum monthly to assess the level of the family member's engagement with services and the progress of the family on tasks of the Family Service Plan.

Court Involvement

8.  Intact family services workers should refer to DCFS Office of Legal Services those intact cases with parenting non-compliance over time, risk to children and when the State's attorney's Office has declined to file a petition (see OIG recommendation 09-1028).

9.  DCFS Legal must track cases not accepted for filing of a petition in Juvenile Court. The Department should identify a single contact person to work with each State's Attorney's office and consider whether to advocate further or file a petition themselves.

10. DCFS regional counsel should meet quarterly with local State's Attorney's and other relevant professionals to address any issues regarding the filing of petitions for court involvement.

Delta Health Systems

11. The Area Administrator should meet with Delta Health Systems in City K to develop a system and/or identify a liaison at Delta to expedite information sharing.

A-38

Attachment: CFS 440-12, *Investigation/Intact Parental Mental Health Case Matrix*

State of Illinois
Department of Children and Family Services

**Investigation/Intact Parental Mental Health Case Matrix**

| Mental Health Records | Medication | Support System |
|---|---|---|
| **Investigation shall not be closed until all records are received!**<br><br>Has DCP obtained records? ☐ Yes ☐ No<br><br>Subpoenas sent? ☐ Yes ☐ No<br>    (list to whom sent and date received; if no, explain)<br><br>Consents obtained from:    (name/relationship to child) | **(Get consents signed before or at hand-off)**<br><br>Prescribing physician:    (Note if primary care physician, physician's assistant, psychiatrist, Ob/Gyn, etc.)<br><br>How long seeing physician? | **(Get consents signed before or at hand-off)**<br><br>Extended family members:<br>(names/nature of contact- frequent or isolated)<br><br>Alternate care providers? |
| **Inpatient Hospitalizations (last five years)**<br><br>**(Include name of hospital and dates of stays)** | **Prescription Medication**<br>**(Include name, dosage and reason)**<br><br>Current prescriptions:<br><br>Past Prescriptions: | **Collaterals**<br><br>Child centered:<br><br>Others: |
| **Outpatient Records Obtained**<br><br>**(Include name and contact information)**<br>Psychiatrist/prescribing physician:<br><br>Therapist/counselor:<br><br>Community mental health center:<br><br>Social Service Agency: | **Compliance**<br><br>☐ Reported compliance (self)<br><br>☐ Reported compliance (professional)<br><br>☐ Reported compliance (family/collateral)<br><br>☐ Drug/alcohol use:    (explain) | **Involved Professionals besides mental health**<br><br>**(Get consents signed before or at hand-off)**<br><br>☐ Daycare/Schools<br><br>☐ Pediatrician/family doctor<br><br>☐ Early intervention services<br><br>☐ Community Services |

A-39

# APPENDIX B

## OFFICE OF THE INSPECTOR GENERAL
### Department of Children and Family Services

### REDACTED REPORT

*This report is being released by the Office of the Inspector General for teaching/training purposes. To ensure the confidentiality of all persons and service providers involved in the case, identifying information has been changed. All names, except those of professional references, are fictitious.*

**File No:**   19-IG-0548

**Subject:**   **Jaylyn Dash (DOB 9/1982)**
**Children:**   **Keanu Erickson (DOB 2/2004 DOD 8/2018)**
**Logan Erickson (DOB 4/2005, DOD 8/2018)**
**Mikah Joiner (DOB 2/2013, DOD 8/2018)**
**Nikola Erickson (DOB 6/2007, DOD 8/2018)**
**Olivia Ingram (DOB 5/2018, DOD 8/2018)**
**Paxton Fowler (DOB 4/2002, DOD 8/2018)**
**Quincy Galloway (DOB 3/2004, DOD 8/2018)**
**Raelynn Dash (DOB 3/2013, DOD 8/2018)**
**Sawyer Hawkins (DOB 5/2008, DOD 8/2018)**
**Tessa Dash (DOB 7/2015, DOD 8/2018)**

## SUMMARY OF COMPLAINT

In August 2018[1,] eight children perished in a house fire in City A occurring in the pre-dawn hours: Olivia Ingram, Raelynn Dash, Logan Erickson, Nikola Erickson, Mikah Joiner, Sawyer Hawkins, Tessa Dash, and Paxton Fowler. The children were reportedly left without adult supervision and the home had no working smoke detectors when the fire broke out. The following day, Keanu Erickson died of injuries sustained in the fire. Two days after the fire, Quincy Galloway, also died of injuries sustained in the fire.

Savannah Patel, mother of three children that perished in the fire, had no contact with the Illinois Department of Children and Family Services (DCFS). Wendy Lowery, mother of one child, had one unfounded child protection investigation in 2002 for inadequate supervision.[2] Allison Mayer,[3] mother of one of the children who died in the fire, had one unfounded investigation in 2007 for medical neglect.[4] Jaylyn Dash, birth mother of five children that perished in the fire had 21 unfounded and one indicated

---

[1] 911 phone call came in 3:57 a.m.
[2] Wendy Lowery is related to Brent Ingram, the father of Jaylyn Dash's youngest children.
[3] Allison Mayer is Jaylyn Dash's sister.
[4] Allison Mayer is Jaylyn Dash's sister; Allison Mayer's son Quincy, lived mainly with his father. Quincy was visiting his cousins the night of the fire.

child protection investigations between July 2004 and May 2018. Jaylyn Dash was a former a youth in care from 1988 to 1994.

Upon being notified of the deaths, Inspector General (IG) investigators conducted searches in SACWIS to review any prior history. At the time the children's deaths were reported, not all of the prior child protection investigations involving Jaylyn Dash were linked to Jaylyn Dash's SACWIS identification. Some reports were found when a person search was conducted for Jaylyn Dash's son Keanu. SCR staff corrected the data entry errors and linked all of the reports to Jaylyn Dash. Most of the investigations had been expunged in accordance with the record retention requirements. Prior to August 2017, any information on investigations that had been expunged (whether indicated or unfounded) would not have been available to child protection workers (CPI) when conducting a person search. In August 2017, the Department made available to CPIs a family's historical information detailing SCR numbers, dates, call narratives, subjects and allegations of investigations as a record of contact with DCFS. The investigation, if expunged, is not available and if indicated the perpetrators name is starred out. As of January 1, 2019, the Department must keep unfounded investigations for five years.

IG investigators reviewed the prior investigations and child welfare services referrals.

**Background**
Jaylyn Dash has ten children:[5]
Iris Dash (DOB 5/2019)- (placed with paternal grandmother)
Olivia Ingram (DOB 5/2018) – *deceased*
Celine Ingram (DOB 7/2016) (placed with paternal grandmother)
Mikah Joiner (DOB 2/21/2013) -*deceased*
Nikola Erickson (DOB 6/13/2007)- *deceased*
Logan Erickson (DOB 4/11/2005)- *deceased*
Keanu Erickson (DOB 2/27/2004) – *deceased*
Dayton Erickson (DOB 10/2002) (lives with his adult sister Elise)
Ford Erickson (DOB 11/2000) (lives with his girlfriend and their child)
Elise Erickson (DOB 9/1998) (living independently at the time of the deaths)

DCFS never had contact with Elise Erickson's father. Hank Erickson is the father of Ford, Dayton, Keanu, Logan, and Nikola. Brent Ingram is the father of Celine, Olivia and Iris. During the child protection investigation subsequent to Iris' birth, Brent Ingram reported he and Jaylyn Dash had been separated for six months.

Once all of the investigations were linked in SACWIS to Jaylyn Dash, a clear record of the family's involvement with DCFS emerged. Jaylyn Dash was investigated for allegations of neglect 21 different times; the death investigation became her 22nd investigation.

On May 23, 2019, the mother was indicated for death by neglect on her children who died in the fire. The rationale stated:

> *Based on the list of evidence Jaylyn stated that she left her apartment about 11 pm and [sic] to go to paternal grandmother's home to drop off Celine during night where there was a block party and was heading home when she received call from family about fire, Fire occurred at about 4 am, Jaylyn stated she left the children with no adult caretaker when she left at 11 pm, Jaylyn stated she is the only person living in household, Other adults reported stated [sic] that Jaylyn lived alone in*

---

[5] During the course of the investigation IG investigators found out that Jaylyn Dash was pregnant and due to give birth in June 2019. IG investigators informed the child protection investigator assigned to the death investigation.

JAYLYN DASH

*her apartment with her children, and Joy, paternal grandmother, stated that Jaylyn arrived to her home at night to drop off Celine (her granddaughter) and did not leave as she was talking to people from block party even after block party ended at 11:30 pm, and Fire Marshall on scene stated he was on scene when the incident occurred and there were no adults in the home when the fire occurred at 4 am therefore there is sufficient evidence for death by neglect in which child was place [sic] at a real, significant, and imminent risk of likely harm due to Jaylyn leaving child with other children alone between hours of 11 pm to 4 am, which is up to 5 hours without care or support, including supervision. There were also 4 other children, ages ranging from 3 month to 5 y/o, who were in fire and are deceased due to her not being home and unaware they were brought over after her departure from home at 11 pm. Jaylyn's blatant neglect and did not take precautionary measures to prevent or mitigate the risk of any likely harm to the child.*

In July 2019, subsequent investigation was opened alleging of risk of harm to Jaylyn Dash's children Iris and Celine. The Department took protective custody of both children placing them in the care of the paternal grandparents.

**FINDINGS**

Jaylyn Dash was overwhelmed with the demands of a special need's child, rebellious adolescent boys and the stresses of poverty. When viewed together, the 22-child abuse and neglect reports showed a pattern of unstable housing, possible inadequate supervision, and chronic child neglect. As school, behavioral health, and community records indicated, the chronic neglect led to adolescent boys who were struggling with behaviors, frustration, and possible violence. Jaylyn Dash did not follow up on service referrals for herself or her children. The surrounding community, including schools and law enforcement, were woefully aware of this family's struggles and made reports to DCFS to intervene and help, these calls for help were not successful. Had all information been linked to Jaylyn Dash, the family history alone could have provided investigative staff the information to better identify trends and understand the family in order to successfully intervene.

**INVESTIGATION**

According to the investigations eventually linked under Jaylyn Dash's name, her children's involvement with child protection investigations began in 2004. At the time of the first investigation, Jaylyn Dash had five-year-old Elise, three-year-old Ford, one-year-old Dayton and five-month old Keanu. IG investigators were able to obtain copies of some of the expunged investigations.

*Child Protection Investigations 2004*
*July 2004 (SCR# 1 A)*
An anonymous reporter alleged that Jaylyn Dash gave her children (five-year-old Elise, three-year-old Ford, one-year-old Dayton, and five-month-old Keanu) beer and marijuana to make them sleep. The reporter also alleged that Jaylyn Dash left the children unsupervised. The report was taken for investigation of substance misuse on the mother, the father and a babysitter whose name has been expunged from the SACWIS record. During the investigation, the verbal children denied ever receiving drugs or alcohol. The primary care physician, who saw the children at least quarterly, reported no concerns about the children or the parents. The father reported that he had to take random urine drops for his job and did not use drugs. The parents felt the landlord was trying to build a case to evict them. The investigation was unfounded at the initial stage, nine days after it began. [6]

---

[6] An investigation can be unfounded in the initial stage (within 14 days), if the CPI determines that the report is not a good faith report of alleged child abuse or neglect. According to Procedure 300, supervisory and management approval is needed.

*August 2004 (SCR# 2 A)*

Less than a month later, a community member reported that Jaylyn Dash did not supervise her children. The reporter said there were always at least four children, usually more, running about without an adult around. The reporter said a four-year-old was nearly hit by a car and police had been out to the home multiple times. The reporter did not have first-hand knowledge of the incidents. The CPI spoke with Elise, who reported that her mother was always with her and her brothers when they went outside. A collateral contact reported the mother adequately supervised the children. The investigation for inadequate supervision was unfounded at the initial stage.

*December 2004 (SCR# 3 A)*

Jaylyn Dash and Hank Erickson (the father of Ford, Dayton and Keanu), were investigated for risk of harm, inadequate supervision, inadequate shelter and environmental neglect after it was reported that the home was filthy, with trash, rotten food, rats and cockroaches throughout, broken windows and no heat. The reporter added that the mother allows relatives to stay at the home, and at times there were over fifty people there. The reporter also said the mother hit the children with a belt and pushed an eight-year old girl through a wall. The investigator visited the home, finding disarray, a few roaches and a broken window. The mother reported that she was amid packing as they were moving in the coming days. She explained the window had been broken by the landlord, who was pushing them to move, when the mother refused to let him in.

The CPI observed the children to be healthy. Elise told the CPI she knew what it meant to get drunk and her parents did not do that. Elise reported she was disciplined by being sent to her room. She denied that her parents hit her or her brothers. She explained that her mother usually cleaned but her mother had been packing so they could move to a new apartment.

The investigator located the landlord, who complained that the family stopped paying rent, the home was dirty, and the children were unsupervised. Three days later the investigator met with the family in their new apartment. The maternal aunt was babysitting; she reported being with the family a couple times a week and not having concerns. The father reported that he had stopped paying rent at the old apartment because of an unaddressed roach infestation. The father said he needed to save money to put down a security deposit on the new place. The investigation was unfounded in the initial stage.

<u>Child Protection Investigations 2005</u>

*October 2005 (SCR# 4 A)*

An anonymous reporter shared that the family moved to the area about a month earlier. Jaylyn Dash's children were seen playing in a construction area, climbing up and down scaffolding, playing on the roof top of a garage and running in the street. The report was taken for investigation of inadequate supervision.

The CPI found that the parents and their five children (Elise age 7, Ford age 4, Dayton age 3, Keanu age 1 and Logan age six months), were living in a small two-bedroom apartment with the mother's sister, Kaylie Mayer and her three children (ages 2, 4, and 6 years old).

The landlord told the investigator that there were too many people living together and he told them they needed to leave. The landlord shared that there were almost always children playing in the front, some playing in the back and the older boys often walking to the corner store on their own.

During the investigation the verbal children, the mother, and the maternal aunt denied that the children were ever left unsupervised, but because there are so many people in a small apartment, the children are often outside. The mother explained that they had been looking for a new apartment but did not have enough money for a security deposit and first month's rent. Jaylyn Dash explained that her sister, Kaylie Mayer, had some developmental delays and needed help with her children. Jaylyn Dash agreed not to allow the children outside alone.

B-4

JAYLYN DASH

The investigator opened a preventative services case for nine days. Norman Funds were secured, and the family found a three-bedroom apartment with more living space. The investigator saw the apartment before closing the case. The case was unfounded, with the supervisor noting the family's economic problems.

_Child Protection Investigations 2006_
_April 2006 (SCR# 5 A)_
An anonymous reporter stated that the apartment building was taken over by teen gang members and the environment is unsafe. The caller reported seeing a five-year-old boy outside, unsupervised all night and broken widows with glass all around. Neighbors were afraid to contact police because gang members had threatened them if they did so.

The CPI went to the building, speaking first with a neighbor who reported that a couple with five children moved in about a month earlier and there was at least one broken window in the family's apartment. The CPI went to the family's apartment. Elise opened the door, and reported her uncle was caring for them. The paternal uncle reported that the parents were not home and would not allow the investigator into the home. The CPI was able to observe a mattress on the dining room floor as the uncle stood in the doorway.

The investigator returned and met with the mother. The CPI observed the apartment to be sparsely furnished but clean. The broken window had been fixed. The children appeared healthy. Jaylyn Dash reported that she, her husband, her brother, and five children moved in about a month earlier. She said the building was known to have gang members living there, and had police activity before she and the other tenant moved in. She explained that she was a stay at home mother, and her children were never unsupervised. She said her son Logan had a seizure disorder and was prescribed an anti-epileptic. She explained the broken window was an accident and the landlord fixed it quickly. The father also denied the children were ever left outside unsupervised. The CPI also spoke with verbal children, Elise and Ford, who corroborated the parent's reports.

The CPI spoke with an area police officer who reported that the parents had recently moved in under an alias and the owner wanted them out. The officer said Jaylyn Dash's siblings were involved with drugs, her mother was currently in jail, several family members moved in and out, and usually there were several of them hanging around outside the building. He said Jaylyn Dash was always outside with the children.

The CPI spoke with Elise's teacher who reported that Elise had excessive absences, including being out at least a week for head lice. She understood this had been an issue at her previous school as well. They had attempted to speak with Jaylyn Dash, but she did not answer calls or respond to messages. The teacher said Elise was smart, but she was often gone and never did homework. Elise was sometimes a little disheveled when she came to school but did not show overt signs of abuse or neglect. The teacher did not know if the family had been referred for truancy.

The CPI spoke with the family doctor who reported that the mother kept up on all of Logan's care and medication as well as the other children's well child visits.

The investigation was unfounded. It was coded as a referral to community-based services, though the investigator noted in the waived contacts that a preventative services case was opened in 2005 for provision of Norman Funds.

_May 2006, SCR# 6-A_
While the April investigation (SCR# 5 A) was pending, an anonymous caller reported seeing Jaylyn Dash hit a five-year-old boy with the back of her hand, and leave her children unsupervised, playing on roof tops.

The yard was full of garbage bags because the family threw the bags out from a back window. The reporter said there were lots of people coming and going, and the reporter believed they were gang involved.

The CPI went to the home and met with Jaylyn Dash and the children. The CPI observed Logan to have some developmental delays and observed Keanu healthy. Elise told the CPI that she did not go to school that day, but the reason was not clear. Elise reported that for discipline, her parents spoke to her or sent her to her room. Three-year-old Dayton had some scratches which he told the CPI were from Keanu. Five-year-old Ford said his mother sometimes hit his arm but mainly threatened to hit him and didn't. The CPI did not observe injuries. Jaylyn Dash told the CPI she was outside cleaning bottles and glass that day, she denied hitting or yelling at any of her children. She shared that earlier that day a group of children broke into the house next door and the lady two doors down called the police. She added that there were often children playing in front of her building and people believed that they belong to her. The mother denied having any issues with substance use, mental illness or domestic violence. Jaylyn Dash shared that she had a pending report with another investigator.

A second investigator came to the home a few days later. The CPI met with Jaylyn Dash and observed the children with the exception of Elise who was at school. The father was reportedly at work. The investigator pointed out that anonymous calls had come into the hotline. The mother opined that the reports were false and new neighbors did not like her. The CPI told her the investigation would be closed out in the initial stage.

*Child Protection Investigations 2007*
*July 2007, SCR# 7-A*
About a year later, an anonymous reporter alleged Jaylyn Dash's children were outside unsupervised for hours and had to beg their mother for food. The reporter alleged that the father used cocaine and marijuana. The prior investigations were not maintained on SACWIS at that time. The 2005 preventative services case was noted.

The CPI visited the home noting concerns with cleanliness and a need for a smoke detector. After completing a Home Safety Checklist, the CPI noted determined the home met minimal standards. The family agreed to get the smoke detector and clean. The CPI observed all the children and interviewed the verbal children. The baby Nikola appeared healthy. Dayton was noted to be a happy child, with dirty feet. The mother reported that he was starting pre-kindergarten in the fall. Elise reported that they have lots of food, they never have to beg their mother, and they were never left alone. Ford gave a similar report. Keanu did not speak much but appeared healthy. Logan had a seizure while the CPI was at the home. The investigator observed both parents taking care of Logan. The mother explained that the seizures lasted 1-2 minutes and Logan took phenobarbital twice a day.

The mother denied the allegations; she reported her children were always supervised and always had food. She denied any drug use in the home. The father also denied the allegations. A relative collateral contact, the paternal uncle, did not report concerns. The children's physician reported that the children were up to date with medical care. He reported Logan was receiving in home developmental, physical and occupational therapy. At one point the mother stopped giving Logan the medication but started again when he had seizures without it. The CPI noted that the doctor did not have any concerns. The investigation was unfounded.

*Child Protection Investigations 2008*
*March 2008, SCR# 8 A*
Eight months later an anonymous caller reported that the home was filthy with feces, dirty toilet paper and feminine products all over. The younger children's dirty diapers were not being changed, three women were seen using drugs (marijuana and crack cocaine) in the living room and two teens were having sex in a room

with the door open. The reporter shared that there were multiple children in the home, but it was unclear how many lived there. The reporter suspected the family was involved with a specific gang.

An investigator visited the home the morning after the call came in. The CPI observed the home to be sparsely furnished with some trash on the floor, but otherwise okay without the presence of feces. She noted the home lacked a smoke detector. Some food was observed. The mother told the CPI she had just received her food stamps and would be grocery shopping the next day. The CPI noted holes in the wall which the mother reported was from plumbers working on the pipes, and the bathroom door was off the hinges. The four younger children were at home, the two older ones in school. The younger children were noted to appear clean and healthy. The CPI also observed Jaylyn Dash's two-year-old niece in the home.

Jaylyn Dash reported that she, her husband, her six children, her sister Regina, her two-year-old niece, her father and her brother all lived in the home. She explained that her large extended family visited often and sometimes stayed the night. Jaylyn Dash denied allowing teens to have sex in her home and denied any drug usage in the home. The mother showed the CPI Logan's Early Intervention assessment indicating he was receiving weekly services through Counseling Center A.

The CPI interviewed the other adults in the home at the time of the visit. A family friend, Savannah Patel, reported that she visited the home daily. She said she had never seen anyone using drugs in the home. She reported that Jaylyn Dash had a large family so there were often visiting relatives. The mother did sometimes run low on food, but the family helped. A maternal uncle, Teddy, reported that he had just been released from jail, and that was why he was staying there. He said they had a large, close family who visited often. He reported he helped clean when the house got dirty. Regina reiterated the friend's and her brother's reports and denied that there was any drug use in the home. The CPI noted that Regina was cleaning while talking to the CPI. The CPI asked about the maternal grandmother, who Regina said was in jail for selling drugs. Maternal uncle Vince touted Jaylyn Dash as a good mother who would never allow anyone to hurt her children.

The CPI completed additional interviews before closing the investigation. The CPI spoke with Logan's in-home therapist who that she had not seen the home or the children dirty, nor had she seen anyone using drugs in her presence. The children's father met the investigator at the DCFS office. He reported that he worked during the day, but at night no one used drugs in the home nor were teens having sex. He shared that food did get low around the end of the month as they were running out of food stamps. He reported that the home did get messy with all the kids, but everyone helped to clean. The father of Regina's child also went to the DCFS office. He denied any drug usage, gang involvement, or open sexual behavior in the home.

Before closing the investigation, the CPI requested the parents complete a drug drop. Jaylyn Dash and Regina were negative. Hank and Waylon were positive for alcohol. The CPI provided them information on alcohol treatment. The CPI made a final home visit noting no concerns with the children. The mother told the CPI she had planned to move. The report was unfounded.

### *Child Protection Investigations 2009*
*March 2009, SCR# 9 A*
About a year later, an anonymous caller reported seeing several small children playing unsupervised in the front yard. The reporter recalled seeing the children during early morning hours outside unsupervised for approximately fifteen minutes.

The CPI went to the home unannounced the following morning.[7] The Jaylyn Dash told the investigator that the family had moved into this apartment less than a month ago, and she and her landlord were having disagreements. The mother explained that they had a party for a niece's birthday the previous Saturday, and the landlord was upset, telling the Jaylyn Dash, "I'm gonna make sure you remember me." The mother believed the landlord called DCFS. The mother denied that her children were unsupervised outside or ever left home alone. The mother denied drug or alcohol use. Elise, Ford, and Dayton all denied ever being left home alone. The younger children, the CPI noted, appeared healthy. The CPI documented completing a Home Safety Checklist, observing food in the home, working utilities, and beds and dressers for all the children. The investigation was unfounded in the initial stage.

*April 24, 2009, SCR# 10 A*
A month later an anonymous reporter alleged Jaylyn Dash drove away from the home every morning for the past month, leaving her children, all under the age of 10, outside in diapers (sometimes without even diapers) and without socks or shoes. The reporter alleged observing maggots on the window sills of the family's apartment and stated a large number of people visited the home throughout the night.

An investigator on the evening shift went to the home around 10:00 pm. A woman who reported to be the grandmother answered the door and told the CPI that Jaylyn Dash and the children were at a party. The investigator left a number asking that the mother call her. Three days later, in the late afternoon, the Jaylyn Dash called saying that she was home and would be available to meet. The mother denied that her children are left outside unsupervised. She believed the landlord called on her.

Approximately two weeks passed before another CPI documented investigative activity be attempting to visit the home at 7:00 pm. The CPI noted that there were white sheets covering the windows and no one responded to knocks on the doors or windows. The CPI documented other unsuccessful attempts to see the family at varying hours of the day and evening. In June, the CPI met with the landlord, who reported the family moved out on May 30, 2009 and did not leave a forwarding address. The landlord reported Jaylyn Dash allowed her young underdressed children to play outside unsupervised in the street. The landlord reported seeing the family on a nearby block.

The investigator conducted a public aid record search and identified a new address 2 blocks away. The CPI went to the building that was surrounded by a locked, black wrought iron gate with a for sale sign in the window. The CPI noted the building appeared vacant. The investigator made additional attempts to visit with the same results. The investigation was reviewed by the area administrator and closed as unfounded, noting the CPI was unable to locate the family.

*August 2009, SCR# 11 A*
In August 2009, a neighbor reported that small children, at a different address in the same neighborhood, were routinely left in the care of teenagers during the day and then after midnight. The caller believed the teenagers were related to the children and possibly gang members. The caller alleged the teens were under the influence of marijuana and alcohol when the children were in their care. The teens also vandalized the neighborhood. The caller reported there were usually about ten children at the home unsupervised ranging in age from 2 to 10 years old; an 8-year old child was mentally disabled. The family threw dirty diapers out of the windows leaving them on the stairs and the ground. Neighbors had spoken with the landlord who planned to evict the family.

An investigator made an unannounced visit to the home. The CPI observed that all the children appeared okay. The verbal children denied ever being left home alone. Jaylyn Dash reported that she was a stay at home mother and had a large extended family, so the children were never left alone. The mother stated she

---

[7] The call had come into the hotline at 7:09 pm.

did not have an eight-year-old child with disabilities, but her four-year-old son Logan had seizures and delays and could never be unsupervised. The mother denied any drug use in the home and said no one in the family was a gang member. The mother shared that father Hank Erickson was in jail. The mother believed the landlord called the hotline because they had an argument over the plumbing. The maternal aunt Regina reported Jaylyn Dash was a good parent and reiterated the children were never left alone. Regina denied drug or gang activity in the home.

The investigator made three attempts to contact the reporter and then closed out the investigation as unfounded.

### *Move Out of State*
Between 2009 and 2013 Jaylyn Dash and her family did not have contact with DCFS. IG investigators found that Jaylyn Dash moved to a neighboring state with her six children in 2010. In July 2010, Jaylyn Dash was arrested by police in that state and charged with retail theft. On September 30, 2010 she was found guilty, and fined.

IG investigators contacted child welfare officials in that state and found that on November 27, 2010, the state's Child Abuse Hotline was informed that Zane Joiner, Jaylyn's then boyfriend, was caught stealing from a drug store, along with his son, ten-year-old Bjorn Shiloh, and Jaylyn's ten-year-old son, Ford Erickson. All three were arrested. A background check found that on the same day, Jaylyn Dash was arrested and charged with resisting arrest and obstruction. It is not clear if she was arrested during the retail theft incident.

On January 1, 2011, Jaylyn Dash was arrested and charged with disorderly conduct. That same day, a child protection investigator visited Jaylyn Dash; Bjorn Shiloh was with his mother, and Ford Erickson was with an aunt. The investigator documented that the alleged perpetrator, Zane Joiner, was arrested for the theft, the two minors were not living with Mr. Joiner, and there appeared to be no "dangerous threats." The investigator closed the investigation.

April 1, 2011, the Dash/Erickson family was referred to Agency A. Case notes from the first contact indicate that Jaylyn Dash left City A with her six children, Elise Erickson, Ford Erickson, Keanu Erickson, Dayton Erickson, Logan Erickson, and Nikola Erickson, because she wanted to remove her children from a gang infested and drug ridden neighborhood. Jaylyn Dash told the visiting case worker, Crystal Vargus, she was diagnosed with depression when she was 11-years-old but had not taken medication for years. Jaylyn Dash reported that she was often stressed because her children had so much energy and she did not know how to calm them down. Jaylyn Dash requested assistance in obtaining a primary physician for the children, occupational, physical, speech, and developmental therapy services for Logan, parenting assistance, and mental health treatment for herself.

From April 14, 2011 through July 2011, Ms. Crystal Vargus visited Jaylyn Dash and the children. Ms. Vargus' case notes indicated that Jaylyn Dash did not participate in mental health services, parenting assistance, obtain a physician for four of the children, or enroll the children in school.

For most of August and September 2011, Ms. Vargus attempted, unsuccessfully, to visit the family. On September 14, 2011, Ms. Vargus closed the case because Jaylyn Dash and the children reportedly moved back to City A.

### *Child Protection Investigations 2013*
*March 2013, SCR# 12 A*
A school social worker reported to the hotline that staff told Jaylyn Dash her 7-year-old developmentally delayed son Logan needed appropriate cold weather clothing. Logan came to school without gloves or a

hat and wore a dirty coat without a zipper. The social worker shared that all students were given a free coat. In addition, Logan was displaying sexual behaviors/gestures and the mother had not sought intervention. The mother's six school-age children had ongoing tardy issues. The mother was also eight to nine months pregnant. The father of the children was reportedly gang-involved but did not live in the home. The social worker stated the mother would become defensive or would cry stating no one helped her, citing frequent moves as an excuse for ongoing neglect. The social worker reported that school had offered assistance and services, but the neglect continued. The report was taken for an allegation of inadequate clothing.

The assigned CPI went to the provided address and was told the family had moved. A few days later the CPI saw the children at school. The CPI first spoke with the social worker who reported that Logan had come to school in a clean coat that day. The CPI met with Logan's teacher. She explained that Logan had severe delays and was not able to follow simple directions; the teacher believed it was because he did not get proper direction at home. The teacher also clarified that Logan did not act out sexually or get aggressive but did curse and often said "fucking bitch." The teacher thought the parents were gang-affiliated. She believed the children's father was recently released from jail.

The CPI attempted to contact the mother using the emergency contact number she provided to the school. Zane Joiner answered the call and agreed to give Jaylyn Dash a message. He would not provide the family's new address. The CPI asked about his relationship with Jaylyn Dash and Zane Joiner said he was her ex-boyfriend. Jaylyn Dash returned the CPI's call and provided her address.

The next day during a visit at the home, Jaylyn Dash told the CPI she could not understand why someone would report her son did not have a coat, showing the CPI Logan's coat and a hat. The mother said the zipper pull was broken but the zipper was still operable. The mother said she had several hats and gloves because her children were constantly losing them. The CPI completed substance abuse and domestic violence screen and a Home Safety Checklist in the three-bedroom apartment. The CPI noted boxes around because the family had just moved, but determined the home was clean. The CPI noted sets of bunk beds and baby equipment Jaylyn Dash's two-week-old daughter. A pit bull puppy was in the home and the CPI cautioned the mother about having large dogs around the baby. The mother said the dog was being picked up by a new owner later that day.

The investigation was unfounded for inadequate clothing and closed 14 days later during the initial stage.

*September 2013, SCR# 13 A- Indicated*
A little after midnight on September 20, 2013, a police officer reported to the hotline that a man found a five-year-old boy running in and out of traffic. The officer noted that the child appeared to be autistic and could not tell the police who he was or where he lived. Police took the child to Hospital A.

When the overnight investigator arrived at the hospital, police had identified the child as Logan Erickson and had located Jaylyn Dash who lived several blocks from the intersection where Logan was found.[8] The mother reported Logan was eight-years-old and severely autistic. She last saw Logan sleeping at around 10:30 pm. Approximately two hour later, her sister called saying that police were knocking on doors searching for the parents of a boy. She called police when she discovered Logan missing. She reported Logan had a history of wandering off during the day, and she usually found him within minutes. She installed a latch near the top of the door, but Logan figured out how to open it with a broom handle. He recently walked to his grandmother's home at 4:00 am. The emergency room physician told the CPI that Logan was physically healthy and appeared to be autistic. The doctor was concerned that Logan had gotten

---

[8] The family lived a little less than half a mile from where Logan was found and one block from where the deadly fire occurred.

out before and said police recommended door alarms and a medical ID bracelet. Logan was released to his mother's care.

Another CPI followed up with the family at their home. The CPI observed door alarms and a new lock on the back door, as well as a medical ID bracelet on Logan. The other children were observed; the verbal children were interviewed outside of the presence of their mother. The CPI also spoke with the father, the children's primary care physician, Logan's school, and other relatives. The doctor's office was not concerned about abuse or neglect but noted appointments for the older children had been missed. The school reported Logan's hygiene issues had improved since addressing concerns with Jaylyn Dash. Relatives did not report concerns. The CPI noted the March 2013 investigation.[9] Jaylyn Dash refused intact services but was referred to Agency B, a program that assisted families with autistic children. Agency B did not have a record of Jaylyn Dash or her children.

*Child Protection Investigations 2014*
*March 2014, SCR# 13 B and SCR# 13 C*
On March 25 and 26, 2014 staff from Logan's school and staff from Nikola and Keanu's school called the hotline. Staff reported Logan functioned at pre-school level and came to school with gang symbols/graffiti scribbled on his neck, arms, and hands. When Logan became angry, he flashed gang signs. Staff at Nikola and Keanu's school reported that the boys were routinely tardy, wearing the same dirty clothes. Nikola asked for food and had bruises, cuts and scrapes he said were from rough housing with his siblings. Staff reported the boys were aggressive. Nikola slept in class or refused to participate. The mother had not responded to requests for meetings. The call on Logan was taken for investigation of substantial risk of harm. The report related to Nikola and Keanu was taken for environmental neglect.

Both investigations were assigned to the same CPI. The CPI went to the home and found fifteen-year-old Elise caring for the older boys. Jaylyn Dash was out with Logan and the baby. Nikola had inked X's around his neck and moustache drawn above his mouth. Nikola said he liked to draw on himself and his brother Logan. Nikola said he did not draw gang symbols because he did not know what they were. Keanu, Dayton, and Ford reiterated Nikola's report. The CPI met with Jaylyn Dash another day and observed Logan and Mikah. The mother said Logan, Nikola and her nephews often wrote on each other even though she told them to stop. Logan and Nikola did not have any markings on them at that time and all the children were observed to be clean. Nikola told the CPI that he stopped writing on himself. The mother agreed to check the boys before they left for school. The CPI completed a Home Safety Checklist, noting the house was neat and appropriately furnished with two working smoke detectors. Relatives denied any gang involvement, substance use, mental health or domestic violence issues and the primary care physician's office did not report concerns. Teachers were contacted before the investigation was closed, they reported the children were coming to school cleaner and on time and the mother was responding to calls. Both investigations were unfounded.

*July 2014, SCR# 13 D*
A nurse from Hospital B reported that police found Logan wandering around in the early morning and brought him to the hospital. Logan could not tell police or hospital staff where he lived or his parents' name. A police officer recognized him, contacted someone who knew the family and tried to reach the mother. An investigation was initiated for inadequate supervision.

An investigator went to the provided address and was told the mother had moved. The CPI was able to reach the father Hank Erickson who reported that Logan was in the care of maternal aunt Allison Mayer when he snuck out. Jaylyn Dash kept the home locked, but Logan sometimes figured out how to open the doors. Hank Erickson stated he and Jaylyn Dash were separated, but she was a good parent. He provided

---

[9] Investigations prior to March 2013 would have been expunged.

the mother's address. The CPI conducted an unannounced visit to the family's home. Jaylyn Dash reported she went to the store in the early morning while everyone was sleeping, leaving the children with her sister who was sleeping when Logan wandered out. They recently moved into the apartment and Logan already figured out how to open the locks. Jaylyn Dash said her brother was going to install safety locks. The grandmother, aunt and the older verbal children supported the mother's report. The children reported that they were not left alone. The CPI completed a Home Safety Checklist, noting working smoke and carbon monoxide detectors. The CPI made a second unannounced visit and observed that safety locks had been installed out of Logan's reach. The children were observed and did not report problems. The CPI called the primary care physician who did not report concerns. The investigation was unfounded and coded as "No Services Needed."

_Child Protection Investigations 2015_
_January 2015, SCR# 13 E_
A suburban police officer reported that sixteen-year-old Elise was at the mall and used her 7-month-old cousin Asher's stroller to hide stolen merchandise. The officer pulled over the car Elise left in. Elise's mother Jaylyn Dash was among the people in the car; others in the car were suspected gang members. Elise was arrested. Jaylyn Dash was not arrested, but police believed she knew about the stolen goods.

The CPI spoke with Asher's father who reported he left Asher with his sister, who was supposed to take the baby back to his mother. His sister and their cousin went to the mall instead. The baby was released to his father and Elise was released to her father.

The CPI visited the homes of Jaylyn Dash and Asher's mother during the investigation. Asher's mother reported she did not know the father planned to send Asher back to her. He usually had Asher a few weekends a month. Asher was observed to be healthy. Jaylyn Dash's children were observed and interviewed. Jaylyn Dash said she was not related to Asher, but her daughter was friends with the baby's aunt. Jaylyn Dash said she was not present when her daughter was shoplifting, though Elise had been caught shoplifting before. Elise denied stealing anything but when the van was pulled over, her friends ran, and she was left there. She corroborated that her friend was watching the baby for her brother. The verbal children did not report abuse or neglect in the home.

Elise Erickson was indicated for risk of harm. Allegations against Jaylyn Dash were unfounded. The CPI determined that Jaylyn Dash was not a caretaker during the actual theft. The investigation was closed and coded as no services needed.

_August 2015, SCR# 14 A[10]_
An anonymous caller reported over-crowding in a single-family home; Jaylyn Dash and her eight children lived in the attic, extended family lived on the second and first floors, and other the adults lived in the basement. The reporter alleged that ten to eleven children, ranging from one to fourteen-years, were unsupervised from 6 a.m. to 11 p.m. and recently six of Jaylyn Dash's children vandalized a neighbor's home. Jaylyn Dash told the reporter to hit her children if they were caught. The reporter said Jaylyn Dash's boyfriend was gang-involved and sold drugs out of the home, adding that police had been to the home that day. Police called the hotline with related information after they responded to call in the late morning about Logan being out unsupervised. The police arrived to find the family looking for Logan. The mother reported that a teenage cousin accidentally left a door unlocked and Logan went outside. As soon as the mother realized he went out, family began looking for him. The officer added that they did not feel it was a neglectful situation.

---

[10] A new SCR number was assigned to this report generating the A sequence identifier. The report was not linked in SACWIS to the family's previous involvement.

JAYLYN DASH

The CPI attempted to see the family at the home. After unsuccessful visits, the landlord informed the investigator that the family was asked to leave. The landlord thought the mother had been arrested and the children went to live with the father. City A police did not have any record of the mother being arrested. The CPI tracked the family by contacting schools for Logan; they reported he was in school in City B, about 40 miles away.

The children, father and stepmother were interviewed in City B. The verbal children reported that the adults in the home did not fight and denied being left unsupervised. The older children reiterated that Logan left the home when a cousin forgot to lock the door. The father reported there had been an incident of domestic violence between Jaylyn Dash and her boyfriend Brent Ingram. He and the mother had a verbal agreement for the children to stay with him because she was having trouble handling them. He added that he was working on legally formalizing the arrangement. The stepmother reiterated that Jaylyn Dash and Brent Ingram had a violent relationship and that Logan had been able to get out of the home while with his mother. The stepmother added that the mother would leave the children with other caretakers while she would go out with younger friends.

The investigator was able to reach the mother two months into the investigation. The mother reported that seventeen-year-old Elise and 2-year-old Mikah were living with her in a new place. The mother stated that her children were not running around unsupervised and they had not vandalized any neighbor's property. She explained that on August 31, 2015 she realized that Logan was not in the home, figuring out that Logan followed her cousin out of the house after her cousin left the door unlocked. Family members searched for Logan. When police found Logan, they did not press any charges because it was an accident. She explained that she had recently been in jail for 30 days on a probation violation. She was on probation for retail theft and provided her probation officer's name. The boys went with their father in City C. Elise and Mikah were with her sister. She planned on signing papers to give the father full custody of the boys.[11] The mother denied using drugs or abusing alcohol, denied mental health issues, and denied domestic violence. The CPI observed the two-bedroom apartment, noting it was clean with working utilities and stocked with food. The CPI observed Mikah and interviewed Elise who reiterated her mother's report and denied any issues in the home. The investigation was unfounded and coded as "No services needed."

*Child Welfare Services Referral 2016*
On March 28, 2016, a social worker from Hospital C reported that CARES[12] was contacted regarding Dayton Erickson who disclosed he was sexually abused several years ago and had thoughts of sexually acting out with other children. The caller said she did not have additional information about Dayton's past abuse but thought the family would benefit from counseling or other services. The narrative included "No known AKAs, Native American ancestry, disabilities, DCFS history or child deaths, domestic violence or substance abuse, or safety concerns." It also stated that Dayton's father lived in City B. The call was taken as a Child Welfare Services referral.[13]

The assigned worker attempted to visit the family, unannounced, on April 3, 2016. The maternal grandmother, Danielle Mayer, answered the door reporting that neither Jaylyn Dash nor Dayton were home.

---

[11] On 9/29/2016 report, SCR# 15 A, Logan Erickson was out of school for ten days due to pink eye. School staff instructed his step-mother to send medical clearance when Logan returned to school. Logan returned without medical clearance and with bruising of his right cheek, right bicep, and upper left arm. Allegations of cuts, bruises, and welts were unfounded against the father, Hank Erickson.

[12] Crisis and Referral Entry Services (CARES) is a telephone response service that handles mental health crisis calls for children and youth in Illinois.

[13] Child Welfare Service referrals are generated when calls to the hotline regarding suspected abuse or neglect do not meet criteria for an investigation under Illinois law, but the family would benefit from community linkages to services. In these cases, the family may be referred to their local DCFS office or a private agency partner in the community that can assist without opening an investigation or removing the children from the home.

JAYLYN DASH

The grandmother reported that Dayton was recently released from Hospital C and was seeing a therapist, though she could not recall the name of the provider. The worker asked Danielle Mayer to have the mother call.

Jaylyn Dash called the worker the next day. The mother explained Dayton was hospitalized for six days and given referrals for the appropriate services. The mother reported counseling was in place at Hospital C and Dayton had been assigned a SASS[14] worker from Hospital B. The worker asked if a safety plan was in place at school. The mother reported that the school was fully aware of the issues and the family did not need services. The worker closed the child welfare services referral case.

*Child Protection Investigations 2017*
*SCR# 13 F July 31, 2017- Unfounded (Investigation on the system at the time of death)*
On July 31, 2017, an anonymous reporter alleged Jaylyn Dash had a physical altercation with her fourteen-year-old son Dayton Erickson. Brent Ingram, the mother's boyfriend, grabbed and choked Dayton. The City A police responded, and Dayton told officers that there was no food in the home and nowhere for the children to sleep. The reporter alleged drug and gang activity in the home, as well as domestic violence between Jaylyn Dash and Brent Ingram.

On August 1, 2017, CPI Emily Wolf spoke with the landlord who reported at least six children were left unsupervised and alone in the apartment. The children cleaned the apartment and three large garbage bags were taken to the alley. CPI Wolf attempted to visit the family but was unsuccessful.

On August 3, 2017, CPI Wolf saw Jaylyn Dash, Mikah, Celine, Logan, Dayton, Nikola, and Keanu. When CPI Wolf interviewed Dayton, he reported that the altercation started because his mother would not give him the car keys. He began swearing, they argued, and he pushed his mother. Brent Ingram shoved Dayton away from Jaylyn Dash, but Brent Ingram did not choke Dayton. Dayton denied domestic violence between his mother and her boyfriend and denied there were drugs in the home.

When CPI Wolf interviewed Jaylyn Dash, the mother explained Dayton argued with her because she refused to give him the car keys. They were swearing and yelling at each other. Dayton pushed her and her boyfriend intervened pushing Dayton away. Jaylyn Dash denied that Brent Ingram choked Dayton and said when the police arrived, she and Dayton were taken to Hospital D. Jaylyn Dash reported Hospital D doctors recommended family therapy and she was given a referral to Agency C to schedule services.

CPI Wolf referred Jaylyn Dash and the entire family for services at Agency D.[15] On August 28, 2017, CPI Wolf unfounded the.

Jaylyn Dash did not secure services for her family from Agency D. Hospital D and Agency C did not have record that Jaylyn Dash participated in family or individual counseling.

**2018**
*March 23, 2018, SCR# 13 G*
Five months prior to the fire, the principal of School A in City A reported to the DCFS hotline that Keanu Erickson went to school smelling of marijuana and exhibited sexualized behavior in school. The principal stated Keanu recently followed a female 8th grade student home, made sexual comments to the girl, and placed his hand between her legs reaching for her vagina. Keanu was arrested by City A police and soon

---

[14] Screening Assessment and Support Services (SASS) is activated by a call to the CARES line.
[15] Agency D is in City A, provides counseling (individual and family), domestic violence services, substance abuse services, life skill coaching, case management, and substance abuse services.

JAYLYN DASH

after, ten other female students reported being sexually harassed, and filed police reports.[16] Keanu would talk about the size of his penis and wanting to have sex with girls. The principal stated Jaylyn Dash had several children and was possibly gang-involved. In addition, Jaylyn Dash was pregnant, and the father was a twenty-year-old former student of School A.

CPI Farrah Zhang visited Jaylyn Dash's home on April 2, 2018. CPI Zhang spoke with Nikola, Logan, Mikah, Dayton, and Keanu. Keanu told CPI Zhang that he only touched the girl's butt and nothing else. Keanu denied being gang-involved and smoking weed before school. He said he did not want to place his body onto someone's else body.

CPI Zhang documented that Jaylyn Dash, who was expecting her ninth child, down played Keanu's behavior. The mother claimed Keanu was playing around and was upset about the whole incident. Jaylyn Dash's apartment was found to be appropriate for eight children and without safety hazards. The principal told the investigator that the victims' parents contacted the City A police, Keanu was arrested, and soon after, several more girls made allegations about Keanu's inappropriate behavior.

A copy of the City A police arrest report indicated that Keanu told police that he approached the thirteen-year old victim, extended his arm, and from behind struck the victim in between her legs with an open hand, over the victim's clothes. Keanu was charged with battery and released to his mother. IG investigators determined that delinquency petition was not filed in Juvenile Court of the local county.

Copies of Keanu's City A Public-School misconduct reports[17] obtained by IG investigators indicated that on March 19, 2018, Keanu received a two-week suspension for the groping incident. When Keanu returned to school, he was immediately placed on a safety plan that limited his contact with female students. Keanu attended school wearing torn pants and loose jeans exposing his underwear. When school staff instructed Keanu to wear sweatpants, he refused, swore at staff, and walked out of school.

On April 24, 2018, Keanu violated the school safety plan; he left school grounds during recess and refused to return. When the security guard attempted to intervene, Keanu said "stop following me or I will stick you in the ….". The City A police were contacted and subdued Keanu. He later left school with a relative.

On May 10, 2018, CPI Gracelyn Abbott visited School A. She spoke with the principal who informed the investigator that Keanu and Nikola were no longer enrolled at School A.[18] The principal reported Keanu was living with an aunt. On May 16, 2018, CPI Abbott determined Nikola attended School B. CPI Abbot spoke with the dean of discipline who reported that the Erickson family had a history of lying, sexual abuse, gang involvement, and contact with City A police. Jaylyn Dash could not control her children. The dean reported that in 2016,[19] former student Dayton (then 13-years old) was living with his father and step-mother

_____

[16] Only one girl filed a report with the City A Police.

[17] On 5/29/14, Keanu was caught vandalizing the west auditorium of School A. Keanu was suspended for two days. 12/16/14, Keanu had brought a BB gun into School A, hiding it in his backpack. Keanu was counseled about his behavior. On 2/13/15, Keanu and another student, were caught smoking cigarettes in the boy's bathroom. Keanu received a detention. On 11/30/17, Keanu had a marijuana joint in class but before staff could confiscate it, Keanu ran out of the school. Keanu was suspended for five days. On 1/22/18, Keanu was walking out of the boy's bathroom yelling "BDN" which means Big Dick Nigga. Keanu was counseled for his behavior. On 2/08/18, Keanu told a female teacher that she had "fine ass and a fat ass." Keanu was counseled for his behavior and received a one day suspension. On 2/21/18, Keanu was shouting out gang names, talking about a vibrator, and was disruptive in class. When Keanu was questioned about the incident by administration, he became agitated, walked out of school, yelling "Stupid ass bitch."

[18] None of Jaylyn Dash's younger children attended School A.

[19] On March 28, 2016, a staff member at School B contacted the CARES line regarding Dayton's sex abuse. The call was as taken as a child welfare services referral.

in Balsa, about 15 miles from City A, when he was returned to his mother. The step-mother called the school and said that she caught Dayton placing her 3-year-old nephew's head in his lap in a position for oral sex. When school staff met with Jaylyn Dash, she reported that Dayton's siblings were abusive to him because Dayton would dress like a girl and paint his finger nails. When school staff spoke with Jaylyn Dash about her children's behavior in school, the mother became defensive and responded in an explosive manner. School staff offered to help Jaylyn Dash with counseling and suggested some places for assistance, but Dayton did not return to school.

The dean reported that Jaylyn Dash was difficult to reach because she often moved and presently lived with an aunt, Ms. Mayer, who had four children attending the school. The Mayer/Erickson family were the "neighborhood bullies."[20] That same day, CPI Abbott attempted to visit the Erickson family at a rear apartment (address not documented) but was unsuccessful. The investigation was unfounded on May 22, 2018.

*Child Welfare Services Referral*
On May 26, 2018, three months before the fire and four days after the G sequence was unfounded, school staff called the hotline reporting that on May 23, 2018, eleven-year-old Nikola was seen by SASS staff who recommended he enter the partial hospitalization program (PHP) at Hospital E. Jaylyn Dash was informed of the SASS recommendation, but Nikola did not return to school. The reporter said Nikola had a history of daily emotional issues at school and behavior that included pacing the halls, outbursts directed to school staff for unknown reasons, and previous hospitalization at Hospital E. The reporter said Jaylyn Dash expressed concern for Nikola but needed help and was struggling to follow through with service referrals. Jaylyn Dash reportedly had twelve people living in her home. Her son Keanu Erickson had sexualized behavior and was under investigation for assault by City A Police. The call was referred for preventative support services.

On May 30, 2018, DCFS supervisor Halle Bradford directed worker Irene Compton to interview the reporter to discuss the referral, review all prior DCFS involvement with the family documenting the priors on a case note, and document the results of the data/CANTS check of all the entire family, and inform the supervisor of the result of the child welfare referral. Worker Compton did not complete the supervisor's directives and action was not taken on the child welfare referral for nearly two months.

On July 25, 2018, child welfare services referral was reassigned to child welfare specialist (CWS) Emily Wolf. Shortly after acknowledging the assignment CWS Wolf completed a data check and documented mother's history:[21]

> *Jaylyn Dash CANTS positive Mother was indicated for Inadequate Supervision in the "A" sequence dated 09-20-2013 MARS/CYCIS # AAAAAAAA as a child opened: 11-16-01 Neglect closed: 12-10-01 Non-active family case under MARS/CYCIS # BBBBBBBB Opened: 11-09-2005 Preventative services Closed: 11-18-2005 Service complete SCR 16A Dash, Jaylyn 07/27/2004 Unfounded SCR 2A DASH, JAYLYN 08/10/2004 Unfounded SCR 3A Dash, Jaylyn 12/09/2004 Unfounded 4A Dash, Jaylyn 10/18/2005 Unfounded SCR 7A Dash, Jaylyn 07/27/2007 Unfounded SCR 12A Dash, Jaylyn 03/06/2013 Unfounded SCR 13A Dash, Jaylyn 09/20/2013 Indicated Mother was indicated for # 74 and #60 towards Logan Erickson Retention: 5 years SCR 13B Dash, Jaylyn 03/26/2014 Unfounded SCR 13C Dash, Jaylyn 03/25/2014 Unfounded SCR 13D Dash, Jaylyn 07/27/2014 Unfounded SCR*

---

[20] Danielle Mayer, maternal grandmother, had contact with the Illinois Department of Child Protection from February of 1983 for neglect/abuse and the last contact in December 2001 for neglect. SACWIS indicated that services were completed and the case(s) closed. In 2006, Ms. Danielle Mayer was arrested and charged with manufacture delivery of controlled substances sentenced to ten years in prison. DCFS records indicate that Ms. Mayer is possibly gang-involved.

[21] Thirteen investigations were linked to the mother's name at that time.

JAYLYN DASH

*13E Dash, Jaylyn 01/24/2015 Indicated Mother was a non-involved subject; father, Hudson Dunlap was indicated for #60 Retention: 5 years SCR 13F Dash, Jaylyn 07/31/2017 Unfounded SCR 13G Dash, Jaylyn 03/23/2018 Unfounded.*

The next day, CWS Wolf spoke with the school social worker who stated Nikola had been having behavioral and academic issues; he could be verbally and physically threatening and had an IEP. Nikola had poor attendance. The school called SASS after he had outbursts and SASS recommended partial hospitalization. The school social worker stated she spoke with Jaylyn Dash about Nikola two or three times, but the mother was not forthcoming. The social worker said Jaylyn Dash could not control Nikola at home and was provided with referrals to Hospital B and Agency B.

Though it was only a child welfare services referral, CWS Wolf completed a CERAP after she went to the home and met with the family. The worker observed a two-month-old infant and children, ages two, five, eleven, thirteen and fifteen-years-old. She noted they appeared well-groomed and well cared for, without observable indicators of abuse or neglect. She noted the home was sparsely furnished but appeared appropriate without observable safety or health hazards.

CWS Wolf provided the mother with referrals for counseling to Hospital B's psychological services program and Agency C. Neither program had record of Jaylyn Dash attending family counseling or individual therapy.

In her interview with IG Investigators, CWS Wolf described Jaylyn Dash, whom she met in 2017 and 2018, as a young woman with many children who was overwhelmed and flustered with her teenagers. CWS Wolf first met Jaylyn Dash in 2017 when CWS Wolf was a CPI and assigned the F sequence investigation. Her second encounter with the family was the 2018 child welfare services referral; CWS Wolf was working in intact family services. CWS Wolf explained that over the past few years responsibility for child welfare services referrals switched back and forth between child protection and intact family workers.[22] CWS Wolf said that when she first met Jaylyn Dash in 2017 she did not note any developmental delays and the apartment, though small, was clean, and a one-year-old was in a pack-n-play crib. CWS Wolf said she spoke with the landlord who told her that Jaylyn Dash lied and said she would only have two children living in the apartment.

CWS Wolf also spoke with Jaylyn Dash's mother, who had concerns about her daughter, specifically about the violence and drug activity within the neighborhood. CWS Wolf provided Jaylyn Dash with referral information to the Agency D located in City A. Jaylyn Dash had already received a referral to Agency C and CWS Wolf advised the mother to go to the first agency that had an opening.

CWS Wolf told IG investigators that she checked SACWIS for any prior investigations related to the Dash/Erickson family during the 2017 F sequence investigation.[23] CWS Wolf said she was not aware of the many prior investigations involving Jaylyn and her children.

When CWS Wolf was assigned the child welfare services referral in July 2018, she recognized Jaylyn Dash's name, completed a search of the family, and was able to see the previously expunged investigations. CWS Wolf drove out to the last known apartment but could not locate the family. After asking around the neighborhood CWS Wolf found the family at a nearby address. She spoke with Jaylyn Dash, who looked

---

[22] The Department previously had a specific unit in the local county dedicated to child welfare service referrals. The unit was disbanded and the child welfare service referrals were assigned to child protection and intact family workers. Currently child protection workers receive the assignments. SEE ALSO Rule and Procedure 304.

[23] At that time of the 2017 F sequence, the September 2013 investigation (an A sequence) and the January 2015 investigation (an E sequence) would have been retained in SACWIS.

much better the second time around. Jaylyn Dash was still with Brent Ingram. CWS Wolf spoke with the children and saw the newborn. CWS Wolf did not recall asking Jaylyn how long she had been living at that address.

CWS Wolf told OIG Investigators she asked the mother if she had gone to the Agency D for counseling. Jaylyn Dash said she had not and CWS Wolf provided the mother with referral information to Hospital B's psychological services program.

**Behavioral Health Services**
*Hospital E*
*Keanu*
On August 9, 2013, Keanu (then nine-years-old) was psychiatrically hospitalized at Hospital E after he reported thinking about jumping out of a window to kill himself. Keanu's mother called police for assistance. At the hospital, Keanu told staff that he had "been increasingly angry and oppositional over the past two years, fighting with his siblings, stepfather and cousins." Keanu then denied suicidal ideation but acknowledged wanting help for his anger. Staff noted Keanu was cooperative, though he appeared sad, anxious, quiet, and withdrawn at intake. The mother reported that Keanu's older brothers were difficult and give him a hard time, but he was generally a good child.

During the hospitalization Keanu was impulsive and had difficulty focusing or paying attention. Staff wrote that he was easily angered when given directives. Keanu was responsive to learning coping skills. The doctor indicated that the mother reported classic symptoms of ADHD and consented for Ritalin to be started. The Ritalin could not be started until a rash that Keanu had cleared, so it was five days into the hospitalization that the medication was started. The mother requested Keanu's discharge, so an evaluation of the medication's efficacy was not feasible.[24] At discharge, the doctor noted that Keanu interacted well with staff and was open to intervention. Keanu was prescribed Ritalin (10 mg at 8:00 am and noon and 5 mg at 4:00 pm) and referred to Agency E for counseling (appointment set for 08/19/2013). Jaylyn Dash was advised to follow up with Keanu's primary care physician for treatment of hypothyroidism.

*Nikola*
Nikola participated in Hospital E's Partial Hospitalization Program (PHP) from December 7 through December 27, 2017. He was referred to treatment defiant and aggressive behavior school; Nikola burned a peer with a lighter and brought brass knuckles to school. The doctor noted Nikola exhibited signs of ADHD, but reported no other problems, saying he was generally happy. The mother reported Nikola had significant anger problems since leaving his father's home two years earlier. Nikola attended the PHP intermittently, missing eight days. He was absent from the program in the two days leading to his psychiatric hospitalization.

Nikola was psychiatrically hospitalized at Hospital E from December 27, 2017 to January 4, 2018. Jaylyn Dash brought Nikola to Hospital E after attempted suicide by jumping in front of a van. Nikola reported his brother upset him, so he got out of his mother's car, ran in front of a moving van and laid down in front of it. Nikola stated his mother's boyfriend picked him up and carried him back to the car. Nikola spoke about killing himself and, according to his mother, killing his brother. Jaylyn Dash reported he was aggressive towards his younger siblings.

---

[24] For formal voluntary psychiatric hospitalization, the patient or guardian may sign a "Request for Discharge" which means the patient needs to be discharged within five days. If the patient is deemed to remain a danger to themselves or others they must go to court in order to have a judge determine that the patient can be hospitalized on an involuntary basis.

The mother told hospital staff that Nikola was destructive and had problems with many people in the neighborhood; stealing from stores and taking apart neighbor's bikes. She said he was generally happy except when fighting with his brother. Nikola stated he fought with his cousins but denied hurting other children. Nikola said he was not anxious, but worried about his seventeen-year-old brother was in a gang. He also felt sad when thinking about his maternal uncle who was beaten to death a few years earlier. During the hospitalization Nikola told Hospital E staff that DCFS had been involved with his stepmother, but not his mother.

The mother told Hospital E staff that Nikola's and his 13-year-old brother Keanu's problematic behaviors began in 2016 when they returned to her home after living with their father. They had not seen their father since. The mother described the brothers being physically aggressive and fighting with each other before she brought them in.

Nikola was noted to do generally well during hospitalization. He participated in group and individual therapies, took his medication and interacting well with peers. Nikola was discharged on January 4, 2018. The social worker and nurse met with Nikola and the mother to discuss the importance of outpatient care. Both were educated again on prescribed medications Adderall and Prozac. The social worker referred Nikola for outpatient care through Agency F Counseling and scheduled an appointment for January 10, 2018. IG investigators contacted Agency F Counseling who confirmed that an appointment had been set up, but Nikola never came there for outpatient services.

### Hospital C

Dayton Erickson was psychiatrically hospitalized at Hospital C from March 28 to April 1, 2016 after being referred by SASS. Dayton, then thirteen-years-old, presented to the hospital after pushing his mother, which he characterized as an accident. He reported feeling sad, depressed and having thoughts of suicide because his peers made fun of him. Dayton reported that he had been mad before and ran away to his brother's girlfriend's house for a week. Dayton shared that he was sexually abused from 2009 to 2015 and he once asked a four-year-old to perform a sexual act on him. He reported receiving therapy to address the sexual abuse. Dayton said a year earlier he heard voices telling him "to do bad things," but did not want to talk about it. He received a provisional diagnosis of major depressive disorder and a final diagnosis of PTSD, sexual abuse victim.

Dayton was discharged with a prescription for Prozac, referred to Hospital E's Partial Hospitalization Program, and to Hospital B SASS for outpatient treatment after completing the partial program. Dayton did not participate in outpatient care.

### Hospital B's Psychological Services Program

#### Nikola

Twice in 2018, Nikola was referred to Hospital B's psychological services program for outpatient behavioral health services. He did not engage in treatment either time.

On January 4, 2018, Hospital B's outpatient program received a message from an Agency G SASS worker that Nikola was discharged from Hospital C after inpatient treatment for attempted suicide. Nikola was not hurt but said he did not care if he died. He disclosed that he wanted to hurt his siblings and did not like his mother's boyfriend. Nikola did not receive outpatient treatment following this suicide attempt. Hospital B's outpatient program did not have

On May 16, 2018, Hospital B's SASS program responded to a crisis call regarding 10½-year-old Nikola. The school social worker called the CARES line because of Nikola's repeated defiance and problematic behavior. A mental health professional (MHP) met with Nikola and the school social worker, with the mother on the phone. The MHP utilized the Children's Severity of Psychiatric Illinois (CSPI) noting Nikola

got in trouble daily, tended to yell, called people names, and disrupted class. Nikola reported he became angry in class because he did not understand the work. The school social worker shared that Nikola was defiant during an interview with a DCFS investigator. Two weeks earlier he hit a dog, which he reported was to defend himself. The SASS evaluator determined Nikola did not want to hurt himself or others and there was no need for hospitalization. He was diagnosed with impulse control disorder. The MHP recommended Hospital E's partial hospitalization program, in addition to outpatient treatment through Hospital B's psychological services program. The treatment recommendations were left with the school social worker.

**City A Police Calls of Service to the Address**

IG investigators reviewed City A Police Department calls of service to the Dash/Erickson household. From June 2015 through August 26, 2018, there were 188 calls for service which included reports of drug dealing, a missing autistic child (Logan) missing seven-year-old Lilly Mayer, male(s) with guns, males smoking weed in the front of the house, an intoxicated female outside, neighbors arguing, kids crying, gangbangers partying and yelling gang slogans in the back yard, blocked traffic, and males shooting at and attempting to break a street lamp with baseball bat.

On June 14, 2018, a caller from the Alderman's Office reported gang members were loitering in the front of the building, throwing fireworks at cars, and causing a disturbance. On July 11, 2018, another caller reported males were smoking marijuana and using fireworks.

In August 2018, five days before the fire, a caller reported someone selling narcotics and alleged kids in the alley planned to set the garbage cans on fire. The next day, a caller reported "the neighbors are smoking weed in front, four women are out there…they have a lot of children out there with them, the women's behavior is erratic. They are throwing things in the front."

Three days before the fatal fire, City A police received nine calls between 11:00 am and 8:00 pm reporting males selling narcotics in front of the building, flashing gang signs, being disruptive, and climbing trees to break the streetlight. One caller reported that the "Police rode by the house, [but] did not get out or say anything."

**Lethal Fire**

**Office of Fire Investigations SFD**

According to a copy of the investigative report, the City A Fire Department (SFD) was originally called to a fire two blocks away from the Erickson/Dash home. The first engine company to arrive on the scene observed heavy fire in the rear of the building venting from the northern rear second floor window. Lieutenant Irwin told the SFD investigator that he ordered his crew to the rear alley to assist the first engine company with hose line deployment. Reaching the staircase to the upper level of the building, Lt. Irwin described conditions as "mild", emphasizing that he did not have to use his self-contained breathing apparatus (SCBA) while assisting with the removal of victims from the front room/bedroom.

A second Lieutenant, Lt. Jimenez, arrived at the scene and entered the front of the building. He described the conditions inside the home as "mild." Lt. Jimenez did not use his SCBA while inside the home. The first City A police officers to arrive at the scene were Ofc. Knowles and Ofc. Longstreet. Both officers reported seeing Savannah Patel rundown the alley with a tray of brownies. They stated she had to be subdued when she was informed of the fire.

Lt. Irwin reported then he entered the second-floor entrance and found a ten-year-old and another victim on the living room floor. Lt. Irwin handed the victims to other fire fighters for rescue and assisted in rescuing two additional victims in a rear bedroom. A diagram of the home indicated that three victims were found near the entrance, three were found in a front bedroom, two were found in the living room area, and two were found in a second bedroom.[25]

A neighbor who refused to be identified, for fear of retribution, reported to SFD Investigator that Savannah Patel was a former tenant of the building and set fire to a couch when she was evicted. The neighbor stated, "the whole block knows of the problem" with the landlord. Some months ago, Savannah's sister-in-law, Jaylyn signed a lease with the landlord so Savannah would not have to leave the building. The family is nothing but trouble, they would harass everybody in the neighborhood, shooting at property and people with a BB gun, and gang bangers were frequent visitors to the home."

Savannah Patel, Jaylyn Dash, and Wendy Lowery were not interviewed by the SFD Investigator because they could not be located.

The SFD Investigator determined the fire did not originate on the exterior of the building, The SFD Investigator noted smoke detectors in the kitchen without batteries, a space heater used for heat, and multiple window air conditioning units but none were factors in the fire. The SFD Investigator listed no working detectors, unattended children, poor housekeeping/obstructed egress (rear porch), and open and dangerous wiring as code violations.

The Investigator concluded that the fire originated in the enclosed rear porch/stairwell. The SFD investigation was undetermined and in suspended status until an examination of the electrical system and components found no abnormal activity.

**CITY A POLICE INVESTIGATION**
City A police Officer Knowles and Ofc. Massey were the first officers on the scene. They reported seeing Savannah Patel walking with a tray of brownies until she saw the fire at which point, she ran toward the building. Savanah Patel reached the front door of the house and opened the door which was blocked by more than one victim laying on the floor. Seven victims.[26] died at the scene of the fire and were transported to Hospital B and three more victims.[27] were transported to Hospital A but were not expected to survive.

The incident report in the investigative record indicated that Jaylyn Dash's oldest daughter Elise was interviewed at Hospital B. Elise told the City A officers that her mother, Jaylyn Dash, stepped out of the apartment to go buy a gallon of water from a nearby gas station prior to the fire.[28]

Later that morning, Detective Salas and Illinois State Fire Marshall Trevino, along with a canine, performed a search of the area between the house and garage and the home's 2nd floor for accelerants. The canine did not detect any traces of accelerant.

Detective Nickey of the Death Investigation Unit documented that an officer who was at the scene of the fire overheard a relative of the family blaming the cause of the fire on a neighbor. That neighbor, Reuben Parrish, reportedly was angry that a bike he lent to the children was never returned. Mr. Parrish claimed that the children borrowed the bike and later said it was stolen from them.

---

[25] These two victims later died of their injuries.
[26] Logan and Nikola Erickson, Mikah Joiner, Olivia Ingram, Tessa and Raelynn Dash, and Paxton Fowler.
[27] Keanu Erickson, Quincy Galloway, and Sawyer Hawkins.
[28] Elise's account to the City A Police Detectives was inconsistent with what she reported to the DCFS Child Protection Investigator.

Mr. Parrish wanted the police to enter the residence and search for the bike. Mr. Parrish was not charged with any crime related to the fire.

Three days after the fire, Detective Nickey received a tip from a sergeant at the local county jail that an inmate overheard the fire was reportedly started by Sterling Reynolds. Mr. Reynolds threatened to burn the house down if Brent Ingram did not return money stolen from Mr. Reynolds.[29] Mr. Reynolds denied starting the fire, stating he was out with his girlfriend. Mr. Reynolds was not charged nor found to have any connection to the fire.

Detective Salas of the City A police Arson Investigation Section conducted a fire analysis of the scene and determined that the fire started in the area (9' x 15') between the rear coach house and garage and the cause of the fire was an open flame to available materials. The reporting Detective could not rule out all other accidental causes for the fire, nor the careless use of smoking materials and electrical equipment. Detective Nickey attempted, unsuccessfully, to interview Wendy Lowery, Jaylyn Dash, and Savannah Patel about the fire. None of the mothers were interviewed by the City A police. No one was criminally charged for the fire or the children's deaths.

*SCR# 13 H*
Jaylyn Dash was interviewed by a CPI three days after the deadly fire. She reported leaving her home about 11 pm to go to a block party. Jaylyn Dash said she stayed at the party for a couple hours and while on her way home, a neighbor told her that her house was on fire. Jaylyn Dash said she was not aware that Mikah, Tessa, and Raelynn were in her home.

Jaylyn Dash told the CPI that her home had smoke detectors but did not remember if they were working. She recalled the smoke detector on the porch was always going off and said the smoke detectors were working because they were checked by a CPI during the last investigation.[30]

Dayton Erickson reported he was in the home before the fire broke out but could not remember what time he left. Elise Erickson told the DCFS investigator that she brought Mikah and Olivia to her mother's home at approximately 7 pm. Elise said the girls' mother Savannah Patel dropped off her other daughter Tessa and Keanu at 11:30 pm because she was going out. Elise then gave Keanu a cell phone and told him to call her for anything.

About two hours later, Elise received a phone call from her mother who was screaming that the home was on fire. Ms. Joy Godden, Olivia and Celine Ingram's paternal grandmother, told the CPI that the block party began shutting down between 11:30 pm and midnight. Jaylyn Dash remained outside talking to people from the party.[31]

Elise later told the CPI that she and Savannah Patel drove Mikah and Olivia to Jaylyn Dash' home at about 7 pm. Savannah Patel brought Tessa into the house. Elise said she never went into the house and thought her mother; Jaylyn Dash was home.

---

[29] One of Brent Ingram's children died in the fire.
[30] She likely was referring to the child welfare services referral conducted in July as CWS Wolf completed a Home Safety Checklist during her visit to the home.
[31] Since the fire, Celine has been living with her paternal grandmother, Joy Godden, and biological father, Brent Ingram. Dayton Erickson has been living with Jaylyn's oldest daughter, Elise Erickson. Jaylyn is reportedly attending Agency H for counseling and Agency I for mental health services.

JAYLYN DASH

In December 2018, the CPI conducted a second interview with Jaylyn. Jaylyn Dash said she left her home at 10 pm or 11 pm. She denied leaving the children home alone. Jaylyn Dash said that Savannah Patel, Elise, and maternal aunt Regina were in the home when she left for the block party. When the CPI asked Jaylyn Dash for Savannah Patel's and Regina's contact information, Jaylyn Dash said she did not have current contact information for either individual. The investigation of the Erickson/ Fowler/ Dash/ Olivia tragedy is in undetermined status.

## ANALYSIS

Until 2013, when Jaylyn Dash was first indicated for child neglect, investigators going to the home would not have found any the prior history on SACWIS despite a history going back 14 years. The situation that came to light was that of a mother who reported she was overwhelmed with the demands of a special need's child, rebellious adolescent boys, and stresses of poverty. Investigators noted concerns about the family. Some of the reports, such as Logan getting out of the home and wandering, directly indicated a concern for the safety of the children that one could argue rose to the level of urgent and immediate necessity, the standard for removal of children. Other reports, when viewed together, show a pattern of unstable housing, possible inadequate supervision, and chronic neglect. As school, behavioral health and community records indicate the chronic neglect seemed to lead to adolescent boys who struggled with behaviors, frustration and possible violence. The oldest child Elise was herself indicated for neglect because she was shoplifting while caring for a small child. Jaylyn Dash did not follow up on service referrals for herself or her children. In reviewing the family history, one could argue that Jaylyn Dash's children of lived in an environment of chronic neglect. DCFS has 21 addresses on file for the Erickson/Dash family. In addition, IG investigators found three more addresses in the bodies of the DCP investigations and the out of state address. It would have taken a cumulative evidence approach to order the mother into intact services if she did not cooperate on her own.

Hotline reports on Jaylyn Dash fell into categories of environmental neglect, Logan's wandering, and later school staff concerns. Early reports to the hotline mainly came from anonymous callers –the family often had disputes with landlords – and several were unfounded in the initial stage as the family was in the midst of moving and therefore either the issue was resolved, or the family was correcting the condition. Each investigation, considered on its own, outlined concerns that while perhaps troubling, did not rise to the level of being indicated in the assessment of the DCP investigator and supervisor, except for two indicated reports. Many of the unfounded investigations resulted from the mother appearing to correct problematic conditions prior to investigation closure. The problematic conditions, however, resumed as evidenced by continued calls to the hotline. Jaylyn Dash did not accept the offer of intact services or follow-through with service referrals for herself and the children. Further the father Hank Erickson provided care for the children at one point but was rarely involved in the later investigations, even as a collateral.

Following the death of a toddler in April 2017, the Department determined that a historical record of a family's contact with DCFS should be retained in SACWIS in a manner that provides at least the basic information reported to the hotline. The change was being implemented at the time of the fire. A historical record would allow workers and supervisors to better identify trends and understand the family. The Department reiterated this idea to workers in a May 16, 2019 announcement that stated, "*It provides information that allows the investigator or caseworker to better understand and serve the family while ensuring immediate safety. A review of prior history should always be performed during the initial stages of any case.*" The announcement also explained how workers can access the history in SACWIS.

In addition to being able to access SACWIS, investigators and workers must have guidance on how to best understand and use the historical information in their decision making. Guidelines should be addressed to supervisors and administrators, leading their teams in the analysis of this information. As DCFS now maintains child protection investigation information and full unfounded investigations for a longer period, the number of families with more extensive histories available will grow. If a parent corrects a condition

JAYLYN DASH

after a visit from a child protection investigator, but consistently reverts to old behaviors/circumstances, they are showing they cannot maintain the change without intervention. That context may be needed regarding the provision of services and pursuing other community partner or even court interventions when needed. In 2004, following a death in an intact case involving chronic neglect, the OIG recommended that any family reaching 13 investigations should receive a full management review.

In addition to investigations, the Department took at least two calls as child welfare service referrals. A child welfare service referral is opened when the hotline report does not meet criteria for investigation, but the family may be in need of assistance. Currently, child welfare services referral assignments rotate between child protection investigators and intact workers statewide. Predictably, these cases are low priority. The child welfare service referral taken in May 2018 was assigned to a worker who was in the process of transferring jobs and therefore did not initiate contact. The case was reassigned two months later to a worker who immediately contacted the family but by then the concerns were not as prominent; the impact of attempting intervention lessened because the presenting problem occurred more than two months earlier. If the Department is going to take Child Welfare Service referrals, they must be attended to in a timely manner. Assigning these cases to already overloaded child protection investigators almost guarantees that they will not be addressed quickly.

A broader community approach may have been a way to intervene with the family. The public questions why the Department, after having contact with the family over 20 times, could not intervene further. The Department would perhaps have been able to discuss the case for compelling services with the accumulated history. Yet the Department was not the only entity to have contact that was unable to effectively address the issues with the family. Schools, police, the alderman, and health care professionals all had contact with the family. However, a mechanism for working collaboratively with the family is not established. Rather they work in silos, with the expectation that another entity will be the one to address the difficult issues with the family. When the Department has consistent contact with a family, even if the immediate assessment does not rise to the level of abuse or neglect, it suggests a pattern of being unable to maintain stability. Families would benefit if the Department and community partners worked collaboratively. As noted above, when a family has multiple contacts with the Department, management should conduct a review and develop a plan for the Department to work with others when necessary.

**RECOMMENDATIONS**

1. In a previous OIG investigation, a recommendation was made that any family with three or more child protection investigations within a year (for one or more persons living in the home) should be reviewed by DCFS management to ensure that underlying issues are being addressed. The OIG reiterates that recommendation for this report. In addition, the Department should have a system for documentation of that review which includes indicating the tasks to be completed, who will complete them, and how the plan will be monitored.

2. The Department should train supervisors on how to assess the full history of the family and how it can be used in the evaluation of the family. When a child protection investigation commences, a family history should be completed, maintained and updated each time the Department receives a new report. The family history should be available to subsequent investigators/caseworkers.

3. The Department should evaluate the current Child Welfare Services referral system for efficacy and responsiveness. The evaluation should include reviewing timeframes for a CERAP, a response time frame, and service provision time frames and determine needed improvements.

4. The Department should develop a management group that liaisons with other community partners to assist in developing comprehensive plans for families with consistent contact with DCFS, law enforcement and concerns from school and behavioral health providers.

JAYLYN DASH

# APPENDIX C

## OFFICE OF THE INSPECTOR GENERAL
### Department of Children and Family Services

### *REDACTED REPORT*

*This report is being released by the Office of the Inspector General for teaching/training purposes. To ensure the confidentiality of all persons and service providers involved in the case, identifying information has been changed. All names, except those of professional references, are fictitious.*

**This interim report is based on Investigation for SCR # 1000-I only**

| | |
|---|---|
| **File No:** | **2019 IG 0992** |
| **Subjects:** | **Child Deaths** |
| **Children:** | **Enzo Spence (DOB: 6/2010, DOD: 10/2018)** |
| | **Daria Robbins DOB: 2/2013, DOD: 10/2018)** |

## SUMMARY OF INCIDENT

In October 2018, eight-year-old Enzo Spence and five-year-old Daria Robbins died in a fire at their family home Illinois. Their mother, Vivian Robbins, and brother, Caleb Spence, were able to exit the home during the fire. Their brother, Bodhi Spence, and the Spence children's father, Alfred Spence, were not at home the day of the fire.

At the time of the fire, DCFS had a pending child abuse investigation against the parents, Vivian Robbins and Alfred Spence (SCR#1000-I). This investigation was opened on March 14, 2018, to investigate allegation #10 - Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare, and allegation #2 - Head Injury, pertaining to one or more of the four minor children living with them. The OIG reviewed these deaths as part of its mandate to review child deaths when the family had contact with the Illinois child welfare system within the year prior to the death.

## INVESTIGATION

*Family Composition for SCR # 1000-I*

| | |
|---|---|
| Mother: | Vivian Robbins DOB 11/1984 |
| Father of Enzo, Caleb, and Bodhi: | Alfred Spence DOB 03/1984 |
| Involved youth: | Bodhi Spence DOB 11/2006 |
| | Caleb Spence DOB: 11/2008 |
| | Enzo Spence DOB 06/2010 and DOD 10/2018 |
| | Daria Robbins DOB 02/2013 and DOD 10/2018 |

*Overview of case*
The Robbins/Spence family has an extensive history with the Department of Children and Family Services.[1] (see attachment 1)

Prior to the children's death, the family had been investigated on nine separate occasions. From 2013 through 2016, the children were removed from the home and placed in care after the mother was arrested for possession of methamphetamine. On February 29, 2016, the children were returned home. The children were home for approximately two years before the fire. During that time, the family had five separate child protection investigations; four were unfounded and one was pending.

Just over one month after children were returned home (April 5, 2016), the hotline was called when the father broke all the windows out of the mother's van. He was arrested and told police he'd been drinking. This investigation was unfounded because it was determined that children were living with mom and dad was not in the home. Police stated that it would be dangerous for the kids if dad lived there.

Less than six months later (August 2016), three of the children were reported missing and found playing inside an ambulance ten blocks away from their home. This was the second time within a month that the three boys had gotten out of the home in the middle of the night. The family composition included the father, who was living in the home. This investigation was unfounded.

Four months later (December 2016), the school called in to report that the mom was looking glassy eyed, like she was back on methamphetamine. The children's attendance at school, which had been great, was getting to be very bad. The day before, the grandmother had come to the school crying and stated Vivian had 'flown the coop.' This investigation was unfounded.

Two months later (February 2017), the school called again to say that mom looked like she was back on methamphetamine; she was skinny, and her teeth were rotting. The father had just been released from jail and was also skinny and had sores on his face. This investigation was also unfounded.

The school called again nine months later (November 2017, H sequence) to report that both parents appeared to be back on methamphetamine. One of the children reported that the heat was off and there was no running water. This investigation was also unfounded.

Investigation of Case SCR # 1000
On 3/14/2018, the school counselor, Ilana Young, contacted the DCFS Hotline again and reported that Enzo Spence (age 10), was in her office sobbing that day. While in her office, Enzo disclosed to Ms. Young that he was scared for his sister, Daria (age 5). He said that their parents had been fighting and their dad punched their mom in the eye and made it bleed. Bodhi got in the middle of the fight and dad hit Bodhi with a metal

---

[1] SCR 1000 A indicated for allegation 79, medical neglect on **4/6/09**

SCR 1000 C indicated for allegation 74, inadequate supervision on **10/9/13**—children taken into protective custody and placed into foster care (2013-2016)

SCR 2000 A the maternal grandfather was alleged perpetrator, Unfounded **10/12/15** for allegation 21, sexual molestation and 22 b substantial risk of sexual injury

SCR D occurred 5 weeks after children were returned home, Unfounded for allegation 60, substantial risk of harm on **6/3/16**

SCR E Unfounded on allegation 74, inadequate supervision on **9/2/16**

SCR F Unfounded on allegation 74 inadequate supervision on **2/6/17**

SCR G Unfounded allegation 60, substantial risk of harm on **2/21/17**

SCR 1000 H unfounded on allegation 60, substantial risk and allegation 82, environmental neglect on **1/30/18**

SCR 1000 I indicated for allegation 60, substantial risk on **11/9/18**

pole. Mom hits Bodhi with a belt, and mom and dad both were using methamphetamine. Dad's mother told Ms. Young that dad has a $100 a day methamphetamine habit, the water and heat have been turned off in the home, they only have space heaters to heat the upstairs, food for the children was limited and the children had previously been in foster care. The date that this conversation between Ms. Young and dad's mother took place was not documented by the person who took the report for DCFS.

The report was sent to the local field office on March 15, 2018. CPI, Joslyn Angulo was assigned to initiate the investigation. She was supervised by Lilah Cantu throughout the investigation. The Area Administrator for the field office at the time of this investigation was Kelly Busick. It was determined that the four children should be interviewed by Polaris Agency.

*Misuse of protective custody*
CPI Angulo was concerned that she would not be able to contact the parents, so she was instructed by her supervisor to arrange for the protective custody of the minors "as soon as possible" to ensure the interviews occurred. On March 15, 2018, CPI Angulo contacted the police department and they agreed to send an officer to the Polaris Agency to take protective custody to transport the children to the interviews. On that same day, CPI Angulo went to the children's respective schools to observe them and to talk to the counselor, Ilana Young, who made the child abuse report to DCFS.

CPI Angulo was able to meet with Caleb Spence (age 9). She observed a bruise on his leg that he said he got from a fall. He also had dirty ears, eczema on his arm, and a scratch by his nostril. CPI Angulo observed the sibling, Enzo Spence (age 7) at the same grade school. CPI Angulo went to the middle school to observe Bodhi Spence (age 11) at his school. She reported in her case notes and that during her interview with Bodhi, he had a "couple of bruises" that did not appear to be from abuse; instead from "more normal child bruising." Bodhi told CPI Angulo that he wrestles and plays football. She also talked with Mark Dorsey, a school counselor at Bodhi's middle school. Mr. Dorsey told CPI Angulo that he never saw bruises or marks on Bodhi, and that Bodhi never reported any problems at home. CPI Angulo stated that the reason why she did not ask the children about the allegations is because they were scheduled for a forensic interview at Polaris Agency the next day.

On March 15, 2018, CPI Angulo attempted to see Daria (age 5) at her preschool. Daria was not in school that day. The staff told CPI Angulo that they had dropped Daria from their program in January 2018, due to lack of attendance. CPI Angulo completed the CERAP/safety assessment on March 15, 2018 at 2:30 pm. The CERAP was approved by the supervisor, Lilah Cantu, before the children were interviewed at Polaris Agency.

After trying to locate the parents, the police then took protective custody of the children to drive them to and from their interviews.

On March 16, 2018, the three boys were picked up by a police officer at their respective schools, taken into protective custody by the police, and transported to Polaris Agency for their forensic interviews. Ms. Angulo stated that before the children were picked up from school for their forensic interviews, she went with the police to the family home to see if they could locate the parents to get permission for the Polaris Agency interviews. No one was home.[2] After the interviews, a police officer transported the boys back to their schools. According to CPI Angulo, Caleb reported nothing of significant concern during his Polaris Agency interview. Enzo stated that he got spanked once with a paddle, his brother, Bodhi, got spanked once with a belt, and that his dad had spanked all the boys at times. Enzo also disclosed that the power was off once for two weeks, another time for two days and that once they did not have water. He further stated that

---

[2] This note was not entered until 7 months later. CPI Angulo stated that prior to entering the note in October 2018, she contacted the police officer who had accompanied her, and he confirmed that they had attempted to contact the parents.

one time, his dad made his mom's eye bleed and he, his mom, and his siblings all went to their grandmother's house for three days because they were scared. He also stated that Daria hides in the corner of the room when mom and dad fight while he and his brothers try to protect her. He said his mom and dad fight over "Connor", who is his mom's boyfriend. During Bodhi's interview, he also reported physical violence between mom and dad and that mom goes back and forth between dad's house and her boyfriend, Connor's house.  He stated that once when his parents fought, his glasses were broken.  He stated that his dad spanked him and his siblings with a paddle, but now they get spanked with a belt on the back of their legs. He stated that sometimes mom and dad buy cigarettes instead of breakfast and on one occasion they had Doritos for breakfast.

*Inappropriate response to Parents' Refusal to allow Child Protection into the Home*

During the seven months that the I sequence investigation was pending, the parents never permitted the investigator into the home. CPI Angulo never requested law enforcement assistance to gain access to the home and her supervisor, Lilah Cantu never instructed her to do so. In her interview with IG investigators, CPI Angulo stated that this was the first house she hadn't been able to get into. She also stated that she was not sure if there was a protocol for this and that she did not remember thinking about utilizing the police for assistance.

The parents initially refused CPI Angulo access to the home on March 16, 2018.  Three days later, on March 19, 2018, CPI Angulo went back to the family home and the parents were there, but again refused to let CPI Angulo in the house. They did agree to speak with her outside. CPI Angulo reported in her interview and her case notes that Daria Robbins was outside of the house with her parents during their conversation. She stated that Daria looked clean, was dressed appropriately, and that she saw no signs of abuse or neglect. She confirmed that Daria had food since she was eating a peanut butter and jelly sandwich while they were outside. During the conversation, CPI Angulo began asking the parents about every allegation in the report. She stated that in her interviews, she normally just goes down the list of allegations reported. The parents denied every allegation that she inquired about. When CPI Angulo asked them about their methamphetamine use, both parents got upset, saying, "I'm done", and went back into the house, taking Daria with them before CPI Angulo could interview her.

Supervisor Cantu directed CPI Angulo to continue to attempt to get in the home and documented the CERAP as "Safe" based on the current information. Neither CPI Angulo, nor her supervisor did anything further regarding the CPI's interaction with the parents.

On March 20, 2018, CPI Angulo reported in her case notes that when she interviewed CPI Nigel Franco, he reported that he had investigated a prior child abuse report on the family on November 1, 2017, alleging that the Robbins/Spence home had no utilities and the parents were suspected to be back on methamphetamine. She also stated that when CPI Franco reported when he went to the house, the utilities were on, so he unfounded the report. The IG interviewers inquired whether CPI Angulo read and took into consideration the prior reports involving the family during her investigation.  She stated that she did look at the previous DCP files on the family and noted that most of them were unfounded.

On May 10, 2018, after six weeks with no family contact, CPI Angulo documented in her notes and stated in her interview with the IG investigators, that she saw Bodhi at his school, and he had no obvious signs of abuse or neglect. She also noted that during the interview with Bodhi, he reported that the police came to their door, took his dad because he threatened to kill himself, and he was hospitalized. He further stated that he and Daria were in the room when his dad made these statements. They were both scared and Daria was crying. This incident should have been investigated further by CPI Angulo, and the police report regarding this incident should have been obtained.

During CPI Angulo's IG interview, she was questioned as to why so much time had lapsed between the two contacts, particularly considering the information she had learned about the family. CPI Angulo explained that she went on vacation during this period and had no explanation for the rest of the weeks where she had no contact, other than she was working on other cases.

CPI Angulo went to the home again on May 11, 2018, to do her last visit for her "Closing Safety Assessment (CERAP)". Again, the parents would not allow her into the house for the required visual inspection; however, they did again talk with her outside the home and allowed Daria to come outside. She noted in her case notes that she observed Daria as being clean, dressed appropriately, with no signs of abuse or neglect. The parents agreed to do a Urinalysis (UA), even though at the last visit, they had refused to do so. Mom reported that she still did not have an ID that is required for the UA.

On May 11, 2018, CPI Angulo documented in her case notes that she saw and spoke with the school counselor, Ilana Young, who made the initial report to DCFS in the "I" sequence. Ms. Young told CPI Angulo that she saw the children's parents, Alfred and Vivian, at the school and that dad "looked like crap". Upon further questioning by CPI Angulo, Ms. Young told her she thought dad's face looked "sunken in" and "he had a sore on his face".

CPI Angulo again talked to the boys at their schools on May 11, 2018, for her "Closing Safety Assessment (CERAP)". CPI Angulo reported the boys were dressed appropriately with no obvious signs of abuse or neglect. Enzo and Caleb reported that "everything is fine" in their home. Caleb said he was not aware of drugs being used in his house, they have food in their house, and that he eats when he gets hungry. Caleb reported that he, his mom, and his siblings walked to Grandma Pearl's house in the rain. He could not recall why they did this. Caleb further stated that dad went to the hospital recently "because the inside of his head hurt".

Enzo reported to CPI Angulo in his interview on May 11, 2018, that mom "sleeps all day and night and dad sleeps a lot" too. Enzo reported that Bodhi was hit with a brown leather belt on the legs (he indicated on the thigh area) about two months ago in March, for calling mom the "B" word**.** Enzo also reported that Bodhi has anger issues. He stated that his mom and dad got into a fight last night because DCFS came to his school. He stated that mom and dad have not used drugs since he was born seven years ago. He reported that he has not seen a pipe in his home, and he feels safe in his home.

On May 11, 2018, supervisor, Lilah Cantu created case notes from her supervision with CPI Angulo. In her supervisory notes, supervisor, Lilah Cantu documented that Bodhi reported to CPI Angulo that his parents had an argument and dad "jumped on" mom. He did not know why they were arguing. He and Daria were in the living room with their parents when this occurred. Bodhi did not know about any drugs in the home or ingested by his parents. He heard his dad tell his mom last month, "you argue all day with me, but when I come home with dope you don't". Bodhi also told CPI Angulo that one day he saw a" pipe thing" in a case in the dining room. He did not know what it was, "but it was glass, green and you could not see through it". Two days prior to this, he saw a "green thing" in his mom's room that looked like a tea kettle and had a "tube thing" coming straight off it. Since this conversation with Bodhi was not documented in CPI Angulo's case notes, the OIG staff asked if these statements by Bodhi were accurate. She did confirm that these statements were made by Bodhi during her interview with him.

Bodhi reported in his interview with CPI Angulo on May 11, 2018, that in April 2018, his father pushed him, but did not hurt him and his mom hit him with a belt on the legs for not listening to her. Bodhi stated that it hurt, however, there were no bruises or welts from this. Also, documented in supervisor, Lilah Cantu's case notes from the May 11, 2018, supervision with CPI Angulo, Bodhi told Angulo about being in foster care in the past and being home with his parents for about four years. He stated that since they have returned to their parents' home "it is worse now than when they first came back". He said it is worse

now because they argue all the time and it is scary for him when his parents argue. He further talked about an incident where his mom left the home with the children after an argument with his dad. They walked in the rain to go to Grandma Pearl's home, but his mom then changed her mind and went back home with his dad. He said that dad threatened to kill himself and he had marks on his neck. He stated the police came and picked him up and took him to the hospital. Supervisor, Lilah Cantu documented in her case notes that, "CPI will get the police report and medical reports to determine whether the children were present during this incident and if a hotline call is needed. CPI Angulo and Supervisor, Lilah Cantu appeared to focus on whether the children were present during this incident and ignored the chaos in the home.

Supervisor, Lilah Cantu also noted from this session, CPI Angulo was "not comfortable" in closing the case at this time since "the children were youth in care and the parents continue to be uncooperative; not allowing the CPI access to their home,  refusing to  commit to a UA , but then said they would at this visit and mom still did not have an ID. Also, CPI stated that she "wants to send a petition" on the case. This is the first time the need to file a "petition" with the court was discussed with CPI Angulo. Subsequently, documented in supervisory notes from eight supervision sessions with Supervisor, Lilah Cantu over a five- month period, CPI Angulo was directed to prepare a juvenile petition. Each supervision note is worded a bit differently, some notes stated, 'needs to send petition,' while others stated, 'wants to send petition,' or 'will complete petition,' and 'will talk to ASA about petition.' CPI Angulo stated in her interview that she was instructed to prepare and file with the court was the one asking the court to order the parents to comply with services. This petition did not get prepared and filed with the court by CPI Angulo until AFTER the death of the two youngest children.

*Failure to obtain timely Urinalysis and Inappropriate Reliance on Need for Consent*

In the supervisory case note dated, May 11, 2018, a directive was given to CPI Angulo by Supervisor, Lilah Cantu to take the parents for drug screenings. This would be the first instruction by Supervisor, Lilah Cantu to CPI Angulo out of nine total supervision sessions where she was given this directive. After six months from the start of the investigation, CPI Angulo finally took mom to get her drug test on September 11, 2018, and at the time of the children's deaths on October 12, 2018. CPI Angulo was only able to obtain a drug screen for mom, but not for dad.  During her interview with the OIG investigators, CPI Angulo stated it took four months before her schedule allowed her to bring mom for a drug screen. This was because drug screens were not available for DCFS cases locally and the closest place was forty minutes away. She stated that with the need to also wait one or more hours while a client was being tested, this could easily take up a good half of her day.  She stated that she had to create a time frame where she could be gone on one case for those number of hours. When asked by the OIG investigators if CPI Angulo talked to mom about her concerns during the drive to and from the drug testing facility, CPI Angulo said she did not.[3] She stated that she purposely wanted to keep the conversation light, given she would be in a car alone with mom for at least one half of a day. CPI Angulo also stated that mom told her she would have a clean drug screen; however, when the results came back the screen showed that mom had amphetamines and methamphetamine in her system.[4]

---

[3] Of concern is that in the pending investigation 1000J the current CPI Regina Eyer has noted the following after his in-person interview with mom, Vivian Robbins: "CPI questioned Mrs. Robbins about her meth use. Mrs. Robbins admitted she had used through August and quit and then started again after the children's death and used 3 times since October 13, 2018. Mrs. Robbins stated she is now sober and wants to seek treatment. CPI questioned Mrs. Robbins about any form of substance abuse treatment and Mrs. Robbins told CPI she has ***gone to some meetings and her sponsor is DCP Investigator Joslyn Angulo's stepdaughter, Shelby Garza. Mrs. Robbins told CPI she has been her sponsor, even before the children's death***"

[4] During supervision on 9/24/18, CPI Angulo and Supervisor Cantu looked up the results of mom's (UA) from 9/11/18 and found mom tested positive for amphetamines and methamphetamine.

After the May 11, 2018, contacts with the family and a supervision session with supervisor Cantu, CPI Angulo made another in-person contact with the family about five weeks later, on June 18, 2018. Again, she was not allowed inside of the house, but was able to talk to the parents outside of their home. Dad reported that he was in the hospital for psychiatric services. CPI Angulo did not have a consent for release of records on her or in her car, therefore she did not get a release of information signed by dad. CPI Angulo said in her interview that she never did get a release signed by dad for his mental health records. She did at some point after June 18, 2018, make a request to the hospital for dad's records from his hospitalization, even though she did not have a release. The hospital refused to send them without a release. Supervisor Cantu stated in her interview that CPIs were always required to have releases in their car because staff never know when they would connect with a parent and be able to get releases signed. It is concerning that neither CPI nor the supervisor were aware that releases are not required, and per procedure 300.50(j), the CFS 600-5 should have been utilized or an administrative subpoena (CANTS 7) could have been issued.

*Failure to Provide Regular Supervision and Follow Supervisory Directives*

Twelve more supervisory sessions occurred between CPI Angulo and supervisor Cantu from May 24, 2018 to October 11, 2018, per supervisor Cantu case notes. At every session, CPI Angulo was given directives on one or more concerns regarding drug testing, getting a release signed by dad, and preparing a juvenile petition to get parental compliance with services.  During this timeframe, the CPI made six more home visits to gain access to the inside of the home and to get a release signed by dad to get his mental health records from his hospitalization. She was unsuccessful with getting either. Although dad was never home for these six visits, mom was home for some of them. At one of the visits, CPI Angulo asked mom if she could come inside of the house to do her inspection and mom told her that dad was not home, and she needed to get dad's permission before she lets the CPI inside of the house. Mom also stated that she would leave a note for dad asking them to contact CPI Angulo. She never did hear from dad and she never was able to connect with him.

The supervisory sessions between Supervisor Cantu and CPI Angulo show that multiple directives were given by Supervisor Cantu to CPI Angulo, including to complete the drug testing on parents and prepare a juvenile court petition. The chart below shows dates when supervisions occurred with CPI Angulo, when each supervision was documented in supervisory notes by Supervisor Cantu, when drug screens were discussed and when the need for a juvenile court petition was discussed.

| Date of Supervision | Date of Documentation | Drug Screen discussed | Petition discussed |
|---|---|---|---|
| 3/15 | 3/15 | | |
| 3/15 | 3/15 | | |
| 3/19 | 3/19 | | |
| 5/11 | 5/11 | D | P |
| 5/24 | 6/12 | | P |
| 7/5 | 7/7 | D | P |
| 7/11 | 7/11 | D | |
| 8/10 | 8/10 | D | P |
| 8/23 | 10/15 | D | P |
| 9/10 | 9/10 | D completed on Mom | P |
| 9/11 | 9/11 | D | |
| 9/21 | 10/14 | D | |
| 9/24 | 9/24 | D | P |
| 10/4 | 10/4 | | |

| 10/10 | 10/10 |  | P |
|-------|-------|--|---|
| 10/11 | 10/14 |  | P |
| 10/11 | 10/14 |  |   |
| 10/13 | 10/15 |  |   |
| 10/13 | 10/14 |  |   |
| 10/24 | 10/24 |  |   |

On September 24th, mom called CPI Angulo to tell her she and the children were moving out to live with her mother because she and dad were not getting along. Supervisor Cantu directed CPI Angulo to talk to mom about opening an Intact Family Case, where the children would remain with her, she would have a service plan to follow, and the goal would be to stabilize the family and get her and the children on a healthy track. It was noted later in the CPI's case notes that mom agreed to this plan. Supervisor Cantu also documented in her supervisory notes from this session that Supervisor Cantu and CPI Angulo planned to discuss with the Assistant State's Attorney (ASA), who handles DCFS cases, about filing a petition for protective custody of the children, depending on what mom tells CPI and what the parents have been up to.

Mom called CPI Angulo again on September 26, 2018, to report that she and the children were still with the maternal grandmother. In a supervision session on October 10, 2018, fifteen days later, CPI Angulo reported to Supervisor Cantu that mom and children remained living out of the family home. She again reported to Supervisor Cantu in a supervisory session on October 11, 2018, just one day before the two children died in the family home fire, that mom and the children remained out of the home. When asked in her interview if she had gone to the maternal grandmother's home at any point in time to verify that mom was living there, CPI Angulo stated that she had not. When asked how she knew, then, that mom and children were still living away from the family home, she stated that she thought they were still out of the home since mom had not called her to tell her otherwise. In the supervisory session on October 10, 2018, Supervisor Cantu and CPI Angulo discussed getting the intact family referral completed and submitted for approval for assignment to a private agency. Supervisor Cantu instructed CPI Angulo also to file a petition "right away". There was no note by either CPI Angulo or Supervisor Cantu indicating that they had talked to the ASA about filing a petition. CPI Angulo stated in her interview that she still had not prepared a petition and did not think the ASA had yet been consulted as of October 11, 2018, fifteen days after the supervisory session where they discussed the plan for the family and to consult with the ASA.

The next day, on October 12, 2018, Enzo and Daria died in a fire at the family residence. CPI Angulo stated in her interview that mom told her that she was in the family home "packing up items" to take with her. Three of the children were at the family home with her, watching TV upstairs, dad was shopping, and Bodhi was with his maternal grandmother, Pearl. Mom was downstairs packing when Caleb came downstairs to tell her that a fire was burning upstairs. Mom attempted to get the two younger children; however, the fire was blocking her ability to get into the room where they had been watching TV.

*Inadequate Assessments*

The case file shows that CPI Angulo did completed the required assessments on May 11, 2018; substance abuse screening; domestic violence screening; and the Home Safety Checklist. The substance abuse screen was done on mom only. CPI Angulo completed the domestic violence screen, even though the family refused the screen and denied any violence occurring in the home. The supervisor approved this screen. The CPI completed the home safety checklist even though she was never allowed in the home, and she documented this, but did not request any assistance from police to get into the home.

On September 10, 2018, a second Safety Assessment was completed on this date. No Safety threats were identified at this time.  The CPI saw the children and completed this assessment on this date to close the

investigation. It should be noted that safety issues were later identified, but not documented, and the investigation did not get closed. On October 3, 2018, CPI Angulo completed the Risk Assessment and identified the family as having risk factors; however, her follow up was documented that the mother agreed to an intact family case and that she was going to send a petition to court. The Petition was not prepared and filed with court until after the children died on October 12, 2018.

*Extensions Granted without Good Cause*

The I sequence investigation remained open for seven months. The Abused and Neglected Child Reporting Act, 325 ILCS 5/7.12 provides that:

> *The Child Protective Service Unit shall determine, within 60 days, whether the report is "indicated" or "unfounded" and report it forthwith to the central register; where it is not possible to initiate or complete an investigation within 60 days the report may be deemed "undetermined" provided every effort has been made to undertake a complete investigation. The Department may extend the period in which such determinations must be made in individual cases for additional periods of up to 30 days each for good cause shown. The Department shall by rule establish what shall constitute good cause*

Rule 300.110 defines *good cause* as follows:

> *D) Good cause for extending the period for making a determination, an additional 30 days may include, but is not limited to the following reasons:*
>
> > *i) State's attorneys or law enforcement officials have requested that the Department delay making a determination due to a pending criminal investigation.*
> >
> > *ii) Medical or autopsy reports needed to make a determination are still pending after the initial 60-day period.*
> >
> > *iii) The report involves an out-of-state investigation and the delay is beyond the Department's control.*
> >
> > *iv) Multiple alleged perpetrators or victims are involved necessitating more time in gathering evidence and conducting interviews.*

None of the above reasons were bases for an extension to be granted in the I sequence investigation. It appears that the investigation was continued because the parents were uncooperative, and the investigator was unable to gain access to the home and was unable to get the parents to complete drug testing. It also appears that the supervisor was vacillating between filing a petition in court and continued attempts to engage the parents in services.

Six extensions were granted during the ongoing investigation, resulting in the investigation continuing for seven months. The first extension was both requested and approved by Supervisor Cantu, because on May 11, 2018, she was temporarily assigned as AA in AA Busick's absence. The remaining five extensions were approved by AA Busick. In her interview on November 16, 2018, AA Kelly Busick stated that her consideration for extensions is mainly to read the request and approve it, based on the supervisor having already approved the extension, and the supervisor is more familiar with the details of the case and why an extension is needed. In the Robbins/Spence case, AA Busick approved the last five extensions based on the following:

June 12, 2018
New info reported and needs to be followed up on by CPI involving medical and law enforcement. A petition will be sent to the court as well. Additional contact will need to be made, need follow up for medical and police, need Petition for Court, need added contacts.

**Note:** the AA used the exact language as the supervisor in her approval.

July 11, 2018
Waiting for medical records and completion of drug screen.

**Note:** the AA used the exact language as the supervisor in her approval.

August 10, 2018
CPI needs the family to sign a release to see if the medical/psychiatric reports can be sent. Petition needs to be sent, if the parents do not comply. CPI needs to take the family to complete a drug screen, as mom does not have an ID and she had not gotten one. Children need to be seen for closing safety assessment (CERAP).
**Note:** the AA used the same language as the supervisor in her approval.

September 10, 2018
CPI needs the dad to sign a release to see if the medical/psychiatric reports can be sent. Alfred has not been home during CPI's contact attempts. Vivian has agreed to have him at the home on September 11, 2018 for the UA and to sign the consent. CPI needs to take the family to complete a drug screen, and they have agreed to do so with CPI providing transportation and verifying identity on September 11, 2018. CPI has interviewed all children and the information provided in the report appears to be old information. Petition may not be needed pending UA results.

**AA writes:** there are additional investigative activities that need to be completed before report can successfully be closed out, such as gathering medical reports.

October 10, 2018
Mother submitted her UA, which was positive for methamphetamines. Mother agreed to an open intact case. CPI sent the referral and CPI is awaiting response for approval. Father has continued to elude CPI. CPI will complete juvenile petition to the court.

**AA writes:** allow for discussion with the ASA about a petition and for intact case opening to talk with ASA for petition, get intact family opened.[5]

*Length of Time Investigation was Ongoing*
The I sequence investigation was ongoing for seven months before the case was referred for any type of family intervention, and when it was finally decided, it took ten days to make the intervention referral for Intact Family Services. The children died before the case was transferred to the private agency for intact services. The activity leading up to the intervention referral is documented on Attachment 2.

**INTERIM ANALYSIS**
Methamphetamine (Meth) is a powerful central nervous system stimulant. A highly addictive drug, Meth comes in different forms; most often it is a powder that dissolves easily in water, though it can also come in clear, chunky crystals called "ice." Meth can be swallowed, snorted, injected, or smoked. It is known by many names, including speed, meth, crystal, crank, biker's coffee, and chalk (ONDCP, 2003; Shaw, 2004).

---

[5] This last extension on10/10/18, was just two days before the children died in the house fire.

Compared to other children, children whose parents use drugs and/or alcohol are three times more likely to be abused and four times more likely to be neglected (Wells & Wright, 2004). This increased risk applies in cases of meth use.[6]

Initial Findings

After interviews and review of documents noted, the following concerns have been identified:

- Unnecessary and inappropriate use of police assistance for protective custody to interview the children.
- Inappropriate response to parents' refusal to allow child protection into the home.
- Inadequate and incorrect assessments (i.e., safety assessments, domestic violence screen, substance abuse screen and the home safety checklist).
- Failure of supervisor to provide regular and consistent supervision to CPI.
- Failure of CPI to follow supervisory directives.
- Lengthy gaps in contacts with the children, their parents and the home.
- Failure to take into consideration the prior eight child abuse/neglect hotline reports to DCFS and investigations completed from these reports.
- The I sequence investigation still pending after seven months later from the initial report date of 3/14/18.
- Approval of six extensions of the investigation without good cause or adequate review.
- Failure to follow Department Rules, Policies and Procedures.
- Failure to make timely referrals for service intervention.
- Systemic drug testing issues.
- Inappropriate reliance on need for consents.

**Unnecessary and Inappropriate Use of Protective Custody to Interview Children**

At the onset of this investigation, it was determined that the Police Department would take protective custody of the children for the sole purpose of doing an interview at Polaris Agency. According to CPI Angulo, this was the decision of Supervisor Cantu, and Angulo did this because she was directed to do so. CPI Angulo stated she did the initial interviews with the boys at school and purposely did not ask them

---

[6] When parents use or make meth, their children often do not have necessities such as food, water, and shelter, and they frequently lack adequate supervision and medical care, including proper immunizations and dental care (NDIC, 2002). In addition, the cycle of meth abuse has a built-in phase when parents usually "crash" and are unable to look after their children (Wells & Wright, 2004). Children in meth-using families may also face hazards such as used hypodermic needles and razor blades (Swetlow, 2003). (**Neglect**). Exposure to parents intoxicated by meth may compromise child safety: when high, users often exhibit poor judgment, confusion, irritability, paranoia, and increased violence. Given the effects it has on libido, children of meth-using parents may be at greater risk for sexual abuse (Swetlow, 2003; Riverside DEC, 2005), either by parents themselves or by other adults coming in and out of the home (NCDOJ, 2004). (**Abuse**).

Brain changes brought on by chronic meth use can impair cognitive function long after a person stops using the drug. Experiments indicate that for up to six months after they stop using, addicts recovering from sustained, heavy meth use may have trouble processing information and may experience anhedonia (inability to experience even the simplest pleasures), depression, and anxiety.

Children whose parents abuse substances are often exposed to chaotic and neglectful lifestyles.

The children of methamphetamine users also may experience a chaotic home life, with inadequate supervision, inconsistent parenting, chronic neglect, parental aggression, violence, and other safety risks (e.g., exposure to chemical and toxic fumes from home-based methamphetamine laboratories, to weapons, or to criminal activity; Amatetti and Young, 2006)

serious questions as she was waiting for Polaris Agency forensic interviews scheduled for the following day. There was no urgent and immediate need for Protective Custody as the CPI had documented the children as safe on the previous day.

**Inappropriate Response to Parents Refusal to Allow Child Protection into the Home**
The parents' refusal to allow child protection into their home during a child protection investigation must be met with an immediate response. The field must immediately request assistance from law enforcement to enter the home, with the backup of immediately filing a petition in court if the family persist in denial of entry.

**Inadequate and Incorrect Assessment**
On March 15, 2018, the *initial safety assessment* was completed after the CPI saw the three boys at school and never saw Daria or the parents. The CPI admitted she did not ask the boys questions about the intake identified issues; she was waiting for the forensic interviews the next day. All safety threats were marked "No" when many of these threats were identified in the intake. The CPI determined all four children to be safe, and Supervisor Cantu accepted this assessment, but did not formally approve or document this for eight days.

The CPI completed her *DV assessment* on May 11, 2018, even though the family refused the screen and consistently denied any violence was occurring in the home. This was contrary to what the reporter stated in her child abuse report to DCFS and contrary to what the children said during their interviews.

The CPI completed her *substance abuse screening* on May 11, 2018, approximately two months after the report was called into DCFS, which stated concerns about the parents abusing drugs. The worker did not take mother for a drug test until September 2018.

The *home safety checklist* was completed with no information as to the safety of the home, given the worker was never allowed to enter the home.

A second *safety assessment* was completed on September 10, 2018. This assessment was done with the intent to close the case. Again, all threats were identified as "No", even though at this point in the investigation, glaring problems became apparent from the children's statements, the lack of cooperation by the parents, and the assertions made in the initial report that were coming to light. It should be noted that safety issues were finally identified in the case (not documented), and therefore the CPI was unable to close the case.

**Failure to Provide Regular and Adequate Supervision**
Supervisor Cantu met with CPI Angulo during this investigation on numerus occasions; these supervisory sessions did not occur on a regular basis and were not structured to accomplish certain goals in a timely manner. The supervision on this case was inadequate to ensure the children were safe or that appropriate interventions were put in place. Supervisor Cantu stated that she has supervision with CPIs "at critical times" or when "things come up" in a case.

**Failure to Follow Supervisory Directives**
Many supervisory directives were given to CPI Angulo. CPI Angulo did not follow through, particularly on important directives that might have saved the children from the fire. Supervisor Cantu repeatedly provided same or similar instructions to CPI Angulo to no avail. The chart on page nine shows the dates the supervisory documentation was put into SACWIS, the dates CPI Angulo was instructed to get parents drug tested, and the dates she was told to prepare a juvenile court petition. Drug testing was discussed ***nine times*** and the court petition was also discussed ***nine times***. The mother in this case was tested in September, six months after the investigation was opened, even though the initial report identified drug use as a

problem. The father was never tested. The Petition was never completed. **Note:** Several of the supervisory sessions were not documented until days or weeks after they occurred. Of specific concern, were the four sessions that were not documented until after the death of two children and are shaded in the chart on page nine.

Work load and caseloads for Supervisor Cantu and CPI Angulo are not mitigating factors for the lack of attention given to this family. Records reviewed by the IG investigators show that Lilah Cantu was supervising 4 to 5 Child protection investigators at any given time during the pending investigation. CPI Angulo's case assignments from March 2018 thru September 2018 were:12 assignments in March; 15 in April; 13 in May; 16 in June; 14 in July; 11 in August; and 11 in September.

**Lengthy Gaps in Contacts with Family Members**
After being assigned the case on March 15, 2018, CPI Angulo made contacts regarding the family, saw three of the four children, and attended Polaris Agency interviews in the first six days, up through March 20, 2018. After this date, no contacts were made for approximately six weeks, until May 10, 2018, with any family members or other individuals regarding the case by CPI Angulo or any other DCFS staff, even though there were eight previous reports with investigations on this family. In previous investigations; some were indicated; the children had been in foster care in the past and returned home; statements by the boys revealed domestic violence in the home; and there was a lack of food at times. The report prompting this investigation was an "I" sequence and made several concerning allegations, including domestic violence, child abuse, drug use by both parents, lack of utilities in the home, little food for the children at times, and the continued refusal of the parents to allow CPI Angulo into their home to conduct a home safety assessment.

After the CPI had an in-person contact on May 11, 2018, another five weeks went by before another contact was made on June 18, 2018.

The CPI had an in-person contact on June 18, 2018 and no further contacts for three months, until September 11, 2018. [7]
The CPI had an in-person contact on September 11, 2018 and no further in-person contacts occurred again, up through the date of the children's deaths on October 12, 2018.

**Failure to Take into Consideration the Prior Hotline Reports**
The CPI stated in her interview that she looked at the previous eight child abuse reports with investigations, and her case notes indicated that she looked at them several months after being assigned the investigation. She intimated in her interview that these previous cases did not hold much weight when investigating this "I" sequence, since most of them were unfounded. One of the first things she should have done, particularly when assigned an "I" sequence case, was to look closely at the prior investigations, regardless of whether they were indicated or unfounded. Had she looked at the previous case closely and shortly after being assigned this case, she might have found consistent conditions existing in the home, made a greater effort to gain access to the home, and considered family intervention in a more timely manner.

**Failure to Complete the Investigation in a Timely Manner**
The investigation was ongoing for seven months, from March 14, 2018 to October 12, 2018, when the children died in the fire. This case dragged on even though the family presented itself shortly after opening the case as a family with several issues that needed to be addressed. The report made to DCFS presented multiple concerns. These concerns were quickly affirmed through the children's statements, the parents'

---

[7]The CPI documented in her case notes attempts she made to see the family at their home on 7/10/18, 8/10/18, 8/17/18, 8/27/18, 9/13/18 and 9/20/18, and talked to the mother on the phone on 9/19 and 9/21, 2018.

behavior when talking with the CPI, statements by school personnel, and the family's multiple past reports and investigations. Rule and procedure 300 require the DCFS investigator to complete the investigation within 60 days and allows for 30-day extensions for good cause when extenuating circumstances exist. The information obtained from interviews and case notes from the file presented no extenuating circumstances; much of the reason for the extensions was due to lack of attending to the case.

**Approvals of Extension Without Cause or Adequate Review**

Under procedure 300, there are specific requirements when requesting an extension and when approving an extension. The review of the extension requests in this case reveals a rote process for approvals. The CPI completes the request; the Supervisor submits the request to the AA for approval; the AA often approves the extension without review of the case or to assure investigative activities and supervisory direction is being followed. This happened several times. Had the supervisor or AA reviewed the previous approvals or the investigation, it would be obvious that this family needed assistance and investigative activities that were not occurring.

**Failure to follow Rule and Procedure 300**

See:
- *Investigative Process*
- *Role of the Child Protection Supervisor*
- *Investigative Activities Requiring Area Administrator Support*
- *Model Supervisory Practice--Framework for Supervision; Format for Supervision*

**Failure to make timely referrals for service intervention**

This report came to DCFS on March 14, 2018. After six months, the decision was finally made to refer this family for Intact Family services. It took almost another month before DCFS and the private agency, Neptune Agency, scheduled a date for the handoff of the case to introduce the agency staff to the family. By the time the handoff date arrived, the two young children had died in a house fire.

**Systemic drug testing issues**

Illegal Drug usage was identified as an issue for the parents in this case at the Intake. However, drug testing was not completed for this mother until six months after the intake and was never completed on the father. The drug testing center is a forty-five-minute drive from the home. This causes problems for families if they do not have transportation to get drug testing and takes a great amount of time away from the worker if they must transport the clients. Clients also need proper identification to have this testing or DCFS must be present to verify persons. These issues contributed to the failure to get timely testing of this family. A six month wait to have drug testing is unacceptable, specifically after the report identified a $100 per day methamphetamine habit.

**Inappropriate Reliance on Need for Consents**

After learning that the police had transported the father for a psychiatric evaluation after threatening suicide, the investigation languished because the CPI could not get the father's consent for release of the medical records. CPI Angulo did not have a consent for release of records in her car during her contact with father. In her interview with IG investigators, she acknowledged that she never obtained a release for the father's mental health records. At some point after June 18, 2018, CPI Angulo did make a request to the hospital for his records, and the hospital refused to send them without a release/consent. Supervisor Cantu stated in her interview that CPIs were required to always have releases in their car. It is concerning that neither CPI, her supervisor nor the AA were aware that releases are not required during a child protection investigation. At a minimum, DCFS Office of Legal Services should have been contacted to assist in getting the records.

**Issues specific to I sequence:**
- Failure to recognize that this case needed to be assessed differently given the family history.
- Failure to respond to cumulative risk/chaotic lifestyle.
- Failure to get parents into drug testing within 72 hours.
- Failure to immediately resolve issue of not getting into home.

Common and similar issues have been found in the review of **sequences A-H** which will be further detailed in the Final Report including, but are not limited to:
- Supervision is not consistent
- Contacts are waived without justification
- CERAPs are approved without required contacts
- All children were not seen as required in investigations
- Children were not interviewed alone
- Drug tests were not completed as necessary
- Time lags in contacts
- Each case was investigated in isolation without looking at the cases in totality

## INTERIM RECOMMENDATIONS

1. The involved Region must immediately be retrained on appropriate response to parents' refusal to allow entry to the home.

2. All Investigations pending more than 60 days in the local field office should be reviewed to assure family and child contacts have occurred and the children are safe, as well as to ensure adequate completion of assessments, proper supervision is occurring, and that there has been follow up on supervision directives.

3. All extensions approved by this administrator should be reviewed to assure that extensions are warranted.

4. The Department should complete a review of the drug testing process in the involved area to determine its availability to families and ensure immediate drug testing resources for the area are readily available.

5. The Department should retrain staff in the involved Field Office on the use of Assessments (Safety, Risk, Domestic violence, Substance abuse, Home Safety checklist).

6. The Department should consider sending involved Field Office child protection teams to the Child Welfare Training Academy to be re-trained on procedure 300 (which should include accessing the family home and completing safety assessments).

7. The Department should review the practice of requesting law enforcement to take protective custody for interviewing purposes.

8. DCFS legal should retrain child protection staff in the involved Region on use of the CFS 600-5 and the CANTS 7 (administrative subpoenas).

# APPENDIX D

## OFFICE OF THE INSPECTOR GENERAL
### Department of Children and Family Services

### REDACTED REPORT

*This report is being released by the Office of the Inspector General for teaching/training purposes. To ensure the confidentiality of all persons and service providers involved in the case, identifying information has been changed. All names, except those of professional references, are fictitious.*

This final report is a continuation of the Office of the Inspector General's (OIG) investigation of SCR# 1000 A through H, and J. SCR# 1000 I was investigated separately, and results of the investigation with recommendations were compiled by the OIG in a <u>Confidential Interim Report,</u> which was sent to the Director of DCFS on December 18, 2018 (attached hereto).

File No: 2019-0992

Subjects: Robbins/Spence Family

Mother: Vivian (Vivi) Robbins DOB 11/1984

Father of Enzo, Caleb, Bodhi: Alfred (Wade) Spence DOB 03/1984

Involved youth:

Bodhi Spence DOB: 11/2006

Caleb Spence DOB: 11/2008

Enzo Spence DOB: 06/2010 and DOD 10/2018

Daria Robbins DOB: 02/2013 and DOD 10/2018

## INCIDENT FORMING THE BASIS FOR THE OIG INVESTIGATION

In October 2018, eight-year-old Enzo Spence and 5-year-old Daria Robbins died in a fire at their family home. Their mother, Vivian Robbins, and brother, Caleb Spence, were able to exit the home during the fire. Their brother, Bodhi Spence, and the Spence children's father, Alfred Spence, were not at home the day of the fire.

At the time of the fire, DCFS had a pending child abuse investigation against the parents, Vivian Robbins and Alfred Spence, (SCR# 1000 I). This investigation was opened on March 14, 2018, to investigate

allegation #10 - Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare, and allegation #2 - Head Injury, pertaining to one or more of the four minor children living in their home.

The Office of Inspector General (OIG) initially investigated the I sequence as part of its mandate to review child deaths when the family had contact with DCFS within the year prior to the children's deaths. Multiple issues and concerns came from the OIG investigation. A summary of the OIG's I sequence investigation, concerns, and recommendations are reported in its Confidential Interim Report, tendered to the Director of DCFS on December 18, 2018.

**The Inspector General (IG) opened a formal investigation into all other Child Protection investigations (SCR #1000 A through H) involving the family and leading up to the deaths of the children due to the grave concerns arising from the performance of all levels of staff involved in the Child Protection investigation of SCR 1000 I sequence; the fact that it was pending for seven months when the two children died in the house fire; and the fact that the family had been investigated nine times before their deaths, including the pending "I" sequence. This Confidential Final Report encompasses all investigations conducted in SCR #1000 and with recommendations based on these concerns.**

## OVERVIEW OF THE CASE

The Robbins/Spence family has an extensive history with DCFS. Prior to the children's death, the family had been investigated on nine separate occasions. The first two investigations, sequences A and B, occurred between 2009 and 2013. The A sequence was indicated, and the B sequence was unfounded. [1] The third investigation, sequence C, occurred also in 2013, and resulted in Vivi Robbins being arrested for possession of methamphetamine and the children being placed in foster care.[2]

In October 2015, a separate, investigation was opened under SCR# 2000 A, when Daria, who was approximately two-and-a-half-years-old at the time, disclosed that her maternal grandfather sexually abused her. This abuse allegedly occurred when Daria went to her maternal grandparents' house for regularly scheduled visits with her brothers, who at the time were residing with these grandparents. This investigation was unfounded and has been expunged.

On August 31, 2015, nearly 2 years later, the children were returned to their mother. On February 29, 2016, the case was closed with the Department and in court. One factor considered by DCFS and the court when returning the children to Vivi Robbins, was that she and Wade Specne were not residing together. Once returned, the children remained with their mother approximately two years before the fire. During this two-year period, the family had six additional reports of child abuse/neglect, each resulting in separate child protection investigations. Five were unfounded and one was pending when the children died.

On April 5, 2016, the DCFS hotline was contacted when the father, Wade Spence, broke all the windows out of Vivi Robbins's van. The police were called, and he was arrested. At the time of his arrest, he told police he was living with his three boys and Vivi Robbins, and that he and Vivi had been drinking all day. This investigation was unfounded even though the Child Protection Investigator's (CPI) case notes noted that the police had stated it would be dangerous for the kids if the dad lived there, and it had been determined

---

[1] SCR 1000 A- Indicated for allegation 79, medical neglect, on **4/6/09**
 SCR 1000 B- Unfounded for allegation 79, medical neglect, finding date unknown.
[2] SCR 1000 C- Indicated for allegation 74, inadequate supervision on **10/9/13**—children taken into protective custody and placed into foster care for over two years between 2013-2016.

the boys were not in the home at the time of the incident.[3] The allegation was unfounded, based on the fact that the children were not involved in this incident. The reporter, an Assistant State's Attorney (ASA) in the local county who had been previously been assigned to pursue DCFS reports in court, could not verify with certainty the children were home during the incident. This incident was reported five weeks after the children were returned home. (SCR# 1000 D)

In August 2016, the DCFS hotline was contacted by the local police to report that the three boys were found playing inside an ambulance ten blocks from their home. When the police brought the boys back home, Vivi and Wade did not know they were gone. This was the second time within a month the three boys had gotten out of the home in the middle of the night. The family composition included the father as living in the home. The investigation was unfounded because Vivi and Wade took immediate action by calling the police once they realized the boys were gone, and because they added locks to the doors. [4] (SCR# 1000 E)

In December 2016, the school contacted the DCFS hotline to report that mom was looking glassy eyed and like she was back on meth. It was also reported that the children's attendance at school, which had been good last year, was getting worse. The day before, the grandmother had come to the school crying and stated Vivian had "flown the coop." The allegation of inadequate supervision was unfounded based on a lack of evidence the children were ever left unsupervised.[5] (SCR# 1000 F)

In February 2017, the school contacted the DCFS hotline to report mom looked like she was back on meth as she was skinny and her teeth were rotting, and the father had just been released from jail and was also skinny and had sores on his face. This investigation was unfounded.[6] The CPI and supervisor determined there was not enough credible evidence Vivi was using illegal drugs, and she appeared stable and able to parent the children appropriately. (SCR# 1000 G)

In November 2017, the DCFS hotline was contacted by the school to report both parents appeared to be back on meth and one of the children reported the heat was off and there was no running water. This investigation was unfounded.[7] CPI observed the home to be clean and appropriate with electricity and running water. Both parents submitted to a drug screen which did not detect any drug use. (SCR# 1000 H)

In March 2018, the school contacted the DCFS hotline to report the mother's eight-year-old son was in the reporter's office sobbing. He had disclosed that he was scared for his five-year-old sister. He stated that their parents had been fighting and their father punched their mother in the eye and made it bleed. He stated his eleven-year-old brother got into the middle of the fight and their father hit him with a metal pole, and the mother hits his brother with a belt. He stated both parents use meth. The paternal grandmother also spoke with the school counselor and disclosed that the father has a $100 a day meth habit, the water and heat had been turned off, they only had space heaters to heat the upstairs, and food is limited. This investigation was pending at the time of the fire. This investigation had six extensions that were granted, resulting in the investigation continuing for seven months. The investigation was indicated the month after the fire.

---

[3] Sequence D report occurred five weeks after children were returned home, Unfounded for allegation 60, substantial risk of harm on **6/3/16**
[4] Sequence E Unfounded on allegation 74, inadequate supervision on **9/2/16**
[5] Sequence F Unfounded on allegation 74 inadequate supervision on **2/6/17**
[6] Sequence G Unfounded allegation 60, substantial risk of harm on **2/21/17**
[7] SCR 1000 H unfounded on allegation 60, substantial risk and allegation 82, environmental neglect on **1/30/18**

In October 2018, while the "I" sequence investigation was pending, the DCFS hotline was contacted to report that law enforcement received a 911 call on October 12, 2018 for a house fire. The reporter stated the mother and her ten-year-old son were the only two family members who were able to get out of the home. When the fire started, the three children, including the ten-year-old, were in the upstairs bedroom watching TV and sleeping. The ten-year-old went downstairs to tell his mother he saw flames and the floor was hot, but he did not wake his two siblings (ages 5 and 8). The mother went to the bedroom and saw flames in the doorway, but it was too hot to enter the room. The mother was able to hear her two children screaming. Both children died in the fire. The home had no power and there were extension cords running from a neighbor's home, with some of the extension cords spliced together. The room where the children were sleeping had a space heater. There was garbage throughout the home. The gas oven was open and was being used to heat the home. The father was at the store and the eleven-year-old was at his grandma's house when the fire broke out. The investigation was indicated. The parents are facing criminal charges. The two surviving siblings were placed in foster care.

## FINDINGS:

Issues of domestic violence, substance abuse, mental health, paramour involvement and chronic neglect were identified, with no interventions provided to this family during the pending I sequence investigation in March 2018. Common practice issues found in the review of the A-H sequences include inconsistent supervision, contacts waived without justification, CERAP approved without contacts being made, all children were not seen or interviewed separately, necessary drug screens were not completed, lengthy time lags between contacts, and each case was investigated in isolation without assessing the totality of circumstances adequately to ensure the safety of these children.

## INVESTIGATION OF SCR #1000, SEQUENCES A through I

**SCR # 1000 A**
**Report Date: 3/24/09**
**Finding date: 4/06/09**
**Reporter: Apollo Medical Center**
**Indicated #79 - Medical Neglect**

Report: Staff at Apollo Medical Center contacted the DCFS hotline to report that 4-month-old Caleb Spence is an outpatient at Apollo Family Practice. Genetic testing was performed and suggested the possibility of cystic fibrosis, which led to a referral to the Apollo Pediatric Clinic. Apollo was contacted and the Pediatric Clinic had indicated the testing had not been completed and the infant was still at risk for the disease. The mother and infant were last seen on March 17, 2009. The mother was asked about the referral and claimed that they indicated the infant is a carrier but not at risk. The mother claimed there was a misunderstanding. The infant has also been diagnosed with a severe skin disorder, eczema, and that the mother's inconsistent compliance with appointments places the infant at risk for a septic infection, as the cracks in the skin can easily lead to an infection. In addition, Caleb was not up to date with his shots.

**SCR # 1000 B**
**Report Date: 2/21/13**
**Finding Date: Information not located**
**Reporter: A Medical Provider**
**Unfounded #79 - Medical Neglect**

Report: A medical provider contacted the DCFS hotline to report that Vivian Robbins missed four follow-up appointments for Daria, who was only two-weeks old at the time of the report. The reporter stated that

Daria was in the hospital for two days due to an irregular heartbeat. She was admitted to Ceres Hospital and transferred to Gemini Hospital in a city about 2 hours from the family's city of residence. The mother was to follow-up with the doctor two days after Daria was discharged, but never did. The mother was instructed not to smoke around Daria; however, the mother was doing this anyway; not only has the mother been smoking around Daria, but she was sleeping in bed with Daria. Furthermore, the reporter stated that Caleb, who was then four-years-old, was diagnosed with asthma and the mother was instructed not to smoke around him, as well. The reporter stated that Daria was currently admitted to the hospital after she went six hours without being fed. She is supposed to eat every three to four hours. The mother was not at the hospital with Daria, and medical staff is not aware of why the mother is not at the hospital with her daughter. The reporter further stated Daria had a low birth weight when born and had gained to a normal weight. The reporter and staff at Gemini Hospital had concerns about sending Daria home with mom.

**SCR #1000 C**
**Report Date: 9/9/13**
**Finding Date: 10/9/2013**
**Reporter: Illinois State Police**
**Indicated #74 - Inadequate Supervision. Unfounded - #10-Substaial Risk (Abuse) Indicated then Unfounded - #60 - Substantial Risk of Harm (Neglect)** [8]

**PC was taken of children because mom was arrested on meth charges. Father was in jail. Children were placed in foster care for over two years.**

Report: Reporter stated, Vivian Robbins was arrested for possession of meth after the Illinois State Police went to the home to execute a search warrant for drugs and found Vivian in possession of meth and sleeping on the floor. Her children were present in the home. The children were taken into protective custody at 11:30 a.m. as Vivian was arrested and the grandparents were not in any condition to take care of the children as they were both intoxicated. Vivian had no viable parental care plan and all four of Vivian's children were in the home: Bodhi age six; Caleb age four; Enzo age three; and seven-month-old Daria. Vivian's sister who was staying at the house with her five-year-old daughter was located at a friend's house with meth in her possession. She was also arrested.

**Child and Family Case** [9] **Opened 2013 to 2016 while children in foster care for over two years**

The case file shows the mother complied with her service plan, and the children were returned home on February 29, 2016, after being in foster care for approximately two-and-a-half-years. When the children were returned to mom, it was noted she had her own apartment, living on her own without dad.

**SCR# 2000 A**[10]
**Report: 10/12/15**
**Finding Date: 10/12/15**
**Reporter: Foster Parent to Daria Robbins**
**Unfounded #21- Sexual Molestation and #22b - Substantial Risk of Sexual Injury**

Report: According to the foster parent, Fiona Taylor, Daria at age two-and-a-half began crying and saying she did not want to go over to her maternal grandparents' home, where her brothers were placed. Daria told

---

[8] This finding was later overturned by Administrative Update.
[9] Case opened for service to family while children in foster care from 9/9/13 to 2/29/16.
[10] Investigation based on allegation that maternal grandfather sexually abused Daria.

Fiona Taylor when she is over visiting her brothers, her grandfather touches her in "a bad spot", pointing to her vaginal area and butt. Daria stated also he touches her "with a brown stick".

**SCR #1856928D**
**Report Date: 4/5/16**
**Finding Date: 6/3/16**
**Reporter: Grace Vaughn, Assistant State's Attorney in the local county**
**Unfounded #60 - Substantial Risk of Harm**

Report: ASA Grace Vaughn contacted the DCFS hotline and reported she had worked in juvenile court on cases involving this family and reported that dad, Alfred Spence, was arrested on March 27, 2016 after a physical altercation with Vivian and broke the window of Vivian's van. She did not know if Bodhi (age 9), Caleb (age 7), or Enzo (age 5) were present. The dad told police at the time of his arrest, he and Vivian had been drinking all day when the incident occurred. ASA Vaughn stated Vivian called this morning and wanted to drop all charges against Alfred. She reported, the children had previously been in foster care, and guardianship was recently restored to Vivian, on February 29, 2016. When guardianship was returned to Vivian, Vivian and Alfred maintained they were no longer living together, but on the day of the altercation, Alfred told police he lived with Vivian and his three sons. ASA Vaughn stated Alfred and Vivian living together poses a substantial risk of harm to their children. She stated the parents have a history of domestic violence and substance abuse. She further stated that the family case was closed because Vivian had fallen out of contact with her caseworker and was not following her after care plan.

**SCR # 1000 E**
**Report: 8/26/16**
**Finding Date is 9/2/2016**
**Reporter: Local Police Officer**
**Unfounded #74 - Inadequate supervision**

Report: The police contacted the DCFS hotline to report that on August 25, 2016 at 6:11am, law enforcement responded to a call of three missing children. The three children were found playing inside an ambulance about ten blocks from their home. Caleb (age 7), Bodhi (age 9), and Enzo (age 6) had gotten out of the back door sometime in the middle of the night. They were not injured. About a month ago, the three boys got out of the house in the middle of the night and broke into a car, and then went to their grandmother's home. The report also noted there is a younger female child who also lives at the home. The mother and father are recovering addicts. Both sets of grandparents are involved with the family.

**SCR # 1000 F**
**Report: 12/8/16**
**Finding date: 2/6/2017**
**Reporter: Principal**
**Unfounded #74 - Inadequate Supervision**

Report: The principal contacted the DCFS hotline to report the children were previously in foster care, due to the mother's substance abuse issues. The mother has since, "cleaned herself" and regained custody of the children. The reporter stated, over the last six months, the mother has started to, "go down a slippery slope" The reporter stated, the mother isn't "the way she was". The mother would present at the school with, "glossy eyes and that type of thing". Reporter stated, last year, the children's attendance was great; however, this year they've missed a lot of school. A couple of weeks after the school liaison went out to the residence, the mother gave some excuses as to why the children were not in school. The reporter stated, yesterday, December 7, 2016, the paternal grandmother came to the school to pick up the children and she was crying. The paternal grandmother told the teacher the mother "flew the coop" on Friday night

D-6

December 2, 2016. The school counselor went to the mother's residence and banged on the door, however there was no response. The blinds were drawn in the front and the back of the residence.

**SCR # 1000 G**
**Report: 2/7/17**
**Finding Date 2/21/17**
**Reporter: Former Foster Parent**
**Unfounded #60 - Substantial Risk of Harm and #82 – Environment Neglect**

Report: Daria's former foster parent, contacted the DCFS hotline to report there is a history of meth abuse by both mom and dad which resulted in the children being removed from mom's care, due to the drug abuse. The parents got back together after the kids were returned to mom and dad got out of jail. She stated, when she saw mom today, she looked skinny and her teeth were rotten and dad just got out of jail, looking skinny with sores on his face. It has been a year since the reporter has seen Daria (age 4). At times, the mom stays at her parents and Vivian goes by Vivi and Spence for known alias.

**SCR #1856928H**
**Report: 11/1/17**
**Finding date 1/30/18**
**Reporters: School Counselor and by an "anonymous" person.**
**Unfounded #82 - Environmental Neglect and unfounded added allegation #60 - Substantial Risk of Harm**

1st Report: A school counselor contacted the DCFS hotline to report there was no heat or running water in the parent's home and suspects the parents are using meth based on the parents' behavior. The reporter had no corroborating information about the drug use. The reporter was told to contact the police to have them do a well-being check.

2nd Added Report: A new allegation of #60 - substantial risk of harm was added when an "anonymous" reporter contacted the DCFS hotline and provided details to Counselor Young's report. This anonymous reporter stated the furnace is broken and there is no running water in the Spence/Robbins home. The father will not call the landlord about the furnace because he is behind in rent. It is unknown if there are alternative heating methods being used. The home is normally dirty, but reporter stated she has not been in the home for 2-3 weeks and doesn't know the current condition of the home. The reporter confirmed both parents use meth in the home and are under the influence when taking care of the children. It is believed, the mother and Daria (age 4) are currently staying with someone named Connor Zamudio, who also uses meth. Connor resides in a trailer in the same city. There is a history of police involvement for both parents and a history of alcohol abuse by the father.

**SCR # 1000 I**
**Report date: 3/14/18**
**Finding Date: 11/9/2018**
**Reporter: School Counselor**
**Indicated #10 - Substantial Risk of Physical Injury and #60 - Injurious to Health and Welfare**

**This "I" sequence investigation was still pending on the date the children died and was the first investigation done by the OIG's office based on the death of the two children. The OIG investigation of this "I" sequence is reported in more detail in the Inspector General's Confidential Interim Report.**

Report: The school counselor contacted the DCFS hotline to report Enzo (age 10) was in her office, sobbing. While in her office, Enzo disclosed to Counselor Young he was scared for his sister Daria (age 5). He said, their parents had been fighting and their dad punched their mom in the eye and made it bleed; Bodhi got in the middle of the fight and dad hit Bodhi with a metal pole; mom hits Bodhi with a belt; and mom and dad use meth. The paternal grandmother told Counselor Young that the father has a $100 a day meth habit; the water and heat have been turned off in the home; they only have space heaters to heat the upstairs; food for the children is limited and the children had previously been in foster care. The date this conversation took place between Counselor Young and paternal grandmother was not documented by the person who took the report for DCFS. The report was sent to the local DCFS field office on March 15, 2018. CPI Joslyn Angulo was assigned to do the investigation, who was supervised by Lilah Cantu throughout the investigation. The area administrator for the local field office was and still is Kelly Busick.

The initial findings from the OIG investigation were reported in the Inspector General's Confidential INTERIM Report.

The failure to follow Department Rules and Procedures, particularly Procedure 300.

There was a blatant failure to follow Section 300.50 – Investigative Process – Preliminary Report of the Investigation: *If the Child Protection Specialist is unable to make a final finding determination within 55 calendar days of the receipt of the report, the Child Protection Specialist must submit a good cause extension request to the Child Protection Supervisor. The Child Protection Supervisor shall review the extension request and if approved, in turn submit the good cause extension request to the Area Administrator, prior to the 55th elapsed calendar day of the investigation.* There was an inappropriate response to the parents' refusal to allow the investigator into the home; lengthy gaps in contacts with the children and parents; a failure to make timely referrals for service interventions; inappropriate reliance on the need for consents to get health records; and there were six extensions of this investigation that were approved without good cause or adequate review.

Section 300.70 - Role of the Child Protection Supervisor: *Supervisory Conferences; Frequency of Supervision; Factors and Activities to be Considered During Supervision.* The supervisor failed to provide regular and consistent supervision, which led to the failure of the investigator to follow supervisory directives.

Section 300.75 -*Investigative Activities Requiring Area Administrator Support*

Section300 – Protective Custody: *Child Protection Supervisors shall approve all protective custodies. The following points regarding protective custody must be discussed during the supervisory conference: Imminent and urgent necessity; and Reasonable efforts to prevent removal.* There was unnecessary and inappropriate use of police assistance for taking protective custody.

In addition, there was a failure to take into consideration the prior eight child abuse/neglect hotline reports to DCFS and investigations completed regarding this family; and a failure to consider the illegal drug usage that was identified as an issue for the parents in this case at the intake. Drug testing was not completed for the mother until 6 months after the intake and was never completed on the father. The drug testing center was a 45-minute drive from the family's city of residence. This causes problems for families if they do not have transportation to get drug testing and takes a great amount of the worker's time if they need to transport the clients. This contributed to the failure to get timely drug testing of this family. However, a six month wait to have testing is unacceptable, specifically after the report identified a $100 per day meth habit.

After investigating the "I" Sequence and preparing and submitting the Inspector General's <u>Confidential Interim Report to the Director,</u> the Inspector General investigators found additional information pertaining to this investigation. It came to the OIG's attention that Vivian Robbins, the mother of the 2 children who died, was involved in a twelve-step program and her sponsor was the step-daughter of the investigator assigned to this investigation, Joslyn Angulo. CPI Angulo investigated this case for the first seven months until she left DCFS to work elsewhere, shortly after the death of the two children. Upon checking into this new information, the OIG was told that CPI Angulo did not disclose this possible conflict of interest to the area administrator, Kelly Busick.

## SIMILAR ISSUES AND CONCERNS FOUND IN SEQUENCES A through I

Through the OIG's investigation, we found a considerable amount of the same issues that are present in sequences A through I.

The contacts were routinely waived without justification; CERAPs were approved without required contacts; all children were not seen during investigations, as is required under Procedure 300; children were not interviewed alone; drug tests were not completed as necessary or in a timely manner, to ensure the children 's safety; significant time lapse between contact with family members; each investigation was investigated in isolation, without looking at the investigations in totality; and statements made by children and others were not followed up to determine the veracity of the statements. The most concerning, as to the "I" sequence investigation, is that CPI Joslyn Angulo did not disclose her connection with the mother, Vivian Robbins, to her superiors. Had she disclosed this, the case likely would have been reassigned to another CPI to avoid any possible conflict of interest.

## RECOMMENDATIONS

1.  *This recommendation addresses personnel issues.*

2.  *This recommendation addresses personnel issues.*

3.  The Central Region must immediately be retrained on appropriate responses to parents' refusal to allow entry into the home.

4.  The Department should retrain staff in the local Field Office on adequate completion and use of assessments. (Safety, Risk, Domestic Violence, Substance Abuse, and Home Safety checklist)

5.  DCFS legal should retrain child protection staff in the involved Region on use of the CFS 600-5 (Release of Information for Child Protection Investigations) and the CANTS 7 (Administrative Subpoenas).

6.  The Department should consider sending local child protection teams to the Child Welfare Training Academy to be re-trained on procedure 300, which should include accessing the family home and completing required assessments accurately and in a timely manner.

7.  All investigations pending more than 60 days in the local field office should be reviewed to assure family and child contacts have occurred in a timely manner and the children are safe. This review should also include looking at assessments to ensure they are timely and properly completed, proper supervision is occurring, and there has been follow up on supervision directives.

8. All extensions approved by this administrator should be reviewed to assure extensions are warranted.

9. The Department should complete a review of the drug testing process in the local area to determine its availability to families and ensure immediate drug testing resources for the area are readily available.

10. The DCFS Office of Legal Services should review the practice of requesting law enforcement to take protective custody for interviewing purposes and retrain staff accordingly.

11. The DCFS Ethics Officer and the DCFS Office of Legal Service should ensure Child Protection Staff in the local field office understand conflicts of interest and what to do in the event they are assigned an investigation in which they have a personal relationship with a subject of the investigation.

SPENCE/ROBBINS – FINAL REPORT