E-FILED
Friday, 17 December, 2021  06:28:29 AM
Clerk, U.S. District Court, ILCD

# OFFICE OF THE INSPECTOR GENERAL
### ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES

# REPORT TO THE GOVERNOR AND THE GENERAL ASSEMBLY

## JANUARY 2019

**MERYL PANIAK, MSW, J.D.**
**ACTING INSPECTOR GENERAL**

# OFFICE OF THE INSPECTOR GENERAL
# ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES

January 1, 2019

To the Governor and Members of the General Assembly:

Enclosed please find a copy of the Office of the Inspector General's January 2019 Annual Report to the Governor and General Assembly. The incidence of child maltreatment is deeply influenced by poverty, violence, mental health and substance use.  System-wide collaboration and data-sharing across multiple service sectors—child welfare, juvenile justice, early childhood, education, public health, and behavioral and mental health fields—are essential to improving child and family safety and well-being on a broad scale.  The societal consequences make it imperative for the child welfare field to continue building on its knowledge, through collaboration and communication, which will go a long way toward improving outcomes for children and youth. Effective collaboration between child welfare agencies and community providers can lead to organizational and systems benefits as well as better family outcomes.  It is my hope that the case investigations, projects, and trainings summarized in this report are useful toward that end.

The Department and its employees, as well as its private agency partners, are responsible for serving some of the State's most vulnerable citizens: families and children in crisis. Department employees, and its agency partners, are accountable to those families and all citizens of the State. Illinois relies on this office to critically examine and respond to the legitimate concerns of the people of Illinois regarding the treatment of children and families.

We have been tasked with examining child deaths, serious injuries, misconduct, poor performance and violations of policy and laws.  We take this obligation, along with our other mandates to make recommendations to advance the Illinois child welfare system very seriously.

The report notes areas where more must be done to ensure that children are safe and well, and the system serving them is performing efficiently and effectively, including ongoing issues with youth that are beyond medical necessity in hospital settings, intact family services, and building a system of care that meets the needs of our youth.

To prevent and tackle child abuse and neglect, we need to support and nurture relationships. The most important relationship is between the child and their parents. Other relationships like those between practitioners and parents, and between local services, are also key.

Caseworkers who remain committed, engaged, and perform competently, and think creatively assure me that we can improve the lives of Illinois' children.

It is an honor to serve as your Inspector General, and this office remains committed to promoting excellence in the child welfare community by establishing and encouraging adherence to quality standards, providing professional development opportunities, and providing DCFS with recommendations and suggestions for effective tools to combat waste, fraud and abuse and succeed in its duties as the Illinois Child Welfare Agency.

Sincerely,

Meryl Paniak, MSW, J.D.
Acting Inspector General

# OFFICE OF THE INSPECTOR GENERAL
# REPORT TO THE GOVERNOR AND THE GENERAL ASSEMBLY

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

INVESTIGATIONS .............................................................................................................. 7

    PART I: DEATH AND SERIOUS INJURY INVESTIGATIONS ............................................. 7

    PART II: CHILD DEATH REPORT ............................................................................... 21

        SUMMARY ............................................................................................................ 22

        HOMICIDE ............................................................................................................ 29

        UNDETERMINED .................................................................................................... 47

        ACCIDENT ............................................................................................................ 72

        NATURAL .............................................................................................................. 96

        NINETEEN-YEAR DEATH RETROSPECTIVE .......................................................... 119

    PART III: GENERAL INVESTIGATIONS ..................................................................... 123

ALLEGATIONS OF CHRONIC MISFEASANCE ................................................................. 145

ERROR REDUCTION ...................................................................................................... 147

LAW ENFORCEMENT AGENCIES DATA SYSTEM (LEADS) ........................................... 151

SYSTEMIC RECOMMENDATIONS ................................................................................... 153

RECOMMENDATIONS FOR DISCIPLINE ......................................................................... 157

CHILD WELFARE EMPLOYEE LICENSES ....................................................................... 159

DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS .............................................. 161

REJECTED OR UNRESOLVED RECOMMENDATIONS IMPACTING CHILD HEALTH AND SAFETY ........ 187

APPENDIX ..................................................................................................................... 191

    CORNELL WEBB…………………………………….....……....…………………………………A-1

# INTRODUCTION

The Office of the Inspector General of the Department of Children and Family Services was created by unanimous vote of the Illinois General Assembly in June 1993 to reform and strengthen the child welfare system. The mandate of the Office of the Inspector General is to investigate misconduct, misfeasance, malfeasance, and violations of rules, procedures, or laws by Department of Children and Family Services (DCFS) employees, foster parents, service providers and contractors with the Department. *See* 20 ILCS 505/35.5 – 35.7. To that end, this Office conducts investigations and makes recommendations to protect children, uncover wrongdoing, improve practice, and increase professionalism within the Department.

## INVESTIGATION CATEGORIES

### Death and Serious Injury Investigations

The Office of the Inspector General investigates deaths and serious injuries of Illinois children whose families were involved in the child welfare system within the preceding 12 months. The Inspector General is an *ex officio* member of the Child Death Review Team Executive Council. The Inspector General receives notification from the Illinois State Central Register (SCR) of all child deaths and serious physical injuries where the child was a youth in care, the family is the subject of an open investigation or service case, or the family was the subject of a previous investigation or closed case within the preceding 12 months. The notification of a child death or serious injury generates a review in which the Critical Event Report and other reports are reviewed and computer databases are searched. When further investigation is warranted, records are impounded, subpoenaed or requested and a review is completed. When necessary, a full investigation, including interviews, is conducted. The Inspector General's Office created and maintains a database of child death statistics and

critical information related to child deaths in Illinois. The following chart summarizes the death cases reviewed in FY 2018:

### FY 18 CHILD DEATH CASES REVIEWED

| | |
|---|---|
| CHILD DEATHS IN FY 18 MEETING THE CRITERIA FOR REVIEW | 98 |
| INVESTIGATORY REVIEWS OF RECORDS | 94 |
| FULL INVESTIGATIONS | 4 |

Summaries of death investigations, with a full investigative report submitted to the Director, are included in the Investigations Section of this Report on page 7. A summary of all child deaths reviewed by the Office of the Inspector General in FY 18 can be found on page 22 of this Report.

### General Investigations

The Office of the Inspector General responds to and investigates complaints filed by the state and local judiciary, Department and Private Agency employees, foster parents, biological parents and the general public. Investigations yield both case-specific recommendations, including disciplinary recommendations, and recommendations for systemic changes within the child welfare system. The Inspector General's Office monitors compliance with all recommendations.

### Child Welfare Employee Licensure Investigations

In 2000, the General Assembly mandated that the Department of Children and Family Services institute a system for licensing direct service child welfare employees. The Child Welfare Employee License (CWEL) permits centralized monitoring of all persons providing direct child welfare services, whether they are employed with the Department or a private agency. The

employee licensing system seeks to maintain accountability, integrity and honesty of those entrusted with the care of vulnerable children and families.

A child welfare employee license is required for both Department and private agency investigative, child welfare and licensing workers and supervisors. The Department, through the Office of Employee Licensure, administers and issues Child Welfare Employee Licenses.

A committee composed of representatives of the Office of the Inspector General, the Child Welfare Employee Licensure Board and the Department's Office of Employee Licensure screens referrals for CWEL Investigations. The committee reviews complaints to determine whether the allegations meet one or more grounds for licensure action as defined in Department Rule 412.50 (89 Ill. Adm. Code 412.50). The Inspector General investigates and prosecutes CWEL complaints and hearings.

When a CWEL Investigation is completed, the Office of the Inspector General, as the Department's representative, determines whether the findings of the investigation support possible licensure action. Allegations that could support licensure action include conviction for specified criminal acts, indicated findings of child abuse or neglect, or egregious acts that demonstrate incompetence or a pattern of deviation from a minimum standard of child welfare practice. Department Rule 412.50 (89 Ill. Adm. Code 412.50) specifies the grounds for licensure action. When licensure action is appropriate, the licensee is provided an opportunity for a hearing. An Administrative Law Judge presides over the hearing and reports findings and recommendations to the Child Welfare Employee Licensure Board. The CWEL Board makes the final decision regarding licensure action.

In FY 2018, 27 cases were referred to the Inspector General for Child Welfare Employee License investigations. In addition, the Inspector General's Office provided research and technical assistance to the Office of Employee Licensure in 23 evaluations of CWEL applicants. Detailed information regarding the CWEL licensure actions can be found on page 159 of this Report.

## FY2018 CWEL INVESTIGATION DISPOSITIONS

| NEW CWEL INVESTIGATIONS | 27 |
|---|---|
| CLOSED/NO CHARGES | 6 |
| MONITORING | 5 |
| PENDING INVESTIGATIONS | 7 |
| CHARGES ISSUED | 9 |
|     LICENSE REVOCATION | 1 |
|     LICENSE RELINQUISHED | 1 |
|     LICENSE SUSPENSION | 1 |
|     PENDING ADMINISTRATIVE HEARING | 1 |
|     PENDNG ALJ RECOMMENDATION | 3 |
|     PENDING CWEL BOARD ACTION | 2 |

### Resolution of Prior Investigations

| LICENSURE ACTION FOR EXISTING INVESTIGATIONS | 13 |
|---|---|
| REVOKED | 5 |
| CHARGE REJECTED BY CWEL BOARD | 1 |
| PENDING ALJ RECOMMENDATION | 4 |
| PENDING CWEL BOARD ACTION | 3 |

*Criminal Background Investigations and Law Enforcement Liaison*

The Inspector General's Office provides technical assistance to the Department and private agencies in performing and assessing criminal history checks. In FY 18, the Inspector General's Office opened 3,359 cases requesting criminal background information from the Law Enforcement Agencies Data System (LEADS). Each case may involve multiple law enforcement database searches and may involve requests on multiple persons. For the 3,359 cases opened in FY 18, the Inspector General's Office conducted 9,898 searches for criminal background information.

In addition, in the course of an investigation, if evidence indicates that a criminal act may have been committed, the Inspector General may notify the Illinois State Police. The Office of the

2

Inspector General may investigate the alleged act for administrative action only.

The Office of the Inspector General assists law enforcement agencies with gathering necessary documents. If law enforcement elects to pursue a criminal investigation and requests that the administrative investigation be put on hold, the Office of the Inspector General will retain the case on monitor status. If law enforcement declines to prosecute, the Inspector General will determine whether further investigation or administrative action is appropriate.

*Referrals from the Office of the Executive Inspector General for the Agencies of the Illinois Governor*

In FY 18, the Office of the Inspector General received 110 referrals for investigation from the Office of the Executive Inspector General for the Agencies of the Illinois Governor. After initial review, a referral may be closed, opened for further investigation, or transferred for further review by Department management, Office of Affirmative Action, Labor Relations, or the Advocacy Office.

### INVESTIGATIVE PROCESS

The Office of the Inspector General's investigative process begins with a Request for Investigation, notification by the State Central Register of a child's death or serious injury, or a referral for a Child Welfare Employee License investigation. Investigations may also be initiated when the Inspector General learns of a pending criminal or child abuse investigation against a child welfare employee.

In FY 2018, the Office of the Inspector General received 3,777 Requests for Investigation or technical assistance.[1] Requests for Investigation and notices of deaths or serious injuries are screened to determine whether the facts suggest possible misconduct by a foster parent,

Department employee, or private agency employee, or whether it suggests a need for systemic change. If an allegation is accepted for investigation, the Inspector General's Office will review records and interview relevant witnesses. The Inspector General reports to the Director of the Department and to the Governor with recommendations for discipline, systemic change, or sanctions against private agencies. The Office of the Inspector General monitors the implementation of accepted recommendations.

The Office of the Inspector General may work directly with a private agency and its board of directors to ensure implementation when recommendations pertain to a private agency. In rare circumstances, when the allegations are serious enough to present a risk to children, the Inspector General may request that an agency's intake for new cases be put on temporary hold, or that an employee be placed on desk duty pending the outcome of the investigation.

The Office of the Inspector General is mandated by statute to be separate from the operations of the Department. Inspector General files are not accessible to the Department. The investigations, investigative reports and recommendations are prepared without editorial input from either the Department or any private agency. Once a Report is completed, the Inspector General will consider comments received and the Report may be revised accordingly.

If a complaint is not appropriate for full investigation by the Office of the Inspector General, the Inspector General may refer the complaint to law enforcement (if criminal acts appear to have been committed), to the Department's Advocacy Office for Children and Families, or to other state regulatory agencies, such as the Department of Financial and Professional Regulation.

---

[1]This includes requests for investigation, notice of child deaths and serious injuries, notification of arrests or pending abuse investigations, and requests for technical assistance and information.

*Administrative Rules*

Rules of the Office of the Inspector General are published in the Illinois Register at 89 Ill. Admin. Code 430. The Rules govern intake and investigations of complaints from the general public, child deaths or serious injuries and allegations of misconduct. Rules pertaining to employee licensure action are found at 89 Ill. Admin. Code 412.

*Confidentiality*

A complainant to the Office of the Inspector General, or anyone providing information, may request that their identity be kept confidential. To protect the confidentiality of the complainant, the Inspector General will attempt to procure evidence through other means, whenever possible. At the same time, an accused employee needs to have sufficient information to enable that employee to present a defense. The Inspector General and the Department are mandated to ensure that no one will be retaliated against for making a good faith complaint or providing information in good faith to the Inspector General.

Reports issued by the Office of the Inspector General contain information that is confidential pursuant to both state and federal laws. As such, Inspector General Reports are not subject to the Freedom of Information Act. Annually, the Office of the Inspector General prepares several reports deleting confidential information for use as teaching tools for private agency and Department employees.

*Impounding*

The Office of the Inspector General is charged with investigating misconduct "in a manner designed to ensure the preservation of evidence for possible use in a criminal prosecution." 20 ILCS 505/35.5(b). In order to conduct thorough investigations, while at the same time ensuring the integrity of records, investigators may impound files. Impounding involves the immediate securing and retrieval of original records. When files are impounded, a receipt for impounded files is left with the office or agency

from which the files are retrieved. Critical information necessary for ongoing service provision may be copied during the impound in the presence of the Inspector General investigator. Impounded files are returned as soon as practicable. However, in death investigations, the Office of the Inspector General forwards original files to the Department's Office of Legal Services to ensure that the Department maintains a central file.

<center>**REPORTS**</center>

Inspector General Reports are submitted to the Director of DCFS. Specific reports are also shared with the Governor. An Inspector General Report contains a summary of the complaint, a historical perspective on the case, including a case history, and detailed information about prior DCFS or private agency contact(s) with the family. Reports also include an analysis of the findings, along with recommendations.

The Office of the Inspector General uses some reports as training tools to provide a venue for ethical discussion on individual and systemic problems in child welfare practice. The reports are redacted to ensure confidentiality and then distributed to the Department or private agencies as a resource for child welfare professionals. Redacted reports are available on the Office of the Inspector General website, or by request from the Office of the Inspector General by calling (312) 433-3000.

*Recommendations*

The Inspector General may recommend systemic reform or case specific interventions in the investigative reports. Systemic recommendations are designed to strengthen the child welfare system to better serve children and families.

Ideally, discipline should have an accountability component as well as a constructive or didactic one. It should educate an employee on matters related to his/her misconduct while also functioning to hold employees responsible for their conduct. Without the accountability component, there is little to deter misconduct. Without the didactic component, an employee

<center>INTRODUCTION</center>

may conclude that s/he has simply violated an arbitrary rule with no rationale behind it.

The Inspector General presents recommendations for discipline to the Director of the Department and, if applicable, to the director and board of the involved private agency. Recommendations for discipline are subject to due process requirements. In addition, the Inspector General will determine whether the facts suggest a systemic problem or an isolated instance of misconduct or bad practice. If the facts suggest a systemic problem, the Inspector General's Office may investigate further to determine appropriate recommendations for systemic reform.

When recommendations concern a private agency, appropriate sections of the report are submitted to the agency director and the board of directors of that agency. The agency may submit a response. In addition, the board and agency director are given an opportunity to meet with the Inspector General to discuss the report and recommendations.

In this Annual Report, systemic reform recommendations are organized into a format that allows analysis of recommendations according to the function within the child welfare system that the recommendation is designed to strengthen. The Inspector General's Office is a small office in relation to the child welfare system. Rather than address problems in isolation, the Inspector General's Office views its mandate as strengthening the ability of the Department and private agencies to perform their duties.

The Office of the Inspector General monitors implementation of recommendations made to the Director of DCFS and private agencies. Monitoring may take several forms. The Office of the Inspector General will monitor to ensure that Department or private agency staff implement the recommendations made. The Inspector General may consult with the Department or private agency to assist in the implementation process. The Inspector General may also develop accepted reform initiatives for future integration into the Department.

## ADDITIONAL RESPONSIBILITIES

*Office of the Inspector General Hotline*

Pursuant to statute, the Office of the Inspector General operates a statewide, toll-free telephone number for public access. Foster parents, guardians *ad litem*, judges and others involved in the child welfare system have called the hotline to request assistance in addressing the following concerns:

- Complaints regarding DCFS caseworkers and/or supervisors ranging from breaches of confidentiality to failure of duty;
- Complaints about private agencies or contractors;
- Child Abuse Hotline information;
- Child support information;
- Foster parent board payments;
- Youth in College Fund payments;
- Problems accessing medical cards;
- Licensing questions;
- Ethics questions; and
- General questions about DCFS and the Office of the Inspector General.

The Office of the Inspector General's Hotline is an effective tool that enables the Inspector General to communicate with concerned persons, respond to the needs of Illinois children, and address day-to-day problems related to the delivery of child welfare services. The phone number for the Office of the Inspector General Hotline is (800) 722-9124.

The following chart summarizes the Office of the Inspector General's response to calls received in FY 18:

### CALLS TO THE INSPECTOR GENERAL HOTLINE IN FY 18

| | |
|---|---|
| INFORMATION AND REFERRAL | 649 |
| REFERRED TO SCR HOTLINE | 68 |
| REQUEST FOR OIG INVESTIGATION | 111 |
| TOTAL CALLS | 828 |

6

# INVESTIGATIONS

This annual report covers the time period from July 1, 2017 to June 30, 2018. The Investigations section has three parts. Part I includes summaries of child death and serious injury investigations reported to the Department Director. Part II contains aggregate data and case summaries of child deaths in families who were involved with the Department in the preceding 12 months. Part III contains general investigation summaries conducted in response to complaints filed by the state and local judiciary, foster parents, biological parents and the general public.

Investigation summaries contain sections detailing the allegation, investigation, Inspector General recommendations and the Department response. In the "OIG Recommendation/Department Response" section of each case, Inspector General recommendations are in bold and the Department's responses to the recommendations follow.

## PART I: DEATH AND SERIOUS INJURY INVESTIGATIONS

### DEATH AND SERIOUS INJURY INVESTIGATION 1

**ALLEGATION**   A 17-month-old toddler was reported missing to police, prompting a massive search. Thirty hours later the toddler was discovered deceased, under a couch, inside her family home. There was an open intact family services case and a pending child protection investigation at the time of the child's death.

**INVESTIGATION**   In September 2016, an intact family services case was opened for the mother of the deceased and her four children following two unfounded child protection investigations for inadequate supervision. Services identified at case opening for the mother included: Norman funds for beds and bedding, parenting classes, and assistance with addressing her ten-year-old son's possible hearing impairment. Mother was reported to receive SSI for cognitive delays; her sister was reported to receive the money monthly as the "overseer of the account." Concerns were expressed about cognitive delays/learning disabilities and mother's ability to ensure her children's physical and mental health needs were adequately addressed. The intact family services case remained open at the time of the toddler's death in April 2017 due to continued hotline reports while the case was open. Between September 2016 and April 2017, there were numerous child protection investigations involving the mother and her children, as well as investigations involving other individuals reported to be living in the home. Three of those investigations were initiated due to reported safety issues for the seven-year-old sibling with significant behavioral health concerns.

The intact worker made regular announced and unannounced visits to the home, visiting at least once a week between September and December 2016; and biweekly in 2017 after a critical decision was made by the worker and supervisor to reduce the frequency of the required home visits. The worker successfully obtained Norman funds to purchase beds and bedding for the family. Concerns about the physical conditions of the home, particularly the soiled carpet, persisted throughout the life of the case and were well documented by the intact worker. Mother and the intact worker discussed having the carpet steam cleaned. While home cleanliness was often noted as an area of concern, it was not assessed during the intact case to have risen to a level of being a

danger to the children's health or safety. Neither the intact worker nor investigators observed the home to be in the "deplorable" condition described by law enforcement at the time of the child's death.

The home was noted to be frequented by individuals and other family members, some living in the home with their children on and off, during the course of service provision. The caseworker documented her concern that the mother was being taken advantage of by those individuals who refused to help with household bills or transportation, and that she was jeopardizing her Section 8 housing because she had unauthorized people living there. Multiple child protection investigations involving the family and others living in the home occurred between the time of the opening of the intact family services case and the child's death. Many of these investigations were not linked together in the State Automated Child Welfare Information System (SACWIS) and did not include all household members living in the home.

The mother did not complete parenting services, though she was referred twice. The mother initially started sessions with a parenting coach through the private agency servicing the case. The sessions were to occur weekly in the evening at the agency. Mother attended very few sessions and the service was discontinued due to transportation, babysitting and scheduling issues in January 2017. The caseworker then referred the mother for in home counseling through an outside provider to begin the month of the child's death.

The deceased toddler's seven-year-old sibling had a history of behavioral problems and attended an alternative school. Within the first two months of the intact family service case opening, the sibling was psychiatrically hospitalized for suicidal ideations and statements, and was hospitalized twice more during the intact family services case. His second hospitalization occurred after the child said he wanted to kill himself with a knife while he was on the school bus headed to school. Screening, Assessment and Support Services (SASS) came to the school and in the screening noted that the mother told school personnel that due to insurance issues the child had not had his psychotropic medication. SASS authorized hospitalization and had an ambulance waiting at school, but the father, who arrived later, refused hospitalization and took the child home. DCFS was contacted and a child protection investigation was opened for medical neglect. Mother was instructed to take the child to the hospital for an evaluation. The child was subsequently admitted. Mother and father reported to the investigator that the medical card had expired; that they had no transportation; and that their finances were too low to refill the prescription. The child's third hospitalization occurred six days prior to his sister's death. The boy had been showing increasingly aggressive, impulsive, and hyperactive behavior at school and was threatening to stab himself. The child reported that his mother had not refilled his prescription for psychotropic medication, which led to changes in his behavior at school. There was no communication between the hospital and the intact worker, and the worker did not attend any discharge staffings.

Despite knowing from the onset of the intact family services case that mother received SSI for a non-physical disability, no formal assessment was conducted to determine the extent of her limitations; how they impacted her ability to ensure her children's safety; and to determine and recommend services that would meet her specific needs.

The intact family services worker visited the home the day before the toddler was reported missing, and a child protection investigator had been to the home the day the toddler was reported missing. The home was reported to have dirty furniture, walls, carpeting, and clothing on bedroom and bathroom floors; however, no immediate safety concerns were noted. There were four adults present at the time the toddler was reported missing. Law enforcement reported finding the home in deplorable condition, and the health department deemed the home inhabitable. The home later burned to the ground; arson is suspected.

The Department initiated a death by neglect investigation against the toddler's mother and two other adults present in the home at the time the toddler went missing. These investigations are pending. A criminal investigation is also pending. The toddler's autopsy report has not been released because the criminal

investigation is pending. The one and eight-year-old siblings were placed in foster care and a 10-year-old sibling was placed with his biological father.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. Any family with three or more child protection investigations within a year (for one or more persons living in the home) should be reviewed by DCFS management to ensure that underlying issues are being addressed.** |
|---|---|

The Department is already handling this issue with a sequence report along with screening reminders. The Department has alerts in place on SACWIS for any family with an open case who is the subject of a new investigation. This alert is on both the investigator and intact worker's desktop. In addition, a third sequence report is in final development stages and the intent is to also add it to the report manager for SACWIS which can be pulled up at any time to identify families with multiple reports. Additionally, on a daily basis, a report is sent to all child protection and intact management that identifies all currently open intact cases and any new reports associated with that family. Searching capabilities have been expanded and staff are now able to search by address to determine if there may be more subjects or investigations associated with that household that they should be assessing and considering. Finally, the sequencing has been changed to follow along whether an investigation is unfounded or expunged so that staff get a truer "reading" as to families that have come to the attention of the Department multiple times. Area Administrators participate in many of these reviews and understand their role is to review cases with a more critical lens and identify and assess any underlying issues.

**2. Whenever the facts suggest the possibility of significant developmental delays, mental illness or other issues that can affect the caregiver's ability to benefit from standard interventions, management must ensure that the delays are assessed and that referrals address identified delays.**

The Department agrees. This is part of ongoing supervision. The Department is addressing these issues by developing goals related to serving these families and identifying and monitoring basic tasks to attain the goals. There are also weekly practice reviews between DCP Area Administrators and Supervisors in which all new cases with children under three are discussed, including their needs and any safety issues or family needs.

*OIG Response: It is critical that the Department ensure that parents with limitations can accomplish the goals set for them – both through evidence-based assessments and task-centered services. Supervision provided without this critical direction from management will not address the problems identified in the OIG Report.*

**3. The Department must develop protocol that requires intact workers to identify family needs that are critical and time sensitive and management must track those cases to ensure the needs are met.**

The Department will not develop another protocol. The Department has other processes which address this. Identification of family needs is a regular part of supervision. In addition, there are already many other processes implemented to track this. In the local area, a process called 360 has been developed to bring community providers and local agencies together. The purpose is to discuss issues and concerns regarding families they are working with and identify resources available within the community, working together to help vulnerable families. In addition, there is an immediate review of all intact cases with a new investigation to ensure divisions discuss the case and any identified needs/concerns are addressed. General reviews are performed by Quality Assurance, Intact Utilization, and APT to also ensure families' needs are being met and safety addressed. Service plans are reviewed with the family on a regular basis to assess completion and barriers to services and with the core practice model rollout, the emphasis is in conducting Child and Family Team Meetings with the families as active participants in identifying what they need.

*OIG Response: Current practice does not prioritize immediate needs. To implement this recommendation the Department needs to identify what it is doing to change current practice and ensure that time-critical events, like ensuring that a child has needed medication, are addressed immediately.*

**4.  The Department's child protection investigation into the death should be closed as "undetermined" pending completion of the criminal investigation and the Department should explore further use of the "undetermined" category for cases where there are ongoing criminal investigations or other extenuating circumstances to allow staff to focus on other investigations.**

An investigation should not be closed in this manner.  Undetermined is statutorily permitted, but is not utilized.  When a case is placed in undetermined status, it is still pending.  The Department cannot hold cases open for years, as it infringes on a person's basic rights.  The Department always has the option to open a new investigation if new information comes in.

*OIG Response: The OIG Recommendation was that "Undetermined" should be used instead of leaving a case open indefinitely, which is what happened in this case.*

**5.  Part of the service plan development process must include consideration of what consents will be necessary to properly serve the family. Workers should make every attempt to obtain informed consent to release of necessary documents at the outset of the service plan process.**

The Department agrees.

**6.  The Department should explore expanding the Child Welfare Training Academy Simulation residential home for intact family workers and supervisors.**

The Department agrees.  However, the primary focus of the Training Academy Simulation is on child protection investigators.  Once they have all been through the training, it can be expanded to Intact and Permanency staff.

**7.  This report should be shared with the involved private agency.**

The Inspector General shared a redacted report with the private agency and the agency's Board of Directors.  The Inspector General met with agency Administrators and a member of the agency's Board of Directors to discuss the findings and recommendations made in the report.

10

## DEATH AND SERIOUS INJURY INVESTIGATION 2

**ALLEGATION**  A four-year-old boy was killed and appeared to have been starved to death. The boy's body had been burned post-mortem making it difficult to ascribe a cause of death. The boy had been removed from his mother's custody four years earlier, but had been returned home one year before his death. The family's case had been closed eight months prior to his death, and there was an unfounded child protection investigation five months prior to the death.

**INVESTIGATION**  Four years before the boy was killed, the boy's three older half-siblings, then ages five, four and two, were left unsupervised in the family's vehicle overnight with temperatures ranging between 32 to 36°F. The mother insisted that she left the three children with an appropriate caretaker, who subsequently left the children overnight in the car. The children, however, consistently reported that it was their mother who left them in the car. The boy, then two-months-old, had been left in the care of a friend's aunt who did not know the mother. The woman informed the assigned child protection investigator that when the mother brought the infant to her he was naked and wrapped in a blanket. The infant boy had been with the woman for two weeks when the investigation of the car incident began. The children were removed from their mother's custody and the mother was arrested for child endangerment.

The mother was indicated for Inadequate Supervision for the three oldest siblings, and Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect for the infant boy. The mother pled guilty to charges of endangering the life and health of the children, and completed 18 months of court ordered supervision. The children were placed in foster care for three and a half years while the mother completed services. Over the course of the case, the four siblings were separated and placed into two different foster homes. The five-year-old and four-year-old were placed together, and the two-year-old and the now deceased boy were placed together. Following the boy's death, the older siblings returned to their last placements, and are in the process of being adopted.

The mother was assessed for services and the assessment identified problems with domestic violence, substance abuse and the tendency for the mother to place her own needs above those of her children. The mother admitted to using corporal punishment as a disciplinary method. The older siblings reported that their mother would whoop them and had used objects such as a belt or sandals/flip flops and had kicked and punched them.

The mother was referred for: individual therapy; a substance abuse assessment; parenting coach/education; parent-child psychotherapy with the boy to assist her in re-establishing a parent-child connection; and family therapy. Regarding the parent-child psychotherapy, the assessor noted that the mother and the boy were separated during a crucial developmental period in which the boy was forming attachments and achieving numerous developmental milestones.

While the mother completed substance abuse treatment, her compliance and progress in individual therapy was minimal. The mother's initial enrollment in individual therapy and parent coaching was terminated for non-compliance. The mother was then re-enrolled at a different therapeutic agency and began individual therapy and parent coaching seven months after the case was opened. Family therapy began with the children 10 months after the case was opened. This continued for eight months, after which the family was transferred to the private agency's counseling department. The mother was to receive individual therapy and family therapy was to be provided by the private agency's counseling department. The mother attended less than half of her individual treatment sessions with the private agency's therapist, and the agency failed to offer the required family therapy. The two oldest siblings, however, were provided individual therapy through a contracted therapist.

Although the mother attended less than half of the sessions, her individual therapy services were terminated as having been successfully completed. Moreover, at termination she remained wedded to her original story that

she had not left her three children unsupervised overnight in the car during dangerously cold weather; rather, she would only acknowledge that she had left them with a caretaker, who was not appropriate, who subsequently left them unsupervised. She also failed to acknowledge responsibility for leaving her unclothed infant child with a stranger. Neither the therapist nor her supervisor were employed by the private agency at the time of the IG investigation.

In addition, neither the mother's therapist nor the children's therapist were included in the family's Child and Family Team Meetings, which is designed to ensure that all appropriate services are provided.

As the mother appeared to be fulfilling her Service Plan, the court permitted unsupervised overnight visits. Within two months, a new child protection investigation was opened because of suspicious bruising on the oldest child after overnight visits. The child reported that the first bruising was from an accidental fall from the bunkbed at the mother's home, and the second incident was from rough play between the two oldest siblings. However, the two oldest siblings informed the private agency worker that their mother would slap them, pull their hair, and put them in time-out. The mother informed the worker that she did not use corporal punishment, and she felt that the oldest two siblings were trying to sabotage the return home. The child protection investigation was unfounded, but the visits were supervised for one month after which unsupervised day visits were allowed. The supervisor reinstated unsupervised overnight visits two months after they were suspended.

In planning to return the children home, the agency noted the mother's lack of outside help. Her boyfriend was identified as a resource and he agreed to assist the mother with childcare. However, prior to the close of the family's case, the boyfriend and mother were no longer together, and the agency did not assist the mother in developing a support network.

When the children were returned home, an Order of Protection required that the mother ensure that her school-age children attended school daily, but it did not have any requirements regarding children who were the boy's age of 3 ½ years. Following his return home, the boy was never enrolled in a Pre-K or Head Start program. The private agency worker informed IG investigators that the mother, despite being employed, wanted to keep the boy home with her.

Two months after the family's case was closed, a third child protection investigation was opened after the two oldest siblings began texting their former foster parent alleging that their mother was beating them and that she only cared about her boyfriend. During the investigation, however, while the children admitted to sending the text messages, they denied having been hit by their mother. The investigation was unfounded.

During the investigation, the child protection investigator spoke with the children's primary care physician. The child protection investigator documented that the doctor's only concern was that he had seen the boy three months prior for an illness, and he wanted the mother to bring the boy back for a checkup. (Doctor's records diagnosed the boy as failure to thrive following bouts of diarrhea self-reported by the mother.) Prior to closing the investigation, the child protection investigator told the mother to take the boy back to the doctor, but did not follow-up to ensure that this was done.

Six months after the close of the investigation, the local police department responded to an emergency phone call of an arson in progress. When they arrived they arrested the mother, her new boyfriend and his brother. The local fire department found a burning bundle in the basement of the abandoned property. Once extinguished, they discovered the boy's body. The boy was pronounced dead at the scene. Due to the extent of decomposition, the boy's autopsy listed his death as homicide by unspecified means and the actual date of death could not be determined. A new investigation was opened and the assigned child protection investigator documented that a detective with the local police department informed her that the boy's body was skin and bones. The detective disclosed that because of the deterioration, they could not determine if there had been any

12

physical abuse, but they could see no signs of blunt force trauma or sex abuse.  The autopsy concluded that the boy was malnourished and looked as though he had starved to death.

According to the mother, four days prior to the arrest, the boy stopped breathing and she performed chest compressions. When she could not revive him, she wrapped him in a towel and laid down in bed with him. She did not seek medical attention. The next day, the mother went into premature labor and had twins. Prior to going to the hospital, the mother and the twins' father walked to the abandoned building, forced their way in, and left the boy's body in the basement. Three days after giving birth, the mother, along with the twins' father and his older brother, decided to dispose of the boy's body by burning it in the vacant residence.

The mother was indicated for Allegation 1, Death by Abuse, for the boy and Allegation 60, Substantial Risk of Injury by Neglect, for the surviving siblings.  The twins' father was indicated for Allegation 60, Substantial Risk of Injury by Neglect, regarding the twins.

The mother was charged with murder and the twins' paternal uncle and the mother were both criminally charged with attempted arson and concealing a death. The twins' father, who was still a minor, was held and charged as a juvenile.

---

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** **1.  In return home cases, the Department Office of Legal Services should ensure that an additional condition be incorporated in the Order of Protection requiring that all preschool aged children are enrolled in and actively attending the appropriate State Pre-Kindergarten or Head Start program.**

The Department has formed a partnership with DHS regarding intact families to ensure we get children to school and into protective daycare.  The agencies are in discussions about an Interagency Agreement regarding upcoming legislation that specifically addresses day care for intact cases to implement PA 100-0860.

**2.  In return home cases, 60 days prior to the child's scheduled return home date, the case worker should meet with the parent(s) and school professionals to introduce the parent to the school, begin the registration process, and identify additional community programs that may be available to the family for social engagement of the children.**

The Department does not agree. An aftercare plan needs to be completed for reunification cases, but it is not intended to be a checklist with specified time frames. The Department will reinforce in training that young children should be engaged in an academic program from school or an early childhood program.

**3.  In all child protection investigations where a medical provider requests that the infant or child be brought in for a medical visit, the investigation shall remain open until the infant or child is seen by the medical provider and the child protection investigator consults with the medical provider.**

The Department agrees. A memo was issued to all SCR and DCP staff with these instructions.

**4.  This report should be shared with the private agency to address the deficiencies in the counseling services provided to the mother and her children.**

The Inspector General shared a redacted report with the private agency and the agency's Board of Directors. The Inspector General met with agency Administrators and a member of the agency's Board of Directors to discuss the findings and recommendations made in the report and to address the agency's counseling services deficiencies.

**DEATH AND SERIOUS INJURY INVESTIGATION 3**

---

| ALLEGATION | A two-and-a-half-year-old died of Anoxic Encephalopathy with Bilateral Lobar Pneumonia after he collapsed and stopped breathing. A child protection investigation was initiated 22 days prior to the child's death and was unfounded and closed six days prior to the child's death. |

---

| INVESTIGATION | The family's involvement with the Department was prompted by a report to the hotline from the child's daycare that the child had marks that appeared to be cigarette burns on both hands. |

The reporter also stated that the child's face had been swollen on two prior occasions. It was further reported that the mother was with an unknown male the last time the child was in daycare (one week ago) and this unknown male hit the child across the face.

The daycare records confirmed a growing concern by staff that the child was being abused. A week prior to the hotline call, the child's teacher's contemporaneously written notes stated that the child arrived at school "with a bruised right side of his face and a top busted lip." The mother was contacted by the daycare and when questioned about the injuries, she said that the child "fell and hit his lip" and "slept on his face…" The teacher took pictures of the injuries.

The caller from the daycare asked to be anonymous, even though she was a mandated reporter. She did, however, leave a phone number from which the investigator was able to determine that the call came from the daycare.

The grandfather had picked the child up from daycare and, when interviewed by child protection, stated that someone at the daycare had told him that the child had fallen. The mother claimed that the injuries on the child's hands had occurred at the daycare. Inspector General investigators asked multiple staff at the daycare if the child was ever injured at the school; they all denied that the child was ever injured at the daycare.

The child was seen in an emergency room. The emergency room physician believed the marks could be impetigo and consulted with the resident pediatrician. The pediatrician recommended a full child abuse assessment. The emergency room physician, however, recommended either a child abuse assessment or an assessment at a hospital with a burn clinic to rule out that the marks were burns. The child protection investigator and on-call supervisor determined that the child should be evaluated at a specific burn clinic. That burn clinic did not have a protocol for conducting a child abuse assessment.

The following day the mother took the child to a hospital burn unit as directed by child protection. A nurse practitioner initially ruled out impetigo and determined that the injuries appeared to be friction burns. This determination was affirmed by a physician.

The marks on the child's hands were on both the front and back of his hands, which would make it unlikely to have occurred in a single fall. The investigator never resolved the question of how or where the friction burns occurred. In an interview with the Inspector General investigators, the nurse practitioner said that she did not delve into the mechanics of how the injury occurred. She said she made no determination of whether this was abusive. She stated that she believed that the determination of whether the injuries were caused by abuse was a determination for the Department to make.

The child protection investigator confirmed for the Inspector General investigators that she never spoke to the hospital nurse practitioner or the physician; and when she found out the diagnosis was friction burn she assumed that friction burn meant the injury was an accident and not inflicted. She could not explain how a single fall resulted in injuries to multiple planes of both hands.

14

The Burn Clinic where the child was seen has a Board-Certified Child Protection Doctor; however, that doctor was never consulted. To further complicate the case, both the supervisor and the investigator believed that they had submitted the case to the Multi-Disciplinary Pediatric Education and Evaluation Consortium (MPEEC) for a second opinion, but that it had been rejected. In fact, the case was never reviewed because the investigator was unfamiliar with technical requirements of submitting a case for a second opinion and the MPEEC intake coordinator failed to provide technical assistance.

Child protection investigators are required to observe the environment where the maltreatment was alleged to have occurred. Despite the grandfather's and mother's claims that the injuries occurred at the daycare, the investigator never went to the daycare or questioned anyone there about the injuries. Neither the supervisor, who provided supervision during the 16-day investigation, nor the Area Administrator, who reviewed the investigation, noted the need to verify the place or mechanics of the injury.

Two days following the close of the investigation, the child experienced cardiac arrest. He died four days later. The autopsy determined that the manner of death was Undetermined and suspicious, but a subsequent child protection investigation did not find sufficient evidence to indicate anyone for the child's death.

MPEEC reviewed the case after the child's death and concluded that the child's collapse and subsequent death was the result of progression of his underlying medical condition, asthma exacerbation resulting from a respiratory illness.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES |
|---|

**1. The Department should consider amending the State Central Register script for addressing Mandated Reporters who request to be anonymous. The Script should ensure that mandated reporters are informed that by remaining anonymous, they may be found in violation of ANCRA.**

A memo was sent to all Hotline staff by the State Central Register Administrator regarding the additional script to use with mandated reporters wanting to remain anonymous.

**2. The MPEEC Second Opinion Form should be available to the Region's child protection staff.**

The Department agrees. Child protection management is working with the Medical Director of MPEEC on the MPEEC Second Opinion Form. Once completed, the form will be issued through the Office of Child and Family Policy.

**3. The Administrator of Child Protection should convene a case discussion, using this report as a teaching tool, with Child Protection Area Administrators, to ensure that staff understand the protocol for requesting a second opinion from MPEEC and the need to comply with Procedures 300.100, *Medical Requirements for Reports of Child Abuse and Neglect*, to obtain a second medical opinion when necessary and the importance of determining the place and mechanics of injuries to a young child as well as investigating whether there were any witnesses.**

The Department worked with MPEEC to clarify the language difference between an off-site referral (for the city's hospitals that are not part of MPEEC) and a true second opinion performed by MPEEC. There have been ongoing discussions in various child protection management meetings statewide about the ability to obtain a second opinion as well as the logistics and resources available to obtain them.

**4. The Area Administrator, Supervisor and Child Protection Investigator should be counseled for failing to ensure that the Environment where Maltreatment Occurred was observed, for failing to comply with Procedures 300.100 by obtaining a second medical opinion when necessary and ensuring that the daycare staff were interviewed concerning the injuries and for failing to question medical staff concerning the mechanics of the injury.**

The Supervisor and Child Protection Investigator were counseled. The report was discussed with the Area Administrator.

**5. This report should be shared with the Supervisor, Child Protection Investigator and the On-call Supervisor to discuss the appropriate use and procedure for referring a child to an MPEEC Hospital for a second opinion for the benefit of the child, especially with suspicion of burns.**

The Report was shared with the Supervisor, Child Protection Investigator and the On-call Supervisor.

**6. This Report will be shared with the hospital's General Counsel.**

The Inspector General shared a redacted report with the hospital's General Counsel.

16

DEATH AND SERIOUS INJURY INVESTIGATIONS

## DEATH AND SERIOUS INJURY INVESTIGATION 4

**ALLEGATION**     An 11-year-old girl accidentally shot her three-year-old brother in the head while playing with a gun she found in their home. The parents had left four of their children, ages three to eleven years, home alone. A fifth child, who had disabilities, had been in residential care for four years at the time of the shooting.

**INVESTIGATION**     The investigation of the accidental shooting was the eleventh time the Department had investigated this family since 2008. Police reported finding a weapon and a spent shell casing, as well as a bag of what was believed to be crack cocaine, in the home. According to the 11-year old sibling, the children were home alone and decided to play cops and robbers. She found a gun in an unlocked gun box in the living room, picked up the gun, and "pushed the button." The gun discharged, striking her three-year-old brother in the head.  The boy was hospitalized and survived.

The mother said they were only gone 30 minutes when they received the call from the neighbor that their son had been shot.  The mother had a concealed carry license and was the listed gun owner.  The father's criminal history prevented him from legally owning a gun. The mother claimed she kept the gun in a locked box and stated that her 11-year-old daughter must have found the key and unlocked the gun box. The Department took protective custody of all four children. The three girls were placed with their maternal grandmother; their brother joined them when he was discharged from the hospital.  The Department indicated the mother for wounds by neglect, as she was the owner of the gun, and both parents were indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect, inadequate supervision and environmental neglect because neither parent was in the home at the time of the incident.

The father has eight drug related convictions, and a conviction for disorderly conduct. He was arrested seven times for domestic violence; however, his only domestic violence conviction was in 2001, before he became involved with the mother.  At the time of the shooting, there was a pending domestic battery charge stemming from an incident in which the father held the same gun used by the children, to the mother's head. The father had been arrested multiple times for physically assaulting the mother. Several years earlier, the father was arrested for strangling the mother.  The mother refused to sign a complaint saying she was scared to do so. Later that same year, the father was arrested after he hit the mother in the face "with a closed fist" causing a bruise around her eye. The father also had 19 bags of what was believed to be marijuana in his possession.  Three months later, police arrested the father again after he allegedly repeatedly punched the mother in the face leaving her with a swollen and blackened left eye.

### *Unfounded and Expunged Child Protection Investigations*
Between May 2008 and November 2012 this family had six child protection investigations that were unfounded and expunged.  In August 2017, the Department began expanding the information available concerning expunged investigations.

The first unfounded investigation was against the maternal grandmother for allegedly leaving the children at home alone while she left to buy drugs. The second unfounded investigation was against the father for allegedly hitting his child and causing her to have a bruise under her eye. The third unfounded investigation was against the mother for allegedly providing inadequate housing for her children. The fourth unfounded investigation was against the mother for allegedly leaving her young children home alone. The fifth unfounded investigation was against the mother for allegedly providing inadequate supervision and environmental neglect. The sixth unfounded investigation was against the mother and father for environmental neglect.

17

### Indicated Investigations

The family was first indicated, almost eight years prior to the shooting, after the school noted a rug or friction burn on the arm of their disabled four-year-old. During the investigation, the child protection investigator observed the home to be uninhabitable, and advised the mother that she and the children needed to leave the home as it was not safe. The child's teacher was concerned about the child's hygiene. The teacher noticed that he had "cakes of mud" on his feet and found that strange since he doesn't walk. She further reported that he often cries when he has to go home. The teacher of the child's sibling stated that her clothes were often dirty and her pants were too small. Other children would make fun of her; staff frequently asked the mother to take her daughter to the bathroom to wash her face and arms before school. The child protection investigator offered the family intact family services, but they refused. The burn allegation was unfounded after a doctor examined the child and the parents were indicated for environmental neglect.

The second and third indicated investigations, that occurred four years prior to the shooting, ran concurrently and both investigations closed on the same date. The second investigation indicated the mother for inadequate shelter to her seven-year-old child; and environmental neglect for three of her children. The third investigation indicated the mother for medical neglect, inadequate food and failure to thrive as to the eight-year-old disabled child. The eight-year-old was placed out of the home in a residential facility.

One year after the second and third indicated investigations, a fourth investigation was initiated while the mother was eight months pregnant. The father had barricaded the door with 2x4s and other furniture, refusing to open it. The police heard a loud scream from the apartment and physical contact. The mother was screaming "please just let me out." The kids could be heard screaming and crying. Within 15 minutes, the police broke down the door. The kids were in the living room; they were dirty and had no shoes on. The police observed broken furniture, and noted the home smelled and had no beds. The father was criminally charged with resisting/obstructing a police officer and domestic battery. One day prior to closing the investigation, the child protection investigator went to the family home. The investigator documented that all home utilities were in working order and the residence was clean; he also observed the children noting no concerns. The same day, the investigator documented that he contacted the children's doctor who said they had no concerns. The parents were initially indicated for allegation 60, substantial risk of harm/environment injurious; however, the indication was unfounded by administrative appeal and the report has been expunged.

### Services

The mother completed parenting education, but did not engage in recommended individual therapy. The investigator referred the father to parenting classes, family counseling, parenting behavioral therapy and individual counseling, none of which he completed. The parents underwent complete psychological evaluations and a parenting capacity assessment which found that the parents had a medium to high risk of continued abuse. The assessment also determined that the parents had other risk factors including lower intellectual functioning, unrealistic expectations for their children and impaired judgement.

### Placement Case

The Administrative Case Review (ACR) for the eight-year-old child at the residential facility noted that there was no documentation that the siblings were being monitored. Although the workers consistently visited the disabled child at the specialized facility, neither the first worker, who managed the case for 32 months, nor the new worker, who managed the case for 13 months, documented any visits to see the other children still residing at home, with one exception. The new worker documented an attempted visit to the home, but was not allowed in by the parents; this visit took place 21 days prior to the shooting.

One of the workers stated that there had been one additional attempted visit that had not been documented where the father would not allow her to come to the home, instead arranging to meet her in an empty lot. She saw the children and spoke with the father. (See Appendix for full redacted report.)

18

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  This report should be shared with the current worker for future case planning.** |

The Department agrees.  The report has been forwarded to the private agency to share with the new worker for future case planning

**2.  SACWIS should link the unfounded A sequence from 2008 and unfounded D sequence from 2011 to the parents' names. Currently, those investigations are only found through a person search for the disabled child.**

The Department agrees. There is an issue in SACWIS that did not allow all the investigation history to appear under the mom's name. OITS has installed a fix in the SACWIS release that links the investigations.

**3.  The Department should conduct an audit of split custody cases (i.e. cases in which some of the children are in state care and some are at home).  A review should determine if the children at home need more intensive services.**

The Department is in discussions with OITS on a report which would give this information.  Once the report is finalized, the Department will determine how to review and follow up with the identified families.

**4.  Management should conduct an enhanced review of families with investigations over C sequences (the OIG provided a draft tool). The review should evaluate whether chronic issues in the family are being addressed or are capable of being addressed.**

A "C" sequence report Review is in final development stages.  Once completed it will be the expectation that all DCP Area Administrators review the report and cases with their staff to ensure appropriate action is taken. In the meantime, there is a desktop alert which identifies any open family case with a new investigation.  DCP Area Administrators are expected to review these cases weekly with supervisors to ensure safety is assessed and family needs are being addressed.  At the same time, APT is reviewing these same cases to ensure dialogue between investigator and worker and to also ensure appropriate actions are taken and the family is being assessed appropriately. Area Administrators participate in many of these reviews and understand their role is to review cases with a more critical lens and identify and assist any underlying issues.

20

# PART II: CHILD DEATH REPORT

Inspector General staff investigate the deaths of children whose families were involved in the Illinois child welfare system within the preceding 12 months. Inspector General staff receive notification of the death of a child from the Illinois State Central Register (SCR), when the death is reported to SCR.[1]  Inspector General staff investigate the Department's involvement with the deceased and his or her family when (1) the child was a youth in the care of DCFS; (2) the family is the subject of an open investigation or service case at the time of the child's death; or (3) the family was the subject of an investigation or service case closed within the preceding 12 months. Whenever Inspector General investigators learn of a child death meeting these criteria, the death is investigated.[2]

Notification of a child's death initiates an investigatory review of records. Inspector General investigators review the death reports and information available through the Department's computerized records. The investigator then obtains additional records including the child's autopsy reports.[3] Records may be requested, impounded, or subpoenaed. Then they are reviewed. The majority of cases involve an investigatory review of records, often including social service, medical, police, and school records, in addition to records generated by the Department or its contracted agencies.

When warranted, Inspector General investigators conduct a full investigation, including interviews. A full investigation may result in a report to the Director of DCFS. Individual cases may not rise to a level necessitating a full investigation, but collectively can indicate systemic patterns or problems that require attention. Inspector General staff may address systemic issues through a variety of means, including cluster reports, initiatives, and trainings.

In Fiscal Year 2018 Inspector General staff investigated 98 deaths of children who died between July 1, 2017 and June 30, 2018, meeting criteria for review. A description of each child's death and DCFS involvement is included in this annual report. During this fiscal year, investigatory reviews of records were conducted in each of the 98 deaths, leading to 4 full investigations which remain pending. Comprehensive summaries of death investigations reported to the Director in FY 18, which may include deaths that occurred in earlier fiscal years, are included in the Investigations section of this annual report.

Sixty-eight of the 98 child deaths reviewed by Inspector General staff also underwent a child protection investigation of the death. Thirty-two of the deaths (47.1%) were indicated, 31 (45.6%) were unfounded and 5 (7.4%) remain pending.  Thirteen of the deaths were ruled homicide in manner; 24 of the deaths had a manner of undetermined; 19 of the deaths had a manner of accident; and 12 of the deaths had a manner of natural.

---

[1] SCR relies on coroners, hospitals, medical examiners and law enforcement to notify them of child deaths, even when deaths are not suspicious for abuse or neglect. Some deaths may not be reported.  As such statistical analysis of child deaths in Illinois is limited because there is no central repository that includes the total number of children that die in Illinois each year. The Cook County Medical Examiner's policy is to notify the Department of the deaths of all children autopsied at the Medical Examiner's office.

[2] Occasionally SCR will not receive notice of a child death and Inspector General staff learn of it through other means.

[3] The Inspector General wishes to acknowledge all the county coroners and the Cook County Medical Examiner's Office for responding to our requests for autopsy reports.

## SUMMARY

Following is a statistical summary of the 98 child deaths investigated by Inspector General staff in FY 18, as well as summaries of the individual cases. The first part of the summary presents child deaths by age and manner of death, case status and manner of death, county and manner of death, and child protection death investigations by result and manner. The second part presents a summary of deaths classified in five manners: homicide, suicide, undetermined, accident, and natural.[4] In Fiscal Year 2018 there were no deaths of children classified as suicide in manner. Please note that the term coroner is used for both coroners and the Cook County Medical Examiner in the individual summaries.

### Key for Case Status at the time of Inspector General investigation:

| | |
|---|---|
| **Youth in Care:** | Deceased was a Youth in Care. |
| **Unfounded DCP:** | Family had an unfounded child protection investigation within a year of child's death. |
| **Pending DCP:** | Family was involved in a pending child protection investigation at time of child's death. |
| **Indicated DCP:** | Family had an indicated child protection investigation within a year of child's death. |
| **Child of Youth in Care:** | Deceased was the child of a youth in care, but not in care themselves. |
| **Open/Closed Intact:** | Family had an open intact family services case at time of child's death / or within a year of child's death. |
| **Open Placement/Split Custody:** | Deceased, who never went home from hospital and had sibling(s) in foster care or child was in care of parent with siblings in foster care. |
| **Return Home:** | Deceased or sibling(s) returned home to parent(s) from foster care within a year of child's death. |
| **Child Welfare Services Referral:** | A request was made for DCFS to provide services, but no abuse or neglect was alleged. |
| **Preventive Services/Extended Family:** | Intact family services case was opened to assist family, but not as a result of an indicated child protection investigation. |
| **Former Youth in Care:** | Child was a youth in care within a year of his/her death. |

---

[4] The causes and manners of death are determined by hospitals, medical examiners, coroners and coroners' juries.

CHILD DEATH REPORT

**TABLE 1: CHILD DEATHS BY AGE AND MANNER OF DEATH**

| CHILD AGE | | HOMICIDE | SUICIDE | UNDETERMINED | ACCIDENT | NATURAL | TOTAL |
|---|---|---|---|---|---|---|---|
| Months of Age | At birth | | | | | 1 | 1 |
| | 0 to 3 | 2 | | 10 | 12 | 9 | 33 |
| | 4 to 6 | | | 6 | | 4 | 10 |
| | 7 to 11 | 2 | | | | 2 | 4 |
| | 12 to 24 | 1 | | 4 | 2 | 4 | 11 |
| Year of Age | 2 | 4 | | 1 | 1 | 1 | 7 |
| | 3 | | | 1 | | 1 | 2 |
| | 4 | 1 | | | | | 1 |
| | 5 | 1 | | 3 | | | 4 |
| | 6 | 1 | | | 1 | | 2 |
| | 7 | | | | 2 | 1 | 3 |
| | 8 | | | | 1 | | 1 |
| | 9 | | | | | | - |
| | 10 | | | | | 1 | 1 |
| | 11 | 1 | | | 1 | 1 | 3 |
| | 12 | | | | | | - |
| | 13 | | | | | | - |
| | 14 | 2 | | | 3 | 1 | 6 |
| | 15 | | | | 2 | | 2 |
| | 16 | 1 | | | | | 1 |
| | 17 | 1 | | 1 | | | 2 |
| | 18 or older | 1 | | | 2 | 1 | 4 |
| | TOTAL | 18 | 0 | 26 | 27 | 27 | 98 |

**TABLE 2: CHILD DEATHS BY CASE STATUS AND MANNER OF DEATH**

| REASON FOR OIG INVESTIGATION* | | HOMICIDE | SUICIDE | UNDETERMINED | ACCIDENT | NATURAL | TOTAL |
|---|---|---|---|---|---|---|---|
| DCP | Pending | 4 | | 2 | 4 | 2 | 12 |
| | Unfounded | 4 | | 10 | 11 | 12 | 37 |
| | Indicated | 4 | | 5 | 2 | 4 | 15 |
| Youth in Care | | 4 | | 3 | 4 | 5 | 16 |
| Former Youth in Care | | | | | | | - |
| Return Home | | | | | | | - |
| Open Placement/Split Custody | | 1 | | | | 2 | 3 |
| Open Intact | | 1 | | 2 | 5 | | 8 |
| Closed Intact | | | | 1 | 1 | 1 | 3 |
| Child of a Youth in Care | | | | 1 | | | 1 |
| Child Welfare Services Referral | | | | 2 | | | 2 |
| Preventive Services/Extended Family | | | | | | 1 | 1 |
| TOTAL | | 18 | 0 | 26 | 27 | 27 | 98 |

\* When more than one reason existed for the OIG investigation, the death was categorized based on primary reason.

**TABLE 3: CHILD DEATHS BY COUNTY OF RESIDENCE AND MANNER OF DEATH**

| COUNTY | HOMICIDE | SUICIDE | UNDETERMINED | ACCIDENT | NATURAL | TOTAL |
|---|---|---|---|---|---|---|
| Adams | 1 | | | 1 | | 2 |
| Champaign | | | | | 1 | 1 |
| Clay | 1 | | | | | 1 |
| Coles | 1 | | | | | 1 |
| Cook | 7 | | 12 | 7 | 9 | 35 |
| DeKalb | 1 | | | | | 1 |
| Edgar | | | | 1 | | 1 |
| Franklin | | | | | 3 | 3 |
| Fulton | | | | 1 | | 1 |
| Hancock | | | | 1 | | 1 |
| Henry | | | | 1 | | 1 |
| Jackson | | | | | 1 | 1 |
| Jersey | 1 | | | | | 1 |
| Lake | | | | | 2 | 2 |
| Lawrence | | | 1 | 1 | | 2 |
| Lee | 1 | | | | | 1 |
| Macon | 1 | | | | | 1 |
| Macoupin | | | | 1 | | 1 |
| Madison | | | 2 | 2 | 3 | 7 |
| Marion | | | | | 1 | 1 |
| McLean | 1 | | | | | 1 |
| Montgomery | | | | | 1 | 1 |
| Ogle | | | 1 | | | 1 |
| Peoria | 1 | | | 1 | 1 | 3 |
| Pike | | | | 1 | | 1 |
| Richland | | | | 1 | | 1 |
| Rock Island | | | | | 1 | 1 |
| St. Clair | | | | 1 | 1 | 2 |
| Sangamon | | | 1 | 2 | 1 | 4 |
| Stephenson | | | 1 | | | 1 |
| Tazewell | | | 1 | 1 | | 2 |
| Union | | | 1 | | | 1 |
| Vermillion | | | 1 | | | 1 |
| Warren | | | | | 1 | 1 |
| White | | | | 1 | | 1 |
| Whiteside | | | | 1 | | 1 |
| Will | 1 | | 2 | 1 | | 4 |
| Williamson | 1 | | | 1 | 1 | 3 |
| Winnebago | | | 3 | | | 3 |
| **TOTAL** | **18** | **0** | **26** | **27** | **27** | **98** |

CHILD DEATH REPORT

**TABLE 4: CHILD PROTECTION DEATH INVESTIGATIONS BY RESULT AND MANNER\***

| FINAL FINDING | Homicide | Suicide | Undetermined | Accident | Natural | Total |
|---|---|---|---|---|---|---|
| Indicated | 12 | - | 9 | 7 | 4 | **32** |
| Unfounded | 0 | - | 12 | 11 | 8 | **31** |
| Pending | 1 | - | 3 | 1 | 0 | **5** |
| **Total** | **13** | **-** | **24** | **19** | **12** | **68** |

\*Child deaths in which at least one person was indicated or unfounded for death by abuse or death by neglect. Note that persons indicated for death will stay on the State Central Register for 50 years.

## FY 2018 DEATH CLASSIFICATION BY MANNER OF DEATH

### HOMICIDE
*Eighteen deaths were classified homicide in manner.*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Blunt trauma due to child abuse | 8 |
| Gunshot wound | 6 |
| Dehydration/starvation | 2 |
| Stab wounds | 1 |
| Blunt trauma due to vehicle striking bicyclist | 1 |
| **TOTAL** | **18** |

### ALLEGED PERPETRATOR INFORMATION:\*

| PERPETRATOR | NUMBER |
|---|---|
| Mother | 3 |
| Father | 3 |
| Mother's Boyfriend | 3 |
| Father's Girlfriend | 1 |
| Uncle | 1 |
| Unrelated Caretaker | 1 |
| Unrelated Adults | 1 |
| Unknown/Unsolved | 3 |
| Unrelated peer | 1 |
| Police Officer | 1 |

\*Some deaths have more than one perpetrator

### UNDETERMINED
*Twenty-six deaths were classified undetermined in manner.*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Undetermined | 14 |
| Asphyxia | 4 |
| Sudden unexplained infant death | 2 |
| Closed Head Injury | 1 |
| Drowning | 1 |
| Drug Overdose | 1 |
| Pending | 3 |
| **TOTAL** | **26** |

## ACCIDENT

*Twenty-seven deaths were classified accident in manner.*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Asphyxia/Suffocation/Sleep-Related | 14 |
| Blunt trauma injuries | 6 |
| Drug overdose | 2 |
| Drowning | 4 |
| Hanging | 1 |
| **TOTAL** | **27** |

## NATURAL

*Twenty-seven deaths were classified natural in manner*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Complications Related to Prematurity | 7 |
| Asthma/Respiratory Illness | 4 |
| Pneumonia/Sepsis | 3 |
| Congenital Problems | 3 |
| Influenza/Viral Illness | 3 |
| Dandy Walker Syndrome | 2 |
| Complications Related to Cerebral Palsy | 2 |
| Cancer | 1 |
| Sudden Infant Death | 1 |
| Undetermined Cause | 1 |
| **TOTAL** | **27** |

CHILD DEATH REPORT







**Reason for OIG Review (98 deaths reviewed)**

CHILD DEATH REPORT

**HOMICIDE**

| Child No. 1 | DOB: 2/2000 | DOD: 8/2017 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 17 years |
| Cause of death: | Gunshot wound to the back |
| Perpetrator: | Unrelated adult |
| Reason for Review: | Youth in care |
| Action Taken: | Investigatory review of records |

**Narrative:** Seventeen-year-old boy fatally shot by a police officer after the officer pursued him and another teenage boy, following a carjacking. A vehicle was reported stolen in a carjacking by two armed suspects; the police spotted the stolen vehicle and attempted to pull it over; however, the driver sped away and a chase ensued. The chase ended when the vehicle struck a semi-truck. The suspects jumped out of the vehicle; both offenders were brandishing hand guns while on foot. As the officer exited his squad car, he identified himself to the offenders and gave a verbal command. The offenders did not comply with the verbal command; the officer feared for his life and shot the youth. The youth was transported to the hospital where he was pronounced deceased. The medical examiner ruled this as a homicide. The Illinois State Police Integrity Unit investigated the police involved shooting.

**Prior History:** The mother of the youth has an extensive history with the Department that dates to 2001. The mother gave birth to at least two substance exposed infants. In June 2003, the deceased youth and his siblings were taken into custody by the Department. The case was adjudicated with a finding of neglect and abuse by the court, with guardianship given to the Department in November 2003. The maternal grandmother became the children's relative foster placement. In April 2007, parental rights were terminated; and in April 2008, the maternal grandmother adopted the deceased youth and three of his siblings. In November 2010, the Department received a report alleging that the maternal grandmother was suffering from panic attacks, mental health issues, and a substance abuse problem. In December 2010, a case for intact family services was opened. In April 2011, protective custody was taken of the children. In June 2012, he was placed in specialized foster care. The maternal grandmother surrendered her parental rights in June 2013. The deceased youth had several placements, including traditional and relative foster homes, and group homes. By the age of fifteen the deceased youth had eight felony convictions, and in July 2015, he was sentenced to five-years' probation. In December 2015, the deceased youth was placed with his paternal grandmother, where he remained until his death. The deceased youth was attending counseling and he was also involved in therapeutic mentoring; however, he refused to engage or participate. The deceased youth was terminated from a job readiness and peace group that had been recommended by his probation officer because of lack of participation. In August 2016, a judge placed him in a mandatory program to provide him with services and classes due to violating probation by missing curfew and being arrested. In late November/December 2016, a new caseworker was assigned. In December 2016, the paternal grandmother gave notice to have the youth removed from her home because of a drive by shooting that involved the youth; however, he remained in her home and she continued to work with the youth and advocate for his needs. In March 2017, the caseworker attended court with the youth for possession of a gun. The youth pled guilty; his current probation was continued.

| Child No. 2 | DOB: 5/2001 | DOD: 8/2017 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 16 years |
| Cause of death: | Complications of multiple blunt force injuries, motor vehicle striking bicyclist |
| Perpetrator: | Drunk driver |
| Reason for Review: | Split custody |
| Action Taken: | Investigatory review of records |

**Narrative:** Sixteen-year-old boy struck by a motor vehicle while riding his bicycle and died from the injuries that he sustained from being struck. The teen and his friends were riding their bicycles. The friends were riding their bikes in front of him when a drunk driver struck the teen. The teen was taken to the hospital and was in a coma until his death eight days later. The driver was arrested and faced criminal charges. The Department did not investigate the death for abuse or neglect.

29

CHILD DEATH REPORT

**Prior History:**  The family had a long history with the Department. There were seventeen unfounded child protection investigations and numerous intact cases from 2000 through 2014. The deceased teen had one sibling and two maternal half-siblings. The deceased and his younger brother were reported to be mentally and physically delayed and autistic. The thirteen-year-old brother cognitively functioned at the age of a five to six-year-old and the fourteen-year-old (deceased) cognitively functioned at the age of a seven to ten-year-old.  In November 2014, the hotline received a call to report that the police became involved with the family due to inappropriate pictures found on the computer. The computer had a thirty-eight minute video that showed the mother, an unknown male, and the mother's fifteen-year-old daughter smoking cannabis and drinking.  The mother admitted that the teen smokes marijuana and drinks while she is present. The investigation against the mother was indicated for substance misuse. An intact family services case was opened because of this investigation. In January 2015, the hotline received a call to report that when the mother's twelve-year-old son arrived at school his face was swollen, including the right eye. The child said that his mother's paramour slapped him across the face two times.   The investigator observed the child with extensive bruising to the right side of his face. The mother, her paramour, and the other children all confirmed that the paramour slapped the child in the face. After the investigator observed the bruising, protective custody was taken of all four children. They were placed with a relative and the case was opened for placement. The investigation against the mother and her paramour for cuts, bruises, welts, abrasions and oral injuries to the mother's twelve-year-old son was indicated. The investigation against the mother for medical neglect to her son was unfounded. The investigation against the mother for substantial risk of physical injury/environment injurious to health and welfare by neglect to all four children was indicated. The three boys were placed in a relative foster home and the girl was placed in the home of a different relative caregiver. The mother and children participated in services, including counseling. The mother visited the boys regularly. In August 2015, the hotline received a call to report that the thirteen-year-old brother had inappropriate sexualized behaviors. The allegation of sexual molestation was unfounded due to the teen's cognitive functioning level of a five-year-old. The allegation for substantial risk of sexual abuse-sexualized behavior of a young child to the teen was indicated. In October 2015, the thirteen-year-old brother was placed in a residential treatment center for autism and sexualized behaviors. In January 2016, the mother was found fit at her permanency hearing and had completed all recommended services. In February 2016, it was court ordered that the other two boys return home to their mother. The daughter's goal had been changed to guardianship with her foster family and was finalized in August 2016 and her case was closed. The caseworker visited the mother and her two sons at their home twice monthly and once a month she transported the mother to the residential facility to visit her other son.

| Child No. 3 | DOB: 1/2012 | DOD: 9/2017 | Homicide |
|---|---|---|---|
| Age at death: | 5 years | | |
| Cause of death: | Gunshot wound to the head | | |
| Perpetrator: | Father | | |
| Reason for Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**    Five-year-old boy shot in the head by his thirty-three-year-old father before shooting himself in the head. The young boy was pronounced dead at the scene; his father was taken by ambulance to the hospital where he later died.  At the time of this incident, there was a pending child protection investigation involving the father for sexual molestation and sexual exploitation to an eleven-year-old boy. While the investigation was pending, a safety plan was put in place for the five-year-old child.  The mother agreed to care for her son in her home and to not allow any unsupervised visits with his father. The investigator further advised the mother that the father had guns in the home and she needed to be careful about going to the home. Four days before the incident the father voluntarily checked himself into the hospital for suicidal ideation.  On the day of the incident, he was released from the hospital and contacted the mother asking to see his five-year-old son.  The mother planned to meet him in a public place to gather school supplies; however, he did not show and the mother went to his home. The father invited the child into the home to play video games; the mother followed him into the home. The father told the mother to get the school supplies, so the mother left the child in a room with the father.  As the mother stepped out of the room the father immediately slammed the door and barricaded it. Minutes later she heard gunshots. The mother went to her car and called the police. The autopsy found that the child died from a gunshot wound to his forehead. The father was indicated posthumously for death by abuse. The mother was indicated for death by neglect, because she left her child with his father in violation of the safety plan.

**Prior History:**    In 2016 the five-year-old child's parents were separated and the child resided with the father and had visitation with his mother. In September 2017, five days before the incident, law enforcement contacted the hotline with allegations of sexual molestation and sexual exploitation to an eleven-year-old boy by his babysitter, the father of the deceased five-year-old child. In a forensic interview, the eleven-year-old boy denied ever being sexually abused.  In November 2017, the report for sexual molestation was unfounded because of insufficient corroborating evidence. The mother of the eleven-year-old boy reported that the father of the deceased five-year-old boy provided child care for her son and his siblings daily and they spent the night at his home on numerous occasions.  The mother denied that her son was sexually abused or had been touched in a sexual manner by anyone. The mother and the child denied sexual abuse. The babysitter to the eleven-year-old and father of the deceased five-year-old was a convicted sex offender. He had completed treatment including assessments and counseling services and was no longer required to register as a sex offender.

| Child No. 4 | DOB: 8/2013 | DOD: 9/2017 | Homicide |
|---|---|---|---|
| Age at death: | 4 years | | |
| Cause of death: | Multiple stab wounds to the chest | | |
| Perpetrator: | Father | | |
| Reason for Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**    Four-year-old boy and his mother were found murdered in their home.  The maternal grandmother was concerned for her daughter and grandson because she was unable to contact her daughter and she did not show up for work.  The grandmother went to her daughter's residence, once inside she discovered her daughter and grandson both deceased.  The autopsy determined that the four-year-old boy died from multiple stab wounds to the chest.  The father was charged with murder after he admitted to killing his son and the mother of his son.  The Department did not investigate the death.

**Prior History:** The mother had two older boys, ages nine and seven, that lived with their father. In July 2017, the hotline was contacted and it was reported that the boys' twenty-two-year-old maternal uncle hit his nine-year-old son and twelve-year-old cousin. The Department investigated the mother for substantial risk/environment injurious by neglect to her son; and the uncle for substantial risk/environment injurious abuse-incidents of violence or intimidation to his nephew and niece. The two boys were interviewed. The seven-year-old denied the uncle hitting him and the nine-year-old boy informed the investigator that his uncle did hit him for talking back.  At the beginning of this investigation, the mother and four-year-old boy lived with the maternal grandparents and the maternal uncle; however, while this investigation was pending the mother and four-year old boy had moved into their own residence.  The mother, uncle and maternal grandparents were interviewed and the four-year-old boy living in the home with his mother was observed with no signs of abuse or neglect.  The uncle admitted to hitting his nine-year-old nephew once with a belt on his back for being disrespectful to the maternal grandparents. The uncle denied hitting his niece. In addition, the investigator interviewed the niece who denied all allegations. In October 2017, the report was unfounded.  There was no evidence that the alleged offender placed the child in substantial risk of physical injury.

| Child No. 5 | DOB: 10/2016 | DOD: 9/2017 | Homicide |
|---|---|---|---|
| Age at death: | 11 months | | |
| Cause of death: | Craniocerebral blunt force trauma | | |
| Perpetrator: | Unknown | | |
| Reason for Review: | Open intact case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Eleven-month-old baby was transported to the hospital with a large contusion on the back of the head; bruising on the forehead, chest and back area; and was pronounced deceased the following day. A week before his death, the baby's mother had left him in the care of a friend. It is not known when the baby was last seen alive. Law enforcement was driving down the street when they observed the babysitter's seventeen-year-old son running down the street holding the baby.  Law enforcement stopped the teen, who said he dropped the baby and rolled on top of him. The baby was unresponsive. Law enforcement contacted EMS and paramedics transported the baby via ambulance to the local hospital. The injuries the baby suffered included bruising to the upper chest and neck, a bite mark to the left upper arm, bruising to the forehead and ears bilaterally and a healing fracture of the eighth rib. The seventeen-year-old was left alone with the baby while his mother left the house or was sleeping; there are conflicting stories. The teen was taken into custody by police. He stated that the baby was asleep in the living room in a gaming chair, and he was lounging on a futon behind the baby. He got up and went to his room and when he came back he tripped over the dog and fell on top of the baby. The information provided did not seem plausible based on the baby's injuries. The teen had recently been released from a juvenile facility for physical abuse and arson. The Department is investigating the mother for death by neglect; inadequate supervision to the deceased baby; and substantial risk of physical injury/environmental injurious to health and welfare by neglect to the deceased baby and his two siblings after learning that the mother was supposed to pick up her baby from the babysitter a few days prior. The Department is also investigating the babysitter and her seventeen-year-old son. Allegations against the seventeen-year-old son include death by abuse, and cuts, bruises, welts, abrasions and oral injuries to the baby. Allegations against the babysitter include inadequate supervision to the baby; cuts, bruises, welts, abrasions and oral injuries by neglect to the baby; environmental neglect to the seventeen-year-old, inadequate supervision to the seventeen-year-old son; and substantial risk of physical injury/environment injurious to health and welfare to the seventeen-year-old. The child protection investigations and the criminal investigation remain pending.

CHILD DEATH REPORT

**Prior History:**  The mother had a history with the Department and was a youth-in-care from 2002 to 2005. Her first involvement with the Department as a parent occurred in May 2007, when she was investigated and unfounded for substantial risk of physical injury/environment injurious to health and welfare by neglect to her ten-month-old son. This investigation has since been expunged. In October 2014, the mother was investigated and unfounded for cuts, bruises, welts, abrasions and oral injuries to her eight-year-old son. This investigation has since been expunged. In February 2017, it was reported that the ten-year-old was unhappy at home because his mother and her paramour argue all the time, he must take care of his younger siblings and the paramour was indicated in 2015 for substantial risk of sexual abuse.  The mother's paramour was investigated for substantial risk of sexual abuse – sex offender has access to the children and the mother and paramour were investigated for inadequate supervision to the children ages ten, five, three and four-months (the deceased baby). The investigator reviewed a prior investigation on the paramour; he had completed a sex offender assessment and was not found to present with any sexual pathology and was low risk to reoffend. The parents admitted that they leave the ten-year-old to watch the younger children for short periods of time, but denied that they ever left him to care for the baby. The mother noted that the family had moved a lot due to her instability. The investigator spoke with the parents about safe sleep habits with their infant. The children were assessed as safe. The investigation for inadequate supervision was indicated against the mother and paramour and the investigation against the paramour was unfounded. The family agreed to intact family services. After the mother and her paramour broke up, he requested and signed a letter refusing services. By May 2017, the mother reported that she and the children were living with her five-year-old's father. The worker deemed the home to be appropriate with no safety concerns. By July 2017, the mother had still not engaged in services, and had not obtained a mental health assessment. The ten-year-old still had not been assessed for counseling, the mother reported that he would start seeing a counselor at school when school was back in session.  In September 2017, the worker got a call from the child protection investigator that the baby had passed away. After the death, the two children remained in the home of the five-year-old's father. In November 2017, the mother signed over guardianship of the children to the five-year-old's father. The intact case remains open. Mom has had minimal contact with the caseworker since the baby's death and is not engaged in services. The babysitter of the deceased baby has a long history with the Department. Her only child is her seventeen-year-old son. Prior to the baby's death, the babysitter had eleven investigations between 2002 and 2014 (seven unfounded).

| Child No. 6 | DOB: 9/2017 | DOD: 10/2017 | Homicide |
|---|---|---|---|
| Age at death: | 1 month old | | |
| Cause of death: | Blunt force injuries of head due to assault | | |
| Perpetrator: | Unknown | | |
| Reason for Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**     One-month-old infant found unresponsive by her father when he woke up in the early morning. He woke up the mother and she called 911. The infant was transported to the children's hospital where she was pronounced deceased. The police called the hotline to report the death and the Department opened a child protection investigation into the death. The father stated that he was drinking the night before and that he had fallen asleep on the sofa.  The mother stated that she let the infant's fifteen-year-old step sister give her a bottle and then she put the infant in the crib on her stomach.  The mother further reported that the infant had been sick with a cold and colicky, but she had not taken her to the doctor. The mother stated that she woke up at approximately 2 a.m. and fed the infant; she then took a bottle and put the infant on her back to sleep with a blanket because it was cold. The father reported that he woke up at 5 a.m. to find the infant on her side with her face toward the side of the bassinet.  The autopsy found that the infant had blunt trauma to the head, with two sites of impact, multiple bleeds in the brain and an abrasion above the eye with suspicion of possible shaken baby syndrome and ruled a homicide. Neither parent or the step-children could provide an explanation for the injuries to the infant. Considering this information, the Department took protective custody of the infant's three siblings and they were placed together in a traditional foster home.  The Department was granted temporary custody of the children. Both parents were indicated for death by abuse due to both parents being in the home when the infant was found unresponsive and neither being able to explain the injuries.  The parents were also indicated for substantial risk of physical harm/environment injurious to health and welfare by neglect to the other children.

**Prior History:**   In July 2016, the police called the hotline to report a domestic violence incident between the mother and father.  The mother was arrested for stabbing the father in the back with a knife while two children, ages three-years and six-months, were present for the incident but were not harmed. The Department initiated an investigation for substantial risk of physical injury/environment injurious to health and welfare by neglect to the children by their mother.  The mother identified an aunt to care for the children while she was in jail. The investigation was indicated against the mother, due to the children being in the home and observing the domestic violence incident between the mother and father. In April 2017, the hotline received a call to report domestic violence between the mother and the father.  The Department opened an investigation for substantial risk of physical injury/environment injurious to health and welfare by neglect to the children by their mother. Both parents admitted that there was a domestic incident in January 2017 and the father was arrested, but denied that the incident was physical.  In June 2017, the investigation was indicated against the mother. The rationale was that there was a history of domestic violence between the mother and father, which put the minors at risk.

| Child No. 7 | DOB: 5/2015 | DOD: 10/2017 | Homicide |
|---|---|---|---|
| Age at death: | 2 years | | |
| Cause of death: | Gunshot wound to the back | | |
| Perpetrator: | Paternal uncle | | |
| Reason for Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

CHILD DEATH REPORT

**Narrative:**     Two-year-old died of a gunshot wound while in the care of his seventeen-year-old uncle. The uncle ran next door and banged on the neighbor's door.  The neighbor called 911 who advised they lay the toddler down on the ground, open his airway, and apply pressure to the wound. Once EMS arrived they continued to treat the toddler and transported him to the hospital where he was pronounced deceased. The hotline received a call from law enforcement to report the toddler's death. The mother and father had left the uncle in charge of his two-year-old nephew and his one-year-old niece. The uncle admitted to police that he found a gun by a dumpster and he and his nephew were playing cops and robbers; he pointed the gun at his nephew and pulled the trigger.  He did not think the gun was loaded. The mother and father denied knowledge of the gun. The police described the home as filthy, covered in roaches and found marijuana on the kitchen table that was within reach of the children.  The Department took the one-year-old into protective custody and investigated the mother, father and uncle for death by abuse, substantial risk of physical injury/environment injurious by neglect to the one-year-old sibling; and inadequate supervision to both children. The uncle was arrested and charged with murder; he was also indicated for his nephew's death, and substantial risk of physical injury/environment injurious by abuse to the one-year-old child who was crawling around in the blood of her brother. The mother and father were indicated for substantial risk and inadequate supervision. The father was indicated for substance misuse because he told the investigator that he would buy marijuana and provided it to the minor uncle and they would smoke it together.  In June 2018, the one-year-old was returned to the parents' physical custody.  The parents continue with services.

**Prior History:**   In July 2017, law enforcement contacted the hotline and reported that the eighteen-year-old father of the deceased two-year-old went to his mother's home and punched his fifteen-year-old brother in the face. The Department investigated the older brother for abuse.  The following day the child protection investigator went to the home where the fifteen-year-old lived with his mother.  The mother of the siblings told the investigator that her sons have girlfriends who are friends and that they were fighting; so, her older son and his girlfriend went to the home to talk to the fifteen-year-old and his girlfriend; they got into an argument and her older son punched her younger son in the face. She called an ambulance and the police arrived with the ambulance. Her younger son was taken to the emergency room and he was found to have a jaw bone fracture. The eighteen-year old was arrested and charged with aggravated battery, a felony and was given probation. The Department indicated the eighteen-year old for bone fractures by abuse to his fifteen-year-old brother.

| Child No. 8 | DOB: 4/2016 | DOD:  10/2017 | Homicide |
|---|---|---|---|
| Age at death: | 17 months | | |
| Cause of death: | Blunt Force Head Injury | | |
| Perpetrator: | Mother's Paramour | | |
| Reason for Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**   A seventeen-month-old toddler died in the hospital after suffering serious injuries that included a skull fracture, scalp hematoma, subdural hemorrhages, severe brain injury, bilateral retinal hemorrhages and significant bruising to the face, arms, torso, ears, and mouth while in the care of the mother's paramour. Two days prior to the death, the Department received a hotline call reporting that mother's paramour contacted 911 stating that the child fell out of his crib, was unconscious and not breathing. When police arrived at the home, the child was lying on the floor unconscious, not breathing and had no pulse. The child looked damp with visible injuries to his head, face, and body. The child was transported to the hospital where he regained a pulse and was placed on a ventilator, but never regained consciousness. The child had suffered a hypoxic brain injury and died two days later. In interviews with police the paramour reported he was the sole caretaker while the mother was at work.  He gave different explanations for the child's injuries. The Department indicated the paramour for death by abuse, head injuries and cuts, bruises, welts, abrasions, and oral injuries. The mother was indicated for death by neglect, head injuries by neglect and cuts, bruises, welts, abrasions and oral injuries by neglect. The paramour was arrested and criminally charged for the child's death.

**Prior History:**   In August 2016, the Department received a hotline call reporting that approximately four weeks ago the mother dropped her four-month-old infant on the floor or in his bassinet because he would not stop crying. It was further alleged that there was domestic violence and drug use by the mother and her paramour. The Department investigated the mother for substantial risk of physical injury. The paramour (not the boyfriend in the death investigation) and the mother denied that the incident ever occurred and the child's day care and primary care physician expressed no concerns about the child. In October 2016, the investigation against the mother was unfounded. In September 2017, the Department again had contact with the family after the hotline received a call from the child's daycare reporting that in August 2017, the child, now sixteen-months-old, arrived at daycare with three large marks on his forehead, between his eyebrows and the top of his forehead. The mother told the daycare that the marks were bug bites that her paramour had tried to "pop" because he thought they were pimples. The child missed a week of daycare following the incident. Sometime after he returned to daycare, the child arrived with a striated bruise from his forehead to his ear. When daycare staff questioned the mother about the bruise, the mother explained that the child got the bruise after running into a table. The child did not return to that daycare center. The Department investigated the mother and her paramour for cuts, bruises, welts, abrasions and oral injuries. The mother told the child protection investigator that her paramour caused the marks on the top part of the child's face when he popped what he believed were pimples. In response to questions about the striated bruise, the mother said the bruise was caused by the child falling outside of a restaurant. The mother told the police the striated bruise was caused by a dog bumping into the child.  The child protection investigator observed the child and saw that he had bruising to his left eye.  The mother explained that this occurred when the child fell into an entertainment center. The investigator noted other injuries and bruises for which the mother provided differing explanations. The investigator asked the mother to take the child to the doctor for further examination and she did. After the doctor saw the child, the doctor reported that she saw no signs of abuse or neglect. Three weeks later, in October 2017 this investigation was still pending when the child was brought to the hospital unconscious with a skull fracture and serious brain injury. In February 2018, the investigation against the mother and paramour was indicated for cuts, bruises, welts following the child's death. In July 2018**,** the Department again had contact with the mother after receiving a hotline call reporting that the mother had just given birth to a baby girl and had failed to inform hospital staff that she had a prior child die while in her care or that her newborn's father was incarcerated and facing criminal charges for the death of her other child. The Department opened an investigation and indicated the mother on the allegation of environment injurious to her newborn. The Department did not take custody of the newborn because mother agreed to participate in intact family services that were offed to her and her newborn child.

CHILD DEATH REPORT

| Child No. 9 | DOB: 6/2011 | DOD: 11/2017 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 6 years |
| Cause of death: | Starvation |
| Perpetrator: | Father |
| Reason for Review: | Unfounded child protection investigation within a year of the child's death |
| Action Taken: | Full investigation pending |

**Narrative:**    Six-year-old boy found by his forty-two-year-old father in his room unresponsive. The father told hospital staff that his six-year-old son had been up and moving around in the morning before he left for work.  The father left his six-year-old and seven-year-old sons home alone, while he went to work.  When the father returned home he checked on the children in their room in the basement, and found his six-year-old son unresponsive. The hospital staff reported that the father carried his son into the hospital, already deceased. The nurse from the hospital stated that the child was "extremely emaciated, malnourished" with sunken eyes and appearing to weigh about 20 lbs. The physicians examining the child found bruising on multiple areas of the body, including the right side of his head, his temple and around his neck.  They also found abrasions near his hips and large scabs on his hands.  The nurse contacted the child's primary care physician who stated that the child had not been seen since 2016, when the child was diagnosed with failure to thrive and referred for follow-up care. The nurse reported that there may be six children living in the home of unknown names and ages.  The Department investigated the father and stepmother for death by abuse; cuts, bruises and welts; and malnutrition to his six-year-old son; for inadequate supervision to the deceased six-year-old and seven-year-old sibling; and for substantial risk of harm, environment injurious, on the remaining children in the home. The child's three siblings came into care following the death of their brother, and are currently with the paternal grandparents. The father and stepmother pleaded guilty to murder.  They face at least 20 years in prison.

**Prior History:**  The biological mother of the deceased child was not involved with him at the time of his death.  She and the father had four children together (including the now deceased child) but they divorced in 2013.  She also had a child from another relationship who resided with her. The father remarried in 2016 and maintained custody of their four children, then ages eleven, seven, six and five (deceased child).  Also residing in the home with the father and step-mother were her two children from a prior relationship who were ages twelve and thirteen. In 2013, the thirteen-year-old half-sibling (who resided with the biological mother) briefly came into Department care when his mother was psychiatrically hospitalized. The mother reported an abusive relationship with the father and the thirteen-year old also reported feeling unsafe with the father who reportedly pushed, slapped him and threatened him. A short-term, court supervised intact family services case followed.  The mother was compliant with services and in December 2013 the Judge closed the case.  In March 2014, the thirteen-year-old half-sibling came into care after he reported his mother's drug use and a subsequent police search found heroin in the home. The child was placed in traditional foster care. The child also reported that his stepfather (the father of the deceased child) had abused him and expressed concern for his younger siblings. The child remains in placement with a goal of independence. The stepmother of the deceased child also had a history with the Department from 2003 through 2006, involving her two biological children. In December 2003, it was reported by law enforcement that she was charged with possession, manufacturing and delivering methamphetamine analog; manufacturing and delivery of barbiturate analog, possession of a controlled substance, possession of cannabis and endangering life/health of a child. In July 2005, the charges were dismissed, except for possession of a controlled substance for which she was sentenced to probation. The Department investigated and indicated the mother for substantial risk of physical injury/environment injurious, but the indicated finding was later unfounded on appeal, and has been expunged.  In July 2005, it was reported that the father intentionally rear ended the mother's car while their two children were in the mother's vehicle. The Department investigated and indicated the father for cuts, bruises and welts; indicated the mother and father for substantial risk of physical injury by abuse. The investigation has since been expunged. In June 2013, the biological mother and maternal grandmother of the deceased child reported that the deceased child and his three siblings were at risk of sexual abuse from their paternal grandfather. The investigation was unfounded and has since been expunged.  In January 2016, the hotline received a call from the then four-year-old child's (deceased child) school reporting concerns about the child's lack of weight gain and strange behaviors with food and eating. The child had lost weight when he returned from Christmas break. The teacher said she and the school nurse had met with the child's father multiple times about his weight, the last meeting just before Christmas break. After break, the father reported that the child had been seen by his pediatrician, who said the child was okay. The father did not provide any details. The Department investigated the father for inadequate food. The Department made an appointment for the child to be seen by a doctor at a children's hospital who reported that he did not suspect any abuse or neglect to the child and referred him to an endocrinologist, as he believed the child's poor weight gain could have a medical explanation.  The parents never took the child to the second doctor and the Department never followed up to ensure the child had been seen by the second doctor. The investigation was unfounded because there was believed to be a medical explanation for the child's low weight. When the investigator met with the family for a final visit, the stepmother informed the investigator that the children were fed regularly at home.

38

CHILD DEATH REPORT

| Child No. 10 | DOB: 10/2015 | DOD: 11/2017 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 years |
| Cause of death: | Blunt force head trauma due to child abuse |
| Perpetrator: | Father's paramour |
| Reason for Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**  Two-year-old toddler suffered extensive brain injuries and died after he was thrown on the floor by his father's twenty-one-year-old paramour. The Department investigated the paramour for head injuries, death by abuse, and substantial risk of physical injury/environment injurious to health and welfare to the toddler.  Additionally, the Department investigated the father for death by neglect, and substantial risk of physical injury/environment injurious to health and welfare by neglect to the toddler. The paramour initially gave conflicting stories regarding the events that led to the toddler's death. However, she eventually told police that as she was caring for the toddler and his twin brother, she became increasingly frustrated and "body slammed" the two-year-old onto the hardwood floor. The paramour did not call 911, but did call the father. The father, unaware of the extent of the toddler's injuries, transported the toddler by personal vehicle to the local hospital where the child was found to have an altered mental status and a subdural hematoma with blown and fixated pupils.  The toddler was intubated and airlifted to a children's hospital where a craniectomy was performed. Following the procedure, the toddler remained unresponsive for five days until he was pronounced deceased, after being taken off life support. A physician who reviewed the toddler's records opined that, "if 911 had been called at the initial time of injury, it is possible that there would have been a much different outcome." The paramour was arrested for homicide and indicated for abusive head injuries, death of the toddler, and substantial risk of physical injury/environment injurious to health and welfare by neglect to the toddler's twin. The investigation against the father was unfounded. An intact family services case was opened, though it was closed two weeks later. Following the toddler's death, the mother retained primary custody of the surviving twin brother.

**Prior History:**  In May 2017, the hotline was contacted to report a domestic dispute that occurred approximately one block away from the mother and father's home. It was reported that the mother and father got into an altercation while the twin infants were left unattended in the home; the children, however, were unharmed.  The Department investigated the parents for inadequate supervision and substantial risk of physical injury/environment injurious to health and welfare by neglect. The father reported that he had not been home the night before and when he arrived home the following morning, the mother confronted him outside and they began to argue. The mother said when she left the twins they were both sleeping. The father called police when he realized she left the twins alone for approximately twenty-five minutes. The mother was indicated for inadequate supervision. In October 2017, another investigation was initiated for inadequate supervision, though the report against the mother and father was "determined to be not a good faith report of potential abuse or neglect," and thus unfounded without further investigation.  The parents had an ongoing custody dispute over the twins prior to the toddler's death.

| Child No. 11 | DOB: 10/2015 | DOD: 12/2017 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 years |
| Cause of death: | Severe dehydration and malnutrition |
| Perpetrator: | Mother |
| Reason for Review: | Indicated child protection investigation within a year of child's death |
| Action Taken: | Full investigation pending |

CHILD DEATH REPORT

**Narrative:**    Two-year-old medically complex child was found deceased by his mom in his pack-n-play. The Department received a call from law enforcement that they were dispatched to the residence of the mother. Upon arrival EMS determined that the toddler was deceased and no attempts were made to revive him. The residence had a stench and was littered with rubbish and dog feces. In the toddler's room, there were hypodermic needles found on the floor, along with trash and several soiled diapers next to the pack-n-play, where the deceased toddler was lying on a lid to a food container. The mother eventually admitted to police that she left the child alone from Friday to Sunday. She stated she put food and a water bottle in his pack-n-play on Friday. She reported that she returned home on Sunday, opened the door to his room and saw that he still had food. Police did not find a water bottle. She did not notice that he was deceased until Monday. She admitted the last time she changed his diaper and fed him was on Friday. She noted he had sores on his lips on Friday, and she had not bathed him for the past eleven days. She was charged with first degree murder and taken into custody; she is awaiting trial. The Department indicated the mother for death by neglect; environmental neglect; malnutrition and inadequate supervision. The autopsy report determined the cause of death was due to severe dehydration and malnutrition.  The OIG is conducting a full investigation of the child's death.

**Prior History:**  The toddler's maternal grandmother had a history with the Department when the mother of the toddler and her siblings came into care in 1999 after nineteen child protection investigations, seven of which were indicated.  The family case was closed in 2002, and the mother and her siblings were adopted in 2004. The mother kept in contact with her biological mother after the adoption.  The mother had a history of uncontrolled diabetes and mental health issues. At the age of twenty, the mother gave birth to her son who was born six weeks premature with health conditions, including right arterial thrombosis, aphasia, and reflux. In April 2016, the hotline received a call from an anonymous reporter stating that the mother was living in unsanitary conditions with her seven-month-old baby. After a formal investigation, the mother was unfounded for environmental neglect in May 2016.  The investigator did not observe the home to be in the unsanitary condition noted in the narrative, and the early intervention staff that were in the home weekly had never reported any concerns. Five months later in September 2016, the hotline received a call from a nurse to report possible neglect to the eleven-month-old. The mother had called the doctor's office threatening to take out her son's G-tube and cursing at the staff. The Department investigated the mother for medical neglect. The baby had missed his last two appointments and missed a swallow study. The investigation was unfounded because the doctor would not diagnose the incident as medical neglect. While this investigation was pending, a relative contacted the hotline to report that the mother was in the hospital for uncontrolled diabetes, the house was filthy and the baby was residing with her. The Department opened a new investigation against the mother for environmental neglect. A safety plan was put in place for the baby to stay with his maternal grandmother and she would supervise visits between mom and baby. The investigator went to the home and observed the baby to be clean, healthy and happy.  The residence was cleaned and the investigation was closed and unfounded against the mother for environmental neglect. In July 2017, a relative contacted the hotline to report concerns that the twenty-two-month old child was left in a room by himself all day and had pulled out his feeding tube. The Department investigated the mother for inadequate supervision, environmental neglect and medical neglect. The mother avoided the investigator and police were called to conduct a welfare check in early August 2017.  The officer assisted the investigators in entering the residence by pushing the door open against piles of clothing, garbage, and other items covering the floor; they could not enter the home more than a four square foot area in the entry way without having to climb over items. The investigator told the mother that she could not allow the toddler to live in these conditions.  The mother agreed to allow the biological grandmother to take the toddler for the weekend so she could clean the apartment.  She cleaned her residence and the toddler returned home. In mid-September 2017, the investigator was informed by the biological grandmother that the toddler had a severe diaper rash and the mother was refusing to seek medical care. The investigator contacted the mother and accompanied her and the toddler to the emergency room. In October 2017, two months prior to the death of the child, the mother was indicated for environmental neglect and medical neglect, and unfounded for inadequate supervision.

CHILD DEATH REPORT

| Child No. 12 | DOB: 3/2017 | DOD: 12/2017 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 9 months |
| Cause of death: | Blunt force injuries due to assault |
| Perpetrator: | Mother |
| Reason for Review: | Pending child protection investigation |
| Action Taken: | Full Investigation pending |

**Narrative:**     Twenty-four-year old mother contacted 911 to report that her nine-month-old infant was unresponsive. The mother initially told police that the infant fell off the bed. The infant was taken by ambulance to the hospital where she was found to have skull fractures, facial bruising, brain hemorrhaging injury to the liver, and fractures in various stages of healing. The infant was pronounced deceased four days later. When questioned by police about the injuries, the mother admitted to picking up the infant and throwing her against a dresser in the presence of her two and three-year-old children. When the infant continued to cry the mother picked up the infant and threw her against the ground. The mother stated that the infant became unconscious and she tried to wake the infant by shaking her. The mother was charged with murder and is in jail awaiting trial. The mother was indicated by the Department for the following allegations: death; bone fractures; internal injuries; head injuries; and substantial risk of harm by neglect. The OIG is conducting a full investigation of the child's death.

**Prior History:**  At the time of the eight-month-old's death, there was a pending child protection investigation that had been opened the previous month that involved the mother's five and six-year-old children whom were living with a relative. The allegations were that while the children were visiting with their mother and her paramour over the weekend one of the children witnessed the paramour push his mother against the wall and was pushed to the ground himself by the mother's paramour.  Prior to the eight-month-old's death, the investigator on the pending investigation was unaware that the mother also had an eight-month-old, two-year-old and three-year-old in her care.

| Child No. 13 | DOB: 10/2017 | DOD: 1/2018 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 months |
| Cause of death: | Closed head injury |
| Perpetrator: | Mother's paramour |
| Reason for Review: | Pending child protection (paramour) at time of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**     Two-month-old infant found by the mother's live in paramour unresponsive and not breathing. The infant was transported to the local hospital and then transported to a children's hospital in critical condition, where she was taken off life support and pronounced deceased two days later. The mother was at work and was not home at the time; the infant was in the care of the mother's paramour. The Department investigated the mom's paramour for death by abuse and substantial risk of physical injury/environment injurious to the infant's siblings. The infant had global hypoxic ischemic injury and there was evidence of retinal hemorrhaging. The injuries were believed to be the result of abuse. The paramour had moved into the home the first week of December 2017, the day he had bonded out of jail and during a pending investigation with the Department. Law enforcement interviewed the paramour regarding the death and he reported giving the infant a bottle, setting the bottled beside the infant and then falling asleep. He woke up and found the infant blue and lifeless.  The paramour stated that he attempted to call 911 twice and the call wouldn't go through, so he called the mother at work, and told her the infant was not breathing.  The mother ran to her vehicle to go home and call 911. The ambulance arrived and transported the infant to the local hospital. The pathologist stated that, based on the extent of the injuries, the infliction of injury would have rendered the infant unconscious instantaneous to several minutes after the point of the trauma being inflicted. The pathologist was confident that the cause of injury would have occurred during the time the paramour said he had been watching the infant. The paramour was indicated for death by abuse; the allegation for substantial risk of physical injury/environment injurious to the infant's older siblings was unfounded. Neither sibling was home at the time of the incident.

CHILD DEATH REPORT

**Prior History:**  At the time of the infant's death there was a pending child protection investigation involving the paramour. In November 2017, the paramour was residing in a different household with his girlfriend, her three minor children ages 15, 13, and 2, and his mother. In November 2017, the hotline was contacted by law enforcement to report that police responded to a domestic disturbance call made by the mother's fifteen-year-old daughter that her mother's paramour slapped her on her face. The police observed the red mark on the right side of her face and the paramour was arrested.  Law enforcement reported that the mother and two minors (the mother's thirteen-year-old autistic son and the paramour's twelve-year-old sister) were present at the time the incident occurred. The Department investigated the paramour for cuts, bruises and welts to the fifteen-year-old girl and for substantial risk of physical injury/environment injurious by neglect to the two minor children who witnessed the incident. The mother reported that she had been in a relationship with the paramour for four months, she denied domestic violence issues or police involvement at the home. She reported police involvement for domestic battery with her fifteen-year-old assaulting her on two occasions and that the fifteen-year-old was on an informal probation for domestic battery against her. At the time of the incident, the family was having a family meeting about tension between the children and the paramour. The fifteen-year-old allegedly dared the paramour to hit her and he did. After the incident, the mother asked the father of the fifteen-year-old if she could stay with him. The investigator spoke with the children who witnessed the incident and they all confirmed the reported incident. The investigator attempted to interview the paramour in jail without success. The fifteen-year-old told the investigator that she and the paramour got into an argument. He yelled I'm about ready to smack you and she told him to do it and he did. She then grabbed her mother's phone and called the police. Eight days later the investigator attempted to see the paramour in jail again and was told he had bonded out the day before. The investigator confirmed with the children and the mother (ex-girlfriend) that they had not been around the paramour and he had not been to the home since he was arrested. In December 2017, the paramour moved in with his new girlfriend (the mother of the deceased baby) the day he bonded out of jail.  Two days after the hotline was contacted to report the death of the baby, the paramour was indicated for cuts, bruises, and welts and substantial risk of physical injury/environment injurious by abuse to the fifteen-year-old and substantial risk of physical injury/environment injurious by neglect to his sister.

| Child No. 14 | DOB: 10/2003 | DOD: 3/2018 | Homicide |
|---|---|---|---|
| Age at death: | 14 years | | |
| Cause of death: | Gunshot wound to the abdomen | | |
| Perpetrator: | Unrelated peer | | |
| Reason for Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  Fourteen-year-old youth in care was shot in the abdomen by an opposing gang member and died.  It was reported that the teen and other members of his gang were in a car when an opposing gang shot at the teen. The teen was transported to the hospital and pronounced deceased.  The teen had been on run for approximately eight months with minimal communication to family or his caseworker when he was shot and killed. The Department did not investigate the death for abuse or neglect. The teen's child case closed after his death.

CHILD DEATH REPORT

**Prior History**:   The deceased teen had one sibling who was two years older than him. In October 2014, the mother was investigated for inadequate supervision after she left her children with an aunt while she went to rehab and never returned to care for them.  The investigation was unfounded. In June 2015, the hotline was called to report that the eleven-year-old child had major truancy issues and had missed twenty-nine days of school and was tardy forty-eight times. The child told the reporter that his parents were alcoholics who were drunk all the time, so he often hides from them. The child was also observed to have a four-inch scratch on his chest, that his mother admitted to causing, but said the child was out of control. The father admitted to having an alcohol problem and has neglected the children due to his addiction.  The investigation against the mother for cuts, bruises, welts, abrasions and oral injuries was unfounded and the investigation against the mother and father for substantial risk of physical injury/environment injurious to health and welfare by neglect was indicated. In August 2015, a case for intact family services was opened with recommendations for parenting skills classes, family counseling and substance abuse treatment. The two children were under the care of the paternal aunt until November 2015, when they returned to their parents. In November 2015, the hotline received a call to report that the children had scabies and that they needed a doctor's note to return to school and that the children were left alone all the time. The investigation against the mother for medical neglect and inadequate supervision was unfounded and was expunged. The parents did not participate in intact family services, they were constantly moving and they wouldn't communicate with the worker.  By January 2016, the mother informed the worker she wanted her case closed. The case was closed unsuccessfully at the end of February due to the family being uncooperative.  In September 2016, there were two investigations opened, one against the teens' parents, and one against the sister's boyfriend's mother after the hotline received a call to report that the teens were homeless. The fifteen-year-old girl was pregnant, due in January and not receiving prenatal care. The girl had been living with her boyfriend and his mother, but it was reported they were asked to leave that home. The investigation against the mother for substantial risk of physical injury/environment injurious to health and welfare by neglect was indicated. The children and extended family reported both parents had an alcohol use problem and were residing in a foreclosed building with no utilities and with other tenants who have substance abuse issues. The investigation against the mother and father for lock out was unfounded because there was no evidence the children were turned away from their home. In September 2016, the Department opened a placement case. The fifteen-year-old girl was placed in the home of fictive kin (her boyfriend's parents' home). She engaged in services and complied with therapy.  Her goal was changed to independence. Her case remains open. In January 2017, the thirteen-year-old brother was placed in a specialized foster home. In July 2017, he left the foster home, stole the foster mother's credit card and attempted to make purchases. A child protective warrant was issued for his arrest. In September 2017, the brother contacted his sister, and she reported that he seemed to be alright. The worker was only able to make limited contact with him via social media, as he would not disclose his whereabouts or meet with her in person. In March 2018, the worker was notified that the teen was killed.

| Child No. 15 | DOB: 10/1998 | DOD: 4/2018 | Homicide |
|---|---|---|---|
| Age at death: | 19 years | | |
| Cause of death: | Respiratory distress, resulting from being shaken when she was five-months-old | | |
| Perpetrator: | Mother | | |
| Reason for Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  Nineteen-year-old youth in care lived in a pediatric residential medical care facility due to medical complications, resulting from being shaken when she was five-months-old.  The youth in care had gone into respiratory distress, staff from the facility called 911 and the youth was transported to the hospital via ambulance and was pronounced deceased. The youth suffered from a seizure disorder, blindness, psychomotor developmental retardation, diabetes and hypothyroidism. She was non-ambulatory, non-verbal, on a ventilator and had a g-tube for feedings.  The mother had an indicated investigation for bone fractures, head injuries, risk of harm from March 1999 and when her daughter died the Department added death by abuse.

**Prior History:**  In March 1999, the Department investigated the mother for bone fractures, head injuries and risk of harm to her five-month-old daughter.  The parents called 911 to report that their five-month-old was sleepy and quiet which was unusual.  The baby was transported to a children's hospital where she was found to have a subdural hematoma, broken clavicle and bleeding behind her retina, indicative of abusive head trauma. She was diagnosed with shaken baby syndrome. The mother was arrested and charged with aggravated battery to a child. She was sentenced to 20 years in prison.  The mother remained in prison until 2016.  The baby stayed in the hospital for a month before she was eventually transferred to the pediatric residential medical care facility where she remained until her death.  The child's case worker visited her monthly, as well as an aunt and grandfather.  The father was not involved with his daughter. After the mother was released from prison, she sought the reversal of the no-contact order, so she could have supervised visits. In April 2017, the mother had a supervised visit with her daughter for the first time.

| Child No. 16 | DOB: 9/2015 | DOD: 4/2018 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 years 7 months |
| Cause of death: | Blunt trauma |
| Perpetrator: | Mother's boyfriend |
| Reason for Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**      Two-year-old boy found to be unresponsive by mother's new twenty-two-year-old live-in boyfriend.  The boyfriend was babysitting the two and four-year-old children while the mother was at work. A neighbor called 911; the toddler was air-lifted from the local hospital to a children's hospital. The toddler was put on life support, but never responded and was pronounced dead at the hospital. Physicians found multiple skull fractures, head injuries, fractures to ribs and arms, and burns on the back consistent with physical abuse. The Department initiated a death investigation. The mother stated that she had noticed some bruises on the toddler since her live-in boyfriend had been in the home.  The boyfriend admitted to police that he had abused the toddler; he was arrested and charged with first degree murder. The death investigation was indicated on the mother for death by neglect to the deceased, inadequate supervision and risk of harm for both children.  The live-in boyfriend was indicated for burns, cuts, and welts by abuse on both children and death and head injuries by abuse to the deceased. The boyfriend is awaiting trial for the murder. Protective custody was taken of the sibling and has been placed in a traditional foster home. The mother has a no contact order. The father of the children is incarcerated and had not had contact with the children for two years.

**Prior History:**  On a Saturday in January 2018, the Department initiated an investigation against the mother for inadequate supervision of her four-year-old. The child was found wandering outside. The mother reported that she had left the child downstairs while she took the younger child upstairs for a bath. When the mother went back downstairs the child was gone; she had left through an open window.  The mother contacted a neighbor to watch the younger child while she went to look for the four-year old. The four-year-old child had been found by a neighbor who contacted police. The police released the child to the mother. The mother reported that she was the only caretaker as she was not working at that time. The mother suspected the child had been trying to walk to school as they do during the week; and the child had done this once before on a day with no school. The mother reported that she had inquired about putting a chain lock on the door and alarms on the windows; however, she lived in public housing and they would not allow it.  The investigator advised the mother to move furniture away from the windows so the child could not reach them. The investigator conducted a later visit and the mother had been keeping the child with her when she went upstairs. The investigation was unfounded. The boyfriend who killed the younger child was not part of the household at that time.

CHILD DEATH REPORT

| Child No. 17 | DOB: 4/2007 | DOD: 6/2018 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 11 years |
| Cause of death: | Gunshot wounds |
| Perpetrator: | Unknown |
| Reason for Review: | Unfounded child protection investigation within a year of the child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**   Eleven-year-old boy was found by his brother shot to death in the home of his father and step-mother. The boy's nineteen-year-old sibling left the home and when he returned an hour later, he found his brother unresponsive with blood all around him. The father and stepmother, who had also just returned home, contacted the police. When the police arrived on the scene, they noted the back door to the apartment building had been kicked in and the door to the family's apartment had also been kicked in. The home appeared ransacked. The Department initiated an investigation for allegations of inadequate supervision and death by abuse. The inadequate supervision and death by abuse were unfounded on the father and step-mother. The   Department indicated an unknown perpetrator for death by neglect. The homicide remains unsolved.

**Prior History:**  From 2006 through 2012, the mother of the deceased eleven-year-old had four investigations, three indicated and one unfounded, that were expunged. In January 2014, an investigation opened on the deceased's father and stepmother for cuts, welts and bruises to the stepmother's six-year-old and substantial risk of harm to their two year old together.  The school of the six-year-old child contacted the hotline to report that the six-year-old child showed up at school with bruises. The police were notified and they took protective custody of the six-year-old child and transported her to the hospital. The child was noted to have bruises on her left arm, bruise on the corner of her left eye and an abrasion on her ear. The child told the school staff that her mother's paramour hit her. The paramour was arrested. When the paramour was released from jail the mother allowed him back in the home around the children because the mother did not believe the child.  The Department took custody of the children and placed them with relatives. The mother had supervised visits with the children. The paramour (father of the two-year-old and deceased) was not allowed contact with those children. The investigation was indicated. In February 2017, when the children went into subsidized guardianship with a relative when the case was closed.  In May 2017, the school contacted the hotline to report that another student had reported that the mother's (mother of the deceased child) fourteen-year-old daughter (half-sibling of the deceased child) was smoking marijuana and having sex with an adult male that was living in the home. The Department investigated a male (former home health client of the mother who was renting a room from her) for substance misuse by abuse and sexual penetration to the fourteen-year-old; investigated the mother for substantial risk of sexual abuse to the siblings and substance misuse by neglect. The investigator spoke with the assistant principal who told the investigator that when the male was bringing lunch to school he confronted him and he denied the allegations. The assistant principal further stated that the girl who reported this to the school had been in trouble for smoking marijuana at school and had been arguing with the fourteen-year-old. The assistant principal and staff had never witnessed the teen or the mother to be under the influence of anything and did not have concerns about the teen. The investigator visited the home and all the children denied any sexual abuse, inappropriate touching, physical abuse or drug use. The fourteen-year-old also denied any drug use by her or anyone in her household and denied any sexual contact with the male. The mother told the investigator her daughter had never said anything to her about the male being inappropriate. The mother explained that the male had moved into her basement about a year ago and helps with the children from time to time while she works. The mother stated that he was like a grandfather to the children.  She denied any drug use in the home. The investigation was unfounded on all allegations.

| Child No. 18 | DOB: 12/2003 | DOD: 6/2018 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 14 years |
| Cause of death: | Multiple gunshot wounds |
| Perpetrator: | Unknown |
| Reason for Review: | Open placement case at the time of child' death |
| Action Taken: | Investigatory review of records |

**Narrative:**  Fourteen-year-old boy was shot and killed at 3:00 a.m. Responding police officers found the teen lying unresponsive on the sidewalk with multiple gunshot wounds.  The teen was transported via ambulance to the hospital where he was pronounced deceased upon arrival. The teen was a documented gang member, and was with his girlfriend when he became engaged in a verbal argument with three unknown individuals while at a gas station.  The teen and his girlfriend left the gas station when a dark colored vehicle approached them and an occupant of that vehicle exited the vehicle and opened fire, striking the teen multiple times.  A criminal investigation into the teen's murder is pending.

**Prior History:** This family was involved in twelve investigations with the Department from 2006 through 2018; three investigations were indicated and nine were unfounded. In April 2006, the godmother of the then two-year-old boy was investigated for burns, and cuts, welts, bruises, abrasions and oral injuries by neglect. The mother stated that the godmother had taken her two children for a few days, as planned, but did not return the children as scheduled.  The godmother took the children to the maternal grandmother's house four days after the scheduled date to return the children, the godmother dropped off the two children and ran out of the home. The two-year-old was found to have second degree burns to his left hand, buttocks and lower back. The investigation for burns was indicated to an unknown perpetrator for the two-year-old's injuries. From August 2008 through December 2016, this family had nine unfounded investigations that were eventually expunged.  The investigations involved a range of allegations, including, substantial risk of physical injury/environment injurious; sexually transmitted diseases on a minor child; substantial risk of sexual abuse/sibling sexual abuse on a minor child; substance misuse by neglect; substantial risk of physical injury/environment injurious to health and welfare – incidents of violence or intimidation; sexual molestation; inadequate supervision; and substance misuse.  In July 2017, the mother delivered a baby girl who tested positive for opiates, cocaine and benzodiazepines.  The mother admitted to using heroin and methadone throughout her pregnancy. The mother was investigated and indicated for substance misuse to the newborn and substantial risk of physical injury/environment injurious to health and welfare to her older children. The mother admitted to the investigator that she snorts heroin daily. She was unwilling to go into inpatient drug treatment. The Department was granted temporary custody of all three children and they were placed with the maternal aunt. The investigation against the mother was indicated**.** In October 2016, it was reported to the hotline that the twelve-year-old daughter was molested by an adult cousin.  The report was unfounded because the mother would not consent to a forensic interview for her daughter. One year later, the same allegation was reported to the hotline.  The cousin was living in the home with the twelve-year-old and her brother.  The mother's whereabouts were unknown.  The twelve-year-old reported the molestation to her mother, but she did not believe the mother reported it.  The Department's investigation against the cousin was indicated.  A criminal case is pending against the cousin.

**UNDETERMINED**

| Child No. 19 | DOB: 11/2015 | DOD: 2/2017 | Undetermined |
|---|---|---|---|

|  |  |
|---|---|
| Age at death: | 1 year |
| Cause of death: | Undetermined |
| Reason for Review: | Youth in care |
| Action Taken: | Investigatory review of records |

**Narrative:**   One-year-old found unresponsive by his forty-seven-year-old maternal grandfather who is also the licensed relative foster parent. The grandfather reported that he put the baby to bed and checked on him in the morning and found him unresponsive. He called for the great grandmother to begin CPR and he called 911. The grandfather, the baby and the baby's sister, whom the grandfather has guardianship of, were staying with the great-grandmother temporarily while the home they were moving into was being finished.  The baby had a history of medical problems including respiratory issues, with a hospitalization for pneumonia, a past bowel obstruction requiring surgery and a prior need for a feeding tube.  The Department investigated the death and the grandfather was unfounded for death by neglect. There was no evidence of injury or trauma and the medical examiner was unable to determine the cause of death.

**Prior History:**  The mother suffered a traumatic brain injury from an accident as a child resulting in cognitive delays. The mother has an extensive history with the Department. In June 2014, the mother was investigated for inadequate supervision when the mother gave birth. She had decided for the newborn to be privately adopted, but the mother then stated she wanted to keep the newborn. The mother left the hospital saying she was going to get a car seat for the newborn and never returned. According to later information, that newborn was adopted. The investigation was unfounded and eventually expunged. In November 2015, the mother was investigated for substantial risk of harm by neglect when it was reported that following the birth of the mother's third child (the deceased baby), there was concern by hospital staff about the mother's ability to care for the newborn due to her cognitive disabilities, a history of domestic violence, and her lack of a stable home.  The mother left the hospital before the investigator could see her and the doctor took protective custody of the newborn. The investigator located the mother who stated that she was not able to take care of the newborn at that time but she wanted her father to have him. The mother shared that the father of the baby also could not care for the newborn. The investigator met with the grandfather who took in the newborn and the investigator referred him for extended family support services to assist with guardianship. The investigation against the mother was indicated.  In January 2016, the mother was investigated for substantial risk of harm by neglect when it was reported that her two-month-old baby (the deceased baby) was in the hospital with pneumonia and required a feeding tube. The mother had agreed when the baby was born to give guardianship to the grandfather; however, the mother was not cooperating and allowing the grandfather to have guardianship. The mother told the investigator that she changed her mind and wanted the baby to go home with her to her grandmother's house. The great-grandmother said she could not care for the baby and that mother would not be appropriate for the baby. The baby came into care and remained with the grandfather as a foster placement. The grandfather and worker were seeking early intervention services for the baby. The mother was not involved. The mother was indicated for substantial risk of harm by neglect.  After the death of the baby, the mother had three more children, including twins, that were taken into care.

| Child No. 20 | DOB: 3/2017 | DOD: 7/2017 | Undetermined |
|---|---|---|---|

|  |  |
|---|---|
| Age at death: | 3 ½ months |
| Cause of death: | Undetermined |
| Reason for Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**      Three-and-a-half-month-old was found unresponsive by a nine-year-old child in the home of her sibling's grandmother, where she and her siblings had spent the night.  The grandmother was caring for the five children, including two of her own, the infant and the infant's two siblings.  The grandmother reported placing the children in the same bed because it was a hot night and the bedroom had air conditioning.  She stated that she last saw and fed the infant around 4 a.m. and put her back in bed with the other children. The Department investigated the grandmother for death by neglect and for substantial risk/environment injurious by neglect to the other children in the house.  The grandmother told the investigator that she was hesitant to care for the infant based on her own poor health related to breathing problems.  During the investigation, the grandmother tested positive for substances and reported that she had used heroin and that her last usage was the day prior to the infant's death and approximately two-and-a-half hours before the infant and two siblings were brought to her home. The Department was granted temporary custody of the grandmother's children.   The investigation against the grandmother was indicated.

**Prior History:**   In October 2016, law enforcement contacted the hotline to report the mother with her two children and her friend with her two children drove to a male's house to start a fight with him. When they got to the male's house, the mother got out of the car and walked in the street screaming that he was hitting her. The four children were in the car during this incident. The mother fled with her two-year-old daughter, leaving her other child with her friend who was a sex offender. The Department investigated the friend for substantial risk of sexual abuse-sex offender. The investigator made numerous good faith attempts to see the subjects in person, but was unsuccessful. The investigator left her contact information and did receive two phone calls and was told by the mother not to go to her house or she would report her for harassment. The case was unfounded, because the subjects were unable to be located; and were uncooperative with the investigation. This investigation has since been expunged.

| Child No. 21 | DOB: 9/2015 | DOD: 7/2017 | Undetermined |
|---|---|---|---|
| Age at death: | 22 months | | |
| Cause of death: | Drowning in a pool | | |
| Reason for Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**   Twenty-two-month-old toddler in the care of his grandparents was found unresponsive face down in their pool.  The fifty-three-year-old grandmother and grandfather were watching their grandchild while the mother was working.  The grandmother was in the home with the toddler when she went to the bathroom, leaving the toddler in the kitchen where the patio door was open, but the screen was closed. When the grandmother went back into the kitchen she heard the toddler making a grunting sound.  She immediately began looking for him in the house, including the basement and bedrooms. She then went outside where the grandfather was and asked if he was with the toddler; he was not.  The grandparents enlisted the help of neighbors to look for the toddler and started checking the backyard of the home, where the above ground pool was, but not looking inside the pool. The grandmother went back in the home, calling the toddler and while looking out the kitchen window she saw her grandchild face down on the surface of the above ground pool.  The toddler was unresponsive and the grandparents began CPR before paramedics arrived.  The toddler was transported to the hospital where he was later pronounced deceased. The Department investigated the death, indicating the grandmother for inadequate supervision and death by neglect.  The family was referred for intact family services including grief counseling and parenting education.  The family did cooperate with recommended services and the intact case was closed in November 2017.

48

**Prior History:**  In December 2016, the hotline received a call from law enforcement stating that the maternal grandmother left her seven-year-old grandchild home alone.  The children and their mother lived with the maternal grandparents during this time.  The Sheriff explained that the mother was at work and the grandmother had taken the child's sibling to the doctor and may have forgotten that the child did not go to school that morning.  Later that afternoon the child protection investigator visited the home.  The seven-year-old child told the investigator that after his grandmother left he called 911; however, the seven-year-old would not answer any other questions asked by the investigator and neither would his older brother.  The grandmother told the investigator that her seven-year-old grandson had missed the bus and since his older brother stayed home for a doctor's appointment, she allowed the seven-year-old to stay home.  When they got ready to go to the doctor her seven-year-old grandson refused to get in the car, she told him she would leave him home alone if he didn't get in the car.  He refused to get in the car and she left.  The seven-year-old then called 911 immediately. The grandmother felt he would be safe by himself, but said she wouldn't do that again. The mother shared that her son can be oppositional and stubborn, and that it is often a daily fight to get him on the bus for school. However, he is good once he gets to school and he behaves in Cub Scouts. The investigator discussed the possibility of a behavioral contract with the seven-year-old and counseling. The mother reported that she felt her mother leaving him home alone would not happen again and they would be seeking ways to deal with his occasional oppositional behavior. The following day the investigator spoke with a collateral contact, a relative, who reported no concerns. The investigator also spoke with the school social worker who had no concerns about abuse or neglect. The investigator then spoke with her supervisor and the grandmother was indicated for inadequate supervision.

| Child No. 22 | DOB: 6/2015 | DOD: 8/2017 | Undetermined |
|---|---|---|---|
| Age at death: | 2 years old | | |
| Cause of death: | Undetermined | | |
| Reason for Review: | Child welfare services referral within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**   Two-year-old found unresponsive in the morning by her twenty-year-old mother. The child was sleeping on a pallet in the living room while the mother was sleeping on a nearby couch. The mother called 911. The fire department responded and found the child in cardiac arrest.  They attempted to start intraosseous infusion in the left leg, but before medication could be started, they had arrived at the hospital. At the hospital, the child was found to be cold with signs of rigor mortis so resuscitation efforts were ceased and the child was pronounced dead at 8:55 am in August 2017. The child had been seen by multiple medical care providers just prior to her death for what started as a rash on her face. The child was seen in the emergency room for the rash and was discharged; she was then seen in clinic the day before her death and the records showed she was diagnosed with Auto-erythrocyte sensitization syndrome, which is a blood clotting disorder. The child had a history of chronic ear infections, GERD and her tonsils and adenoids removed.  An autopsy was performed, and a bruise on the face was confirmed, consistent with blunt trauma, as well as a bite on the child's tongue, which was also documented by medical professionals prior to her death; no plausible explanation was provided.  The pathologist completing the autopsy wrote that although the definitive cause of death could not be determined they theorized that the death may have been caused by asphyxiation or terminal seizure, as indicated by brain swelling and bite on the tongue, but seizures cannot be determined post-mortem. The mother was investigated for death by abuse, cuts welts and bruises to the infant, and substantial risk to the sibling. During the investigation, the family agreed to a safety plan where the sibling could stay with the maternal grandmother.  The sibling was also given a full body scan; no injuries or abnormalities were found.  All the parties in the household were interviewed by the police regarding the bruises found on the deceased child.  In May 2018, the death investigation was unfounded.

**Prior History:**  In May 2017, the Department received a call to the hotline from a physician requesting assistance for the mother. The doctor shared that the mother, during an appointment for her other child (the deceased child's only sibling) the day before, told him that she had been homeless for a little more than a week.  The mother told the office that she was going to be staying with her father and gave the office an address. The doctor requested that any available services be offered. That same day, a child welfare worker called the physician who reiterated her concerns. The worker reached out to the mother through both phone and letters, including sending her a list of resources for the mother and her children. In June 2017, the mother called the worker. The mother said the clinic told her that the Department would be calling and she was afraid that the Department would come and take away her children. The worker explained that the clinic did not report any abuse or neglect they just wanted to know if services could be offered to assist with educating her on services available in the community. The mother said she would review the packet of information the worker sent. The worker asked the mother to call if she had any questions. Following the discussion with the mother the child welfare services referral was closed.

| Child No. 23 | DOB: 7/2017 | DOD: 9/2017 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 months |
| Cause of death: | Sudden unexplained infant death |
| Reason for Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**  Two-month-old found by his father face down in his pack-n-play not breathing.  The father called 911 and the infant was transported to the hospital via ambulance.  The Department investigated the mother and father for death by neglect. The police and the child protection investigator observed a soft bed pillow, many blankets, a bottle and toys in the crib. The parents reported that the infant was sick with respiratory issues and a fever for a few days prior to his death. The mother stated that she propped the infant up with a pillow and upon waking for work in the morning she did not check on the infant. The parents stated that the infant did not wake up for a feeding during the night.  The autopsy found that the death was a result of positional asphyxiation. The parents were both indicated for death by neglect. The Department offered intact family services; however, the family did not engage and the matter was closed unsuccessfully in December 2017.

**Prior History:**  In March 2017, the hotline received a call to report that the mother's seventeen-year-old daughter told her teacher that her mother's paramour punched her in the eye. The reporter stated that the teen's eye was swollen shut with a small cut on her eyebrow.  It was reported that the paramour was upset when the teen called him a loser and he punched her. The Department investigated the mother and paramour for substantial risk of physical injury/environment injurious to health and welfare to the mother's seventeen-year-old daughter. The child protection investigator met with the mother, paramour and adult sibling of the teen who all stated that she fell on the bathroom floor and that the teen has behavioral issues.  The adult sibling denied that there was any fighting or hitting in the home and denied the paramour being mean to anyone in the house.  The investigator met with the teen who stated that she made the entire story up and she had slipped on the bathroom floor. In April 2017, the investigation was unfounded.

| Child No. 24 | DOB: 5/2017 | DOD: 9/2017 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 months |
| Cause of death: | Undetermined |
| Reason for Review: | Child welfare services referral within a year of child's death |
| Action Taken: | Investigatory review of records |

CHILD DEATH REPORT

**Narrative:**   Four-month-old baby found unresponsive by her mother who was in bed with her mother and her four-month-old sibling.  The mother contacted 911; the paramedics arrived and began working on the baby; she was transported to the hospital where she was pronounced deceased. The police contacted the hotline to report the baby's death.  The mother reported that she woke up to find the baby unresponsive in bed. According to the mother, the baby had been sick with a cold for a couple of days before her death. The baby was sleeping in an adult bed with her mother. An investigation for death by neglect was initiated against the mother. The child protection investigator spoke to the treating physician, who stated that the baby was deceased upon arrival to the hospital. The doctor reported that the mother was appropriately surprised and upset; there was no indication that the mother was under the influence of drugs or alcohol. The medical examiner ruled the death undetermined, but found no evidence of abuse or neglect. The medical examiner reported that the death may have been natural, due to disease of an undiagnosed genetic cardiac condition, which can cause dysrhythmia and may have no finding at autopsy. The child protection investigation was unfounded due to the autopsy findings and that the incident did not rise to the level of blatant disregard.

**Prior History**:  Within a week of the infant's birth, the Department received two child welfare referral requests from hospital staff to help connect the family to community services; however, the mother refused to give her address to hospital staff, which delayed the Department in contacting the family for months. The week before the infant died, the Department contacted the family and the mother reported she was no longer in need of assistance because she received help from a community organization. The child welfare referrals were closed after the death of the baby.

| Child No. 25 | DOB: 10/2011 | DOD: 9/2017 | Undetermined |
|---|---|---|---|
| Age at death: | 5 years (six days shy of 6th birthday) | | |
| Cause of death: | Asphyxia due to unexplained cause; physical and environmental neglect contributing | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**   Nineteen-year-old stepmother reported to police that the five-year-old had been napping and had wet the bed so she cleaned the mattress before leaning the mattress and box spring against the wall. She then made a pallet on the floor and the child went back to sleep. The stepmother reported finding the mattress and box spring on top of the child when she went back into the room in the early evening. Emergency services transported the child to the hospital where he was pronounced dead. Doctors observed contusions on the child's head and chest and lacerations on the child's legs not appearing to be consistent with the story. The police reported that the stepmother's fifty- year- old mother was also at the home and may have been the caretaker at the time. The child's twenty-three-year-old father was reportedly not inside the home at the time of the incident. The father, once at the hospital, reported that the child had fallen from an all-terrain-vehicle a few days before, but only had minor injuries. Investigations were initiated for allegations of death and substantial risk of physical injury for the one-year-old sibling on the stepmother, the stepmother's mother and the father. The stepmother gave birth a week after the death. That baby and the one-year-old sibling of the deceased were taken into custody and placed in traditional care. The investigation was indicated for death by abuse to the child, and substantial risk to the siblings by the stepmother and father. The step-grandmother was unfounded for death by abuse and substantial risk.

**Prior History:**  The father had prior Department involvement.  The father and the deceased's mother had been indicated for failure to thrive on the then seven-month-old sibling in November 2014.  The family was offered intact services, but refused. In January 2016, the parents were unfounded for substantial risk of physical injury by neglect to then four-year-old deceased, and two siblings, then ages one-and-a-half years and three months old. The following month, February 2016, they were unfounded for environmental neglect and inadequate supervision. Those investigations have been expunged. In April 2016, the parents had separated. The two younger siblings were living with the mother in Missouri and the deceased was living with the father in Illinois. The mother brought the deceased to the doctor during a visit as the child appeared to have lost weight. The father was unfounded for failure to thrive, but indicated for medical neglect when it was found that there was a mistake in weight recording, but the father had not followed up on gastroenterology appointment for the child. The investigator assured the appointment was kept before closing the investigation. The father was offered intact services, but refused. The last contact before the death was in November 2016 after the birth of the deceased's three-year half sibling. Hospital staff called as they suspected the mother, who had a black eye, may have been abused by the father. The hospital wanted to assure the safety of the mother and the baby considering the father's prior history of indicated failure to thrive and medical neglect. That investigation was unfounded and expunged.

| Child No. 26 | DOB: 8/2017 | DOD: 9/2017 | Undetermined |
|---|---|---|---|
| Age at death: | 6 weeks | | |
| Cause of death: | Undetermined | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  Twenty-six-year-old mother reported finding her six-week-old son unresponsive in bed with her when she awoke in the early morning.  The mother reported that she and her two children live with the maternal grandmother. The mother reportedly woke up around 1:00 a.m. and fed the infant and then placed the infant in the queen size bed with her and the three-year-old sibling, though she reported the infant usually slept in the bassinet.  The mother awoke at around 4:00 a.m. and noticed the infant was not breathing and had blood on his onesie. The maternal grandmother attempted mouth-to-mouth resuscitation while the mother called 911.The paramedics arrived and transported the baby to the hospital where he was pronounced deceased.   The Department investigated the mother for death by neglect and risk of harm to her three-year-old child. The medical examiner noted no evidence of trauma and a clean toxicology screen; there was no clear cause of death. The pathologist reported that the child could have died from a cardiac dysrhythmia which would not show upon autopsy, but since the baby was in an unsafe sleep environment it is possible the infant died from that. As there was no way to determine if the infant died of natural causes or asphyxia, the death was signed out as undetermined. In December 2017, the investigation was unfounded.

CHILD DEATH REPORT

**Prior History:**   In May 2017, the Department received a call to the hotline from law enforcement reporting that they had been called because someone found a three-year-old wandering alone in the late morning.  The person who found the child took him into the nearby library where there was an off-duty officer who searched for the parents for an hour before taking protective custody of the child.  The officers noted that the child was dressed appropriately and did not have any bruises or marks. The report was taken for investigation of inadequate supervision.  The child protection investigator went to the police station. The police explained that a local homeless man found the child and later recalled that he was the grandchild of a woman who worked nearby.  They first contacted the grandmother's place of work and then the mother called police within the hour to report her son missing. The investigator spoke with the mother who explained that she and her mother (the maternal grandmother) left the home to go shopping and she left her three-year-old son home with her fifteen-year-old brother (maternal uncle). Her son and brother were sleeping when they left the house. The mother woke up her brother asking him to watch the three-year-old and he agreed to do so.  When the mother and maternal grandmother retuned home about two hours later, she could not find her three-year-old son and she called police.  The mother did acknowledge that the three-year-old could unlock the door.  The investigator told the mother to install a lock higher up on the door and out of the reach of the child. The investigator completed a home safety checklist and informed the mother the importance of separate sleeping space for children because of the risk of rollover, as the mother was pregnant at the time.  July 2017, the investigation was unfounded and has since been expunged.

| Child No. 27 | DOB: 10/2013 | DOD: 10/2017 | Undetermined |
|---|---|---|---|
| Age at death: | 3 ½ years | | |
| Cause of death: | Complications of ligature related asphyxia | | |
| Reason for Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**   Three-year-old child suspended from a belt looped through hangers in a closet.  The child was found by the mother's twenty-nine-year-old roommate. The roommate took the child down and got the twenty-five-year-old mother who was taking a bath at the time. The mother instructed the roommate to call 911. The child and a two-year-old sibling were playing in a bedroom closet (no door on the closet). Police theorize that the child stood on a pile of clothes to reach toys on a shelf and the preschooler's head was caught in a belt looped on hangers. In a struggle, the child kicked the clothes out from underneath her feet and was strangled. Police closed out the death as accidental. The Department investigated the death; the mother was unfounded for death and substantial risk of harm on the other children and the roommate was indicated for inadequate supervision.

**Prior History:**   The mother, who had her first child at age thirteen, has, in addition to the deceased, two children older and two children younger than the deceased.  Prior to the child's death the mother had seven investigations for neglect, five that were unfounded and have been expunged and two that were indicated. Three of the investigations were in January and February 2014, where the older children missed their bus or the mother was not at the bus stop to pick up the younger child after the schedule was changed. A fourth investigation came in November 2014 when it was alleged that the younger of the two school aged children missed the bus and walked to school without gloves. The mother was unfounded for neglect. In December 2015, a Department worker assigned a child welfare services referral called the hotline reporting the mother did not have any food or furniture in the home and was not allowing the worker to see the children. The report was investigated for inadequate food and substantial risk of harm. The investigator visited the home finding the mother using the stove/oven for heat and the baby sleeping on the air mattress. The mother reported that she had just moved and didn't have any money. The investigator provided the mother with a Pack-and-Play and other supplies, but again found the mother using the stove/oven for heat and the baby on the air mattress during a second visit to the home. The investigator cautioned the mother, arranged for furniture to be donated, and for the mother to get her public assistance and Medicaid cards re-established. The investigator unfounded the inadequate food allegation, but indicated the mother for substantial risk of harm. The investigator offered intact case services, but the mother refused. The following month, January 2016, the hotline was called when the eight-year-old refused to get on the bus to go home; the child feared getting in trouble for getting poor marks in school. The mother was unfounded for substantial risk of harm.  In  December 2016, the mother was indicated for inadequate clothing and inadequate supervision when the eight-year old sibling missed the bus and began walking to school in sub-zero weather. The mother reported that she had taken the child to the building foyer early enough for the bus, but then left the child down there before the child got on the bus. The child reported running after the bus realizing it had passed and did not put on his hat and mittens. The mother agreed that either she or the eleven-year-old sibling would wait with the child to assure the eight-year-old gets on the bus. The case was signed out with a referral for community based services.

| Child No. 28 | DOB: 8/2017 | DOD: 10/2017 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 7 weeks |
| Cause of death: | Undetermined |
| Reason for Review: | Open intact case at the time of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**    Seven-week-old infant found unresponsive by his mother in a twin bed between her and his two siblings. The mother reported that she fell asleep sitting propped up with pillows behind her back against the wall in a twin sized bed with the infant in her arms. The mother woke up to find that the infant must have rolled out of her arms into the middle of the bed between her and the infant's two siblings (three years and eleven months). The infant was unresponsive. The mother carried the infant into the maternal grandfather's room, whom the family was living with at the time; the grandfather attempted CPR; 911was called and the paramedics transported the infant to the hospital via ambulance where the infant was pronounced deceased. The Department investigated and indicated the mother for death by neglect, as the mother reported that the infant slept in a pack-n-play; however, the pack-n-play was full of "stuff." The sibling reported that the four of them slept in the twin bed regularly and that the infant did not sleep in the pack-n-play.   The siblings were taken into protective custody and were placed with the maternal grandfather.  The children are doing very well with the grandfather, who is assisted in caretaking by his sister.

CHILD DEATH REPORT

**Prior History:**  The mother had a history with child welfare in another state and was to have bi-weekly contact with Child Welfare.  The mother had been living with her father for only a short time when the infant died. The mother had an intact case open with the Department in Illinois when the infant died. In November 2016, the hotline was called by an anonymous reporter saying that the mother and father of the deceased infant's two siblings at the time were heroin users and had a significant history of domestic violence.  The Department investigated and unfounded both parents for significant risk of harm, as there was insufficient evidence of risk of harm to the two children. In March 2017, the hotline was called by law enforcement, following a verbal altercation between the mother and father of the deceased infant's siblings and the maternal grandmother.  Both parents tested positive for drugs.  The Department investigated and indicated both parents for substantial risk of physical injury/environment injurious to health and welfare by neglect and an intact case was opened, which remained open when the infant died. In August 2017, the hotline was called by the hospital as the deceased infant was born substance exposed with methadone in his system.  The infant was addicted to methadone at birth and remained in the hospital for about three weeks for addiction treatment. The Department investigated and unfounded the mother for substantial risk of physical injury/environment injurious to health and welfare by neglect, as the only substance involved was methadone.

| Child No. 29 | DOB: 1/2016 | DOD: 10/2017 | Undetermined |
|---|---|---|---|
| Age at death: | 1 ½ years | | |
| Cause of death: | Undetermined | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  One-and-half-year-old was found on the floor not breathing by the mother's twenty-seven-year-old friend and was pronounced deceased.  It was reported that the twenty-five-year-old mother went upstairs to her friend's apartment with her one-and-half-year-old daughter the night before. The friend's seven and eight-year-old children were also in the home. Everyone in the apartment had fallen asleep and sometime during the early morning hours, the mother woke up and went back down to her own apartment. She observed her daughter asleep on the couch with her friend and the other children, and didn't want to wake her up, so she left her there.  The mother also did not wake up her friend to tell her she was leaving her apartment.  The friend woke up at approximately 4 a.m. and found the baby on the floor not breathing. As part of the autopsy, it was determined after an expert review of x-rays taken of the baby, that she had a linear non-displaced right parietal skull fracture.  The forensic pathologist indicated that the autopsy found no evidence of significant natural disease, injury, active infection, congenital anomaly, malformations, metabolic disorders or malignancy. Medical records obtained during the autopsy found that in June 2017, the baby had been seen in the emergency room after a fall at a community pool. The baby was also seen in September 2017 for vomiting with blood, and in October 2017 for vomiting; however, she was not reported to be ill at the time of death. The child protection investigation remains pending.

**Prior History:**  In June 2017, the hotline received a call from a friend/neighbor to report that she witnessed the deceased baby's babysitter (the friend who found the deceased baby in October 2017) harming the baby.  She reported that the babysitter slapped the baby in the back, causing the baby to hit her head off the wall several times, leaving a knot on the baby's forehead.  The babysitter tried to blame the mother saying the child fell in the pool.  The babysitter would hit the baby causing the baby to fall on the floor; she also yells and swears at the baby. This reporter was no longer staying with the babysitter as the babysitter told her to leave. The reporter was now staying in a shelter. The Department investigated the babysitter for cuts, bruises and welts. The investigator interviewed the babysitter, who reported that she had never hit or pushed the baby.  The babysitter stated that the baby had fallen and hit her head at a pool and said the mother was with her and they took the baby to the hospital for treatment. The medical records did confirm this account of events and it was noted in the records that a child abuse screen was also completed.  The babysitter added that she recently had a friend staying with her and she told the friend to leave.  The former friend had become upset and told people she was going to call the Department to retaliate against her. The investigator also spoke with the babysitter's two children who confirmed that that baby had fallen at the pool and said that their mother did not hit the baby.  The investigator interviewed the mother and she did observe the child to have a bruise on her forehead. The mother confirmed the baby had fallen and hit her head at the pool; she denied that anyone ever hit the baby.  The mother stated that she never had an issue with the babysitter and confirmed that she did have someone living with her.  The investigation was unfounded and has since been expunged.

| Child No. 30 | DOB: 10/2017 | DOD: 11/2017 | Undetermined |
|---|---|---|---|
| Age at death: | 23 days | | |
| Cause of death: | Asphyxia by unknown means | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**    Three-week-old infant was found unresponsive by his teenaged parents and was later pronounced deceased. The seventeen-year-old mother was at the maternal grandfather's house with her two children and their father.  While the mother was giving her one-and-a-half-year-old a bath the seventeen-year-old father was changing the infant. The father admitted to police that he was frustrated with the infant; shook him and threw him down on the bed.  The infant subsequently fell off the bed and onto a hammer that was lying on the floor.  The father stated that the infant was fussy and he was tired. The father placed the infant in bed with him and rolled over onto the infant. The infant began vomiting, turning pale and became unresponsive. The father was criminally charged with aggravated battery to the infant, although the charges were subsequently dropped.  The Department took protective custody of the sibling and the sibling was placed in a traditional foster home.  An autopsy found the cause of death to be asphyxia by unknown means. The autopsy showed multiple minor injuries. The infant was in an unsafe sleeping environment. The investigation against the mother and father for substantial risk of physical injury/environment injurious by neglect to the sibling was indicated. The investigation against the father for cuts, bruises, welts; bone fractures; and death by abuse was indicated.

CHILD DEATH REPORT

**Prior History:**   The unfounded child protection investigation involved the teenaged mother's parents. In July 2017, it was reported to the hotline that the mother left the father and their three children to have an affair with another man. Six days prior to the report there was a domestic incident that involved the mother, father and the mother's paramour. The mother went after the father with "car straps" and the father punched the mother's paramour in the presence of the children; the father was given a ticket for battery. Four days later, the mother went to the father's house to see the children and she started hitting the father. The landlord contacted police and the mother was arrested for battery.  The mother has possible bi-polar disorder with heroin use and the father has a cognitive delay. The Department investigated the mother and father for substantial risk of physical injury/environment injurious by neglect to the deceased infant's teen mother and her siblings.  The investigator met the father who had obtained an order of protection against the mother and the kids were included in the order of protection.  The father reported that the mother left two weeks ago and was dating someone.  The mother came to the home demanding the father buy her things and began hitting him. The father believes the mother and her paramour are on drugs. The infant's teenaged mother reported that her mother came to the home the other day asking her dad to buy her things; she stated her mother started "wigging out"; and her mother was hitting her father.  She further reported that her sister told her mother she needed to leave if she was going to act like that and her mother started hitting her.  The investigator met with the teenaged mother's two siblings who both reported that the mother hits their father in front of them.  The children reported that the mother's paramour had been threatening their father.  The children were staying with their aunt and were clean and appropriately dressed. No outward signs of abuse or neglect. The paternal aunt stated that the teenaged mother and her one-year-old daughter stayed with her and that the teenaged mother was having issues with truancy. She also stated that she assists with the care of the other children and will continue to help out with the kids. In September 2017, the investigator met with the children and they reported that things were fine at home with their mother not being around. The teenaged mother was pregnant with her second child and was receiving prenatal care. The investigation was unfounded.

| Child No. 31 | DOB: 9/2017 | DOD: 11/2017 | Undetermined |
|---|---|---|---|
| Age at death: | 2 months | | |
| Cause of death: | Pending Autopsy | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**   Two-month-old infant found unresponsive by her mother; 911 was contacted and the infant was transported to the hospital where she was pronounced deceased. The Department opened an investigation against the mother for death by neglect.  The detective on the case reported that the parents admitted to drinking and smoking marijuana on the evening the infant died.  The parents stated that the infant had initially fallen asleep in the swing. After the child fell asleep, the parents drank and smoked marijuana. The mother woke up to feed the infant and fell asleep with the infant in bed with her. When the mother awoke, she was facing the wall and the infant was turned to the side behind the mother. The two-year-old and one-year-old siblings were upstairs with the maternal grandmother with whom they lived with at the time of this incident.  It was also reported that the house was dirty and infested with roaches. There was garbage and rotten food on the counter tops, floor and tables. The house had an odor.  There was marijuana paraphernalia confiscated out of the home. The Department added an allegation against the mother and father for environmental neglect to the infant and her sibling. The family agreed to a safety plan. The medical examiner reported initial findings that there was no indication that the infant died of abuse or trauma; the infant was diagnosed with Downs Syndrome and kidney issues.  This was likely a layover death, but they were waiting for toxicology. In July 2018, the toxicology results found that the infant had isopropyl alcohol (rubbing alcohol) in his tissues. Additional forensic testing was needed. The child protection death investigation remains pending due to outstanding autopsy and the need for an MDT (multi-disciplinary team) meeting to discuss findings of the autopsy.  The family agreed to intact family services. The family was referred for a substance abuse assessment, grief counseling, and ongoing monitoring of the home. The intact family services case was closed successfully in June 2018.

**Prior History:**  The father had a history with the Department as a child. He was the subject in six investigations as a child and was a youth in care at different times between 1997 and 2004. In May 2015, the mother and father were investigated for substantial risk of physical injury/environment injurious to health and welfare to their five-month-old daughter, when it was reported that there was a domestic violence incident that took place between the mother and father in the presence of their baby.  While the mother was holding the baby she and the father began "swinging at each other" and the mother dropped the baby.  The investigation was indicated. In July 2016, the mother was investigated for cuts, bruises, welts, abrasions and oral injuries; inadequate food; and for substantial risk of physical injury/environment injurious to health and welfare – incidents of violence or intimidation, when it was reported that the mother pinches her one-and-a-half-year-old baby on her legs, arms and stomach so the baby will cry. The baby was reported to have small bruises on her arms.  The mother also was reported to pick up the one-and-a-half-year-old baby and five-month-old baby by their wrists, holding them up and dangling them in the air. The investigation was unfounded and eventually expunged. In January 2017, there was an unfounded investigation against the father for substantial risk of physical injury/environment injurious to health and welfare-incidents of violence or intimidation to his eight-year-old brother, who was staying with the father for a few nights and reported that the father punched him to keep him awake to play video games. The father denied this and the investigation was unfounded.

| Child No. 32 | DOB: 8/2017 | DOD: 11/2017 | Undetermined |
|---|---|---|---|
| Age at death: | 2 ½ months | | |
| Cause of death: | Sudden Unexpected Infant Death | | |
| Reason for Review: | Child of a youth in care | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**   Two-and-half-month-old infant found unresponsive laying on her back in her crib by her mother at 9:00 a.m. There were no known concerns regarding the scene or the crib. The mother and infant were visiting a maternal cousin. The mother stated that she last saw the infant alive at 5:30 a.m.  The mother woke up and found the infant unresponsive and attempted to perform CPR and the cousin called 911.  The ambulance was taking too long, so the cousin drove the family to the hospital where the infant was pronounced deceased. The infant was found to have blood in her lungs and appeared to have spit up blood.  The infant also had a small rash to her forehead, but no other known injuries. The investigator spoke with the infant's pediatrician who had no concerns. The autopsy found no known medical history documented, no foul play, no traumatic injuries on examination, skeletal survey was negative for trauma or deformity and toxicology was negative. The manner of death was ruled undetermined, cause of death was determined to be sudden unexpected infant death. The investigation against the mother for death by neglect was unfounded.

**Prior History:**   The father was a youth in care from 2002 through 2014, when he aged out of care. He had a son in August 2014 who came into care in May 2016 and the case closed in January 2017, when the child was returned home to his father. The mother became a youth in care when she and her siblings were placed with relatives in December 2010, after a failed intact family services case from January 2010. The mother moved around between relatives and unauthorized placements. In 2014, the mother's goal was changed to independence. In July 2015, the mother gave birth to her first child. The caseworker brought her a pack-n-play and discussed safe sleep.   The mother was working with a parenting coach and completed a new birth assessment. The mother was doing well with the infant. In February 2016, the mother and baby were placed in a transitional living program. In August 2016, the mother was investigated for substantial risk of physical injury/environment injurious to health and welfare by neglect to her son, after it was reported that the eighteen-year-old mother was involved in an altercation with her one-year-old child present. The investigation was unfounded and eventually expunged. By September 2016, the mother was moving around living with various family members and her paramour. In March 2017, she moved out of state and had an apartment with her boyfriend. The worker continued visiting the mother twice a month out-of-state. The home was safe and appropriate. In August 2017, the mother gave birth to her second child (deceased infant). The worker did not know that the mother was pregnant. The mother admitted she did not know until about the sixth month.  The mother was evicted from her apartment out of state and moved back to Illinois and was living with relatives. By October 2017, the mother and the children were living with her paternal grandmother, but she planned to move in with her aunt, an unauthorized placement as the aunt would not allow the worker to complete background checks on all family members living in the home. A new worker was assigned in October 2017. In November 2017, the mother told the worker that she had no desire for services and remained uncooperative. Shortly thereafter, the worker received a call from the mother that the infant had died. After the death, the mother and her paramour lived with the paramour's grandmother. The safety plan ended in December 2017 and the mother and the surviving sibling were living in an unauthorized placement. The mother wanted her DCFS case closed. She was engaged in therapy, but no other services. The mother's case remains open and she is now living in an independent living placement.

| Child No. 33 | DOB: 6/2017 | DOD: 11/2017 | Undetermined |
|---|---|---|---|
| Age at death: | 5 months | | |
| Cause of death: | Undetermined | | |
| Reason for Review: | Pending Child Protection Investigation at the time of the child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**        Five-month-old baby found unresponsive by his thirty-six-year-old mother around 4:00 a.m. when the father got up for work.  The baby was on his back in bed with the parents.  The baby had been crying in the middle of the night around 3:00 a.m. so the mother took the baby out of his swing and laid the baby next to her. When the parents awoke the mother noticed the baby was not moving and was unresponsive. She then noticed the baby's mouth was blue and began CPR, while the father called 911. The father took over CPR until the paramedics arrived. The baby was transported to a children's hospital and pronounced dead at 5:40 a.m. The parents denied any possible rollover.  At the last well-baby check-up in October 2017, the baby was healthy.  An autopsy was completed; the medical examiner informed the investigator that the baby was diagnosed with lymphocytic myocarditis (a potentially lethal medical condition). Although the myocarditis may have been the cause of death, because the baby was co-sleeping with two adults at the time, he was unable to say for certain that the baby died of natural causes.  An investigation was initiated by the Department against the mother and father for death by neglect. The mother was indicated with the rationale that there was sufficient evidence to support that the mother displayed a blatant disregard for the baby's well-being, as she co-slept with the baby despite being given anticipatory guidance regarding safe sleeping practices for the baby, the mother co-slept with the baby anyway.  Although the baby was diagnosed with myocarditis the medical examiner could not rule out the possibility that the baby suffered asphyxia due to the risk factors posed by the co-sleeping. The father was unfounded with the rationale that he was asleep when his wife put the baby in bed with them.

**Prior History:**   In September 2017, a nurse reported to the hotline that the mother admitted to open hand slapping her three-month-old infant in the face. The mother stated this when she was at the hospital for an evaluation for post-partum depression and self-harm. This incident occurred four days prior to this evaluation following a physical altercation between mother and father. The reporter stated that the mother currently has bruises.  The Department initiated an investigation against the parents for substantial risk of physical injury/environment injurious of health and welfare.  During the investigation, the mother was hospitalized. Paternal relatives moved in with the family to help care for the baby. The mother became involved in mental health services.  The investigator referred the family for intact services but the hand off was not completed before the death. The mother and father were indicated for all allegations. The rationale was that both parents admitted to domestic violence in the home and that the infant is at a developmental stage where he is dependent on his parents for health and safety.

| Child No. 34 | DOB: 6/2017 | DOD: 12/2017 | Undetermined |
|---|---|---|---|
| Age at death: | 5 ½ months | | |
| Cause of death: | Undetermined | | |
| Reason for Review: | Open intact family services case at the time of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**        Five-and-half-month-old baby found unresponsive by her twenty-year-old mother. The mother called 911; the police arrived and attempted CPR until the ambulance arrived and paramedics continued CPR on the way to the hospital where the baby was ultimately pronounced deceased. The hotline received a call reporting that the mother gave two different accounts of what happened surrounding the death. It was also reported that the baby had been dead for several hours before 911 was called. It was further reported that the living conditions were very poor with garbage, food, clothes and beer bottles throughout the residence and that marijuana and marijuana paraphernalia was within reach of the two-year-old sibling. On the floor of the room with the crib and bassinette, there were bottles with solidified formula. Food and toilet paper was scattered around the crib and there was no bedding on the mattress of the crib.  The Department investigated the mother for death by abuse and environmental neglect to both of her children; and substantial risk of physical injury/environment injurious by neglect to her older child. In a separate investigation, the mother's live in paramour (and father to the older sibling) was investigated for death by abuse; the Department also investigated him for environmental neglect and substantial risk. After the death of the baby, her two-year-old sibling was taken into protective custody. Law enforcement investigated the death and forwarded to the State's Attorney for review. The State's Attorney reported a lack of evidence that the child died from abuse and would not charge for the death of the child. The investigations were unfounded for death and indicated for environmental neglect and substantial risk.

**Prior History:**   In September 2017, the hotline received a call from a nurse to report that the mother had brought her two-month-old daughter in for her two-month old check-up and was diagnosed as failure to thrive. The infant had only gained 12 oz. in two-months. The mother was breastfeeding and using formula. The reporter was concerned that the mother was watering down the formula. It was reported that the infant had poor muscle tone and severe lag in head movement.   The Department investigated the mother for failure to thrive.   On the date the report was made, the investigator met with the mother and observed her two children. The infant was observed drinking formula. It was noted that she did appear to be small, but seemed to take the formula well. The two-year-old was observed taking a nap; he appeared healthy and did not have observable injuries.   The mother acknowledged that the nurse practitioner had concerns about her infant not gaining weight. She had another appointment scheduled in two weeks. The mother denied watering down the formula.   The babysitter confirmed that the infant was being fed as directed and that the formula was not being watered down. The mother accepted intact family services. While the investigation was pending the infant was hospitalized as she was having difficulty with having bowel movements.   The treating physician changed her formula to a soy based formula and the infant began gaining weight. The investigation was unfounded with a referral for community based services. Once the formula was changed the baby started to gain weight and was developing well.   The mother had been cooperative with services and stayed up to date on the baby's medical appointments. The intact case was open at the time of the baby's death in December.

| Child No. 35 | DOB: 9/2017 | DOD: 12/2017 | Undetermined |
|---|---|---|---|
| Age at death: | 3 months | | |
| Cause of death: | Undetermined | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**       Three-month-old infant found unresponsive by his twenty-seven-year-old mother. The mother called 911 and when paramedics arrived on the scene the mother was holding the infant and rigor mortis had already set in. The infant was pronounced deceased on the scene. The Department investigated the mother for death by neglect and substantial risk of physical injury/environment injurious to health and welfare by neglect to both of her surviving children. The mother reported to the investigator that she had picked up the infant at her mother's home the night before. The mother went to a Christmas party where her other two children were and she stayed for a little while; the infant was with her the entire time. She left the party and picked up her paramour and returned to her apartment approximately two hours later. She gave the infant a bottle and laid him in her queen size bed, she fed the infant again in the middle of the night and she awoke in the morning and found him unresponsive.   Her paramour stayed the night and the mother and the paramour slept in the same bed with the infant. The medical examiner found the manner of death to be undetermined because it was unknown whether external factors or the sleeping environment caused or contributed to the death. The medical examiner also could not rule out genetic abnormalities. In April 2018, the investigation against the mother was unfounded.

**Prior History:** In December 2016, the hotline received a call from a school counselor to report that the mother's seven-year-old child reported that his uncle makes him look at his penis "all the time" and tells him not to tell anyone. The child denied any touching, but was afraid of his uncle because he makes him do this all the time. The Department investigated the uncle for sexual exploitation and substantial risk of sexual abuse-sibling of sex abuse. The child had been going to the paternal grandmother's house every day after school until the mother could pick him up. The investigator spoke to the uncle who denied the allegation. A forensic interview took place with the child who reported that after a basketball game the uncle asked the child to go into his bedroom where the uncle showed him his penis. The child denied that there were other times this happened. The mother believed her son and said they would not go to that house anymore. In January 2017, the investigation was closed and the uncle was indicated. In December 2016, three weeks after the first investigation was called into the hotline, a call from a physician came into the hotline to report that the mother's two-year-old daughter had three different visible scars on different planes which were "suspicious" and "concerning" and inconsistent with the mother's account of injuries. Two days before this report was made, this same doctor had examined the child as part of the first investigation and observed her to have visible injuries which included a linear scar on her right wrist that ran from her wrist to her elbow and two separate patterned linear scars on her right interior thigh that the mother said may have been from "falling onto a mattress" at her grandmother's house. The child also had a visible burn and scar on her left elbow, which the mother said was from a "hair iron" at the grandmother's home. The mother did not give the time frame for any of these injuries and never sought medical help for the child. The mother said the grandmother watches her seven-year-old son and his two-year-old sister daily when she is at work. The doctor stated that the child would not disclose how she received the injuries and that the mother was present during the exam. The Department investigated the mother for cuts, bruises, welt, abrasions and oral injuries and burns to the two-year-old. The investigator noted that although the doctor expressed concerns he could not specify whether the injuries were a result of abuse. The investigator went to the family home and the seven-year-old told the investigator that he and his sister had gotten hurt on a bedframe and that his uncle took it apart. The mother confirmed their story and showed the investigator the dismantled bedframe and she noted that the bedframe had sharp edges. The investigation was unfounded against the mother.

| Child No. 36 | DOB: 3/2016 | DOD: 1/2018 | Undetermined |
|---|---|---|---|
| Age at death: | 22 months | | |
| Cause of death: | Undetermined | | |
| Reason for Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Twenty-two-month old medically complex toddler found unresponsive by his twenty-one-year old mother. The mother called 911 and started CPR. Paramedics arrived on the scene and transported the toddler to the hospital where he was pronounced deceased. The toddler was born premature at 25 weeks gestation. Due to complications from pre-maturity, the toddler had the medical diagnosis of cerebral palsy and respiratory issues. The family slept together in one room that had a large king-size mattress on the floor along with a small mattress and a small bed. The mother reported that the toddler had been fussy throughout the night before his death and she was unable to get him to go to sleep until early morning. She woke up around noon to go to the bathroom and found the toddler cold and non-responsive. The autopsy report determined the cause of death as undetermined. The Department did not investigate the death for abuse or neglect.

**Prior History**:   The family first came to the attention of the Department in October 2015 when the police called the hotline to report that the mother and father left their three-year-old child unsupervised for an hour and a half.  The mother left the child in the father's care at her residence.  The father left the home to go shopping and the child was found by security staff in the hallway of the apartment complex crying. Before taking the child to the police department, the security officer went into the home to get shoes and clothing for the child. He said that the apartment was not clean nor did it appear taken care of, as you could not navigate through the apartment because of clothing, food, and general household items throughout the apartment. The police took protective custody of the child, and contacted the mother, who reported that she left her son in the care of his father. The police waited an hour and a half before the father returned. Upon returning, the father was arrested and charged with child endangerment.  The mother picked up the child from the police department. The Department investigated the mother for environmental neglect that was unfounded and later expunged. The Department investigated the father for inadequate supervision and was indicated.  In September 2017, the Department received a call to the hotline to report that the mother of the deceased twenty-two-month old and one of the neighbors left their children home alone and the children were found on the back porch of the home without any supervision.  The police were called and found the kids to be unsupervised.  The mother and neighbor left their children in the care of a friend; however, the friend left the children unattended. The friend admitted to leaving the children unattended and was arrested for child endangerment and indicated for inadequate supervision.  The mother was unfounded for inadequate supervision due to evidence supporting that she appropriately left the children in the care of a friend.

| Child No. 37 | DOB: 11/2017 | DOD: 1/2018 | Undetermined |
|---|---|---|---|
| Age at death: | 2 months | | |
| Cause of death: | Undetermined | | |
| Reason for Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**      Two-month-old infant died after being found unresponsive in her bassinet by her foster father, which was the maternal cousin. It was reported that the foster father had put the infant down in her bassinet on her stomach with her head turned to the side; approximately two-and-half hours later the foster father checked on the infant and found her face down in her bassinet, not breathing.  The infant was taken to the hospital via ambulance in full cardiac arrest and was put in the pediatric ICU and placed on a ventilator. Two weeks later, the infant was extubated and pronounced dead. The Department investigated the foster father for death by neglect. The foster father stated that the day before the incident the infant was sleepier than usual and taking four hour naps. He further stated that before he put the infant down for a nap she seemed a bit "antsy" because she hadn't had a bowel movement in four days. The investigation was unfounded as an accidental suffocation due to the child sleeping in prone position and a contributing factor of viral infection in a very young infant. This combination may have resulted in the respiratory arrest that subsequently led to the cardiac arrest. The cause of death was ruled undetermined.

**Prior History**:  The deceased infant's mother had physical and mental health limitations because of a seizure she suffered at age two. She was paralyzed on her left side, required a wheelchair, and had the mental functioning of a ten-year-old. In April 2016, the mother gave birth to the infant's sibling and the hotline was called due to the mother's mental health and physical limitations. The mother was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect because of her physical and mental limitations.  In May 2016, the Department was granted temporary custody of the infant and placed him in foster care with the mother's cousin.  The mother underwent a psychological evaluation and parenting capacity assessment which concluded that the mother had underlying depression as well as trauma concerns consistent with PTSD. The assessment concluded that the mother was physically incapable of caring for an infant or young child.  In August 2017, the foster parent informed the agency that the mother had recently been discharged from the psychiatric hospital and was currently five to six months pregnant and homeless. The cousin volunteered as a placement resource for when the child is born; his home was determined to be safe upon the birth of the newborn.  In November 2017, the hotline was notified by the hospital that the mother gave birth to her daughter who was born premature at thirty-three weeks. The mother was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect due to her severe mental and physical limitations and inability to parent. The infant was discharged after two-weeks to the foster home. The infant was sleeping in a bassinet in her foster father's room and was cared by her foster grandmother while the foster father worked.

| Child No. 38 | DOB: 10/2017 | DOD: 2/2018 | Undetermined |
|---|---|---|---|
| Age at death: | 4 months | | |
| Cause of death: | Undetermined | | |
| Reason for Review: | Closed Intact; indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**    Four-month-old was found unresponsive by her nineteen-year-old mother while sleeping in an adult bed. The mother and maternal grandfather transported the infant to the hospital where she was pronounced deceased. The Department investigated the mother for death by neglect.  The investigation revealed that at approximately 5 p.m., the mother laid the infant down for a nap on an adult bed on top of a blanket that was folded multiple times. The mother also covered the infant with a blanket.  The mother sat on the bed resting upon the headboard drifting in and out of sleep; the mother denied laying down in the bed.  At approximately 5:30 p.m., the grandfather checked on the infant; he saw her asleep and left the room.  At approximately 6:45 p.m., the mother went to wake the infant and she was not breathing.  The mother did not call 911; she and the grandfather put the infant in the car and drove her to the hospital, which was approximately five minutes away from the home. The mother attempted CPR in the car on their way to the hospital. Upon arrival to the emergency room, hospital staff attempted to revive the infant but were unsuccessful.  The infant was pronounced deceased at 7:14 p.m. The investigation against the mother was unfounded.  The investigator provided the family with a referral for grief counseling.

CHILD DEATH REPORT

**Prior History:** In October 2015, the hotline was contacted and it was reported that the maternal grandfather's paramour was prostituting the grandfather's sixteen-year-old daughter (the deceased infant's mother). The Department indicated the paramour for substantial risk of sexual abuse to the thirteen-year-old (the infant's maternal aunt) and human trafficking to the sixteen-year-old. In October 2016, the hotline was contacted and it was reported that the paramour was residing back in the home after being investigated a year earlier and indicated for human trafficking. The Department investigated and indicated the father for substantial risk of sexual/environment injurious by neglect to his daughters. The father told the investigator that upon completion of the first investigation, he was told he could allow his paramour to reside in the home again. However, the investigator concluded that the father was aware the paramour was previously indicated and allowed her to reside in the home putting his daughters at risk. The father agreed to intact family services. An intact case was open from December 2016 to October 2017. The family was compliant with services and met with the case manager regularly. The father continued his relationship with the paramour; but she was not allowed to live in the home or have unsupervised contact with the father's daughters. The paramour was given resource information regarding a sexual predator assessment. The paramour was unable to complete recommended services due to her lack of income. While the intact case was open, the deceased infant's mother learned she was pregnant. She received prenatal care, contacted the appropriate facilities for services regarding daycare and parenting education, and obtained infant equipment and clothing. In October 2017, the case manager completed a final home visit with the family and the family was given resource information regarding parenting services. In December 2017, a school social worker contacted the hotline to report that the maternal aunt who was fifteen-years-old disclosed that the father's paramour has been residing in the home since September 2017. It was reported that the paramour was not supposed to be in the home because of a sex trafficking charge by the FBI. The Department investigated the paramour for substantial risk of sexual abuse-sex offender having access to the father's daughters. The father reported that he was still seeing the alleged perpetrator. He further stated that the intact worker told him he could see her and she could go to his home, but she could not reside there or sleep there. The daughters both denied that the father's paramour lived in the home, but said their father was still seeing her. In January 2018, the paramour was indicated.

| Child No. 39 | DOB: 4/2000 | DOD: 3/2018 | Undetermined |
|---|---|---|---|
| Age at death: | 17 years | | |
| Cause of death: | Pending autopsy | | |
| Reason for Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**          Seventeen-year-old boy died due to injuries he sustained at six weeks of age when he was severely abused and suffered head trauma. The Department added the allegation of death by abuse to the original indicated investigation from 2000 against his mother and father. Thirteen days before the boy's death he was admitted to the hospital for respiratory syncytial virus (RSV) and a urinary tract infection and was discharged eight days later. He was readmitted to the hospital the following day with a fever, stoma drainage, gastric residual, respiratory issues and seizures. His kidneys began to fail and he passed away a few days later due to multiple organ failure. Both parents were indicated for death by abuse due to the original inflicted injuries.

**Prior History**:  In June 2000, the hotline received a call from hospital staff to report that the mother had brought her six-week-old son to the emergency room because of lethargic behavior.  The parents had reported that the infant vomited twice the day prior.  The staff stated that the minor looked pale and gray and his head looked large. He had a crescent shape mark on the left cheek.  Tests performed in the emergency room indicated two subdural hematomas, with possible retinal hemorrhages.  The infant required immediate surgery to alleviate the pressure off the brain.  The infant was admitted to the PICU. Subsequent tests revealed the infant to have retinal hemorrhages in both eyes, three broken ribs, and seizures on the left side of the brain.  The EEG showed that the infant had suffered a stroke from strangulation.  The hospital staff stated that the infant's injuries appeared to be both old and recent.  The Department indicated the parents for allegations of subdural hematoma, cuts, welts, abrasions, and oral injuries, brain damage/skull fracture, and bone fractures.  The mother offered no explanation for the injuries and both parents said they were the only caregivers for the infant. The Department was granted temporary custody of the infant and his two-year-old brother.  His two-year-old brother was placed with a relative. When the brother turned eighteen, his case was closed with the Department and he remained in the care of his relative. Due to the infant's injuries, he was diagnosed with cerebral palsy, developmental delays, seizure disorder, cortical blindness, spastic quadriplegia, inoperative shunt, tube fed, microcephaly, severe mental retardation and osteopenia. He was left in a vegetative state. At six-months of age the baby was placed in a specialized foster home. He had lived in this home until the death of his foster parent in 2015. He was then placed in a residential facility for non-ambulatory individuals with severe and profound developmental disabilities; he remained there until his death.

| Child No. 40 | DOB: 7/2012 | DOD: 4/2018 | Undetermined |
|---|---|---|---|
| Age at death: | 5 years | | |
| Cause of death: | Oxycodone intoxication with a contributing factor of congenital heart disease | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  Five-year-old boy found unresponsive by his mother in the morning. The mother started CPR and contacted 911. The paramedics arrived on the scene and transported the child via ambulance to the hospital where he was pronounced deceased. The mother reported that the night prior to his death, the child stated his heart hurt. An autopsy performed later that day, found the child to have a congenital defect that was never diagnosed by medical professionals. A month later, the toxicology results from the autopsy came back and showed lethal levels of Oxycodone in the child's system at the time of death. Due to this new information, the Department investigated the mother for the death and substantial risk of physical injury/environment injurious to health and welfare by neglect to the deceased child's sibling. The investigator met with the mother who reported that the child had come home from school and at around 5 p.m. he said he was tired, laid down and took a nap for an hour.  When he woke up he appeared to be fine and went to bed around midnight. The mother noted that a family friend's two children ages six and seven, were also spending the night at her home. The mother woke up around 2 a.m. checked on the children and saw the five-year-old child sleeping on his side.  She then woke up at around 6 a.m. and discovered her child's eyes open and rolled back, he was cold and stiff.  When toxicology results were obtained, police interviewed family to figure out the source of the drug.  The police told the investigator that they had interviewed the mother for two hours and they had no way of knowing if the child ingested the medication at the mother's home or not. The coroner reported that it was difficult to place a time frame on when the pill was taken and how long it would take to affect the child since the amount of drug taken was unknown. The mother agreed to a drug screen and took her children for medical check-ups. The mother's drug screen showed THC; she admitted to smoking marijuana. The mother did not have a prescription for Oxycodone and she denied giving her son any medications.  No one in the home reported seeing the child taking any medications. The three-year-old sibling was found to have the same heart condition that her brother had. The investigation against the mother was unfounded, since the child could have gotten the medication from anywhere and the investigator and police were unable to determine where the drug came from.

CHILD DEATH REPORT

**Prior History:**  In May 2017, the hotline was contacted to report that the mother's home was unsanitary. It was reported that there were dirty diapers, rotting food, garbage and junk everywhere; the children did not have beds; and the children did not go to school.  The mother was investigated for environmental neglect.  The investigator went to school and spoke with the ten-year-old sibling of the deceased child, who reported that sometimes the home is clean and sometimes the home is dirty with toys however he helps his mom clean up the mess. The investigator conducted a home visit but the mother was not home. The investigator was allowed in the house and laid eyes on the infant (four months), who was sleeping and appeared clean, appropriately dressed and showed no signs of abuse or neglect. Six days later the investigator went back to the home and observed the children in the home to be clean, appropriately dressed and showed no signs of abuse or neglect.  The home was appropriate and in good condition. The investigation against the mother was unfounded

| Child No. 41 | DOB: 9/2017 | DOD: 4/2018 | Undetermined |
|---|---|---|---|
| Age at death: | 6 ½ months | | |
| Cause of death: | Asphyxia due to overlaying due to co-sleeping in an adult bed | | |
| Reason for Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**     Thirty-five-year-old mother found her six-and-a-half-month-old baby unresponsive in bed where she was reportedly co-sleeping with her two-year-old sibling and an adult. The mother contacted 911 and started CPR. The baby was transported to the hospital by ambulance where she was pronounced deceased. The Department investigated the mother and father for death by neglect. This was the third infant of the mother's that passed away due to co-sleeping; two prior infants died in sleep-related circumstances, in 2012 and in 2014. Autopsy findings were consistent with asphyxia due to overlaying while co-sleeping in an adult bed with an adult and a child. The parents were both indicated for death by neglect. The two surviving children came into care of the Department.

**Prior History:**  The deceased baby was one of five children born to this mother. The mother and father were involved with the Department as children. The mother's first encounter with the Department as an adult was in December 2012, when her five-month-old son died.  The five-month-old was in the care of the father and his paramour, while the mother was with her three-year-old child who was having outpatient surgery. The five-month-old died while co-sleeping with his caregivers. The Department investigated the father and his paramour for death by neglect. The Department also investigated the matter for substantial risk of physical injury/environment injurious to the three-year-old child by her mother after she left her daughter at the hospital after being notified about the death of her son. In February 2013, both investigations were unfounded.  In February 2014, law enforcement reported the death of the mother's two-and-half-month-old to the DCFS hotline.  The mother contacted 911 when she found the baby unresponsive. The Department investigated the mother for death by neglect. The mother acknowledged that she had consumed alcohol on the date of the incident; she then laid down with her two-and-half-month-old and awoke to find her unresponsive. The mother had a pack-n-play available for the baby and had received information about the risks of co-sleeping prior to the incident. In April 2014, the mother was indicated for death by neglect and was referred for community services. In September 2017, medical personnel contacted the hotline following the birth of the deceased six-and-a-half-month-old baby. It was reported that the mother disclosed two previous child deaths. The Department investigated the mother for substantial risk of physical injury/environment injurious by neglect to the newborn girl. The investigator interviewed the mother and observed the newborn. The mother told the investigator she was involved with community programs and would be receiving home visits; and had received a pack-n-play. The investigator provided a pamphlet on "Safe Sleep for Baby." The father showed the investigator the designated sleeping area for the baby. During the investigation, the investigator learned that the mother had traces of marijuana in her system during her pregnancy with the infant. The investigator put a safety plan in place and required the mother to drop clean before being left unsupervised with her baby. At the close of the investigation, the infant was in good health. The mother dropped clean and reported that she had not been using or drinking. In November 2017, the mother was indicated for risk of harm to the infant.

CHILD DEATH REPORT

| Child No. 42 | DOB: 1/2018 | DOD: 5/2018 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 months |
| Cause of death: | Closed head injury |
| Reason for Review: | Indicated child protection investigation within a year of the child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**  Four-month-old died after he was found choking by the mother's paramour. The mother left her four-month-old with her paramour at his house while she was at work. The paramour stated that he left a bottle propped up on a pillow to feed the infant, while he went to check on his two young children in another room.  The paramour said when he went back to check on the infant, the four-month-old was choking and in distress. Emergency medical services were called and the infant was pronounced deceased at the hospital. When questioned by police, the paramour stated that the infant was prone to vomiting after eating. The autopsy determined that the infant died of a closed head injury, detailing numerous cranial and retinal hemorrhages sustained prior to death, however, the manner of death is still pending. There is a pending criminal investigation with no identified suspects. The police and state's attorney are still conducting interviews. The child protection investigation initiated against the paramour after the infant's death remains pending for death by neglect to the infant and inadequate supervision to the paramour's two young children.

**Prior History:**  In March 2018, the mother left her three-month old (now deceased) infant with a friend while she was at work. Later that day, the hotline was contacted by law enforcement to report that an open line 911 call was made and traced to the home of the babysitter. It was reported that when law enforcement arrived at the home the porch reeked of marijuana, and a three-year-old child was observed through a window, sitting on a bed with the cell phone. Law enforcement also observed the three-month-old in a carrier next to the bed with a propped bottle. The three-year-old would not open the door for law enforcement and the babysitter was seen lying on the bed, unresponsive. Law enforcement forced entry, and shook the babysitter until she woke up. The babysitter admitted to partying and using drugs (meth and ecstasy) the night before. She further stated that while the children were in her care, she smoked marijuana and fell asleep.  There was marijuana and drug paraphernalia in the house within reach of the children. The babysitter had a history of substance abuse and was on probation. Two days after the initial report, the investigator met with the mother who had since found a new babysitter for the infant, and stated she would not allow the babysitter to watch her children in the future. She said that she knew the babysitter had a prior history of drug use, and knew that "she still smoked pot but did not know she was using meth." The babysitter was investigated and indicated for inadequate supervision and substantial risk of physical injury/environment injurious to health and welfare by neglect of the two young children. The mother's paramour, at the time of the death of the infant, also had a history with the Department—in 2014, he was investigated for sexual penetration and substantial risk of sexual abuse of two children that he was babysitting. The investigation was unfounded against the paramour.

| Child No. 43 | DOB: 2/2018 | DOD: 5/2018 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 months |
| Cause of death: | Undetermined |
| Reason for Review: | Pending child protection investigation at the time of child's death |
| Action Taken: | Investigatory review of records |

CHILD DEATH REPORT

**Narrative:**     Two-month-old was found unresponsive by his thirty-three-year-old mother; she contacted 911 and was instructed to start CPR. The paramedics arrived and the infant was transported to the hospital via ambulance where he was pronounced deceased. It was reported that the mother was co-sleeping with the infant on the couch at the maternal grandmother's house. It was further reported that the mother was the last person to see the infant alive and sleeping at approximately 12 a.m. The Department investigated the mother for death by neglect. The mother told the investigator that she placed the infant on his left side on top of a receiving blanket on a sofa to sleep. The mother sat towards the end of the sofa and slept sitting up the entire time; she denied lying down on the sofa. There was approximately fifteen inches of space between the mother and infant. The mother woke up at 6 a.m. to find the infant unresponsive. There was no infant bed in the grandmother's home, the infant slept on the couch. The autopsy determined the cause and manner of death as undetermined. In November 2018, the investigation against the mother was unfounded, as there were no signs of trauma.

**Prior History:**   The deceased infant is one of four children born to the mother, none of which are in her care. The mother has an extensive history with the Department as a child and parent. The mother had an open case with the Department when she gave birth to her son in February 2018. The mother contacted her worker and informed the worker that she had given birth to a boy, but she did not provide the date or hospital; she did not reveal the whereabouts of the infant to the Department, which prompted a hotline call in March 2018. The worker had concerns about the newborn baby while in the mother's care. The mother's other child was in a residential placement; and the mother had supervised visitation. The mother had been smoking marijuana throughout her pregnancy; and was still dropping dirty after being sent to rehab and the mother had a history of alcohol abuse. The Department investigated the mother for substantial risk of physical injury/environment injurious by neglect to the infant. This investigation was pending at the time of the infant's death. The investigator made a good faith attempt to see the mother and the infant. The worker confirmed the information she gave to the hotline and stated that the mother may be living with a boyfriend and provided an address. The worker also informed the investigator that mother currently had a child in care for medical neglect. The worker reported the last time she saw the mother was about a month or so ago at juvenile court. The worker stated that the mother had not been cooperating with services and continued to drop dirty while in rehab treatment. The investigator asked the worker to have mom text or call him so that arrangements could be made to observe the newborn and assess mom for additional service needs. In April 2018, the parents brought the infant to a DCFS office, the infant was dressed appropriately with no signs of abuse or neglect. The infant was allowed to be placed in the care of his father. The investigator informed the mother that she was not allowed to have unsupervised contact with the infant because she had an open case and had not completed services. Both parents agreed. The investigator informed biological father to complete paperwork to obtain sole guardianship. This investigation was still pending at the time of the infant's death. In June 2018, the investigation against the mother was indicated.

| Child No. 44 | DOB: 7/2012 | DOD: 05/2018 | Undetermined |
|---|---|---|---|
| Age at death: | 5 years | | |
| Cause of death: | Pending autopsy | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**        Five-year-old medically complex child with scoliosis and a neuromuscular disorder was taken to the hospital by his thirty-six-year-old mother after she noticed he was having trouble breathing. The medical staff noted that the child's stomach was distended and lab work indicated he had ketoacidosis. The child was transferred to a children's hospital where he was later pronounced deceased. Despite the child's medical issues, the Department is investigating the death.  The grandparents went to the hospital and reported concerns about the mother, specifically the mother's drug use and over-using enemas on the child and possibly perforating the child's bowels. Furthermore, the mother's thirty-four-year-old boyfriend of seven months had previously been indicated for death by abuse to another girlfriend's child in 2005. He eventually pleaded guilty to child endangerment in exchange for testimony against the mother and was sentenced to five years. The mother of that child was sentenced to ten years. The child protection investigator spoke with relatives and a teacher who voiced concern about the mother's ability to care for the child. The recent primary care physician told the investigator he did not have specific concerns. The previous primary care physician indicated the grandparents mainly brought the child in and he had recommended follow-up with specialists.  The investigator had not interviewed the parents and boyfriend at the request of law enforcement. A final autopsy report has not been completed; however, during the autopsy the child was found to have blunt trauma injuries. The current death investigation and law enforcement case remains pending.

CHILD DEATH REPORT

**Prior History:** In November 2016, the Department received a call to the hotline and it was reported that the mother had been using meth while her four-year-old son was in the home and she had been observed to be under the influence on numerous occasions. Furthermore, a known meth dealer frequented the home and the mother's sister had admitted to having sex with the dealer in exchange for meth for herself and the mother. The caller expressed concern about the mother's ability to care for her special needs child. The report was unfounded for substantial risk of physical injury by neglect. The report was expunged at the time of the death. In June and July 2017, the father of the child contacted the hotline to report that someone told him that they had seen the mother using meth in front of the child and the mother was spending money on drugs, not paying the utilities, and not tending to the child's dental needs. The Department investigated the mother for inadequate supervision and medical neglect. The father told the investigator that his brother had gone to the mother's house twice in one week and observed the mother, her sister and her sister's boyfriend smoking meth. The father stated that he and the mother were separated for about three years and that her drug use was part of the reason for the separation. The investigator then spoke with the paternal uncle who said he had never witnessed the mother using drugs, he just heard about it from his brother. He had no concerns about the care of his nephew. The mother did ask the uncle for financial help, as his brother was not helping her. He said his brother became upset when he called chastising him not for helping the mother. The investigator then spoke with the mother who stated that she was frustrated with the father and that she had concerns about his drug use as he had been acting erratically and he had a history of heroin usage. The mother said that her son is small for his age, he has scoliosis and other medical issues that the doctors have not found a definitive diagnosis for yet. The mother did report occasional marijuana use when the child is being cared for by someone else. The child was small and kneeling on a skateboard, using his arms to propel himself. He appeared at ease in the care of his mother. The investigator spoke with a friend who reported no beliefs that the mother was using any drugs while she was caring for the child. The investigator spoke with other family members who reported some concerns about possible medical appointments being missed but did not have specifics. The investigator spoke with the pediatric practice where the child had been seen. The primary doctor who saw the child regularly just had left the practice and the family was referred to the practice from another doctor who retired. They reported seeing the child once. While this investigation was pending the hotline received a call from another relative reporting that when she went to the mother's home recently, she found a bag of crack or meth on the table in the child's reach, which the mother then moved. She also found drug paraphernalia in a kitchen drawer. The relative was worried that the child did not get out of the home enough and that the mother does not take him to the doctor or physical therapy. The mother was investigated for medical neglect. A new investigator was assigned to this investigation. She went to the home and the mother denied any drug usage. She further stated that the hospital has not assigned her a new primary care physician and the child had been receiving in-home therapy, but stopped at the age of three. The hospital is aware that he was not receiving physical therapy. At the next appointment, he was going to be placed in a cast from his chest to his hips. The medical records were obtained by the investigator and reviewed. It was noted that the child was born at 34 weeks and was in the NICU for three months. He required supplemental oxygen and a g-tube placement for feeding. Some chromosomal abnormalities were found. One note from May 2016 indicated that the doctor felt the child had made great progress since his first appointment in August 2015. The mother did need to follow up with neurology. The nurse practitioner reported that the mother's lack of follow through would not cause serious or long-term harm and no doctors had documented any concerns. Both investigations were unfounded. There was not further contact with the Department until the death of the child.

**ACCIDENT**

| Child No. 45 | DOB: 1/2002 | DOD: 5/2017 | Accident |
|---|---|---|---|
| Age at death: | 15 years | | |
| Cause of death: | Multiple blunt force injuries from an all-terrain vehicle crash | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**   Fifteen-year-old boy and his twelve-year-old sibling took an all-terrain vehicle on a public roadway. The vehicle crashed and rolled over on the two children. The children were taken to the hospital and the fifteen-year-old later died. The twelve-year-old was admitted and treated for serious injuries later being released to her parent. The Department did not investigate the death.

**Prior History:**   In August 2016, an anonymous reporter called the hotline stating that the fifty-two-year-old father of the deceased and the sibling was a drug user and violent towards the forty-year-old mother who is scared to leave the father. The caller stated the children are withdrawn and scared and the mother fears that he will hurt her and the children if he finds out she is trying to divorce him. The report was taken for investigation of substantial risk of physical injury by neglect. The child protection investigator contacted law enforcement who reported that they had responded to an incident of domestic violence in 2012, in which the mother was a victim of the father. The mother had no history with law enforcement. In March 2016, the father had been reported for suspicious activity, but no charges were pursued. The investigator interviewed the children at school who reported feeling safe in their home. They both reported that their parents fought. The older child recalled an incident from a few years earlier where police were called because the father was being violent towards the mother, but he had not been violent since that time. The school counselor reported no concerns about the children. The mother explained to the investigator that the couple had just separated and the father was living with his parents. The mother had obtained an emergency order of protection because the children did not want to be with their father. The mother stated that he had been violent in the past, but not recently. However, he was angry and verbally abusive towards the family and she suspected he was using substances. The father reported that his wife had filed for divorce and confirmed the domestic violence incident in 2012. He denied drug use, indicating he suffered from depression and took psychotropic medication. He reported his wife was a good mother and neither of them had harmed the children. In October 2016, the investigation was unfounded. There has been no further contact with the Department.

| Child No. 46 | DOB: 3/2010 | DOD: 7/2017 | Accident |
|---|---|---|---|
| Age at death: | 7 years | | |
| Cause of death: | Intraventricular hemorrhage due to skull fracture due to blunt impact trauma | | |
| Reason for Review: | Pending child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**      Seven-year-old boy was riding his bike when he was struck by a vehicle.  It was reported that the boy was riding his bike in an alley and was struck when he went onto the street.  The boy was on his way to a friend's house who lived down the street. The Department did not investigate the death.

72

**Prior History:**  The deceased child was one of four children born to the mother. In April 2016, an anonymous caller contacted the hotline reporting that the three older children had been reporting domestic violence between the mother and her paramour, and the paramour hitting the six-year-old child when he tried to intervene. The reporter added that the children were dirty, windows were covered with boards, there was spoiled food and the mother sold drugs out of her home. The Department investigated the mother for environmental neglect and substantial risk of harm by neglect and substantial risk of harm by abuse by the paramour. The investigator interviewed the children at school and spoke with the seven-year-old's teachers who reported that the child one time talked about her mother having marijuana at the house. The teacher said that the child is usually clean but often disheveled, her clothes are too small and she often did not have her glasses. The children denied any drugs in the home but did report that the mother's paramour hit the mother. The investigator spoke with law enforcement who reported suspicions of drug activity in the home but no evidence. The investigator met with the mother who reported that there had been issues of domestic violence with her paramour, but she had ended the relationship.  The investigator observed bruises on the mother's face. The home was observed to be clean and appropriate. During this investigation, the investigator was not able to locate the paramour. Neighbors reported that they had not seen him back at the mother's home.  Police also reported having a warrant out for him. In June 2016, the investigation was unfounded against the mother and the investigation against the paramour was indicated. In February 2017, the hotline received a call from the eight-year-old child's school to report that she told her teacher that she was not at school the Friday before because her mother became angry with her, put her hands around her neck, and punched her in the eye.  The teacher noticed a healing bruise.  The Department investigated the mother for cuts, welts, bruises and substantial risk of harm by abuse. The investigator interviewed the seven-year-old and eight-year-old children at school and it was reported by the seven-year-old sibling that the mother did not hit them and took good care of them.  The sibling said if they got in trouble they were sent to their room.  The eight-year-old reported that last week she kissed her cousin while playing and her mother got upset, tried to grab her with both hands but ended up accidentally hitting her in the eye. The investigator observed a light mark on the child's eye lid. The child further stated that she was not afraid of her mother. The investigation was unfounded. The investigator and supervisor noted that while there were some concerns there was not enough evidence to indicate the mother. In May 2017, a teacher contacted the hotline to report that the eight-year-old child went to school with what appeared to be ringworm on her cheek.  The child reported to her teacher that her mother hit her in the face with a plastic spoon leaving a mark on her face. The child also reported drug use in the home. The mother reported that the child had ringworm on her arm and her younger two-year-old sibling hit her in her face with a spatula.  She admitted to smoking marijuana when the children were with their father at his house, but did not use other drugs.  The investigator interviewed the child before closing the investigation and she confirmed that her sister hit her with the spatula and denied that her mother hit her. The children's doctor had no concerns of abuse or neglect.  While the report was pending the seven-year-old sibling was killed.  The investigator offered family services before closing the investigation as unfounded against the mother.

| Child No. 47 | DOB: 1/2006 | DOD: 7/2017 | Accident |
|---|---|---|---|
| Age at death: | 11 years | | |
| Cause of death: | Hanging | | |
| Reason for Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**      Eleven-year-old boy was found hanging with an animal leash around his neck by his eight-year-old brother. The mother called 911 and the boy was transported to the hospital where he was pronounced deceased. The police called the hotline to report the boy's death. The Department did not investigate the death for abuse or neglect. The autopsy determined the cause of death was an accidental hanging.

CHILD DEATH REPORT

**Prior History:**   In October 2016, the police called the hotline after being called to the family home for a domestic incident. An investigation for substantial risk of physical injury/environment injurious to health and welfare by neglect to all three children by their parents was opened. The mother and father had gotten into an argument that became physical.  The mother drove to the police department to report the domestic incident. The boy reported that he woke up when he heard his parents arguing, got in the middle of them; the father grabbed his shirt and threw him on the couch.  In December 2016, both parents were indicated. The Department offered the family services but the parents refused.

| Child No. 48 | DOB: 2/2002 | DOD: 7/2017 | Accident |
|---|---|---|---|
| Age at death: | 15 years | | |
| Cause of death: | Blunt impact trauma due to motor vehicle accident | | |
| Reason for Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**      Fifteen-year-old girl was an unrestrained front seat passenger in a car that went off the road and overturned in a field.  She was partially ejected from the car and was pronounced dead upon arrival to the hospital.  Two other people, including the nineteen-year-old driver, were in the car and had minor injuries.

**Prior History:**  In May 2017, a counselor from a social service agency reported that according to the deceased girl's school principal, she was using social media to offer prostitution services to men.  He was also contacting police. The principal shared that she had reviewed the teenager's social media page, and the fifteen-year-old said she was quitting school to engage in prostitution and it appeared that she had her own apartment.  The Department initiated an investigation for human trafficking. Upon receiving the report, a child protection investigator made a good faith attempt to the address listed in the report; no one was home. The investigator visited the police station and obtained reports from earlier that year. The first report, was made by a concerned citizen regarding a video of the teen posted on social media. The second and third, were made by the teen's mother and listed as "Offenses Involving Children: Runaway-Minor Requiring Authoritative Intervention."  The police told the investigator that they were familiar with the teen and that she was a part of a well-known prostitution ring involving multiple underage girls.  The police advised the investigator to contact the FBI as they do investigations specific to human trafficking and sex trafficking. FBI Special Agents reported being familiar with the teen and further stated that they need one of the girls to talk openly with them to give them the information.  Until they obtain first-hand accounts of prostitution and sex trafficking, it is difficult to prosecute these men; they had no intention of prosecuting the girls for solicitation.  In June 2017, the teen was picked up by police as she was listed as a runaway.  She became extremely hostile and violent, so police transported her to the ER to be assessed. Her behavior continued to escalate in the ER requiring her to be sedated and restrained.  The police and mother stated that this behavior was out of character for the teen. The investigator spoke with the ER staff who reported the teen's urinalysis had tested positive for multiple substances. The investigator later attempted to interview the teen; however, she stated she was not going to answer any questions. The investigator told the teen that people were worried about her and she just wanted to discuss her staying safe, and help is available. The teen agreed to go home with her mother. The investigator provided information on counseling services available as well as discussing the case with SASS. The investigation was indicated for human trafficking to an unknown perpetrator.

| Child No. 49 | DOB: 5/2017 | DOD: 7/2017 | Accident |
|---|---|---|---|
| Age at death: | Two months | | |
| Cause of death: | Complications of asphyxia due to unsafe sleeping environment | | |
| Reason for Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

CHILD DEATH REPORT

**Narrative:**        One-week-old infant was found unresponsive wedged between the back of the couch and a cushion. The mother reported that all the younger children were sleeping downstairs because it was cooler.  The mother had laid the infant and two siblings on the couch and she slept on the floor next to the couch; when she awoke, she noticed her two-year-old laying on top of the infant.  The infant was unresponsive and not breathing; the mother started compressions and called 911.  The infant was transported to the local hospital in full cardiac arrest and not breathing.  The infant was revived at the hospital and then flown to a children's hospital in critical condition. The Department opened an investigation against the mother for substantial risk of physical injury/environment injurious to health and welfare by neglect to the infant. It was reported to the investigator by the hospital social worker that the doctors were ruling this an accident and the mother had been consistent with her story and the investigation was unfounded. Approximately two-weeks after the investigation was unfounded the hotline received a call reporting that the two-month-old had died.  The parents had decided to withdraw life support earlier in the day and he lived a little over an hour before being pronounced deceased. The Department investigated the mother for death by neglect. The autopsy report found the cause of death to be from complications of asphyxia due to unsafe sleeping environment and the manner of death was accident. In March 2018, the investigation against the mother for death by neglect was unfounded.

**Prior History**:   In June 2016, the hotline received a report that a three-year-old child was wandering the streets unattended.  The mother reported that she was at the park with her other children and the three-year-old wanted to leave. She brought him to her cousin's home to watch him. The cousin denied that the mother told her that the three-year-old was in the home. The cousin fell asleep and the child left the home. The police cited the mother with child endangerment.  During the pending investigation, the police contacted the hotline to report a domestic incident between the mother and her paramour. The mother reported that the children were asleep upstairs during the incident.  The mother agreed to intact family services. The investigation was closed and indicated for inadequate supervision against the mother. The intact family services recommended that the mother participate in parenting classes, domestic violence assessment and to comply with all recommendations stemming from domestic violence assessment, and to ensure her children are supervised always. In October 2016, the mother informed the worker she was pregnant. The mother was minimally engaged in services and repeatedly denied that she needed domestic violence services. In May 2017, two days after the mother gave birth, the worker visited the mother in the hospital and discussed the importance of safe sleeping; the worker ensured that the mother had a pack-n-play for the infant. Five days later, the worker was notified by the hospital social worker that the infant had been found unresponsive and taken to the hospital. A child protection investigation was opened for substantial risk. The infant's five siblings were placed with their maternal aunt pursuant to a safety plan. In late May, the mother was referred for a mental health assessment and it was recommended that she engage in therapy. In July 2017, the safety plan was terminated and the investigation was unfounded. The children were returned to the mother's care.  The intact case closed eight months after the infant's death.

| Child No. 50 | DOB: 10/2002 | DOD: 8/2017 | Accident |
|---|---|---|---|
| Age at death: | 14 years | | |
| Cause of death: | Multiple blunt force injuries due to bicyclist struck by motor vehicle | | |
| Reason for Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**    Fourteen-year-old was hit by a car while riding his bike around midnight and died at the scene.  It was reported that the mother of the teen contacted the intact family services worker to inform him that the teen was riding his bike and was struck by a vehicle, and was pronounced dead at the scene. The Department did not investigate the death for abuse or neglect.

**Prior History:**  The family first came to the attention of the Department in 2010 due to an unfounded report of inadequate supervision against the mother. The family had two more unfounded investigations, one in 2013 and one in 2016 for substantial risk after reports of domestic violence between the parents in front of their children. The county Sheriff reported to be familiar with this family and their ongoing domestic violence issues. In April 2017, the county State's Attorney contacted the hotline to report that the family was court ordered to complete services. An investigation was opened due to ongoing domestic violence issues in the home. It was reported that at the end of March 2017, the mother's paramour was drunk and argued with the fourteen-year-old and a fight ensued; mom's paramour pushed, shoved and hit the teen multiple times. The Department investigated the mother for substantial risk of physical injury/environment injurious to health and welfare by neglect to her teen son and investigated the mother's paramour for substantial risk of physical injury/environment injurious to health and welfare – incidents of violence or intimidation to the teen. The investigation was indicated in June 2017. The family was referred for intact family services to address domestic violence and possible substance abuse in the home. The mother had reported that the teen had marijuana in his bedroom.  The family had over sixteen police reports for domestic violence.  In June 2017, it was reported that the mother and the teen completed mental health assessments with no recommendations made for either of them. In July 2017, it was reported that the father completed parenting classes while incarcerated.  The caseworker continued to make visits to the home and recommend services until the teen's death. The intact case was closed after the death as the teen was the only child in the home.

| Child No. 51 | DOB: 7/2010 | DOD: 8/2017 | Accident |
|---|---|---|---|
| Age at death: | 7 years | | |
| Cause of death: | Complications of near drowning | | |
| Reason for Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**      Seven-year-old boy who was mildly autistic died from an accidental drowning while attending a family event in another state. During the trip, the boy, his adult brother, and his three cousins went to the pool. The adult brother was supervising the boy, who did not know how to swim. The brother asked the seventeen-year-old cousin to watch the boy while he went inside to use the bathroom. The boy wandered to the deep side of the pool and slipped off the "floatie" he was using while the seventeen-year-old was distracted. The cousins screamed for help, as they were poor swimmers. The brother ran back and jumped into the pool, pulled the boy out and began CPR until the ambulance arrived and transported the boy to the hospital. While he was in the hospital he developed pneumonia, and was diagnosed with acute respiratory failure, brain damage, lack of oxygen and lung complications.  He was then airlifted back to a hospital in Illinois where he was put on life support. The hospital staff called the hotline to report the incident and the Department opened an investigation for inadequate supervision of the boy by his brother. The parents signed a DNR and the boy died from complication of near drowning. The allegation of death by neglect was added to the investigation. Both allegations were eventually unfounded against the adult brother of the boy.

**Prior History:**  In June 2015, the police contacted the hotline after responding to a call about a young boy wandering the streets unsupervised. The Department opened an investigation for inadequate supervision against the mother. The mother reported that the boy was autistic and needed constant supervision. The boy's mother had told her adult son to watch the boy while she went out. The adult son fell asleep and the door was unlocked; the boy let himself out and went to the park. In August 2015, the boy's mother was indicated for inadequate supervision. Over a year later, in October 2016, the hotline was contacted after the fire department received calls about a boy alone on the side of the road. The Department opened an investigation for inadequate supervision and substantial risk of physical injury/environment injurious to health and welfare by neglect.  The mother reported that she left her son in the basement while she went to do laundry. She reported they usually kept the keys to get out of the home out of reach from the boy, but the brother had accidentally left the keys in a place where the boy could get to them. The family reported this was not the first time the boy had gotten out of the house unattended. The mother agreed to put better locks on the door. The investigation was indicated for inadequate supervision and substantial risk of physical injury/environment injurious to health and welfare by neglect to the boy by his mother.

| Child No. 52 | DOB: 8/1999 | DOD: 9/2017 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 18 years |
| Cause of death: | Mixed Opioid Intoxication |
| Reason for Review: | Youth in Care |
| Action Taken: | Investigatory review of records |

**Narrative:**     Eighteen-year-old youth was found unresponsive in the foster home of his maternal grandmother; 911 was called and the paramedics arrived and determined the youth to be nonviable and his death was pronounced at the scene without intervention. An autopsy determined that the cause of death was mixed opioid intoxication (heroin and fentanyl).  Two days prior to his death, this youth was arrested for possession of heroin. To evade arrest, he ingested three small baggies of heroin. The police reportedly had no knowledge of him ingesting the heroin. He was given a court date and released from custody. According to his girlfriend, after returning home in the evening following his arrest he complained of feeling slightly ill and itchy; afterwards he complained of being very sleepy, and was discovered unresponsive the next morning.

**Prior History:**  After his mother's death in 2010, the youth and his sibling resided with a maternal aunt who became their legal guardian. In December 2013, the aunt sent the youth to live with his maternal grandmother, because the aunt felt that she was unable to effectively manage his behaviors. In May 2014, the youth was psychiatrically hospitalized for eight days. The aunt/legal guardian was indicated for lockout to the youth after she refused to pick him up and would not give consent for the youth's maternal grandmother to continue to care for him. The Department was granted temporary custody of the youth and placed him in residential placement. The youth struggled in residential placement going on run, and becoming involved in the juvenile justice system.  In 2017, the youth was placed in relative foster care with his maternal grandmother.  The youth's worker had regular contact with him and attempted to engage him in services, including substance use treatment, mental health services, and teen parenting services as he had an infant daughter.  The youth refused services, was not employed or attending school; and was not compliant with the terms of his probation.

| Child No. 53 | DOB: 6/2017 | DOD: 9/2017 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 ½ months |
| Cause of death: | Overlay |
| Reason for Review: | Pending child protection investigation at the time of child's death |
| Action Taken: | Investigatory review of records |

CHILD DEATH REPORT

**Narrative:**    Two-and-a-half-month old was found on the couch unresponsive by her father; she was transported to the hospital where she was pronounced deceased. The mother stated that she originally placed the infant in a pack-n-play for the night, and in the middle of the night she fed the infant. The mother woke up the father to burp the infant.  The father stated that he fell asleep with the infant on the loveseat after feeding/burping her; he woke up a few hours later and "felt something wet on his side." The father noticed the infant was not breathing and there was blood around her mouth and nose. The parents started CPR and called 911; the infant was transported to the hospital where she was pronounced deceased. During the child protection investigation, the father did admit to rolling over onto the infant.   The investigation for substantial risk of physical injury by neglect to the infant was indicated; the investigation for death by neglect to the infant was unfounded; the infant was originally placed in the pack-n-play the night before to go to bed and the investigation for substantial risk to the deceased infant's siblings was unfounded.

**Prior History:**   The deceased infant had two half siblings from her father's previous relationship.  The father's children were placed with him when the mother of his children brought them to a Department office and left them there. The mother was investigated and indicated for abandonment/desertion of her children, ages four and two-years-old at the time. The Department took protective custody of the children and placed them with the father. In April 2017, the hotline received a call to report that the father was selling heroin out of the home. It was reported that the home had no running water, busted out windows and no electricity. It was further reported that the father had children with different women, one of them busted windows out of the home while the children were home. The Department investigated the father for substantial risk of physical injury/environment injurious by neglect and inadequate shelter.   After a formal investigation, in June 2017, the investigation was unfounded. The home had working heat, electricity, and water. The investigator observed the home to have no exposed wiring or structural deficits which would endanger the health and safety of the children. The broken windows in the home were temporarily repaired. The investigator did not observe evidence of drug use in the home; no drug paraphernalia or suspicious smells in the home. This investigation has since been expunged. In July 2017, the hotline received a call to report that there was a domestic altercation at the residence involving the infant's mother and father, with the infant present. The Department investigated the mother and father for substantial risk of physical injury/environment injurious to the infant. The investigator observed the infant and interviewed the parents. The parents denied substance abuse. The home was clean with no issues noted. The mother stated everything she told police wasn't true. The parents denied hitting each other. The father did admit to locking the mother out of the house because she was acting crazy. The investigator spoke to the parents about intact services, but they declined. Following the incident, the mother and infant left the home for a few days and said that she and the father had worked things out. In September 2017, after the death of the infant the investigation was unfounded with services offered and refused.

| Child No. 54 | DOB: 2/2011 | DOD: 9/2017 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 6 years |
| Cause of death: | Drowning |
| Reason for Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**   Forty-eight-year-old father found his six-year-old son at the bottom of a four-foot deep above ground pool, while at a gathering at a friend's home.  The Department investigated the father for death by neglect and for substantial risk/environment injurious by neglect to the boy's twelve-year-old half sibling. The father told the investigator that the adults and two children spent the day swimming. After they finished swimming, the adults sat on the deck listening to music and watching television while the children played.  The father stated that he became concerned of the whereabouts of his six-year-old son, so he went inside the house to look for him; he said his step-son was in the house playing video games. The father went back outside and discovered his son at the bottom of the pool.  The father pulled him out; a friend started CPR on the child until the paramedics arrived and transported the child to the hospital where he was pronounced deceased.  The father stated that he had consumed approximately four to five beers that day. The father was indicated for death by neglect and substantial risk/environment injurious to the surviving sibling.

**Prior History:**  In March 2016, the Department investigated the father for sexual exploitation to his five-year-old son and his ten-year-old step-son after it was reported that the boys observed him having intercourse with his girlfriend.  During a forensic interview, the boys denied anyone touching them inappropriately or seeing any naked pictures.  There were no disclosures of sexual abuse. In May 2016, the investigation was unfounded, as there was no credible evidence of sexual exploitation.  In November 2016, the hotline was contacted with a report that over a weekend in October the eleven-year-old and five-year-old boys reported that the father took them to the park and went to the bar leaving them for 30-40 minutes unattended.  The eleven-year-old said the bar was out of their sight and when his step-father returned he smelled of alcohol. The Department investigated the father for inadequate supervision to the children. The investigator spoke with the boys and they both reported that their father took them to the park and left them alone while he ran the track, and that the trees made it hard for them to see him running. The father admitted to running around the park and leaving the boys unattended. He also admitted to leaving the older child on one occasion and going to a restaurant. He and his girlfriend told the investigator that the oldest child had a cell phone and had his father's number and his girlfriend's number in the phone.   The investigator discussed not leaving the boys unattended. The father and his girlfriend denied leaving them alone in an unsafe situation and the boys never said they were afraid of being in the park.  In December 2016, the investigation was unfounded. Services were offered; however, the father refused.

| Child No. 55 | DOB: 6/2017 | DOD: 9/2017 | Accident |
|---|---|---|---|
| Age at death: | 3 months | | |
| Cause of death: | Suffocation | | |
| Reason for Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**      Three-month-old youth in care found unresponsive on the couch after the thirty-one-year-old relative foster father (maternal uncle) fell asleep on the couch with the baby. The foster father had laid the baby next to him on the couch, face up on top of a pillow. The foster father woke up during the night finding the baby face down and wedged between his leg and the pillow. The aunt and uncle rushed the baby to the hospital; the uncle driving while the aunt performed CPR in the back seat. The baby was pronounced deceased at the hospital. The Department investigated the foster father for death by neglect. The investigation was unfounded following the autopsy finding of death to be consistent with accidental suffocation.

CHILD DEATH REPORT

**Prior History:**   In November 2014, the mother first came to the attention of the Department when she gave birth to her third child who tested positive for cocaine.  The mother also tested positive for cocaine and marijuana.  The Department investigated the mother for substance misuse.  The mother admitted to using cocaine and marijuana during her pregnancy.  She also reported that she had been in jail in October 2014 on a probation violation.  The mother was indicated for substance misuse. The investigator referred the case for intact family services. At the end of January 2015, the children were no longer attending the facility where they were receiving services and the mother had missed some home health visits for the baby. The intact worker and supervisor presented the case to the State's Attorney.  In early February 2015, the mother tested positive for drugs and she admitted using drugs and alcohol.  The State's Attorney filed a petition and the three children were taken into custody.  The three children were originally placed with a maternal great aunt.  The oldest child (five-years-old) was eventually placed with his father and his child case closed in August 2015. The father of the two-year-old child became involved in the case. The agency provided transportation to visits, referrals for services and monthly bus passes for the parents.  The mother and the father had issues with stable housing, often staying with various friends and relatives.  The father had a criminal background that included drug and assault convictions. He tested positive for substances at times during this case. Neither parent engaged in services and both were inconsistent in visiting.  Both parents had been arrested on probation violations during 2016 and spent time in jail.  In November 2016, the State's Attorney agreed to seek termination of parental rights. In the beginning of 2017, the parents missed visits and the decision was made to change visits to monthly.  The father spent January to March 2017 in jail and after getting released he became aggressive with the relative foster parent (great aunt) who would then no longer allow him in her home.  The mother had limited contact with the worker. In May 2017, the mother reported that she was pregnant and was due in July 2017.  In June 2017, the parents' rights were terminated. That same month, the foster parent reported to the worker that the mother had given birth.  The worker spoke with the hospital social worker who reported that both the mother and the baby tested positive for cocaine. The worker called the hotline. The Department investigated the mother for substance misuse. The Department took protective custody of the newborn.  The worker for the older children had located a relative, maternal uncle and his wife, as a placement. In July 2017, the mother was indicated for substance misuse. The infant was noted to be doing well in the foster home of the maternal uncle and getting regular medical care.  In September 2017, the family arranged for siblings and parent visits to take place together so the parents could see all the children. The parents did attend some visits but had not yet engaged in services at the time of the infant's death.  In October 2018, the great aunt adopted the two children she had been fostering since 2015.

| Child No. 56 | DOB: 7/2017 | DOD: 10/2017 | Accident |
|---|---|---|---|
| Age at death: | 3 months | | |
| Cause of death: | Asphyxia due to an unsafe sleeping environment, co-sleeping with an adult | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**      Three-month-old infant was found unresponsive by his twenty-one-year-old father after his twenty-one-year-old mother laid him down in bed with his father. The father contacted 911 and the infant was transported to the hospital where he was pronounced deceased. The Department investigated the mother and father for death by neglect. The mother told the investigator that as she left the home, she woke the father up and put the infant in bed with him on his back.  The father said he woke up at that time and then put the infant on his stomach.  Both parents said due to his hernia he liked to be on his stomach. The infant was scheduled to have hernia surgery.  The father checked on him a couple of times and the infant was alright; the last time he checked he did not see him breathing. The investigator spoke with the family members in the home who said they had never seen the parents mistreat the infant. The coroner determined the cause of death to be asphyxia due to co-sleeping with an adult. The investigation against the parents was unfounded.

CHILD DEATH REPORT

**Prior History**:   The mother and father of the infant resided in a home with paternal relatives, including the grandmother and her husband. In June 2017, approximately four-months before the infant's birth, law enforcement contacted the hotline after responding to a call of a suicidal teenager.  The police were called to the home the mother and father of the infant were living in at the time, because a teen living in the house ran out of the home with a plan to jump off a bridge. The teen disclosed that her stepfather touched her inappropriately while her mother was at work.  The Department investigated the stepfather for sexual molestation and substantial risk of sexual abuse-sibling of sex abuse victim by the stepfather to the other children in the home. The mother and father of the infant were listed as non-involved subjects as they resided in the home at the time of the investigation.  Both law enforcement and the Department conducted investigations. The police did not file charges against the stepfather and the investigation with the Department was unfounded.

| Child No. 57 | DOB: 4/2003 | DOD: 11/2017 | Accidental |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 14 years |
| Cause of death: | Methadone intoxication |
| Reason for Review: | Youth in care |
| Action Taken: | Investigatory review of records |

**Narrative:**     Fourteen-year-old girl found unresponsive, face down on her bed by her foster father. The foster father started CPR and called 911. She was transported to the hospital where she was pronounced dead. The foster father reported that he had heard the girl moving around the apartment at approximately 9:30 pm. He then went to bed. He heard the girl's alarm clock going off at approximately 5:45 am.; and when it was never turned off, the foster father went into her bedroom to check on her and found her unresponsive. An autopsy was completed and the cause of death was determined to be methadone intoxication and the manner was accidental. The Department did not investigate the teen's death.

**Prior History:** In August 2013, the deceased girl and her sibling, a brother who is autistic, were removed from their mother's care due to inadequate supervision of the boy. The boy had left his family's apartment unsupervised during the early morning hours and walked to a fast food restaurant by himself.  During the investigation, it was noted that this had occurred on five other occasions during the months of July and August 2013.  The Department took protective custody of both children, and they were placed in the care of a relative. Since coming into the Department's custody, the girl had numerous placements. All placements ended in disruption due to her behavior. The teen was hospitalized for psychiatric care twice in 2016, referred to a partial hospitalization program and later for therapy.  In October 2016, the children were returned to the care of their biological father in Oklahoma. In June 2017, the biological father requested that his daughter be removed from his home and brought back to Illinois. She was moved, and placed in a non-relative, traditional foster home. In August 2017, the biological father stated that he could not continue to care for his son with autism, and in September 2017, the boy was moved back to Illinois into a non-relative, traditional placement. The children were residing in two different placements, but living on the same street at the time of the girl's death.

| Child No. 58 | DOB: 5/2003 | DOD: 11/2017 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 14 years |
| Cause of death: | Blunt force injuries to head and neck |
| Reason for Review: | Pending child protection investigation at the time of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**    Fourteen-year-old boy was struck by a car and killed while he was walking home from a friend's house. The hotline was contacted regarding his death and it was reported that the teen was staying at a friend's house. The teen was being bullied, so he left the home and began to walk home, which was ten miles away in the dark, when he was struck by a vehicle and killed.  The Department investigated the friend's mother for death by neglect, since she was the responsible caregiver at the time of the accident. The investigator met with the teen's friend, who stated that the teen was at his house the night he was killed for a slumber party. The investigator spoke with the friend's mother and the other teens that were at the house for the slumber party. They all reported that the fourteen-year-old got into an argument with one of the other kids who was seventeen-years-old, but no one thought it was a big deal. The fourteen-year-old stated he was going to the gas station that was a couple blocks away to get soda and chips, but he never returned. They then learned he was hit by a car. The friend's mother stated that the fourteen-year-old was over at her house almost every day and stated that if she had known the teen was going to try and walk home she would not have let him. An autopsy was conducted and the cause of death was blunt force trauma to the head.  In March 2018, the investigation was unfounded.

**Prior History**:    The deceased's older brother had a history of behavioral issues and mental health diagnosis. There were two prior investigations regarding the brother's behaviors in 2013 and 2014; both were unfounded, but an intact family services case was opened from June 2014 to May 2015. It was recommended the family participate in family psychotherapy and that the family ensure that the twelve-year-old brother received appropriate medical follow up for his behavioral issues and start seeing a psychiatrist. In April 2015, court ordered intact family services was closed. The family agreed to continue counseling for the brother after case closure and all other services were completed. In July 2015, the hotline received a call to report that the parents' home was filthy. The Department investigated the mother for environmental neglect to her three children.  The investigator observed the house and instructed the mother to clean the home.  The investigation was unfounded. In December 2016, law enforcement contacted the hotline to report allegations of sexual abuse against the father. It was reported that the ten-year-old daughter had three girls spend the night and that the father laid down with the girls and attempted to touch two of the girls inappropriately and was spooning with the other. The Department investigated the father for sexual molestation and substantial risk of sexual abuse. According to the police, the girls gave credible statements that the father attempted to touch them and they believed it was sexual in nature. The father was interviewed by the police and he denied this. There was no actual sexual contact. The police released the father and no charges were filed. It was noted that while the actions may have been inappropriate, there was not abuse or neglect. The daughter stated that she felt safe at home and it had never happened before and hasn't happened since. The investigation was unfounded for lack of evidence. In November 2017, the hotline was contacted by law enforcement to report a physical altercation between the father and deceased teen. It was reported that the father was drunk and harassing the teen. The father pushed the teen and the teen then began to punch the father. The Department investigated the father and mother for substantial risk. The investigator spoke with the mother and the mother agreed to let the investigator visit the home the following week and interview her son; however, the teen was killed three days prior to the scheduled visit. The investigation was unfounded against the mother, for a lack of evidence that she was neglectful in this situation. The allegation against the father was indicated due to him being intoxicated and repeatedly antagonizing the teen, eventually leading to a physical altercation with police involvement. In January 2018, the investigation was closed.

| Child No. 59 | DOB: 11/2017 | DOD: 1/2018 | Accident |
|---|---|---|---|
| Age at death: | 2 months | | |
| Cause of death: | Asphyxia due to overlay | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

CHILD DEATH REPORT

**Narrative:**        Thirty-three-year-old mother awoke in the morning to find her two-month-old infant face down, not breathing and cold.  The mother contacted 911 and tried to perform CPR.  The infant was transported to the hospital where the infant was pronounced dead. It was reported that the mother had three other children in the home ages twelve, ten and two.  The Department investigated the mother for death by neglect. The investigator implemented a safety plan for the other children and the investigator spoke with the mother, who stated that at around 2 a.m. she fed the infant and laid her on her back in bed with her, but when she woke up in the morning the infant had rolled over onto her stomach and the mother noticed she wasn't breathing.  The investigator spoke with the pediatrician who had just seen the infant in December and there were no concerns.  The autopsy findings reported that the cause of death was due to co-sleeping on an adult bed. The investigation was unfounded against the mother for death by neglect. The mother asked for grief counseling for herself and the children. The investigator referred the family for intact family services and the family agreed.

**Prior History:**   In February 2010, the hotline received a call to report that the mother attempted suicide by holding a knife to her own throat and that both parents were drunk during the incident.  The parent's four-year and two-year-old children were present during the incident, but not harmed. It was further reported that law enforcement is frequently out to the residence for domestic disturbances and that the mother had been arrested for battery in the past.  The Department investigated the mother for substantial risk of physical injury/environment injurious to health and welfare by neglect to her children. The investigation was unfounded after an appeal.  The family was offered intact family services. The mother received services for drug and alcohol treatment, mental health treatment, and showed progress in her parenting skills. The case was closed in May 2011 after services were successfully completed. In October 2016, the hotline received a call to report that the mother had brought her eleven-year-old daughter to the doctor for a school physical. During the examination, the child complained of sharp belly pain on her lower right side and the doctor referred the child to have tests done at another hospital, but the mother never took the child for tests.  The Department investigated the mother for medical neglect and the investigation was unfounded.  In March 2017, the hotline received a call from law enforcement to report that the mother had been arrested for an unrelated traffic warrant and her children ages eleven, nine and one were left home alone. The Department investigated the mother for inadequate supervision. The mother told the police her children were waiting for her. The police went to the apartment and found the children unsupervised. The mother reported that she left the children with the neighbor upstairs. The eleven-year-old and nine-year-old stated that when their mother left the home, she sent them to the neighbor upstairs, but shortly thereafter they went back downstairs to watch television and then the police showed up. The neighbor confirmed this. The mother reported the children go between their apartment and the neighbor's apartment frequently. The investigator observed all three children to appear healthy with no signs of abuse or neglect. The home was clean and utilities were on. In May 2017, the investigation was unfounded.

| Child No. 60 | DOB: 7/2009 | DOD: 1/2018 | Accident |
|---|---|---|---|
| Age at death: | 8 years | | |
| Cause of death: | Seizure due to remote hypoxic-ischemic brain injury due to remote bedding asphyxia | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**      Eight-year-old medically complex boy was found unresponsive in his bed by his mother. The mother's paramour called 911 and she and her paramour performed CPR on the child until paramedics arrived and transported him to the hospital where he was pronounced deceased. The child had a history of several medical conditions, that included cerebral palsy and a global hypoxic ischemic brain injury that was caused from co-sleeping with his mother as a newborn. The child also had a g-tube for feedings and was unable to care for himself.  The Department investigated the mother for death by neglect. The mother stated that the child had been sick, having coughing spells prior to his death and that she had taken the child to the hospital several times in the last ten days due to his coughing spells. She further stated that since the child was having the coughing spells, she placed a pillow under his head when she put him to bed. When she awoke she found the child lying on his side with his face half into his pillow. The investigator spoke to the child's physician and found no concerns. The investigation for death by neglect was unfounded. The coroner did not find any evidence of abuse or neglect and none of the siblings had suspicious injuries. The child had reportedly been congested but per the autopsy, the primary cause of death was a seizure.

**Prior History:** The mother was investigated by the Department thirteen times from April 2009 until the death of her son in January 2018. Eleven investigations were unfounded (including the investigation for death by neglect to her son in January 2018) and two investigations that were indicated. The first indicated report was from April 2009, in which the parents were indicated for inadequate supervision and environmental neglect. The second indicated investigation was from July 2009, when the hotline received a call to report that the mother found her eleven-day-old newborn (the deceased) face down and unresponsive in bed with her.  The newborn was in full cardiac arrest and was transported to the hospital via ambulance.  The newborn had been unresponsive for approximately twenty minutes and was put on a ventilator.  There was no outward signs of abuse or trauma.  It was also reported that when the first responders arrived at the home it was filthy with cock roach infestation, fleas, and trash strewn all about the apartment. The newborn suffered a global hypoxic-ischemic brain injury and was diagnosed with cerebral palsy and eventually had to have a g-tube placed for feedings.  The mother and father were indicated for head injuries by neglect and for environmental neglect. In August 2009, the family was referred for intact family services.  The intact case was opened for one year. There were nine unfounded reports between 2010 and January 2017; they were unfounded for substantial risk, inadequate food, environmental neglect, inadequate supervision or medical neglect to the deceased. In January 2017, a family member called the hotline and the family was referred for child welfare services, but the mother declined services. In May 2017, the hotline received a call to report that the mother's nine-year-old son attended school with a dog bite to his face, having been bitten by a Pitbull.  The investigator met with the two healthy children at school, who appeared to be clean, appropriately dressed and did not display outward signs of abuse or neglect.  The mother's disabled son appeared to be clean and did not show any signs of abuse.  The investigation against the mother for environmental neglect was unfounded, due to insufficient evidence to prove the family's environment was harmful to the children's well-being.

| Child No. 61 | DOB: 1/2018 | DOD: 1/2018 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 13 days |
| Cause of death: | Asphyxia due to overlay |
| Reason for Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**      Twenty-six-year-old mother found her thirteen-day-old infant unresponsive after rolling on top of the infant during a nap. The infant was napping in a twin-sized bed with her mother and a one-year-old sibling. The shelter, where the mother and her four children resided, called 911.  Emergency medical services performed CPR and transported the infant to the hospital where she was pronounced deceased.  The room at the shelter had two bunk beds and a pack-n-play. An autopsy determined the cause of death to be asphyxia/overlay.  The mother was investigated and indicated for allegation of death by neglect and substantial risk of physical injury/environment injurious after the child protection investigation revealed that the mother had been educated on the importance of safe sleep and had been provided a crib for the infant. Following the infant's death, an intact family services case was opened.

CHILD DEATH REPORT

**Prior History:**  Four days before the infant's death, a worker from the shelter where the family resided, contacted the hotline. The worker reported that the mother has left her four children unsupervised on several occasions, including when she comes down for meals without them.  An investigation was opened for inadequate food and inadequate supervision.  The mother was indicated for inadequate supervision as to her four children. The mother admitted to leaving the children unattended for short periods of time. The child protection investigator observed written documentation from the shelter that outlined specific dates and times the mother left her children unsupervised, signed by the mother.  The allegations of inadequate food were unfounded. The mother denied that she was not feeding her children; the oldest child was able to list foods that the mother fed him. During the investigation, the child protection investigator discussed safe sleep with the mother and provided her with a pack-n-play for the infant.

| Child No. 62 | DOB: 1/2018 | DOD: 2/2018 | Accident |
|---|---|---|---|
| Age at death: | 7 weeks | | |
| Cause of death: | Undetermined | | |
| Reason for Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**       Seven-week-old infant was found unresponsive in bed with her twin brother and parents. The infant was rushed to the hospital where she was pronounced deceased. The Department is investigating the death and the investigation is pending.  The surviving twin and nine-year-old sibling were taken into temporary custody of the Department. The petition noted that the seven-week-old twins had not yet been taken to the doctor, the parents ignored the advisement of the Department to use safe sleep practices given just three days before the death, the parents had allowed drug paraphernalia in the home and the mother had a history with Department.

**Prior History:** The deceased infant has a twin brother and three older siblings (ages: nine, six and three years).  In October 2016, law enforcement contacted the hotline to report that the maternal uncle had gotten into a car accident with his seven-year-old niece, four-year and two-year-old nephews and a neighbor child. The maternal uncle was arrested and charged with a DUI and four counts of child endangerment.  The Department investigated the uncle for substantial risk of harm.  The parents reported that the uncle moved in with them after losing his job. The parents reported that the uncle watched the children while they were at work. Both parents reported that the uncle was not drinking when they left the children in his care.  The parents asked the uncle to leave the home and had not seen him since the accident. The investigator was never able to locate the uncle, but indicated the uncle for substantial risk of harm by neglect based on the police report. Four months later, the eight-year-old told her teacher that her maternal uncle lived with them and he babysat her and her younger brothers until her mom comes home from work. The eight-year-old said that her uncle gets drunk and will yell at her.  One time she couldn't wake up her uncle and she took care of her brothers. The Department investigated the parents and uncle for substantial risk of harm by neglect and inadequate supervision. The uncle had moved back with the family after getting out of jail.  The uncle reported that he drank a beer while watching the children once. The investigator met with the parents who stated that they spoke with the uncle telling him he could not drink while watching the children, and he agreed. The father reported they were going through a divorce and the eight-year-old was most affected and was angry with her uncle.  Before the investigation was closed the mother and eight-year-old moved out of the home. The father and the two boys moved out of state. In April 2017, the investigation against the parents and the uncle was indicated for substantial risk of harm by neglect and inadequate supervision. In October 2017, the eight-year-old's teacher contacted the hotline to report that the eight-year-old had ongoing issues with a rash and hygiene. The Department investigated the mother for environmental and medical neglect. The girl told the investigator that her mother puts medication on her sores and they are healing. The mother reported that her daughter had showed her the rash when she picked her up from a relative's home and took her to the clinic right away. The doctor said it could be an allergic reaction to bug bites among other things. The doctor gave her a prescription for an allergy medication and informed her to put calamine lotion on the rash. The investigator checked for bugs around the home but had not found any; the rash was clearing up. In December 2017, the investigation was unfounded. In February 2018, it was reported that law enforcement went to the home of the mother and her paramour looking for the paramour's brother.  The mother and her paramour live in the home with their newborn twins and the mother's nine-year-old daughter. The police found the brother hiding upstairs in a closet and was in possession of heroin. The mother and paramour were upstairs in the same bedroom and the twins were on the bed. The police found needles on the dresser.  The mother was arrested on a traffic warrant.  The Department investigated the parents for substantial risk of harm by neglect. The investigator met with the family and observed the seven-week-old twins sleeping in bassinets.  The parents stated that they were not aware that the brother was using and that he had been in rehab and thought he was clean. The investigator completed a home safety checklist including discussing safe sleep with the parents. He observed blankets in the bassinet and advised the parents to remove the blankets.  Three days later the seven-week-old twin girl was found unresponsive and pronounced deceased. In March 2018, the parents were indicated for risk of harm for allowing the uncle with a history of drug use to be around the children.  The Department was granted temporary custody of the children and placed them with the paternal aunt and her husband who are committed to adopting the children.

| Child No. 63 | DOB: 12/2017 | DOD: 3/2018 | Accident |
|---|---|---|---|
| Age at death: | 3 months | | |
| Cause of death: | Asphyxia due to co-sleeping | | |
| Reason for Review: | Intact family case open at the time of child's death | | |
| Action Taken: | Investigatory review of records | | |

CHILD DEATH REPORT

**Narrative:**  Three-month-old infant was found unresponsive in bed with her twenty-one-year-old mother, twenty-six-year-old father, two-year-old and four-year-old siblings. The Department investigated the parents for death by neglect and substantial risk of harm to the two siblings. The Department took custody of the siblings and placed them with a relative.  The children had been with relatives in a voluntary plan after the deceased infant tested positive for drugs at birth. The parents both entered drug treatment and two weeks prior to the infant's death the children had gone home.  At the time of the infant's death, the parents tested positive for methamphetamines. The parents were indicated for death by neglect and substantial risk of harm to the two siblings.

**Prior History:**  In August 2016, the hotline received a call and it was reported that the parents trailer was filthy with dirty dishes throughout the home, flies everywhere, food on the floor, including old dog food, dirty carpeting with an odor; and that the parents had a three-year-old and an eight-month-old crawling around the floor. The Department investigated the parents for environmental neglect. The child protection investigator observed the home to be cluttered and disheveled with moldy food on dishes and pans; fleas and flies throughout the home and a dirty potty training chair.  The mother told the investigator that the home had been spotless when they left the house and that the clutter, mess and rotten items must have been placed by the landlord. The investigator took the mother to the trailer and she admitted the items were theirs. The investigation was indicated for environmental neglect. The parents moved into a clean home with relatives. In February 2017, the hotline received a call that the one-year-old had gotten out of the home while the parents were asleep. The Department investigated the parents for inadequate supervision; however, the child was released back to the parents and no arrests were made. The investigation was unfounded the same day the report was made and was expunged at the time of the infant's death. In December 2017, a hospital worker contacted the hotline to report that the twenty-one-year-old mother gave birth and that both mom and infant tested positive for methamphetamines and the mother tested positive for marijuana as well.  It was also reported that the mother tested positive for methamphetamine at a prenatal visit in August.  The Department investigated the parents for substantial risk of harm and substance misuse.  The parents had left the older children with the maternal grandmother while the mother was giving birth. The parents agreed to intact family services and allowing the children to stay with the maternal grandmother while they received treatment.  After discharge from the hospital the infant went to stay with the maternal grandmother and the mother went to stay with other relatives. She visited the children and the father went to jail after missing a court date while the mother was in labor. The mother started substance abuse treatment. The father received probation with treatment a condition of probation. Both had been dropping clean and were living with relatives.  After the intact case was opened in late January, the investigation was indicated and closed.  In March 2018, the parents had been consistently participating in drug treatment and had three clean random drops.  The couple was staying with the paternal uncle who had enough bedrooms for the children.  The worker completed a home safety checklist and noted the crib and bassinet for the toddler and infant. She reviewed safe sleep information with them. The day prior to the death of the infant, the mother called the worker stating that the father had just been told to do a drop and tested positive.  The mother said she was sure it was a false positive and asked the worker to follow-up with re-testing.  The next day, after the worker learned of the death of the infant the worker received a call from the testing agency stating that the father's re-testing was negative.

| Child No. 64 | DOB: 7/2016 | DOD: 3/2018 | Accident |
|---|---|---|---|
| Age at death: | 20 months | | |
| Cause of death: | Mechanical/traumatic asphyxiation wedged between crib and wall | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**    Twenty-month-old toddler was found by her hearing-impaired grandfather suspended from a crib railing by one leg, and wedged between her crib and a dresser. She was transported by ambulance to a local hospital and then flown to a children's hospital in critical condition where she later died. It was reported that the grandfather fed the children and put them to bed; he left the room to do laundry; he returned approximately fifteen minutes later and observed the toddler and her four-month-old sibling still asleep in their respective beds.  The grandfather left the room again; returned fifteen minutes later and found the toddler unresponsive and hanging upside down outside of her crib with a blanket wrapped around her neck.  The toddler was wedged between the baby bed and the dresser.  The grandfather removed the toddler from the blanket and placed her on his bed; he performed CPR, paramedics arrived and transported her to the hospital.  The Department investigated the grandfather for death by abuse; cuts, bruises, and welts; and inadequate supervision. An allegation of sexual penetration to the toddler was added because upon initial exam it was believed that the child had genital tearing. Both grandparents were investigated for substantial risk of physical injury/environment injurious by neglect to the toddler's siblings. An autopsy performed determined the cause of death to be Wedging (traumatic/mechanical asphyxia). In July 2018, the investigation against the grandparents was unfounded.  There was insufficient evidence to support the allegation for death by abuse; cuts, bruises and welts to the toddler; inadequate supervision to toddler by grandfather. The allegation for sexual penetration was unfounded, as a sexual abuse kit was completed and there was no evidence of sexual assault and were no findings of sexual abuse at the time of the autopsy being completed.  The allegation for substantial risk of physical injury/environment injurious by neglect to the toddler's siblings by grandparents was unfounded as there was never any evidence that the siblings were placed at risk of harm.

**Prior History:**  In 2016 the deceased and her siblings resided with the grandparents and the grandparents subsequently became their legal guardians. In July 2017, the mother contacted the hotline to report that her one-year-old daughter broke her leg when she fell off a bed four days earlier, while in the care of the grandfather. The Department investigated the grandfather for bone fractures by neglect and inadequate supervision. The mother reported that the children's father was in jail.  The incident happened approximately four days prior to report being made. The child was taken to the hospital for the injury and no hotline call was made by hospital. The grandfather was changing the child on the bed and when the grandfather reached for something behind him the child fell off the bed. The grandmother stated that the child fell off the bed and was taken for medical treatment immediately after the incident occurred. Grandmother worked and grandfather stayed home with the children. Grandfather had partial hearing loss; he reported relying on reading lips, vibrations and animal senses. The child was being seen by a doctor on a regular basis; the child was treated by orthopedic doctor who believed that the incident was accidental. The investigation against the grandfather was unfounded.

| Child No. 65 | DOB: 3/2018 | DOD: 4/2018 | Accident |
|---|---|---|---|
| Age at death: | 2 weeks | | |
| Cause of death: | Asphyxia due to co-sleeping with an adult | | |
| Reason for Review: | Open intact case at the time of the child's death | | |
| Action Taken: | Investigatory review of records | | |

CHILD DEATH REPORT

**Narrative:** Two-week-old infant was found unresponsive by his mother around 6:30 a.m. The mother called 911, paramedics arrived on the scene and transported the infant to the hospital where he was pronounced deceased. When law enforcement arrived on the scene they observed a lot of alcohol in the home.  The mother was taken into police custody after she blew a .14 on the breathalyzer. The mother reported that she woke up around 2:00 a.m. fed the infant and went back to sleep. When she woke up in the morning the infant was dead. The mother stated that she slept on the couch with the infant. The mother admitted to drinking the night before; she was highly intoxicated and her story changed a few times during police interviews.  The mother had an open intact family services case and when asked why the worker did not know she was pregnant, she stated the worker never asked so she never told her.  The Department took protective custody of the infant's five siblings. During forensic interviews with the children, they all reported that the infant slept on the couch with their mother. The children all reported that their uncle and grandfather were at the home with their mother the night before the infant died. The coroner had ruled the death asphyxiation due to adult co-sleeping. The mother was arrested for reckless homicide. The investigation remained pending until the final autopsy. The mother was indicated for death by neglect and inadequate supervision due to her being highly intoxicated and co-sleeping with her infant.

**Prior History:** This family was involved in nine investigations with the Department from 2012 through 2017; five investigations were indicated and four were unfounded. There were three unfounded investigations in 2012 for substantial risk, inadequate supervision, and poison-noxious substances on the mother and her paramour. They were all expunged. In May 2014, the mother and her paramour were investigated for inadequate supervision to her six-year-old; the mother was investigated for environmental neglect to her six-year old and three-year-old, after it was reported that the six-year-old was left home alone for five hours. The home was "unlivable," as there was trash all over, dead mice on the floor, and roaches. The investigator found evidence that the mother had been attempting to rid the home of mice and roaches and the investigation against the mother was unfounded. The investigation against the mother's paramour for inadequate supervision was indicated because the paramour admitted that he was in charge of watching the six-year-old and left the home. In September 2015, the paramour was investigated and indicated for inadequate supervision to three of the children, ages three, one and four, after it was reported that while the mother was at work, the paramour left the children alone for approximately forty minutes while he went to the store. He was arrested for child endangerment. A safety plan was put in place. While this investigation was pending, in October 2015, it was reported that the paramour was drinking and passed out leaving the three-year-old unsupervised. The three-year-old was found wandering the streets and the paramour was arrested again for child endangerment. An intact family services case was opened for the family. The paramour did not participate in services. The mother ensured that the paramour would not have unsupervised contact with the children and the case was closed in May 2016. In July 2016, the paramour was investigated and indicated for inadequate supervision to the four-year-old and two-year-old, after it was reported that the paramour went to the mother's house and an argument ensued. The children were being cared for by their maternal grandfather while the mother was at work. The paramour went to the grandfather's home and asked to take the children out for ice cream. The paramour dropped them off with a woman who did not know the children and then went to the mother's home with a gun. The police were flagged down by a neighbor and found the paramour in the yard with the gun and arrested him. The children were returned to their mother and the mother assured the investigator that she would not allow contact between the paramour and the children. In January 2017, the mother and paramour were investigated and indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to all five children, after it was reported that law enforcement was dispatched for a domestic involving the mother and paramour. The ten-year-old stated that the paramour began yelling at the mother and hit her twelve times with a closed fist in the face, and shoved her against the wall. The mother had bruising to the face, a laceration to the forehead, and swelling and redness to the neck where she was choked. When the ten-year-old told the paramour to stop the paramour shoved him. The family agreed to intact family services, which was open at the time of the infant's death. In February 2017, the mother was investigated and unfounded for inadequate supervision to four of her children ages nine, six, two and four. The investigation was eventually expunged. The intact family services caseworker saw the family ten days before the infant was born. The worker did not know that the mother was pregnant. The mother had completed all services, but the intact case was still open at the time of the infant's death due to the paramour not engaging in services. The investigator took protective custody of all the children in April 2018, after the death of the infant. The children were placed with relatives and the case remains open.

| Child No. 66 | DOB: 2/2018 | DOD: 4/2018 | Accident |
|---|---|---|---|
| Age at death: | 2 months | | |
| Cause of death: | Likely suffocation due to breathing obstruction from a blanket | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

CHILD DEATH REPORT

**Narrative:** A two-month old girl was found unresponsive by her father. The father reported to police that around 4:00pm, while home alone with his two-month-old and seventeen-month-old children, the father swaddled the two-month-old and placed her on her side in the parents' bed and put a bottle in the infant's mouth. The father reported that the seventeen-month-old was sleeping in a toddler bed in the room and he laid down next to the two-month-old to take a nap. The father reported that he awoke around 11:00pm and saw the seventeen-month-old sitting up in her toddler bed and found the two-month-old unresponsive. Paramedics who were on the scene reported that the infant's body was stiff when they arrived at the home. According to the autopsy report, the cause of death is likely suffocation due to breathing obstruction from a blanket and co-sleeping in an adult bed is a contributing factor.  The Department was granted temporary custody of the seventeen-month-old and the father was indicated for death by neglect and inadequate supervision.

**Prior History:**  In 2014, prior to the deceased child's birth, the hotline was contacted alleging non-organic failure to thrive to the mother's 3-month-old child. During the child protection investigation, the mother violated the safety plan and the Department was granted temporary custody of the 3-month old. The mother was indicated for non-organic failure to thrive. Four months later, the mother could not be located by the Department.  Mother's parental rights to the half sibling of the deceased child were terminated in 2016. Six months after parental rights were terminated, the mother gave birth to a second child.  A month after the mother gave birth, the hotline was contacted alleging risk of harm to the baby given that the mother was previously uncooperative and parental rights had been terminated on a different child. The investigation was pending for six months and ultimately unfounded and closed because the mother could not be located.  Nine months after the investigation was unfounded, the mother's two-month old child died.

| Child No. 67 | DOB: 4/2015 | DOD: 4/2018 | Accidental |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 ½ years |
| Cause of death: | Multiple blunt force injuries due to motor vehicle striking pedestrian |
| Reason for Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**     Two-and-a-half-year-old toddler died as a result of head and chest trauma sustained from being struck by a minivan while walking across an intersection with his twenty-three-year-old maternal aunt who was pregnant, and also struck by the van. The toddler was taken from the scene to the nearest hospital by ambulance and then flown by helicopter to a children's hospital, where he later died. The medical examiner contacted the hotline to report the death of the toddler. The driver of the van had the light and there were concerns that the positioning of the sun was a factor.  The aunt and the toddler were walking against the light. The Department initiated an investigation for death by neglect to the toddler by his aunt. The investigation against the aunt was unfounded. The police had deemed this incident accidental and no charges were made.  Furthermore, there was no evidence presented to show the aunt was in any way impaired, physically or mentally.

**Prior History:**   In May 2016, the mother was investigated for medical neglect to the deceased toddler, after a hospital social worker contacted the hotline to report that the toddler was admitted to the burn unit in April 2016, due to a grease burn on his face and scalp. Upon discharge the mother was instructed to bring the toddler to the clinic for follow up. The hospital became concerned when the mother failed to follow up in the burn clinic on multiple occasions. The mother stated to the investigator that transportation was an issue. The investigator observed the toddler and observed the mother using the prescribed cream. The mother was instructed by the investigator to bring her toddler to the emergency room and to the burn clinic; the mother complied and the investigation was unfounded. In May 2017, the deceased toddler's maternal grandmother with whom his family lived, was investigated for inadequate supervision to her sixteen-year-old daughter. A juvenile officer contacted the hotline to report that the sixteen-year-old girl was arrested the night before for retail theft along with a teenaged friend.  She was taken to the County Probation office after her guardian was not located.  The investigator met with the grandmother and was informed that she did go and pick up her daughter at the juvenile detention center and brought her home. The grandmother did have a curfew in place for her daughter. She denied that her daughter had a history of running away, but had been hanging out with a friend who was a chronic runaway and was told to stay away from her. The investigator provided the grandmother with a list of community resources, which included counseling services for the minor.  In July 2017, the investigation was unfounded with a referral for community based services.

| Child No. 68 | DOB: 4/2018 | DOD: 5/2018 | Accident |
|---|---|---|---|
| Age at death: | 25 days | | |
| Cause of death: | Asphyxia due to overlaying and co-sleeping | | |
| Reason for Review: | Open intact family services at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**      Twenty-five-day-old infant found unresponsive after co-sleeping on a couch. The twenty-seven-year-old mother stated that she had finished nursing and burped the infant; she was sitting on the couch in an upright position; and the infant was upright in her left arm facing upward. The mother awoke twenty or twenty-five minutes later and the infant was blue. The mother started CPR and ran over to a neighbor's house to get help. The neighbor continued CPR and 911 was called. Upon arrival to the scene, the law enforcement officer observed the infant's face to be blue and there was dried blood around his mouth.  The mother explained that she was breastfeeding the infant and fell asleep. The mother pulled her shirt up and the officer observed blood all over her left breast area.  The infant was transported via ambulance to the hospital where he was pronounced deceased. The Department investigated the mother for death by neglect. During the death investigation, the mother's surviving children were placed with a relative under a safety plan; pending results of the autopsy. The autopsy performed found the cause of death to be attributed to asphyxia due to overlaying while co-sleeping on a couch.  The investigation against the mother was unfounded for death by neglect.

92

CHILD DEATH REPORT

**Prior History:** In March 2018, an intact family services case with court involvement was opened following a Department investigation in December 2017 that resulted in indicated findings of substantial risk of physical injury/environment injurious by neglect due to an incident of domestic violence between the mother and her paramour. The child protection investigator filed a petition requesting court supervision because the mother initially refused intact services. The mother was cooperative with her service plan, which included parenting, therapy/mental health for all family members and court cooperation. The intact case had only been open for two months prior to the infant's death. In addition to the intact case, there were two pending child protection investigations at the time of the infant's death. In April 2018, the hotline was contacted with allegations of substantial risk of physical injury/environment injurious after it was reported that the uncle made a threat to the mother's eight-year-old daughter that he was going to "bash her head" in and the mother did nothing. Three days later, another call came into the hotline after the mother ran into a store and her daughter who remained in the car, found mace in the car and sprayed herself in the face. Allegations of substantial risk of physical injury/environment injurious and inadequate supervision were taken for investigation. In June 2018, both investigations were unfounded. The investigation involving the uncle revealed that the uncle told the mother's daughter that if she continued to bounce on the yoga ball in the hallway upstairs, close to the stairwell, she would likely fall and bash her head. As for the other investigation, it was determined that the mother had discussed with the child to not play with mace in the past and its use for safety reasons.

| Child No. 69 | DOB: 7/1999 | DOD: 5/2018 | Accident |
|---|---|---|---|
| Age at death: | 18 years | | |
| Cause of death: | Drowning due to motor vehicle accident | | |
| Reason for Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Eighteen-year-old girl was in a car accident which resulted in her death. The teen was a passenger in a vehicle that rolled over into water. Law enforcement was dispatched to a motor vehicle accident and found a vehicle on its top partially submerged in a creek with two occupants that were still seat belted. The driver said the crash resulted from swerving to miss a deer. There was no suspicion of drug or alcohol impairment as to the driver. The driver told the officer that the deceased had smoked cannabis and drug paraphernalia was found in the deceased's belongings. The Department did not investigate the death.

**Prior History:** The mother of the deceased teen had an extensive history with the Department dating back to 1998. None of her children are in her care. In a report dated September 1998, the mother was indicated for inadequate supervision to her one-year-old (the deceased teen's sibling), after he was found playing unsupervised in the street. The deceased teen had a twin brother. In July 2003, she and her twin brother (four years of age) were taken into care for risk of harm due to repeated reports of inadequate supervision. In October 2005, the mother's parental rights to the twins (then six years of age) were terminated. In November 2005, the mother's youngest child (twenty-two months of age) came into care; the mother's parental rights to this child were also terminated. The twins and the youngest sibling were adopted by the same family. In 2014, the twins both came back into care. The deceased twin's brother came back into care through dependency. The teen receives services and is enrolled in college. The deceased teen came into care as a minor in need of authoritative intervention. At the time of the teen's death, she had a goal of independence in which she had satisfactory progress. She was compliant with services and had regular contact with her caseworker. She was employed; was participating in the employee incentive program; and had recently bought a car. She had sibling visits and was doing well in her foster home.

| Child No. 70 | DOB: 3/2018 | DOD: 6/2018 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 ½ months |
| Cause of death: | Asphyxia due to prone sleeping on an adult bed |
| Reason for Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**    Two-and-a-half-month old found unresponsive on an adult bed in a motel room by her mother.  The mother called 911, administered CPR until the paramedics arrived, and they transported the infant to the hospital where she was pronounced deceased. The Department investigated the parents for death by neglect and substantial risk of physical injury/environment injurious to health and welfare by neglect to the one-year-old sibling.  The parents both reported that they had been staying in the motel over the weekend. The mother gave the infant a bottle in the middle of the night and put her on the adult bed on her back with three pillows surrounding her. When the mother awoke in the morning the infant was found on her stomach and unresponsive.  The parents reported that the one-year-old sibling usually woke up before them and played in the motel room until they woke. The one-year-old sibling was placed with his grandfather under a safety plan. The autopsy determined that the death was caused from positional asphyxia. The investigation was indicated for death by neglect to the deceased and substantial risk to the one-year-old.

**Prior History:**  The mother had an extensive history with the Department as a child.  The mother's first encounter with the Department as a parent was in July 2017, when the hotline was called to report that the mother, her paramour and the mother's one-year-old were residing with the maternal grandmother and the home was infested with cockroaches, bed bugs, lice, and the grandmother was a hoarder. The Department investigated the mother for environmental neglect. The investigator met with the family and the one-year-old was observed to be clean and well cared for. The grandmother stated that the mother, paramour and baby moved in with her a few days ago and would stay until they could find their own place. The mother brought a lot of things with her from storage and that was why the house was cluttered. The baby did have a clean playpen and was not likely in immediate danger.  The investigator returned to the home a week later and the clutter had been reduced significantly. The investigation was unfounded. The paramour who had a daughter from a previous relationship was involved with the Department as well.  In October 2016, there was an investigation for substantial risk to his daughter by her mother that was unfounded. In February 2017, the hotline was contacted to report that there was a domestic violence incident between the mother and father that took place in front of their child. The father pushed the mother onto the bed the child was laying on. The father was arrested and was no longer living in the home. The father was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to his three-month-old daughter.

| Child No. 71 | DOB: 12/2016 | DOD: 6/2018 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 18 months |
| Cause of death: | Drowning |
| Reason for Review: | Indicated child protection investigation and open intact family services case within a year of the child's death |
| Action Taken: | Full investigation pending |

94

CHILD DEATH REPORT

**Narrative:**    Eighteenth-month-old toddler found by her twenty-two-year-old mother floating in the family swimming pool. A neighbor attempted CPR. When police arrived, they continued CPR until the paramedics arrived and transported the toddler to the hospital where she was pronounced deceased. It was reported that the mother put her children to bed the night before, which was the last time she saw her toddler alive. The mother woke up the following morning, peaked into her toddler's room to check on her and believed the toddler was still asleep.  As everyone was up and starting their day, they noticed the toddler was missing. The mother looked for her and found the toddler floating in the swimming pool. The mother pulled the toddler out of the pool, ran to a neighbor's house to call 911. The pool was approximately 14-16' round and 4' deep. There was no fence or gate around the pool and the ladder was laying on the ground next to the pool.  The Department investigated the mother for death by neglect and inadequate supervision to the toddler and substantial risk of physical injury/environment injurious by neglect to the three-year-old sibling. The mother was indicated and the three-year-old sibling came into care.

**Prior History:**   In June 2015, it was reported to the hotline that after the mother and her paramour got into an altercation, the mother became upset and left with her two-month-old infant in a vehicle while intoxicated. She was advised not to drive by law enforcement.  The Department indicated the mother for substantial risk of physical injury/environment injurious to health and welfare by neglect to her infant. In July 2015, it was reported that the mother was staying in a residence that had methamphetamine and cannabis paraphernalia located in the home and tested positive for methamphetamine and THC. The mother admitted to using meth and reported her last use was the day before. The mother reported to ongoing treatment for substance abuse since the age of twelve. The Department took protective custody of the three-month-old infant. A placement case was opened and the infant was placed in foster care.  The mother was indicated for substantial risk of physical injury. In August 2016, the sixteen-month-old child was returned to his mother and the case was closed.  In February 2017, it was reported to the hotline that an altercation had occurred between the mother and her paramour.  The mother reported to law enforcement that she wanted to file a domestic battery report against her paramour for a physical altercation. She told law enforcement that she was holding her infant as her paramour was hitting her and at one point he hit the child in the head; she said the child was not hurt. Her brother witnessed the incident. The mother reported breaking up with her paramour and was moving out of the home.  She wanted to obtain an order of protection.  There was a history of domestic violence between the mother and paramour. The Department investigated the mother for substantial risk of physical injury /environment injurious to health and welfare by neglect; and investigated the paramour for substantial risk of physical injury/environment injurious to health and welfare-incidents of violence or intimidation. In March 2017, an intact family services case was opened, so the mother could receive domestic violence education and supportive counseling.  In April 2017, the mother's ex-paramour was indicated for substantial risk of physical injury/environment injurious to health and welfare-incidents of violence or intimidation and the mother was unfounded.  The mother obtained an order of protection and charges against her ex-paramour were filed for domestic battery/bodily harm.  In May 2017, the intact family case was closed. In February 2018, it was reported to the hotline that the mother had been abusing alcohol and methamphetamines while supervising her two-year-old and one-year-old.  The Department investigated the mother for substantial risk of physical injury/environment injurious by neglect to her children. The children were placed with the maternal grandmother. The mother admitted to the investigator to random meth use and said she would be positive for a drug test if taken. The mother asked for help to get into treatment, so she could get her children back after she completes an inpatient program. The investigator discussed intact family services and the mother agreed to cooperate with services, counseling and drug testing. In the beginning of April 2018, the intact case worker spoke with the mother who was extremely agitated and said she wanted services to be over. She also said that her and the kids were moving in with her mom and her mom would keep her off drugs. The mother agreed to a drop and it was negative. It was recommended the case be closed if the mother was refusing services; had a clean drug screen; and planned to move into her mother's home. The maternal grandmother had been the caregiver for the children on numerous occasions and had demonstrated a willingness to keep the children safe. At the end of April 2018, the investigation against the mother was indicated, after she admitted to ongoing substance abuse with meth.

CHILD DEATH REPORT

NATURAL

| Child No. 72 | DOB: 7/2015 | DOD: 7/2017 | Natural |
|---|---|---|---|

| | |
|---:|:---|
| Age at death: | 23 months |
| Cause of death: | Malignant brain tumor |
| Reason for Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**     Twenty-three-month-old toddler taken to a local hospital in early June 2017 for vomiting, weight loss, changes in behavior, and loss of motor skills. The toddler was diagnosed with a brain tumor and transferred to a children's hospital where she remained until her death.  The Department did not investigate the death.

**Prior History:**  In September 2016, a shelter worker called the hotline when the twenty-six-year-old mother accused the twenty-five-year-old father of punching and trying to choke her while she was holding their then fourteen-month-old baby. Police interviewed both parents, but no arrests were made. The mother had obtained an order of protection, but the father had obtained one two days before she did. The report was taken for investigation of an allegation of substantial risk of harm by the father to the children ages one and two-years-old. The relatives with whom the family lived reported the parents often argued verbally but they had never witnessed any physical altercations. The parents had a prior history in another state; both had been investigated for inadequate supervision for which investigators found credible evidence. The mother was investigated for physical abuse of the older child; the disposition was undetermined meaning there was not enough evidence to confirm, but not enough to rule it out. During the Illinois child protection investigation, the parents separated. The investigation was unfounded.

| Child No. 73 | DOB: 4/2016 | DOD: 7/2017 | Natural |
|---|---|---|---|

| | |
|---:|:---|
| Age at death: | 1 year |
| Cause of death: | Complications of Dandy Walker Syndrome |
| Reason for Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**     One-year-old medically complex baby found unresponsive by her twenty-four-year-old mother.  The baby was taken to the hospital and pronounced deceased.  The child suffered from Epilepsy, Cerebral Palsy and Dandy Walker Syndrome, which is a rare congenital brain malformation. She required tube feeding and had not been expected to live for more than a year. The coroner confirmed with medical providers that the baby had lived longer than she was expected to and the death was natural. The hospital did a skeletal survey of the child which was negative; based on that and the doctor's confirmation of the child's illness, the coroner decided to not do an autopsy. The investigation was unfounded for death by neglect and the investigator referred the family for preventative intact services citing a history of domestic violence.

96

**Prior History:**   The mother of the deceased child has three older children. She did not have prior involvement with the Department, but the father did with his children by another woman. A year prior to the death, the father was the alleged perpetrator in multiple investigations involving the mother of another child of his. In April 2016, the father's former paramour and the father were indicated for substantial risk of harm when police responded to their home for a domestic disturbance and the father was arrested. The ex-paramour reported that the father had been violent and that night attacked her and tried to strangle her while her children were asleep in the room. The children woke up during the fight, and the former paramour left the home with the oldest child and went to a relative's home to call the police. During the investigation, the mother/ex-paramour ended the relationship with the father and he moved to a different residence. The investigator referred the mother for community based domestic violence services. In November 2016, an anonymous reporter contacted the hotline to report that the mother/ex-paramour had allowed the father back into the home despite a history of domestic violence. The mother denied that the father had returned to the home and that they only communicate about their daughter.  The neighbor who babysits for the mother reported that the father had not been around the home. The investigation against the mother/ex-paramour was unfounded for substantial risk of physical harm by neglect and inadequate supervision. In February 2017, an anonymous reporter contacted the hotline to report that the father was once again around the mother and that he and another male had gotten into a fight in the home with the children present. The Department investigated the mother and father for substantial risk of harm by neglect and environmental neglect to the children. The mother stated that there had been no incidents of violence in her home since April of 2016 when the father was arrested. She explained that she just began letting the father over after the birth of their son. The father told the investigator that he lives with his girlfriend (mother of the deceased) and has only been coming over to help with the children, and had not been coming around until recently. He reported that he had not gotten into a fight with anyone at the mother's home. The investigator spoke with the maternal grandmother who confirmed that the father lives with his girlfriend who just gave birth to twins and he just recently started coming around after her daughter gave birth to their son. She did not have any concerns about the parenting he and her daughter provided. The investigation was unfounded. In May 2017, an anonymous reporter contacted the hotline to report that the father had beaten up a woman, his former paramour. The Department investigated the former paramour and father for substantial risk of harm by neglect. The investigator spoke with the police who reported that there were no reports called on the mother or father the night before.  The mother reported that whenever the father is around a report is called on the Department; she believes it is his girlfriend (mother of the deceased) who gave birth to twins. The girlfriend was at her home the night before, creating a disturbance outside while her children were in the car.  The mother said her children were inside as it was cold and rainy.  The father reported that he had gone to the mother's home to stay. His girlfriend (the mother of the deceased) went to the house and she threw his clothes and his dog out of the car into the street and yelled obscenities, but there was no physical altercation. The investigation was unfounded.

| Child No. 74 | DOB: 11/2009 | DOD: 8/2017 | Natural |
|---|---|---|---|
| Age at death: | 7 years | | |
| Cause of death: | Aspiration pneumonia | | |
| Reason for Review: | Pending child protection investigation at the time of the child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**    Seven-year-old medically complex girl found dead lying on the couch at her residence by a family member. The child was born at 31 weeks gestation; had feeding issues and difficulty gaining weight. After birth, she spent eight weeks in the neonatal unit. In January 2010, she was readmitted because she aspirated and stopped breathing for six minutes. The child had cerebral palsy; seizure disorder; respiratory issues; had a feeding tube; and weight loss possibly related to cerebral palsy. The deceased child lived with her mother and three siblings; and two of her siblings lived with her father. There was a pending investigation at the time of her death. Allegations for death by neglect and substantial risk of physical injury/environment injurious by neglect to her three siblings were added.  An autopsy performed attributed the death to acute aspiration pneumonia, which is commonly seen in patients with cerebral palsy, and this reflects the swallowing difficulties. There were no findings of abuse or neglect. The investigation against the mother was unfounded.

**Prior History:**  An intact family case was opened in July 2010 following an indicated report for medical neglect and inadequate food to the deceased child. In April 2013, the intact case was closed with services completed. Between the close of the intact case and the child's death, there were five unfounded investigations. In August 2017, three days before the child's death, an anonymous reporter contacted the hotline with allegations of inadequate supervision and environmental neglect to the deceased. The reporter stated the child doesn't speak, is in a wheelchair and is tube fed.  The reporter stated the mother neglected bathing the child; the child smells and is left in her chair without her diaper being changed. The child had flea bites on her. The investigator went to the family home. She interviewed the mother and observed the children. She observed the child, who has cerebral palsy and is non-verbal, on the couch. The child was observed to be clean; wearing a clean diaper. She had no odor. The mother stated she bathes the child every other day. The worker observed the feeding tube and mother showed the worker the food that she must put through the child's feeding tube. The child was observed to have flea bites on her legs and arms and the mother advised that she allowed her mother and her mother's two dogs to stay in her home and the dogs brought fleas in the home. The mother did have sprays, powder and flea bombs that she was using to try to get rid of the fleas. The home had some clutter but the overall condition of the home was adequate. The investigator also spoke with multiple individuals during the investigation, none had any concerns with how the mother cared for the child or any of her children. The investigation against the mother was unfounded.

| Child No. 75 | DOB: 7/2017 | DOD: 8/2017 | Natural |
|---|---|---|---|
| Age at death: | 13 days | | |
| Cause of death: | Septic Shock from prematurity | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**    Thirteen-day old newborn born at 26 weeks gestation died at a children's hospital after going into cardiac arrest. The Department received a call to the hotline regarding the death of the newborn, stating that the death was due to the newborn being born prematurely. The reporter further stated that there were no outward signs of abuse, neglect or trauma.  No autopsy was performed.  The Department did not investigate the death.

**Prior History:**   In April 2017, the Department initiated contact with the family when the director of the daycare center reported that the three-year old brother to the deceased newborn had been involved in a couple of incidents with the boy asking girls to pull their pants down. The reporter shared that the child's behavior had been getting worse; and he had gone into a playhouse with a little girl; the little girl had pulled her pants down and the boy was touching her private area. The Department initiated an investigation of Substantial Risk of Sexual Abuse-Sexualized behavior of a young child. The investigator spoke with the director of the daycare and met with the mother, father and child. The child stated that he felt safe in his mother's home, including liking his stepfather. The child was asked if he was touched by anyone and he stated only by an eight-year-old girl in a playhouse outside of school.  He said no one else had touched him and if they did he would tell his parents and teachers. The mother took the child to the doctor who stated that it was normal for two preschoolers to have exploratory behaviors.  Both parents reported that they had not seen the reported behaviors at home.  In June 2017, the investigation was unfounded after the investigator met with the child once again and he denied anyone hurting him and denied any sexual abuse. The investigation has since been expunged.

| Child No. 76 | DOB: 8/2017 | DOD: 8/2017 | Natural |
|---|---|---|---|
| Age at death: | 0 | | |
| Cause of death: | Intrauterine Fetal Demise | | |
| Reason for Review: | Open placement case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**      A thirty-five-year old mother gave birth to twins at home.  The mother called 911 several hours after the birth; she stated that she had fallen asleep after giving birth and cutting the umbilical cords. The delay meant that the infant was not pronounced dead until the following day though the autopsy indicated the infant was a stillbirth. After the birth of the twins the mother was psychiatrically hospitalized as she was actively psychotic. The mother has been diagnosed with paranoid schizophrenia and bipolar disorder and has been hospitalized multiple times. The Department took protective custody of the surviving twin and placed the infant in foster care.  The Department conducted a death investigation; the mother was unfounded on the death allegation but indicated for substantial risk of harm to the surviving twin.

**Prior History:**     The mother first came to the attention of the Department in January 2010 when a reporter had concerns about the mother's ability to parent her eighteen-month-old baby, as the mother has been diagnosed with a serious mental illness, does not take her medications and often leaves the home. The mother was indicated for substantial risk of harm by neglect. An intact case was opened from January 2010 to May 2011. In January 2012, a health care professional reported that the mother had been observed punching her child in the stomach.  The staff member also reported the mother had hallucinations involving the child.  The mother was indicated for substantial risk of harm by abuse and the child was taken into protective custody. During the placement case, the mother engaged in mental health treatment including therapy and medication management. The child was returned home in June 2015.  In October 2015, a report came into the hotline that the mother was brought to the hospital for a psychiatric evaluation as the mother had been isolating herself, not taking her medications and not allowing family to see the child. The child was taken into protective custody and placed with a relative. The mother was indicated for substantial risk of harm by neglect. The case was adjudicated in April 2016. In September 2017, the goal was changed to substitute care pending termination of parental rights as the mother was not participating in services. In February 2018, the mother signed a specific consent allowing the relative to adopt the child. The surviving twin was placed in traditional foster care as the relative felt they could not take in the baby without quitting their job. The mother gave birth to another child in August 2018. The newborn was taken into protective custody and placed in the same traditional foster home as the surviving twin.

| Child No. 77 | DOB: 8/2017 | DOD: 9/2017 | Natural |
|---|---|---|---|

| | |
|---:|:---|
| Age at death: | 7 weeks |
| Cause of death: | Complications of Pneumonia Sepsis |
| Reason for Review: | Pending child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**  Seven-week-old infant was taken to the hospital two days before his death. The infant had been struggling to breathe approximately twelve hours prior to the mother taking the infant to the hospital. When the infant arrived at the hospital, he was already septic. Two days later he was pronounced deceased. The autopsy determined the death was from natural causes, due to sepsis from pneumonia. The death of the infant came to the attention of the Department two months later, while an investigation from August 2017 was pending.  In December 2017, the child protection investigator investigating the hotline report from August was informed by a sibling that the infant died in September. The autopsy stated the infant died of natural causes, and it was not called into the hotline. The investigator then had the infant's medical records reviewed by a child abuse pediatrician who consults with the Department. The physician stated that the records noted the infant had not eaten or slept and there were reported issues with the infant's breathing for twelve hours prior to going to the hospital.  Additionally, the infant was not taken to his well-child visit that was scheduled a month before his death. The physician informed the investigator that if the infant was brought in for medical attention sooner, the outcome might have been different. A child protection investigation for death by neglect was opened in January 2018 because of the physician's statements.  In August 2018, the investigation was indicated for death by neglect against the mother.

**Prior History:**  Both parents had a history with the Department. The mother was a youth in care from approximately 2005-2009 and the father was taken into care as an infant and adopted as a preschooler. In addition to the decedent, the mother had three other children, two school-aged youth and a preschooler. The father of the deceased infant and two siblings, also died in September 2017. The mother's first contact with the Department as a parent occurred in November 2014 when the hotline received a call regarding the mother's then four-month-old child.  The baby was admitted to the hospital two days earlier after he was seen by his pediatrician, due to concerns about the infant's lack of weight gain. The baby was born medically complex with a skin disorder and was to receive medication for the next six months. At the infant's four-month check-up, he weighed the same as he did at birth and the pediatrician had concerns regarding parental compliance with the infant's medications.  Upon hospital admission, the infant gained weight normally.  In mid -December 2014, the investigator opened an intact family case, and in early 2015 both parents were indicated for medical neglect, failure to thrive, and malnutrition.  In August 2015, the intact case successfully closed. A year later, in July 2016, another investigation against the parents for medical neglect to their then two-year-old son was unfounded. The following year, in August 2017, the hotline received a call to report that the eldest sibling was taken to the emergency room after being struck by a truck. The child was riding a bike at the grandmother's house in the road without a helmet, as his mother had given birth to a baby boy the day prior. The child sustained minor injuries to his extremities and had a concussion. The Department investigated the mother for cuts, bruises, welts, abrasions and oral injuries by neglect and inadequate supervision.  The mother reported to the investigator that she stepped into the house to show her grandmother the newborn, after telling the child not to ride his bike in the street. In September 2017, the investigator and her supervisor determined that the investigation would be unfounded, but the investigator needed to complete a final safety assessment. After not being able to locate the family for two months, she met with the eight-year-old at school who informed her that the newborn child died shortly after he was hit by the truck, and the father was killed in September. A new investigation was initiated due to the infant's death and the investigation into the bike accident was unfounded.

| Child No. 78 | DOB: 8/2017 | DOD: 10/2017 | Natural |
|---|---|---|---|
| Child No. 79 | DOB: 8/2017 | DOD: 2/2018 | Natural |

| | |
|---:|:---|
| Age at death: | Twin one - 5 weeks |
| Age of death: | Twin two - 6 months |
| Cause of death: | Cardiovascular failure due to bacterial sepsis; multi-organ failure |
| Reason for Review: | Unfounded child protection investigation within a year of children's death |
| Action Taken: | Investigatory review of records |

CHILD DEATH REPORT

**Narrative:**      Twin boys born at 28 weeks gestation died from complications of prematurity. When the twenty-three-year-old mother gave birth to the twin boys, mother and babies tested positive for marijuana. The mother had received limited prenatal care during her pregnancy. The mother presented to the hospital one day prior to the birth and found out that one of the twin's amniotic sacs was leaking and it resulted in an infection; however, the mother left the hospital against medical advice with oral antibiotics. The following day, the mother went into labor at home, returned to the hospital, and underwent an emergency cesarean section because of the infection.  Five weeks after the birth of the twins, the first twin died. The Department initiated an investigation for death by neglect to the first twin and medical neglect to the surviving twin.  During the investigation, the mother reported that she had left the hospital against medical advice for approximately six hours to attend to matters at home, but returned to the hospital shortly thereafter. She reported it was a difficult pregnancy and the twins were born with multiple medical issues. The mother shared that she was stressed, grieving for the first twin and dealing with the medical issues of the surviving twin, as her work schedule did not allow her to go to the hospital every day.  The hospital social worker told the child protection investigator that they could not conclude the first twin's death was a direct result of the mother's actions as the infant had several medical complications. Shortly after the death of the first twin, the surviving twin was transferred to a children's hospital.  The social worker at the children's hospital told the child protection investigator that she did not think the doctor would say there was medical neglect to the surviving twin because of the mother's actions prior to birth, and further stated that the surviving twin suffered from several medical issues. The physician at the children's hospital reported that the parents have been appropriate with visits and calls to the hospital. In December 2017, the surviving twin was transferred from the children's hospital to a local hospital, as the doctors determined that the surviving twin's condition to be terminal.  In February 2018, the second twin died. Following the death of the second twin, the child protection specialist referred the case to intact family services.  The investigation was unfounded for death by neglect to the first twin and no death allegation was investigated in the death of the second twin.

**Prior History:**  In November 2015, the mother came to the attention of the Department with the birth of her oldest child. Following the birth, the mother displayed symptoms of mental illness, which she had been diagnosed with previously. The father expressed concern about the mother trying to take the baby and hurt herself or hurt the baby. The parents eventually gave private guardianship of the child to a couple who were friends of the family. The investigation was indicated for substantial risk of harm by neglect, but later unfounded on appeal and has been expunged. In February 2017, a second investigation was initiated against the parent for cuts, welts and bruises to their toddler. The person who had guardianship reported that the toddler came home after visiting with his parents with a bruise to his groin and penial area.  The toddler was seen by his doctor the following day. The doctor did not note bruising and opined bruising from blunt force from the day before would have been visible.  The investigation was unfounded for cuts, bruises and welts, citing the report of the physician. The investigation has since been expunged. In April 2017, the parents went to court to end the private guardianship arrangement. In November 2017, it was reported that the parents had a history of domestic violence, used synthetic marijuana and recently their toddler wandered off for a few hours before being found in a neighbor's garage. The reporter further shared that the mother had not been taking her psychotropic medication. An investigation was initiated for inadequate supervision by both parents to the toddler and substantial risk of harm by neglect to the toddler. The parents denied the toddler getting out of the house and denied using synthetic marijuana, but reported occasional use of marijuana. The mother reported that she had a history of mental health issues. The local police said that they had never received a report of a child missing and did not have concerns about the family. The toddler's primary care physician had no concerns. In December 2017, before the investigation closed, a call came into the hotline that the mother became aggressive toward the father while the toddler was in the home.  An investigation was initiated for substantial risk of harm by neglect to the toddler. The police responded to the call finding the mother on a porch, acting erratically. When paramedics arrived, it was recommended that the mother be taken to the hospital for evaluation, but the mother refused to go. The police told the child protection investigator that there was no report of domestic violence between the parents. The father shared that he had become concerned about the mother's behavior and called his father to come and get him and the toddler. The father stated that the mother had been psychiatrically hospitalized at least eight times prior and does not take her psychotropic medications. She had also been using synthetic marijuana. The mother was psychiatrically hospitalized and the toddler went to the home of the paternal grandfather. The father tested positive for synthetic marijuana, was referred for a substance abuse assessment and participated in treatment.  The mother told the child protection investigator that she and the father were arguing and denied hitting the father.  The mother was having a hard time dealing with the death of the first twin and the condition of the surviving twin. She had arranged to go for outpatient mental health services and the child protection investigator corroborated this with the facility. In March 2018, both parents were indicated for substantial risk of harm by neglect as he had tested positive for substances while caring for the toddler alone.  An intact family case was opened. The parents ended their relationship, and the toddler remained living with the father and paternal grandparents. The mother's visits with the toddler were supervised by the maternal grandfather. As of October 2018, the mother had participated in several twice weekly clean drops and had engaged in substance use treatment and psychiatric care. The intact case remains open.

| Child No. 80 | DOB: 1/2016 | DOD: 10/2017 | Natural |
|---|---|---|---|
| Age at death: | 1 ½ years | | |
| Cause of death: | Undetermined | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**    One-and-a-half-year-old medically complex boy found unresponsive by the teen mother's boyfriend.  The mother called 911 while the boyfriend started CPR on the baby.  Paramedics arrived and the baby was pronounced deceased on the scene.  The baby had a significant medical history of Down's Syndrome, very small thyroid gland and intestinal issues that required bowel surgery, all of which could have contributed to his death. The Department did not investigate the death.

CHILD DEATH REPORT

**Prior History:**  In February 2017, the paternal step-grandmother called the hotline and reported that the eighteen-year-old mother was not giving her baby, who had several health issues, regular nebulizer treatments or doing his physical therapy exercises. The child protection investigator went to the mother's home where she lived with her parents and observed the baby in the care of his maternal grandfather. The baby was clean, smiling and not wheezing or coughing. The mother reported to the investigator the following day that the baby has in-home physical therapy weekly and has been making progress. She also reported that she gives him breathing treatments at night before bed.  The mother reported that the father and she broke up and the father has told her that he did not want her new boyfriend anywhere near the baby and that is why the father is upset. The investigator spoke with the nurse for the baby's primary care physician who reported that the baby was last seen for his twelve-month visit and that the baby was prescribed breathing treatments as needed. The doctor believed the baby to be developmentally on target and he had no concerns. The investigator interviewed the father who reported that he and the mother both love the baby and he had no concerns about her as a mother.  The investigator spoke with the physical therapist who reported that she did not have any concerns about the baby's development or the care he receives from his mother.  The therapist thought the report might be related to the parent's break-up.  The investigation against the mother was unfounded. In May 2017, the mother contacted the hotline to report that the baby had been admitted to the hospital for injuries he had when he returned from his father's home over the weekend. The mother picked up the baby after the paternal aunt called and told her that the baby would not stop crying and he wasn't eating or drinking.  When the mother arrived, she noticed a bruise on his forehead, circular marks on the baby's stomach, marks on his rib area and brown marks on his neck. The mother took the baby to the hospital; x-rays were negative, but he was admitted since he had not urinated since the night before.  The mother also reported domestic violence with the father being the aggressor. The Department investigated the father for cuts, bruises and welts and medical neglect. The hospital social worker reported that the baby had a bowel resection surgery. Hospital staff were not concerned about abuse. The mother reported that the baby had a section of his intestines removed and that was why he was fussy and not eating or drinking over the weekend.  The father admitted to the investigator that he did not give the baby his thyroid medication for two days because he did not realize it was in the diaper bag.  The physician did not have concerns with the parents and stated that missing two days of the thyroid medication was not medical neglect.   In June 2017, the investigation against the father was unfounded.

| Child No. 81 | DOB: 10/2017 | DOD: 10/2017 | Natural |
|---|---|---|---|
| Age at death: | 0 | | |
| Cause of death: | Congenital Diaphragmatic Hernia | | |
| Reason for Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**     An infant born with Congenital Diaphragmatic Hernia was transferred to a children's hospital where the newborn died later that day.  Hospital physicians determined the death was from natural causes and no autopsy was performed.  The Department did not investigate the death.

**Prior History:**  The mother and father had been investigated for allegations of environmental neglect to their other children, a two-year-old and six-month-old.  In May 2017, a relative contacted the hotline with concern about the family's living conditions. The investigator went to the home, observed the residence, both children, and interviewed the parents. The investigator observed black mold in the kitchen tiles and on the kitchen floor.  The investigator further observed a room cluttered with debris and trash. The door to the room had been removed from the hinges. While the investigator was there, the door that had been placed in front of the doorway to prevent the children from going in fell, nearly landing on the two-year-old. The mother and father agreed that the home was unsafe for the children and agreed to leave the home immediately.  The parents made arrangements to stay with a relative until the conditions in the home were addressed. In July 2017, the parents were indicated for environmental neglect to their children. The family remained living with the relative who was reported to be a good support.

CHILD DEATH REPORT

| Child No. 82 | DOB: 5/2017 | DOD: 11/2017 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 6 months |
| Cause of death: | Viral bronchitis |
| Reason for Review: | Closed Intact; indicated child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**     Six-month-old baby was found unresponsive by her mother.  The hotline received a call from law enforcement to report the death of the baby.  It was reported that the mother was visiting relatives the day prior to the death of the baby and the mother did not want to drive home, so the mother and her four children went to a friend's home and spent the night.  The mother gave the baby a bottle at around 11 p.m. and put the baby in a queen size bed with her three siblings; the bed had a sheet and a comforter.  The mother and friend slept together in a different room.  The following morning around 8 a.m. the mother checked on the children and found the baby unresponsive; she called 911.  The Department investigated the mother for death by neglect and substantial risk of physical injury/environment injurious by neglect to her three children.  An autopsy determined the cause of death to be viral bronchitis and the manner of death was natural.  The investigator spoke to a prior investigator who told her that she provided the mother with a pack-n-play in an investigation for cuts, welts, bruises to the infant's two-year-old sibling in May 2017 when the deceased baby was only five days old. She further stated that she educated the mother on safe sleep.  The mother admitted that she continued to co-sleep with her infant after education was provided.  In February 2018, the mother was indicated for death by neglect.

**Prior History:**   In May 2017, an employee from a crisis nursery reported to the hotline that the mother's two-year-old had two symmetrical bruises on each side of his bottom. The toddler was dropped off when the mother went into labor.  The parents are required to complete a body chart when they come in to show if the children had any marks or bruises and the mother did not note any marks.  The bruises on the two-year-old were noticed when the reporter was changing his diaper. The mother was investigated for cuts, bruises and welts. The mother stated the marks on her son's buttocks were eczema. The investigator observed the child's buttocks and there were no signs of abuse or bruising. The mother had just moved and had no furniture.  The mother told the investigator that she and the children were sleeping on the floor. The mother did not have a crib or bassinet for the newborn.  In June 2017, a preventative service case was opened during which time the investigator obtained beds for the children and mom; and a mattress for the futon she had, so the family would have a sofa in the living room.  The mother was also given a pack-n-play for her newborn and was educated on safe sleep. In July 2017, the investigation of the mother was unfounded and the preventative service case was closed.

| Child No. 83 | DOB: 4/2006 | DOD: 12/2017 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 11 years |
| Cause of death: | Complications of Asthma |
| Reason for Review: | Youth in care |
| Action Taken: | Investigatory review of records |

**Narrative:**  Eleven-year-old medically complex youth in care died in the hospital. Earlier that day, the youth's home health nurse brought her to a friend's birthday party.  After the party, the nurse took the youth to her home where they waited for the foster parent to pick up the youth. While at the nurse's home, the youth started to have trouble breathing, the nurse administered breathing treatments and called 911. The youth was pronounced dead shortly thereafter. The youth's medical history included prematurity, asthma, and bowel disruptions requiring a G-tube for feedings. The youth had frequent hospital stays for health issues, including respiratory issues, infectious and gastric issues related to the removal of her bowel. The Department did not investigate the death.

CHILD DEATH REPORT

**Prior History**:  The youth was hospitalized for health-related issues in late 2006. After the youth's mother did not visit or make herself available to consent for the youth's medical procedures, the hotline was called to report medical neglect. The mother was indicated for medical neglect and an intact family services case was opened in April 2007. In 2008, there were three additional child protection investigations for medical neglect, substantial risk and inadequate food and shelter against the mother. In December 2008, the Department was granted temporary custody of the youth while hospitalized. The youth's siblings remained in the care of their mother. The youth was placed in a specialized foster home due to her ongoing medical issues. After a failed placement, she returned to the hospital, where she stayed for over a year until a new specialized foster home could be identified. She was admitted to the hospital again in 2011 due to an infection and remained there for over a year until another specialized foster home was identified. In 2014, the foster parent requested to adopt the youth. Parental rights were terminated in early 2015 and the goal was changed to adoption. The Department received a hotline call in early 2017 that another child in the foster home had a black eye and belt loop marks. The Department opened an investigation for cuts bruises welts and oral abrasions, which was ultimately unfounded against the foster mother. After a brief safety plan, the Department determined it would be detrimental to the youth's health goals to be removed from the foster parent's home. The youth remained in the home with a goal of adoption, until the youth's death.

| Child No. 84 | DOB: 6/2014 | DOD: 12/2017 | Natural |
|---|---|---|---|
| Age at death: | 3 years | | |
| Cause of death: | Complications of cerebral palsy | | |
| Reason for Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**    Three-year-old medically complex girl who resided in a specialized pediatric nursing home for children with disabilities was found by nursing home staff in her bed, not breathing and unresponsive. Staff called 911 and the toddler was transported via ambulance to the hospital where she was pronounced deceased. An autopsy determined the cause of death to be complications of cerebral palsy. Due to complications at birth, the child was born with a traumatic brain injury resulting in significant delays and infantile spasm. She used a CPAP machine to help her breathe at night and had a g-tube because of difficulty swallowing food. The Department did not investigate the death.

**Prior History:**  The mother and father were both involved with the Department as children. The mother's first involvement with the Department as a parent was in April 2015, when she was indicated for poison noxious substances by neglect to her ten-month-old daughter after she accidentally overdosed her on prescribed medications.  An intact case was opened for neglect and was closed in June 2015 as service was completed. In October 2016, law enforcement contacted the hotline. It was reported that the mother contacted the police due to an altercation involving her paramour with their two-year-old daughter present. The altercation started as a verbal argument and escalated with the paramour kicking a hole in the door of the room where the mother was with her toddler. The mother was indicated for substantial risk/environment injurious by neglect and the father was indicated for substantial risk/environment injurious by abuse. The mother refused intact services, did not get an order of protection, and said the paramour left the home and was banned from coming back.  In November 2016, the hotline was contacted for the mother's failure to keep appointments for her toddler's left lower leg fracture.  The report was unfounded as it was determined the mother only missed one appointment and took the toddler to her appointment the following day. In May 2017, a nurse from a children's hospital contacted the hotline to report that the toddler who had developmental delays and a g-tube, was in the 0% for weight and had lost weight since her last visit with the doctor. The Department investigated the mother for failure to thrive. The toddler was hospitalized at the time the report was made and the mother was instructed to take the toddler for weekly weight checks after discharge from the hospital.  The mother stated that the toddler throws up a lot and that is why she is not gaining weight.  She denied neglecting her toddler.  The case was referred for intact family services.  The child protection investigator went to the home for a transitional visit and noticed food coming out of the toddler's mouth and that the toddler was having difficulty breathing.  The mother stated she had been like that since the day before and the investigator called paramedics who then transported her to the hospital.  The toddler was diagnosed with aspirations and pneumonia, and her weight was down significantly. The mother was in the process of admitting her toddler to a specialized nursing home due to her vast medical needs. A nurse contacted the Department and said that the mother had continued to miss appointments for weight checks, and had missed all appointments since June 2017.  Weight gain for the toddler had been an issue since January 2017; however, the toddler gained weight every time she was admitted to the hospital. The mother had not followed through with ensuring the toddler was receiving sufficient nutrition to gain weight. The mother did place the toddler in the specialized nursing home for children with disabilities after she was told the toddler was going to be oxygen and g-tube dependent.  In August 2017, the mother was indicated for failure to thrive.

| Child No. 85 | DOB: 1/2016 | DOD : 12/2017 | Natural |
|---|---|---|---|

|  |  |
|---|---|
| Age at death: | 23 months |
| Cause of death: | Sepsis due to Streptococcus Pyogenes |
| Reason for Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**      Twenty-seven-year-old mother and twenty-eight-year-old father called 911 after noticing their twenty-three-month old toddler had become unresponsive. The toddler was transported by ambulance to the emergency room where he was pronounced dead. The toddler had been running a high-grade fever for approximately one week prior to his death.  He was seen in the emergency room two days earlier and was discharged with instructions that the parents push fluids and give him baby Motrin. A child protection investigation was opened against the parents for death by neglect. An autopsy showed that the twenty-three-month old boy died of sepsis due to Streptococcus Pyogenes; the manner of death was ruled natural. The allegation of death by neglect against the parents was unfounded.

**Prior History:**   In October 2017, the father was investigated for allegations of substantial risk of physical injury/environment injurious to health and welfare-incidents of violence or intimidation to his six-year-old son, the deceased child's half-brother. The child complained of pain in his leg after being whipped by his father. The father admitted to disciplining the child after he had to be restrained at school twice.  The investigator interviewed the child's mother and grandmother who both denied the boy was abused. No marks or bruises were observed on the child by his father.  The report was unfounded.

CHILD DEATH REPORT

| Child No. 86 | DOB: 8/2017 | DOD: 1/2018 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 months |
| Cause of death: | Acute airway failure due to Pfeiffer Syndrome |
| Reason for Review: | Youth in care |
| Action Taken: | Investigatory review of records |

**Narrative:**  Four-month-old youth in care died in the hospital in the neonatal intensive care unit where the baby had been placed shortly after birth. The baby's mother had been psychiatrically hospitalized during her pregnancy at 30 weeks gestation for aggressive behaviors. Her toxicology results tested positive for cocaine and marijuana. The baby's mother did not receive prenatal services and the baby was exposed to drugs during the mother's pregnancy. The baby was born prematurely at 35 weeks and exposed to marijuana, cocaine and barbiturates.  The baby started to experience seizures a few minutes after birth; and after 30 minutes the baby was intubated. The baby had respiratory failure, possible neonatal seizures and dysmorphic features, congenital choanal stenosis, craniosynostosis and peripheral pulmonary stenosis. The hotline was called and an investigation was opened for substance misuse by neglect against the mother and she was later indicated.  The Department was granted temporary custody and consented for the baby to be transferred to the neonatal intensive care unit at a children's hospital for better medical care and specialty doctors. Throughout the hospital course, the baby had multiple surgeries and poor prognosis. Doctors reported that the baby had an extreme case of Pfeiffer Syndrome with midface hypoplasia; the baby had no bone structure supporting his eyes or throat. The baby suffered from severe respiratory distress and was placed in a medically induced coma. Due to ongoing complications, the baby's prognosis was poor and he died in the hospital in January 2018. The Department did not investigate the baby's death.

**Prior History:**  The mother was involved with the Department as a child. She had a long mental health history and substance abuse history. She has had multiple psychiatric hospitalizations and a diagnosis of Bipolar Disorder.  She admitted to using marijuana during all her pregnancies and in the presence of her children. She gave birth to her first child at the age of 15, and remained in her mother's home to raise the child. Her mother died in 2008, but she stayed in the home to help raise her siblings and her own child. The mother's first contact with the Department as a parent occurred in March 2009 when the hotline was contacted and it was reported that she pulled a knife on her sister. The investigation was unfounded but this incident resulted in her daughter getting placed in the Department's custody. Between 2009 and 2017, the mother gave birth to three more children; all were removed from her care due to the mother being uncooperative and noncompliant with services.  The mother was admitted to the hospital in July 2017, and diagnosed with psychosis. At the time, she was 30 weeks pregnant. She tested positive for cocaine and marijuana. An investigation was opened for substance misuse by neglect to the newborn, and temporary custody was granted to the Department. The mother was discharged from the hospital with no forwarding address; she was reported to be homeless. The mother continues to have an open placement case for the other children removed from her care.

| Child No. 87 | DOB: 1/2017 | DOD: 1/2018 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 11 months |
| Cause of death: | Myocarditis due to influenza and respiratory syncytial and virus adenovirus rhinovirus |
| Reason for Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**  In December 2017, an eleven-month-old reportedly had a fever and later in the day was found unconscious and not breathing. The baby was transported to the hospital via ambulance where he remained until his death two weeks later.  The baby was being treated for a viral illness. The Department received a call into the hotline by a relative during the hospitalization. The allegations for substantial risk of harm by neglect were pending at the time of his death. The hospital social worker confirmed that the baby was transported to the hospital after he stopped breathing; and that he had severe brain damage and was on a ventilator.  She further shared that the parents had been appropriate and the hospital did not have concerns for abuse. The treating physician told the investigator that the child was suffering from four different viruses which led to his collapse. They had found no indications of abuse or neglect and that the child was medically quite ill. The investigation was unfounded. The Department did not investigate the death.

**Prior History:**  In October 2017, the hotline received a call to report that the father had texted the mother six days earlier instructing her to pick up the baby before he killed him. It was further reported that there were no other incidents of abuse or neglect, but the family was worried because the father seemed to have an anger problem and that the father uses marijuana.   The Department investigated the father for substantial risk of harm. The investigator spoke with the mother who stated that the night of the text she had gone out with her sister and was not home to breast feed the baby so he was irritable. The mother stated that despite the text she does not believe he would ever hurt the children. She denied any violence in their relationship. The mother further stated that she had just asked the father to move out five days earlier and that he had not been spending the night. The investigator met with the father who readily admitted sending the aggressively worded text to the mother but said he never meant it literally, he would never hurt his child. The father stated he does not have the best relationship with some of the mother's relatives and that does not help. The father also stated that he was staying with mother and aunt. The mother later added that her mother had told her that she would call DCFS on the mother if she did not stop seeing the father. The mother took the baby to the doctor to be examined and the doctor noticed no injuries and no concerns. The investigation was indicated; the investigator provided a referral for parenting classes for the father and counseling for both parents.

| Child No. 88 | DOB: 3/2000 | DOD: 1/2018 | Natural |
|---|---|---|---|
| Age at death: | 17 years | | |
| Cause of death: | Stomach rupture due to bowel obstruction due to cerebral palsy | | |
| Reason for Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**       Seventeen-year-old youth in care with a complex medical history died in the hospital in January 2018.  The youth had been diagnosed with cerebral palsy, epilepsy, and intellectual disability. Over the course of the youth's life, he was diagnosed with non-organic failure to thrive multiple times and had a G-tube placed to assist with feedings. Before his death, the youth was sick with a fever, vomiting, had abdominal pain; and the foster mother noticed the youth's abdomen was tender and swollen. The youth was taken to the emergency room and then transferred to a children's hospital. A suctioning gastric tube was placed to drain the fluid accumulating in the youth's abdomen. The youth coded and healthcare providers were unable to revive him after 30 minutes of resuscitative efforts. The youth was pronounced dead, due to stomach rupture, bowel obstruction and cerebral palsy. An autopsy performed found the manner of death to be natural. The Department did not investigate the youth's death.

CHILD DEATH REPORT

**Prior History:**  At around one month of age, the youth suffered an Apparent Life-Threatening Event described as an "interrupted SIDS episode" where he stopped breathing and had a lot of blood coming out of his mouth. He was hospitalized and put on life support. Later, the youth began missing developmental milestones in his early childhood and was diagnosed with cerebral palsy, seizures, and developmental delays among other medical complications.  Following an unfounded investigation for medical neglect to the youth, an intact family services case was opened from 2007 to 2012. In May 2008, a hotline call was made by the hospital reporting that the youth was diagnosed with non-organic failure to thrive.  The youth's mother was indicated for medical neglect and failure to thrive and intact family services continued. In November 2008, the youth was again hospitalized for non-organic failure to thrive and a hotline call was made. The mother was again indicated for failure to thrive and the Department was granted Temporary Custody.  The youth returned to his mother's care in August 2011 and the department closed the case.  In October 2014, the youth was again reported to the Department hotline for weight loss of 11 pounds from January 2014 to October 2014. The mother was indicated for failure to thrive. Temporary Custody was granted to the Department again and he was placed at a residential nursing home facility.  While living at the nursing home, the youth's mother visited infrequently.  In February 2015, the youth was placed in a specialized foster home where he remained for the rest of his life.  The mother ceased contact with her son in May 2015 and she was unable to be located. The goal was changed to adoption in May 2017.

| Child No. 89 | DOB: 8/2015 | DOD: 1/2018 | Natural |
|---|---|---|---|
| Age at death: | 2 years | | |
| Cause of death: | Influenza A | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  Two-year-old toddler found unresponsive in her bed by the mother's paramour. The mother called 911; paramedics arrived on the scene and attempted to resuscitate her, and transported her to the hospital where she was pronounced deceased. The Department investigated the mother for death by neglect. The mother told the investigator that the toddler had a fever and cough prior to her death.  The mother and her paramour were giving the toddler medicine to break her fever. The mother thought she had a common cold.  The mother stated that she put the toddler to bed at around 8:30 p.m. At around 10 p.m. the paramour gave the toddler some medicine since her head was hurting her, and she went back to bed.  The paramour was later awoken by a loud noise and looked around; he didn't find anything, so he checked on the children and when he checked on the toddler she was unresponsive. The autopsy determined that the toddler had tested positive for influenza. The rest of the family was tested for influenza and two of the other children also tested positive. The investigation against the mother was unfounded. The mother agreed to intact family services, so the family could receive counseling.

**Prior History:**  In October 2017, the hotline was called by the mother's friend to report that the mother told her friend that her paramour hits the two-year-old and once held her head in the couch to stop her from crying.  The reporter also noted a history of domestic violence. The Department investigated the mother for substantial risk of physical injury/environment injurious to health and welfare by neglect to all four children.  The investigator met with the eight-year-old at his school and he denied any abuse in the home.  The investigator met with the family in their home and observed positive interactions between the mother, paramour and the children.  The investigator spoke with the four-year-old child who remembered that the paramour did push the toddler's face into the couch. The investigator then spoke with the mother and her paramour and both confirmed the incident that occurred in another state approximately six to eight months ago.  The paramour stated that he recalled from his childhood that when he cried, adults gave him a pillow to cry into. He stated he put the cushion to the toddler's face but that she could still breathe and only for a few seconds. The mother yelled at him and he knew it was wrong. He stated he loved the children. The investigation against the mother was unfounded, due to insufficient evidence. The family admitted it happened, but denied that the toddler could not breathe. The incident happened months ago and there have been no additional incidents.

| Child No. 90 | DOB: 2/2018 | DOD: 3/2018 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 6 days old |
| Cause of death: | Extreme prematurity |
| Reason for Review: | Open placement case at time of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**  Six-day-old newborn was born prematurely at 25 weeks gestation and died in the NICU. The mother tested positive for amphetamines at the infant's birth. The newborn was reported to have multiple medical conditions and hospital medical staff were unable to determine if the newborn was experiencing withdrawals, due to his premature status and medical condition.  The investigator went to the hospital and observed the newborn in the incubator and noticed his facial features were not fully developed. The investigator met with the hospital social worker, who stated that that they were unsure if the baby would survive.  The mother had not received any prenatal care. The investigator was notified by the hospital a few days later that the newborn had died. The treating physician stated that the cause of death was from extreme prematurity, but that the mother's drug use could have contributed to the early delivery and prematurity of the infant.  In April 2018, the investigation against the mother for death by neglect was indicated.

CHILD DEATH REPORT

**Prior History:**  The mother had a long history with the Department, including prior history as a child. She was in foster care for most of her childhood. The mother's first involvement with the Department as a parent was in 2003, when she had two unfounded reports against her. In 2004, the mother was indicated for inadequate supervision to her four-year-old child. In 2006, the mother was unfounded for substantial risk after the mother gave birth, and it was reported that she was not visiting and was drinking daily. The mother had no other child protection investigations until 2012, when an investigation was opened against the mother for environmental neglect and substantial risk after a hotline call reported that the mother was bi-polar and non-compliant with medication, lived in deplorable conditions and did not clean up after their dog. This investigation was unfounded on appeal. In March 2014, the mother was investigated for cuts, bruises, welts, abrasions and oral injuries to her seven-year-old child, who was non-verbal and Autistic with developmental delays. The investigation against the mother was unfounded. In April 2015, the mother was investigated for substantial risk of physical injury/environment injurious to health and welfare to her five children; and for cuts, bruises, welts, abrasions and oral injuries to her fifteen-year-old child, when it was reported that the fifteen-year-old went to school and disclosed that she had an altercation with her mother several days ago and she was physically assaulted.  The teen reports that her mother is an alcoholic and often drunk and when she can't get alcohol, she gets violent. The mother had three children that were not enrolled in school and one minor requiring a therapeutic school setting.  There was evidence to support that the mother posed a risk to the welfare of three of her children by not having them enrolled in school. The mother was indicated for substantial risk, but unfounded for cuts welts bruises because there was no evidence of cuts bruises or welts when the investigator observed her. In January 2016, the mother was investigated for substantial risk of physical injury/environment injurious to health and welfare to her five children; and for cuts, bruises, welts, abrasions and oral injuries to her fifteen-year-old daughter, when it was reported that the fifteen-year-old did not feel safe in her home.  She stated that the mother is an alcoholic who drinks every day and is physically abusive towards her and her siblings. The investigation was unfounded and eventually expunged. In October 2016, the mother was again investigated for substantial risk of physical injury/environment injurious to health and welfare by neglect to her seven children for similar allegations. After a formal investigation, the investigation was unfounded and eventually expunged. In November 2016, the mother was investigated for substantial risk of physical injury/environment injurious to health and welfare by neglect to three of her children and cuts, bruises, welts, abrasions and oral injuries by neglect to her eight-year-old son.  The mother's paramour was investigated for cuts, bruises, welts, abrasions and oral injuries to the mother's eight-year-old child; and tying/close confinement to the mother's eleven-year-old child, when it was reported that the paramour punched the eight-year-old in the face causing a bruise on the upper right cheek and the paramour locked the eleven-year-old child out on the balcony.  The paramour was arrested and pled guilty to child endangerment and confirmed the incident.  The investigation against the mother was unfounded and the investigation against the paramour was indicated. In January 2017, the mother and paramour were investigated for substantial risk of physical injury/environment injurious to health and welfare by neglect to her seven children, when it was reported that there was a domestic violence call and the mother had stabbed her paramour. This incident occurred in the presence of all the children.  The paramour was transported to the hospital for treatment. The mother was in jail at the police station. The mother admitted to drinking alcohol earlier in the day. The mother stabbed her paramour seven times. The Department took protective custody of all the children. Three of the children were placed with their father. The Department was granted temporary custody of the other four children.  Two children were placed with a maternal uncle. The paramour's two children were placed with a paternal aunt. In March 2017, the investigation was indicated for substantial risk. The placement case for the four children remains open.

| Child No. 91 | DOB: 4/2007 | DOD: 3/2018 | Natural |
|---|---|---|---|
| Age at death: | 10 years old | | |
| Cause of death: | Lung Disease/Persistent Asthma | | |
| Reason for Review: | Pending child protection investigation at the time of child's death | | |
| Action Taken: | Investigatory review of records | | |

CHILD DEATH REPORT

**Narrative:**      Ten-year-old boy with a history of medical problems including Asthma and Chronic Obstructive Pulmonary Disease (COPD) died from chronic lung disease/persistent Asthma.  Five days prior to this child's death the father took his son who had a cold and had difficulty breathing, to the emergency room. He was released home the same day with instructions to continue monitoring his condition, no medications were prescribed. Five days later the father called 911 after observing the child's breathing to be exacerbated. He was transported by ambulance to the hospital where he was pronounced dead. The hospital did not contact the Department's State Central Registry after the child died.

**Prior History:**  This family first came to the attention of the Department in early February 2018, when the hotline received a call from a teacher where the deceased child attended school.  The reporter stated that the child often missed school; had hygienic issues and chronic health problems.  The Department initiated an investigation for environmental neglect to the child by the mother and father. This investigation was pending at the time of the child's death.  Despite the child protection investigator's efforts, she had not seen the child or contacted the parents prior to the child's death. The child protection investigator had made numerous good faith attempts in February and March to contact the family in person, by phone and through correspondence. In March 2018, she attempted to see the child at school; however, the teacher informed the investigator that the child had died earlier in the month. The child protection investigator interviewed both parents on the day she learned of the child's death. Both parents denied that their son was ever dirty or neglected in any way. They further reported that the child was born prematurely and only weighed one pound; and had multiple surgeries and always had issues with his lung development; he was diagnosed with COPD, Asthma and was fed through a g-tube. Both parents admitted that the child missed several days of school because they would not send him if he had any congestion. The investigator contacted the child's physician who denied that he had any concerns of abuse or neglect and confirmed that he had seen the child prior to his death.  In April 2018, the investigation was unfounded against both parents.  The child protection investigator referred the family for grief counseling.

| Child No. 92 | DOB: 7/2017 | DOD: 3/2018 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 8 months |
| Cause of death: | Pulmonary hypertension due to atrioventricular canal defect due to bronchopulmonary dysplasia |
| Reason for Review: | Youth in care |
| Action Taken: | Investigatory review of records |

**Narrative:**      Eight-month-old medically complex baby died in the hospital. The baby, born at 29 weeks gestation with significant congenital heart defects, was admitted to the hospital a month before her death and underwent open heart surgery to repair a hole in her heart.  Following the surgery, the baby was in critical condition and never left the hospital. The baby suffered from Down's Syndrome, pulmonary hypertension, underdeveloped lungs, poor heart function and vascular complications.  The Department did not investigate the death.

CHILD DEATH REPORT

**Prior History:** In July 2015, a hospital social worker contacted the hotline to report that the thirty-four-year-old mother, who had been diagnosed with schizoaffective disorder, refused to undergo a cesarean section to prevent a multitude of possible birth defects or permanent disabilities. Following the vaginal birth, the baby had no movement and was unresponsive for the first seven minutes of life; possibly representing seizure activity. The baby was intubated and on a ventilator in the neonatal intensive care unit. The mother and baby tested positive for cocaine and marijuana. The mother had an older child at home. The Department investigated the mother for risk of harm by abuse and neglect, substance misuse by neglect and environmental neglect. The investigator met with the doctor who stated that the baby would be in the hospital for three to four weeks and they will be observing to determine his level of disability. The doctor also stated that the mother had been combative. The investigator met with the mother and asked about her decision not to have a cesarean section to prevent any birth defects; and the mother replied that she can do what she wants with her body and she did not want them to cut her stomach. The investigator explained to the mother that hopefully the baby will be able to come home but they needed to visit the home to make sure it was okay and an intact case can be opened for substance use services. The mother refused to discuss her mental illness. The investigator met with the maternal grandmother who had the two-year-old sibling in her care. The grandmother expressed concern about the mother's ability to handle a new baby especially with disabilities and feels the mother would become overwhelmed trying to care for a baby with special needs. At the time of discharge, the investigator worked out a safety plan between the mother and maternal grandmother and referred the case for intact family services; however, the mother continued to be combative and uncooperative. The investigator and supervisor made the decision to take protective custody of the children. The two-year-old was placed with the maternal grandmother and the infant was placed in a traditional foster home, as the relatives did not feel they could handle the infant's special needs. The mother was indicated for risk of harm by abuse and neglect, substance misuse by neglect and environmental neglect. During the placement case, the mother was referred for drug treatment, random urine drops, individual therapy and parenting classes. She tested positive for cocaine. She was arrested and spent time in jail. After leaving jail she spent time in shelters rejecting housing assistance. In October 2016, the infant was placed with the maternal grandmother, since she had obtained her foster care license. In January 2017, the mother told the worker she was pregnant. The grandparents committed to keeping the children, but stated they wanted guardianship. In June 2017, the mother was in a treatment program in jail. In July 2017, the hospital social worker contacted the hotline to report that the mother went to the hospital from jail to give birth to her third baby. The mother was refusing to talk to hospital staff, was not giving any information and had not named the baby. The Department investigated the mother for substantial risk of harm to her newborn. The investigator met with the mother who reported that she was living in transitional housing as a condition of her probation. She was on house arrest, had electronic monitoring and could only leave the facility to go to the doctor or court. In September 2017, the mother returned to jail after violating the terms of her probation. In September 2017, when the baby was ready for discharge, protective custody was taken. During the placement case, the infant was placed in a residential medical care facility. In October 2017, the maternal grandmother began visiting the infant with his siblings. In January 2018, the baby was placed in a specialized foster home. The maternal grandparents had decided to adopt the baby's siblings. The adoption is pending.

| Child No. 93 | DOB: 10/2017 | DOD: 3/2018 | Natural |
|---|---|---|---|
| Age at death: | 5 months | | |
| Cause of death: | Cardiopulmonary arrest due to pulmonary hypertension due to ventricular septal defect and premature birth | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**   Five-month-old baby died in the hospital where he had been hospitalized since birth. Thirty-four-year-old mother gave birth to her son prematurely at twenty-nine weeks gestation. The baby was born with multiple health complications that included: Down Syndrome, ventricular septal defect, pulmonary hypertension and chronic lung disease. The cause of death was due to medical complications as a result of his premature birth. The Department did not investigate the death.

**Prior History:** In January 2017, the hotline was contacted by a counselor who was seeing two of the three siblings of the deceased baby. It was reported that during a counseling session the six-year-old child reported that his nine-year-old brother asked him to suck his privates. The Department investigated allegations of sexual penetration, inadequate supervision, substantial risk of sexual abuse-sibling of sex abuse victim.  The child protection investigator contacted the reporter who stated that as far as she knew it happened one time; there is no indication that the children are acting out sexually; and she did not have any other concerns other than the one incident. The father stated that the six-year-old told both he and the mother that the nine-year-old shoved his head down in his privates, but nothing of a sexual nature happened. The father further stated that once he learned of this incident, he addressed the issues with the children and put them into counseling. The father said that the boys are kept separated, are supervised, doors remain open, and the boys do not bathe together.  A forensic interview took place and the six-year-old child denied anyone touched him inappropriately or asked him to touch their private parts.  No disclosures of sexual abuse were made at the forensic interview.  All evidence suggested that the parents took immediate action when they became aware of the incident and got the children into counseling.  In March 2017, the investigation was unfounded, since all persons in the household denied that such an incident took place.  A week later, a teacher contacted the hotline to report concerns that the five-year-old sibling of the other two children who is developmentally delayed was still wearing pull-ups and comes to school in dirty pull-ups. The reporter also stated that the child told her when the weather is nice and he misses school, he plays outside all day and that his mother isn't with him when he plays outside. The Department investigated the mother and father for inadequate supervision and environmental neglect. The mother denied that she intentionally sends the five-year-old to school with a dirty pull up. She reported that some days he will refuse to have it changed before he gets on the bus. The investigator also spoke with the five-year-old child and he stated that mom or dad goes outside with him and watches him; and that mom and dad change his pull up and that he does not want to be changed before he goes to school. The investigation was unfounded.

| Child No. 94 | DOB: 12/2017 | DOD: 3/2018 | Natural |
|---|---|---|---|
| Age at death: | 3 months | | |
| Cause of death: | Pulmonary hypoplasia due to multiple congenital anomalies | | |
| Reason for Review: | Youth in Care | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**      Three-month-old infant died in March 2018 at the hospital where she had been hospitalized since birth.  Thirty-four-year-old mother gave birth to her daughter prematurely at thirty-five weeks gestation, drug exposed.  In addition, the infant was born with several congenital anomalies not related to the substance exposure.  The medical examiner determined the cause of death to be pulmonary hypoplasia due to multiple congenital anomalies, no autopsy was performed. The Department did not investigate the death.

114

CHILD DEATH REPORT

**Prior History:** In May 2017, law enforcement contacted the hotline after the mother was investigated and indicated for risk of harm and inadequate supervision to her five-year-old and seven-year-old nephews after taking them to a bar and driving with them while intoxicated. In October 2017, it was reported that the mother grabbed her sixteen-year-old daughter by her hair and hit her several times during an argument. The mother was investigated for substantial risk of physical injury/environment injurious health and welfare-incident of violence or intimidation to her daughter. During the investigation, the daughter denied that her mother hit her or pulled her hair and the report was unfounded. In January 2018, after giving birth to the deceased the hospital contacted the hotline to report that mom tested positive for Clonazepam, that she was not prescribed.  Reporter further stated that mom had a history of drug use, and had little to no prenatal care.  An investigation was opened for substance misuse by neglect to the infant by mother.  The mother did not cooperate with the investigation and the Department was granted temporary custody of the infant and her nine-year-old sibling and a placement case was opened. The mother was indicated for substance misuse by neglect. The case was closed upon the death of the infant and her nine-year-old sibling's case closed in May 2018 after her father was granted guardianship and custody.

| Child No. 95 | DOB: 4/2018 | DOD: 4/2018 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 6 days |
| Cause of death: | Dandy Walker Syndrome |
| Reason for Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**    Six-day-old newborn died in the hospital after being born at 25 weeks gestation. She was diagnosed with severe Dandy Walker Syndrome, a congenital disease; and the back half of her brain hadn't developed. During the pregnancy, the mother tested positive for cocaine, and the umbilical cord results from the newborn were positive for cocaine, alcohol and methadone. The newborn's premature birth and death was attributed to Dandy Walker Syndrome, which is not correlated to drug use. The Department investigated and indicated the mother for substance misuse and death by neglect, given that the newborn tested positive for substances and the mother's use of substances during pregnancy. The mother was unfounded for substantial risk of harm to her older children as their father had full custody of the children and only allowed the mother to see them while supervised.

**Prior History:** In December 2015, the hotline received a call to report that the thirty-one-year-old mother gave birth to a newborn who tested positive for opiates. The Department investigated the mother for substance misuse by neglect. The mother admitted to the investigator that she used drugs not prescribed to her; she tested positive for opiates and cocaine during her pregnancy. The mother also reported using heroin. The investigation against the mother was indicated. The case was referred for intact family services. Both parents participated in services. In April 2016, four months into the intact case the hotline received a call to report that the mother had been brought to the hospital after overdosing on heroin at the maternal grandmother's house, while the children were present. The mother was investigated for substantial risk of harm. The father and paternal grandmother took the children home and agreed that the mother would not be with the children unsupervised; however, the mother had reached the point of being unsupervised after participating in treatment and testing clean. She took the children to her mother's home and then went out and used cocaine and oxycodone. The mother admitted to using heroin and oxycodone. As part of the open intact case the mother was participating in intensive outpatient services with weekly drug screens. The investigation against the mother was indicated. The case closed out in January 2017; the mother had successfully completed intensive outpatient treatment and aftercare. In September 2017, the hotline received a call to report that the mother and maternal aunt overdosed on heroin while the mother's one-year-old son was present in the home. Upon the arrival of EMS, the mother received medicine to revive her. The mother and aunt declined services and did not go to the hospital. The mother reported the child was visiting the mother at the maternal grandmother's home, when the mother turned pale and blood started coming from her nose. An aunt called 911 and started CPR. She then called the father to come and pick-up the one-year-old. The mother said that day was the first time she had used since March. The father obtained an order of protection against the mother and filed to get full custody of the boys. The intact case was opened from October 2017 through April 2018; the mother entered methadone treatment. The children remained with the father. The worker noted that the father had completed parenting classes. In October 2017, the mother agreed to the father having residential custody and she would have supervised visits; The mother visited on occasion, visiting less after January 2018. The case was closed at the six-month mark as the children and father were doing well. In April 2018, the hotline received a call to report that the two-year-old was outside the house alone and unattended without any adult supervision. Th grandmother and neighbors around the home stated the father was with the child outside. The investigation for inadequate supervision against the father was unfounded.

| Child No. 96 | DOB: 5/2018 | DOD: 5/2018 | Natural |
|---|---|---|---|
| Age at death: | 1 day | | |
| Cause of death: | Tension pneumothorax due to extreme prematurity | | |
| Reason for Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Thirty-six-year-old mother gave birth to twins, a boy and a girl, at 24 weeks gestation. The twins were immediately transferred to a children's hospital and the following day the girl died from complications from prematurity. The Department did not investigate the death.

116

CHILD DEATH REPORT

**Prior History:**  The mother had three prior unfounded child protection investigations; two of which (December 2013 and March 2014) have been expunged.  In October 2017, it was reported to the hotline that the mother's fifteen-year-old son told a school counselor that his mother would not allow him into the home and he had to sleep outside.  He and his mother had been arguing and she told him to leave.  The teen left for a couple of days and stayed with his aunt, who was reported to be supportive.  The Department investigated the mother for inadequate supervision. The investigator spoke with the teen who stated that he had been staying at his aunt's house, but due to the lack of room he went back to his mother's house, but his mother did not answer, so he spent the night outside. He had a key and could have gone in the house or he could have stayed at his aunt's home.  The investigator spoke with the mother who explained that the teen had left home and went to stay with his aunt when she tried to impose discipline.  She further stated that she never told her teen son to leave and she did not hear her son knock on the door when she came back home, since the air conditioner was running in her room in the back of the home. The investigator did observe a window air conditioner. The mother stated that the teen had some behavioral issues and the investigator confirmed that the police had been involved for a Minor Requiring Authoritative Intervention calls. The investigator spoke with the aunt who confirmed that the teen had been at her home and said that the mother was struggling with the teen's behavior problems.  The investigation was unfounded at the initial stage. There has been no further involvement with the Department.

| Child No. 97 | DOB: 10/2003 | DOD: 6/2018 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 14 years |
| Cause of death: | Chronic respiratory failure due to sepsis due to Seckel syndrome |
| Reason for Review: | Indicated child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**   Fourteen-year-old medically complex girl was hospitalized for approximately five months leading up to her death.  The teen was diagnosed with seizures at three-months of age; she had multiple chronic diseases and deformities, including, dwarfism and long-standing Seckel syndrome with quadriplegia and artificial nutrition via tube feedings. She had microcephaly and Psycho syndrome (slow growth of bones). The teen was non-verbal and unable to care for herself.  The cause of death was determined to be respiratory failure due to sepsis, due to Seckel syndrome. The Department did not investigate the death.

**Prior History:**  The family has an extensive history with the Department.  The first time the family came to the attention of the Department was in 2004, after Norman Funds were requested through a child welfare specialist referral. In August 2011, the hotline received a call to report that the family was living in deplorable conditions with a severely disabled eight-year-old child (the deceased). The Department investigated the mother, father and grandmother for environmental neglect, which was indicated; and for substantial risk of physical injury/environment injurious to health and welfare by neglect, which was unfounded and eventually expunged.   In January 2015, the hotline received a call to report that the mother's paramour slapped their eight-month-old baby in the face. The paramour admitted that he did "pop" the baby in the mouth when she spits so she would stop.  The investigation for substantial risk of physical injury/environment injurious to health and welfare to the baby was indicated and the investigation for inadequate supervision was unfounded. The family was referred for intact family services. In May 2015, the mother, her paramour and their baby moved out of state; and the disabled child was left in the care of her maternal grandmother, the grandmother's paramour, and her father. The mother's disabled daughter was assessed safe in the care of her father and grandmother. The intact case was closed. After the intact case closed there were six unfounded investigations from May 2015 through March 2018 for inadequate supervision, environmental neglect, medical neglect, substantial risk of physical injury/environment injurious to health and welfare by neglect. These investigations were ultimately expunged.  The girl continued to live with her father and grandmother until she was admitted to the hospital in early 2018 for failing health. She remained in the hospital until her death. The grandmother, with whom she lived, was indicated for environmental neglect in early 2018.

CHILD DEATH REPORT

| Child No. 98 | DOB: 4/2018 | DOD: 6/2018 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 ½ months |
| Cause of death: | Sudden infant death syndrome (SIDS) |
| Reason for Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**   Two-and-a-half-month-old found in her bassinet unresponsive by her father. He contacted 911, and the baby was transported to the hospital where she was pronounced deceased. The Department investigated the mother and father for death by neglect. The father stated that he fed the baby and laid her in the bassinet, with two blankets, one under the baby and one that covered her.  The father went to check on the baby twenty minutes later and noticed she had vomit around her mouth. He contacted 911, cleaned the vomit out of her mouth and started CPR.  Paramedics arrived on the scene and transported the baby via ambulance to the hospital where she was pronounced deceased.  The autopsy attributed the death to sudden infant death syndrome (SIDS).  The investigation remains unfounded pending approval.

**Prior History:**  The father had a long history with the Department as a child and an adult. The father and his ex-wife had five unfounded investigations between 2014 and 2015. The deceased's mother's first contact with the Department was in August 2014, when she was investigated for substantial risk to the deceased's sibling, which was unfounded and expunged. In 2016, the father and his ex-wife, were going through a divorce, and the ex-wife was indicated for substantial risk to her children after showing up to the police station stating someone took her child out of state. She was acting erratically and the police did not know if the mother was on drugs or had mental health issues. The Department was granted temporary custody of the children, and the one child she had with the father was returned home to live with the father in August 2017.  In October 2017, the hotline received a call from the father's ex-wife to report that their three-year-old daughter was being physically abused by her father and there was domestic violence in the home between the father and his wife. She also reported that they had gotten into an argument and the father punched her in the face.  The investigator spoke with the ex-wife's caseworker, who had no concerns about the child in the father's care. The worker stated that the ex-wife did not tell her about the incident until she missed a visit and was complaining. She stated that the ex-wife had told her that she would rather the child come back into the care of the Department than stay with her father. The father told the investigator that he had recently obtained an order of protection against his ex-wife, and the judge had advised that one more visit between his ex-wife and the child could occur before the no contact order. The ex-wife had brought her paramour with her to the visit. When the father realized the visit wasn't going well, the adults went outside. The father reported that his ex-wife told her paramour to hit her and then say the father was the one who hit her. The police were called and the father was arrested. The father stated some of his neighbors saw the incident and could vouch for him. He denied that he ever hit his ex-wife. The father stated that his ex-wife told her caseworker that she only went to the father's house to cause trouble and get the child removed from his care; which the ex-wife's caseworker confirmed. The wife (mother of the deceased child) confirmed the father's version of events and denied any domestic violence in the home between her and the father.  The investigator noted that the wife was pregnant and due in April 2018. The investigator observed the children, who appeared healthy and safe. The investigator returned to speak with the children and both children reported feeling safe in their home and denied any maltreatment. The investigator also discussed safe sleeping practices with the parents for when the new baby arrives in April 2018.  The ex-wife could not be located during this investigation to be interviewed. In November 2017, the investigation was unfounded.

CHILD DEATH REPORT

NINETEEN-YEAR DEATH RETROSPECTIVE

| FISCAL YEAR | 2000-12 | | 2013 | | 2014 | | 2015 | | 2016 | | 2017 | | 2018 | | TOTAL | | AVERAGES | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CASE STATUS | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | 00-18 | % |
| Youth in Care | 335 | 24.1% | 15 | 16.1% | 19 | 19.2% | 24 | 25.0% | 17 | 17.0% | 20 | 18.5% | 16 | 16.3% | 446 | 23% | 24 | 23% |
| Unfounded DCP | 276 | 19.9% | 19 | 20.4% | 28 | 28.3% | 30 | 31.3% | 23 | 23.0% | 33 | 30.6% | 37 | 37.8% | 446 | 23% | 23 | 22% |
| Pending DCP | 159 | 11.5% | 12 | 12.9% | 16 | 16.2% | 14 | 14.6% | 26 | 26.0% | 22 | 20.4% | 12 | 12.2% | 261 | 13% | 14 | 13% |
| Indicated DCP | 100 | 7.2% | 10 | 10.8% | 6 | 6.1% | 5 | 5.2% | 8 | 8.0% | 8 | 7.4% | 15 | 15.3% | 152 | 8% | 8 | 8% |
| Child of Youth in Care | 53 | 3.8% | 0 | 0.0% | 0 | 0.0% | 1 | 1.0% | 2 | 2.0% | 1 | 0.9% | 1 | 1.0% | 58 | 3% | 3 | 3% |
| Open Intact | 214 | 15.4% | 7 | 7.5% | 10 | 10.1% | 3 | 3.1% | 9 | 9.0% | 15 | 13.9% | 8 | 8.2% | 266 | 13% | 14 | 13% |
| Closed Intact | 54 | 3.9% | 8 | 8.6% | 2 | 2.0% | 9 | 9.4% | 7 | 7.0% | 6 | 5.6% | 3 | 3.1% | 89 | 4% | 5 | 4% |
| Open Placement/ Split Custody | 78 | 5.6% | 10 | 10.8% | 13 | 13.1% | 6 | 6.3% | 3 | 3.0% | 2 | 1.9% | 3 | 3.1% | 115 | 6% | 6 | 6% |
| Closed Placement/ Return Home | 20 | 1.4% | 4 | 4.3% | 0 | 0.0% | 0 | 0.0% | 1 | 1.0% | 0 | 0.0% | 0 | 0.0% | 25 | 1% | 1 | 1% |
| Others | 99 | 7.1% | 8 | 8.6% | 5 | 5.1% | 4 | 4.2% | 4 | 4.0% | 1 | 0.9% | 3 | 3.1% | 124 | 6% | 7 | 6% |
| TOTAL | 1388 | 100% | 93 | 100% | 99 | 100% | 96 | 100% | 100 | 100% | 108 | 100% | 98 | 100% | 1,982 | 100% | 105 | 100% |

| FISCAL YEAR | 00-12 | 13 | 14 | 15 | 16 | 17 | 18 | Totals |
|---|---|---|---|---|---|---|---|---|
| Total Deaths | 1388 | 93 | 99 | 96 | 100 | 108 | 98 | 1982 |
| Youth in Care | 335 | 15 | 19 | 24 | 17 | 20 | 16 | 446 |
| Natural | 186 | 6 | 8 | 10 | 5 | 6 | 5 | 226 |
| Accident | 48 | 2 | 4 | 3 | 2 | 3 | 4 | 66 |
| Homicide | 69 | 3 | 4 | 9 | 7 | 6 | 4 | 102 |
| Suicide | 16 | 1 | 1 | 1 | 2 | 3 | 0 | 24 |
| Undetermined | 16 | 3 | 2 | 1 | 1 | 2 | 3 | 28 |
| Unfounded Investigation | 276 | 19 | 28 | 30 | 23 | 33 | 37 | 446 |
| Natural | 98 | 3 | 5 | 5 | 8 | 8 | 12 | 139 |
| Accident | 92 | 7 | 9 | 12 | 8 | 13 | 11 | 152 |
| Homicide | 47 | 3 | 6 | 4 | 4 | 6 | 4 | 74 |
| Suicide | 10 | 0 | 1 | 2 | 2 | 1 | 0 | 16 |
| Undetermined | 29 | 6 | 7 | 7 | 1 | 5 | 10 | 65 |
| Pending Investigation | 159 | 12 | 16 | 14 | 26 | 22 | 12 | 261 |
| Natural | 52 | 2 | 5 | 3 | 8 | 7 | 2 | 79 |
| Accident | 45 | 3 | 2 | 4 | 3 | 8 | 4 | 69 |
| Homicide | 33 | 3 | 1 | 3 | 3 | 1 | 4 | 48 |
| Suicide | 3 | 0 | 0 | 0 | 2 | 0 | 0 | 5 |
| Undetermined | 26 | 4 | 8 | 4 | 10 | 6 | 2 | 60 |
| Indicated Investigation | 100 | 10 | 6 | 5 | 8 | 8 | 15 | 152 |
| Natural | 39 | 1 | 0 | 1 | 3 | 3 | 4 | 51 |
| Accident | 34 | 6 | 1 | 1 | 3 | 3 | 2 | 50 |
| Homicide | 13 | 1 | 1 | 1 | 1 | 1 | 4 | 22 |
| Suicide | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 3 |
| Undetermined | 13 | 1 | 4 | 2 | 0 | 1 | 5 | 26 |
| Child of a Youth in Care | 53 | 0 | 0 | 1 | 2 | 1 | 1 | 58 |
| Natural | 23 | 0 | 0 | 0 | 0 | 1 | 0 | 24 |
| Accident | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 12 |
| Homicide | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 10 | 0 | 0 | 1 | 2 | 0 | 1 | 14 |
| Open Intact | 214 | 7 | 10 | 3 | 9 | 15 | 8 | 266 |
| Natural | 103 | 1 | 4 | 0 | 2 | 5 | 0 | 115 |
| Accident | 52 | 4 | 3 | 1 | 2 | 4 | 5 | 71 |
| Homicide | 28 | 0 | 2 | 1 | 1 | 2 | 1 | 35 |
| Suicide | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 3 |
| Undetermined | 29 | 2 | 1 | 0 | 4 | 4 | 2 | 42 |

CHILD DEATH REPORT

| FISCAL YEAR | 00-12 | 13 | 14 | 15 | 16 | 17 | 18 | Totals |
|---|---|---|---|---|---|---|---|---|
| Closed Intact | 54 | 8 | 2 | 9 | 7 | 6 | 3 | 89 |
| Natural | 19 | 1 | 1 | 3 | 1 | 2 | 1 | 28 |
| Accident | 19 | 3 | 0 | 1 | 2 | 1 | 1 | 27 |
| Homicide | 10 | 2 | 1 | 2 | 1 | 2 | 0 | 18 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 6 | 2 | 0 | 3 | 3 | 1 | 1 | 16 |
| Open Placement/Split Custody | 78 | 10 | 13 | 6 | 3 | 2 | 3 | 115 |
| Natural | 47 | 5 | 10 | 4 | 1 | 2 | 2 | 71 |
| Accident | 12 | 3 | 1 | 1 | 0 | 0 | 0 | 17 |
| Homicide | 8 | 1 | 2 | 0 | 0 | 0 | 1 | 12 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 11 | 1 | 0 | 1 | 2 | 0 | 0 | 15 |
| Closed Placement | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 12 |
| Natural | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| Accident | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Homicide | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Adopted | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| Former Youth in Care | 14 | 2 | 4 | 2 | 1 | 0 | 0 | 23 |
| Return Home | 18 | 4 | 0 | 0 | 1 | 0 | 0 | 23 |
| Interstate compact | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Preventive services | 34 | 1 | 0 | 0 | 0 | 1 | 1 | 37 |
| Subsidized Guardianship | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Child of former Youth in Care | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| Extended family support | 11 | 0 | 0 | 2 | 1 | 0 | 0 | 14 |
| Child Welfare Referral | 17 | 5 | 1 | 0 | 2 | 0 | 2 | 27 |

121

122

| PART III: GENERAL INVESTIGATIONS |
| --- |

## GENERAL INVESTIGATION 1

| ISSUE | In the wake of the death of a toddler whose family had been the subject of 11 child protection investigations in the two years prior to her death, a news agency reported that some Department employees disclosed that child protection supervisors in the Field Office offered an incentive program that encouraged investigators to close cases early. Following the toddler's death, the Department published a 22 page report about the Department's interactions with the family.  Subsequently, a commissioned external entity was asked to review the Department's actions in the case and make recommendations. Neither the Department's Report or the external entity's report identified the closing incentive issue or other organizational problems that may have contributed to the errors made by the field. |
| --- | --- |

| DISCUSSION | The Field Office is within the DCFS Northern Region. Fully staffed, the Field Office had five child protection teams with 27 child protection investigators and one supervisor per team. At the time that the toddler's family was involved with the Department, the entire Northern Region of DCFS, including the Field Office, was understaffed (at times as low as 66% understaffed), resulting in excessive investigative caseloads. Office caseloads were particularly high in the second half of calendar year 2016. Regional administrators were notifying upper level DCFS management weekly of the ongoing staffing crisis. |
| --- | --- |

In December 2016, the Area Administrator of the Field Office offered a one-time award of a $100 gift card to whichever investigator could close the most cases in January 2017.

There were, in fact, various types of incentive programs for early closure of cases throughout the State at that time. One county had instituted the Blue Star Program, which tracked and congratulated investigators for closures. In 2016, the Central Region challenged investigators to close 12 investigations per month. Those investigators who completed 12 investigations were incentivized with food parties or public acknowledgment. One team supervisor rewarded investigators for closing cases by temporarily removing them from assignment rotation (penalizing those who did not close enough cases with even higher caseloads). In the Southern Region, three different supervisors provided gift cards for closure.

*Caseload Requirements*

In 1991, the Department entered into a federal consent decree, known as the BH Consent Decree. The purpose of the BH Consent Decree was "to assure that DCFS provides children with at least minimally adequate care," including the need to ensure that "children shall be free from foreseeable and preventable physical harm." To implement these standards, the Consent Decree provides that investigators should not receive more than 153 investigations per year (just under an average of 13 cases per month).

Child Protection investigations vary widely in the amount of work needed, but all investigations include record retrieval, record reviews, scene investigation, multiple interviews, documentation, notification of findings, scheduling, travel, meeting with the Assistant State's Attorney, when necessary, to screen a case into court or seek a protective order attending court, if necessary, and providing testimony. A full-time investigator with an investigative caseload of 12 would have roughly 9 hours to complete all tasks on a given investigation.

Management of caseloads required watching for population shifts, vacancies and increases in accepted hotline reports for investigations in each area of the State, as well as planning for expected attrition and bureaucratic hiring delays.

By the beginning of July 2016, the Department had over 1000 investigations in excess of the number that could be assigned at a ratio of 1:10.

*Other Management Initiatives*
Regionally, some areas were worse than others. In February 2015, the local Field Office had 3 vacancies and Northern Region, as a whole, had 9 vacancies. By August 2015, the Field Office had 11 vacancies and the Northern Region had 29. By April 2016, the number of vacancies in the Northern Region had jumped to 50.

The OIG investigation disclosed that a large contributing factor to the caseload problem was that the prior Director had several management initiatives that seemed to take priority over caseload distribution work.

The OIG investigation identified the following management initiatives under the prior Director that were competing with caseload management work:

- The Child Welfare Summit – A multiple day program intended to bring together Department staff, private agency staff, attorneys and judges to discuss current problems in child welfare. Notably, none of the topics included the growing investigative caseload problem or the difficulties in hiring skilled investigators in certain regions.

- Predictive Analytics – The Department was pursuing the use of data analytics in providing child welfare services to families. The initiative provided several million dollars to an out-of-state for-profit data analytics firm that used a proprietary algorithm to identify cases most likely to result in death or serious injury. The result was that the entity notified case managers in 25-50% of cases analyzed that there was over a 90% probability of death or serious injury in the next 2 years. In addition to the contracts, several new department staff were added to assist with the data analytic process.

  The contract has been discontinued.  The contractor never shared with the Department what their work had disclosed in terms of systemic or organizational issues.

- Immersion Sites – Four areas in the state were identified for providing more intensive services and to pilot practice improvement. This initiative is still in force.

- Success Academy – The prior Director, in conjunction with the External Entity, developed a leadership training program that was based on business models piloted by for-profit businesses. The Academy challenged future leaders to examine problems in the field. The ideal of providing incentives for closing investigation was offered during Academy training. The Administrator who had provided the closure incentives was engaged in Success Academy. There is no indication that anyone in existing management or training applied critical thinking to assess the potential for harm of such a program in the atmosphere of unmanageable caseloads.

The OIG investigation found that prior management did not assess the true cost of high investigative caseloads to our families. High caseloads result in high staff turnover and can force investigators to take dangerous shortcuts.

The OIG investigation also found that the monthly report that the Department was using to analyze caseloads did not provide a realistic picture of the problem because it included investigators who were on leave or otherwise unavailable to take cases. In addition, new staff would not be considered until a running average caseload for the last year showed continuing need. This prevented DCFS management from reacting to a spike in new reports until several months after the problem arose.

124

In addition, the Department did not have a centralized system for addressing caseload problems, so managers with high caseloads developed an informal system in which they would call around the state to other areas and request staff be detailed to their office. One manager estimated that 80% of her time was spent managing caseloads.

It is predictable that when a large structural problem goes unaddressed, efforts to tackle the symptom (cases not closed timely) will not help and frequently, will harm. That is what happened when management encouraged incentives for closure rather than addressing the caseload problem.

Soon after the new Director began, she implemented a new program, Deferred Action Investigators, which permits the Department to hire investigators in anticipation of vacancies and the caseload numbers began to come down.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. Work with local community colleges to develop curriculum for a Certification Program that incorporates Core Training to create a pipeline of new hires in areas that have trouble hiring sufficient staff.**

The Department does not agree.  The Department is already addressing this issue by doing the following: 1) Working with schools of social work and recruiting out of these schools. 2) Establishing a pipeline of new hires and using interns who become certified. 3) Negotiating with the union on several options in hot spot areas such as Rockford, Waukegan and Freeport. 4.) Expanding the degree requirements to include special education.

**2. A new column should be added to the Caseload and Vacancy Report to identify a 3-month running average, in addition to the 12 month running average of Intake, so that the Department can be more responsive to trending increases.**

The Department is already using a new report from Budget to more accurately reflect current caseloads. Operations convenes a monthly call with OES, Budget and Legal and each region to get a full understanding of what is happening on the ground level. The divisions now track workers in training, on vacation and on medical leave on a weekly basis to understand the real operating needs of the region.

**3. Management should develop a temporary workforce (75-day contractors) in major urban areas to address predictable seasonal shifts in intake.**

The Department actively attempts to fill 75-day appointment positions but has found that there is very little interest in direct service work in areas where we have a need.  We will continue to hire where we have interested, viable candidates.

**4. The Department should explore an agreement with American Federation of State, County and Municipal Employees (AFSCME) to commit new hires to stay in the Office they were hired into for a minimum of 2 years, absent exigent circumstances.**

The Department is currently in negotiations with the union on various proposals which cannot be discussed until and unless agreements are reached.

**5. Management must have a database that makes it easy to track office caseloads in real time, to permit a more efficient system of moving/detailing staff between offices for emergencies.**

The report which Budget and Finance issues monitors caseloads in real time.

## GENERAL INVESTIGATION 2

| ALLEGATION | The Office of Inspector General received a complaint alleging that the Department's Chief Information Officer was unqualified for the job and had falsified credentials. |
| --- | --- |

**INVESTIGATION** The Department's Chief Information Officer (CIO) is responsible for developing the Department's data and information systems and maintaining data security. While not required for the position, a Project Management Professional (PMP) Certification is a widely respected credential for high-level management careers. The certification requires extensive and verified management experience as part of the application process and a passing grade on a four hour test. The CIO had listed PMP Certification on his cover letter, resume and his posted Management Biography and he had claimed to have PMP Certification during his job interview. The OIG learned from the Project Management Institute (PMI) that the CIO had never been certified.

The CIO's resume also claimed a Certificate in Executive Management from a particular University. When the University was contacted, University officials stated that they did not offer such a certificate and did not have any record of the CIO attending their institution. When the OIG asked the CIO for a copy of the Certificate, he stated that he had placed it in a storage unit and his belongings had been sold for failure to pay storage fees.

Much of the job experience claimed in his State Job Application concerned work he allegedly performed for a company that he owned, and could not be verified. The CIO failed to disclose that he worked for another state agency from which he was discharged during his probationary period for poor work performance, falsification of department documents and discourteous behavior.

The interview process for the $115,000/year position was conducted by the prior Director of the Department and two contractors, whose contract the CIO would be overseeing. A Department Manager reviewed his application and checked references, but the Manager failed to note obvious discrepancies in the submitted materials and failed to verify the information that was submitted.

The OIG noted that in a submission to the federal court concerning compliance with the BH Consent Decree, the Department had represented that a new CIO had been hired, who was certified by PMI.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**  **1.  The Chief Information Officer should be discharged with a "Do Not Rehire" notation in his personnel file.**

The CIO was discharged from the Department.

**2.  The Department should ensure that contractors are not directly involved in the hiring process of anyone who may be providing contract oversight in the future.**

The Department agrees.  The Director and her senior staff shall ensure this will be monitored and not reoccur.

**3.  The Department Manager should review this report and be counseled concerning her failure to critically review the application materials and verify the information provided.  The Manager should also be counseled on creating a conflict of interest by involving consultants in the hiring of the manager who would be monitoring their contract.**

126

3:18-cv-03085-SEM-TSH   # 62-4   Page 133 of 216

The Department agrees.  The report was shared with the Department Manager and she received a counseling session.

**4. For high level management hires, the Department must verify prior employment and critical credentials, even if not required by the job description, to ensure that trustworthy individuals are hired.**

The Department agrees with this recommendation and routinely verifies employment history and credentials for all employees, especially when such credentials are requested for certain positions.   In this case, the CIO falsified information on his application, so the Department was unable to verify his previous State employment.  Since this case, the Office of Employee Services has put in place a system that will flag someone who has had previous State employment and who may not have acknowledged it on their application.

***OIG Comment: In this case, the Department did not verify the prior non-state employment on the CIO's application.  In addition to the application, the CIO submitted a form reporting previous employment at the State agency, so had someone reviewed the submissions with the application, they would have noted many discrepancies.  While ensuring that other state employment is identified, it is not sufficient since it would not have identified the prior work history information that was also untrue. The only thing that will address the problem is if a particular entity, whether it is the interviewer or the personnel office, had the responsibility to critically examine all documents and verify information provided.***

GENERAL INVESTIGATIONS

GENERAL INVESTIGATION 3

| ALLEGATION | A substance abuse assessment intake worker engaged in a sexual relationship with a mother for whom he had completed a court ordered substance abuse evaluation. |

| INVESTIGATION | A mother whose two children, ages three months and six years, were taken in to the Department's custody for allegations of abuse, was ordered by the Juvenile Court to complete a substance abuse assessment. She was referred to the agency designated to perform substance abuse assessments for that court, and a substance abuse evaluator was assigned and completed the assessment. |

The children's relative foster parent told the Integrated Assessment Clinical Screener that the mother said she went out on a date with someone who evaluated her for Court. The mother told Inspector General investigators that shortly after her court ordered substance abuse assessment, the substance abuse evaluator invited her to accompany him to a motel on a Friday afternoon and she accepted. She reported they were there for three hours and engaged in sexual intercourse.

IG investigators corroborated the mother's story with the motel records. Those records revealed the name, address, make of car, license number, and credit card receipt of the substance abuse evaluator. The documented date of this transaction was the same date on which the mother said she was at the motel with the substance abuse evaluator.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The substance abuse evaluator should be disciplined up to and including discharge in accordance with agency personnel policies.** |

The Inspector General shared a redacted report with the private agency. The employee was discharged.

**2. This report should be shared with the Illinois Alcohol and Other Drug Abuse Professional Certification Association, Inc.**

The Inspector General shared the report with the Illinois Alcohol and Other Drug Abuse Professional Certification Association, Inc.

**GENERAL INVESTIGATION 4**

**ALLEGATION**

The Inspector General received a complaint alleging that a former private agency employee who in 2014 was indicated as a perpetrator of sexual penetration and sexual molestation of a 16 year-old youth-in-care and may have been criminally convicted for his actions, still held an active Child Welfare Employee License issued by the Department.

**INVESTIGATION**

In 2018, Inspector General investigators verified that the former employee still held an active Child Welfare Employee License issued by the Department and confirmed that the Licensee first came to the attention of the Department in 2014 when the hotline received a report that the Licensee, then employed as a counselor at a private agency, had been arrested and criminally charged for having a sexual relationship with a sixteen-year-old youth residing at the agency where the Licensee was employed. The Department investigated and indicated the Licensee on allegations of sexual penetration and sexual molestation. Two months later, the Licensee was convicted of felony criminal sexual assault by an individual holding a position of trust, authority, or supervision over a victim aged 13-17 and sentenced to seven years in the Illinois Department of Corrections. The IG investigators further confirmed that the Licensee is incarcerated in an IDOC facility, has a projected discharge date of January 2020, and is registered as a child sex offender-sexual predator on the Illinois Sex Offender Registry.

**LICENSURE ACTION**

**The Office of the Inspector General filed administrative charges seeking revocation of the former employee's Child Welfare Employee License. The license was revoked.**

**GENERAL INVESTIGATION 5**

| | |
|---|---|
| **ALLEGATION** | A Department employee gave an "unnamed person" confidential information from a child protection hotline report, and that "unnamed person" gave this information to the alleged perpetrator of the resulting child protection investigation. |

**INVESTIGATION** During the child protection investigation, the child protection investigator ("CPI") interviewed the alleged perpetrator. The alleged perpetrator notified the CPI that he had received a screen shot of the child protection hotline narrative, including the reporter's name and occupation, and provided it to the CPI. The alleged perpetrator stated that he received this printout from someone who wanted to remain anonymous ("unnamed person"). The alleged perpetrated also told the CPI the first name of the Department employee who had provided the screenshot to the "unnamed person."

The same day, the CPI reported the confidentiality breach to her supervisor and provided the screen shot the alleged perpetrator gave to her. Inspector General investigators confirmed the identity of the Department employee stating that she was the only one in the area with that first name who had access to that investigation in the State Automated Child Welfare Information System (SACWIS). At the request of the Area Administrator, the supervisor took a picture of the Department employee at her work station for comparison of her screen saver to the strip of screen saver that was evident in the screen shot. The background screens at the bottom of the two screens in both pictures appeared to be the same. The supervisor further confirmed that there were no other computers in the office with that screen saver on their monitor screen.

IG investigators subpoenaed and analyzed personal phone records from the Department employee and the alleged perpetrator. The IG investigators found one phone number in common between the two records and were able to identify the "unnamed person."

In an interview with the IG investigator, the "unnamed person", now identified, confirmed that he provided the screen shot to the alleged perpetrator and further stated that he knew the Department employee and her husband.

In an interview with an IG investigator, the Department employee denied sharing confidential information with anyone outside the Department. When asked about her relationship with this person the Department employee initially said she knew him casually. She guessed that she spoke to him twice a month on average. She said she had not seen him socially for almost two years. The Department employee's phone records showed daily calls and text messages with this "unnamed person" including a phone conversation the night before the IG investigator interviewed the "unnamed person." The Department employee said it was likely her husband who had been talking to him, as he often uses her phone when she is home. The phone records confirmed that most of the calls and text messages were made after work.

In addition to the above, the IG investigators reviewed this Department employee's e-mails and found that she had a substantial amount of personal emails sent to both her mother and a friend who works at another state agency. Of grave concern, the employee had used the state email system to share confidential report information with her mother.

Subsequent to the allegations, the Department put the Department employee on administrative leave pending the outcome of the IG investigation.

130

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The Department employee should be disciplined up to and including discharge for violating the Department Confidentiality Policy and personal use of the state email system.** |
|---|---|

The Department agrees. The Department employee was discharged from the Department, and through a grievance settlement, the discharge was reversed to a resignation with no reinstatement to DCFS.

**2. The Department should ensure that there are adequate supports available to the Department employee during the disciplinary process. For more information, the designated supports should contact the Office of the Inspector General prior to any disciplinary meeting with the Department employee.**

The Department agrees.

## GENERAL INVESTIGATION 6

| ALLEGATION | A child protection investigator falsified several contact notes in SACWIS. |
|---|---|

**INVESTIGATION**   The child protection investigator was assigned to investigate an abuse allegation of injuries to a non-ambulatory and functionally non-verbal child.  The child's family was receiving intact family services at the time of the hotline report.  Intact family services were initiated to assist the mother in securing necessary medical treatment for the child and his twin who were diagnosed with Cerebral Palsy.  The intact family services worker entered timely notes in the SACWIS intact family services record indicating the child protection investigator had not contacted the mother in the month following the hotline call.

The SACWIS investigation record revealed that, with the exception of two supervision notes and the closing CERAP, the child protection investigator created the entire investigation the day before the investigation was closed.  The investigator uploaded three photos of the children, entered one case note, eleven contact notes and submitted for supervisor approval a safe initial CERAP, Substance Abuse Summary, and Domestic Violence Screening, indicating the children were seen and the mother was interviewed the day of the hotline call.  The investigator documented in-person contact with the hotline reporter, a school faculty member, both children and the mother on the day the hotline call was placed. All affirmed that they did not meet with the investigator on this day.  The investigator also documented phone contact with the children's primary care physician and the intact family worker.  The children's physician did not speak with the investigator, did not examine the child and did not have any information about the child's reported injuries contrary to the investigator's contact note.  The intact family services worker was on an extended leave of absence the day the child protection investigator documented speaking with the worker about the family.

The investigator failed to include and assess photos of the child's injuries which were provided to the investigator by the reporter within days of the hotline call.  The investigator's only visit with the twins occurred the day before the investigation closed, two months after the hotline call, at which time the investigator took and uploaded photos of the children to the SACWIS investigation record.  The child's injuries were healed.  The investigator's supervisor believed the documented contact notes to be accurate.  The supervisor assumed the SACWIS photos of the children were taken on the day of the hotline call, thereby satisfying investigative requirements of documenting the child's injuries and meeting the mandate to see the children within 24 hours of the hotline call.

Additionally, during the course of the intact family case, the twins' mother delivered a third child in a neighboring state.  The baby was exposed in utero to methadone and was hospitalized for 5 weeks to treat withdrawal.  The mother concealed her substance abuse history until the child's birth.  The SACWIS record did not contain a reassessment of the mother's substance abuse history or service provision after the birth of her third child.  The mother did not re-enroll the twins into their specialized school, deciding to home school.  She secured their medical appointments four months into the intact family services case.  The mother then failed to follow-through with recommended appointments.  The twins did not receive necessary medical follow-up until nearly four months after their initial appointments.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The Child Protection Investigator should be disciplined, up to and including discharge, for failing to perform duties and falsifying contact notes and assessments.** |
|---|---|

The Department agrees. After a Pre-disciplinary Hearing/rebuttal, this employee was placed on suspension pending decision on discharge. The employee then submitted a resignation before Central Management Services approved the discharge. The Department accepted the resignation with no reinstatement rights to DCFS and the suspension pending decision of discharge remains on his record. Charges were issued against his Child Welfare Employee License, and are pending with the Administrative Hearings Unit.

**2.  This report should be shared with the private agency intact family team and administrators to assist in planning future tasks with the mother.**

The intact family services case was closed.

## GENERAL INVESTIGATION 7

| ALLEGATION | A private agency caseworker signed his supervisor's name to Department forms without authority. |
|---|---|

**INVESTIGATION**    The falsified forms were designed to track critical case issues during the Administrative Case Review Process. In several different cases, the worker submitted forms to the Reviewer which contained his signature, and what purported to be his supervisor's signature. During a routine monthly peer review of case files, a co-worker, who was familiar with the supervisor's signature, noted that the signature on the forms did not look like the supervisor's signature. The co-worker notified the supervisor, who agreed that the suspicious signatures did not belong to her. The supervisor stated that she had never given the worker the authority to sign her name to the documents. The agency determined that the signatures were forged and discharged the worker. The case was referred to the OIG for investigation to determine whether action should be taken against the worker's Child Welfare Employee License.

When shown the disputed signatures in an interview with IG staff, the caseworker admitted that he had signed his supervisor's name. The caseworker stated that he had signed his supervisor's name only after discussing the forms with her and getting her approval and that in each instance he was given specific authorization over the phone from the supervisor. In addition, the caseworker claimed that the agency had a practice of caseworkers signing their supervisor's names. The worker was unable, however, to provide the name of any co-worker who could verify that claim. In an interview with IG staff, the supervisor reviewed each document and confirmed that the multiple alleged forgeries were not her signatures. She reported to IG investigators that the caseworker had never shown or discussed with her the documents on which he signed her name and confirmed that she had never authorized him to sign her name on any forms. The supervisor and the agency's regional director denied that it was common practice at the agency for workers to sign their supervisors' names. The OIG also interviewed co-workers on the caseworker's team. None verified a practice or instance of signing their supervisor's name without her written direction.

| LICENSURE ACTION | **The Office of the Inspector General filed charges against the employee's Child Welfare Employee License. A hearing was held and the Administrative Law Judge issued a decision. A Motion to Reconsider is is pending.** |
|---|---|

134

## GENERAL INVESTIGATION 8

**ALLEGATION**     A DCFS permanency worker actively hindered the placement of a three-month-old infant with her maternal grandparents, expressed bias towards the grandparents, and did not complete an Interstate Compact request in a timely manner.  The  worker also did not perform required case management tasks.

**INVESTIGATION**     A bi-racial child was born to a mother who admitted to using heroin and cocaine throughout her pregnancy.  The newborn suffered severe withdrawal symptoms, and spent several weeks in the hospital.  After a failed attempt at a residential drug treatment center, placement of the infant was discussed.  The mother told the child protection investigator she wanted the infant to be placed with her father and stepmother out of State.  At the time, the infant's father disagreed, and the two-month-old infant was placed temporarily in the unlicensed home of the father's friend.  The next month, after the foster parent indicated she could not keep the infant, all parties agreed the infant would be placed with the maternal grandparents.  A Department Area Administrator noted that an Interstate Compact would be requested, and the child would remain in the temporary foster home until the Interstate Compact was completed. Both parents refused reunification services and ceased communicating with the worker.

The infant's placement case was assigned to a Department worker.  The Department worker was directed by his supervisor to complete a referral for an Interstate Compact. From that point on, the worker resisted completing the Interstate Compact to place the child out of State despite repeated calls from the maternal grandmother.  The worker did not document most of his contacts with the grandmother, child and foster parent, explaining that "it's not my style to document all of my contacts."   In his written case notes, the worker was often dismissive and suspicious of the maternal grandmother referring to her as "the lady from [out of state] self-alleging to the Department she is the wife of the infant's mother's father."  Two months after the worker was assigned the case, the maternal grandmother located the parents and transported them to the Department office for a meeting with the worker regarding the infant's placement. At this meeting, both parents reiterated their desire for their daughter to be placed with the mother's parents and eventually to be adopted by them.  A security guard at the Department office wrote a statement detailing her observation that the worker was rude and dismissive to the maternal grandmother, and would not allow her in the meeting though the parents had requested she be included.  Neither the worker nor his supervisor spoke to the grandmother separately; although, both had voiced reservations about her commitment to her grandchild.

The following month, the supervisor again directed the worker to complete the Interstate Compact.  She also informed the worker and grandmother that she would be the contact person for information.   The Interstate Compact Placement Request packet was submitted, but was returned incomplete because the worker did not complete certain required tasks.  The Interstate Compact was not approved until the following month.  Three weeks after the Interstate Compact was approved and four months after the worker was directed to complete it, the child was transported to the grandparent's home by the worker and his supervisor.  The case was transferred to another worker.  The supervisor retired from the Department.

The Interethnic Placement Act provides that the State shall not deny or delay placement of a child for adoption when an approved family is available outside of the jurisdiction with responsibility for handling the child's case, and prohibits placement decisions based on race, color, or national origin of the person or child involved.

135

**OIG RECOMMENDATIONS /
DEPARTMENT RESPONSES**          **1.  The employee should be disciplined.**

The Department agrees.  The employee remains on leave of absence.  Disciplinary charges have been drafted and will be presented upon his return to work from leave.

**2.  This report should be shared with the employee's current supervisor.**

The Department agrees.

GENERAL INVESTIGATIONS

## GENERAL INVESTIGATION 9

| | |
|---|---|
| **ALLEGATION** | A Department licensing worker was arrested for Aggravated Driving Under the Influence (DUI)/No valid insurance, disorderly conduct and resisting a police officer. |

**INVESTIGATION**    The Inspector General investigators reviewed the police report and interviewed police, witnesses and the Department worker.  According to the police report, the police were dispatched after a report that this Department worker, who had a black eye, was driving on the lawn at an urgent care clinic and a bystander became concerned with her erratic driving and took her car keys.

When the officers arrived at the clinic, they attempted to talk to the Department worker; however, she ignored the officers' commands to stop and talk. Instead, she went back into the clinic to use the restroom.  The officers attempted to detain her but she pulled away nearly hitting the officer with the bathroom door.  While she used the restroom, the officers gained possession of her keys and monitored her to ensure she did not remove any evidence.  She was detained and began yelling profanities at the officers and others in the Clinic.  The Department worker failed three different field sobriety tests and she was arrested for DUI, disorderly conduct and resisting a police officer.

After being placed under arrest, the Department worker reportedly became irate and continued shouting profanities. The police transported her to a local emergency room, for examination of her facial bruising as noted by the person who called 911. The Department worker continued her aggressive behavior at the hospital screaming obscenities at doctors and nurses.  The worker was advised to watch her language as children were present. Police officers held her on a chair so a nurse could examine her eye. This Department worker was deemed fit for incarceration and she was escorted out of the hospital, while continuing to shout profanities at the police officers. While getting into the squad car, she attempted to kick one of the officers.

The worker was transported to the county jail.  She pleaded down from Aggravated DUI (Class 4 Felony) to a DUI (Class A misdemeanor), the judgment was withheld pending two years court supervision and she was fined. The Disorderly Conduct and Resisting Police charges were dropped.

The Department worker was discharged for conduct unbecoming of a Department employee.

Subsequently, the worker was again arrested for DUI, disorderly conduct and aggravated battery.  According to the police report, the worker went into a store where she became loud and argumentative. The clerk attempted to escort her out of the store and the worker forced the clerk against a soda machine and shoved her fingers into the clerk's chest. The police officer gave the worker two field sobriety tests, both of which she failed.

| | |
|---|---|
| **LICENSURE ACTION** | **The Office of the Inspector General issued charges against the employee's Child Welfare Employee License.  The Employee relinquished her Child Welfare Employee License.** |

137

**GENERAL INVESTIGATION 10**

| | |
|---|---|
| **ALLEGATION** | A Child Protection Investigator (CPI) began a relationship with a man eight months after she was assigned as the on-call investigator to investigate allegations against the man. |

**INVESTIGATION**     The Child Protection Investigator started a relationship with a man who was the former subject of four child protection investigations. During the third investigation, the CPI was the on-call investigator.  The CPI's attempts to see the man were unsuccessful and the only contact she had was with the grandparents during this investigation. This third investigation was indicated against this man with a five-year retention.

In an interview with the Inspector General investigator, the CPI stated that she met the man on a dating website and for a while she did not know that this man had previously been investigated by the Department and did not remember being the on-call investigator in the third investigation. As they were exchanging messages on the dating site, the CPI told him that she worked for the Department and he replied that he had met some of her co-workers, as they had investigated him before. Upon learning this information, the CPI contacted the current child protection investigator for the family and asked for her opinion of the man, without disclosing that she was asking for personal, and not professional, reasons. The current investigator provided her with confidential information in the belief that the CPI was asking her opinion for work-related purposes.

Staff had been alerted to a Facebook post by the CPI stating she was in a relationship with the man and informed her supervisor.   The Supervisor informed the CPI that she had been the on-call worker in the third investigation and that her being in a relationship with this former subject could be a conflict of interest.  One week later the CPI left on vacation with the former subject.

The Code of Ethics for Child Welfare Professionals prohibits relationships until two (2) years following termination of the client's status. Though this former subject may not have been the CPI's direct client, he was the subject of a report that she was assigned to investigate. The CPI should have sought an ethical discussion with her supervisor or the ethics officer and the conflict of interest committee.

The CPI has recently bid for a Department position in another location.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**     **The Department employee should be disciplined for her violation of Rule 437, *Employee Conflict of Interest*, Administrative Procedure #20, *Electronic Mail/Internet Usage/SACWIS Search Function*, and an ethical violation of being in a relationship with a former subject of an investigation that she was assigned to investigate.**

The Department agrees but limits the basis of discipline to violation of confidentiality. The employee received a one-day suspension.  The employee's supervisor has discussed the ethical issue with the employee.

138

**GENERAL INVESTIGATION 11**

| | |
|---|---|
| **ALLEGATION** | The Inspector General received a complaint alleging that the Executive Director of a private agency misappropriated Department funds for personal use. It was also alleged |

that the agency misused clients' emancipation funds and knowingly permitted the youth-in-care placed in the agency's Transitional Living Program (TLP) to smoke cannabis on the premises.

| | |
|---|---|
| **INVESTIGATION** | Inspector General investigators obtained the private agency's ledgers covering two fiscal years.  According to the ledgers, the agency allocated a substantial amount of |

Department funds towards payment for "membership dues" at a private social club. Membership dues are a disallowable expense for which the private agency is not allowed to use the Department funds.  Other disallowable expenses were paid with privately donated funds that do not have the same restrictions as the Department funds.

IG investigators also reviewed agency bank records and identified numerous potentially disallowable transactions. Many of the transactions were for food, beverages and lodging, and appeared not to be directly related to youth-in-care.  In addition to the potentially disallowable expenses, IG investigators identified blatant disallowable expenses such as speeding tickets that were paid for with Department funds and classified as "Staff Transportation" and "Staff Development and Training." The Inspector General referred these matters to the Office of Financial Review to audit the expenditures to ensure that the funds were used for Department youth or other program related expenses.

The investigation failed to find support for the allegation that the private agency took emancipation funds from youth in Transitional Living Programs and Independent Living Organizations (ILO) and used them for the private agency's expenses. Four young adults were named as youth from which emancipation funds were withheld. Youth-in-care are permitted to "spend down" their emancipation accounts for specific purposes.  This issue, as well as the allegation about cannabis use, were referred to the Department's residential monitoring division for further investigation. The Monitoring Division found no evidence to support either allegation.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  DCFS Office of Financial Review should conduct full FY16, 17 and 18 audits of the ledger categories of *Staff Development and Training*, *Office Supplies and Equipment*, *Building and Equipment*** |

***Operations*, *Maintenance* and *Maintenance Service TLP*, to determine whether the agency claimed disallowable expenses. Any funding for Staff Development and Training must be supported by curriculum and attendance logs. The Office should also conduct an audit of home improvement expenses to determine whether there are any charges not used for Department programs. If any suspected malfeasance is found, such as agency money being spent on the executive director's personal home, this matter shall be referred to the DCFS Office of the Inspector General.**

The Department agrees. The Auditors have now completed the field-work phase of the audit and are working on reviewing the information retrieved from the Agency and calculating the disallowed costs.  The Auditors are also waiting on additional documentation from the Agency. Once the review is completed, and the disallowed costs have been calculated, a comprehensive audit report will be compiled.

**2.  DCFS Office of Financial Review shall seek reimbursement from the contracted agency for any speeding tickets or private social club dues paid with the Department funds.**

139

The Department agrees.  The Auditors have now completed the field-work phase of the audit and are working on reviewing the information retrieved from the Agency and calculating the disallowed costs.  The Auditors are also waiting on additional documentation from the Agency. Once the review is completed, and the disallowed costs have been calculated, a comprehensive audit report will be compiled.

**3.   Department monitors should further investigate allegations that youth are being allowed to smoke marijuana inside the contracted agency's TLP facility.**

The Department agrees.  Monitoring staff met with the Agency around this and other allegations. No evidence to support this allegation was found. The agency must adhere to their program plan which prohibits illegal drugs in the ILO/TLP. All youth must sign a housing agreement which prohibits the use of drugs. Any youth found using any substance or who appears to have substance abuse issues will undergo a substance abuse assessment; they are reported to Illinois Department of Human Services and are provided with a list of agencies that will complete a Substance Abuse evaluation and can schedule an appointment.  All of these efforts are done to discourage the use of any type of illegal substance.

**4.   Department monitors should review procedures and the accounts of the four youths named to ensure funds were not improperly held.**

The Department agrees.  Monitoring staff met with the Agency around this and other allegations.  No evidence to support this allegation was found.  Accounts of the four youth were reviewed and no improprieties were found.  All of the youth who qualified for Emancipation funds received their funds; no funds were improperly withheld from youth.  Monitoring made several suggestions of how to improve bookkeeping, including that clients sign a receipt when receiving funds; copies of checks placed in client files; and an improved bookkeeping system to earmark where funds are coming from and going to.

**5.   DCFS Office of Financial Review and Department monitors shall provide the Office of Inspector General with the preliminary findings prior to notification to the agency.**

The auditors will share the findings with the Director and the Department will determine how to proceed.

**GENERAL INVESTIGATION 12**

| | |
|---|---|
| **ALLEGATION** | An aunt complained that the Department illegally removed her niece and nephew from her care. |

**INVESTIGATION**   The children's mother had been killed by her boyfriend, the father of the mother's third child. During the ensuing child protection investigation, investigators located two older siblings (the niece and nephew) who had a different father, who had been living with their aunt. The aunt did not have any legal relationship with the children.

When the father of the older children learned that the mother had been killed, he stated that he wanted custody of his two children. The father had been paying child support and he stated that the mother had denied him visitation with the children. Generally, the Department does not take protective custody of children who are in the care of a responsible relative and show no signs of abuse or neglect. The Department took protective custody of the children in the aunt's care even though there was no suggestion of abuse or neglect. While the investigator and supervisor initially allowed the older children to stay with their aunt, they soon moved the children to their father's home. The youngest child, whose father was arrested for murder, was placed with the aunt.

At the Shelter Care hearing after protective custody was taken, the State's Attorney filed a Petition alleging urgent and immediate necessity to remove the children without making the aunt a party to the juvenile case. The Juvenile Court Act names "responsible relatives" as necessary parties to any Petition to remove the children. The court, however, was reportedly advised that the older children had been living with their aunt. The Judge dismissed the Petition and sent the older children home with their father.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**   **1. To facilitate sibling bonding and visitation with their sibling, the Department should ensure that the siblings are offered services to address the children's abrupt removal from their aunt's home, including a child and family team meeting or a clinical staffing with all family members.**

The Department agrees. A clinical staffing was attempted. However, both the father and the aunt declined to meet to discuss any issues. The older siblings are at home with their biological father and sibling visits are occurring with the youngest child, who remains in the care of his maternal aunt. The Department only has a legal relationship with the youngest child.

**2. This report should be shared with the child protection investigator and supervisor as a learning tool.**

The Department agrees. The redacted report was shared with the investigator and the supervisor.

141

## GENERAL INVESTIGATION 13

| **ALLEGATION** | A mother complained that her former worker appeared in Probate Court to testify against the mother in her custody battle with the father. The mother believed that the testimony would be a breach of her confidentiality. |
|---|---|

**INVESTIGATION**   The Department's confidentiality rules, as well as the Abused and Neglected Child Reporting Act (89 Ill. Admin. Code 431; 325 ILCS 10) prohibit release of a family's confidential information except in specified circumstances. Testimony at the custody hearing did not fall into any of the permissible exceptions, and would have violated confidentiality rules and statutes. The mother's case with the Department had been closed for six months when the private agency worker received a subpoena to testify at the custody hearing.  The worker brought it to her supervisor's attention and the supervisor was concerned that the worker's testimony at a custody hearing would violate the mother's confidentiality. The supervisor contacted a representative of the Department's Office of Legal Services for assistance. The legal representative stated that he did not see a legal challenge to the subpoena but suggested that the agency consult its own legal counsel.

The agency's legal counsel told agency management that she did not believe the Judge would allow the testimony because it breached confidentiality but did not file an objection to the subpoena. The worker stated that no one counseled her about what she could or could not say, and she was told to appear in court in compliance with the subpoena.

After the worker was sworn in and began giving testimony, the Judge halted the proceedings and stated that he believed that the testimony would violate confidentiality. The Judge took a short recess, located the relevant case and barred the testimony of the worker.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**    **1. This report should be shared with the worker and her supervisor.**

The Department agrees.  The report was shared with the worker and her supervisor.

**2. This report should be shared with the private agency.**

The Inspector General shared a redacted report with the private agency.

**3. The Department should ensure that legal staff take steps to protect confidential client information, even when that information is sought through a private agency with which DCFS contracts.**

The Department agrees.  The Office of Legal Services drafted and discussed a Confidentiality Memo with Department attorneys and Administrative Hearings Unit attorneys. The Confidentiality Memo was also provided to Private Agencies at the provider meeting in Springfield.

**4. The Department should ensure that legal staff are trained on bases for objecting to subpoenas for confidential client information.**

The Department agrees. The Office of Legal Services trained Legal staff on the bases for objecting to subpoenas for confidential client information.

**GENERAL INVESTIGATION 14**

| ALLEGATION | The Office of the Inspector General received a complaint alleging that a child protection investigator offered to pay co-workers to cover his standby assignment. |
|---|---|

**INVESTIGATION**     During the course of the Inspector General's investigation, investigators learned that the practice of offering co-workers a financial incentive when investigators cannot find someone to voluntarily cover their standby assignment had been a long-standing practice at the field office.

Child protection investigators are required by both the Central Management Services (CMS) position descriptions and the Supplemental Agreement between American Federation of State, County and Municipal Employees (AFSCME) and the Department, to work standby shifts that are assigned to them.

According to the DCFS Employee Handbook, section 3.9 Conflict of Interest, *Guidelines to Help Avoid Conflicts of Interests*, "Employees should not accept, or agree to accept, any form of compensation or consideration other than salary from the Department for any services rendered as part of the normal duties and responsibilities within their job…".

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The Department should issue a written communication reminding all staff eligible to perform standby of the rules that must be followed in situations where an employee previously scheduled to work standby no longer is interested or cannot due to a hardship situation. The communications should include notice that offering and/or accepting payment to work someone else's standby assignment violates conflict of interest rules that could lead to disciplinary action up to and including discharge.**

The Department agrees. An announcement was posted on the DNet.

**2. A redacted copy of this report should be shared with Regional Administrators and discussed with staff site wide at staffings with child protection investigators and supervisors.**

The Department agrees.  A redacted copy of the report and copies of each regions Standby Agreement were shared with each Regional Administrator.  Instructions were given that the report is to be reviewed with all Child Protection staff.

144

# ALLEGATIONS OF CHRONIC MISFEASANCE

The Office of the Inspector General (OIG) is an essential agent in the prevention and detection of fraud, waste and abuse in the Illinois Department of Children and Family Services (DCFS) programs, projects and operations. The OIG's goals include advancing integrity and accountability in DCFS through independent oversight; promoting excellence in the child welfare community by establishing and encouraging adherence to quality standards; providing professional development opportunities through Error Reduction Training; and providing DCFS with recommendations and suggestions for effective tools to combat waste, fraud and abuse and succeed in its duties as the Illinois Child Welfare Agency.

Through the mandates of the OIG office, we are diligent in working to advance the Department's child welfare practices in child protection, business practices, community collaboration and placement services. The OIG has undertaken numerous investigations and initiated projects designed to improve practice, uncover wrongdoing and increase the professionalism of the Department.

When the OIG notices a particularly high level of complaints in a specific segment of the child welfare system, the OIG will conduct a systemic review. Investigations yield both case-specific recommendations and recommendations for systemic changes within the child welfare system.

## ISSUES OF MISFEASANCE

The Office of the Inspector General has the statutory authority to conduct investigations into allegations of or incidents of possible misconduct, misfeasance, malfeasance, or violations of rules, procedures, or laws by any employee, foster parent, service provider, or contractor of the Department of Children and Family Services.

*Misfeasance* is conduct that is lawful but inappropriate or incorrect. *Malfeasance* is a higher level of wrongdoing than misfeasance. Malfeasance is the intentional conduct that is wrong or unlawful, especially by officials or public employees.

Bureaucratic misfeasance can occur with the best of intentions, but can result in substantial harm to an individual child. In evaluating chronic issues of misfeasance affecting the Illinois Child Welfare System, that require review, we consider many factors, including:

- mandatory requirements for OIG reviews, as set forth in laws, regulations, or other directives;
- requests made or concerns raised by the Director of DCFS
- management's actions to implement OIG recommendations from previous reviews; and
- potential for positive impact.

For Fiscal Year 2019, we will continue our review on youth in care that are 'beyond medical necessity' (BMN) as well as the Department's intact family service programs. Issues of misfeasance may come to the attention of the OIG from the press, the General Assembly or the general public.

## Beyond Medical Necessity

When medical staff in psychiatric hospitals have determined that a youth is stable enough to be cared for outside of a hospital setting and are thus ready for discharge, but the Department or guardian charged with their care cannot locate an appropriate placement, the result is known as "beyond medical necessity" – or

BMN, a term used when a youth remains hospitalized beyond the medical and insurance approved length of stay.

The Department's clinical data shows that in FY 2017 there were 273 episodes of youth in care being designated as BMN; in FY 2018 that number increased to 329.

The upward trend of youth in care who remain hospitalized beyond medical necessity shows that the Department continues to lack the capacity it needs. The availability of community-based services and resources for youth with significant mental and behavioral health needs continues to be at crisis levels. The Department needs a strategy for developing the capacity it needs, and more importantly needs to analyze and to develop new strategies, and then to commit to specific actions it will take to meet the service and resource needs of these high-end youth in care.

The OIG will continue to look at how the Department might build a robust and meaningful crisis response system that enables providers to help prevent disruptions in placement, as well as how the Department might focus its efforts on supporting children with significant needs in a more comprehensive and realistic way. Youth who end up hospitalized beyond medical necessity are children for whom crises were to be expected, and may well require hospitalization in the future. Building a system that recognizes this reality, and provides individualized clinical services to youth in their community-based placement, identifies in advance where the youth will be cared for if hospitalization becomes necessary, and contemplates return to the youth's prior placement when a crisis passes, are all strategies that need to be explored in depth.

**INTACT FAMILY AND REUNIFICATION SERVICES**
With few exceptions, families receiving intact services from the Department are those families in which there has been an *indicated* finding of abuse or neglect. The services are generally voluntary, but the Department has an option of going to court to compel compliance with intact services when necessary to protect the safety and well-being of the children.

Ultimately, all the Department's and POS Agencies' work should be driven by the safety and wellbeing of children, preserving and supporting families in their duty to protect and nurture their children.

Over the years, the Inspector General had recommended the Department move to a more specialized/targeted services model for all abuse and neglect.

We are currently assessing and will continue our review of the intact contracts; current policy/procedure for intact services; data; cost analysis; outcome analysis; subsequent reports of child maltreatment; length of service case, return home planning, et. al.

In addition, in FY 19 the OIG plans to utilize the *Return Home Toolbox*, previously developed by the OIG, to pilot a reunification training. The *Return Home Toolbox* focuses on reunification planning as an ongoing process which begins well in advance of the anticipated return home date.

By constantly focusing attention on a shared vision and on more specific goals and objectives, our work has the potential to permeate the culture of the agency, becoming a tool for creating systemic change. For FY 2019 the OIG will continue to work to promote positive change, foster increased accountability and integrity, and address core challenges with youth that are BMN and the DCFS intact family services program.

The OIG will continue to review the above challenges in the coming fiscal year, and will continue to pursue and complete, accurate, relevant and timely reports with specific recommendations to the DCFS Director.

146

CHRONIC ISSUES OF MISFEASANCE

# ERROR REDUCTION

In 2008, the Illinois General Assembly enacted Error Reduction legislation that required the Office of the Inspector General to develop Error Reduction Implementation Plans intended to remedy repeated child welfare practices errors that compromise or threaten children's safety, based on findings of the Inspector General's investigations and by Child Death Review Teams. 20 ILCS 505/35.7.

As a result of this legislation, over the past decade the OIG has developed extensive Error Reduction Training curricula and provided statewide trainings to over 1,500 DCFS and private agency child welfare workers and administrators, including clinical and legal staff, permanency, intact and child protection workers.  The initial set of Error Reduction trainings focused on child protection investigations where an infant or young child suffered instances of bruising after an Inspector General's data review indicated a strong correlation between subsequent death and serious injuries and prior unfounded cuts, welts and bruises allegations. In the second phase of trainings, the OIG focused on the provision of intact family services to families dealing with a parent's mental illness. The OIG's investigations involving these families revealed patterns of practice errors similar to those identified in Cuts, Welts and Bruising investigations, such as workers failing to obtain relevant records and failing to share relevant facts about the family with treating mental health professionals and other physicians when the parent had a history involving substance abuse or domestic violence. These trainings resulted in Departmental policy and procedural changes related to obtaining records and communicating with mental health professionals about clients.

**Egregious Acts of Physical Maltreatment**
In 2015, the OIG produced an Error Reduction Training curriculum covering five main topics, *"Lessons Learned from Physical Abuse Fatalities."* During the course of developing this curriculum, several Inspector General death and serious injury investigations involved cases of egregious abuse or torture of young children.  The investigations revealed that – despite the gravity of the abuse or torture – Department staff believed that it was necessary to offer standard parenting services despite any evidence that such services could ameliorate the risk of harm for these children in the future.  As a result, permanency was delayed for the most vulnerable and traumatized children in our system.

One of the main topics explored in the Error Reduction Curriculum, "*Systemic Errors in the Legal System, High Risk Specialized Assessment*" defines egregious acts of physical maltreatment, and outlines the legal provisions relevant to reunification services in cases of egregious physical abuse and referrals for specialized assessment in cases of extreme abuse.  The training focused on modifying the clinical and legal practices in cases of egregious physical abuse.  Regarding clinical services, the training seeks to ensure that a family is appropriately assessed, with a determination of whether there are any evidence-based services that could realistically alleviate safety threats to enable a child to return to the home.  Issues addressed include considerations about initial service planning, specialized assessments, useful tools/instruments and an overview of processes and time frames. To help the field conceptualize the continuum of physical abuse, and where egregious acts fall therein, the Inspector General developed the "*Maltreatment Continuum*" – a visual tool illustrating the characteristics, spectrum and severity escalation from Minor Assaults to Egregious Acts of Physical Abuse.

With respect to legal aspects of egregious acts cases, the training focused on how these cases differ from more traditional cases and examined the legal framework for addressing such cases.

147

In 2015-2016, the Egregious Acts Training was presented to nearly 400 child welfare staff in Cook County and the Southern Region, including child protection workers, permanency and intact administrators, managers, child protection investigation supervisors, local State's Attorneys and DCFS Legal staff.

In 2018, the OIG continued its error reduction implementation efforts and presented the Egregious Acts Training to a multi-disciplinary group of over 70 Northern Region DCFS and private agency administrators and supervisors, as well as local State's Attorneys and DCFS legal staff. The OIG anticipates completing this statewide training in FY 2019 with presentation in the Central Region to both Department and private agency staff. Recognizing the necessity of a multi-systemic approach to managing these cases of egregious physical abuse, the OIG continues to collaborate with Regional staff from the DCFS Divisions of Legal Services and Clinical Services as well as State's Attorneys to examine the legal provisions that permit early termination of reasonable efforts to reunite families, where children have suffered egregious physical abuse.

### Parent Training

In 2018, the OIG conducted a parent training in Cook County for parenting youth in care. This training was based on a collaborative curriculum developed by the OIG and the Teen Parent Services Network (TPSN) and was intended to help lower the mortality rate among children born to DCFS youth in care (See FY 11 Office of the Inspector General Report, *10-Year Review of Deaths of Children of DCFS Parenting Teens*). The interactive, discussion-driven training aimed to educate young parents on how to:

- understand the importance of always placing their child to sleep in a safe environment (alone, on its back, in a crib, without any heavy blankets/bedding/toys/bumpers);
- develop non-violent and soothing responses to infant crying;
- develop appropriate and supportive responses to challenging developmental behaviors of toddlers and preschoolers;
- understand the mechanics of abusive head trauma; and
- recognize warning signs for potential domestic violence to a child and/or a parent.

### Community Map Training

Effective community mapping is based on the principle that *a referral should never be a blind date.* That is, case managers need to develop community specific knowledge, establish linkages with trusted community providers, anticipate potential obstacles, and help navigate parents through their ambivalence to successfully engage in services.

In 2018, the OIG reprised its earlier efforts that began as collaboration between the Inspector General and the Teen Parent Services Network (TPSN) to train staff working with pregnant and parenting youth on how to develop and utilize an Eco-map—a working tool that identifies both formal and informal support systems within the young parents' community. In this interactive training, the case manager and the young parent walk through the neighborhood together and visit community resources such as settlement houses, Title X clinics, local libraries, park districts, and early childhood education centers. By collaborating to identify resources and through the caseworker's modeling of how to engage with service providers, the young parent's ability to establish in-person relationships with community providers should be enhanced.

The threefold intent of the training was to 1) give the case workers knowledge of existing community-based agencies; 2) to understand the importance of developing personal relationships with community-based agencies that enrich a young family's well-being; and 3) to model for the young parent how to access services for his or her family.

This training was initially piloted over 10 years ago. Teen Parent Services Network (TPSN) incorporated eco-map training as part of their annual, multi-day specialty training for case managers of pregnant and/or

ERROR REDUCTION

parenting youth.  A review by the OIG, however, revealed that TPSN was not adhering to the training model and the classes had deteriorated to become only a classroom exercise rather than a hands-on event of workers walking and learning about the community with the young parent.  In FY19, the OIG will revisit whether TPSN has been able to provide the eco-map trainings while maintaining fidelity to the original training model.

**Intact Family Services Trainings – 2019:** Return Home Toolbox Pilot and Prior Training Follow-Up

In past years, the OIG has devoted considerable training efforts to the provision of Intact Family Services.  Since that time, the OIG has been working with the Department throughout the extensive revamping of the Intact Family Services program statewide.  In FY19, the OIG plans to utilize its previously developed *Return Home Toolbox* to pilot new Intact Family Services training.  The *Return Home Toolbox* focuses on reunification planning as an ongoing process which begins well in advance of the anticipated return home date.  To ensure a thorough understanding of the progress of the case and what will set the family up to succeed once reunification occurs, the planning should involve a series of clinical staffings, with key players, at key stages in the progress of the case. The *Toolbox* identifies key issues to consider when reassessing interventions being used with the family.

150

# LAW ENFORCEMENT AGENCIES DATA SYSTEM (LEADS)

The Department is required by statute to assess relevant criminal history of caretakers prior to placement of children and to accomplish its other statutory duties. (20 ILCS 505/5(v)). Criminal History Record information (CHRI) is generally accessed through fingerprinting. However, the legislature has noted that the Department may need more immediate information to assure the safety of children. "LEADS is a multistate law enforcement, computerized telecommunications system designed to provide services, information, and capabilities to the law enforcement and criminal justice community."[1]

The Office of Inspector General for the Department of Children and Family Services, (DCFS), meets the definition of a criminal justice agency in the Department of Justice Regulations on Criminal Justice Information Systems (Title 28, Code of Federal Regulations, Part 20, Subpart A). Because of its status as a criminal justice agency, the OIG has broader access to obtain Criminal History Record Information (CHRI) than the Department.

**DCFS Administrative Procedure**

DCFS Administrative Procedure 6 (AP #6), specifies the use of the LEADS system for the Department of Children and Family Services.  "LEADS information may also be helpful to the Investigation Specialist in assessing risk to him or herself in conducting an investigation, to placing workers when assessing a child's safety in a potential relative home placement, and to child welfare workers when arranging for visits and contact between parents and children and making important case decisions."[2]  AP #6 describes people authorized to receive LEADS information as "the Investigation Supervisor and Investigation Specialist investigating a report of child abuse/neglect, the placing worker evaluating the appropriateness of a placement with an unlicensed relative, the child welfare supervisor and child welfare worker assigned to a child welfare case, and the managers in their chains of command."

Workers receiving LEADS responses are cautioned that "LEADS criminal history checks are name based and may not provide an accurate criminal background for the subject.  The only way to accurately identify a person's criminal background is through a fingerprint check."[3] LEADS provides summaries, when available, of the following information:

- Pending (unresolved) charges.
- Arrest that did not result in charges.
- Charges that did not result in a conviction.
- Convictions.
- Existing orders of protection, including domestic violence orders of protection.
- Closed orders of protection for two years after expiration date.
- Existing warrants issued.
- Driver's license information.
- Whether the offender was sentenced to imprisonment.

---

[1] Department of State Police, Adopted Rules, Title 20, Chapter II, Part 1240, page 1.
[2] Administrative Procedure #6, Use of Law Enforcement Agencies Data System LEADS, page 3.
[3] Illinois State Police LEADS Daily Briefing 010818.

- Whether the individual is a registered sex offender, child sex offender, or child murderer.

DCFS and Purchase of Service Agency (POS) staff must assess LEADS information to identify its potential impact on child safety.  If there is reason to suspect that the subject has a criminal record outside of Illinois, the staff are required to contact the Office of the Inspector General, Bureau of Investigations by facsimile at 217/557-8843 or 312/433-3245 to request an out-of-state check.

**Placement Clearance Desk Criminal Case Disposition Requests**
When the Placement Clearance Desk is deciding on a non-licensed home for placement and the Illinois LEADS contains an arrest which may pose a safety threat to a child, but there is no disposition information, the OIG provides technical assistance in obtaining the disposition.

**Integrated Assessment Assistance**
OIG provides technical assistance to Integrated Assessment intake coordinators requesting out of state LEADS checks and occasionally out of state child abuse/neglect history of a parent who is participating in an integrated assessment following placement of their children with Illinois DCFS.

**OIG Investigations**
OIG investigators may request a LEADS check on people involved in OIG investigations of misfeasance, malfeasance or child death investigations.

**LEADS Restrictions**
The LEADS system, as dictated by State and Federal law cannot be used to do background checks for employment or licensing purposes. The Illinois Administrative Code restricts the use of the LEADS network and LEADS data for personal purposes.[4] It states that the information available via LEADS is for criminal justice purposes only and notes that "Violations of the misuse of information from the LEADS system can result in suspension, termination and even a criminal charge."[5]

---

[4] Ill. Admin. Code tit. 20, pt. 1240.
[5] Illinois State Police LEADS Daily Briefing 040418 and 040518.

CRIMINAL BACKGROUND CHECK COORDINATION

# SYSTEMIC RECOMMENDATIONS

The Inspector General's investigative reports contain both systemic and case specific recommendations. The recommendations for systemic reform for Fiscal Year 2018 have been categorized below according to the function that the recommendation is designed to strengthen within the child welfare system. The Office of the Inspector General is a small office in relation to the child welfare system. Rather than address problems in isolation, the Office of the Inspector General views its mandate as strengthening the ability of the Department and private agencies to perform their duties. Recommendation categories are as follows:

- **CHILD PROTECTION**
- **LEGAL**
- **PERSONNEL**
- **SERVICES**
  - **Consent for Release of Information**
  - **Intact Family Services**
  - **Mental Illness and Developmental Delays**
  - **Return Home**
  - **Split Custody**
- **STATE CENTRAL REGISTER**

## CHILD PROTECTION

- In all child protection investigations in which a medical provider requests that the infant or child be brought in for a medical visit, the investigation shall remain open until the infant or child is seen by the medical provider and the child protection worker consults with the medical provider. (See Death and Serious Injury Investigation 2.)

- Department management should conduct an enhanced review of families with investigations over C Sequences. The review should evaluate whether chronic issues in the family are being addressed or are capable of being addressed. (See Death and Serious Injury Investigation 1 and 4.)

- The Department should explore further use of the 'Undetermined' category for child protection investigations where there are ongoing criminal investigations or other extenuating circumstances, to allow staff to focus on other investigations. (See Death and Serious Injury Investigation 1.)

- The Multi-Disciplinary Pediatric Education and Evaluation Consortium (MPEEC) Second Opinion Form should be accessible to Cook County child protection staff. (See Death and Serious Injury Investigation 3.)

## LEGAL

- The Department should ensure that legal staff take steps to protect confidential client information, even when that information is sought through a private agency with which DCFS contracts. (See General Investigation 13.)

- The Department should ensure that legal staff are trained on bases for objecting to Subpoenas for confidential client information. (See General Investigation 13.)

## PERSONNEL

- The Department should ensure that contractors are not involved in the hiring process. (See General Investigation 2.)

- For high level management hires, the Department must verify prior employment and critical credentials, even if not required by the job description, to ensure that trustworthy individuals are hired. (See General Investigation 2.)

- The Department must develop practices to ensure workable caseloads. (See General Investigation 1.)

- The Department's Caseload and Vacancy Report should be revised to identify a 3-month running intake average, in addition to the 12-month running intake average, to allow the Department to be more responsive to trending increases. (See General Investigation 1.)

- Department management should develop a temporary workforce (75-day contractors) in major urban areas to address predictable seasonal shifts in intake. (See General Investigation 1.)

- The Department should explore an agreement with AFSCME to commit new hires to remain in the office where they were hired for a minimum of two years, absent exigent circumstances. (See General Investigation 1.)

- Department management must have a database to allow for the efficient, real-time tracking of office caseloads to permit a more efficient system of moving/detailing staff between offices during emergencies. (See General Investigation 1.)

- The Office of Employee Services should issue a written communication informing staff that payment in any form should not be offered or accepted for duties that are a normal part of their job description and that such actions could result in discipline up to and including discharge. (See General Investigation 14.)

## SERVICES

### Consent for Release of Information
- Part of the service plan development process must include consideration of what consents will be necessary to properly serve the family. Workers should make every attempt to obtain informed consent to release of necessary documents at the outset of the service plan process. (See Death and Serious Injury Investigation 1.)

### Intact Family Services
- The Department must develop protocol that requires intact family services workers to identify family needs that are critical and time sensitive and management must track those cases to ensure the needs are met.  (See Death and Serious Injury Investigation 1.)

154                                    SYSTEMIC RECOMMENDATIONS

- The Department should explore expanding the Child Welfare Training Academy Simulation Residential Home for intact family workers and supervisors. (See Death and Serious Injury Investigation 1.)

*Mental Illness or Developmental Delays*
- Whenever facts suggest the possibility of significant developmental delays or mental illness or other issues that can affect the caregiver's ability to benefit from standard interventions, management must ensure that the delays are assessed and that referrals address identified delays. (See Death and Serious Injury Investigation 1.)

*Return Home*
- In return home cases, the Department's Office of Legal Services should ensure that an additional condition be incorporated in the Order of Protection requiring that all preschool aged children are enrolled in and actively attending the appropriate State Pre-Kindergarten or Head Start program. (See Death and Serious Injury Investigation 2.)

- In return home cases, 60 days prior to the child's scheduled return home date, the case worker should meet with the parent(s) and school professionals to introduce the parent to the school, begin the registration process, and identify additional community programs that may be available to the family for social engagement of the children. (See Death and Serious Injury Investigation 2.)

*Split Custody Cases*
- The Department should conduct a review of split custody cases (cases in which some of the children are in state care and some are at home) to determine if the children at home require more intensive services. (See Death and Serious Injury Investigation 4.)

## STATE CENTRAL REGISTER

- The Department should consider adopting a policy that informs Mandated Reporters who wish to remain anonymous that failure to provide sufficient contact information will be viewed as a possible violation of the requirements of Abused and Neglected Child Reporting Act (ANCRA) and, for those facilities licensed by the Department, will be referred for a licensing investigation. (See Death and Serious Injury Investigation 3.)

156

# RECOMMENDATIONS FOR DISCIPLINE

In FY 2018, the Inspector General recommended discipline of Department and private agency employees for the conduct detailed below.  Discipline recommendations ranged from counseling to discharge.

- A high-level Department administrator misrepresented his professional credentials and employment history.  (See General Investigation 2.)

- A Department administrator failed to critically review the employment application materials and verify the information provided by a high-level management hire. In addition, the former Director and the Administrator permitted consultants to actively participate in the hiring process of the manager who would be monitoring their contract.  (See General Investigation 2.)

- A child protection investigator failed to verify the family's account that a child had been injured at a daycare and failed to determine how the child's multiple injuries had occurred. The child protection supervisors and an administrator failed to note the errors in the investigation and approved unfounding the investigation.  (See Death and Serious Injury Investigation 3.)

- A child protection investigator falsified seven contact notes and fraudulently completed the *CERAP*, *Substance Abuse Summary*, and *Domestic Violence Screening* in an investigation of abuse to an eight-year-old special needs child. (See General Investigation 6.)

- A child welfare specialist hindered and unduly delayed the completion of an Interstate Compact Placement request of an infant with her grandparents for over three months and exhibited unprofessional bias against the grandparents.  (See General Investigation 8.)

- A clerical worker disclosed confidential information from hotline reports to a friend and a family member in violation of the Department Confidentiality Policy and used the state email system for personal use.  (See General Investigation 5.)

- A substance abuse evaluator engaged in a sexual relationship with a client for whom he completed a court ordered drug and alcohol assessment.  (See General Investigation 3.)

- A child protection investigator engaged in a personal relationship with a father who had prior and pending investigations with the Department. The investigator had assisted in one of the prior investigations, but had never met the father. Upon learning that the father was currently involved with the Department, the investigator contacted other investigative staff and accessed SACWIS for information, without disclosing that she was personally involved with the father.  (See General Investigation 10.)

158

# CHILD WELFARE EMPLOYEE LICENSES

The following cases represent actions filed against Child Welfare Employee Licenses (CWEL) in FY 2018.

- A private agency employee was charged with falsifying SACWIS notes of home visits and forging foster parent signatures on an agency form designed to ensure that home visits occurred. The worker was also charged with failing to cooperate with a handwriting analysis regarding the forgery charges. The case is pending in the Administrative Hearing's Unit.

- A Department employee was charged with false testimony and falsification of SACWIS notes for claiming to have spoken with the child's grandfather, claiming that both children were present for a safety assessment, and falsely documenting that she saw both children at school.  The charges are pending with the Administrative Hearing's Unit.

- A Department employee was charged with falsifying multiple investigatory contact notes with an intact family services worker, a doctor, a principal and the school therapist. The investigator is also charged with falsifying a *CERAP*, *Substance Abuse Screen* and *Domestic Violence Assessment* in the same case. The charges are pending in the Administrative Hearings Unit. (See General Investigation 6.)

- A Department employee was charged with falsification for documenting that a child was present at an interview when only the mother was present. The worker received a two-week License suspension.

- A Department employee was charged with habitual or excessive use of alcohol after two arrests for Driving Under the Influence during which she behaved belligerently with police and physically assaulted a store employee. The employee relinquished her CWEL. (See General Investigation 9.)

- A Department employee was charged with falsifying three notes of contact with the alleged perpetrator in one investigation. She was also charged with failing to cooperate with the OIG investigation. The Administrative Law Judge's (ALJ) Recommendation is pending with the CWEL Board.

- A former private agency worker was convicted of Criminal Sexual Assault, indicated for Sexual Molestation and placed on the Sex Offender Registry for crimes committed against a youth in care. Charges were filed and his CWEL has been revoked.

- A Department employee was charged with providing false testimony in court when she falsely stated that she had referred to and conferred with a Department Domestic Violence Specialist concerning a case. The charges are pending in the Administrative Hearings Unit.

- A Department employee was charged with having a romantic relationship with a father she had investigated. She also had significant phone and in-person contact with the father during the investigation that was not recorded in SACWIS and failed to document the father's illicit drug use. Within a few months of completing the investigation the father and his children were living with the investigator. In addition, the investigator had several confidential client files, including the father's, in her garage without ensuring their confidentiality. The Administrative Law Judge's Recommendation is pending with the CWEL Board.

- A Department employee was charged based on the indicated findings in two child protection investigations. The case is pending with the Administrative Hearings Unit.

- A Private Agency employee was charged with forging his supervisor's name on multiple Administrative Case Review documents.  The case is pending in the Administrative Hearings Unit. (See General Investigation 7.)

160

CHILD WELFARE EMPLOYEE LICENSES

## DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS

The Inspector General made the following recommendations in previous Fiscal Years, but the recommendations were not fully implemented before the Annual Report was issued. The current implementation status of these recommendations is detailed below in the following categories.

- **CHILD PROTECTION**
- **CONTRACT MONITORING**
- **DOMESTIC VIOLENCE**
- **FOSTER HOME LICENSING**
- **INTACT FAMILY SERVICES**
- **LAW ENFORCEMENT**
- **MEDICAL**
- **MENTAL HEALTH**
- **OLDER YOUTH IN CARE**
- **PERSONNEL**
- **SERVICES**
- **WORKER SAFETY**

**CHILD PROTECTION**

FY 2015

**Rules and Procedures should be amended to provide that any abuse allegations that can be permissively retained for 20 years should be retained for 20 years when criminal charges have been filed and either resulted in a conviction, or are pending (from OIG FY 15 Annual Report, Death and Serious Investigation 5).**

> *FY18 Department Update:* The recommendation was incorporated into proposed Procedures 300.150, *Child Abuse and Neglect Investigative File*, which was posted for comment on November 29, 2018. Once the procedures have been fully implemented the Department will have concluded its response to the recommendation.

FY 2014

**As part of the temporary custody screening process, child protection will notify DCFS Office of Legal Services and DCFS Clinical of high risk cases such as those where a parent has demonstrated dangerous behavior such as abduction; torture; threats to kill with plan; or taking children hostage and cases involving severe mental illness: (a.) upon notification, DCFS Clinical will initiate an emergency clinical staffing within 5 working days, including all relevant parties and records, and (b.) authorize a specialized integrated assessment (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 2).**

> *FY18 Department Update:* DCFS Procedures 315, Appendix F, *Clinical Services Specialized Assessment Protocol*, outlines the Department's procedure for notifying and referring cases of suspected egregious acts of child maltreatment to the Division of Clinical Services. Cases are referred via the submission of the CFS 399-1, *Referral for Clinical Services* to the designated

161

outlook email. The Maltreatment Continuum, developed by the Inspector General's Office to assist the field in conceptualizing egregious acts of maltreatment, is used by the Special Assessment Team in identifying and assessing cases of alleged egregious acts of maltreatment. The Division of Clinical Services' process for involvement in these cases is outlined within Appendix F of Procedures 315. There is not a formal system for separately tracking these cases within Clinical however, all referrals to the Division of Clinical Services, including those involving suspected cases of egregious acts, are tracked within the Division's Clinical referral system. The Department has concluded its response to this recommendation.

**FY 2012**
**The Department's database currently only automatically prompts management approval for death and facility reports. The automatic prompt for management approval should include allegations of burns, head injuries, internal injuries and children under six with allegations of cuts, bruises, welts, abrasions and oral injuries (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 2).**

*FY18 Department Update:* In addition to deaths, facility reports, unqualified reports, and reports involving youth in care, the following serious harms allegations automatically escalate to the Area Administrator (AA) for final approval: #2/52- Head Injuries, #4/54- Internal Injuries, #5/55- Burns, #6/56- Poison/Noxious Substances, #7/57- Wounds and #9/59- Bone Fractures. As part of normal supervision per Procedure 300.70, *Role of the Child Protection Supervisor* and 300.75, *Area Administrator Requirements* Area Administrators are notified of investigations related to serious harms allegations with children three and under and supervisors are expected to pay attention to cases with children six and under with serious injuries. Cases are discussed as part of regular supervision between staff and supervisor and supervisor and Area Administrator. Cuts, welts, and bruises are not identified types of allegations which will be automatically sent for Area Administrator approval, but should be discussed during normal supervision with an Area Administrator. The Department has concluded its response to this recommendation.

**FY 2010**
**Child protection managers should track and maintain data on cases presented to the State's Attorney's Office for filing of petitions and the State's Attorney's Office's response. Child protection offices should share this information with DCFS Office of Legal Services (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 7).**

*FY18 Department Update:* Child Protection will identify a liaison at each downstate field office who will provide DCFS Legal with cases presented to the State's Attorney's Office for filing of petitions and the State's Attorney's Office's response. DCFS Legal will track and maintain data on these cases until it can be considered later as part of the Department's redesign of SACWIS, known as CCWIS design.

**CONTRACT MONITORING**

**FY 2017**
**DCFS Employee Services should ensure that appropriate criminal and drivers' license checks are performed for persons with Personal Service Contracts (from OIG FY 17 Annual Report, General Investigations 1).**

*FY18 Department Update*: The Department has not initiated any new Personal Services Contracts since the Inspector General's report. If a new Personal Service Contract is implemented, the Office of Employee Services will complete criminal background clearances. If the Personal Service Contract requires travel, the Department will ensure that a driver's license check is completed.

*FY 18 OIG Comment:* This investigation found that the Department's Office of Employee Services *had* done a criminal background check but had not assessed the danger of an unresolved charge for Driving Under the Influence. A driver's license check may not correct the failure to assess since pending charges may not immediately affect the status of the driver's license. In this case, the employee's driver's license was revoked soon after hire, but he continued to drive a state car.

FY 2015

**In 2015, the Office of the Inspector General, in conjunction with the Executive Office of the Executive Office of the Inspector General, found that the Department failed to adequately monitor over 18 million dollars of State funds that were given to a vendor over several years. The Recommendations that came from that Report are summarized as follows: The Department's monitoring functions are too isolated. The Office of Financial Review, formerly Office of Field Audits, which examines financial compliance, must consult and work with Program staff, since many issues of financial compliance will require knowledge of the program itself. For instance: to be sure that an agency is not receiving more than 20% in Administrative Expenses, Field Audits will need to consult with staff that know the program to be sure that the submitted budge is an honest reflection of the administrative program costs. Similarly, if an agency allocates costs between different programs, Field Audits must consult program staff to verify the allocation system presented by the agency. At the same time, Program Staff must be trained on the financial reporting requirements, such as disallowable expenses, so that they can educate vendors and ensure compliance (from OIG FY 15 Annual Report, General Investigations 2).**

*FY18 Department Update*: The Department has taken the following steps: The Office of Financial Review amended their procedures to include consultation with Program Monitors prior to the on-site review and consultation after the review as needed; The Office of Financial Review amended procedures to copy Program Monitors on any reports of an on-site review; The Office of Budget & Finance implemented a centralized, computer-based grant reconciliation system that provides for a line-item review to track quarterly expenditures which includes both direct program expenses and administrative costs; The Office of Budget & Finance maintains the grant reconciliation system used by all Divisions and provides administrative oversight during the year for compliance prior to the approval of billing; Beginning in FY18, the Office of Contract Administration initiated an annual review of budget-based agreements to review both direct and indirect administrative costs for reasonableness; Beginning in FY18, the Office of Contract Administration began annual training to contract monitoring staff on the issue of administrative costs for budget-based (grant) agreements and this training will continue to be strengthened; Beginning in FY18, the Office of Financial Review and the Department's Chief Accountability Officer implemented a heightened review schedule based on the findings of the federal grant accountability act (GATA) Internal Control Questionnaire system; Beginning in FY19, the Department moved the non-board Contract Monitoring System off of Access to a web-based system and will begin issuing quarterly compliance reports to administrators; In FY19, the Department will move the Grant Reconciliation System to a web-based system using the GATA line items and training is being scheduled this month on the new system. Program monitoring and the review of the audited financials provides financial oversight of the reported line item costs. The above changes have been implemented to improve contract monitoring and the Department will continue to implement on-going improvements as needed. The Department has concluded its response to this recommendation.

**DOMESTIC VIOLENCE**

FY 2016

**In cases of severe domestic violence, Department procedures should require safety plans that include the involvement of shelter staff or other family support agreeing to contact the Department if the family leaves (from OIG FY 16 Annual Report, General Investigation 4).**

> *FY18 Department Update:* The recommendation has been incorporated in draft Procedures 300, Appendix G, *Child Endangerment Risk Assessment*. The anticipated date of completion is Spring 2019.

FY 2014

**When child protection investigations involve an arrest for domestic violence, investigators should contact pretrial services to obtain bail conditions (from OIG FY 14 Annual Report, General Investigation 1).**

> *FY18 Department Update:* The recommendation has been incorporated in draft Procedures 300.50, *Investigative Process*. Once the procedures have been fully implemented the Department will have concluded its response to the recommendation.

FY 2015

**The Department should develop guidelines identifying behavior that calls into question protective capacity of a non-offending caretaker. When protective capacity issues are identified the Department must review available records and conduct a clinical interview to assess protective capacity. Recommendations from the Assessment must be included in any service plan (from OIG FY 15 Annual Report, Death and Serious Investigation 3).**

> *FY18 Department Update:* The recommendation has been incorporated in draft Procedures 300 Appendix J, *Domestic Violence.* The Office of Child and Family Policy anticipates posting for comment by February 2019.

FY 2012

**The Department should examine the continued utility of the Domestic Violence Screen and determine whether the Screen assists in assessing safety and risk to children (from OIG FY 12 Annual Report, General Investigations 1).**

> *FY18 Department Update*: The recommendation has been incorporated in draft Procedures 300 Appendix J, *Domestic Violence.* The Office of Child and Family Policy anticipates posting for comment by February 2019. Reference to the use of the domestic violence screen has been removed in the draft of Appendix J. Appendix J provides workers guidance regarding interview questions for children, adult victims, and alleged batters. DCFS Clinical will work with Child Protection staff to address the use of the Child Welfare Violence Screen created by the Inspector General's Office.

FY 2012

**The Department should consider requesting the assistance of Child Advocacy Centers (CAC) to interview children in investigations where there is chronic violence in the home and parents have**

**failed in the past to cooperate with services (from OIG FY 12 Annual Report, General Investigations 1).**

> *FY18 Department Update*: The recommendation has been incorporated in draft Procedures 300 Appendix J, *Domestic Violence*. The Office of Child and Family Policy anticipates posting for comment by February 2019.

FY 2012

**Policy Transmittal 2010.23, which issues revisions to Procedures 302.260, *Domestic Violence Practice Guide*, and Procedures 300, Appendix J: *Domestic Violence*, provides for batterers to remain in the home with a domestic violence safety plan. This policy should be amended to clarify that when domestic violence has occurred in the home, it is presumed that the home environment is too dangerous for the child to remain, unless the perpetrator of violence is out of the home. Policy Transmittal 2010.23 should make clear that establishing a domestic violence safety plan for children should not preclude taking protective custody (from OIG FY 12 Annual Report, General Investigations 1).**

> *FY18 Department Update:* The Division of Clinical Services has requested that the Office of Child and Family Policy rescind Policy Transmittal 2010.23 or remove the following language: "require as a possible alternative to taking protective custody when the batterer does not leave the home, development of a safety and protection plan with the non-offending adult victim that identifies actions that can be taken to protect the adult victim and children." In addition, the following language was incorporated in the draft of Procedures 300 Appendix J, *Domestic Violence:* "If the caregiver is unable to demonstrate a capacity to protect the children in the home, and/or the presence of domestic violence creates risk factors that compromise their safety, the children should be taken into protective custody." The Office of Child and Family Policy anticipates posting Appendix J for comment by February 2019.

FY 2011

**The Domestic Violence protocol should be revised to address the cumulative effect of domestic violence and strategies for addressing cases of chaotic family life in which the victim/abuser dynamic results in an incalculable emotional toll to the children, including collaboration with DCFS Clinical and the Office of Legal Services (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 11).**

> *FY18 Department Update*: The recommendation has been incorporated in draft Procedures 300 Appendix J, *Domestic Violence*. The Office of Child and Family Policy anticipates posting for comment by February 2019.

FY 2011

**The Department should integrate into its Domestic Violence protocol the need for increased scrutiny and heightened risk when a person suspected of being a victim of domestic violence has provided false information to protect an abuser of his or her child (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 12).**

> *FY18 Department Update*: The recommendation has been incorporated in draft Procedures 300 Appendix J, *Domestic Violence*. The Office of Child and Family Policy anticipates posting for comment by February 2019.

**FOSTER HOME LICENSING**

FY 2016

**The Department's Licensing Division should be trained to return as incomplete any forms that do not reflect an actual assessment of the required factors by the employer (from OIG FY 16 Annual Report, General Investigation 11).**

> *FY18 Department Update*: Agencies and Institutions (A&I) staff have been instructed not to accept a Background Check Unit response assessment, unless each question is answered. A & I Licensing and Background Check Unit staff return any incomplete assessments back to the assigned licensing team that supervises the application for licensure, or license. The Licensing Division is in the process of drafting policy to address the recommendation through a policy guide. The employer has the responsibility of assessing whether or not to retain an employee, then completing and signing the BCUC 1D form.  Licensing will train staff, using this redacted report as a teaching tool to provide clarification and ensure that all Licensing staff understand they are to review the form and not sign off until the assessment has been properly and fully completed by agency management, not the employee themselves. This will be completed the first quarter of 2019.

FY 2016

**The Department has a fiduciary duty to protect wards from environmental dangers such as secondhand smoke exposure. When a medically complex or premature infant is referred for placement in a home with environmental tobacco exposure, the Department should make a referral to the Chief Nurse for review of the home and associated risks. (See also Inspector General Report #14-2326) (from OIG FY 16 Annual Report, Death and Serious Investigation 8).**

> *FY 16 Department Response:* The Department agrees. In accordance with Department policy, referrals are made to DCFS Nursing in those case situations involving a medically complex or premature infant referred to placement in a home with environmental tobacco exposure.

> *FY18 Department Update:* The Department agrees that it is our duty to protect medically complex and premature infants with compromised breathing conditions from secondhand smoke. Good social work practice will not support placement of such children in a home where there is secondhand smoke.

FY 2015

**A foster care license applicant must provide the licensing worker with Consent for Release of Information form for the Social Security Administration (SSA). The Social Security Administration Consent form should be used (from OIG FY 15 Annual Report, Death and Serious Investigation 8 and 10).**

> *FY18 Department Update*: This recommendation is under review.

FY 2015

**The Department should amend CFS 718-A, *Authorization for Background Check for Foster Care and Adoption*, to include authorization to determine if the applicant has an active case with the Illinois Department of Rehabilitation Services (from OIG FY 15 Annual Report, Death and Serious Investigation 8 and 10).**

166

*FY18 Department Update:*  This recommendation is under review.

FY 2015

**Once the Department obtains the SSA and DHS information, the applicant's potential disability should not necessarily bar the person from providing foster care, but rather the information should be considered for whether the person is physically and mentally capable of caring for children. When there is a significant discrepancy between the DCFS health record and the SSA or DHS, the Department should refer to SSA or DHS for possible fraud and consider revocation for lack of trustworthiness (from OIG FY 15 Annual Report, Death and Serious Investigation 10)**

*FY18 Department Update:* This recommendation is under review.

FY 2010

**The Department should amend Procedures 301, Appendix E,** *Placement Clearance Process***, to provide guidelines for the monitoring and resolution of involuntary placement holds. These guidelines should include instructions for requesting the removal of an involuntary placement hold. The guidelines should also require that when an involuntary placement hold is placed on a foster home, the licensing worker and licensing supervisor should re-evaluate the placement hold every six months (from OIG FY 10 Annual Report, General Investigation 4).**

*FY 16 Department Update:* Revisions have been made to Procedure 301-Appendix E to provide guidelines for monitoring and resolution of involuntary placement holds. The Policy Guide with these changes was approved and is currently pending issuance with Office of Child and Family Policy.

*FY18 Department Update*: Revisions to Procedures 301-Appendix E is in process with the Office of Child and Family Policy. There are also two pending policy releases related to involuntary placement holds, both are in process with the Office of Child and Family Policy. The first policy release reflects the proposed change in the CFS 597-FFH, *Family Foster Home Licensing Monitoring Record*, that would require licensing representatives to address whether the home is on an involuntary placement hold, and the justification for the hold to remain in place. This also applies to voluntary holds. The second policy release is a proposed policy guide to be placed in Rules & Procedures 383 & 402. Rule 402 has been pending due to a court injunction that stopped the process from moving forward. The court issues appear to be resolved and the Department can now move forward with promulgating revisions in Rule 402. Rule 402 are now scheduled to go to 1st Notice in January 2019.

*FY 18 OIG Comment:* The Office of the Inspector General continues to receive complaints from both private agencies and foster parents regarding holds and the difficulty of getting a hold removed once it's been placed. Procedures 301, Appendix E (IV)(i) *Removing a Hold*, does not accurately reflect the current practice for removing holds. According to DCFS licensing, the Department has an internal Procedure to remove a hold that is not found in current Procedures 301, Appendix E. The Department's internal procedure should be incorporated into Procedures.

**INTACT FAMILY SERVICES**

FY 2017

**At the transitional visit in Intact Family Services cases with a medically complex child, the child protection investigator and intact family services caseworker should request that the parent sign consents for the worker to communicate with the child's medical home regarding the child's health and medical care management (from OIG FY 17 Annual Report, Death and Serious Injury Investigation 8).**

> *FY18 Department Update:* Procedures 302.388, *Intact Family Services* will be updated to reflect changes. A workgroup from the Child Welfare Advisory Committee Front End will be involved along with Intact Administration for this to be accomplished by the end of 2018. The Department does not support the use of standardized consents but does want caseworkers to seek obtaining a consent for all relevant providers. The Department also encourages staff to be actively involved in attending medical appointments with families and providing transportation if needed. Medically complicated children are a high priority. Expectations include active involvement in supporting the families' accessing medical care and Intact Family Services is to be actively involved. Expectations around medically involved children will be included in updates to Procedures 302.388.

FY 2017

**In Intact Family Services cases involving medically complex children, the caseworker must convene a staffing, within 30 days of receiving the case, with the medical case manager and parent(s) to discuss the child's care and assess parent's needs for tangible and emotional support (from OIG FY 17 Annual Report, Death and Serious Injury Investigation 8).**

> *FY18 Department Update*: The Department agrees that this is a fundamental practice to address services to medically complex children. During both trainings with Investigation staff and Statewide Intact Provider meetings, contact with medical providers has been stressed, including worker attendance at medical staffing. This will be formalized during the updates to Procedures 302.388, *Intact Family Services*. Child Protection has been encouraged to refer cases to Intact Family Services in these situations as quickly as possible so that if a child is hospitalized, the workers can meet with attending medical staff and attend hospital meetings, training and discharge planning meetings.

FY 2017

**The Department should replicate the Intact Family Recovery (IFR), which provides intensive services to caretakers with substance abuse problems, in the Joliet and Aurora sub-regions (from OIG FY 17 Annual Report, Death and Serious Injury Investigation 9).**

> *FY18 Department Update*: The Intact Family Recovery Program has been implemented functioning in Rockford and Joliet; referrals began April 1, 2018. The recovery coach is housed in the respective DCFS offices. A random assignment study is being conducted to determine successful outcomes. The Department has concluded its response to this recommendation.

FY 2012

**The Department should develop an effective consultation process and procedures specific to failure to thrive investigations and the provision of intact family services in cases with a failure to thrive child (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 4).**

*FY 17 Department Update:* The recommendation will be incorporated in draft Procedures 300.130(3) *Referral for services*, and draft Procedures 300.100, *Medical Requirements for Reports of Abuse and Neglect.* Intact Management staff has also worked with a physician specializing in abuse and neglect and DCFS Clinical around the Departments response to failure to thrive and medical neglect cases. The Intact Unit flagged all the intact family cases that have allegations 79 and 81 attached to them and those cases are prioritized for practice reviews as the Department recognizes and agrees these cases need close medical consultation.

*FY18 Department Update*: Intact Family Services providers are encouraged to utilize DCFS Clinical Services along with the child's medical providers for consultation. This practice will also be clarified as a clinical referral in the revisions to Procedures 302.388, *Intact Family Services.*

FY 2012

**The Department should explore the use of court-ordered service compliance with intact families where there is a high level of risk of future violence and lack of cooperation with Department services (from OIG FY 12 Annual Report, General Investigations 1).**

*FY 16 Department Update:* The recommendation was incorporated into Procedures 302.388(g), *Responsibilities of the assigned Intact Family Services worker* and issued via Policy Transmittal 2016.05 on 4/25/16. The recommendation has also been incorporated into draft Procedures 300-Appendix J, *Domestic Violence*.

*FY18 Department Update:* The recommendation will be incorporated in Procedures 300, Appendix J, *Domestic Violence* which is pending Proposed Policy Review.

FY 2014

**Consistent with the intent and spirit of the Division of Mental Health discharge planning (IL Administrative Code Title 59, Section 125.50), Department Rules and Procedures should require DCFS workers to contact staff at psychiatric facilities prior to the discharge of any involved family members to communicate concerns or issues known to the Department and to monitor compliance with discharge recommendations. In cases in which the patient has already been discharged, the Division of Child Protection must obtain complete psychiatric records, including any discharge recommendations, and follow-up with community providers identified. If the facility becomes involved during the pendency of a placement or intact family case, the worker should seek the consent of the involved family member to receive records and monitor compliance with discharge recommendations (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 2).**

*FY18 Department Response*: In FY 16 the recommendation was incorporated in Procedures 315. The recommendation will also be incorporated into Proposed Procedures 300. 50, *Investigative Process* which was released for comment on December 1, 2018.

**LAW ENFORCEMENT**

FY 2016

**The Department must review all UIRs involving a youth with a gun or ammunition to ensure that Administrative Procedure 18, requiring notification of law enforcement, has been followed (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

*FY18 Department Update*: The Department has a workgroup in the infancy stage, called the Significant Threats Workgroup. The group consists of DCFS Clinical, Residential Monitoring and Dually Involved staff and law enforcement. The goal is to develop a plan of action and a protocol for youth who appear to pose a serious threat or fit a profile such as potential school shooters, those who make bomb threats, etc. In addition, the Office of Information Technology Services is generating a weekly arrest report drawn from significant event reporting. The regional Dually Involved Specialists are tasked with deep diving into cases with gun charges, significant threats, and/ or youth with frequent arrest incidences in short periods of time. For youth that meet the profile of youth we need to pay close attention to, they flag those cases to the Significant Threats Workgroup. In addition, the Department has a contract with the Youth Advocate Program, which specializes in gang/crisis intervention. The Department can deploy those advocates to follow up on cases and youth which may involve gangs or other crime.

## MEDICAL

FY 2017

**In cases of medical neglect where a caregiver failed to give a child prescribed medication, the Department should develop practice for addressing a parent's non-compliance with the administration of medication (from OIG FY 17 Annual Report, Death and Serious Injury Investigation 8).**

*FY18 Department Update:* DCFS Nurses are available to accompany caseworkers to meet with families, communicate with the child's medical providers and/or attend medical appointments upon request. The DCFS nurse can also review medical records (including lab results) to determine if medication levels in the patient's blood are therapeutic at the request of a worker or provider in consultation with the medical provider(s). DCFS Nurses are available to participate in Child and Family Team meetings and/or clinical staffings to address medical concerns including in situations in which medication administration is at issue. The Department has concluded its response to this recommendation.

FY 2016

**The Department, in conjunction with its Medical Director, should inform the field regarding training and resources for child welfare staff concerning the risks of secondhand smoke exposure for children as well as smoking cessation resources for clients and families (from OIG FY 16 Annual Report, Death and Serious Investigation 8).**

*FY 17 Department Update:* Health Services worked with Foster Parent Support to include the danger of smoking and second-hand smoke information in the foster parent newsletter and on the foster parent website. Health Services, along with the Medical Director, will work with Training and Development to implement online training for field staff. It is anticipated that the online training will be available by the end of the fiscal year.

*FY18 Department Update:* On-line training has been developed by DCFS Nursing and Training. This new course introduces foster parents and DCFS and Purchase of Service staff to the dangers and effects of secondhand smoke, as well as the policies related to second hand smoking. The self-paced, on-demand training is available online to child welfare staff as of November 16, 2018. The training slides will also be provided in the quarterly addition of "Now and Forever" (the Foster parent's magazine) in the January 2019 edition. Health Services worked previously with the Communications Office and Foster Parent Support to include the dangers of smoking and second-

DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS

hand smoke on the foster parent website. However, as of this writing, those resources are not on the foster parent website. Health Services will work with Communications to add these resources to the website, as well as include a reminder of Administrative Codes Section 402.8, *General requirement for foster homes* which states, "No person shall smoke tobacco in a foster family home, open or enclosed motor vehicle while transporting a foster child, or within 15 feet of entrances, exits, windows that open, and ventilation intakes that serve the foster family home [410 ILCS 82/10 and 70].

**FY 2016**

**The private agency should ensure that their nurse maintains contact with all medical providers for medically complex children. The agency should inform all involved medical providers of their duties to the child and request notification from the medical provider of any concerns regarding the children for whom they provide care (from OIG FY 16 Annual Report, Death and Serious Investigation 8).**

*FY 16 Department Response:* The Department agrees. This recommendation will be expanded to include all agencies. The redacted report will be shared.

*FY18 Department Update*: This is still in process.

**FY 2015**

**The Department should ensure that all reception center staff are made aware that when a youth is taken into protective custody parental consent for medication administration is sufficient. If consent cannot be immediately procured, the youth should be provided with his/her prescription medication on an emergency basis until parental consent can be obtained. The Department should also clarify whose responsibility it is to obtain parental consent for medication when a youth is taken into protective custody (from OIG FY 15 Annual Report, General Investigation 17).**

*FY18 Department Update:* The recommendation was incorporated into proposed Procedures 300.120, *Taking Children into Protective Custody*, which was posted for comment on November 29, 2018. Once the procedures have been fully implemented the Department will have concluded its response to the recommendation.

**FY 2011**

**HealthWorks should obtain the results of newborn genetic metabolic screens on all children, regardless of their age, upon entering Department care. If the results of the genetic screen are unavailable, the Department should ensure that the screen is completed during the HealthWorks comprehensive exam or by the child's primary care physician (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 9).**

*FY 17 Department Update:* Illinois Department of Public Health is currently sending the new fields to OITS. Additional Birth Data Fields include Birth Weight, Gestational Age, Apgar Score 5, Apgar Score 10, Plurality, Birth Order, Abnormal Conditions, and Congenital Abnormalities. The mapping of the new fields to SACWIS Health Birth Data was completed and tested in August 2017. The program to update the Birth Data in SACWIS was put into production in August 2017. The program that updates the fields in eHealth is currently being tested by Health Service MIS.

*FY18 Department Update:* Other mapping related to health data (including additional birth data) is in process. However, the newborn metabolic screening is not complete. The Department

continues to collaborate with the Illinois Department of Public Health on how to access this data and map it to SACWIS.

FY 2014

**If a Regional Medical Consultant report is pending when custody is taken of a child, the child protection investigator and medical program coordinator should arrange for a phone conference to review their preliminary findings with the placement agency supervisor. The Coordinator should ensure that the agency receives a copy of the report upon completion (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 8).**

*FY18 Department Update*: The recommendation has been incorporated into proposed Procedures 300.100, *Medical Requirements for Reports of Child Abuse and Neglect*, which were released for comment on November 29, 2018. Once the procedures have been fully implemented the Department will have concluded its response to the recommendation.

FY 2014

**When a Regional Medical Consultant report is pending the Integrated Assessment screener should be part of the case conference in order to integrate the medical information into the integrated assessment (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 8).**

*FY18 Department Update:* The Integrated Assessment screener obtains all Multi-Disciplinary Pediatric Education and Evaluation Consortium (MPEEC) reports from investigative or casework staff. The Integrated Assessment screener will also attend the staffing if the staffing occurs after the Integrated Assessment screener has been assigned to the case. Most Child Abuse assessments occur in the earlier stages of the investigative process and the child is not yet in care in which case the report is requested by the Integrated Assessment Intake Coordinator or the assigned Integrated Assessment screener. If the report is received or if the Integrated Assessment screener participates in the staffing, the findings and recommendations of these reports are included in the Integrated Assessment report. Integrated Assessment screeners consistently obtain medical reports from investigative or casework staff under the Integrated Assessment Protocol. In addition, Integrated Assessment screeners have access to the Health file located in SACWIS and utilize the assistance of Child Welfare Nurse Specialists in the Region when assistance is needed in obtaining and interpreting medical records. The Department has concluded its response to this recommendation.

**MENTAL HEALTH**

FY 2015

**From OIG FY 2015 Annual Report, Special Investigations, *Psychotropic Medication and Hospitalizations of 3 and 4 year olds:* An ecological and developmental focused Specialized Assessment must be used for children under age 6 who have been referred to the CARES hotline or for whom the Guardian receives a request for psychotropic medication. The Assessment should include the following:**
   a. **Description of identified problematic behaviors;**
   b. **Ecological and Developmental perspective including prior trauma and neglect suffered by the child and number of transitions;**
   c. **Corroboration of whether identified problem behaviors occur across settings; with Child Behavior Checklist from key informants including foster parents, relatives, teachers, early education providers, and other relevant professionals;**

d.  The ecological and developmental perspective include prior trauma and neglect suffered by the child and number of transitions the child has encountered;
e.  A description of typical day (weekday and weekend);
f.  Description of sleep routine; visitation schedules, foster home composition;
g.  A Functional Behavior Analysis of the child's behavior; and
h.  Description of non-chemical evidence-based interventions that will be attempted prior to use of psychotropic medication.

*FY18 Department Update*: Policy Transmittal 2018.11, *Procedure 325* and Procedures 325.40, *Medication Approval Standards* were both finalized and issued on July 5, 2018. The procedures explain the role and function of the Continuity of Care Centers and addresses the assessments used per their contracts. The Department has concluded its response to this recommendation.

FY 2015

**SASS must stop using the CSPI on children six years of age and under (from OIG FY 15 Annual Report, Special Investigations, *Psychotropic Medication and Hospitalizations of 3 and 4 year olds*).**

*FY18 Department Update:* The Illinois Medicaid-Crisis Assessment Tool (IM-CAT) has replaced the CSPI-EC as one of the components used to assess children in crisis who are involved in a mobile crisis response episode. This tool does include a functional assessment of a variety of factors that impact the reason for crisis intervention. This is the official tool chosen by Healthcare and Family Services to be completed at the point of crisis to determine the most appropriate clinical intervention. This tool, in conjunction with accompanying clinical, social history and contextual information, allows the clinician to recommend the best course of treatment to ameliorate the issues that brought the child/youth to the point of needing emergency mental health treatment. The Department has concluded its response to this recommendation.

FY 2015

**The Department needs to train foster parents and caseworkers on first-line interventions recommended in the Department's consulting psychiatrist's Schematic Summary (from OIG FY 15 Annual Report, Special Investigations, *Psychotropic Medication and Hospitalizations of 3 and 4 year olds*).**

*FY18 Department Update:* Policy Transmittal 2018.11, *Procedure 325* and Procedures 325.40, *Medication Approval Standards* were both finalized and issued on July 5, 2018. These approval standards apply to administration of psychotropic medications to youth in care 5 years of age or younger. The DCFS Training Department has been working with the University of Illinois at Chicago team on the training module. This module is designed for caseworkers to be trained on the updated Procedure 325.40. It is anticipated to be complete before the end of 2018. On June 29, 2018, the Office of Learning and Professional Development prepared a nearly finalized draft of Part I, Procedure for Consent of Psychotropic Meds for Youth in Care Ages 5 & Under and submitted it to project sponsors for review and approval. This one-hour, self-paced, on-demand course is designed for DCFS and POS caseworkers and supervisors. This course reviews the procedures for obtaining consent, administering and monitoring psychotropic medications prescribed to children under the age of 5 years. The second training module will be designed for caseworkers and foster parents. Part II, Procedure for Consent of Psychotropic Meds for Youth in Care Ages 5 & Under course is under development. On August 5, 2018, the Office of Learning and Professional Development rolled out the Psychotropic Medication Management for Children and Youth in Substitute Care course. This 3-hour self-paced, on-demand course explains the use of

psychotropic medication with our youth in care and the appropriate way to receive consent for the use of these medications. 584 staff have completed the course.

FY 2015

**The Guardian's Office should retain Psychotropic Medication Request Forms completed for youths in care and ensure that first line treatments, as outlined by the Department's consulting psychiatrist, have been provided prior to approval for psychotropic medication (from OIG FY 15 Annual Report, Special Investigations, *Psychotropic Medication and Hospitalizations of 3 and 4 year olds)*.**

> *FY18 Department Update*: University of Illinois at Chicago (UIC) psychiatric consultants provide oversight by ensuring that each treating physician's request has a second opinion, psychiatric consultants at UIC review each request for first line treatments. The Department has concluded its response to this recommendation.

FY 2013

**The Office of the Guardian should adopt a policy for the review of Restriction of Rights forms that includes a review for compliance with the Mental Health Code (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 3).**

> *FY18 Department Update*: The Guardian's Office has implemented an internal protocol for processing and evaluating restriction of rights for youth in care.

FY 2012

**Access to means, specifically firearms, is predictive of suicide completion.  Research has shown and as noted in two adolescents' deaths, those at risk of suicide will break into locked rooms and locked cabinets to access the firearms.  When the Department is placing an adolescent at risk of suicide in a foster home or facilitating a return to the biological home where there is a gun, the Department should conduct a clinical staffing to educate the parents (biological and foster) that the risk of suicide doubles if there is a firearm in the house, even if the gun is locked up.  The staffing should utilize the materials developed by The University of Illinois at Chicago Institute for Juvenile Research for their Youth Suicide Prevention program.  If the family has firearms, they should be asked to store the guns outside of the home.  If the parent will not store the firearm elsewhere they must store firearms with a trigger lock in a lockbox.  The keys should be kept in a secure or supervised setting.  In return home situations of a suicidal youth, where the biological parent refuses to store the gun with a trigger lock in a lock box, the caseworker should contact DCFS Legal for assistance in presenting the case in Juvenile court for purpose of obtaining a court order (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).**

> *FY 16 Department Update:* Policy Guide 2015. 08, *Enhanced Firearm Safety in Foster Family Homes* was issued May 1, 2015.  In July 2016, a complaint for declaratory and injunctive relief was filed against the Director, challenging various rules and regulations related to firearm safety.  At the present time, the Director is conducting a review of 402 Licensing Standards.

> *FY 17 Department Update:* Extensive proposed amendments to Rule 402, *Licensing Standards for Foster Family Homes* are awaiting further review and approval prior to First Notice filing.

> *FY18 Department Update:*  The Department is reviewing this recommendation.

174

**OLDER YOUTH IN CARE**

FY 2015

**From OIG FY 2015 Annual Report, Special Investigations,** *Shelter and Runaway Report:* **The Shelter System should be revamped to include the following:**

- **The Department should determine the number of older Cook County shelter youth with histories of serious mental illness who cycle in and out of the present Shelter system. The Department should develop a specialized stabilization center for this population of youth.**
- **In addition to clinical services, this stabilization center should have an outreach unit that functions similarly to homeless mental health delivery services.**
- **The stabilization center should host supportive NAMI (or similar) groups for relatives or other child centered collateral of the youth who are willing to partner with stabilization efforts.**
- **The Center should tightly coordinate educational services to assure the residents' educational rights are secured. This is crucial for those youth who are eligible or up for redetermination for SSI benefits. The center should also provide alternative educational programming similar to Education Options program at the Madden Center.**
- **The Department should determine the annual number of Cook County shelter youth 15 years old or older who are involved with the Juvenile Justice System or adult probation and who cycle through its Shelter system. The Department should develop a restorative justice stabilizing center for this targeted population, working closely with Juvenile Court personnel and Probation. The staff of the shelter should have the ability to network with the various Detention Alternative programs including Electronic Monitoring and Evening Reporting Centers and substance abuse programs. Clinical services should be provided for those youth who have mental health or adjustment problems.**
- **The Department should develop a violence-free stabilizing center for the older youth (over 17) involved with the criminal court system or dually involved with adult and juvenile courts. The programming of the shelter should model a Safer Foundation approach. The staff should work with Cook County Sheriff, Criminal Court personnel and Probation. The stabilizing center should clearly define a nonviolence contract with each youth who enter the program. If the terms of the center's nonviolence contract are violated the Department should immediately inform the Juvenile Court and Adult probation of the violation and the intention of the Department to request termination of the adult's wardship.**
- **The Department should develop a specialized clinical and educational stabilization/shelter program for female youth who have or are at high risk of being victims of trafficking. The Department should consider the Cook County Sheriff's Office offer of prevention work with potential trafficking victims.**

*FY 18 Department Update:* The Department disagrees with the recommendation to develop specialized stabilization/shelter programs. The Department plans to develop short term Interim Care Unit(s) that have increased clinical and therapeutic capacity which will provide a variety of clinical support or diagnostic services. These Interim Care Unit(s) will provide trauma informed treatment services and will offer family engagement and after care support services. The Interim Care Unit intends to maintain youth at their home school which may require that staff provide transportation to the youths' schools, or to work with the home school district to schedule other forms of transportation services. This program will develop individualized treatment plans to address the specific needs of youth they would serve. The first two programs in current development are Aunt Martha's Youth Services Children's Reception Center (CRC) and Daniel J. Nellum Youth Services. Aunt Martha's has recognized that there is an increasing complexity of the young people served at the CRC, manifested in both physical and mental health conditions. Anticipated to begin in early 2019, Aunt Martha's will enhance its clinical capacity as well as

increase overall to serve up to 30 male and female youth. The additional enhanced supports will better support and train staff, improve youth engagement, increase youth access to mental health and substance abuse services, and better ensure youth and staff safety, as well as facility security. Daniel J. Nellum has recognized that the youth they serve come with a history of severe behavioral issues, delinquencies, criminal histories, chronic AWOL behavior and/or poor compliance with services. These youth have experienced traumas ranging from verbal abuse, physical abuse, sexual abuse, medical and educational neglect, and abandonment, which have led to some youth being hyper vigilant, distrustful, exhibiting sexualized problematic behavior, delinquent behaviors and severe anger management issues. The program redesign will provide assessment of the youth's mental health, educational, pre-vocational, vocational, and life skills needs in order to develop a comprehensive plan of treatment to manage trauma related mental health issues and reduce recidivism. They also plan to provide highly structured and well-supervised individual and group programming to address identified needs. They will ensure court appearances and reduce the likelihood of re-arrest while allowing the youth to continue attending school and plan for their future. The plan is for them to serve up to 12 young men in a new location with an evidence based trauma informed treatment model, with an expected opening in the Spring of 2019.

FY 2014
**In fiscal year 2014, the Inspector General's Office made the following recommendations (from OIG FY 14 Annual Report, General Investigation 13):**
- **Colleges and universities offer an orientation week for all incoming students. Similarly, the transitional living program should provide a two-week orientation period for all teen parents. The orientation should focus on building family and community support using a task-centered/ecological approach. During this orientation period, the transitional living program case manager and family support worker will jointly introduce a young parent to community-based resources in the area and begin building the foundation of a support system. (a) Family support worker duties include: introducing a youth and her child to local Head Start programs and supporting progress through monthly visits; introducing a young parent and her child to libraries, WIC offices, park districts; establishing a pediatric medical home for a young parent's child; (b) Case manager duties include: supporting the youth in their educational setting through monthly visits to the young parent's school or job to assist the youth to overcome obstacles that hinder achievement. If the young parent is without a medical home, accompanying them to a local Title X Clinic/medical home; and exploring recreational, physical fitness and arts programs in the community with the youth. The case manager should diligently assist the young parent in maintaining and strengthening their extended support system, including inviting a young parent's family or friends to an orientation meal and visiting with a young parent's emergency caretaker.**
- **When a young parent transitions into a transitional living program, the receiving case manager shall introduce themselves to school staff within the first ten days and ask to be notified via email of any absences. To support the case managers efforts to sustain attendance, case managers must arrange to have access to the applicable education notification system portals for absences or cuts. If the school does not have a portal system (such as the Alternative School Network), the case manager should arrange notification through available mentors or teachers. If a young parent has two consecutive absences from school, the case manager must immediately make in-person contact. The Teen Parent Support Network Education Support Department shall be consulted before**

DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS

**absenteeism becomes a chronic issue. This recommendation should be incorporated into Procedures 302,** *Services Delivered by the Department*, **Appendix J,** *Pregnant and/or Parenting Program.*

*FY 18 Department Update:* The recommendation has been incorporated in proposed Procedures 302, Appendix J, *Pregnant and/or Parenting Program.* The proposed procedures were posted for Proposed Policy Review on November 19, 2018. Once the procedures have been fully implemented the Department will have concluded its response to the recommendation.

FY 2014
**In fiscal year 2014, the Inspector General's Office made the following recommendations (from OIG FY 14 Annual Report, General Investigation 13):**
- **During the transitional living program pre-placement process, the sending case manager will assist the young parent in identifying the names, addresses and phone numbers of individuals whom the youth wants on their visiting list. The receiving case manager will amend this list as the young parent's supports change over time. This recommendation should be incorporated into Procedures 302,** *Services Delivered by the Department*, **Appendix J,** *Pregnant and/or Parenting Program.*
- **The Department should incorporate the two-week orientation period and pre-placement process as a model for all teen parent transitional living programs This recommendation should be incorporated into the Procedures 302,** *Services Delivered by the Department*, **Appendix J,** *Pregnant and/or Parenting Program.*

*FY 17 Department Update:* The recommendations have been incorporated in all Independent Living and Transitional Living program (ILO/TLP) plans including those for specialty populations such as pregnant and parenting teens.

FY 2014
**To increase communication and collaborations among the transitional living program system of care, a young parent's case manager and family support worker should meet with day-shift community support staff to review progress and enhance opportunities for the young parent and their child's successful engagement in education, and to strengthen the mother and child support system. Shift summaries should be reviewed before this meeting. These meetings should occur every four to six weeks. This recommendation should be incorporated into the Procedures 302,** *Services Delivered by the Department*, **Appendix J,** *Pregnant and/or Parenting Program* **(from OIG FY 14 Annual Report, General Investigation 13).**

*FY18 Department Update:* The Department does not agree that it is necessary to add this language to either P302, Appendix J or the ILO/TLP program plan.  Currently, TLP programs either have the case manager on site who meet with the youth and shift staff on a daily basis or the case manager minimally meets with the youth and shift staff weekly to discuss day to day issues and/or concerns.  In addition, there is either a monthly or quarterly review meeting with the youth.  At that meeting the case manager, shift staff and youth review progress, goal setting and ways to enhance opportunities for the young parent and their child's successful engagement in education, and to strengthen the mother and child support system.

DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS

FY 2014

**Anticipating college enrollment, a case manager should assist a young parent in beginning the application process for grants and federal aid when high school graduation or high school equivalency testing (GED) completion is imminent. Youths in care should not have to confront the daunting and complicated process of applying for Pell grants and federal aid (FAFSA) without hands-on assistance. The Teen Parent Support Network Education Support Department or Youth In College should assist any parenting youth who has completed high school or earned a GED in completing these required applications. This recommendation should be incorporated into the Procedures 302,** *Services Delivered by the Department*, **Appendix J,** *Pregnant and/or Parenting Program* **(from OIG FY 14 Annual Report, General Investigation 13).**

> *FY18 Department Update*: Proposed changes to Procedures 302, Appendix J, *Pregnant and/or Parenting Program* were posted for Proposed Policy Review on November 19, 2018. Once the procedures have been fully implemented the Department will have concluded its response to the recommendation.

## PERSONNEL

FY 2016

**Employers should get a copy of the Child Protection Investigation Summary along with the Notice of Indicated Child Abuse/Neglect Report when an employee has been indicated (from OIG FY 16 Annual Report, General Investigation 11).**

> *FY18 Department Update*: DCFS Licensing and the Office of Legal Services have been working on addressing this issue. Draft language to the CFS 718-B is pending approval with both offices and will be completed by December 31, 2018.

FY 2013

**DCFS must establish guidelines for professional ride-alongs with DCFS staff. Guidelines for medical professionals (e.g., medical residents) should address what are permissible and impermissible tasks (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 12).**

> *FY 18 Department Update:* The recommendation has been incorporated into draft Administrative Procedure #29, *Interns and Shadows.* The anticipated completion date is January 2019. Once the procedures have been fully implemented the Department will have concluded its response to the recommendation.

## SERVICES

FY 2017

**Prior to return home, caseworkers must develop a reunification plan that identifies basic necessities that must be in place before return home (food, beds, diapers, etc.); support services that must be in place before return home (homemaker, visiting nurse, counseling, early intervention, Head Start, day care, school, respite care, etc.); and community resources appropriate and available within two miles of the family's home (WIC, food pantry, local library, etc). The Department must ensure that the family is securely anchored to supportive services (from OIG FY 17 Annual Report, Death and Serious Injury Investigation 2).**

*FY18 Department Update:* The Department makes every effort to ensure that needs and services are in place prior to return home as part of reunification planning. This is best practice and each case should be assessed and monitored by the caseworker and supervisor to ensure this occurs. This is being addressed further through the coming implementation of the Core Practice Model integrated with the Model of Supervisory Practice.

FY 2017

**The Department should fund transportation to daycare or Head Start programs in return home cases where there are multiple young children and the parents – because of poverty or increased stress – cannot transport their children (from OIG FY 17 Annual Report, Death and Serious Injury Investigation 2).**

*FY18 Department Update*: Youth in Care with Individualized Educational Plans have transportation paid for. As of the 2017-2018 school year, youth in care no longer qualify under the McKinney Vento Homeless Assistance Act. DCFS and the Illinois State Board of Education (ISBE) have partnered to share the cost of transportation 50/50. However, this is only for ISBE funded pre-schools and Head Start programs. Any daycare not funded by ISBE does not get transportation reimbursement. Daycare transportation is still a work in progress.

FY 2017

**Representatives from the Department of Public Health should be invited to a Child Protection Supervisors meeting to discuss the role of APORS (Adverse Pregnancy Outcomes Reporting System) for high-risk infants. In child protection investigations involving a premature infant where it appears that the parent has missed medical appointments including well-child visits, child protection supervisors should be guiding investigators to contact WIC and APORS because a high-risk situation may exist (from OIG FY 17 Annual Report, Death and Serious Injury Investigation 4).**

*FY18 Department Update:* Cook County Regional Management will coordinate a meeting with the Illinois Department of Public Health and Child Protection Supervisors to discuss and explain the role of APORS for high-risk infants. This meeting will take place the first quarter of 2019.

FY 2017

**The Department must develop resources including funding for residential treatment centers to develop their own step-down foster homes (from OIG FY 17 Annual Report, Death and Serious Injury Investigation 6).**

*FY18 Department Update:* The Department currently offers the Foster Care Placement Enhancement/Enhanced Wraparound Program as an incentive to agencies that are willing to develop homes specifically for youth stepping down from residential treatment programs to specialized foster care. Through this program, the agency can receive a financial incentive for each youth they accept that is stepping down from a residential program and for each new foster home they develop that successfully takes a step-down youth. Once the youth has stayed in the home for 30 days, the new foster parent can also receive a financial incentive every month for twelve months for sustainability and support.

FY 2016 and FY 2017

**The Department should develop a violence and substance free therapeutic community based model similar to a halfway house model for youth 18 and over involved with the criminal court system or dually involved with adult and juvenile courts for crimes against a person. The programming should require that the youth: enter into a nonviolence contract, obtain a minimum of part time employment, participate in continuing education through the City of Chicago Community Colleges (technical certification program, GED, or Associate Arts degree) or credit recovery or alternative school programs for youth who can earn a high school diploma. The therapeutic model should clearly define a no-violence contract with each youth who enters the program. If the terms of the shelter's non-violence contract are violated the Department should immediately inform the Juvenile Court and Adult probation of the violation and the intention of the Department to request termination of the youth's wardship. Programming should include Safer Foundation and the Isaac Ray Center (from OIG FY 16 Annual Report, Death and Serious Investigation 10 and from OIG FY 17 Annual Report, Death and Serious Injury Investigation 6).**

> *FY18 Department Update:* The Department recently developed and implemented the Heartland Alliance Re-Entry Program for youth in detention waiting for a higher level of care. This program serves Cook County juvenile detention or Department of Juvenile Justice youth. This is a 3-6 month program which involves restorative justice programming, individual therapy, and substance abuse programming. Weekly staffing's are convened at the facility to prepare youth to transition to community-based programs versus residential treatment. Additionally, the Department, in conjunction with the Department of Juvenile Justice, is exploring detention centers with underutilized space. The two agencies will determine if available space at detention centers could be converted to house a therapeutic community-based model. In mid-2018, the Department engaged in further discussions with the Safer Foundation, however, the Safer Foundation's programming focuses on education and employment readiness, therefore it was determined that this program would not meet our needs as a therapeutic community placement program for dually involved youth. The Department does refer youth to Safer Foundation for education and employment needs. The Department also utilized community based programs such as the Youth Advocate Program to engage youth that have a history of violence and substance abuse. Furthermore, the Department utilizes agencies such as Thresholds, Riveredge and Stepping Stones to accept youth and provide intensive therapeutic treatment for youth over the age of 18. The Department has concluded its response to this recommendation.

FY 2016

**The Department should explore collaboration with the Illinois DHS Division of Mental Health, Division of Alcoholism and Substance Abuse, and the Cook County Sheriff's Office to develop a stabilization strategy for DCFS Cook County young adults with mental illness and substance abuse problems who are charged with crimes against a person that exclude them from the criminal mental health court (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

> *FY18 Department Update:* The Department continues to explore collaborations with other state, county and local government agencies. DCFS and the Department of Juvenile Justice meet regularly to improve the process by which youth are discharged and placed in the community, but also are looking at options to develop more in-state placement resources for youth that are severely mentally ill and cannot sustain themselves in a community based setting. The Department is already working very closely with the Sheriffs' Office on human trafficking issues. The Office of Delinquency Prevention and Restorative Justice envisions youth and young adults, at risk of becoming entrenched in multiple systems, being safely diverted from crime and violence, safely re-entered into their community, and ultimately achieving permanency. Recently, there was a

180                          DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS

multi-state agency collaboration to develop programming and resources that would address the needs of more at risk youth and young adults that have the most barriers to achieving permanency and self-sufficiency. In October 2018, 53 dually involved youth engaged in a 2-day summit with the Department of Juvenile Justice, DCFS, Department of Human Services, Illinois State Board of Education and the Governor's Office to dialogue and develop solutions to address the needs of young people that fall into these categories. The involved youth discussed issues affecting their age group such as education, drugs, gangs, and engaged in a discussion to develop solutions.

FY 2016

**To counter the lure of gangs and guns, the Department must offer programs in severely economically disadvantaged neighborhoods, such as Englewood, Lawndale and Austin, that include, remedial tutoring and enhanced learning opportunities for DCFS youths in care and children who have achieved permanency through subsidized guardianship or adoption who have reading and/or math scores two grades below level, and to offer the opportunity for pro-social recreational programs with safe passage (transportation) for these children (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

*FY 17 Department Update:* The Department participates as an official member of the Illinois Criminal Justice Information Authority (ICJIA), an intergovernmental and advocacy group collaborative responsible for funding crime data, policy efforts, and crime victim services. The Department has encouraged the authority to make funding available for supportive programs specifically for children and families that have achieved permanency and were exposed to community violence. This is now one of ICJIA funding priorities. The Departments' Office of Education and Transition Services has 5 separate contracts that provide a variety of services, which include, but are not limited to; on-site counseling, home visits to increase parental involvement, re-engaging youth who are out of school, educational coaching and mentoring for drop outs. These programs are located and/or serve all the economically disadvantaged neighborhoods within the Chicagoland area for youth between the ages of 6-21. This investment cost the Department approximately $5,696,604. The Department is also exploring HopSkipDrive, a child-focused ride sharing company, that Los Angeles County uses to transport foster youth to and from their school of origin safely despite a placement disruption. Staff are assigned to work on specific issues and recommendations identified in the OIG Homicide Report in collaboration with specific DCFS administrators; depending on the issue area. Department staff are also working with the Office of Education and Transition Services to specifically look at the additional transportation needs caregivers may have for their children in areas exposed to community violence. Staff will be doing a community needs assessment by way of interviewing, administering and analyzing survey results collected from case managers, caregivers, and youth that reside and attend school in the neighborhoods identified in the OIG Homicide Report.

*FY18 Department Update:* There have been programs developed in FY18 and FY19 specifically in these neighborhoods to enhance positive outcomes for these youth, including the Breakthrough After School Program and the UCAN After School Program. These programs are being piloted on a small scale with our most at-risk communities such as Austin and Garfield. If the programs yield positive results, it may be expanded to Englewood and other areas of the city. The Department has concluded its response to this recommendation.

FY 2016

**When a special education youth in a residential program outside of the City of Chicago is transferring to a therapeutic/specialized, foster/relative home or transitional living program in Chicago, the Regional educational advisor from the sending community and the receiving Chicago Regional educational advisor should meet in advance of the school transfer to develop a transitional plan with the receiving school and the receiving agency assuring that the youth receives timely and appropriate special education services. The youth should be involved in the planning and afforded the opportunity to visit the receiving school prior to the transfer and the Department should fund an educational mentor to assist the youth for the first six weeks of the school transfer. The educational mentor should provide transportation for the first six weeks and assist the youth in adjusting (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

> *FY18 Department Update:* Chicago Public Schools have a DCFS educational liaison who work with youth in care that have Individual Education Plans to ensure their transition to new educational settings is less stressful. The Department also has the Northern Illinois University educational advisors who will ensure a transition plan occurs. The Educational Advisors will consult with the receiving school and the youth for six weeks to ensure the youth transitions successfully. The Office of Education and Transition Services will work with the Office of Information Technology to ensure that their office is notified of placement changes in Cook County, specifically those moved to therapeutic or specialized placements and then will follow up accordingly with Chicago Public Schools to ensure all records are transferred and necessary reports are implemented. However, the Department does not agree with funding an educational mentor to assist the youth for the first six weeks of the school transfer to provide transportation and assist the youth with adjusting. School districts receive Title I funds to transport youth who are special education students. Due to this funding, districts should remain responsible for transportation, not the educational advisors.

FY 2016

**The Department should explore identification of entities that can offer credit recovery programs similar to the one at Maryville Madden Shelter (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

> *FY18 Department Update:* This issue is ongoing. Every traditional school district throughout the State that is Illinois State Board of Education funded offers credit recovery. The alternative School Network, which serves youth in Cook County, also offers credit recovery to all qualified youth. There is still an issue for youth placed in residential therapeutic day schools. Some of the youth have had long lapses in education due to hospitalizations. Credit recovery is done primarily on an individual basis and is most often independent of an instructor. Youth/Students need to have the mental capability to do this work online independently. The resources are available. The DCFS Office of Education and Transition Services can be contacted to find the resources/schools available in different regions or districts. Again, residential therapeutic day schools are not required to provide credit recovery due to the type of student being served**.** The Department has concluded its response to this recommendation.

FY 2016

**Similar to the Rosecrance model, the Department should develop a supportive recovery transitional living program for its young adults in Cook County who are in their early stages of recovery. The program should offer individual, group and family counseling, educational and employment services**

**with incentivized goal setting in these areas (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

> *FY18 Department Response*: For any youth who need substance abuse services the Department will contract with outpatient providers to develop a Transitional Living Program. The Department also has existing providers that have staff who provide substance abuse services and supports or who contract, on their own, with community substance abuse agencies who are willing to come into their programs to provide individual, group and family counseling around substance abuse and recovery issues. For those youth with significant substance abuse issues, the Department also refers youth to inpatient substance abuse programs such as Rosecrance and Gateway.

FY 2016

**The Department should utilize The Addicted Minor Act to obtain court ordered treatment for dually involved youth who are in need of substance abuse treatment in lieu of violating their delinquency probation (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

> *FY18 Department Response:* The Department explored this idea and held several meetings on the use of the Addicted Minor's Act. All parties involved in the discussion agreed it was not feasible. The Assistant State's Attorney never brings petitions under that statute and drug treatment can be mandated by Juvenile Justice or DCFS case plan.

*FY 18 OIG Comment:* The Inspector General's Office agrees that it may be easier to address this issue through delinquency court orders. The practice should be solidified through training and/or policy reform.

FY 2016

**For effective collaboration Cook County Region DCFS should pursue an agreement with the Cook County Probation Department to cross train the dually involved specialized caseworkers and the youth's assigned probation officers. The training should cover the ins and outs of probation, delinquency court and gang safety and the DCFS related policies and expectations. The trainings should be conducted biannually and include a discussion component provided by experienced caseworkers and probation officers on gang involvement and lessons learned (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

> *FY18 Department Update:* The Department successfully completed Multi-System Collaboration Training and Technical Assistance. The outcome was a joint agency plan to expand the Dually Involved Committee and develop cross-training between DCFS, Department of Juvenile Justice (DJJ) and Cook County Probation. The Dually Involved Committee has a large number of stakeholders and the Department is only a member of the Committee. The Committee is under the purview of the Cook County Chief Juvenile Judge's Office. The involved agencies are currently in the process of developing a survey of each agency's training needs. DCFS will be surveying DCFS front-line workers and those results, along with those from DJJ and Department of Corrections will be assessed and we will develop training modules based on needs assessment. It is anticipated that the three agencies will launch the needs assessment in December 2018, and training will be implemented during the summer of 2019.

FY 2016

**The Department should request that the Office of Administration of the Illinois Court (AOIC) allow the Department to receive all Delinquency court assessments such as the Youth Assessment and Screening Instrument (YASI) and Violence Risk Assessment for youths in care of the Department. For consistency of measurements across agencies the Department should administer the YASI on those dually involved youth who end their probation or parole but continue under the Department's guardianship (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

> *FY18 Department Update*: Cook County Probation is no longer using the Youth Assessment and Screening Instrument (YASI) as their assessment tool. Probation is now using the Ohio Youth Problems Functioning and Satisfaction Scale. The Office of Information Technology is currently working on a portal with IT staff from Cook County Probation to retrieve probation documents on youth in care. Department staff will be able to go into the portal and access relevant documents such as probation orders, assessments and other documents relevant to youth in care. This is in the early stages of development.

FY 2016

**When sibling groups are placed in a foster home, the Department should require an assessment of the pragmatic demands of the placement given the developmental and chronological ages and needs of the children and demands on the foster parent. The assessment should identify specific concrete supportive services the caregiver will need to successfully care for the children, such as enrolling preschool age children in a Head Start program, or in the alternative, appropriately accredited childcare center; supportive homemaker services; respite; and assessing the transportation needs related to the children's services (from OIG FY 16 Annual Report, Death and Serious Investigation 7).**

> *FY18 Department Update:* The Department will not initiate an additional assessment as described above. The factors raised in this recommendation are standard points of care and best practice. This is a core component of best practice and each case should be assessed and monitored by the case worker and supervisor as well as incorporated in any required clinical assessment. This issue should be addressed further through the coming implementation of the Core Practice Model integrated with the new Model of Supervisory Practice.

FY 2010

**The Department should develop guidelines for when it is appropriate to refer a family to the Extended Family Support Program for consideration of guardianship of a minor through Probate Court and also train them on the differences of guardianship through Probate Court versus referring a case to Juvenile Court. The Short-Term Guardianship Form should never be used when it appears that the problem requiring guardianship will not be resolved within one year (from OIG FY 10 Annual Report, General Investigation 9).**

> *FY18 Department Update:* The recommendation was incorporated into draft Procedures 300.130, *Referral for Services*, which was posted for comment on November 29, 2018. Once the procedures have been fully implemented the Department will have concluded its response to the recommendation.

FY 2015

**Program Plans for parenting classes, coaching and mentoring must require rigorous standards for developing a baseline of behavior and goals and measurement of change (from OIG FY 15 Annual Report, Death and Serious Investigation 1).**

> *FY 17 Department Update:* The Nurturing Parenting Program (NPP) continues to be offered in Cook County through 3 agencies. The Department developed a plan for implementing the NPP program beyond Cook County in FY 17. Agencies were selected, more than 40 facilitators trained and a NPP national trainer, has been identified to offer ongoing consultation to support the implementation. While limited implementation did begin in Immersion sites, further implementation is currently on hold while the Department considers outcome data.

> *FY18 Department Update:* In Cook County, there are currently 3 agencies providing the Nurturing Parenting Program (NPP) to birth parents through the Illinois Birth-Three demonstration. There have been 360 parents that have completed this intervention over the life of the waiver. Successful completion for those enrolled across the 3 agencies reporting data is 66%. NPP utilizes the Adult Adolescent Parenting Inventory (AAPI) at baseline and completion to assess parenting beliefs across 5 competencies. IB3 evaluators have provided data regarding change in parental beliefs and permanency for parents that have completed NPP. Caregivers and birth parents are found to demonstrate clear improvements in the five constructs of the model with the most substantial changes noted in parental empathy. Regarding permanency, families that participated in NPP were 22.8% more likely to experience permanence through reunification or subsidized guardianship. The Department is currently aware of 7 providers outside of Cook County that provide Nurturing Parenting to families being served through intact and placement. Five providers are located within Immersion sites. The Department did extend one new contract for NPP in FY' 18 to Youth Advocate Program in Decatur, IL. NPP is not a formal part of the Immersion Site evaluation.

## WORKER SAFETY

FY 2014

**When a DCFS worker has a case involving a caretaker who is suspected of anabolic steroid use, the worker should contact the Administrator for Substance Abuse Services for information on the appropriate anabolic steroid screen (from OIG FY 14 Annual Report, General Investigation 1).**

> *FY18 Department Update:* The recommendation has been incorporated into proposed Procedures 300.140, *Consultations*, which were released for comment on November 29, 2018. Once the procedures have been fully implemented the Department will have concluded its response to the recommendation.

FY 2011

**For the safety of the worker and child, the State Central Register should notify local police when allegations include information about a large quantity of illegal drugs (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 15).**

> *FY18 Department Update:* The recommendation has been incorporated into proposed Procedures 300.160, *Notifications,* which were released for comment on November 29, 2018. Once the procedures have been fully implemented the Department will have concluded its response to the recommendation.

186

# REJECTED OR UNRESOLVED RECOMMENDATIONS IMPACTING CHILD HEALTH AND SAFETY

The following Office of the Inspector General's recommendations impact child safety and have been either rejected by the Department or pending for at least 4 years without resolution.

FY 2015
**From OIG FY 2015 Annual Report, Special Investigations,** *Shelter and Runaway Report:* **The Department should redefine its search procedure including the following:**

- **The Department should amend Rules to eliminate adult youths in care, who are not high risk (developmental disabilities, mental illness, human trafficking, in critical need of medication or bona fide missing) from Rules and Procedures 329.**
- **Adult youths in care without disabilities who chronically absent themselves from voluntary placements should be transitioned out of Department responsibility.**

> *FY18 Department Response*: The Department disagrees with this recommendation. The Department will continue to work with all youth, including older youth, until they have achieved permanency or a permanent connection.

FY 2015
**From OIG FY 2015 Annual Report, Special Investigations,** *Shelter and Runaway Report:* **The duties of the DCFS specialized unit for tracking and locating missing children should be limited to those children under 18 and disabled or Bona Fide missing adults. With lower caseloads, the Unit can provide more technical assistance searching databases and assist in contacting extended family and friends. For frequent runners, shelter staff in consultation with the specialized Unit should complete the De-Briefing Form–when a youth in care returns to the shelter system.**

> *FY18 Department Response*: The Department disagrees with this recommendation. The Department will continue to track and locate missing children of all ages, as long as they are under the Departments' care. For frequent runners, shelter staff can assist in completing the De-Briefing form when a youth in care returns to the shelter system.

FY 2017
**The Department and the involved private agency should develop policy for accessing publicly posted social media for information relevant to investigative, intact and/or placement cases (from OIG FY 17 Annual Report, General Investigations 4).**

> *FY18 Department Update:* The Department needs to address how to use social media better, but we must work within the confines of state policies regarding the use of social media. The Department has had numerous conversations with the Illinois Department of Innovation and Technology regarding implementation of the recommendation. Initially the Department was going to have each field office identify a liaison who would have access to all social media for the office, but the plan was rejected by the Illinois Department of Innovation and Technology. There are

caseworkers and supervisors who access social media on their own electronic devices, but there is no mechanism to do so Department wide.

**FY 2013**
**When there is a question about a youth in care having seizures or whether to discontinue a youth in care's seizure medication, the Department should assure that a sleep deprived EEG has been conducted as part of the evaluation (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 3).**

*FY 15 OIG Comment:* This recommendation was made after the Office of the Inspector General investigated the death of a youth in care who died of seizures while in a specialized treatment unit that the Department funds. At the time of his death, the unit had determined that the youth in care could be taken off his anti-seizure medication. Prior to issuing its recommendation the Inspector General consulted with both the Epilepsy Foundation and a leading Ph.D. in the field, both of whom affirmed the need for a sleep-deprived EEG before discontinuing anti-seizure medication. A sleep deprived EEG might have saved the child's life in this Office of the Inspector General Death Investigation. In addition to recommending the sleep-deprived EEG prior to making such a determination, the Office of the Inspector General recommended that the unit be assessed by an Independent Reviewer. The Independent Review was completed on March 30, 2015. The Independent Reviewer agreed that "in cases where seizures are being evaluated or seizure treatment is being significantly changed, a sleep-deprived EEG should be obtained if clinically feasible." Given that a youth in care died and that the Department's own contracted experts recommended a sleep deprived study prior to taking a child off anti-seizure medication, the Department needs to find a way to communicate this requirement to providers.

> *FY18 Department Update*: The Department maintains its original and ongoing disagreement on the use of a sleep deprived EEG in every case where anti-seizure medication is being discontinued. An EEG will be done if recommended by the treating physician. The Department has concluded its response to this recommendation.

**FY 2005**
**The Child Endangerment Risk Assessment Protocol (CERAP) should be amended to require that workers note when a risk factor cannot be answered because of insufficient information. Under such circumstances, workers should be required to perform diligent inquiry into relevant facts for assessment within 48 hours. The Department should develop procedures to ensure that there is follow-up and resolution of unknown variables (from OIG FY 05 Annual Report, Death and Serious Injury Investigation 9).**

> *FY 16 Department Update:* The workgroup continues to review procedures regarding CERAP and technical changes that are deemed appropriate for completion in 2017.

> *FY 17 Department Update:* Same Response provided from fiscal year 2016.

*FY 17 OIG Comment:* Adequate risk assessment must include a mechanism to ensure that the field retrieves critical information.

> *FY18 Department Update*: It is not necessary to amend the CERAP to require that workers note when a risk factor cannot be answered because of insufficient information. Part of an ongoing investigation is to collect information and evidence as it relates to risk and safety. At any time, as safety threats are identified over the life of the investigation, the CERAP can be updated and

that information included-there is a milestone within the CERAP that allows this.  Risk and the subset of safety are continually addressed over the course of an investigation.  In addition, if there are service needs related to risk, an intact case can be opened or referrals made to community services when that risk factor is identified. The Department has concluded its response to this recommendation.

FY 2014, 2010, 2008, 2005, 2001, 1999
**The Department should develop policy to address suspected substance abuse in the workplace (from OIG Recommendations made in 2014, 2005, 2001 and 1999).  In FY 08 and FY 10 the Inspector General also recommended that the Department amend Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* to add "failure to timely comply with an order for drug or alcohol testing after a finding of reasonable suspicion" as a basis for licensure action under Rule 412. 50, *Misconduct* (from OIG FY 10 Annual Report, General Investigation 21 and OIG FY 08 Annual Report, General Investigation 32).**

*FY 16 Department Update:* Reasonable Suspicion Drug Testing was an item negotiated during the 2015-2016 AFSCME master contract negotiations.  The parties reached impasse and this item is reportedly one of the items on the table.  Per the statewide email that was sent out November 16, 2016, by John Terranova, the Governor's Office and CMS will be providing further guidance to all agencies and employees on which provisions will be implemented and when.

*FY18 Department Update*: Reasonable Suspicion Drug Testing was an item negotiated during the 2015-2016 AFSCME Master Contract negotiations.   The State of Illinois and AFSCME are at a stalemate in terms of negotiating.   Since this is a topic covered by a union contract, the Department cannot do anything further on this recommendation.  The Department has concluded its response to this recommendation.

190

# APPENDIX

# OFFICE OF THE INSPECTOR GENERAL
### Department of Children and Family Services

<div style="border:1px solid">

*REDACTED REPORT*

</div>

*This report is being released by the Office of the Inspector General for teaching/training purposes. To ensure the confidentiality of all persons and service providers involved in the case, identifying information has been changed. All names, except those of professional references, are fictitious.*

**File No:**     **2017 IG 2545**

**Children:**    **Marcus Webb (DOB 7/2004)**
**Alicia Webb  (DOB 7/2005)**
**Deloris Webb (DOB 10/2010)**
**Noel Webb (DOB 11/2011)**
**Cornell Webb (DOB 12/2013)**

## SUMMARY OF COMPLAINT

In March 2017, an eleven-year-old girl accidentally shot her three-year-old brother in the head while playing with a gun she found in their home. The parents had left four of their children, ages three to eleven years, home alone. The Department of Children and Family Services ("DCFS" or "The Department") was involved with the family through an open placement case on an older sibling at the time of the injury to the three-year-old.

## INVESTIGATION

### Background

Betty Reinhardt (DOB 07/1988) and Arthur Webb (DOB 06/1982) have five children. Four were residing with them at the time of the shooting: Alicia Webb (DOB 07/2005), Deloris Webb (DOB 10/2010), Noel Webb (DOB 11/2011) and Cornell Webb (DOB 12/2013). Their oldest child, Marcus Webb (DOB 7/2004), is a youth in care placed at a residential medical facility. Marcus, who requires a wheelchair due to severe disabilities, is diagnosed with microcephaly, cerebral palsy, and profound cognitive delays. In 2013, the Department indicated the mother for inadequate food, medical neglect and failure to thrive on Marcus. Marcus had been in residential care for four years at the time of the shooting.

According to the integrated assessment, the mother and father are not married. They began dating in 2003 when the mother was 15 years old and the father was 21 years old. According to the Law Enforcement Automated Data System ("LEADS"), the couple has a significant history of domestic violence and the father has an extensive criminal history. (See below)

**Serious Injury**

**Sequence K Child Protection Investigation, Betty Reinhardt (March 2017)[1]**

In March 2017, a police officer reported that three-year-old Cornell was shot in the head while home alone with his sisters Noel (5), Deloris (6) and Alicia (11). The police were dispatched in the late afternoon after one of the children alerted a neighbor.  Police found Cornell on the floor with a gunshot wound to his right temple.[2]  Police did not initially know the identity of the shooter and the officer reported that the children's stories were not consistent.[3]  Cornell was transported to the hospital in critical condition. No other children were injured. Betty Reinhardt (mother) and Arthur Webb (father) went to the hospital after being notified of the injury to their son.

Police reported finding a weapon and a spent shell casing in the home as well as a bag of what was believed to be crack cocaine on the TV stand in the bedroom.  Police also found questionable living conditions. According to the police officer's account to the DCFS hotline:

> The home is filthy with debris in every room, crumbs on the floor and little to no food in the home. Each room is littered with garbage and clothes, there are roaches in the home, open food containers, pots and pans in standing water and garbage on the kitchen table, the hallway closet is packed and reporter had to step over clothes and garbage in the home. The stove was open and being used as a heat source and there are soiled mattresses on the floor and no sheets.

The investigation was opened for allegations of wounds by neglect, substantial risk/environment injurious to health and welfare, inadequate supervision, and environmental neglect against the mother Betty Reinhardt and father Arthur Webb. The investigation was assigned to CPI Beverly Curry and supervisor Regina Harvey.

During the investigation, child protection investigators learned that after the children came home from school in March 2017, the parents left to go shopping. Eleven-year-old Alicia reported the children decided to play cops and robbers. She found a gun in an unlocked gun box in the living room by the sofa.[4] Alicia said she picked up the gun, "pushed the button" and the gun discharged, striking three-year-old Cornell in the head. The mother said they were gone approximately 30 minutes when they received a call from the neighbor that Cornell had been shot. The mother, who has a conceal and carry license, is listed as the gun owner.[5] The mother said she placed the gun in the closet in a lock box. She believes, while she and the children's father were out of the house, Alicia found the key and unlocked the gun box.[6]

Both parents were arrested that night. The investigator implemented a safety plan for the three girls to stay with their maternal grandmother. In March 2017, protective custody was taken of all four children. The girls remained with the maternal grandmother. Cornell joined his siblings in the maternal grandmother's home after being discharged from the hospital a month later.

---

[1] There is no J sequence; there are two A sequences, one unfounded from May 2008 and one indicated from April 2009.

[2] The police reported that the family lives in the first-floor unit at Address E.

[3] For several hours, Alicia reported that the shot came from someone on the street. After speaking with her grandmother, Alicia reported that she had been playing with the gun.

[4] According to the police report, Alicia said she took the gun box out of the closet and brought it to the couch where she took the gun out. She said the gun went off simply by pulling the trigger.

[5] According to police reports, the father held a firearm to the mother's head in a domestic incident two months prior. IG investigators compared the serial numbers and determined it was the same gun.

[6] In a June 2017 integrated assessment, the mother told the assessors she had bought the gun for protection but stated that there was no incident prompting the purchase. She denied that Mr. Webb, who had been convicted of multiple felonies and cannot own a gun, influenced her to purchase a gun.

A-2

The child protection investigation closed in May 2017. The Department indicated the mother for wounds by neglect as the mother was the owner of the gun, the lockbox was not locked and the gun was loaded. Both parents were indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect and inadequate supervision as neither parent was present in the home at the time of the incident and eleven-year-old Alicia was caring for her three younger siblings ranging in age from six to three years.  The parents were also indicated for environmental neglect as the police officer described the home as deplorable and the building department condemned the home following the shooting.

The mother, Betty Reinhardt, was charged with four counts of endangering the life of a child. She was initially arrested, but later released by police. The father, Arthur Webb, was charged with aggravated unlawful use/possession of a weapon by a felon, possession of a controlled substance and four counts of endangering the life of a child. The father remains in county jail.

***Arthur Webb Criminal History***
Arthur Webb has an extensive criminal history that includes over 30 arrests between July 2000 and March 2017, when he was arrested at the time of Cornell's gunshot wound.  He has since remained in county jail. He has eight drug related convictions for which he has served time in prison and one conviction for disorderly conduct. He has been arrested seven times for domestic violence. His only domestic violence conviction was in 2001, before he became involved with Betty Reinhardt. One domestic battery charge from January 2017 is pending stemming from Mr. Webb holding a gun to the mother's head. (See below)

Police arrested Mr. Webb multiple times for physically assaulting Ms. Reinhardt.  In April 2009, eight days into the indicated A-sequence investigation (see below), Arthur Webb was arrested at the family home after Ms. Reinhardt accused him of trying to strangle her during an argument. The police attempted to get Ms. Reinhardt to sign a complaint, but she refused saying she was scared to do so.[7] There was no indication that the CPI was aware of the incident.  In December 2009, Arthur Webb was arrested after he hit Ms. Reinhardt in the face "with a closed fist" causing a bruise around Ms. Reinhardt's eye.  Mr. Webb also had 19 bags of what was believed to be marijuana in his possession.  Three months later, in March 2010, police arrested Mr. Webb again after he repeatedly punched Ms. Reinhardt in the face leaving her with a swollen and blackened left eye. He was charged with domestic battery.

In February 2011, Mr. Webb was convicted of possession of a controlled substance and sentenced to two-and-a-half years in prison. He was released nine months later in November 2011. In June 2012, Mr. Webb received a second conviction on possession of a controlled substance and was sentenced to two years in prison. He was released in February 2013 on probation. He violated his probation when he was arrested for domestic battery on Ms. Reinhardt in October 2013. He returned to prison in October 2013 and was released three weeks later. (See I-sequence below for more on the Domestic Violence incident that violated his probation.)

**Prior Department History**
***Indicated Report 2009***
***Sequence A, April 2009, Arthur Webb***
In April 2009, the police department reported that 20-year-old Betty Reinhardt told police about a burn on then four-year-old Marcus's arm. She said she first noticed the burn the day before and believed the burn happened at school.  The mother reported Marcus's last day at school was two days prior. Marcus had been at home with his father on the day she discovered the burn. The investigation was assigned to Child Protection Investigator ("CPI") Marie Reynolds.

---

[7] Prior to April 2009, Mr. Webb was arrested in July 2006 for punching Ms. Reinhardt when Ms. Reinhardt was a juvenile.

According to investigation notes, the emergency room physician who examined the injury believed Marcus had a rug burn on his arm and a scratch next to his diaper. The mother said she was not sure where the injuries came from as their home had hardwood floors and no rugs.[8]  The primary care physician who reviewed the hospital records did not have concerns about abuse regarding these injuries, but did report that the mother had missed appointments and she had been counseled about the importance of staying current with medical care because of Marcus's disabilities.

Two days after the hotline call, the CPI observed the home at Address A. The CPI noted the home was cold and observed holes in the walls that went through to the outside along with broken windows. The CPI noted electrical extension cords running throughout the house,[9] a lack of smoke detectors, a dirty refrigerator with open food in it, dirty dishes and piles of dirty clothes. The CPI informed Ms. Reinhardt that she, Marcus and three-year-old Alicia needed to leave the home as it was not safe. The CPI recommended they stay with a friend or in a shelter. The mother reported that the house was in foreclosure and though she pays $600 per month in rent, she had not seen or heard from the landlord. Sixteen days later, the CPI and supervisor went to the home to see if the home had been cleaned and repaired. The holes were covered up and the home was observed to be slightly cleaner than before; however, the CPI noted in her contact notes, "the environment continues to be unsanitary and can pose a risk to health of the children."

*School*
During the investigation, the CPI spoke to Marcus's teacher who reported that Marcus is never alone at school and they always use two staff members to move Marcus. The teacher stated that he has never been injured at school. The teacher did voice concern with Marcus's hygiene noting that he often comes to school wearing dirty clothes and needing a bath. When he returned from a recent break, Marcus had "cakes of mud" on his feet, which school personnel found strange as Marcus does not walk. The teacher said he often cries when he has to go home. At Alicia's school, the teacher told the CPI that Alicia's clothes were also dirty and her pants were so small that she could not button them. The teacher said she bought new clothing for Alicia and gave them to her mother, but Alicia has never worn those clothes to school. The aide reported that children make fun of Alicia by saying she is dirty and staff frequently ask the mother to take Alicia to the bathroom to wash her face and arms before school.

In June, just prior to the close of the investigation, the CPI offered Ms. Reinhardt intact family services including a homemaker, counseling, a support group for parents of special needs children, assistance with locating an adequate shelter and parent coaching. Ms. Reinhardt refused the services saying she "wanted DCFS to leave her alone."  CPI Reynolds noted "Ms. Reinhardt was informed of the risk of not accepting services should the department receive another hotline call."  In June 2009, the burn allegation was unfounded against the father with the explanation that "the marks are scratches."  The parents were indicated for environmental neglect. The CPI provided the family with a letter of referral to Salvation Army to obtain clothing, bill payment assistance, and housing assistance. The level of intervention was marked "Services offered/refused."

### Unfounded and Expunged Child Protection Investigations May 2008 to November 2012
Between May 2008 and November 2012, six child protection investigations were unfounded and expunged. Three of the six investigations were reported by mandated reporters. The following investigations were not found in the State Automated Child Welfare Information Service (SACWIS) database at the time of the gunshot wound to Cornell in March 2017.  In August 2017, the Department began expanding the information found in SACWIS, including allowing some information from unfounded and expunged investigations to remain in the SACWIS database. Currently, SACWIS retains the intake narrative and the

---

[8] Marcus was x-rayed and doctors found no bone fractures.
[9] The CPI noted that the children were playing with the extension cords.

allegations for reports that have been unfounded and expunged. Inspector General (IG) investigators obtained some of the investigations that have been expunged.

*Sequence A[10] (May 2008)*
In May 2008,[11] the DCFS hotline received a call from a neighbor who reported that the mother, Betty Reinhardt, left three-year-old Marcus and two-year-old Alicia in the maternal grandmother's care while she was at work. The grandmother then reportedly left to buy drugs, leaving the children home alone in a dirty house. A subsequent call came in stating the home is dirty with trash, old food and cockroaches throughout. The reporter stated that there are four unknown children[12] in the home who reportedly eat the cockroaches and get in trouble for doing so. Reporter stated that there is no edible food in the home, just old food all over the floor. The call was taken as related information. The investigation was taken for inadequate supervision against the grandmother and environmental neglect against both the grandmother and the mother.

The grandmother's apartment was observed on the same day as the DCFS hotline call and the CPI found the apartment to be clean with only small areas of clutter. The children were noted as clean and healthy. The mother and grandmother, denied that the mother's children were left unattended. The investigation was later unfounded for all allegations.

*Sequence B Child Protection Investigation (2009)*
In September 2009, Alicia's teacher called the DCFS hotline alleging that four-year-old Alicia reported that her father hit her causing a bruise under her eye. According to the Child protection investigation, Alicia relayed the same information to the CPI but did not say how or why Alicia's father hit her. However, the mother, father and maternal aunt denied that the father hit Alicia and said Alicia was clumsy. The father said Alicia received the injury while playing with a friend. The CPI noted the home was clean with plenty of food. The allegation of cuts, welts and bruises was unfounded against her father with the explanation that the injury resulted from playing with another child. The investigation did not discern when the injury occurred, where the child was when it happened or if anyone else observed the incident besides the alleged perpetrator.

*Sequence C Child Protection Investigation (2011)*
In February 2011, three months after Deloris was born,[13] six-year-old Marcus's school called the DCFS hotline to report that Marcus, who has cerebral palsy, microcephaly, a G-tube, is non-verbal and uses a wheelchair, comes to school "filthy" on a daily basis. Marcus's bus attendant and school personnel noticed the front door to the family residence was boarded up and pad-locked from the outside. The school reported the windows in the home were broken. The reporter stated that police, on a well-being check, found running water and heat. The reporter noted concern about six-year-old Marcus, noting that if there was a fire, Marcus would not be able to get out of the home.

According to the SACWIS documents, the CPI went to Marcus's school the following day. The CPI noted that Marcus was very clean. The teacher said though Marcus was well groomed that day, he frequently comes to school with body odor. The teacher said she attempted to talk to the mother about it, but Ms. Reinhardt became upset. The CPI then observed the home and found that neither the front door nor the

---

[10] This investigation is not found when conducting a search for a person search of Betty Reinhardt. The investigation is found with a search performed on Alicia or Marcus Webb. The mother's last name is spelled Rhinehardt in the investigation.
[11] Eleven months before the indicated environmental neglect investigation described above.
[12] The mother Betty Reinhardt had two children, three-year-old Marcus and two-year-old Alicia, and the maternal aunt also lived in the home with her two children, three-year-old Arianna White and two-year-old Antoinette White.
[13] Mr. Webb was entering prison at this time.

windows were broken, as they had been repaired by the landlord. The house had water, heat and smoke detectors.   The mother explained that sometimes there is a bad odor when Marcus's G-tube leaks. Allegations of inadequate housing were unfounded on the mother.

*Sequence D Child Protection Investigation*[14] *(2011)*
Three months later, in May 2011, a non-mandated reporter[15] informed the DCFS hotline that the mother asked a friend to babysit the night before. The friend was unable to babysit. The mother then left six-year-old Marcus, five-year-old Alicia and six-month-old Deloris home alone, and she did not return until 4:30 am.  It was also alleged that three other young children were present in the home. According to the narrative:

> The reporter stated that the apartment is very dirty stating there are dirty diapers, and old food all over. The reporter said there are three cats and there is cat feces and urine all over. The apartment is infested with roaches and roaches crawl all over Marcus's machine and in the other children's ears. The reporter stated that there are three guns in the apartment and expressed concern over Marcus's disability.

The investigation was taken for inadequate supervision and environmental neglect of the children and assigned to CPI Helen Edwards.  According to the investigation documents, the CPI was unable to contact the family until 12 days after the DCFS hotline call. The CPI observed Marcus, Alicia and Deloris who were all living with their mother and grandmother. Alicia, the only verbal child, denied that she was being left alone, saying that her mother and grandmother are always home.  She also denied that there are roaches in the home. The mother denied that the children were left unattended, that the home was dirty and that there were guns in the home, stating she had recently been investigated for the same allegations. The mother also informed the CPI that she had no other children. CPI noted that the home appeared clean. The grandmother also denied the children are left unattended, stating that she babysits when the mother leaves. The grandmother added that there had been several DCFS hotline calls against the mother for similar allegations. She denied there were any guns in the home. The grandmother told the CPI that the mother has been having problems with "some people" who broke her car window and tried to set the house on fire. The CPI contacted Marcus's physician who stated she had no concerns and that Marcus is up to date on immunizations. The CPI also contacted Alicia and Deloris's doctor who also stated both children were up to date with immunizations and that the doctor had no concerns about the children. The investigation was unfounded. The CPI noted the mother agreed to an aftercare plan of providing minimum parenting standards, adequate care and supervision, medical care, and ensuring there is a responsible adult to babysit when she is not around.[16]

*Sequence E Child Protection Investigation (2011)*
Three months later, in August 2011, a non-mandated reporter told the DCFS hotline that Ms. Reinhardt has clothes and garbage scattered all over the home and a bed bug problem requiring $1000 worth of exterminator services. Additionally, the reporter noted that the children were not bathed and Marcus had been going to school dirty and malodorous in a damaged wheel chair. The reporter stated that the day before, the mother left the three children home alone while she and someone at the reporter's home went shopping. The reporter stated that the hotline has been called four times regarding the condition of the children and the mother's home, but the Department has not done anything. The reporter further cautioned that the mother would not let DCFS in the home and advised that the CPI take the police with them. The reporter asked to remain confidential. The investigation was again assigned to CPI Helen Edwards.

---

[14] This investigation does not show up in SACWIS when a person search is performed on Betty Reinhardt or the father, Arthur Webb. It only shows up under Marcus or Alicia Webb searches.
[15] Despite many attempts, the CPI was unable to contact the reporter during the investigation.
[16] The CPI documents that the mother signed the aftercare agreement.

The reporter told the CPI that she was a former neighbor of the family and had been at the family home a week before. She reiterated that the children are always dirty and there is garbage and bugs all over the home. The reporter said that she also called the hotline on the maternal aunt who lives upstairs with her own children.[17] The maternal grandmother told the CPI that people who know the mother are making false allegations against her and mother and grandmother denied ever leaving the children home alone. The mother and grandmother acknowledged the home had broken windows and that Marcus's wheelchair is in need of repair, but they have contacted the company to replace the part. The CPI did not observe any bugs, but noted the front door had cracked glass with a blanket covering it and no doorknobs,. There was a locked metal gate on the outside of the door. The mother told the CPI she was eight months pregnant and receiving prenatal care.

The CPI contacted Marcus's school who said that Marcus had recently begun attending the school and they did not have concerns. The CPI spoke with the case manager for Marcus's doctor who stated that Marcus is seen every six months, a prescription for food for his g-tube is sent monthly and the doctor has noted no concerns. Six-year-old Alicia told the CPI that she is never left alone and that the mother and grandmother are "always at the house." She also said she helps her mother clean every day. CPI Edwards again asked the mother to agree to the same aftercare plan she had less than three months prior.

The mother was unfounded for environmental neglect, inadequate supervision, and substantial risk of harm/environment injurious to Marcus, Alicia, and Deloris. It is unknown if intact family services were offered.

*Sequence F Child Protection investigation*[18] *(2012)*
Over a year later, in November 2012, the DCFS hotline received a report from seven-year-old Alicia's school saying that she comes to school tired, unbathed and in clothes that do not fit. According to the narrative, the school employee reported:

> …7 year old Alicia constantly comes to school wearing the same dirty clothing, with dirty skin, and has a strong body odor. Mother Betty stated that Alicia has a habit of wearing her brother [sic]… clothing. Unknown [Marcus] is disabled and wets his pants. Reporter stated that Betty allows Alicia to wear the clothing and does not change her. Reporter stated that she has not been able to see the difference in sizing with Alicia's clothing. Reporter stated that Alicia also is very lethargic and falls asleep in class all day; Reporter is constantly waking Alicia up. When Reporter asked Betty why Alicia was so tired and sleeping all day, Betty laughed and stated "I don't know." Alicia is also late and has excessive absences. Reporter stated that today Betty came to school to request home schooling for Alicia. Betty stated that Alicia was playing and kicked her foot through a glass window and cut her foot and leg. Alicia has stitches up her leg and cannot walk…Betty stated that Alicia would be out of school for at least 10 days. When the school requested paperwork from the doctor or hospital, Betty could not provide it…Reporter stated that Unknown [Marcus] is wheelchair bound, but she is not sure of his disability. Reporter stated that when you try to ask Alicia questions, she just looks at you. Reporter stated that Alicia has a developmental delay. Reporter stated that she has smelled a strong odor of marijuana on Betty when she has picked up Alicia.

The mother and father were unfounded for environmental neglect against Alicia only. The other children are not mentioned.

---

[17] SACWIS contains no records regarding the maternal aunt, Bernice Reinhardt, or her earlier reported children, Arianna White and Antoinette White.

[18] The F sequence would have been available in 2013 when the G and H sequences were being investigated.

*Sequences G and H Child Protection Investigations, Betty Reinhardt (Indicated) (2013)*

In mid-February and early March 2013, at the time Mr. Webb was released from prison, the DCFS hotline received two reports of neglect (H and G sequences)[19] within three weeks of each other. The investigations ran concurrently and both were indicated on the same day. The family had been living at Address B for two years at the time of the investigations. The H-sequence was called in by an anonymous reporter in February 2013 stating that the outside of the family home was extremely filthy, with piles of garbage on the porch back to the alleyway, and was so infested with roaches that they can be seen from the outside. The children have been observed regularly carrying out sacks of garbage from inside the house. The children have dirty hair, skin and clothes. The reporter stated the windows are boarded up and believes the apartment building is condemned.

The following day, CPI Cheryl Underwood went to the home address, but the mother refused to let the CPI in the home. CPI Underwood documented she saw Alicia and Marcus, but the mother refused to allow her to speak with them.

While the H-sequence was pending, a hospital social worker called the DCFS hotline in March 2013, initiating the G-sequence investigation. The social worker reported that eight-year-old Marcus, a current patient, had an eleven pound[20] weight loss since May 2012, ten months prior, which is the last time he saw a doctor. Further, he had gained 4.5 pounds since being admitted to the hospital four days earlier. The social worker stated the mother claimed she was feeding him adequately, which the reporter said was not possible considering his weight loss and subsequent rapid weight gain while in the hospital.

During the investigation, CPI Underwood spoke to the hospital social worker who said Marcus had not been seen in the clinic for over one year, missing several appointments with his primary doctor, orthopedic doctor and neurologist. The doctors stated that the mother's explanation about how much food she gives him is not plausible given his weight loss.[21] Medical staff shared that Marcus had a hip replacement in February 2012 that required braces for him to rehabilitate, but the mother never picked up the braces and Marcus missed his physical therapy appointments. The CPI also spoke with the doctor who recalled prior hospitalizations for weight loss when Marcus was a toddler. In March 2013, the Department took protective custody of Marcus after confirming that Marcus had been categorized as failure to thrive on three prior occasions.

In March 2013, a month after the H-sequence initiated and six days after the failure to thrive report was called in, CPI Underwood returned to the mother's home address listed in the hotline report (Address B). Though the mother was there at the time of the visit, the mother said she did not live there; she was just picking up mail. The mother said she lived at another location giving only a street name, but said she was not on the lease or the utilities and could not provide contact information for the landlord. The CPI noted the outside of the home at Address B was boarded up and there was broken glass everywhere. There were also piles of garbage all around the house.

Days later, the CPI visited the home that the mother reported she and her children were living at, Address C. The CPI found no clothing in the home for the family and questioned the mother. The mother became angry and began cursing at the worker.

The father, Arthur Webb, told the CPI that he was not living with the family. He said that he had been in and out of jail and was currently living with his mother. He said until recently, the family was staying in

---

[19] In SACWIS the H sequence is dated prior to the to the G sequence. SCR administer Lynne Howard told IG investigators that there are circumstances when that occurs.
[20] The original complaint was in kilograms.
[21] There is no indication in SACWIS that a hotline call was made at this time.

the condemned house, but they moved out and began staying with Ms. Reinhardt's sister. In March 2013, the children were observed at the maternal grandmother's home. When asked her address (seven-year-old) Alicia Webb told the CPI the Address B location. The CPI reported that Alicia seemed delayed and had difficulty expressing that she was safe.

The CPI visited Alicia's school and spoke with the teacher who, like previous teachers, stated she was concerned about the environment based on how the minor presented at school. The teacher said she is not groomed or appropriately dressed and her clothing was dirty. One day she came to school with her brother Marcus's pants on that smelled like urine. The teacher noted that Alicia would sleep during class, had been absent about 60 days over the last semester, and that the excessive absences meant she could not be evaluated for her academic deficiencies. The teacher reported that, over the last three weeks, Alicia had been bringing money to school, and one day she started passing cash out to her classmates. The teacher also expressed concern for Alicia's siblings, given that she knew one was disabled and the others were younger.[22]  The school confirmed that, as of two months prior, the last known address was Address B.

In the G-sequence investigation. Marcus's school also expressed concerns for Marcus's well-being, saying that he had poor attendance in school, needs a new wheelchair and they have difficulty reaching the mother. A school aide said Marcus would come to school with roaches in his wheel chair and it was apparent he was not bathed as he had body odor and was dirty. She also said she had grown increasingly concerned about his weight loss. The school nurse confirmed that she was giving the correct amount of PediaSure everyday but said he is often absent from school.

In March 2013, supervisor Bruce Dunlap documented a final supervisory note for the H-sequence. He stated that the mother refused to allow the investigator into the home. The outside of the home had broken and boarded up windows. The school reported that the children had body odor. The mother, the alleged perpetrator, gave a different address that she and her children were residing at, but she was unable to show the children's clothing or bills to support that she was living there. Based on the conditions of the home and mother's lack of cooperation, there is evidence to support a finding of neglect. The recommended finding is to indicate.  The supervisor noted that the case is being opened to a placement team[23] for services.

Both the H and G-sequence investigations closed on the same day in March 2013. For the H-sequence, Ms. Reinhardt was indicated for inadequate shelter for Alicia and environmental neglect for Marcus, Alicia and Noel.[24]  Though CPI Underwood documented observing two-and-a-half-year-old Deloris along with her siblings as part of both investigations, Deloris was not listed as a child victim. In the G-sequence, the mother was indicated for medical neglect, inadequate food and failure to thrive against Marcus. The supervisor noted that placement services were opened for Marcus, but there was no mention about ensuring the safety in the home of the remaining three children, seven-year-old Alicia, two-year-old Deloris and one-year-old Noel. The first two Child Endangerment Risk Assessment Protocols ("CERAP") in the G sequence investigation pertained only to Marcus and were marked unsafe with the safety plan of the hospital; it was marked safe once he was taken into custody. The two CERAPS completed in the H-sequence, at the start[25] and the conclusion of the investigation, did not identify the presence of any safety factors and the CERAPS were marked safe. The first CERAP included Marcus as CPI Underwood specified seeing all the children in her safety decision. She also noted the mother did not allow her into the home and told CPI Underwood that CPI Helen Edwards had recently completed an assessment.[26] For the final CERAP, CPI Underwood described the safety decision:

---

[22] The teacher said she is the one who called the hotline on the unfounded F sequence.
[23] The Department took protective custody of Marcus in March of 2013.
[24] Inadequate shelter was not added as a possible allegation for Noel, Deloris or Marcus.
[25] The H sequence was initiated before the G sequence.
[26] CPI Edwards had completed the F sequence which began in November 2012.

CPI HAD THE OPPORTUNITY TO GO HOME AND THE MOTHER REFUSE ME ASSESS (SIC) INTO THE HOME AT THIS TIME. CPI OBSERVED THE OUTSIDE OF THE HOME GARBAGE ALL IN THE BACK OF THE HOME, TRASHED IS PILED UP THERE IS BROKEN GLASS AND WINDOWS BOARDED UP EVERY WHERE. AT THIS TIME ACCORDING TO THE FAMILY THEY ARE NOT ALLOWING THE CHILDREN TO GO INTO THE HOME THEREFORE THE CHILDREN ARE SAFE.

**Placement Case (2013)**

Marcus's placement case opened in March 2013, and was assigned to Larry Washington and supervisor Jacqueline Smartt. After leaving the hospital, Marcus spent six months at a rehabilitation center before being placed at a residential facility where he currently resides. In April 2013, Ms. Reinhardt, Mr. Webb and the three children moved out-of-state until July 2013.

In May 2013, following the move out of state, Mr. Washington documented contacting the DCFS Interstate Compact Director to inquire about the other state monitoring the three children at home with the parents. The Interstate Compact Director reported that official interstate services could not be established if there is not an open case on the children in the home. He advised that the worker could contact the county child welfare office in the other state to request periodic "Courtesy Visits." Mr. Washington documented that he then consulted with his supervisor, Jacqueline Smartt, who instructed him to contact the county child welfare office in the other state.[27] No other case notes have any information about the other state's child welfare. Mr. Washington's next documentation is of a visit to see Marcus in June 2013.

In June 2014, Marcus's goal was changed from "Return Home" to "Cannot be Provided for in a Home Environment." Mr. Washington managed the case for over two and a half years documenting his last contact note in December 2015.[28]  In February 2016, Lorraine Asberry began making monthly visits to the residential facility to see Marcus. According to SACWIS, Ms. Smartt officially assigned the placement case to Ms. Asberry in May 2016.

According to case documentation, though the workers consistently visited Marcus at the residential facility, neither Mr. Washington, who managed the case for 32 months, nor Ms. Asberry, who managed the case for 13 months, documented any visits to see the other children with one exception. Ms. Asberry documented a visit to the home but was not allowed in by the parents. That visit took place in February 2017, 21 days prior to the shooting.[29]

According to SACWIS notes, there were problems with the parents' visits with Marcus. In July 2013, while Marcus was still at the rehabilitation center, his parents and siblings attended a birthday party for him, but issues arose. The rehabilitation center staff told the worker that the parents seemed to have little control of their children. They described the children as being "all over the place" and the parents were unable to redirect the behavior of Marcus's sister, eight-year-old Alicia.

In September 2013, Marcus was transferred to a residential facility. In September 2013, Mr. Washington supervised a parent child visit at the facility. During the visit, the father became angry at the worker and

---

[27] IG investigators contacted out-of-state child protection for the county where the family resided who confirmed they had no records of contact with the family.

[28] Lorraine Asberry was given a parallel assignment for the case in February 2016. Mr. Washington was officially taken off assignment in May 2016. Lorraine Asberry became the primary at that time. Ms. Asberry had been making monthly visits to the residential facility starting in February 2016 and attended the ACR in March 2016.

[29] The note documenting the visit was created the same evening as the shooting.

A-10

began yelling loudly about problems he had with Mr. Washington. The worker repeatedly asked Mr. Webb to lower his voice and stopped the visit when Mr. Webb did not calm down. As the facility aide was wheeling Marcus back to his room, Mr. Webb blocked the access and demanded that they finish the visit. With staff intervention, Mr. Webb eventually relented, which allowed staff to take Marcus back to his room ending the visit. From then on, the father was banned from the facility; the mother was allowed to continue visiting.  Ms. Reinhardt told Mr. Washington that Mr. Webb gets anxious when he is around too many children with disabilities and he had not wanted to visit Marcus at his school either. The father would occasionally visit with Marcus at a restaurant across the street from the residential facility.

According to the placement file, while Mr. Washington was the assigned worker, the mother completed parenting education but did not engage in the recommended individual therapy. After the shooting, Ms. Reinhardt confirmed that she never began therapy sessions. Mr. Washington referred the father to parenting classes, family counseling, parenting behavioral therapy and individual counseling. Mr. Webb did not complete any of the referred services. Mr. Webb and Ms. Reinhardt completed a psychological evaluation and a parenting capacity assessment. After Marcus's goal changed from return home, the service plan only referenced parental visits.

*Arthur Webb's Psychological Findings*
In July 2013, Mr. Webb participated in a psychological evaluation conducted by Rita Blakemore, Ph.D. The psychologist determined Mr. Webb had an Axis II diagnosis of borderline intellectual functioning and noted multiple gunshot wounds on Axis III.[30] She wrote in summary:

> Mr. Webb's cognitive ability was classified in the extremely low to borderline intellectual functioning… Mr. Webb does exhibit judgment and reasoning deficits as well as rigidity in parenting, indicating a risk for being inflexible when dealing with a child that fit one's expectations…thee deficits coupled with the stressors of parenting…increase the likelihood of lapses in judgment.

> **Recommendations:** Mr. Webb to reorient his antisocial behaviors. Become sensitive to needs of others, accept responsibility of shared social living, and deter rebellious activities. Strengthen his social skills, accepting responsibility and consequences of his actions.

According to the results of Betty Reinhardt 's psychological,

> While Ms. Reinhardt's full scale IQ was in the Borderline to low average classification, Ms. Reinhardt has an "extremely low verbal comprehension score." She had clinically significant levels of symptoms on the paranoid ideation dimension which reflect projective thought, hostility, grandiosity, suspiciousness, centrality and fear of loss of autonomy. She has demonstrated a number of immature coping mechanisms and these symptoms appear to be masking her depressive symptoms…Ms. Reinhardt's potential for child abuse could not be assessed…she attempted to portray herself in an unrealistically virtuous manner and she appears to have unrealistic expectations for herself and perhaps her children. Ms. Reinhardt also exhibits judgement and reason deficits…These deficits couples with the stressors of parenting a child with special needs increases the likelihood of lapses in judgment, and for child neglect.

---

[30] The DSM 5 (May 2013) no longer uses the Axis system; Axis II was used for personality disorders and intellectual disorders. Axis III denotes general medical conditions. There was no indication of an Axis I diagnosis which is all psychological conditions outside of personality and intellectual disorder.

The psychologist diagnosed Ms. Reinhardt with Depression Disorder NOS.[31]

According to a Parenting Capacity Assessment completed by Dr. Blakemore in August 2013, the mother had high risk for abuse, and the father had medium risk but low frustration tolerance and impulsivity. The psychologist also noted that the father has a chronic pattern of engaging in antisocial and criminal activities. She noted both parents had low-to-moderate intellectual functioning and lacked problem solving skills. They both had unrealistic expectations of their children's ability to care for themselves.[32]

*Sequence I Child Protection Investigation, Betty Reinhardt (2013)*
*(Indicated then administratively unfounded and expunged)*
In October 2013, while Ms. Reinhardt was eight months pregnant, a police officer reported to the Hotline that officers had responded to a call of domestic battery. According to the hotline narrative, when the police arrived, they attempted to gain entry, but Mr. Webb refused to open the door.  Mr. Webb barricaded the door with 2 x 4's and other furniture. The police could hear loud screaming from the apartment and physical contact. The mother was screaming "please just let me out." The kids could be heard screaming and crying. Within 15 minutes, the police broke the door down. The kids were in the living room; they were dirty and had no shoes on. Police observed broken furniture, and noted the home smelled and had no beds. Mr. Webb was "highly intoxicated" and arrested for unlawful restraint.[33] The police stated they had been to the home several times for domestic battery situations.[34]  The officer reported that the "Mom was not concerned."

According to the police report,[35] in addition to the details of the hotline narrative, the police arrived at approximately 5:30 am. The mother could be heard from inside the house pleading for the father to let her out of the home and Mr. Webb could be heard yelling "you're not leaving out this door." While on scene, the mother initially denied that Mr. Webb would not let her and the children leave the home. After officers reminded her of the 911 call, the mother told police that Mr. Webb came home in a "highly intoxicated state" at about 5:00 am and began arguing. Mr. Webb initially went to sleep but he woke up and began pushing Ms. Reinhardt. When she and the children tried to leave, Mr. Webb barred the door and refused to allow them to go. Mr. Webb said that the argument started because Ms. Reinhardt was upset that she had been out all night. He said he told Ms. Reinhardt she was free to leave, but he would not allow her to take the children. Mr. Webb resisted police when they attempted to put him in the police car for transport to the jail and the police used a Taser to gain compliance. Mr. Webb was charged with resisting/obstructing a police officer and domestic battery, both class A misdemeanors.

CPI George Vance documented that he went to the home by 1:00 pm the same day, in October 2013. He interviewed the mother who said the father had been out drinking, and when he came home, he started arguing. Mr. Webb pushed her and she called the police. She said the children were sleeping in their bedrooms at the time of the incident[36] and denied any previous domestic violence in the home. Mr. Vance noted that the mother informed him that she has an "open DCFS intact family case" and the assigned follow up worker is Larry Washington.[37]  Mr. Vance noted that the "home was clean and appropriate."

---

[31] Not otherwise specified meaning the psychologist did not have enough specific information or history to give a more definitive diagnosis of the type of depression, though she clearly exhibited symptoms of depression. "NOS" is no longer used in DSM 5, having been replaced with "other specified" or "unspecified."

[32] Mr. Webb reported receiving special education services for behavior and learning disabilities. He said he was expelled from school in 8th grade and joined a gang. He's been shot 10 times over five different occasions. As of 2013, he had been arrested 40 times as an adult (mostly for selling drugs) and has been in jail multiple times.

[33] He was sent to the county jail.

[34] The family had moved at that time and now lived at Address D.

[35] The report was obtained by the OIG.

[36] Mr. Vance observed eight-year-old Alicia, three-year-old Deloris and two-year-old Noel, and he noted no visible marks or bruises. Alicia "denied being awoke when the incident occurred in the home."

[37] The family did not have an open intact family case. The family had an open placement case.

Two days later, CPI Henry Vassos was assigned the investigation. CPI Vassos spoke with Mr. Washington and his supervisor Jacqueline Smartt. CPI Vassos noted that he told the worker and supervisor he would set up a meeting with the mother that day in the office and speak with her about the new hotline report. CPI Vassos documented that Mr. Washington said thus far the mother has "allowed him into her home, but he needed to further assess her with regards to the services that are needed." The placement case file shows no documentation of visits to the home by Mr. Washington and makes no mention of the I-sequence investigation in the case notes or any meeting with the mother about the I-sequence.

Two months later, one day prior to closing the case, CPI Vassos went to the family home. The father told the CPI that on the day of the incident, he and the mother were arguing but denied a physical fight. The mother told CPI that "all was well with them" and that Mr. Webb did not harm her. CPI Vassos documented that all home utilities were in working order and the residence was clean. CPI Vassos observed the children noting no concerns. The same day, CPI Vassos documented that he contacted the children's doctor who said there were no concerns.

The following day, the child protection supervisor completed a final supervisory consultation where he noted that "…the father was the aggressor toward the mother in front of the children…father had barricaded himself in." The supervisor also noted incorrectly that the family case was "open for intact services." Under level of intervention, the investigator noted that the family had a "currently open case." Betty Reinhardt and Arthur Webb were initially indicated for allegation 60, substantial risk of harm/environment injurious in December 2013; however, the indication was unfounded by administrative appeal in February 2015 and the report has been expunged.[38]

The I-sequence is not contained in the placement file. Mr. Washington documented seeing the mother at the residential facility two days after he spoke to CPI Vassos about the I-sequence allegations, but he made no reference to it in his notes. In the March 2014 service plan, however, he wrote that "the hidden history of this father's multi-year Domestic Violence History against this mother, his long-term paramour, came to light as the result of a Police/DCP Domestic Violence Barricading incident in their home [in October 2013]." Mr. Washington added that "Domestic Violence victim therapy will be added to [Ms. Reinhardt's] individual therapy." After the shooting, Ms. Reinhardt reported that she never started the individual therapy. Mr. Webb also never followed through with domestic violence services or couples counseling.

At a November 2013 status hearing for Marcus, Mr. Washington presented a court report in which he noted that the "DCFS case manager" offered intact family services four times to the mother and each time she declined the services. The mother also refused Norman funds and related assistance. A CASA report for the same court date noted that sibling visits could not occur "pending development of appropriate parenting skills" by the mother. According to the CASA report, the case worker reported "the siblings' behavior is not controllable" by the mother and not appropriate for visits at the residential campus. The same report noted that the mother was currently receiving parenting coaching for Marcus's siblings at the DCFS office and, according to the case worker, a security guard had to intervene during the last parent coaching session due to kids "rough-housing." Neither the CASA report nor Mr. Washington mentioned the pending I-sequence at the time of court.

Between October 2013 and June 2014, Mr. Washington entered three SACWIS notes. The notes documented visits with Marcus at the residential facility. After June 2014, Mr. Washington completed monthly visits to see Marcus at the residential facility.

---

[38] IG investigators obtained a copy of the full investigation.

*Case Under Lorraine Asberry*[39]

According to a March 2017 chronology submitted as part of critical event reporting, Ms. Asberry referred the father to Grace Lutheran for counseling but he stopped attending sessions.[40] In June 2016, she referred the father to Johnson & Associates for individual counseling but he did not follow through. In July 2016, he was referred to Bethel Family Center for parenting classes but left the agency during his intake appointment upon learning that he was expected to attend multiple parenting classes.

In January 2017, Arthur Webb was arrested for aggravated assault with a deadly weapon, according to LEADS.  It did not appear the Department knew about his arrest at the time. According to the police report, Ms. Reinhardt and Mr. Webb got into a verbal altercation after which Ms. Reinhardt went to bed. Later, as she told police, she was awoken by Mr. Webb pointing a gun to her head saying, "you think I won't pop you and kill myself?" The mother provided a signed complaint and Mr. Webb was arrested. The mother told the police that she is the legal owner of the gun. Though the gun was initially taken into custody by the police during the call to the home, the gun was ultimately returned as the mother was the legal owner of the gun. The same gun was later used when eleven-year-old Alicia accidentally shot her three-year-old brother Cornell.[41] The incident was referenced by CPI Curry in her investigation following the shooting. There is no indication that a DCFS hotline call was made at the time of the incident.

In February 2017, Ms. Asberry documented[42] that she "met with the family outside of their home, due to them having plans for the evening and they were eager to leave." She observed the children happily playing outside.[43] The worker discussed that the possibility of the parents having unsupervised home visits with Marcus may be addressed at court later that week. The worker explained that for Marcus to come home, the worker had to complete a CERAP on the apartment. The parents refused; Mr. Webb said he did not understand why the worker needed to  CERAP the home and why his children needed to be observed. Ms. Asberry reiterated that since they were considering unsupervised visits in his home, a CERAP must be completed. She noted, "that this worker should be monitoring the children in his home." Mr. Webb pointed out that the last time this worker visited with the children it was outside of the home.[44] Ms. Reinhardt said it was not necessary to complete a CERAP today, because due to her work schedule she has not completed the training at the residential facility. The worker wrote "Unfortunately, it is an ongoing issue with Mr. Webb allowing this worker to visit with the children monthly and he continues to tell this worker that there is no need to see his children that are residing in the home."

At the February 2017 permanency hearing, the worker maintained that Marcus's special needs require skilled nursing care at the residential facility. The worker informed the court that Ms. Reinhardt has not followed through with the training at the residential facility to ensure that she can care for Marcus off-grounds. Further, the parents refused to allow the worker to complete a CERAP of the home during her last visit with the family in February 2017. After court the worker and Mr. Webb's attorney discussed with the parents the need for the worker to observe the children in the home monthly and the need to conduct a CERAP evaluation of the home. Mr. Webb stated that his children do not have anything to do with DCFS. The worker and his attorney informed Mr. Webb that unsupervised visits can only be granted if the worker completes a CERAP prior to visits taking place, and the worker must be allowed to visit and observe his other children at least monthly. Mr. Webb became upset with Ms. Asberry requiring the intervention of the deputies.

---

[39] Between March 2016 and November 2016, Ms. Asberry had a caseload between 16 and 22.

[40] The document did not note how many sessions he attended.

[41] IG investigators noted that the serial number of the guns, as noted in the police reports, matched.

[42] The note was written on the same day as the hotline learned of the shooting.

[43] On that day in February 2017, the local high temperature was 59 degrees.

[44] Ms. Asberry told IG investigators that the only other visit where she observed the children took place in August 2016 when she met the father and children in an empty lot not far from the home.

CORNELL WEBB

*Visits to the home*

Ms. Asberry told IG investigators that, though she documented only one visit to the home, she made another visit in August 2016 that she did not document. Ms. Asberry stated that in August the father would not allow her to come to the home and instead arranged to meet her at an empty lot near where she believed the home was located. She saw the children and spoke with the father. She said she saw the outside of the home but was not allowed in during the second visit in February 2017. She told IG investigators that she was unsure of her responsibilities towards the children who remained with the parents and did not know if she had to make monthly visits because the goal was not return home. When asked if she consulted with her supervisor she said she did not ask Ms. Smartt. SACWIS contains only two supervisory notes completed by supervisor Jacqueline Smartt in the almost four years she supervised it; one at the handoff in March 2013 and one a month later in April 2013.[45]

*Administrative Case Review ("ACR") Report*

Shortly after Ms. Asberry took over the placement case, she attended an ACR March 2016. According to the ACR feedback, "mother has custody of Marcus's siblings and there is no documentation of them being monitored by the worker." Under recommendations, the manager wrote "Worker should make sure that the children that mother has in her custody are closely monitored to make sure [of] their safety and wellbeing." Copies of the ACR feedback were distributed to the supervisor, Jacqueline Smartt.

**Current Placement Case**

All four remaining children in Ms. Reinhardt and Mr. Webb's care were taken into custody in March 2017. The three oldest were quickly placed with the maternal grandmother. In April 2017, Cornell was discharged to the maternal grandmother's care. Marcus is still receiving care at the residential facility. A private agency was assigned the family placement case and a new worker was assigned in April 2017.

In April 2017, approximately a month after the shooting, Alicia was admitted to a psychiatric hospital after she told school staff and her grandmother that she wished to kill herself and her cousin. Alicia was discharged in May 2017 to the grandmother. That same month, therapy was initiated for all four children. It was learned that Alicia was having issues with bullying at her school so she was transferred to another school. She continues to have behavioral problems, but meets with a therapist, a school counselor and a mentor. At a staffing in September 2017, the school nurse reported that Alicia checks in with her up to three times a day. An Individualized Education Plan (IEP) was developed in January 2018 to add services at school. The worker has continued to attend meetings at the school. The worker has requested case study evaluations for both Noel and Deloris.

In May 2017, Cornell had a final surgery on his head to replace his cranial cap. According to the SACWIS notes, Cornell is doing well. He continues to see a neurologist every six months. He has some problems with his eyesight due to the shooting. Cornell is presently attending Head Start and the worker has been in contact with the teacher. He has started physical therapy at the hospital. Cornell, Noel and Deloris participated in Child Parent Psychotherapy, mainly with the grandmother, though the mother has attended some sessions.

The children visit with the mother several times a week, some weeks daily, at the grandmother's home, supervised by the grandmother. Notes indicate that the mother will come over and assist the grandmother with baths and bedtime routines. By October 2017, the placement supervisor noted that the mother had become inconsistent in therapy and had missed two requested drug drops. The mother had lost her job and was behind on her rent. The grandmother reported the mother was visiting less, "a couple times a week." The worker addressed the importance of visiting consistently with the mother.

---

[45] Jacqueline Smartt retired from the Department.

The children initially visited their father monthly at the county jail. Noel pulled a fire alarm during a visit in March 2018.[46] The private agency staff team conducted a staffing to discuss visits with father. The team decided it was in the best interest of the children to change visits to every other month because of the children's reactions. The worker noted that Noel often cries and gets upset during visits and Noel and Cornell become aggressive toward each other and toward the father.  Sibling visits happen monthly with Marcus at the residential facility.

The mother is in therapy through the private agency as are the children, but the mother has missed urine drop requests.  She is reportedly working for a temporary employment agency. The goal remains return home in 12 months.

## ANALYSIS

The outcome of this case was predictable and perhaps preventable. Parents with severe domestic violence issues, a history of chronic neglect and non-organic failure to thrive, and drug convictions should have alerted the Department to screen this case into court for mandated supervision after the mother and father did not voluntarily cooperate with services. The Department served Marcus, addressing his extensive medical needs but the there was no specific plan to address the issues for the rest of the family. The Department sought psychological evaluations and parenting capacity assessments which indicated the parents had a medium to high risk for abuse, intellectual limitations, judgment deficits and unrealistic expectations for their children. This information was not applied to the assessment of the children at home, even when investigations on the family continued after Marcus came into care. The significant risk these factors posed to the children left in the care of the mother and father meant that Department services should not have been left up to the discretion of the family when they had not engaged in prior offers of services.

Families with numerous risk factors and multiple child protection investigations should not be viewed as a snapshot at the time of investigation. Rather, the family risk factors require assessments that acknowledge the cumulative effects of chronic issues and the lack of sustained changes or failures of prior interventions. The mother and father repeatedly refused intact family services; no change was seen and the Department continued to investigate the same issues. Twice before Marcus came into care, the Department settled for the mother agreeing to an "aftercare plan" to provide basic parenting to her children. The agreement was neither enforceable nor monitored. After Marcus was taken into custody and his four siblings were left in the parents' care, the Department learned of the father's violence toward the mother. The mother and father did not cooperate with any services offered by the permanency worker, but the intervention level did not change. Child protection investigators did not seek a more intense level of services believing that the placement worker was addressing issues with the family.  Cases such as these, with high investigation sequences, should be reviewed by management to assess what further intervention is needed. (See Attachment A.)

The father has a history of drug related convictions and arrests for domestic violence, including beating the mother, threatening her with a gun and barricading the family inside the apartment. In January 2017, two months prior to Cornell's shooting, the police were called to the home because the father held the mother's gun to her head during an argument. The police arrived and arrested the father but did not call the Department hotline. Although the mother could legally own a gun, the father's prior felony convictions make it illegal for him to possess a gun. The fact that the father could get a hold of the gun suggests that the mother was either not properly locking her gun away or lacked control of access to the gun, posing a risk to the children in the home. The same gun was used to shoot Cornell two months later when the children were left alone and his eleven-year-old sister accessed the gun while playing.

---

[46] The sheriff said a visit would not be allowed in April because of the incident.

Marcus's siblings were not regularly monitored, though it was not required by procedures at that time. This was further complicated by the goal for Marcus not being returned home, so there was no sense of urgency to assure the home was appropriate.  By November 2016, Procedures 315 was amended to require, "if there are other children in the home of one or both parents of a child in substitute care, the assigned DCFS permanency worker is responsible to (i) conduct at least weekly face to face visits with those children [those remaining with their parents] during the integrated assessment period (ii) visit those children in their home every 30 days (iii) observe the parenting skills exhibited with those children (iv) monitor the children's safety (v) help the parents access/obtain community resources that may be needed for the children (e.g. medical, education, social mental health, alcohol and other drug abuse treatment)." Certainly, there may be situations where the special needs of a child lead to a parent's inability to care for the child at home, and there is not a risk to the other children remaining with the parent. However, in this case, risk to all the children existed; Marcus's medical neglect necessitated immediate removal, but the mother was also indicated for environmental neglect. She had an earlier indication for environmental neglect and three unfounded investigations for environmental neglect or inadequate shelter after cleaning the home during the investigation, demonstrating a consistent pattern of needing assistance to maintain minimal parenting standards. (See Attachment A.)

**RECOMMENDATIONS**

1) This report should be shared with the current worker for the purpose of future case planning.

2) SACWIS should link the unfounded A sequence from 2008 and unfounded D sequence from 2011 to the parents' names. Currently those investigations are only found through a person search for Marcus.

3) The Department should conduct an audit of split custody cases (i.e. cases in which some of the children are in state care and some are at home).  The review should determine if the children at home are in need of more intensive services.

4) Management should conduct an enhanced review of families with investigations over C sequences using a tool similar to the one attached. The review should evaluate whether chronic issues in the family are being addressed or are capable of being addressed.

A-17

**Attachment A**

## Webb Family Table of Department Involvement

| Date | May 2008 A | April 2009 A | Sept. 2009 B | Feb. 2011 C | May 2011 D | Aug. 2011 E | Nov. 2012 F | Feb and March 2013 H and G | Oct. 2013 I | March 2017 K |
|---|---|---|---|---|---|---|---|---|---|---|
| **Findings** | Unfounded Expunged | Indicated | Unfounded Expunged | Unfounded Expunged | Unfounded Expunged | Unfounded Expunged | Unfounded Expunged | Indicated Both | Indicated/ unfounded administratively | Indicated |
| **House** | Dirty house, trash, roaches, old food | Cold, holes in outside walls; no smoke detectors, dirty fridge Filthy; unsafe | | Front door padlocked; and boarded up, windows broken; (next day) police say house has heat and water; Door and windows later repaired by landlord. | Filthy, cat feces, dirty diapers, roaches; *(12 days later)* house ok | Clothes and garbage scattered; bed bugs; Locked metal gate on front door; no doorknobs | | Outside of home filthy; roaches; Windows boarded up; | Broken furniture; odor; no beds; *Home clean and appropriate (same day); (2 month later: home ok)* | Filthy No food Roaches No heat |
| **Children's Conditions** | | Marcus's injuries; Marcus dirty; odor; mud on feet; Alicia dirty and clothing too small; mother father won't use clothing from teacher | Alicia bruised | Marcus filthy; Frequent history of body odor; mother becomes upset when teacher tried to talk about cleanliness. | | Marcus dirty and odor; wheelchair broken | Alicia tired, sleeping, dirty, odor; Alicia's leg injured needing stitches. | Children dirty; Marcus lost 11 lbs; Marcus missed many Dr. appts. No follow up after surgery/ rehab braces; poor attendance; needs new wheelchair; roaches; | Children dirty | Cornell shot in the home |
| **Domestic Violence** | | | | | | | | | Mom screaming to be let out; children present; police report frequent visits for DV; mom provides false info to CPI; | |
| **Gun** | | | | | 3 guns in home *Adults denied* | | | | | Unlocked; Available to kids; No safety lock |
| **Drugs** | Alleged use | | | | | | Strong odor of pot on mom | | Father intoxicated at time of incident | |