# OFFICE OF THE INSPECTOR GENERAL
### ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES

# REPORT TO THE GOVERNOR AND THE GENERAL ASSEMBLY

## JANUARY 2018

## DENISE KANE, PH.D.
### INSPECTOR GENERAL

# OFFICE OF THE INSPECTOR GENERAL
## ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES

January 1, 2018

To Governor Rauner and Members of the General Assembly:

Too often, child protection workers enter situations where angels fear to tread. This year a child protection investigator fell victim to brutal violence when she was taking protective custody of a child. She may never recover from this violent episode. Her attacker is being charged with attempted murder.

In too many situations, child welfare workers monitoring the safety of an "intact" family are expected to enter homes where the adults, rather than protecting the children, allow violence to invade the home, and the case has not been screened into juvenile court. Once screened into court, a judge can determine if the children's safety can be assured with a protective order. Many times the parents, rather than discharging their duty to their children, ignore the effects of violence on their children. This type of violence inevitably erupts against the children or causes lingering psychological damage. It is for the sake of the children's safety and well-being that DCFS legal staff, state's attorneys, and judges should bind these parents to protective orders or take temporary custody of the children.

This year's annual report includes an eight-year (2010-2017) retrospective on the deaths of children whose families were receiving Intact Family Services (See pages 117-129). Based on this historical perspective of cases where a child has *already* been harmed at the hands of a parent or parent's significant other, we conclude that certain DCFS intact family services procedures, such as requiring written parental consent for a worker to obtain vital information from certain child centered collaterals, are not legally required and ultimately can compromise safety.   Time and time again, Inspector General death investigations have concluded that a child who has been harmed at the hands of their parent or parent's significant other needs the protective arms of teachers and relatives.

Organizational barriers to child welfare are often the most difficult to identify.  In the past three years, the Department conducted or commissioned reviews after child deaths. Most of these reviews failed to address systemic deficiencies or organizational breaches within Department management that may have contributed to fatal events.  For instance, the reviews were silent about the fact that investigative and intact family services workers' caseloads were dangerously high – in some instances 50-100% above the prescribed limit.  The reviews ignored the stark reality that in some overloaded offices, investigators were actually offered incentives to close cases.  The reviews failed to mention that private agencies had a no-decline requirement in their contracts, meaning that they could not refuse a case for intact family services, despite the fact that some of these cases came with a 99% probability that the child would suffer death or serious injury within 24-months. The extreme probability ratings were based on predictive analytics by a Department vendor that later acknowledged that the probability language was "confusing."  The current Director did not renew the vendor's contract.  Whether statistically significant or not, the probability

ratings should have raised questions about whether a child was so unsafe at home as to warrant screening the case into court, or whether additional services were needed to ensure a child's safety. Unconscionably, in spite of these dire forecasts, DCFS offered no additional funding for increased interventions with families, and after the first month the DCFS contract afforded agencies only one in-person contact each month for a child and family.  No special funding was triggered to allow for increased eyes on a family.

Other Department-commissioned reviews did not identify that private agency front line workers, tasked with confronting such dangerous situations, on average, earned $16-$17 per hour, or that an explosively violent youth, who had brutally attacked another resident, was left in the program without additional resources to assure the safety of fellow youth, his child care workers or himself  (See Appendix B).  None of the reports made a call for a fortified state budget, without which even the strongest agency leadership will be hampered.

During the same period that the Department was commissioning these reviews, critical Inspector General investigations were met with Department statements that the Office of the Inspector General was acting beyond its statutory authority.  It was not.  It is no coincidence that this resistance came at a time when the Office or the Inspector General was investigating corruption cases within the former Director's management (See page 131). Optics, not reality, had become the operating premise of the organization. Current leadership appears to be reversing that trend.

It is imperative that the child welfare Inspector General's Office be independent and knowledgeable about the real landscape of child welfare. This includes an honest assessment of the partnership between public and private agencies and public accountability. We can do no less for the safety and well-being of our children.

On behalf of myself and our staff, I thank you for giving us the opportunity to contribute to the safety and well-being of our children and their families.

Respectfully,

Denise Kane, Ph.D.
Inspector General

# OFFICE OF THE INSPECTOR GENERAL
# REPORT TO THE GOVERNOR AND THE GENERAL ASSEMBLY

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

INVESTIGATIONS .............................................................................................. 7

   DEATH AND SERIOUS INJURY INVESTIGATIONS .................................................. 7

   CHILD DEATH REPORT ..................................................................................... 37

      SUMMARY ............................................................................................ 38

      HOMICIDE ............................................................................................ 43

      UNDETERMINED .................................................................................... 56

      ACCIDENT ............................................................................................ 69

      NATURAL ............................................................................................. 90

      SUICIDE .............................................................................................. 111

   EIGHTEEN-YEAR DEATH RETROSPECTIVE ....................................................... 113

   DEATHS IN INTACT FAMILY SERVICES CASES FY 2010-2017 ......................... 117

   GENERAL INVESTIGATIONS .......................................................................... 131

ADDRESSING CORRUPTION FROM WITHIN ................................................... 149

ERROR REDUCTION ....................................................................................... 153

SYSTEMIC RECOMMENDATIONS ................................................................... 157

RECOMMENDATIONS FOR DISCIPLINE ......................................................... 161

CHILD WELFARE EMPLOYEE LICENSES ....................................................... 163

DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS ............................... 165

APPENDIX ...................................................................................................... 201

   LUCIANO GEE…………………………………………………………….A-1

   EASTON HURST……………………………………………………….……... B-1

# INTRODUCTION

The Office of the Inspector General of the Department of Children and Family Services was created by unanimous vote of the Illinois General Assembly in June 1993 to reform and strengthen the child welfare system. The mandate of the Office of the Inspector General is to investigate misconduct, misfeasance, malfeasance, and violations of rules, procedures, or laws by Department of Children and Family Services (DCFS) employees, foster parents, service providers and contractors with the Department. *See* 20 ILCS 505/35.5 – 35.7. To that end, this Office conducts investigations and makes recommendations to protect children, uncover wrongdoing, improve practice, and increase professionalism within the Department.

## INVESTIGATION CATEGORIES

### Death and Serious Injury Investigations

The Office of the Inspector General investigates deaths and serious injuries of Illinois children whose families were involved in the child welfare system within the preceding 12 months. The Inspector General is an *ex officio* member of the Child Death Review Team Executive Council. The Inspector General receives notification from the Illinois State Central Register (SCR) of all child deaths and serious physical injuries where the child was a youth in care, the family is the subject of an open investigation or service case, or the family was the subject of a previous investigation or closed case within the preceding 12 months. The notification of a child death or serious injury generates a preliminary investigation in which the death report and other reports are reviewed and computer databases are searched. When further investigation is warranted, records are impounded, subpoenaed or requested and a review is completed. When necessary, a full investigation, including interviews, is conducted. The Inspector General's Office created and maintains a database of child death statistics and

critical information related to child deaths in Illinois. The following chart summarizes the death cases reviewed in FY 2017:

### FY 17 CHILD DEATH CASES REVIEWED

| | |
|---|---|
| CHILD DEATHS IN FY 17 MEETING THE CRITERIA FOR REVIEW | 108 |
| INVESTIGATORY REVIEWS OF RECORDS | 98 |
| FULL INVESTIGATIONS | 10 |

Summaries of death investigations, with a full investigative report submitted to the Director, are included in the Investigations Section of this Report on page 7. A summary of all child deaths reviewed by the Office of the Inspector General in FY 17 can be found on page 37 of this report.

### General Investigations

The Office of the Inspector General responds to and investigates complaints filed by the state and local judiciary, Department employees, foster parents, biological parents and the general public. Investigations yield both case-specific recommendations, including disciplinary recommendations, and recommendations for systemic changes within the child welfare system. The Inspector General's Office monitors compliance with all recommendations.

### Child Welfare Employee Licensure Investigations

In 2000, the General Assembly mandated that the Department of Children and Family Services institute a system for licensing direct service child welfare employees. The Child Welfare Employee License (CWEL) permits centralized reporting of all persons providing direct child welfare services, whether they are employed with the Department or a private agency. The employee licensing system seeks to maintain accountability, integrity and honesty of those

entrusted with the care of vulnerable children and families.

A child welfare employee license is required for both Department and private agency investigative, child welfare and licensing workers and supervisors. The Department, through the Office of Employee Licensure, administers and issues Child Welfare Employee Licenses.

A committee composed of representatives of the Office of the Inspector General, the Child Welfare Employee Licensure Board and the Department's Office of Employee Licensure screens referrals for CWEL Investigations. The committee reviews complaints to determine whether the allegations meet one or more grounds for licensure action as defined in Department Rule 412.50 (89 Ill. Adm. Code 412.50). The Inspector General investigates and prosecutes CWEL complaints and hearings.

When a CWEL Investigation is completed, the Office of the Inspector General, as the Department's representative, determines whether the findings of the investigation support possible licensure action. Allegations that could support licensure action include conviction for specified criminal acts, indicated findings of child abuse or neglect, egregious acts that demonstrate incompetence or a pattern of deviation from a minimum standard of child welfare practice. Department Rule 412.50 (89 Ill. Adm. Code 412.50) specifies the grounds for licensure action. When licensure action is appropriate, the licensee is provided an opportunity for a hearing. An Administrative Law Judge presides over the hearing and reports findings and recommendations to the Child Welfare Employee Licensure Board. The CWEL Board makes the final decision regarding licensure action.

In FY 2017, 16 cases were referred to the Inspector General for Child Welfare Employee License investigations. In addition, the Inspector General's Office provided research and technical assistance to the Office of Employee Licensure in 12 evaluations of CWEL applicants.

## FY 2017 CWEL INVESTIGATION DISPOSITIONS

| CASES OPENED FOR FULL INVESTIGATION | 16 |
|---|---|
| CLOSED/NO CHARGES | 9 |
| ACTION PENDING BOARD DECISION | 2 |
| LICENSES RELINQUISHED | 1 |
| PENDING ADMINISTRATIVE HEARING | 3 |
| PENDING INVESTIGATION | 1 |

### Resolution of Prior Investigations

| CASES PRIOR TO FY 17 | 13 |
|---|---|
| LICENSES SUSPENDED | 2 |
| REVOCATION | 4 |
| PENDING FINAL DECISION (CWEL BOARD) | 3 |
| PENDING ADMIN. LAW JUDGE DECISION | 3 |
| CHARGES DISMISSED | 1 |

*Criminal Background Investigations and Law Enforcement Liaison*

The Inspector General's Office provides technical assistance to the Department and private agencies in performing and assessing criminal history checks. In FY 17, the Inspector General's Office opened 2,428 cases requesting criminal background information from the Law Enforcement Agencies Data System (LEADS). Each case may involve multiple law enforcement database searches and may involve requests on multiple persons. For the 2,428 cases opened in FY 17, the Inspector General's Office conducted 10,396 searches for criminal background information.

In addition, in the course of an investigation, if evidence indicates that a criminal act may have been committed, the Inspector General may notify the Illinois State Police, and the Office of the Inspector General may investigate the alleged act for administrative action only.

The Office of the Inspector General assists law enforcement agencies with gathering necessary documents. If law enforcement elects to

investigate and requests that the administrative investigation be put on hold, the Office of the Inspector General will retain the case on monitor status. If law enforcement declines to prosecute, the Inspector General will determine whether further investigation or administrative action is appropriate.

## INVESTIGATIVE PROCESS

The Office of the Inspector General's investigative process begins with a Request for Investigation or notification by the State Central Register of a child's death or serious injury or a referral for a Child Welfare Employee License investigation. Investigations may also be initiated when the Inspector General learns of a pending criminal or child abuse investigation against a child welfare employee.

In FY 2017, the Office of the Inspector General received 3,820 Requests for Investigation or technical assistance.[1] Requests for Investigation and notices of deaths or serious injury are screened to determine whether the facts suggest possible misconduct by a foster parent, Department employee, or private agency employee, or whether it suggests a need for systemic change. If an allegation is accepted for investigation, the Inspector General's Office will review records and interview relevant witnesses. The Inspector General issues recommendations for discipline, systemic change, or sanctions against private agencies to the Director of the Department and to the Governor. The Office of the Inspector General monitors the implementation of accepted recommendations.

The Office of the Inspector General may work directly with a private agency and its board of directors to ensure implementation when recommendations pertain to a private agency. In rare circumstances, when the allegations are serious enough to present a risk to children, the Inspector General may request that an agency's intake for new cases be put on temporary hold,

or that an employee be placed on desk duty pending the outcome of the investigation.

The Office of the Inspector General is mandated by statute to be separate from the Department. Inspector General files are not accessible to the Department. The investigations, investigative reports and recommendations are prepared without editorial input from either the Department or any private agency. Once a Report is completed, the Inspector General will consider comments received and the Report may be revised accordingly.

If a complaint is not appropriate for full investigation by the Office of the Inspector General, the Inspector General may refer the complaint to law enforcement (if criminal acts appear to have been committed), to the Department's Advocacy Office for Children and Families, or to other state regulatory agencies, such as the Department of Financial and Professional Regulation.

### Administrative Rules

Rules of the Office of the Inspector General are published in the Illinois Register at 89 Ill. Admin. Code 430. The Rules govern intake and investigations of complaints from the general public, child deaths or serious injuries and allegations of misconduct. Rules pertaining to employee licensure action are found at 89 Ill. Admin. Code 412.

### Confidentiality

A complainant to the Office of the Inspector General, or anyone providing information, may request that their identity be kept confidential. To protect the confidentiality of the complainant, the Inspector General will attempt to procure evidence through other means, whenever possible. At the same time, an accused employee needs to have sufficient information to enable that employee to present a defense. The Inspector General and the Department are mandated to ensure that no one will be retaliated against for making a good faith complaint or providing information in good faith to the Inspector General.

---

[1] This includes requests for investigation, notice of child deaths and serious injuries, notification of arrests or pending abuse investigations, and requests for technical assistance and information.

Reports issued by the Office of the Inspector General contain information that is confidential pursuant to both state and federal law. As such, Inspector General Reports are not subject to the Freedom of Information Act. Annually, the Office of the Inspector General prepares several reports deleting confidential information for use as teaching tools for private agency and Department employees.

*Impounding*

The Office of the Inspector General is charged with investigating misconduct "in a manner designed to ensure the preservation of evidence for possible use in a criminal prosecution." 20 ILCS 505/35.5(b). In order to conduct thorough investigations, while at the same time ensuring the integrity of records, investigators may impound files. Impounding involves the immediate securing and retrieval of original records. When files are impounded, a receipt for impounded files is left with the office or agency from which the files are retrieved. Critical information necessary for ongoing service provision may be copied during the impound in the presence of the Inspector General investigator. Impounded files are returned as soon as practicable. However, in death investigations, the Office of the Inspector General forwards original files to the Department's Office of Legal Services to ensure that the Department maintains a central file.

## REPORTS

Inspector General Reports are submitted to the Director of DCFS. Specific reports are also shared with the Governor. An Inspector General Report contains a summary of the complaint, a historical perspective on the case, including a case history, and detailed information about prior DCFS or private agency contact(s) with the family. Reports also include an analysis of the findings, along with recommendations.

The Office of the Inspector General uses some reports as training tools to provide a venue for ethical discussion on individual and systemic problems in child welfare practice. The reports are redacted to ensure confidentiality and then distributed to the Department or private agencies as a resource for child welfare professionals. Redacted reports are available on the Office of the Inspector General website, or by request from the Office of the Inspector General by calling (312) 433-3000.

*Recommendations*

The Inspector General may recommend systemic reform or case specific interventions in the investigative reports. Systemic recommendations are designed to strengthen the child welfare system to better serve children and families.

Ideally, discipline should have an accountability component as well as a constructive or didactic one. It should educate an employee on matters related to his/her misconduct while also functioning to hold employees responsible for their conduct. Without the accountability component, there is little to deter misconduct. Without the didactic component, an employee may conclude that s/he has simply violated an arbitrary rule with no rationale behind it.

The Inspector General presents recommendations for discipline to the Director of the Department and, if applicable, to the director and board of the involved private agency. Recommendations for discipline are subject to due process requirements. In addition, the Inspector General will determine whether the facts suggest a systemic problem or an isolated instance of misconduct or bad practice. If the facts suggest a systemic problem, the Inspector General's Office may investigate further to determine appropriate recommendations for systemic reform.

When recommendations concern a private agency, appropriate sections of the report are submitted to the agency director and the board of directors of that agency. The agency may submit a response. In addition, the board and agency director are given an opportunity to meet with the Inspector General to discuss the report and recommendations.

In this Annual Report, systemic reform recommendations are organized into a format that allows analysis of recommendations according to the function within the child welfare system that the recommendation is designed to strengthen. The Inspector General's Office is a small office in relation to the child welfare system. Rather than address problems in isolation, the Inspector General's Office views its mandate as strengthening the ability of the Department and private agencies to perform their duties.

The Office of the Inspector General monitors implementation of recommendations made to the Director of DCFS and private agencies. Monitoring may take several forms. The Office of the Inspector General will monitor to ensure that Department or private agency staff implement the recommendations made. The Inspector General may consult with the Department or private agency to assist in the implementation process. The Inspector General may also develop accepted reform initiatives for future integration into the Department.

### ADDITIONAL RESPONSIBILITIES

*Office of the Inspector General Hotline*

Pursuant to statute, the Office of the Inspector General operates a statewide, toll-free telephone number for public access. Foster parents, guardians *ad litem*, judges and others involved in the child welfare system have called the hotline to request assistance in addressing the following concerns:

- Complaints regarding DCFS caseworkers and/or supervisors ranging from breaches of confidentiality to failure of duty;
- Complaints about private agencies or contractors;
- Child Abuse Hotline information;
- Child support information;
- Foster parent board payments;
- Youth in College Fund payments;
- Problems accessing medical cards;
- Licensing questions;
- Ethics questions; and

- General questions about DCFS and the Office of the Inspector General.

The Office of the Inspector General's Hotline is an effective tool that enables the Inspector General to communicate with concerned persons, respond to the needs of Illinois children, and address day-to-day problems related to the delivery of child welfare services. The phone number for the Office of the Inspector General Hotline is (800) 722-9124.

The following chart summarizes the Office of the Inspector General's response to calls received in FY 17:

### CALLS TO THE INSPECTOR GENERAL HOTLINE IN FY 17

| | |
|---|---|
| INFORMATION AND REFERRAL | 675 |
| REFERRED TO SCR HOTLINE | 69 |
| REQUEST FOR OIG INVESTIGATION | 107 |
| TOTAL CALLS | 851 |

6

# INVESTIGATIONS

This annual report covers the time period from July 1, 2016 to June 30, 2017. The Investigations section has three parts. Part I includes summaries of child death and serious injury investigations reported to the Department Director and the Governor. Part II contains aggregate data and case summaries of child deaths in families who were involved with the Department in the preceding 12 months. Part III contains general investigation summaries conducted in response to complaints filed by the state and local judiciary, foster parents, biological parents and the general public.

Investigation summaries contain sections detailing the allegation, investigation, Inspector General recommendations and the Department response. In the "OIG Recommendation/Department Response" section of each case, Inspector General recommendations are in bold and the Department's response to the recommendations follows.

## DEATH AND SERIOUS INJURY INVESTIGATIONS

### DEATH AND SERIOUS INJURY INVESTIGATION 1

**ALLEGATION**  A five-year-old girl died as a result of multiple injuries caused by blunt force trauma. The girl's family was the subject of three child protection investigations and an intact family services case during the year preceding her death.

**INVESTIGATION**  Eleven months after the five-year-old girl moved to her father's home, the father's girlfriend killed his daughter. The five-year-old had been living with her mother, her nine-year-old sister and six-year-old brother when her mother was investigated by child protection and indicated for leaving her children in an unsafe environment. The children were removed from their mother's care and placed with their non-custodial father and his girlfriend. Two months after moving in with their father and his girlfriend the hotline was called because the five-year-old girl had a broken (spiral break) arm and hospital staff suspected abuse. When interviewed by the child protection investigator, both the girl and the girlfriend, who was the only other person present, demonstrated that the girl had injured herself by getting her arm twisted in the couch. The abuse investigation of the girl's broken arm was unfounded. While the abuse investigation on the girl's broken arm was pending a second hotline call was made, alleging that the six-year-old brother was often observed with bruising. A family member called the hotline within the next month alleging new bruises on the boy. Within six months of their placement with their father, there were two abuse investigations, both unfounded, with the intact family services case closed shortly (30 days) after the abuse investigations were unfounded. In both instances, the children had been in the sole care of the girlfriend. The five-year-old girl was killed in her father's home four months later.

The Department never assessed the father's home for safety nor had any contact with the family over the next two months until a transitional visit was finally conducted and an intact family services case was opened through a private agency. However, the private agency was not granted access to the case records until five weeks after the case was assigned to the agency.

During the transitional visit, at which the father, his girlfriend and all the children were present, the family agreed to accept intact services. The girlfriend told the workers that when the siblings had come to live in the

home they had arrived with rashes on their bodies, as well as lice and warts, and the boy had white worms in his stool.

Two weeks later, the investigator spoke with a local police detective; the local police were also investigating the incident regarding the girl's fractured arm. The police informed her that criminal charges would not be pursued. The investigator obtained law enforcement records of their interview with the emergency room physician who told them she had accepted the family's report of how the injury occurred. The report was unfounded. Only the father had been named as a possible perpetrator, despite all accounts of the incident stating that the children had been in the sole care of the girlfriend when the girl had been injured.

Before the child protection investigation of the girl's broken arm was unfounded, the Department received another report of injuries in the father's home. It was alleged the then six-year-old boy had bruising to his arm which appeared to be a handprint and that he repeatedly presented with cuts and scabs on his face and had a broken nose at one point. Again, the allegation named only the children's father as an alleged perpetrator, despite the fact that the girlfriend was the primary caretaker. The child protection investigator spoke to the intact family services worker and her supervisor regarding the new allegations of bruising to the boy. Both stated they had no concerns regarding the family. The caseworker stated the father had told her the boy might have issues with his equilibrium as he fell down frequently. The caseworker and her supervisor expressed their belief that the father should obtain legal custody of the children. The investigator then spoke to the boy's teacher who confirmed he often arrived with a variety of cuts and bruises and at one point had a broken nose. The teacher also reported that the boy, who was not present that day, had been absent from class excessively. An Inspector General review of school attendance records found the boy had missed approximately one-third of the school year to date.

The father and his girlfriend stated the boy had injured himself by tripping over a shoe in his room, a story that was corroborated by his siblings. The father had not been present in the home at the time the injury occurred and all of the children had been in the care of the girlfriend. The first investigator took photographs of the boy's injuries and completed body charts for all of the children, documenting no additional injuries to them.

Two days later, the investigator of the girl's arm fracture received an email from the boy's teacher expressing concern that he had not yet returned to school. The teacher requested guidance as to how to address the situation and at what point she might consider requesting intervention from the Department. The investigator did not respond to the teacher's email but forwarded it to the investigator of the boy's injuries, who never responded. In an interview with the Inspector General investigator, the boy's teacher recalled she had become increasingly concerned regarding the boy's frequent appearances at school with fresh injuries and had at one point taken photos of bruises she saw on him, which she sent to the investigator. In a subsequent email to Inspector General staff, the teacher stated that the boy had stopped coming to school after the father had learned that she had photographed the boy's injuries. The teacher stated that the girlfriend then assumed the task of picking the children up from school and would become belligerent towards her and would accuse other students in the class of picking on the boy.

A second caller contacted the hotline alleging new injuries to the boy. The investigator re-contacted the intact services caseworker who minimized the significance of the new report and stated she had no concerns regarding the children's safety in their father's care. The investigator visited the family for the second and final time during this investigation and noted no concerns.

One month later, the investigator spoke with the children's pediatrician who said she had observed numerous injuries to the boy over time but that he was an active child. She had observed a healing cut to the back of his skull which had required staples to heal which the father told her was the result of a fall against the bathtub.

She said the boy had a pronounced lack of educational development for a six-year-old and that the father informed her he had never attended school prior to coming to live in his home. The following day, the investigator again spoke with the intact services caseworker who informed her that the agency planned to leave the children in the father's care and close the case. The caseworker stated the father had complied with all tasks required of him and asserted the children had not been abused. The investigator then contacted a local police detective who had investigated the report of injuries to the boy and was informed no charges would be pursued; law enforcement could neither prove nor disprove who might have perpetrated abuse against the boy and the father was not present in the home at the time the boy's injuries occurred. The report of abuse to the boy was unfounded against the father. The supervisor who approved unfounding the investigation had supervised all investigations. In an interview with Inspector General staff, the investigator stated she did not recall speaking with the children's pediatrician and she had not shared the photos of the boy's injuries with the pediatrician. One month after this investigation was closed, the intact family services case was also closed.

Throughout the private agency's handling of the intact services case, the caseworker failed to accurately assess the situation in the father's home or identify means to alleviate potential sources of stress upon the family. In addition to the injuries that had been reported to the hotline (the girl's broken arm, bruising to the boy's arm and face and prior bruising), the father had notified the private agency worker of additional injuries to the boy, which she never reported to the hotline. Her supervisor, however, did attempt to discuss the injuries with child protection staff. While the investigation of the injury to the boy was pending, the father contacted the intact services caseworker, two times in one month, to tell her that the boy had been injured in the bathroom: once, that he had fallen over a crate in the bathroom and ten days later, that he had an open wound on the back of his head from falling in the bathtub. The intact family worker did not share this information with any of the child protection investigators.

The intact family caseworker and her supervisor also did not consider the change in household dynamics that likely occurred when three children under the age of 10 with physical and educational issues related to their previous living conditions were placed in a home with limited space under the primary care of the father's girlfriend, who had recently given birth to an infant of her own. The girlfriend was never listed as a member of the household and was therefore never assessed regarding her ability to provide care to the siblings. Furthermore, the caseworker and her supervisor neglected to engage the family in a wide variety of social service resources which were available to them in their community. The caseworker and her supervisor repeatedly demonstrated a cavalier disinterest in providing anything beyond the minimum effort required to shuttle the family's case toward closure. Both the intact supervisor and his direct superior were terminated two weeks after the family's intact services case was closed for their mishandling of cases, including this one. One week later, the caseworker resigned her position with the agency. The Executive Director said that in the wake of the departures the agency has conducted a systematic review of their cases and implemented new training policies for employees.

Four months after the intact services case was closed, local police reported to SCR that the girl had been pronounced dead on arrival at a local hospital emergency room. During the subsequent child protection investigation, the sibling's paternal grandfather stated the girlfriend had called him and asked him to come to the family's home to help watch the children. The paternal grandfather said that during the course of the call the girlfriend said the girl fell and told her to be careful, though the paternal grandfather did not hear the girl call out or say anything. According to the paternal grandfather, upon arriving at the house he began playing with his infant grandson and asked the girlfriend where the girl was. The girlfriend stated the five-year-old girl was taking a bath. The paternal grandfather saw the bathroom door was closed and admonished the girlfriend for being inattentive while the girl was in the tub. The girlfriend then opened the bathroom door and told the girl not to close it but the paternal grandfather heard no response from her. A short time later the girlfriend said she was going to get the girl out of the tub and screamed after entering the bathroom. The

paternal grandfather stated that he rushed into the room and saw the girl lying unresponsive in the tub face-up. He stated the girl was not submerged in the shallow of water and that her face was not wet. Following the girl's death, an autopsy was performed which concluded her death was the result of multiple blunt force trauma injuries including a skull fracture, a lacerated liver and numerous contusions all over her body. The autopsy found both the acute injuries which led directly to her death as well as chronic injuries indicative of ongoing physical abuse. In interviews with child welfare professionals the two oldest children detailed repeated whippings and beating administered by both their father and the girlfriend, who were both subsequently indicated for multiple allegations of abuse and neglect by the Department. The girlfriend was charged with first degree murder of the girl and is currently in jail awaiting trial.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The Department should develop a workload formula to provide additional funding in complex intact family services when agencies have to simultaneously provide rehabilitative services to a parent who has neglected or abused a child(ren) and supportive and protective services to the non-custodial parent who assumes the care of the child(ren). The complexity of the needs of the children in these split cases likewise must be assessed for meaningful supportive services.**

The Department agrees. The Department is currently reassessing the Intact Family Services program model and developing methods to allow for a "360 degree" approach to provide children and families with intensive services. DCFS maintains an investment in helping the family whether or not there is an open investigation, by assisting and supporting the service providers. The focus is on collaboration and working for the success in serving the family effectively with all providers and DCFS at the table.

**2. Email communication during a child protection investigation must be made a part of the official record when the information is relevant to the investigation.**

The Department agrees. A notice was issued to all child protection staff.

**3. In keeping with the Strengthening Families Model, intact family services workers should be required to familiarize themselves with their families' communities and demonstrate a command of community early education and preschool resources and other protective social support for children to reduce abuse and neglect, as recommended by the Inspector General in Report 08-1260.**

The Department agrees. Intact Family Services workers are expected to be knowledgeable of community and governmental resources available to families for free or at a nominal charge, and to regularly refer families for such services. Intact Family Services workers shall coordinate and monitor service referrals made to community organizations, service providers and state human service systems in order to maximize their combined benefits and minimize confusion and contradictions to the family. Detailed language of worker expectations is in P302.388 g) Responsibilities of the Assigned Intact Family Service Worker.

**4. This report should be shared with the involved child protection investigators and supervisor.**

The Department agrees. The redacted report will be shared with the child protection investigators and supervisor of this case.

**5. The Inspector General will share this report with the private agency.**

The Inspector General shared a redacted report with the private agency. The Inspector General met with agency Administrators and a member of the agency's Board of Directors to discuss the findings and recommendations made in the report. The agency terminated the employment of the supervisor and his direct

superior two weeks after the family's intact services case was closed for their mishandling of cases, including this one. One week later, the caseworker resigned her position with the agency. In the wake of the departures, the agency conducted a systematic review of their cases and implemented new training policies for employees.

**DEATH AND SERIOUS INJURY INVESTIGATION 2**

| ALLEGATION | A 17-month-old was discovered to have serious injuries including bone fractures to both arms and a wrist, an injury to his liver and several bruises to his arms and chest. |

At the time the family had an open case; the Department had legal guardianship of the 17-month-old, and his 2½ -year-old sister, both of whom had returned home seven months earlier under an order of protection. The older child had been removed at the age of five months because of fractures and failure to thrive.

| INVESTIGATION | The first child protection investigation began when a hospital social worker reported to the State Central Registry (SCR) that the 18-year-old mother brought in |

the then 5-month-old sister because she was not using her left leg. The doctor ordered a skeletal survey, presuming the leg was broken. The doctor had heightened concerns because the baby had previously been diagnosed as failure to thrive, the mother had not been following up with her well-baby care, and the mother had a black eye when she brought the child to the doctor. The baby lived with the mother and the 33-year-old father who had a history of domestic violence. An allegation against the mother of bone fractures by abuse was taken for investigation.

The skeletal survey revealed that the sister had multiple metaphyseal fractures in different stages of healing. The mother initially stated that the sister was hurt when the walker that she was in collapsed. The mother later said that the infant may have been hurt during a disagreement when the mother attempted to take the sister away from the father and the father would not let go of the infant. A child abuse doctor determined that because of the child's development level, the type and extent of the injuries, and the lack of a reasonable explanation, the injuries were most likely abusive in nature. The child protection investigator took protective custody, and the judge granted the Department temporary custody of the sister. She was placed with her 22-year-old godmother and the placement case was assigned to a private agency. Two months after the initial hotline call, the parents were indicated for bone fractures by abuse. The sister was moved from her godmother's care to a traditional foster placement four months later.

During the integrated assessment interview, the mother disclosed previous psychiatric hospitalizations for impulsive, threatening, and aggressive behaviors. Records from the hospitalizations alluded to a limited capacity for empathic insight and below average cognitive functioning, in addition to difficulties adjusting and appropriately responding to life stressors. The integrated assessment screener's recommendations included: substance abuse treatment, a domestic violence assessment, parent-child interaction therapy, individual psychotherapy, a life skills assessment for the mother, and an Early Intervention developmental evaluation for the sister. The initial Integrated Assessment stated that reunification for the sister was guarded to poor given her past injuries and risk of ongoing intimate partner violence.

Five months after the sister came into care, the couple had their second child and the SCR hotline was contacted at his birth. A second investigation was opened because of concerns for the infant's safety. The parents were indicated for substantial risk of physical injury by neglect to the newborn due to the prior indicated finding of abusive bone fractures to the sister and the couple's history of domestic violence. The Department took temporary custody of the newborn and placed him with his sister in the traditional foster home.

The parents were both referred for individual therapy, substance abuse treatment and domestic violence services. Therapy sessions for both parents were supposed to be weekly—regular attendance was an issue. The father's sporadic attendance was reportedly due to work conflicts and the weekly sessions were reduced to bi-weekly, then once monthly within his home. The mother reported scheduling difficulties and health concerns. Throughout the course of their respective therapy sessions, neither parent admitted to past abuse of

the sister. In addition to individual therapy sessions, the mother and father also received four joint therapy sessions where they focused on their relationship. These joint sessions, however, all occurred prior to the children being returned home. Both parents initially enrolled in intensive outpatient substance abuse services but were unsuccessfully discharged for non-attendance. The caseworker told investigators that she did not believe the father had a substance abuse problem. The mother later re-engaged and successfully completed the treatment program. Both parents submitted random urine drops that were all negative. The father was initially discharged from domestic violence services for poor attendance, which he attributed to work conflicts. After the classes were changed from weekdays to weekends, he successfully completed the recommended services. The mother completed a shorter treatment program for domestic violence and was reportedly empowered upon discharge. The mother successfully completed the recommended parenting classes.

The sister was screened for developmental concerns shortly after protective custody was taken, and received developmental and physical therapy. The second child was deemed to be hitting developmental targets and not in need of services. The family never received Parent-Child Interactive Therapy to address parental attachment to a seriously abused, failure to thrive infant as recommended in the integrated assessment because the agency correctly determined the children were too young for that service. The agency did not explore other parent-child therapy options. The father's therapist reportedly observed the parents' interactions with their children and described them to be appropriate.

Five months after taking protective custody of the second child, the parents were granted unsupervised visits. Six months later, the parents were granted overnight visits and within a month, the court ordered the children to be returned home under a supervision order. At the time, the children were nearing their first and second birthdays, and the mother was four months pregnant with the couples' third child. Day care and early Head Start programs were not sought for this family. The parents continued to meet with their recovery coaches and therapists, but the mother's individual therapy sessions were reduced to once a month by phone following the children's return home. Less than four months after the children were returned home, the mother was discharged from individual therapy due to her continued stability and consistency in communication. There were no in-home sessions after the children were returned home.

Five months after the children were returned home, the second child, then 16 months, was admitted to the hospital after the primary care physician diagnosed the toddler with possible non-organic failure to thrive. He was below the 1st percentile on the growth curve. The physician observed a deceleration in growth. The physician's notes indicated that the child had been on-track until about 11 months old around the time the toddler was returned to the mother. The mother reported that the child was eating normally. After being admitted and observed in the hospital for three days, the child gained weight and concerns were raised that environmental causes were likely. The caseworker reportedly attributed the poor growth to part of the developmental stage. The mother missed the follow-up appointment because she went into labor and delivered her third child. The hotline was not called about the failure to thrive, or when the new infant was born, and a petition was never filed for the third child. The caseworker assumed, without verification, that the mother was using the former foster parent as support and for respite care for the children.

Approximately a month and a half after the second child was hospitalized for failure to thrive, he was again hospitalized with bruises and a fractured elbow. Earlier that day, the mother told the father that she was going to hurt the children. Later that day, the father disclosed this conversation to his therapist and the therapist called the hotline. Police arrived at the residence and found the mother hiding in the basement, while the children were unsupervised. The police took protective custody and the children were taken to the hospital to be examined. The second child had several fractures and an injured internal organ. The newborn also had a fracture with signs of healing. Both parents were arrested and the children were again placed with their former foster parents.

Another integrated assessment was completed recommending that parental rights be terminated with no recommendation for services. The foster parents were willing to provide permanency for all three children and the mother agreed to sign surrenders. The mother was incarcerated, awaiting trial for aggravated battery of minors; the father moved out of state and contacted the children once. The father's parental rights were terminated and the children remained with their foster parents with the permanency goal changed to adoption.

---

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The Department should issue a notification to all private foster care agencies and Officers of the Court that six months of daycare can be funded as part of reunification services.**

The Department agrees. This was originally issued on 12/17/2015 as a D-Net Announcement introducing revised P302.330 Day Care Services and the supporting appendices and application documents that went along with it.

A D-Net announcement was issued again on 12/1/17, with instructions and clarification of reunification and day care service eligibility. To further follow up, the Office of Child Development has sent a copy of the transmittal to all Regional Administrators and Program Managers to share with private agencies, as well as to DCFS Legal to disseminate to the courts.

**2. Prior to return home, caseworkers must develop a reunification plan that identifies basic necessities that must be in place before return home (food, beds, diapers, etc.); support services that must be in place before return home (homemaker, visiting nurse, counseling, early intervention, Head Start, day care, school, respite care, etc.); and community resources appropriate and available within two miles of the family's home (WIC, food pantry, local library, etc). The Department must ensure that the family is securely anchored to supportive services.**

The Department agrees but notes that it is not always realistic that the Department will be able to find/access services within two miles of the family's home nor can the Department guarantee that all services will be in place prior to return home.

**3. The Department should fund transportation to daycare or Head Start programs in return home cases where there are multiple young children and the parents – because of poverty or increased stress – cannot transport their children.**

The Department agrees. DCFS Office of Education is having ongoing discussions with the Illinois State Board of Education and the Department of Human Services to help children in return home cases with transportation to daycare and Head Start. Some of these children qualify for Head Start transportation due to having an Individualized Education Plan (IEP). Other funding for transportation falls under the McKinney-Vento Homeless Assistance Act.

**4. The Inspector General will share this report with the involved private agency.**

The Inspector General shared a redacted report with the private agency. The Inspector General met with agency Administrators and a member of the agency's Board of Directors to discuss the findings and recommendations made in the report.

**DEATH AND SERIOUS INJURY INVESTIGATION 3**

| ALLEGATION | A four-month-old boy died as a result of blunt force trauma injuries inflicted by his father. At the time of the boy's death, a child protection investigation against his mother was pending and his family had an open placement case with the Department. |

| INVESTIGATION | The boy's mother had herself been a Department youth in care, and both she and the father came from families with multi-generational involvement with the Department. The mother, who was 20 years old at the time of the boy's birth, had two older children, a 3-year-old boy and 1-year-old girl, who had previously been removed from her custody and resided together in a traditional foster home. The oldest child was removed from the mother's care after her repeated failure to make adequate provisions for his care resulting in two indicated findings against her for Inadequate Supervision. She was subsequently found unfit, did not complete court ordered child welfare services and surrendered her parental rights to the child. |

After the birth of the mother's second child, the hotline was contacted with allegations of Substantial Risk of Harm. The girl was taken into protective custody and the case was screened into juvenile court. The court found both parents "unfit" based on mother's previous finding of unfitness, her lack of compliance with services, domestic violence and father's criminal history and use of drugs. The girl was made a ward of the court. A goal was established for the girl to return home to the mother. An Integrated Assessment (IA) of the couple was conducted, which noted the mother had experienced long-term instability regarding her living situations but had recently been approved for a Housing Voucher. She was unemployed and had no employment history. The father worked short-term odd jobs as they became available through an employment service. Both the mother and father related a history of domestic violence by the father against the mother. In the Integrated Assessment, the clinical screener noted the mother, "demonstrate(d) limited protective skills, minimize(d) domestic violence and power control dynamics in her relationships and struggle(d) to put her child's needs before her own." Of the father, the clinical screener noted he, "demonstrate(d) anti-social and narcissistic traits and power control dynamics." The clinical screener concluded that the prognosis for the girl's reunification with her mother was "poor" and for the father was "guarded" and recommended concurrent planning in the event the child could not safely be returned to their care.

Throughout the placement case, the parents engaged in an intermittent relationship, with the father sporadically residing in the mother's home. The mother had become pregnant with her third child, her second by the father. At a permanency review hearing, the family's Department caseworker testified in favor of the initiation of limited unsupervised visitation for the mother with her child. The caseworker stated it was necessary to allow the mother unsupervised visitation in order to determine whether she would be capable of parenting on her own. The caseworker's recommendation to begin the unsupervised visits was based on her observation of positive changes in the mother's behavior, the stabilization of her housing situation and her engagement with required services. The caseworker stated she was aware the mother was still in contact with the father, but said she truly believed their relationship was over and that the mother placed a greater priority on regaining and maintaining custody of her children than continuing a relationship with him. The result of the permanency hearing was a finding of "fitness" in favor of the mother, which would allow for unsupervised visitation at the Department's discretion. The child's goal was changed to Return Home within 5 months. This ruling also meant the mother would be permitted to keep her third child in her custody upon his birth. The father, who was non-compliant with services, remained unfit and was not allowed unsupervised visits.

Following the boy's birth, the situation in the mother's home and her compliance with services deteriorated. Involved workers who provided services in the home documented the mother repeatedly expressed her frustration with caring for a newborn and her feelings of stress related to her overall situation and the

Department's involvement in her life. The mother also said she was angry with the father as she was aware he was not complying with services and was not able to help her. The mother additionally related her concerns as to how she would manage caring for a second child if and when her daughter was returned to the home, as that was the permanency goal. Six weeks after the boy's birth, unsupervised visits between the mother and her daughter were increased from four hours to eight hours in length. Soon thereafter, the caseworker documented a precipitous decline in the mother's compliance with the requirements of the visits, as she was not present at her home when the girl was to be dropped off or would not be there with the child when she was supposed to be picked up. One month after the unsupervised visits began, the visitation specialist who had dropped the girl off for a visit returned to the house and found the mother outside alone. The mother told the specialist that the father had arrived at the home and began kicking the front door, so she took the children to a neighbor's house. The mother filed for an Order of Protection against the father, which was granted; however, the mother requested for it to be vacated after only four days. Two days after the Order was removed, the mother left a voicemail message for the caseworker stating she wanted the Department to leave her alone and threatening to leave the state if necessary to end their involvement with her family.

A child protection investigation was opened in response to the incident which precipitated the Order of Protection. During the course of the investigation, the father confirmed to the investigator that he and the mother had resumed their relationship, a development that had been suspected by involved workers. The father stated he had felt he needed to hide from the workers who had been in and around the home at times when he was present so that neither he nor the mother would get in trouble for him being around the children. The investigator later met with the mother who confirmed her renewed relationship with the father and admitted she had sent him out the back door of her home on one occasion when the visitation worker had arrived but denied she had ever allowed him unsupervised contact with the baby boy. After speaking with the mother, the investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) determining the mother's home to be safe. The following day a staffing was held amongst involved workers which concluded that while there were concerns regarding the father's presence in the household it could not be proven that he had been in the home during any of the unsupervised visits and it had not been ordered by the court that he could not have contact with the baby boy. Those in attendance at the meeting were unaware that the mother had given notice to her landlord of her intention to move out of her apartment after having been threatened with eviction. The basis for her proposed eviction were ongoing complaints of conflict between the mother and the father, who was living in the home but was not listed on the lease. One neighbor had reported witnessing the mother chasing the father while holding a knife and police had been called to respond to the residence on multiple occasions.

Six days after the staffing was held, the mother made a call for emergency services stating the baby boy had fallen while in her home. Emergency personnel responded to the residence and transported him to a local hospital where physicians observed the boy's head to be "massively swollen" with both his eyes almost completely shut. The boy presented with numerous bruises to his face, head and shoulders and his injuries were inconsistent with the mother's explanation. The boy subsequently died as a result of his injuries and his father, who had been caring for him alone at the time the injuries were inflicted, admitted to having slammed the boy against a bed, hitting him across the face and biting him on the shoulder after becoming angered by his crying. Prior to committing the abuse against the boy, the father and mother had been engaged in a physical altercation that resulted in him choking her and throwing her around the house. The mother's brother, who had been present when the altercation occurred, had intervened allowing the mother to leave the home. The father then left the house but returned and, after the boy began crying, told the mother's brother that he would attend to the child because he was his son.

A child protection investigation opened in response to the boy's death resulted in indicated findings of Death by Abuse and multiple other allegations of physical harm against the father and Death by Neglect against the mother. The mother was arrested by local police and charged with child endangerment. She pled guilty and

received 30 months in prison. The father was also arrested and was originally charged with aggravated battery, however the charge was upgraded to First-Degree Murder following the boy's death. He pled guilty and was sentenced to 43 years in prison.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The Department should share a redacted version of this report with the involved County Court Improvement Program/Permanency Enhancement Program for discussion.**

The Department agrees. The redacted report will be shared with the involved County Court Improvement Program/Permanency Enhancement Program.

**2. The Department should share this report with the involved DCFS Staff and Regional Administrator for training purposes.**

The Department agrees. The redacted report has been shared and reviewed with staff. In addition, the redacted report has been given to the Office of Learning and Professional Development to incorporate into training.

**3. A redacted version of this report should be included in Department training regarding protective daycare services.**

The Department agrees. The Office of Learning and Professional Development Management has been in contact with the Inspector General regarding rolling out the next phase of Intact Error Reduction trainings in other regions. A schedule will be put in place with the OIG for January - June of 2018 using this report as a teaching case.

**4. The Inspector General will include this report (along with OIG 15-2613 and OIG 15-3141) in an Error Reduction Training for the Southern Region in July 2017. The training will address issues related to the filing of petitions for protective orders in Intact Family Services cases and Placement cases and the duty to inform the court of critical case developments affecting child safety in Return Home cases.**

The Department agrees. Office of Learning and Professional Development Management has been in contact with the Inspector General regarding rolling out the next phase of Intact Error Reduction trainings in other regions. A schedule will be put in place with the Inspector General for January - June of 2018 using this report as a teaching case.

## DEATH AND SERIOUS INJURY INVESTIGATION 4

| ALLEGATION | A five-month-old girl died of starvation and dehydration due to neglect. A child protection investigation of the inadequate supervision by the children's father had been closed eight days prior to her death. |
|---|---|

**INVESTIGATION**

The child protection investigation was opened after police responded to a report that the girl's two older siblings, boys ages two and three years old, had been seen unsupervised in their apartment building and had been left at home alone. Upon their arrival at the family's residence, officers found the two boys as well as the then three-month-old girl unattended. The three-month-old was on an adult mattress, six inches from the edge. The children's paternal grandmother, who also lived in the home, arrived and told officers the children had been in their father's care while she visited a neighbor. Approximately 30 minutes after police had arrived, the father returned home and stated he had left the house in order to purchase a pack of cigarettes. The father was placed under arrest for child endangerment and the children were left in the care of their grandmother. Police contacted the children's mother who told them she was homeless at the time after being kicked out of the family's home following a dispute with the father. The following day, a report was made to the State Central Register (SCR) and a child protection investigation was opened.

The child protection investigator assigned to see the children within 24 hours (meeting 'the mandate') visited the home the same day the hotline was called and met with the grandmother and the three children. The investigator documented no concerns regarding the children's physical well-being or the suitability of the home. The investigator implemented a Safety Plan requiring the grandmother to be responsible for the children and not to allow the father to be around them unsupervised upon his release from jail. The investigation was then transferred to another investigator who did not take any action in the investigation for 3 weeks.

Three weeks later, the first investigator's supervisor requested that he return to the family's home to assess the situation at that time. Despite this directive, the investigator conducted no further action on the case until over one month later. That date coincided with the end of the 60-day period established by statute for investigations to either be completed or extended with approval. The investigator visited the family home again for the first time in two months and met with the grandmother, who contacted the children's mother and asked her to come speak with the investigator. Since the first visit, the children's father had been incarcerated after being charged with a felony unrelated to the endangerment case and the mother had moved back in the home. The investigator observed the children and wrote in his case notes, "All three of the children appeared to be free of any salient signs of abuse or neglect." The grandmother expressed her belief that the mother was a good caretaker of the children and said she would be willing to allow her to continue living in the home for a few months until she was able to afford her own apartment. The grandmother also stated she would accept guardianship of the children if their mother was unable to care for them.

Upon her arrival at the home, the mother spoke with the investigator and stated that while she was grateful to the grandmother for allowing her to live in the home she did not see it as a viable long-term situation and hoped to move into her own apartment with the children. In an interview with OIG staff, the investigator stated that during his conversation with the mother he offered her services routinely presented to clients, such as counseling and parenting classes, which she refused. The investigator said that, in response to the mother's stated desire to secure housing for herself and the children, he informed her that the Department could only provide money for housing if she demonstrated an ability to pay her rent in the future. In a separate interview, the Inspector General investigators learned from a Department Housing Administrator that while the Department does require proof of a client's ability to continue paying rent in order to access funds to secure

housing, it is also possible to utilize housing advocacy services to obtain Section 8 housing at a reduced rate. The Housing Administrator confirmed that at the time the investigator spoke with the mother the Department had vouchers for Section 8 housing available.

In his interview with IG staff, the investigator stated that while in the home he saw the then five-month-old girl in her bassinet and lifted her blanket to observe her physical condition. The investigator noted the baby was small in size but appeared otherwise healthy. The mother informed the investigator the girl had been born prematurely and had spina bifida and additionally stated that the members of her side of the family were small in stature. The investigator did not document in the State Automated Child Welfare Information System (SACWIS) that the girl had been born prematurely or had spina bifida.

After leaving the home, the investigator contacted the children's pediatrician. The pediatrician stated there were no concerns regarding the family's care of the children but that they frequently cancelled appointments or failed to arrive at the office at all. The girl had not yet been seen for her four-month check-up and had not received all of her immunizations. In an interview with IG staff, the pediatrician stated that while she was generally aware the family faced some challenges she did not know the parents had separated or that the mother had been homeless before returning to the grandmother's home. She stated that around the time the child protection investigation had been opened the mother requested a prescription for a special formula provided to premature infants but never came in to pick it up. The pediatrician stated that if staff at her clinic are aware a family is experiencing disruptions in their lives they increase outreach efforts in order to provide additional support.

An IG review of the girl's birth records found that since she had been born prematurely, the hospital where she was delivered had made a referral to Illinois' Adverse Pregnancy Outcome Referrals Service (APORS) for follow up intervention. Records created by the APORS nurse assigned to the family showed she had conducted a visit to the family's home and discussed developmental goals for the girl with the mother. The nurse subsequently documented multiple unsuccessful attempts to contact the mother around the time the girl should have been taken to the pediatrician for her four-month check-up. Records also showed that while the girl had certain features at birth associated with Spina Bifida, she had not been diagnosed with the disease definitively.

Following his meeting with the pediatrician, the investigator met with his temporarily assigned supervisor and recommended closing the case with an indicated finding of inadequate supervision against the father. In an interview with the IG staff, the temporarily assigned supervisor stated that her meeting with the investigator was her first involvement with the case as she was filling in for his regular supervisor, who was ill. The temporary supervisor stated she had consulted with the regular supervisor prior to the meeting with the investigator and was satisfied by his presentation of his work on the case. The temporary supervisor stated she had been informed by the investigator that the girl had missed some medical appointments and that he had called the mother and grandmother to urge them to take her to the doctor. The temporary supervisor was not aware the girl had been born prematurely or had spina bifida. The temporary supervisor said that despite the gap in medical care for the girl she did not consider requesting an extension for the investigation as the case had been opened for inadequate supervision as opposed to medical concerns or medical neglect.

Eight days after the case was closed, an ambulance transported the mother and the girl to a hospital emergency room. Hospital staff noted the girl presented as being severely emaciated and that she was, "skin and bones, every rib could be seen." The mother told staff the girl had seemed sick the previous evening and that her breathing seemed "off." Approximately one hour after her arrival at the hospital the girl was pronounced dead. A report was made to SCR, prompting a new child protection investigation, and a criminal investigation was initiated by local police. An autopsy found evidence of malnutrition and dehydration and the girl's death was ruled a homicide due to neglect. The mother was arrested and charged with felony child

endangerment and is currently being held in jail awaiting trial. The girl's two older brothers were taken into custody by the Department and placed in traditional foster care as a result of the uncertainty regarding which family members might have been aware of the girl's deteriorating condition and failed to take any action.

After the infant died, the grandmother was interviewed by newspaper reporters and told them that the investigator did not actually visit her home the second time. In reviewing the record, Inspector General staff found a safety checklist that appeared to have been signed by the grandmother on the second visit to the home (just prior to the girl's death). After reviewing the document, the grandmother acknowledged that it was her signature and recanted her earlier statement, noting that the investigator had, in fact, been to her home on two occasions.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. The child protection investigator should be disciplined for his failure to document critical information on the infant (i.e. that the infant was born prematurely and had spina bifida) and for his failure to verbally inform his supervisor of the special needs of the infant. The child protection investigator should be disciplined for a perfunctory investigation, which was administratively supported.** |

The Department agrees. The pre-disciplinary meeting was held. The region is awaiting the rebuttal and then will make decision on disciplinary action.

**2. In all child protection investigations where a medical provider requests that the infant or child be brought in for a medical visit, the investigation shall remain open until the infant or child is seen by the medical provider and the child protection worker consults with the medical provider.**

The Department agrees. A memo was issued to all child protection staff.

**3. This case should be used as a training tool with child protection investigators. In this case, the services offered to the family by the child protection investigator were perfunctory and bureaucratic, and did not meet the family's needs. The child protection investigator offered parenting classes and counseling to a mother whose actual immediate needs were lack of a job and housing and the medical care of her daughter. The child protection investigator should have tailored his service recommendations to the true needs of the family. While the child protection investigator did discuss Norman funds with the mother, he only presented barriers to accessing Norman funds, not the opportunities it would have afforded the family, especially at the time Section 8 vouchers were available.**

The Department agrees. The Department will use this case as a training tool in investigations. However the key aspects of the case are already being incorporated into Child Protection Foundations. The Office of Learning and Professional Development will contact the OIG regarding incorporating this case into in-service trainings. The Inspector General sent the Director thirteen cases involving Birth-3 children, and the Department, working with Casey Family programs, is incorporating these cases into the Birth-3 Conference presentation.

**4. Representatives from the Department of Public Health should be invited to a Child Protection Supervisors meeting to discuss the role of APORS for high-risk infants. In child protection investigations involving a premature infant where it appears that the parent has missed medical appointments including well-child visits, child protection supervisors should be guiding investigators to contact WIC and APORS because a high-risk situation may exist.**

The Department agrees.

**DEATH AND SERIOUS INJURY INVESTIGATION 5**

| ALLEGATION | A 1½-year-old boy died as a result of multiple injuries due to blunt force trauma. A child protection investigation of physical abuse of the boy had been unfounded less than three months prior to his death. |
|---|---|

| INVESTIGATION | The first child protection investigation was initiated after the boy's mother brought him to a hospital emergency room with bruises to his face and a swollen lip. The mother stated to hospital staff the boy had been in the care of his father, who told her the boy had been dropped while being held by a young relative at a birthday party. However the father later changed his story and reported that he dropped the boy while bending down to pick-up a diaper bag. The mother, who was not in a relationship with the father, said it was the first occasion that the father had been responsible for caring for the boy on his own. |
|---|---|

The boy was examined by a physician's assistant who identified contusions to the boy's face, contusions to the nose, and swelling of his right knee. A local police officer who responded to the hospital spoke with the mother and took photographs of the boy's injuries. The officer advised the mother to visit the police station on the next workday to address her concerns regarding the father's conflicting accounts of how the injuries occurred. The mother followed the officer's recommendation and went to the police station two days later to speak with a detective. The mother reiterated the varying accounts provided by the father and the paternal grandmother of how the boy was injured and that both had traveled to the hospital after she informed them she had taken the boy there. The mother stated she had spoken to the father in the days since the incident and expressed her confidence in the father's assurance the injuries had been caused accidentally.

After the child protection investigator was assigned to the case she went to the hospital to observe the boy in his room. The investigator also took pictures of the boy's injuries but was unable to speak with the physician's assistant who had treated him as she had been called away on an emergency. The investigator then interviewed the mother who related the accounts the father had given her as to how the injuries occurred. The mother stated that the father had denied paternity of the then 14-month-old boy until recently when a DNA test paid for by the paternal grandmother confirmed the boy was his. The mother said the father had been attentive to the boy since that time but stated he was immature and had not yet grasped the seriousness of caring for a young child.

Two days later, following the mother's visit to the police station, the investigator documented receiving a message from the detective that the police would not be pursuing charges against the father. During the interview, the IG staff showed the investigator the photographs of the injuries taken by police. The investigator stated she had not seen the pictures before and said the injuries were more pronounced in the photos than they had appeared when she saw the boy several hours later. The investigator had faxed a request for police records the day before closing the investigation but did not specifically request police photographs. The Police personnel faxed the investigator a summary of contact with the family, however the records received did not include the photographs or either the field report or investigative report that pertained to the allegations that initiated the child protection investigation.

Two days after speaking with the detective, the investigator interviewed the father at the local Department field office. The father stated that he was alone in his apartment with the boy and dropped him while holding him with one arm and simultaneously attempting to pick his baby bag up from the floor. The father said the boy landed face-first on the coffee table and his nose began bleeding. The father told the investigator he originally invented the story that the boy had been dropped by one of his young relatives while at the birthday party they had attended prior to going to his apartment because it was the first time he had cared for the boy

on his own and he feared being denied another opportunity to do so as a result of the accident. The father said he had then decided to tell the truth when being interviewed by police and denied his son had ever been abused or neglected. The investigator did not create a timeline of events in order to verify the chronology presented by the father. In her interview with the IG staff, the investigator stated she had originally been scheduled to speak with the father at his home on the day they met but he arrived at the field office so she conducted the interview there. At no point in her work on the case did the investigator visit the father's home to conduct a scene investigation. In the State Automated Child Abuse and Neglect Information System (SACWIS) the investigator had marked "Observe Environment Where Maltreatment Occurred" as a completed task. The investigator told the IG staff that she always checks that category when she sees a family's home, which she had done when she later visited the mother's residence, but usually notes if it is not the location where an incident took place. The investigator stated she had not requested a waiver for not observing the father's home where the injuries occurred, as required by Department Rule, but said it was an oversight.

Two months after the hotline report was made, the investigator spoke with the physician's assistant who had treated the boy at the hospital, who stated her only concern regarding the family had been the father's differing stories as to how the injuries occurred. The investigator documented physician's assistant said she could not conclusively say the boy's injuries were the result of abuse. The day after speaking with the physician's assistant, the investigator consulted with her supervisor and recommended unfounding the report against the father. The supervisor approved the decision and the case was closed. At the time of the investigation, the child protection investigator was responsible for a high volume of pending cases.

A qualitative review of child deaths in Illinois in 2006 and 2007 conducted by the IG staff, which formed the basis for the Inspector General's first Error Reduction Report (issued in 2007), found that many child protection investigations regarding allegations of physical abuse suffered from a lack of substantive communication between investigators and medical professionals. Based upon the correlation between investigations of physical abuse and the subsequent deaths by abuse of the children involved, the IG investigators identified a critical question to be posed to medical professions as being, "Given all the facts, do you think it is more likely that the injuries were caused by abuse or accident?"

At the Inspector General's request, the medical director for the regional child abuse expert team reviewed the boy's medical records, the pictures of his injures taken by police and the child protection investigation. The medical director concluded that the boy's injuries could not have been the result of a single fall as he had multiple impact injuries that would not be present even if he had bounced off of the table or floor after being dropped. When interviewed by IG staff, the Physician Assistant stated that she did not consider whether the injuries could have occurred in a single fall and whether they were consistent with the father's explanation.

Less than three months after the report was unfounded, the boy was brought to a second hospital's emergency room by the father. He was unresponsive and presented numerous bruises at various stages of healing all over his body, a burn mark to his hand, and a bite mark on his shoulder. The boy was pronounced dead and physicians determined that based on his core temperature and the onset of rigor mortis that he had been deceased for approximately three to four hours prior to his arrival. The father, who had been caring for the boy for the previous few days, admitted striking him. When asked by police how hard he had hit the boy on a scale of one to ten, the father gauged his level of force as "eight." The child protection investigation opened subsequent to the boy's death was indicated against the father. He was charged with murder by local law enforcement and is currently in jail awaiting trial.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** |
|---|

**1. Given the high caseload that the investigator was assigned, the investigator should be counseled for the following failures: a.) failure to conduct a scene investigation b.) failure to create a timeline; c.) rationalizing unfounding the case in part because of no history of abuse when the alleged perpetrator had no history of care; d.) failure to identify the bilateral bruising as unlikely to have occurred in a single incident; and e.) accepting the physician assistant's conclusion without ensuring that the physician assistant, or other medical personnel, answered the appropriate question: is it 'more likely than not' that the injuries were the result of abuse.**

The Department agrees. A counseling memo is being issued to the employee.

**2. The child protection supervisor should be counseled for her failure to note the following errors in the child protection investigation: a.) failure to conduct a scene investigation b.) failure to create a timeline; c.) rationalizing unfounding the case in part because of no history of abuse when the alleged perpetrator had no history of care; d.) failure to identify the bilateral bruising as unlikely to have occurred in a single incident; and e.) accepting the physician assistant's conclusion without ensuring that the physician assistant, or other medical personnel, answered the appropriate question: is it 'more likely than not' that the injuries were the result of abuse.**

The Department agrees. The child protection supervisor was counseled.

**3. Findings from this report should be shared with the Board of Directors of the involved medical center.**

The Inspector General shared information about this case with the Board of Directors of the involved medical center.

**4. The Department's regional medical child abuse expert team should conduct training at the involved medical center using a redacted form of this Report as a training tool.**

The Department agrees. The Inspector General will collaborate with the team to present the training.

## DEATH AND SERIOUS INJURY INVESTIGATION 6

| ALLEGATION | A 16-year-old boy living in a residential facility died of asphyxiation after being restrained with a choke hold during a physical confrontation with staff members. |
|---|---|

| INVESTIGATION | The boy's family, which consisted of his parents and their five children, had been involved with the Department prior to his birth and had an extensive history of |

instability, mental health issues, substance dependency and sexual abuse. The boy's mother had been diagnosed with serious mental health issues and had been prescribed medication to manage her conditions while also intermittently experiencing drug dependency. She was receiving social security disability payments. As a result of ongoing issues in the family home, the two youngest children, the then five-year-old boy and his three-year-old sister, were placed with their maternal grandmother. The boy continued to live with his maternal grandmother until he was 12 years old when she concluded she could no longer manage his behavior, at which time he was returned to his mother's care. During the intervening years the boy's father had passed away.

Shortly after returning to his mother's home, the boy was psychiatrically hospitalized after pulling a knife on his siblings and threatening to kill himself. Upon admission the boy was diagnosed with a serious mental illness disorder and over time was diagnosed with additional and complicating serious mental illnesses associated with lack of control and anger. Clinical assessments found the boy had deficiencies in several areas of functioning; becoming easily agitated, demonstrating an inability to focus for prolonged periods of time, frequently exhibiting aggressive and threatening behavior and showing a lack of empathy or remorse for his actions. He was also physically large for his age, measuring almost 5½ feet tall and weighing 165 pounds at age 12. The combination of the boy's size and volatile behavior led to numerous instances of conflict both in his home with his family and at school as he repeatedly engaged in physical altercations with relatives and school personnel. The boy became involved with the juvenile justice system following an incident in his home when he began choking his mother and struck his three-month-old nephew who was being held by his sister while she attempted to intervene. He was taken into custody at a juvenile detention center but the mother refused to press charges. Rather she sought to obtain DCFS guardianship for the boy. Upon being released from detention, he was placed in the residential living facility, located in a neighboring state.

Throughout his time at the residential living facility the boy's combative and defiant behavior continued, as did his physical outbursts. While his case had a stated goal of being returned to his mother's home, she repeatedly expressed ambivalence or outright opposition toward their reunification, though she did desire to maintain a relationship with him. The boy made visits to his mother's home which were required to be supervised by his maternal grandmother who had previously cared for him, though those were suspended after he admitted smoking marijuana during a weekend visit after returning to the facility.

Two months before his 15th birthday, the boy attacked a fellow resident at the facility, repeatedly hitting him in the head with a closed fist, continuing to hit the peer after he was on the ground, to the point of unconsciousness. He was arrested and charged with Substantial Battery and Disorderly Conduct. Following the arrest, the boy was returned to the residential facility, however two days later he left without permission and was subsequently arrested for Burglary and Theft after breaking into a private home across the state line in Illinois. Although the boy faced delinquency charges in two states and was in Department custody there was little to no collaboration between the various involved governmental agencies to construct a plan for addressing or attempting to regulate his behavior. The boy was sentenced to five years of probation for the charges in Illinois, the maximum term allowed under law at the time. The court in the neighboring state made a determination to close his Battery case and ordered the boy to pay a $20 fee to the victim, noting that if he had been an adult he would have been charged with a felony. Around the same time, the residential facility

psychiatrist who treated the boy discontinued the administration of a psychotropic drug he had been receiving based on observations that he had been making progress toward his treatment objectives. In an interview with the IG staff, the boy's caseworker stated the psychiatrist was reluctant to prescribe medication to him because of his history of refusing it, combined with his propensity to consume alcohol and illicit drugs during the frequent occasions when he left the residential facility or his mother's home without permission. The boy's permanency goal was changed to independence after his mother informed involved child welfare staff she did not believe she would be able to control his behavior if he returned home.

Throughout his time at the residential facility, involved child welfare professionals sought referrals for alternative placements for the boy that might be better suited to address his behavioral outbursts. However, his history of violence and involvement with the juvenile justice system precluded his admission to multiple programs amidst a scarcity of available options. In response to the ongoing uncertainty of his future placement the boy's caseworker pursued an alternative approach, advocating for his return to his mother's home and referring him for Intensive Placement Stabilization Services through a private agency. The stabilization services were to include in-home family therapy, individual therapy, parenting classes and substance abuse services, however the boy's mother was unwilling to participate in the program and the boy was resistant to engaging with workers. An Inspector General review of private agency records from the stabilization services program found minimal involvement with the assigned caseworker, no mention of the boy's scholastic performance, his assault of a fellow resident and subsequent arrest or his repeated absences from his intended placements. There was also no record of any crisis intervention being provided to him in response to these incidents.

The boy's behavior at the residential facility continued to deteriorate and he was moved between various campuses operated by the organization in efforts to deescalate conflicts with residents and staff. At one point, police were called to one of the campuses in response to the boy challenging staff and attempting to incite other residents to use their greater numbers to overwhelm the workers. Upon the arrival of law enforcement, the boy urged the other residents to "fuck up the police" and threatened an officer. He was detained but not arrested and facility staff transported him to another campus.

Six weeks later, the boy refused to follow a directive made by a staff member. When a second staff member arrived and attempted to redirect the boy's behavior a physical confrontation ensued involving all three. The second staff member placed the boy in headlock or chokehold and the three fell to the ground. Following the impact of the fall the boy appeared to be unconscious and emergency personnel were summoned to provide medical attention. Efforts to revive the boy were unsuccessful and he was pronounced dead after being transported to a local hospital. An autopsy found pulmonary congestion and edema and the medical examiner ruled the boy's death to be a homicide resulting from asphyxia due to restraint. A resident who witnessed the incident reported overhearing the second staff member telling the first they needed to "get their story straight," an account that was later confirmed by both staff members to law enforcement. A child protection investigation resulted in indicated reports against both staff members for Death by Neglect and Risk of Harm. The second staff member was criminally charged with Involuntary Manslaughter, to which he pleaded not-guilty, and both staff members were charged with Obstruction of Justice, though that charge against the first staff member was later dropped. In October 2017, the second staff member pleaded guilty to charges of obstruction of justice and the involuntary manslaughter charge was dismissed. Neither the Department's internal clinical review of this case nor an external review commissioned by the Department noted the boy's violent history as a relevant factor.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The Department should convene a workgroup that would accept referrals of violent youth in care whose behaviors endanger the safety of other youth in placement. The workgroup** |
| --- | --- |

should assist child welfare specialists and placement treatment teams in coordinating needed information and identifying resources.

The Department has implemented practices to address the issue. For the last few months, the Director has convened an internal workgroup around the highest end youth, including violent youth, youth with high end behavioral health needs, those with developmental disabilities, and those on the threshold of being emancipated. The "Stuck Kids Workgroup" (the name reflects youth "stuck" in an inappropriate placement) meets with the Director every week for 2.5 hours. The purpose is to 1) to utilize the expertise from divisions across the agency to find or create the right collection of programs and services for youth, in the most appropriate placement, and 2) put the youth on a sustainable path. The workgroup identifies and addresses barriers and impediments in the current configuration of services, identifies services we need to purchase, and addresses how to stimulate that service being available in the provider community. The workgroup also reviews data related to youth in these populations and reviews internal Department processes in order to streamline.

**2. The private agency must address the failures in this case. The Inspector General will share the report with the private agency.**

The Inspector General shared the redacted report with the private agency. The Inspector General will meet with the agency's Administrators and a member of the Board of Directors to discuss the findings and recommendations made in the report.

**3. As it can be predicted that youth in care placed at locations bordering on two counties may be involved in multiple court jurisdictions, the involved county Immersion Site Director should develop a work group with the agency, the local juvenile justice council, and involved prosecuting offices to ensure coordination of efforts involving individual youth.**

The administrator of the Office of Delinquency Prevention and Restorative Justice is a member of the Stuck Kids Workgroup (Department Workgroup, see above), and these youth are discussed in that workgroup as well. As part of those meetings, the Department frequently has to deal with other jurisdictions and plan for that as part of these meetings.

**4. The Department should use this report as a teaching tool with all management staff responsible for Dually Involved Youth.**

The Department agrees. This report will be shared and discussed with all Dually Involved staff at the next team meeting.

**5. The Department must develop resources including funding for residential treatment centers to develop their own step down foster homes.**

The Department is currently involved in negotiations with several providers for high end services, asking these providers to come up with more comprehensive strategies to serve this group of young people. There might be some youth who need to stay in a residential facility longer and there might even be some youth who need a secure setting.

**6. The Inspector General reiterates recommendations made in the Street Homicide Report (16-2602, issued April 4, 2016) and the Shelter Care and Runaway Report (15-2385, issued June 11, 2015) that the Department should develop and staff secure violence and substance free therapeutic stabilization center based on a model similar to a halfway house for youth 18 and over who are involved with the**

**criminal court system or dually involved with adult and juvenile courts for crimes against a person. This program should be extended to include violent youth under 18 who pose a risk to the safety of other peers in their placements.**

The Department agrees with the need to develop programming for these kids in a way that fits the programs to the youth rather than buying the programs and trying to fit the youth into the program. This is an ongoing conversation with providers.

## DEATH AND SERIOUS INJURY INVESTIGATION 7

| ALLEGATION | A one-year-old girl died of dehydration, with failure to thrive related to her premature birth as a significant contributing factor. A child protection investigation of the girl's parents' failure to ensure she received adequate medical care was open at the time of her death. |
|---|---|

**INVESTIGATION**    The girl and her twin sister were born prematurely, delivered at only 26-weeks gestation, and had been hospitalized for over two months before being released. The girl's twin sister had significant medical issues including respiratory distress, hypoxia and aspiration pneumonia. The sister was also born with a cleft palate and required a gastronomy tube (G-tube) in order to feed. Although the sister required consistent medical attention in order to address her multiple health issues, her parents repeatedly missed home visits by nurses assigned to provide care to her and neglected to attend follow-up appointments with doctors and a pediatric surgeon attempting to treat her. The parents' ongoing failure to meet the sister's medical needs prompted the initiation of a child protection investigation.

The child protection investigator assigned to the report went to the address provided to the State Central Register (SCR) as the family's home. Upon arrival, the investigator learned the family had moved six months earlier. Although the family was not present, the investigator documented the attempt to visit the family as an in-person contact. The investigator did not document any further efforts to locate the family the following day, which was his last work day prior to leaving for a week-long vacation. As a result of the investigator's inaccurate documentation, the investigator's supervisor was unaware the sister had not been observed or assessed, despite the fact the SCR report was based upon concerns regarding inattention to her significant medical issues.

Five days later, while the investigator was on vacation, SCR received another call regarding the sister reporting her case with the home health nursing service had been closed due to multiple missed appointments. The report reiterated information provided in the initial hotline call and additionally noted the sister had failed to gain sufficient weight since being released from the hospital following surgery on her cleft palate. In response to the second hotline call, a substitute investigator was dispatched to observe the girl as soon as possible and assess her safety. Later that day, a substitute investigator went to the family's new home and spoke with the mother. The mother stated she had missed the sister's appointments due to the hospitalization of her mother-in-law and that her Women, Infants and Children (WIC) funds were inadequate to pay for the special formula the girl required. The substitute investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) determining she was safe and the mother assured her she would take the sister to see her pediatrician.

The following day, the mother took the twins to see their pediatrician. The pediatrician noted the one-year-old sister weighed only 11 pounds, half the typical weight for a child her age. She also observed that the sister presented at the developmental stage of a two-month-old and was unable to sit up or roll over. The pediatrician additionally noted that the sister had asthma and stridor, a condition causing noisy breathing related to obstructed airflow, and rickets. The pediatrician learned from the mother the girl's rickets were untreated because she was unable to obtain a prescription for Vitamin D and refused to pay for the over the counter supplements herself. The new information regarding the sister's condition led to yet another report being made to SCR.

Six days after the latest hotline call was made, the primary investigator, on his third day back from vacation, visited the pediatrician's office. Upon arriving, he was informed the pediatrician was out of the office and would not be returning. The investigator did not ask that the pediatrician be contacted or whether there was

another health care professional who could provide information about the sister's health and care. The investigator also did not request to see the sister's medical records. After leaving the office, the investigator went to the family's home and encountered an unidentified teenage girl who spoke to him through the window. The teenager told the investigator that her paternal grandmother, who was present in the home, had instructed her to inform him that the mother was not there. The investigator then left without attempting to speak with the grandmother or observe the twins. The investigator made no further attempts to contact the children or their pediatrician.

In an interview with the IG staff, the investigator acknowledged recording his initial unsuccessful attempt to visit the family as an in-person contact, which he characterized as an error. The investigator also reluctantly admitted having previously been disciplined for performing the same action on other occasions. The investigator said his decision not to pursue other means of obtaining medical information about the children after visiting the pediatrician's office and learning she was not there was based in an interest to speak with the physician personally. The investigator could not provide an explanation as to why he did not make any further efforts to observe the children or communicate with the pediatrician prior to the girl's death.

Nine days after the investigator made his final unsuccessful attempt to contact the children and their pediatrician, emergency personnel responded to a call from the family's home where the girl had been found unresponsive on an air mattress she had been sleeping on alongside her mother and 11-year-old female cousin. The girl was transported to an area hospital where she was pronounced dead. The mother told law enforcement she had placed the girl on her own mattress on the floor of the mother's bedroom prior to going to bed herself and suggested that one of the many young cousins who were staying in the house that night might have placed the baby back on the air mattress after the mother had fallen asleep. None of the children acknowledged having done so. A detective present at the home noted that the air mattress the mother, the girl and her cousin had slept on was under-inflated.

The substitute investigator who had previously assumed responsibilities during the primary investigator's vacation was assigned to the child protection investigation of the girl's death. The substitute investigator went to the family's home later on the day the girl died, where she interviewed the parents and observed the girl's five siblings but did not speak with them. The substitute investigator consulted with a Department administrator and a decision was reached for the children to remain in the home under a safety plan. Later that evening, a Department regional administrator determined the safety plan was insufficient and directed the substitute investigator to return to the home. The substitute investigator then went back to the home, determined that the children were unsafe and removed them from the home.

During the course of the child protection investigation of the girl's death, Department staff became aware the mother had been the subject of an unfounded investigation for Risk of Harm eight months prior to the girl's death. The case had been opened in response to a report that the mother had been found asleep with one of the twins while the other was asleep on the floor in a car seat with a blanket covering her face. In an interview with IG staff, a Department SCR administrator explained that SCR call floor workers are only required to provide full Child and Youth Centered Information System (CYCIS) as part of the case narrative in death investigations. In all other instances they are only required to affirm whether the result of a CYCIS check is positive or negative, placing the responsibility upon the investigator to review the narrative for pertinent historical information. Given the importance of this information and the vulnerability of the children involved in these situations, the Department should require that SCR call floor workers include full CYCIS case narratives to ensure investigators are fully aware of a family's relevant previous involvement with the Department.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. The primary child protection investigator should be disciplined, up to and including discharge, for his negligent performance of duties. The Department must take into** |

**consideration, in determining appropriate discipline, the investigator's working environment, including but not limited to high caseload assignments and how these challenges influenced the ability of the investigator and the State to achieve child safety goals.**

The Department agrees.

**2. The Department should require that SCR call floor workers include full Child and Youth Centered Information System (CYCIS) information as part of the Child Abuse/Neglect (CA/Ns) narrative in child protection investigations involving children age three and younger to ensure that an investigator has this pertinent information at the onset of the investigation.**

The Department agrees. A memo was issued to all hotline staff to include CYCIS information in full as part of the CA/Ns narrative for all reports.

**DEATH AND SERIOUS INJURY INVESTIGATION 8**

| ALLEGATION | A nine-year-old girl died of natural causes related to Rett Syndrome, a neurological disorder. The girl's mother had been the subject of an indicated report for Medical Neglect three months earlier and the family had an open case for intact services at the time of her death. |

| INVESTIGATION | The girl had been born with Rett Syndrome, a neurological disorder that causes restricted physical development, difficulty with feeding and swallowing, breathing |

irregularities and seizures. The girl was non-ambulatory and non-verbal and received all of her nutrition though a gastronomy tube (g-tube). Her seizure disorder required her to receive two medications which needed to be administered on a regular basis. The girl lived with her mother and her two siblings, a 10-year-old sister and 7-year-old brother. The children's parents were divorced and their father resided in another state.

After the children traveled from home for an extended visit with their father out of state, the father requested that the mother send an additional supply of clonazepam, one of the anti-seizure medications, as he had not been provided with an enough to last for the duration of her visit. Following the children's return home, it was alleged that the mother had not been providing the girl with her anti-seizure medications as frequently as required, leading to the opening of a child protection investigation.

The assigned child protection investigator began her work on the case by conducting a visit to the mother's home, where she observed the children and identified no outward signs of abuse or neglect. The mother was adamant that she was compliant with fulfilling the requirements of the girl's medicinal and nutritional needs but stated she faced restrictions imposed by her insurance provider limiting her ability to refill the necessary prescriptions, which she cited as the reason the girl's full supply had not been sent along with her on the trip to the father's home. Three days after visiting the mother's home, the investigator spoke with the case manager for the girl's pediatrician, who stated that neither she nor the pediatrician had concerns regarding the mother's care for the girl. However, four days later, the case manager contacted the investigator and reported that after reviewing pharmacy records she had determined that one of the girl's medications, which was prescribed in 30-day amounts, had only been refilled three times over an eight-month period. The case manager also noted that the dosage of that medication had been raised in response to an increase in the girl's seizure activity. Following receipt of this, the case manager consulted with the pediatrician who opined that the mother's failure to refill the prescription on a monthly basis demonstrated the girl was not receiving an adequate amount of the medication.

The investigator addressed the infrequency of the prescription refills with the mother and explained that her failure to administer necessary medicine on a consistent basis constituted medical neglect. The mother stated the girl had been hospitalized multiple times in recent months, which had resulted in an additional supply of the medication being stockpiled at their home. The mother also minimized the extent of the girl's condition, telling the investigator she did not have "normal" seizure activity but instead had more minor episodes in which she began staring. When the investigator offered to review any additional documentation the mother could obtain to support her contention she had received additional medication during the hospitalizations, the mother became agitated, acknowledged she may not have administered the girl's medication as frequently as required and was somewhat overwhelmed by the responsibility of caring for her medically complex daughter and two other children by herself. The investigator informed the mother that the report for medical neglect would be indicated against her and that an intact services case would be opened to help connect the family with supportive services and assure compliance with the medication schedule.

The intact services case was opened through a private agency and a transitional visit was conducted in the

family's home amongst the assigned caseworker, her supervisor and the investigator, as well as the mother and her three children. During the meeting the mother again expressed frustration at the restrictions her insurance coverage placed on her ability to obtain medical equipment, such as a lift to assist in bathing the girl. Throughout the three months the family's intact services case was open, the mother was receptive to services but maintained she was not legally obligated to give the girl medications she did not deem to be beneficial. At one point, the mother again expressed her contention that the girl did not have seizures but "tremors" during which she remained alert. According to the Epilepsy Foundation, seizures can present themselves in varying degrees of severity, from minor to fully disabling, but must be addressed in a consistent manner. Although both the caseworker and her supervisor were aware of the strain the mother was under to comply with the girl's care while also fulfilling her responsibilities to her two other children, they did not refer her to advocacy organizations focused on those with seizure disorders and their families. The caseworker and her supervisor also accepted the mother's contention that attempting to obtain additional medical equipment through her insurance provider would be futile and did not attempt to identify alternative sources that might provide assistance in procuring those items.

In a telephone interview with Inspector General investigators, the caseworker stated that she had been unfamiliar with Rett Syndrome prior to becoming involved with the family but had done research in order to increase her awareness of the condition. The caseworker said she consistently communicated with the mother regarding the girl's medication schedule but acknowledged she relied upon the mother's self-report of how frequently the drugs were administered. The caseworker did not check or document the amount of medicine present in their containers during her visits to the family's home or review pharmacy records to ensure the mother was refilling the girl's prescriptions on a regular basis. In a separate telephone interview, the caseworker's supervisor stated she believed the caseworker had regularly monitored the amount of medicine present in the home and was surprised to learn the caseworker had only observed the drugs on one occasion. The supervisor recognized the difficulty inherent in ensuring a parent is compliant with administering medication to a child and acknowledged that advising caseworkers to take pictures of the amount of medicine present in containers as well as the refill dates listed on their labels could assist in that task.

Three months after the intact services case had been opened, the mother went into the girl's room in the morning and found her unresponsive in her bed. The family had moved into a new home they shared with a friend of the mother, a registered nurse. The mother rushed the girl into the friend's room for assistance; however, the girl was already deceased. The mother told Department and law enforcement investigators the girl had been ill with a respiratory infection and had been experiencing difficulty breathing. An autopsy determined the girl's cause of death to be cardiac arrhythmia due to Rett Syndrome. A toxicology test found nothing to suggest the girl did not have a therapeutic level of her anti-seizure medications in her system. The investigator contacted the child's primary care physician, a pediatrician with extensive knowledge of the child's disorder. He opined that the child had been prescribed two medications, but the second was to be used only "as needed" to control skeletal contractures. Although the mother had appealed the indicated finding of medical neglect against her, she withdrew her appeal following her daughter's death, citing her reluctance to have to focus on the events surrounding the family's loss.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. In cases of medical neglect where a caregiver failed to give a child prescribed medication, the Department should develop practice for addressing a parent's non-compliance with the administration of medication.** |
|---|---|

The Department does agree that we need to find a way to determine when a parent is non-compliant with medications. The Department will work on an overall strategy for handling medically complex cases that can

be implemented and which is more likely to be effective in changing the behavior of the parent or family caring for the child.

**2. At the transitional visit in Intact Family Services cases with a medically complex child, the child protection investigator and intact family services caseworker should request that the parent sign consents for the worker to communicate with the child's medical home regarding the child's health and medical care management.**

The Department agrees. Because this service is voluntary, Intact Family Services workers must obtain consent to talk to any providers involved with the family. This includes primary care physicians, schools, therapists, any other service providers involved in the family. The Department agrees this is best practice to serve the family in a complete manner. Our Intact staff typically obtain consents at the transitional visit or within the first 14 days of engagement. As part of "360 casework" process, the role of the investigator in participating in the transitional visit and supporting the signing of consents is being emphasized further. This process has already been implemented in Joliet.

**3. In Intact Family Services cases involving medically complex children, the caseworker must convene a staffing, within 30 days of receiving the case, with the medical case manager and parent(s) to discuss the child's care and assess parent's needs for tangible and emotional support.**

The Department agrees. For cases involving medical neglect and medically complex children, the Department agrees there should be a connection with the medical providers and the Intact services staff. It is important for the Intact staff to understand the medical needs of the child to assist the family with ensuring proper and required medical care is obtained. The Child and Family Team meeting will be the vehicle for staffing such cases.

**4. The Inspector General will incorporate this report into the Intact Family Error Reduction training that will be piloted in the Southern Region in July 2017.**

The Department agrees. The Office of Learning and Professional Development Management has been in contact with the Inspector General regarding rolling out the next phase of Intact Error Reduction trainings in other regions. A schedule will be put in place with the Inspector General for January - June of 2018 using this report as a teaching case.

**5. The Inspector General will share a redacted report with the private agency**.

The Inspector General shared a redacted report with the private agency. The Inspector General met with agency Administrators and a member of the agency's Board of Directors to discuss the findings and recommendations made in the report.

**DEATH AND SERIOUS INJURY INVESTIGATION 9**

| ALLEGATION | An 18-month-old boy died after being trapped beneath a dresser that had fallen on top of him in his family's home. During the 10 months preceding the boy's death, his parents had been the subjects of two indicated child protection investigations as well as two unfounded investigations and a fifth investigation was pending. The family had also been referred for child welfare services and had an open intact services case at the time of the boy's death. |

| INVESTIGATION | The parents and their four sons, ages three, two and twins both eighteen months old at the time of the boy's death, resided in a volatile and chaotic household. The father, a former veteran, readily acknowledged a severe alcohol problem, and the mother struggled with the abuse of opiate-based prescription drugs as recognized by relatives, involved child welfare workers and law enforcement officers. The father was also diagnosed with mental health issues and received medication to manage his condition; however, his compliance with his treatment plan was wildly inconsistent. The father's alcoholism and unpredictable behavior rendered him largely unable to serve as a caretaker for the boys, leaving the mother, often in her own compromised state, to serve as the sole caretaker for four very young children. This inequality regarding the assumption of duties in the home led to a great deal of conflict between the parents. |

The couple had an extensive, documented history of domestic violence. The police were repeatedly called to the family home to address physical altercations between the couple, often while the children were present. The father was arrested on multiple occasions for striking the mother and was jailed for an extended period of time following one incident in which he punched the mother and struck her with a lamp. In other instances, the couple agreed for the father to leave the home on a temporary basis so the children could remain in the home in the mother's custody. However, during these periods, it was evident that the parents did not adhere to the agreed upon safety plans which required the father's visits with the children be supervised and prohibited the father from having contact with the mother. Involved child welfare professionals eventually concluded that, despite the mother's protestations that she would refrain from engaging with the father and would divorce him, it was highly unlikely she would sever her relationship with him or take the necessary measures to ensure the children would not be placed at risk by being in his presence unsupervised.

While the mother was the children's primary and often only caretaker, her ongoing abuse of prescription opioids greatly inhibited her ability to effectively oversee their care. Police and child welfare professionals who met with her in-person or spoke to her over the phone frequently documented her slurred speech and apparent sluggishness during their communications. The mother was prescribed medications to manage medical and mental health issues, but drug tests revealed drug levels that exceeded therapeutic levels. It was later learned that her primary physician, who had served as a source of information for child welfare professionals, had a history of being fined and suspended for prescribing controlled substances without proper evaluation or documentation. The mother was eventually instructed by child welfare workers to identify a new physician to treat her legitimate medical needs; however, she continued to engage in drug-seeking behavior.

Throughout their involvement with the Department, the father was straightforward in his acknowledgement of his alcoholism, but was unable to consistently comply with any treatment plans. He was non-compliant with Antabuse, a drug that causes illness with alcohol ingestion, hid alcohol in the home, and consumed alcohol when has was the sole caretaker of the children. This behavior resulted in incidents when the children were placed at great risk of harm as when the oldest boy was found walking alone and naked around the neighborhood. When police returned the boy to the family's home, they found the father unconscious while the other three children and the family's two large dogs roamed freely. In discussing his struggles with

alcohol with child welfare workers, the father often mentioned his previous military service and his feelings of shame that his behavior did not uphold to military standards. Although the U.S. Department of Defense has a family advocacy program to provide support services to those in need, the father's inactive status made him ineligible to avail himself of the program.

Child welfare professionals tasked with providing services to the family found themselves ill-equipped to deal with the multitude of challenges facing the household. The combination of substance abuse issues, domestic violence, mental health challenges, and unstable employment involving both parents, while they cared for four children under the age of three, proved overwhelming. Child welfare workers frequently used the threat of screening the family's case with the State's Attorney's Office as a means to spur the parents' compliance with directives but did not follow through on the threats. The failures in this case were less those of the involved child welfare professionals and more a systematic reliance upon the standard intact and placement services most often utilized in less extreme cases. The Department, recognizing the need for specialized services has developed and instituted the Intact Family Recovery (IFR) program in one region of the state. The IFR model provides an array of interventions predicated on a greater intensity and duration of services and intensive home visits involving child welfare and substance abuse workers. One of the most significant features of the model is a Memorandum of Agreement (MOA) which fully disclosed the program and its conditions including the use of graduated sanctions such as protective orders, moderated community services for parents and the ultimate sanction of future screening for the temporary custody of children. The Recovery Coach Program (RCP) serves families in which children have been removed from the custody of one or both parents because of substance-related maltreatment. The goal of the RCP is to reunify families when the parents can provide a safe and drug-free home for their children.

Almost five months after the family's intact services case was opened, an ambulance was called to the family's home in response to a report that one of the 18-month-old twins was not breathing. He was transported to a local hospital where he was pronounced dead. The parents reported he had been found beneath a large dresser which had toppled over onto him. Police noted all the dresser drawers were open. A child protection investigation was initiated which resulted in an indicated finding against both parents for Death by Neglect and Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect. The determination to indicate the report against the parents was based largely upon the extensive history of inadequate supervision in the home.

Following the boy's death, the other three siblings were taken into protective custody and placed in a traditional foster home. Involved workers documented significant improvement in the boys' overall behavior after the move but also noted they regressed after conducting visits with their mother. Workers additionally noted the mother frequently made disparaging comments about the foster parents and was not supportive of her children's continued involvement with that family. Eventually the mother's participation in visits subsided and workers identified a strong likelihood of a resurgence of her substance abuse issues.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. The Department should replicate the Intact Family Recovery (IFR), which provides intensive services to caretakers with substance abuse problems, in the Joliet and Aurora sub-regions.** |

DCFS was a partner on a successful competitive federal funding application to expand the Intact Family Recovery (IFR) Program. Illinois has been awarded a Regional Partnership Grant from ACF, to begin Oct. 1. This is a 5-year award for a public-private partnership that aims to improve outcomes for children who have been affected by substance abuse issues. The Illinois proposal is focused on keeping families together and helping parents start and maintain recovery so that they can be safe and effective parents for their children. We proposed to work with intact families in Boone, Winnebago, Kankakee and Will counties. The model we

have proposed pairs a recovery coordinator with an intact family services caseworker, and embeds the recovery coordinator in the child welfare provider's agency. It also lengthens the time an intact family can be involved in services. Per Federal requirements, this award is a research study, with treatment and control groups.

**2. In accidental deaths associated with a consumer product that may have posed an unreasonable risk of injury or death, the Child Protection Investigator's supervisor should be required to report the product to the Consumer Product Safety Commission.**

The Department agrees. A memo with the phone number of the Consumer Product Safety Commission was issued to child protection staff.

## CHILD DEATH REPORT

Inspector General staff investigate the deaths of children whose families were involved in the Illinois child welfare system within the preceding twelve months. Inspector General staff receive notification of the death of a child from the Illinois State Central Register (SCR), when the death is reported to SCR.[2] Inspector General staff investigate the Department's involvement with the deceased and his or her family when (1) the child was a youth in the care of DCFS; (2) the family is the subject of an open investigation or service case at the time of the child's death; or (3) the family was the subject of an investigation or service case closed within the preceding twelve months. Whenever Inspector General investigators learn of a child death meeting this criteria, the death is investigated.[3]

Notification of a child's death initiates an investigatory review of records. Inspector General investigators review the death reports and information available through the Department's computerized records. The investigator then obtains additional records including the child's autopsy reports.[4] Records may be impounded, subpoenaed, or requested. Then they are reviewed. The majority of cases are investigatory reviews of records, often including social service, medical, police, and school records, in addition to records generated by the Department or its contracted agencies.

When warranted, Inspector General investigators conduct a full investigation, including interviews. A full investigation may result in a report to the Director of DCFS. Individual cases may not rise to a level necessitating a full investigation, but collectively can indicate systemic patterns or problems that require attention. Inspector General staff may address systemic issues through a variety of means, including cluster reports, initiatives, and trainings.

In Fiscal Year 2017 Inspector General staff investigated 108 deaths of children who died between July 1, 2016 and June 30, 2017, meeting criteria for review. A description of each child's death and DCFS involvement is included in this annual report. During this fiscal year investigatory reviews of records were conducted in all of the deaths, leading to 10 full investigations. Seven of those investigations are pending. Comprehensive summaries of death investigations reported to the Director in FY 17, which may include deaths that occurred in earlier fiscal years, are included in the Investigation section of this annual report.

Sixty-five of the 108 child deaths investigated by Inspector General staff also underwent a child protection investigation of the death. Twenty-seven of those investigations were conducted in sleep-related deaths. Eleven of the deaths (41 %) were indicated, 15 (56%) were unfounded and one remains pending. Seventeen of the deaths had a manner of accident; ten of the deaths had a manner of undetermined.

In preparing this annual report investigators from the Office of the Inspector General did a retrospective of deaths occurring when the Department had an open intact family services case. Deaths were reviewed from FY 10 through FY 17. See page 117.

---

[2] SCR relies on coroners, hospitals, medical examiners and law enforcement to notify them of child deaths, even when the deaths are not suspicious for abuse or neglect. Some deaths may not be reported. As such statistical analysis of child deaths in Illinois is limited because the total number of children that die in Illinois each year is unknown. The Cook County Medical Examiner's policy is to notify the Department of the deaths of all children autopsied at the Medical Examiner's office.

[3] Occasionally SCR will not receive notice of a child death and Inspector General staff learn of it through other means.

[4] The Inspector General wishes to acknowledge all the County Coroners and the Cook County Medical Examiner's Office for responding to our requests for autopsy reports.

***Summary***

Following is a statistical summary of the 108 child deaths investigated by Inspector General staff in FY 17, as well as summaries of the individual cases. The first part of the summary presents child deaths by age and manner of death, case status and manner of death, county and manner of death, and child protection death investigations by result and manner. The second part presents a summary of deaths classified in five manners: homicide, suicide, undetermined, accident, and natural.[5] Note that the term coroner is used for both coroners and the Cook County Medical Examiner in the individual summaries.

***Key for Case Status at the time of Inspector General investigation:***

Youth in Care . . . . . . . . . . . . . . Deceased was a Youth in Care.   Minors in this category were previously referred to as a ward.

Unfounded DCP . . . . . . . . . . . Family had an unfounded child protection investigation within a year of child's death.

Pending DCP . . . . . . . . . . . . . Family was involved in a pending child protection investigation at time of child's death.

Indicated DCP . . . . . . . . . . . . Family had an indicated child protection investigation within a year of child's death.

Child of Youth in Care . . . . . . . Deceased was the child of a youth in care, but not in care themselves. These minors were previously referred to as Child of a Ward.

Open/Closed Intact . . . . . . . . Family had an open intact family services case at time of child's death or within a year of child's death.

Open Placement/Split Custody Deceased, who never went home from hospital, had sibling(s) in foster care or child was in care of parent with siblings in foster care.

Return Home . . . . . . . . . . . . . Deceased or sibling(s) was returned home to parent(s) from foster care within a year of child's death.

Child Welfare Services Referral A request was made for DCFS to provide services, but no abuse or neglect was alleged.

Preventive Services/
Extended Family. . . . . . . . . . . . . . . . . Intact family services case was opened to assist family, but not as a result of an indicated child protection investigation.

Former Youth in Care. . . . . . . . . . . Child was a youth in care within a year of his/her death. These minors were previously referred to as Former Ward.

---

[5] The causes and manners of death are determined by hospitals, medical examiners, coroners and coroners' juries.

**TABLE 1: CHILD DEATHS BY AGE AND MANNER OF DEATH**

| | CHILD AGE | HOMICIDE | SUICIDE | UNDETERMINED | ACCIDENT | NATURAL | TOTAL |
|---|---|---|---|---|---|---|---|
| Months of Age | At birth | | | 1 | | 1 | 2 |
| | 0 to 3 | 1 | | 8 | 11 | 5 | 25 |
| | 4 to 6 | 3 | | 3 | 4 | 2 | 12 |
| | 7 to 11 | | | 3 | 3 | 2 | 8 |
| | 12 to 24 | 3 | | 2 | 2 | 3 | 10 |
| Year of Age | 2 | 1 | | 1 | 3 | 4 | 9 |
| | 3 | | | | | 1 | 1 |
| | 4 | | | | | | - |
| | 5 | | | | 1 | 1 | 2 |
| | 6 | | | | | 1 | 1 |
| | 7 | | | | | | - |
| | 8 | 1 | | | | | 1 |
| | 9 | | | | | 2 | 2 |
| | 10 | | | | | | - |
| | 11 | | | | 2 | 2 | 4 |
| | 12 | 1 | | | | 2 | 3 |
| | 13 | 1 | | | 1 | 1 | 3 |
| | 14 | | 1 | | 1 | 3 | 5 |
| | 15 | 1 | | | 2 | 1 | 4 |
| | 16 | | 2 | | | | 2 |
| | 17 | 2 | | | 1 | 1 | 4 |
| | 18 or older | 4 | 1 | 1 | 2 | 2 | 10 |
| | TOTAL | 18 | 4 | 19 | 33 | 34 | 108 |

**TABLE 2: CHILD DEATHS BY CASE STATUS AND MANNER OF DEATH**

| | REASON FOR OIG INVESTIGATION* | HOMICIDE | SUICIDE | UNDETERMINED | ACCIDENT | NATURAL | TOTAL |
|---|---|---|---|---|---|---|---|
| DCP | Pending | 1 | | 6 | 8 | 7 | 22 |
| | Unfounded | 6 | 1 | 5 | 13 | 8 | 33 |
| | Indicated | 1 | | 1 | 3 | 3 | 8 |
| Youth in Care | | 6 | 3 | 2 | 3 | 6 | 20 |
| Former Youth in Care | | | | | | | - |
| Return Home | | | | | | | - |
| Open Placement/Split Custody | | | | | | 2 | 2 |
| Open Intact | | 2 | | 4 | 4 | 5 | 15 |
| Closed Intact | | 2 | | 1 | 1 | 2 | 6 |
| Child of a Youth in Care | | | | | | 1 | 1 |
| Child Welfare Services Referral | | | | | | | - |
| Preventive Services/Extended Family | | | | | 1 | | 1 |
| TOTAL | | 18 | 4 | 19 | 33 | 34 | 108 |

\* When more than one reason existed for the OIG investigation, the death was categorized based on primary reason.

## TABLE 3: CHILD DEATHS BY COUNTY OF RESIDENCE AND MANNER OF DEATH

| County | Homicide | Suicide | Undetermined | Accident | Natural | TOTAL |
|---|---|---|---|---|---|---|
| Adams | | | | 1 | 1 | 2 |
| Bureau | | | | | 1 | 1 |
| Champaign | | | | | 2 | 2 |
| Christian | | | | 4 | | 4 |
| Coles | | | | 1 | 1 | 2 |
| Cook | 14 | | 10 | 3 | 9 | 36 |
| DuPage | | | | | 2 | 2 |
| Fayette | | | | | 1 | 1 |
| Fulton | | | | | 1 | 1 |
| Jackson | | 1 | | | | 1 |
| Jefferson | | | | | 2 | 2 |
| JoDaviess | 1 | | | | | 1 |
| Kane | | | 1 | | | 1 |
| Knox | | | | 1 | | 1 |
| Lake | | 1 | | 1 | 2 | 4 |
| Lee | | | 1 | | | 1 |
| Livingston | | | | | 1 | 1 |
| Macon | | | | 1 | | 1 |
| Madison | | | 2 | 2 | | 4 |
| Marion | | | 1 | | | 1 |
| McDonough | | | | 1 | | 1 |
| McLean | | | | 1 | 1 | 2 |
| Morgan | | | 1 | | | 1 |
| Peoria | | 1 | | 3 | 1 | 5 |
| Richland | 1 | | | 1 | | 2 |
| Rock Island | | | | 1 | 1 | 2 |
| Saline | | | | | 1 | 1 |
| Sangamon | | | 1 | 4 | 1 | 6 |
| St. Clair | 1 | | | 2 | 2 | 5 |
| Tazewell | | | | | 2 | 2 |
| Washington | | | 1 | | | 1 |
| Whiteside | | 1 | | | | 1 |
| Will | 1 | | | | 2 | 3 |
| Williamson | | | | 2 | | 2 |
| Winnebago | | | 1 | 4 | | 5 |
| **TOTAL** | **18** | **4** | **19** | **33** | **34** | **108** |

## TABLE 4: CHILD PROTECTION DEATH INVESTIGATIONS BY RESULT AND MANNER*

| FINAL FINDING | Homicide | Suicide | Undetermined | Accident | Natural | Total |
|---|---|---|---|---|---|---|
| Indicated | 6 | - | 5 | 11 | 4 | 26 |
| Unfounded | 1 | - | 9 | 9 | 14 | 33 |
| Pending | 3 | - | 2 | 1 | - | 6 |
| Total | 10 | - | 16 | 21 | 18 | 65 |

*Child deaths in which at least one person was indicated or unfounded for death by abuse or death by neglect. Note that persons indicated for death will stay on the State Central Register for 50 years.

## FY 2016 DEATH CLASSIFICATION BY MANNER OF DEATH

### HOMICIDE
*Eighteen deaths were classified homicide in manner.*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Gunshot wound(s) | 8 |
| Injuries due to child abuse | 2 |
| Asphyxiation by suffocation and neck compression | 1 |
| Injuries due to blunt force trauma | 2 |
| Blunt force head trauma | 1 |
| Stabbing | 1 |
| Homicide by unspecified means | 1 |
| Pending | 2 |
| **TOTAL** | **18** |

#### PERPETRATOR INFORMATION:*

| PERPETRATOR | NUMBER |
|---|---|
| Mother | 2 |
| Father | 2 |
| Mother's Boyfriend | 3 |
| Aunt | 1 |
| Unrelated Caretaker | 1 |
| Unrelated Adults | 1 |
| Unknown/Unsolved | 9 |

*Some deaths have more than one perpetrator

### SUICIDE
*Four children or young adults died from suicide this fiscal year. Two died of gunshot wounds, one from blunt force injuries, and one died from hanging.*

### UNDETERMINED
*Nineteen deaths were classified undetermined in manner.*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Undetermined | 15 |
| Sudden death in an infant with unexplained facial abrasions, respiratory viral changes and multiple complications due to premature birth | 1 |
| Extreme prematurity due to maternal methamphetamine use | 1 |
| Pending | 2 |
| **TOTAL** | **19** |

**ACCIDENT**

*Thirty-three deaths were classified accident in manner.*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Asphyxia/Suffocation/Overlay/sleep related | 17 |
| Carbon Monoxide poisoning due to a house fire | 5 |
| Drug overdose | 1 |
| Injuries due to blunt force trauma | 4 |
| Blunt force head trauma | 2 |
| Drowning | 3 |
| Choking on food | 1 |
| **TOTAL** | **33** |


**NATURAL**

*Thirty-four deaths were classified natural in manner*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Asthma/Respiratory Illness/Pulmonary Issues | 9 |
| Complications from Chronic disease (Cerebral palsy or Muscular Dystrophy) | 9 |
| Cardiac conditions | 2 |
| Seizures/Epilepsy | 5 |
| Complications of prematurity | 5 |
| Autoimmune Issues | 1 |
| Gastrointestinal Illness | 1 |
| SIDS | 1 |
| Liver Disease | 1 |
| **TOTAL** | **34** |

## HOMICIDE

| Child No. 1 | DOB 08/95 | DOD 07/16 | Homicide |
|---|---|---|---|
| Age at death: | 20 years | | |
| Cause of death: | Gunshot wound to the head | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Police responded to a call of shots fired and found two youth shot in a parked SUV. The front passenger was a 20-year-old youth in care who was shot in the head. The back seat passenger had been shot in the leg. Police reports indicated that it appeared the driver had fled the scene on foot. There was no evidence the shots were fired at close range. A police investigation of the youth in care's murder remains unsolved but open.

**Prior History:** The youth was 20 days short of his 21st birthday when he died. Records show that the youth was learning disabled and his disability led him to exhibit aggressive behavior that caused him disciplinary problems in school. He was psychiatrically hospitalized twice in 2007 and diagnosed with intermittent explosive disorder. Later, in 2011, he was diagnosed with post-traumatic stress disorder. The youth entered the Department's care in 2011 when he was 15 years old; he had been placed in a juvenile detention center on battery charges and his mother missed court dates on the charges, leading to the filing of a neglect petition and the youth entering DCFS care. He was placed with a cousin. Later that year he was charged with possession of a controlled substance and he was again placed in detention. After his release he was placed in a residential treatment center until February 2013. His time there was characterized by frequent unauthorized absences and brief stays in detention. In December 2012 he was charged with felony theft and placed on probation. In March 2013 he was arrested again for felony theft and went to jail pending trial. In April 2013 he pleaded guilty and was sentenced to two years in the Department of Corrections. He was paroled in February 2014 and placed in a transitional living program. The program's agency closed on June 30, 2016 and the youth went on run before he could be transferred to another agency. During his life the youth had a total of sixteen juvenile arrests and forty adult arrests.

| Child No. 2 | DOB 01/12 | DOD 08/16 | Homicide |
|---|---|---|---|
| Age at death: | 4 years | | |
| Cause of death: | Homicide by unspecified means | | |
| Perpetrator: | Mother | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death; children returned home within a year of child's death | | |
| Action Taken: | Full investigation, Report to Director December 1, 2017 | | |

Narrative:      Police responded to an emergency phone call of an arson in progress at an abandoned, single family home. When they arrived they arrested three possible suspects, a 27-year-old woman and 17 and 19-year-old brothers. Police requested assistance from the fire department because of a strong scent of accelerant. The fire department found a burning bundle in the basement, and once extinguished, discovered a child's body. The child was pronounced deceased at the location. The child was determined to be the 27-year-old woman's 4½-year-old son. Because of the extent of decomposition, the boy's autopsy report listed his cause of death as homicide by unspecified means. The mother and the 19-year-old male have been criminally charged with one count of attempted arson, one felony count of concealing the death of a person who died by means other than homicide, and three felony counts of concealing the death of a person by moving the body. They are in jail awaiting trial. The 17-year-old male, the mother's live-in boyfriend, is charged as a juvenile and is being held in detention. The mother was indicated for death by abuse and for substantial risk of physical injury/ environment injurious to health and welfare by neglect to her surviving children, ages 6½, 8, and 10, and newborn twins. The 17-year-old was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to the twins, as their father. All five children were taken into protective custody. The three older children were placed with their former foster parents.

Prior History:    In April 2012 police were called because a 4-year-old child was seen alone in an apartment building. Police then discovered two other children, ages 2 and 5, in a car they had slept in overnight. The 5-year-old boy led police to the apartment where their mother had spent the night with her boyfriend. The deceased had been left with a friend's relative two weeks earlier in an informal arrangement. The mother pleaded guilty to child endangerment. DCFS indicated her for inadequate supervision and substantial risk of physical injury/environment injurious to health and welfare by neglect. The children were taken into custody and placed in traditional foster care where they remained until returning home in 2015. During the open placement case the mother completed substance abuse services, including outpatient care and complying with random urine drops. She inconsistently participated in individual and family therapy, but consistently visited the children. In April 2014 the mother began unsupervised visits. In April 2015 the mother successfully had the children home for an extended unsupervised visit their entire spring break, leading to their return home. Though the return home plan included enrolling the deceased child in Head Start or pre-kindergarten, the mother did not do so, choosing to keep the child at home. The family's caseworker visited the home until closing out the case in November 2015. In January 2016 a child protection investigation was initiated for substantial risk of physical injury/environment injurious to health and welfare by neglect to the 9-year-old because of reports of corporal punishment to him. He and his sibling recanted their allegations and the investigation was unfounded. During the investigation, the CPI became aware that the deceased needed to be seen by his physician and the mother agreed to take the boy. However, the CPI unfounded the allegations and closed the case before ensuring the mother took the child. Following the boy's death, the two oldest siblings admitted that they had lied during the investigation and the mother had used corporal punishment.

| Child No. 3 | DOB 10/98 | DOD 09/16 | Homicide |
|---|---|---|---|
| Age at death: | 17 years | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       An unidentified person called 911 at approximately 10:30pm to report shots had been fired in a parking lot. Responding officers found the 17-year-old youth lying face down in the parking lot with multiple gunshot wounds to the torso. He was transported by ambulance to the hospital. He died from massive internal hemorrhaging that a surgeon was unable to stem. The youth was not under the influence of any drugs or alcohol at the time of his death. A witness reported to police that the youth was standing in the parking lot when he was approached by two males who shot at him and then fled on foot. DCFS did not investigate the youth's death because no child abuse or neglect was suspected. A police investigation of the youth in care's murder remains unsolved but open.

Prior History:    The youth was on parole from a juvenile correctional facility of the Illinois Department of Juvenile Justice at the time of his death. He was wearing an electronic monitoring bracelet on his ankle. The youth's family history is significant for violence and trauma. His mother was a victim of physical and sexual abuse as a child. His maternal grandmother was murdered by her partner when the mother was 15 years old. The mother had a violent relationship with the youth's father. One of her eight children was born medically complex, entered DCFS care at age two, and was adopted at age six. The youth, at the age of nine, witnessed the murder of his father's close friend. And, thirty-five days before the youth's death, his older brother was murdered. The youth was first arrested at age ten. He came to the Department's attention in July 2013 when at age fourteen he violated the terms of his probation and was simultaneously committed to DCFS's care and the Illinois Department of Juvenile Justice. By then he had been arrested thirteen times and had been suspended from school at least six times. After being incarcerated for four months, the youth was placed back on probation. While on probation the youth used drugs and engaged in delinquent behavior. He was recommitted to the Illinois Department of Juvenile Justice in March 2015. He was paroled in December 2015 on electronic monitoring and placed in his father's home. He was uncooperative with parole services and declined DCFS teen parenting services after he told his caseworker he was a father. He refused to provide any information about the baby or the baby's mother. The youth's caseworker last saw him in June 2016. She tried unsuccessfully to contact him in July and August.

| Child No. 4 | DOB 04/98 | DOD 09/16 | Homicide |
|---|---|---|---|
| Age at death: | 18 years | | |
| Cause of death: | Gunshot wound to the head | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Eighteen-year-old youth in care was killed in a drive by shooting while she was attending a vigil for a friend who had been shot and killed the previous day. A van drove up to the group holding the vigil and two people got out and started shooting. The shooters then got back in the van and drove away. Two boys, ages 16 and 17, were shot and wounded. A police investigation of the youth in care's murder remains unsolved but open.

Prior History:    The teen entered the Department's care in August 2014. Her mother had earlier abandoned her and the teen was living with an older sister, but the sister moved out of state, leaving the teen to fend for herself. In the months before her death, the youth was living with fictive kin. A caseworker saw her every two weeks. The youth was attending high school regularly and getting good grades. She looked forward to graduating in June 2017 and hoped to get into an independent living program.

| Child No. 5 | DOB 03/98 | DOD 10/16 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 18 years |
| Cause of death: | Multiple gunshot wounds |
| Perpetrator: | Unknown |
| Reason For Review: | Youth in care |
| Action Taken: | Investigatory review of records |

**Narrative:** Eighteen-year-old youth in care was walking a block away from his transitional living program home around 11:30pm when he was shot multiple times by an offender who approached him. The youth had slipped out of the home without informing staff he was leaving or following the protocol for signing out. Program staff speculated that he was headed to a gas station a few blocks away to buy snacks. Patrol officers in the area heard the shots fired and responded to the scene, finding the youth lying face down in the street. He was taken by ambulance to the hospital where he was pronounced deceased the following day. Staff at the transitional living program were disciplined because they should have been aware that the youth had left the home. The youth was not believed to be gang-involved and it is unknown why he was targeted. A police investigation of the youth in care's murder remains unsolved but open.

**Prior History:** The youth and his family first came to the attention of DCFS in 1999 when his 24-year-old mother attempted suicide by overdose and the 24-year-old father responded by calling her family instead of seeking emergency medical attention. After several months in foster care the youth and his three siblings were returned home pursuant to an order of protection. The parents had a fifth child in 2000 and the family's case was closed in late 2002. Over the next several years the family had no DCFS involvement, but later reports noted there was drug and alcohol use in the home as well as domestic violence. The parents divorced in 2011 when the youth was 13. He and his 11-year-old brother stayed with the father while the mother took the three girls. She remarried and they went to live in a neighboring state. The boys visited their mother and sisters frequently. During a visit in 2012 the youth was arrested for hitting his mother. In October 2013 the neighboring state's court ordered him into a residential facility. In December 2014 he returned home to his father. In January 2015 he and his father got into an altercation and his father put him out of the home. He stayed with a friend's family, but couldn't be enrolled in school because the father refused to provide the family with the necessary documents. In July 2015 the 17-year-old youth called the hotline to report he was homeless. The police also called the hotline at that time to report the youth had been arrested for being a passenger in a stolen car with the son of the family he was staying with and the family refused to accept custody of him. He entered the Department's custody at that time. He was placed in a shelter where he remained for several months. He had difficulty obeying the rules: he smoked marijuana, left the facility without permission, and exhibited aggressive behavior toward peers and staff. In September 2015 he was arrested and charged with battery for an incident toward a staff member. In October 2015 he was placed in the transitional living program where he remained until his death. Initially he had issues similar to those he demonstrated at the shelter, but he made progress: he earned his GED in June 2016, planned to enroll in a community college in January 2017, and worked with a mentor with whom he had a positive relationship.

| Child No. 6 | DOB 02/15 | DOD 11/16 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 21 months |
| Cause of death: | Multiple injuries due to child abuse |
| Perpetrator: | Mother's boyfriend |
| Reason For Review: | Indicated child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative: Twenty-two-year-old male called 911 to report that his 28-year-old girlfriend's toddler was not breathing. He told responding police that he had given the toddler some candy and she choked. He said that he squeezed her to help her breathe. The child was taken by ambulance to the hospital where she was pronounced deceased. She presented with bruises on her face, chest, and abdomen. Police, DCFS and coroner investigation revealed that the toddler had been in the care of the mother's boyfriend of five months while the mother was out performing community service for a DUI conviction. The toddler had been severely beaten and sustained massive injuries, including lacerations to her liver and pancreas. The boyfriend was charged with first degree murder and is in jail awaiting trial. He was indicated for death by abuse. The mother was not indicated in the toddler's death.

Prior History: There were three prior investigations involving this family. The first investigation, reported in September 2015, was unfounded for head injuries by neglect. The deceased, then an infant of 7 months, was taken to the hospital by her mother who said she fell down the stairs with the infant. The infant had bruising to her scalp. The mother had a documented case of hip dysplasia and said her hip gave out. She was diagnosed with injury to her tailbone from the incident. A physician specializing in child abuse and neglect found the story consistent with the infant's injury. The second investigation, reported in February 2016, was indicated for substantial risk of physical injury/environment injurious to health and welfare after the mother was charged with a DUI and child endangerment after hitting parked cars while her 4-year-old daughter was in the car with her. The deceased and her 6 and 7-year-old siblings were at home with the mother's sister. The mother was court mandated into services and DCFS referred the mother to community-based services. The third investigation, reported in August 2016, was unfounded for cuts, bruises and welts by abuse and neglect. An anonymous reporter called the hotline alleging that the mother had left the deceased, then 18 months, on the bed unsupervised and the child fell off the bed, and had a large bump and bruise on the right side of her forehead. The reporter said the child always had bruises on her. The child was taken to the hospital where she was observed to have only the bruise on her forehead, which the treating physician said was consistent with the mother's explanation that the child fell off the bed when the mother turned her back to get some clothes out of the closet. The mother reported she had completed parenting classes and substance abuse treatment and was on probation doing 40 hours of community service for her earlier DUI. No further services were recommended.

| Child No. 7 | DOB 08/08 | DOD 11/16 | Homicide |
|---|---|---|---|
| Age at death: | 8 years | | |
| Cause of death: | Asphyxiation due to suffocation and manual strangulation | | |
| Perpetrator: | Unrelated adult male | | |
| Reason For Review: | Closed intact family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: In the evening, the eight-year-old girl was waiting for her church's bus outside her home with her guardian aunt's 47-year-old live-in boyfriend. He went inside to check the bus schedule and learned it was not running that evening. When he went back outside, the girl was not there. Family members searched for her for about 15 to 20 minutes and then called police to report her missing. She was found later that evening deceased. She had been sexually assaulted, suffocated and strangled. The 45-year-old aunt's boyfriend was initially a suspect so law enforcement called the hotline and a report was taken for investigation of death by abuse. The investigation was unfounded when the boyfriend was eliminated as a suspect. A man attending a party nearby was arrested and charged with first degree murder and predatory sexual assault. He is in jail awaiting trial.

Prior History:    The child, who had a heart condition, seizure disorder, and developmental delays, came to the Department's attention when she was born. Her 39-year-old mother was developmentally delayed and services were requested for the mother. The mother gave the 59-year-old maternal grandmother guardianship of her daughter. In 2012, when she was 3½ years old, the girl's babysitter was indicated for substantial risk of sexual injury after he was arrested for sexually abusing other children he babysat. From March 2014 to October 2014, an intact family services case was open. The child was staying with her maternal aunt while her grandmother was in the hospital and there were concerns about whether the developmentally delayed aunt was capable of ensuring the child's medical needs were addressed. The aunt and her boyfriend proved able to care for the child and the aunt assumed guardianship for the child, though the grandmother was still involved. In July 2015 the aunt was investigated and indicated for inadequate shelter and environmental neglect to the child based on the poor condition of the home. A second intact family services case was open from August 2015 to November 2015. The family cleaned the home and made necessary repairs. The aunt and her boyfriend also participated in parenting education. In November 2016 the aunt was unfounded on an allegation of inadequate supervision related to an investigation involving sexualized play between the child and an 8-year-old friend. During that investigation an investigator walked through the family's home and had no concerns about safety or cleanliness.

| Child No. 8 | DOB 08/99 | DOD 12/16 | Homicide |
|---|---|---|---|
| Age at death: | 17 years | | |
| Cause of death: | Gunshot wound to the torso | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Around noon an unknown citizen called 911 to report a shooting. A 17-year-old male had been walking down the sidewalk with a 21-year-old female when an unknown male offender approached them on foot and fired shots at them. The teen was killed and his companion was injured with a gunshot wound to the leg. DCFS did not investigate the teen's death because no child abuse or neglect was suspected. A police investigation of the teen's murder remains unsolved but open.

Prior History:    In the nine months before his death, the teen's 38-year-old mother had called the Department requesting services and was investigated for lock-out and inadequate supervision. In March 2016 the mother called the hotline requesting assistance because her son had been increasingly difficult and she was afraid of him. She had arranged for him to stay with other people but wanted help. A child welfare worker referred her to the Department of Human Services Comprehensive Community Based Youth Services (CCBYS), a diversion program to minimize youth, ages 11-17, and their families' involvement in child welfare and juvenile justice systems. In June 2016 the hotline took a report for investigation of inadequate supervision against the mother when a social service provider called the hotline to report the teen said he had been sleeping in the stairwell of his apartment building for the last three days because his mother wouldn't allow him home. The mother told the child protection investigator that her son had been raised by his grandmother until the age of twelve, and she and her son had problems in their relationship. She had arranged for him to stay with a neighbor for two days and the third night she was at the hospital and did not know he could not get into the home. The teen denied telling anyone he couldn't return home and the mother said he could come back home. The teen was on probation for breaking the windows of his mother's car. His probation officer said the mother was trying to learn how to handle the teen and was sending him to stay with a relative over the summer. The investigation was unfounded for inadequate supervision. In September 2016 the probation officer called the hotline to report the mother would not allow the teen back home. A report was taken for investigation of lock-out. The probation officer placed the teen in a shelter while he worked with the family and CCBYS to find a placement for him. When the teen was asked to leave the shelter following a dispute with another resident, the Department took protective custody and placed him in a DCFS shelter. The mother decided to allow the teen back home and custody lapsed. The Department unfounded the lock-out allegation, and noted that juvenile probation and CCBYS were involved with the family.

| Child No. 9 | DOB 01/96 | DOD 12/16 | Homicide |
|---|---|---|---|
| Age at death: | 20 years | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Twenty-year-old youth in care and his 21-year-old cousin were both shot and killed outside their home around 10:30pm. The cousin received a phone call to meet someone outside and he and the youth walked outside. Two minutes later, family members heard shots fired, called 911 and went outside to investigate. The cousin was found on the side of the house; the youth was found in the alley behind the house. Both sustained multiple gunshot wounds and died. A police investigation of the youths' murders remains unsolved but open.

Prior History:        The youth and his two younger siblings entered foster care in 2008 because of abuse. Their mother had chronic mental health issues and her parental rights were terminated in 2011. The youth's siblings were adopted by the same foster parent in 2014. The youth had lived with his maternal step-uncle, step-aunt, and cousins since 2009 when he was thirteen. He performed poorly in school and regularly got into trouble. He had some arrests as a juvenile for theft. His foster parents and caseworker ensured he had an individualized education plan, received counseling, and engaged with a mentor. In 2014 he completed a food job training program and subsequently held a series of part-time jobs at fast food restaurants. He graduated from high school in 2015. In the summer of 2015 he was arrested for robbery of a cell phone and spent time in jail. In February 2016 the youth became a father. He visited his son frequently, but refused teen parenting services. In March 2016 he was shot during an armed robbery at a restaurant in which he was working. In the months before his death, the teen was working part-time, but did not follow through on referrals made by his worker for job training or life skills classes. He would have aged out of DCFS care the month after his death.

| Child No. 10 | DOB 11/16 | DOD 02/17 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 months |
| Cause of death: | Multiple injuries due to child abuse |
| Perpetrator: | Father |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Eighteen-year-old father and 47-year-old maternal grandmother took the 2½-month-old infant to the emergency department after the baby vomited while feeding and became lethargic with labored breathing. The emergency department stabilized the infant before transferring her to a children's hospital. The infant was found to have bilateral head trauma, old and new, and healing posterior rib fractures. The infant remained in intensive care until her death three weeks later following the removal of life support. Hospital staff called the hotline and the Department initiated an investigation for allegations of head injuries by abuse and bone fractures by abuse by the father and the 16-year-old mother. After the infant died, the Department added an allegation of death by abuse. Days after the infant's death, the father was arrested and charged with aggravated domestic battery for attempting to strangle the mother. During the investigation of that incident the father admitted to shaking and slamming the infant. He was charged with first degree murder and is in jail awaiting trial. The father was indicated for death by abuse, head injuries by abuse, and bone fractures by abuse. The mother was indicated for death by neglect, head injuries by neglect, and bone fractures by neglect based on collateral reports that the mother was aware of the father's abuse of the infant.

**Prior History:** Seven months before the infant's birth, the maternal grandmother of the infant called the hotline to report that her daughter's 17-year-old boyfriend (the infant's father) had not been allowed home for at least a month. A report was taken for investigation of lock-out by the teen's mother. The maternal grandmother said that the teen had been staying at her house and could continue to stay there, but his mother had not asked about his welfare or offered any money to help. The teen's mother, younger sister, and older brother all reported that the teen had not been kicked out of their home, but left on his own. The mother said she wanted her son to return home, but he did not want to. The mother was unfounded for lock-out.

| Child No. 11 | DOB 11/16 | DOD 03/17 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 months |
| Cause of death: | Complications of hypoxic ischemic encephalopathy due to maternal uterine rupture and placental abruption due to blunt force injuries to mother due to assault |
| Perpetrator: | Father |
| Reason For Review: | Youth in care |
| Action Taken: | Investigatory review of records |

**Narrative:** Twenty-three-year-old mother gave birth prematurely at 34 weeks gestation after domestic battery induced early labor. As a result of intrauterine trauma, the baby was born with hypoxic ischemic encephalopathy, fetal blindness, deafness, seizures, global developmental delays, spastic cerebral palsy, and sinus tachycardia. The baby was taken into protective custody during a then pending child protection investigation involving the homicide of her 3-year-old sibling. Upon discharge from the hospital the baby was placed in a long term care facility. Two weeks before her death the baby was hospitalized for acute pneumonia with sepsis. She died from complications caused by the intrauterine assault. The Department conducted a child protection investigation of the baby's death and indicated the father for death by abuse and indicated the mother for death by neglect. The father was charged with first-degree murder for the deaths of both of his children. He is in jail awaiting trial.

Prior History:    The Department's first contact with the family was in October 2016 when the 22-year-old father was arrested for beating his 3-year-old child to death over two days. During the course of that beating he also beat the pregnant mother, causing injuries to the fetus and a premature birth. A one-year-old sibling was taken into custody and placed with a relative. During the investigation the mother reported that she and the father had been in a relationship for four years during which he beat both her and the child. The father was indicated for death by abuse and substantial risk of physical injury by abuse. The mother was indicated for the same allegations by neglect. The surviving sibling remains in care with the relative. It is suspected that the mother is visiting the father in jail using a sister's ID. The State's Attorney has filed a motion for expedited termination of parental rights.

| Child No. 12 | DOB 11/14 | DOD 04/17 | Homicide |
|---|---|---|---|
| Age at death: | 2 years | | |
| Cause of death: | Craniocerebral blunt trauma | | |
| Perpetrator: | Mother's boyfriend | | |
| Reason For Review: | Closed intact family services case within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:        Mother's 23-year-old boyfriend took her unresponsive 2-year-old son to the hospital around 9:00pm. Doctors found the toddler was in critical condition with a brain bleed and very low heart rate, requiring his transfer to a children's hospital in a neighboring state. The boyfriend told the 23-year-old mother that he left the toddler in the bathtub while he attended to their 3-month-old daughter. When he returned he found the child on the floor crying. The boyfriend told the hospital social worker that the child had climbed out of the tub so he put him back in and left the room. He then heard a thump and saw the child lying on the floor unable to stand or keep his balance. Then, just as the mother was returning home the toddler began to vomit. The mother wanted to call 911, but her friend drove the boyfriend and toddler to the nearby hospital while the mother remained home with the other children. At the children's hospital surgeons attempted to relieve pressure on the child's brain from a large subdural hematoma, but the child was pronounced dead that night. Medical personnel called the hotline and a report was taken for investigation of death by neglect and substantial risk of physical injury/environment injurious to health and welfare by neglect to the other children in the home by the mother and her boyfriend. The Department also referred the case to the Southern Illinois Child Death Investigation Task Force. The child's autopsy revealed that he suffered from numerous subgaleal and subdural hematomas, a complex skull fracture, subarachnoid and interventricular hemorrhages, and retinal hemorrhages with evidence of fairly recent injury. He also had bruises and contusions on multiple planes of his body. Criminal and child protection investigations are pending. The mother's older child and the couple's baby were taken into custody and placed with relatives. The mother and her boyfriend have been minimally cooperative with services. In May 2017 the mother reported she is two months pregnant.

Prior History:   In November 2015 an anonymous reporter called the hotline with concerns about trash covering the floors of the home, spoiled food left out and the gas shut off by the gas company. A report of environmental neglect was investigated and indicated. The mother reported being overwhelmed; Norman Funds were provided to pay utilities, but the mother had trouble cleaning the home. An intact family services case was opened in January 2016. Throughout January, February, and March of that year, the mother did not keep the house up to minimal standards, was non-compliant with services, and struggled to maintain stable housing. In February 2016 the intact family services worker reported visiting the home and though it met minimal standards, advised the mother the house needed to be cleaned by the worker's next visit the following week. Within that week though relatives called the intact family worker complaining of a dirty home and she directed them to the hotline initiating a second investigation for environmental neglect. The children went to stay at the homes of their respective fathers. The grandmother, with whom the mother lived, reported that she called the hotline because she wanted more help cleaning the home and paying utilities. The home was cleaned by the mother following the hotline report. The mother reported that she wanted to move out in the next few months if the intact family worker would provide assistance. She then gave the fathers custody of the children. By April 2016 the mother had been more consistent in maintaining the house, but often avoided the worker, not responding to calls, being gone for scheduled visits, and shortening unannounced visits. She requested case closure in June 2016, but when asked to finalize the process, requested the case remain open. During the coming months the worker transported the mother to enroll in WIC, attempted to assist the mother with housing, offered the assistance of the agency's outreach worker At the beginning of February 2017, after almost a year of minimal cooperation, the agency closed the case.

| Child No. 13 | DOB 11/15 | DOD 04/17 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 17 months |
| Cause of death: | Pending |
| Perpetrator: | Unknown |
| Reason For Review: | Open intact family services case at time of child's death; pending child protection investigation at time of child's death |
| Action Taken: | Full investigation pending |

Narrative:       Seventeen-month-old toddler was reported missing to police, prompting a massive search. Thirty hours later she was discovered deceased, under a couch, inside her family home. There were four adults present at the time she was reported missing. Law enforcement reported finding the home in deplorable conditions; the health department deemed the home uninhabitable. The home later burned to the ground, arson is suspected. The Department initiated a death by neglect investigation against her mother. It is pending. A criminal investigation is also pending. The toddler's autopsy report has not been released because the criminal investigation is pending. The one and eight-year-old siblings were placed in foster care, and a 10-year-old sibling was placed with his biological father. High caseloads for child protection investigators and intact family workers played a critical role in service provision to the family. The Inspector General is conducting a full investigation of this child's death.

Prior History:   Between April 2016 and the child's death in April 2017 there were at least ten child protection investigations on the family and household members. An intact family services case was opened on the family in September 2016 and remained open at the time of the toddler's death. There were also three pending child protection investigations involving the family and household members at the time of the child's death. The intact family worker had been to the home the day before the child was reported missing; the child protection investigator had been to the home the day the deceased was reported missing.

| Child No. 14 | DOB 10/16 | DOD 05/17 | Homicide |
|---|---|---|---|
| Age at death: | 6½ months | | |
| Cause of death: | Pending | | |
| Perpetrator: | Mother, alleged | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**  Twenty-seven-year-old mother called 911 when she woke up and discovered her 6½-month-old infant in her queen bed not breathing. The infant's 29-year-old father was not home. The mother said she rolled the infant over and discovered that he had vomited and was not breathing. The infant was taken by ambulance to the hospital and then airlifted to another hospital where he was placed on life support. The baby had pneumonia which could have been from the infant aspirating on his vomit. Doctors believed the infant suffocated. The infant had no physical signs of abuse or neglect. After four days the infant was removed from life support and died. Law enforcement initiated an investigation and called the hotline. The Department took a report for investigation of death by abuse and substantial risk of physical injury/environment injurious to health and welfare by neglect to the infant and his 2-year-old sister, who was placed in a safety plan with a relative. In September 2017 the mother confessed to local law enforcement and the FBI that she smothered the infant because she could no longer handle his crying. The mother was charged with first-degree murder. The child protection investigation is pending for death by abuse to her son and substantial risk of physical injury/environment injurious to health and welfare by neglect to her daughter. Her daughter was placed in foster care.

**Prior History:**   Nine days before the infant's birth, in October 2016, police called the hotline to report they had gotten an email from a neighboring state that the mother was a registered sexual offender in that state with two prior convictions for felony child abuse. No details were shared other than the mother had been convicted of incest for having a child with her brother. The CPI completed background checks and learned that the mother's two eldest children were the result of incest with two of her older brothers. The eldest child was removed from her care in 2010 after she received second and third degree burns while in her mother's care, leading to a conviction for felony child abuse. The mother's second child was removed from her care due to extensive medical needs that she could not properly care for. Mother signed surrenders and those children were adopted. The mother's third child lives with his father, who has custody, and she only saw him occasionally. The CPI learned that the mother had completed probation and counseling successfully for both the felony child abuse and the incest convictions. The CPI spoke with the former probation officer, human services worker, and counselor who all reported no concerns about the mother having her children in her care. The mother registered as a sexual offender in Illinois and corrected her failure to register status. The child protection investigation was unfounded for substantial risk of sexual abuse and the infant and his then-one-year-old sister were allowed to remain in the parents' care.

| Child No. 15 | DOB 10/15 | DOD 05/17 | Homicide |
|---|---|---|---|
| Age at death: | 19 months | | |
| Cause of death: | Multiple blunt force injuries of the head and neck due to assault | | |
| Perpetrators: | Paternal aunt and her boyfriend | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Full investigation pending | | |

CHILD DEATH REPORT

Narrative:        Nineteen-month-old toddler became unresponsive around 1:45pm while being cared for by his 28-year-old paternal aunt's 33-year-old boyfriend. The boyfriend called 911 and paramedics responded, finding a faint pulse before the child went into cardiac arrest in the ambulance. The toddler was pronounced deceased at the hospital. He had some bruises, primarily on the left side of his upper body. The aunt was at work at the time and the boyfriend was caring for the toddler and the couple's 3½-month-old daughter. Their 8-year-old son was at school. The toddler had been living with the couple for six weeks. An autopsy was performed and the forensic pathologist noted eighteen areas of injury. The fatal injuries are believed to have occurred 1-3 days prior to the toddler's death, during which time he was in the care of both his aunt and her boyfriend. Their two children were taken into custody and placed with a paternal aunt. They were indicated for death by abuse and for substantial risk of physical injury/environment injurious to health and welfare by neglect to their two children. A criminal investigation is pending.

Prior History:    Neither the paternal aunt nor boyfriend had any history with DCFS. The toddler's mother was the subject of a child protection investigation involving the toddler in April 2017. At that time staff from a residential substance abuse treatment center called the hotline to report that the toddler's mother had dropped the toddler off at the center's day care facility and then left the center without telling anyone. A report was taken for investigation of inadequate supervision. The toddler was taken into protective custody and placed in a safety plan with his paternal aunt and her boyfriend. An assistant state's attorney, prior to the temporary custody hearing, advised the investigator to allow protective custody to lapse because the parents had come forward, had no prior history with DCFS, and they agreed to leave the child with the paternal aunt. The Department then opened an intact family services case with the toddler living with his aunt and her boyfriend and the 30-year-old mother and 29-year-old father promising to reengage in substance abuse treatment. The aunt received no financial assistance for caring for her nephew. The mother reentered residential treatment and at the time of the toddler's death, the family's caseworker was making arrangements for the mother to move to the family unit so her son could live with her at the treatment center.

| Child No. 16 | DOB 12/04 | DOD 06/17 | Homicide |
|---|---|---|---|
| Age at death: | 12 years | | |
| Cause of death: | Multiple stab wounds | | |
| Perpetrator: | Mother's boyfriend | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:        Twelve-year-old girl was stabbed multiple times by her mother's 31-year-old boyfriend. Two months prior to the girl's murder, the boyfriend was released from prison after serving 2 years and 3 months for aggravated domestic battery and strangulation of the child's 42-year-old mother. One-day prior to the death, the natural mother allowed the boyfriend to stay the night. On the day of the death, the mother told the boyfriend that she wanted him to leave but he refused. Later that evening, the mother and her daughter went to the store and on their way back to the apartment complex called the police to have the boyfriend removed from the apartment. While waiting for police, the mother sent the daughter into the building to deliver some items bought at the store to a neighbor. When the daughter did not return, the mother went into the apartment complex and could hear a struggle and screaming coming from her apartment. The mother returned outside to call police again. When police arrived the boyfriend was seen fleeing the building with a metal object in his hand and the daughter was found on the living room floor with multiple stab wounds. The daughter was transported to the hospital in critical condition where she was later pronounced deceased. The boyfriend has been charged with murder, aggravated kidnapping and aggravated assault of a police officer. He is being held in jail without bond. The Department conducted an investigation into the death indicating mother's boyfriend for death by abuse.

Prior History:    Fourteen months prior to the child's death, school personnel called the hotline to report that students were saying that the 11-year-old girl was having sex with older boys. The call was taken as a child welfare services referral and the child's mother declined services. Thirteen months prior to the child's death, the hotline was contacted again by school personnel who reported the child was saying that she had sex with grown men and was raped, but recanted her story. The hotline took a report for investigation of inadequate supervision by the girl's mother. During the investigation, the child denied having sex with older men and denied that she was raped. Both mother and child denied that the girl was staying out late and the investigation was unfounded. Nine months prior to the child's death, medical personnel called the hotline to request parenting classes for the mother after the 11-year-old girl tested positive for gonorrhea and chlamydia. The reporter stated that the mother and child would be offered individual counseling and family therapy at the clinic. A child welfare services referral was taken. The mother told the child welfare services worker that the child contracted the STDs after seeing a 13-year-old boyfriend while staying with her father in a different city over the summer. She said the child was going to start individual therapy and sex education courses and the referral was closed.

| Child No. 17 | DOB 07/01 | DOD 06/17 | Homicide |
|---|---|---|---|
| Age at death: | 15 years | | |
| Cause of death: | Gunshot wounds | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Pending child protection investigation at time of teen's death; unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: The fifteen-year-old teen, two weeks shy of his 16th birthday, was riding in the back seat of an SUV around 10:30pm when another vehicle began following the SUV and shot into it. The teen was struck in the back and in the head and died at the hospital less than an hour later. DCFS did not investigate the youth's death because child abuse or neglect was not suspected. A police investigation of the teen's murder remains unsolved but open.

Prior History:    In December 2016, while the teen was psychiatrically hospitalized, he reported that a couple of months earlier his mother had handcuffed his feet. The hotline was called and the Department initiated an investigation for an allegation of tying. The mother admitted cuffing the teen's legs together, saying that the teen had come home intoxicated after being on run for some time, and she feared him leaving again while she was at work. The cuffs were not very tight and the teen was able to get out and leave the home. The mother stated that he had come home intoxicated and belligerent before and she had called the police who said they could not take him to the hospital because he was not a danger to himself or others. The mother, the grandparents, and the sibling all reported that the police told the mother she had the right to lock the teen up in order to protect him if needed. The mother took that to mean she could cuff him. The mother agreed that it was not appropriate, but she desperately wanted to protect her son from being harmed out in the streets. The teen told the investigator that he was intoxicated and he understood why his mother did it. He said he was not harmed and was able to get out of the cuffs. The investigator provided the mother with information on the Screening Assessment and Support Services (SASS) program. The investigation was unfounded. In May 2017, two weeks before the teen's death, hospital staff who had been evaluating the teen, reported to the hotline that the teen was living with and having a sexual relationship with his 19-year-old girlfriend in his mother's home. The mother, who did not speak English, reported that she did not know the girlfriend could not live with them, and she would take the girlfriend back to her father's home and not allow the relationship. The teen left home over the next week and was killed before being located.

| Child No. 18 | DOB 04/04 | DOD 06/17 | Homicide |
|---|---|---|---|
| Age at death: | 13 years | | |
| Cause of death: | Gunshot wound of the chest | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Unfounded child protection investigation within a year of teen's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: The 13-year-old boy was playing basketball with friends in a friend's backyard around 7:30pm when he was shot and killed. Approximately five shots were fired from the alley. None of the other boys were hit. A police investigation of the teen's murder remains unsolved but open. The Department did not investigate the child's death because abuse or neglect was not suspected.

Prior History:  There were two prior unfounded child protection investigations involving the deceased's siblings. The first unfounded investigation occurred in October 2016 when the deceased's 41-year-old mother was investigated for substantial risk of physical injury/environment injurious to health and welfare by neglect to the youngest of her five children, a son aged 11. The child's school called the hotline to report that his mother had not had the child psychiatrically evaluated as requested following a school suspension. The investigation showed that the child was psychiatrically hospitalized four months earlier; a SASS (screening assessment and support services) evaluation was completed at school upon the child's return with no concerns of violence or self-harm; and the child was receiving counseling at school. The second unfounded investigation occurred in April 2017 when the mother's 21-year-old daughter was investigated for torture and cuts, bruises, welts by abuse to her 13-year-old sister. The 13-year-old had a one-inch bruise on her arm. The 21-year-old admitted to hitting her sister and making her exercise as punishment for sexting a boy. The mother responded appropriately by having her younger daughter stay with an aunt until the older daughter moved out (as had already been planned); and agreeing that the older daughter would no longer be allowed to discipline the younger daughter. The police declined to investigate. The child protection investigator referred the family to community-based services.

## UNDETERMINED

| Child No. 19 | DOB 04/16 | DOD 07/16 | Undetermined |
|---|---|---|---|
| Age at death: | 3 months | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A two-month-old baby was sleeping on a couch with her 38-year-old maternal grandmother and 3-year-old maternal aunt. The baby's 14-year-old maternal aunt discovered her unresponsive, face down on a couch cushion next to the grandmother in the early morning. They called 911 and began CPR. Emergency services personnel transported the baby to the hospital where doctors pronounced her dead at 6:00am. First responders reported that the home was a mess and the grandmother appeared to be under the influence of alcohol or drugs. The baby's 17-year-old mother was not in the home at the time of her baby's death. A hotline report was taken as a D sequence investigation against the grandmother for allegations of death by abuse, substantial risk of physical injury/environment injurious to health and welfare by neglect, and inadequate supervision. The grandmother was unfounded for the allegation of death by abuse, but indicated for substantial risk and inadequate supervision to her children as she admitted to drinking while caring for the baby and her own children and not being compliant with her psychotropic medication for her diagnosed mental illness. The children were placed in foster care.

Prior History:    The grandmother had three unfounded reports in 2011 and two unfounded reports in 2013. The reports have all been expunged. An intact family services case was open from August 2011 to August 2012. According to records, the grandmother had been investigated for allegations of prostituting her teen daughter, leaving her children home alone, and lacking food for all her children. Though the reports were unfounded, the case was opened to assist the family. The teen, with whom the grandmother had difficulties, went to live with a paternal aunt. During the intact family services case the grandmother and her teen daughter engaged in counseling; the grandmother cooperated with random urine screens that were all negative; and she completed parenting classes. Her children had all done well in school and were participating in summer camp at the close of the case. In May 2014 two hotline calls came in involving assaults between the grandmother and the teen mother of the deceased. The grandmother reported that her teen daughter had started attacking her and she responded. The teen's siblings reported their mother and sister fought often. The grandmother was indicated for cuts, bruises, welts and substantial risk of physical injury/environment injurious to health and welfare by neglect. An intact family services case was opened. During the case the grandmother completed a mental health assessment and was prescribed medication and participated in parenting classes. The worker provided Norman Funds for beds and utilities. The mother, who was pregnant, stayed with relatives throughout much of the case, but reported participating in parenting classes at school and starting prenatal care. The worker offered referrals for substance abuse assessment and domestic violence services but both the grandmother and the teen mother refused. The case was closed in November 2014. In February 2016 the teen mother was indicated for inadequate supervision when her then one-year-old child became ill from being exposed to marijuana smoke and eating old food off the floor while the mother was sleeping. The investigator made a referral for community-based services for the teen mother and engaged relatives to support her.

| Child No. 20 | DOB 04/16 | DOD 07/16 | Undetermined |
|---|---|---|---|
| Age at death: | 2½ months | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Open intact family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A two-month-old infant was found unresponsive and face down by her mother in bed. The infant had been co-sleeping with her parents and 19-month-old sibling on a queen sized bed. The parents called 911 and attempted CPR, however, the infant could not be revived. The mother admitted she smoked marijuana before going to bed. The father reported taking a Xanax pill that had not been prescribed to him before going to bed. The Department conducted a death investigation. The coroner was unable to determine whether the infant died from natural causes or asphyxia and ruled the cause and manner of death as undetermined. Still, the parents were indicated for death by neglect and for substantial risk of physical injury/environment injurious to health and welfare by neglect.

Prior History:    Prior to the infant's birth, the father physically assaulted the mother while he was intoxicated, causing their 4-month-old baby to fall out of a stroller and sustain a bruise on her forehead. The mother declined to pursue charges, but the father was indicated for cuts, bruises, welts and abrasions. The parents agreed to participate in intact family services. One month after the case was opened the mother reported that she was pregnant. The mother obtained prenatal care. She was minimally cooperative with intact family services. The infant and two-year-old sibling received routine well-child medical care. The worker assisted the family in getting a crib for the infant and educated them about safe sleep for infants. The worker provided in-home parenting education for the father, but the mother refused to participate.

| Child No. 21 | DOB 08/16 | DOD 08/16 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 19 days |
| Cause of death: | Undetermined |
| Reason For Review: | Pending child protection investigation |
| Action Taken: | Investigatory review of records |

Narrative: A nineteen-day-old infant was found unresponsive in the morning by her twenty-year-old mother. The infant was transported to the hospital where she was pronounced deceased. The infant had been co-sleeping in a full size bed with her mother, nineteen-year-old father, and a three-year-old sibling. There was a pending child protection investigation and a safety plan was in place, prohibiting unsupervised contact between the parents and their children. DCFS investigated the infant's death. Both parents admitted to sleeping in bed with the infant. Mother and father were indicated for death by neglect and substantial risk of physical injury/environment injurious to the two older siblings. The older children came into care and a placement case was opened. The children were returned home to mother under an order or protection in June 2017.

Prior History:     In 2012, the father was indicated for sexual molestation of a cousin. The parents have a history of domestic violence. In March 2016, the hotline was called after a domestic incident involving the parents. The father admitted to kicking the mother while she was pregnant. The mother relocated with the children and father was indicated for substantial risk of physical injury/environment injurious. In July 2016, an anonymous reporter contacted the hotline. Allegations of medical neglect (to one-year-old child born prematurely); inadequate food; substantial risk of physical injury/environment injurious by neglect; and substantial risk of sexual abuse-sex offender has access were taken for investigation. This investigation was indicated following infant's death.

| Child No. 22 | DOB 04/16 | DOD 09/16 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 5 months |
| Cause of death: | Undetermined |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative: A five-month-old infant was found unresponsive in his crib by his 36-year-old mother. His mother and 38-year-old father began CPR and called emergency medical services. The infant was transported to the hospital by ambulance but was pronounced dead upon arrival. The infant had been placed on his stomach for his nap. The parents reported that the infant had been born premature with a congenital heart defect. The infant had a heart murmur caused by a narrowed vessel and a valve problem. The coroner determined the cause and manner of death to be undetermined. The Department did not investigate the death.

Prior History: The infant's family had two prior unfounded investigations and one pending investigation at the time of his death. The pending investigation was eventually unfounded. The investigations were initiated in response to allegations related to the infant's 8-year-old half-sibling. The first unfounded investigation, in November 2015, alleged environmental neglect and inadequate shelter. The second unfounded investigation in May 2016 was due to allegations of substantial risk of physical injury/environment injurious to health and welfare by neglect. Both reports were from the sibling's non-custodial parent. When interviewed, the child and parent denied the allegations and school and medical personnel did not report concerns. The third investigation began out of hospital staff's concern for the sibling's urinary incontinence in September 2016. The sibling reportedly told a hospital staff member that she was afraid of using the restroom at night and lacked food at home. As the third investigation was underway, the death of the infant occurred, and was called in as related information for the third investigation. The third investigation was also unfounded.

| Child No. 23 | DOB 06/16 | DOD 10/16 | Undetermined |
|---|---|---|---|
| Age at death: | 3½ months | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A twenty-two-year-old mother found her 3½ -month-old son unresponsive around 9:00am lying on his stomach in an adult bed between her and a friend. The mother called 911 and the infant was taken to the hospital where he was pronounced dead. The mother and infant had stayed overnight at the friend's home. The mother fed the infant around 3:00am and put him in his stroller to sleep. The infant awoke around 4:00am and the friend laid him in bed between himself and the mother. The infant had been born prematurely and spent a week in the hospital following his birth. Three days before he died, the mother took the infant to the emergency room because he was having trouble breathing. He was diagnosed with an upper respiratory infection and given Tylenol. The Department was notified of the infant's death by the hospital, Medical Examiner's office, and police. A report was taken for investigation of death by neglect against the mother. The infant's cause and manner of death were undetermined, with the assistant medical examiner noting that it was not possible to determine whether the infant died from natural causes (such as a cardiac dysrhythmia due to a cardiac ion channelopathy) or from an asphyxial mechanism (such as overlay or smothering) because the autopsy can look the same in both situations. The death investigation was unfounded against the mother. The mother initially agreed to participate in intact family services, but changed her mind two weeks later.

Prior History:    The night before the infant's death, a relative of the infant's 5-year-old sister called the hotline to report the children's mother had told her daughter's father that the maternal grandmother's boyfriend had touched their daughter's private parts. A child protection investigation for sexual molestation was opened and investigated concurrently with the death investigation. The daughter underwent a forensic interview and medical exam at a local child advocacy center. Both were negative for concerns of abuse to the child. The mother denied telling the father that their daughter was sexually abused and wished for their daughter to remain with the maternal grandmother. Two weeks before the infant's death, the maternal grandmother had told the mother that she could not live in the home any longer. The 5-year-old stayed with her grandmother, but the mother took the infant with her. The sexual molestation investigation was unfounded.

| Child No. 24 | DOB 06/16 | DOD 10/16 | Undetermined |
|---|---|---|---|
| Age at death: | 4½ months | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A twenty-one-year-old mother called 911 around 8:30am when she awoke and found her 4½ - month-old twin unresponsive lying face down in her crib. The infant was premature born by c-section after 27 weeks gestation. Law enforcement officers who responded to the 911 call contacted the hotline to report that the twin's sister was bundled in a car seat and appeared overheated so was taken to the emergency room along with the unresponsive infant, who was pronounced dead at the hospital. The Department took a report for investigation of death by neglect and substantial risk of physical injury/environment injurious to health and welfare by neglect to the deceased's twin and one and 3-year-old siblings. Both allegations were unfounded after investigation. The mother had kept all medical appointments for the twins. They had been seen by their pediatrician three days earlier and the mother was given a referral to see a nephrologist because of concern about the twins' kidneys. The surviving twin was hospitalized for a couple of days to increase her weight. She and her siblings were placed in a safety plan with the Safe Families Program for several months following their sister's death. The intact family services case was kept open to assist the young mother with her children.

Prior History:   In January 2016 the mother was unfounded, but her boyfriend was indicated, for substantial risk of physical injury/environment injurious to health and welfare by neglect following an incident of domestic violence. The mother left her boyfriend and moved to her own apartment with her two children. In August 2016 the hotline was called by the hospital where the twins were being treated following their premature births. The hospital wanted to discharge the twins but staff were concerned their mother would not be able to care for them and manage their frequent medical appointments, especially given her limited support system. The mother was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to the twins because she had not participated in training at the hospital on caring for the special needs of the twins. The mother's step-father and a friend agreed to help the mother and an intact family services case was opened to assist the family.

| Child No. 25 | DOB 09/16 | DOD 11/16 | Undetermined |
|---|---|---|---|
| Age at death: | 6 weeks | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A six-week-old infant was found not breathing around 10:00am by his 29-year-old mother. At about 6:15am the mother breastfed the infant and placed him in a wooden cradle with a firm mattress and no pillows or blankets. She went to check on the infant three-and-a-half hours later and found him unresponsive. The 30-year-old father called 911 while the mother started CPR. At the hospital the baby was intubated and doctors found he was experiencing ventricular tachycardia. The baby was pronounced dead that afternoon. The coroner noted that while the cause of death could not be determined, it was possible there was a genetic condition that contributed to the infant's death and suggested the siblings be screened for heart disease. The Department did not investigate the infant's death.

Prior History: Two months prior to the infant's death a school nurse reported that during a meeting to enroll one of the deceased's 2-year-old twin siblings into special education, the mother reported the special needs twin did not have a sense of pain because he is not bothered by being spanked. In addition, the father picked up the special needs twin by the arm and grabbed the other twin and threatened to beat him. A report was taken for substantial risk of physical injury by abuse on the twins and their one-year-old sibling. The mother told the investigator that the father does not abuse the children, but his voice is loud. He wanted them to sit down during the meeting so he was brusque. The mother shared that the family had just moved and were now in a different school district. The child protection investigator offered the mother a portable crib as she was visibly pregnant and the mother accepted. The father denied hitting his children, noting that he was quite loud at the school that day and that he is a strict and firm parent. The investigator observed the children and discussed age appropriate discipline. The investigator visited the home again after the deceased was born. The pediatrician confirmed the children were seen regularly and that she had seen the newborn. The reporter told the investigator that the father sounded threatening, but she never actually saw him hit the child. The investigation was unfounded.

| Child No. 26 | DOB 02/16 | DOD 11/16 | Undetermined |
|---|---|---|---|
| Age at death: | 9 months | | |
| Cause of death: | Sudden death in an infant with unexplained facial abrasions, respiratory viral changes and multiple complications due to premature birth | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

CHILD DEATH REPORT

Narrative: A nineteen-year-old mother found her medically complex nine-month-old infant unresponsive in her adult bed. The infant was oxygen dependent and required an oxygen mask at all times. The mother placed the infant, who was wearing his mask, on her bed for a nap and laid down next to him to play on her phone. She denied falling asleep. After twenty minutes, the boy's father returned home from work, and the mother attempted to wake the infant but he was unresponsive. The father called 911 while the mother administered CPR. The infant was declared deceased at the hospital. Law enforcement and the coroner's office notified the hotline of the infant's death. Neither reported concerns of foul play or abuse or neglect. The Department took a report for investigation of death by abuse and referred the infant's death to the Southern Illinois Child Death Investigation Task Force. The infant suffered from chronic lung disease due to prematurity and needed oxygen 24 hours a day. The child protection investigation was unfounded for death by abuse ten months later.

Prior History:     The infant was born prematurely at 25 weeks gestation via emergency cesarean section. His mother's pregnancy was complicated due to obesity and breech presentation. After his birth, the infant was placed on a ventilator and spent five and a half months in the neonatal intensive care unit. He was diagnosed with multiple medical conditions including bronchopulmonary dysplasia, atrial thrombus, fungus on his kidney, inguinal hernia repair, and patent ductus arteriosus. His diagnosis of bronchopulmonary dysplasia required home administration of oxygen at all times. Two weeks after the infant's discharge, his pediatrician called the hotline after the infant's home health care nurse told her that the parents were not allowing the nurse to consistently visit the child and there were concerns by both the pediatrician and the nurse that the infant was not gaining enough weight. The Department opened a child protection investigation for failure to thrive. It was unfounded based on medical records and the pediatrician stating that the infant would be slow to gain weight because of his numerous medical issues. The pediatrician never considered or diagnosed the child with non-organic failure to thrive. Two weeks after the investigation was closed, an anonymous reporter called the hotline to report that the parents were giving the child whiskey to help him sleep, and they were inconsistent with leaving the oxygen mask on the infant. A child protection investigation was opened for substance misuse by the mother. The paternal grandmother admitted to putting whiskey on the infant's gums for teething, an old family remedy. She agreed not to do it any longer. The pediatrician was not concerned about the infant not being on oxygen all the time, and the mother denied the infant being off oxygen except when he was getting a bath or when she changed him. The investigation was pending at the time of the infant's death and unfounded one month later.

| Child No. 27 | DOB 08/16 | DOD 12/16 | Undetermined |
|---|---|---|---|
| Age at death: | 3 months | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Unfounded child protection investigation within a year of the child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: The three-month-old baby, who was born prematurely, was discovered unresponsive by his 23-year-old father. The father had put the infant to sleep on his back in his playpen between 10:00 and 11:00pm. The father slept in the same room. At around 1:00am the father woke up and checked on the infant and discovered he was not breathing. The father called for assistance and began performing CPR. The family was residing with the father's relatives and there were numerous witnesses. Including the parents, there were a total of seven adults living in the home. Two of the deceased's three older siblings (ages 8 and 12) also lived there; a 15-year-old sibling lived with another relative. A family of two adults and two minors were also visiting at the time. Law enforcement described the home as being in deplorable conditions both structurally and environmentally. Photos taken of the scene depicted the playpen as containing blankets, clothing, multiple bottles and other miscellaneous items. The coroner documented that while the death was undetermined the contents of the playpen raised the possibility of bedding asphyxia. The baby was also found to have pneumonia. The 34-year-old mother was indicated for environmental neglect to all three children. The father was indicated for the same allegation to the deceased, his child. An allegation of death by neglect was unfounded.

Prior History: In September 2015 the mother was arrested for an incident involving her 7-year-old child and the child's 37-year-old father. The child, who was being picked up by her father at the maternal grandmother's home, stated that her mother punched her in the ribs, pulled her hair, and dug her nail into the child's nose. The father reported that when he was leaving the home carrying the child in his arms, the mother attacked him, punching him, ripping his shirt and scratching him. He said that while attacking him, the mother nicked the child on the nose and leg. The mother denied touching the child and stated that the child was in the car. The child protection investigator noted a mark on the child's nose and a scratch on the leg. The child said the nose mark was from her mother, but the scratch was from a fall off a bike. The mother was indicated for cuts, bruises, welts by abuse, and substantial risk of physical injury/environment injurious to health and welfare by abuse. In June 2016, a 12-year-old sibling of the deceased said that she had been molested by a 15-year-old sibling four years earlier. A Victim Sensitive Interview was conducted and a determination was made that there was not enough credible or consistent evidence to support the allegation. When the child protection investigator spoke with the investigating law enforcement officer, the officer stated that he had a long standing knowledge of the family members and the family's dynamics. The officer informed the investigator that the family members were always attempting to cause problems for each other. The officer stated that the sibling who was accused of the act denied it and had always been honest with the officer in the past. He believed the teenager was telling the truth. The mother informed the investigator that she had left her two younger children in the care of relatives while she found new housing and got settled. When she went to pick up the children, the 12-year-old protested, wanting to stay with her aunt and uncle. The investigation was unfounded.

| Child No. 28 | DOB 07/16 | DOD 12/16 | Undetermined |
|---|---|---|---|
| Age at death: | 4½ months | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Open intact family services case at time of child's death; pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A twenty-three-year-old mother was staying in a motel with her five children, ages 4½ months and 1½ , 3, 4, and 9 years. She fed the infant around noon and she and the infant dozed off while she was laying on the bed holding the infant. She was woken up by one of her other children who told her the infant had blood coming out of his nose. Emergency services transported the infant to the hospital where he was pronounced dead. His autopsy report noted that suffocation could not be ruled out as a cause of death because of the bed sharing. Police called the hotline and an investigation was started for death by neglect and for substantial risk of physical injury/environment injurious to health and welfare by neglect. The investigation was unfounded for both allegations. The infant had a history of prematurity and bleeding in the brain from birth.

Prior History:    In September 2016 the mother was indicated for medical neglect for missing medical appointments for her 1½ -year-old daughter, who was medically compromised as a result of being born prematurely at 23 weeks gestation. The mother explained that she did not have a car and getting to the appointments was difficult. Hospital staff noted that the mother went to appointments when they provided her with cab fare. In October 2016 the hotline was called with a report of medical neglect against the mother for the deceased who was still hospitalized following his premature birth at 26 weeks gestation. The hospital said they had contacted the mother a number of times to come into the hospital for training on how to feed the infant so he could be released from the hospital. After the report was made the mother received training and the infant was released to her care. The investigation was pending at the time of the infant's death, but was subsequently unfounded. An intact family services case was opened on the family while the investigation was pending. The day before the infant's death, the family's worker called the hotline to report that the mother moved to another city without telling her and without transferring in-home nursing services for the infant and 1½-year-old before she moved. An investigation of substantial risk of physical injury/environment injurious to health and welfare was pending at the time of the infant's death and subsequently indicated. The mother participated in an integrated assessment with the intact family worker, who visited the family weekly until the mother moved. The worker made referrals for the mother for counseling, parenting classes, and a mental health assessment, but the mother moved before the services began.

| Child No. 29 | DOB 11/15 | DOD 12/16 | Undetermined (pending) |
|---|---|---|---|
| Age at death: | 1 year | | |
| Cause of death: | Undetermined pending autopsy | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A twenty-eight-year-old mother reported awakening to child's screams at 8-9 p.m. She reported picking the 1-year-old child up out of her pack-n-play and contacting 911 after the child went limp. The child was transported by ambulance to the hospital where doctors found a parietal skull fracture and a subdural hematoma. She died four days later. The mother reported the child had several medical diagnoses including shortening of the spine; a condition where her brain is fused; and seizures. The mother and child moved from another state approximately 4-5 months earlier and were living with mother's former boyfriend, not the child's father. The mother has another child who resides with his father. The toddler was in the care of mother's ex-boyfriend and his brother during the time the pathologist believed the injuries occurred. The brother confessed to throwing the child in her play pen and shaking her. He is currently in jail on an unrelated matter and has not yet been charged with the toddler's death. The Department opened a child protection investigation into the death. Both the child protection and criminal investigations are pending receipt of the autopsy.

Prior History:    Minor was brought to the emergency room by her mother for vomiting and dehydration, ten days prior to the toddler's head injuries. This was her third ER visit in a month. The hotline was contacted due to concerns of neglect. The mother was not following through with medical recommendations. She had not followed up with the primary care physician or picked up prescription medications. An allegation of medical neglect was taken for investigation. This investigation, pending at the time of the toddler's death, remains pending

| Child No. 30 | DOB 01/17 | DOD 01/17 | Undetermined |
|---|---|---|---|
| Age at death: | 0 (Ninety minutes) | | |
| Cause of death: | Extreme prematurity due to maternal methamphetamine use | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A thirty-four-year-old mother tested positive for methamphetamines while giving birth to her eighth child. The newborn only lived for ninety minutes before passing away; the newborn was not tested for substances due to her death. A hospital social worker called the hotline to report the infant's death. A child protection investigation was opened for death by neglect and for substantial risk of physical injury/environment injurious to health and welfare by neglect to the mother's other children. The mother left the hospital against medical advice. Due to the parents' long history of substance abuse and domestic violence, the child protection investigator placed the children in a safety plan with a relative and opened an intact family services case. When the relative could no longer care for the children, the investigator took protective custody. However, the state's attorney declined to file a petition for temporary custody and the children were returned to their mother. She declined to participate in intact family services and the case was closed. Seven months after the infant's death, the mother was indicated for death by neglect and for substantial risk of physical injury/environment injurious to health and welfare by neglect to her other children.

Prior History:    The family has a lengthy history with the Department. Between 2003 and 2015 the parents were investigated at least thirteen times. They had three intact family services cases open during that time: from August 2007 to January 2009, May 2013 to March 2014, and June 2015 to December 2015. During all of the cases the parents failed to cooperate and the cases were closed. The parents had a history of domestic violence and substance abuse. The father was frequently intoxicated during interactions with child welfare workers and law enforcement. In 2016, the mother gave birth to a baby girl, and both she and the baby tested positive for methamphetamines. A child protection investigation was opened and indicated for substance misuse to the baby by her mother. The mother gave the baby up for adoption. She was offered services but refused them. The mother and father had an on-again-off-again relationship in 2016 due to the ongoing domestic violence and substance abuse issues. In June 2016 a child protection investigation was opened for substantial risk of physical injury/environment injurious to health and welfare by neglect to the children after a family member alleged there was ongoing domestic violence between the parents in front of the children and drug paraphernalia present in the home and accessible to the children. The investigation was unfounded; there were no police reports of domestic violence and no evidence of drugs was observed in the home. Two days before the infant's death, police called the hotline after the father made comments of wanting to commit suicide while caring for one of the children. When the police arrived at the home, the father was intoxicated. A child protection investigation was opened against the father for inadequate supervision and substantial risk of physical injury/environment injurious to health and welfare by neglect. The mother and father had recently separated and the mother had a new boyfriend. The father stated he was not serious about committing suicide – it was just a drunken comment. There were ongoing concerns about the father's alcohol use and his ability to supervise his children. The investigation was ultimately indicated against the father for inadequate supervision and substantial risk of physical injury/environment injurious to health and welfare by neglect to the child in his care at the time of the incident. The investigation was indicated after the intact family case opened at the time of the infant's birth and death.

CHILD DEATH REPORT

| Child No. 31 | DOB 03/16 | DOD 01/17 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 10 months |
| Cause of death: | Undetermined |
| Reason For Review: | Closed intact family services case within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** A twenty-four-year-old mother discovered her 10-month-old infant unresponsive in his car seat where he was typically placed to sleep. The infant was transported by ambulance to the hospital where he was pronounced deceased and discovered to have an internal core temperature of 102 degrees. The parents denied that the infant had been sick. The infant was the family's second child to die. The Department conducted an investigation into the infant's death. Two older siblings were initially placed in a safety plan with a relative but were eventually taken into custody. The parents were indicated for death by neglect and for substantial risk of physical injury/environment injurious to health and welfare by neglect to their two older children.

**Prior History:** In February 2015 a nurse contacted the hotline after a 15-month-old girl was brought to the emergency room for the second time in less than two weeks for trouble breathing; and the mother had not followed up with a primary care physician after the first visit. The toddler was hospitalized and treated for acute respiratory distress and a collapsed lung. A child protection investigation was initiated and a hospital social worker said she would call the child protection investigator when the toddler was ready for discharge; however, the child was discharged three days before her death without any notification to DCFS. The toddler died from an asthma attack. Following the toddler's death, the mother was indicated in that investigation for substantial risk of physical injury/environment injurious to health and welfare by neglect. The Department also investigated and indicated the mother for death by neglect and an intact family services case was opened. The case was open from April 2015 to January 2016 when the family moved out of the service area without informing the worker.

| Child No. 32 | DOB 12/14 | DOD 05/17 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 years |
| Cause of death: | Undetermined |
| Reason For Review: | Open intact family services case at time of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** A twenty-six-year-old mother discovered her medically complex 2-year-old child unresponsive in her crib around 3:00pm. The mother placed the toddler in the car seat; picked up her two older children, ages four and six years, at school; and then drove to the hospital. Doctors pronounced the child deceased at just after 4:30 pm. The child was born with congenital hydrocephalus, and Dandy Walker syndrome, a congenital brain malformation. The child was receiving palliative care at the time of her death. The Department and coroner conducted investigations of the child's death. The mother would not participate in a scene investigation with the coroner and refused to cooperate with the child protection investigation. At autopsy the child had abrasions and a subgaleal hemorrhage. In addition, the older children reported that the mother had left them alone in the past. The surviving children were initially placed in a safety plan with a relative but were taken into custody after the mother and relative did not abide by the plan. The mother was indicated for death by neglect, inadequate supervision, substantial risk of physical injury/environment injurious to health and welfare by neglect, and cuts, bruises, welts. The children were returned to their mother's care under an order of supervision in September 2017. Their case remains open.

Prior History: In November 2016 the mother's 2-month-old infant died of probable asphyxia due to an unsafe sleeping environment (mother sleeping with the baby on the couch). The Department investigated the infant's death, unfounding the mother for death by neglect. During the investigation, the investigator provided a crib for the medically complex child. She referred the mother for preventative intact family services which were initiated five weeks prior to the 2-year-old child's death. The mother was resistant to services. The worker made five attempted home visits, both scheduled and unannounced, and one successful visit outside of an initial meeting. The mother cancelled one visit the day before the child's death. The mother did not want to sign a release of information for the intact family worker to contact medical providers, saying she had not been investigated for medical neglect. The mother did request grief counseling services and the worker provided her with referrals.

| Child No. 33 | DOB 03/97 | DOD 05/17 | Undetermined |
|---|---|---|---|
| Age at death: | 20 years | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A twenty-year-old youth in care was found unconscious in the shower at about 7:00pm by staff in her transitional living program. The youth had physical health conditions including Type I (insulin-dependent) Diabetes, asthma, and obesity. She had mental health diagnoses including bipolar disorder, generalized anxiety disorder, and post-traumatic stress disorder. At around 5:00pm the youth tested her blood sugar and staff gave her an insulin injection. The youth refused to eat dinner and went to her apartment. At around 6:15pm staff went to check on the youth, knocked on her door, heard her shower running, and left. At 7:40pm staff went to check on her again, heard the shower still running, entered the apartment, and found the youth deceased.

Prior History:   The youth entered the Department's care on a dependency petition in August 2013 at the age of 16. The youth had disclosed during an emergency department visit that her 39-year-old father had been hitting her for the past year. During the exam she was observed to have finger mark bruises on both of her arms from her father forcefully grabbing her. The youth alleged substance abuse and domestic violence by her parents and did not want to return home. Her parents described her as out of control and noncompliant with her medication. The youth was hospitalized to get her blood sugar under control. A mental health evaluation was also completed and the youth was psychiatrically hospitalized for three weeks. After her release from the hospital the youth was initially placed in a shelter, then a group home for a year, then stepped down to her grandmother's care. After six months the youth's mental health issues proved too difficult for the grandmother and after a brief hospitalization, in June 2015, the youth was placed in the transitional living program where she remained until she died. She had a goal of independence. The youth was attending school and group counseling and went regularly to medical appointments. She had difficulty maintaining an optimal glucose level, but she refused to see a nutritionist specializing in diabetes.

| Child No. 34 | DOB 08/15 | DOD 05/17 | Undetermined (pending) |
|---|---|---|---|
| Age at death: | 1½ years (21 months) | | |
| Cause of death: | Pending Autopsy | | |
| Reason For Review: | Unfounded child protection investigation within a year of the child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: In August 2017 a father reported to the hotline that in May 2017 his 1½-year-old daughter was in the driveway at the home of her 25-year-old mother when a family friend hit the toddler with a car while backing out of the driveway. The mother was inside a pole barn, about 100 feet from the driveway, tending to her 10-month-old and not watching the other child. The father expressed concern about the home environment being dirty, with dogs that are not house trained and saws and power tools within reach of the children. The report was taken for allegations of death by neglect, environmental neglect and substantial risk of harm by neglect. The autopsy, the child protection investigation and the criminal investigation are all pending.

Prior History: Five months before the toddler's death, the then five-month-old sibling was brought to the Emergency Department by his 24-year-old mother, and his 49-year-old maternal grandmother, with swelling on the left side of his head. The mother told hospital staff that she tripped over the high chair and the baby fell out hitting his head. The women reported that the baby seemed okay the night before but in the morning the left side of his head was swollen. A CT Scan showed the infant had a parietal left skull fracture, but was discharged to the mother with instructions to follow-up at a children's hospital. Medical staff did not have any other safety concerns. The investigator interviewed the mother and the grandmother at their home and observed the children. The grandmother reported being present when the baby was hurt. She shared that the mother was feeding the baby by sitting in a chair facing him. She got up from the table and tripped over the bottom part of the chair and knocked him over. He fell backwards and hit his head. The investigator observed a portable baby chair strapped to a bar stool; the investigator took pictures and had the mother demonstrate what happened. The investigator showed the pictures and discussed the explanation with a physician who opined that the explanation seemed likely. The investigator also consulted with collaterals, including law enforcement and the teacher of the six-year-old sibling. No concerns were reported. The investigation was unfounded.

| Child No. 35 | DOB 04/17 | DOD 06/17 | Undetermined |
|---|---|---|---|
| Age at death: | 2 months | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Youth in Care | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A twenty-three-year-old mother took her two-month-old to stay overnight in a hotel in violation of a relative caregiver placement agreement. The mother, 28-year-old putative father and infant shared a hotel room bed. The mother reported that she placed the infant on her chest and fell asleep. The following morning the mother and father found the infant unresponsive on the floor next to the bed. The mother contacted the infant's forty-seven-year-old maternal grandmother, with whom the infant had been placed since birth after testing positive for methamphetamines. The grandmother who had permitted the infant's mother to take the infant to the hotel was notified. The grandmother arrived at the hotel and drove the unresponsive infant back to her home before calling 911. A child protection investigation was opened after the infant's death. The mother was indicated for death by neglect to her infant. The maternal grandmother was indicated for death by neglect and inadequate supervision to her infant granddaughter. The mother's six-year-old son was removed from his grandmother's home and placed in a traditional foster home.

CHILD DEATH REPORT                                                           67

Prior History: In 2014 the mother was indicated for substantial risk of physical injury to her then four-year-old son. The mother was observed with a bloody black eye after an incident of domestic violence involving the child's father. The child informed the investigator that he had witnessed his mother being hit on this and previous occasions. The mother was uncooperative with police and child protection investigator regarding the name and whereabouts of the child's father. In April 2017 the mother gave birth to a full term baby girl who tested positive for methamphetamines. A child welfare investigation was opened. The mother initially denied drug use and later blamed her children's father with lacing a bottle of water which she consumed. The investigator learned that there had been four incidents of domestic violence, with an order of protection against the father as recently as February 2017. The mother was indicated for substance misuse by neglect to her infant and substantial risk of physical injury to her son. Protective custody was taken and the six-year-old and newborn were placed with the maternal grandmother. The mother had daily twelve hour supervised visits in the maternal grandmother's home.

| Child No. 36 | DOB 04/17 | DOD 06/17 | Undetermined |
|---|---|---|---|
| Age at death: | 2½ months | | |
| Cause of death: | Undetermined, asphyxia cannot be excluded as a cause or a factor contributing to death | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A forty-five-year-old father awoke to find his 2½-month-old daughter unresponsive. He called 911 and attempted CPR until emergency services arrived. The infant was taken to the hospital where she was pronounced dead. The father had last seen his daughter alive when he placed her to sleep on the floor around 11:00pm. She was placed on her stomach with her head to the side with an infant blanket over her back. Her 15-month-old brother was lying next to her while her 2½-year-old brother slept with the father next to them on the couch. The infant had a crib, but the father wanted all the kids near him so he could hear them if one of them woke. The father was alone caring for the children himself because the 42-year-old mother had stayed overnight at a girlfriend's home after attending a concert. The hospital and medical examiner notified the hotline of the infant's death. A report was taken for investigation of the father for death by neglect to the infant and substantial risk of physical injury/environment injurious to health and welfare by neglect to the siblings. Only the risk allegation was indicated based on the police having responded to the home several times for domestic disputes, often after the father had been drinking. Aside from there being alcohol in the home, there was no evidence the father had been drinking around the time of the infant's death. Intact family services were offered to the family but they refused them.

Prior History:   In September 2016, prior to the infant's birth, the parents were investigated and unfounded for substantial risk of physical injury to their two children and the mother's almost 13-year-old daughter. The landlord of the parents' trailer park called the hotline after neighbors complained about the parents fighting. Both parents admitted to a history of verbal disputes, but denied any physical violence between them. The 12-year-old denied seeing the parents hit each other. Police reports confirmed calls to the home for verbal disputes as well as one physical dispute after both parents had been drinking. The paternal grandmother reported the parents took good care of the children and she had no concerns that they were being abused or neglected.

| Child No. 37 | DOB 11/16 | DOD 06/17 | Undetermined |
|---|---|---|---|
| Age at death: | 7 months | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigation pending receipt of records | | |

CHILD DEATH REPORT

Narrative:        Twenty-two-year-old mother found her 7-month-old son unresponsive in his pack n play crib, lying face down, under multiple thick blankets around 7:45am. She called 911 and paramedics responded, taking the infant to the hospital where he was pronounced deceased. The mother last saw the infant alive at 1:00am when she fed him a bottle and placed him in the pack n play next to her bed. Law enforcement called the hotline to advise of the infant's death and that the home was in deplorable condition with mice and roaches, an overflowing toilet, dirty clothes, rotten food, garbage, and dirty diapers throughout. A report was taken for investigation of death by abuse, substantial risk of physical injury/environment injurious to health and welfare by neglect, and environmental neglect. The infant's 21-month-old sibling was evaluated at the hospital and found to have a fungal infection on her chest and back. She was taken into custody and placed in a traditional foster home. The family's home was deemed uninhabitable by the city and the parents were indicated for environmental neglect. The death by abuse and substantial injury allegations were unfounded.

Prior History:     In February 2017 a physician called the hotline to report that the couple's 17-month-old daughter had tested for a high lead level and she had missed medical appointments. The reporter said the mother and the 33-year-old father also had a 3-month-old son who needed to be tested. The physician stated that the older child already had developmental delays and a continued high lead level could cause further delays and potentially permanent brain damage. A report was taken against the parents for investigation of medical neglect and substantial risk of physical injury/environment injurious by neglect. The parents were interviewed and denied being told they were supposed to get further testing. An investigator observed the children and the home and a city inspector checked the home for lead. There were no concerns about the home's condition, and it passed a lead level test. The investigator confirmed that the parents followed through on medical and early intervention appointments for the children and the allegations were unfounded.

## ACCIDENT

| Child No. 38 | DOB 01/15 | DOD 07/16 | Accident |
|---|---|---|---|
| Age at death: | 18 months | | |
| Cause of death: | Drowning | | |
| Reason For Review: | Open intact family services case at time of child's death; pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: The 13-year-old sister went out to the pool and found her 18-month-old brother floating face down in the water immediately after her friend texted her a photo of what he thought was a doll floating in the family's pool. She didn't know what to do so she ran into the house and woke her 36-year-old mother who was asleep. The mother went to the pool, pulled the child out and performed CPR. The 13-year-old called 911. When emergency workers arrived, the mother was holding the child who was unresponsive and cool to the touch. He was transported to the hospital where he was pronounced dead. Police and DCFS investigated the child's death. The pool, which was about 10 feet across and 2 feet deep, had just been put up two days earlier with the help of the three younger children's 34-year-old father. The day before the child's death, the father caught the child trying to use a riding toy to climb into the pool. He took the toy away, told the child no, and informed the mother of the child's attempt. Following investigation of the child's death, the mother was charged with felony child endangerment. She was indicated for death by neglect and for substantial risk of physical injury/environment injurious to health and welfare by neglect to her four surviving children, ages 13, 9, 5½ and 2½, who were taken into custody and placed with their two fathers. In January 2017 the court released the children into their fathers' custody.

Prior History: The Department indicated four hotline reports generated from May 2015 to March 2016 involving inadequate supervision or substantial risk of physical injury/environment injurious to health and welfare by neglect. A fifth report initiated in June 2016 alleging inadequate supervision was pending at the time of the child's death. An intact family services case was opened in June 2015 after the first indicated investigation. The mother, who lived alone with the five children, had some support from her parents and the children's two fathers. The agency servicing the case filed a petition in November 2015 for a supervision order which was pending at the time of the death. The agency also tried to file a motion for temporary custody of the children in June 2016, but the State's Attorney's Office did not believe there was enough evidence at the time.

| Child No. 39 | DOB 11/15 | DOD 07/16 | Accident |
|---|---|---|---|
| Age at death: | 8 months | | |
| Cause of death: | Suffocation | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: An eight-month-old baby died after her 26-year-old babysitter put her face down on a couch and slept beside her. The baby sitter was an unlicensed provider providing overnight care. The Department conducted a child protection investigation of the baby's death. At the time of the baby's death there were a total of nine children in the home ranging in age from nine months to seven years. Three of the children were the babysitter's. The babysitter was indicated for environmental neglect to her three children and the six children she was babysitting because of an unsanitary living environment due to an infestation of insects. She was unfounded for death by neglect and inadequate shelter. An intact family case was opened from August 2016 to June 2017.

Prior History: The mother of the deceased has two other children and no prior DCFS involvement. The babysitter had three prior child protection investigations. The first took place in April 2015 when she was indicated for substantial risk of physical injury/environment injurious to health and welfare after credible statements that she was hitting one of her children with a cord. In September 2015 the babysitter was unfounded for inadequate supervision and inadequate food. In May 2016, two months prior to the baby's death, she was unfounded for environmental neglect. The child protection investigators were unaware that she was running an unlicensed overnight daycare.

| Child No. 40 | DOB 01/01 | DOD 08/16 | Accident |
|---|---|---|---|
| Age at death: | 15 years | | |
| Cause of death: | Blunt trauma of the head, right arm, and right leg due to motor vehicle crash | | |
| Reason For Review: | Pending child protection investigation at time of teen's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A fifteen-year-old girl driving a stolen van around 4:30pm was being chased by law enforcement when she drove around two squad cars dispatched to stop her from the front, increased her speed and lost control of the van. She crossed four lanes of traffic, struck a guard rail, and then struck another vehicle. The teen was ejected from the van and died at the scene. The driver of the other vehicle was not injured. The night before her death, the teen had stayed at a relative's home. The van the teen was driving had been reported stolen that morning. No one called the Department to report the teen's death; school personnel told the child protection investigator in a pending investigation.

Prior History: At the end of July 2016 an anonymous reporter called the hotline to report the teen's 33-year-old mother leaves her six children, ages 15, 14, 12, 4, and 2-year-old twins, home alone for long periods of time and then the older children leave the younger children home alone. A report was taken for investigation of inadequate supervision. An investigator met with the family at their home. The mother and older children, including the teen, said the mother only left them home alone for short periods to run errands and that when she was at work, they were watched by their aunt or uncle. The mother believed her landlord made the call. This investigation was pending at the time of the teen's death, but was unfounded afterward based on the family's statements to the investigator. A second investigation was also pending at the time of the teen's death. In mid-August the family's landlord called the hotline to report the family's home was filthy with water damage, a torn wall, and exposed wiring. A report was taken for investigation of inadequate shelter and environmental neglect. The investigation showed that the family was being evicted and the mother had called the city inspector who viewed the home and believed the mother had staged its damage. There were garbage bags throughout the home and it smelled of mold. The mother reported they would stay with family and friends until they moved. The investigator attempted to see and interview the teen three times before her death: once the family was not home, once the mother said she was at a relative's home, and once the mother said she was out with friends. After the teen's death the investigator saw the family in their new residence which the investigator described as clean. The older children were in counseling at school and the mother reported having family support. The investigation was unfounded.

| Child No. 41 | DOB 01/16 | DOD 09/16 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 7 months |
| Cause of death: | Asphyxia due to entrapment in a couch while co-sleeping with an adult |
| Reason For Review: | Open intact family services case at time of child's death |
| Action Taken: | Full investigation pending |

Narrative: A seven-month-old baby boy was found unresponsive by his 33-year-old mother in the morning. The police were called around 7am, and the baby was taken to the hospital where he was pronounced deceased. The hospital social worker called the hotline and noted that there were no visible signs of injuries to the baby, but he was born prematurely at 34 weeks gestation and had been diagnosed with failure to thrive three months before his death. A child protection investigation was opened for death by abuse and substantial risk of physical injury/environment injurious to health and welfare by neglect. The mother disclosed to the police that she was sleeping with the baby on the couch. The mother also reported drinking alcohol the night before the incident. The child protection investigator observed the home to be dirty with minimal food, gnats flying around the kitchen, and empty beer cans in the bathroom cabinets. The home had minimal furniture and no baby items like diapers or wipes. The basement was flooded with sewer water more than ankle deep which caused the entire home to smell musty. The child protection supervisor deemed that because there was no door preventing access to the flooded basement, the home was a safety hazard and the mother's nine other children were taken into care. At the time of the infant's death, the mother had an open intact family services case. The worker had been to the home the day before the infant's death and noted no concerns. The mother was indicated for death by neglect. The four oldest children were placed in their father's or paternal relatives' care. The five youngest (all under age six) were placed together with their father and his girlfriend; the children all had medical issues and a review of their histories with their doctors showed that the mother was not bringing the children to their medical appointments. The case remains open for intact family services.

Prior History: The mother and her children first came to the attention of the Department in July 2015 after a nurse called the hotline requesting services for the family. The mother's four oldest children were relatively healthy, but her younger six children had medical issues and the mother was having difficulty getting the young children to all of their medical appointments. A month later, a child protection investigation was opened for medical neglect to a then nine-month-old twin after the mother failed to bring him to a medical appointment. The child protection investigation was unfounded two months later. Six months after that investigation closed, a second child protection investigation was opened for medical neglect after the same twin was taken to the emergency department by his father feverish and lethargic. The twin was diagnosed with Systemic Inflammatory Syndrome. He was born prematurely, had a seizure disorder, and did not have developed lung capacity to handle illnesses. The reporter stated that the mother should have noticed the twin's condition and brought him to the emergency department earlier. When the child protection investigator went to the home on the day the hotline call was made, she found the thirteen-year-old child watching his five younger siblings. An aunt was supposed to be watching the children. The child protection investigator called the hotline and a child protection investigation was opened for inadequate supervision of the children by the aunt. Following investigations, the mother was indicated for medical neglect and the aunt was indicated for inadequate supervision. While the child protection investigations were pending, the Department opened an intact family services case to assist the mother with transportation to medical appointments and child care. The intact family services worker monitored the family and relied solely on the mother's accounts of when medical appointments were to occur. The intact family services worker had minimal contact with medical professionals. The children consistently missed their medical appointments throughout the intact family services case. In August, one of the children's doctors called the hotline to report that the mother had missed several important medical appointments for the child. The baby was diagnosed in June with failure to thrive and the mother did not bring him for follow-up. The mother also failed to bring her other children in for scheduled appointments with specialists. The investigation was pending when the baby died. The mother was subsequently indicated for medical neglect to two of her children, but was unfounded for medical neglect to the deceased after a doctor opined that the failure to thrive may not have been a result of medical neglect.

| Child No. 42 | DOB 02/98 | DOD 09/16 | Accident |
|---|---|---|---|
| Age at death: | 18 years | | |
| Cause of death: | Combined drug (4-ANPP and opiate) toxicity | | |
| Reason For Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

Narrative: An eighteen-year-old youth in care was found unresponsive by a homeless acquaintance in a tent located in a park. The acquaintance had met the teenager the previous day at a methadone clinic through a mutual friend. After obtaining a dose of methadone the acquaintance invited her back to his tent where she smoked crack cocaine. The man left the tent and returned at 9:00pm to find the youth asleep. The man awoke at 1:40am to find the youth unresponsive. An autopsy determined that the youth died from a combined (4-ANPP and opiate) toxicity. Toxicology results indicate the youth had fentanyl, morphine and cocaine present in her blood.

CHILD DEATH REPORT

Prior History: In 2006, at the age of eight, the youth came into care due to charges of aggravated battery of a child against her mother; the youth reported that her mother had intentionally burned her with an iron during an argument. The youth had multiple complex problems: low-average intellectual functioning, mental illness diagnoses (ADHD, Post-traumatic Stress Disorder, and Bipolar Disorder), chronic elopements, chronic truancy, multiple relative and group home placements, criminal history and three adolescent pregnancies. At the time of her arrest for auto theft in 2015 the youth was pregnant with her third child and subsequently placed in a group home for pregnant and parenting teens. She was active with the Teen Parent Service Network (TPSN) since 2011 when, at age 13, she gave birth to her first child who was subsequently placed in the home of a relative. In 2012 and 2015 she gave birth to two more children who were placed with their older sibling. TPSN offered services, including an education mentor, family support specialist, family planning and individual therapy. After her conviction and release from jail in July 2016 the youth moved between the homes of two relatives. The worker attempted to see the youth four days before her death and left her contact information.

| Child No. 43 | DOB 03/16 | DOD 10/16 | Accident |
|---|---|---|---|
| Age at death: | 6½ months | | |
| Cause of death: | Positional asphyxia due to wedged between bed mattress and wall | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A twenty-five-year-old mother found her 6½-month-old son unresponsive around 11:30am. The infant was found with his face in between a 6-8 inch gap between the bed mattress and the wall. His legs were still on the mattress. The infant's mother had placed him for a nap on the adult mattress, which was on the floor in the living room, and had fallen asleep beside him. Police responded to the mother's 911 call and advised the hotline of the infant's death. Police did not share any concerns about the child's death or the mother's explanation, or that the mother appeared under the influence of drugs or alcohol. The Department took a report for investigation of death by neglect. It was unfounded. A urine screen completed nearly a month after the infant's death was negative for substances. The deceased was an only child. The mother and the 35-year-old father were given referrals for community-based counseling services.

Prior History: In April 2016 the mother was investigated and unfounded for inadequate supervision and environmental neglect after an anonymous reporter called the hotline to report the mother had left her son, then one-month-old, in a car by himself while she went into an education center to take care of some business. The reporter also alleged that the mother's home was filled with trash and dirty dishes everywhere. An investigator visited the mother and baby at home. The mother admitted leaving the baby alone in the car, stating it was only for a "split second" while she ran inside to get baby clothes from a friend. The investigator informed the mother that it was not okay to leave the baby unattended in a car and the mother agreed to not do it again. The investigator observed the apartment to be cluttered, but with clean dishes. She observed a bassinet for the baby. The investigator also spoke to a nurse who was visiting the home weekly for weight checks of the baby. The nurse stated the mother was doing well with the infant's feedings and she did not have any concern about the care the mother was providing to the infant.

| Child No. 44 | DOB 07/98 | DOD 10/16 | Accident |
|---|---|---|---|
| Age at death: | 18 years | | |
| Cause of death: | Blunt force trauma to the head due to single vehicle crash | | |
| Reason For Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

Narrative: An eighteen-year-old youth in care died in a single vehicle crash at around 6:15pm. He was traveling at approximately 60 mph on a highway and swerved off the road, went through a fence, and hit a tree. He was ejected from his truck and pronounced deceased at the hospital an hour later. A witness who had been traveling behind him for a while said he had not been speeding or driving erratically. Police found synthetic marijuana in his car and a toxicology test showed he was positive for synthetic marijuana at the time of his death.

Prior History: The youth had a history with DCFS dating almost to his birth. His mother was investigated a number of times, primarily for environmental neglect. The 12-year-old youth entered DCFS care in November 2010 when his 42-year-old mother failed to clean up the unsanitary conditions of their home after being investigated for environmental neglect. He was placed with a relative and did well in the home. He was returned to his mother's care in November 2011, but returned to his relative placement in January 2012 after his mother was arrested for stealing scrap metal from a yard while the youth was with her. In January 2013, after the mother participated in services, the youth was returned home again. In August 2013 the youth's primary care physician called the hotline to report the youth's mother had not refilled any of his prescriptions for asthma, ADHD, and depression since March 2013. He was removed from his mother's care again and placed in traditional foster care. He did well in the foster home and wanted to stay there, but in September 2016 the foster parents became concerned the youth was using drugs, and in October 2016 they informed the caseworker the youth had been arrested for possession of synthetic marijuana and he would not be allowed to stay in their home. The youth demanded that he be allowed to stay in a placement of his choosing, an "unauthorized placement" at the home of a woman he knew. Two days later the youth died. On his 18th birthday the youth received $23,000 from a trust that had been established with the proceeds of a settlement from an accident when he was 7 years old. His behavior decreased at a rapid pace: not attending school, using drugs, and running through the money.

| Child No. 45 | DOB 06/16 | DOD 10/16 | Accident |
|---|---|---|---|
| Age at death: | 4 months | | |
| Cause of death: | Asphyxia due to overlaying while co-sleeping on a couch | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A thirty-two-year-old mother found her four-month-old infant unresponsive at around 5:00am when she got up to get a drink. The mother, who admitted she was intoxicated when she went to sleep at around 12:00am, had slept with the baby on a couch. The baby was on the inside of the couch with her back against the couch and her front facing the mother. When the mother returned from getting her drink, the baby was face down on the couch and unresponsive. The mother woke the father and they called 911 and performed CPR. The baby was pronounced deceased at the hospital. The mother was charged with involuntary manslaughter and two counts of felony child endangerment. DCFS indicated her for death by neglect to the infant and substantial risk of physical injury/environment injurious to health and welfare by neglect to three surviving children, ages 1½, 4, and 6. The infant's 28-year-old father was indicated for substantial risk of physical injury/environment injurious to health and welfare – incidents of violence or intimidation, based on the two older children's reports of domestic violence. The surviving children were taken into custody. The 4 and 6-year-old children were placed with the 6-year-old's paternal grandmother. The 1½-year-old child, who was in her father's care at the time of the infant's death remained with him. DCFS is providing services and monitoring the children's care.

Prior History: The mother has history with the Department dating to 2007 when she left her first child with a relative and did not return when she was supposed to. The mother's parental rights were later terminated and that child was adopted. Based on a finding of unfitness regarding her first child, her second child spent his first couple of years with his paternal grandparents. He returned to his mother's care in 2012. In January 2016 the oldest child's adoptive mother called the hotline with an allegation of medical neglect to the mother's 3-year-old. The child's doctor denied the child was medically neglected. The adoptive mother was temporarily caring for the mother's 1-year-old child and the mother complained she wouldn't return her. The police got involved and the child was returned to her mother. In September 2016 a doctor called the hotline to report that the mother had two black eyes and gave different stories about how she got them. The Department took a report for investigation of substantial risk of physical injury/environment injurious to health and welfare by neglect. On the day of the report, the investigator spoke to the reporter, the mother, the four-year-old child, and a friend who said she was at the home when the mother sustained the black eyes. The mother reported she and the father got into an argument when she lied and told him he wasn't the infant's father; he pushed her to storm past her and she lost her balance and hit her face on a dresser. The child and the friend corroborated the mother's story. There was no further investigation until after the infant's death (approximately six weeks). At that time, the mother reported that everything fell apart since she last saw the investigator and she started using substances in the last few weeks.

| Child No. 46 | DOB 07/16 | DOD 10/16 | Accident |
|---|---|---|---|
| Age at death: | 3 months | | |
| Cause of death: | Bedding asphyxia | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Twenty-eight-year-old mother found her three-month-old son unresponsive at around 2:45 on Saturday morning. The infant had been sleeping on his stomach on an air mattress while his 18-month-old sister slept next to him in a pack-n-play. The family had been temporarily staying with relatives. The mother and relatives checked on the children throughout the night while they visited and had drinks downstairs. The mother reported having one drink with the equivalent of two shots of alcohol earlier in the evening. At the time she found the baby unresponsive, she had laid down in bed beside him. Police, who responded to the infant's death, called the hotline to report the mother smelled of alcohol. The Department investigated a report of death by neglect to the infant and substantial risk of physical injury/environment injurious to health and welfare by neglect to the 18-month-old sibling. A 9-year-old sister was staying with her father at the time. DCFS indicated the mother for death by neglect with the rationale that the mother had been educated about safe sleep practices on multiple occasions, had drank alcohol and smelled like alcohol on the night of the infant's death, and that such actions constituted blatant disregard of her parental responsibilities. The mother was not sleeping with the infant at the time of his death and she tested negative for substances in a toxicology test taken a few days after the infant's death.

Prior History: In February 2016 the Department began an investigation against the mother for causing bruises to her 9-year-old daughter. The daughter told school officials that her mother had struck her with a belt as punishment for using a cell phone without permission. The investigator observed bruises on the child's arm and thigh. The mother described frustration with her daughter's recent behavior, but denied that she hit her. The mother explained that she and the father were divorcing and her daughter had been acting out. Neither the child's father nor grandmother was worried about the mother's care of the child. The child was seen in the emergency department five days after the bruises were observed and a doctor noted that a physical exam showed no signs of trauma. In April 2016, at the time the investigation was unfounded, the child reported that things at home were better, her mother was not harming her, and that she was regularly talking with her father.

| Child No. 47 | DOB 04/05 | DOD 10/16 | Accident |
|---|---|---|---|
| Age at death: | 11½ years | | |
| Cause of death: | Basal skull fracture due to blunt head trauma | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** An eleven-year-old child was riding a four wheeler ATV with his mother's 39-year-old boyfriend at a "Mud Fest" ride. The child was sitting at the front driving and overturned the vehicle, becoming unconscious. Someone called 911 and emergency services responded, taking the child to the emergency room where he was pronounced dead about an hour later. Neither the child nor the adult was wearing a helmet or protective gear. Substance use was not a factor in the accident. Police notified the hotline of the child's death, but the Department did not take a report for investigation.

**Prior History:** There were three prior investigations involving the family: in September 2013, December 2014, and October 2015. All three investigations were initiated by the children's 32-year-old mother against their 33-year-old father. The reports alleged bruises to the youngest child, 2½ years old at the time of the last report, and substantial risk of physical injury/environment injurious to health and welfare to her brothers, 10 and 12 at the time of the last report. All three investigations were unfounded because of a lack of credible evidence to support the allegations.

| Child No. 48 | DOB 07/16 | DOD 11/16 | Accident |
|---|---|---|---|
| Age at death: | 4 months | | |
| Cause of death: | Positional asphyxia due to prone position and co-sleeping on an adult mattress | | |
| Reason For Review: | Unfounded child protection investigation within one year | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** A twenty-five-year-old mother awoke at 10:45am to find her infant unresponsive. The mother last saw the infant alive at 5:00am when she fed him and put him back to sleep, laying him on his stomach next to her on a mattress on the floor. The infant had been in the emergency room two days earlier and was diagnosed with bronchitis. The mother called 911 and started CPR. The infant was taken to the hospital where he was pronounced deceased. The hotline was called by the police and hospital and a report was taken for investigation of death by neglect. The Department also referred the child's death to the Southern Illinois Child Death Investigation Task Force, but the local police declined their assistance. A skeletal survey performed at the hospital showed the infant had a healed fracture of the left radius (forearm). His siblings, ages 1½ and 2½ years, were examined. The 1½-year-old had bruises on her face, stomach, back, and arms. The 2½-year-old did not have injuries. The children were taken into custody and placed in foster care together. The mother was indicated for bone fractures to the deceased, cuts, bruises, and welts to the 1½-year-old, and substantial risk of physical injury/environment injurious to health and welfare by abuse to both siblings. The mother was unfounded for death by neglect. While she co-slept with the infant and had been provided with materials about safe sleep, there were no factors, such as alcohol or drug use, that contributed to the infant's death.

Prior History: In February 2016, prior to the infant's birth, a Department of Human Services worker called the hotline to report that a woman told her she had kicked the mother and her two children out of her home. She said the mother drugged the children to keep them quiet, kept them in a closed room with dirty diapers for up to 20 hours at a time, neglected to feed them, and kicked and slapped them. A report was taken for investigation of substantial risk of physical injury/environment injurious to health and welfare by abuse. Investigation showed that the woman had called the police and officers helped the mother gather her things and transported her and the children to a local shelter. The woman had wanted the police to make the mother leave the children with her, but police refused. The investigator interviewed the mother who denied the allegations. She observed the children who appeared healthy, with no signs of physical abuse. The mother's caseworker at the shelter reported the mother was cooperating with the program and taking good care of her children. The mother had recently moved to Illinois from a neighboring state. She had been investigated and unfounded for neglect in 10/15, 11/15, 12/15, and 1/16. All four investigations were initiated by the same reporter and suspected to be harassment.

| Child No. 49 | DOB 9/16 | DOD 11/16 | Accident |
|---|---|---|---|
| Age at death: | 2 months | | |
| Cause of death: | Suffocation | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A thirty-one-year-old mother awoke to find her 33-year-old husband laying on top of their 2-month-old son. Around 10:30am, the parents fed the infant and laid down in their bed to watch TV, placing the infant between them face up on the bed. The parents fell asleep and the mother awoke almost two hours later. The parents started CPR and called 911. The infant was pronounced deceased at the hospital. Law enforcement notified the hotline on the infant's death, stating there was nothing suspicious about the baby's death and no drinking or substance use by the parents was suspected. DCFS took a report against the parents for investigation of death by neglect and referred the case to the Southern Illinois Child Death Investigation Task Force, though it was not activated. The Department's investigation was open for three months and then unfounded.

Prior History: Prior to the infant's birth, the parents were investigated in June 2016 for inadequate supervision to their youngest child, a boy almost 3 years old. Police found the 2½-year-old playing in the street in front of his house; the boy would jump onto the grass when he spied a car driving by. The officer brought the child to his door. The family was home. A child protection investigator visited the family at home. They explained that the family had been outside when the older boys decided they wanted to have a water balloon fight. The 11 and 13-year-old boys looked for water balloons while the father went to the basement to see about turning on the water outside. The father noticed a leaking water pipe and called the mother downstairs to look at it. A few minutes later they heard the dog barking and the 11-year-old went to investigate and found the officer outside with his brother. The police corroborated the family's story. The family had recently moved from a neighboring state where they had one unsubstantiated child protection investigation within the prior year for marks on the 11-year-old boy's chin, caused by his brother. The child had never left the house unaccompanied before and the parents planned to install a chain lock. The investigation was unfounded.

| Child No. 50 | DOB 10/16 | DOD 12/16 | Accident |
|---|---|---|---|
| Age at death: | 7 weeks | | |
| Cause of death: | Suffocation | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Upon waking at 8:30am, 26-year-old father discovered his almost two month baby deceased. He attempted chest compressions while he and the 23-year-old mother waited for emergency services to arrive, but he stated he knew based upon her coloring that she was deceased. The parents stated the baby had taken a nap from 5pm until 7pm when she woke up fussy. The father fed her a bottle, but she only drank about one ounce before vomiting. The mother stated that she changed the baby's wet diaper and the father immediately put her back to bed. The baby was put to sleep on her back, in her pack 'n play, wearing a onesie and wrapped in a big, heavy blanket. The father had wrapped the baby in the blanket, including her head, in an attempt to keep her warm. There was an operating space heater set to 78 degrees placed approximately three feet from the pack 'n play. Law enforcement said the temperature in the home was 80 degrees. The parents stated that they allowed the baby to cry without checking on her because the pediatrician said that sometimes you just have to let the baby cry. The mother reported going to bed shortly after the father at 2am; she heard the baby whimper then stop crying. Both parents stated they immediately fell asleep and slept through the night; the father was the first to wake up. The Department investigated the baby's death. The child protection investigator learned from the pediatrician that every recommendation made to the parents was resisted; the parents admitted to doing the opposite of what they were instructed regarding not giving an infant an enema or gripe water. The pediatrician informed the investigator that allowing a seven-week-old to cry for seven hours without checking on her is neglectful. Two prior child protection investigators had educated both parents about safe sleep in October and November 2016, including not allowing blankets and other suffocation hazards in the crib. Both parents were indicated for death by neglect.

Prior History: The parents have two other children in the guardianship of the maternal grandmother. In October 2016, following the infant's birth, two investigation were initiated and assigned to different child protection investigators. The first investigation alleged substantial risk of physical injury/environment injurious to health and welfare by neglect based on the mother having two children removed from her care because of abuse. Two weeks later a second investigation alleged substantial risk of physical injury by abuse; the hotline caller stated there was a witness who had seen the parents shaking the infant. Both investigations were unfounded. While they were not the reporters, both child protection investigators were able to trace the source of the reports back to the grandmother and other family members. The grandmother and family members denied having witnessed the mother commit any abuse toward her children. The grandmother informed the investigators that her belief that abuse had or would take place was based on the mother's history of aggression as a child and history of psychiatric hospitalization. The parents were estranged from the grandmother because they felt she had tricked them into giving her guardianship of their older children, and she could afford a lawyer while they could not. The infant's pediatrician had no concerns about the infant's care, but said the father had been notably rude to the facility's staff and complained about having to bring the baby back to the clinic because of the distance from the clinic to the family's residence.

| Child No. 51 | DOB 01/99 | DOD 12/16 | Accident |
|---|---|---|---|
| Child No. 52 | 04/05 | 12/16 | |
| Child No. 53 | 04/11 | 12/16 | |

| | |
|---|---|
| Age at death: | 17 years, 11 years, and 5 years |
| Cause of death: | Smoke and soot inhalation due to house fire |
| Reason For Review: | Pending child protection investigation at time of children's deaths |
| Action Taken: | Investigatory review of records |

CHILD DEATH REPORT

Narrative: Three children, ages 5, 11, and 17 died in a house fire in the early morning. A fourth, age 14, was injured in the fire. The 39-year-old mother and two of the children, ages 4 and 13, escaped unharmed. The oldest child, age 18, was staying with a friend. At 5:00pm the night before the fire, a neighbor called the hotline concerned that the family did not have heat or food in the home, that they were using space heaters, and that the mother allowed two of her teenagers to smoke marijuana. The assigned investigator learned about the fire on his way to the home the next morning. The mother denied having any space heaters in the home and a fire department investigator did not find any. While the cause of the fire could not be ascertained, the fire department investigator did not find any reason to believe anyone in the home started it. An allegation of death by neglect was not added to the pending investigation. The allegations of inadequate shelter, inadequate food, and substance misuse were ultimately unfounded.

Prior History: The family has a lengthy history with the Department dating to 1999 with thirteen indicated child abuse and neglect reports. Between 1998 and 2012 the mother had seven children. The children were in foster care from 2006 until their return home in 2010 and 2011. The family's case was closed in 2012. From 2013-2015 the oldest child was in the Department's care because of juvenile delinquency. Prior to the hotline call just before the children's deaths, they had not been involved with the Department for approximately a year and a half. The mother's history includes unstable housing, choosing abusive men, and placing her own needs ahead of her children's needs.

| Child No. 54 | DOB 09/16 | DOD 01/17 | Accident |
|---|---|---|---|
| Age at death: | 3½ months | | |
| Cause of death: | Positional asphyxia due to prone and co-sleeping on adult mattress | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A twenty-seven-year-old father found his 3½-month-old son unresponsive around noon laying on his stomach. The father last saw the infant alive around 8:00am when he burped the baby and fell back asleep with him in an adult bed. The 23-year-old mother was at work at the time. The father called 911 and the infant was taken by ambulance to the hospital where he was pronounced dead. Police notified the hotline of the infant's death, stating there were other children in the home and the home appeared to be in good condition. The call-taker noted there were no safety concerns. Police told the hotline the father had said the infant was the second child he had lost, but the police had no further information. The hotline took a report for investigation of death by neglect and substantial risk of physical injury/environment injurious to health and welfare by neglect to the infant by his father. The hotline also referred the case to the Southern Illinois Child Death Investigation Task Force. The father admitted falling asleep with the infant in an adult bed; the bed's mattress was covered in plastic and had a comforter on it. The father reported that a woman he had been involved with had told him she had had their baby, but it died from prematurity. The infant's older sibling was found to be well-cared for and the Department unfounded the investigation.

Prior History: Two weeks before the infant's death, law enforcement called the hotline to advise that a kidnapping report had been filed against the mother in a neighboring state. The maternal grandmother had died seven months earlier, leaving behind infant twins. The mother had assumed the care of her twin half-siblings. The twins' father established paternity after the maternal grandmother's death and was awarded sole custody, but the mother fled with her twin half-siblings. While no child abuse or neglect was alleged, the Department took a report for investigation of substantial risk of physical injury/environment injurious to health and welfare by neglect to the twins against the mother. Prior to her son's death, a child protection investigator tried to find the mother using the address given by police as well as the address on file with public aid, neither of which was accurate. The investigator also called the water department and had the mother's public aid account flagged. Following the infant's death, the twins were taken into protective custody and turned over to their father. The child protection investigation was unfounded with the investigator noting the twins had appeared well-cared for and the situation was a legal matter, not a DCFS matter.

| Child No. 55 | DOB 10/16 | DOD 01/17 | Accident |
|---|---|---|---|
| Age at death: | 2½ months | | |
| Cause of death: | Asphyxiation due to co-sleeping on adult bed with adult | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: In January 2017, a neighbor reported that the 28-year-old mother had found her 2½-month-old baby in bed with her, not breathing and emergency medical services were called. The baby had reportedly been seen by a doctor the day before for congestion. The Department took a report for investigation of death by neglect. During the investigation, the mother initially told law enforcement that the baby had been in her bassinet. The mother admitted to drinking two to three beers. The mother's friend reported they both drank six beers and one shot. The mother later admitted to this as well and that she had taken the baby into bed with her. The mother was indicated for death by neglect.

Prior History: In early December 2016, a police officer called the hotline to report that the mother called the officer and said that the night before she and the 36-year-old father were arguing and the father punched her in the face twice while she was holding their one-month-old infant. The police did not see visible injuries on the mother's face, but her finger was swollen from where the father had grabbed her four days earlier. The mother said she and the baby were leaving to stay with family. A substantial risk of physical injury/environment injurious to health and welfare by neglect report was investigated and indicated against both parents. The officer informed the child protection investigator that they have been called for five domestic incidents, but the parents denied any issues when police arrive. The mother told the investigator that the father had never previously hit her and he had not punched her in the face, rather he hit her with an open hand on the back of her head. She said the baby was on the changing table at the time. The mother said the only reason she reported the incident was so that there would be a report on file in case the father tried to get custody of the infant. The mother said they were having problems in their relationship and they were arguing about it. The father also denied domestic violence, but admitted they argued often. During the investigation the child protection investigator discussed safe sleep with the parents.

| Child No. 56 | DOB 01/17 | DOD 04/17 | Accident |
|---|---|---|---|
| Child No. 57 | DOB 02/15 | DOD 04/17 | |
| Age at death: | 3 months; 2 years | | |
| Cause of death: | Carbon monoxide intoxication due to inhalation of smoke and soot due to house fire | | |
| Reason For Review: | Unfounded child protection investigation within a year of children's death | | |
| Action Taken: | Investigatory review of records | | |

CHILD DEATH REPORT

Narrative: A three-month-old infant and his 2-year-old sister were sleeping in an upstairs bedroom of their house when a fire broke out on the upper floor. The 29-year-old father was severely burned in an attempt to save them. The mother was injured in the fire as well. The parents were in the midst of remodeling their home. The father reported that the power went out in the home around midnight and he reset the electrical box. After falling asleep downstairs, with the children asleep upstairs in their own bedrooms, he awoke to a "crackling sound." The fire report indicated that after the power went out, and the father was unable to restore power to the upstairs floor, he connected two electric heaters for the children's rooms to extension cords. The fire chief noted that with the remodel in progress there were exposed electrical wires, and the father's brother reported there had been prior electrical issues in the home. The exact cause of the fire was undetermined. The Department did not conduct an investigation of the children's deaths.

Prior History: The father has three older children from a previous relationship, ages 5, 7, and 9 years, who were visiting their mother at the time of the fire. In August 2016, the mother of the children reported that the home of their father and stepmother was filthy with animal waste on the floors and no water so the children do not bathe or have clean clothes. She added that the couple also had two small children. A child protection investigator visited the home and found that the water had been turned off recently. The stepmother reported that they had a small leak they did not know about resulting in a nearly $800 water bill. The investigator noted stains on the carpeting that appeared to be old, but did not see or smell any urine or feces. She determined the home was okay. The investigator also spoke with the older children who denied the reports. The father denied the allegations and cited tension in his relationship with the children's mother. In a follow up visit with the children they again denied the allegations. The investigator noted the water had also been turned back on. The allegation of environmental neglect was unfounded.

| Child No. 58 | DOB 12/16 | DOD 4/17 | Accident |
|---|---|---|---|
| Age at death: | 3½-months | | |
| Cause of death: | Bedding asphyxia due to left bronchopneumonia | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A thirty-five-year-old father found his 3½-month-old baby face down, unresponsive at 9:30am. The father's 20-year-old girlfriend was the last person to see the baby alive, when around 4:00am she changed him and placed him back to sleep in his bassinet on a boppy (nursing support) pillow. The father reported using the pillow because of the baby's acid reflux. The baby was pronounced dead at the hospital where he had no signs of abuse or neglect, and the only concern was that he appeared not to have been bathed for a couple of days. The Department initiated an investigation for death by neglect and for substantial risk of physical injury/environment injurious to health and welfare by neglect to the girlfriend's 18-month-old son. Both allegations were unfounded after investigation.

Prior History: Prior to the baby's birth, in May 2016, the baby's 21-year-old mother was indicated for head injuries, bone fractures and failure to thrive to her 6-month-old son. She had taken the baby to the doctor and he was found to have weight loss and bruises; his doctor hospitalized him and ordered a skeletal survey which revealed a skull fracture and rib fractures. While she initially blamed her boyfriend (the deceased's father), she later confessed that while caring for the baby alone one evening she became frustrated because he would not stop crying, punched him in the face, and threw him across the room. She also admitted squeezing him across the chest when frustrated in the past. The mother was charged with aggravated assault to which she pleaded guilty. The baby entered foster care and is placed with maternal relatives. The mother's parental rights were terminated in June 2017. In December 2016 the mother gave birth to the deceased and the father obtained custody. The Department opened an intact family services case to monitor the father and his girlfriend's care of the infant. A caseworker visited regularly, noting that the baby appeared well-cared for and was seen by a doctor for well-child visits.

| Child No. 59 | DOB 02/17 | DOD 04/17 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 months |
| Cause of death: | Suffocation due to unsafe sleep environment due to sleeping with adult in adult bed |
| Reason For Review: | Indicated child protection investigation within a year of child's death |
| Action Taken: | Full investigation, no report to Director |

Narrative: A twenty-four-year-old mother arrived home from work at 1:00am to find her 2-month-old daughter unresponsive in bed with the infant's 28-year-old father. The mother called 911 and the infant was taken by ambulance to the hospital where she was pronounced deceased. The coroner's office notified the hotline and the Department took a report for investigation of death by neglect to the infant by her father. The Department notified the Southern Illinois Child Death Investigation Task Force. The mother reported that the infant had been to the doctor the day before her death; she was having some trouble breathing and keeping down her formula. The pediatrician changed the infant's formula, gave her four immunizations, and instructed the mother to schedule the infant for evaluation for a seizure disorder. The Department conducted an investigation of the infant's death and unfounded the father for death by neglect. The mother left the father after the infant's death.

Prior History: In August 2016, prior to the infant's birth, the Department investigated and indicated the mother for cuts, bruises, welts by abuse to her 5-year-old son. The boy's grandmother had observed bruises on his arm, leg, and back, and the boy said his mother had hit him. The boy's 3-year-old sister did not have any injuries. The mother admitted to using corporal punishment on her children and to causing the bruises on her son. The grandmother and aunt, who often cared for the children, believed the mother was stressed, not abusive. The children were behind on their vaccinations. The mother was in school and working. While not documented, the child protection investigator told OIG investigators that he had offered the mother intact family services, but she refused them. He counseled her to avoid corporal punishment, especially the use of an instrument, and she was receptive.

| Child No. 60 | DOB 03/17 | DOD 04/17 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 weeks |
| Cause of death: | Positional asphyxia due to unsafe sleeping environment |
| Reason For Review: | Indicated child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative: A three-week-old infant's 29-year-old father awoke at 6:30am to find the baby, who was in bed with the father and the 27-year-old mother, unresponsive. Emergency medical services transported the baby to the hospital where doctors pronounced her dead. The coroner notified the State Central Register of her death, not noting any signs of abuse or neglect at the time of the call. The parents were investigated and unfounded for an allegation of death by neglect. However, they were indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect because during the investigation police informed the investigator of a domestic incident that had occurred between the parents when the mother was eight months pregnant, in January 2017. Police had responded to a call, but the father had left the home prior to their arrival. The child protection investigator obtained the police report and noted the presence of their children. The father moved out of the house after the infant's death. The family was referred for intact family services in June 2017; there have been no concerns about the children's safety and the worker hopes to close the case in December 2017.

Prior History: In October 2016 neighbors complained to a social service provider, present in the apartment building, about the children running around and fear that they were left home alone. The social service provider confirmed the children were home alone. Police responded, finding the home was a mess and the children saying they had not eaten that day. Police located the maternal grandmother who went to get the children. The mother reported that she had left that morning to go to work expecting the babysitter to be there within minutes. The mother was indicated for inadequate supervision after leaving her five children, ages 1, 3, 4, 7, and 8, home alone. She was unfounded for inadequate food and environmental neglect as the investigator found the apartment adequately clean and there was food in the home.

| Child No. 61 | DOB 07/16 | DOD 04/17 | Accident |
|---|---|---|---|
| Age at death: | 9 months | | |
| Cause of death: | Asphyxiation due to co-sleeping on adult bed, with bronchiolitis a significant contributing condition | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A twenty-year-old mother and her 9-month-old son and 20-month-old daughter were homeless and had been staying with various friends and family. On the day of her son's death, the mother went to her cousin's home. In the afternoon, she laid down in an adult bed with the children and took a nap. She awoke to her daughter making noise and found her infant son unresponsive. He was taken by ambulance to the hospital where he was pronounced dead. Police notified the hotline of the infant's death; a report was taken for investigation of death by neglect and for substantial risk of physical injury/environment injurious to health and welfare by neglect to the surviving child. Both allegations were indicated with the rationale that the mother went to sleep with the children knowing she was exhausted; she had been educated about the dangers of co-sleeping; she had been provided during two prior investigations with three pack n play cribs that she was not using, and she had missed medical appointments for the children. The surviving child is placed in foster care with the private guardian of her older sibling.

Prior History: The mother gave birth to her first child at the age of 15. That child is in the private guardianship of a paternal relative. The mother's first contact with DCFS was in July 2016 after the infant's birth when hospital staff called the hotline concerned about the mother's ability to care for the infant. The mother was unfounded for substantial risk of physical injury/environment injurious to health and welfare by neglect. At the end of the investigation, the mother and her two children were living with the family of the infant's 15-year-old father, even though his mother had filed a complaint about the mother having sex with her son. The investigator provided her with two pack n play cribs for the children. In December 2016 the hotline took a report against the mother for sexual penetration to the 15-year-old father, burns by neglect to the infant, and inadequate food to both children. The investigation was unfounded. As they had done previously to avoid the mother getting into trouble, both parents denied that the 15-year-old was the father of the infant. The mother, who was staying with a cousin, showed the investigator formula and food. She also showed the investigator a mark on the infant's leg, saying she didn't know what it was from, but she put Neosporin on it. The investigator took a photo of the mark and showed it to the child's primary care physician who said based on the age of the mark it could have been anything. The allegations were unfounded.

| Child No. 62 | DOB 11/16 | DOD 5/17 | Accident |
|---|---|---|---|
| Age at death: | 5½ months | | |
| Cause of death: | Positional asphyxia | | |
| Reason For Review: | Closed preventative services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A five-and-a-half-month-old infant was found face down in an adult bed by a 22-year-old relative. The baby's 24-year-old mother reported that she had placed the baby on her stomach on the bed and told relatives that she was going to the store. The mother lived on the lower floor of a building in which family lived on the upper floor. The relatives believed the mother had taken the baby with her as she never requested that they care for the baby. The relative had gone downstairs for another reason and found the baby unresponsive. Law enforcement reported the child's death to DCFS; relatives reported that the mother regularly placed the baby on her stomach to sleep and fed her whole milk instead of formula which they felt contributed to the baby having diarrhea. They also reported that the baby had been born two months prematurely and had been hospitalized for meningitis. The Department investigated the baby's death and indicated the mother for death by neglect and inadequate supervision for leaving the baby without a care plan. The baby's father and older sibling had picked up the mother that morning to take her to the store, but the father did not know that the mother had not made a care plan for the baby. Following the baby's death, the Department offered the father, who is the main caretaker of the surviving child, intact family services and he accepted. The worker has referred the family to housing advocacy and counseling services.

Prior History: The mother, who had been a youth in care from January 2004 to September 2013, became involved with the Department as a parent in November 2016 when a hospital social worker called the hotline expressing the need for services for the mother and the newborn. The social worker reported the baby was born prematurely at 29 weeks gestation; her meconium was positive for marijuana; and she would remain hospitalized for the next eight weeks. The mother had a history of mental illness and was homeless, staying at a shelter. The social worker anticipated the mother having problems following through on medical care for the premature baby, however, noted that the mother currently seemed stable with no signs of mental health problems. The social worker added that the mother has a 2-year-old child who resides with her father. The assigned child welfare specialist spoke with the social worker who reported that the mother was visiting, feeding and bonding with the baby and participating in counseling services at the hospital so she had no immediate concerns. The child welfare worker arranged to meet with the mother at the hospital. The mother reported that she had moved in with her aunt and did not need services at that time. The worker prepared a service referral packet for the mother for future use. The hospital social worker also agreed to contact the hotline if any other safety concerns arose. The Department had no further contact with the family until the baby's death.

| Child No. 63 | DOB 01/17 | DOD 05/17 | Accident |
|---|---|---|---|
| Age at death: | 3½ months | | |
| Cause of death: | Probable suffocation | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

CHILD DEATH REPORT

Narrative: A three-and-a-half-month-old infant was co-sleeping in an adult bed with his 20-year-old father when his father woke up and noticed the boy gasping for breath. The father initially called a relative who told him the infant might be choking and instructed him to pat the infant on the back. When that did not work, the father called 911. The infant was taken to the hospital and the treating doctor found that the infant had bleeding in the brain and would likely not survive. A hospital social worker called the hotline and a child protection investigation was opened for head injuries by abuse to the infant by his father. Three days later, the infant was ruled brain dead and taken off life support. An allegation of death by abuse was added to the child protection investigation. The infant primarily lived with his 18-year-old mother. The mother had allowed the father to take the infant for a few days. The father reported that he was staying with his brother and his brother's wife. He did not have a crib or bassinet for the baby in their home. The father reported that the infant was fine the day prior; the infant slept from 4pm to 8pm, when the father woke him up to change and feed him. The mother reported that she video-chatted with the father and infant around 11pm that night, and the infant appeared fine. The father woke up to change and feed the infant around 3am and put him back to sleep in the adult bed. The father reported there was a pillow next to the infant; the police found a pillow at the scene with some dried blood on it. Both the child protection investigation and a police investigation are still pending.

Prior History: Two weeks after the infant's birth, the infant's doctor called the hotline to report that the mother did not bring the child in for a follow-up appointment. The doctor had concerns because the infant had been admitted to the NICU after his birth due to possible pneumonia and sepsis. The infant had been discharged four days after his birth. At his first follow-up appointment, the doctor noted that the infant had lost significant weight and he instructed the mother to bring the infant back four days later as he may have a lingering infection causing him to lose weight. The mother did not bring the child back to the doctor for follow-up. The Department opened a child protection investigation of medical neglect. The child protection investigator met with the mother and infant, and the mother reported that she was switching doctors and had an appointment in two weeks. The mother reported she was receiving WIC and the infant was doing well and gaining weight. The child protection investigator spoke to the new doctor after the appointment, and the doctor stated the child was on track for weight gain, and she had no concerns. The child protection investigation was unfounded for medical neglect.

| Child No. 64 | DOB 01/15 | DOD 05/17 | Accident |
|---|---|---|---|
| Age at death: | 2 years | | |
| Cause of death: | Craniocerebral injuries due to pedestrian struck by a sport utility vehicle | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A nineteen-year-old mother was standing on her front porch with an 18-year-old girlfriend talking and watching her 2-year-old son play outside. He kept running off and the mother or her friend went after him several times. The boy liked to watch trains; he heard a train and ran around the side of the building outside the view of his mother. Video surveillance showed his mother went looking for him and found him just after he was hit by an SUV, only 2½ minutes after losing sight of him. She observed the driver of the SUV driving away. Police and DCFS investigated the child's death. The 60-year-old driver, who was identified by the mother's friend, was apprehended at her home. She was arrested and charged with leaving the scene of an accident, no valid driver license or insurance, improper backing, and failure to give aid or information. She was convicted of leaving the scene of an accident, a class 4 felony. No criminal charges were brought against the mother and she was unfounded for death by neglect.

Prior History: In July 2016 a nurse called the hotline to report the mother had brought the child into a clinic due to a rash. The rash was described as two half-dollar-sized circles – one on the upper right arm and the other on the left groin area. The injuries were scabbing over and the toddler did not appear to be in any pain. The reporter said they looked like burns, but it hadn't been confirmed. The reporter swabbed the injuries for culture and advised the mother to follow up with her primary care physician. A report was taken for investigation of burns by abuse to the 18-month-old child. Investigation revealed that the injuries to the child's skin were staph infections and the child was diagnosed with cellulitis. The mother appropriately treated the child according to the doctor's instructions and the investigation was unfounded.

| Child No. 65 | DOB 02/04 | DOD 05/17 | Accident |
|---|---|---|---|
| Age at death: | 13 years | | |
| Cause of death: | Drowning | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A thirteen-year-old girl drowned in a lake. She and three boys had skipped school and gone to the beach. The girl, who could not swim, jumped into water that was over her head, and she struggled to stay afloat. One of the boys tried to save her while the others alerted authorities, but she went under water and he could not find her. DCFS did not investigate the teen's death, however, an anonymous reporter called the hotline on the day she died to report that the children were often left home alone and asked neighbors for food. An investigator met with the family at their home. The verbal children, ages 11, 14, and 15, denied the allegations, as did their 32-year-old mother. The home was stocked with food and with formula for the 10-month-old infant. The infant did not have a crib, so the investigator took a pack-n-play to the home. The family was referred to grief counseling. The report was unfounded against the mother for inadequate food.

Prior History: A year earlier the mother's boyfriend was indicated for cuts, bruises, and welts by abuse to the deceased's older sister, then age 13. The mother and her boyfriend, who was drunk, got into an argument and the boyfriend took her mother's phone. The teen intervened and the boyfriend hit her in the face causing injuries. The mother called police, but the boyfriend left before they arrived. The mother and the teen's siblings corroborated the teen's account of what happened and the mother stopped seeing the boyfriend.

| Child No. 66 | DOB 07/15 | DOD 05/17 | Accident |
|---|---|---|---|
| Age at death: | 22 months | | |
| Cause of death: | Choking | | |
| Reason For Review: | Open intact family services case at time of child's death; pending child protection investigation at time of child's death; child of former youth in care | | |
| Action Taken: | Full investigation pending | | |

Narrative: On the morning of his death the toddler awoke at 7:00am and his 22-year-old mother prepared him ramen noodles for breakfast. After serving her son his meal the mother turned away to wash dishes at the sink. Shortly thereafter she heard her son gasping for breath and choking. The mother took her son out of the chair and attempted to remove the noodles from his mouth. When he became unresponsive she began CPR. The mother's 19-year-old boyfriend was present and assisted the mother. They called 911 at 8:50am. The child was pronounced dead after numerous attempts to revive him in the emergency department. The Department investigated the toddler's death and in September 2017 the mother was indicated for death by neglect and for substantial risk of physical injury/environment injurious to health and welfare by neglect to her 8-month-old daughter. The mother's boyfriend was also indicated for substantial risk to the mother's daughter. An allegation of death by abuse was indicated to an unknown perpetrator. The girl entered foster care and was placed with a licensed foster family who had previously provided the mother with respite care.

Prior History: The deceased child's mother became involved with the Department in 1997 when she and her two sisters were taken into care after being found unattended in an abandoned building. Three years later the sisters were adopted by their paternal grandmother. By 2008 the adoption had failed and all three sisters were placed in foster care on Minor Requiring Authoritative Intervention (MRAI) petitions. Over the course of eight years the youth in care experienced numerous foster care placements, psychiatric hospitalizations, and four residential placements. She gave birth to the deceased in July 2015 while she was placed at a transitional living program for mentally ill pregnant and parenting youth in care. She was emancipated in June of the following year. At the time of her emancipation the mother was five months pregnant with her second child. She resided in low income housing. Three months after she emancipated the mother gave birth to her daughter who tested positive for THC. A child protection investigation was conducted. While the investigation was unfounded, the mother, who admitted to feeling overwhelmed, agreed to participate in intact family services. Over twenty-two months beginning with the deceased child's birth and culminating with his death, the mother was the subject of nine child protection investigations. Three investigations were indicated, including two posthumously, and six were unfounded. In December 2015, while the mother was still a youth in care, she was indicated for substantial risk of physical injury after she engaged in a fight while the deceased was present. In August 2016 the mother and her live-in boyfriend were indicated for cuts, bruises, welts by neglect and substantial risk of physical injury after the deceased, then 13 months-old, was observed with facial bruises.

| Child No. 67 | DOB 04/17 | DOD 05/17 | Accident |
|---|---|---|---|
| Age at death: | 1 month | | |
| Cause of death: | Asphyxia due to entrapment between couch cushions in a prone sleeping position | | |
| Reason For Review: | Closed intact family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A twenty-three-year-old mother called emergency medical services just before 9:00pm reporting that she had found her one-month-old baby lying face down on the couch unresponsive. She had last seen the baby alive around 4:00pm. The infant was transported to the hospital where resuscitation efforts were made without success and the infant was pronounced dead. Medical personnel called the hotline to report the death as well as multiple areas of possible bruising. The Department investigated and indicated the mother and 23-year-old father for death by neglect, finding that the parents had been educated about safe sleep practices for infants during a prior child welfare services case on the infant's 1½-year-old sibling, and in placing the baby to sleep on the couch, they showed blatant disregard for the infant's safety. They also indicated the parents for substantial risk of physical injury/environment injurious to health and welfare by neglect to the older sibling. The pathologist determined the areas that appeared to be bruising were birthmarks, and the parents were unfounded for cuts, bruises, welts.

Prior History: The family became involved with the Department in September 2015 when a police officer called the hotline to report they had responded to a call from a pediatrician's office for bruises appearing to be adult finger marks on an infant's abdomen. The marks were two inches long and consistent with an adult sized hand; the baby was not in any distress. The parents did not have any explanation for the marks but were cooperative with the officer. The doctor had the infant transported to an emergency room. A child protection investigation was started for cuts, bruises, welts by abuse. The child protection investigator consulted with a child abuse pediatrician who reported the infant had bruises on her hands, under her right eye, on her foot, her arm, and abdomen. A skeletal survey was negative. The doctor opined that the bruises were highly suspicious for inflicted child abuse, and although there were multiple caretakers, the most likely perpetrators were the parents. The doctor noted the baby was otherwise healthy and growing normally. The parents were indicated for cuts, bruises, welts by abuse. The baby was taken into protective custody and placed in traditional foster care. The parents participated in supervised visits and an integrated assessment in which the clinical assessor recommended the baby be returned home. At a December 2015 court hearing the parents stipulated to the allegations in the petition and the judge ordered the baby be returned home under an order of supervision. A worker made announced and unannounced visits. The parents both worked and a maternal aunt babysat. The parents attended parenting classes and counseling. The baby was involved with Healthy Start. The former foster parent had occasional overnight visits with the baby, providing respite for the parents. In May 2016 the case was closed in court with guardianship returned to the parents.

| Child No. 68 | DOB 06/02 | DOD 05/17 | Accident |
|---|---|---|---|
| Age at death: | 14 years | | |
| Cause of death: | Traumatic brain injury due to blunt force trauma | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: An almost 15-year-old boy jumped out of the back of his moving school bus. He had been dared for two weeks to jump. On the last day of school of 8th grade, he did it. The bus was going approximately 30 miles per hour when the teen jumped. Witnesses said he landed on his feet but then rolled on the ground. The teen was unconscious when emergency services arrived. Three days later he was declared dead. He was an organ donor. He tested positive at death for marijuana and fentanyl. The coroner notified DCFS of the teen's death. The Department did not conduct a child protection investigation because no abuse or neglect was suspected in the teen's death.

Prior History: In April 2016 the teen visited his 48-year-old mother in the hospital without an adult. Hospital staff called the hotline concerned the teen was without adult supervision while his mother was hospitalized. A report was taken for inadequate supervision and substantial risk of physical injury/environment injurious to health and welfare by neglect. It was unfounded after it was determined that the teen was in the custody of his 35-year-old aunt pursuant to a juvenile court order. The teen was involved in the juvenile justice system. He was returned to his mother's care at the end of July 2016 with an order that DCFS open an intact family services case. The teen was placed on probation. In November 2016 the teen was arrested for burglary and placed in detention. After his release his aunt became his guardian when it was determined that his mother, who had severe health issues including congestive heart failure and chronic obstructive pulmonary disease, was unable to care for him. In the months before his death, the teen saw a psychiatrist, went to counseling, cooperated with probation, and attended school more regularly.

| Child No. 69 | DOB 01/02 | DOD 05/17 | Accident |
|---|---|---|---|

| Age at death: | 15 years |
|---|---|
| Cause of death: | Multiple blunt force injuries from all-terrain vehicle crash |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative: A fifteen-year-old boy and his 12-year-old sister took an all-terrain vehicle on a public roadway. The ATV crashed and rolled over on the two children. The children were taken to the hospital and the teen later died. The 12-year-old girl was admitted to the hospital and treated for serious injuries before being released to her parent. The Department did not conduct an investigation of the teen's death.

Prior History: In August 2016 an anonymous reporter called the hotline stating that the 52-year-old father of the two children was a drug user and was violent towards the 40-year-old mother who was scared to leave him. The caller stated the children were withdrawn and scared and the mother feared that if the father found out she was trying to divorce him, he would hurt her and the children. A report was taken for investigation of substantial risk of physical injury/environment injurious to health and welfare by neglect. The child protection investigator contacted law enforcement who reported that they had responded to an incident of domestic violence to the mother by the father in 2012. The mother had no history with law enforcement. The father had been reported for suspicious activity in March 2016 but no charges were pursued. The investigator interviewed the children at school who reported feeling safe in their home. They both reported that their parents fought. The older child recalled an incident from a few years earlier when police were called because of their father being violent towards their mother, but he had not been violent since that time. The school counselor knew of no concerns about the children. The mother explained to the investigator that the couple had just separated and the father was living with his parents. The mother had obtained an emergency order of protection because the children did not want to be with their father. The mother stated that he had been violent in the past, but not recently. She suspected he was using substances. The father reported that his wife had filed for divorce and they did have an incident of domestic violence in 2012. He denied drug use, stating he suffered from depression and took psychotropic medication. He reported his wife was a good mother and neither of them had harmed the children. The investigation was unfounded in October 2016.

| Child No. 70 | DOB 09/14 | DOD 06/17 | Accident |
|---|---|---|---|

| Age at death: | 2½ years |
|---|---|
| Cause of death: | Drowning |
| Reason For Review: | Youth in care |
| Action Taken: | Full investigation pending |

Narrative: A two-and-a-half-year-old severely delayed youth in care was found at the bottom of his foster mother's in ground swimming pool. The youth-in-care had been diagnosed with fetal alcohol syndrome, autism, cerebral palsy, sensory issues and global developmental delays. The foster mother had put the boy down for a nap around 2:00pm, and the foster mother also took a nap. Her adopted 10-year-old daughter woke him up approximately an hour later to tell her the boy was no longer in his room. The foster mother had affixed an alarm and a baby gate to the door of the boy's room because he was known to escape and wander outside, however, the foster mother reported the battery to the alarm was dying and she did not hear it. After searching for the boy for approximately 45 minutes, the foster mother called the police. The police found the boy at the bottom of the pool around 5:30pm. The foster mother was indicated for death by neglect and inadequate supervision. The pool did not have a fence around it, despite the worker telling her one month prior to the boy's death that she needed to install a fence. The foster mother had been a licensed foster parent for over ten years, had always had the pool, and had never had a fence around it. A licensing complaint was made against the foster mother and in August she surrendered her license after being placed on involuntary hold. There is a pending child protection investigation against the agency for neglect for not appropriately inspecting the home and making sure the home was compliant with licensing regulations.

Prior History: The boy's mother had three children removed from her care prior to the boy's birth. Her eldest two children were removed in 2012 after a child protection investigation was conducted for inadequate supervision and substantial risk of physical injury/environment injurious to health and welfare by neglect. The two girls were placed together in a traditional foster home. The mother had ongoing issues of substance abuse, housing issues, and mental health issues. She had made minimal progress at the time of her third child's birth, but was allowed to keep her third child in her care until the child was removed in January 2014, at two months of age, when the mother showed up to an emergency shelter smelling of alcohol. The infant was placed with her two sisters in a traditional foster home. The boy was born after the mother was admitted to the emergency room for being highly intoxicated and pregnant. The boy was removed from her care and placed with the foster parent in whose care he died. The mother's parental rights were terminated on her two oldest children in 2015. The mother and father signed specific consents in November 2016 for their two younger children to be adopted by their respective foster parents.

## NATURAL

| Child No. 71 | DOB 09/14 | DOD 07/16 | Natural |
|---|---|---|---|
| Age at death: | 21 months | | |
| Cause of death: | Sudden unexpected death in epilepsy (SUDEP) due to complications of a viral infection of the brain | | |
| Reason For Review: | Closed family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A twenty-one-month-old toddler was found unresponsive and limp by her twenty-three-year-old mother at approximately 9:45am. Mother called 911, and the toddler was pronounced deceased at the hospital. The toddler was diagnosed with brain damage due to severe medical neglect by her father at age six months. Mother gave the toddler her medication and lay down with her on the mother's full sized bed. At 1:00 am, the mother woke up and relocated to the couch. Law enforcement called the hotline to report the child's death. A child protection investigation was opened for death by neglect to the toddler, and substantial risk of physical injury/environment injurious to health and welfare by neglect to the mother's other two children. The child protection investigation was unfounded. At the time the child protection investigation was closed, the autopsy was still pending.

Prior History:   When the toddler was six months old, a hospital social worker contacted the hotline after the baby was admitted to the hospital with cerebral edema. The child was in the father's care because the mother was out of state. The reporter said the child was diagnosed with a viral infection two weeks earlier. The reporter stated that the baby became more ill; had lost two pounds in five days; had reported seizure activity at home; and would have long term effects due to the lack of prompt follow up of a respiratory illness. The Department opened a child protection investigation for allegations of medical neglect, internal injuries by neglect and substantial risk of physical injury/environment injurious to health and welfare by neglect to the child by the father. The allegations were indicated and an intact family services case was opened for the mother and her children, who were in her care. The father was not allowed to have unsupervised visits. The intact family services case closed successfully six months prior to the child's death.

| Child No. 72 | DOB 07/09 | DOD 07/16 | Natural |
|---|---|---|---|
| Age at death: | 6½ years | | |
| Cause of death: | Seizure disorder due to cerebral palsy | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A thirty-eight-year-old father called 911 after finding his medically complex son, three days shy of his seventh birthday, having a seizure. The boy was taken to the emergency department where he was stabilized before being taken to a children's hospital where he died later that day. The hospital notified DCFS of the child's death and that they had no concerns about child abuse or neglect. Three days later, an out of state medical examiner's office called the hotline to report the child had bruising on his shoulders in different stages of healing that was not from emergency medical treatment. The Department took a report for investigation of death by abuse. The report was unfounded after investigation. No bruising was noted on the child during his autopsy and hospital staff reported they did not see injuries. The child's primary care physician had no concerns about the child being abused or neglected. The Southern Illinois Child Death Investigation Task Force was involved. The child was determined to have died from seizure disorder due to cerebral palsy, a natural death. The child death investigation was unfounded against the father for death by abuse.

Prior History:    Six months before the child's death, a paternal relative called the hotline to report the child had been left in the care of his paternal grandmother who was not able to adequately care for him because of her own health problems. The Department took a report of medical neglect against the father. The child's mother had died when he was an infant. An investigator observed the child and spoke with his father, paternal grandmother, and primary care physician. The grandmother reported helping her son care for the child, explained her grandson's care, and demonstrated for the investigator how she suctioned the child's tracheostomy tube. She said she was able to care for him despite having her own medical issues. The investigator spoke with the child's primary care physician who stated that the child received regular medical care and he had no concerns of medical neglect. The Department unfounded the investigation against the father.

| Child No. 73 | DOB 06/14 | DOD 07/16 | Natural |
|---|---|---|---|
| Age at death: | 2 years | | |
| Cause of death: | Complications of biliary atresia | | |
| Reason For Review: | Babysitter, at the time of death, had an open placement case | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A two-year-old girl was found unresponsive around 8:00am by her 29-year-old mother. The mother began CPR and contacted emergency medical services. The girl was transported to a hospital where she was pronounced deceased about 40 minutes later. The child, her three older siblings, and three other unrelated children were in the care of a 29-year-old babysitter overnight. The mother and her friend had gone out for the evening. The deceased was the youngest child present. The babysitter contacted the mother during the night saying the two-year-old was fussy and uncomfortable. The mother returned to the home and gave the babysitter Tylenol. The girl went to sleep, but the babysitter reported that the girl woke again at 4am and appeared to be wheezing, but eventually went back to sleep. The child suffered from heart problems and biliary atresia, a condition which affects the liver in infants and causes other issues including rickets. A prior surgical procedure to correct the condition was unsuccessful and the child was being evaluated for a liver transplant. The babysitter had an open placement case at the time of the girl's death. The child protection investigator instructed the mother and her friend not to use the babysitter as a caretaker for their children in the future and informed the babysitter that she should not provide care for other children. The babysitter was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect. During the death investigation it was found that the mother had missed several medical appointments. A parallel investigation was conducted on the mother, indicating her for medical neglect.

Prior History: The babysitter is the mother of three children, two in private guardianship arrangements and one in foster care. She has a history of mental illness, developmental delays and substance abuse. The youngest child was taken into care shortly after birth in 2015 because of concerns about the parents' ability to care for an infant. The infant was placed with the relative who had guardianship of the oldest sibling. The placement case was open at the time of the death. Both parents surrendered their rights to the child in March 2017.

| Child No. 74 | DOB 04/14 | DOD 08/16 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 years |
| Cause of death: | Respiratory failure due to compromised cardiorespiratory system |
| Reason For Review: | Indicated child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative: A seventy-five-year-old maternal great-grandmother/guardian was on her way to the hospital with her 22-month-old grandson, who had a cold and was experiencing respiratory problems, when he began vomiting and appeared very ill. The grandmother pulled over and called 911. The child, who had Downs Syndrome and had undergone heart surgery, was taken to the hospital where he was pronounced dead. The child's death was referred to the Southern Illinois Child Death Investigation Task Force, but the Department did not take a report for investigation of the child's death because abuse or neglect was not suspected.

Prior History:   In June 2016 law enforcement called the hotline to report that the child's 23-year-mother and her 26-year-old boyfriend were arrested for possession of heroin and the child and his 5-year-old sister were released to the care of their great-grandmother. The Department took a report for investigation of substantial risk of physical injury/environment injurious to health and welfare by neglect to the children by their mother. The mother was incarcerated on drug and child endangerment charges. She signed short-term guardianship papers authorizing the great-grandmother to act as her children's guardian during her incarceration. The great-grandmother had already been caring for the children on a regular basis and tending to their medical care, and she had the help and support of the children's maternal aunt. The children were determined to be safe in their grandmother's care. The investigation was indicated against the mother.

| Child No. 75 | DOB 08/16 | DOD 09/16 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 5 days |
| Cause of death: | Bilateral empyema (collection of pus in the pleural cavity) due to extreme prematurity |
| Reason For Review: | Pending child protection investigation at time of child's death; open placement case at time of child's death (sibling in foster care) |
| Action Taken: | Investigatory review of records |

Narrative: A five-day-old infant born prematurely at 29 weeks gestation died in a children's hospital where she had been transferred after her birth for treatment of respiratory distress syndrome, apnea of prematurity, hyperbilirubinemia, and sepsis. The Department did not investigate the infant's death, but there was a pending investigation at the time of the infant's death. Hospital staff had called the hotline upon the infant's birth alleging substantial risk of physical injury/environment injurious to health and welfare by neglect against the infant's parents because of their involvement with DCFS. The report was subsequently indicated against both parents.

Prior History:   The deceased's sister entered foster care in January 2016 at the age of 3½ months. The infant had experienced facial bruising while in her father's care and follow-up two weeks later revealed the infant had a healing wrist fracture. The child was placed with her maternal grandparents and the 23-year-old mother and 24-year-old father were receiving services toward reunification with the child.

| Child No. 76 | DOB 08/05 | DOD 09/16 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 11 years |
| Cause of death: | Heart failure due to heart transplant with antibody mediated rejection due to transplant coronary artery disease |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Full investigation pending |

**Narrative:** An eleven-year-old boy died of heart failure after his parents failed to provide him with necessary immunosuppressant medications for a heart transplant and neglected to ensure he attended medical appointments. The Department conducted a child protection investigation of the child's death and indicated the 36-year-old mother and 41-year-old father for death by neglect, medical neglect, and substantial risk of physical injury/environment injurious to health and welfare by neglect. The parents were criminally charged with endangering the life of a child.

**Prior History:** In April 2015 the deceased's teenage half-siblings began living with the family because their mother from the father's prior relationship was indicated for environmental neglect. An intact family services case was opened on the mother of the half-siblings that included services for the half-siblings. Days after the half siblings went to live with the family a child protection investigation was opened on one of the half-siblings for sexual molestation of the deceased. The investigation was unfounded. In July 2015 a second child protection investigation was initiated on the same teenage half-sibling for touching a 4-year-old guest of the house. The half-sibling was indicated in the investigation for sexual penetration and sexual molestation. At the same time, the mother of the half-siblings moved from the area and the intact family case was closed in August 2015. In the month prior to the child's death, August 2016, the hotline initiated two investigations: one for medical neglect against the parents of the deceased (later indicated) and one for substantial risk of physical injury/environment injurious to health and welfare (later unfounded and expunged). The allegation of medical neglect was called in after the parents missed three successive quarterly cardiology appointments for the deceased. The child protection investigator went to the home and the mother explained the family had problems getting to the children's hospital because of the distance. The investigator assisted the mother in finding someone who would assist with transportation and called with the mother to make an appointment for later that month. The parents took the child to the hospital for the appointment and the child was admitted. He remained at the hospital until his death. A referral was made for intact family services nine days before the child's death. The intact family worker met the family at a hospital staffing four days before the child died. Both investigations were pending at the time of the child's death.

| Child No. 77 | DOB 08/02 | DOD 09/16 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 14 years |
| Cause of death: | Encephalitis due to cerebral palsy with profound cognitive impairment due to tracheostomy dependent |
| Reason For Review: | Youth in care |
| Action Taken: | Investigatory review of records |

**Narrative:** A fourteen-year-old girl found unresponsive with no pulse by her teacher in her long-term residential care facility. Staff began CPR, and emergency medical services transported her to the nearest emergency department. The girl was pronounced dead upon arrival. The girl's caseworker and the Department were notified of the girl's death by the coroner six days after her death. The coroner did not perform an autopsy and ruled the death to be caused by the girl's encephalitis. A child protection investigation was not opened following the girl's death.

Prior History:    In February 2014, the hotline received a call alleging medical neglect of the then 11-year-old girl. The girl was nonverbal, non-ambulatory, had a seizure disorder, spastic cerebral palsy, profound cognitive impairment, a restricted airway, severe muscular contracture, pronounced scoliosis, and random choreiform movements. Medical professionals in the hospital echoed concerns of medical neglect. The Department took protective custody in March 2014 and the girl was moved to a long term care facility. The mother was indicated for medical neglect and substantial risk of physical injury/environment injurious to health and welfare by neglect. The indicated finding for substantial risk was later overturned. The Department was granted guardianship of the girl in February 2015. In November 2015, the hotline received a call alleging that staff at the residential care facility dropped the girl after failing to take necessary precautions and neglected to give the girl a medical exam to check for injuries from the fall. The staff member who dropped the girl resigned prior to the child protection investigation being opened, and was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect. The allegation of medical neglect was unfounded against this former staff member. The girl was transferred to a different residential care facility in January 2016 where she remained until her death.

| Child No. 78 | DOB 03/99 | DOD 10/16 | Natural |
|---|---|---|---|
| Age at death: | 17 years | | |
| Cause of death: | Cardiopulmonary arrest due to thrombosis of femoral vein due to obesity | | |
| Reason For Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A foster mother returned home at 1:00pm after leaving the house at 6:30am to find her 17-year-old foster daughter unresponsive lying on the floor behind the bathroom door. The foster mother called 911 and the youth was taken to the hospital where she was found to have blood clots in her lungs and brain. She died in the hospital two days later. The youth had a medical history significant for obesity, depression, and asthma. She underwent a tonsillectomy and adenoidectomy in September 2016. Twelve days later the youth's foster mother took her to the emergency room because she was limping and complaining of upper leg pain. She had an ultrasound which appeared normal and was discharged with a diagnosis of muscle pain. The next day she was seen for follow-up from her surgery and while she continued to complain of leg pain, she was found to be healing well.

Prior History:    The youth was born to teen parents. At the age of five months she was left in the care of an 8-year-old cousin who twisted the infant's leg trying to quiet her crying. The infant suffered a spiral fracture and entered the Department's custody. She was returned to her father, but the arrangement failed after two years and the youth returned to the Department's care. She was placed with a paternal cousin who was appointed the youth's guardian in 2006. In 2014 the guardian refused to allow the 15-year-old to return home when she was assessed as needing only a partial, not full, hospitalization program for making alleged homicidal threats to her guardian. The guardian was indicated for lock-out and substantial risk of physical injury/environment injurious to health and welfare, and the Department resumed custody. During the year prior to her death, the youth lived in a specialized foster home. She was enrolled in school and attended therapy and a mentoring program. She had a goal of independence.

| Child No. 79 | DOB 10/16 | DOD 10/16 | Natural |
|---|---|---|---|
| Age at death: | 1 day | | |
| Cause of death: | Extreme prematurity | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Police called the hotline to report they responded to a call of an infant born in a hotel room. The 19-year-old mother did not have prenatal care aside from seeing a physician two weeks earlier for bleeding. The infant, born at an estimated 23 weeks gestation, was taken to the hospital where she was treated for prematurity. The Department first took a report for investigation of substantial risk of physical injury/environment injurious to health and welfare by neglect. It added an allegation of substance misuse by neglect after the infant and mother tested positive for cocaine and cannabis, and the mother admitted to smoking "spice." After the infant's death, an allegation of death by neglect was added pursuant to a Department policy that requires the allegation be added when death occurs to a substance exposed infant with a pending substance misuse allegation. The mother was indicated for all three allegations. Even though doctors would not say that the mother's drug use caused the premature delivery, the Department indicated the mother for the infant's death because the mother used drugs while pregnant and admitted to hoping the drugs would terminate her pregnancy. The mother was also indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to her 3½-year-old daughter who was in the care of her 26-year-old father (not the father of the infant) at the time of the infant's birth. The child was taken into protective custody and placed with her father. An intact family services case was opened.

Prior History:    In June 2016 the mother and father of the 3-year-old were investigated for inadequate supervision and environmental neglect when a DCFS investigator called the hotline stating she saw the child daily unsupervised on the family's patio when she was at her boyfriend's apartment. She said the child was dirty and from what she could see through the patio door, the living room was strewn with garbage. The allegations were unfounded after an investigator interviewed the parents, saw their apartment, and interviewed collaterals. The parents explained that they watched the child from a couch that was placed next to the sliding glass door to the patio. While the apartment was messy, the conditions were not unsanitary or unsafe, and the parents cleaned it up before her next visit. Neither the child's primary care physician nor the paternal grandmother had concerns about the child's care.

| Child No. 80 | DOB 10/16 | DOD 10/16 | Natural |
|---|---|---|---|
| Age at death: | 4 days | | |
| Cause of death: | Necrotizing enterocolitis due to prematurity | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A four-day-old baby boy died in the hospital. He was born prematurely at 31 weeks gestation and tested positive for amphetamines. He was born with a bowel condition called necrotizing enterocolitis and underwent two surgeries where it was determined he had no viable bowel. The infant's condition was determined to be caused by prematurity. The hospital and a coroner's office called the hotline to advise of the baby's death. A report had been called into the hotline after the child's birth and was pending at the time of the infant's death. The Department did not add an allegation of death by neglect, but a referral was made to the Southern Illinois Child Death Investigation Task Force.

Prior History:   At the time of the infant's birth, the hospital called the hotline to report the 31-year-old mother had tested positive for methamphetamines, amphetamines, and opiates; they were awaiting results for the baby. The Department took a report for investigation of substantial risk of physical injury/environment injurious to health and welfare by neglect. The mother admitted to using someone else's prescription diet pills, stating she used them for energy during long shifts at work. The child protection investigation was concluded with the Department indicating the mother for substantial risk of physical injury/environment injurious to health and welfare by neglect because the mother used substances while pregnant and for substance misuse by neglect because the infant tested positive for amphetamines after birth. A month before the infant's birth, the Department had initiated an investigation of inadequate supervision against the mother when her two-year-old son was found outside unsupervised while she slept inside. Following the infant's death the mother was indicated for inadequate supervision of her two and seven-year-old sons. An intact family services case was opened to assess the mother for substance abuse services.

| Child No. 81 | DOB 08/97 | DOD 10/16 | Natural |
|---|---|---|---|
| Age at death: | 19 years | | |
| Cause of death: | Aspiration pneumonia due to cerebral palsy due to anoxic brain injury | | |
| Reason for Review: | Teenager was a youth in care | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A nineteen-year-old medically complex youth in care died in the hospital where he had been treated for pneumonia for two weeks. The youth, who was severely disabled, had lived in a skilled nursing care facility since entering the Department's care five years earlier. In his final year of life the youth was beset by seizures and pneumonia and was hospitalized several times.

Prior History:   The youth entered the Department's care in March 2011 because of his parents' medical neglect, including missing his medical appointments and failing to give him his prescribed dose of anti-seizure medication.

| Child No. 82 | DOB 01/03 | DOD 11/16 | Natural |
|---|---|---|---|
| Age at death: | 13 years | | |
| Cause of death: | Aspiration pneumonia | | |
| Reason For Review: | Pending child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A thirteen-year-old medically complex boy was admitted to the hospital for pneumonia. The teen had numerous hospitalizations due to respiratory problems. His mother had previously signed a DNR. The teen was chronically ill with multiple diagnoses including: seizure disorder; cerebral palsy; microcephaly; profound developmental delay; spastic quadriplegia; acute chronic respiratory failure; neuro-muscularscoliosis; and poor airway protection. He was non-verbal and non-mobile. His condition did not improve and medical treatment ceased. The teen died two days later.

Prior History: The family has an extensive history with the Department with three prior open family cases. There were two child protection investigations pending at the time of the teen's death. In September 2016 a nurse contacted the hotline after the mother went to the ER for gallbladder issues. She was accompanied by the father and a two-and-a-half-year-old sibling. Reporter said the parents got into a verbal altercation while at the ER in front of the child and the mother jerked the child by the arm while pulling him up to the exam stretcher. Allegations of substantial risk of physical injury/environment injurious by abuse and substantial risk of sexual abuse-sex offender has access (father is a registered sex offender) were taken for investigation. The deceased was hospitalized with pneumonia at the time. The report was unfounded after the teen's death. In October, while the above investigation was pending, a second investigation began after a home nurse contacted the hotline with an allegation of medical neglect to the deceased teen, who had recently been discharged from the hospital. An allegation of death by neglect was added to the pending investigation after the teen died. Both allegations were unfounded as the medical professionals stated the child was expected to die due to his complex medical issues and they did not attribute the death to neglect by mother.

| Child No. 83 | DOB 11/04 | DOD 11/16 | Natural |
|---|---|---|---|
| Age at death: | 12 years | | |
| Cause of death: | Seizure disorder due to cerebral palsy | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A forty-nine-year-old mother found her 12-year-old medically complex daughter unresponsive around 5pm and called 911. The child, who had cerebral palsy, was taken to the emergency room and then airlifted to another hospital where she died two days later. The hospital called the hotline because the child was observed to have a bruise near her left eye. The Department investigated a report of cuts, bruises, welts by abuse to the child by her mother and her mother's 43-year-old boyfriend. Following investigation, the bruise was believed to have occurred when the child had the seizure that led to her death. The child had bite marks inside her mouth, a sign of seizure activity. While the child had a history of seizures, she had not had one in a couple of years and was taken off her anti-seizure medication. The investigation was unfounded.

Prior History: In February, an employee with the Department of Human Services called the hotline to report that a personal assistant paid by the agency to help take care of the child reported that the mother had a drinking problem. The Department investigated and unfounded a report of inadequate supervision and substantial risk of physical injury/environment injurious to health and welfare by neglect to the child by her mother. The mother, who had recently fired the personal assistant, admitted to occasionally drinking alcohol, but denied getting intoxicated or having a drinking problem. The mother's boyfriend, who spent a lot of time at the residence, also denied the mother had a problem. The residence was observed to be clean and appropriate and the investigator did not witness any alcohol beverages in the home. The child was observed to look healthy; she was non-verbal. Interviewees, including a former caseworker and other current personal assistants, were not concerned about the child's care or mother's drinking.

| Child No. 84 | DOB 10/02 | DOD 12/16 | Natural |
|---|---|---|---|
| Age at death: | 14 years | | |
| Cause of death: | Liver and kidney failure due to Duchenne Muscular Dystrophy | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A fourteen-year-old boy with Duchenne Muscular Dystrophy died in the hospital where he had been treated for his disease for eight days. There was a pending investigation on the teen's 30-year-old mother for medical neglect (see below). An allegation of death by neglect was added and indicated; the teen had received little primary or specialized medical care (only urgent care) for the past seven years which caused the progression of his disease and led to his death. The mother was also indicated for malnutrition and medical neglect of the teen. She was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to her 3½-year-old son who was taken into protective custody and placed with his paternal grandmother.

Prior History:   In November 2016 the teen's 16-year-old uncle, who also had Duchenne Muscular Dystrophy, was hospitalized. During his hospitalization his 57-year-old mother told staff that her grandson also had Duchenne's and had not been seen by a specialist for the disease in a long time. After an investigation was initiated for medical neglect, the teen was hospitalized and subsequently died.

| Child No. 85 | DOB 11/07 | DOD 12/16 | Natural |
|---|---|---|---|
| Age at death: | 9 years | | |
| Cause of death: | Cardiac arrhythmia due to Rett Syndrome | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Full investigation, Report to Director June 29, 2017 | | |

Narrative: A nine-year-old medically complex child was found unresponsive in her bed by her 36-year-old mother. The child had Rett Syndrome, an incurable neurological disorder. Affected children often develop autistic-like behaviors, breathing irregularities, feeding and swallowing difficulties, growth retardation, and seizures. The child was hypotonic, non-verbal, non-ambulatory, and received all nutrition through g-tube feedings five times a day. The child was also diagnosed with a seizure disorder, common in patients with Rett Syndrome. A supervisor with the agency servicing the family's case notified the hotline of the child's death. The hotline took a report for investigation of death by neglect against the mother based on a recent indicated report involving the child not receiving her prescribed medications. A toxicology report conducted as part of the child's autopsy indicated that the child's medications were at therapeutic levels. The coroner opined that medication compliance did not play a role in the child's death, and the death by neglect investigation was unfounded. **See Investigation No. 8**

Prior History: At the time of the child's death, there was an open intact family services case. In September 2016 the child's mother was indicated for medical neglect of the child for failing to consistently provide her daughter with her prescribed anti-convulsant medication. An intact family services case was opened to ensure medication compliance. During the ninety days that the intact family services case was open, the child was regularly seen by the caseworker. The mother reported that she was administering the anti-seizure medication as prescribed. The mother, who had meager health insurance through her employer, sought the worker's help to obtain a chair lift to assist her in bathing her daughter. The worker, who had limited knowledge of the child's neurological disorder, was challenged in her efforts to help the mother obtain medical equipment.

| Child No. 86 | DOB 07/02 | DOD 12/16 | Natural |
|---|---|---|---|
| Age at death: | 14 years | | |
| Cause of death: | Sepsis due to probable gastrointestinal illness | | |
| Reason For Review: | Indicated child protection investigation within a year of teen's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A thirty-five-year-old mother reported she and her children began getting ill with a stomach virus with vomiting and diarrhea two days before her 14-year-old son's death. On the day of his death the teen took a nap. When the mother went to check on him she found him disoriented and called emergency medical services. The local emergency department transferred the teen to a level 1 trauma center where he was later pronounced dead. The trauma center noted the teen appeared to have gone into hypovolemic shock. The Department did not investigate the teen's death.

CHILD DEATH REPORT

Prior History:    In March 2016 a neighbor called 911 to report a disturbance at the father's residence. Police responded and discovered that the 37-year-old father had been physically disciplining the teen with a rod from the mini blinds, leaving welts on his legs and cuts and abrasions on his arms. The father was arrested and charged with felony aggravated domestic battery and the teen was taken for medical attention. The teen was released to his mother, who did not live with the father. She agreed to not allow the father visitation. The teen reported having no issues with his mother. The father was indicated for cuts, bruises, welts by abuse.

| Child No. 87 | DOB 12/05 | DOD 12/16 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 11 years |
| Cause of death: | Cardiac arrhythmia during root canal dental procedure with local lidocaine with epinephrine anesthesia |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative: An eleven-year-old girl went into cardiac arrest while undergoing a root canal procedure. The girl's dentist performed CPR until emergency services personnel arrived. The girl was taken by ambulance to the hospital where she was pronounced dead. The girl had received a local anesthetic, which at autopsy was found to be within reported safe concentrations for her age group. The girl had complained of stomach upset during a break in the dental procedure; shortly after the procedure resumed, she grabbed her stomach and became unresponsive. The girl's 58-year-old paternal grandmother, who was present during the procedure, said the child had had previous dental work where lidocaine was used with no adverse effects. The girl had no pertinent medical history other than seasonal allergies. The Department did not investigate the girl's death.

Prior History:    In September 2007 the paternal grandmother called DCFS asking for help to get legal custody of her granddaughter and was referred to the Extended Family Support Program. In September 2013 the Department investigated the paternal grandmother for cuts, bruises, welts by abuse to the girl. The girl, then seven, reported that injuries to her thigh were from her grandmother hitting her with a belt. The grandmother admitted to hitting her granddaughter with a belt as punishment for stealing candy at a store earlier that day. The grandmother was indicated for cuts, bruises, welts by abuse and the case was closed with a referral to community-based services. In April 2016, the Department investigated the grandmother for substantial risk of physical injury to her granddaughter. The girl told her teacher that her grandmother hit her in the head and kneed her in the back, so she ran away from home. The teacher had never seen any unexplained marks on the child and said she always came to school clean and appropriately dressed. The child protection investigator did not witness any injuries on the child and neither did the child's father who picked her up when she ran away. The grandmother denied hurting the girl. She believed the girl wanted to go live with her father, who recently was released from prison and was believed to be back with the girl's mother. The investigation was unfounded.

| Child No. 88 | DOB 11/01 | DOD 01/17 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 15 years |
| Cause of death: | Diabetic ketoacidosis due to acute pancreatitis due to pancreatic cystic neoplasm (favor solid-pseudopapillary neoplasm) |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative: A fifteen-year-old teenager with diabetes died in the emergency room. The day before, the teen's 43-year-old father noticed she was exhibiting balance problems and disoriented behavior and he tested her blood sugar, found it to be high, and gave her insulin. Later that evening he tested her blood sugar again and it was still high, so he gave her some more insulin. He monitored her throughout the night and morning and she seemed to be doing better, but by the afternoon she had declined and her blood sugar, while lower than the day before, was still high. The 40-year-old mother was home then and helping the teen clean up to go to the hospital when the teen became unresponsive. Police and the hospital called the hotline to report the teen's death. The Department took a report for investigation of death by neglect and medical neglect to the teen by her parents. Both parents were indicated for both allegations as the teen's endocrinologist and the coroner believed the teen may have survived if the parents had reacted earlier to her high blood sugar and symptoms. The teen had missed a scheduled appointment with her endocrinologist in November. The school nurse said that the teen's compliance with testing her blood sugar at the nurse's office during the school day was good for a teenager. The pancreatic cystic neoplasm discovered at the teen's death was believed to be benign and treatable. The parents initially agreed to intact family services to monitor their medically complex 9-year-old son, but changed their minds before a case could be opened.

Prior History:    In June 2016 the parents were investigated for medical neglect of the teen. Emergency department personnel called the hotline after the teen was admitted to the pediatric intensive care unit for diabetic ketoacidosis. The investigation was unfounded after talking to hospital staff, the family, the child's pediatrician, and the child's endocrinologist. The teen, who was responsible for taking her medication and testing her blood sugar level, had been lying to her parents recently about her compliance with her treatment plan. Both doctors reported that the teen had been to recent medical appointments, and there were no concerns that the parents were medically neglecting the teen. The teen stated she planned to take her medication regularly because she did not like the way she felt when she was sick.

| Child No. 89 | DOB 09/14 | DOD 01/17 | Natural |
|---|---|---|---|
| Age at death: | 2 years | | |
| Cause of death: | Klebsiella oxytoca bacterial sepsis due to bilateral renal dysplasia | | |
| Reason For Review: | Open intact family case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: The two-year-old child was born with Posterior Urethral Valve and spent the first three months of his life in the NICU. He was diagnosed with end-stage kidney disease and required Peritoneal Dialysis to sustain his life. He received G and J tubes in order to receive nutrition. He also had a history of seizures. Two months prior to his death, the child was hospitalized with Perotinitis, which is an infection in the Peritoneum. He remained in the hospital for a month and a half. He was discharged three days prior to his death and stayed with his grandparents, who cared for the child when the mother was at work. The child's father lived out of state and had no relationship with the child. The child completed daily lab work at his dialysis clinic. The day before his death, the child's potassium levels were high and mother was instructed to increase his dialysis to 18 hours. At 2:15am, the mother called the nurse at the dialysis clinic and reported that his exit site appeared to be leaking and they were only able to get a few cycles in. The nurse consulted with the doctor and about 7:00am advised the mother to bring the child to the hospital. As the grandparent was getting the child dressed to go to the hospital, he had a seizure and stopped breathing. The paramedics were called and CPR was performed. He was pronounced deceased at the hospital. The intact family services caseworker called the hotline to report the death. The grandparents were investigated for death by neglect. The investigation was unfounded less than a month later.

CHILD DEATH REPORT

Prior History:    The mother was indicated for medical neglect to the child twice in 2015 after she admitted to not administering his dialysis a couple of times resulting in his hospitalization and then again for not ensuring he had all of his 16 prescription medications. An open intact family services case was opened in September 2015 to assist the mother with ensuring that the child was receiving his feeding and dialysis as required. During the intact family services case, the mother gave birth to her second child, a healthy baby girl. The child was seen regularly at a kidney dialysis clinic and the family met monthly with the social worker at the clinic. The intact family services case closed successfully in April 2016. In September 2016, the hotline was called after the mother took the child to the hospital and he was diagnosed with failure to thrive because he had lost significant weight since his last visit. A child protection investigation was opened and the mother was indicated for medical neglect twelve days prior to the child's death. While the child protection investigation was pending, the child was hospitalized. A second intact family services case was opened a few weeks prior to the child's death, while he was still in the hospital. After his discharge, the intact family services worker visited the family once, two days prior to his death. The intact family services case closed two months after the child's death; the mother stated she did not need counseling and she did not want to continue with services.

| Child No. 90 | DOB 06/04 | DOD 01/17 | Natural |
|---|---|---|---|
| Age at death: | 12 years | | |
| Cause of death: | Seizures due to congenital defects | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A fifteen-year-old boy found his 12-year-old brother unresponsive in bed just after midnight. The family called 911 and the child was pronounced deceased at the hospital. The child was born with Treacher Collins Syndrome, a condition that affects the development of bones and other tissues of the face. He had limited verbal skills. He attended a specialized school and did well there. The child also had a history of seizure disorder but had been taken off his medication by his doctor because he had not had a seizure in over a year. The family's caseworker notified the hotline of the child's death. An investigation was initiated and later unfounded against the 44-year-old mother and her boyfriend who was in the home the night of the child's death. The child had had a 6 minute seizure at school in early December. His primary care physician saw him the following week and wanted the child to be seen by a neurologist. He had an appointment scheduled. The primary care physician believed the child died from a seizure in his sleep. Police found nothing suspicious about the child's death.

Prior History:    The deceased was the mother's youngest child. She has three teenagers ages 15, 16, and 17. The family has been engaged in individual and family therapy since 2014. In October and November 2015 two of the teens alleged they were hit by their mother. In one case the teen had hit the mother first. The mother was indicated for substantial risk of physical injury/environment injurious to health and welfare by abuse and an intact family services case was opened in February 2016. The investigator spoke with the mother's therapist who said the mother sometimes minimized issues and bullied the children. The worker helped the family apply for Norman funds when they moved homes, ensured the children were enrolled in school, monitored the youngest child's medical care, and set up new therapy for the family. The case was closed in May 2017.

| Child No. 91 | DOB 10/11 | DOD 01/17 | Natural |
|---|---|---|---|
| Age at death: | 5 years | | |
| Cause of death: | Respiratory failure due to severe comorbidity | | |
| Reason For Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A five-year-old medically complex youth in care was admitted to the hospital from his nursing care facility with a diagnosis of pneumonia three days prior to his death. The child had a medical history including prematurity, fetal drug exposure, cerebral palsy, asthma, MRSA, dysphagia, encephalopathy, developmental delays, and anatomic airway obstruction. He required a gastrostomy tube for feeding, a tracheostomy, a vagus nerve stimulator to control his seizures, and an oxygen monitor. At birth, the child's predicted life expectancy was four years. The child's caseworker notified the hotline of the child's death. The Department did not investigate the child's death because no abuse or neglect was suspected.

Prior History:   The youth was born substance exposed at 34 weeks gestation and his 26-year-old mother was indicated for substance misuse by neglect. The infant, who had multiple medical issues, was taken into custody and placed with his maternal grandmother who was raising the mother's older child. The mother surrendered her parental rights to the child in November 2012. The father's parental rights were terminated in April 2013. The mother died of a drug overdose in July 2014. The grandmother became a licensed specialized foster parent with a plan to adopt the child. The child remained in his grandmother's home until April 2015 when his health care needs required him to move to a nursing care facility. He moved between the facility and the hospital until his death. The grandmother, who lived three hours away from the nursing care facility, visited her grandson weekly.

| Child No. 92 | DOB 09/16 | DOD 02/17 | Natural |
|---|---|---|---|
| Age at death: | 4 months | | |
| Cause of death: | Sudden Infant Death Syndrome (SIDS) | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A forty-year-old father found his 4½-month-old infant unresponsive around 4:00am. The infant was found on his back in his bassinette with a light blanket covering him up to his chest. The infant was staying with his father for the weekend. The father fed the baby between 9:30 and 11:30pm and put the baby to bed. He checked on the baby when he awoke at 4:00am and found him cold. The father called 911 and the baby was pronounced deceased at home. The father reported the baby had experienced a fever, congestion, and diarrhea in the week before his death, but he did not have any symptoms on the night before he died. Law enforcement called the hotline noting the infant had no signs of injuries or abuse. A report was taken against the father for investigation of death by neglect. It was ultimately unfounded.

Prior History:   A month after the infant's birth a family member called the hotline to report that the infant's teen brother, who lived with his father and step-mother, was concerned about his half-sibling's safety. The teen had been removed from his mother's care seventeen years earlier in another state. The mother was presently homeless and psychiatrically hospitalized and believed to have a substance abuse problem. The hotline took a report for investigation of substantial risk of physical injury/environment injurious to health and welfare by neglect that was indicated in January 2017. In December 2016 the investigator referred the family for intact family services. The mother agreed to allow the infant to stay with the maternal aunt and maternal grandmother until she became stable. The mother was staying in a shelter. The Department allowed the infant's father to have unsupervised overnight visitation with him. In the week prior to the infant's death, the family had signed short-term guardianship papers for the infant's half-sibling's step-mother and father to be the infant's primary caregivers.

| Child No. 93 | DOB 12/13 | DOD 02/17 | Natural |
|---|---|---|---|
| Age at death: | 3 years | | |
| Cause of death: | Complications of DiGeorge Syndrome | | |
| Reason For Review: | Pending child protection investigation at time of child's death; closed intact family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A three-year-old medically complex girl was taken ill to the local hospital by her 22-year-old mother and 39-year-old maternal grandmother. The child was transferred to a children's hospital. Seven days later the child was discharged to her mother and that night the child went into cardiac arrest and died from complications that arose from her severe expression of DiGeorge Syndrome. DiGeorge syndrome is caused by the microdeletion of chromosome. The child suffered from congenital heart defects, immuno deficiencies, and renal, pulmonary and gastrointestinal problems. The child had a g-tube for feeding and required oxygen. The local hospital called the hotline with a report of medical neglect. The  investigation was unfounded after the girl's death as doctors opined her condition was a result of her complex medical issues. No death allegation was added.

Prior History:    In September 2014 a social worker from the long term care facility caring for the baby since birth, reported that neither the mother (who has developmental delays) nor the grandmother had been trained to care for the baby who could not be discharged until a caregiver was identified and trained. The social worker also reported that the family had not followed up with the DSCC (Division of Specialized Services). Over the next two months the mother and grandmother completed several trainings. The investigator referred the case for intact family services and the allegation of medical neglect was unfounded. In March 2015 a second investigation was initiated after the mother and grandmother missed two appointments in January; one in February; and one in March. Transportation was an issue and the family refused to go to the local hospital (a level II trauma center affiliated with a major teaching hospital), to which Medicaid would cover transportation. The investigator and the intact family worker visited the home together. After the family refused to take the child to the local hospital for an injection that was missed, protective custody was taken and the child was placed in a care facility. The mother and grandmother were indicated for medical neglect. Though the Department was granted temporary custody, the child was returned home twenty days later. The medical care of the child was transferred to another hospital and the family made all of their appointments. The intact family case closed in August 2015. In September 2015, police notified the hotline that the grandmother had been arrested for battering her 18-year-old daughter. The grandmother told the investigator her daughter had attacked the mother of the deceased, who was pregnant, and she intervened. The grandmother was indicated for substantial risk of physical injury by abuse to her minor children ages 16, 9 and 7 years. In January 2016, the hotline was notified of the death of the mother's three-week-old baby. The 23-year-old father had taken the baby, who was born with congenital heart defects, into bed with him and later discovered the baby unresponsive. The cause and manner of death for the baby were undetermined. The then two-year-old sibling was taken into protective custody, but the judge ordered the baby returned home two days later and that an intact family case be opened. An intact family worker regularly visited the home and found the child was consistently receiving medical care. After the death investigation on the infant was unfounded and the petition withdrawn from court. The mother requested the intact family case be closed.

| Child No. 94 | DOB 09/14 | DOD 02/17 | Natural |
|---|---|---|---|
| Age at death: | 2 years | | |
| Cause of death: | Anoxic Encephalopathy with Bilateral Lobar Pneumonia | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Full investigation, Report to Director December 1, 2017 | | |

Narrative: A two-year-old boy collapsed on the stairs in the lobby of a family friend's apartment building and stopped breathing. Paramedics were able to revive him and he was taken by ambulance to the hospital. He was transferred to a children's hospital because of his critical condition, and he remained in a coma until his death four days later. The child had been sick in the days leading to his death. He had a history of breathing-related problems when he became sick, and he was diagnosed with asthma shortly before his death. The Department unfounded the mother for head injuries and death by abuse.

Prior History:    Twenty-three days prior to the child's death, daycare staff called the hotline for what they believed was burns to both of the child's hands on multiple planes. The daycare staff added that they had observed injuries to the boy's face the week before. A report was taken for investigation of burns by neglect and substantial risk of physical injury/environment injurious to health and welfare by neglect to the child by his 21-year-old mother. During the investigation a doctor diagnosed the boy's hand injuries as possible friction burns; he observed no injuries to the child's face. The mother stated that the child fell at daycare causing the injuries to the child's hands and that he slept on his face causing swelling. The investigator did not share the mother's explanation with a medical professional nor did she talk to daycare staff about whether the child had fallen. The investigation was unfounded for both allegations two days prior to the boy's hospitalization and eventual death.

| Child No. 95 | DOB 04/16 | DOD 03/17 | Natural |
|---|---|---|---|
| Age at death: | 11 months | | |
| Cause of death: | Immunological disorder | | |
| Reason For Review: | Child of a youth in care | | |
| Action Taken: | Investigatory review of records | | |

Narrative: An eighteen-year-old youth in care's 19-year-old fiancée found the youth's 11-month-old infant unresponsive around 11:00am in the infant's pack n play crib. The youth and her child lived with her fiancée and his family. The infant was last seen alive at 4:00am by the mother. The mother had taken the infant to the emergency room the night before and the infant was diagnosed with thrush. They got home at 10:00pm and the mother gave the infant her prescription medicine and a bottle and put her to sleep in her pack n play. Upon discovering the infant unresponsive, the family called 911 and the infant was pronounced deceased at the family's home by a deputy coroner. There was no suspicion of abuse or neglect and the Department did not take a report for investigation of the infant's death. The infant was the mother's only child.

Prior History:    The mother entered foster care in 2008 at the age of 9 when it was discovered that she was routinely caring for her 2-year-old sister with no, or inappropriate, adult supervision. Parental rights were eventually terminated. In August 2016 someone working with the mother called the hotline to report that her 3-month-old infant had a bruise on her head the prior week and a bruise on her leg yesterday. It was unknown how the infant got the bruises because developmentally she was not yet rolling over. The worker said the mother had never been observed to be aggressive with the infant or do anything to physically harm her. She also said the infant had been left in the care of various individuals over the past week and when the reporter saw the bruise it was after the infant had been picked up from a caretaker. A report was taken for investigation of cuts, bruises, welts by an unknown perpetrator. The investigation was unfounded because of insufficient evidence. When the investigator saw the infant she had no injuries. While the reporter had seen a bruise on the infant's head, she did not see a bruise on the infant's leg, but had been told by the mother's foster parent that the infant might have a bruise on her leg. The mother denied ever seeing a bruise on the infant's leg.

| Child No. 96 | DOB 06/98 | DOD 04/17 | Natural |
|---|---|---|---|
| Age at death: | 18 years | | |
| Cause of death: | Seizure | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: An eighteen-year-old transported to the hospital after his 52-year-old mother found him unresponsive in his bed. The male teen was pronounced dead at 1:36pm in the emergency department of the hospital. The investigator from the coroner's office, in reporting the death, stated the teen had a history of autism and severe seizures. The mother reported that the teen had a severe seizure in the week prior to his death.

Prior History:   In May 2016 a school social worker reported that the teen attended their special education program because of his autism and epilepsy. The mother had missed his daily epilepsy medication several times, which lead to him being hospitalized and he recently had poor hygiene with a strong body odor. The mother would put three diapers on him saying that the multiple diapers were to absorb the urine if he had a seizure. In addition the teen had stitches a few weeks ago but the mother has not followed up and skin was growing around the stitches. A child protection investigator met with the teen at his home. The investigator observed him wearing a helmet to protect him when he had seizures. He waved hello and seemed to understand simple instructions, though he did not speak to the investigator. The investigator documented that the home was clean. The investigator spoke with the mother who reported the teen just had his stiches taken out the day before, later than they had planned because she was simultaneously caring for her ill parents. The mother explained that the teen had seizures about once or twice a week and she would give him medicine if his seizures lasted longer than four minutes. The investigator also spoke with the teen's neurologist and primary care physician. Neither had any concerns about abuse or neglect. In July 2016 the allegations of environmental neglect and medical neglect were unfounded.

| Child No. 97 | DOB 10/16 | DOD 04/17 | Natural |
|---|---|---|---|
| Age at death: | 6 months | | |
| Cause of death: | Sudden Unexplained Infant Death due to Aspiration Event | | |
| Reason For Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

Narrative:  Forty-four-year-old foster father found the six-month-old infant unresponsive in his crib around 9:30pm. The infant was in the care of the foster parent's eighteen-year-old son and his eighteen-year-old girlfriend while the foster parents went out for dinner. The foster mother, a nurse, performed CPR on the infant and the foster father called 911. The infant was taken to the hospital and declared brain dead the next morning. Medical personnel called the hotline to report the infant's death and that the infant had a rib fracture and two small retinal hemorrhages in his right eye. A child protection investigation was opened for death by neglect by the foster parents and their son, and for bone fractures by neglect by the son. The son reported that he fed the infant around 8pm, and put him to bed around 8:30pm; he stated he placed him on his back, in a crib, and on top of a fuzzy blanket. The son reported that the infant cried for a little while and then became quiet, which he assumed meant the infant had fallen asleep. The foster parents returned home an hour later. The son's girlfriend confirmed the story. The coroner reported that the bone fracture and retinal hemorrhaging could be a result of CPR and did not find any signs of trauma to the infant. The foster parents and their son were unfounded for death by neglect and bone fractures by neglect. A foster home licensing complaint was also filed due to the infant's death. During the child protection investigation, the investigator expressed concern about a previously indicated investigation on the son from 2011. The investigator determined that a protective plan be implemented that the son could not be in a caretaking role with any foster child in the future. The son joined the military and no longer resides in the home. The protective plan is still in place.

Prior History:    At the time of the infant's birth, his 29-year-old mother had an open placement case involving her two older children who were placed with their paternal grandmother. The mother had been involved with the Department three times prior to the infant's birth. Her two older children had lived with their father and his girlfriend, who were accused multiple times of selling drugs out of their home. The older children were removed from their fathers care and the case was opened in juvenile court. The mother was made part of those cases. She was not the subject of any child protection investigation leading to the older children being in care. However, due to her lack of participation in services, she was deemed unfit and had done nothing to regain her fitness when the infant was born. After the infant was born, the hospital social worker called the hotline to report that the mother was unfit and had just given birth. A child protection investigation was opened for substantial risk of physical injury/environment injurious to health and welfare by neglect. The infant's father was a registered sex offender. The department took protective custody and the infant was placed in a traditional foster home. Both parents regularly attended supervised visits with the infant. The mother was recommended to complete individual therapy, a substance abuse evaluation, and a psychiatric consultation due to her history of substance use and mental health issues. The father was recommended to attend counseling and parenting classes. The mother had begun services, but the father had not engaged in services. Two weeks before the infant's death, the father told the caseworker he thought his son should be adopted by the foster parents.

| Child No. 98 | DOB 10/15 | DOD 04/17 | Natural |
|---|---|---|---|
| Age at death: | 18 months | | |
| Cause of death: | Viral bronchitis and pneumonia | | |
| Reason For Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Fifty-one-year-old paternal grandmother found the eighteen-month-old twin boy unresponsive on his stomach in his pack-n-play on top of a blanket and mattress pad, with another small blanket on top of him. There was one small toy in the pack-n-play with the child. He and his twin brother were placed with the grandmother in relative foster care. The grandmother called 911. The boy was pronounced deceased an hour later. The coroner called the hotline to report the death, and stated  there was no sign of trauma and no obvious hazards. A child protection investigation was opened against the grandmother for death by neglect, and a companion report was taken and a child protection investigation opened against the parents for death by neglect. The investigator learned that the twins each had their own pack-n-play. The night before, the grandmother supervised a visit between the mother and the twins at the grandmother's house. The grandmother picked up the twins from daycare and the mother arrived at the home around 6:40pm. The mother and grandmother fed the twins and the mother put the twins to sleep around 8:15pm. The mother was unsupervised when she put the twins to sleep in their room. The mother left the house shortly after putting the twins to sleep. The grandmother found him unresponsive the next morning. The investigator spoke to the pediatrician, who stated that the twins were seen a week earlier for a well-child check and the doctor reported no concerns, but the medical records showed that the boy had respiratory issues for the three weeks before his death. The other twin was seen two days before the boy's death and he presented with a cough and fever. The doctor prescribed an antibiotic. The daycare provider reported no concerns about the children the day before the boy's death. The autopsy showed that the boy died from viral bronchitis and pneumonia. The allegations of death by neglect against the grandmother and the parents were unfounded.

Prior History:     The twins were born to their twenty-nine-year-old mother and thirty-year-old father who have two other children together, born in 2009 and 2010. The mother also had two daughters from a previous relationship. In 2010, the children were taken into care due to abuse by the mother to one of the older daughters. The mother's two oldest children were placed with their father. The couple's two older children were placed with paternal relatives who later adopted the children. In October 2015 one of the twins tested positive for opiates at birth. The hotline was called for substantial risk of physical injury, environment injurious to health and welfare and substance misuse. The investigation was unfounded because the mother had a prescription from her doctor for hydrocodone. In December 2016 the twins came into care after allegations that the couple was caring for a friend's 2-year-old boy when he sustained life-threatening abusive injuries. The twins were placed with their paternal grandmother and her paramour. That child protection investigation was pending when the twin died in his grandmother's care. The couple was eventually indicated for the abusive injuries as they were the sole caretakers for over a week before the injuries, but they were not criminally charged. While the twins were in care with their paternal grandmother, the parents were referred for parenting classes, counseling, a domestic violence assessment, and substance abuse assessments. The parents complied with services and assessments. Three months after the case opened, the parents were allowed supervised visits with the twins. The surviving twin remains in foster care.

| Child No. 99 | DOB 08/16 | DOD 04/17 | Natural |
|---|---|---|---|
| Age at death: | 8½ months | | |
| Cause of death: | Carnitine Palmitoyltransferase II Deficiency | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A twenty-eight-year-old mother found her eight-month-old daughter unresponsive in the morning. She called 911 around 11:00am and the baby was taken to the hospital in full cardiac arrest; she was pronounced deceased twenty minutes later. The baby was born with the genetic condition Carnitine Palmitoyltransferase II Deficiency which prevents the body from using certain fats for energy, particularly during periods without food. It requires a special diet and can cause a host of medical problems. The baby had been sick for about a week before her death. The night before she died, her mother and 23-year-old father were involved in a domestic dispute and the police were called. The mother had caused small cuts on the father's back, the back of his head, and one of his eyebrows swinging scissors. Emergency services personnel witnessed the parents pulling the baby back and forth. They examined the baby and cleared her around 2:00am. The mother declined further medical treatment for the baby. The father was arrested on an outstanding warrant and taken to the hospital to have his injuries examined. Police called the hotline and a report was taken against the parents for substantial risk of physical injury/environment injurious to health and welfare by neglect to the baby and her 6-year-old sister. An allegation of death by abuse by the father was added later that day when the hotline was notified of the baby's death. The substantial risk allegation was indicated and the death allegation was unfounded. The 6-year-old was placed in a safety plan with the maternal grandmother and an intact family services case was opened with mother being allowed to live in the maternal grandmother's home so long as her contact with her daughter was supervised.

Prior History:   From the time of the infant's birth through March 2017, there were three unfounded reports. The first report was unfounded for substance misuse as the only drug the infant tested positive for at birth was marijuana, which is not a controlled substance. The second report was unfounded for substantial risk of physical injury/environment injurious to health and welfare by neglect after it was shown the parents were engaged in substance abuse services and the baby's medical needs were being addressed. The third report was unfounded for medical neglect after the parents followed through on medical appointments for the baby. Three days before the infant died, a medical provider called the hotline to report the mother had canceled the infant's monthly cardiology appointment without rescheduling it and the infant was overdue for the appointment. After multiple attempts, the investigator saw the family in their home the day before the infant's death. The baby appeared fussy and the mother reported she had a fever and was teething. The investigator told the mother to schedule the appointment and call her the next day to let her know the date. After the infant's death, the parents were indicated for medical neglect; in addition to missing the cardiology appointment, the infant had missed appointments with her dietician and genetic specialist.

| Child No. 100 | DOB 04/17 | DOD 04/17 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 0 |
| Cause of death: | Prematurity due to placental abruption |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative: A premature infant, born at 24 weeks gestation via emergency C-section due to placental abruption, died two hours after his birth. The twenty-seven-year-old mother, who was brought to the hospital in police custody, claimed that she was shoved against a wall during her arrest; and complained of abdominal pain and vaginal bleeding. Mother denied drug use but tested positive for marijuana. The Department did not conduct a child protection investigation of the infant's death but did open an investigation for substantial risk of physical injury/environment injurious by neglect to the four surviving siblings because of concerns of domestic violence in the parents' relationship.

Prior History:   There have been numerous calls to the hotline alleging inadequate supervision and substantial risk of physical injury/environment injurious by parents and other caretakers; the mother was indicated one time for inadequate supervision in 2012. In March 2017, a hospital social worker contacted the hotline after the mother brought her 7-year-old child to the hospital with wrist pain. The reporter was concerned that the explanation was not consistent with the injury and was concerned for the children because of the mother's behavior in the emergency room. The child protection investigation was unfounded for inadequate supervision and substantial risk of physical injury/environment injurious when the three siblings provided the same information that the child was running from a dog when he fell down.

| Child No. 101 | DOB 11/07 | DOD 05/17 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 9½ years |
| Cause of death: | Bronchial asthma |
| Reason For Review: | Closed intact family services case within a year of child's death |
| Action Taken: | Investigatory review of records |

CHILD DEATH REPORT

Narrative: A nine-year-old boy had been complaining of trouble breathing on and off all day; he used his asthma inhaler pump throughout the day. After returning home from being out with his 27-year-old father, he complained of chest pain and his 25-year-old mother started him on a nebulizer treatment. The child said he was feeling ok, but a little while later he said the treatment was not working. The mother called 911 and when paramedics arrived, the child was turning blue and panicking. He was taken to a children's hospital where he later died. The coroner called the hotline to report the child's death. A report was taken for investigation of death by neglect and substantial risk of physical injury/environment injurious to health and welfare by neglect. The death by neglect allegation was unfounded because there was no indication that the child's parents hadn't been treating his asthma. The substantial risk of physical injury allegation was indicated because during the investigation the mother reported a recent incidence of domestic violence with one of her children's fathers with whom she had a history of domestic violence. An intact family services case was opened. The mother's four surviving children, ages 3, 5, 6, and 8, have since entered foster care because of the mother's continued relationship with the father.

Prior History:    The family has a history with DCFS dating to July 2009 when the mother's boyfriend (later, the father of the 6-year-old) was indicated for bone fractures and cuts, bruises and welts by abuse to the mother's 2-month-old infant daughter. The infant and the deceased were placed in foster care but returned to their mother in June 2011. Five years later, in February 2016, the same child went to school with lash marks and bruises on her arm. The same boyfriend was indicated for cuts, bruises, welts by abuse, and the mother was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect. An intact family services case was open from March 2016 to August 2016; the mother met regularly with the worker, participated in some parenting classes, and received Norman Funds. Her boyfriend was incarcerated at the time and she reported their relationship was over. However, she resumed the relationship once he was released.

| Child No. 102 | DOB 05/17 | DOD 05/17 | Natural |
|---|---|---|---|
| Age at death: | 2 days | | |
| Cause of death: | Persistent Pulmonary Hypertension secondary to Meconium Aspiration | | |
| Reason For Review: | Open placement case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A thirty-year-old mother gave birth to a full term baby who went into immediate respiratory distress needing transfer to a children's hospital. The mother tested positive for and admitted to cocaine, alcohol, and opiate use during pregnancy. The baby's urine was positive for cocaine. The baby had collapsed lungs and a hole in one of her lungs. The Department conducted an investigation at the time of the birth. The mother would only speak to the investigator on the phone and admitted to drug use. The investigation was indicated against the mother for substance misuse and unfounded for death by neglect as doctors reported that they could not say maternal drug use caused the death.

Prior History: The mother has five older children, ages 5, 8, 10, 12 and 17 years. None of the children are in her care. The mother has four prior indicated reports for inadequate supervision and medical neglect. In 2013 all the children came into care. The four youngest children were adopted by a relative in 2015. The 17-year-old remains a youth in care, though the mother's rights have been terminated; the youth lives with a different relative.

| Child No. 103 | DOB 06/17 | DOD 06/17 | Natural |
|---|---|---|---|
| Age at death: | 3 days | | |
| Cause of death: | Complications due to premature birth, autopsy pending | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A four-day-old infant born prematurely at 26 weeks gestation died in the hospital. He had a collapsed lung and a brain bleed. DCFS did not investigate the infant's death, however, it was referred to the Southern Illinois Child Death Investigation Task Force.

Prior History:    The family's first involvement with DCFS occurred in 2009 when an unknown reporter called the hotline with concern the parents were neglecting their 3-month-old infant. An investigation was unfounded. In 2015, two more investigations were unfounded: one for cuts, bruises, welts to the child, then 6 years old, by the mother's paramour and the other for environmental neglect. The first indicated investigation stemmed from a July 2016 report that while babysitting the child the mother's boyfriend's 20-year-old son sexually molested the child as well as tied her to a chair and duct-taped her mouth because she talked too much. After investigation, including a victim sensitive interview, the young man was indicated for tying/close confinement. A January 2017 investigation was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to the 8-year-old and her 3-month-old sister, but after appeal it was reversed to unfounded. A February 2017 report led to the 8-year-old child's maternal grandmother being indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect. The grandmother had taught the child how to make herself throw up after eating while the child stayed with her for the summer. The child had since lost a lot of weight and was hospitalized for purging, stating she heard her grandmother's voice commanding her to do it. A May 2017 report was unfounded on the mother and her boyfriend for environmental neglect and on the boyfriend for cuts, bruises, welts to the child. Twice, in September 2015 and January 2017, preventive services requests were made for the family because of concerns of neglect and chronic lice. An intact family services case was opened in January 2017 and closed in July 2017. During the case, the worker assured the mother addressed the medical needs of the children; she confirmed counseling was in place for the eight-year-old child; and ensured the parents participated in counseling and random drug urine screens. The worker offered grief counseling, but the family said they were seeking it through their church.

| Child No. 104 | DOB 09/14 | DOD 06/17 | Natural |
|---|---|---|---|
| Age at death: | 2½ years | | |
| Cause of death: | Bronchial asthma | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: A thirty-two-year-old mother found her 2½-year-old son unresponsive after laying him down on a bed. Emergency medical services and the coroner called the hotline to report the child's death. The Department took a report for investigation of death by abuse against the mother. Police also investigated the child's death. The mother had taken the child, who had had a cold for a couple of days, to the maternal grandmother's home. As they walked home, the child fell on his buttocks and appeared stunned so the mother carried him the rest of the way to her god-brother's home. When she laid the child on a bed, his eyes were open but he was unresponsive. The god-brother called 911. The DCFS investigation was unfounded and the police investigation was closed after the child, who had no signs of abuse or neglect, was found to have died from bronchial asthma.

Prior History:    In April 2016 the Department initiated an investigation after police called the hotline to report the mother had come into the station to say she had just been the victim of a physical altercation with the child's 39-year-old father. The parents had violated a no contact order of protection by the father visiting the child in the mother's apartment. The mother had left the child, who witnessed the altercation, in the home with the father and when police responded, the father was gone and the child was alone. The mother was not injured. The 1½-year-old was observed to have some scratches and bruises on his legs, but there was insufficient evidence that they occurred during the parents' altercation. The parents were unfounded for cuts, bruises, welts, but indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect and inadequate supervision. After 2½ months of inactivity on the investigation, it was reassigned and completed in early August, with a referral for the mother to receive domestic violence counseling.

## SUICIDE

| Child No. 105 | DOB 5/00 | DOD 7/16 | Suicide |
|---|---|---|---|
| Age at death: | 16 years | | |
| Cause of death: | Gunshot wound to the head | | |
| Reason For Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 106 | DOB 12/01 | DOD 10/16 | Suicide |
|---|---|---|---|
| Age at death: | 14 years | | |
| Cause of death: | Blunt force trauma due to being struck by a train | | |
| Reason For Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 107 | DOB 5/01 | DOD 6/17 | Suicide |
|---|---|---|---|
| Age at death: | 16 years | | |
| Cause of death: | Prescription drug overdose | | |
| Reason For Review: | Unfounded child protection investigation within a year of teen's death | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 108 | DOB 9/97 | DOD 9/17 | Suicide |
|---|---|---|---|
| Age at death: | 20 years | | |
| Cause of death: | Hanging | | |
| Reason For Review: | Youth in care | | |
| Action Taken: | Investigatory review of records | | |

## 18-YEAR DEATH RETROSPECTIVE

**TOTAL DEATHS BY CASE STATUS FY 2000 TO FY 2017**

| FISCAL YEAR | 2000-11 | | 2012 | | 2013 | | 2014 | | 2015 | | 2016 | | 2017 | | TOTAL | | AVERAGES | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CASE STATUS | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | 00-17 | % |
| Youth in Care | 316 | 24.6% | 19 | 17.9% | 15 | 16.1% | 19 | 19.2% | 24 | 25.0% | 17 | 17.0% | 20 | 18.5% | 430 | 23% | 24 | 23% |
| Unfounded DCP | 244 | 19.0% | 32 | 30.2% | 19 | 20.4% | 28 | 28.3% | 30 | 31.3% | 23 | 23.0% | 33 | 30.6% | 409 | 22% | 22 | 21% |
| Pending DCP | 147 | 11.5% | 12 | 11.3% | 12 | 12.9% | 16 | 16.2% | 14 | 14.6% | 26 | 26.0% | 22 | 20.4% | 249 | 13% | 13 | 13% |
| Indicated DCP | 88 | 6.9% | 12 | 11.3% | 10 | 10.8% | 6 | 6.1% | 5 | 5.2% | 8 | 8.0% | 8 | 7.4% | 137 | 7% | 8 | 7% |
| Child of Youth in Care | 52 | 4.1% | 1 | 0.9% | 0 | 0.0% | 0 | 0.0% | 1 | 1.0% | 2 | 2.0% | 1 | 0.9% | 57 | 3% | 3 | 3% |
| Open Intact | 200 | 15.6% | 14 | 13.2% | 7 | 7.5% | 10 | 10.1% | 3 | 3.1% | 9 | 9.0% | 15 | 13.9% | 258 | 14% | 14 | 14% |
| Closed Intact | 52 | 4.1% | 2 | 1.9% | 8 | 8.6% | 2 | 2.0% | 9 | 9.4% | 7 | 7.0% | 6 | 5.6% | 86 | 5% | 5 | 5% |
| Open Placement/ Split Custody | 77 | 6.0% | 1 | 0.9% | 10 | 10.8% | 13 | 13.1% | 6 | 6.3% | 3 | 3.0% | 2 | 1.9% | 112 | 6% | 6 | 6% |
| Closed Placement/ Return Home | 19 | 1.5% | 1 | 0.9% | 4 | 4.3% | 0 | 0.0% | 0 | 0.0% | 1 | 1.0% | 0 | 0.0% | 25 | 1% | 1 | 1% |
| Others | 87 | 6.8% | 12 | 11.3% | 8 | 8.6% | 5 | 5.1% | 4 | 4.2% | 4 | 4.0% | 1 | 0.9% | 121 | 6% | 7 | 7% |
| TOTAL | 1282 | 100% | 106 | 100% | 93 | 100% | 99 | 100% | 96 | 100% | 100 | 100% | 108 | 100% | 1,884 | 100% | 104 | 100% |

**CHILD DEATHS BY DCFS CASE STATUS AND MANNER OF DEATH FY 2000 THROUGH 2017**

| FISCAL YEAR | 00-11 | 12 | 13 | 14 | 15 | 16 | 17 | Totals |
|---|---|---|---|---|---|---|---|---|
| **Total Deaths** | 1282 | 106 | 93 | 99 | 96 | 100 | 108 | 1884 |
| **Youth in Care** | 316 | 19 | 15 | 19 | 24 | 17 | 20 | 430 |
| Natural | 178 | 8 | 6 | 8 | 10 | 5 | 6 | 221 |
| Accident | 46 | 2 | 2 | 4 | 3 | 2 | 3 | 62 |
| Homicide | 62 | 7 | 3 | 4 | 9 | 7 | 6 | 98 |
| Suicide | 14 | 2 | 1 | 1 | 1 | 2 | 3 | 24 |
| Undetermined | 16 | 0 | 3 | 2 | 1 | 1 | 2 | 25 |
| **Unfounded Investigation** | 244 | 32 | 19 | 28 | 30 | 23 | 33 | 409 |
| Natural | 92 | 6 | 3 | 5 | 5 | 8 | 8 | 127 |
| Accident | 79 | 13 | 7 | 9 | 12 | 8 | 13 | 141 |
| Homicide | 40 | 7 | 3 | 6 | 4 | 4 | 6 | 70 |
| Suicide | 10 | 0 | 0 | 1 | 2 | 2 | 1 | 16 |
| Undetermined | 23 | 6 | 6 | 7 | 7 | 1 | 5 | 55 |
| **Pending Investigation** | 147 | 12 | 12 | 16 | 14 | 26 | 22 | 249 |
| Natural | 48 | 4 | 2 | 5 | 3 | 8 | 7 | 77 |
| Accident | 41 | 4 | 3 | 2 | 4 | 3 | 8 | 65 |
| Homicide | 30 | 3 | 3 | 1 | 3 | 3 | 1 | 44 |
| Suicide | 3 | 0 | 0 | 0 | 0 | 2 | 0 | 5 |
| Undetermined | 25 | 1 | 4 | 8 | 4 | 10 | 6 | 58 |
| **Indicated Investigation** | 88 | 12 | 10 | 6 | 5 | 8 | 8 | 137 |
| Natural | 36 | 3 | 1 | 0 | 1 | 3 | 3 | 47 |
| Accident | 30 | 4 | 6 | 1 | 1 | 3 | 3 | 48 |
| Homicide | 10 | 3 | 1 | 1 | 1 | 1 | 1 | 18 |
| Suicide | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 3 |
| Undetermined | 11 | 2 | 1 | 4 | 2 | 0 | 1 | 21 |
| **Child of a Youth in Care** | 52 | 1 | 0 | 0 | 1 | 2 | 1 | 57 |
| Natural | 23 | 0 | 0 | 0 | 0 | 0 | 1 | 24 |
| Accident | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 12 |
| Homicide | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 9 | 1 | 0 | 0 | 1 | 2 | 0 | 13 |

| FISCAL YEAR | 00-11 | 12 | 13 | 14 | 15 | 16 | 17 | Totals |
|---|---|---|---|---|---|---|---|---|
| **Open Intact** | **200** | **14** | **7** | **10** | **3** | **9** | **15** | **258** |
| Natural | 99 | 4 | 1 | 4 | 0 | 2 | 5 | 115 |
| Accident | 47 | 5 | 4 | 3 | 1 | 2 | 4 | 66 |
| Homicide | 27 | 1 | 0 | 2 | 1 | 1 | 2 | 34 |
| Suicide | 2 | 0 | 0 | 0 | 1 | 0 | 0 | 3 |
| Undetermined | 25 | 4 | 2 | 1 | 0 | 4 | 4 | 40 |
| **Closed Intact** | **52** | **2** | **8** | **2** | **9** | **7** | **6** | **86** |
| Natural | 18 | 1 | 1 | 1 | 3 | 1 | 2 | 27 |
| Accident | 18 | 1 | 3 | 0 | 1 | 2 | 1 | 26 |
| Homicide | 10 | 0 | 2 | 1 | 2 | 1 | 2 | 18 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 6 | 0 | 2 | 0 | 3 | 3 | 1 | 15 |
| **Open Placement/Split Custody** | **77** | **1** | **10** | **13** | **6** | **3** | **2** | **112** |
| Natural | 47 | 0 | 5 | 10 | 4 | 1 | 2 | 69 |
| Accident | 12 | 0 | 3 | 1 | 1 | 0 | 0 | 17 |
| Homicide | 7 | 1 | 1 | 2 | 0 | 0 | 0 | 11 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 11 | 0 | 1 | 0 | 1 | 2 | 0 | 15 |
| **Closed Placement** | **12** | **0** | **0** | **0** | **0** | **0** | **0** | **12** |
| Natural | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| Accident | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Homicide | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Adopted** | **6** | **0** | **0** | **0** | **0** | **0** | **0** | **6** |
| **Former Youth in Care** | **13** | **1** | **2** | **4** | **2** | **1** | **0** | **23** |
| **Return Home** | **17** | **1** | **4** | **0** | **0** | **1** | **0** | **23** |
| **Interstate compact** | **3** | **0** | **0** | **0** | **0** | **0** | **0** | **3** |
| **Preventive services** | **33** | **1** | **1** | **0** | **0** | **0** | **1** | **36** |
| **Subsidized Guardianship** | **1** | **0** | **0** | **0** | **0** | **0** | **0** | **1** |
| **Child of former Youth in Care** | **4** | **0** | **0** | **0** | **0** | **0** | **0** | **4** |
| **Extended family support** | **6** | **5** | **0** | **0** | **2** | **1** | **0** | **14** |
| **Child Welfare Referral** | **12** | **5** | **5** | **1** | **0** | **2** | **0** | **25** |

## DEATHS IN INTACT FAMILY SERVICES CASES FY 2010 - 2017

**INTRODUCTION**

Last year's annual report to the Governor and General Assembly included a 17 year (2000-2016) analysis of 323 youth whose cause of death was ruled homicide and who had been involved with the Department in the year prior to their murder. The retrospective report detailed that most (75%) of the homicides of youth in care were the result of street violence, and nearly a third (101 deaths) of all homicides of children (323 in total) with some form of Departmental involvement were caused by street violence. A secondary investigation of the 11 street homicides of youth in care during FY2016, also included in last year's annual report, illuminated the Department's inadequate response to the varied needs of older youth, most especially the needs of youth who live in predominately high risk, high poverty neighborhoods. This fiscal year, eight children with Department involvement, ranging in age from 13 to 20 years old, were killed because of street violence. One homicide involved an 18-year-old youth in care, who was shot and killed in her Washington Heights neighborhood while she attended a vigil for a friend who had been killed the previous day. Another street-related death occurred after a 20-year-old youth in care and his cousin stepped outside of his aunt's house in the Austin neighborhood to meet a friend. The youngest child, a 13-year-old, was killed while playing basketball with his friends (also in the Washington Heights neighborhood), a fifth of a mile from his house.



Using the Center for Disease Control's WONDER data, accessed December 2016 and December 2017, the Office of the Inspector General compared the homicides of all children in Illinois to the homicides of youth with Departmental involvement. The CDC data was current to 2015 and had not reported on data for 2015 or 2016. To obtain the crude rate, investigators divided the number of homicides in Illinois of youth 15-19 by the total number of youth in Illinois of the same age.

## DEATHS IN INTACT FAMILY SERVICES CASES

This year, because of the public's concern with the deaths of children whose families were receiving intact family services at the time of the child's death, we are providing an analysis of 2010-2017 data on the deaths of 91 children who were part of an open intact family case at the time of their death. During this 7 year period, 31,000 families received intact family services. A group synopsis of the manner of death of 91 children (Natural, Accident, Homicide and Undetermined) is provided below. The most chilling, if not the most sorrowful child deaths, are killings at the hands of a child's parents, their partners, or relatives. Over the last 7 years, 10 children were victims of homicide while their family was receiving intact family services, seven of whom were killed by parents, their partners or relatives. Over the same seven year period eight children were victims of homicide within a year after the family's intact case was closed. This analysis reviews the 91 deaths that occurred while there was an open intact family case, as well as homicides in recently closed intact family cases. Case examples are found on pages 124-129.



*There was one child death by suicide within this seven year period, which occurred in FY2015.
**Note. From "Executive Statistical Summary," by Department of Children and Family Services – Division of Quality Assurance, June 2013, p.5. & from "Executive Statistical Summary," by Department of Children and Family Services – Division of Quality Assurance, July 2017, p.7.



While some statisticians may describe these homicides as statistically insignificant, the fiduciary response of child welfare professionals has to be that there is something strongly amiss with the homicides of children who we were there to protect. If we as child welfare professionals hold ourselves accountable, while recognizing that we are always in a learning environment, we may be better able to lower the rate of child homicides. Our analysis of the homicides includes new and historical recommendations relevant to the safety of each of the children who died at the hands of those who were to love and nurture them. We owe these children no less.

*The Range of Intact Family Services*
With few exceptions, families receiving intact family services from the Department are those families in which there has been an *indicated* finding of abuse or neglect. The services are generally voluntary, but the Department has an option of going to court for a protective order to compel compliance with intact services when necessary to protect the safety and well-being of the children.

The range and extent of problems within these families varies, and as such, the range, intensity and expertise of services should vary. Almost 20 years ago when our communities were struggling with the cocaine epidemic, the Inspector General in conjunction with the Department developed specialized intact family services for substance exposed infants who remained in the care of their family after an indicated finding of neglect. The length of services was 18 months because shortcuts in the road to recovery do not safely anchor the family. The rate the Department paid for the intensive services (visits multiple times a week with the nuclear and extended families in the community and treatment centers) was higher than the rate it paid for generic intact family services. Each family had two workers – a child welfare worker and a substance abuse worker. Staff were cross-trained in obtaining court orders to compel service compliance when necessary. The program has been highly successful. A Recovery Matrix was developed that required the enrollment of preschool children in Head Start, and Developmental screenings for 0- to 3-year-olds. Prior to the use of the matrix, none of the preschool aged children were enrolled; the use of the Recovery Matrix resulted in 75% of the families' preschoolers being enrolled in Head Start. Recently, a

group of Northern Region private agencies, in a collaborative effort with Illinois Collaboration for Youth and the support of DCFS, sought and were awarded a multi-year federal grant from the Administration for Children and Family to provide intensive intact family services to families with substance misuse.

Over the years, the Inspector General recommended the Department move to a more specialized/targeted services model for all abuse and neglect cases. A young overwhelmed parent, whose physical discipline or emotional response to a toddler includes bruising the child, needs a different set of services than a single, struggling, working mother with a medically complex child who misses medical appointments. For example, if the bruises on the toddler appeared shortly after the mother had a new boyfriend, more intensified interventions and monitoring are warranted. The problems exponentially increase with the added presence of domestic violence and substance abuse, especially if the substance abuse is compounded by a mental illness. Add the stress of multiple children or cognitive vulnerabilities in the same family, and any reasonable person would conclude skilled interventions are needed. Presently, Illinois ranks at the bottom of the nation in funding services for the developmentally disabled, yet the Department's expectation is that the intact family services worker with a developmentally disabled parent will obtain supportive services from non-existent community resources.

In addition to the above descriptions, intact family cases can be opened when a child is "locked out" of the family's home because of ungovernable behavior of the child, fear of trafficking, gang involvement or delinquency. Again, these cases require significantly different services and expertise from those identified above.

*Contractual Requirements for Intact Family Service Providers*
In addition to procedural requirements, such as how often the family must be seen, the Program Plan for intact services has the following substantive requirements:

- Agencies cannot decline cases;
- Caseload levels above a 10:1 ratio cannot continue for more than three months;
- Staff must be familiar with and make referrals to local community and governmental resources available to families – "linkages to services beyond those provided through (DCFS Intact Family Services) are vital to performance success in serving families";
- Staff must "ensure the safety and well-being of all clients;"
- Adequate supervision (1 supervisor to 7 staff);
- Timely and complete documentation;
- Notification to the Department of critical incidents in the life of the family such as change of family composition, police involvement, suspected substance abuse, threats to safety and wellbeing;
- Compliance with the Mandated Reporting Act.

*Outcome Measures*
Separate from the provisions of the Program Plan cited above, the Department has created 12 Outcome Measures by which to judge intact agencies' contractual performance. The Outcome Measures are:

1. Whether 90% of families remain intact during service provision;
2. Whether family cases reopen within 12 months of case closure;
3. Whether 100% of children are not maltreated during service provision;
4. Whether children are maltreated within 6 months of case closure;
5. Whether cases are closed within the required time frames (6 months for less serious cases and 12 months for more serious cases);

6.  Whether all children are seen every week for the first month of services;
7.  Whether parents/caregivers are seen every week for the first month of services;
8.  Whether all children are seen once a month, after the first month;
9.  Whether parents/caregivers are seen once a month, after the first month;
10. Whether the Initial Assessment of the family is completed within 45 days;
11. Whether Service Plans are completed with 45 days;
12. Whether staff has weekly, individualized, case-specific supervision

*Comparison of Outcome Measures and Contractual Requirements*

Notably, workable caseload ratios of 10:1 were not included on the list of Outcome Measures. That fact, in conjunction with the 'No-Decline' policy, has led many agencies to continue to accept new cases when their staff is overburdened. Some agencies are handling averages of upwards of 18 cases per worker – a caseload level that invites errors and services that are more like gestures than actual interventions. At times, agencies ask to be placed on a voluntary intake hold because of the liability of heavy caseloads. In one instance, an agency was denied and several agencies reported that they are wary of asking for a hold since there may be repercussions with future assignments after they have hired staff.

When agencies decline cases because they are at their limit and cannot safely service additional cases, this is not a violation of the 'No-Decline' policy; it is compliance with the contract requirements regarding workable caseloads, and it is ethical and in the best interests of our clients.

*The Difficulty with the Contract's Outcome Measures*

Ultimately, all of the Department's and POS Agencies' work should be driven by the safety and well-being of children, and preserving and supporting families in their duty to protect and nurture their children. If the family violates this duty, the child welfare worker has a statutory duty to call the hotline, and other times a diligent worker may need to request court orders to ensure that a child remaining in their home does so under safe conditions.  Sometimes the factors that create unsafe environments are wholly outside the control of the intact agency. However, rather than measuring whether the agency is developing and monitoring protective factors associated with child safety and well-being, the Department chose to set two of the agency's outcomes as 100% no maltreatment (measured by hotline calls) and A *ceiling* of 90% of the cases remaining intact. Thus, if a child is in danger and the worker correctly identifies the risk of maltreatment, good casework would dictate that the worker and supervisor call the hotline and screen the case into court to compel compliance or support the removal of the children, depending on the severity of the risk. Contrary to seeing these actions as protective, the Contract sets up a situation whereby the agency might be penalized. These two Outcome Measures have the potential to create a dangerous disincentive to ensuring the safety of children. Additionally, in many cases the children in high risk families need to be seen more than once a month. The workload formula should reflect this likely reality.

*Lessons Learned*

Twenty-three years of closely analyzing child death cases has resulted in a wealth of data and analysis concerning those factors that are consistent with child well-being and safety. We respectfully suggest that the Department consider substituting some of the *protective* factors below for the Outcome Measures currently used. These protective factors appear consistent with the Director's reassessment of the intact family services program model and development of a "360-degree" supportive approach to provide children and families with intensive services:

- Increasing the number contacts with the family and child, rather than requiring only one contact per month for the majority of months the case is open.
- Frequent contact with child-centered/identified collaterals. School is the main social institution, outside of the family, that cares for the child. Involving teachers and school counselors provides

an added source of protection as well as information on a child's behaviors and emotional well-being. A child's sporadic or frequent absences may portend trouble at home.

- Ensuring that all children under six are enrolled in, and attending, daycare or Head Start; pre-school teachers are often keen observers of their students;
- Identifying collateral contacts with extended family who have been protectors of the child/ren in the past and developing protective barriers from exploitive family members.
- Making collateral contacts with the infant-children's pediatrician or family physician to develop a family-centered partnership for anticipatory guidance to the family. Collaboration must include informing the medical home if the family has a history of domestic violence, and/or struggles with substance abuse or mental illness, such as postpartum depression.[1]
- Retrieval and review of relevant documents, including copies of all police arrest reports related to violence and relevant parental or child mental health records before the transition meeting between the family, the child protection investigator and the intact family services caseworker.[2]

*Supervision*

The average starting salary of a private agency intact family services caseworker is $15-17.50/hour. The majority of the caseworkers are BA level with less experience than DCFS caseworkers. The ratio of caseworkers to supervisor in intact services is 7:1. Because of the intensity of problems within many of the intact families, (purportedly 20-30% presented with overwhelming risks of harm, see below), high quality supervision is essential. The supervisor must provide hands-on supervision, coaching and field training. Because of the low pay, caseworker turnover is high and many supervisors have to assume the work after a caseworker worker has resigned. Funding for a more reasonable supervision ratio (4:1) for cases identified as high risk would afford the needed critical oversight for family support and child safety.

The Department's contracts with Florida companies Mindshare and Eckerd for Predictive Analytics resulted in dire warnings to agencies that between 20% and 30% of the intact family cases the Department had given them had a 90% "probability" of death or serious injury to their children within two years. Despite the dire warnings, no extra funding, caseload relief, or automatic referrals for court protection orders accompanied the "prediction."[3]

*Barriers to Improving Intact Family Services*

The Department needs to include caseloads in its analyses of intact family service performance. While the Department established caseload ratios of 1 intact family worker to 10 families (1:10), an OIG review of monthly Agency Performance Team Reports showed most of an agency's workforce was above this ratio. Many agencies had an average caseload as high as 1 worker for 18 families (1:18). Just as high child protection caseloads led to dangerous conditions for children, high caseloads for intact family services workers compromise children's safety and well-being.

Intact Family Services Procedure 302.388(g)(7) states that "Professional collateral contacts, including child-centered collaterals, shall be made . . . **only with the family's prior knowledge and written consent.**" [emphasis in original] There is nothing in Rule or statute requiring a parent's written consent to speak with teachers, doctors and child-centered collaterals who are willing to speak to them during provision of intact family services.

---

[1] A major focus in the American Academy of Pediatrics 2008 Bright Futures is Anticipatory Guidance
[2] Ideally, these should have been subpoenaed and received by child protection investigators prior to the transitional meeting. However, Inspector General investigations found with high investigatory caseloads and a pressure to close investigations Child Protection Investigators often did not subpoena relevant police or mental health records.
[3] The vendors commented to the Chicago Tribune that their probability prediction language was perhaps too stark. The current Director determined not to renew this contract.

Rule 430, which governs confidentiality, states:

> Professionals or Other Service Providers
>> Persons receiving services from the Department or its contractual agencies are to be informed that personal health information (other than mental health information) may be shared without their consent with other service providers when it is necessary for the proper provision of services or the establishment of paternity or support for a dependent minor.
>>
>> A) With the exception of mental health records, as provided for in Section 431.100, personal information may be released by Department employees acting within their official capacity to professionals who are providing services to persons served by the Department. These professionals may include psychiatrists, psychologists, physicians, social workers, homemakers, contractors with the Department, social service agencies, foster parents, child care facilities and others providing services to persons served by the Department when the information is necessary for the proper delivery of services to the persons served by the Department.
>>
>> B) The Department, in releasing personal information, will limit the information released to that which is necessary to properly provide the service. The persons receiving the information shall be notified by the Department that the information is confidential and that the information is not to be further released except as is necessary for the proper delivery of service.
>>
>> C) Department employees may release personal information needed to establish paternity or support for a dependent child or relative.

We have been unable to find a basis in statute or rule that prohibits workers from speaking with collateral contacts who are willing to speak with them without the consent of the parent. The importance of this cannot be overstated. Professional and child-centered collateral contacts are essential to providing quality intact family services. In cases with indicated findings related to medical neglect, substance abuse or mental illness, confidentiality rules will require consents to exchange information.

Certainly, best practice includes informing the family of how the case is going to be monitored, but the current Procedures suggest that the family gets to decide how the case will be monitored, which can have dangerous consequences.

Similarly, Intact Family Services Procedure 302.388 (g)(12)(B) prohibits workers from talking with extended family collaterals without the prior knowledge and written consent of the parent. Again, the Procedures do not cite any authority for this prohibition.

Intact family services are dependent on a solid foundation laid by a thorough child protection investigation that includes retrieval of all relevant information, such as police reports, relevant mental health records, and medical records. Intact workers are at a disadvantage, as compared to child protection workers – who have power to subpoena records – in getting full records. When child protection investigators are strapped because of high caseloads, getting full records may fall to the wayside. If the child protection investigator does not utilize their administrative subpoena power to obtain all necessary documents, the problems will be compounded once the case is transitioned to intact.

**CONCLUSION**

The Department should reconsider the current Outcome Measures for intact family services to specifically include measuring worker contacts with relevant professionals (teachers, doctors, daycare) and extended family and child-centered collaterals, as well as ensuring that all children are enrolled in Head Start and receive 0-3 Developmental Screenings, as required by statute. Outcome measures that have the potential to discourage calls to the hotline or screening cases into court should be eliminated.

The current version of Intact Family Services Procedures needlessly discourages workers from speaking with relevant professionals and extended family collaterals. Child protection administrators and DCFS Legal staff could work together to ensure that all necessary records are subpoenaed during the investigation, thereby making intact family services workers' interventions more reliable.

Until this year, private agencies, by contract, had to foot the bill for parenting classes in assigned intact family services cases in which it was evident that a struggling parent needed parenting intervention. This year the Department funded and established the evidenced-based Nurturing Parent programs in many communities and, at the recommendation of the Inspector General's Office, the Department funded protective daycare for the children in intact families. Such critical resources support the Department's efforts to preserve families while assuring the safety and well-being of the children.

Training for intact family services workers should include hands-on observation opportunities. The workers should participate in ride-alongs with child protection investigators, observe days at Head Start programs, and observe the legal screening of a case with the State's Attorney's office.

***CASE EXAMPLES***
***Child Deaths in Intact Family Services Cases***

**Child Deaths by Homicide**

Over the last 7 years, 10 families with an open intact family services case had a child die by homicide. Six of these children were killed by a parent's spouse, paramour or relative caregiver; one adolescent was killed in a street homicide while another was killed accidentally by his 13-year-old friend who had a gun. A four-year-old was killed by her mother, and a seven-week-old  was accidentally killed by his autistic seven-year-old brother.

Since 2010, the Inspector General has opened four homicide investigations involving an open intact family services case, two of which occurred in 2017. In 2012, a full investigation was completed on a 17-month-old who was killed by his 18-year-old mother's 22-year-old boyfriend. One year earlier, the mother and boyfriend had been investigated after the infant suffered a broken femur. During that investigation the boyfriend's explanation was determined by a physician to be consistent with the injury and the child protection investigation was unfounded.

Three Inspector General investigations remain pending, as an IG investigation cannot be completed until the child protection investigation of the death is closed. A summary of the pending Inspector General investigations follows:

- In 2016 a 4½-year-old girl with cystic fibrosis was killed by her mother. An intact case had been opened 10 months prior to the girl's homicide and her 8-year-old brother was present in the home at the time of her death .  In June 2017, the child protection investigation was closed and the mother was indicated for death by abuse.  In the resulting criminal case, the mother was charged with murder and was found not guilty by reason of insanity.  She was placed in the care of the Illinois Department of Human Services. The child protection investigation was closed

following the verdict. In the 14 months prior to the girl's death, there had been 8 child protection investigations, 5 of which were indicated for allegations of medical neglect, inadequate supervision, and substantial risk of physical injury/environment injurious. One of the investigations was pending at the time of the little girl's death.

- In 2017 a 17-month-old became unresponsive while being cared for by his paternal aunt's boyfriend. The couple's three and a half month old infant was also in the home. The aunt and boyfriend had been caring for the toddler for six weeks while his mother and father were attending residential substance abuse treatment programs. An autopsy was performed and the forensic pathologist noted 18 areas of injury. The paternal aunt and her boyfriend were indicated for death and substantial risk of physical injury. Their infant and eight-year-old were taken into protective custody and placed with relatives.

- The 2017 homicide of a 17-month-old toddler found under a couch after a massive 30 hour search has received national attention. There were four adults present in the home at the time the toddler was reported missing. Law enforcement found the home in deplorable condition; the health department deemed the home uninhabitable. Shortly thereafter, the house was burned to the ground, and arson is suspected. In the year preceding the toddler's death, there were at least 10 child protection investigations on the family and household members. An intact family services case was opened and remained open at the time of the toddler's death. During the time of this case, the intact family services worker had at least 18 open cases. There were also three pending child protection investigations involving the family and household members at the time of the child's death. The intact family services worker had been to the home the day before the child was reported missing and the child protection investigator had been to the home the day that the toddler was reported missing.

**Natural Deaths**

Natural death is the leading manner of death of Illinois children. Over the last seven years 36[4] families with an opened DCFS intact family services case had a child die of natural causes. Many of the children in this cohort were medically complex who came from working class or poor families struggling to care for them. Often they had had multiple medical diagnoses. The parents at times were overwhelmed by the number of medical appointments, prescriptions (one child had 15 medications), transportation difficulties, and the daily demands in caring for their medically complex child, and often siblings as well, while trying to maintain employment.  Several of the families were the subject of multiple investigations. The stories below of seven of these families exemplify the struggles of the majority of these families:

- A 4½-year-old medically-complex boy died in the hospital following complications after surgery for tonsillectomy and adenoidectomy. The family had a previous (within one year) unfounded medical neglect investigation. The parents had difficulty making all the medical appointments for the child because of their work schedules and transportation problems. The child's doctor did not consider the child neglected. The child had a six-year-old brother.

- A five-year-old died from a fatal inherited disorder (Batten disease). His mother would often stay with him during his multiple hospitalizations while the father would care for his older 13-year-old and 7-year-old siblings. The father was indicated for inadequate supervision after he left the older children at home overnight while he went to work.

---

[4] One infant had been listed as open intact at the time of his death, however upon this review it was found that the child was in the care of the Department at the time of his death (Caleb Tyus)

- A six-year-old boy with a rare, benign brain tumor died in the hospital following brain surgery. The brain tumor caused the child to fly into rages, often injuring himself. The mother, who also had a one and two-year-old, had been investigated for bruising on the six-year-old. Medical professionals, service providers, family members and others described the child as often harming himself. The investigation was unfounded.

- A 10½-year-old developmental delayed child with cerebral palsy and seizure disorders who required a G-tube for feeding died of bronchopneumonia while in care of her grandmother. The child had been brought to the doctor the week before and had been receiving breathing treatments at home. The year before her death, a hospital social worker had called the hotline because the mother had missed several medical appointments. The mother worked full time and her mother cared for the child during the day. The grandmother had recently begun cancer treatments and had transportation problems making it difficult to keep all of the girl's appointments. The mother was indicated.

- A 16-year-old child died in the hospital while receiving palliative care for Alexander disease, a rare and slowly progressing and fatal neurodegenerative disease. The Department had three investigations on the mother, all unfounded based on the treating physician's opinion that she was doing the best she could with the limited resources she had. The mother had three younger children.

- A 13-year-old medically complex child died in the hospital after being taken there by ambulance in respiratory distress. The child appeared well cared for and medical staff did not suspect neglect. The family had five other children ages ranging from 3 to 11 years old.

- A nine-year-old child who suffered from Rett Syndrome died of complications from her disease. A week before her death she and her two sisters had been stricken with the flu. All the children had been seen by their pediatrician twice the week before. The divorced mother found her daughter unresponsive in the morning. The child had a therapeutic level of her medications at the time of her death. The previous summer, the father had reported that the mother failed to provide him with all of his daughter's medications when she came for an out-of-state visit. The mother admitted that she had not filled one medication prior to visit because the 30 day supply had not run out and she could only renew the prescription at the end of 30 days. There was a dispute about whether the mother had filled some of the child's prescriptions (she noted the child had spent multiple days in the hospital and was discharged with medication). She was indicated and was going to appeal the finding prior to her child's death.

*Natural Deaths of Prematurely Born Children*:  Over 20% of the natural deaths occurring in open intact cases were deaths of infants who died of complications from prematurity. The infants, ranging in age from one hour to eight weeks, included a set of twins. DCFS did not investigate seven of the infants' deaths.  The stories below detail the deaths of prematurely born infants whose families had an open intact case at the time of the death:

- The single prematurely born infant whose death was investigated had been born with fetal alcohol syndrome and died after heart surgery; he had been born to a recovering alcoholic. His siblings were taken into care following his death.

- A second infant, who died of complications of premature birth, was born to a 19-year-old mother who had a drinking problem. The intact family services agency had brought the family to court

prior to the infant's birth. The children were returned to the mother under continual court supervision, but she continued to have problems with alcoholism.

- A three-day-old infant born at 26 weeks gestation died while in the hospital. Several professionals reported that the mother appeared limited. Over the eight years prior to the infant's death the family, including relative caregivers of the family's children, had eight investigations and two preventive cases opened. Three of the investigations were indicated, but one was overturned on appeal: the mother's boyfriend's 19-year-old was indicated for tying and confinement of a 6-year-old and the maternal grandmother was indicated for substantial risk of physical injury by neglect to the then 8-year-old. A preventive intact family services case was opened at the time of the premature birth.  It had been opened for concerns of neglect, describing the family as having a chronic problem with lice.

*Natural Deaths of Children with Court Involved Families:*   Three out of four of the families within this cohort of natural child deaths were screened for court involvement prior to the child's death.  The fourth family's case was screened into court following the death. A summary of these cases follows:

- A mother with a history of chronic substance abuse and chronic parenting issues was under court supervision prior to the death of her three-year-old medically complex child. She had two other children, both born with cocaine in their systems. Her three-year-old child was receiving hospice services at the time of his death.

- The case of a young mother who had a State adult guardian because of mental retardation was screened into court when her guardian reported that she was incapable of caring for her infant. There were mental health and domestic violence concerns. The family was indicated for substantial risk of physical injury but the State's Attorney refused to file a child protection petition. The infant died of bronchopneumonia at 11 weeks. The parents had brought the infant to the doctor for diarrhea a few weeks before his death.

- An infant who was three months old died of pneumonitis due to an acute viral infection. The family had two prior indicated reports and had been under court supervision at the time of his death. A month before his birth his one-year-old sister was taken into protective custody following a broken clavicle. Six months prior the mother's boyfriend's son had been accidently scalded. The water temperature for the bathtub faucet when tested was 144 degrees. At the temporary custody hearing for the sister, the toddler was released home under an order of supervision.

- One family's case was screened into court after their six-month-old infant was found unresponsive in his crib. He died of bronchopneumonia. The infant had five surviving siblings, all under the age of seven. Prior to his death there had been two preventive cases opened because the mother was low-functioning. While the intact family services case was open the Department conducted three child protection investigations (substance misuse, bruises and inadequate shelter), all of which were unfounded. After the infant's death, the parents were indicated for death by neglect and the infant's five siblings came into care.

*Child Deaths Due to SIDS and/or SUID :* Five infants who were between four weeks and four months old died of SIDS. A summary of each of those cases follows:

- One infant who died from SIDS was born with cocaine in his system. DCFS opened an intact family services case to assist the mother with substance abuse treatment. The mother did not cooperate with services after the baby's death.

- A six-month-old twin born premature died of SUID (Sudden Unexplained Death of An Infant). The family had been indicated when the twins were three months old because of environmental neglect. The family was about to be evicted and the home had no gas.

- The oldest youth who died of natural causes was an 18-year-old and she died of complications from anorexia. Her family had received intact services and cooperated with mental health services for their daughter.

**Accidental Deaths**

Over the last 7 years, 24 families with an open DCFS intact family services case had a child die of accidental injuries.[5] Seven of the children died from accidents commonly identified as leading causes of accidental death: drowning, car accident, risky adolescent behaviors, choking and medication poisoning. The children ranged in age from 9 months to 16 years old. In summary:

- Three children drowned; one in a tub, one in a pool and the oldest while swimming in a lake.
- A toddler was run over by his inebriated mother while she was backing up her car.
- A 14-year-old with a positive toxicology for illicit drugs jumped from the back of a moving bus on a dare.
- One toddler choked on ramen noodles and another one-year-old died after accidentally ingesting his mother's prescribed methadone.

Unintentional injuries are a leading cause of deaths of children. Water safety awareness campaigns remind parents to be vigilant and "water wise." Choking hazards are routinely discussed during well baby checkups and understanding of adolescent risk taking behavior is explored in research on brain development. The Center for Disease Control and Prevention reports that medications are the leading cause of child poisoning. Illinois is in the midst of an unprecedented opioid epidemic and methadone is the most common FDA approved medication to treat opioid addiction. Methadone can be a life saver for a recovering adult but it can be a life threatening medication if accidentally ingested by a young child. Safe storage in a locked box is crucial to ensure that a curious child does not become the victim of a methadone overdose.

The above identified one-year-old who died of methadone poisoning was unknowingly given a water bottle stored in the refrigerator that contained diluted methadone. That incident prompted the Inspector General to conduct methadone safe storage training to inform case managers and substance abuse providers that a person's behavior at home may differ from the clinic's standard practice and procedure. The IG developed an informational poster on the safe storage of methadone. The poster was widely distributed as part of state wide substance abuse training for DCFS case managers, and it was shared with the Director of the Division of Alcohol and Substance Abuse (DASA) for use in methadone clinics and substance abuse treatment programs.

---

[5] One family suffered the loss of twins.

*Sleep Related Deaths*

In 2011, the Center for Disease Control's Division of Reproductive Health launched the Sudden Unexpected Infant Death Initiative. The goal of the Initiative was to standardize infant death classifications. Deaths attributed to Sudden Infant Death Syndrome (SIDS) remained classified as "Natural," as long as the following factors occurred: an autopsy, a scene investigation, review of medical/clinical history, appropriate lab tests, and that the infant was found in a "safe sleep" environment.

With the new guidelines many infant deaths that had previously been classified as "Natural" are classified as "Undetermined." As a result, "Natural" infant deaths decreased in Illinois after 2011. In addition, the Sudden Unexpected Infant Death Initiative clarified that asphyxia-related deaths, such as layovers, should be considered "Accidental."

Seventeen  infants of parent's with an open intact services case died from asphyxia/suffocation related to parental sleep practices. The deceased infants ranged in age from 12 days to 9 months, with 64% of the infants ages 4 months or younger. Studies show a high prevalence of bed sharing especially with infants four months or younger. In one study, nearly 18% of parents reported their infant "usually" co-slept with another person. In another survey, 59% to 65% of parents reported that their infant had co-slept with them at least once during the first three months of life. Bed sharing comes with modifiable risks. Education across settings may help encourage parents to "share their room not their bed." The appropriate response to unsafe sleep practices is a concerted effort, involving the Department of Public Health, Department of Children and Family Services, pediatricians, family practitioners, hospitals, and communities to educate parents about safe sleep to ensure that all parents understand the risks involved.

The Office of the Inspector General maintains that the medical examiner/coroner or other first responders are well trained to notify the hotline if they are suspicious of abuse or neglect. For example, four of the deceased infants who were not found in a "safe sleep" environment were born substance exposed. Three of those parents were under the influence of alcohol and/or drugs at the time of their infant's death. The parent became the subject of a child protection investigation and in each case they were indicated for death by neglect and substantial risk of physical injury to their surviving children.[6]

**Undetermined Deaths**

Over the last 7 years, 19 families with an open DCFS intact family services case had a child die of undetermined causes. The medical examiner/coroner cites the cause of death as undetermined when the autopsy, examination of the death scene, and clinical history provide no conclusive cause of death. Eleven deaths involved infants not found in a "safe sleep" environment while an additional four were classified as Sudden Unexpected Death of an Infant (SUDI). The remaining 4 undetermined deaths involved an 18-month-old found trapped under an overturned dresser; an 8-month-old found drowned in a tub; a seventeen-month-old child found unresponsive who at autopsy had signs of prior abuse; and a 3-year-old found unresponsive while in the care of an aunt whose family had a history of unexplained child deaths.

---

[6] Additionally, parents of a child not born substance exposed but admitted to using heroin at the time of their infant's death and were investigated and indicated for death by neglect.

# GENERAL INVESTIGATIONS

**GENERAL INVESTIGATION 1**

**ALLEGATION**   Both the Executive Inspector General (EIG) and the Inspector General of DCFS (OIG-DCFS) staff received an anonymous complaint alleging wide-ranging violations of hiring, contracting, procurement laws and rules by the former DCFS administration that benefitted a group of Florida individuals and corporations. The allegations included the following:

- The former Director had hired a person to be his driver and the person had recently been arrested in Florida for Driving Under the Influence;
- The former Director had awarded a no-bid contract to a Florida corporation that included close associates of the former Director;

**INVESTIGATION**   *Confidential Assistant*
  The investigation found that the former Director had hired a recent college graduate from Florida on a Personal Services Contract as a Confidential Assistant. The assistant was hired at an annualized rate of $50,000 over a nine month contract [The Department was taking steps to hire the Assistant in a more permanent state position after the contract obligation expired.]. The Assistant was to accompany the former Director to meetings and report back to executive staff for purposes of follow-up. In the almost three months of work by the Assistant, the only work product that could be located consisted of two e-mails.

The same day that the Confidential Assistant was hired, the former Director wrote him a check for $1000 out of the former Director's personal bank account. Seventeen days later he wrote him another check for an additional $500. Less than two weeks after being hired, the former Director and the Assistant used the State car to go on a short vacation together out of state.

Because the Confidential Assistant worked under a contract, he was required to submit regular billing. The OIG-DCFS staff identified several fraudulent billings in the three months that he worked for the Department. One billing approved by the former Director included time that the assistant spent on vacation with the former Director. Other billings approved by a former Deputy Director represented inflated work hours for holidays or weekends totaling over $1300.00.

The Joint Investigation confirmed that the Confidential Assistant had been arrested just three months prior to the initiation of the contract for Driving Under the Influence in Florida. Following his arrest the Assistant had been granted a restricted driver's license to drive for work purposes only. However, a month later he violated the conditions of the restricted license and his license was revoked [The assistant also failed to attend DUI school which resulted in a "Cancelled" license.] prior to the initiation of the contact.

Though the Assistant did not disclose the arrest or revoked driver's license on his employment application, both the former Director and the Assistant stated that the Assistant disclosed the DUI arrest to the former Director prior to hire but said he was permitted to drive for work purposes. The former Director made no effort to verify the Assistant's statements about his license.

Following receipt of an interim report from the OIG-DCFS, the Department suspended and later terminated

the Confidential Assistant's Personal Services Contract for improper billing.

*Business/Political Associates*

The former Director had arranged a no-bid contract with a Florida corporation that provided services through four Florida consultants that had donated at total of $11,275 to his 2014 campaign for Florida Attorney General. The four consultants were all people with whom the former Director had worked while in Florida. One of the consultants was a business partner that the former Director had owned multiple properties with including one property at the time of the contract. The Director did not disclose any of this information until after his initial interview by OIG-DCFS investigators. After the investigation began, the former Director disclosed the joint real estate holding [The Joint investigation reported in error that the department only obligated $150,000 in FY 16. The Department obligated $150,000 in FY15, $206,793 in FY16, and $329,550 in FY17.].

The former Director also arranged for a no-bid contract to a Florida videographer to create two Public Service Announcements. The videographer donated time to the former Director's 2014 Florida Attorney General campaign. Neither the Director nor the administrator that the Director charged with facilitating the contract checked to ensure that the charges for the Public Service Announcements were fair or whether other vendors could perform the services for less money.

The investigation found that documentation for the no-bid contract included false information that the Florida Company had previously provided work free of charge to the Department to justify the no-bid contract. The former Director also referred to this false 'fact' during his interview with OIG-DCFS Investigators.

The investigation also found that the former administration had wrongly characterized several contracts as grants, in an apparent attempt to avoid scrutiny under the Illinois Procurement Code.

**FINDINGS**
1. **The former Director mismanaged DCFS in hiring the Confidential Assistant.**
2. **The Confidential Assistant abused State Time and failed to provide accurate records.**
3. **The former Director improperly approved the initial inaccurate time records.**
4. **The Confidential Assistant violated the Vehicle Use Policy.**
5. **The Confidential Assistant failed to disclose the License Restrictions on State Employment Forms.**
6. **The former Director violated Conflict of Interest Rules by participating in the decision to award a no-bid contract to the Florida consulting company.**
7. **The former Director and an Administrator committed mismanagement in commissioning the Florida company to produce Public Service Announcements without complying with the Illinois Procurement Code.**
8. **The Department committed mismanagement by processing the no-bid contracts as grants.**

*Addendum and Update*

The Inspector General issued an Addendum to the Joint Report to address concerns specific to the Department of Children and Family Services as well as an update regarding the former Director's assistant. The Addendum determined that in addition to violating general conflict of interest concerns, the former Director violated the Code of Ethics for Child Welfare Professionals and the Department's Conflict of Interest Rule 437 (89 Ill Admin Code 437) by hiring and supervising a person with whom he maintained a personal friendship. In addition to the $1500 in cash that the former Director had given the Assistant within the first three weeks of employment, the former Director continued giving the Assistant funds after his contract had been terminated for false billing. After the contract was terminated, the former Director provided the Assistant with another $1500 in cash, one month's rent ($2074.37) and a plane ticket to New York, where they travelled

together. During this time the former Director also provided a job reference to a prospective employer for the former Assistant. The former Director told the employer:

> [The former Director] met [the former Assistant] through his friend [a Florida Lobbyist] about a year or two ago…[The former Director] offered [the former Assistant] a job as his confidential advisor [The Job title was Confidential Assistant.] … [The former Assistant] acted as [the Director] when [the Director] was not available to attend meetings or be at the office, he knew all information that [the former Director] knew. [The former Assistant] has an outgoing personality and is very engaging - he has a sense of confidence that people around him can feel. From [the former Assistant's] time spent in the military he learned to be very organized and disciplined, he was able to take direction well and never complained. [The former Director] mentioned that he can benefit from learning how to prioritize work better by doing the boring projects first to get them out of the way before starting projects he is more interested in. [The former Director] would love to work with [the former Assistant] again, he was an exemplary employee and he wishes [the former Assistant] well.

The Addendum and Update found that in providing the false job reference, the former Director had used his official position to benefit a personal friend and engaged in conduct that could adversely affect the confidence of the public in the integrity of the Department.

The Addendum also found that prior to hiring the Confidential Assistant through a personal service contract, an employee of the Department's Employee Services had learned that the Assistant had been arrested for drunk driving while conducting a background check. After asking the Deputy Director of Employee Services if she should get the disposition that would have told her the Confidential Assistant's license was revoked, the Deputy Director asked her not to get the disposition and proceed with the hire. Neither the former Director nor the Deputy Director of Employee Services shared the information with the Department's Contract Division or otherwise ensured that the Confidential Assistant had a valid drivers' license. As a result, the Confidential Assistant drove a state car over 1,400 miles without a license.

Lastly, the OIG-DCFS Addendum noted that the Public Service Announcements prepared by the Florida videographer appeared unrelated to Department needs. The first Announcement was to promote water safety, but it focused on safety concerns related to bathing children. In fact, water safety was a concern of the Illinois Child Death Review Team because of children drowning in pools and other outdoor bodies of water. The second Announcement prepared by the Florida videographer concerned safe sleep practices. A substantially similar video was already available to the Department to distribute free of charge.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **The joint investigative report was submitted to the Governor with the following recommendations:** |

**1. Do not rehire the Confidential Assistant.**

The Governor agreed with and accepted the recommendation.

**2. Continue its efforts to obtain reimbursement from the Confidential Assistant for payments he received from DCFS for dates on which he did not work.**

The Governor agreed with and accepted the recommendation.

**3. Conduct training of procurement and contracts staff, to ensure that staff are knowledgeable about**

**the requirements that must be met for no-bid grants.**

The Governor agreed with and accepted the recommendation.

**4. The Governor's Office should take whatever action it deems appropriate regarding the then-Director.**

The Director resigned on May 31, 2017.

## Recommendations from the ADDENDUM:

**1**. **The Deputy Director should review this report and be counseled on the failure to ensure follow-up of critical information (DUI arrest) known to the division that could have compromised the safety of the Director and Illinois residents.**

The Department agrees.

**2. DCFS Employee Services should ensure that appropriate criminal and drivers' license checks are performed for persons with Personal Service Contracts.**

The Department agrees.

GENERAL INVESTIGATIONS

## GENERAL INVESTIGATION 2

**ALLEGATION** A Florida event planning company received a no-bid contract to perform event planning services in Illinois in violation of the Procurement Code.

**INVESTIGATION** The former Director told a newly hired Deputy Director (from Florida) to contact the president of a Florida event planning company to plan an upcoming Summit in Illinois. The president of the company was someone that the former Director worked with and was a donor to the former Director's 2014 campaign for Florida Attorney General. In order to avoid favoritism and waste of state resources, the Illinois Procurement Code requires that State employees determine procurement needs and then post an invitation for bids. Illinois State law provides a preference for Illinois vendors, and for small purchases such as event planning, Illinois agencies are required first to provide a request for quotes from Illinois small businesses that are preregistered with the Illinois Chief Procurement Office. To avoid bias or favoritism, state employees are not permitted to have substantive conversations with potential bidders before the bids are made. In this case, the Florida company was given full information and provided a formal proposal for cost and scope of services before any request for quotes was drafted for Illinois companies or the state procurement officer was consulted.

Following the proposal submission, three separate state employees reviewed the proposal and concluded that the bulk of the services identified in the contract could be provided at no cost by the Department's own Education and Training Division. Of the services the Department could not do, the Inspector General noted that the State's university system could also have provided similar services at a lower rate.

The Department Deputy in charge of negotiating the contract attempted to lower the cost of the contract by eliminating the services from the proposal that the Department could do themselves. The Florida consulting firm declined to lower their price or reduce the scope of service. The former Director asked the deputy to go ahead with the contract anyway.

When the Senior Procurement Officer learned of the plan, she notified agency staff that the contract would need to be bid out and that if an Illinois company provided a better or equal bid, it would have to be awarded the contract. Rather than developing an invitation to bid, the former director approached an existing no-bid grant contractor, and asked them to subcontract with the Florida event planning company, in an apparent effort to avoid competitive bidding and state procurement oversight.

When the Senior Procurement Officer learned that the former Director had asked another contractor to subcontract for the services, she wrote a memo to the Chief State Procurement Officer. The complaint was not forwarded to an investigative body for several months.

The subcontract was for approximately $34,000 which was to include all facets of the event planning but did not include travel expenses. Though the original subcontract was to cover all event planning services, the Department was in the process of developing another subcontract with the event planners, and obligated an additional $37,000 in planning fees when this OIG investigation began. Ultimately, the negotiations for the second subcontract fell through. The Department went ahead with the October 2016 summit using DCFS staff from the Education and Training Department, saving Illinois citizens over $30,000.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** **1. The State Procurement Office should adopt a policy whereby reasonable suspicions of Procurement violations are referred for investigation within one week of receipt.**

The Executive Ethics Commission agrees.

**2. All Executive Staff must be immediately trained or retrained on the Procurement Code and Procurement Reporting requirements.**

Over 50 members of the Department's executive leadership team have attended training on the Procurement Code and Procurement Reporting, the training was conducted by the Chief Procurement Officer's Office. When new management staff are hired, they will be required to watch the video as part of their training.

## GENERAL INVESTIGATION 3

| **ALLEGATION** | A Regional Administrator responsible for overseeing $9,000 worth of gift cards donated to the Department failed to adequately monitor disbursement of the cards or ensure they were provided to Department youth in care. |

| **INVESTIGATION** | In 2016, the employees of a local hospital held a gift card drive to collect gift cards for youth ages 12-20 who were in the care of the Department. The employees |

collected 330-gift cards which were delivered to Department staff. The gift cards, which were a restricted gift, were subsequently given to the Regional Administrator to be distributed. The Inspector General's investigation found the Regional Administrator did not store the gift cards securely and never inventoried the cards to determine how many had been provided. In an interview with Inspector General investigators, the Regional Administrator denied knowing that the gift cards donated by the hospital employees were restricted for Department older youth in care.

In addition to 330-gift cards donated by the hospital, the Regional Administrator was also provided with 90-gift cards that were donated by Department employees. The 420-gift cards were to be distributed to youth at two holiday parties hosted by the Department.

As part of the effort to collect gift cards for older youth, the Regional Administrator established a partnership with a local elementary school-age youth who, along with his father, had gained recognition for collecting and donating toys to children affected by natural disasters. The Regional Administrator informed the Department that the youth and his father had started a charitable organization to support their cause. The Regional Administrator created a flyer to publicize one of the holiday parties as the associated gift card drive. The flyer was posted on the Department's internal website and was emailed directly to regional DCFS employees and some private agency administrators. The flyer announced that the local youth had selected DCFS older youth as one of the groups, in addition to a town in another state that had been devastated by a hurricane, and solicited Department employees to donate gift cards.

After the flyer had been posted internally and distributed externally, the Department's Ethics Officer advised the Regional Administrator that the announcement violated the Department's policy against supervisors asking employees to make monetary donations. The Ethics Officer also raised concerns about whether the child/father's non-profit organization was a recognized charitable organization in accordance with Illinois law and repeatedly requested that the Regional Administrator verify the organization's status, which she declined to do.

The Inspector General investigation determined that the Regional Administrator had no verifiable documentation to show how many gift cards she had distributed, or to whom. While an unknown number of gift cards were distributed to youth at the holiday parties, the Regional Administrator also gave gift cards to the child/father's non-profit organization, who kept no records and who stated to Inspector General investigators they never knew if the gift cards were from the Department or the Regional Administrator personally. At the time the Regional Administrator gave the child/father team the donated gift cards, their non-profit corporation was not a registered charity in Illinois and did not have status as a 501(c)(3) organization, thus making them ineligible to solicit or receive tax-deductible donations.

Finally, although over 140-gift cards remained undistributed and in the Regional Administrator's possession after the holiday season, she declined to respond to employees' inquiries about the whereabouts of the cards or their requests to obtain gift cards for youth in care who had been unable to attend one of the holiday parties. Apart from the Regional Administrator's actions, the Department's Communications Deputy was aware of a

discrepancy between the number of gift cards that the hospital believed they donated versus the number that was actually delivered to the Department. Rather than notifying the hospital of the discrepancy, the Deputy remained silent and miscommunicated to the Governor's Office that the Department had in fact received 365-gift cards, the number of cards that had been anticipated. In an interview with Inspector General investigators, the Deputy stated she believed correcting the error would have been embarrassing to the hospital. The Deputy was derelict in her duty to communicate accurate facts as she knew them to the Governor, as well as her duty, as a communications professional, to tactfully alert the hospital of the number of gift cards they donated.

The Regional Administrator was entrusted with over 400-gift cards donated to the Department. She had no idea how many cards she had or how many she distributed, and based on the Inspector General review there remain at least 114-gift cards (valued at approximately $2,400) unaccounted for. The Administrator was not credible in her estimate of the number of gift cards distributed to Department youth and provided no explanation for the missing gift cards. Her lack of fiscal responsibility undermined the Department's reputation for integrity and jeopardized future donations for youth in care. Her failure to safeguard the donated gift cards was determined to be gross mismanagement.

In addition to the Administrator's management failures, she turned over some quantity of donated gift cards to an individual that was not associated with a registered charity, who also kept no records, in direct contravention to the Ethics Officer's directions.

The Inspector General shared this report with the Department's Ethics Officer.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | Because the then-General Counsel for the Department chose to represent the Regional Administrator during the Inspector General investigation, the Report was submitted to the Governor's Office. |
|---|---|

**1.  The Regional Administrator should be disciplined, up to and including discharge, for the gross mismanagement of 420 donated gift cards.**

The Administrator resigned.

**2.  The Regional Administrator should not have any responsibility for projects involving safeguarding of money or property.**

The Administrator resigned.

**3.  The Deputy should be counseled concerning her failure to correct the error she learned about when she received 330-gift (rather than an anticipated 365-gift cards).**

The Deputy resigned.

**4.  The Holiday Party Committee should be commended for their diligence in raising questions about missing gift cards.**

The Department agrees.

**5.  This report, as well as the Gift Giving Protocol, must be shared with anyone in charge of the Cook County DCFS Holiday Party in the future.**

GENERAL INVESTIGATIONS

The Department agrees.

**6.   The 143 undistributed cards should be distributed to older youth in Cook County who registered, but did not attend, the December 11th party for older youth.**

The cards were distributed to older Cook County youth.

## GENERAL INVESTIGATION 4

| ALLEGATION | A child protection investigator, after taking protective custody, placed a 17-year-old boy in the home of his 13-year-old girlfriend. |
|---|---|

| INVESTIGATION | The 17-year-old boy and his family had an extensive history of involvement with the Department dating back to his youth. The family was also well-known to local |
|---|---|

law enforcement as a result of frequent physical altercations between him and his parents and other incidents in the home which led to the intervention of police officers. At the time of the most recent Department and law enforcement contact, a primary source of conflict between the 17-year-old and his parents was his ongoing romantic relationship with a 13-year-old girl. The parents objected to the relationship and were concerned that a sexual relationship could result in legal consequences for the boy.

A child protection investigation was initiated after a report was made to the State Central Register (SCR) that the boy's parents had locked him out of the house and refused to shelter him after the 17-year-old physically assaulted his parents. The police who were holding the 17-year-old at the police station for domestic violence against his parents, told the child protection investigator that the boy's status as a juvenile prevented him from being detained by police. The parents, who were receiving medical treatment at the time for the injuries sustained by the assault, feared for their own safety and refused to let the boy come home. The investigator began seeking a temporary placement for the boy but was unable to identify a relative who would agree to take him in. Though the Department has a contract with a residential facility to provide emergency shelter to youths in care, the shelter refused to accept the boy due to his prior aggressive behaviors towards the shelter staff. In an interview with the IG staff, the child protection investigator stated she did not pursue placing the boy in any other shelters that may have had available beds as she determined such an environment might be dangerous for him.

Eventually the boy suggested a woman he said he had known for a long time as a potential placement. The investigator contacted the woman who was the mother of the 13-year-old girlfriend. The mother said she had no concerns about allowing the boy to reside in her home. The mother, who had to work late on the night of placement, told the investigator that since she could not be home, her 18-year-old daughter could monitor the boy and her 13-year-old daughter until she arrived home. The investigator then transported the boy to the home and left the boy in the 18-year-old's care. The investigator did not record the name of the 18-year-old daughter or perform a Child Abuse and Neglect Tracking System (CANTS) check, which would have shown that the 18-year-old daughter was the subject of a child protection investigation and was only permitted supervised contact with her own daughter. The investigator also failed to conduct a Law Enforcement Agency Database System (LEADS) criminal background check on her prior to leaving the boy in her care. The boy told the investigator he did not have prescribed medication with him and that he would need for it to be obtained from his parents' home. The boy also informed the investigator there was a bag of illegal drugs under his bed in his room at the parents' home. The investigator documented her belief that the drugs were "most likely methamphetamine" and contacted law enforcement to retrieve the bag. After retrieving the bag police agreed the contents were likely methamphetamine but would have to have it tested. A law enforcement representative communicated to IG staff that the test of the bag's contents was still pending but that, in the area, lab results were taking two to three years to be returned.

In the interview with the Office of the Inspector General staff, the investigator stated the boy's parents strongly objected to his placement in the woman's home because of his relationship with her 13-year-old daughter. The investigator said both the boy and the 13-year-old girl stated their relationship had ended and stated she found their denials to be credible. The investigator did not document the boy's parents' concerns in the State Automated Child Welfare Information System (SACWIS).

One week after the boy was placed in the home, the girl's mother made a hotline report that his behavior had become erratic as he did not have his medication. Although the investigator had agreed to retrieve it from the parents' house on the night she took the boy into custody she had not made any effort to do so. Additionally, the Department did not submit a placement packet regarding the boy's move into the woman's home for more than three weeks after he was taken into Department custody. Because of the delay, placement services were not initiated in a timely manner.

In an interview with the IG staff, the private agency caseworker responsible for monitoring the boy's case said she thought his placement in the same home as the 13-year-old girl was problematic from the outset. The caseworker stated both she and her supervisor suspected the two were still involved in a romantic relationship but had no proof to confirm their beliefs. An OIG review of social media accounts operated by the boy and the 13-year-old girl found a plethora of information clearly demonstrating their ongoing romantic involvement. In the month before the boy was placed in the woman's home the two had posted they were engaged to be married and in the days just prior to his placement the pair posted photos of themselves hugging and kissing. The month after the boy was placed in the home, the girl responded to critical comments posted to her account regarding the couple's age difference and her mother's feelings regarding their relationship by responding that the boy now lived with her family and "my mom knows obviously."

In an interview with the IG staff, a social worker from the boy's school said school staff also had voiced concerns about the placement to the investigator. The investigator documented that the social worker supported the investigator's placement decision. The social worker denied ever having made such statements and said that both she and principal expressed opposition to the placement to the investigator. The social worker also provided IG staff with contemporaneously written notes confirming their expression of concern to the investigator about the placement. In her interview with the IG staff, the investigator acknowledged the principal had expressed concern about the placement but could not explain why she had not included the principal's statements in the case record.

Beginning six weeks after the boy was placed in the home the situation began to deteriorate. The boy and the 13-year-old girl began having conflicts related to his jealousy over her communications with other males. These conflicts became increasingly physical, ultimately resulting in both the boy and the 13-year-old girl being arrested for domestic violence against each other.

An OIG review of the child welfare history of the girl's mother found that her 18-year-old daughter had also been romantically involved with a significantly older teenage male when she was 14 and that in that instance the mother had also allowed the boyfriend to move into her home. Ultimately the relationship resulted in the underage daughter having a child of her own.

Following the incident of domestic violence between the boy and the 13-year-old girl, the boy was removed from the home and placed with his paternal grandmother. After turning 18 the boy moved to another state and discontinued his involvement with the Department.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The child protection investigator should be disciplined for irresponsibly placing a 17-year-old youth in the home of his 13-year-old girlfriend, thereby placing the 13-year-old at risk of sexual exploitation and the 17-year-old at risk of delinquent/adult charges of child sexual abuse; and providing biased and misleading case documentation that borders on falsification.** |

The Department agrees. The pre-disciplinary meeting was held. After receipt of rebuttal, a decision will be made on disciplinary action needed.

**2. Management should review why it took 23 days to open the placement case and determine if this is a single incident or more frequent. Management should consider streamlining the process to insure placement cases are opened as quickly as possible after youth are taken into care.**

The Department agrees. The Cook County Intact PSA is notifying the Senior Deputy Director of cases not opened timely. Beginning in December 2017, the downstate Intact PSA will be assigning Intact family cases and will monitor case openings.

**3. The Department and the involved private agency should develop policy for accessing publicly posted social media for information relevant to investigative, intact and/or placement cases.**

The Department needs to address how to use social media better, but we have to work within the confines of state policies regarding the use of social media. The Department is agreeable to working on this issue and suggests we examine it in the context of the normalcy work already in progress.

The Inspector General shared a redacted report with the private agency. The Inspector General will meet with agency Administrators and a member of the agency's Board of Directors to discuss the findings and recommendations made in the report.

## GENERAL INVESTIGATION 5

| **ALLEGATION** | A Department caseworker provided false testimony in court during a hearing regarding whether to permit unsupervised visitation to the mother whose two children had been removed from her care. |
|---|---|

| **INVESTIGATION** | The caseworker was called to testify in response to the mother's petition to be granted unsupervised visitation with her two children, a five-year-old girl and a three-year-old boy. |

The children had been removed from the mother's custody over one year earlier after the boy was found walking alone one block away from the family's home. Police responded to the report of the unattended child and went to the family's home where they found an inadequate amount of food for the children. The mother was arrested and charged with child endangerment. A subsequent child protection investigation resulted in an indicated report against the mother for neglect. The children were taken into protective custody by the Department and placed in a traditional foster home. A service plan required the mother to attend individual and family therapy, undergo a psychological evaluation and attend parenting classes.

The hearing was called to consider the mother's motion for unsupervised visits with the children. After being called to the stand and sworn in, the caseworker testified that the mother had successfully completed "seven or eight months" of weekly therapy sessions through a counseling agency and had only missed "maybe three or four sessions" throughout that time. The caseworker additionally testified the mother had adequately addressed the issues she faced which had resulted in her children being taken into Department custody. When asked by the judge if she had received a final report from the counseling agency confirming the mother's satisfactory completion of therapy the caseworker affirmed she had and apologized for not having provided it to the court. The caseworker stated she did not have the report to present to the court because she had been sick and away from work and had been unaware of the court date, though the judge reminded her she had been present at the previous hearing when the date for this hearing had been set. She also testified that she had personally observed supervised visits between the children and the mother. Based on the caseworker's testimony the mother had successfully completed her required therapy sessions, the judge granted the Department permission to allow unsupervised visitation between the mother and her children.

An Inspector General review of records from the counseling agency found the mother had failed to appear for any of her scheduled therapy sessions for over two months after they were intended to have begun. After participating in two sessions she then cancelled four of the next six appointments. Six months after the therapy appointments were initiated the counseling agency completed a report closing the mother's case, which was the only report the agency produced regarding the family. The closing report noted the mother was resistant to treatment, exhibited depression related to her separation from her children and had not accepted responsibility for her role in their removal from her care. Over the course of those six months the mother had attended only four therapy sessions. The counseling agency provided IG staff with confirmation the closing report had been sent to the caseworker almost three months prior to the hearing.

In an interview with IG staff, the caseworker contradicted her testimony in court and the records retained by the counseling agency, stating she had not yet received the closing report prior to the hearing but had relied upon an earlier report she had been provided by the agency. The caseworker had also testified in court that she had personally observed "maybe" two of the supervised visits conducted between the mother and her children, however IG staff contacted staff from the agency that facilitated the visits who reported the caseworker had not been present at any meetings between the mother and her children. When questioned about this discrepancy in her interview with IG staff, the caseworker stated she could not recall whether she had monitored any of the visits.

An OIG review of case notes recorded by the caseworker in the State Automated Child Welfare Information System (SACWIS) found numerous instances where notes were repeated verbatim for multiple entries. These notes included visits to the children's school the caseworker claimed to have conducted on days when class was not in session and the school was closed. They also recorded the caseworker having observed the children in their classrooms. Through consultation with school administrators, IG staff learned the school's procedure for students meeting with visitors requires students to be excused from their classrooms to meet with the visitors in a separate room. Furthermore, all visitors must sign in and a copy of their identification is made and placed in the student's file. The school had no record of the caseworker ever having visited them at the building.

The Office of the Inspector General filed charges to revoke the employee's Child Welfare Employee License. After a hearing, an Administrative Law Judge issued an order recommending revocation to the Child Welfare Employee Licensure Board.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The caseworker should be disciplined, up to and including discharge, for falsification of court testimony and case records.** |
| --- | --- |

The Department agrees. The employee resigned with no reinstatement rights.

## GENERAL INVESTIGATION 6

**ALLEGATION**  A private agency worker assigned to a residential facility fathered a child with a former client who was still a youth in care at the time their relationship began. Administrators of the private agency were alleged to have taken no action upon being informed of the mother's allegation the worker was the father of her child.

**INVESTIGATION**  The mother, who had been a youth in care of the Department since she was five years old, was placed in the residential facility from the age of eleven to fourteen. The private agency worker was employed by the agency at that time and had been assigned to the girls' dormitory where the mother had resided. Approximately six to nine months after turning 18 years old, the mother, who was still a youth in care of the Department, became pregnant during a period of time she was known to be residing in a series of unapproved placements. Following the birth of her child, a boy, the mother continually refused to identify the father of her baby to her caseworker.

Seventeen months after the boy was born the mother filed a petition to establish paternity of her son, naming the private agency worker as the child's father. The same day, the girl's Guardian *ad litem* (GAL) contacted an administrator of the residential facility and informed her of the mother's petition. In an interview with IG investigators, the GAL stated the administrator was "appropriately horrified" upon learning of the allegation of paternity but gave no indication of how the agency would respond to the report. In a separate interview with the IG investigators, the administrator stated she and another employee immediately questioned the worker who denied having any romantic or sexual relationship with the mother. The worker did acknowledge having encountered the mother at one time while he was away from the facility and having helped her move into a new home and inviting her to his house afterwards. The worker volunteered to take a paternity test in order to refute the allegation.

In an interview with the IG staff, the administrator stated she initiated an "internal investigation" in accordance with agency policy. However, the IG staff determined this investigation consisted only of the director's questioning of the worker and an interview with another co-worker who was familiar with the mother from her time living at the facility. The administrator did not pursue any additional information from the worker regarding the time the mother spent at his home and did not ensure the worker did in fact take a paternity test to directly address the issue. Furthermore, the agency took no steps to adjust or curtail the worker's responsibilities at the agency, which still included monitoring of the girls' dormitory. In her interview, the administrator stated, "I was really vouching for the fact that [the sexual relationship] didn't happen because it was not in my purview that he would conduct himself in this way."

An IG review of the worker's personnel file found no record of the GAL's notification to the agency of the mother's petition nor any documentation of the internal investigation. In her interview, the director told the IG staff she did not take any notes related to the call or make any written report. The administrator could not recall when she raised the allegation with the agency's executive director. In a separate interview with IG investigators, the executive director stated he could not recall if he and the administrator had discussed restricting the worker's duties or access to the facility while determining the outcome of the allegation. The executive director stated that if a hotline report was made against an employee the agency would limit their access to residents. When asked why the allegation in this case didn't warrant such action being taken, the executive director responded, "I don't know." Both the administrator and the executive director stated they were unaware the mother was still a youth in care at the time the petition was filed and acknowledged the worker continued to have unrestricted access to the residential facility for the next five months until a court ordered DNA test returned a positive result that he was the father of the mother's child.

Following the father's admission he was the father of the boy, the agency terminated his employment for violating the *Code of Ethics for Child Welfare Professionals*. In her interview with IG staff, the administrator stated she attempted to report the situation to the State Central Register (SCR), however the call was refused as the mother was 18 years old at the time of conception. The administrator said she contacted the Department licensing representative responsible for monitoring the residential facility but only exchanged telephone messages with her and they never discussed the matter. The administrator notified the Department residential facility monitor of the youth in care's report only after paternity had been established.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. This report should be shared with the private agency.**

The Inspector General shared a redacted report with the private agency. The Inspector General met with agency Administrators and a member of the agency's Board of Directors to discuss the findings and recommendation made in the report. Following the employee's admission that he was the father of the boy, the agency discharged the employee for violating the *Code of Ethics for Child Welfare Professionals*.

GENERAL INVESTIGATIONS

## GENERAL INVESTIGATION 7

**ALLEGATION**   A child protection investigator falsified case notes purporting she made six in-person visits to a family's home during the course of an investigation of the serious physical abuse of a seven-week-old boy.

**INVESTIGATION**   The seven-week-old boy had been brought to a hospital emergency room by his parents who reported he had not been using his left arm since the previous day. X-rays revealed the boy had a "bucket-handle" fracture to the arm. The parents stated they were unaware of how the injury could have occurred and that there had been at least six individuals, both relatives and non-relatives, who had cared for the boy during the previous few days. A child protection investigation was opened naming the parents as the alleged perpetrators of physical abuse and a mandate investigator was assigned to immediately respond to the report. The mandate investigator observed the boy in the hospital and visited the family home where he interviewed the parents and the individuals they identified as collateral contacts and met with the boy's three-year-old brother. The mandate investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) determining the children to be unsafe in the home and developed a safety plan, which the parents agreed to. Under the safety plan, family friends moved into the home temporarily while the parents moved out. The parents also agreed not to have any unsupervised contact with their children until further notice.

The following day, the child protection investigator responsible for completing the case contacted hospital staff and learned that the boy, who had been released, needed to return to the facility for further x-rays because of a possible additional fracture in his arm. The investigator documented her telephone contact with the family friends serving as the children's caregivers informing them of the hospital's instructions. The investigator made no contact with either the parents or the children that day and did not see the family until nine days later. At that time, the investigator observed the children and met with the mother, informing her the safety plan would remain in place until the results of the additional x-rays had been reviewed by medical personnel. Six days later, the investigator called the mother and reiterated that the safety plan would be continued as "more investigation [was] needed."

Two months later, the investigator submitted a referral for intact services to be provided to the family. A Department administrator rejected the request and instructed the investigator to refer the case to the State's Attorney's Office to seek temporary custody of the children. In an interview with the IG staff, the Department administrator stated her decision to seek temporary custody rather than provide intact services was based on her review of the case, which involved a very young victim of what a medical review had determined was likely a serious, inflicted physical injury and the absence of an explanation of how it occurred. The investigator then referred the case to the State's Attorney's Office; however, the case was rejected based on a determination the screening packet was incomplete and missing critical notes regarding the investigator's contacts with the family. The investigator later resubmitted the screening packet which then included documentation of six in-person contacts between the investigator and the family. The case was accepted by the State's Attorney's Office and a temporary custody hearing was scheduled for the following day.

During the temporary custody hearing, while under oath, the investigator admitted having fabricated the six in-person visits she had documented and testified that she had not been in the home or seen the children or the parents in almost four months. In an interview with IG staff, the investigator stated the in-person visits she had documented in fact represented telephone conversations she had engaged in with the mother, whom she said called her frequently in an effort to have the safety plan terminated. When questioned as to why these frequent phone conversations were not represented in the case record, the investigator stated that she had kept separate handwritten notes of her phone calls with the parents and other involved professionals. When asked

by the IG staff to provide the handwritten notes, the investigator stated she would be unable to as she had destroyed them following the temporary custody hearing. The investigator additionally admitted to IG staff that the CERAP she had completed determining the children to be safe in the home had been based on reports the mother had made during their phone conversations and not on observation of the children.

Soon after testifying at the temporary custody hearing, the investigator resigned from her position with the Department. Following its investigation, the IG staff initiated proceedings to revoke the investigator's Child Welfare Employment License (CWEL). After a full hearing in front of an Administrative Law Judge (ALJ), the ALJ recommended to the CWEL Board that the investigator's license be revoked. The investigator appealed and the CWEL Board rejected the recommendation of the ALJ and ordered her license to be reinstated.

# ADDRESSING CORRUPTION FROM WITHIN

One of the statutory mandates of the DCFS Office of Inspector General is to investigate and report on allegations of malfeasance by any employee or contractor of the Department. (20 ILCS 505/35.5) When malfeasance occurs at the highest levels of the Department, the harmful effects can resonate throughout the Department. While that level of malfeasance is thankfully rare, it is critical to the taxpayers and the families we serve to address corruption at the earliest opportunity.

**History of Inspector General Corruption Investigations**

**2005**

In 2005, the Inspector General noted that a high ranking Department Deputy Director, with close ties to former Governor Blagojevich, had disclosed on his Ethics Disclosure Statement that he had received a gift from a company that did not have a contract with the Department. Research by the Office of Inspector General showed that the company providing the gift was so closely aligned with a DCFS vendor that they shared an office and phone number and were both controlled by the same individual– so that when called, the number provided by one company, connected to a voicemail naming the other company.

Further investigation found that the same Deputy Director was requiring other Department vendors to disburse state funds allotted to their programs to companies in which the Deputy Director had a financial interest – or simply to the Deputy Director, himself.

While the DCFS Inspector General investigation was pending, the Executive Inspector General for the Agencies of the Governor (a position and office newly created by then-Governor Blagojevich) demanded that the IG's investigation be handled by his Office. He cited an Administrative Order, issued by Governor Blagojevich, that required all state Inspector Generals to report to the new Executive Inspector General. The DCFS Inspector General declined, finding that Governor Blagojevich's Executive Order was in conflict with the Illinois Statute that governed the actions of the DCFS Inspector General. The Executive Inspector General then initiated an investigation of the DCFS Inspector General's Office and impounded all computers of DCFS OIG staff that worked on the investigation of the Deputy Director. The DCFS Inspector General asked the Ethics Commission to appoint an independent investigator. The Ethics Commission agreed and the investigation was eventually closed.

The DCFS Inspector General filed a Report with then Governor Blagojevich and the Department, which called for the removal of the Deputy Director. The Deputy Director abruptly resigned in 2005 and was federally prosecuted based on the DCFS Inspector General's findings. In 2010 he pled guilty to federal fraud charges and was sentenced to six months in prison to be followed by six months on home confinement.

**2007**

In 2007, the Office of the Inspector General received a complaint that a contractor hired by the Department to provide drug testing services to intact families was not, in fact, performing the tests it was paid for. The contractor was married to an individual that provided significant political contributions to former Governor Blagojevich.

In reviewing the billing history, the Inspector General noted that the company's billings had greatly increased every year. The Inspector General noted that it was strange that the company, which performed drug tests for intact families, would have such large annual increases when the numbers of substance exposed infant death's decreased steadily.

The Inspector General impounded the records of the drug testing company and found that a substantial number of the billings were fabricated. The DCFS Inspector General recommended that the agency's contract be terminated and referred the owner of the company to the States Attorney's Office for criminal prosecution. The agency's owner was criminally prosecuted by the States Attorney's Office based on the DCFS Inspector General's investigation. She pled guilty to false billing charges and was sentenced to four years' probation and $200,000 in fines and restitution. She was also civilly prosecuted by the Attorney General's Office, which resulted in additional monetary judgements against the owner.

**2010**

In 2010, the Inspector General learned that a DCFS vendor had hired (through a subcontract) a former DCFS Deputy Director who had stolen funds from the Department just a few years earlier (see above 2005). The vendor's contract was to provide academic tutoring to at-risk Department youth in care. In fact, the Department was receiving federal funding for the contract based on the representation that youth in care were receiving services under the contract. The investigation found that the funds were actually being diverted to a public school sports program, already funded by Chicago Public Schools, in which none of the participants were DCFS youth in care. There was little evidence of any tutoring associated with the program. The investigation also found that documentation had been altered to make it appear that the former Deputy Director participated in the program. Interviews disclosed that the actual work performed by former Deputy Director consisted of lobbying for the vendor. The Department is prohibited from paying for lobbying expenses.

The investigation also faulted the poor monitoring of the vendor by the Department. The investigation found that while the vendor's president provided little or no direct services, her entire salary had been unquestioningly characterized as a 'direct expense.' This was important because DCFS disallows administrative expenses when they are more than 20% of direct expenses. In addition, while the certain staff only worked a small portion of their overall time on the DCFS contract, the monitors had permitted their full salaries to be paid by DCFS.

When the Inspector General sought the assistance of the Attorney General's Office to prosecute the vendor, the Attorney General's Office determined that the Contract Requirements had been written so vaguely as to make prosecution impossible.

**2010-2011**

As a result of the 2010 investigation (above), the DCFS Inspector General reviewed all DCFS Contracts for academic tutoring with similarly vague contract terms. In doing so, the Inspector General noted that several of those Contracts had been awarded to a new vendor. Further investigation found that the new Vendor owned and operated various companies, some for profit, some not for profit. The vendor had been awarded four separate DCFS Grants and was also receiving DCFS funds to be the fiscal agent of three family advocacy centers throughout the State. Over the prior three years reviewed, the vendor had received over $6 million from the Department. The Contractor was close personal friends with the Director of the Department at the time.

The Inspector General found that the vendor also received funds from other State Agencies. It appeared that the vendor was submitting the same billings to different State Agencies to support receipt from multiple funding sources for the same service. The IG approached the Executive Inspector General and the two Inspector Generals' Offices performed a Joint Investigation that uncovered dozens of falsified and forged documents, in addition to duplicate and triplicate billing, that had been submitted to support receipt of various payments to the vendor. Based on the Joint Investigation, the United States Attorney successfully prosecuted the vendor. He was sentenced to 24 months in prison and required to pay almost $500,000 in restitution. Then DCFS Director resigned after the joint investigation found that he failed to cooperate.

**2016**

*Confidential Assistant*

In 2016 both the DCFS Inspector General and the Executive Inspector General received a complaint that the Department had hired a number of individuals from Florida and elsewhere, in violation of personnel and contracting rules. The complaint identified an Assistant to be the then-Director, who the complaint alleged had been hired as the then-Director's 'driver.' The complaint stated that the 'driver' had an unresolved drunk driving arrest.

The Investigation confirmed that the Assistant had been hired under a Personal Services Contract at an annualized rate of $50,000/year. The contract was for a limited time, but the Department was building a State position at the same rate of pay. The assistant was a recent college graduate who had no prior experience in child welfare. The investigation also confirmed that the Assistant had been arrested in Florida for Driving Under the Influence just three months prior to being hired by the Department. Although the Assistant was initially permitted to drive for work purposes, his Florida driver's license had been revoked one month prior to hire for failing to attend DUI school and for violating the terms of the conditional license. While the former Director and the Deputy Director knew of the DUI arrest, neither did anything to ensure that the Assistant had a valid driver's license. The Assistant drove a State Vehicle over 1400 miles without a valid driver's license.

The investigation also found that the former Director provided cash and other gifts to the Assistant, including taking a personal vacation together, out of state, using the State Car. Throughout the three months that the Assistant worked for the State, the IG was able to find only two pages of work product.

The IG investigation also found that the Assistant had billed the State for over $1,300 of time during holidays and weekends when he did not appear to be doing State work. After being alerted by the DCFS Inspector General, the Department cancelled the contract and sought to recover the overpayment. To date, the State has not recovered the money.

Following the termination of the Assistant's contract, the investigation found that the former Director provided the Assistant additional cash gifts totaling over $3000, and in response to a formal request on the State e-mail system for a job reference, the former Director gave the former Assistant a glowing recommendation and claimed that the Assistant's job had been to act as the Department's Director when the former Director was unavailable.

*No-Bid Contract to a Florida Business Associate*

In 2016 the former Director also arranged a no-bid contract with a Florida company. All the work under the no-bid contract was performed by four consultants, all based in Florida. One of the consultants was a close personal friend and business associate of the former Director.

After the Inspector General questioned the former Director about his association with the consultant, the former Director belatedly disclosed the association to the Department's Conflict of Interest Committee. The IG partnered with the Executive Inspector General and in 2107, they released the Joint Investigative Report that found, in addition to other findings, that the former Director has engaged in mismanagement in the hiring of the Confidential Assistant and in substantially participating in the decision to award a no-bid contract to a consultant without disclosing that they owned property together.

*No-Bid Contract to Florida Videographer*

A Florida media and political consulting company received a no-bid contract to produce two public service videos concerning child safety. The two public service announcements produced were to alert parents to the dangers of unsafe sleep practices with infants and the dangers of leaving small children unattended in the bathtub.

The media and political consulting company consisted of one man; a producer and registered Florida lobbyist. He had worked with the former Director and provided his expertise to the former Director's political campaign free of charge.

The Director, who commissioned the contract without bidding out to Illinois companies or determining whether the cost was fair and reasonable, claimed that the cost of the contract was only to reimburse for production costs and that the producer was donating his time and equipment. This fact was contradicted by the producer who stated that none of his services to the Department were provided for free. He said the charge for the two public service announcements was "no more or less" than what he normally charges for any client. He noted, in fact, that the "lion's share" of the charges to DCFS were for his creative work and expertise.

More importantly, substantially similar videos already existed, having been created by not for profits, that were available to the Department free of charge. In addition, the Inspector General's investigation disclosed that Illinois had only one infant death related to leaving an infant unattended in a bathtub. The recommendation to distribute videos on water safety referred to the high number of child deaths that occur each summer in outdoor lakes, rivers, and pools.

*No-Bid Contract to Florida Event Planner*
While the joint investigation was pending, the IG learned of a no-bid contract that had been awarded to a Florida company for event-planning services. The former Director had previously worked with the company in Florida and the president of the company was a donor to the former Director's 2014 campaign for Florida Attorney General. Procurement rules requires that state agencies request quotes from Illinois small businesses preregistered with the State Procurement Office. Instead, the former Director assigned a deputy director to solicit the services from the Florida event planning company. The Director was informed that many of the services proposed by the event planning company could be provided for free from the DCFS Education and Training Division. When the Senior State Procurement Officer informed senior management about the need to post the contract for Illinois bidders, the Director approached a large research institution, with which the Department already had a large grant agreement and asked them to subcontract with the Florida event planner. The action was an apparent effort to avoid competitive bidding and State Procurement oversight.

**2017**
The Inspector General received a complaint that the Department was unable to account for thousands of dollars in gift cards, donated by a local children's hospital for the Annual Holiday Party in 2016. The IG investigation found that the cards were managed by a Regional Administrator who did not keep any records of the disposition of the cards, and, by her own admission handed several of the cards over to an individual who represented himself as part of a registered charity, but he was not. The Regional Administrator had been alerted by the new DCFS Ethics Officer that it was necessary to confirm the not for profit status of the organization, but the Regional Administrator still failed to do so. In the end, over a hundred of the gift cards could not be accounted for. The DCFS Inspector General recommended that the Administrator be discharged.

# ERROR REDUCTION

In FY 2017, the Office of the Inspector General continued implementation of its error reduction initiative to identify and address practice errors and organizational weaknesses in Illinois' child welfare system, that may increase likelihood of a child dying or suffering a serious injury. This work added to efforts which began in 2008, with the enactment of legislation requiring the Office of the Inspector General to remedy patterns of errors or problematic practices that compromise or threaten the safety of children, as identified in Inspector General death and serious injury investigations and by Child Death Review Teams. (20 ILCS 505/35.7)

The basis for the error reduction legislation was a recognition that flawed organizational practices can contribute to potentially tragic outcomes for children, including death or serious injury. The Inspector General's training curriculum that grew from this legislation introduced the concept of error management – i.e. what can be done to prevent the occurrence of tragic error by applying error reduction methods to child protection investigations involving cuts, welts and bruises? By using a systems perspective and root cause analysis, the Inspector General developed and presented numerous field trainings designed to reduce such errors.

### *Error Reduction Trainings – An Historical Perspective and Current Challenges*

*Cuts, Welts and Bruises Training:*
The initial set of error reduction trainings, which began in 2009, addressed child protection investigations of bruising of infants and young children. A review by the Inspector General noted a correlation between prior unfounded Cuts, Welts and Bruises allegations, and the subsequent death or serious injury of a child; and that bruising on children as young as a few months old was often minimized. The Inspector General recognized that a cultural change in investigative practices was required. A critical component of implementing this shift came with the subsequent review of child protection cases closed six months after the trainings, conducted by the Inspector General and DCFS' Office of Quality Assurance. The review measured child protection teams' application of the error reduction trainings to their investigations, and DCFS Regions were given region-specific feedback. The Cuts, Welts and Bruises Error Reduction Training curriculum was incorporated into Core Training for new Child Protection Investigators.

In 2010 and 2011, the Inspector General continued to evolve error reduction training, and conducted a second round of trainings focusing on intact families with parental mental illness. In these cases, similar problematic practices became evident that mirrored practices previously identified in Cuts, Welts and Bruises investigations. In particular, intact family services workers were not routinely obtaining relevant records, or sharing relevant facts with treating clinicians to close information loopholes. By the end of 2012, the Inspector General's staff had trained DCFS and private agency intact family services staff in the Southern and Central Regions and Cook County. To support these trainings, the Department issued policy guidelines directing child protection investigators to ask parents/caregivers about mental health issues and requiring the investigator to obtain the relevant mental health records (*see* Policy Guide 2011.07, *Obtaining Records of Patients with Mental Illness).* Ultimately, in 2012 the Mental Health Trainings for DCFS Intact Family workers were postponed due to budget cuts, which led to the elimination of DCFS Intact Family Teams.

In 2013, the Department's reorganization/realignment resulted in the creation of High Risk Intact Specialists. The Division of Training requested assistance from the Inspector General's Office, to train this new class of workers in Mental Health Error Reduction principles. The Inspector General's staff provided an overview of the mental health training and facilitated discussions on communication with

mental health professionals, obtaining relevant documents, and working with families with parental mental illness.

In 2014, the Inspector General conducted five Multi-System Error Reduction Trainings for select private agency and DCFS staff. The training provided an overview of three Error Reduction Initiatives, including Young Parent Training, Bruising Training, and Grief and Loss Training.

In 2017, the Inspector General conducted a follow-up training for intact family services supervisors and administrators in Southern Region, in response to a complaint from a State's Attorney (who had collaborated with the Inspector General in Error Reduction Trainings) that the case of a mother who repeatedly hit her daughter in the face, causing severe bruising, was indicated by DCFS but was not screened into court because of the worker's misconception that it would not pass legal screening. The principles addressed in the training were meant to be used in two types of cases: (1) where the risks are too high to *not* provide services and monitoring, but not high enough to remove children from parents' custody; or (2) in return home cases where the Department requires supportive services and supervision in the transitional period. In the case that prompted the follow-up training, although there was ample evidence to indicate the mother for physical abuse, and police expressed their intention to prosecute her criminally for domestic battery, the mother was allowed to refuse voluntary intact family services with no repercussions. She was later prosecuted for the abuse to her daughter. In interviews with the Inspector General, both the child protection worker and supervisor expressed their erroneous belief that the local court rarely granted protective orders, and they thereby assumed their best option was to simply accept the mother's refusal of services, advise her to control her behavior, and to "wait and see." The Inspector General's follow-up training in Southern Region included a panel discussion involving regional DCFS attorneys which helped to facilitate discussion and understanding of the legal tools available to staff. The concept of using the court to assist working with a family who may be resistant to intact service was emphasized. The training incorporated two redacted Inspector General investigations involving split custody and return home intact family cases. The training also involved discussions of examples and guidelines for utilizing Orders of Supervision, protective daycare and other supportive services.

*Egregious Acts of Physical Abuse Trainings*
The Inspector General's training staff continued to expand its curriculum to inform both administration and front-line staff, and to promote critical thinking and decision-making. Several Inspector General death or serious injury investigation involved cases of egregious abuse or torture of young children. The investigations revealed that – despite the gravity of the egregious abuse – the Department had a practice of offering standard parenting services, for which there was no evidence to support the notion that such services could ameliorate the risk of harm for these children. In 2015 and 2016, the Inspector General's Office provided Egregious Acts Training, which centered around a five-topic Error Reduction training curricula: *Lessons Learned from Physical Abuse Fatalities*, and specifically, "Systemic Errors in the Legal System, High Risk Specialized Assessments *(Topic 5)"* Those trainings were presented to 72 clinical staff across Illinois and 300 private agency staff, department child protection, permanency, intact staff supervisors and managers. The training focused on changing practice to ensure that a family is appropriately assessed, with a determination of whether or not there are any evidence-based services that could realistically alleviate safety threats to a child in that home. To help the field conceptualize the continuum of physical abuse, and where egregious acts fall therein, the Inspector General utilized the *Maltreatment Continuum* – a visual tool illustrating the characteristics, spectrum and severity escalation from Minor Assaults to Egregious Acts of Physical Abuse.

Recognizing the necessity of a multi-systemic approach to managing cases of egregious physical abuse, the Inspector General collaborated with regional staff from the DCFS Division of Legal Services and State's Attorneys to examine and train on the legal provisions that exist to deny reunification services for families where children have suffered egregious acts of physical abuse.

The 2017 *Egregious Acts* trainings that evolved out of this collaborative effort were delivered to DCFS clinical staff, casework managers, supervisors and trainers in the Southern Region and Cook County. The trainings focused on how these cases differ from more traditional cases and specifically on the legal framework for addressing egregious acts cases, as well as critical clinical considerations, such as initial service planning, specialized assessments, useful tools/instruments and an overview of processes and time frames.

*Current Challenges*
Looking toward FY 2019 and beyond, Office of the Inspector General anticipated completing a hand-off to the Department's Division of Training and Professional Development, who would incorporate the egregious acts trainings into their ongoing training curricula. In the interim, however, several cases came to the Inspector General's attention which raised concerns about failures of the clinical and/or legal systems to identify egregious acts of physical abuse at the onset, and to subsequently take timely and appropriate clinical and legal actions. It became clear that the clinical and legal systems that had been contemplated to address these rare cases were not functioning practically or efficiently and, most concerning, was the realization that the failures at play were working against the best interest of the children in Department care who have suffered some of the most extreme harms at the hands of their caregivers.

To that end, the Office of the Inspector General has temporarily suspended training on this subject while collaborating with DCFS Clinical, Child Protection and Legal staff to examine the shortcomings and develop a system of checks and balances that is practically functional. Further, the IG's training staff dedicated to Error Reduction have been reduced by approximately half which has frustrated the Inspector General's efforts to timely disseminate this information to the field.

### Enhanced Chronic Care Guide

The Office of Inspector General revised and enhanced the Caring for Children with Chronic Heath Conditions guide, which is available on the DCFS website. The enhanced Guide was specifically developed to assist DCFS-funded Intact Family Agencies in their work with parents and relatives caring for a child with a chronic or complex health condition. These families have been the subject of a medical neglect investigation and referred for intact services.

The more intact family workers knows about a chronic condition, the better able they are to make plans for care, anticipate challenges down the road, and know where to seek help. Also, it is critical that intact family workers gains an understanding of psychological, cultural, community, and, environmental factors that influence the family's care of a child with a chronic condition. Intact family workers may need to help the family lower the potential risks of ineffective health management that may include helping the family overcome a feeling of powerlessness because of the complex regimens and decisional conflicts that occurs between a system of heath care providers and the family.

Caring for a child with a chronic health condition presents challenges to parents, since the chronic condition may affect the child, brothers, sisters as well as the parents.

### Parent Caregiver Guide

In FY 2017, the Office of Inspector General revised and reformatted the 2012 edition of *A Helpful Guide for Parents and Caregivers*, a required element of the Home Safety Checklist assessment. The content of the Guide was updated to include current American Academy of Pediatrics (AAP) information, such as, Sudden Unexpected Infant Death (SUID); infant brain development; and safe methadone storage.

**Training with Substance - Abusing Parents**

In February 2017 the Office of Inspector General provided Maryville's Mom's Recovery Program with an adapted version of Young Parent Training. Young Parent Training was designed by the Office of Inspector General and the Teen Parent Service Network (TPSN) to reduce the risk of infant mortality and prepare inexperienced parenting youth for the challenges of caring for their infant. Recognizing the difference in maturity and life experiences of the mothers in the Recovery Program, the training was revised to include scenarios that were more relatable to mothers struggling with sobriety and the associated risks to their young children. The training covered:

•      Non-violent parenting approaches to address challenging developmental behavior
•      Criteria for identifying nurturing non-violent caregivers
•      The importance of safe sleep practices
•      Activities that enhance a young child's brain development

The recovery program has incorporated the adapted training into their parenting curriculum presented on a quarterly basis to mother's entering their program.

**Community Mapping Training**

Goodness of Fit cannot be over-estimated when assisting parents in identifying supportive community resources. Community mapping is a method to develop formal and informal support systems for families. It is based on the principle that case managers need to develop community specific knowledge, establish linkages with trusted community providers, anticipate potential obstacles, and help navigate parents through their ambivalence to successfully engage in services.

In June 2017 the Office of Inspector General conducted Community Map training for Intact Family Recovery (IFR) case managers. The IFR model integrates child welfare and substance abuse disciplines to maximize child safety and effective participation in treatment for families receiving intact services after the birth of a first or second substance exposed infant. To reinforce the importance of developing knowledge and establishing relationships with community providers, the training took place at a community based recovery program. Caseworkers became familiar with the neighborhood by walking to selected community resources where they received first-hand knowledge from seasoned Head Start teachers, children's librarians, and health care providers.

# SYSTEMIC RECOMMENDATIONS

The Inspector General's investigative reports contain both systemic and case specific recommendations. The recommendations for systemic reform for Fiscal Year 2017 have been categorized below according to the function that the recommendation is designed to strengthen within the child welfare system. The Office of the Inspector General is a small office in relation to the child welfare system. Rather than address problems in isolation, the Office of the Inspector General views its mandate as strengthening the ability of the Department and private agencies to perform their duties. Recommendation categories are as follows:

- **CHILD PROTECTION**
- **CHILD WELL-BEING**
- **CORRUPTION**
- **ERROR REDUCTION**
- **PERSONNEL**
- **SERVICES**
  - **Dually Involved Youth**
  - **Intact Family**
  - **Residential**
  - **Return Home**
  - **Substance Abuse**
  - **Violent Youth**

## CHILD PROTECTION

- In all child protection investigations where a medical provider requests that the infant or child be brought in for a medical visit, the investigation shall remain open until the infant or child is seen by the medical provider and the child protection worker consults with the medical provider.

- The Department should require that the State Central Register (SCR) call floor workers include full history of the family's contacts with the Department as part of the narrative in child protection investigations involving children age three and younger to ensure that an investigator has this pertinent information at the onset of the investigation.

- Email communication during a child protection investigation must be made a part of the official record when the information is relevant to the investigation.

- At the transitional visit for intact family services cases with a medically complex child, the child protection investigator and intact family services case worker will request that the parent sign consents for the worker to communicate with the child's medical home regarding the child's health and medical care management.

- Inspector General Report 16-3119 should be used as a training tool with child protection investigators. In this case, the services offered to the family by the child protection investigator were perfunctory and bureaucratic, and did not meet the family's needs. The child protection investigator offered parenting classes and counseling to a mother that need assistance with employment, housing

and the medical care of her daughter. The child protection investigator should have tailored his service recommendations to the true needs of the family. While the child protection investigator did discuss Norman funds with the mother, he presented only the barriers to accessing Norman funds, rather than the opportunities it would have afforded the family, especially since, at that time, housing vouchers were available.

- Representatives from the Chicago Department of Public Health should be invited to a Cook County Child Protection Supervisors meeting to discuss the role of the Department of Public Health's Adverse Pregnancy Outcome Reporting System (APORS) for high-risk infants. In child protection investigations involving a premature infant where it appears that the parent has missed medical appointments including well-child visits, child protection supervisors should be guiding investigators to contact both APORS and the federal Women, Infants and Children Program (WIC) because a high-risk situation may exist.

- In accidental deaths associated with a consumer product that may have posed an unreasonable risk of injury or death, the Department should advise child protection supervisors to report the product to the Consumer Product Safety Commission.

## CHILD WELL-BEING

- The Department should develop a policy for accessing content publicly posted on social media content for information relevant to investigative, intact and/or placement cases.

## CORRUPTION

- The State Procurement Office should adopt a policy whereby reasonable suspicions of Procurement Code violations are referred for investigation within one week of receipt.

- All Executive Staff must be immediately trained or retrained on the Procurement Code and procurement reporting requirements.

- Conduct training of procurement and contracts staff to ensure that staff are knowledgeable about the requirements that must be met for no-bid grants.

- Inspector General Report 17-1696, as well as the Gift Giving Protocol, must be shared with anyone managing the Cook County DCFS Holiday Party in the future.

## ERROR REDUCTION

- The Inspector General will include Report 16-2327 (along with OIG Reports 15-2613 and 15-3141) in an Error Reduction Training for the Southern Region to address issues related to the filing of petitions for protective orders in Intact Family Services cases and Placement cases and the duty to inform the court of critical case developments affecting child safety in Return Home cases.

**PERSONNEL**

- The Department's Division of Employee Services should ensure that appropriate criminal and driver's license checks are performed for persons with Personal Service Contracts.

**SERVICES**

*Dually Involved Youth*
- Given that youth in care placed in locations bordering two counties may be involved in multiple juvenile court jurisdictions, the Immersion Site Director should develop a work group with involved agencies, local law enforcement, and state's attorneys to ensure coordination of efforts concerning dually involved youth.

*Intact Family*
- The Department should develop a workload formula to provide additional funding in complex intact family services cases when agencies have to simultaneously provide rehabilitative services to a parent who has neglected or abused a child(ren) and supportive and protective services to the non-custodial parent who assumes the care of the child(ren). The complexity of the needs of the children in these split cases, likewise, must be assessed for meaningful supportive services.

- In keeping with the Strengthening Families Model, intact family services workers should be required to familiarize themselves with their families' communities and demonstrate a command of community early education and preschool resources and other protective social supports for children to reduce abuse and neglect, as recommended by the Inspector General in Report 08-1260.

- In intact family services cases involving medically complex children, the intact family case worker must convene a staffing, within 30 days of receiving the case, with the medical case manager and parent(s) to discuss the child's care and assess parent's needs for tangible and emotional support.

- In cases of medical neglect where a caregiver failed to give a child prescribed medication, the Department should develop practice for addressing a parent's non-compliance with administration of medication.

*Residential*
- The Department must develop resources, including funding, for residential treatment centers to develop their own step-down foster homes.

*Return Home*
- The Department should issue a notification to all private foster care agencies and Officers of the Court that six months of daycare can be funded as part of reunification services.

- Prior to return home, staff must develop a reunification plan that identifies basic necessities (food, beds, diapers, etc.); support services (homemaker, visiting nurse, counseling, early intervention, Head Start, day care, school, respite care, etc.); and community resources that are appropriate and available within close proximity of the family's home (WIC, food pantry, local library, etc.). The Department must ensure that the family is securely anchored to supportive services prior to the children's return home.

- The Department should fund transportation to daycare or Head Start programs in return home cases where there are multiple young children and the parents, because of poverty or increased stress, cannot transport their children.

*Substance Abuse*

- The Department should replicate the Intact Family Recovery Program (IFR), which provides intensive services to caretakers with substance abuse problems, in the Joliet and Aurora sub-regions.

*Violent Youth*

- The Office of the Inspector General reiterates its recommendation from the Street Homicide Report and Shelter Care and Runaway Reports that the Department should develop a staff secure, violence and substance free, therapeutic stabilization center based on a model similar to a halfway house for youth 18 and over involved with the criminal court system or dually involved with adult and juvenile courts for crimes against a person. This program should be extended to include violent youth under 18 who pose a risk to the safety of other peers in their placements.

- The Department should convene a workgroup that would accept referrals of violent youth in care whose behaviors endanger the safety of other youth in placement. The workgroup should assist child welfare specialists and placement treatment teams in coordinating critical information and identifying resources.

# RECOMMENDATIONS FOR DISCIPLINE

In FY 2017, the Inspector General recommended discipline of Department and private agency employees for the conduct detailed below. Discipline recommendations ranged from counseling to discharge.

- A former Director of DCFS arranged for the hire of a Confidential Assistant, approved inaccurate time records of the Assistant, violated Rules vacationing with the Assistant using a State vehicle, allowed the Assistant to drive the State car, despite knowing of a recent arrest for Driving Under the Influence, and provided a positive job reference for the Assistant after his Contract had been cancelled for submitting false timesheets.

- A former Confidential Assistant to the Director abused state time and failed to provide accurate records. The Confidential Assistant violated Vehicle Use Policy and failed to disclose License Restrictions on State Employment Forms.

- A former Director violated Procurement rules when he substantially participated in two decisions to award no-bid state contracts to personal acquaintances and friends, most of whom had donated time or money to him as a political candidate for office in Florida. He also failed to disclose that he owned investment and other property with one of the consultants.

- A child protection investigator assigned to investigate medical neglect and possible failure to thrive of a disabled one-year-old infant falsely documented a failed attempt to observe the infant and her twin as a completed in-person visit. While the investigation was pending for one month, the investigator never observed the twins, contacted the pediatrician, or interviewed the twins' mother.

- A Department administrator failed to ensure follow-up of a criminal background check that disclosed a recent arrest for Driving Under the Influence for a contractual state employee.

- A child welfare specialist testified in court that a mother had successfully completed treatment, despite having received information that the mother had been discharged from the program for failure to comply. The worker also testified to having personally observed visits that were monitored by a private agency.

- A Department administrator failed to maintain an accounting record of how she had disposed of 420 donated gift cards totaling in value over $9,000. She gave several of the gift cards to a man associated with a purported charity to benefit children in other states. The administrator did not check the status of the charity, despite being advised to do so. The charity was not recognized as a state or federal charity.

- A Department administrator failed to act after learning that she received 35 less gift cards than the donor claimed to have provided.

- A child protection investigator placed a 17-year-old in the home of his 13-year-old girlfriend despite knowing that the two had had a sexual relationship, relying only on the teens' promises that they were no longer romantically involved, and ignored the concerns of school and the boy's parents, who worried that he could be criminally charged. The investigator's documentation failed to even record the concerns of the school principal and mischaracterized that the school had agreed with the placement.

- A child protection investigator failed to document critical medical information about an infant (i.e. that the infant was born prematurely and had spina bifida) and failed to verbally inform his supervisor

of the special needs of the infant and did not make a meaningful attempt to engage the homeless mother in services.

- A child protection investigator failed to conduct a scene investigation; failed to create a timeline of the events prior to the injuries; and relied on the alleged perpetrator's lack of abuse history despite that fact that the young alleged perpetrator had never cared for the child before. The investigator failed to note the inconsistency between the claimed mechanics of the injury (a single fall) and the bruising, which was on both sides of the child's face. The child protection supervisor failed to note the errors in the investigation and approved unfounding it.

# CHILD WELFARE EMPLOYEE LICENSES

The following cases represent action taken against Child Welfare Employee Licenses (CWEL) in FY 2017.

### *License Revocation*
- Two employees had their Child Welfare Employee Licenses revoked for failing to respond to charges of falsification.
- One employee had their Child Welfare Employee License revoked for maintaining an intimate relationship with a foster parent on the employee's caseload.
- One employee had their Child Welfare Employee License revoked for sharing confidential information with a friend.

### *License Relinquished*
- An employee relinquished his license after the Inspector General filed egregious act charges for providing false information to police in connection with an incident in which he appeared to have solicited sex from an underage girl.

### *License Suspension*
- An employee had their Child Welfare Employee License suspended for 1 year for sending an inappropriate and suggestive text to a client.
- An employee had his license suspended for 120 days for multiple instances of incorrect information entered; the Administrative Law Judge determined that the misinformation could not be determined to be intentional given the extremely high caseload of the employee.

### *Pending Charges Filed*
- Charges were filed against an employee after he was named as an indicated perpetrator of child abuse.
- Charges were filed against an employee for forging his supervisor's signature.
- Charges were filed against an employee for falsification of a note.

164

# DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS

The Inspector General made the following recommendations in previous Fiscal Years, but the recommendations were not fully implemented before the Annual Report was issued. The current implementation status of these recommendations is detailed below in the following categories.

- **APPEALS**
- **CASELOADS**
- **MENTAL HEALTH**
  - **Psychotropic Medication**
- **CONTRACT MONITORING**
- **EGREGIOUS ACTS**
- **INFORMATION TECHNOLOGY**
- **FOSTER HOME LICENSING**
  - **Fraud**
- **INTACT FAMILY SERVICES**
- **LAW ENFORCEMENT**
- **MEDICAL**
- **OLDER YOUTH IN CARE**
- **PERSONNEL**
- **PROCEDURAL CHANGES**
  - **Abuse and Neglect Child Reporting Act (ANCRA)**
  - **Child Endangerment Risk Assessment Protocol (CERAP)**
  - **Interpersonal Violence**
  - **Procedures 300, Reports of Child Abuse and Neglect**
  - **Short-term Guardianship**
- **STATE'S ATTORNEY**
- **SERVICES**
- **WORKER SAFETY**

**APPEALS**

FY 2016
**The Department should develop internal policy specifying that all persons involved with the Director's Office on specific appeals must recuse themselves from communications or discipline regarding those appeals as well as discussions with the particular ALJs' supervisors (from OIG FY 16 Annual Report, General Investigation 5).**

> *FY 16 Department Response:* The Department agrees. The Department's Ethics Officer will work with the Office of Legal Services and the Administrative Hearings Unit to develop internal policy.

> *FY 17 Department Update:* The Department's Ethics Officer will be continuing to meet with staff from the Office of Legal Services and the Administrative Hearings Unit to complete the development of an internal policy.

FY 2015

**The Administrative Hearings Unit should establish a policy whereby requests for appeal are not dismissed as untimely unless proof of service can be shown (from OIG FY 15 Annual Report, General Investigation 17).**

> *FY 17 Department Update:* The Department continues to makes every effort to grant appeals and reviews each of these cases on a case by case basis.

*FY 17 OIG Comment:* Without a policy in place, the practice will unfairly impact poor families who cannot afford a lawyer.

FY 2013

**The Department should revise Rule 336, *Appeals of Indicated Abuse/Neglect Findings*, to include the following: (a). It is presumed that physicians and other professional testimony by phone is permitted unless for good cause shown. When good cause is shown, the ALJ's Recommendation shall note that testimony by phone was disallowed and why; (b.) Whenever a critical piece of evidence is excluded, the ALJ's Recommendation shall so state and include an explanation of the reasons therefore; and (c.) Grounds for dismissal (Rule 336.190) should include: "The appellant has admitted in a court of law to the facts supporting the Rationale for the indicated finding." (from OIG FY 13 Annual Report, General Investigation 19).**

> *FY 17 Department Update:* Rule 336, *Appeal of Child Abuse and Neglect Investigation Findings* was revised and issued December 6, 2017.

## CASELOADS

FY 2016

**The Department should adopt and communicate a policy whereby investigators with untenable caseloads will not be subject to discipline or negative evaluations if they are unable to comply with the 60-day closure requirement for all their cases.**

> *FY 16 Department Response:* The Department does not agree.

> *FY 17 Department Update:* The Department does not agree.

FY 2016

**This report will be shared with the court overseeing the BH consent decree (from OIG FY 16 Annual Report, General Investigation 1)**

> *FY 16 Department Response:* The (former Department Director) rejected the report and its recommendations.

*FY 16 OIG Comment:* The Inspector General notes that the Department has no authority to reject Office of the Inspector General reports (as opposed to recommendations).

> *FY 17 Department Update:* The Department continues to develop plans to address caseloads and has on-going discussions with plaintiffs' counsel in the B.H. matter. The Department's Office of Legal Services regularly reviews caseload reports and the data continually shows improvement.

FY 2016

**The Department must commit to a sustainable remedy to this problem by the end of this fiscal year (from OIG FY 16 Annual Report, General Investigation 1).**

> *FY 16 Department Response:* The (former Department Director) rejected the report and its recommendations.

> *FY 17 Department Update:* The Department continues to develop plans to address caseloads and has on-going discussions with plaintiffs' counsel in the B.H. matter. The Department's Office of Legal Services regularly reviews caseload reports and the data continually shows improvement.

## MENTAL HEALTH

FY 2014

**The Department, the Division of Mental Health and the Illinois State Board of Education should collaborate to share local community focused resources for Illinois children and adolescents requiring intensive psychiatric services including outpatient, in-home and residential care (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 3).**

> *FY 17 Department Update:* The Specialized Family Support Program (SFSP) began in April 2017 and was created to assist parents whose children are at risk for custody relinquishment due to high mental and behavioral health needs. The program offers in-home and community based services along with additional funding to assist the family in accessing the appropriate array of services to meet the needs of the child or youth.

FY 2013

**The Office of the Guardian should adopt a policy for the review of Restriction of Rights forms that includes a review for compliance with the Mental Health Code (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 3).**

> *FY 16 Department Update:* A policy guide was developed to provide staff with clarification on the review of the restriction of rights forms that includes a review for compliance with the Mental Health Code. The Policy Guide is pending issuance.

> *FY 17 Department Update:* Same Response provided from fiscal year 2016.

FY 2012

**Access to means, specifically firearms, is predictive of suicide completion. Research has shown and as noted in two adolescents' deaths, those at risk of suicide will break into locked rooms and locked cabinets to access the firearms. When the Department is placing an adolescent at risk of suicide in a foster home or facilitating a return to the biological home where there is a gun, the Department should conduct a clinical staffing to educate the parents (biological and foster) that the risk of suicide doubles if there is a firearm in the house, even if the gun is locked up. The staffing should utilize the materials developed by The University of Illinois at Chicago Institute for Juvenile Research for their Youth Suicide Prevention program. If the family has firearms, they should be asked to store the guns outside of the home. If the parent will not store the firearm elsewhere they must store firearms with a trigger lock in a lockbox. The keys should be kept in a secure or supervised setting. In return home situations of a suicidal youth, where the biological parent refuses**

to store the gun with a trigger lock in a lock box, the caseworker should contact DCFS Legal for assistance in presenting the case in Juvenile court for purpose of obtaining a court order (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).

> *FY 16 Department Update:* Policy Guide 2015.08, *Enhanced Firearm Safety in Foster Family Homes* was issued May 1, 2015. In July 2016, a complaint for declaratory and injunctive relief was filed against the Director, challenging various rules and regulations related to firearm safety. At the present time, the Director is doing a review of 402 Licensing Standards.

> *FY 17 Department Update:* Extensive proposed amendments to Rule 402, *Licensing Standards for Foster Family Homes* are awaiting further review and approval prior to First Notice filing.

### *Psychotropic Medication*

FY 2015

**From OIG FY 2015 Annual Report, Special Investigations, *Psychotropic Medication and Hospitalizations of 3 and 4 year olds:* An ecological and developmental focused Specialized Assessment must be used for children under age 6 who have been referred to the CARES hotline or for whom the Guardian receives a request for psychotropic medication. The Assessment should include the following:**
   a. **Description of identified problematic behaviors;**
   b. **Ecological and Developmental perspective including prior trauma and neglect suffered by the child and number of transitions;**
   c. **Corroboration of whether identified problem behaviors occur across settings; with Child Behavior Checklist from key informants including foster parents, relatives, teachers, early education providers, and other relevant professionals;**
   d. **The ecological and developmental perspective include prior trauma and neglect suffered by the child and number of transitions the child has encountered;**
   e. **A description of typical day (weekday and weekend);**
   f. **Description of sleep routine; visitation schedules, foster home composition;**
   g. **A Functional Behavior Analysis of the child's behavior; and**
   h. **Description of non-chemical evidence-based interventions that will be attempted prior to use of psychotropic medication.**

> *FY 16 Department Update:* The DCFS policy guide "Prescribing Psychotropic Medication to Children Under 6 Years Old in Illinois in State Guardianship" was updated to address the questions and concerns that were identified. The policy and forms were resubmitted to the Office of Child and Family Policy for review.

> *FY 17 Department Update:* Same Response provided from fiscal year 2016.

FY 2015

**SASS must stop using the CSPI on children six years of age and under (from OIG FY 15 Annual Report, Special Investigations, *Psychotropic Medication and Hospitalizations of 3 and 4 year olds).***

> *FY 17 Department Update:* The CSPI-EC is not distinguished from the CSPI at this point. The two have been integrated, and it is the expectation that the providers be utilizing the updated IM-CSPI at this time.

*FY 17 OIG Comment:* The CSPI-EC does not sufficiently address the contextual and environmental factors that may be critically important in young children. A functional analysis is needed. For instance, it may be that the caregiver is a more appropriate target of crisis intervention.

FY 2015

**The Department needs to train foster parents and caseworkers on first-line interventions recommended in the Department's consulting psychiatrist's Schematic Summary (from OIG FY 15 Annual Report, Special Investigations, *Psychotropic Medication and Hospitalizations of 3 and 4 year olds*).**

> *FY 15 Department Response:* The Department is developing a self-paced training for all staff and foster parents.

> *FY 16 Department Update:* This curriculum is still in process of development. Dr. Naylor has requested an expanded version of his original guideline. Professional Development staff is meeting with his staff monthly to complete this project.

> *FY 17 Department Update:* This curriculum is still in process of development. The protocol Dr. Naylor was using changed during the course of curriculum development. The Office of Learning and Professional Development is working with Dr. Naylor's staff and the workgroup. The workgroup is waiting on Procedure 325.4 approval but development continues.

*FY 17 OIG Comment:* This recommendation has been pending for 3 years.

FY 2015

**The Guardian's Office should retain Psychotropic Medication Request Forms completed for youths in care and ensure that first line treatments, as outlined by the Department's consulting psychiatrist, have been provided prior to approval for psychotropic medication (from OIG FY 15 Annual Report, Special Investigations, *Psychotropic Medication and Hospitalizations of 3 and 4 year olds*).**

> *FY 15 Department Response:* The Guardian's Office will explore developing a process to ensure that first line treatment recommendations are completed prior to approval psychotropic medication.

> *FY 16 Department Update:* The Office of the Guardian does not keep Medicaid Request Forms, however, The Guardians Office keeps psychotropic medication request forms for one year, and UIC psychiatrist review each request for first line treatments.

> *FY 17 Department Update:* Same Response provided from fiscal year 2016.

*FY 17 OIG Comment:* It is important to note that the history of first line treatments helps inform us of efficiencies or deficiencies of treatments.

**CONTRACT MONITORING**

FY 2015

**In 2015, the Office of the Inspector General, in conjunction with the Executive Office of the Executive Office of the Inspector General, found that the Department failed to adequately monitor over 18 million dollars of State funds that were given to a particular vendor over several years. The Recommendations that came from that Report are summarized as follows (from OIG FY 15 Annual Report, General Investigation 2): The Department's monitoring functions are too isolated. The Office of Field Audits, which traditionally examines financial compliance, must consult and work with Program staff, since many issues of financial compliance will require knowledge of the program itself. For instance: in order to be sure that an agency is not receiving more than 20% in Administrative Expenses, Field Audits will need to consult with staff that know the program to be sure that the submitted budge is an honest reflection of the administrative program costs. Similarly, if an agency allocates costs between different programs, Field Audits must consult program staff to verify the allocation system presented by the agency. At the same time, Program Staff must be trained on the financial reporting requirements, such as disallowable expense, so that they can educate vendors and ensure compliance.**

*FY 17 Department Update:* The Office of Field Audits has amended their procedures to include consultation with the Program Monitors prior to any on-site review and to have additional consultation with the Program Monitors after the on-site review, if necessary. Additionally, the Program Monitors are copied on any reports that are distributed as a result of an on-site review. In FY16 the Department implemented the line item review within the Grant Reconciliation System which is a Microsoft Access program that tracks actual quarterly expenditures against the approved budgeted line items for all budget based contracts that utilize estimated payments. This system tracks both direct program expenses and administrative costs and includes a straight line projection of expenditures. Data entry into the system is completed by contract monitoring staff and is maintained by central office financial staff who provide oversight and technical assistance. In addition, there was a thorough central office review in FY18 of all budget based agreements to review both direct and indirect administrative costs for reasonableness. Annual training will continue to be provided to contract monitoring staff on this issue for budget-based (grant) agreements.

The Department remains committed to continuing efforts to strengthen the monitoring system. Previous changes implemented by the Office of Financial Review and improvements to the grant reconciliation system will be maintained. In addition, the entire non-board contract monitoring system is receiving a substantial upgrade this year with significantly improved reporting capabilities. Training of monitoring staff regarding direct, direct administrative and indirect administrative costs remains on-going. The combination of program monitoring with the review of the audited financials aids in the financial oversight of the reported line item costs.

*FY 17 OIG Comment:* Based on the difficulties involved in correcting long-standing failures in the Department's monitoring system, the OIG urges the Department to emphasize the need for Program Monitors to verify that financial information provided by the vendor is consistent with the Program Monitor's knowledge of the services provided. For instance, Program Monitors must be required to review the vendor's allocation of spending, as well as the vendor's characterization of direct expenses – as a central part of the monitoring process. In addition to tracking what expenses are reported, it remains critical for program staff to verify reported line items.

FY 2012

**The Department should review the Agency's allocation of salaries to the Program, including a review of whether staff performs direct or administrative services. [The Department cannot pay more than 20% of direct costs for administrative costs.] Based on the results of the review and the issues identified in this report, the Department should determine whether to continue contracting with the Agency (from OIG FY 12 Annual Report, General Investigations 28).**

> *FY 15 Department Update:* The Internal Audit report will be completed by December 31, 2015.

> *FY 16 Department Update:* It is anticipated that the agency's limited scope audit report will be released by December 31, 2016.

> *FY 17 Department Update:* The Department ceased contracting with this provider effective December 5, 2011. The DCFS Office of Internal Audits (OIA) review period for the provider 906 Review (client case records and SACWIS records review) and other limited staff service records, cost allocation and monitoring audit procedures was for the three state contracted fiscal years of 2008 through 2010. Preliminary summary audit results were shared internally and discussed with DCFS senior management at the end of fiscal year 2015, including the Department should not contract with this provider in the future due to significant internal control concerns over contract compliance and financial reporting. Since this provider no longer contracted with the Department, other OIA on-going audit plan audit coverage priorities to comply with State law within the Fiscal Control and Internal Auditing Act and staffing limitations within the OIA of two full-time auditors, have not allowed for an official audit report to be issued to date for this provider.


FY 2010

**Subcontractors under Department contracts should be subject to the same transparency as contractors. All subcontracts to Department contracts should be listed and available for public viewing on the internet (from OIG FY 10 Annual Report, General Investigation 2).**

> *FY 17 Department Update:* New procedures have been established as a result of the Grant Accountability and Transparency Act (GATA). This information is now posted on the GATA website and the Department's information is managed by the Department's Chief Accountability Officer. The Illinois Grant Accountability and Transparency Act is the first, and currently only, state legislation in the nation to require the adoption and implementation of a comprehensive set of standards that mandate accountability and transparency throughout the entire life cycle of a grant. Since this finding in FY10, the Office of Contract Administration (OCA) has implemented measures to track, document, review and monitor subcontractors. However, the Department still does not have the ability to post contracts and/or subcontracts on the Internet. OCA is fully compliant with all transparency requirements for both GATA and the new procurement Bulletin requirements for exempt contracts.

*FY 17 OIG Comment:* The OIG reiterates its' recommendation for transparency in subcontracting especially since subcontracts were used during the last fiscal year to circumvent the Procurement Law.

**EGREGIOUS ACTS**

FY 2014

**As part of the temporary custody screening process, child protection will notify DCFS Office of Legal Services and DCFS Clinical if high risk cases such as those where a parent has demonstrated dangerous behavior as abduction; torture; threats to kill with plan; or taking children hostage and cases involving severe mental illness: (a.) upon notification, DCFS Clinical will initiate an emergency clinical staffing within 5 working days, including all relevant parties and records, and (b.) authorize a specialized integrated assessment (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 2).**

*FY 16 Department Update:* The Department is in the process of training all regions on the policy for egregious cases. Southern Region staff were trained in May 2016 and Cook County staff were trained in September 2016. Until staff in Northern and Central Regions have been trained, the Integrated Assessment program completes a specialized assessment and works with the field to ensure that appropriate recommendations are included in the Integrated Assessment.

*FY 17 Department Update:* Egregious Acts Training has been postponed by the Inspector General due to concerns regarding the Integrated Assessment. The Integrated Assessment does not capture egregious acts accurately and it is too long to be read by a Judge or State's Attorney. Once the issue is resolved, the Inspector General and the Office of Learning and Professional Development will complete a training together. The last region will be completed by Office of Learning and Professional Development. No date was given but the Inspector General and the Clinical Division are working on the issue.

**INFORMATION TECHNOLOGY**

FY 2012

**The Department database currently only automatically prompts management approval for death and facility reports. The automatic prompt for management approval should include allegations of burns, head injuries, internal injuries and children under six with allegations of cuts, bruises, welts, abrasions and oral injuries (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 2).**

*FY 16 Department Update:* The Department is not moving forward on this recommendation until we determine the future of the SACWIS system.

*FY 17 Department Update:* The Department has begun a feasibility study to replace the current IL child welfare database (SACWIS) with a new child welfare database (CCWIS).

**FOSTER HOME LICENSING**

FY 2016

**The Department's Licensing Division should be trained to return as incomplete any forms that do not reflect an actual assessment of the required factors by the employer (from OIG FY 16 Annual Report, General Investigation 11).**

*FY 16 Department Response:* The Department agrees. DCFS Licensing staff and the Background Check Unit will be trained. The licensing administrator is developing guidelines and will

schedule a time for all staff to receive the information and ask questions for any clarifications needed.

*FY 17 Department Update:* Same Response provided from fiscal year 2016.


FY 2016

**The Department has a fiduciary duty to protect wards from environmental dangers such as secondhand smoke exposure. When a medically complex or premature infant is referred for placement in a home with environmental tobacco exposure, the Department should make a referral to the Chief Nurse for review of the home and associated risks. (See also Inspector General Report #14-2326) (from OIG FY 16 Annual Report, Death and Serious Investigation 8).**

*FY 16 Department Response:* The Department agrees. In accordance with Department policy, referrals are made to DCFS Nursing in those case situations involving a medically complex or premature infant referred to placement in a home with environmental tobacco exposure.

*FY 17 Department Update:* Same Response provided from fiscal year 2016.


FY 2010

**The Department should amend Procedures 301, Appendix E, *Placement Clearance Process*, to provide guidelines for the monitoring and resolution of involuntary placement holds. These guidelines should include instructions for requesting the removal of an involuntary placement hold. The guidelines should also require that when an involuntary placement hold is placed on a foster home, the licensing worker and licensing supervisor should re-evaluate the placement hold every six months (from OIG FY 10 Annual Report, General Investigation 4).**

*FY 16 Department Update:* Revisions have been made to Procedure 301-Appendix E to provide guidelines for monitoring and resolution of involuntary placement holds. The Policy Guide with these changes was approved and is currently pending issuance with Office of Child and Family Policy.

*FY 17 Department Update:* Revisions have been made to Procedure 301, Appendix E. The Policy Guide is awaiting issuance.

*FY 17 OIG Comment:* The issue of foster homes remaining on hold indefinitely continues to be an issue. The Office of the Inspector General continues to receive complaints from both private agencies and foster parents regarding indefinite holds and the difficulty of getting a hold removed once it's been placed. Procedures 301, Appendix E (IV)(i) *Removing a Hold,* does not accurately reflect the current practice for removing holds.


***Fraud***

FY 2015

**A foster care license applicant must provide the licensing worker with Consent for Release of Information form for the Social Security Administration (SSA). The Social Security Administration Consent form should be used (from OIG FY 15 Annual Report, Death and Serious Investigation 10).**

*FY 16 Department Update:* Revisions to the form and procedure are in process. The Licensing Division submitted draft language to revise Foster Home Licensing Procedures 402.4(a), *Initial Application* and Procedures 402.5, *Application for renewal of license* and Appendix A, Renewal of Foster Home Licenses; and Initial and Renewal Application forms (CFS 597-A and CFS 598). This will capture information regarding whether or not the applicant or licensee applying for renewal is receiving payments from the Social Security Administration and/or services through the Illinois Department of Rehabilitation Services due to a disability. When an applicant for licensing receives services and/or payments due to a disability, the Department will use proper consents (OMB No. 0960-0566; OMB No. 05; and CFS 600-3) in order to secure further information for assessment of the caregiver's ability to meet the needs of youth in care. These draft policy changes are pending review.

*FY 17 Department Update:* Same Response provided from fiscal year 2016.

FY 2015

**The Department should amend CFS 718-A,** *Authorization for Background Check for Foster Care and Adoption***, to include authorization to determine if the applicant has an active case with the Illinois Department of Rehabilitation Services (from OIG FY 15 Annual Report, Death and Serious Investigation 10).**

*FY 16 Department Update:* Revisions to the form and procedure are in process. The Licensing Division submitted draft language to revise Foster Home Licensing Procedures 402.4(a), *Initial Application* and Procedures 402.5, *Application for renewal of license* and Appendix A, Renewal of Foster Home Licenses; and Initial and Renewal Application forms (CFS 597-A and CFS 598). This will capture information regarding whether or not the applicant or licensee applying for renewal is receiving payments from the Social Security Administration and/or services through the Illinois Department of Rehabilitation Services due to a disability. When an applicant for licensing receives services and/or payments due to a disability, the Department will use proper consents (OMB No. 0960-0566; OMB No. 05; and CFS 600-3) in order to secure further information for assessment of the caregiver's ability to meet the needs of youth in care. These draft policy changes are pending review.

*FY 17 Department Update:* Same Response provided from fiscal year 2016.

FY 2015

**Once the Department obtains the SSA and DHS information, the applicant's potential disability should not necessarily bar the person from providing foster care, but rather the information should be considered for whether the person is physically and mentally capable of caring for children. When there is a significant discrepancy between the DCFS health record and the SSA or DHS, the Department should refer to SSA or DHS for possible fraud and consider revocation for lack of trustworthiness (from OIG FY 15 Annual Report, Death and Serious Investigation 10)**

*FY 15 Department Response:* Revisions to application forms and procedure are in process. The only reason the information would be requested from the Social Security Administration or Division of Rehabilitation Services would be to include it in the licensing home study. The home study, taken as a whole, would determine the recommendation for licensure and/or any restrictions on the license related to the type of care a child requires, or age of child placed in the home.

*FY 16 Department Update:* Revisions to application forms and procedure are still in process. The only reason the information would be requested from the Social Security Administration or Division of Rehabilitation Services would be to include it in the licensing home study. The home study, taken as a whole, would determine the recommendation for licensure and/or any restrictions on the license related to the type of care a child requires, or age of child placed in the home.

*FY 17 Department Update:* Same Response provided from fiscal year 2016.

FY 2015

**A foster care license applicant must provide the licensing worker with Consent for Release of Information form for the Social Security Administration. The Social Security Administration Consent form should be used (from OIG FY 15 Annual Report, General Investigation 8).**

*FY 15 Department Response:* This objective is being accomplished through the use of the foster home initial and renewal application forms (CFS 597-A & CFS 598) instead of the 718-A. A policy guide and procedures will be issued. CFS 109 will be issued by the Office of Child and Family Policy.

*FY 16 Department Update:* Revisions to the form and procedure are in process. The Licensing Division submitted draft language to revise Foster Home Licensing Procedures 402.4(a), *Initial Application* and Procedures 402.5, *Application for renewal of license* and Appendix A, Renewal of Foster Home Licenses; and Initial and Renewal Application forms (CFS 597-A and CFS 598). This will capture information regarding whether or not the applicant or licensee applying for renewal is receiving payments from the Social Security Administration and/or services through the Illinois Department of Rehabilitation Services due to a disability. When an applicant for licensing receives services and/or payments due to a disability, the Department will use proper consents (OMB No. 0960-0566; OMB No. 05; and CFS 600-3) in order to secure further information for assessment of the caregiver's ability to meet the needs of youth in care. These draft policy changes are pending review.

*FY 17 Department Update:* Same Response provided from fiscal year 2016.

FY 2015

**The Department should amend CFS 718-A,** *Authorization for Background Check for Foster Care and Adoption***, to authorize a check of public benefits (from OIG FY 15 Annual Report, General Investigation 8).**

*FY 15 Department Response:* Revisions to the form and procedure are in process. A policy guide will be distributed with the form changes.

*FY 16 Department Update:* Revisions to the form and procedure are in process. The Licensing Division submitted draft language to revise Foster Home Licensing Procedures 402.4(a), *Initial Application* and Procedures 402.5, *Application for renewal of license* and Appendix A, Renewal of Foster Home Licenses; and Initial and Renewal Application forms (CFS 597-A and CFS 598). This will capture information regarding whether or not the applicant or licensee applying for renewal is receiving payments from the Social Security Administration and/or services through the Illinois Department of Rehabilitation Services due to a disability. When an applicant for licensing receives services and/or payments due to a disability, the Department will use proper

consents (OMB No. 0960-0566; OMB No. 05; and CFS 600-3) in order to secure further information for assessment of the caregiver's ability to meet the needs of youth in care. These draft policy changes are pending review.

*FY 17 Department Update:* Same Response provided from fiscal year 2016.

FY 2015

**The former ward who is an adult with no current Department involvement should be notified about the fraudulent use of his confidential information and the Department should offer to perform credit fraud checks for him for at least 3 years (from OIG FY 15 Annual Report, General Investigation 4).**

*FY 17 Department Update:* The Department sent a letter to the former youth in care, sharing a link and explaining how to obtain a free credit report from the three major credit bureaus. The Department also offered to assist in obtaining the credit reports if the person did not understand how to do so. The former youth in care was advised that if there was any adverse ratings on the credit report due to the situation, to contact the DCFS Office of the Guardian and they would assist in getting the information removed from the credit report. Lastly, they were provided the number of the Office of the Illinois Attorney General Identity Fraud Division who would assist with this matter.

**INTACT FAMILY SERVICES**

FY 2012

**The Department should develop an effective consultation process and procedures specific to failure to thrive investigations and the provision of intact family services in cases with a failure to thrive child (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 4).**

*FY 16 Department Update:* The recommendation has been incorporated in draft Procedures 300.130(3) *Referral for services*, and draft Procedures 300.100, *Medical Requirements for Reports of Abuse and Neglect.*

*FY 17 Department Update:* The recommendation will be incorporated in draft Procedures 300.130(3) *Referral for services*, and draft Procedures 300.100, *Medical Requirements for Reports of Abuse and Neglect.* In addition, Intact Management staff has done some work with a physician specializing in abuse and neglect and DCFS Clinical around the Departments response to failure to thrive and medical neglect cases. The Intact Unit has flagged all the intact family cases that have allegations 79 and 81 attached to them and those cases are prioritized for practice reviews as the Department recognizes and agrees these cases need close medical consultation.

FY 2012

**The Department should explore the use of court-ordered service compliance with intact families where there is a high level of risk of future violence and lack of cooperation with Department services (from OIG FY 12 Annual Report, General Investigations 1).**

*FY 16 Department Update:* The recommendation was incorporated into Procedures 302.388(g), *Responsibilities of the assigned Intact Family Services worker* and issued via Policy Transmittal 2016.05 on 4/25/16. The recommendation has also been incorporated into draft Procedures 300-

Appendix J, *Domestic Violence*.

> *FY 17 Department Update:* The recommendation has been incorporated into draft Procedures 300-Appendix J, *Domestic Violence,* which is pending.

*FY 17 OIG Comment:* This recommendation has been pending for 5 years and the most recent draft provided by the Department was dated September 2014 and does not address the recommendation. Court involved intact services, when necessary, are critical to child safety.


FY 2014

**Consistent with the intent and spirit of the Division of Mental Health discharge planning (IL Administrative Code Title 59, Section 125.50), Department Rules and Procedures should require DCFS workers to contact staff at psychiatric facilities prior to the discharge of any involved family members to communicate concerns or issues known to the Department and to monitor compliance with discharge recommendations. In cases in which the patient has already been discharged, the Division of Child Protection must obtain complete psychiatric records, including any discharge recommendations, and follow-up with community providers identified. If the facility becomes involved during the pendency of a placement or intact family case, the worker should seek the consent of the involved family member in order to receive records and monitor compliance with discharge recommendations (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 2).**

> *FY 16 Department Update:* The Department addressed this in Procedures 315, which were issued via Policy Transmittal 2016.11 on November 22, 2016. Staff will be trained on this requirement in Procedures 315 training. Language has also been incorporated in draft Procedures 300.50.

> *FY 17 Department Update:* Same Response provided from fiscal year 2016.

*FY 17 OIG Comment:* This recommendation requires procedural changes relating to child protection and intact which was not addressed in the Department's update.


**LAW ENFORCEMENT**

FY 2016

**The Department must review all UIRs involving a youth with a gun or ammunition to ensure that Administrative Procedure 18, requiring notification of law enforcement, has been followed (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

> *FY 16 Department Response:* The Department agrees with this recommendation and will send a notice to staff regarding Administrative Procedure 18. The Department also notes that it is actively working on upgrading the UIR system. To the extent that information contained in a UIR indicates a youth in the custody of the Department is involved with a gun or ammunition, Administrative Procedure requires both notification to law enforcement and the initiation of additional services. The Department is in the process of reviewing and updating Administrative Procedure 18.

> *FY 17 Department Update:* The Departments' Office of Delinquency Prevention and Restorative Justice (ODPRJ) is working with the Office of Information Technology Services (OITS) to receive Significant Event Reports for all arrests. One of ODPRJ is to closely monitor delinquency

and initiate a rapid response and intervention for high risk incidents, particularly gun related incidents.

FY 2016
**A child protection administrator from the local Department field office should invite a representative from the regional Child Advocacy Center to a team meeting to discuss the recourse child protection investigators have when law enforcement decides not to refer a case for a Victim Sensitive Interview (from OIG FY 16 Annual Report, General Investigation 19).**

*FY 16 Department Response:* The Department agrees.

*FY 17 Department Update:* The regional Child Advocacy Center has set a protocol that all cases must be referred by Law Enforcement. If a case is referred by the Department, they will not accept the case. The region and the CAC are attending monthly meetings to work out any issues. In addition, DCFS staff are now attending staffings on cases, which has improved the process.

**MEDICAL**

FY 2016
**The Department, in conjunction with its Medical Director, should inform the field regarding training and resources for child welfare staff concerning the risks of secondhand smoke exposure for children as well as smoking cessation resources for clients and families (from OIG FY 16 Annual Report, Death and Serious Investigation 8).**

*FY 16 Department Response:* The Department agrees. Online training through DCFS Health Services will be provided within the current fiscal year and will include information on the risk of secondhand smoke exposure to children, as well as smoking cessation resources. DCFS Health Services will also provide information on the Foster Parent web site about risk of second hand smoke exposure, as well as cessation resources. Currently, the Department provides linkage to the Illinois Department of Public Health's Quit Tobacco program for smoke cessation resources.

*FY 17 Department Update:* Health Services worked with Foster Parent Support to include the danger of smoking and second hand smoke information in the foster parent newsletter and on the foster parent website. Health Services, along with the Medical Director, will work with Training and Development to implement online training for field staff. It is anticipated that the online training will be available by the end of the fiscal year.

FY 2016
**The private agency should ensure that their nurse maintains contact with all medical providers for medically complex children. The agency should inform all involved medical providers of their duties to the child and request notification from the medical provider of any concerns regarding the children for whom they provide care (from OIG FY 16 Annual Report, Death and Serious Investigation 8).**

*FY 16 Department Response:* The Department agrees. This recommendation will be expanded to include all agencies. The redacted report will be shared.

*FY 17 Department Update:* Same Response provided from fiscal year 2016.

FY 2015

**The Department should ensure that all reception center staff are made aware that when a youth is taken into protective custody parental consent for medication administration is sufficient. If consent cannot be immediately procured, the youth should be provided with his/her prescription medication on an emergency basis until parental consent can be obtained. The Department should also clarify whose responsibility it is to obtain parental consent for medication when a youth is taken into protective custody (from OIG FY 15 Annual Report, General Investigation 17).**

> *FY 16 Department Update:* Language was added to draft Procedures 300.120, *Taking Children into Protective Custody* and Emergency Shelter Procedures were issued as new Procedures 301.55, *Temporary Placement in the DCFS Statewide Emergency Shelter System via* Policy Transmittal 2016.10.

> *FY 17 Department Update:* Same Response provided from fiscal year 2016.

FY 2013

**When there is a question about a youth in care having seizures or whether to discontinue a youth in care's seizure medication, the Department should assure that a sleep deprived EEG has been conducted as part of the evaluation (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 3).**

*FY 15 OIG Comment:* This recommendation was made after the Office of the Inspector General investigated the death of a youth in care who died of seizures while in a specialized treatment unit that the Department funds. At the time of his death, the unit had determined that the youth in care could be taken off his anti-seizure medication. Prior to issuing its recommendation the Inspector General consulted with both the Epilepsy Foundation and a leading Ph.d in the field, both of whom affirmed the need for a sleep-deprived EEG before discontinuing anti-seizure medication. A sleep deprived EEG might have saved the child's life in this Office of the Inspector General Death Investigation. In addition to recommending the sleep-deprived EEG prior to making such a determination, the Office of the Inspector General recommended that the unit be assessed by an Independent Reviewer. The Independent Review was completed on March 30, 2015. The Independent Reviewer agreed that "in cases where seizures are being evaluated or seizure treatment is being significantly changed, a sleep-deprived EEG should be obtained if clinically feasible." Given that a youth in care died and that the Department's own contracted experts recommended a sleep deprived study prior to taking a child off anti-seizure medication, the Department needs to find a way to communicate this requirement to providers.

> *FY 17 Department Update:* No update provided.

FY 2011

**HealthWorks should obtain the results of newborn genetic metabolic screens on all children, regardless of their age, upon entering Department care. If the results of the genetic screen are unavailable, the Department should ensure that the screen is completed during the HealthWorks comprehensive exam or by the child's primary care physician (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 9).**

> *FY 17 Department Update:* Illinois Department of Public Health is currently sending the new fields to OITS. Additional Birth Data Fields include Birth Weight, Gestational Age, Apgar Score 5, Apgar Score 10, Plurality, Birth Order, Abnormal Conditions, and Congenital Abnormalities. The mapping of the new fields to SACWIS Health Birth Data was completed and tested in

August 2017. The program to update the Birth Data in SACWIS was put into production in August 2017. The program that updates the fields in eHealth is currently being tested by Health Service MIS.

FY 2014

**If a Regional Medical Consultant report is pending when custody is taken of a child, the child protection investigator and medical program coordinator should arrange for a phone conference to review their preliminary findings with the placement agency supervisor. The Coordinator should ensure that the agency receives a copy of the report upon completion (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 8).**

*FY 16 Department Update:* This language is in draft revisions to Procedures 300.100 *Medical Requirements.* The information is also in Procedures 302.388(h)(2), *Assessments to Develop the Family Service Plan.*

*FY 17 Department Update:* The recommendation will be incorporated in draft Procedures 300.100, *Medical Requirements.*

FY 2014

**When a Regional Medical Consultant report is pending the Integrated Assessment screener should be part of the case conference in order to integrate the medical information into the integrated assessment (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 8).**

*FY 16 Department Update:* Integrated Assessment staff attend the Integrated Assessment if the MPEEC case conference occurs during the Integrated Assessment process. If the case conference has occurred prior to Integrated Assessment's involvement, the IA staff obtain the MPEEC report. This is part of the Integrated Assessment protocol.

*FY 17 Department Update:* Due to administrative changes within the MPEEC program, the Integrated Assessment program is currently making a determination as to the need for modification of the Integrated Assessment Protocol to ensure that reports continue to be obtained on all MPEEC involved cases.

**OLDER YOUTH IN CARE**

FY 2015

**From OIG FY 2015 Annual Report, Special Investigations, *Shelter and Runaway Report:* The Department should redefine its search procedure including the following:**
   a.   **The Department should amend Rules to eliminate adult youths in care, who are not high risk (developmental disabilities, mental illness, human trafficking, in critical need of medication or bona fide missing) from Rules and Procedures 329.**

*FY 16 Department Response:* All youth in care are under the same processes and the same steps when they go missing per Procedure 329. The exception for this population is that the youth over the age of 18 years are not required to be listed with NCMEC nor are they required to have a Child Protection Warrant.

*FY 16 OIG Comment:* Treating this population as homogenous has contributed to the failings of the system and placed children in harms' way.

> *FY 17 Department Update:* Overall, the Department agrees that the 18-21 population is one that needs a re-evaluated policy and practice and should not be treated the exact same as minor children in care. The Director established an internal committee in October 2017 to review the policies and programs or lack thereof that can improve successful safety and permanency outcomes for 18-21 year olds. The Department is willing to report updates on solutions and strategies from the committee.

b. **Adult youths in care without disabilities who chronically absent themselves from voluntary placements should be transitioned out of Department responsibility.**

> *FY 16 Department Response:* Youth in care over the age of 18 years will be recommended for closure, based upon approval by the courts. There are areas in the state where the workers are more successful than other parts of the state.

> *FY 17 Department Update:* Youth over the age of 18 have the right to request for case closure as well as have the ability to re-enter care or access supportive services before their 21st birthday. The Department currently makes every attempt to keep 18-21 year olds engaged and take advantage of Chaffee Foster Care Independence programs, particularly if he/she has not achieved permanency or established a permanent connection.

c. **The Department should add a narrative field to the Department's Child Runaway Form to include relevant information, including what the child was wearing, who they were last seen with, the license plate of any vehicles they left in, any statements by the child prior to the run and precipitating events.**

> *FY16 Department Response:* This has been addressed. The incident number is SAC 191 to add a descriptive narrative field to the 1014.

> *FY 17 Department Update:* The Department will review and assess the administration and effectiveness of the updated Child Runway Form. No further update.

d. **Cook County Shelters/Centers should establish individualized Community Pass Authorizations with caseworkers at a youth's intake, so that shelter staff does not need to consult with caseworkers for every pass request. Shelter/centers should have the ability to alter agreements with good cause.**

> *FY 16 Department Response:*    No Response Provided

> *FY 17 Department Update:* The Department agrees and this is addressed within Procedures 301.55 under Community Activities.

FY 2015
**From OIG FY 2015 Annual Report, Special Investigations,** *Shelter and Runaway Report:* **The duties of the DCFS specialized unit for tracking and locating missing children should be limited to those children under 18 and disabled or Bona Fide missing adults. With lower caseloads, the Unit can provide more technical assistance searching databases and assist in contacting extended family and**

**friends. For frequent runners, shelter staff in consultation with the specialized Unit should complete the De-Briefing Form–when a youth in care returns to the shelter system**

*FY 16 Department Update:* The shelter does not have access to the SACWIS system. When the youth share information regarding their whereabouts, notes are generated and passed on to the case worker during the next business day.

*FY 16 OIG Comment:* The OIG investigation found that critical information was not being captured because the caseworkers' responsibilities with respect to children on run were unrealistic. The Department needs to address the problem or the omissions will continue.

*FY 17 Department Update:* Procedure 329.50 requires that the worker within two business days conduct a thorough follow-up interview with the child using the CFS 680-A, missing child De-briefing form to guide and document the interview and complete the document in SACWIS.

FY 2015
**From OIG FY 2015 Annual Report, Special Investigations, *Shelter and Runaway Report:* The Shelter System should be revamped to include the following:**

    **a.    The Department should expand its existing system of emergency foster homes to accommodate children 13 years and younger, and their sibling groups, coming into care for the first time.**

*FY 16 Department Update:* The Department is in the process of expanding Emergency Foster Care homes. The Department has recruited additional foster parents to expand emergency foster care for this population. Other private agencies have also expressed an interest in developing emergency foster homes.

*FY 17 Department Update:* DCFS launched Emergency Foster Care in August 2016. Currently, there are five entities who have emergency foster homes: DCFS, Childserv, Garden of Prayer, National Youth Advocate Program (NYAP) and Ada S McKinley, for placement of children ages 0-17. Since the inception of the program, the Department and private agencies have provided emergency foster care to approximately 160 children. Siblings have been accommodated with placement in the same home.

    **b.    All emergency foster homes should be on a centralized database to reliably track available homes for matching;**

*FY 16 Department Update:* The Department is exploring the possibility of tracking the Emergency Foster homes by integrating the emergency homes into the Foster Care Placement System database.

*FY 17 Department Update:* There is a daily EFC Census Excel Report issued from OITS with the demographic information of each home, youth name, DOB, length of stay, discharge destination, case worker name, region/site/field.

    **c.    All emergency foster homes should be required to transport children to their schools of origin to help stabilize and lower the trauma to the children.**

*FY 16 Department Update:* Transporting youth in care to the "school of origin" is determined on a case by case basis, and is based on an assessment to determine if it is in the child/youth's best interest to attend the "school of origin" (e.g. safety, educational support).

*FY 16 OIG Comment:* Since Emergency Foster Homes are focused on taking in our very young children who are in the Protective or Temporary Custody of the State, the most compassionate and least traumatizing approach is to let them remain anchored to their school or origin. Their teachers and friends at school can offer them comfort and a form of stabilization during confusing times.

*FY 17 Department Update:* A major requirement of the EFC program is that the agency/foster parents understand the importance of maintaining the youth in their school of origin and that they are required to transport youth to school. School Transfers for Youth in Foster Care Under the Every Student Succeeds Act (ESSA) of 2015, states that all children in foster care will remain in their school of origin when they move, unless it is determined on a case by case basis that it is not in their best interest.

    **d.   The Department should determine the number of older Cook County shelter youth with histories of serious mental illness who cycle in and out of the present Shelter system. The Department should develop a specialized stabilization center for this population of youth.**

    **e.   In addition to clinical services, this stabilization center should have an outreach unit that functions similarly to homeless mental health delivery services.**

    **f.   The stabilization center should host supportive NAMI (or similar) groups for relatives or other child centered collateral of the youth who are willing to partner with stabilization efforts.**

    **g.   The Center should tightly coordinate educational services to assure the residents' educational rights are secured. This is crucial for those youth who are eligible or up for redetermination for SSI benefits. The center should also provide alternative educational programming similar to Education Options program at the Madden Center.**

*FY 16 Department Update:* The Departments' plan has been a reduction of the number of youth placed in shelters. Shelters Program Plans detail expectations of the shelter providers and the responsibilities to maintain a safe environment and provide programming for services for the youth. The Shelter program is expected to manage the shelter milieu in a manner that maintains a safe, nurturing and therapeutic environment and protects the rights of all youth. During a shelter episode the provider ensures the safety and well-being of all clients while receiving services under the contract.

*FY 16 OIG Comment:* The investigation disclosed serious flaws in the Shelter Program. The response does not address the failings or provide meaningful solutions.

*FY 17 Department Update:* No response provided

    **h.   The Department should determine the annual number of Cook County shelter youth 15 years old or older who are involved with the Juvenile Justice System or adult probation and who cycle through its Shelter system. The Department should develop a restorative justice stabilizing center for this targeted population, working closely with Juvenile Court personnel and Probation. The staff of the shelter should have the ability to network with the various Detention Alternative programs including Electronic Monitoring and Evening Reporting Centers and substance**

abuse programs. Clinical services should be provided for those youth who have mental health or adjustment problems.

*FY 16 Department Update:* See above. The Department's plan has been a reduction of the number of youth placed in shelters.

*FY 17 Department Update:* No response provided

> **i.  The Department should develop a violence-free stabilizing center for the older youth (over 17) involved with the criminal court system or dually involved with adult and juvenile courts. The programming of the shelter should model a Safer Foundation approach. The staff should work with Cook County Sheriff, Criminal Court personnel and Probation. The stabilizing center should clearly define a nonviolence contract with each youth who enter the program. If the terms of the center's nonviolence contract are violated the Department should immediately inform the Juvenile Court and Adult probation of the violation and the intention of the Department to request termination of the adult's wardship.**

*FY 16 Department Update:* See above. The Department's plan has been a reduction of the number of youth placed in shelters.

*FY 17 Department Update:* No response provided

> **j.  The Department should develop a specialized clinical and educational stabilization/shelter program for female youth who have or are at high risk of being victims of trafficking. The Department should consider the Cook County Sheriff's Office offer of prevention work with potential trafficking victims.**

*FY 16 Department Update:* The Department's plan has been a reduction of the number of youth placed in shelters.

*FY 16 OIG Comment to h-j:* The Department's response ignores the problems identified in the OIG Shelter Report and the FY 16 Street Homicide Report that identified serious deficits in the Department's response to violence and mental health issues.

> *FY 17 Department Update:* No response provided

FY 2014

**In fiscal year 2014, the Inspector General's Office made the following recommendations (from OIG FY 14 Annual Report, General Investigation 13):**

- **Colleges and universities offer an orientation week for all incoming students. Similarly, the transitional living program should provide a two-week orientation period for all teen parents. The orientation should focus on building family and community support using a task-centered/ecological approach. During this orientation period, the transitional living program case manager and family support worker will jointly introduce a young parent to community-based resources in the area and begin building the foundation of a support system. (a) Family support worker duties include: introducing a youth and her child to local Head Start programs and supporting progress through monthly visits; introducing a young parent and her child to libraries, WIC offices, park districts; establishing a pediatric**

medical home for a young parent's child; (b) Case manager duties include: supporting the youth in their educational setting through monthly visits to the young parent's school or job to assist the youth to overcome obstacles that hinder achievement. If the young parent is without a medical home, accompanying them to a local Title X Clinic/medical home; and exploring recreational, physical fitness and arts programs in the community with the youth. The case manager should diligently assist the young parent in maintaining and strengthening their extended support system, including inviting a young parent's family or friends to an orientation meal and visiting with a young parent's emergency caretaker.

- When a young parent transitions into a transitional living program, the receiving case manager shall introduce themselves to school staff within the first ten days and ask to be notified via email of any absences. To support the case managers efforts to sustain attendance, case managers must arrange to have access to the applicable education notification system portals for absences or cuts. If the school does not have a portal system (such as the Alternative School Network), the case manager should arrange notification through available mentors or teachers. If a young parent has two consecutive absences from school, the case manager must immediately make in-person contact. The Teen Parent Support Network Education Support Department shall be consulted before absenteeism becomes a chronic issue. This recommendation should be incorporated into Procedures 302, *Services Delivered by the Department*, **Appendix J**, *Pregnant and/or Parenting Program*.

- During the transitional living program pre-placement process, the sending case manager will assist the young parent in identifying the names, addresses and phone numbers of individuals whom the youth wants on their visiting list. The receiving case manager will amend this list as the young parent's supports change over time. This recommendation should be incorporated into Procedures 302, *Services Delivered by the Department*, **Appendix J,** *Pregnant and/or Parenting Program*.

- The Department should incorporate the two-week orientation period and pre-placement process as a model for all teen parent transitional living programs This recommendation should be incorporated into the Procedures 302, *Services Delivered by the Department*, **Appendix J,** *Pregnant and/or Parenting Program*

*FY 17 Department Update:* The recommendations will be incorporated in Procedures 302, *Services Delivered by the Department*, Appendix J, *Pregnant and/or Parenting Program.*

FY 2014
To increase communication and collaborations among the transitional living program system of care, a young parent's case manager and family support worker should meet with day-shift community support staff to review progress and enhance opportunities for the young parent and their child's successful engagement in education, and to strengthen the mother and child support system. Shift summaries should be reviewed before this meeting. These meetings should occur every four to six weeks. This recommendation should be incorporated into the Procedures 302, *Services Delivered by the Department*, **Appendix J,** *Pregnant and/or Parenting Program* **(from OIG FY 14 Annual Report, General Investigation 13).**

*FY 15 OIG Update:* The private agency established monthly regional meetings to enhance communication with their transitional living programs (TLP) Community Support Staff. At these regional meetings, Community Support Staff, case managers, and Child and Family Specialists meet together to discuss concerns about cases and share information. The recommendation will be incorporated into

revisions to Procedures 302, Services Delivered by the Department, Appendix J, Pregnant and/or Parenting Program.

> *FY 17 Department Update:* The recommendation will be incorporated in Procedures 302, *Services Delivered by the Department*, Appendix J, *Pregnant and/or Parenting Program*.

FY 2014

**Anticipating college enrollment, a case manager should assist a young parent in beginning the application process for grants and federal aid when high school graduation or high school equivalency testing (GED) completion is imminent. Youths in care should not have to confront the daunting and complicated process of applying for Pell grants and federal aid (FAFSA) without hands-on assistance. The Teen Parent Support Network Education Support Department or Youth In College should assist any parenting youth who has completed high school or earned a GED in completing these required applications. This recommendation should be incorporated into the Procedures 302, *Services Delivered by the Department*, Appendix J, *Pregnant and/or Parenting Program* (from OIG FY 14 Annual Report, General Investigation 13).**

> *FY 17 Department Update:* The recommendation will be incorporated in Procedures 302, *Services Delivered by the Department*, Appendix J, *Pregnant and/or Parenting Program*.

**PERSONNEL**

FY 2016

**Employers should get a copy of the Child Protection Investigation Summary along with the Notice of Indicated Child Abuse/Neglect Report when an employee has been indicated (from OIG FY 16 Annual Report, General Investigation 11).**

> *FY 16 Department Response:* The Department agrees. The Department needs to amend the consent form so employees understand what can be disclosed. DCFS Legal, Licensing and Child Protection have met and will continue to meet to develop a protocol for review and redaction of the Investigation Summary. Proposed additional language for the Authorization for Background Checks is currently being reviewed.

> *FY 17 Department Update:* The Office of Legal Services, Office of Licensing and Division of Child Protection will continue to meet to develop a protocol for review and redaction of the investigation summary. The Office of Legal Services has provided additional language for the Authorization for Background Checks and that language is currently being reviewed.

FY 2013

**DCFS must establish guidelines for professional ride-alongs with DCFS staff. Guidelines for medical professionals (e.g., medical residents) should address what are permissible and impermissible tasks (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 12).**

> *FY 17 Department Update:* The proposed policy review for Administrative Procedure #29, *Interns and Shadows*, ended on 10/05/17. The workgroup is currently reviewing the comments.

FY 2014, 2010, 2008, 2005, 2001, 1999

**The Department should develop policy to address suspected substance abuse in the workplace (from OIG Recommendations made in 2014, 2005, 2001 and 1999). In FY 08 and FY 10 the Inspector General also recommended that the Department amend Rule 412,** *Licensure of Direct Child Welfare Service Employees and Supervisors* **to add "failure to timely comply with an order for drug or alcohol testing after a finding of reasonable suspicion" as a basis for licensure action under Rule 412.50,** *Misconduct* **(from OIG FY 10 Annual Report, General Investigation 21 and OIG FY 08 Annual Report, General Investigation 32).**

> *FY 16 Department Update:* Reasonable Suspicion Drug Testing was an item negotiated during the 2015-2016 AFSCME master contract negotiations. The parties reached impasse and this item is reportedly one of the items on the table. Per the statewide email that was sent out November 16, 2016, by John Terranova, the Governor's Office and CMS will be providing further guidance to all agencies and employees on which provisions will be implemented and when.

> *FY 17 Department Update:* No new response provided

FY 2009

**Rule 437,** *Employee Conflict of Interest***, should be amended to clarify that secondary employment must always be reported to one's supervisor. The supervisor should determine (if necessary, with consultation from management and/or the Conflict of Interest Committee) whether the secondary employment creates a conflict. The employee must be told to update the supervisor whenever their secondary employment duties change and a notation of the secondary employment should be maintained in a supervisory file, which is transferred each time supervision changes (from OIG FY 09 Annual Report, General Investigation 25).**

> *FY17 Department Update:* Rule 437 is in the process of being revised.

FY 2007

**A task group should be assembled to revise Rule 437,** *Employee Conflict of Interest***, and draft related Procedures. Procedural additions should include:**
   a. **If an employee takes secondary employment where there is the potential for contact with DCFS clients, a wall needs to be built between the DCFS employee and any DCFS clients being serviced by the secondary employer. In this case, the employee's supervisor should call the secondary employer to verify the wall is in place.**
   b. **The supervisor should review secondary employment at the time of the annual review to see if a conflict has developed that was not present when the employee accepted the secondary employment.**
   c. **Instructions on how to contact the Conflict of Interest Committee.**
   **All DCFS employees should receive training on the revised Rule and Procedures 437,** *Employee Conflict of Interest* **(from OIG FY 07 Annual Report, Employee Conflict of Interest).**

> *FY 17 Department Update:* Rule 437 is in the process of being revised.

FY 2006

**The Department's Conflict of Interest Committee should establish procedures for building walls between private agencies and DCFS Administrators who have decision-making power over agencies that they previously worked for (from OIG FY 06 Annual Report, General Investigations 28).**

> *FY 17 Department Update:* Rule 437 is in the process of being revised.

## PROCEDURAL CHANGES

### Abuse and Neglect Child Reporting Act (ANCRA)

FY 2007

**The Abused and Neglected Child Reporting Act (ANCRA) should be amended to clarify that the Department can share unfounded investigative information during a subsequent child protection or criminal investigation with the State's Attorney and Law Enforcement under specified circumstances for purposes consistent with the Abuse and Neglect Child Reporting Act or criminal prosecution (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 4).**

> *FY 17 Department Update:* In July 2016 ANCRA (Abused and Neglected Reporting Act) 325 ILCS 5/7.8 was amended to include this recommendation.

### Child Endangerment Risk Assessment Protocol (CERAP)

FY 2016

**In cases of severe domestic violence, Department procedures should require safety plans that include the involvement of shelter staff or other family support agreeing to contact the Department if the family leaves (from OIG FY 16 Annual Report, General Investigation 4).**

> *FY 16 Department Response:* The Department agrees. The Child Endangerment Risk Assessment Protocol (CERAP) Appendix will be updated.

> *FY 17 Department Update:* The workgroup continues to review procedures regarding CERAP and technical changes that are deemed appropriate for completion in 2017.

FY 2007

**The Child Endangerment Risk Assessment Protocol (CERAP) should be amended to require that workers note when a risk factor cannot be answered because of insufficient information. Under such circumstances, workers should be required to perform diligent inquiry into relevant facts for assessment within 48 hours. The Department should develop procedures to ensure that there is follow-up and resolution of unknown variables (from OIG FY 05 Annual Report, Death and Serious Injury Investigation 9).**

> *FY 16 Department Update:* The workgroup continues to review procedures regarding CERAP and technical changes that are deemed appropriate for completion in 2017.

> *FY 17 Department Update:* Same Response provided from fiscal year 2016.

*FY 17 OIG Comment:* Adequate risk assessment must include a mechanism to ensure that the field retrieves critical information.

### Interpersonal Violence

FY 2014

**When child protection investigations involve an arrest for domestic violence, investigators should contact pretrial services to obtain bail conditions (from OIG FY 14 Annual Report, General Investigation 1).**

> *FY 16 Department Update:* The recommendation has been incorporated into revisions to draft Procedures 300.50(c)(6)(B), and draft Procedures 300.140, *Consultations.*

> *FY 17 Department Update:* Same Response provided from fiscal year 2016.

FY 2015

**The Department should develop guidelines identifying behavior that calls into question protective capacity of a non-offending caretaker. When protective capacity issues are identified the Department must review available records and conduct a clinical interview to assess protective capacity. Recommendations from the Assessment must be included in any service plan (from OIG FY 15 Annual Report, Death and Serious Investigation 3).**

> *FY 16 Department Update:* The recommendation has been incorporated in draft Procedures 302.260, *Domestic Violence* as well as the draft of Procedures 300-Appendix J, *Domestic Violence.*

> *FY 17 Department Update:* Same Response provided from fiscal year 2016.

*FY 17 OIG Comment:* This recommendation has been pending for two years and the most recent draft provided by the Department was dated September 2014. Ensuring assessment of protective capacity is critical to child safety. None of the drafts provided by the Department address protective capacity in child protection investigations.

FY 2012

**The Department should examine the continued utility of the Domestic Violence Screen and determine whether the Screen assists in assessing safety and risk to children (from OIG FY 12 Annual Report, General Investigations 1).**

> *FY 16 Department Update:* The Domestic Violence Screen will be replaced with the Child Welfare Domestic Violence Screen, created collaboratively with the Office of the Inspector General. The recommendation has been incorporated into draft Procedures 300-Appendix J, *Domestic Violence.*

> *FY 17 Department Update:* The recommendation has been incorporated into draft Procedures 300-Appendix J, *Domestic Violence,* which is pending.

*FY 17 OIG Comment:* This recommendation has been pending for two years and the most recent draft provided by the Department was dated September 2014 and does not contain any reference to the updated Child Welfare Domestic Violence screen.

FY 2012

**The Department should consider requesting the assistance of Child Advocacy Centers (CAC) to interview children in investigations where there is chronic violence in the home and parents have failed in the past to cooperate with services (from OIG FY 12 Annual Report, General Investigations 1).**

> *FY 16 Department Update:* The recommendation has been incorporated into draft Procedures 300-Appendix J, *Domestic Violence*. The Department continues to discuss this issue with the Statewide CAC Administrator to determine feasibility of the CACs handling these interviews, as it will require programmatic and contractual changes.

> *FY 17 Department Update:* The recommendation has been incorporated into draft Procedures 300-Appendix J, *Domestic Violence,* which is pending.

*FY 17 OIG Comment:* This recommendation has been pending for 5 years and the most recent draft provided by the Department was dated September 2014 and does not contain any reference to referrals to Children's Advocacy Centers.

FY 2012

**Policy Transmittal 2010.23, which issues revisions to Procedures 302.260, *Domestic Violence Practice Guide*, and Procedures 300, Appendix J: *Domestic Violence*, provides for batterers to remain in the home with a domestic violence safety plan. This policy should be amended to clarify that when domestic violence has occurred in the home, it is presumed that the home environment is too dangerous for the child to remain, unless the perpetrator of violence is out of the home. Policy Transmittal 2010.23 should make clear that establishing a domestic violence safety plan for children should not preclude taking protective custody (from OIG FY 12 Annual Report, General Investigations 1).**

> *FY 16 Department Update:* The recommendation has been incorporated into draft Procedures 300-Appendix J, *Domestic Violence,* which is pending.

> *FY 17 Department Update:* Same Response provided from fiscal year 2016.

*FY 17 OIG Comment:* This recommendation has been pending for 5 years and is critical to child safety. The most recent draft provided by the Department was dated September 2014 and does not address the recommendation.

FY 2011

**The Domestic Violence protocol should be revised to address the cumulative effect of domestic violence and strategies for addressing cases of chaotic family life in which the victim/abuser dynamic results in an incalculable emotional toll to the children, including collaboration with DCFS Clinical and the Office of Legal Services (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 11).**

*FY 16 Department Update:* The recommendation has been incorporated into draft Procedures 300-Appendix J, Domestic Violence.

*FY 17 Department Update:* Same Response provided from fiscal year 2016.

*FY 17 OIG Comment:* The recommendation has been pending for 6 years and the most recent draft provided by the Department is dated September 2014.

FY 2011

**The Department should integrate into its Domestic Violence protocol the need for increased scrutiny and heightened risk when a person suspected of being a victim of domestic violence has provided false information to protect an abuser of his or her child (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 12).**

*FY 16 Department Update:* The recommendation has been incorporated into draft Procedures 300-Appendix J, *Domestic Violence.*

*FY 17 Department Update:* Same Response provided from fiscal year 2016.

*FY 17 OIG Comment:* This recommendation has been pending for 5 years and the most recent draft provided by the Department is dated September 2014. It is critical to child safety to ensure increased scrutiny when a caretaker has signaled a desire to protect the abuser over the need to protect the child.

### *Procedures 300, Reports of Child Abuse and Neglect*

FY 2015

**Rules and Procedures should be amended to provide that any abuse allegations that can be permissively retained for 20 years should be retained for 20 years when criminal charges have been filed and either resulted in a conviction, or are pending (from OIG FY 15 Annual Report, Death and Serious Investigation 5).**

*FY 15 Department Response:* This recommendation will be included in revisions to Procedures 300, *Reports of Child Abuse and Neglect*. Part 431, *Confidentiality of Persons Served by the Department of Children and Family Services*, and Part 436, *Records Management*, will also be updated to address this recommendation.

*FY 16 Department Update:* The recommendation has been incorporated into draft Procedures 300.150, *Child Abuse and Neglect Investigative File.*

*FY 17 Department Update:* The recommendation will be incorporated into draft Procedures 300.150, *Child Abuse and Neglect Investigative File.*

FY 2009

**The Department should train investigators and issue policy to require that when investigating injuries that occurred during babysitting, the investigator should determine the names of all other children that the babysitter provides care for, and interview them when appropriate and add children as additional alleged victims when appropriate. Parents, including non-custodial involved parents, of all children who are added as additional alleged victims should be notified of pending**

and completed investigations as required by the Abused and Neglected Child Reporting Act (ANCRA) and existing Rule and Procedure (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 3).

> *FY 16 Department Update:* The recommendation has been incorporated in draft Procedures 300.50, *Investigative Process* as well as draft Procedures 300.160 *Notifications*.

> *FY 17 Department Update:* The recommendation has been in draft Procedures 300.50, *Investigative Process* and will be incorporated in draft Procedures 300.160 *Notifications*.

### Short-term Guardianship

FY 2010

**The Department should develop guidelines for when it is appropriate to refer a family to the Extended Family Support Program for consideration of guardianship of a minor through Probate Court and also train them on the differences of guardianship through Probate Court versus referring a case to Juvenile Court. The Short-Term Guardianship Form should never be used when it appears that the problem requiring guardianship will not be resolved within one year (from OIG FY 10 Annual Report, General Investigation 9).**

> *FY 15 Department Update:* The recommendation will be incorporated into revisions to Procedures 300, *Reports of Child Abuse and Neglect* which will be issued in March 2016.

> *FY 16 Department Update:* The training has been updated to provide guidance to child protection staff on making referrals to the Extended Family Support Program, to include not referring a client to the program if short-term guardianship will not be resolved in 1 year. Language was also added to draft Procedures 300.130(g), *Extended Family Support Program*.

> *FY 17 Department Update:* The recommendation will be incorporated in draft Procedures 300.130(g), *Extended Family Support Program*.

## STATE'S ATTORNEY

FY 2016

**The Department's legal division should work with county State's Attorneys and courts to define use of supervision orders in those cases in which the risk is too high for no services but not high enough to remove children from their parent's custody. This would include cases in which a child was battered (from OIG FY 16 Annual Report, Death and Serious Investigation 9).**

> *FY 17 Department Update:* The Department continues to engage with the local State's Attorney's Office and circuit court judges in various jurisdictions on a regular basis to address the issue of obtaining orders of protection and orders of supervision. This is addressed as well at the quarterly meeting with judges.

FY 2013

**When there is a pending criminal investigation involving the same victims with similar allegations in a Child Protection (DCP) investigation, the DCP supervisor and investigator should consult with the Department's Office of Legal Services for an opinion or case conference with the State's**

**Attorney to determine a course of action to ensure protection of the child without jeopardizing the criminal investigation (from OIG FY 13 Annual Report, General Investigation 8).**

> *FY 16 Department Update:* This language is in draft Procedure 300.50, Investigative Process and has also been added to revisions to Procedures 300-Appendix B, *Allegation System*.

> *FY 17 Department Update:* Same Response provided from fiscal year 2016.

FY 2010
**Child protection managers should track and maintain data on cases presented to the State's Attorney's Office for filing of petitions and the State's Attorney's Office's response. Child protection offices should share this information with DCFS Office of Legal Services (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 7).**

> *FY 16 Department Update:* As described in the BH filings with the court, the Department is reviewing an updated system to replace SACWIS. The Department is withdrawing its acceptance of this recommendation until we determine future needs of the Department.

> *FY 17 Department Update:* The Department has begun a feasibility study to replace SACWIS with a CCWIS system.

*FY 17 OIG Comment:* This recommendation is about the need for an informal county based system to allow management to better coordinate with individual States Attorney's Offices. This could begin prior to a statewide database redesign which is likely to take several years.

**SERVICES**

FY 2016
**The Department should develop a violence and substance free therapeutic community based model similar to a halfway house model for youth 18 and over involved with the criminal court system or dually involved with adult and juvenile courts for crimes against a person. The programming should require that the youth: enter into a nonviolence contract, obtain a minimum of part time employment, participate in continuing education through the City of Chicago Community Colleges (technical certification program, GED, or Associate Arts degree) or credit recovery or alternative school programs for youth who can earn a high school diploma. The therapeutic model should clearly define a no-violence contract with each youth who enters the program. If the terms of the shelter's non-violence contract are violated the Department should immediately inform the Juvenile Court and Adult probation of the violation and the intention of the Department to request termination of the youth's wardship. Programming should include Safer Foundation and the Isaac Ray Center (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

> *FY 16 Department Response:* The Department agrees to explore the utility of both the Safer Foundation and the Isaac Ray Center programs and will develop a plan for a therapeutic community based model for its 18-20 year old dually involved youth consistent with this recommendation. The Department expects the plan to be completed by October 1, 2016 and the program operational by April 1, 2017. The Department is exploring this therapeutic community model. Currently, the Safer Foundation does not provide housing to our youth, and the Isaac Ray Center has only DJJ in-patient services. It should be noted that the Isaac Ray Center is developing an outpatient program in the next year, and the Department will continue dialogue with the

foundation to ascertain whether and when their program will be useful to our youth in care. The revised Housing Agreement is included in all FY17 ILO/TLP agency program plans.

*FY 16 OIG Comment:* While the Safer Foundation does not provide housing to youth in care, the agency does provide community transition settings and does provide court involved youth ages 16-21 with the following services; interventions that court involved youth in care could clearly benefit from:

- Transition Centers, two secure residential facilities located in the Lawndale community which allow incarcerated individuals, ages 18 and older to serve out the last 30 days to 24 months of their sentences in a community-based work-release setting.

- Youth Education Program, an intensive GED preparedness and job readiness training program. Youth ages 16 to 21 are linked to a Safer Intensive Case Manager upon completion of the program. The youth can be followed for up to two years to receive support in continuing their academic studies, vocational training or obtaining a job.

- Safer Supportive Services for court involved individuals ages 18 and over. The program provides treatment services for substance abuse, anger management and other mental health services.

- Employment Services offered through Safer Foundation job readiness programs where individuals learn not only job skills but how to respond to questions regarding their criminal background in order to obtain employment.

- PACE Institute an adult literacy and High School Equivalency preparation program offered to Cook County Department of Corrections (CCDOC) detainees, ages 17 and older who want to improve upon their educational level.

- In addition, Midwest Re-entry and Employment Network (MREN) awarded the Safer Foundation pass through funds to support a grant to Central States SER for programs that help improve the employability of court involved youth who reside in the Little Village and Garfield Park communities.

*FY 17 Department Update:* The Department is continuing to explore the development of substance free therapeutic community models for dually involved youth. The Department met with the Isaac Ray Center in June 2017. This organization is dissolving and all the staff are in the process of a transition. However, the Department plans to continue to consult with Dr. Conant who was the Program Director for Isaac Ray Center at the JTDC on developing a community-based model for detention center youth. The Department met with the Safer Foundation in July 2017. This appears to be a promising partnership for the Department. More discussions will take place on how to effectively partner not just for the youth, but also for the youths family. The Department is currently working on a program plan and contract with the Heartland Alliance Saura Center to develop a 3-6 month staff secure stabilization center for youth transitioning from detention.

FY 2016

**The Department should explore collaboration with the Illinois DHS Division of Mental Health, Division of Alcoholism and Substance Abuse, and the Cook County Sheriff's Office to develop a stabilization strategy for DCFS Cook County young adults with mental illness and substance abuse**

**problems who are charged with crimes against a person that exclude them from the criminal mental health court (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

*FY 16 Department Response:* The Department agrees to explore collaboration with these agencies to consider strategies that already exist or what may be needed. This recommendation also requires coordination with the Cook County State's Attorney's Office and the Cook County Public Defender's Office. The Dually Involved staff will take the lead on follow up.

*FY 17 Department Update:* The Department will discuss this strategy in 2018 Dually Involved Committee meetings to gather feedback from dually involved stakeholders regarding this level of coordination.

FY 2016

**To counter the lure of gangs and guns, the Department must offer programs in severely economically disadvantaged neighborhoods, such as Englewood, Lawndale and Austin, that include, remedial tutoring and enhanced learning opportunities for DCFS youths in care and children who have achieved permanency through subsidized guardianship or adoption who have reading and/or math scores two grades below level, and to offer the opportunity for pro-social recreational programs with safe passage (transportation) for these children (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

*FY 16 Department Response:* The Department agrees to convene a workgroup with other governmental entities to consider implementation of the suggested programs. The responsibility to promote education and enhanced learning opportunity falls to many entities within the community, but primarily the school districts. Ancillary support could be provided by governmental entities such as park districts, libraries, child welfare and the Department. In addition, the Department plans to use the immersion sites, as described in the Department's Implementation Plan, to develop more community-based services and programs such as those suggested by the OIG. The Department will identify community resources and use the immersion sites as a means to contract with and access services. This may include enhancing services provided by FACs.

*FY 17 Department Update:* The Department participates as an official member of the Illinois Criminal Justice Information Authority (ICJIA), an intergovernmental and advocacy group collaborative responsible for funding crime data, policy efforts, and crime victim services. The Department has encouraged the authority to make funding available for supportive programs specifically for children and families that have achieved permanency and exposed to community violence. This is now one of ICJIA funding priorities. The Departments' Office of Education and Transition Services has 5 separate contracts that provide a variety of services, which include, but are not limited to; on-site counseling, home visits to increase parental involvement, re-engaging youth who are out of school, educational coaching and mentoring for drop outs. These programs are located and/or serve all the economically disadvantaged neighborhoods within the Chicagoland area for youth between the ages of 6-21. This investment cost the Department approximately $5,696,604. The Department is also exploring HopSkipDrive, a child-focused ride sharing company, that Los Angeles County uses to transport foster youth to and from their school of origin safely despite a placement disruption. Gil Walker is assigned to work on specific issues and recommendations identified in the OIG Homicide Report in collaboration with specific DCFS administrators; depending on the issue area. Department staff are also working with the Office of Education and Transition Services to specifically look at the additional transportation needs caregivers may have for their children in areas exposed to community violence. Staff will be

doing a community needs assessment by the way of interviewing, administering and analyzing survey results collected from case managers, caregivers, and youth that reside and attend school in the neighborhoods identified in the OIG Homicide Report.

FY 2016

**When a special education youth in a residential program outside of the City of Chicago is transferring to a therapeutic/specialized, foster/relative home or transitional living program in Chicago, the Regional educational advisor from the sending community and the receiving Chicago Regional educational advisor should meet in advance of the school transfer to develop a transitional plan with the receiving school and the receiving agency assuring that the youth receives timely and appropriate special education services. The youth should be involved in the planning and afforded the opportunity to visit the receiving school prior to the transfer and the Department should fund an educational mentor to assist the youth for the first six weeks of the school transfer. The educational mentor should provide transportation for the first six weeks and assist the youth in adjusting (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

> *FY 17 Department Update:* DCFS educational advisors, caseworkers and Chicago Public School District personnel meet to determine what is in the child/student's best interest. They fill out a BID form (Best Interest Determination) to make sure the youth's needs are placed before any other factors such as funding concerns. The Office of Education and Transitional Services, DCFS Office of the Guardian, and DCFS Legal are working with Chicago Public Schools to determine transportation funding that is fair and equitable for all parties involved. Chicago Public Schools have a DCFS educational liaison work with our youth with Individual Education Plans to ensure their transition to new educational settings is less stressful. Our Northern Illinois University educational advisors also assist caseworkers with making sure the special education services are taking place in the proper setting.

FY 2016

**The Department should explore identification of entities that can offer credit recovery programs similar to the one at Maryville Madden Shelter (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

> *FY 16 Department Response:* The Department agrees with this recommendation. The Divisions of Placement and Community Services, Clinical Services and Monitoring will take the lead on follow up.

> *FY 17 Department Update:* This is currently being explored.

FY 2016

**Similar to the Rosecrance model, the Department should develop a supportive recovery transitional living program for its young adults in Cook County who are in their early stages of recovery. The program should offer individual, group and family counseling, educational and employment services with incentivized goal setting in these areas (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

> *FY 16 Department Response:* The Department agrees with this recommendation and will attempt to identify a provider willing and able to provide transitional living services similar to the

Rosecrance model. The Divisions of Placement and Community Services, Clinical Services and Monitoring will take the lead on follow up.

*FY 17 Department Update:* The Department consulted with a Provider to discuss the development of a supportive recovery transitional living program for young adults in Cook County who are in the early stages of recovery. After discussion with the Provider and the Community, the Provider determined that based on the site they had available, they would not develop such a program. The Department will continue to attempt to identify a provider willing and able to provide transitional living services similar to the Rosecrance model.

FY 2016

**The Department should utilize The Addicted Minor Act to obtain court ordered treatment for dually involved youth who are in need of substance abuse treatment in lieu of violating their delinquency probation (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

*FY 16 Department Response:* The Department agrees to meet with the Office of the Inspector General, Office of the Public Defender, DCFS Legal, and the Juvenile Justice Initiative to consider the optimal way to order youth into treatment. The discussion will include consideration of whether there would be any benefits from the use of the Addicted Minor Act for dually-involved minors.

*FY 17 Department Update:* The Department will designate Legal, Clinical, and Delinquency staff to participate in the next meetings facilitated by the Inspector General regarding this recommendation. The Department will also recruit a member of the probation department to participate as well. However it is our understanding that a decision has been made by DCFS and the OIG to look at other means to treat addicted minors.

FY 2016

**For effective collaboration Cook County Region DCFS should pursue an agreement with the Cook County Probation Department to cross train the dually involved specialized caseworkers and the youth's assigned probation officers. The training should cover the ins and outs of probation, delinquency court and gang safety and the DCFS related policies and expectations. The trainings should be conducted biannually and include a discussion component provided by experienced caseworkers and probation officers on gang involvement and lessons learned (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

*FY 16 Department Response:* The Department agrees with the recommendation to pursue such an agreement. The Department's Dually Involved unit will explore the need for and development of training. Several years ago the Department, along with a CWAC subgroup on dually-involved youth, developed an outline and training materials on such cross-training. These materials will be provided as a basis for updating the training.

*FY 17 Department Update:* In July 2017, The Department's Office of Delinquency Prevention and Restorative Justice (ODPRJ) applied for a multi-system collaboration training and technical assistance grant offered by Georgetown University, Center For Juvenile Justice Reform, and Office of Juvenile Justice and Delinquency Prevention. The Department's ODPRJ partnered with Cook County Probation and the Illinois Department of Juvenile Justice on completing the grant application. In August 2017, the Department was awarded the non-monetary Multi-System Collaboration Training and Technical Assistance Grant. One core objective of the grant is to

develop a cross-training at the conclusion of the completion of the 12 technical assistance sessions. The Departments' goal is to co-facilitate a cross-training with probation and DJJ in the summer of 2018.

FY 2016
**The Department should request the Illinois Justice Project/Juvenile Justice Leadership Data Collection and Information Sharing Workgroup and the Dually-Involved Committee consider proposing legislation or rules that would permit sharing of information and coordination between the Cook County Juvenile Justice Courts and the Cook County Abuse and Neglect Courts, when in the best interests of dually-involved youth (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

*FY 16 Department Response:* The Department agrees with this recommendation. The Cook County Dually Involved Committee, which consists of staff from DCFS, probation and other stakeholders, meets on a monthly basis. This agenda item is included every month. There are differing opinions between the offices (Public Defender, State's Attorney, Probation, DCFS and Child Protection and Juvenile Justice Courts) about the level of sharing and the time in the proceeding it is appropriate to share. The group is in the process of documenting agreed upon principles and practice including conversation and document sharing. This is very much an ongoing process which may extend over the year.

*FY 17 Department Update:* In November 2017, an information sharing MOU was signed by the leadership of IDCFS, Cook County Juvenile Probation, Circuit Court of Cook County, Cook County State's Attorney, Public Guardian's Office, Cook County Juvenile Temporary Detention Center, Chicago Police Department, Presiding Judges of Juvenile Justice and Child Protection.

FY 2016
**The Department should request that the Office of Administration of the Illinois Court (AOIC) allow the Department to receive all Delinquency court assessments such as the Youth Assessment and Screening Instrument (YASI) and Violence Risk Assessment for youths in care of the Department. For consistency of measurements across agencies the Department should administer the YASI on those dually involved youth who end their probation or parole but continue under the Department's guardianship (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

*FY 16 Department Response:* The Department's Office of Legal Services and the Division of Clinical Services will follow up with the Cook County Probation Department to determine if the Department can receive the YASI assessments for youth in DCFS custody. The primary assessment tool used by DCFS is the CANS; the DCFS Division of Clinical Services will analyze whether it is advisable to use of the additional tool of YASI assessment for dually involved youth who have completed their probation or parole. The Cook County Dually Involved Committee, which consists of representatives from probation, DCFS and other stakeholders, is already conversing about information sharing, including the YASI. Cook County Probation is willing to share the YASI on an individual case basis.

*FY 17 Department Update:* The November 2017 Dually Involved Committee Information MOU allows for sharing of assessments and screening instruments, as needed. A decision has not been made as to whether or not the Department shall administer the YASI on youth who end their probation or parole. This activity may be better suited for the Probation Department.

FY 2016

**The Department should request to participate in the Gang School Safety Team real time monitoring approach for youths in care with gun/gang/violence activity including related social media (from OIG FY 16 Annual Report, Death and Serious Investigation 10).**

> *FY 16 Department Response:* The Department agrees to contact the CPD Gang School Safety Team and explore access to information regarding gang violence and shooting victims. The Office of Legal Services will take the lead on follow-up. DCFS Legal, Operations and the Office of the Guardianship Administrator have begun meetings with the Youth Investigations Division. The group will explore services that the Chicago Police Department can provide our youth including coordination of services. Meetings will be ongoing.

> *FY 17 Department Update:* The Departments' Legal, Community, and Delinquency representatives are participating in monthly meetings with the Chicago Police Departments' Juvenile Intervention and Support Center (JISC) Unit. The Department and CPD are working on three projects; 1) Information Sharing Agreement, 2) a WebPortal for CPD to determine if a juvenile is a youth in care, and 3) developing a multi-disciplinary field team to monitor and approach youth that are showing trends in escalating delinquent behaviors and arrest.

FY 2016

**When sibling groups are placed in a foster home, the Department should require an assessment of the pragmatic demands of the placement given the developmental and chronological ages and needs of the children and demands on the foster parent. The assessment should identify specific concrete supportive services the caregiver will need to successfully care for the children, such as enrolling preschool age children in a Head Start program, or in the alternative, a NAEYC accredited childcare center; supportive homemaker services; respite; and assessing the transportation needs related to the children's services (See also OIG Report #11-2976) (from OIG FY 16 Annual Report, Death and Serious Investigation 7).**

> *FY 16 Department Response:* The Department agrees. The assigned caseworker is expected to conduct a continual assessment of the child's needs.

> *FY 17 Department Update:* The assigned caseworker is expected to conduct a continual assessment of the child's needs.

*FY 17 OIG Comment:* While expected, this pragmatic assessment does not occur either in the foster care or intact setting. Management needs to proactively address the failures.

FY 2015

**Program Plans for parenting classes, coaching and mentoring must require rigorous standards for developing a baseline of behavior and goals and measurement of change (from OIG FY 15 Annual Report, Death and Serious Investigation 1).**

> *FY 15 Department Response:* The Department agrees. A protocol will be developed.

> *FY 16 Department Update:* The Nurturing Parenting Program is currently being offered in Cook County and is being considered for implementation in select areas throughout the State of Illinois, completion is planned for 2017.

*FY 17 Department Update:* The Nurturing Parenting Program (NPP) continues to be offered in Cook County through 3 agencies. The Department developed a plan for implementing the NPP program beyond Cook County in FY 17. Agencies were selected, more than 40 facilitators trained and a NPP national trainer, has been identified to offer ongoing consultation to support the implementation. While limited implementation did begin in Immersion sites, further implementation is currently on hold while the Department considers outcome data.

FY 2011

**The Department should assure that when youths in care turn 16 years of age they obtain state-issued identification cards (from OIG FY 11 Annual Report, General Investigation 22).**

*FY 17 Department Update:* At the age of 16 years old until the youth reach the age of 21, youth can obtain their first state-issued identification card free of charge from the Illinois Secretary of State. The caregiver or caseworker must accompany the youth to the Secretary of State facility and will be required to present to official proof of identification in the form of a state issued Driver's License and proof of the child's residence/address. An Information Transmittal on the process was released on August 9. 2017.

**WORKER SAFETY**

FY 2014

**When a DCFS worker has a case involving a caretaker who is suspected of anabolic steroid use, the worker should contact the Administrator for Substance Abuse Services for information on the appropriate anabolic steroid screen (from OIG FY 14 Annual Report, General Investigation 1).**

*FY 16 Department Update:* The recommendation has been incorporated in draft Procedures 300.140 and Appendix B, allegations 10 and 60. Language was also added to Procedures 302, Appendix A, *Substance Affected Families*.

*FY 17 Department Update:* Same Response provided from fiscal year 2016.

FY 2011

**For the safety of the worker and child, the State Central Register should notify local police when allegations include information about a large quantity of illegal drugs (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 15).**

*FY 16 Department Update:* Language was incorporated into draft Procedures 300.50, *Investigative Process* and draft Procedures 300.160 *Notifications*. The Child Protection Specialist shall notify local law enforcement and document the notification in a contact note. A memo will also be issued to SCR staff to flag these cases to the field when a caller identifies a large quantity of drugs during a hotline call, to ensure the safety of the worker and child victims.

*FY 17 Department Update:* Same Response provided from fiscal year 2016.

# APPENDIX

**A. LUCIANO GEE**

**B. EASTON HURST**

# OFFICE OF THE INSPECTOR GENERAL
### Department of Children and Family Services
### 2240 W. Ogden Avenue
### Chicago, IL 60612
### (312) 433-3000
### (312) 433-3032 Fax

---

### *REDACTED REPORT*

---

*This report is being released by the Office of the Inspector General for teaching/training purposes. To ensure the confidentiality of all persons and service providers involved in the case, identifying information has been changed. All names, except those of professional references, are fictitious.*

---

**File No:**    15-2613
**Child:**     Luciano Gee, DOB 9/2013
**Subject:**   Serious Injury

## SUMMARY OF COMPLAINT

The Office of the Inspector General (OIG) conducted an investigation after receiving notice in March 2015 of serious injuries to 17-month-old Luciano Gee. At the time the injuries were discovered the family had an open case; the Department had legal guardianship of Luciano and his 2½-year-old sister Tariana, both of whom had been returned home seven months earlier in August 2014 under an order of protection after being removed because of bone fractures to then 5-month-old Tariana.

## INVESTIGATION

### Background

Twenty-one-year-old Vanessa Malone[12] (DOB 11/1994) and thirty-six-year-old Alfonso Gee (DOB 8/1979) have three children together: Tariana (DOB 9/2012); Luciano (DOB 9/2013); and Ethan Gee (DOB 2/2015). Ms. Malone and Mr. Gee have been together since Ms. Malone was sixteen years old and she moved in with him shortly after they met.[13]

---

[12] Vanessa Malone is a former youth in care. According to CYCIS, Ms. Malone was removed from her biological parents (Farah Ivey and Benson Angulo) in April 1996 at 17 months and was placed in foster care. She was a youth in care of the state until August 2004 when she was adopted by Cindy Malone, her 9th placement.

[13] Mr. Gee reported being in a relationship with Ms. Malone since she was 16. He stated that when they met, she was untruthful about her age, stating that she was 19. Mr. Gee explained this was around the same time that Vanessa was experiencing a great deal of difficulty at home and was put out of her mother's home. Mr. Gee said that he did not learn that Ms. Malone was 16 until several months after they had begun a sexual relationship. (Per Integrated Assessment (IA) dated 6/2013)

**Child Protection Investigation – Sequence A**

This family became involved with the Department of Children and Family Services (DCFS) on a Monday in February 2013 when a Midwest Hospital social worker contacted the hotline. The narrative reads:

> Action Needed – Please assure the safety of the child. Reporter states that [5-month-old] Tariana was sent from the local pediatrician, Dr. Day, to the hospital for a skeletal survey. Tariana has not been using her left leg and it is presumed broken. Vanessa told reporter that she was trying to get Tariana out of the walker and it was too low causing the leg to be injured. Vanessa told reporter that she has been in and out of foster care for her entire childhood and has now aged out.

An allegation of bone fractures by abuse (#9) to Tariana by her eighteen-year-old mother was taken for investigation.

On-call child protection investigator Daria Menotiades spoke to the source/primary care physician Dr. Day by phone that day. Her contact note documenting the conversation reads:

> This CPS spoke with Dr. Day regarding this case. She stated that the mother has not brought the minor back to the physician as recommended and had not followed up with the minor's shots. She stated that the minor is failure to thrive and is very small. She stated that the minor is 11 lbs at four months, but was born weighing 5 lbs. She stated that she requested that a skeletal survey is completed on the minor to ensure that there are no additional fractures. She stated that the minor should not go home with the mother at this time. She stated that she spoke with the physician and learned that the minor has a lower femur fracture; upper tibia.

Investigator Menotiades interviewed mother at the hospital about two and a half hours later. The contact note reads in part:

> Mother stated that she had the minor in a walker and the walker is bent low the (sic) the floor. She stated that she believed that she may have pulled the minor out inappropriately. When asked about following up with the doctor and the minor's immunizations she stated that she does not have money to get back and forth. The mother had a black eye and when asked about it, she admitted that the child victim's father, Alafonso (sic) Gee, DOB 8/1979 hit her in the eye and in the nose. She stated that there had not been any other dv concerns. She stated that they argued because he texted her sister. She stated that he put her out of the home and when she knocked on the door (sic) requesting her wallet, he pulled her in and hit her. She stated that he called the police and when they came, he was arrested and is still in jail. Mother denied any substance abuse. She admitted that she was a youth in care, but had been adopted. She stated that she completed the freshman year of school. She stated that she is not employed currently.

The investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) Safety Determination Form that was marked UNSAFE. The investigator identified the following safety risk factors: #13 (the presence of domestic violence which affects caretaker's ability to care for and/or protect child from imminent, moderate to severe harm), noting that the mother had a black eye and reported that the father of the child victim hit her;[14] and #15 (other), noting that the child had a bone fracture.

---

[14] According to a contact note in the DCP investigation, father was arrested and taken to jail for a domestic violence incident. The arresting officer was Officer Leblanc. Father, Alfonso Gee, later admitted to the incident.

According to her contact note, mother became visibly upset when the investigator explained that a safety plan was needed or protective custody of the minor would be taken. A safety plan was implemented with Tariana's godmother, Gabriela Hale.[15] Mother was not allowed to spend the night or to have any unsupervised contact with the infant.

The next day, Tuesday, the investigation was assigned to child protection investigator Heather Joiner. In a supervisory note dated that day, child protection supervisor Iliana King identified this as an MPEEC (Multidisciplinary Pediatric Education and Evaluation Consortium) case. Amongst other things, she instructed the investigator to complete a scene investigation; see the walker; and to take a scene doll and have mother re-enact how she pulled the child out of the walker. Investigator Joiner attempted to contact mother by phone the following day and left her a voicemail message.

Three days later, on Friday, Investigator Joiner spoke with Ms. Malone's adoptive mother, Cindy Malone, by phone. The contact note documenting the conversation reads:

> Ms. Malone stated that she began caring for Vanessa 10 years ago and adopted her and two of her sisters. Ms. Malone stated that she has not heard from Vanessa since Monday, when baby Tariana was at the hospital. Ms. Malone stated that Vanessa does not live with her, but with boyfriend Alfonso Gee, age 33. They met about one year ago and lived together at the current address for the past month. Ms. Malone stated that Vanessa and Alfonso fight all the time. She stated that there is an ongoing history of Domestic Violence. They got into a conflict the previous Friday and the boyfriend was arrested and taken to jail. Ms. Malone stated that Vanessa came to her house that Saturday with a black eye. Tariana was in the care of the godmother at the time. Ms. Malone stated that she was constantly scolding Vanessa about taking the baby to the doctor and that Vanessa was not keeping the baby's well child appointments. There were ongoing concerns about Tariana's low weight. During the weekend, godmother Gabriela Hale called MGM with concerns about Tariana's weight and the appearance of an injured leg. Ms. Malone stated that she made Vanessa take Tariana to primary care physician Dr. Daye (sic) on Monday. The baby was then referred to Midwest Hospital and DCFS became involved. Ms. Malone stated that Vanessa had a black eye when she took the baby to the hospital. Ms. Malone stated that she last heard from Vanessa when she called from the hospital on Monday asking Ms. Malone to take the baby. Ms. Malone stated that she was in the middle of her brother's funeral at the time, but that the baby is in good hands with the god mother. Ms. Malone stated that Vanessa is a defiant 18 year old. She was known to cut off communication for days at [a] time when scolded by Ms. Malone regarding the care of Tariana. Ms. Malone stated that she did not agree to Vanessa's relationship with Alfonso Gee, which was another reason for her strained relationship with Vanessa.

Three days later, a Monday, Investigator Joiner interviewed both parents; completed a home safety checklist; completed substance abuse and domestic violence screens; and conducted a scene investigation. Mother told the investigator that she only had the baby walker for one week when Tariana was injured. She said she obtained the walker from her adoptive mother (Cindy Malone) and assumed it was safe because her mother was a licensed daycare provider. Investigator Joiner observed the baby walker and noted that the walker appeared to be several years old; was lopsided; and appeared to be defective. Using a DCFS doll, mother showed the investigator how she placed Tariana in the walker and placed a blanket behind her back to hold her in place. She then showed the investigator how she lowered the walker to the lowest setting so that the baby's feet could touch the ground. Mother stated that she placed the baby in

---

[15] Vanessa attempted to use her adoptive mother for the safety plan but she was on her way to a funeral and unable to come to the hospital immediately. Ms. Hale was 22 years old and lived with her parents.

front of the television and left the room. She stated that a few minutes later she heard Tariana scream and came back in the room and saw that the walker collapsed on the baby's leg. Mr. Gee said he told the mother not to put the baby in the walker due to her age. He told the investigator that he was not present at the time of the incident. The investigator informed the parents that intact family services would be recommended, and they would be referred for parenting classes and domestic violence counseling.

Tariana remained in a safety plan with godmother Gabriela Hale while her case was reviewed by MPEEC Dr. Jerome Norman at Southern Hospital who received the case 15 days after the initial hotline call. After reading the radiology report from Midwest Hospital (MH), Dr. Norman recommended Tariana have a skeletal survey.[16] She was taken to Southern Hospital (LH) for the skeletal survey six days after Dr. Norman received the case. Dr. Norman noted the following in part in his MPEEC report dated April 2013:

> A review of the x-rays of the left lower extremity done in 2/2013 at MH revealed multiple injuries:
> 1. A healing classic metaphyseal lesion (cml) of the left distal femur.
> 2. A healing crush injury to the growth plate (Salter-Harris type V) of the left distal femur with some sclerosis.
> 3. A CML (bucket-handle type) of the left proximal tibia with periosteal reaction.
> 4. A CML of the proximal left fibula.
> A review of the skeletal survey done on 3/2013 at LH revealed multiple injuries:
> 1. There is deformity of the right proximal humerus with significant periosteal reaction.
> 2. There is deformity of the left proximal humerus.
> 3. There are bilateral proximal femoral sclerotic and cystic changes that are more pronounce[d] on the left than the right side.
> 4. There is a subacute fracture along the growth plate of the right distal femur with metaphyseal extension (Salter-Harris type II).
> 5. The healing CML and Salter-Harris type V fractures of the left distal femur seen in 2/2013 at MH were noted again on skeletal survey with increased sclerosis.
> 6. The healing CML fracture of the left proximal tibia was noted again on skeletal survey.

> **Impression and Plan**
> In summary, Tariana was a 5-month-old female infant at the time of the incident with multiple fractures in different stages of healing. Because of the developmental level at the time of the injuries (non-ambulatory), the type and extent of the injuries and the lack of a plausible explanation for them, these injuries are most likely abusive in nature.

> It is paramount that Tariana remains in a safe environment until a plausible explanation for her injuries is obtained. Otherwise, she could be at risk of repetitive and escalating abuse, including death.

The Department took protective custody of Tariana two days after Dr. Norman's report and was granted temporary custody two days after that. Tariana was formally placed with her godmother who had been caring for her pursuant to the safety plan.

---

[16] Primary care physician Dr. Day told the investigator she requested a skeletal survey. It does not appear that this was done at Midwest Hospital.

Mother and father were indicated as the perpetrators of abuse on allegation #9 – bone fractures by abuse two weeks later, in May 2013. The rationale was that the baby had multiple bone fractures with different healing ages; mother and father had no explanation for the injuries; mother and father were residing together and there was domestic violence.

**Child Protection Investigation – Sequence B[17]**

The hotline was called when Luciano was born in September 2013 (seven months after the first hotline call) because of concerns about his safety if he were left in the care of his parents. Following a child protection investigation, mother and father were indicated for #60 – substantial risk of physical injury/environment injurious by neglect to Luciano.

A petition was filed and the court entered an order granting the Department temporary custody of Luciano Gee in October 2013. The basis of the finding was:

> Mother and putative father have 1 prior indicated report for bone fractures. Parents have 1 other minor who is in DCFS custody with findings of abuse, neglect and physical abuse having been entered. Parents have supervised visitation with this minor's sibling. Services are ongoing for mother including individual therapy and completing an updated mental health evaluation. Mother had previously been diagnosed with bipolar disorder and was prescribed medication. Putative father is non-compliant with substance abuse treatment. Individual therapy is ongoing for putative father and he is in need of domestic violence services. Parents have a history of domestic violence. Mother and putative father reside together. Paternity has not been established.

**Placement case**

According to CYCIS, a placement case was opened for abuse in April 2013. Tariana remained in the care of her godmother (with whom she had been placed in February initially under a safety plan) until August 2013. In August, Tariana was moved to a traditional foster placement with licensed foster parents, Kevin and Mae Olson.[18] Luciano was also placed with the Olsons when he entered care in October 2013.[19] Nadia Peyton, supervised by Olivia Qualls, was the assigned worker from Ace Agency.

*Integrated Assessment*

Clinical screener Penelope Romney, LCPC completed an initial integrated assessment.[20] Ms. Malone disclosed a history of several psychiatric hospitalizations at Riverview Hospital since her early teen years. She said she felt the hospitalizations were unnecessary and primarily driven by her adoptive mother. Ms. Malone explained that any time she and her mother had a verbal or physical altercation; her mother would

---

[17] This investigation has been expunged and is no longer available on SACWIS.

[18] According to case notes, Tariana was removed from Ms. Hale's care after a newer fracture was found in her right leg and it could not be determined who caused the injury, Ms. Hale or the biological parents. A Placement Review Staffing was held and the final Clinical Placement Review Decision was made on 9/2013 that it was in Tariana's best interest to be moved.

[19] The case manager learned that mother was pregnant with her second child in May 2013, shortly after the placement case opened.

[20] Integrated Assessment dated June 2013.

call the police to have her hospitalized. Ms. Malone reported minimal support from family members. She said her primary support was Mr. Gee.

Recommendations for services included: substance abuse assessment; domestic violence assessment; parent-child interaction therapy; individual psychotherapy; and a life skills assessment for Ms. Malone. The screener also recommended an Early Intervention developmental evaluation for Tariana.

Ms. Malone's and Mr. Gee's prognosis for reunification with Tariana ranged from guarded to poor based on the fact that Tariana sustained multiple injuries while in the care of her parents and neither parent provided a "plausible explanation"[21] as to how she sustained the injuries. Additionally, domestic violence was a prevalent risk factor in the case.

_Services_

_Mother's Hospitalization History_

Mother signed a consent for release of information allowing her caseworker to obtain all medical and mental health records for 2011 from Riverview Hospital for purposes of case management planning.[22] These records were then shared with mother's assigned therapist for purposes of treatment.

According to the Riverview records, mother had a history of multiple admissions for impulsive, threatening and aggressive behaviors and for depression and self-injurious behaviors. In 2011, she had repeated hospitalizations in a very short period of time: the records documented three hospitalizations and two referrals to their partial hospitalization program[23] that year. Throughout her hospitalizations there were consistent reports of depressed mood with tearfulness, irritability, aggressive and hostile behavior, self-injury[24] and non-compliance with medications. She had been prescribed Zoloft for depression and Risperdal for anger.[25] Her diagnosis was mood disorder, not otherwise specified.

Ms. Malone was hospitalized in July 2011, prompted by superficial cuts to her arm, reports of anger and sadness over her relationship with her girlfriend and feeling like she wanted "to disappear." Upon stepping down to the partial hospitalization program she reported feeling better, more able to cope and believing that the anti-depressant Zoloft had helped. However, one day after beginning the partial program, she was readmitted to the inpatient unit following a physical altercation with her two sisters. Staff noted that upon arrival she was disheveled, with scratches and torn clothing. She reported that she had only become physical in self-defense. After discharge Ms. Malone went to the partial program for six sessions. She reported to her psychiatrist that the family session did not go well because her mother wanted her to change her friends and she did not want to do so. Staff wrote that Ms. Malone had some insight upon discharge, but was reluctant to take responsibility for her behavior. She was discharged from the partial program on October 3, 2011.

---

[21] The OIG has previously recommended and trained staff to refrain from using the phrase "plausible explanation." Almost anything can be plausible. Instead, staff should use terms such as reasonable and likely. When talking to a physician about abuse, the question should be, "Given all the facts we've discussed, do you think it is more likely that the child suffered these injuries as a result of abuse or accident?"

[22] The consent dated June 2013 and the Riverview Hospital records are part of the case record impounded by the Office of the Inspector General.

[23] The partial hospitalization program consists of attending outpatient programming five days a week for at least four hours a day. Patients attend groups, individual therapy, psychiatry medication management weekly and family therapy.

[24] The notes indicate prior self-injury in 2010.

[25] Records note that she had previously been prescribed Abilify and Adderall.

A psychological evaluation was completed during a hospitalization in September 2011. Ms. Malone described having a difficult relationship with her mother. Her Millon Adolescent Clinical Inventory indicated she felt significant discord with her family. Other elevated scores "indicated that she might have the tendency to view others with little empathy, while placing her own needs above others." In the summary section the psychologist wrote:

> Cognitive testing suggests she is functioning at a well below average level of cognitive function (borderline)…Vanessa did not endorse any mood disorders, but appeared to be having problems effectively and appropriately dealing with stressors in her life. Personality testing indicated that she has the most difficulty when she does not get her way and tends to respond with anger, becoming impulsive and irresponsible. Vanessa's focus on her own needs combined with possible misinterpretation of social cues might interfere with her ability to see that others have needs and feelings.

Her Axis I diagnosis was Adjustment Disorder with Mixed Disturbance of Emotions and Conduct.

On December 3, 2011, Ms. Malone's mother called police because of aggressive behavior. Records indicate Ms. Malone had run away four days earlier and then got into an altercation with her mother when she returned. She admitted to not taking her prescribed medication. She was also found to be positive for chlamydia. Ms. Malone remained in the hospital for 16 days, discharged home with Superior Agency as the outpatient provider. She gave birth to Tariana, her first child, less than one year later.

*Individual Therapy*
Ms. Peyton referred both parents for individual therapy. Mr. Gee was referred in June 2013 and sessions with Ace Agency Therapist Quincy Thompson, LCPC began shortly after.[26] Ms. Malone was also referred and her sessions with Ace Agency Therapist Rosie Selock began two weeks later.[27]

Mr. Thompson told OIG investigators that upon assignment, he discussed the case with Foster Care Director Olivia Qualls; received copies of the MPEEC report; and was given a copy of the Integrated Assessment. Ms. Selock told OIG investigators she was also given a copy of the Integrated Assessment and confirmed that she was aware of Ms. Malone's prior psychiatric hospitalizations.[28]

Individual therapy was scheduled to occur on a weekly basis however, regular attendance was an issue with both parents. Mr. Thompson described Mr. Gee's attendance as sporadic and said he frequently reported work conflicts as the reason he was unable to meet.[29] In an attempt to meet more regularly and to alleviate the conflict with work and other responsibilities, Mr. Gee's therapy sessions were moved to the home.[30]

Ms. Selock told OIG investigators that in the beginning, therapy generally occurred only once or twice a month, not weekly as scheduled. In a September therapy report, Ms. Selock noted that in the three months

---

[26] Mr. Thompson told OIG investigators that less than 50% of his clients are involved with child welfare and that this was one of only a few that involved abuse.

[27] Ms. Selock has been employed at Ace Agency since 2010. She is a master's level therapist with a degree in counseling/psychology. Ms. Selock reported prior experience working with clients involved with child welfare and said she enjoyed working with young adults in their late teens/early twenties (Ms. Malone's age).

[28] Ms. Selock could not recall whether she received a copy of the MPEEC report.

[29] Employment was an issue throughout the case. Mr. Gee was the sole financial provider for the family. He was employed on and off as a landscaper and as a building manager.

[30] Weekly sessions were reduced to every other week beginning in April 2014. They were further reduced to once a month in September 2014 (after the children were returned home). Mr. Gee's individual therapy was ongoing when the children re-entered care in March 2015.

since therapy began, she and Ms. Malone only had four sessions because of "various schedule conflicts due to Ms. Malone's paramour's work schedule, attending other required services, becoming re-enrolled in school, and more recently, health concerns due to her pregnancy." They decided to have phone sessions on a weekly basis until Ms. Malone's health stabilized and to meet on a more regular basis after the birth of her baby.[31] According to Ms. Selock's records, office sessions resumed in November 2013.

Mr. Thompson and Ms. Selock addressed the abuse to Tariana and the severity of her injuries in therapy sessions with their respective clients. Neither parent admitted to intentionally causing physical harm to their daughter. Mr. Gee repeatedly stated that his daughter was not injured while in his care; had difficulty believing that she was injured to the extent reported; and initially focused on his desire to discover who the perpetrator was. While Ms. Malone acknowledged the severity of Tariana's injuries, she was insistent that neither she nor Mr. Gee directly caused the injuries. A therapy note written by Ms. Selock noted:[32]

> Client shared that she and paramour believe daughter may have a skeletal disorder of some sort as a way of explaining how she may have sustained her injuries. Client has shared that the only way her daughter may have been hurt was during a disagreement between client and paramour. Client went to take daughter away from paramour and paramour would not let go of their daughter. Client shared that she was angry and may have been more rough than she had realized, though she does not believe that she could have seriously injured her daughter especially in light of the fact that her daughter did not seem to be sensitive to touch or did not seem to be in pain.

Mr. Thompson and Ms. Selock told OIG investigators that although neither parent admitted to hurting Tariana, both parents acknowledged that ultimately they were responsible for their daughter's safety as her caretakers.

Ms. Selock told OIG investigators that Ms. Malone never expressed any reservations about having her children returned to her care. In a therapy note documenting an August 2014 session, Ms. Selock noted the following in part:

> The client has not expressed any hesitation in having her children returned to her care and has said that though she knows it is going to be more constant work for her, she feels ready and able to manage all of the responsibilities of being a stay at home mom for two young children. Client has expressed being grateful for the relationship she has built with the children's foster parents. They have welcomed the client and Alf into their home and have fully supported and encouraged them to step into the proper roles as the biological parents. The client does not feel any apprehension in utilizing help and support from the foster mother as she needs it.

Ms. Malone's therapy sessions continued but were reduced to once a month and occurred by phone after Tariana and Luciano were returned home in August 2014. Ms. Selock told OIG investigators that once the children were home, it was more difficult for Ms. Malone to attend her therapy sessions. During a September phone session, Ms. Malone shared with her therapist that she was pregnant with her third child and although it was not planned, she and Mr. Gee were both happy about the pregnancy. The last phone session occurred November 2014 and the therapist documented:

---

[31] Ms. Malone gave birth to her second child (Luciano) in 9/2013. Ms. Selock learned of his birth during a phone session a week later.

[32] Dated August 2013.

Client maintains that apart from being tired at times with her pregnancy progressing smoothly and having Alf working much longer days, she still feels confident that she is in a good place and is willing and able to contact sources of support and service providers including this therapist should she feel the need to have extra support. Client shared that she had actually connected again recently with the children's previous foster parents and have planned for her children to visit them for a day this next week so that client can have some time to herself to rest.

Ms. Malone was successfully discharged from individual therapy in November 2014. The closing summary notes the reason for termination as: "Services have been terminated due to the continued stability and consistency in communication with the client after her children have returned to her care without having any unusual incidents. The decision to terminate services has also been made after consulting with Ace Agency." All of Ms. Malone's sessions occurred in the office or by phone; there were no in-home sessions.

In addition to individual sessions, Mr. Thompson and Ms. Selock conducted several joint sessions with the parents.[33] The Prepare/Enrich assessment was used as a tool in the joint sessions.[34] The joint sessions were used to discuss issues of division of labor and relationship dynamics. Ms. Malone was significantly younger than Mr. Gee and Mr. Gee was described as a "traditionalist" in his belief that men provided for the family and women cared for the children and the home.

Although Parent-Child Interaction Therapy (PCIT) was recommended for the family, Mr. Thompson told OIG investigators that it was not done in part because PCIT is designed for kids between the ages of 3-6 years of age and Tariana and Luciano were both much younger. Mr. Thompson told OIG investigators that he had the opportunity to observe the parents caring for the children in the home on multiple occasions and described their interactions as appropriate. Although none of Ms. Malone's individual therapy sessions occurred in the home, Ms. Selock also told OIG investigators that she observed Ms. Malone with her children on three occasions.

In retrospect, both therapists told OIG investigators that the possibility Ms. Malone would experience post-partum depression after her third pregnancy should have been considered prior to terminating services.

*Substance Abuse Services*

Ms. Peyton referred Mr. Gee and Ms. Malone for JCAP (Juvenile Court Assessment Program) assessments that were completed in July 2013. The assessment team recommended residential substance abuse treatment for Mr. Gee but he opted for an intensive outpatient treatment program instead. He was referred to outpatient substance abuse services at Empire Center. Mr. Gee started services at Empire but was unsuccessfully discharged due to non-attendance. In June 2014 Ms. Peyton sent him for an assessment at Upsilon and he was found not appropriate for treatment services [no level of care]. A full panel urine screen was conducted at the time resulting in a negative finding for illicit substances. Ms. Peyton told OIG investigators she did not believe that Mr. Gee had a substance abuse problem. She said he was referred for an assessment because he reported having a drink after work on a regular basis and smoking "blunts" in the past.

---

[33] Four joint sessions occurred in March, May, and June 2014.
[34] Prepare/Enrich is a customized couple assessment completed online that identifies a couple's strengths and growth areas.

Ms. Malone was referred for intensive outpatient substance abuse services at Empire because of her history of substance abuse with marijuana as her primary drug of choice and alcohol as her secondary.[35] Ms. Malone completed her intake assessment at Empire in July and began services in August 2013. In January 2014, she was unsuccessfully discharged from Empire for non-attendance. She re-engaged with Empire and successfully completed substance abuse treatment and received a certificate in May 2014.

Both parents received Sigma Agency coaching services for drug abuse recovery. Ms. Malone and Mr. Gee submitted to random urine drops through Sigma and all drops were negative. They were both successfully discharged from Sigma services in December 2014.

*Domestic Violence Services*

Mr. Gee completed a Domestic Violence Assessment in November 2013 through Rho Rehabilitation Agency and it was recommended that he engage in a 26 week program. In May 2014, Mr. Gee was discharged unsuccessfully due to attendance issues that he blamed on work. His class time was changed from weekdays to Saturdays and he completed the 26 classes in September 2014. He was required to attend three after care sessions as well, which he did. According to Ms. Peyton, this was the hardest service to get the father to agree to because father saw himself as the victim.

Ms. Malone participated in and completed a six week domestic violence program through Lakeside Agency from August 2013 to September 2013. Ms. Peyton said she spoke to the domestic violence provider who reported that Ms. Malone was "really engaged and empowered by the time she was done."

*Parenting*

Ms. Peyton told OIG investigators that Ms. Malone was referred by the child protection investigator to parenting classes. Ms. Malone successfully completed group parenting classes through Lakeside Agency in June 2013 and received a certificate of achievement.

*Mother's Psychiatric Evaluation*

In November 2013, Ms. Malone completed an outpatient psychiatric evaluation with Dr. Sasha Underwood at Southern Hospital. According to Ms. Peyton, the evaluation was requested to determine whether the mother was in need of medication and mother's portion of the integrated assessment was shared with the assessor. Ms. Peyton said the results were shared with mother's individual therapist as well as with everyone in court.

The evaluation was based on Ms. Malone's self-report. No psychiatric diagnosis was identified and Dr. Underwood reported no evidence of bipolar disorder or any psychiatric mood disorder (a concern of mother's based on family history). No psychiatric services were recommended.

*Children's Services*

Tariana was referred to Early Intervention in June 2013 due to concerns with her gross motor skills and overall development. She was evaluated by developmental and physical therapists and qualified for services. She received developmental therapy once a week in the home for 60 minutes and physical therapy twice a month.

Luciano had 0-3 developmental screenings in March 2014 and October 2014. He was on target with no developmental concerns.

---

[35] Per JCAP assessment 7/2013.

After return home, Tariana was reassessed for services through Lincoln Children's Hospital in January 2015. It was determined that she was no longer in need of physical therapy but weekly developmental therapy sessions would continue in the home.[36]

*Visits*

Biological parents were granted unsupervised visits in February 2014. The frequency and duration of the visits were at the discretion of Ace Agency. The unsupervised visits began within three days and took place at the Ace office on Fridays from 10-12 pm. One month later, Ace increased visits to include Sunday visits in the parents' home from 8:30 am – 5 pm. The first visit took place three days later. Overnight visits were granted in court in August 2014. The first overnight visit took place that night. The children had one overnight visit the first week and two the following week. The plan was to add an additional day each week so that by the next court date three weeks later, they would have had four overnights.

*Return Home*

In August 2014, Tariana and Luciano were returned to their parents' care with an order of protection. The Department retained legal guardianship of the children. Services were ongoing. The worker, Nadia Peyton, made announced and unannounced visits to the family. Both parents continued to meet with their therapists and their Sigma recovery coaches. Tariana continued to receive developmental and physical therapy.

The case was heard in court in November 2014 for a progress report and status on return home. The court heard testimony from Ms. Peyton. The worker reported that return home was going well. She reported that the Sigma recovery coach planned on discharging both parents and that mother had been discharged from individual therapy (two days earlier). The worker asked that the order of protection be extended for another three months to allow biological father to do his three aftercare classes at Rho Rehabilitation where he had been referred for domestic violence services and to allow enough time for the family to receive everything they were entitled to in reunification funds. The court granted the extension.[37]

Sixteen-month-old Luciano was admitted to the hospital in January 2015 by his primary care physician (Dr. Velez of Delta Clinic) due to possible FTT. An Omega Hospital Admitting History/Physical reads:

> 16mo male normal birth history here with poor weight gain. Patient was seen at routine well child visit at 13mos and was noted to be <1%ile on normal growth curve. Patient returned for follow up visit at 16 months and had lost 1.2kg since that time. Patient sent to Peds floor for work up on poor weight gain. Mom reports a robust diet at home that includes cheerios, apples, cheese and milk for breakfast; lunch: hot dogs, peanut butter and jelly sandwiches, at least 2 fruits a day, and milk. Dinner includes at least one protein (chicken/fish/pork/beef), as well as mashed potatoes and/or pasta. Children have snack time after their nap which includes cheezits, pretzels and cheese and/or cookies. Mom says she is with the patient all day. She has not noticed any change in behavior or activity level. No change in appetite or stool consistency or color. However mom raises concerns that she sees undigested bits of food in his stool sometimes (corn, lima beans, greens). Patient usually eats well and finishes what is on his plate.

---

[36] Tariana was receiving developmental therapy on Tuesdays from 9-10 a.m.

[37] The next court date was scheduled for February 11, 2015. On February 11, the case was continued until May 19 for a Progress Report.

> Of note patient was only returned to Mom's care at 11-12 months of age. Both he and his older sister were removed from the home because his older sister was noted to have up to 9 fractures at various parts of her body. Mom did not know the outcome of the DCFS or medical evaluation. She is concerned that the older sister might have had rickets. Based on medical records that mom brought with her, patient with normal growth curve/velocity up until 11 months of age, where there is a deceleration in his growth curve that crosses percentiles.

Luciano was observed for 48 hours and his weight was assessed daily. His weight improved over a 36 hour period. Specifically, the discharge summary noted:

> Patient admitted directly from PCP clinic due to possible FTT. Labs drawn and unremarkable. Patient was observed for 48 hours, and weight was assessed daily. Patient was evaluated by nutrition service who recommended 3 meal[s] a day + 3 snacks. Weight improved by 300 grams over a 36 hour period, which makes environmental causes (limited PO intake at home) more likely. DCFS involved (case worker Mrs. Peyton) and evaluated family while in hospital. Will continue to follow case. Mother instructed extensively about appropriate dietary requirements for child before discharge.

Luciano was discharged two days after his hospital admission with plans for continued close follow-up with primary care physician (PCP) to monitor growth. The caseworker said she did not see Luciano's hospitalization as a red flag. She said it was her understanding that Luciano was in an odd stage of development; his appetite had changed; and he was being seen regularly by his primary care physician.[38]

Four days later, Primary Care Physician Dr. Velez spoke with mother, who reported that things were going well since being discharged. Mother agreed to follow up with the doctor the following day however she missed that appointment because she went into labor. Her third child, Ethan, was born in four days after Luciano's discharge. Mom and the baby were released from the hospital after two days. A petition was never filed for Ethan.

Luciano, accompanied by mother and father, was seen for a follow-up visit in February 2015. A note documenting the visit reads in part:

> **Impression and Plan**
> **Diagnosis**
> Failure to thrive (child)
> **Plan:**   Patient has gained weight since recent hospitalization. Parents are very anxious, which I think child is picking up on. Encouraged to eat meals as a family, if patient wants to eat of (sic) parent's plate then do that with child eating majority of the food, continue to encourage a variety of foods dense in calories, failure to thrive booklet given. Family to follow up in 1 month for weight check. Parents also to enroll in WIC and home nursing visiting program through Beta. Will continue to monitor.

The caseworker conducted a home visit and last saw the family the following day.

---

[38] Delta Clinic medical records show that Luciano was seen once in November 2014.

**Interview with Nadia Peyton**

OIG investigators interviewed Ms. Peyton, the assigned placement worker on the Malone/Gee case for almost two years.[39] She was articulate and shared information freely regarding her assessment and involvement with the family.

Ms. Peyton told OIG investigators that the only document she had in her possession when she was initially assigned the case in April 2013 was a copy of the child protection investigation (A-Sequence). She explained that the only reason she had the investigation was because the Ace Agency Foster Care Coordinator attended Tariana's temporary custody hearing and was given a copy. Ms. Peyton told OIG investigators she had to request all other documents, including the MPEEC report, from court personnel.

Ms. Peyton identified the domestic violence between Ms. Malone and Mr. Gee; and Tariana's multiple injuries/fractures as the primary issues in the case. Ms. Peyton told OIG investigators that even though they were never clear how the injuries to Tariana occurred, the agency treated this case as an abuse case. Neither Ms. Malone nor Mr. Gee took responsibility for the injuries and they provided more than one possible explanation for the injuries: (1) Tariana was injured when a walker collapsed while she was in it; and (2) the parents were both pulling Tariana during a domestic incident. In addition, Ms. Peyton expressed concern about the vast age difference between mother and father; Ms. Malone's dependence on Mr. Gee; and her concern that if the children were returned, Ms. Malone would be tied to the home caring for young children with no outlets. She said she encouraged mother to go to school and/or work. Ms. Peyton said that the mother really only had Mr. Gee and "he loved that."

Ms. Peyton described Ms. Malone and Mr. Gee as extremely cooperative. She said that they were the ideal couple in that she told them what services they needed to do and they did them. She reported regular communication amongst the professionals involved in the case as well as good relationships between the professionals, biological parents and foster parents. Like the therapists, Ms. Peyton observed the parents interacting with their children and said that the case aide also observed the parents together "working as a team." Ms. Peyton told OIG investigators that the foster parents were this family's support system and that they went above and beyond in helping the family even suggesting that unsupervised visits occur in their home so as not to disrupt the children's schedule. The foster parents would leave the home during the unsupervised visits. Ms. Peyton said that the foster mother agreed to be mother's support prior to the decision to return home. She reported that she knew of two occasions that the foster mother took Tariana and Luciano (once to the zoo and once to the aquarium) to give the mother a break. In addition to having completed most services, Ms. Peyton told OIG investigators that the decision to return home was made because the parents had demonstrated the ability to manage the kids, food, and shelter.

Ms. Peyton told OIG investigators that she made regular visits after Tariana and Luciano were returned to their parents' care. According to her contact notes, she made weekly home visits for the first month of return home; two visits in the second month; and once a month visits starting in month three of return home.[40] Mother did her best to keep the kids on the same feeding and nap schedule that they had become accustomed to while in foster care. Ms. Peyton reported that Ms. Malone had the children's schedule posted to her refrigerator.

Ms. Peyton is still involved with the case and the family as supervisor for the current placement worker. She told OIG investigators that she and the foster parents have had contact with Ms. Malone since her incarceration. The foster parents have even brought the children to visit. Ms. Peyton said that mother told

---

[39] Ms. Peyton was the assigned worker from April 2013 to March 2015.

[40] According to her contact notes, following return home, Ms. Peyton made visits on the following dates: 8/2014, 9/2014, 9/2014, 9/2014, 9/2014, 9/2014, 10/2014, 10/2014, 11/2014, 12/2014, 1/2015, and 2/2015.

her that the reason she did not call the foster mother for help was because she didn't want the foster mother or the caseworker to think she couldn't handle things and didn't want her kids taken away.

**Child Protection Investigation – Sequence C**

In March 2015, a hospital social worker called the hotline after Luciano was hospitalized with multiple bruises to his body and a possible fractured elbow. Earlier that day, Alfonso Gee's therapist called the police and stated that 20-year-old Vanessa Malone told her boyfriend, Mr. Gee, that she was going to hurt their children (5-week-old Ethan; 17-month-old Luciano; and 30-month-old Tariana). When police arrived, they had to break the door down and found the mother hiding in the basement and the children unsupervised. Tariana was on the first floor urinating in the corner of a room and Luciano and Ethan were in another room. The police observed Luciano with ice cubes wrapped around a swollen [right] elbow; he had bruising to both arms and bruising on his forehead. The police took protective custody of the three children and they were taken to the hospital for medical treatment and testing. Tests and x-rays revealed that Luciano had fractures to the humerus (upper arm) in both arms; a wrist fracture; and injury to his liver. Ethan had a left ulna (left forearm bone) fracture with signs of healing.

The Hudson Hospital social worker reported the following to the hotline:

> ACTION NEEDED: Children in police protective custody and at hospital for medical treatment and testing. Older two children are wards of DCFS. Reporter states the father's therapist called the police and stated the mother had told the father that she was going to hurt the children. Police came on the scene and had to break the door down and found the mother hiding in the basement. The 1 year old had an ice cube wrapped around his elbow and bruising on the left side of his arm, top of the forehead, and the elbow is also swollen. They are pending x-ray results at this time. The elbow might be fractured. Reporter states the child's ribs also look abnormal and there could have been old rib fractures but that is not diagnosed yet, as test results are pending. The father told police that at 10 pm last night when he came home he noticed the 1 year old child's arm might be broken but he did not seek medical attention as he didn't want to get anyone in trouble. Today the mother had made the statement that she couldn't handle it and would hurt the kids and the father still left the kids alone with the mother today. Reporter states the home was filthy, there is feces and urine everywhere and the 1 year old had fresh vomit all over him. The 1 year old also has some old bruising on his stomach. The one month old has bruising on the side of his face. The 1 month old and 2 year old are currently being examined, so it is unknown if the 2 year old has any marks or injuries at this time. The mother and father have both been arrested. LEADS requested. Reporter did not provide information regarding support systems, history of domestic violence, history of substance abuse, AKA's, disabilities, safety issues for a worker going into the home, or Native American Ancestry. **This family has an open case and DCFS has legal on the older two children. The mother was indicated in 2013 for bone fractures to the now 2 year old. CPD log completed. ISP referral completed.

Allegations of cuts, welts, and bruises by abuse (#11) to Luciano and Ethan by mother; medical neglect (#79) to Luciano by father; substantial risk of physical injury/environment injurious by neglect (#60) to the three children by father; and environmental neglect (#82) to the three children by mother and father were taken for investigation.

The next day, allegations of internal injuries by abuse (#4) and bone fractures by abuse (#9) to Luciano by mother and bone fractures by abuse (#9) to Ethan by mother were added after the following was reported to the hotline:

Reporter called stating that the results of the tests and X-rays from last night's (03/2015) incident were received today, resulting in the following: Ethan Gee, age 1 month a fractured Ulna. Lucianno (sic) Gee, age 1, tests revealed Fractures to the Humerus in both arms, wrist fracture and internal injury to the liver.
Lucianno (sic) has extremely elevated LFT [liver function test].

Child Protection Investigator Valentina Watson was the assigned investigator.

The day after the first C-sequence hotline call, the order of protection entered against mother and father in August 2014 was vacated. A petition for adjudication of wardship was filed as to Ethan Gee. DCFS was awarded temporary custody of the three minors and they are all placed with Tariana and Luciano's former foster parents, Mr. and Mrs. Olson.

_Hudson Hospital medical records_

A Hudson Children's Hospital Child Protective Services Final Summary by Zoey Ganter, MD dated 12 days after the original C-sequence hotline call reads:

**FINAL IMPRESSION**

At this time, Luciano was admitted with severe right arm swelling with underlying proximal humerus corner fracture – acute. Complete medical work-up including shoulder aspiration ruled out infection. In addition he presented with several bruises/contusions to his arms and chest. These appeared acute and resolved rapidly.

On further work-up, he was found to have an occult left proximal humerus corner fracture and a right distal radius (wrist) corner fracture that was confirmed on dedicated wrist x-rays.

In discussion with the police and DCFS, the history provided is that mom reports getting frustrated with the child crying and picking him up by the arms. Picking him up in a reasonable manner that you would handle a toddler would not result in these injuries. In addition they are of differing ages. The corner fracture on the wrist is unable to be aged.

This child's siblings have also sustained fractures that have occurred only in parents care. There is no evidence of bone disease. According to the GAL and the foster agency, this child and his sister have not sustained any fractures while in foster care. According to the records sent to me which I have reviewed there is no mention of the child sustaining a fracture or injury in foster care.

Lastly, Luciano was admitted to Omega Hospital in January for FTT that was determined to be non-organic. According to the PMD records we obtained, this child appeared to be growing along the growth chart while in foster care. It is concerning that his FTT occurred when reunified with his parents.

In this investigation an adequate explanation has not been offered for the injuries in this child or in his 5 week old sibling who was found to have a healing fracture.

**FINAL MANNER AND RECOMMENDATIONS**
Abusive

The final impression for Ethan reads:

> 5 week old with unexplained left ulna (left forearm bone) fracture with signs of healing. On the day of presentation there was no tenderness or external signs which correlates with a healing fracture. There is no report of trauma or injury. Birth records do not indicate trauma from birth. Ethan was not a big baby, there is no shoulder dystocia described, and no concern of him being stuck or requiring extra efforts to be delivered. In addition, fractures from birth trauma are uncommon and typically are clavicle fractures or, more rarely, humerus fractures.
>
> In such a young baby who is not mobile, an unexplained fracture is extremely concerning – this is traumatic injury that no one has an explanation for. His bones appear normal on skeletal survey as do his siblings bones. There is no concern for bone disease at this time. In addition, his siblings have both sustained fractures. As far as we are aware, all fractures have occurred in parents care and no fractures by report when the siblings were in foster care.
>
> Unexplained fracture in this context is highly suspicious for inflicted injury. In a setting where there is a vested interest in hiding the truth, we do not know what happened to this child and the most likely explanation is inflicted injury. When taking into account the siblings injuries, it seems to correlate. Return to the environment he was in where no one can explain his injury is extremely high risk and in this baby the ultimate risk is death.

Following a formal investigation, in May 2015, father was indicated for medical neglect (#79) to Luciano and substantial risk of physical injury/environment injurious by neglect (#60) to Luciano, Ethan and Tariana. Mother was indicated for bone fractures by abuse (#9) to Ethan and Luciano; internal injuries by abuse (#4) to Luciano; and cuts, welts and bruises by abuse (#11) to Luciano. Both parents were indicated for failure to thrive (#81) to Luciano.

## TIMELINE



**September 2013**
Hotline called for substantial risk of physical injury of Luciano.

**January 2015**
Luciano was admitted to the hospital due to possible failure to thrive.

**August 2014**
Luciano and Tariana were returned to their parents under an order of protection.

**February 2013**
Hotline was called because Tariana was found to have fractures.

**October 2013**
Luciano entered care.

**February 2015**
Ethan was born.

**April 2013**
Placement case was opened for abuse.

**November 2014**
Mother was discharged from individual therapy. (Father continued once a month).

**February 2014**
Bio-parents were granted unsupervised visits

**March 2015**
Third hotline call after father reported to therapist mom's threat to kids.

Jan Feb Mar Apr May Jun Jul Aug Sep Oct Nov Dec | Jan Feb Mar Apr May Jun Jul Aug Sep Oct Nov Dec | Jan Feb Mar Apr
2013                                            2014                                            2015

<u>Current Permanency Plan</u>

Serenity Higgins completed an integrated assessment in April 2015. In the assessment, Ms. Higgins noted that based on previous service plans and current prognosis for Mr. Gee and Ms. Malone, no recommendations were being made for services. She recommended that parental rights be terminated and that DCFS Legal be consulted in order to determine how to proceed. The prognosis for each parent reads:

**Prognosis**
When considering the reunification between Ms. Malone and Tariana, Luciano and Ethan, the prognosis is poor. Ms. Malone has lost custody of her children prior to the most recent case opening. Documented injuries have indicated major bone breaks in her children under the age of 1. Ms. Malone does not take responsibility for the injuries. She has received treatment and services (parenting classes, domestic violence training and therapy), but has not made gains as noted by the continued domestic violence as well as severe maltreatment of all 3 children. Ethan, 2 months, suffered an unexplained left ulna (arm) fracture, indicating the presence of severe maltreatment. Tariana, Luciano and Ethan have experienced parenting that has likely been influenced by Ms. Malone's trauma history and mental illness which have severely impacted her judgment, insight, affect regulation, behavioral controls and empathic abilities. Thus it is recommended that the case worker consult with DCFS Legal to consider the expedited termination of parental rights.

When considering the reunification of Mr. Gee and Tariana, Luciano and Ethan, the prognosis is poor. Mr. Gee has lost custody of his children prior to involvement in the current open case. Although he has not been indicated for the abuse of his children, Mr. Gee failed to seek appropriate medical attention for them, knowing they had sustained severe injuries. Documentation exists indicating the ages of the bone breaks sustained by the children under the age of 1, denoting a degree of healing, pointing to the presence of neglectful parenting. Mr. Gee appears to take some responsibility of negligence however has struggled to make changes after receiving treatment and services like domestic violence training, parenting classes and therapy. Although Mr. Gee has made some progress, it appears unlikely he will be able to resolve issues in a 6-12 month timeframe. It is recommended that concurrent planning take place at this time.

Tariana, Luciano and Ethan remain in their adoptive placement with Mr. and Mrs. Olson. The Olsons are willing to provide permanency for all three children. Mother agreed to sign surrenders.

Mother has been incarcerated in county jail since March 2015; she is awaiting trial for aggravated battery of minors. Father is currently residing in Arkansas and has only visited with the minors once since the children reentered foster care. The worker's last contact with the father was in April 2015 and his only visit with the minors was in May 2015.

Parental rights were terminated as to father and the permanency goals for the children were changed in court in April 2016 to adoption.

## ANALYSIS

In February 2013, the hotline was contacted after five-month-old Tariana Gee's physician ordered a skeletal survey because she was not using her left leg and it was presumed broken. The doctor had heightened concerns because Tariana had previously been diagnosed as failure to thrive and the doctor noted that the mother had not been following up with her well-baby care. Tariana's eighteen-year-old mother had a black eye when she brought Tariana to the doctor. She and the thirty-three-year-old father were living together at the time and had a history of domestic violence.

The skeletal survey revealed that Tariana had suffered multiple metaphyseal fractures in different stages of healing.[41] An MPEEC doctor determined that because of Tariana developmental level, the type and extent of the injuries, and the lack of a reasonable explanation for them,[42] the injuries were most likely abusive in nature. The child protection investigation resulted in indicated abuse findings against both parents as perpetrators and Tariana entered foster care in April 2013. Five months later Luciano entered care at birth.

While the prognosis for return home was guarded to poor, both parents readily engaged in services and worked towards reunification. Although neither parent ever admitted to hurting Tariana, they both

---

[41] Tariana's injuries would fit within the middle category of Severe Assault under the new Maltreatment Continuum. The Maltreatment Continuum, based on the Abuse Dimensions Inventory and Conflict Tactical Scales for Parent and Child, is a visual tool illustrating child abuse characteristics and their severity. The recommended intervention for the severe assault category is Evidence-Based Parent/Child Family Rehabilitation Intervention.

[42] The mother initially stated that Tariana was hurt when the walker the infant was in collapsed. She would later say that the infant may have been hurt during a disagreement when she tried to take the infant away from the father; she was angry, the father would not let go of the infant, and she may have been rougher than she realized.

"acknowledged that ultimately they were responsible for their daughter's safety as her caregivers."[43] With starts and stops, both parents completed domestic violence services and substance abuse treatment. Ms. Malone and Mr. Gee were engaged in individual therapy since June 2013. In addition to individual therapy, there were four joint sessions involving both parents and their therapists; however, all four sessions occurred prior to the children's return home. It would have been prudent to initiate in home couple or family therapy sessions once the children were returned.

The family never received targeted parent-child interventions to address parental attachment to a seriously abused, failure to thrive infant. Although the integrated assessment recommended PCIT, the agency was correct in their determination that this was not an appropriate service because of Tariana's age. A more appropriate referral may have been Child Parent Psychotherapy, which does both observation and intensive relationship work with parent and child.

In August 2014, almost two-year-old Tariana and 11-month-old Luciano were returned to their mother and father's custody under a protective order. Both parents continued to meet with their Sigma recovery coaches and their therapists; although Ms. Malone's individual therapy sessions mostly occurred by phone following the children's return. Twenty-year-old Vanessa Malone was four months pregnant with her third child when Tariana and Luciano were returned.

### Decrease in Support & Oversight & Increase in Childcare Responsibilities

At the same time that the parents' childcare responsibilities were significantly increasing, the family's support and oversight were reduced in preparation for case closure. Following Tariana and Luciano's return home, mother's individual therapy sessions were reduced to once a month and occurred by phone. The caseworker's home visits also gradually decreased to once a month. Within a three month time span, remaining services ended. Mother was discharged from individual therapy, with her last session occurring on November 15. Subsequently, the Sigma recovery coach successfully discharged both mother and father in December 2014.

Once services were completed, the family's only identified support system was the children's former foster parents. The involved professional's optimistic belief that the mother could or would find the time to proactively seek assistance from the foster parents or others was unrealistic. The young mother was caring for two toddlers without the assistance of the father, was isolated with no friends or family nearby, and was well into her third pregnancy.

The agency's reduction of services followed a routine path of reunification. According to Rule and Procedure, agencies are required to provide six months of aftercare, but there are no guidelines as to what services may be appropriate or available. Procedures address the frequency of visits required post reunification: following return, an initial face-to-face intervention with the child and parent must be made via a visit in the home by the assigned caseworker within 24 to 72 hours after the child's return home. Following the initial visit, weekly or more frequent intervention and contact, as determined by the supervisor, with the child and parent in the home is required for the first month following reunification and at least two of the visits during the first month must be unannounced. Frequency of intervention and contact subsequent to the first month of reunification shall be at least monthly until such time as safety and risk assessments indicate that there are no longer sufficient safety or risk factors present to require continued contact (see Section 315.110 c). Procedures do not address when such visits shall occur, such as higher stress times of meal preparation, bath-time, or bed-time, to evaluate family functioning.

---

[43] This generic therapeutic acknowledgement of having a generalized responsibility for the overall child's safety is similar to the therapeutic non-disclosure offered in the Wesby investigative report (OIG #13-1393).

In January 2015, sixteen-month-old Luciano was hospitalized for failure to thrive, a condition that mirrored Tariana's history prior to her abuse. The medical records noted that Luciano had a normal growth curve until 11 months when he returned home and there was a deceleration in his growth curve that crossed the percentiles. He was observed for 48 hours; his weight improved over a 36-hour period and he was discharged to his mother with detailed instructions regarding his feeding and follow-up medical care. At the time of his discharge, the children were still under DCFS guardianship with a protective order. The red flag of Luciano being diagnosed with failure to thrive while in his mother's care, just like his sister, seems to have been missed by the caseworker. Rather, she believed that Luciano was simply in a stage of development where his appetite had changed.

Documentation from a February 2015 follow-up medical visit noted "parents to enroll in WIC and home nursing visiting program through Beta." Sadly, Ace Agency had failed to assist the mother in enrolling herself and the two children into the WIC program at the time of the children's return home in August 2014. This preventive intervention was crucial for a family that previously had a failure to thrive child.

Less than a week after Luciano's release from the hospital, Ms. Malone gave birth to her third child. Ms. Malone was now responsible for a newborn and two toddlers, one with a recent diagnosis of failure to thrive requiring amongst other things more frequent doctor's visits. The children's father was a "traditionalist" in his view of the male/female roles and was mostly absent as he worked long hours to support the family financially. This was an acutely stressful situation for anyone, let alone a young mother, with a history of impulsivity, who had only cared for one child for five months prior to her removal because of abuse. Logic would have called for proactively increasing services that would both provide more eyes on the children as well as assist the mother in caring for them.

In this case, the optimism associated with a potentially successful reunification appeared to blind the agency to the acute environmental stresses associated with a young mother caring for three children under the age of three with little to no support. Day care and early Head Start programs were not sought for this family despite the fact that several options existed close to the family's home including the Echo infant/child day care program; Kappa Child Development Center;[44] and Phi Early Care and Learning Center.[45] Both the Echo and Kappa childcare programs offer community support to young parents. The Inspector General has conducted community mapping trainings at the Phi Center because of its commitment to the community. Most private agencies are familiar with employment related day care but are not aware that parents are eligible for subsidized child care services at the point of their children's return home date, for a maximum period of six months thereafter (see Procedures 302.330). There are no conditions attached to the service.

The Department's reunification procedure is unclear with regards to whether reunification services can be extended and intensified for good cause past six months. Reunification, although a positive milestone for the family, is also a time of readjustment for the family. The provision of support services and monitoring of the family can be critical following the children's return home and the family's needs may actually be greater than when the children were in foster care. Support networks such as daycare, Head Start, respite care, peer support groups, linkages with the health and education systems and other community-based services can provide families with protection from the possibility of further disruption. In addition, when return home coincides with major life events, such as the birth of a baby; start or loss of a job; change in housing; or identification of a health condition, the family should receive additional supports and services.

---

[44] This center accepts two-year-olds for Early Head Start and is located a little over a mile away from the family's home.

[45] This center provides both infant and child care services starting at six weeks of age.

**RECOMMENDATIONS**

1. The Department should issue a notification to all private foster care agencies and Officers of the Court that six months of daycare can be funded as part of reunification services.

2. Prior to return home, staff must develop a reunification plan that identifies basic necessities (food, beds, diapers, etc.); support services (homemaker, visiting nurse, counseling, early intervention, Head Start, day care, school, respite care, etc.); and community resources appropriate and available within close proximity of the family's home (WIC, food pantry, local library, etc.). The Department must ensure that the family is securely anchored to supportive services.

3. The Department should fund transportation to daycare or Head Start programs in return home cases where there are multiple young children and the parents – because of poverty or increased stress – cannot transport their children.

4. The Inspector General will share this report with Ace Agency.

# OFFICE OF THE INSPECTOR GENERAL
### Department of Children and Family Services

---

### *REDACTED REPORT*

---

*This report is being released by the Office of the Inspector General for teaching/training purposes. To ensure the confidentiality of all persons and service providers involved in the case, identifying information has been changed. All names, except those of professional references, are fictitious.*

---

**File No:**     16 - 2485
**Child:**     Easton Hurst
            DOB**:** 08/1999
            DOD**:** 03/2016
**Subject**:     Death Investigation


## SUMMARY OF COMPLAINT

Easton Hurst, a 16-year-old youth in care placed at Palmetto, died in March 2016 at Bluebill Medical Center in Yarrow, Illinois. The autopsy completed the following day noted that Easton, who was over six feet and two hundred pounds, had the following injuries: petechial hemorrhages both in and around his eyes;[46] four lacerations on the inside of his lower lip with the largest measuring 0.15 inches; 1 inch bruise on the left elbow; 0.5 inch bruise on his right temple; 0.3 inch hemorrhage on the left side of his neck extending from the superior rim of the thyroid down to the hyoid bone.[47] Internal examination revealed pulmonary congestion and edema. The brain had a dusky blue appearance with evidence of anoxic encephalopathy. The medical examiner ruled the cause of death as asphyxia due to restraint, manner homicide.

At the time of his death, Easton was placed at Palmetto's Crow House in Rosewood, Illinois. The evening staff reported that Easton was having difficulty following directions and became physically aggressive. During a restraint performed by Palmetto staff, Easton became unconscious and staff called 911. The Palmetto nurse began CPR while waiting for paramedics. According to Emergency Room records, Easton received 10 rounds of epinephrine from paramedics and did not have a heart beat upon arrival.[48] He received an additional five rounds of epinephrine in the emergency department. Easton was pronounced dead at 11:10pm.

---

[46] Petechiae in the eyelids, conjunctivae, and sclera are a result of increased pressure in the microvasculature when the neck is compressed and is a sign of asphyxia.

[47] Injuries to the skin and soft tissue of the neck can indicate evidence of compression and asphyxia. Graham, M.A. (2016). Pathology of Asphyxial Death. *Medscape.* Retrieved from: http://emedicine.medscape.com/article/1988699-overview#a8

[48] Epinephrine is used during cardio pulmonary resuscitation efforts in order to improve coronary and cerebral blood flow. Doses may be repeated every 3-5 minutes.
Buck, M. L. (2010) A Review of Medications for Pediatric Cardiopulmonary Resuscitation. *Pediatric Pharmacotherapy 16*(7). Retrieved from: http://www.medscape.com/viewarticle/726741_3

Two Palmetto staff members were arrested that night in connection with the death of Easton. Ralph Sparks was charged with involuntary manslaughter and obstruction of justice. The involuntary manslaughter charges were dropped and he was convicted of obstruction of justice. Derek Belan was charged with obstruction of justice; prosecutors dropped those charges in exchange for his testimony against Ralph Sparks.

A consultant completed an Independent Review on Palmetto's Residential Treatment Services and DCFS Clinical completed a Special Focus Review of Easton's case. IG investigators reviewed both reports. The The consultant's report made specific findings and recommendations. Palmetto's President Tara Wilkerson shared Palmetto's response with IG investigators. Some of those responses and subsequent actions are noted in this report; this report, however, does not cover all areas of the consultant's review. The DCFS Clinical Review noted that Easton's extensive trauma required increased efforts towards the possibility of creating a "lasting adult connection through identifying fictive kin or a specialized foster home."

## INVESTIGATION

### Background
Easton is the child of Juliette Hurst and Oscar Goodwin who were married at the time of his birth, according to the integrated assessment. Prior to coming into care, Easton lived with his parents and then his grandmother and the family had intermittently received intact services from the Department. Easton's mother has a history of chronic substance use and chronic mental health problems, including reported diagnoses of paranoid schizophrenia and bipolar disorder. At 24 years old, in 1992, Ms. Hurst gave birth to her first child, Kingsley. She had four more children over the next nine years: Violet in 1993, Mikaela in 1996, Easton in 1999 and Kennedi in 2001. The family received intact services from the Department prior to Easton's birth. Shortly after Easton's birth a second intact family case was opened with the family from October 1999 until June 2001. Two years later the Department opened a third intact family case from January to June 2003. In 2004, the maternal grandmother, 51-year-old Jade Zimmerman (DOB (2/1953) obtained private guardianship of five-year-old Easton and his three-year-old sister Kennedi.

*Intact Family Case*
In April 2007, while seven-year-old Easton and six-year-old Kennedi lived with Ms. Zimmerman, the Department opened a case with Mr. Goodwin and Ms. Hurst after Ms. Hurst took ten-year-old Mikaela for an abortion. Professionals at the abortion clinic called the hotline because the mother did not seem concerned about the pregnancy and subsequent abortion. The Department indicated an adult paternal cousin, Henry Goodwin, of the sexual penetration of Mikaela and risk of sexual harm to 13-year-old Violet. Fourteen-year-old Kingsley was interviewed and denied that anyone touched him or that he knew what was happening to his siblings. During the investigation, Mikaela told a relative that her brother, Kingsley, raped her; Violet also disclosed that her brother raped her. Relatives reported to child protection investigators that the mother knew that the abuse had taken place and that she had told her daughter to keep the door locked so her brother could not mess with her. However, the mother reported that her husband had kicked her out of the home several months earlier in December and that was when Henry Goodwin lived in the home. The mother shared that she did not take medication for schizophrenia because she did not have a medical card, but she would buy medication from friends if she started hearing voices. Ms. Hurst told the CPI she was not hearing voices at that time. The mother reported that she had been clean and sober for four years, but also reported using cocaine and heroin once a month. During the investigation, DCFS ruled out the grandmother Ms. Zimmerman as a placement for Violet and Mikaela,

because the grandfather, Francis Brown, lived in the home and had been indicated for sexual penetration.[49] There was no discussion of Easton and Kennedi being at risk in the home.

The Department opened intact family services with Oscar Goodwin and his daughters as well as 14–year-old Kingsley. After living under a safety plan with an aunt for about a month, both girls entered foster care in May 2007. At the time, Mr. Goodwin was seriously ill and required dialysis. He requested his children be returned to him so they could assist in caring for him.[50] Within five months, October 2007, the father was hospitalized and put on life support. He died two days later. According to DCFS records, the aunt took both of his daughters to the hospital to say goodbye to their father. There was no record that 14-year-old Kingsley entered foster care at the time of his father's death. Both Mikaela and Violet remained with the aunt who obtained subsidized guardianship. Violet re-entered foster care in October 2010 and was placed in a specialized foster care placement. In 2012, her case was transferred to a program for teen parents because she became pregnant; she was placed in a transitional living program. Throughout her case, Violet often stayed with her mother, Juliette Hurst in an unauthorized placement. The Department closed Violet's case in December 2014 when she turned 21 years old.[51]

In 2011, the grandmother returned 12-year-old Easton to his mother, citing that she could not manage his disruptive behaviors, but she retained guardianship. At the time, Juliette Hurst continued to struggle with substance abuse and mental health problems. The mother later reported to DCFS that her son was psychiatrically hospitalized at least six times while in her care.[52]

On February 7, 2012 Easton was admitted to Dahlia Hospital after threatening to kill himself. According to hospital records, Easton pulled a knife on his sibling and had been non-compliant with medication.[53] Easton told staff that "I got angry and stated I wanted to kill myself. I didn't mean it." Easton had a prescription for Concerta 54 mg, but reportedly would spit it out of his mouth. Diagnosis at admission included Impulse Control Disorder; the psychiatrist started him on Risperdal to address impulsivity.

The hospital social worker noted that Ms. Hurst said Easton had been removed from her care and had lived with his grandmother for nine years before returning to her home three months ago. Easton's 19-year-old brother Kingsley lived in the home as well as Ms. Hurst's partner, Grant Wolfe, whom she referred to as Easton's step-father. Ms. Hurst disclosed her history of bipolar disorder, schizophrenia and substance use disorder diagnoses, reporting that she took psychotropic medication. She also shared that Kingsley had a history of substance abuse, but had received treatment. Ms. Hurst did not work, but Mr. Wolfe was employed. The mother shared that she had problems with Easton, stating Easton had a history of stealing from family members, had fought at school three to four times a week and had been suspended several times. He also reportedly broke a cat's paw. The social worker identified his intact family as one of Easton's strengths, as well as his desire to work on his anger problems. Ms. Hurst believed that she had

---

[49] DCP indicated Francis Brown for sexual penetration of his niece in July 2004(SCR#0704A). The 13-year-old made the disclosure to a Sunday school teacher, stating that it happened approximately two years earlier at least three times while her uncle babysat.  She reported never telling anyone. The mother reported that she and her husband had separated that they no longer saw paternal relatives. She had reported the abuse to her husband.  The mother alleged the paternal relatives did not believe the child and protected the whereabouts of Francis Brown. Mr. Brown was never located or interviewed by DCP.

[50] During the first weeks of the case, Mr. Goodwin did not cooperate with providing financial assistance for items his daughters needed.

[51] According to Department of Healthcare and Family Services Data, Violet and her now four-year-old son reside in Boleyjack. There has been no further contact with DCFS.

[52] The OIG located psychiatric medical records for Easton Hurst from Dahlia Hospital, Lowery Figueroa Hospital and Navarro Hospital.

[53] According to Medicaid Recipient Information from DHS, Easton received psychiatric services in 2008 but there was no record of a prescription filled for psychotropic medication.

a good relationship with her son, but admitted that the transition had been difficult. The mother indicated that the grandmother lived three blocks away and could provide support.[54]

Hospital staff recorded that Easton had a history of aggressive outbursts and below average intelligence.[55] They also noted that Easton generally had a flat affect, became irritated when people touched him, had difficulty focusing for prolonged periods, appeared easily agitated, and ignored rules. Nursing staff assessed that Easton fed into peers' negative behaviors, called them names, was disruptive and impulsive, and had to be removed from group sessions due to a need for constant redirection. Easton did not demonstrate any aggressive behavior while hospitalized. The psychiatrist documented that Easton lacked insight into his behavior, but the medication appeared to be calming him down. He remained hospitalized for six days and was discharged on February 13 with a diagnosis of Mood Disorder and a prescription for Risperdal 0.5 mg twice daily. Follow-up care would be provided through Dove Clinic with outpatient therapy.

About three months later, on May 11, 2012 security staff from Merlin School called Lowery Police after an incident involving 12-year-old Easton. During a disturbance, Easton struck the security guard with his feet and fists. Lowery Police cited Easton for battery and took him into custody.

On July 11, 2012, Easton was transferred from Ulysses Hospital's emergency room to Lowery Figueroa Hospital for homicidal ideation towards his brother and grandmother. Eason reported that he threatened his brother and grandmother with a knife. He stated that his mother had not been giving him his medication and he had difficulty with focus, concentration and managing his anger.[56] The evaluator noted that the 12-year-old, weighing 165 pounds and five feet five inches tall, appeared older than his stated age. At the hospital, Easton was stabilized with medication. On July 17, he was discharged to his grandmother with a prescription for Risperdal and follow-up appointments.

From July 19 through 24, 2012, Easton attended Navarro partial hospitalization program with a diagnosis of intermittent explosive disorder and a need for assistance with anger management. Navarro provided medication management as well as group, expressive, and family therapies. During the partial hospitalization program hours, Easton did not display any aggressive behavior or homicidal ideations. Staff noted that Easton had problems with anger, authority figures, peers and siblings; he had punched or broken things when angry; and he received multiple suspensions for fighting. The record stated that he had been arrested for fighting with police and placed on probation for four months.[57] When staff interviewed Ms. Hurst, she reiterated Easton recently moving in, her own mental health and substance abuse problems, and that she still struggled with Mr. Goodwin's death five years earlier. Easton was discharged from the program because of insurance issues. He would continue with Risperdal liquid 0.5 mg twice a day.

On September 26, 2012, Lowery Police arrested Easton at Merlin School for aggravated assault of a teacher/school employee. A teacher called police after Easton became verbally aggressive and stated "I am going to stick you" while walking towards the teacher. According to the police report 13-year-old Easton was 5'7" and 175 pounds. His mother was notified and Easton was released from police custody

---

[54] The maternal grandmother remained Easton's legal guardian at this time. She signed all consents for treatment and medication during Easton's hospitalization.

[55] Easton's specific IQ was not stated in the record.

[56] He had two prior hospitalizations at Dahlia Hospital.

[57] This information may have been provided by the mother. There is no record of Easton being on Juvenile Probation in County A at that time and IG investigators were unable to locate a police report. It is possible the petition was not filed in court on the condition of completion of a term of supervision. Following the completion the records would be expunged.

with a court date scheduled for October 24, 2012.[58] IG investigators were unable to determine the disposition. Lowery Police records also document an arrest for possession of cannabis at Merlin School on December 6, 2012. School staff noticed a strong odor of marijuana from Easton's coat and called the police. This incident was handled by the police as a station adjustment.

**County A Juvenile Justice Court and Finding of Dependency**
On May 4, 2013 Easton became physically aggressive with his mother and 20-year-old sister Violet, in the presence of his three-month-old nephew, after he was confronted for stealing his brother's wallet. According to Ms. Hurst, after she confronted Easton about the stolen wallet, Easton became angry and began to choke her. Violet attempted to intervene while holding her three-month-old son. Easton then attempted to hit Violet with a closed fist but accidentally hit the infant. The infant was taken to the hospital for medical attention. Lowery Police arrested Easton and charged him with two counts of domestic battery, one count of assault, and theft. The 13-year-old was detained at County A Juvenile Detention Center and the judge vacated his grandmother's guardianship order appointing DCFS as guardian under a delinquency petition. His mother, Juliette Hurst, refused to press charges and the judge dismissed the juvenile justice case. Violet's Transitional Living Program was unaware of the incident; the TLP's records were also silent on Violet's stays with her mother. The Department assigned Lily Dougherty as Easton's case manager on May 30, 2013. Four days later, on June 3, 2013, delinquent charges were dismissed because the family would not agree to testify, the mother stating she wanted Easton to get help.

After release from juvenile detention on June 3, 2013, Easton was placed at Kappa shelter where he remained for nearly three months. While placed at the shelter, staff reported that Easton had kicked a special needs resident in the stomach for "touching him" and had run away twice. Ms. Dougherty took Easton for interviews with residential programs at Thoreau and Victory. Easton attended but refused to actively participate in the Victory interview. During the interview, Easton reported that he was actively gang involved. The staff member surmised that Easton likely did not want to attend their program because of its location in gang territory. On August 22, the Department transferred Easton from Kappa Shelter to Redwood Shelter for four days after he kicked an autistic resident. Staff noted that Easton appeared to have no empathy or concern for people with disabilities.

On July 5, 2013, an integrated assessment was submitted. It reiterated the mother's personal history and the family's history of DCFS involvement. The mother indicated that she received social security income but was inconsistent with psychiatric treatment and medication compliance. Despite the mother's history of substance use, the screener never asked if Easton may have been alcohol exposed in utero. Current research from the National Institute of Health posits that prenatal alcohol exposure is associated with a risk of psychiatric problems including learning disabilities, conduct disorder and poor impulse control and is difficult to diagnose without maternal history. Obtaining the information could have assisted in the assessment of Easton. Bell & Chimata (2015) found that neurodevelopmental disorders associated with prenatal alcohol exposure are a serious public health problem for lower-income African American communities on Chicago's South Side.[59] Continuing research is being conducted on the use of vitamin supplementation to those individuals who were exposed to alcohol prenatally to ameliorate some of the behavioral effects.[60]

---

[58] The court date was listed in the police report. The County A Court Clerk System has no record of court activity for this incident.

[59] Bell, C. C. & Chimata, R. (2015). Prevalence of neurodevelopmental disorders among low-income African-Americans at a clinic on Chicago's South Side. *Psychiatric Services*; 00, 1-4.

[60] Nguyen, T.T.; Risbud R.; Mattson S.; Chambers C.; Thomas J. (2016) Randomized, double-blind, placebo-controlled clinical trial of choline supplementation in school-aged children with fetal alcohol spectrum disorders. *American Journal of Clinical Nutrition* 104: 1683-1692

The clinical screener noted that Ms. Hurst had difficulty recalling and communicating past abuse and neglect of her children. Ms. Hurst stated her mental health issues, high blood pressure and diabetes were barriers to her parenting and discipline strategies had not worked with Easton. Ms. Hurst declined individual therapy, agreeing only to participate in family therapy to maintain a relationship with Easton. The clinical screener assessed the prognosis for reunification between Ms. Hurst and Easton as poor and recommended concurrent planning.

> Ms. Hurst was very vocal about her desire to not reunify with Easton. She stated on several occasions that he is not allowed back into her home. Ms. Hurst has subjected Easton to multiple adverse experiences, traumatic events, and abandonments. It appears her remorse for her actions is minimal and she has limited empathy for Easton's experiences. Ms. Hurst is not willing to participate in any services outside of family therapy in order to reunify. She is in need of multiple services including substance abuse, psychiatric, and mental health. Ms. Hurst's unwillingness to participate in services will prevent reunification from ever occurring.

The clinical screener assessed that Easton demonstrated difficulties in several areas of functioning, exercising poor judgment, aggressive behavior and lack of empathy and remorse. His self-reported gang involvement and substance use, smoking five marijuana blunts a day, placed him at increased risk. The screener recommended a substance abuse assessment and treatment, specifically intensive outpatient or inpatient services. Given the mother's report of Easton's prior psychiatric hospitalizations, the screener recommended obtaining his psychiatric records and participation in a psychiatric evaluation. Individual and family therapy would be needed to address his trauma history and assist in his "tenuous" relationship with his mother. Finally, the screener recommended a multi-disciplinary school staffing to assess Easton's needs and strengths to prevent failure and behavior problems in the classroom.

**Placement at Palmetto Homes**

On August 26, 2013, Palmetto admitted Easton to their Bard Homes program. Bard Homes is located in an neighboring state, 20 miles from Palmetto's main campus in Illinois. Just days after being placed, Easton was arrested on September 1, 2013 for stealing a bicycle in Rhodes, Illinois, approximately two miles from Bard.

Within the first month of placement, Palmetto's psychiatrist, Dr. Moss, diagnosed Easton with conduct disorder, intermittent explosive disorder, enuresis and cannabis use disorder. The psychiatrist prescribed 25 mg Thorazine to be given three times a day to address Easton's anger control. Dr. Moss recommended that Easton participate in individual, group, family and recreational therapy at Palmetto. The consent unit approved use of Thorazine to address aggression, agitation and irritability and DDAVP medication for nocturnal enuresis. [61] Easton saw Dr. Moss for monthly medication monitoring. In Easton's initial Mental Health Assessment (MHA), completed on September 19, 2013, Easton was described as irritable, aggressive and sad, which he externalized as problematic behaviors.

At a September 24 30-day placement staffing, Easton's case manager Ms. Dougherty shared with Palmetto staff that the mother did not want Easton to return home and refused to participate in services except family counseling to maintain a relationship. Staff noted Easton was in eighth grade at the on-ground therapeutic school though he tested at the fifth grade for math and second grade in reading. Staff reported that Easton had been restrained three times and attempted to go on run three times. Despite his mother's consistent statements that Easton could not return to her, the final discharge plan was return home to Ms. Hurst with concurrent plan of discharge to a group home by January 2015.

---

[61] His prior medication of Risperdal had been discontinued. The enuresis was related to the use of Thorazine.

Easton participated in a substance abuse evaluation through Zeta Agency on October 17, 2013. During the evaluation, Easton reported alcohol and cannabis use beginning at the ages of nine and seven years respectively. The evaluator recommended random urine screens as well as Level 1 treatment, which consisted of eight weekly substance abuse group sessions. In an October 2014 follow-up, Zeta noted that Easton attended one of the eight sessions, partly because he was held in juvenile detention in June and July 2014, during weeks two through seven of treatment. On the eighth week, Easton refused to attend. He was subsequently re-referred for treatment and completed all eight weeks successfully on January 22, 2015.

As Easton adjusted to placement at Palmetto, the court set the initial permanency goal as return home within 12 months. During a visit in October 2013, Ms. Dougherty informed Easton that his mother would begin visiting Palmetto two Saturdays a month. Ms. Dougherty encouraged Easton to participate in services and cooperate with staff so that he could return home. However, on November 11, 2013 Easton became physically aggressive with Palmetto staff after refusing to follow staff instructions. According to a complaint filed by Easton, staff member Andreas Compton shoved him and stomped on his head during a restraint. A Palmetto nurse examined Easton and found no evidence of physical injury. At a November 21, 2013 permanency hearing all parties agreed the return home within 12 months goal was contingent on Ms. Hurst engaging in individual therapy, drug assessment, random urine drug screens, and providing consent for release of information for the case manager to speak with her psychiatrist. However, Ms. Hurst, who was present at the court date, again refused services and stated that she did not want her son returned to her care. The concurrent plan was for Easton to step down to a group home with a goal of independence.

Around this time Easton was referred to County B Illinois juvenile court for the September bicycle theft and was given 25 hours of community service, which he completed working in the dining room at Palmetto.

During the holidays in November and December 2013, Palmetto took Easton to visit his mother at her home. The visits were supervised by his maternal grandmother. However, in February 2014 Ms. Dougherty documented that Easton's home passes would be suspended after he admitted smoking marijuana at home during a weekend visit from February 15 to February 16.[62] Dr. Moss ordered urine drug screens after Easton returned from home visits.

Easton continued to display aggressive behavior. In March 2014, Easton and another peer attacked Palmetto staff member, Andreas Compton, who entered Easton's bedroom just around midnight because he smelled smoke. Easton and another resident were smoking a cigarette, refused to extinguish it and became aggressive when Mr. Compton attempted to take the cigarette. Mr. Compton attempted a restraint, Easton struggled and held Mr. Compton in a bear hug while the other resident hit and kicked him. Mr. Compton explained to police that two other staff told Easton to release Mr. Compton, who reported beginning to feel dizzy from the hold. Mr. Compton stated he told Easton that if he did not let go of him, he would have to bite him. When Easton would not let go, Mr. Compton turned his head and bit Easton above his eye. Easton released Mr. Compton who fell to the ground. Palmetto notified the County C Sheriff's Department who took statements from staff and Easton. Bard Homes staff also notified County C Child Protection who conducted an investigation into the incident. Medical personnel took Easton to the hospital for treatment. The injury did not require sutures. Palmetto placed Mr. Compton on administrative leave during the investigations.[63] Staff noted needing further discussion of Easton's

---

[62] Palmetto also included this information in a court report.
[63] According to Palmetto records, Mr. Compton had a Therapeutic Crisis Interventions refresher on September 11, 2013.

triggers and coping skills during meetings to mitigate his risk of aggression. Staff was also to receive training on Therapeutic Crisis Interventions (TCI). Easton stated that he was mistreated and that he did nothing to provoke Mr. Compton's aggression. However, a report from the County C sheriff found that Mr. Compton acted in self-defense and Easton had been the aggressor. The County C Child Protection unsubstantiated the report against Mr. Compton as well. Bard Homes staff had reported no previous incidents with Mr. Compton, though Easton had filed a complaint on Mr. Compton in November 2013 that had been unsubstantiated. That same month, Dr. Moss requested an increase in Easton's Thorazine, up to 75 mg three times a day, based on Palmetto reports that Easton exhibited unstable behavior.[64] The following month Easton requested a decrease in medication, but Dr. Moss noted Easton continued to demonstrate anger, irritability, and impulsivity. Six weeks later, Palmetto staff reported that Easton had a more stable mood and no behavioral issue, and Dr. Moss decreased his Thorazine to 50 mg three times a day.

*Delinquency Charges*
On June 12, 2014 Easton attacked a fellow Bard Homes resident, hitting a peer "in the head, multiple times, with a closed fist." Staff described the victim as appearing unconscious, face down on the ground with "a lot of blood" under his head, and immediately removed Easton from the area. The victim appeared confused, slurred his speech, and was unable to recall what happened. He was taken to the hospital where he received treatment for a concussion. Easton told police the peer fell to the floor after he hit him in the head and he continued punching him until staff removed him. The County C Sheriff arrested Easton and charged him with substantial battery and disorderly conduct.

Two days later, Easton eloped from Bard Homes. He was arrested in Illinois the following day, June 15, for residential burglary and theft. He had broken into a home and stole electronics and alcohol. He had also stolen shoes from a store. Ms. Dougherty attended a court hearing in County B on June 17 regarding the burglary charges while Easton remained in custody at Juvenile Detention. Easton now faced delinquency charges in two states.

On the same day of his burglary charges, Ms. Hurst informed Palmetto staff that she felt it was in both her and Easton's best interests if he did not return to her care. His mother stated she had recently had a miscarriage and she needed to control her diabetes and high blood pressure. She felt she could not handle Easton.

*Illinois County B Juvenile Justice*
On June 26, 2014 the County B judge decided Easton would remain in custody because of his flight risk and the severity of the charges. According to DHFS records, medications for Easton were filled on July 5 while he remained in detention. On July 16, the judge heard testimony regarding the charges of residential burglary. The judge released Easton to Palmetto on July 29 after Easton, on the advice of his attorney, pleaded guilty to the lesser charge of burglary.

Easton returned to Palmetto the next day, July 30, at which time Dr. Moss reduced Easton's Thorazaine to 25 mg three times a day. Psychiatry records noted that Palmetto staff described Easton as "reasonably stable" since his discharge from detention the previous day. Easton reported to Dr. Moss, "I don't know how I ended up in jail. How did that happen?" Dr. Moss noted that Easton had limited insight and social judgement.

---

[64]  The request for psychotropic medication consent documented Easton's height at 5'8" and weight of 203lbs. He had gained forty pounds in six months. The doctor reported that a weight management plan with diet and exercise had been implemented. The medications were approved for 180 days.

On September 30, 2014 the County B delinquency court judge placed 15-year-old Easton on mandatory five years juvenile probation for residential burglary. Five years was the maximum juvenile probation sentence.[65] The conditions of Easton's probation included 50 hours of public service and no contact with the store he stole from or the resident of the home he broke into. The judge further ordered that Easton refrain from violent or harassing behavior, drugs, and gang affiliation. Additionally, he could not have unsupervised contact with the two youth involved in the burglary. Easton's County B probation officer, Mr. Espinoza, told IG investigators that the prior neighboring state battery charge was documented in the probation social investigation; therefore County B Juvenile Justice was aware of the battery in County C. (See Below).

*Neighboring State County C Juvenile Justice (August – October 2014)*

Easton was arraigned in County C court on August 15, 2014 for the charge of substantial battery. The charge had been upgraded because the victim had lost consciousness. According to the petition filed, if the offense had been committed by an adult, it would be considered a Class I Felony with a fine of up to $10,000 and up to three years six months of imprisonment. The court ordered Easton to remain in residential treatment, refrain from discussing the case with his co-defendant and have no contact with the victim. On September 17,  Easton waived his right to a trial and pleaded guilty to misdemeanor battery to avoid a felony case. On October 16, 2014 Easton attended court in County C for disposition of his misdemeanor battery. The state reported that Easton had been sentenced to five years probation in County B Illinois and was expected to be discharged from Bard Homes by the winter of 2015 (see step down below). The court decided to close Easton's case, requiring Easton to pay a $20 victim fee within 90 days. The same month, Dr. Moss discontinued Thorazine noting that Easton made significant progress towards his treatment goals. For the remainder of Easton's placement at Palmetto, he would not be prescribed any other psychotropic medication.

**Goal Change to Independence**

At a County A Permanency Hearing on September 4, 2014, after 12 months in care, Easton's permanency goal was changed to Independence. His mother had informed child welfare staff that she could not parent Easton, citing his continued physical aggression and involvement with juvenile delinquency. Palmetto staff completed a Permanency court report detailing Easton's progress in their program over the last six months. The treatment team described Easton as "control sensitive," meaning he lacked the ability to regulate being told no, being controlled or accepting when he did not get his way. The treatment team made efforts to control him as little as possible by setting expectations, provided his choices did not place himself or others in danger. While Easton had earned higher levels within the programs at times, his success was often short lived and he returned to a baseline of dangerous and maladaptive behaviors. Palmetto staff noted an improvement in his behaviors since his release from detention. He participated in group and individual therapy, but downplayed his behaviors by "externalizing responsibility for his actions on peers or staff." During the court hearing, Ms. Dougherty informed the court of Easton's unusual incidents, including his recent juvenile detention in County B from June 12 through July 29, 2014 and his battery of a peer.

During a child and family team meeting on September 23, Easton requested termination of family therapy. His mother encouraged him to stay engaged in therapeutic services, but Easton continued to request family therapy cease. He also requested assurance that he would be stepped down to a less restrictive environment. Staff participants stated that if he could show progress he could be stepped down. Palmetto terminated family therapy at Easton's request. Supervised visits would begin with his mother in October 2014 and would occur twice monthly at the mother's home supervised by the grandmother.

---

[65] The maximum probation period for juveniles has since been reduced.

Easton continued problematic behavior. On October 8, 2014, Easton received a consequence after "flashing gang signs." Easton then threw a chair at the staff member. Staff restrained Easton and completed the Harm Precaution form. The listed precautions included that he should be in proximity to staff at all times to hear and see actions, he would be restricted from passes until October 15, 2014 and he could not have a roommate. A 1:1 staff/client ratio was recommended. Despite that incident, when Ms. Dougherty visited Easton at Palmetto on October 23, she discussed beginning the step-down process. Easton requested a group home in Dekker and wanted to attend regular school and learn a trade, specifically construction. Ms. Dougherty explained that DCFS Central Matching would provide possible placements and placement could occur in January or February 2015. Ms. Dougherty noted that Easton's behaviors at Palmetto had improved over the last two weeks and he had received privileges to go out in the community with staff.

Easton began visiting his mother again. In December, Easton's mother reported that he stole money from her and his sister that month and requested suspension of his visits. Ms. Hurst even called Palmetto after Easton's Christmas visit requesting that staff search him and his room for $280 he had stolen from her checking account and reiterated she did not want him to visit if he was going to steal.

Palmetto entered Easton into DCFS Central Matching on January 13, 2015; Ms. Dougherty expected Easton could be stepped down in the coming two months. Staff encouraged Easton to write down questions he had for potential group home programs and worked to prepare Easton for a transition. *(See Efforts to Move to Group Home section below)* Though the February permanency hearing was postponed,[66] Palmetto staff reported that Easton had been doing well and was scheduled for a day visit with his mother later in the month. On March 10, Ms. Dougherty participated in a staffing with Palmetto and reported that Easton had been matched with Blue River and Hinton group homes and interviews would be scheduled with both programs. After the meeting, Easton reported being tired of Palmetto; Ms. Dougherty encouraged him to meet his goals so he could be stepped-down. She told him it was a process and he needed to be patient.

At a Permanency hearing on March 19, 2015, Palmetto staff reported the unusual incidents from the prior six months, noting that Easton refused individual therapy. Ms. Dougherty amended the Client Service Plan to reflect that family therapy had ended and removed all of Ms. Hurst's tasks. At this hearing, Ms. Hurst, Ms. Dougherty and the Guardian ad litem, Troy Runyon, asked the judge to approve a motion for unsupervised overnight visitation with Ms. Hurst. Ms. Dougherty explained to IG investigators that despite Easton's limited cooperation with services, when he ran he would go to his mother's home and she suspected his mother would often keep him there for a couple days before calling the caseworker. By having the visits approved it might increase communication between the family and DCFS. The judge granted the motion contingent on a CERAP of the home by the case manager.

**Home Visits**
Ms. Dougherty completed the CERAP of Ms. Hurst's home on March 25, 2015. The case manager noted that the mother's boyfriend, Orlando Moran, could not be on premise during the visits as noted in the court order for visitation. Unsupervised overnight visits would take place twice a month with Palmetto staff transporting Easton to and from his mother's home.

Fairly quickly, behavioral difficulties began. On March 29, he was scheduled to be picked up from his mother's home. When staff arrived, Ms. Hurst informed them that Easton was at a friend's house. After 35 minutes, a Palmetto supervisor instructed the staff member to return to the facility without Easton as they had two other residents in the van. Easton arrived just as the staff were leaving and agreed to return to Palmetto with them. While driving back, staff informed Easton that he would receive a consequence for

---

[66] The judge was not in court that day.

not being at his mother's home at the agreed upon time. Easton became angry and threatened to "flip the van." Easton removed his seat belt and moved towards the front of the van, causing the driver to pull the car to the side of the highway. Easton returned to his seat when the staff member stated that the next action would be calling the police. They were able to safely return without further incident.

According to Palmetto records as of April 2015, Easton remained on the waiting list for step down to a group home with a target discharge date of June 2015. He was second on the waiting list at Hinton and eighth on the waiting list at Blue River. His DCFS case manager requested additional matches given the length of the waiting lists. He subsequently matched with Dogwood Home in Greene and Lambda Services in Webb. However, Dogwood declined to interview Easton because they did not serve clients with diagnoses of Conduct Disorder.

On Sunday, May 17, Ms. Dougherty visited Ms. Hurst's home to see Easton. Ms. Dougherty had called the mother earlier to ensure that Easton was there. When the case manager arrived, the mother reported that Easton had left the home immediately after she had called. Ms. Hurst thought Easton might be at a friend's home, a former Palmetto resident, and she provided the location where she believed they resided. Ms. Hurst reported having met the friend's mother and grandmother. Ms. Dougherty advised Ms. Hurst that she needed to know where Easton was at all times. Ms. Dougherty requested that Ms. Hurst call her once Easton arrived home. At 8:00 pm that evening, Ms. Dougherty called Ms. Hurst who stated that Easton had not returned home. An hour later, Palmetto staff arrived to transport Easton back to Bard Homes, but he was still not home by 10:00 pm. Ms. Hurst called Ms. Dougherty crying, fearful something had happened to her son, and said she had called both the hospital and police and neither had Easton. When Easton returned to home at 11:00 pm, he reported being at his girlfriend's house. He spoke with Ms. Dougherty who described his attitude as nonchalant. Upon return to Palmetto, Easton was placed on 72 hours of AWOL precautions.

In May 2015, Easton disclosed to Ms. Dougherty that his mother had been using drugs "for a while now." Despite this information and the fact that Easton's goal had been changed to Independence, Ms. Dougherty noted that she encouraged Easton towards positive behaviors in order to return home to his mother. Ms. Dougherty noted in the case record that Ms. Hurst would need to stay clean from drugs in order for him to return to her. Ms. Dougherty told IG investigators that Easton did ask her about joining two programs, a residential education/job training program and the other a military school for at-risk youth. While she knew he would not be able to join because he was on probation, she did tell him that he would need to change his behavior drastically before that could be considered.

On June 3, 2015, Palmetto staff arrived to pick up Easton from his mother but no one answered the door and Ms. Hurst did not answer the phone. At 10:00 pm, Ms. Hurst called Palmetto inquiring as to why Easton had not been picked up. Palmetto staff returned to the home, arriving at 11:30 pm, and again no one answered the door or the phone. The following day, after calling and making arrangements with Easton to pick him up, Ms. Dougherty went to the home to transport Easton back to Palmetto. Ms. Hurst approached the case manager and asked her for money.[67]

*Probation Progress Report*
On May 19, 2015, Ms. Dougherty transported Easton to the County B Courthouse for a probation progress report. Palmetto staff had submitted a court report detailing Easton's activities since his last progress report two months earlier. These incidents included Easton becoming aggressive toward a female

---

[67] When Easton left the apartment, the case manager noted that Easton was smoking a cigarette. She instructed him that he could not smoke in her car. Easton refused to explain where he got the cigarettes.

staff member after losing privileges, a dangerous behavior incident report for excessive swearing, getting in staff's personal space, running into other residents' rooms, two incidents of smoking cigarettes, and making sexually inappropriate comments toward female staff. Easton stated he would not pay $78.51 in restitution as court ordered stating, "they'll have to lock me up." He had completed 43 hours of community service. According to the court report, Easton's discharge date had been extended to June 2015 to accommodate group home waitlists at Blue River and Hinton. During Easton's probation progress report that day, the judge instructed Easton to start paying his restitution and admonished him that probation could not be terminated until he fulfilled his restitution.

*Struggles at Palmetto*
In the first week of June 2015, Easton's Palmetto therapist, a Licensed Clinical Psychologist, completed a therapy report highlighting Easton's continued struggle with the wait for group home placement. Easton expressed frustration with the process believing that he had done everything required of him for placement in a group home

During a June 11, 2015 permanency hearing in County A, which Easton refused to attend, Palmetto reported an increase in Easton's noncompliant behaviors and aggression. Palmetto detailed for the Court that Easton completed the 9th grade and would attend summer school with his continued IEP for emotional disturbance. Easton had five UIRs since his last court date in March and Palmetto recommended that Easton remain in placement and continue to work on step-down to a group home. The judge expressed concerns about Easton's behaviors and requested that Palmetto request an evaluation with his psychiatrist, Dr. Moss. Ms. Dougherty told IG investigators that Dr. Moss did not want to prescribe medication for Easton because he had a history refusing medication, and of using illicit drugs and alcohol when on run.

On June 25, Easton had a violent outburst requiring a TCI restraint after staff requested that he put out his cigarette. The restraint lasted seven minutes. Two days later, Easton eloped and was gone for most of July. During a discussion with Easton's care team (Bard Homes staff, DCFS, GAL, and Ms. Hurst), participants determined that the best way to encourage Easton to return to Palmetto would be to ask that his goal be changed to return home. His mother, who previously stated she could not care for Easton, agreed to the goal change, stating she preferred him in her home rather than on the streets. Easton subsequently returned to his mother's home on July 26. Though he initially refused to leave, Ms. Dougherty transported him back to Palmetto three days later. Ms. Dougherty reassured Easton that she would request he be returned to his mother and discharged from Palmetto at the next permanency hearing on September 17. Easton's unsupervised weekend visits with his mother continued. On August 16, 2015, Easton was not at his mother's home at the scheduled time to return to Palmetto from his weekend visit. His mother did not know his whereabouts.

*County B Juvenile Justice*
County B Juvenile Court issued a warrant on August 18, 2015 after Easton failed to appear at court hearing.[68] On August 22, when Easton came to his mother's home, she called Lowery police informing him that he was a missing person and had a warrant out for him. Lowery police arrested him on the outstanding warrant and transferred him to Juvenile Detention in Arrington where he had an aggressive altercation with a detention officer. On August 25, 2015, a County B Juvenile judge ordered Easton to remain in detention and scheduled a probation violation hearing for September 1, 2015. There was a possibility that Easton would be sentenced to Illinois Department of Juvenile Justice (IDJJ) for his original burglary charge with a sentence not to exceed his 21st birthday. During the September 1 hearing, Easton admitted to leaving treatment without permission and pleaded guilty to violation of probation. The judge released him from detention to Palmetto, with a sentencing date set for September 29, 2015.

---

[68] County B previously issued a warrant on July 28, after Easton failed to attend a court hearing on July 7, 2015.

EASTON HURST

**Return Home Goal**

At a September 17, 2015 permanency hearing Palmetto staff and Ms. Dougherty advocated for Easton's immediate return home to his mother. Ms. Dougherty reported referring the family to Acme Intensive Placement Stabilization Services for in-home family therapy, individual therapy, parenting classes, and substance abuse services.[69] Palmetto would contact the family twice a week for post-discharge stabilization services. Easton would be expected to participate in family therapy and attend school daily. Ms. Dougherty told IG investigators that the team was looking at return home because Easton began to feel as though he would not get stepped down to a group home, for which he had been waiting a long time. In addition, Easton would often end up at his mother's home and, despite the mother's stated ambivalence at times, she would keep him at home and not inform the caseworker until Easton began displaying behavior problems.

The judge did not agree to an immediate return home. Instead, the judge changed Easton's permanency goal from Independence to Return Home and ordered overnight visitation at Ms. Hurst's home Monday through Friday, with services to be in place before Easton's potential discharge from Palmetto. Easton would return to Palmetto on the weekend. Palmetto would not provide the post-discharge in-home services because Easton was not fully returned home and would be returning on the weekends. The next court hearing was set for November 23, 2015.

Ms. Dougherty attended Easton's sentencing hearing in County B on September 29, 2015 for violation of probation. She informed the court of Easton staying with his mother five days a week and returning to Palmetto on the weekends. The court continued Easton's sentencing until after the expected full return home date at the end of November.

*Acme Intensive Placement Stabilization (IPS)*

Acme had an IPS Contract for FY 2015 for $431,681 annual, to be paid quarterly ($104,179.25 per quarter). According to the Program Plan:

> *IPS is a short-term placement stabilization program that provides services to children. IPS is expected to provide a mix of formal and informal supports to families to promote placement stability. As such, each service array is flexible, individualized and tailored to the needs of the child and family. A typical service array might include therapy, respite, family support, crisis intervention, recreation supplies, tutoring, school advocacy and psychosocial education. . . . . The IPS provider plans, organizes, staffs and administers a community-based program that provides an array of critical, intensive therapeutic interventions and/or facilitation services to clients with emotional and behavioral stabilization. Services may include, but are not limited to individual therapy, family support, psychosocial education, tutoring, etc.*

As she stated in court, Ms. Dougherty referred Easton to Acme IPS program to support Easton in his mother's home. The referral also identified that Easton had had Special Education services in the past year, stating:

> *Easton is being stepped down from a residential treatment facility to his mother's home. Worker is requesting services to help stabilize the placement.*

The service plan developed August 31, 2015 was provided to Acme IPS on September 21, 2015. The plan explained that Easton had come into care because the mother was unable to handle his behavior; he had

---

[69] Cooper Counseling, who subcontracted with Acme, was to do family therapy and individual therapy with the mother. After the therapist visited the home, she contacted the caseworker and said the mother only wanted services for Easton and did not want to participate in individual therapy herself.

been diagnosed with Intermittent Explosive Disorder and needed to address anger, school attendance/delinquency (he missed 20 days last year), he was on probation for residential burglary as well as mental health services. The plan noted the mother's long history of mental illness, for which she received social security income, and her history of substance abuse.

Acme supervisor Dimitri Littrice sent a letter to Easton's mother, notifying her of the referral on September 21, 2015, that stated the program provides home-based services to "foster children" to support their "placement in your home" and added, "We depend greatly on the support and participation of the foster parent." The consent form that Ms. Hurst signed, as well as a consent form sent to the DCFS Guardian's Office, identified her as the foster parent. Acme assigned Tatum Kasich, a worker with a bachelor's degree. [70] Throughout the file, both the worker and his supervisor, Mr. Littrice, refer to Ms. Hurst as Easton's foster parent.

The plan for services included an hour of counseling with Easton every other week and the availability of 24-hour crisis intervention services. [71] According to the IPS services plan, an initial home visit was to take place within five days with a child and family team meeting scheduled 30 days from the initial opening. After several failed attempts to arrange an initial appointment,[72] the family's initial meeting occurred on October 13, nearly a month after case opening. Ms. Dougherty attended the initial meeting during which Ms. Hurst threatened to throw Easton out because he had stolen his sister's phone and money from her and a neighbor. Ms. Dougherty informed Ms. Hurst that she would not be able to return Easton to Palmetto until Thursday. Easton refused to discuss the mother's accusations. Mr. Kasich noted, "client shut down and did not want to discuss the incident." Mr. Kasich further noted that the "placement" appeared to be "somewhat volatile." That same day the worker prepared, and the supervisor approved, an Interim Care Plan stating IPS would help Easton find a job or additional activities; that Mr. Kasich would counsel Easton on following the rules of his "placement" and on "his decisions and choices." The file does not contain a full assessment.

In November 2015, Mr. Kasich documented visiting the home twice.[73] On November 3, Easton continued to deny stealing his sister's phone, but had paid for a replacement. With the exception of the two first lines the notes are verbatim. Mr. Kasich reportedly had Easton complete an application for a youth services program. That month the supervisor indicated Easton had made reasonable progress. Mr. Kasich documented that during a visit on December 1, Easton and Ms. Hurst began arguing because Easton refused to participate. A little more than a week later, Acme closed the case since Easton had returned to Palmetto.[74] The IPS records were silent on Easton's school performance, the assault charge with Juvenile Justice screening and his absences from the home. Crisis intervention was not provided for these incidents.

*Osprey School*

Ms. Dougherty arranged for Easton to be enrolled at Osprey School, a therapeutic day school which is part of the Lowery Public Schools Alternative Network. Easton failed summer school. He had six credits from Palmetto's therapeutic school program and would start school as a sophomore. According to school

---

[70] Tatum Kasich has a Bachelor of Science degree. Nora Park told OIG staff that IPS staff training includes trauma-informed care and the Department provides monthly training on the Attachment Regulation and Competency (ARC) model. Currently the IPS program hires both Masters level and Bachelor level staff. Masters level staff earn under $32,000 annually.

[71] The record also indicated that the mother had a positive drug drop.

[72] Mr. Kasich documented phone calls to the mother and in one note indicated that the mother was working.

[73] The mother cancelled one session saying Easton had an appointment with a job placement agency.

[74] Nora Park, IPS Director, told IG staff that Mr. Kasich is no longer with the agency in part because of the handling of this case.

records, from September 17 to December 19, 2015, Easton was enrolled as a sophomore at Osprey School. Easton had an excused absence on September 29 for a mandatory court date in County B and was truant on October 8. He had four more absences (October 27, 28; November 17 and 18). He obtained below average grades (F, D, D, C, C-) for the quarter.[75]

On Wednesday, October 21, Lowery police responded to Osprey High School for aggravated assault of a teacher/school employee. According to police records, Easton entered a classroom, walked up to the teacher, made a gesture with his hand, and yelled "bang!" The teacher felt threatened. Easton had previously bragged to other students that he owned a gun. Easton was searched on the premises, but no weapon was found. Police took him into custody and alerted his mother. Lowery police found that Easton had an active County B warrant and had him transported to Detention in County B. He was released to his case manager that same day. The court date for the assault charge was set for November 18, 2015 at County A Juvenile Justice Court. Osprey High School records did not contain any information about the incident or his subsequent three day suspension from school. On November 18, Ms. Dougherty transported Easton to County A Juvenile Justice Court for a hearing on the assault charge on the teacher.[76] When they arrived at court, Ms. Dougherty learned the assault charge had been dropped.

Easton's behavior continued to deteriorate after the arrest. When Easton returned to Palmetto the weekend following the assault charge, he set fire to paper in his room. The following weekend Easton became combative when staff confiscated a lighter from his belongings. Staff had to remove other residents from the unit for safety, and called police. Prior to the police arrival, Easton turned over the lighter to staff and remained separated from the milieu for the remainder of the day. The next weekend, Palmetto staff drove Easton back to Bard Homes, but he returned to his mother's home later that evening. He went AWOL from Palmetto the following weekend. Palmetto staff, Ms. Hurst, and DCFS concluded that Easton would no longer be transported to visits by Palmetto staff; he would take the train instead.[77] Easton did not return to Palmetto that weekend.

A November 23, 2015 Palmetto permanency court report requested that Easton be discharged from their program because of noncompliance and behaviors that placed the safety of youth and staff at risk. However, the judge was absent, and the court date was rescheduled. At court on December 9, the judge ordered that Easton return to Bard Homes full-time and gave the Department discretion regarding unsupervised visitation. The Palmetto case manager transported Easton back to Bard Homes that day.

*Bard Homes Harm to Others Precaution*
On December 27, 2015, 18 days after returning to Bard Homes full-time, Easton became aggressive with the staff resulting in a restraint.[78] Easton had failed to follow staff directives and took food from another resident. Staff John Oakley placed his hand on the cooler to prevent Easton from taking more. Easton began to escalate, making threats and pushing staff. John Oakley and fellow staff Maksim Vance conducted a TCI restraint that lasted eight minutes. Half way through the restraint, program manager Jericho Krause provided assistance. During the restraint, Easton bit Mr. Oakley, causing injury that required medical attention at the emergency room. Palmetto staff completed a *Harm to Others Precaution Form* as a result of the incident between Easton and Mr. Oakley. Easton would not be allowed passes and interactions with John Oakley would be restricted. The following day staff reported the incident to the County C Sherriff's Department who came to the facility and gave Easton a citation for battery. While talking to his mother two days after the incident, Easton said that after his discharge, he planned to return to Bard Homes and "shoot the place up."

---

[75] His transfer transcript from the special education school while in residential care was all A's.
[76] According to Osprey School records, Easton was absent on November 17 and 18, 2015.
[77] Easton was often not home when Palmetto went to transport.
[78] According to the incident report, all staff involved in the incident had a TCI refresher on October 28, 2015.

The County C juvenile justice assistant district attorney's office informed Palmetto staff that rather than a municipal citation, they were going to pursue juvenile justice charges because of Easton's history of prior charges in County C.[79] The attorney stated that the case may be transferred to County B for supervision of probation because of Easton's active probation case.[80]

At a January 7, 2016 staffing with Palmetto staff, Easton and GAL Troy Runyon, Ms. Dougherty reported that Ms. Hurst seemed to have lost interest in having Easton returned to her home. Easton continued to express a desire to go home; staff noted Easton would need to improve and his mother would have to engage in services. Palmetto and Ms. Dougherty continued and even increased their efforts with the matching process when return home to the mother seemed less viable. Palmetto expressed concern about Easton's ability to engage in treatment within their facility.

*County B Violation of Probation*

Easton went home for a weekend visit on January 8th with a plan to return to Bard Homes by train; he did not return that Sunday. Palmetto staff and the caseworker spoke with the mother and decided that Easton could return the next day, Monday January 11. Easton left his mother's home on Monday, but he did not return to Palmetto. Palmetto staff informed Easton's County B juvenile probation officer of the AWOL status. The probation officer requested written confirmation to give to the state's attorney. On Wednesday, January 13 he was picked up by Gantner police with another Palmetto resident who was also AWOL.[81] Easton refused to return to Palmetto and became combative. Law enforcement transported him to a DCFS Shelter. According to the shelter intake form, shelter staff, Palmetto staff and DCFS spoke about getting Easton back to Bard Homes. Palmetto staff attempted to transport Easton back to their program at 6 pm, but he refused. A DCFS Administrator approved Easton's placement at the shelter. Two days later, on January 15, Easton ran from the shelter. Palmetto staff and the DCFS case manager worked together to locate Easton. On January 19, 2016 Palmetto staff spoke with Easton's mother who stated Easton had been staying with her, but had left her home around 4:00 pm and said he was going to go to the shelter. He did not appear at the shelter and reportedly returned to his mother's home later that week. On January 20, Easton received a notice that County B had made the decision to file a petition for a violation of probation with a hearing scheduled for the next day. Easton refused to attend the court hearing and the judge issued a bench warrant.[82] He remained AWOL for the next several days.

At a County A Permanency hearing on January 28, 2016, Palmetto presented a court report documenting the mother's ambivalence toward Easton returning home and the residential facility's frustration about Easton's lack of compliance. The report also noted that Easton failed to complete any school work since returning to Bard Homes. Palmetto recommended that Easton be discharged from their program because his noncompliance and behaviors placed Palmetto residents at risk. The case was continued for April 6, 2016 because Easton, still AWOL, was not present. Following the hearing, Palmetto, Ms. Dougherty, the GAL and Ms. Hurst's attorney staffed the case. The DCFS case manager reported that Ms. Hurst had been working on entering in-patient drug treatment and may have to give up her apartment. Because this impacted Easton's discharge from Palmetto, staffing participants agreed to continue to pursue placement at a group home at this time.

---

[79] Easton had beaten a peer unconscious in 2014.

[80] The case would have to be prosecuted in County C but the probation case could be supervised by County B with his existing probation, post adjudication.

[81] Palmetto staff also informed the probation officer that Easton had been picked up by Gantner police. Palmetto notes also indicate that the caseworker spoke with the probation officer.

[82] Palmetto and the caseworker informed the mother of the court date as she was in contact with Easton.

*Execution of the Warrant*
On February 1, 2016, Easton's mother called Ms. Dougherty reporting that Easton was getting on the train to return to Palmetto. Ms. Dougherty advised Palmetto staff to alert the probation office and the police so Easton could be met at the train station to execute the January 21st warrant. Waxwing Police met Easton as he got off the train and took him into custody; he was held in detention. Easton attended court with Palmetto staff the following day. The judge continued the hearing to February 4 for the DCFS case manager to attend. Easton remained in detention. At the February 4 hearing, Palmetto staff reported to the court that Easton was not amenable to treatment and requested he be discharged from their program. The judge informed Palmetto that that was between DCFS, Palmetto and County A child welfare court. The judge stated he would not hold Easton and released him from detention to Palmetto staff. The judge requested Palmetto and DCFS develop a plan to prevent Easton from leaving the Palmetto premises. The DCFS case manager and Palmetto staff agreed to a plan that included one-to-one staffing for a limited period and suspended home passes. According to the Palmetto record, they reported that it was unsafe to physically intervene given that Easton assaulted Palmetto staff the last time he was restrained. The next court date was scheduled for March 2016. Palmetto staff told IG investigators that the one to one staffing was planned as a crisis response, usually in place for 48 to 72 hours as that staffing level is unsustainable for longer periods without specific funding and identified staff.

That same afternoon, Easton attended court in County C for the battery charges resulting from the attack on the Palmetto staff member. Easton entered a not guilty plea and the matter was scheduled for pre-trial conference on February 12, 2016. On the date scheduled for pre-trial the County C Juvenile Assistant District Attorney contacted Palmetto staff reporting that the pre-trial conference would not be held that day. Instead the case was being sent back to the Sheriff's Department and Juvenile Intake in County C for pursuit of criminal charges rather than a citation. Palmetto staff informed the caseworker, the County B Juvenile Probation Officer, and the probation supervisor, of the change. The charge was still pending at his death.

*Removal from Bard Homes*
On February 15, 2016 staff from Bard Homes completed a serious incident report after Easton's behavior resulted in police involvement. Around 8:00 pm Easton refused to follow staff directives and began swearing at staff, encouraging his peers to join him. Easton refused to wait for his snack and began to threaten staff, inciting other residents to join him, saying there were more residents than staff and the residents could take over. He made statements that he would be "calling his people" to come from Lowery. Palmetto staff called police. Easton became verbally aggressive with police and encouraged residents to "fuck up the police." Police handcuffed Easton, separating him from the other residents. Easton threatened a female officer and began clenching his fists. At 2:10 am, three male Palmetto staff arrived from the main campus to transport him to Palmetto's Crow House for the remainder of the night. Law enforcement did not arrest Easton or issue a citation.

The following day, Palmetto staff informed the DCFS caseworker and the County B Probation Department of the incident the previous evening. Palmetto asked probation if this incident would result in a probation violation. The probation staff replied that the decision was that of the States Attorney although the outcome would likely be the same, as Easton already had pending violations. Probation officer Espinoza said he would wait for updates from County C.

At a staffing on February 24, Palmetto reiterated the request they had made in an email on February 17 for an emergency lateral move for Easton. Palmetto cited they no longer had the ability to provide treatment because of his unwillingness to engage in services. According to Palmetto notes, Easton's behaviors had been stable at Crow over the past week but they considered it a "honeymoon phase." Palmetto stated that "he disengaged from us entirely-keeping him here longer would lead to negative outcomes, worse that's been done so far." The DCFS caseworker indicated she did not object to a lateral

move. The DCFS caseworker noted the mother had moved but was not providing a current address,[83] so the plan to pursue group home placement continued as approval for a lateral move was pending. The approximate waitlists for the approved matches remained three to six months. Ms. Dougherty told IG investigators that although Easton was high on the waiting lists, there were few openings and emergency placements from shelters would take precedence.

Palmetto's March 2016 quarterly staffing report noted that Easton remained on Palmettos' main campus at Crow House because his behaviors at Bard Homes required an emergency transfer. The DCFS case manager had ceased all visits in Lowery with family because of Easton's elopement risk and his mother's moving. The report reiterated Easton's issues since returning to Palmetto full time. The report noted that precautions for Easton included being directed to time out if he began to display behaviors indicative of aggression. If Easton became physically aggressive, police would be contacted. His triggers for aggression included not getting what he wanted and feeling targeted by others.

During a visit two weeks after the staffing, Easton told Ms. Dougherty that he had interviewed for placement at Victory and Thoreau residential programs, and was waiting for an interview with Partridge Program. Easton requested a visit to his mother's home, adding that she was living with someone. Ms. Dougherty reminded him that he would not be allowed passes because of his previous behavior. Furthermore, the worker would have to conduct a background check on the person living with his mother before he could visit. The worker said she would arrange for his mother to visit at Palmetto; this was Easton's last visit with his caseworker.

The day before Easton's death, he refused to attend a court hearing in County B for pre-trial on probation violations. The judge noted that Easton still owed restitution, which he continued to refuse to pay. The judge issued a bench warrant and planned for the Sheriff's office to pick him up, possibly that same day. Palmetto staff and Ms. Dougherty alerted the court that Easton had been transferred to the Crow House in Rosewood. At the time of this hearing, the court date would be re-scheduled once Easton was detained.

Following Easton's death, Rosewood Police noted that County C Sheriff had forwarded to them the warrant issued by County B on the day Easton refused to attend his court hearing. The police noted they did not believe their receiving the warrant was in connection with the death, but because County C had found that Easton was not at the Bard Homes facility. Ms. Dougherty confirmed for IG investigators that both herself and Palmetto staff had said in court at the pre-trial hearing that Easton had been moved to Crow House in Rosewood.

**Efforts to Move to Group Home**

Ms. Dougherty shared an email chain from February 2015 through February 2016 documenting communication with Central Matching regarding step down to a group home. On February 20, 2015 Central Matching indicated Blue River and Hinton had been identified as possible group home placements. Palmetto staff and Ms. Dougherty provided the needed documents for those agencies to review. By the beginning of April 2015, Easton had been interviewed by both agencies but placed on their waiting lists. Ms. Dougherty requested additional matches from Central Matching since neither agency anticipated an opening before summer. Central Matching asked for updates from Blue River and Hinton who reiterated their lack of current openings. Central Matching then provided the additional matches of Dogwood Home and Montgomery. In early May 2015, Dogwood requested documentation of a mental health assessment. Central Matching also asked for an update from the other providers. Hinton and Blue River both indicated Easton was still on their waiting lists (second and eighth respectively) but neither anticipated any openings before July 2015. By May 11, Dogwood reported that they were in talks with Cecil Mapes, then head of Central Matching, about the referral and were declining Easton. This pattern of

---

[83] The mother later informed the worker that she was living with a friend temporarily.

Central Matching asking for updates and the subsequent answers of no openings for months continued, at least twice a month, through August 2015. The emails indicated that Montgomery was talking with Cecil Mapes, possibly for approval, but the emails did not indicate if that was the issue. By September 2015, Hinton indicated Easton had gone to fifth on the waiting list as three emergency placements had taken priority on the list. Furthermore, the first opening would not be for another 30-45 days. In October 2015, Central Matching asked for another update from the matched agencies with replies of no possible openings before December. In November 2015, the caseworker confirmed, when asked, that she had explored family and fictive kin or a foster home without success. In December 2015, Ms. Dougherty reported that Easton still needed group home placement; his behavior problems were increasing and efforts to return home were unsuccessful.[84] The worker asked Central Matching for increased efforts to find a group home for Easton. In response Central Matching asked for an update from Blue River and Hinton. Hinton indicated Easton was first on the waiting list but did not anticipate any openings for three to six months. On December 23, Regina Singh, on behalf of Central Matching asked the worker if she continued to recommend group home placement as the request had been open for nine months. Ms. Dougherty confirmed that she did and Easton's behavior has been problematic because of his frustration with waiting to move. The pattern of at least twice-monthly update requests continued in January 2016. Finally, in February 2016, they hoped to start preplacement visits with Blue River, who hoped to have an opening in the coming months.

According to email streams, by February 17, 2016 Palmetto was requesting an emergency lateral move following his temporary move from Bard Homes to Crow House. In addition to having been moved from Bard Homes because of the assault on the staff member, Easton was not in school; school work was being brought to him. Easton was not enrolled in the local school district because his official placement at Bard Homes was out of state (and had required an interstate compact which the caseworker had completed at the time of placement). Palmetto pointed out that the Illinois Board of Education dictated that his educational services had to be provided through Lowery Public Schools as that was his last home district. The request for a lateral move was approved 29 days before Easton's death. No matches had been found before the time of Easton's death. Easton had participated in interviews with Thoreau and Victory. During the Victory interview, Easton stated that he would not participate in individual or family therapy and that being at Victory would just make it easier to go AWOL. Easton told Thoreau that he needed to work on his anger, but would not participate in treatment, and later contradicted himself by saying he did not need to work on anything. On the day of his death, Easton participated in a phone interview with Partridge residential program for a lateral move to their facility in Lowery.[85] Easton said he needed to work on his anger but felt his aggression and elopement were justified, so he did not need to work on those. He also reported that he did not care about school. Ms. Dougherty told IG investigators she did not think the other residential treatment centers were truly considering accepting Easton into their program.

*County B Juvenile Probation Officer*
IG investigators met with Easton's assigned County B juvenile probation officer, Andy Espinoza. Mr. Espinoza was the assigned officer from the time Easton was placed on probation in September 2014 until Easton's death. Mr. Espinoza explained that after adjudication, another probation officer completed a social investigation with recommendations for the court.[86] The assigned probation officer supervises the probation and prepares periodic progress reports for the court.

---

[84] Ms. Dougherty told IG investigators that as Easton was not fully returned home in September, she never interrupted the Central Matching process, knowing there was a chance return home would not succeed.

[85] The Palmetto note indicated that Partridge described the program as having seven clients to a dorm, each with their own room, and the facility as having an art studio, gym, basketball court, baseball diamond, and soccer field.

[86] IG investigators requested the social investigation and the probation order, but have not received either.

 Mr. Espinoza reported that he visited Easton monthly at his placement in the neighboring state, except during the periods when Easton was held at the detention center. He reported that Palmetto staff were generally present during the meetings or he would meet with staff while there. He often spoke by phone with the DCFS case manager who consistently attended Easton's court dates.[87] He never met with Easton's mother and had never been asked about recommendations regarding Easton's return to his mother. He reported that he made one attempt to see Easton at his mother's house in the fall of 2015, but got stuck in traffic and never made the visit. He never considered the commitment to the Department of Juvenile Justice for Easton because he was never re-charged with anything past the initial burglary. Further it would be unlikely that a youth would be committed to IDJJ for violating probation by leaving placement unauthorized. Mr. Espinoza did not recall details of Easton's battery charge in the neighboring state that occurred just days before his burglary arrest in Illinois, though he did recall that it was in the social investigation. Mr. Espinoza did not recall initial concerns about aggression or violence with Easton since Easton had been referred to court for burglary.

Mr. Espinoza described Easton as a typical DCFS youth in care in a residential treatment facility, who had a difficult background and was angry about his upbringing. He did not see Easton as an especially violent or aggressive youth. Mr. Espinoza acknowledged to IG investigators that there was no communication between the County B Juvenile Court and the County C Juvenile Court, but he was not surprised by that because there is no conduit for such communication. He did note that Ms. Dougherty communicated regularly with him and was very involved in the case.

**Death of Easton**
*Palmetto UIR*
The day after Easton's death in March 2016, Dr. Gianna Erickson, POS Manager/Administrator from Palmetto Group, completed an Unusual Incident Report documenting the restraint that resulted in his death. Dr. Erickson noted that Easton became aggressive with staff who then initiated a restraint at 9:42pm. The evening supervisor received notification of the restraint at 9:44pm. The narrative summarized that both staff members were holding Easton when they slipped and fell resulting in Easton hitting his head at approximately 9:54pm. Staff noted that Easton appeared unconscious and notified the on duty nurse. The evening supervisor arrived at 9:58pm and directed staff to call 911. The paramedic instructed staff to begin CPR at 10:02pm. The nurse arrived at this time and began CPR.[88] After completing one round of CPR, the paramedics arrived and continued lifesaving interventions. The ambulance transported Easton to Bluebill Medical Center where doctors pronounced him dead at 11:10pm. The Rosewood police arrived on the scene with the paramedics and initiated an investigation of the incident, including calling the DCFS Hotline. Dr. Gianna Erickson contacted Pedro Reeves from Residential Monitoring at 10:36pm. Van Griffin, Vice President of Residential Services, contacted Easton's mother and transported her to Bluebill. Ms. Dougherty and Easton's GAL received notification the following morning at 8am and 8:30am respectively.

*DCP Investigation*
The Department assigned DCP Investigator Leigha Norman who received supervision from Tegan Sellers. The Department opened two companion investigations related to Easton's death, naming Derek Belan as perpetrator in one and Ralph Sparks as perpetrator in the other.

The day after Easton's death, Ms. Norman met with the County B Task Force. According to DCP notes, the Task Force decided that DCFS could not participate in the law enforcement interviews. Detective Yoder shared that law enforcement had interviewed Palmetto staff member Max Tyson, who was present

---

[87] Mr. Espinoza did not attend the court dates. Mr. Espinoza told IG investigators that a court liaison attends court and presents the progress report to the judge.
[88] Beginning a full 8 minutes past the time unconsciousness was first assessed.

when the incident occurred. He reported that on the evening of Easton's death, staff members Derek Belan and Max Tyson were working at Crow House, including around 9:15 pm, when Mr. Belan gave Easton a directive which Easton refused to follow. Mr. Belan then phoned Ralph Sparks, another Palmetto staff member working at a different house that evening. Mr. Sparks reportedly had a calming effect on the children and they hoped his presence would de-escalate the situation with Easton. Upon Mr. Sparks' arrival, Easton tried to punch him. Mr. Sparks and Mr. Belan then attempted to place Easton in a TCI restraint but a physical fight ensued. Easton put Mr. Belan in a headlock.[89] Mr. Sparks freed Mr. Belan, placing Easton in a headlock/chokehold and all three individuals fell to the ground.[90] Mr. Tyson reported that Easton then appeared unconscious; staff contacted Supervisor Shaan Len and the Palmetto Nurse, Meredith Kiezel. When they arrived, Easton was in the "support room" propped up against the wall. Mr. Sparks called 911 at 9:59pm. The nurse noted that Easton was not breathing as of 10:04pm when she arrived on the scene and began CPR. Detective Yoder explained that during interrogations of Mr. Sparks and Mr. Belan, both admitted to moving Easton to the support room after he became unconscious. Six residents of the Crow House reported witnessing the incident, with one resident witnessing the entire event. The residents were interviewed by law enforcement. One resident reported overhearing Mr. Sparks tell Mr. Belan that they "needed to get their stories straight." Both staff members admitted that statement during law enforcement interviews.

Two days after Easton's death, law enforcement informed DCP that Ralph Sparks had been charged with Involuntary Manslaughter and that Derek Belan was charged with Obstruction of Justice. Mr. Sparks is being held in County B jail on a $1,000,000 bond. In April 2017 prosecutors reported they were dropping charges against Mr. Belan. The Lowery Times reports that Mr. Belan is expected to testify in future hearings.

The DCP investigations remained open until completion of the autopsy as well as the criminal investigation. The County B Coroner ruled the death a homicide by asphyxia due to restraint. On October 13, Ms. Norman recommended a finding of indicated for the allegations of death by abuse and risk of harm by abuse for Mr. Sparks due to the choke hold he used during the restraint that lead to Easton's death. The Department indicated Mr. Belan for allegations of death by abuse and substantial risk of harm on October 26, 2016.

The DCP investigation contained documents on Therapeutic Crisis Intervention training, First Aid and CPR training for both Mr. Sparks and Mr. Belan.[91] Mr. Belan completed TCI training in July 2015.[92] According to TCI policy, he should have received a six month refresher training by January 2016, but there are no records to indicate this took place. There was no record of CPR training for Mr. Belan. Records for Ralph Sparks documented that he completed a TCI refresher course in October 2015. Mr. Sparks completed CPR certification on November 4, 2014. Certification was valid for two years.

**Therapeutic Crisis Intervention (TCI) Policy**
Palmetto implemented and trained staff in Therapeutic Crisis Intervention. The consultant noted in their review that TCI is "the most widely utilized among the four behavioral management options for residential treatment programs currently approved by DCFS." OIG staff spoke with Martha J. Holden, Project Director of the Residential Child Care Project from Cornell University about Therapeutic Crisis Intervention (TCI) restraint methods and safety recommendations.

---

[89] Derek Belan was approximately 5'7" and weighed 125 pounds.
[90] Ralph Sparks was approximately 6 feet and weighed 190 pounds.
[91] The report states that TCI and CPR records were obtained for Derek Belan. There are no CPR records found in the attachments for Mr. Belan.
[92] Derek Belan began employment at Palmetto on July 7, 2015.

Ms. Holden explained that TCI should be contained within wider crisis management techniques and each resident on a unit has a team of professionals that develop and maintain a unique crisis management plan that is expected to be implemented at all times. The crisis management plans should be detailed and personalized, regularly updated, and consider all aspects of the individual's health. For instance, a child's size, age, and the size of staff should be considered and incorporated into the crisis management plan. Each technique taught to professionals has different staff requirements to safely implement the hold, but all of the techniques require someone to monitor and oversee the restraint implementation. Although there are no size cutoffs for restraint techniques, a medical professional is necessary in the development of approved TCI techniques because certain holds increase the risk of serious injury—obesity is associated with comprised respiratory and circulatory systems and therefore certain restraints are actively discouraged. Throughout the conversation, Ms. Holden reiterated that the crisis management system developed at Cornell's Resident Child Care Project is targeted for school aged children, although there are modifications for preschoolers and individuals with developmental disabilities. When asked about a situation with 8-10 teenage males, Ms. Holden advised consistent staffing of 4-5 individuals.

According to the medical examiner's report, Easton Hurst was 6'2'' and 206 pounds at the time of his death. The most recent behavior management plan dated March 2016 noted Easton's history of aggression towards peers and staff and recommended interventions included therapeutic restraint, holds and seclusion with police contact noted as an additional tool for staff. Shortly thereafter however, staff determined that if Easton became physically aggressive police would be called rather than Palmetto staff intervening. The DCFS Clinical report noted that Easton was a "control-sensitive" individual and restraints would be contraindicated. Palmetto, in the response to the consultant's report, which referenced the clinical report, noted that TCI is not contra-indicated if the youth is posing a danger to themselves or others.

The consultant's Independent Review had findings and recommendations regarding Palmetto's use of TCI. Palmetto President Tara Wilkerson provided Palmetto's response to the consultant's Independent Review. Ms. Wilkerson noted that Palmetto has adopted the optional TCI refresher trainings at three month intervals supplementing the required 12 hour trainings at six month intervals.

**Staffing Ratios**
During the County B violation of probation hearing on February 4, 2016, the judge admonished Palmetto and DCFS to develop a plan to prevent Easton from eloping. According to a Palmetto note, this plan included one to one staffing for Easton. Through interviews, IG investigators learned this one to one staffing was a temporary fix. Other OIG investigations determined that in order to consistently provide one to one staffing, agencies would need to appeal to DCFS for specific funding.

The Independent Review completed by the consultant indicated that Palmetto was insufficiently staffed to manage house shifts due to vacant positions and high staff turnover. Palmetto President Tara Wilkerson provided the Office of the Inspector General with Palmetto's response to the consultant's Independent Review. Regarding the finding that there were frequently an insufficient number of staff, including veteran staff, Ms. Wilkerson noted that Palmetto has acknowledged this and even testified at Illinois legislative hearings about a "workforce crisis." She noted that DCFS monitoring visits and internal records did not support the argument that Palmetto often lacked the needed number of staff. She added that veteran staff often seek overtime, though she indicated they have also been criticized for "an over-reliance on this pool of staff." Palmetto pays Mental Health Specialists an average $11.83/hr. Ralph Sparks was making $16.15/hr and Derek Belan was making $12.25/hr as of June 1, 2015. [93] Palmetto

---

[93] Staff employed by the Illinois Department of Juvenile Justice Correctional centers as Correctional Officer trainees earn $42,432 annually. Staff with an Associate's Degree earn approximately $64,000 annually. Psychiatry Tech staff

provided IG investigators with the ratios for Crow House on the date of Easton's death as four staff for 16 youth. The ratio that month ranged from four staff for eight youth to three staff for 16 youth. Palmetto staff pointed out that the ratio does not reflect additional mentors, volunteers or recreation staff who may be available and providing coverage for individual or group activities and does not include supervisors in the area who are able to assist when needed. In the consultant's review Ms. Wilkerson explained:

> The "ratio" is generally viewed as a fixed number regardless of circumstance and does not factor in the need to increase staff/youth ratio in some areas as conditions warrant by moving staff around. Also, annually a "budgeted" number of ideal positons is identified based on a corresponding census. The number of ideal positions is adjusted if census is lower than anticipated; this is often not considered when looking at a sheet that shows "open positions". Lastly, it is common in this sector (as w/police, emergency rooms and other service oriented 24/7/365 environments) to utilize overtime and or "as needed" part-time staff to fill in to ensure adequate coverage for the numbers of clients in the environment and to ensure adequate staffing patterns even if there are "open positions" or positions that have not been able to be filled. The "ratio" also does not reflect additional mentors, volunteers or centralized recreation staff who may be available and providing coverage via youth individualized and/or group activities, as well as supervisors who may be present in the environment and available to help if needed. Lastly, the house staff/youth census sheet does not reflect day to day fluctuations of youth not present due to home visits, hospitalizations and/or on run status. Staff are often 1/1 w/a youth in the hospital or driving youth to court/appointments/home or sibling visits, etc., which is at a lower ratio than the minimum.

*Illinois Department of Juvenile Justice (IDJJ)*
As of July 1, 2015 the number of juveniles in Illinois Department of Juvenile Justice Facilities totaled 697 youth. As of June 30, 2016 that number decreased to 390, a 44% reduction in the population. DCFS youth in care comprised 36 of those youth incarcerated. Thirty more youth were in after care facilities and one youth was considered on an unauthorized absence. The ratio of youth to security staff required to manage behaviors and maintain safety within the Juvenile Justice Department was 1.175 in June 2015 and 1.2 in September of 2015.[94] DCFS designated three of Palmetto's residential programs as "severe." Youth in care placed in these programs struggled with highly significant emotional and behaviors challenges. The ratio of youth to staff for a severe contracted residential unit is three. Those ratios increase during the evening and overnight hours when youth are expected to be sleeping. For example, most overnight ratios for moderate contract residential are 9:1 youth to staff. What these ratios fail to account for is moments of crisis and TCI procedure. For example, 2 staff with 5 youth is well within a moderate or severe contract ratio; however, if one of those youth were to become escalated and require physical management using TCI techniques, 2 staff would be required to manage that 1 child alone leaving no one else to manage the other 4 youth. At 9:15pm on the day of Easton's death, when Easton began displaying defiant behaviors, there were two staff present at Crow House with a total of five youth. Additional staff members were called to assist as Easton's behavior escalated.

**Workplace Violence for Mental Health Workers**
Consultants also reviewed internal data for staff injury rates related to behavior management. The rates of staff injuries/restrain episodes were 2.63% in FY15 and 4.05% in FY 16, three times higher than OSHA comparable rates for similar organizations. Statewide data was not available for comparison injuries. Much of the research demonstrates an increased likelihood of workplace violence for health care workers.

---

in hospitals with psychiatric units with a high school diploma and two or less years of experience earn $28,502-37,079 annually in the Lowery area.
[94] Information received from the Juvenile Justice Quarterly Reports for July and October 2015

These incidents are most likely to arise from customer or client perpetrating against the worker. According to the Bureau of Labor Statistics, "48% of all nonfatal injuries from violent acts against workers occurred in the health care sector" in the year 2000 (as cited by McPhaul, 2004, pg. 5). This is especially true for mental health facilities. Again in 2000, the Bureau of Labor Statistics reports that "health service workers overall had an incidence rate of 9.3 for injuries resulting from assaults and violent acts. This compares to an overall private sector injury rate of 2 for injuries resulting from assaults and violent acts. (Occupational Safety and Health Administration [OSHA], 2004, pg. 5). Most of these statistics are derived from labor statistics involving injuries that result in days away from work. These rates are most likely an underrepresentation of actual incidents of injury.

In order to conclude the number of violence related injuries including those that do not require time away from work, a survey was conducted. The Department of Justice's (DOJ) National Crime Victimization Survey from 1993 to 1999 determined that the average annual rate for non-fatal violent crime for all occupations is 12.6 per 1000 workers; whereas the rate for mental health professionals and mental health custodial workers is 68.2 and 69 respectively (OSHA, 2004). However, even these statistics may be an underrepresentation.

**References**
McPhaul, K., Lipscomb, J., (September 30, 2004). Workplace Violence in Health Care: Recognized but not Regulated. *Online Journal of Issues in Nursing,* 9 (3). Retrieved from: http://www.nursingworld.org/MainMenuCategories/ANAMarketplace/ANAPeriodicals/OJIN/TableofContents/Volume92004/No3Sept04/ViolenceinHealthCare.aspx
Occupational Safety and Health Administration [OSHA]. (2004) Guidelines for Preventing Workplace Violence for Health Care & Social Services Workers. Retrieved from: https://www.osha.gov/Publications/osha3148.pdf

**ANALYSIS**

The events in Crow House in March 2016 had tragic outcomes both for 16-year-old Easton Hurst and 37-year-old Ralph Sparks, the worker who assisted in the restraint of Easton that resulted in his death. Easton had a history of violent and aggressive behavior that was ill-suited for a group residential environment. The child welfare system had proved wholly incapable of changing Easton's behaviors, which presented physical safety risks both to other youth in care and to child welfare staff.

Between the ages of 12 and 13, Easton attacked a security guard, pulled a knife on his brother, assaulted a teacher, choked his mother and hit an infant with a closed fist (intending to hit his sister). While at Kappa in 2013, he kicked a special needs resident in the stomach. At Palmetto, beginning in 2013, he had several incidents of physical aggression:

- November 2013 – physical assault of staff;
- March 2014 – attacked staff;
- June 2014 – attacked another resident by punching him in the head, beating him to the point he appeared unconscious and causing a concussion;
- February 2015 – became aggressive and attempted to get other residents to join him in attacking staff; when police arrived, threatened to "fuck up" others;
- March 2015 – threatened to "flip the van," while being transported, removed his seatbelt and moved toward driver, until driver threatened to call police;
- March 2015 – aggressive with staff;
- June 2015 – violent outburst;

- August 2015 – aggressive confrontation with Detention staff;
- October 2015 – assault of teacher;
- October 2015 – fire set and combative with staff;
- December 2015 – took food from another resident and became aggressive with staff who had to seek treatment at the hospital;
- December 2015 – threatened "to shoot the place [Palmetto] up."
- February 2016- incited other residents to attack staff; threatened a police officer

Easton suffered from Intermittent Explosive Disorder, often directed against authority figures and other residents. Despite the incidents above, Easton was never held in detention for longer than thirty-five days, and the detention he served was for property crimes. He was 6 feet tall and weighed over 200 pounds, claimed to have a gun, and had threatened people with knives. This made it especially difficult to control the risk he posed to staff and other residents.

In January 2016, Palmetto asked the Judge presiding over Easton's County B delinquency petition to order that Easton be discharged from their program for failure to follow rules and placing both staff and other residents at risk of harm. The Judge refused, finding that Easton's placement was a decision for DCFS or the Child Protection Division Judge.

Easton's case demonstrates the failure of the various systems (delinquency court across state jurisdictions, child protection court, DCFS, Juvenile Probation, residential treatment) to effectively work together to address violent behavior of youth in care. The child welfare system, on its own, is not well-suited to handle chronic violence. Since Palmetto campuses stretch across the state border, it is predictable that County C (neighboring state) and County B (Illinois) may have to work together in cases that span jurisdictions.

The Department has the responsibility to protect all children in its care. While Easton maintained a threatening and provocative demeanor throughout his teen years, the risk presented in a group environment increased greatly in June of 2014, when he brutally attacked a fellow resident to the point of unconsciousness. There was no indication that anything child welfare experts provided was decreasing Easton's threatening and violent behaviors. However, Palmetto noted that Easton had limited incidents and showed "significant progress" in early October 2014.[95] From the end of June to the end of July, Easton was in detention. Though he was released from detention at the end of July, Easton was awaiting adjudication in his County C battery case throughout October. In July, he was released from County B, where he had been held for a property crime of residential burglary. In August, the County C district attorney filed a felony battery case against Easton. Easton had beaten a fellow youth, causing the youth to suffer a concussion. This suggests that Easton could respond to external controls. Neither the consultant's Independent Review nor the DCFS Clinical Special Focus Review mentioned the June 2014 incident of Easton beating a peer.[96]

In April 2016, this Office completed a review of 11 homicides of DCFS youth. One of the recommendations was for the Department to develop a violence-free therapeutic community for youth. The community would require the youth to enter into a non-violence contract, obtain part-time employment, participate in continuing education programs, and coordinate closely with delinquency court and probation to ensure that youth are held accountable when necessary.

---

[95] Easton was prescribed thorazine until October 2014.
[96] The Clinical Review noted a court hearing for a charge of substantial battery but did not provide a description.

In developing this Report, OIG staff contacted Boston Jimenez, SPSA in charge of dually-involved youth, to assess the Department's progress in implementing the April 2016 recommendation. Mr. Jimenez did not identify any significant progress.

The decision to return Easton to his mother was a poor decision at its outset. The decision was likely driven by the acute desperation of staff, who knew that a step down to a group home was months away and that another residential placement was unlikely. The child welfare system had been unable to effectively manage Easton's violent behaviors. It was also unlikely that his mother could manage him. She struggled with her own problems and he had seriously harmed her in the past.

**Acme**
The services provided by Acme's Intensive Placement Stabilization program were neither intensive nor stabilizing. Easton's return home presented serious and difficult problems, none of which were addressed by the Program. There was no recognition of the difficulties that Ms. Hurst would face, given her history with Easton and her severely limiting mental illnesses. Even though Easton was identified as having missed a substantial amount of school and may have needed an Individual Education Plan, there was no attempt to contact the school. Tatum Kasich was ill-prepared to address these issues and received little to no supervision.

The Inspector General will share this Report with the following:

- The County B Juvenile Justice Council
- The County B Immersion Site Director
- Administrative Office of Illinois Courts
- The County C District Attorney's Office
- The Office of County A Public Guardian

**RECOMMENDATIONS**

The recommendations should not be shared independent of the investigative report.

1. The Department should convene a permanent workgroup that would accept referrals of violent youth in care whose behaviors endanger the safety of other youth in placement. The workgroup should assist child welfare specialists and placement treatment teams in coordinating needed information and identifying resources..

2. Acme needs to address the failures in this case. The Inspector General will meet with the Acme Board of Directors.

3. As it can be predicted that youth in care placed at Palmetto Bard Homes Campus may be involved in both County C and County B Juvenile Justice, the County B Immersion Site Director should develop a work group with Palmetto, The County B Juvenile Justice Council and the County C District Attorney to ensure coordination of efforts involving individual youth.

4. The Department should use this report as a teaching tool with all management staff responsible for Dually Involved Youth.

5. The Department must develop resources including funding for residential treatment centers to develop their own step down foster homes.

6.  The Office of the Inspector General reiterates its recommendation from the Street Homicide Report and Shelter Care and Runaway Report that the Department should develop a staff secure violence and substance free therapeutic stabilization center based on a model similar to a halfway house for youth 18 and over involved with the criminal court system or dually involved with adult and juvenile courts for crimes against a person. This program should be extended to include violent youth under 18 who pose a risk to the safety of other peers in their placement.