# OFFICE OF THE INSPECTOR GENERAL
## ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES

# REPORT TO THE GOVERNOR AND THE GENERAL ASSEMBLY

## JANUARY 2017

## DENISE KANE, PH.D.
### INSPECTOR GENERAL

# OFFICE OF THE INSPECTOR GENERAL
# ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES

January 1, 2017

To Governor Rauner and Members of the General Assembly:

In 1993, three-year old Joseph Wallace was murdered.  The Department had recently returned the child to the care of his mother. In response to his death, the Office of the Inspector General for DCFS was created. The Office was charged with examining not only whether individual workers had committed fatal errors, but also whether there were organizational flaws that contributed to poor decision-making. In addition, in consideration of the best interests of children, we needed to ensure that horrors such as Joseph's death did not result in unfairly limiting children's return home when it is safe to do so.   Since 2000, the Office has conducted 1,776 investigatory reviews of records of deaths and serious injury of children who were either in the care of the Department at the time of their death, or were, like Joseph, involved with DCFS within the 12 months before their death.  The Office conducted 231 full investigations of these deaths. Throughout the years, the Office has also conducted specialized in-depth death investigations, such as homicides of children whose young parent was under the care of the Department.

This year's annual report contains an investigation of eleven children and adolescents who, while in the care of the Department, were victims of street homicides. (See Street Homicide Report, page 35.)  All except one lived in Cook County. Many were cared for by relatives who helped raise the youth when their parents could not or did not. Many of the children struggled academically and were reading at two levels below expectation as early as the second or third grade. They lived in communities where "safe passage" must be provided so children can be offered protection from gunfire on their way to and from school. These high poverty communities largely lack opportunities for children to succeed.  Public health and delinquency research show the likelihood that these vulnerable children will become disconnected from the larger society.

The Inspector General's investigation found that our child welfare system does not provide sufficient supports to combat the lure of drugs and gangs to avoid disengagement from our educational institutions. Neither does the Department provide safe transportation for its children to participate in pro-social and recreational programs. Currently, the Department has in its care 169 grammar school children who live in the Austin, Lawndale, Englewood, and Garfield communities of Chicago. The cost of providing these essential supportive services to our grammar school children pales in comparison to the cost of an almost inevitable path to gangs and guns and drugs.

Our Homicide Report called on the Department to provide the necessary support for our children in state care who live in areas of high poverty. The Department's concluding response to the Report was to claim that the Office of the Inspector General acted beyond its authority in "doing this investigation and in recommending sweeping policy change."  We disagree.  Conducting such investigations is and always has been one of the fundamental purposes of this Office, and is squarely within our statutory investigative authority.

The Department has a fiduciary duty to provide for the well-being of its vulnerable youngsters and to foster their potential. There are practices and resources that are already proven through evidence-based studies to make a difference in children's lives. The Department must fortify community based agencies

to provide such proven interventions.  These vulnerable young lives, in danger of disconnection from society, cannot be put on hold. The risk and costs are too high.

Twenty three years have passed since Joseph's death. Each year the annual report includes cumulative data on the death of children who are in the care of the Department or whose family had involvement with the Department within 12 months before the child's death. This year we are using the data and related investigations for a retrospective view of DCFS involved children who were victims of homicides while in the home of their biological parent, in foster care, or in residential care. Critical review helps us to determine individual and potential root causes and whether there is a need to change or enhance policies and practices related to child protection and child welfare. (See page 145.)

In the same spirit we are including a substantive overview of organizational failures and harms. It is important to maintain an institutional memory of roads to harm, if we are not to repeat institutional errors that harmed Illinois children and their families. (See page 205.)

On behalf of myself and our staff, I thank you for giving us the opportunity to contribute to the safety and well-being of our children and their families.


Respectfully,

Denise Kane, Ph.D.
Inspector General

# OFFICE OF THE INSPECTOR GENERAL
# REPORT TO THE GOVERNOR AND THE GENERAL ASSEMBLY

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

INVESTIGATIONS ............................................................................................... 7

    DEATH AND SERIOUS INJURY INVESTIGATIONS ................................................. 7

    STREET HOMICIDES INVESTIGATIVE REPORT…..………………………………..35

    CHILD DEATH REPORT .................................................................................. 71

        SUMMARY ................................................................................ 73

        HOMICIDE ................................................................................ 78

        SUICIDE ................................................................................... 91

        UNDETERMINED ....................................................................... 92

        ACCIDENT ............................................................................... 109

        NATURAL ................................................................................ 123

    SEVENTEEN-YEAR DEATH RETROSPECTIVE ..................................................... 141

    CHILD DEATHS RULED HOMICIDE FY 2000-2016…………………………………145

    GENERAL INVESTIGATIONS ........................................................................... 149

        INVESTIGATIVE CASELOADS REPORT SUMMARY (GENERAL INVESTIGATION 1)
        AND DEPARTMENT RESPONSE………………………………………………149

ORGANIZATIONAL FAILURES AND HARMS ....................................................... 205

ERROR REDUCTION………………………………………………………………211

    LESSONS LEARNED FROM PHYSICAL ABUSE FATALITIES CURRICULUM ............................ 212

ETHICS ............................................................................................................ 233

SYSTEMIC RECOMMENDATIONS ......................................................................... 239

RECOMMENDATIONS FOR DISCIPLINE ................................................................ 245

CHILD WELFARE EMPLOYEE LICENSES ............................................................. 247

COORDINATION WITH LAW ENFORCEMENT ...................................................... 249

DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS .................................... 251

APPENDIX ......................................................................................................... 295

    DEPARTMENT RESPONSE AND INSPECTOR GENERAL REBUTTAL TO
    SLEEP RELATED DEATH INVESTIGATIONS……………………………………………..A-1

# INTRODUCTION

The Office of the Inspector General of the Department of Children and Family Services was created by unanimous vote of the Illinois General Assembly in June 1993 to reform and strengthen the child welfare system. The mandate of the Office of the Inspector General is to investigate misconduct, misfeasance, malfeasance, and violations of rules, procedures, or laws by Department of Children and Family Services (DCFS) employees, foster parents, service providers and contractors with the Department. *See* 20 ILCS 505/35.5 – 35.7. To that end, this Office conducts investigations and makes recommendations to protect children, uncover wrongdoing, improve practice, and increase professionalism within the Department.

## INVESTIGATION CATEGORIES

*Death and Serious Injury Investigations*

The Office of the Inspector General investigates deaths and serious injuries of Illinois children whose families were involved in the child welfare system within the preceding 12 months. The Inspector General is an *ex officio* member of the Child Death Review Team Executive Council. The Inspector General receives notification from the Illinois State Central Register (SCR) of all child deaths and serious physical injuries where the child was a youth in care, the family is the subject of an open investigation or service case, or the family was the subject of a previous investigation or closed case within the preceding 12 months. The notification of a child death or serious injury generates a preliminary investigation in which the death report and other reports are reviewed and computer databases are searched. When further investigation is warranted, records are impounded, subpoenaed or requested and a review is completed. When necessary, a full investigation, including interviews, is conducted. The Inspector General's Office created and maintains a database of child death statistics and critical information related to child deaths in

Illinois. The following chart summarizes the death cases reviewed in FY 2016:

### FY 16 CHILD DEATH CASES REVIEWED

| | |
|---|---|
| CHILD DEATHS IN FY 16 MEETING THE CRITERIA FOR REVIEW | 100 |
| INVESTIGATORY REVIEWS OF RECORDS | 90 |
| FULL INVESTIGATIONS | 10 |

Summaries of death investigations, with a full investigative report submitted to the Director, are included in the Investigations Section of this Report on page 7. Summary of all child deaths reviewed by the Office of the Inspector General in FY 16 can be found on page 73 of this report.

*General Investigations*

The Office of the Inspector General responds to and investigates complaints filed by the state and local judiciary, Department employees, foster parents, biological parents and the general public. Investigations yield both case-specific recommendations, including disciplinary recommendations, and recommendations for systemic changes within the child welfare system. The Inspector General's Office monitors compliance with all recommendations.

*Child Welfare Employee Licensure Investigations*

In 2000, the General Assembly mandated that the Department of Children and Family Services institute a system for licensing direct service child welfare employees. The Child Welfare Employee License (CWEL) permits centralized monitoring of all persons providing direct child welfare services, whether they are employed with the Department or a private agency. The employee licensing system seeks to maintain accountability, integrity and honesty of those entrusted with the care of vulnerable children and families.

A child welfare employee license is required for both Department and private agency investigative, child welfare and licensing workers and supervisors. The Department, through the Office of Employee Licensure, administers and issues Child Welfare Employee Licenses.

A committee composed of representatives of the Office of the Inspector General, the Child Welfare Employee Licensure Board and the Department's Office of Employee Licensure screens referrals for CWEL Investigations. The committee reviews complaints to determine whether the allegations meet one or more grounds for licensure action as defined in Department Rule 412.50 (89 Ill. Adm. Code 412.50). The Inspector General investigates and prosecutes CWEL complaints and hearings.

When a CWEL Investigation is completed, the Office of the Inspector General, as the Department's representative, determines whether the findings of the investigation support possible licensure action. Allegations that could support licensure action include conviction for specified criminal acts, indicated findings of child abuse or neglect, egregious acts that demonstrate incompetence or a pattern of deviation from a minimum standard of child welfare practice. Department Rule 412.50 (89 Ill. Adm. Code 412.50) specifies the grounds for licensure action. When licensure action is appropriate, the licensee is provided an opportunity for a hearing. An Administrative Law Judge presides over the hearing and reports findings and recommendations to the Child Welfare Employee Licensure Board. The CWEL Board makes the final decision regarding licensure action.

In FY 2016, 22 cases were referred to the Inspector General for Child Welfare Employee License investigations. In addition, the Inspector General's Office provided research and technical assistance to the Office of Employee Licensure in 18 evaluations of CWEL applicants.

## FY 2016 CWEL INVESTIGATION DISPOSITIONS

| CASES OPENED FOR FULL INVESTIGATION | 22 |
|---|---|
| CLOSED/NO CHARGES | 7 |
| CHARGES WITHDRAWN | 2 |
| REVOCATION | 1 |
| REVOCATION *PENDING BOARD* | 4 |
| LICENSES RELINQUISHED | 4 |
| PENDING ADMINISTRATIVE HEARING | 2 |
| MONITORING ONLY | 2 |

### Resolution of Prior Investigations

| CASES PRIOR TO FY 16 | 14 |
|---|---|
| CLOSED/ NO CHARGES | 1 |
| LICENSES RELINQUISHED | 2 |
| REVOCATION | 2 |
| PENDING FINAL DECISION | 5 |
| PENDING ADMIN. LAW JUDGE  DECISION | 4 |

*Criminal Background Investigations and Law Enforcement Liaison*

The Inspector General's Office provides technical assistance to the Department and private agencies in performing and assessing criminal history checks. In FY 16, the Inspector General's Office opened 2,909 cases requesting criminal background information from the Law Enforcement Agencies Data System (LEADS). Each case may involve multiple law enforcement database searches and may involve requests on multiple persons. For the 2,909 cases opened in FY 16, the Inspector General's Office conducted 10,013 searches for criminal background information.

In addition, in the course of an investigation, if evidence indicates that a criminal act may have been committed, the Inspector General may notify the Illinois State Police, and the Office of the Inspector General may investigate the alleged act for administrative action only.

The Office of the Inspector General assists law enforcement agencies with gathering necessary documents. If law enforcement elects to

investigate and requests that the administrative investigation be put on hold, the Office of the Inspector General will retain the case on monitor status. If law enforcement declines to prosecute, the Inspector General will determine whether further investigation or administrative action is appropriate.

### INVESTIGATIVE PROCESS

The Office of the Inspector General's investigative process begins with a Request for Investigation or notification by the State Central Register of a child's death or serious injury or a referral for a Child Welfare Employee License investigation. Investigations may also be initiated when the Inspector General learns of a pending criminal or child abuse investigation against a child welfare employee.

In FY 2016, the Office of the Inspector General received 3,317 Requests for Investigation or technical assistance.[1] Requests for Investigation and notices of deaths or serious injury are screened to determine whether the facts suggest possible misconduct by a foster parent, Department employee, or private agency employee, or whether it suggests a need for systemic change. If an allegation is accepted for investigation, the Inspector General's Office will review records and interview relevant witnesses. The Inspector General reports to the Director of the Department and to the Governor with recommendations for discipline, systemic change, or sanctions against private agencies. The Office of the Inspector General monitors the implementation of accepted recommendations.

The Office of the Inspector General may work directly with a private agency and its board of directors to ensure implementation when recommendations pertain to a private agency. In rare circumstances, when the allegations are serious enough to present a risk to children, the Inspector General may request that an agency's intake for new cases be put on temporary hold,

or that an employee be placed on desk duty pending the outcome of the investigation.

The Office of the Inspector General is mandated by statute to be separate from the Department. Inspector General files are not accessible to the Department. The investigations, investigative reports and recommendations are prepared without editorial input from either the Department or any private agency. Once a Report is completed, the Inspector General will consider comments received and the Report may be revised accordingly.

If a complaint is not appropriate for full investigation by the Office of the Inspector General, the Inspector General may refer the complaint to law enforcement (if criminal acts appear to have been committed), to the Department's Advocacy Office for Children and Families, or to other state regulatory agencies, such as the Department of Financial and Professional Regulation.

*Administrative Rules*

Rules of the Office of the Inspector General are published in the Illinois Register at 89 Ill. Admin. Code 430. The Rules govern intake and investigations of complaints from the general public, child deaths or serious injuries and allegations of misconduct. Rules pertaining to employee licensure action are found at 89 Ill. Admin. Code 412.

*Confidentiality*

A complainant to the Office of the Inspector General, or anyone providing information, may request that their identity be kept confidential. To protect the confidentiality of the complainant, the Inspector General will attempt to procure evidence through other means, whenever possible. At the same time, an accused employee needs to have sufficient information to enable that employee to present a defense. The Inspector General and the Department are mandated to ensure that no one will be retaliated against for making a good faith complaint or providing information in good faith to the Inspector General.

---

[1]This includes requests for investigation, notice of child deaths and serious injuries, notification of arrests or pending abuse investigations, and requests for technical assistance and information.

Reports issued by the Office of the Inspector General contain information that is confidential pursuant to both state and federal law. As such, Inspector General Reports are not subject to the Freedom of Information Act. Annually, the Office of the Inspector General prepares several reports deleting confidential information for use as teaching tools for private agency and Department employees.

*Impounding*

The Office of the Inspector General is charged with investigating misconduct "in a manner designed to ensure the preservation of evidence for possible use in a criminal prosecution." 20 ILCS 505/35.5(b). In order to conduct thorough investigations, while at the same time ensuring the integrity of records, investigators may impound files. Impounding involves the immediate securing and retrieval of original records. When files are impounded, a receipt for impounded files is left with the office or agency from which the files are retrieved. Critical information necessary for ongoing service provision may be copied during the impound in the presence of the Inspector General investigator. Impounded files are returned as soon as practicable. However, in death investigations, the Office of the Inspector General forwards original files to the Department's Office of Legal Services to ensure that the Department maintains a central file.

### REPORTS

Inspector General Reports are submitted to the Director of DCFS. Specific reports are also shared with the Governor. An Inspector General Report contains a summary of the complaint, a historical perspective on the case, including a case history, and detailed information about prior DCFS or private agency contact(s) with the family. Reports also include an analysis of the findings, along with recommendations.

The Office of the Inspector General uses some reports as training tools to provide a venue for ethical discussion on individual and systemic problems in child welfare practice. The reports

are redacted to ensure confidentiality and then distributed to the Department or private agencies as a resource for child welfare professionals. Redacted reports are available on the Office of the Inspector General website, or by request from the Office of the Inspector General by calling (312) 433-3000.

*Recommendations*

The Inspector General may recommend systemic reform or case specific interventions in the investigative reports. Systemic recommendations are designed to strengthen the child welfare system to better serve children and families.

Ideally, discipline should have an accountability component as well as a constructive or didactic one. It should educate an employee on matters related to his/her misconduct while also functioning to hold employees responsible for their conduct. Without the accountability component, there is little to deter misconduct. Without the didactic component, an employee may conclude that s/he has simply violated an arbitrary rule with no rationale behind it.

The Inspector General presents recommendations for discipline to the Director of the Department and, if applicable, to the director and board of the involved private agency. Recommendations for discipline are subject to due process requirements. In addition, the Inspector General will determine whether the facts suggest a systemic problem or an isolated instance of misconduct or bad practice. If the facts suggest a systemic problem, the Inspector General's Office may investigate further to determine appropriate recommendations for systemic reform.

When recommendations concern a private agency, appropriate sections of the report are submitted to the agency director and the board of directors of that agency. The agency may submit a response. In addition, the board and agency director are given an opportunity to meet with the Inspector General to discuss the report and recommendations.

In this Annual Report, systemic reform recommendations are organized into a format that allows analysis of recommendations according to the function within the child welfare system that the recommendation is designed to strengthen. The Inspector General's Office is a small office in relation to the child welfare system. Rather than address problems in isolation, the Inspector General's Office views its mandate as strengthening the ability of the Department and private agencies to perform their duties.

The Office of the Inspector General monitors implementation of recommendations made to the Director of DCFS and private agencies. Monitoring may take several forms. The Office of the Inspector General will monitor to ensure that Department or private agency staff implement the recommendations made. The Inspector General may consult with the Department or private agency to assist in the implementation process. The Inspector General may also develop accepted reform initiatives for future integration into the Department.

### ADDITIONAL RESPONSIBILITIES

*Office of the Inspector General Hotline*

Pursuant to statute, the Office of the Inspector General operates a statewide, toll-free telephone number for public access. Foster parents, guardians *ad litem*, judges and others involved in the child welfare system have called the hotline to request assistance in addressing the following concerns:

- Complaints regarding DCFS caseworkers and/or supervisors ranging from breaches of confidentiality to failure of duty;
- Complaints about private agencies or contractors;
- Child Abuse Hotline information;
- Child support information;
- Foster parent board payments;
- Youth in College Fund payments;
- Problems accessing medical cards;
- Licensing questions;
- Ethics questions; and

- General questions about DCFS and the Office of the Inspector General.

The Office of the Inspector General's Hotline is an effective tool that enables the Inspector General to communicate with concerned persons, respond to the needs of Illinois children, and address day-to-day problems related to the delivery of child welfare services. The phone number for the Office of the Inspector General Hotline is (800) 722-9124.

The following chart summarizes the Office of the Inspector General's response to calls received in FY 16:

### CALLS TO THE INSPECTOR GENERAL HOTLINE IN FY 16

| | |
|---|---|
| INFORMATION AND REFERRAL | 886 |
| REFERRED TO SCR HOTLINE | 75 |
| REQUEST FOR OIG INVESTIGATION | 71 |
| TOTAL CALLS | 1032 |

*Ethics Officer*

The Inspector General served as the Ethics Officer for the Department of Children and Family Services through FY 2016. The Inspector General reviewed Statements of Economic Interest for possible conflicts of interest of those employees of the Department of Children and Family Services who are required to file a Statement of Economic Interest.

For FY 16, 605 Statements of Economic Interest were submitted to the Ethics Officer. For the 605 statements submitted, there were 113 disclosures of secondary employment or business ownership.

### ACTION ON FY 16 STATEMENTS OF ECONOMIC INTEREST

| | |
|---|---|
| ECONOMIC INTEREST STATEMENTS FILED | 605 |
| DISCLOSURES OF SECONDARY EMPLOYMENT OR BUSINESS OWNERSHIP | 113 |

INTRODUCTION

The Office of the Inspector General Ethics staff also coordinated and monitored DCFS compliance with the statewide ethics training mandated under the Illinois State Officials and Employees Ethics Act of 2003. In 2016, the Office of the Inspector General ensured that 2,652 DCFS employees completed the training. In addition to DCFS employees, DCFS board and commission members were asked to have their members complete off-line training. In 2016, 234 DCFS board and commission members were required to complete the off-line ethics training.

In addition, the Ethics Officer and Ethics staff responded to inquiries from Department and private agency employees concerning their ethical duties and responsibilities under the Child Welfare Employee Ethics Code, Department Rules and Procedures and the State Officials and Employees Ethics Act of 2003. For a full discussion of ethics consultations, see page 233.

INTRODUCTION

# INVESTIGATIONS

This annual report covers the time from July 1, 2015 to June 30, 2016.  The Investigations section has four parts.  Part I includes summaries of child death and serious injury investigations reported to the Department Director and the Governor.  Part II contains aggregate data and case summaries of child deaths in families who were involved with the Department in the preceding 12 months.  Part III contains general investigation summaries conducted in response to complaints filed by the state and local judiciary, foster parents, biological parents and the general public.

Investigation summaries contain sections detailing the allegation, investigation, Inspector General recommendations and Department response.  In the "OIG Recommendation/Department Response" section of each case Inspector General recommendations are in bold, and for some recommendations, Inspector General comments on the Department's responses are included in italics.

## DEATH AND SERIOUS INJURY INVESTIGATIONS

### DEATH AND SERIOUS INJURY INVESTIGATION 1

**ALLEGATION**

A 17 year-old male in Transitional Living Program was shot and killed while committing an armed robbery.  At the time of his death, the boy had been in the care of the Department for almost three years and for six weeks prior to his death was residing in a Transitional Living Placement (TLP).

**INVESTIGATION**

The boy's involvement with the Department began just after he turned 14 years-old when a case was opened to provide intact services to his family.  The request for intact services had been made by the boy's probation officer, who had begun working with him after he was sentenced to supervision following an incident in which he stole a classmate's cellular phone.  The boy later told the probation officer he had stolen the phone and sold it in order to get money to purchase marijuana.  The boy had a history of diagnosed mental health issues including Oppositional Defiant Disorder, Impulse Disorder and Attention Deficit Hyperactivity Disorder (ADHD), for which he had been prescribed psychotropic medication.  He had twice been psychiatrically hospitalized in response to exhibiting aggressive behaviors, such as hitting relatives and fighting with peers, and stealing both at home and in school.  The boy's mental health issues were compounded by the effects of his having been hit by a car at age 12.  As a result of being struck and run over by a hit-and-run driver, he had suffered a traumatic brain injury as well as damage to his liver and a broken leg. His traumatic brain injury caused him to experience seizures.

Following the initiation of intact services, the boy continued to exhibit the pattern of behavior that had led to his involvement with the juvenile justice system.  He was repeatedly arrested for incidents of retail theft as well as assault, trespassing and loitering and routinely failed to report to his probation officer as required or comply with the terms of electronic monitoring.  Two months after the case was opened, the State Central Register (SCR) received a report the boy had been the victim of domestic violence inflicted by his mother's boyfriend, who resided in the family home.  Concerns were raised regarding potential alcohol abuse by the boy's mother; however, she refused to participate in any substance abuse assessment.  The boyfriend was ultimately indicated for Cuts, Welts and Bruises.  The boy's delinquent behavior continued and culminated in the issuance of a juvenile arrest warrant resulting in him being taken into custody and held at a juvenile

detention center.  Based on the recommendations of his probation officer, child welfare professionals, and with the consent of his mother, the court committed the boy to the guardianship of the Department one month prior to his 15th birthday.

After being held at the juvenile detention center for seven months, during which time he engaged in fights with peers and resisted participation in school, the court ordered the boy to be placed in a residential facility. Both the boy and his mother opposed the decision as they wanted him to be returned to the mother's home. Five weeks after being placed at the facility, the boy left without approval and a juvenile arrest warrant was issued.  He was found one week later and taken back to juvenile detention.  A Clinical Intervention for Placement Preservation (CIPP) meeting was subsequently held to identify means of ensuring the success of the boy's next placement.  In light of his ongoing refusal to comply with the terms of court monitoring and elopement from the residential facility, a determination was made the boy should be placed in a location a significant distance away from the city where he lived.  A residential treatment center in a rural area was identified and the boy was placed there.

Two months after the boy was placed at the residential treatment center, he was arrested by local police for mob action and sentenced to probation and community service.  Following this initial incident, the boy exhibited greatly improved behavior and benefitted from a caseworker who worked with him diligently on an individual basis.  While living at the center, the boy earned his General Equivalency Degree (GED) and began attending courses at a local college.  After five months at the treatment center, the boy was scheduled to "step-down" to a group home; however, his transfer was delayed by a lack of available space at potential destinations.  The boy remained at the treatment center for six months beyond his scheduled release before finally being moved into a Transitional Living Program (TLP) located in the city he was from and where his family still lived.

The boy initially expressed excitement to his TLP caseworker about the prospect of his new living environment and participated in efforts to enroll in a local college and identify nearby services.  Three days after moving into the placement, the boy failed to return to the TLP and was reported absent without permission.  Upon his return, staff learned the boy had been questioned by police regarding a shooting.  The boy told staff he and two friends had been attacked on the street and one of his friends had been shot and killed.  The boy was provided trauma focused intervention and consoled by his TLP caseworker, who maintained consistent engagement with him and supported his efforts to pursue his education.  Despite this intervention, the boy repeatedly left the TLP without permission and, during the six weeks he was placed at the TLP, he was absent from the location one-third of the time.  In a meeting with staff when he returned, the boy stated that during his absences he resided at the home where his mother, sister and maternal grandmother lived.  The boy wanted the home to be designated as an approved placement, however it was explained to him the home would have to be assessed and determined to be safe in order to meet that criteria.

Six weeks after being placed in the TLP, the then-17 year-old boy and a 15 year-old male accomplice were shot and killed by the proprietor of a liquor store in his mother's neighborhood while attempting to commit an armed robbery.  Local police documented that the two were also suspected of involvement in several other robberies that had occurred in the area in the hours preceding their deaths.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  Given the likelihood that youth in Transitional Living Programs will maintain family involvement, funded family interventions – such as Brief Strategic Family Therapy – need to be a standard treatment component in Transitional Living Programs.** |
| --- | --- |

The Department does not agree.  The Department cannot make this a standard treatment component for all

providers due to program and budget issues.

*OIG Comment: SAMHSA Model Programs notes that Brief Strategic Family Therapy was developed for children and adolescents with conduct problems, substance abuse use, problematic family relations and associations with antisocial peers. Outcomes included 75% reduction in marijuana use, 58% reduction in association with antisocial peers and 42% improvement in conduct disorders, and a retention rate of 75% of the families. BSFT counselors can handle 10-12 families participating in home services-most of DCFS' funded transitional living centers serve 10-12 youth at each site. The services are most often provided in the evening hours to accommodate parents for 12-16 weeks. The estimated costs for implementing the model is $10,000 and $35,650 for training and certification (costs include transportation) for five counselors. The National Institute on Drug Abuse (NIDA) provides a training manual at no cost. The price is not high considering the loss that our youth are facing.*

**2.   Adolescents living in Transitional Living Programs who have family members who have mental health issues or who abuse alcohol/drugs should be encouraged to participate in support groups for family members of those abusing alcohol/drugs or the severely mentally ill and should be offered transportation by agency staff.**

The Department agrees.

*OIG Comment: The Department did not agree to provide safe transportation to allow the youth to attend support groups.*

## DEATH AND SERIOUS INJURY INVESTIGATION 2

| ALLEGATION | A three year-old boy died as a result of extensive physical abuse inflicted while spending the summer in the home of a family acquaintance in another state.  The boy was adopted by his foster parent and his case was closed seven months prior to his death. |
|---|---|

**INVESTIGATION**     At the time of the boy's birth, his family had an open case with the Department and his two older siblings were removed from the custody of their biological mother 14 months earlier.  The mother was non-compliant with services and continued to consume alcohol during her pregnancy.  As a result of the mother and father's inability to demonstrate progress toward the goal of reunification with the two older children, the boy was taken into custody upon discharge from the hospital at two days old and placed in the home of his godmother, who was also a licensed foster parent.

At 13 months-old, evaluations of the boy began to identify multiple developmental delays in speech and language, social-emotional functioning and sensory processing.  At 21 months-old the boy was repeatedly found to experience significant delays in all areas of development and, at 22 months-old, began occupational therapy on a weekly basis in the foster mother's home.  The boy also had a history of bronchitis, asthma and recurrent ear infections which required surgery to implant tubes in both ears.

As the boy grew older, further evaluations noted he exhibited features of Autism Spectrum Disorder and was later diagnosed with Alcohol Related Neurodevelopmental Disorder.  At 31 months-old, it was determined the boy possessed skills in the 15 to 24 month-old range and it was recommended he receive, "intensive therapy services to address his global developmental delay."  Although speech therapy had been recommended for him 10 months earlier, it had not yet been implemented.  In an interview with Inspector General investigators, the case manager could not provide an explanation for the delay in initiating services.

Following the assessment at 31 months, the foster mother, who was pursuing adoption of the boy, requested he be considered for specialized foster care.  Specialized foster care authorizes higher monthly reimbursement to foster parents of children with specialized needs, to compensate them for the additional care that they will be required to provide. The boy's case was referred for a Clinical Intervention for Placement Preservation (CIPP) meeting to address the increasingly difficult behavior he was demonstrating in the home in addition to his significant developmental delays.  The boy's caseworker noted that all the services the boy required were, "not being offered and available in a timely matter for him due to his extensive special needs."  An Office of the Inspector General review of the case record discovered the decision on whether to classify the boy as specialized  was "adoption deflected;" however no documentation regarding the decision was present in the case file.  In an interview with Inspector General investigators, the Department Administrator who made the decision to deflect stated that because the boy was in the process of being adopted, the decision about whether he was specialized should be made by the Adoptions Unit. Despite the scope of the boy's physical and developmental delays, the foster mother's request for specialized foster care was denied.  In an interview with Inspector General investigators, the caseworker stated she was, "surprised he wasn't approved [as he was] globally developmentally delayed," and she believed he needed increased services.  Following the denial, the Department administrator informed the foster mother she could, "contact [the Department] after the adoption and they would review his needs then."  The Department's decision to deny the specialized determination failed to ensure the boy's best interests were the basis for determining his care rate.

The boy's adoption was completed just after his third birthday.  The adoption process took six months to complete as the foster mother had delayed finalizing the arrangement until after learning whether the boy would be designated for specialized care.

The lack of funding and services resulted in the foster mother relying on the local school system for therapy. As a result, the boy was without any therapy during the summer months. Six months after the adoption was finalized, the adoptive mother agreed to allow the boy to accompany three neighbor children to spend the summer with their maternal grandmother in another state.  The adoptive mother had been assured that the grandmother had experience handling children with special needs.  Six weeks after the children arrived at the home, the grandmother brought the boy to an emergency room, reporting he had stopped breathing.  Medical personnel attempted to resuscitate him but their efforts were unsuccessful.  An autopsy found the boy had extensive bruises on his body corresponding with the timeframe of his arrival in the grandmother's home and bleeding on his brain approximately two to three weeks old.  The medical examiner noted that it, "took an entire day for his external examination and a second day for his internal examination" due to the extent of his injuries.   Subsequent investigations conducted by local law enforcement and the Department found the neighbor was aware of her mother's past physical abuse of children, including of herself.  It was also learned the mother had communicated via social media with the grandmother's boyfriend, who lived in the home, who had written he would, "send the children home in a box," and, "chop [them] up in little pieces and send them to the dump."  The boy's adoptive mother had no knowledge of the grandmother's history of abuse towards children or the boyfriend's violent messages.   The grandmother ultimately pled guilty to second-degree murder and was sentenced to 30 years in prison.  A child protection investigation of the neighbor was indicated for Inadequate Supervision for allowing her children to reside with the grandmother despite being fully aware of her history of abuse.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. The Department should ensure that a child's specialized care determination shall be based on the child's needs.** |
|---|---|

The Department agrees.

**2. The Department's Specialized Foster Care Unit should be required to document and include in the child's file all assessments, decisions regarding placements and recommendations identified by the unit.**

The Department agrees.

## DEATH AND SERIOUS INJURY INVESTIGATION 3

| ALLEGATION | A four month-old infant residing in the home of a relative died of undetermined causes. A child protection investigation involving the infant's family had been opened three months prior to her death. |
|---|---|

**INVESTIGATION**   The family's involvement with the Department was prompted by a report to the Hotline that the mother had an unstable housing situation and frequently left the then two month-old girl with others while disappearing for days or weeks at a time. It was also reported the mother demonstrated little interest in or attachment to the baby and frequently responded to her crying with threats to throw the child out the window. The report was accepted and a child protection investigation was opened.

The following day, the assigned child protection investigator visited the mother's cousin, in whose home the mother and the baby had most recently resided. The cousin affirmed the characterization of the mother as described in the hotline call and said her whereabouts were unknown at that time. In addition, the cousin stated the mother had substance abuse issues which compounded her existing mental health problems, and had been banned from the building where the cousin lived as a result of her behavior. The investigator determined the baby to be unsafe based on the numerous risk factors presented by the family. The investigator permitted the cousin to keep the baby under a safety plan pending agreement by the mother. In an interview with Inspector General investigators, the child protection investigator stated she discussed sleeping arrangements with the cousin, who had a two year-old daughter of her own, and observed a bassinet she believed would be appropriate for the baby. Although the Inspector General has previously recommended, and the Department has accepted, that the Department ensure that cribs are provided to caretakers if needed, the investigation showed that cribs were not available at the investigator's field office at the time, despite ongoing efforts to address the shortfall. As safe and appropriate sleeping environments are vital to ensuring the health and welfare of children, the ability of the Department to provide cribs quickly and efficiently is of the utmost importance.

The investigator only made two visits to the cousin's home during the nearly three month period that the investigation was opened, although Department Rules and Procedures require weekly visits when a safety plan is implemented. At the time, the investigator had an untenably large number of cases assigned to her.

During her meeting with the investigator, the mother acknowledged leaving the baby with a friend for two days but denied any extended absences or substance abuse issues. The mother reported she had an older daughter who resided with that child's father and said unstable housing at the time the older child was born prevented her from being able to care for her. The mother stated she was currently residing in a shelter and wished to have her baby returned to her. The investigator informed the mother that a case would be opened for intact family services. The confluence of risk and safety factors in this case – threats of violence, substance abuse, mental illness, lack of consistent parental interest, transience – required more than standard intact services. The Department should have responded with attempts to involve the court system and seek a protective order to compel compliance with services, in addition to intense monitoring.

In preparing for the initiation of intact services, the investigator consulted with staff at the shelter where the mother lived to ensure she could reside there along with the baby and a plan was made for the baby to join her one week later. Prior to the baby joining the mother at the shelter, the cousin contacted the investigator to alert her to social media messages posted by the mother. The mother had expressed her intention to leave the state after the infant was returned to her and described relocation plans she had already finalized. The investigator determined the infant would remain with the cousin until the intact family services case was

opened.  The investigator completed a second CERAP determining the infant to be unsafe based on the mother's stated intention to flee the state once she was returned.  Three days later, the investigator completed a final CERAP designating the infant as safe although no factors in the case had changed.  The CERAP stated the infant would remain in the care of the cousin until the intact family services case was opened.

Six weeks later, the baby was found unresponsive in her makeshift crib, which consisted of blankets placed inside a gardening wagon.  The cause and manner of death were undetermined and no abuse or neglect was suspected.  At the time of the infant's death, the family's intact services case had still not been opened.  The current referral process requires workers to email their requests to area administrators for implementation without any formalized system in place to track and monitor these referrals.  Although the investigator's supervisor stated she had forwarded the investigator's referral to the area administrator, the supervisor was unable to locate it in her email and said she frequently emptied her mailbox for storage purposes.  The area administrator was unable to confirm ever having received a request for the family to receive intact services.

---

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | |
|---|---|

**1.  The Department should work with county state attorney's offices to request court involvement and the use of protective orders to increase service compliance with parents who express a desire to parent but who have not demonstrated behavior consistent with their verbal wishes.  Such orders are particularly effective in cases involving substance abuse.**

The Department agrees.  As a continuation of discussions which were initiated at the inaugural transformation summit, the Department will continue to work with the Administrative Office of the Illinois Courts (AOIC) to address issues for process improvement.

*OIG Comment: The Inspector General believes that this recommendation cannot be accomplished without involving State's Attorney Offices as well.*

**2.  The Department's Office of Information and Technology Services (OITS) must develop a tracking and tickler system within the State Automated Child Welfare Information System (SACWIS) for the opening of intact family cases.  Case openings should not be dependent on an exchange of emails.**

The Department agrees. However, the Intact Utilization Unit would track this information in SACWIS.   A work order was submitted requesting a monthly report of case openings so numbers of cases can be tracked.

**3.  The Department needs an inventory system that assures that child protection has rapid access to cribs.**

The Department agrees and will enhance our current inventory system.  Each field office now has their own supply of cribs and a designated Crib Coordinator to track crib inventory as well as distribution and reorder of new inventory.

## DEATH AND SERIOUS INJURY INVESTIGATION 4

| ALLEGATION | An infant died of extreme prematurity approximately one hour after her birth.  At the time of the baby's delivery, her family had an open case for intact family services with the Department. |

| INVESTIGATION | |

The infant's family had a long history of involvement with the Department.  The mother had two older daughters, ages nine and seven, who had been removed from her care seven years earlier.  The mother tested positive for narcotics when both children were born and had significant substance abuse issues.  The mother subsequently surrendered her parental rights to both girls and they were adopted.  The father, who had six older children by two other mothers, had previously been the subject of two indicated reports for Risk of Sexual Injury for repeatedly failing to ensure that a relative with a history of severe child sexual abuse did not have access to his children.  The father had also been indicated for Risk of Physical Injury after police were called in 1997. He had locked two of his children out of their home while threatening to commit suicide.  When the police arrived, the father was pushing and shoving the mother while holding his then four year-old daughter.   The father had obtained temporary custody of his two youngest children, an 11 year-old boy and 14 year-old girl, after their mother was involved in a domestic violence incident with her paramour.

Seven months after the father's two children were placed in the home he shared with his new wife, she gave birth to the couple's first child, a girl.  Although the baby tested negative for drugs, the attending physician noted she exhibited signs of apparent methadone withdrawal.  A child protection investigation and high risk intact family services were initiated to provide support following the birth.  During the investigation, the father reported the mother abused prescription drugs and alcohol while caring for the children.   The report was subsequently indicated against the mother for Risk of Physical Injury to the newborn girl and intact services were continued.

Four months after the investigation was closed, the State Central Register (SCR) received a report the father had taken the mother into the basement of the family home, forced her head through a noose affixed to the ceiling and left her hanging for approximately one minute.  While the baby girl was reported to have been with her maternal grandparents when the incident occurred, the father's two children, ages 12 and 9 at the time, were aware of the incident, although not physically present in the basement.  There were conflicting reports as to whether the older children had been in the home at the time or learned of the incident when their father told them what he had done.  A new child protection investigation was opened and the three children were taken into protective custody.  The investigator obtained the police report which recorded the father had texted another individual stating he had attempted to hang his wife.  While both the father and mother had initially denied to police the attack had actually occurred, the mother later confirmed to officers she had in fact been hung by the neck in the home by the father.  However, the mother informed police she would not cooperate with any efforts to prosecute the father as he provided monetary support to her and had told her such an incident would not happen again.

At a juvenile court hearing the day after the children were taken into protective custody, the father testified he had made comments referring to hanging his wife but characterized his remarks as idle talk with no basis in reality.  The court released the children to the father's care.  The court's decision was not appealed by the Department.  Two weeks later, the two older children were interviewed at a Children's Advocacy Center (CAC).  During the interviews, which were observed by the assigned child protection investigator as well as a local detective and assistant state's attorney, the girl stated the father had admitted to her he had almost hung the mother in the basement of their home, although she and the other children did not witness it.  As the investigator completed his work on the case, he conducted a final consultation with his supervisor.  The

investigator and his supervisor concluded that while they believed the hanging incident as described by both the mother and father had occurred, the children could not be considered to be at risk since they had not witnessed the attack. Based upon this rationale, the investigator and the supervisor unfounded the report against the father.

The State of Illinois defines child abuse to include acts or circumstances that threaten a minor with harm or create a substantial risk of harm to the child's health or welfare. Emotional maltreatment is included in the definition of abuse or neglect. In addition to being exposed to abusive behavior, many children are further victimized by coercion to remain silent about abusive behavior, making them complicit in their own mistreatment or that of their siblings or relatives. Violent behaviors such as chocking or strangulation in domestic violence cases are often precursors to homicide. The federal Violence Against Women Act of 2013 added felony strangulation and suffocation to federal law. In Illinois, placing one's hands on another's throat during a domestic battery to choke or strangle that person constitutes a Class 2 felony offense of domestic battery. The court's decision to return the children to the father placed the Department in the untenable position of supervising an intact case that too high risk for intact services.

Two months after the investigation was closed, the mother delivered the baby girl that died shortly after birth. The mother tested positive for Xanax, benzodiazepines and tricyclics. The baby, who was delivered at 20 weeks gestation, was not tested for substances and her death was ruled to be a result of extreme prematurity, which can be associated with maternal substance abuse.

---

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. In cases of extensive domestic violence, such as this case where the father admitted to hanging the mother with a noose around her neck and leaving her there for one minute, the Department should appeal the court's decision of no probable cause and no urgent and immediate necessity to remove the children.**

The Department does not agree.

*OIG Comment: The Inspector General stands by the recommendation. The father's sociopathic behavior presents a risk to the children.*

**2. This report should be shared with Department attorneys for training purposes.**

The Department agrees. The redacted report will be utilized with staff.

## DEATH AND SERIOUS INJURY INVESTIGATION 5

| ALLEGATION | A seven month-old boy suffered extreme physical abuse, including scalding and multiple fractured bones, while in the care of his mother and her boyfriend. Despite the severity of the boy's life-threatening injuries, the Department maintained a goal of reunification with the mother for over one year while child welfare professionals worked with the family. |

| INVESTIGATION | A child protection investigation involving the family was initiated after the boy was brought to a hospital emergency room with numerous egregious abusive injuries. Attending physicians noted the boy had a burn across his face that formed a "mask" of blistered and peeling skin and ascertained the injury must have occurred within a few hours of him being brought to the hospital. Upon further examination, doctors also found the boy had a lacerated liver, skull fractures and healing fractures of his right femur, left tibia and three ribs. Doctors determined the boy's skull fractures had occurred at various times and were the result of multiple incidents of trauma. Likewise, the healing fractures in his legs and ribs were of varying ages and indicated multiple events of abuse. The mother told hospital staff the boy's face had been burned after he rolled off a bed while the mother was in another room and became lodged between the wall and a radiator. Physicians informed responding police officers and the assigned child protection investigator that the nature of the boy's injury was not a contact burn, as it would be if it occurred as the mother described, but was the result of the boy's face being submerged in boiling water. The mother explained the boy's fractures were the result of him falling out of bed two months prior, however that explanation was inconsistent with the extent and number of injuries presented.

The mother and her boyfriend, who arrived at the hospital later, were both separately questioned by police and the child protection investigator. Throughout their accounts, both repeatedly changed their stories as to whom was present with the boy in the mother's home prior to coming to the hospital and the cause of his injuries. Each confirmed the two were the boy's only caretakers but denied ever causing harm to the boy themselves while implicating the other for hitting him periodically. Both the mother and her boyfriend also reported issues of domestic violence between the couple with each characterizing the other as the aggressor. The mother and her boyfriend were eventually taken into custody by police and released three days later. During the subsequent child protection investigation, the mother continued to offer various explanations for how the boy's face was burned, but would change her story after being informed her account was inconsistent with his injuries.

Almost one month after being admitted to the hospital, the boy was ready to be released. Although the boy's mother had signed over temporary guardianship to the maternal grandmother and she was identified as a potential caretaker, it was determined that the extent of his medical needs post-release would require specialized placement. The identified foster parent attended training at the hospital for two weeks and, upon the boy's release following six weeks in the hospital, he was moved to her traditional foster home. The child protection investigation was ultimately indicated against both the mother and her boyfriend for Head Injuries by Abuse, Burns by Abuse, Fractures by Abuse, Torture and Medical Neglect. A case was opened for intact family services and personnel from a private agency began working with the family.

Throughout her involvement with the private agency, the mother demonstrated behavior incompatible with being the full-time caretaker for a child. Agency staff routinely noted the mother was disengaged during visits with the boy and regularly had to be redirected by workers to attend to his basic needs. Whenever the maternal grandmother was present, the mother deferred to her to care for the boy and frequently characterized his typical actions of seeking attention or food as examples of him being "spoiled" or "greedy." Workers also reported the mother exhibited difficulty establishing boundaries related to visitation, supervision and parenting. An Integrated Assessment, conducted six weeks after the boy entered the foster home, found the |

mother was, "guarded and had difficulty engaging," with workers and "appeared to be attempting to present herself in a positive manner and it appeared that some of her statements may not be reliable based on other documented information."  The mother reported having previously been diagnosed with depression and bipolar disorder and that she had been psychiatrically hospitalized at ages 16 and 17 following violent outbursts at home.  The mother stated she had been prescribed medication for her conditions but had ceased taking it four years earlier.  The assessor noted that the mother demonstrated no sense of culpability for the severe, permanently disfiguring injuries her son suffered.  She placed all blame for his suffering on the boyfriend, and refused to accept any responsibility for failing to protect him.  The assessor concluded that given the boy's need for significant, long-term support for his physical, emotional and behavioral development, the mother's demonstrated lack of attachment could pose a further risk to his well-being.  The assessor determined the prognosis for the boy's reunification with the mother to be poor and recommended consideration of expedited termination of the mother's parental rights.

In an interview with Inspector General investigators, the private agency supervisor who oversaw the family's case stated that while the subject of expedited termination of the mother's parental rights was raised, "no one took the lead," among involved professionals.  As such, agency staff continued to pursue a path toward eventual reunification.  In the field of child welfare, there are few, if any, evidence-based treatments or services that have been proven to correct the conditions that result in severe and extreme physical violence against children.  In the absence of known effective treatments, children can be left to drift in foster care for years in pursuit of a perpetual goal of returning home that is unlikely to ever be achieved.  The Office of the Inspector General, with the assistance of members of the Child Death Review Team, developed a Maltreatment Continuum to assist the field in readily identifying abuse rising to an "egregious" level, for which there are no known effective evidence-based interventions.  These cases involve an, "egregious, sadistic or torturous act that inflicts significant pain, causes extensive external and/or internal bruising, serious injury or death."  Although these instances represent only a very small percentage of cases, they require intense efforts and consume a disproportionate amount of resources pursuing a Return Home goal that could be better utilized where reunification is a more realistic outcome.

Thirteen months after the boy was released from the hospital, his mother relinquished her parental rights.  The mother had continued to make minimal progress toward the goal of having the boy return home and had repeatedly failed to comply with the actions required of her.  The mother signed consents for the maternal grandmother, who had since become a licensed foster parent and assumed custody of the boy, to adopt him.  The boy's father, who had been incarcerated for much of the time the family's case was open, initially expressed a desire to have the boy placed with him, however his involvement waned following his release from prison.  Six months after the boy was placed with the grandmother, a caseworker made an unannounced visit to the home and found the boy had been left in the sole care of the mother, who had recently moved in.  A child protection investigation was opened for Risk of Harm for the boy being left with the mother unsupervised.  The grandmother agreed to have the mother leave the home and involved workers from the private agency have since reported no ongoing concerns with the placement.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The Department's Office of Legal Services and Division of Clinical Practice and Professional Development should develop a tracking system for cases involving egregious abuse and outcomes.** |
|---|---|

The Department agrees.  Egregious abuse cases are now tracked via the Clinical Referral system through the completion of the 399-1. The Egregious Act Protocol has been written into Procedure 300 and training has been completed in the Southern and Cook Regions.

**2.  Regional Clinical and Legal Staff should convene interdisciplinary case conferences to support the field in appropriately servicing these children.**

The Department agrees. Formal staffings will be convened by the regional clinical staff at a minimum on a quarterly basis.

**DEATH AND SERIOUS INJURY INVESTIGATION 6**

| ALLEGATION | A three month-old infant died of swelling to her brain as a result of undetermined causes.  In the seven months prior to her death, the infant's family had been the subjects of two child protection investigations, one of which was indicated against the infant's mother for neglect of her one year-old sister. |
|---|---|

**INVESTIGATION**

The first child protection investigation was initiated after the State Central Register (SCR) received a report the one year-old sister had a bruise on her ear and that her father, who was separated from her mother, was receiving threats via text message from the mother's current boyfriend.  The child protection investigator assigned to the case made an unsuccessful attempt to call the father the day after the report was made.  The investigator then went to the mother's home and saw the girl, whom he noted had no visible bruises.  He also saw the mother's other two children, boys aged 10 and 6 who had different fathers than the one year-old, and recorded no concerns with their appearance or behavior.  The mother acknowledged conflict between the father and her current boyfriend but said she believed the father was jealous of her new relationship and resented making child support payments.  Although the investigator knew the father claimed to have a photograph of the bruise to the girl's ear, he never met with the father prior to closing the investigation.  In addition, the investigator never reviewed the text messages purported to contain threats made by the boyfriend against the father.  The investigator did speak with the children's primary physician who stated she had seen the girl approximately five days after the bruising to her ear was have to occurred but did not observe the injury.  However, as has been noted in previous OIG reports, bruising to infants and young children can heal quite rapidly and may not be apparent even a short time after injuries occur.  The investigator ultimately concluded the report should be unfounded, based primarily upon the physician's statement she had not observed a bruise on the girl, and his decision was approved by his supervisor.

One month after the case was closed, a second child protection investigation of the family was opened.  The allegation was essentially unchanged from the first report, claiming the one year-old girl repeatedly exhibited bruises, scratches and swelling which her mother minimized or explained away as being caused by incidental contact with inanimate objects or other children.  The report again mentioned ongoing conflict between the one year-old's father and the mother's boyfriend.  Upon accepting the report, a mandate investigator spoke to the mother by phone and requested she take the girl to be seen by a doctor.  The mother complied and took her to a local hospital, where medical personnel who examined her noted significant bruising in various stages of healing over different parts of her body, including her head and jaw.  The mandate investigator took photographs of the girl's bruises but noted the injuries were not readily apparent in the pictures.  A decision was made to implement a safety plan, requiring the children to reside with the oldest child's paternal aunt and the boyfriend to refrain from having any contact with them.  All parties agreed to the plan and the children were placed with the aunt, who lived upstairs from the mother in the same building.

Four days after the case was opened, it was assigned to the same investigator who had handled the first report.  Two days later, the investigator spoke with the father, who reiterated his concerns about possible physical abuse of his daughter in light of the repeated, unexplained bruises he said he found on her.  The same day, the investigator made an unannounced visit to the aunt's home and observed the one year-old girl, who appeared well.  The investigator made a return trip to the home one week later and saw all three children, with the two older boys reporting never having seen or experienced any abuse by their mother or her boyfriend.  The mother told the investigator that the bruise to the girl's jaw had been caused when she fell after being placed unsecured upon a regular chair while eating.  Two weeks later, the father obtained an emergency motion granting him temporary custody of the one year-old girl.  Since the girl was leaving the aunt's home and the two boys did not present any safety concerns, the safety plan was terminated.

As the investigator prepared to close the case, he spoke with the assistant to the children's primary physician who reported no concerns with the children's health or care.  The investigator did not consult with the doctor who saw the girl when she was taken to the hospital to determine whether the injury to her jaw was consistent with the mother's explanation.  Furthermore, although a police inquiry into the girl's injuries was opened, the investigator never contacted law enforcement to learn of their findings.  The police had obtained photos of bruises on the one year-old taken by the father as well as copies of text messages to him from the boyfriend, alternately insulting him and threatening possible violence against his daughter.  The police also received medical records from the hospital related to the examination of the girl following the second SCR report.  Prior to closing the case, the investigator's supervisor waived the requirement that he contact law enforcement on the erroneous basis there had been no police involvement.  The investigator and his supervisor ultimately indicated the report against the mother for inadequate supervision, based on the conclusion the one year-old's injury had been caused by the mother's inattentiveness in placing her in a chair unsecured.  At the time the investigator handled both investigations involving the family, he was responsible for a volume of cases exceeding the amount established by a federal consent decree intended to limit the workload of child protection investigators.

Three weeks before the case was closed, the mother gave birth to her child with the boyfriend.  Three months later, both parents brought the baby to a hospital emergency room exhibiting vomiting and lethargy.  Upon examination, doctors found the baby had swelling to her brain tissue and retinal hemorrhages, which are often indicative of a baby having been shaken violently.  Her injuries appeared to medical staff to be "non-accidental" and her condition was listed as grave.  While the baby was hospitalized, her primary physician, who also treated the mother's other children, was consulted by hospital staff and concluded that, based on the nature of her traumatic injuries, the baby had been the victim of physical abuse.  One week after being admitted to the hospital, the baby girl died.  A post-mortem examination conducted by the Medical Examiner concluded the baby's cause and manner of death were undetermined, as he could not conclusively state the brain swelling was the result of "shaken baby syndrome" rather than some other natural cause.

In response to the Medical Examiner's findings, the child protection investigation was unfounded against the mother and her boyfriend for death by abuse and indicated to an unknown perpetrator.  They were indicated for Substantial Risk of Injury to the two boys, based on the circumstances of the girl's questionable death while in their care.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  The child protection investigator should receive discipline for his failure to complete a thorough investigation including failure to obtain medical records. The Department must take into** |

**consideration, in determining appropriate discipline, the investigator's working environment, including but not limited to high caseload assignments and how these challenges influenced his ability and the State's ability to achieve child safety goals.**

The Department agrees.  The Department will initiate the disciplinary process.

**2.  The child protection investigator's supervisor should receive discipline for her failure to ensure the completion of a thorough investigation including contact with law enforcement and obtaining medical records.**

The Department agrees.  The Department will initiate the disciplinary process.

## DEATH AND SERIOUS INJURY INVESTIGATION 7

**ALLEGATION**    A five year-old boy died as a result of deliberately inflicted blunt trauma to his head. At the time of his death, the boy was in the care of the Department and was residing in the home of his maternal aunt, where he had been placed two months earlier along with his nine year-old brother.

**INVESTIGATION**    The boy and his two older brothers, ages nine and seven, had been removed from the custody of their parents fourteen months earlier as a result of ongoing domestic violence and substance abuse issues in their family's home. During the first twelve months after removal, the brothers were moved through six different placements with relatives, traditional foster parents and, at one point, a shelter. Prior to their sixth placement, which was in the home of their paternal grandmother, the grandmother determined she would only be willing to care for the middle brother on a long-term basis. After two days, the boy and his oldest brother were moved once again, this time into the home of their maternal aunt.

During their time in their previous placements, the sibling group had been observed to engage in problematic behaviors amongst themselves and while interacting with other children. The oldest brother was reported to be excessively physical with his younger siblings and all three engaged in rough play. It had also been documented that the boys inappropriately touched each other and other children. Concerns about the boys' inappropriate contact with other children had ended two of their placements. To address these issues, caseworkers had developed an unworkable protective plan which required caretakers to ensure that the boys were never unattended when awake, even though they shared a bedroom. Additionally, the younger boy had a significant ongoing problem with toileting issues, frequently wetting himself or removing waste from his diaper with his hands.

The boys' maternal aunt was 22 years-old and lived alone with her two children, ages 2 years and 2 months-old. Despite the significant pressures faced by a young single mother with two small children, the private agency handling the family's case identified her as a suitable caretaker for the boy and his oldest brother. While the caseworker stated she informed the aunt at the time the brothers were placed of their history of inappropriate physical contact and the boy's toileting problem, the agency failed to provide concrete assistance regarding how to address these issues. The 22 year-old complained about the staggering amount of laundry necessitated by the youngest child's toileting problems.

One month after the brothers were placed in the home, the caseworker learned the father of the aunts' two children was an occasional presence. The aunt told the caseworker the father only stopped by to pick up the children and was not involved with the household. As the placement went on, the aunt repeatedly voiced her frustrations to the caseworker regarding the boy's inability to control his bodily functions and reported the boy often lashed out by hitting and kicking her. At a clinical staffing held in an effort to stabilize the placement, it was noted that Unusual Incident Reports (UIR) had not been completed in accordance with Department Rule in response to the sexualized behaviors exhibited by the brothers in their previous foster homes. During the meeting, the aunt stated she had never been aware of concerns about the brothers being alone with each other or other children. It was also found that while it had been recorded in the case notes that a safety plan intended to address the brothers' behavior had been forwarded to a Department administrator, no such safety plan was present in the case record and the agency could not produce proof of sending. The staffing produced a series of tasks for the caseworker to conduct in order to help stabilize the placement, and that her supervisor must ensure their completion. In her interview with Inspector General investigators, the caseworker was unable to recall which of the tasks, if any had been accomplished prior to the boy's death.

Six weeks after the boys were placed in the home, they were taken for a sibling visit with their middle brother. Two child welfare workers present at the visit noted several bruises on the youngest boy, which the children attributed to playing with each other. Though one of the workers documented informing the caseworker of the bruises, there was no indication in the case record the caseworker followed up with either the workers or the aunt about the injuries. One week later, during a visit to the home by the caseworker, the aunt reported the boy had large bruises on his legs which she said were the result of him being pushed off of a bed by his oldest brother. The aunt also stated the five year-old boy was injuring himself and making statements that he hoped the aunt would go to jail for hurting him. The aunt expressed concern that the boy's injuries might lead to suspicions of child abuse against her. In response, the caseworker spoke to the boy who denied hurting himself or saying anything about wanting the aunt to go to jail. In her notes, the caseworker reported a strong smell of urine when she entered the boys' room.

Concurrently, a counselor who was making visits to the home recorded the boy often seemed sad and isolated when she was there and that the aunt frequently spoke negatively about him in his presence. In an interview with Inspector General investigators, the counselor said that during her visits to the home the aunt appeared overwhelmed by the work required to maintain the household of four young children and always had something negative to say about the boy. The counselor stated she had no communication with the caseworker during her efforts with the family. In her interview with Inspector General investigators, the caseworker stated she had been entirely unaware of the counselor's involvement with the family.

One week after the counselor's last visit to the home, emergency services were called to the home and found the boy unresponsive and in cardiac arrest. He was transported to a hospital emergency room where hours of efforts to revive him proved unsuccessful and he was pronounced dead. Attending physicians noted multiple bruises at various stages of healing over his body and a post-mortem examination found significant bruises on his face and under his scalp all around his head. The oldest brother was moved into a traditional foster home and a child protection investigation was opened. Initially, the child protection investigation deferred to a criminal investigation being conducted by local law enforcement. Both the aunt and the oldest brother initially denied any physical abuse in the home. The autopsy report for the boy identified numerous injuries throughout his body including a contusion of the frenulum, which is frequently indicative of having a soft object placed forcefully into the mouth. A photograph taken at the scene by police when the boy was found unresponsive showed a rolled up sock lying near where he was found. The boy's manner of death was ruled a homicide, however the final determination was not made until 16 months after his death. Law enforcement declined to pursue criminal charges in the case. The child protection investigation was ultimately indicated against the aunt for Death by Abuse and Death by neglect as she had stated she was the children's sole caretaker and that the father of her two children never resided in her home.

Four months after the autopsy was finalized, the oldest brother resumed counseling and began relating accounts of conditions inside the aunt's home while the boys lived there. The oldest brother described the father of the aunt's children as being a prominent presence in the home and expressed his belief the man had killed the boy. The brother also said the couple would affix a sock in the boy's mouth with duct tape and make him run around the home. The brother's disclosures resulted in the initiation of a new child protection investigation, which was unfounded. Inspector General staff ensured the State's Attorney that had reviewed the case for criminal prosecution had knowledge of the new disclosures by the brother.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The private agency supervisor should be disciplined for approving an inappropriate placement for the boy and his oldest brother; for her failure to develop a safety plan in response to** |
|---|---|

**the injuries identified on the boy throughout his placement with the aunt; for not submitting a UIR in a**

timely manner; for her failure to enter supervisory notes in the State Automated Child Welfare Information System (SACWIS); and her overall failure to provide supervisory oversight in this case.

The Department agrees.

*OIG Response: The Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors.  The Inspector General met with agency management and a representative from the Board of Directors to discuss the findings in this report. The supervisor resigned from the agency. To address the supervision deficiencies noted in in this report, the agency has provided additional training and support to supervisors and the Program Director is conducting random file reviews to ensure adequate supervision of cases.*

2.   The private agency caseworker should be disciplined for her failure to locate an appropriate placement for the boy and his oldest brother; for her failure to develop a safety plan in response to the injuries identified on the boy throughout his placement with the aunt; for her failure to effectively coordinate services to address the needs of the children in the home.

The Department agrees.

*OIG Response: The caseworker was counseled.  The caseworker transferred from the foster care unit to another unit within the agency and her current supervisor was made aware of the findings in this report. The caseworker has also been paired with a more experienced caseworker who is providing support to the caseworker.*

3.   The Office of the Inspector General will share the report with local law enforcement.

The Department agrees.

*OIG Response: The Inspector General shared the report findings with the local state's attorney managing the case.*

4.   The Office of the Inspector General will share the report with the oldest brother's Guardian *ad Litem*.

*OIG Response: The Inspector General shared a redacted copy of the report with the brother's Guardian ad litem.*

5.   When sibling groups are placed in a foster home, the Department should require an assessment of the pragmatic demands of the placement given the developmental and chronological ages and needs of the children and demands on the foster parent.  The assessment should identify specific concrete supportive services the caregiver will need to successfully care for the children, such as enrolling preschool age children in a Head Start program, or in the alternative, a NAEYC accredited childcare center; supportive homemaker services; respite; and assessing the transportation needs related to the children's services (See also OIG Report #11-2976.)

The Department agrees.  The assigned caseworker is expected to conduct a continual assessment of the child's needs.

## DEATH AND SERIOUS INJURY INVESTIGATION 8

| | |
|---|---|
| **ALLEGATION** | A nine month-old infant died as a result of a stroke suffered during surgery to repair congenital heart defects. The infant had been removed from her parents' custody three months prior to her death based on concerns regarding their ability to care for her multiple medical needs. |

| | |
|---|---|
| **INVESTIGATION** | The infant's mother became involved with the Department two years prior to her birth after the mother had threatened suicide with a knife in the presence of her two |

older children. The mother had a history of substance abuse issues and neither she nor her paramour at the time were deemed to be suitable caretakers for the children at the time. The Department took protective custody of the siblings and subsequently indicated the mother for Substantial Risk of Physical Injury. During the following two years, the mother failed to comply with her service plan and made no progress with services while the children remained in a pre-adoptive traditional foster home. Two months before the infant's birth, the court changed the older children's goal to "substitute care pending a court determination of termination of parental rights." The court terminated the mother's parental rights four months after the infant's birth.

The baby girl was born with multiple congenital heart defects and required hospitalization in a pediatric intensive care unit, where she underwent surgery to have a shunt inserted into her heart to improve the flow of oxygen to her blood. As a result of her compromised medical condition, physicians determined the girl would require heart surgery after she was nine to twelve months old and would require diligent, detailed care until that time. The baby remained hospitalized for the first three months of her life, during which time the mother and the girl's father did not visit her consistently, missed appointments and failed to engage in trainings essential to facilitate her discharge. Given the mother's history of non-compliance with the Department and the demonstrated inability of either parent to effectively participate in her care during hospitalization, health care professionals were doubtful they would be able to adequately attend to her medical needs.

A hospital nurse explained that any caretaker for the baby would be responsible for overseeing a home monitoring system as well as regularly recording her weight, feeding schedule and oxygen levels. All information would need to be reported twice a week to ensure the baby's continued development. Additionally, the hospital nurse emphasized the significance of ensuring the baby resided in a smoke-free environment and the potentially serious consequences of her being exposed to smoke. The hospital nurse stated that even if a caretaker smoked cigarettes outside the home, they would need to change clothes and shower prior to being in proximity to the baby, as smoke particles clinging to fabric and surfaces represented a threat to her health.

As the girl's release from the hospital became imminent, a child protection investigation was opened based on the parents' continued failure to engage in her care. During the course of the investigation, the girl's paternal grandparents were identified as substitute caretakers. Hospital staff reported that the grandmother had received training on how to care for the baby and the assigned investigator visited the grandparent's home, where the parents also lived, and found preparations had been made for the baby to live there. Involved child welfare professionals held a staffing at which it was determined the baby would be placed in the grandparents' home, provided the parents moved to other accommodations. The private agency selected to provide services to the family who had a nurse on staff who would work with the grandparents to ensure they met the baby's needs.

During the staffing, the need to maintain a smoke-free environment in the home was discussed. On the medical form contained in the foster home licensing file, it was documented that the grandmother and the teenage son each smoked one pack of cigarettes a day. The staffing participants determined that in addition

to being required to smoke outside of the home, the grandparents would have to utilize a "smoking coat" which they would wear while smoking and then remove after re-entering the house. In an interview with Inspector General investigators, an administrator from the Department's Specialized Foster Care Unit stated she had engaged in conversations with medical workers who had suggested the grandparents smoke outside and use a "smoking coat," however none of these interactions had been documented. At no point was the possibility of engaging in smoking cessation efforts discussed with the family. The grandparents agreed to abide by the smoking plan and, four days later, the baby was released from the hospital and placed in the grandparents' home. The baby's parents were both subsequently indicated for Substantial Risk of Harm by Neglect.

Both the Office of the U.S. Surgeon General and the Centers for Disease Control have concluded that a "risk-free" level of exposure to secondhand smoke does not exist. Research has demonstrated that secondhand smoke exposure is correlated with a multitude of negative outcomes; including wheezing, asthma, lung infections and Sudden Infant Death Syndrome (SIDS). Given that premature infants often experience respiratory and cardiovascular issues, secondhand smoke exposure can be even more detrimental to this population. Additionally, some early studies of "thirdhand smoke" (particles and gasses given off by cigarettes that cling to clothes, walls, hair and skin) have found levels of a nicotine-related chemical produced by the body to be seven times higher in the babies of smokers than those of non-smokers.

Immediately following the baby's placement in the grandparents' home, both the private agency caseworker and private agency nurse recorded satisfactory compliance with her monitoring program and general care. Although involved workers concluded the grandmother, who served as the baby's primary caretaker, was conscientious and invested, they overlooked significant stress factors in the home. The grandfather's profession required him to travel extensively and made him routinely unavailable to provide additional support. Furthermore, workers learned the grandmother was dyslexic and had difficulty reading, however these limitations were not considered in relation to her ability to complete the extensive logging of the girl's development which was vital for the hospital's oversight of her health.

Four months after the baby had been placed in the home, the grandparents brought her to a scheduled cardiac appointment. At the time, the girl had missed her last two appointments and had not been seen by a physician in two months. The grandmother stated she had continued to monitor and record the girl's statistics, but had not relayed them to medical providers. The girl was found to have decreased levels of oxygen in her blood and required hospital admission. Initially hospital staff noted the girl smelled of cigarette smoke, had gained only one pound in the last six weeks, appeared dirty and exhibited a breakdown of her perineal skin, indicating her diaper had not been changed regularly. Five days later, she underwent surgery but experienced complications that required a heart and lung bypass. Six weeks later, during the second of two additional surgeries, the girl experienced a stroke causing catastrophic brain injury requiring full life support. Ten days later, following consultation amongst physicians and the hospital's ethics board, a decision was reached to remove the girl from life support, resulting in her death.

During the child protection investigation of the girl's death, the grandmother stated she had been unable to call in the girl's most recent vital statistics as her phone had been disconnected for non-payment. Involved medical professionals reported to the child protection investigator that the grandmother's reports had been inconsistent throughout the time the girl was placed in the home and that concerns about the grandparents' ability to provide the extensive care the girl required had grown. Although the private agency assigned to provide services had a nurse on staff, the nurse never communicated with the home monitoring program to determine whether the grandparents maintained regular contact. The doctor stated that while he had some concerns regarding the care the infant received, he could not call it medical neglect. The child protection investigation was unfounded.

Four months after the girl's death, the mother gave birth to her fourth child.  The boy, born at 31-weeks gestation, tested positive for marijuana.  A subsequent child protection investigation resulted in indicated findings against both parents for Risk of Harm and upon the boy's release from the hospital seven weeks later; he was placed with the paternal grandparents.  Hospital staff reported the grandmother, who had been a near constant presence at the hospital, had almost completely stopped smoking.  Although a case was initially opened to provide intact services to the family, neither parent complied with services and ad the case was later screened into court.  In the interim, the father had been arrested and convicted of burglary and sentenced to four years in prison.  The boy remains in the grandparents' home.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The Department's Specialized Foster Care Unit should be required to document and appropriately share all assessments, service recommendations or monitoring issues identified by the unit.** |

The Department agrees.  The Specialized Foster Care Unit as well as the Central Matching Team staff will share all assessments, service recommendations or monitoring issues identified by the unit. The Deputy Directors of Clinical and Placement/Community Services will develop the protocol.

**2.  The Department has a fiduciary duty to protect wards from environmental dangers such as secondhand smoke exposure.  When a medically complex or premature infant is referred for placement in a home with environmental tobacco exposure, the Department should make a referral to the Chief Nurse for review of the home and associated risks.  (See also Inspector General Report #14-2326)**

The Department agrees.  In accordance with Department policy, referrals are made to DCFS Nursing in those case situations involving a medically complex or premature infant referred to placement in a home with environmental tobacco exposure.

**3.  The Department, in conjunction with their Medical Director, should inform the field regarding training and resources for child welfare staff concerning the risks of secondhand smoke exposure for children as well as smoking cessation resources for clients and families.**

The Department agrees.  Online training through DCFS Health Services will be provided within the current fiscal year and will include information on the risk of secondhand smoke exposure to children, as well as smoking cessation resources. DCFS Health Services will also provide information on the Foster Parent web site about risk of second hand smoke exposure, as well as cessation resources. Currently, the Department provides linkage to the Illinois Department of Public Health's Quit Tobacco program for smoke cessation resources.

**4.  The private agency should ensure that their nurse maintains contact with all medical providers for medically complex children.  The agency should inform all involved medical providers of their duties to the child and request notification from the medical provider of any concerns regarding the children for whom they provide care.**

The Department agrees. This recommendation will be expanded to include all agencies.  The redacted report will be shared.

**DEATH AND SERIOUS INJURY INVESTIGATION 9**

| **ALLEGATION** | A newborn baby died on the day of his birth as a result of numerous medical anomalies. Nine months prior to the baby's death, the baby's mother had been the subject of an indicated report for physical abuse of her nine year-old daughter. |
|---|---|

| **INVESTIGATION** | The child protection investigation had been initiated after the girl arrived at school |
|---|---|

with visible bruises on both sides of her face. The girl reported she had been punched in the face by her mother multiple times while being driven home from school the previous day. The girl stated her mother was upset with her for inadvertently engaging the lock screen of a computer tablet and forgetting the access code. The day the hotline report was made, a child protection investigator interviewed the girl at the school. The investigator took photographs of the girls' injuries, in which the bruises to both sides of her face were visible. The investigator documented the mark to the right side of the girls' face as a, "possible handprint with red and black bruising." The girl told the child protection investigator that she regularly got in trouble at home for lying and that her mother would often hit her with a belt "everywhere." When the investigator asked the girl if she was afraid of her mother, the girl began crying. After further questioning, the investigator concluded the girl was not fearful of her mother but was concerned about getting in trouble because of the incident. The child protection investigator met with school personnel, who stated the girl had demonstrated some behavioral issues but had never previously disclosed any possible abuse. The child protection investigator then waited at the school to speak with the mother when she arrived to pick up her daughter.

In speaking with the child protection investigator, the mother admitted striking her daughter in the face, stating she did so in response to the girl lying about locking the tablet. The mother claimed she had hit the girl with an open hand and was frustrated with her behavior both at home and in school. The mother had been accompanied to the school by her other child, an 11 month-old girl, whom the investigator observed to appear healthy. The investigator instructed the mother to take the girl to be seen by either her primary physician or doctors at a local emergency room within 24 hours for evaluation of her injuries.

In an interview with Inspector General investigators, the investigator stated that she assessed the children to be safe in the care of their mother at that time, in part, because they did not appear to be fearful of her and seemed well cared for. The investigator said she discussed appropriate and inappropriate forms of discipline with the mother as well as intact family services, which she said the mother agreed to consider. Additionally, the investigator stated she based her decision to allow the children to remain with their mother on the grounds that it was the family's first involvement with the Department, the injury was consistent with the mother's description of events, no instrument was used and the children's maternal grandmother, who watched them every day while the mother worked, was an involved source of support. Both the investigator and the investigator's supervisor stated they never considered taking the children into protective custody.

Five days after the hotline report was made, the child protection investigator spoke to local police, who informed her the mother would be arrested for domestic battery. The investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) determining the children to be safe and no safety plan was enacted. One month later, just before closing the case, the investigator went to the family's home and completed another CERAP again concluding the children to be safe. The child protection investigator informed the mother of her intention to indicate the report against her for Cuts, Welts and Bruises. The mother was offered the opportunity to engage with intact family services but declined and the case was closed. Three weeks later, the investigator learned from local police that due to staffing issues they had not yet been able to interview the mother, which was a prerequisite for the State's Attorney to bring charges. As of the completion of the Inspector General investigation, the mother had yet to be charged regarding the incident.

The mother's action of repeatedly hitting her daughter in the face, resulting in bruises, would be considered a severe assault. In this case, although there was ample evidence to indicate the mother for abuse and police expressed their intention to prosecute her criminally for domestic battery, the mother was allowed to refuse services and retain custody of her children. In their interviews with Inspector General investigators, both the investigator and her supervisor stated that the court in the county where the family lived rarely used protective orders and they did not believe they would be successful in obtaining one in this case. Both the investigator and her supervisor said that given the court's aversion to issuing orders of protection, they did not feel they had any other options than to advise the mother to control her behavior and take a "wait-and-see" approach. Court monitoring enhances compliance. When the Department does not screen cases into court because of the belief they will not be accepted, the Department is allowing perceived barriers to guide decisions on child safety. The Department must attempt to educate and work with State's Attorneys and courts for the safety and increased well-being of children.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES |
|---|

**1. The Department's legal division should share a redacted copy of the Inspector General's report, including colored photos of the injuries, with the local State's Attorney for discussion purposes.**

The Department agrees. A redacted copy of the Inspector General's report, along with color photos, was provided to the local State's Attorney's Office.

**2. The Department's legal division should work with county State's Attorneys and courts to define use of supervision orders in those cases in which the risk is too high for no services but not high enough to remove children from their parent's custody. This would include cases in which a child was battered.**

The Department does not agree due to the inability of the Department to control the courts process. We have, however, taken the following steps: DCFS Legal and a Child Protection Administrator met with the State's Attorney's Office, Chief of the Children's Justice Division and discussed the importance of collaboration between DCFS and the State's Attorney's office to increase use of orders of protection and supervision for cases in which the risk is too high for no services and not high enough to remove the children from the parents' custody and the parents refuse intact services.

**DEATH AND SERIOUS INJURY INVESTIGATION 10**

| | |
|---|---|
| **ISSUE** | In FY 2014 three and in FY 2015 eight youth in care were the victims of street violence homicides. The Office of the Inspector General conducted a cohort investigation on these killings. Ten homicides occurred in Cook County; one in Winnebago County. All youth |

were 17 years or older at the time of their death with the exception of one 14 year-old. The youngest of the victims in this report had no involvement with substance abuse or juvenile justice, and was reportedly doing well in his placement. Rather, his victimization was more related to the community factors where he resided.

| | |
|---|---|
| **DISCUSSION** | The redacted executive summary of the report follows on page 35. |

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **DEPARTMENT RESPONSE TO OIG REPORT 16-2602, HOMICIDES OF WARDS** |

Societal problems including poverty, gang violence and lack of educational services contribute to the tragic and escalating incidence of youth homicide in Cook County, Illinois. The Department appreciates the OIG's detailed analysis of potential ways to address these issues in report #16-2602. Notably, the recommendations in the report are relevant broadly to homicides of youth, and are not limited to youth in DCFS care.

Earlier this year under Director Sheldon's guidance, the Department conducted Quality Assurance reviews of the circumstances surrounding youth in care who were lost to homicides during the prior year. Director Sheldon's goal was the identification of patterns that could illuminate practice and lead to reforms at DCFS to better serve at-risk youth. The QA reviews were shared with the OIG prior to the issuance of report #16-2602. The Department is committed to partnering with other government and private entities as it searches for and develops approaches to this pervasive public health and welfare concern.

Upon receipt of report #16-2602, a work group was convened and the Department thoughtfully reviewed each of the OIG's 13 recommendations. Although many of the recommendations are beyond the scope and authority of DCFS alone, the Department is committed to working with the broader community to develop resources and solutions to address the challenges of youth homicide.

We welcome the spirit of the OIG's commitment to youth in Illinois, but the Department has strong procedural objections to the assumption of a broad policymaking role by the OIG and to the OIG's process of developing this report, as detailed at the end of this document for the record. OIG Rule 430.100(b)(2) states that the Director shall specifically accept, reject, or seek modification of specific recommendations; therefore we have included that response in the Department's comments on each item.

**RECOMMENDATIONS**

*Programming and Prevention Services*

**1. To counter the lure of gangs and guns, the Department must offer programs in severely economically disadvantaged neighborhoods, such as Englewood, Lawndale and Austin, that include, remedial tutoring and enhanced learning opportunities for DCFS wards and children who have achieved permanency through subsidized guardianship or adoption who have reading and/or math scores two grades below level, and to offer the opportunity for pro-social recreational programs with safe passage (transportation) for these children.**

The Department agrees to convene a workgroup with other governmental entities to consider implementation of the suggested programs. The responsibility to promote education and enhanced learning opportunity falls to many entities within the community, but primarily the school districts. Ancillary support could be provided by governmental entities such as park districts, libraries, child welfare and the Department.

In addition, the Department plans to use the immersion sites, as described in the Department's Implementation Plan, to develop more community-based services and programs such as those suggested by the OIG. The Department will identify community resources and use the immersion sites as a means to contract with and access services. This may include enhancing services provided by FACs.

*Educational Services*

**2. When a special education youth in a residential program outside of the City of Chicago is transferring to a therapeutic/specialized, foster/relative home or transitional living program in Chicago, the Regional educational advisor from the sending community and the receiving Chicago Regional educational advisor should meet in advance of the school transfer to develop a transitional plan with the receiving school and the receiving agency assuring that the youth receives timely and appropriate special education services. The youth should be involved in the planning and afforded the opportunity to visit the receiving school prior to the transfer and the Department should fund an educational mentor to assist the youth for the first six weeks of the school transfer. The educational mentor should provide transportation for the first six weeks and assist the youth in adjusting.**

DCFS agrees to meet with representatives of the Chicago School District to develop a transitional plan for youth who are transferring schools. DCFS is currently using educational specialists to assist youth in transitions to new schools. When appropriate, the Department may fund an educational mentor to provide transportation and transitional assistance to youth for the first six weeks after the transfer. The DCFS Division of Clinical Services will take the lead on follow up in working with schools.

A workgroup has been established to explore the feasibility of expanding identified programs to assist more youth in care who have special education needs and are transitioning to a new living arrangement/programming site. It is also a goal to broaden this work statewide, as a standard. The workgroup has also discussed the possibility of repurposing the POS Educational Liaisons and their responsibilities. This work will include discussions with Budget and Finance**.**

**3. The Department should explore identification of entities that can offer credit recovery programs similar to the one at Maryville Madden Shelter.**

The Department agrees with this recommendation. The Divisions of Placement and Community Services, Clinical Services and Monitoring will take the lead on follow up.

*Substance Abuse Recovery*

**4. Similar to the Rosecrance model, the Department should develop a supportive recovery transitional living program for its young adults in Cook County who are in their early stages of recovery. The program should offer individual, group and family counseling, educational and employment services with incentivized goal setting in these areas.**

The Department agrees with this recommendation and will attempt to identify a provider willing and able to provide transitional living services similar to the Rosecrance model. The Divisions of Placement and Community Services, Clinical Services and Monitoring will take the lead on follow up.

DEATH AND SERIOUS INJURY INVESTIGATIONS

**5.  The Department should utilize The Addicted Minor Act to obtain court ordered treatment for dually involved youth who are in need of substance abuse treatment in lieu of violating their delinquency probation.**

The Department agrees to meet with the Office of the Inspector General, Office of the Public Defender, DCFS Legal, and the Juvenile Justice Initiative to consider the optimal way to order youth into treatment. The discussion will include consideration of whether there would be any benefits from the use of the Addicted Minor Act for dually-involved minors.

***Dually Involved Youth***

**6.  For effective collaboration Cook County Region DCFS should pursue an agreement with the Cook County Probation Department to cross train the dually involved specialized caseworkers and the youth's assigned probation officers. The training should cover the ins and outs of probation, delinquency court and gang safety and the DCFS related policies and expectations. The trainings should be conducted biannually and include a discussion component provided by experienced caseworkers and probation officers on gang involvement and lessons learned.**

The Department agrees with the recommendation to pursue such an agreement.  The Department's Dually Involved unit will explore the need for and development of training. Several years ago the Department, along with a CWAC subgroup on dually-involved youth, developed an outline and training materials on such cross-training. These materials will be provided as a basis for updating the training.

**7.  The Department should request the Illinois Justice Project/Juvenile Justice Leadership Data Collection and Information Sharing Workgroup and the Dually-Involved Committee consider proposing legislation or rules that would permit sharing of information and coordination between the Cook County Juvenile Justice Courts and the Cook County Abuse and Neglect Courts, when in the best interests of dually-involved youth.**

The Department agrees with this recommendation.  The Cook County Dually Involved Committee, which consists of staff from DCFS, probation and other stakeholders, meets on a monthly basis. This agenda item is included every month. There are differing opinions between the offices (Public Defender, State's Attorney, Probation, DCFS and Child Protection and Juvenile Justice Courts) about the level of sharing and the time in the proceeding it is appropriate to share. The group is in the process of documenting agreed upon principles and practice including conversation and document sharing. This is very much an ongoing process which may extend over the year.

**8.  The Department should request that the Office of Administration of the Illinois Court (AOIC) allow the Department to receive all Delinquency court assessments such as the Youth Assessment and Screening Instrument (YASI) and Violence Risk Assessment for wards of the Department. For consistency of measurements across agencies the Department should administer the YASI on those dually involved youth who end their probation or parole but continue under the Department's guardianship.**

The Department's Office of Legal Services and the Division of Clinical Services will follow up with the Cook County Probation Department to determine if the Department can receive the YASI assessments for youth in DCFS custody.  The primary assessment tool used by DCFS is the CANS; the DCFS Division of Clinical Services will analyze whether it is advisable to use of the additional tool of YASI assessment for dually involved youth who have completed their probation or parole.

The Cook County Dually Involved Committee, which consists of representatives from probation, DCFS and other stakeholders, is already conversing about information sharing, including the YASI. Cook County Probation is willing to share the YASI on an individual case basis.

**9.  The Department should request to participate in the Gang School Safety Team real time monitoring approach for wards with gun/gang/violence activity including related social media.**

The Department agrees to contact the CPD Gang School Safety Team and explore access to information regarding gang violence and shooting victims. The Office of Legal Services will take the lead on follow-up. DCFS Legal, Operations and the Office of the Guardianship Administrator have begun meetings with the Youth Investigations Division. The group will explore services that the Chicago Police Department can provide our youth including coordination of services. Meetings will be ongoing.

**10.  The Department must review all UIRs involving a youth with a gun or ammunition to ensure that Administrative Procedure 18, requiring notification of law enforcement, has been followed.**

The Department agrees with this recommendation and will send a notice to staff regarding Administrative Procedure 18.  The Department also notes that it is actively working on upgrading the UIR system. To the extent that information contained in a UIR indicates a youth in the custody of the Department is involved with a gun or ammunition, Administrative Procedure requires both notification to law enforcement and the initiation of additional services. The Department is in the process of reviewing and updating Administrative Procedure 18.

**11.  The Department should develop a violence and substance free therapeutic community based model similar to a halfway house model for youth 18 and over involved with the criminal court system or dually involved with adult and juvenile courts for crimes against a person. The programming should require that the youth: enter into a nonviolence contract, obtain a minimum of part time employment, participate in continuing education through the City of Chicago Community Colleges (technical certification program, GED, or Associate Arts degree) or credit recovery or alternative school programs for youth who can earn a high school diploma. The therapeutic model should clearly define a no-violence contract with each youth who enters the program. If the terms of the shelter's non-violence contract are violated the Department should immediately inform the Juvenile Court and Adult probation of the violation and the intention of the Department to request termination of the youth's wardship. Programming should include Safer Foundation and the Isaac Ray Center.**

The Department agrees to explore the utility of both the Safer Foundation and the Issac Ray Center programs and will develop a plan for a therapeutic community based model for its 18-20 year old dually involved youth consistent with this recommendation. The Department expects the plan to be completed by October 1, 2016 and the program operational by April 1, 2017.

The Department is exploring this therapeutic community model. Currently, the Safer Foundation does not provide housing to our youth, and the Isaac Ray Center has only DJJ in-patient services. It should be noted that the Isaac Ray Center is developing an outpatient program in the next year, and the Department will continue dialogue with the foundation to ascertain whether and when their program will be useful to our youth in care.

The revised Housing Agreement is included in all FY17 ILO/TLP agency program plans.

DEATH AND SERIOUS INJURY INVESTIGATIONS

*OIG Comment: While the Safer Foundation does not provide housing to youth in care, the agency does provide community transition settings and does provide court involved youth ages 16-21 with the following services; interventions that court involved youth in care could clearly benefit from:*

- *Transition Centers, two secure residential facilities located in the Lawndale community which allow incarcerated individuals, ages 18 and older to serve out the last 30 days to 24 months of their sentences in a community-based work-release setting.*

- *Youth Education Program, an intensive GED preparedness and job readiness training program. Youth ages 16 to 21 are linked to a Safer Intensive Case Manager upon completion of the program. The youth can be followed for up to two years to receive support in continuing their academic studies, vocational training or obtaining a job.*

- *Safer Supportive Services for court involved individuals ages 18 and over. The program provides treatment services for substance abuse, anger management and other mental health services.*

- *Employment Services offered through Safer Foundation job readiness programs where individuals learn not only job skills but how to respond to questions regarding their criminal background in order to obtain employment.*

- *PACE Institute an adult literacy and High School Equivalency preparation program offered to Cook County Department of Corrections (CCDOC) detainees, ages 17 and older who want to improve upon their educational level.*

*In addition, Midwest Re-entry and Employment Network (MREN) awarded the Safer Foundation pass through funds to support a grant to Central States SER for programs that help improve the employability of court involved youth who reside in the Little Village and Garfield Park communities.*

**12. The Department should explore collaboration with the Illinois DHS Division of Mental Health, Division of Alcoholism and Substance Abuse, and the Cook County Sherriff's Office to develop a stabilization strategy for DCFS Cook County young adults with mental illness and substance abuse problems who are charged with crimes against a person that exclude them from the criminal mental health court.**

The Department agrees to explore collaboration with these agencies to consider strategies that already exist or what may be needed.  This recommendation also requires coordination with the Cook County State's Attorney's Office and the Cook County Public Defender's Office.  The Dually Involved staff will take the lead on follow up**.**

**13. The African American Family Commission should review the findings in this report to develop recommendations for legislation or other necessary reforms.**

The Department agrees that the findings and the Department's response to the recommendations should be shared with the African American Family Commission.  The Office of Racial Equity and the Senior Deputy Director of Program Practice will take the lead on follow up.  The Department will review any recommendations for legislation or other reforms. The redacted report has been given to the Office of Racial Equity and the Deputy Bureau Chief of Program Practice for follow-up with the African American Family Commission.

*OIG COMMENT: The Inspector General met with the executive director of the African American Family Commission to discuss the findings and recommendations made in this report. The Commission is concerned about the fragility of the community based agencies because of funding shortages.  The Commission seeks assurance from the Department that community based agencies will receive the necessary funding to help address teen violence.*

## LEGAL AND JURISDICTIONAL COMMENTS

While appreciative of the recommendations of the OIG, the Department objects to the OIG report in the following overarching respect:

The OIG acted beyond its statutory authority in doing this investigation, and in recommending sweeping policy change in this context.  The Children and Family Services Act provides that the Inspector General shall have "the authority to conduct investigations into allegations of or incidents of possible misconduct, misfeasance, malfeasance, or violations of rules, procedures, or laws by any employee, foster parent, service provider, or contractor of the Department of Children and Family Services. . . ." Report #16-2602 does not involve an investigation into such violations.  Nor does the report suggest changes that address misfeasance, malfeasance or violations of rules or procedures by the Department. OIG's rule (but not statute) authorizes the OIG to investigate when deaths or serious injuries occur in foster homes, child welfare institutions, independent living programs and other facilities licensed by the Department, or when there was an open case during the prior 12 months, which was not the situation with all of the deaths investigated in this report.  Also, the recommendations stretch far beyond DCFS, and implicate the functioning of multiple State, County and other entities.

The Department requests that, in accordance with law, its responses accompany the OIG's final recommendations.

## STREET HOMICIDES

### OFFICE OF THE INSPECTOR GENERAL
### Department of Children and Family Services

### *REDACTED REPORT*

*To ensure the confidentiality of the youths in this case, names have been changed and are fictitious.*

**File:**          **2016-2602**

**Subject:**          **Homicides of Wards[1]**

## INTRODUCTION

The murder of a youth in care of the Department who was killed by a Chicago Police Officer has become a catalyst for reform within the Chicago Police Department and the Cook County States Attorney's Office. His death should also cause pause for the Department of Children and Family Services and be a catalyst for change within the child welfare and juvenile justice systems. The boy was one of 11 youth who were in the Department's care when they were murdered in FY 2014 and 2015. With the exception of this boy, the youth in this cohort were the victims of peer street violence. The Office of the Inspector General conducted a cohort investigation on these killings. Most of the youth lived and came from severely economically disadvantaged neighborhoods. The structural and environmental factors in these neighborhoods create and reproduce urban poverty. Most of the youth struggled in school with poor reading and math scores that were identified early on without meaningful interventions. The families in their neighborhoods face the toxic stress of guns and gang violence. The inequities inherent in these neighborhoods include failing schools, lack of economic opportunities, and paucity of recreational and other supportive social institutions. While the city of Chicago acknowledged that a safe passage was necessary to get children to and from schools, no one assured that safe passage was arranged for children to engage in recreational or supportive educational programs. While there are resources in these communities, such as The Boys and Girls Clubs of Chicago, these agencies receive no public funds to provide safe transportation despite the daily sounds of gunfire. The Department is well aware that as early as the third or fourth grade, if its children cannot read or keep up with math abilities of their classmates, the likelihood of the child dropping out of school increases exponentially. Gangs become an attractive avenue when a youth faces school failure. While Title XIX (Medicaid) funding can provide some support for interventions, it will not support either prosocial recreational programs or safe passage, and so is an insufficient remedy to the lure of gangs and guns in disenfranchised communities. Four of the youth in this cohort who lived in these high-risk neighborhoods came back into the Department's care after disrupted adoptions or guardianships. Sadly, three of the relative caregivers requested the youth's removal when the family became frightened by the youth's gang involvement and access to guns. The fourth relative caregiver passed away. While two of the families requested

---

[1] On August 23, 2016 Governor Bruce Rauner signed an Executive Order directing all references of "ward of the state" or "ward of the Department" used within the child welfare system to be changed to "youth in care." This report predated the Executive Order.

adoption/guardianship service assistance, the interventions neither addressed the child's academic vulnerabilities nor the lure of the gangs**.**

Many of the youth in the cohort had access to guns and as one explained, when he had his gun on him, "I get respect." With the exception of one youth who used hard drugs (PCP), and the very youngest of the cohort who had no substance abuse problems, all of the youth used marijuana almost daily. Marijuana and alcohol can deaden the humiliation from school failure while contributing to further academic failure. It can soften the toxic effects of an environment besieged with violence while putting the individual in harm's way. Two youth who had completed substance abuse treatment voiced realistic concerns about relapse if returned to their previous placements. Neither was given the opportunity for young adult substance abuse transitional living programs.

The Chicago Reporter recently described the high rate of unemployment in many of these neighborhoods as a product of a perfect storm of issues including disinvestment, poor public schools, and high incarceration rates.[2] The majority (9) of the youth in this cohort were 18 and older, entering young adulthood with no employment skills. Only two had held jobs, and even then, they were only for a few weeks. The majority had been involved with the juvenile justice system, with some moving to the criminal justice system, thus heading towards lessening employment opportunities. The Department does not contract with existing resources such as the Isaac Ray Center and the Safer Foundation for mental health and employment resources, despite their expertise with this population.

The Office of the Inspector General previously recommended violence prevention programs and interventions for violent youth offenders to the Department. Many Department of Juvenile Justice agencies have implemented aggression replacement and moral reasoning programs to enhance the concept of restorative justice. The Office of the Inspector General has issued numerous Investigative Reports on violence. Following the murder of a female ward by another female ward, the Office of the Inspector General recommended that the Department determine the size and scope of its violent youth population and those youth at high risk for violence in order to intervene effectively while assuring the safety of the community. Tragically, the single female in this FY 2014-15 cohort mirrored the previous Inspector General's investigation. She was violent, mentally ill, abused substances, was involved with adult criminal court, and so threatened other youth in her living site that orders of protection were filed. She was murdered while she was violently attacking a citizen.

As late as June 2015, the Office of the Inspector General repeated its recommendation that the Department needs to consider not only the safety and accountability of its young adults but also the safety of the community:

> The Department should develop a violence-free stabilizing center for the older youth (over 17) involved with the criminal court system or dually involved with adult and juvenile courts. The programming of the shelter should model a Safer Foundation approach. The staff should work with Cook County Sheriff, Criminal Court personnel and Probation. The stabilizing shelter should clearly define a no violence contract with each youth who enters the program. If the terms of the shelter's non- violence contract are violated the Department should immediately inform the Juvenile Court and Adult probation of the violation and the intention of the Department to request termination of the youth's wardship.

---

[2] Lynch, L.R. (2016, March 29). On Chicago's West Side, no rebound from the recession. *The Chicago Reporter*. Retrieved from http://chicagoreporter.com/on-chicagos-west-side-no-rebound-from-the-recession/

**EXECUTIVE SUMMARY**

This report examines the homicide deaths of 11 DCFS wards killed during FY 2014 and 2015. A brief synopsis of each youth's case is provided. Following the synopses are an analysis and recommendations.

**Gael**

Early in 2015, 14-year-old Gael was murdered in a southern suburb of Chicago where he lived in a specialized foster home. A short time after Gael's death, two suspects, ages 19 and 20, were arrested and charged with his murder. They are currently awaiting trial in the Cook County Jail. Gael had been scheduled to transfer to a new foster home the week after his death because his foster parent at that time was in the process of moving out of state.

Gael first came to the attention of DCFS in 2010, when he was 10 years old. He, his parents, and five younger siblings were found to be living in unsafe conditions in an abandoned house. All of the children, including Gael, were placed in protective custody. A subsequent medical examination revealed that Gael and his siblings had been subjected to significant physical abuse. The parents were later found to be depressed and the mother had an IQ of 65. The children were all placed in foster care. Gael's case was subsequently transferred to a private specialized foster care agency for case management after he was placed in specialized foster placement.

Gael had a history of psychiatric diagnosis and medical issues. Prior to DCFS involvement, he was also diagnosed with Lead Poisoning in 2006 and was diagnosed with Type II Diabetes in October 2009. The DHFS records available to the Department do not indicate how these were treated and if follow-up testing was done.

An IEP completed in 2010 indicated that Gael had a full scale IQ of 89, with a significant differential between his verbal score of 96 and his performance score of 83. His achievement test scores at that time were very low: 1.1 in Reading and 2.6 in Math. It was intimated that he had not attended school for the year leading up to his entry into DCFS custody. Gael received special education services, with a primary disability of Emotional Disorder, and had an IEP at school. The caseworker attended IEP meetings and noted that Gael was going to be meeting with a teacher after school for extra help. In December 2013, test scores indicated that his Reading level had risen to 4.4 but his Math score had declined to 1.3. The school district decided to hold him back in 8th grade against the school social worker's recommendation.

According to law enforcement, Gael was a casualty of a dispute between two breakaway factions of a major street gang. Law enforcement questioned whether Gael was gang involved. However, a lieutenant of the local police department knew Gael through his off-duty work as a security guard at Gael's middle school. The lieutenant identified Gael's body. The lieutenant stated that while Gael might have been involved in some ill-advised activity on social media, he was not involved in any gang activity, nor was he prone to aggressive behavior. The lieutenant stated that Gael was visiting a friend at a housing complex where rivals of the suspects charged with Gael's murder are known to live. Gael is the youngest of the victims in this report, and it appears that of this group, his personal behavior contributed the least to his being at risk for this type of violence; his victimization was more related to the community factors where he resided. He was doing well in foster placement at the time of his death. Statistically, African-American youths in Gael's community are equally at risk for this type of street violence.

**Luca**

Seventeen-year-old Luca was shot to death in the summer of 2014, one block from the home of his godparent. The police reports described him as having been engaged in conversation with several

unknown assailants who were in a black van. A second victim, the son of the godparent, was wounded but survived.

The family came to the attention of DCFS in 2007 when the mother was indicated for inadequate supervision. The mother had left the children with their father, who was unable to care for them. A second report came early in 2008 when a hospital social worker notified DCFS that the mother was not providing medical care for Luca's younger sister. The mother was indicated for medical neglect. An Intact Family Services case was opened and closed within months. The mother was again indicated for medical neglect in the fall of 2011. A second Intact Family Services case remained open until the following spring, the same day the hotline received a report that the mother had abandoned the children. Fifteen-year-old Luca and three younger siblings came into the care of DCFS that day. The mother was indicated for inadequate supervision and temporary custody was granted on. Luca's parents were declared unfit at a neglect hearing in the fall of 2012. His mother remained homeless and she died the next year.

Luca's case was assigned to a private child welfare agency. He was placed in the relative foster homes of his aunt and grandmother, but did poorly in both homes, with behavior problems and runaways. In the summer of 2012, the grandmother refused to allow him back into her home. Although he had moved Luca regularly visited his grandmother's house where his siblings lived. He was moved to the home of his godmother, an unlicensed placement. He stayed there intermittently until his death. His godmother's son had been on probation. A Social Investigation completed by the Juvenile Probation Department indicated that Luca's godmother had a continuing alcohol problem including a conviction for a DUI. She also had been on Court supervision for a battery charge.

For a brief period, the godparent moved to Indiana and Luca was placed in the home of his aunt and her husband, an unlicensed relative placement. Luca had a difficult time adhering to rules and expectations in his aunt's home. His aunt stated he could be seen on Facebook flashing gang signs. Once Luca's godmother relocated back to Chicago, on the southeast side, both Luca and his godmother requested his placement back with the godmother. Luca began visiting the godmother's home on weekends.

Luca's involvement with Juvenile Justice began when 16 year-old Luca was charged with misdemeanor Battery and had to appear in Court in DuPage County. He was charged with attempted robbery later that same year.

In February 2014, 17-year-old Luca returned to his godparent's home. The caseworker continued to have concerns. During a visit early in 2014, she smelled marijuana and suspected Luca was high. At a status hearing in spring 2014, the Court Appointed Special Advocate expressed concerns about Luca's gang involvement and the area of Chicago in which he was living.

Luca continued to attend a therapeutic day school, at an off-campus site of a high school while living in Chicago. He was in an off-campus program because he had been previously expelled from high school for possession of marijuana. For a few weeks, Luca also had a part time job at a restaurant. The agency provided transportation to and from school. Luca graduated from high school in June 2014, shortly before he was murdered. His godmother's son was with Luca when he was killed. He left the scene of the murder and was found with a gunshot wound by the police and transported to the hospital.

**Peyton**
A Chicago Police Officer shot and killed 17-year-old Peyton in the fall of 2014.

Peyton's mother, a DCFS ward at the time, was 15 years old when she gave birth to him in 1997. The mother and her siblings became DCFS wards less than a year earlier when their mother gave birth to a substance-exposed infant. The maternal grandmother had a long history of drug abuse and an extensive criminal record and gave birth to her first child at 13 years old. Peyton's mother spent some time in foster homes, including the home of her maternal grandmother. The teen parent received services through a child welfare agency when Peyton was born. She gave birth to his sister three years later.

Seven months later, the mother left Peyton and his infant sister home alone. Peyton's sister severely burned her leg on a radiator. The mother was indicated for inadequate supervision and Peyton and his sister were taken into care. They were placed in several foster homes, including the relative foster homes of the paternal great-grandmother and that of the maternal great-grandmother. The court returned both children to their mother.

Thirteen months later, the Department indicated the mother for physical abuse after she and her boyfriend beat Peyton in front of staff at his daycare center. Protective custody was taken of Peyton and his sister, and they were placed in a traditional foster home. A month later, they were moved to the relative foster home of their great-grandmother after Peyton reported that he had been sexually abused in the foster home.

DCFS vacated guardianship of Peyton's mother when she turned 21. She continued to receive services as a parent. Peyton and his sister remained in the home of their great-grandmother. The mother struggled with homelessness and substance abuse and did not visit consistently. A permanency goal of subsidized guardianship was established for Peyton and his sister three years later.

In 2008, guardianship was established with their 74 year old great-grandmother. She received $422 a month. The great-grandmother's daughter, Peyton's great-aunt, was established in court as the backup caregiver.

After DCFS involvement ended, Peyton continued to have behavioral issues in school and home. Peyton had consistent problems in school with truancy, behavioral issues and poor academic achievement. He finished elementary school at a school designed for children with academic and behavioral problems. He did poorly in high school. He was assigned to an alternative school for ninth grade. Peyton had suspensions and expulsions. He received special education services when present at school. He began using substances by the age of 12 when he reported beginning daily use of marijuana. He also used PCP.

Peyton was first arrested at age 13 for drug possession. In 2012, he was placed on probation on a juvenile petition for Possession of a Controlled Substance. Two petitions for violation of probation were filed, one of which resulted in Peyton being sentenced to Intensive Probation. The second violation recommitted him to probation just before his death. While he was involved with the Delinquency Court, Peyton had several warrants issued for his arrest. He also spent a significant amount time in the Juvenile Detention Center.

When Peyton was 15 years old, his great-grandmother passed away. Peyton was released from the Juvenile Detention Center to see her before her death and to attend the funeral. Immediately after, he cut off his electronic monitoring bracelet and went on run. When he was apprehended, he was once again placed in the Juvenile Detention Center. According to an integrated assessment, Peyton's mother reported to the Department that the great-grandmother had died and she was requesting that the subsidy be transferred to her as Peyton was now staying with her. The mother had petitioned the

court to have him returned to her custody. Despite having been named as the back-up caregiver, the great aunt told Inspector General investigators that the Department did not contact her regarding Peyton and his sister being placed with her. The court found the mother unfit and returned Peyton and his sister to the custody of DCFS.

Peyton remained in detention. His sister was placed in the relative foster home of their maternal uncle. Peyton joined her there after he was released from detention. Peyton was referred to a foster care program for DCFS youth involved in the juvenile justice system. In the fall, he was enrolled at an alternative high school. Between his enrollment and his death, he was suspended twice. Peyton continued his involvement with a behavioral health clinic for services but was inconsistent after he moved to his foster home. Two weeks before his death, his caseworker took him to an intake appointment for services.  He was scheduled to begin twice-weekly services, but had not started before his death.

The uncle's home remained Peyton's official placement until the time of his death. He was also spending a significant amount of time with his mother. Peyton's younger sister was returned to the mother's custody after Peyton's death.

**Roland**

Eighteen-year-old Roland was murdered  in the summer of 2014. He was shot several times in front of the home of his grandmother and aunt on the southwest side of Chicago. His murder remains unsolved, but police believe it may be gang related. Police reports indicated that he was a member of a faction of a major street gang.

Between December and April, a few years before his death, the Department initiated four child protection investigations on his mother. Two were indicated and two were unfounded and have been expunged. In April 2012, while Roland and his older sister were at school, their mother moved with the two youngest children to a new home and did not inform the older children. During the investigations, his mother reported that Roland vandalized the apartment and she was facing eviction. She also reported he was refusing to take medications. Prior to DCFS involvement, Roland was psychiatrically hospitalized in 2008 for aggressive behavior at both home and school. He was hospitalized again and diagnosed with Mood Disorder and Impulse Control Disorder. According to the integrated assessment, Roland had been treated for lead exposure as an infant. All the children were screened into court.

Prior to his involvement with DCFS, Roland had juvenile arrests. Juvenile Court placed Roland on Probation, the result of his having been found guilty of Attempted Residential Burglary and Criminal Damage to Property. Prior to DCFS custody, the delinquency judge had appointed a maternal aunt as a temporary guardian. Roland's sister was also living there. Protective custody was taken of 16 year-old Roland and his sister in 2012. At that time, their aunt indicated that she was unable to be a long-term caregiver. She complained of Roland's aggressive behavior, marijuana use, and refusal to attend school. The 18-year-old sister refused services and made her own living arrangements with relatives. She complained to investigators that the mother had abandoned them in this fashion before and that she had beaten them with extension cords and belts. She eventually entered the Youth in College Program.

Roland was placed in the detention center. Eight days later, he transferred from the Juvenile Detention Center to a detention alternative program. In the fall of 2012, was placed in a residential drug treatment program. He remained in that program until early the following year, when he was successfully discharged. Roland transitioned to his grandmother's home against his caseworker's recommendation. Roland relapsed soon after returning to the grandmother's home. He also began

exhibiting other problematic behaviors. He was moved to his aunt's home, but she soon requested his removal.

Roland was placed at a youth shelter. He remained there until late summer of 2013, when he was placed in a residential treatment center. He did well at the residential treatment center but consistently reported that he wanted to leave the program when he turned 18. His juvenile probation was terminated while he was at the residential treatment center.  His mother picked him up from the facility on his 18th birthday and took him to her home, against his caseworker's recommendations.

Roland remained in unauthorized placement at various relatives' homes between the end of 2013 and his death the following summer. He briefly attended school in the spring of 2014, but had dropped out following his arrest for Possession of a Controlled Substance and Trespassing. He was briefly in Cook County Jail. The caseworker maintained contact with Roland and his mother. Case notes indicate that Roland agreed to be placed in a Transitional Living Program (TLP) and to enter the shelter system to facilitate that move. He later refused to accompany the caseworker to the shelter despite having previously agreed to do so.

The day before Roland's death, the worker received a call from shelter staff stating Roland and his mother had come to the shelter requesting services but there was a delay with the authorization process. A second shift worker at the shelter had found an open bed at one of the shelters, but Roland and his mother had left and the case manager could not reach Roland, and his caseworker was still working on authorization. They planned to continue the process the next day.

The mother reported that the caseworker told her to take Roland to the shelter, not necessarily on that date but when the opportunity presented itself. She stated that she and Roland were at the shelter for several hours but the intake worker reported they could not get authorization to place him. The intake worker said she told Roland and his mother to return the next day. The mother took Roland to her mother and sister's home on her way to work. It was in front of this home where Roland was murdered the following morning. Before the caseworker was notified of his death, he had been seeking approval for Roland's placement that morning.

Since Roland's death, the Department has re-issued the directive that it is not necessary to contact the caseworker to place wards who have walked into the shelter. It states that the shelter intake will receive all the necessary documentation to place the ward from the Child Intake and Recovery Unit and that unit will notify the caseworker.

### Trey

In the spring of 2014, 18-year-old ward Trey was murdered outside a DCFS-funded facility in Chicago. Trey had multiple gunshot wounds to his head, chest, and arms. Police found 9 mm shells at the scene. Trey had moved into the Transitional Living Shelter from a group home two weeks earlier. The Chicago Police Department homicide case incident report listed him as a member of a major street gang.

Three years before his homicide, a dependency petition was filed and the court granted DCFS temporary custody of the soon-to-be 16-year-old. Trey's grandmother, his adoptive parent, could no longer care for him because of his anti-social behaviors, gang affiliations, and her increasingly failing health. The grandmother had a prior history of aortic dissection and had recently been diagnosed with heart failure. The grandmother had contacted the Department approximately one year earlier requesting assistance with Trey. The grandmother told DCFS that Trey had severe behavior problems, had been suspended five times, and had stolen her car.

Trey, who had been born substance exposed, had previously entered foster care at 3 years old when his mother abandoned him in a drug house. After a temporary foster placement, he was placed with an uncle, where he joined his 7-year-old brother. Trey's maternal grandmother also moved into the home and later adopted him. While living with his maternal grandmother, Trey received special education services to address emotional and learning disabilities. In sixth grade, he read at a second grade level. A full neurological evaluation determined that he had a complex developmental encephalopathy, most likely secondary to apparent multiple intrauterine drug exposures. He was later prescribed medication for ADHD.

In 2011, after Trey's adoption disrupted, DCFS placed him in a traditional foster home. Within three weeks of the placement, the family requested his removal. The foster mother required emergency surgery and Trey had brought a gun into the home. Trey admitted to the caseworker that he had a gun, but that it had been taken from him. Trey was moved to a shelter. Trey admitted to having a gun at a clinical staffing, and stated he was involved with a major street gang on the west side of Chicago. There had been several deadly gang outbursts and he felt he needed the gun for protection. Despite Trey's admission of gun possession, child welfare staff did not follow DCFS Procedure 18 that addresses how to handle wards in possession of guns, including notification of local authorities. During this time, Trey also reported daily marijuana and alcohol use. He remained in placement at the shelter for approximately four months, but he was reported absent regularly. The Chicago Police Department arrested him three times in a nine-day span and brought him to a holding facility on charges of battery, possession of cannabis, assault, and criminal damage to property. Trey choked a peer in during his last month at the shelter.

Trey moved into a group home in the fall of 2011. Trey was enrolled at a high school with special education services. He did well during the first six weeks of school, but demonstrated anti-social behavior across the school and group home settings within a few months. He was arrested multiple times for aggravated assaults. Trey was also hospitalized for anti-social behaviors, including aggression towards group home staff and peers, regular marijuana use, and elopement. The assessment tool for hospitalization noted that Trey reportedly had a weapon and was gang involved. Following discharge, he resisted treatment and failed to take his medication consistently. He had his first court date on aggravated assault and assault late in 2012. The case manager had pressed charges against Trey during the previous winter after he pulled out a lighter and lit it two inches from his case manager's face while threatening to set her on fire. SASS authorized admission to a facility. He received supervision with a probation officer for the assault charge.

After discharge, Trey refused court-ordered anger management classes and substance abuse treatment. In fall of 2012, he violated his supervision for failing to meet his probation officer, and the judge ordered him to the evening reporting center. He continued to be reported for school infractions, including aggression to peers, disrespect to teachers, disrupting classes, and displaying gang signals. His juvenile supervision ended in the early summer of 2013. That fall, Trey was arrested and charged as an adult with Domestic Battery. He received court supervision and was again ordered to anger management classes. The Court issued an Order of Protection against Trey because he physically abused, intimidated, and stalked a 16-year-old who resided in the same group home. By the spring term, his high school transferred him to an alternative school but he refused to attend. He was the oldest resident at the group home. Trey entered a Transitional Living Facility in Chicago in the spring of 2014. He was murdered less than two weeks later. In his last contact with staff, he said he was going to make some money.

**Sergio**
In late 2014, Chicago Police Department detectives notified residential staff that 18-year-old Sergio had been found shot to death in an alley. Officers found three .40-caliber shell casings at the scene.

During a canvass of the neighborhood, police learned that several people heard multiple gunshots earlier that morning. The medical examiner pronounced Sergio dead at the scene and ruled the death a homicide.

Sergio came to the attention of the DCFS at 16 years old, in September 2012, when the hotline received a report that the US Embassy had arranged for Sergio's return to the United States after his mother left him in a foreign country. His mother refused to allow him to return to her home, citing his aggressive behaviors and saying she feared for the safety of her 2-year-old son, Sergio's half-brother. Sergio later reported instances of abuse at the hands of relatives in the foreign country, including sexual abuse. The Department indicated the mother for Lock Out and placed Sergio in a traditional foster home. The foster father agreed to be a temporary placement for the teenager, but preferred a younger child.

Three months after placement, the foster father requested Sergio's removal after he had allegedly taken a weapon to school and the foster father reported being afraid of the teenager. Sergio was placed at the shelter until a foster placement could be located. During the Integrated Assessment, Sergio reported weekly marijuana use beginning at age 14. The clinical screener summarized that Sergio appeared to have experienced multiple traumatic experiences throughout his childhood that impacted his emotional and interpersonal functioning.

Sergio remained at the shelter for just over 30 days, until a clinical staffing approved him for group home placement. The shelter could not locate a foster home, even though Sergio reported wanting to remain in a foster home in the suburbs. Sergio moved to a group home in the fall of 2012 and attended high school as a sophomore. He often skipped class, received failing grades, went on run daily, and smoked marijuana. Within the first three months, Sergio required hospitalization for aggressive behaviors. He was non-compliant with medication. Police arrested Sergio twice for theft, commencing his involvement with Juvenile Services. Sergio received supervision. One month later, he had a third arrest for Possession of Alcohol by a minor and retail theft.

Within a four month span in 2013, Sergio was arrested four more times. Three were juvenile arrests for criminal trespass to a motor vehicle, disorderly conduct, and failure to appear at court. Police picked him up on a warrant and he served two days in County Jail. On the fourth arrest, Sergio was charged as an adult for Disorderly Conduct-False 911 call, a class 4 felony. Police had concerns that staff could not control Sergio. He had been reported as runaway 84 times in the previous ten months. Sergio attended court at the end of May and agreed to treatment; instead he was stepped up to a residential placement.

Sergio was placed at a residential facility, where he remained until the fall of 2014. Staff enrolled him in high school as a sophomore. Sergio had two additional arrests shortly after his placement at the facility. In one of these arrests he was charged with battery. That spring, 18 year old Sergio went on run for approximately three weeks. During that time, local police arrested him for criminal sexual abuse, later reduced to battery, for which he received adult probation.

Sergio moved to a residential program for young adults in the fall of 2014 and continued to exhibit impulsivity, an inability to handle emotions, and poor insight and judgment. He used alcohol and marijuana. He transferred from high school to an alternative school placement because of behavior difficulties, but did not regularly attend school. Sergio was considered absent without leave seven times, including the day before he was murdered.

**Camryn**

In the spring of 2014, 18-year-old Camryn was shot multiple times outside of the home of his girlfriend's sister. Police found a semi-automatic pistol at the scene. A ballistic test showed the semi-automatic pistol had not been fired. Before he died, Camryn gave police the name of the shooter. Camryn had a total of eight gunshot wounds: three in his abdomen, two in his lower right back, and three that shattered his right arm. He died during surgery. Law enforcement arrested and charged a 17-year-old with first-degree murder the following month. The shooter was acquitted, testifying he fired in an act of self-defense. The shooter testified that Camryn pulled the gun out while he was in the car and he fired his gun believing Camryn was going to fire at him.

The Department has a long history with Camryn's family starting from 1990, when child protection indicated the mother for inadequate supervision and physical abuse to an older sibling. The mother had a history of substance abuse beginning at age 14. She participated in inpatient and outpatient substance abuse treatment. She relapsed twice. The mother reported having diagnoses of depression and borderline personality disorder. She received mental health services from a community agency. Camryn became involved with the Juvenile Justice System at age 9, after he shot a peer with a bb gun. He was placed in foster care late in the following year, after a violent episode where he threatened his sister with a knife. During his first six months in foster care, Camryn had three failed foster home placements.

In the summer of 2007, the Department placed 11-year-old Camryn at a residential treatment center. His mother visited him consistently during his stay. Camryn adjusted to school and his behaviors improved over time. At the end of 2009, 14-year-old Camryn moved to a specialized foster home. Four months later, he went on run during a family visit. Police picked him up 10 days later on a Delinquency Petition, alleging Possession of Cannabis and Cocaine with the intent to deliver. Camryn admitted a previous history of selling heroin, marijuana, and cocaine when he was 11 years old. He explained he had been a member of a street gang and at times had been in possession of multiple guns. Camryn was committed to Illinois Youth Corrections, where he remained for six months.

Upon his discharge from Illinois Youth Corrections in the fall of 2010, soon to be 15 year old Camryn was placed at a residential facility, where he received bi-weekly individual sessions and attended high school. While at the residential facility, staff completed 15 UIRs, including a school suspension for fighting. His placement lasted less than four months. Camryn eloped in late December and was missing for three weeks before he returned in early 2011. He continued to run from the facility. Camryn was placed in detention that spring and transferred to Illinois Youth Corrections in the southern region five days later. Sixteen-year-old Camryn had 10 adjudicated offenses and five violations of Probation. While at Illinois Youth Corrections in the southern region, his DCFS case was transferred to the local DCFS field office. His mother remained in contact with Camryn, but distance made it difficult for her to visit. While incarcerated, Camryn cooperated with services and did well in GED classes.

Camryn was released early in 2012 and placed at a group home, where he stayed for two months before running. His whereabouts were unknown for over eight months, from spring 2012 to early 2013. During this time, Camryn regularly called his mother and sister. Police picked Camryn up on a warrant and he was transferred from the county detention center to Illinois Youth Corrections. He was then transferred to a different location within Illinois Youth Corrections. Camryn attended GED classes while in Illinois Youth Corrections. At 17 ½ years old, Camryn was discharged in the spring of 2013 and went to live with his older sister. Camryn wanted to attend college and was provided with information about the Youth in College program. However, his case assignment remained in

southern Illinois. He enrolled in four classes at College in the late summer of 2013. The college dropped him for non-payment.[3] Bureaucratic delays were caused by lack of coordination between the case management agency and Department middle management resulting in failure to provide him with community college tuition payment forms until the following year. Camryn continued to meet with his parole officer and cooperate with the conditions of parole. He met with his case manager, who provided him with payment information for community college in the spring of 2014. Camryn was killed three days later.

**Westley**

In the fall of 2014, Westley was shot multiple times behind a Transitional Living Placement (TLP). Westley had been living at the TLP for six months at the time of his death. Police officers arrested and charged 20 year old Edward, also a DCFS ward, with Westley's murder.

Westley first came to the attention of DCFS as a substance exposed infant. SACWIS records indicate that a family case was opened from the fall of 1995 until the summer of 1997. The family had no further involvement with the Department for the next 14 years.

In the fall of 2011, a hotline caller reported that Westley's mother refused to pick him up at the police station. He had been arrested for a robbery, allegedly committed at his high school. Westley reported that his mother had kicked him out of her house a few weeks prior to his arrest saying he had struck his grandmother. DCFS was granted custody of Westley six days later. He was placed on probation the following month.

For the following 15 months, Westley was either on run or in shelter care. One of his runs lasted for 10 months. He was the subject of several juvenile arrest warrants. He was placed at a detention alternatives program of the Juvenile Court at the end of 2012. From there, he was placed at a group home, on the southeast side of Chicago in early 2013.

Westley's initial stay at the group home was characterized by behavioral issues, school problems, and substance abuse. In the summer of 2013, the delinquency judge ordered Westley to be held in custody after his probation officer showed the court pictures the youth had posted on social media depicting him holding a handgun. He tested positive for high levels of THC indicating heavy use of marijuana. He was released from custody the following month and ordered to cooperate with treatment. He was ordered to attend an evening reporting center program and returned to the group home.

After he returned to the group home, he was soon charged with two new delinquent offenses. The first was for robbery and assault of a staff member at the group home, the second was for retail theft. He pleaded guilty to retail theft; the assault and battery charges were dismissed when the staff member did not come to court. The court ordered Westley into residential substance abuse treatment in the fall of 2013. He was placed at a treatment facility and remained there for approximately two months. He successfully completed treatment and returned to the group home despite the fact that this move was contraindicated for maintaining his sobriety. He told his caseworker he felt anxious about returning to the group home. He feared he would relapse if returned to the group home. He was referred to outpatient treatment as a follow-up to residential treatment. However, his attendance was inconsistent and he soon lapsed back into marijuana abuse and other problematic behaviors.

---

[3] The Community College Payment Program allows youth under DCFS Guardianship enrolling in an Illinois community college the opportunity to have their tuition, fees, required books, and supplies paid for by DCFS.

Westley's mother has a documented history of drug and alcohol abuse. Reports allege that he suffered from fetal alcohol syndrome. Early health records do not definitively support this diagnosis, but the clinician at the group home indicated that some of his learning problems could be attributed to fetal alcohol exposure. He was never evaluated for special education services while in the care of DCFS.

In early 2014, 18 year old Westley was recommended for a step-down to a TLP. He was placed in a TLP later that spring. His adjustment to the setting at the TLP was reasonably successful. Nevertheless, he still struggled with his substance abuse issues and did not attend classes at an alternative high school.

Westley continued to struggle with his substance abuse issues and was in the process of being referred to a program when he was killed. He seemed to respond to some of the staff. He was referred by the staff for teen parenting services as he had a 3-year-old daughter whom he was not seeing because he was estranged from the mother. His wanting to visit his daughter motivated him to attend school regularly again. He also was named as a possible father for another child but a paternity test proved he was not the father. He had a phone interview with teen parenting services staff eight days before he was killed.

### Isaac

Eighteen year old Isaac was murdered in the spring of 2015. His body was found behind a building on the south side of Chicago. According to witness accounts, Isaac was shot by two young males who were following him in a vehicle. The driver of the vehicle exited and fired a number of shots. The passenger also got out of the car, walked with the driver to where Isaac lay prone on the ground, and shot him again. Reports from the Chicago Police Department indicate the shooting may be part of an ongoing feud between a breakaway faction of one major street gang and a similar faction of another gang.

Isaac's initial involvement with DCFS came when he was 2 months old and his biological mother abandoned him. The mother was reported to have severe addiction problems and had similarly abandoned Isaac's older brother. This older sibling also came under DCFS guardianship and was adopted by a relative. Isaac was placed with his maternal great aunt in the summer of 1997. Isaac's adoptive mother reported that he had been drug exposed in utero. The adoption was completed three years later. The adoptive mother was provided a monthly stipend of $326 per month.

Isaac was arrested for Aggravated Unlawful Use of a Weapon when he was 17 years old. Two months later, Isaac pleaded guilty and was sentenced to probation. The court also ordered the Probation Department to complete a Social Investigation for the sentencing hearing in Cook County Juvenile Court. While conducting the Social Investigation, the hotline received a report that Isaac's adoptive mother had expressed thoughts of killing Isaac. She stated he was breaking her heart because of his involvement with the streets and the gangs. She was later indicated for risk of harm. The Delinquency Judge committed him to DCFS. At that time, Isaac was placed at a staff-secure facility used as an alternative placement to the Juvenile Detention Center. He was transferred to the Shelter two weeks later. He remained in that placement until his death the following spring.

Isaac attended high school. He had poor attendance, and exhibited aggressive behavior when he was there. He never advanced beyond ninth grade. Psychological testing completed in 2014 indicated that he had a full scale IQ of 79. Isaac admitted daily use of marijuana, but he did not participate in substance abuse treatment.

While at the Shelter, Isaac was uncooperative with efforts to secure a more permanent placement for him. According to records from the Child Intake Recovery Unit, Isaac was reported absent a total of 51 times in a five month period. Of these incidents, 18 were for two days or more. There is no indication of Isaac's whereabouts in the two weeks prior to his death. Residential facility staff indicated that the youth returned to their program but there was not a bed available for him. Isaac refused their offer of transportation to the shelter. A juvenile warrant was issued for him that same day when he failed to appear for a hearing on his delinquent case. He appeared later in the day and the warrant was recalled. The case notes indicate that the caseworker attempted to place Isaac in a Transitional Living Program, but two programs rejected him and Isaac refused to consider a third.

**Desmond**

In the summer of 2015, the body of 20-year-old Desmond was found on Chicago's far south side. Police reports described the body as "burned beyond recognition." Desmond's girlfriend identified him based on remnants of clothing. She had reported Desmond missing to the police. The Medical Examiner listed the cause of death as undetermined and the manner of death homicide.

Desmond's mother had a long history of involvement with DCFS. In 1995, Desmond's older brother was treated for a spiral fracture of his leg. He had suffered second-degree burns 11 months earlier, the result of a skillet falling off the stove. After the second incident, 9 month-old Desmond and his older brother were placed in the relative foster home of their aunt. When she requested their removal, they were placed with another aunt, their mother's adoptive sister. Subsequently, four younger siblings would be removed from the mother's care and placed with relatives.

In 2002, Desmond's aunt obtained subsidized guardianship of seven year-old Desmond and received $384 a month. When Desmond was 12, the guardian reported that Desmond began having behavioral problems. According to reports, Desmond had a brief intervention in 2008 that consisted of participation in an outpatient program. However, his guardian refused the medication upon recommendation of Desmond's pediatrician.

The first of a series of arrests and referrals to Juvenile Court began the month after his discharge. In April 2008, he was arrested for Criminal Trespass to Land. Five months later, 13 year old Desmond was arrested for Aggravated Battery after he struck a girl in the head with a bat. He pleaded guilty to the reduced charge of battery. Desmond was placed on Court Supervision. After being found in violation of the Supervision Order, he was placed on probation and ordered to enter residential drug treatment. While at the residential treatment center, Desmond admitted to smoking two marijuana blunts daily. He was discharged approximately three weeks later for aggressive behavior toward peers, and failed to complete the program. That winter, he was placed on probation for Robbery.

Desmond had a long history of failure in school. He attended 10 different schools and failed to achieve in all of them. He was expelled from Chicago Public Schools in 2009 because of alleged gang activity. At the time of his death, he had failed to graduate from high school or earn a GED.

In 2010, his guardian petitioned the court to have her guardianship of Desmond vacated. Both Delinquency Court and DCFS provided services in an attempt to stabilize the placement. Multi-Systemic Therapy was ordered through Delinquency Court and DCFS arranged for Adoption Preservation Services. After a search warrant was executed on her home because the police believed that Desmond had hid a gun used in a murder, the guardian reported she was threatened with eviction and wanted to give up guardianship. DCFS assumed guardianship of 15 year-old Desmond.

Because of his dual involvement with the Child Protection and Delinquency Courts, Desmond was referred to the foster care program for DCFS youth involved in the juvenile justice system. Desmond

STREET HOMICIDES INVESTIGATIVE REPORT                47

was initially placed at the Shelter from which he frequently ran. He was placed in his first specialized foster home in the summer of 2010. He was required to take part in meetings at the agency offices and participate in the youth advocate program for which he would receive a $300 monthly stipend.

Desmond's behavior while in the foster care program for DCFS youth involved in the juvenile justice system ranged from noncompliant to aggressive. Multiple specialized foster parents requested his removal. A violation of probation was filed in the spring of 2011 alleging that Desmond had threatened his caseworker. Program staff would at times withhold Desmond's stipend for failure to participate, but he would become combative and threatening and staff would acquiesce. On one occasion, he threatened his caseworker verbally in her office and then reiterated the threat in a text message when he was refused his stipend. There are references in the case notes to the caseworker meeting Desmond in the community and giving him the stipend despite his lack of participation. In early 2012, Desmond was sentenced to the Juvenile Detention Center and his probation case was closed. This ended Desmond's involvement with the Delinquency Court.

Over the following years his pattern of non-compliance continued. He cycled in and out of various foster homes. Desmond became a father in 2012. He was offered services for teen parents but refused to participate. In 2014, he was arrested for Domestic Battery after he assaulted the mother of his child and spent time in Cook County Jail. Desmond pleaded guilty and was sentenced to Conditional Discharge and Jail. There was also a protective order issued for the victim.

When he was 20 years old, Desmond attended a clinical staffing with his caseworker. The case note from the meeting reported that Desmond, though officially placed in a non-relative foster home on the south side of Chicago, was not staying there regularly. It was reported that he often stayed with either his girlfriend, the mother of his child, or a cousin. During the meeting Desmond agreed to enroll in a GED class and was once again informed of available teen parent services. A Youth Transition Plan was completed and Desmond was informed to appear at a permanency hearing the following week. Desmond failed to attend the hearing despite the caseworker's reminder the day before. There was no further contact with Desmond before his body was discovered. The case note describing this hearing was the last entered in Desmond's case. Desmond's body was found several days later.

**Maliyah**

Twenty-year-old Maliyah died after being stabbed during an altercation. According to Chicago Police Reports, Maliyah accompanied two friends she knew to an alley in the neighborhood. The group had arranged to meet another peer there. One of Maliyah's friends had been feuding with that peer on Facebook. Police reports state the trio cornered the man. Maliyah punched him first and the two others followed, punching and kicking the man. The man being attacked removed a two-inch pocketknife from his boot, stabbed Maliyah in the chest, and then stabbed the two men before escaping. He called 911 once on the train. One of Maliyah's friends suffered multiple stab wounds to the arm, chest and back; the other suffered stab wounds to his face. The two friends were arrested and charged with felony murder.

Maliyah's mother was 16 years-old when she gave birth to her. The mother later reported that Maliyah's father abused her and after having another child with him, left the marriage when Maliyah was two years old. The Department has not had contact with the father and Maliyah was inconsistent as to if she had contact with her father. Maliyah was known to the Department since at least the age of five years. The mother reported to Cook County Special Services that Maliyah has a history of sexual abuse beginning at age 3, when Maliyah's babysitter watched pornography with her. The report did not provide further details and there does not seem to have been any DCFS involvement at this time. Maliyah's stepfather was unfounded for sexual molestation in 2001 but had been indicated

for risk of harm. Maliyah displayed sexualized behaviors and eventually an unknown perpetrator was indicated. She became a ward at age 9, when her mother was indicated for inadequate supervision and was not cooperating with services, including those for Maliyah. Her siblings also came into care.

Between 2007 and 2014, Maliyah was psychiatrically hospitalized over 30 times while moving between five different residential facilities. Maliyah had a history of sexual abuse and trauma, severe mental illness, substance abuse and violent behavior.[4] Maliyah's five siblings eventually obtained permanency, four returned to the parents and one to a subsidized guardian. Maliyah's behavioral and mental health problems kept her in the system. The family case closed in 2011 and a goal of independence was entered for Maliyah six months later. One of the facilities in which she was placed was an out of state dialectical therapy residential program that she first entered at age 14. Over 15 months, she moved between hospitalizations and behavior therapy residential program. She moved into a residential treatment home when she was fifteen years old. She continued to require placement changes and hospitalizations. She was psychiatrically hospitalized 19 more times before moving to a treatment program for the mentally ill.

Maliyah had been detained in juvenile detention centers in 2010, 2011, 2013, and 2014. Maliyah had four arrests as a juvenile and two arrests as an adult before moving to the treatment program for the mentally ill. The reasons for arrests included kicking a police officer and physically assaulting a residential staff member. Just prior to admission in the treatment program, Maliyah had been placed on adult probation for a forcible felony, aggravated battery.

Maliyah moved to the treatment program about a year before her death. Prior to admission, she had earned over eighteen credits, putting her less than six credits short of graduation, and was at a 12th grade level. She had attended a high school with 120 students through the Special Education Association. Her IEP states, "[Maliyah] requires a small group, highly structured environment with intensive behavioral supports in place to maintain her behavior." Though her treatment program worker enrolled her in the local school, a school with over 1500 students, Maliyah did not attend. Maliyah was expected to get herself to and from school using public transportation. She enrolled in a GED program in the month before her death but had not started.

The twelve months that Maliyah was at the treatment program included four hospitalizations, nine unauthorized leaves, and three arrests. She continued her assaultive behavior and destroying property when she became angry. Maliyah had initially been accepted into the treatment program's Transitional Living Program. Despite the staff's rigorous efforts Maliyah began refusing to take her medication and her behavior escalated. During her time there, she was placed in more structured residential placements. Within three months of being placed there, Maliyah had stolen another resident's cell phone. Staff intervened to prevent a physical confrontation; police were called and she was charged with theft.

Less than a month prior to her 20th birthday, according to a Chicago Police report, Maliyah threatened physical violence towards another resident. Maliyah was arrested for simple battery and spent a night in Cook County Jail. The following day, Maliyah was released from jail on an I-Bond. She returned to the treatment program seeking out the peer she had been fighting with the day before. She punched a staff member several times in the head and face, and damaged a fax machine and computer monitor. Police were called and she was psychiatrically hospitalized.

---

[4] Although one integrated assessment indicated that Maliyah reported she was transgender, caseworkers did not confirm this.

A week after her birthday Maliyah was arrested for a third time after attacking another housemate, striking her head with a garbage can lid and punching her in the face. Maliyah was taken to Cook County Jail where she remained for a little more than a month. During the course of the arrest, a bench warrant in another jurisdiction[5] was discovered. After her release from Cook County Jail, Illinois State Police transferred Maliyah to the other jurisdiction to answer for the warrant there. She pleaded guilty to violating probation and was held in that County Jail before returning to Chicago. The three Cook County charges were still pending at the time of her death.

Placement options for Maliyah became limited after she was banned from the treatment program's residential sites for threatening staff and she was not allowed at other sites after the resident she had attacked obtained an order of protection against Maliyah. The treatment program notified the Department they had no placement for her within their facilities. They determined they could not serve her in their residential or transitional living programs because of her escalating violent behavior. They would have to move her to the community and serve her through their outreach program. She moved to DCFS Shelters. The treatment program, working with DCFS to find placement options, had to place Maliyah into a single room occupancy hotel not affiliated with the treatment program or any other service provider. Even those options were limited. Maliyah had no income and it was unlikely she would qualify for social security income as she was not compliant with treatment or medication.[6]

Less than a month after being released from jail, Maliyah went to the treatment program's administrative building. When told that she could not have money, Maliyah had an outburst, choked a staff member, and destroyed over $1000 worth of furniture. Police were called and they advised staff to have her hospitalized instead of arresting her. Treatment program staff filed a petition to initiate involuntary hospitalization. When released from the hospital a week later, she moved to the single occupancy room building. Staff made a plan to meet her in the community, not in her apartment, because of her previous violent outbursts. She had been out of the hospital for approximately six weeks when she was killed.

The initial daily log entries at the treatment program described her as accepting direction from staff, socializing with other residents, and having a good sense of humor, yet Maliyah did not continue that pattern. Despite Maliyah's violent behavior, impulsivity, and emotional instability, treatment program workers described her, as others had before, as engaging but unpredictably aggressive. Although she attended therapy only sporadically, her therapist noted she voiced remorse. Staff reported that she responded well to strong relationships. When she had more access to the community and was off her medications, she became violent towards staff and other residents. She began staying away from her placement more often. She reported regularly using marijuana, alcohol, and other drugs when they were available. She did not feel as though she needed medication. Workers noted she often spoke about her gang involvement and her obligations to the gang. Police do not suspect that the altercation that resulted in her death was gang related.

## ANALYSIS

All but one of the families in this investigation lived in high poverty communities. Four of the homicide victims were under the age of 3 when they first entered the child welfare system. Isaac and

---

[5] Maliyah was sentenced to probation for a charge of Battery that occurred in another county. She violated the terms of her probation by failing to appear to Cook County probation after moving to the treatment program. A warrant was issued in that county on January 23, 2015. According to county court records, she appeared before the court on March 27, 2015 while in custody.

[6] The treatment program was paying for her placement, but many single room occupancy hotels require a resident to have proof of income, such a social security income.

Desmond entered state care during infancy. Peyton and Trey were 3 years old at the time they initially came into state care. All four of these children were eventually placed with relatives who became their adoptive parent or subsidized guardian. The remaining seven entered foster care well into school age. Two of the youth, Maliyah and Gael, came into state care between the ages of 9 and 10. Maliyah's family had intact services prior to her coming into care. Camryn was 12 years old when he entered care and Westley and Luca were 15. The remaining two, Roland and Sergio, were 16 years old when they first came into DCFS custody. Sergio came into care after he returned from living in a foreign country. Isaac was 17-½ when he entered DCFS custody.

All were the victims of street violence with the exception of Peyton. Ten homicides occurred in Cook County; one happened in Winnebago County. Five homicide cases were closed with arrests. This 45% clearance rate is higher than the 26% clearance rate in Chicago.[7]   Seventeen-year-old Keaton was arrested and charged with the murder of Camryn.  Keaton was acquitted of the murder on the grounds of self-defense. Twenty-year-old Edward, also a ward of DCFS, is the alleged murderer of Westley.  Both lived in the same Transitional Living program. Edward is in the Cook County Jail awaiting trial. Gael was alleged to have been shot by 19 and 21 year olds. They are both incarcerated and awaiting trial. Two young adults, ages 19 and 20, were arrested and charged with felony murder in the death of Maliyah. Maliyah and the two young men attacked another young man. In self-defense, he stabbed Maliyah and the other two attackers. A Chicago Police Officer has been charged with the murder of Peyton.

**Social, Environmental, and Community Factors**

*Education and Employment*
Of the 10 homicide victims between the ages of 17 and 20, only one, 17-year-old Luca, graduated from high school. He attended an off-campus therapeutic program of a high school in southwest suburban Chicago. He was murdered a few weeks after his graduation. Camryn earned his alternative degree certification while he was in custody at the Illinois Department of Juvenile Justice. He was the only one in the cohort who had been sent to juvenile corrections. He had enrolled in community college when released and completed his own application to secure financial aid, but he had to withdraw from classes because the case management agency failed to secure his DCFS tuition payment forms. A year passed before the agency rectified this obstacle. Camryn was killed shortly before he was to re-enroll in college. The majority of the youth had itinerant school histories, attending multiple schools with low academic ratings. Desmond attended five grammar schools and five high schools. He had a number of expulsions. Peyton attended three grammar schools and two high schools. At the time of his death, Peyton was enrolled in an alternative school but was on suspension on the day he was killed. Both Desmond and Peyton had their school years disrupted frequently by stays in the Juvenile Detention Center.

Youth in this cohort faced many obstacles to educational success. Most attended public schools that have low academic ratings in communities plagued with poverty and violence. They were all functioning below grade level in Reading and Math. While some were, for a period of time, placed in a residential program, they returned to Chicago communities upon discharge. Eighteen-year-old Roland did well when attending a therapeutic school but stopped attending school within three months of returning to Chicago. Maliyah's Individual Education Plan [IEP] at her small therapeutic school successfully enabled her to reach the 12th grade. However, Maliyah transferred into a large Chicago Public School. She attended no more than a few days; the Chicago Public School was 10 times the size of her rural therapeutic school.

---

[7] The clearance rate for Illinois as a whole is 45%.

All of the victims who were 17 and older were in significant need of vocational advocacy and training. Two of the homicide victims were employed. Seventeen-year-old Luca worked part time in a restaurant for a few weeks before he was killed. Camryn had obtained an alternative degree and attempted to enter the Job Corps while he was waiting for the college assistance, but was denied because he was still on parole. According to case notes, Desmond, age 20, was employed for a total of two weeks before being fired and he never obtained new employment.

The combination of unemployment and lack of enrollment in school is commonly referred to as the "Disconnection Rate."  This rate is very high for African American males in Chicago between the ages of 16 and 24.[8]  Chicago's overall Disconnection Rate is 13.3%, placing it ninth best among 25 metropolitan areas in the United States. However, for young African Americans, the Disconnection Rate sits at 24%, making it the sixth most disconnected among 25 metropolitan areas in the United States for this population. The Disconnection Rates in the communities where most of these wards resided was significantly higher than the rate for the rest of the city. In South Lawndale, for instance, the Disconnection Rate is 35%. It is similarly high in Englewood and other communities with a high African American population.[9] Youth Disconnection is a significant risk factor for recidivism and violence. As Disconnection was a factor for the majority of these youths, it needs to be addressed more effectively. Programs such as Safer Foundation, specifically designed to address the employment deficits of young adult ex-offenders, need to be applied to this young adult population.

***Lead Exposure***

Thirty-six percent (4) of the youth had a history of lead exposure. Gael, Desmond, and Roland lived in the city of Chicago at the time of their positive lead tests. Three-year-old Trey was taken from a drug house on the Westside of Chicago, and tested positive for lead six months later. During the integrated assessment, Roland's mother reported that he required hospitalization as an infant for high lead levels. Gael tested positive for lead in 2006. At that time, 26% of the children tested for lead in the Lawndale neighborhood had high levels, compared to 15% citywide. In Desmond's and Roland's neighborhood, Englewood, 47% of the children tested positive compared to 30% citywide in 2002. The children of Chicago are affected by lead poisoning at rates twice as high as the national average. Evens et al. researched the impact of lead toxicity of children in the Chicago Public School system.[10] Findings showed lead toxicity was associated with poorer academic achievement in reading and math and confirmed early childhood lead exposure is a major risk factor for poor academic achievement. The majority of lead poisoning cases are reported in the neighborhoods of the south and west side of Chicago, particularly the city's low-income, impoverished neighborhoods of Englewood, Austin, and Lawndale.[11]  Lead poisoning in these neighborhoods is six times higher than lead poisoning in other areas of Chicago, predominantly affecting black low-income communities.[12] The Illinois Department of Public Health reported more than 10,000 children living in Chicago had blood lead levels greater than the reference point of 5 micrograms per deciliter (µg/dL) in 2013. Lead-based paint and toxic dust is commonly found in the housing of Chicago neighborhoods with limited community resources.

---

[8]  Youth Disconnection. (2016). *Measure of America*. Retrieved from http://www.measureofamerica.org/disconnected-youth/

[9] ibid

[10] Evens, A., Hryhorczuk, D., Lanphear, B. P., Rankin, K. M., Lewis, D. A., Forst, L., & Rosenberg, D. (2015). The impact of low-level lead toxicity on school performance among children in the Chicago Public Schools: a population-based retrospective cohort study. *Environmental Health, 14*(1), 21.

[11]  Hawthorne, M. (2015, May 1). Lead paint poisons poor Chicago kids as city spends millions less on cleanup. *Chicago Tribune*. Retrieved from http://www.chicagotribune.com/news/ct-lead-poisoning-chicago-met-20150501-story.htm

[12]  Epton, A., Bordens, A., & Hing, G. (2015, May 1). Chicago lead poisoning rates vary by location, time. *Chicago Tribune*. Retrieved from http://apps.chicagotribune.com/news/watchdog/chicago-lead-poisoning/index.html

This exposure is the primary cause for Chicago's childhood lead poisoning. Chicago relies primarily on the Section 8 federal housing policy to subsidize housing for families with low-income. Unfortunately, these are the living spaces that are exposing children to lead, and once detected, it is often too late to reverse the neurological effects it has on a young child's developing brain.[13] Research had linked lead poisoning to developmental delays, academic difficulties, violence, juvenile delinquency, and emotional and behavioral problems. According to Lead Safe Illinois, lead poisoning can cause brain and nervous system damage resulting in speech delay. Lead poisoning has also been associated with inattention, impulsivity, delays in reaction time, and hyperactivity. Even children with lead exposure below the threshold of 10 µg/dL, will lose 5 to 7 IQ points.

The Centers for Disease Control note that research has not specifically examined the impact of early childhood educational interventions on cognitive or behavioral outcomes for children with lead exposure.[14]  However, early intervention programs, such as Head Start, have documented improvements in learning and developmental outcomes in children with developmental delays and educational deficits. Head Start focuses on children's health, nutrition, mental health, and social service needs, which mitigates social and economic factors that may limit a child's ability to learn. Schnur and John[15] and the Center for Disease Control[16] recommend children with lead exposure displaying emotional and behavioral problems would benefit from early intervention programs such as Head Start and other special education and enrichment services.  It is suggested that a nurturing and enriched environment may reduce the negative effects from lead exposure. Moodie *et al.* found that an attentive and supportive home environment led to improved educational outcomes.[17]  A supportive environment included parental support of schoolwork and extra-curricular activities. One of the authors specified the need for an enriched learning environment that could include museums, art, music, and exercise;[18] enhanced stimulation not readily available in impoverished neighborhoods where lead exposure is more prevalent.

### *Prenatal Drug and Alcohol Exposure*

Prenatal exposure to alcohol affects a developing embryo as early as the fourth week of gestation, with midline facial abnormalities as the first developmental defect observed.[19] This development may be occurring even before a woman knows she is pregnant. However, the effects of prenatal alcohol exposure are persistent throughout the pregnancy. Thus, it is important to emphasize that all children who have been affected by prenatal alcohol exposure do not necessarily have all or any of the facial features associated with Fetal Alcohol Syndrome [FAS], there are many implications to being exposed to alcohol while in utero, such as Fetal Alcohol Spectrum Disorder [FASD]. For our

---

[13]  Hawthorne, M. (2015, December 31). Federal housing policy leaves poor kids at risk of lead poisoning. *Chicago Tribune*. Retrieved from http://www.chicagotribune.com/news/ct-cha-lead-paint-hazards-met-20151231-story.html

[14]  Lead. (2016, January 29). *Centers for Disease Control and Prevention.* Retrieved from http://www.cdc.gov/nceh/lead/

[15]  Schnur, J., & John, R. M. (2014). Childhood lead poisoning and the new Centers for Disease Control and Prevention guidelines for lead exposure.*Journal of the American Association of Nurse Practitioners*, *26*(5), 238-247.

[16]  Centers for Disease Control and Prevention (CDC). (2012). Low level lead exposure harms children: a renewed call for primary prevention. *Atlanta: Advisory Committee on Childhood Lead Poisoning Prevention*.

[17]  Educational Services for Children Affected by Lead Expert Panel. Educational interventions for children affected by lead. Atlanta: U.S. Department of Health and Human Services;2015.

[18]  Flam, F. (2016, February 19). Don't live in Flint? Lead is still your problem. *Chicago Tribune*. Retrieved from http://www.chicagotribune.com/news/opinion/commentary/ct-lead-poisoning-water-flint-children-20160218-story.html

[19]  O'Neil, E. (2010, September 28) Facial abnormalities of fetal alcohol syndrome (FAS). *Embryo Project Encyclopedia*.

population, this is an unknown variable since it is difficult to get reliable retrospective information. Previous Inspector General investigations found that neither child protection nor caseworkers correctly request information during the substance abuse screening, nor do they note historical information about prenatal alcohol use.

One of the 11 youth in this cohort had a confirmed history of prenatal alcohol exposure, but several mothers had severe and chronic drug abuse, sometimes combined with homelessness and prostitution. The co-morbidity of drug and alcohol abuse raises the probability that these mothers may have drank sometime during pregnancy, placing the infant at risk for FASD.

Dr. Carl Bell has reported that from his work as a consultant at the Cook County Juvenile Detention Center, he discovered that two-thirds to three-quarters of the youths have speech and language problems, Attention Deficit Hyperactivity Disorder, intellectual disability, and specific learning disorders.[20]  He noted FASD as the leading cause of these disorders. Bell also reported that the prevalence of neurobehavioral disorders associated with prenatal alcohol exposure among children seen in child protective services has thus far eluded detection. However, he noted his experience with psychiatric clinic patients who have been involved with child protective services suggests that these rates are also high. Dr. Bell believes individuals with fetal alcohol syndrome have largely gone undiagnosed, and with no intervention and neurodevelopmental difficulties, they may find it difficult to be productive adults (i.e. maintain employment etc.).[21]

As FASD is considered to be a continuum disorder, some children will display deficits in many areas of functioning, while others may display mild problems in one or two domains. Children with histories of prenatal alcohol exposure may exhibit difficulty in their ability to apply knowledge and skills, and to process some types of sensory information. They may also struggle with symptoms of inattention, impulsivity, emotional and behavioral dysregulation, impaired working memory, planning, and organization.

Research has demonstrated that children with FASDs have significant structural and functional changes in the brain.[22]  Areas of the brain responsible for executive functioning, emotional and behavioral regulation, and cognitive functioning are particularly susceptible to the effects of prenatal alcohol exposure. Cerebral damage often results in a wide range of dysfunction, including: difficulty with transitions; poor motor planning; poor problem solving skills; concrete thinking (i.e., which may interfere with arithmetic skills and abstract thinking); attentional deficits; difficulty applying learning to different situations; trouble interpreting social cues; problems regulating responses (i.e. to sensation; explosive tempers; bad judgment); and difficulty following and understanding directions.[23] [24]  Skills and knowledge may be mastered, then lost. As a result, the child may have difficulty following through with directives. While the child may express understanding of a concept for days on end, they may later subsequently "lose" that information. Thus, children with FASDs require patient teaching and re-teaching. Regulating responses to various sensory experiences can present another level of challenge in dealing with the day-to-day world. As such, he/she needs additional

[20] Bell, C. (2014). Fetal Alcohol Exposure Among African Americans. *Psychiatric Services*, 65(5), p. 569
[21] Bell, C. (2015, July 18). Dr. Carl Bell says fetal alcohol syndrome 'biggest public health problem for African-Americans since slavery.' *Inquisitr*. http://www.inquisitr.com/2262013/dr-carl-bell-says-fetal-alcohol-syndrome-biggest-public-health-problem-for-african-americans-since-slavery/#OeFso5ohlsAldl8p.99
[22] Chasnoff, I. J., et al. (2008). FASD across the span of childhood: A handbook for parents and providers. *Children's Research Triangle*.
[23] Bell, C. (2014). Fetal Alcohol exposure among African Americans. *Psychiatric Services*, 65(5), p. 569
[24] Chasnoff, I. J., et al. (2008). FASD across the span of childhood: A handbook for parents and providers. *Children's Research Triangle*.

structure and support to complete more complex tasks and may benefit from visual cues or breaking down multicomponent tasks into smaller units.

### Gang Involvement

Seven of the 17 and older youth claim specific gang affiliation. All but one of the victims were alleged to have been peripherally involved with gangs. The meaning and reality of gang involvement has changed greatly during the past decade in a way that has perhaps put youths, such as these victims, at an even greater risk for violence in these communities. Previously, large swaths of the inner city of Chicago were controlled by large, well-structured street gangs. These were organized around a criminal enterprise, namely the street sale of illicit drugs.

In recent years, these gangs have broken up into small cliques who claim to control small patches of these communities, frequently confined to a few square blocks.[25] These groups are loosely organized and not necessarily around a specific criminal activity. This development has put youth in these communities even more at risk. Merely traveling around their neighborhood, on foot, can be a perilous task. The disputes between members of these small factions are frequently petty or retaliatory in nature.[26] These disputes are triggered by what might appear to be trivial matters, such as a previous fight, an insult, or a taunt delivered through social media. Lethal violence is, in most instances, the first resort to settling these disputes. This development coincided with an ever increasing availability of guns in these communities. These weapons were also characterized by their enhanced lethality. It was not unusual for youths such as these to have high-powered handguns, capable of accommodating multi-round clips, in their possession. Thus it was common for the sites of these murders to be strewn with numerous spent shell casings.

The proliferation of smaller gangs also presents a significant risk for youth who are placed in shelter care facilities and group homes. Several of the youth in this cohort investigation complained prior to or subsequent to being placed in these facilities that moving about in that particular area of the city would be a risky proposition for them. The expression of this fear is, in most instances, real and not manipulative. In many of these neighborhoods, just being an unrecognized face could invite violence. The effect that this fear has on the ability of these wards to successfully adjust to a placement cannot be underestimated. It also impacts their ability to participate successfully in the treatment and programming being offered to them.

### Gun Violence

Gun violence has become ubiquitous in many of the communities in which the youth live, putting them at an increased risk to be victimized by gun violence. Eighty two percent (9) of this group of homicide victims died as a result of a gunshot wound; eight were African American. This is congruent with both national and local statistics. In 2014, 2,374 black males between the ages of 15 to 24 died as a result of a homicide in the United States. Of these, 93% (2,219) were firearms related. Included amongst Chicago's 436 homicides in 2014 were 83 black males ages 13 to 20. Of those 83, all but two died as a result of gunshot injury. Of the 488 total homicides in Chicago in 2015, 20% (96) were black males between the age of 13 and 20. All of these deaths were firearm related.

The majority of these victims come from communities with a high minority population and a low socio-economic profile. When placed in foster care, transitional living programs, adoptive homes, or

---

[25] Hughes, L. A. (2013). Group cohesiveness, gang member prestige, and delinquency and violence in Chicago, 1959–1962. *Criminology*, *51*(4), 795-832.

[26] Weisel D. (2002). The evolution of street gangs: An examination of form and variation. In Reed W., Decker S. (Eds.), *Responding to gangs: Evaluation and research* (pp. 25-65). Washington, DC: U.S. Department of Justice, National Institute of Justice.

with a subsidized legal guardian, these children are likely to remain in impoverished communities. All of these youth were placed in communities in Chicago where gun violence is disproportionately prevalent.

Six of the youths either had a criminal record with gun charges or documentation of involvement with weapons in their case record. In two cases, involving Luca and Camryn, guns were found at the scenes of their murders. In Camryn's case, the gun found on the ground had not been fired and the person charged with his murder testified that Camryn had pulled a gun on him. In Luca's case, it was unclear if the gun was his or belonged to the son of his unlicensed caregiver, who was wounded and fled the scene, or to their assailant.

Four of the victims previously had indications of gun possession. Westley had a posted picture of himself holding a gun on Facebook. A judge ordered him into custody after this picture was presented at court. In the case of Westley, a UIR should have been generated by group home staff after they learned that he posted the picture of himself holding a gun on social media. Trey brought a gun to his foster home, prompting his foster parent to take him to the shelter and to demand immediate removal. The incident generated an Unusual Incident Report, but the police were never notified to secure the weapon. Desmond's aunt petitioned the court to vacate guardianship after the police searched her home for a gun that had allegedly been used in a murder. Isaac pleaded guilty in Juvenile Delinquency Court to Unlawful Use of a Weapon, a forcible felony, after police found him to be in possession of a loaded handgun.

### Unusual Incident Reports of Wards with Guns

Inspector General investigators reviewed 48 Unusual Incident Reports from 2011 to 2015 and contemporaneous Department case notes for the youth involved, where the incident was coded as ward possessing or having access to a firearm or ammunition.[27] Of these Unusual Incident Reports [UIRs], 75% involved youth over 18. Six of the incidents were reported after staff, family, or foster parents noted gun activity depicted on social media.

In 1999, the Department issued Administrative Procedure 18 defining the actions staff should take in response to a ward that has or is suspected to have a gun in their possession. The procedure directs staff to immediately contact law enforcement for assistance.

The Administrative Procedure specifies that Department or private agency staff should not search for or seize the weapon, though they may direct law enforcement to the reported location of firearms or ammunition.[28] The procedure is meant not only for the protection of the youth, foster families, and staff but also for the protection of their communities.

The Office of the Inspector General analysis showed several cases in which law enforcement was not contacted. Moreover, despite the clarity of Administrative Procedure 18 and the severe potential for harm, Department monitors failed to review the UIRs to ensure that law enforcement was contacted.

Eighteen UIRs did not document any communication with law enforcement. Two of the 18 UIRs reported that staff confiscated a weapon (a .38 caliber gun and a BB gun) with no documentation of what the staff did with the gun or whether law enforcement was contacted. In two cases, foster

---

[27] The Office of Information Technology Services provided the Office of the Inspector General with the UIRs. As the system had to rely on the coding of the incident, this is likely an undercount and not reliable data. For example, if the UIR was coded as "Assault of a ward alleged" and the narrative reported possession of a gun, it would not have been included.

[28] Other duties include completing an Unusual Incident Report and convening a clinical staffing.

parents contacted caseworkers to report that the youth brought a gun into the foster home. Trey, one of the wards killed, reportedly brought a gun into his foster home in July 2011. The UIR states the foster family brought Trey to the shelter and called the caseworker, but there is no documentation, either in case notes or the UIR system, that law enforcement was contacted. In the other foster home case, the only notation about law enforcement is that the foster parents were told to contact law enforcement. In another case, staff contacted Project Safe Neighborhood, but did not contact police. Project Safe Neighborhood will focus on removing the gun from the community, but will not provide accountability for the youth.

The remaining 13 cases present different responses, none of which included contacting law enforcement. In six of the incidents, staff only document that the youth denied, recanted or claimed that they no longer had the gun.[29] In five of the 13 incidents, staff searched for the gun or ammunition themselves[30] and did not find any. In one of those cases, the ward was arrested for battery later that month, at which time police found a gun in the facility.[31] In another of the cases resolved by search only, the UIR stated that the ward had pointed a gun at another resident. A search found no gun, and it does not appear that police were contacted. Less than a month later, police came to the facility and arrested two wards (including the ward that was alleged to have pointed a gun at another ward) for suspicion of involvement in an armed robbery.

In the two remaining UIRs, the only dispositions noted were internal counseling.

*Substance Abuse*
Substance abuse issues impacted the ability of all of the young adults in this cohort to maintain their placements, achieve academically, and successfully participate in services to help reach the goals outlined in their treatment plans. The most common drugs of choice for youths in this demographic are marijuana and alcohol, with the former predominating. A recent study found that abuse of hard drugs (cocaine, hallucinogens, opiates, amphetamines and sedatives) is less frequent among African Americans who had been involved in Juvenile Justice than non-Hispanic whites.[32] All 10 youths who were 17 and older admitted to using marijuana. Four of the youth were born drug and/or alcohol exposed and in-utero exposure was suspected in one additional case. Peyton had a history of abusing PCP, a dangerous, dissociative anesthetic. Peyton's biological family, including his mother and grandmother, had a generational history of PCP and heroin abuse. The Medical Examiner noted the presence of a small amount of PCP in his system at the time of his death.

Three of the youth were court-ordered to participate in residential substance abuse treatment by the Delinquency Court as a condition of probation. One was discharged from residential substance abuse treatment for aggressive behavior, shortly after entering. During his five years with the Department, he never completed any other program, but he was not penalized. Two others successfully completed these programs, but the Department lacked aftercare sober housing options in which to place them after they were discharged from treatment. Instead, both were returned to placements that were not conducive to maintaining sobriety. Westley predicted his relapse should he return to his prior group

---

[29] One claimed that he had thrown the gun in an alley because he was being chased by police and another claimed that he had already sold the gun.

[30] Four involved searches of the premises and one documented only a search of the person accused. Two of the five incidents also included counselling the youth internally.

[31] The agency completed a UIR regarding his arrest and it is included in the UIRs reviewed; the police had come to the facility after receiving information the ward was involved with a robbery.

[32] Welty, L. J., Harrison, A. L., Abram, K. M., Olson, N. D., Aaby, D. A., McCoy, K. P., Washburn, J. J., Telpin, L. A. (2016). Health disparities in drug and alcohol use disorders: A 12 year longitudinal study of youths after detention. *American Journal of Public Health*.

home.   Roland's caseworker strongly recommended that he not be returned to his relative foster home, because of concerns with both the home and the community. Both relapsed.

These cases underscore the need for young adult transitional sober living programs. These programs could be utilized with DCFS youth and young adults who need to ease their transition into a substance-free lifestyle. Each of these programs offer a structured, sober, and supportive environment with on-site access to outpatient treatment service; individual, group, and family counseling; self-help groups; career/employment guidance and goal setting; incentive systems to encourage positive goal setting and reward academic and employment progress.

Peyton, who had a history of using PCP, was not referred for residential treatment. Residential treatment was not attempted because it was thought his tendencies toward explosive behavior would preclude his successful completion of a residential program. At the time of his death, Peyton was receiving substance abuse services from a clinic in Chicago, where his mother also was receiving services. He had not attended the program for three months prior to his death, at least in part because he was placed in a relative foster home in the South Shore neighborhood of Chicago, about 14 miles away, requiring transfers from train to bus on public transportation. The foster program serving him at the time did not transport him to the agency for continuity of treatment. Given that the youth's mother was receiving treatment at the same program, a family treatment model could have benefitted both.  Instead, his caseworker referred him just before his death to an outpatient program, closer to his foster home. Peyton's caseworker did not accompany him to the referred program and he had not begun attending sessions before his death.

There was a demonstrated need for effective substance abuse treatment and aftercare transitional programming in each of these cases. The remaining six 17- to 20-year-old victims never attended drug abuse treatment although it was indicated for them. Most felt they did not need substance abuse treatment and were not cooperative with referrals. Sergio was to attend treatment as a condition of his probation; however there was no documentation of a referral in his record and no repercussions for non-attendance. .

The Office of the Inspector General has made previous recommendations for DCFS youth who have substance abuse problems. The following recommendation was repeated in a December 2014 Report entitled "An Integrated Approach to Management of High Risk DCFS Wards."

> **Interventions for Substance-Abusing Youth:** [For] *an adolescent whose behavior is self-destructive and uncooperative, but is also using drugs, the Department should consider filing a petition on the minor as an Addicted Minor (ILCS 705, 405/4-1 et sec) to make use of the authority of the court in servicing such youth.* (Recommended May 1999, 97-IG-1520).

### *Disrupted Permanency and the Lack of Early Interventions*
Isaac entered foster care at two months of age after his mother abandoned him with a neighbor and never returned. The mother had a history of chronic and severe substance abuse that included an extensive arrest history with convictions for possession of controlled substances and prostitution. Records from the Department of Healthcare and Family Services revealed that Isaac was born with a heart defect. Cocaine use during pregnancy leads to adverse effects and damage to the developing heart. Children born to mothers with a history of cocaine abuse have an increased risk for congenital

heart defects.[33] [34] Ventricular Septal Defect (VSD) is one of the most common congenital heart malformations. VSD is when the wall between the ventricles of the heart does not fully close and leaves a hole.[35] [36] [37] Isaac remained in the same relative placement for three years until completion of adoption by his 40 year-old aunt in the summer of 2000, when he was 5. She received an adoption subsidy of $326. Isaac came back into care after his adoptive aunt with a broken heart threatened the then 17 year-old because of his delinquency and gang related behavior.

Desmond entered foster care as an infant related to prior indicated reports of abuse against his mother to an older sibling. Desmond's brother had suffered burns and later a fracture that the mother could not appropriately explain. Professionals also reported that the mother appeared to be cognitively delayed and unprepared to care for an infant. In the spring of 1998, Desmond tested positive for lead exposure while living in the relative foster home of a maternal aunt. After six years in DCFS care, Desmond's 37 year-old aunt obtained subsidized guardianship of Desmond and his brother. The subsidy for Desmond was $384. The worker determined Desmond did not have any developmental needs. The subsidy failed to note that Desmond had a history of lead exposure. Desmond returned to state care at 15 years old, when his aunt requested her guardianship be vacated because of Desmond's antisocial behavior. He had been expelled from the public schools the year before the disrupted guardianship but his school failure had begun years before. Post-adoption services were offered after he was embedded in delinquent behaviors and were ineffective.

Peyton came from a family with generational DCFS and substance abuse involvement. At the time of his birth, Peyton's 15 year-old mother was a ward of the state. Both she and the maternal grandmother had substance abuse issues. Peyton was first placed with DCFS at age 3 but returned to the care of his mother approximately 18 months later. At the age of 5, he re-entered foster care because of physical abuse by his mother and her boyfriend. The Department placed him in a traditional foster home, but he was removed a month later following reports of sexual abuse. The Department then placed Peyton with his 68 year-old great-grandmother. Peyton would remain in this home in the city's Austin neighborhood and his great-grandmother obtained subsidized guardianship in early 2008. At the time of guardianship, the great-grandmother was 74 years old caring for 11 year-old Peyton. While the subsidy agreement included weekly individual in-home therapy, it did not offer a specialized rate for the great-grandmother who received $422 monthly. Because of the guardian's age, the Department required designation of a back-up caregiver, and Peyton's great aunt was named as the Backup Caregiver. The great-aunt stated that she and the great-grandmother attended Peyton's final Child Protection court hearings where the great aunt affirmed she would care for Peyton if the great-grandmother could not. However, when the great-grandmother died five years later the Department did not execute the Back-Up Caregiver agreement. Delinquency court was unaware of the existence or DCFS' policy of Back-Up Caregiver plans. The great aunt was not

[33] Mone, S. M., Gillman, M. W., Miller, T. L., Herman, E. H., & Lipshultz, S. E. (2004). Effects of environmental exposures on the cardiovascular system: prenatal period through adolescence. *Pediatrics*, *113*(Supplement 3), 1058-1069.

[34] Meyer, K. D., & Zhang, L. (2009). Short-and long-term adverse effects of cocaine abuse during pregnancy on the heart development. *Therapeutic advances in cardiovascular disease*, *3*(1), 7-16.

[35] MedlinePlus Medical Encyclopedia. (2013, November 11). Ventricular septal defect. *National Institutes of Health: U.S. National Library of Medicine*. Retrieved from
https://www.nlm.nih.gov/medlineplus/ency/article/001099.htm

[36] Meyer, K. D., & Zhang, L. (2009). Short- and long-term adverse effects of cocaine abuse during pregnancy on the heart development. *Therapeutic Advances in Cardiovascular Disease*, *3*(1), 7-16.

[37] Mone, S. M., Gillman, M. W., Miller, T. L., Herman, E. H., & Lipshultz, S. E. (2004). Effects of environmental exposures on the cardiovascular system: prenatal period through adolescence. *Pediatrics*, *113* (Supplement 3), 1058-1069.

contacted for placement of Peyton. He re-entered foster care with his sister and was placed with a 24 year-old relative who could not control either youth.

Trey, who was born with intrauterine substance exposure, remained in the care of his mother while she attended substance abuse treatment. Trey's prenatal drug exposure would go on to provide difficulty for the youth with both school and behavior issues throughout childhood. At the age of 3, Trey's mother abandoned him in a drug house on Chicago's Westside and DCFS obtained custody. Several months later, while living in a relative placement, Trey tested positive for lead exposure. Trey continued living in the same building when his grandmother became his foster parent. Trey received special education services to address delays related to his encephalopathy and learning disability. Trey was adopted by his 60-year-old maternal grandmother, though she suffered from chronic heart disease. At the time of the adoption in summer of 2007, the grandmother only received $301 a month. Trey's family received the least amount of subsidized financial support despite his medical diagnoses, special education needs, and documented substance and lead exposures. Four years after the adoption, his 64 year-old grandmother said she could no longer care for him because of his delinquent and gang-related behavior.

## Austin Community Resources and Obstacles



Austin ranks 9th out of Chicago's 77 community areas for violent crimes and 27.2% of families in Austin live under the poverty line.

38

---

[38] The gang territory map was created by compiling and cross-referencing several online sources:
Chicago Gang Map. (2015). *TheRealStreetz.com*. Retrieved from
          http://www.therealstreetz.com/2015/05/07/chicago-gang-map/
Chicago Gang Map 2015. (2015). [Google map of gang territories retrieved on 2/29/2016]. Retrieved from
          https://www.google.com/maps/d/viewer?mid=zjXUB8UVgnvM.kMb_DJfSkT2k&hl=en_US
Chicago Gang Map 2015 WIP. (2015). [Google map of gang territories retrieved on 2/29/2016]. Retrieved from
          https://www.google.com/maps/d/viewer?mid=zDZvSJjLCDcY.kJt704ch_hqo

## Chicago Lawn Resources and Obstacles



Chicago Lawn ranks 27th out of Chicago's 77 community areas for violent crimes and 28.6% of families live under the poverty line. [39]

## Englewood Resources and Obstacles



Englewood ranks 4th out of Chicago's 77 community areas for violent crimes and 45.8% of families in Englewood live under the poverty line. [40]

---

Ramos, E. (2016). In Chicago, gangs abound, but there are they?. *WBEZ 91.5*.Retrieved from
https://www.wbez.org/shows/wbez-news/in-chicago-gangs-abound-but-where-are-they/0d956c2e-
171a-483a-8666-f5228d98812d

[39] Ibid.

### Dually-Involved Youth

Except for 14-year-old Gael, all of the youth were dually-involved with child welfare and juvenile justice. According to information provided to the Office of the Inspector General from Cook County Probation and DCFS Legal, there are 95 youth with dual involvement (open cases in Juvenile and Child Protection Courts). Additionally, judges from Cook County Juvenile Delinquency court have appointed DCFS guardian of 174 youth who were not previously in DCFS custody. However, of these 269 youth, only 156 have an assigned probation officer. Effective collaboration between the child welfare and juvenile justice agencies greatly enhances the possibility for a positive outcome.[41] Nationally, studies show that African American youth are overrepresented amongst those children who are involved with both child welfare and juvenile justice.[42]   This is also the case in Illinois, especially in Cook County.

The two jurisdictions of child protection and juvenile justice should not function in ignorance of each other. If a child is dually-involved, the delinquency court will exercise a greater influence on the outcome for the child because of the sanctions available. While a child protection judge can recommend services for a child victim, the judge cannot order the youth to comply with services. Delinquency Court will most likely be the final arbiter relative to what course of action will be pursued on this youth's behalf. While the probation officer answers to the judge in the delinquency court and the caseworker to the judge in child protection court, they should both be encouraged to provide their perspective and knowledge of this youth to the respective courts. The decisions that these courts make should be informed by both of these perspectives. In Peyton's case, child protection failed to execute his great-grandmother's backup plan for his great-aunt to become his back up guardian. Juvenile Justice was not aware of the DCFS policy requiring backup caregiver plans for elderly relative or foster parents assuming guardianship. Presently, there are no venues for joint conferences between the Delinquency and Child Protection Courts on a youth who is dually-involved. Although there are joint working committees and an expectation that probation officers and child welfare workers will coordinate their efforts, the system is fraught with holes. While DCFS workers should be required to attend all delinquency hearings and probation officers should attend the youth's permanency, this investigation found that the strength of child welfare caseworker's involvement with the delinquency division appeared to be dependent on the characteristic of the individual workers, rather than an adherence to a policy of coordination. This investigation found that critical assessments or reports completed by the probation department were routinely not in the child protection records. The Youth Assessment and Screening Instrument (YASI) and violence risk assessments can now be shared between Probation and the Department of Juvenile Justice and should likewise be shared with Child Protection. If the juvenile is committed to the Illinois Department of Juvenile Justice, the collaboration would have to be between that department and DCFS. The need for effective collaboration is no less crucial than that between child protection, delinquency courts, and probation.

While a delinquency judge made an effort to actively involve child welfare in one case, there is no legal framework in Illinois to integrate these hearings. There are models in other jurisdictions, such as the King County, Washington's System Integration Initiative that provide a framework worth exploring. Idaho also provides a statutory framework for combining the two proceedings when it is determined to be in the child's best interests.

---

[40] Ibid.

[41] Cusick, G.R., Goerge, R. M., & Bell, K. C. (2009). From corrections to community: The juvenile reentry experience as characterized by multiple systems involvement. *Chapin Hall at the University of Chicago*.

[42] H. Huang et al. (2012). The journey of dually-involved youth: The description and prediction of rereporting and recidivism. *Children and Youth Services Review* 34 254-260.

In Illinois, any juvenile convicted of an offense described in the statute as a forcible felony is required to be sentenced to a five-year probation term that can only be terminated at the end of that term or when the youth reaches his or her majority. Three of the youth (Isaac, Westley, and Roland) had juvenile forcible felony convictions for offenses including Aggravated Unlawful Use of a Weapon, Robbery, and Attempt residential burglary. Consequently, the jurisdiction of the delinquency court over this youth and the involvement with the probation department would continue, in many instances, until guardianship was vacated. With these types of dually-involved wards, enlisting the assistance of Probation could be the lifeline for the youth. One youth, the only female in the cohort, had a forcible felony charge of Aggravated Battery as an adult. This 20-year-old had a serious history of mental illness, substance abuse, violence, and non-compliance. Her behavior was a threat to citizens and contributed to her death. The criminal court, unlike juvenile court, offers no lifeline in these precarious situations.

There are cases in which a dually-involved child's interests are best served through the Abuse and Neglect Courts and the Juvenile Justice courts sharing information and working together to address chronic problems, such as substance abuse. Such coordination would benefit the Department's work, in allowing more directed and appropriate services to address chronic issues.

### Youth in Cohort in Dually-Involved Programing

Three of the youth in this group, Desmond, Isaac, and Peyton, were enrolled in a program designed specifically to work with dually-involved wards, whom are both involved with the child welfare and juvenile justice systems. The program partners with youth advocate programs to provide the services necessary to stabilize youth in the community and reduce recidivism. The model adheres to the principles of Balanced and Restorative Justice addressing competency, development and community safety in equal measure. The guidelines for the program describe a multi-dimensional or wrap-around approach to the needs of the client and their family, including licensing relative foster parents within 90 days. The program recruits and trains foster parents for alternative placements when living with family is not possible. Written into the program is a "No Reject, No Eject" policy.

Desmond received services through the dually involved program for almost five years, from the time he was 15 to 20. During that time, he did not attend school, did not participate in court-ordered substance abuse treatment, and violated the conditions of his probation. Foster parents requested his removal because of frequent unauthorized absences and his threatening and aggressive behavior toward the foster parents or their family members. Despite his obstinate refusal to cooperate, Desmond was provided a monthly stipend of $300. On one occasion, he threatened the caseworker when she refused to provide his stipend. The worker subsequently relented and gave him a partial payment. The effectiveness of his continued involvement in this program was questionable. Desmond had a Juvenile felony charge of Aggravated Battery and Robbery that was reduced on a plea to misdemeanor Battery and Theft, with 30 days served in detention, allowing the Delinquency court to terminate him early rather than fulfill the mandatory five-year probation for a forcible felony.

The specialized foster care model included in the dually-involved program would be best applied to the younger delinquent population. Desmond needed interventions when he was 10 and failing in school. The services of the dually-involved program should include support to relative and traditional foster parents, guardians and adoptive parents in distressed communities at the first instance of school failures, juvenile arrests, substance abuse, and serious mental illness before the road to dual involvement. This early intervention would enhance the prospects for a positive outcome. At present, DCFS is pursuing a pilot program to provide short term residential stabilization to dually-involved youth.

The pilot document for this program suggests a heavy reliance on the Child and Adolescent Needs and Strengths Instrument for evaluation of the client's progress in the program and the appropriate level of care. In addition to this evaluation, the youth should also be assessed for risk of violence, both as victims and perpetrators, and their programs should be individualized to address this risk. The Youth Assessment and Screening Instrument (YASI) and violence assessments can now be shared between Probation and the Department of Juvenile Justice and should likewise be shared with Child Protection. Those DCFS or private agency caseworkers servicing this population should be trained on the use of YASI for a cross agency measurement of progress.

The Cook County Juvenile Probation Department has recently implemented a pilot program, Violence Intervention Probation. The program targets juveniles who have been arrested for gun related offenses in certain high crime geographical areas. The program involves collaboration between traditional probation, the Intensive Probation Gang School Safety Team and the Probation Department's clinical unit. This program includes probation officers from the Gang School Safety Team monitoring social media activity of the youths in an effort to identify and eliminate any online gang/violence related activity. The intensive monitoring included in this model may be effectively applied to dually-involved youth. Social media activity often chronicles their activities including threats, use of drugs, and possession of firearms. It was specifically mentioned in the case notes of three of these victims. This real time information is critical to the safety of youth, their families, and communities, and should be available either through the Probation Department or directly from Chicago Police Department to the DCFS personnel, who are working with this population.

The Department should request the assistance of the Cook County Probation Department to train these specialized caseworkers on the ins and outs of probation, delinquency court and Gang Safety. Likewise, DCFS should offer a specialized training for probations staff on related DCFS policies and expectations. Without a mutual understanding, real collaboration is unlikely.

The Dually Involved Committee consists of representatives from the judiciary, Juvenile Probation, and DCFS, and provides the opportunity to work collaboratively on the implementation of pilot initiatives, such as the Regenerations Residential Pilot, and could recommend other approaches to work with this difficult population. In November 2015, the Department announced the initiation of The Conscience Community Network (CCN) to serve 50 dually-involved youth in four Illinois Counties (Cook, Franklin, Jefferson, and Lake). The CCN is a collaborative model, using evidenced-based treatments.[43]  Progress on this model could be shared with the Cook County Dually Involved Committee.

A highly focused education and employment intervention that includes substance abuse and mental health services should be implemented for dually-involved young adults. The Safer Foundation has long provided these types of services to youth and young adults in this category. The Isaac Ray Center has been providing mental health services to youth in the Cook County Temporary Juvenile Detention Center for a number of years. Halfway houses and substance-free transitional living programs could be established using the expertise of these two agencies to provide a safe targeted therapeutic environment for this population with tight collaboration with the Cook County Sheriff's Office, adult probation, and the adult Redeploy program. Monthly stipend would be based on the young adult's cooperation and performance.

---

[43] The Inspector General has previously recommended targeted interventions. (See 02-IG-1136 January 2003, 15-IG-2385, June 2015 and "An Integrated Approach to Management of High-Risk DCFS Wards" December 2014).

STREET HOMICIDES INVESTIGATIVE REPORT

*Mental Health Service Provider*

Individuals diagnosed with mental illness are no more likely than the general population to be violent. However, the MacArthur Violence Risk Assessment Study provided strong evidence that a mentally ill individual who is also a substance abuser is significantly more likely to commit violence; at highest risk are those living with them.[44] The prevalence rate for violence within a year of discharge from a mental health facility for patients diagnosed with both substance abuse and a mental health disorder was as high as 43%.[45]

Maliyah had a history of violent behavior prior to being placed in a transitional living program that specialized in serving youth with mental illness. In addition, she abused substances and had a history of non-compliance with mental illness treatment.

The agency providing services to Maliyah serve mentally ill youth and young adults through age 20; referrals to the program come from DCFS, Illinois State Board of Education and Juvenile Justice. The mentally ill transitional living program is almost exclusively for mentally ill DCFS wards. This agency is most often the service provider for youth with the most serious issues through both their residential and transitional living programs. Yet their model relies on a level of maturity and cooperation that is unachievable for some of the youth placed there.

Maliyah came to the agency's program five credits short of graduation. Maliyah never attended school at the agency despite being at a 12th grade level when entering. Agency staff enrolled her in a school with ten times more students and had an unreasonable expectation that she would use public transportation. She should have been assigned a case aide to anchor her in going to school. In the absence of her going to school, they did not use credit recovery or an internet based program to finish school. There have been other cases of youth transferring from small therapeutic school settings and small schools in rural areas, who fail to achieve and are overwhelmed in the large Chicago public school setting.

Cook County Criminal Court has a mental health court for property crimes, not for crimes against persons. Violence precludes young adults from being able to use these specialized courts. Cook County Jail does not want to be the repository for mentally ill individuals who abuse substances. The Division of Alcoholism and Substance Abuse residential treatment programs designed to serve Mentally Ill Substance Abusers exclude those with a history of violence. The agency servicing Maliyah made strong attempts to serve her however Maliyah's behavior necessitated that she be stepped up to a more structured residential placement, though even that proved unsuccessful for her. The agency initiated involuntary hospitalizations but inpatient hospitalization service those with acute mental illness in need of stabilization. Patients stay an average of 5-7 days, being released once stabilized. A person can only be involuntarily hospitalized if they have been deemed a danger to themselves or others.

Eventually Maliyah's violent behavior led to the need for her to be placed outside of the agency's sponsored housing at an SRO hotel; The agency had an ethical obligation to protect other residents from the dangers she presented. The ethical obligation belongs not only to the agency servicing Maliyah, but also to the Department.

---

[44] Steadman, H.J., Mulvey, E.P., Monaham, J., Robbins, P.C., Appelbaum, P.S., Grisso, T., Roth, L.H., & Silver, E. (1998). Violence by people discharged from acute psychiatric inpatient facilities and by others in the same neighborhoods. *Archives of General Psychiatry,* 55, 393-401.
[45] Ibid

A partial redacted copy of this report will be shared with: the Presiding Judge of the Cook County Child Protection Division, the Presiding Judge of the Cook County Juvenile Justice Division, the Acting Director of the Cook County Juvenile Probation and Court Services, the Superintendent and Deputy Superintendent of the Chicago Police Department, the Cook County Sheriff and the Illinois African-American Family Commission.

## RECOMMENDATIONS

*Programming and Prevention Services*

1. To counter the lure of gangs and guns, the Department must offer programs in severely economically disadvantaged neighborhoods, such as Englewood, Lawndale and Austin, that include remedial tutoring and enhanced learning opportunities for youth in care and children who have achieved permanency through subsidized guardianship or adoption who have reading and/or math scores two grades below level, and to offer the opportunity for pro-social recreational programs with safe passage (transportation) for these children.

*Educational Services*

2. When a special education youth in a residential program outside of the City of Chicago is transferring to a therapeutic/specialized, foster/relative home or transitional living program in Chicago, the Regional educational advisor from the sending community and the receiving Chicago Regional educational advisor should meet in advance of the school transfer to develop a transitional plan with the receiving school and the receiving agency assuring that the youth receives timely and appropriate special education services. The youth should be involved in the planning and afforded the opportunity to visit the receiving school prior to the transfer and the Department should fund an educational mentor to assist the youth for the first six weeks of the school transfer. The educational mentor should provide transportation for the first six weeks and assist the youth in adjusting.

3. The Department should explore identification of entities that can offer educational credit recovery programs.

*Substance Abuse Recovery*

4. The Department should develop a supportive recovery transitional living program for its young adults in Cook County who are in their early stages of recovery. The program should offer individual, group and family counseling, educational and employment services with an incentivized goal setting in these areas.

5. The Department should utilize The Addicted Minor Act to obtain court ordered treatment for dually involved youth who are in need of substance abuse treatment in lieu of violating their delinquency probation.

*Dually Involved Youth*

6. For effective collaboration Cook County Region DCFS should pursue an agreement with the Cook County Probation Department to cross train the dually involved specialized caseworkers and the youth's assigned probation officers. The training should cover the ins and outs of probation, delinquency court and gang safety and the DCFS related policies and expectations.

The trainings should be conducted biannually and include a discussion component provided by experienced caseworkers and probation officers on gang involvement and lessons learned.

7.  The Department should request the Illinois Justice Project/Juvenile Justice Leadership Data Collection and Information Sharing Workgroup and the Dually-Involved Committee consider proposing legislation or rules that would permit sharing of information and coordination between the Cook County Juvenile Justice Courts and the Cook County Abuse and Neglect Courts in Illinois, when in the best interests of dually-involved youth.

8.  The Department should request that Administrative Office of the Illinois Courts (AOIC) allow the Department to receive all Delinquency court assessments such as the Youth Assessment and Screening Instrument (YASI) and Violence Risk Assessment for youth in care of the Department. For consistency of measurements across agencies the Department should administer the YASI on those dually involved youth who end their probation or parole but continue under the Department's guardianship.

9.  The Department should request to participate in the Gang School Safety Team real time monitoring approach for youth in care with gun/gang/violence activity including related social media.

10. The Department must review all Unusual Incident Reports involving a youth in care with a gun or ammunition to ensure that law enforcement has been notified.

11. The Department should develop a violence and substance free therapeutic community based model similar to a halfway house model for youth 18 and over involved with the criminal court system or dually involved with adult and juvenile courts for crimes against a person. The programming should require that the youth: enter into a nonviolence contract, obtain a minimum of part time employment, participate in continuing education through the City of Chicago Community Colleges (technical certification program, GED, or Associate Arts degree) or credit recovery or alternative school programs for youth who can earn a high school diploma. The therapeutic model should clearly define a non-violence contract with each youth who enter the program. If the terms of the shelter's non-violence contract are violated the Department should immediately inform the Juvenile Court and Adult probation of the violation and the intention of the Department to request termination of the youth's wardship. Programming should include Safer Foundation and the Isaac Ray Center.

12. The Department should explore collaboration with the Illinois DHS Division of Mental Health, Division of Alcoholism and Substance Abuse, and the Cook County Sherriff's Office to develop a stabilization strategy for DCFS Cook County young adults with mental illness and substance abuse problems who are charged with crimes that exclude them from the criminal mental health court.

13. The African American Family Commission should review the findings in this report to develop recommendations for legislation or other necessary reforms.

**OIG UPDATE**

In the spring of 2016 the city of Chicago partnered with the Chicago Department of Public Health to improve health equity in Chicago's Communities, launching Healthy Chicago 2.0.

The Child Opportunity Index measures community characteristics that impact a child's overall development focusing on three main domains: educational, health and environmental and social and economic. All three factors combined provide a measure of opportunity for children living in one of Chicago's communities. Data from Healthy Chicago 2.0 found that 48% of Chicago children live in neighborhoods with low child opportunity. (See Map Below). Children living in these communities are not afforded the opportunities needed for healthy development and are more likely to have low academic achievement, experience unemployment, live below the poverty level, and become a victim of assault (homicide) or firearm related death, be exposed to a toxic environment, and become a teen parent. In addition, the foster parents or guardians living in those areas are more likely to live below the poverty level.



**Child Opportunity Index**
- Very High
- High
- Moderate
- Low
- Very Low

**COMMUNITY AREAS with lowest child opportunity**

- **A** Austin
- **B** West Garfield Park
- **C** North Lawndale
- **D** South Lawndale
- **E** Archer Heights
- **F** Brigthton Park
- **G** New City
- **H** Fuller Park
- **I** West Englewood
- **J** Englewood
- **K** Washington Park
- **L** West Pullman
- **M** Riverdale
- **N** South Deering
- **O** East Side
- **P** Hegewisch

STREET HOMICIDES INVESTIGATIVE REPORT

In the communities of Austin, Englewood, Garfield and Lawndale the Department has 169 elementary school aged children in foster care and 43 elementary school aged children who are living in adopted or in subsidized guardian homes.  Those areas are represented  as very low opportunity areas in the Healthy Chicago 2.0 map on the prior page.  The children in these communities are at increased risk for low academic success, poverty and violence.  Sixty-four percent of the 169 elementary school aged youth in care are placed with relatives provided with monthly subsidies to assist in their care.  Subsidy payments range from $231-$310 for 25 unlicensed relatives; $392-$511 for 71 licensed relatives.  Thirteen children receive specialized foster care services with increased services and payment to caregivers.  The remaining 60 children are placed in traditional (34) and specialized placements (26).

Austin located on Chicago's west side ranks 17th out of 77 of Chicago's neighborhoods for violent crimes.  Englewood, located on Chicago's south side ranks 10th out of the 77 neighborhood for violent crimes.  According to data maintained by the Chicago Tribune the Austin neighborhood saw a 10% increase in violent crimes for the similar time period last year.

http://crime.chicagotribune.com/chicago/community/austin

| Data Measured | Austin | Englewood | Chicago |
|---|---|---|---|
| Per Capita Income | $15, 920 | $11,993 | $27, 148 |
| Population Below the Poverty Line | 27% | 42.2% | 18.7% |
| Unemployment | 21% | 21% | 11% |

The Office of the Inspector General reiterates the importance of intervening early for these vulnerable school aged youth in care.  As Guardian, the Department has a fiduciary responsibility to partner with agencies in communities where these at-risk children live.  The African American Family Commission concurs with this as a responsibility of the Department.

70

## CHILD DEATH REPORT

Inspector General staff investigate the deaths of children whose families were involved in the Illinois child welfare system within the preceding twelve months. Inspector General staff receive notification of the death of a child from the Illinois State Central Register (SCR), when the death is reported to SCR.[1] Inspector General staff investigate the Department's involvement with the deceased and his or her family when (1) the child was a youth in the care of DCFS;[2] (2) the family is the subject of an open investigation or service case at the time of the child's death; or (3) the family was the subject of an investigation or service case closed within the preceding twelve months. Whenever Inspector General investigators learn of a child death meeting this criteria, the death is investigated.[3]

Notification of a child's death initiates an investigatory review of records. Inspector General investigators review the death reports and information available through the Department's computerized records. The investigator then obtains additional records including the child's autopsy reports.[4] Records may be impounded, subpoenaed, or requested. Then they are reviewed. The majority of cases are investigatory reviews of records, often including social service, medical, police, and school records, in addition to records generated by the Department or its contracted agencies.

When warranted, Inspector General investigators conduct a full investigation, including interviews. A full investigation may result in a report to the Director of DCFS.  Individual cases may not rise to a level necessitating a full investigation, but collectively can indicate systemic patterns or problems that require attention. Inspector General staff may address systemic issues through a variety of means, including cluster reports, initiatives, and trainings.

In Fiscal Year 2016 Inspector General staff investigated 100 deaths of children who died between July 1, 2015 and June 30, 2016, meeting criteria for review. A description of each child's death and DCFS involvement is included in this annual report. During this fiscal year investigatory reviews of records were conducted in all of the deaths, leading to 10 full investigations. Eight of those investigations are pending. Comprehensive summaries of death investigations reported to the Director in FY 16, which may include deaths that occurred in earlier fiscal years, are included in the Investigation section of this annual report.

Sixty-two of the 100 child deaths investigated by Inspector General staff also underwent a child protection investigation of the death. Twenty-one of the 62 child protection investigations (34%) were initiated pursuant to a Departmental change in policy executed through an internal memorandum in July 2015, that the hotline will "take ALL unsafe sleep deaths and near deaths for full investigation." Child protection investigations began in those 21 cases because the child died during sleep - without any suspicion of abuse or neglect, such as impairment by alcohol or drugs, contributing to the child's death. In all 21 cases, the hotline was notified of the death by a first responder – police and/or coroner – who were

---

[1] SCR relies on coroners, hospitals, medical examiners and law enforcement to notify them of child deaths, even when the deaths are not suspicious for abuse or neglect. Some deaths may not be reported.  As such statistical analysis of child deaths in Illinois is limited because the total number of children that die in Illinois each year is unknown. The Cook County Medical Examiner's policy is to notify the Department of the deaths of all children autopsied at the Medical Examiner's office.

[2] On August 23, 2016 Governor Bruce Rauner signed an Executive Order directing all references of "ward of the state" or "ward of the Department" used within the child welfare system to be changed to "youth in care."

[3] Occasionally SCR will not receive notice of a child death and Inspector General staff learn of it through other means.

[4] The Inspector General wishes to acknowledge all the county coroners and the Cook County Medical Examiner's Office for responding to our requests for autopsy reports.

conducting their own investigation of the infant's death.  As persons mandated by law to report any suspicion of abuse or neglect, if they uncovered any suspicion of abuse or neglect during their investigation they would be obligated to report that suspicion to the hotline. An example of this occurred in Child No. 1 in the individual summaries: the coroner notified the hotline that a five-week-old infant had been found unresponsive in his crib. The following day, the coroner called the hotline again to report that the infant's autopsy revealed multiple injuries from child abuse leading to a child protection investigation of death by abuse. This was the system that was in place, worked, and made best use of State resources prior to the Department's change in policy.

Eighteen of the 21 "unsafe sleep" death investigations, without reported suspicions of abuse or neglect were eventually unfounded. The investigations were open for a range of two months (59 days) to ten months before being unfounded:[5]

> 3 open for just over two months;
> 2 open for three months;
> 3 open for four months;
> 1 open for five months;
> 5 open for six months;
> 1 open for seven months;
> 1 open for eight months;
> 1 open for nine months;
> 1 open for ten months.

The length of time the investigations were open violates the Department's policy as delineated in its July 2015 Informational Transmittal: If exacerbating factors "such as drug and alcohol use; presence of domestic violence; and prior child deaths or other safety issues (e.g. a child sleeping in a crib full of garbage) . . . do not exist, the Child Protection Specialist should quickly unfound and complete the investigation, exit the family's life, and allow them to grieve and deal with the death of their child."

Two of the 21 investigations are pending: Child No. 62 and Child No. 100. One has been open for over nine months and the other for over five months. The sole indicated investigation is Child No. 1, discussed above, in which coroner called the hotline back within 24 hours to report suspected abuse. The parents were indicated for death by abuse.

For a complete discussion of the Department's policy and the Inspector General's objections to it, please see *The Department of Children and Family Services' Unilateral Implementation of Policy Regarding Investigations of Sleep-Related Deaths*, Appendix A.

**Homicides**
An investigation of a two year cohort of DCFS Youth in Care who were victims of street homicides is contained in this report. (See page 29)  In addition to that report Office of the Inspector General Staff did a 17 year review of the homicides investigated by the office because of prior involvement. (Child Deaths Ruled Homicide 2000-2016 See Page 145).

---

[5] Pursuant to ANCRA (325 ILCS 5/7.12 ) investigations are supposed to be indicated or unfounded within 60 days, however, in individual cases the Department may extend the period in which such determination is made for additional periods of up to 30 days each for good cause shown.

**Summary**

Following is a statistical summary of the 100 child deaths investigated by Inspector General staff in FY 16, as well as summaries of the individual cases. The first part of the summary presents child deaths by age and manner of death, case status and manner of death, county and manner of death, and child protection death investigations by result and manner. The second part presents a summary of deaths classified in five manners: homicide, suicide, undetermined, accident, and natural.[6] Note that the term coroner is used for both coroners and the Cook County Medical Examiner in the individual summaries.

*Key for Case Status at the time of Inspector General investigation:*

Youth in Care . . . . . . . . . . . . . .   Deceased was a Youth in Care.  Minors in this category were previously referred to as Ward.

Unfounded DCP . . . . . . . . . . .   Family had an unfounded child protection investigation within a year of child's death.

Pending DCP . . . . . . . . . . . . . .   Family was involved in a pending child protection investigation at time of child's death.

Indicated DCP . . . . . . . . . . . .   Family had an indicated child protection investigation within a year of child's death.

Child of Youth in Care . . . . . . .   Deceased was the child of a youth in care, but not in care themselves. These minors were previously referred to as Child of a Ward.

Open/Closed Intact . . . . . . . . .   Family had an open intact family services case at time of child's   death / or within a year of child's death.

Open Placement/Split Custody   Deceased, who never went home from hospital, had sibling(s) in foster care or child was in care of parent with siblings in foster care.

Return Home . . . . . . . . . . . . . .   Deceased or sibling(s) was returned home to parent(s) from foster care within a year of child's death.

Child Welfare Services Referral   A request was made for DCFS to provide services, but no abuse or neglect was alleged.

Preventive Services/
Extended Family. . . . . . . . . . . . . . . .   Intact family services case was opened to assist family, but not as a result of an indicated child protection investigation.

Former Youth in Care. . . . . . . . . . .   Child was a youth in care within a year of his/her death. These minors were previously referred to as Former Ward.

---

[6] The causes and manners of death are determined by hospitals, medical examiners, coroners and coroners' juries.

**TABLE 1: CHILD DEATHS BY AGE AND MANNER OF DEATH**

| | CHILD AGE | HOMICIDE | SUICIDE | UNDETERMINED | ACCIDENT | NATURAL | TOTAL |
|---|---|---|---|---|---|---|---|
| **Months of Age** | At birth | | | | | | |
| | 0 to 3 | 2 | | 15 | 8 | 12 | 37 |
| | 4 to 6 | 2 | | 5 | 6 | 1 | 14 |
| | 7 to 11 | | | 1 | 1 | 3 | 5 |
| | 12 to 24 | 1 | | 1 | 1 | 2 | 5 |
| **Year of Age** | 2 | 2 | | | | 1 | 3 |
| | 3 | | | | | 1 | 1 |
| | 4 | 1 | | | | 1 | 2 |
| | 5 | | | | | | - |
| | 6 | | | | | | - |
| | 7 | | | 1 | 2 | | 3 |
| | 8 | | | | | | - |
| | 9 | | | | | 1 | 1 |
| | 10 | | | 1 | | 1 | 2 |
| | 11 | | 1 | | | 1 | 2 |
| | 12 | | | | | | - |
| | 13 | | | | | 1 | 1 |
| | 14 | 1 | 1 | | 1 | 1 | 4 |
| | 15 | 1 | | | 1 | 1 | 3 |
| | 16 | 3 | 1 | | | | 4 |
| | 17 | 2 | 2 | | 1 | | 5 |
| | 18 or older | 3 | 2 | | | 3 | 8 |
| | **TOTAL** | **18** | **7** | **24** | **21** | **30** | **100** |

**TABLE 2: CHILD DEATHS BY CASE STATUS AND MANNER OF DEATH**

| REASON FOR OIG INVESTIGATION* | | HOMICIDE | SUICIDE | UNDETERMINED | ACCIDENT | NATURAL | TOTAL |
|---|---|---|---|---|---|---|---|
| **DCP** | Pending | 3 | 2 | 10 | 3 | 8 | 26 |
| | Unfounded | 4 | 2 | 1 | 8 | 8 | 23 |
| | Indicated | 1 | 1 | | 3 | 3 | 8 |
| Youth in Care | | 7 | 2 | 1 | 2 | 5 | 17 |
| Former Youth in Care | | | | 1 | | | 1 |
| Return Home | | | | | | 1 | 1 |
| Open Placement/Split Custody | | | | 2 | | 1 | 3 |
| Open Intact | | 1 | | 4 | 2 | 2 | 9 |
| Closed Intact | | 1 | | 3 | 2 | 1 | 6 |
| Child of a Youth in Care | | | | 2 | | | 2 |
| Child Welfare Services Referral | | 1 | | | 1 | | 2 |
| Preventive Services/Extended Family | | | | | | 1 | 1 |
| **TOTAL** | | **18** | **7** | **24** | **21** | **30** | **100** |

\* When more than one reason existed for the OIG investigation, the death was categorized based on primary reason.

CHILD DEATH REPORT

**TABLE 3: CHILD DEATHS BY COUNTY OF RESIDENCE AND MANNER OF DEATH**

| COUNTY | HOMICIDE | SUICIDE | UNDETERMINED | ACCIDENT | NATURAL | TOTAL |
|---|---|---|---|---|---|---|
| Adams | | | | 1 | | 1 |
| Boone | | | | | 1 | 1 |
| Champaign | | | | | 1 | 1 |
| Coles | | | | 1 | | 1 |
| Cook | 12 | 2 | 16 | 3 | 7 | 40 |
| DuPage | | 1 | 1 | 1 | 2 | 5 |
| Edgar | | | 1 | | | 1 |
| Franklin | | | | 1 | | 1 |
| Fulton | | | | | 2 | 2 |
| Gallatin | | | | | 1 | 1 |
| Hancock | | 1 | | | | 1 |
| Iroquois | | | | | 1 | 1 |
| Jackson | | | | 1 | | 1 |
| Kane | | | | 1 | 1 | 2 |
| Kankakee | 1 | | | 1 | | 2 |
| Lake | 1 | | 1 | 1 | 2 | 5 |
| LaSalle | | | | | 1 | 1 |
| Macon | | | | | 1 | 1 |
| Madison | | | 2 | 2 | | 4 |
| McLean | | | | 1 | | 1 |
| Montgomery | | | | 1 | | 1 |
| Peoria | 2 | | | | 2 | 4 |
| Rock Island | | | 1 | | | 1 |
| St. Clair | 1 | 1 | | 4 | 1 | 7 |
| Saline | | | | | 1 | 1 |
| Sangamon | | | 1 | | 1 | 2 |
| Stevenson | 1 | | | | | 1 |
| Tazewell | | 1 | | | | 1 |
| White | | | | 1 | | 1 |
| Will | | | | | 1 | 1 |
| Williamson | | | | 1 | 1 | 2 |
| Winnebago | | 1 | 1 | | 3 | 5 |
| **TOTAL** | **18** | **7** | **24** | **21** | **30** | **100** |

**TABLE 4: CHILD PROTECTION DEATH INVESTIGATIONS BY RESULT AND MANNER**

| FINAL FINDING | Homicide | Suicide | Undetermined | Accident | Natural | Total |
|---|---|---|---|---|---|---|
| Indicated | 7 | - | 6 | 4 | 2 | **19** |
| Unfounded | - | - | 15*** | 12 | 6*** | **33** |
| Pending | 2 | - | 3 | 2 | 3 | **10** |
| Total | 9 | - | 24 | 18 | 11 | **62** |

** Child deaths in which at least one person was indicated or unfounded for death by abuse or death by neglect. Note that persons indicated for death will stay on the State Central Register for 50 years.

***One of these deaths was initially but then unfounded when appealed.

## FY 2016 DEATH CLASSIFICATION BY MANNER OF DEATH

### HOMICIDE
*Eighteen deaths were classified homicide in manner.*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Gunshot wound(s) | 8 |
| Injuries due to child abuse* | 1 |
| Starvation and dehydration due to neglect | 1 |
| Asphyxiation by suffocation and neck compression | 1 |
| Asphyxia due to restraint | 1 |
| Overdose of morphine, alprazolam and amitriptyline | 1 |
| Injuries due to blunt force trauma | 3 |
| Multiple injuries | 1 |
| Blunt force head trauma | 1 |
| **TOTAL** | **18** |

#### PERPETRATOR INFORMATION:*

| PERPETRATOR | NUMBER |
|---|---|
| Mother | 5 |
| Father | 4 |
| Unrelated Caretaker | 1 |
| Unrelated Adults | 2 |
| Unrelated Peer | 1 |
| Unknown/Unsolved | 6 |

*Some deaths have more than one perpetrator

### SUICIDE
*Seven children or young adults died from suicide this fiscal year.  Five of the youth hung themselves, one died of a drug overdose and one died of a gunshot wound.*

### UNDETERMINED
*Twenty-four deaths were classified undetermined in manner.*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Undetermined | 17 |
| Asphyxia due suffocation by plastic bag | 1 |
| Complications of chronic renal disease with malnutrition and unsafe sleep contributory factors | 1 |
| Complications of prematurity with contributing conditions of maternal drug use and submersion in water at delivery | 1 |
| Gunshot wound | 1 |
| Pending | 2 |
| Sudden unexpected/unexplained death in infancy (SUDI) | 1 |
| **TOTAL** | **24** |

CHILD DEATH REPORT

## ACCIDENT
*Twenty-one deaths were classified accident in manner.*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Asphyxia/Suffocation/Overlay/sleep related | 15 |
| Carbon Monoxide poisoning due to a house fire | 1 |
| Drowning | 1 |
| Drug overdose | 2 |
| Gunshot Wound | 1 |
| Injuries from motor vehicle collision | 1 |
| **TOTAL** | **21** |

## NATURAL

| CAUSE OF DEATH | NUMBER |
|---|---|
| Asthma/Respiratory Illness | 4 |
| Bacterial infection | 1 |
| Cardiac conditions | 3 |
| Congenital abnormalities | 3 |
| Complications from Chronic disease (Cerebral palsy or Muscular Dystrophy) | 2 |
| Complications of prematurity | 3 |
| Pneumonia | 3 |
| Seizures/Epilepsy | 4 |
| Sepsis/Septic Shock | 2 |
| Sudden unexpected/unexplained death in infancy (SUDI) | 1 |
| Undetermined | 3 |
| Viral syndrome | 1 |
| **TOTAL** | **30** |

## HOMICIDE

| Child No. 1 | DOB 8/15 | DOD 9/15 | Homicide |
|---|---|---|---|
| Age at death: | 5 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple injuries due to child abuse | | |
| Perpetrators: | Mother and Father indicated | | |
| Reason For Review: | Pending child protection investigation at time of child's death; indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Five-week-old infant was found unresponsive in his crib around 4:00pm by his 26-year-old mother. The 28-year-old father did chest compressions for almost an hour and then called 911. A coroner investigator notified the hotline of the infant's death. He said the crib did not have anything in it that would have put the infant at risk. He said the parents were being interviewed by police. The hotline took a report for investigation of death by neglect to the infant and substantial risk of physical injury/environment injurious to health and welfare by neglect to the infant's 6-year-old sibling. The following day a coroner investigator called the hotline to report the infant's autopsy had been performed and the baby had multiple injuries due to child abuse. The pathologist had already spoken to police and the state's attorney's office. DCFS added an allegation of death by abuse to the investigation. The mother and father were indicated for death by abuse and for substantial risk of physical injury. The infant had a large skull fracture; blunt trauma of the head with hemorrhages, including subdural hemorrhages; multiple rib fractures; pancreas and liver hemorrhages; and retinal hemorrhages. The pathologist noted, "the injuries represent inflicted trauma that occurred on multiple occasions (separated by time)." The mother reported she and the father were the infant's only caretakers. Both parents denied hurting the infant. The child protection investigator noted that law enforcement reported no criminal charges were filed because of insufficient evidence: neither parent admitted to harming the infant and the mother is cognitively delayed. The mother's 6-year-old child is in foster care with the maternal grandmother.

Prior History:     In July 2015 the mother's 6-year-old daughter had a friend sleep over. The next day, after her mother picked her up, the friend described being sexually abused by the mother's paramour's 12, 15, and 17-year-old brothers who also had slept overnight. The friend's mother called the hotline and two reports were generated. The first report for sexual abuse to the friend by the three brothers and inadequate supervision to the friend by the mother and paramour. The second report was for substantial risk of sexual injury to the daughter by the three brothers. In the first report, the boys were found not to be eligible perpetrators for a child protection investigation because they were not caretakers of the friend. Police investigated the incident as a criminal matter. The paramour (the infant's father) reported seeing the boys walking back and forth in the hallway by the 6-year-old girl's bedroom and when he checked to see what was going on, he saw one of the teens standing over the friend. He called his father to pick up the brothers. The mother and paramour were indicated for inadequate supervision of the friend in the first report. During the investigation the child protection investigator saw the infant laying in a crib in the living room and counseled the mother on safe sleep. The second investigation was pending at the time of the infant's death, but ultimately the brothers were indicated for substantial risk of sexual injury to the mother's 6-year-old daughter.

CHILD DEATH REPORT

| Child No. 2 | DOB 6/00 | DOD 10/15 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 15 years |
| Substance exposed: | No, unknown |
| Cause of death: | Overdose of morphine, alprazolam and amitriptyline |
| Perpetrator: | Unrelated male adult |
| Reason For Review: | Open child welfare services referral at time of child's death; unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Fifteen-year-old girl's partially burned body was found behind a seemingly abandoned mobile home by next-door neighbors who were cleaning the property. It was believed to be a day or two old. Police were called and investigated. The coroner notified DCFS of the teen's death. DCFS did not open an investigation as no abuse or neglect was suspected. The 37-year-old mother had filed a missing person report several days before the teen's death. A 15-year-old friend of the teen told police she and the teen had been snorting drugs at an adult male's apartment when the teen overdosed. She and the man took the teen's body to a rural area where the man set her on fire using a liquid accelerant. Within weeks the 28-year-old man shot and killed himself after being pulled over by police for a traffic stop. He was wanted on two counts of aggravated criminal sexual abuse. The 15-year-old friend pleaded guilty to concealing a death and moving a body. She was sentenced to five years of probation.

**Prior History:** In April 2015, the father of the mother's two youngest children, 9 and 12-year-old boys, called the hotline alleging the mother bought her 17-year-old son marijuana and alcohol; that she did not properly care for the boys or their 15-year-old sister, and that his sons are scared of their 17-year-old brother because he is uncontrollable and broke their mother's wrist. The Department investigated allegations of substance misuse, substantial risk of physical injury, environmental neglect and inadequate clothing. The investigation was unfounded. While the father complained about the mother's care of the children, the children described him as an unhappy person who harassed them; the 17-year-old said his mother fell on her wrist when she was trying to calm him down after the boys' father came over saying crazy things and threatening to call DCFS. The children said they were well-cared for by their mother and their principal said the school had not had any issues with the children. In September 2015 a social services worker called the Department to request services for the family because the mother felt she could not control her children. A child welfare services referral was pending at the time of the teen's death. Following the teen's death the mother declined services. In July 2016, the oldest brother was arrested for punching his younger brothers and the hotline was called. During that investigation, in August 2016, the mother left the two younger sons with a friend and failed to return resulting in her two younger sons entering foster care. They are placed with their maternal grandfather.

| Child No. 3 | DOB 3/01 | DOD 11/15 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 14 years |
| Substance exposed: | No/unknown |
| Cause of death: | Gunshot wound of torso |
| Perpetrator: | Unknown |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Fourteen-year-old boy was walking down a sidewalk with two friends around 9:30pm when an unidentified male approached them and fired multiple shots. The teens fled and only the deceased was hit. He was found deceased on the sidewalk with a gunshot wound to his back. DCFS did not open an investigation as no abuse or neglect was suspected. A police investigation of the teen's murder remains unsolved but open.

Prior History:    The family's only known involvement with DCFS was shortly before the teen's death. In September 2015 a hospital social worker called the hotline to report the teen was at their hospital getting stitches for a laceration to his lip caused by his mother hitting him in the mouth. An investigation of cuts, bruises, and welts by abuse by the 33-year-old mother to her son was pending at the time of the teen's death. The investigator had learned that the teen had not shown up to attend a high school football game with his elementary school coach and teammates. His mother went looking for him and found him leaving a building with other boys "high as a kite." She reacted by hitting him. The mother, who was sixteen weeks pregnant with twins, reported she was moving to another state at the beginning of October in search of a better life and to get her son back on track. The teen and his 7-year-old sibling reported good care by their mother. The teen said this was the first time his mother had hit him and he was sorry he had worried her. The school social worker reported she had worked with the teen for four years and the mother did her best to keep him safe. The family did move out of state, but the mother said it did not work out and they returned to Illinois a couple of weeks before the teen's death. The investigator had been waiting for records from the hospital to close the investigation; it was unfounded after the teen's death.

| Child No. 4 | DOB 10/13 | DOD 11/15 | Homicide |
|---|---|---|---|
| Age at death: | 25 months | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple blunt force injuries | | |
| Perpetrator: | Mother and father indicated | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:        Two-year-old child was taken to the emergency room by his 18-year-old father. The child arrived unresponsive with bruising on his face and body. He was pronounced deceased shortly after arrival. The father fled the hospital after being told his son had died. The child's 16-year-old mother had dropped the child off with his father the previous morning. Police, a hospital nurse, and the coroner called the hotline to report the child's suspicious death. The resulting child protection investigation revealed prior abuse by both the mother and father. Both parents were indicated for death by abuse, internal injuries by abuse, cuts, bruises and welts by abuse, and substantial risk of physical injury by abuse to their 11-month-old son. The couple's third child, born in February 2016, was placed in foster care at birth. The siblings are placed together in a traditional foster home and have a goal of return home to their mother. Neither parent has been criminally charged in the abuse or death of their son.

Prior History:    In April 2015 a woman staying at a shelter in a neighboring state told the shelter staff that her 16-year-old daughter had left the shelter and returned to Illinois with her infant and toddler. The woman said her daughter had called to tell her that she punched the toddler in the face and he had a black eye. The woman told shelter staff that she was going to Illinois to get the toddler. Shelter staff called child welfare in the neighboring state with the information, adding that the grandmother had not returned to the shelter. The neighboring state's child welfare called the Illinois hotline and a report was taken for investigation of cuts, bruises, and welts to the toddler by his mother. Aside from names and dates of birth, the only information given to the hotline to locate the family was an address. The investigator visited the address, but it appeared to be an abandoned building and no one responded. The investigator visited an address on file with public aid, but the family did not live there. Prior to closing the investigation, the investigator learned that the toddler was with the grandmother in the neighboring state. A few months later the toddler returned to Illinois with his mother.

CHILD DEATH REPORT

| Child No. 5 | DOB 4/13 | DOD 11/15 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2-1/2 years |
| Substance exposed: | No, but mother admitted to smoking marijuana during her pregnancy |
| Cause of death: | Multiple injuries |
| Perpetrator: | Mother |
| Reason For Review: | Closed intact family services case within a year of child's death |
| Action Taken: | Full investigation pending |

Narrative:       Two-and-a-half-year-old girl was taken to the emergency room by her 18-year-old mother after she was found unresponsive in bed with a relative in the morning. Upon arrival at the hospital, the little girl appeared pulseless and cold to the touch. A medical examination revealed bruising to multiple areas of her body, a possible bite mark, burns to the bottoms of both her feet, multiple rib fractures, and blunt force internal injuries. Law enforcement arrested the mother and charged her with murder. She is in custody awaiting trial. The coroner notified DCFS of the girl's abusive death. The Department conducted a child protection investigation and the mother was indicated for death by abuse, head injuries by abuse, bone fractures by abuse, and cuts, bruises, welts by abuse. While in jail, the mother gave birth to a baby in July 2016. The Department took custody of the infant and placed her in the home of a relative. The OIG is conducting a full investigation of this child's death.

Prior History:   Two years earlier the mother was arrested for child endangerment after she got into an argument at a party and allegedly pushed the deceased, who was then an infant sitting in her car seat, over a porch ledge. The infant sustained multiple abrasions and was treated and released from the hospital. The Department investigated and indicated the 16-year-old mother for cuts, bruises, and welts by abuse and arranged for the maternal grandmother to obtain short term guardianship of the infant. The family was then referred for intact family services. However, because of an error during case assignment, the receiving agency never opened a case to provide services and acknowledged such in a January 2015 case note. The mother struggled with mental health and substance abuse issues and received services, including family therapy with the maternal grandmother, through juvenile probation.

| Child No. 6 | DOB 3/98 | DOD 1/16 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 17 years |
| Substance exposed: | No |
| Cause of death: | Multiple gunshot wounds |
| Perpetrator: | Unrelated adult |
| Reason For Review: | Teen was a youth in care |
| Action Taken: | Full investigation, Report to Director June 28, 2016 |

Narrative:       Seventeen-year-old youth in care was shot to death while committing armed robbery. The youth and a 15-year-old male accomplice entered a store intending to commit armed robbery. The youth - armed with a gun - jumped over the checkout counter, pointed the gun at the store's cashier and ordered her to get down on the floor. The store's owner heard the commotion and observed the robbery taking place from his upper-level office/security room. The owner retrieved his own gun and opened fire, striking and killing both teenagers. The store's owner was not charged with a crime. The teenagers were suspected to have committed several other robberies earlier in the day. **See Death and Serious Injury Case 1.**

Prior History:   The youth entered the Department's care when he was 14 years old, as a result of his chronic delinquent behaviors and a long history of involvement with the juvenile delinquency court.  He had been psychiatrically hospitalized several times due to his aggressive and defiant behavior, and habitual stealing from home, school, and peers. The youth was first arrested for theft at age 11. When he was 12 years old, he ran out into the street while playing with friends and was hit by a car. The driver accidentally reversed the car and ran over him a second time before driving off. The youth suffered a traumatic brain injury, seizures, and broken bones, and was in an induced coma for several days. He was arrested again for theft at age 13 and began habitually failing to cooperate with juvenile court interventions. An intact family services case was opened at the request of the boy's juvenile probation officer. Neither the youth nor his mother complied with service plan requirements to get substance abuse assessments or participate in family counseling. At age 14 the youth was the victim of domestic battery by his mother's boyfriend. The youth continued to get arrested and was repeatedly held at a detention center. Consequently, with his mother's consent, the youth was committed to the Department's guardianship by the juvenile court and the intact family services case was closed. He was placed in a residential facility, but frequently left without permission and continued his delinquent behaviors. When he was 15 the youth was moved to a residential program far from the area where he grew up. The youth's delinquency subsided. He earned his GED and began taking college courses. When it was time for the 17-year-old to step down to the less restrictive environment of a group home, none could be located. He remained in his residential placement for six months beyond his discharge date and then stepped down to a transitional living program. The youth received comprehensive support and services from the transitional living program staff, however, he frequently left his placement for days at a time in order to return to visit the neighborhood where he grew up and where his mother continued to reside. At the time of his death, the boy was in his old neighborhood. The store the boy was robbing when he was killed was 0.6 miles away from his mother's home.

| Child No. 7 | DOB 4/99 | DOD 2/16 | Homicide |
|---|---|---|---|
| Age at death: | 16 years | | |
| Substance exposed: | No, unknown | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Teen was a youth in care | | |
| Action Taken: | Investigatory review of records | | |

Narrative:   Sixteen-year-old youth in care was shot at approximately 8:30am by an unknown assailant who confronted him on the street one-and-a-half blocks from his home. The youth was believed to have been on his way to school. The youth was not gang-involved and did not have an arrest history. He lived in a violent neighborhood and was the sixth young black male to be shot and killed in his community in the first five weeks of 2016. DCFS did not open an investigation as no abuse or neglect was suspected. A police investigation of the youth in care's murder remains unsolved but open.

Prior History:   The deceased became a youth in care in May 2011 at the age of 12, along with three of his siblings. The children's mother had gone to jail and had not made a care plan for her children. The mother had a history of significant involvement in the criminal justice system, domestic violence, and substance abuse. The youth was initially placed in a foster home with two of his siblings. After two years, in October 2013, they moved with the foster parent to another state. The youth and his brother were returned to Illinois, however, and in July 2014 the youth was placed in a group home followed by a shelter and then another group home, where he did well. The youth was enrolled in school and had no significant behavior problems. In the Spring of 2015 the youth began requesting visits to his grandfather's home, where he had lived prior to becoming a youth in care and where two of his siblings were living. After an unauthorized absence from his group home in May 2015, a transition began to move the youth to his grandfather's home where he wanted to live. He began living with his grandfather in August 2015 and was enrolled in school.

CHILD DEATH REPORT

| Child No. 8 | DOB 11/15 | DOD 3/16 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 months |
| Substance exposed: | No |
| Cause of death: | Blunt force head trauma |
| Perpetrator: | Father |
| Reason For Review: | Pending child protection investigation at time of child's death; split custody (sibling in foster care) |
| Action Taken: | Full investigation pending |

**Narrative:** Four-month-old infant died in the hospital after being removed from life support three days after being admitted to the hospital with a massively swollen head, two black eyes, extensive bruising to his face and body, and a bite mark on his shoulder. The infant's 20-year-old mother left him in the care of his 20-year-old father when she went to work. She called 911 when she returned home. Police investigated and notified the hotline of the infant's abusive injuries. The father confessed to causing the baby's injuries because the baby's crying made him angry. The father was charged with first degree murder. He is in custody awaiting trial. The mother pleaded guilty to child endangerment and was sentenced to 30 months in prison. A child protection death by abuse investigation is open as the Department waits to receive the infant's autopsy report from the coroner. The OIG is conducting a full investigation of this child's death.

**Prior History:** The mother entered foster care on a dependency petition in December 2011 at the age of 16 and pregnant. She was emancipated in August 2014 at the age of 19 while pregnant with her second child. The mother's first child entered foster care in January 2012 after she repeatedly left the infant in her foster home without arranging for his care. She surrendered her parental rights to the child in September 2014. He is in the process of being adopted. The mother's second child, who shared a father with the deceased, entered foster care after her birth in October 2014. The mother participated in services, but the father did not. In October 2015 the court found the mother fit and she began having unsupervised visits with the child in anticipation of her return home. The following month the mother gave birth to the deceased. In late January 2016 a worker called the hotline to report that the mother was allowing the father who had a court finding of unfit to be around the children. An investigation for substantial risk of physical injury/environment injurious to health and welfare by neglect to the children by the parents was pending at the time of the infant's death. It was unfounded two months after the infant's death with the rationale that there was insufficient evidence the father had violated a court order prohibiting unsupervised contact with the 1-1/2-year-old child and there was no court order preventing the father from being around the infant.

| Child No. 9 | DOB 8/99 | DOD 3/16 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 16 |
| Substance exposed: | Yes |
| Cause of death: | Asphyxia due to restraint |
| Perpetrator: | Unrelated Caregiver |
| Reason For Review: | Teen was a youth in care |
| Action Taken: | Full investigation pending |

**Narrative:** Sixteen-year-old youth in care died following an improper restraint in his residential placement. The youth's behavior in the placement had been deteriorating. On the evening of his death, the youth failed to follow directions by staff and he became aggressive. At one point, the youth had a staff member in a choke hold. The two staff members involved in the restraint have been criminally charged, one for involuntary manslaughter and the other for obstruction of justice. A child protection death investigation was conducted and both staff members were indicated for death by abuse and substantial risk of physical injury by abuse. The OIG is conducting a full investigation of this teen's death.

Prior History:   The youth in care's family had a significant history with the Department beginning in 1997. Over the next ten years the family received periodic intact family services. When he was five years old, the maternal grandmother obtained private guardianship of the deceased and a sibling because of the mother's continuing struggle with mental illness and substance abuse. The father cared for the remaining siblings, but they entered foster care in 2007. By the age of 13, the grandmother reported increased problems with the youth both at home and at school, and the teen returned to his mother's care. Approximately one year later, a delinquency court judge ordered the teen into the care of the Department on a dependency petition. The youth was placed at a residential facility that provided services to address behavioral and substance abuse issues. The youth visited with his mother in her home. He had a goal of return home, although the mother had previously stated that she could not handle the youth's behaviors; she did not participate in recommended services; and family therapy had been discontinued one year earlier.

| Child No. 10 | DOB 4/11 | DOD 4/16 | Homicide |
|---|---|---|---|
| Age at death: | One day shy of 5 years | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxiation by suffocation and neck compression | | |
| Perpetrator: | Mother | | |
| Reason For Review: | Open intact family services case at time of child's death; pending child protection investigation at time of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:        Four-and-a-half-year-old girl with cystic fibrosis was pronounced deceased at the emergency room around 3:20pm. A roommate had returned home to find the 37-year-old mother sitting on top of the child with her hand over the child's nose and mouth. An 8-year-old sibling was present. The mother has been charged with first degree murder and is in custody. A child protection death investigation is still pending after eight months. The Southern Illinois Child Death Investigation Task Force investigated the case with the local police and DCFS is waiting for their records. The 8-year-old sibling was placed in foster care with fictive kin; a 16-year-old brother was placed with the paternal grandmother; and a 14-year-old sister was already in the legal custody of her step-mother at the time of the sister's death. The OIG is conducting a full investigation of this child's death.

Prior History:   Between February 2015 and the little girl's death in April 2016, there were at least eight child protection investigations on the family, five of which were indicated, with allegations including medical neglect, inadequate supervision, and substantial risk of physical injury/environment injurious to health and welfare by neglect. One of the investigations was pending at the time of the girl's death. Also, an intact family services case was open at the time of the girl's death. It had been opened in June 2015 to provide services to address mental health concerns, parenting skills, and housekeeping standards.

| Child No. 11 | DOB 9/14 | DOD 4/16 | Homicide |
|---|---|---|---|
| Age at death: | 19 months | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple injuries due to blunt force trauma | | |
| Perpetrator: | Father | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

CHILD DEATH REPORT

Narrative:        Nineteen-month-old toddler was taken to the hospital unresponsive by his 28-year-old father. The child was covered in bruises and he was hypothermic. He had been dead for several hours. The toddler's father said he left the child in the car while he went for a job interview. A hospital nurse called the hotline to report the child's death was suspicious for abuse. A hotline report was taken for investigation of death by abuse, cuts, bruises, and welts by abuse and inadequate supervision. DCFS and police investigated. The father had called the child's 24-year-old mother two days earlier asking for a visit. He picked up the child and was supposed to return him the next day, but when the mother called the father he asked to keep the child for a couple more days. The father admitted to harming the toddler and then putting him in the backseat of the car where he left the toddler with his cousin while he went to a job interview. The father has been charged with first degree murder and is in jail awaiting trial. He was indicated for death by abuse and for cuts, bruises, welts by abuse. He was unfounded for inadequate supervision. The toddler was the parents' only child.

Prior History:     In November 2015 the 14-month-old child's mother took him to the hospital with facial bruises and abrasions and swollen lips. The mother told hospital staff that the child had been on a seven hour visit alone with his father for the first time. Police were called to the hospital and the father gave conflicting stories about what had happened. The hospital called the hotline to report suspicion of abuse. The father explained to the child protection investigator that he had taken the toddler to a birthday party to meet relatives. He stopped at his apartment afterward and while holding the toddler in a football hold, he reached down to grab a travel bag and the toddler slipped from his arms and fell hitting his face first. He said he was scared the mother would not let him see the toddler again, so he made up a story that his young niece had dropped the child at the party. The physician's assistant who treated the child at the hospital said the child's injuries could have come from a fall and her only concern was the discrepancy in stories. She was not willing to say conclusively that the injuries were from abuse. The investigator did not seek a second medical opinion. The police did not pursue any charges against the father and DCFS unfounded the father for cuts, bruises, welts by abuse.

| Child No. 12 | DOB 10/96 | DOD 5/16 | Homicide |
|---|---|---|---|
| Age at death: | 19 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Teen was a youth in care | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Nineteen-year-old youth in care was found with three gunshot wounds in the early morning in a gangway by police. He had been shot at more than eleven times. The youth was taken by ambulance to the hospital where two surgeries were performed. He was in the ICU in critical condition for a day before he suffered a stroke that rendered him brain dead. He was removed from a ventilator and died the following day. A police investigation of the teen's murder remains unsolved but open.

Prior History:   At the age of 17, a juvenile delinquency court judge placed the youth in DCFS guardianship. In the first eight months he was placed in two different specialized foster homes and received services from a private agency program designed to provide specialized foster care and appropriate targeted services to youth involved in both the juvenile and delinquency court systems. During this time he violated his probation and spent two weeks in juvenile detention before he was returned to his specialized placement. The foster parent reported the teen did not attend school, had issues with substance abuse and did not abide by his 8pm curfew.  Because of his behavior, the court violated his probation and placed him on electronic monitoring. Subsequently, the youth was arrested for battery charges and spent approximately six months in a youth correctional facility.  He was paroled in January 2016 and placed into the home of a prior specialized foster parent. Over the next three months the youth in care was doing well: he attended school and cooperated with his parole agent and abided by the rules of his foster parent, including curfew. Hours before he was murdered, around 10:00pm, he had been returned to his foster home by his advocate who had taken him on an outing. After he arrived home, he received a call from his mother suggesting that he join her and other family members at a party. His body was found in the vicinity of the party. It is believed the youth in care engaged in a confrontation with other youth at the party and was shot.

| Child No. 13 | DOB 10/98 | DOD 5/16 | Homicide |
|---|---|---|---|
| Age at death: | 17 | | |
| Substance exposed: | Yes, cocaine and alcohol | | |
| Cause of death: | Single gunshot to the head | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Teen was a youth in care | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Seventeen-year-old youth in care was found by law enforcement on the sidewalk lying in a pool of blood. The youth appeared to have been beaten and shot. Friends of the youth went to his foster home that evening, at approximately 11pm, and informed the foster mother that the youth had been shot. The foster mother provided law enforcement with a photo for identification. A police investigation of the teen's murder remains unsolved but open.

Prior History:   The youth's mother had a substantial history with the Department related to substance abuse and had abandoned the youth after birth at the hospital. The Department placed the youth in a relative foster home with five older siblings. Two years later the youth and one older sibling moved to a traditional foster home because the relative became overwhelmed caring for six children. The two children were subsequently adopted.  However, several years after the adoption, the adoptive mother had concerns about the youth's behaviors and requested stabilization services. The youth required care outside of the home and was placed in a residential center that provided mental health and behavioral services. The adoptive mother participated in services and the family had weekly visits. When the facility determined the youth was ready for discharge, the adoptive mother requested the court vacate her guardianship and the youth returned to the care of the Department. Over the next five years the youth was placed in multiple specialized foster homes, the last of which lasted for three years. The youth had been removed from prior foster homes because of aggression and caregiver reports that the youth possessed knives and set items on fire. The youth exhibited problems in school with aggression. While the youth successfully completed the 8th grade, he struggled throughout high school with multiple suspensions, both in public school and an alternative school. The youth's case record reflected that he may have been involved in gang activity. He became involved with delinquency court after a fight at school resulted in a teacher suffering a broken nose. The youth's case manager requested a case study for the youth for evaluation of special education services, but the school district never completed the assessment. The Department enlisted the assistance of a legal services non-profit agency. On the day of the youth's death, the foster mother had grounded him because of a school suspension, but he left the home under the guise of taking out the garbage. The youth was shot that same evening.

| Child No. 14 | DOB 8/95 | DOD 5/16 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 20 |
| Substance exposed: | Unknown |
| Cause of death: | Multiple gunshot wounds |
| Perpetrator: | Unknown |
| Reason For Review: | Deceased was a youth in care |
| Action Taken: | Investigatory review of records |

Narrative:       Twenty-year-old youth in care was shot to death at 4:00pm while walking down the street, a block from his father's home. The perpetrator fired multiple shots from a vehicle as it passed the victim. A police investigation of the youth in care's murder remains unsolved but open.

Prior History:       The youth had been in the Department's care since 2005. His mother had a history of substance abuse and criminal behavior and left him for periods of time with a fictive grandmother. The youth's father had a significant criminal history. The youth maintained a relationship with his father, but not his mother. When he entered foster care at age nine, the youth was placed with a maternal aunt. Less than two years later, the youth was psychiatrically hospitalized for the first time. Subsequent placements, both specialized foster care and residential care, failed because of the youth's aggressive and violent behavior. He became involved with a gang and was the subject of a delinquency petition for which he received a year of court supervision. At the age of eighteen the youth was placed in a transitional living program and he obtained his GED and enrolled in a community college. In the next year, he had three criminal court cases filed against him for battery of a staff member, obstructing a peace officer, and robbery. At the age of nineteen, eleven months before his death, the youth was shot in the neighborhood he lived in as a child. His injuries required several surgeries and weeks of hospitalization. Because of his injuries, the youth withdrew from school and never re-enrolled.  Five months before he was shot, the youth had been a passenger in a car into which shots were fired and his cousin was killed. The youth was not physically harmed. Six months before his death, the youth moved into an independent living apartment, in a neighborhood away from his gang ties, and he had a goal of independence. He was the father of a one-and-a-half-year-old daughter and was receiving teen parent services. He and the toddler's mother had a history of domestic violence with the 20-year-old mother being the more aggressive of the two. She had been banned from his apartment by the agency. Eight days before his murder, the youth had been robbed at gunpoint while visiting his father in a neighborhood he had been cautioned against because of the risk it presented to him.

| Child No. 15 | DOB 11/15 | DOD 5/16 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | Just shy of 6 months |
| Substance exposed: | No |
| Cause of death: | Starvation and dehydration due to neglect |
| Perpetrator: | Mother |
| Reason For Review: | Indicated child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:        Five-and-a-half-month-old baby was found unresponsive in the early morning by her 22-year-old mother, who called 911. The mother reported that she checked on the baby approximately six hours earlier and thought she was getting sick because she "seemed off." The baby was pronounced dead at the hospital. Medical staff noted the baby appeared severely emaciated. A hospital nurse and the coroner notified the hotline of the baby's death. A report was taken for investigation of death by neglect and for substantial risk of physical injury to the mother's other two children. The baby had been born prematurely at 34 weeks and was in the NICU for weeks before being discharged home. Her weight at autopsy was more than a pound less than her last recorded weight from a well-baby check four months earlier. The mother was charged with endangering the life of a child and is in custody awaiting trial. Her two surviving children, ages one and three years, were taken into custody. It was believed the mother had recently stopped feeding the children. They were hospitalized for two days to evaluate their nutrition and monitor their food intake before being placed in traditional foster care. The children's 21-year-old father was not involved at the time. He is currently in prison on unrelated drug and weapon charges. The mother was indicated for death by neglect, malnutrition, and inadequate food to the baby and for substantial risk of physical injury/environment injurious to health and welfare by neglect to the surviving children.

Prior History:     In March 2016 a neighbor notified law enforcement that the children appeared to be home alone. When police arrived they found the door open. The deceased, then three months old, was laying on a bed, with no adults present. The father arrived home saying he had just left to get a pack of cigarettes. The police estimated he was gone at least 30 minutes. The father was arrested and charged with child endangerment. DCFS was notified and initiated an investigation against the father for inadequate supervision. The paternal grandmother stepped in to care for the children. She reported that the parents were separated and the mother was homeless. During the course of the investigation the father remained in jail. The paternal grandmother allowed the mother to move into the home to care for the children and to allow her to save money for her own apartment. Eight days before the baby's death, the investigator observed the children before closing the investigation with an indicated finding of inadequate supervision against the father. The children were in the care of the mother who was assisted by the grandmother; the baby was observed dressed, asleep in a bassinette. The investigator spoke with the children's primary care physician, who reported that the older children were up to date with their medical care, but the family had missed the baby's four month well-child check. The doctor had no other concerns. The investigator advised the mother and grandmother to take the baby to the doctor's office. The investigator offered the mother services but she declined.

| Child No. 16 | DOB 2/00 | DOD 6/16 | Homicide |
|---|---|---|---|
| Age at death: | 16 years | | |
| Substance exposed: | No, unknown | | |
| Cause of death: | Shotgun wound to the chest | | |
| Perpetrator: | Friend | | |
| Reason For Review: | Unfounded child protection investigation within a year of teen's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Sixteen-year-old boy was shot and killed by a 17-year-old friend at the friend's home. The friend was showing the teen and the teen's 20-year-old cousin a shotgun, and he was loading and unloading it. The cousin went outside to smoke a cigarette and heard a "pop." He returned to find the teen bleeding and tried to stop it. 911 was called. Resuscitative efforts were unsuccessful and the teen was pronounced dead at the scene. The 17-year-old friend has been charged with first degree murder.

Prior History:    In September 2015 the teen's 37-year-old mother took the teen to a psychiatric hospital demanding he be admitted because he had been arrested for shoplifting. While trying to get the teen admitted, the mother reported that the teen and his 11-year-old sibling resided with their 47-year-old father, who was regularly intoxicated and allowed the teen to leave his house to go drink with friends. Hospital staff called the hotline and reports were taken against both parents for substance misuse, against the father for inadequate supervision, and against the mother for inadequate shelter. The reports were unfounded after investigation. The parents and both children denied the allegations. The investigator spoke with the children's primary care physician who had no concerns, and with the teen's school who reported both parents were involved and doing the best they could with the teen.

| Child No. 17 | DOB 4/16 | DOD 6/16 | Homicide |
|---|---|---|---|
| Age at death: | 7 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Blunt force injuries of head | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Seven-week-old baby girl was found appearing floppy with irregular breathing and bruising over her eyelid by her 26-year-old mother. The mother reported she had left the sleeping infant at home for about an hour after receiving a call that her 25-year-old boyfriend, the infant's father, had been arrested while driving her car. The mother's 6-year-old son and the father's 10-year-old brother were also at home. The mother called an 18-year-old friend and asked him to come check on the kids while she went to retrieve her car before it got towed. She also asked the infant's uncle who lived downstairs to look in on the children. When she arrived home the 10-year-old told her something was wrong with the baby. The friend said he had checked on the kids a couple of times between smoking and talking to the uncle outside. The mother drove the baby to the hospital. The baby was transferred to a children's hospital where she died the next day. The hospital notified the police and DCFS. The children had victim sensitive interviews and confirmed they had been checked on by the friend and uncle. The 6-year-old boy disclosed that the 10-year-old boy had "shook and killed" his sister. No criminal charges were filed as it was believed the 10-year-old boy was responsible for the infant's death. However, the mother was indicated for death by neglect, head injuries by neglect, and cuts, bruises and welts by neglect to the infant. She also was indicated for inadequate supervision of all three children. The 6-year-old, who had been visiting his mother, is back living with his father and his younger sister. The 10-year-old boy is in counseling.

Prior History:    In August 2015, prior to the infant's birth, an anonymous reporter called the hotline to report that the parents always leave the mother's two children, ages 2 and 5, home alone. The hotline took a report for investigation of inadequate supervision. An investigator spoke with the mother who denied leaving her children home alone; he spoke with the 5-year-old who denied being left home alone with his sister; and he spoke with the maternal grandmother, who reported she lived in the neighborhood, watched the children when needed, and vouched for her daughter's good care of the children.

| Child No. 18 | DOB 5/98 | DOD 6/16 | Homicide |
|---|---|---|---|
| Age at death: | 18 | | |
| Substance exposed: | No, unknown | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Teen was a youth in care | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Eighteen-year-old youth in care was found at approximately 2:00am lying face down in the street with multiple gunshot wounds to his head and back by police who were responding to reports of shots fired. Witnesses reported that the youth got out of a car and approached a group of men standing on the street when someone opened fire. A police investigation of the teen's murder remains unsolved but open.

Prior History:     The youth in care's family came to the attention of the Department in 2007 when the mother failed to obtain medical care for the child, then nine years old. While the Department took protective custody and placed the youth with relatives, the court allowed custody to lapse and the Department provided intact family services instead. Over the next three months the mother struggled with mental health and substance abuse issues, and threatened child welfare staff and relatives who cared for her children. The Department obtained custody of the child and one younger sibling in February 2008. The siblings were placed with different relatives, one of whom would subsequently adopt the sibling. Over the next year the deceased exhibited aggressive behaviors in school and homes and was moved to two different relatives' homes. According to relative caregivers, the child had difficulty with school work, including reading and math. After his third relative placement disrupted, the Department placed the child in a group home for three months until an appropriate placement could be located. The 11-year-old was approved for specialized foster care and over the next 18 months he had three different placements. According to his specialized foster parents, the youth continued with aggressive behaviors in the homes and schools, as well as leaving home without the permission of his caregivers. The youth was reportedly gang involved at a young age. After his third specialized foster home placement disrupted, the youth returned to the group home until he was approved for residential treatment. Over the next four years the youth was placed in four different residential programs. He continued to have issues with aggression and explosive behavior. Shortly after his first residential placement, the youth became involved with the juvenile justice system after several arrests in the community. The youth was court mandated to detention on four separate occasions as a result of criminal activity and failure to adhere to the conditions of his probation. During one incarceration, the youth completed the eighth grade. He qualified for special education services, however, he never meaningfully obtained further education. Three months prior to his death, the youth was placed with a sibling in another part of the state and was referred to the Teen Parent Service Network because he was going to become a parent. Family and child welfare staff hoped the placement would keep him away from gang activity. At the time of his death the youth had returned to the area to visit his newborn child.

CHILD DEATH REPORT

## SUICIDE

| Child No. 19 | DOB 2/98 | DOD 8/15 | Suicide |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | No, unknown | | |
| Cause of death: | Complications of mixed drug (doxepin, venlafaxine, amphetamine, and topiramate) intoxication | | |
| Reason For Review: | Unfounded child protection investigation within a year of teen's death | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 20 | DOB 12/00 | DOD 9/15 | Suicide |
|---|---|---|---|
| Age at death: | 14 years | | |
| Substance exposed: | No, unknown | | |
| Cause of death: | Hanging | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 21 | DOB 12/95 | DOD 10/15 | Suicide |
|---|---|---|---|
| Age at death: | 19 years | | |
| Substance exposed: | No, unknown | | |
| Cause of death: | Hanging | | |
| Reason For Review: | Child was a youth in care | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 22 | DOB 4/04 | 11/15 | Suicide |
|---|---|---|---|
| Age at death: | 11 years | | |
| Substance exposed: | No, unknown | | |
| Cause of death: | Hanging | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 23 | DOB 11/98 | DOD 1/16 | Suicide |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | No, unknown | | |
| Cause of death: | Hanging | | |
| Reason For Review: | Pending child protection investigation at time of teen's death | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 24 | DOB 10/96 | DOD 4/16 | Suicide |
|---|---|---|---|
| Age at death: | 19 years | | |
| Substance exposed: | No, unknown | | |
| Cause of death: | Gunshot wound to the head | | |
| Reason For Review: | Teen was a youth in care | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 25 | DOB 9/99 | DOD 6/16 | Suicide |
|---|---|---|---|
| Age at death: | 16 years | | |
| Substance exposed: | No, unknown | | |
| Cause of death: | Hanging | | |
| Reason For Review: | Pending child protection investigation at time of teen's death | | |
| Action Taken: | Investigatory review of records | | |

## UNDETERMINED

| Child No. 26 | DOB 6/15 | DOD 7/15 | Undetermined |
|---|---|---|---|
| Age at death: | 3 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Three-week-old infant was found unresponsive by her mother around 4:45am. The infant had been sleeping between the 19-year-old mother and the 26-year-old father in a full-sized bed. She was last seen alive around midnight. After feeding the baby a bottle, the father laid the infant on his chest and fell asleep in bed. The couple was spending the night together with their baby in a motel; they did not have a portable crib with them. The coroner's office advised DCFS of the infant's death and that police were involved. DCFS took a report for investigation of death by neglect to the infant by her mother and father. Responding police officers did not find any drugs or alcohol or anything suspicious in the motel room. The infant's autopsy noted that no anatomic findings could exclude the possibility of asphyxia so the infant's cause and manner of death were undetermined. The parents were unfounded for death by neglect after nine months.

Prior History:     Four days before the infant's death the father called the hotline to report the mother had texted him saying she was going to kill herself and the baby. The hotline took a report for investigation of substantial risk of physical injury/environment injurious to health and welfare by neglect to the infant by her mother. An investigator interviewed the mother who denied telling anyone she had thoughts of hurting herself or the baby. The investigator observed a crib and other baby items at the maternal grandfather and step-mother's home, where the mother and infant lived. She completed a home safety checklist. The father denied both that he called the hotline and that the mother had ever threatened to hurt herself or the baby. The mother's step-mother and a cousin were interviewed and told the investigator that the mother was taking good care of the baby. They did not have concerns about the mother's mental health. The investigation was completed and unfounded after the baby's death.

| Child No. 27 | DOB 6/15 | DOD 7/15 | Undetermined |
|---|---|---|---|
| Age at death: | 4 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

CHILD DEATH REPORT

Narrative:      Four-and-a-half-week-old infant was found unresponsive at 4:30am by her 27-year-old mother. The infant was placed to sleep in a car seat around 7:30pm and the car seat was put on the mother's bed. There were no objects or blankets in the car seat. The coroner called the hotline to notify the Department of the infant's death, stating there was no suspicion of abuse or neglect of the infant, who had been born prematurely at 34 weeks gestation and diagnosed with a heart murmur. Police also notified the Department of the infant's death, stating there were no signs of trauma or anything suspicious. The 37-year-old father was present in the home at the time of the infant's death. The Department initiated a report against the mother and father for investigation of death by neglect. It was unfounded after six months.

Prior History:    The mother has a history of child protection investigations by the Department dating to June 2013 when her 6-year-old son was hit by a car and died. The mother was walking down the street with her 2-year-old son in a stroller and her 6-year-old son on a bike when the child was hit by a car. The incident was determined to be an accident. The 26-year-old father of the 2-year-old called the hotline several times regarding the mother's care of their son; the investigations were unfounded for insufficient evidence. The son spent time living with both the mother and the father. In June 2015 the father called DCFS to report medical neglect of their son, who had Rosai-Dorfman disease, a rare disorder characterized by overproduction and accumulation of a specific type of white blood cell in the lymph nodes of the body, most often those of the neck. The father alleged the mother was not taking their son to his medical appointments and he could not always take him. In July 2015 the child was hospitalized and a hospital social worker called the hotline reiterating the father's concerns. An investigator tried many times to reach the mother, but was unsuccessful in obtaining contact information from the father or relatives. The infant died while this investigation was pending. The investigation was subsequently indicated against the mother for medical neglect to her son. In November 2015 the child entered foster care. He is placed with his paternal grandmother.

| Child No. 28 | DOB 6/15 | DOD 8/15 | Undetermined |
|---|---|---|---|
| Age at death: | 7 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Split custody (sibling in foster care) | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Seven-week-old infant was found face up unresponsive by her 27-year-old mother at 7:00am. The mother said the baby was in a bassinette that was in bed with her at a women's shelter where they were residing. A coroner investigator notified the hotline of the infant's death, including that shelter staff reported to police that the mother left the shelter with the infant the previous evening at 9:00pm and returned at 11:00pm and the mother smelled of alcohol and appeared intoxicated when she returned. The hotline took a report for investigation of death by neglect. A residential aide at the shelter told a detective that she went into the mother's room at approximately 5am and witnessed the infant laying face up in the bed with the mother, cooing and making baby noises, but the infant was not in a bassinette. The pathologist who performed the infant's autopsy noted, "it is possible that a rare genetic or metabolic disorder could have contributed to death. However, it is not possible to rule out the contribution of an unsafe sleeping environment (bed-sharing with adult) to death." After a three month investigation the mother was indicated for death by neglect with the rationale that the mother left the shelter with the baby after curfew and returned to the facility under the influence; it was reported the mother always sleeps with the baby; and the investigator was not able to find the mother to interview her.

Prior History:   The deceased was the mother's third child. Her first child, whom she gave birth to at age 19, was adopted after her parental rights were terminated. Her second child entered foster care in October 2014 at eight months old after she was kidnapped from her mother by her father in another state where the mother was staying. The child was recovered through an Amber Alert and the Illinois State police notified DCFS. The father was prosecuted and convicted for the child's kidnapping. DCFS indicated both parents for substantial risk of physical injury/environment injurious to health and welfare by neglect because of their history of domestic violence, substance abuse, and criminal activity. When the deceased was born, juvenile court instructed the caseworker to call the hotline based on the mother's history. An investigation of substantial risk of physical injury/environment injurious to health and welfare by neglect was unfounded. The infant's medical visits were current, and the investigator completed a home safety checklist with the mother in the shelter. The mother was making progress in services and visiting regularly with her child in foster care. The mother is still working toward her second child's return home, however, she continues to struggle with substance abuse.

| Child No. 29 | DOB 6/15 | DOD 8/15 | Undetermined |
|---|---|---|---|
| Age at death: | 7 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Pending child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Seven-week-old infant was found unresponsive around 7:00am by his mother. The infant was face down in a queen-sized bed in which he was sleeping with his 19-year-old parents and 3-year-old uncle. The family was living with a cousin. The infant was last seen alive around 5:00am when his mother fed him and they went back to sleep. The parents called 911 and then ran with the infant to the fire station, which was four houses away. The infant was taken by ambulance to the hospital where he was pronounced dead. Police notified the hotline of the infant's death, stating that an officer had gone to the home and found it clean and appropriate; there were no signs of trauma found on the baby; and neither parent appeared intoxicated or on drugs. The Department opened an investigation of death by neglect that was unfounded after six months. The deceased was the parents' only child.

Prior History:   In July 2015 an anonymous reporter called the hotline alleging that she had recently been in a house where three women were living with their children in uninhabitable conditions. Investigations were initiated against the women for inadequate shelter and environmental neglect. All three investigations, including the one involving the deceased, were unfounded because all of the women and children lived in homes different from the one identified by the reporter. The home was owned by an aunt of the women and the report was believed to be harassment.

| Child No. 30 | DOB 7/15 | DOD 9/15 | Undetermined |
|---|---|---|---|
| Age at death: | 7 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Pending child protection investigation at time of child's death; child of a youth in care | | |
| Action Taken: | Investigatory review of records | | |

CHILD DEATH REPORT

Narrative:      Seven-week-old infant was found unresponsive around 6:30am by his 17-year-old mother who was a youth in care. The infant had been placed to sleep around 10:30pm in a bassinette in the living room of the youth in care's foster home. After feeding the infant around 1:00am, the mother placed the infant on his back on top of a standard-sized pillow between herself and her 8-year-old foster brother, who had fallen asleep on her queen-sized bed while watching TV. She awoke to find the infant unresponsive lying on his side. 911 was called and the infant was taken by ambulance to the hospital where he was pronounced dead. A hospital social worker and the coroner notified the Department of the infant's death. No physical signs of abuse or neglect were noted. The hotline took a report against the youth in care for investigation of death by neglect and for substantial risk of physical injury/environment injurious to health and welfare by neglect to the youth's 8-year-old foster brother. After three and a half months the investigation was unfounded. The pathologist noted in the autopsy report that it was not possible to determine whether the infant's unsafe sleep position may have caused or contributed to the infant's death. The youth was offered grief services and support through the Teen Parent Services Network and was provided with an attorney through the assistance of the Special Counsel to the DCFS guardian to represent her during the child protection and criminal investigation of her son's death. The youth now lives in a transitional living program.

Prior History:    In 2002, at the age of four, the mother became a youth in care and was placed with a paternal aunt. The paternal aunt received subsidized guardianship of the youth in 2005. In 2012 the guardianship disrupted and the mother became a youth in care on a dependency petition. After a psychiatric hospitalization, placement with her godmother, and time spent in the Juvenile Detention Center and a shelter, the youth in care, then three months pregnant, went on run. Her worker made multiple attempts to locate her, including requesting a juvenile arrest warrant. A month after the infant's birth, the mother agreed to live with her godmother, but she and the infant never showed up and a hotline report was made against the mother for substantial risk of physical injury/environment injurious to health and welfare by neglect. Once she learned of the pending investigation the youth moved into her godmother's home with the infant and became involved with teen parent services. Following the infant's death, the mother was indicated on the risk report. After an appeal was filed the Department reviewed and reversed its finding to unfounded.

| Child No. 31 | DOB 7/15 | DOD 9/15 | Undetermined |
|---|---|---|---|
| Age at death: | 7 weeks | | |
| Substance exposed: | Marijuana | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Child was youth in care | | |
| Action Taken: | Investigatory review of records | | |

CHILD DEATH REPORT                                                    95

Narrative:      Seven-week-old infant was found unresponsive on a couch around 8:00am by her 43-year-old foster mother, who called 911. The infant was taken by ambulance to the hospital where she was pronounced deceased. Police and the infant's caseworker notified the hotline. The Department took a report against the foster mother for investigation of death by neglect. The foster mother reported that around 4:00am she took the infant out of her bassinette, took her downstairs, fed her a bottle, and then laid her on top of a blanket on top of a towel on the couch. The infant had her back against the back of the couch and her head resting on a small couch pillow. The foster mother then went back to sleep upstairs. She awoke around 6am, checked on the infant, and noticed that she had not moved and assumed she was sleeping. She went upstairs to get ready for work and get her 2-year-old foster daughter ready for the day. She found the infant unresponsive around 8am. The pathologist who conducted the infant's autopsy noted in the report that the infant had evidence of a possible bacterial infection, and also that the contribution of the unsafe sleep position to her death could not be ruled out. The foster mother was unfounded for death by neglect, but indicated for inadequate supervision and for substantial risk of physical injury/environment injurious by neglect to her 2-year-old foster daughter, who had been placed with her since the age of 3 months, but removed from her care after the infant's death. The findings were overturned by the Dupuy administrator; the foster mother was eligible for a Dupuy hearing because she was employed as an occupational therapy assistant for children with special needs. Her foster daughter, however, was not returned to her care and remains in the foster home to which she was moved.

Prior History:   The infant, who was born exposed to marijuana, entered foster care right after her birth. Her mother, who has a history of mental illness and substance abuse, had three other children removed from her care in 2013, and she had not participated in services to address her issues and regain custody.

| Child No. 32 | DOB 8/15 | DOD 9/15 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 weeks |
| Substance exposed: | Yes, opiates |
| Cause of death: | Undetermined |
| Reason For Review: | Pending child protection investigation at time of child's death; open intact family services case at time of child's death |
| Action Taken: | Full investigation pending |

Narrative:      Four-week-old infant, who was born substance-exposed, appeared cold and unresponsive while on a walk with her 25-year-old mother and 2-year-old sister. The mother returned to the children's maternal grandparents' home where they had been staying and they called 911. Emergency services responded and the infant was believed to be deceased when they arrived. She was taken by ambulance to the hospital where she was pronounced deceased. A coroner investigator notified the hotline of the infant's death, stating it was possible the baby was already dead when the mother went on the walk. When the coroner investigator went to the home, he noted police officers there were concerned that the mother was "out of it." She had not been that way when first responders observed her earlier. The hotline took a report for investigation of death by neglect and for substantial risk of physical injury/environment injurious to health and welfare by neglect to the 2-year-old child. The 2-year-old was placed in a safety plan with her paternal grandparents for four months until the Department took custody of her and placed her with them as foster parents. After four and a half months the mother was indicated for death by neglect and substantial risk of physical injury by neglect with the rationale that the mother was the caretaker at the time of the infant's death; the autopsy report did not "provide sufficient evidence to rule out possible abuse or neglect;" and the mother had multiple previously indicated investigations involving substance abuse.

CHILD DEATH REPORT

Prior History:   Both of the mother's children were born substance-exposed. After her first child's birth, the mother was indicated for substance misuse by neglect and an intact family services case was opened. The mother participated in inpatient substance abuse treatment with the baby. After completing treatment, the mother went to live in a recovery home with the baby, and the intact family services case was closed. A few months later when the mother relapsed she was indicated for substantial risk of physical injury by neglect. A second intact family services case was opened. The mother returned to substance abuse treatment, but did not complete recommended services. After she tested positive for cocaine the mother was indicated again for substantial risk of physical injury by neglect. Eleven months later the deceased was born substance-exposed and a child protection investigation of substance misuse by neglect was pending at the time of the infant's death. The infant had been released from the hospital to the mother and the 50-year-old father pursuant to an agreement that the mother would not be left alone with the infant. Two days before the infant's death, the parents got into an argument and the mother left with the infant to stay with the maternal grandparents. The pending investigation was subsequently indicated against the mother for substance misuse by neglect.

| Child No. 33 | DOB 5/15 | DOD 9/15 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 months |
| Substance exposed: | No |
| Cause of death: | Asphyxia due to suffocation by plastic bag |
| Reason For Review: | Child of a youth in care |
| Action Taken: | Investigatory review of records |

Narrative:        Four-month-old infant was found unresponsive at 7:30am by his 16-year-old mother who is a youth in care. The infant was taken by ambulance to the hospital and pronounced dead by an emergency room physician. The mother reported that she fed the infant at 5:00am and then placed him on her chest, after which they both fell asleep in her queen-sized bed. When the mother awoke two and a half hours later she found the infant had slipped from her arms. The infant had fallen off the bed into a plastic bag filled with personal items and another plastic bag was on top of the infant's body, covering his face. The mother had recently been placed with her child in a private agency approved fictive kin placement. The infant's father was not involved in his care. A hospital nurse and a coroner investigator called the hotline. The Department initiated an investigation of death by neglect against the 16-year-old mother. Five months later, in February 2016, the youth in care was indicated for death by neglect to her only child. In July 2016, after she appealed the finding, the Department reviewed and reversed the finding to unfounded.

Prior History:  The mother entered foster care in 2012 along with her two siblings. The youth in care was referred to the Teen Parent Services Network in November 2014 shortly after her case manager learned of her pregnancy. The youth received the services of a therapist, education coach and doula during her pregnancy. After the birth of her son the mother participated in a New Birth Assessment. The infant was up to date on all immunizations. The youth in care had been educated about safe sleep practices by the doula as well as the New Birth assessor. The youth received additional coaching on safe sleep after concerns were noted regarding her reluctance to place the infant in a crib to sleep. The New Birth assessor expressed concern when visiting the mother at a new placement and finding no crib there. The case manager took a portable crib to the foster home and took a crib to the maternal grandmother's home for overnight visits. During a home visit two days before the infant's death, the case manager learned the portable crib had again been left at the maternal grandmother's home. The foster mother reported that her brother would pick up the crib that day. There was no crib in the home the night the infant died.

| Child No. 34 | DOB 6/15 | DOD 10/15 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 months |
| Substance exposed: | No |
| Cause of death: | Undetermined |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

<u>Narrative</u>:        Four-month-old baby was found unresponsive in his crib by his 26-year-old father in the early morning. The father had laid the infant down in his crib about four hours earlier on his back on a boppy pillow with a blanket from his waist to his feet. The 27-year-old mother called the father around 3:00am to say she was leaving work soon, prompting the father to get up to check on the baby. The father called 911 and paramedics responded and took the infant to the hospital where he was pronounced deceased. There were no outward signs of abuse or neglect. The father said the infant had been sick and was seen by the doctor four days earlier for vomiting and fever. The coroner notified the hotline of the infant's death with the information noted above. The hotline took a report against the father for investigation of death by neglect to the infant and for substantial risk of physical injury to the infant's 4-year-old sibling. Investigation confirmed the father's report. After four months, the investigation was unfounded. The mother's 4-year-old child was placed in a safety plan with relatives for the first month of the investigation. The pathologist noted in the infant's autopsy report that the infant likely died from SIDS, but because the death was unwitnessed it was possible, but unlikely, that the infant died from asphyxia. Therefore, the infant's cause and manner of death were certified as undetermined. An intact family services case, opened one month into the investigation, was closed after the investigation was unfounded. The mother, who separated from the infant's father, had allowed a worker to visit the home, but refused all services.

<u>Prior History</u>:    Prior to the infant's birth, there were two prior child protection investigations involving the mother's daughter. In October 2014 the mother called police to report her 3-year-old daughter was sexually acting out and had been found naked with her roommate's 3-year-old boy. Police called the hotline and a report was initiated for investigation of inadequate supervision by the mother, the mother's boyfriend (later the infant's father), and the roommate. The mother accused her roommate of sexually abusing her daughter. The investigation was unfounded. The little girl was examined by a doctor; there was no evidence of sexual assault and she appeared to have a yeast infection. In December 2014 a school social worker called the hotline to report the little girl said "daddy," the mother's boyfriend, scratched her, pointing to her vagina. Investigation showed that the mother had taken the child to multiple exams for sexual abuse and they were normal. The mother had a history of sexual abuse and she did not want her daughter to go through it. The investigation was unfounded. The mother asked her boyfriend to leave her home. She later allowed him back as he was present at the time of their son's death.

| Child No. 35 | DOB 8/15 | DOD 11/15 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 months |
| Substance exposed: | No |
| Cause of death: | Undetermined |
| Reason For Review: | Closed intact family services case within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:        Three-month-old infant was found unresponsive around 7:30am by his 24-year-old mother. The infant was last seen alive around 3:00am when she fed him and placed him back to sleep in his baby swing. The coroner called the hotline to report the infant's death, stating there were no signs of trauma on the child, both the mother and the 21-year-old father had histories of drug and alcohol "infractions," and the father had a history of an assault arrest. The hotline opened an investigation for death by neglect to the infant by both parents and for substantial risk of physical injury by neglect by the mother to her 2 and 5-year-old children. The first responder police officer, who is also an EMT, reported he found nothing suspicious and the parents' statements were credible and consistent. There was no evidence gathered during the investigation that either parent had a problem with drugs or alcohol or that the father had a history of assault. During a scene investigation the mother demonstrated swaddling the baby in a large comforter and placing him in a semi upright position in a baby swing. The baby was colicky and a physician's assistant had told her that colicky babies like to sleep in a more upright position, although the physician's assistant told the investigator she qualified that by stating the baby should not be left alone. After a three month investigation, the mother was indicated for death by neglect with the rationale, "Although the cause of death of [the baby] is listed as 'undetermined' the sleeping arrangements for [the baby] were unsuitable and likely contributed to or were the cause of his death . . . . By placing the child in an unsafe sleeping arrangement and not being close by, there was a clear blatant disregard for [the baby's] safety and well-being." The substantial risk of physical injury allegation was unfounded.

Prior History:    In November 2014 the mother brought her then 5-month-old daughter to the police station with facial bruises. She had left the infant and the infant's 3-1/2-year-old brother in the care of their 24-year-old father overnight while she went to visit a friend. The maternal grandmother picked up the children the next morning, saw the bruises, and called the mother. The 3-1/2-year-old boy said his daddy hurt his sister. The mother, who had been contemplating divorce from the father, left the father and filed for divorce. The father was indicated for cuts, bruises, welts by abuse to the infant. With the mother's consent, the Department opened an intact family services case. There was a safety plan in place that the father could not see the children until he met with the caseworker to discuss services. The father rejected efforts by the caseworker to meet with him and did not attempt contact with the mother or children. The caseworker monitored the mother and children in their home, but the mother did not want to participate in services and at her request, the case was closed in May 2015. The mother would have been five or six months pregnant with the deceased at the time of case closure, but there was no indication in the record that the caseworker knew that the mother was pregnant or that she had entered into a relationship.

| Child No. 36 | DOB 10/15 | DOD 12/15 | Undetermined |
|---|---|---|---|
| Age at death: | 1-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        One-month-old infant was found unresponsive in his bassinette by his 18-year-old mother and 19-year-old father at approximately 9:30am in the father's home. The infant, the couple's only child, had been placed to sleep in the bassinette on his back on top of a standard size pillow with a small thin pillow under his head. He was covered by a thin fleece blanket. The infant had rolled off the pillow and was found between the pillow and the side of the bassinette. The mother told an investigator she used the pillow as a mattress. The father heard the infant crying around 6:00am, but he didn't get up because the baby stopped crying. The coroner notified the Department of the infant's death. After a six-month investigation of death by neglect, DCFS unfounded the parents.

Prior History:      At the time of the infant's death, there was a pending child protection investigation involving the father's family, with whom he lived. His 14-year-old sister had told her school principal that her mother struck her with a belt across the face and punched her in the face. The principal did not observe any injury to the child's face. An investigation of cuts, bruises, welts by abuse was eventually unfounded against the teen's mother. The teen denied being hit; her mother denied hitting her; the teen had no injuries; and her medical care was current.

| Child No. 37 | DOB 9/15 | DOD 12/15 | Undetermined |
|---|---|---|---|
| Age at death: | 2 months | | |
| Substance exposed: | Yes, opiates, morphine, codeine, and 6-MAM (metabolite unique to heroin) | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:      Two-and-a-half-month-old substance-exposed infant was found unresponsive around 11:45pm by his mother. The infant had been staying in a motel room with his 23-year-old mother and 26-year-old father. The family was visiting the maternal grandfather in a neighboring state. While the father was out with the grandfather, the mother laid the baby on the bed on his back surrounded by three pillows. She sat up in bed reading a book and occasionally dozing off. The family had a pack n play at home, but did not bring it with them to the motel. The neighboring state did not investigate the infant's death. The family's caseworker notified the Illinois hotline of the infant's death. The hotline took a report for investigation of death by abuse. The investigation was unfounded five months later. The infant was an only child.

Prior History:      The infant was born exposed to several substances: opiates, morphine, codeine, and 6-MAM (a metabolite unique to heroin) and experienced withdrawal symptoms after birth, spending several days in the hospital. The mother was investigated and indicated for substance misuse by neglect. An intact family services case was opened and a safety plan was put in place that required 24-hour supervision of the parents with the infant by one of the two grandfathers. The mother participated in a substance abuse assessment that recommended she enter a 90-day inpatient treatment program. The mother refused, stating she was attending Narcotics Anonymous meetings. A month after the infant's birth, the mother tested positive for opiates, and the intact family services agency referred the case to the local State's Attorney's office for court involvement. The case was accepted, but it was given a future court date. The baby died before the court date.

| Child No. 38 | DOB 1/16 | DOD 1/16 | Undetermined |
|---|---|---|---|
| Age at death: | 1 day | | |
| Substance exposed: | Yes, mother tested positive for cocaine, opiates, and marijuana | | |
| Cause of death: | Complications of prematurity with contributing conditions of maternal drug use and submersion in water at delivery | | |
| Reason For Review: | Closed intact family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Newborn infant, born prematurely at approximately 29 weeks gestation, died in the hospital. The infant's 31-year-old mother went into labor at home and gave birth into a toilet. The infant's 34-year-old father arrived home to the mother screaming and called 911. The baby was taken by ambulance to the hospital where he died several hours later. The coroner called the hotline to report the infant's birth and death and that the mother had tested positive for drugs. The Department took a report for investigation of death by neglect. At autopsy the infant tested positive for nicotine and levamisole (a veterinary medication commonly used as a cutting agent for cocaine). The pathologist noted that the infant's manner of death was difficult to ascertain between natural and accident because neither "acute drug intoxication (maternal) [n]or drowning" could be reasonably excluded. After a six month investigation, the Department indicated the mother for death by neglect, noting the mother was intoxicated and gave birth on a toilet submerging the infant into toilet water.

Prior History:     The mother has a history of substance use since the age of twelve and has engaged in substance addiction treatment on several occasions. In September 2014 during a well-being check, police found the mother intoxicated and her 9-year-old child not in school and without food. Police called the hotline and a report was taken for investigation of substantial risk of physical injury/environment injurious to health and welfare by neglect and inadequate food. The mother agreed to give her mother temporary guardianship of her son while she sought treatment. The report was indicated for substantial risk and an intact family services case was opened. The mother engaged in substance abuse treatment. The boy's father decided he wanted custody of the boy and the mother and grandmother agreed that the boy should live with his father and his family until the mother could provide a stable home for the child. The Domestic Relations Court awarded custody to the father and in April 2015 the intact family services case was closed.

| Child No. 39 | DOB 12/15 | DOD 1/16 | Undetermined |
|---|---|---|---|
| Age at death: | 4 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death; Closed intact family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Four-week-old infant who was napping with his 22-year-old father in an adult bed was found unresponsive when his father awoke approximately two hours later. The infant's 21-year-old mother was not at home. The coroner notified the Department of the infant's death. The Department took a report for investigation of death by neglect to the infant by his father and for substantial risk of physical injury/environment injurious to health and welfare by neglect to the infant's 25-month-old sister. The infant had been born by emergency cesarean section. He had DiGeorge Syndrome, a chromosomal disorder that can result in cardiac problems, autoimmune disorders, endocrinology dysfunction, and delayed development with emotional and behavioral problems. The baby had congenital heart defects and spent his first weeks of life in the hospital. At the time of his death he had a higher than expected amount of Tylenol in his system but it did not cause his death. After a four month investigation the father was unfounded for death by neglect and substantial risk of physical injury.

Prior History:     The family of four lived with the maternal grandmother and her children. In September 2015 police called the hotline to report that the grandmother had been arrested for battering her 18-year-old daughter while other children were present. Witnesses reported that the 18-year-old started a physical fight with her pregnant 21-year-old sister and the grandmother intervened. The grandmother was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to her 8, 9 and 17-year-old children who were present during the physical altercation. Two weeks before the call, an intact family services case was closed. The case had been opened in September 2014 to monitor the medical care and well-being of the 21-year-old mother's first child who was also born with DiGeorge Syndrome and congenital heart defects.

| Child No. 40 | DOB 6/05 | DOD 1/16 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 10 years |
| Substance exposed: | No |
| Cause of death: | Undetermined, autopsy pending |
| Reason For Review: | Child was a youth in care within a year of his death |
| Action Taken: | Investigatory review of records |

Narrative:        Ten-year-old medically complex boy was found unresponsive in the bathtub in approximately 2 inches of water by his 51-year-old relative guardian. The boy had cerebral palsy and a seizure disorder. He was blind, non-verbal, hard of hearing, and non-ambulatory. He loved to play in water and his guardian had placed him in the bathtub around 9:00am, heard him splashing around 11:15am, and when she checked on him an hour later, he was unresponsive. Police and hospital staff called the hotline. The Department took a report for investigation of death by neglect to the boy by his guardian. The child's autopsy report has not been completed and the child protection investigation remains open. The State's Attorney is waiting for the autopsy report to determine whether to file criminal charges. The guardian surrendered her foster home license.

Prior History:    When the boy was three months old, he was the victim of inflicted head trauma by his 24-year-old father. The infant was left severely compromised. The father was convicted of battery and served time. The 18-year-old mother participated in intact family services for one year and the child's medical care was monitored. In January 2010 when he was 4-1/2 years old, the boy was taken to the emergency room where he was discovered to have a leg fracture, rib fractures, internal injuries to his liver and spleen, and a questionable head injury. The mother and her 24-year-old boyfriend had no reasonable explanations for the child's injuries, stating he got his leg caught in a crib rail. They were both indicated for internal injuries and bone fractures by abuse. The child entered foster care with the couple's 16-month-old daughter. The children were placed with the little girl's paternal grandmother. In January 2013, the court returned the little girl, then four years old, to her mother's custody. In July 2015 the grandmother was made the boy's subsidized guardian.

| Child No. 41 | DOB 9/15 | DOD 2/16 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4-1/2 months |
| Substance exposed: | Marijuana |
| Cause of death: | Sudden Unexpected Death in Infancy |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:        Four-month-old infant was found limp and unresponsive in his playpen on his back around 8:30am by his 23-year-old father, who reported feeding him around 6:00am and placing him back into his playpen. The infant's 23-year-old mother attempted CPR and called 911. The infant was taken by ambulance to the hospital where he was pronounced dead. Police notified DCFS of the infant's death and the hotline took a report for investigation of death by abuse and for substantial risk of physical injury/environment injurious to health and welfare by neglect to the mother's 1-1/2-year-old son. The assigned child protection investigator never met with the family despite multiple and varied attempts to do so, such as visiting the home, making appointments with the mother by phone, contacting relatives, and attending a public aid appointment for which the mother did not show. An order to produce the child was issued without effect. After two and a half months the parents were unfounded for death by neglect. The infant's autopsy showed cardiac abnormalities and the pathologist noted it was not clear whether they caused or contributed to the infant's death. The mother was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to her toddler based on her refusal to allow DCFS to see the child and assess his safety.

CHILD DEATH REPORT

Prior History:   At the time of the infant's death there was a child protection investigation pending against the parents for bone fractures by abuse to the infant and for substantial risk of physical injury/environment injurious to health and welfare by neglect to both boys. The parents took the infant to the hospital because his right arm "wasn't working properly." He was found to have a non-displaced fracture to the mid-shaft of his humerus. The father told hospital staff that he had pulled the child by the arm toward him to change the baby's diaper. He told the child protection investigator that he also yanked the infant's arm out of a onesie that was too small. He told police he grabbed the infant by the arm and swung him onto his chest as he was laying on the floor. During the investigation the father went to jail on an unrelated charge, and it was believed he would be in jail for 30 days. Evaluation of the infant's fracture by an expert in child abuse was begun but not completed until after the infant's death. The doctor opined that much force was needed to break the infant's arm and it could not have been caused accidentally by the father being too rough with him. The father was indicated for bone fractures by abuse to the baby.

| Child No. 42 | DOB 11/15 | DOD 3/16 | Undetermined |
|---|---|---|---|
| Age at death: | 4 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Pending child protection investigation at time of child's death; open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Four-month-old infant was found unresponsive by his 30-year-old mother around 6:00am. The baby had been sleeping in a queen-sized bed with the mother and three siblings, ages 2, 4, and 6. The mother called 911 and the infant was taken by ambulance to the hospital where he was pronounced deceased. A hospital nurse called the hotline with notification of the infant's death and to advise that a coroner investigator was at the mother's home. The Department initiated a report for investigation of death by neglect. The intact family services worker accompanied the child protection investigator to interview the mother. The mother showed them how each child had slept in her bed: one at the foot of the bed, the infant on one side of her, and the other two children on the other side of her. She said the children normally did not sleep with her. The mother admitted to drinking alcohol the night before the infant's death, but did not say how much. After a seven month investigation the mother was indicated for death by neglect to the infant and substantial risk of physical injury to her other children because she admitted drinking alcohol. Shortly after the infant's death, the mother placed her children in the Safe Families program and engaged in a substance abuse treatment program. The children are back with their mother and continue to receive intact family services.

Prior History:     The family has been involved with DCFS since July 2012. The mother has three indicated reports, three unfounded reports, and one expunged report. Most of the reports involved the mother's oldest child whose severe behavior problems led to psychiatric hospitalization. The family's case was screened with the local state's attorney's office in December 2015 resulting in the opening of an intact family services case. The mother's eighth report, for substantial risk of physical injury/environment injurious to health and welfare by neglect, was pending at the time of the infant's death. The intact family services worker had called the hotline concerned about the mother. The mother, whom the worker believed had been drinking, called the worker stating she was tired and having a hard time. The mother struggled with transporting her children to school after having to move, and working with her oldest child's special needs. The intact family services worker regularly made unannounced visits, including visiting in the early morning to observe the mother's morning routine and provide suggestions. The investigation was unfounded after the infant's death.

| Child No. 43 | DOB 4/15 | DOD 3/16 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 11 months |
| Substance exposed: | No |
| Cause of death: | Complications of chronic renal disease due to congenital obstructive uropathy with malnutrition and unsafe sleep contributory factors |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:      Eleven-month-old medically complex infant was found unresponsive by his 22-year-old mother during a nap. The mother had laid the infant down on his side on her adult bed in a "nest" of blankets so he would not roll off the bed. He rolled over onto his stomach with his pacifier in his mouth. The mother called 911. At the emergency room medical personnel were able to obtain a pulse two different times through resuscitation efforts, but it could not be sustained. The infant had spent twelve hours nightly on a renal dialysis machine because of a congenital blockage of his urinary tract. He was fed through a gastrostomy tube. A child protection supervisor notified the hotline of the infant's death and a report was taken against the mother for investigation of death by neglect. The death investigation is still pending after nine months; the investigator is awaiting a decision by the local state's attorney on criminal charges and the state's attorney is waiting for a report from the Illinois State Police. The deceased was an only child.

Prior History:      An August 2015 allegation of medical neglect was unfounded against the mother after she, the child's doctor, and an early intervention professional agreed there had been miscommunication about the infant's need for a developmental assessment. Another allegation of medical neglect, reported at the end of September 2015 was indicated based on the mother missing two specialist appointments and concerns the infant was not getting the proper medical treatment at home. The hospital where the infant received his care set up transportation services for the mother. She declined intact family services from the Department. In February 2016 an investigation was initiated against the 24-year-old father for substantial risk of physical injury by abuse. The father, who did not live with the mother and infant, threatened to kill the mother and infant and struck the mother in the head. He was arrested for domestic battery and the mother obtained an order of protection. The father explained to the investigator that he was tired and stressed after a long week at the hospital where the infant had been treated for failure to gain weight; he wanted the mother to care for the baby but she had left the baby with him. The father had called relatives saying he was frustrated. The paternal grandmother took the father and the baby to the mother's home, and the father attacked the mother when they arrived. The father was indicated on the investigation following the infant's death.

| Child No. 44 | DOB 2/09 | DOD 3/16 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 7 years |
| Substance exposed: | No |
| Cause of death: | Gunshot wound to the chest |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

CHILD DEATH REPORT

Narrative:      Seven-year-old boy died of a gunshot wound to the chest around 4:00pm. He, his 6-year-old cousin, and his 1-1/2-year-old brother were being cared for by their grandmother while their mother was out shopping. The grandmother, who was in her room with the toddler, heard a shot and discovered the 7-year-old had been shot. He was taken by ambulance to the hospital where he was pronounced dead. Police, hospital staff, and the coroner called DCFS to report the child's death. The hotline took a report against the grandmother and the mother for investigation of death by neglect and against the grandmother for substantial risk of physical injury and inadequate supervision of the other two children in the home. The 6-year-old cousin reported that the 7-year-old boy's 10-year-old brother had put the gun in a dresser drawer in the boy's mother's room and then left the house to go to a cousin's. There were inconsistent reports of whether the boys found the gun outside or whether it was given to them by a young friend. After the brother left, the boy and his cousin went into the mother's room and the 7-year-old boy took the gun out of the dresser and pulled the trigger. Police described the neighborhood as being unsafe with eleven gun calls in four days involving the family's block alone. Police did not track the source of the gun that killed the child. The grandmother and mother were unfounded on the report. The child protection investigator provided the family with referrals for counseling.

Prior History:    In January 2016 an employee at a counseling center called the hotline to report that the deceased's 30-year-old mother had brought her 6-year-old nephew in for an appointment and while they were in the waiting room, she got upset with her nephew and slapped him on the back of his head. The employee worried about how the aunt might treat the boy in private if that was how she treated him in public with someone watching. A report was taken for investigation of substantial risk of physical injury by abuse against the aunt to her nephew. The investigation was pending at the time of the boy's death; an investigator had unsuccessfully made attempts to meet with the family. The investigation was unfounded eight days after the boy's death.

| Child No. 45 | DOB 3/15 | DOD 4/16 | Undetermined |
|---|---|---|---|
| Age at death: | 13 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Pending child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Thirteen-month-old toddler was found unresponsive around 8:00am laying face up on the floor next to a mattress by his 13-year-old sister who alerted their 33-year-old mother. The mother called 911 and the toddler was taken to the emergency room where he was pronounced deceased. The mother reported the child had a cold and runny nose a few days earlier. The mother had fed the child a bottle around 5:00am and laid the child back on the mattress on the floor where he was sleeping with two siblings, ages 5 and 13. Police and the coroner called the hotline to notify the Department of the child's death and that they were investigating and conducting a scene investigation. The coroner noted there were no outward signs of abuse or neglect. The hotline took a report for investigation of death by neglect and for substantial risk of physical injury by neglect to the mother's eight surviving children. The toddler was a twin, born prematurely at 27 weeks gestation. He and his twin were the mother's third set of twins and he was the second of the mother's children to die; four years earlier another twin died at two months of age in the hospital. After six months, the mother was unfounded for death by neglect and substantial risk. The pathologist noted in the child's autopsy report that "although it is very likely this death is via natural causes (via bronchopneumonia, or cardiac dysrhythmia due to ion channelopathy), asphyxia causes (suffocation due to overlay or blanket covering face, or smothering) are also possible, but cannot be confirmed or excluded." Developmentally, the toddler was able to lift and turn his head side to side, roll, scoot, crawl, stand alone, and walk with help.

Prior History:    In December 2015 the mother called emergency services after smoking marijuana that she believed was laced with something because it made her highly intoxicated. The mother was taken to the hospital in an ambulance and police called the hotline after they realized there was no one in the home to watch the children. The mother's 11-year-old child called an aunt who came to get the children. The hotline took a report for investigation of inadequate supervision and environmental neglect as police described the home as filthy with no toilet paper and a foul smell. A child protection investigator visited the following day and noted there was toilet paper in the home. She conducted a home safety checklist and observed play pens for the babies. The investigator referred the mother for a substance abuse assessment. Five days after the toddler's death, the investigation was indicated for inadequate supervision and unfounded for environmental neglect. After the mother appealed the Department reviewed and reversed its indicated finding to unfounded.

| Child No. 46 | DOB 1/16 | DOD 4/16 | Undetermined |
|---|---|---|---|
| Age at death: | 3 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Split custody (siblings in foster care) | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Three-month-old infant was found unresponsive around 12:15am by his 26-year-old mother who was awakened by the 27-year-old father getting up to use the bathroom. The infant had been sleeping in a queen-sized bed between his parents. He was placed on top of a standard size pillow that was covered with two fleece baby blankets. He was laid on his side with a cotton baby blanket rolled and positioned behind him. The baby was found lying on his stomach. The mother called 911 and the baby was taken to the hospital where he underwent resuscitative efforts for approximately four hours before expiring. The coroner notified the hotline of the infant's death. A report was taken for investigation of death by neglect and substantial risk of physical injury/environment injurious to health and welfare by neglect to the infant and his 2-year-old sister. The 2-year-old was screened into court at the request of an assistant state's attorney but a judge found no probable cause or urgent and immediate necessity existed to remove the child. She was placed in a safety plan with her maternal grandmother for three and a half months. The investigation was unfounded after five months. The pathologist who conducted the infant's autopsy noted, "only a mild pneumonia was identified, which may have developed during the resuscitative efforts in the hospital. Because asphyxia may not cause any anatomic changes, and given the unsafe sleeping environment, asphyxia cannot be excluded as a cause of death or factor contributing to death."

Prior History:    The mother has two children in foster care. The children were taken into custody in February 2013, at the ages of one and three, after the mother was arrested for the third time for child endangerment related to her inadequate supervision of the children. In January 2014 the mother gave birth to her third child and concealed the child's existence from her caseworker and the court for approximately one year. The state's attorney filed a motion to take the child into custody, but the judge allowed her to remain with her mother under an order of protection. The mother had participated in services, including parent training, a substance abuse assessment, and individual and family counseling. The mother has unsupervised visits with the children and they have goals of return home.

| Child No. 47 | DOB 2/16 | DOD 6/16 | Undetermined |
|---|---|---|---|
| Age at death: | 3-1/2 months | | |
| Substance exposed: | Marijuana | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Three-month-old infant was found unresponsive by her 19-year-old mother. The mother called 911 and the infant was taken to the hospital where she was pronounced dead. Police called the hotline and a report was taken for investigation of death by neglect. The infant's death was investigated by the Southern Illinois Child Death Investigation Task Force. Mother told the coroner that she slept with the infant in an adult bed. She fed the infant at 8:30am and then laid her back on the bed to go get ready to go out. When she returned the infant was unresponsive in the same position in which she had been placed. The 23-year-old father had just returned home from borrowing a car and found the mother screaming with the infant in her arms. The mother said she always slept with the infant because of a "near SIDS" event in April 2016. The father was taken straight to the police station for questioning. He was there for hours and after the interview he was told his daughter had died. He gave police permission to search the home where police found bottles of Nyquil. The father's 3-year-old son who had been visiting underwent a medical exam and an interview at the CAC. At autopsy the infant had no evidence of trauma and no drugs were found in her system. The child protection death investigation is still pending after six months as local law enforcement and DCFS await information from the Southern Illinois Child Death Investigation Task Force.

Prior History:        In April 2016 the father was investigated for substantial risk of physical injury/environment injurious to health and welfare by neglect to the infant after she had a near-SIDS experience. At the emergency room, the father's 3-year-old son said his dad had dropped the baby. The father denied dropping the baby and the mother reported she never heard anything that sounded like a drop nor did she hear the baby cry. Instead, when she got out of the shower and checked on the infant, she found her unresponsive. An EMT was able to revive the infant. The infant had no visible injuries and a brain MRI, abdominal sonogram, and skeletal survey were normal. The parents admitted to smoking marijuana. The investigation was unfounded with no services needed. A second investigation against the father was initiated eight days later when the 3-year-old son returned to his mother's home with scratches and a bruise on his buttocks. The boy had what appeared to be claw mark scratches on his left arm and right thigh and a bruise with scratches on his buttocks. The boy told the investigator that the cat at his dad's house caused his injuries. His step-mother said he had been pulling on the cat and the cat responded by jumping on him. His step-grandmother reported she had witnessed the boy let out a scream and the cat run away. The investigation was pending at the time of the infant's death and subsequently unfounded.

| Child No. 48 | DOB 1/16 | DOD 6/16 | Undetermined |
|---|---|---|---|
| Age at death: | 5 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined, autopsy pending | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Five-month-old infant was found unresponsive by his 31-year-old mother around 8:00pm. She said she last checked on the infant five hours earlier when she propped the baby up with a bottle. Mother took the infant to the hospital where he was pronounced dead. The infant had old bruising around his forehead and bruising on his buttocks. Police notified the hotline and an investigation was initiated against the mother for death by neglect. Later that day, a family member called the hotline to report the infant had died while in the care of his 11-year-old sister who had been left alone to care for the baby, a 1-1/2-year-old sister, and a 9-year-old brother while their mother was out with a friend getting her van fixed. The 11-year-old had called her aunt crying that her mother was not home and she could not get her baby brother to breathe. The hotline added an allegation of inadequate supervision to the report. That night the police called the hotline again to report they had taken limited custody of the siblings and that mother's male roommate was added as a suspect to the child's death. The Department added allegations of death by neglect and substantial risk of physical injury by neglect/environment injurious to health and welfare by neglect to the children by the roommate. The children are placed in foster care with relatives. In a victim sensitive interview, the 11-year-old girl said she was babysitting her 1-1/2-year-old and 5-month-old siblings from about 12:00 to 8:00pm. Her 9-year-old brother was not home. The coroner reported the infant had extensive bruising to his face, arms, legs, scrotum, and buttocks. The infant also had a skull fracture. The autopsy report is not completed. Police and DCFS investigations are pending. The 11-year-old girl has legal representation.

Prior History:    The two older siblings' father was indicated in December 2014 for sexual penetration and sexual molestation of his 14-year-old niece and for substantial risk of sexual injury to his nephews and his two children. In April 2015, the youngest sibling's paternal grandmother called the hotline to report that the mother leaves the 7-month-old baby to be cared for by 7, 11, and 12-year-old children in the home. A report was taken for investigation of inadequate supervision. The baby's father called the hotline four days later with the same report. The family was living with their mother's friend and her children. Both mothers and the children denied that they were left without an adult caretaker and a neighbor (who later became the mother's roommate) told the investigator that he took care of the children if the mothers could not be there. The mother had recently left the father and showed the investigator the father's texts threatening to call DCFS to make her childless. The investigations were unfounded. In October 2015 police called the hotline to report the mother's 3-year-old nephew had been found walking down the street by himself. The nephew unlocked the door and left the house while everyone else was sleeping. The family child-proofed the doors and the investigation was unfounded.

| Child No. 49 | DOB 4/16 | DOD 6/16 | Undetermined |
|---|---|---|---|
| Age at death: | 6 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

CHILD DEATH REPORT

Narrative: Six-week-old infant was found unresponsive around 7:00am by his 27-year-old mother. She woke up to feed him and he wasn't breathing. She put him in his car seat and then left him there in her bedroom in a house she shared with others. When a roommate came home for lunch she told him the baby was dead. A friend of the roommate who had accompanied him home went into the bedroom, tried to do CPR and called 911. Paramedics worked on the infant and took him to the hospital where he was pronounced dead. The mother could not explain why she did not call for help after finding the infant unresponsive other than that she was scared. Police called the hotline with the information noted above. The Department took a report for investigation of death by abuse. The mother reported she was at a barbeque with the baby all day and drank 4-5 beers over ten hours. A friend drove them home around 8:00pm and she took the baby out of his car seat and placed him in her twin-sized bed. She fell asleep in the same bed around 1:00am. When she awoke in the morning she noticed the baby was unresponsive and had blood coming out of his nose so she put him in his car seat hoping it would stop. She was scared and drank two beers after finding her son unresponsive. After a four and a half month investigation, the mother was indicated for death by neglect.

Prior History: The mother has a history of alcohol abuse and domestic violence. In April 2015 an intact family services case was opened after the mother and her boyfriend were indicated for substantial risk of physical injury to the mother's 1-1/2 and 7-year-old children. The boyfriend had stabbed the mother in the hand while intoxicated. Four months later the family's caseworker found the children home alone and put them in a safety plan with an aunt. The mother made arrangements for an out of state relative to take custody of the children. The children are in the private guardianship of the relative. In February 2016 the 8-year-old child disclosed to the relative that she had been previously sexually abused by her mother's boyfriend and also by her adult cousin, the son of the aunt she had stayed with under a safety plan. Although the cousin had no criminal history of violence or sexual assault, the child described the cousin, aunt and mother all drinking together during the prior intact family services case. Both perpetrators were indicated for sexual abuse based on a victim sensitive interview with the child. There is an open police investigation.


## ACCIDENT

| Child No. 50 | DOB 4/15 | DOD 7/15 | Accident |
|---|---|---|---|
| Age at death: | 3 months | | |
| Substance exposed: | No | | |
| Cause of death: | Closed head injury due to motor vehicle accident | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Three-month-old infant was removed from life support; he died the following day and his organs were donated. Three days before he died, the infant was ejected, buckled in his car seat, from a vehicle being driven by his 20-year-old father. The father did not yield to traffic and the vehicle was struck on the passenger side where the infant was seated in his car seat. The front passenger, the parents' friend, died at the scene. The 20-year-old mother, who was in the back seat with the infant, sustained minor injuries. The father sustained critical injuries, but survived. The deceased was the couple's only child. The father has a 4-year-old daughter. A police investigation is open and a child protection death investigation is pending against the father after seventeen months as the Department waits to find out whether and what charges will be brought against the father.

Prior History:    In December 2014 police were called about a domestic altercation. The father had gone to his 2-year-old daughter's great-grandmother's home where he knew the child was visiting with her mother who was intoxicated. The mother threatened to kill herself if the father took the child from her. The grandmother took the child to another room and called police. When police arrived the mother was battering the father. The mother was taken to the hospital for assessment. She was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect and referred to community services.

| Child No. 51 | DOB 5/15 | DOD 8/15 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2-1/2 months |
| Substance exposed: | Marijuana |
| Cause of death: | Suffocation |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:    Two-month-old infant was found unresponsive by her 20-year-old mother around 10:00am. The mother had been sleeping with the infant on a couch. The mother and a friend took the baby to the hospital where she was pronounced dead. A nurse at the hospital called the hotline to report that the mother admitted to smoking marijuana and drinking alcohol the night before and then sleeping with the baby. The nurse said police were already at the hospital and the coroner had been contacted. DCFS took a report for investigation of death by neglect and substantial risk of physical injury/environment injurious to health and welfare by neglect. The Southern Illinois Child Death Investigation Task Force also investigated. The mother admitted to driving around in a car with friends the night before, drinking and smoking marijuana, with her infant and 1-1/2-year-old son in the car. They got home around 4:00 or 5:00am and she went to sleep with her children on the couch. The mother was indicated for death by neglect and for substantial risk of physical injury/environment injurious to health and welfare by neglect to her surviving child. He was placed in foster care with a relative. The mother has signed consents for the child to be adopted by the relative.

Prior History:    The hotline was called when the deceased was born because she tested positive for marijuana and PCP. Because the mother denied PCP use and tested positive for marijuana only, the infant's pediatrician consulted with the local children's hospital who believed the result was a false positive and did not recommend further testing. A child protection investigator observed the home where the mother was living with a cousin and found it to be appropriate. It had a crib for the baby. The mother moved in with a friend prior to the investigation being unfounded for substance misuse and that home had a pack n play.

| Child No. 52 | DOB 2/15 | DOD 8/15 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 5 months |
| Substance exposed: | No |
| Cause of death: | Asphyxia secondary to unsafe sleeping conditions with contributing factor of large old left frontal cerebral infarct |
| Reason For Review: | Closed child welfare services referral within a year of child's death |
| Action Taken: | Investigatory review of records |

CHILD DEATH REPORT

Narrative:      Five-and-a-half-month-old infant was found unresponsive around 8:30am by an 8-year-old member of his household. The girl reported that she heard the infant crying and went to check on him. He had been sleeping on the couch. The girl said she picked him up and tried to give him a bottle, but he didn't want it. She rocked him to sleep and then placed him on his stomach in his pack n play. When she checked on him later he wasn't breathing. The deceased and his 30-year-old mother were living with the 8-year-old girl, her two siblings, and their 28-year-old mother. Police, who responded to the 911 call, called the hotline to report the infant had a bite mark on one leg and small cuts on the other leg. He noted the crime scene unit was en route. The hotline took a report for investigation of death by abuse; cuts, bruises, and welts by abuse; and substantial risk of physical injury/environment injurious to health and welfare by abuse. After five and a half months the mother was unfounded for death by abuse; cuts, bruises, and welts by abuse; and substantial risk because the marks on the infant were believed to be bug bites or self-inflicted nail marks. The infant had some medical problems, including a seizure disorder for which he took medication. The infant's autopsy report noted that a large old left frontal cerebral infarct appeared to represent a contributing factor to the infant's cause of death. The mother was indicated for environmental neglect because of the unsanitary condition of the home, including a cockroach infestation. The infant's pack n play was filled with diapers, a blanket, a bottle, toys, a plastic bag containing personal hygiene items and medication bottles, and a wallet.  Cockroaches were crawling throughout it.

Prior History:  In June 2015 the mother called the hotline to report that she, her 4-year-old daughter, and the deceased had been living with friends, but the friends were moving and the landlord had given her two weeks to move out. She said she had nowhere to go and could not stay at a shelter because she was a registered sex offender. She had a conviction for promoting the juvenile prostitution of her 15-year-old sister. The mother said that in 2006, at age 21, she pleaded guilty to protect her sister. She had to register as a sex offender until May 2016.  A child welfare services referral was initiated and a worker met with the mother ten days later. Prior to the visit, the mother had sent her daughter to live with the maternal grandmother. Another child was already living with an aunt. The worker reviewed community resources with the mother, including a list of financial resources, but told the mother the Department could not open an intact family services case because of budget issues.

| Child No. 53 | DOB 1/15 | DOD 8/15 | Accident |
|---|---|---|---|
| Age at death: | 7 months | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to unsafe sleep environment | | |
| Reason For Review: | Unfounded child protection investigation with a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Seven-month-old infant was found unresponsive around 10:00am by his 14-year-old sister in a king-sized bed that he had been sharing with four siblings, ages one-and-a-half to ten. The infant was pronounced deceased at the residence and the coroner notified DCFS. There were no outward signs of abuse. The 30-year-old mother reported the infant was last seen alive around 2:30am when the 14-year-old fed him a bottle and placed him back in bed. The Department took a report for investigation of death by neglect and for substantial risk of physical injury to the mother's five surviving children. The Southern Illinois Child Death Investigation Task Force also investigated. The mother was unfounded for death by neglect and for substantial risk of physical injury. She was indicated for inadequate supervision of the infant because investigation showed that the older children were largely responsible for the infant's care. The mother agreed to accept services and an intact family services case was open from August 2015 to August 2016. The mother completed in-home parenting classes, received funds to establish stable housing, and followed through with mental health services for her teen daughter.

Prior History:      The family had five unfounded investigations from August 2013 to April 2015. Three of the investigations were available for review (the other two had been expunged). The investigations involved the teen daughter making and recanting allegations of sexual abuse and pregnancy by various individuals. School personnel, police, and mental health professionals were consulted during the investigations and believed the teen had mental health problems that the mother was attempting to address in counseling. The other children denied any abuse or neglect in their home.

| Child No. 54 | DOB 6/15 | DOD 8/15 | Accident |
|---|---|---|---|
| Age at death: | 2 months | | |
| Substance exposed: | Marijuana | | |
| Cause of death: | Asphyxia due to unsafe sleep environment | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Two-month-old infant was found unresponsive in his crib around 11:30am by his 28-year-old mother who called 911. The responding police officer notified the hotline of the infant's death. He said the mother reported that she had bipolar disorder and after she placed the infant to sleep in his crib she took a prescribed Xanax and went to sleep. The officer said there was a soft pillow in the infant's crib and the mother said that when she found the infant he was on his side with his mouth halfway on the pillow. He said there were no blatant signs of abuse or neglect to the infant. DCFS took a report for investigation of death by neglect and for substantial risk of physical injury/environment injurious to health and welfare by neglect to the mother's 4 and 6-year-old daughters. The coroner also called the hotline. He reported the mother had changed her story and that all three children had been sleeping in her bed. She woke up at 10:00 and made the girls breakfast and then checked on the baby and found him unresponsive. She said that at some point during the night she had put the baby in his crib, but at another point put him back into her bed. The information was added to the investigation. The mother was questioned at the police station and reported the infant had been in her bed from about 2:00am to 6:30am. The girls had victim sensitive interviews at a child advocacy center; neither reported abuse or neglect. After five months, the investigation was unfounded for death by neglect and substantial risk of physical injury/environment injurious to health and welfare by neglect.

Prior History:   Prior to the infant's birth, in May 2015, the mother was investigated and unfounded for substantial risk of physical injury/environment injurious to health and welfare by neglect to her 4 and 6-year-old daughters. The 6-year-old girl had told her school social worker while crying uncontrollably that her mother had whooped her with a belt two days earlier and she was afraid to go home because she would get whooped again. A child protection investigator interviewed the child with the social worker and observed her to have serious mood swings during the interview from crying to defiant to happy. She asked for her "mommy" during the interview. She denied being scared of her mother and said her mother kept her safe. The investigator looked over the child and did not see any signs of injury. The social worker said the mother had been cooperative with school in the past. The girl's 4-year-old sister was interviewed; she said her mother was nice, she wasn't afraid of her, and she didn't get whooped. The girls had been seen by their primary care physician without concern in February 2015.

| Child No. 55 | DOB 4/15 | DOD 10/15 | Accident |
|---|---|---|---|
| Age at death: | 6 months | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to prone sleeping position in soft adult bedding | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Six-month-old infant was found unresponsive by his 50-year-old babysitter around 6:00am. The infant had been sleeping in an adult bed with the babysitter, who said she found him face up without any bedding obstructing his breathing. She last saw him alive around 1:00am when he lost his pacifier and she put it back in his mouth. The infant's mother had asked her to keep the infant and his 7-year-old sibling overnight because she had a date. Police notified the hotline of the infant's death, stating there were no signs of abuse or neglect to the deceased, his sibling or the babysitter's 14-year-old son. DCFS took a report for investigation of death by neglect which was unfounded after two months.

Prior History:    In April 2015 the infant's 22-year-old mother was investigated and unfounded for the allegation of inadequate shelter. The 7-year-old's father reported having heard that his child and the mother were sleeping in parks. The boy was interviewed at school and reported that he, his mother, and his brother lived with his grandmother. The investigator later went to the home and interviewed the mother and observed the infant, who appeared healthy. The mother confirmed that she and her children lived with her family.

| Child No. 56 | DOB 9/15 | DOD 10/15 | Accident |
|---|---|---|---|
| Age at death: | 12 days | | |
| Substance exposed: | No | | |
| Cause of death: | Pulmonary edema and congestion due to asphyxial event due to positional asphyxiation | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Twelve-day-old infant was found unresponsive around 6:00am by her 24-year-old mother. Earlier, the infant's 23-year-old father had fed her and held her as he sat in a recliner chair. They both fell asleep. When the mother checked on them, she noticed that the father did not appear to be holding the infant's head correctly. The parents called 911 and the infant was taken to the hospital where she was pronounced deceased. Police notified the Department of the infant's death. A report was taken for investigation of death by abuse and for substantial risk of physical injury by neglect to the couple's 21-month-old and 4-year-old children, who were taken into custody and placed with their paternal grandmother. The parents, who had hidden the infant's pregnancy and birth from their intact family services worker, were unfounded for death by abuse, but indicated for substantial risk of physical injury by neglect to the two surviving children because of ongoing concerns about substance abuse, mental health issues, and truthfulness of the parents.

Prior History:     In September 2014 the parents were arrested for stealing prescription medication. The couple's two children were with the paternal grandparents at the time. In addition to having substance abuse issues, the parents admitted to domestic violence. They were indicated for substantial risk of physical injury by neglect. An intact family services case was opened. In January 2015 police called the hotline to report they had been to the home multiple times in the past 24 hours for domestic violence concerns. The Department began an investigation of substantial risk of physical injury by neglect. The child protection investigator and the intact family services worker agreed to put the children in a safety plan with the paternal grandmother while the intact family services worker filed a petition seeking custody of the children. By May 2015 the petition had still not been heard and the parents had engaged in services, so the safety plan was ended and the children returned to their parents' care. The worker planned to request court supervision instead of custody when the petition was heard.

| Child No. 57 | DOB 7/15 | DOD 10/15 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 months |
| Substance exposed: | No |
| Cause of death: | Suffocation due to positional asphyxia |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:     Three-month-old infant was found unresponsive face down by his 20-year-old mother about an hour after she placed him down for a nap. Police responded to the mother's 911 call and found an infant who was clean, had no marks or injuries, and appeared well-cared for. Neither the mother nor the 23-year-old father appeared to be under the influence of alcohol or drugs. The mother reported placing the infant in a playpen to take a nap. She placed a sleeping bag inside the playpen for added padding and comfort. Also in the playpen were a bottle and two toys. Five days after the death, police called the hotline to report environmental concerns about the home, including trash and dirty diapers throughout the home, clutter, and marijuana pipes. The playpen was said to be adequately clean. Police said they did not notify the Department earlier because they did not need DCFS's assistance and they wanted the family to have time to grieve before DCFS went out. In addition to accepting the police report of environmental neglect, DCFS added and investigated an allegation of death by neglect to the infant by his parents and substantial risk of physical injury/environment injurious to health and welfare by neglect to the couple's 14-month-old son. Two-and-a-half months later, the parents were unfounded for the infant's death, but indicated for environmental neglect and environment injurious. Following the infant's death, the parents placed their toddler in the guardianship of his paternal grandparents so they could work through personal issues including the death of their child.

Prior History:     In May 2015, two months before the infant's birth, an anonymous reporter called the hotline alleging the family's home was not sanitary and was unsafe for the couple's young child. The same day, a child protection investigator visited the home and found it to be in acceptable environmental condition. The couple's 9-month-old infant was clean. The parents shared threatening and vulgar text messages from the same telephone number as the anonymous reporter. The investigation of environmental neglect was unfounded based on the observed condition of the home; the report was believed to have been falsely made to harass the family.

| Child No. 58 | DOB 11/08 | DOD 12/15 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 7 years |
| Substance exposed: | No |
| Cause of death: | Carbon monoxide intoxication due to inhalation of smoke and soot due to house fire |
| Reason For Review: | Child was a youth in care |
| Action Taken: | Investigatory review of records |

CHILD DEATH REPORT

Narrative:      Seven-year-old girl died in a fire between 8:30 and 9:30am in the relative foster home of her maternal grandmother. After the fire started, the 47-year-old grandmother grabbed the 7-year-old and her 8-year-old sister and started to run out of the house, but something fell on her back causing her to fall and lose her grip on both girls. When she got outside her 7-year-old granddaughter was not with her. The girl's 25-year-old uncle ran back into the home, but he was unable to find her among the smoke and flames. He and the grandmother suffered burns in the fire. The fire is believed to have been caused by a hair dryer underneath some blankets. At the time of the girl's death, the grandmother was in the process of becoming a licensed foster parent and a fire evacuation plan had been executed and signed four days prior to the child's death. DCFS was notified of the child's death by the agency servicing the sisters' case. The hotline did not take a report for investigation. The grandmother is in the process of adopting her surviving granddaughter. The girl's mother signed specific consents for the adoption and the father was found unfit.

Prior History:      The deceased and her sister entered foster care in February 2014 after they were found walking barefoot outside without adult supervision in below zero temperatures after a snowstorm. They had slept through the night in a truck and awoke cold and without their 24-year-old mother. The girls were placed with their paternal grandparents until May 2015 when allegations of corporal punishment prompted their removal. In June 2015 they were placed with their maternal grandmother.

| Child No. 59 | DOB 9/14 | DOD 1/16 | Accident |
|---|---|---|---|
| Age at death: | 16 months | | |
| Substance exposed: | No | | |
| Cause of death: | Probable asphyxia due to unsafe sleeping environment | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death; unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Sixteen-month-old child was found by his 17-year-old mother around 11:45pm wedged between the wall and the mattress of an adult bed. The mother had placed the toddler on the bed around 11:00pm at her sister's home during a family get-together. The mother called 911 and paramedics transported the toddler to the hospital where doctors pronounced him deceased. Police documented that the toddler was placed on a queen-sized bed pushed up against the wall. There was a 6-8 inch wide gap between the bed and the wall. The bed had an oversized comforter extending into the gap that the toddler had vomited on. The boy's mother had placed a pillow in the gap near the head of the bed, but she found her son wedged in the gap near the foot of the bed with his back to the wall and his face against the mattress. The mother was distraught over the death of her only child and had to be sedated and hospitalized. The coroner called the hotline to notify the Department of the toddler's death. The Department took a report for investigation of death by neglect. It was unfounded two months later.

Prior History:      The hospital where the 16-year-old mother gave birth called the hotline after the infant's birth because the teen and the father refused to give the father's age and he appeared to be in his late 20s. A report was taken against the father for sexual penetration to the mother because the teen was living with the father (otherwise only a police investigation would have been appropriate). The report was unfounded. The maternal grandmother reported she did not know about the relationship until after her daughter was pregnant and did not know how old the father was. The parents refused to reveal the father's age saying the relationship was consensual and he did not know her age when they began the relationship. The teen agreed to return home to live with her mother. In October 2015 the teen called the police to report the sexual molestation of her 12-year-old sister by their maternal grandfather. Police called the hotline. The grandfather had an earlier indicated report of sexual molestation to a cousin of the sisters. The girl was consistent in her accounts and the grandfather was indicated for sexual molestation of the girl and substantial risk of sexual injury to the girl and the grandfather's 15-year-old daughter. The teen was not indicated as an alleged victim because she was living with paternal relatives and was not a member of the household where the abuse occurred.

| Child No. 60 | DOB 10/98 | DOD 1/16 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 17 years |
| Substance exposed: | No |
| Cause of death: | Multiple drug intoxication (fentanyl, heroin, alprazolam) |
| Reason For Review: | Pending child protection investigation at time of teen's death |
| Action Taken: | Investigatory review of records |

Narrative:       Seventeen-year-old girl was found unresponsive and cold by her 17-year-old boyfriend around 11:00am. The two had come home around 3:00am and gone to bed. Her 43-year-old father checked on them and found them sleeping before he left early in the morning. Police, who responded to the boyfriend's 911 call, found drugs in the home. Cell phone video showed the girl snorting a white powder she may have thought was cocaine, but was actually heroin. The child protection investigator of a pending report notified the hotline of the teen's death. The Department did not conduct a child protection investigation of the teen's death.

Prior History:       In August 2015, while psychiatrically hospitalized, the teen alleged her father had beaten her with a belt and the hospital called the hotline. A child protection investigation revealed a depressed, out of control teen who used drugs. Her parents were divorced and she lived with her father who took her to the hospital because he could not control her behavior. He denied abusing his daughter and she recanted the allegation. Local police were involved with the family and had referred them to services. The investigation was unfounded for cuts, bruises, and welts by abuse. In November 2015 the police called DCFS to request services for the family, but the father refused, stating his daughter was already in treatment. In December 2015 a juvenile probation officer called to report the father and daughter had gotten into an altercation and the teen had a bruised eyelid that she said was from her father hitting her. The teen reported her father had been drinking and they got into an argument about her drug use and she broke a computer and a window. The teen went to stay temporarily with her mother, but was back with her father at the time of her death. The investigation was unfounded after the teen's death as the injury was believed to have occurred during the father's attempt to calm the teen during an argument.

| Child No. 61 | DOB 9/15 | DOD 1/16 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 months |
| Substance exposed: | No |
| Cause of death: | Suffocation due to unsafe sleep conditions |
| Reason For Review: | Indicated child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:       Three-and-a-half-month-old infant was found unresponsive around 10:00am by her 34-year-old father. The father had fed the baby a bottle around 6:00am and then went to lie down in the living room. The infant still seemed hungry, so the 34-year-old mother fixed a second bottle, propped the infant up on a pillow on the parents' bed and used a folded comforter to prop the bottle up on the baby's chest. The mother then joined the father in the living room and fell back asleep. When the father awoke and discovered the infant, the comforter was over her face and it had vomit on it. Police notified the hotline with a request that DCFS check the 4 and 5-year-old siblings' welfare. The hotline took a report for investigation of death by neglect. Both parents were indicated for death by neglect with the rationale that the baby died from an unsafe sleeping arrangement. They were also indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to their two other children because the father used methamphetamines and had hid them behind a couch cushion where the children could have found them. The parents refused intact family services, but the father did start drug treatment. He suffered from narcolepsy and reported using methamphetamines to stay awake so he could help the mother with the children. The parents had family support and the children were in school.

Prior History:     The family had two prior reports with the Department. In December 2014 the parents were indicated for inadequate supervision after they left their 4-year-old son alone in a running car in an alley for at least 15 minutes while they argued inside a house. Both parents were indicated for inadequate supervision and the investigation was closed with no services needed. In November 2015 the parents were investigated for sexual abuse after their younger son, then 4, told someone at school he had to touch his mom's pee pee when he slept with his parents and he was scared; the class was learning about feelings. Both boys underwent forensic interviews with no disclosure of sexual abuse. The 4-year-old boy reported he may have accidentally touched his mother's pee pee with his toe. The investigation was unfounded.

| Child No. 62 | DOB 9/15 | DOD 2/16 | Accident |
|---|---|---|---|
| Age at death: | 5 months | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to overlay | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Five-month-old infant was found unresponsive by his 21-year-old mother around 10:00am when she awoke. The mother had last seen the baby alive around 3:00am when she took him out of his car seat and fed and changed him. She laid down on the couch, placed the baby on her chest, and patted him on the back. She fell asleep before she could put him back in his car seat. When she awoke, the infant was underneath her and unresponsive. The mother ran with the baby to a nearby police station. Police called the hotline to report what had happened and that the mother and the 17-year-old father were being questioned by police. The Department took a report for investigation of death by neglect and substantial risk of physical injury by the mother to her 2 and 6-year-old children, who were being cared for by their grandmother since their brother's death. The mother reported that the infant normally slept in his car seat or on her chest because his bassinette broke during a recent move to her aunt's home. The Southern Illinois Child Death Investigation Task Force also investigated. DCFS's child protection death investigation remains pending after nine months because the task force has not completed its investigation. In March the mother moved into her mother's home and a preventive services case was opened. Her worker helped the mother enroll her 6-year-old in an after-school program and the mother in parenting classes, provided a toddler bed for the 2-year-old, and offered assistance with obtaining housing and grief counseling.

Prior History:     In August 2015 the mother's 12-year-old sister told a school staff member that the mother, her older sister, had pulled her hair, pushed her to the floor, and punched her in the face. School staff called the hotline and a report was taken for investigation of cuts, bruises, welts by abuse to the 12-year-old by her 21-year-old sister. Three siblings, ages 9, 11, and 15, denied that that the older sister hurt the younger one, reporting that she frequently lied about being hurt. The 21-year-old denied hurting her sister as did the children's mother who reported the child had some mental health concerns – during the investigation, the child, while on a school trip, jumped off a bus threatening to run into traffic to commit suicide. The report was unfounded.

| Child No. 63 | DOB 9/15 | DOD 2/16 | Accident |
|---|---|---|---|
| Age at death: | 4 months | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to unsafe sleeping conditions | | |
| Reason For Review: | Closed intact family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Four-and-a-half-month-old infant was found unresponsive around 8:30pm by his 26-year-old mother. She had fed him a bottle around 6:30pm and laid him face up in a playpen. The playpen was lined with two cotton blankets and a fleece baby blanket on top of a thin mattress pad. The baby was covered by a fleece baby blanket up to his chest. When the mother checked on the baby she found him face down. A family member called 911 and the baby was taken to the emergency room where he was admitted to the pediatric intensive care unit with a diagnosis of anoxic brain injury. He died in the hospital two days later. Two weeks earlier the mother and her brother called 911 when the infant appeared limp. By the time an ambulance arrived, the infant appeared normal but was taken to the emergency room where he was checked and found to be fine. The coroner notified the hotline of the infant's death and a report was taken for investigation of death by abuse. The report was unfounded after four months based on the autopsy report.

Prior History:      After being discharged from the hospital following her son's birth, the mother panicked about how she was going to take care of her son; she was not financially stable and did not want to burden her parents with whom she lived and whom had not known she was pregnant. She had the taxi take her to the police station where she relinquished her son pursuant to the Abandoned Newborn Infant Protection Act (Illinois' Safe Haven law). She then went home and told her parents what she had done and they promptly encouraged her to get her son back. The next morning the mother learned that her son had already been placed in a licensed foster home in accordance with the Act. The mother attended court four days later and learned that she would have to undergo a DNA test and a home study to get her son back. A few weeks later, DCFS opened an intact family services case to assist the mother with these tasks. A visit between the mother and her son did not occur until five weeks after the first court date. Nine weeks after she relinquished him, the court returned the infant to his mother's care after the DNA test and home study were completed. The infant lived with his mother, uncle, and grandparents.

| Child No. 64 | DOB 2/16 | DOD 3/16 | Accident |
|---|---|---|---|
| Age at death: | 27 days | | |
| Substance exposed: | No | | |
| Cause of death: | Probable asphyxiation due to unsafe sleep environment | | |
| Reason For Review: | Closed intact family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Four-week-old infant was found unresponsive by his 30-year-old mother around 2:30am lying on his stomach underneath his 18-month-old sibling. The infant was sleeping in a queen-sized bed with his parents. The 18-month-old sibling had crawled into the bed during the night. The mother woke up the 28-year-old father who started CPR while the mother called 911. The infant was taken to the hospital where he was pronounced dead. Police called the hotline to report the infant's death. According to the police, the family had come home from a funeral and repast around 10:30pm. The mother fed the baby a bottle in bed and burped him and fell asleep with him in the bed. The father was already in the bed and the sibling had crawled into the bed during the night. The officer did not have any other concerns and said the coroner investigator, who was also at the scene, had no concerns. DCFS took a report for investigation of death by neglect and substantial risk of physical injury/environment injurious to health and welfare by neglect to the infant's ten siblings. The parents cooperated with the coroner's investigation. An autopsy showed the infant had an atrial septal defect and a likely bacterial infection at the time of his death. The mother admitted to consuming alcohol the evening prior to the infant's death, but denied being intoxicated. The child protection investigation of the infant's death was unfounded on both parents after eight months.

Prior History:    In November 2015 an anonymous reporter called the hotline stating that a mother who lived nearby had ten children ranging in age from six months to 13 years who were consistently dirty, smelled of urine, and asked for food.  The hotline took a report for investigation of inadequate food and environmental neglect. An investigator went to the home which she observed to be sparsely furnished but generally clean. The family did not have beds, but they had plenty of food. The children reported eating and taking baths regularly. The school social worker reported that sometimes the children come to school dirty or smelling of urine and the school tries to help with extra clothes and gifts at Christmas. The children's medical clinic confirmed the children received medical care. The investigator obtained beds for the family. The investigation was unfounded, but the investigator felt the family could use some help and referred them for intact family services. Initially the mother agreed to accept services, but two weeks later she changed her mind and the case was closed.

| Child No. 65 | DOB 2/16 | DOD 3/16 | Accident |
|---|---|---|---|
| Age at death: | 5 weeks | | |
| Substance exposed: | Yes, opiates | | |
| Cause of death: | Suffocation due to bed sharing with adults on an adult bed | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Five-week-old substance-exposed infant was found in the morning face up, not breathing, with her nose bleeding. She was between her temporary guardians in a king-sized bed in which they were sleeping. The guardians called 911 and police responded. The police had previously responded to a call of the infant not breathing while feeding at 11 days old. Police notified the Department of the infant's death and DCFS took a report against the guardians for death by neglect. A child protection investigator observed two cribs in the home, one for the infant and one for the infant's 2-year-old sister. The guardians reported the infant normally slept in her crib in their room. The infant had no injuries and was well developed; there were no signs of drug or alcohol use by the guardians; and the 2-year-old was observed to be well-cared for. The investigation was unfounded after more than seven months.

Prior History:    The deceased was her 31-year-old mother's ninth child. Her mother and 38-year-old father had given temporary guardianship of her to a paternal aunt and uncle who had earlier adopted another of their children. The couple planned to adopt the infant as well. The infant's father died from a heart attack eight days before the infant died. The mother has a history with DCFS dating to her childhood. She gave birth to her first child at age 14 and was a youth in care from ages 15 to 18. Only two of her nine children are in her custody; the others have been privately adopted, are in the guardianship of relatives, or live with their fathers. At the time of the infant's death, there was a pending child protection investigation against the mother for delivering the infant substance-exposed. During and after her pregnancy the mother was in a methadone treatment program. The investigation was indicated after the infant's death because the mother admitted to having used Vicodin and Percocet without a prescription during her pregnancy. The mother declined DCFS services. She was in treatment and had a substance abuse counselor, she and her 3 and 11-year-old children lived with relatives, and the children had been seen regularly by their primary care physician and received their immunizations on schedule.

| Child No. 66 | DOB 3/01 | DOD 3/16 | Accident |
|---|---|---|---|
| Age at death: | 15 years | | |
| Substance exposed: | No | | |
| Cause of death: | Drowning | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**     Fifteen-year-old girl and her 16-year-old boyfriend were found by a family member deceased in a water-filled ditch. The couple had been riding an ATV (all-terrain vehicle) belonging to the boyfriend's family when they missed a turn in the roadway and skidded into a steep ditch that was full of water. The teens were knocked unconscious and drowned. The hotline was called by a friend/neighbor who reported the father had a history of not supervising his children when they rode ATVs. The father was investigated and unfounded after four months for death by neglect and substantial risk of physical injury/environment injurious to health and welfare by neglect. The teen, who lived with her mother, had gone to a friend's house where she and a group of friends went out riding. She and her boyfriend had become separated from the group when the accident occurred.

**Prior History:**     Earlier in the month of her death, the Department investigated the girl's 34-year-old father for inadequate supervision and environment injurious to health and welfare related to a UTV (utility task vehicle) accident involving her 5 and 11-year-old brothers who lived with their father. The father had been driving the UTV when he skidded on gravel during a turn and the UTV rolled over. No one was wearing helmets and the 5-year-old was not seat-belted, however, no one was injured. The investigation was unfounded. The parents were divorced with the boys living with their father and the girl living with their mother.

| Child No. 67 | DOB 3/16 | DOD 5/16 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 7 weeks |
| Substance exposed: | No |
| Cause of death: | Suffocation due to parental roll over |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**         Seven-week-old infant was found unresponsive by his 29-year-old mother around 11:30am. The mother was awoken by the mother's sister who brought home her one-year-old child who had spent the night at the aunt's home. The aunt went into the parents' bedroom to see the infant and found the baby in bed with the mother and the 29-year-old father who was asleep with his head on top of the baby with the baby's face pushed into a pillow. The mother called 911 and the infant was taken by ambulance to the hospital where he was pronounced dead. Police called the hotline to report the infant's death and that the parents admitted to drinking beer prior to sleeping with the baby. DCFS took a report for investigation of death by neglect. The mother reported drinking 1-1/2 beers while socializing with family. Around 4:00am she took the baby out of his pack n play, fed him a bottle, and then placed him to sleep on top of a pillow next to her in bed. The father reported drinking 6 beers between 9:00pm and 5:00am and going to bed around 8:00am. He said the baby was sleeping next to the mother when he went to bed. Both parents were indicated for death by neglect because DCFS had given them a pack n play for the infant to sleep in; they had been warned about the dangers of co-sleeping; and the father had been up all night and consumed alcohol prior to going to bed.

**Prior History:**     The mother has a history with DCFS dating to at least 2005. Prior to the infant's death, she had been investigated 18 times for child abuse and neglect. She has four surviving children, ages 1-1/2, 8, 11, and 15. The infant and 1-1/2-year-old share a father. The mother has a history of domestic violence and mental health issues. A preventive services case was open from April 2012 until August 2013 to address these issues. In September 2012, the Department screened the case for court involvement, but the local assistant state's attorney did not believe there was urgent and immediate necessity to remove the children and said the county did not have adequate resources to seek an order of supervision mandating the mother to participate in services. In January 2016, the mother's 15-year-old son, who had a history of mental health problems, was psychiatrically hospitalized and the hotline was called with concerns. A report was taken for investigation and unfounded. The mother gave birth to the deceased during the investigation and DCFS provided the family with a pack n play because they did not have a crib.

| Child No. 68 | DOB 4/09 | DOD 5/16 | Accident |
|---|---|---|---|
| Age at death: | 7 years | | |
| Substance exposed: | No | | |
| Cause of death: | Gunshot wound to the abdomen | | |
| Reason For Review: | Child was a youth in care | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Seven-year-old girl was shot and killed in the backyard of her 49-year-old maternal grandmother's home with whom she was placed as a youth in care. Police investigation revealed that the girl's 30-year-old mother was visiting the child with her new 30-year-old boyfriend who had a history of domestic violence and was a felon. They were practicing shooting with the mother's 32-year-old brother, who was also a felon. The brother was instructing another sister's 3-year-old son how to shoot a rifle. The 3-year-old pulled the trigger as his 7-year-old cousin passed in front of them. The grandmother conspired with family members to blame the shooting on her 16-year-old developmentally delayed adopted son to protect her adult son and daughter. The grandmother and mother were charged with obstruction of justice. The uncle was charged with endangering the life of a child, obstruction of justice, and unlawful possession of a weapon by a felon. The boyfriend was charged with unlawful possession of a weapon by a felon. The grandmother was indicated for substantial risk of physical injury by neglect because she allowed her son and her daughter's boyfriend to engage in target practice in the proximity of young children. The uncle was indicated for death by abuse. The deceased's two older sisters were removed from the maternal grandmother's care. They are placed in a foster home together and their goal is guardianship with the foster parents. The grandmother was a licensed foster parent. She had always denied having firearms in her home. A licensing investigation was completed and violations of licensing standards were substantiated. The licensing agency is in the process of revoking the grandmother's foster home license.

Prior History:   In January 2014, at the age of four, the deceased became a youth in care along with her 5 and 7-year-old sisters. Their mother had a history of domestic violence with the girls' 28-year-old father and a paramour and had violated multiple orders of protection that put the girls at risk of physical injury. The girls were placed in foster care with their maternal grandmother with whom they had previously lived.

| Child No. 69 | DOB 1/16 | DOD 6/16 | Accident |
|---|---|---|---|
| Age at death: | 4 months | | |
| Substance exposed: | No | | |
| Cause of death: | Suffocation complicated with interstitial pneumonia and bronchopneumonia | | |
| Reason For Review: | Open intact family services case at time of child's death; pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Four-and-a-half-month-old infant was found unresponsive around 7:00am by her 26-year-old mother who was sleeping with the infant and her 1-year-old daughter on a futon couch. During the night, after feeding the infant, the mother fell asleep with the infant between her and the back of the couch. The mother called 911 and emergency services personnel took the infant to the hospital where she was pronounced deceased. The infant, who was born prematurely at 32 weeks gestation, had spent the first two months of her life in the hospital. Police informed the hotline of the infant's death and investigated it. The Department took a report for investigation of death by neglect. The mother submitted to a drug test the day after the infant's death and it was negative. The report was unfounded after four months with the rationale that the mother had not exhibited a blatant disregard of her parental responsibilities that resulted in her child's death.

Prior History:      In August 2015 the 29-year-old father was arrested for drug sales out of a hotel room that the mother and father were living in with two of their five children. He went to prison on charges from the arrest. An intact family services case was opened on the mother and the 2 and 5-year-old children who lived with her. Two older children, ages 6 and 8, were in the guardianship of their paternal grandmother and a 3-year-old child was in the care of a paternal aunt. The deceased was born while the intact family services case was open. Concerns about the care of the children, including the medical care of the deceased and her 2-year-old sibling, led to child protection investigations and court-ordered supervision orders on the children. An inadequate supervision investigation was pending against the mother at the time of the infant's death, prompting the assistant state's attorney to seek juvenile warrants for protective custody of the mother's five surviving children. They are in foster care; the two oldest with their paternal grandmother and the three youngest with unrelated foster parents.

| Child No. 70 | DOB 1/02 | DOD 6/16 | Accident |
|---|---|---|---|
| Age at death: | 14 years old | | |
| Substance exposed: | No | | |
| Cause of death: | Drowning | | |
| Reason For Review: | Pending child protection investigations at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Fourteen-year-old youth was pronounced dead by the local fire department after being pulled out of a lake. The youth and his 18-year-old brother were swimming in a no swim channel and attempted to reach a dock. The older brother reached the landing, but turned back to assist his younger brother who was struggling in the water. The older brother was unable to save his sibling. The brothers' 35-year-old mother and other family members were present when the incident occurred. The Department did not conduct a child protection investigation of the teen's death.

Prior History:      The family has a series of child protection investigations dating to August 2014 when the mother was indicated for inadequate shelter and substantial risk of physical injury to her five children. The mother obtained housing while the investigation was open. During 2015 and 2016 there were seven unfounded child protection investigations against the mother, involving inadequate shelter, inadequate supervision, environmental neglect, substantial risk of physical injury, and cuts, bruises, and welts. In 2015 the mother's 14 year-old daughter was indicated for cuts, bruises, welts by abuse after striking her 13-year-old brother over the head with a glass jar. The mother was provided with a referral for community based services. Two of the seven investigations were pending at the time of the teen's death and unfounded afterward. The first alleged that the mother had failed to provide adult supervision while she was hospitalized for ten days. The investigation revealed that the mother had arranged for relatives as well as her 18-year-old son to care for the children. The second investigation was initiated six days before the teen died. It alleged that the children were dirty and not supervised while the mother was at work. The investigation determined that the children were supervised by an older sibling and the mother's cousin during the hours that the mother worked. The mother refused services offered by the Department.

**NATURAL**

| Child No. 71 | DOB 5/15 | DOD 7/15 | Natural |
|---|---|---|---|
| Age at death: | 7 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Trisomy 18 | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:　　　Seven-week-old infant died at home during the night. Earlier that day the baby had been released from the hospital to hospice care so he could pass away at home with his family. The baby had been hospitalized since birth when he was diagnosed with Trisomy 18, a genetic disorder that disturbs normal development and results in death. Half of infants with Trisomy 18 die within the first week of life and 90% die before their first birthday. DCFS did not investigate the infant's death.

Prior History:　　　At the time of the infant's death there was a pending child protection investigation involving the infant's 31-year-old mother and his 4-year-old sister. A police officer called the hotline to report that he had issued the mother a citation for shoplifting with her 4-year-old daughter. The mother told the officer she stole because she had no money; she had missed a lot of work because she had a terminally ill child. He feared she was desperate and did not have a support system. The hotline took a report for investigation of substantial risk of physical injury/environment injurious to health and welfare by neglect. The mother explained to a child protection investigator that she worked at a fast food restaurant but had to take leave because of complications with her pregnancy and then to see her sick son in the hospital. She was without income and her daughter needed clothes because she had outgrown them. She took clothes from the store, but paid for food with her LINK card. Her daughter was holding a teddy bear and a lip gloss when they walked out of the store; she had not intended to steal them. The girl's doctor and teacher were interviewed and did not have concerns about the girl's care. The Department indicated the mother on the report one month after her baby's death. She was not offered services.

| Child No. 72 | DOB 11/14 | DOD 7/15 | Natural |
|---|---|---|---|
| Age at death: | 8 months | | |
| Substance exposed: | No | | |
| Cause of death: | Seizure disorder | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:　　　Eight-month-old boy was taken by ambulance to the hospital after having a seizure. He was pronounced deceased at the hospital about an hour later. The infant's 24-year-old mother had dropped him off at the maternal grandmother's house earlier that day to be cared for while she ran to the store. While there, the infant suffered a seizure and an aunt called 911. His mother told the doctor that Eli had a fever of 105 earlier in the day. The reporter, an assistant chief deputy coroner, told the hotline it was the infant's third visit to the emergency department with seizure activity and he was under the care of a physician. The reporter had no suspicion of abuse or neglect and said neither did the police. At autopsy, the infant had seizure medication in his system. The Department did not conduct a child protection death investigation.

Prior History:　　　Four months before the infant was born, police called the hotline to report that the mother had started a physical altercation with her 13-year-old sister in the presence of her three children, ages 2 and 4 years and 9 months. The sister sustained a cut on her foot and scratches on her face. The mother was indicated for cuts, bruises, welts by abuse to her sister and substantial risk of physical injury/ environment injurious to health and welfare by neglect to her three sons. The mother was referred to community-based services.

| Child No. 73 | DOB 4/15 | DOD 8/15 | Natural |
|---|---|---|---|
| Age at death: | Almost 4 months | | |
| Substance exposed: | No | | |
| Cause of death: | Aspiration pneumonia | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Almost four-month-old infant was found unresponsive on his back in his bassinette by his father. The infant had been laid down approximately a half hour earlier. His father went to check on him after hearing his older, 16-month-old, son scream. The father, who had been a volunteer fire fighter trained to do CPR, called 911 and performed CPR on the infant. The infant was pronounced deceased about six hours later after resuscitation efforts at two hospitals. At the second hospital, a bruise was noted on the infant's forehead. Police and the coroner interviewed the 20-year-old mother and 22-year-old father at the hospital. The hospital, police, and the coroner notified DCFS of the infant's death. DCFS investigated the parents for death by abuse, cuts, bruises, and welts by abuse and substantial risk of physical injury by abuse to their surviving child. All allegations were unfounded after a three month investigation. The infant died from a natural cause of death and the responding paramedic was adamant that the infant did not have a bruise on his forehead when she treated him.

Prior History:        At the time of the infant's death there was a child protection investigation pending against the parents for environmental neglect to the children and against the father for substantial risk of physical injury by abuse to the 16-month old boy. The investigation was unfounded following the infant's death. A relative alleged the children smelled like cat urine and were dirty and that she witnessed the father yank the toddler's arm. An investigator saw the children who were not dirty and did not smell like cat urine; she observed the home environment to be adequate; and she did not see any injuries on the children. A June 2015 child protection investigation was unfounded for substantial risk of physical injury/environment injurious by neglect the day before the infant's death. The investigation began after the couple's landlord tried to serve eviction papers on the family with her pit bull present and the father grabbed a pellet gun and police were called. The family was given a referral to community-based services. In April 2015 the parents had been unfounded on a report of environmental neglect after an investigator found the family's home to be well-kept.

| Child No. 74 | DOB 8/95 | DOD 8/15 | Natural |
|---|---|---|---|
| Age at death: | 19 years | | |
| Substance exposed: | No | | |
| Cause of death: | Acute respiratory failure due to recurrent pneumonia and anoxic brain injury | | |
| Reason For Review: | Teen was a youth in care | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Nineteen-year-old medically complex youth in care, who was one week shy of his 20th birthday, was found unresponsive around 10:45pm by nursing staff in his nursing care facility. The youth had undergone a procedure two days earlier to treat scar tissue under his arms and it was reported to have gone well. The youth was visited by his caseworker eleven days before he died. The Department did not conduct a child protection death investigation.

Prior History:        The deceased became a youth in care in April 2008 at age 12 after having an asthma attack while he was unsupervised. In October 2008 he suffered a severe asthma attack that resulted in anoxic brain injury and multiple medical problems. He required 24-hour around the clock medical care and was placed in the nursing care facility where he lived until his death.

CHILD DEATH REPORT

| Child No. 75 | DOB 7/15 | DOD 8/15 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 weeks |
| Substance exposed: | No, however, mother has a history of substance abuse |
| Cause of death: | Hypoplastic Left Heart Syndrome |
| Reason For Review: | Open placement case (siblings in foster care) |
| Action Taken: | Investigatory review of records |

Narrative:        Three-week-old infant died in the hospital where she had been treated since birth for a rare congenital heart defect.  DCFS did not investigate the infant's death.

Prior History:        In June 2014 the 28-year-old mother gave birth to her fourth child. The baby was born exposed to cocaine and prompted the mother's first DCFS investigation in Illinois. The mother was indicated for substance misuse and both parents were indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect. The baby and her 19-month-old brother entered foster care because of the mother and 38-year-old father's substance abuse histories. The mother had a prior history of methamphetamine abuse and had two children removed from her care in another state. Those children have since been adopted by her sister. The parents participated in substance abuse services, parenting classes, and counseling. The father obtained a job and they moved into a new home. The court returned the two children to their parents' care in August 2015, two weeks after the infant's death. The family was monitored by a caseworker for two months before their case was closed.

| Child No. 76 | DOB 8/15 | DOD 8/15 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 days |
| Substance exposed: | No |
| Cause of death: | Trisomy 18 |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:        Four-day-old twin baby girl with Trisomy 18 died in the hospital. She and her twin were born prematurely at 33 weeks gestation. The twin did not have Trisomy 18. Trisomy 18 is a genetic disorder in which the affected infant has an extra copy of chromosome 18 which disturbs normal development. The genetic disorder occurs in 1 in 6,000 to 8,000 live births. Half of infants with Trisomy 18 die within the first week of life and 90% die before their first birthday. DCFS did not investigate the infant's death.

Prior History:        The 32-year-old mother has a history with DCFS dating to 2000 when her two children were removed from her care. They were adopted in 2002. In January 2013 the mother was indicated for environmental neglect of her 9-year-old daughter. In June 2014 the Department opened another investigation of environmental neglect after it received a report that an 8-month-old baby had roach bites. The family's home was cluttered and had animal feces, roaches, and flies throughout. The family exterminated the home and cleaned it. The mother and 27-year-old father of the 8-month-old were indicated for environmental neglect. They declined intact family services. The older child went to live with her father. In November 2014 and May 2015 the older child's father alleged mistreatment of his daughter by the younger child's father. After investigation, the Department unfounded allegations of cuts, bruises, welts by abuse and substantial risk of physical injury/environment injurious to health and welfare by neglect. Following the death of the infant, there have been two environmental neglect reports; both were unfounded after the family improved conditions in the home.

| Child No. 77 | DOB 5/97 | DOD 8/15 | Natural |
|---|---|---|---|
| Age at death: | 18 years | | |
| Substance exposed: | No, unknown | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Teen was a youth in care | | |
| Action Taken: | Investigatory review of records | | |

<u>Narrative:</u>      Eighteen-year-old youth died in the hospital where he had been receiving supportive care after being found one month earlier by his 72-year-old paternal grandmother experiencing what looked like a seizure. The youth never regained consciousness. The Department did not conduct a child protection investigation of the teen's death.

<u>Prior History:</u>      The youth was committed to the Department's guardianship in 2012 at the age of 14 by a delinquency court judge. The youth had been in the guardianship of his paternal grandmother since the age of three. He had a series of arrests and involvement with the delinquency court beginning in 2010 and a history of substance abuse and mental health diagnoses since 2009, when he was 12. In 2011 the youth attempted suicide. After entering the guardianship of the Department, the youth was placed in two different residential facilities before running away. He remained missing for two and a half months in 2015. At the time of the episode leading to his death, the youth was in the unauthorized placement of his paternal grandmother until further provisions could be made for him.

| Child No. 78 | DOB 3/11 | DOD 9/15 | Natural |
|---|---|---|---|
| Age at death: | 4 years | | |
| Substance exposed: | No | | |
| Cause of death: | Bronchial asthma | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

<u>Narrative:</u>      Four-year-old boy was found unresponsive around 3:30am by his 62-year-old father. The father, who had fallen asleep on the couch in the living room, had gotten up to use the bathroom and found the boy lying face down underneath the 33-year-old mother in the father's bed. The parents had been drinking the night before and the mother and son, who did not live with the father, spent the night. Police notified the hotline of the boy's death. The Department opened an investigation against the parents for death by neglect. The autopsy showed that the boy died of bronchial asthma. The investigation was indicated against the mother and father for death by neglect, but the finding was overturned on appeal.

<u>Prior History:</u>      The mother has three teenaged children who are in the care of their father. She and the father have a lengthy history with DCFS and the domestic relations court regarding their children; at one point the court ordered the children into the custody of a maternal aunt. In October 2014 the father of the deceased called the hotline to report that the mother, who had primary custody of the boy, did not pick him up on time following a visit. A report taken for inadequate supervision against the mother was unfounded; the mother had picked her son up a day later than she planned because she was caring for her sick mother.

| Child No. 79 | DOB 8/15 | DOD 9/15 | Natural |
|---|---|---|---|
| Age at death: | 4 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Complications of prematurity | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Four-week-old infant, born prematurely at 24 weeks, died in the hospital where he had been treated since birth. His 24-year-old parents were at his bedside. The infant had multiple medical complications including respiratory distress, acute renal failure, bilateral germinal matrix hemorrhages, sepsis, small bowel rupture, metabolic acidosis, and hyperkalemia. The mother had a history of recurrent pregnancy loss and a history of a particular gene mutation. DCFS did not investigate the infant's death.

Prior History:      Prior to the birth of the infant, in February 2015, the Department investigated a report of substantial risk of physical injury/environment injurious to health and welfare by neglect to the mother's 4-year-old daughter based on a report of a domestic violence incident between the mother and the infant's father. The investigation was unfounded and the mother was referred to community based services. In July 2015 the father was arrested for reckless driving and child endangerment. Both he and the mother were indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect and an intact family services case was opened. The case was closed two weeks after the infant's death because the parents were unwilling to participate in DCFS services, citing involvement with community services instead.

| Child No. 80 | DOB 5/15 | DOD 10/15 | Natural |
| --- | --- | --- | --- |
| Age at death: | 4-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Pending child protection investigation at time of child's death; closed intact family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Four-month-old infant, born prematurely at 35 weeks gestation, began gasping for air as his uncle was getting him ready to take him to his babysitter's house across the street. The uncle called 911 and the infant was taken to the hospital where he was revived and transferred to another hospital where he died the following day. A police officer and a hospital nurse called the hotline to report that after the infant was revived, he was examined and found to have bruises on his back and buttocks. DCFS took a report for investigation of death by abuse by the 48-year-old paternal grandmother and the 25-year-old uncle, and the infant's one-year-old brother was placed in foster care. The infant's 25-year-old mother had signed a notarized letter giving the grandmother guardianship of the infant and his one-year-old brother two weeks earlier. At autopsy, what were initially thought to be bruises were determined to be Mongolian spots. The infant's cause of death could not be determined, but the pathologist noted that the infant had a history of apnea of prematurity that had required a two week stay in the neonatal intensive care unit. After three months, the grandmother and uncle were unfounded for death by abuse and for substantial risk of physical injury to the one-year-old boy, who has since returned to his mother's care.

Prior History:       The mother had a case open for intact family services from May 2013 until December 2014 because of substance abuse and domestic violence concerns. While the case was open, two of the mother's three children went to live with relatives and the youngest remained in her care. At the beginning of October 2015, the mother and father had a domestic dispute in front of their one-year-old, to which the police responded and called the hotline. A report was taken for investigation of inadequate supervision and substantial risk of physical injury/environment injurious to health and welfare by neglect. The mother was psychiatrically hospitalized a few days after the incident. She did not feel she was able to care for the children so she gave guardianship to the paternal grandmother. The DCFS investigation was completed after the infant's death; both parents were indicated for inadequate supervision and substantial risk of physical injury/environment injurious to health and welfare by neglect to both boys.

| Child No. 81 | DOB 9/14 | DOD 10/15 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 13 months |
| Substance exposed: | No |
| Cause of death: | Hyponatremic dehydration due to bronchopneumonia with significant contributing condition of failure to thrive following an extremely premature birth |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Full investigation, Report to Director October 7, 2016 |

**Narrative:**     Thirteen-month-old toddler was found unresponsive at 7:00am at the foot of an inflatable queen sized mattress that she shared with her 32-year-old mother and 11-year-old cousin. At 10:30pm the prior evening, the mother placed the baby on her chest and fell asleep. The following morning an older sibling found the baby at the foot of the mattress unresponsive and woke up the mother. The baby was transported to the hospital by ambulance and pronounced dead. The coroner called the hotline to notify the Department of the infant's death. The Department took a report for investigation of death by neglect and for substantial risk of physical injury to the surviving siblings. The children were placed with a family friend under a safety plan. The parents violated the plan within days of its implementation and the five surviving siblings were taken into protective custody. They are in traditional foster care. The parents were indicated for death by neglect based on the coroner's belief that had the toddler's condition been treated, she would more likely than not be alive. The parents were also indicated for substantial risk of physical injury to their surviving children.

**Prior History:**     The mother and the 33-year-old father have a history of substance abuse dating to 2008 when the mother gave birth to her fourth child, who was born substance-exposed. An intact family services case was opened, however, the mother and father were uncooperative with services and routinely tested positive for cocaine. During the two years that the case was open, the paternal grandmother became the court ordered guardian for the children for a period of nine months. The case was closed unsatisfactorily in May 2010. In January 2015 the mother was the subject of a child protection investigation which alleged substantial risk of physical injury by neglect to her 4-month-old twin daughters. The twins had recently been discharged from a three month hospitalization after their premature birth at 26 weeks gestation. A worker assigned to provide early intervention services reported that she had found the infants placed in unsafe sleep arrangements and the mother of six appeared "out of it." The investigation was unfounded. The child protection investigator did not know about the mother's history of substance abuse because of a computer error that did not link her case history to her investigation history.  Six months later, another investigation was initiated alleging medical neglect of the deceased child's twin sister. Again, the investigation did not include the mother's past history with the Department. A medical provider alleged that the medically complex premature baby had missed numerous home health care appointments as well as follow-up appointments with pediatric specialists. An attempted visit conducted the day before the investigator went on vacation was marked as an in-person contact. It was not until a week later, after another provider called with concern about the twin's health care, that another investigator saw the twins and instructed the mother to take the infant to the pediatrician. Two days later, the twins' pediatrician called the hotline resulting in an additional allegation of medical neglect to the deceased twin. Five days later, after returning from vacation, the investigator was instructed to see the twins as well as interview their pediatrician. The investigator went to the home and spoke to an adolescent who reported that her mother was not at home but her grandmother was present. The investigator did not ask to see the twins or speak to the grandmother. Later that day, the investigator went to the pediatrician's office and was informed that the doctor was not in that week. He left without asking to speak to one of the doctor's colleagues, requesting medical records, or asking that the doctor be contacted. These attempted contacts were the investigator's last actions before the 13-month-old died nine days later. The parents were ultimately indicated for medical neglect of the twins.

CHILD DEATH REPORT

| Child No. 82 | DOB 3/06 | DOD 10/15 | Natural |
|---|---|---|---|
| Age at death: | 9 | | |
| Substance exposed: | No | | |
| Cause of death: | Bronchial asthma | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Nine-year-old boy was pronounced dead in the emergency room after being taken there by his 41-year-old father. The boy awoke in the early morning coughing and wheezing and his father gave him his inhaler. The boy passed out after saying he couldn't breathe and was going to die. Police called the hotline after discovering the home was filthy with dirt, garbage and roaches, and believing the home's condition may have contributed to the boy's asthma attack and death. Cockroaches are a known contributory factor to worsening asthma. The home was declared uninhabitable and condemned by the health department. DCFS investigated the boy's death and the father was indicated for death by neglect and for environmental neglect to the other children in the home, who went to stay with a relative. An intact family case was opened to provide services to the mother and the father, who lived in separate homes.

Prior History:      In August 2015 the boy's 17-year-old sister called the hotline to report that their 35-year-old mother was abusing prescription drugs and injecting heroin. A report was taken for investigation of substantial risk of physical injury/environment injurious to health and welfare by neglect to the girl and her three siblings who lived in the home. The four children lived with their mother and great-grandparents. Their three younger siblings, including the deceased, lived with their father and were not subjects of the report. The investigation was indicated as the mother admitted to using drugs. She had previously been in substance abuse treatment and wished to return. The investigator referred her to a community-based drug treatment program. The children were determined to be safe in the care of their great-grandparents who were aware of the mother's drug use.

| Child No. 83 | DOB 8/12 | DOD 11/15 | Natural |
|---|---|---|---|
| Age at death: | 3 years | | |
| Substance exposed: | No | | |
| Cause of death: | Acute bacterial laryngotracheitis with IgA deficiency contributing | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Three-year-old girl was found deceased in the morning by her 64-year-old maternal great-grandmother. Police responded to a 911 call. The coroner pronounced the child deceased at the maternal great-grandparents' home at 7:50am. Police notified the hotline of the child's death, reporting that the 23-year-old mother put the child to bed on the floor where she normally slept and in the morning she was found deceased. The responding officer said they had not observed anything suspicious other than the fact that the three-year-old reportedly died during her sleep. The child lived with her mother, two-and-a-half-month-old sister, 16-month-old brother, and maternal great-grandparents. The Department took a report against the mother for investigation of death by abuse and for substantial risk of physical injury/environment injurious to health and welfare by neglect to her two surviving children. The Southern Illinois Child Death Investigation Task Force also investigated. The pathologist who completed the child's autopsy noted in the January 2016 report that the little girl died from an acute bacterial respiratory infection and that IgA deficiency contributed to her cause of death: "this deficiency causes a lack of a type of antibody that protects against infections of the mucous membranes lining the airways and digestive tract. Thus, she is more susceptible to upper respiratory infections and their sequelae. There is a familial history of an inherited cardiac disease that may be a contributing cause of her death; however, there is no record of her being tested for this disease." The child's primary care physician was aware of her low IgA and had seen her three times for colds in the last six months. A safety plan was in place for two months while waiting for the child's autopsy report; the children stayed with a great aunt and uncle and the mother was able to see them in a supervised setting. The child protection investigation was unfounded after ten months, in September 2016. It had remained open for many months while waiting for police reports and crime scene photos. A month after the child's death, an intact family services case was opened. A worker monitored the safety plan and provided services, including domestic violence and mental health services, to the mother and the father of the two surviving children. With the cooperation of the family the case closed in September 2016.

Prior History:      In July 2015, while the mother was pregnant with his second child, the father was arrested for domestic battery of the mother. The father was convicted of domestic battery/bodily harm and was sentenced to 101 days in jail and 24 months of probation. The mother obtained an order of protection and the father was indicated for substantial risk of physical injury by neglect to the couple's one-year-old child. Five days after the investigation was closed, a second investigation was initiated after an anonymous reporter called the hotline alleging the mother and her children were living with her father who was a sexual predator. At the time of the hotline call the mother was in the hospital giving birth to her third child. The mother and children were living with the maternal great-grandparents. Her father, who was a registered sex offender, lived in a camper in the backyard. The mother and grandparents reported he was never left alone with the children. Police reported he followed the rules and had been told that if he was ever alone with the children he and his daughter would be in trouble. The investigation was unfounded.

| Child No. 84 | DOB 11/13 | DOD 11/15 | Natural |
|---|---|---|---|
| Age at death: | 2 days shy of 2 years old | | |
| Substance exposed: | No | | |
| Cause of death: | Seizure due to anoxic encephalopathy | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Twenty-three-month old medically complex child was found not breathing when his 21-year-old mother and 25-year-old father checked on him in the morning. He was found lying on his back in his crib. The coroner's report noted there were no objects in the child's crib. The child had a medical history of anoxic encephalopathy at birth, seizure disorder, and recurrent respiratory illnesses. He had severe cerebral palsy, was developmentally disabled and non-verbal, and required a G-tube for feeding. He was an only child. DCFS did not conduct a child protection investigation of the child's death; his serial seizures were considered terminal.

CHILD DEATH REPORT

Prior History:    There were three unfounded child protection investigations involving the child in the year before his death. The first two involved his feeding and weight and were unfounded after talking to physicians treating the child. The third report, called into the hotline in July 2015, alleged environmental neglect because of a fly infestation and bed bugs. A child protection investigator witnessed some flies that the family was addressing with fly paper and screens. No evidence of bed bugs was found. The investigator discussed the child's medical care with the parents and the child's pediatrician. The investigator also made a referral to the Division of Specialized Care for Children so the parents could access more supportive services.

| Child No. 85 | DOB 4/15 | DOD 12/15 | Natural |
|---|---|---|---|
| Age at death: | 8 months | | |
| Substance exposed: | No | | |
| Cause of death: | Endocardial Fibroelastosis | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Eight-month-old baby was found unresponsive by his 30-year-old father around 10:00pm. About an hour earlier the baby had been fussy and the father soothed him and put another blanket on him because it was cold. The baby was sleeping in his crib on his stomach. The father called 911 and the baby was taken to the hospital where he was pronounced dead.  An Emergency Room doctor notified the baby's pediatrician of the baby's death and she called the hotline because she had previously made a report involving the baby (see below). DCFS took a report for death by abuse and substantial risk of physical injury/environment injurious to health and welfare by neglect to a two-and-a-half-year-old sibling. The investigation was unfounded three and a half months later. The infant died of a rare heart disorder that affects infants and children. The symptoms begin rapidly and its onset often causes sudden death in infancy.

Prior History:    The infant was the subject of a report of medical neglect seven days after his birth. His pediatrician called the hotline to report that at the baby's four day visit he was jaundiced and in need of a bilirubin test. The 29-year-old mother was told to go directly to the lab for a blood draw, but the lab reported she never came in and the parents had not responded to phone calls by the doctor's office. Untreated elevated bilirubin in infants can cause long-term neurological damage. A DCFS investigator talked to the mother on the day of the report; the mother explained she was exhausted the day of the doctor visit and did not believe getting the test was an emergency. She took the infant for the test the same day. The bilirubin resolved on its own over the next couple of days. The investigator spoke to the pediatrician prior to closing the investigation; the mother had kept follow-up visits, the infant's immunizations were up to date, and the baby was gaining weight. The investigation was unfounded.

| Child No. 86 | DOB 12/15 | DOD 12/15 | Natural |
|---|---|---|---|
| Age at death: | 4 days | | |
| Substance exposed: | No | | |
| Cause of death: | Extreme prematurity | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Four-day-old baby died in the hospital. His 21-year-old mother had severe preeclampsia and chronic hypertension and the infant was born prematurely by emergency cesarean section at 26 weeks gestation. DCFS did not investigate the infant's death.

Prior History:     The infant's 25-year-old biological father is married to a 22-year-old woman and has three children with her. In July 2015 the Department investigated a report of inadequate supervision to the couple's eldest child, a 3-year-old boy, after he was discovered riding his big wheel in the street unattended around 8:30am. Investigation showed that the child left the house while everyone was sleeping; the family was not aware that the child knew how to open doors himself; and they started using dead bolt locks on the doors after the incident. The investigation was unfounded.

| Child No. 87 | DOB 10/04 | DOD 12/15 | Natural |
|---|---|---|---|
| Age at death: | 11 years | | |
| Substance exposed: | No | | |
| Cause of death: | Brain death due to cardiorespiratory arrest due to Status asthmaticus | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Eleven-year-old girl was taken off life support and died in the hospital seven days after having a severe asthma attack at her aunt's home. The girl's 35-year-old mother was out with the 29-year-old aunt getting Christmas gifts for the children through Toys for Tots. The aunt's boyfriend, age unknown, was babysitting the deceased and five other children when the 11-year-old girl had an asthma attack. The boyfriend called the aunt who told the mother her daughter was not breathing. None of the three adults called 911. Instead the mother and aunt returned home, which took 20 minutes. They found the child on the floor unresponsive and called 911. They said they did not call 911 earlier because they thought the boyfriend would have to go in the ambulance and leave the other children home alone. A hospital nurse shared with a deputy coroner that the child did not have a diagnosis to explain her collapse; that there was a family history of asthma; that the child had been picked up early from school two days before her fatal attack because of respiratory distress and used her sister's inhaler; and she had not seen a doctor for her respiratory difficulties. With the consent of a deputy coroner, the child was not autopsied and her death certificate was signed by a hospital physician. Neither the hospital nor the coroner called the hotline. Nine days later a deputy coroner received a call from a concerned citizen who believed the parents were responsible for the girl's death because she had been using her mother's inhaler and her parents had not sought medical care for their daughter. The coroner did not call DCFS with the information. Two months later, in March 2016, a school counselor called the hotline to report that the mother's 18-year-old daughter had been taking care of her younger siblings every day after school because her mother was grieving and trying to find comfort by drinking alcohol. Hotline staff called the coroner for information about the child's death and a report was taken for investigation of death by neglect and substantial risk of physical injury/environment injurious to health and welfare by neglect. The DCFS investigation found that the deceased had had three asthma attacks at school over fifteen months, the last being two days before her fatal attack; on each occasion her mother was called to pick her up from school and take her to see a doctor, but the mother never sought medical care. The mother and her three and 16-year-old children had asthma, but the mother had no asthma medication in the home. Four minor children, ages 7 months, 3, 5, and 16 years, were taken into custody. The four children are in traditional foster care after moving from a relative placement where their needs were not being met. The three younger children are placed together. The 16-year-old is placed separately. Their 14-year-old sibling is in the care of his father. A criminal investigation is open and child protection death investigations are pending against the mother and the aunt's boyfriend.

Prior History:      The mother had an intact family case open for a year in October 2002. Her children were in foster care from July 2007 until September 2009 when they were released by the court to their father's care. Less than a year later, in violation of a court order, the 31-year-old father gave the children back to the mother because he had lost his job and housing. In February 2015, the 13-year-old son told school staff that he was afraid to go home because he had forged his mother's name on a letter turned into school. He had not gone home the previous night. The school called the hotline and DCFS took a report for inadequate supervision because the reporter believed the mother did not know where the child had been all night and she did not make a missing person report. The report was unfounded. The mother called the police but was told she had to wait 24 hours before the boy could be called a runaway. She also called friends in the family's old neighborhood, but did not locate him.

| Child No. 88 | DOB 12/15 | DOD 2/16 | Natural |
|---|---|---|---|
| Age at death: | 7 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Probable viral syndrome | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:            Seven-week-old infant was found unresponsive by her 32-year-old mother around 4:50am. The mother called 911 and the infant was taken to the hospital where she was pronounced dead. A Sheriff's deputy advised the hotline of the infant's death stating paramedics found the baby covered in urine and feces with the tips of her finger mauled off and small parts of her ear missing. The deputy noted the infant slept in a baby swing and the house was filthy and infested with cockroaches. The hotline took a report for investigation of death by abuse, environmental neglect and substantial risk of physical injury/environment injurious to health and welfare by neglect to the five surviving children in the home. The mother told the investigator that she put the baby down to sleep around 11:00pm in a mechanical swing where she slept and at 1:00am she changed the baby's diaper. The infant had been sick with a cold. The home had a cockroach infestation and mice living in it and the pathologist believed the baby was chewed on as she was dying and after death. The child protection death investigation is pending after ten months. The surviving children, ages 3 to 12, were taken into custody. They are placed with various relatives. The prognosis for their return home to their mother and 33-year-old father of the youngest child is poor.

Prior History:      In September 2011 the mother's 7 and 8-year-old sons and 1-year-old daughter were taken into custody after the 7-year-old boy set fire to a neighbor's garage, destroying it and the car in it, and killing the family's dog. A day earlier the boy had burglarized another garage. Investigation revealed that the boy's 8-year-old brother also exhibited disturbing behavior and the mother was unable or unwilling to address it. The children were placed with a relative and participated in services, including psychiatric treatment. The mother participated in services including domestic violence and parenting programs. In January 2013 she gave birth to a son who entered foster care after birth. The child's father was a registered sex offender who completed treatment. He was 21 and the victim was 16 at the time of the offense. By August 2013 all of the children had been returned home. In March 2015, prior to the deceased's birth, the Department unfounded a report of substantial risk of physical injury to the mother's 4-year-old daughter when evidence showed that the mother had accidentally slammed a car door on the child as the child climbed over the front seat and exited out the driver's side door. The child was not injured.

| Child No. 89 | DOB 12/15 | DOD 2/16 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 months |
| Substance exposed: | No |
| Cause of death: | Cardiopulmonary arrest due to uncertain etiology |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:        Two-and-a-half-month-old infant was found unresponsive just after midnight by his 21-year-old mother. He had been sleeping in a baby swing. The mother reported feeding the infant about an hour earlier. The mother and 29-year-old father performed CPR and called 911. Paramedics got a light pulse and took the infant to the local hospital where he was airlifted to another hospital and put on life support. When his parents were told the infant was brain dead, they removed him from life support. Eleven days before he died, the infant had been discharged from the hospital where he had been treated for RSV (Respiratory Syncytial Virus) and diagnosed with Pulmonary Interstitial Glycogenosis, a rare lung disease. Pulmonary Interstitial Glycogenosis causes an accumulation of glycogen in the lungs leading to a thickening of the interstitium, decreasing the space between the air sacs of the lungs, making it harder for oxygen to get from the air sacs to the blood supply. The baby's autopsy report noted that he had not had any recent illness or infection that would have caused cardiopulmonary arrest. A hospital social worker notified the investigator of a pending child protection investigation that the infant had died. The Department did not conduct a death investigation; however, the pending child protection investigation did not close until six months later in August 2016 when it received the infant's autopsy report.

Prior History:      In January 2016 a hospital nurse called the hotline to report that the five-week-old infant had been brought to the hospital because of difficulty breathing. It was the second time the infant had been hospitalized; he was taken to the hospital at two weeks old for turning blue and vomiting blood.  At the second hospitalization, the nurse said the mother reported she had been sleeping in bed with the infant when the father came into the room and heard the baby gurgling and bleeding from the nose and mouth. The hotline took a report for investigation of substantial risk of physical injury by neglect. It was eventually unfounded based on the infant's diagnosis through lung biopsy.

| Child No. 90 | DOB 11/01 | DOD 3/16 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 14 |
| Substance exposed: | No |
| Cause of death: | Septic shock due to Kernicterus due to seizure disorder |
| Reason For Review: | Teen was a youth in care |
| Action Taken: | Investigatory review of records |

Narrative:        Fourteen-year-old medically complex youth in care died in the hospital. Six days earlier she was taken to the hospital ill. She had been showing signs of improvement, but the day before her death she spiked a high fever and showed signs of septicemia. The teen had lived in a nursing care facility since 2011. No abuse or neglect was suspected in the teen's death and DCFS did not investigate.

Prior History:      The youth entered the Department's care in December 2009 at the age of eight after she was taken to the hospital severely malnourished. She had cerebral palsy, was non-verbal and non-ambulatory, and had a gastrostomy tube for feeding. Her 29-year-old mother was convicted of criminal neglect of her and served time in prison. Three siblings also entered foster care. They are in the subsidized guardianship of a relative.

| Child No. 91 | DOB 3/03 | DOD 4/16 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 13 years |
| Substance exposed: | No |
| Cause of death: | Respiratory failure secondary to acute aspirations due to chronic lung disease |
| Reason For Review: | Pending child protection investigation at time of child's death; Open intact family services case at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:          Thirteen-year-old medically complex girl died in the hospital shortly after being taken there by ambulance in respiratory distress. DCFS did not investigate the girl's death. The coroner investigated and did not suspect foul play. Hospital staff did not suspect abuse or neglect as the girl appeared well-cared for. She had a history of chronic lung disease, micro-aspiration, and pneumonia; she was on a respirator 24 hours a day and fed through a g-tube up to six hours a day. The girl received home health nursing services 90 hours per week.

Prior History:          A September 2015 report of medical neglect to the girl by her mother was unfounded. Hospital staff had called the hotline because the mother had not taken the girl directly to the emergency room after being instructed by her doctor to take her there. The girl had a low oxygen saturation level. The child's doctor did not think she was medically neglected, but that the mother was overwhelmed with her daughter's care and the care of her other five children, ages 3 to 11. A February 2016 report of medical neglect to the girl by her 39-year-old mother and 40-year-old father was pending at the time of the child's death. The girl had been hospitalized and the mother had not completed the medical training necessary to allow the girl to go home. Concerns about the parents' operation of the ventilator and feeding through the g-tube led to both parents being indicated for medical neglect following the girl's death. While the investigation was pending, an intact family services case was opened to monitor the parents' care of the child. The case was open for less than two weeks when the girl died.

| Child No. 92 | DOB 3/06 | DOD 4/16 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 10 years |
| Substance exposed: | Unknown |
| Cause of death: | Spastic quadriplegia cerebral palsy |
| Reason For Review: | Pending child protection investigation at time of child's death; closed intact family services case within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:          Ten-year-old medically complex boy died in a hospice care center the day after he was admitted. He had been in and out of the hospital multiple times in the year before his death. The boy and his 29-year-old mother had moved to Illinois from Honduras in 2014 to get better medical care for him. The boy's 38-year-old father and 3-year-old sister joined them in early 2015. The Department did not conduct a child protection investigation of the child's death.

Prior History:      In July 2015 a health plan case manager called the hotline with concerns the parents were unable to care for the boy's multiple medical problems related to his cerebral palsy. The child had been hospitalized and was then in a rehabilitation center for six months. The parents were unfounded in an investigation of substantial risk of physical injury/environment injurious to health and welfare by neglect based on medical providers who said the parents had been trained and demonstrated appropriate care of the child. An intact family services case was opened to link the family with services. The case was open for six months, until January 2016. A worker obtained Norman funds for the family, monitored the child's medical care, and facilitated getting the child educational services. In September 2015 the mother was indicated for inadequate supervision when she left the children home alone to go to work. A family member cancelled at the last minute and the children were home for two hours until the father got home from work. At the time of the boy's death there was a pending investigation for inadequate supervision. A school official went to the home to get the mother's signature on some forms. No one answered so she waited and the mother arrived home 40 minutes later with her 3-year-old daughter. The mother was indicated after the boy's death for inadequate supervision of him.

| Child No. 93 | DOB 7/15 | DOD 5/16 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 9 months |
| Substance exposed: | No |
| Cause of death: | Seizure disorder |
| Reason For Review: | Open preventive services case at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:      Almost 10-month-old baby began gasping for air and stopped breathing while playing on a bed with his 18-year-old mother. The mother called 911 and the baby was taken to the hospital where he was pronounced dead. The baby had multiple medical problems including seizure disorder, partial paralysis, kidney issues, blindness, and extreme hearing loss. The infant had been hospitalized on at least two occasions. He was receiving medical care and therapies for his medical problems. Police notified the hotline of the baby's death; the Department did not conduct a child death investigation.

Prior History:      In November 2015 the baby was taken to the hospital by his paternal grandmother because he was lethargic. The baby was hospitalized and discovered to have Urosepsis, a systemic reaction of the body to a bacterial infection of the urogenital organs. It has the risk of life-threatening symptoms including shock. A nurse called the hotline with a report of medical neglect. The report was unfounded following investigation as more than one caretaker described the baby as behaving normally until the morning he was taken to the hospital. A preventive services case was opened to provide support to the family.

| Child No. 94 | DOB 4/16 | DOD 5/16 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 13 days |
| Substance exposed: | No |
| Cause of death: | Complications from prematurity |
| Reason For Review: | Sibling returned home within a year of child's death & pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:      Thirteen-day-old twin baby boy, delivered by cesarean section at 27 weeks gestation, died in the children's hospital where he had been transferred after birth. His twin was stillborn. The Department did not investigate the infant's death.

Prior History:     In January 2014 the 19-year-old mother and her 20-year-old paramour were investigated and indicated for abuse to their one-month-old infant who was diagnosed with bilateral subdural hematomas, a femur fracture, and thirteen broken ribs caused by non-accidental means. The father pleaded guilty to aggravated battery and was sentenced to six months in jail and 30 months of probation. The infant was placed in foster care with paternal relatives. The parents separated. They both participated in services. In June 2015 the mother gave birth to her second child with another father. The baby boy remained in his parents' care. In August 2015 the parents engaged in a physical argument in which no one was injured, but the father was arrested; the parents were investigated and unfounded for substantial risk of physical injury to the infant. In February 2016 the mother's first child, then 2 years old, was returned to his mother's care. Eight days later the caseworker learned from a relative that the mother was pregnant with twins. Later that month, the grandmother called the hotline to report the mother and the father of the younger child were living together and he was not supposed to be around the mother's older child. A report was taken for investigation of substantial risk of physical injury/environment injurious to health and welfare by neglect; it was unfounded after the infant died. In June 2016, within a month of the infant's death, the 2-year-old boy's case was closed because he had returned to his mother's care. At the time, the mother and the father of the 1-year-old boy were homeless and living in a hotel with the two children.

| Child No. 95 | DOB 4/14 | DOD 5/16 | Natural |
|---|---|---|---|
| Age at death: | 25 months | | |
| Substance exposed: | No | | |
| Cause of death: | Complications of congenital heart disease | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Twenty-five-month-old toddler was found gasping for air around 5:30am by her 41-year-old cousin. The toddler had been sleeping in a bed with the cousin and her 62-year-old grandmother. Emergency medical services were called and upon their arrival, they found the toddler unresponsive. They transported her to the hospital where she was pronounced deceased. The cousin had been caring for the toddler for several days because the toddler's mother was on pregnancy bed rest. Police notified the hotline of the toddler's death stating there were no indications of drug or alcohol use in the home and the doctor reported he did not see any trauma or bruising on the child's body. The hotline took a report for investigation of death by neglect against the cousin and grandmother. A coroner investigator called later the same day and an allegation of environmental neglect was added on the cousin regarding her own four children because of cockroaches in the home. All allegations were unfounded following investigation. The toddler died from undiagnosed congenital heart disease.

Prior History:     In May 2015 the Department investigated a report of inadequate supervision and substantial risk of physical injury/environment injurious to health and welfare by neglect after receiving a report that the mother had left her 12-month, 6 year and 7-year-old children home alone the previous night and that the mother regularly left them home alone. The investigation was unfounded after speaking with the mother, children, and relatives. The mother and older children denied the allegation. The mother reported the children had spent the night at their cousin's home and the cousin corroborated that the children had spent the night at her home and often stayed at her home because she had similarly aged children.

| Child No. 96 | DOB 9/97 | DOD 5/16 | Natural |
|---|---|---|---|
| Age at death: | 18 years | | |
| Substance exposed: | No | | |
| Cause of death: | Severe cardiomyopathy due to Duchenne Muscular Dystrophy | | |
| Reason For Review: | Teen was a youth in care | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Eighteen-year-old youth in care with Duchenne Muscular Dystrophy and Dilated Cardiomyopathy died in the hospital. He had multiple health complications in the months preceding his death requiring multiple hospitalizations. Three weeks before his death he was admitted to the hospital with RSV (Respiratory Syncytial Virus) and congestive heart failure. His condition worsened and he died in the hospital. The day before he died, family and friends visited to say goodbye and celebrate the youth's high school graduation; a school official was there to present him with a diploma. The Department did not conduct a child protection investigation of the youth in care's death.

Prior History: The youth came into the care of DCFS in 2013 at the age of 13 because on more than one occasion his mother left him alone with his 11-year-old brother with the expectation that the brother would care for the special needs teenager. The mother had substance abuse issues. The youth was placed with and cared for by his maternal grandmother. The youth's younger brother is in the subsidized guardianship of his paternal grandparents.

| Child No. 97 | DOB 3/16 | DOD 6/16 | Natural |
|---|---|---|---|
| Age at death: | 3 months | | |
| Substance exposed: | No | | |
| Cause of death: | Respiratory failure due to hypoxic ischemic encephalopathy | | |
| Reason For Review: | Child was a youth in care | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Three-month-old youth in care died in the hospital in the neonatal intensive care unit where she had been treated since birth. The infant had been delivered by c-section when her 28-year-old mother's placenta detached. The infant had been deprived of oxygen and was born with severe brain injury and neurological deficits. She was on a ventilator to breathe and received feedings by gastrostomy tube. DCFS did not investigate the infant's death.

Prior History: The infant and her three older siblings, ages one, two, and nine years, entered foster care in April 2016 following a hotline report by a doctor who had witnessed the infant's father mistreat his one-year-old daughter in the infant's hospital room. The 39-year-old father had been indicated in August 2015 for the allegation of sexual penetration to his girlfriend's 8-year-old daughter, the infant's sister, who had given a descriptive and credible account of the abuse. At that time the mother reported believing her daughter and making her boyfriend leave the home. After the doctor's hotline report, the mother reported that she allowed her boyfriend back into her home after he convinced her that he did not abuse her daughter. She reported ongoing domestic violence. All four children entered foster care in April 2016. The three surviving siblings have goals of return home to their mother.

| Child No. 98 | DOB 2/01 | DOD 6/16 | Natural |
|---|---|---|---|
| Age at death: | 15 years | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Unexpected Death in Epilepsy (SUDEP) | | |
| Reason For Review: | Closed intact family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Fifteen-year-old girl with a history of epilepsy was found unresponsive in her bed around 7:30am by her 34-year-old mother and 39-year-old father. The police and fire department responded and took the child to the hospital where she was pronounced deceased. A hospital nurse called the hotline to advise the Department of the child's death. She reported the child had been compliant with her medication and she had no signs of abuse or neglect. The Department did not conduct a child death investigation.

<u>Prior History:</u>    In May 2015 an allegation of cuts, bruises, and welts by abuse to the deceased's 5-year-old brother was unfounded; the parents and the couple's three children denied any abuse in the home and the children's pediatrician did not have any concerns about abuse or neglect. In October 2015 the social worker at the deceased's school called the hotline because the teen was concerned about her father's drinking and his behavior toward her pregnant mother. When a child protection investigator went to the home she found many cords running through the apartment from a neighbor's home because the family did not have any electricity. There also was no food in the home. The parents were indicated for inadequate shelter and inadequate food and the father was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect. The Department opened an intact family services case and the child protection investigator conducted a transitional visit with the assigned private agency worker and the family. Thereafter, the parents did not respond to visits, calls or letters and the case was closed in February 2016.

| Child No. 99 | DOB 4/16 | DOD 6/16 | Natural |
|---|---|---|---|
| Age at death: | 7 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Sepsis (presumed) | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

<u>Narrative:</u>        Seven-week-old infant died in the hospital where she had been placed on life support. Three days earlier the infant's family had taken her to the emergency room for signs of a cold and fever. She was sent home with Tylenol. The following day the family took the infant to another emergency room because she seemed to have gotten worse. The hospital administered an antibiotic but the baby's body began to shut down and she was placed on life support until her parents removed it that evening. The parents declined an autopsy at the hospital and the coroner was not called. It is believed the infant died from an infection(s) that passed into her bloodstream. The family's caseworker notified the hotline. The Department did not conduct a child protection investigation of the infant's death because no abuse or neglect was suspected.

<u>Prior History:</u>        A hospital social worker called the hotline when the infant was born. The infant's 16-year-old mother had a serious, chronic health condition; a history of risky behavior; unstable housing; and a 3-year-old child with an unknown living arrangement. A report was taken for investigation of substantial risk of physical injury/environment injurious to health and welfare by neglect against the teen mother. It was indicated. The teen was residing with the infant's 18-year-old father and the paternal grandmother. The teen's mother was incarcerated and she had given guardianship of the teen to a maternal aunt who has guardianship of the teen's 3-year-old son. An intact family services case was opened and the worker had seen the family several times before the infant's death.

| Child No. 100 | DOB 4/16 | DOD 6/16 | Natural |
|---|---|---|---|
| Age at death: | 2 months | | |
| Substance exposed: | No, but mother has a history of substance abuse | | |
| Cause of death: | Sudden Unexpected Death in Infancy | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Two-month-old infant was found unresponsive by his 24-year-old mother. The mother had been babysitting her friend's two children at her friend's home and fell asleep on the couch with the infant laying on his stomach across her lap. About an hour after the friend arrived home, the mother woke up screaming that the baby wasn't breathing. 911 was called and the friend's father, who had returned home with her, performed CPR as did emergency services and hospital personnel. The infant was pronounced dead. The Sheriff's Department called the hotline and advised the mother was still at the hospital and talking to police; while she had a history of heroin use, she appeared sober. The Department opened an investigation of death by neglect. Allegations of substantial risk of physical injury and inadequate supervision were added to the investigation when it was learned the mother had violated a two month old safety plan in a pending child protection investigation. The death investigation is still pending after 6 months.

Prior History: The hotline was called when the mother gave birth to the deceased. The mother had a history of heroin use and tested positive for opiates twice during her pregnancy, but she and the baby both tested negative for substances at the time of the baby's birth. The father was serving time in prison for a violence-related offense. Hospital staff was concerned about the infant's safety because the mother's patience level seemed low and her anxiety level appeared high. A report was pending at the time of the infant's death for investigation of substantial risk of physical injury/environment injurious to health and welfare by neglect to the infant by his mother. A safety plan was put into place in which the mother agreed to live with the infant with the maternal grandparents; and the mother and maternal grandparents agreed that all of the mother's contact with the infant would be supervised by the maternal grandparents. Before the infant's death, the mother completed a substance abuse assessment and no treatment was recommended. The investigator was going to refer the mother for intact family services. The investigation was completed and unfounded after the infant's death.

CHILD DEATH REPORT

## 17-YEAR DEATH RETROSPECTIVE

**TOTAL DEATHS BY CASE STATUS FY 2000 TO FY 2016**

| FISCAL YEAR | 2000-10 (11YR TOTAL) | | 2011 | | 2012 | | 2013 | | 2014 | | 2015 | | 2016 | | TOTAL | | AVERAGES 2000-16 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CASE STATUS | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| Youth in Care | 291 | 24.9% | 25 | 22.1% | 19 | 17.9% | 15 | 16.1% | 19 | 19.2% | 24 | 25.0% | 17 | 17.0% | 410 | 23% | 24 | 23% |
| Unfounded DCP | 221 | 18.9% | 23 | 20.4% | 32 | 30.2% | 19 | 20.4% | 28 | 28.3% | 30 | 31.3% | 23 | 23.0% | 376 | 21% | 22 | 21% |
| Pending DCP | 130 | 11.1% | 17 | 15.0% | 12 | 11.3% | 12 | 12.9% | 16 | 16.2% | 14 | 14.6% | 26 | 26.0% | 227 | 13% | 13 | 13% |
| Indicated DCP | 80 | 6.8% | 8 | 7.1% | 12 | 11.3% | 10 | 10.8% | 6 | 6.1% | 5 | 5.2% | 8 | 8.0% | 129 | 7% | 8 | 7% |
| Child of Youth in Care | 48 | 4.1% | 4 | 3.5% | 1 | 0.9% | 0 | 0.0% | 0 | 0.0% | 1 | 1.0% | 2 | 2.0% | 56 | 3% | 3 | 3% |
| Open Intact | 179 | 15.3% | 21 | 18.6% | 14 | 13.2% | 7 | 7.5% | 10 | 10.1% | 3 | 3.1% | 9 | 9.0% | 243 | 14% | 14 | 14% |
| Closed Intact | 49 | 4.2% | 3 | 2.7% | 2 | 1.9% | 8 | 8.6% | 2 | 2.0% | 9 | 9.4% | 7 | 7.0% | 80 | 5% | 5 | 5% |
| Open Placement/ Split Custody | 69 | 5.9% | 8 | 7.1% | 1 | 0.9% | 10 | 10.8% | 13 | 13.1% | 6 | 6.3% | 3 | 3.0% | 110 | 6% | 6 | 6% |
| Closed Placement/ Return Home | 17 | 1.5% | 2 | 1.8% | 1 | 0.9% | 4 | 4.3% | 0 | 0.0% | 0 | 0.0% | 1 | 1.0% | 25 | 1% | 1 | 1% |
| Others | 85 | 7.3% | 2 | 1.8% | 12 | 11.3% | 8 | 8.6% | 5 | 5.1% | 4 | 4.2% | 4 | 4.0% | 120 | 7% | 7 | 7% |
| TOTAL | 1169 | 100% | 113 | 100% | 106 | 100% | 93 | 100% | 99 | 100% | 96 | 100% | 100 | 100% | 1,776 | 100% | 104 | 100% |

**CHILD DEATHS BY DCFS CASE STATUS AND MANNER OF DEATH FY 2000 THROUGH 2016**

| FISCAL YEAR | 00-10 (11YR Total) | 11 | 12 | 13 | 14 | 15 | 16 | TOTALS |
|---|---|---|---|---|---|---|---|---|
| Total Deaths | 1169 | 113 | 106 | 93 | 99 | 96 | 100 | 1776 |
| **Youth in Care** | **291** | **25** | **19** | **15** | **19** | **24** | **17** | **410** |
| Natural | 168 | 10 | 8 | 6 | 8 | 10 | 5 | 215 |
| Accident | 43 | 3 | 2 | 2 | 4 | 3 | 2 | 59 |
| Homicide | 54 | 8 | 7 | 3 | 4 | 9 | 7 | 92 |
| Suicide | 12 | 2 | 2 | 1 | 1 | 1 | 2 | 21 |
| Undetermined | 14 | 2 | 0 | 3 | 2 | 1 | 1 | 23 |
| **Unfounded Investigation** | **221** | **23** | **32** | **19** | **28** | **30** | **23** | **376** |
| Natural | 83 | 9 | 6 | 3 | 5 | 5 | 8 | 119 |
| Accident | 72 | 7 | 13 | 7 | 9 | 12 | 8 | 128 |
| Homicide | 38 | 2 | 7 | 3 | 6 | 4 | 4 | 64 |
| Suicide | 8 | 2 | 0 | 0 | 1 | 2 | 2 | 15 |
| Undetermined | 20 | 3 | 6 | 6 | 7 | 7 | 1 | 50 |
| **Pending Investigation** | **130** | **17** | **12** | **12** | **16** | **14** | **26** | **227** |
| Natural | 44 | 4 | 4 | 2 | 5 | 3 | 8 | 70 |
| Accident | 32 | 9 | 4 | 3 | 2 | 4 | 3 | 57 |
| Homicide | 30 | 0 | 3 | 3 | 1 | 3 | 3 | 43 |
| Suicide | 2 | 1 | 0 | 0 | 0 | 0 | 2 | 5 |
| Undetermined | 22 | 3 | 1 | 4 | 8 | 4 | 10 | 52 |
| **Indicated Investigation** | **80** | **8** | **12** | **10** | **6** | **5** | **8** | **129** |
| Natural | 34 | 2 | 3 | 1 | 0 | 1 | 3 | 44 |
| Accident | 28 | 2 | 4 | 6 | 1 | 1 | 3 | 45 |
| Homicide | 7 | 3 | 3 | 1 | 1 | 1 | 1 | 17 |
| Suicide | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 3 |
| Undetermined | 10 | 1 | 2 | 1 | 4 | 2 | 0 | 20 |
| **Child of Youth in Care** | **48** | **4** | **1** | **0** | **0** | **1** | **2** | **56** |
| Natural | 21 | 2 | 0 | 0 | 0 | 0 | 0 | 23 |
| Accident | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 12 |
| Homicide | 7 | 1 | 0 | 0 | 0 | 0 | 0 | 8 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 8 | 1 | 1 | 0 | 0 | 1 | 2 | 13 |
| **Open Intact** | **179** | **21** | **14** | **7** | **10** | **3** | **9** | **243** |
| Natural | 87 | 12 | 4 | 1 | 4 | 0 | 2 | 110 |
| Accident | 44 | 3 | 5 | 4 | 3 | 1 | 2 | 62 |

| FISCAL YEAR | 00-10 (11YR Total) | 11 | 12 | 13 | 14 | 15 | 16 | TOTALS |
|---|---|---|---|---|---|---|---|---|
| Homicide | 23 | 4 | 1 | 0 | 2 | 1 | 1 | 32 |
| Suicide | 2 | 0 | 0 | 0 | 0 | 1 | 0 | 3 |
| Undetermined | 23 | 2 | 4 | 2 | 1 | 0 | 4 | 36 |
| **Closed Intact** | **49** | **3** | **2** | **8** | **2** | **9** | **7** | **80** |
| Natural | 18 | 0 | 1 | 1 | 1 | 3 | 1 | 25 |
| Accident | 15 | 3 | 1 | 3 | 0 | 1 | 2 | 25 |
| Homicide | 10 | 0 | 0 | 2 | 1 | 2 | 1 | 16 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 6 | 0 | 0 | 2 | 0 | 3 | 3 | 14 |
| **Open Placement/Split Custody** | **69** | **8** | **1** | **10** | **13** | **6** | **3** | **110** |
| Natural | 45 | 2 | 0 | 5 | 10 | 4 | 1 | 67 |
| Accident | 8 | 4 | 0 | 3 | 1 | 1 | 0 | 17 |
| Homicide | 7 | 0 | 1 | 1 | 2 | 0 | 0 | 11 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 9 | 2 | 0 | 1 | 0 | 1 | 2 | 15 |
| **Closed Placement** | **12** | **0** | **0** | **0** | **0** | **0** | **0** | **12** |
| Natural | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| Accident | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Homicide | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Adopted** | **6** | **0** | **0** | **0** | **0** | **0** | **0** | **6** |
| **Former Youth in Care** | **12** | **1** | **1** | **2** | **4** | **2** | **1** | **23** |
| **Return Home** | **15** | **2** | **1** | **4** | **0** | **0** | **1** | **23** |
| **Interstate Compact** | **3** | **0** | **0** | **0** | **0** | **0** | **0** | **3** |
| **Preventive Services** | **33** | **0** | **1** | **1** | **0** | **0** | **0** | **35** |
| **Subsidized Guardianship** | **1** | **0** | **0** | **0** | **0** | **0** | **0** | **1** |
| **Child of Former Youth in Care** | **4** | **0** | **0** | **0** | **0** | **0** | **0** | **4** |
| **Extended Family Support** | **6** | **0** | **5** | **0** | **0** | **2** | **1** | **14** |
| **Child Welfare Referral** | **11** | **1** | **5** | **5** | **1** | **0** | **2** | **25** |

144

## CHILD DEATHS RULED HOMICIDE FY 2000 - 2016

Between fiscal years 2000 and 2016, the Office of the Inspector General received notification of 323 youth whose cause of death was ruled a homicide and where the child was in the care of the Department or had contact with Department in the 12 months leading up to the homicide. Of the 323 deaths, 91 of the children were in the Department's care at the time of their death and 232 of the children's family had prior involvement with the Department. Using the Centers for Disease Control's WONDER data, the Office of the Inspector General compared the homicide deaths of children in Illinois based on age groups. The Inspector General split the data into two age categories: youth 14 and under and youth 15 and older. The homicides of youth 14 and under are actual numbers.  For youth 15 and older the OIG used the crude rate for the state and actual numbers for Department youth.  To obtain the crude rate investigators divided the number of homicides in Illinois youth 15-19 by the total number of youth in Illinois of the same age.[1]



**Homicides of Youth 14 and Under**

---

[1] The Centers for Disease Control Wonder data accessed December 2016.  The CDC data was current to 2014 and had not reported on data for 2015 or 2016.

**Homicides in Youth 15 and Older**



## Homicides of Children in the Care of the Department

From FY2000 through FY2016 the Office of the Inspector General reviewed the homicides of 91 children placed in the care of the Department. Twelve children had entered foster care after sustaining incapacitating abusive injuries at the hands of their parents; one was fatally injured by an uncle. The children died after the initial abusive event because of their susceptibility to infection and disease. The manner of their deaths was classified as homicide.

Ten infants and children killed while living in foster care ranged in age from six weeks to eight-years-old. Two were infants, two were toddlers, four were preschoolers and the two oldest were elementary school. The two-year-old and three-year-old were killed by their parents, one during an approved unsupervised visitation and the second was killed when the relative foster parent allowed the mother to take the child to the grandmother's home. The agency had no knowledge that the relative was allowing the mother to have unsupervised contact with the children. The father was residing with the grandmother when he murdered the child and his wife by setting the family on fire. A pregnant fourteen-year-old foster child, who was on run from a shelter, was killed by her over thirty-year-old boyfriend.

Seven children and adolescents in foster care or independent living were killed by another youth. A five-month-old in relative foster care was killed by his nine year-old-brother who was play wrestling with the infant. An eleven- year-old foster child, who was on run, was shot at a friend's home by a 16-year-old. Two 13-year-old foster children were killed by a cousin or brother while placed in relative foster care. A 14-year-old foster child, who was recently placed in the licensed foster home, stabbed her 13-year-old foster sister. The sixth youth, an 18-year-old, was killed by his cousin in another state while on run from a relative foster home. The oldest youth, a 20-year-old was killed by a 17-year-old who lived in the same independent living program.

The majority of youth (60) was 13 and older when killed during incidents of street violence. In FY2016 the Office of the Inspector General issued a cohort study of 11 youth in care who fell victim to violence in their communities. See the full investigation on page 29 of this report.

One 16-year-old was killed during an inappropriate physical restraint (choke hold) in a residential facility. The medical examiner ruled the cause of death as asphyxia with manner as homicide. Two residential

staff members took part in the incident.  One staff member was charged with obstruction of justice.  The other staff member was charged with involuntary manslaughter and remains in custody awaiting trial.  A full Inspector General investigation is pending regarding the youth's death.   The Inspector General had previously investigated a restraint death of an 11-year-old placed in a residential program in FY2001.[2]

In that restraint incident, two residential staff members had restrained the 11-year-old while in a clinician's waiting room.  The staff had used an inappropriate restraint, straddling her.  When the police responded to the event, they found the staff members still sitting on her.  The medical examiner ruled the death as accidental asphyxia.  The Assistant State's Attorney appeared before the Grand Jury to seek involuntary manslaughter charges against both staff members.  The Grand Jury determined that the facts presented to them did not warrant an indictment, and the case was closed.  One of the employees was terminated and the other resigned.



**Street Homicides of Youth with Prior Department Involvement**
The Inspector General reviewed the data on children killed when the Department had previous involvement (within 12 months) with the child or family.  Forty children killed were in this category.  Thirty-seven of the children died in an incident of gun violence, including the youngest child, a five year old, who was shot while a passenger in a relative's car.  The child's father was a gang member with a criminal history of firearm offenses who was believed to be the intended target.  A 27-year-old distant relative, also a gang member with a criminal history, was charged with first degree murder.  The second youngest child, seven-years-old, was killed when the apartment building the family lived in was intentionally set on fire to kill a rival gang member.   A twelve-year-old was stabbed while intervening in an argument between her sixteen-year-old sibling and the sibling's 18-year-old friend.  The third youth was a 16-year-old stabbed during an altercation where the youth was the aggressor.

---

[2] OIG #97-3863



CHILD DEATHS RULED HOMICIDE FY 2000-2016

# GENERAL INVESTIGATIONS

**GENERAL INVESTIGATION 1**

**ALLEGATION**  During the course of an investigation, the Office of the Inspector General again identified excessive caseload assignment as an ongoing impediment for child protection investigators.

**INVESTIGATION**  While investigating a report of falsification of records, the Inspector General found that the child protection investigator had been assigned new investigations well in excess of the standards established by a federal consent decree. Inspector General investigators reviewed case assignment across all teams for a two-month period.  Inspector General investigators found that while levels varied, caseload assignment levels were elevated across all regions of the state. The Inspector General has found that investigators continue to be assigned cases greatly in excess of the standard established by the consent decree intended to ensure the effectiveness and quality of their efforts.

The institutional failings of the Department create a toxic work environment in which it is foreseeable that some investigators will take dangerous shortcuts that can lead to lethal errors.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**  **1.  This report will be shared with the court overseeing the BH consent decree.**

The Department rejects the report and its recommendations.

*OIG Comment: The Inspector General notes that the Department has no authority to reject Office of the Inspector General reports (as opposed to recommendations).*

**2.  The Department must commit to a sustainable remedy to this problem by the end of this fiscal year.**

The Department rejects the report and its recommendations.

*OIG Comment: The Inspector General notes that the Department has no authority to reject Office of the Inspector General reports (as opposed to recommendations).*

_____

**DEPARTMENT RESPONSE FOLLOW.**



**Bruce Rauner**
**Governor**

**George H. Sheldon**
**Director**

To: DCFS Office of Inspector General

From: George H. Sheldon, Director

Re: Response to "Statewide Investigative Caseloads" Report, OIG File No. 2016-IG-2769

_____

The DCFS Office of Inspector General ("OIG") recommended that: 1) its two-page report titled Statewide Investigative Caseloads should be shared with the court overseeing the B.H. Consent Decree; and 2) that DCFS should commit to a sustainable remedy to this problem by the end of the fiscal year. The Department rejects the two recommendations made in "Statewide Investigative Caseloads" report, OIG File No. 2016-IG-2769 ("Report") and further responds as follows:

The OIG has no authority under rule or procedure to make determinations about whether DCFS is in compliance with the terms of the B.H. Consent Decree. The federal district court in the ongoing B.H. litigation has the authority to make such a determination. Indeed, the investigative caseload issue has been the subject of discussion and review by the B.H. plaintiffs, the Department and the federal court. The OIG concedes that it did not receive a complaint relating to compliance with B.H. caseloads— instead, the OIG chose to look at the issue while in the course of an unrelated investigation of a single child protection worker. It appears that the OIG did not do a full investigation of the issue prior to issuing the 2½ page report. Because this report is beyond the scope of an OIG investigation and is being addressed within the B.H. litigation, the Department rejects the recommendations.

DCFS faces ongoing challenges to compliance with the B.H. Court's caseload requirements. Turnover is high and continuous in the stressful position of Child Protection Investigator. Challenges arise because DCFS is bound to comply with the hiring process as set forth in the Personnel Code, and the provisions of the collective bargaining agreement. Open positions must be offered to current employees within the state and DCFS can hire individuals outside of state government only if there have been no candidates with contractual rights to the positions via job assignment, upward mobility or transfers from other agencies who bid on the position. As more fully set forth in Section III, below, DCFS is taking aggressive steps to try to fill vacancies within the constraints of State of Illinois hiring rules. These challenges are entirely unrelated to budget issues.

The OIG's report and recommendations, however, are based on an insufficient, unreliable and invalid sample of child protection caseload data, a complete misunderstanding of the provisions of the B.H. Consent Decree and a failure to investigate or consider steps already being taken to address caseloads for child protection investigators. When the OIG asked DCFS personnel about the caseloads, Department personnel offered three separate times to provide the OIG with information relating to the plan to deal with the caseload issue. Rather than request and review that information, the OIG instead

issued the report to the Governor's office on May 6, 2016. Thus, the OIG issued the report without becoming fully informed.  On the other hand, the Department had previously met with the B.H. plaintiffs' counsel and discussed the detailed plan to address caseloads, and that is the appropriate forum for such discussions.  For these reasons, the OIG's report does not contribute to an understanding of the caseload issue, which is already before the parties and the court in the B.H. litigation.

I.  **OIG Has No Authority to Determine Compliance with B.H. Consent Decree**

During the course of an investigation into allegations that a child protection investigator committed falsification of records, the OIG reviewed the caseload of the particular investigator who was the subject of the OIG complaint.  The OIG determined that this investigator was assigned caseloads exceeding the limits in the B.H. Consent Decree.  The OIG then chose to review the statewide "Protective Service Team by Worker" reports for the two-month period from January to February 2016. Based on this report, the OIG concluded that DCFS was out of the compliance with the caseload standards of the B.H. Consent Decree.

The Children and Family Services Act authorizes the Inspector General to conduct "investigations into allegations of or incidents of possible misconduct, misfeasance, malfeasance, or violations of rules, procedures or laws by an employee, foster parent, services provider or contractor" of DCFS.  20 ILCS 505/35.5(a).  The Inspector General is required to adopt rules necessary to carry its functions, purpose, and duties.  Id.

DCFS Rule 430.40 sets forth the complaint process for the Inspector General. 89 Ill. Admn. Code 430.40.  The Office of the Inspector General accepts written complaints, including complaints from the general public.  All complaints are evaluated to determine if they suggest possible misconduct, misfeasance, malfeasance, or a violation of rules, procedures or statutes by a DCFS employee, foster parent service providers or contractors to determine if a full investigation is warranted.  89 Ill. Admn. Code 430.40(b), (c).  The OIG rule specifies that complaints will not be accepted unless the complaint alleges misconduct, misfeasance or malfeasance or a violation of rules, procedures or statutes or a basis for employee licensure action, the complaint is against a person within the jurisdiction of the Inspector General's office and the allegations can be independently verified through investigation.  89 Ill. Admn Code 430.40(d).

The OIG failed to adhere to its rules by issuing in the "Statewide Investigative Caseloads" report. The OIG concedes that there was no complaint giving rise to an investigation into caseloads; rather, while the OIG was conducting an investigation into allegations of falsification by a single worker, investigators decided to review statewide caseload data for a two-month period.  Even if there had been a complaint, a violation of B.H. caseload standards is not a matter that is properly subject to an OIG investigation.  The court may approve a plan to address consent decree standards at any time, may choose to amend the consent decree standards at any time, and may determine whether the department is or is not in compliance.  The OIG has authority to investigate misconduct, misfeasance, malfeasance or violations of *rules, procedures or laws*.  The OIG's rules define misfeasance as the "improper performance of some act that a person may lawfully do," and malfeasance as "a wrongful act that the actor has no legal right to do, or any wrongful conduct that affects, interrupts, or interferes with performance of an official duty." 89 Ill. Admn. Code 430.20.  The issue of caseload standards does not fall anywhere within the definition of misfeasance or malfeasance.  Nor does it implicate any violation of a rule, procedure or law.  Whether caseload standards are sufficient within the terms of the B.H. Consent Decree is a determination for a court, not the OIG.

Also, it does not appear that the OIG conducted a meaningful investigation into the caseload issue in any event.  The report details that the OIG investigators "reviewed the statewide January and February 2016 Protective Service Team by Worker reports."  While the OIG asked for and received certain limited information about caseloads for a discrete time period, it appears that no telephonic or in-person interviews were conducted, there was no effort to analyze a valid sample nor were there efforts to review the extensive efforts DCFS is making to address caseloads.  In fact, the OIG report reflects a lack of understanding about how DCFS analyzes the issue of compliance with B.H. Caseload standards and what DCFS is doing to address the issue.

Indeed, the OIG failed to pursue relevant information that was offered on three separate occasions by DCFS Deputies.  Specifically: 1) On May 3, 2016, Diane Moncher from the OIG emailed Nora Harms-Pavelski seeking information on vacancies for child protection.  Ms. Harms-Pavelski directed Ms. Moncher to the Office of Employee Services, and also stated, "if you need any information about how we are covering vacancies for whatever doing our coverage plan give me a yell."  2) Tammy Grant responded to Ms. Moncher's email on May 4, 2016 providing a list of vacancies and invited Ms. Moncher to contact her if she had any questions.  3) The next day, Deputy Director of Operations Michael Ruppe emailed Ms. Moncher saying he would be happy to provide information on how Operations has been addressing the workload.  None of these three DCFS Deputies heard from anyone in the OIG's office regarding claims of excessive caseloads.  Rather than following up, the OIG issued a report to the Governor's office.

## II.     **Background on B.H. Caseload Provisions and Involvement of Plaintiffs and Court**

The B.H. Consent Decree provides that "each DCFS child protective services investigator will be assigned no more than 12 new abuse or neglect investigations per month during nine months of a calendar year" and "[d]uring the other three months of the calendar year, the investigator will be assigned no more than 15 new abuse or neglect investigations per month.  Neither the nine months nor the three months need occur consecutively."  B.H. Consent Decree Par. 26(a).

The B.H. Consent Decree requires a review of child protection caseloads over a calendar year.  In the past, DCFS has reviewed child protection caseloads in a variety of ways, including looking at the child protection investigator's average caseload based on an average of the B.H. caseload standards, looking at the child protection investigator's caseloads over a full calendar year and looking at the child protection investigator's caseloads on a rolling twelve-month basis.

The OIG report only looks at the caseloads for child protection investigators for the first two months of 2016.  The OIG does not explain its calculations, nor does it state whether the calculations are based on teams or on individual child protection investigators.  At one point, the OIG notes that "[a] majority of the teams started the calendar year already in violation of the B.H. Consent Decree. . ," but later states that an OIG investigator determined that 73% of the investigators in the Cook region and 68% of investigators in the  Northern Region were over the B.H. limit as of February 2016." (OIG Report, p. 1)

The OIG recommends that the OIG's report be shared with the court overseeing the B.H. decree. (OIG Report, p. 2). This recommendation both overlooks and misapprehends essential components of the B.H. Consent Decree. Paragraph 68 of the B.H. Consent Decree provides that if plaintiffs' counsel asserts that the Department is or is likely to be out of the compliance with any terms of the decree, they shall notify the Department and the parties shall meet to discuss the areas of non-compliance and to prepare a plan for achieving compliance.  B.H. Restated Consent Decree, Par. 68(d).  Any plan for

compliance shall be submitted to the Court and, subject to the Court's approval, shall be incorporated into the Decree.  Id. The Decree expressly prohibits class members from enforcing the Decree solely on isolated instances of non-compliance. B.H. Restated Consent Decree, Pars. 6, 68(e).

The terms of the Consent Decree clearly require the parties to discuss and attempt to resolve any issues of potential concern regarding compliance with the provisions of the Consent Decree.    The parties are then required to develop a plan and present the plan to the court for approval.

In fact, during the course of the B.H. litigation, DCFS has had challenges meeting the caseload provisions for child protection investigations set forth in the Decree.  In the past, in accordance with the provisions of the Consent Decree, plaintiffs' counsel and DCFS have conferred and developed a plan for compliance.  In 2012, the court approved an Implementation Plan to Address Investigation Caseloads, which required the hiring of new investigative staff, the hiring on an emergency and temporary basis of retired employees with child protection experience and the temporary assignment of non-investigative DCFS staff to child protection investigator positions.

In April 2016, plaintiffs' counsel in B.H. requested a meeting with DCFS staff to discuss caseload concerns amongst investigative staff.  The information provided below was the same information provided to plaintiffs' counsel during that meeting.  The discussions that occur between the parties are confidential settlement discussions under the Federal Rules of Evidence.

### III.  Current DCFS Efforts to Reduce Caseloads for Child Protection Investigators

The OIG's second recommendation is that the Department commit to a sustainable remedy to the caseload problem by the end of this fiscal year.  (OIG Report, p. 2)  The only information upon which the OIG bases her recommendation is her own analysis of the caseloads for two months for child protection investigators.  The OIG apparently made no attempt to interview DCFS management staff regarding their efforts to address the caseload standards, even though the Deputy Directors of Child Protection, Operations and Employee Services expressly offered to provide additional and specific information.  Had the OIG done so, she would have learned that DCFS management has been diligently working to develop remedies to the caseload issue for child protection investigators and has engaged in numerous efforts over the past year to address the issue.

### A.  Regular Review of Caseload and Hiring Data

DCFS Senior Operations management staff review both caseloads and vacancies for child protection staff on a monthly basis.  Senior Operations staff reviews a "Child Protection Caseload Report – Details" report from SACIWS which contains the current number of staff, the number of pending cases at the start of the month, the number of newly assigned cases, the average number of newly assigned cases, the number of completed cases, and the number of pending cases at the end of the period.  This report gives a slightly more detailed look at the workload of the investigators than the 2016 Protective Service Team by Worker Reports relied upon by the OIG since it indicates to which cases the investigator is assigned, which cases the investigator has completed and how many cases the investigator has pending at the end of the period.

DCFS Senior Operations staff also reviews vacancy reports for child protection positions throughout the state on a monthly basis. Regional personnel liaisons prepare regular reports on status of vacancies to alert Operations management staff of the status in relation to posting, filling and any ongoing challenges. The Operations Senior Deputy maintains close communication with the Office of

Employee Services Deputy regarding the status of vacancies and the filling of those vacancies, including weekly phone conferences regarding vacancy issues.

Additionally, the DCFS Office of Employee Services and the DCFS Office of Finance and Budget review on a weekly basis the list of child protection vacancies. The purpose of this review is to enable the Office of Employee Services to ensure that any open child protection investigator position is posted at the earliest possible time.

**B.   Current Child Protection Investigation Staffing Issues**

DCFS acknowledges that there are currently staffing and vacancy issues for child protection investigators, particularly in the Northern and Central Regions. DCFS shared and discussed data regarding the vacancies with the plaintiffs in B.H. in late April 2016. As of early May, there were 52 vacancies for child protection positions in Northern region, 36 vacancies for child protection investigator positions in the Central Region, 24 vacancies in Cook County and 6 vacancies in the Southern Region. DCFS is currently attempting to staff child protection investigators at a ratio of 10:1 and the vacancy projections listed below are based on the 10:1 case ratio. The 10:1 ratio will attempt to account for leaves of absences and vacation schedules of child protection investigators. The information presented below regarding vacancies and other data is based on a caseload of 10:1 for each child protection investigator.

In any effort to address caseload compliance, DCFS is bound to comply with the state hiring process, as set forth in the Personnel Code, and the provisions of the collective bargaining agreement. When a child protection investigation position becomes vacant, DCFS is first required to post the position for internal staff to bid on the position for ten days. DCFS can only seek to hire individuals outside of state government if there have been no candidates with contractual rights to the positions via job assignment, upward mobility or transfers from other agencies who bid on the position.

For individuals who have never worked for the State of Illinois, who have worked for the State of Illinois but never held certified status, who have been a certified State of Illinois employee and wish to exercise veteran's preference rights or who are a certified non-veteran State of Illinois employee and wish to be seek a new position, the state hiring process commences with the submission of an employment application to Central Management Services (CMS) for a specific position. CMS will "grade" the application based on the education, training and experience provided. If an individual obtains a passing grade, the individuals name will be placed on the open competitive eligible list for a position in the two counties selected on the employment applications. DCFS will request an Open/Competitive Eligibility list from CMS when all efforts to fill the vacancy via the Personnel Code and Master Contract have been exhausted.

**C.   DCFS Efforts to Expedite the Hiring Process**

In December 2015, at the request of Director Sheldon, CMS and the Governor waived Administrative Order #2 relating to the grading process of employment applications by CMS. This action moved the grading of DCFS child protection investigative staff to a priority level for purposes of candidate grading, resulting in the grading of 600 Child Protection Specialist applications and the placement of additional names on the Open/Competitive Eligibility list. The DCFS Office of Employee Services worked closely with staff from CMS to assist candidates who sought to appeal a grade from CMS through the administrative appeal process.

154                                    GENERAL INVESTIGATIONS

The DCFS Office of Employee Services employs two full time recruiters.  One recruiter is located in Chicago and is bi-lingual and the other recruiter is located in Springfield.  Recruitment staff regularly attend events to recruit staff and currently maintain a Recruitment Tracking system that tracks the number of potential candidates from each event.  Recruitment staff currently recruit at 45 different universities around the state. Regional personnel liaisons prepare regular reports on the status of vacancies to alert Operations management of the status in relation to posting, filling and challenges. The Operations Senior Deputy maintains close communication with the Office of Employee Services Deputy Director regarding vacancies and the filling of vacancies with weekly conversations regarding staffing/vacancy issues. The DCFS Office of Employee Services also advertises vacancy needs on various social media sites, including Linked-In, Facebook, the DCFS External Website and various other organizations through our Communications Office.

Effective March 2016, CMS, at the request of DCFS, expanded the degree requirements for Child Protection Specialists to include degrees in Criminal Justice, Criminal Justice Administration and Law Enforcement.  In anticipation of this change, beginning in February 2016, DCFS recruitment staff began advertising the expanded degree requirements at recruitment events in order to encourage applicants with those degrees to apply for child protection investigator positions.

DCFS maintains continuous postings for various counties, including Danville, DeKalb, Elgin, Galesburg, Jacksonville, Kankakee, Quincy, Waukegan, Aurora, Peoria and Urbana.  Generally, a position is posted for a maximum of ten days.  The continuous posting allows for ongoing, daily advertising of the position on the state job website.

The efforts described above have been effective and resulted in the addition of a number of candidates to eligibility lists across the state.  However, DCFS still has a number of counties and offices where there are no individuals on the current eligibility list and those counties include Danville, DeKalb, Elgin, Galesburg, Jacksonville, Kankakee, Quincy, Waukegan, Aurora, Peoria and Urbana. The Office of Employee Services and Office of Budget and Finance review vacancies for approval on a weekly basis in an effort to keep vacancies moving quickly.  As soon as a position is expected to become vacant, the Office of Employee Services requests that the Personnel Liaisons put the vacancy into the system in order for DCFS to attempt to fill the position prior to the separation date whenever possible.  When the Office of Employee Services and the Office of Budget and Finance review and attempt to fill vacancies, they are doing so at the ratio of 10:1.

DCFS management has worked very closely with AFSCME in order to obtain agreements to waive some of the contractual rights in filling vacancies in an effort to hire external candidates more quickly.  The agreements between DCFS and AFSCME involve posting waivers, five-day postings and backfill language.

As of May 2016, CMS reports they currently have approximately 221 Open/Competitive Applications and 90 Promotional Applications to be graded and that they are currently grading applications received as of March 14, 2016.  This information is a significant improvement since, in the past, CMS has been more than nine months behind in grading applications.   CMS also indicated that it has eight to ten applications in the appeal process at this time.

The Office of Employee Services will be working with Director Sheldon again to make a request to CMS and the Governor's Office to waive Administrative Order #2 to do another sweep of the pending applications in order to expedite the grading process.  This again will increase the number of applicants

available on the Open/Competitive Eligibility list, especially in those counties where there are no current candidates.

### D.   Specific Efforts to Address DCFS Child Protection Caseloads

DCFS utilizes a variety of efforts to address needs of local offices and teams that have either a high number of child protection vacancies or a staff with a high level of newly assigned or pending cases. These efforts are dictated not only by the terms and conditions of the Personnel Code, but also by the provisions of the collective bargaining agreement.

#### 1.   Short Term Contracts for Retirees

DCFS continues to utilize retirees on 75-day contracts in an effort to cover offices where DCFS has a high volume of vacancies.  Currently, DCFS has two retirees in the Galesburg office, one retiree in Belleville, one retiree in Alton and one retiree in Danville.  DCFS continues to reach out to retirees to develop additional resources.  In the past, DCFS has used retirees to cover offices where DCFS had a high volume of vacancies in the Northern and Cook regions.  DCFS also has in place a 75-day contract with a retired Acting Regional Administrator to assist in the review of undetermined investigations and identify tasks for the field to complete for the finalization of the investigation.

#### 2.   Overtime Projects for Staff with Child Protection Experience

DCFS child protection management has developed overtime projects for child protection staff throughout the state.  In the Northern Region, DCFS has regularly utilized overtime projects and has specifically used overtime projects for the Waukegan, Joliet and Rockford offices, which are offices where DCFS continually has challenges in filling child protection positions. DCFS currently has an overtime project ongoing in the Central region, including the Danville, Springfield and Urbana offices, and in the past has offered overtime to staff to cover offices in Galesburg, Peoria and Quincy.  DCFS has also used overtime projects to cover vacancies in Cook County.

DCFS has also offered overtime to persons who were previously certified as investigators and transferred to other divisions.

#### 3.   Plan to Detail Staff with Child Protection Experience

DCFS child protection management has detailed staff in the past in the Northern and Central regions from fully staffed offices to those offices that were experiencing high vacancies.  Detailing of child protection investigators is governed by the collective bargaining agreement.  An employee shall not be detailed for more than six work weeks in four calendar months and a specific position shall not be filled by detailing for more than 15 work weeks. Article XIV, Section 5, pp. 81.  The union and management may agree to reasonable extensions of the time frames where operational needs dictate. Id.  DCFS management must first seek volunteers for detail assignments in order of seniority.  If there are no volunteers, DCFS staff may be detailed and the detail shall be rotated among qualified employees in inverse seniority order.   Article XIV, Section 5, p. 82.

DCFS management detailed child protection investigators from the Southern Region to the Danville office to assist in completing cases.  DCFS management also has detailed investigative supervisors to investigator positions when feasible.  DCFS management also uses "floaters" to handle cases in offices experiencing high vacancies.

DCFS developed a detail plan for staff, which is set forth below:

<u>Voluntary details</u>:
3 detailed to Joliet from Belleville May 13-20
4 plus 1 supervisor detailed to Joliet for June 3-10 (1 from Alton, 1 from Belleville, 1 from Carlyle, 1 from Anna, 1 from Granite City)
6 plus 1 supervisor detailed to Waukegan for June 3-10 (3 from Olney, 2 from Belleville, 1 from Mt Vernon, 1 from Murphysboro)
5 plus 1 supervisor detailed to Rockford for June 10-17 (2 from E St Louis, 3 from Belleville, 1 from Carlyle)


<u>Central Region</u>:

5 detailed to Danville (1 from Charleston, 1 from Urbana, 1 from Lincoln, 1 from Bloomington, 1 Bloomington floater)
1 detailed to Peoria from Ottawa
2 detailed to Galesburg from Rock Island

<u>Northern Region</u>:
2 details to Rockford, 1 from Sterling and 1 from Freeport
1 detail from Kankakee to Joliet
4 details to Elgin from Aurora, however it has been determined since this is the same county these are not considered details
3 details to Waukegan from Woodstock

<u>Cook County</u>:
2 detailed to midnights (1 from Harvey, 1 from 1911); 1 from Harvey detailed to after hours, weekends, holidays & CDA's

**4.  <u>Other Efforts</u>**
    In addition to the above efforts, DCFS management may delay individuals who are leaving child protection investigator positions to go to other positions in other DCFS divisions or specialties.  DCFS undertook this effort primarily in Cook County and Northern Region in conjunction with union notification.

    DCFS also is considering some boundary changes in reference to the geographical area that offices cover in the western part of the Northern region.  This change will increase the ability to fill vacancies with general candidates on the Open/Competitive Eligibility List.  This proposed change would require negotiation with the union prior to any changes.


**-  END OF DEPARTMENT RESPONSE  -**

*OIG Rebuttal: The Cook County Office of the Public Guardian also expressed concern about investigative caseload "that clearly exceed a reasonable workload." As the Cook County Public Guardian further noted,*

> *"Even well-intentioned, dedicated and truthful investigators, caseworkers and managers are stymied in their attempts to serve children and families under the weight of overwhelming caseloads." (Letter from the Cook County Public Guardian to Director George Sheldon dated March 2, 2016.)*

*In 2013 DCFS provided a detailed description of its child welfare workforce as part of its Federal Fiscal Year 2013 Annual Progress and Service Report.  The Report noted that caseload size depended on child protection intake, standards set by an Illinois federal court Consent Decree, and outcomes of safety, permanency and well-being of the children and families involved in the child welfare system. Utilizing workforce studies and its valued outcomes for families, Illinois reported that it used a 9:1 Caseload size for Child Protection Specialist to meet its goal of reasonable active investigations. [IDCFS Annual Progress and Services Report Federal Fiscal Year 2013, Chapter X.] The caseworker ratio took into consideration average years of service, benefit time, and administrative as well as investigative tasks and duties. At that time demographic information on its current staff and recent hires found the average child welfare worker had over 13 years of experience.*

*The graph below tracks DCFS' child protection 10:1 caseload size and intake from July 2014 through July 2016. Beginning in March 2015, the discrepancy between needed headcount and actual headcount has consistently widened statewide as shown in the chart below. The graph is based on caseload data maintained by the Department which is at a ratio of 10 cases per investigator.*



GENERAL INVESTIGATIONS

*According to the DCFS Executive Statistical Summary (dated October 31, 2016) the number of Child Abuse/Neglect Reports Taken increased 16% to 78,581 in FY 16 from the previous fiscal year. While there was a 16% statewide increase in child protection intake, certain areas (Rockford, Aurora, Champaign, Cook Admin and Cook Central) of the state faced crises with insufficient numbers of investigators. The mean assignment load in these areas of the state ranged from 18 to 21 investigations. In the first half of calendar year 2016, the percent of workers in these areas with caseloads exceeding a reasonable standard increased from 63% to 94%.*



*The Child Welfare League of America in a December 2013 Special Report voiced its expert opinion that it is not possible for CPIs no matter how qualified, experienced, and well-trained to work effectively in caseloads that are too high. [CWLA Special Review Report December 19, 2013.] CWLA recommended child protection caseload be limited to no more than 12 new active cases. A key management function is to ensure that investigative caseloads are tenable. Over the years, investigators workload tasks have increased without lowering caseload size.*

*Effective management of child protection workloads requires continuous monitoring of workload capacity. Indicators include tracking trends of investigations intakes and population shifts, backlogs of overdue open investigations, use of overtime or unpaid time to complete investigations, noting if there is increasing needs for bi-lingual investigators and increase demands for more investigatory or administrative duties. [IG investigations found that some investigators and supervisors would take a vacation day and work in their office to catch up on their open investigations without the cost response of being assigned a new investigation.] Such monitoring builds the predictive capacity of the agencies to measure workload burdens and afford remedial remedies prior to overburdening workers and increasing the risks to child safety. As the data from FY 2014 suggests, the Department previously took such anticipatory management actions which resulted in reasonable caseloads.*

## GENERAL INVESTIGATION 2

| ALLEGATION | A four year-old girl was subjected to four separate Children's Advocacy Center (CAC) interviews within one year. |
|---|---|

| INVESTIGATION | The mother had been a victim of severe long-term sexual abuse throughout her childhood and, as the result of being raped, gave birth at the age of 13. The baby |
|---|---|

was subsequently adopted. As an adult, the mother's mental health diagnoses included bipolar disorder, paranoid schizophrenia and post-traumatic stress disorder (PTSD). The mother also began using heroin and prescription pills as a teen. When the mother, at age 21, gave birth to the girl the baby tested positive for methadone. The parents separated when the girl was 10 months-old and eight months later the father petitioned the court for full custody. The mother's relatives supported the father's pursuit of sole custody relating accounts of her drug addiction and statements the mother had made expressing "urges" to cause the girl physical harm. The mother and father eventually agreed to a custody agreement calling for the girl to spend alternating weeks with each parent, though the father was named as the girl's primary custodian.

While the custody proceedings were pending, the mother married another man. Thirteen months after the custody arrangement was adopted by the court, the mother gave birth to a son. The father of the girl maintained a cordial relationship with the mother and stepfather, with the mother later telling law enforcement she had considered the father her best friend even after she married the stepfather. Two months before the girl turned four years-old, the father married another woman and they went on their honeymoon. Upon their return, the mother refused to return the girl to the father's home as scheduled and filed a *pro se* motion in court claiming the father had sexually abused the girl. In response to the allegation, the court instituted a modified custody arrangement which only allowed the father supervised visitation for an eight-hour period one day per week, and a child protection investigation was initiated.

The mother told the assigned child protection investigator that she suspected the girl's paternal grandfather had sexually abused her, though she had accused the father of committing abuse in her court filing. The mother claimed the girl's paternal aunt had previously confided to her that she had been molested by the paternal grandfather as a child and the mother became concerned after the girl began exhibiting "humping" behaviors around her home. The mother informed the investigator of her history of mental health and substance abuse issues, stating she had not used heroin since the previous year. The investigator then spoke with the girl who denied experiencing or witnessing any inappropriate contact by her father or anyone else. The investigator informed the mother that she would not schedule a Child Advocacy Center (CAC) interview since the girl had denied any abuse had occurred.

One week later, the mother called the investigator and told her the girl had disclosed to a therapist that, "someone had done something orally to her," prompting her to seek medical examination that resulted in a Child Advocacy Center interview. The investigator consulted with staff members from the medical center where the examination and interview were conducted. Staff reported the girl's physical examination was normal and that she denied any abuse. The investigator noted the staff were "suspicious" of the mother's statements as she could not provide an explanation for the basis of her belief her daughter had been abused. The investigator also spoke separately with the paternal grandfather and paternal aunt who both denied any history of improper sexual behavior during the aunt's childhood or in relation to the girl.

Over the next two weeks while the investigation was pending, the mother made repeated allegations of sexual abuse of the girl by the father to therapists, local law enforcement and the State Central Register (SCR). The mother's campaign resulted in two additional sexual abuse-related interviews of the girl being conducted on consecutive days, one of which was conducted by another Child Advocacy Center. While it was reported that

during the first of the new interviews the girl had disclosed inappropriate contact with her father, during the second Child Advocacy Center interview, she again denied any abusive experiences.  The investigator noted that the mother had become angry following the second Child Advocacy Center interview upon learning that the girl did not disclose any abuse.  The day after the second Child Advocacy Center interview, the mother reported to local police that after the father picked the girl up for a visit, she had trailed his car for over 100 miles back to his home.  The mother conveyed her belief she had witnessed the father sexually abusing the girl during the drive.  Five days after the mother made this allegation, the investigator and her supervisor unfounded the report of abuse against the father and paternal grandfather, based on the girl's denial of any improper behavior.

The mother persisted in lodging complaints and accusations through any available avenue.  Although the investigation had been unfounded, the modified custody order remained in place.  However, the mother refused to make the girl available for visits with the father, resulting in him being unable to see the girl for eight months.  It was not until the court threatened the mother with incarceration that she relented and let visitation resume.  A few weeks after the visits resumed, a report was made to SCR alleging the girl had disclosed sexual abuse by her father.  The same child protection investigator was assigned to the case and ultimately decided to indicate the report against the father for Sexual Penetration based on statements the girl made during two additional Child Advocacy Center interviews, regarding an alleged incident that would have taken place before the father married.

Over time, the child welfare field has become increasingly aware of the harm that can be visited on young children by repeated interviews and investigations into sexual abuse allegations.  To address these concerns, Child Advocacy Centers have been created as a means to minimize the trauma faced by children in such circumstances.  In this case, within one year the four year-old girl participated in ten interactions with therapists, police officers and teachers, including four Child Advocacy Center interviews, all focused on alleged sexual abuse inflicted upon her by her father.

In the interviews, the girl had provided increasingly, improbably detailed descriptions of the abuse she had allegedly experienced.  Despite her experience with the family, the investigator did not recognize the pattern of behavior exhibited by the mother.  Additionally, the investigator did not take into account that the timeline of events presented by the mother and the girl were directly contradictory to each other and that the incident of abuse would have to have occurred during the time period when the father was being denied any visitation with the girl by the mother.  Furthermore, if the incident had occurred when the father last had access to the girl, it would be the same incident that had been the subject of the previously unfounded investigation.

During a subsequent juvenile court hearing, law enforcement officers involved in the case cast doubt on the mother's credibility and described her behavior throughout as 'bizarre.'  In testimony to the court, the investigator stated she had neglected to review her prior investigation of the father and did not recall the initial Child Advocacy Center interview when the girl denied any abuse.  The court ultimately dismissed the charges of abuse against the father and the Department later voluntarily withdrew the indicated finding.  The girl currently resides in the custody of her father through a guardianship agreement.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  A redacted version of this report will be shared with the executive director of the Children's Advocacy Centers of Illinois to facilitate appropriate training and protocol for servicing** |

**cross-jurisdictional child advocacy cases to avoid multiple interviews of a child for the same incident.**

The Department agrees.

The Inspector General shared the redacted report with the executive director.

**2.  This report should be shared and reviewed with the child protection investigator for educational purposes.**

The Department agrees.  The redacted report will be shared and reviewed with the child protection investigator.

GENERAL INVESTIGATIONS

## GENERAL INVESTIGATION 3

**ISSUE**   The Office of the Inspector General objected to the Department's unilateral decision to investigate families who engaged in "unsafe sleep" practices, which include co-sleeping with infants or placing quilts, bumpers or pillows in cribs with infants, or placing infants to sleep on their stomachs. The Office of the Inspector General notified the Department of the need for public notice regarding such changes in practice that impact the public. Specifically, the Inspector General notified the Department that under the Illinois Administrative Procedure Act, such changes need to be enacted through the formal rulemaking process, which involves public notice through application to the Joint Committee on Administrative Rules.

**DISCUSSION**   On July 17, 2015, the Department internally issued a change in policy -- to be immediately effective – that whenever the Department learned of a child death associated with *unsafe sleep practices*, regardless of whether abuse or neglect was reasonably suspected, the Department would open an Abuse/Neglect child protection investigation.

*Unsafe Sleep Practices* include the following:

- Infants sleeping in cribs with blankets, pillows or bumper pads;
- Infants placed to sleep in cribs on their stomachs;
- Infants placed in adult beds;
- Infants co-sleeping with other children or adults;
- Infants sleeping on any other surfaces (couch, chair, etc.) other than an approved crib or bassinette.

The Office of the Inspector General for the Department of Children and Family Services has challenged the Department's practice. The American Academy of Pediatrics has recommended a directed education campaign to ensure that families know of the dangers of unsafe sleep environments and the Inspector General's Office supports targeted education. The Office of the Inspector General also supports investigating unsafe sleep practices when there is reason to suspect abuse or neglect (the caretaker's judgement seemed impaired by alcohol or drugs, or prior history with the Department made the death suspect, for example).

The State should not, however, be intruding in families' lives without a reasonable suspicion of abuse or neglect. Even now, placing an infant in an unsafe sleep environment is not considered abuse or neglect.  To begin defining unsafe sleep practices, such as bed-sharing, as abuse or neglect, the law requires the State to be transparent to public comment. The State is required to submit their new policy to the Joint Committee on Administrative Rules, which allows for public comment about the change in policy. The Department's internal and unilateral announcement of a change in policy that so greatly affects the public violates the Administrative Procedure Act.

Studies show that the prevalence of bed sharing is high. In one study, nearly 18% of parents reported their infant "usually" co-slept with another person. [Illinois Pregnancy Risk Assessment Monitoring System. (2009). *2009 Report: Illinois Pregnancy Risk Assessment Monitoring System.* Retrieved 2013.12-December from http://www.idph.state.il.us/: http://www.idph.state.il.us/health/prams_rpt_09.pdf.]   In another survey, 59% to 65% of parents reported that their infant had co-slept with them at least once during the first three months of life. [Hauck, F.R. (2008). Infant Sleeping Arrangements and Practices During the First Year of Life., *Pediatrics, Volume 122, Supplement 2, s113-s120.*]  With such a high prevalence of bed-sharing, the public should be permitted to know about and comment on the unilateral decision to change policy.

Moreover, the policy is likely to have a disproportionate impact on poor families and cultures that have

historically embraced bed-sharing as positive parenting. *The Office of the Inspector General found that all cases in which parents were indicated for a sleep-related death, in the absence of evidence that they were impaired due to alcohol or drugs, were overturned on administrative appeal.*

The Office of Inspector General filed a complaint with the Joint Committee on Administrative Review. The Committee reviewed the Department's action and issued an Objection to the new policy. The Joint Committee on Administrative Review agreed with the Office of Inspector General that Illinois law requires that such a shift in public policy can only be accomplished through the rulemaking process, which allows for public comment. To date, the Department has not issued the Rule for public comment.

**See Appendix A for the Department's response and the Inspector General's rebuttal.**

GENERAL INVESTIGATIONS

## GENERAL INVESTIGATION 4

| **ALLEGATION** | A child protection investigator falsified information entered into the Department's database in one case and provided incorrect information to her supervisors and the Office of Legal Services regarding whether a client had secured an order of protection in another case. |
| --- | --- |

**INVESTIGATION**   In the first case, the child protection investigator had been assigned to a report of an 11 year-old boy whose mother had left him alone at a social service agency office without making provisions for his supervision at or transportation from the facility. Agency staff attempted to contact the mother and various relatives in order to find someone who could pick the boy up from the location. The boy's stepfather, who was no longer involved in a relationship with his mother, eventually agreed to pick him up from the agency. A report was made alleging inadequate supervision and the child protection investigator was assigned to the case.

When the child protection investigator's supervisor reviewed the rationale section of the investigation, she found an extensive narrative from an earlier investigation involving the family. In an interview with the Inspector General investigators, the child protection investigator stated she had copied the entry from the previous investigation into the current case notes in order to use them as a reference while working. The child protection investigator said she was unaware she had neglected to delete the copied entry and had not intended to include it in the current investigation. In a separate interview with Inspector General investigators, a co-worker of the child protection investigator stated that the Database contains a "glitch" that sometimes erases data that has already been entered if more than one information window is open at a time. The co-worker said that in order to avoid that problem, it is the practice of many investigators to "cut and paste" information from its source and place it in the window they are using at the time. No copy of the case note including the entry from the previous investigation had been preserved by the supervisor or any other Department employees who viewed it. The Office of the Inspector General was unable to substantiate the claim that the investigator had intentionally submitted the entry from the prior case as part of her work on the investigation of inadequate supervision.

In the second investigation, the mother of six children was severely beaten by the father of two of the children, ages four and one, while they watched. After the beating, the mother begged to be taken to the hospital but the father refused. The mother was later seen at a hospital emergency room and was treated for a punctured lung and fractured ribs. While the mother was in the hospital, she was visited by the father's sister, who attempted to persuade her from pursuing charges; the father had been arrested as a result of the attack.

Three days after she was beaten, the mother filed for and received an Emergency Order of Protection against the father that was valid for three weeks from the date of issue. In a case note dated two days before the Emergency Order of Protection was to expire, the investigator recorded that the mother had come to the local Department field office and presented her with a long-term Order of Protection that would remain in effect for two years. A review of the contact note by Inspector General investigators found that it had been entered two months after the date of contact, which was a national holiday when the office was closed. The child protection investigator's supervisor had also created an entry, also two months later, affirming the mother had come to the office on the same date as recorded by the investigator. Inspector General investigators additionally found that the document presented to the investigator by the mother was only the original Petition for the emergency Order of Protection. In her interview with Inspector General investigators, the child protection investigator stated she only checked the document to see that the names of all six children were included and did not recognize it was merely a Petition for the order that was due to expire in two days. Based on the belief that the mother had secured a long-term Order of Protection, the Safety Plan was terminated. The mother and her children then left the domestic violence shelter where they had been residing

and returned to the father's home.   In an interview with Inspector General investigators, the shelter's executive director stated that it is not the facility's policy to notify the Department when a Department-involved client leaves the shelter.

Upon learning of the family's departure from the shelter, Department staff began attempts to locate them and the investigator found them at the father's home.   Later that day, a staffing was held amongst involved child welfare workers and Department administrators to address the children's safety.   During the staffing, the investigator repeatedly affirmed the mother had secured a long-term Order of Protection.   It was not until a representative from the Department's Legal Division checked court records that it was learned the mother had never obtained the Order.   The investigator's negligent review of documents the mother tendered represented a blatant disregard for her duties given the severity of the violence in the home, the mother's inability to recognize the potential danger posed by the father, and the mother's unwillingness to secure a long-term Order of Protection which was critical to ensuring the children's safety.   The Office of the Inspector General issued a charge against the investigator's Child Welfare Employment License (CWEL) based on her negligent review of the document submitted to her by the mother.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  In cases of severe domestic violence, Department procedures should require safety plans that include the involvement of shelter staff or other family support agreeing to contact the Department if the family leaves.** |

The Department agrees. The Child Endangerment Risk Assessment Protocol (CERAP) Appendix will be updated.

## GENERAL INVESTIGATION 5

**ALLEGATION**  The Inspector General received a complaint alleging that a Department Administrator brought disciplinary charges against an Administrative Law Judge as retaliation for the Administrative Law Judge's ruling against the Department in two particular administrative appeals and for announcing her intention to file a complaint with the Office of the Inspector General.

**INVESTIGATION**  The Administrative Law Judge had recently overruled the Department in two appeals of indicated abuse findings. In the first case, the Department had charged a high school coach with sexual molestation of a 16 year old girl. The Administrative Law Judge found that the Department had failed to prove the elements of sexual molestation and granted the appellants' request to have the finding expunged. The Administrative Law Judge noted that the facts would have supported a charge of Risk of Harm, but since the Department had not asked for a finding regarding Risk of Harm, the Administrative Law Judge was forced to order expunction of the indicated finding.

In the second case, a mother had been indicated for abusing her son. The child had been physically abused by his father. The Administrative Law Judge found that the Department failed to show any act of the mother that would support a finding of abuse, and therefore granted her request to expunge her abuse record. The Administrative Law Judge noted that had the Department charged the mother with Neglect instead of Abuse, the indication could have been sustained.

The Administrative Hearings Unit sent both Recommendations to the Director. The Director is empowered to accept, reject, amend or return the Recommendations for further proceedings. In these two cases, the Director responded to the Recommendations from the Administrative Law Judge by returning the cases to the Administrative Hearings Unit and directing the Department's Office of Legal Services to file new charges against the two appellants for Risk of Harm and Neglect, respectively.

After both cases were returned to the Administrative Hearings Unit for further proceedings, the Administrative Law Judge was summoned to a meeting with the Chief Administrative Law Judge and a Department Administrator who wanted to discuss how the Administrative Law Judge planned to handle the two cases that had been sent back. The Administrative Procedure Act prohibits *ex parte* conversations. An *ex parte* conversation is when one party speaks to the Judge without the other parties' participation or knowledge. The Administrative Law Judge believed that it was improper to discuss either case with the Administrator because the Department was a party in both cases.

In both appeals, the Administrative Law Judge ruled that based on Rule and Procedure, the Office of Legal Services could not amend charges after the conclusion of the Hearing. In both cases, the original Recommendations were sent again to the Director, who then accepted the Recommendations.

One day after ruling in the first case, the Administrative Law Judge was counselled for unprofessional conduct toward the Administrator and Chief Administrative Law Judge, which included eye rolling and walking away while being spoken to.

Ten days after the ruling in the second case, the Administrative Law Judge received formal disciplinary charges that focused on her conduct in the two cases. The ALJ was charged with making arguments for the appellants and for making unnecessary comments while setting a briefing schedule. None of the parties had complained that the ALJ had behaved inappropriately.

The OIG investigation found that the Administrator had been instrumental in the formulation of the letter

directing the Office of Legal Services to recharge the two appellants. The OIG determined that the integrity of the administrative process was compromised by the dual roles of formulating the direction and participating in discussions and disciplinary proceedings regarding how the Hearings Judge ruled. The Administrator had separated from the Department prior to the completion of this investigation.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. The Department should develop internal policy specifying that all persons involved with the Director's Office on specific appeals must recuse themselves from communications or discipline regarding those appeals as well as discussions with the particular ALJs' supervisors.** |

The Department agrees. The Department's Ethics Officer will work with the Office of Legal Services and the Administrative Hearings Unit to develop internal policy.

## GENERAL INVESTIGATION 6

| | |
|---|---|
| **ALLEGATION** | A Department field office supervisor abused her authority and failed to notify management of a personal conflict of interest regarding a child protection investigation assigned to her team. |

**INVESTIGATION**   The State Central Register (SCR) received a report alleging a staff member at a residential facility had engaged in an inappropriate relationship with a youth and another staff member had assisted him in leaving the facility and going on run in order to reunite with his family.  The report was accepted and assigned to the local field office closest to the residential facility.  Upon receiving the report, the field office supervisor immediately recognized that one of the facility employees named was a close personal friend of hers.  Rather than inform management of the obvious conflict of interest and request the investigation be transferred to another field office, the supervisor assigned the case to an investigator on her team.  In an interview with the Inspector General investigators, the child protection investigator stated that he and another investigator advised the supervisor that the case should be transferred to another office, but that the supervisor stated she had done so with a previous allegation against the same facility employee and had been dissatisfied with how it was handled.

After rebuffing the second investigators' recommendation to have the case transferred, the supervisor instructed the child protection investigator to take protective custody of her friend's child as well as another child she knew to be residing in the home – neither of whom were subjects of the pending investigation.  When the second investigator protested to the supervisor that no basis existed for taking custody of the children, the supervisor contacted local police and 911, identifying herself as a representative of the Department, and instructed them to go to the home and break the door down in order to reach the children.  When the officer who spoke with the supervisor requested that she meet him at the home with documentation supporting her request, the supervisor informed him she did not have any paperwork and was not supposed to be investigating the case.

In addition, the supervisor misrepresented herself to others outside the Department, inflating her rank and authority in attempts to persuade others to follow her directives.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  The field office supervisor should be disciplined, up to and including discharge, for abuse of power and failure to notify management of a conflict of interest.** |

The Department agrees. The employee was discharged.

**GENERAL INVESTIGATION 7**

| **ALLEGATION** | A Department field office supervisor made threatening statements regarding her administrative superiors and exhibited unprofessional behavior towards colleagues. It |

was also alleged that a particular worker stated that he had heard the supervisor say that she wanted to kill two of her superiors.

| **INVESTIGATION** | The supervisor's behavior raised concern among her coworkers after she made statements regarding her displeasure with two of her administrative superiors. |

While discussing her dissatisfaction with the superiors, the supervisor stated she "knew people" and "could get people" if she felt they had wronged her.  Given the potential threat posed to others in the field office, the Inspector General forwarded the report to the Illinois State Police (ISP) for investigation.

The Police conducted interviews with several of the supervisor's coworkers, who described her behavior as increasingly erratic and, at times, intimidating.  The supervisor demonstrated emotional volatility that disrupted meetings and interfered with the ability of field office employees to conduct their work on behalf of youth in care.  The supervisor was portrayed as being, "constantly tearful and angry," and multiple coworkers related instances when she had veered towards physical confrontation by jabbing her fingers near the face of one colleague and using her body to block a doorway to prevent another from leaving a room following a heated discussion.  In her interview with the Police, the supervisor denied making any threats of violence against her superiors or other coworkers.  The supervisor acknowledged that she had "snap[ped] back" at one of her superiors for what she characterized as "rude" and "condescending" behavior.  The supervisor admitted making statements that she "knew people" and "could get people" but said she was referring to higher ranking members of the Department's chain of command whom she could approach with complaints about her treatment in the field office.  The supervisor stated she did not recall making any threats to kill her superiors or any other coworkers but supposed that if she had, the statements were misguided jokes or comments made out of frustration that her colleagues misinterpreted.  The State Police ultimately determined the issue to be an internal administrative matter and closed its investigation.

Office of the Inspector General staff relied on the interviews conducted by the State Police and initiated an administrative investigation during which additional examples of the supervisor's inappropriate behavior became known.  Coworkers described the supervisor as having explosive outbursts.  Colleagues also spoke of a clinical staffing which the supervisor inappropriately used as an opportunity to complain about others in the field office.  At the conclusion of the meeting, the supervisor approached a Department contractor and attempted to get advice on personal issues.  The contractor stated the supervisor repeatedly refused to terminate the line of conversation despite the contractor's assertion that any such discussion would be improper.  However, when contacted by Inspector General staff, the co-worker who was alleged to have heard the supervisor make a death threat denied that he had made such a statement. While the Inspector General was unable to substantiate the allegation the supervisor had threatened physical violence, her behavior had caused disruption in the field office and prompted multiple coworkers to be concerned for their physical well-being.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  The field office supervisor should be disciplined for conduct unbecoming a child welfare supervisor and insubordination for her statement that "she knew people" who could "get" her superiors.** |

The Department agrees.  The employee received a 29 day suspension.

**2.  The field office supervisor should be required to have a fitness for duty examination.**

The Department agrees.  A fitness for duty exam was completed and the employee was deemed fit to return to work.

**3.    The field office supervisor should be offered Employee Assistance Program services.**

The Department agrees. The employee was referred for Employee Assistance Program services.

## GENERAL INVESTIGATION 8

**ALLEGATION**   A DCFS employee complained that the actions of a Department Administrator toward a supervisor and case manager created a risk of workplace violence. The complaint alleged that the Administrator promised a biological mother that she would appear in court on the family's behalf, in favor of immediate return home for their teenage daughter, in direct opposition to the Department's clinical and safety determinations. The complaint further alleged that the Administrator's assurances to the family, which were made with insufficient knowledge of the family history, and without consulting DCFS Legal, exacerbated the parents' existing anger toward their DCFS workers. On the day of the court hearing, the judge ruled against immediate return home of the daughter. Following the court's determination the father and mother made violent threats of harm to the DCFS worker and supervisor.

Subsequent to the employee's complaint about the Administrator, an Officer of the Court also complained to the Inspector General about the Administrator's conduct on the day of the court hearing. That complaint alleged that the Administrator "came to court to testify having never spoken to either the caseworker or supervisor on the case," and that "it seems the only thing [she] did before deciding to testify […] in contradiction to the DCFS worker and supervisor and on behalf of the parents" was to get the Department's clinical assessment, which recommended residential placement for the girl. The Officer's complaint also noted that the mother had previously publicly threatened the DCFS supervisor.

**INVESTIGATION**   The family's 14-year-old daughter was taken into protective custody after her parents dropped her at a community hospital to be psychiatrically hospitalized and refused to allow her home when the hospital determined no hospitalization was necessary. The parents, who were not cohabitating and had a volatile relationship, initially refused to communicate with the police or the crisis agency. Several days later, they expressed a desire to have the girl returned to the mother's home.

The family moved frequently and had lived in several states. The girl had been psychiatrically hospitalized at least 12 times over the preceding 2 ½ years. She had a significant history of risk-taking behaviors, sexual victimization, and substance misuse, was a frequent runaway and was described as aggressive and defiant. The parents, who had a history of domestic violence, had been connected with community-based family preservation and mental health services in the past, but were repeatedly inconsistent in keeping appointments and never successfully engaged in family therapy. The father had a history of violence and severe mental illness, including incarceration in another state for domestic battery of the mother. The Department's clinical assessor and the placement supervisor (both licensed clinical social workers) completed Integrated Assessments that detailed a family with a complex dynamic which, in recent years, had experienced ongoing instability, significant domestic violence and severe mental illness. Portions of the information self-reported by the mother were found to be untrue, including the extent of the family's history of domestic violence and mental illness.

A court decision on the issue of temporary custody was not reached until approximately four months after protective custody was taken. During this time, the girl moved between an emergency shelter and a psychiatric hospital, after she physically attacked a peer at the shelter. During this time, Department staff secured consents and with diligence followed DCFS procedures and Best Practice obtaining relevant Illinois and out-of-state mental health and law enforcement records. In a timely manner they incorporated the facts obtained into an updated Integrated Assessments and a comprehensive Court Report. Shortly before the temporary custody re-hearing, the mother had contacted the Department Administrator for assistance in having her daughter returned home. The Administrator agreed to attend the next court hearing to testify on the family's behalf because, as she later wrote to her superiors, she felt the family had not been given a fair chance and had not received community-based services. Records showed, however, that the family had

repeatedly been offered these services. Although the Court Report was forwarded to the Administrator before the temporary custody re-hearing, the Administrator chose not to read it and did not access SAWCIS for the completed Integrated Assessments. She chose to rely only on the mother's self-reports. The Court Report that had been submitted to all parties detailed the family's complex history and included clinical recommendations for the child and her parents. This report was forwarded to the Administrator the day before the re-hearing. The following day, the Administrator came to court to testify but she did not testify after consultation with the Department's attorneys.

During the court hearing, the mother testified that she had regularly been providing the girl with her prescribed psychotropic medications and that the girl had graduated from elementary school. Records show both facts were untrue. At the conclusion of the hearing, the court granted temporary custody to the Department with a goal of return home.  The court found that the Department had taken reasonable efforts to prevent the girl's removal from her parents, but that she was in need of stable care that could not be provided in her home.

After the the father exited the court room. he screamed "He [the judge] sided with those b***hes!" (referring to the caseworker and supervisor), and yelled to the supervisor, "I'm going to cut your daughter's mother f***ing head off!" while making a throat slashing gesture with his hand. The sheriff removed the father which caused a maternal relative to verbally assure the supervisor that the father would, in fact, harm her child because "[she] harmed his [daughter]."  The mother waited by the outdoor parking lot for the supervisor, and jumped out at her from behind the bushes, cursing, as the supervisor passed by.  As a result of the incident, the sheriff and the supervisor both filed incident reports; security officers stationed at the worker/supervisor's workplace were provided photos of the parents and alerted of the potential danger.

DCFS Management asked the Administrator to respond in writing to the facts presented in the supervisor's incident report.  In her responding document, and in her interview with Inspector General investigators, the Administrator repeatedly demonstrated that her knowledge of the case was not fact based but based solely on significantly flawed, self-reported information provided to her by the girl's mother.  While the Administrator claimed that the worker and supervisor had refused to meet with her about the case, this claim was unsubstantiated. The Administrator appeared anchored to beliefs based on her initial impressions of the case, and accused the case management team of trying to sabotage her.

The Administrator abused her authority when, without factual foundation, she determined that the Department should not have taken custody of the teenaged girl.  Her behavior with the family likely fueled the existing tension between the family and the placement team, and gave the family unrealistic expectations that she, and not the judge, was the arbiter of facts.  The Inspector General determined that the Administrator had acted with reckless disregard for the safety of her staff and created an unsafe work environment.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The Administrator should be disciplined for conduct unbecoming a Department official.  In considering the appropriate level of discipline, this report should be viewed in conjunction with General Investigation 9.** |

The Department rejects this report and recommendation.  A Department review of the report determined there was no violation of law, policy or procedure in the actions of the administrator and that the administrator was responding to concerns raised by family members regarding the handling of the case.

*OIG Comment: The Inspector General acknowledges that the recommendation has not been accepted by the Department; however, the Department does not have the authority to reject Inspector General reports.*

*The Department has procedures and standards regarding obtaining relevant law enforcement and mental health records and the reliance on fact based assessments. If a child protection investigator or case-manager had not obtained the relevant documents and based their safety decisions only on first impressions and self-reports, they would be disciplined.  The same standard applies to Administrators. The Administrator's misguided assumptions placed  staff at risk.*

GENERAL INVESTIGATIONS

**GENERAL INVESTIGATION 9**

**ALLEGATION**   A veteran DCFS employee with aggressive cancer requested an investigation into the conduct of a DCFS Administrator who he believed was retaliating against him because of his refusal to personally involve her in his sensitive medical decisions.  He complained that the Administrator was continually questioning him about his medical condition and personal circumstances, to a point where he became worried that the Administrator did not believe he was seriously ill. The employee was extremely distressed that the Administrator intrusively questioned his family member about details of his condition, while his family was already struggling with the intense grief and trauma of his disease. The Inspector General and another state office conducted a joint investigation.  [Since his death, the family gave the Inspector General permission to include a summary of the investigation in this Annual Report.]

**INVESTIGATION**   The employee, a DCFS veteran of over 20 years, began utilizing accrued benefit time due to a life-threatening and aggressive illness. During this time, the employee regularly contacted the DCFS Administrator on one of her three work phones (cell, desk and assistant) to keep her apprised of relevant information regarding his condition, and followed DCFS rules and procedures regarding use of benefit time. He specifically deflected her demands that he contact her on her personal cell phone to discuss his treatment. Despite this, the Administrator repeatedly crossed professional boundaries by insisting on non-work related contact with the employee, arriving uninvited at the hospital in an attempt to see him there, and even suggesting she would wait outside his home until he would speak with her about his personal circumstances.  The Administrator maintained that she was trying to be compassionate, although days after the employee again declined to take her personal contact information she mischaracterized her level of contact with the employee to her supervisor, giving the impression that the employee was not in contact with her, which resulted in the employee having to adhere to procedures typically reserved for employees suspected of sick time abuse while fighting for his life.  The Administrator later admitted that she did not correct the misperception about their level of contact, despite being copied on an email which claimed the employee was not calling in sick.  In addition to crossing professional boundaries with the employee, who was fighting for his life, the Administrator also approached the employee's family member at work and emphasized that the employee needed to contact her outside of work to discuss his personal medical situation.

The investigation determined that the employee had substantially complied with call-in procedures and had contacted the Office of Employee Services to request FMLA Leave. There was a four day period in which the employee did not call in daily while he was attempting to secure a second opinion from his HMO about his prognosis. The investigation also found that the Administrator engaged in offensive and insensitive conduct and was unreasonably seeking personal health information from the employee and his family that was un-related to his work performance.  The Administrator's actions had engendered a fear of job loss for the employee, at a time when his personal circumstances made the possibility of job loss particularly distressing.

Unrelated to use of benefit time, the investigation also determined that during the same period of time the Administrator misrepresented important factual information about the employee's work, which placed him in a false light.  During the course of investigating the complaints about the Administrator's behavior, investigators learned that DCFS Procedures require the Administrator to notify certain individuals within two hours, in the event of a child's death.  The Administrator had recently directed her supervisees to contact her about the death first, and she would then make her required notifications within the required 2-hour time frame. In a particular case, the employee notified the Administrator of a death within 2 ½ hours, however, the Administrator did not adhere to her own time requirements and made her required notifications 3 ½ hours after that, in violation of Procedures.  The Administrator sent an email to her superior with the following explanation for her untimeliness:

*This is another death case that [Employee] did not notify me on nor complete the paperwork.*

The investigation determined that the Administrator's statement was misleading.  Interviews with relevant administrators and analysis of Department data confirmed that the employee had complied with her directive for the particular case, and that there was not "another death case" where the employee had failed to notify or complete work.

The DCFS Employee Handbook, Chapter 3, Section 3.16 prohibits the falsification of records and requires accuracy of documents and information provided by employees.  Violation of this requirement can lead to disciplinary action up to and including discharge.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  The Administrator should be disciplined up to and including discharge for conduct that created an unlawful work environment in violation of state and federal laws and for** |

**falsification of information.**

The Department rejected this Report and the recommendation of the Inspector General in this report.  A Department/Office of Legal Services review of the report and recommendations determined that the report contained flaws in the OIG's factual and legal analysis and conclusions that led to overstated and incorrect recommendations.  Based on its review, the Department did counsel the Administrator on how to handle issues related to employees with serious illness in the future.

*OIG Comment: The Inspector General acknowledges that this recommendation has not been accepted by the Department; however, the Department does not have the authority to reject Inspector General reports. The Inspector General stands by its Report and recommendation and notes that the legal determinations referred to, including that the Administrator created an unlawful work environment in violation of state and federal laws, were the findings of the State entity specifically tasked with making those determinations.*

GENERAL INVESTIGATIONS

**GENERAL INVESTIGATION 10**

| **ALLEGATION** | A child protection investigator falsified documents and fabricated information to reflect work she did not perform while investigating possible physical abuse of a five year-old girl. |
|---|---|

**INVESTIGATION**      The girl's mother, who was the subject of the abuse report, contacted the Department after receiving notification the allegation against her had been unfounded. The mother stated she had been unaware of any abuse investigation involving her family and had not had any contact with Department personnel. The investigation of the mother had been initiated following a report the girl had complained of pain in her genital area and that the mother had failed to seek medical treatment for her.

The child protection investigator assigned to the case documented attempts to contact the mother by phone and visit the family at their home at the time the case was opened. Following these unsuccessful attempts, no other work on the case was recorded for 55 days until the closure date approached. At that time, the investigator documented an in-person meeting with the mother and the girl at the family's home. The investigator noted the mother denied the allegation of medical neglect and expressed anger related to her belief the report had been fabricated by an individual with a grudge against her. The investigator's notes included information regarding the children's school, although no attempt to speak to school personnel was documented. The investigator also recorded that the mother provided the names of the children's physician and a child welfare professional she identified as a source of support to the family.

In an interview with Inspector General investigators, the mother denied ever meeting with or speaking to the investigator. The mother refuted numerous details provided in the case record including the names of the children's physician and the school they attended. The OIG found that the phone number attributed to the children's physician was disconnected and had not previously been used by her practice. While the documented physician was a member of the same practice as the children's actual doctor, the documented physician told Inspector General investigators she had never treated them nor spoken with the child protection investigator. The children's actual doctor informed Inspector General investigators that she had never had concerns regarding the children's health or their mother's willingness to provide care for them. Staff at the school the investigator identified as the one the children attended stated they had never been students there, while personnel from the school the mother identified confirmed the children were enrolled at that institution. When Inspector General investigators attempted to contact the child welfare professional listed as a source of support to the family, the private agency stated they had no current or former employees by that name. A child welfare professional with the same name was located at another agency, however that person stated she had no knowledge of the mother or her family and had never spoken to the child protection investigator. The child protection investigator had documented a phone conversation with the child welfare professional during which that person described the mother as a single parent who attended school while raising her three small children. The mother was in fact married, worked full-time, and had children aged 13, 8, and 5.

The case record contained a completed Home Safety Checklist purportedly signed by the mother during the investigator's visit to the family's home. The mother denied the investigator had ever come to the home and stated no one would have been present at the time of the visit listed in the case record. Furthermore, the mother stated she had never seen the Home Safety Checklist let alone signed it and denied the signature was hers. An OIG comparison of the signature on the Checklist and the mother's signature on correspondence with the Department found the two did not match.

The investigator has been on extended medical leave and was unavailable to be interviewed by OIG

investigators.   A temporary suspension of her Child Welfare Employee License (CWEL) was enacted in response to her apparent falsification of case records.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  The child protection investigator should be disciplined by the Department, up to and including termination, for falsifying investigative notes.** |
| --- | --- |

The Department agrees.  The employee resigned from the Department due to medical issues.

## GENERAL INVESTIGATION 11

| **ALLEGATION** | A private agency caseworker and her husband were the subjects of indicated reports related to physical abuse of their one year-old son.  The private agency failed to conduct a meaningful assessment of the caseworker's suitability to provide services to teen parents and their young children in light of the indicated finding. |

| **INVESTIGATION** | A child protection investigation involving the caseworker's family was opened after the one year-old boy arrived at day care with a black eye and staff observed multiple bruises on other parts of his body. Professionals had noted other black eyes on the child in the past. Although the caseworker and her husband stated the boy's black eye was a result of being hit with a toy by his two year-old sister, physicians who attended to the boy concluded his injuries were due to blunt force and inconsistent with the explanation provided.  Both children were taken into protective custody and the subsequent investigation found that six months earlier, the husband had been arrested for domestic battery against the mother when the children were present.  The police report of the incident noted the husband had been holding the boy while striking the mother in the head, however the criminal case was dismissed when the mother failed to appear in court.  The child protection investigation resulted in indicated findings against both parents for Cuts, Welts and Bruises and Substantial Risk of Harm to both children. |

Following the indicated finding against the caseworker, the Department's Central Office of Licensing notified the private agency that the employee had an indicated finding.  The Department required the agency to complete an eight-question assessment of the employee's fitness to continue in their duties based on the criteria outlined in Department Rule. The criteria address the severity and frequency of the abuse and/or neglect in the indicated report as well as the employee's work history, character and response to the findings against them.  If the employer chooses to retain the indicated employee, the organization must ask the Department for a clearance.  While the Department is considering the request, the employee may not be left alone with children.

In an interview with Inspector General investigators, the private agency's director of employee management stated that she had been instructed by staff from the Department's Licensing Division to allow the employee herself to answer the questions contained in the assessment.  In response to a question regarding the likelihood abuse would reoccur, the employee responded that no abuse had occurred and portrayed herself and her husband as being unjustly victimized by the indicated report.  The private agency made no attempt to obtain independent information and relied solely upon the employee's account of events.  The agency's director of employee management returned the form to the Department requesting a clearance.  The director signed the document affirming the employee would not be left alone with children while the clearance request was pending.  In her interview with Inspector General investigators, the director stated that the agency management ensured that the employee, who worked with teen moms, mostly over 18, would not be alone with her two 17 year-old clients.

In separate interviews with Inspector General investigators, both the Department licensing representative and her supervisor stated their understanding that the questions on the form were intended to be answered by the involved employee.  The licensing representative and supervisor stated that the only basis for returning a form to an agency would be if the questions had not been answered at all because the Department had no authority to "second guess" the agency's assessment of an employee.

After the agency submitted the request for clearance, staff learned the Child Welfare Employment License (CWEL) board had temporarily suspended the employee's license in response to the indicated report.  The agency's director of employee management contacted the Department licensing representative and asked to

withdraw the clearance request.  The director was instructed to complete a second form.  The agency then submitted a second form expressing the agency's intention to terminate the caseworker's employment.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.    Employers should get a copy of the Child Protection Investigation Summary along with the Notice of Indicated Child Abuse/Neglect Report when an employee has been indicated.**

The Department agrees. The Department needs to amend the consent form so employees understand what can be disclosed.  DCFS Legal, Licensing and Child Protection have met and will continue to meet to develop a protocol for review and redaction of the Investigation Summary. Proposed additional language for the Authorization for Background Checks is currently being reviewed.

**2.  The Department's Licensing Division should be trained to return as incomplete any forms that do not reflect an actual assessment of the required factors by the employer.**

The Department agrees. DCFS Licensing staff and the Background Check Unit will be trained.  The licensing administrator is developing guidelines and will schedule a time for all staff to receive the information and ask questions for any clarifications needed.

**3.  The private agency should take corrective action to ensure that its staff understand the importance and proper procedures associated with assessing indicated findings for child abuse and in developing appropriate protection plans for the children of youth in care.**

The Department agrees.

*OIG Comment:  The Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors. The private agency agrees and will provide additional training.*

## GENERAL INVESTIGATION 12

| | |
|---|---|
| **ALLEGATION** | A child protection investigator failed to conduct a thorough investigation of allegations of physical abuse against a seven year-old boy. |

| | |
|---|---|
| **INVESTIGATION** | The child protection investigator was assigned to the case after the State Central Register (SCR) received a report the boy had a large welt on his back that had clearly been inflicted by an instrument. |

The day after the report was made, the investigator made a "good faith" attempt to visit the boy at his school but was informed upon arrival the child was absent that day. The investigator then placed a phone call to the number listed for the family's residence but the number proved to be invalid. The investigator did not speak to any school personnel about the boy while he was there or travel to the home address, located just three miles away from the school. The investigator performed no further work on the case for the following six weeks.

Five weeks after the initial hotline report was made, the Hotline received a second call involving the boy, from a hospital that noticed many marks and bruises on the boy, informing the Department he was being moved to another hospital for psychiatric evaluation. Despite being provided with the second hotline call, which was taken as "Related Information" to the initial report, the investigator took no action until one week later when he was informed the boy was medically ready to be released from the second hospital. The investigator requested a copy of the boy's medical records from the hospital social worker, however an Office of the Inspector General review of the case file found only the cover sheet from the fax transmission. While interacting with the hospital social worker, the investigator did not ask any questions about the boy or obtain any relevant information. An Office of the Inspector General review of the boy's medical records found physicians treating him during his initial hospitalization had noted multiple linear marks on various locations of his body as well as numerous scratches and healing scars.

Three days after being informed the boy was ready to be released from the second hospital, the investigator met with him at the facility. The investigator asked the boy specifically if he had been hit with an extension cord by his mother, as had been alleged in the initial hotline report. The boy stated that his mother had "hurt him" and later said he "wanted to cut himself with a knife." Following his visit with the boy, the investigator went to the family home and met with the boy's mother. The mother denied hitting her son with an extension cord and attributed the boy's many injuries to a young playmate. The mother stated she lived in the home with an adult female cousin, the boy and his five year-old brother, who the investigator assessed as being cared for appropriately.

Two days later, the child protection investigator's supervisor spoke with the mother, who had contacted her to determine when the boy would be released from the second hospital. The supervisor questioned the mother about the boy's report that there were additional people living in the home the mother had not identified. The supervisor also told the mother the boy had stated there was a cousin residing in the home whom he feared and asked if the adult female cousin was that individual. The mother stated the adult female cousin had a close relationship with the boy and portrayed him as making vindictive accusations towards others when he became frustrated or upset. The mother also stated some relatives had recently been staying in the home due to a death in the family and expressed her belief these were the "cousins" the boy had referenced.

Following her conversation with the mother, the supervisor spoke with the social worker from the second hospital who informed her the mother had independently undertaken efforts to obtain individual and family counseling. That same day, an area administrator reviewed the case and directed that the case be indicated and opened for services immediately. The report was subsequently indicated against the mother for Cuts, Welts and Bruises and the family case was closed with a referral for community-based services. In an

interview with Inspector General investigators, the child protection investigator acknowledged having made no efforts on the case for six weeks following his initial attempt to see the boy at his school.  The investigator stated he saw no reason the boy would not be safe if returned to his home but could not provide a basis for reaching that conclusion.  The investigator relied almost exclusively upon the mother's report of how the boy was injured, his behavior and the composition of her household.  The Office of the Inspector General review of the boy's full medical records, which the investigator never obtained, found the boy had reported to hospital staff that he had been struck with brooms, cords and a belt by others living in the home and that the adult female cousin hit him most frequently.  The boy identified two other cousins as residents of the home as well as his mother's boyfriend, whom the mother had never mentioned.  Furthermore, the boy stated he had witnessed domestic violence between his mother and her boyfriend which included lamps and phones being thrown across the room.  By failing to speak with staff from the boy's school or obtain his complete medical record, the investigator relied on an incomplete understanding of the boy's home environment prior to closing the case.  His single, explicit question to the boy regarding whether his mother had struck him with an extension cord prevented him from engaging the boy in a wider discussion of how he was being treated in his home and who was present there.

At the time this case was assigned, the child protection investigator was carrying a caseload significantly above the threshold established by a federal consent decree intended to prevent workers from becoming overburdened.  The federal consent decree provides that, in a nine month period, no investigator should be assigned more than 15 new cases in one month – or more than 12 new cases in three consecutive months. This investigator was assigned 23 new cases that month.   The child protection investigator stated he was overwhelmed by the volume of cases he was responsible for and felt it was inevitable that not all the requirements of every case could be met.  In her interview with Inspector General investigators, the child protection investigator's supervisor stated she had assumed responsibility for the investigator's team shortly before the initial hotline report was made and was tasked with learning the details of several hundred cases in a short period of time in an effort to familiarize herself with the team's pending investigations.   The supervisor explained that all members of her team had caseloads above the level established in the consent decree, which required her to prioritize the cases her subordinates deemed most critical and forego her review of others until case closure.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The investigator should receive discipline for an inadequate investigation in waiting seven weeks to see a child after a hotline report of possible abuse and for not exploring more thoroughly** |

**who was hurting the child.  The Department must take into consideration, in determining appropriate discipline, the investigator's working environment, including but not limited to high caseload assignments and how these challenges influenced his ability and the State's ability to achieve child safety goals.**

The Department agrees.  The employee will be disciplined.

182                                   GENERAL INVESTIGATIONS

## GENERAL INVESTIGATION 13

| ALLEGATION | A private agency caseworker engaged in a romantic relationship with the father of a family on her caseload.  The caseworker also falsified case records to represent that she had been present at court sessions she did not attend. |
|---|---|

| INVESTIGATION | The family's involvement with the Department began after an infant tested positive for cocaine. |
|---|---|

A child protection investigation was initiated.   During the investigation, the mother admitted using cocaine while she was pregnant and stated she had continued to use cocaine and had stopped taking a drug prescribed to her to address post-partum depression.  The mother was subsequently indicated for substance misuse and the baby was taken into Department custody.  The family was already part of an open case for intact services as a result of a previous indicated report against the mother.  The girl's father, who lived apart from the mother, expressed a desire to care for the baby, however concerns about a criminal background resulted in the child's placement in the home of her paternal grandmother.  The grandmother was designated as the individual responsible for supervising visits between the father and the baby girl.

Four months after being assigned the case, the caseworker requested to be removed from her role with the family.  In a series of text messages, the caseworker told her supervisor that she had learned the father was a relative of her former paramour, with whom she had a child.  The caseworker claimed that relatives of the father had threatened to disrupt her employment because of her role in providing services to the family.  The investigator's supervisor responded by assuming immediate responsibility for the family's case.  One hour after the investigator texted the supervisor, the supervisor received a phone call from the mother.  The mother stated that the caseworker and the father were involved in a romantic relationship and provided photographs depicting the two together in social situations.  The mother expressed her concern that the caseworker was biased against her and that she was not adequately ensuring that visits between the baby and the father were being properly supervised.

The photographs provided to the Inspector General's Office clearly depicted the father and the caseworker at a baseball game and on a Valentine's Day dinner cruise together.

In an interview with Inspector General investigators, the caseworker denied having a romantic relationship with the father but acknowledged meeting him publicly on two occasions, on a dinner cruise and at a baseball game.  The caseworker stated she had encountered the father by chance on the cruise and that she had received permission from her supervisor to take him and his five year-old son to the game with tickets that had been donated to the agency.  In an interview with Inspector General investigators, the supervisor stated that the caseworker had asked for the tickets to take her boyfriend to the baseball game.  Inspector General investigators learned from the dinner cruise operator that the father and the caseworker had reserved their places in advance and the caseworker had not bought her tickets at the door with a group of girlfriends as she had claimed.

In separate interviews with Inspector General investigators, both the caseworker and the father stated they had communicated infrequently while she was assigned to provide services and had spoken only once since the caseworker was removed from the family's case.  The father also denied any knowledge that he was in any way related to the caseworker's son.

An Inspector General review of phone records for the caseworker and the father found that during the four months she was assigned to his case, the two had exchanged 2,558 phone calls and texts, including 22 exchanges on the day of the Valentine's Day dinner cruise.  In addition, the two had traded another 1,628 calls

and texts since the caseworker had been removed from the case.

While reviewing the case record, the Inspector General investigators identified a significant discrepancy between the caseworker's account of her appearance at a hearing for the baby girl and the official court transcripts.  In her notes, the caseworker reported appearing in court.  The transcripts recorded that when the presiding judge requested information from the caseworker, she was not present in the courtroom and could not be located in the building.  In a second interview with Inspector General investigators, the caseworker stated she had signed into the courtroom but was upstairs at a hearing for another client when the family's case was called.  An Office of the Inspector General review of the transcript from that hearing showed officers of the court were also trying to find the caseworker to provide information, but she could not be found.

Following an internal investigation by the private agency, the caseworker resigned her position.  The agency's personnel records include a prohibition against the caseworker being rehired.  The Office of the Inspector General drafted charges against the caseworker's Child Welfare Employee License (CWEL) for an egregious act and case note falsification. A Recommendation for Revocation was issued.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | The Inspector General issued charges against the child protection investigator's Child Welfare Employee License (CWEL).  The CWEL Board revoked the employee's license. |

GENERAL INVESTIGATIONS

## GENERAL INVESTIGATION 14

**ALLEGATION**    A high school administrator was suspended from her position after her employer conducted a Child Abuse and Neglect check and found she had previously been the subject of an indicated report. The administrator denied being the individual identified in the child protection investigation.

**INVESTIGATION**    The administrator was notified of her suspension after the school conducted a random child abuse/neglect database check that found she had previously been indicated for Inadequate Supervision and Risk of Physical Injury of her four year-old son. The administrator noted that not only had she never been the subject of a child protection investigation but that she was not the parent of the child named in the investigation, had no knowledge of the child, and had never lived in the area where the investigation had taken place.

An Inspector General review of the original child protection investigation found that the mother involved in the abuse/neglect report and the school administrator had the same first and last names, though both were spelled slightly differently. At the time of the investigation, the mother had provided a birthdate that matched that of the administrator. A search of public records and investigative databases by Inspector General investigators established that the mother and the administrator were distinct individuals with no relationship to each other. The Office of the Inspector General determined the mother had provided a false date of birth to the investigator at the time the case was opened and that the investigator had failed to verify the information provided to her. The birthdate the mother gave to the investigator was the administrator's actual date of birth.

In an interview with Inspector General investigators, a supervisor with the Department's Central Office of Licensing stated that since the birthdate listed in the original investigation corresponded to that of the administrator, the discrepancies in the spelling of the two names was dismissed as a typographical error. The supervisor stated that in cases where names return positive results for indicated reports with slight name alterations, the Department errs on the side of caution, which is why a positive result for the administrator was reported to the school.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**    **1. The State Central Register (SCR) shall review the child protection investigation involving the mother and amend the birthdate recorded for her. All erroneous misspellings of the mother's name should also be corrected.**

The Department agrees. The incorrect information has been removed from the SACWIS database and data in the Placement Clearance Desk is in the process of being corrected.

**2. A redacted version of this report should be used as part of training of child protection investigators on the critical task of verifying identity.**

The Department agrees. The redacted report will be utilized for training of child protection investigators.

**3. The Department should immediately notify the administrator's employer that she was erroneously identified as an indicated perpetrator and that the Department has never had reason to investigate her for any allegation of abuse or neglect. The administrator should receive a copy of the letter sent to her employer.**

The Department agrees.  The notification letter was issued to the employed and the administrator.

**4. The State Central Register should flag the names of the administrator and the mother as potential victim and perpetrator of identity theft to ensure that this error does not recur in the future.**

The Department does not agree.  SCR does not have the capability to "flag" names in this way.  The Department will explore further with Office of Information and Technology Services to see if this can be done.

## GENERAL INVESTIGATION 15

| **ALLEGATION** | A large number of documents produced by the Department containing highly confidential information were found strewn behind a Department office. |
|---|---|

**INVESTIGATION**   The Inspector General's Office became aware of a significant breech of the Department's confidentiality when an Unusual Incident Report (UIR) was made stating a high volume of case files had been located in a dumpster behind a Department office and that numerous individual papers were lying in the alley and an adjacent parking lot.  A recent storm had apparently caused the papers to be blown out of a dumpster not designed for disposal of confidential documents. The files and loose papers that could be retrieved had been collected by employees and consolidated into trash bags.  Inspector General investigators reviewed the documents and found they contained significant confidential information regarding Department youth in care and clients as well as others involved in their cases.  This information included names, birthdates and social security numbers.

Inspector General investigators reviewed the building's protocols for securing and disposing of classified materials and found that locked, designated document destruction bins and unsecured receptacles used for recycling paper were both utilized for discarding confidential documents.  In an interview with the OIG, a representative of the cleaning service that handles refuse removal for the building stated that confidential documents were routinely placed in receptacles with regular garbage.  In a related interview with the manager of the Background Check Unit (BCU), the Office of the Inspector General learned the unit did not have access to a document shredder in violation of Department and State Police policy.  The unit has since been provided with a shredder.

The Office of the Inspector General identified approximately half of all the documents found as being associated with cases handled by a particular adoption specialist.  In an interview with Inspector General investigators, the adoption specialist described disposing of confidential documents in the recycling bins.  The adoption specialist denied having thrown away any confidential documents and stated that the files had disappeared from her desk.  The adoption specialist acknowledged she had not reported the files missing.  Upon being presented with documents related to a Law Enforcement Agency Database System (LEADS) check from a case she was responsible for the adoption specialist initially confirmed the handwritten notes were hers, then stated she was uncertain.  A handwriting analysis conducted by an expert at the behest of the Office of the Inspector General concluded the documents were very likely to have been created by the adoption specialist.  During the course of this investigation, it was learned the adoption specialist had not completed the certification required to serve in her position.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**   **1.  The adoption specialist should be disciplined, up to and including discharge, for breach of confidentiality.**

The Department agrees.  The disciplinary process is pending.

**2.  The Department should ensure that adoption specialists statewide have completed all required training for adoption certification.**

The Department agrees. All Department adoption staff are required to take this training and become certified.

**3.  The Department should retrain all staff of the proper disposal of confidential documentation.**

The Department agrees.  In foundation trainings, workers are informed about properly maintaining confidentiality. Notices have been placed in the local county's field offices and administrative support has developed a strategy to post in all DCFS offices statewide.

**4.  Notices regarding the proper disposal of confidential materials in the secured shredding receptacles should be posted throughout all Department sites.**

The Department agrees.  Notices have been placed in the local county's field offices and administrative support has developed a strategy to post in all DCFS offices statewide.

**5.  The Department's facilities managers should post warning signs on all of the I-Cycle bins stating confidential documents need to be disposed of in the gray secured shredding bins.**

The Department agrees.  All I-Cycle bins at facility have posted signs that they have been converted to trashcans. I-Cycle signs are no longer visible due to coverage with paint. In addition, signs have been placed on garbage cans, stating that papers and materials containing any form of information relating to the Department or its privileged information is prohibited and must be disposed of  in locking shredder bins.

**6.  The building's Director of Facilities and/or his staff should conduct random checks of the common trash cans at the building for improperly disposed of confidential documents and, if any are found, the documents should be removed and notification should be made to labor relations of the date and place/cubicle where the document was found.  The random checks should continue for at least the next six months.**

The Department agrees.  The local county's Facilities Manager met with his facilities managers and informed them to complete random checks of common trash at a minimum of twice per month for improperly disposed of items. If any improperly disposed of documents are found, the documents shall be removed, secured and the need for discipline will be considered.

**7.  Cleaning staff at the building should be instructed to secure all documents/material that appear to be confidential and notify the Director of Facilities or his staff.  Anytime improper disposal of confidential materials is substantiated, discipline should be pursued.**

The Department agrees.  The local county's Facilities Manager met and informed cleaning and janitorial staff at the building to be watchful for documents appearing to be confidential that are placed in the trash or improperly disposed of.  Anytime an item is found, the cleaning and janitorial staff are to remove and secure the documents and inform Facilities Management. Cleaning staff have been provided a simple form to document where, date and time the documents were found.

GENERAL INVESTIGATIONS

## GENERAL INVESTIGATION 16

| | |
|---|---|
| **ALLEGATION** | A child protection investigator falsified case notes, documenting attempted visits to children that did not occur. |

**INVESTIGATION**     The child protection investigator was assigned to a report of physical abuse of a 13 year-old girl by her mother.  The girl lived in a home with her mother, her aunt and her three younger siblings.  On the day the case was assigned, the investigator interviewed the girl and one of her siblings along with the aunt and the children's maternal grandmother at a Department field office.  The girl reported that she was doing homework with a friend when her mother asked her to help clean up their home.  The girl said that when she resisted the request, her mother took away the computer she was using and began hitting her in the head, face, arms and legs.  The girl then ran from the home and contacted police.  The responding officer noted that the girl's clothes were torn and he observed scratches to the girl's face and hair missing from her head.  The officer had recorded that the home was in disarray with trash strewn on the floor and the smell of rotting food.  The mother was arrested for domestic battery while the children were allowed to remain in the home with the grandmother.

The girl reported that her mother consumed alcohol on a nightly basis and had threatened to kill her in the past.  The grandmother stated she had been present in the home at the time of the incident and had witnessed the mother's physical abuse of the girl.  The grandmother said she had waited outside in the police car after the officer arrived because the mother had a knife and had attempted to stab her.  In the case record, the child protection investigator noted that the other two siblings were in school at the time the interviews were conducted at the field office and that arrangements were made to meet with them at the family home later that afternoon following dismissal.

The child protection investigator recorded four "good faith" attempts to meet with the other siblings on the day the case was opened, in order to comply with Department Rule requiring all involved children to be seen within 24 hours of an abuse or neglect report.  All four unsuccessful attempts were reported as having occurred at two separate locations within a one-hour timespan.  The notes created by the child protection investigator documenting the attempted visits were entered over one month after they supposedly occurred.  In addition, the documented attempts contradicted information recorded by the investigator's supervisor during two meetings conducted within the weeks after the case was assigned.  In those notes, the supervisor had recorded the investigator's acknowledgement that she had failed to see the other two siblings within the 24-hour mandate.

In an interview with Inspector General investigators, the child protection investigator insisted she had met with the other two children on the day the case was assigned to her.  Although it was not reflected in her case notes, the investigator stated she had gone to the children's school in an effort to see them but had been informed by school staff that the children had been signed out by their mother and grandmother prior to her arrival.  Inspector General investigators contacted the school which provided attendance records and sign-in sheets which showed the children had been present for the duration of the day in question and had not been removed by the mother or grandmother.     The notes maintained by the child protection investigator's supervisor also showed that at the time she asserted she had been conducting the good faith attempts, she had been in the midst of work on another case, taking a child into protective custody and transporting her to the hospital.  When presented with the supervisor's case notes, the child protection investigator stated that she did not recall speaking with the supervisor about missing the mandate for seeing the two siblings but did not question the validity of the entries and said the supervisor would not have recorded information that was inaccurate or untrue.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | The Office of the Inspector General issued charges against the child protection investigator's Child Welfare Employee License (CWEL). The investigator voluntarily relinquished her license. |
| --- | --- |

**GENERAL INVESTIGATION 17**

| ALLEGATION | A Department employee who also served as a representative for the employee's union altered Department forms in order to submit a false claim for reimbursement. |
|---|---|

| INVESTIGATION | The Department employee, a supervisor in a position overseeing financial transactions, had a schedule which permitted her to rotate and rearrange her days off from work with the approval of her supervisor. The employee would submit her requests for time off on Department Benefit Slips in triplicate, with one copy being retained by the employee. |
|---|---|

In addition to her work for the Department, the employee negotiated contracts with the Department on behalf of the employee's union. It is the practice of the union to provide compensation to its members if they find it necessary to use benefit time from their jobs with the Department in order to perform their union duties. In order to receive compensation from the union, workers must submit an expense report and attach photocopies of their Department Benefit Slips that document the worker's use of benefit time to conduct union business.

An Office of the Inspector General review of timesheets submitted to the union by the employee found she had falsified her copies of the documents, altering them to represent the approved days off as vacation days. The employee submitted 15 fraudulent forms to the union totaling $3,615.95 in reimbursement payments. In an interview with Inspector General investigators, the employee admitted changing the forms in order to obtain payment from the union. The employee stated she had misunderstood the rules regarding requesting the payments and, "made a bad judgment call," in altering the forms. The employee said she had paid restitution to the union to resolve the issue.

Department employees are expected to engage in ethical conduct and possess a high degree of fiduciary responsibility, particularly those who manage and process Department finances. The employee's fraudulent conduct in this case suggests she does not meet the standards required of her position.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The Department employee should be disciplined by the Department, up to and including termination, for repeatedly falsifying Department Form CFS-728 (Employee Request Form for Use of Benefit Time) in order to fraudulently obtain union reimbursement.** |
|---|---|

The Department agrees. The employee received a 30 day suspension. Discipline was reduced to a 15 day suspension through the grievance process.

## GENERAL INVESTIGATION 18

| **ALLEGATION** | A child protection investigator failed to adequately document her work or collaborate with other involved child welfare professionals in a case involving the placement of newborn twins. |
|---|---|

| **INVESTIGATION** | At the time of their birth, the fraternal twins, a boy and a girl, tested positive for cocaine and marijuana as well as exposure to the HIV virus. |

Their mother, who had a 10-year history of involvement with the Department, had four older children. Two of them had also been born drug-exposed and all had been removed from her custody as a result of her refusal to engage in required services. The mother's long-term substance abuse issues and non-compliance with treatment had been extensively documented and was well known to her private agency caseworker, who had handled her case for over three years.

The youngest of the mother's four older children, a two year-old boy, had been placed in a traditional foster home shortly after his birth. Upon the birth of the twins, the foster parents expressed a desire to have them placed in their home. The foster mother, a pediatric nurse who specialized in substance exposure and chronic illness, took a leave of absence from work in order to help care for the children. Two weeks after the twins were born, in anticipation of their discharge from the hospital, the caseworker emailed the child protection investigator who had been assigned to the report of their substance-exposed birth. The caseworker conveyed her belief the foster parents would be the best candidates for placement and informed her they had been granted an increase in the licensing capacity of their home to enable them to accept the twins. The investigator did not respond to the caseworker's messages.

Three days later, the caseworker received a phone call from a woman who identified herself as the sister-in-law of the twins' putative father. The woman, who had previously been licensed as a foster parent through the agency, requested that the babies be placed in the home she shared with her girlfriend. The caseworker told the woman she had never known of a sister-in-law being involved with the family in the three years she had been working with them and informed her of the agency's intention to place the children with the sibling's foster parents. Two days later, the caseworker informed the investigator that foster parents were prepared to accept the twins upon their release from the hospital. The same day, the investigator also spoke with a counselor at the substance abuse treatment facility the mother had entered two days earlier. The counselor stated the mother had refused to be honest with staff about "anything" and had told them her newborn twins were residing with their father. The mother had admitted to the counselor smoking crack while pregnant and as recently as the day before entering treatment.

Four days later, the child protection investigator met with the twins' mother and putative father at the Department field office. The mother had left treatment prior to completion. The parents were accompanied to the meeting by two women; one of whom, unbeknownst to the investigator, was the woman who had identified herself to the caseworker as the father's sister-in-law, the other woman was her girlfriend. During the meeting, the girlfriend and the mother told the investigator that they had the same father, making them half-sisters and enabling the girlfriend to be considered as a relative for placement of the twins in her home. Three days later, when the twins were scheduled to be discharged, the investigator informed the caseworker the parents were "irate" at the plan to place the twins with the sibling's foster parents and demanded the twins be placed with the woman and her girlfriend. The caseworker recognized the name of the woman as the person who had previously presented herself as the father's sister-in-law and expressed concern at the divergent stories of kinship being presented by the couple. In an interview with Inspector General investigators, the caseworker reported the child protection investigator told her, "if the mom is saying that's her sister, then that's her sister."

After being kept at the hospital for another five days for medical reasons, the twins were discharged. They were taken into protective custody by the investigator and moved into the home of the unlicensed couple. At a temporary custody hearing two days later, the caseworker presented her concerns about the placement to the court and offered information from other relatives of the parents who disputed any family bond between them and the woman or her girlfriend. The agency then used its discretion to remove the twins from the home of the unlicensed couple and prepared to place them with the sibling's foster parents. In an interview with Inspector General investigators, the child protection investigator's supervisor stated she was unaware the caseworker objected to the twins' placement with the woman and her girlfriend and did not know the foster parents were still a viable option at the time. Throughout her handling of the case, the investigator failed to document crucial information in the State Automated Child Welfare Information System (SACWIS). These omissions included multiple contacts with the caseworker, the parents and the woman and her girlfriend related to the supposed familial relationships. As such, the child protection investigator's supervisor did not have a comprehensive understanding of the dynamics involved in the child protection investigator's decision to place the twins with the woman and her girlfriend.

In her interview with Inspector General staff, the child protection investigator acknowledged the caseworker disagreed with her decision not to place the twins with the foster parents. The investigator demonstrated a poor understanding of Department Procedures intended to prioritize placing children in homes with relatives, since the sibling is also a relative; and ignored the clearly presented questions about the legitimacy of the relationship and the trustworthiness of the couple.

When the caseworker arrived at the home of the couple, six days after the court hearing, to remove the twins, the couple denied her access to any of the clothes and supplies they had acquired for the twins. As a result, the foster mother had to travel to the home with formula, diapers, car seats and clothes in order to transport the children home. Additionally, the couple denied they possessed any of the remaining 11-day supply of AZT that had been provided by the hospital to treat the twins' HIV exposure, requiring the foster mother's father to travel to a hospital that night to obtain more. Three months later, the twins' Guardian *ad Litem* (GAL) requested that an involuntary hold be placed on the home of the woman and her girlfriend, who had applied for licensure. In response, a licensing representative from the private agency went to the couple's home and met with them. The woman denied she ever claimed to be the father's sister-in-law and her girlfriend asserted she was in fact the mother's sister. Both claimed they had been fully cooperative with the caseworker when she arrived at the home to remove the twins and had provided her with unfilled prescriptions for their AZT. Based entirely upon the statements made by the couple and without corroboration or further examination, the licensing worker unsubstantiated the GAL's complaint. The foster care license for the home is currently pending.

---

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. The child protection investigator should be counseled for failing to disclose full information to her supervisor regarding contradictory reports of the woman and her girlfriend's familial relationships with the family and the availability of foster home placement with a sibling.** |

The Department agrees. The employee will be counseled.

**2. This report should be shared with the private agency to aid in the agency's decision to recommend a foster home license to the woman and her girlfriend.**

The Department agrees.

The Inspector General shared the report with the private agency and the agency's Board of Directors.

## GENERAL INVESTIGATION 19

| ALLEGATION | A three year-old boy was given a cell phone by his father that contained sexually explicit photos and videos.  A child protection investigator and local police did not conduct a thorough investigation of the allegation of sexual exploitation of a child. |
| --- | --- |

| INVESTIGATION | The young boy's mother found the boy in his bedroom watching a video on the phone of his father having sex with an unknown woman.  The mother confiscated |
| --- | --- |

the phone and found it contained numerous photos and videos of the father engaged in sexual acts with various women.

The day after the mother discovered the graphic media on the phone, a child protection investigator assigned to the case met with the mother at the local Department field office.  The mother's attorney also participated in the meeting via speaker phone.  The mother stated the father had told her he gave the boy the phone because he did not need it anymore and had taught him how to use it to take photos.  The police did not file charges.  The officer stated that a Victim Sensitive Interview (VSI) of the boy would not be scheduled and expressed his conclusion that the father's actions did not constitute sexual exploitation of a child.

Two weeks later, the child protection investigator met with the father at the field office.  The father stated the phone had been accidentally included with the items he delivered to the mother's house for the boy and that he would not have intentionally given it to him. The investigator failed to resolve the discrepancies in the parents' accounts of how the phone came to be in the boy's possession. After consulting with her supervisor, the investigator concluded the incident did not meet the definition of sexual exploitation and unfounded the report against the father.

An Office of the Inspector General review of the case record found that both the child protection investigator and police readily accepted the father's assertion he had given the boy the videos inadvertently.  The child protection investigator did not ask the boy how he came into possession of the phone and police did not speak with him at all. At the time of this child protection investigation, the child protection investigator had a high caseload.

The determination of whether to conduct Victim Sensitive Interviews is made by local law enforcement.  In this case, officers declined to request the Children's Advocacy Center (CAC) conduct a VSI with the boy.  In an interview with Inspector General investigators, the child protection investigator stated she had forwarded information about the case to the CAC as required but understood the decision of law enforcement not to have the boy interviewed was final.  The Office of the Inspector General clarified with the CAC that if a Department investigator has concerns regarding the police's refusal to refer a case for a VSI, they can request that the CAC intervene to ask for reconsideration of the decision.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  A child protection administrator from the local Department field office should invite a representative from the regional Child Advocacy Center to a team meeting to discuss the** |
| --- | --- |

**recourse child protection investigators have when law enforcement decides not to refer a case for a Victim Sensitive Interview.**

The Department agrees.

GENERAL INVESTIGATIONS

## GENERAL INVESTIGATION 20

| ALLEGATION | A child protection investigator falsified documents, claiming to have met with a four year-old boy who had been placed at Risk of Harm by his father. |
|---|---|

**INVESTIGATION**     The boy had been picked up at his mother's house by his father, who lived in another state, and was traveling with him by car back to the father's home. When a police officer attempted to pull the father's car over for speeding, the father did not comply and led officers on a high-speed chase. When the father was finally apprehended, police found 31 grams of heroin and 2 pounds of marijuana in the backseat of the car, along with the boy. The father was arrested for felony Eluding of a Police Officer, felony Child Endangerment, and narcotics charges. The boy's mother traveled to the other state, retrieved the boy and returned home. A child protection investigation of the father was initiated.

The assigned child protection investigator entered all of his notes on the final day the case was open. The investigator had documented a phone conversation with the mother the day after the incident, scheduling a meeting at her home for the following day. For the day the meeting with the mother and the boy was to have taken place, the investigator recorded having completed a Child Endangerment Risk Assessment Protocol (CERAP), an Adult Substance Abuse Screen, a Domestic Violence Screen and a Home Safety Checklist. The investigator noted no concerns regarding the boy or the mother but did request a waiver, stating that the mother had refused to sign the Home Safety Checklist. The documents were submitted to the investigator's supervisor for approval and his decision to indicate the report against the father for Substantial Risk of Physical Injury by Neglect was accepted.

In an interview with Inspector General investigators, the mother denied the child protection investigator ever came to her home or met with her or her son. She confirmed she had spoken to the child protection investigator by phone on the day he recorded in his notes but it was to schedule a visit for the next day and the investigator did not keep the scheduled visit. The child protection investigator had also documented speaking with the boy's aunt whom he claimed resided in the home. The mother identified the aunt's name recorded by the child protection investigator as that of her 13 year-old daughter who did not live with her regularly and had not been present on the day the meeting supposedly occurred.

In his interview with Inspector General investigators, the child protection investigator admitted never having visited the family's home or meeting with the boy or his mother. The child protection investigator stated he had inadvertently transcribed the notes from another case into the family's case record. The child protection investigator was unable to explain how information from the other case would have included the name of the mother's daughter or why the Home Safety Checklist recorded the mother's unwillingness to sign it when it had never been presented to her. The investigator acknowledged that he had submitted initial and final CERAPs, as well as the other assessments of the mother's home, to his supervisor for approval without ever visiting the home or seeing the boy. The Office of the Inspector General filed a complaint with the Department's Child Welfare Licensure Division for action against the investigator's child welfare license. Charges have been issued and are pending.

An Office of the Inspector General review of the child protection investigator's caseload found he had been assigned an extraordinarily high number of investigations during the five month period surrounding the time he was assigned this case. His caseload exceeded, by a staggering amount, reasonable caseload standards. While the investigator's falsification of records cannot be excused, excessively high caseloads present an institutional condition with the potential to impact child safety.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. The child protection investigator should be disciplined, up to and including discharge, for falsification.** |

The Department agrees.  The employee resigned after being informed that he was being suspended pending discharge.

**2. The Department should adopt and communicate a policy whereby investigators with untenable caseloads will not be subject to discipline or negative evaluations if they are unable to comply with the 60-day closure requirement for all their cases.**

The Department does not agree.

**3. The Inspector General issued charges against the child protection investigator's Child Welfare Employee License. The case is pending before the Administrative Hearings Unit.**

GENERAL INVESTIGATIONS

## GENERAL INVESTIGATION 21

| | |
|---|---|
| **ALLEGATION** | A child protection investigator falsified contact notes regarding reported contacts with a 16 year-old girl, the subject of an abuse investigation, and her school counselor. |

| | |
|---|---|
| **INVESTIGATION** | The girl had reported that an adult male friend of her father's had touched her inappropriately and attempted to kiss her while giving her a ride home. The girl |

was taken to a therapist by her mother and both law enforcement and child protection investigations were opened. The child protection investigation was ultimately indicated against the friend for Sexual Molestation.

The child protection investigator had documented visiting the girl at her school. The investigator also documented attempting to meet with the girl's counselor while at the school but that he was unavailable.

Two days later, the supervisor received a phone call from the girl's mother. The mother denied the investigator had met with the girl at her school. The supervisor then spoke directly with the girl who stated she knew who the investigator was but that she had not seen her at school on the day in question. The supervisor contacted school staff who denied the investigator had been at the building that day. The supervisor then reviewed security footage with school personnel and found no evidence the investigator had been on the premises that day.

The investigator resigned from her position with the Department without reinstatement rights. The case was referred to the Office of the Inspector General to investigate whether the worker's Child Welfare Employee License should be revoked. The investigator failed to respond to the Inspector General's requests for information regarding the allegations. Failure to provide information to the Inspector General is a basis for licensure action. The Office of the Inspector General filed charges against the investigator's Child Welfare Employee License (CWEL) and, after she further disregarded notice of the action, an Administrative Law Judge recommended her license be revoked.

| | |
|---|---|
| **STATUS** | **The Inspector General issued charges against the caseworker's Child Welfare Employee License for failure to respond. An Order of Abandonment was issued to which the caseworker did not respond. The Administrative Law Judge recommended the caseworker's license be revoked.** |

## GENERAL INVESTIGATION 22

| | |
|---|---|
| **ISSUE** | The Illinois Governmental Ethics Act provides that state employees with certain types of job duties are required to file a Statement of Economic Interests (SOEI) annually in May. (5 ILCS 420/4A-101). This report details the results of the 2016 filing of Statements of Economic Interests (SOEI) by Department employees and members of the Children and Family Services Advisory Council (CFSAC). |

**DISCUSSION**     In 2016, the Department certified to the Secretary of State the names of 597 DCFS employees and 8 members of the Children and Family Services Advisory Council (CFSAC) who were required to file a 2016 SOEI (total filers = 605). (Please see section entitled *Ethics* in this Annual Report for 2016 statistics about the types of disclosures made.)

The State Officials and Employees Ethics Act requires the Ethics Officer to review certain Statements prior to filing with the Secretary of State. (5 ILCS 430/20-23(2)). Failure of the Ethics Officer to review certain Statements prior to filing results in negative audit findings for the Department, as does any instance where a filer submits an incomplete form. To best ensure compliance with the requirements and spirit of the Ethics Act, the Department required each DCFS filer to send their completed, original Statement to the Ethics Officer for technical review. The Ethics Officer then filed every correctly completed form with the Secretary of State (and contacted filers who have submitted incomplete forms).

In 2016, 50 employees sent their Statements directly to the Secretary of State rather than to the DCFS Ethics Officer as instructed; 46 employees made this error for the first time and 4 employees made this error for the second consecutive year. Additionally, five employees were fined by the Secretary of State for late filing. One employee, who was fined $1,715 for his late filing in June 2012, remains delinquent.

In an effort to reduce high rates of employees failing to send their original forms to the Ethics Officer for review, beginning in 2011, a "Non-Compliance Letter" was issued to employees who failed to follow the Department's filing instructions by filing directly with the Secretary of State. The process of issuing Non-Compliance letters had an overall positive deterrent effect over a 5 year period, however, in 2016 the Department discontinued this practice. Additionally, in 2016 Department management determined that Agency Performance Team (APT) monitors and Program Monitors no longer met the criteria that would require filing a SOEI. Finally, while the overall identification and filing process has greatly improved from past years, difficulties persist regarding failure to cull the list to remove all retirees and to identify all employees on medical leave.

## GENERAL INVESTIGATION 23

**ALLEGATION**   A private agency caseworker was discharged in response to allegations she had falsified case records and lied to her superiors regarding home visits and transporting clients to counseling sessions. The Office of the Inspector General was asked to investigate to determine her suitability to retain her Child Welfare Employment License (CWEL).

**INVESTIGATION**   The caseworker had been assigned to provide services to a four year-old girl who had been removed from the custody of both parents after her father was indicated for sexually abusing her and the mother was indicated for Risk of Harm by Neglect. While residing in a relative foster home, the girl had been referred for sex abuse victim counseling at a facility located 60 miles from the foster home. A Department administrator stated that the great distance between the foster home and the counseling facility was due to the dearth of available service providers in the region. Records maintained by the counseling facility showed the girl missed 11 of the 20 scheduled counseling sessions during the 14 months following the referral. In response, the court removed the private agency from the case, citing the agency's failure to ensure to girl regularly attended counseling.

Three days after the court entered its decision, an administrator from the private agency documented a conversation she had with the caseworker 10 weeks earlier. In her notes, the administrator recorded that in response to a question regarding the girl's participation in counseling, the caseworker responded the girl had been attending "sporadically." The administrator also recorded that the caseworker went on to say she had been transporting the girl to counseling two to three times per month. The caseworker's alleged misrepresentation of the girl's attendance at counseling was the grounds for her termination, on the basis she had lied to the administrator about the frequency of her participation.

In an interview with Inspector General investigators, the caseworker confirmed she used the word "sporadically" to describe the girl's attendance at counseling but denied saying she personally transported the girl two to three times per month. The caseworker cited the distance from the foster home to the counseling facility, the numerous extra-curricular activities the girl was involved in and concerns about her unease with being transported by people unfamiliar to her as reasons for her inconsistent attendance. Inspector General investigators identified communication issues between various involved child welfare professionals and para-professionals that resulted in uncertainty regarding how often the girl attended counseling sessions and sometimes led to inaccurate information being related to coworkers. Although the administrator had stated to OIG staff she was unaware of any issues related to the girl's attendance at counseling, a review of email records found she had been included on a communication addressing that very issue. While the caseworker had erroneously represented in court that a specific visit had occurred, the Inspector General investigation found that the false testimony was not intentional. She had been notified by the transporter that the visit would take place and was unaware that the visit had not occurred.

Following the caseworker's dismissal from the private agency, agency staff identified two other cases in which they alleged the caseworker had falsified information related to home visits. In interviews with Inspector General investigators, both of the involved families provided inconsistent accounts of the caseworker's presence in their homes and the frequency of her visits. The Office of the Inspector General found insufficient evidence to support the allegations made by the private agency against the caseworker.

**OIG FINDINGS**   The Office of the Inspector General found insufficient evidence to support the allegations made by the private agency against the caseworker.

**GENERAL INVESTIGATION 24**

| **ALLEGATION** | A child protection investigator falsified case notes regarding an indicated report of physical abuse against a father and provided false testimony at an administrative hearing of the father's appeal for the indicated finding. |
|---|---|

**INVESTIGATION**   The initial report against the father alleged he had picked up his eight year-old daughter after she kicked his six year-old son, carried her into a bedroom and threw her to the floor.  The father was then reported to have held the girl against the floor, preventing her from rising or leaving the room.  After a mandate investigator went to the children's school and met with them on the day after the report was made, the case was transferred to the child protection investigator.  Almost two months after being assigned the case, the investigator entered all of his investigative notes on the same day.  The following day, the investigator met with his supervisor and recommended the report be indicated against the father.  The recommendation was approved and the father was indicated for Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare.

In contact notes entered into SACWIS, the child protection investigator had documented two occasions when he had met with the children and their mother at their home, which was a separate residence from the father's.  In an interview with Inspector General investigators, the mother stated she had never met the child protection investigator and he had never interviewed her or the children about the incident or been to their home.  The mother stated the child protection investigator had scheduled a visit at one time but failed to show up and later told her over the phone that rescheduling was unnecessary.  Both of the children involved in the incident as well as their 14 year-old sister, whom the child protection investigator had also claimed to have interviewed, denied ever meeting with him.  In his notes regarding his meeting with the 14 year-old, the child protection investigator recorded that she had been with friends when the incident occurred.  The 14 year old, however, stated that she was not with friends that day and had stayed at her mother's home.  The mother additionally stated that the children could not have spoken with the child protection investigator at her home at the time one of the meetings was supposed to have occurred as it was during school hours.  Inspector General investigators confirmed with the children's school that they had been present and in the building that day.  Additionally, the child protection investigator's notes listed the mother's home as being located in another town than the father's, 12 miles away.  The mother's and father's houses are in the same town and only one block apart from each other.

The father appealed the indicated finding against him, necessitating a hearing before an Administrative Law Judge (ALJ).  During the hearing, the investigator testified to the facts contained in his case notes, affirming he had met with the two children directly involved in the incident.  In explaining his rationale for indicating the report, the investigator stated he based his decision on the fact the mother had obtained an Order of Protection against the father.  The ALJ ultimately sided with the father and overturned the indicated report, concluding that since the Order of Protection had been granted *ex parte* without the father being present or represented by counsel, there had been no finding of actual abuse by the court.

After learning of the child protection investigator's alleged falsification of case notes, his supervisor conducted a random review of his previous cases.  In two instances, families disputed notes created by the investigator documenting in person meetings with them.  The child protection investigator initially agreed to participate in an interview with Inspector General investigators, but he canceled on the morning the interview was to take place.  Another interview was scheduled for five days later, however that morning Inspector General investigators called his workplace to confirm his attendance and were informed he had called in sick for the rest of the week.  The child protection investigator did not respond to multiple phone calls and emails from the Inspector General investigators and, one month later, Inspector General investigators were informed

by his supervisor that the investigator had not returned to the office since missing the second scheduled interview.  Inspector General investigators made final attempts to reach the investigator on his personal phone, leaving messages advising him of his obligation to make himself available for an administrative interview in accordance with Department Rule.  The child protection investigator never responded.  The Office of the Inspector General subsequently filed a complaint against the child protection investigator's Child Welfare Employee License for revocation. The Child Welfare Employee License was revoked.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES |
| --- |

**1.  The child protection investigator should be discharged from the Department for falsification of investigative notes, for giving false testimony at the appeal hearing, and for failing to cooperate with an Office of the Inspector General investigation.**

The Department agrees.  The employee was discharged.

**2.  The Inspector General issued charges against the child protection investigator's Child Welfare Employee License (CWEL).  The Administrative Law Judge recommended revocation, but the decision of the CWEL Board is pending.**

## GENERAL INVESTIGATION 25

| | |
|---|---|
| **ALLEGATION** | A Department caseworker falsified case notes entered into the State Automated Child Welfare Information System (SACWIS) in three separate cases. |

**INVESTIGATION**    In one case, the caseworker was alleged to have fabricated documentation of a visit to the home of a father who had assumed custody of his daughter after her mother was arrested for the murder of the girl's sister. The girl, who had been placed with her father five years earlier when she was six years-old, and her father had met regularly with the caseworker at their home until the family moved to another town, located approximately 60 miles from the caseworker's field office.

Following the move, the caseworker conducted his visits with the girl at her school or in the home of her aunt. In his notes, the caseworker documented making six good faith attempts to see the father at the family home but recorded all of those attempts as being unsuccessful. Five of the six documented good faith efforts occurred on days the caseworker had the opportunity but had not attempted to visit the girl at school. The single successful visit to the family home the caseworker recorded was reported to have occurred one week after one of the good faith attempts. In the case notes, the caseworker documented having a conversation with both the father and the girl while in the home. In an interview with Inspector General investigators, the father stated that the meeting recorded by the caseworker never occurred. The father additionally stated that while the caseworker had picked the girl up from the home before and had dropped off paperwork there before, he had never been inside the house.

In his interview with Inspector General investigators, the caseworker stated he had made an error when entering his notes. He stated that when he checked his handwritten notes, he realized that the notes for that day actually reflected facts he had learned from a conversation with the grandmother. In reviewing the case record, Inspector General investigators found the caseworker habitually neglected to enter his case notes in a timely fashion, sometimes waiting as long as 11 months to complete them. The caseworker's chronic failure to enter his notes in a timely fashion greatly increased the likelihood of unreliable documentation. The caseworker's practice of allowing so much time to elapse between performing duties and recording them rendered genuine supervision of his work impossible.

In the other two cases, the Office of the Inspector General was unable to substantiate allegations of case record falsification. In one, a foster mother disputed the number of times the caseworker reported coming to her home but confirmed that all the actions he claimed had occurred during the visits that had been completed. In the other case, involving a 13 year-old child residing in a residential facility, there was insufficient evidence for the allegation. Although the facility had a protocol for having guests sign-in when entering, facility administrators acknowledged the policy was lax and not consistently enforced. Furthermore, when Inspector General investigators attempted to obtain records of sign-in sheets pertaining to the visit in question, investigators were informed that the logs had been lost and could not be located.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.   The caseworker should be disciplined for unreasonably delayed entry of case notes.** |

The Department agrees. The caseworker served a 123 day suspension.

**2.   The caseworker requires close supervision with regard to timely entry of notes and documented good faith attempts. A deadline of 24 hours for entering his case notes should be instituted and**

**enforced with notice that deviation of more than 48 hours will subject him to discipline.   The caseworker should also be informed that he must enter timely documentation of attempts to schedule visits in advance and must leave a card or note with his name and the date and time of any good faith attempt if the individual is not home.**

The Department agrees.   However, the caseworker resigned his employment after serving a 123 day suspension.

**3.  The residential facility should review its security and sign-in procedures to ensure that it has a clear record of visitors and that identification is always checked prior to entry.**

The Department agrees.  The Inspector General shared this recommendation and relevant portions of the report with the residential facility.

204

# ORGANIZATIONAL FAILURES AND HARMS

In 1993, the Illinois child welfare community was rocked by a horrific child death of a 3 year-old by hanging. The child was killed by his mother soon after Department staff, including a worker, supervisor, and Administrative Case Reviewer, decided that it was safe to return the boy to his mother, who had a history of violence, fire-setting, drug abuse and suffered from documented serious mental illnesses. The event shook the public's faith in the child welfare system, as a whole, and resulted in the creation of our Office. The Office was entrusted to examine not only errors made by individual workers, but to examine problems of a broader, institutional nature. In 2008, the Illinois legislature reaffirmed its mandate to the Office of the Inspector General to continue to review systemic issues when it added the Error Reduction Act to the enabling statute of the Office of Inspector General.

In recognition of this important legislative mandate the Office has examined both individual and systems errors that can lead to harm of children.  The Inspector General's Office often uses a systems perspective with root cause analysis to develop recommendations for remedies to these risks.

This past year, the Office of Inspector General undertook an examination of the street violence that plagues many of our children and families and issued an investigative report, Homicide of Wards.  While the Department accepted most of the recommendations for systemic change, the Department also responded by alleging, without basis, that our Office acts beyond its authority when our investigations look beyond the fault of the individual worker. (See page 29 for Department's Response to Homicide of Wards report.)

It is important to maintain an institutional memory of roads to harm, if we are not to repeat institutional/organizational errors that harmed Illinois children and their families.

**Institutionalizing Small Children**

In the late 1990's a foster parent of a six year-old complained to the Office of Inspector General that her foster son who had been placed in her home two months prior and doing well had been removed from her care because the Department had a practice of sending very young children who they had labeled as 'perpetrators' who were sexually aggressive, into institutional facilities for sexual offender treatment. The foster parent was incredulous that an adult offender model was being applied to a six year-old and that he would now be relegated to live in an institution. It caused her to question whether the child was removed because he was a white child placed with a black foster family. The Department's prevailing belief that a six year-old had the same developmental capacity as an adult or that institutional racism was operating were quite troubling. The Inspector General's investigation recommended the immediate removal of the child from the residential treatment facility and return to his compassionate foster parent. Her complaint led to an expansive investigation into a system in which children seven and under were viewed as sexual threats equivalent to adolescent and adult sex offenders. The systemic investigation found that children as young as two-and-a-half had been permanently labelled as "sexually aggressive."  Our six year-old had been designated as sexually aggressive at age four, based on an isolated incident.  While in respite foster care, following the trauma of removal from his family of origin, he crawled into bed with other members of the household and tried to kiss them. In another case, a five year-old had touched his own genitals at naptime.  These children were characterized as "perpetrators" and stigmatized in the community. The conclusion of the Inspector General's report was that DCFS services were ineffective and harmful to small children exhibiting minor and understandable sexual behaviors.  This investigative trail also led to an investigation into potential bias against trans-racial foster care and adoptions.

While these disturbing practices have ended, they are far from ancient history and provide cautionary examples for the critical need of independent systemic oversight for an organization that has such power over people's lives; others follow.

**Contingency Planning for Permanency Support**

The Office of the Inspector General received a complaint from a police officer who found a five year-old walking through the streets and alleys with his adoptive mother at 4 am. The child had previously been in the care of the Department, which had recently approved the adoption. The mother who was in her late seventies had dementia and was wandering while her son held tightly to her hand watching over her. The officer was distraught because the Department's hotline cannot accept dependency calls and wanted him to report neglect by the incapacitated adoptive mother. He felt strongly that the Department was the one who was neglectful for not properly assessing or supporting the family at the time of the adoption. The Office of the Inspector General investigated the officer's complaint. Further investigations led to institutional change in the Department's policies and practices on older caregivers.  Based on the Inspector General's recommendations the Department began to offer supportive services in collaboration with the Department on Aging, and to involve the extended family in permanency and contingency planning for a back-up caregiver in case of failed health.  In 2015 with the assistance of the Office of the Inspector General and DCFS Office of Legal Services, the Department of Children and Family Services and Department on Aging signed an Intergovernmental Agreement for system referrals and assessments and exchange of information between the agencies' case managers. However, funding cuts to the Department on Aging weakened the ability of the Department of Aging to serve this population.

**Special Consideration for Youth with Immigrant Status**

Inspector General investigations identified a lack of understanding and appreciation for the ways in which immigration status can affect a child's future. The Inspector General spearheaded training and protocol for both workers and youth to ensure that the rights and responsibilities of immigrant youth are respected and understood.

A parenting youth in care who had recently been granted Special Immigrant Juvenile Status [SIJS] was arrested for battery shortly after his 18th birthday.  Neither the youth nor his worker was aware that a criminal conviction arising from the incident would render him eligible for deportation. Consequently, the youth was convicted and deported, leaving his child and the child's mother without his support.

The Office of the Inspector General and the Department's Immigration Services Unit collaborated with Loyola University Chicago School of Law Child Law Center to train foreign born youth in care and their case workers on navigating the immigration process. The Office of the Inspector General and the Department's Immigration Services Unit developed materials for case managers and youth in care that provided a step-by-step guide to understanding the complex USCIS status adjustment process.

**Basic Safety Checks**

In 2000 Illinois led the nation in fire fatalities. Most of the victims were the very young or old. Within two years, the Office of Inspector General had investigated over 19 fire fatalities including four children and a teen mother who were under the guardianship of the Department and the teen mother's infant. An additional five children were killed in the homes of their parents while the Department had an opened or recently closed Intact Family case. The Inspector General recommended and assisted the Department in instituting aggressive preventive strategies. Working with the State's Fire Marshal, the Chicago Fire Department, a Lombard Fire Department Public Education Coordinator and local fire departments, the Inspector General Office's provided statewide child welfare training on fire prevention. The trainings

piloted a Home Safety Checklist, provided fire detectors to each DCFS office for distribution to families, and had local fire fighters assist in the training of child protection investigators. Additionally the fire fighters assisted in educating the Department's teen parents. Many of the community firefighters offered to install the smoke detectors for single parents. The Home Safety Checklist was adapted from an educational Public Health home visiting program. As an assessment and educational tool, the Home Safety Checklist assists parents in promoting the safety of their children. The parent and caregivers were given copies of the assessments. Safety topics ranged from safe sleep to advice about leaving your children with appropriate non-violent caregivers. Investigators distributed portable cribs. By 2004, the Department adopted the model with the support of the Child Death Review Teams and expanded the Home Safety Checklist to include Intact and Permanency workers. The Intact and Permanency checklist is more comprehensive. The tool has been incorporated into procedures and expanded to include additional safety threats.

**Achieving Recovery with Families Suffering from Substance Abuse**

During the late 1980's through the 1990's the nation was in the throes of a drug epidemic. Following a wave of child deaths involving substance abusing parents, the Inspector General issued "The Inspector General's Report to the Governor on Recommendations for Improving the Child Welfare Response to Families Affected by Parental Substance Abuse." (1996) One of the investigations that led to the report involved a 32 year-old mother of six who was indicated for death by neglect of her five month-old son who died of starvation. At the time of the infant's death, there were no specialized intact family services for substance abusing families. The mother had an extensive history of substance abuse and had given birth to a substance-exposed infant three years earlier. The intact family services worker was unaware that the mother had dropped out of drug treatment because the worker and the substance abuse provider were not in communication. The mother, who had been linked to WIC, later admitted that she sold her coupons to purchase drugs. The intact worker had not assured that the infant was enrolled in well child medical care and had made only one cursory observation of the infant who was bundled in a blanket before his death. The worker had also failed to involve the extended family to assist in monitoring the well-being of the children. The Inspector General investigation noted that frequently, substance abuse providers and child welfare workers operated independently, on differing timelines and with different goals.

Because of the conflicting goals and timelines of substance abuse and child welfare adequate monitoring of the families in recovery must be coordinated and ensured. The Office of the Inspector General determined that the Department's reliance upon standard intact family services was ineffective, and failed to lower the risks of harm to the family's children. The Inspector General's Report recommended a specialized intervention model which married child welfare and substance abuse approaches and practices. The Office of the Inspector General, in collaboration with treatment experts, developed a practice model which emphasized intensive services by child welfare and substance abuse providers to address barriers and secure a parent's placement in an appropriate level of substance abuse treatment while assuring child safety. The model ensured that children had regular well child medical care and were engaged in early education programs such as Head Start and other assessment services that they were entitled to. Mothers were transported to their post-partum medical appointment where family planning options were discussed. The Department accepted the recommendation and issued a Request for Proposal (RFP). The RFP resulted in the development of The Intact Family Recovery model. Unlike general intact family services which typically lasted 6 months (with an option to extend to 12 months) the Recovery Model called for intensive services lasting 18-24 months. Recognizing that a family's road to recovery may involve relapses, parents are required to sign a Memorandum of Agreement (MOA) acknowledging their understanding of the program, and that graduated sanctions, including Court Supervision, would be sought for failure to adhere to the agreed upon conditions of the program.

**Serious Harms to Infants**

Soon after the Office of Inspector General was created, a caseworker requested the Office investigate a case with a permanency goal of Return Home. She stated that her young client was anxious during compelled visits with his mother and the caseworker was not sure that Return Home was in the child's best interests. The mother had recently been found Not Guilty by Reason of Insanity for the violent ritual murder of his little sister. The Department and the Juvenile Court had retained a goal of Return Home because the law only permitted termination of parental rights if a parent had been *convicted* of murder of a sibling. Since the mother had been found Not Guilty by Reason of Insanity, the Department believed that they had no options. The Office of the Inspector General successfully sought a new legislation to include Not Guilty by Reason of Insanity of murder of a sibling as a basis for terminating parental rights and ensured that the best interests of the child drove case decisions.

A series of Inspector General investigations into the serious harms of infants found that child welfare investigators and caseworkers were misinformed about the serious risk associated with infant bruising. It is rare for young infants to suffer bruises compared to children who are crawling or walking. Inspector General death investigations had revealed that the field had a tendency to ignore bruises on infants, including small abdominal and facial bruises, even when the bruises could only have been the result of inflicted harm. As part of the Error Reduction Initiative, the Office of the Inspector General developed a curriculum and trained Division of Child Protection investigators, Intact and Permanency workers statewide on bruising of an infant, toddler or young child. The curriculum included academic articles on the prevalence, distribution and location of bruises on children. A poster illustrating the prevalence and distribution of accidental bruising in infants contrasted high and low suspicion bruising. The poster also contrasted skull and facial injuries from autopsies of non-accidental bruising in infants and children. As a part of the training effort the poster was distributed statewide to DCFS field offices, private agencies and Courts. A companion guide accompanied the poster providing additional information to help professionals effectively utilize the illustrations as teaching tool.

**Child Safety and the Child's Right to be Heard**

A series of Inspector General investigations into deaths and serious harms of children between the ages of four and nine years old found that the concerns of relatives and other adults invested in the young victims' lives were often missed or minimized. Investigators were not trained to question self-reports or corroborate facts. In addition, DCFS policy only required investigators to interview persons outside the family (collaterals) that were identified by the parents. There seldom was an opportunity given to the child to voice who he or she trusted and believed watched out for his or her well-being. Asking a child to identify a support person assures a deeper safety net for the child. The Office of the Inspector General recommended policy changes and conducted trainings that required investigators to identify child-centered collaterals (those that the child identifies as persons they feel safe with) and emphasized the importance of corroborating self-reports. In addition, the Office of the Inspector General recommended that non-custodial fathers be interviewed when they were involved with caretaking responsibilities. The Inspector General investigators found that in many investigations of injuries to four to nine year-olds concerned individuals who had been a strong support or protector of the child were not sought out or were ignored when they voiced serious concerns over a parent's new boyfriend and a corresponding appearance of injuries on the child.

The Inspector General learned that the Department had conducted trainings around the State informing workers that it was 'illegal' to speak to persons outside the nuclear family during a child protection investigation. Involving a child-centered collateral in a Safety Plan and ensuring children are attending Head Start or Pre-school are important ways to ensure support of a struggling family and to enhance the

child's safety net.  The Office of the Inspector General collaborated with the Department to develop procedures and training to ensure that workers interviewed all relevant persons during an investigation and included extended family in Safety Planning.

Several Inspector General death investigations involved families suffering from chronic domestic violence. The Office of the Inspector General found a lack of understanding and communication between the court system addressing the domestic violence and the child welfare system. The practice in the field was to ask the victim to procure an Order of Protection in domestic violence court, but not to accompany the victim to court, even when the victim was the child. As a result, there was little understanding of facts presented to the domestic violence court. The Office of the Inspector General recommended that whenever domestic violence was serious enough to present a risk of harm to the children, the worker should accompany the victim to court to ensure full sharing of information.

### Collaboration with Medical Professionals

A series of Inspector General investigations found that information about the circumstances of the injuries and relevant information about a parent's history of substance abuse, mental illness or domestic violence were not exchanged with the child's physician when the investigator requested an opinion about whether the child's injuries were consistent with abuse.  Requesting a professional opinion without an exchange of relevant information compromises the integrity of the opinion and prevents the physician from providing anticipatory guidance to the family and the child. To lower the risks of harm to infants and children, child protection workers need the assistance of pediatricians and family physicians. Dr. Hymel, a pediatrician who testified on behalf of the American Academy of Pediatrics to House Ways and Means Subcommittee Hearing on Improving Child Protection Services, reported pediatricians often are not provided the information vital to the child's follow-up care, especially in substantiated cases of abuse. He found that pediatricians tend to dwell on the periphery of the child protection system. But, after child protection concludes its investigation, it is the child's physician who can monitor the child's well-being in subsequent visits.  If child abuse and neglect are to be combated, the village providing the safety net has to include the child's physician, professionals and family members who are invested in the well-being of the child.  Involving the family's physician does not preclude seeking the expert opinion of a certified child abuse pediatrician when doubts exist about the cause of the child's injuries.

### Contraindicated Use of Beta-blockers with Asthma medication

In 2002, an OIG investigation revealed that a child in care with a diagnosis of moderate persistent asthma was also prescribed a beta-blocker drug. Such medications are contraindicated for use with asthma drugs called beta-agonist drugs (Albuterol, Ventolin, Proventil). The use of beta-blocker medications, for the treatment of aggressive and violent behaviors, had become more prevalent, although not yet FDA approved for this indicated use in the pediatric population. In addition to identifying all youth in care being prescribed both medications, the OIG recommended that the Division of Health Policy conduct an ongoing review of potential contraindicated drug use every six months and that Healthworks physicians should be alerted to watch for contraindicated uses of these drugs. The Inspector General also issued a report on the use of multiple psychotropic medications with very young children.

### Young Parents in Care

The Department has a special duty to support and protect the rights of pregnant and parenting youth in care.  In 2011, the Office of the Inspector General conducted a Ten Year Review of Deaths of Children of DCFS Parenting Teens. Ten infants were the victims of homicide.  In six of the 10 homicides the mother, who was a current or former youth in care, was implicated, including two cases where the mother and her

boyfriend were criminally charged. Four of the 10 homicides were committed by fathers; three of these fathers were youth in care.

In an effort to lower the infant mortality rate of babies born to parenting youth, the Office of the Inspector General developed a risk reduction training curriculum. The interactive, discussion-driven training aimed to promote safe sleep practices; develop non-violent and soothing responses to infant crying, support nurturing responses to challenging developmental behaviors; understand the mechanics of abusive head trauma; and recognize warning signs for potential domestic violence.

A companion training was developed to meet the unique needs of young fathers, an often overlooked and underserviced population. In 2014, Young Parent Training added strategies to promote infant brain development through a curriculum that emphasized talking, touching, reading or playing with their child. Parents' learned the effect of trauma or neglect on an infant's brain development, and how to discern the difference between accidental and non-accidental bruising in infants and toddlers. The more than 1000 youth trained voiced their appreciation; so much so, that a group of young fathers created a training video encouraging other young father's participation.

**Egregious Acts**

Several Inspector General death or serious harm investigations have involved cases of egregious abuse or torture of young children. The investigations disclosed that – regardless of how egregious the abuse was – the Department had a practice of offering generic parenting services (e.g., parenting classes) to ameliorate the risk of harm.  There is no evidence to support that those services can reduce the risk of future harm in cases of egregious abuse.  The Inspector General developed an Error Reduction Plan and worked collaboratively with the Department and various State's Attorneys to change practice in cases of egregious abuse and ensure that the family is appropriately assessed to determine whether any services could ameliorate the risk of further harm.

ORGANIZATIONAL FAILURES AND HARMS

# ERROR REDUCTION

In 2008, legislation was enacted requiring the Office of the Inspector General to remedy patterns of errors or problematic practices that compromise or threaten the safety of children as identified in Inspector General death and serious injury investigations and by Child Death Review Teams (20 ILCS 505/35.7).

Following legislative hearings, the Office of the Inspector General worked with legislators to develop this error reduction statute.  Recognizing that multiple weaknesses in organizational processes can align to create a tragic outcome such as the death or serious injury of a child, the Office of the Inspector General used a systems perspective and root cause analysis to develop recommendations and trainings to reduce those errors that may result in the death or serious injury of a child. Although occasional accidents cannot be avoided, a systems perspective makes it possible to introduce a systematic and comprehensive approach to investigation and prevention efforts with the goal of decreasing their occurrence. Root cause analysis is used to identify points in a system where improvements can realistically be made to reduce the likelihood that a negative event will occur.

The Inspector General's error reduction initiative to identify and address failures in the state's child protection system is aimed at building better organizational processes and reducing the incidence of child injury and death. The error reduction initiative informs both administration and front-line staff, and promotes critical thinking and decision-making.

Several Inspector General death or serious injury investigations have involved cases of egregious abuse or torture of young children. The investigations revealed that – despite the gravity of the egregious abuse – the Department had a practice of offering standard parenting services (e.g., parenting classes) to ameliorate the risk of harm.  There is no evidence to support that a generic services approach can reduce the risk of future harm in cases of egregious abuse.  The Inspector General developed an Error Reduction Plan and worked collaboratively with the Department and various State's Attorneys to change practice in cases of egregious abuse, and ensure that the family is appropriately assessed to determine whether any services could ameliorate the risk of further harm.

In FY 2015, the Inspector General developed a five-topic Error Reduction training curricula: *Lessons Learned from Physical Abuse Fatalities*. The training curricula and Guide were designed to remedy patterns of errors or problematic practices that compromise or threaten the safety of children. Topic 5, one of the topics in the training curricula ("Systemic Error in the Legal System, High Risk Specialized Assessments") covers egregious acts of maltreatment; legal provisions to deny reunification services in cases of egregious acts of maltreatment, and referral for specialized assessment in cases of extreme abuse. To assist the field in conceptualizing egregious acts of maltreatment, the Office of Inspector General created the **Maltreatment Continuum**, a visual tool illustrating the characteristics, spectrum, and severity escalation from Minor Assaults to Egregious Acts of Maltreatment. At the end of FY2015, the Inspector General presented Topic 5 Error Reduction to seventy-two statewide clinical staff for input and feedback.

In FY 2016, 300 Private Agency and Department Child Protection, Permanency, and Intact: Administrators, Managers, Investigation Supervisors, State's Attorneys, and DCFS Legal staff in Cook and the Southern regions were trained on Topic 5, Systemic Error in the Legal System, High Risk Specialized Assessments. The Central and Northern regions are slated for Error Reduction training in 2017. The detailed curriculum is as follows:

## LESSONS LEARNED FROM PHYSICAL ABUSE FATALITIES CURRICULUM

### INTRODUCTION

The concepts presented here are meant as reinforcement training for Child Protection supervisors and investigators, applying knowledge gained from literature on child mortality from physical abuse, and Inspector General's death investigations of children fatally abused within a year after contact with the Illinois Department of Children and Family Services. This error reduction training is intended to encourage an introspective organizational environment that recognizes the occurrences of errors and acknowledges near misses to learn from them to improve practice and prevent the risk of sentinel events.

Disasters are rarely the result of one major mistake by one incompetent worker, but by the result of a system operating with a pattern of small errors or omissions (Munro, 2005). These small errors may not have an adverse effect on their own, but on one tragic occasion come together and lead to sentinel event: an unexpected occurrence involving death or serious physical or psychological injury, or the risk thereof.

*Rate of Physical Abuse v. Rate of Child Maltreatment Deaths*
Though the national rate of physical abuse has decreased (Finkelhor & Jones, 2006), there is a substantial increase in the incidence of child maltreatment fatalities from abusive injuries, a slight increase in hospitalizations from physical abuse, and an increase in the incidence of deaths during hospitalizations due to abuse (Leventhal & Gaither, 2012).

*-Discussion-*
*Why has the incidence of abuse decreased? How does that affect child protection?*

Some hypothesize the decrease is due to a general shift in social norms and attitudes, which has changed the way children are viewed and treated. Behaviors that were previously acceptable are no longer so easily tolerated. In addition, the availability of contraception lowered the number of unwanted children and stresses within family households. (Finkelhor & Jones, 2006)

Historically, certain marginalized groups such as slaves, servants, and women were seen as no more than chattel - property without rights. At the whim of their masters, they could be subjected to deliberate physical assault. Those beliefs were put asunder through wars, the civil rights and women's movements. Within the last thirty years, there has been a similar cultural shift in how children are valued. Children are no longer considered the mere property of their parents, but individuals with rights. Meeting parental duty to children is considered the fundamental basis for a parent's right to their children. If there is an egregious act or a pattern of a parent's compromising his/her duty of protecting the child the parent's rights are similarly compromised.

**Evidence of cultural shift:**
- Surveys of parents in the late 1990's showed declining support for corporal punishment and favored less violence toward children. (Finkelhor & Jones, 2006)
- Social intervention agents such as educators, domestic violence professionals, early interventionists, child development professionals and child trauma researchers called for change. Funding began for children's programs such as Head Start.
- Since 1975 there has been a decline in physical abuse in the U.S. Between 1975 and 2002 18% fewer children were slapped or spanked by caregivers. Between 1975 and 1985 there was a 35%

212                                    ERROR REDUCTION

decline of parents hitting children with an object. (Zolotor, Theodore, Runyan, Chang, & Laskey, 2011)

- Internationally, children are viewed through a more kindly lens and there have been a number of policy initiatives to end corporal punishment of children.
  - In 1989 the UN Convention on the Rights of the Child stated that "members must take measures to protect children from all forms of physical or mental violence, injury or abuse, neglect or negligent treatment, maltreatment or exploitation, including sexual abuse, while in the care of parent(s), legal guardian(s) or any other person who has the care of the child." (United Nations Human Rights, 1989)
  - Twenty-three of forty-seven Council of Europe countries have passed laws prohibiting the use of corporal punishment within the home. (duRivage, et al., 2015). Sweden was first in 1979. Romania and Ukraine had passed laws by 2004. Recent countries include Andorra, Estonia and Malta.
  - As of 2010, three Central and South American countries, Venezuela, Uruguay and Costa Rica have passed laws against corporal punishment. (Zolotor & Puzia, Bans against Corporal Punishment: A systematic review of the laws, changes in attitudes and behaviors, 2010).
  - More countries in Central and South America have followed suit between 2010 and 2014, including Honduras, Argentina, Bolivia, Brazil and Nicaragua.
  - Between 2007 and 2015, six African countries outlawed corporal punishment in the home: Togo (2007), the Republic of Congo (2010), Kenya (2010), Tunisia (2010), South Sudan (2011), and Benin (2015). A bill proposing outlawing corporal punishment is presently under consideration in Uganda.

## TOPIC ONE

The Rule of Optimism, as described by scholar Eileen Gambrill (author of Social Work Practice, A Critical Thinker's Guide), is the tendency to have a benign opinion about parents and injuries on a child. The Rule of Optimism appears to be the operating bias in many child death cases.

The Rule of Optimism can be countered by relying on a wide range of information, key informants and robust sources of evidence.

**Avoid the following "investigative pitfalls":**

I.    **Making decisions without sufficient information or misinterpreting information.**
- Not obtaining or not critically reviewing relevant reports[1]
  - Such as police reports, previous child abuse reports, school records, mental health records or medical records.
  - Example: *See Lawrence and Jacobs/Landry case studies*
- Failure to give critical attention to new evidence that should have revised an assessment of the situation.
- Over reliance on self-reports or failure to verify self-reports
  - Such as not checking IDs to assure identity (for example, if there is a new person such as a new boyfriend/girlfriend interacting with the child), not completing a valid LEADs, and not checking work schedules or doctors' appointments to validate mitigating self-reports.
- Shortcuts in scene investigations:

---

[1] Trainer note: This relates to Topic 3 and contributes to a weak investigative foundation.

- ▪ Part of the information gathering process includes an adequate scene investigation, including reenactments, conducting scene investigations in the location of incident or in locations other than the home, and requesting to see devices suspected to be involved in an incident.
- ▪ In the David Quentin case, the investigator observed the basement where the child was punished and looked at the equipment the child was forced to use; however, she failed to ask how the equipment was used, or request a demonstration of how the equipment was used.
- ▪ In another example, an investigator accepted that the child was injured in the early afternoon at a neighborhood playground without going to see the actual playground. His mother's work schedule showed she was at work in the early afternoon on the day of the "injury" and could not have taken the child to the park.
- Closing investigations with poor documentation, thus limiting subsequent investigators/ caseworkers' ability to assess threats or risks to a child.
- Anchoring Bias: In the David Quentin case, the investigator appeared to have had an anchoring bias, resulting in her judging the pre-adoptive father to be a good caregiver based on his youth ministry and his service in the military, despite his use of bizarre punishments and home schooling of his own children.[2]
- Positive Re-framing Deception: In Office of the Inspector General investigations, mothers with children already in care lied about or hid pregnancies for fear that DCFS would take the child away. While that may be a motive, investigators/workers should consider whether this is part of a pattern of deception or passively concealing information.

## II.  Failing to properly assess child's injuries and/or follow-up with child's injuries.[3]

- Not ensuring child sees physician to assess injury, due to:
  - ▪ Lack of knowledge about rapid healing of infant bruises or injuries.
  - ▪ Minimizing "fading" injuries on child's face, neck, and ears.
  - ▪ Lack of knowledge about abdominal injuries and failure to understand that small injuries to the abdominal region are high risk.  Young children are not as able as adults to protect abdominal areas (Trokel et al. 2004). Their abdominal muscles are relatively weak, allowing impacting forces to be transmitted inward more easily. Mid-abdominal structures such as the small intestines, liver and pancreas are particularly vulnerable (Zitelli, McIntire, & Nowalk, 2012). Children's organs are also comparatively larger than those of adults in proportion to their body. As a result they are at greater risk for injury (Saxena et al., 2010). Even if there is little or no bruising, when a child states that they have been hit in the stomach, they should be taken to the doctor, *see Keira Geddes case study*. Children with acute small intestinal tears generally have severe abdominal pain within an hour or two of injury (Zitelli, McIntire, & Nowalk, 2012).
  - ▪ Lack of knowledge about thoracic (chest) injuries: Thoracic injuries have a high morbidity and mortality rate because they are the result of the application of massive forces to the chest such as stomping, slamming or violent throws. Thoracic injuries can present with significant respiratory distress, with complaints of severe chest pain.
- Not asking relatives or reporter if they have pictures of current or past injuries.
- Not providing physicians with descriptions of injuries provided by caretakers who reported concerns.
- Not comparing explanations given to the investigator for the injuries. *See Patrick George case study*.

---

[2] See Topic 4- Unrealistic and Developmentally Inappropriate Demands, Halo Effect
[3] See bruising slides in Section 5

- Not having the technical ability and equipment to download pictures from cellphones or not requesting law enforcement assistance to download informants' pictures of young children's injuries. *See Ina Ordonez and Jessica Brown case studies.*
- Not consulting with child abuse doctors or other relevant professionals for second opinion when needed.

**III.  Failure to establish a safety net for child.**
- Discounting child centered collaterals, interviewing only the parent identified collaterals. Examples of prompting questions to assist the child in identifying collateral contacts include:
  - Who are you special to?
  - Who do you go to if you have a problem?
  - Who do you trust?
  - Who comforts you?
- Failing to contact or establish a relationship with child-centered collaterals in order to form a support network.
- Not enlisting child-centered collateral such as collaterals identified by the child, extended family members, child's medical professionals, and school personnel to keep additional eyes and ears on child.
- Failing to contact support network when the parent has a new paramour and there is a concurrent emergence of injuries on the child.
- DCFS Procedures include the following examples of additional prompting questions to assist the worker in identifying collateral contacts:
  - Who best knows the mother's/father's side of the family?
  - Who within this family can best assist in setting in motion the planning activities of the family?
  - Who is the peacemaker in the family?
  - Who is the wisest member or person who can best approach other members to get their assistance in planning for the future of the children?
  - With whom do you spend your holidays?
  - Who watches your children?
  - Who are your family members?

<em>-Narrative-</em>

*Parent has engaged in a new relationship or the individual has just moved into the household and extended family has concerns about bruising. Their concerns have been growing because the child appears to have more injuries since the individual relationship has developed. Family may have noted bruises but attributed them to accidents. Now they are unsure or are suspicious of abuse. In several homicide cases, misconception of parent's right for privacy or considering the extended family as "meddling" appeared to be the fault-line dividing the children from protective early development professionals or other supportive adults who can help protect a child or deter an adult from inflicting future harm on a child.*

## TOPIC TWO

Not viewing with caution parental/contextual risk factors including domestic violence, alcohol use, drug use, mental illness, use of weapons and expressed concerns over paramour(s) and child. These conditions warrant careful assessment.

I.   **Risk Factors for child maltreatment**
  - Primary risk factor: Violence: A parent's anger/hyper-reactivity are strongly related to the occurrence of child physical abuse (In Office of the Inspector General investigations it was noted that hyper-reactive parents isolate the child from supportive family members.)
  - Additional risk factors include: Unwanted child; Parent use of corporal punishment; Parent anxiety; Past criminal behavior; Family conflict; Family Cohesion; and Partner violence (Stith, et al., 2009)
  - Parent factors independent of the child such as parent anger/hyper-reactivity and family factors like high family conflict and low family cohesion can contribute to a lethal risk of child abuse. (Stith, et al., 2009)

*-Ellia Brown Narrative-*

*Ellia, age two-and-a-half, died as a result of multiple blunt force injuries due to physical abuse by her twenty-two year old father. The father came to the Department when he was 17 years old and was placed in a Transitional Living Program (TLP). Other residents of the program feared him. At one point he burned the clothing of a peer. He violated prohibition and was sentenced to a year of incarceration during which he was placed in isolation.*

*Ellia's father was indicated for cuts, welts and bruises when she was 1 year-old. While in her father's care, Ellia was fatally abused when she exhibited normal exploratory behavior and resisted toilet training- behavior that is considered to be developmentally normal for her age. When interviewed by the police, the father recounted an incident where Ellia entered the furnace room and could not be found. When the father found Ellia, he slapped her hand but Ellia did not respond so he spanked her hard 7-8 times. On another occasion, Ellia got into the bath while her father was out of the room and splashed water all over the floor. The father became angry because he said his daughter knew never to enter the bath without supervision and "whooped" her 3-4 times. Ellia's father also recounted that over a period of days prior to her death where he repeatedly physically punished her for having toilet accidents. The abuse included multiple punches to the stomach. Ellia was merely exhibiting behavior that is appropriate for her age: after the age of one, children develop a sense of curiosity about the world and exhibit normal exploratory behavior, and toilet training refusal or resistance is commonplace.*

II.   **MacArthur Dangerousness Study and NIMH Study**
  - People with mental illness are no more likely to be dangerous than the general population.
  - People with mental illness who abuse drugs or alcohol are five times more likely to be violent that the general population. *See Rachel Lawrence case study.*
  - In dually disordered individuals the odds are 2.6 to 1 that psychiatric symptoms will occur before the person begins the abuse of alcohol or drugs (Pepper, 1993)

III.   **The Relationship between Duties and Rights**
  - The moral philosopher, James Wakefield, argued the principle that a parent's right to his/her child is based on the parent's duty to care for and protect the child. If a parent fails to discharge this duty, the right to their children is compromised. He noted that the parent's right is in jeopardy when a parent's personal desires for drugs, alcohol, personal freedom for sexual intimacy or adult companionship is chosen over the parent's duty to care for and protect the child. *See Jacobs/Landry case study*

IV.  **Not properly assessing and understanding risk factors, precursors or motivators for child abuse.**
- Understating the volatility of violence once violence has occurred.
- Not viewing with caution parental or contextual risk factors such as domestic violence, alcohol abuse, drug abuse, mental illness, concerns over paramour(s) and child injuries.

## TOPIC THREE

Achilles heel for follow-up: When a weak foundation exists because of insufficient information in the child protection investigation, the on-going future risk to the children can exponentially increase.

I.  **Weak Foundation**
- Several Office of the Inspector General death or serious harms investigations found situations where investigators did not obtain vital critical records that would have informed follow up workers, such as police reports, medical records, mental health records. *See Rachel Lawrence case study.* The importance of obtaining the records during the investigation is paramount because it is only during the course of an investigation that the Department can subpoena records, including mental health records.
- Child protection investigations in which mental health is a significant issue are not to be closed until mental health records are obtained. Once the records are obtained, the investigator and his or her supervisor are to meet to review the information contained within the records to assess its impact on child safety. If the parent refuses to sign the consent, the Illinois Mental Health and Developmental Disabilities Code (740 ILCS 110/11(i)) authorizes the Department to obtain mental health records by way of subpoena. If an investigator has difficulty obtaining these records they should immediately contact DCFS Legal and their manager. **If a subpoena is not enforced in a timely manner (10 days) it compromises the ability of the Attorney General to win an enforcement hearing.**
- Once obtained, the records become part of the investigation file which is shared with the follow-up case manager to further assess risk and safety and determine what services are necessary for the family.[4] If followed, this process ensures that those involved in decision-making have the parent/caregiver's mental health records at the onset of the case. Most mental health treatment facilities have detailed discharge treatment plans.

**Rachel Lawrence Case Study:** Though the investigator visited the State Operated Mental Health Facility where the father was hospitalized, the investigator did not request the records. The records detailed the discharge plan developed for the father which included outpatient appointments. The records also note the father's history of substance abuse and pattern of non-compliance with treatment. According to the hospital records the father reported he first used PCP as a teenager and his mother used alcohol on a daily basis. The father acknowledged PCP use every other day for two months prior to an earlier psychiatric hospital admission; and he had been using PCP daily for two weeks when he threatened to kill himself and his children. In addition the records revealed a start-stop pattern to the father's psychiatric care and non-compliance with his psychotropic medication. He did not attend follow-up appointments as instructed, ran out of medication frequently, and utilized the emergency department to get his medication. When admitted to the state facility he had been off his medication for two weeks. The social worker discussed with the children's mother the possibility of the father attending day treatment after his discharge. The father's assigned aftercare community mental health agency, had a day treatment program. The paternal grandmother picked the father up at discharge and a nurse went over his discharge plan. The

---

[4] Policy guide 2011.07, September 15, 2011

father was given a prescription for two weeks of medication. He never contacted the community mental health clinic, and he did not go back to the psychiatrist at a local hospital.

## II.   Statements made at the time of violent incidents to the police or courts are relevant to child welfare work.

**Jacobs/Landry Case Study:** Police called the Department when they found that a mother allowed a man who had brutally beaten her child two years earlier (and went to prison for the attack) back around the child. The mother feigned lack of knowledge. Had the investigator obtained the full law enforcement investigative record from the earlier assault, the investigator would have been informed about the boyfriend's propensity for violence because the record included a statement, in the mother's own words, detailing the 20 hour assault of her 5 year-old son. The boyfriend strangled the boy with a cord, stuffed soiled underpants into his mouth, punched, kicked, and called the child racially derogatory names. Investigators as well as follow-up workers and integrated assessors need full records to be able to properly assess a capacity to protect.

## III.   Likewise, medical, police or court records surrounding a violent incident are critical.

**Patrick George Case Study:** A cuts, bruises and welts investigation conducted just months before the homicide of a three year-old was unfounded by an investigator who did not obtain the police records, the court records or the medical records.

The mother reported that the child was very active and had fallen. However the hospital records were replete with descriptions of the child's injuries. The hospital's photographs and body charts clearly depicted numerous injuries that could never be explained away by an overactive child. Within six hours of Patrick's hospital admission, his mother admitted that his injuries were not accidental. The information necessary for an abuse finding was readily retrievable within five days of the child's hospitalization for suspicious injuries. That information included an arrest report with statements by the mother, a criminal charge, a domestic violence protective order, the medical opinion of an attending doctor, extensive medical records with a discharge diagnosis of abuse, and the suspicions called in that the mother had been untruthful about a live-in paramour.

## TOPIC FOUR

Making unrealistic or developmentally inappropriate demands on a child.

## I.   Research Findings
- While some abusive parents have incomplete or distorted knowledge and understanding of normal child development, others possess adequate child development knowledge but do not apply it to childrearing practices.
- Two-thirds of cases of physical abuse begin as corporal punishment, but because of circumstances that are labeled as the child's fault (i.e. defiant child; child hits back), the situation escalates out of control and the child is injured (Douglas and Strauss, 2007) (Burchinal, Skinner & Reznick, 2010).
- Punishment involving either physical or emotional measures often reflects the caregiver's anger or desperation, rather than a thought-strategy of discipline intended to encourage the child to understand expectations of behavior. Such punishment uses external controls and involves power and dominance. It is also frequently not tailored to the child's age and developmental level.

II.     **Attributions of negative intentions to young children appear related to the parent's knowledge or lack of knowledge of child development.**
- Beliefs about children's negative intentions have been linked to harsh parenting and subsequent cases of child abuse.
- Researchers found a set of beliefs held by mothers that infants/young children misbehave intentionally and need to be punished to stop the bad behavior to learn to respect the mother's authority.
- The infant/child "wants to make me angry" or that they misbehaved or are naughty (waking up mother in the middle of night, intentionally wetting the bed/themselves). Parents in this group also viewed the crying child as an indicator that the baby was "spoiled."
- Punishment of children for things like toilet training accidents speaks to authoritarian or rigid attitudes of parents towards children. These parents may be demanding and controlling, and feel the need to curb the willfulness of their children.

III.    **Caretakers should be assessed for their level of empathy.**
- Caretakers ignoring a child's pain, suffering or unhappiness indicates a lack of empathy. Social experiments have shown that when an aggressor recognizes pain in the person they are hurting the aggression declines. Lack of empathy is a central symptom of narcissistic and anti-social personality disorder.

*-Narrative-*
*In the case of Yolonda Bradshaw, the initial call to the hotline was to report a relatively mild injury. Investigative staff mistakenly assumed that the adults' discipline arose from benign but misguided intent.*

IV.     **Investigators and placement workers should be wary of the Halo Effect.**
- It is a type of cognitive bias or mental shortcut in which our overall impression of a person influences how we feel and think about his or her character. When impressions based upon our like or approval of a caregivers' appearance, profession, or religious position/affiliation, judgments regarding safety threats and risks to children may be minimized. Conversely, dislike or disapproval of a caregiver may lead to exaggerated assessments of safety threats and risks. Caseworker should guard against this type of mental shortcut which can compromise the accurate assessment of safety and risk, undermining a dispassionate and unblinking assessment of parents and family functioning.

V.      **Concept of Inappropriate Punishment**
- Certain child behaviors have been found to elicit higher levels of physical punishment (i.e. self-endangerment; aggression). The behaviors that are most often dealt with by way of physical punishment are those that break a moral code, directly challenge parental authority and control, or present a danger to the child or others.
- Some caregivers frequently make demands on their children that are developmentally inappropriate such as an infant being "respectful" of the parents work schedule (Douglas, 2013). Caregivers who are responsible for their child's death often see their children as "difficult," which can be lethal in combination with parental stress. If they discipline their children with physical exercises that are developmentally inappropriate (such as forcing children to hold their arms out) and which the children cannot perform, failure at these tasks may lead parents to attempt more severe forms of punishment that result in abuse.

**David Quentin Case Study Narrative**: David's pre-adoptive father reported being in the military and used to work with youth in their church. He believed that boys were more capable and smarter

than others thought. He stated that for discipline, he made the boys do wall squats and push-ups. The investigator explained that the boys were at a different developmental level than the children he was used to working with and that forcing the boys to stay in the basement for hours and other forms of discipline must cease. The investigator further reported that the pre-adoptive father told her he had shown the boys how to use the helmet with the weights attached, although she did not record that fact in her notes. The investigator stated to Inspector General investigators that she did go down to the basement but only saw hand weights, no free weights. The Inspector General investigators showed her a picture of weight equipment used to strengthen neck muscles. The equipment has head gear and chains where a free weight is attached. The investigator stated the equipment she saw looked similar except that it was older, made of old worn away leather and included a mask like covering around the eyes with a chin strap and the chain was smaller. The basement floor was concrete with no carpeting. There were old toys and boxes, and some old kitchen chairs. She did not have the boys demonstrate for her how they had to use the basement weights.

- **Developmental behaviors that may trigger harsh reactions.** *Seven Deadly Sins of Childhood* (Schmitt, 1987):

| | |
|---|---|
| Colic | Normal negativism |
| Awakening at night | Normal poor appetite |
| Separation anxiety | Toilet training resistance |
| Normal exploratory behavior | |

### -Yolonda Bradshaw Narrative-

*Children aged two, four and nine-years-old were subjected to "strength training" discipline. Discipline included "walking it out" which consisted of holding books over their heads and walking for long periods of time and "stretching it out" which was a pushup formation that the children had to maintain, sometimes maintaining this position with books on their back. This abuse could go on for days. If the children fell asleep or failed at the punishments they were whipped with a belt.*

- Children under the age of eight do not have the physical ability to do strength training. A child's failure to comply with the demands of posturing with their arms held up over their heads holding books could exasperate the punishing parent and lead to escalating harshness.

### -Discussion-

Eileen Munro suggested that if discipline is developmentally inappropriate but does not rise to the level of an indicated report, as a preventative intervention the Child Protection Worker may talk to the parent suggesting something like: "it appears to me that the children are not minding you and sometimes it seems like the situation is getting worse instead of better." The CPI would then ask the parent for the name of the primary care doctor or nurse practitioner and advise the parent that they are going to ask the pediatrician to give the parent an impartial evaluation of the situation. (Munro, 2005)


### TOPIC FIVE

Systemic Error in the Legal System, High Risk Specialized Assessments

ERROR REDUCTION

I.   **An egregious act of maltreatment is defined as an "sadistic, or torturous act that inflicts significant pain, causes extensive external and/or internal bruising, serious injury or death," acts that would qualify as "extreme or repeated cruelty" under Illinois law.**
   - In Illinois, one of the grounds of unfitness for a parent is extreme or repeated cruelty to a child, and Illinois courts have consistently affirmed the decision to terminate parental rights on this ground of unfitness (Illinois Statute:705 ILCS 50-1(d)).
   - DCFS Rule mandates that expedited termination of parental rights must be sought whenever there is extreme or repeated cruelty to a child (DCFS Rule: Section 309.50(d)(1)). Despite this, many children who have been the victims of extreme abuse spend years in foster care with return home goals where the child's best interests and need for permanency are not pursued.

II.   **There is a misconception in the field that reasonable efforts to reunify must be made in all cases. This is untrue.**
   - The Federal Adoption and Safe Families Act (Federal Statute: Public Law 105-89) includes provisions to deny reunification services under certain circumstances and gives states latitude to develop any additional "aggravated circumstances" in which parents need not be offered services. Under Illinois law the Department may file a motion requesting a finding that reasonable efforts to reunify are no longer appropriate and should cease.

III.   **What do Evidence Based Treatments Say?**
   - There are little to no evidence-based treatments/services that have been proven to correct the conditions leading to severe and extreme physical violence against children. However, the Inspector General's staff has investigated cases involving severe physical abuse where parents have sporadically participated in generic services or were provided services that cannot remedy such severe physical abuse. This led to children drifting in foster care for years because of a perpetual return home goal.
   - In FY15, the Office of Inspector General shared findings of lessons learned from investigations of physical abuse fatalities with the Department's Director of Operation and Associate Deputies of Child Protection and Clinical Practice Services. The Department incorporated those findings into revised Procedure 300.30 (issued 10/9/2015). The Policy requires the Department's Division of Clinical Practice to provide High Risk Specialized assessments in cases of egregious acts of maltreatment.

**Egregious acts include:**
   - Perpetrator repeatedly thrown or slammed an infant or toddler against a hard surface using a strong degree of force creating a likelihood of abusive head trauma or multiple injuries including bruising or fractures over time.
   - Perpetrator caused abusive abdominal injuries, especially in very young children.
   - Perpetrator submerged and held a young child's head under water or repeatedly submerged a child's head creating a significant real or imminent risk of harm.
   - Perpetrator beat up or hit a child with an object using a degree of force that could be reasonably expected to cause serious injury or death.
   - Perpetrator attempted to or actually smothered, choked, strangled, or applied any other severe thoracic compression to a child.
   - Perpetrator extensively burned or scalded a child on purpose.
   - Perpetrator threatened or attached a child with a weapon, such as a knife, gun, or combustible substance.
   - Perpetrator took a child hostage.
   - Sadistic injury to a child.
   - Homicide of a child.

- Non-accidental poisoning.

*Case examples*:

**Example 1:** A mother brought her child to the ER in August and said her baby burned his face on a radiator while in her care. The baby had a full facial burn that was clearly not a radiator burn. The baby was admitted to the burn unit where doctors ordered a full work-up to determine the possible existence of poly-trauma, which came back positive with both old and new injuries and which showed the mother had lied about the mechanism of injury and the timing. There was no history of seeking medical treatment for any of the injuries discovered in the work-up:

| INJURY | AGE | COMMENT |
|---|---|---|
| Skull fractures | Cannot age | Impact injuries; numerous to the occipital and right parietal. Indicative of more than one impact to head. |
| Rib fractures | Healing, callus, weeks old, no fracture line, difficult to say with certainty | 8-11 posterior next to spine, mechanism squeezing most likely but could be impact. |
| Femur fracture, right | Old, healing, sclerotic and callus weeks old again | Distal impact to lower leg, force applied above knee morphology does not aid |
| Tibia, left | Old healing fracture weeks old | Healing fracture older since one cannot appreciate fx line or alternatively this was periosteal reaction that is healing from shearing injury to the leg |
| Internal injuries, liver laceration right lobe | Grade two, very high AST 1573 and ALT 1189; normal around 30-60. Anything higher than 80 warrants CT | Blunt trauma to the abdomen; major blunt force required |
| Confluent scald burn to the face in mask distribution | Acute hours old not days per mother occurred 6-8 hours prior to arrival in ER | History provided by mother is not consistent with the sustained injury |

The integrated assessor in the case wrote the following prognosis:

> The prognosis for reunification between [child] and his mother appears poor at this time. [Child] suffered severe injuries including multiple fractures, a large facial burn, and internal injuries that were determined to be the result of non-accidental trauma. It appears that he suffered significant physical abuse on multiple occasions. Although [mother] continued to claim no knowledge of or participation in [child's] injuries, she was indicated by DCFS for several allegations, including torture. Reunification most likely will not occur within 12 months, and concurrent planning should be considered. Furthermore, this case meets the criteria for expedited termination of parental rights as mandated by Illinois statute (750 ICS 50/1; 405/1-2; 405/2-13) and IDCFS policy (Policy Guide 98.1, Appendix A) based on the grounds that maltreatment of this child can be considered severe or extremely cruel. It is recommended that the case manager consult with the DCFS Legal Counsel and other professionals involved in the case prior to the next court hearing regarding the appropriateness of considering expedited termination of [mother's] parental rights.

**-Discussion-**

However, the integrated assessor also listed service recommendations appropriate for a return home goal. No termination of parental rights petition was filed.

Given that a child suffered over time with numerous events of severe abuse, do you think an Evidenced Based Treatment exists that could ensure this infants future safety?

**Example 2:** The example involves a young child who was sadistically tortured over 20 hours. The mother provided police with a handwritten account of the abuse, but over the years minimized the incident. The family continued to be involved in child protection investigations, and ultimately, the child and a younger sibling were returned home. In this case, the legal system operated under the mistaken belief that expert testimony was needed to prevent a child from returning home. *See full Jacobs/Landry case study.*

**Mother's statement to police:**
Last night 9:30pm, Douglas Landry, Lauryn Saunders and Aaron Jacobs returned home. Five year-old Aaron was told to go get his p.j.s on. Aaron didn't turn the light on so he grabbed boxers and two t-shirts, which angered Doug because it wasn't p.j.s to him. Doug punched Aaron in the chest, knocking him down. Doug told Aaron to get up. Doug hit him again knocking him down. Doug again told him to get up. Doug asked Aaron why he is such a stupid nigger? Aaron didn't answer so he punched him again, again knocking him down again. At this point Doug sent me outside to "cool off" since I was upset and making things worse. Approx. 5 mins. later Doug came outside to smoke and told me to "Go put your dumb nigger to bed." I went in and Aaron was putting his p.j.s on and going potty. I asked him if he was OK and told him I love him and put him to bed. I thought it was over so I put a movie on and layed down. Approx 1hr later Doug started talking to Aaron, trying to wake him up. After about 15 mins Aaron woke up. Doug said "Oh Hi you're up. Good stand up." I told Doug to leave him alone and let him sleep." Doug said "Now you wanna talk to me? Well tough now I am talking to the little nigger."

Then Doug punched Lauryn (me) in the shoulder and told me to roll back over. I didn't hear what Doug said to Aaron next but I heard him say "If you say you don't know one more time I am going to kill you." I did not see Doug hit Aaron the next 6 times but I felt the bed move and heard the thump, and Aaron's grunt of pain each time. At this point Doug noticed that Aaron had peed his pants and started yelling about that. Doug made Aaron take off his wet underpants and put them on his head. I got up and went pee, and again tried to get Doug to let Aaron go back to bed. He said no. That Aaron needed to learn to hold his bladder. Doug knocked Aaron down 2 more times with punches to the chest. Doug pushed me and told me to go back to bed or I was going to make it worse to Aaron. I laid back down but so I could see them a little bit better. I again don't know what set him off but he put a cord around Aaron's neck and swung him in an over hand circle landing him on his cushions. This scared Aaron so bad that he peed again. This infuriated Doug. Doug stuffed his wet pants in Aaron's mouth and gagged him. Aaron almost threw up.

Doug told Aaron that if he puked on the floor he would make Aaron lick it up and then beat him again. So Aaron ran to the bathroom to throw up. When he came back Doug made him put on clean underwear. While Aaron was pulling them up Doug grabbed him hard by the penis and said if he pissed in this pair he would rip it off. Aaron cried out when Doug did this so Doug got up and kicked him in the abdomen with his steel toed work boots on. I freaked. I couldn't hold it in anymore. So Doug took his boots off and

kicked him 2 or three times more. Then Doug told Aaron to sit by the wall but not to fall asleep. Then Doug laid down by me and turned off the light. This is when I fell asleep for a few hours. I woke up at about 6:30-7:00am Aaron was asleep but Doug was not. After I had used the bathroom and gone outside to smoke I came back in and Doug woke Aaron up again. Doug asked Aaron if he had fun last night. Aaron said yes (meaning at bigger bite before this all started) Doug said he was lying and started in on him about lying. Doug hit him in the chest 2 times knocking him down. The second time Aaron hit his head and cried out. Doug jumped on him with one hand over Aaron's mouth and the other around his throat. Doug told him if he cried again he would break his neck. I got Doug to go outside and smoke. When he came back in he said he wanted to go for a drive and both of us or just Aaron was coming with him. I tried to get him to go by himself but he wouldn't. He said he needed collateral, because he couldn't trust me to be there when he got back. We left the house at about 11am. We stopped at my parents to drop off something. He said "Hurry up and don't say a word. Aaron can stay with me so I know you will hurry" I hurried. Then we went driving. All over from Freeport to Cedarville then Freeport Prairie then out by Lena then out to Willow Lake. When we got to willow Lake he said he was done with me and I was supposed to drop him off at his parents. When Doug was getting out of the car I said I didn't understand what was going on. As in how was he going to get his stuff and when was I supposed to see him next. He took it to mean I hadn't been listening to him so he freaked out and punched me in the shoulder and back 3 or 4 times and in the left side of my head 3 or 4 times. Doug drove out to the Lake Le-Aqua-Na access and said this is where Aaron and I were going to die.

He hit me several more times and yelled more. At one point he made us get out of the car and he drove off. But not far. He backed up and said Aaron could go with him. He made Aaron get in the front seat and he drove off, again not far. He backed up again and grabbed Aaron around the throat with both hands and tossed him over the seat to the back and told me to get in. We headed home after that. He seemed calmer and we were OK for about 2 hours. Then Aaron didn't eat enough of his dinner or do it fast enough and Doug went off again. I went out to smoke after I got Doug calmed down and Aaron back to eating. While I was outside Doug came out and said "You better get back in here quick." He sounded alarmed so I ran in but he just wanted me to see him kick Aaron. He kicked him 3 times with a running start sending Aaron flying each time. I got in the way and he hit me in the stomach and said "if I didn't stay out of it I wouldn't have any kids to worry about." He then picked Aaron up by the neck and shirt to his height and slammed Aaron on the concreted basement floor. Then when Aaron got up he did a pile drive on Aaron, knocking him to the ground again. I went outside under the pretense of smoking and ran next door and asked her to call the police, then ran back so Doug wouldn't know I had gone. Then the police showed up.

### -Discussion-

In the second example, the mother voluntarily resumed her relationship with the child's abuser stating that her previously reported abuse of the child was exaggerated and that the child was not afraid of the abuser.

**Do you think this mother can ensure her son's future safety and wellbeing?**

To successfully implement the specialized assessments and expedite termination of parental rights in cases involving acts of egregious physical abuse, this error reduction initiative seeks to:

1. Inform DCP staff that their investigation must provide a strong foundation for subsequent legal actions. DCP must ensure they receive all relevant records and preserve them for subsequent use in clinical and legal proceedings;

2. Educate DCFS clinicians on how to write specialized assessments in a way that will be persuasive in court. Educate clinicians on how to incorporate basic legal terminology and phrases, like "child's best interest," and how to ensure clinical impressions are clearly communicated to legal professionals and the court;

3. Educate DCFS legal staff on the circumstances in which Illinois statute and case law support the termination of parental rights on the basis of extreme or repeated cruelty to a child. Educate DCFS legal staff on how to effectively utilize specialized assessments in legal proceedings.

Information identifying an egregious act may be gathered at the time of intake by the Department's "hotline", State Central Register (SCR), or during the course of a child protection investigation. During intake, the report must be flagged as an egregious act case to alert the Child Protection Specialist and Child Protection Supervisor that the investigation must be referred to Office of Legal Services and Department's Clinical Division. DCFS "hotline" Floor Workers must document in the intake narrative that the report information contains an egregious act.

The DCFS Office of Legal Services will be notified to assist in the development of legal strategies. Early identification and assessment may allow for termination of parental rights in those egregious cases where no evidence-based treatment exists that can remedy extreme acts of violence against a child.

## ILLINOIS APPELLATE COURT PRECEDENTS

Illinois appellate decisions have consistently upheld the termination of parental rights due to parental unfitness based on a parent's extreme or repeated cruelty or failure to protect. The appellate decisions in the following five cases show what facts the Court relied on in making the decision to uphold the termination of parental rights:

1. *In re J.B. and J.H.* (Cook County) - 2014 IL App (1st) 140773, 19 N.E.3d 1273
2. *In re Janine M.A.* (Mason County) - 342 Ill.App.3d 1041, 796 N.E.2d 1175
3. *In the Interest of B.R.* (Peoria County) - 282 Ill. App.3d 665, 669 N.E.2d 347
4. *In re Hollis* (Champaign County) - 135 Ill.App.3d 585, 482 N.E.2d 230
5. *In re I.B.* (Peoria County) - 397 Ill. App.3d 335, 340, 921 N.E.2d 797

**In re J.B. and J.H. (Cook County) 2014 IL App (1st) 140773, 19 N.E.3d 1273**
**Extreme or Repeated Cruelty**
An eight-year-old child presented at the hospital with a broken femur bone and pelvis; and facial contusions that were determined to be inflicted trauma and non-accidental. The right femur bone had two fractures, including an older fracture that showed calcification (meaning the fractures occurred at separate times). Mother admitted causing the injuries, and stated the abuse occurred after the child's three-year-old sibling told her that the eight-year-old had almost pulled the TV down onto him (which the eight-year-old denied).

Mother made her child do leg squats as punishment. When the child complained and could not continue to do leg squats, the mother hit him with a belt. She then threw the child to the bathroom floor where the child hit his head on a bath tub, and then removed the child's pants and continued to hit him with the belt. The mother punched her son repeatedly in the face and body when he tried to block the blows, placed both hands around his throat to choke him, stood on child's leg with full weight while continuing to punch and hit him, and did not stop beating her son until another adult intervened and dragged her away. The eight-year-old was left crying on the bathroom floor without pants. At the hospital, he was in intense pain and screamed, "I'm sorry for whatever I did. Please don't hurt me anymore."

His injuries included an acute proximal right femur fracture close to his hip, displaced, that required high impact to break; a distal femur fracture closer to his knee, minimally displaced with some calcification so it could not have occurred the same day as the beating; and a non-displaced inferior pubic rami fracture, which required more than just minor trauma.

The mother lied to paramedics that her son fell because she didn't "want to face fact she was the one who hurt him." The child reported that his mother hits him like this "a lot, all the time" but it had never been like what it was this time.

The mother said she had a history of anger management with this child, and that she would hit him with her fist in the chest or arm or tell him to get away from her because she "just didn't want to be bothered by him."

A petition was filed for adjudication, alleging a substantial risk of physical injury/an environment injurious to health and welfare, neglect of necessary care, and physical abuse. The petition was amended to add the allegation of torture and to seek permanent termination of parental rights at disposition. A petition requesting temporary custody was also filed. At the time, the mother was in jail with criminal charges. She had given a written statement to police detailing what she had done, and the statement was admitted into evidence.

Both children were placed in the temporary custody of the Department. There were "no contact" and "no visitation" orders issued against the mother. Both children were adjudicated neglected and abused. The mother was found unfit for: 1) failure to show a reasonable degree of interest, concern or responsibility for the minors' welfare; 2) failure to protect both minors from conditions injurious to their welfare; 3) depravity (both minors); and 4) extreme or repeated cruelty. [Depravity consists of an inherent deficiency of moral sense and rectitude. It may consist of a series of acts or a course of conduct which indicates a deficiency in a moral sense and shows either an inability or an unwillingness to conform to accepted morality].

At a consolidated disposition and best interests hearing, the mother was found unfit by clear and convincing evidence. The court also determined it was in the children's best interests to terminate parental rights. In this case, it took 17 months between the abuse and the termination of parental rights.

The mother appealed this finding, claiming the incident was excessive corporal punishment, not extreme cruelty. She argued her severe beating of her child should not be considered extreme or repeated cruelty since it occurred one time. The Appellate court upheld the unfitness findings, determining that the beating of this child was extreme cruelty and supported a finding of unfitness. In doing so, the court held that a single incident of extreme cruelty is enough to support a finding of unfitness; there does not have to be extreme *and* repeated cruelty. The court also held that after an episode of extreme cruelty, a parent is not entitled to a specific time period to "remedy any conditions."

ERROR REDUCTION

The court also determined that a parent may be found unfit for failing to protect a child from the parent herself, and that evidence of unfitness for one child can be used to support a finding of unfitness with respect to other children in the home.

### In re Janine M.A. (Mason County) 342 Ill.App.3d 1041, 796 N.E.2d 1175
**Failure to Protect**

Mother stipulated to the allegations in the petition that her 3 children were neglected because they resided in an injurious environment because there was a long history of domestic violence within the home and their father had twisted their 11-year-old brother's arm behind his back and threatened to burn the house down with the boy inside if he testified against the father in a pending court matter. At disposition, the children were made wards of the court while continuing to live with their mother. The father was not to reside with the family and was only to have supervised visits with the children. Mother violated the visitation order by allowing the father to have unsupervised visitation, and the children were removed and placed in foster care.

The Court determined 1) the mother had difficulty with issues of codependency and continued to have contact with her husband; 2) she left the children with unapproved babysitters so she could spend time with her husband; and 3) her husband was seen with one child in unsupervised visitation. It was also noted that mother actively maintained a relationship with the abuser, and stayed in constant contact using two-way radios. Although the mother attended counseling, she "did not internalize and demonstrate the lessons she learned there."

In this case, the children were removed because mother continued her relationship with the abuser. She was repeatedly told she needed to put her children's safety above her desires to be with the abuser, but consistently failed to do so. She minimized the abuser's alcohol problem, and made excuses for him and his behavior.

Mother was found unfit on the basis that she had failed to protect her children from conditions within their environment injurious to the children's welfare. The appellate court upheld the finding. The court noted that the abuser's long record of domestic violence should have placed the mother on notice that he might be violent toward children. In addition, the mother witnessed the abuser threaten and physically abuse one child.

The Court held that, "Evidence supporting a parent's unfitness toward one child may serve as the basis for termination of parental rights as to all children."

### In the Interest of B.R. (Peoria County) 282 Ill. App.3d 665, 669 N.E.2d 347
**Failure to Protect**

A 14-month-old was the victim of shaken baby syndrome. When admitted to the hospital, the child also had extensive bruising over a large portion of his body (bruising was not consistent with normal activities for child that age), and experienced cardiac arrest which may have been caused by brain injury. The child had hemorrhages in retinas of both eyes (an injury consistent with a rapid acceleration/deceleration injury). The medical prognosis was that the child will remain severely impaired, and will never be able to function normally or independently. The bruising was consistent with at least two episodes of blunt trauma separated by 1-2 days. The mother's boyfriend was the perpetrator of the abuse.

The day before the child was admitted to the hospital, the mother left the child with her boyfriend, so she could go on a job interview. When she returned, she observed a bruise on her child's forehead. The father told her the child stopped breathing "spontaneously," and that he slapped the child a few times, resulting in a bruise. The mother questioned his account, but stopped asking about the bruise after she was yelled at to stop asking.

Prior to that incident, the mother had seen her boyfriend "whip" another one of her children in the head with a metal belt buckle. There was a history of domestic violence in the home. During an argument over money, the mother's boyfriend punched her twice in the face while she was holding their infant, and then hit the infant in the head. At the time of this violence incident, the mother was 4.5 months pregnant and the infant was seven months old.

Both parents were found unfit. The father was found unfit on numerous grounds, including extreme or repeated cruelty. The mother was found to be unfit for failing to protect her children.

The mother appealed the finding of unfitness. The Appellate court found that trial court's decision to find mother unfit for failing to protect her children from conditions within their environment was not against the manifest weight of the evidence, and that once a finding of unfitness has been made, all considerations must yield to the best interests of children.

The Appellate court held the record reflects mother had more forewarning about father's violent tendencies toward herself and her children than she claimed. The court considered the following: 1) six months before child's injuries and while she was pregnant, the mother told a police officer that her boyfriend had punched her twice in the face while she was holding then 7-month-old child and that he hit the child in the head; 2) during investigation of victim's injuries, the mother told a police officer that her boyfriend had previously whipped her 3-year-old child in the head with a chrome belt buckle; and 3) mother admitted that she saw a bruise on the victim's forehead the day before the incident but did not pursue the issue after her boyfriend yelled at her when she asked how he got the bruise.

The Appellate court noted that the mother had continued to stay in a relationship with the abuser after the violent incident, and that there was continued violence. The court highlighted an incident that occurred after the infant was injured, where the mother chased her boyfriend with a butcher knife until police came, and her boyfriend pushed her head into a window.

The court also noted that although the mother was referred for domestic violence counseling, she did not consistently attend, and felt that "she didn't need it." She also minimized the abuse, and contradicted prior statements to police by claiming that when she and her boyfriend were together, he participated in raising children and she had never seen him mistreat them. The mother was found to have poor judgment with regard to decisions affecting her own well-being.

### *In re Hollis* (Champaign County) 135 Ill.App.3d 585, 482 N.E.2d 230
### Extreme or Repeated Cruelty

A four-month-old child was brought to the ER by his grandmother. The infant had a collapsed lung, broken ribs and internal bleeding. The infant had a prior history of: 1) a fractured femur at one month old; and 2) an unexplained bruise under his eye as a three-month-old.

At the hospital, the infant's fractures on the right ribs were less than a week old, however fractures on the left ribs were between one and six weeks old. (An infant's ribs are pliable and require an extraordinary amount of force to fracture) The infant's father admitted previously squeezing the infant when the infant would not stop crying.

The father's parental rights were terminated after he was found unfit due to extreme or repeated cruelty. The Appellate Court found clear and convincing evidence of father's unfitness. The father claimed he didn't intend to hurt child so badly. The Court held that the result, rather than intent, is more important in defining cruelty. The Court determined that the infant's father intended to hurt the child, and reasoned that the fact that he didn't intend or know the extent of the injuries is irrelevant. The Court held that, "When a parent engages in extreme or repeated cruelty, his conduct at other times is largely irrelevant."

ERROR REDUCTION

In this case, the Court also noted that: 1) both parents denied severity of child's injures; 2) both parents showed lack of emotion regarding the child; and 3) mental health staff concluded father would not benefit from counseling due to sociopathic personality, immaturity, and substantial lack of insight.

***In re I.B.*** **(Peoria County) 397 Ill. App.3d 335, 340, 921 N.E.2d 797**
**Extreme or Repeated Cruelty**
A four-month-old suffered numerous injuries, including bruising to a number of areas of body, multiple rib fractures, a fractured tibia, a fractured fibula, and a fractured radius in his wrist. The mother had shaken and squeezed the infant, and the father had bit the infant on his cheek, shaken and squeezed the infant, and lifted up the infant by his ankles. The mother told hospital staff and police that the infant's injuries were caused by the infant hitting himself or sleeping on bottle (which was unlikely due to the infant's age). At hearing, the father said that the chest bruises were caused by throwing the infant in the air during game or hugging the infant too hard. The father was found to be unfit due to extreme or repeated cruelty.

After the unfitness finding, the father argued that he was not given an opportunity to correct the conditions that led to the child's removal. The unfitness finding itself was not challenged. The Appellate Court held that unfitness based on extreme or repeated cruelty does not entitle a parent to a specific period of time to correct the problems. The court found the infant's physical safety and welfare would be in jeopardy if he was returned home, based on the prior acts of abuse.

The court determined that evidence supporting a parent's unfitness toward one child may serve as the basis for termination of parental rights as to all children. The court may terminate the parental rights of a parent at the initial dispositional hearing (if the original or amended petition contains a request for termination of parental rights and appointment of a guardian with power to consent to adoption). 705 ILCS 405/2-21. Any adult person, any agency, or association by its representative may file, or the court on its own motion, consistent with the health, safety, and best interests of the minor may direct the filing through the State's Attorney of a petition in respect of a minor under this Act. 705 ILCS 405/2-13.

| **Minor Assault †**<br>*Physical discipline without causing bruising or injury.* | **Severe Assault †**<br>*Excessive discipline that could reasonably be expected to inflict pain and cause injuries including patterns of new and old injuries.* | **Egregious Act of Maltreatment**<br>*Egregious, sadistic, or torturous act that inflicts significant pain, causes extensive external and/or internal bruising, serious injury or death.* |
|---|---|---|
| • Spanked on the bottom with an open hand.<br>• Hit on the bottom with a hard object, such as a hair brush or belt.<br>• Slapped on the hand arm or leg.<br>• Pinched on a limited area.<br>• Shook (older than 2 years).<br><br>*Additional factors (such as the amount of force used or age of the victim) can increase the severity of these behaviors to severe.* ***Refer to the Contributing Factors Chart.*** | • Threw, knocked down, kicked hard, or hit resulting in a less severe fracture such as metaphyseal fractures or distal clavicle.<br>• Slapped on the face, head, mouth, or ears.<br>• Hit with a hard object on a place other than the bottom.<br>• Burned to a limited extent.<br>• Any bruising, including pinch bruising, over an extended area and/or over multiple planes.<br><br>*Additional factors (such as age of child, the amount of force used, the number of injuries, and the number of prior reports) can increase the severity of these behaviors to egregious.* ***Refer to the Contributing Factors Chart.*** | • Repeatedly thrown or slammed an infant or toddler against a hard surface using a strong degree of force creating a likelihood of abusive head trauma or multiple injuries including bruising or fractures over time.<br>• Abusive abdominal injuries, especially in very young children.<br>• Submerged and held young child's head under water or repeatedly submerged child's head creating a significant real or imminent risk of harm.<br>• Beat up or hit with an object using a degree of force that could be reasonably expected to cause serious injury or death.<br>• Attempting to or actually smothering, choking, strangling or any other severe thoracic compression.<br>• Non-accidental extensively burned or scalded.<br>• Threatened or attacked a child with a weapon such as a knife, gun or combustible substance; Took child hostage.<br>• Sadistic or premeditated injury or torture.<br>• Homicide of a child.<br>• Non-accidental poisoning. |
| **Recommended Intervention: Evidence-Based Prevention** | **Recommended Intervention: Evidence-Based Parent/Child Family Rehabilitation Intervention** | **Recommended Intervention: Presumptive Reunification Bypass** |

† The CTSPC scale used this language in reference to child abuse.

**The Maltreatment Continuum** is a visual tool illustrating child abuse characteristics and their severity.  This tool is based on research of child abuse instruments, the Abuse Dimensions Inventory (ADI), the Conflict Tactic Scales for Parent and Child (CTSPC), literature on child abuse, and Inspector General's death investigations of children fatally abused within a year of contact with the Illinois Department of Children and Family Services.

The following **Historical, Clinical and Current** contributing factors can increase the risk and severity of abusive behavior, worsening prognosis for family rehabilitation. ***Alcohol or substance abuse in combination with any of the below factors exponentially worsens the prognosis for family rehabilitation.***

## CONTRIBUTING FACTORS

| Historical | |
|---|---|
| • Pattern of dishonesty<br>• Relationship instability<br>• Personality disorder<br>• Psychopathy<br>• Violent acts, including intense sustained rage or violence against children | • Violent attitudes<br>• Past violent partners<br>• Choosing a violent perpetrator over the child<br>• Inadequate treatment response as evidenced by previous failed attempts<br>• Lost custody of other children |

| Clinical | |
|---|---|
| • Impulsivity<br>• Lack of insight/empathy<br>• Major mental illness with a lack of compliance or unresponsive to treatment | • Self-injury<br>• Suicidal gestures/attempts<br>• Threat of/or fire setting<br>• Anti-social personality disorder<br>• Violent ideation |

| Current | |
|---|---|
| • Pattern of dishonesty<br>• Violence<br>• Current violent partner<br>• Lack of personal support<br>• Instability (affective, behavioral or cognitive) | • Difficulty coping with stress<br>• Reasonable efforts lack feasibility given the severity of abuse and vulnerability of child<br>• Denial of responsibility or need for treatment |




Illinois Department of DCFS Children & Family Services

Office of the Inspector General, Department of Children and Family Services

**312.814.6800**
www.DCFS.Illinois.gov

<u>**WORKS CITED**</u>

*DCFS Rule*
Section 309.50(d)(1)

*Illinois Appellate Decisions*
In re J.B. and J.H., 2014 IL App (1st) 140773, 19 N.E.3d 1273
In re Janine M.A., 342 Ill.App.3d 1041, 796 N.E.2d 1175
In re Hollis, 135 Ill.App.3d 585, 482 N.E.2d 230
In re I.B., 397 Ill. App.3d 335, 340, 921 N.E.2d 797
In the Interest of B.R., 282 Ill. App.3d 665, 669 N.E.2d 347

*Illinois Statutes*
705 ILCS 50-1(d)
705 ILCS 405/2-13
705 ILCS 405/2-21

*Federal Statute*
Public Law 105-89

Burchinal, M., Skinner, D., & Reznick, J. S. (2010). European American and African American mothers' beliefs about parenting and disciplining infants: A mixed-method analysis. *Parenting: Science and Practice*, *10*(2), 79-96.

Chaffin, M., Funderburk, B., Bard, D., Valle, L. A., & Gurwitch, R. (2011). A combined motivation and parent–child interaction therapy package reduces child welfare recidivism in a randomized dismantling field trial. *Journal of Consulting and Clinical Psychology*, *79*(1), 84.

Chaffin, M., Silovsky, J. F., Funderburk, B., Valle, L. A., Brestan, E. V., Balachova, T., ... & Bonner, B. L. (2004). Parent-child interaction therapy with physically abusive parents: efficacy for reducing future abuse reports. *Journal of consulting and clinical psychology*, *72*(3), 500.

Douglas, E. M. (2013). Case, service and family characteristics of households that experience a child maltreatment fatality in the United States. *Child abuse review*, *22*(5), 311-326.

Douglas, E. M., Mohn, B. M., & Gushwa, M. K. (2014). The Presence of Maltreatment Fatality-Related Content in Pre-service Child Welfare Training Curricula: A Brief Report of 20 States. *Child and Adolescent Social Work Journal*, *32*(3), 213-218.

duRivage, N., Leray, E., Pez, O., Bitfoi, A., Koc, C., Goelitz, D., et al. (2015). Parental Use of Corporal Punishment in Europe: Intersection between Public Health and Policy. *PloS on, 10*(2).

Finkelhor, D., & Jones, L. (2006). Why Have Child Maltreatment and Child Victimization Declined? *Journal of Social Issues, 62*(4), 685-716.

First 5 Los Angeles. (2012). *Harsh Parenting Measurement Study Final Report*. Harder + Company Community Research.

Jones, D. P. (1987). The untreatable family. *Child Abuse & Neglect*, *11*(3), 409-420.

Katz, L., & Robinson, C. (1991). Foster Care Drift: A Risk Assessment Matrix. *Journal of Policy, Practice, and Program, 70*(3), 347-358.

Leventhal, J. M., & Gaither, J. R. (2012). Incidence of Serious Injuries Due to Physical Abuse in the United States. *Pediatrics, 130*(5).

Monahan, J., & Appelbaum, P. (2000). Reducing violence risk: Diagnostically based clues from the MacArthur Violence Risk Assessment Study. In S. Hodgins (Ed.), <u>Effective prevention of crime and violence among the mentally ill</u>. Dordrecht, The Netherlands: Kluwer Academic Publishers (pp.19-34)

Monahan, J., Appelbaum, P., Mulvey, E., Robbins, P., & Lidz, C. (11994) Ethical and legal duties in conducting research on violence: Lessons from the MacArthur Risk Assessment Study. Violence and Victims, 8, 380-39.

Monahan, J., & Steadman, H. (eds) (1994). Violence and mental disorder: Developments in risk assessment. Chicago: University of Chicago Press.

Monahan, J., Steadman, H., Appelbaum, P., Robbins, P., Mulvey, E., Silver, E. Roth, L., & Grisso, T. (2000). Developing a clinically useful actuarial tool for assessing violence risk. British Journal of Psychiary, 176, 312, 319.

Monahan, J. Steadman, J., Silver, E., Appelbaum, P., Robbins, P., Mulvey, E., Roth , L., Grisso, T., & Banks, S. (2001). Rethinking risk assessment: The MacArthur study of mental disorder and violence. New York: Oxford University Press.

Munro, E. (2005). A Systems Approach to Investigating Child Abuse Deaths. *British Journal of Social Work, 35*, 531-546.

Pepper, B. (1993). Interfaces Between Criminal Behavior, Alcohol and Other Drug Abuse and Psychiatric Disorders. *Crime, Substance Abuse and Mental Illness*.

Schmitt, B. D. (1987). Seven deadly sins of childhood: Advising parents about difficult developmental phases. *Child abuse & neglect* , 421-432.

Steadman, H. J., Mulvey, E. P., Monahan, J., Robbins, P. C., Appelbaum, P. S., Grisso, T., ... & Silver, E. (1998). Violence by people discharged from acute psychiatric inpatient facilities and by others in the same neighborhoods. *Archives of general psychiatry*, *55*(5), 393-401.

Stith, M. S., Liu, T. L., Davies, C., Boykin, E. L., Alder, M. C., Harris, J. M., et al. (2009). Risk Factors in Child Maltreatment: A Meta-analytic Review of the Literature. *Aggression and Violent Behavior*, 13-29.

Swartz, M. S., Swanson, J. W., Hiday, V. A., Borum, R., Wagner, H. R., & Burns, B. J. (2014). Violence and severe mental illness: the effects of substance abuse and nonadherence to medication. *American journal of psychiatry*.

United Nations Human Rights. (1989, November 20). *Convention on the Rights of the Child* . Retrieved August 25, 2015, from http://www.ohchr.org/Documents/ ProfessionalInterest/crc.pdf

Zitelli, B., McIntire, S., & Nowalk, A. (2012). Abdominal and Intrathoracic Injuries. In *Zitelli and Davis' Atlas of Pediatric Physical Diagnosis* (6 ed., pp. 215-217).

Zolotor, A. J., & Puzia, M. E. (2010). Bans against Corporal Punishment: A systematic review of the laws, changes in attitudes and behaviors. *Child Abuse Review, 19*, 229-247.

Zolotor, A. J., Theodore, A., Runyan, D. K., Chang, J. J., & Laskey, A. L. (2011). Corporal Punishment. *Child Abuse Review, 20*, 57-66.

ERROR REDUCTION

# ETHICS

**ETHICS OFFICER**

Soon after her appointment as Illinois' first DCFS Inspector General, in the late fall of 1993 the Office of Inspector General laid the groundwork for the development of a Code of Conduct and an Illinois *Code of Ethics for Child Welfare Employees*. Both codes served to remind employees and contracting agencies of the public trust and confidence placed in them by the citizens of Illinois and were developed to assist them in discharging their professional duties to the children and families of our State. In 1995, the State of Illinois' *Code of Ethics for Child Welfare Professionals* was adopted and published. The Code was developed by a broad-based committee of experts and practitioners in child welfare and ethics in Illinois whose work was coordinated by the Inspector General's staff. Soon afterwards the Inspector General's staff published an accompanying training manual for the Code of Ethics. The Illinois *Code of Ethics for Child Welfare Employees* became the first of its kind and a national model. The manual was adopted and published as a book by the Child Welfare League of America. Prior to the appointment of an agency Ethics Officer, the Inspector General's office served as an informal resource for consultation on ethics issues from child welfare professionals subject to the Code of Ethics.

In 1997 as part of a statewide ethics reform, then-Governor Edgar issued an Executive Order requiring the heads of each agency to designate an Ethics Officer, and the Inspector General was appointed as the Department's first Ethics Officer. Key to her role was a commitment and profound respect for the fiduciary nature of both state employment and child welfare, and the understanding that in order to effectively change the culture of an agency, Ethics must be viewed as more than a black letter interpretation of what is prohibited by law. Rather, it is a careful weighing of difficult questions that informs child welfare practice and ensures that decisions are made with the understanding that child welfare employees carry the public trust and spend the public's money. To that end, subsequent to her appointment, the Ethics Officer developed and distributed hypothetical ethical scenarios to the field, in addition to creating "Ethics in Action" training videos to model and foster ethical discussions. Over the past 19 years in her role as Ethics Officer, public and private child welfare professionals and administrators have robustly requested ethics assistance and consultations.

A primary function of the DCFS Ethics Officer is to address inquiries and concerns from the field. Additionally, the Ethics Officer monitors the mandated annual ethics training; reviews all Statements of Economic Interest submitted by over 600 Department employees and council members annually; assists the Department in review of contracts disclosures; provides a revolving door analysis to the Office of the Executive Inspector General for certain employees leaving Department employment; receives reports of ex parte communications in rulemaking.

In fiscal year 2016, the DCFS Director deemed there was an inherent conflict and a chilling effect in having the same individual serve as Inspector General and Ethics Officer. In September 2016 the Director removed the Inspector General as Ethics Officer and exercised his statutory authority to appoint a new individual to that position. While the Inspector General recognizes the Director's prerogative to make this change, the Inspector General strongly disagrees that there has ever been a conflict of interest, real or apparent, nor any chilling effect.

The following is a summary of the Ethics Officer's activities during fiscal year 2016.

**<u>Ethics Inquiries from the Field</u>**

During fiscal year 2016, the Ethics Officer responded to inquiries from both Department and private agency employees. While the DCFS Conflict of Interest Committee reviews most inquiries related to

secondary employment of DCFS employees and contractors, inquiries that pertain to private agency employees or which are otherwise outside the scope of Rule 437 – *Employee Conflicts of Interest* are generally referred to the Ethics Officer for review.  Below is a sample of inquiries the Ethics Officer received in 2016.

### Conflicts of Interest Involving Secondary Employment

The Ethics Officer reviewed secondary employment inquiries made by private agency employees as well as issues that involve potential conflicts with Department employees' outside work (apart from approval of secondary employment).

- A Department employee contacted the Ethics Officer to inquire whether it was a conflict of interest for a Department contractor to also volunteer as a Court Appointed Special Advocate (CASA). The Ethics Officer advised that because the contractor's duties to the Department were distinct from her duties as a CASA volunteer, it would only be a conflict for her to serve the same individuals in her Department capacity and as a CASA volunteer.  The Ethics Officer noted that in either capacity, however, the individual should be advocating for the best interest of the child.

### Conflicts of Interest Arising from Multiple Relationships

- The Ethics Officer provided guidance to a Department Administrator regarding her ongoing relationship with her prior employer.  Prior to joining the Department, the Administrator worked for an out-of-state agency that had also recently contracted with the Department. After receiving a complaint about a possible conflict of interest concerning the Administrator's involvement with a DCFS contractor who was her former employer, the Inspector General advised her to build an ethical wall between herself and the out-of-state contractor and to contact the DCFS Conflict of Interest Committee for a determination. The Administrator contacted the Committee and discussions were initiated. The Committee determined that because the Administrator had just left a leadership role with the out-of-state contractor, and because they had both come to DCFS at roughly the same time within the past year, there was the appearance of a conflict of interest and any duties she had with respect to the contractor should be assumed by someone outside her chain of command.

  Four months later, the Ethics Officer was informed of two key facts that the Administrator failed to disclose to the Conflict of Interest Committee: (1) several weeks before she contacted the Committee to disclose her relationship with the out-of-state contractor, a principal with the contractor asked the Administrator to expedite their DCFS contract, which she did; and (2) after the Inspector General advised her to build a wall between herself and the contractor, she requested to use the principal's out-of-state apartment for a week (for personal use), although she stated to him that her request may have been "out of line." Because it appeared that the Administrator had ignored or disregarded the Conflict of Interest Committee's determination, and appeared to engage in a *quid pro quo* (expediting a contract and then requesting a personal favor) it became a matter for investigation.

- An employee contacted the Ethics Officer about an incident several years prior in which she and her former supervisor (traveling together) were involved in an auto accident on personal time which resulted in legal proceedings.  Based on that event and the resulting lawsuit, Department management and the union (on the employee's behalf) determined that it was a conflict of interest for the employee to continue reporting to that supervisor. A written agreement was reached which detailed necessary changes in the supervisory reporting structure for that field office, because the involved supervisor was the single supervisor in the office. The employee contacted the Ethics Officer to revisit the issue of whether, two years later, a conflict still existed in that reporting

234                                                              ETHICS

structure, because the employee sought a new Department position in which she would again report to the original supervisor. The employee had been notified that she could not interview for the position because of the prior written agreement.  The Ethics Officer advised that until the pending litigation was resolved, it would remain a conflict of interest for her to report to the supervisor and the written agreement must stand.

### *Conflicts of Interest Arising in Case Management and Programs*

- A pre-adoptive foster parent contacted the Ethics Officer for assistance.  The foster parent had been the non-relative, licensed foster parent for a two-year-old child since birth, and was approaching the finalization of adoption proceedings. His foster home was licensed and monitored by the Department. The foster parent was concerned because he had just been advised that due to his state employment with a different agency, it was against licensing regulations for his home to be monitored by the Department, and he would have to transfer his foster home license to a private agency.  Such a transfer would necessarily delay permanency for the child. After speaking with the licensing supervisor, the Ethics Officer and supervisor agreed that since it was a licensing regulation, the issue should have been addressed when the foster home was licensed several years prior, but that given the timing and the best interests of the young child involved, transferring the license and thereby delaying permanency for this child would cause greater harm than allowing the adoption to proceed without transferring the license.

- A Department employee received a request from the local Court Appointed Special Advocate organization to write a letter of support for the organization to receive a funding grant.  The local CASA did not receive any funding from DCFS. The Ethics Officer advised the employee that there was not a conflict of interest in writing a letter in her official capacity, however, for the sake of transparency the letter should include that DCFS contracted with and funded a significant portion of the statewide organization's budget.

### *Conflicts of Interest Involving Gifts, Donations, Honorarium, Sales and Solicitation*

- A licensing administrator contacted the Ethics Officer for guidance about whether she or her supervisee could accept clothing and other non-monetary donations to their field office from a foster parent. Neither the administrator nor the supervisee stood to directly benefit from the donations. The Ethics Officer advised that because both employees had decision-making authority with respect to the foster parent's foster home license, accepting the donations was not allowable under Department rules and policy and would create an appearance of impropriety. The Ethics Officer advised, however, that the administrator could arrange for the donations to be redirected to the DCFS Division of Communications which manages all donations made to DCFS.

- An employee contacted the Ethics Officer for guidance after receiving wine and chocolate with a "thank you" card at work from Department clients.  The Ethics Officer advised that accepting the gift would violate Department Rule 437 and that if the employee knew the identity of the gift giver and was able to return the gifts, he should do so. Further, the Ethics Officer advised the employee to write the gift giver a letter explaining that although it was a gracious and thoughtful gesture, DCFS has strict prohibitions against employees accepting gifts from clients.

- An employee contacted the Ethics Officer after she and several co-workers received invitations to a special event honoring a community leader. The tickets were each valued at $75, and they were offered to the employees at no cost by one of the event planners.  The individual offering the

tickets, however, occasionally served as a legal advocate for youth in care, and could receive contingency fees from settlement agreements reached in cases where he represented Department clients.  The Ethics Officer agreed with the employee's assessment that accepting the tickets created an appearance of impropriety because the gift giver had the potential for receiving a contingency fee related to legal advocacy for youth in care.

*Inquiries Involving Employment Matters*

- An employee contacted the Ethics Officer to provide guidance about whether it would be unethical for Employee A to offer money to Employee B (who had bidding seniority) to forego taking a vacant position, in order to allow Employee A to be offered the position instead. The Ethics Officer advised that such a situation would be considered a bribe, a *quid pro quo*, and would violate Department rules and ethics.

**Revolving Door Prohibition of the Ethics Act**
Ethics staff responded to many inquiries by Department and private agency employees and administrators regarding the details of the prohibition, to whom it applies and how to complete the waiver request process.  During fiscal year 2016, the Ethics Officer provided five full revolving door analyses to the Office of the Executive Inspector General regarding DCFS employees leaving state employment.

**Ex Parte Communications**
Pursuant to the requirements of the State Officials and Employees Ethics Act, the Ethics Officer is required to file with the Executive Ethics Commission reports that include material oral or written communications made to an agency during a rulemaking period or related to a regulatory, quasi-adjudicatory, investment, or licensing matters pending before or under consideration by the agency. (5 ILCS 430/5-50).  In fiscal year 2016, the Ethics Officer did not receive any reports of *ex parte* communications.

**Consultation on Department Contracts and Contract Disclosures**
The Ethics Officer assisted Department management with review of certain types of contracts disclosures made by potential service providers to identify conflicts of interest that might prevent the Department from pursuing the contract.  This assistance included review of over 30 contracts, regarding specific disclosures as well as consultation with Department employees who monitor certain contracts to ensure they understood the intricacies involved.

**Statements of Economic Interest Reviews**
Review of each Statement of Economic Interest by the Ethics Officer prior to filing is statutorily mandated under the State Officials and Employees Ethics (5 ILCS 430/20-23).  In 2015, the Office of the Inspector General reviewed 605 Statements of Economic Interest that were required to be filed by persons in the Department who:

    (1) are, or function as, the head of a department, commission, board, division, bureau, authority or other administrative unit within the government of this State, or who exercise similar authority within the government of this State;

    (2) have direct supervisory authority over, or direct responsibility for the formulation, negotiation, issuance or execution of contracts entered into by the State in the amount of $5,000 or more;

    (3) have authority for the issuance or promulgation of rules and regulations within areas under the authority of the State;

(4) have authority for the approval of professional licenses;

(5) have responsibility with respect to the financial inspection of regulated nongovernmental entities;

(6) adjudicate, arbitrate, or decide any judicial or administrative proceeding, or review the adjudication, arbitration or decision of any judicial or administrative proceeding within the authority of the State;

(7) have supervisory responsibility for 20 or more employees of the State;

(8) negotiate, assign, authorize, or grant naming rights or sponsorship rights regarding any property or asset of the State, whether real, personal, tangible, or intangible; or

(9) have responsibility with respect to the procurement of goods or services.  5 ILCS 420/Art. 4A-101.

All SOEIs received by the Ethics Officer are first reviewed for technical errors. Once a properly completed SOEI is received by the Ethics Officer and forwarded to the SOS for filing, the Ethics Officer conducts a second level of review for any SOEI with a response on the form other than "no," "none" or "n/a".  This substantive review is intended to address any disclosures that may create a conflict of interest, both under the Ethics Act and DCFS Rule 437 – *Employee Conflict of Interest.*

Overall, the Ethics Officer reviewed a total of 113 separate disclosures made on 90 (15%) SOEIs.  Of the 113 disclosures, there were 42 (37%) instances where a disclosure indicated that the employee engaged in secondary employment and/or business ownership within the preceding calendar year.  In 37 (88%) of those 42 instances, the Ethics Officer sent a letter to the employee and supervisor reminding each of the potential for a conflict of interest that always exists between State employment and outside work, and the importance of maintaining clear boundaries between State employment and any secondary employment.[1] This breakdown is illustrated below:



**605 SOEI filed (100%)**

- 90 (15%) to Ethics Officer for "further review"
- Of the 90 SOEIs that included a substantive disclosure, 42 (37%) involved secondary employment and/or business ownership
- Of the 42 employees who had some form of secondary employment (including business ownership likely to require day-to-day management) 37 (88%) will receive a secondary employment letter

Apart from secondary employment and business ownership, the Ethics Officer reviewed:

---

[1] Letters are sent to any employee who is still engaged in the secondary employment reported, or who has a business ownership that could require day-to-day management activities.  Letters are not sent in instances where Ethics staff confirms that the information listed pertained to former employment, military service or if the reporting individual is a CFSAC board member and not a DCFS employee.

- 18 disclosures involving the business interests and/or employment of the reporter's spouse;
- 18 disclosures of an ownership interest (distinguishable from a business ownership and frequently indicative of ownership in real property or stocks);
- 17 disclosures of gifts received valued (in aggregate) of greater than $500;
- 4 disclosures of lobbyist affiliation;
- 1 disclosure of primary employment (of a CFSAC member who is not a DCFS employee; and
- 13 disclosures of prior employment

**ACTION ON 2016 STATEMENTS OF ECONOMIC INTEREST**

**STATEMENTS OF ECONOMIC INTEREST FILED:**       **605**

**DISCLOSURES OF SECONDARY EMPLOYMENT OR
BUSINESS OWNERSHIP:**       **42**

# SYSTEMIC RECOMMENDATIONS

The Inspector General's investigative reports contain both systemic and case specific recommendations. The recommendations for systemic reform for Fiscal Year 2016 have been categorized below according to the function that the recommendation is designed to strengthen within the child welfare system. The Office of the Inspector General is a small office in relation to the child welfare system. Rather than address problems in isolation, the Office of the Inspector General views its mandate as strengthening the ability of the Department and private agencies to perform their duties. Recommendation categories are as follows:

- **CHILD PROTECTION**
- **ETHICS**
- **LEGAL**
- **PERSONNEL**
- **SERVICES**
  - **Medical**
  - **Service Planning**
  - **Substance Abuse**
  - **High Risk Youth in Specialized Care**

## CHILD PROTECTION

- The Department must commit to a sustainable remedy to the problem of high caseloads by the end of fiscal year 2016.

- The Department should adopt and communicate a policy whereby investigators with untenable caseloads will not be subject to discipline or negative evaluations for failing to comply with the 60 day closure requirement for investigations.

- The Department needs an inventory system that assures that child protection has rapid access to cribs.

- Child protection investigators should be trained on the critical task of verifying identity.

## ETHICS

- The Department should develop internal policy specifying that all management employees on specific administrative appeals must recuse themselves from communications or discipline regarding those appeals as well as discussions with the particular Administrative Law Judges' supervisors.

- DCFS Office of Legal Services and Division of Clinical Practice and Professional Development should track cases involving egregious abuse and outcomes.

- The Department should retrain all staff on the proper disposal of confidential documentation.

- Notices regarding the proper disposal of confidential materials in the secured shredding receptacles should be posted throughout all Department sites.

- The Department's Facilities Managers should post warning signs on all of the I-Cycle bins stating confidential documents need to be disposed of into the grey secured shredding bins.

## LEGAL

- In cases of extensive domestic violence, such as this case where the father admitted to hanging the mother with a noose around her neck and leaving her there for one minute, DCFS should appeal the court's decision of 'No Probable Cause' and "No Urgent and Immediate Necessity" to remove the children. This report should also be shared with Department Attorneys for training purposes.

- Department Legal should work with county State's Attorneys and courts to define use of Orders of Supervision when the risk is too high to forego services but not high enough to remove children from their parents' custody.

- The Department's Information Transmittal directing the State Central Register to begin accepting calls of child death without facts or allegations suggesting abuse or neglect is outside the Department's statutory authority and its implementation should immediately cease.

- The Department should work with county State's Attorneys' offices to request court involvement and the use of protective orders to increase service compliance with parents who express a desire to parent but who have not demonstrated behavior consistent with their verbal wishes. Such orders are particularly effective in cases involving substance abuse.

## PERSONNEL

- When Department licensing staff receives a request to continue employing staff that has been Indicated for Child Abuse/Neglect and the request does not reflect an actual assessment of the allegations, licensing staff should return the request to the private agency.

- Child Welfare employers should get a copy of the DCP Investigation Summary along with the Notice of Indicated Child Abuse/Neglect Report when an employee has been Indicated.

- The Department should ensure that Adoption Specialists statewide have completed all required training for adoption certification.

## SERVICES

*Medical*
- The Department has a fiduciary duty to protect youth in care from environmental dangers, such as second hand smoke exposure.  When a medically complex or premature infant is referred for placement in a home with smokers, the Department should make a referral to the Chief Nurse for review of the home and associated risks.

- The Department, in conjunction with the Department Medical Director, should inform the field regarding training and resources for child welfare staff concerning the risks of secondhand smoke exposure for children as well as smoking cessation resources for clients and families.

*Service Planning*

- The Department Office of Information and Technology Services (OITS) must develop a tracking and tickler system within SACWIS for the opening of intact family cases. Case openings should not be dependent upon an exchange of emails.

- The Department's Specialized Foster Care Unit, which is responsible for determining whether a family is entitled to an increased rate because of a child's special needs, should be required to document and appropriately share all assessments, service recommendations or monitoring issues identified by the unit.

- Given the likelihood that youth in Transitional Living Programs will maintain family involvement, funded family interventions—such as Brief Strategic Family Therapy—need to be a standard treatment component in Transitional Living Programs.

- Adolescents living in Transitional Living Programs who have family members who abuse alcohol should be encouraged to participate in support programs and should be offered transportation to those programs by agency staff.

- When sibling groups are placed in a foster home, the Department should require an assessment of the pragmatic demands of the placement given the developmental and chronological ages of the children, as well as the needs of the children, and demands on the foster parent. The assessment should identify specific concrete supportive services the caregiver will need to successfully care for the children, such as enrolling preschool age children in a Head Start Program, or in the alternative a National Association for the Education of Young Children (NAEYC) accredited childcare center; supportive homemaker services; respite; and assessing the transportation needs related to the children's services.

- Regional Clinical and Legal staff should convene interdisciplinary case conferences to support the field in appropriately servicing children that have been victims of egregious harm.

*Substance Abuse*

14. The Department should develop a supportive recovery transitional living program for its young adults in Cook County who are in their early stages of recovery. The program should offer individual, group and family counseling, educational and employment services with an incentivized goal setting in these areas.

15. The Department should utilize The Addicted Minor Act to obtain court ordered treatment for dually involved youth who are in need of substance abuse treatment in lieu of violating their delinquency probation.

*High Risk Youth In Care*

16. To counter the lure of gangs and guns, the Department must offer programs in severely economically disadvantaged neighborhoods, such as Englewood, Lawndale and Austin. The programs should include remedial tutoring and enhanced learning opportunities for youth in care and children who have achieved permanency through subsidized guardianship or adoption who have reading and/or math scores two grades below level. The programs should also offer the opportunity for pro-social recreational programs with safe passage (transportation) for these children.

17. The Department should explore identification of entities that can offer educational credit recovery programs.

18. For effective collaboration, Cook County Region DCFS should pursue an agreement with the Cook County Probation Department to cross train the dually involved specialized caseworkers and the youth's assigned probation officers. The training should cover the specifics of probation, delinquency court and gang safety and the DCFS related policies and expectations. The trainings should be conducted biannually and include a discussion component provided by experienced caseworkers and probation officers on gang involvement and lessons learned.

19. The Department should request the Illinois Justice Project/Juvenile Justice Leadership Data Collection and Information Sharing Workgroup and the Dually-Involved Committee consider proposing legislation or rules that would permit sharing of information and coordination between the Cook County Juvenile Justice Courts and the Cook County Abuse and Neglect Courts in Illinois, when in the best interests of dually-involved youth.

20. The Department should request that Administrative Office of the Illinois Courts (AOIC) allow the Department to receive all Delinquency Court assessments such as the Youth Assessment and Screening Instrument (YASI) and Violence Risk Assessment for youth in care of the Department. For consistency of measurements across agencies the Department should administer the YASI on those dually involved youth who end their probation or parole but continue under the Department's guardianship.

21. The Department should request to participate in the Gang School Safety Team real time monitoring approach for youth in care with gun/gang/violence activity including related social media.

22. The Department must review all Unusual Incident Reports involving a youth in care with a gun or ammunition to ensure that law enforcement has been notified.

23. The Department should develop a violence and substance free therapeutic community based model similar to a halfway house model for youth 18 and over involved with the criminal court system or dually involved with adult and juvenile courts for crimes against a person. The programming should require that the youth: enter into a nonviolence contract, obtain part time employment, participate in continuing education through the City of Chicago Community Colleges (technical certification program, GED, or Associate Arts degree) or credit recovery or alternative school programs for youth who can earn a high school diploma. The therapeutic model should clearly define a non-violence contract with each youth who enter the program. If the terms of the shelter's non-violence contract are violated the Department should immediately inform the Juvenile Court and Adult Probation of the violation and the intention of the Department to request termination of the youth's wardship. Programming should include Safer Foundation and the Isaac Ray Center.

24. The Department should explore collaboration with the Illinois DHS Division of Mental Health, Division of Alcoholism and Substance Abuse, and the Cook County Sheriff's Office to develop a stabilization strategy for DCFS Cook County young adults with mental illness and substance abuse problems who are charged with crimes that exclude them from the criminal mental health court.

25. The African American Family Commission should review the findings in this report to develop recommendations for legislation or other necessary reforms.

SYSTEMIC RECOMMENDATIONS

*Specialized Care*

- The Department should ensure that specialized care rate decisions are based on the child's needs rather than the likelihood of a disruption in placement.

26. When a special education youth in a residential program outside of the City of Chicago is transferring to a therapeutic/specialized, foster/relative home or transitional living program in Chicago, the Regional Educational Advisor from the sending community and the receiving Chicago Regional Educational Advisor should meet in advance of the school transfer to develop a transitional plan with the receiving school and the receiving agency assuring that the youth receives timely and appropriate special education services. The youth should be involved in the planning and afforded the opportunity to visit the receiving school prior to the transfer and the Department should fund an educational mentor to assist the youth for the first six weeks of the school transfer. The educational mentor should provide transportation for the first six weeks and assist the youth in adjusting.

244

# RECOMMENDATIONS FOR DISCIPLINE

In FY 2016, the Inspector General recommended discipline of Department and private agency employees for the conduct detailed below. Discipline recommendations ranged from counseling to discharge.

- A child protection supervisor failed to notify management that the supervisor had a close relationship with a subject of an investigation that had been assigned to the supervisor's team. The supervisor then ordered two investigators on her team to take protective custody of the subject's child, and another child, who were uninvolved in the pending investigation, based on facts unrelated to the pending investigation.

- A child protection investigator entered false investigative notes in which he claimed to have interviewed the mother, the child and the mother's sister in the family home, which he had never been to. He also documented completing an in-person Risk Assessment, Substance Abuse Assessment and Domestic Violence Assessment on the mother, who he never met in person.

- A private agency foster care worker and supervisor placed two brothers with significant needs for supervision with a 22 year old relative with two small children of her own and failed to ensure the development of a safety plan in response to significant bruising on the younger brother. They also failed to assess the needs placed on the young relative when one of the brothers had 5-7 toileting accidents per day and the relative expressed frustration with the practical aspects of handling the brothers.

- A Department Administrator intervened in a case and offered to provide court testimony in opposition to Department workers, based solely on the mother's self-report to the Administrator. The Administrator failed to review prior investigations and clinical assessments of the family prior to appearing to testify in court.

- A child protection investigator falsified investigative notes and gave false court testimony that he had interviewed the mother and children at their home. He also failed to cooperate with the Inspector General's investigation.

- A foster care worker entered case notes so late that it obstructed the ability of his supervisor to provide supervision.

- A child protection investigator falsified contact notes of in-person interviews with the subjects of the investigation and home visits.

- A child protection investigator, seeking guidance from her supervisor regarding where to place the children, failed to inform her supervisor that the family they were considering as a relative placement may actually not have a familial relationship to the children and that a sibling of the children was placed in another home, which was available as a placement option.

- A child protection investigator waited seven weeks to see a child victim after the hotline report of possible abuse. After another hotline call, alleging additional abuse, the investigator failed to interview relevant persons and failed to review medical records. As a result of the incomplete investigation, the investigator never learned the composition of the household or who had hurt the child.

- A child protection investigator and supervisor failed to interview the hotline reporter, failed to contact law enforcement and failed to obtain existing photographs of the injuries and medical records.

OTHER MISCONDUCT

- A Department supervisor displayed uncontrolled anger and made vague threats to harm management that was unbecoming of a child welfare supervisor and which resulted in co-workers fearing for their safety.

- A Department employee altered Department forms in order to make it appear that she had taken benefit time, enabling her to submit false claims for reimbursement of time to the Union.

- A Department adoption worker failed to properly dispose of confidential materials which led to a breach of confidentiality.

- A Department Administrator engaged in intrusive and insensitive conduct when the Administrator sought personal health information from a supervisee and the supervisee's family. The Administrator also misrepresented factual information regarding the supervisee's work.

# CHILD WELFARE EMPLOYEE LICENSES

The following cases represent action taken against Child Welfare Employee Licenses (CWEL) in FY 2016.

## License Revocation

- A private agency worker's Child Welfare Employee License (CWEL) was revoked after she engaged in a non-professional relationship with a father on her caseload. The worker was also found to have falsified two case notes in which she stated that she was in court when she was not.

## License Revocation Pending Board's Final Decision

- The Office of the Inspector General issued charges based on falsification of case record, court reports or court testimony against a Department employee who falsified six case notes of in-person visits that had not occurred in a case involving a seven-week old infant with multiple unexplained bone fractures.  The employee had also falsified the safety assessment since she had not yet seen the children.  After a hearing on the charges, the Administrative Law Judge (ALJ) recommended revocation of the worker's license. A final decision is pending with the CWEL Board.

- The Office of the Inspector General issued charges against a former private agency employee based on falsification of case records and failure to provide information regarding a pending licensure investigation within 30 days after a written request by the Office of the Inspector General.  The Administrative Law Judge recommended that the worker's license be revoked after the licensee failed to file an Answer to the charges; failed to appear at the scheduled pre-hearing; and failed to request a reinstatement of her right to a hearing within 30 days of the abandonment order issued by the ALJ.  A final decision is pending with the CWEL Board.

- The Administrative Law Judge recommended that the child welfare license of a former department employee be revoked based on abandonment after the licensee failed to file an answer to the charge of falsification; failed to appear at the scheduled pre-hearing; and failed to request a reinstatement of her right to a hearing within 30 days of the abandonment order. A final decision is pending with the CWEL Board.

- The Office of the Inspector General issued charges against a Department employee based on falsification of case record.  The Administrative Law Judge recommended revocation of the worker's license based on abandonment after the licensee failed to file an Answer to the charges; failed to appear at the scheduled pre-hearing; and failed to request a reinstatement of her right to a hearing within 30 days of the abandonment order. A final decision is pending with the CWEL Board.

## Licenses Relinquished

- A Department employee voluntarily relinquished her child welfare license after the Office of the Inspector General had issued charges based on falsification of case record.

- A private agency employee voluntarily relinquished her license after the Office of the Inspector General issued Charges based on egregious acts and failure to provide information within 30 days of a written request from the Office of the Inspector General.  Because the licensee failed to cooperate during the OIG investigation into allegations that the licensee had sold illegal prescription and non-prescription drugs to a client, a minor, on her caseload; failed to file an Answer to the Charges; and failed to appear at the scheduled pre-hearing on the charges, the Administrative Law Judge had

already issued an order of abandonment of licensee's right to a hearing at the time that the voluntary relinquishment was submitted.

- A private agency worker voluntarily relinquished her child welfare license during an Office of the Inspector General investigation into allegations that the licensee had falsified case notes documenting in-person visits that did not occur.

- A private agency worker voluntarily relinquished her license during an Office of the Inspector General investigation into allegations that the licensee provided false court testimony regarding submission of a referral for drug testing.

## Pending Administrative Hearing

- The Office of the Inspector General issued charges based on falsification of case records against a Department employee who was alleged to have falsely claimed that he made in-person visits that did not occur. The case is pending administrative hearing.

- The Office of the Inspector General issued charges based on falsification of case record and court testimony against a Department employee who gave false testimony that the mother had successfully dealt with issues that brought the case into the system, when the mother had been dropped by the therapist for non-compliance, and the worker had been notified of the non-compliance.  The worker also authored case notes falsely claiming that she made in-person visits that did not occur. The CWEL matter is pending administrative hearing.

## Charges Withdrawn

- Licensee was accused of accepting adoption assistance payments without notifying the Department that the adoptee no longer lived with her.  Office of the Inspector General withdrew the Charges after new evidence came to light.

- A Department employee falsified case notes in an assigned case.  After charges of Falsification were issued, the Office of the Inspector General learned that the worker had a serious illness and had undergone surgery that rendered her unable to respond to the Charges. The Office of the Inspector General withdrew the Charges without prejudice to later refiling.

CHILD WELFARE EMPLOYEE LICENSES

# COORDINATION WITH LAW ENFORCEMENT

- In May 2011, the Office of the Inspector General completed a joint investigation with the Executive Inspector General of contract fraud perpetrated by George E. Smith, an owner of various for profit and not for profit entities that received over $18 million in grants from the Department of Children and Family Services over several years, as well as grants or contracts from other public entities. The joint investigation called for massive changes to the Department's process of monitoring grants and contracts. Mr. Smith was referred to the United States Attorney's Office for prosecution.

According to the United States Attorney's Office for the Central District of Illinois:

*Friday, September 23, 2016*

### Chicago Businessman Sentenced to Two Years in Prison for Grant Fraud Scheme

*Springfield, Ill. – A Chicago businessman has been ordered to serve 24 months in prison for a fraud scheme that resulted in two state agencies awarding separate, but nearly identical, grants to his not-for-profit entity in September 2008. U.S. District Court Judge Sue E. Myerscough sentenced George E. Smith, 66, and ordered that Smith pay restitution of nearly $500,000 to the state. Judge Myerscough allowed Smith to self-report as directed by the federal Bureau of Prisons to begin serving his prison sentence. Smith waived indictment and pled guilty in March 2016, to two counts of mail fraud and one count of money laundering.*

*In rendering today's sentence, Judge Myerscough noted that Smith exploited his personal relationship with a former director of the Illinois Department of Children and Family Services related to a grant in the amount of $450,000 awarded by the agency on Sept. 2, 2008, under the Students at Risk Program. On Sept. 8, 2008, the Illinois Board of Education awarded Smith's not-for-profit a similar grant in the amount of $342,000. According to the terms of the grants, both provided for similar services to be provided to the same at-risk population in the Chicago area during fiscal year 2009. The populations served, sources of referral, services to be provided, and the goals for each grant were essentially identical. Neither DCFS nor ISBE were aware of the issuance of an identical grant by the other state agency. Smith then converted the duplicate funding to his personal and business use.*

*Both grants were awarded to Diversified Behavioral Comprehensive Care, a not-for-profit entity owned and operated by Smith. In addition, Smith owned and operated three for-profit entities: Diversified Behavioral Services, Inc., Management Planning Institute, Inc., and the Institute for Positive Child and Family Development. From 2005 through 2011, Smith, through both his not-for-profit and for-profit entities, received millions of dollars in funding from agencies of the state of Illinois, including DCFS, ISBE, and the Illinois Department of Human Services.*

*Smith further admitted that in February 2009, he caused Illinois DHS to award a third grant of $200,000 to DBCC to provide community services relating to*

*the prevention, intervention, treatment and rehabilitation of alcohol and other drug abuse and dependency. In fact, Smith admitted that he submitted and caused to be submitted false and fraudulent documentation to DHS falsely representing the amount of community services DBCC actually provided under the DHS grant and fraudulently caused DHS to pay DBCC a total of $138,901.*

*Smith was ordered to pay restitution in the amount of $342,000 to the Illinois State Board of Education and $138,901 to the Illinois Department of Human Services – Division of Alcoholism and Substance Abuse.*

*Assistant U.S. Attorney Timothy A. Bass prosecuted the case on behalf of the U.S. Attorney's Office for the Central District of Illinois. The investigation was conducted by the Federal Deposit Insurance Corporation, Office of Inspector General (FDIC-OIG) with the assistance and cooperation of the Office of Inspector General, Illinois Department of Children and Family Services; the Illinois Attorney General; the Illinois Board of Education, and the Illinois Department of Human Services.*

**Other Law Enforcement Assistance in 2016**

▪ A County Sheriff's office contacted the Office of the Inspector General to assist them in identifying a body that they believed to be a body of a young adult who had previously been in the care of the Department. The Office of the Inspector General assisted the Sheriff's Office in reviewing the records for information that might help to identify the deceased.

▪ Law enforcement contacted the Office of the Inspector General alleging that a child protection investigator had investigated a mother who she knew to be the key witness against her son in an Attempted Murder prosecution. The investigator was criminally charged.

▪ The Department's Office of Employee Services contacted the Office of the Inspector General for assistance after a worker had been barred from a military site when their criminal background check showed an arrest, ten years earlier, for underage solicitation of prostitution. The Office of the Inspector General determined that the individual had never been convicted of underage solicitation.

▪ The Office of the Inspector General was contacted regarding allegations against an employee by an adult who claimed that she had been sexually assaulted by the employee and others when they were all minors, over 20 years earlier. The alleged victim also claimed that when she confronted the employee, he threatened to harm her if she revealed her allegations. The Inspector General investigation, which included a review of text messages, failed to establish evidence of either allegation.

▪ An employee was alleged to have stated her intent to harm specific Department management and was otherwise displaying angry outbursts in the office that were scaring co-workers. The Office of the Inspector General referred the matter to State Police. The Police conducted an investigation and referred the matter back to the OIG to proceed administratively, based on the police investigation.

▪ While conducting a background check on an applicant for a Child Welfare Employee License, Inspector General investigators learned that there was a possible identity theft of the applicant's social security number. The Inspector General notified the Federal Trade Commission Identity Theft Hotline to report the possible identity theft.

---

## DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS

---

The Inspector General made the following recommendations in previous Fiscal Years, but the recommendations were not fully implemented before the Annual Report was issued. The current implementation status of these recommendations is detailed below in the following categories.

- Child Protection
- Contract Monitoring
- Domestic Violence
- Foster Home Licensing
- Law Enforcement
- Legal
- Medical
- Personnel
- Services
- Teen Issues

**CHILD PROTECTION**

FY 2015
**Rules and Procedures should be amended to provide that any abuse allegations that can be permissively retained for 20 years should be retained for 20 years when criminal charges have been filed and either resulted in a conviction, or are pending (from OIG FY 15 Annual Report, Death and Serious Investigation 5).**

> *FY 15 Department Response:* This recommendation will be included in revisions to Procedures 300, *Reports of Child Abuse and Neglect*. Part 431, *Confidentiality of Persons Served by the Department of Children and Family Services*, and Part 436, *Records Management*, will also be updated to address this recommendation.

> *FY 16 Department Update:* The recommendation has been incorporated into draft Procedures 300.150, *Child Abuse and Neglect Investigative File.*

FY 2015
**Burn allegations (other than third degree) should be added to the list of abuse allegations that can be permissively retained for 20 years (from OIG FY 15 Annual Report, Death and Serious Investigation 5).**

> *FY 15 Department Response:* This recommendation will be included in revisions to Procedures 300, *Reports of Child Abuse and Neglect*. Part 431, *Confidentiality of Persons Served by the Department of Children and Family Services*, and Part 436, *Records Management*, will also be

updated to address this recommendation. Revisions will also need to be made to SACWIS, the State Automated Child Welfare Information System.

*FY 16 Department Update:* The recommendation has been incorporated into Procedures 300.150, *Child Abuse and Neglect Investigative File.*


FY 2015

**The Administrative Hearings Unit should establish a policy whereby requests for appeal are not dismissed as untimely unless proof of service can be shown (from OIG FY 15 Annual Report, General Investigation 17).**

*FY 16 Department Update:* The Department has not found a way to send individual 'final finding' letters with legal proof of service due to the very high costs of doing so. The letters are computer generated, sent in batch by an outside service. The Administrative Hearings Unit makes case by case determinations about dismissal after review of the facts in each case. Thus, the hearings often go forward in the Administrative Hearings Unit under these circumstances. Further, the circuit courts sometimes remand these matters to the Administrative Hearings Unit if they have been dismissed. Due process is provided to appellants.

*FY 16 OIG Comment: The Department's response suggests that appeals requests can still be dismissed as untimely even if the Department cannot prove notification. The lack of policy will unfairly impact the due process rights of poor clients without legal representation.*

*FY 16 Department Response:* The Department is aware of no evidence that the Administrative Hearings Unit dismisses as untimely the appeals of pro se appellants more often than the appeals of appellants who are represented by counsel.


FY 2015

**Department and private agency case managers must inform the Teen Parent Service Network whenever a parenting ward is the subject of a pending and/or indicated child welfare investigation (from OIG FY 15 Annual Report, Death and Serious Investigation 4).**

*FY 15 Department Response:* Office of Information Technology Services (OITS) developed a report which is provided to TPSN weekly. The Recommendation will be included in revisions to Procedures 300, *Child Abuse and Neglect Investigations*, Procedures 315, *Permanency Planning.*

*FY 16 Department Update:* The recommendation has been incorporated in Procedures 300, Appendix B, *The Allegations System* and Procedures 315 Subpart C, *Assessment and Other Casework Activities*. Procedures 315 were issued via Policy Transmittal 2016.11 on November 22, 2016.


FY 2014

**On-call supervisors should be required to have a DCFS issued laptop with them while on call. In situations where an on call supervisor does not have access to the internet and the air card signal is not adequate, that supervisor should be required to locate the closest point to their home where the air card functions. On-call supervisor SACWIS notes should be entered contemporaneously. The supervisor in this case should receive discipline for not entering any notes (from OIG FY 14 Annual Report, General Investigation 1).**

> *FY 16 Department Update:* All child protection supervisors and front-line staff will be provided new iPhone 6S+'s and access to the SACWIS mobile app by early 2017.  This will eliminate the need for the laptop and air card while out in the field.

FY 2014

**When child protection investigations involve an arrest for domestic violence, investigators should contact pretrial services to obtain bail conditions (from OIG FY 14 Annual Report, General Investigation 1).**

> *FY 16 Department Update:* The recommendation has been incorporated into revisions to draft Procedures 300.50(c)(6)(B), and Procedures 300.140, *Consultations.*

FY 2014

**When a DCFS worker has a case involving a caretaker who is suspected of anabolic steroid use, the worker should contact the Administrator for Substance Abuse Services for information on the appropriate anabolic steroid screen (from OIG FY 14 Annual Report, General Investigation 1).**

> *FY 16 Department Update:* The recommendation has been incorporated in draft Procedures 300.140 and Appendix B, allegations 10 and 60. Language was also added to Procedures 302, Appendix A, *Substance Affected Families*.

FY 2014

**The Department should overturn the mother's indicated finding for violating the unwritten safety plan by signing a short term guardianship document (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 6).**

> *FY 16 Department Update:* The Administrative Hearings Unit makes case by case determinations about dismissal after review of the facts in each case.  Thus, the hearings often go forward in the Administrative Hearings Unit under these circumstances. Further, the circuit courts sometimes remand these matters to the Administrative Hearings Unit if they have been dismissed.  Due process is provided to appellants.

*FY 16 OIG Comment: The Department's update does not address the recommendation. In this particular case the mother was indicated solely because she signed a legal short-term guardianship document. It should be voluntarily unfounded.*

FY 2014

**The Department should clarify in its Procedures how investigators should complete "person" data checks in SACWIS. This information should be incorporated into training (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 5).**

> *FY 16 Department Update:* Direction to perform a person search is in Procedures 300.50, *Investigative Process*. Every Child Protection Specialist receives intense SACWIS training in Foundations on how to perform person searches in SACWIS as part of their investigation.

FY 2014

**The Inspector General reiterates the prior recommendation from the Inspector General death investigation, #11-2542: The Department should use this Report and Inspector General Report #09-0231 as training tools for management to address with child protection supervisors the risks associated with harsh punishment and the need for thorough investigation of such punishment (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 1).**

*FY 16 Department Update:* Harsh punishment training was superseded by the Egregious Acts Training that was held in Southern Region and Cook County. Central and Northern Regions will be trained by June 30, 2017. The Harsh Punishment Training was written by the Office of Professional Development and has been approved by the Inspector General's office.

FY 2014

**As part of the temporary custody screening process, child protection will notify DCFS Office of Legal Services and DCFS Clinical of high risk cases such as those where a parent has demonstrated dangerous behavior as abduction; torture; threats to kill with plan; or taking children hostage and cases involving severe mental illness: (a.) upon notification, DCFS Clinical will initiate an emergency clinical staffing within 5 working days, including all relevant parties and records, and (b.) authorize a specialized integrated assessment (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 2).**

*FY 16 Department Update:* The Department is in the process of training all regions on the policy for egregious cases. Southern Region staff were trained in May 2016 and Cook County staff were trained in September 2016. Until staff in Northern and Central Regions have been trained, the Integrated Assessment program completes a specialized assessment and works with the field to ensure that appropriate recommendations are included in the Integrated Assessment.

FY 2013

**The Department should use this report and Inspector General Report #09-0231 as training tools for management to address with child protection supervisors the risks associated with harsh punishment and the need for thorough investigation of such punishment (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 2).**

*FY 16 Department Update:* Harsh punishment training was superseded by the Egregious Acts Training that was held in Southern Region and Cook County. Central and Northern Regions will get training by June 30, 2017. The Harsh Punishment Training was written by the Office of Professional Development and approved by the Inspector General's Office.

FY 2012

**The Department database currently only automatically prompts management approval for death and facility reports. The automatic prompt for management approval should include allegations of burns, head injuries, internal injuries and children under six with allegations of cuts, bruises, welts, abrasions and oral injuries (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 2).**

*FY 16 Department Update:* The Department is not moving forward on this recommendation until we determine the future of the SACWIS system.

FY 2012

**The Department should develop an effective consultation process and procedures specific to failure to thrive investigations and the provision of intact family services in cases with a failure to thrive child (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 4).**

> *FY 16 Department Update:* The recommendation has been incorporated in draft Procedures 300.130(3) *Referral for services*, and draft Procedures 300.100, *Medical Requirements for Reports of Abuse and Neglect.*

FY 2009

**The Department should train investigators and issue policy to require that when investigating injuries that occurred during babysitting, the investigator should determine the names of all other children that the babysitter provides care for, and interview them when appropriate and add children as additional alleged victims when appropriate. Parents, including non-custodial involved parents, of all children who are added as additional alleged victims should be notified of pending and completed investigations as required by the Abused and Neglected Child Reporting Act (ANCRA) and existing Rule and Procedure (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 3).**

> *FY 16 Department Update:* The recommendation has been incorporated in draft Procedures 300.50, *Investigative Process* as well as draft Procedures 300.160 *Notifications*.

FY 2007

**The Abused and Neglected Child Reporting Act (ANCRA) should be amended to clarify that the Department can share unfounded investigative information during a subsequent child protection or criminal investigation with the State's Attorney and Law Enforcement under specified circumstances for purposes consistent with the Abuse and Neglect Child Reporting Act or criminal prosecution (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 4).**

> *FY 16 Department Update:* This recommendation has been incorporated in revisions to Rule 431, *Confidentiality of Personal Information of Persons Served by the Department of Children and Family Services.* The workgroup continues to review language for proposed amendments to Rule 431.

FY 2007

**A third box should be added to each safety factor in the Child Endangerment Risk Assessment Protocol (CERAP), acknowledging that information for that factor may be "unknown" or "uncertain" and add a section at the conclusion of the factors list for identifying information that needs to be gathered in the future to further assess safety (from OIG FY 06 Annual Report, General Investigations 16).**

> *FY 16 Department Update:* The workgroup continues to review procedures regarding CERAP and technical changes that are deemed appropriate for completion in 2017.

FY 2007

**The Child Endangerment Risk Assessment Protocol (CERAP) should be amended to require that workers note when a risk factor cannot be answered because of insufficient information. Under such circumstances, workers should be required to perform diligent inquiry into relevant facts for assessment within 48 hours. The Department should develop procedures to ensure that there is follow-up and resolution of unknown variables (from OIG FY 05 Annual Report, Death and Serious Injury Investigation 9).**

> *FY 16 Department Update:* The workgroup continues to review procedures regarding CERAP and technical changes that are deemed appropriate for completion in 2017.

## CONTRACT MONITORING

FY 2015

**The agency the Department contracted with to provide parent coaching should discharge or cease contracting with the parent coach who was assigned to the family for the poor quality of her work on this case and her failure to accurately report (from OIG FY 15 Annual Report, Death and Serious Investigation 1).**

> *FY 15 Department Response:* Because of the limited number of providers and the number of subcontracts under this agency, the Director agreed to a corrective action plan with the agency. According to that plan, the agency is to continue implementation of their current "Agency Corrective Action Plan" as well as address other recommendations made within the clinical review. A six month follow-up clinical review will be conducted to assess the program's progress regarding recommendations and adherence to their practice guidelines.

*FY 15 OIG Comment: This case involved a family of seriously physically abused children. One of the children disclosed to the parenting coach that he had been hit over the head with a plastic baseball bat. The mother taunted and made cruel statements to the children, and the father appeared overwhelmed because the mother distanced herself from parenting duties. In addition, the children demonstrated fear of the parents. The parenting coach, hired and supervised by the private counseling agency, responded to these incidences by presenting a "why it is bad to lie" puppet show to the child who made the disclosure. Moreover, the coach continued to report progress despite taunting and inappropriate behavior by parents who had seriously abused an infant. In an unrelated case, involving the same private agency, the Office of the Inspector General found that an employee of the agency had stolen wards' social security numbers and filed a false police report, and one of the owners of the agency blindly accepted the word of the employee that the allegations were made up. The Office of the Inspector General reviewed the Corrective Action Plan that the Department developed with the private counseling agency. There is nothing in the Corrective Action Plan that addresses either of the concerns raised in the Inspector General reports.*

> *FY 16 Department Update:* The parenting coach involved in this case no longer works for the agency.

FY 2015

**In light of the private agency's co-owner/clinical director's demonstration of poor judgment in minimizing the validity and importance of a valid order of protection, and in conjunction with the Inspector General's findings in a forthcoming investigation, there are serious questions about whether the private agency is able to provide quality clinical services and whether therapists/counselors are receiving adequate supervision as required by the agency's contracts.**

**The Department should conduct a substantive clinical audit of the agency's clinical supervision to determine whether adequate supervision is being provided (from OIG FY 15 Annual Report, General Investigation 4).**

> *FY 15 Department Response:* Because of the limited number of providers and the number of subcontracts under this agency, the Director agreed to a corrective action plan. A corrective plan was provided to the agency. According to that plan, the agency is to continue implementation of their current "Agency Corrective Action Plan" as well as address other recommendations made within the clinical review. A six month follow-up clinical review will be conducted to assess the program's progress regarding recommendations and adherence to their practice guidelines. Clinical will schedule the follow-up assessment.

*FY 15 OIG Comment: The forthcoming investigation referred to above involved family of seriously physically abused children. One of the children disclosed to the parenting coach that he had been hit over the head with a plastic baseball bat. The mother taunted and made cruel statements to the children, and the father appeared overwhelmed because the mother distanced herself from parenting duties. In addition, the children demonstrated fear of the parents. The parenting coach, hired and supervised by the private counseling agency, responded to these incidences by presenting a "why it is bad to lie" puppet show to the child who made the disclosure. Moreover, the coach continued to report progress, despite taunting and inappropriate behavior by the parents who had seriously abused an infant. In an unrelated case, involving the same private agency, the Office of the Inspector General found that an employee of the agency had stolen wards' social security numbers and filed a false police report, and one of the owners of the agency blindly accepted the word of the employee that the allegations were made up. The Office of the Inspector General reviewed the Corrective Action Plan that the Department developed with the private counseling agency. There is nothing in the Corrective Action Plan that addresses the concerns raised in the Inspector General reports.*

> *FY16 Department Response:* The Departments' Clinical Division conducted an on-site review at the agency in February 2016 and found that the agency should continue implementation of their corrective action plan. Recommendations were made specific to incorporation of trauma-informed evidence-based treatment, parenting coach practice model, record keeping, use of clinical forms and other documentation by the agency, as well as their clinical supervision and oversight. Clinical and Monitoring will continue to monitor progress on the agency's' corrective action plan.

*FY 16 OIG Comment: The Corrective Action Plan did not address the concerns raised in the Inspector General reports.*

FY 2015

**The Office of Field Audits should amend their procedures to require consultation with program monitors to ensure that any cost allocation system and the apportionment of administrative expenses has integrity (from OIG FY 15 Annual Report, General Investigation 2).**

> *FY 15 Department Response:* The Office of Field Audits will amend their procedures to add to the current consultation with the Program Monitors, additional procedures that will address this issue. The Office of Field Audits will work with the Monitors to complete the procedures.

> *FY 16 Department Update:* The Office of Field Audits has amended their procedures to include consultation with the Program Monitors prior to any on-site review and to have additional consultation with the Program Monitors after the on-site review, if necessary. Additionally, the

Program Monitors are copied on any reports that are distributed as a result of an on-site review.

FY 2015
**The Office of Field Audits should amend their procedures to require review of consolidated financial statements with program monitors to ensure that allocations of costs among programs and between administrative and direct expenses are correct (from OIG FY 15 Annual Report, General Investigation 2).**

> *FY 15 Department Response:* The Office of Field Audits is working with the Division of Monitoring and Operations to develop procedures to address the issue of the allocation of costs between administrative and direct expenses and to determine the best use of resources to conduct this collaboration.

> *FY 16 Department Update:*    The issue of properly identifying and assigning administrative costs is now tasked to the Governor's Offices of Management and Budget (GOMB) through implementation of the Grant Accountability and Transparency Act. As part of the overall statewide grant administration process, GOMB will determine statewide indirect cost rates for vendors.    Additionally, GOMB conducts a risk assessment of vendors insuring increased scrutiny for those vendors determined to be at risk.   Additional reporting and/or adherence to a corrective action plan may be required until the vendor is no longer determined to be at risk.

*FY 16 OIG Comment: Neither the* Grants Accountability and Transparency Act (*GATA) nor GOMB excuses the Department from designating staff for each contract and grant to ensure compliance with the Contract and Program Plan, which includes ensuring responsible allocation of costs in accordance with the Contract and Program Plan.*

FY 2015
**The Division of Monitoring must issue a directive to supervisors to ensure that program monitors of grants and quasi-grant funded programs understand that part of their duties include an analysis of administrative versus direct expenses and ensuring that state funds are used for state purposes. Program monitors should also be informed of the availability of financial audit staff to assist them in this function (from OIG FY 15 Annual Report, General Investigation 2).**

> *FY 15 Department Response:* The Division of Monitoring will issue a directive to agency performance and residential monitors and supervisors that part of their duties includes alerting program monitors, contract administration and fiscal audit staff of any suspected fiscal improprieties observed within grants and quasi-grant funding programs.

> *FY 16 Department Update:* Department monitors (APT & Residential) do not monitor grants or quasi-grant programs.    However, all monitors are directed to report suspected fiscal improprieties within agencies and facilities to Fiscal Audits.

*FY16 OIG Comment: Per the Auditor General findings and law, the Department must have staff assigned to all contracts and grants to ensure that taxpayer funds are being spent responsibly. The OIG investigation of $18 million in contract fraud made clear that Department staff charged with monitoring did not have the knowledge, skills or support to detect fiscal improprieties.*

FY 2013

**The Department needs to take action with the mental health agency for violations of their contract with the Department (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 1).**

> *FY 13 Department Response:* Due to the fact that the mental health agency's contract is shared with the Departments of Healthcare and Family Services and Human Services/Division of Mental Health as well as DCFS, the downstate DCFS Behavioral Health Services Administrator consulted with those two state agencies regarding an appropriate plan of corrective action for the involved mental health agency employees.

> *FY 14 Department Update:* DCFS and the Department of Healthcare and Family Services conducted (DHFS) an on-site review of the agency. Administrative compliance was found to be acceptable. Clinical issues were found and brought to the agency's attention, which the agency intends to dispute. Significant billing issues were discovered, and these were referred to the DHFS Inspector General for direction on how to proceed. It was our expectation that further interaction with the agency would occur, once a decision was made by the agency about how to address billing irregularities. At that point, we expect the agency to respond to all of the issues identified by the review team.

> *FY 15 Department Update:* The SASS program is undergoing revision to be more responsive to the needs of children in psychiatric crisis by changing the focus to mobile crisis response rather than just assessing the need for psychiatric hospitalization. This revised programming will be implemented through the CARES Pilot Program catchment area of Champaign, Vermillion, Ford and Iroquois counties. The projected start date is January 1, 2016. DCFS, HFS and DHS/DMH are also working with Chapin Hall to revise the current version of the CANS and its subset, the CSPI. The goal of this revision is to enhance the utility of the instrument to be more reflective of the needs of children in psychiatric crisis so that more timely and accurate service planning can be accomplished.

> *FY 16 Department Update: (None Provided)*

FY 2013

**The Department should conduct a Field Audit of the Agency and determine the following: (a.) actual administrative/direct expenses of Department programs through a programmatic analysis of functional job duties; (b.) identify consultants to ensure that all consultants have passed the required background checks and to verify that their costs are appropriately allocated; (c.) whether using staff allocated on a full-time basis to perform work for other contracts violates the Grant; (d.) the extent to which complaining employees performed additional duties for which they were to be compensated beyond their stated annual salary; (e.) when the additional counseling took place and whether it resulted in double billing to the Department; (f.) whether personnel and consultants in both programs have the required educational credentials and have passed the required background checks; (g.) whether billings are supported by timesheets, signature sheets of the party receiving services and progress or clinical notes; (h.) what rental or mortgage payments are being made, to whom and for what property. Copies of any leases or other documentation of rental or mortgage payments should be secured. Any automobile expense and payments should be analyzed, and logs reflecting any business use of the car should be secured. Any disbursements that do not appear related to the Program Plan should be analyzed; (i.) whether more than 33% of billing is for indirect costs; and (j.) when travel time has been billed to the Department, whether the travel time billed is supported by corresponding travel documentation from staff (from OIG FY 13 Annual Report, General Investigation 10).**

*FY 16 Department Update:* The Forensic Audit was completed by a contracted forensic audit firm and a final report was released internally and a copy was provided to the Inspector General in March 2016.

FY 2013

**The Department should amend its 2013 audit of the private agency to clarify that costs for the Founder/CEO's condo and for her personal vehicle are entirely disallowable expenses.  In addition, the Department should identify those expenditures for the two years preceding the audit as disallowable costs (from OIG FY 13 Annual Report, General Investigation 12).**

*FY 16 Department Update:* The private agency's attorney made a settlement offer. After consultation with the Department's Legal Department, the settlement offer was accepted. The Department received the funds on October 4, 2016.

FY 2012

**The Department should review the Agency's allocation of salaries to the Program, including a review of whether staff performs direct or administrative services.  [The Department cannot pay more than 20% of direct costs for administrative costs.]  Based on the results of the review and the issues identified in this report, the Department should determine whether to continue contracting with the Agency (from OIG FY 12 Annual Report, General Investigations 28).**

*FY 15 Department Update:*  The Internal Audit report will be completed by December 31, 2015.

*FY 16 Department Update:* It is anticipated that the agency's limited scope audit report will be released by December 31, 2016.

FY 2011

**The Illinois Department of Children and Family Services should implement the following safeguards to their training and procedures:**

> ➢ **DCFS contract and financial monitoring training must be required for all DCFS program and financial monitors, as well as those reviewing annual audits, within three months of receipt of a contract monitoring assignment and every two years thereafter. Training should emphasize that the Program Monitor's *chief duty* is to verify, by personal knowledge, the receipt of goods and services provided.**
>
> **Any training should address, at minimum:**
> - **General grant monitoring responsibilities;**
> - **Audits including comparison of audit figures with approved budgets and related responsibilities;**
> - **Approval of Quarterly Reports and related responsibilities;**
> - **Rules and procedures regarding under spending and related responsibilities;**
> - **Rules and procedures regarding disallowable costs and related responsibilities;**
> - **Rules and procedures regarding reduction in grant amounts responsibilities;**
> - **Rules and procedures regarding excess revenue and allowable offset and related responsibilities; and**

- **Rules and procedures involving inquiries into expenses to related entities and related responsibilities.**

➢ **In addition, all DCFS Program Monitors should be required to certify that:**
   - **the report of direct versus administrative expenses have been verified and is appropriately allocated;**
   - **the Program Monitor has considered whether to reduce future contract or grant amounts based on under-spending or disallowable costs;**
   - **the quarterly reports have been reviewed and compared to the budget; and**
   - **the Program Monitor has reviewed and approved leases supporting rental costs.**

➢ **On a biannual basis, each DCFS Deputy Director must submit to the DCFS Director and the DCFS Division of Finance, Technology and Planning, a list of each contract monitored by his or her division and listing the program monitor assigned to each individual contract. The DCFS Division of Finance, Technology and Planning should be required to cross-check the list to ensure that all contracts are assigned a Program Monitor, and also to ensure that all Program Monitors receive the required Contract Monitoring Training. Every six months the DCFS Division of Finance, Technology and Planning should be required to forward to the DCFS Office of the Inspector General a list of any unmonitored contracts.**

*FY 16 Department Update:* Contract and Financial Monitoring Training occurs on an annual basis for all program and financial monitors and all Deputies. The Office of Contract Administration meets annually with every division to provide technical assistance, training and review of all contracts assigned to said division.


FY 2010
**Subcontractors under Department contracts should be subject to the same transparency as contractors. All subcontracts to Department contracts should be listed and available for public viewing on the internet (from OIG FY 10 Annual Report, General Investigation 2).**

*FY 16 Department Update:* New procedures have been established as a result of the Grants Accountability and Transparency Act (GATA), this information is now posted on the GATA website and the Departments' information is managed by the Departments Chief Accountability Officer. The Illinois Grant Accountability and Transparency Act is the first, and currently only, state legislation in the nation to require the adoption and implementation of a comprehensive set of standards that mandate accountability and transparency throughout the entire life cycle of a grant. Since this finding in FY10 OCA has implemented measures to track, document, review and monitor subcontractors. However, the Department still does not have the ability to post contracts and/or subcontracts on the internet. OCA has complied with the recommendation that "Subcontractors under Department contracts should be subject to the same transparency as contracts."


**DOMESTIC VIOLENCE**

FY 2015
**The Department should develop guidelines identifying behavior that calls into question protective capacity of a non-offending caretaker. When protective capacity issues are identified the**

**Department must review available records and conduct a clinical interview to assess protective capacity.  Recommendations from the Assessment must be included in any service plan (from OIG FY 15 Annual Report, Death and Serious Investigation 3).**

> *FY 15 Department Response:* Operations and Clinical will meet to plan strategy and update procedures.

> *FY 16 Department Update:* The recommendation has been incorporated in draft Procedures 302.260, *Domestic Violence* as well as the draft of Procedures 300-Appendix J, *Domestic Violence.*

FY 2012

**The Department should examine the continued utility of the Domestic Violence Screen and determine whether the Screen assists in assessing safety and risk to children (from OIG FY 12 Annual Report, General Investigations 1).**

> *FY 16 Department Update:* The Domestic Violence Screen will be replaced with the Child Welfare Domestic Violence Screen, created collaboratively with the Office of the Inspector General. The recommendation has been incorporated into draft Procedures 300-Appendix J, *Domestic Violence.*

FY 2012

**The Department should consider requesting the assistance of Child Advocacy Centers to interview children in investigations where there is chronic violence in the home and parents have failed in the past to cooperate with services (from OIG FY 12 Annual Report, General Investigations 1).**

> *FY 16 Department Update:* The recommendation has been incorporated into draft Procedures 300-Appendix J, *Domestic Violence.* The Department continues to discuss this issue with the Statewide CAC Administrator to determine feasibility of  the CACs  handling  these interviews, as it will require programmatic and contractual changes.

FY 2012

**The Department should explore the use of court-ordered service compliance with intact families where there is a high level of risk of future violence and lack of cooperation with Department services (from OIG FY 12 Annual Report, General Investigations 1).**

> *FY 16 Department Update:* The recommendation was incorporated into Procedures 302.388(g), *Responsibilities of the assigned Intact Family Services worker* and issued via Policy Transmittal 2016.05 on 4/25/16.  The recommendation has also been incorporated into draft Procedures 300-Appendix J, *Domestic Violence*.

FY 2012

**Policy Transmittal 2010.23, which issues revisions to Procedures 302.260, *Domestic Violence Practice Guide*, and Procedures 300, Appendix J: *Domestic Violence*, provides for batterers to remain in the home with a domestic violence safety plan.   This policy should be amended to clarify that when domestic violence has occurred in the home, it is presumed that the home environment is too dangerous for the child to remain, unless the perpetrator of violence is out of the home.  Policy**

**Transmittal 2010.23 should make clear that establishing a domestic violence safety plan for children should not preclude taking protective custody (from OIG FY 12 Annual Report, General Investigations 1).**

> *FY 16 Department Update:* Draft Procedures 300-Appendix J, *Domestic Violence* has been revised and the draft no longer contains the language that a safety plan can be developed if the batterer remains in the home.

FY 2011

**The Domestic Violence protocol should be revised to address the cumulative effect of domestic violence and strategies for addressing cases of chaotic family life in which the victim/abuser dynamic results in an incalculable emotional toll to the children, including collaboration with DCFS Clinical and the Office of Legal Services (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 11).**

> *FY 16 Department Update:* The recommendation has been incorporated into draft Procedures 300-Appendix J, Domestic Violence.  This includes instructions for collaboration with clinical and legal staff on domestic violence cases.

FY 2011

**The Department should integrate into its Domestic Violence protocol the need for increased scrutiny and heightened risk when a person suspected of being a victim of domestic violence has provided false information to protect an abuser of his or her child (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 12).**

> *FY 16 Department Update:* The recommendation has been incorporated into draft Procedures 300-Appendix J, *Domestic Violence.*

**FOSTER HOME LICENSING**

FY 2015

**No child who has asthma or any serious chronic respiratory or cardiovascular complications or vulnerabilities, nor any premature infant should be placed in a home where the foster parent or any member of the household smokes. The Placement Clearance Process should be expanded to encompass smoking habits and medical needs of children (from OIG FY 15 Annual Report, Death and Serious Investigation 10).**

> *FY 15 Department Response:* This recommendation remains under review.

> *FY 16 Department Update:* Per Department policy, referrals are made to DCFS Nursing in case situations involving a medically complex or premature infant referred to placement in a home with environmental tobacco exposure.

FY 2015

**A foster care license applicant must provide the licensing worker with Consent for Release of Information form for the Social Security Administration (SSA). The Social Security Administration**

**Consent form should be used (from OIG FY 15 Annual Report, Death and Serious Investigation 10).**

> *FY 16 Department Update:* Revisions to the form and procedure are in process.  The Licensing Division submitted draft language to revise Foster Home Licensing Procedures 402.4(a), *Initial Application* and Procedures 402.5, *Application for renewal of license* and Appendix A, Renewal of Foster Home Licenses; and Initial and Renewal Application forms (CFS 597-A and CFS 598). This will capture information regarding whether or not the applicant or licensee applying for renewal is receiving payments from the Social Security Administration and/or services through the Illinois Department of Rehabilitation Services due to a disability.  When an applicant for licensing receives services and/or payments due to a disability, the Department will use proper consents (OMB No. 0960-0566; OMB No. 05; and CFS 600-3) in order to secure further information for assessment of the caregiver's ability to meet the needs of youth in care.   These draft policy changes are pending review.

FY 2015
**The Department should amend CFS 718-A, *Authorization for Background Check for Foster Care and Adoption*, to include authorization to determine if the applicant has an active case with the Illinois Department of Rehabilitation Services (from OIG FY 15 Annual Report, Death and Serious Investigation 10).**

> *FY 16 Department Update:* Revisions to the form and procedure are in process.  The Licensing Division submitted draft language to revise Foster Home Licensing Procedures 402.4(a), *Initial Application* and Procedures 402.5, *Application for renewal of license* and Appendix A, Renewal of Foster Home Licenses; and Initial and Renewal Application forms (CFS 597-A and CFS 598). This will capture information regarding whether or not the applicant or licensee applying for renewal is receiving payments from the Social Security Administration and/or services through the Illinois Department of Rehabilitation Services due to a disability.  When an applicant for licensing receives services and/or payments due to a disability, the Department will use proper consents (OMB No. 0960-0566; OMB No. 05; and CFS 600-3) in order to secure further information for assessment of the caregiver's ability to meet the needs of youth in care.   These draft policy changes are pending review.

FY 2015
**Once the Department obtains the SSA and DHS information, the applicant's potential disability should not necessarily bar the person from providing foster care, but rather the information should be considered for whether the person is physically and mentally capable of caring for children. When there is a significant discrepancy between the DCFS health record and the SSA or DHS, the Department should refer to SSA or DHS for possible fraud and consider revocation for lack of trustworthiness (from OIG FY 15 Annual Report, Death and Serious Investigation 10).**

> *FY 15 Department Response:* Revisions to application forms and procedure are in process. The only reason the information would be requested from the Social Security Administration or Division of Rehabilitation Services would be to include it in the licensing home study.  The home study, taken as a whole, would determine the recommendation for licensure and/or any restrictions on the license related to the type of care a child requires, or age of child placed in the home.

*FY 16 Department Update:* Revisions to application forms and procedure are still in process. The only reason the information would be requested from the Social Security Administration or Division of Rehabilitation Services would be to include it in the licensing home study.   The home study, taken as a whole, would determine the recommendation for licensure and/or any restrictions on the license related to the type of care a child requires, or age of child placed in the home.

FY 2015
**The Department should pursue the revocation of the foster mother's foster care license (from OIG FY 15 Annual Report, General Investigation 8).**

*FY 15 Department Response:* There continues to be a Director's Involuntary Hold on the license which prohibits any placements.  The Department will follow-up with the private agency to determine where this case is in the enforcement process.

*FY 16 Department Update:* The foster parent voluntarily surrendered her foster home license, effective December 2015. The former foster parent does not have an active license with DCFS and if she attempts to seek licensure again, a review of the old licensing file would be required, including the information that led to this OIG recommendation.

FY 2015
**A foster care license applicant must provide the licensing worker with Consent for Release of Information form for the Social Security Administration.   The Social Security Administration Consent form should be used (from OIG FY 15 Annual Report, General Investigation 8).**

*FY 15 Department Response:* This objective is being accomplished through the use of the foster home initial and renewal application forms (CFS 597-A & CFS 598)  instead of the 718-A.  A policy guide and procedures will be issued. CFS 109 will be issued by the Office of Child and Family Policy.

*FY 16 Department Update:* Revisions to the form and procedure are in process.  The Licensing Division submitted draft language to revise Foster Home Licensing Procedures 402.4(a), *Initial Application* and Procedures 402.5, *Application for renewal of license* and Appendix A, Renewal of Foster Home Licenses; and Initial and Renewal Application forms (CFS 597-A and CFS 598). This will capture information regarding whether or not the applicant or licensee applying for renewal is receiving payments from the Social Security Administration and/or services through the Illinois Department of Rehabilitation Services due to a disability.  When an applicant for licensing receives services and/or payments due to a disability, the Department will use proper consents (OMB No. 0960-0566; OMB No. 05; and CFS 600-3) in order to secure further information for assessment of the caregiver's ability to meet the needs of youth in care.   These draft policy changes are pending review.

FY 2015
**The Department should amend CFS 718-A,** *Authorization for Background Check for Foster Care and Adoption***, to authorize a check of public benefits (from OIG FY 15 Annual Report, General Investigation 8).**

*FY 15 Department Response:* Revisions to the form and procedure are in process. A policy guide will be distributed with the form changes.

*FY 16 Department Update:* Revisions to the form and procedure are in process. The Licensing Division submitted draft language to revise Foster Home Licensing Procedures 402.4(a), *Initial Application* and Procedures 402.5, *Application for renewal of license* and Appendix A, Renewal of Foster Home Licenses; and Initial and Renewal Application forms (CFS 597-A and CFS 598). This will capture information regarding whether or not the applicant or licensee applying for renewal is receiving payments from the Social Security Administration and/or services through the Illinois Department of Rehabilitation Services due to a disability. When an applicant for licensing receives services and/or payments due to a disability, the Department will use proper consents (OMB No. 0960-0566; OMB No. 05; and CFS 600-3) in order to secure further information for assessment of the caregiver's ability to meet the needs of youth in care. These draft policy changes are pending review.

## FY 2013

**In order to educate foster parents on evidence based practice, the Department should make available legitimate websites that reference evidence based treatment, such as Parent Child Interaction Therapy (PCIT) and the National Alliance on Mental Illness (NAMI) family guide (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 1).**

*FY 15 Department Update:* This recommendation will be included in the updated PRIDE curriculum. The PRIDE curriculum is under revision and not ready for implementation at this point. The PRIDE manager is following up on this recommendation to ensure these resources are provided in the current PRIDE training in the interim.

*FY 16 Department Update:* Regional Training Managers are providing this information to licensing agencies during quarterly licensing staff meetings to share with their foster parents. PRIDE Training is still in revision. The plan is to pilot in Immersion Sites by January 2017. The information is being processed to be posted on the foster parent link of the VTC as a direct link to each website.

## FY 2010

**The Department should amend Procedures 301, Appendix E, *Placement Clearance Process*, to provide guidelines for the monitoring and resolution of involuntary placement holds. These guidelines should include instructions for requesting the removal of an involuntary placement hold. The guidelines should also require that when an involuntary placement hold is placed on a foster home, the licensing worker and licensing supervisor should re-evaluate the placement hold every six months (from OIG FY 10 Annual Report, General Investigation 4).**

*FY 16 Department Update:* Revisions have been made to Procedure 301-Appendix E to provide guidelines for monitoring and resolution of involuntary placement holds. The Policy Guide with these changes was approved and is currently pending issuance with Office of Child and Family Policy.

**LAW ENFORCEMENT**

FY 2011

**For the safety of the worker and child, the State Central Register should notify local police when allegations include information about a large quantity of illegal drugs (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 15).**

> *FY 16 Department Update:* Language was incorporated into Procedures 300.50, *Investigative Process* and Procedures 300.160 *Notifications*. The Child Protection Specialist shall notify local law enforcement and document the notification in a contact note. A memo will also be issued to SCR staff to flag these cases to the field when a caller identifies a large quantity of drugs during a hotline call, to ensure the safety of the worker and the child victim(s).

FY 2010

**The Department should pursue an interagency agreement with the Illinois Law Enforcement Alarm System to identify the local law enforcement agency with jurisdiction to provide written notification of the Hotline reports required by statute and Department Rule (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 10).**

> *FY 16 Department Update:* Language was added to Procedures 300.50, *Investigative Process* and Procedures 300.160, *Notifications*, with instructions to staff on notification to law enforcement via the CANTs 14 form. The Department reiterates that the local field office is the responsible entity for making the notification to local law enforcement.

FY 2010

**The State Central Register should adopt a form to provide written notification to local law enforcement of the Hotline reports required by statute and Department Rule (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 10).**

> *FY 16 Department Update:* Language was added to Procedures 300.50, *Investigative Process* and Procedures 300.160, *Notifications*, with instructions to staff on notification to law enforcement via the CANTs 14 form. The Department reiterates that the local field office is the responsible entity for making the notification to local law enforcement and the CANTs 14 is the vehicle for that notification.

FY 2007

**Department Procedure 300.70, *Special Types of Reports,* should be amended to include second-degree burns as injuries requiring referrals to local law enforcement and the State's Attorney (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 5).**

> *FY 16 Department Update:* Department Procedure 300.50(k), *Referrals to Law Enforcement and State's Attorney* has been amended to include second degree burns. This has also been added to 300.160, N*otification to Law Enforcement.*

**LEGAL**

FY 2015

**The Department should pursue legislative change to permit expedited termination for severe abuse cases in which DCFS Clinical has determined that no services can correct the presenting problem (from OIG FY 15 Annual Report, Death and Serious Investigation 1).**

> *FY 16 OIG Update:* The Office of the Inspector General worked with the Department and developed and presented trainings and procedures to ensure severe abuse cases are handled appropriately.

FY 2013

**The Department should revise Rule 336,** *Appeals of Indicated Abuse/Neglect Findings***, to include the following: (a). It is presumed that physicians and other professional testimony by phone is permitted unless for good cause shown.  When good cause is shown, the ALJ's Recommendation shall note that testimony by phone was disallowed and why; (b.) Whenever a critical piece of evidence is excluded, the ALJ's Recommendation shall so state and include an explanation of the reasons therefore; and (c.) Grounds for dismissal (Rule 336.190) should include: "The appellant has admitted in a court of law to the facts supporting the Rationale for the indicated finding." (from OIG FY 13 Annual Report, General Investigation 19).**

> *FY 16 Department Update:* The time to file the proposed rule expired on May 8, 2016 before the Office of Child and Family Policy was given approval to file a Second Notice. First Notice for new Rule 336 rulemaking should be filed by December 15, 2016.

FY 2013

**When there is a pending criminal investigation involving the same victims with similar allegations in a Child Protection (DCP) investigation, the DCP supervisor and investigator should consult with the Department's Office of Legal Services for an opinion or case conference with the State's Attorney to determine a course of action to ensure protection of the child without jeopardizing the criminal investigation (from OIG FY 13 Annual Report, General Investigation 8).**

> *FY 16 Department Update:* This language is in draft Procedure 300.50, Investigative Process and has also been added to revisions to Procedures 300-Appendix B, *Allegation System*.

FY 2010

**The Department should develop guidelines for when it is appropriate to refer a family to the Extended Family Support Program for consideration of guardianship of a minor through Probate Court and also train them on the differences of guardianship through Probate Court versus referring a case to Juvenile Court.  The Short-Term Guardianship Form should never be used when it appears that the problem requiring guardianship will not be resolved within one year (from OIG FY 10 Annual Report, General Investigation 9).**

> *FY 15 Department Update:* The recommendation will be incorporated into revisions to Procedures 300, *Reports of Child Abuse and Neglect* which will be issued in March 2016.

> *FY 16 Department Update:* The training has been updated to provide guidance to child protection staff on making referrals to the Extended Family Support Program, to include not referring a

client to the program if short-term guardianship will not be resolved in 1 year. Language was also added to draft Procedures 300.130(g), *Extended Family Support Program*.

FY 2010

**The Department should amend Rule 431.60,** *Subject Access to Records of Child Abuse and Neglect Investigations* **to reflect current practice mandated by a federal court order in the** *Dupuy* **decision (from OIG FY 10 Annual Report, General Investigation 7).**

> *FY 16 Department Update:* This recommendation is included in revisions to Rule 431, *Confidentiality of Personal Information of Persons Served by the Department of Children and Family Services*. The workgroup continues to review language for proposed amendments to Rule 431 and are awaiting comments from policy review.

FY 2010

**Child protection managers should track and maintain data on cases presented to the State's Attorney's Office for filing of petitions and the State's Attorney's Office's response.   Child protection offices should share this information with DCFS Office of Legal Services (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 7).**

> *FY 16 Department Update:* As described in the BH filings with the court, the Department is reviewing an updated system to replace SACWIS. The Department is withdrawing its acceptance of this recommendation until we determine future needs of the Department.

**MEDICAL**

**From OIG FY 2015 Annual Report, Special Investigations,** *Psychotropic Medication and Hospitalizations of 3 and 4 year olds:* **An ecological and developmental focused Specialized Assessment must be used for children under age 6 who have been referred to the CARES hotline or for whom the Guardian receives a request for psychotropic medication. The Assessment should include the following:**

   a. **Description of identified problematic behaviors;**
   b. **Ecological and Developmental perspective including prior trauma and neglect suffered by the child and number of transitions;**
   c. **Corroboration of whether identified problem behaviors occur across settings; with Child Behavior Checklist from key informants including foster parents, relatives, teachers, early education providers, and other relevant professionals;**
   d. **The ecological and developmental perspective include prior trauma and neglect suffered by the child and number of transitions the child has encountered;**
   e. **A description of typical day (weekday and weekend);**
   f. **Description of sleep routine; visitation schedules, foster home composition;**
   g. **A Functional Behavior Analysis of the child's behavior; and**
   h. **Description of non-chemical evidence-based interventions that will be attempted prior to use of psychotropic medication.**

> *FY 15 Department Response:* DCFS Policy Guide "Prescribing Psychotropic Medication to Children Under 6 Years Old in Illinois State Guardianship" is in process which delineates management of requests for psychotropic medication and/or psychiatric hospitalizations for young children.   Currently, the DCFS Consent Unit is notifying the Psychology program

whenever there is request for psychotropic medication and/or psychiatric hospitalization for wards under six years. For children in Cook County, they will be referred to one of the DCFS Division of Clinical Practice and Professional Development Continuity of Care Centers (CCC.) The CCCs provide outpatient psychiatric and therapeutic services for youth with mental health problems that are causing significant distress or functional impairment in their family, school or other environment. A second CCC will be opening in the Springfield area soon. The child is referred for a three month therapy trial.  If the child is already in therapy at another location, contact is made with that therapist to notify them about the psychotropic medication request and to have the comprehensive Diagnostic form completed. Children in regions not serviced by a CCC will be linked with a comparable level therapist.   All of the children will receive a comprehensive Diagnostic Assessment. This assessment will be revised to include recommended ecological and developmental information. The assessment will be completed by the therapist as part of initial intake. The child will be referred via our outpatient psychiatric referral process using CFS-431-2 submitted to OUTLOOK mailbox PSYCHIATRIC REFERRAL. After the 3 month trial, the child's need for psychiatric intervention will be assessed.

*FY 15 Inspector General comment: The Department should expand the CCC agencies to become community based care lead agencies that manage therapeutic services required for this vulnerable population.  The CCC agencies could act as umbrella agencies that provide crucial ancillary services such as functional behavior analysis, occupational therapy and speech therapy in meaningful dosages to ameliorate these children's behavior problems and/or developmental delays.  These programs are not antithetical to trauma focused therapy, but help integrate the child into the community.  The Department should contract with the University of Illinois at Chicago Child and Adolescent Diagnostic and Family Support Program through the Developmental Disabilities Family Clinic as a CCC agency.  The program currently provides comprehensive interdisciplinary assessment and services to children with complex developmental and socio-emotional concerns.*

*FY 16 Department Update:* The DCFS policy guide "Prescribing Psychotropic Medication to Children Under 6 Years Old in Illinois in State Guardianship" was updated to address the questions and concerns that were identified. The policy and forms were resubmitted to the Office of Child and Family Policy for review.

FY 2015

**SASS must stop using the CSPI on children six years of age and under (from OIG FY 15 Annual Report, Special Investigations,** *Psychotropic Medication and Hospitalizations of 3 and 4 year olds).*

*FY 15 Department Response:* The CSPI has been revised to more accurately reflect the needs of children under the age of six.  This revision is currently undergoing review by national experts and will be presented to the Department upon completion of that review.  It is anticipated that the revised instruments will result in a more effective response to young children in crisis situations. The CSPI will continue to be used for the time being until a successor assessment tool can be established. Ceasing the use of the CSPI at this time would leave the SASS program without an assessment tool for children under six.

*FY 15 OIG Comment: The harsh reality is that SASS used and continues to use an invalid assessment tool for this population that has caused harm to vulnerable children.*

*FY 16 Department Update:* DCFS, HFS and DHS/DMH worked with Dr. John Lyons to update the current version of the CSPI to include additional age-specific items, particularly focused on children in the 0-5 age range, with the goal of enhancing the utility of the instrument to be more

reflective of the needs of children in psychiatric crisis.  The Departments are in the process of training SASS providers across the state on the updated CSPI with the expectation the providers begin implementing the tool immediately following training. All SASS Providers will be trained to use the CSPI-EC by the end of this calendar year.

*FY 16 OIG Comment: The currently revised CSPI, the Illinois Medicaid–Child Severity of Psychiatric Illness (IM–CSPI) Behavioral Health Crisis Assessment Tool (Ages 0 to 21) fails to adequately address the context of the child's developmental stage and ignores the environment in which a young child's behavior occurred.  While this current version implements specific age parameters for many of the items, it does not consider the contextual factors for young children (ages six and younger).  The IM–CSPI "form serves as both a decision support tool and as documentation of the identified needs of the child served along with the decisions made with regard to treatment and placement at the time of crisis." However, it is noted that the IM–CSPI has six key principles that should "make the assessment process move more smoothly." The fourth principle states: "It is a descriptive tool.  Rate the "what" and not the "why." The CSPI describes what is happening with the individual, but does not seek to assign a cause for the behavior or the situation."*

*This fourth principle directly conflicts with the above direction that the form serves as a "decision support tool."  Evaluating the "what" of a behavior without considering the "why" of these very young children, fails to provide a meaningful assessment of the crisis.  A functional analysis of the situation is necessary because it provides a complete picture or context.  For example, a 16-year-old who overdoses on medication can be taken at face value for suicidal ideation but a three- or four-year-old who swallows pills cannot be.  Questions regarding the context must be asked...were the pills lying out for the child to reach, was the child being supervised, etc?  A poignant example is a four-year-old who put a toy gun to his head while in his therapist's office.  The four-year-old witnessed his mother committing suicide by shooting herself in the head, precipitating his entry into foster care. He was labeled as suicidal and psychiatrically hospitalized when it is just or more likely that this act was a reenactment of what he witnessed.  The assessor rated the CSPI suicide risk the highest rating (3) meaning "Need is dangerous or disabling immediate or intensive action required."  Understanding the child's contextual framework would have better identified a more appropriate crisis response.*

*Though young children can present as having a behavioral health crisis it may be as likely that the parent or caregiver is having the behavioral health crisis, possibly overwhelmed or frustrated.  If so, the parent or caregiver's situation is the more appropriate target of crisis intervention.  As noted in the Community Behavioral Healthcare Association of Illinois comments on the Illinois 1115 Waiver application regarding in-home intensive services, when the identified client is the child there is a need to gear services toward "the family system" not only the child.*

## FY 2015
**The Department needs to train foster parents and caseworkers on first-line interventions recommended in the Department's consulting psychiatrist's Schematic Summary (from OIG FY 15 Annual Report, Special Investigations, *Psychotropic Medication and Hospitalizations of 3 and 4 year olds).***

*FY 15 Department Response:* The Department is developing a self-paced training for all staff and foster parents.

*FY 16 Department Update:* This curriculum is still in process of development. Dr. Naylor has requested an expanded version of his original guideline. Professional Development staff is meeting with his staff monthly to complete this project.

FY 2015

**When a consulting psychiatrist attaches a qualified approval for psychotropic medication, the Department must ensure that the qualifications are met (from OIG FY 15 Annual Report, Special Investigations, *Psychotropic Medication and Hospitalizations of 3 and 4 year olds*).**

> *FY 15 Department Response:* The Guardian's Office will explore developing a process to ensure that the qualifications are met.

> *FY 16 Department Update:* To ensure qualifications for children 4 years old or under, these children are referred to the Continuity of Care Clinics ("CCC") and when appropriate the medications are modified for duration until the children are assessed by the CCC.

*FY 16 OIG Comment: Preliminary hard numbers do not support that all children on psychotropic medications are being referred.*

FY 2015

**The Guardian's Office should retain Psychotropic Medication Request Forms completed for wards and ensure that first line treatments, as outlined by the Department's consulting psychiatrist, have been provided prior to approval for psychotropic medication (from OIG FY 15 Annual Report, Special Investigations, *Psychotropic Medication and Hospitalizations of 3 and 4 year olds*).**

> *FY 15 Department Response:* The Guardian's Office will explore developing a process to ensure that first line treatment recommendations are completed prior to approval psychotropic medication.

> *FY 16 Department Update:* The Office of the Guardian does not keep Medicaid Request Forms, however, The Guardians Office keeps psychotropic medication request forms for one year, and UIC psychiatrist review each request for first line treatments.

FY 2015

**The Division of Service Intervention – Health Services must implement an effective monitoring system over the SACWIS e-Health data system to avoid the failures noted in this report, such as an asthmatic child admitted to the ER multiple times within six months without supplemental interventions, including a nursing referral and notification to the child's pulmonologist (from OIG FY 15 Annual Report, Death and Serious Investigation 9).**

> *FY 15 Department Response:* The Health Policy administrator and DCFS Medical Director are working with the Office of Information Technology Services (OITS) to make needed enhancements to SACWIS/E-health. The current Procedure 302 Appendix 0 will be revised to reflect that any child who has an Emergency room visit or admitted to the hospital for asthma related diagnosis MUST have a completed CFS691 form (asthma diagnosis). The caseworker and foster parent must have a copy of an Asthma Action Plan from the respective hospital and the worker must complete a nursing referral (CFS 531) for continued consultation and health recommendations.

> *FY 16 Department Update:* Administrative Case Review will provide a feedback alert to Health Services on any child diagnosed with Asthma.  It is noted if there is a current Asthma plan, Health Services follows up with the worker and supervisor to ensure the child's needs are met and there is a current Asthma plan. The DCFS Guardian's Office will contact Health Services

DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS

whenever there is an ER or hospital visit due to asthma related symptomology.  In both of the aforementioned cases, the child is evaluated for inclusion in the Asthma Project which involves DCFS nursing staff visiting the home of the caregiver and educating them and the child, if age appropriate, on triggers within the home or the RedCap education and training.  These children are followed at 3, 6 and 12 months by the DCFS nurse.

FY 2015

**The Department's Clinical Division (Nursing) will review wards currently taking asthma medication or identified as having had an emergency room visit or other hospitalization with an asthma or other airway disease diagnosis (based on Medicaid data), and assess whether they should be included in the Department's Asthma database and what nursing interventions are appropriate for each ward (from OIG FY 15 Annual Report, Death and Serious Investigation 9).**

*FY 15 Department Response:* The Health Policy administrator and Medical Director are working with OITS to make needed enhancements to SACWIS/E-health.  Data is currently not viable for use on prescribed asthma medications for wards.  At full implementation, data will identify DCFS children who are taking prescription medication.

*FY 16 Department Update:* All children with asthma are referred for DCFS nursing services and must have a current asthma plan.

FY 2015

**The Department should ensure that all reception center staff are made aware that when a youth is taken into protective custody parental consent for medication administration is sufficient.  If consent cannot be immediately procured, the youth should be provided with his/her prescription medication on an emergency basis until parental consent can be obtained.  The Department should also clarify whose responsibility it is to obtain parental consent for medication when a youth is taken into protective custody (from OIG FY 15 Annual Report, General Investigation 17).**

*FY 16 Department Update:* Language was added to Procedures 300.120, *Taking Children into Protective Custody* and Emergency Shelter Procedures were issued as new Procedures 301.55, *Temporary Placement in the DCFS Statewide Emergency Shelter System via* Policy Transmittal 2016.10.

FY 2014

**If a Regional Medical Consultant report is pending when custody is taken of a child, the child protection investigator and medical program coordinator should arrange for a phone conference to review their preliminary findings with the placement agency supervisor.  The Coordinator should ensure that the agency receives a copy of the report upon completion (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 8).**

*FY 16 Department Update:* This language is in draft revisions to Procedures 300.100 *Medical Requirements*. The information is also in Procedures 302.388(h)(2), *Assessments to Develop the Family Service Plan.*

FY 2014

**If the child does not come into custody but an intact family case is opened while a Regional Medical Consultant report is pending, the Department should develop a mechanism for the medical program coordinator to convene a phone conference with Intact Family Services when a child remains in the home.  The Coordinator should ensure that intact family staff receive a copy of the report upon completion (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 8).**

> *FY 16 Department Update:* This is addressed in Procedure 302.388(h)(2), *Assessments to Develop the Family Service Plan*.

FY 2014

**When a Regional Medical Consultant report is pending the Integrated Assessment screener should be part of the case conference in order to integrate the medical information into the integrated assessment (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 8).**

> *FY 16 Department Update:* Integrated Assessment staff attend the Integrated Assessment if the MPEEC case conference occurs during the Integrated Assessment process. If the case conference has occurred prior to Integrated Assessment's involvement, the IA staff obtain the MPEEC report. This is part of the Integrated Assessment protocol.

FY 2014

**Consistent with the intent and spirit of the Division of Mental Health discharge planning (IL Administrative Code Title 59, Section 125.50), Department Rules and Procedures should require DCFS workers to contact staff at psychiatric facilities prior to the discharge of any involved family members to communicate concerns or issues known to the Department and to monitor compliance with discharge recommendations.  In cases in which the patient has already been discharged, the Division of Child Protection must obtain complete psychiatric records, including any discharge recommendations, and follow-up with community providers identified.  If the facility becomes involved during the pendency of a placement or intact case, the worker should seek the consent of the involved family member in order to receive records and monitor compliance with discharge recommendations (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 2).**

> *FY 16 Department Update:* The Department addressed this in Procedures 315, which were issued via Policy Transmittal 2016.11 on November 22, 2016. Staff will be trained on this requirement in Procedures 315 training. Language has also been incorporated in draft Procedures 300.50.

FY 2014

**The Department, the Division of Mental Health and the Illinois State Board of Education should collaborate to share local community focused resources for Illinois children and adolescents requiring intensive psychiatric services including outpatient, in-home and residential care (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 3).**

> *FY 14 Department Response:* Coordination of work continues within the Governor's Office Health Innovation & Transformation (GOHIT) multi-agency committee composed of representatives from DCFS, the Department of Mental Health (DMH), and the Department of Health and Family Services (HFS).

*FY 15 Department Update:* DCFS has continued collaboration with HFS and DHS regarding improving services for children with mental health issues. Through the Illinois Choices pilot, six new services have been developed and implementation of the new services will begin in the next few months. The services include enhanced mobile crisis response, crisis stabilizers, crisis respite, intensive in-home services, family peer support and respite. DCFS is also collaborating with HFS and DHS in the transformation of the children's behavioral health system via interagency agreements that are in the process of being finalized. DCFS has also enhanced the availability of Intensive Placement Stabilization services via additional funding and expansion of the target population for these services.

*FY 16 Department Update:* (None Provided)

FY 2013

**When there is a question about a ward having seizures or whether to discontinue a ward's seizure medication, the Department should assure that a sleep deprived EEG has been conducted as part of the evaluation (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 3).**

*FY 13 Department Response:* The Department will review this recommendation with the Inspector General.

*FY 14 Department Update:* The Department does not agree. It is not standard medical protocol to have a sleep deprived EEG conducted as part of the evaluation. The requirement for sleep deprived EEGS before discontinuing anti-seizure medication should be made by the involved medical professionals treating the child. Specific to this individual case, the physicians should have obtained all records including those from other hospitals.

*FY 15 Department Update:* DCFS does not receive notice and is unable to monitor when a medication is discontinued by a physician.

*FY 15 OIG Comment:* This recommendation was made after the Office of the Inspector General investigated the death of a ward who died of seizures while in a specialized treatment unit that the Department funds. At the time of his death, the unit had determined that the ward could be taken off his anti-seizure medication. Prior to issuing its recommendation the Inspector General consulted with both the Epilepsy Foundation and a leading Ph.d in the field, both of whom affirmed the need for a sleep-deprived EEG before discontinuing anti-seizure medication. A sleep deprived EEG might have saved the child's life in this Office of the Inspector General Death Investigation. In addition to recommending the sleep-deprived EEG prior to making such a determination, the Office of the Inspector General recommended that the unit be assessed by an Independent Reviewer. The Independent Review was completed on March 30, 2015. The Independent Reviewer agreed that "in cases where seizures are being evaluated or seizure treatment is being significantly changed, a sleep-deprived EEG should be obtained if clinically feasible." Given that a ward died and that the Department's own contracted experts recommended a sleep deprived study prior to taking a child off anti-seizure medication, the Department needs to find a way to communicate this requirement to providers.

FY 2013

**The Department should ensure that when a ward is hospitalized, the treating hospital is provided Integrated Assessments (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 1).**

*FY 14 Department Update:* There is a SACWIS functionality that allows workers to print out the Child Section of the Integrated Assessment for any issues related to confidentiality. A Tips & Tricks sheet with instructions on securing the Child Section of the Integrated Assessment will be created by early December. Revisions to Procedures 315, *Permanency Planning*, will include the process for ensuring that the treating hospital is provided the Integrated Assessments when a ward is hospitalized.

*FY 15 Department Update:* Procedures 315, *Permanency Planning*, will include the process for ensuring that the treating hospital is provided the Integrated Assessments when a ward is hospitalized. The Department anticipates that permanent policy will be issued by spring of 2016.

*FY 16 Department Update:* The recommendation was incorporated in Procedures 315 and issued via Policy Transmittal 2016.11 on November 22, 2016. The caseworker is now required to provide a copy of the child portion of the Integrated Assessment with the treating hospital when a youth in care is hospitalized.

FY 2013

**The Department and HealthWorks of Illinois should amend the Initial Health Screening in order to prompt the examiner to complete a body diagram. HealthWorks providers can utilize a body diagram provided by their institutions or one provided by the Department (CANTS 2A/2B) (from OIG FY 13 Annual Report, General Investigation 2).**

*FY 16 Department Update:* Every child now has a complete body chart at the Initial Health Screen and all HealthWorks providers follow this procedure.

FY 2013

**The Office of the Guardian should adopt a policy for the review of Restriction of Rights forms that includes a review for compliance with the Mental Health Code (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 3).**

*FY 16 Department Update:* A policy guide was developed to provide staff with clarification on the review of the restriction of rights forms that includes a review for compliance with the Mental Health Code. The Policy Guide is pending issuance.

FY 2013

**The specialized medical center is required to provide training to professionals. Training should target medical staff at the six hospitals affiliated with the specialized medical centers and include pediatricians in their network. The training should include guidelines for skeletal surveys (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 4).**

*FY 16 Department Update:* The Pediatric Resource Center provided numerous educational and outreach sessions throughout the region. Dr. Petrak conducted educational sessions specific to the OIG recommendations to physicians, mid-level providers and nurses. Training took place at 5 regional locations between April and June 2015. Numerous specialized trainings were done in addition.

FY 2012

**Access to means, specifically firearms, is predictive of suicide completion. Research has shown and as noted in two adolescents' deaths, those at risk of suicide will break into locked rooms and locked cabinets to access the firearms.  When the Department is placing an adolescent at risk of suicide in a foster home or facilitating a return to the biological home where there is a gun, the Department should conduct a clinical staffing to educate the parents (biological and foster) that the risk of suicide doubles if there is a firearm in the house, even if the gun is locked up. The staffing should utilize the materials developed by The University of Illinois at Chicago Institute for Juvenile Research for their Youth Suicide Prevention program. If the family has firearms, they should be asked to store the guns outside of the home. If the parent will not store the firearm elsewhere they must store firearms with a trigger lock in a lockbox. The keys should be kept in a secure or supervised setting. In return home situations of a suicidal youth, where the biological parent refuses to store the gun with a trigger lock in a lock box, the caseworker should contact DCFS Legal for assistance in presenting the case in Juvenile court for purpose of obtaining a court order (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).**

>  *FY 16 Department Update:* Policy Guide 2015.08, *Enhanced Firearm Safety in Foster Family Homes* was issued May 1, 2015. In July 2016, a complaint for declaratory and injunctive relief was filed against the Director, challenging various rules and regulations related to firearm safety. At the present time, the Director is doing a review of 402 Licensing Standards.

FY 2012

**The Department should assure via the service plan that biological or foster families of children with mental illness are linked to psycho-education programs such as National Alliance on Mental Illness' Family-to-Family Education Program, which is a free 12-week course for family caregivers of individuals with mental illness. There are Family to Family programs located throughout Illinois (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).**

>  *FY 16 Department Update:* The Department addressed the recommendation to link families to psycho-educational programs in Procedures 301 and Procedure 315. Procedures 315 were issued via Policy Transmittal 2016.11 on November 22, 2016. For Intact Services, language regarding mental health support groups has been incorporated in Procedures 302.388(g) *Responsibilities of the Assigned Intact Worker.*

FY 2012

**The Department should consider adopting an integrative family approach in addition to individual therapy for any ward with mental illness (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).**

>  *FY 14 Department Update:*  The NAMI Family to Family Education Program on-line learning resources was added to the Foundation training and the PRIDE curriculum.

>  *FY 15 Department Update:*  The recommendation will be incorporated into revisions to the PRIDE training Curriculum.

>  *FY 16 Department Update:* (None Provided)

FY 2011

**HealthWorks should obtain the results of newborn genetic metabolic screens on all children, regardless of their age, upon entering Department care.  If the results of the genetic screen are unavailable, the Department should ensure that the screen is completed during the HealthWorks comprehensive exam or by the child's primary care physician (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 9).**

> *FY 16 Department Update:* The Director reached out personally to the Illinois Department of Public Health (IDPH). The IDPH Director will facilitate a Memorandum of Understanding, which will allow DCFS to load newborn screening and birth certificate information into SACWIS. The Department has received the test files for APORS/Metabolic screening and agreements have been reached on what can be stored and shared. This work will be scheduled into SACWIS eHealth as soon as resources are available.

**PERSONNEL**

FY 2014

**In order to accurately reflect the meeting duration of DCFS advisory group meetings, the Department should amend Procedures 428.17, *Department Advisory Council*, *Minutes*, to require that in addition to the date and location of Council, Commission, or Committee meetings, the minutes filed with the Director of the Department also include the start-time and end-time of each meeting.  (Note: this recommendation did not pertain to the Child Death Review Team for which meetings and minutes are not available for public inspection, pursuant to the Child Death Review Team Act. 20 ILCS 515/30 (from OIG FY 14 Annual Report, General Investigation 16).**

> *FY 16 Department Update:* The recommendation has been incorporated in the most recent draft of Rule 428, *Department Advisory Councils and Committee*. The recommendation will be added to Procedures after the Rule has completed its approval process.

FY 2013

**DCFS must establish guidelines for professional ride-alongs with DCFS staff.  Guidelines for medical professionals (e.g., medical residents) should address what are permissible and impermissible tasks (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 12).**

> *FY 16 Department Update:* The recommendation has been incorporated in draft Administrative Procedures #29.

FY 2006

**The Department should develop policy to address suspected substance abuse in the workplace (from OIG Recommendations made in 2005, 2001 and 1999). In FY 08 and FY 10 the Inspector General also recommended that the Department amend Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* to add "failure to timely comply with an order for drug or alcohol testing after a finding of reasonable suspicion" as a basis for licensure action under Rule 412.50, *Misconduct* (from OIG FY 10 Annual Report, General Investigation 21 and OIG FY 08 Annual Report, General Investigation 32).**

*FY 16 Department Update:* Reasonable Suspicion Drug Testing was an item negotiated during the 2015-2016 AFSCME master contract negotiations. The parties reached impasse and this item is reportedly one of the items on the table. Per the statewide email that was sent out November 16, 2016, by John Terranova, the Governor's Office and CMS will be providing further guidance to all agencies and employees on which provisions will be implemented and when.


FY 2014

**As previously recommended, the Department should amend Rules and Procedures, including a requirement for compliance with reasonable suspicion drug testing in Rule 412, *Licensure of Direct Child Welfare Workers and Supervisors,* and develop protocol and contracts to provide an infrastructure for prompt determination of allegations of employees being under the influence while at work.  The protocol should include identifying available testing facilities for reasonable suspicion testing; a definition of reasonable suspicion; procedure for training for management and supervisors for corroboration in support of reasonable suspicion determinations (from OIG FY 14 Annual Report, General Investigation 14).**

*FY 15 OIG Response:* The Office of the Inspector General has been recommending an incident-based management response for allegations of employee substance abuse since 1999. The Office of the Inspector General notes that other governmental entities including the City of Chicago and the Illinois Department of Corrections, several years ago successfully negotiated incident-based policies to respond to such allegations.

*FY 16 Department Update:* Reasonable Suspicion Drug Testing was an item negotiated during the 2015-2016 AFSCME master contract negotiations. The parties reached impasse and this item is reportedly one of the items on the table. Per the statewide email that was sent out November 16, 2016, by John Terranova, the Governor's Office and CMS will be providing further guidance to all agencies and employees on which provisions will be implemented and when.


FY 2009

**Rule 437, *Employee Conflict of Interest*, should be amended to clarify that secondary employment must always be reported to one's supervisor.  The supervisor should determine (if necessary, with consultation from management and/or the Conflict of Interest Committee) whether the secondary employment creates a conflict.  The employee must be told to update the supervisor whenever their secondary employment duties change and a notation of the secondary employment should be maintained in a supervisory file, which is transferred each time supervision changes (from OIG FY 09 Annual Report, General Investigation 25).**

*FY 16 Department Update:* First notice was not filed in 2016 as planned. The Department is seeking an updated fiscal impact statement and further internal review and approval to file the First Notice.


FY 2007

**A task group should be assembled to revise Rule 437, *Employee Conflict of Interest*, and draft related Procedures. Procedural additions should include:**
   **a. If an employee takes secondary employment where there is the potential for contact with DCFS clients, a wall needs to be built between the DCFS employee and any DCFS clients being serviced by the secondary employer.  In this case, the employee's supervisor should call the secondary employer to verify the wall is in place.**

    **b. The supervisor should review secondary employment at the time of the annual review to see if a conflict has developed that was not present when the employee accepted the secondary employment.**

    **c. Instructions on how to contact the Conflict of Interest Committee.**

    **All DCFS employees should receive training on the revised Rule and Procedures 437, *Employee Conflict of Interest* (from OIG FY 07 Annual Report, Employee Conflict of Interest).**

*FY 16 Department Update:* First notice for Rule 437, *Employee Conflict of Interest,* was not filed in FY 2016 as planned and the Department is seeking an updated fiscal impact statement and further internal review and approval to file the First Notice.

FY 2006

**The Department's Conflict of Interest Committee should establish procedures for building walls between private agencies and DCFS Administrators who have decision-making power over agencies that they previously worked for (from OIG FY 06 Annual Report, General Investigations 28).**

*FY 16 Department Update:* First notice for Rule 437, *Employee Conflict of Interest*, was not filed in FY 2016 as planned and the Department is seeking an updated fiscal impact statement and further internal review and approval to file the First Notice.

## SERVICES

FY 2015

**The Department must develop written policy regarding whether and under what circumstances there are effective services that can protect children following a finding of severe abuse. Standard parenting coaching should never be used to address severe abuse and violence (from OIG FY 15 Annual Report, Death and Serious Investigation 1).**

*FY 15 Department Response:* The Department agrees.  The Inspector General will assist Department Clinical staff in developing guidelines to determine severe abuse (i.e. abdominal injuries, broken bones, vulnerability or disability of the child.)  The guidelines will include different standards depending on the age of the child.

*FY 16 Department Update:* Maltreatment Continuum posters were developed in consultation with clinical staff and are posted in field offices.  Egregious Acts training has been completed.  In two sections of Procedures 300, it states that egregious acts will consult with Legal and Clinical. Language on Egregious Acts has also been added to Procedures 315, *Principles of Permanency Planning*, which was issued via Policy Transmittal 2016.11 on November 22, 2016.

FY 2015

**The Service Plan for any case that comes to the Department as a result of severe abuse, must be subject to DCFS clinical review within the first 60 days. The review must focus on whether the Service Plan addresses the parenting problems that caused the harm to the child. The case should continue to be clinically reviewed every 6 months (from OIG FY 15 Annual Report, Death and Serious Investigation 1).**

*FY 15 Department Response:* The Department agrees.  A protocol will be developed.

*FY 16 Department Update:* Language on Egregious Acts has been added to Procedures 315, *Principles of Permanency Planning* which was issued via Policy Transmittal 2016.11 on November 22, 2016.  Clinical staff will provide follow up review for those children identified as victims of egregious acts at a required milestone.

FY 2015

**Program Plans for parenting classes, coaching and mentoring must require rigorous standards for developing a baseline of behavior and goals and measurement of change (from OIG FY 15 Annual Report, Death and Serious Investigation 1).**

*FY 15 Department Response:* The Department agrees.  A protocol will be developed.

*FY 16 Department Update:* The Nurturing Parenting Program is currently being offered in Cook County and is being considered for implementation in select areas throughout the State of Illinois, completion is planned for 2017.

FY 2015

**Post Adoption Services should convene a staffing to arrange additional services including mental health supportive services, signing consents for the Department on Aging, and reviewing the  back-up caregiver plan with the children's 71-year-old adoptive father (from OIG FY 15 Annual Report, Death and Serious Investigation 7).**

*FY 15 Department Response:* The Department agrees and the staffing will be convened.

*FY 16 Department Update:* The staffing was completed.

FY 2015

**Post Adoption Services should train the Division of Child Protection staff in this region on post adoption services and the interagency agreement between DCFS and the Department on Aging (from OIG FY 15 Annual Report, Death and Serious Investigation 7).**

*FY 15 Department Response:* Training has been provided. This training will be offered on-line Statewide on an ongoing basis.

*FY 16 Department Update:* The training was held in this region.

FY 2015

**The former ward who is an adult with no current Department involvement should be notified about the fraudulent use of his confidential information and the Department should offer to perform credit fraud checks for him for at least 3 years (from OIG FY 15 Annual Report, General Investigation 4).**

*FY 15 Department Response:* The current agreement with TransUnion does not allow DCFS to run credit reports for youth over 18.  The Department drafted updated language and a contract amendment with TransUnion is in process.  The Department will send the offer letter once we receive authorization from TransUnion to perform the necessary checks.

*FY 16 Department Update:* The Department will send the offer letter once we receive authorization from TransUnion to perform the necessary checks.

*OIG Comment: The OIG notes that the checks recommended may very well be outside of the current contract, but need to be provided nonetheless.*

FY 2015

**Policy Guide 2014.13:** *Intact Family Services Referral Criteria and Procedures* **should cross-reference the requirements of Policy Guide 2011.07,** *Obtaining Records of Parents with Mental Illness* **(from OIG FY 15 Annual Report, General Investigation 18).**

*FY 15 Department Response:* The recommendation will be included in revisions to Procedures 302, *Services Delivered by the Department*.

*FY 16 Department Update:* The recommendation was incorporated in Procedures 302. Policy Transmittal 2016.05, *Procedures 302.388, Intact Family Services* was issued on April 26, 2016.

FY 2014

**The Department should ensure that placement workers require that caregivers sign consents for the worker to follow-up with medical providers and Women, Infant and Children (WIC) for a non-ward child that remains in the home of the parent when there is an open case involving other children in care. The follow-up with medical providers and WIC should be included in the service plan (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 9).**

*FY 16 Department Update:* The recommendation was incorporated in Procedure 315.65, *Prepare and File Initial Visitation and Contact Plan* which was released via Policy Transmittal 2016.11 on November 22, 2016. Staff will be trained on this requirement in Procedures 315 training.

FY 2014

**Private child welfare agencies providing intact family services should have at least one pack-n-play on hand that can be distributed to families on an emergency basis until a crib can be accessed (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 4).**

*FY 16 Department Update:* The recommendation has been incorporated in Procedures 302.388(g) *Infant Safe Sleep* and Procedures 300-Appendix K, *Infant Safe Sleep Practices*.

FY 2014

**When a parent has exhibited such dangerous behavior as abduction; torture; threats to kill with plan; or taking the children hostage, and the Department has made a Critical Decision to substantially restrict visitation, the Department shall file a Visitation Plan with the Court and Parties within 10 days of the Department being named as Temporary Custodian in accordance with 705 ILCS 405/2-10(2). The Visitation Plan shall comply with the requirements of Appendix A to Procedures 301 and shall clearly state the reasons for the restriction and shall include 1) supporting documentation such as police reports, psychological or psychiatric reports or case notes documenting observations and 2) a statement that the Department intends to share information on the restriction with necessary persons, such as school, daycare and the child's pediatrician (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 2).**

*FY 16 Department Update:* The Department addressed the recommendation around restricted visitation in Procedures 315, *Permanency Planning* which was released via Policy Transmittal 2016.11 on November 22, 2016. Draft Procedures 300 was updated to include this language, in Procedures 300.50, *Investigative Process* and Procedures 300.100, *Medical Requirements for Reports of Child Abuse and Neglect.*

FY 2014

**The Department shall train front-line staff on the creation and use and filing of the restricted Parent-Child Visitation Plan above including the use of visitation centers when necessary and procedures for accessing and reviewing any restrictions imposed by criminal court as a condition of bond (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 2).**

*FY 16 Department Update:* The Department addressed the recommendation around restricted visitation in Procedures 315, *Permanency Planning* which was released via Policy Transmittal 2016.11 on November 22, 2016. Draft Procedures 300 was updated to include this language, in 300.50, *Investigative Process* and 300.100, *Medical Requirements for Reports of Child Abuse and Neglect.*

FY 2014

**If any Party objects to any part of the Visitation Plan filed in the Juvenile Court, DCFS Office of Legal Services shall request that the matter be referred to the Juvenile Court Clinic (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 2).**

*FY 16 Department Update:* The Department addressed the recommendation around restricted visitation in Procedures 315, *Permanency Planning* which was released via Policy Transmittal 2016.11 on November 22, 2016. Staff will be trained on this requirement in Procedures 315 training.

FY 2014

**When a parent has exhibited such dangerous behavior as abduction; torture; threats to kill with plan; or taking the children hostage and the court permits visitation, such visitation should always be in a DCFS office, court or a visitation center (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 2).**

*FY 16 Department Update:* The Department addressed the recommendation around restricted visitation in Procedures 315, *Permanency Planning* which was released via Policy Transmittal 2016.11 on November 22, 2016. Staff will be trained on this requirement in Procedures 315 training.

FY 2014

**Court ordered restrictions on parental contact, such as supervised visitation, with children in foster care must be communicated to children's schools or day care programs. The Department should develop procedures for notification and include them in the parent/child visitation and education procedures (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 2).**

*FY 16 Department Update:* The Department addressed the recommendation around restricted visitation in Procedures 315, *Permanency Planning* which was released via Policy Transmittal

2016.11 on November 22, 2016. Staff will be trained on this requirement in Procedures 315 training.

**FY 2012**

**When Clinical Consultants note a critical parenting issue during an Integrated Assessment or a clinical consult, the consultants must provide written recommendations to amend the Service Plan if necessary to address critical risk or safety issues (from OIG FY 12 Annual Report, General Investigations 1).**

> *FY 16 Department Update:* The Department addressed the need to require a written recommendation from clinical screeners in the Integrated Assessment process and clinical consultants in the consultation process to amend the service plan when a critical parenting issue is identified. This is addressed in Procedures 315, *Permanency Planning* which was issued via Policy Transmittal 2016.11 on November 22, 2016. Language was also added to Procedure 302.388(g) *Responsibilities of the Assigned Intact Family Services Worker.*

**FY 2012**

**The Department should develop and document a plan for children ages 9-14, who enter the child welfare system following the loss of a parent or significant caretaker, and any child who experiences the death or loss of a parent or significant caretaker while in care.  In developing this plan, the child should be asked to identify individuals who can be part of the child's social support system (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).**

> *FY 16 Department Update:* The Department addressed the development of a social support plan in Procedure 315.135(i), *Social Support Plan Following Death of a Parent or Caregiver.* This social support plan shall be incorporated into the Family Service Plan. Procedure 315 *Permanency Planning* was issued via Policy Transmittal 2016.11 in November 22, 2016.

**FY 2012**

**Workers should be educated that because children do not experience grief in a linear fashion, that grief therapy may have to be accessed at different times during a child/adolescent's development. In addition, pastoral counseling resources should be made available to the youth (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).**

> *FY 16 Department Update:* The Department is revising administrative procedures for crisis response to more clearly identify methods of addressing the needs of youth dealing with issues of grief including referral to pastoral counseling.

**FY 2011**

**The Department should assure that when wards turn 16 years of age they obtain state-issued identification cards (from OIG FY 11 Annual Report, General Investigation 22).**

> *FY 16 Department Update:* The recommendation has been incorporated into revisions to Procedures 302-Appendix M, *Transition Planning for Adolescents* as well as to Rule 301.60, *Placement Selection Criteria.*

FY 2006

**The Department should review and update the Emergency Reception Center (ERC) Manual to include expectations of follow-up workers bringing children to the Emergency Reception Center (from OIG FY 06 Annual Report, General Investigations 4).**

> *FY 16 Department Update:* Emergency Shelter Procedures were issued as Procedures 301.55 in Policy Transmittal 2016.10. Training for child welfare staff will be in Procedures 315 training starting in November 2016. Investigation and other staff will be trained through a webinar in early 2017. A Policy Guide for Emergency Foster Care Procedures is being developed and should be drafted, approved and posted for review by December 31, 2016.

**TEEN ISSUES**

**From OIG FY 2015 Annual Report, Special Investigations, *Shelter and Runaway Report:* The Department should redefine its search procedure including the following:**

   a.   **The Department should amend Rules to eliminate adult wards, who are not high risk (developmental disabilities, mental illness, human trafficking, in critical need of medication or bona fide missing) from Rules and Procedures 329.**

> *FY16 Department Response:*   All youth in care are under the same processes and the same steps when they go missing per Procedure 329. The exception for this population is that the youth over the age of 18 years are not required to be listed with NCMEC nor are they required to have a Child Protection Warrant.

*FY 16 OIG Comment: Treating this population as homogenous has contributed to the failings of the system and placed children in harms way.*

   b.   **Adult wards without disabilities who chronically absent themselves from voluntary placements should be transitioned out of Department responsibility.**

> *FY16 Department Response:*  Youth in care over the age of 18 years will be recommended for closure, based upon approval by the courts.  There are areas in the state where the workers are more successful than other parts of the state.

   c.   **The Department should add a narrative field to the Department's Child Runaway Form to include relevant information, including what the child was wearing, who they were last seen with, the license plate of any vehicles they left in, any statements by the child prior to the run and precipitating events.**

> *FY16 Department Response:*  This has been addressed. The incident number is SAC 191 to add a descriptive narrative field to the 1014.

   d.   **The Department should cease using Unusual Incident Reports for reporting runaways since other DCFS forms can be adapted to be more relevant to finding the youth and remedying precipitating factors. Unusual Incident Reports should however, track truancy and curfew violations since early intervention on these behaviors can stabilize youth and prevent future harm. Likewise, an older ward who is absent from scheduled programming for short periods of time (from one to several hours) should be classified as**

**non-compliant, not missing. An individual ward's chronic non-compliance in residential programs should trigger a clinical consultation.**

*FY16 Department Response:*  The Department has ceased using the UIR system for reporting runaways.

**e.  Cook County Shelters/Centers should establish individualized Community Pass Authorizations with caseworkers at a youth's intake, so that shelter staff does not need to consult with caseworkers for every pass request. Shelter/centers should have the ability to alter agreements with good cause.**

*FY16 Department Response:*  (No Response Provided)

**f.  The Department should issue written policy concerning the conditions under which law enforcement can distribute information including pictures to assist in locating missing children. A streamlined process for securing DCFS Guardian consent should also be developed.**

*FY 15 Department Response:* The missing youth work group will address/plan changes to procedures/SACWIS.  The Unusual Incident Report (UIR) work group will work with missing youth group to make changes to UIR system regarding missing youth. The Inspector General's report will be shared with both work groups.

*FY 16 Department Update: FY 16 Department Update:*  Procedure 329.30 b (2) provides written instructions that address the distribution of photos of youth in care by allowing the caseworker to give consent to NCMEC.   Once the photo is published by NCMEC, distribution of the photo does not violate Department's confidentiality.

**From OIG FY 2015 Annual Report, Special Investigations, *Shelter and Runaway Report:* The duties of the DCFS specialized unit for tracking and locating missing children should be limited to those children under 18 and disabled or Bona Fide missing adults. With lower caseloads, the Unit can provide more technical assistance searching databases and assist in contacting extended family and friends.**

**a.  The Department should ensure that the Unit has a database structure that enables it to track and provide analysis on frequent runners. The Unit should be the electronic repository of all critical information on frequent runners: Child Identification Form, all De-Briefing Forms (completed when a youth returns from run) and an updated digital photo of the youth.**

*FY 16 Department Update:*  The CIRU database contains *Location History Record* of each episode a minor is reported missing.  The database contains the debriefing information, in form CFS680-A.   In addition when the youth go missing the information is documented and deactivated based on the length of time the minor is missing.  This information is maintained electronically in the CIRU database.

b.  **The Unit should develop an outreach recovery unit for highly vulnerable children that works closely with the Cook County Sheriff and other law enforcement. The Unit operations should include an afternoon and evening schedule.**

*FY 16 Department Update:* The Child Rescue Unit has been operational since 3/14/16 and the unit is operational during normal business hours.  This new unit was developed through an interagency agreement with Cook County.  Outside of normal working hours, this is currently being managed by the Sheriff's Office until additional resources can be secured to support the whole unit.

c.  **For frequent runners, shelter staff in consultation with the specialized Unit should complete the De-Briefing Form–when a ward returns to the shelter system**

*FY 16 Department Update: FY 16 Department Update:*  The shelter does not have access to the SACWIS system. When the youth share information regarding their whereabouts, notes are generated and passed on to the case worker during the next business day.

*FY 16 OIG Comment: The OIG investigation found that critical information was not being captured because the caseworkers' responsibilities with respect to children on run were unrealistic. The Department needs to address the problem or the omissions will continue.*

FY 2015

**The Statewide Shelter Care Coordinator must centrally track all significant failures and problems of shelters. All Corrective Action Plans, Licensing and other complaints about shelters must be shared with the Statewide Shelter Coordinator. The Coordinator must review all existing Rule, Policy and Procedure and ensure that it is consistent and addresses responsibility for transportation in all foreseeable circumstances (from OIG FY 15 Annual Report, Special Investigations, *Shelter and Runaway Report*).**

*FY 15 Department Response:* A workgroup will be constructed including representatives from Operations, Clinical, Monitoring, Licensing, Legal, Strategic Planning to begin discussion and planning.  The Department can determine number of youth with serious mental health challenges. The same will be done for youth involved in Juvenile Justice System.

*FY 16 Department Update:* All complaints and action plans, identified by Licensing and Monitoring are forwarded to the Coordinator.  The outcomes of the action plans are maintained by the coordinator.

**From OIG FY 2015 Annual Report, Special Investigations, *Shelter and Runaway Report:* The Shelter System should be revamped to include the following:**

a.  **The Department should expand its existing system of emergency foster homes to accommodate children 13 years and younger, and their sibling groups, coming into care for the first time.**

*FY 16 Department Update:*  The Department is in the process of expanding Emergency Foster Care homes.  The Department has recruited additional foster parents to expand emergency foster care for this population.  Other private agencies have also expressed an interest in developing emergency foster homes.

    **b.   All emergency foster homes should be on a centralized database to reliably track available homes for matching;**

*FY 16 Department Update:* The Department is exploring the possibility of tracking the Emergency Foster homes by integrating the emergency homes into the Foster Care Placement System database.

    **c.   All emergency foster homes should be required to transport children to their schools of origin to help stabilize and lower the trauma to the children.**

*FY 16 Department Update:* Transporting youth in care to the "school of origin" is determined on a case by case basis, and is based on an assessment to determine if it is in the child/youth's best interest to attend the "school of origin" (e.g. safety, educational support).

*FY 16 OIG Comment: Since Emergency Foster Homes are focused on taking in our very young children who are in the Protective or Temporary Custody of the State, the most compassionate and least traumatizing approach is to let them remain anchored to their school or origin. Their teachers and friends at school can offer them comfort and a form of stabilization during confusing times.*

    **d.   The Department should determine the number of older Cook County shelter youth with histories of serious mental illness who cycle in and out of the present Shelter system. The Department should develop a specialized stabilization center for this population of youth.**
    **e.   In addition to clinical services, this stabilization center should have an outreach unit that functions similarly to homeless mental health delivery services.**
    **f.   The stabilization center should host supportive NAMI (or similar) groups for relatives or other child centered collateral of the youth who are willing to partner with stabilization efforts.**
    **g.   The Center should tightly coordinate educational services to assure the residents' educational rights are secured. This is crucial for those youth who are eligible or up for redetermination for SSI benefits. The center should also provide alternative educational programming similar to Education Options program at the Madden Center.**

*FY 16 Department Update:* The Departments' plan has been a reduction of the number of youth placed in shelters. Shelters Program Plans detail expectations of the shelter providers and the responsibilities to maintain a safe environment and provide programming for services for the youth.
The Shelter program is expected to manage the shelter milieu in a manner that maintains a safe, nurturing and therapeutic environment and protects the rights of all youth.

During a shelter episode the provider ensures the safety and well-being of all clients while receiving services under the contract.

*FY 16 OIG Comment: The investigation disclosed serious flaws in the Shelter Program. The response does not address the failings or provide meaningful solutions.*

    **h.   The Department should determine the annual number of Cook County shelter youth 15 years old or older who are involved with the Juvenile Justice System or adult probation and who cycle through its Shelter system. The Department should develop a restorative justice stabilizing center for this targeted population, working**

**closely with Juvenile Court personnel and Probation. The staff of the shelter should have the ability to network with the various Detention Alternative programs including Electronic Monitoring and Evening Reporting Centers and substance abuse programs. Clinical services should be provided for those youth who have mental health or adjustment problems.**

*FY 16 Department Update:* See above. The Departments plan has been a reduction of the number of youth placed in shelters.

> **i. The Department should develop a violence-free stabilizing center for the older youth (over 17) involved with the criminal court system or dually involved with adult and juvenile courts. The programming of the shelter should model a Safer Foundation approach. The staff should work with Cook County Sheriff, Criminal Court personnel and Probation. The stabilizing center should clearly define a nonviolence contract with each youth who enter the program. If the terms of the center's nonviolence contract are violated the Department should immediately inform the Juvenile Court and Adult probation of the violation and the intention of the Department to request termination of the adult's wardship.**

*FY 16 Department Update:* See above. The Departments plan has been a reduction of the number of youth placed in shelters.

> **j. The Department should develop a specialized clinical and educational stabilization/shelter program for female youth who have or are at high risk of being victims of trafficking. The Department should consider the Cook County Sheriff's Office offer of prevention work with potential trafficking victims.**

*FY 16 Department Update:* The Departments plan has been a reduction of the number of youth placed in shelters.

*FY 16 OIG Comment: The Department's response ignores the problems identified in the OIG Shelter Report and the FY 16 Street Homicide Report that identified serious deficits in the Department's response to violence and mental health issues.*

FY 2015

**All shelters should be required to have transportation available 24/7 and children should be transported to their schools of origin to help stabilize and lower the trauma to the children unless clinically determined that the child has the ability and motivation to self-transport and attend (from OIG FY 15 Annual Report, Special Investigations,** *Shelter and Runaway Report)***.**

*FY 16 Department Update:* The Shelter Care Program plan, states," The provider is responsible for providing or arranging all transportation necessary to ensure youth access to all services required under this Program Plan, e.g. behavioral health, medical, which may include the comprehensive medical exam for children recently under Department custody, specialty medical appointments, as well as recreational, educational and after school activities. The shelter provider is responsible to provide transportation in all foreseeable circumstances.

FY 2015

**Child protection should inform the school the child is attending that protective custody has been taken and ensure that the school's counselor and nurse are notified (from OIG FY 15 Annual Report, Special Investigations, *Shelter and Runaway Report*).**

> *FY 15 Department Response:* Language will be included in Procedures 300, *Reports of Child Abuse and Neglect* revisions.  Language will be added to Procedures 315, *Permanency Planning*.

> *FY 16 Department Update: FY 16 Department Update:* Language has been added to Draft Procedures 300, *Reports of Child Abuse and Neglect* revisions.  Language is in Procedures 315, *Permanency Planning*.

FY 2015

**The Cook County Shelter system must have designated staff at each shelter who have access to SAWCIS. All shelters/centers, if permitted by fire codes, should have alarms and delayed locks at each exit with designated staff responsible for responding to alarms at all times and for timely crisis interventions to youth contemplating running from the facility. Each shelter shall have a written run protocol with training approved by the Department (from OIG FY 15 Annual Report, Special Investigations, *Shelter and Runaway Report*).**

> *FY 16 Department Update:* Shelter staff  has been identified and the names have been submitted to allow to provide SACWIS access. SACWIS training will be provided. Each shelter has a written run protocol. Upon admission to shelter, youth are assessed for their youth's risk for violent/aggressive behavior and elopement. The findings should be documented in the youth's individual treatment plan with appropriate individualized interventions. Individual plans should be reviewed and updated as behaviors/circumstances change.

FY 2015

**The current monitoring system is ineffective to solve persistent and serious issues. Whenever a facility demonstrates continued failures to comply with serious issues identified in writing that concern child safety and welfare – the Deputy Director over the program must be notified. The Deputy Director must approve a Corrective Action Plan, with identified sanctions and timelines, for serious unresolved issues (from OIG FY 15 Annual Report, Special Investigations, *Shelter and Runaway Report*).**

> *FY 16 Department Update:* UIC and Northwestern University have developed a residential monitoring plan for the Department as reported in the BH plan.  This plan has been accepted by the Department and implementation is planned in FY17.

FY 2015

**The Department program monitors must be proficient in direct vs. administrative expenses (review of any annual audits and consolidated financial reports) and staff allocation to provide a check and balance system that the program is complying with the program plan (from OIG FY 15 Annual Report, Special Investigations, *Shelter and Runaway Report*).**

> *FY 16 Department Update:* DCFS monitors (APT & Residential) do not monitor grants or quasi-grant programs.  However, all monitors are directed to report suspected fiscal improprieties within agencies and facilities to Fiscal Audits.

*FY 16 OIG Comment: The Department's response does not address the problems identified in the report in which the monitor failed to identify serious waste and divergence from the Program Plan.*

FY 2015

**The Department's Office of Field Audits should issue written policy that requires consultation with program monitoring staff during any Field Audit to ensure that expenses self-reported by the facility conform with the Program Monitor's understanding of the program (from OIG FY 15 Annual Report, Special Investigations,** *Shelter and Runaway Report)***.**

> *FY 15 Department Response:* The Office of Field Audits will continue to confer with the Monitors before and after a field audit.

> *FY 16 Department Update: FY 16 Department Update:* The Office of Field Audits will continue to confer with the Monitors before and after a field audit. The Department has completed its response to this recommendation.

FY 2015

**In fiscal year 2014, the Inspector General's Office made the following recommendations (from OIG FY 14 Annual Report, General Investigation 13):**

- **Colleges and universities offer an orientation week for all incoming students. Similarly, the transitional living program should provide a two-week orientation period for all teen parents. The orientation should focus on building family and community support using a task-centered/ecological approach. During this orientation period, the transitional living program case manager and family support worker will jointly introduce a young parent to community-based resources in the area and begin building the foundation of a support system. (a) Family support worker duties include: introducing a youth and her child to local Head Start programs and supporting progress through monthly visits; introducing a young parent and her child to libraries, WIC offices, park districts; establishing a pediatric medical home for a young parent's child; (b) Case manager duties include: supporting the youth in their educational setting through monthly visits to the young parent's school or job to assist the youth to overcome obstacles that hinder achievement. If the young parent is without a medical home, accompanying them to a local Title X Clinic/medical home; and exploring recreational, physical fitness and arts programs in the community with the youth. The case manager should diligently assist the young parent in maintaining and strengthening their extended support system, including inviting a young parent's family or friends to an orientation meal and visiting with a young parent's emergency caretaker.**

- **When a young parent transitions into a transitional living program, the receiving case manager shall introduce themselves to school staff within the first ten days and ask to be notified via email of any absences. To support the case managers efforts to sustain attendance, case managers must arrange to have access to the applicable education notification system portals for absences or cuts. If the school does not have a portal system (such as the Alternative School Network), the case manager should arrange notification through available mentors or teachers. If a young parent has two consecutive absences from school, the case manager must immediately make in-person contact. The Teen Parent Support Network Education Support Department shall be consulted before absenteeism becomes a chronic issue. This recommendation should be incorporated into Procedures 302,** *Services Delivered by the Department***, Appendix J,** *Pregnant and/or Parenting Program***.**

- **During the transitional living program pre-placement process, the sending case manager will assist the young parent in identifying the names, addresses and phone numbers of individuals whom the youth wants on their visiting list.  The receiving case manager will amend this list as the young parent's supports change over time. This recommendation should be incorporated into Procedures 302,** *Services Delivered by the Department*, **Appendix J,** *Pregnant and/or Parenting Program***.**

- **The Department should incorporate the two-week orientation period and pre-placement process as a model for all teen parent transitional living programs This recommendation should be incorporated into the Procedures 302,** *Services Delivered by the Department*, **Appendix J,** *Pregnant and/or Parenting Program*

   *FY 16 Department Update:* Procedures 300-Appendix J, *Domestic Violence* is currently pending release with the Office of Child and Family Policy.

FY 2014

**To increase communication and collaborations among the transitional living program system of care, a young parent's case manager and family support worker should meet with day-shift community support staff to review progress and enhance opportunities for the young parent and their child's successful engagement in education, and to strengthen the mother and child support system.  Shift summaries should be reviewed before this meeting.  These meetings should occur every four to six weeks.  This recommendation should be incorporated into the Procedures 302,** *Services Delivered by the Department*, **Appendix J,** *Pregnant and/or Parenting Program* **(from OIG FY 14 Annual Report, General Investigation 13).**

*FY 15 OIG Update:   The private agency established monthly regional meetings to enhance communication with their transitional living programs (TLP) Community Support Staff.    At these regional meetings, Community Support Staff, case managers, and Child and Family Specialists meet together to discuss concerns about cases and share information. The recommendation will be incorporated into revisions to Procedures 302, Services Delivered by the Department, Appendix J, Pregnant and/or Parenting Program.*

   *FY 16 Department Update:* Procedures 300-Appendix J, *Domestic Violence* is currently pending release with the Office of Child and Family Policy.

FY 2014

**Anticipating college enrollment, a case manager should assist a young parent in beginning the application process for grants and federal aid when high school graduation or high school equivalency testing (GED) completion is imminent. Wards should not have to confront the daunting and complicated process of applying for Pell grants and federal aid (FAFSA) without hands-on assistance. The Teen Parent Support Network Education Support Department or Youth In College should assist any parenting youth who has completed high school or earned a GED in completing these required applications.  This recommendation should be incorporated into the Procedures 302,** *Services Delivered by the Department*, **Appendix J,** *Pregnant and/or Parenting Program* **(from OIG FY 14 Annual Report, General Investigation 13).**

   *FY 16 Department Update:* Procedures 300-Appendix J, *Domestic Violence* is currently pending release with the Office of Child and Family Policy.

FY 2011

**The Department should develop housing contracts with wards and enforce regulations addressing the use of drugs, alcohol, firearms, and violence. Institutional sanctions should be consistent across programs and the juvenile court should be immediately notified when a ward is violating housing contracts that threaten the safety or the well-being of the ward. Housing contracts should make clear that funding for the apartment will stop and the court will be informed of transgressions involving criminal activity (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 4).**

> *FY 15 Department Update:*  The recommendation will be communicated to providers, and the FY 16 contracts will be amended by January 31, 2016.

> *FY 16 Department Update:* The FY17 Program Plans have been amended. Language was added to address the use of drugs, alcohol, and violence on the premises, including guns or weapons of any kind. Language was also added that both the Court and the GAL will be notified of any violations.

294

# APPENDIX

**DEPARTMENT RESPONSE AND INSPECTOR GENERAL REBUTTAL TO
SLEEP RELATED DEATH INVESTIGATIONS**

**MEMORANDUM**

To:         George H. Sheldon, Acting Director
From:       DCFS Office of Legal Services
Date:       September 23, 2015
Re:         Response to OIG: Legal Authority to Investigate Deaths of Children Found in an Unsafe Sleep Environment

_____

This memorandum addresses the issue presented by the Office of the Inspector General's (OIG) August 10, 2015 Confidential Memorandum, which challenges the statutory and constitutional authority of the Illinois Department of Children & Family Services ("DCFS") to conduct child death investigations that arise in the context of unsafe sleep.[1]   In a previous memorandum written in January 2014, the OIG raised different issues related to the procedures for investigating child deaths that result from co-sleeping and for determining whether to indicate caregivers for abuse or neglect.  This memorandum is not intended to be a response to that earlier memorandum which was written 21 months ago and may not reflect current practices.[2]   In the future, however, DCFS would welcome input from and collaboration with the OIG regarding procedures relating to unsafe sleep death investigations that may remain relevant.

### Legal Issue

Whether DCFS has the legal authority to investigate the deaths of children that are reported to the Child Abuse and Neglect Hotline when the caller provides information sufficient to raise a reasonable suspicion that the child was placed in an unsafe sleep environment?

### Short Answer

Yes.  When DCFS receives a report of a child death, and information that the child was placed in an unsafe sleep environment, DCFS has the legal authority to investigate the circumstances of the death under ANCRA.[3]   Unexpected child death coupled with circumstances that suggest an unsafe sleep situation provides DCFS a reasonable basis to suspect that abuse or neglect may have occurred sufficient to open an investigation into the death.[4]   Such investigations do not violate the Fourth Amendment to the U.S. Constitution.   The Fourth Amendment cases cited by the OIG relate to the methods used in conducting searches and seizures; they do not address the question of whether DCFS has the authority to open an investigation. The OIG has presented DCFS with no facts suggesting that in conducting any investigation, DCFS made an unconstitutional search.  Indeed, when DCFS investigates a home, it often does so with the consent of the family.

_____

[1] For purposes of this memo, the term "unsafe sleep" will be used to refer to the practices identified in footnote 1 of the OIG August 10, 2015 Confidential Memorandum.

[2] The January 9, 2014 OIG Confidential Memorandum is entitled: "Investigating and Indicating parents for Co - Sleeping in the Absence of Drug or Alcohol Use With No Other Evidence of Neglect." Hereinafter referred to as "January 2014 memo." Although this memorandum is not a response to that previous OIG memo, DCFS notes that the January 2014 memo contains useful historical information which will be referred to herein.

[3] 325 ILCS 5/1 et seq.

[4] DCFS' legal authority to investigate these situations is separate and distinct from the policy regarding whether to indicate a caregiver for abuse or neglect following the death of the child.  This memorandum addresses only the legal authority to investigate, which was challenged in the OIG's August 10, 2015 memorandum.

DEPARTMENT RESPONSE AND INSPECTOR GENERAL REBUTTAL TO
SLEEP RELATED DEATH INVESTIGATIONS

It is well established that "infants should sleep alone, on their backs, and in cribs.  Sleep related deaths are a preventable public health issue. . ."[5]   By statute, Illinois hospitals are required to educate new parents about safe sleep habits; the American Academy of Pediatrics and other groups issue warnings about the dangers of unsafe sleep; and multiple states in addition to Illinois investigate *all* unsafe sleep child deaths.  DCFS' decision to investigate all unsafe sleep child deaths is not only legal, it is prudent and consistent with child welfare practice in the United States.

## Background
### A.  Co-Sleeping and other Unsafe Sleep Practices are Dangerous

In its January 2014 memo, the OIG provides helpful historical details regarding DCFS' decision to investigate unsafe sleep related deaths.  The OIG discussed the serious risks associated with co-sleeping and refers to a number of medical experts on this subject.  The American Academy of Pediatrics recommends against co-sleeping, noting that it "exposes the infant to additional risks for accidental injury and death, such as suffocation, asphyxia, entrapment, falls, and strangulation."[6] The Consumer Product Safety Commission and the National Institute of Child Health and Human Development reported that infants sleeping in adult beds are 20 times more likely to suffocate than infants who sleep alone in cribs.[7]

The Illinois legislature recognizes the dangers of unsafe sleep and the importance of universal education for parents regarding safe sleep practices.  The Hospital Licensing Act, 210 ILCS 85/11.7, requires hospitals to provide written instructional materials to parents of newborns emphasizing  methods to reduce the risks of Unsafe Sleep environments,  and requires hospital staff to discuss the materials with them before discharge.[8]  Further, on September 30, 2013 then-Governor Quinn issued a Proclamation stating that "adult beds, waterbed, couches, chairs, pillows, quilts and other soft surfaces are not appropriate or safe for sleeping infants," and "babies sleep safest when sleeping alone, on their backs, in a bassinet or crib with a firm mattress and tightly fitted sheets that is free of pillows, bumpers, blankets and other items."[9]

### B.  DCFS' Decision to Investigate all Unsafe Sleep Child Deaths is Good Policy

In light of the emerging science, the Illinois Child Death Review Teams recommended that DCFS accept for investigation calls about infants who die while co-sleeping.  Indeed, according to the OIG, the "Illinois Child Death Review Teams recommended that parents or caregivers be indicated for Substantial Risk of Physical Injury by Neglect if before their baby died in an unsafe sleep environment they had received information about safe sleep and chose not to follow it."[10]   In 2011, DCFS began investigating all unsafe sleep deaths.[11]  That practice continued for more than two years, throughout 2012 and 2013, before the OIG raised the matter with DCFS in January 2014.  Thereafter, the Department stopped investigating all such reported deaths for a time.  During much

---

[5] OIG January 9, 2014 memo.

[6] AAP Task Force on Sudden Infant Death Syndrome, 2011.

[7] National Maternal and Child Health Bureau Center for Child Death Review.

[8]  The original statute was passed in 2011, but the requirement that "the materials shall include information concerning safe sleep environments developed by the American Academy of Pediatrics or a statewide or nationally recognized SIDS or medical association" became effective on July 15, 2015.

[9] Governor's proclamation from September 30, 2013.

[10] January 2014 OIG memo at 12.

[11] January 2014 OIG memo at 2.

of 2014 and the first half of 2015, DCFS only investigated unsafe sleep child deaths if the reporter to the hotline stated there were known exigent circumstances, such as drugs or alcohol.

In 2015, under new leadership, DCFS determined that it should investigate all reports of child death when the death occurred in the context of unsafe sleep.   An Informational Transmittal dated July 17, 2015 was issued to all child protection and hotline staff instructing them on the revised requirements concerning the assessment, initiation, and investigation of reports of unsafe sleep deaths or near deaths.   The transmittal makes clear that although all unsafe sleep deaths will be *investigated* by DCFS, caregivers will *not be indicated* for abuse or neglect unless exacerbating factors are identified that contributed to the death, such as drug and alcohol use, domestic violence and other safety issues.[12]   The transmittal expressly states that caregivers should not be indicated merely because they were informed of the dangers of unsafe sleep at the hospital. Further, the transmittal states that if exacerbating factors are not identified, the child protection specialist should quickly complete the investigation, exit the family's life and allow them to grieve.

Contrary to the view of DCFS, the OIG's August 10, 2015 memorandum concludes that DCFS should *not investigate* unsafe sleep child deaths unless the hotline reporter has personal knowledge of exigent circumstances, such as the use of drugs or alcohol by the caregiver at the time a child was put in an unsafe sleep situation.   Yet, it is the DCFS investigation that may uncover such exigent circumstances.   Often, the reporter to the hotline does not have personal information relating to whether there are factors such as caregivers' history of domestic violence, use of drugs or alcohol, or prior involvement with DCFS, including other child deaths in the family.

Since receiving the OIG's August 10, 2015 memorandum, DCFS reached out to the Sudden Infant Death Services of Illinois Inc., a SIDS advocacy group, to determine if the group supports the decision to investigate all unsafe sleep deaths.   Executive Director Nancy Muruyama provided a letter confirming the group's full support for DCFS' decision to investigate all unsafe sleep deaths specifically stating that "I understand that you are in support of investigating all sleep related infant deaths in Illinois.  SIDS of Illinois Inc., is behind you 100% on this initiative."[13] DCFS also asked for the opinion of Dr. Jill Glick, from the University of Chicago Comer Children's Hospital.  Dr. Glick has participated on the Cook County Child Death Review Team for at least 10 years.  She provided a letter setting forth her strong endorsement of the DCFS policy of investigating child deaths called into the hotline.[14]   Dr. Glick highlights that it is the child welfare agency that is best equipped to handle these investigations, as DCFS "has the training and commitment to the insurance of protecting children." She notes that the "role DCFS plays in child death investigations is crucial as no one entity will truly answer the question of what really happened to that child, not the pathologist, the coroner, the ME or police. If we are going to prevent future deaths it will come from the excellent work by DCFS within the context of the investigation and from a public policy perspective." She cites several examples where it was the DCFS investigational findings that clarified the cause and manner of a death of a child.   Lastly, the Governor's Office of Early Childhood Development sent a letter "to strongly support the continuing practice of the Department of Children and Family Services (DCFS) to accept all unexpected infant sleep deaths."[15]   The letter

---

[12] July 17, 2015 Informational Transmittal.
[13] Letter from Sudden Infant Death Services of Illinois, Inc., to DCFS Director George Sheldon, September 21, 2015.
[14] Letter from Dr. Glick dated September 22, 2015.
[15] Letter from Governor's Office of Early Childhood Development dated September 22, 2015.

praises "DCFS for its current stance on investigating all unexpected sleep related deaths" and "urges the agency <u>not</u> to change its position on the issue.  Many times medical examiners do not have the expertise to identify sleep related/rollover deaths and DCFS's involvement is critical."

### C.  Other States Investigate all Unsafe Sleep Child Deaths

DCFS has begun to look at the practices of other states, and it is clear that Illinois DCFS is not unique in its decision to investigate all unsafe sleep child deaths.  Many states report that unsafe sleeping deaths are the leading cause of death in infants under 12 months of age. Unsafe sleep deaths are often preventable and recently doctors, hospitals and child protection departments around the United States began advising parents against co-sleeping and other unsafe sleep methods.   Several states adopted a policy of investigating all unexplained child deaths, including Michigan, New York, Vermont and Utah.

Michigan has taken a firm approach on unsafe sleep and as a result, Michigan Child Protective Services has established a procedure for investigating all cases where an unsafe sleep environment *may* have been a factor in the infant's death, stating that "a CPS investigation must occur in ANY case where an unsafe sleep environment may have been a factor in a child's death."[16]   Michigan defines an unsafe sleep environment as including one or more of the following: infant co-sleeping with another adult or child; soft bedding, such as blankets or pillows; any objects in the crib, such as stuffed animals, bumper pads, pillows, etc.; infant sleeping in an adult bed, on a couch, on the floor, or any other location that is not a crib, bassinet or portable play yard; the infant sleeping on the stomach or side; or the infant overdressed/overheated.[17]

Similar to Illinois, the New York State Office of Children and Family Services investigates all reports of sleep-related infant fatalities.  A complete Child Protective Services investigation must be conducted and recorded, as required by 18 NYCRR 428.5 and 432.2(b)(3), including the ongoing assessment of the safety and well-being of any surviving children in the household. The thorough and complete investigation of sleep-related cases serves to determine whether the death or injury is the result of abuse or maltreatment, allows an assessment to be made concerning the safety of any other children in the home and contributes to the growing understanding of the factors that create risk for sleeping children, particularly infants.[18]

Vermont and Utah also investigate child deaths where the cause of death is unknown or undetermined.[19]

---

[16] Email sent September 17, 2015 from Colin Parks, State Manager, CPS Policy at State of Michigan.
[17] https://www.michigan.gov/documents/mihp/MIHPinfantsafesleepeduc_460816_7.pdf
[18]http://ocfs.ny.gov/main/policies/external/ocfs_2013/LCMs/13-OCFS-LCM-01%20Investigation%20and%20 Determination%20of%20Sleep-Related%20Fatality%20and%20Injury%20CPS%20Reports.pdf.
[19] Vermont investigates any child death where the immediate cause of death is unknown. During the investigation, the investigator applies policies in place related to risk of harm in making the determination of whether or not the parent should be substantiated for abuse/neglect/risk of harm. Utah investigates all child fatalities when the cause of death is undetermined.  When information is received regarding a child fatality resulting from ab use or neglect or where the cause of death is undetermined, intake will accept a referral for Child Protective Services investigation.

D.  Illustrative Cases Reflecting Importance of Investigation

Frequently, the caller to the hotline does not know the details about exacerbating factors in addition to an unsafe sleep environment that may have contributed to a child's death.  As we understand the OIG's position, it is that DCFS is not authorized to investigate an unexpected child death in the context of an unsafe sleep environment unless the hotline caller has personal knowledge of exacerbating factors that contributed to the death.   To illustrate why DCFS considers investigations even in this context to be of critical importance, some specific examples will be addressed, in which the hotline caller did not specifically state that s/he   had reasonable cause to suspect abuse or neglect, but DCFS intake personnel appropriately determined there was reasonable basis for such a suspicion.

_Baby H._  DCFS received a report from law enforcement in early 2014 stating that a two month old male infant was found unresponsive face down at 6:00 in the morning in the family bed. The only information in the report itself was that the child was placed in his crib at 1:00 in the morning and at some point between 1:00 a.m. and 6:00 a.m., the child was placed in the parents' bed.  Reporter stated that there was no observable trauma or abuse to the child.  This call was received during a time period during which DCFS was investigating all calls of "unsafe sleep deaths." DCFS opened an investigation in this case because the infant died in an adult bed and was co-sleeping with the parents, which constitutes unsafe sleep.

During the course of the investigation, it was discovered that both parents drank alcohol and smoked marijuana on the night of the incident, to the point that neither parent could remember who placed the baby in their bed.   It was also discovered during the investigation that the law enforcement officer smelled a "strong alcoholic beverage coming from the breath of the alleged perpetrator."   These factors were not reported by the hotline caller, but they have obvious importance to the investigation and mission of keeping children safe.

_Baby L._  In August 2013, a hospital nurse called the DCFS hotline to report the death of a two week old infant.  The only information contained in the initial report is that the mother fed the baby at her bedside and lay down with the baby in an adult bed and fell asleep. When the mother woke up, Baby L. was unresponsive.  A subsequent DCFS investigation uncovered that the mother admitted she "drank 4-5 beers and had 3 puffs" of marijuana on the night of the incident.  The mother was also obese, but this was not known at the time the report was called in to the hotline.

_Baby C._  In late 2013, DCFS received a report of the death of a nine month old infant. The reporter indicated that Baby C. was swaddled in a blanket and also had a "thick" blanket placed over her face as she slept in her Pack & Play.  The report intake also stated that Baby C. did not have "any outward signs of abuse or neglect."  DCFS opened the case for investigation because the baby died in an unsafe sleep environment (the thick blanket placed over her face). The investigation uncovered many exacerbating factors that showed the mother had a blatant disregard for parental responsibilities, including the following:

- The child was placed in a playpen with 5 larger adult blankets and 1 baby blanket;
- The playpen was placed over the heat register which read 120 degrees when the furnace first starts;

- The home smelled of pet odor and cigarette smoke and there were piles of feces on the floor;
- The mother was informed multiple times by multiple sources (the maternity nurse, the primary care physician and the WIC case manager) that a baby should never sleep with anything covering her face or with other blankets in the crib; and
- The autopsy report described the sleep environment as "tightly swaddled and covered with blanket, hot ambient temperatures, and unclean, unhygienic premises."

### E.  Decision to Investigate in the Case Provided by the OIG was Appropriate

_Baby G._  The OIG sent an email to DCFS on September 16, 2015, attaching "a recent death notification, in which the caller (coroner) clearly articulates the lack of suspicion of abuse or neglect; the call was nonetheless opened for investigation of abuse/neglect."  This case was not exclusively related to unsafe sleep and it is unclear why the OIG provided this example to DCFS.  The decision to investigate was made by DCFS based on suspicion of neglect because the parents did not check on the child for at least 11 hours, even though the child had a high temperature the night before his death and was given Motrin by his parents before he was laid to sleep.  Under the circumstances of this unexpected child death, DCFS had facts giving rise to suspected child neglect and opened an investigation.  Ultimately, DCFS did not indicate the parents for neglect in this case, but that has no impact on whether DCFS properly determined an investigation should be opened.

**Analysis of Legal Authority to Investigate All Unsafe Sleep Child Deaths**

DCFS has the legal authority, under state statute and in accordance with the Fourth Amendment, to investigate all reports of unsafe sleep deaths.  The unexpected death of a child who has been placed in an unsafe sleep environment triggers a suspicion of abuse or neglect regardless of whether there are other exacerbating factors known to the hotline reporter.  The DCFS investigation is necessary to determine if there were extenuating circumstances that caused or led to the death (drugs, alcohol, etc.).

### A.  ANCRA Gives DCFS the Authority to Investigate

Under the Abused and Neglected Child Reporting Act ("ANCRA"),[20]  DCFS must "upon receiving reports made under this Act, protect the health, safety, and best interests of the child in all situations in which the child is vulnerable to child abuse or neglect, offer protective services in order to prevent any further harm to the child and to other children in the same environment or family, stabilize the home environment, and preserve family life whenever possible."[21]  Under ANCRA, DCFS is the sole agency responsible for receiving and investigating reports of child abuse or neglect.[22]

In order to receive reports of child abuse and neglect, DCFS must "be capable of receiving reports of suspected child abuse or neglect 24 hours a day, 7 days a week."[23]  ANCRA

---

[20] 325 ILCS 5/1 et seq.
[21] 325 ILCS 5/2
[22] 325 ILCS 5/7.3
[23] 325 ILCS 5/7.4

further requires that "there shall be a single State-wide, toll-free telephone number established and maintained by the Department which all persons, whether or not mandated by law, may use to report suspected child abuse or neglect at any hour of the day or night, on any day of the week."[24]

Any person required to report under ANCRA, who has a reasonable cause to believe that a child has died as a result of abuse or neglect, must report the suspicion to the appropriate medical examiner or coroner. The coroner shall investigate the report and provide his gross findings immediately to agencies including DCFS. The DCFS investigator assigned to the case shall have the right to receive a copy of the completed autopsy report.[25]

In all cases involving "a child abuse or neglect report made to the central register involving the death of a child, the Department **shall** (i) investigate or provide for an investigation of the cause of and circumstances surrounding the death or serious life- threatening injury, (ii) review the investigation, and (iii) prepare and issue a report on the death or serious life-threatening injury."[26]

The Illinois Administrative Procedure Act sets forth the process in which state agencies exercise the authority delegated to them by the legislature to create administrative law through the adoption of agency regulations.[27]   DCFS, under the Illinois Administrative Procedure Act, promulgated Rule 300, "Reports on Child Abuse and Neglect."  DCFS Rule 300 "governs how child abuse and neglect is reported and how such reports are handled and investigated."[28]

The OIG's memorandum argues that "the State's ability to investigate child abuse and neglect derives from the identification of reasonable suspicion of abuse or neglect.  Without a call providing information suggesting suspicion of abuse or neglect, the State has no legal basis to conduct an investigation."  In the opinion of DCFS, the fact that a child unexpectedly dies after being placed in an unsafe sleep environment, in itself, gives rise to a reasonable suspicion of abuse or neglect. Therefore, DCFS has the legal basis to conduct an investigation in these circumstances. Whatever the subjective belief may or may not be of the reporter, DCFS must make the determination of when to investigate based on the totality of information it has.[29] When a child death occurs in an unsafe sleep environment, an investigation is essential to the determination of whether there were any exacerbating factors that contributed to the death. Furthermore, DCFS is the "sole agency responsible for receiving and investigating reports of child abuse or neglect made under this Act."[30]  The legislature used broad language so that DCFS, as the expert in child welfare, has leeway to determine when to investigate reports of child abuse or neglect in fulfilling its statutory mission to protect the health, safety and best interests of children.

Furthermore, under state law, a mandated reporter is required to call the hotline anytime she has reasonable cause to believe a child has been abused or neglected; the mere fact that DCFS receives a call from a mandated reporter concerning an unsafe sleep death gives rise to a

---

[24] 325 ILCS 5/7.6
[25] 325 ILCS 5/4.1
[26] 325 ILCS 5/4.2
[27] 5 ILCS 100
[28] 89 Ill. Admin. Code, pt. 300.10
[29] DCFS directs mandated reporters, in its Mandated Reporter Training, that "when in doubt, MAKE A CHILD ABUSE REPORT and let DCFS do its job by investigating."
[30] 325 ILCS 5/7.3

DEPARTMENT RESPONSE AND INSPECTOR GENERAL REBUTTAL TO
SLEEP RELATED DEATH INVESTIGATIONS

presumption that the reporter has reasonable cause to believe there was abuse or neglect.  In fact, ANCRA states that "for the purpose of any proceedings, civil or criminal, the good faith of any persons required to report or refer, or permitted to report, cases of suspected child abuse or neglect or permitted to refer individuals under this Act or required to disclose information concerning reports of child abuse and neglect in compliance with Sections 4.2 and 11.1 of this Act, shall be presumed."[31]   The OIG suggests that sometimes mandated reporters call with information that an unsafe sleep death has occurred, but they simultaneously express their affirmative opinion that there was no abuse or neglect leading to the death.  The OIG has not provided any example of this occurrence that is on point. Regardless, the agency has the flexibility to determine when the totality of circumstances called into the hotline give rise to potential abuse or neglect and trigger a need to investigate.

Under current policy as set forth in the July 17, 2015 Informational Transmittal, DCFS investigates unsafe sleep death calls as suspected neglect allegations. ANCRA defines a "neglected child" as:

> any child who is not receiving the proper or necessary nourishment or medically indicated treatment including food or care not provided solely on the basis of the present or anticipated mental or physical impairment as determined by a physician acting alone or in consultation with other physicians or otherwise is not receiving the proper or necessary support or medical or other remedial care recognized under State law as necessary for a child's well-being, or other care necessary for his or her well-being, including adequate food, clothing and shelter; or who is subjected to an environment which is injurious insofar as (i) the child's environment creates a likelihood of harm to the child's health, physical well-being, or welfare and (ii) the likely harm to the child is the result of a blatant disregard of parent or caretaker responsibilities.[32]

A child who dies after being placed in an unsafe sleep environment may not have been receiving "other care necessary for his or her well being" or may have been "subjected to an environment which is injurious insofar as (i) the child's environment creates a likelihood of harm to the child's health, physical well-being, or welfare and (ii) the likely harm to the child is the result of a blatant disregard of parent or caretaker responsibilities."

The OIG correctly notes that Illinois Coroner's Act, 55 ILCS 5/3-3 requires the Coroner to conduct a preliminary investigation into the circumstances of an unexplained death and that the impetus is on the Coroner to determine if DCFS shall be called so as to report suspected abuse or neglect.  DCFS agrees, and believes that if the Coroner (or Medical Examiner) calls DCFS to report an unsafe sleep death, then DCFS should investigate.  In the absence of a Child Protection Services investigation, many factors may be overlooked or missed by law- enforcement and/or the Coroner. That is not to say that law enforcement or Coroners are doing anything remiss, but their focus is different from that of DCFS Child Protection Services, whose expertise is to evaluate child safety in the home.

---

[31] 325 ILCS 5/9
[32] 325 ILCS 5/3

DEPARTMENT RESPONSE AND INSPECTOR GENERAL REBUTTAL TO
SLEEP RELATED DEATH INVESTIGATIONS

On September 16, 2015, the OIG sent to DCFS an email dated November 10, 2010, from DCFS' former Child Death Review Team Administrator[33] regarding information to be distributed to Illinois coroners.  This email contains nothing relating to unsafe sleep specifically, nor does it lend any support for the notion that DCFS does not have the legal authority to investigate reports of unsafe sleep deaths.  In fact, the email only serves to show that the determination about when to initiate an investigation is placed on DCFS, not on reporters to the hotline. According to this five year old email, "the law states that DCFS cannot investigate unless there is suspected abuse/neglect," which is an accurate statement of ANCRA. And as the memorandum underscores, the determination of what constitutes suspected abuse/neglect, and whether to investigate, is made by DCFS.  As the email notes, mandated reporters do not necessarily understand the concept of neglect in the child welfare context:

> Also, CDRT has discussed that mandated reporters do not understand the neglect piece.  It is usually easy to identify the abuse but the neglect is more complicated.   The manner of death being accidental does not mean that neglect did not occur.  In drowning deaths the manner is often accidental but if the child was not supervised it may be neglectful.

Therefore, this email, which is not in the context of unsafe sleep, supports DCFS' current policy and highlights why the legislature gave the authority to DCFS, as the child welfare agency, to determine if the circumstances surrounding the death of a child rise to the level of suspected abuse or neglect requiring an investigation.

### B.  Investigations of Unsafe Sleep Deaths Do Not Violate the Fourth Amendment

All child abuse investigations must be conducted in a manner that does not violate a person's rights under the Fourth Amendment of the U.S. Constitution.  The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[34]

As it relates to child abuse and neglect investigations, the Fourth Amendment dictates that a State actor must obtain a warrant and have probable cause before he can enter a person's home in order to conduct the investigation.   However, there are exceptions to these general requirements; the exceptions include consent, exigent circumstances, or a reasonable suspicion of abuse/neglect. The Fourth Amendment is only triggered if a person has a "legitimate expectation of privacy" in the place or thing being searched.  Thus, not every DCFS investigation has Fourth Amendment implications, as not every investigation involves a search or seizure as protected under the Fourth Amendment.

The OIG argues that DCFS' policy to investigate all unsafe sleep deaths raises Fourth Amendment issues.  This reflects a misreading of the Fourth Amendment.  The State's ability to investigate child abuse and neglect derives from ANCRA; only the *limitations* on the investigation are controlled by the Fourth Amendment.   The OIG cites cases showing that the

---

[33] Email sent from CDRT Administrator November 10, 2010.
[34] U.S. Const. amend. IV

Fourth Amendment limits the methods of search and seizure in the social work and other contexts—such as the limitation on a social worker's entry into a private residence (or school) to conduct a child abuse investigation without a warrant or consent, without evidence of exigent circumstances, and without reasonable suspicion of abuse.

A Fourth Amendment concern is triggered when there is a search or seizure and the person has a "legitimate expectation of privacy" in the place or thing being searched. The majority of DCFS investigations involve the consent of the alleged perpetrators. The case law to which OIG cites describes situations in which child protection staff and/or police forced their way into a home (or school) to conduct investigations where there was no warrant, consent, exigent circumstances, or even a reasonable suspicion of abuse. These cases are inapposite.

Courts repeatedly recognize that individuals do not have a constitutional right to be free from child abuse and neglect investigations. The liberty interest in familial privacy is 'limited by the compelling governmental interest in the protection of children particularly where the children need to be protected from their own parents."[35] As such, that liberty interest "does not include the right to be free from child abuse investigations."[36] Illinois courts have long recognized that "[t]he strong governmental interest in taking immediate action to protect the child justifies the immediate investigation."[37] Courts have found that where a parent consents to the entry of a child protective service worker into their home, there is no Fourth Amendment violation.[38]

The Seventh Circuit recognizes that the threshold consideration in a Fourth Amendment inquiry is whether the governmental conduct in question constitutes a search or seizure within the meaning of the amendment's text and that the next step in the analysis is the reasonableness of the search or seizure.[39] The determination of what is reasonable is dependent on the context in which the search takes place.[40]

The OIG argues that *Calabretta v. Floyd* does not allow caseworkers to enter a family home to conduct a child abuse investigation without a warrant, exigent circumstances or parental consent. The facts reveal that it took 14 days for the caseworker and a police officer to go to the home for purposes of the investigation (the family was being investigated after an anonymous caller stating he heard a child crying "no, daddy, no."). The officer told the mother that they did not need a warrant to enter the home; thus, the mother allowed entry. Once inside, the caseworker instructed the 12 year old girl to pull down her three year old sister's pants so she could look to

---

[35] Doe v. Heck, 327 F.3d 492, 520 (7th Cir. 2003). (quoting Brokaw, 235 F.3d at 1019); see also Xiong v. Wagner, 700 F.3d 282, 291 (7th Cir. 2012).

[36] Heck, 327 F.3d at 520 (citing Brown v. Newberger, 291 F.3d 89, 94 (1st Cir. 2002) and Watterson v. Page, 987 F.2d 1, 8 (1st Cir. 1993).

[37] E.Z. v. Coler, 603 F.Supp. 1546 (1985) (court rejects plaintiffs' claim for injunctive relief regarding DCFS pattern and practice of conducting searches of homes during child abuse and neglect investigations and routine searches of bodies of minor children where testimony demonstrated that entry into homes and search of children were totally voluntary).

[38] Roe v. Texas Department of Protective and Regulatory Services, 299. F.3d 295 (5th Cir. 2002) (court found there was no Fourth Amendment violation in a situation where a child protection investigator had telephone a conversation with parent and explained she worked for CPS and needed to talk to parent regarding a referral concerning the care and welfare of her daughter and the next morning CPS worker went to parent's home and entered the home and the parent did not do or say anything to show she did not want CPS worker to enter home).

[39] Doe, 327 F.3d at 510-511.

[40] Id.

see if there were any marks on her, as during the investigation the caseworker was informed the parents used a stick to discipline the children.   The court held that absent an emergency, "a reasonable official would understand that they could not enter the home without consent or a search warrant."   The court stated that the fact that it took fourteen days after the report to enter the home for investigatory purposes shows that the caseworker and officer "perceived no immediate danger or serious harm to the child."

DCFS appreciates that the Fourth Amendment places on its child protection investigative staff the obligation to conduct lawful child abuse or neglect investigations.  DCFS is not arguing that it should have the ability to enter every home in which an unsafe sleep death occurred without either a warrant, consent, or a showing of exigent circumstances.   In fact, ANCRA dictates that "if the Child Protective Service Unit is denied reasonable access to a child by the parents or other persons and it deems that the health, safety, and best interests of the child so require, it shall request the intervention of a local law enforcement agency or seek an  appropriate court order to examine and interview the child."[41]

DCFS Rule 300 and its accompanying Procedure 300 speak to how staff should proceed with investigations when an alleged perpetrator or parent refuses entry to the home, access to a child, or will not cooperate with the investigation.   Rule 300.110 (d) states that "in person contact is not required when: A) any subject of a child abuse or neglect report refuses to meet with or speak to the investigative worker; and B) the worker has attempted to involve the local law enforcement agency or the State's Attorney, but this has failed to gain cooperation."[42] Procedures 300 elaborate further on the ability to waive required contacts.[43]

The court in *Calabretta* and every case cited by the OIG speaks to the constitutionality of the specific child abuse or neglect investigations at issue, but not one of the cases addresses whether the State has *the authority to initiate* a child abuse or neglect investigation. The OIG cites *Doe v. Heck* as precedent that the state must only conduct a search on a person or entity that has a reasonable expectation of privacy against state intrusion when there is a "definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger."[44]   In *Doe*, a child protection investigator entered a private school without a warrant or consent, of the school or the parent, to interview a child about alleged corporal punishment.   The investigator stated that a warrant was not necessary due to exigent circumstances.   The court held that there was no evidence of exigent circumstances because the investigator never indicated the victim was under

---

[41] 325 ILCS 5/7.5

[42] DCFS Rule 300.110

[43] Procedure 300.60 (e) states that "a waiver is an action granted after careful consideration by an Investigation Supervisor or Manager allowing an Investigation Specialist to proceed to an investigation finding without making a contact or contacts required by  procedure. The Investigation Supervisor or Manager must have critical case specific information in order to approve or deny a waiver. This information includes but is not limited to the following: the number and methods of attempts to obtain the required information; the exploration of alternative avenues to obtain the required information (e.g., interviewing other person that can provide the information, review of medical records in lieu of interviewing a medical resident that is no longer available, etc.); evaluation of the level of importance of the information as evidence; the Investigation Specialist has attempted to notify the non-cooperative subject of the Department's responsibility and authority, under Illinois law, to investigate the report; the local law enforcement agency and/or the State's Attorney's Office have either exhausted their authority in attempts to get the subject to cooperate, or have refused to become involved.

[44] Doe v. Heck, 327 F.3d 492, 520 (7th Cir. 2003).

any threat of immediate harm. The court stated that although "the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context in which a search takes place." On the facts, this case is not similar to one involving the unexpected death of a child who was placed in an unsafe sleep situation. On the law, the *Doe* court did not even address the authority and/or legal ability of the Wisconsin child protection agency to initiate the investigation of abuse; the court's decision was limited to the methods of the actual investigation and its legality under the constraints of the Fourth Amendment.

The OIG briefly notes that the court in *E.Z. v. Coler* held that a State actor only needs a reasonable suspicion that a child is in danger of death or serious injury before he can legally conduct a reasonable search. Plaintiffs were eight minor children and their parents, who were subjects of Illinois DCFS investigations. The court, speaking specifically about DCFS procedures, held that "the analysis of applicable law establishes that imposition of the warrant requirement or probable cause standard upon DCFS investigations would disserve the public interest. Requiring a warrant or probable cause would hinder effective child abuse investigations and could result in death or injury of abused children."[45] Although the court in *E.Z.* allowed for a less strict interpretation of the Fourth Amendment, the scope was still limited to the actual search, not the State's ability to initiate the investigation in the first place.

## CONCLUSION

The cases cited by the OIG discussing the constitutionality of specific child abuse and neglect investigations under the strictures of the Fourth Amendment offer no guidance about the authority of DCFS to *initiate* an investigation on all reports of unsafe sleep deaths. DCFS' ability to initiate an investigation of child abuse or neglect derives from ANCRA, which requires DCFS to investigate instances of abuse or neglect reports concerning the death of a child and made to the central registry. A reasonable suspicion of abuse or neglect arises when a child dies after having been placed in an unsafe sleep environment.46 Respectfully, DCFS recognizes its obligations to carry out lawful investigations. The OIG has not identified any situation where this failed to occur.

---

[45] E.Z. v. Coler, 603 F.Supp. 1546 (1985).

[46] DCFS understands the need to update its current procedures, including Appendix K, to provide guidance and direction the child protection staff on how to efficiently and consistently conduct unsafe sleep death investigations. DCFS welcomes the OIGs participation in updating any necessary procedures and policies, including updating the Mandated Reporter Training, to ensure that the investigations into unsafe sleep death are conducted legally, uniformly and in a manner least disruptive to grieving families.

DEPARTMENT RESPONSE AND INSPECTOR GENERAL REBUTTAL TO
SLEEP RELATED DEATH INVESTIGATIONS

### THE DEPARTMENT OF CHILDREN & FAMILY SERVICES' UNILATERAL IMPLEMENTATION OF POLICY REGARDING INVESTIGATION OF SLEEP-RELATED DEATHS

On July 17, 2015, the Department internally issued a change in policy - to be effective immediately - that any time the hotline is notified of a child death with unsafe sleep - *even when the first responder specifically states that they have no suspicion of abuse or neglect* - the Department will open an investigation of the family for death by neglect. Use following Informational Transmittal.

The Office of the Inspector General for the Department of Children and Family Services has written three reports challenging the Department's practice.[47]  The OIG Reports challenge the new policy on several bases:

1.      It is likely that the Policy violates both state law and the constitutional right to be free from unreasonable search and seizure;

2.      The Policy greatly affects the public, and yet was implemented without the benefit of the statutorily required Rulemaking process;

3.      The Policy takes needed resources from the Department to address what is actually a public health issue;

4.      The Policy is intrusive and harmful to grieving families and is likely to have an unfair disparate impact on poorer families.

Ongoing objections to the implemented Policy are summarized below.

Background

The Department of Children and Family Service's Child Abuse and Neglect Hotline (the State Central Register) takes three types of calls:

•      Calls alleging abuse or neglect

•      Calls from professionals requesting information on prior indicated investigations, such as judges (such as domestic relations court, guardianship courts, juvenile courts, doctors, police, and coroners)

•      Calls from professionals required to investigate child deaths (coroners) and other first responders  (police, hospitals) who do not suspect abuse or neglect and who are calling solely for the purpose of notification of a non-suspicious child death.[483]

Prior to July 17, 2015, the Department's practice was to only open investigations when the caller suspected abuse or neglect and the facts disclosed supported such suspicion. In all cases where a coroner/Medical Examiner called only to notify the State of the death, the coroner/Medical Examiner was instructed to re-contact the Hotline upon receiving any additional information suggestive of abuse or neglect.

---

[47]Investigating and Indicating Parents for Co-Sleeping in the Absence of Drug or Alcohol Use With No Other Evidence of Neglect, January 9, 2014;  Follow-Up to Report: *Investigating and Indicating Parents for Co-Sleeping In The Absence of Drug or Alcohol Use or Other Evidence of Neglect, June 27, 2014;Memo re Legality of Child Death Investigations and the Reasonable Suspicion Standard, August 10, 2015.*

[48]For a time the Department had a practice of investigating these deaths but the practice was discontinued after an Inspector General Report in 2014.

Based on the July 17 Policy, the Department investigated the following cases:

1.      Baby P. Death of a 10-hour-old infant in the hospital. A hospital nurse called the hotline "to make a death notification." The nurse reported that the coroner suspected the baby died of asphyxiation after the mother fell asleep while breastfeeding in her hospital bed. The mother reportedly had a difficult vaginal birth and lost a lot of blood.

2.      Baby H. Death of a 9-month-old infant in her crib. The coroner called the hotline stating the infant had a cold and was congested so her mother gave her Tylenol before bed time and laid her face up in her crib on a pillow to help her breathe. Three hours later the mother checked on her and found her unresponsive in the same position. The coroner told the call-taker that an x-ray had been completed and there were no signs of trauma or bruising and there were no concerns of domestic violence, substance abuse, or criminal history of the parents.

3.      Baby K. Death of a 4-month-old infant who was sleeping on top of blankets on the floor with her parents and two-year-old sibling. Police and a medical examiner investigator called the hotline, stating the children were on one end of the makeshift bed, the parents were on the other. The baby was placed to sleep face up and discovered face up. The parents are from West Africa. They denied alcohol or drug abuse. There was no sign of trauma to the infant and x-rays were negative. The infant and sibling appeared well taken care of. There were no cribs in the home. The mother was distraught. The Department put the surviving child in a safety plan.

The Department's Policy Is Illegal

The State is only permitted to intrude into a family's home when there are "exigent circumstances" warranting such intrusion. The courts have found that allegations that a child is suspected of being abused or neglected will furnish such exigency. A notification that discloses simply that the child died in his or her sleep does not.

The Illinois Abused and Neglected Child Reporting Act (ANCRA, 325 ILCS 5) sets out the Department's authority to investigate families for abuse and neglect. According to ANCRA, the Department's investigative authority is initiated upon a call received by the Hotline alleging suspicion of abuse or neglect. A call alleging abuse or neglect must allege facts that, if true, would satisfy the Department's definitions of abuse or neglect. (325 ILCS 5/7.6; 89 Ill.Admin.Code 300).

To substantiate a report of death by neglect, the caller must state facts that support that the parent or caretaker exercised *blatant disregard* for their responsibilities. Blatant disregard occurs when a "real, significant, and imminent risk of harm would be so obvious to a reasonable parent or caretaker that it is unlikely that a reasonable parent or caretaker would have exposed the child to the danger without exercising precautionary measures to protect the child from harm" (325 ILCS 5/3), such as when a first responder reports that the parents appeared impaired or the conditions of the house appear dangerous.

Studies show that the prevalence of bed sharing is high. In one study, nearly 18% of parents reported their infant "usually" co-slept with another person.[49]   In another survey, 59% to 65% of parents

---

[49]  Illinois Pregnancy Risk Assessment Monitoring System. (2009). *2009 Report: Illinois Pregnancy Risk Assessment Monitoring System.* Retrieved 2013.12-December from http://www.idph.state.il.us/: http://www.idph.state.il.us/health/prams_rpt_09.pdf.

DEPARTMENT RESPONSE AND INSPECTOR GENERAL REBUTTAL TO
SLEEP RELATED DEATH INVESTIGATIONS

reported that their infant had co-slept with them at least once during the first three months of life.[50] With such a high prevalence in the parenting population, it is difficult to see how the Department would meet its burden of showing that such behavior shows blatant disregard for a child's safety.

The Department's Policy Was Not Adopted Through the Rule-Making Process

The decision to begin investigating and indicating parents for the death of their child based on sleep arrangement alone is a change in policy that affects the public and, pursuant to the Illinois Administrative Procedure Act (5 ILCS 100/1-70), can only be implemented through the rulemaking process. Especially given its controversial nature, the Department's new policy requires a public airing.

The Department's Policy Is Wasteful of DCFS Resources

The vast majority of sleep-related infant deaths are brought to the Department's attention by police, hospitals, and coroners who have already conducted preliminary investigations in which no suspicion of abuse or neglect was uncovered. In many cases, like the Baby H. case, the parents or caretakers have already been interviewed about the circumstances of the child's death when the Department is notified of the death.

By statute, the coroner/medical examiner is required to investigate all unexplained deaths (55 ILCS 5/3-3013). In Cook County, the Office of the Medical Examiner has a dedicated investigator assigned to complete a child death interview protocol and conduct a thorough scene investigation to share with the pathologist performing the child's autopsy to assist in determining the child's cause and manner of death.

Prior to the July 2015 Policy, mandated reporters who provided notification of a child's death to the Department were informed that if they uncovered additional information that revealed a suspicion of abuse or neglect to the deceased or to surviving siblings, they were required by law to call back the hotline so that a child protection investigation could be initiated. This process worked. Therefore, the Department should use its already strained resources to investigate cases in which abuse and neglect are alleged, not cases in which it is not.

Deaths that previously were classified as Sudden Infant Death Syndrome (SIDS), a natural cause of death, are now being classified as Undetermined or Sudden Unexplained Death in Infancy (SUDI), an undetermined cause of death, when the child is not found alone on his or her back in a crib that does not have any blankets, pillows, toys or bumper pads. Coroners/Medical Examiner label these deaths "undetermined" because scientists do not yet know the role, if any, that alternative sleep arrangements may play in the child's death. Parents have been indicated by the Department for death by neglect when their child's cause and manner of death were classified as undetermined. If medical science cannot tell us how these children died, then DCFS cannot hold their parents or caretakers responsible for their deaths.

Addressing infant sleep safety is a public health issue best addressed through education, not investigating and indicating parents whose child has died. The American Academy of Pediatrics recommends against bed sharing and advocates a directed education campaign to ensure families know how to provide a safe infant sleep environment. In its most recent policy statement on infant sleep (November 2016), one of the Academy's recommendations is that, "Health care providers are encouraged to have open and nonjudgmental conversations with families about their sleep practices."

---

[50] Hauck, F.R. (2008). Infant Sleeping Arrangements and Practices During the First Year of Life., *Pediatrics, Volume 122, Supplement 2, s113-s120.*

Pediatricians, who are mandated reporters in Illinois, are not calling the hotline to report parents for neglect when they learn their patients are bed sharing. If bed sharing and certain other sleep arrangements are considered neglectful in Illinois, mandated reporters will need to be educated to call the hotline whenever they learn of these arrangements being used with children known to them in their professional capacity.

<u>The Department's Policy Is Intrusive and Harmful to Families</u>

Investigating parents for abuse or neglect solely because a child died unexpectedly during sleep is intrusive and harmful to families and should not be allowed. Parents and siblings are grieving when DCFS knocks on the door to announce they are investigating the family for causing the infant's death by neglect. Surviving siblings are interviewed about the care they are receiving by their parents, often-times they are taken from their parents after the traumatic loss of their sibling and put into a safety plan while the child protection investigation is pending.

In the case of Baby H. above, a child protection investigator went to the family's home nine hours after the baby's death. The investigator noted, "Mother was distraught and unable to answer questions." The 7 and 12-year-old siblings were asked "if there was anyone causing them problems in the home," and what the parents do when they do something wrong i.e., discipline." All of the children, including the one-year-old, appeared well-cared for and the home looked appropriate, but the investigator went on to interview the family's pediatrician and the principal at the oldest child's school; and requested the deceased child's medical records. All of this occurred after the coroner had already interviewed the mother, x-rayed the child, and reported there were no concerns.

Moreover, the policy is likely to have an unfair impact on poor families who may be intimidated and who may not have the resources to challenge a bureaucracy through the administrative appeal process. *The Office of the Inspector General found that all cases in which parents were indicated for a sleep-related death, in the absence of evidence that they were impaired due to alcohol or drugs, were overturned on administrative appeal.*

The Office of the Inspector General supports the investigation of the deaths of children when there is reason to suspect abuse or neglect, such as when a parent sleeps in the same bed as an infant while impaired by alcohol or drugs, or the family's prior history with the Department makes the infant's death suspect. The State should not, however, be intruding in families' lives without a reasonable suspicion of abuse or neglect. Even now, placing an infant in an unsafe sleep environment is not considered abuse or neglect. To begin defining unsafe sleep practices, such as bed-sharing, as abuse or neglect, the law requires the State to be transparent to public comment. The State is required to submit their new policy to the Joint Committee on Administrative Rules, which allows for public comment about the change in policy. The Department's internal and unilateral announcement of a change in policy that so greatly affects the public violates the Administrative Procedure Act.

The Office of the Inspector General filed a complaint with the Joint Committee on Administrative Review. The Committee reviewed the Department's action and issued an Objection to the Department's policy. The Joint Committee on Administrative Review agreed with the Office of the Inspector General that Illinois law requires that such a shift in public policy can only be accomplished through the rulemaking process, which allows for public comment. To date, the Department has not issued the Rule or public comment.

DEPARTMENT RESPONSE AND INSPECTOR GENERAL REBUTTAL TO
SLEEP RELATED DEATH INVESTIGATIONS



Bruce Rauner
Governor

George H. Sheldon
Acting Director

## INFORMATIONAL TRANSMITTAL

**DATE:**         July 17, 2015

**TO:**           All Child Protection and Hotline Staff

**FROM:**         Nora Harms-Pavelski, Deputy Chief, Division of Child Protection

**SUBJECT:**      Unsafe Sleep Deaths and Near Deaths

**EFFECTIVE:**    **Immediately**

## I.    PURPOSE

The purpose of this informational transmittal is to inform all child protection and hotline staff of revised requirements concerning the assessment, initiation, and investigation of reports of unsafe sleep deaths or near deaths.

## II.   INITIATION OF REPORTS OF UNSAFE SLEEP DEATHS OR NEAR DEATHS

Effective immediately the Child Abuse and Neglect Hotline will take ALL unsafe sleep deaths and near deaths for investigation.  Deaths are to be coded with allegation #51, death by neglect.   Allegation #60 should be taken on surviving siblings/children ONLY if the circumstances surrounding the death place those children at risk.

Child Protection Specialists shall utilize rule and procedure when assessing these cases.  To make a determination of abuse or neglect, focus should be on identifying the exacerbating factors that may have contributed to the unsafe sleep death or injury, such as drug and alcohol use; presence of domestic violence; and prior child deaths or other safety issues (e.g. a child sleeping in a crib full of garbage).  If such exacerbating factors do not exist, the Child Protection Specialist should quickly unfound and complete the investigation, exit the family's life, and allow them to grieve and deal with the death of their child.

When making a decision to indicate a perpetrator related to an unsafe sleep death or injury, the Child Protection Specialist must gather evidence and document the exacerbating, surrounding circumstances that led to a blatant disregard of parent or caretaker responsibilities and the child's death.  Receiving prior information regarding the dangers of unsafe sleep at the hospital for new parents is **NOT** evidence to support an indicated finding, as adults all learn differently and there is not consistency in how this information is presented to parents.



DEPARTMENT RESPONSE AND INSPECTOR GENERAL REBUTTAL TO
SLEEP RELATED DEATH INVESTIGATIONS

A-17

Circumstances related to poverty, such as sleeping on a pallet or in bed with parents, do not constitute evidence to support an indicated finding in the absence of other contributing conditions such as drug and alcohol use. Perpetrators in unsafe sleep investigations are to be indicated for allegation #51 only. Under no circumstances is allegation #60 to be used in relation to the deceased child victim. If it is learned during the course of the investigation that the circumstances leading to the unsafe sleep death impacts the safety of surviving children and no allegation was taken at the time of the report, the Child Protection Specialist should add allegation #60 and identify those children as child victims. Each death related to unsafe sleep practices should be assessed individually considering the circumstances and evidence surrounding the death and the weight of those factors and evidence when proceeding to a formal investigation and making a final determination.

## III. PROCEDURES

Procedures 300 will be revised to include the above procedures.

## IV. QUESTIONS

Questions may be directed to the Office of Child and Family Policy at 217-524-1983 or e-mail through Outlook at OCFP-Mailbox or for non-Outlook users cfpolicy@idcfs.state.il.us.