# OFFICE OF THE INSPECTOR GENERAL
## ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES

# REPORT TO THE GOVERNOR AND THE GENERAL ASSEMBLY

## JANUARY 2016

**DENISE KANE, PH.D.**
**INSPECTOR GENERAL**

# OFFICE OF THE INSPECTOR GENERAL
## ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES

January 1, 2016

To Governor Rauner and Members of the General Assembly:

This year's annual report sadly captured our failures to our child welfare children and families. There are times when citizens, State agencies and our governmental leaders must have a collective conscience to remedy our social failings.  When State agencies use an assessment tool that has never been validated on the very young to psychiatrically hospitalize three and four year-old children, shame on us.  When a four year-old comes into state custody with the developmental speech of a two year-old, and we only afford him 15 minutes of speech therapy once a week, shame on us. When a ward is gunned down in the streets by an officer whose duty is to protect and there is no integrity to those reporting the incident, shame on us as a society.  When our State's Public Health and Mental Health systems become so eviscerated that vulnerable families have to face child protection investigations without prevention services, shame on us.

It is with hope of a collective conscientious response that I submit this year's annual report.

Respectfully,

Denise Kane, Ph.D.
Inspector General

# OFFICE OF THE INSPECTOR GENERAL
# REPORT TO THE GOVERNOR AND THE GENERAL ASSEMBLY

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

INVESTIGATIONS ................................................................................................... 7

    DEATH AND SERIOUS INJURY INVESTIGATIONS .................................................. 7

    CHILD DEATH REPORT ....................................................................................... 40

        SUMMARY ...................................................................................... 42

        HOMICIDE ...................................................................................... 47

        SUICIDE ......................................................................................... 61

        UNDETERMINED .............................................................................. 62

        ACCIDENT ....................................................................................... 76

        NATURAL ........................................................................................ 92

    SIXTEEN-YEAR DEATH RETROSPECTIVE ........................................................... 107

    SPECIAL INVESTIGATIONS ................................................................................ 111

        PSYCHIATRIC HOSPITALIZATION AND MEDICATION OF PRESCHOOL WARDS ......... 111

        SHELTER AND RUNAWAY REPORT ................................................... 119

    GENERAL INVESTIGATIONS .............................................................................. 125

RECOMMENDATIONS FOR WARDS IN RESIDENTIAL FACILITIES ............................... 157

ERROR REDUCTION ........................................................................................... 161

    EDUCATION TRAINING ..................................................................................... 183

ETHICS .............................................................................................................. 185

SYSTEMIC RECOMMENDATIONS .......................................................................... 191

RECOMMENDATIONS FOR DISCIPLINE AND CONTRACT TERMINATION ..................... 199

CHILD WELFARE EMPLOYEE LICENSES ............................................................... 201

COORDINATION WITH LAW ENFORCEMENT .......................................................... 203

DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS ......................................... 205

UNRESOLVED RECOMMENDATIONS ..................................................................... 291

APPENDIX ......................................................................................................... 297

    A.    JAMAL WESBY ...........................................................................A-1

    B.    COOK COUNTY RUNAWAYS AND SHELTER FACILITIES ...................B-1

# INTRODUCTION

The Office of the Inspector General of the Department of Children and Family Services was created by unanimous vote of the Illinois General Assembly in June 1993 to reform and strengthen the child welfare system. The mandate of the Office of the Inspector General is to investigate misconduct, misfeasance, malfeasance, and violations of rules, procedures, or laws by Department of Children and Family Services (DCFS) employees, foster parents, service providers and contractors with the Department. *See* 20 ILCS 505/35.5 – 35.7. To that end, this Office has undertaken numerous investigations and initiated projects designed to protect children, uncover wrongdoing, improve practice, and increase professionalism within the Department.

## INVESTIGATION CATEGORIES

### Death and Serious Injury Investigations

The Office of the Inspector General investigates deaths and serious injuries of Illinois children whose families were involved in the child welfare system within the preceding 12 months. The Inspector General is an *ex officio* member of the Child Death Review Team Executive Council. The Inspector General receives notification from the Illinois State Central Register (SCR) of all child deaths and serious physical injuries where the child was a ward of DCFS, the family is the subject of an open investigation or service case, or the family was the subject of a previous investigation or closed case within the preceding 12 months. The notification of a child death or serious injury generates a preliminary investigation in which the death report and other reports are reviewed and computer databases are searched. When further investigation is warranted, records are impounded, subpoenaed or requested and a review is completed. When necessary, a full investigation, including interviews, is conducted. The Inspector General's Office created and maintains a database of child death statistics and critical information related to child deaths in

Illinois. The following chart summarizes the death cases reviewed in FY 2015:

#### FY 15 CHILD DEATH CASES REVIEWED

| | |
|---|---|
| CHILD DEATHS IN FY 15 MEETING THE CRITERIA FOR REVIEW | 96 |
| INVESTIGATORY REVIEWS OF RECORDS | 76 |
| FULL INVESTIGATIONS | 20 |

Summaries of death investigations, with a full investigative report submitted to the Director, are included in the Investigations Section of this Report on page 7. Summary of all child deaths reviewed by the Office of the Inspector General in FY 15 can be found on page 40 of this report.

### General Investigations

The Office of the Inspector General responds to and investigates complaints filed by the state and local judiciary, Department employees, foster parents, biological parents and the general public. Investigations yield both case-specific recommendations, including disciplinary recommendations, and recommendations for systemic changes within the child welfare system. The Inspector General's Office monitors compliance with all recommendations.

### Child Welfare Employee Licensure Investigations

In 2000, the General Assembly mandated that the Department of Children and Family Services institute a system for licensing direct service child welfare employees. The Child Welfare Employee License (CWEL) permits centralized monitoring of all persons providing direct child welfare services, whether they are employed with the Department or a private agency. The employee licensing system seeks to maintain accountability, integrity and honesty of those entrusted with the care of vulnerable children and families.

A child welfare employee license is required for both Department and private agency investigative, child welfare and licensing workers and supervisors. The Department, through the Office of Employee Licensure, administers and issues Child Welfare Employee Licenses.

A committee composed of representatives of the Office of the Inspector General, the Child Welfare Employee Licensure Board and the Department's Office of Employee Licensure screens referrals for CWEL Investigations. The committee reviews complaints to determine whether the allegations meet one or more grounds for licensure action as defined in Department Rule 412.50 (89 Ill. Adm. Code 412.50). The Inspector General investigates and prosecutes CWEL complaints and hearings.

When a CWEL Investigation is completed, the Office of the Inspector General, as the Department's representative, determines whether the findings of the investigation support possible licensure action. Allegations that could support licensure action include conviction for specified criminal acts, indicated findings of child abuse or neglect, egregious acts that demonstrate incompetence or a pattern of deviation from a minimum standard of child welfare practice. Department Rule 412.50 (89 Ill. Adm. Code 412.50) specifies the grounds for licensure action. When licensure action is appropriate, the licensee is provided an opportunity for a hearing. An Administrative Law Judge presides over the hearing and reports findings and recommendations to the Child Welfare Employee Licensure Board. The CWEL Board makes the final decision regarding licensure action.

In FY 2015, 22 cases were referred to the Inspector General for Child Welfare Employee License investigations. In addition, the Inspector General's Office provided research and technical assistance to the Office of Employee Licensure in 22 evaluations of CWEL applicants.

## FY 2015 CWEL INVESTIGATION DISPOSITIONS

| CASES OPENED FOR FULL INVESTIGATION | 22 |
|---|---|
| INVESTIGATIONS COMPLETED/NO CHARGES | 7 |
| REVOCATION | 4 |
| LICENSE SUSPENSION | 0 |
| LICENSES RELINQUISHED | 3 |
| PENDING INVESTIGATION | 1 |
| PENDING ADMINISTRATIVE HEARING | 7 |

### Resolution of Prior Investigations

| CASES PRIOR TO FY 15 | 7 |
|---|---|
| REVOCATION | 2 |
| LICENSE SUSPENSION | 2 |
| LICENSE RELINQUISHED | 1 |
| PENDING FINAL DECISION | 2 |

*Criminal Background Investigations and Law Enforcement Liaison*

The Inspector General's Office provides technical assistance to the Department and private agencies in performing and assessing criminal history checks. In FY 15, the Inspector General's Office opened 3,347 cases requesting criminal background information from the Law Enforcement Agencies Data System (LEADS). Each case may involve multiple law enforcement database searches and may involve requests on multiple persons. For the 3,347 cases opened in FY 15, the Inspector General's Office conducted 11,420 searches for criminal background information.

In addition, in the course of an investigation, if evidence indicates that a criminal act may have been committed, the Inspector General may notify the Illinois State Police, and the Office of the Inspector General may investigate the alleged act for administrative action only.

The Office of the Inspector General assists law enforcement agencies with gathering necessary documents. If law enforcement elects to investigate and requests that the administrative investigation be put on hold, the Office of the Inspector General will retain the case on monitor

status.  If law enforcement declines to prosecute, the Inspector General will determine whether further investigation or administrative action is appropriate.

# INVESTIGATIVE PROCESS

The Office of the Inspector General's investigative process begins with a Request for Investigation or notification by the State Central Register of a child's death or serious injury or a referral for a Child Welfare Employee License investigation.  Investigations may also be initiated when the Inspector General learns of a pending criminal or child abuse investigation against a child welfare employee.

In FY 2015, the Office of the Inspector General received 3,783 Requests for Investigation or technical assistance.[1] Requests for Investigation and notices of deaths or serious injury are screened to determine whether the facts suggest possible misconduct by a foster parent, Department employee, or private agency employee, or whether it suggests a need for systemic change.  If an allegation is accepted for investigation, the Inspector General's Office will review records and interview relevant witnesses.  The Inspector General reports to the Director of the Department and to the Governor with recommendations for discipline, systemic change, or sanctions against private agencies.  The Office of the Inspector General monitors the implementation of accepted recommendations.

The Office of the Inspector General may work directly with a private agency and its board of directors to ensure implementation when recommendations pertain to a private agency.  In rare circumstances, when the allegations are serious enough to present a risk to children, the Inspector General may request that an agency's intake for new cases be put on temporary hold, or that an employee be placed on desk duty pending the outcome of the investigation.

---

[1]This includes requests for investigation, notice of child deaths and serious injuries, notification of arrests or pending abuse investigations, and requests for technical assistance and information.

The Office of the Inspector General is mandated by statute to be separate from the Department.  Inspector General files are not accessible to the Department.  The investigations, investigative reports and recommendations are prepared without editorial input from either the Department or any private agency.  Once a Report is completed, the Inspector General will consider comments received and the Report may be revised accordingly.

If a complaint is not appropriate for full investigation by the Office of the Inspector General, the Inspector General may refer the complaint to law enforcement (if criminal acts appear to have been committed), to the Department's Advocacy Office for Children and Families, or to other state regulatory agencies, such as the Department of Financial and Professional Regulation.

*Administrative Rules*

Rules of the Office of the Inspector General are published in the Illinois Register at 89 Ill. Admin. Code 430.  The Rules govern intake and investigations of complaints from the general public, child deaths or serious injuries and allegations of misconduct. Rules pertaining to employee licensure action are found at 89 Ill. Admin. Code 412.

*Confidentiality*

A complainant to the Office of the Inspector General, or anyone providing information, may request that their identity be kept confidential.  To protect the confidentiality of the complainant, the Inspector General will attempt to procure evidence through other means, whenever possible.  At the same time, an accused employee needs to have sufficient information to enable that employee to present a defense.  The Inspector General and the Department are mandated to ensure that no one will be retaliated against for making a good faith complaint or providing information in good faith to the Inspector General.

Reports issued by the Office of the Inspector General contain information that is confidential

pursuant to both state and federal law.  As such, Inspector General Reports are not subject to the Freedom of Information Act.  Annually, the Office of the Inspector General prepares several reports deleting confidential information for use as teaching tools for private agency and Department employees.

*Impounding*

The Office of the Inspector General is charged with investigating misconduct "in a manner designed to ensure the preservation of evidence for possible use in a criminal prosecution." 20 ILCS 505/35.5(b).  In order to conduct thorough investigations, while at the same time ensuring the integrity of records, investigators may impound files.  Impounding involves the immediate securing and retrieval of original records.  When files are impounded, a receipt for impounded files is left with the office or agency from which the files are retrieved. Critical information necessary for ongoing service provision may be copied during the impound in the presence of the Inspector General investigator. Impounded files are returned as soon as practicable.  However, in death investigations, the Office of the Inspector General forwards original files to the Department's Office of Legal Services to ensure that the Department maintains a central file.

# REPORTS

Inspector General Reports are submitted to the Director of DCFS.  Specific reports are also shared with the Governor.  An Inspector General Report contains a summary of the complaint, a historical perspective on the case, including a case history, and detailed information about prior DCFS or private agency contact(s) with the family.  Reports also include an analysis of the findings, along with recommendations.

The Office of the Inspector General uses some reports as training tools to provide a venue for ethical discussion on individual and systemic problems in child welfare practice. The reports are redacted to ensure confidentiality and then distributed to the Department or private agencies

as a resource for child welfare professionals. Redacted reports are available on the Office of the Inspector General website, or by request from the Office of the Inspector General by calling (312) 433-3000.

*Recommendations*

The Inspector General may recommend systemic reform or case specific interventions in the investigative reports.  Systemic recommendations are designed to strengthen the child welfare system to better serve children and families.

Ideally, discipline should have an accountability component as well as a constructive or didactic one.  It should educate an employee on matters related to his/her misconduct while also functioning to hold employees responsible for their conduct.  Without the accountability component, there is little to deter misconduct. Without the didactic component, an employee may conclude that s/he has simply violated an arbitrary rule with no rationale behind it.

The Inspector General presents recommendations for discipline to the Director of the Department and, if applicable, to the director and board of the involved private agency. Recommendations for discipline are subject to due process requirements. In addition, the Inspector General will determine whether the facts suggest a systemic problem or an isolated instance of misconduct or bad practice.  If the facts suggest a systemic problem, the Inspector General's Office may investigate further to determine appropriate recommendations for systemic reform.

When recommendations concern a private agency, appropriate sections of the report are submitted to the agency director and the board of directors of that agency.  The agency may submit a response.  In addition, the board and agency director are given an opportunity to meet with the Inspector General to discuss the report and recommendations.

In this Annual Report, systemic reform recommendations are organized into a format

that allows analysis of recommendations according to the function within the child welfare system that the recommendation is designed to strengthen. The Inspector General's Office is a small office in relation to the child welfare system. Rather than address problems in isolation, the Inspector General's Office views its mandate as strengthening the ability of the Department and private agencies to perform their duties.

The Office of the Inspector General monitors implementation of recommendations made to the Director of DCFS and private agencies. Monitoring may take several forms. The Office of the Inspector General will monitor to ensure that Department or private agency staff implement the recommendations made. The Inspector General may consult with the Department or private agency to assist in the implementation process. The Inspector General may also develop accepted reform initiatives for future integration into the Department.

# ADDITIONAL RESPONSIBILITIES

*Office of the Inspector General Hotline*

Pursuant to statute, the Office of the Inspector General operates a statewide, toll-free telephone number for public access. Foster parents, guardians *ad litem*, judges and others involved in the child welfare system have called the hotline to request assistance in addressing the following concerns:

- Complaints regarding DCFS caseworkers and/or supervisors ranging from breaches of confidentiality to failure of duty;
- Complaints about private agencies or contractors;
- Child Abuse Hotline information;
- Child support information;
- Foster parent board payments;
- Youth in College Fund payments;
- Problems accessing medical cards;
- Licensing questions;
- Ethics questions; and

- General questions about DCFS and the Office of the Inspector General.

The Office of the Inspector General's Hotline is an effective tool that enables the Inspector General to communicate with concerned persons, respond to the needs of Illinois children, and address day-to-day problems related to the delivery of child welfare services. The phone number for the Office of the Inspector General Hotline is (800) 722-9124.

The following chart summarizes the Office of the Inspector General's response to calls received in FY 15:

### CALLS TO THE INSPECTOR GENERAL HOTLINE IN FY 15

| | |
|---|---|
| INFORMATION AND REFERRAL | 1146 |
| REFERRED TO SCR HOTLINE | 139 |
| REQUEST FOR OIG INVESTIGATION | 90 |
| TOTAL CALLS | 1375 |

*Ethics Officer*

The Inspector General is the Ethics Officer for the Department of Children and Family Services. The Inspector General reviews Statements of Economic Interest for possible conflicts of interest of those employees of the Department of Children and Family Services who are required to file a Statement of Economic Interest.

For FY 15, 626 Statements of Economic Interest were submitted to the Ethics Officer. For the 626 statements submitted, there were 44 disclosures of secondary employment or business ownership.

### ACTION ON FY 15 STATEMENTS OF ECONOMIC INTEREST

| | |
|---|---|
| ECONOMIC INTEREST STATEMENTS FILED | 626 |
| DISCLOSURES OF SECONDARY EMPLOYMENT OR BUSINESS OWNERSHIP | 44 |

The Office of the Inspector General Ethics staff also coordinated and monitored DCFS compliance with the statewide ethics training mandated under the Illinois State Officials and Employees Ethics Act of 2003. In 2015, the Office of the Inspector General ensured that 2,704 DCFS employees completed the training. In addition to DCFS employees, DCFS board and commission members were asked to have their members complete off-line training. In 2015, 351 DCFS board and commission members were required to complete the off-line ethics training.

In addition, the Ethics Officer and Ethics staff responds to inquiries from Department and private agency employees concerning their ethical duties and responsibilities under both the Child Welfare Employee Ethics Code, Department Rules and Procedures and the State Officials and Employees Ethics Act of 2003. For a full discussion of ethics consultations, see page 185.

**PLEASE NOTE: ALL NAMES IN THIS REPORT, WITH THE EXCEPTION OF CITATIONS TO SCHOLARLY ARTICLES OR COURT CASES, ARE FICTITIOUS.**

INTRODUCTION

# INVESTIGATIONS

This annual report covers the time from July 1, 2014 to June 30, 2015.  The Investigations section has four parts.  Part I includes summaries of child death and serious injury investigations reported to the Department Director and the Governor.  Part II contains aggregate data and case summaries of child deaths in families who were involved with the Department in the preceding 12 months.  Part III contains special investigations.  Part IV contains general investigation summaries conducted in response to complaints filed by the state and local judiciary, foster parents, biological parents and the general public.

Investigation summaries contain sections detailing the allegation, investigation, Inspector General recommendations and Department response.  For some recommendations, Inspector General comments on the Department's responses are included in italics in the "OIG Recommendation/Department Response" section of each case.

## DEATH AND SERIOUS INJURY INVESTIGATIONS

### DEATH AND SERIOUS INJURY INVESTIGATION 1

**ALLEGATION**   An eight-month-old boy died as a result of massive brain swelling due to a fractured skull from multiple blunt force injuries of varying ages.  Five weeks prior to the infant's death, a child protection investigation against his parents had been unfounded for physical abuse to a sibling and risk of harm to the infant and his three siblings.

**INVESTIGATION**   Four years prior to the eight-month-old boy's death, his then seven-week-old brother suffered a transverse fracture (complete break separating the bone) of his femur by one of his parents, who both denied knowing how the child was injured. The doctors determined not only that the infant had been abused, but that the severe injury had been ignored for one to two weeks – despite the fact that his injury would have caused demonstrable pain. Both parents were indicated for bone fractures by abuse. He and his two siblings were placed in foster care.

The child protection investigation was completed prior to the completion of the integrated assessment, yet the clinical screener who completed the family's integrated assessment relied on a partial, incomplete investigation. As a result, the integrated assessment did not document that the parents had been indicated for the child's broken femur. Multiple service providers later received and relied on the assessment as a source of information and assessment, and those working with the family remained unaware the parents were indicated for abuse for breaking the seven week old's leg. None of the service providers requested or reviewed the completed child protection investigation, nor was it attached to the referrals.

This also resulted in a Service Plan that failed to address that one or both of the parents had severely abused the infant. The lack of full information allowed some service providers to accept as plausible the parents' assertions that the child could have been injured when they co-slept with him or by his siblings playing too roughly with him, and resulted in the parents being referred for the generic services of parenting classes, psychological evaluations, therapy, and mentoring.

At adjudication, the judge found that the perpetrator of the abuse was unknown. The court later set the parents' goal as return home within 12 months. The parents were granted supervised day visits. The parents were minimally compliant with required services. Because they demonstrated little progress from services, they were referred for parent coaching.

The treatment goals the parent coach used with the family were standard goals used by parent coaching staff at the agency and remained virtually the same throughout the sessions. The sessions generally occurred at the same time of day and within the parents' home and varied little. Progress reports that covered the span of multiple months provided only a generalized overview of sessions along with the parent coach's assessment. The parent coach's records did not contain documentation of individual sessions.

Sixteen months after the initial child protection investigation, the mother, who had denied being pregnant, gave birth to a fourth child. A child protection investigation was conducted, and the parents were indicated for substantial risk of physical injury by neglect to the newborn. A safety plan was put in place for the private child welfare agency worker to monitor in lieu of taking protective custody; no petition was filed. The parents had three more children while the case was open, another boy and twins. The parents again attempted to hide the subsequent pregnancies from the Department. None were screened with the State's Attorney's Office; and neither the State's Attorney's Office nor the Office of the Public Guardian sought the filing of petitions.

Approximately a year-and-a-half after their case was opened for services, the parents were granted unsupervised day visits, up to four hours a day, five days a week with their three children who were in placement, at the private agency's discretion. Six months after the parents were granted unsupervised day visits, the mother's attorney filed a petition for unsupervised overnight visits, which the judge granted. Two weeks prior to being granted overnights, the parents had given birth to their fifth child. The caseworker notified the hotline of the child's birth. The call was taken as information only. Shortly after overnight visits began, the family's parent coach documented that the parents had successfully completed parent coaching and closed their case.

The parents began unsupervised visits from Friday to Sunday with their five children ages one month, one year, two-and-a-half years, four-and-a-half years, and six years. After two months, their visits were extended from Thursday to Sunday. Seven weeks after the latest extension, the private agency again agreed to increase the visits by a day, from Wednesday to Sunday. However, the Guardian *ad Litem* notified the private agency that one of the children stated that his father had hit him hard on the head with a plastic bat as discipline, and that the child had alleged that corporal punishment had also been used on his siblings. The private agency suspended unsupervised visits and notified the hotline of the allegation, which was taken as information only. The parents denied the allegations and accused the child of lying.

Weeks after the child's outcry of corporal punishment, the case was in court. The Guardian *ad Litem* had filed a motion requesting that unsupervised overnight visits be revoked and documented the child's outcry of corporal punishment. The mother's public defender had filed a motion for return home. The judge entered a permanency order of Return Home within five months for all three boys and left the parent/child visitation to the private agency's discretion.

The private agency referred the parents for additional parent coaching. The same parent coach who described the parents five months earlier as nurturing parents who had made excellent progress was reassigned to the family. The parents were uncooperative and combative with their caseworker, who brought the siblings to the home for sibling visits prior to the parent coaching session and remained at the home throughout the parent coaching sessions, as well as with the parent coach. Both parents repeatedly denied the allegations of corporal punishment, and the mother was openly hostile toward the child who made the outcry.

The caseworker documented numerous incidents of the mother taunting and threatening the children. Documentation indicated that the caseworker relayed these observations to the parent coach.  In addition, the parent coach failed to document the cruel behavior displayed by the mother that the parent coach observed.

The private agency worker informed the judge and the children's Guardian *ad Litem* of the ongoing concerns regarding the parents' inappropriate behaviors and comments toward their children and their minimal participation in parent coaching.  In contrast, the parenting coach's notes do not detail any negative behavior by the parents.  Despite the private agency's ongoing documentation of concerns regarding the parents as well as the Guardian *ad Litem's* reservations, the parents' goal of Return Home was never changed nor did anyone involved with the case recommend that it be changed. However, the Guardian *ad Litem*, with the private agency's agreement, intended to file a motion in court to require the parents to participate in an assessment with the Juvenile Court Clinic to determine whether additional services for the family were warranted.

Five months after the initial outcry that suspended unsupervised overnight visits and reinitiated parent coaching, another sibling disclosed that the father had whipped one of his brothers with a belt for wetting the bed during overnight visits, but stated that he had not disclosed the incident because he feared his parents. The child also disclosed that during the unsupervised overnight visits, the parents had called names and picked on his brother whose femur was broken by abuse at the onset of the case.

Shortly after the sibling's disclosure of past corporal punishment to his brother and poor treatment by the parents toward another brother, the parent coach completed a progress report. The parent coach documented in a progress report that the parents denied the allegation that reinitiated parent coaching and noted that the child had a history of lying, despite the parents' resistance to parent coaching, concerning behaviors toward the child who made the outcry, a second outcry by another child of corporal punishment, and an ongoing rejection over years of the child whose broken femur brought the family to the Department's attention. The parent coach documented that the child had recanted to her and that she had been working with the child on the importance of honesty. The recent outcry by another sibling was not noted in the report. The parent coach wrote that the parents were successfully applying the skills being taught through parent coaching.   The Department contracted with a private counseling agency for the services of the parenting coach.  The private counseling agency was required to supervise the parenting coach.

Weeks prior to the commencement of unsupervised day visits, the family's parent coaching ended. The parent coach, at the caseworker's request, continued to provide several one-on-one parent coaching sessions between the parents and their two boys whom they treated with negative partiality. In her termination report, the parent coach noted her continued support for reunification. She described the parents as having successfully completed parent coaching and documented that they made "excellent" progress.

The only Service Plan tasks the parents had once parent coaching ended were to secure employment or vocational training, allow the placement worker to monitor the non-ward children, and refrain from negative comments about the maternal grandmother.

Despite the private agency's documented concerns with the parents' behaviors toward their children and belief that they were only going through the motions with the parent coach, the private agency made the decision, based largely on the parent coach's recommendation, to allow limited day visits to resume.

A month after unsupervised day visits resumed, the parents gave birth to twins. The parents, who had also denied this pregnancy until shortly prior to giving birth, concealed the twins' birth from the private agency for three weeks. When the caseworker learned of the births, the worker notified the hotline, which took the call as information only. The parents now had seven children.

Approximately two months after the parents gave birth to the twins, the case was heard in court. The parents, without prior notice, stated that they wanted to sign specific consents allowing their two boys in relative foster care to remain with their caregivers under subsidized guardianship, and to allow the third child's traditional foster parent to adopt him. The parents, through their attorneys, asked that their Return Home goal be ended. The Guardian *ad Litem* withdrew her request for an assessment of the parents. They were given until the next court date to ensure they wanted to relinquish their parental rights. However, prior to the case being heard in court, the parents went to the courthouse and relinquished their parental rights to the three children in placement.

Six months after unsupervised day visits began, the child abuse hotline was notified after one of the boys in placement told an interviewer from the Guardian *ad Litem's* office that the father had kicked his two-year-old sister who resided with the parents, causing her to fall and injure her lip. The allegation was taken for investigation. The assigned child protection investigator went to the home and interviewed the parents, who denied the allegation and stated that the relative foster parent had coached the child to cause problems. The child protection investigator observed the child, who had no marks. The child protection investigator spoke with the caseworker, who denied having observed the girl with an injured lip. No timeline was completed and the investigator did not ask the caseworker when she last saw the girl or when the boys had last visited the parents' home. The child protection investigator interviewed the child who made the outcry 46 days after being assigned to the case. The child protection investigator did not interview the relative foster parent, although present, nor the two other siblings in placement, who were possible witnesses of the incident. The investigator concluded that the child was coached by his caregiver as the parents alleged because he glanced toward his relative caregiver while being interviewed by the child protection worker. The investigation was unfounded and closed.

Thirty-seven days after the child protection investigation was closed, one of the eight-month-old twins died from injuries associated with blunt force trauma to the head. The baby had multiple head injuries, bruises on the spine and stomach, a massive infection consistent with peritonitis (which would have caused severe abdominal pain), and a healing rib fracture estimated to be one month old. The autopsy documented that the child died from cerebral edema due to (intermediate cause) cerebral contusion due to (intermediate cause) fracture of the skull due to (proximate cause) multiple blunt force injuries, with contributing factors of blunt force injuries of varying ages. His death was ruled a homicide.

The three surviving siblings who had been in the parents' care were taken into custody. Medical exams revealed that the deceased child's eight-month-old twin brother had bilateral parietal skull fractures, and the 18-month-old sibling suffered a rib fracture. The father confessed to causing the fatal injuries to the eight-month-old boy. He was charged with the child's murder as well as aggravated battery of a child under 13 years of age; three days before the father was scheduled to appear in criminal court on the charges, he hung himself in jail. The three children who were taken into custody remain in placement.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The Department must develop written policy regarding whether and under what circumstances there are effective services that can protect children following a finding of severe abuse. Standard parenting coaching should never be used to address severe abuse and violence.** |

The Department agrees.  The Inspector General will assist Department Clinical staff in developing guidelines to determine severe abuse (i.e. abdominal injuries, broken bones, vulnerability or disability of the child.)  The guidelines will include different standards depending on the age of the child.

**2.   The Service Plan for any case that comes to the Department as a result of severe abuse, must be subject to DCFS clinical review within the first 60 days. The review must focus on whether the Service Plan addresses the parenting problems that caused the harm to the child. The case should continue to be clinically reviewed every 6 months.**

The Department agrees.  A protocol will be developed.

**3.   Program Plans for parenting classes, coaching and mentoring must require rigorous standards for developing a baseline of behavior and goals and measurement of change.**

The Department agrees.  A protocol will be developed.

**4.   The Department should pursue legislative change to permit expedited termination for severe abuse cases in which DCFS Clinical has determined that no services can correct the presenting problem.**

The Department does not agree.   It is unnecessary for DCFS, or any other entity to seek a legislative amendment as recommended.  Section 2-13.1 of the Juvenile Court Act already prescribes the steps needed in order for the Court to terminate reasonable efforts early.  Specifically, 705 ILCS 405/2-13.1(a) states at any time after a petition has been filed the State's Attorney, Guardian *ad litem* or DCFS may file a motion to request a finding that reasonable efforts to reunify the minor with his/her parents should cease.

If Clinical makes a determination that no services can correct the presenting problem then DCFS can file a motion requesting early termination of reasonable efforts.  If the Court determines that reunification services are no longer appropriate and a dispositional hearing has already occurred, then the case will proceed to a permanency hearing where the Court will set the appropriate goal.

*OIG Comment:  The Office of the Inspector General is working with the Department to develop training and procedures to ensure severe abuse cases are handled appropriately.*

**5.   This report should be shared with the child protection investigator and the investigator's supervisor of the allegation of abuse just before the death as a teaching tool in lieu of discipline to address the poorly executed investigation.**

The report was shared with the employee and the current supervisor.

**6.   The agency the Department contracted with to provide parent coaching should discharge or cease contracting with the parent coach who was assigned to the family for the poor quality of her work on this case and her failure to accurately report.**

Because of the limited number of providers and the number of subcontracts under this agency, the Director agreed to a corrective action plan with the agency.  According to that plan, the agency is to continue implementation of their current "Agency Corrective Action Plan"  as well as address other  recommendations made within the clinical review.   A six  month follow-up clinical review will be conducted  to assess the program's progress regarding recommendations and  adherence to their practice guidelines.

*OIG Comment: This case involved a family of seriously physically abused children.  One of the children disclosed to the parenting coach that he had been hit over the head with a plastic baseball bat. The mother taunted and made cruel statements to the children, and the father appeared overwhelmed because the mother distanced herself from parenting duties.  In addition, the children demonstrated fear of the parents. The parenting coach, hired and supervised by the private counseling agency, responded to these incidences*

*by presenting a "why it is bad to lie" puppet show to the child who made the disclosure. Moreover, the coach continued to report progress despite taunting and inappropriate behavior by parents who had seriously abused an infant.  In an unrelated case, involving the same private agency, the Office of the Inspector General found that an employee of the agency had stolen wards' social security numbers and filed a false police report, and one of the owners of the agency blindly accepted the word of the employee that the allegations were made up. The Office of the Inspector General reviewed the Corrective Action Plan that the Department developed with the private counseling agency.  There is nothing in the Corrective Action Plan that addresses either of the concerns raised in the Inspector General reports.*

## DEATH AND SERIOUS INJURY INVESTIGATION 2

| ALLEGATION | An eight-month-old boy died as a result of extreme physical abuse inflicted by his mother's boyfriend. A child protection investigation of physical injuries to the boy was pending at the time of his death. |
|---|---|

| INVESTIGATION | Six weeks prior to the baby boy's death, a child protection investigation was initiated after the State Central Register (SCR) received a report the eight-month- |
|---|---|

old had been observed two days earlier with injuries to the right side of his forehead and his left upper thigh. The reporter stated that the infant's mother said the injuries occurred when the baby rolled off a mattress and the bruises to the infant's legs were caused when her boyfriend hit him when he would not stop crying. The incident had prompted the mother, who also had a four-year-old daughter, to leave the boyfriend. The reporter stated the mother had said her relationship with the boyfriend was over, but she had since returned to him.

The child protection investigator documented an unsuccessful initial attempt to locate the family. In her notes, the investigator described knocking on the door of a residence at the address she obtained for the family. In an interview with Inspector General investigators, the child protection investigator reiterated this account, stating she could not identify the exact address but went to two different homes at the approximate location and knocked on the front doors. In fact, the address provided for the family is a retail business that occupies the only building on the block. Later that day, the investigator spoke with the reporter who reiterated her observations of the children's injuries and her concerns regarding the mother's return to the home she shared with her boyfriend. The reporter told the investigator that while she did not know the family's address she believed the mother and boyfriend worked for the boyfriend's parents at a retail business. The same type of retail business occupies the location corresponding with the address provided for the family. The investigator documented a second attempt to locate the family at the address but, despite receiving new information pertaining to the relevance of the retail business, she did not enter the establishment as part of her efforts.

The following day, the investigator and her supervisor resumed the search for the family and entered the retail business, where they found the boyfriend and the four-year-old girl alone. They were told the family resided in a room behind the store and the girl led them outside and around the back to the residence where they found the mother and the infant. The investigator took three photos of the infant documenting a contusion to his forehead, a bruise on his thigh and diaper rash. Although both the investigator and supervisor were present, they did not complete a body chart with measurements or location of the infant's injuries. The mother stated the infant had hit his head after he rolled off a mattress and fell onto a hard surface. While the investigator interviewed the mother, the supervisor was occupied with caring for the children. The investigator's interview with the mother was cursory and failed to obtain explanations for all of the infant's injuries or establish a timeline of when they occurred, information of particular relevance regarding a non-mobile baby. She also did not determine who cared for the children and when, failing to reconcile the mother's statement she took her children with her everywhere she went with her reported work activity, which required her to drive long distances with great frequency. The mother did state that others sometimes watched the children on occasion; however, the investigator did not obtain the names or addresses of any of these individuals. The mother denied any domestic violence issues but stated she had previously been involved in abusive relationships, including with the children's father. Although the investigator established that the four-year-old girl had been away from school for one week, corresponding with the time period the mother left the home and the abuse was alleged to have occurred, she did not elicit an explanation for the absence. In her interview with Inspector General investigators, the investigator also acknowledged she did not ask the mother about any bruising to the infant's thighs as had been alleged in the hotline report.

In their interviews with Inspector General investigators, both the investigator and her supervisor stated they questioned the credibility of the reporter since the reporter had not contacted law enforcement immediately

upon seeing the infant's injuries or contacted the hotline until after the children were no longer in their presence. The investigator and her supervisor failed to recognize the likelihood that the reporter took action after realizing the mother did not uphold her vow to separate from her boyfriend and had in fact returned to live with him.

The investigator and supervisor observed the family's living area, which consisted of a single, sparsely furnished room with uncovered electrical outlets, no crib and no smoke or carbon monoxide detectors. The investigator spoke briefly with the boyfriend who denied ever serving as a caregiver for the children, despite the fact he had been alone with the girl when the workers arrived at the business. The investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) which identified no threats to the children's safety. The mother agreed to obtain a crib that evening, make repairs to the living area and take the infant to his pediatrician for an examination the next day.

Following the visit, the investigator and her supervisor staffed the case, with the supervisor instructing the investigator to follow up on the infant's visit to the doctor and forward a form to the medical provider used to document injuries to children and record the observations and conclusions of medical personnel who attend to them. In her interview with the Inspector General investigators, the child protection investigator asserted she had forwarded the form to the doctor's office the day after the visit to the family's home. An Inspector General review of the case record found the investigator's note regarding the form, which was not created until the day the baby boy died, misidentified the treating physician. The investigator maintained she had faxed the form to the doctor's office from the Department field office the day after the visit, however she stated she did not wait to confirm the transmission went through. A review of the fax machine's history found no transmissions, successful or otherwise, from the terminal to the doctor's office. In an interview with the Inspector General investigators, the nurse identified by the child protection investigator as the person she spoke to confirmed the children's doctor was not the one listed on the form completed by the investigator. The nurse stated she had no contact with the investigator until she received a phone call and a fax from her on the day the baby boy died. All evidence obtained by the Inspector General investigators supported the conclusion the investigator lied about sending the form to the doctor's office, both contemporaneously to her supervisor and later to the Inspector General investigators during the course of this investigation. Furthermore, the Inspector General investigators found no efforts were made by the child protection investigator to visit the family or ensure the infant had been seen by a doctor during the six week period between the visit to the family home and the infant's death. On the day the baby boy died, the investigator and her supervisor engaged in a flurry of activity, belatedly creating case notes documenting their work on the case.

Six weeks after the investigator and her supervisor visited the family's residence, the mother returned home with the four-year-old girl after having left the infant in the care of her boyfriend. The mother found the eight-month-old covered with a sheet, unresponsive in his crib. When the mother attempted to call for emergency assistance, the boyfriend took the phone from her, struck her, and fled from the home. He was later apprehended by police on a street nearby while stabbing himself with knives. The infant was transported to a local hospital emergency room where he was pronounced dead. An autopsy performed on the infant found he had been scalded over 20% of his body resulting in first- and second-degree burns. The baby also presented a litany of injuries caused by abuse, including numerous hemorrhages, lacerations, contusions to his abdomen and lungs and healing rib fractures, as well as acute cocaine intoxication. The girl was taken into protective custody and placed in the home of a maternal relative. A subsequent child protection investigation resulted in the boyfriend being indicated for Death by Abuse and several other allegations. The mother was indicated for Substantial Risk of Injury because she had maintained her relationship with the boyfriend after becoming aware of his abuse of the infant and had continued to allow him to serve as caretaker for the children outside of her presence. The criminal investigation of the infant's death led to charges of First Degree Murder, Aggravated Battery and Endangering the Welfare of a Child. No criminal charges were filed against the mother of the children.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. The child protection investigator should be disciplined up to and including discharge for lying to Inspector General investigators during her interview; for falsification of contact** |

**notes; for lying to and misleading her supervisor in this investigation; for failing to perform basic investigative activities; and for not reassessing the children's safety after their mother failed to take the infant to the doctor.**

The employee was discharged.

**2. The child protection supervisor should be disciplined for her failure to recognize the high-risk nature of this case and supervise it appropriately.**

The employee received a 30-day suspension.

**3. The Department's Office of Legal Services should staff this case with the local State's Attorney to address the pursuit of criminal charges against the mother based on her failure to protect her son from her boyfriend who she knew had already abused him.**

DCFS Legal has discussed this case with the local State's Attorney's Office.

**DEATH AND SERIOUS INJURY INVESTIGATION 3**

| ALLEGATION | The mother of three young boys renewed her romantic relationship with the man who had tortured her oldest son after he was released from prison for abusing the child. Department personnel failed to adequately assess the mother's competence to protect her children and allowed her family's intact services case to be closed without ensuring she had complied with its recommendations. |

**INVESTIGATION**   Four years earlier, the man had been convicted of Aggravated Battery to a Child after holding the mother, who was three months pregnant with his child at the time, and her then five year-old son hostage during a 20-hour ordeal. During the episode, the man engaged in extreme and sadistic abuse of the boy that included repeatedly punching and kicking, strangling him with a cord, pulling on his genitals and stuffing soiled underwear in his mouth after the beatings caused him to lose control of his bladder. At one point the man took the mother and her son from the house where he held them and drove them to a lake where he told the mother he planned to kill her and her child. After returning to the home the mother, who was also physically abused throughout the incident, escaped to the home of a neighbor and police were alerted. The mother later stated the man had been physically abusive to both of them prior to the incident and provided law enforcement with a detailed, written description of the severe abuse inflicted upon her and her son by the man while they were being held captive.

The man was sentenced to prison for two years but was released on parole after one. A condition of his release was that he have no contact with the mother or her son he had tortured. While the man was incarcerated, the mother had given birth to his son. Six months after his release, police conducting a traffic stop of the man's vehicle found the mother and her two children with him in the car. The violation of the no contact order prompted a child protection investigation and the Inspector General's assistance was requested to perform an out of state criminal history check. The Inspector General investigators found the man had previously been convicted in another state of Assault on a Child Under 16 for physically abusing his then girlfriend's two year-old son. The man's abuse had included punching the child in the genitals, using him as a target for shooting practice with his BB gun and forcing him to assist in the abuse of the girlfriend after the man tied the woman to a chair. During the course of the child protection investigation following the probation violation, the mother claimed to have misunderstood the conditions of the no contact order and routinely provided involved law enforcement and child welfare personnel with contradictory or misleading information. The mother minimized the man's history of violence and threatening behavior and attempted to re-characterize the episode that led to his incarceration. The mother persisted in maintaining a relationship with the man, cohabitating with him and having another son with him, all while making considerable efforts to conceal their involvement from the Department, the private agency charged with providing intact services to the family and the Court. At the conclusion of the Inspector General's prior involvement with the case, it was recommended that a Clinical Screener assist in an Integrated Assessment to determine whether the mother had the capacity to protect her children in light of her continued relationship with the man and her dishonesty with involved professionals.

The Inspector General's recommendation was accepted by the Department and the report was forwarded to its Domestic Violence Intervention Program. The case was assigned to a domestic violence specialist to conduct a clinical consultation. The specialist's work on the case consisted of a review of the case history and a meeting with the family's intact services caseworker and her supervisor. The specialist never met with or spoke to the mother while assessing her willingness and ability to ensure her children were safe. The specialist concluded that counseling for the mother, her abused son and the man was adequate to mitigate any potential harm despite the man's history of calculated, sadistic violence towards the women and children he was involved with, his ongoing presence in the lives of the family, the mother's steadfast refusal to comply with services and habitual concealment or alteration of critical facts.

The specialist's finding was eventually reviewed and approved by her supervisor, almost six weeks after it was submitted. The Consultation Referral Form completed by the specialist and approved by her supervisor contained no clinical direction regarding the mother's capacity to protect her children. Furthermore, there was no evidence to suggest the specialist or her supervisor forwarded the Consultation Referral Form to private agency staff, preventing whatever substantive value might have been present in the evaluation from being incorporated into the family's Integrated Assessment. The cursory, boilerplate nature of the specialist's evaluation combined with the failure to provide the results of the evaluation to workers dealing with a volatile family situation on a regular basis represented a lost opportunity for meaningful intervention and neglect of the Department's responsibilities to the clients it serves.

Three months after the specialist's evaluation was approved by her supervisor, another ex-girlfriend of the man and her mother were found shot to death in their home. Two weeks later, the man, who was a suspect in the case, committed suicide with a gun while being pursued by law enforcement officers. Ballistic tests later determined the weapon the man used to kill himself was the same gun used in the double homicide. Although the mother had steadfastly denied to child welfare professionals that she and the man had any recent contact, she acknowledged to Illinois State Police (ISP) the two had maintained a relationship throughout the months leading up to the murders and the man's death. The man's girlfriend at the time of his death, whom he was living with along with her three young children, told ISP she and the man had engaged in a sexual encounter with the mother during the period of time between the murders and his death. An ISP review of a computer found in the home the man shared with his girlfriend found explicit photos of the man engaged in sexual behavior with the girlfriend's three year-old daughter. The girlfriend admitted lying previously to medical professionals about the nature of a broken leg the three year-old suffered while in the care of the man and that he had caused the injury. The broken leg had required the girl to be hospitalized and ISP also found photos of the man and the girlfriend engaged in sexual acts in the presence of the girl in her hospital room. The girlfriend was subsequently charged with Sexual Exploitation of a Child. A concurrent child protection investigation indicated the girlfriend for Substantial Risk of Physical Injury while the man was posthumously indicated for a host of allegations related to child sexual abuse and exploitation.

One month after the man's suicide, the Domestic Violence Intervention Program supervisor forwarded the Consultation Referral Form to the mother's new caseworker at another agency, where the family's case had been transferred. The Form was finally reviewed with the mother, four months after it had been completed. The mother rejected the recommendations made by the report and her service plan remained unchanged. In an interview with the Inspector General investigators, the mother's new worker stated she was only able to confirm the mother had attended six counseling sessions and had otherwise failed to comply with services. Four months after the man's suicide, the mother requested that the intact family services and juvenile court cases be closed on the basis that the man was no longer a threat to the children. The new caseworker submitted the request, incorrectly stating the mother had had no contact with the man for six months prior to his death and had complied with domestic violence services and parenting instruction. An Order of Dismissal was entered stating court supervision was no longer required and the family's intact service case was closed, designated as "Service Completed."

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The Department should not use either the Domestic Violence Intervention Program specialist or her supervisor for clinical consultations or evaluations that require assessment of parental capacity to protect.** |
| --- | --- |

The Department agrees.

**2.   The Department should develop guidelines identifying behavior that calls into question protective capacity of a non-offending caretaker.  When protective capacity issues are identified the Department must review available records and conduct a clinical interview to assess protective capacity. Recommendations from the Assessment must be included in any service plan.**

Operations and Clinical will meet to plan strategy and update procedures.

**3.   This investigation should be used as a teaching tool for assessing parental protective capacity.**

DCFS Integrated Assessors and regional clinical staff throughout the state participated in Error-Reduction training presented by the Inspector General staff. This investigation was utilized as part of the two-day training and included discussion of parental protective capacity.

**4.   This report and the previous report will be shared with the Illinois State Police.**

The Inspector General shared the report with the Illinois State Police officers that conducted the investigation.

## DEATH AND SERIOUS INJURY INVESTIGATION 4

| **ALLEGATION** | A two-year-old girl died from multiple blunt force trauma injuries inflicted by her father, a recently emancipated Department ward. Nine months prior to the young girl's death, while her father was still a ward, he was indicated for physical abuse of the child. |

**INVESTIGATION**   The father had an extensive history of involvement with the Department beginning when he and his twin brother tested positive for cocaine at birth. At age one, both of the twins were placed in the care of their maternal grandmother and by age eight they had been joined in the home by their mother's four other children, all of whom had been born substance exposed and adopted by the grandmother. That same year the siblings relocated out-of-state to reside with another relative, however five years later the twins returned to the maternal grandmother's home after she suffered a stroke, leaving the two 13 year-olds to serve as her primary caretakers.

Following his return to the grandmother's home as an adolescent, the youth began demonstrating a pattern of aggressive and anti-social behavior. During the next five years, he dropped out of two high schools and was arrested three times, though charges were dropped in all cases. When the youth was 17½ , a hotline report was made alleging the grandmother's home was uninhabitable and a subsequent child protection investigation resulted in all the siblings being taken into protective custody. The youth's entry into protective custody was delayed for two days as he was incarcerated in a Juvenile Detention Center on an outstanding warrant. In the four months immediately after protective custody was taken, the youth moved through four foster placements as his behavior and non-compliance continually disrupted each living situation. Ultimately, the 18-year-old youth was arrested and convicted on a robbery charge. He was placed on two years special adult probation. Following his conviction, he was placed in a Transitional Living Program (TLP).

His adverse behavior continued while at the TLP and culminated in another arrest and criminal conviction after he stole a fellow resident's clothes and set them on fire. As a result of the offence and violating his probation, the youth was sentenced to one year in prison. While he was incarcerated, the youth reported he was the parent of a baby girl but refused to provide any identifying information for the mother or child.

The youth's sentence was extended as a result of his conduct in prison and failure to comply with required services, which included anger management classes. Following his release, the then 20-year-old youth was placed in a TLP and assigned a caseworker. The TLP caseworker, aware of the youth's history of behavioral issues, observed firsthand his unwillingness to adhere to facility rules. Five months after being placed, the youth was arrested for driving a car involved in a traffic accident. He was arrested for a number of moving violations as well as resisting arrest.

Two weeks after the arrest, a child protection investigator contacted the caseworker seeking to arrange an interview with the youth regarding an allegation that he had physically abused his one-year-old daughter. The investigation was opened when the toddler's mother and maternal grandmother reported observing bruises to her face and buttocks after picking her up after a weekend with the youth.

The child protection investigator observed the child and noted visible marks on the toddler's face and thighs. The investigator spoke with her treating physician who stated her injuries were not consistent with the account provided and that the patterned marks she presented with were of concern. The investigator recommended unfounding the report of abuse against the youth without ever having spoken to him. The investigator's supervisor approved the conclusion but the mandated reporter requested a review of the decision.

A child protection administrator reviewed the investigation and the report. The investigator contacted the TLP caseworker and informed her of the indicated finding. Later that day, the caseworker told the youth he had been indicated for physical abuse of the toddler. The youth denied the allegation.

Although the Teen Parent Service Network (TPSN) had been aware of the father for two years, no services were provided because, at the time, TPSN intake procedure did not allow for a case to be opened for a father if he would not identify the mother or child to staff.

Two months after the child protection investigation was indicated, the youth was preparing to emancipate from the Department. He informed his caseworker that he had been caring for his daughter for the past 19 days in the home of his girlfriend, where he resided. Despite the knowledge of previous abuse, the caseworker failed to respond to the information that he had just been indicated for abusing her. Five days after the meeting, the youth emancipated from the Department.

Seven months after the youth emancipated, he called emergency personnel to the home of his girlfriend, where he resided. First responders found the toddler dead on the floor, covered with a sheet. After initially telling police his daughter had fallen from a high chair and hit her head on the floor, the youth admitted to causing the toddler's injuries. The youth stated he had become increasingly frustrated with having to care for the toddler during the time she was in his home as he was unemployed and had no money for food and diapers. The youth admitting having physically abused his daughter on a daily basis since she arrived at his home and described a pattern of increasing levels of physical discipline over several days leading up to her death. The maternal grandmother informed police of the previous incident of suspected abuse that had been reported to the Department but that she and the child's mother were unaware of the outcome of that investigation.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | |
|---|---|

**1.  Department and private agency case managers must inform the Teen Parent Service Network whenever a parenting ward is the subject of a pending and/or indicated child welfare investigation.**

Office of Information Technology Services (OITS) developed a report which is provided to TPSN weekly.

The Recommendation will be included in revisions to Procedures 300, *Child Abuse and Neglect Investigations*, Procedures 315, *Permanency Planning*.

**2.  The Teen Parent Service Network should track all indicated child welfare investigations on Department parenting wards and ensure appropriate interventions.**

TPSN is utilizing the Investigations Involving DCFS Pregnant/Parenting Wards for tracking purposes.  This notification allows workers to ensure appropriate interventions.

**3.  The Transitional Living Placement caseworker will be referred for a Child Welfare Employee License (CWEL) investigation for her failure to call the hotline after learning that the youth was caring for the child.**

The Inspector General has issued charges against the employee's child welfare license.

**DEATH AND SERIOUS INJURY INVESTIGATION 5**

| ALLEGATION | A three-year-old boy died of undetermined causes while with his mother at the home of her boyfriend. A child protection investigation of alleged physical abuse of the boy was unfounded four months prior to his death. |

| INVESTIGATION | The first child protection investigation involving the family was initiated after the three-year-old was observed with bruises to his forehead and abdominal pain. The young boy had been taken to an emergency room for examination, however the severity of his condition resulted in him being transferred to a hospital specializing in pediatric care. After arriving at the pediatric hospital, it was determined he suffered from kidney and pancreatic malfunction, with an enlarged liver and low blood count. |

The assigned child protection investigator went to the pediatric hospital and spoke to hospital personnel who informed her they had observed injuries in the same location on each of the young boy's ears as well as bruises to his forehead. The mother had reported to staff that he had recently been lethargic and seemed only to want to sleep. The investigator then interviewed the mother who stated all of his injuries occurred three days earlier. The mother described the three-year-old as being "hyperactive" with a high pain threshold and prone to hurting himself. By the mother's account, the child had fallen twice while playing at a park near their home. The first time while running around, causing a bruise to one side of his forehead, and the second when he walked behind a child swinging and the two collided. She said after the two returned home the young boy had run into a chair, injuring one ear. Then they had gone to the home of her boyfriend, where the child then banged his other ear against a table while playing beneath it with toy cars. The investigator took pictures of the boy's injuries but did not complete a body chart documenting their location, length or stages of healing. The investigator did not contact staff from the emergency room where the young boy was originally taken for treatment. The emergency room records would have shown that the mother had changed her explanation on how the swinging collision occurred.

After interviewing the mother, the investigator spoke with the treating physician, who acknowledged the injuries to the young boy's head but prioritized the urgency of treating his internal issues, the cause of which had yet to be determined. At the time of the young boy's admission, the pediatric hospital did not have a child abuse team or a physician on staff who specialized in child abuse. The hospital did not evaluate the three-year-old's conditions in light of the information available at the time as potential child abuse. Although a social worker at the pediatric hospital had met with the mother, she did not perform a psychosocial assessment. In an interview with Inspector General investigators, the social worker stated it was hospital policy at the time not to perform an assessment if the Department had already been contacted, under the assumption Department personnel would handle these duties. The social worker informed the Inspector General investigators the hospital's policy has since been amended calling for assessments to be conducted regardless of existing Department involvement.

Throughout the child protection investigation, the investigator failed to perform several essential tasks. The mother stated the child's injuries had occurred at a park near their home; however, the investigator never obtained the name of the park, or its location, or conducted a site visit to determine if the mother's description was accurate. The investigator was aware the mother was employed but did not verify her work schedule, despite her statement that the trip to the park with the young boy had occurred on a weekday afternoon. A review of the mother's employment records showed she was at work at the time she said she and her son were at the park. The investigator also never established how long the two were at the park, how they got there, or if there were any witnesses to the events she described. The young boy was released from the hospital three days after he had been admitted; however, the investigator did not visit or assess the mother's home prior to

his release. In an interview with investigators from the Inspector General's Office, the child protection investigator stated she did not believe a Child Endangerment Risk Assessment Protocol (CERAP) was necessary as doctors were not concerned about possible abuse at the time of his discharge.

Three days after the three-year-old was discharged, the investigator spoke with the mother's boyfriend by phone. The boyfriend stated he had not seen the young boy injure himself against the table in his home as he was in another room at the time. He also said that while he did have children of his own who frequently visited they did not reside with him, though one of his children had been present when the young boy was injured. The boyfriend said he had just moved to his new residence the day before and provided the investigator with an address that later proved to be non-existent. The investigator asked the boyfriend for his name and birthdate in order to perform a Law Enforcement Agency Database System (LEADS) check.  The investigator did not verify the information by looking at the boyfriend's driver's license or other identification. The result of the LEADS check was negative; however, it was later learned the boyfriend had provided a false name and birthdate to the investigator.

A LEADS check under the boyfriend's true name and birthdate performed during the investigation of the young boy's death showed he had been arrested 12 times but had no convictions.  The absence of any convictions on his record was erroneous. The LEADS system relies upon local police departments to independently enter information into the system. In addition, the worker was only provided with a summary of the full criminal history which was incorrect.

A LEADS check performed by Inspector General investigators of the boyfriend's actual name and birthdate found 10 aliases, 5 birthdates and three social security numbers associated with him. The LEADS check showed the boyfriend had been arrested 35 times and had three convictions, including one for assault. The assault conviction was for Felony Aggravated Domestic Battery to a Child. Thirteen years earlier, the boyfriend had whipped a two year-old boy with a belt and scalded him with boiling water, causing first and second degree burns. The child protection investigation of the incident had been expunged from the system as a result of the amount of time that had elapsed. Although Department Rule allows for the retention of some records of abuse to be maintained for up to 20 years, third degree burns are included in that category while first and second degree burns are not.

After speaking with the boyfriend and conducting the LEADS check under his false name, the investigator conducted no more work on the case for almost two months.  After 54 days since speaking with the boyfriend, the investigator made her first visit to the mother's home. The investigator did not visit the boyfriend's home and continued to identify him as a peripheral figure in the family's life, as the mother denied he ever served in a caretaking role for the young boy, even though they frequently spent overnights in the boyfriend's home. Although the mother and her son lived with her parents, the investigator did not interview them. Five days after the home visit, the investigator recommended the report be unfounded and conducted a review with her supervisor. The investigator's supervisor approved the conclusion and signed off on the case and waived the requirement for a number of required contacts; including day care providers, law enforcement officers and witnesses

Four months after the case was closed, the mother and the boyfriend arrived at a hospital emergency room with the three-year-old, who was unresponsive. The young boy was pronounced dead on arrival. An autopsy performed on the young boy was unable to establish a clear cause of death; however, the post-mortem examination found numerous injuries indicative of serious physical abuse, including bruises, human bite marks and healing rib fractures.  The medical examiner recorded the child's body temperature was 95 degrees at the time of his autopsy and noted the low temperature suggested he had been deceased for a significant amount of time before being brought for medical attention.  The mother provided conflicting accounts of the timeline of events leading up to her discovery of the unresponsive young boy in the home and could not

adequately explain why she had not immediately called 911. The mother claimed she was alone with her son at the boyfriend's home when she found the child in distress.  A child protection investigation of his death resulted in indicated findings against the mother for Death by Neglect, Bone Fracture by Neglect, Cuts, Welts and Bruises by Neglect and Human Bites by Neglect. The official cause of death was undetermined and no criminal charges have been filed.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | |
|---|---|

**1.  This report should be shared with the administration of the pediatric hospital where the boy was treated for his initial injuries.**

The report was shared with the hospital.

**2.  The child protection investigator should receive non-disciplinary counseling for her failure to interview all members of the household, failure to do a scene investigation, failure to secure photo identification for background checks and asses the family's home prior to the boy's discharge from the hospital. A copy of this report should be shared with the investigator.**

The employee received non-disciplinary counseling.

**3.  The child protection investigator's supervisor should receive non-disciplinary counseling for her failure to ensure that the investigator completed basic tasks including obtaining photo identification for background checks, assessing the family's home prior to the boy's discharge from the hospital and ensuring that all members of the household are interviewed. A copy of this report should be shared with the investigator's supervisor.**

The employee received non-disciplinary counseling.

**4.  The Department should ensure that all Priority One Teams receive training regarding obtaining LEADS printouts and assessing criminal histories that involve a pattern of arrests for interpersonal violence.**

Operations will ensure training is completed with Priority One Teams.  The Department is also implementing statewide training.

**5.  When a child three and under suffers an injury and the accidental or intentional nature of that injury cannot be determined and the medical provider does not have a child abuse specialist, the Department should ensure that child protection staff obtain a second opinion from the contractual DCFS medical experts throughout the state.**

Procedures 300, *Reports of Child Abuse and Neglect*, were revised to include this recommendation and issued by Policy Transmittal 2015.23. Training has commenced.

**6.  Inspector General investigators will assist the Sheriff's Department in the criminal investigation of the boy's death.**

Inspector General investigators have met with and continue to offer assistance to law enforcement in this case.

**7.  Rules and Procedures should be amended to provide that any abuse allegations that can be permissively retained for 20 years should be retained for 20 years when criminal charges have been**

**filed and either resulted in a conviction, or are pending.**

This recommendation will be included in revisions to Procedures 300, *Reports of Child Abuse and Neglect*. Part 431, *Confidentiality of Persons Served by the Department of Children and Family Services*, and Part 436, *Records Management*, will also be updated to address this recommendation.

**8.   Burn allegations (other than third degree) should be added to the list of abuse allegations that can be permissively retained for 20 years.**

This recommendation will be included in revisions to Procedures 300, *Reports of Child Abuse and Neglect*. Part 431, *Confidentiality of Persons Served by the Department of Children and Family Services*, and Part 436, *Records Management*, will also be updated to address this recommendation. Revisions will also need to be made to SACWIS, the State Automated Child Welfare Information System.

**DEATH AND SERIOUS INJURY INVESTIGATION 6**

| **ALLEGATION** | A five-year-old boy died as a result of blunt force trauma from being struck in the chest by his mother's boyfriend. During the seven months prior to the boy's death, |

his family had two unfounded child protection investigations regarding reported injuries to the boy's seven-year-old brother.

| **INVESTIGATION** | The first report of injuries to the seven-year-old brother was made after he complained of pain in his abdomen and told school personnel he had been hit in the |

stomach by an older sibling. The following day the seven-year-old said his abdomen still hurt and stated the initial injury had actually been caused when his mother's boyfriend whipped him with a belt and the buckle struck him in the stomach. His allegation was reported to the hotline and a child protection investigation was initiated. The assigned child protection investigator went to the school and met with the seven-year-old and an administrator. The investigator noted no visible injuries to his midsection. The child denied being routinely struck as a form of discipline but did describe regular use of corporal punishment, such as being made to stand in a corner with his arms outstretched for extended periods of time. He stated he was not afraid of his mother or her boyfriend and the administrator told the investigator the school had no previous concerns about the family's treatment of the children or their welfare. However, the mother's boyfriend had only lived in the home for five months, having moved into the home after knowing the mother for two weeks, and the children had only attended the school for three months, limiting school personnel's knowledge of the family.

The investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) determining the children in the home to be safe and his conclusion was approved by his supervisor. The rationale for the safe designation was based on the absence of visible marks on the brother's stomach, the brother's statement he was not fearful of his caretakers and the school's lack of concerns regarding the family prior to the report. The absence of visible wounds to a child's abdomen does not eliminate the possibility of injury to internal organs. Abdominal trauma often is not accompanied by external bruising and symptoms of being punched, kicked or struck might not appear for several hours or days. Such injuries occur more frequently in younger children and have a delayed presentation for medical care as they are more easily incorrectly attributed to other causes or go unrecognized altogether. In addition, the absence of fear of caretakers and lack of concerns by school personnel are not protective factors supporting the determination an environment is safe. While basing their determination upon these unreliable factors, the investigator and his supervisor failed to recognize known risk factors for abuse, such as the recent arrival of an unrelated paramour into the family home and the boy's disclosure of physically exerting positions or exercises employed as discipline. In previous cases, the Inspector General has identified the utilization of such tasks for discipline as an indicator of escalating physical punishment that can result in abuse. When children are disciplined with physical tasks that are developmentally inappropriate and which they cannot perform, their failure at these tasks may lead to more severe forms of punishment.

The investigator met with the mother at the family home. The mother acknowledged she and her boyfriend, who was not present, spanked the children but denied that they used objects against them or that the boyfriend had hit the brother with a belt. The mother told the investigator the children did not have an older sibling at all and characterized the seven-year-old as a habitual liar who told stories in an effort to get attention.

Five weeks after the investigator visited the home, a second report involving the family was made to the State Central Register (SCR) expressing concerns the brother had suffered physical abuse. The day of the report an investigator went to the brother's afterschool day care facility and observed a small red mark on his forehead. The brother told the investigator he and the boy had been playing with a frisbee and an errant throw hit him in the head. The case was then reassigned to the child protection investigator handling the first investigation,

which was still pending. The first investigator then returned to the family home and spoke with the mother's boyfriend for the first time. The boyfriend stated that on the day in question (in the first investigation) he had spanked the brother but denied striking him in the stomach or hitting him with a belt. Following the conversation with the boyfriend the investigator informed the family he would recommend that the first allegation of abuse by the boyfriend be unfounded.

The next day the investigator spoke to school personnel about the second abuse report. School staff stated the child had arrived at school with a visible bump on his head and had told various personnel differing stories as to how it occurred. When questioned about the inconsistencies, staff said the boy told them if he told them the truth about what happened his mother would whip him with a belt again. The child ultimately told school personnel that the night before he had been made to stand in a corner with his arms outstretched while his mother whipped him with a belt. The boy said it was while this was occurring that he fell forward and hit his head on a doorknob, causing the welt. Ten days later, the investigator interviewed the mother and the two siblings. The mother denied whipping the seven-year-old with a belt and stated she did not employ physical discipline with her children. The mother reiterated her assertion the child was routinely untruthful and attention-seeking. The child and his four-year-old brother told the investigator they felt safe in their home and did not fear their caretakers. Four days after this visit with the family, the first abuse report was officially unfounded. The second abuse report was also unfounded one month later. Both decisions relied heavily upon the children's statements they were not afraid to reside in the home, the absence of significant visible physical evidence of injury and statements from the mother that the brother was known to lie in order to get attention.

On the younger child's fifth birthday, five months after the second child protection investigation was closed, a 911 call was made reporting a medical emergency at the family's home. Police arrived and found the boy unresponsive. He was transported to a local hospital where he was pronounced dead. The seven-year-old was taken into protective custody and a medical examination identified multiple marks, bruises and lacerations to his upper legs and buttocks. The treating physician noted his injuries were consistent with loop marks indicative of being whipped with a belt and were too numerous for him to count. The mother admitted to investigators that on the morning the younger son died, his brother had shown her a bruise on his upper thigh he said the boyfriend had caused. During a subsequent child sensitive interview, the seven-year-old stated the boyfriend would often punch the children in the chest as a form of discipline. He also described witnessing episodes of domestic violence inflicted by the boyfriend against the mother.

The ensuing child protection investigation of the younger boy's death resulted in the mother being indicated for Death by Neglect and Cuts, Welts and Bruises by neglect to his brother. The boyfriend was indicated for Death by Abuse to the five-year-old and Cuts, Welts and Bruises by Abuse and Substantial Risk of Physical Injury to the seven-year-old. The law enforcement investigation led to the boyfriend being charged with two counts of First Degree Murder and Aggravated Battery to a Child. The mother was charged with a felony count of Endangering the Life or Health of a Child. Their cases are currently pending.

Five months after the boy's death, the mother gave birth to a son. The boyfriend, who was incarcerated at the time, is the child's father. The brother currently resides in a relative foster home with a goal of being returned to his mother's custody in one year.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  When a child is alleged to have been hit in the stomach and complains of pain or has a poor appetite (or if a non-verbal child exhibits pain, poor appetite, irritability or a change in behavior),** |

**the child should immediately be evaluated by a physician, even when the child has no visible injuries. The Department should ensure this is included in Procedures 300, *Child Abuse and Neglect Investigations*. The form, Referral Form for Medical Evaluation of a Physical Injury to a Child**

**(CANTS 65-A), should clearly document the allegation of being hit in the stomach and complaints of pain.**

This recommendation has been incorporated into Procedures 300, *Child Abuse and Neglect Investigations*. Training has commenced.  The issues regarding the medical evaluation form will be clarified in additional revisions to Procedures 300.

**2.   This report should be shared with the Department's Training Division, with child protection supervisors and with the child protection investigator assigned to the two unfounded reports.**

The redacted report has been shared with the Office of Professional Development.  These requirements have been included in Procedures 300, *Child Abuse and Neglect Investigations*, which is being trained to all child protection staff statewide.  The revisions to Procedures 300 are also being incorporated into Foundations Training for Child Protection Specialists.  The report has been shared with supervisors and Area Administrators and with the involved child protection investigator.

**DEATH AND SERIOUS INJURY INVESTIGATION 7**

| ALLEGATION | A five-and-a-half-year-old girl died of natural causes from a seizure in her sleep related to complications from cerebral palsy. A child protection investigation was pending at the time of her death. |
|---|---|

**INVESTIGATION**

The child was highly medically complex. She was born premature and was without oxygen for approximately 20 minutes at birth. Her medical issues included cerebral palsy, seizure disorder, encephalopathy, quadriplegia, stenosis of the esophagus, GERD, and hip dysplasia. She had a history of aspirating and required a feeding tube.

At the time of her birth, the child's family had an open placement case with the Department, her parents were not participating in services recommended by the Department, and her two older siblings resided with their maternal great grandparents in relative foster care. A month after her birth, her mother signed specific consents allowing the great grandparents to adopt her older siblings.

When the girl was two months old, the private foster care agency assigned to the family's case requested an expanded capacity license so she could be placed with her 67-year-old maternal great grandmother and 64-year-old maternal great grandfather, where her two older siblings resided. The agency's decision to recommend a waiver relied on multiple factors, including the fact that the great grandparents had a strong extended family support system, had years of experience successfully fostering both traditional and relative children, were already caring for her two older siblings, and were familiar with the infant's medical needs. At six months old, the infant was placed in the home of her great grandparents. At the time of her placement, they had six other foster and adopted children residing in their home.

Throughout her life, the level of care the child required was extensive. She required complete assistance with her daily living skills; had frequent medical appointments; was prescribed multiple medications; and received physical, occupational, and speech therapies.

When the child was three-and-a-half years old, her then 69 and 66-year-old great grandparents adopted her. At the time of the adoption, a detailed written backup plan was completed and signed by the backup caregivers in the event that the great grandparents were no longer able to care for her. Medical exams of the great grandparents indicated that both were generally healthy. The Guardian *ad Litem* voiced no concerns regarding the adoption. Relatives, the child's special education teacher, and medical personnel submitted letters of recommendation on behalf of the great grandparents.

Less than two years after the great grandparents adopted the child, three child protection investigations were conducted involving the great grandparents four months before the child's death. Three child protection investigators, and two supervisors, were aware that the 71-year-old great grandmother, who was the primary caregiver, was ill with cancer and that her illness was affecting her caregiving. Despite the critical situation in the household, DCFS child protection investigators did not refer the family for post-adoption services, which would have linked the family to appropriate services including the Illinois Department on Aging. Post-Adoption would also have begun to explore the back-up plans developed when the child was adopted. The great grandmother died six months after the third child protection investigation closed.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. Post Adoption Services should convene a staffing to arrange additional services including mental health supportive services, signing consents for the Department on Aging, and reviewing the** |
|---|---|

 back-up caregiver plan with the children's 71-year-old adoptive father.

The Department agrees and the staffing will be convened.

**2.   Post Adoption Services should train the Division of Child Protection staff in this region on post adoption services and the interagency agreement between DCFS and the Department on Aging.**

Training has been provided. This training will be offered on-line Statewide on an ongoing basis.

## DEATH AND SERIOUS INJURY INVESTIGATION 8

---

| **ALLEGATION** | A three-year-old girl died after being severely physically abused by her legal guardian/maternal great aunt's boyfriend. A child protection investigation of alleged physical abuse of the girl by the boyfriend was opened eight days prior to her death. |
|---|---|

---

| **INVESTIGATION** | Following several hotline calls with allegations of domestic violence between the teen parents, DCFS |
|---|---|

was preparing to take the six-month-old child into custody when the mother agreed to allow her maternal great-aunt to care for the child. Approximately one-and-a-half years later, the maternal aunt obtained guardianship in probate court. At the time the toddler entered her home, the great aunt was married, but she filed for divorce just under two years after she began caring for the child. Three months after the filing, the great aunt began a new relationship with the boyfriend and he moved into the family's home shortly thereafter.

Four months after the great aunt's relationship with the boyfriend began, the State Central Register (SCR) received a report from a secondary source alleging the three-year-old girl had been observed to have bruises on her back and buttocks. It was further alleged the boyfriend had caused the injuries, was engaged in drug activity in the home, and that the young girl's hair appeared to be falling out with no explanation. The secondary source contacted the hotline on behalf of a primary source who they said was reluctant to make the call but was willing to speak to investigators about the allegations. The report was accepted and a child protection investigation was opened. The assigned child protection investigator received the case in the evening and began by requesting local law enforcement to perform a well-being check at the family's home. Responding officers reported finding no one present. The investigator then attempted to contact the secondary source who made the hotline call, but her call went unanswered and she was unable to leave a message. The only phone number for the secondary source that the hotline worker who accepted the report recorded was a work number, which was unlikely to be answered given the time of the investigator's call. In an interview with Inspector General investigators, an SCR administrator stated it was standard practice for operators to ask callers for the best number to reach them rather than request all numbers that might prove useful for future contact. Given the importance of thoroughness, efficiency and timeliness when conducting investigations, acquiring as much pertinent information as possible at intake, including all relevant phone numbers for reporters, would improve the likelihood of reaching them as soon as possible.

After her unsuccessful attempt to contact the secondary source, the child protection investigator was able to reach the primary source. In her case notes, the child protection investigator recorded a summation of their conversation, in which the source said she knew the child was losing her hair and that she did not say the child had bruises. She said she used to babysit the child but had not seen her in a while as the great aunt restricted her access to the child. In response, the investigator had chastised the primary source, stating, "she should refrain from making allegations if she has not seen minor or is [un]certain about what happened." In her interview with Inspector General investigators, the child protection investigator stated it was late evening when she spoke with the primary source and she, "couldn't sit there all night talking to her." The investigator said that as a result she began the conversation with direct questions regarding the allegations of bruising that the primary source, "back-pedaled." In formulating her characterization of the report's veracity, the investigator neglected to account for the reticence the primary source had initially exhibited in having someone else make the SCR call, suggesting the source was fearful of coming forward herself. Rather than reassure the primary source her concerns would be addressed professionally and confidentially, the investigator struck an accusatory tone and discounted her report.

The following day, the child protection investigator contacted local law enforcement regarding previous police activity at the family's residence. The investigator was informed that one week before the hotline call,

the young girl's "uncle" had made an in-person visit to the station to request "advice." The child protection investigator failed to obtain any further information related to this contact between a relative and law enforcement. The Inspector General investigators obtained documents related to the relative's visit to the police station and found the contact had actually involved the young girl's paternal grandfather, the great aunt's brother. The grandfather had told police he was concerned about the boyfriend's presence in the home where the young girl was living and his suspicions of the couple's involvement with drugs. In her interview with Inspector General investigators, the child protection investigator acknowledged never requesting or reviewing any police documentation of the interaction or informing her supervisor of the contact.

Later that day, after speaking with police, the investigator made her first attempt to visit the family but found no one home and left a note requesting a call. Five days later, the investigator began a scheduled one-week vacation. Although Department Procedure requires attempts to be made every 24 hours to establish contact with a family involved in a child protection investigation, the single home visit represented the only effort to locate the family prior to the young girl's death. In her interview with Inspector General investigators, the investigator conveyed the difficulty related to being assigned a new case during the week prior to her vacation beginning, as she was busy trying to complete work on existing cases. A review of the investigator's case log found that at the time she received the young girl's case, she had been assigned a number of cases beyond the threshold recommended as part of a consent decree the Department entered into which was intended to limit individuals' workloads. In a separate interview with Inspector General investigators, the investigator's supervisor stated she was aware the investigator had not seen the family prior to beginning her vacation but intended to keep working on this case, as well as others, while she was out of the office. Both the investigator and her supervisor confirmed there was no system in place to ensure such required family contacts are conducted when assigned workers are unavailable. Although the great aunt called the investigator twice prior to her beginning her vacation, the investigator did not hear either message until she called into her voicemail on the day the young girl died. In her interview with Inspector General investigators, the investigator stated it was not her practice to check her voicemail every day.

Eight days after the initial hotline report was made, the great aunt returned home and found the three-year-old girl gasping for air. She was transported to a local hospital where she was pronounced dead. An autopsy found she had severe head injuries including subdural hematoma, intraretinal hemorrhages and perineural optic nerve damage. The young girl also presented numerous bruises on her body at different stages of healing and patchy hair loss across the top of her head. It was determined the fatal injuries were the result of blunt force trauma and the manner of death was ruled homicide. During the course of the subsequent law enforcement investigation it was concluded that only the great aunt and her boyfriend had been with the child on the day her injuries were inflicted. The boyfriend had been alone with the young girl for nine hours while the great aunt was out of the home. When the great aunt returned, she observed a fresh bruise on the child for which the boyfriend provided an implausible explanation. The criminal investigation led to Felony First Degree Murder charges being filed against the boyfriend. He is currently in jail awaiting trial. A second child protection investigation initiated in response to the young girl's death resulted in the boyfriend being indicated for Death by Abuse and the great aunt being indicated for Death by Neglect.

During the course of its investigation, the Inspector General investigators found another individual had previously contacted the hotline with concerns about the boyfriend's presence and activities in the home. With the assistance of SCR, the Inspector General investigator was able to identify the record of the hotline call. The Inspector General investigators learned that intake calls are indexed by the name of the subject of the allegation and those names are the only means of searching for any additional related calls. The previous call, which was taken as "information only, did not appear in searches for related reports because the boyfriend's name was spelled incorrectly.

Ten weeks after the three-year-old girl's death, her mother gave birth to another daughter. Five weeks later,

police were called to the mother's home in response to a domestic violence incident involving her and the baby's father. The mother obtained an order of protection against the father and a short-term intact family services case was opened through a private agency to assist the mother and baby. Eight months later, the mother was arrested for assaulting a relative whom she and the baby were living with at the time. In response, private agency staff created a safety plan calling for the baby to remain with the relative while the mother moved out of the home. The safety plan remained in place for four months while the mother continued to be non-compliant with required services and made threats to kidnap the baby. The mother also failed to provide adequate financial support to the baby despite receiving public funds to do so and neglected to take the baby to necessary medical appointments. At one point, after being informed of the mother's behavior, a state's attorney advised the private agency caseworker to make a hotline report and, if the call was not accepted, screen the case into court. The caseworker made a hotline call, but after the report was not accepted she did not screen the case into court. The safety plan was only finally ended when the relative who was caring for the baby was planning to leave town on vacation and the mother was the only available caretaker. Private agency staff allowed the mother to resume custody of the baby under a set of conditions or have the child placed in a non-relative home. Department procedure requires safety plans to be voluntarily entered into by the family and employed as temporary measures for stabilization rather than solutions to ongoing issues. The baby's safety plan was in place for four months, was not entered into on a voluntary basis by the family, and was only rescinded out of necessity rather than a change in the mother's behavior or circumstances.

---

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.   In addition to asking for the best phone number at which a reporter can be reached, SCR call floor workers should ask for other phone numbers, such as a cell phone number, at which the reporter may be reached.** |

This recommendation has been included in the State Central Register (SCR) script.

**2.   In addition to training staff on how to search and link Information and Referral intakes, SCR should train staff to be comprehensive in their documentation of Information and Referrals.**

SCR staff received SCR Linking training.  They also receive SCR Foundations training which covers all types of Intakes, including Information and Referrals, and they are taught how to document those.  Additionally, in the revision of P300, *Child Abuse and Neglect Investigations*, the intakes are better defined and clarified as how SCR staff are to use them and when to apply a specific intake.   All SCR staff are attending the revised P300 training.

**3.   Supervisors must require that their workers listen to their voicemail before leaving on vacation and leave an outgoing message referring callers to their supervisor in their absence.**

Staff have been notified.  Since all staff do not have voice mail, it was also put in revised Procedures 300.70c, *Supervisory Duties, Case Assignment.*

**4.   The child protection investigator should be counseled for her less than professional conduct while speaking with the primary source; for failing to follow up on the police statement that a relative had sought advice nine days earlier; and for not checking her voicemail before going on vacation.**

The employee was counseled.

**5.   The child protection supervisor should be counseled for failing to ensure that daily attempts were made to see a three year-old alleged victim of physical abuse following the investigator's good faith**

**attempt.**

The employee was counseled.

**6.   The private agency assigned to the intact family services case should counsel their employees about the proper and inappropriate uses of safety plans.**

The Inspector General shared the report with the private agency and requested that the agency review its practices on safety planning.

**7.   The Department's Clinical Division should review the newborn girl's case to determine whether services being provided are appropriate and whether the girl should be screened with the local State's Attorney's office.**

The State's Attorney declined to file.

**8.   This report should be shared with the Attorney General's Office with regards to pending litigation.**

DCFS was voluntarily dismissed from the litigation, but the recommendation was still shared with the Attorney General's office.  Both DCFS Legal and the Attorney General's office continue to track the federal litigation, which is currently stayed pending resolution of the criminal trial regarding the death because DCFS employees have previously been subpoenaed for depositions and DCFS anticipates receiving a subpoena for documents as part of the discovery process.

An information transmittal was issued noting the need to improve compliance with making/documenting daily good faith attempts to see child victims and to ensure we are gathering all pertinent information by completing out of state LEADS.

**DEATH AND SERIOUS INJURY INVESTIGATION 9**

| ALLEGATION | A nine-year-old ward died of bronchial asthma. The child had a history of poorly controlled asthma, and had multiple asthma-related incidents/attacks requiring |

emergency room treatment within the year prior to his death. His death was the first death of a ward with asthma since the Department implemented a statewide asthma policy along with education and training twelve years earlier, in response to a recommendation in a 1999 Inspector General's report on asthma. In response to the child's death, the Inspector General initiated a review of the effectiveness of the Department's current asthma policy.

| INVESTIGATION | By the time the child entered foster care at age seven, his asthma had already been documented as problematic in two prior child protection investigations and he had |

a medical diagnosis of mild persistent uncontrolled asthma. In his first six months of foster care, his asthma exacerbated and he was referred for a pediatric pulmonology consult. The pulmonologist changed the child's diagnosis to severe persistent asthma, poorly controlled, and documented concerns that although the child's airway was severely obstructed during the consult, he did not seem distressed nor did he perceive the severity of his asthma. The child was administered a breathing treatment, which brought only mild improvement. The pulmonologist documented that the combined issues increased the child's risk for fatal asthma. The pulmonologist documented a 14-point response to the child's asthma, which he explained to the foster parents and child.

Over the next several months, the child's asthma seemed to be well controlled. His foster parents consistently administered the child's medications and took him to his medical appointments. After approximately nine months of his asthma remaining fairly well controlled, the eight-year-old child had an asthma attack while with his caseworker, which necessitated emergency room treatment. Hospital records documented that despite his severe asthma attack, he was highly active in the emergency room and in no apparent distress.

Approximately three months after the asthma attack with his caseworker, he had another asthma attack that required emergency room treatment. The child had a third asthma attack two months later, which also required emergency room care. On both occasions, the child's foster parents took him to a different hospital emergency room than the one at the hospital with which the child's pulmonologist and pediatrician were affiliated. The child's pulmonologist and pediatrician remained unaware of the second and third asthma attacks, and inaccurately believed that the child's asthma was well controlled.

The child's pulmonologist went on medical leave. Because the clinic erroneously believed the child's asthma was well controlled, when it had in fact exacerbated, his appointment was rescheduled to a later date. Days prior to his rescheduled appointment, the child and his younger sibling were placed with their grandmother, an unlicensed relative, as their current caregivers were unable to continue providing care. The grandmother was unable to transport the nine-year-old to his appointment on short notice, and rescheduled the boy's appointment several weeks later.

After residing with his grandmother for a month, the child spent a day visiting cousins and playing at the park. In the evening, he told his grandmother that he was having difficulty breathing, and the grandmother administered two nebulizer treatments. Shortly thereafter, the child collapsed and died of a bronchial asthma attack.

The Department's statewide asthma policy had three primary ways of identifying a ward with asthma:
1. submission of the Identification of a Child Diagnosed with Asthma form (CFS 691);
2. identification of asthma as (1) a life-threatening disease documented by a medical professional or (2)

a medical condition requiring an extraordinary level of service intervention in order to stabilize and sustain the child in placement on the Checklist for Children at Initial Placement form (CFS 418-J);
3. submission of a DCFS Regional Nurse Referral Form (CFS 531).

The Department's Division of Service Intervention Health Services, which includes the Division of Nursing, was charged with identifying, tracking and providing additional support to wards with asthma. However, the Division of Service Intervention Health Services was unaware of the child. Although the Identification of a Child Diagnosed with Asthma form was in the child's case record, the Division of Service Intervention-Health Services, where it was to have been submitted, did not have any record of receiving it. At the child's initial foster care placement, he was identified as having mild, intermittent asthma and his asthma did not meet the criteria necessary for the checklist to be submitted. Although the child's asthma warranted a nursing referral, none was ever made and the Division of Nursing remained unaware of him.

In an attempt to identify child wards diagnosed with asthma, the Department's Division of Service Intervention-Health Services keeps a Special Medical Conditions database. The Inspector General found that wards with asthma were not being adequately identified in the Special Medical Conditions database. Further, information suggested that even wards who were identified as having asthma and entered in the database were not being tracked or given education and supportive services, as the Division of Nursing was unaware that there was a Special Medical Conditions database.

A ward's medical information is available online to Department and private agency staff via the Statewide Automated Child Welfare Information System (SACWIS) e-Health data system. Although not exhaustive, the information includes the child's diagnosis, medications, emergency room visits, and hospital admissions. However, no one is required to monitor the e-Health data, and the child's medical information indicating that he had three emergency room visits within a year went unnoticed; a nursing referral was not submitted, nor was his pulmonologist or pediatrician notified.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The Division of Service Intervention – Health Services must develop a collaborative system to ensure that all divisions within the Department are identifying wards with asthma and notifying** |

**the Health Services unit. The Division of Service Intervention – Health Services must integrate wards' asthma information into the Health Service's Special Medical Conditions Database, and ensure that each of these wards and their caregivers receive increased education and services.**

At case opening, a child should be identified as having an asthma diagnosis via initial placement form CFS 418J and/or form CFS 691, identification of a child diagnosed with asthma. A screening form and Asthma Action Plan are completed and copies are sent to Health Services Information Specialist for tracking. Ad hoc reports are completed as requested and for asthma related initiatives. Health Services Administrator and Medical Director have engaged DCFS Guardian to "bridge the gap" between a consent given for an asthma related ER/hospitalization and caseworker, nurse follow up. DCFS guardian consent line copies Health Policy Administrator on all consents given for asthma related ER/Hospitalizations. Health Policy Administrator or DCFS Chief nurse follows up with worker to ensure proper referral/protocol is introduced.

**2. The Division of Service Intervention – Health Services must implement an effective monitoring system over the SACWIS e-Health data system to avoid the failures noted in this report, such as an asthmatic child admitted to the ER multiple times within six months without supplemental interventions, including a nursing referral and notification to the child's pulmonologist.**

The Health Policy administrator and DCFS Medical Director are working with the Office of Information

Technology Services (OITS) to make needed enhancements to SACWIS/E-health. The current Procedure 302 Appendix 0 will be revised to reflect that any child who has an Emergency room visit or admitted to the hospital for asthma related diagnosis MUST have a completed CFS691 form (asthma diagnosis).  The caseworker and foster parent must have a copy of an Asthma Action Plan from the respective hospital and the worker must complete a nursing referral (CFS 531) for continued consultation and health recommendations.

**3.  The Department's Clinical Division (Nursing) will review wards currently taking asthma medication or identified as having had an emergency room visit or other hospitalization with an asthma or other airway disease diagnosis (based on Medicaid data), and assess whether they should be included in the Department's Asthma database and what nursing interventions are appropriate for each ward.**

The Health Policy administrator and Medical Director are working with OITS to make needed enhancements to SACWIS/E-health.  Data is currently not viable for use on prescribed asthma medications for wards.  At full implementation, data will identify DCFS children who are taking prescription medication.

DEATH AND SERIOUS INJURY INVESTIGATIONS

**DEATH AND SERIOUS INJURY INVESTIGATION 10**

| | |
|---|---|
| **ALLEGATION** | A Department ward died of undetermined causes three weeks before his third birthday. At the time of his death, the child resided in a traditional non-relative foster home with two of his siblings. |

| | |
|---|---|
| **INVESTIGATION** | The almost three-year-old and his twin brother had been placed in the foster home when they were four-months-old after being removed from their mother's custody |

as a result of the mother's failure to adequately address the infant's medical issues. The toddler had been born prematurely and presented multiple health complications, including a rare congenital neural tube condition that affected his brain, as well as lymphoid hyperplasia which caused the rapid growth of cells in his lymph tissue. The toddler also had a history of enlarged adenoids and exhibited respiratory problems including labored breathing and sleep apnea.

The twins' foster mother had been licensed through a private agency for six years prior to the children being placed in her home. In her initial licensing application, the foster mother reported she only worked between 16-20 hours per week. She also stated she was in reasonable health, was physically capable of caring for children, and was not a cigarette smoker. Two medical forms were in the file, which had been completed four and nine years, respectively, after the foster mother was initially licensed. The first identified obesity as a health issue for the foster mother. The second form, completed two months prior to the toddler's death, listed obesity as a health concern, as well as diabetes, which she reported she had been diagnosed with 13 years earlier. Additionally, the second medical form stated the foster mother did in fact smoke cigarettes.

The caseworker reported smelling cigarette smoke in the home four months after the twins were placed there. The foster mother acknowledged that both she and her boyfriend, whom she said was frequently in the home, were smokers, but stated they did not smoke around the children. Although Department Licensing Rules prohibit smoking either inside or within a 15-foot radius of a foster home, there was no further discussion of the issue.

Two months after the caseworker noted the smoking issue, the foster mother's boyfriend, who had moved into the home, formally applied to the Department to be recognized as a member of her household. In his application, the boyfriend reported a criminal history consisting of five convictions for drug-related offenses. His most recent conviction had occurred 11 years earlier. An assessment included in the application noted that the boyfriend assisted the foster mother in caring for the children, was appropriate and caring towards them, and had truthfully divulged his criminal history. The boyfriend's application to join the household was denied and he was required to move out of the home in order for the foster mother to retain her license. The Illinois Child Care Act allows the Department to waive criminal histories provided certain criteria are met, including that their offenses are more than 10 years old and that they truthfully divulge their pasts at the outset of the application process. Although there is no rational basis, the statute can be read as prohibiting waivers for anyone moving into a home after a child has been placed.

As part of her boyfriend's application process, the foster mother reported her household income consisted of about $600 she received monthly in food stamps and another approximately $600 her boyfriend received from the Illinois Department of Rehabilitation Services (DORS) under the auspices of the Illinois Department of Human Services (DHS) for serving as the foster mother's personal assistant. In order to qualify for a personal assistant through DORS, an individual must demonstrate that without such services they would likely require full-time care in a residential nursing facility. A review of the foster mother's DORS case file found the foster mother's request for services was supported by a letter from a doctor citing numerous health issues. The letter stated the foster mother suffered from uncontrolled diabetes mellitus as well as chronic obstructive pulmonary

disease, experienced shortness of breath, and should be restricted from lifting more than 15 pounds. It also detailed significant cognitive impairments regarding her judgment, insight, concentration, motivation, and ability to process or retain new information. The foster mother had been approved for a personal assistant, her boyfriend, one year before the twins were placed in her home.  In reviewing the case file, the Inspector General investigators found no evidence that the involved private agency staff considered whether the foster mother had adequate income to care for three young children, especially once the boyfriend was forced to move out.

Six months after the last documented visit by private agency staff to the foster mother's home, which served to support her intent to adopt the siblings, emergency personnel were called to the home after the boyfriend found the two-year-old unresponsive in his bed. He was transported to a local hospital where he was pronounced dead. An autopsy performed by the medical examiner found the cause of the toddler's death to be undetermined. The police who responded performed CPR on the boy and he coughed up a piece of a hot dog. The foster mother reported the child frequently had difficulty breathing when sleeping on his back and said she had been instructed by a doctor to put him on his side to sleep at night, "to prevent irregular breathing." The foster mother stated she smoked two cigarettes per day and her boyfriend smoked 10 per day, and they admitted to smoking in and around the home though they believed they did not subject the children to second hand smoke. The private agency recommended revoking the foster mother's foster home license.

The Inspector General referred the case to DORS for a reassessment of the foster mother's physical health and mental functioning. Upon arriving at the home, the assessor encountered the boyfriend, who stated the foster mother was asleep after taking prescription painkillers and could not be awakened. The assessor observed the foster mother under the covers of her bed, but her boyfriend's multiple attempts to awaken her were unsuccessful. The assessor interviewed the boyfriend, who reported the foster mother had been in a car accident 15 years earlier and which resulted in five vertebrae fractures in her back and neck. The boyfriend said the injuries caused the foster mother debilitating pain and she required his assistance for bathing, using the bathroom, and performing household tasks.  The Inspector General also learned that the foster mother had applied for supplemental security income on nine occasions and had been denied benefits each time, though she had appealed the most recent rejection.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  A foster care license applicant must provide the licensing worker with a Consent for Release of Information form for the Social Security Administration (SSA). The Social Security Administration Consent form should be used.** |
|---|---|

Revisions to application forms and procedure are in process.   A policy guide will be distributed with the form changes.

**2.  The Department should amend CFS 718-A, *Authorization for Background Check for Foster Care and Adoption*, to include authorization to determine if the applicant has an active case with the Illinois Department of Rehabilitation Services.**

Revisions to the form and procedure are in process.  A policy guide will be distributed with the form changes.

**3.  Once the Department obtains the SSA and DHS information, the applicant's potential disability should not necessarily bar the person from providing foster care, but rather the information should be considered for whether the person is physically and mentally capable of caring for children. When there is a significant discrepancy between the DCFS health record and the SSA or DHS, the Department should refer to SSA or DHS for possible fraud and consider revocation for lack of**

**trustworthiness.**

Revisions to application forms and procedure are in process. The only reason the information would be requested from the Social Security Administration or Division of Rehabilitation Services would be to include it in the licensing home study.  The home study, taken as a whole, would determine the recommendation for licensure and/or any restrictions on the license related to the type of care a child requires, or age of child placed in the home.

**4.   The Department must ensure, either through Rules, legislation or policy interpretation, that foster homes are entitled to consideration of waivers of criminal backgrounds when appropriate.**

With the involvement of Licensing, the Office of Legal Services has written a policy directive providing for the simultaneous issuance of both a foster home's licensing application and criminal background waiver in appropriate situations. The Department believes this is a reasonable interpretation of the statute that will facilitate granting of waivers when warranted.  The Office of Legal Services is supporting the Licensing staff in its review of licensing forms to make any charges necessary to comply with the policy directive, and in the training of internal and private agency staff.

**5.   This report should be shared with the private agency, both to assist in the revocation process and to educate staff concerning necessary referrals for licensing investigations (smoking in home) and more robust exploration of whether the foster parent has sufficient income to meet licensing standards.**

The Inspector General shared the report with the private agency and the agency's Board of Directors. In response to additional information provided by the private agency, the Inspector General is investigating additional concerns involving third parties.

**6.   No child who has asthma or any serious chronic respiratory or cardiovascular complications or vulnerabilities, nor any premature infant should be placed in a home where the foster parent or any member of the household smokes. The Placement Clearance Process should be expanded to encompass smoking habits and medical needs of children.**

This recommendation remains under review.

## CHILD DEATH REPORT

Inspector General staff investigate the deaths of children whose families were involved in the Illinois child welfare system within the preceding twelve months. Inspector General staff receive notification of the death of a child from the Illinois State Central Register (SCR), when the death is reported to SCR.[1] Inspector General staff investigate the Department's involvement with the deceased and his or her family when (1) the child was a ward of DCFS; (2) the family is the subject of an open investigation or service case at the time of the child's death; or (3) the family was the subject of an investigation or service case closed within the preceding twelve months. If Inspector General investigators learn of a child death meeting this criteria that was not reported to the SCR, staff will still investigate the death.

Notification of a child's death initiates an investigatory review of records.  Inspector General investigators review the death reports and information available through the Department's computerized records. The investigator then obtains additional records including autopsy reports.[2]  Records may be impounded, subpoenaed, or requested. Then they are reviewed. The majority of cases are investigatory reviews of records, often including social service, medical, police, and school records, in addition to records generated by the Department or its contracted agencies.

When warranted, Inspector General investigators conduct a full investigation, including interviews.  A full investigation may result in a report to the Director of DCFS.  Individual cases may not rise to a level necessitating a full investigation, but collectively can indicate systemic patterns or problems that require attention. Inspector General staff may address systemic issues through a variety of means, including cluster reports, initiatives, and trainings.

In Fiscal Year 2015 Inspector General staff investigated **96** child deaths meeting criteria for review, *a decrease (of 3) from 99 deaths in FY 2014, which had increased (by 6) from 93 deaths in FY 2013*.  A description of each child's death and DCFS involvement is included in this annual report for children who died between July 1, 2014 and June 30, 2015.  During this fiscal year investigatory reviews of records were conducted in 76 cases. Full investigations were opened in 20 cases.  Eighteen investigations are pending. Comprehensive summaries of death investigations reported to the Director in FY 15, which may include deaths that occurred in earlier fiscal years, are included in the Investigation section of this annual report.

In Fiscal Year 2015 no child had a cause of death of Sudden Infant Death Syndrome (SIDS). This is reflective of a national statistic showing that over the past 20 years, the rate of infant mortality attributed to SIDS has decreased while the rate of infant deaths attributed to accidental asphyxiation or undetermined causes has increased. As noted in the report submitted by the Inspector General in FY 2014 regarding investigating and indicating parents for co-sleeping, this is due, in large part, to the reclassification of infant deaths that historically would have been called SIDS (Sudden Infant Death Syndrome), a natural manner of death, to SUDI (Sudden Unexplained Death in Infancy) or Undetermined, undetermined manners of death. According to the Centers for Disease Control (CDC) and

---

[1] SCR relies on coroners, hospitals, medical examiners and law enforcement to notify them of child deaths, even when the deaths are not suspicious for abuse or neglect. Some deaths may not be reported.  As such statistical analysis of child deaths in Illinois is limited because the total number of children that die in Illinois each year is unknown. The Cook County Medical Examiner's policy is to notify the Department of the deaths of all children autopsied at the Medical Examiner's office.

[2] The Inspector General wishes to acknowledge all the county coroners and the Cook County Medical Examiner's Office for responding to our requests for autopsy reports.

CHILD DEATH REPORT

the National Association of Medical Examiners (NAME), a death is only properly classified as SIDS when there is no other cause of death identified after a complete autopsy, including toxicology and other laboratory tests, scene investigation, and review of the medical/clinical history, *and there are no unusual scene findings or sleeping conditions identified.* In the DCFS population there has been a steady decrease in the number of infant deaths classified as SIDS and an increase in the deaths classified as SUDI.

### *Two Year Cohort Report of DCFS Ward Victims of Street Homicides*

During FY 2015 the Office of the Inspector General initiated an investigation of wards killed due to street violence. The report, *Two Year Cohort Report of DCFS Ward Victims of Street Homicides*, will address wards killed in FY 2014 and FY 2015. In FY 2014 *three* wards were killed in street violence. Two of the wards were 18 years old and one was 17 years old.  In FY 2015 *eight* wards were killed in street violence. Six of the eight wards were either 18 or 19 years old. The other two were even younger - 14 and 17 years old.

Murder charges have been filed in four of the eight deaths. In the case of the 14-year-old victim, two males, ages 19 and 21, have been charged. In the case of the 17-year-old victim, a Chicago police officer has been charged. In the case of one of the 19-year-old victims, a 20-year-old male ward has been charged. And in the case of the 20-year-old victim, 20 and 21-year-old males have been charged. Four of the murders are unsolved. The number of wards killed by street violence in FY 2015 is two times the highest number in any of the last five years. The report is expected to be completed in early 2016.

## Summary

Following is a statistical summary of the 96 child deaths investigated by Inspector General staff in FY 15, as well as summaries of the individual cases. The first part of the summary presents child deaths by age and manner of death, case status and manner of death, county and manner of death, and child protection death investigations by result and manner. The second part presents a summary of deaths classified in five manners: homicide, suicide, undetermined, accident, and natural. [3] Note that the term coroner is used for both coroners and the Cook County Medical Examiner in the individual summaries.

### *Key for Case Status at the time of Inspector General investigation:*

Ward . . . . . . . . . . . . . . . . . . . . .   Deceased was a ward.

Unfounded DCP . . . . . . . . . . .   Family had an unfounded child protection investigation within a year of child's death.

Pending DCP . . . . . . . . . . . . . .   Family was involved in a pending child protection investigation at time of child's death.

Indicated DCP . . . . . . . . . . . .   Family had an indicated child protection investigation within a year of child's death.

Child of Ward . . . . . . . . . . . . .   Deceased was a ward's child, but not a ward himself/herself.

Open/Closed Intact . . . . . . . . .   Family had an open intact family services case at time of child's death / or within a year of child's death.

Open Placement/Split Custody   Deceased, who never went home from hospital, had sibling(s) in foster care or child was in care of parent with siblings in foster care.

Return Home . . . . . . . . . . . . . .   Deceased or sibling(s) was returned home to parent(s) from foster care within a year of child's death.

Child Welfare Services Referral   A request was made for DCFS to provide services, but no abuse or neglect was alleged.

Preventive Services/
Extended Family . . . . . . . . . . . . . . . . .   Intact family services case was opened to assist family, but not as a result of an indicated child protection investigation.

Former Ward . . . . . . . . . . . . . . . . . . . .   Child was a ward within a year of his/her death.

---

[3] The causes and manners of death are determined by hospitals, medical examiners, coroners and coroners' juries.

**Table 1: Child Deaths by Age and Manner of Death**

| | CHILD AGE | HOMICIDE | SUICIDE | UNDETERMINED | ACCIDENT | NATURAL | TOTAL |
|---|---|---|---|---|---|---|---|
| Months of Age | At birth | | | 1 | | 1 | 2 |
| | 0 to 3 | 1 | | 11 | 8 | 5 | 25 |
| | 4 to 6 | | | 3 | 2 | 2 | 7 |
| | 7 to 11 | 1 | | 2 | 2 | 3 | 8 |
| | 12 to 24 | 2 | | 3 | 4 | 4 | 13 |
| Year of Age | 2 | | | | 1 | 1 | 2 |
| | 3 | 2 | | | 1 | | 3 |
| | 4 | | | | | 1 | 1 |
| | 5 | 1 | | | | 4 | 5 |
| | 6 | 1 | | 1 | | 1 | 3 |
| | 7 | | | | 1 | | 1 |
| | 8 | | | | 1 | | 1 |
| | 9 | | | | | 2 | 2 |
| | 10 | | | | | | |
| | 11 | | | | | | |
| | 12 | | | | | | |
| | 13 | | 1 | | 1 | | 2 |
| | 14 | 1 | | | | | 1 |
| | 15 | | | | | | |
| | 16 | 3 | | | | | 3 |
| | 17 | 3 | 3 | | 1 | 1 | 8 |
| | 18 or older | 6 | | | 2 | 1 | 9 |
| | TOTAL | 21 | 4 | 21 | 24 | 26 | 96 |

**Table 2: Child Deaths by Case Status and Manner of Death**

| REASON FOR OIG investigation* | | HOMICIDE | SUICIDE | UNDETERMINED | ACCIDENT | NATURAL | TOTAL |
|---|---|---|---|---|---|---|---|
| DCP | Pending | 3 | | 4 | 4 | 3 | 14 |
| | Unfounded | 4 | 2 | 7 | 12 | 5 | 30 |
| | Indicated | 1 | | 2 | 1 | 1 | 5 |
| Ward | | 9 | 1 | 1 | 3 | 10 | 24 |
| Former Ward | | 1 | | | 1 | | 2 |
| Return Home | | | | | | | 0 |
| Open Placement/Split Custody | | | | 1 | 1 | 4 | 6 |
| Open Intact | | 1 | 1 | | 1 | | 3 |
| Closed Intact | | 2 | | 3 | 1 | 3 | 9 |
| Child of a Ward | | | | 1 | | | 1 |
| Child Welfare Services Referral | | | | | | | 0 |
| Preventive Services/Extended Family | | | | 2 | | | 2 |
| TOTAL | | 21 | 4 | 21 | 24 | 26 | 96 |

* When more than one reason existed for the Office of the Inspector General investigation, the death was categorized based on primary reason.

**Table 3: Child Deaths by County of Residence and Manner of Death**

| COUNTY | HOMICIDE | SUICIDE | UNDETERMINED | ACCIDENT | NATURAL | TOTAL |
|---|---|---|---|---|---|---|
| Adams | 1 | | 1 | 1 | | 3 |
| Bureau | | | | | 1 | 1 |
| Cass | 1 | | | | | 1 |
| Champaign | | | 1 | | | 1 |
| Christian | | | | 1 | | 1 |
| Cook | 16 | 3 | 8 | 5 | 15 | 47 |
| DuPage | | | 1 | | 1 | 2 |
| Franklin | | | | 1 | | 1 |
| Hancock | | | 1 | 1 | | 2 |
| Henry | | | | | 1 | 1 |
| Jackson | | | | 1 | 1 | 2 |
| Jersey | | | | 1 | 1 | 2 |
| Kane | | | 1 | | | 1 |
| Kankakee | | | | 1 | | 1 |
| Lake | | | 1 | 1 | | 2 |
| LaSalle | | | 1 | | 1 | 2 |
| Livingston | | | | 1 | | 1 |
| Marion | | | | 1 | | 1 |
| Peoria | 1 | | 1 | 2 | 1 | 5 |
| Randolph | 1 | | | | | 1 |
| Rock Island | | | 1 | | | 1 |
| St. Clair | | 1 | 1 | 2 | 2 | 6 |
| Saline | | | 1 | 1 | | 2 |
| Sangamon | | | | 1 | | 1 |
| Will | | | 2 | | | 2 |
| Williamson | | | | 1 | 1 | 2 |
| Winnebago | | | | 1 | 1 | 2 |
| Out of State | 1 | | | 1 | | 2 |
| **TOTAL** | **21** | **4** | **21** | **24** | **26** | **96** |

**Table 4: Child Protection Death Investigations by Result and Manner\*\***

| FINAL FINDING | Homicide | Suicide | Undetermined | Accident | Natural | Total |
|---|---|---|---|---|---|---|
| Indicated | 5 | 1 | 7 | 10 | 2 | **25** |
| Unfounded | 0 | 0 | 6 | 8 | 5 | **19** |
| Pending | 0 | 0 | 1 | 0 | 0 | **1** |
| Total | 5 | 1 | 14 | 18 | 7 | **45** |

\*\* Child deaths in which at least one person was indicated or unfounded for death by abuse or death by neglect. Note that persons indicated for death will stay on the State Central Register for 50 years.

## FY 2015 DEATH CLASSIFICATION BY MANNER OF DEATH

### HOMICIDE
*Twenty-one deaths were classified homicide in manner.\**

| CAUSE OF DEATH | NUMBER |
|---|---|
| Gunshot wound(s) | 11 |
| Injuries due to child abuse* | 6 |
| Asphyxia due to smoke inhalation | 1 |
| Malnutrition due to starvation | 1 |
| Stab Wounds | 1 |
| Undetermined | 1 |
| **TOTAL** | **21** |

*Includes one death where the initial abusive injuries left the child severely disabled and the child died of a seizure disorder resulting from the injuries

### PERPETRATOR INFORMATION:*

| PERPETRATOR | NUMBER |
|---|---|
| Mother | 1 |
| Father | 3 |
| Mother's Boyfriend | 2 |
| Father's girlfriend | 1 |
| Caretaker | 1 |
| Unrelated Adults | 5 |
| Unrelated Peer | 3 |
| Unknown/Unsolved | 9 |

*Some deaths have more than one perpetrator

| PERPETRATOR GENDER | PERPETRATOR AGE RANGE | CHARGES |
|---|---|---|
| Males | 19 years-43 years | Murder (8 men)<br>Involuntary Manslaughter (1 man )<br>Obstruction of justice (1 man – other charges are expected) |
| Females | 21 years- 42 years | Murder (2 women)<br>Involuntary Manslaughter (1 woman) |

## SUICIDE
*Four children died from suicide this fiscal year.  Three of the youth hung themselves and one died of a gunshot wound.*

## UNDETERMINED
*Twenty-one deaths were classified undetermined in manner.*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Undetermined | 11 |
| Sudden unexpected/unexplained death in infancy (SUDI) | 6 |
| Asphyxia due to unsafe sleeping position | 1 |
| Medical conditions complicated by substance exposure | 1 |
| Asphyxia due to smoke inhalation | 1 |
| Gunshot wound | 1 |
| **TOTAL** | **21** |

## ACCIDENT
*Twenty-four deaths were classified accident in manner.*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Asphyxia/Suffocation/Overlay/sleep related | 12 |
| Multiple blunt injuries from motor vehicle collision | 4 |
| Drug overdose | 3 |
| Drowning/complications of near drowning | 4 |
| Burns/thermal injuries | 1 |
| **TOTAL** | **24** |

## NATURAL
*Twenty-six deaths were classified natural in manner.*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Cardiac conditions | 5 |
| Congenital abnormalities | 3 |
| Complications from Cerebral Palsy/ Chronic disease process | 5 |
| Severe acidosis | 1 |
| Cancer | 4 |
| Viral syndrome | 2 |
| Asthma/Respiratory Illness | 3 |
| Sudden unexpected/unexplained death in infancy (SUDI) | 1 |
| Sepsis | 1 |
| Complications of diabetes | 1 |
| **TOTAL** | **26** |

## HOMICIDE

| Child No. 1 | DOB 2/08 (reported) | DOD 7/14 | Homicide |
|---|---|---|---|
| Age at death: | 6-1/2 years (reported) | | |
| Substance exposed: | Unknown | | |
| Cause of death: | Malnutrition due to starvation | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:        Six-and-a-half-year-old boy was taken to the hospital emergency department by a 27-year-old woman who stated she was his mother. The woman, who is mentally ill, claimed to have given birth to the child in Colombia and to have raised him there until he was approximately two years old. She then left him in Colombia in the care of his putative father where he had reportedly lived for the last four years. The woman said that on the day she went to the emergency department, an individual approached her and informed her that her son and his father were in the United States. The father contacted the woman and made arrangements to bring her the boy that evening because he could no longer care for the child. When the boy arrived he told the woman that he was hungry, but when the woman fed him he began choking and foaming at the mouth. A family member took the woman and child to the emergency department where the child died. Aside from the woman, family members denied having any knowledge about the child prior to him arriving at the mother's home. A child protection death investigation was conducted. The Department indicated an "unknown perpetrator" for death by abuse and malnutrition of the child. The woman was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to three of her children living with her at the time of the child's death. In February 2015 a family member identified the deceased in photos shown by the police as one of the woman's older children, who was previously reported to be living in Mexico with his father or other relatives. That child would have been 13 years old at the time of death. DNA tests have confirmed that the woman was the boy's biological mother. Police continue to investigate the child's death.

Prior History:    In June 2013 an anonymous reporter called the hotline stating that the mother's two sons appeared to be emaciated and extremely small and do not attend school because their mother does not want them seen. When interviewed the mother reported the boys lived in Mexico with an aunt. The mother called the aunt and the investigator spoke with her.  She said she lived in Mexico and had been caring for the boys for several years. The aunt would not give the investigator her phone number. The investigator left a voice mail message for the Mexican Consulate but the investigation was unfounded for substantial risk of physical injury by neglect prior to speaking with anyone at the consulate. In April 2014 a mental health provider called the hotline concerned about two of the mother's children, believed to be eight and nine, because the mother said she was teaching them how to kill themselves. The reporter said the mother had six children all together, but four were believed to live in another state. The mother told the reporter that the family had moved because DCFS was looking for them. The reporter did not have an address. The following month an investigator located the family and met with the mother, maternal grandmother, and three of the mother's children, ages 12, 14, and 16 years. The children reported they lived with their maternal grandmother. They denied their mother lived with them or taught them how to harm themselves. The children were not in school, reporting they feared the gangs and violence in their neighborhood. They had been seen by a doctor within the last year. The mother was unfounded for substantial risk of physical injury by abuse. Prior to that investigation being closed, in May 2014, a therapist called the hotline to report that the maternal grandmother, who was actually the great aunt, was forcing the mother to care for her four children, ages 8-13 years, even though she was not mentally stable enough to do so. The reporter cautioned that the mother admitted to hiding her children during past investigations or lying that they are in Mexico. The hotline took a report for investigation of inadequate supervision by the maternal grandmother/aunt. During the investigation the mother reported she had two children who lived in Columbia with their father. The investigation was pending at the time of the boy's death. Following his death the Department took protective custody of the three children living with the maternal grandmother/aunt. The children were initially placed in a shelter where there was concern about maternal relatives stalking the shelter. After a few weeks the brothers were placed in a foster home together and their sister was placed in a different foster home. She has since sabotaged multiple placements. In July 2015 the boys' foster mother requested that the older boy be removed because of his behavior. He is placed with a maternal aunt. The children visit with each other and with their mother and maternal grandmother/aunt.

| Child No. 2 | DOB 11/10 | DOD 7/14 | Homicide |
|---|---|---|---|
| Age at death: | 3-1/2 years | | |
| Substance exposed: | No, but his mother used alcohol during pregnancy | | |
| Cause of death: | Multiple blunt force trauma | | |
| Perpetrator: | Unrelated caregiver | | |
| Reason For Review: | Child was a ward within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:    Three-and-a-half-year-old developmentally delayed former ward was beaten to death in another state by his temporary caregiver. The child's adoptive mother sent him to another state to stay with the mother of a friend of the adoptive mother's. The friend sent her own three children to stay with her mother for the summer. The adoptive mother had never met the 42-year-old caregiver but believed she had experience dealing with special needs children and could provide her son with therapies over the summer. The child had been with the caregiver for almost two months at the time of his death. The caregiver has been charged with murder in the other state.

Prior History:   The child entered foster care at birth because his siblings, ages 3 and 4, were in foster care and there were ongoing concerns about the parents' ability to care for the children. The child was placed with a 46-year-foster mother who adopted him three years later, in December 2013. The child's parents signed specific consents for the foster mother to adopt him. A June 2013 evaluation identified the child as having alcohol-related neurodevelopmental disorder (a fetal alcohol spectrum disorder), sensory processing disorder, and significant developmental delays. The evaluator recommended the child receive intensive therapy services. The child's worker attempted to get the child approved for an adoption subsidy with a higher monthly payment so that his needs could be addressed, but the request was denied.

| Child No. 3 | DOB 12/95 | DOD 8/14 | Homicide |
|---|---|---|---|
| Age at death: | 18 years | | |
| Substance exposed: | No/unknown | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Deceased was a ward | | |
| Action Taken: | To be included in a report about ward homicide | | |

Narrative:       Eighteen-year-old ward was shot and killed around 7:30am in front of his grandmother and aunt's home. He had reportedly gone out to buy cigarettes and was smoking in front of the house when he was shot. His mother had dropped him off at this home a day before after unsuccessfully attempting to get him placed at a DCFS shelter. The ward had left his residential treatment facility voluntarily on his 18th birthday. He had been residing, unauthorized, in relatives' homes since that time. A police investigation of the teen's murder remains unsolved but open.

Prior History:   The deceased and two siblings entered the Department's care in June 2012 after their 35-year-old mother moved from the family's home while the deceased and his older sibling were at school and a younger sibling was hospitalized. The mother took her two youngest children, ages six and 11 years old, with her but when DCFS located them, custody was given to their fathers. The mother was indicated for inadequate supervision and for lock-out of the hospitalized child. The deceased had several placements during his time in care and was involved in both juvenile and adult probation.

| Child No. 4 | DOB 12/96 | DOD 8/14 | Homicide |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | No | | |
| Cause of death: | Gunshot wound of the head | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Seventeen-year-old boy was sitting in a parked car at about 10:00pm on a weekend night when he was shot in the head by a male who had approached him earlier in the night. The teen had been in the park with a friend talking to some girls when the male approached him and asked him if he was selling "weed." When the teen responded no, the male walked away. He returned later and shot the boy. A police investigation remains unsolved but open.

Prior History:   Six weeks prior to the teen's death, a social worker called the hotline to report that the teen's 42-year-old mother had obtained an order of protection against the teen's brother, her 20-year-old son, because he had threatened to kill her and the teen. The report, which was pending at the time of the teen's death, was ultimately unfounded.

| Child No. 5 | DOB 5/11 | DOD 8/14 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 years |
| Substance exposed: | Yes, methamphetamines |
| Cause of death: | Asphyxia due to smoke inhalation |
| Perpetrator: | Father, presumed |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:        Three-year-old and 20-month old brothers died as a result of a house fire. Their 43-year-old father also died in the fire. The fire occurred at their residence at approximately 5:00pm. The three victims were transported to an area hospital where the 20-month-old boy and the father were pronounced dead. The 3-year-old boy was airlifted to a neighboring state hospital, where he died the next day. Based on an investigation of the scene, the fire department believed that the fire was intentionally set and initially labeled the fire as incendiary. After lab results on the evidence collected at the scene came back inconclusive for ignitable fluids, the fire department classified the fire as undetermined. The 24-year-old mother and the boys' 4-month-old sibling had been staying with friends at the time of the fire. The Department did not conduct child protection death investigations because the children's caregiver, their father, also died in the fire. A social worker at the neighboring state hospital called the Department to request child welfare services for the mother and surviving child. While the mother initially expressed a desire for services, she later declined stating she was relying on friends for support. The Department provided her with referrals to community-based agencies for grief counseling and housing. Since the deaths, the mother has struggled with substance abuse. She gave birth to her fourth child in March 2015; while the infant did not test positive for substances at birth, the mother did and she was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect. Her two children are in the care of relatives by private agreement. Note that the boys died in different states and different manners of death were ascribed.  See Child No. 29.

Prior History:     The deceased tested positive for methamphetamines at his birth. The Department investigated and indicated the mother for substance misuse by neglect. The infant entered foster care after the police raided the parents' apartment and found drugs in plain sight. The parents participated in multiple services to address substance abuse and parenting, and they cooperated with the terms of their probation.  In November 2012 the mother gave birth to her second son. He was not born substance-exposed and he was allowed to remain in his parents' care. In February 2013 the court returned the first son home and in August 2013 the court case was closed. Three months after the court case was closed, the hotline was called with a report of medical neglect because the parents did not follow through on rabies shots for the 2-year-old boy who had been bitten by a stray dog. The Department indicated both parents for medical neglect and ensured they followed through with the complete series of shots. In the spring of 2014 the mother gave birth to her third child. At the time of the baby girl's birth, hospital staff were concerned about the mother's ability to care for the infant.   The Department opened an investigation for an allegation of inadequate supervision which was subsequently unfounded.   The investigator found that the parents met the needs of their children and had continued involvement with community resources for support.   Hospital staff later reported no concerns about the parents and discharged the infant to their care.

| Child No. 6 | DOB 6/98 | DOD 8/14 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 16 years |
| Substance exposed: | Unknown |
| Cause of death: | Gunshot wound to the head |
| Perpetrator: | Unknown |
| Reason For Review: | Open intact family services case at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:       Sixteen-year-old youth was shot and killed. Around 11:45pm he was sitting in a car with another teen and a 21-year-old man when a gunman approached the car and started shooting. The 21-year-old man also died. The other teen survived. A police investigation of the murders remains unsolved but open.

Prior History:    In October 2013 a hotline call was made after the deceased's 9-year-old sister showed up to school in her pajamas and said that her step-father hit her mother. The reporter said the girl was often unwashed and unkempt. The mother and step-father admitted to one incident of domestic violence several months earlier, and the six children in the family, ages five to 15, denied ongoing domestic violence. An investigation of substantial risk of physical injury/environment injurious to health and welfare by neglect was unfounded, but an intact family services case was opened to assist the 33-year-old mother who was overwhelmed caring for the six children. The intact family services worker made referrals for in-home parent coaching and domestic violence services. She provided information on GED preparation classes and alternative high schools for the deceased, who was not attending school. In July 2014 the mother reported that she and the children were going to another state for a few weeks. After several weeks the mother called the worker stating she was not returning to Illinois. The mother reported the deceased was with her and doing well. After his death, she told the worker that the teen did not go out of state with the family but stayed behind and lived with an aunt. She said she planned to send for him later.

| Child No. 7 | DOB 12/97 | DOD 8/14 | Homicide |
|---|---|---|---|
| Age at death: | 16 years | | |
| Substance exposed: | No/unknown | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Sixteen-year-old boy was shot multiple times several blocks away from his home. The teen was with a couple of friends who stated that two individuals approached them on foot shouting gang slogans and repeatedly shot the teen. The teen was alive when police responded but was pronounced dead at the hospital.  A police investigation of the teen's murder remains unsolved but open.

Prior History:   In November 2013 police called the hotline to report a domestic dispute between the teen, his 18-year-old sister and their 50-year-old father who had been drinking. The sister expressed anger that the father could afford alcohol when there was so little food in the home. The father pushed her up against a window and the teen intervened. The teens lived with their father and uncle; their mother was deceased. The uncle reported the father became belligerent and aggressive when he drank alcohol. The uncle, who paid the rent, said he would not permit the father to live in the home once released from jail. When interviewed, the father denied living in the home and declined a referral for substance abuse treatment. The father was indicated for substantial risk of physical injury by neglect. The teen was referred to a community service organization for counseling and an adult brother vowed to keep a closer eye on his siblings.

| Child No. 8 | DOB 10/97 | DOD 9/14 | Homicide |
|---|---|---|---|
| Age at death: | 16 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Unrelated adults | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Sixteen-year-old youth was shot multiple times and killed around 5:45pm while talking to someone outside a building on the block where he lived. The teen was on his way to return a video game. Two men, 20 and 21 years old, have been charged with first-degree murder and are in jail awaiting trial.

Prior History:    In July 2010 and May 2011 the deceased and his mother came to the Department's attention because of his mother's mental health problems. An intact family services case was opened both times, with the second case closing in August 2012. In December 2013 the hotline was called with a report of substantial risk of physical injury by abuse to the 16-year-old. The teen was living with his maternal grandmother when his 39-year-old mother came for a visit. She started a physical altercation and unsuccessfully tried to get the teen psychiatrically hospitalized. The investigation was unfounded because the teen's only injury was a scratch on his face. The teen had been living with his maternal grandmother for much of his life and she continued to be his caregiver following the incident.

| Child No. 9 | DOB 9/97 | DOD 10/14 | Homicide |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | No,  however his mother has a history of substance abuse | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Police officer charged | | |
| Reason For Review: | Deceased was a ward | | |
| Action Taken: | Full investigation pending | | |

Narrative:        Seventeen-year-old ward died from multiple gunshot wounds around 10:00pm. A police officer has been charged with his murder. The ward was shot 16 times. He was on intensive probation at the time of his death and had recently been placed with a maternal uncle.

CHILD DEATH REPORT

Prior History:    The ward was born to a 15-year-old mother who herself was a ward. The teen mother entered DCFS care at the age of 12 because of her mother's extensive drug history, including giving birth to a substance-exposed (PCP) infant, her lack of participation in services, and her extensive criminal history for drug charges. By the age of 18 the teen ward lost custody of her then 3-year-old son and his younger sister after she left the children home alone and the younger sister suffered extensive burns which required hospitalization. The mother was indicated for inadequate supervision. The two children were placed with several relatives and were returned to the mother in 18 months under an order of protection. A year after they were returned to their mother, the then 5-year-old boy and his sister re-entered DCFS custody because of physical abuse by the mother and her boyfriend. The boy reported that he often witnessed domestic violence between his mother and her boyfriend. His father was incarcerated. The mother, then 21 years old, did not participate in services, struggled with continued drug use and did not visit her children. After several failed placements, including one where the boy was sexually abused, the maternal great-grandmother took the children into her home. In first grade the boy was described as sometimes explosive. In 2006, when the boy was nine, the great-grandmother obtained subsidized guardianship of the children and DCFS closed its case. The boy became involved with gangs at age 11 and selling drugs on the street at age 12. At the age of 13 he was arrested and referred to juvenile court for possession of a controlled substance. At the age of 16 he was incarcerated at the juvenile detention center for violation of probation. He was released and placed on electronic monitoring so he could visit his 79-year-old great-grandmother before she died and attend her funeral. Afterward DCFS became his guardian and learned that he had been living with his mother prior to his detention. While in detention he exhibited aggressive behaviors, but his behavior was uneven. At times he was respectful and insightful; however his poor judgment put him at risk of harm. At one court hearing he was high on PCP and had an aggressive outburst in the courtroom resulting in his being taken into custody and placed in detention. He violated probation several times and cut off his ankle home monitor. His mother became involved in treatment and began family therapy with her son. The community service provider recommended intensive outpatient treatment while probation recommended commitment to the Department of Corrections or a residential treatment center. The court-appointed advocate recommended residential treatment. A DCFS staffing resulted in a referral to an intensive specialized foster care program for dually involved (delinquent and child welfare) youth. He and his mother agreed to attend therapy. His uncle agreed to have the youth placed with him. Intensive probation stayed involved and the ward was enrolled in an alternative school. He was suspended once but was enrolled when he died.

| Child No. 10 | DOB 2/14 | DOD 10/14 | Homicide |
|---|---|---|---|
| Age at death: | 8 months | | |
| Substance exposed: | No | | |
| Cause of death: | Craniocerebral injuries due to blunt force head trauma with thermal burns, cocaine intoxication and multiple injuries contributing to the infant's death | | |
| Perpetrator: | Mother's boyfriend | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Full investigation, Report to Director 2/24/15 | | |

Narrative:        Eight-month-old infant was found unresponsive by his 21-year-old mother covered with a blanket in his crib. The mother had left the baby in the care of her 28-year-old boyfriend while she took her 4-year-old daughter to a school Halloween party. The baby had head injuries, rib fractures, scald burns, bruises, and abrasions. Some of his injuries were old. The mother called 911. The infant was pronounced dead at the hospital. The boyfriend was arrested and charged with first degree murder, aggravated battery and endangering a child's welfare. He pleaded guilty and was sentenced to 50 years in prison. No criminal charges were filed against the mother. The boyfriend was indicated for death by abuse, head injuries by abuse, bone fractures by abuse, burns by abuse, substance misuse by abuse, and cuts, bruises, welts by abuse to the baby and for substantial risk of physical injury by abuse to the 4-year-old sibling. The mother was indicated for death by neglect, head injuries by neglect, bone fractures by neglect, burns by neglect, cuts, bruises, welts by neglect, and inadequate supervision to the baby and for substantial risk of physical injury by neglect to the 4-year-old sibling. She is in foster care and has a goal of return home to her mother.

Prior History:      There was a pending child protection investigation against the boyfriend for abuse to the infant and against the mother for neglect of the infant and his sibling. An anonymous reporter had called the hotline approximately six weeks earlier alleging bruises to the infant that were later observed by the child protection investigator and her supervisor. The reporter alleged that the boyfriend had caused the bruises and that the mother had temporarily left him, but returned with the children to live with him. The worker and supervisor did not put a safety plan into place for the children; instead the mother was asked to take the child to the doctor the next day to have the bruises assessed. The mother never took the child to be examined, but the investigator informed her supervisor that the doctor's office did not have any concerns. There was no documented investigative activity in the case for more than a month prior to the infant's death. See Death and Serious Injury Case 2.

| Child No. 11 | DOB 10/95 | DOD 11/14 | Homicide |
|---|---|---|---|
| Age at death: | 19 years | | |
| Substance exposed: | Unknown, possibly fetal alcohol syndrome | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Unrelated peer | | |
| Reason For Review: | Deceased was a ward | | |
| Action Taken: | To be included in a report about ward homicide | | |

Narrative:        Nineteen-year-old ward was shot around 11:00pm in the parking lot behind his transitional living program. A residential advisor to the program performed CPR on the teen while waiting for emergency services to arrive. The teen was pronounced dead at the hospital. Witnesses reported seeing two males running from the scene dressed in all black. The teen had been living in the placement since May 2014. He had reportedly left an hour earlier to go to the store. A ward who lived in the same transitional living program has been charged with his murder and is in jail awaiting trial.

Prior History:      In September 2011 the teen's 50-year-old mother refused to allow him back into her home after he was arrested for robbery and was physically aggressive toward his grandmother. The mother was indicated for lock-out and DCFS was awarded custody of the teen. The 16-year-old was placed in a shelter until a more suitable arrangement could be made, but the teen frequently left the shelter without authorization, disappearing for most of 2012. In January 2013 the Department placed the teen in a group home where he received services to address mental health concerns. While he initially did well, the teen later experienced absences from his placement, substance use and criminal behavior. He was involved with juvenile probation. In 2014, at the age of 18 and to help him prepare for independence, he was moved to the transitional living program. His adjustment to the new placement appeared successful with no major events in the six months leading to his death. The ward was a father and had been offered teen parenting services.

| Child No. 12 | DOB 10/13 | DOD 11/14 | Homicide |
|---|---|---|---|

| | |
|---:|---|
| Age at death: | 13 months |
| Substance exposed: | No |
| Cause of death: | Seizure Disorder due to Hypoxic Ischemic Encephalopathy due to suffocation in a car seat |
| Perpetrators: | Parents (delayed death) |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:     Thirteen-month-old medically complex ward was found unresponsive by her foster mother in the morning. The foster mother had cared for the child for five months. No abuse or neglect by the foster mother was suspected and the Department did not investigate the child's death. Both of the child's parents were charged with involuntary manslaughter after she died because her death was from injuries she suffered almost a year earlier while in their care.

Prior History:     In December 2013, when the child was two months old, her 19-year-old mother and 33-year-old father left her dressed in a snowsuit in a car seat overnight with a blanket covering her face causing a lack of oxygen to her brain. The infant sustained severe brain injury leaving her seriously medically compromised. The mother and father repeatedly lied to medical professionals, police, and DCFS about what had happened. The parents were indicated for head injuries by neglect. The child spent three months in the hospital before being discharged to foster care. Neither parent worked to regain guardianship of the child and the father surrendered his parental rights.

| Child No. 13 | DOB 1/96 | DOD 12/14 | Homicide |
|---|---|---|---|

| | |
|---:|---|
| Age at death: | 1 month shy of 19 years |
| Substance exposed: | Unknown |
| Cause of death: | Multiple gunshot wounds |
| Perpetrator: | Unknown |
| Reason For Review: | Deceased was a ward |
| Action Taken: | To be included in a report about ward homicide |

Narrative:     Eighteen-year-old ward was found unresponsive at approximately 5:00am by police who were notified by a passerby that there was someone lying in an alley nearby. The officers found the ward in the alley with gunshot wounds. During a canvass of the neighborhood police learned that gunshots had been heard by several people between 1:00 and 1:30am that morning. The ward was pronounced dead at the scene. A police investigation of the teen's murder remains unsolved but open.

Prior History:     The Department took custody of the deceased in September 2012 after the hotline was notified that the U.S. Embassy had arranged for the teen's return to the United States after his mother left him in a foreign country with relatives. His mother refused to allow him to return home, stating that she was afraid of her son. The 37-year-old mother was indicated for the allegation of lock out. The teen was placed in a foster home but the foster father requested his removal after only one month because he was afraid of the teen. Over the next two years the ward was placed in both group and residential placements. The teen did not consistently attend school or participate in his mental health services. He frequently was on run from his placements and was involved with both juvenile and adult probation.

| Child No. 14 | DOB 2/00 | DOD 1/15 | Homicide |
|---|---|---|---|

| | |
|---:|---|
| Age at death: | 1 month shy of 15 years |
| Substance exposed: | No/Unknown |
| Cause of death: | Gunshot wound to the head |
| Perpetrators: | Two unrelated men |
| Reason For Review: | Child was a ward |
| Action Taken: | To be included in a report about ward homicide |

Narrative:      Fourteen-year-old ward was shot and killed as he left a friend's home around 7:30pm. The teen was on his way to his foster home to make his 8:00pm curfew. Two suspects, ages 19 and 21 years, were arrested and charged with first degree murder. They are in jail awaiting trial.

Prior History:   The deceased and his five siblings entered foster care four years earlier after law enforcement found the children and their parents living in an abandoned home. The parents refused to go to a shelter and the children were taken into custody. Physical examination of the children revealed serious physical abuse. Over the next four years the parents made little progress with recommended services. The deceased required mental health and special education services. In April 2013 the teen was placed in his fifth foster home. The placement was stable and provided the teen with structure and attachment, however, one month before the teen's death, his foster parent informed the agency of a desire to move out of state and the agency had begun looking for a new foster placement for the teen.

| Child No. 15 | DOB 11/96 | DOD 4/15 | Homicide |
|---|---|---|---|
| Age at death: | 18 years | | |
| Substance exposed: | Unknown, yes by report of adoptive mother | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Deceased was a ward | | |
| Action Taken: | To be included in a report about ward homicide | | |

Narrative:      Eighteen-year-old ward died at a hospital less than an hour after being shot multiple times. Police responded to a call of shots fired and found the ward lying in an alley about 2:00pm. Witnesses reported seeing the teen being followed while walking through an empty lot. When the teen cut through the alley, the driver and a passenger in the vehicle got out of the car and executed the teen at close range. The teen was gang-involved and police believe heightened conflict between rival gangs led to the teen's murder. A police investigation of the teen's murder remains unsolved but open.

Prior History:   The deceased entered foster care two months after his birth and was adopted in 2000 by his maternal great aunt who was his foster mother. In October 2014 a delinquency court judge awarded guardianship of the 17-year-old teen to the Department after the teen's probation officer reported that his adoptive parent made multiple, credible statements about wanting to kill the teen. The mother was indicated for substantial risk of physical injury by abuse. The teen was placed in a shelter from which he was frequently reported absent. He refused other placement options and wanted to return to his adoptive mother who refused to accept him back into her home. In January the teen became a father but refused teen parent services. The teen was largely missing from his shelter placement in the month leading up to his death.

| Child No. 16 | DOB 2/14 | DOD 4/15 | Homicide |
|---|---|---|---|
| Age at death: | 14 months | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple blunt force injuries due to child abuse | | |
| Perpetrator: | Mother's boyfriend | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Fourteen-month-old toddler became unresponsive while in the care of his mother's 23-year-old live-in boyfriend. The 21-year-old mother had left the child in his care around 2:30-3:00pm when she left for work. The boyfriend called her at work to tell her to come home because something was wrong with the child. She got home at 5:30 and found the child making choking sounds. She called 911. When emergency personnel arrived at the scene the boyfriend was holding the toddler at arm's length and the toddler was vomiting; the boyfriend told a paramedic, "here, take it." The child's stomach was distended and bruised. The police and DCFS investigated the child's death. The boyfriend was arrested and charged with first degree murder. He is in jail awaiting trial. No charges were filed against the child's mother. The couple had been dating for approximately six months and living together for two months. The maternal grandmother had cared for the toddler for about three to four weeks before his death, but about five days before he died, his mother took him for a day outing and did not return him to the grandmother's home. The mother's 2-1/2 year-old son lived with the maternal grandmother. The mother had also lived with the maternal grandmother until she moved in with her boyfriend. The boyfriend was indicated for death by abuse and cuts, bruises, welts by abuse to the deceased and substantial risk of physical injury by abuse to the mother's 2-1/2-year-old son. The mother, who lied during the investigation, was indicated for death by neglect to the toddler and substantial risk of physical injury/environment injurious to health and welfare by neglect to both sons. The surviving child was taken into custody by DCFS. He is placed with his maternal grandmother who is compliant with services being provided to the child. There is no evidence of drug use or criminal activity in the home.

Prior History:    In March 2014 an anonymous reporter called the hotline to report that the mother and her 16 and 17-year-old siblings were abusing alcohol and drugs, operating a tattoo business, and selling marijuana out of the home they lived in with their mother. The caller further alleged that the mother's two children were not being protected from harm and that the mother had a boyfriend who may be dangerous (this boyfriend was different from the one who later killed her child). A report was taken for investigation of substantial risk of physical injury/environment injurious to health and welfare by neglect to the mother's 1-month-old and 15-month-old sons and to the maternal grandmother's two teen children. An investigator made several attempts to see the family at the maternal grandmother's home, but no one answered the door. Each time he left messages to call him. The investigator went to two neighborhood high schools looking for the teens, but they did not attend those schools. The investigator called the local police who reported they had received a call in February to check the well-being of a 2-week-old baby, but when they went to the home no one was there. The investigation was unfounded in May 2014 because the investigator could not make contact with the family.

| Child No. 17 | DOB 9/09 | DOD 5/15 | Homicide |
|---|---|---|---|
| Age at death: | 5-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Internal injuries sustained from multiple blunt force impacts | | |
| Perpetrator: | Father's girlfriend | | |
| Reason For Review: | Closed intact family services case within a year of child's death; unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:        Five-year-old child was found unresponsive in the bath tub by her father's 27-year-old girlfriend. The girl was in the bathtub with the door closed when the paternal grandfather arrived at the home to help care for the girl and her 18-month-old half-brother. An autopsy revealed that the girl was beaten to death and that she had been chronically abused. The girlfriend was charged with first degree murder and is in jail awaiting trial. She was indicated for death by abuse, head injuries by abuse, internal injuries by abuse, and cuts, bruises, welts by abuse to the deceased; for cuts, bruises, welts by abuse to the deceased's 7 and 10-year-old siblings; and for substantial risk of physical injury by abuse to her 18-month-old son. The 28-year-old father was indicated for death by neglect, head injuries by neglect, internal injuries by neglect, and cuts, bruises, welts by neglect to the deceased; for cuts, bruises, welts by neglect to the deceased's 7 and 10-year-old siblings; and for substantial risk of physical injury by neglect to his 18-month-old son. The father left the care of his children to his girlfriend whom he knew was overwhelmed with the responsibility. He had seen injuries on his children but accepted his girlfriend's explanations for them. No criminal charges were filed against the father. The surviving three children are in foster care. The two older children are placed together with a maternal cousin. The youngest is placed with his maternal grandmother. The permanency goal for all three children is to return home to their father. He visits with the children regularly and is engaged in services.

Prior History:      The deceased and her two siblings had been living with their mother until a child protection investigation in April 2014 revealed that their mother had been leaving them in the care of their disabled grandfather in an unsafe environment. The mother was indicated for inadequate supervision, inadequate shelter, and environmental neglect and the children were moved to the care of their father and his girlfriend, who had one child of their own. The children were cared for primarily by the girlfriend. An intact family services case was opened in August 2014. While the case was open there were two child protection investigations for abuse. Both investigations were unfounded. The intact family services case was closed in January 2015.

| Child No. 18 | DOB 2/15 | DOD 5/15 | Homicide |
|---|---|---|---|
| Age at death: | 3 months | | |
| Substance exposed: | No | | |
| Cause of death: | Closed head injury | | |
| Perpetrator: | Father | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Three-month-old infant taken by ambulance to the hospital was pronounced dead on arrival. The 20-year-old father reported that around 10:00pm he was holding the baby when his hands went numb and he dropped the baby. He called the 23-year-old mother who was at work. She came home and then called 911. The father later admitted to shaking the baby. He was arrested three days after the infant's death on charges of obstructing justice/destroying evidence. He remains in jail and the criminal investigation remains open. The Department indicated the father for death by abuse and indicated the mother for substantial risk of physical injury by abuse to the 2-year-old sibling because she left him in the care of the infant's father knowing that he had mental health issues, was not taking medication, and had a bad temper. The sibling was taken into custody and placed in traditional foster care. The child recently moved to a relative foster home.

Prior History:   In November 2014, prior to the birth of the deceased, a professional from a local counseling agency reported that a client shared that a couple she knew was tying their one-year-old child to a chair all day to keep him from running around and then giving the toddler an antihistamine to cause the child to sleep through the night. The client also said the step-father would abuse the child for no reason. An investigator went to the home unannounced shortly after the call was made. The investigator observed the home and completed a home safety checklist. The child was in a highchair eating when the investigator arrived. The parents explained that they were keeping the child busy eating while they put up their Christmas tree. They denied keeping him in a chair all day. The mother reported that she had been giving the child some cold medicine the last few nights for congestion and was following the instructions on the bottle. The investigator observed an almost full bottle of the medicine. The step-father denied hurting the child and the investigator did not observe any signs of abuse or neglect on the child. The investigator noted the toddler appeared comfortable with the parents and that they interacted appropriately. The investigator also spoke with someone at the child's pediatrician's office who voiced no concerns about the child or parents. The investigation was unfounded.

| Child No. 19 | DOB 3/98 | DOD 6/15 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 17 years |
| Substance exposed: | No/unknown |
| Cause of death: | Multiple gunshot wounds |
| Perpetrator: | Unknown |
| Reason For Review: | Closed intact family services case within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:   Seventeen-year-old youth was found unresponsive lying on the sidewalk about three miles away from his home. The police were called around 2:00am. Paramedics found multiple gunshot wounds to the teen's chest; another individual, lying next to the teen, had also been shot. The teen was pronounced dead at the scene. The other person was taken to the hospital and listed in fair condition. According to police, both victims had been shot in a car at a different location. The police investigation remains unsolved but open.

Prior History:   In March 2014 the deceased's 30-year-old mother and her 28-year-old boyfriend were indicated for medical neglect of their 2-year-old daughter. They took their daughter to the hospital because she had a seizure. The mother said that the child had not had her seizure medication for the past two weeks because they ran out of it. The child was first diagnosed with a seizure disorder in November 2013. In December 2013 she had a seizure after her mother stopped giving the child her medication because she thought it made her act funny. The child had not yet been seen by a neurologist as recommended in November. An intact family services case was opened. The worker helped the parents get a neurology appointment; with their HMO insurance they could only call one day a month for an appointment the next month and the appointments filled by 9:00am. The worker visited regularly, monitored the family's compliance with the child's treatment plan, and obtained counseling for the mother. At the mother's request, she also provided a counseling referral for the deceased, but after attending his intake appointment, he declined to return. The case was closed in November 2014.

| Child No. 20 | DOB 3/95 | DOD 6/15 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 20 years |
| Substance exposed: | No/unknown |
| Cause of death: | Homicide by unspecified means |
| Perpetrator: | Unknown |
| Reason For Review: | Deceased was a ward |
| Action Taken: | To be included in a report about ward homicide |

Narrative:      Twenty-year-old ward's badly burned body was found in an alleyway by a passerby who alerted police. The youth is believed to have been beaten or choked to death and then burned. The youth was identified by clothing found at the scene.  A police investigation of the teen's murder remains unsolved but open.

Prior History:   The youth entered foster care as an infant after his toddler sibling was severely physically abused. The children were placed together with a relative, who after a year could no longer care for the children. They were moved to the home of another relative who obtained subsidized guardianship of the children in 2002 when the deceased was seven years old. In March 2010 the 15-year-old boy's guardian reported problems including truancy, substance abuse and criminal behavior and the family received adoption preservation services. The guardian petitioned the court to vacate the guardianship order and the youth and his older sibling returned to the Department's care. The youth was living in a traditional foster home at the time of his death. The youth was offered services through a private agency program designed to work with DCFS youth in the juvenile justice system; however, the teen never availed himself of the programs and services available to him.

| Child No. 21 | DOB 2/95 | DOD 6/15 | Homicide |
|---|---|---|---|
| Age at death: | 20 years | | |
| Substance exposed: | No/unknown | | |
| Cause of death: | Stab wound to the chest | | |
| Perpetrator: | Unrelated peers | | |
| Reason For Review: | Deceased was a ward | | |
| Action Taken: | Full investigation pending | | |

Narrative:      Twenty-year-old ward was stabbed and killed while committing a crime with two peers, ages 20 and 21 years. The three peers had lured a 19-year-old man, whom the 21-year-old had feuded with on Facebook, into an alley and beat him. The victim pulled a knife from his boot and stabbed his attackers before fleeing and calling police. The 20 and 21-year old men were charged with murder because the ward was killed during the commission of a felony, aggravated battery. The men are in jail awaiting trial. No charges were filed against the 19-year-old who acted in self-defense. The four peers met at the social service agency where the ward was placed.

Prior History:   The deceased, along with her five siblings, entered foster care at the age of ten. The family had been involved with DCFS for five years prior because of abuse by the children's step-father and neglect by their mother. Within a year of being placed in foster care the ward began a series of residential placements and mental health hospitalizations. She demonstrated increasingly violent criminal behavior that persisted until her death. In 2014 the ward was placed with an agency that serves mentally ill wards who are emancipating from the Department. She frequently assaulted staff and residents and was repeatedly psychiatrically hospitalized. One month prior to her death the ward had transitioned to a single resident occupancy apartment because a resident at her placement obtained an order of protection against her.

**SUICIDE**

| Child No. 22 | DOB 12/96 | DOD 9/14 | Suicide |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | No/unknown | | |
| Cause of death: | Asphyxia due to hanging | | |
| Reason For Review: | Open intact family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 23 | DOB 5/01 | DOD 11/14 | Suicide |
|---|---|---|---|
| Age at death: | 13 years | | |
| Substance exposed: | No/unknown | | |
| Cause of death: | Gunshot wound of the head | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 24 | DOB 11/97 | DOD 2/15 | Suicide |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | No/unknown | | |
| Cause of death: | Asphyxia due to hanging | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 25 | DOB 9/97 | DOD 4/15 | Suicide |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to hanging | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**UNDETERMINED**

| Child No. 26 | DOB 2/14 | DOD 7/14 | Undetermined |
|---|---|---|---|
| Age at death: | 4 months | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden unexpected infant death secondary to bed sharing with father | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

<u>Narrative:</u>    Four-month-old infant was found unresponsive by her 17-year-old father with whom she was sleeping. The coroner's office notified DCFS of the infant's death. The coroner stated that the father, who was not believed to have been under the influence of alcohol or drugs when he went to sleep, last saw the infant alive at approximately 1:30am. When he awoke less than an hour later, he discovered the child was underneath him and was unresponsive. The father awoke the paternal great grandmother who was visiting the home at the time, and they rushed the infant to the hospital where she was pronounced dead at 2:35am. The infant had been visiting her father at the time of her death. The coroner noted that the police were involved and that there were no visible signs of abuse or neglect to the infant. The coroner conducted an investigation. The Department did not conduct a child protection investigation of the infant's death because no abuse or neglect was suspected.

<u>Prior History:</u>    There were two unfounded child protection investigations involving the infant's 17-year-old mother. In January 2014 the hotline was called with an allegation of mental cruelty to the then-pregnant teen by her 38-year-old mother. The investigation was unfounded based on the teen's and mother's denials of maltreatment. Two days after the infant's birth in February 2014, the hotline was called with an allegation of substance misuse because the teen's mother had given the teen a narcotic pain reliever not prescribed to her for post-delivery pain. The caller alleged the medication could cause harm to the infant because the teen mother was breast-feeding. The investigation was unfounded based on the infant's doctor's statement that the amount of medication given on the one occasion would not have harmed the infant.

| Child No. 27 | DOB 6/14 | DOD 7/14 | Undetermined |
|---|---|---|---|
| Age at death: | 1 month | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Pending child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

<u>Narrative:</u>    One-month-old infant was discovered unresponsive lying with her mother on a couch around 10:00am by her 9-year-old brother. At 5:00am, after feeding the baby a bottle, the mother laid down on the couch with the baby. She held the baby in her right arm which was propped on a couch pillow. The infant was pronounced dead at the home. At 3:00am that morning, police had responded to a domestic call. The 35-year-old mother was intoxicated and the 35-year-old father of the infant had been drinking. The parents were arguing and throwing things at each other. The 9-year-old boy brought the infant to the police's attention. The baby's diaper was soaked through. Police had the father change the baby, calmed the parents and told them to go to bed. The father placed the infant in a bassinette in the living room and went to sleep in the bedroom. The mother remained in the living room with the two children. Police did not call the hotline. The police, coroner, and DCFS investigated the infant's death. The mother was indicated for death by neglect and for substantial risk of physical injury/environment injurious by neglect to her 9-year-old son. The father was indicated for substantial risk of physical injury/environment injurious by neglect to the infant. The mother refused substance abuse treatment but accepted a referral for domestic violence services. At the close of the investigation the 9-year-old was in the care of his father who had obtained an order of protection against the mother and was seeking full custody of the boy through family court.

Prior History:    There was a pending child protection investigation involving this family at the time of the infant's death. In May police called the hotline to report that the mother called the police stating her boyfriend (the subsequently born infant's father) had hit her 9-year-old son. The dispatch operator heard the boyfriend in the background telling the boy he better lie to police and say it did not happen. The mother had had an argument with the boy and he hit her. She told her boyfriend who hit the child and left a bruise on his chest. The child told the investigator what had happened. He denied the boyfriend had ever hit him before. The boyfriend was arrested and jailed for domestic battery. The mother, who was a month away from giving birth, obtained an order of protection. After his release from jail the boyfriend went to live with his parents. Just before the baby's birth, the investigator spoke to the mother and 9-year-old, both of whom denied the boyfriend was living in the home. The investigator planned to open a case for intact family services to address domestic violence. The investigation was completed after the infant's death. The mother was indicated for substantial risk of physical injury/environment injurious by neglect and the boyfriend was indicated for cuts, bruises, welts by abuse.

| Child No. 28 | DOB 6/13 | DOD 8/14 | Undetermined |
|---|---|---|---|
| Age at death: | 13 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Closed intact family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Thirteen-month-old medically complex child, who was born prematurely at 25 weeks gestation, was found unresponsive by his 39-year-old mother at around 1:00 a.m. The mother reported the child had been fussy so she brought him into bed with her. The mother, who was significantly overweight, was sleeping in a twin-sized bed.  The mother told hospital personnel that she must have dozed off, but later denied to a child protection investigator that she fell asleep. She said that after 10 to 15 minutes of laying with the child she noticed he was not breathing and yelled for her mother to call 911 while she began CPR. The infant was hospitalized in critical condition; he died five days later. Police who responded to the home called the hotline because the family was uncooperative and the mother was arrested for hitting a police officer while paramedics were putting the child into the ambulance. The mother was unfounded for substantial risk of physical injury/environment injurious to health and welfare by neglect and for death by neglect because it could not be determined how the child died.

Prior History:    In January 2014 a hospital social worker called the hotline to report the mother was removing the then six-month-old infant's nasogastric feeding tube at home and as a result the infant was not receiving enough nutrition or gaining weight. An investigation was indicated for inadequate food. The mother admitted removing the tube because she felt the infant was feeding well enough by bottle. The infant's physician, who had seen the infant five days earlier, reported the infant was not getting enough calories by oral intake and should continue to use the nasogastric tube for feedings. An intact family services case was opened to monitor the mother's compliance with the infant's treatment plan. The case was closed in May 2014 with the agreement of the child's physician. At that time the child no longer needed the nasogastric tube and he was growing and doing well.

| Child No. 29 | DOB 11/12 | DOD 8/14 | Undetermined |
|---|---|---|---|
| Age at death: | 20 months | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to smoke inhalation | | |
| Reason Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Three-year-old and 20-month old brothers died as a result of a house fire. Their 43-year-old father also died in the fire. The fire occurred at their residence at approximately 5:00pm. The three victims were transported to an area hospital where the 20-month-old boy and the father were pronounced dead. The 3-year-old boy was airlifted to a neighboring state hospital, where he died the next day. Based on an investigation of the scene, the fire department believed that the fire was intentionally set and initially labeled the fire as incendiary. After lab results on the evidence collected at the scene came back inconclusive for ignitable fluids, the fire department classified the fire as undetermined. The 24-year-old mother and the boys' 4-month-old sibling had been staying with friends at the time of the fire. The Department did not conduct child protection death investigations because the children's caregiver, their father, also died in the fire. A social worker at the neighboring state hospital called the Department to request child welfare services for the mother and surviving child. While the mother initially expressed a desire for services, she later declined stating she was relying on friends for support. The Department provided her with referrals to community-based agencies for grief counseling and housing. Since the deaths, the mother has struggled with substance abuse. She gave birth to her fourth child in March 2015; while the infant did not test positive for substances at birth, the mother did and she was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect. Her two children are in the care of relatives by private agreement. Note that the boys died in different states and different manners of death were ascribed. See Child No. 5.

Prior History:       The deceased's family became involved with the Department before he was born. His older brother tested positive for methamphetamines when he was born in May 2011. The Department investigated and indicated the mother for substance misuse by neglect. The infant entered foster care after the police raided the parents' apartment and found drugs in plain sight. The parents participated in multiple services to address substance abuse and parenting, and they cooperated with the terms of their probation. In November 2012 the mother gave birth to the deceased, her second son. He was not born substance-exposed and he was allowed to remain in his parents' care. In February 2013 the court returned the first son home and in August 2013 the court case was closed. Three months after the court case was closed, the hotline was called with a report of medical neglect because the parents did not follow through on rabies shots for the 2-year-old boy who had been bitten by a stray dog. The Department indicated both parents for medical neglect and ensured they followed through with the complete series of shots. In the spring of 2014 the mother gave birth to her third child. At the time of the baby girl's birth, hospital staff were concerned about the mother's ability to care for the infant. The Department opened an investigation for an allegation of inadequate supervision which was subsequently unfounded. The investigator found that the parents met the needs of their children and had continued involvement with community resources for support. Hospital staff later reported no concerns about the parents and discharged the infant to their care.

| Child No. 30 | DOB 7/14 | DOD 8/14 | Undetermined |
|---|---|---|---|
| Age at death: | 1 month | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

CHILD DEATH REPORT

Narrative:        One-month-old infant was found unresponsive by her 23-year-old mother lying on a futon with her 5-year-old sibling around midnight. The mother had just returned from smoking a cigarette outside with her 23-year-old boyfriend. When emergency medical services responded, the infant's eyes appeared bruised and she had blood around her mouth and the blanket and rocker she had been sleeping in. The police, coroner, and DCFS investigated the child's death. When interviewed at the hospital, the mother initially said she found the infant in her rocker/sleeper, but before leaving the hospital corrected herself stating she found the infant on the futon with the infant's sibling. An autopsy and coroner's investigation found no evidence of abuse to the infant; there was no bruising to the infant's eyes and full body x-rays revealed no fractures. The coroner believed the baby died while sleeping and was likely already deceased when the 5-year-old picked her up and laid down with her on the futon. Blood found on the infant (and blanket and rocker) was from the death process. The mother and her boyfriend were unfounded for death by neglect and the mother was unfounded for substantial risk of physical injury by neglect to her 5-year-old daughter and 1-year-old son.

Prior History:   In November 2013 the hotline was called with a report that the mother's four-year-old daughter had a large bruise on her right thigh. The child gave conflicting accounts of how she got the bruise. The mother, father, and maternal grandmother, with whom family lived, reported the child had run into a table while playing with cousins. The child was seen by her doctor who believed the injury was consistent with the explanation and likely an accidental bruise. Both parents were unfounded for cuts, bruises, and welts by abuse.

| Child No. 31 | DOB 9/14 | DOD 10/14 | Undetermined |
|---|---|---|---|
| Age at death: | 3-1/2 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden unexplained infant death with co-sleeping with two adults and prematurity significant conditions contributing to death | | |
| Reason For Review: | Open placement case | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Three-and-a-half-week-old infant, born prematurely at 34 weeks gestation, was found unresponsive around 1:30am by her 22-year-old mother. The infant was sleeping in bed with her mother and 18-year-old father. The family called 911 and the infant was taken by ambulance to the hospital where she was pronounced dead. The infant was born weighing 3-1/2 pounds. She was released from the hospital three days after her birth. On the fourth day, her mother took her to the emergency room because the mother had difficulty keeping the infant awake long enough to feed her. The infant was hospitalized for six days and was at home for only two weeks before her death. The police and coroner investigated. The Department did not conduct a child protection investigation of the infant's death because no abuse or neglect was suspected.

Prior History:   The mother resided with the infant and her 22-month-old daughter in a home with her 59-year-old step-father and two half-siblings. Her mother died in March 2012. In December 2012 an intact family services case was opened after several hotline calls alleged neglect to the mother's two half-siblings by their father. In July 2013, while the intact family services case remained open, the family became court involved and the mother was appointed temporary guardian of her two half-siblings, then ages seven and ten. In January 2014, the court ordered guardianship to the Department but allowed the children to remain in the home. The case was transferred to the foster care program. During the time the foster care case was open, there were two hotline reports involving the deceased child's mother. The mother was indicated in January 2014 for medical neglect after an investigation revealed that her one-year-old daughter suffered a ruptured ear drum because the mother failed to treat an ear infection. In March 2014, she was indicated, along with her step-father, for inadequate supervision and inadequate clothing to her then 8-year-old half-sibling. Following the infant's death, the hotline was contacted after a domestic violence incident between the deceased child's mother and father. Following a formal investigation, the father was indicated for substantial risk of physical injury/environment injurious by abuse; mother and her step-father were indicated for substantial risk of physical injury/environment injurious by neglect. The mother's daughter and her two half- siblings were removed from her care. Her daughter was returned to her care by the court approximately one month later. Her half-siblings are currently placed with another relative.

| Child No. 32 | DOB 5/14 | DOD 10/14 | Undetermined |
|---|---|---|---|
| Age at death: | 5 months | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden unexplained infant death | | |
| Reason For Review: | Closed intact family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Five-month-old infant was found unresponsive by his 31-year-old father around 3:30pm at the mother's apartment. The 27-year-old mother was out running errands with the infant's 12-month-old sister. The father called 911. Paramedics were unable to resuscitate the infant and transported him to the hospital where he was pronounced dead. The father last saw the infant alive an hour earlier when he laid the baby in his portable crib on his side with a bottle propped up by a blanket. At the scene, emergency personnel found blood on a comforter in the parents' bedroom. The father said the infant had not been in the bedroom. The parents had a history of domestic violence and the mother had an open intact family services case closed four months earlier. Because of these circumstances, the police, coroner, and DCFS investigated the infant's death. The autopsy and coroner's investigation found nothing, including trauma or a disease process, to explain the infant's sudden death. The police investigation was closed with no action. The Department unfounded the parents for death by abuse but indicated them for substantial risk of physical injury/environment injurious to health and welfare by neglect because they violated a November 2013 order of protection prohibiting the father from having contact with their older child. A safety plan was initiated for that child at the time of the infant's death, but the parents violated the safety plan and the child was placed in foster care. The parents are participating in services, including domestic violence counseling, and the child has a goal of return home.

Prior History:   In November 2013 an intact family services case was opened after a petition was filed by the local state's attorney alleging the couple's 6-month-old daughter was neglected because of the father's drinking and domestic violence. The mother obtained an order of protection, moved in with the maternal grandparents, and participated in domestic violence services. The court ordered that the father have no contact with the child. He was not ordered to participate in any services. While the case was open the mother learned she was pregnant with the deceased. In June 2014 the court closed the case because the mother had made efforts to resolve the issues that brought the family to the attention of the court. The mother declined further services from the Department.

CHILD DEATH REPORT

| Child No. 33 | DOB 10/14 | DOD 10/14 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 11 days |
| Substance exposed: | No |
| Cause of death: | Sudden unexplained infant death with co-sleeping with adult in adult bed a significant factor |
| Reason For Review: | Unfounded child protection investigation within a year of child's death; open preventive services case within a year of child's death |
| Action Taken: | Investigatory review of records/referral to school superintendent |

**Narrative:**　　Eleven-day-old twin infant was found unresponsive by her 29-year-old mother in the morning. The mother had fallen asleep while breastfeeding the infant. A home health nurse, present in the home overnight to care for another child, called 911 and performed CPR until paramedics arrived. The infant was pronounced dead at a hospital across the state line. No abuse or neglect was suspected in the infant's death and DCFS did not conduct a child protection death investigation.

**Prior History:**　　In 2009 a preventive services case was opened for three months to address concerns about the mother's ability to meet the needs of her second son, a 2-year-old, who had undergone an organ transplant, used a feeding tube, and required daily medications. The case was closed after the mother moved across the state line. In October 2013 a report of substantial risk of physical injury/environment injurious to health and welfare by neglect against the mother and the 35-year-old father to three of her four children was unfounded. The couple's fourth child, who was born in May 2013 with multiple congenital issues from Trisomy 9, had been hospitalized since birth and the family was staying in a Ronald McDonald house. The family was panhandling and neither the 6 nor 7-year-old child attended school. The infant was nearing discharge and the family had no housing. The investigation was unfounded; although there were identified concerns, they did not rise to the level of neglect. The family was receptive to services and an intact family services case was opened. The intact family services case remained open until January 2014. While the case was open the family secured housing and Public Health prepared to provide in-home medical assistance once the hospitalized infant was discharged. In May 2014 home health nurses expressed concerns about the home environment and DCFS investigated allegations of medical neglect and environmental neglect. Both allegations were unfounded. The child's physician did not believe she was being medically neglected and the home, while cluttered and having some cleanliness issues, did not present a health risk to the child. There were ongoing concerns that the children were not in school. The parents said they were home-schooling, but the nurses never witnessed it and the books the mother said she used were always in the same spot. Seventeen days after the twin infant's death, a home health nurse called the hotline with another environmental neglect report. It was unfounded. A report of medical neglect was indicated against the mother almost a year after the twin's death when she missed several medical appointments for the children, including the medically complex child. An intact family services case was opened in October 2015. After an initial review of this case, an Inspector General investigator wrote to the school superintendent to advise that the kids were not in school in March 2015. In April 2015, the Inspector General investigator received a response from the superintendent's office stating that they notified the principal of the neighborhood elementary school; they requested the school district conduct an investigation; and the truancy officer would also investigate. In October 2015 the mother reported to her intact family services worker that the children were being homeschooled using online programs.

| Child No. 34 | DOB 9/14 | DOD 12/14 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 months |
| Substance exposed: | No |
| Cause of death: | Undetermined |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:        Two-month-old infant was found unresponsive in his bassinet by his 30-year-old father around 9:15am. He was last seen alive at 7:00am when his father fed and burped him and placed him on his back in his bassinet.  In the bassinet were blankets, a toy and a baby book. The coroner conducted an investigation. Although the coroner notified the Department of the child's death, the coroner did not suspect abuse or neglect in the child's death. The Department did not conduct a child protection death investigation.

Prior History:        There was one known prior investigation involving the family. In January 2014, prior to the infant's birth, police called the hotline after responding to an argument between the parents. The father had been drinking with other family members while working on a plumbing problem. After he fell asleep, the 29-year-old mother woke him and he allegedly hit her in the head with his elbow and she called police. The couple's 2 and 5-year-old children were home at the time. The father's 35-year-old sister, who lived in the home, reported hearing the mother yell, but did not see what happened in the bedroom. The parents were unfounded for substantial risk of physical injury to the children. The family refused intact family services, but the father agreed to undergo a substance abuse assessment and follow any recommendations.

| Child No. 35 | DOB 6/08 | DOD 12/14 | Undetermined |
|---|---|---|---|
| Age at death: | 6 years | | |
| Substance exposed: | Unknown | | |
| Cause of death: | Gunshot wound to the head | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Six-year-old boy was found bleeding and unresponsive from a gunshot wound by his 27-year-old father who responded to hearing the gunshot. The father called 911 and emergency services responded, taking the child to the hospital. He was pronounced dead the following day when life support was removed. The afternoon of the shooting the child had been playing in his paternal grandmother's bedroom with two cousins, ages 4 and 9. The children had climbed to the top of a closet in the bedroom and removed a gun from a red velvet cloth on a shelf in the closet. The gun belonged to the children's grandmother, who claimed she did not realize the gun was among her deceased father's belongings. The grandmother was indicated for death by neglect and for substantial risk of physical injury/environment injurious to health and welfare by neglect to the six children present in her home at the time of the child's death. She was unfounded for inadequate supervision because she was not home when the incident took place. The father was unfounded for death by neglect because he did not know the gun was in the home.

Prior History:        In July 2014 the deceased child's mother was shot and killed in the early morning hours while driving on an expressway. The child and his two siblings, ages 8 and 10, went to live with their maternal grandmother because their father was incarcerated at the time. In August 2014 an anonymous reporter alleged the maternal grandmother's home was filthy and that she physically abused the children. The grandmother was unfounded for substantial risk of physical injury/environment injurious to health and welfare by neglect and for environmental neglect because the children had no signs of physical abuse and the home environment was clean. During the investigation, arguments occurred over the custody of the children between the maternal grandmother, the father and the paternal aunt. The father was released from jail and took his children to his mother's home where his sister and her three children also lived. The paternal aunt became the primary caregiver. In September 2014 an anonymous reporter called the hotline alleging that the paternal aunt physically abused the deceased, did not have enough food to feed the children, and lived in a dirty home. The aunt was investigated and unfounded for cuts, bruises, welts by abuse, inadequate food, and environmental neglect. Following the child's death the paternal aunt obtained guardianship of the two surviving siblings. Their father participates in their care.

CHILD DEATH REPORT

| Child No. 36 | DOB 9/14 | DOD 12/14 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2-1/2 months |
| Substance exposed: | No |
| Cause of death: | Undetermined |
| Reason For Review: | Open intact family services case at time of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**      Two-and-a-half-month-old infant was found unresponsive around 8:00pm in her crib by her 21-year-old mother and 29-year-old father, both of whom are developmentally delayed. The parents had fed the infant and laid her down for a nap at approximately 4:00pm. They covered her with blankets because the home was chilly and laid an additional blanket over the top of the crib. The parents last observed the infant breathing at approximately 7:00pm. The infant was taken to the hospital by ambulance where she was pronounced dead at 8:47pm. The coroner investigated the death and determined that the child was placed in her crib on top of a fleece blanket with a folded towel under her head. The pathologist who conducted the baby's autopsy found evidence of past head trauma as well as recent surface injuries to the infant's head. The coroner ruled the cause and manner of death undetermined because neither the sleep environment, past head trauma, nor toxicologic findings (cough medicine) could be excluded as having contributed to her death. The Department investigated and indicated the parents for death by neglect and cuts, bruises, welts by abuse to the deceased. While the investigation was pending, in May 2015, the couple's 1-1/2-year-old daughter was taken into custody when she was observed by the child protection investigator to have a bruise under her eye. The parents were indicated for cuts, bruises, welts by abuse to their surviving child, who is in relative foster care with her maternal grandmother.

**Prior History:**   In October 2014 the 13-day-old infant was taken to the hospital by ambulance with her father. The infant had bruising to her forehead and a brain bleed. The father reported that the mother, who was significantly overweight, had a seizure and fell on top of the baby. The mother, who had a seizure disorder, admitted to not consistently taking her seizure medication. The mother was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to the infant and the infant's one-year-old sister because the mother was not following her treatment plan for her seizure disorder. An intact family services case was opened toward the end of November. An intact family services worker visited the family for the transitional visit and made two more visits in December, including the day prior to the infant's death. The worker discussed with the mother the need to set up medical appointments for herself and early intervention services for the children. Intact family services continued until the surviving child entered foster care.

| Child No. 37 | DOB 9/14 | DOD 1/15 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 months |
| Substance exposed: | No |
| Cause of death: | Sudden unexplained death in infancy |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**      Four-month-old infant was found unresponsive on her stomach in her crib by her 26-year-old father around 7:45pm. The maternal grandmother called 911 and the infant was transported by ambulance to the hospital where she was pronounced dead. The infant's 23-year-old mother had laid the baby for a nap around 5:30pm on her stomach on top of a soft, thick blanket. The coroner conducted an investigation and the infant's autopsy report noted that the sleeping arrangement put the infant at high risk for suffocation which could not be ruled out after a complete autopsy. No abuse or neglect was suspected in the infant's death and the Department did not conduct a child protection investigation.

Prior History:   In December 2013 an anonymous reporter called the hotline to report that the parents used drugs and did not dress their 11-month-old baby appropriately for the winter weather. The caller further alleged that the father had recently been arrested for a domestic dispute. An investigation was initiated against both parents for allegations of inadequate clothing and substantial risk of physical injury/environment injurious to health and welfare by neglect to the baby. The allegations were unfounded due to insufficient evidence. The investigator observed adequate clothing for the child. The parents had recently moved in with the maternal grandmother following a domestic dispute while living with the father's grandmother. The maternal grandmother's home appeared safe, clean, and appropriate for the infant, and the maternal grandmother vouched for the parents' good care of the infant.

| Child No. 38 | DOB 11/14 | DOD 1/15 | Undetermined |
|---|---|---|---|
| Age at death: | 7 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined, cannot exclude the possibility that an unsafe sleep environment and/or asphyxia contributed to death | | |
| Reason For Review: | Pending child protection investigation and split custody (siblings in foster care) | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Seven-week-old infant was found unresponsive by her 21-year-old mother around noon. The infant had been sleeping face down on her mother's chest. The mother called 911 and the infant was transported to the hospital where she was pronounced dead. The mother had fed the infant around 3:30am and laid the infant face down on her chest. The infant awoke at 6:00am and the mother fed her again and laid her back face down on her chest. The mother awoke at 9:00am and the baby was still on her chest and the mother went back to sleep. The coroner and DCFS investigated the infant's death. There was a crib in the home. DCFS indicated the mother for death by neglect because she failed to exercise safe sleep practices.

Prior History:        The mother was a ward of DCFS for twelve years, from the ages of five to 17. She gave birth to her first child at age 16 and received teen parent services. In 2012 when she was 18 years old she gave birth to her second child. That child's father was killed by gunshot in front of her prior to the child's birth. The mother became involved with DCFS as a parent in December 2012 when the police called the hotline after responding to a domestic disturbance at the residence mother shared with a brother and her father. Police found the mother's 3-year-old daughter alone, locked in a bedroom while the mother was at work. Drugs and drug paraphernalia were also found in the bedroom. The mother was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect, substance misuse, cuts, welts, and bruises by abuse, and tying/close confinement to her 3-year-old. The grandfather and uncle were also indicated. Protective custody was taken of the little girl and her 7-month-old baby brother. They were placed in relative foster care with the baby's paternal grandmother, but later moved to the relative foster home of their maternal grandmother. Mother engaged in services sporadically and stopped altogether in December 2013. In December 2014, the worker called the hotline after learning that the mother had given birth to a baby girl. A report was taken for investigation of substantial risk of physical injury/environment injurious to health and welfare by neglect because the mother had not completed any services regarding the two children in care. The investigation was pending at the time of the infant's death. Several attempts were made to locate the mother and baby. The maternal grandmother denied having contact information for the mother and the baby was not located prior to her death. After the baby's death, the mother was indicated on the report. The two surviving children were removed from their maternal grandmother, who was investigated and indicated for inadequate supervision after DCFS learned she had been leaving the children in the care of their mother unsupervised. The girl is in a traditional foster home. The boy is back with his paternal grandmother. Both children have permanency goals of guardianship.

CHILD DEATH REPORT

| Child No. 39 | DOB 7/14 | DOD 2/15 | Undetermined |
|---|---|---|---|
| Age at death: | 7 months | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden unexplained death in infancy | | |
| Reason For Review: | Open extended family support services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Seven-month-old infant was found unresponsive asleep on the couch on his stomach around 2:30am by his maternal grandmother's 41-year-old boyfriend. The 48-year-old grandmother was at work at the time. The infant was living with his maternal grandmother, grandmother's boyfriend, and a 24-year-old individual who was renting a room in the home. The grandmother's boyfriend had swaddled the infant in a blanket because he was fussy and laid him on his stomach on the couch. The infant, who was born prematurely at 26 weeks gestation, was pronounced dead at the hospital. The police and coroner investigated. The coroner notified DCFS of the infant's death and that no abuse or neglect was suspected. DCFS did not conduct a child protection investigation of the infant's death.

Prior History:   Two months prior to the infant's death, the maternal grandmother called the hotline seeking information on how to gain guardianship of the infant because his 19-year-old mother had left two weeks prior and hadn't returned. The infant had been living at the grandmother's home since his release from the hospital following his premature birth. The mother also lived there much of the time. The grandmother's information was taken for referral to the Extended Family Support Program and sent to the field office. The referral was assigned to a worker almost a month later and the worker had not yet reached out to the family when the infant died. The Department offered the grandmother grief counseling following the infant's death. The Area Administrator explained that at the time of the referral the area was operating with supervisory vacancies and the field was delegated to assist with residential placement problems. He further explained that when workers prioritize their cases, child welfare service referrals, which he estimated average six to nine per worker per month, get put on the back burner because they are not included in workers' assignment counts and because they involve less serious issues.

| Child No. 40 | DOB 6/14 | DOD 3/15 | Undetermined |
|---|---|---|---|
| Age at death: | 8 months | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to unsafe sleeping position | | |
| Reason For Review: | Child of a ward; unfounded child protection investigation | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Eight-month-old infant was found unresponsive by her 19-year-old mother who is a ward. The mother had returned to her foster home after work and around 5:00pm laid down on her bed to rest. She laid the baby on her chest. The mother fell asleep and awoke approximately an hour later when a foster sister asked where the baby was. The infant was discovered between the bed and a wall, laying face down on a 30 gallon plastic garbage bag filled with clothes. Paramedics and hospital staff's attempts to resuscitate the infant were unsuccessful. The baby was current with her well-baby checks and immunizations. A child protection death investigation was conducted against the teen mother. She was indicated for death by neglect because she slept with the baby on an adult bed.

Prior History:   The teen mother and her four siblings have been wards since 2005. Their parents' rights were terminated in 2009. The teen and her younger sister had resided in the foster home for the past nine years. The teen had graduated from high school in June 2014. At the time of her baby's death the ward was attending community college and she was employed part-time. While pregnant the teen had received prenatal care. She was engaged in services through the Teen Parent Services Network (TPSN) including: weekly individual therapy, parenting support and training, and doula services. In December 2014 a social services worker called the hotline to report the then 6-month-old infant had a small, linear mark on her arm. The mother, her foster mother, and her foster sister were investigated and unfounded for cuts, bruises, welts by abuse. The infant was evaluated by a hospital pediatrician who reported the baby showed no signs of abuse and she had no safety concerns for the baby.

| Child No. 41 | DOB 10/13 | DOD 4/15 | Undetermined |
|---|---|---|---|
| Age at death: | 18 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Open intact family services case at time of child's death; pending child protection investigation at time of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:   Eighteen-month-old toddler was discovered by his 30-year-old father and 42-year-old mother deceased, trapped under an overturned dresser around 4:00pm. The parents reported that they put their 2 and 3-year-old boys and 18-month-old twins down for naps in their rooms around 1:00pm and then went to take naps themselves. The dad put a movie on for the older boys. The deceased had a history of climbing out of his crib. It is believed he climbed out of his crib and went into his brothers' room and one or more of the boys climbed onto the drawers of the dresser tipping it over.

Prior History:   The family came to the attention of the Department in May 2014 following a domestic dispute involving the parents drinking. The father entered a rehabilitation program and the investigation was unfounded. In September 2014 one of the children got through a baby gate and fell down four stairs. An investigation was unfounded. Later that month the hotline was called again when the oldest child was discovered walking down the street unsupervised. His father was at home intoxicated; he had relapsed. An investigation was indicated for inadequate supervision against the father and an intact family services case was opened. The father was referred for substance abuse treatment, the mother engaged in counseling services, developmental screening appointments were made for the children, and the intact family services worker encouraged the mother to enroll the two oldest boys in daycare. While the intact family services case was open, between January and March 2015, the police were called twice, once for a domestic battery and once for the father being found passed out outside the family home. An investigation was indicated against the father for substantial risk of physical injury/environment injurious to health and welfare by neglect and the father reengaged in treatment. In early April police called the hotline after responding to an argument between the parents while the father was drunk. The father was arrested on a warrant for domestic battery. Child protection workers made at least three attempts to see the family at home during the fifteen days between the report and the child's death, but no one was home. While the three surviving children were removed from their parents' care after the child's death, the court returned them home less than four months later. They reentered foster care five days later following an altercation between the parents when the father was intoxicated and the cycle of alcohol abuse and domestic violence continued. The children have a permanency goal of return home.

CHILD DEATH REPORT

| Child No. 42 | DOB 4/15 | DOD 5/15 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 5 weeks |
| Substance exposed: | Unknown, mother used alcohol during pregnancy |
| Cause of death: | Undetermined |
| Reason For Review: | Closed intact family services case within a year of child's death |
| Action Taken: | Full investigation pending |

Narrative:      Five-week-old infant was found around 9:00am by her 35-year-old mother and 35-year-old father shaking in her car seat struggling to breathe. She was warm and they took her temperature which was 106.3 degrees Fahrenheit. The parents called 911 and placed cool, wet towels on the infant. When paramedics arrived the infant was no longer breathing. She was pronounced dead at the hospital. The father reported feeding the infant at 11:00pm and placing her to sleep in her car seat in her crib. The coroner and DCFS conducted investigations. The infant was believed to have had a febrile seizure (associated with fever), but it was not believed to have caused the infant's death. DCFS unfounded the parents for death by neglect, but indicated them for substantial risk of physical injury/environment injurious to health and welfare by neglect to the surviving children.

Prior History:      The deceased's mother has been involved with DCFS on and off since 2008 because of neglect of her children. An intact family case was opened from April 2014 until February 2015. The deceased was the mother's seventh child. The mother has a history of alcohol abuse and her husband, the father of the deceased and the two youngest surviving children, reported the mother struggled with alcohol abuse during her pregnancy with the deceased. The children, ages 18 months to 16 years, entered foster care following the infant's death. They all have behavioral problems and two of the older children have been psychiatrically hospitalized since entering care. The children have permanency goals of return home although the mother has expressed that she does not want her three older children returned to her.

| Child No. 43 | DOB 5/15 | DOD 5/15 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 1 hour, 22 minutes |
| Substance exposed: | Yes, opiates |
| Cause of death: | Acute chorioamnionitis with bilateral multicystic renal dysplasia and opiate exposure contributing factors |
| Reason For Review: | Closed extended family support services case within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:      Newborn, who was born prematurely at 27 weeks gestation, died one hour and 22 minutes after birth. The baby had been exposed to a bacterial infection in utero and had multiple cysts on her kidneys. The 26-year-old mother tested positive for opiates, but she denied drug use and refused to cooperate with the coroner's investigation. The mother left the hospital against medical advice. She had not sought prenatal care until her 20th week of pregnancy. At that time the doctor found fetal abnormalities and referred the mother to the hospital, but the mother did not go for two days. The mother said she attempted to get an abortion but it was too late. For these reasons the mother was indicated for death by neglect. The mother was not provided with services because she has no children in her care.

Prior History:      The baby was the mother's fifth child, the first with her current boyfriend. The mother had at least one indicated report for giving birth to a substance-exposed infant in July 2009. An intact family services case was open for fourteen months. The parents were minimally cooperative, but the children were safe and linked with Early Intervention, school services, and community-based services. The four children, ages 10, 8, 6 and 5 years, are in the care of their paternal grandparents. The children had been living with their grandparents full-time since April 2014. In July 2014 the grandfather contacted the Department for assistance with getting guardianship. An extended family support program case was opened and the grandparents received guardianship in August 2014.

| Child No. 44 | DOB 2/15 | DOD 5/15 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3-1/2 months |
| Substance exposed: | No |
| Cause of death: | Undetermined |
| Reason For Review: | Indicated child protection investigation within a year of child's death |
| Action Taken: | Full investigation pending |

**Narrative:** Three-and-a-half-month-old baby died in the hospital after being hospitalized for six days. The 32-year-old mother reported that the infant, her fourth child, had been vomiting since birth and she had taken the infant to her pediatrician. Thirteen days before the infant's death the mother took the baby for x-rays and blood tests which her pediatrician said were normal. The baby showed improvement for a couple of days, but then the baby started vomiting more frequently, began sleeping more, and then appeared in pain, so the mother took the baby to the hospital emergency room and the baby was transferred to a children's hospital where she was diagnosed with bilateral cerebral edema (brain swelling), bilateral retinal hemorrhaging, and bucket handle factures of the left tibia. The hospitalist caring for the baby believed she was a victim of shaken baby syndrome (aka abusive head trauma). The police, coroner, and DCFS investigated the infant's death. The pathologist who conducted the infant's death noted that after "a complete autopsy consisting of investigation, external and internal examination of the body, histology, toxicology, and radiology" the infant's death could not be determined. He wrote: "The findings of cerebral edema and retinal and peri-optic nerve hemorrhage can be seen in the so-called shaken baby syndrome. However, these findings are non-specific and can be seen with natural disease processes, as well. Possible extremity fractures were noted in the medical records. However, no fractures were seen by the forensic radiologist, or during extensive histological sampling of the extremities in question." An unknown perpetrator was indicated for death by abuse. The parents were unfounded for death by abuse and for head injuries by abuse, but they were indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to the infant's 9 and 10-year-old siblings. The rationale for the findings was based on the opinion of the hospital doctor, not on the findings at autopsy. Inspector General staff obtained a second opinion from a forensic pathologist who agreed with the autopsy pathologist's conclusions. The siblings were placed in relative foster care at the time of the baby's hospitalization and they remain in care.

**Prior History:** The family's prior involvement with the Department involved the mother's third child. In October 2014, the hotline was called with a report that the mother's 37-year-old boyfriend threatened the father of the deceased infant and it was alleged that the boyfriend had pinched the 10 month-old's ear. The boyfriend was unfounded for cuts, bruises, welts by abuse and the mother and boyfriend were unfounded for substantial risk of physical injury/environment injurious to health and welfare by neglect to the baby and her siblings. The mother reported that the child had nodded off in her walker and hit her ear on the plastic rim. The investigator interviewed the boyfriend and the baby's pediatrician. The reporter failed to respond to the investigator's requests for an interview. In January 2015 the reporter and a hospital nurse called the hotline to report bruises on the then 13-month-old child's face and a bruise on her thigh. Family members and a babysitter described seeing the toddler with frequent bruising that the mother attributed to falls and learning to walk. She also described placing the toddler in an unsecured chair while the toddler was being fed and the toddler falling out of the chair while reaching for food. The mother's boyfriend was interviewed. He reported that he works six days a week and denied being alone with the children. The mother's older children denied abuse to themselves or seeing their younger sibling abused. The mother was indicated for cuts, bruises, welts, by neglect and for inadequate supervision. The mother's boyfriend was unfounded for cuts, bruises, welts by abuse. Prior to the conclusion of the investigation the toddler's father sought and was granted emergency temporary custody of the toddler. The mother received supervised visitation.

CHILD DEATH REPORT

| Child No. 45 | DOB 4/15 | DOD 6/15 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 7 weeks |
| Substance exposed: | No |
| Cause of death: | Undetermined |
| Reason For Review: | Pending child protection investigation at the time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:        Seven-week-old infant was discovered breathing shallowly around 9:00am in his car seat by his 32-year-old mother. The mother and her son were in town for her grandmother's funeral and were staying at an aunt's home. The baby slept in his car seat and his mother slept on a couch next to him. She last saw him alive and well around 3:00am when she fed him a bottle. The family called 911 and the aunt performed CPR until the ambulance arrived. The baby was dead on arrival at the hospital. A child protection investigation of the infant's death was unfounded. It could not be determined whether the infant died from natural causes such as an electrical disturbance of the heart or whether he died from positional asphyxia due to sleeping in an upright position in a car seat, as both circumstances tend to result in "negative" autopsies.

Prior History:        The deceased was his mother's eighth child. The family had an intact family services case open because of neglect from January 2011 until November 2012. At the time of the infant's death there was a pending child protection investigation for substantial risk of physical injury/environment injurious to health and welfare by neglect against the mother and the 30-year-old father of the newborn. Police called the hotline. The mother and father had broken up but she allowed him to come over to talk and they got into an argument. The father was drunk and choked the mother and bit her on the arm. The father left before the police arrived. The children were in their rooms during the incident. After the infant's death, both parents were indicated for substantial risk of physical injury/environment injurious to health and welfare, and an intact family services case was opened.

| Child No. 46 | DOB 5/15 | DOD 6/15 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 1 month |
| Substance exposed: | Yes, opiates (methadone) |
| Cause of death: | Undetermined |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:        One-month-old infant, who was born prematurely at 34 weeks gestation, was found unresponsive around 5:00am by his 55-year-old foster grandmother. The infant had been sleeping in an upstairs bedroom in a queen-sized bed with his 14-year-old foster sister while the grandmother was downstairs playing cards with the grandmother's sisters. The foster grandmother was watching the children for a couple of days while the foster parents were out of state. The foster grandmother had last seen the infant alive around 3:00am when she checked on him. There was a bassinet in the home. The grandmother reported that the infant was sleeping with the teen and the grandmother had been checking on him throughout the night because her daughter, the infant's foster mother, was worried about his breathing because of his prematurity. A child protection death by neglect investigation is pending against both the foster sister and foster grandmother.

Prior History:   In February 2013 the then 23-year-old mother gave birth to her second child. He was born substance exposed and the mother was indicated for substance misuse by neglect and substantial risk of physical injury by neglect. An intact family services case was opened, but the mother did not follow through on services and her two children were placed in relative foster care. In October 2014 the older child was released to his father's care and in June 2015 the younger child was adopted by the foster parents of the deceased child. When the deceased was born, his mother was engaged in treatment and participating in a methadone maintenance program. However, the infant entered foster care because the mother had been found unfit within the past year and still had a number of services to complete. The mother was unfounded for substance misuse by neglect but was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect. The infant was placed in the same relative foster home as his sibling.

## ACCIDENT

| Child No. 47 | DOB 2/14 | DOD 7/14 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4-1/2 months |
| Substance exposed: | No |
| Cause of death: | Asphyxia due to co-sleeping |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:    Four-and-a-half-month-old infant was found unresponsive around 8:00am by the 19-year-old daughter of his 39-year-old godmother/caregiver. The teen had been sleeping with the infant in a full-sized bed. The infant was placed to sleep around 10:30pm on his back on the bed without blankets or toys around him. The teen joined him about an hour later on the other side of the bed. When the teen found the infant unresponsive he was face up in the middle of the bed. The teen reported she was a light sleeper and would have known if she rolled over onto the infant. A week before the infant's death his 25-year-old mother left him in the care of his godmother because the mother had become homeless and was living out of her car. The mother's 5 and 7-year-old daughters were left with another caregiver and her 3-year-old son was in the care of his father. The coroner conducted an investigation. The Department investigated and indicated the mother for death by neglect because she left the infant in the care of his godmother and had not provided her with a crib or bassinette. The Department later withdrew and unfounded the finding after the mother filed an appeal. DCFS did not investigate the godmother or her daughter for the infant's death.

Prior History:      Six months earlier the godmother called the hotline to report that the mother's home was filthy and there was no food for the children. However, when the child protection investigator saw the home (after several unsuccessful attempts) it was clean and there was adequate food for the children. The mother was 39 weeks pregnant with the deceased and she had a bassinette in the home. Neither a head start teacher nor the children's pediatrician had concerns about the children's care and the children were current with their immunizations and well-child visits. The investigation was unfounded.

| Child No. 48 | DOB 6/14 | DOD 7/14 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 weeks |
| Substance exposed: | No |
| Cause of death: | Pulmonary edema and congestion due to asphyxial event due to parental overlay |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:       Two-week-old infant was found unresponsive around 5:45am by his 22-year-old mother. The mother woke up and discovered the infant underneath his 20-year-old father in the couple's full-sized bed. The couple's two other children, ages 1-1/2 and 3 years, were sleeping at the foot of the bed. There was a bassinette next to the bed and the mother reported normally putting the baby back in the bassinette after feeding him. After a middle of the night feeding, however, the baby fell asleep in her arms and she fell asleep too. The coroner conducted an investigation and believed the father did not know the baby was in the bed and accidentally rolled over onto him while sleeping. Law enforcement responded to the parents' 911 call and called the hotline with a report of environmental neglect based on the condition of the family's home. The parents were indicated for environmental neglect. The Department did not investigate the child's death because neither the coroner nor law enforcement suspected abuse or neglect in the infant's death.

Prior History:     The family was involved in a February 2014 child protection investigation. The parents and their two children were living in the home of a friend who had an open intact family services case. After a visit to the home, the caseworker called the hotline with a report of environmental neglect by both families in their respective children. While the investigation was pending the family moved out of the home. The mother reported that she was unable to keep the home clean because of the other residents and the caseworker confirmed that she had tried. The investigation was unfounded.

| Child No. 49 | DOB 6/14 | DOD 7/14 | Accident |
|---|---|---|---|
| Age at death: | 3 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxial death due to co-sleeping with adults | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Three-week-old infant was found unresponsive around 8:30am by his 26-year-old mother. The infant had been sleeping in an adult bed between his mother and his 20-year-old father and was last seen alive by his mother around 3:00am when she fed him. The parents admitted to drinking alcohol the previous night while playing cards with friends. Police believed the father rolled over the baby based on interviews that the father was intoxicated. The mother reported she was advised in the hospital after giving birth that she should not sleep with the baby and the baby normally slept in his own bed. Both parents were indicated for death by neglect.

Prior History:     Two weeks before the infant's birth, police called the hotline to report substantial risk of physical injury to the mother's roommate's 7-month-old son by the mother's boyfriend, the father of the unborn infant. The father, who was intoxicated, had entered the home uninvited and refused to leave when the mother, roommate, and child returned home. The roommate called police who upon responding found the boyfriend hiding in a closet. The child protection investigation was unfounded because the boyfriend was not an eligible perpetrator as he was not a household member (he did not live in the home) nor was he in a caretaker role for the child.

| Child No. 50 | DOB 12/12 | DOD 7/14 | Accident |
|---|---|---|---|
| Age at death: | 19 months | | |
| Substance exposed: | No, however, mother has a history of opiate abuse | | |
| Cause of death: | Acute morphine toxicity | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Nineteen-month-old toddler was found unresponsive in her crib around 7:00am by her 30-year-old father. Laboratory results from the toddler's autopsy showed that she had morphine in her system. The toddler's 33-year-old mother, who had a history of substance abuse, admitted to relapsing from her opiate addiction recovery and buying some morphine pills days earlier. The evening before the toddler's death, the mother lost ¼ to ½ of a pill while crushing it on a dresser that was about 6 inches away from the toddler's pack 'n play crib. When she couldn't find it, she thought it was a small enough piece not to matter. She did not tell anyone and the toddler's father was unaware the mother had relapsed. It is believed the toddler found the partial pill and swallowed it. The mother was convicted of child endangerment and is serving a four-year prison sentence with a parole date of May 2016.  She was indicated for death by neglect. The father was unfounded for death by neglect. The mother's 9-year-old son is in the temporary guardianship of the toddler's father and her teenaged son is in the guardianship of his maternal grandparents with whom he has lived for many years.

Prior History:   In August 2013 an anonymous reporter called the hotline stating that the child, then 8 months old, had chemical burns to her leg. A report was taken for investigation of burns by neglect against the mother. The assigned child protection investigator saw what appeared to be small red marks and blisters on the baby's thigh near the seam of her diaper. The parents believed the burns were from a chemical reaction from a particular brand of diapers that they stopped using. The baby was seen by her nurse practitioner who said there was no way to tell what the injuries were or how they were caused, but they were possibly from a burn or from fingernail scratches. It was noted in the investigation that the mother had a history of drug use, but was in recovery. The mother was unfounded for burns by neglect.

| Child No. 51 | DOB 9/06 | DOD 7/14 | Accident |
|---|---|---|---|
| Age at death: | 7-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple blunt injuries due to a bicycle and automobile collision | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Seven-and-a-half-year-old boy was struck and injured by an automobile. He died in the hospital two days later. The boy and his 9-1/2-year-old sister had ridden their bikes to a friend's house approximately a block and a half away from their home. When it was time to go home, the boy took off on his bike, rode right into the road and was hit by the car. The accident happened in a small community with little traffic. The driver of the automobile was not impaired and was driving the county road speed limit of 35 miles per hour. A child protection investigation of the boy's death was unfounded.

Prior History:   In December 2013 the children's bus driver called the hotline to report that the 9-year-old girl told him her father got upset with her and choked her and threw her up against a wall. A report was taken for investigation of substantial risk of physical injury by abuse. The girl's brothers reported that their father got upset with their sister and grabbed her by the hood of her sweatshirt and pulled it and she fell against the wall. Her older brother said his sister had been acting bad and mean before the incident. The father similarly described what happened. The girl, who did not have any injuries, said that her dad apologized, that he was normally nice, and that things had returned to normal. The investigation was unfounded.

| Child No. 52 | DOB 5/14 | DOD 8/14 | Accident |
|---|---|---|---|
| Age at death: | 2-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Overlay while co-sleeping with an adult in an adult bed | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Two-and-a-half-month-old infant was found unresponsive around 4:30am by her 48-year-old maternal grandmother with whom she had been sleeping in an adult bed. The infant was last seen alive by her grandmother around 11:00 p.m. the previous night. According to the coroner's report, the infant normally slept with her mother or grandmother. No abuse or neglect was suspected and the Department did not conduct a child protection investigation of the infant's death.

Prior History:   In the month prior to the infant's death, the 17-year-old mother and the grandmother were investigated for environmental neglect. An anonymous caller to the hotline reported that the home the infant was living in was infested with ants and cockroaches and smelled like a rotting animal; and the mother was neglectful. An investigator went to the home which he observed to be clean. He did not observe any bugs or detect any foul odor. The baby appeared happy and well-cared for. The mother believed the report to be false, made by two individuals who accused her of hacking into one of their Facebook accounts. The mother reported the baby slept in her car seat; she had an old pack 'n play crib but said she did not use it because the baby screamed all night if placed in it. The investigator provided the mother with a new pack 'n play crib and unfounded the investigation.

| Child No. 53 | DOB 12/92 | DOD 9/14 | Accident |
|---|---|---|---|
| Age at death: | 21 years | | |
| Substance exposed | Unknown, mother has history of substance abuse | | |
| Cause of death: | Poly substance toxicity | | |
| Reason For Review: | Deceased was a ward within a year of ward's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Twenty-one-year-old youth was found deceased in the bedroom of her home.  At autopsy routine toxicological tests showed Benzoylecgonine (cocaine metabolite) combined with therapeutic levels of Morphine (pain medication), Alprazolam (anti-anxiety medication) and Norfluoxetine (anti-depressant metabolite) in the youth's blood.

Prior History:    In June 2010 the Department was granted temporary custody of the 17-year-old youth. Her mother was addicted to illicit substances and unable to adequately parent the youth. In August 2010, the youth and her one-year-old son moved into a transitional living program apartment for teen parents. The youth remained in transitional living apartments until she emancipated at age 21 in December 2013. In October 2011 she completed her GED. She enrolled in community college, but dropped out. In August 2012 agency personnel servicing her case tried to engage her in drug treatment after learning she was addicted to substances. The youth entered drug treatment six times but did not complete the programs. In February 2013 the youth was indicated for inadequate supervision and substantial risk of physical injury/environment injurious to health and welfare by neglect to her 3-1/2-year-old son. In November 2013 the youth entered into an informal arrangement with her biological mother to care for her son because of concern that he would become a ward of the state. Staff recommended the youth find an alternate care provider for her son because of her mother's history, but she did not. The agency servicing the ward's case tried to screen the mother's son into court, but was unsuccessful because the child was not in her care and was living in another county of the state. A caseworker visited the maternal grandmother's home to check on the child and brought the youth there to visit her son. The grandmother enrolled the child in services. In July 2014 an investigation was initiated against the maternal grandmother when police called the hotline to report the grandmother threatened the mother with a butter knife when she came to take the child back. While the investigation was pending the child was placed in a safety plan and the mother died. The grandmother was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to the child. She was also indicated for inadequate supervision because of her long history of heroin abuse and because she admitted to relapsing in April 2014 while she was caring for her grandson. The child was taken into custody; he is placed with a maternal aunt with a goal of adoption.

| Child No. 54 | DOB 6/14 | DOD 10/14 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 months |
| Substance exposed: | No |
| Cause of death: | Asphyxia due to prone sleeping position with adult soft pillow and soft bedding |
| Reason For Review: | Closed intact family services case within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:    Three-month-old infant was found unresponsive by his 21-year-old mother when she awoke in the morning. The previous evening the mother gave the infant a bottle of formula containing approximately .5mg of melatonin to aid his sleep. At 8:30pm the mother placed the infant on his back in his crib and covered him with a blanket. An adult pillow was also present in the crib. The mother was awakened by the infant at 3:00am and she attempted to feed him but he refused a bottle. The mother returned to bed, awakening at 7:30am to find the infant rolled onto his side against the crib railing, unresponsive. Police and hospital staff notified the hotline of the infant's death. A neighbor also called the hotline expressing concern that the mother allegedly gave the children pills to aid their sleep. A child protection investigation was opened. The investigator learned the mother had been informed by a nurse and a previously assigned intact family services worker about safe sleep practices. The coroner determined that the infant died of asphyxia as a consequence of prone sleeping in a crib with an adult pillow and soft bedding at his face. The mother was indicated for death by neglect and given a referral for community-based services. The mother's 24-year-old boyfriend and biological father to the oldest as well as the deceased child was not indicated. Although the boyfriend resided with the mother he was at work when the baby died. The deceased's two older siblings, ages one and three, reside primarily with the paternal grandmother and biological father of the 1-year-old. The mother has had this informal arrangement since both children were infants. The mother and biological father of the 3-year-old visit with the children at the grandmother's home and both children have occasional overnight weekend visits. On the evening prior to the death of the infant, the mother's 3-year old child stayed overnight while her younger sister remained at home. After the infant's death, a safety plan was implemented for two weeks with the 3-year-old living with her paternal grandmother and the 1-year-old remaining in the care of her father and paternal grandmother. The children remained in these homes when the safety plan was terminated.

CHILD DEATH REPORT

Prior History:    In January 2013 a physician called the hotline requesting child welfare services for the mother and her 11-month-old baby.  The physician was concerned that the family was homeless; the mother was using drugs and leaving the baby with various caregivers; and the infant was not up to date on her immunizations. At the time of the call the mother was pregnant with her second child who was due in May 2013. The assigned worker found that the mother and infant lived primarily with the paternal grandparents and the grandmother cared for the infant when needed. The mother admitted to occasional marijuana use, but not while caring for the infant. The mother denied other substance use and reported that the child's immunizations were up to date. The mother requested housing assistance and the worker provided her with appropriate housing referrals. The grandparents assured the worker that the mother and her children were welcome to stay with them as long as needed. The case was closed one month later based on the worker's assessment that mother had an adequate support system. Approximately six months later, law enforcement contacted the hotline after the mother was in a car accident, hitting and breaking two utility poles and landing in a ditch. The 20-year-old mother had been driving while intoxicated. Witnesses reported that a male passenger left the scene with a young child before police arrived. A child protection investigation was initiated and the mother was indicated for inadequate supervision and substantial risk of physical injury/environment injurious to health and welfare by neglect. An intact family services case was opened. During the course of services over eight months, the worker conducted regular visits; the mother was referred for outpatient substance abuse treatment and mental health counseling; and protective daycare services were arranged so that the mother could attend services. Random toxicology screens completed in February and March were negative for all substances, but her last drug screen came back from the lab with invalid results. In early spring 2014 the mother was discharged unsatisfactorily from both counseling and substance abuse services for lack of attendance. The mother informed her worker that she had reunited with the father of her oldest child and intended to move to another city. The worker suspected that the mother was pregnant but the mother denied it. The worker visited the mother's new home in the other city and completed a Home Safety Checklist which included a discussion of safe sleep practices. The mother requested that her case be closed and the worker determined that the mother was meeting minimum parenting standards. The case was closed three months prior to the birth of the deceased.

| Child No. 55 | DOB 12/96 | DOD 10/14 | Accident |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | Unknown,  mother has a history of substance abuse | | |
| Cause of death: | Multiple injuries due to automobile striking fixed object | | |
| Reason For Review: | Deceased was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Seventeen-year-old ward died in a motor vehicle collision. The ward was driving a stolen vehicle. Police tried to pull him over and the ward refused to stop. According to coroner and fire department reports, the ward was driving and being chased at speeds up to 60mph until he crashed into a fence and light post. The youth was not wearing a seat belt. When emergency services arrived, the youth's legs were pinned underneath the dashboard and he had to be extricated. He had a broken neck and no pulse. He was pronounced dead shortly after arriving at the hospital. The passenger in the car, also a DCFS ward, survived the crash.

Prior History:    As a boy the youth lived with his father and step-mother, but in 2008 the father moved out of state with a girlfriend and left the youth behind. A paternal aunt took the youth in, but he exhibited behavioral problems that led her to call DCFS to provide for him. The Department found his mother and he went to live with her. The Department provided intact family services. In 2011 the youth was removed from his mother's care because she was not consistently participating in substance abuse treatment and he was acting out and getting suspended from school. The youth then entered a cycle of failed foster and residential placements and criminal behavior. At the time of his death the youth was placed at a residential facility but had been absent without permission since the afternoon before the accident. He wished to be emancipated when he turned 18.

| Child No. 56 | DOB 4/14 | DOD 10/14 | Accident |
|---|---|---|---|
| Age at death: | 5-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxiation due to drowning | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Five-and-a-half-month-old infant was found floating face down in the bathtub by her 48-year-old grandmother. The grandmother, who babysat the infant and her 2-year-old sister while their mother worked, had put the children in the bathtub together, with the infant in a baby bath seat. She then left the bathroom to take a phone call and did not return to the bathroom until she saw the 2-year-old in the hallway calling for her, 25 minutes later. The grandmother was found guilty of child endangerment. She received 30 months of probation. She was indicated for death by neglect to the infant and substantial risk of physical injury to the 2-year-old child. The children's parents were indicated for substantial risk of physical injury because of ongoing domestic violence. The county state's attorney's office declined to pursue a juvenile court case, suggesting that DCFS should give the family an opportunity to participate in services. The Department opened an intact family services case, which was subsequently closed eight months later as services were completed.

Prior History:    There were three prior investigations involving the mother's eldest child. In April 2012, the 5-year-old child told his teacher he burned his arm after bumping into a curling iron. Following investigation, including talking to the child's primary care physician, DCFS unfounded the report of burns by neglect. In October 2012 the mother's boyfriend (the father of the 2-year-old and deceased infant) was indicated for substantial risk of physical injury to the then 6-year-old boy following a physical altercation in which the mother's wrist was broken while the boy was present. The mother reported breaking up with her boyfriend following the incident and she was referred to community-based services. The third investigation, which was unfounded, took place in April 2014 when the 7-year-old boy reported having been hit by his father, whom he had not seen in several months. The boy was living with his father in another state at the time of his infant sister's death. The Department contacted the boy's father, school, and the state's child welfare department to check on the boy's safety.

| Child No. 57 | DOB 11/00 | DOD 11/14 | Accident |
|---|---|---|---|
| Age at death: | Just shy of 14 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple blunt force injuries due to bicyclist struck by pick-up truck | | |
| Reason For Review: | Child was a ward placed in the custody of his mother | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Thirteen-and-a-half-year-old boy was killed by a car as he rode his bike across a busy street around 5:45pm. The boy and his 10-year-old brother were on their way home from a friend's house. The brother was unharmed. The boys' 34-year-old mother had left the boys and their 9-year-old brother in the care of a 35-year-old babysitter who gave them permission to go to a friend's house around the corner, but not to the friend's house who lived across the busy street. The boys had previously disobeyed instructions and crossed the street without permission. Persons interviewed, including the police, reported that the boys, who were developmentally delayed and had mental health concerns, were often observed on their bikes riding around the neighborhood without adult supervision. The mother was unfounded for death by neglect, but indicated for inadequate supervision of all three boys. All three surviving children are now in foster care.

Prior History:    The family has a history with DCFS dating to 2012 when the 32-year-old mother and 38-year-old father were investigated for neglect of their three sons and one daughter. The parents divorced in late 2012. In October 2013 an intact family services case was opened on the mother and children after the deceased and his brother went to school smelling of alcohol. The mother's boyfriend's adult son with whom the family lived gave the boys the alcohol. He was indicated for substance misuse by abuse to the three boys. The family became court involved in January 2014 because of the Department's concern about the mother's lack of control over the children. In August 2014 the Department was awarded guardianship of the children, but the court allowed the mother to retain custody of them. All three boys had been psychiatrically hospitalized within the past year and the mother did not regularly administer their prescription medications.

| Child No. 58 | DOB 2/94 | DOD 11/14 | Accident |
|---|---|---|---|
| Age at death: | 20 years | | |
| Substance exposed: | No/unknown | | |
| Cause of death: | Acute hydromorphone toxicity | | |
| Reason For Review: | Deceased was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Twenty-year-old ward went into cardiac arrest around 2:30am while rehearsing in a music studio in another state in which he was living. He died from an accidental overdose of hydromorphone, an opioid narcotic prescribed for pain.

Prior History:    The deceased had been involved with DCFS on and off since the age of three. His father was killed in a gang-related shooting when he was two months old and his mother had problems with substance abuse. The youth had a history of mental health and substance abuse problems. He had a juvenile criminal history dating to 2008. A delinquency court judge committed him to DCFS's guardianship in 2011, the same year he became a father. In 2014, while living in an independent living apartment, the youth moved to another state telling his worker that he was scared for his life after being shot at in his neighborhood. He maintained contact with his caseworker who visited him in the other state and was working to get him to his next court date in Illinois to become emancipated. She spoke with the ward two days before his death.

| Child No. 59 | DOB 10/14 | DOD 11/14 | Accident |
|---|---|---|---|
| Age at death: | 6 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to co-sleeping in an adult bed in the prone position | | |
| Reason For Review: | Split custody (siblings in foster care) | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Six-week-old infant was found unresponsive around 10:30am by his 29-year-old father. A family member called 911. Paramedics attempted to resuscitate the infant but he appeared to have been deceased for a few hours. Law enforcement called the hotline because they suspected the parents were not telling the truth about the circumstances of the infant's death. Blood was found on the infant's nose and on the sheets on the parents' bed. The father eventually admitted that after feeding the infant during the night he placed the infant on his chest and fell back asleep. He later awoke and the infant was next to him. He picked up the baby and put him in his bouncy seat. The 28-year-old mother was unaware. The father was indicated for death by neglect. He tested positive for marijuana and two prescription drugs for which he did not have prescriptions. The mother was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to the infant because she had been found unfit as to two other children within the past 12 months, had not participated in services to address the reasons those children were removed from her care, and tested positive for marijuana and two prescription drugs for which she did not have prescriptions.

Prior History:    In January 2011 the mother's then 5 and 7-year-old children entered foster care after the mother failed to participate in intact family services to address domestic violence between herself and a paramour. The mother completed none of the recommended services. The children were placed with a maternal aunt who adopted them in December 2014 after their parents' rights were terminated.

| Child No. 60 | DOB 11/13 | DOD 12/14 | Accident |
|---|---|---|---|
| Age at death: | 1 year | | |
| Substance exposed: | No | | |
| Cause of death: | Complications of anoxic brain injury secondary to near drowning | | |
| Reason For Review: | Pending child protection investigation at the time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Twelve-month-old baby was found unresponsive in the bathtub around 8:45am by her 4-year-old cousin who alerted her 38-year-old father who was sleeping on the couch in the living room. The 36-year-old mother, who was the baby's guardian, was asleep in the bedroom. The baby had been playing in the bathtub with two other cousins, ages 2-1/2 and 5 years. The father called 911 and the baby was taken to the hospital where she was on life support for nine days before passing. The baby's 24-year-old mother was incarcerated and had given temporary custody and guardianship of the baby to her cousin in June 2014. Following the incident, she revoked her cousin's guardianship and was involved in the medical decision-making regarding her daughter, including executing a do not resuscitate order. The cousin and her boyfriend were indicated for death by neglect and inadequate supervision of the baby and inadequate supervision of their own three children who were removed from the home and placed in relative foster care following the incident.

Prior History:    DCFS investigated the guardian and her boyfriend in August 2014 after the deceased, then nine months old, nearly drowned in the bathtub. The boyfriend had been bathing the baby and his 2-year-old son when he left the bathroom to get soap and a towel. When he returned the baby was under water. He screamed for his girlfriend and they called 911 and started CPR. The baby was taken by ambulance to the hospital where she was admitted for 23 hours of observation. Police and DCFS investigated the incident and determined it was an accident. The boyfriend was unfounded for inadequate supervision. There was an investigation pending at the time of the baby's death. Three days before the incident that led to her death, law enforcement called the hotline to report that the guardian and her boyfriend had had an argument in the middle of the street. The couple had stopped their van in traffic and argued while two of the children ran around in the busy street. No one was injured, but the couple was charged with reckless conduct. A report was taken for investigation of substantial risk of physical injury/environment injurious to health and welfare by neglect to all four children. An investigator attempted to see the family the following day at their home. She rang the doorbell several times but there was no answer. The investigation was concluded and indicated after the baby's death.

| Child No. 61 | DOB 11/14 | DOD 1/15 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 months |
| Substance exposed: | Yes, cocaine |
| Cause of death: | Asphyxia due to overlay |
| Reason For Review: | Pending child protection investigation; open intact family services case within a year of child's death |
| Action Taken: | Full investigation pending |

<u>Narrative</u>:     Two-month-old infant was found unresponsive at 3:45am by her 44-year-old father underneath the body of her 21-year-old sleeping mother. The mother was visiting the infant's father who was living in an abandoned building without utilities. The mother admitted that she had consumed beer purchased by the infant's father and ingested 80mg of her prescribed methadone before falling asleep with the baby in her arms. Two hours prior to the infant's death the police had stopped the mother and father who they observed arguing on the street. The couple reported they were on their way to a liquor store. The officers conducted a well-being check on the infant and instructed the couple to go home. The mother reported she last saw the baby alive at 3:30am when she fed her a bottle. Fifteen minutes later the father called 911. The infant was observed by police unresponsive lying on a dirty mattress. The infant was transported by ambulance to the hospital and pronounced dead. The coroner, police, and DCFS investigated the infant's death. The mother was charged with involuntary manslaughter. The father was charged with domestic battery after he was observed striking the mother in the ambulance. Both parents were indicated for death by neglect, inadequate shelter, and environmental neglect to the deceased. The mother also was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to her 10-year-old son. He entered the Department's custody and his maternal grandmother, with whom he already lived, became his foster parent. He has a permanency goal of guardianship by his maternal grandmother.

<u>Prior History</u>:     The deceased was born substance-exposed and a child protection investigation was initiated for substance misuse.  The mother did not have consistent prenatal care. While the investigation was pending the mother entered a residential substance abuse treatment program. The infant remained hospitalized for one month after which she joined her mother at the treatment facility. Three days later the mother was discharged from the program for theft and possession of a knife. While in treatment she tested negative for illegal substances. The mother and infant went to live with the infant's maternal grandmother and the mother's 10-year-old son whom the maternal grandmother had cared for since his infancy. The mother was indicated for substance misuse and was referred to the Intact Family Recovery (IFR) program for intact family services. The IFR worker learned during the transitional meeting with the mother and the child protection investigator that the mother was the subject of a second, pending child protection investigation for inadequate supervision and substantial risk of physical injury by abuse to the infant. A nurse practitioner had contacted the hotline after observing the mother picking up the infant by one arm, leaving the infant unattended on an exam table, and appearing intoxicated during a well-baby check-up. The mother explained that she had gotten little sleep the night before the check-up because the baby had been fretful. She described lifting the infant's arm to dress her, not pick her up. After learning about the investigation during the transitional visit, the IFR worker immediately administered a drug test which was negative for illegal substances. The mother was reenrolled in a methadone treatment program that she had attended for three weeks while pregnant. The IFR worker met with the mother four times over 17 days from the transitional visit to the date of the infant's death. The mother was administered two additional drug tests during subsequent home visits: one ten days before the infant's death and one three days before the infant's death. The results of both tests were negative for illegal substances. Subsequent to the infant's death, the mother was indicated on the pending child protection investigation for inadequate supervision of the infant at the nurse practitioner's office.

| Child No. 62 | DOB 10/12 | DOD 2/15 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 years |
| Substance exposed: | No |
| Cause of death: | Positional asphyxia |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

<u>Narrative</u>:        Two-year-old child with Down Syndrome and congenital heart disease was found unresponsive around 3:30am by her 45-year-old mother. The child was found face down between the mother's bed and a recliner chair. The child's crib had been pushed against one end of the bed because the child had recently begun climbing of her crib. The recliner chair was pushed up against the other side of the bed and the child's 12-year-old sibling was asleep there. The coroner's office investigated. Although the coroner notified the Department of the child's death, the coroner did not suspect abuse or neglect in the child's death. The Department did not conduct a child protection death investigation.

<u>Prior History</u>:    In August 2014 one of the child's doctors called the hotline to report the mother was not following through on her daughter's medical care. The child was supposed to be seen by three different doctors every three months, but the mother was not keeping that schedule. The doctor called the mother to schedule an appointment and the mother said she would call back, but she didn't. The doctor warned her that he would call DCFS if she did not call back to schedule the appointment. The mother told the child protection investigator that she was unaware how frequently the child needed to be seen and that attending appointments was difficult because she had to work. The child was seen by her doctors while the investigation was pending and future appointments were made. The reporting doctor said he believed the mother, who had four children, had a lot going on and did not think the child was otherwise neglected, but that it took a hotline report to get the mother to schedule the appointments. The mother was indicated for medical neglect.

| Child No. 63 | DOB 01/15 | DOD 02/15 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 weeks |
| Substance exposed: | No, but mother has a history of substance abuse |
| Cause of death: | Positional asphyxia |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

<u>Narrative</u>:    Two-week-old infant was found unresponsive on a couch by his 31-year-old mother. DCFS took a report for investigation of death by neglect. The mother told the police, coroner, and the child protection investigator that she laid the baby on a pillow on one end of the couch while she sat on the other end. The mother reported that she dozed off and when she awoke the baby was still on the pillow but had slid down a bit. When she picked him up she noticed he was not breathing. The mother started CPR and called for the grandmother to call 911. The mother told the police, coroner and DCFS investigators that she could not have overlaid the baby as she was on the other end of the couch. The coroner reported that he talked extensively to the mother on four different occasions and her story was consistent. The coroner also indicated that neither parent smelled of alcohol nor appeared to be under the influence of drugs. The coroner stated it appeared the baby died because his head was tilted in a way that cut off his airway. The child protection investigator also spoke with the mother's probation officer who reported that mother had been clean for an extended period and had tested clean two days before the infant's death. The pediatrician for the baby and the mother's one-and-a-half-year-old toddler told the investigator she had no concerns. The mother was unfounded for death by neglect.

CHILD DEATH REPORT

Prior History:     The mother has given birth to five children. She has a history with the Department dating to 2005 when her boyfriend was indicated for physical abuse of her eldest child and she was referred to community-based services. Five years later, in May 2010, the two oldest children entered foster care after the mother was minimally cooperative with an investigation and she was indicated for cuts, bruises, welts. Her third child was born in February 2011 and also came into care. The mother had periods of housing instability and limited contact with caseworkers, but she entered services, including drug treatment and parenting classes; and she was cooperative with probation. The two youngest children were returned home in October 2012. However, in December 2012, the children reentered foster care after the sheriff found the mother was sheltering an old boyfriend in her home and she lost her housing. In April 2013 the mother signed surrenders and the children were adopted by their foster parents. In June 2013 the mother gave birth to her fourth child and the Department investigated the mother for substantial risk of physical injury/environment injurious to health and welfare by neglect. The mother was unfounded because she denied using drugs, was participating in treatment and her probation officer said the mother was compliant and consistently tested negative for drugs. In April 2014 the Department investigated the mother for substantial risk of physical injury/environment injurious to health and welfare by abuse after a hotline call alleging that the mother was using drugs.  The mother was unfounded because she denied using drugs and her probation officer said she consistently tested negative for drugs. The mother was living with the maternal grandmother. The hotline was not notified of the birth of the deceased.

| Child No. 64 | DOB 2/15 | DOD 3/15 | Accident |
|---|---|---|---|
| Age at death: | 2 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to unsafe sleeping conditions | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Two-week-old infant was found unresponsive by her 29-year-old mother around 5:30pm. The mother had fed the baby and placed her in the crook of the arm of the 47-year-old father, who was awake and lying on the living room floor. The mother went into the kitchen; when she returned about a half-hour later, she found the father asleep and the baby unresponsive. Emergency responders noticed that the father smelled like alcohol, but he did not appear intoxicated. The father, who did not work that day, admitted to drinking a pint of vodka earlier, finishing it around 1:30 p.m. A toxicology screen on the mother was negative. The father's screen was negative for drugs and his blood alcohol content was within the legal limit for driving. The infant and her older siblings, ages 2 and 6, appeared well-cared for. Both parents were unfounded for death by neglect as well as risk to their surviving children. The father was referred for counseling because of his grief and guilt over his child's death.

Prior History:     The father has two additional children with another woman, an 18-year-old daughter and a 12-year-old son. In August 2014 an anonymous reporter called the hotline alleging environmental neglect to the boy by his mother and father. A visit to the boy's home and interviews with family members did not uncover evidence of environmental neglect and the investigation was unfounded.

| Child No. 65 | DOB 7/13 | DOD 4/15 | Accident |
|---|---|---|---|
| Age at death: | 21 months | | |
| Substance exposed: | No | | |
| Cause of death: | Probable drowning | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Twenty-one-month-old toddler drowned in a small above ground pool with an attached wooden deck in his grandparents' backyard. The pool was filled with about 12 inches of murky rain water as it had not yet been cleaned and filled for the season. The toddler had been playing with his 3, 5, and 7-year-old brothers and a young cousin in his grandparents' backyard while his 32-year-old father, grandfather and uncles were working on a car. When the children noticed the toddler was missing they told the adults and a search ensued, with one of the uncles discovering the boy in the pool. The grandmother was not home and the 26-year-old mother had gone to pick up pizza for the family. The toddler had been seen by an adult within 30 minutes of his being discovered in the pool. A child protection investigation against the boy's parents was unfounded for death by neglect.

Prior History:    In July 2014 the hotline was called with allegations of inadequate supervision and environmental neglect. The caller alleged that the family's home was dirty and filled with bugs, urine and feces from the family's dog; and that the children were allowed to play with knives and run around and play in the family's pool unsupervised. A child protection investigation was unfounded. An investigator visited the home and found it in good condition; the parents described appropriate pool safety, including adult supervision and removal of the ladder from the pool to prohibit access; and the two older children reported their parents watched them play in the yard and in the pool.

| Child No. 66 | DOB 12/06 | DOD 4/15 | Accident |
|---|---|---|---|
| Age at death: | 8 years | | |
| Substance exposed: | Unknown | | |
| Cause of death: | Complications of thermal injuries due to immersion in hot water | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Eight-year-old child with Cornelia de Lange Syndrome (a developmental disorder), who was wheelchair bound, non-verbal, and required a feeding tube, died at the hospital as a result of complications from an accidental scalding burn a month prior. The child had sustained partial thickness immersion scald burns to his feet, legs, and buttocks when he was placed in a bathtub of scalding water. He underwent four different surgeries for debridement and grafts as a result of the incident. The nurse who was caring for the child at the time of his injuries was indicated for death by neglect and for burns by neglect.

Prior History:    In February 2014 an anonymous reporter called the hotline to report the mother was depressed and not taking care of her 9-year-old daughter or her medically complex 7-year-old son, especially when a nurse wasn't present. The reporter also alleged that the home was dirty and the 9-year-old wasn't fed properly. A child protection investigator spoke with the children's pediatrician and the daughter's school principal and neither expressed concern. The mother reported compliance with her mental health treatment for depression and that she had family support. The mother was unfounded for substantial risk of physical injury/environment injurious to health and welfare by neglect to both children and for inadequate food to the daughter. In March 2015, fifteen days prior to the burn injuries, the medically complex child's principal called the hotline with concern that the 45-year-old mother was unable to provide for her son, stating that when the in-home nurse is not there, the child is not fed or bathed. He said the child missed school often because the mother did not have him ready for the bus. A report was taken for investigation of substantial risk of physical injury/environment injurious to health and welfare by neglect and environmental neglect to the child. The investigator had seen the child, talked to the mother, the home health nurse and interviewed the primary care physician who had seen the child a day earlier. The medical professionals did not have concerns. The mother reported that the nursing agency had changed from five days a week to three days a week and she was adjusting.  The report was pending at the time of the child's death. It was ultimately unfounded. An intact family services case was opened to address environmental and mental health issues.

CHILD DEATH REPORT

| Child No. 67 | DOB 8/14 | DOD 5/15 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 8 months |
| Substance exposed: | No |
| Cause of death: | Suffocation due to positional asphyxia |
| Reason For Review: | Indicated child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:  Eight-month-old infant was found unresponsive face down trapped between the mattress and the wall by her 24-year-old father around 11:15pm. The infant's 22-year-old mother had placed her to sleep on an adult bed around 7:30pm. There was a crib in the room but it was filled with clean laundry. Police notified the hotline. The responding officer stated there was nothing suspicious about the death and that it was a horrible accident. The Department investigated the parents for death by neglect and substantial risk of physical injury to their two surviving children, ages 2-1/2 and 4 years. The mother was indicated for death by neglect because she placed the child to sleep on the bed instead of the crib. The other allegations were unfounded.

Prior History:     In August 2014 the father was caring for his two children, then 1-1/2 and 3 years old, and left them unsupervised for a few minutes in the bedroom. The 1-1/2-year-old boy was playing on the floor and the 3-year-old girl was playing on the bed which was next to an open screened window. When the father returned he discovered the girl had fallen out the third story window.  He ran downstairs and the little girl told him she fell out the window when she was waving at kids playing on the grass below. The father called 911. The girl had a broken arm that was put in a splint which was removed the following month.  She also had a laceration to her kidney which healed on its own. The father was indicated for cuts, bruises, and welts by neglect (though a bone fracture indication would also have been appropriate).

| Child No. 68 | DOB 9/13 | DOD 5/15 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 20 months |
| Substance exposed: | No |
| Cause of death: | Cerebral disruption due to basal, frontal, and occipital skull fractures due to blunt head trauma |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:     Twenty-month-old toddler was run over by an SUV driven by his 39-year-old maternal grandmother who was backing out of the driveway. The grandmother was getting the toddler ready for a visit with relatives and went outside to move the car to put him in it. She left the boy in the house with his 40-year-old grandfather who was on the phone. The toddler was standing at the door crying. As the grandmother backed out she heard a thump and when she got out of the vehicle, she saw the child's body. The grandparents immediately took the toddler to the hospital emergency department where he was pronounced dead. The police, coroner, and DCFS investigated. The toddler's death was an accident and the Department unfounded both grandparents for death by neglect.

Prior History:    The grandparents were raising the toddler for their 21-year-old daughter. Their involvement with DCFS was regarding another daughter, a 16-year-old who was exhibiting challenging behavior. In April 2015 police called the hotline after the teen and her father had an argument that escalated to the father slapping the teen in the face. The teen ran away and the parents called the police who found the girl and brought her home. She had a bruise on her cheek. The father was indicated for cuts, bruises, welts by abuse and a referral was made for community-based services. The parents wanted services to help with their daughter's behavior because they felt she was out of control. A day after police called the hotline, a report was made alleging mental injury to the girl because the father allegedly called her demeaning names. Investigation revealed the father had shared with his daughter what he heard was being said about her in the neighborhood. The teen's counselor did not believe she was being abused or neglected by either of her parents and the investigation was unfounded.

| Child No. 69 | DOB 6/12 | DOD 6/15 | Accident |
|---|---|---|---|
| Age at death: | 3 years | | |
| Substance exposed: | No | | |
| Cause of death: | Drowning | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death; closed child welfare services referral within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Three-year-old girl was found unresponsive around 4:00pm by her 32-year-old mother in her family's five-foot deep, above-ground swimming pool located in the back yard. Access to the pool was not restricted; while the pool had a fold-up ladder, it was placed at the back of the pool abutting a wooden privacy fence, making it impossible to fold. The little girl's mother realized about 30 minutes earlier that she had lost track of the child and began looking for her. The mother's older children, ages 6, 8, and 10, often went a few doors down to play with neighbor children. After checking and not finding the child there, the mother and neighbors began looking for the child and the mother found her in the pool. Someone called 911 and the child was taken to the hospital where she was pronounced dead. The coroner, police, and DCFS investigated. The police did not believe criminal charges were warranted as they uncovered no evidence to suggest the incident was anything more than an accident. The Department indicated the mother for death by neglect and inadequate supervision of the 3-year-old girl who, because of her age, required close supervision, particularly when access to the backyard pool was unrestricted. The investigation was coded "no service needed" and DCFS did not provide services to the family.

Prior History:    In December 2014 a school staff member called the hotline to request child welfare services for the family. She had been talking to the 10-year-old child who said that her mother sometimes makes the children go upstairs because she believes someone is in their house. She also said that her mother does not cook, clean, or do laundry unless the maternal grandmother is there; and that the 10-year-old makes sure the younger children eat. A worker visited the home and found it clean and free of hazards. The maternal grandmother, who lived in the home, denied that anything strange was going on and the mother declined services. Two weeks later the 5-year-old child fell off a bed while playing with her 7-year-old brother. Three days after the fall, the maternal grandmother called the children's medical provider upset that the mother had not taken the child to the emergency room. The mother took the child to the clinic that day and the child was diagnosed with a displaced clavicle fracture. A clinic staff member called the hotline stating there was no suspicion of physical abuse or medical neglect, but there was concern about the grandmother's frequent calls to the clinic concerning the mother's parenting skills and possible psychiatric issues. The hotline took a report for investigation of bone fractures by neglect. It was unfounded. During the investigation the mother's mental health was assessed and found to be normal.

CHILD DEATH REPORT

| Child No. 70 | DOB 11/14 | DOD 6/15 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 7 months |
| Substance exposed: | No |
| Cause of death: | Combination of mild bronchiolitis and overlay sleeping |
| Reason For Review: | Open intact family services case at time of child's death |
| Action Taken: | Investigatory review of records |

<u>Narrative</u>:        Seven-month-old twin infant born prematurely at 35 weeks gestation was found unresponsive by his 32-year-old father at 3:55am face down in a pack-n-play that he was sharing with his twin. The father last saw the infant alive at 7:00pm the night before. The mother was not living in the home. The father had two pack-n-plays but he kept the twins together in one. The infant had a heart murmur. He was hospitalized and diagnosed two months earlier with respiratory syncytial virus and had been receiving regular breathing treatments since then. No abuse or neglect was suspected in the infant's death, but because of the family's history, after administrative review, an investigation was initiated against the father for death by neglect to the infant and for substantial risk of physical injury/environment injurious to health and welfare by neglect to the three surviving children living in the home. The allegations were unfounded.

<u>Prior History</u>:        In September 2013 an anonymous reporter called the hotline stating that the parents' 3-year-old daughter was bitten by a dog and their 1-year-old son had a bird bath fall on him because the parents did not properly supervise them. Following investigation the parents were indicated for inadequate supervision of both children.  In April 2015 an anonymous reporter contacted the hotline to report that about a week ago the 27-year-old mother hit the father's 12-year-old son in the stomach, picked him up, and threw him across the room. The reporter said that the father works out of town and leaves the mother to care for the children, but she is often away from home and abuses drugs. An investigation was initiated against the mother for substantial risk of physical injury by abuse to the 12-year-old boy and for inadequate supervision of all the children. During the investigation the mother tested positive for drugs in large levels and the father obtained an emergency order of protection. In late April the mother was arrested for DUI and possession of a controlled substance. The mother was indicated for both allegations. An intact family services case was opened and the children remained at home in the care of the father.

**NATURAL**

| Child No. 71 | DOB 9/08 | DOD 7/14 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 5-1/2 years |
| Substance exposed: | No |
| Cause of death: | Complications from cerebral palsy |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Full investigation, Report to Director June 30, 2015 |

Narrative:      Five-and-a-half-year-old medically complex child died at home. It is believed she had a seizure in her sleep. The child was born prematurely. She was diagnosed with cerebral palsy, seizure disorder, encephalopathy, quadriplegia, stenosis of the esophagus, gastroesophageal reflux disease, and hip dysplasia. She had a history of aspiration and required a feeding tube. The police and coroner responded to the scene and neither observed anything suspicious. The Department did not conduct a child protection death investigation.

Prior History:      The deceased was adopted in 2012 at the age of 3-1/2 years by her maternal great grandparents who were then 67 and 71 years old. Her adoptive parents had earlier adopted nine children, including two of the deceased's biological siblings. Because of their advanced age, the couple identified back up caregivers for the child should they be unable to continue to care for her. Less than two years after the adoption, there were three child protection investigations involving the family within four months of the child's death. The adoptive mother was ill with cancer and her illness was affecting her caregiving. Child protection never referred the family to post-adoption services to help the family. The adoptive mother died eight months after the child. See Death and Serious Injury Case 7.

| Child No. 72 | DOB 6/14 | DOD 8/14 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 5 weeks |
| Substance exposed: | No |
| Cause of death: | Multiple congenital abnormalities |
| Reason For Review: | Open placement case |
| Action Taken: | Investigatory review of records |

Narrative:      Five-week-old infant, who was born prematurely at 36 weeks gestation with multiple medical problems, died in the hospital where she had been treated since birth. The infant was diagnosed with Turner Syndrome (missing or partially missing X chromosome), hypoplastic left heart syndrome (congenital heart defect in which the left side of the heart is critically underdeveloped), and hydronephrosis (swelling of a kidney due to build-up of urine). On the day of her death the infant underwent an upper gastrointestinal procedure. Following the procedure she began having trouble breathing and extensive medical attempts to save her were unsuccessful.

Prior History:      The deceased had three older siblings who have been placed together in foster care since 2012 after their 23-year-old mother was indicated for physical abuse and neglect of the oldest child, then age three, and the 19-year-old father of the youngest child, a 2-month-old infant, was indicated for physical abuse to the 3-year-old girl. The mother and the father of the two older children are engaged in services and the children have permanency goals of return home. The mother informed her worker that she did not know she was pregnant with the deceased until late in her pregnancy and that she had talked to an adoption agency about placing the baby for adoption. The worker notified the hotline of the infant's birth and a report was taken for investigation of substantial risk of physical injury/environment injurious to health and welfare by neglect. It was unfounded following the infant's death.

| Child No. 73 | DOB 12/08 | DOD 8/14 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 5-1/2 years |
| Substance exposed: | Yes |
| Cause of death: | Complications of multiple congenital anomalies |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:      Five-and-a-half-year-old medically complex child died at the hospital after resuscitation efforts failed. The child, who had serious and numerous medical problems and was wheelchair bound and non-verbal, appeared normal throughout the day at his residential nursing care facility. That evening the child's respiratory therapist observed that his tracheostomy had come out. She reinserted it and called for help. Nursing staff had documented just a few moment earlier that the child appeared fine. Nursing staff and then paramedics and hospital emergency department staff were unable to resuscitate the child.

Prior History:   The deceased was born substance-exposed with multiple medical problems. He entered foster care at the age of six months after his 33-year-old mother left a substance abuse treatment facility with him for two days and did not administer his medication to him while they were gone. The child spent the majority of his life in nursing care facilities. His father, who was 48 at the time of the child's death, successfully completed drug treatment and participated in 12-step programs. He visited with his son every week, laundered his clothing, and participated in the child's medical appointments. The child's mother, who continued to struggle with substance abuse, visited him sporadically.

| Child No. 74 | DOB 9/13 | DOD 9/14 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 1 day shy of 1 year |
| Substance exposed: | No |
| Cause of death: | Severe Acidosis |
| Reason For Review: | Split custody (siblings in foster care) |
| Action Taken: | Investigatory review of records |

Narrative:      Almost one-year-old medically complex infant died in the hospital where he had been treated for the past 15 days. The infant was born prematurely at 32 weeks gestation with his intestines outside of his body. He had hydrocephalus, requiring a shunt; had a seizure disorder; and required a feeding tube. In the morning on the day he was hospitalized, the infant's 28-year-old mother and 55-year-old father noticed an irregularity with the infant's shunt, but they had court appearances so they did not take the infant to the hospital until later that day. A hospital social worker called the hotline to report medical neglect. The infant had multiple cardiac arrests and little brain function during his 15 day hospital stay.  He died from severe acidosis due to elevated carbon dioxide in his blood from poor lung functioning.  The parents were unfounded for medical neglect because the infant's treating physician believed the outcome for the infant would have been the same even if the parents had brought him to the hospital earlier.

Prior History:    The family became involved with the Department in November 2011, when a social worker reported that the parents and their combined six children had to leave a shelter because the father attacked another male resident. The parents were indicated for inadequate shelter and for substantial risk of physical injury by abuse and neglect. The father also was indicated for inadequate supervision. The six children were taken into custody and placed in relative and traditional foster homes. The children were returned to the mother's care in June 2012, under court supervision. The family then fled to different states. The family eventually returned to Illinois and the children reentered custody in May 2013. The mother participated in services. In September 2013, the caseworker called the hotline to report the mother had given birth to the deceased. During the investigation, the Department discovered that the mother also had given birth to a baby in December 2012. The mother was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect. The toddler was doing well in her parents' care and was allowed to remain with them. The deceased remained hospitalized for four months after his birth. Upon discharge from the hospital he lived with his parents and sister. The parents' other six children remained in foster care. In July 2014 a hospital social worker called the hotline with a report of medical neglect to the deceased because the infant had missed some appointments. The parents explained that sometimes they had transportation problems. The infant's primary care physician at the treating hospital believed the parents were managing the infant's care the best they could and that he was not medically neglected. The family's caseworker reported the parents were behaving appropriately with the two children at home. The investigation was unfounded. All six children in foster care were returned to their parents in July 2015.

| Child No. 75 | DOB 9/04 | DOD 9/14 | Natural |
|---|---|---|---|
| Age at death: | 10 days shy of 10 years | | |
| Substance exposed: | No | | |
| Cause of death: | Leukemia | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Almost 10-year-old boy died in the hospital where he was being treated for leukemia, which had been recently diagnosed.

Prior History:   Eight months prior to the boy's illness and death, an anonymous reporter called the hotline to report inadequate food and inadequate clothing to the boy and his two brothers, ages 3 and 4. The reporter did not know the children's names or where the family lived, but did know their maternal great-aunt's workplace. The investigator saw the children at their maternal grandmother's home where they stayed after school. The grandmother and the two older boys denied that the children ever went without food or clothing. Neither the local police nor the children's pediatrician had any concerns about the family. The 9-year-old boy's teacher stated he came to school dressed appropriately and seemed well-fed. The worker visited the family home and observed plenty of food and clothing. The investigation was unfounded.

| Child No. 76 | DOB 9/14 | DOD 11/14 | Natural |
|---|---|---|---|
| Age at death: | 2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Probable viral syndrome | | |
| Reason For Review: | Closed intact family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

CHILD DEATH REPORT

Narrative:      Two-month-old infant, who was born prematurely, was found unresponsive by her 25-year-old mother lying on her back in her bassinette with a blanket covering her up to her chest. The infant had been laid down for an afternoon nap after which her mother and two-year-old sibling also laid down to nap. The 30-year-old father, who worked the night shift, was also sleeping. After the mother awoke and fed the sibling she checked on the infant and found her unresponsive. The grandfather, who lived in the home and was terminally ill, called 911. His hospice nurse, who was just arriving, performed CPR until emergency personnel arrived. Police called the hotline to report that the doctor at the hospital was concerned about possible neglect because the infant's eyes were dry and she was dehydrated. The home was kept very warm to keep the grandfather comfortable. The coroner reported the infant likely died from a viral syndrome as household members had recently been sick and the infant had been a bit lethargic with loss of appetite.  A child protection investigation of the infant's death was unfounded against both parents for death by neglect and for substantial risk of physical injury/environment injurious to health and welfare by neglect to their 2-1/2 and 7-year-old children.

Prior History:   In January 2011 a hotline report was made by the father against the mother alleging that when he picked up his 3-1/2-year-old son for a visit, the child had a burn on the side of his stomach. The child was medically evaluated and the burn was determined to be a bruise. Neither parent nor the child had an explanation. The child's medical examination revealed a burn on the child's arm that the father believed may have come from a space heater in his home. The mother was unfounded for burns by abuse, but the father was indicated for burns by neglect. He was also indicated for environmental neglect because of environmental concerns in his home. In April 2013 an intact family services case was opened following the mother's arrest for domestic battery to the father. Both parents participated in domestic violence counseling and the case was closed in September 2014. While the intact family services case was open a neighbor called the hotline twice: first to report fighting between the parents and second to report the 7-year-old boy had fallen out of a window. Investigations were conducted and unfounded. The parents admitted to arguing but denied any physical altercations and there had been no domestic violence calls to the police in over a year. While the child did fall out of his bedroom window, the father had not realized the lock was broken and the child could open it. The fall happened early in the morning while the rest of the family was sleeping. The boy told the investigator he had been trying to look at birds outside his window.

| Child No. 77 | DOB 1/10 | DOD 12/14 | Natural |
|---|---|---|---|
| Age at death: | 4-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple congenital heart defects | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Almost 5-year-old ward died in the hospital where she had been receiving palliative care since being removed from a heart transplant waiting list. Her family was with her when she died. The family had been living in a Ronald McDonald house the last couple of months of her life so they could spend time with her. The child had spent the majority of her life in the hospital because of her complex cardiac problems.

Prior History:    The child's 28-year-old mother and 35-year-old father were indicated for substantial risk of physical injury by neglect in an April 2014 report. The hospital where the child was being treated reported that the parents did not visit regularly or participate in the child's treatment plan as expected. An intact family services case was opened and assessment revealed that the parents lived approximately 30 miles away and an hour's drive from the hospital, the father worked full-time, the family had only one car, and the parents had three other children. In June 2014 the child became a ward on a dependency petition with her parents' agreement after her cardiac attending team decided she needed a heart transplant. The child lived in the hospital until her death. The placement worker assisted the family by obtaining funds for rent, bus passes to increase visitation to the child, consultation by a DCFS nurse, and individual therapy for the mother to help her cope and understand her child's medical and emotional needs.

| Child No. 78 | DOB  11/10 | DOD 12/14 | Natural |
|---|---|---|---|
| Age at death: | 4 years | | |
| Substance exposed: | No | | |
| Cause of death: | Hepatic angiosarcoma due to multi organ system failure | | |
| Reason For Review: | Open intact family services case at time of child's death; pending child protection investigation at time of child's death; unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Four-year-old boy died in the hospital from a rare malignant liver tumor that was diagnosed two-and-a-half months earlier. At the time of his death, the boy had been in the hospital for almost three weeks receiving treatment. The boy's 22-year-old mother, with the help of the boy's doctor, decided to remove him from life support. A hotline report made in December while the child was hospitalized alleged medical neglect against the mother for not giving the child all his medication. After the child's death the investigation was unfounded for both medical neglect and death by neglect because the boy's cancer was malignant; his mother's failure to give him the medication did not result in his death; and the efficacy of the medication to improve the boy's condition was unknown. An intact family services case opened in early December remained open following the boy's death. After the death, the mother moved several times, did not enroll her 6-year-old child in school, and refused to consider leaving the children with relatives in a safety plan. Protective custody was taken of the surviving children in February 2015, and they were placed with relatives.  A month later, temporary custody was vacated as the mother had established housing with a relative and the children were returned to her care. The family continued to receive intact family services until October 2015 when the children reentered foster care because of their mother's transience.

Prior History:    In December 2013 the mother called the hotline to report that she and her children were homeless. The mother stated that she received SSI because she had learning disabilities. A report was taken for investigation of inadequate shelter. The mother and her four children, ages one through five, went to stay with a relative. The investigator made housing referrals and unfounded the investigation. In October 2014 a nurse called the hotline to report that the child, who was then just shy of four years old, was brought by a cousin to the hospital with a distended, hard stomach the size of a basketball. A medical neglect investigation ensued and was unfounded. While it was concerning that the child's stomach had been swollen for several weeks without the mother seeking medical care, the treating physician believed the mother's developmental delays made it difficult for her to recognize the seriousness of her son's condition and did not believe the mother had exhibited blatant disregard for his health. The family had a history of unstable housing, moving back and forth between two cities, and an intact family services case was opened to provide services.

.

| Child No. 79 | DOB 8/97 | DOD 1/15 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 17 years |
| Substance exposed: | No/unknown |
| Cause of death: | Bronchopneumonia due to bacterial infection, with cerebral palsy a significant contributing condition |
| Reason For Review: | Closed intact family services case within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:        Seventeen-year-old medically complex youth was found unresponsive in his home around 9:30pm by his adult sister. The youth had cerebral palsy and epilepsy, had a g-tube, was wheelchair bound, and was severely developmentally delayed. The coroner conducted an investigation. Although the coroner notified the Department of the child's death, the coroner did not suspect abuse or neglect in the child's death. The Department did not conduct a child protection death investigation.

Prior History:    In March 2014, a nurse called the hotline to report that the youth was receiving his pills whole when they were supposed to be crushed; that he missed medical appointments; and that the parents were not following through with the school nurse's recommendation for a g-tube. The parents were investigated and indicated for medical neglect and inadequate food to the youth. The youth weighed only 45 pounds. He needed to gain weight to have a surgery that would increase his comfort level by removing a plate in his hip. The parents believed they could help their son gain weight by feeding him orally, but it took the youth a long time to eat and the food needed to be of a pudding-like consistency. The parents were taking the youth to his medical appointments. An intact family services case was opened briefly from May 2014 to July 2014 to link the family to services.

| Child No. 80 | DOB 7/08 | DOD 1/15 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 6 years |
| Substance exposed: | No |
| Cause of death: | Probable myocarditis |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:    Six-year-old child was found lying unresponsive in the bathtub with the shower running around 5:30pm by her 31-year-old step-father. The child was transported to the hospital where she was pronounced dead. Emergency responders noted the child had vaginal bruising, a healing scar on her thigh and a bruise on her lower back. The police, coroner and DCFS investigated the child's death. The police initially detained the step-father. At autopsy, the pathologist noted multiple abrasions on the child's torso, three labial contusions, an irritated hymen, and two bruises and an abrasion on her thigh. The injuries, however, did not contribute to the child's death. The 23-year-old mother was indicated for death by neglect and inadequate supervision because she admitted to police that she left the child home alone for almost two hours until the step-father returned home and found her. Both the mother and step-father were indicated for cuts, bruises, welts by abuse and substantial risk of physical injury/environment injurious to health and welfare by neglect to the 1-1/2-year-old sibling. An unknown perpetrator was indicated for sexual penetration of the deceased and for substantial risk of sexual abuse to her sibling. The sibling entered foster care and is placed with a relative.

Prior History:    In March 2014, the child's teacher called the hotline to report that the child, then five years old, had a bruise on her back, forehead, and one near her eye, and had hair missing from the back of her head that the child first attributed to her baby brother pulling on and then to her step-father pulling out. A report was taken for investigation of cuts, bruises, welts by abuse and substantial risk of physical injury by abuse. The teacher also contacted police. The day the reports were made, the investigator and police detective observed a small bruise on the child's forehead and a scrape on her chin. The child protection investigator noted that the child's hair was a little uneven, but she did not observe any bald spots. The parents denied any physical abuse to the child. The child told the investigator that her forehead bruise was from a fall at the park and that she hurt her chin running down the hall in her apartment, but that in the past her step-father has kicked her and pulled her hair. The investigator ensured the child was seen by her pediatrician and spoke with the doctor both before and after the exam. The doctor stated that while the child's hair was growing in unevenly, there was no indication it had been pulled out. Also, the injuries were consistent with the explanations provided. The detective closed his case without arrest. The child protection investigation was unfounded. The family was referred for community-based services and the parents participated in parent coaching services.

| Child No. 81 | DOB 4/13 | DOD 2/15 | Natural |
|---|---|---|---|
| Age at death: | 21 months | | |
| Substance exposed: | No | | |
| Cause of death: | Sepsis due to complications of acute lymphoblastic leukemia | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Twenty-one-month-old toddler, who was diagnosed with leukemia in November 2014, was found unresponsive by his grandmother around 8:30am in the adult bed they were sharing. The toddler and his two siblings, ages 4 and 7 years, were spending the night at their grandmother's home. The grandmother reported the boy had been somewhat lethargic without much of an appetite. She gave him his pain medication before putting him to sleep. He moaned during the night and vomited several times. The grandmother last saw him awake around 5:00am when they fell back asleep. The child's last chemotherapy treatment was three days earlier. There was no evidence of overlay. The child's death was unexpected. The coroner's office investigated. Although the coroner notified the Department of the death, neither the coroner nor the treating physician suspected abuse or neglect. The Department did not conduct a child protection investigation of the child's death.

Prior History:    In November 2014 an employee at the deceased's day care center called the hotline to report bruises on the toddler's forehead, arm and leg, and a sore on his lip. The child's mother did not know how the bruises were caused but said the child kept scratching at his lip. A report was taken for investigation of cuts, bruises, welts by abuse. When interviewed, day care staff reported the child had been less active the past two weeks. The mother was asked to take the child for a medical exam. The mother took the child to the emergency room; he was admitted and diagnosed with acute lymphoblastic leukemia. The following day he was transferred to a children's hospital where treatment began. A hospital social worker informed the investigator that the bruises were believed to be related to the leukemia. The investigation was unfounded against the mother and she was given a referral for community-based services.

| Child No. 82 | DOB 11/13 | DOD 2/15 | Natural |
|---|---|---|---|
| Age at death: | 15 months | | |
| Substance exposed: | No | | |
| Cause of death: | Acute asthma exacerbation | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Fifteen-month-old toddler died from an asthma attack. A hospital social worker called the hotline stating the mother reported that the toddler was eating cereal around 10:45am when she started choking and coughing. When the 21-year-old mother and her friend saw that the toddler's lips were turning blue, they put her in the car and drove to a hospital about 20 minutes away, unaware there was a hospital 5 minutes away. The mother reported the toddler fell asleep during the car ride and that is when doctors believe she stopped breathing. They arrived at the hospital around 11:35am and the toddler was pronounced dead at noon. The Department investigated and indicated the mother for death by neglect because she did not have the child's nebulizer or albuterol treatment at the friend's home; she did not call 911 which could have facilitated more timely medical intervention; and the child had not seen a primary care physician within two days of her recent hospitalization for acute respiratory distress and a collapsed lung. The mother also was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to her 2-1/2-year-old son who was staying with his maternal grandmother at the time of his sister's death. An intact family services case was opened.

Prior History:      There was a child protection investigation pending at the time of the toddler's death. Nine days before her death the child had trouble breathing and after not seeing improvement with a breathing treatment, her mother called 911. Emergency services took the child to a hospital where she was stabilized and then transferred to a second hospital. The first hospital called the hotline as it was the toddler's second time in the emergency room in less than two weeks for trouble breathing and the mother had not followed up with a primary care physician after the first ER visit. The mother appeared developmentally delayed. The child was hospitalized at the second hospital and treated for acute respiratory distress and a collapsed lung. A hospital social worker said she would call the child protection investigator when the child was ready for discharge, however, the child was discharged three days before her death without any notification to DCFS. The mother was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect after the toddler's death.

| Child No. 83 | DOB 2/05 | DOD 2/15 | Natural |
|---|---|---|---|
| Age at death: | 8 days shy of 10 years | | |
| Substance exposed: | No | | |
| Cause of death: | Pulmonary hemorrhage | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:      Nine-and-a-half-year-old boy died in the hospital. He had a Wilms tumor (cancer originating in the kidney) that metastasized to his liver.

Prior History:      In April 2014 a hospital physician called the hotline to report that the only child had old (pigmentation scarring) loop marks on his back and on one upper arm. The 28-year-old mother admitted that in the past she had disciplined the child with a belt, aiming for his buttocks. She reported the last time she had used corporal punishment, which she described as cultural, was two months earlier. The child said the last time he was hit with a belt was a long time ago. He said he was not afraid of his mother and she took good care of him. The child's maternal grandmother helped care for the child and said the mother was not abusive. The investigator spoke with the mother about alternative forms of discipline and the mother was unfounded for cuts, bruises, welts by abuse.

| Child No. 84 | DOB 2/15 | DOD 2/15 | Natural |
|---|---|---|---|
| Age at death: | 8 days | | |
| Substance exposed: | No | | |
| Cause of death: | Congenital heart defects | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:	Eight-day-old baby, born at 28 weeks gestation, died at the children's hospital where she had been transferred to shortly after birth. The baby had been born with congenital heart defects and she needed a heart transplant to survive.  The assigned case manager was working with the DCFS Guardian to arrange for the needed consents for a transplant at the time of the infant's death.

Prior History:	The 22-year-old mother had made an adoption plan for the baby prior to her birth. After the baby was born with serious heart issues, the adoption plan fell through. The mother left the baby at the hospital reporting she needed to care for other children and an elderly relative at home. The hospital called the Department and the case was screened into court for dependency. After the baby's death, the case manager arranged for a funeral service and burial for the infant.

| Child No. 85 | DOB 10/14 | DOD 2/15 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 months |
| Substance exposed: | No |
| Cause of death: | Tracheobronchopneumonitis |
| Reason For Review: | Closed intact family services case within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:	Four-month-old infant was found unresponsive in her crib by her 25-year-old father at 2:00am. The family had been living in a hotel room for the past two weeks. The father last saw the infant alive at 1:00am when she woke up crying and he picked her up. The father placed her back in the crib on her stomach. There were blankets in the crib. The mother had just finished her shift at work when the baby was discovered unresponsive. Police called the hotline to report the child's death and that the hotel room was filthy, reeked of marijuana, and marijuana was present in the room. The Department conducted an investigation for death by neglect by the father and environmental neglect by both parents. The couple's 2-year-old son was placed in a safety plan with the maternal grandmother, who was already caring for the mother's 6-year-old son. The infant died from a type of pneumonia. The father was unfounded for death by neglect, but both parents were indicated for environmental neglect. The father also was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect and for inadequate supervision because police discovered marijuana in the hotel room and surveillance cameras showed that he had left the children alone in the hotel room for a time.  By the close of the investigation the family had agreed that the children should continue to live with the maternal grandmother. The parents separated and the mother was staying with the maternal grandmother and helping with the children's care.

Prior History:	In August 2013 a hospital high-risk clinic called the hotline to report that the mother was not bringing her then 8-month-old infant in for medical appointments and they could not reach the mother. The infant was born at 25 weeks gestation weighing 1.7 pounds and was supposed to be seen monthly, but had not been seen since May. The mother was indicated for medical neglect and an intact family services case was opened.  The case was open until May 2014. During that time the infant was healthy and attending medical appointments; he was referred to early intervention services; and the family moved into an apartment with the help of Norman funds.

| Child No. 86 | DOB 8/09 | DOD 3/15 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 5-1/2 years |
| Substance exposed: | No |
| Cause of death: | Bronchopneumonia due to streptococcus bacterial infection with seizure disorder, cerebral palsy, and Rett syndrome contributing to her death |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:       Five-and-a-half-year-old medically complex ward was found unresponsive in the morning when her foster mother went to wake her for school. The foster mother called 911 and the girl was pronounced dead at her home where she had lived for most of her life. Police and the coroner investigated and neither suspected abuse or neglect. The Department did not conduct a child protection death investigation. Three days before the girl's death the foster mother took her to the doctor because of labored breathing. A chest x-ray at that time did not reveal pneumonia.

Prior History:    The deceased's 25-year-old mother has a history with DCFS dating to 2007 for abuse and neglect. She has five surviving children. One child is in the care of her father; three are in foster care with their maternal grandmother who is seeking guardianship of them; and one child is in a licensed non-relative foster home. The mother is participating unsuccessfully in services.

| Child No. 87 | DOB 6/14 | DOD 3/15 | Natural |
|---|---|---|---|
| Age at death: | 9 months | | |
| Substance exposed: | Yes, marijuana | | |
| Cause of death: | Congenital heart disease | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Full investigation pending | | |

Narrative:       Nine-month-old medically complex ward died in the hospital after life support was removed. The ward had been hospitalized for more than half her life for treatment of congenital heart defects. At the time of her death the infant had been hospitalized for two months and had had multiple surgeries. It is believed she had a stroke during one of the surgeries and suffered a catastrophic brain injury.

Prior History:    The infant's mother had two older children removed from her care in 2012 when law enforcement responded to the family's home after the mother threatened suicide. The 18-year-old mother was subsequently hospitalized and her 6 and 21-month-old children were placed in foster care. Her rights to those children were subsequently terminated and the children have permanency goals of adoption. When the infant was born with multiple congenital heart defects she remained in the hospital for over 70 days. During that time neither the mother nor the 22-year-old father visited or participated in her care. They were indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect and upon discharge the infant was placed with her paternal grandparents, both of whom smoked. The grandmother smoked a pack of cigarettes a day in the home, but after the child was placed in the home, the child welfare agency created a plan for the grandparents to smoke outside the home. In the months leading up to her final hospitalization, the grandparents missed several of the infant's medical appointments.

| Child No. 88 | DOB 1/15 | DOD 3/15 | Natural |
|---|---|---|---|
| Age at death: | 2 months | | |
| Substance exposed: | Unknown, mother has a history of alcohol abuse | | |
| Cause of death: | Sudden unexpected death in infancy | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Two-month-old infant was found unresponsive around 7:45pm by his 38-year-old foster father. The infant had been fed a bottle around 6:30pm. He then fell asleep on his 31-year-old foster mother's chest, and at 7:30pm was laid down for a nap on his stomach with his head to the side on the foster parents' bed. The bed had a flat sheet on it with no blanket. The foster mother reported the infant was colicky and laying on his stomach helped him sleep. Overnight the infant normally slept swaddled in a blanket on his back in a crib. The police and coroner investigated the infant's death and notified DCFS that it appeared to be from natural causes. DCFS did not conduct a child protection investigation of the infant's death, but the Licensing Division put a hold on the foster parents' foster home license and removed their other foster child, a 4-month-old infant, pending the deceased's cause of death. The infant was returned to the foster parents' care six months later. The foster parents wanted to adopt a child and had agreed to accept two infants into their home. The deceased was a fussy baby who did not pass a 2-month-old developmental screen. Concerns were noted about his muscle tone and he needed further evaluation. Two months after the infant's death, a 14-month-old sibling, who was placed in a different foster home, died from an undiagnosed heart condition. See Child No. 95.

Prior History:        The deceased was the youngest of six children born to his 22-year-old mother. The family came to the attention of DCFS in 2010 when the oldest child was diagnosed with failure to thrive. The mother was indicated for the allegation failure to thrive and was referred to community-based services. Later an intact family services case was open from July 2013 to December 2013 after a hotline report alleging substantial risk of physical injury/environment injurious to health and welfare by neglect was indicated against the mother because of her drinking and leaving her children with her mother for days at a time. Another intact family services case was open from January 2014 to August 2014, after an unfounded investigation of an accidental injury to the 4-year-old child. The children, ages three weeks to four-and-a-half years, entered foster care in February 2015 after the mother was observed by a home-based educator to drive intoxicated with her children in the car. The three oldest surviving children are in foster care with their maternal grandmother and the youngest child is in a licensed foster home.

| Child No. 89 | DOB 7/13 | DOD 4/15 | Natural |
|---|---|---|---|
| Age at death: | 21 months | | |
| Substance exposed: | No, however, mother has a history of substance abuse | | |
| Cause of death: | Bronchopneumonia due to viral infection | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Twenty-one-month-old boy who was born with multiple congenital anomalies including microcephalic encephalocele, a neural tube defect, died in the hospital in the pediatric intensive care unit where he had been admitted the previous day with a diagnosis of pneumonia. Two days before his death, the medically complex child, who lived in a nursing care facility, began experiencing low blood oxygen levels for which treatment was begun, but his condition declined and he was hospitalized.

Prior History:        The infant entered substitute care following his birth. His four older siblings were already in foster care because of neglect related to their mother's substance abuse and non-compliance with her mental health treatment. The infant remained hospitalized for two months before being transferred to a nursing care facility. He resided there for approximately ten months before moving to the facility in which he lived until his death.

| Child No. 90 | DOB 2/13 | DOD 4/15 | Natural |
|---|---|---|---|
| Age at death: | 2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Complications of spinal muscular atrophy | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

CHILD DEATH REPORT

Narrative:      Two-year-old child with the genetic disease Spinal Muscular Atrophy, who was ventilator-dependent and required home health care, was found in full cardio respiratory arrest by her home health care nurse. Paramedics were called and the child was transported to the hospital by ambulance. The child died in the hospital two days later after being taken off life support. The child's 35-year-old mother believed the child's death was caused by a home health nurse's lack of care and hospital staff called the hotline. The coroner called the hotline after a subdural hematoma and a femur fracture were found at autopsy and a death by abuse allegation was added against an unknown perpetrator. Following further review and testing, the subdural hematoma was determined to be small with no evidence of head trauma, most likely related to the child's medical condition or treatment, and did not contribute to the child's death. The femur fracture also was attributed to the child's disease, which causes the muscles to waste. The death by abuse allegation was unfounded. The nurse was unfounded for medical neglect as there was no evidence that she was negligent.

Prior History:   There were two prior investigations involving medical neglect to this child. In May 2014 the mother made a report against a home health nurse and in July 2014 a different nurse made a report against the mother. In both investigations discord between the mother and nursing staff was apparent. While disagreements over the child's care existed, there were no actions or inactions that rose to the level of medical neglect and the investigations were unfounded. In the first investigation the medical neglect allegation surfaced in the context of the child having the femur fracture that was also identified at autopsy. The fracture was believed to have occurred during routine care and there were no concerns of abuse.

| Child No. 91 | DOB 1/15 | DOD 4/15 | Natural |
|---|---|---|---|
| Age at death: | 3 months | | |
| Substance exposed: | No | | |
| Cause of death: | Septic shock | | |
| Reason For Review: | Open placement case (siblings in foster care) | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Three-month-old infant died in the hospital where she had been admitted since birth for extreme prematurity. The infant was born at 24 weeks gestation, weighing 1 lb, 3.4 oz. She was the fourth child born to her 19-year-old mother. Her twin brother died in utero before birth.

Prior History:   The young mother, who is mentally ill, has a history with DCFS dating to July 2012 when an intact family services case was opened with the Department. The case was open until February 2014. In September 2014 the mother's three children, ages 15 months, two, and four-and-a-half-years, entered the Department's care after the mother was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect in an August 2014 investigation. The three children were placed together in a traditional foster home. When the infant was born in February 2015, the hotline was called; the mother was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect to the infant because of her history with the Department and her lack of participation in services.

| Child No. 92 | DOB 4/15 | DOD 4/15 | Natural |
|---|---|---|---|
| Age at death: | 0 | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple medical anomalies | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:      Newborn baby died within a half-hour of his birth. He was born with numerous medical anomalies that were not known prior to his delivery despite the 28-year-old mother having prenatal care.

Prior History:    In May 2014 DCFS investigated the mother for cuts, bruises, welts to her 9-year-old daughter. The mother admitted to hitting her daughter in the face because she was angry about her daughter's lying behavior. The child had bruising to both sides of her face. The police were notified and wanted to pursue criminal charges against the mother with the local state's attorney but said they couldn't because they had not been able to interview the mother. DCFS indicated the mother for cuts, bruises, welts by abuse and offered her services, but she declined them. Based on county practice, DCFS did not believe they could successfully involve the county state's attorney or court in the case.

| Child No. 93 | DOB 6/94 | DOD 4/15 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 20 years |
| Substance exposed: | Unknown |
| Cause of death: | Hypoxic ischemic encephalopathy due to hypoglycemic arrest due to diabetes mellitus with seizure disorder contributing to death |
| Reason For Review: | Deceased was a ward |
| Action Taken: | Investigatory review of records |

Narrative:    Twenty-year-old ward with Type 1 Diabetes and Pervasive Developmental Disorder with an IQ of 73 was discovered unresponsive in the morning by his 61-year-old foster mother. He had been awake and getting ready for school. He died in the hospital when life support was removed after being in a coma for four days.

Prior History:    The youth entered foster care in February 2009 at the age of 14 after a second indicated report regarding his mother's ability to care for her four children. The mother was indicated for environmental neglect. A year prior she had been indicated for medical neglect of the youth related to his diabetes, which had been diagnosed in December 2007. His mother was developmentally disabled and mentally ill. The youth was placed in specialized foster care with his younger brother. He did well in the care of his foster family. He was linked with a diabetes clinic and his diabetes was managed with appropriate medical services and foster family support. At the time of his death he had been having some trouble with low blood sugar and was scheduled to get an insulin pump. The day before he was found unresponsive, he had met with his endocrinologist to go over the procedure. He saw his caseworker that afternoon and told her about the pump he was getting. Given his age, the youth had been working toward independence and was in the process of completing independent living skills classes. His foster mother had expressed her commitment to her relationship with the youth. She is in the process of adopting his 16-year-old brother.

| Child No. 94 | DOB 7/14 | DOD 5/15 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 10 months |
| Substance exposed: | No |
| Cause of death: | Laryngotracheobronchitis of the lungs and airways with staphylococcus aureus bacteremia a significant contributing factor |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:      Ten-month-old infant ward was found unresponsive at 5:00am by her foster mother's 28-year-old boyfriend. The 42-year-old foster mother called 911 and the child was transported to the hospital where she was pronounced dead. The night before, the foster mother put the infant to sleep in an adult bed between herself and her boyfriend to monitor the infant because she had been sick for a couple of days and had a fever. The infant was last seen alive by the boyfriend at 2:00am when he checked her fever and repositioned her on her back to help her breathe. The infant had been given a nebulizer treatment earlier that day and Tylenol before bed. The infant died from what is commonly known as croup. The pathologist noted that staphylococcus aureus bacteremia was a significant contributing factor in the infant's death and that it may be related to her underlying chronic respiratory inflammation. He also noted that the child was co-sleeping without evidence of overlaying. The police, coroner, and DCFS investigated the infant's death. Both the foster mother and boyfriend were unfounded for death by neglect. The foster mother was also unfounded for substantial risk of physical injury to her own two children, ages 12 and 15 years. A foster home licensing investigation also was conducted.

Prior History:   The deceased was her 34-year-old mother's tenth child. She was the seventh of the children who shared a father. The infant was born prematurely at 30 weeks gestation weighing 3 pounds, 8 ounces and spent five weeks in the hospital. She entered foster care from there and had lived with the foster mother and her children since February 2015. All nine of the deceased's siblings, ages two to 14, are wards. The first seven entered foster care in 2012 after the oldest child's school called the hotline to report numerous injuries that were caused by extreme physical abuse. The other three children became wards directly after birth based on the physical abuse of their siblings. Some of the children have been adopted and the others have goals of substitute care pending determination on termination of parental rights.

| Child No. 95 | DOB 3/14 | DOD 6/15 | Natural |
|---|---|---|---|
| Age at death: | 14 months | | |
| Substance exposed: | Unknown, mother has a history of alcohol abuse | | |
| Cause of death: | Congenital heart defect | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Fourteen-month-old toddler became unresponsive while out to lunch with his 32-year-old foster mother. The foster mother called 911 and the toddler was taken to the hospital where it was determined that he was suffering from an undiagnosed congenital heart defect called Anomalous Left Coronary Artery from the Pulmonary Artery (ALCAPA). Doctors wanted to stabilize the child before performing a procedure to correct the defect. The next day, however, the child suffered a second cardiac arrest and he died the following day. Symptoms of ALCAPA may be mistaken for colic in young infants. If the condition is not treated it will lead to a heart attack. The child was small for his age. He and his twin had been moved to the foster home from a different foster home a month earlier. He had seen a doctor the day before the cardiac event. Following the child's death, his four siblings were seen by a pediatric cardiologist. Two of the siblings had small cardiac findings that were considered benign. Two months earlier, the toddler's 2-month-old brother died in a foster home from Sudden Unexpected Death in Infancy, a natural manner according to the coroner. See Child No. 88.

Prior History:   The deceased was a twin and one of six children. The mother came to the attention of DCFS in 2010 when her oldest child was diagnosed with failure to thrive. The mother was indicated for the allegation failure to thrive and was referred to community-based services. Later an intact family services case was open from July 2013 to December 2013 after a hotline report alleging substantial risk of physical injury/environment injurious to health and welfare by neglect was indicated against the mother because of her drinking and leaving her children with her mother for days at a time. Another intact family services case was open from January 2014 to August 2014 after an unfounded investigation of an accidental injury to the 4-year-old child. All six children, ages three weeks to four-and-a-half years, entered foster care in February 2015 after the mother was observed by a home-based educator to drive intoxicated with her children in the car. The three oldest surviving children are in foster care with their maternal grandmother and the youngest child is in a licensed foster home.

| Child No. 96 | DOB 1/15 | DOD 6/15 | Natural |
|---|---|---|---|
| Age at death: | 5 months | | |
| Substance exposed: | No | | |
| Cause of death: | Complications of Hypoxic Ischemic Encephalopathy | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Five-month-old infant died in her home while in the care of a nurse. The infant was born with Hypoxic Ischemic Encephalopathy (brain damage caused when an infant's brain does not get enough oxygen and blood) and had resulting medical complications including cerebral palsy. She was in the care of a children's hospital for the majority of her life, but had been living at home with 24-hour hospice nursing care for six days prior to her death.

Prior History:       The family became involved with the Department in April 2014 following a physical altercation between the 40-year-old mother and 45-year-old father in the presence of the infant. The parents had taken the baby to a neurology appointment and learned that she would have special needs for the remainder of her life. While in the parking lot at the medical facility, the mother blamed the father for the diagnosis and attempted to strangle him. The father elbowed the mother and broke her nose. The infant was in a car seat in the back of the car during the incident. The infant was admitted to the children's hospital for care and the mother was admitted to a hospital for treatment of depression. The mother was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect. The father was unfounded for the same allegation. The parents, who were experiencing high stress because of the infant's health situation, were receptive to the opening of an intact family services case. They engaged in services including counseling and support groups. Their caseworker visited them at their home five days before the infant's death.

CHILD DEATH REPORT

## 16-YEAR DEATH RETROSPECTIVE

**TOTAL DEATHS BY CASE STATUS FY 2000 TO FY 2015**

SIXTEEN-YEAR DEATH RETROSPECTIVE

| FISCAL YEAR / CASE STATUS | 2000-09 (10YR TOTAL) # | % | 2010 # | % | 2011 # | % | 2012 # | % | 2013 # | % | 2014 # | % | 2015 # | % | TOTAL # | % | AVERAGES 2000-15 # | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ward | 272 | 25.0% | 19 | 22.9% | 25 | 22.1% | 19 | 17.9% | 15 | 16.1% | 19 | 19.2% | 24 | 25.0% | 393 | 23% | 25 | 23% |
| Unfounded DCP | 204 | 18.8% | 17 | 20.5% | 23 | 20.4% | 32 | 30.2% | 19 | 20.4% | 28 | 28.3% | 30 | 31.3% | 353 | 21% | 22 | 21% |
| Pending DCP | 116 | 10.7% | 14 | 16.9% | 17 | 15.0% | 12 | 11.3% | 12 | 12.9% | 16 | 16.2% | 14 | 14.6% | 201 | 12% | 13 | 12% |
| Indicated DCP | 73 | 6.7% | 7 | 8.4% | 8 | 7.1% | 12 | 11.3% | 10 | 10.8% | 6 | 6.1% | 5 | 5.2% | 121 | 7% | 8 | 7% |
| Child of Ward | 41 | 3.8% | 7 | 8.4% | 4 | 3.5% | 1 | 0.9% | 0 | 0.0% | 0 | 0.0% | 1 | 1.0% | 54 | 3% | 3 | 3% |
| Open Intact | 170 | 15.7% | 9 | 10.8% | 21 | 18.6% | 14 | 13.2% | 7 | 7.5% | 10 | 10.1% | 3 | 3.1% | 234 | 14% | 15 | 14% |
| Closed Intact | 47 | 4.3% | 2 | 2.4% | 3 | 2.7% | 2 | 1.9% | 8 | 8.6% | 2 | 2.0% | 9 | 9.4% | 73 | 4% | 5 | 4% |
| Open Placement/ Split Custody | 68 | 6.3% | 1 | 1.2% | 8 | 7.1% | 1 | 0.9% | 10 | 10.8% | 13 | 13.1% | 6 | 6.3% | 107 | 6% | 7 | 6% |
| Closed Placement/ Return Home | 12 | 1.1% | 5 | 6.0% | 2 | 1.8% | 1 | 0.9% | 4 | 4.3% | 0 | 0.0% | 0 | 0.0% | 24 | 1% | 2 | 1% |
| Others | 83 | 7.6% | 2 | 2.4% | 2 | 1.8% | 12 | 11.3% | 8 | 8.6% | 5 | 5.1% | 4 | 4.2% | 116 | 7% | 7 | 7% |
| **TOTAL** | **1086** | **100%** | **83** | **100%** | **113** | **100%** | **106** | **100%** | **93** | **100%** | **99** | **100%** | **96** | **100%** | **1,676** | **100%** | **105** | **100%** |

108

SIXTEEN-YEAR DEATH RETROSPECTIVE

## CHILD DEATHS BY DCFS CASE STATUS AND MANNER OF DEATH 2000 THROUGH 2015

| FISCAL YEAR | 00-09 (10YR Total) | 10 | 11 | 12 | 13 | 14 | 15 | TOTALS |
|---|---|---|---|---|---|---|---|---|
| Total Deaths | 1086 | 83 | 113 | 106 | 93 | 99 | 96 | 1677 |
| **Ward** | **272** | **19** | **25** | **19** | **15** | **19** | **24** | **393** |
| Natural | 152 | 16 | 10 | 8 | 6 | 8 | 10 | 210 |
| Accident | 42 | 1 | 3 | 2 | 2 | 4 | 3 | 57 |
| Homicide | 53 | 1 | 8 | 7 | 3 | 4 | 9 | 85 |
| Suicide | 12 | 0 | 2 | 2 | 1 | 1 | 1 | 19 |
| Undetermined | 13 | 1 | 2 | 0 | 3 | 2 | 1 | 22 |
| **Unfounded Investigation** | **204** | **17** | **23** | **32** | **19** | **28** | **30** | **353** |
| Natural | 79 | 4 | 9 | 6 | 3 | 5 | 5 | 111 |
| Accident | 68 | 4 | 7 | 13 | 7 | 9 | 12 | 120 |
| Homicide | 34 | 4 | 2 | 7 | 3 | 6 | 4 | 60 |
| Suicide | 4 | 4 | 2 | 0 | 0 | 1 | 2 | 13 |
| Undetermined | 19 | 1 | 3 | 6 | 6 | 7 | 7 | 49 |
| **Pending Investigation** | **116** | **14** | **17** | **12** | **12** | **16** | **14** | **201** |
| Natural | 44 | 0 | 4 | 4 | 2 | 5 | 3 | 62 |
| Accident | 25 | 7 | 9 | 4 | 3 | 2 | 4 | 54 |
| Homicide | 28 | 2 | 0 | 3 | 3 | 1 | 3 | 40 |
| Suicide | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| Undetermined | 17 | 5 | 3 | 1 | 4 | 8 | 4 | 42 |
| **Indicated Investigation** | **73** | **7** | **8** | **12** | **10** | **6** | **5** | **121** |
| Natural | 30 | 4 | 2 | 3 | 1 | 0 | 1 | 41 |
| Accident | 27 | 1 | 2 | 4 | 6 | 1 | 1 | 42 |
| Homicide | 7 | 0 | 3 | 3 | 1 | 1 | 1 | 16 |
| Suicide | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 2 |
| Undetermined | 9 | 1 | 1 | 2 | 1 | 4 | 2 | 20 |

| FISCAL YEAR | 00-09 (10YR Total) | 10 | 11 | 12 | 13 | 14 | 15 | TOTALS |
|---|---|---|---|---|---|---|---|---|
| **Child of Ward** | **41** | **7** | **4** | **1** | **0** | **0** | **1** | **54** |
| Natural | 18 | 3 | 2 | 0 | 0 | 0 | 0 | 23 |
| Accident | 10 | 2 | 0 | 0 | 0 | 0 | 0 | 12 |
| Homicide | 6 | 1 | 1 | 0 | 0 | 0 | 0 | 8 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 7 | 1 | 1 | 1 | 0 | 0 | 1 | 11 |
| **Open Intact** | **170** | **9** | **21** | **14** | **7** | **10** | **3** | **234** |
| Natural | 82 | 5 | 12 | 4 | 1 | 4 | 0 | 108 |
| Accident | 43 | 1 | 3 | 5 | 4 | 3 | 1 | 60 |
| Homicide | 23 | 0 | 4 | 1 | 0 | 2 | 1 | 31 |
| Suicide | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 3 |
| Undetermined | 20 | 3 | 2 | 4 | 2 | 1 | 0 | 32 |
| **Closed Intact** | **47** | **2** | **3** | **2** | **8** | **2** | **9** | **73** |
| Natural | 17 | 1 | 0 | 1 | 1 | 1 | 3 | 24 |
| Accident | 15 | 0 | 3 | 1 | 3 | 0 | 1 | 23 |
| Homicide | 10 | 0 | 0 | 0 | 2 | 1 | 2 | 15 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 5 | 1 | 0 | 0 | 2 | 0 | 3 | 11 |
| **Open Placement/Split Custody** | **68** | **1** | **8** | **1** | **10** | **13** | **6** | **107** |
| Natural | 44 | 1 | 2 | 0 | 5 | 10 | 4 | 66 |
| Accident | 8 | 0 | 4 | 0 | 3 | 1 | 1 | 17 |
| Homicide | 7 | 0 | 0 | 1 | 1 | 2 | 0 | 11 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 9 | 0 | 2 | 0 | 1 | 0 | 1 | 13 |
| **Closed Placement** | **12** | **0** | **0** | **0** | **0** | **0** | **0** | **12** |
| Natural | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| Accident | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Homicide | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

SIXTEEN-YEAR DEATH RETROSPECTIVE

110

SIXTEEN-YEAR DEATH RETROSPECTIVE

| Fiscal Year | 00-09 (10YR Total) | 10 | 11 | 12 | 13 | 14 | 15 | Totals |
|---|---|---|---|---|---|---|---|---|
| Adopted | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| Former Ward | 11 | 1 | 1 | 1 | 2 | 4 | 2 | 22 |
| Return Home | 10 | 5 | 2 | 1 | 4 | 0 | 0 | 22 |
| Interstate compact | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Preventive services | 33 | 0 | 0 | 1 | 1 | 0 | 0 | 35 |
| Subsidized Guardianship | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Child of former ward | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| Extended family support | 6 | 0 | 0 | 5 | 0 | 0 | 2 | 13 |
| Child Welfare Referral | 10 | 1 | 1 | 5 | 5 | 1 | 0 | 23 |

# SPECIAL INVESTIGATIONS

## PSYCHIATRIC HOSPITALIZATION AND MEDICATION OF PRESCHOOL WARDS

### INTRODUCTION

The Inspector General investigated the death of a four-year-old foster child who died from abuse inflicted by her foster mother, who is now serving a life sentence for the child's murder. The girl was three-and-a-half when she came into care with her two-and-a-half-year-old sister and one-year-old brother. After a short stay with a maternal grandmother who was overwhelmed by the care of three young children, the siblings were placed in a traditional foster home. Within six months, their newborn sibling was placed in the same home. There is no regular respite offered to traditional foster parents who care for young sibling groups of foster children under the age of three. The foster mother in this case had biological children of four and seven years old in addition to the four foster children. When the child turned four, her foster mother began having difficulty with her. The girl was eventually psychiatrically hospitalized two months before her homicide based on the foster mother's descriptions of her behavior. No attempt was made to verify if the reported behaviors existed across settings at the State pre-kindergarten program that the child attended.

The Inspector General's investigation found severe systemic failures that compromised the foster child's safety and call into question the validity of the information that led to the child's psychiatric hospitalization. Additionally, the investigation found that a mental health therapist had handed the distressed foster mother a controversial, junk-science treatment book. The author, a former dog groomer, promoted radical, pathological methodologies to be used on foster or special needs children. The young foster parent, overwhelmed with the care of six small children, including the stress of caring for a newborn, appeared to scapegoat the four-year-old. The foster child's early death served as an impetus for the Inspector General to conduct a systematic investigation into the practice of DCFS and the DCFS Screening Assessment and Support Services (SASS) funded program in the psychiatric hospitalization of DCFS children ages four and younger. The investigators reviewed all available records to determine whether reported behaviors leading to the children's hospitalizations were both valid and reliable. The investigation also examined whether hospitalizations were based on fundamental attribution errors, which occur when behaviors are explained by internal personality traits or dispositions but the environment in which the behaviors occur is ignored.

### SUMMARY

Inspector General investigators obtained data from the Office of the DCFS Guardian of all three and four-year-old wards who had been psychiatrically hospitalized from March 2010, when the Guardian began tracking the hospitalization of young children, through 2012. The data includes 32 children, including the child detailed above.  Thirty-one of the 32 children had reports of aggressive behaviors that contributed to their hospitalizations.

Of the children in this investigation, those who received necessary community-based services, that enhanced pro-social development, fared better.

The Inspector General's investigation focused on whether the child welfare and mental health systems looked at these often traumatized children through developmental and ecological lenses. A developmental

lens views behaviors in the context of age-appropriate and normal developmental struggles, considering the emotional and social competencies of the individual child and the parent or caretaker. A developmental lens places into context common problems, such as an exhausted parent's struggle with a child's sleep and bedtime routines, and recognizes that a preschool child with expressive or receptive language delays may have behavior problems. A child with communication deficits can easily become frustrated and exhibit temper tantrums or aggressive behaviors. One child, four years and 11 months old, had the expressive language of a child aged two years and 11 months. He only received 15 minutes of speech therapy a week at school, which was hardly effective considering the obstacles his speech deficit presented to pro-social skills development.

An ecological approach stresses the importance of placing psychological phenomena in context. Children are social learners and acquire behaviors from face-to-face interactions with parents and family, and might in turn use what they learned when interacting with peers (Kerig and Lindahl, 2001).

As many as a third of children who come into care have seen or been victims of domestic violence in their homes. One three-year-old boy in this investigation came from a family with an extensive history of domestic violence. He entered foster care after his mother committed suicide by shooting herself in the head; he was on the front porch at the time. Previous Inspector General investigations found that children exposed to violence may freeze, withdraw or, sadly, imitate the aggressor. Some children become protective of family members and feel a sense of failure or guilt for not being able to stop the violence. When children are caught in an untrustworthy environment, they may not have the ability to trust a new environment when they are first placed in foster care. Violence inflicted on children directly and children's observations of violent acts are both traumatic situations. The young boy who witnessed the aftermath of his mother's suicide never received grief and loss therapy even though two children's hospitals in adjacent communities provided such services.

Approximately 600,000 of the children born in the United States each year may have been prenatally exposed to alcohol. These children may suffer from a broad range of difficulties including long-term health, behavior, development, and academic achievement. Five mothers in this investigation reported using substances while pregnant; two gave birth to a substance-exposed infant. The DCFS substance abuse screen does not specifically target prenatal alcohol use and prenatal health records were not obtained, even for those infants who came into state custody at birth or shortly thereafter. Neurodevelopmental disorders associated with prenatal alcohol exposure are a serious public health problem. In all but three cases, the records were silent on this risk factor. Recent literature suggests the use of vitamin supplements (choline, folate and vitamin A) to prevent or ameliorate the effects from fetal alcohol exposure.

The intense anxiety and fear that often follow a traumatic event can be especially troubling for children. Some children may demonstrate regressive behaviors such as thumb sucking or bed wetting, may be more prone to nightmares and fear of sleeping alone, and may see their performance in school suffer. Other changes in behavior patterns may include throwing tantrums more frequently, displaying aggressive behaviors, or withdrawing and becoming more solitary.

Preschool children typically display negative emotional behaviors when frustrated or irritable. The severity of such behaviors varies depending on the temperament of the child. The degree of difficulty of these behaviors depends, in part, on the individual skill and understanding of the child's caregivers. Some studies (Rubin, 2004) suggest a temporal relationship in which placement change precedes and may contribute to attachment distress, leading to increased aggressive behavior, which often results in visits to emergency departments and even hospitalization.

Although admission to a psychiatric inpatient unit may be necessary for management of risks when communities do not have viable alternatives, Marsenich (2002) noted that no evidence supports the view that hospitalization leads to long-term, positive outcomes relative to other care options. Instead, we must focus on increasing intensity or quality of services and placements in the community for the youngest of our children, including greater collaboration between hospitals, foster parents, child welfare staff, and community mental health providers to assure that the best community care is provided in a timely fashion. It is clinically unsound and ethically problematic for a young child who enters foster care with inappropriate learned social behavior to be given a mental health diagnosis before the child is given enriched opportunities to learn pro-social skills in a reinforcing environment; remedial skills training should be the prudent course of action by a foster care agency.

## Methodology

The investigators divided the 32 children into three cohorts based on their age upon entry into foster care. Using an ethnographic qualitative records review, the investigators documented the context of the child's life prior to and after their hospitalization. This context includes the reasons the child came into foster care, the level of isolation or support to the foster family, and whether the child was placed as part of a sibling group, as well as the timely use of evidence-based or evidence supported treatment interventions and strategies. The investigation also determined the children's involvement in early education and recreational or community activities. The investigators paid special attention to transitions, including the number and length of children's placements, reason for transitions, and changes of caseworkers and agencies.

Emerging concerns regarding the effects of psychotropic medication on very young children demanded a deeper analysis on the eight children in this investigation who had either been prescribed Lithium (mood stabilizer), Risperdal (second generation antipsychotic), or Depakote (used to treat adult seizure disorder and adult Bipolar Disorder; used off-label for pediatric seizures), or whose records indicated a discrepancy between the prescribing and consulting psychiatrist. Further analysis also examined issues related to problems with the administration of the psychotropic medication. In some cases, the foster parent disagreed with medicating the child and altered or discontinued the child's medication. In other cases, the child faced a chaotic home, which was likely, rather than a psychiatric disorder requiring medication, to be the root cause of disruptive behaviors.

## Findings

The investigation found that 94% of the children in this report were not provided non-chemical, evidence-based interventions before their initial hospitalization. Only six children in this investigation did not receive psychotropic medications, although one of the six children initially received a prescription that was later determined unnecessary. Contextual assessment of a child using a Functional Behavioral Assessment may obviate, or at least minimize, the need for both psychiatric hospitalization and psychopharmacologic therapy. In the field of psychopharmacology, different providers maintain differing opinions on treatment strategies for various conditions and behaviors. This study was not intended to critique therapeutic choices; its goal is to emphasize the need to rule out less invasive, and potentially more beneficial, non-chemical strategies before turning to psychopharmacological therapy.

### The Need for Ecological and Developmental Assessments

Doctors, especially when prescribing psychotropic medication for children, must have an accurate clinical picture. Psychiatrists rely on patients or informed sources for information on behavior and symptoms outside of the hospital or office setting. For DCFS wards, this source is overwhelmingly foster parents. There was little evidence of the doctors obtaining additional or corroborating information from

caseworkers, daycare providers, teachers and therapists. Using only one of these sources may lead to an improper diagnosis and possible inappropriate medication, especially when an overwhelmed foster parent provides the information, or when the symptoms and behaviors described are not placed in a timeline or within a context. This problem is compounded by the tendency to generalize from extreme but rare incidents. Too often, psychiatrists do not know what a child's usual day looks like. The psychiatric assessments did not include either an ecological or developmental analysis that would ensure that a child's response to chaos and or abuse is not carelessly pathologized. Too many assessments relied on a foster parent's description of problematic behaviors without determining whether the problem behaviors exist across settings, and failed to consider a Functional Behavioral Analysis that might eliminate the need for psychotropic medication. Screening Assessment and Support Services currently uses the Childhood Severity of Psychiatric Illness (CSPI) screening tool when assessing children under age six. However, the CSPI has not been validated for this age group and was never intended to be used for such young children.

Models stressing *person* pathology have long dominated the study of behavioral, emotional, and learning problems. Discussions of cause, diagnosis, and intervention strategies make this apparent. Foster children who deal with multiple transitions and are exposed to often severe treatment or neglect are especially likely to be harmed by a strictly *person-based* pathological approach.

Lack of context or simple listing of symptoms or incidents can lead to exaggeration of symptoms and recorded misinformation. Amplification, in turn, can lead to classification in a high risk category that places children on certain trajectories. For example, Eli's foster mother, who was caring for three small children under five, said he was trying to set the house on fire and attempting to kill the cat. Eli did not actually try to start a fire; he and his sister were playing in the bathroom where the foster mother had left a lit candle. During play, they tossed toilet paper near the candle that caught fire. Eli also had a nightmare about the cat. The foster mother also reported that he had been expelled from daycare because of his aggression but Inspector General investigators found this to be false; the foster parent lost funding for employment related daycare when she could not provide evidence of her self-reported home-based business. When the foster parent took Eli to the Emergency Department, they arrived around 8:00 pm. Medical records note that Eli was jumping on the bed at the Emergency Department and was not moved to the unit until 1:00 am.  The attending physician requested Tenex (centrally-acting alpha agonist/centrally-acting antihypertensive; used to treat adult hypertension and used off-label for heroin withdrawal, migraine headaches, and pediatric ADHD) to the Department's Psychotropic Medication Consent Line seeking approval for the psychotropic medication.  The Department's consulting psychiatrist asked why the doctor requested Tenex over an antipsychotic.  The next communication documented in the database maintained by the consulting psychiatrist's staff shows the request for Tenex was rescinded and a request for Risperdal had been approved five days after the initial request. According to hospital records, Eli no longer required medication and was discharged that same day with no prescriptions.  Eli told psychiatric hospital staff that he was bored at home while the foster mother watched television all day.

### *The Need for Collaboration and True Integration of Information*

This investigation demonstrated a need for a more substantial collaboration between the medical providers involved in a child's care. There is a pervasive lack of integrated information on these children. While collaboration between the Department's Clinical Division, consulting psychiatrists, and case managers is critical for the duration of all cases involving serious mental health concerns and very young children, collaboration is of utmost importance at initial intake and at the 30 day post-hospitalization staffing. While some case files included evidence of professionals raising important contextual questions or recommending less invasive interventions, there was no integration of or documented follow-up on those recommendations. With representatives of each part of the child's care team speaking directly to

each other, discrepancies in their care can be explored and hopefully rectified. More importantly, a true participatory staffing would ensure uniform review and compliance with parameters and guidelines.

In addition, the investigation found that psychotropic medications, including antipsychotics and off-label use medications, were being prescribed without obtaining consent from the DCFS Guardian.  One doctor, a neurodevelopmental pediatrician, prescribed Trileptal to a four-year-old without obtaining the appropriate approval.  Medical records of this child indicated he planned to use the off-label medication if an EEG warranted a need for it.  However, the investigation found the EEG was never administered but the medication was prescribed anyway.  The case manager requested consent for this medication two weeks after the child began taking it.  Approximately one month later, this child was hospitalized as a result of a severe cutaneous adverse reaction to the medication, known as Drug Reaction with Systemic Symptoms (DRESS).

The investigation also found that once psychotropic medication has been prescribed, there is no required reassessment at specific intervals to ensure that only the minimum required chemical interventions are used.

Children six and under who are referred to Crisis and Referral Entry Service (CARES) need to have Specialized Assessments that would ensure implementation of recommendations contained in this Report and evidence-based practice. The Specialized Assessment must include information regarding the child's typical daily schedule (weekday and weekend), identified problematic behaviors, and data from multiple sources to determine whether those behaviors exist across settings, as well as child-centered collaterals to determine to whom the child feels special. Supervisors must ensure that each case manager solicits information from all caregivers, school staff, and daycare providers and other relevant professionals through a Child Behavior Checklist. A Functional Behavioral Assessment should be pursued prior to hospitalizing a young child. Several psychiatric hospitals noted the risk these young children face on units with older children and the lack of appropriate programing for such very young children. This suggests that alternatives to hospitalizations should be supported.

### *The Need for Critical Ancillary Services and Supports to Child and Caretakers*

All of DCFS' preschool age children should be in Head Start or State pre-kindergarten programs. Children in this investigation, who received necessary community-based services that enhanced pro-social development, fared better. Critical ancillary services include system of care services, to provide continuity and linkage to the community, occupational, speech or other remedial therapy, and involvement in extra-curricular activities. Children provided with these resources were able to significantly decrease both the number of hospitalizations and number of psychotropic medications. Any treatment modality must involve the caregiver as well as a realistic appraisal of supports that the caregiver may need. Several of the children in this investigation suffered from ever shifting visitation schedules that appeared to ignore the confusing effects these changes had on the children. The number of transitions many of these children experienced was inexcusable.

*For the full report: Use of Psychotropic Medications and Psychiatric Hospitalizations of Three and Four Year Olds, see DCFS Website (www.illinois.gov/dcfs) and click on "Office of the Inspector General" under "About Us".*

**OIG RECOMMENDATIONS/DEPARTMENT RESPONSES**

**The Department has a heightened responsibility to children who come into their care from high risk situations.**

**1.   Young children from families with high risk histories of violence, and/or substance abuse and mental illness should receive timely ameliorative and preventive services when they first come into foster care. Young children from high risk households who exhibit aggressive behaviors should receive first line evidence and in rural areas, preferably home-based interventions such as Parent Management Training – The Oregon Model (PMTO), Parent Child Interaction Therapy (PCIT), Incredible Years, and Collaborative Problem Solving.**

Integrated Assessments will identify these children as they enter care and make recommendations for ameliorative and preventive services in final report when appropriate and available. Preference will be given to evidence informed, home based services.  The State Provider data base will assist in identification of home based evidence informed services. The Clinical Division has reviewed program plans for counseling and therapy providers to ensure the requirement for therapy providers to demonstrate training and competency in the utilization of trauma informed evidence based practice.   The treatment providers can then apply for credentialing in trauma informed evidence based practice once the revised contracts are received.

**2.   An ecological and developmental focused Specialized Assessment must be used for children under age 6 who have been referred to the CARES hotline or for whom the Guardian receives a request for psychotropic medication. The Assessment should include the following:**
  **a.   Description of identified problematic behaviors;**
  **b.   Ecological and Developmental perspective including prior trauma and neglect suffered by the child and number of transitions;**
  **c.   Corroboration of whether identified problem behaviors occur across settings; with Child Behavior Checklist from key informants including foster parents, relatives, teachers, early education providers, and other relevant professionals;**
  **d.   The ecological and developmental perspective include prior trauma and neglect suffered by the child and number of transitions the child has encountered;**
  **e.   A description of typical day (weekday and weekend);**
  **f.   Description of sleep routine; visitation schedules, foster home composition;**
  **g.   A Functional Behavior Analysis of the child's behavior; and**
  **h.   Description of non-chemical evidence-based interventions that will be attempted prior to use of psychotropic medication.**

DCFS Policy Guide "Prescribing Psychotropic Medication to Children Under 6 Years Old in Illinois State Guardianship" is in process which delineates management of requests for psychotropic medication and/or psychiatric hospitalizations for young children.   Currently, the DCFS Consent Unit is notifying the Psychology program whenever there is request for psychotropic medication and/or psychiatric hospitalization for wards under six years. For children in Cook County, they will be referred to one of the DCFS Division of Clinical Practice and Professional Development Continuity of Care Centers (CCC.) The CCCs provide outpatient psychiatric and therapeutic services for youth with mental health problems that are causing significant distress or functional impairment in their family, school or other environment. A second CCC will be opening in the Springfield area soon. The child is referred for a three month therapy trial.  If the child is already in therapy at another location, contact is made with that therapist to notify them about the psychotropic medication request and to have the comprehensive Diagnostic form completed. Children in regions not serviced by a CCC will be linked with a comparable level therapist. All of the children will receive a comprehensive Diagnostic Assessment. This assessment will be revised

to include recommended ecological and developmental information. The assessment will be completed by the therapist as part of initial intake. The child will be referred via our outpatient psychiatric referral process using CFS-431-2 submitted to OUTLOOK mailbox PSYCHIATRIC REFERRAL. After the 3 month trial, the child's need for psychiatric intervention will be assessed.

*Inspector General comment: The Department should expand the CCC agencies to become community based care lead agencies that manage therapeutic services required for this vulnerable population. The CCC agencies could act as umbrella agencies that provide crucial ancillary services such as functional behavior analysis, occupational therapy and speech therapy in meaningful dosages to ameliorate these children's behavior problems and/or developmental delays.  These programs are not antithetical to trauma focused therapy, but help integrate the child into the community.  The Department should contract with the University of Illinois at Chicago Child and Adolescent Diagnostic and Family Support Program through the Developmental Disabilities Family Clinic as a CCC agency. The program currently provides comprehensive interdisciplinary assessment and services to children with complex developmental and socio-emotional concerns.*

**3.   The above assessment should be developed with collaboration and shared with all professionals involved in the child's care.**

After review of psychotropic medication request by the consulting psychiatrist, the Guardian's Office informs the caseworker and consulting psychologist that a need for further assessment is needed.  The draft assessment form has a box at the bottom indicating it will be shared with necessary persons. The update will include the collaboration piece.

**4.   SASS must stop using the CSPI on children six years of age and under.**

The CSPI has been revised to more accurately reflect the needs of children under the age of six.  This revision is currently undergoing review by national experts and will be presented to the Department upon completion of that review.  It is anticipated that the revised instruments will result in a more effective response to young children in crisis situations. The CSPI will continue to be used for the time being until a successor assessment tool can be established. Ceasing the use of the CSPI at this time would leave the SASS program without an assessment tool for children under six.

*Inspector General comment: The harsh reality is that SASS used and continues to use an invalid assessment tool for this population that has caused harm to vulnerable children.*

**5.   Children age 6 and under who are at risk of psychiatric hospitalization must be offered critical ancillary services, including System of Care (SOC) link-up services, occupational therapy and extra-curricular activities. The Department with the help of its Medical Director needs to assure that young wards with aggression problems and speech delays receive enhanced speech therapy.**

The Intensive Placement Stabilization (IPS) program is invited and attends all CIPPs in person, when possible, including for children six and under to assess whether the child and family could benefit for intensive in-home services. IPS services can be accessed by the child's worker prior to placement disruption.  Caseworkers can request IPS services if there has been a history of placement instability and want to be proactive to ensure the youth's placement remains stable. IPS also provides stabilization services to children stepping down from a higher level of care to ensure supportive services are in place for improved changes for success. Further information is in Procedures 301.66, *Intensive Placement Stabilization Services.*

**6.  The Department must ensure that all therapy provided to our wards is evidence-based.**

The revised counseling and program plans for FY16 incorporates the requirements for therapy providers to demonstrate training and competency in the utilization of trauma informed evidence based practice are being finalized by contracts and will be mailed to providers.  The treatment providers can then apply for credentialing in trauma informed evidence based practice once these revised contracts are received.

**7.  The Department must ensure that all preschool aged wards attend State pre-kindergarten or Head Start programs.**

This is already procedurally required per Procedure 314.7, *Early Childhood Education*. A reminder will be sent to DCFS and POS staff and we will ask for supervisor documentation to be in file to confirm.

**8.  During the Integrated Assessment the clinical screen should sensitively inquire if the mother may have used alcohol prior to her knowing if she was pregnant. Because recent studies have demonstrated promising potential in the administration of Choline, folate and Vitamin A both prenatally and for use with children who have a risk of prenatal exposure to alcohol, the Department should ensure that foster parents receive a stipend to offset the costs of such supplements for infants and younger children who come into care with any indication of maternal alcohol use.**

The DCFS Medical Director is not in agreement with this recommendation. While she does not think the supplements will hurt the child, she has some concern that they have not been scientifically proven to help the child.  The Integrated Assessors do ask about alcohol usage as part of the assessment process.

**9.  The Department needs to train foster parents and caseworkers on first-line interventions recommended in the Department's consulting psychiatrist's Schematic Summary.**

The Department is developing a self-paced training for all staff and foster parents.

**10. The Department should ensure that the neurodevelopmental pediatrician involved does not treat any ward of the state, including prescribing psychotropic medications.**

The Department consulted with their consultant regarding this recommendation. The consultant noted that this doctor should not be prescribing to wards.  The consultant has also requested that their programmer run a query to identify all medication consent requests from this doctor over the past four years and will make that data available to the administrator of the Psychology and Psychiatry programs.

**10. When a consulting psychiatrist attaches a qualified approval for psychotropic medication, the Department must ensure that the qualifications are met.**

The Guardian's Office will explore developing a process to ensure that the qualifications are met.

**11. The Guardian's Office should retain Psychotropic Medication Request Forms completed for wards and ensure that first line treatments, as outlined by the Department's consulting psychiatrist, have been provided prior to approval for psychotropic medication.**

The Guardian's Office will explore developing a process to ensure that first line treatment recommendations are completed prior to approval psychotropic medication.

SPECIAL INVESTIGATIONS

## SHELTER AND RUNAWAY REPORT

### ISSUE

The Office of Inspector General received a complaint that a 14 year-old DCFS ward was twice refused re-admittance to a shelter for teen girls after returning from being on run. The complaint also referenced another 14-year-old girl who was sexually assaulted. After interviewing the girl, the police contacted the same shelter to pick her up. No one arrived and as a result, the girl was forced to spend the night in lock up at the police station.

### INVESTIGATION

The Department contracts with six facilities in Cook County designed to provide short-term shelter for youths entering into the child welfare system. The current shelter care system is severely over-taxed because of a lack of alternatives for youth to transition into more permanent placements. While the system was designed to house youth for up to 60 days, the current average stay is six to nine months and many stay over a year. Moreover, the current system includes shelter care for many young wards, including infants, whose first introduction to DCFS care is a shelter placement and who would be far better served by a network of specialized emergency foster homes, instead of institutional care. The shelter at issue was designed to house up to 15 girls between the ages of 14 and 16.

*Problems Identified with the Department's Monitoring and Administration of Shelter System*

The Inspector General investigation disclosed serious problems in the Department's monitoring of the shelter facility:

- The Department had noted serious flaws in the program, such as lack of programming for the girls, serious incidents such as arson, large numbers of girls on run, lack of adequate computers for the girls, failure to get the girls to medical appointments or therapy and the general shabbiness of the home. The Department's response to these problems was to visit the facility 90 times during 2014, have the facility draft its own corrective action plan, and then failed to monitor implementation of the plan that was drafted.
- While the facility was paid a set guaranteed rate based on occupancy of 11 girls, the facility had an average daily occupancy rate of approximately 7 girls. Despite the small population, the facility was often staffed with volunteers instead of paid workers. Monitors failed to ask where the money was going.
- The facility paid $100,000 and $80,000 respectively to the executive director and a clinical director who were rarely present at the facility. Monitors failed to question their compensation.
- The Inspector General investigation found that the "Clinical Director" was largely engaged in lobbying and fundraising efforts on behalf of the facility. DCFS Rules prohibit the Department for compensating a facility for either of these functions.
- DCFS Rules prohibit any vendor from being compensated for administrative costs in excess of 20%. The facility was compensated for administrative expenses far in excess of 20% of direct costs, but despite 90 visits by monitoring to the facility, the question was never raised.
- The Inspector General investigation confirmed the allegation that a 14 year-old who was on run from the facility was forced to spend a night in a police lock-up after being a victim of sexual assault because no one from the facility went to pick her up, despite having been contacted by police.

- The Inspector General investigation confirmed that on two occasions, another 14 year old girl who was on run, was refused re-entrance to the facility.
- The administration of the shelter care system often failed to communicate important policy changes to the shelters.

## *Missing Children*

The Inspector General investigation also disclosed problems with the Department's response to missing children. This particular shelter had 1600 run incidents in one year. While the Department has a specialized unit dedicated to assistance in locating missing youth, the unit does not physically search for the children. The unit has also failed to analyze the population in a meaningful way to allow a stratified response to the heterogeneous group of runners.

A missing or runaway ward is defined as a child or youth for whom the Department is legally responsible, who leaves his or her place of residence without the consent of the person or entity given responsibility for his or her care and custody. 89 Ill. Adm. Code 329.2. The Procedures further define "child or youth" to include wards aged 18 to 21. The Department processes approximately 15,000 reports of runaway youth each year. According to DCFS data, the majority of missing wards on a given day (49-55%) are adult wards (18-21 year olds) who choose to be absent. The Department's current policy does not differentiate between these "missing" adult wards without any disabilities or compromising conditions and younger missing wards who are at a significantly higher danger level. Additionally, two-thirds (66%) of the 15,000 reports appear to be children (or adults) who are gone less than 24 hours. Some are gone for only an hour. "Missing wards" include wards who violate pass or curfew policy – youth who ask to visit family or friends and go without permission or return late.  This policy does not differentiate between 18 year-olds requiring residential placement because of a compromising condition and 18 year-olds who are not bona fide missing.

At the same time, buried within the 15,000 reports are the few high-risk children who are suspected of being abducted. DCFS data confirms that missing children under the age of six are few in number (between one and three are reported per day) and missing children between the ages of seven and thirteen average between four to six per day. The younger children are more likely abducted. Both groups of children comprise less than 5% of the DCFS category of "missing children." Despite a slew of forms, DCFS does not structure its data collection so that one can easily and immediately access information on youth ages 14 year-old through 17 year-old for whom the missing status is unusual, who may be involved in human trafficking, or who suffer from developmental disabilities or severe mental illness.

The Inspector General investigation analyzed the population of runners and found:

- The Inspector General investigation found that for every child reported missing, the caseworker is required to complete a plethora of forms and paperwork, much of which is duplicative and, at the same time, fails to capture critical information, such as precipitating events, whether children have special risk factors, such as human trafficking or developmental disabilities, whether they are frequent runners, and if so, where they have gone in the past.
- The Unusual Incident Reporting system that was used to track runs was nothing more than a compilation of numbers which was never analyzed to provide a more effective response.
- DCFS Rules require that "dispositions" be filed once a youth has returned that would include valuable information. The Inspector General investigation found no dispositions filed for the period of time reviewed.

SPECIAL INVESTIGATIONS

- Many facilities reported that several of the wards that they had reported missing were only considered missing because the facility was unable to reach the caseworker to approve a pass for the ward.

The Sheriff's Office has a special unit dedicated to finding our missing children. The Office, reported, however, that they are often delayed by an inability to get consent to share the child's picture as necessary to locate the missing child.

*The full report, Cook County Runaways and Shelter Facilities, is attached to this report as Appendix B.*

## OIG Recommendations/Department Responses

1. **The Department should redefine its search procedure including the following:**
   a. **The Department should amend Rules to eliminate adult wards, who are not high risk (developmental disabilities, mental illness, human trafficking, in critical need of medication or bona fide missing) from Rules and Procedures 329.**
   b. **Adult wards without disabilities who chronically absent themselves from voluntary placements should be transitioned out of Department responsibility.**
   c. **The Department should add a narrative field to the Department's Child Runaway Form to include relevant information, including what the child was wearing, who they were last seen with, the license plate of any vehicles they left in, any statements by the child prior to the run and precipitating events.**
   d. **The Department should cease using Unusual Incident Reports for reporting runaways since other DCFS forms can be adapted to be more relevant to finding the youth and remedying precipitating factors. Unusual Incident Reports should however, track truancy and curfew violations since early intervention on these behaviors can stabilize youth and prevent future harm. Likewise, an older ward who is absent from scheduled programming for short periods of time (from one to several hours) should be classified as non-compliant, not missing. An individual ward's chronic non-compliance in residential programs should trigger a clinical consultation.**
   e. **Cook County Shelters/Centers should establish individualized Community Pass Authorizations with caseworkers at a youth's intake, so that shelter staff does not need to consult with caseworkers for every pass request. Shelter/centers should have the ability to alter agreements with good cause.**
   f. **The Department should issue written policy concerning the conditions under which law enforcement can distribute information including pictures to assist in locating missing children. A streamlined process for securing DCFS Guardian consent should also be developed.**

The missing youth work group will address/plan changes to procedures/SACWIS. The Unusual Incident Report (UIR) work group will work with missing youth group to make changes to UIR system regarding missing youth. The Inspector General's report will be shared with both work groups.

2. **The duties of the DCFS specialized unit for tracking and locating missing children should be limited to those children under 18 and disabled or Bona Fide missing adults. With lower caseloads, the Unit can provide more technical assistance searching databases and assist in contacting extended family and friends.**
   a. **The Department should ensure that the Unit has a database structure that enables it to track and provide analysis on frequent runners. The Unit should be the electronic repository of all critical information on frequent runners: Child Identification Form, all**

> De-Briefing Forms (completed when a youth returns from run) and an updated digital photo of the youth.
>
> b. The Unit should develop an outreach recovery unit for highly vulnerable children that works closely with the Cook County Sheriff and other law enforcement. The Unit operations should include an afternoon and evening schedule.
>
> c. For frequent runners, shelter staff in consultation with the specialized Unit should complete the De-Briefing Form–when a ward returns to the shelter system

The Shelter Administrator and appropriate licensing/monitoring staff will complete work plan to address this recommendation.  The Shelter Administrator will review Department Rule, policy, and procedures regarding transportation.

**3.  The Statewide Shelter Care Coordinator must centrally track all significant failures and problems of shelters. All Corrective Action Plans, Licensing and other complaints about shelters must be shared with the Statewide Shelter Coordinator. The Coordinator must review all existing Rule, Policy and Procedure and ensure that it is consistent and addresses responsibility for transportation in all foreseeable circumstances.**

A workgroup will be constructed including representatives from Operations, Clinical, Monitoring, Licensing, Legal, Strategic Planning to begin discussion and planning.  The Department can determine number of youth with serious mental health challenges.  The same will be done for youth involved in Juvenile Justice System.

**4.  The Shelter System should be revamped to include the following:**

> a. The Department should expand its existing system of emergency foster homes to accommodate children 13 years and younger, and their sibling groups, coming into care for the first time.
>> i. All emergency foster homes should be on a centralized database to reliably track available homes for matching;
>> ii. All emergency foster homes should be required to transport children to their schools of origin to help stabilize and lower the trauma to the children.
>
> b. The Department should determine the number of older Cook County shelter youth with histories of serious mental illness who cycle in and out of the present Shelter system. The Department should develop a specialized stabilization center for this population of youth.
>> i. In addition to clinical services, this stabilization center should have an outreach unit that functions similarly to homeless mental health delivery services.
>> ii. The stabilization center should host supportive NAMI (or similar) groups for relatives or other child centered collateral of the youth who are willing to partner with stabilization efforts.
>> iii. The Center should tightly coordinate educational services to assure the residents' educational rights are secured. This is crucial for those youth who are eligible or up for redetermination for SSI benefits. The center should also provide alternative educational programming similar to Education Options program at the Madden Center.
>
> c. The Department should determine the annual number of Cook County shelter youth 15 years old or older who are involved with the Juvenile Justice System or adult probation and who cycle through its Shelter system. The Department should develop a restorative justice stabilizing center for this targeted population, working closely with Juvenile Court personnel and Probation. The staff of the shelter should have the ability to network with the various Detention Alternative programs including Electronic Monitoring and Evening

Reporting Centers and substance abuse programs. Clinical services should be provided for those youth who have mental health or adjustment problems.

d.  The Department should develop a violence-free stabilizing center for the older youth (over 17) involved with the criminal court system or dually involved with adult and juvenile courts. The programming of the shelter should model a Safer Foundation approach. The staff should work with Cook County Sheriff, Criminal Court personnel and Probation. The stabilizing center should clearly define a nonviolence contract with each youth who enter the program. If the terms of the center's nonviolence contract are violated the Department should immediately inform the Juvenile Court and Adult probation of the violation and the intention of the Department to request termination of the adult's wardship.

e.  The Department should develop a specialized clinical and educational stabilization/shelter program for female youth who have or are at high risk of being victims of trafficking. The Department should consider the Cook County Sheriff's Office offer of prevention work with potential trafficking victims.

A workgroup will be constructed including representatives from Operations, Clinical, Monitoring, Licensing, Legal, Strategic Planning to begin discussion and planning.  The Department can determine number of youth with serious mental health challenges.  The same will be done for youth involved in Juvenile Justice System.

**5.  All shelters should be required to have transportation available 24/7 and children should be transported to their schools of origin to help stabilize and lower the trauma to the children unless clinically determined that the child has the ability and motivation to self-transport and attend.**

This will be included in revisions to shelter procedures.  Program plans will also be updated as needed.

**6.  Child protection should inform the school the child is attending that protective custody has been taken and ensure that the school's counselor and nurse are notified.**

Language will be included in Procedures 300, *Reports of Child Abuse and Neglect* revisions.  Language will be added to Procedures 315, *Permanency Planning*.

**7.  The Cook County Shelter system must have designated staff at each shelter who have access to SAWCIS. All shelters/centers, if permitted by fire codes, should have alarms and delayed locks at each exit with designated staff responsible for responding to alarms at all times and for timely crisis interventions to youth contemplating running from the facility. Each shelter shall have a written run protocol with training approved by the Department.**

Based upon the differences in design of each physical plant, each facility would have to be assessed separately, especially in consideration of delayed locks, in order to assure state and local fire codes are met and signed off on by the State Fire Marshall and any other required local authority.  There would not be a blanket approval, but each facility assessed separately.

Training will review and provide feedback on the Shelter training curriculum when received from Operations.

Appropriate divisions will meet to discuss and plan.  Will need assistance from Office of Information Technology Services (OITS).  Once agreement of plan is reached, shelters will be contacted and program plans updated.

**8.  The Teen Parent Service Network clinical staff should interview and arrange non-violent parenting training for any parenting youth in the Shelter/Center system.**

A TPSN staff person would assess parenting needs of clients who cycle through the shelter care system. There is not a specific "non-violent" parenting training but they are taught discipline techniques besides physical punishment. TPSN has a Clinical Consultant who monitors the needs of TPSN young people in the shelters. The consultant prepares a shelter report that is sent weekly and while it focuses primarily on moving to a permanent placement, it also captures parenting needs.  The consultant attends staffings at times for these parents as well. The New Birth Assessment process would capture those pregnant youth who are in their last trimester and some of the parents who are in the shelters may already be receiving parenting support.

**9.  The current monitoring system is ineffective to solve persistent and serious issues. Whenever a facility demonstrates continued failures to comply with serious issues identified in writing that concern child safety and welfare – the Deputy Director over the program must be notified. The Deputy Director must approve a Corrective Action Plan, with identified sanctions and timelines, for serious unresolved issues.**

The Monitoring management team will review the submissions to the Request for Information (RFI) and develop a Request for Proposal (RFP) for external contract monitoring. Inspector General reports regarding monitoring will be utilized in developing an RFP for the external monitoring of residential and group home treatment interventions.  The Inspector General reports regarding monitoring may be shared with the selected vendor(s) as appropriate and necessary.

**10. The Department program monitors must be proficient in direct vs. administrative expenses (review of any annual audits and consolidated financial reports) and staff allocation to provide a check and balance system that the program is complying with the program plan.**

The Division of Monitoring will issue a directive to agency performance and residential monitors and supervisors that part of their duties include alerting program monitors, contract administration and fiscal audit staff of any suspected fiscal improprieties observed within grants and quasi-grant funding programs.

**11. The Department's Office of Field Audits should issue written policy that requires consultation with program monitoring staff during any Field Audit to ensure that expenses self-reported by the facility conform with the Program Monitor's understanding of the program.**

The Office of Field Audits will continue to confer with the Monitors before and after a field audit.

**12. The monitors should receive non-disciplinary counseling for failing to report the use of interns to fulfill their required staffing ratio.**

The employees received non-disciplinary counseling.

***See Appendix B for the full report, Cook County Runaways and Shelter Facilities, and page 157 for Recommendations for Wards in Residential Facilities.***

# GENERAL INVESTIGATIONS

**GENERAL INVESTIGATION 1**

| ISSUE | The Office of Inspector General conducted an internal analysis of death investigations where children were killed by their parents/caregivers within twelve months of their involvement with the Department of Children and Family Services. |
|---|---|

| DISCUSSION | |
|---|---|

The Office of the Inspector General investigative and error reduction teams identified lethal errors with the Illinois Child Welfare system that resulted in serious harm or the death of vulnerable children. Inadequate assessments of the parents/caretakers who were being investigated or were offered services after physically abusing their children contributed to the failure to protect the children from future harm. The review also found in situations where the infant or child suffered from egregious harm there is little to no evidence that standard or evidence-based interventions could safely mitigate the likelihood of future harm to the child. High risk factors, such as the degree of violence to the child, the lack of empathy of the adult, histories of previous domestic violence, untrustworthiness because of deception, dishonesty or manipulation of the perpetrator or partner, substance abuse combined with mental illness, anger/hyper-reactivity and a history of non-compliance with treatment, were missed or naively reframed. The Department lacks a systematic method of identifying these high risk cases and providing an in-depth specialized assessment that could inform the agency and court of the overwhelming risks to the child. To remedy this problem, the Inspector General recommended the development and implementation of specialized assessments when a child was a victim of egregious abuse and training of administrators and field staff on lethal errors.  See section on Error Reduction Training, page 161.

**GENERAL INVESTIGATION 2**

| **ISSUE** | Department contract and financial monitoring reform. |
|---|---|

**DISCUSSION**

In October 2011, the Office of the Inspector General, in conjunction with the Office of the Executive Inspector General for the Agencies of the Governor, issued a report concerning the Department's award of grants in excess of $18 million to entities in Chicago all owned by a particular individual. The grants were plagued by forged signatures on documents purporting to substantiate expenses, excess administrative salaries, ghost employees and falsified credentials. The Report detailed numerous omissions and failures in the Department's monitoring of these grants that permitted the abuses to go on, largely without detection.

Both the Governor and the Department accepted the following Recommendation from the Report:

> *DCFS contract and financial monitoring training must be required for all DCFS program and financial monitors, as well as those reviewing annual audits, within three months of receipt of a contract monitoring assignment and every two years thereafter. Training should emphasize that the Program Monitor's chief duty is to verify, by personal knowledge, the receipt of goods and services provided.*

In FY 2015, while investigating allegations of violations of rules and policies at a shelter for teen girls, the Office of Inspector General noted some of the same monitoring problems that had plagued the Department in 2011. While monitors visited the facility multiple times each month, the agency was never questioned about the $100,000 of the Executive Director and the $80,000 salary (both characterized as direct program expenses) paid to the mother of the Program Director, despite the fact that neither was present on a day to day basis. Moreover, although the facility received a standard amount each month to allow for the employment of a specific staff to client ratio, monitors noted that the staff at the facility was often largely volunteers.

The Inspector General investigators questioned financial and program monitors for the facility concerning the questions above. Each believed it was the role of the other to have followed up on such matters.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.  The Office of Field Audits should amend their procedures to require consultation with program monitors to ensure that any cost allocation system and the apportionment of administrative expenses has integrity.**

The Office of Field Audits will amend their procedures to add to the current consultation with the Program Monitors, additional procedures that will address this issue.  The Office of Field Audits will work with the Monitors to complete the procedures.

**2.  The Office of Field Audits should amend their procedures to require review of consolidated financial statements with program monitors to ensure that allocations of costs among programs and between administrative and direct expenses are correct.**

The Office of Field Audits is working with the Division of Monitoring and Operations to develop procedures to address the issue of the allocation of costs between administrative and direct expenses and  to determine the best use of resources to conduct this collaboration.

**3.   The Division of Monitoring must issue a directive to supervisors to ensure that program monitors of grants and quasi-grant funded programs understand that part of their duties include an analysis of administrative versus direct expenses and ensuring that state funds are used for state purposes. Program monitors should also be informed of the availability of financial audit staff to assist them in this function.**

The Division of Monitoring will issue a directive to agency performance and residential monitors and supervisors that part of their duties include alerting program monitors, contract administration and fiscal audit staff of any suspected fiscal improprieties observed within grants and quasi-grant funding programs.

## GENERAL INVESTIGATION 3

**ACTION**    The Inspector General created an informational brochure addressing the safe storage of methadone prescriptions to mitigate the risk associated with splitting methadone doses and storing them in non-child proof containers.

**DISCUSSION**    In response to four deaths of young children who fatally overdosed by ingesting methadone stored in their homes, the Inspector General staff created education materials highlighting safe storage practices for keeping the drug in the home. One child ingested methadone that his parent was receiving in hospice for palliative care while he was dying from cancer. The hospice did not dispense the medication in a bottle with a childproof cap. In the cases of the other three children, the investigation found that methadone dosages are placed in unlabeled containers when patients split their dosages in order to take smaller amounts throughout the day and they mix the medicine with another beverage. Though methadone prescriptions call for patients to take their full daily dose at once, the practice of splitting methadone dosages to take throughout the day is not an uncommon practice; 25% of methadone patients may take their medicine in this manner. Failure to secure this potent drug in a clearly labeled childproof container underestimates the high risk of poisoning and death to anyone not intended to consume it, particularly curious children.

The education materials developed by the Office of the Inspector General highlight safe methadone storage practices, the hazards of mixing and storing methadone, and signs and symptoms of methadone poisoning. The brochure also includes graphics illustrating locations in the home where methadone should never be kept and provides a list of resources. The Inspector General provided the informational materials to the Department and the Illinois Division of Alcohol and Substance Abuse (DASA), which informed the Inspector General of its intention to share the materials with its workers and clients.

## GENERAL INVESTIGATION 4

| ALLEGATION | A private agency employee and contractor for the Department fraudulently claimed two wards as dependents on his personal income tax returns, listing their names and social security numbers. |
| --- | --- |

| INVESTIGATION | On his 2009 and 2012 tax returns, the employee claimed one Department ward and one former ward as dependent foster children, listing their names and social security numbers. |
| --- | --- |

In an interview with Inspector General investigators, the employee confirmed he had never been a licensed foster parent and had never had any Department-involved children living in his home. One ward had a long history of living in a residential facility and the case of the former ward had been closed out years before the employee claimed him as a dependent.

The employee told Inspector General investigators that a foster mother with whom he previously had a romantic relationship had provided him with the wards' social security numbers for the purpose of claiming them on his personal tax returns. He stated that she did that because he assisted with their care, but he was unable to provide an accurate physical description of either of them. In a separate interview with Inspector General investigators, the foster mother admitted giving the employee permission to claim some of her foster children as dependents because he assisted her from time to time and it was a way of giving him some compensation. The employee justified using the confidential information for his own benefit because the mother of his biological child, who has sole custody, had refused to allow him to claim their daughter as a dependent on his taxes.

During the course of the investigation, the employee made numerous allegations against his daughter's biological mother who was also employed at DCFS. He alleged she misused her position as a Department administrator to harass and sabotage him, obtain his work schedule and to research his girlfriends' backgrounds and employment. None of these claims were substantiated. Rather, investigators determined the biological mother had obtained an Order of Protection against him after he provided false documentation to police which purportedly would allow him to pick-up their daughter from school. Furthermore, while the Inspector General investigation was ongoing, the father was jailed for contempt of court when he presented fabricated evidence to the court during his daughter's custody hearing.

In addition to the employee's work with the Department, he was also employed by a Department-contracted agency as a counselor, mentor and parent coach, sometimes serving Department clients. Comments made by the agency's co-owner/clinical director reflected extremely poor judgment and clinical skills when she minimized the validity and importance of the biological mother's Order of Protection against the employee, documenting in an email to Department staff her unsupported belief that the Order lacked merit and was merely a tool used by a "woman scorned" to sabotage her former paramour.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The employee should be prohibited from working for the Department and/or with any Department wards via a contracted agency.** |
| --- | --- |

The former contractual employee was placed on the barred vendors list.

**2. The foster home license of the foster parent who provided the employee with wards' confidential information should be permanently revoked and she should be prohibited from having any Department**

**wards placed in her home in the future.**

The foster care license continues to be on involuntary hold.  The Department's Division of Licensing - Agencies & Institutions is working with the private agency in pursuing revocation of the license.

**3.  A credit fraud check should be run for the current ward annually until his Department case is closed.**

This recommendation is ongoing.

**4.  The former ward who is an adult with no current Department involvement should be notified about the fraudulent use of his confidential information and the Department should offer to perform credit fraud checks for him for at least 3 years.**

The current agreement with TransUnion does not allow DCFS to run credit reports for youth over 18.  The Department drafted updated language and a contract amendment with TransUnion is in process.  The Department will send the offer letter once we receive authorization from TransUnion to perform the necessary checks.

**5.  A redacted copy of this report should be shared with the private agency where the employee is a counselor.**

The report was shared with the private agency.

**6.  In light of the private agency's co-owner/clinical director's demonstration of poor judgment in minimizing the validity and importance of a valid order of protection, and in conjunction with the Inspector General's findings in a forthcoming investigation, there are serious questions about whether the private agency is able to provide quality clinical services and whether therapists/counselors are receiving adequate supervision as required by the agency's contracts.  The Department should conduct a substantive clinical audit of the agency's clinical supervision to determine whether adequate supervision is being provided.  See Death Investigation 1.**

Because of the limited number of providers and the number of subcontracts under this agency, the Director agreed to a corrective action plan.  A corrective plan was provided to the agency.  According to that plan, the agency is to continue implementation of their current  "Agency Corrective Action Plan"  as well as address other  recommendations made within the clinical review.   A six  month follow-up clinical review will be conducted  to assess the program's progress regarding recommendations and  adherence to their practice guidelines.  Clinical will schedule the follow-up assessment.

*OIG Comment: This case involved a family of seriously physically abused children.  One of the  children disclosed to the parenting coach that he had been hit over the head with a plastic baseball bat. The mother taunted and made cruel statements to the children, and the father appeared overwhelmed because the mother distanced herself from parenting duties. In addition, the children demonstrated fear of the parents. The parenting coach, hired and supervised by the private counseling agency, responded to these incidences by presenting a "why it is bad to lie" puppet show to the child who made the disclosure.  Moreover, the coach  continued to report progress, despite taunting and inappropriate behavior by the parents who had seriously abused an infant.  In an unrelated case, involving the same private agency, the Office of the Inspector General found that an employee of the agency had stolen wards' social security numbers and filed a false police report, and one of the owners of the agency blindly accepted the word of the employee that the allegations were made up. The Office of the Inspector General reviewed the Corrective Action Plan that the Department developed with the private counseling agency.  There is nothing in the Corrective Action Plan that addresses the concerns raised in the Inspector General reports.*

## GENERAL INVESTIGATION 5

**ALLEGATION**

A private agency caseworker falsified case records, documenting required visits to client's homes that never occurred.

**INVESTIGATION**

Following the caseworker's departure from the agency, a foster mother reported to the new worker that the previous caseworker had only visited her home twice during the prior six-month period. Agency administrators determined that the worker had documented making monthly visits. In light of the foster mother's disclosure, the agency compared the caseworker's two most recent entries regarding the family in the State Automated Child Welfare Information System (SACWIS) and found the two entries were almost identical in language and content.

A review of the caseworker's case files found striking similarities between entries documenting client home visits. Furthermore, the Inspector General investigators conducted interviews with several of the foster families on the caseworker's client roster. Some foster parents acknowledged the caseworker had made visits to their homes but not with the frequency she had recorded in her notes. One foster mother who kept detailed records of the family's interactions with involved workers provided the Inspector General investigators with her notes which contradicted four occasions when the caseworker had recorded having been present in the home. Other foster parents denied the caseworker had ever come to their homes and said they had never even met her, let alone participated in the visits she described in her records.

In an interview with Inspector General investigators, the caseworker was unable to explain the nearly identical notes contained in some of her case files and attributed the misconduct complaint to a personality conflict with a former co-worker. Although the caseworker had documented a visit to the home of one foster parent, who lives in a remote, hard to access area, she could not describe the house or how she located it. The caseworker maintained she had conducted all the home visits she had documented but could not explain why multiple clients had contradicted her assertions and could not provide any evidence to support her statements.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

Based on the review of the case record and the interviews with clients and the caseworker, the Inspector General issued charges against the caseworker's Child Welfare Employee License (CWEL) for falsification of case records. The caseworker later signed a voluntary relinquishment of her CWEL license.

## GENERAL INVESTIGATION 6

| | |
|---|---|
| **ALLEGATION** | A private agency caseworker failed to conduct required visits to a foster home and falsified documents to reflect that visits had occurred. |

**INVESTIGATION**   The caseworker was responsible for monitoring the foster home of a recently placed newborn girl and her three year-old sister, who had resided in the home for three years. After the younger sister had been in the home for eight months, the foster mother complained to private agency staff that the caseworker had not been out to visit the home since the baby had initially been placed. Agency staff reviewed the caseworker's notes entered in the State Automated Child Welfare Information System (SACWIS) and found she had documented monthly visits to the home. The caseworker had also submitted home visit reports for each meeting signed by both the caseworker and the foster mother. When questioned by agency staff about the foster mother's allegations, the caseworker insisted she had conducted all documented visits and that the foster mother had signed a home visit report for each visit that was made.

A review of the case record identified significant differences between the signatures attributed to the foster mother on nine of the ten home visit reports and her signature on other documents related to her foster care license. In an interview with the Inspector General investigators, the foster mother was shown the home visit reports and asserted that her signed name as it appeared on seven of the reports was not in her handwriting, while she was unsure of two others. The only signature the foster mother affirmed was in her handwriting appeared on the first home visit report from when the baby girl was initially placed. The foster mother pointed out discrepancies between her signature and the ones attributed to her, including one instance where her last name was misspelled. In her interview with Inspector General investigators, the caseworker stated she had conducted all documented visits and denied forging the foster mother's signature on any of the reports.

The Inspector General investigators enlisted the assistance of a handwriting expert for a forensic examination of the home visit reports. The expert concluded that the foster mother's signature on the first home visit report matched those found on other documents in her licensing file while the signatures on the other nine home visit reports were not consistent with that of the foster parent. The caseworker provided the Inspector General investigators and the forensic examiner with a handwriting sample for comparison. The examiner identified deliberate attempts to alter their natural script. The examiner concluded there were features of the caseworker's writing sample that made it more likely than not that the signatures in question had been written by the caseworker.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. The private agency caseworker should be disciplined according to the agency's policies and procedures, up to and including discharge.** |

The Inspector General shared the report with the private agency and the agency's Board of Directors. The employee resigned.

**2. The Inspector General will draft charges for revocation of the caseworker's Child Welfare Employee License.**

The Inspector General brought charges against the caseworker's Child Welfare Employee License. The caseworker voluntarily relinquished the license prior to the administrative hearing.

**GENERAL INVESTIGATION 7**

| **ALLEGATION** | A private agency caseworker falsified documents to show she had conducted home visits that did not occur. |
|---|---|

| **INVESTIGATION** | The private agency became aware of allegations made by a foster parent of a special needs ward placed in her home that the caseworker had not been |
|---|---|

conducting required home visits.  The private agency contacted other foster parents the caseworker was responsible for providing with services, several of whom also reported the caseworker had not been coming to their homes.  An agency review of the caseworker's records pertaining to the clients who said she had not been to their homes found she had documented performing regular visits to their residences.  When confronted by agency administrators, the caseworker admitted documenting, "things that did not happen," and that she, "knew it was wrong."  The caseworker's employment with the agency was terminated for poor job performance and falsifying records.  The case was referred to the Office of the Inspector General for investigation of the caseworker's Child Welfare Employee License (CWEL).

Inspector General investigators made repeated attempts to contact the caseworker by telephone and mail to enlist her cooperation in the CWEL investigation; however, the caseworker was ultimately unresponsive.  Inspector General investigators made additional efforts to obtain alternate contact information for the caseworker and identify others with knowledge of her whereabouts.  Six months after the Inspector General investigators initiated efforts to locate the caseworker, she called the investigators.  The caseworker stated she would voluntarily relinquish her CWEL in lieu of any further investigation.  The Inspector General investigators advised the caseworker she was required to submit her CWEL relinquishment form within three weeks in order to prevent any further action against her license.  The caseworker did not submit the relinquishment form.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | The Inspector General issued charges against the caseworker's Child Welfare Employee License for failure to respond.  An Order of Abandonment was issued to which the caseworker did not respond.  The CWEL Board revoked her license. |
|---|---|

## GENERAL INVESTIGATION 8

**ALLEGATION**   The Inspector General received a law enforcement assist request from the Social Security Administration (SSA) Inspector General's Office regarding an investigation of a scheme to fraudulently obtain retirement benefits through the use of multiple identities. The SSA investigation focused on a woman licensed as a foster parent to care for Department wards.

**INVESTIGATION**   The foster mother had been licensed to accept Department wards into her home for ten years, beginning with her acceptance into a professional foster parent program administered by a private agency that hired individuals as full-time staff members. These foster parents received free housing and board payments for each ward in their care, in addition to benefits and vacation pay. The professional foster parent program ended and the foster mother transferred her foster care home license to another agency. The foster mother later transferred her license to two other private agencies and was accepted each time with no concerns about her fitness to serve as a caregiver.

In order to maintain their licenses, foster parents are required to submit to an assessment every four years to ensure they continue to meet the conditions established by the Department. These assessments include medical evaluations of the individual and disclosure of the foster parents' financial resources in order to verify they possess the physical, mental and economic ability to provide care to wards. A review of the foster mother's licensing file found that she participated in all required medical assessments and was repeatedly deemed to be in good mental and physical health. The foster mother reported no significant physical problems and denied having any history or concerns about her mental health. The case file also contained three medical evaluation forms used by the Department to identify if the foster parent presents any issues or medications, "that may affect the adult's ability to maintain alertness, endurance and performance to tasks and responsibilities associated with caring for up to six children ages zero to eighteen." Each of the doctor's evaluations asserted the foster mother had no disabilities, significant impairments or medicine schedules that would limit her ability to provide care. In her financial disclosures, the foster mother reported outside income from businesses she owned and a pension, but she did not list any payments from any government agencies.

After being contacted by SSA, the DCFS Inspector General learned that for the previous 20 years the foster mother had been receiving social security disability insurance payments for a diagnosed psychiatric disorder. The SSA had initiated an investigation of the foster mother, whose disability payments had automatically converted to retirement benefits five years earlier, after it was determined she had submitted a second application to receive retirement benefits from SSA under an assumed name. The Inspector General then engaged in a joint investigation with SSA and further examination of the foster mother's history found she had created multiple identities, utilizing several aliases, various birthdays and at least two different social security numbers. She was also identified as having multiple sources of income, including the payments and benefits she received as a professional foster parent, while she received disability insurance payments, in violation of federal law.

In order to originally obtain social security disability benefits, the foster mother had reported suffering serious injuries in an automobile accident. She had reported that in addition to the physical limitations that resulted which prevented her from being able to perform basic tasks, she had also suffered severe cognitive impairments including an inability to concentrate, nervousness and paranoia. Based on her self-report to a doctor during a 30-minute assessment, she had been diagnosed with a mental health disorder that would raise concerns about her suitability as a foster parent.

During an interview with an SSA investigator, the foster mother provided him with an expired state

identification card bearing the name she used to receive social security benefits.  When asked for a current form of identification, she offered a driver's license in the name she used for her foster parent licensure, which also listed a different date of birth, address and driver's license number.  The foster mother was unable to provide any explanation for the discrepancy.  The foster mother was then presented with the evidence obtained during the course of the joint investigation which outlined the contradictions and inconsistencies between the information provided to SSA and her involvement with the Department.  The foster mother was asked to provide previous tax returns to support her assertion she was not in fact employed as a professional foster parent while receiving social security disability payments.  Five days after the interview, the foster mother reported to the SSA investigator that she could not provide the documentation as her accountant had died.  The foster mother was asked to obtain the tax returns from the IRS and submit them to the investigator. The foster mother has yet to comply with the request and the SSA investigation remains pending.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  The Department should pursue the revocation of the foster mother's foster care license.** |

There continues to be a Director's Involuntary Hold on the license which prohibits any placements.  The Department will follow-up with the private agency to determine where this case is in the enforcement process.

**2.  A foster care license applicant must provide the licensing worker with a Consent for Release of Information form for the Social Security Administration.  The Social Security Administration Consent form should be used.**

This objective is being accomplished through the use of the foster home initial and renewal application forms (CFS 597-A & CFS 598)  instead of the 718-A.  A policy guide and procedures will be issued. CFS 109 will be issued by the Office of Child and Family Policy.

**3.  The Department should amend CFS 718-A,** *Authorization for Background Check for Foster Care and Adoption***, to authorize a check of public benefits.**

Revisions to the form and procedure are in process.  A policy guide will be distributed with the form changes.

**GENERAL INVESTIGATION 9**

| **ALLEGATION** | A Department caseworker intentionally delayed a request by biological parents to have their newborn son placed with his paternal aunt in another state and the child was instead placed in a traditional foster home where the foster father had ties to the Department. |

| **INVESTIGATION** | Both parents resided in another state and were homeless. They came to Illinois just before their baby was born. The baby boy was delivered at 34 weeks and his mother tested positive for cocaine at the time of his birth. The positive substance abuse drug test prompted a child protection investigation to be opened and the parents spoke to an investigator at the hospital. The mother admitted using cocaine during her pregnancy and both parents reported histories of long-term substance abuse and mental health issues. The couple had been moving in and out of shelters in the months prior to the baby's birth and had no meaningful connection to or support system in Illinois, as their families resided in a neighboring state. The parents identified the paternal aunt as a willing caretaker who would accept placement of the baby in her home and informed workers she was traveling to the hospital from out-of-state at that time to join them. |

Three weeks after the baby was born, the child protection investigator conducted a phone interview with the aunt, who had returned to her home out-of-state. The aunt stated that she and her husband, who were caring for their own six month-old twins, were willing to accept the baby boy into their household. The investigator had previously conducted Law Enforcement Agency Database System (LEADS) checks on the aunt and her husband and found neither had a criminal history. Three days after the call, a shelter care hearing was held, at which time the boy was found to be neglected and was taken into custody of the Department and placed in a traditional foster home since the parents had no relatives in Illinois. The aunt was present at the hearing, having traveled from out-of-state in order to attend. The same day, the child protection investigation was indicated against the mother for Substantial Risk of Injury. The parents subsequently returned to the state where their families lived. Although the aunt had been identified by the parents and had demonstrated efforts to be involved in the boy's case, at no time during the child protection investigation was a request for an Interstate Compact on the Placement of Children (ICPC) submitted. The ICPC is a contract between states that authorizes collaboration between agencies to ensure children who are placed in another state for foster care or adoption receive adequate protection and support services. The ICPC establishes procedures for the placement of children and assigns responsibility for the agencies and individuals involved in placing them.

Following the hearing, the placement case was assigned to a Department caseworker for services. In an interview with Inspector General investigators, the caseworker stated she did not initially identify the geographic issues in the case or recognize the immediate need to request an ICPC. The caseworker stated it was not until a status hearing six weeks later, attended by the parents and the aunt, that the caseworker understood the need to submit such a request. The caseworker said that at the time she had not completed an ICPC request in 10 to 15 years and had several other cases she was more focused upon. An Inspector General review of the case file found that it was not until more than two months after the status hearing that the caseworker made any efforts to begin the process of obtaining an ICPC and another two months passed before a completed request was submitted. The caseworker was unable to provide an explanation for the delay in making the request; although, during the time the caseworker had the case, she had inconsistent supervision, with three different individuals overseeing her efforts during the first three months of her involvement. After the request was finally submitted, an additional month elapsed before it was forwarded to the other state to begin the assessment of the aunt's home. At that time the father was living in the aunt's home, which would have served as a bar to placement of the boy. The assessment was delayed for one month in order for the father to find alternative housing. The neighboring state's assessment process itself took a month to be completed before the aunt's home was approved as a placement for the boy. The decision arrived 10 months

after the boy was born and more than 9 months since he had been placed in the traditional foster home.

One month after the ICPC had been approved, the caseworker and her supervisor determined the boy should remain in his current foster home. Their decision was based largely upon the fact the boy was almost one year-old and had bonded well with the foster parents. The caseworker and the supervisor also cited concerns about the aunt and her husband already having young twins of their own and that the aunt had not maintained contact with the child (foster parents) while the ICPC was pending. Although the aunt called the caseworker after learning the ICPC had been approved, the caseworker did not document this contact in the State Automated Child Welfare Information Tracking System (SACWIS). In an interview with Inspector General investigators, the aunt said she had been instructed after the initial shelter care hearing not to communicate directly with the foster family, though she could not recall who might have given her that directive.

The father of the foster family was a Department employee, which led to concerns among advocates for the parents and aunt that decisions about the boy's placement were being influenced by Department personnel. In an interview with Inspector General investigators, the foster father stated he was not familiar with the caseworker prior to the boy being placed in his home. The Inspector General investigation found the foster family's license is supervised by a Department employee, in violation of Department Rule 437, *Employee Conflict of Interest*. The intertwining involvement of multiple Department employees as decision makers and interested parties in this case presents a conflict of interest which created an appearance of impropriety and cast suspicion on the motives of those involved at the expense of the Department's reputation.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. The caseworker should be disciplined for her failure to timely Complete a Request for Interstate Compact.** |
|---|---|

The employee received a written reprimand.

**2. This case should be used as a training tool on the importance of completing timely requests for Interstate Compact on the Placement of Children.**

This case is being incorporated into the Foundations training for Permanency/Placement Workers.

**3. The boy's case and the monitoring of the foster parent license must be transferred to a private agency.**

The boy's case and the foster home license have been transferred.

**4. The Department must notify the court of the two conflict of interest violations of Rule 437, *Employee Conflict of Interest*, in this case.**

The DCFS Office Of Legal Services provided notice to all parties of the recommendation and the potential violations of DCFS Rule 437. The Office of the Inspector General informed the juvenile court of the potential violations.

**GENERAL INVESTIGATION 10**

| ALLEGATION | A private agency caseworker engaged in inappropriate relationships with current and former Department clients. |
|---|---|

**INVESTIGATION** The Inspector General's involvement was prompted by a law enforcement investigation of an alleged sexual relationship between the caseworker and a client on his caseload engaged in drug treatment counseling. As the police investigation continued, additional allegations of improper relationships with clients and inappropriate behavior toward coworkers by the caseworker over several years were made by multiple individuals. The criminal investigation ultimately concluded that while the caseworker had engaged in sexual relationships with two of his adult clients, the relationships had been consensual and would not result in criminal charges. The private agency terminated the caseworker's employment.

The Inspector General investigators established that private agency administration had been aware of ongoing concerns regarding the caseworker's behavior but repeatedly minimized his behaviors or viewed his actions as isolated incidents, despite the frequency with which they were alleged. On one occasion, a client who was familiar with the caseworker from her previous involvement with the private agency voiced objection to being again referred to the agency for services. The client stated that after the original case had been closed, she had encountered the caseworker at a bar where he made sexual advances toward her and attempted to sell drugs to her companion. Workers from other organizations who referred clients to the private agency for services expressed concerns to agency staff regarding the caseworker's possible involvement with them. A computer technician who had been called to the private agency's office also reported finding a history of pornographic websites having been accessed from the caseworker's terminal.

A review of the caseworker's personnel file found he had previously been placed on administrative leave following the allegations made by the client that she had been propositioned by the caseworker at a bar. In an interview with Inspector General investigators, the agency's executive director stated he had no recollection of the meeting at which the caseworker was placed on leave, though minutes kept by the agency recorded his attendance. The executive director expressed his belief the agency had acted appropriately in placing the caseworker on temporary leave and said he had spoken personally with the caseworker, who denied any wrongdoing and attributed the allegation to a worker at another agency with a vendetta against him. The executive director stated he accepted the caseworker's explanation and he was reinstated. In regards to the report from the computer technician, the executive director stated the caseworker might have only accessed pornographic websites in passing and that the technician had not provided any photos or specific information to substantiate the claim.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. This report should be shared with the agency and its fiscal agent.**

The Inspector General shared the report with the fiscal agent for the involved agency. The fiscal agent terminated its contract with the Department to serve as the fiscal agent for this agency.

**GENERAL INVESTIGATION 11**

| | |
|---|---|
| **ALLEGATION** | A Department call floor operator accessed information from the State Automated Child Welfare Information System (SACWIS) related to a case that was not assigned to her. |

| | |
|---|---|
| **INVESTIGATION** | The call floor operator approached a co-worker and initiated a conversation regarding a hotline call that had been made to the State Central Register (SCR) |

involving the co-worker's relative. The operator suggested that the co-worker should intervene in the situation and become a foster parent to the involved child. The operator had not been the Department worker who accepted the hotline call and had no professional involvement with the case.

In an interview with Inspector General investigators, the operator's supervisor stated she had identified the issue of employees accessing SACWIS to obtain information about cases they were not involved with as a problem in the office and had issued an order to workers to refrain from doing so. The supervisor said the operator had spoken openly in the office about reviewing recently initiated investigations in SACWIS in order to identify infants who might be available for her to care for as a foster or adoptive parent.

Unrelated to the charge of accessing confidential information, the Inspector General investigators noted that the operator had been the foster parent, for 20 months, of a boy who was placed in her home at 16 days-old following an SCR report. A review of SCR records found the operator was the SCR call taker who received the hotline call that initiated the Department's involvement with the baby's family as well as the subsequent reports that led to his being taken into custody. The baby was placed in foster care with the operator later on the same day she had accepted the subsequent reports.

In her interview with Inspector General investigators, the operator denied speaking to the co-worker about the call involving her relative. The operator stated she had become aware of the case through news reports and acknowledged she "probably" had accessed additional information from SACWIS to ensure the Department had been contacted. She said she often did this until she was instructed by her supervisor to discontinue her practice of obtaining information about cases she was not involved with from SACWIS. The Inspector General investigation determined that it was likely the operator had discussed the information regarding this report with her co-worker. There was, however, no evidence to suggest the operator had influenced the decision to place her own foster the child in her foster home.

In interviews with Inspector General investigators, SCR administrators acknowledged awareness of operators accessing SACWIS for information unrelated to the specific calls they had been assigned. The SCR administrators informed the Inspector General investigators that their response to such occurrences had been verbal instructions to discontinue the behavior, though these instances of redirection were not documented. Department Administrative Procedure 20 prohibits workers from accessing information on the SACWIS database that does not pertain directly to a case to which they are assigned. The practice of workers obtaining information they are not entitled to could result in the confidentiality of those involved with the Department to be compromised, undermining the public's trust in the Department.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. The call floor operator should be counseled against discussing confidential information with co-workers.** |

The employee was counseled.

**2.   State Central Register Management should issue a written directive to be incorporated into the call taker manual prohibiting call takers from accessing SACWIS on any cases not related to hotline calls they receive and enforce existing Administrative Procedure 20, *Electronic Mail/Internet Usage/SACWIS Search Function*, through discipline for violations.**

The Department agrees.  The SCR Administrator e-mailed directive to staff.

# GENERAL INVESTIGATION 12

**ALLEGATION**
A private agency caseworker engaged in a romantic relationship with the foster father of a family on her caseload.

**INVESTIGATION**
The case was referred by the private agency after the caseworker confessed the relationship to agency management and her employment was terminated.  In an interview with Inspector General investigators, the caseworker stated that after the relationship with the foster father commenced they did not discuss issues regarding the foster children during their personal time.  The caseworker said she did not exercise any favoritism towards the family and did not disturb the children's placement in the home.  The caseworker acknowledged having reservations about entering into the relationship but said she did not regard the foster father as a client, in contrast to the children or biological parents she worked with on her caseload.  The Department's Code of Ethics for Child Welfare Professionals expressly prohibits sexual relationships with foster parents in Section 5b, *Responsibilities to Foster Parents*.  Such relationships undermine public confidence in the impartiality of child welfare professionals and present significant potential impediments for the delivery of effective services to foster families.

In her interview, with Inspector General investigators the caseworker denied receiving any ethics training during her employment with the private agency.  In a separate interview with Inspector General investigators, an agency administrator stated that while the agency had not developed its own internal code of ethics, it relied upon the Code established by the Department and expected all employees to comply with its requirements.  The administrator said the agency had established an Ethics Committee which employees were encouraged to engage to address any ethical questions or concerns.

The Inspector General investigation found the caseworker's behavior was a blatant violation of the Code of Ethics for Child Welfare Professionals and charges were issued against her Child Welfare Employment License (CWEL).

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**
**1.   The private agency should expand its existing ethics infrastructure to include advising new employees that the agency has adopted the Department's Code of Ethics for Child Welfare Professionals.**

The private agency provided training to staff on the agency's policies regarding personal relationships with clients and the Code of Ethics for Child Welfare Professionals.

## GENERAL INVESTIGATION 13

| | |
|---|---|
| **ALLEGATION** | A private agency caseworker provided a confidential child protection investigation summary to the man who was the subject of the investigation. |

| | |
|---|---|
| **INVESTIGATION** | The man who was the subject of the investigation had been accused of striking his seven year-old son during an argument with the boy's mother regarding |

disciplining the boy for his misbehavior in school.  During an interview with the assigned child protection investigator, the man repeatedly referred to "lies" contained in the report of the incident.  When questioned about his assertions the man told the investigator he had obtained a copy of the pending report and presented an unredacted copy of the Department's investigative summary.  When asked by the investigator how he acquired the summary, the man responded, "I have connections with DCFS."  The investigator informed the man he was in possession of confidential material and confiscated the summary.  The investigator observed that the document displayed the name of the person who had printed it from the State Automated Child Welfare Information System (SACWIS), a private agency caseworker.

In an interview with the Inspector General investigators, the man stated he had a personal romantic relationship with the caseworker and had taken the SACWIS summary from her home without her knowledge.  The caseworker had no involvement with the pending investigation against the man and no professional reason to have the summary in her possession.  Information contained in the SACWIS database is confidential and is only authorized to be accessed on a case-by-case basis by child welfare professionals with direct involvement.  In her interview Inspector General investigators, the caseworker admitted she printed the summary and said she did so after learning from the man of the pending investigation against him. The caseworker stated she had two children and wanted to know the details of the investigation in order to ensure the man did not pose a risk to them.  She said she had no intention of sharing the summary with the man but that he had taken it from a dresser drawer in her home without her knowledge.  The Inspector General's investigation did not find the accounts of the caseworker or the man to be credible.

The caseworker acknowledged she was aware of Department Rules regarding confidentiality and had signed a Statement of Confidentiality with the private agency where she was employed.  The caseworker stated that her supervisor at the private agency was aware of her actions and that no discipline had been taken against her.  In an interview with the Inspector General investigators, the caseworker's supervisor explained the agency had decided to withhold disciplinary action pending the completion of the Inspector General's investigation.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  The private agency caseworker should be disciplined up to and including discharge for violation of confidentiality and Administrative Procedure 20,** *Electronic Mail/Internet* |

*Usage/SACWIS Search Function.*

The Inspector General issued charges against the employee's child welfare license.  The CWEL Board Temporarily Suspended her license pending resolution of the charges.

## GENERAL INVESTIGATION 14

**ALLEGATION**  A child protection investigator was involved in a romantic relationship with a father who was the alleged perpetrator in two investigations she had conducted.

**INVESTIGATION**  The father and his family had an extensive history of involvement with the Department and local law enforcement.  The father and mother had a volatile relationship resulting in multiple indicated reports, orders of protection and arrests for domestic violence.  Following a hotline call after the couple had separated reporting the mother was allowing a registered sex offender to have contact with their two children, a 15 year-old boy and 13 year-old girl, a child protection investigator was assigned to the case.  The investigator was unable to find any evidence to support the allegations and unfounded the report.  In separate interviews with Inspector General investigators, the investigator and the father stated that following the close of the investigation the father began consulting the investigator for advice and a friendship between the two developed.

Two years after the case was unfounded, the State Central Register (SCR) received a report the father had punched his son and hit him with a belt.  The case was assigned to the same investigator who had handled the previous hotline report.  In an interview with Inspector General investigators, the investigator's supervisor stated that case assignments were made on a rotating basis and the investigator was next in line.  The supervisor stated the investigator told her she had previously handled a case involving the family but never disclosed she had a relationship with the father outside of her professional capacity.  The supervisor stated if she had been aware of an existing relationship between the investigator and the father she would have had the case transferred to another investigator.  The supervisor said she had previously taken such action and provided documentation of her prior efforts to transfer cases involving potential conflicts of interest.  The investigator ultimately recommended the report against the father be unfounded.

Six weeks after the child protection investigation was closed, Department personnel were informed the investigator had accompanied the father on a trip to visit his friend in another state and had been introduced to the friend as the father's girlfriend.  The friend later stated he, "guessed he wasn't supposed to tell," he had met the investigator under those circumstances.

In an interview with Inspector General investigators, the father stated he only contacted the investigator at work and never called her personal phone.  The Inspector General investigator subpoenaed personal phone records for the investigator and the father and identified 331 phone calls between the two that occurred after the child protection investigation had been closed.  In a separate interview, the investigator acknowledged having a friendship with the father that began when she conducted her first investigation of the family.  The investigator stated she had accompanied the father on the trip out of state, covering 280 miles round trip, so the father could listen to the engine because she was having car trouble.  The investigator said it never occurred to her that conducting an investigation involving someone she had a personal relationship with would constitute a conflict of interest; however, she also claimed to have informed her supervisor that she knew the father prior to accepting the second investigation.

In addition, the investigator had entered a contact note in an unrelated investigation, identifying it as an interview with the reporter.  In fact, the investigator had spoken to a co-worker of the reporter, who was unfamiliar with the family, but the investigator did not know this because she had failed to ascertain the name of the person she spoke with.

While the Inspector General's investigation was ongoing, the caseworker was discharged by the Department for falsification of records and failure to perform required duties in other cases.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **The Inspector General issued charges against the child protection investigator's Child Welfare Employee License.** |
| --- | --- |

## GENERAL INVESTIGATION 15

| ALLEGATION | A Department caseworker borrowed thousands of dollars from a foster parent on her caseload. |

**INVESTIGATION**  The caseworker had been assigned to provide services to a pregnant 15 year-old developmentally disabled Department ward who had been taken into protective custody after being pressured into a sexual relationship with a 35 year-old man by her parents.  Just prior to the baby's birth, the mother was placed in the traditional foster home of a woman who had been issued a foster care home license by the Department four months earlier.  Following the baby's birth, the mother and her child remained together in the foster mother's home.

In an interview with Inspector General investigators, the foster mother stated that six months after the placement began she started to receive text messages from the caseworker asking to borrow money.  The foster mother stated she had become aware the caseworker was involved in bankruptcy proceedings and repeatedly agreed to provide her with funds.  The caseworker offered a variety of reasons for needing the money, including car repairs, dental work and paying household bills due to conflicts with her financial institution.  One request for $1250 was attributed to the caseworker's son receiving a substantial fine in another state for a red light camera violation committed in the caseworker's car.  Another request for $1000 came after the caseworker stated money she had previously been given by the foster mother had been stolen out of her car.  During a four-month period, the caseworker made 10 requests to borrow funds from the foster mother totaling $12,500.  The foster mother decided to complain because she had never been paid back.  The Inspector General investigator subpoenaed the caseworker's phone records and, with the cooperation of local law enforcement, was able to establish that the text messages sent by the caseworker to the foster mother were legitimate.

In an interview with Inspector General investigators, the foster mother stated she willingly assisted the caseworker out of a sense of helpfulness but gradually became uncomfortable with the lending as the caseworker neglected to pay back any of the money, as she had promised.  The foster mother eventually stopped giving the caseworker money and later confronted her in a public place over her failure to return any of the funds.  As the teen mother's behavior in the foster home became increasingly erratic, the foster mother and the caseworker addressed the possibility of having the mother removed from the home but allowing the baby to remain in the foster mother's care.  The foster mother stated to the Inspector General investigators she never intended for her financial assistance to the caseworker to influence decisions regarding foster care placement decisions.  She stated she always provided the caseworker with funds in cash and that the caseworker had repeatedly asked the foster mother not to divulge the loans to anyone.  Two weeks after the foster mother provided the last loan, the foster mother requested the removal of the mother from her home following extreme behavioral outbursts by the mother.

In the caseworker's interview with Inspector General investigators, she initially stated she had borrowed $4000 from the foster mother on one occasion when she mentioned an immediate personal financial hardship during the course of a conversation about the mother's behavior.  When informed that Inspector General investigators had reviewed multiple text messages from the caseworker to the foster mother requesting money for a variety of reasons, the caseworker admitted accepting money and denied knowing how much she had received in total.  The caseworker acknowledged that at the time of the interview she had not paid back any of the funds to the foster mother.  The caseworker characterized the foster mother as being, "angry at the world," after being unable to retain custody of the baby.  The caseworker denied stating or implying that by loaning her money the foster mother could influence her ability to have the baby remain in her care.  The caseworker acknowledged the circumstances of the situation constituted a conflict of interest.  The Code of Ethics for

Child Welfare Professionals clearly prohibits child welfare professionals from allowing their private interests to conflict or appear to conflict with their responsibilities to clients.  The Inspector General filed charges against the caseworker's Child Welfare Employment License (CWEL).

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.  The caseworker should be disciplined up to and including discharge.**

The employee was discharged.

GENERAL INVESTIGATIONS

## GENERAL INVESTIGATION 16

| ALLEGATION | A Department placement worker made inappropriate communications to a mother on his caseload whose four children had been placed in foster care. |
|---|---|

**INVESTIGATION**    The mother's children had been removed from her custody after she was the subject of three indicated reports for abuse and neglect of them during a 16-month period. The family was frequently homeless and the mother presented mental health issues that impeded her ability to provide adequate care for the children. Following the third indicated report, a case was opened for permanency services and assigned to the placement worker. In an interview with the Inspector General investigators, the mother stated she first met the placement worker at a court hearing one week after her case was opened and again at a second hearing a week later. The mother stated she had exchanged frequent calls and text messages with the worker, primarily related to scheduling visits with her children. On the night after the second hearing, the mother said she received two text messages from the worker, both after 10:30 pm.

The first text message expressed the worker's attraction to the mother and his desire to meet with her that evening, as well as a plea to not let anyone else know he had made the request. The second text, sent six minutes later, included an apology for having sent the first message as it was "disrespectful". The mother stated she did not respond to either text and pretended not to have received them when she spoke with the worker by phone the following day. The Inspector General subpoenaed the placement worker's phone records. The records confirmed both messages had been sent from the worker's phone to the mother's on the night in question.

In his interview with Inspector General investigators, the placement worker confirmed the phone number the messages had been sent from was his and said no one else had accessed or used his phone at that time. When presented with the content of the text messages, the worker denied having sent them but was unable to provide an explanation for how they were sent from his phone to the mother without his action or knowledge. The placement worker's attempt to initiate a romantic relationship with a client on his caseload, the mother of four children removed from her custody who presents mental health issues, constituted a clear violation of professional boundaries and abuse of his authority.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**    **1. The placement worker should be disciplined up to and including discharge.**

The employee was discharged. The Inspector General issued charges against the worker's Child Welfare Employee License.

## GENERAL INVESTIGATION 17

| ALLEGATION | The mother of a 14 year-old boy with severe behavioral problems agreed to a Dependency order in court so that the boy could be ordered to undergo necessary treatment.  The mother was indicated for neglect and was not notified of the finding by the Department. |
|---|---|

**INVESTIGATION**  The boy had a long history of mental illness stemming from his diagnoses of bipolar disorder, conduct disorder, intermittent explosive disorder, sexual and physical aggression and delinquency.  His frequent violent outbursts towards family members and the general public resulted in numerous criminal charges for domestic battery, aggravated battery, theft and criminal damage to property.  The boy had been psychiatrically hospitalized multiple times and had been prescribed three psychotropic medications to help stabilize his volatile behavior.  A child protection investigation was initiated after police were called to the family's home following a physical altercation between the boy and the mother's boyfriend.  Both the boy and the boyfriend were arrested and the boy was placed in a juvenile facility.

The assigned child protection investigator interviewed the mother, who stated she was no longer capable of controlling the boy's erratic, dangerous behavior.  The mother, who also had a 10 year-old son, expressed concerns about her ability to keep the younger brother safe from the boy's explosive outbursts.

Five days later, the mother accompanied the investigator and a Department placement worker and an Assistant State's Attorney to the boy's shelter care hearing.  In her case notes, the placement worker recorded that she and the Assistant State's Attorney explained to the mother she would be agreeing to Neglect by Stipulation, allowing the boy to become a Department ward without assigning blame or responsibility to the mother.  At a dependency hearing two weeks later, The mother stipulated to and the court found the boy was, "without the proper care necessary for his well-being through no fault, neglect or lack of concern by his parent."  The boy was adjudicated a dependent and became a ward of the Department and was placed at a residential facility operated by a private agency.

At the time the boy was taken into protective custody, his mother collaborated with the child protection investigator to transport some of his belongings to the residential facility.  The mother included some of the boy's psychotropic medications and provided her verbal consent for the boy to take them as necessary.  Despite the mother's actions, staff at the residential facility did not allow the boy to take his medications.  A review of communications among staff members found confusion regarding the process of obtaining consents for medical treatment, a delay in getting consent because of a problem with the DCFS Guardian's fax number, and the private agency staff's unfamiliarity with their own rules.  Involved staff repeatedly cited a need to secure the consent of the Guardianship Administrator to administer the boy's psychotropic medications, however agency policy did not require such consent.  Agency policy does allow for parents to give written consent, however the mother, who had given verbal consent, was never contacted.

After two weeks without any medication the boy experienced a severe outburst at the facility and had to be psychiatrically hospitalized.  The inability of private agency staff to recognize the danger of cutting off his necessary medicine "cold-turkey" in light of the severity of the boy's past behavior and their failure to ensure he was assessed by a medical professional after refusing to provide him with his medications constitutes a negligent disregard for the health and well-being of a child in crisis.

Fourteen months after the boy became a Department ward, the mother was informed by her employer that an annual check of the Child Abuse and Neglect Tracking System (CANTS) had returned a positive result on her for child neglect.  The mother attempted to file an appeal of the indicated finding, however her application was rejected as being untimely.  The mother's employment with the organization, which involved work with

at-risk populations, was then terminated for her inability to overturn the indicated finding.

The mother reported to Inspector General investigators that she had never been informed of the indicated finding against her and therefore had never had an opportunity to appeal the result within the allotted timeframe.  The Illinois Abused and Neglected Child Reporting Act (ANCRA) requires that the subjects of indicated reports be informed by U.S. mail and certified letter if funding is available, intended to provide the Department with proof of notification.  Department Rule also requires child protection investigators to attempt verbal notification of indicated findings to the subjects of those reports.  The Inspector General investigation found no evidence to suggest the investigator in this case, who was aware of the mother's involvement in the process of the boy becoming a ward, ever attempted to provide her with verbal notification of the indicated finding.  In an interview with Inspector General investigators, a State Central Register (SCR) administrator stated that the Department does not send notification letters to the subjects of indicated reports via certified mail, since funding is not available. While the Department's database records show that a letter was sent, letters are sent by regular mail only.   If letters are not returned to the SCR mailing facility, the Department assumes the letters have been successfully received.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | |
|---|---|

**1.  Given that the Department is unable to prove that notice of indicated findings was issued to the mother, she should be provided an opportunity to appeal the remaining finding against her.**

This matter was heard by the Administrative Law Judge and the mother was permitted to appeal the indicated finding.  AHU continues to set cases for hearing where appellant requests an appeal after 60 days of receiving Notice of Indicated Findings from SCR where service of notice of indicated findings cannot be proven.

**2.  The Administrative Hearings Unit should establish a policy whereby requests for appeal are not dismissed as untimely unless proof of service can be shown.**

Discussions were held with Administrative Hearings Unit.  There are budgetary issues and we will continue to explore.

**3.  The private agency that operates the residential facility should counsel the staff who failed to follow the private agency's policy which would have allowed for administration of the boy's psychotropic medication.**

The Inspector General shared the report with the private agency and the agency's Board of Directors. The Inspector General's report was amended in response to clarifications provided by the private agency.

**4.  The Department should ensure that all reception center staff are made aware that when a youth is taken into protective custody parental consent for medication administration is sufficient.  If consent cannot be immediately procured, the youth should be provided with his/her prescription medication on an emergency basis until parental consent can be obtained.  The Department should also clarify whose responsibility it is to obtain parental consent for medication when a youth is taken into protective custody.**

The Shelter Administrator will ensure communication with shelters on this issue.  This will be included in Procedures 300, *Child Abuse and Neglect Investigations,* updates and Procedures 301, as appropriate.  Shelter procedures addressing this recommendation will be issued.

**GENERAL INVESTIGATION 18**

| | |
|---|---|
| **ISSUE** | The Department failed to incorporate the provisions of an earlier Intact Family Services Policy Guide into an updated version provided to workers. |

**DISCUSSION**    The Inspector General conducted a review of Department Policy Guide 2014.13: *Intact Family Services Referral Criteria and Procedures*.  While the current policy guide addresses proper evaluation of any and all substance abuse or mental health issues that might impact a determination regarding children's safety in a home, it does not include direction on utilization of the CFS 440-12 form in cases involving parental mental illness.  The CFS 440-12 form is intended to assure that mental health records and other relevant information regarding support systems are obtained during child protection investigations and provided to intact family service workers during case transition.

Previous Department Policy Guide 2011.07 was issued five years ago in response to several Office of the Inspector General investigations that found the Department's failure to obtain parental mental health records in those cases had seriously compromised the safety of children.  In order to maintain consistency and ensure the most complete possible care for children whose parents present mental health issues, both policy guides should be utilized in conjunction with one another.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. Policy Guide 2014.13:** *Intact Family Services Referral Criteria and Procedures* **should cross-reference the requirements of Policy Guide 2011.07.**

The recommendation will be included in revisions to Procedures 302, *Services Delivered by the Department*.

**GENERAL INVESTIGATION 19**

| | |
|---|---|
| **ISSUE** | The Department's Licensing Unit misinterpreted state law regarding potentially allowing individuals with criminal histories to move into licensed foster homes. |

**DISCUSSION**      The Illinois Child Care Act allows for the Department to issue waivers to individuals with non-serious criminal histories to serve as foster parents or reside in foster homes provided the offenses are more than 10 years old and that they truthfully divulge their pasts at the outset of the application process. The Department's Central Office of Licensing has interpreted the statute to prohibit granting a waiver to anyone attempting to move into an existing foster home. The rationale for this practice is that since an existing foster home has already been licensed, the person seeking to join the household did not convey their criminal history prior to the beginning of the foster home application process. A Department Licensing Administrator confirmed to Inspector General investigators that it is current practice to prohibit considering a waiver for anyone attempting to move into a foster household after children have been placed. The practice is delineated on the form used by the Department for waiver requests.

The Inspector General investigators consulted with an administrator from the Department's Legal Division who agreed that, legally, the Child Care Act does not require waivers to be automatically denied as standard practice. This current interpretation of the statute effectively bars any individual with a non-serious criminal history from becoming a member of a foster parenting household, even if the criminal history was a misdemeanor conviction from 30 years earlier.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**      **1. The Department's Criminal History Waiver Request Form should be amended to permit consideration of waivers for disclosed, aged, non-serious criminal offenses of persons who join the foster home after the foster home application process is complete.**

The background check waiver form and process have been amended to remove language that did not stem from the Child Care Act. The remaining language on the form is taken from the Child Care Act. No information transmittal was issued, as only 2 persons at Central Office of Licensing work with and send out the forms.

**GENERAL INVESTIGATION 20**

| | |
|---|---|
| **ISSUE** | In her role as DCFS Ethics Officer, the Inspector General manages the review and filing of annual Statements of Economic Interest required to be filed by certain employees, |

pursuant to the State Officials and Employees Ethics Act. (5 ILCS 430/20-23). After the 2015 filing period concluded, the Inspector General issued her report detailing overall Departmental compliance and identifying issues that arose during the process.

| | |
|---|---|
| **DISCUSSION** | In 2015, the Department certified to the Secretary of State the names of 612 DCFS employees and 14 members of the Children and Family Services Advisory Council |

(CFSAC) who were required to file a 2015 SOEI (total filers = 626). (Please see section entitled *Ethics* in this Annual Report for 2015 statistics about the types of disclosures made.)

The State Officials and Employees Ethics Act requires the Ethics Officer to review Statements prior to filing with the Secretary of State. (5 ILCS 430/20-23(2)). Failure of the Ethics Officer to review *all* Statements prior to filing results in negative audit findings for the Department and instances where the Secretary of State rejects forms because they are improperly completed. To address these issues, the Department requires each DCFS filer to send their completed, original Statement to the Ethics Officer who in turn files every correctly completed form with the Secretary of State (and contacts filers who need to make corrections).

In 2015, 55 individuals (53 employees and 2 CFSAC board members) sent their Statements directly to the Secretary of State rather than to the DCFS Ethics Officer as instructed. Only one of these individuals made this error for a second consecutive year. Additionally, six employees and one CFSAC board member were fined by the Secretary of State for late filing. One employee, who was fined $1,715 for his late filing in June 2012, remains delinquent.

In an effort to reduce high rates of employees failing to send their original forms to the Ethics Officer for review, beginning in 2011, a "Non-Compliance Letter" was issued to employees who failed to follow the Department's filing instructions by filing directly with the Secretary of State. The process of issuing Non-Compliance letters had an overall positive deterrent effect.

Historically, the Ethics Officer has noted deficiencies in the Department's process for identifying the employees who are required to file a Statement.  In 2015, the Inspector General and the Department worked together to revise the identification process, including a 2-phased review process involving Deputy Directors, and coding by OES for positions that would be required to file a SOEI on an annual basis.  This revised process appears to have improved the accuracy of the identification process.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.   The Department should send Informational Letters to the 53 employees who sent their SOEIs to the Secretary of State Office for the first time this year.** |

Informational letters were sent as required.

**2.   The DCFS employee who failed to follow filing instructions despite repeated warning should be disciplined.**

The Statement of Economic Interests process has been discussed with the employee.

**3.   The revised process for development of the list of persons required to file remedied several previously chronic problems and should be incorporated into written procedures.**

The Department has incorporated this recommendation into practice. The Office of Employee Services (OES) will run a report of the positions/employees who are currently identified as being required to file Statements of Economic Interest in the month of December.  This report will be distributed to the Deputy Directors for their review to ensure that all positions have been accurately captured based on the functions of their positions prior to submitting the list to the Secretary of State.

**GENERAL INVESTIGATION 21**

| | |
|---|---|
| **ISSUE** | The Inspector General sought to update which Department advocacy groups are statutorily mandated to participate in annual ethics training and to clarify advisory council name changes. |

| | |
|---|---|
| **DISCUSSION** | The State Officials and Employees Ethics Act (5 ILCS 430) requires appointees to state boards and commissions to complete annual ethics training, which is administered by the Ethics Officer (the Inspector General). Some advisory groups covered under the act are multi-agency groups involved with other offices of state government. In 2014, the Office of the Executive Inspector General notified the Ethics Officer that responsibility for one multi-agency group was assigned to the Department of Economic Opportunity. As such, the DCFS Ethics Officer was no longer charged with oversight of ethics training for the agency. |

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.   Omit the multi-agency group from the list of DCFS advisory groups required to take annual ethics training.** |

The listing has been removed.

**2.   Omit the multi-agency group from the Department's public website listing of, "DCFS Statutory Advisory Groups."**

The listing has been removed.

**3.   Update the name of the Illinois Adoption Advisory Council to the Adoption Registry Confidential Intermediary Council on Department's website to reflect the group's name change.**

The name has been revised.

## GENERAL INVESTIGATION 22

**ALLEGATION**    A child protection supervisor misrepresented herself in order to obtain confidential medical information pertaining to a child protection investigator.

**INVESTIGATION**    The investigator and the supervisor were assigned to different child protection teams within the same Department field office. It was the office's practice to require workers to request vacation time far in advance in order to ensure staff levels were at least at 50 percent during times of the year when absences tended to be high. Team supervisors met collectively to review and coordinate vacation requests from investigators in an effort to minimize disruption to the office and ensure equanimity.

After holiday time had been arranged, the investigator asked for time off just prior to the upcoming holiday for approved time under the Family Medical Leave Act (FMLA), which allows for unpaid days off to address personal or familial medical issues. When presented with the investigator's FMLA designation, her supervisor granted the time off. The investigator's supervisor approved the request because she was compelled to do so by the investigator's FMLA designation and the investigator had no history of abusing her requests for days out of the office.

When other supervisors in the office learned the investigator's time off had been approved they asked the investigator's supervisor to consult with the Department's FMLA liaison. The supervisor refused, basing her decision on the investigator's history and her understanding of the Department's FMLA policy. Two other supervisors then contacted the FMLA liaison and inquired about the propriety of her use of FMLA time for the upcoming absence. In an interview with Inspector General investigators, the Department's FMLA liaison stated the supervisors who called her never represented themselves as the investigator's supervisor. The liaison said she assumed the supervisor she spoke with primarily was responsible for overseeing the investigator's work. After the call was completed, the liaison determined the person she had spoken to was not the investigator's supervisor and she ceased further contact with the individual.

As a result of the ongoing conflict over the approval of the investigator's days off, a Department Regional Administrator held a meeting with all child protection supervisors in the office. The Administrator reviewed and upheld the decision to grant the investigator's days off. The investigator was asked to submit proof of the medical necessity of her absence and she complied with the request.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**    **1. The Department Regional Administrator should meet with supervisors and discuss how similar disputes about investigator holiday time will be resolved in the future.**

This recommendation was implemented.

# RECOMMENDATIONS FOR WARDS IN RESIDENTIAL FACILITIES

The Inspector General reviewed prior investigations involving high risk wards and compiled a report of recommendations to address the needs of this residential population. The Report addressed the double-threat presented by youth who exhibit violent or criminal behavior: immediate and targeted interventions and accountability are needed for the youth and, at the same time, the Department must ensure the safety of the community and other children in care.

In addition, the Inspector General noted that the Department often failed to effectively monitor residential facilities. In part due to a reporting system (the Unusual Incident Reporting System) that had become a bureaucratic function and did not capture or analyze critical information.

The population of high risk wards includes a large number of wards who are frequent "runners." In addition to the Inspector General's subsequent report, which focused on the Department's response to youth on run, this Report noted that the population of children and youth who are missing or on run are not a homogenous group – the group identified the need to stratify the Department's response to children and youth on run.

***Evidence-based Therapeutic Interventions for Wards with Violent or Criminal Behavior***

1. **Multi-Systemic Therapy and intensive case management for delinquent wards with repeated psychiatric hospitalizations:   The Inspector General asked that the Department,** *implement a multi-systemic therapy (MST) approach and an intensive case management program for the 12-13% of hospitalized wards with multiple yearly psychiatric hospitalizations and wards who are involved in both delinquency and adult courts.* **(Recommended January 2003, #02-IG-1136 and #02-IG-0558).**

2. **Aggression Replacement Training (ART):** *The program should implement anger replacement therapy (ART combines anger control training (emotional), psychological skill stream training and moral reasoning).* **(Recommended January 2003, #02-IG-1136 and #02-IG-0558).  [Also see recommendation regarding Evening Reporting Centers below, Section II.1)**

3. **Multi-Dimensional Family Approach for reintegrating wards with violent behavior back into the community:  The Inspector General asked that a specific residential facility incorporate into** *its treatment intervention for youth whose anticipated discharge plan is a return to parents or relatives,* **[and to]** *adopt a multi-dimensional family approach (Chamberlain, 1998).  One of the goals of this family treatment should be to assist viable members of the child/ren's extended family in building a caring and civil community of empathy and moral reasoning in areas of sexuality and violence.  The family group sessions should take place* **[in a location]** *to be inclusive of multiple extended family members by avoiding taxing transportation while reinforcing realistic community safety planning.  Extended family visits and three-month aftercare therapeutic services should be incorporated as part of the treatment intervention to help the family transition the child into his family's community.  As part of the multi-dimensional services the children's caretakers should receive a transitional consultation from the children's medical provider and the children's schools.* **(Recommended September 2003, #03-IG-0851).**

4. **Pro-social skills training: In a set of Office of the Inspector General Reports addressing the Child Welfare System's responses to sexually aggressive behavior, the Inspector General noted that the appropriate emphasis of therapy and accountability requires an emphasis on empathy and pro-social skill development.** *Sexually Aggressive Children and Youth (SACY) Reports (dated June 30, 1999 and June 13, 2000).*

5. **Interventions for Substance-Abusing Youth: [For]** *an adolescent whose behavior is self-destructive and uncooperative, but is also using drugs, the Department should consider filing a petition on the minor as an Addicted Minor (ILCS 705, 405/4-1 et sec) to make use of the authority of the court in servicing such youth.* **(Recommended May 1999, 97-IG-1520).**

6. **Establishment of a multi-disciplinary panel to assess placements and treatment options for high-risk wards:** *The Guardian's Office has to proactively meet its responsibility, "to assure a permanent, secure and nurturing living arrangement for each child the Department serves." The Guardian's Office should assemble a panel to examine the present population of high-risk wards, recommend placement / treatment options, make recommendations about how to sustain an on-going effort to review high-risk cases and examine which may need court review for compliance with mental health services. The panel should include: the guardian, psychologists, psychiatrists, a pharmacologist, adolescent health experts, ethicists and selected independent examiners. The panel should designate a smaller group available to the Guardian for on-going consultation in these extreme cases.* **(Recommended January 2003, #02-IG-1136 and #02-IG-0558).**

7. **Developing Evidence-Based Interventions: The Inspector General asked that the** *Department concentrate the* **[funding for the University of Illinois']** *Child Family Research on assisting residential and foster care providers in developing evidenced based interventions for violence prevention and response and transitional services for the return home of younger adolescent and adolescent wards.* **(Recommended September 2003, #03-IG-0851). [The Department will need to provide supports, in the form of ongoing training of workers and supervisors and consultation, to assure continuous fidelity to the intervention model in group homes, residential facilities and successful reintegration of youth into their home communities.]**

*The Need to Promote Accountability and Ensure the Safety of Others*

1. **Evening Reporting Centers: [For youth who are dually involved in the Juvenile Justice system and the Department],** *the Department should* **[promote use of]** *evening* **[reporting]** *centers […] similar to the current models utilized by* **[the Cook County]** *Juvenile Court.* **[The Department should request]** *a court order for supervision . . .* **[incorporating reporting to the center as part of the court order]** *and involve separate facilities for youth ages 13-16 years old and young adults 17-18 years old. The evening* **[reporting]** *center should have the capacity to supervise court ordered community service and time spent in the center should be scaled to a youth's progress at the evening* **[reporting]** *center, community, and school. Residential facilities should arrange for transportation of their clients. Following the balanced and restorative justice model, adult mediators can be used for conflict resolution between the delinquent and their victim.* **[The three-fold intervention described in Section I.A.2., above, for Aggression Replacement Training should be utilized with youth in Evening Reporting Centers.] (Recommended January 2003, #02-IG-1136 and #02-IG-0558).**

2. **Identification of possible sexual assault in residential facilities:  The Inspector General asked to meet with the Clinical Director of a specific residential facility to:** … *review proposed changes to its clinical protocols and training to address the failure to identify  initial reports as possible sexual*

*assault with an immediate referral to law enforcement; and failure to respond to the confirmed information regarding sexual activity between youths of such tender ages with immediate medical and clinical interventions (through the Children's Advocacy Center).* **(Recommended September 2003, #03-IG-0851).**

3. **Secure facilities for youth with foreseeably dangerous behavior:** *The Department has been remiss in its fiduciary duty by not establishing secure facilities for youth whose behavior poses an established pattern of foreseeable serious risk of bodily harm to self or others (as specified in DCFS Rule 411).* **(Recommended January 2003, #02-IG-1136 and #02-IG-0558).**

4. **Half-Way Houses:** The Inspector General asked that t*he Department develop a placement model similar to halfway houses for high-risk wards (17 years and older) who have been released from the Juvenile Division of the Department of Corrections or are violating probation orders. The ward should be held strictly accountable for school, work, curfew, etc. The Department should consult with programs such as Safer Foundation or Isaac Ray regarding the development of secure halfway houses.* **(Recommended January 2003, #02-IG-1136 and #02-IG-0558).**

5. **Restorative justice model:** The Inspector General asked that t*he Department and the Cook County State's Attorney discuss how to set up a restorative justice model for DCFS wards.* **(Recommended September 2003, #03-IG-0851).**

6. **Weekend emergency responses for youth-on-youth sexual assault:** The Inspector General asked that: [t]*he Department secure the assistance of* [a local child advocacy center] *in developing a system of weekend emergency responses for alleged child on child sexual assault evaluations for DCFS wards that reside in* [DCFS] *residential programs.* **(Recommended September 2003, #03-IG-0851).**

7. **Contracting with Youth:** *The Department should develop housing contracts (for rent subsidies) with wards and enforce regulations addressing the use of drugs, alcohol, firearms, and violence. Institutional sanctions should be consistent across programs and the juvenile court should be immediately notified when a ward is violating housing contracts that threaten the safety or the well-being of the ward. Housing contracts should make clear that funding for the apartment will stop and the court will be informed of transgressions involving criminal activity.* **(Recommended June 2011, #09-IG-2951).**

*The Need for a More Comprehensive and Substantive System to Measure Performance at Residential Facilities*

1. **"Action taken" on Unusual Incident Reports:** *The Department should continue to monitor implementation of a single reporting system for UIRs. In addition, for a six-month validity and reliability trial period, the agency must institute a streamlined UIR reporting process. During the pilot period, the agency should assign a numbering system to UIRs so that one incident is reported one time. Future clarifications or corrections would be filed under the same number so that it becomes possible to track number of incidents. In addition, the agency should prohibit supervisory additions, deletions, edits or rejections of UIRs. Supervisory corrections and clarifications can be filed with the Department through supplementary clarifying or correcting reports. During the six-month trial period, both the Department and agency management should review the original and supplemental UIRs to inform them on the validity and reliability of the contents in UIR reporting categories and the need for additional training regarding UIR preparation. Further, both the Department and agency management should review and monitor the "Action Taken" section of*

*UIRs, both to ensure that appropriate action is taken and to again inform the need for future training. During this validity and reliability trial period precautions should be taken for the potential of over reporting by staff.*   **(Recommended September 2003, #03-IG-0851).**

*Missing and Runaway Youth*

**The Office of the Inspector General developed a Flow Chart to classify missing and runaway youth into low, medium and high risk cases, with associated levels of Department response to ensure that the most dangerous cases receive sufficient attention at all levels.**

# ERROR REDUCTION

In 2008, legislation was enacted requiring the Office of the Inspector General (OIG) to remedy patterns of errors or problematic practices that compromise or threaten the safety of children as identified in Inspector General death and serious injury investigations and by Child Death Review Teams (20 ILCS 505/35.7).

Following legislative hearings, the Office of the Inspector General worked with legislators to develop this error reduction statute. The Office of the Inspector General recognized that multiple weaknesses in organizational processes occasionally line up to create a tragic outcome, resulting in the death or serious injury of a child. The Office of the Inspector General used a systems perspective and root cause analysis to develop recommendations and trainings to reduce those errors that may result in the death or serious injury of a child. Although occasional accidents can't be avoided, a systems perspective makes it possible to introduce a systematic and comprehensive approach to investigation and prevention efforts with the goal of decreasing their occurrence. Root cause analysis is used to identify points in a system where improvements can realistically be made to reduce the likelihood that a negative event will occur.

The Office of the Inspector General's error reduction initiative to identify and address failures in the state's child protection system is aimed at building better organizational processes and reducing the incidence of child injury and death. The error reduction initiative informs both administration and front-line staff, and promotes critical thinking and decision-making.

In 2015, the Office of the Inspector General produced an error reduction training curriculum covering five main topics. This curriculum was critiqued by the Department's Director of Operation and Associate Deputies of Child Protection and Clinical Practice Services. The detailed curriculum is as follows:

## INTRODUCTION

The concepts presented here are meant as reinforcement training for Child Protection supervisors and investigators, applying knowledge gained from literature on child mortality from physical abuse, and Inspector General's death investigations of children fatally abused within a year after contact with the Illinois Department of Children and Family Services. This error reduction training is intended to encourage an introspective organizational environment that recognizes the occurrences of errors and acknowledges near misses to learn from them to improve practice and prevent the risk of sentinel events.

Disasters are rarely the result of one major mistake by one incompetent worker, but by the result of a system operating with a pattern of small errors or omissions (Munro, 2005). These small errors may not have an adverse effect on their own, but on one tragic occasion come together and lead to sentinel event-an unexpected occurrence involving death or serious physical or psychological injury, or the risk thereof.

*Rate of Physical Abuse v. Rate of Child Maltreatment Deaths*
Though the national rate of physical abuse has decreased (Finkelhor & Jones, 2006), there is a substantial increase in the incidence of child maltreatment fatalities from abusive injuries, a slight increase in hospitalizations from physical abuse, and an increase in the incidence of deaths during hospitalizations due to abuse (Leventhal & Gaither, 2012).

*-Discussion-*
*Why has the incidence of abuse decreased? How does that affect child protection?*

Some hypothesize the decrease is due to a general shift in social norms and attitudes, which has changed the way children are viewed and treated. Behaviors that were previously acceptable are no longer so easily tolerated. In addition, the availability of contraception lowered the number of unwanted children and stresses within family households. (Finkelhor & Jones, 2006)

Historically, certain marginalized groups such as slaves, servants, and women were seen as no more than chattel - property without rights. At the whim of their masters, they could be subjected to deliberate physical assault. Those beliefs were put asunder through wars, the civil rights and women's movements. Within the last thirty years, there has been a similar cultural shift in how children are valued. Children are no longer considered the mere property of their parents, but individuals with rights. Meeting parental duty to children is considered the fundamental basis for a parent's right to their children. If there is an egregious act or a pattern of a parent's compromising his/her duty of protecting the child the parent's rights are similarly compromised.

**Evidence of cultural shift:**

- Surveys of parents in the late 1990's showed declining support for corporal punishment and favored less violence toward children. (Finkelhor & Jones, 2006)
- Social intervention agents such as educators, domestic violence professionals, early interventionists, child development professionals and child trauma researchers called for change. Funding began for children's programs such as Head Start.
- Since 1975 there has been a decline in physical abuse in the U.S. Between 1975 and 2002 18% fewer children were slapped or spanked by caregivers. Between 1975 and 1985 there was a 35% decline of parents hitting children with an object. (Zolotor, Theodore, Runyan, Chang, & Laskey, 2011)
- Internationally, children are viewed through a more kindly lens and there have been a number of policy initiatives to end corporal punishment of children.
  - In 1989 the UN Convention on the Rights of the Child stated that "members must take measures to protect children from all forms of physical or mental violence, injury or abuse, neglect or negligent treatment, maltreatment or exploitation, including sexual abuse, while in the care of parent(s), legal guardian(s) or any other person who has the care of the child." (United Nations Human Rights, 1989)
  - Twenty-three of forty-seven Council of Europe countries have passed laws prohibiting the use of corporal punishment within the home. (duRivage, et al., 2015). Sweden was first in 1979. Romania and Ukraine had passed laws by 2004. Recent countries include Andorra, Estonia and Malta.
  - As of 2010, three Central and South American countries, Venezuela, Uruguay and Costa Rica have passed laws against corporal punishment. (Zolotor & Puzia, Bans against Corporal Punishment: A systematic review of the laws, changes in attitudes and behaviors, 2010).
  - More countries in Central and South America have followed suit between 2010 and 2014, including Honduras, Argentina, Bolivia, Brazil and Nicaragua.
  - Between 2007 and 2015, six African countries outlawed corporal punishment in the home: Togo (2007), the Republic of Congo (2010), Kenya (2010), Tunisia (2010), South

ERROR REDUCTION

Sudan (2011), and Benin (2015). A bill proposing outlawing corporal punishment is presently under consideration in Uganda.

TOPIC ONE

**The Rule of Optimism, as described by scholar Eileen Gambrill (author of Social Work Practice, A Critical Thinker's Guide), is the tendency to have a benign opinion about parents and injuries on a child. The Rule of Optimism appears to be the operating bias in many child death cases.**

***The Rule of Optimism can be countered by* relying *on a wide range of information, key informants and robust sources of evidence.***

**Avoid the following "investigative pitfalls":**

I.     **Making decisions without sufficient information or misinterpreting information.**
- Not obtaining or not critically reviewing relevant reports[1]
    - Such as police reports, previous child abuse reports, school records, mental health records or medical records.
    - Example: *See Lawrence and Jacobs/Landry case studies*
- Failure to give critical attention to new evidence that should have revised an assessment of the situation.
- Over reliance on self-reports/ failure to verify self-reports
    - Such as not checking IDs to assure identity (for example, if there is a new person such as a new boyfriend/girlfriend interacting with the child), not completing a valid LEADs, and not checking work schedules or doctors' appointments to validate mitigating self-reports.
- Shortcuts in scene investigations:
    1. Part of the information gathering process includes an adequate scene investigation, including reenactments, conducting scene investigations in the location of incident or in locations other than the home, and requesting to see devices suspected to be involved in an incident.
    2. In the David Quentin case, the investigator observed the basement where the child was punished and looked at the equipment the child was forced to use; however, she failed to ask how the equipment was used, or request a demonstration of how the equipment was used.
    3. In another example, an investigator accepted that the child was injured in the early afternoon at a neighborhood playground without going to see the actual playground.  His mother's work schedule showed she was at work in the early afternoon on the day of the "injury" and could not have taken the child to the park.
- Closing investigations with poor documentation, thus limiting subsequent investigators/ caseworkers' ability to assess threats or risks to a child.
- Anchoring Bias: In the David Quentin case, the investigator appeared to have had an anchoring bias, resulting in her judging the pre-adoptive father to be a good caregiver based on his youth

---

[1] Trainer note: This relates to Topic 3 and contributes to a weak investigative foundation.

ministry and his service in the military, despite his use of bizarre punishments and home schooling of his own children.[2]

- Positive Re-framing Deception: In Office of the Inspector General investigations, mothers with children already in care lied about or hid pregnancies for fear that DCFS would take the child away. While that may be a motive, investigators/workers should consider whether this is part of a pattern of deception or passively concealing information.

## II. Failing to properly assess child's injuries and/or follow-up with child's injuries.[3]

- Not ensuring child sees physician to assess injury, due to:
  - Lack of knowledge about rapid healing of infant bruises or injuries.
  - Minimizing "fading" injuries on child's face, neck, and ears.
  - Lack of knowledge about abdominal injuries and failure to understand that small injuries to the abdominal region are high risk.  Young children are not as able as adults to protect abdominal areas (Trokel et al. 2004). Their abdominal muscles are relatively weak, allowing impacting forces to be transmitted inward more easily. Mid-abdominal structures such as the small intestines, liver and pancreas are particularly vulnerable (Zitelli, McIntire, & Nowalk, 2012). Children's organs are also comparatively larger than those of adults in proportion to their body. As a result they are at greater risk for injury (Saxena et al., 2010). Even if there is little or no bruising, when a child states that they have been hit in the stomach, they should be taken to the doctor, *see Keira Geddes case study*. Children with acute small intestinal tears generally have severe abdominal pain within an hour or two of injury (Zitelli, McIntire, & Nowalk, 2012).
  - Lack of knowledge about thoracic (chest) injuries: Thoracic injuries have a high morbidity and mortality rate because they are the result of the application of massive forces to the chest such as stomping, slamming or violent throws. Thoracic injuries can present with significant respiratory distress, with complaints of severe chest pain.
- Not asking relatives or reporter if they have pictures of current or past injuries.
- Not providing physicians with descriptions of injuries provided by caretakers who reported concerns.
- Not comparing explanations given to the investigator for the injuries. *See Patrick George case study*.
- Not having the technical ability and equipment to download pictures from cellphones or not requesting law enforcement assistance to download informants' pictures of young children's injuries. *See Ina Ordonez and Jessica Brown case studies*.
- Not consulting with child abuse doctors or other relevant professionals for second opinion when needed.

## III. Failure to establish a safety net for child.

1. Discounting child centered collaterals, interviewing only the parent identified collaterals. Examples of prompting questions to assist the child in identifying collateral contacts include:
   - Who are you special to?
   - Who do you go to if you have a problem?

---

[2] See Topic 4- Unrealistic and Developmentally Inappropriate Demands, Halo Effect
[3] See bruising slides in Section 5

ERROR REDUCTION

- Who do you trust?
- Who comforts you?

2. Failing to contact or establish a relationship with child-centered collaterals in order to form a support network.

3. Not enlisting child-centered collateral such as collaterals identified by the child, extended family members, child's medical professionals, and school personnel to keep additional eyes and ears on child.

4. Failing to contact support network when the parent has a new paramour and there is a concurrent emergence of injuries on the child.

5. DCFS Procedures include the following examples of additional prompting questions to assist the worker in identifying collateral contacts:
   - Who best knows the mother's/father's side of the family?
   - Who within this family can best assist in setting in motion the planning activities of the family?
   - Who is the peacemaker in the family?
   - Who is the wisest member or person who can best approach other members to get their assistance in planning for the future of the children?
   - With whom do you spend your holidays?
   - Who watches your children?
   - Who are your family members?

*-Narrative-*

*Parent has engaged in a new relationship or the individual has just moved into the household and extended family has concerns about bruising. Their concerns have been growing because the child appears to have more injuries since the individual relationship has developed. Family may have noted bruises but attributed them to accidents. Now they are unsure or are suspicious of abuse. In several homicide cases, misconception of parent's right for privacy or considering the extended family as "meddling" appeared to be the fault-line dividing the children from protective early development professionals or other supportive adults who can help protect a child or deter an adult from inflicting future harm on a child.*

TOPIC TWO
**Not viewing with caution parental/contextual risk factors including domestic violence, alcohol use, drug use, mental illness, use of weapons and expressed concerns over paramour(s) and child. These conditions warrant careful assessment.**

I.   **Risk Factors for child maltreatment**
   - Primary risk factor: Violence: A parent's anger/hyper-reactivity are strongly related to the occurrence of child physical abuse (In Office of the Inspector General investigations it was noted that hyper-reactive parents isolate the child from supportive family members.)
   - Additional risk factors include: Unwanted child; Parent use of corporal punishment; Parent anxiety; Past criminal behavior; Family conflict; Family Cohesion; and Partner violence (Stith, et al., 2009).

> **Parent factors independent of the child such as parent anger/hyper-reactivity and family factors like high family conflict and low family cohesion can contribute to a lethal risk of child abuse.** (Stith, et al., 2009)

**Ellia Brown Narrative:** Ellia, age two-and-a-half, died as a result of multiple blunt force injuries due to physical abuse by her twenty-two year old father. The father came to the Department when he was 17 years old and was placed in a Transitional Living Program (TLP). Other residents of the program feared him. At one point he burned the clothing of a peer. He violated prohibition and was sentenced to a year of incarceration during which he was placed in isolation.

Ellia's father was indicated for cuts, welts and bruises when she was 1 year-old. While in her father's care, Ellia was fatally abused when she exhibited normal exploratory behavior and resisted toilet training- behavior that is considered to be developmentally normal for her age. When interviewed by the police, the father recounted an incident where Ellia entered the furnace room and could not be found. When the father found Ellia, he slapped her hand but Ellia did not respond so he spanked her hard 7-8 times. On another occasion, Ellia got into the bath while her father was out of the room and splashed water all over the floor. The father became angry because he said his daughter knew never to enter the bath without supervision and "whooped" her 3-4 times. Ellia's father also recounted that over a period of days prior to her death where he repeatedly physically punished her for having toilet accidents. The abuse included multiple punches to the stomach. Ellia was merely exhibiting behavior that is appropriate for her age: after the age of one, children develop a sense of curiosity about the world and exhibit normal exploratory behavior, and toilet training refusal or resistance is commonplace.

II.  **MacArthur Dangerousness Study and NIMH Study**
   - People with mental illness are no more likely to be dangerous than the general population.
   - People with mental illness who abuse drugs or alcohol are five times more likely to be violent that the general population. *See Rachel Lawrence case study.*
   - In dually disordered individuals the odds are 2.6 to 1 that psychiatric symptoms will occur before the person begins the abuse of alcohol or drugs (Pepper, 1993)

III. **The Relationship between Duties and Rights**
The moral philosopher, James Wakefield, argued the principle that a parent's right to his/her child is based on the parent's duty to care for and protect the child. If a parent fails to discharge this duty, the right to their children is compromised. He noted that the parent's right is in jeopardy when a parent's personal desires for drugs, alcohol, personal freedom for sexual intimacy or adult companionship is chosen over the parent's duty to care for and protect the child. *See Jacobs/Landry case study*

IV.   **Not properly assessing and understanding risk factors, precursors or motivators for child abuse.**
  - Understating the volatility of violence once violence has occurred.
  - Not viewing with caution parental or contextual risk factors such as domestic violence, alcohol abuse, drug abuse, mental illness, concerns over paramour(s) and child injuries.

TOPIC THREE
**Achilles heel for follow-up: When a weak foundation exists because of insufficient information in the child protection investigation, the on-going future risk to the children can exponentially increase.**

**Weak Foundation**
Several Office of the Inspector General death investigations found situations where investigators did not obtain vital critical records that would have informed follow up workers, such as police reports, medical records, mental health records. *See Rachel Lawrence case study.* The importance of obtaining the records during the investigation is paramount because it is only during the course of an investigation that the Department can subpoena records, including mental health records.

Child protection investigations in which mental health is a significant issue are not to be closed until mental health records are obtained. Once the records are obtained, the investigator and his or her supervisor are to meet to review the information contained within the records to assess its impact on child safety. If the parent refuses to sign the consent, the Illinois Mental Health and Developmental Disabilities Code (740 ILCS 110/11(i)) authorizes the Department to obtain mental health records by way of subpoena. If an investigator has difficulty obtaining these records they should immediately contact DCFS Legal and their manager. **If a subpoena is not enforced in a timely manner (10 days) it compromises the ability of the Attorney General to win an enforcement hearing.**

Once obtained, the records become part of the investigation file which is shared with the follow-up case manager to further assess risk and safety and determine what services are necessary for the family.[4] If followed, this process ensures that those involved in decision-making have the parent/caregiver's mental health records at the onset of the case. Most mental health treatment facilities have detailed discharge treatment plans.

**Rachel Lawrence Case Study:** Though the investigator visited the State Operated Mental Health Facility where the father was hospitalized, the investigator did not request the records. The records detailed the discharge plan developed for the father which included outpatient appointments. The records also note the father's history of substance abuse and pattern of non-compliance with treatment. According to the hospital records the father reported he first used PCP as a teenager and his mother used alcohol on a daily basis. The father acknowledged PCP use every other day for two months prior to an earlier psychiatric hospital admission; and he had been using PCP daily for two weeks when he threatened to kill himself and his children. In addition the records revealed a start-stop pattern to the father's psychiatric care and non-compliance with his psychotropic medication. He did not attend follow-up appointments as instructed, ran out of medication frequently, and utilized the emergency department to get his medication. When admitted to the state facility he had been off his medication for two weeks. The social worker discussed with the children's mother the possibility of the father attending day treatment after his discharge. The father's assigned aftercare community mental health agency, had a day treatment program. The paternal grandmother picked the father up at discharge and a nurse went over his discharge plan. The

---

[4] Policy guide 2011.07, September 15, 2011

father was given a prescription for two weeks of medication. He never contacted the community mental health clinic, and he did not go back to the psychiatrist at a local hospital.

**Statements made at the time of violent incidents to the police or courts are relevant to child welfare work.**

**Jacobs/Landry Case Study:** Police called the Department when they found that a mother allowed a man who had brutally beaten her child two years earlier (and went to prison for the attack) back around the child. The mother feigned lack of knowledge. Had the investigator obtained the full law enforcement investigative record from the earlier assault, the investigator would have been informed about the boyfriend's propensity for violence because the record included a statement, in the mother's own words, detailing the 20 hour assault of her 5 year-old son. The boyfriend strangled the boy with a cord, stuffed soiled underpants into his mouth, punched, kicked, and called the child racially derogatory names. Investigators as well as follow-up workers and integrated assessors need full records to be able to properly assess a capacity to protect.

**Likewise, medical, police or court records surrounding a violent incident are critical.**

**Patrick George Case Study:** A cuts, bruises and welts investigation conducted just months before the homicide of a three year-old was unfounded by an investigator who did not obtain the police records, the court records or the medical records.

The mother reported that the child was very active and had fallen. However the hospital records were replete with descriptions of the child's injuries. The hospital's photographs and body charts clearly depicted numerous injuries that could never be explained away by an overactive child. Within six hours of Patrick's hospital admission, his mother admitted that his injuries were not accidental. The information necessary for an abuse finding was readily retrievable within five days of the child's hospitalization for suspicious injuries. That information included an arrest report with statements by the mother, a criminal charge, a domestic violence protective order, the medical opinion of an attending doctor, extensive medical records with a discharge diagnosis of abuse, and the suspicions called in that the mother had been untruthful about a live-in paramour.

TOPIC FOUR
**Making unrealistic or developmentally inappropriate demands on a child.**

I.   Research Findings
   - While some abusive parents have incomplete or distorted knowledge and understanding of normal child development, others possess adequate child development knowledge but do not apply it to childrearing practices.
   - Two-thirds of cases of physical abuse begin as corporal punishment, but because of circumstances that are labeled as the child's fault (i.e. defiant child; child hits back), the situation escalates out of control and the child is injured (Douglas and Strauss, 2007) (Burchinal, Skinner & Reznick, 2010).

II.  Punishment involving either physical or emotional measures often reflects the caregiver's anger or desperation, rather than a thought-strategy of discipline intended to encourage the child to understand expectations of behavior. Such punishment uses external controls and involves power and dominance. It is also frequently not tailored to the child's age and developmental level.

III. Attributions of negative intentions to young children appear related to the parent's knowledge or lack of knowledge of child development.

- Beliefs about children's negative intentions have been linked to harsh parenting and subsequent cases of child abuse.
- Researchers found a set of beliefs held by mothers that infants/young children misbehave intentionally and need to be punished to stop the bad behavior to learn to respect the mother's authority.
- The infant/child "wants to make me angry" or that they misbehaved or are naughty (waking up mother in the middle of night, intentionally wetting the bed/themselves). Parents in this group also viewed the crying child as an indicator that the baby was "spoiled."
- Punishment of children for things like toilet training accidents speaks to authoritarian or rigid attitudes of parents towards children. These parents may be demanding and controlling, and feel the need to curb the willfulness of their children.

IV.     Caretakers should be assessed for their level of empathy. Caretakers ignoring a child's pain, suffering or unhappiness indicates a lack of empathy. Social experiments have shown that when an aggressor recognizes pain in the person they are hurting the aggression declines. Lack of empathy is a central symptom of narcissistic and anti-social personality disorder.

*-Narrative-*
*In the case of Yolonda Bradshaw, the initial call to the hotline was to report a relatively mild injury. Investigative staff mistakenly assumed that the adults' discipline arose from benign but misguided intent.*

V.     Investigators and placement workers should be wary of the Halo Effect. It is a type of cognitive bias or mental shortcut in which our overall impression of a person influences how we feel and think about his or her character. When impressions based upon our like or approval of a caregivers' appearance, profession, or religious position/affiliation, judgments regarding safety threats and risks to children may be minimized. Conversely, dislike or disapproval of a caregiver may lead to exaggerated assessments of safety threats and risks. Caseworker should guard against this type of mental shortcut which can compromise the accurate assessment of safety and risk, undermining a dispassionate and unblinking assessment of parents and family functioning.

VI.     **Concept of Inappropriate Punishment**
- Certain child behaviors have been found to elicit higher levels of physical punishment (i.e. self-endangerment; aggression). The behaviors that are most often dealt with by way of physical punishment are those that break a moral code, directly challenge parental authority and control, or present a danger to the child or others.
- Some caregivers frequently make demands on their children that are developmentally inappropriate such as an infant being "respectful" of the parents work schedule (Douglas, 2013). Caregivers who are responsible for their child's death often see their children as "difficult," which can be lethal in combination with parental stress. If they discipline their children with physical exercises that are developmentally inappropriate (such as forcing children to hold their arms out) and which the children cannot perform, failure at these tasks may lead parents to attempt more severe forms of punishment that result in abuse.

**David Quentin Case Study Narrative**: David's pre-adoptive father reported being in the military and used to work with youth in their church. He believed that boys were more capable and smarter than others thought. He stated that for discipline, he made the boys do wall squats and push-ups. The investigator explained that the boys were at a different developmental level than the children he was used to working with and that forcing the boys to stay in the basement for hours and other forms of discipline must cease. The investigator further reported that the pre-adoptive father told her he had shown the boys how to use the helmet with the weights attached, although she did not record that fact in her notes. The investigator stated to Inspector General investigators that she did go down to the basement but only saw hand weights, no free weights. The Inspector General investigators showed her a picture of weight equipment used to strengthen neck muscles. The equipment has head gear and chains where a free weight is attached. The investigator stated the equipment she saw looked similar except that it was older, made of old worn away leather and included a mask like covering around the eyes with a chin strap and the chain was smaller. The basement floor was concrete with no carpeting. There were old toys and boxes, and some old kitchen chairs. She did not have the boys demonstrate for her how they had to use the basement weights.

- **Developmental behaviors that may trigger harsh reactions.** *Seven Deadly Sins of Childhood* (Schmitt, 1987)*:*

| | |
|---|---|
| Colic | Normal negativism |
| Awakening at night | Normal poor appetite |
| Separation anxiety | Toilet training resistance |
| Normal exploratory behavior | |

**Yolonda Bradshaw Narrative:** Children aged two, four and nine-years-old were subjected to "strength training" discipline. Discipline included "walking it out" which consisted of holding books over their heads and walking for long periods of time and "stretching it out" which was a pushup formation that the children had to maintain, sometimes maintaining this position with books on their back. This abuse could go on for days. If the children fell asleep or failed at the punishments they were whipped with a belt.

- Children under the age of eight do not have the physical ability to do strength training. A child's failure to comply with the demands of posturing with their arms held up over their heads holding books could exasperate the punishing parent and lead to escalating harshness.

*-Discussion-*
*Eileen Munro suggested that if discipline is developmentally inappropriate but does not rise to the level of an indicated report, as a preventative intervention the Child Protection Worker may talk to the parent suggesting something like: "it appears to me that the children are not minding you and sometimes it seems like the situation is getting worse instead of better." The CPI would then ask the parent for the name of the primary care doctor or nurse practitioner and advise the parent that they are going to ask the pediatrician to give the parent an impartial evaluation of the situation. (Munro, 2005)*

<u>TOPIC FIVE</u>
**Systemic Error in the Legal System, High Risk Specialized Assessments**

An egregious act of maltreatment is defined as an "sadistic, or torturous act that inflicts significant pain, causes extensive external and/or internal bruising, serious injury or death," acts that would qualify as "extreme or repeated cruelty" under Illinois law.

- In Illinois, one of the grounds of unfitness for a parent is extreme or repeated cruelty to a child, and Illinois courts have consistently affirmed the decision to terminate parental rights on this ground of unfitness **(Illinois Statute:705 ILCS 50-1(d))**.
- DCFS Rule mandates that expedited termination of parental rights must be sought whenever there is extreme or repeated cruelty to a child **(DCFS Rule: Section 309.50(d)(1))**. Despite this, many children who have been the victims of extreme abuse spend years in foster care with return home goals where the child's best interests and need for permanency are not pursued.

There is a misconception in the field that reasonable efforts to reunify must be made in all cases. This is untrue.

- The Federal Adoption and Safe Families Act **(Federal Statute: Public Law 105-89)** includes provisions to deny reunification services under certain circumstances and gives states latitude to develop any additional "aggravated circumstances" in which parents need not be offered services. Under Illinois law the Department may file a motion requesting a finding that reasonable efforts to reunify are no longer appropriate and should cease.

**What do Evidence Based Treatments Say?**

There are little to no evidence-based treatments/services that have been proven to correct the conditions leading to severe and extreme physical violence against children. However, the Inspector General's staff has investigated cases involving severe physical abuse where parents have sporadically participated in generic services or were provided services that cannot remedy such severe physical abuse. This led to children drifting in foster care for years because of a perpetual return home goal.

In FY15, the Office of Inspector General shared finding of lessons learned from investigations of physical abuse fatalities with the Department's Director of Operation and Associate Deputies of Child Protection and Clinical Practice Services. The Department incorporated those findings into revised Procedure 300.30 (issued 10/9/2015). The Policy requires the Department's Division of Clinical Practice to provide High Risk Specialized assessments in cases of egregious acts of maltreatment.

Egregious acts include:
- Perpetrator repeatedly thrown or slammed an infant or toddler against a hard surface using a strong degree of force creating a likelihood of abusive head trauma or multiple injuries including bruising or fractures over time.
- Perpetrator caused abusive abdominal injuries, especially in very young children.
- Perpetrator submerged and held a young child's head under water or repeatedly submerged a child's head creating a significant real or imminent risk of harm.
- Perpetrator beat up or hit a child with an object using a degree of force that could be reasonably expected to cause serious injury or death.
- Perpetrator attempted to or actually smothered, choked, strangled, or applied any other severe thoracic compression to a child.
- Perpetrator extensively burned or scalded a child on purpose.

- • Perpetrator threatened or attached a child with a weapon, such as a knife, gun, or combustible substance.
- • Perpetrator took a child hostage.
- • Sadistic injury to a child.
- • Homicide of a child.
- • Non-accidental poisoning.

*Case examples*:

**Example 1:** A mother brought her child to the ER in August and said her baby burned his face on a radiator while in her care. The baby had a full facial burn that was clearly not a radiator burn. The baby was admitted to the burn unit where doctors ordered a full work-up to determine the possible existence of poly-trauma, which came back positive with both old and new injuries and which showed the mother had lied about the mechanism of injury and the timing. There was no history of seeking medical treatment for any of the injuries discovered in the work-up:

| INJURY | AGE | COMMENT |
|--------|-----|---------|
| Skull fractures | Cannot age | Impact injuries; numerous to the occipital and right parietal. Indicative of more than one impact to head. |
| Rib fractures | Healing, callus, weeks old, no fracture line, difficult to say with certainty | 8-11 posterior next to spine, mechanism squeezing most likely but could be impact. |
| Femur fracture, right | Old, healing, scierotic and callus weeks old again | Distal impact to lower leg, force applied above knee morphology does not aid |
| Tibia, left | Old healing fracture weeks old | Healing fracture older since one cannot appreciate fx line or alternatively this was periosteal reaction that is healing from shearing injury to the leg |
| Internal injuries, liver laceration right lobe | Grade two, very high AST 1573 and ALT 1189; normal around 30-60. Anything higher than 80 warrants CT | Blunt trauma to the abdomen; major blunt force required |
| Confluent scald burn to the face in mask distribution | Acute hours old not days per mother occurred 6-8 hours prior to arrival in ER | History provided by mother is not consistent with the sustained injury |

The integrated assessor in the case wrote the following prognosis:

> The prognosis for reunification between [child] and his mother appears poor at this time. [Child] suffered severe injuries including multiple fractures, a large facial burn, and internal injuries that were determined to be the result of non-accidental trauma. It appears that he suffered significant physical abuse on multiple occasions. Although [mother] continued to claim no knowledge of or participation in [child's] injuries, she was indicated by DCFS for several allegations, including torture. Reunification most likely will not occur within 12 months, and concurrent planning should be considered. Furthermore, this case meets the criteria for expedited termination of parental rights as mandated by Illinois statute (750 ICS 50/1; 405/1-2; 405/2-13) and IDCFS policy (Policy Guide 98.1, Appendix A) based on the grounds that maltreatment of this child can be considered severe or extremely cruel. It is recommended that the case manager consult with the DCFS Legal Counsel and other professionals involved in the case prior to the

next court hearing regarding the appropriateness of considering expedited termination of [mother's] parental rights.

*-Discussion-*

*However, the integrated assessor also listed service recommendations appropriate for a return home goal. No termination of parental rights petition was filed.*

*Given that a child suffered over time with numerous events of severe abuse, do you think an Evidenced Based Treatment exists that could ensure this infants future safety.*

**Example 2:** The example involves a young child who was sadistically tortured over 20 hours. The mother provided police with a handwritten account of the abuse, but over the years minimized the incident. The family continued to be involved in child protection investigations, and ultimately, the child and a younger sibling were returned home. In this case, the legal system operated under the mistaken belief that expert testimony was needed to prevent a child from returning home. *See full Jacobs/Landry case study.*

**Mother's statement to police:**
Last night 9:30pm, Douglas Landry, Lauryn Saunders and Aaron Jacobs returned home. Aaron was told to go get his p.j.s on. Aaron didn't turn the light on so he grabbed boxers and two t-shirts, which angered Doug because it wasn't p.j.s to him. Doug punched Aaron in the chest, knocking him down. Doug told Aaron to get up. Doug hit him again knocking him down. Doug again told him to get up. Doug asked Aaron why he is such a stupid nigger? Aaron didn't answer so he punched him again, again knocking him down again. At this point Doug sent me outside to "cool off" since I was upset and making things worse. Approx. 5 mins. later Doug came outside to smoke and told me to "Go put your dumb nigger to bed." I went in and Aaron was putting his p.j.s on and going potty. I asked him if he was OK and told him I love him and put him to bed. I thought it was over so I put a movie on and layed down. Approx 1hr later Doug started talking to Aaron, trying to wake him up. After about 15 mins Aaron woke up. Doug said "Oh Hi you're up. Good stand up." I told Doug to leave him alone and let him sleep." Doug said "Now you wanna talk to me? Well tough now I am talking to the little nigger."

Then Doug punched Lauryn (me) in the shoulder and told me to roll back over. I didn't hear what Doug said to Aaron next but I heard him say "If you say you don't know one more time I am going to kill you." I did not see Doug hit Aaron the next 6 times but I felt the bed move and heard the thump, and Aaron's grunt of pain each time. At this point Doug noticed that Aaron had peed his pants and started yelling about that. Doug made Aaron take off his wet underpants and put them on his head. I got up and went pee, and again tried to get Doug to let Aaron go back to bed. He said no. That Aaron needed to learn to hold his bladder. Doug knocked Aaron down 2 more times with punches to the chest. Doug pushed me and told me to go back to bed or I was going to make it worse to Aaron. I laid back down but so I could see them a little bit better. I again don't know what set him off but he put a cord around Aaron's neck and swung him in an over hand circle landing him on his cushions. This scared Aaron so bad that he peed again. This infuriated Doug. Doug stuffed his wet pants in Aaron's mouth and gagged him. Aaron almost threw up.

Doug told Aaron that if he puked on the floor he would make Aaron lick it up and then beat him again. So Aaron ran to the bathroom to throw up. When he came back Doug made him put on clean underwear. While Aaron was pulling them up Doug grabbed him hard by the penis and said if he pissed in this pair he would rip it off. Aaron cried out when Doug did this so Doug got up and kicked him in the abdomen with his steel toed

work boots on. I freaked. I couldn't hold it in anymore. So Doug took his boots off and kicked him 2 or three times more. Then Doug told Aaron to sit by the wall but not to fall asleep. Then Doug laid down by me and turned off the light. This is when I fell asleep for a few hours. I woke up at about 6:30-7:00am Aaron was asleep but Doug was not. After I had used the bathroom and gone outside to smoke I came back in and Doug woke Aaron up again. Doug asked Aaron if he had fun last night. Aaron said yes (meaning at bigger bite before this all started) Doug said he was lying and started in on him about lying. Doug hit him in the chest 2 times knocking him down. The second time Aaron hit his head and cried out. Doug jumped on him with one hand over Aaron's mouth and the other around his throat. Doug told him if he cried again he would break his neck. I got Doug to go outside and smoke. When he came back in he said he wanted to go for a drive and both of us or just Aaron was coming with him. I tried to get him to go by himself but he wouldn't. He said he needed collateral, because he couldn't trust me to be there when he got back. We left the house at about 11am. We stopped at my parents to drop off something. He said "Hurry up and don't say a word. Aaron can stay with me so I know you will hurry" I hurried. Then we went driving. All over from Freeport to Cedarville then Freeport Prairie then out by Lena then out to Willow Lake. When we got to willow Lake he said he was done with me and I was supposed to drop him off at his parents. When Doug was getting out of the car I said I didn't understand what was going on. As in how was he going to get his stuff and when was I supposed to see him next. He took it to mean I hadn't been listening to him so he freaked out and punched me in the shoulder and back 3 or 4 times and in the left side of my head 3 or 4 times. Doug drove out to the Lake Le-Aqua-Na access and said this is where Aaron and I were going to die.

He hit me several more times and yelled more. At one point he made us get out of the car and he drove off. But not far. He backed up and said Aaron could go with him. He made Aaron get in the front seat and he drove off, again not far. He backed up again and grabbed Aaron around the throat with both hands and tossed him over the seat to the back and told me to get in. We headed home after that. He seemed calmer and we were OK for about 2 hours. Then Aaron didn't eat enough of his dinner or do it fast enough and Doug went off again. I went out to smoke after I got Doug calmed down and Aaron back to eating. While I was outside Doug came out and said "You better get back in here quick." He sounded alarmed so I ran in but he just wanted me to see him kick Aaron. He kicked him 3 times with a running start sending Aaron flying each time. I got in the way and he hit me in the stomach and said "if I didn't stay out of it I wouldn't have any kids to worry about." He then picked Aaron up by the neck and shirt to his height and slammed Aaron on the concreted basement floor. Then when Aaron got up he did a pile drive on Aaron, knocking him to the ground again. I went outside under the pretense of smoking and ran next door and asked her to call the police, then ran back so Doug wouldn't know I had gone. Then the police showed up.

### -Discussion-
*In the second example, the mother voluntarily resumed her relationship with the child's abuser stating that her previously reported abuse of the child was exaggerated and that the child was not afraid of the abuser.*

*Do you think this mother can ensure her son's future safety and wellbeing?*

To successfully implement the specialized assessments and expedite termination of parental rights in cases involving acts of egregious physical abuse, this error reduction initiative seeks to:

1. Inform DCP staff that their investigation must provide a strong foundation for subsequent legal actions. DCP must ensure they receive all relevant records and preserve them for subsequent use in clinical and legal proceedings;

2. Educate DCFS clinicians on how to write specialized assessments in a way that will be persuasive in court. Educate clinicians on how to incorporate basic legal terminology and phrases, like "child's best interest," and how to ensure clinical impressions are clearly communicated to legal professionals and the court;

3. Educate DCFS legal staff on the circumstances in which Illinois statute and case law support the termination of parental rights on the basis of extreme or repeated cruelty to a child. Educate DCFS legal staff on how to effectively utilize specialized assessments in legal proceedings.

Information identifying an egregious act may be gathered at the time of intake by the Department's "hotline", State Central Register (SCR), or during the course of a child protection investigation. During intake, the report must be flagged as an egregious act case to alert the Child Protection Specialist and Child Protection Supervisor that the investigation must be referred to Office of Legal Services and Department's Clinical Division.  DCFS "hotline" Floor Workers must document in the intake narrative that the report information contains an egregious act.

The DCFS Office of Legal Services will be notified to assist in the development of legal strategies. Early identification and assessment may allow for termination of parental rights in those egregious cases where no evidence-based treatment exists that can remedy extreme acts of violence against a child.

### ILLINOIS APPELLATE COURT PRECEDENTS

Illinois appellate decisions have consistently upheld the termination of parental rights due to parental unfitness based on a parent's extreme or repeated cruelty or failure to protect. The appellate decisions in the following five cases show what facts the Court relied on in making the decision to uphold the termination of parental rights:

1. *In re J.B. and J.H.* (Cook County) - 2014 IL App (1st) 140773, 19 N.E.3d 1273
2. *In re Janine M.A.* (Mason County) - 342 Ill.App.3d 1041, 796 N.E.2d 1175
3. *In the Interest of B.R.* (Peoria County) - 282 Ill. App.3d 665, 669 N.E.2d 347
4. *In re Hollis* (Champaign County) - 135 Ill.App.3d 585, 482 N.E.2d 230
5. *In re I.B.* (Peoria County) - 397 Ill. App.3d 335, 340, 921 N.E.2d 797

*In re J.B. and J.H.* (Cook County) 2014 IL App (1st) 140773, 19 N.E.3d 1273
**Extreme or Repeated Cruelty**
An eight-year-old child presented at the hospital with a broken femur bone and pelvis; and facial contusions that were determined to be inflicted trauma and non-accidental. The right femur bone had two fractures-including an older fracture that showed calcification (meaning the fractures occurred at separate times). Mother admitted causing the injuries, and stated the abuse occurred after the child's three-year-old sibling told her that the eight-year-old had almost pulled the TV down onto him (which the eight-year-old denied).

Mother made her child do leg squats as punishment. When the child complained and could not continue to do leg squats, the mother hit him with a belt. She then threw the child to the bathroom floor where the child hit his head on a bath tub, and then removed the child's pants and continued to hit him with the belt.

The mother punched her son repeatedly in the face and body when he tried to block the blows, placed both hands around his throat to choke him, stood on child's leg with full weight while continuing to punch and hit him, and did not stop beating her son until another adult intervened and dragged her away. The eight-year-old was left crying on the bathroom floor without pants. At the hospital, he was in intense pain and screamed, "I'm sorry for whatever I did. Please don't hurt me anymore."

His injuries included an acute proximal right femur fracture close to his hip, displaced, that required high impact to break; a distal femur fracture closer to his knee, minimally displaced with some calcification so it could not have occurred the same day as the beating; and a non-displaced inferior pubic rami fracture, which required more than just minor trauma.

The mother lied to paramedics that her son fell because she didn't "want to face fact she was the one who hurt him." The child reported that his mother hits him like this "a lot, all the time" but it had never been like what it was this time.

The mother said she had a history of anger management with this child, and that she would hit him with her fist in the chest or arm or tell him to get away from her because she "just didn't want to be bothered by him."

A petition was filed for adjudication, alleging a substantial risk of physical injury/an environment injurious to health and welfare, neglect of necessary care, and physical abuse. The petition was amended to add the allegation of torture and to seek permanent termination of parental rights at disposition. A petition requesting temporary custody was also filed. At the time, the mother was in jail with criminal charges. She had given a written statement to police detailing what she had done, and the statement was admitted into evidence.

Both children were placed in the temporary custody of the Department. There were "no contact" and "no visitation" orders issued against the mother. Both children were adjudicated neglected and abused. The mother was found unfit for: 1) failure to show a reasonable degree of interest, concern or responsibility for the minors' welfare; 2) failure to protect both minors from conditions injurious to their welfare; 3) depravity (both minors); and 4) extreme or repeated cruelty. [Depravity consists of an inherent deficiency of moral sense and rectitude. It may consist of a series of acts or a course of conduct which indicates a deficiency in a moral sense and shows either an inability or an unwillingness to conform to accepted morality].

At a consolidated disposition and best interests hearing, the mother was found unfit by clear and convincing evidence. The court also determined it was in the children's best interests to terminate parental rights. In this case, it took 17 months between the abuse and the termination of parental rights.

The mother appealed this finding, claiming the incident was excessive corporal punishment, not extreme cruelty. She argued her severe beating of her child should not be considered extreme or repeated cruelty since it occurred one time. The Appellate court upheld the unfitness findings, determining that the beating of this child was extreme cruelty and supported a finding of unfitness. In doing so, the court held that a single incident of extreme cruelty is enough to support a finding of unfitness; there does not have to be extreme *and* repeated cruelty. The court also held that after an episode of extreme cruelty, a parent is not entitled to a specific time period to "remedy any conditions."

The court also determined that a parent may be found unfit for failing to protect a child from the parent herself, and that evidence of unfitness for one child can be used to support a finding of unfitness with respect to other children in the home.

**In re Janine M.A.** (Mason County) 342 Ill.App.3d 1041, 796 N.E.2d 1175
**Failure to Protect**
Mother stipulated to the allegations in the petition that her 3 children were neglected because they resided in an injurious environment because there was a long history of domestic violence within the home and their father had twisted their 11-year-old brother's arm behind his back and threatened to burn the house down with the boy inside if he testified against the father in a pending court matter. At disposition, the children were made wards of the court while continuing to live with their mother. The father was not to reside with the family and was only to have supervised visits with the children. Mother violated the visitation order by allowing the father to have unsupervised visitation, and the children were removed and placed in foster care.

The Court determined 1) the mother had difficulty with issues of codependency and continued to have contact with her husband; 2) she left the children with unapproved babysitters so she could spend time with her husband; and 3) her husband was seen with one child in unsupervised visitation. It was also noted that mother actively maintained a relationship with the abuser, and stayed in constant contact using two-way radios. Although the mother attended counseling, she "did not internalize and demonstrate the lessons she learned there."

In this case, the children were removed because mother continued her relationship with the abuser. She was repeatedly told she needed to put her children's safety above her desires to be with the abuser, but consistently failed to do so. She minimized the abuser's alcohol problem, and made excuses for him and his behavior.

Mother was found unfit on the basis that she had failed to protect her children from conditions within their environment injurious to the children's welfare. The appellate court upheld the finding. The court noted that the abuser's long record of domestic violence should have placed the mother on notice that he might be violent toward children. In addition, the mother witnessed the abuser threaten and physically abuse one child.

The Court held that, "Evidence supporting a parent's unfitness toward one child may serve as the basis for termination of parental rights as to all children."

**In the Interest of B.R.** (Peoria County) 282 Ill. App.3d 665, 669 N.E.2d 347
**Failure to Protect**
A 14-month-old was the victim of shaken baby syndrome. When admitted to the hospital, the child also had extensive bruising over a large portion of his body (bruising was not consistent with normal activities for child that age), and experienced cardiac arrest which may have been caused by brain injury. The child had hemorrhages in retinas of both eyes (an injury consistent with a rapid acceleration/deceleration injury). The medical prognosis was that the child will remain severely impaired, and will never be able to function normally or independently. The bruising was consistent with at least two episodes of blunt trauma separated by 1-2 days. The mother's boyfriend was the perpetrator of the abuse.

The day before the child was admitted to the hospital, the mother left the child with her boyfriend, so she could go on a job interview. When she returned, she observed a bruise on her child's forehead. The father told her the child stopped breathing "spontaneously," and that he slapped the child a few times, resulting in a bruise. The mother questioned his account, but stopped asking about the bruise after she was yelled at to stop asking.

Prior to that incident, the mother had seen her boyfriend "whip" another one of her children in the head with a metal belt buckle. There was a history of domestic violence in the home. During an argument over money, the mother's boyfriend punched her twice in the face while she was holding their infant, and then

ERROR REDUCTION                                                          177

hit the infant in the head. At the time of this violence incident, the mother was 4.5 months pregnant and the infant was seven months old.

Both parents were found unfit. The father was found unfit on numerous grounds, including extreme or repeated cruelty. The mother was found to be unfit for failing to protect her children.
The mother appealed the finding of unfitness. The Appellate court found that trial court's decision to find mother unfit for failing to protect her children from conditions within their environment was not against the manifest weight of the evidence, and that once a finding of unfitness has been made, all considerations must yield to the best interests of children.

The Appellate court held the record reflects mother had more forewarning about father's violent tendencies toward herself and her children than she claimed. The court considered the following: 1) six months before child's injuries and while she was pregnant, the mother told a police officer that her boyfriend had punched her twice in the face while she was holding then 7-month-old child and that he hit the child in the head; 2) during investigation of victim's injuries, the mother told a police officer that her boyfriend had previously whipped her 3-year-old child in the head with a chrome belt buckle; and 3) mother admitted that she saw a bruise on the victim's forehead the day before the incident but did not pursue the issue after her boyfriend yelled at her when she asked how he got the bruise.

The Appellate court noted that the mother had continued to stay in a relationship with the abuser after the violent incident, and that there was continued violence. The court highlighted an incident that occurred after the infant was injured, where the mother chased her boyfriend with a butcher knife until police came, and her boyfriend pushed her head into a window.

The court also noted that although the mother was referred for domestic violence counseling, she did not consistently attend, and felt that "she didn't need it." She also minimized the abuse, and contradicted prior statements to police by claiming that when she and her boyfriend were together, he participated in raising children and she had never seen him mistreat them. The mother was found to have poor judgment with regard to decisions affecting her own well-being.

### *In re Hollis* (Champaign County) 135 Ill.App.3d 585, 482 N.E.2d 230
**Extreme or Repeated Cruelty**
A four-month-old child was brought to the ER by his grandmother. The infant had a collapsed lung, broken ribs and internal bleeding. The infant had a prior history of: 1) a fractured femur at one month old; and 2) an unexplained bruise under his eye as a three-month-old.

At the hospital, the infant's fractures on the right ribs were less than a week old, however fractures on the left ribs were between one and six weeks old. (An infant's ribs are pliable and require an extraordinary amount of force to fracture) The infant's father admitted previously squeezing the infant when the infant would not stop crying.

The father's parental rights were terminated after he was found unfit due to extreme or repeated cruelty. The Appellate Court found clear and convincing evidence of father's unfitness. The father claimed he didn't intend to hurt child so badly. The Court held that the result, rather than intent, is more important in defining cruelty. The Court determined that the infant's father intended to hurt the child, and reasoned that the fact that he didn't intend or know the extent of the injuries is irrelevant. The Court held that, "When a parent engages in extreme or repeated cruelty, his conduct at other times is largely irrelevant."

In this case, the Court also noted that: 1) both parents denied severity of child's injures; 2) both parents showed lack of emotion regarding the child; and 3) mental health staff concluded father would not benefit from counseling due to sociopathic personality, immaturity, and substantial lack of insight.

***In re I.B.*** (Peoria County) 397 Ill. App.3d 335, 340, 921 N.E.2d 797
**Extreme or Repeated Cruelty**
A four-month-old suffered numerous injuries, including bruising to a number of areas of body, multiple rib fractures, a fractured tibia, a fractured fibula, and a fractured radius in his wrist. The mother had shaken and squeezed the infant, and the father had bit the infant on his cheek, shaken and squeezed the infant, and lifted up the infant by his ankles. The mother told hospital staff and police that the infant's injuries were caused by the infant hitting himself or sleeping on bottle (which was unlikely due to the infant's age). At hearing, the father said that the chest bruises were caused by throwing the infant in the air during game or hugging the infant too hard. The father was found to be unfit due to extreme or repeated cruelty.

After the unfitness finding, the father argued that he was not given an opportunity to correct the conditions that led to the child's removal. The unfitness finding itself was not challenged. The Appellate Court held that unfitness based on extreme or repeated cruelty does not entitle a parent to a specific period of time to correct the problems. The court found the infant's physical safety and welfare would be in jeopardy if he was returned home, based on the prior acts of abuse.

The court determined that evidence supporting a parent's unfitness toward one child may serve as the basis for termination of parental rights as to all children. The court may terminate the parental rights of a parent at the initial dispositional hearing (if the original or amended petition contains a request for termination of parental rights and appointment of a guardian with power to consent to adoption). 705 ILCS 405/2-21. Any adult person, any agency, or association by its representative may file, or the court on its own motion, consistent with the health, safety, and best interests of the minor may direct the filing through the State's Attorney of a petition in respect of a minor under this Act. 705 ILCS 405/2-13.

**Specialized Assessment and Trainings**
Cases of egregious acts of child maltreatment will require a clinical Specialized Assessment. The Specialized Assessment will determine whether to by-pass reunification and seek a permanency goal other than reunification. Expedited termination of parental rights will be sought in those egregious cases where no evidence-based treatment exists to remedy extreme acts of violence against a child.

The Office of Inspector General has trained DCFS Regional Clinical staff and Integrated Assessors in Error Reduction principles and lessons learned from Physical Abuse Fatalities. DCFS consulting psychologists are currently reviewing assessment instruments to be utilized for the Specialized Assessment.  Psychologists are meeting with forensic psychologist Dan Cuneo, Ph.D. regarding the assessment format and process.  DCFS' Office of Information Technology Services is running the number of cases with qualifying allegations that would meet criteria for Specialized Assessment. DCFS' Integrated Assessment Administrators, Senior Deputy Directors and the Administrator of Social Work Practice are working to formalize this policy.

In early 2016, all of DCFS' Regional and Area Administrators, and supervisors will be trained in Error Reduction: Lessons from Physical Abuse Fatalities. Upon completion of training management staff will train frontline staff in Error Reduction principles and Lessons from Physical Abuse Fatalities.

To assist the field in conceptualizing egregious acts of maltreatment the Office of Inspector General created the Maltreatment Continuum, a visual tool illustrating the spectrum and characteristics of child abuse: Minor Assault, Severe Assault and Egregious Acts of Maltreatment. The Maltreatment Continuum will be distributed to DCFS Field Offices and private agencies by the end of January 2016.

# MALTREATMENT CONTINUUM

| **Minor Assault †**<br>*Physical discipline without causing bruising or injury.* | **Severe Assault †**<br>*Excessive discipline that could reasonably be expected to inflict pain and cause injuries including patterns of new and old injuries.* | **Egregious Act of Maltreatment**<br>*Egregious, sadistic, or torturous act that inflicts significant pain, causes extensive external and/or internal bruising, serious injury or death.* |
|---|---|---|
| • Spanked on the bottom with an open hand.<br>• Hit on the bottom with a hard object, such as a hair brush or belt.<br>• Slapped on the hand arm or leg.<br>• Pinched on a limited area.<br>• Shook (older than 2 years).<br><br>*Additional factors (such as the amount of force used or age of the victim) can increase the severity of these behaviors to severe.* **Refer to the Contributing Factors Chart.** | • Threw, knocked down, kicked hard, or hit resulting in a less severe fracture such as metaphyseal fractures or distal clavicle.<br>• Slapped on the face, head, mouth, or ears.<br>• Hit with a hard object on a place other than the bottom.<br>• Burned to a limited extent.<br>• Any bruising, including pinch bruising, over an extended area and/or over multiple planes.<br><br>*Additional factors (such as age of child,  the amount of force used, the number of injuries, and the number of prior reports) can increase the severity of these behaviors to egregious.* **Refer to the Contributing Factors Chart.** | • Repeatedly thrown or slammed an infant or toddler against a hard surface using a strong degree of force creating a likelihood of abusive head trauma or multiple injuries including bruising or fractures over time.<br>• Abusive abdominal injuries, especially in very young children.<br>• Submerged and held young child's head under water or repeatedly submerged child's head creating a significant real or imminent risk of harm.<br>• Beat up or hit with an object using a degree of force that could be reasonably expected to cause serious injury or death.<br>• Attempting to or actually smothering, choking, strangling or any other severe thoracic compression.<br>• Non-accidental extensively burned or scalded.<br>• Threatened or attacked a child with a weapon such as a knife, gun or combustible substance; Took child hostage.<br>• Sadistic or premeditated injury or torture.<br>• Homicide of a child.<br>• Non-accidental poisoning. |
| **Recommended Intervention: Evidence-Based Prevention** | **Recommended Intervention: Evidence-Based Parent/Child Family Rehabilitation Intervention** | **Recommended Intervention: Presumptive Reunification Bypass** |

**The Maltreatment Continuum** is a visual tool illustrating child abuse characteristics and their severity.  This tool is based on research of child abuse instruments, the Abuse Dimensions Inventory (ADI), the Conflict Tactic Scales for Parent and Child (CTSPC), literature on child abuse, and Inspector General's death investigations of children fatally abused within a year of contact with the Illinois Department of Children and Family Services.

The following **Historical, Clinical and Current** contributing factors can increase the risk and severity of abusive behavior, worsening prognosis for family rehabilitation. ***Alcohol or substance abuse in combination with any of the below factors exponentially worsens the prognosis for family rehabilitation.***

## CONTRIBUTING FACTORS

| **Historical** | |
|---|---|
| • Pattern of dishonesty<br>• Relationship instability<br>• Personality disorder<br>• Psychopathy<br>• Violent acts, including intense sustained rage or violence against children | • Violent attitudes<br>• Past violent partners<br>• Choosing a violent perpetrator over the child<br>• Inadequate treatment response as evidenced by previous failed attempts<br>• Lost custody of other children |

| **Clinical** | |
|---|---|
| • Impulsivity<br>• Lack of insight/empathy<br>• Major mental illness with a lack of compliance or unresponsive to treatment | • Self-injury<br>• Suicidal gestures/attempts<br>• Threat of/or fire setting<br>• Anti-social personality disorder<br>• Violent ideation |

| **Current** | |
|---|---|
| • Pattern of dishonesty<br>• Violence<br>• Current violent partner<br>• Lack of personal support<br>• Instability (affective, behavioral or cognitive) | • Difficulty coping with stress<br>• Reasonable efforts lack feasibility given the severity of abuse and vulnerability of child<br>• Denial of responsibility or need for treatment |

† The CTSPC  scale used this language in reference to child abuse.

 

Office of the
Inspector General,
Department of Children
and Family Services

**312.814.6800**
**www.DCFS.Illinois.gov**

<u>**WORKS CITED**</u>

*DCFS Rule*
Section 309.50(d)(1)


*Illinois Appellate Decisions*
In re J.B. and J.H., 2014 IL App (1st) 140773, 19 N.E.3d 1273
In re Janine M.A., 342 Ill.App.3d 1041, 796 N.E.2d 1175
In re Hollis, 135 Ill.App.3d 585, 482 N.E.2d 230
In re I.B., 397 Ill. App.3d 335, 340, 921 N.E.2d 797
In the Interest of B.R., 282 Ill. App.3d 665, 669 N.E.2d 347


*Illinois Statutes*
705 ILCS 50-1(d)
705 ILCS 405/2-13
705 ILCS 405/2-21

*Federal Statute*
Public Law 105-89

Burchinal, M., Skinner, D., & Reznick, J. S. (2010). European American and African American mothers' beliefs about parenting and disciplining infants: A mixed-method analysis. *Parenting: Science and Practice*, *10*(2), 79-96.

Chaffin, M., Funderburk, B., Bard, D., Valle, L. A., & Gurwitch, R. (2011). A combined motivation and parent–child interaction therapy package reduces child welfare recidivism in a randomized dismantling field trial. *Journal of Consulting and Clinical Psychology*, *79*(1), 84.

Chaffin, M., Silovsky, J. F., Funderburk, B., Valle, L. A., Brestan, E. V., Balachova, T., ... & Bonner, B. L. (2004). Parent-child interaction therapy with physically abusive parents: efficacy for reducing future abuse reports. *Journal of consulting and clinical psychology*, *72*(3), 500.

Douglas, E. M. (2013). Case, service and family characteristics of households that experience a child maltreatment fatality in the United States. *Child abuse review*, *22*(5), 311-326.

Douglas, E. M., Mohn, B. M., & Gushwa, M. K. (2014). The Presence of Maltreatment Fatality-Related Content in Pre-service Child Welfare Training Curricula: A Brief Report of 20 States. *Child and Adolescent Social Work Journal*, *32*(3), 213-218.

duRivage, N., Leray, E., Pez, O., Bitfoi, A., Koc, C., Goelitz, D., et al. (2015). Parental Use of Corporal Punishment in Europe: Intersection between Public Health and Policy. *PloS on, 10*(2).

Finkelhor, D., & Jones, L. (2006). Why Have Child Maltreatment and Child Victimization Declined? *Journal of Social Issues, 62*(4), 685-716.

First 5 Los Angeles. (2012). *Harsh Parenting Measurement Study Final Report.* Harder + Company Community Research.

Jones, D. P. (1987). The untreatable family. *Child Abuse & Neglect*, *11*(3), 409-420.

Katz, L., & Robinson, C. (1991). Foster Care Drift: A Risk Assessment Matrix. *Journal of Policy, Practice, and Program, 70*(3), 347-358.

Leventhal, J. M., & Gaither, J. R. (2012). Incidence of Serious Injuries Due to Physical Abuse in the United States. *Pediatrics, 130*(5).

Monahan, J., & Appelbaum, P. (2000). Reducing violence risk: Diagnostically based clues from the MacArthur Violence Risk Assessment Study. In S. Hodgins (Ed.), Effective prevention of crime and violence among the mentally ill. Dordrecht, The Netherlands: Kluwer Academic Publishers (pp.19-34)

Monahan, J., Appelbaum, P., Mulvey, E., Robbins, P., & Lidz, C. (11994) Ethical and legal duties in conducting research on violence: Lessons from the MacArthur Risk Assessment Study. Violence and Victims, 8, 380-39.

Monahan, J., & Steadman, H. (eds) (1994). Violence and mental disorder: Developments in risk assessment. Chicago). University of Chicago Press.

Monahan, J., Steadman, H., Appelbaum, P., Robbins, P., Mulvey, E., Silver, E. Roth, L., & Grisso, T. (2000). Developing a clinically useful actuarial tool for assessing violence risk. British Journal of Psychiary, 176, 312, 319.

Monahan, J. Steadman, J., Silver, E., Appelbaum, P., Robbins, P., Mulvey, E., Roth , L., Grisso, T., & Banks, S. (2001). Rethinking risk assessment: The MacArthur study of mental disorder and violence. New York: Oxford University Press.

Munro, E. (2005). A Systems Approach to Investigating Child Abuse Deaths. *British Journal of Social Work, 35*, 531-546.

Pepper, B. (1993). Interfaces Between Criminal Behavior, Alcohol and Other Drug Abuse and Psychiatric Disorders. *Crime, Substance Abuse and Mental Illness*.

Schmitt, B. D. (1987). Seven deadly sins of childhood: Advising parents about difficult developmental phases. *Child abuse & neglect* , 421-432.

Section 309.50(d)(1).

Steadman, H. J., Mulvey, E. P., Monahan, J., Robbins, P. C., Appelbaum, P. S., Grisso, T., ... & Silver, E. (1998). Violence by people discharged from acute psychiatric inpatient facilities and by others in the same neighborhoods. *Archives of general psychiatry*, *55*(5), 393-401.

Stith, M. S., Liu, T. L., Davies, C., Boykin, E. L., Alder, M. C., Harris, J. M., et al. (2009). Risk Factors in Child Maltreatment: A Meta-analytic Review of the Literature. *Aggression and Violent Behavior*, 13-29.

Swartz, M. S., Swanson, J. W., Hiday, V. A., Borum, R., Wagner, H. R., & Burns, B. J. (2014). Violence and severe mental illness: the effects of substance abuse and nonadherence to medication. *American journal of psychiatry*.

United Nations Human Rights. (1989, November 20). *Convention on the Rights of the Child* . Retrieved August 25, 2015, from http://www.ohchr.org/Documents/ProfessionalInterest/crc.pdf

Zitelli, B., McIntire, S., & Nowalk, A. (2012). Abdominal and Intrathoracic Injuries. In *Zitelli and Davis' Atlas of Pediatric Physical Diagnosis* (6 ed., pp. 215-217).

Zolotor, A. J., & Puzia, M. E. (2010). Bans against Corporal Punishment: A systematic review of the laws, changes in attitudes and behaviors. *Child Abuse Review, 19*, 229-247.

Zolotor, A. J., Theodore, A., Runyan, D. K., Chang, J. J., & Laskey, A. L. (2011). Corporal Punishment. *Child Abuse Review, 20*, 57-66.

## EDUCATION TRAINING

A review of recent Office of the Inspector General investigations revealed that, for many wards of the state and caseworkers, misinformation about the college application or financial aid process impedes a successful transition to college.  Additionally, some wards who received enhanced support and resources from the Department had difficulty completing college.

In FY 2015, in an effort to increase the number of DCFS wards who make successful transitions to college or post-secondary programs, the Office of the Inspector General created two resource guides with input from the Cook County Youth Advisory Board (*A Guide to Federal and State Financial Aid,* and *Most Common Student Questions & Concerns About Post-Secondary Education*) and jointly developed a training with the Office of the Cook County Public Guardian titled *Enhancing Educational Outcomes for Older Youth: A Panel Discussion on Post-Secondary Resources and Supportive Services*. The panel discussion featured representatives from the Illinois Student Assistance Commission, the City Colleges of Chicago, the Teen Parenting Services Network, MyTime, and DCFS

# ETHICS

**ETHICS OFFICER**

The Inspector General is the appointed Ethics Officer for the Department of Children and Family Services under the *State Officials and Employees Ethics Act.* 5 ILCS 430/20-23. In this role, the Ethics Officer assists Department and private agency administrators and employees in interpreting the Ethics Act, the Child Welfare Code of Ethics and Rule 437—*Employee Conflicts of Interest.*

A primary function of the DCFS Ethics Officer is to address inquiries and concerns from the field. Additionally, the Ethics Officer monitors the mandated annual ethics training; reviews all Statements of Economic Interest submitted by over 600 Department employees and council members annually; assists the Department in review of contract disclosures; provides a revolving door analysis to the Office of the Executive Inspector General for certain employees leaving Department employment; receives reports of ex parte communications in rulemaking.  A member of the ethics staff sits on the Department's Conflict of Interest Committee, which responds to Department employee inquiries regarding secondary employment and other issues covered by Rule 437.

**Ethics Inquiries from the Field**

During fiscal year 2015, the Ethics Officer responded to inquiries from both Department and private agency employees.  While the DCFS Conflict of Interest Committee reviews most inquiries related to secondary employment of DCFS employees and contractors, inquiries that pertain to private agency employees or which are otherwise outside the scope of Rule 437 – *Employee Conflicts of Interest* are generally referred to the Ethics Officer for review.

*Conflicts of Interest Involving Secondary Employment*

The DCFS Conflict of Interest Committee typically reviews inquiries involving secondary employment, unless the inquiry comes from a private agency employee, because private agencies are not subject to Rule 437 – *Employee Conflicts of Interest*.  The Ethics Officer reviews secondary employment inquiries made by private agency employees as well as issues that involve potential conflicts with Department employees' outside work (apart from approval of secondary employment).

- A DCFS administrator contacted the Ethics Officer for guidance after learning that a child protection investigator he supervised also maintained a private legal practice and was the attorney representing the defendant in a high profile murder case.  The case did not involve DCFS, but the administrator was concerned about the appearance of a conflict if it was disclosed that the defense attorney was also a Department employee.  The Ethics Officer advised that the investigator's secondary employment as an attorney would not be problematic as long as he did not represent any clients with Department involvement, and that he maintain clear boundaries between his state and private employment.

- A child protection supervisor contacted the Ethics Officer because she believed she had a conflict of interest between her secondary employment and an investigation assigned to her team.  The supervisor had previously been approved by the Conflict of Interest Committee to engage in part time work at a psychiatric hospital (that did not contract with DCFS), provided she adhere to certain caveats, one of which was that she not supervise any child protection investigations that involved the hospital where she worked. Over one year later, the supervisor's team was assigned a child protection investigation which involved a child who was a patient at the hospital where she worked on weekends.  The Ethics Officer discussed the conflict with the supervisor, and the

investigation was transferred to a different investigative team in order to avoid an actual conflict as well as the appearance of a conflict.

## Conflicts of Interest Arising from Multiple Relationships

- A DCFS employee who was also a foster parent licensed through a private agency inquired about whether it was acceptable for her to have a DCFS ward placed in her home.  The Ethics Officer advised that the spirit of Rule 402 – *Licensing Standards for Foster Homes,* is that placement is monitored by an entity that is *not* the licensee's employer, and therefore the placement could not go forward.

- A day care licensing representative contacted the Ethics Officer because she believed she had conflicts of interest with two different entities she was assigned to license, and she was unsure about whether it was appropriate for her to continue as the licensing representative for those entities. One entity was working toward re-licensure, and the other was seeking a permit.  The licensing representative had developed close social relationships through church and other community activities with several individuals who either owned/or worked for/or were associated with the entities. The Ethics Officer explored issues that can arise when a professional has multiple relationships (or dual roles) and that it is not always realistic to assume that one can maintain objectivity.   Ultimately, the Ethics Officer determined that based on the circumstances and relationships the licensing representative described, it did appear that there was appearance of a conflict of interest as well as an actual conflict of interest with one entity, and the potential for a conflict with the second entity.  The Ethics Officer and the licensing representative discussed the fact that even if the worker was able to achieve objectivity, the integrity of the decisions she made could still be open to question (which is the appearance of a conflict issue).  The Ethics Officer worked with DCFS management to ensure that the licensure responsibilities for one of the entities was transferred to a different representative. The Ethics Officer and management were able to address the potential conflict with the other entity so that the licensing representative could remain in that assignment.

- A DCFS employee who works in foster parent recruitment contacted the Ethics Officer after learning that a foster parent she had worked with listed her as the informational contact for prospective foster parents on the website of her non-profit organization. The employee inquired about whether this was permissible and whether it was a conflict with her job to be present at the non-profit's fundraiser at a foster parent recruitment table. The Ethics Officer advised that as a method of recruiting foster parents, these activities were permissible because the employee's participation would be as a DCFS representative, not as a DCFS endorsement of the non-profit organization.

## Conflicts of Interest Arising in Case Management and Programs

- A Department employee contacted the Ethics Officer to see if it was a violation of ethics rules for him to anonymously pay an overdue utility bill for a family he was working with who was no longer eligible for Norman funds.  The Ethics Officer advised that as long as the employee made the payment anonymously and maintained anonymity he would not be violating any ethics rules because he had removed the potential for a power imbalance.

- A private agency administrator contacted the Ethics Officer about a program at the agency where foster parent volunteers spend time with the children placed in their shelter doing daily activities such as homework and having meals. The administrator was concerned that having the foster parents interact with the residents outside of a foster care setting might be a breach of confidentiality. After review, the Ethics Officer advised that the program raised no ethical concerns and that it might actually give the foster parents the benefit of greater understanding about the youth in care.

- A DCFS administrator contacted the Ethics Officer in advance of an upcoming state election and reported that union representatives in the field office where she was located were approaching employees during the work day and inquiring whether they had already voted and if they were available for canvassing. The Ethics Officer consulted with the Executive Ethics Commission who stated that even though the union members' contact was not related to any specific candidate or political party, the activity violated ethics rules because the union members had an obvious affiliation.

_Conflicts of Interest Involving Gifts & Honorarium, Sales or Solicitation_

- A Department supervisor invited her supervisees to a private fundraising event that she and her husband were holding for their non-profit organization, which cost $60 to attend. The Ethics Officer advised that, in accordance with the Employee Handbook 3.1, under no circumstances should a supervisor ever solicit donations from a supervisee and that no employee should ever feel compelled to donate money for any reason. The Ethics Officer worked with Department management to resolve the issue.

- A Department employee inquired to the Ethics Officer about whether she could collect used winter coats for a local shelter. The Ethics Officer advised that in accordance with the Employee Handbook, it would be permissible for her to solicit during break time and in a break room, but that she could not solicit from anyone she supervised.

- A Department employee inquired about whether it was a violation of the Department's rules for an employee to solicit his or her co-workers for donations to purchase a gift for their supervisor. The Ethics Officer advised that the solicitation was not appropriate because of the spirit of the Personnel prohibition against supervisors soliciting from supervisees. (Employee Handbook 3.1) The Ethics Officer worked with management to address the situation.

_Conflicts of Interest Involving Use of State Resources_

- A DCFS placement supervisor contacted the Ethics Officer because she was concerned about a worker on her team who had received a personal check from an agency to purchase a car seat for a ward's infant. Specifically, the supervisor was concerned about the worker depositing the check into her personal bank account when the payment was for a state resource. The Ethics Officer advised that as long as there is a receipt provided to track and verify the expenditure, the method of obtaining the car seat (which should be considered an emergency expense to ensure the safety of the child) was acceptable.

- A Department employee inquired about whether a birth parent, who is a DCFS parent trainer and family advocate, could display and sell a book he authored at a DCFS event. The Ethics Officer advised that this was not permissible because having the parent display the book at a Department run event would appear as an endorsement, which is not allowable.

_Conflicts of Interest Involving Board Memberships and/or Professional Affiliations_

- The Ethics Officer was contacted by an administrator at a small private agency who was going through a leadership transition.  The administrator inquired about whether it was a conflict of interest for their Acting Executive Director to continue serving on the DCFS Adoption Attorney Panel.  The Ethics Officer advised that it was not a conflict to have one individual serve in these two capacities, provided she not work with any families or wards through the Panel who were also receiving services from the private agency.

**Revolving Door Prohibition of the Ethics Act**

Ethics staff responded to many inquiries by Department and private agency employees and administrators regarding the details of the prohibition, to whom it applies and how to complete the waiver request process.  During fiscal year 2015, the Ethics Officer provided 3 full revolving door analyses to the Office of the Executive Inspector General regarding DCFS employees leaving state employment.

**Ex Parte Communications**

Pursuant to the requirements of the State Officials and Employees Ethics Act, the Ethics Officer is required to file with the Executive Ethics Commission reports that include material oral or written communications made to an agency during a rulemaking period or related to a regulatory, quasi-adjudicatory, investment, or licensing matters pending before or under consideration by the agency. (5 ILCS 430/5-50).  In fiscal year 2015, the Ethics Officer made one report of _ex parte_ communications to the Executive Ethics Commission.

**Consultation on Department Contracts and Contract Disclosures**

The Ethics Officer assisted Department management with review of certain types of contracts disclosures made by potential service providers to identify conflicts of interest that might prevent the Department from pursuing the contract.  This assistance included review of over 30 contracts, regarding specific disclosures as well as consultation with Department employees who monitor certain contracts to ensure they understood the intricacies involved.

**Statements of Economic Interest Reviews**

Review of each Statement of Economic Interest by the Ethics Officer prior to filing is statutorily mandated under the State Officials and Employees Ethics Act (5 ILCS 430/20-23).  In 2015, the Office of the Inspector General reviewed 626 Statements of Economic Interest that were required to be filed by persons in the Department who:

(1) are, or function as, the head of a department, commission, board, division, bureau, authority or other administrative unit within the government of this State, or who exercise similar authority within the government of this State;

(2) have direct supervisory authority over, or direct responsibility for the formulation, negotiation, issuance or execution of contracts entered into by the State in the amount of $5,000 or more;

(3) have authority for the issuance or promulgation of rules and regulations within areas under the authority of the State;

(4) have authority for the approval of professional licenses;

(5) have responsibility with respect to the financial inspection of regulated nongovernmental entities;

(6) adjudicate, arbitrate, or decide any judicial or administrative proceeding, or review the adjudication, arbitration or decision of any judicial or administrative proceeding within the authority of the State;

(7) have supervisory responsibility for 20 or more employees of the State;

(8) negotiate, assign, authorize, or grant naming rights or sponsorship rights regarding any property or asset of the State, whether real, personal, tangible, or intangible; or

(9) have responsibility with respect to the procurement of goods or services.  5 ILCS 420/Art. 4A-101.

To meet the requirements imposed by the Ethics Act and to prevent Statements of Economic Interests (SOEI) with technical errors from being rejected for filing, the Department and Ethics Officer requires that *every* SOEI to be filed by a Department employee or by a member of the Children and Family Services Advisory Council be sent first to the Ethics Officer.  To achieve this goal, the Department contacts each employee and Council member required to file, on multiple occasions, and provides specific instructions about how to complete the form.  Every SOEI that is received by the Ethics Officer undergoes two layers of review; the first is a preliminary review for technical errors and the second is a substantive review for conflicts of interest.  After preliminary review, all properly completed SOEIs are forwarded to the Secretary of State for filing.  The Ethics Staff personally contact any individual who sent in a form with technical errors, to assist them in completing a new or revised form.

Once a properly completed SOEI is received by the Ethics Staff and forwarded to the SOS for filing, the Ethics Officer conducts a second level of review for any SOEI with a response on the form other than "no," "none" or "n/a".  This substantive review is intended to address any disclosures that may create a conflict of interest, both under the Ethics Act and DCFS Rule 437 – *Employee Conflict of Interest*.

Of the total 626 SOEIs filed in 2015, the Ethics Officer reviewed any Statement which included a substantive answer (i.e. any answer other than "no," "none" or "n/a").  This amounted to 84 (13%) SOEIs filed for a total of 114 separate disclosures.  Of these 84 SOEIs, there were 44 (52%) instances where a disclosure indicated that the employee engaged in secondary employment and/or business ownership within the preceding calendar year.  In 40 (91%) of those 44 instances, the Ethics Officer will send a letter to the employee and supervisor reminding each of the potential for a conflict of interest that always exists between State employment and outside work, and the importance of maintaining clear boundaries between State employment and any secondary employment.[1]  This breakdown is illustrated on the following page.

---

[1] Letters are sent to any employee who is still engaged in the secondary employment reported, or who has a business ownership that could require day-to-day management activities.  Letters are not sent in instances where Ethics staff confirm that the information listed pertained to former employment, military service or if the reporting individual is a CFSAC board member and not a DCFS employee.



- 84 (13%) to Ethics Officer for "further review"

- Of the 84 SOEIs that included a substantive disclosure, 44 (52%) instances involved secondary employment or business ownership

- Of the 44 instances of reported secondary employment (including business ownership likely to require day-to-day management) 34 employees were sent a secondary employment letter.

Apart from secondary employment and business ownership, the Ethics Officer reviewed:

- 19 reports involving business interests or employment by a spouse or family member of the reporter;
- 18 reports of an ownership interest (distinguishable from a business ownership and frequently indicative of ownership in real estate property or stocks)
- 9 reports of gifts received valued (in aggregate) of greater than $500
- 5 reports of reimbursement for travel/expenses (which is typically reported under the same category as gifts/honorarium)[2]
- 4 reports of lobbyist affiliation
- 13 reports of primary employment (for CFSAC members who are not DCFS employees, and for 2 DCFS employees who disclosed current positions);
- 2 reports of prior employment

### ACTION ON 2015 STATEMENTS OF ECONOMIC INTEREST

STATEMENTS OF ECONOMIC INTEREST FILED:          626

DISCLOSURES OF SECONDARY EMPLOYMENT
OR BUSINESS OWNERSHIP:                                        44

Please see General Investigation #20 for more detailed information about 2015 Filing Non-Compliance Statistics.

---

[2] This included 3 reports of reimbursement for DCFS employees who also act as Reviewers for the Council on Accreditation.  These are reviewed because of potential violations of the Gift Ban in the Ethics Act. Although this is not part of their DCFS job duties, this was not counted as secondary employment.

# SYSTEMIC RECOMMENDATIONS

The Inspector General's investigative reports contain both systemic and case specific recommendations. The systemic reform recommendations for Fiscal Year 2015 have been categorized below according to the function that the recommendation is designed to strengthen within the child welfare system.  The Office of the Inspector General is a small office in relation to the child welfare system.  Rather than address problems in isolation, the Office of the Inspector General views its mandate as strengthening the ability of the Department and private agencies to perform their duties. Recommendation categories are as follows:

- **CHILD PROTECTION**
- **EMERGENCY SHELTER CARE**
- **ETHICS**
- **LICENSING**
- **MISSING CHILDREN**
- **MONITORING**
- **SERVICES**
    - *Domestic Violence*
    - *High Risk Wards*
    - *Medical Services*
    - *Psychiatric Services*
    - *Service Planning*
    - *Substance Abuse Services*
    - *Teen Parenting Services*
- **STATE CENTRAL REGISTER**

## CHILD PROTECTION

- When a child is alleged to have been hit in the stomach and complains of pain or has a poor appetite (or if a non-verbal child exhibits pain, poor appetite, irritability, or a change in behavior), the child should immediately be evaluated by a physician, even when the child has no visible injuries. The Department should ensure this is included in Procedures. The DCFS Form to be completed by the physician should clearly document the allegation of being hit in the stomach and complaints of pain.

- When a child age three and under suffers an injury and the accidental or intentional nature of that injury cannot be determined and the medical provider does not have a child abuse specialist, the Department should ensure that child protection staff obtain a second opinion from the contractual medical experts throughout the state.

- The Department should ensure that all Priority One Teams receive training regarding obtaining use of criminal history from the Law Enforcement Agencies Database System printouts and assessing criminal histories that involve a pattern of arrests for interpersonal violence.

- Procedures should be amended such that for those allegations where the Department has discretion regarding how long to maintain the indicated finding, any injury to a child that is serious enough that criminal charges were filed, should be retained for 20 years.

- Supervisors must require that their workers listen to their voicemail before leaving on vacation and leave an outgoing message referring callers to their supervisor in their absence.

- The Administrative Hearings Unit should establish a policy whereby requests for appeal of indicated abuse/neglect allegations are not dismissed as untimely unless proof of service can be shown.

- Child protection should inform the school the child is attending that protective custody has been taken and ensure that the school's counselor and nurse are notified.

**EMERGENCY SHELTER CARE**

- The Department should ensure that all reception center staff are made aware that when a youth is taken into protective custody, parental consent for medication administration is sufficient (written consent is preferred; verbal consent must be documented), and in its absence, rather than abruptly stopping medication that can have a detrimental effect on the youth, the youth should be provided with his/her valid prescription medications until parental consent can be obtained and/or a medical evaluation is completed.  The Department should also clarify whose responsibility it is to obtain parental consent for medication when a youth is taken into protective custody.

- The Statewide Shelter Care Coordinator must centrally track all significant failures and problems of shelters. All Corrective Action Plans, Licensing and other complaints about shelters must be shared with the Statewide Shelter Coordinator. The Coordinator must review all existing Rule, Policy and Procedure and ensure that it is consistent and addresses responsibility for transportation in all foreseeable circumstances.

- The Shelter System should be revamped to include the following:

  a. The Department should expand its existing system of emergency foster homes to accommodate children 13 years and younger, and their sibling groups, coming into care for the first time.

     i. All emergency foster homes should be on a centralized database to reliably track available homes for matching;

     ii. All emergency foster homes should be required to transport children to their schools of origin to help stabilize and lower the trauma to the children.

  b. The Department should determine the number of older Cook County shelter youth with histories of serious mental illness who cycle in and out of the present Shelter system. The Department should develop a specialized stabilization center for this population of youth.

     i. In addition to clinical services, this stabilization center should have an outreach unit that functions similarly to homeless mental health delivery services.

     ii. The stabilization center should host supportive National Alliance on Mental Illness (NAMI) groups for relatives or other child centered collateral of the youth who are willing to partner with stabilization efforts.

     iii. The Center should tightly coordinate educational services to assure the residents' educational rights are secured. This is crucial for those youth who are eligible or up for redetermination for Social Security disability benefits. The center should also provide alternative educational programming.

c. The Department should determine the annual number of Cook County shelter youth 15 years old or older who are involved with the Juvenile Justice System or adult probation and who cycle through its Shelter system. The Department should develop a restorative justice stabilizing center for this targeted population, working closely with Juvenile Court personnel and Probation. The staff of the shelter should have the ability to network with the various Detention Alternative programs including Electronic Monitoring and Evening Reporting Centers and substance abuse programs. Clinical services should be provided for those youth who have mental health or adjustment problems.

d. The Department should develop a violence-free stabilizing center for the older youth (over 17) involved with the criminal court system or dually involved with adult and juvenile courts. The programming of the shelter should model a Safer Foundation approach. The staff should work with the Cook County Sheriff's Office, Criminal Court personnel and Probation. The stabilizing shelter should clearly define a no violence contract with each youth who enter the program. If the terms of the shelter's non- violence contract are violated the Department should immediately inform the Juvenile Court and Adult probation of the violation and the intention of the Department to request termination of the youth's wardship.

e. The Department should develop a specialized clinical and educational stabilization/shelter program for female youth who have or are at high risk of being victims of trafficking. The Department should consider the Cook County Sheriff's Office offer of prevention work with potential trafficking victims.

- All shelters should be required to have transportation available 24/7 and children should be transported to their schools of origin to help stabilize and lower the trauma to the children unless clinically determined that the child has the ability and motivation to self-transport and attend.

- The Cook County Shelter system must have designated staff at each shelter who have access to the Illinois Child Welfare database (SACWIS). All shelters/centers, if permitted by fire codes, should have alarms and delayed locks at each exit with designated staff responsible for responding to alarms at all times and for timely crisis interventions to youth contemplating running from the facility. Each shelter shall have a written run protocol with training approved by the Department.

## ETHICS

- Advisory Groups with DCFS Director Appointees: The DCFS Liaison for each advisory group that has members appointed by the DCFS Director should notify the Ethics Officer by email of any changes to the group membership within 15 calendar days of the change, to ensure compliance with ethics training (which must occur within 30 days of new membership).

- For transparency to the public, as well as to facilitate the Department and Ethics Officer with timely and accurate membership information, the advisory group information on the DCFS website should be updated within 30 calendar days of any change to the group membership and/or to the DCFS Liaison.  The individual page for each advisory group should always include an accurate "last updated" date.

## LICENSING

- The current form that is used by the Department to request a waiver does not permit the Department to consider a waiver after the application process closes and children are placed in the home. Thus, the Department could never waive even an only misdemeanor if the person was not living in the home at the time of the application process.

- The Department should check to see whether foster parent applicants are receiving social security disability payments for disabilities that have not been disclosed but may interfere with the foster parent's ability to care for children. A foster home license applicant must provide the licensing worker with a Consent for Release of Information form for the Social Security Administration. The Social Security Administration consent form should be used. The consent form should be sent to the licensee's local social security office.

- The Department should amend the *Authorization for Background Check for Foster Care & Adoption* form to authorize a check of public benefits to permit searches for undisclosed benefits that may indicate a disability that interferes with childcare.

- If the Department learns that the applicant is receiving previously undisclosed payments or benefits for disabilities, the applicant's disability should not necessarily bar the person from providing foster care but rather the information should be considered for whether the person is physically and mentally capable of caring for children. When there is a significant discrepancy between the DCFS health record and the information provided by the Social Security Administration or the Department of Human Services, the Department should refer the case for possible fraud and consider revocation of any license for lack of trustworthiness.

- No child who has asthma or any other compromised breathing issues should be placed in a home where the foster parent or any member of the household smokes. The Placement Clearance Process should be expanded to encompass smoking habits and medical needs of the child.

## MISSING CHILDREN

- The Department should redefine its search procedure for Missing Children to include the following:

  a. The Department should amend Procedures to eliminate adult wards, who are not high risk, from full search protocol required for minor wards and adult wards who are high risk (developmental disabilities, mental illness, human trafficking, in critical need of medication or abducted). Although, pursuant to newly enacted legislation, the Department will be required to file Missing Person reports on all wards in residential facilities, including adult wards.

  b. Adult wards without disabilities who chronically absent themselves from voluntary placements should be transitioned out of Department responsibility.

  c. The Department should add a narrative field to the Missing Child Form to include relevant information, including what the child was wearing, who they were last seen with, the license plate of any vehicles they left in, and the child's statements prior to the run and precipitating events.

  d. The Department should cease using Unusual Incident Report forms for reporting runaways since other DCFS forms can be adapted to be more relevant information geared to finding the youth and remedying precipitating factors. Unusual Incident Reports should however, track truancy and curfew violations since early intervention on these behaviors can stabilize youth and prevent future harm. Likewise, an older ward who is absent from scheduled programming for short periods of time (from one to several hours) should be classified as non-compliant with the program, not missing. An individual ward's chronic non-compliance in residential programs should trigger a clinical consultation.

  e. Cook County Shelters/Centers should establish individualized Community Pass Authorizations

with caseworkers at a youth's intake, so that shelter staff does not need to consult with caseworkers for every pass request. Shelter/centers should have the ability to alter agreements with good cause.

f. The Department should issue written policy concerning the conditions under which law enforcement can distribute information including pictures to assist in locating missing children. A streamlined process for securing DCFS Guardian consent should also be developed.

▪ The Department's Child Intake and Recovery Unit duties for tracking and locating missing children should be limited to those children under 18 and those over 18 who are disabled, abducted or believed to be involved in human trafficking. With lower caseloads, the Unit can provide more technical assistance searching databases and assist in contacting extended family and friends.

a. The Department should ensure that the Child Intake and Recovery Unit has a database structure that enables it to track and provide analysis on frequent runners. The Child Intake and Recovery Unit should be the electronic repository of all critical information on frequent runners: Child Identification Form, all De-Briefing Forms prepared whenever a child has returned from being on run and an annually updated digital photo of the youth.

b. The Child Intake and Recovery Unit should develop an outreach recovery unit for highly vulnerable children that works closely with the Cook County Sheriff and other law enforcement. The Unit operations should include an afternoon and evening schedule.

c.  For frequent runners, shelter staff in consultation with the Child Intake and Recovery Unit should complete the De-Briefing Form–when a ward returns to the shelter system

## MONITORING

▪ The current monitoring system is ineffective to solve persistent and serious issues. Whenever a facility demonstrates continued failures to comply with serious issues identified in writing that concern child safety and welfare – the Deputy Director over the program must be notified. The Deputy Director must approve a Corrective Action Plan, with identified sanctions and timelines, for serious unresolved issues.

▪ The Department must provide a written reminder to all program monitors that monitoring duties include reporting to licensing violations  that impact child safety. In addition monitors need to be proficient in identifying direct vs. administrative expenses (review of any annual audits and consolidated financial reports) and staff allocation to provide a check and balance system that the program is complying with the program plan.

▪ The Department's Office of Field Audits should issue written policy that requires consultation with program monitoring staff during any Field Audit to ensure that expenses self-reported by the facility conform with the Program Monitor's understanding of the program.

▪ The Department's Office of Field Audits should amend their procedures to require consultation with program monitors to ensure that any cost allocation system and the apportionment of administrative expenses has integrity.

▪ The Division of Monitoring must issue a directive to supervisors to ensure that program monitors of grants and quasi-grant funded programs understand that part of their duties include an analysis of administrative versus direct expenses and ensuring that state funds are used for state purposes. They should also be informed of the availability of financial audit staff to assist them in this function.

**SERVICES**
*Domestic Violence*
- When the Department requires Domestic Violence victim services as part of a Service Plan, it should use the same standard as courts and require 26 sessions before judging compliance.

*High Risk Wards*
- The Department should implement a multi-systemic therapy (MST) approach and an intensive case management program for the 12-13% of hospitalized wards with multiple yearly psychiatric hospitalizations and wards who are involved in both delinquency and adult courts.

- The intensive management program for wards with multiple psychiatric hospitalizations should implement anger replacement therapy (ART combines anger control training [emotional], psychological skill stream training and moral reasoning).

- Residential facilities for youth with multiple psychiatric hospitalizations should incorporate into its treatment, intervention for youth whose anticipated discharge plan is a return to parents or relatives, and should adopt a multi-dimensional family approach.  One of the goals of this family treatment should be to assist viable members of the child/ren's extended family in building a caring and civil community of empathy and moral reasoning in areas of sexuality and violence.  The family group sessions should take place in a location designed to be inclusive of multiple extended family members by avoiding taxing transportation while reinforcing realistic community safety planning.  Extended family visits and three-month aftercare therapeutic services should be incorporated as part of the treatment intervention to help the family transition the child into his family's community.  As part of the multi-dimensional services the children's caretakers should receive a transitional consultation from the children's medical provider and the children's schools.

*Medical Services*
- The Division of Service Intervention – Health Services must implement an effective monitoring system over the e-Health data system to avoid the failures noted in an Inspector General Report, such as an asthmatic child admitted to the ER multiple times within six months without a referral to nursing or notification to the child's pulmonologist.

- The Department's Clinical Division (Nursing) should review wards currently taking asthma medication or identified as having had an emergency room visit or other hospitalization with an asthma or other airway disease diagnosis (based on Medicaid data), and assess whether they should be included in the Department's Asthma database and what nursing interventions are appropriate for each ward.

*Psychiatric Services*
- Young children from families with high risk histories of violence, and/or substance abuse and mental illness should receive timely ameliorative and preventive services when they first come into foster care. Young children from high risk households who exhibit aggressive behaviors should receive first line evidence-based treatment and in rural areas, preferably home-based interventions  such as Parent Management Training – The Oregon Model (PMTO), Parent Child Interaction Therapy (PCIT), Incredible Years, and Collaborative Problem Solving

- An ecological (which examines problem behaviors in the context in which they occur) and developmental (which examines problem behaviors in the context of the individual's age and limitations) focused Specialized Assessment must be used for children under age 6 who have been referred to the Crisis and Referral Entry Service hotline or for whom the DCFS Guardian receives a request for psychotropic medication. The Assessment should include the following:

a.   Description of identified problematic behaviors;

b.   An Ecological and Developmental perspective including prior trauma and neglect suffered by the child and number of transitions;

c.   Corroboration of whether identified problem behaviors occur across settings: with Child Behavior Checklist from key Informants including foster parents, relatives, teacher/early education providers and other relevant professionals;

d.   The ecological and developmental perspective include prior trauma and neglect suffered by the child and number of transitions the child has encountered;

e.   A description of a typical day (weekday and weekend);

f.   Description   of   sleep   routine:   visitation   schedules,   foster   home   composition;

g.   A Functional Behavior Analysis of the child's behavior; and

h. Description of non-chemical evidence-based interventions that will be attempted prior to use of psychotropic medication.

- The Screening Assessment and Support System (SASS) must stop using an assessment tool on children 6 years of age and under since the tool has never been validated for children 6 and under and was never intended to be used on such young children.

- Children age 6 and under who are at risk of psychiatric hospitalization must be offered critical ancillary services, including community link-up services, occupational therapy and extra-curricular activities. The Department, with the help of its Medical Director, needs to assure that young wards with aggression problems and speech delays receive enhanced speech therapy.

- The Department must ensure that all therapy provided to our wards is evidence-based.

- The Department must ensure that all pre-school aged wards attend State Pre-K or Head Start programs.

- Because recent studies have demonstrated promising potential in the administration of Choline, folate and Vitamin A, both prenatally and for children who may have been exposed to alcohol in utero, the Department should ensure that foster parents receive a stipend to offset the costs of such supplements for infants and younger children who come into care with any indication of maternal alcohol use.

- The Department needs to train foster parents and caseworkers on first-line (non-chemical) interventions for youth with serious mental health issues or serious problematic behaviors.

- When a consulting psychiatrist attaches a *qualified* approval for psychotropic medication, the Department must ensure that the qualifications are met.

- The Guardian's Office should retain Psychotropic Medication Request Forms completed for wards and ensure that first line treatments, have been provided prior to approval for psychotropic medication.

*Service Planning*
- The Department must develop written policy regarding whether there are effective services that can protect children following a finding of severe abuse. Standard parenting coaching should never be used to address severe abuse and violence.

- The Service Plan for any case that comes to the Department as a result of severe abuse, must be subject to DCFS clinical review within the first 60 days. The review must focus on whether the Service Plan addresses the parenting problems that caused the harm to the child. The case should continue to be clinically reviewed every 6 months.

- Program Plans for parenting classes, coaching and mentoring must require rigorous standards for developing a baseline of behavior and goals and measurement of change.

- The Department should pursue legislative change to permit expedited termination for severe abuse cases in which DCFS Clinical has determined that no services can correct the presenting problem.

*Substance Abuse Services*
- The Department will reproduce brochures that outline safe storage of Methadone, a drug used as part of a recovery program for addicts, for distribution to parents in recovery on their caseloads. The brochure and an electronic color copy will be sent to all programs licensed by the Department of Human Services' Division of Alcohol and Substance Abuse for distribution to parents and caregivers.

*Teen Parenting Services*
- DCFS and private agency case managers must inform Teen Parenting Service Network staff whenever a parenting ward is the subject of a pending and/or indicated child welfare investigation.

- The Teen Parenting Service Network staff should track all indicated child welfare investigations on DCFS parenting wards and ensure appropriate interventions.

- Teen Parent Service Network clinical staff should interview and arrange non-violent parenting training for any parenting youth in the Department's Emergency Shelter/Center system.


**STATE CENTRAL REGISTER**
- State Central Register management should issue a written directive to be incorporated into the call taker manual prohibiting call takers from accessing SACWIS on any cases not related to Hotline calls they receive and enforcing existing Administrative Procedure 20, *Electronic Mail/Internet Usage/SACWIS Search Function*, through discipline for violations.

- In addition to requesting a phone number at which a reporter can be reached, State Central Register call floor workers should ask for other phone numbers, such as a cell phone number, at which the reporter may be reached.

- In addition to training staff on how to search and link Information and Referral intakes, State Central Register staff should be trained to record any Information and Referrals provided to the caller and the caller's response.

# RECOMMENDATIONS FOR DISCIPLINE AND CONTRACT TERMINATION

In FY 2015, the Inspector General recommended discipline of Department and private agency employees and termination of Department contracts for the conduct detailed below. Discipline recommendations ranged from counseling to discharge.

## ABUSE/NEGLECT INVESTIGATIONS AND MISCONDUCT RELATED TO CASEWORK

- A child protection investigator falsified case notes and provided false information to the Office of the Inspector General. During a child protection investigation of serious bruising to a 5 month old child in a home plagued with domestic violence, the investigator failed to ensure that the child was seen by a doctor. After the child was killed, the investigator entered a case note, falsely documenting that several weeks earlier, the investigator had contacted the clinic and faxed a Department form to the doctor's office to complete. In addition, after learning that the mother had not taken the infant to the doctor, the investigator failed to reassess the children's safety.

- A child protection supervisor of an investigation involving allegations of multiple and serious bruising to a five month old child failed to recognize the high risk nature of this case and supervise it appropriately.

- A parenting coach failed to report or address taunting and cruel behavior of the mother, and failed to credit the child's disclosure of abuse against parents who had already exhibited serious abusive behavior towards an infant. The parenting coach reacted to the child's disclosure by accepting the parents' denial and then presenting a puppet show to the child about why it is bad to lie.

- A child protection supervisor failed to ensure that daily attempts were made to see a 3-year-old alleged victim of physical abuse following the child protection investigator's initial good faith attempt, knowing that the child protection investigator had gone on vacation.

- A foster care manager at a private agency forged parent signatures on forms documenting home visits that did not occur and for falsified case notes reflecting visits.

- A private foster care agency staff member failed to ensure that a 17 year old ward received his psychotropic medication for two weeks despite his mother's oral consent to administer the medication which resulted in the rapid decline of his mental health.

- A private agency caseworker, supervisor and administrator used a safety plan for an infant in lieu of screening the case into court for custody when the mother had a history of failing to comply with services, and was prohibited from living with the infant because she had physically attacked her grandmother, who got a protective order against the mother. The safety plan provided for the grandmother to care for the child.

- A child protection investigator displayed unprofessional behavior during an interview with a source. The source had reported seeing bruises on a 3 year old that weekend, who had patches of hair missing and whose mother had just brought a new boyfriend into the home. When the source exhibited uncertainty, the investigator documented that she told the source not to call in unless she was "sure" because there were children who were really being hurt. The child was killed the next week. The

investigator also failed to follow up on the police statement that an uncle had sought advice nine days earlier; and failed to check voice mail before going on vacation.

- A child protection investigator failed to check photo identification of a paramour in the home, while investigating suspicious bruising of a toddler. By providing a false name and birthdate, the paramour was able to hide a criminal history involving 34 arrests and a conviction for aggravated domestic battery to a child.  The investigator also failed to interview all members of the household, failed to do a scene investigation, and failed to assess the home prior to the toddler's discharge from the hospital.

- The child protection supervisor failed to ensure that the investigator completed basic tasks including obtaining photo identification for background checks, assessing the home prior to the child's discharge from the hospital and ensuring that all members of the household were interviewed.

- A DCFS caseworker failed to submit a request for an interstate compact for six months. The interstate compact was necessary to place the child with a relative who lived out of state. The parents also lived out of state and were only in Illinois for a brief time when drug abuse and homelessness issues caused them to lose custody of their newborn.

- A DCFS caseworker borrowed approximately $13,000 from a foster parent on her caseload.

## OTHER MISCONDUCT

- An employee of a private counseling agency who also contracted directly with the Department to provide training, falsely claimed Department wards as dependents (listing their social security numbers) on his personal income tax and falsely claiming that he was a foster parent.

- A DCFS placement worker sent a text message from his personal cellular phone to a parent on his caseload in the middle of the night, telling her he was very attracted to her and would like to get together sometime.

- A private agency caseworker accessed and printed an investigative summary involving her boyfriend. The boyfriend read the document, which provided him with the name of the person who had contacted the hotline, a serious violation of law and confidentiality.

- A call floor operator violated confidentiality by accessing a report that she had not taken. She then discussed the report with a co-worker who she had determined was related to the subjects of the report. The operator claimed that she and others routinely checked the system after reading an article in the newspaper involving a child, to make sure that the hotline had been called.  Her breach of confidentiality was mitigated by the lack of clear rules at the State Central Register prohibiting access to reports that the call floor taker was not directly involved with.

- A DCFS worker sent their Statement of Economic Interest directly to the Secretary of State rather than to the DCFS Ethics Officer for a second consecutive year, despite multiple notifications and warnings.

# CHILD WELFARE EMPLOYEE LICENSES

The following cases represent action taken against Child Welfare Employee Licenses in FY 2015.

### LICENSE REVOCATIONS
- A Licensee had their Child Welfare License revoked after refusing to cooperate with the States Attorney's Office and providing assistance to the defense during the criminal prosecution of her paramour for sexually abusing her daughter.

- A Licensee who was also a foster/adoptive parent, had their license revoked after a court determination that the Licensee had falsely claimed that an adopted child still lived with them, which allowed the Licensee to wrongly continue to receive an adoption subsidy from the Department for four years.

### LICENSE SUSPENSIONS
- A Licensee was suspended for 90 days after authoring a contact note falsely claiming that she had contacted the school counselor.

- A Licensee received a 30 day suspension after having significant phone contact with a mother on his case record, which was not supported by case notes.

### LICENSE RELINQUISHMENTS
- A Licensee relinquished his License after charges were brought alleging that he falsified a contact with a doctor.

- A Licensee relinquished her License after charges were brought that she forged a foster parent's signature on forms and authored casenotes that supported her claim of home visits, which she had never made.

- A Licensee relinquished her License after charges were issued that she had falsely documented home visits.

- A Licensee relinquished her License during the Office of Inspector General investigation into charges that she had falsified documentation in licensure files.

### FY 2015 CHARGES PENDING
- Charges were issued against a worker who borrowed $13,000 from a foster parent on her caseload.

- Charges were issued against a worker who accessed SACWIS (the Department's database) and printed a child welfare investigation summary pertaining to her boyfriend, who viewed the summary and learned the identity of the hotline caller.

- Charges were issued against a worker who developed an intimate relationship with a foster parent on her caseload.

- Charges were issued against an investigator who interviewed the wrong person by failing to even question the identity of the person prior to the interview.

- Charges were issued against a worker for false documentation and for failing to cooperate with the Office of Inspector General investigation.

- Charges were issued against a worker who failed to examine documentation provided by a mother to support the mother's claim that she had procured an order of protection against her paramour who had severely abused her and presented a risk of harm to the children. The mother had not procured a permanent order of protection and the document given to the worker was a petition the mother had filed earlier for a 30 day order of protection.

- Charges were issued against a worker who was indicated for medical and environmental neglect of her child.

- Charges were issued against a worker who sent two texts to a mother on his caseload after hours; the first suggesting they get together sometime because he found her attractive and the second purporting to apologize for the first.

CHILD WELFARE EMPLOYEE LICENSES

# COORDINATION WITH LAW ENFORCEMENT

- The Office of the Inspector General investigated a complaint from the Cook County Sheriff regarding wards being turned away from the Department's shelter care system. See General Investigation 1.

- A Licensing worker notified their supervisor after receiving $400 in cash in a holiday card from a licensed provider who was seeking renewal of their license. The matter was referred to the Office of the Inspector General. The Inspector General referred it for criminal investigation. The Illinois State Police declined to charge. The license was not renewed.

- While investigating a charge by an adult woman that she had been sexually molested when she was 8 years old by older children, the police learned that one of the alleged then-juvenile perpetrators was now a DCFS employee. The woman claimed that the DCFS employee had contacted her and threatened her for pursuing the sexual molestation charges. The police asked the Office of the Inspector General to review the contacts from the DCFS Employee for possible administrative action. A preliminary review did not disclose facts to support an administrative action. While the investigation was pending, the DCFS employee resigned.

- While assisting the Department's Office of Child Welfare Employee Licenses with background checks, Inspector General staff found that one of the applicants had been the victim of identity theft. The Office of the Inspector General referred the matter to the Social Security Administration.

- The Illinois Department of Health and Family Services requested assistance in investigating a daycare provider who was suspected of fraudulent claims for payments for daycare services.

- Law Enforcement from another state requested assistance in investigating charges of sexual abuse in which the alleged perpetrators were formerly Illinois foster parents.

- The United States Office of Social Security Administration requested the assistance of the Office of the Inspector General in investigating a recipient of social security disability funds, suspected of fraud, who was also a foster parent for DCFS wards. She was using two names and two Social Security numbers.

- The Cook County Sheriff's Office requested the assistance of the Office of the Inspector General in investigating a "cold" case homicide of a teen who died in California in the 1980's to determine whether the deceased may have been a former ward who had gone missing.

*Assistance with Fund Recovery Litigation*
- In FY 2012, the Office of the Inspector General issued a joint report with the Inspector General of the Executive Agencies of the Governor questioning $18 million in Department funds that went to a single vendor, who owned multiple entities which contracted with several state and local agencies. The investigation disclosed significant fraud, which included ghost pay-rolling, double-billing and forged signatures. The Office of the Inspector General has provided ongoing assistance to the Office of the Attorney General in pursuing civil recovery of funds from the vendor.

*Criminal Update*

▪ In FY 2013, the Office of the Inspector General investigated the placement of a ward who had been arrested and charged with sexual assault of a staff person at his residential placement. He was found guilty and sentenced to 18 years in prison and must register as a sex offender for life.

# DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS

The Inspector General made the following recommendations in previous Fiscal Years, but the recommendations were not fully implemented before the Annual Report was issued. The current implementation status of these recommendations is detailed below in the following categories.

- Child Protection
- Child Welfare Employee Licensure (CWEL)
- Contract Monitoring
- Domestic Violence
- Foster Home Licensing
- Law Enforcement
- Legal
- Medical
- Personnel
- Services
- Teen Issues

## CHILD PROTECTION

**The Department of Children and Family Services should reinstate its historical practice of investigating co-sleeping deaths only when the report discloses circumstances suggesting possible abuse or neglect, such as an intoxicated parent or a previous co-sleeping death in the same family. In the alternative, the Department should immediately convene public hearings toward adopting Rules governing investigating and indicating co-sleeping deaths (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 10).**

> *FY 14 Department Response:* The State Central Register (SCR) no longer takes a death report based solely on an unsafe sleep practice. Training was provided to staff.

*FY 15 OIG Comment:* On July 17, 2015, the new Acting Director of DCFS reversed the Department's position without notice to the Inspector General and without any opportunity for public comment, in violation of the Administrative Procedure Act.

> *FY 15 Department Update:* The Department disagrees with the Inspector General's Office and is continuing to investigate hotline reports of deaths of children who are found in an unsafe sleep environment. On September 23, 2015, the Department provided the Inspector General's Office a detailed memorandum responding to the Office of the Inspector General's August 10, 2015 Confidential Memorandum. The Office of the Inspector General's memorandum challenges the statutory and constitutional authority of the Department to conduct certain child death investigations. The Department concludes that it has the legal authority under both statute and the constitution to investigate the unexpected deaths of children that are reported to the Child Abuse

and Neglect Hotline when the caller provides information sufficient to raise a reasonable suspicion that the child was placed in an unsafe sleep environment.  The Department's decision to investigate, but only indicate for abuse or neglect when exacerbating factors are identified that contributed to the death, all unsafe sleep child deaths is not only legal, it is prudent and consistent with child welfare practice in the United States.  The Department asked the Inspector General to provide authority explaining why the Department's change in position had to go through the Rulemaking procedure and the Inspector General declined.  It is the Department's position that the current practice is consistent with the present Statute, Rule and Procedure.

*FY 15 OIG Response:* By law, the authority of the Department to investigate a family begins with a call to the Hotline alleging a reasonable suspicion of abuse or neglect. With the Department's unilateral decision to investigate unsafe sleep, the Department has defined unsafe sleep as abuse or neglect. Unsafe sleep, as defined by the Department, includes co-sleeping with your infant, having quilts or bedding in a crib or placing an infant to sleep on his or her stomach. Current Rules of the Department do not define co-sleeping with your child as abuse or neglect. Moreover, two separate Pregnancy Risk Assessment Monitoring Systems (PRAM) surveys found that more than half of those questioned admitted to co-sleeping with their infants at times. Two recent surveys estimate that over half of all parents admit to co-sleeping with their infants, at times. Given the prevalence of this practice, the Inspector General believes that the practice of co-sleeping is a public health issue and has notified the Department that such a change in definition of abuse or neglect must have a public airing and must be accomplished through the Rulemaking process.

The Inspector General has also noted that the Department's new policy could disproportionally impact minority and low income families. Department statistics demonstrate the potential for disproportionality: while African Americans comprised approximately 34% of all child abuse investigations (FY 2014), they comprise approximately 55% of those investigated for sleep-related infant death.

The decision to equate co-sleeping with reasonable suspicion of abuse or neglect also means that doctors, pediatricians, hospital workers and other mandated reporters could be criminally prosecuted for failing to call the Hotline when they learn that their patient or client has fallen asleep with an infant. Such a drastic change should not be accomplished without public notice and input.

**As a follow-up to the Safe Sleep Report, the Inspector General made an additional recommendation: Once the policy and procedures are finalized in accordance with ANCRA, the Office of the Inspector General recommends the Department undertake a review of all the sleep-related deaths indicated for Allegation #51 (Death by Neglect) during the period in which all sleep-related infant deaths were investigated to decide whether the findings should stand or be overturned, applying the factors identified in the revised policy and procedures. [Although many parents were indicated for #60 (Risk of Harm) related to sleep practice during this same time period, the Inspector General recommends the Department limit its review to cases indicated for #51, recognizing that an indicated finding of #60 has a 5-year retention (unlike #51 which has a 50-year retention) and the review of these cases would require a great amount of resources.]**

*FY 14 Department Response:* The Department's response is pending.

*FY 15 Department Update:* The Department disagrees with the Inspector General and is continuing to investigate hotline reports of deaths of children who are found in an unsafe sleep environment.  On September 23, 2015, the Department provided the Inspector General a detailed memorandum responding to the Inspector General's August 10, 2015 Confidential Memorandum.  The Inspector General memorandum challenges the statutory and constitutional authority of the

Department to conduct certain child death investigations. The Department concludes that it has the legal authority under both statute and the constitution to investigate the unexpected deaths of children that are reported to the Child Abuse and Neglect Hotline when the caller provides information sufficient to raise a reasonable suspicion that the child was placed in an unsafe sleep environment. DCFS' decision to investigate, but only indicate for abuse or neglect when exacerbating factors are identified that contributed to the death, all unsafe sleep child deaths is not only legal, it is prudent and consistent with child welfare practice in the United States.

**If child protection investigators cannot meet their obligation to assess child(ren) in a timely manner the supervisor should assure that the police are contacted for a welfare check (from OIG FY 14 Annual Report, General Investigation 1).**

*FY 14 Department Response:* Department Procedures 300, *Reports of Child Abuse and Neglect*, is on target to issue final policy by December 31, 2014. Procedures 300 policy training is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:* The recommendation has been incorporated in Procedures 300.50, *Initiation of an Investigation.* Training has commenced and will continue through January 2016.

**On-call supervisors should be required to have a DCFS issued laptop with them while on call. In situations where an on call supervisor does not have access to the internet and the air card signal is not adequate, that supervisor should be required to locate the closest point to their home where the air card functions. On-call supervisor SACWIS notes should be entered contemporaneously. The supervisor in this case should receive discipline for not entering any notes (from OIG FY 14 Annual Report, General Investigation 1).**

*FY 14 Department Response:* Department Procedures 300, *Reports of Child Abuse and Neglect,* is on target to issue final policy by December 31, 2014. Procedures 300 policy training is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions. The child protection supervisor received a 1-day suspension.

*FY 15 Department Update:* Procedures 300.70, *Supervisory Duties* will be updated by March 30, 2016 to include the expectation that supervisors are required to have a state issued laptop in their immediate possession and utilize it when performing after hours duties.

**When child protection investigations involve an arrest for domestic violence, investigators should contact pretrial services to obtain bail conditions (from OIG FY 14 Annual Report, General Investigation 1).**

*FY 14 Department Response:* Department Procedures 300, *Reports of Child Abuse and Neglect*, is on target to issue final policy by December 31, 2014. Procedures 300 policy training is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:* The recommendation will be incorporated into revisions to Procedures 300, Appendix-B, allegation #60 which will be released in March 2016.

**When a DCFS worker has a case involving a caretaker who is suspected of anabolic steroid use, the worker should contact the Administrator for Substance Abuse Services for information on the appropriate anabolic steroid screen (from OIG FY 14 Annual Report, General Investigation 1).**

*FY 14 Department Response:* Department Procedures 300, *Reports of Child Abuse and Neglect*, is on target to issue final policy by December 31, 2014.  Procedures 300 policy training is planned for the period January 1, 2015 to June 30, 2015.  This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update: FY 15 Department Update:* The recommendation will be incorporated into updates to Procedures 300, *Reports of Child Abuse and Neglect* due to be released in March of 2016. The recommendation will also be incorporated into revisions to Intact Family Services and Placement procedures.

**To ensure that alleged perpetrators of abuse and neglect receive notification of the investigative findings and their right to appeal, the Department must develop a system to ensure that at the close of an investigation the address for the alleged perpetrator(s) listed in SACWIS is accurate.  This report should be shared with the State Central Register for the purpose of developing a system of checking the address in death cases when there are multiple reporters calling the hotline regarding the same report (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 9).**

*FY 14 Department Response:* The recommendation has been incorporated into revisions to Procedures 300, *Reports of Child Abuse and Neglect*, which is on target to issue final policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions. An Enterprise Service Request (CFS 822) was created and approved by the Office of Information and Technology Services for investigations that cannot close without a verified address for the perpetrator.

*FY 15 Department Update:* The recommendation has been incorporated in Procedures 300 and its Appendix B. Training has commenced and will continue through January 2016.

**The investigative field should be trained that in cases with abusive injuries and multiple caretakers, the investigator must develop a timeline of caretakers during the critical period of time in which the injuries could have been inflicted (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 6).**

*FY 14 Department Response:* A pilot training session is completed.  The Department is planning for a statewide roll out in the first quarter of 2015.

*FY 15 OIG Update:* The recommendation has been included in the Head Trauma Training which is currently being conducted statewide to all child protection staff.

**The Department should overturn the mother's indicated finding for violating the unwritten safety plan by signing a short term guardianship document (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 6).**

*FY 14 Department Response:* The Department does not agree to voluntarily overturn the indicated finding.  The Department does agree to amend Rule 300 and/or Procedures 300, *Reports of Child Abuse and Neglect*, whichever is necessary, to include a provision that will allow the Director to permit a late expungement appeal for good cause.

*FY 15 Department Update:* Administrative Code Rule 336 and Rule 300 will need to be revised in order to provide for a provision that would allow the Director to permit a late expungement appeal for good cause.

**The Department should develop a training to focus on honing interviewing skills for child protection, identifying critical facts and developing information early on regarding critical facts (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 6).**

*FY 14 Department Response:* A pilot training session is completed.  The Department is planning for a statewide roll out in the first quarter of 2015.

*FY 15 Department Update:* The recommendation has been included in the Head Trauma Training which is currently being conducted statewide to all child protection staff.

**The Department should clarify in its Procedures how investigators should complete "person" data checks in SACWIS. This information should be incorporated into training (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 5).**

*FY 14 Department Response:* The recommendation has been incorporated into revisions to Department Procedures 300, *Reports of Child Abuse and Neglect*, which is on target to issue final policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:* The recommendation will be incorporated in revisions to Procedures 300 which will be issued in March 2016. The recommendation will also be incorporated in Administrative Procedure 5.

**The Inspector General reiterates the prior recommendation from the Inspector General death investigation, #11-2542: The Department should use this Report and Inspector General Report #09-0231 as training tools for management to address with child protection supervisors the risks associated with harsh punishment and the need for thorough investigation of such punishment (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 1).**

*FY 14 Department Response:* This training will be incorporated into the training scheduled to begin in January 2015 on the revisions to Procedures 300, *Reports of Child Abuse and Neglect*. This training will be conducted between January 2015 and June 30, 2015.

*FY 15 Department Update:* The Office of the Inspector General provided new material to the Office of Professional Development to be used in the Error Reduction: Lessons from Physical Abuse Fatalities training.  Training is anticipated to begin in the 1st quarter of calendar year 2016.

**Ensure that child protection investigations are not approved for closure when alleged perpetrators have not been interviewed by child protection because of a police investigation without retrieving and reviewing a copy of the police investigation, including interview reports (from OIG FY 14 Annual Report, General Investigation 17).**

> *FY 14 Department Response:* Department Procedures 300, *Reports of Child Abuse and Neglect*, is on target to issue final policy by December 31, 2014.  Procedures 300 policy training is planned for the period January 1, 2015 to June 30, 2015.  This training will reinforce caseworker and supervisor compliance with the policy revisions.

> *FY 15 Department Update:* The recommendation has been incorporated into Procedures 300. Training is in process and will be completed in January 2016.

**The Child Advocacy Center's consent forms should include the Advocacy Center's Family Advocate (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 1).**

> *FY 14 Department Response:* The Department has discussed this recommendation with the Child Advocacy Centers (CAC) in this county and they agree.  The CACs did, however, assert that the CACs are not responsible for collecting the actual medical evaluation nor are they responsible for ensuring the information is received by DCFS.  The Inspector General is currently in continued meetings with the Child Advocacy Centers Advisory Board regarding the acceptance of this recommendation.

*FY 15 OIG Update:* The Child Advocacy Center provided notification to the Inspector General that it had accepted the recommendation and would be incorporating the recommendation into Protocol.

**The Child Advocacy Center Advisory Committee should request that medical clinics that are co-located within Child Advocacy Centers include body charts or photographs to document any observed injuries and if the injuries may be suggestive of abuse, will ensure that the child is questioned separately from caretakers (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 1).**

> *FY 14 Department Response:* The Inspector General is currently in continued meetings with the Child Advocacy Centers Advisory Board regarding the acceptance of this recommendation.

*FY 15 OIG Update:* The Child Advocacy Center provided notification to the Inspector General that it had accepted the recommendation and would be incorporating the recommendation into Protocol.

**The Child Advocacy Protocol should be amended to include questions determining whether the child victim is, or has recently been involved in counseling.  Intake procedures should include verbal contact with ongoing or recent counselors to learn all information that may be helpful in assisting criminal or child protection investigators or medical personnel, advocates and mental health professionals in their treatment of the child or adolescent (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 1).**

> *FY 14 Department Response:* The Inspector General is currently in continued meetings with the Child Advocacy Centers Advisory Board regarding the acceptance of this recommendation.

*FY 15 OIG Update:* The Child Advocacy Center provided notification to the Inspector General that it had accepted the recommendation and would be incorporating the recommendation into Protocol.

**As part of the temporary custody screening process, child protection will notify DCFS Office of Legal Services and DCFS Clinical of high risk cases such as those where a parent has demonstrated dangerous behavior as abduction; torture; threats to kill with plan; or taking children hostage and cases involving severe mental illness: (a.) upon notification, DCFS Clinical will initiate an emergency clinical staffing within 5 working days, including all relevant parties and records, and (b.) authorize a specialized integrated assessment (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 2).**

*FY 14 Department Response:* Department Procedures 300, *Reports of Child Abuse and Neglect*, is on target to issue final policy by December 31, 2014.  Procedures 300 policy training is planned for the period January 1, 2015 to June 30, 2015.  This training will reinforce caseworker and supervisor compliance with the policy revisions.

DCFS Clinical will provide an emergency clinical meeting within 5 working days upon notification from Child Protection (CFS 399-1 *Clinical Referral Form*). The meeting will include all available relevant parties and records.  It will also include authorization for a specialized integrated assessment.  A follow up meeting with all relevant parties and records will occur within 30 days of the commencement of the specialized integrated assessment. The specialized integrated assessment will be completed by an LCSW, LCPC or PhD that has a minimum of 3 years of mental health experience and the screener will be supervised by a PhD or LCSW who has a minimum of 3 years of mental health experience.

*FY 15 Department Update:* Error Reduction Training for high risk cases was provided to Integrated Assessment and regional clinical staff thru the Office of the Inspector and was completed in October 2015.  Consulting psychologists are currently reviewing assessment instruments to be utilized for the specialized assessments.  OITS is also running a number of cases with qualifying allegations that would meet criteria for specialized assessment. Integrated Assessment administrators, Deputy Director and Administrator of Social Work Practice are working on the development of a formalized policy. Procedures 300 were issued to staff in October 2015 and training is in process.

**The Department should require that investigators request that the treating hospital physician or nurse complete a body diagram when a child victim is initially seen in a hospital setting. The treating physician or nurse can utilize a body diagram provided by their institution or one provided by the Department (CANTS 2A/2B) (from OIG FY 13 Annual Report, General Investigation 2).**

*FY 13 Department Response:* The Department agrees to require investigators to request completion of a body diagram/chart from treating hospital physicians or nurses with corresponding documentation in the SACWIS file.  A Policy Alert detailing expectations will be issued to investigation staff and will be included in revisions to Procedures 300, Reports of Child Abuse and Neglect.

*FY 14 Department Update:*  The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is

planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:*   The recommendation has been incorporated into Procedures 300.100(c), *Medical Consultations and Examinations during an Investigation.* Training has commenced and will continue through January 2016.

**The following language should be added to Procedures 300 – Appendix B, *Allegation Substantial Risk of Physical Injury* (#60):  If the alleged child victim has a Special Health Care Need as defined in Procedures 302 – Appendix O, a referral for nursing consultation services shall be made by completing the DCFS Regional Nurse Referral Form, CFS 531 (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 12).**

*FY 13 Department Response:* Recognizing the complex nature of this recommendation, the Inspector General's Office and the Department will be reviewing the issues presented in this case to develop appropriate policy and procedure.

*FY 14 Department Update:*   The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:*   The recommendation has been incorporated into Procedures 300, Appendix B, *The Allegation System.* Training has commenced and will continue through January 2016.

**In child protection investigations involving medically complex children whose home health care is at issue (medical neglect OR substantial risk of physical injury), the child protection investigator should convene a telephone or in-person conference with relevant parties (e.g., parents, nursing care agency, Division of Specialized Care for Children, child's primary care physician, other medical providers) to facilitate communication, establish facts and design a plan of action.  DCFS Nursing staff should be utilized to help coordinate such a staffing (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 12).**

*FY 13 Department Response:* Recognizing the complex nature of this recommendation, the Inspector General's Office and the Department will be reviewing the issues presented in this case to develop appropriate policy and procedure.

*FY 14 Department Update:*   The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:* The recommendation has been incorporated into Procedures 300.100 (e)(2), C*onference.* Training has commenced and will continue through January 2016.

A copy of this report should be shared with the current area administrator, the first child protection investigator and her supervisors.  The area administrator should facilitate a discussion with staff regarding errors in the investigation (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 4).

> *FY 13 Department Response:* The report has been shared with the Area Administrator and the child protection supervisor. The report will be shared with the child protection investigator upon the employee's return from leave.

> *FY 14 Department Update:*  The child protection investigator remains on leave at this time.

> *FY 15 Department Update:*  The child protection investigator remains on leave at this time.

When SCR receives a report from hospital staff of injuries to a child three years and under and there has been a previous report of serious injury within the last six months, SCR should code the report as requiring an "Emergency Response" to see the child victim immediately (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 4).

> *FY 13 Department Response:* A memo was issued to SCR staff.  This recommendation will be included in revisions to P300, *Reports of Child Abuse and Neglect*.

> *FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

> *FY 15 Department Update:*  Procedures 300.30(g), *Response Indicators*, now requires an emergency response when, "SCR receives a report from hospital staff of injuries to a child 6 years and younger and there has been a previous report of serious injury involving any of the subjects of the pending report." Training has commenced and will continue through January 2016.

The Department should use this report and Inspector General Report #09-0231 as training tools for management to address with child protection supervisors the risks associated with harsh punishment and the need for thorough investigation of such punishment (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 2).

> *FY 13 Department Response:* These reports will be sent to Regional Administrators to address with the Area Administrators who will discuss in their all-staff meetings.

> *FY 14 Department Update:*  Revised child protection in-service training courses will include these reports.

> *FY 15 Department Update:*  The training was developed in coordination with the Inspector General's Office and begins in early 2016.

**The Department must address and remedy its continuing violation of a consent decree which dictates appropriate caseload standards for the number of investigations assigned to child protection investigators (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 2).**

*FY 12 Department Response:* The Office of Employee Services is working with Operations to fill vacancies.

*FY 13 Department Update:* Overall DCFS is meeting the caseload requirements for investigative staff as set forth in the consent decree and meets regularly with the plaintiffs' counsel in the case to address caseloads and other issues.

*FY 13 OIG response:* The Inspector General notes that the consent decree fails to account for actual caseloads in specific regions where caseloads exceed reasonable investigative standards. Such pockets of excessive investigative caseloads put the children in those communities at risk.

*FY 14 Department Update:* The Department continually monitors investigative caseload assignment and is currently staffing at 10 to 1 case ratio for investigators. Reports are received regularly from budget and finance staff that document assignment caseload and staffing levels. The report also documents if particular offices are understaffed based on case ratio, overstaffed or at correct level. Bureau of Operations staff monitor this report and use it in communicating with Office of Employee Services to ensure positions are requested to be filled to maintain a 10 to 1 ratio. The Bureau Chief discusses caseloads of all specialties with DCFS legal staff on a monthly basis.

*FY 15 Department Update:* The Department realizes that investigative caseloads are high in some parts of the state. We are currently attempting to fill/hire close to 100 investigator positions across the state with the majority being in Northern Region and Cook County. We are currently using a case to worker ratio of 10 to 1. We monitor this on a regular basis via a monthly report developed and distributed by Office of Budget and Finance which documents the case to worker ratio and number of staff needed. We are challenged by the fact that CMS is taking a long period of time to grade applications and in some areas of the state there are not enough candidates on the CMS eligibility list in comparison to the number of positions we may need to hire from the outside for. The Director's office is assisting in communication with the Governor's office in relation to this challenge. In areas where caseloads are high the Regional Administrators have developed plans to assist in addressing and the Department has utilized paid overtime and the use of previous child protection certified staff to assist in ensuring safety as well as to assist in completion of cases. We are also utilizing 75 day contracts with retired investigators where possible.

**The Department must track, and supervisors and management must respond to, failure to actually see the child that is the subject of the investigation (from OIG FY 12 Annual Report, General Investigations 14).**

*FY 12 Department Response:* This recommendation will be included in revisions being made by the Procedures 300, *Reports of Child Abuse and Neglect*, workgroup.

*FY 13 Department Update:* The Department will issue a Policy Alert to inform staff of the necessary changes in practice while working to incorporate the changes into Procedures 300, Reports of Child Abuse and Neglect.

*FY 14 Department Update:*   The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:* The recommendation has been incorporated into Procedures 300.50 (c)(2), *Good Faith Attempt to Initiate an Investigation*.   Training has commenced and will continue through January 2016.

**Child Protection supervisors should be trained to manage and triage SACWIS alerts for their teams. Any alerts indicating that a child has not been seen within five days must be immediately addressed to insure the child's safety (from OIG FY 12 Annual Report, General Investigations 8).**

*FY 12 Department Response:* This recommendation will be included in revisions being made by the Procedures 300, *Reports of Child Abuse and Neglect*, workgroup.

*FY 13 Department Update:* The Department will issue a Policy Alert to inform staff of the necessary changes in practice while working to incorporate the changes into Procedure 300.

*FY 14 Department Update:*   The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:*  The recommendation has been incorporated into Procedures 300.50 (c)(2), *Good Faith Attempt to Initiate an Investigation*. Training has commenced and will continue through January 2016.

**If the Department determines that suspicion of risk, rather than evidence of risk, are sufficient criteria to accept a report, the Department should request the assistance of Children's Advocacy Centers to train State Central Register (SCR) staff on red flags that warrant investigation of sexual abuse (from OIG FY 12 Annual Report, General Investigations 4).**

*FY 12 Department Response:* The Department is converting the call floor manual into procedures and will review this information for possible inclusion.

*FY 13 Department Update:* The SCR call floor manual is being converted into procedures and contained within procedures 300.  The appropriate standards for sexual risk of harm are included in procedures 300 revisions.  Through staff meetings, SCR Administration has ensured that hotline workers are applying this standard.  Additionally, SCR has developed foundations training for all staff which includes the allegation system, CERAP certification, and assessment skill training.

*FY 14 Department Update:*   The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is

planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:*  The recommendation has been incorporated into Procedures 300 and Appendix B.  Training has commenced and will continue through January 2016.

**Procedures 300, Appendix B: *Reports of Child Abuse and Neglect*, The Allegations System should be amended to add the following instruction to all allegations of physical abuse: *Ask the child if there is an extended family member, another adult or caretaker that he or she feels safe with, important or special to. Persons identified by the child victim shall be interviewed* (from OIG FY 12 Annual Report, General Investigations 1).**

*FY 12 Department Response:* The recommendation will be included in revisions being made by the Procedure 300, *Reports of Child Abuse and Neglect*, workgroup.

*FY 13 Department Update:* The Department will issue a Policy Alert to inform staff of the necessary changes in practice while working to incorporate the changes in Procedure 300.

*FY 14 Department Update:*  The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:*  The recommendation has been incorporated into Procedures 300-Appendix B (h), *Contacts, Activities and Documentation required for all Allegations*. Training has commenced and will continue through January 2016.

**The Department database currently only automatically prompts management approval for death and facility reports. The automatic prompt for management approval should include allegations of burns, head injuries, internal injuries and children under six with allegations of cuts, bruises, welts, abrasions and oral injuries (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 2).**

*FY 12 Department Response:* The Department is currently considering significant changes in its supervisory structure and will look further into how best to integrate this recommendation as a result of those modifications. Additional considerations include discussions regarding feasibility and timeframe for coding into the database.

*FY 13 Department Update:* Until the change is implemented in SACWIS, public service administrators alert their area administrator to review all investigations involving burns, head injuries, and internal injuries and investigations involving children under six with allegations of cuts, bruises, welts, abrasions and oral injuries.

*FY 14 Department Update:*  The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:*   The recommendation will be incorporated into revisions to Procedures 300.75 which will be completed by March 2016.   Operation staff are currently working with OITS on needed SACWIS changes and a reminder will be sent to the field.

**The Office of the Inspector General reiterates the recommendation made in a prior Inspector General Report that any time a child who is the subject of a child protection investigation is hospitalized during the course of a child protection investigation, the Division of Child Protection should convene a case conference with the treating medical and social work team to address child safety and discharge planning (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 3).**

*FY 12 Department Response:* This recommendation will be included in revisions being made by the Procedures 300, *Reports of Child Abuse and Neglect*, workgroup.

*FY 13 Department Update:* The Department will issue a Policy Alert to inform staff of the necessary changes in practice while working to incorporate the changes in Procedure 300.

*FY 14 Department Update:*   The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:*   The recommendation has been incorporated into Procedures 300.100(c)(1), *Medical Consultation*.

**Any time a child who is the subject of a child protection investigation is hospitalized during the course of a child protection investigation, the Division of Child Protection should convene a case conference with the treating medical and social work team to address child safety and discharge planning (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 4).**

*FY 12 Department Response:* This recommendation will be included in revisions being made by the Procedure 300, *Reports of Child Abuse and Neglect*, workgroup.

*FY 13 Department Update:* The recommendation will be incorporated into the revisions to procedures and a process established for developing the plan.

*FY 14 Department Update:*   The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:*   The recommendation has been incorporated into Procedures 300.100(c)(1), *Medical Consultation*. Training has commenced and will continue through January 2016.

**The Department should develop an effective consultation process and procedures specific to failure to thrive investigations and the provision of intact family services in cases with a failure to thrive child (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 4).**

> *FY 12 Department Response:* This recommendation will be included in revisions being made by the Procedure 300, *Reports of Child Abuse and Neglect*, workgroup.

> *FY 13 Department Update:* The division of Child Protection will work with the Clinical and Training divisions to create procedures and a consultation process that accurately reflects current medical literature regarding failure to thrive children.

> *FY 14 Department Update:*  The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

> *FY 15 Department Update:*  The recommendation will be incorporated in revisions to Procedures 300 which will be issued in March 2016.

**The Department should revise the procedures for investigating an allegation of failure to thrive (FTT, Allegation 81) so that they are consistent with current medical literature that FTT is at times a multifactorial condition and the existence of an organic component of the FTT does not rule out a non-organic component as well (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 4).**

> *FY 12 Department Response:* This recommendation will be included in revisions being made by the Procedure 300, *Reports of Child Abuse and Neglect*, workgroup. Information on failure to thrive and use of growth charts was also included as a part of the nurses training.

> *FY 13 Department Update:* Failure to Thrive and use of Growth Charts was also included as a part of the nurses training in October 2012.  The division of Child Protection will work with the Clinical and Training divisions to create procedures and a consultation process that accurately reflects current medical literature regarding failure to thrive children.

> *FY 14 Department Update:*  The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

> *FY 15 Department Update:*  The recommendation has been incorporated into Procedures 300-Appendix B, Allegation #81, *Failure to Thrive*.

**From OIG FY 12 Annual Report, Death and Serious Injury Investigation 6: The Department should amend procedures to reflect the importance of contact with the involved non-custodial parent, to include, but not be limited to, the following:**

**A)**     **Section 300.60(c) Required Investigative Contacts should be revised to state:**

**If all of the subjects and other adults and children who are regular members of the alleged child victim's household _as well as the involved, non-custodial parent_, are not listed on the SACWIS intake summary at the time the report is taken, the Investigation Specialist shall add them to the SACWIS investigation.**

**During the formal investigation, investigative staff shall have direct, in-person contact with all children in the child victim's household, alleged perpetrators and other adults in the household, if these contacts have not already occurred. _During the formal investigation, Investigative staff shall also interview the non-custodial parent, if involved in the child's life, if this interview did not already occur, as there is a presumption that involved non-custodial parents have relevant information._ Since contact with the alleged child victim(s) is required during the initial investigation, it need not be repeated during the formal investigation, unless the Investigation Specialist determines further contact is necessary or additional contacts are necessary due to the existence of a safety plan/unsafe safety assessment.**

B) **Section 300.60(c) subsection (4) should be added to state:**

_**4) The Non-Custodial Parent Who Is Involved in their Child's Life**_

_**The Investigation Specialist is required to interview the involved non-custodial parent. There is a presumption that involved non-custodial parents have relevant information and therefore should be interviewed during the child protection investigation.**_

C) **Section 300.60(g) Other Required Investigative Contacts should be revised to state:**

**In addition to the required contacts with the subjects of the report, other persons in the household, _the involved non-custodial parent,_ law enforcement agencies, and the State's Attorney's Office, the Department has established other minimum investigative contacts for each allegation that are required before the investigation can be considered completed. See Appendix B, The Allegations System, for specific investigative standards for each allegation.**

D)　　**Section 300.100(d) Notify Subjects of the Report should be revised to state:**

**The Investigation Specialist shall make reasonable efforts to verbally notify the parent/guardian of the alleged child victim, and/or the alleged perpetrator if different from the child's parent/guardian, of the Investigation Specialist's recommended determination (indicated or unfounded). _Additionally, the Investigation Specialist shall make reasonable efforts to verbally notify the involved, non-custodial parent of the recommended determination. The Investigation Specialist shall make reasonable efforts to notify non-involved non-custodial parents of indicated reports, and make reasonable efforts to notify non-involved non-custodial parents of unfounded reports when they are aware of the report._ The Investigation Specialist shall communicate with limited/non-English speaking or hearing impaired persons as well as persons with other disabilities, using a method by which they can understand the notice, e.g., interpreters, TDD/TTys etc. The Investigation Specialist shall document all efforts to make such verbal notification and the method used on a SACWIS contact note.**

*FY 12 Department Response:* A memorandum was issued. The recommendation will be included in revisions being made by the Procedure 300, *Reports of Child Abuse and Neglect*, workgroup.

*FY 13 Department Update:* The CERAP revisions of May 2013 addressed these issues and strengthened language regarding non-custodial parents. The SCR script now includes questions regarding non-custodial parents. This was instituted in November 2012. In addition, the Department will issue a Policy Alert to inform staff of the necessary changes in practice while working to incorporate the changes into Procedures 300.

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:* The second part of Inspector General recommendation A will be incorporated into revisions to Procedures 300 which will be issued in March 2016. The second part of recommendation A was incorporated into Procedures 300.50(b)(8)(D), *Non-Custodial Parent* and Procedures 300-Appendix B (h), *Contacts, Activities and Documentation Required for all Allegations.* Recommendation *B* was incorporated into Procedures 300.50(b)(8)(D), *Non-Custodial Parent* and Procedures 300-Appendix B (h), *Contacts, Activities and Documentation Required for all Allegations.* Inspector General Recommendation C has been incorporated into Procedures 300.50(b)(8)(D), *Non-Custodial Parent* and Procedures 300-Appendix B (h), *Contacts, Activities and Documentation Required for all Allegations.* Recommendation D was incorporated into Procedures 300.160(b), *Notifications by the Child Protection Specialist.*

**The Department should train investigators and issue policy to require that when investigating injuries that occurred during babysitting, the investigator should determine the names of all other children that the babysitter provides care for, and interview them when appropriate and add children as additional alleged victims when appropriate. Parents, including non-custodial involved parents, of all children who are added as additional alleged victims should be notified of pending and completed investigations as required by the Abused and Neglected Child Reporting Act (ANCRA) and existing Rule and Procedure (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 3).**

*FY 09 Department Update:* A policy/information transmittal is being developed to notify staff.

*FY 10 Department Update:* The DCFS Office of Legal Services is reviewing the definition of "involved parent" in conjunction with other changes to the Abused and Neglected Child Reporting Act (ANCRA) required by the DuPuy Federal Lawsuit. Litigation is currently in the final stages. The anticipated completion date is summer 2011.

*FY 11 Department Update:* The Office of Legal Services is working with the Administrator of State Central Register to revise all notification letters.

*FY 12 Department Update:* The notification letters have been revised and the Office of Information Technology Services is in the process of incorporating the forms into the Statewide Automated Child Welfare Information System (SACWIS). The recommendation will be included in revisions to Procedures 300, *Reports of Child Abuse and Neglect.*

*FY 13 Department Update:* Training is being developed for child protection staff to review the need to determine the names of all children cared for by an independent babysitter or facility, interview when deemed appropriate, and added to the investigation as victims when appropriate. This training will include procedures regarding various types of field notifications needed and guidelines for notification which will include and ensure parents of child victims and subjects are notified of the outcome of the investigation. A memo was previously sent to Operations Management staff February 9, 2013 to share with their staff; reminding them to ensure parents are added properly to the investigation in order to receive required notice.

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:* The recommendation will be incorporated into revisions to Procedures 300 which will be issued in March 2016.

**As previously recommended by the Office of the Inspector General in FY 2007, Department procedures should be amended to require that in child protection investigations in which the plan is for a family member to obtain private guardianship of the child/ren, the family should be referred to the Extended Family Support Program (EFSP) for assistance in securing private guardianship (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 11).**

*FY 08 Department Response:* The Service Intervention Deputy has reviewed and approved the draft procedure. The procedure has been sent to the Office of Child and Family Policy for the revision process.

*FY 09 Department Update:* The Department studied the Procedure and determined that the change could increase the Extended Family Support Program budget by as much as $400,000 per year. The Division of Service Intervention is currently determining where the money can be found for this change.

*FY 09 OIG Response:* The Department should explain how it arrived at the projected additional cost of $400,000, including a line item breakdown of projected expenses by Region. The projected cost of assisting family members to obtain private guardianship of a child must be weighed against potential savings created by assisting and strengthening families to prevent them from entering the system.

*FY 10 Department Update:* The recommendation has been incorporated into draft Procedures 302.385, *Extended Family Support Program*. Once the draft procedures are approved the Division of Service Intervention will begin training on the referral process.

*FY 11 Department Update:* The recommendation has been incorporated into draft Procedures 302.385, *Extended Family Support Program*. Once the draft procedures are approved the Division of Service Intervention will begin training on the referral process.

*FY 12 Department Update:* The recommendation will be incorporated into the intact family and child welfare intake redesign.

*FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years. The Department will issue a Policy Alert to inform staff of the necessary changes in practice while working to incorporate the changes into Procedure.

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:* The recommendation has been incorporated in Procedures 300.130(g), *Extended Family Support Program (EFSP)* and Procedures 302.389(c), *Referral for EFSP Services.* Training has commenced and will continue through January 2016.

**The Abused and Neglected Child Reporting Act (ANCRA) should be amended to clarify that the Department can share unfounded investigative information during a subsequent child protection or criminal investigation with any persons named in Section 11.1, Disclosure of Information for purposes consistent with the Abuse and Neglect Child Reporting Act or criminal prosecution (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 4).**

*FY 07 Department Response:* The Office of Legal Services has assigned an attorney to draft amendments to the Abused and Neglected Child Reporting Act (ANCRA), which address the above issue, as well as other proposed changes to ANCRA, and will submit as a single legislative package. The targeted date of completion is May 2008.

*FY 08 Department Update:* The Office of Legal Services has assigned an attorney to draft amendments to the Abused and Neglected Child Reporting Act (ANCRA), which address the above issue, as well as other proposed changes to ANCRA, and will submit as a single legislative package. The anticipated date of completion is February 2009.

*FY 09 Department Update:* Draft amendments to the Abused and Neglected Child Reporting Act addressing this issue will be submitted as part of the legislative package for the Fall Session 2010.

*FY 10 Department Update:* Amendments to the Abused and Neglected Child Reporting Act addressing this issue will be submitted as part of the legislative package for the Spring Session 2011.

*FY 11 Department Update:* The Office of Legal Services will work with Legislative Affairs to incorporate language into the Abused and Neglected Child Reporting Act pertaining to sharing unfounded reports during a criminal or child protection investigation.

*FY 12 Department Update:* DCFS Legal has determined that Rule 431 can be amended without pursuing legislation. Revisions to Rule 431, Confidentiality of Personal Information, are being drafted. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* OCFP will work with the respective Division to review this recommendation and determine if it can be included in current revisions to Rule 431.

*FY 14 Department Update:*   This recommendation is included in a revision of Rule 431, *Confidentiality of Personal Information of Persons Served by the Department of Children and Family Services*.  We anticipate filing the 1st Notice in the third quarter of FY 15.

*FY 15 Department Update:*   This recommendation will be included in revisions to Rule 431, *Confidentiality of Personal Information of Persons Served by the Department of Children and Family Services*.

**The Department should ensure that available fathers be explored as potential placements.  If a safety plan is likely to last longer than six months, the Department should facilitate a legal relationship between the child and the caretaker (from OIG FY 06 Annual Report, General Investigations 11).**

*FY 06 Department Response:* A committee has been formed to revise the safety assessment process.  The committee continues to work on the safety assessment framework protocol. Targeted completion date is June 2007.

*FY 07 Department Update:* The Child Endangerment Risk Assessment Protocol (CERAP) draft, currently being field tested, directs the attention of the worker to consider available fathers as potential placements.

*FY 08 Department Update:* The Child Endangerment Risk Assessment Protocol draft provides that non-custodial parents should be identified and assessed first for potential out-of-home placement when a safety plan is needed.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 09 OIG Response:* According to the most recent data, just over 100 families have been referred statewide to agencies that the Department contracts with to provide services to fathers. The Department needs to encourage broader participation for fathers of DCFS involved children.

*FY 10 Department Update:* The recommendation has been incorporated into the draft Safety Enhancement Protocol (Procedure 300, Appendix G). The estimated date of implementation is July 2011.

*FY 11 Department Update:* The training for Enhanced Safety Model began in the Fall of 2011 and will be completed in Spring 2012. The Enhanced Safety Model includes prompts to be sure that available fathers are considered as placement options. However, the Enhanced Safety Model does not include facilitating a legal relationship with substitute care givers should the safety plan last longer than 6 months. This facilitation of a legal relationship between the substitute caregiver and the children will be considered by the incoming Director in consultation with the Office of Legal Services.

*FY 12 Department Update:* The Department will incorporate the clarification into Procedures 300, *Reports of Child Abuse and Neglect*.

*FY 13 Department Update:* The new safety model has been implemented and staff trained to assess non-custodial parents as resources to ensure child safety. The recommendation has been incorporated into Procedures 300, Appendix G (j).

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:*  The recommendation has been incorporated into Procedures 300.120(e)(1)(B), *Rule out Criteria* and Procedures 300-Appendix G(j), *Safety Planning.* Training has commenced and will continue through January 2016.

**A third box should be added to each safety factor in the Child Endangerment Risk Assessment Protocol (CERAP), acknowledging that information for that factor may be "unknown" or "uncertain" and add a section at the conclusion of the factors list for identifying information that needs to be gathered in the future to further assess safety (from OIG FY 06 Annual Report, General Investigations 16).**

*FY 07 Department Response:* The current draft Child Endangerment Risk Assessment Protocol (CERAP) that is being field-tested provides two assessment tools. The first is used at the outset and permits workers to note that more information is needed before the question can be answered.

*FY 08 Department Update:* The current draft of the initial CERAP acknowledges the option that more information is needed to assess safety.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 10 Department Update:* The recommendation has been incorporated in the draft Safety Enhancement Protocol, *Procedure 300, Appendix G: Child Endangerment Risk Assessment.* The estimated date of implementation is July 2011.

*FY 11 Department Update:* The training for Enhanced Safety Model began in the fall of 2011 and will be completed in spring 2012.

*FY 12 Department Update:* The Department and the Office of the Inspector General are continuing to review this recommendation toward maximizing child safety.

*FY 13 Department Update:* The Inspector General and the new Acting Director will discuss this recommendation and the Inspector General investigation on which it was based to determine whether its implementation will enhance child safety.

*FY 14 Department Update:*  The Director has approved the plan to move forward with developing enhancements to CERAP.  The CERAP work group will convene to address changes or enhancements to CERAP as well as training development of safety planning.

*FY 15 Department Update:*  The CERAP workgroup met to continue work on enhancements to CERAP.  Staff are currently drafting recommendations for changes to CERAP for presentation to the Director prior to December 31, 2015.

**The Child Endangerment Risk Assessment Protocol (CERAP) should be amended to require that workers note when a risk factor cannot be answered because of insufficient information.  Under such circumstances, workers should be required to perform diligent inquiry into relevant facts for assessment within 48 hours.  The Department should develop procedures to ensure that there is follow-up and resolution of unknown variables (from OIG FY 05 Annual Report, Death and Serious Injury Investigation 9).**

*FY 07 Department Update:* The draft Child Endangerment Risk Assessment Protocol, currently being piloted, addresses this recommendation.

*FY 08 Department Update:* The recommendations resulting from the pilot were submitted to the Safety Workgroup, which is meeting regularly to incorporate these recommendations. There is a possibility of some additional slight modifications to incorporate the recent Department focus on Trauma-Informed practices. Procedures 300, Appendix G: Safety Assessment Enhancement, has been revised and will be implemented when changes to SACWIS are completed. The anticipated date of implementation is July 2009.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 10 Department Update:* The recommendation has been incorporated in the draft Safety Enhancement Protocol, *Procedure 300, Appendix G: Child Endangerment Risk Assessment*. The estimated date of implementation is July 2011.

*FY 11 Department Update:* The training for Enhanced Safety Model began in the fall of 2011 and will be completed in spring 2012. The Enhanced Safety Model allows the investigator to complete an initial Safety Assessment that includes gathering additional information before completing the assessment.

*FY 12 Department Update:* The Department and the Office of the Inspector General are continuing to review this recommendation toward maximizing child safety.

*FY 13 Department Update:* The Inspector General and the new Acting Director will discuss this recommendation and the Inspector General investigation on which it was based to determine whether its implementation will enhance child safety.

*FY 14 Department Update:* The Director has approved the plan to move forward with developing enhancements to CERAP. The CERAP work group will convene to address changes or enhancements to CERAP as well as training development of safety planning.

*FY 15 Department Update:* The CERAP workgroup met to continue work on enhancements to CERAP.  Staff are currently drafting recommendations for changes to CERAP for presentation to the Director prior to December 31, 2015.


**CHILD WELFARE EMPLOYEE LICENSURE (CWEL)**

**The Department should amend procedures to require the CWEL Division to notify the Department of Professional and Financial Regulation of any revocation of a CWEL license (from OIG FY 11 Annual Report, General Investigation 5).**

*FY 11 Department Response:* The requirement to notify the Department of Professional and Financial Regulation has been included in the draft of the amendments to Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors*. The amendments will be submitted to the Joint Commission on Administrative Rules (JCAR).

*FY 12 Department Update:* The Department is in the process of revising Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors*.

*FY 13 Department Update:* The Department of Professional Regulations does not regulate CWEL licenses, so this recommendation cannot be implemented.

*FY 14 Department Update:* Draft revisions to Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors,* includes the language that if an employee's CWEL license is suspended or revoked and they have a LCSW or LCPC, the Department will notify the Department of Financial and Professional Regulations.

*FY 15 Department Update:* The recommendation was incorporated into amendments to Rule 412.80, *Revocation and Suspension of License* effective May 15, 2015.

**The Inspector General recommended that Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors*, be revised:**

- **To permit the Department to refuse to issue a license with knowledge that the applicant had committed a violation that would warrant licensure revocation or if the applicant had engaged in behavior that would pose a risk to children or state resources;**
- **To expand the list of criminal pending charges or convictions that would warrant a refusal to issue a license to include any crime of which dishonesty is an essential element;**
- **To permit the Department to refuse to issue a license if the applicant provides false information during the licensing process;**
- **To provide guidelines for assessing whether certain unbarred criminal convictions and abuse or neglect findings should prevent licensure because of the characteristics of the crime;**
- **To permit the Division of Child Welfare Employee Licensure to refer applications for investigation to verify facts presented (from OIG FY 06 Annual Report, General Investigations 26).**

*FY 07 Department Update:* The Clinical Division, through the Child Welfare Employee Licensure (CWEL) staff, has drafted proposed changes to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors*. The draft of the proposed amendment incorporates input from the Inspector General, and the appointed Board members of the Child Welfare Employee Licensure (CWEL) program. The text of the proposed amendment will be submitted to the Director for review, approval, and transmittal to the Joint Committee on Administrative Rules (JCAR).

*FY 08 Department Update:* The revisions to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* were submitted to the Office of Child and Family Policy on November 21, 2008 and will begin the revision/comment process. The anticipated date of completion is June 2009.

*FY 09 Department Update:* The amended Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors,* has been submitted to the Joint Committee on Administrative Rules for review. The anticipated completion date is Fall 2010.

*FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License*, was filed in October 2009. The second Notice was never filed.  The Office of Child and Family Policy will resubmit the first notice again by January 2011, subject to approval.

*FY 11 Department Update:* The Department will resubmit the amendments to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* with the Joint Committee on Administrative Rules.

*FY 12 Department Update:* Revisions to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors,* have been distributed for comment.

*FY 13 Department Update:* Draft was sent to JCAR in June 2013 and in November 2013 the edited draft was submitted to DCFS Legal for review and facilitation of review by the Governor's Office.

*FY 14 Department Update:*  The recommendation is included in draft revisions to Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors*.  JCAR had questions on this revision after 1st Notice.  Negotiations on language are complete.  2nd Notice documents are being prepared.  The Department will seek Governor's office fiscal note and policy approval to file 2nd Notice.  The Department will file 2nd Notice as soon as all approvals to do so are secured.

*FY 15 Department Update:* The recommendation has been incorporated into Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors.* Policy Transmittal 2015.15 was issued to staff on June 1, 2015.


**The Department should amend Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors*, to provide specific provisions for voluntary relinquishment of a Child Welfare Employee License:**

- **A licensee may voluntarily relinquish his or her license at any time.**
- **The voluntary relinquishment of a CWEL during a pending licensure or disciplinary investigation or proceeding shall be recorded in the CWEL files as "*relinquished during licensure or disciplinary investigation or proceeding.*"**
- **Voluntary relinquishment of a license must be filed with the Child Welfare Employee License Division on a form prescribed by the CWEL Division.  The form must contain an acknowledgment that reinstatement will be subject to consideration of the facts disclosed in any pending licensure investigations or proceedings.  Voluntary relinquishment does not divest the Inspector General of the jurisdiction to complete a pending investigation.**
- **An Application for License from a licensee who previously relinquished his or her license shall be considered a Request for Reinstatement rather than an Application for License. (from OIG FY 08 Annual Report, General Investigation 30).**

*FY 08 Department Response:* The Department agrees.  The Office of Child and Family Policy has begun the revision process.

*FY 09 Department Update:* Revisions to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisor,* is currently being reviewed by the Joint Committee on Administrative Rules.

*FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License*, was filed in October 2009. The second Notice was never filed due to failure to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first Notice again by January 2011, subject to approval.

*FY 11 Department Update:* The Department will resubmit the amendments to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors,* with the Joint Committee on Administrative Rules.

*FY 12 Department Update:* Revisions to Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* have been distributed for comment.

*FY 13 Department Update:* Draft was sent to JCAR in June 2013 and in November 2013 the edited draft was submitted to DCFS Legal for review and facilitation of review by the Governor's Office.

*FY 14 Department Update:* The recommendation is included in draft revisions to Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors*. JCAR had questions on this revision after the 1st Notice. Negotiations on language are complete. 2nd Notice documents are being prepared. The Department will seek Governor's office fiscal note and policy approval to file the 2nd Notice. Due to delays within the reviews completed by the Governor's office, it is anticipated that we may not be able to file 2nd Notice before 12-31-14. The Department will file the 2nd Notice as soon as all approvals to do so are secured.

*FY 15 Department Update:* The recommendation has been incorporated into Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors.* Policy Transmittal 2015.15 was issued to staff on June 1, 2015.

**Section 412.100, *Restoration of Revoked or Suspended License*, should be amended as follows: Section 412.100, *Restoration of Revoked, Suspended or Relinquished License*: A licensee may request the restoration of his or her license by submitting a written request to the Board providing specific reasons to support the request. In considering an application to reinstate or grant a license that was relinquished during a pending licensure investigation or administrative proceeding, the Board shall consider any charges filed along with a report or sworn statement by the Office of the Inspector General regarding the evidence developed in the investigation. For the purpose of considering a Request for Reinstatement, the Board shall presume that the facts developed during the investigation or the pending charges are true, when the license was surrendered during a pending investigation or licensure proceeding; the licensee may rebut the presumption for good cause shown. The Board may not reinstate a license where it has been shown by investigation and administrative hearing that it is not in the best interest of the public to do so. Considerations that will be reviewed when making a finding of "in the best interest of the public" include, but are not limited to: the nature of the offense for which the license was revoked; the period of time that has elapsed since the revocation; evidence of rehabilitation; and character references (from OIG FY 08 Annual Report, General Investigation 30).**

*FY 08 Department Response:* The Department agrees.  The Office of Child and Family Policy has begun the revision process.

*FY 09 Department Update:* Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* is currently being reviewed by the Joint Committee on Administrative Rules.

*FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License,* was filed in October 2009. The second Notice was never filed due to failure to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first Notice again by January 2011, subject to approval.

*FY 11 Department Update:* The Department will resubmit the amendments to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* with the Joint Committee on Administrative Rules.

*FY 12 Department Update:* Revisions to Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* have been distributed for comment.

*FY 13 Department Update:* Draft was sent to JCAR in June 2013 and in November 2013 the edited draft was submitted to DCFS Legal for review and facilitation of review by the Governor's Office.

*FY 14 Department Update:*  The recommendation is included in draft revisions to Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors*.  JCAR had questions on this revision after the 1st Notice. Negotiations on language are complete. 2nd Notice documents are being prepared. The Department will seek Governor's office fiscal note and policy approval to file the 2nd Notice. Due to delays within the reviews completed by the Governor's office, it is anticipated that we may not be able to file the 2nd Notice before 12-31-14.  The Department will file the 2nd Notice as soon as all approvals to do so are secured.

*FY 15 Department Update:*  The recommendation has been incorporated into Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors.* Policy Transmittal 2015.15 was issued to staff on June 1, 2015.


## CONTRACT MONITORING

**The Department needs to take action with the mental health agency for violations of their contract with the Department (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 1).**

*FY 13 Department Response:* Due to the fact that the mental health agency's contract is shared with the Departments of Healthcare and Family Services and Human Services/Division of Mental Health as well as DCFS, the downstate DCFS Behavioral Health Services Administrator consulted with those two state agencies regarding an appropriate plan of corrective action for the involved mental health agency employees.

*FY 14 Department Update:* DCFS and the Department of Healthcare and Family Services conducted (DHFS) an on-site review of the agency. Administrative compliance was found to be acceptable.  Clinical issues were found and brought to the agency's attention, which the agency intends to dispute.  Significant billing issues were discovered, and these were referred to the DHFS Inspector General for direction on how to proceed. It was our expectation that further

interaction with the agency would occur, once a decision was made by the agency about how to address billing irregularities. At that point, we expect the agency to respond to all of the issues identified by the review team.

*FY 15 Department Update:* The SASS program is undergoing revision to be more responsive to the needs of children in psychiatric crisis by changing the focus to mobile crisis response rather than just assessing the need for psychiatric hospitalization. This revised programming will be implemented through the CARES Pilot Program catchment area of Champaign, Vermillion, Ford and Iroquois counties. The projected start date is January 1, 2016. DCFS, HFS and DHS/DMH are also working with Chapin Hall to revise the current version of the CANS and its subset, the CSPI. The goal of this revision is to enhance the utility of the instrument to be more reflective of the needs of children in psychiatric crisis so that more timely and accurate service planning can be accomplished.

**The Department's licensing division should change its practices so that it critically evaluates the facts in each substantiated complaint, even in first-time complaints, to determine what kind of action to take (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 11).**

*FY 13 Department Response:* Twice monthly supervision protocols have been established statewide. A review of substantiated licensing complaints will be conducted to insure that appropriate actions are taken as indicated.

*FY 14 OIG Comment:* The Inspector General investigation involved an unlicensed facility in which the Department investigated and found that the facility was operating illegally. Rule 383 requires that, "If the Department finds that the child welfare agency or child care facility is being, or has been, operating without a license or permit, the Department shall report the results of its investigation to the Attorney General and to the appropriate State's Attorney for investigation and, if appropriate, prosecution [225 ILCS 10/11]." The Inspector General investigation found that Department practice, however, was to request that no prosecution occur for first time offenders as stated in the following language which was added to the letter, "The Department is not seeking prosecution of the above-named owner/operator by your office at this time. However, I may contact you in the future to request prosecution if the facility continues to operate or resumes operation without a valid license or permit."

*FY 14 Department Update:* The Department has consulted with Legal Counsel and the above language will be removed from the letters that are sent out in these cases.

*FY 15 Department Update:* The CFS 596-24 form has been revised effective February 2015.

**The Department should conduct a Field Audit of the Agency and determine the following: (a.) actual administrative/direct expenses of Department programs through a programmatic analysis of functional job duties; (b.) identify consultants to ensure that all consultants have passed the required background checks and to verify that their costs are appropriately allocated; (c.) whether using staff allocated on a full-time basis to perform work for other contracts violates the Grant; (d.) the extent to which complaining employees performed additional duties for which they were to be compensated beyond their stated annual salary; (e.) when the additional counseling took place and whether it resulted in double billing to the Department; (f.) whether personnel and consultants in both programs have the required educational credentials and have passed the required background checks; (g.) whether billings are supported by timesheets, signature sheets of the party receiving services and progress or clinical notes; (h.) what rental or mortgage payments are being made, to**

whom and for what property.  Copies of any leases or other documentation of rental or mortgage payments should be secured.  Any automobile expense and payments should be analyzed, and logs reflecting any business use of the car should be secured.  Any disbursements that do not appear related to the Program Plan should be analyzed; (i.) whether more than 33% of billing is for indirect costs; and (j.) when travel time has been billed to the Department, whether the travel time billed is supported by corresponding travel documentation from staff (from OIG FY 13 Annual Report, General Investigation 10).

*FY 13 Department Response:* Field Audits has completed their review.  The Department is finalizing its contract with the forensic auditor to conduct a review of the agency.

*FY 14 Department Update:*  The Department anticipates the forensic audit being completed by January 31, 2015.

*FY 15 Department Update:*  The Forensic Audit has been completed and a Draft Report is being reviewed by Department personnel.  The review and corrections should be completed by January 31, 2016.

**The Department should amend its 2013 audit of the private agency to clarify that costs for the Founder/CEO's condo and for her personal vehicle are entirely disallowable expenses.  In addition, the Department should identify those expenditures for the two years preceding the audit as disallowable costs (from OIG FY 13 Annual Report, General Investigation 12).**

*FY 13 Department Response:* The Auditors will issue an Addendum to the Final Audit Report that will clarify that the costs for the Executive Director's condominium and personal vehicle are disallowable.  The agency, however, no longer has a contractual relationship with the Department and it will be difficult to determine excess revenue and recover funds.

*FY 14 Department Update:* The agency requested an Exit Conference and it was held on October 16, 2014.  They did not present any documentation that would change the findings and recommendations.  They received an Exit Conference Summary letter to this effect.  They requested an Administrative Hearing on Friday, November 28, 2014.  Once the Administrative Hearings Department schedules a date, we will proceed.

*FY 15 Department Update:*  The agency's Attorney has made a settlement offer.  The Department's Attorney is working on a response to their request and a hearing is scheduled for late December 2015.

**The Department should immediately initiate the review of the unit with an expectation of a written report no later than January 2014 (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 3).**

*FY 13 Department Response:* The Department has contracted for an independent review of psychiatric hospital programs for Department wards.

*FY 14 Department Update:* The Department anticipates the review to begin the third quarter of FY15.  The delay was due to the reviewer waiting for another review to be complete to utilize their review as a guide for completing the review of this provider.

*FY 15 Department Update:* The review was completed in March 2015 and a formal report was submitted.

**The current agency monitoring system fails to ensure safety of children, address noted agency deficiencies and problems and enforce contractual and other requirements. The Department should replace the existing monitoring system with a single coordinated system designed to competently evaluate agencies' performance, define the problem and develop solutions, and react to child safety concerns based on fact-gathering confirmatory measures. An effective monitoring system must combine and integrate programmatic, financial, licensing and contractual monitoring functions (from OIG FY 12 Annual Report, General Investigations 2).**

*FY 12 Department Response:* Implementation of this recommendation will be a component of the new monitoring design.

*FY 13 Department Update:* The non-substitute care monitoring system has been developed and will be distributed initially as an Action Transmittal in 12/13. This essentially incorporates these recommendations and is in alignment with the substitute care monitoring system developed by Regulation and Monitoring.

*FY 14 Department Update:* In December 2013, Policy Guide 2013.07, *Procedures 302.360 and 315.310,* was issued to provide instructions regarding the monitoring of non-substitute care service contracts. The Contract Charter group is charged with completing the draft procedures, which will incorporate all of the elements of Policy Guide 2013.07 and expand to include all contract monitoring requirements.

*FY 15 Department Update:* Policy Guide 2013.07, an instruction manual, and monitoring tools are provided to all monitors. Contract training is offered yearly and one-on-one training is also available as requested.

**The Department should review the Agency's allocation of salaries to the Program, including a review of whether staff performs direct or administrative services. [The Department cannot pay more than 20% of direct costs for administrative costs.] Based on the results of the review and the issues identified in this report, the Department should determine whether to continue contracting with the Agency (from OIG FY 12 Annual Report, General Investigations 28).**

*FY 12 Department Response:* The Department is currently planning this audit including a workplan/audit program. The Department should have a request of materials out to the Agency in December 2012.

*FY 13 Department Update:* The Department's Office of Internal Audits issued an audit initiation letter to the agency in May 2013 for a 906 review, Time and Attendance Records, Personnel Direct or Indirect Service Activities, and Cost Allocation Review for the audit period of July 1, 2007 through June 30, 2010. The audit entrance conference was held on June 12, 2013, on site audit field work continued through July 12, 2013, and an outstanding financial and personnel records request was provided at that time. The agency did not provide outstanding records until August 2013. Internal Audits is currently completing audit procedures for the agency and plans to issue a draft audit report to the agency by December 31, 2013.

*FY 14 Department Update:*  Following the loss of staff in the Office of Internal Audits which required re-assignment of several projects, a revised issuance date of prior to 12/31/14 was developed.  Final work regarding the Management Letter is almost complete and issuance of both the draft audit report and Management Letter will occur prior to the revised deadline.

*FY 15 Department Update:*  The Internal Audit report will be completed by December 31, 2015.

**From OIG FY 11 Annual Report, General Investigation 1: The Illinois Department of Children and Family Services should implement the following safeguards to their training and procedures:**

➢ **Vendors, grantees and contractors should be required to disclose all public contracts held by related parties in the Consolidated Financial Report (CFR). Instructions to the CFR should require contractors to report public funding of affiliates and related entities. Vendors, grantees and contractors should also be obligated to provide a description of programs supported by the public funding.**

➢ **Grants, contracts, program plans and independent audits should be electronically scanned, stored in a central location and made accessible to program and financial monitors for review.**

➢ **DCFS contract and financial monitoring training must be required for all DCFS program and financial monitors, as well as those reviewing annual audits, within three months of receipt of a contract monitoring assignment and every two years thereafter. Training should emphasize that the Program Monitor's *chief duty* is to verify, by personal knowledge, the receipt of goods and services provided.**

> **Any training should address, at minimum:**
> - **General grant monitoring responsibilities;**
> - **Audits including comparison of audit figures with approved budgets and related responsibilities;**
> - **Approval of Quarterly Reports and related responsibilities;**
> - **Rules and procedures regarding under spending and related responsibilities;**
> - **Rules and procedures regarding disallowable costs and related responsibilities;**
> - **Rules and procedures regarding reduction in grant amounts responsibilities;**
> - **Rules and procedures regarding excess revenue and allowable offset and related responsibilities; and**
> - **Rules and procedures involving inquiries into expenses to related entities and related responsibilities.**

➢ **In addition, all DCFS Program Monitors should be required to certify that:**
> - **the report of direct versus administrative expenses have been verified and is appropriately allocated;**
> - **the Program Monitor has considered whether to reduce future contract or grant amounts based on under-spending or disallowable costs;**
> - **the quarterly reports have been reviewed and compared to the budget; and**
> - **the Program Monitor has reviewed and approved leases supporting rental costs.**

➢ **On a biannual basis, each DCFS Deputy Director must submit to the DCFS Director and the DCFS Division of Finance, Technology and Planning, a list of each contract**

**monitored by his or her division and listing the program monitor assigned to each individual contract. The DCFS Division of Finance, Technology and Planning should be required to cross-check the list to ensure that all contracts are assigned a Program Monitor, and also to ensure that all Program Monitors receive the required Contract Monitoring Training. Every six months the DCFS Division of Finance, Technology and Planning should be required to forward to the DCFS Office of the Inspector General a list of any unmonitored contracts.**

*FY 11 Department Response:* Vendors, grantees and contractors will be required to disclose all public contracts held by related parties and public funding of affiliates and related entities as well as a description of the programs supported by the public funding in the Consolidated Financial Report ("CFR") to the DCFS Divisions of Finance, Technology, and Planning and Monitoring, which receive and analyze CFRs. These requirements will be incorporated into requests to vendors, grantees, and contractors for their CFR submissions for annual contract budget and financial desk audit activities. Estimated completion date and recommendations for compliance is 4th Qtr FY12.

Evaluation of the existing DCFS Division of Procurement and Contracts/Office of Contract Administration Access database, used to determine if grants, contracts, program plans and independent audits can be electronically scanned, stored in a central location and made accessible to monitors, is currently underway. Estimated completion date and recommendations for compliance is 3rd Qtr FY12.

The current contract and financial monitoring training program for grants will be updated by Division of Procurement and Contracts/Office of Contract Administration in conjunction with Divisions of Finance, Technology and Planning and Support Services. This effort will be coordinated and/or led by staff of the newly formed Office of Contract Compliance. Estimated completion date and recommendations for compliance is 3rd Qtr FY12.

Interim process controls include the tracking of monitors' visits to grantees and the tracking of metrics (i.e. number of clients and cost per client served) of all grantees. Tracking of metrics for all grantees awarded over $10,000 should be complete by the end of 2nd Qtr FY12.

A DCFS Administrative Procedure is being developed by the Division of Finance, Technology and Planning. This effort will be coordinated with staff of the Office of Contract Compliance once hired. Estimated completion date and recommendations for compliance is by 3rd Qtr FY12.

Subject to Senate confirmation, Richard Calica will become the Director of DCFS on December 15, 2011. He will be undertaking a comprehensive review of DCFS, including contracts, grants, and controls relating to the same. Under Mr. Calica, the processes above may be modified and/or added to.

*The following is the Department's Update for FY 12:*

- For FY13, DCFS requires all vendors, grantees and contractors (collectively, "contracting entities") with whom DCFS does business, to disclose all public contracts, pending contracts, bids, proposals and procurements held or done by the contracting entities. In FY 14, DCFS also will require contracting entities to provide a description of those programs funded by other public entities or related parties in order to identify instances where multiple public agencies are funding similar (or identical) programs. For certain contracts over $150,000, contracting entities must also submit to the DCFS Division of Finance, Technology and

Planning a Consolidated Financial Report ("CFR").  The Division of Finance, Technology and Planning reviews each submitted CFR to ensure that costs are appropriately allocated and that funding is not duplicated.  DCFS has revised the instructions for reporting on the CFR form to include, reinforce and make clear that all funding, including public funds received by the contracting entity, must be reported.  Those instructions will be sent to contracting entities beginning January 2013.   The Department is also developing procedures to facilitate appropriate information-sharing and coordination with the Office of Field Audits regarding identifying and recovering disallowed costs.  The estimated completion date for finalizing such procedures is the fourth quarter of FY13.

- The Department completed an evaluation of the existing DCFS Division of Procurement and Contracts/Office of Contract Administration Access database to determine if grants, contracts, program plans and independent audits can be electronically scanned, stored in a central location and made accessible to monitors.  DCFS concluded that use of the contract Access database for this purpose is not feasible.  Thus, the Department is developing a separate platform for such information including program, fiscal, license and performance information.  This information will be accessible to all Department monitoring staff, regardless of their monitoring function.  The estimated completion date is the fourth quarter of FY13.

- In the third quarter of FY12, the Department reviewed all its contracts to identify the responsible DCFS monitoring staff for each contract and the type of monitoring provided.  In addition, to the extent there were contracts to which no monitoring staff had been assigned, the Department made necessary assignments.

- With regard to training, the programs described below reflect all of the training-related recommendations.  Each monitor will attend the training program appropriate to his or her duties, and DCFS will train any new monitoring staff.

- Training for Contract and Fiscal Monitoring Staff:  The Department, through its Offices of Procurement and Contracts, Training, and Division of Finance, Technology and Planning, has updated the training program for contract and fiscal monitoring staff.  DCFS held the initial updated training, led by the staff of the Office of Contract Compliance, in the second quarter of FY12.  The Department will conduct the training annually.  Two sessions are scheduled for January and February of 2013.

- Training for Program Monitoring Staff: DCFS has revised its program monitoring model and training for program monitors.  All Department staff responsible for monitoring agency programs will follow the same model regardless of the type of service purchased.  The Department began training all program monitors on the new model in the second quarter of FY13.  Estimated completion date is the fourth quarter of FY13.

- Fraud Prevention and Detection Training (for all Monitoring Staff): The Office of the Illinois Attorney General and the DCFS Office of Inspector General developed fraud prevention and detection training.  The DCFS Inspector General and representatives of the Attorney General conducted two fraud prevention and detection training sessions for all DCFS leadership in November 2012.   This training will be rolled out to all contract, fiscal and program monitoring staff in the third quarter of FY13.

- The Department amended its audit instructions for FY13 to require a vendor's auditor to certify the vendor's fraud prevention and detection program.

- For grants, the Department implemented a centralized database to track budgeted costs, quarterly program costs, payroll tax and fringe benefit costs of all grantees (regardless of funding amount) and to record service quantity and quality metrics.  The database allows staff to identify and address deviations from budgeted costs.  The database is designed to assist staff in identifying and recovering any unspent funds at the end of the contract period.

- DCFS is developing administrative procedures and policies concerning the following: requirements for approval of a new provider; grant reconciliation procedures; program

monitoring criteria; and criteria for identifying financially and otherwise troubled vendors. The estimated completion date for these policies and procedures is the second quarter of FY 14.

- The Department established a work group in FY13 to develop additional strategies and to collaborate on overall contract monitoring, management, and fraud prevention and detection. Membership of the group includes Department management and the DCFS Office of the Inspector General.  The work group, among other things, is developing a new vendor orientation packet that will detail provider responsibilities around reporting, allowable costs and excess revenue.  This packet also will include information on where the vendor may go to find additional help and technical assistance.  The workgroup meets regularly.
- The Department is revising its Monitoring Protocol and Training. All Department staff who are Program Monitors will be required to attend the training and follow the Monitoring Protocol.

*The following is the Department's response for FY 2013:* In FY 13, the Department has:

- Provided fraud prevention/detection training conducted for DCFS executive, contract and program monitoring staff;
- Instituted annual training for all current and new contract and program monitoring staff;
- Assigned monitors to all department contracts;
- Segregated duties between people who issue contracts and people who monitor contracts  to provide for appropriate checks and balances and eliminate potential conflicts;
- Implemented a new contract monitoring model with four levels of compliance and corrective action;
- Developed an automated provider profile to track programmatic, fiscal, and regulatory health of contracted providers;
- Required all contracts to have measurable outcomes;
- Required providers to disclose third party transactions and ownership interests;
- Required vendors to identify actual location where services are provided;
- Required providers to identify contracts that were received from other state agencies and entities and a description of the work funded by that contract;
- Revised Audit Instructions requiring independent auditors to certify that vendor has a fraud prevention and detection program;
- Contracted with Dun and Bradstreet to identify financially vulnerable vendors on a more timely basis;
- Required program monitors to conduct a sample and verification of bills;
- Developed a red flag process to identify problems regarding, among other things, non-payment of staff and others as required in the contact;
- Issued an Request For Proposal for forensic auditing services;
- Developed a new vendor approval process and updated Requirements for Decision Memos to enter into new or modified contracts;
- Begun to develop an automated vendor billing system to reduce errors and include additional verification of services provided;
- Begun to develop a technical assistance program for new and struggling providers'
- Begun to align all FY15 purchasing decisions to the Department's strategic goals of safety, permanency, well-being and accountability.

DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS

*FY 14 Department Update:* The Request For Proposal for forensic auditing services has been completed. The contract has been awarded to a vendor and they have initiated work at DCFS direction.

The automated vendor billing system has been included in the Department's submission of requirements to the Enterprise Resource Planning (ERP) committee. The goal of ERP is to move Illinois towards upgrading to a single, unified system that will replace antiquated software developed independently by state agencies over many years.

A draft Administrative Procedure for addressing troubled providers and offering technical assistance has been developed. The purpose of the Administrative Procedure is to establish clear criteria for identification, monitoring and administrative actions with troubled purchase of service providers who contract with the Department. The Procedure also identifies department staff responsible for oversight of troubled providers and guidelines by which identified troubled providers are dispositioned by the Department. Estimated completion is June 30, 2015.

Beginning with the FY15 contract planning process the Department's strategic goals of safety, permanency, well-being and accountability were identified and factored into the decision making by Department Executive staff. In addition, work continues in relation to the Governor's Budgeting for Results or Illinois Performance Reporting System. The development, tracking and use of outcome metrics with benchmarks, continues to progress both in performance contracting as well as across all contracts.

*FY 14 OIG Update:* In the wake of the Inspector General's 2010 investigation which uncovered $18 million in fraud committed by a Department service provider, the Inspector General worked with the Office of the Attorney General to develop and present a comprehensive training for Department contract/program monitoring staff on fraud detection and prevention.

*FY 15 Department Update:* A Policy Guide was issued on December 6, 2013. In February 2014, the Office of the Inspector General provided training with Administration addressing Fraud Prevention. In March 2014, the Regional Administrators and Area Administrators received training on Monitoring. The annual contract training was completed in April 2014 on Monitoring and the Office of the Inspector General presented Fraud Prevention. In September 2014, a webinar was completed for Area Administrators monitoring Child Advocacy Centers. A monitoring training was completed with an individual program monitor for Universities in September 2015. Training for Intact Family Service Central Office Staff on Monitoring was completed on November 2015.

**When reviewing audits of grantees, line items in the audits should be compared to approved Budget line items. Deviations from the Budget must be approved by Program Monitors before the audit is approved. Unapproved expenses should be referred for overpayment recoupment (from OIG FY 12 Annual Report, General Investigations 27).**

*FY 12 Department Response:* The rate setting unit within the Division of Finance, Technology and Planning is currently comparing costs reported in the audit reports for the years ending on June 30, 2012 or later, as they are received from providers, with the fiscal years 4th quarter reports to see whether the reported costs match. The audits are then forwarded to the Office of Field Audits for desk review. Reports from providers will continue to be reviewed and compared throughout the current fiscal year.

Prior to conducting an audit, the Office of Field Audits contacts the program monitor to discuss the agency, and provides a copy of the audit when it is complete.  Procedures will be amended to require the program monitor to follow-up on findings as well as to refer the agency to the Department's Troubled Vendor Committee for action if warranted.

*FY 13 Department Update:* The Department has developed a draft monitoring protocol to better integrate monitoring functions and ensure that grant monitors review and compare budgets and audits.

*FY 14 Department Update:* The Department has constructed additional capabilities into the shared grant monitoring tool that automatically highlight material variances between budgeted costs and projected spending by line item.  This additional functionality is designed to allow contract monitors to quickly determine instances where projected spending is expected to materially differ from budgeted levels.  Contract monitors are trained on the importance of identifying and resolving conditions where spending levels by line are, or will be expected to be, materially different from budgeted values.

*FY 15 Department Update:*  The Department has incorporated the recommendation into the fiscal year 2016 contracts to address the line item reconciliation process.  Program Monitors will now have the responsibility to insure compliance with the line item reconciliation requirement and additional oversight will be provided centrally through the shared grant monitoring tool.

**Subcontractors under Department contracts should be subject to the same transparency as contractors.  All subcontracts to Department contracts should be listed and available for public viewing on the internet (from OIG FY 10 Annual Report, General Investigation 2).**

*FY 10 Department Response:* The Department agrees.  The Finance, Technology and Planning Division will work with the Office of Communication to determine if this is possible through the current system developed for public viewing of contracts on the internet.  An initial discussion was held and anticipated resolution is in 2011.

*FY 11 Department Update:* Contract Administration and Office of Information Technology Services staff will meet to determine how to implement this recommendation utilizing the Department's current technological systems.

*FY 12 Department Update:* The subcontract Agreement boilerplate was updated for Fiscal Year 2013 to reflect the same disclosures/transparency requirements as are required for primary contracts.  Implementation is still pending for appropriate technology to house and make all subcontracts available for public viewing. This will also be a component of the new monitoring design.

*FY 13 Department Update:* Subcontracts are not yet available on the internet for public viewing.

*FY 14 Department Update:*  Subcontracts are not available on the internet for public viewing, nor are the primary contracts.  Contracts and subcontracts are available to those within DCFS via the Budget and Finance Share-Point site.  Subcontracts are now logged, which they were not in FY10 and are subject to the same monitoring protocol as the primary vendor contracts.  They are also required to use the DCFS subcontract agreement that contains the same disclosures as the primary vendor contracts.  It is not feasible at this time to make contracts and subcontracts available via the internet as the Share point posting has been a huge undertaking as some vendors have as

many as 50 subcontracts.  We have implemented new measures to track, document, review and monitor subcontractors.  They are, in fact, subject to nearly the same scrutiny as the primary vendor.

*FY 15 Department Update:*  The Department is not able to post contracts on the internet at this time.

**The Department must develop a reliable Contract Monitoring process that would provide checks and balances and separation of functions to prevent the abuses.  The process must include (from OIG FY 06 Annual Report, General Investigation 12):**

- **Quarterly review of expenditures to ensure that expenditures were related to the Contract**;
- **Quarterly review of services, to ensure that the goods or services were provided;**
- **Contractual and Rule requirement that any contractual spending for services or items not specifically covered under the Contract must be approved, in writing, by the Contract Division;**
- **Lapsed funds and obligation of funds must be approved in writing by the Contract Division.**

*FY 11 Department Update:* Standards for each contract and responsibilities are in place.  Training for Fiscal Year 2012 started in October and will be completed this year. The Inspector General is continuing to work with the Attorney General to develop targeted monitoring and fraud detection training.

*FY 12 Department Update:* This will be incorporated into the Department's new monitoring design.

*FY 13 Department Update:* Project Charter was signed by the Director on 8/22/13 formalizing the contracting principals for the Department and establishing a workgroup to develop written policies/procedures governing the execution, utilization and monitoring of contracts.  Project Charter incorporates all of these recommendations.  The Action Transmittal will be issued in December 2013 and the procedure manual will be completed in January 2014.

*FY 14 Department Update:*  In December 2013, Policy Guide 2013.07, *Procedures 302.360 and 315.310,* was issued to provide instructions regarding the monitoring of non-substitute care service contracts.  The Contract Charter group has drafted procedures for all contract monitoring.  The group is charged with completing the draft procedures, which will incorporate all of the elements of Policy Guide 2013.07 and expand to include all contract monitoring requirements.

*FY 15 Department Update:*  Policy Guide 2013.07, an instruction manual, and monitoring tools are provided to all monitors.  Contract training is offered yearly and one-on-one training is also available as requested.

**D**OMESTIC VIOLENCE

**The Department should examine the continued utility of the Domestic Violence Screen and determine whether the Screen assists in assessing safety and risk to children (from OIG FY 12 Annual Report, General Investigations 1).**

> *FY 12 Department Response:* SACWIS 5.0 was not released as scheduled, thus the newly revised Domestic Violence Screen was not released.  The enhanced screening questions will be incorporated into the paper version of the Domestic Violence Screen and also included in updated Domestic Violence Policy and Domestic Violence Practice Guide.  The Department will work with the Office of the Inspector General to ensure that issues raised in this report are incorporated into the new Domestic Violence Screen.

> *FY 13 Department Update:* An update to the Statewide Automated Child Welfare Information System (SACWIS) was released in Spring 2013 and the updated, child-focused screening questions were incorporated into the Domestic Violence screen in SACWIS. As there is another scheduled SACWIS update in March 2014, additional screening questions will be added.  This will correspond with the evidence based, trauma focused practice recommendations identified to be added to the Domestic Violence Policy Guide.

> *FY 14 Department Update*:  Revisions to Appendix J, *Domestic Violence*, are being reviewed and decisions will be made to incorporate the language into the revisions to Procedures 300 due out 12/31/14.

> *FY 15 Department Update:*  The Domestic Violence Screen will be replaced with the Child Welfare Domestic Violence Screen, created collaboratively with the Office of the Inspector General. The recommendation will also be incorporated in Procedures 300-Appendix J.

**The Department should consider requesting the assistance of Child Advocacy Centers to interview children in investigations where there is chronic violence in the home and parents have failed in the past to cooperate with services (from OIG FY 12 Annual Report, General Investigations 1).**

> *FY 12 Department Response:* Training and/or procedures will be amended to remind investigators that the Child Advocacy Centers are a potential resource and may be helpful to families with chronic violence.  Parents have to consent to allow their child to be interviewed at a Child Advocacy Center and if they have been uncooperative, it is not likely they would agree.  DCFS will explore the efficacy of pursuing more court orders in homes with prevalent violence to compel parents to comply, and then seek use of CACs to interview those children.

> *FY 13 Department Update:* The recommendation will be incorporated into the revisions to procedures and a process established for developing the plan. Training and/or procedures will also be amended to remind investigators that the Children's Advocacy Center is a potential resource and may be helpful for families where chronic violence is present.

> *FY 14 Department Update*:  Revisions to Appendix J, *Domestic Violence*, are being reviewed and decisions will be made to incorporate the language into the revisions to Procedures 300 due out 12/31/14.

> *FY 15 Department Update:*  Procedures 300-Appendix J is in the process of being revised. Appendix J is expected to be completed by early 2016 and any updates to procedure 300 will be

incorporated by March 2016.  Interviewing at the CAC for chronic violence does not fall within the CAC protocols.  Operation staff will talk with the Statewide CAC Administrator by February 1, 2016 regarding this possibility.

**The Department should explore the use of court-ordered service compliance with intact families where there is a high level of risk of future violence and lack of cooperation with Department services (from OIG FY 12 Annual Report, General Investigations 1).**

*FY 12 Department Response:* Training and/or procedures will be adopted to ensure that the field is aware that court-ordered service compliance should be considered for families suffering from chronic violence who are non-compliant with services.

*FY 13 Department Update:* The recommendation will be incorporated into the revisions to procedures and a process established for developing the plan. The Department will also explore the efficacy of pursuing more court orders in homes with prevalent violence to compel parents to comply and then seek use of Children's Advocacy Centers to interview those children.

*FY 14 Department Update*:  Revisions to Appendix J, *Domestic Violence*, are being reviewed and decisions will be made to incorporate the language into the revisions to Procedures 300 due out 12/31/14.

*FY 15 Department Update:* The recommendation will be incorporated into revisions to Procedures 302.

**Policy Transmittal 2010.23, which issues revisions to Procedures 302.260, *Domestic Violence Practice Guide*, and Procedures 300, Appendix J: *Domestic Violence*, provides for batterers to remain in the home with a domestic violence safety plan.  This policy should be amended to clarify that when domestic violence has occurred in the home, it is presumed that the home environment is too dangerous for the child to remain, unless the perpetrator of violence is out of the home.  Policy Transmittal 2010.23 should make clear that establishing a domestic violence safety plan for children should not preclude taking protective custody (from OIG FY 12 Annual Report, General Investigations 1).**

*FY 12 Department Response:* The Department will clarify this language in the Policy Transmittal.

*FY 13 Department Update:* Procedure 300 Appendix G, CERAP, was revised and a policy transmittal was issued on 5-17-13. Procedures 300 Appendix J, Domestic Violence, will also be revised to omit the language that a safety plan can be developed if the batterer remains in the home. The revisions will be outlined in a new Policy Transmittal when the revisions are complete.

*FY 14 Department Update*:  Revisions to Appendix J, *Domestic Violence*, are being reviewed and decisions will be made to incorporate the language into the revisions to Procedures 300 due out 12/31/14.

*FY 15 Department Update:*  Procedures 300-Appendix J is in the process of being revised. Appendix J is expected to be completed by early 2016 and any updates to procedure 300 will be incorporated by March 2016. In addition an Information Transmittal clarifying the expectations regarding this recommendation will be sent to staff.

*FY 15 OIG Comment:* In FY 13, the Department reported that Procedures 300 Appendix J, Domestic Violence, would be revised to omit the language that a safety plan can be developed if the batterer remains in the home. The Office of the Inspector General reiterates the need to make this critical change.

**The Domestic Violence protocol should be revised to address the cumulative effect of domestic violence and strategies for addressing cases of chaotic family life in which the victim/abuser dynamic results in an incalculable emotional toll to the children, including collaboration with DCFS Clinical and the Office of Legal Services (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 11).**

> *FY 11 Department Response:* Statewide Administrator of Specialty Services and the Administrator of Domestic Violence Intervention Program will schedule a series of meetings with Cook and Downstate Deputy Legal Counsel to review the Domestic Violence protocol, to assess the efficacy of current protocol, review current research as well as evidence-based practice recommendations and revise the existing protocol.  A redacted copy of this investigation and the recommendation will be shared with participants at the meeting.

> *FY 12 Department Update:* The enhanced Domestic Violence Screen in SACWIS 5.0 offers investigative and casework staff additional questions in screening and interviewing for domestic violence. The Department is in the process of revising the Domestic Violence Practice Guide.

> *FY 13 Department Update:* The Clinical Division is in the process of revising the Domestic Violence Practice Guide.  The guide will be updated to include evidence based, trauma-focused research that addresses the cumulative effect of domestic violence on children.  The guide will also offer practice recommendations for the field and is anticipated to be completed in March 2014.

> *FY 14 Department Update*:  Revisions to Appendix J, *Domestic Violence*, are being reviewed and decisions will be made to incorporate the language into the revisions to Procedures 300 due out 12/31/14.

> *FY 15 Department Update:*   The recommendation will be incorporated into revisions to Procedures 300-Appendix J. This will include instruction for collaboration with clinical and legal staff in domestic violence cases. Clinical will continue to collaborate with Operations and DCFS Legal regarding the need to address in service delivery regarding the effects of domestic violence on children. Domestic Violence Specialists will also continue to provide in-service presentations to private agency and Department staff regarding interventions for the trauma effects of domestic violence on children.

**The Department should integrate into its Domestic Violence protocol the need for increased scrutiny and heightened risk when a person suspected of being a victim of domestic violence has provided false information to protect an abuser of his or her child (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 12).**

> *FY 11 Department Response:* This case was presented as an in-service training at the regular Regional Clinical Managers meeting.  The managers were provided guidance as to what actions to take in the future on similar case situations. Specifically, if such a situation happens again where Clinical staff in the process of staffing a case have safety concerns they are to take

proactive action.  The Regional Clinical Manager will make sure that the worker's supervisor, POS and DCFS Agency executive casework staff and APT monitor (for POS) are made aware of the concerns and seek action.  If the manager is not able to resolve this at their level they are to immediately inform (both by phone and in writing) their immediate supervisor and the Associate Deputy of Clinical.  The Associate Deputy will intervene and seek to resolve the issue(s). If needed he/she will seek the intervention of the Deputy Director to assure that safety concerns are addressed at the highest level warranted.

The Administrator of the Specialty Services Unit and the Administrator of the Domestic Violence Intervention Program will update and revise the Domestic Violence Practice Guide to reflect the practice dynamics of this case.  The dynamics of this case are indicative of power and control that occurs in domestic violence cases, and will be incorporated as examples in the training on the Domestic Violence Practice Guide.

*FY 12 Department Update:* The Department is in the process of revising the Domestic Violence Practice Guide.

*FY 13 Department Update:* The Domestic Violence Practice Guide has been developed and will be incorporated into SACWIS for use by the field.

*FY 14 Department Update*:  Revisions to Appendix J, *Domestic Violence*, are being reviewed and decisions will be made to incorporate the language into the revisions to Procedures 300 due out 12/31/14.

*FY 15 Department Update:*  The recommendation has been incorporated into Procedures 300.50(k)(2)(D), *Failure to Protect*. Procedures 300-Appendix J is in the process of being revised. Appendix J is expected to be completed by early 2016 and any updates to procedure 300 will be incorporated by March 2016. In addition an Information Transmittal clarifying the expectations regarding this recommendation will be sent to staff.

**In rural areas where there is suspicion of drug involvement or domestic violence, the Department should consider requiring investigators to include the local sheriff's department when requesting incident reports (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 11).**

*FY 10 Department Response:* The Department agrees.  The recommended language is being added to Department Procedure 300.60 (g), *Other Required Investigative Contacts*.

*FY 11 Department Update:* This information was incorporated into a draft policy transmittal concerning law enforcement involvement in child abuse investigations and includes the Child Abuse Law Enforcement Notification form developed by the Office of the Inspector General. All documents have been forwarded to the Office of Child and Family Policy. The targeted implementation date is June 2012.

*FY 12 Department Updat*e: The recommendation has been incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification*. The recommendation will be included in revisions being made to Procedures 300, *Reports of Child Abuse and Neglect.*

*FY 13 Department Update:* The recommendation was incorporated into Policy Guide 2012.02 and will be included in revisions to Procedures 300, *Reports of Child Abuse and Neglect.*

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:*  The recommendation has been incorporated into Procedures 300.50(k)(3), *Additional Circumstances that Require Notification of Law Enforcement*. Training is currently in process.


## FOSTER HOME LICENSING

**The Department should formalize a process wherein the Placement Clearance Desk notifies the appropriate Day Care Home Licensing personnel of any foster placements in dual license homes moving forward (from OIG FY 14 Annual Report, General Investigation 2).**

*FY 14 Department Response:* Revisions are being incorporated into Department Procedures 301, *Placement and Visitation Services*, Appendix E, *Placement Clearance Process*.

*FY 15 Department Update:* The recommendation has been incorporated into Procedures 301-Appendix E(II)(c), *Clearance Issued.*


**The Department should require licensing entities to get a consent and review the child protection investigation as part of the enforcement process for recommending a waiver of a Child Abuse and Neglect Tracking System (CANTS) indicated finding (from OIG FY 14 Annual Report, General Investigation 3).**

*FY 14 Department Response:* A policy guide will be issued and shall include the requirement for licensing staff to gain a written consent from the applicant (for licensure) in order to review the indicated and redacted child protection report, before making a request for a waiver for an indicated perpetrator who resides in the household.  Department Rules & Procedures 383, *Licensing Enforcement*, are open for review and the policy guide directives shall be incorporated into them at time they are adopted.

*FY 15 Department Update:* The recommendation was incorporated in Policy Guide 2015.06 which was issued on March 19, 2015.


**In order to educate foster parents on evidence based practice, the Department should make available legitimate websites that reference evidence based treatment, such as Parent Child Interaction Therapy (PCIT) and the National Alliance on Mental Illness (NAMI) family guide (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 1).**

*FY 13 Department Response:* The Office of Training will place hyperlinks to evidence based internet sites for foster parents on the DCFS training system (www.dcfstraining.org).  The list of hyperlinks will also be included in the On-Line Foster PRIDE training course.  In addition, the Office of Training and Clinical Division staff will provide each foster care agency director with a list of internet sites that reference evidence based treatment models including Inspector General

recommended sites and those used through the DCFS Permanency Improvement Initiative Grant and the Title IV-E Waiver program for the care of infants through age three.

*FY 14 Department Update:* The updates to the DCFS Foster PRIDE curriculum are ready for use and will be introduced beginning January 1, 2015. The evidence-based reference in the form of on-line links to the learning resources of the National Alliance on Mental Illness (NAMI) Family Guide and the Parent Child Interaction Therapy resources are included in the PRIDE updates.

*FY 15 Department Update:* This recommendation will be included in the updated PRIDE curriculum. The PRIDE curriculum is under revision and not ready for implementation at this point. The PRIDE manager is following up on this recommendation to ensure these resources are provided in the current PRIDE training in the interim.

**In FY 14, the Office of the Inspector General revised the recommendation made in the OIG FY 09 Annual Report, Death and Serious Injury Investigation 11, to state: Rule and Procedure and Training should be amended to clarify that in any Department Licensed facility, dogs must be observed to ensure that there are no outward and obvious signs of abuse or neglect of the animal and to observe whether the dog is socialized with family member(s) at the initial licensing visit and every monitoring licensing visit to ensure that any dogs in the home do not present a danger to children.**

*FY 14 Department Update:* Rule and Procedure 402, *Licensing Standards for Foster Family Homes*, are currently open and these recommendations have been incorporated into the revision. It is anticipated that Rule would be filed in 3rd quarter FY 15. Revisions to the CFS 597-FFH (Family Foster Home Licensing Monitoring Record) & CFS 506-I (Initial Foster Home Licensing Assessment) are in process. Expected implementation date is 12/15/14.

*FY 15 Department Update:* The 506-I (Initial Foster Home Licensing Assessment) and 597-FFH (FAMILY FOSTER HOME LICENSING MONITORING RECORD) were both revised in December 2014. Procedures 402 already require use of the two forms before initial licensure (506-I) and subsequent monitoring visits that occur after licensure (597-FFH).

**The Department should amend Procedures 301, Appendix E, *Placement Clearance Process*, to provide guidelines for the monitoring and resolution of involuntary placement holds. These guidelines should include instructions for requesting the removal of an involuntary placement hold. The guidelines should also require that when an involuntary placement hold is placed on a foster home, the licensing worker and licensing supervisor should re-evaluate the placement hold every six months (from OIG FY 10 Annual Report, General Investigation 4).**

*FY 10 Department Response:* A Department committee is drafting revisions regarding involuntary placement holds.

*FY 11 Department Update:* Revisions to Procedures 301, Appendix E, *Placement Clearance Process* have been drafted and submitted to the Office of Child and Family Policy for further review.

*FY 12 Department Update:* Placement Hold procedures are being drafted. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* A workgroup is working on the implementation of this recommendation.

*FY 14 Department Update:*  The workgroup continues to draft revised procedures.

*FY 15 Department Update:*  Licensing staff currently monitors the homes they place on hold through an assessment process. Operations staff will work with Licensing staff to develop a Department wide process to monitor placement holds. The process will require, at a minimum, a yearly update indicating the need for the home to remain on hold or notification that the hold may be lifted. The process will also be incorporated into Procedures.

**The Department should amend Department Rule and Procedure 402*, Licensing Standards for Foster Family Homes*, to require that licensing workers identify alternate caregivers, determine where the alternate care will take place and perform background checks in accordance with Rule 385*, Background Checks*, of all adults and those over 13 years of age residing in the alternate care home when the care will take place other than in the foster parent's home (from OIG FY 09 Annual Report, General Investigation 3).**

*FY 09 Department Response*: Revisions to Rule 402, *Licensing Standards for Foster Family Homes*, are being drafted that would require that licensing staff identify alternative caregivers and perform background checks in accordance with Rule 385, *Background Checks*, of all adults and those over 13 years old residing in the alternate care home.

*FY 09 OIG Response:* The critical information that needed to be gathered in this case was where the care was being provided.  Unless the Department requires information about where the care is being provided, the harm that the children were subjected to in this case could be repeated.

*FY 10 Department Update:* No update provided.

*FY 11 Department Update:* The Department will be further reviewing this recommendation before amending Rule and Procedure 402, *Licensing Standards for Foster Family Homes*, to determine if Part 301, *Placement and Visitation Services*, also needs amending, with regards to children not in a licensed home receiving care or placement with an alternate caregiver.

*FY 12 Department Update:* The Department will conduct further review of this recommendation.

*FY 13 Department Update:* The Bureau of Operations, the Office of Child & Family Policy, and DCFS Legal are currently developing procedures regarding alternate caregivers for foster children and the legalities in conducting background checks for such caregivers.

*FY 14 Department Update*: Rule 385, *Background Checks,* revisions include language addressing babysitters (non-licensed service providers). The Department is waiting for approval from the Governor's Office to file second notice on Rule 385. We anticipate adopting this Rule amendment in the third quarter of FY 15.

*FY 15 Department Update:*  Rule 385 was amended and Policy Transmittal 2015.06 and corrected Policy Transmittal 2015.08 were issued to staff.

**The Department should issue a policy memorandum that states that whenever possible, each foster home should have a single entity that monitors placement of foster children and foster home licensing. The Department may grant waivers to the policy based on individual children's needs but must ensure that the guidelines stated above are in place whenever a waiver is granted (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:* The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update:* No update provided.

*FY 11 Department Update:* The Deputy Director of Monitoring will co-chair a subcommittee with Agency Performance Team, Licensing, private agency and Department staff to address these issues.  The anticipated start date is January 2012.

*FY 12 Department Update:* This will be included in the new monitoring design.

*FY 13 Department Update:* The policy statement is being developed for distribution in fiscal year 2015.

*FY 14 Department Update:*  Agency Performance Team (APT) Monitoring Tools shall be revised and access to the PR04 screen for APT staff shall be provided by 12/1/14.

*FY 15 Department Update:*  Monitoring tools have been updated.  The majority of APT staff have access to PR 04 and access will be requested for newer staff that do not yet have access. This will ensure that agency performance monitors, who monitor all foster care agencies, are able to easily determine the licensing agency for a foster home, who is placed in the foster home and which agency services each child in the home. Therefore, the APT monitor can share any licensing concerns with all of the agencies involved with a single foster home and with DCFS Licensing Enforcement simultaneously.

**Whenever a waiver is granted, and case responsibility is transferred to a single agency, the relinquishing agency should not be penalized, but should be moved up for case rotation assignment of a new case (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:*  The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update:* No update provided.

*FY 11 Department Update:* Agencies are not penalized when case responsibility is transferred to a single agency.

*FY 11 OIG Response:* When shared cases are transferred, the agency loses funding. The agency transferring the children should receive immediate consideration for new placements.

*FY 12 Department Update:* The agencies loss of such cases is taken into account in terms of the percentage of referral opportunity to replace the case that was transferred.  The child's geography and the other agencies in the area with lower percentage of referrals are factored in terms of when the agency that transferred such a case would meet the criteria for a replacement intake.

*FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years. The Director's Office and Operations will collaborate when there is a waiver request to ensure agencies are not penalized.

*FY 14 Department Update:* Department staff are meeting to discuss implementation of this recommendation.

*FY 15 Department Update:*  Current practice has been revised so that agencies are no longer penalized when case responsibility is transferred to a single agency.


## LAW ENFORCEMENT

**When there has been a prior serious indicated abuse finding or a prior conviction for serious battery to a child, and a parent is permitting continued access to the child by the abuser, the Department must secure the full investigative file from law enforcement prior to closing the CA/N investigation (from OIG FY 14 Annual Report, General Investigation 4).**

*FY 14 Department Response:* The recommendation has been incorporated into revisions to Department Procedures 300, *Reports of Child Abuse and Neglect*, which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:* The recommendation has been incorporated into Procedures 300-Appendix B(h)(2)(M). Training has commenced and will continue through January of 2016.


**The Integrated Assessor must be provided with a copy of the police report, the mother's statement to police following the 20-hour incident and the chronology prepared by the Inspector General's Office.  The next Integrated Assessment must address whether the mother has the capacity to protect her children in light of her current minimization and continued lack of honesty with professionals (from OIG FY 14 Annual Report, General Investigation 4).**

*FY 14 Department Response:* The domestic violence specialty service program provided a clinical consult with then-assigned private agency team.   The domestic violence specialty program subsequently provided the family's new case managing agency recommended documentation including a copy of the clinical consultation report.

*FY 15 OIG Comment:* After her six year old child was brutally tortured, abused and humiliated for 20 hours, the mother welcomed the abuser back in their home after his prison sentence ended. Moreover, within days after the torture, the mother began denying and minimizing her paramour's behavior and lying to professions to protect him over her children. The Department's assessment failed to address these issues and determine the mother's capacity to protect her children.

*FY 15 Department Update:* Clinical referrals specific to the question of a parent's capacity to protect their children will include a referral for a parenting capacity assessment by an approved licensed provider as clinically indicated.

**This report should be used as a case study with DCFS Chicago Police Department liaisons and the Chicago Police Department coordinators to address future collaborative efforts between the Chicago Police Department and DCFS (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 5).**

*FY 14 Department Response:* The Department's quarterly meeting with the Chicago Police Department Coordinators was attended by CPD Commanders from each area and area coordinators from areas south and central. The redacted Inspector General report was reviewed with emphasis on better outcomes and decision-making for both entities when there is clear and consistent communication. The Department, through its liaisons and SCR, will assist CPD in determining if a family has open involvement with DCFS.

*FY 14 OIG Response*:  According to the DCFS Chicago Police Department Liaisons, while communication has improved with Detectives investigating major crimes, Child Protection Investigators continue to have difficulty accessing patrol officers to obtain information about open investigations. The Inspector General is coordinating with the CPD Chief of Patrol to facilitate communication between patrol officers and child protection investigators.

*FY 15 OIG Update:* The Inspector General's Office provided DCFS Police Liaisons with pertinent contact information to assist in facilitating communication efforts between Chicago Patrol Officers and DCFS.

**For the safety of the worker and child, the State Central Register should notify local police when allegations include information about a large quantity of illegal drugs (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 15).**

*FY 11 Department Response:* If during a child protection investigation, a DCP investigator observes large quantities of drugs, they will notify law enforcement. The Department plans to issue a Law Enforcement Notification Policy Guide to implement this practice.

*FY 12 Department Update:* The recommendation was incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification*, and distributed in January 2012. The recommendation will be incorporated into procedures.

*FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years.

*FY 14 Department Update:*  The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:* The recommendation will be incorporated into revisions to Procedures 300 which will be issued in March 2016.

**When a child is hospitalized for injuries or conditions that are suspected to be the result of abuse or neglect by a primary caregiver and there is a concurrent law enforcement and child protection investigation, there must be a safety planning conference between law enforcement and child protection before the child is discharged (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 8).**

*FY 10 Department Response:* The Department agrees. Department Procedure 300.50, *Reports of Child Abuse and Neglect, Initial Investigation,* will be amended to include the recommended language.

*FY 11 Department Update:* This information was incorporated into a draft policy transmittal concerning law enforcement involvement in child abuse investigations and includes the Child Abuse Law Enforcement Notification form developed by the Office of the Inspector General. All documents have been forwarded to the Office of Child and Family Policy.

*FY 12 Department Update:* The recommendation was incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification*, and distributed in January 2012. The recommendation will be incorporated into procedures.

*FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years.

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:* The recommendation has been incorporated into Procedures 300.50(k)(3), *Additional Circumstances that Require Notification of Law Enforcement*. Training is in process and will be complete in January 2016.

**In cases where police have a pending criminal investigation, Division of Child Protection investigators should not reveal a preliminary finding of unfounded to the family prior to a supervisory conference to explore whether another conference with law enforcement should take place (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 8).**

*FY 10 Department Response:* A practice memo will be distributed to child protection staff.

*FY 11 Department Update:* This information was incorporated into a draft policy transmittal concerning law enforcement involvement in child abuse investigations and includes the Child Abuse Law Enforcement Notification form developed by the Office of the Inspector General. All documents have been forwarded to the Office of Child and Family Policy.

*FY 12 Department Update:* The recommendation was incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification*, and distributed January 2012.  The recommendation will be incorporated into procedures.

*FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years.

*FY 14 Department Update:*  The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:*  The recommendation has been incorporated in Procedures 300.50(b)(3), *Good Faith Determination*. Training is in process and will be complete in January 2016.

**The Department should pursue an interagency agreement with the Illinois Law Enforcement Alarm System to identify the local law enforcement agency with jurisdiction to provide written notification of the Hotline reports required by statute and Department Rule (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 10).**

*FY 10 Department Response:* A letter was sent to the Illinois Law Enforcement Alarm System (ILEAS) Director requesting access to the ILEAS System.  Upon receipt of access to the system, State Central Register staff will be trained.

*FY 11 Department Update:* The meeting with the Illinois Law Enforcement Alarm System and State Central Register (SCR) occurred and determined it is not possible to develop the interface as recommended.  It was determined SCR is not the most efficient unit to pinpoint the law enforcement office of jurisdiction. Rather, the Division of Child Protection team supervisor is responsible for ensuring notification to the local law enforcement and following up for their decision. This information was incorporated into a draft policy transmittal detailing the Child Abuse Law Enforcement Notification process, including the notification form drafted by the Office of the Inspector General.  The policy transmittal and notification form have been submitted to the Office of Child and Family Policy for review and the targeted implementation date is June 2012.

*FY 11 OIG Response:* The State Central Register (SCR) is the best unit for first response. The critical importance of such notifications, along with the harm that can result from failure to notify, warrants a two-pronged approach that would allow SCR to coordinate with the Illinois Law Enforcement Alarm System and also allow child protection staff to follow-up with local law enforcement. The Illinois Law Enforcement Alarm System is an emergency response system that coordinates federal disaster response with State agencies. The Department should take advantage of this coordinated System.

*FY 12 Department Update:* The recommendation was incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification*, and distributed January 2012.  The recommendation will be incorporated into procedures.

*FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years.

*FY 14 Department Update:*   The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.  The CANTS 14 form is used by field staff for this notification.

*FY 15 Department Update:* The recommendation will be incorporated into revisions to Procedures 300 which will be issued in March 2016.

**The State Central Register should adopt a form to provide written notification to local law enforcement of the Hotline reports required by statute and Department Rule (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 10).**

*FY 10 Department Response:* The form is currently being developed.

*FY 11 Department Update:* Notification to local law enforcement in child abuse investigations has been developed and all documents, including the notification form have been submitted to the Office of Child and Family Policy. Procedures 300, *Reports of Child Abuse and Neglect*, will be revised to incorporate these changes. The targeted implementation date is June 2012.

*FY 12 Department Update:* The recommendation has been incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification* and CANTS-14 form, *Child Abuse Law Enforcement Notification.* The recommendation will be included in revisions being made to Procedures 300, *Reports of Child Abuse and Neglect.*

*FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years.

*FY 14 Department Update:*   The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.  The CANTS 14 form is used by field staff for this notification.

*FY 15 Department Update:* The recommendation will be incorporated into revisions to Procedures 300 which will be issued in March 2016.

**Department Procedure 300.70, *Special Types of Reports,* should be amended to include second-degree burns as injuries requiring referrals to local law enforcement and the State's Attorney (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 5).**

*FY 07 Department Response:* Language regarding this recommendation is being drafted and will be submitted to the Office of Child & Family Policy for approval.

*FY 08 Department Update:* The Inspector General's recommendation was based on a request by the Children's Advocacy Center (CAC). The Department continues to review the feasibility of the recommendation.

*FY 09 Department Update:* In Procedures 300, *Reports of Child Abuse and Neglect* (Appendix B, Allegations, Burns 5/55), the Department will add "notification to State's Attorney on 2nd, 3rd, and 4th degree burns" in order to implement the recommendation.

*FY 10 Department Update:* Procedure 300, *Reports of Child Abuse and Neglect*, Appendix B-*The Allegation System*, Allegation #5-Burns will be amended to include notification to State's Attorney in cases of 2nd, 3rd, and 4th degree burns. The Department is awaiting approval from the Joint Committee on Administrative Rules (JCAR) to move forward.

*FY 11 Department Update:* The Office of Child and Family Policy is currently drafting amendments to 300.70, *Special Types of Reports*, to include the new law enforcement child abuse notification form and referrals to law enforcement for second degree burns. The estimated completion date is December 2011.

*FY 12 Department Updat*e: The recommendation has been incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification*. The recommendation will be included in revisions being made to Procedures 300, *Reports of Child Abuse and Neglect.*

*FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years. Policy Guide 2012.02 was distributed to staff and will be incorporated into Procedure 300 revisions.

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:* The recommendation will be incorporated into revisions to Procedures 300 which will be issued in March 2016.


**LEGAL**

**The Department should revise Rule 336, *Appeals of Indicated Abuse/Neglect Findings*, to include the following: (a). It is presumed that physicians and other professional testimony by phone is permitted unless for good cause shown. When good cause is shown, the ALJ's Recommendation shall note that testimony by phone was disallowed and why; (b.) Whenever a critical piece of evidence is excluded, the ALJ's Recommendation shall so state and include an explanation of the reasons therefore; and (c.) Grounds for dismissal (Rule 336.190) should include: "The appellant has admitted in a court of law to the facts supporting the Rationale for the indicated finding." (from OIG FY 13 Annual Report, General Investigation 19).**

*FY 13 Department Response:* The recommendations have been implemented in practice. Department Rules will be revised to reflect these recommendations.

*FY 14 Department Update:* Revisions to draft of Rule 336, *Appeals of Indicated Abuse/Neglect Findings,* required additional edits to comply with ANCRA definitions. The Department will seek fiscal note and policy approvals from the Governor's office in order to file the 1st Notice.

*FY 15 Department Update:* Office of Child and Family Policy has sent the request for a fiscal note to the Governor's Office of Management and Budget (GOMB) for approval. After approval is received they will seek the Governor's Office approval to file a Second Notice.

**In FY 2013, a state court found against the Department for entering into a safety plan for removal of the children after the States Attorney had told them that there was insufficient evidence that the child was at any risk of harm. In that case, doctors stated at the outset that they did not believe that the child's injury was the result of abuse or neglect. The decision was shared with the field without explanation from the Department's Office of Legal Services. As a result, the myth grew in the field that it was best to avoid asking the States Attorney to Petition for Removal. The Inspector General investigated the death of a child who was at serious risk of physical harm and protective custody should have been taken. The investigator and supervisor had not sought to screen the child's case into court because of the misguided fear that it would preclude them from entering into a safety plan with the family. The Inspector General therefore recommended:**

**The Department's Office of Legal Services must correct the misperceptions in the field regarding a recent court decision in which the Department was held liable for wrongly retaining custody of a child (*Hernandez v. Foster*, 657 F.3d 463). (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 7).**

*FY 13 Department Response:* The Department will issue a Policy Alert to inform staff of the necessary changes in practice while working to incorporate the changes into Procedure. Language addressing this recommendation was incorporated into Procedures 300, Appendix G, *Child Endangerment Risk Assessment.*

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:* The recommendation was incorporated in Procedures 300-Appendix G(j), *Safety Planning.* Training is in process and will be complete in January 2016.

**The Department's Office of Legal Services should have quarterly discussions of new case law with managers and supervisors so the field has an adequate understanding of their effect on practice. The Office of Legal Services must translate the legal opinions into practical guidelines that can be implemented into practice (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 7).**

*FY 13 Department Response:* The Office of Legal Services will update Operations staff on new case law that impacts practice.

*FY 14 Department Update:*  The Office of Legal Services will update Operations staff on the case law that impacted the issues in the investigation.

*FY 15 Department Update:*  The requirements of Hernandez vs. Foster have been incorporated into Procedures 300-Appendix G and DCFS Legal has conducted training.  While there has not been a similar case or case law that requires training, DCFS Legal has conducted training for investigation staff on cases and other legal issues that impact litigation including Allegation #60.

**When there is a pending criminal investigation involving the same victims with similar allegations in a Child Protection (DCP) investigation, the DCP supervisor and investigator should consult with the Department's Office of Legal Services for an opinion or case conference with the State's Attorney to determine a course of action to ensure protection of the child without jeopardizing the criminal investigation (from OIG FY 13 Annual Report, General Investigation 8).**

*FY 13 Department Response:* Child protection will work closely with the Office of Legal Services to ensure compliance with this recommendation. This recommendation will be included in revisions to Procedures 300, *Reports of Child Abuse and Neglect.*

*FY 14 Department Update:*  The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:* The recommendation will be incorporated into revisions to Procedures 300 which will be issued in March 2016.

**In intact family services cases with a pending criminal investigation, the involved Child Advocacy Centers must convene a multi-disciplinary case conference with the Family Advocate, law enforcement and the agency providing intact family services to provide information critical to managing the case while protecting the integrity of the criminal investigation and the safety of involved children (from OIG FY 13 Annual Report, General Investigation 8).**

*FY 13 Department Response:* The Department agrees. The Inspector General's Office will address this recommendation with the Cook County Child Advocacy Advisory Board.

*FY 14 OIG Update:* The Inspector General's Office is continuing ongoing discussions with the Cook County Child Advocacy Advisory Board in order to implement the recommendation.

*FY 15 OIG Update:* The State's Attorney's Office notified the Inspector General that the Child Advocacy Center had accepted the recommendation and would be incorporating the recommendation into Protocol.

**The Department should develop guidelines for when it is appropriate to refer a family to the Extended Family Support Program for consideration of guardianship of a minor through Probate Court and also train them on the differences of guardianship through Probate Court versus referring a case to Juvenile Court.  The Short-Term Guardianship Form should never be used**

**when it appears that the problem requiring guardianship will not be resolved within one year (from OIG FY 10 Annual Report, General Investigation 9).**

> *FY 10 Department Response:* This recommendation and the redacted report are currently under review by a Department contractor responsible for review of guardianship and extended family support service issues.

> *FY 11 Department Update:* The recommendation has been incorporated in draft Procedures 302.385, *Extended Family Support Program*. Once the draft procedures are approved the Division of Service Intervention will begin training on the referral process.

> *FY 12 Department Update:* This is a component of the intact family and child welfare intake redesign.

> *FY 13 Department Update:* The recommendation will be incorporated into the revisions to Procedures 300, *Reports of Child Abuse and Neglect*.

> *FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

> *FY 15 Department Update:* The recommendation will be incorporated into revisions to Procedures 300 which will be issued in March 2016.

**Child Protection managers, supervisors and investigators and intact family services workers should be trained on the guidelines for referring a family to the Extended Family Support Program (from OIG FY 10 Annual Report, General Investigation 9).**

> *FY 10 Department Response:* This recommendation and the redacted report are currently under review by a Department contractor responsible for review of guardianship and extended family support service issues.

> *FY 11 Department Update:* The recommendation has been incorporated in draft Procedures 302.385, *Extended Family Support Program*. Once the draft procedures are approved the Division of Service Intervention will begin training on the referral process.

> *FY 12 Department Update:* This is a component of the intact family and child welfare intake redesign.

> *FY 13 Department Update:* Procedures for the Extended Family Support Program have been drafted as Rule 302.385 and are being reviewed. The procedures should be finalized and distributed by June 2014. Training on the procedures will be scheduled to coincide with release.

> *FY 14 Department Update:* The Department incorporated Extended Family Support Program practice guidelines into Foundations training for all investigators, supervisors, and intact family staff. The recommendation has also been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1,

2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:*  Guidelines for referring a family to the Extended Family Support Program has been incorporated in Procedures 302.389, *Extended Family Support Program.* Training is in process and will be complete in January 2016.


**The Department should amend Rule 431.60,** *Subject Access to Records of Child Abuse and Neglect Investigations* **to reflect current practice mandated by a federal court order in the** *Dupuy* **decision (from OIG FY 10 Annual Report, General Investigation 7).**

*FY 10 Department Response:* An initial draft of the revisions is complete; however, further review is required in order to guard against improper disclosures.

*FY 11 Department Update:* Office of Legal Services is in the process of revising Rule 336, *Appeal of Child Abuse and Neglect Investigation Findings,* and reviewing related rules which may need to be amended.

*FY 12 Department Update:* The Committee continues to meet and revise Rule 336 *Appeal of Child Abuse and Neglect Investigation Findings*.  Once Rule 336 is completed, Rule 431.60 will be revised to conform to the provisions in Rule 336.

*FY 13 Department Update:* The draft revisions to Rule 336 *Appeal of Child Abuse and Neglect Investigation Findings* has been completed and is currently under review by the workgroup for edits. A Policy Guide will be issued that will contain the elements of this draft rule to bring the Department into compliance with statute that becomes effective January 1, 2014.

*FY 14 Department Update:*  The language in Rule 431.60 has been changed and will be released in the next draft for 431.

*FY 15 Department Update:*  The Department is in the process of revising Rule 431.


**Child protection managers should track and maintain data on cases presented to the State's Attorney's Office for filing of petitions and the State's Attorney's Office's response.  Child protection offices should share this information with DCFS Office of Legal Services (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 7).**

*FY 10 Department Response:* The Department issued a memorandum to child protection staff instructing staff to refer cases of critical parental non-compliance in which the State's Attorney has refused to file a petition to the Office of Legal Services.  Child protection managers will track such responses monthly.

*FY 11 Department Update:* The Division of Child Protection is currently refining a process implemented in 2010 to track juvenile court petitions.  The division is also exploring the development of shared drives specifically dedicated to screening results and subsequent activities and decision-making by the assigned child protection investigator and supervisor.

*FY 12 Department Update:* The Department is exploring tracking and reporting capabilities in SACWIS.

*FY 13 Department Update:* The Department continues to examine the need to bring the CYCIS functionality (which includes the PC legal capture) into the SACWIS application.

*FY 14 Department Update:* A request to make the necessary changes/additions to SACWIS in order to capture this data on the decision tab of the investigation was submitted on December 9, 2014.

*FY 15 Department Update:* The recommendation will be incorporated into revisions to Procedures 300 which will be issued in March 2016.

**The Department's Interstate Compact Procedures should be revised to require:**

- **When an interstate compact is denied, the Interstate Compact Unit shall notify the Office of Legal Services. The Office of Legal Services will then monitor the case to ensure that the interstate compact is neither violated or circumvented in a manner that compromises the safety of children;**

- **If an interstate compact is disputed or violated, the Office of Legal Services will notify DCFS Clinical and DCFS Clinical will convene a staffing with the agency caseworker and supervisor, and the GAL;**

- **Notification of the Interstate Compact Unit, by the agency, if an interstate compact placement request is pending and the children are sent to the placement under consideration (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 4).**

*FY 09 Department Response:* Revisions are being made to Procedure 328, *Interstate Placement of Children*, in order to incorporate these requirements. The Interstate Compact Office has been directed to report all such situations immediately to DCFS Office of Legal Services who then monitors the case to ensure that the Interstate Compact Agreement is not violated or circumvented in a manner that compromises the safety of children. Copies of that notification are sent to an Associate Deputy Director to verify that direction is being carried out.

*FY 10 Department Update:* Revisions to Procedure 328, *Interstate Placement of Children*, are still in process. In the event an interstate compact is disputed or violated the Department's Office of Legal Services notifies the DCFS Division of Clinical Services. The Office of Legal Services receives and monitors notifications received from the Interstate Compact Unit.

*FY 11 Department Update:* Revisions to Procedure 328, *Interstate Placement of Children*, are still in process.

*FY 12 Department Update:* The Department is revising Procedures 328, *Interstate Placement of Children*. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* Procedures 328 workgroup has launched the revision process; there have been many barriers getting all stakeholders to the table to revise these procedures; it is believed many of the barriers have been removed and the work can move forward.

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 328, *Interstate Placement of Children*, which was posted for comment on 11/06/14.

*FY 15 Department Update:* The recommendation was incorporated into Procedures 328 *Interstate Placement of Children* and Policy Transmittal 2015.17 was issued to staff on June 17, 2015.

## MEDICAL

**If a Regional Medical Consultant report is pending when custody is taken of a child, the child protection investigator and medical program coordinator should arrange for a phone conference to review their preliminary findings with the placement agency supervisor. The Coordinator should ensure that the agency receives a copy of the report upon completion (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 8).**

*FY 14 Department Response:* The recommendation has been incorporated into revisions to Department Procedures 300, *Reports of Abuse and Neglect*, which is on target to issue final policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.  Relevant language will also be incorporated into Department Procedures 301, *Placement and Visitation Services*. Regional Medical Consultant Programs will be advised to implement by February, 2015 and Department Operations and Contract staff will work to incorporate recommendations into the FY16 program plans for each medical resource program.

*FY 15 Department Update:* The recommendation will be incorporated into Procedures 300.100, *Medical Requirements* which is due to be released in March 2016.

**If the child does not come into custody but an intact family case is opened while a Regional Medical Consultant report is pending, the Department should develop a mechanism for the medical program coordinator to convene a phone conference with Intact Family Services when a child remains in the home. The Coordinator should ensure that intact family staff receive a copy of the report upon completion (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 8).**

*FY 14 Department Response:* The recommendation has been incorporated into revisions to Department Procedures 300, *Reports of Abuse and Neglect*, which is on target to issue final policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.  Relevant language will also be incorporated into Department Procedure 302.388, *Intact Family Services*. Regional Medical Consultant Programs will be advised to implement by February, 2015 and Department Operations and Contract staff will work to incorporate recommendations into the FY16 program plans for each medical consultant program.

*FY 15 Department Update:* The recommendation has been incorporated into proposed changes to Procedures 302.388, which is currently out for comment.

**When a Regional Medical Consultant report is pending the Integrated Assessment screener should be part of the case conference in order to integrate the medical information into the integrated assessment (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 8).**

> *FY 14 Department Response:* As part of the intake process for open placement cases, Integrated Assessment (IA) intake will inquire as to whether there are any outstanding Regional Medical Consultant reports to ensure that this documentation is incorporated into the Integrated Assessment. In cases in which a Regional Medical Consultant case conference is pending, the IA screener will arrange to participate in the case conference in order to integrate this information into the IA assessment.  These additions will be made part of the Integrated Assessment intake protocol.

> *FY 15 Department Update:* Integrated Assessment administration and/or the Clinical director from the Integrated Assessment program are attending quarterly meetings with the Cook County MPEEC team.   Integrated Assessment staff in Cook County also attends the 2 day training offered by the Advocacy Center.   Additional resources outside of Cook County are being explored.

**The Regional Medical Consultant Coordinator should ensure that child protection investigators and supervisors are notified of the date and time of staffings held in the partner hospitals that pertain to their assigned investigations (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 8).**

> *FY 14 Department Response:* The Department agrees.  This process will be written into FY16 program plans.

> *FY 15 Department Update:* The process has been written in the FY 16 program plans.

**The Child Advocacy Center should institute procedures or protocol to ensure that critical information learned by the Medical Clinic is collaboratively shared with members of the interdisciplinary team (from OIG FY 14 Annual Report, General Investigation 17).**

> *FY 14 Department Response:* The Department agreed. The Inspector General is currently in continued meetings with the Child Advocacy Centers Advisory Board regarding the acceptance of this recommendation.

*FY 15 OIG Update:*  The State's Attorney's Office notified the Inspector General that the CAC Board had accepted this recommendation and will incorporate the recommendation into written protocol and procedure.

**Consistent with the intent and spirit of the Division of Mental Health discharge planning (IL Administrative Code Title 59, Section 125.50), Department Rules and Procedures should require DCFS workers to contact staff at psychiatric facilities prior to the discharge of any involved family members to communicate concerns or issues known to the Department and to monitor compliance with discharge recommendations. In cases in which the patient has already been discharged, the Division of Child Protection must obtain complete psychiatric records, including any discharge recommendations, and follow-up with community providers identified.  If the facility becomes**

**involved during the pendency of a placement or intact case, the worker should seek the consent of the involved family member in order to receive records and monitor compliance with discharge recommendations (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 2).**

> *FY 14 Department Response:* Department Procedures 300, *Reports of Child Abuse and Neglect,* is on target to issue final policy by December 31, 2014.  Procedures 300 policy training is planned for the period January 1, 2015 to June 30, 2015.  This training will reinforce caseworker and supervisor compliance with the policy revisions. Department Procedures 315, P*ermanency Planning*, is underway and still in the content development stages.  Anticipated training and procedure roll out is July 2015.

> *FY 15 Department Update:* The recommendation will be incorporated into updates to Procedures 300, *Reports of Child Abuse and Neglect* due to be released in March of 2016.

**DCFS Clinical should consult with the Division of Mental Health to develop a system of coordination with DCFS and DMH for identifying whether a patient is DCFS involved, and, if so, contact information for discharge staffing coordination (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 2).**

> *FY 14 Department Response:* DCFS Clinical Deputy Director and Executive Director for Region One Central for the Division of Mental Health have developed an initial process of coordination between DCFS and the Division of Mental Health (DMH) in situations in which a DMH patient is also DCFS involved.  However, that process has not yet been institutionalized.

> *FY 15 Department Update:* DCFS Clinical Deputy Director has made multiple attempts to set up a meeting with the Department of Mental Health (DMH) regarding coordination of services for DCFS involved patients.  DCFS has provided contact information to DMH to help facilitate communication and coordination with them.

*FY 15 OIG Response:* This is a sad reflection of what happens when a major state institution (Division of Mental Health) has been eviscerated by funding cuts.

**The Department, the Division of Mental Health and the Illinois State Board of Education should collaborate to share local community focused resources for Illinois children and adolescents requiring intensive psychiatric services including outpatient, in-home and residential care (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 3).**

> *FY 14 Department Response:* Coordination of work continues within the Governor's Office Health Innovation & Transformation (GOHIT) multi-agency committee composed of representatives from DCFS, the Department of Mental Health (DMH), and the Department of Health and Family Services (HFS).

> *FY 15 Department Update:* DCFS has continued collaboration with HFS and DHS regarding improving services for children with mental health issues. Through the Illinois Choices pilot, six new services have been developed and implementation of the new services will begin in the next few months. The services include enhanced mobile crisis response, crisis stabilizers, crisis respite, intensive in-home services, family peer support and respite. DCFS is also collaborating with HFS and DHS in the transformation of the children's behavioral health system via interagency agreements that are in the process of being finalized. DCFS has also enhanced the availability of

Intensive Placement Stabilization services via additional funding and expansion of the target population for these services.

**The Department should ensure timely development of a web portal for HealthWorks physicians to directly access their patients' (wards) medical, mental health and prescription medication data from OIG FY 13 Annual Report, Death and Serious Injury Investigation 1).**

*FY 13 Department Response:* The Department Health Policy Administrator has made a formal request to the Office of Information and Technology Services (OITS) for development of a web portal to permit Health Works physicians to directly access wards' medical records. OITS accepted the request for development of the web portal project and has placed it on their list for development.

*FY 14 Department Update:* Health Policy Administrator met with Office of Information and Technology Services (OITS) and the DCFS Medical Director regarding physician access to health care information on Department wards via the Illinois Healthcare and Family Services Medical Electronic Data Interchange System (MEDI). Legal issues and concerns have been cleared with DCFS Legal. Department of Health and Family Services has informed OITS staff that they will need to complete web application development before there can be connectivity to MEDI. It is anticipated that OITS can begin web development for connected with MEDI after completion of their current psychotropic med work/interagency agreement with DHS.

*FY 15 Department Update:* The project has been tentatively scheduled for the current FY, 4th quarter.

**The Department should ensure that when a ward is hospitalized, the treating hospital is provided Integrated Assessments (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 1).**

*FY 13 Department Response:* A representative from the Office of Legal Services will provide legal advice and counsel to the Guardianship Administrator regarding consents for the sharing of the reports.

*FY 14 Department Update:* There is a SACWIS functionality that allows workers to print out the Child Section of the Integrated Assessment for any issues related to confidentiality. A Tips & Tricks sheet with instructions on securing the Child Section of the Integrated Assessment will be created by early December. Revisions to Procedures 315, *Permanency Planning*, will include the process for ensuring that the treating hospital is provided the Integrated Assessments when a ward is hospitalized.

*FY 15 Department Update:* Procedures 315, *Permanency Planning*, will include the process for ensuring that the treating hospital is provided the Integrated Assessments when a ward is hospitalized. The Department anticipates that permanent policy will be issued by spring of 2016.

**Information from the report on Childhood Obesity should be incorporated into the Department's Foundation training curriculum, which now includes children's chronic health conditions (from OIG FY 13 Annual Report, General Investigation 20).**

*FY 13 Department Response:* The Department agrees. The Educational Report on Childhood Obesity and A Guide for Caseworkers and Caregivers: Caring for Children with Chronic Health Conditions will be added to the Foundation Core Curriculum update on Child Health training course for DCFS and POS agency caseworkers. The information will also be included in the PRIDE training course for foster and adoptive parents.

*FY 14 Department Update:* The Foundation course for new caseworkers includes the Obesity subject matter content starting with the November 2014 schedule for both Intact Family Services and Permanency-Placement. The PRIDE course for new foster parents will implement the Obesity content for new foster parents starting in January 2015.

*FY 15 Department Update:* The recommendation has been incorporated into Foundations and Pride training effective December 2015.

**The Department and HealthWorks of Illinois should amend the Initial Health Screening in order to prompt the examiner to complete a body diagram. HealthWorks providers can utilize a body diagram provided by their institutions or one provided by the Department (CANTS 2A/2B) (from OIG FY 13 Annual Report, General Investigation 2).**

*FY 13 Department Response:* The revised form, including a body diagram, has been reviewed by the Department's medical director and submitted to the Office of Child and Family Policy for approval.

*FY 14 Department Update:* The HealthWorks encounter form has been revised to include a body diagram. The Office of Child & Family Policy are currently finalizing the revision process. This will amend the Initial Health Screening requirements to include a body diagram to be completed by a medical professional at the time of the initial HealthWorks exam, ensuring a body chart is completed for all children as they enter substitute care. Some children may have a body chart completed as the result of procedure 300 requirements dependent on allegations taken, but this process will ensure a body chart is completed for all children and the chart completed by HealthWorks will be part of their permanent case record.

*FY 15 Department Update:* Procedures 300 has been revised and emphasizes the use of a body chart throughout the procedure and is now also included in a special medical section of Procedures 300. After review of Procedures 300 changes and the original recommendation, Operations has asked the Office of Child and Family Policy to approve the revised draft form developed by DCFS Clinical. This will amend the Initial Health Screening requirements to include a body diagram to be completed by a medical professional at the time of the initial Healthworks exam, ensuring a body chart is completed for all children as they enter substitute care. Some children may have a body chart completed as a result of Procedure 300 requirements dependent on allegations taken, but this process will ensure a body chart is completed for all children and the chart completed by Healthworks will be part of their permanent case record.

**Procedures 302 – Appendix O, *Services Delivered by the Department – Referral for Nursing Consultation Services*, should be rewritten so that it clearly states which children with special health care needs are required to be referred for nursing consultation services and to what types of pending investigations children with special health care needs must be added as alleged victims. The requirements should be cross-referenced to the appropriate allegations in Procedures 300 –**

**Appendix B,** *Reports of Child Abuse and Neglects – The Allegation System* **(from OIG FY 13 Annual Report, Death and Serious Injury Investigation 12).**

*FY 13 Department Response:* Recognizing the complex nature of this recommendation, the Inspector General's Office and the Department will be reviewing the issues presented in this case to develop appropriate policy and procedure.

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:* The recommendation has been incorporated in Procedures 302-Appendix O(a), *Diagnoses and Medical Conditions that are Appropriate for Referral,* and Procedures 300.100(d), *DCFS Nurse Referrals.* Training is in process and will be complete in January 2016.

**The Office of the Guardian should adopt a policy for the review of Restriction of Rights forms that includes a review for compliance with the Mental Health Code (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 3).**

*FY 13 Department Response:* The Department agrees.  Policy is being developed.

*FY 14 Department Update:* Restriction of Rights Forms are reviewed and recorded at the Guardian's Office.  Each Restriction of Right Form of children in Cook County where the Department has guardianship is forwarded to the Legal Advocacy Services.  If there are any trends or possible safety concerns the Guardian's Office contacts Legal Advocacy Services directly to request a review.   All Restriction of Rights forms are forwarded to the caseworkers to be placed in the child's file.

*FY 15 Department Update:* The FY 14 Department Update will be incorporated in policy or written procedures.

**When there is a question about a ward having seizures or whether to discontinue a ward's seizure medication, the Department should assure that a sleep deprived EEG has been conducted as part of the evaluation (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 3).**

*FY 13 Department Response:* The Department will review this recommendation with the Inspector General.

*FY 14 Department Update:* The Department does not agree.  It is not standard medical protocol to have a sleep deprived EEG conducted as part of the evaluation.  The requirement for sleep deprived EEGS before discontinuing anti-seizure medication should be made by the involved medical professionals treating the child. Specific to this individual case, the physicians should have obtained all records including those from other hospitals.

*FY 15 Department Update:* DCFS does not receive notice and is unable to monitor when a medication is discontinued by a physician.

*FY15OIG Comment:* This recommendation was made after the Office of the Inspector General investigated the death of a ward who died of seizures while in a specialized treatment unit that the Department funds. At the time of his death, the unit had determined that the ward could be taken off his anti-seizure medication. Prior to issuing its recommendation the Inspector General consulted with both the Epilepsy Foundation and a leading Ph.d in the field, both of whom affirmed the need for a sleep-deprived EEG before discontinuing anti-seizure medication. A sleep deprived EEG might have saved the child's life in this Office of the Inspector General Death Investigation. In addition to recommending the sleep-deprived EEG prior to making such a determination, the Office of the Inspector General recommended that the unit be assessed by an Independent Reviewer. The Independent Review was completed on March 30, 2015. The Independent Reviewer agreed that "in cases where seizures are being evaluated or seizure treatment is being significantly changed, a sleep-deprived EEG should be obtained if clinically feasible." Given that a ward died and that the Department's own contracted experts recommended a sleep deprived study prior to taking a child off anti-seizure medication, the Department needs to find a way to communicate this requirement to providers.

**The specialized medical center is required to provide training to professionals. Training should target medical staff at the six hospitals affiliated with the specialized medical centers and include pediatricians in their network. The training should include guidelines for skeletal surveys (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 4).**

> *FY 13 Department Response:* The Department agrees and is currently reviewing the provider's program plan.

> *FY 14 Department Update:* The Pediatric Resource Center received a copy of the recommendation from the Inspector General and subsequently shared and reviewed the report and recommendations with the Hospital. The Pediatric Resource Center met with the Hospital's training advisory group and the advisory group indicated a willingness to allow the Pediatric Resource Center to provide training to medical staff and pediatricians in the Hospital's network as outlined in the Inspector General recommendation. The Pediatric Resource Center agreed to develop and deliver the training by 6/30/15.

> *FY 15 Department Update:* Operations staff contacted the Pediatric Resource Center staff December 4, 2015 to confirm the dates of training and will continue to follow-up.

**The Department should initiate a policy that whenever the hotline is notified by a physician that protective custody has been taken of a minor because the parents' religious beliefs do not permit them to consent to necessary medical procedures, the information should be transmitted to the State's Attorney's Office without an intervening investigation, unless additional information in the report suggests abuse or neglect (from OIG FY 12 Annual Report, General Investigations 6).**

> *FY 12 Department Response:* Revisions to Department procedures are pending.

> *FY 13 Department Update:* This recommendation will be included in revisions to Procedures 300. The DCFS Office of the Inspector General has also submitted guidelines to the Illinois Emergency Medical Services for Children training. DCFS Office of Legal Services shall train the DCFS State Central Registry on this process. Additionally, when contacted by the local State's Attorney's Office, DCFS Regional Counsel shall offer legal technical support in drafting of a petition for a juvenile court proceeding.

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:* The recommendation has been incorporated in Procedures 300.30(z), *Protective Custody.* Training is in process and will be complete in January 2016.

**Access to means, specifically firearms, is predictive of suicide completion. Research has shown and as noted in two adolescents' deaths, those at risk of suicide will break into locked rooms and locked cabinets to access the firearms.  When the Department is placing an adolescent at risk of suicide in a foster home or facilitating a return to the biological home where there is a gun, the Department should conduct a clinical staffing to educate the parents (biological and foster) that the risk of suicide doubles if there is a firearm in the house, even if the gun is locked up. The staffing should utilize the materials developed by The University of Illinois at Chicago Institute for Juvenile Research for their Youth Suicide Prevention program. If the family has firearms, they should be asked to store the guns outside of the home. If the parent will not store the firearm elsewhere they must store firearms with a trigger lock in a lockbox. The keys should be kept in a secure or supervised setting. In return home situations of a suicidal youth, where the biological parent refuses to store the gun with a trigger lock in a lock box, the caseworker should contact DCFS Legal for assistance in presenting the case in Juvenile court for purpose of obtaining a court order (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).**

*FY 12 Department Response:* The Department will revise policy to indicate that trigger locks are required for all gun safes/cabinets in foster homes and in biological parent homes when a child has signs of depression and/or suicidal ideation and will return home.

*FY 13 Department Update:* OCFP and the licensing division are determining the necessary revisions in rule and procedure to implement the recommendation.

*FY 14 Department Update:* The recommendation has been incorporated in the Draft revision of Procedures 315.100, *Assessment.*

*FY 15 Department Update:* The recommendation will be incorporated into Procedures.

**The Department should assure via the service plan that biological or foster families of children with mental illness are linked to psycho-education programs such as National Alliance on Mental Illness' Family-to-Family Education Program, which is a free 12-week course for family caregivers of individuals with mental illness. There are Family to Family programs located throughout Illinois (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).**

*FY 12 Department Response:* The Department will revise policy to include this recommendation. Clinical's newsletter (referenced in recommendation #2) will include a treatment reference to the use of psycho-education programs for youth and families, such as NAMI's free, 12-week Family to Family Education Program.

*FY 13 Department Update:* Procedure 301.60 (a) and Procedures 315.100 (a) and (b) are being revised to implement this recommendation.

*FY 14 Department Update:* The Department anticipates issuing Procedures 301.60, Procedures 315.100 and Procedures 315.350 as permanent policy by 12-31-14.

*FY 15 Department Update:* The recommendation will be incorporated into Procedures, which will be issued in the spring of 2016.

**The Department should consider adopting an integrative family approach in addition to individual therapy for any ward with mental illness (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).**

*FY 12 Department Response:* The Department agrees.

*FY 13 Department Update:* The Department's Integrated Assessment Program will provide recommendations, as well as specific information to foster parents, about the NAMI Family to Family Education Program in cases in which a ward's mental illness is identified as a presenting concern including situations in which youth are brought into DCFS custody as a result of a psychiatric lock out. In addition, the Clinical Division will include the learning resources of the NAMI Family to Family Education program in the updates to the Foundation core training courses for new Child Protection and Child Welfare caseworkers, and into the updates to the Foster PRIDE 2014 curriculum and training for foster parents.  The updates (including the NAMI learning resources) to both the Foster PRIDE and Foundation training courses are expected to be completed by March 30, 2014.

*FY 14 Department Update:*  The NAMI Family to Family Education Program on-line learning resources was added to the Foundation training and the PRIDE curriculum.

*FY 15 Department Update:*  The recommendation will be incorporated into revisions to the PRIDE training Curriculum.

**HealthWorks should obtain the results of newborn genetic metabolic screens on all children, regardless of their age, upon entering Department care.  If the results of the genetic screen are unavailable, the Department should ensure that the screen is completed during the HealthWorks comprehensive exam or by the child's primary care physician (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 9).**

*FY 11 Department Response:* With the signed Inter-Agency Agreement between DCFS and the Department of Public Health (IDPH) for the Exchange of Health Information, the Division of Service Intervention has requested the Office of Information Technology Services (OITS) to complete the task of "mapping" the IDPH data to be included in the weekly electronic interface with the Department's database, SACWIS.   For those children for whom there is no match in the IDPH database for results of Neonatal Screening for Genetic and Metabolic Disorders, HealthWorks Lead Agencies are instructed to follow-up with the child's primary care physician for the appropriate follow-up screening and testing.

*FY 12 Department Update:* The Department continues to work with the Department of Healthcare and Family Services to obtain the Illinois Department of Public Health data.  Even

though the data is from IDPH the Department must access it through the HFS warehouse.  HFS has an internal process that needs to be completed in order to add the data to the Department's data-feed.  The Department will obtain the IDPH data as soon as HFS adds it to the weekly feed.

*FY 13 Department Update:* OITS has scheduled the work to complete the electronic interface with the DHFS Medical Data Warehouse for the IDPH data. The requests from DCFS to DHFS for the IDPH data had to be re-submitted several times.

*FY 14 Department Update:*  The Department is now in the process of mapping and testing the Department of Public Health data for inclusion in the SACWIS e-health.

*FY 15 Department Update:*  The Department and Healthcare and Family Services (HFS) continue to collaborate in obtaining the data. HFS has requested data access from the IDPH vendor that maintains the data.


**PERSONNEL**

**In order to accurately reflect the meeting duration of DCFS advisory group meetings, the Department should amend Procedures 428.17,** *Department Advisory Council*, *Minutes*, **to require that in addition to the date and location of Council, Commission, or Committee meetings, the minutes filed with the Director of the Department also include the start-time and end-time of each meeting.  (Note: this recommendation did not pertain to the Child Death Review Team for which meetings and minutes are not available for public inspection, pursuant to the Child Death Review Team Act. 20 ILCS 515/30 (from OIG FY 14 Annual Report, General Investigation 16).**

*FY 14 Department Response:* Department Procedures 428, *Department Advisory Council*, is currently under revision.  The Department will incorporate this language into that revision.

*FY 15 Department Update:* The recommendation has been incorporated in the most recent draft of Rule 428, *Department Advisory Groups* has been updated to include this information.  The recommendation will be added to Procedures after the Rule has completed its approval process.


**The Department should confirm that all advisory groups are adhering to the timekeeping policies as outlined in Rules and Procedures 428 (from OIG FY 14 Annual Report, General Investigation 16).**

*FY 14 Department Response:* Approximately 90% of the Advisory Councils are in compliance at this time.  The remaining groups have either not met or have had only one meeting.

*FY 15 Department Update:* The new Department Advisory Board Coordinator is diligently working to ensure all advisory groups are adhering to the timekeeping policies in Rule and Procedure 428.


**On the DCFS website section for "Advisory Groups, the Department should clearly identify which advisory groups are statutory and which are non-statutory, and include the following information for each group: (a) Statutory citation, if applicable (b) Identify who appoints group members, and length of appointment (c) Identify Chair and DCFS Staff or Liaison (d) Annually updated member**

**list (e) Appointment terms of all members, if applicable (from OIG FY 14 Annual Report, General Investigation 16).**

> *FY 14 Department Response:* The Department continues to work with Advisory Groups to update all information on the web.  The information requested in the recommendation is included on the advisory group site.

> *FY 15 Department Update:* The website is constantly being updated with new and/or revised information on each individual board as soon as the information is made available to the Advisory Coordinator.

**_Advisory Groups with DCFS Director Appointees:_ The DCFS Liaison for each advisory group that has members appointed by the DCFS Director should notify the Ethics Officer by email of any changes to the group membership within 15 calendar days of the change, to ensure compliance with ethics training (which must occur within 30 days of new membership) (from OIG FY 14 Annual Report, General Investigation 16).**

> *FY 14 Department Response:* The Department agrees.

> *FY 15 Department Update:* The Ethics Officer is currently in possession of the most current information on each Advisory Council Board, including new appointee(s), appointment date(s), and Term Expiration Date(s).  This is an ongoing process and the emphasis is now being placed on getting the notifications out by the designated time.

**For transparency to the public, as well as to provide the Department and Ethics Officer with timely and accurate membership information, the advisory group information on the DCFS website should be updated within 30 calendar days of any change to the group membership and/or to the DCFS Liaison.  The individual page for each advisory group should always include an accurate "last updated" date (from OIG FY 14 Annual Report, General Investigation 16).**

> *FY 14 Department Response:* The Department agrees.

> *FY 15 Department Update:* The new Department Advisory Board Coordinator is working diligently to ensure this information is updated on the D-Net.

**The child protection investigator should be disciplined for her failure to interview the child, who was accessible at school, in a reasonable time period; and for waiting to request a criminal history (LEADS) check until the day the investigation was closed (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 5).**

> *FY 14 Department Response:* Discipline of the employee is pending as the employee is on a leave of absence.

> *FY 15 Department Update:* The employee has returned from a leave of absence and discipline is now in process.

**The Lending Library should be limited to peer-reviewed publications that have passed the review procedures of the national *Child Welfare Information Gateway*.  Other books should be subject to an internal review process, staffed with *ad hoc* specialists in the appropriate fields, who will certify to having reviewed the material and that it comports with existing DCFS Rules and Procedures (from OIG FY 14 Annual Report, General Investigation 15).**

> *FY 14 Department Response:* The review of all existing Child Welfare Lending Library Books, Journals and DVD continues, and is expected to be completed by June 30, 2015.   The Lending Library has been discontinued pending the complete review of all existing items, and that all existing items comport with Department Rules and Procedures.  No new items will be added to the Library until the review of all existing items have been reviewed and certified by ad hoc subject matter experts. The review process will also cover all future submissions to the Lending Library.

> *FY 15 Department Update:* The DCFS Lending Library was closed in July 2015.  The need to monitor the breadth of materials and ensure they were all in line with the evolving standards of best practices and DCFS policy proved to be beyond the scope of the program.

**The Department should establish procedures limiting use of Department facilities after-hours to ensure that there is no access to confidential information (from OIG FY 13 Annual Report, General Investigation 31).**

> *FY 13 Department Response:* Revisions to Department Rule 433, *Use of Department's Facilities and Grounds*, is pending approval for submission to the Joint Committee on Administrative Rules. The Office of Legal Services and the Office of the Inspector General have approved the draft.

> *FY 14 Department Update:*  The Department anticipates having Rule 433, *Use of Department's Facilities and Grounds*, adopted by 12-31-14.

> *FY 15 Department Update:*  Rule 433, *Use of Department's Facilities and Grounds* was adopted on December 9, 2014.

**The Department should determine whether to require the presence of a Department staff person or if the presence of security is sufficient for after-hours use of Department facilities (from OIG FY 13 Annual Report, General Investigation 31).**

> *FY 13 Department Response:* Revisions to Department Rule 433, *Use of Department's Facilities and Grounds*, is pending approval for submission to the Joint Committee on Administrative Rules. The Office of Legal Services and the Office of the Inspector General have approved the draft.

> *FY 14 Department Update:*  The Department anticipates having Rule 433, *Use of Department's Facilities and Grounds*, adopted by 12-31-14.

> *FY 15 Department Update:*  Rule 433, *Use of Department's Facilities and Grounds* was adopted on December 9, 2014.

**If the Department continues to permit after-hours use of Department facilities by non-Department groups, the Department should determine whether to apply through Central Management Services (CMS) and use the CMS liability waiver for use of Department facilities after hours (from OIG FY 13 Annual Report, General Investigation 31).**

> *FY 13 Department Response:* Revisions to Department Rule 433, *Use of Department's Facilities and Grounds*, is pending approval for submission to the Joint Committee on Administrative Rules. The Office of Legal Services and the Office of the Inspector General have approved the draft.

> *FY 14 Department Update:* The Department anticipates having Rule 433, *Use of Department's Facilities and Grounds*, adopted by 12-31-14.

> *FY 15 Department Update:* Rule 433, *Use of Department's Facilities and Grounds* was adopted on December 9, 2014.

**The Department should formalize the policy for overtime with regards to commute time and distribute it to management with notice to staff (from OIG FY 13 Annual Report, General Investigation 33).**

> *FY 13 Department Response:* This policy will be formalized and included in Administrative Procedure 12, *Travel Guide for DCFS Employees*.

> *FY 14 Department Update:* Administrative Procedure 12, *Travel Guide for DCFS Employees*, has been revised and submitted to the Office of Child & Family Policy for implementation to include language regarding commute time and mileage.

> *FY 15 Department Update:* D-Net Announcements have been posted to staff to clarify the new commuting policy. Administrative Procedure 12, *DCFS Travel Guide* is in the process of being revised.

**DCFS must establish guidelines for professional ride-alongs with DCFS staff. Guidelines for medical professionals (e.g., medical residents) should address what are permissible and impermissible tasks (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 12).**

> *FY 13 Department Response:* Procedures were established with the Medical Director of Child Protective Services at the University of Chicago Comer's Children's Hospital, the Cook County Regional Administrator, and the Office of Legal Services to include a "Release and Waiver of Liability Agreement", "Medical Residents Confidentiality Agreement" and "Criteria for Medical Residents Shadowing Investigators." These documents and process are used when residents shadow DCFS child protection investigators. The Office of Child and Family Policy will review Part 431, *Confidentiality of Personal Information of Persons Served by the Department of Children and Family Services* to determine revision requirements to meet this recommendation. The forms will be formally approved and assigned in this process.

> *FY 14 Department Update:* The Department continues to work on draft Administrative Procedures for ride-alongs, shadowing, and internships. Projected completion date is the end of 3rd quarter fiscal year 2015.

*FY 15 Department Update:*  Operations staff and the Office of Child & Family Policy will have a draft policy for review by January 15, 2016.

**Department Rule 401.380, *Personnel Records*, should be amended to require that in addition to verifying work history, child welfare agencies should also contact previous employers to verify work performance by asking if the employee would be eligible for rehire. Verification should be completed by contacting an official source at the agency such as human resources, management or a supervisor knowledgeable about the employee's work performance. The Rule should also include that any employment offer to a currently employed person should be contingent upon contacting the current employer to verify their work performance prior to hire (from OIG FY 12 Annual Report, General Investigations 18).**

*FY 12 Department Response:* The Department's Division of Licensing and the Office of Child and Family Policy are drafting amendments to the Rule.

*FY 13 Department Update:* CFS 508-1, *Information on Person Employed in a Child Care Facility,* was revised December 2013 and Procedures 401, *Licensing Standards for Child Welfare Agencies,* is being revised to implement the recommendation.

*FY 14 Department Update:* Rule 401.80 does stipulate when the CFS 508-1 is to be completed (prior to hire) and Procedure 401.380 does as well.  The Department will revise Procedure 401 to specify that the CFS508-1 is to be completed for all prospective employees. This will include the language "is the employee eligible for rehire."

*FY 15 Department Update:*  The recommendation has been incorporated into Procedures 401, *Licensing Standards for Child Welfare Agencies* which was issued on May 4, 2015.

**The Department should develop policy to address suspected substance abuse in the workplace (from OIG Recommendations made in 2005, 2001 and 1999). In FY 08 and FY 10 the Inspector General also recommended that the Department amend Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* to add "failure to timely comply with an order for drug or alcohol testing after a finding of reasonable suspicion" as a basis for licensure action under Rule 412.50, *Misconduct* (from OIG FY 10 Annual Report, General Investigation 21 and OIG FY 08 Annual Report, General Investigation 32).**

*FY06 Department Response:* The Department developed a definition and procedure for Reasonable Suspicion testing. The Department agrees to amend the Employee Manual and the Employee Licensure Rule to address Reasonable Suspicion of substance abuse and will also engage in discussions with the union.

*FY 07 Department Update:* The Department's workgroup addressing the need for incident-based reasonable suspicion drug or alcohol testing is currently developing protocol for pre-employment drug testing. Reasonable suspicion testing has been put on hold temporarily.

*FY 08 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 08 OIG Response:* The Inspector General has been continuously recommending this critical change in policy for nine years. The policy change sought by the Inspector General would have a minimal budgetary impact. The lack of reasonable suspicion policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk.

*FY 09 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 10 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 11 Department Update:* Management fully supports reasonable suspicion testing for direct child welfare service employees and supervisors. Direct child welfare service employees and supervisors are bargaining unit members. As such implementation of reasonable suspicion drug/alcohol testing, unless legislatively mandated, must be negotiated with the collective bargaining units. Management routinely proposes to CMS Labor Relations that reasonable suspicion testing be included in collective bargaining agreements. Management also routinely proposes that reasonable suspicion testing be added to supplemental collective bargaining agreements. Without a reasonable suspicion testing policy in place amendment of Rules and Procedures is futile. The State will be involved in contract negotiations with AFSCME in 2012 and the Department intends to continue pressing this point.

*FY 11 OIG Response:* The Inspector General notes that the City of Chicago and both the Illinois State Police and the Department of Corrections have had Reasonable Suspicion Testing for several years. The City of Chicago and the Department of Corrections employees are represented in large part by the same union as most employees with the Department of Children and Family Services. Moreover, Direct Child Welfare employees and supervisors at DCFS must possess Child Welfare Employee Licenses. The Inspector General has urged since 2005 that Reasonable Suspicion Testing be added as a requirement for Child Welfare Licensure. The Department has failed to act on the recommendation.

*FY 12 Department Update:* A workgroup has been formed to review all drug/alcohol related Office of the Inspector General recommendations to determine implementation steps. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* The Department will reconvene the workgroup to address this recommendation.

*FY 14 Department Update:* A policy to address suspected substance abuse would need to be negotiated as a part of the Master Contract Agreement. Contract negotiations are scheduled to begin on 12/10/14 as the contract expires on 6/30/15.

*FY 15 Department Update:* A policy to address Suspected Substance Abuse is being negotiated as a part of the Master Contract Agreement. Contract negotiations began in December 2014 and are continuing to occur with no agreed settlement at this time.

*FY 15 OIG Response:* The Office of the Inspector General has been recommending an incident-based management response for allegations of employee substance abuse since 1999. The Office of the Inspector General notes that other governmental entities including the City of Chicago and the Illinois Department of Corrections, several years ago successfully negotiated incident-based policies to respond to such allegations.

**As previously recommended, the Department should amend Rules and Procedures, including a requirement for compliance with reasonable suspicion drug testing in Rule 412,** *Licensure of Direct Child Welfare Workers and Supervisors,* **and develop protocol and contracts to provide an infrastructure for prompt determination of allegations of employees being under the influence while at work.  The protocol should include identifying available testing facilities for reasonable suspicion testing; a definition of reasonable suspicion; procedure for training for management and supervisors for corroboration in support of reasonable suspicion determinations (from OIG FY 14 Annual Report, General Investigation 14).**

> *FY 14 Department Response:* A policy to address Suspected Substance Abuse would need to be negotiated as a part of the Master Contract Agreement.  Contract negotiations are scheduled to begin in December 2014 as the contract expires June 30, 2015.   The current language in Rule 412.50(a)(8), *Licensure of Direct Child Welfare Workers and Supervisors*, *Grounds for Suspension, Revocation or Refusal to Reinstate License*, states that a license may be suspended or revoked for: Habitual or excessive use or addiction to alcohol, narcotics, stimulants, or any other chemical agent or drug that results in a worker's inability to practice with reasonable judgment, skill or safety (This shall not include any person who has sought, will seek or is receiving substance abuse treatment if it does not impact on their ability to practice with reasonable judgment, skill or safety).

> *FY 15 Department Update:* A policy to address Suspected Substance Abuse is being negotiated as a part of the Master Contract Agreement.  Contract negotiations began in December 2014 and are continuing to occur with no agreed settlement at this time.

*FY 15 OIG Response:* The Office of the Inspector General has been recommending an incident-based management response for allegations of employee substance abuse since 1999. The Office of the Inspector General notes that other governmental entities including the City of Chicago and the Illinois Department of Corrections, several years ago successfully negotiated incident-based policies to respond to such allegations.

**Rule 437,** *Employee Conflict of Interest***, should be amended to clarify that secondary employment must always be reported to one's supervisor.  The supervisor should determine (if necessary, with consultation from management and/or the Conflict of Interest Committee) whether the secondary employment creates a conflict.  The employee must be told to update the supervisor whenever their secondary employment duties change and a notation of the secondary employment should be maintained in a supervisory file, which is transferred each time supervision changes (from OIG FY 09 Annual Report, General Investigation 25).**

> *FY 09 Department Response:* The conflict of interest workgroup is in the process of finalizing the proposed changes to Rule 437, *Employee Conflict of Interest.*

> *FY 10 Department Update:* The anticipated completion date for submission of draft Rule 437, *Employee Conflict of Interest,* for internal and external comment is the first quarter of 2011.

*FY 11 Department Update:* Revisions to Rule 437, *Employee Conflict of Interest*, have been drafted. It is anticipated that the first notice will be published in Fiscal Year 2012.

*FY 12 Department Update:* Revisions to Rule 437, *Employee Conflict of Interest* is being prepared for JCAR.  The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* Revisions to draft Rule 437, *Employee Conflict of Interest,* is ready for policy review.

*FY 14 Department Update:*  The Department is waiting for fiscal note approval for Rule 437, *Employee Conflict of Interest*.  We will then have to secure approval to file the 1st Notice from the Governor's policy office.

*FY 15 Department Update:*  The Department received Governor's policy office approval on December 4, 2015 to proceed to secure the Director's signature for 1st Notice publication.

**A task group should be assembled to revise Rule 437, *Employee Conflict of Interest*, and draft related Procedures. Procedural additions should include:**
>  a. **If an employee takes secondary employment where there is the potential for contact with DCFS clients, a wall needs to be built between the DCFS employee and any DCFS clients being serviced by the secondary employer.  In this case, the employee's supervisor should call the secondary employer to verify the wall is in place.**
>  b. **The supervisor should review secondary employment at the time of the annual review to see if a conflict has developed that was not present when the employee accepted the secondary employment.**
>  c. **Instructions on how to contact the Conflict of Interest Committee.**
>  **All DCFS employees should receive training on the revised Rule and Procedures 437, *Employee Conflict of Interest* (from OIG FY 07 Annual Report, Employee Conflict of Interest).**

*FY 07 Department Response:* A task group was assembled, but is currently in abeyance, and the Director is currently reviewing possible changes to Rule 437.

*FY 08 Department Update:* The conflict of interest workgroup has reconvened and is in the process of finalizing the proposed changes to Rule 437, *Employee Conflict of Interest*, and in drafting new procedures that support the revised rule.  The anticipated completion of revised Rule 437, *Employee Conflict of Interest*, is March 2009.

*FY 09 Department Update:* The workgroup has reconvened to address outstanding issues, including fire walls and secondary employment.  We have contacted the chair of the Secondary Employment Subcommittee to initiate further deliberations with the subcommittee. The anticipated completion date for submission of the draft of Rule 437, *Employee Conflict of Interest,* for internal and external comment is January 2010.

*FY 10 Department Update:* The anticipated completion date for submission of draft Rule 437, *Employee Conflict of Interest,* for internal and external comment is the first quarter of 2011. A copy will be sent to the Inspector General upon completion. Draft procedures will follow once the rule has been adopted.

*FY 11 Department Update:* Revisions to Rule 437, *Employee Conflict of Interest*, have been drafted. It is anticipated that the first notice will be published in Fiscal Year 2012.

*FY 12 Department Update:* Revisions to Rule 437, *Employee Conflict of Interest* is being prepared for JCAR. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* The Office of Child and Family Policy is working on final revisions to draft Rule 437 and will be sending Rule 437 out for first notice.

*FY 14 Department Update:* This recommendation is incorporated into a revision to Rule 437, *Employee Conflict of Interest*. The Department is waiting for approval of the fiscal note from the Governor's office. Once we receive fiscal note approval, we will seek approval to file the first notice from the policy office within the Governor's office.

*FY 15 Department Update:* The Department received Governor's policy office approval on December 4, 2015 to proceed to secure the Director's signature for 1st Notice publication.

**The Department's Conflict of Interest Committee should establish procedures for building walls between private agencies and DCFS Administrators who have decision-making power over agencies that they previously worked for (from OIG FY 06 Annual Report, General Investigations 28).**

*FY 06 Department Response:* The procedures have been drafted by the Conflict of Interest Committee.

*FY 07 Department Update:* The Director is considering the recommended changes.

*FY 08 Department Update:* A Conflict of Interest workgroup is in the process of finalizing the proposed changes to Rule 437, *Employee Conflict of Interest,* and is drafting new procedures that support the revised rule. The anticipated date of completion is March 2009.

*FY 09 Department Update:* The workgroup has been reconvened to address outstanding issues, including fire walls and secondary employment. We have contacted the chair of the Secondary Employment Subcommittee to initiate further deliberations with the subcommittee. The Conflict of Interest workgroup is in the process of finalizing the proposed changes to Rule 437, *Employee Conflict of Interest*. The anticipated completion date for submission of the draft of Rule 437, *Employee Conflict of Interest,* for internal and external comment is January 2010.

*FY 10 Department Update:* Anticipated completion date for submission of draft Rule 437, *Employee Conflict of Interest,* for internal and external comment is the first quarter of 2011.

*FY 11 Department Update:* Revisions to Rule 437, *Employee Conflict of Interest*, have been drafted. It is anticipated that the first notice will be published in Fiscal Year 2012.

*FY 12 Department Update:* Rule 437, *Employee Conflict of Interest*, is being prepared for JCAR. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* The Department will incorporate the recommendation into Rule 437.

*FY 14 Department Update:*  This recommendation is incorporated into a revision to Rule 437, *Employee Conflict of Interest*.  The Department is waiting for approval of the fiscal note from the Governor's office.  Once we receive fiscal note approval, we will seek approval to file the first notice from the policy office within the Governor's office.

*FY 15 Department Update:*  The Department received Governor's policy office approval on December 4, 2015 to proceed to secure the Director's signature for 1st Notice publication.

## SERVICES

**The Department's form CFS 444-2 (*Appointment of Short-Term Guardian*) should include instructions requiring consent of identified fathers, whose whereabouts are known in compliance with the Parentage Act (from OIG FY 14 Annual Report, General Investigation 12).**

*FY 14 Department Response:* Department Procedures 300, *Reports of Child Abuse and Neglect*, is on target to issue final policy by December 31, 2014.  Procedures 300 policy training is planned for the period January 1, 2015 to June 30, 2015.  This training will reinforce caseworker and supervisor compliance with the policy revisions.

*FY 15 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 and training has commenced and will continue through January 2016.  The Department agrees to provide instruction to staff via information transmittal to acquire consent of identified fathers but the Department cannot change the form as it is a part of statute.  Information transmittal will be distributed by January 30, 2016.

**The Department should ensure that placement workers require that caregivers sign consents for the worker to follow-up with medical providers and Women, Infant and Children (WIC) for a non-ward child that remains in the home of the parent when there is an open case involving other children in care. The follow-up with medical providers and WIC should be included in the service plan (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 9).**

*FY 14 Department Response:* Department Procedures 315, *Permanency Planning*, is underway and still in the content development stages.  Anticipated training and procedure roll out is July 2015.

*FY 15 Department Update:* The anticipated date for the draft of Procedures 315, *Permanency Planning* to be sent for review and comment is December 2015.  The final document is expected to be issued in the spring of 2016.

**Private child welfare agencies providing intact family services should have at least one pack-n-play on hand that can be distributed to families on an emergency basis until a crib can be accessed (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 4).**

*FY 14 Department Response:* Language has been incorporated into the draft revisions of Department Procedures 302.388, *Intact Family Services*.

*FY 15 Department Update:* The recommendation will be incorporated into Procedures 302.388, *Intact Family Services*.

**When a parent has exhibited such dangerous behavior as abduction; torture; threats to kill with plan; or taking the children hostage, and the Department has made a Critical Decision to substantially restrict visitation, the Department shall file a Visitation Plan with the Court and Parties within 10 days of the Department being named as Temporary Custodian in accordance with 705 ILCS 405/2-10(2). The Visitation Plan shall comply with the requirements of Appendix A to Procedures 301 and shall clearly state the reasons for the restriction and shall include 1) supporting documentation such as police reports, psychological or psychiatric reports or case notes documenting observations and 2) a statement that the Department intends to share information on the restriction with necessary persons, such as school, daycare and the child's pediatrician (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 2).**

*FY 14 Department Response:* Department Procedures 300, *Reports of Child Abuse and Neglect*, is on target to issue final policy by December 31, 2014. Procedures 300 policy training is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions. Department Procedures 315, *Permanency Planning*, is underway and still in the content development stages. Anticipated training and procedure roll out is July 2015.

*FY 15 Department Update:* The recommendation will be incorporated into revisions to Procedures 301 which will be completed by January 15, 2016. A Policy Guide will be issued December 15, 2015 to include the recommendation.

**The Department shall train front-line staff on the creation and use and filing of the restricted Parent-Child Visitation Plan above including the use of visitation centers when necessary and procedures for accessing and reviewing any restrictions imposed by criminal court as a condition of bond (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 2).**

*FY 14 Department Response:* Department Procedures 315, *Permanency Planning*, is underway and still in the content development stages. Anticipated training and procedure roll out is July 2015.

*FY 15 Department Update:* Procedures 315, *Permanency Planning* is in the process of being finalized and training will begin in February 2016.

**If any Party objects to any part of the Visitation Plan filed in the Juvenile Court, DCFS Office of Legal Services shall request that the matter be referred to the Juvenile Court Clinic (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 2).**

*FY 14 Department Response:* Department Procedures 315, *Permanency Planning*, is underway and still in the content development stages. Anticipated training and procedure roll out is July 2015.

*FY 15 Department Update:* The anticipated date for the draft of Procedures 315, *Permanency Planning* to be sent for review and comment is December 2015. The final document is expected to be issued in the spring of 2016.

**When a parent has exhibited such dangerous behavior as abduction; torture; threats to kill with plan; or taking the children hostage and the court permits visitation, such visitation should always be in a DCFS office, court or a visitation center (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 2).**

> *FY 14 Department Response:* Department Procedures 315, *Permanency Planning*, is underway and still in the content development stages.  Anticipated training and procedure roll out is July 2015.

> *FY 15 Department Update:* The anticipated date for the draft of Procedures 315, *Permanency Planning* to be sent for review and comment is December 2015.  The final document is expected to be issued in the spring of 2016.

**Court ordered restrictions on parental contact, such as supervised visitation, with children in foster care must be communicated to children's schools or day care programs.  The Department should develop procedures for notification and include them in the parent/child visitation and education procedures (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 2).**

> *FY 14 Department Response:* Department Procedures 315, *Permanency Planning*, is underway and still in the content development stages.  Anticipated training and procedure roll out is July 2015.

> *FY 15 Department Update:* The anticipated date for the draft of Procedures 315, *Permanency Planning* to be sent for review and comment is December 2015.  The final document is expected to be issued in the spring of 2016.

**Quality Assurance should review the Office of Child Development's process for approving daycare expenses to make it more efficient (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 2).**

> *FY 14 Department Response:* Quality Assurance has initiated the pre-planning phase of this review.  Scheduling conflicts necessitated pushing this review into the 3rd quarter of FY15.

> *FY 15 Department Update:* Following Quality Assurances' Review the Office of Child Development established a new day care service eligibility application assignment process; assigned one person to file all documents; and has developed logs to track application status'. Revisions to Procedures are in process. Training for investigators, caseworkers, supervisors, managers, administrators, day care providers, birth parents and foster parents will begin in March of 2016.

**Whenever a case manager submits the Special Immigrant Referral Form (CFS 1016) to the Immigration Services Unit, the Immigration Coordinator should convene an immigration conference with the eligible ward, their case manager and an invested adult such as a foster parent or concerned relative (from OIG FY 13 Annual Report, General Investigation 3).**

*FY 13 Department Response:* The DCFS Guardianship Administrator discussed this recommendation with the Assistant Guardian and the Immigration Unit. This information has been included in the recommended revisions to Procedures 327, Appendix F, *Guardianship Services, Immigration/Legalization Services of Foreign Born DCFS Ward*.

*FY 14 Department Update:* The Department continues to work to finalize the draft of Procedures 327, *Guardianship Services*. The Department anticipates having the draft out for comment by 12-31-14.

*FY 15 Department Update:* The recommendation has been incorporated into Procedures 327-Appendix F(c)(4), *Petition and Lawful Permanent Resident Application.*

**During the immigration conference the Immigration Coordinator will provide the ward and the worker with copies of *Immigration 101* and *Immigration Resource and Practice Guide*. These materials will be reviewed and special emphasis will be placed on the risks and responsibilities of adolescent wards in the process of status adjustment. All USCIS forms requiring the ward's signature, forms that are pre-populated by the Immigration Coordinator, will be reviewed with the ward and worker during the conference (from OIG FY 13 Annual Report, General Investigation 3).**

*FY 13 Department Response:* Requirements to provide the worker and ward with copies of the Immigration 101 and the Immigration Resource Guide has been included in the recommendations for revisions to Procedures 327, Appendix F, *Guardianship Services, Immigration/Legalization Services of Foreign Born DCFS Ward.*

*FY 14 Department Update:* The Department continues to work to finalize the draft of Procedures 327, *Guardianship Services*. The Department anticipates having the draft out for comment by 12-31-14.

*FY 15 Department Update:* The recommendation has been incorporated into Procedures 327-Appendix F(c)(4), *Petition and Lawful Permanent Resident Application.*

**The Department should revise Procedures 327, Appendix F, *Immigration/Legalization Services for Foreign Born DCFS Wards* to include the requirement that case management staff notify the Immigration Services Unit of any arrest or detainment of a non-citizen ward for consultation/instruction about notification of the ward's public defender(from OIG FY 13 Annual Report, General Investigation 3).**

*FY 13 Department Response:* Procedures 327, Appendix F, *Guardianship Services, Immigration/Legalization Services of Foreign Born DCFS Ward* is currently being revised to include the recommended instructions to case management staff about how to proceed when there is an arrest or detainment of a non-citizen ward.

*FY 14 Department Update:* The Department continues to work to finalize the draft of Procedures 327, *Guardianship Services*. The Department anticipates having the draft out for comment by 12-31-14.

*FY 15 Department Update:* The recommendation has been incorporated into Procedures 327-Appendix F(c)(4), *Petition and Lawful Permanent Resident Application.*

**The Department should revise Procedures 327, Appendix F, *Immigration/Legalization Services for Foreign Born DCFS Wards* to reflect the recommendations from this report (from OIG FY 13 Annual Report, General Investigation 3).**

> *FY 13 Department Response:* Procedures 327, Appendix F, *Guardianship Services, Immigration/Legalization Services of Foreign Born DCFS Ward* is currently being updated to reflect the recommendations in this report.

> *FY 14 Department Update:* The Department continues to work to finalize the draft of Procedures 327, *Guardianship Services*. The Department anticipates having the draft out for comment by 12-31-14.

> *FY 15 Department Update:* The recommendation has been incorporated into Procedures 327-Appendix F(c)(4), *Petition and Lawful Permanent Resident Application.*

**The Department should include the definition of "godparent" in Procedures 301, *Placement and Visitation Services*, and clarify that the godparent/godchild relationship must have a historical basis, preceding immediate involvement with the Department (from OIG FY 13 Annual Report, General Investigation 5).**

> *FY 13 Department Response:* The Department agrees. These recommendations will be considered by the workgroups addressing sibling placement/visitation and fictive kin care.

> *FY 14 Department Update:* Procedures 315, *Permanency Planning*, is under complete revision and Fictive Kin language will be included. The anticipated issue date is June 2015.

> *FY 15 Department Update:* The recommendation was incorporated into Procedures 301.80 which was issued in June 2015.

**The DCFS *Affidavit of Relationship* form [CFS 458-A] should be amended to require the following: (a.) Signature of the biological parents to affirm that the person claiming to be a child's godparent has been entrusted by parents with "a special duty that includes assisting in raising the child if the parent cannot." (DCFS Rule 304.2) and (b.) Affirmation from the biological parent(s) that the child's relationship with these relatives has a historical basis, and preceded their child coming into the care of the above-named relatives (from OIG FY 13 Annual Report, General Investigation 5).**

> *FY 13 Department Response:* The Department agrees. These recommendations will be considered by the workgroups addressing sibling placement/visitation and fictive kin care.

> *FY 14 Department Update:* Procedures 315, *Permanency Planning*, is under complete revision and Fictive Kin language will be included. The anticipated issue date is June 2015.

> *FY 15 Department Update:* The recommendation was incorporated into Procedures 301.80 which was issued in June 2015.

**DCFS *Affidavit of Relationship* form [CFS 458-A] must be accompanied by a statement of supporting facts articulating the historic basis/pre-existing relationship between the godparent(s) and the child, prior to the case being screened into court (from OIG FY 13 Annual Report, General Investigation 5).**

> *FY 13 Department Response:* The Department agrees. These recommendations will be considered by the workgroups addressing sibling placement/visitation and fictive kin care.

> *FY 14 Department Update:*  Procedures 315, *Permanency Planning*, is under complete revision and Fictive Kin language will be included.  The anticipated issue date is June 2015.

> *FY 15 Department Update:*  The recommendation was incorporated into Procedures 301.80 which was issued in June 2015.

**When Clinical Consultants note a critical parenting issue during an Integrated Assessment or a clinical consult, the consultants must provide written recommendations to amend the Service Plan if necessary to address critical risk or safety issues (from OIG FY 12 Annual Report, General Investigations 1).**

> *FY 12 Department Response:* The Department will ensure that managers are aware of clinical recommendations that impact child safety and that the issues are incorporated into service plans.

> *FY 13 Department Update:* There are current discussions with OITS regarding moving Clinical referral, consultation and staffing documentation into SACWIS. IAs are already embedded in SACWIS. Provisions can be made to either have Clinical recommendations automatically populate service planning and assessment tools or utilize a checklist similar to one that already exists in investigations (waivers would have to be part of a supervisory function).  Until the SACWIS updates are completed, Clinical staff can continue to send copies of reports with their recommendations to workers and their supervisors.  The Administrator of Social Work Practice will contact Senior Administration in Operations to help determine the best manner to ensure clinical recommendations that impact child safety are incorporated into service plans.  This will be initiated by 12-06-13.

> *FY 14 Department Update:* This issue will be reviewed with operations senior staff on 12/15/14 and Regional Administrators will be expected to ensure all direct service staff receive this direction in verbal and written communication by 1/15/15. The recommendation will also be incorporated into Procedures.

> *FY 15 Department Update:*  The recommendation will be included in revisions to Procedures 315.

**The Department should develop and document a plan for children ages 9-14, who enter the child welfare system following the loss of a parent or significant caretaker, and any child who experiences the death or loss of a parent or significant caretaker while in care.  In developing this plan, the child should be asked to identify individuals who can be part of the child's social support system (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).**

> *FY 12 Department Response:* The Department agrees and will incorporate the recommendation into policy.

*FY 13 Department Update:* Procedure 301.60 (a) and Procedures 315.100 (a) and (b) are being revised to implement this recommendation.

*FY 14 Department Update:* The Department anticipates issuing Procedures 301.60, Procedures 315.100 and Procedures 315.350 as permanent policy by 12-31-14.

*FY 15 Department Update:* The recommendation will be included in revisions to Procedures 315.

**Workers should be educated that because children do not experience grief in a linear fashion, that grief therapy may have to be accessed at different times during a child/adolescent's development. In addition, pastoral counseling resources should be made available to the youth (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).**

*FY 12 Department Response:* The Department will review the Crisis Response Administrative Procedure along with other resources to determine the most efficient way to make this information available to our workers. The Department's Clinical Division will release a newsletter for all child welfare staff, discussing the symptoms and impact of depression, loss and grief on adolescent development. The newsletter will emphasize suicide prevention and alert workers to symptoms and behavior associated with depression, grief and suicidal ideation. The newsletter will also identify various evidence-based treatments and strategies for workers and family members.

*FY 13 Department Update:* From 2009-2011, all case carrying DCFS and POS staff received ongoing trauma training through the learning collaborative. In addition, Trauma 201 has been incorporated into both Foundation and Pride training for new child welfare workers and for caregivers, which provides information and clinical guidance regarding traumatic grief including information about seeking out treatment services. In addition, Clinical will revise and enhance the Department's Crisis Response section of Administrative Procedure to include information pertaining to the trajectory of acute versus chronic grief following a traumatic event and when/where to seek therapeutic assistance, including pastoral counseling.

*FY 14 Department Update:* The Department is revising administrative procedures for crisis response to more clearly identify methods of addressing the needs of youth dealing with issues of grief including referral to pastoral counseling. Targeted date for completion of revisions is January 2015.

*FY 15 Department Update:* The recommendation will be incorporated into permanent policy. The anticipated completion date is Spring of 2016.

**The Department should assure that when wards turn 16 years of age they obtain state-issued identification cards (from OIG FY 11 Annual Report, General Investigation 22).**

*FY 11 Department Response:* Department procedures will be drafted to require the obtaining of State Identification Cards for wards.

*FY 12 Department Update:* Department procedures will be drafted to require the obtaining of State Identification Cards for wards.

*FY 13 Department Update:* The recommendation will be incorporated into Procedures 302, Appendix M.

*FY 14 Department Update:*  Revisions to Procedures 302 Appendix M are still being drafted. The Department anticipates posting for comment by 12/31/14.

*FY 15 Department Update:* The recommendation will be incorporated in to revisions to Procedures 302-Appendix M which will be issued in March 2016.

**The Department should review and update the Emergency Reception Center (ERC) Manual to include expectations of follow-up workers bringing children to the Emergency Reception Center (from OIG FY 06 Annual Report, General Investigations 4).**

*FY 07 Department Update:* The updated ERC Protocol/Manual (Transmittal) has not been finalized and is on hold with the Office of Child and Family Policy awaiting information resolution regarding shelter transportation issues.  When it is completed the informational transmittals will go out to DCFS and private agency staff. Also, training will take place for all staff regarding protocol on how CWS or DCP can make an Emergency Shelter referral and intake guidelines for bringing children and youth into ERC for an emergency temporary shelter care placement.

*FY 08 Department Update:* The Emergency Reception Center Protocol has been drafted and is awaiting approval to be sent out for comment. The anticipated date for distribution/implementation is January 2009.

*FY 09 Department Update:* Referral forms for the Emergency Reception Center (CFS 1900 and CFS 1901) were issued in February 2009. The referral form does not address procedures for admission to the Emergency Reception Center. Emergency Reception Center protocol is on hold at this time.

*FY 10 Department Update:* At the request of the Division of Child Protection (DCP), the ERC Protocol was placed on hold due to a planned reorganization and remains on hold as of November 2010.

*FY 11 Department Update:* Restructuring of the Emergency Reception Center (ERC) is still planned therefore the implementation of the ERC Protocol is still on hold at this time.

*FY 12 Department Update:* Standardized procedures for utilizing the Emergency Reception Center are being drafted.  The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* Shelter care procedures are currently being drafted.

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 301 Appendix G, *Temporary Placement to the Statewide Emergency Shelter System*, which were posted for comment on 11-06-14.

*FY 15 Department Update:*  The recommendation will be incorporated into Procedures 301.50 (formerly known as Appendix G).

**Substance affected and dually diagnosed clients should be referred to child welfare teams with expertise in working with these clients and families. Programs such as the Intact Family Recovery program (IFR) have expertise with both populations and successfully enroll 70% of the eligible children they serve in Head Start and state pre-K programs (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 10).**

*FY 09 Department Response:* There is no policy or protocol for referring substance exposed infants to the Intact Family Recovery program. However, the Division of Service Intervention gets a weekly report from Quality Assurance on Cook County substance exposed infant cases. The Division of Service Intervention then contacts the assigned child protection staff to inform them that the case may be appropriate for the Intact Family Recovery program and how to make the referral.

*FY 09 OIG Response:* Referrals to the Intact Family Recovery program should be required in specific circumstances and incorporated into written policy.

*FY 10 Department Update:* Revisions to Policy Guide 99.13, *Services for DCFS Substance Affected Families*, are currently being drafted.

*FY 11 Department Update:* The Divisions of Service Intervention, Child Protection and Monitoring will form a committee to review policy and resources to address this issue.

*FY 12 Department Update:* The Division of Clinical Practice, Specialty Services Unit provides consultation to caseworkers on a variety of complex cases including dually diagnosed clients.

*FY 13 Department Update:* The joint consultation process for dually involved (mentally ill/substance abuse) cases has been implemented within the Specialty Services unit of the Clinical Division. Staff from the substance abuse services unit now jointly provide consultation to caseworkers and staff cases with DCFS mental health and other specialty staff when needed. The DCFS substance abuse unit has been attempting to obtain a listing from DASA of providers capable of providing dual diagnosis (MI/SA) services to DCFS involved families. DASA staff have not completed the list yet; their latest report was they are 75% complete with the list.

*FY 14 Department Update:* The Clinical Division, through the Specialty Services Unit, responds to any requests for consultations or staffings on cases with substance abuse or dual diagnosis issues. The Department has also made resources available on the D-Net for workers to use and access DASA funded treatment programs for potential substance affected families and/or dual diagnosis cases. In Cook County the IFR program staff receives a report on new SEI cases. IFR staff contact assigned workers if the case has not been referred to the IFR program. All IFR cases are assessed for co-occurring mental health issues. Also, for placement cases in Cook County, IV-E waiver staff monitors new temporary custody cases and follow up with workers on any cases that have not been screened for substance abuse and mental health by the JCAP program. JCAP staff will reach out to any parents and conduct assessments at their homes or other locations if they are unable to come to the JCAP office.

*FY 15 Department Update:* Operations will ensure that Administrative staff not utilizing the program is made aware of the program. DCFS Clinical will schedule a meeting with staff to discuss the referral information.

**TEEN ISSUES**

**Colleges and universities offer an orientation week for all incoming students. Similarly, the transitional living program should provide a two-week orientation period for all teen parents. The orientation should focus on building family and community support using a task-centered/ecological approach.  During this orientation period, the transitional living program case manager and family support worker will jointly introduce a young parent to community-based resources in the area and begin building the foundation of a support system.  (a) Family support worker duties include: introducing a youth and her child to local Head Start programs and supporting progress through monthly visits; introducing a young parent and her child to libraries, WIC offices, park districts; establishing a pediatric medical home for a young parent's child; (b) Case manager duties include: supporting the youth in their educational setting through monthly visits to the young parent's school or job to assist the youth to overcome obstacles that hinder achievement. If the young parent is without a medical home, accompanying them to a local Title X Clinic/medical home; and exploring recreational, physical fitness and arts programs in the community with the youth. The case manager should diligently assist the young parent in maintaining and strengthening their extended support system, including inviting a young parent's family or friends to an orientation meal and visiting with a young parent's emergency caretaker (from OIG FY 14 Annual Report, General Investigation 13).**

> *FY 14 Department Response:* The Department is currently working on a revision to the teen parenting procedures and will review this recommendation for incorporation into the draft.

> *FY 15 Department Update:* The recommendation has been incorporated into the revisions to Appendix J which is currently being reviewed by the plaintiffs' counsel in Hill v. Erickson.

**When a young parent transitions into a transitional living program, the receiving case manager shall introduce themselves to school staff within the first ten days and ask to be notified via email of any absences.  To support the case managers efforts to sustain attendance, case managers must arrange to have access to the applicable education notification system portals for absences or cuts. If the school does not have a portal system (such as the Alternative School Network), the case manager should arrange notification through available mentors or teachers. If a young parent has two consecutive absences from school, the case manager must immediately make in-person contact. The Teen Parent Support Network Education Support Department shall be consulted before absenteeism becomes a chronic issue. This recommendation should be incorporated into Procedures 302, *Services Delivered by the Department*, Appendix J, *Pregnant and/or Parenting Program* (from OIG FY 14 Annual Report, General Investigation 13).**

> *FY 14 Department Response:* A program redesign for Independent Living and Transitional Living programs is in process.  This will be integrated into the design and an appropriate orientation program will be developed.  The program model and orientation should be completed in early 2015.

> *FY 15 Department Update:* The recommendation has been incorporated into the revisions to Appendix J which is currently being reviewed by the plaintiffs' counsel in Hill v. Erickson.

**During the transitional living program pre-placement process, the sending case manager will assist the young parent in identifying the names, addresses and phone numbers of individuals whom the youth wants on their visiting list.  The receiving case manager will amend this list as the young parent's supports change over time. This recommendation should be incorporated into Procedures 302,** *Services Delivered by the Department***, Appendix J,** *Pregnant and/or Parenting Program* **(from OIG FY 14 Annual Report, General Investigation 13).**

> *FY 14 Department Response:* The Department is currently working on a revision to the teen parenting procedures and will review this recommendation for incorporation into the draft.

> *FY 15 Department Update:* The recommendation has been incorporated into the revisions to Appendix J which is currently being reviewed by the plaintiffs' counsel in Hill v. Erickson.

**The Department should incorporate the two-week orientation period and pre-placement process as a model for all teen parent transitional living programs This recommendation should be incorporated into the Procedures 302,** *Services Delivered by the Department***, Appendix J,** *Pregnant and/or Parenting Program* **(from OIG FY 14 Annual Report, General Investigation 13).**

> *FY 14 Department Response:* The Department is currently working on a revision to the teen parenting procedures and will review this recommendation for incorporation into the draft.

> *FY 15 Department Update:* The recommendation has been incorporated into the revisions to Appendix J which is currently being reviewed by the plaintiffs' counsel in Hill v. Erickson.

**To increase communication and collaborations among the transitional living program system of care, a young parent's case manager and family support worker should meet with day-shift community support staff to review progress and enhance opportunities for the young parent and their child's successful engagement in education, and to strengthen the mother and child support system.  Shift summaries should be reviewed before this meeting.  These meetings should occur every four to six weeks.  This recommendation should be incorporated into the Procedures 302,** *Services Delivered by the Department***, Appendix J,** *Pregnant and/or Parenting Program* **(from OIG FY 14 Annual Report, General Investigation 13).**

> *FY 14 Department Response:* The Office of the Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors. The Inspector General met with agency management and a representative from the Board of Directors to discuss the findings in this report.  The private agency will create opportunities for all staff members to participate in team meetings a minimum of once per month.  These meetings are in addition to the quarterly individual client staffings.

*FY 15 OIG Update:*    The private agency established monthly regional meetings to enhance communication with their transitional living programs (TLP) Community Support Staff.    At these regional meetings, Community Support Staff, case managers, and Child and Family Specialists meet together to discuss concerns about cases and share information. The recommendation will be incorporated into revisions to Procedures 302, *Services Delivered by the Department,* Appendix J, *Pregnant and/or Parenting Program.*

**The transitional living program must immediately cease requiring Social Security Numbers for visitors.  Similar to college and university dormitory policy, transitional living programs should require visitors to produce a state-issued (including drivers license or state ID) or school photo identification (from OIG FY 14 Annual Report, General Investigation 13).**

> *FY 14 Department Response:* The agency's management team reviewed their current visitor policy and acknowledges that balancing the home-like environment with the safety concerns is a continuous challenge.  The agency notes that through the use of background checks many people with serious criminal histories were not allowed in the buildings.  The agency will continue to review for alternative methods for ensuring a safe environment.

*FY 15 OIG Update:*  The private agency no longer collects Social Security numbers from visitors for the purpose of conducting a background check.  Instead, visitors at the transitional living program sites are asked to show a State identification card or a school identification card as a condition of entry.

**The transitional living program must increase Head Start Enrollment within their programs to 80% within the next fiscal year (from OIG FY 14 Annual Report, General Investigation 13).**

> *FY 14 Department Response:* The Department agrees that the private agency should work with pregnant and parenting youth in their transitional living programs (TLP) to increase the percentage of children ages 3 to 5 of teen parents that are enrolled in Head Start programs. The private agency will establish a tracking system to monitor Head Start enrollment and participation levels with the goal of increasing these levels to 80%.

*FY 15 OIG Update:*  As of September 2015, the private agency had 59 children of wards who were eligible to be in daycare or Head Start.  The private agency had 38 children who were eligible for daycare but were too young for Head Start; fourteen (37%) of these 38 children were enrolled in daycare.  The agency had 21 children who were old enough to be eligible for Head Start; ten (48%) of these 21 children were enrolled in Head Start.  To bring up attendance at Head Start programs, the private agency had caseworkers personally introduce Head Start to the parents of 27 children not enrolled in Head Start programs in their communities.  During these personal introductions, caseworkers took young parents to visit a Head Start facility, observe programming, and speak with staff.

**Whenever a violent incident occurs, transitional living program staff must ensure the safety of the involved youth and other youth living in the transitional living program.  The transitional living program should review the incidence of violence and staff compliance with the policies of providing therapy and mediation (from OIG FY 14 Annual Report, General Investigation 13).**

> *FY 14 Department Response:* The private agency will review their existing crisis protocols and modify as necessary.  Any modifications made will be reviewed with transitional living program staff.

*FY 15 OIG Update:*  The private agency implemented a new "trauma-informed" and evidence-based model of conflict resolution.  98% of TLP workers have been trained on this new model.  This model of conflict resolution is being used to resolve conflicts between residents of the private agency's transitional living programs.

Anticipating college enrollment, a case manager should assist a young parent in beginning the application process for grants and federal aid when high school graduation or high school equivalency testing (GED) completion is imminent. Wards should not have to confront the daunting and complicated process of applying for Pell grants and federal aid (FAFSA) without hands-on assistance. The Teen Parent Support Network Education Support Department or Youth In College should assist any parenting youth who has completed high school or earned a GED in completing these required applications. This recommendation should be incorporated into the Procedures 302, *Services Delivered by the Department*, Appendix J, *Pregnant and/or Parenting Program* (from OIG FY 14 Annual Report, General Investigation 13).

> *FY 14 Department Response:* The Department is currently working on a revision to the teen parenting procedures and will review this recommendation for incorporation into the draft.

> *FY 15 Department Update:* The recommendation has been incorporated into the revisions to Appendix J which is currently being reviewed by the plaintiffs' counsel in Hill v. Erickson.

A GED test or college entrance exam should be considered a "critical appointment," requiring that the case manager transport the youth. This recommendation should be incorporated into the Procedures 302, *Services Delivered by the Department*, Appendix J, *Pregnant and/or Parenting Program* (from OIG FY 14 Annual Report, General Investigation 13).

> *FY 14 Department Response:* Department procedures will be revised to reflect this. Department Procedures 314, *Educational Services*, is expected to be issued for comment in the 3rd Quarter of FY15 and Department Procedures 315, *Permanency Planning*, is expected to be issued in August 2015.

> *FY 15 Department Update:* The recommendation was incorporated into Procedures 314. Policy Transmittal 2015.05 was issued to staff in March 2015.

This Report was used to structure a future Error Reduction Plan for the Hill-Erickson class (from OIG FY 14 Annual Report, General Investigation 13).

> *FY 14 Department Response:* The Inspector General and the Department, through the Hill-Erikson Class Monitor, have been developing training and implementing an Error Reduction Plan on an ongoing basis.

*FY 15 OIG Update:* The Teen Parenting Services Network (TPSN) has assumed responsibility for training case managers using the error reduction model developed by the Office of the Inspector General. The Office of the Inspector General periodically reviews TPSN's efforts to ensure adherence to the model.

The Department should develop housing contracts with wards and enforce regulations addressing the use of drugs, alcohol, firearms, and violence. Institutional sanctions should be consistent across programs and the juvenile court should be immediately notified when a ward is violating housing contracts that threaten the safety or the well-being of the ward. Housing contracts should make clear that funding for the apartment will stop and the court will be informed of transgressions involving criminal activity (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 4).

*FY 11 Department Response:* Amendments to the Independent Living (ILO) and Transitional Living Program (TLP) plans are being developed.

*FY 12 Department Update:* Independent Living (ILO) and Transitional Living Program (TLP) contract language is in the process of being reviewed and updated.

*FY 13 Department Update:* The following requirements are in place: Section 6.4.15 of the ILO/TLP program plan requires providers to have written protocols with respect to weapons, illegal substance, domestic violence, and dangerous behaviors. In addition, DCFS Procedure requires providers to promptly submit an Unusual Incident Report whenever such an incident occurs, and those reports are distributed to the GAL, among others. The language regarding stopping funding and informing the court of transgressions involving criminal activity will be included in the FY 15 ILO and TLP Program Plans.

*FY 14 Department Update:* Language will be included in FY 2016 ILO and TLP program plans that are being prepared for review by the Legal Department.

*FY 15 Department Update:* The recommendation will be communicated to providers, and the FY 16 contracts will be amended by January 31, 2016.

# UNRESOLVED RECOMMENDATIONS

The following Office of the Inspector General's recommendations impact child safety and have been either rejected by the Department or pending for at least 4 years without resolution.

**The Department of Children and Family Services should reinstate its historical practice of investigating co-sleeping deaths only when the report discloses circumstances suggesting possible abuse or neglect, such as an intoxicated parent or a previous co-sleeping death in the same family. In the alternative, the Department should immediately convene public hearings toward adopting Rules governing investigating and indicating co-sleeping deaths (from OIG FY 14 Annual Report, Death and Serious Injury Investigation 10).**

> *FY 14 Department Response:* The State Central Register (SCR) no longer takes a death report based solely on an unsafe sleep practice.  Training was provided to staff.

*FY 15 OIG Comment:* On July 17, 2015, the new Acting Director of DCFS reversed the Department's position without notice to the Inspector General and without any opportunity for public comment, in violation of the Administrative Procedure Act.

> *FY 15 Department Update:* The Department disagrees with the Inspector General's Office and is continuing to investigate hotline reports of deaths of children who are found in an unsafe sleep environment.  On September 23, 2015, the Department provided the Inspector General's Office a detailed memorandum responding to the Office of the Inspector General's August 10, 2015 Confidential Memorandum. The Office of the Inspector General's memorandum challenges the statutory and constitutional authority of the Department to conduct certain child death investigations. The Department concludes that it has the legal authority under both statute and the constitution to investigate the unexpected deaths of children that are reported to the Child Abuse and Neglect Hotline when the caller provides information sufficient to raise a reasonable suspicion that the child was placed in an unsafe sleep environment.  The Department's decision to investigate, but only indicate for abuse or neglect when exacerbating factors are identified that contributed to the death, all unsafe sleep child deaths is not only legal, it is prudent and consistent with child welfare practice in the United States.  The Department asked the Inspector General to provide authority explaining why the Department's change in position had to go through the Rulemaking procedure and the Inspector General declined.  It is the Department's position that the current practice is consistent with the present Statute, Rule and Procedure.

*FY 15 OIG Response:* By law, the authority of the Department to investigate a family begins with a call to the Hotline alleging a reasonable suspicion of abuse or neglect. With the Department's unilateral decision to investigate unsafe sleep, the Department has defined unsafe sleep as abuse or neglect. Unsafe sleep, as defined by the Department, includes co-sleeping with your infant, having quilts or bedding in a crib or placing an infant to sleep on his or her stomach. Current Rules of the Department do not define co-sleeping with your child as abuse or neglect. Moreover, two separate Pregnancy Risk Assessment Monitoring Systems (PRAM) surveys found that more than half of those questioned admitted to co-sleeping with their infants at times. Two recent surveys estimate that over half of all parents admit to co-sleeping with their infants, at times. Given the prevalence of this practice, the Inspector General believes that the practice of co-sleeping is a public health issue and has notified the Department that such a change

in definition of abuse or neglect must have a public airing and must be accomplished through the Rulemaking process.

The Inspector General has also noted that the Department's new policy could disproportionally impact minority and low income families. Department statistics demonstrate the potential for disproportionality: while African Americans comprised approximately 34% of all child abuse investigations (FY 2014), they comprise approximately 55% of those investigated for sleep-related infant death.

The decision to equate co-sleeping with reasonable suspicion of abuse or neglect also means that doctors, pediatricians, hospital workers and other mandated reporters could be criminally prosecuted for failing to call the Hotline when they learn that their patient or client has fallen asleep with an infant. Such a drastic change should not be accomplished without public notice and input.

**The Department should pursue an interagency agreement with the Department of Healthcare and Family Services (DHFS) allowing DCFS Division of Child Protection staff access to Recipient Claim Detail information (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 11). In fiscal year 2010 the Office of the Inspector General also recommended the following: Training for child protection staff should incorporate information about the availability and benefit of recipient claim details from the Department of Healthcare and Family Services and their Recipient Restriction Unit (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 7).**

*The following is historical information regarding the implementation of this recommendation:* Resolving difficult allegations of Medical Neglect or Failure to Thrive often requires retrieving and analyzing a myriad of medical records.  In recognition of this, the Abused and Neglected Child Reporting Act [ANCRA] requires the Department of Children and Family Services to: *enter into an inter-agency agreement with the Department of Healthcare and Family Services and the Department of Human Services (acting as successor to the Department of Public Aid under the Department of Human Services Act) to establish a procedure by which employees of the Department may have immediate access to records, files, papers, and communications (except medical, alcohol or drug assessment or treatment, mental health, or any other medical records) of the Department of Healthcare and Family Services, county departments of public aid, the Department of Human Services, and local governmental units receiving State or federal funds or aid to provide public aid, if the Department determines the information is necessary to perform its duties under the Abused and Neglected Child Reporting Act, the Child Care Act of 1969, and the Children and Family Services Act.* 325 ILCS 5/7.20

In FY 2008, the Office of the Inspector General recommended that the Department work with Healthcare and Family Services to access the database containing Medicaid Claim Detail to facilitate child protection investigations involving medical questions and to implement the statutory mandate.  The Inspector General made the recommendation after investigating the death of a medically complex 18 month-old whose parent had been indicated for medical neglect for failing to administer his medication appropriately.   At the time of the child protection investigation, the investigators did not have access to Medicaid data that would have assisted in identifying the child's numerous medical providers.

In FY 2009, the Inspector General reiterated the recommendations for obtaining Medicaid data in two separate death investigations.   Two children drowned while unattended in their mother's car after the car rolled into a retention pond.  The mother had two prior indicated child protection investigations in the preceding year that involved allegations of inadequate supervision.  The mother had a history of prescription drug abuse that included being denied medication refills 23 times in the four months between child protection investigations.  Department staff was unaware

of any resource to assist with issues of prescription drug abuse. In the second Inspector General investigation, a mother of two children veered into on-coming traffic, killing herself and both of her children. The mother and both children were receiving Intact Family Services at the time of their deaths related to issues of child abuse and neglect. The mother had significant mental health issues and demonstrated a pattern of doctor shopping and medication seeking in order to obtain multiple prescriptions for numerous psychotropic drugs, anti-depressants and pain killers.

*FY 14 Department Update:* In November 2014, the Department of Healthcare and Family Services (DHFS) notified the Department and the Inspector General's Office that it had determined that current Federal Medicaid Confidentiality law prohibited permitting access to Medicaid Claim Detail for the purpose of conducting a child abuse/neglect investigation.

**The Department should review and update the Emergency Reception Center (ERC) Manual to include expectations of follow-up workers bringing children to the Emergency Reception Center (from OIG FY 06 Annual Report, General Investigations 4).**

*FY 07 Department Update:* The updated ERC Protocol/Manual (Transmittal) has not been finalized and is on hold with the Office of Child and Family Policy awaiting information resolution regarding shelter transportation issues. When it is completed the informational transmittals will go out to DCFS, POS, CWS, and DCP staff. Also, training will take place for all staff regarding protocol on how CWS or DCP can make an Emergency Shelter referral and intake guidelines for bringing children and youth into ERC for an emergency temporary shelter care placement.

*FY 08 Department Update:* The ERC Protocol has been drafted and is awaiting approval to be sent out for comment. The anticipated date for distribution/implementation is January 2009.

*FY 09 Department Update:* Referral forms for the Emergency Reception Center (CFS 1900 and CFS 1901) were issued in February 2009. The referral form does not address procedures for admission to the Emergency Reception Center. Emergency Reception Center protocol is on hold at this time.

*FY 10 Department Update:* At the request of the Division of Child Protection (DCP), the ERC Protocol was placed on hold due to a planned reorganization and remains on hold as of November 2010.

*FY 11 Department Update:* Restructuring of the Emergency Reception Center (ERC) is still planned therefore the implementation of the ERC Protocol is still on hold at this time.

*FY 12 Department Update:* Standardized procedures for utilizing the Emergency Reception Center are being drafted.

*FY 13 Department Update:* Shelter care procedures are currently being drafted.

*FY14 Department Update:* The recommendation has been incorporated into revisions to Procedures 301 Appendix G, *Temporary Placement to the Statewide Emergency Shelter System*, which were posted for comment on 11-06-14.

*FY 15 Department Update:* The recommendation will be incorporated into Procedures 301.50 (formerly known as Appendix G).

**The Department should develop an expedited process for distributing proposed decisions to all parties in expungement appeals, with opportunity to file written objections, prior to the issuance of final administrative decisions in expungement appeals (from OIG FY 11 Annual Report, General Investigation 23).**

> *FY 11 Department Response:* The Department rejected the recommendation based on case law that interprets the section of the Administrative Procedure Act not to include the final administrative decision by a Director.

*FY 12 OIG Response:* The Inspector General maintains that implementation of this recommendation would strengthen the Administrative Process while assuring fairness and more reliable decision making.

**The Department should develop policy to address suspected substance abuse in the workplace (from OIG Recommendations made in 2005, 2001 and 1999). In FY 08 and FY 10 the Inspector General also recommended that the Department amend Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* to add "failure to timely comply with an order for drug or alcohol testing after a finding of reasonable suspicion" as a basis for licensure action under Rule 412.50, *Misconduct* (from OIG FY 10 Annual Report, General Investigation 21 and OIG FY 08 Annual Report, General Investigation 32).**

> *FY06 Department Response:* The Department developed a definition and procedure for Reasonable Suspicion testing. The Department agrees to amend the Employee Manual and the Employee Licensure Rule to address Reasonable Suspicion of substance abuse and will also engage in discussions with the union.

> *FY 07 Department Update:* The Department's workgroup addressing the need for incident-based reasonable suspicion drug or alcohol testing is currently developing protocol for pre-employment drug testing. Reasonable suspicion testing has been put on hold temporarily.

> *FY 08 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 08 OIG Response:* The Inspector General has been continuously recommending this critical change in policy for nine years. The policy change sought by the Inspector General would have a minimal budgetary impact. The lack of reasonable suspicion policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk.

> *FY 09 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

> *FY 10 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement

this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 11 Department Update:* Management fully supports reasonable suspicion testing for direct child welfare service employees and supervisors.  Direct child welfare service employees and supervisors are bargaining unit members.  As such implementation of reasonable suspicion drug/alcohol testing, unless legislatively mandated, must be negotiated with the collective bargaining units.  Management routinely proposes to CMS Labor Relations that reasonable suspicion testing be included in collective bargaining agreements.  Management also routinely proposes that reasonable suspicion testing be added to supplemental collective bargaining agreements.  Without a reasonable suspicion testing policy in place amendment of Rules and Procedures is futile.  The State will be involved in contract negotiations with AFSCME in 2012 and the Department intends to continue pressing this point.

*FY 11 OIG Response:* The Inspector General notes that the City of Chicago and both the Illinois State Police and the Department of Corrections have had Reasonable Suspicion Testing for several years.  The City of Chicago and the Department of Corrections employees are represented in large part by the same union as most employees with the Department of Children and Family Services.  Moreover, Direct Child Welfare employees and supervisors at DCFS must possess Child Welfare Employee Licenses.  The Inspector General has urged since 2005 that Reasonable Suspicion Testing be added as a requirement for Child Welfare Licensure.  The Department has failed to act on the recommendation.

*FY 12 Department Update:* A workgroup has been formed to review all drug/alcohol related Office of the Inspector General recommendations to determine implementation steps.  The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* The Department will reconvene the workgroup to address this recommendation.

*FY 14 Department Update:* A policy to address suspected substance abuse would need to be negotiated as a part of the Master Contract Agreement. Contract negotiations are scheduled to begin on 12/10/14 as the contract expires on 6/30/15.

*FY 15 Department Update:*  A policy to address Suspected Substance Abuse is being negotiated as a part of the Master Contract Agreement.  Contract negotiations began in December 2014 and are continuing to occur with no agreed settlement at this time.

*FY 15 OIG Response:* The Office of the Inspector General has been recommending an incident-based management response for allegations of employee substance abuse since 1999. The Office of the Inspector General notes that other governmental entities including the City of Chicago and the Illinois Department of Corrections, several years ago successfully negotiated incident-based policies to respond to such allegations.

# APPENDIX

**APPENDIX A:**

JAMAL WESBY

**APPENDIX B:**

COOK COUNTY RUNAWAYS AND SHELTER CARE FACILITIES

**PLEASE NOTE:  ALL NAMES IN THIS REPORT, WITH THE EXCEPTION OF CITATIONS TO SCHOLARLY ARTICLES OR COURT CASES, ARE FICTITIOUS.**

# OFFICE OF THE INSPECTOR GENERAL
## Department of Children and Family Services

| REDACTED REPORT |
|---|

*This report is being released by the Office of the Inspector General for instructional purposes. To ensure the confidentiality of all persons and service providers involved in the case, identifying information has been changed. All names, except those of professional references, are fictitious.*

**File:**       13-1393
**Subject:**  Child Death & Serious Injury
**Child:**     Jamal Wesby (DOB: 4/12; DOD: 12/12)

## SUMMARY OF COMPLAINT

In December 2012, Michael Wesby called 911 after he discovered his eight-month-old son, Jamal, whom he had laid down for a nap, blue and unresponsive. Jamal was taken by ambulance to South Community Hospital where medical staff unsuccessfully attempted life-saving procedures. An autopsy revealed the infant died from multiple blunt force injuries to his head. Jamal had lived at home with his mother, father, and three siblings. Doctors examined his three siblings. Jamal's eight-month-old twin brother, James, was found to have bilateral parietal skull fractures and a subgaleal hematoma; one-and-a-half-year-old Byron was found to have a healing rib fracture; and two-and-a-half-year-old Summer did not have any injuries. Three older siblings, ages four, six, and seven, were in foster care. The Office of the Inspector General investigated Jamal's death pursuant to its mandate to investigate the deaths of children whose families were involved with the Department of Children and Family Services within a year of their deaths. This extensive report covers four years of Department involvement.

## INVESTIGATION

### Family Composition & Summary

At the time of Jamal's death, 26-year-old Stacy Lee (DOB: 6/86) and her boyfriend, 26-year-old Michael Wesby (DOB: 3/86), resided with four of their children: two-and-a-half-year-old Summer Wesby (DOB: 4/10): one-and-a-half-year-old Byron Wesby (DOB: 3/11); and eight-month-old twins Jamal and James Wesby (DOB: 4/12). The parents had three children in placement: six-year-old Deon Wesby (DOB: 10/06); four-and-a-half-year-old Deonte Wesby (DOB: 11/08); and Ms. Lee's seven-year-old son Lamont West (DOB: 3/05).[1]

The Wesby family's involvement with DCFS began in December 2008 when the seven-week-old Deonte suffered an unexplained broken leg, and he and his two siblings entered foster care. Over the next four years, the parents participated in visitation, psychological evaluations, couple

---

[1] Lamont's father was identified as Aiden West. He did not participate in services and rarely visited Lamont.

and individual counseling, parenting classes, and parent coaching. Between December 2008 and September 2012, the parents had four more children. Ms. Lee denied all of her pregnancies to her caseworker and supervisor (she admitted her pregnancy with Byron a month before giving birth). None of those children were screened with the State's Attorney Office; and neither the State's Attorney's Office nor the Office of the Public Guardian sought the filing of petitions. The Department conducted four child protection investigations while the older children were in custody; and the children in foster care alleged abuse of excessive corporal punishment by their parents on three occasions. After the children had been in foster care for three-and-a-half years, the parents, amidst allegations of corporal punishment, signed specific consents for the children's guardianship and adoption.

<u>December 2008, DCP Investigation (SCR Sequence A)</u>

In December 2008, a nurse at North Hospital notified the hotline that parents brought seven-week-old Deonte (DOB: 11/08) to the emergency room for constipation. An examination found the baby had a broken left femur, for which his parents had no explanation. SCR took the report for investigation. Deonte was transferred to South Gate Hospital for treatment by an orthopedic physician. Medical records noted Deonte was placed in a cast and given morphine and Tylenol for pain. Radiographic image reports, in the child protection record, showed a transverse fracture of the mid shaft of the left femur.

Both the 22-year-old mother, Stacy Lee, and the maternal grandmother, Myrtle Lee, with whom the parents and children lived, told the child protection investigator that Deonte had been crying more than usual for the past couple of days. 22-year-old Michael Wesby denied noticing any change in Deonte's disposition. Both parents denied knowing how Deonte was injured. Ms. Lee stated that he had not fallen or been dropped. Mr. Wesby questioned whether he may have rolled over the baby while sleeping with him. Neither of the parents identified caretakers for the infant aside from themselves and the mother added that her other children were not left alone with Deonte.

Child protection staff consulted South Gate Hospital professionals during the investigation. The radiologist told the child protection supervisor that Deonte's broken femur was a severe injury that could not have been caused accidentally outside of a significant trauma such as a car accident. He said the most likely cause of the injury was abuse. He also noted that the injury was one to two weeks old at the time the child was taken to the emergency room; the delay in seeking treatment was a red flag for abuse. The South Gate Hospital Child and Family Protective Services Nurse told the supervisor that the mother, when informed that the baby would not be going home with her pending investigation, "did not appear UPSET AT ALL." Deonte was discharged after three days to a friend of his mother's pursuant to a safety plan. After approximately a week, the friend requested Deonte's removal because he cried too much. The investigator placed him at the Emergency Reception Center (ERC).

In January 2009, the Department took protective custody of Lamont, Deon and Deonte. The court awarded temporary custody to the Department that month. The parents were granted supervised day visits. Deon was placed with his paternal great grandparents and Lamont was placed with his maternal grandmother. Deonte was moved from ERC to a traditional foster home for a short period. He was placed with a maternal aunt who requested his removal after a month, returning to the traditional foster home in March 2009.[2] In February 2009, the

---

[2] Records did not identify the reason Deonte was not placed with either of his siblings. The maternal grandmother told the IA screener that she had offered to care for Deonte as well, but that the DCP

investigation was indicated against both the mother and the father for bone fractures by abuse (#9) to Deonte. Both parents were also indicated for substantial risk of physical injury by neglect (#60) to Lamont and Deon,[3] but the findings were unfounded in July 2013 as a result of the Illinois Supreme Court's decision in *Julie Q.*[4]

## 2009

Kappa Services
In January 2009, while the investigation was pending and the case was being opened to Kappa Services (Kappa), the parents moved from City A area to City B (approximately 180 miles) to seek housing as they had received a Section 8 voucher in City B. The parents lived with friends until they located a Section 8 approved apartment in May 2009 (copy of lease provided to Kappa).[5] The children remained in City A, and Kappa in City B serviced the case. Kappa records only contained a partial pending DCP investigation. Misty Gills was the assigned worker.[6] In the fall of 2009, Lisa Turner-Johnson became her supervisor. Kappa issued the parents transit cards to enable them to travel to City A twice a month for visits with their children.

*Integrated Assessment*
An integrated assessment (IA) was completed in April 2009.[7] The clinical screener noted that because of time constraints, the assessment was not as comprehensive as usual. Although the investigation was indicated in February 2009, the clinical screener wrote in the IA that complete records regarding Deonte's injury were not available. The clinical screener used a partial child protection investigation to describe why the case was opened for services, noting that an investigation was initiated for bone fractures by abuse (#9). She did not know that both parents were indicated as perpetrators of Deonte's broken femur based on a radiologist's statement that the injury was most likely caused by abuse and that the parents were the only caretakers of the infant. In an interview with Inspector General investigators the clinical screener could not explain why she did not have the completed investigation but said if she had known the outcome of the investigation, she would have documented it in the IA and incorporated it into her assessment. The IA, including the following paragraph about the family's reason for DCFS involvement, was later shared as a source of information with multiple service providers:

> The current case came to the attention of the child abuse and neglect hotline in December 2008. Nursing staff at North Hospital called and stated that one

---

Investigator felt it was too much for her, as her adult son, who had Crohn's Disease, also resided in the household.

[3] A finding of substantial risk of physical injury by abuse (#10) would have been more appropriate because the bone fracture was caused by abuse, not neglect.

[4] In *Julie Q. v. Department of Children and Family Services* 2013 IL 113783, Illinois held that DCFS was without authority to add allegation #60 to its allegation system because of an amendment to the Abused and Neglected Child Reporting Act (ANCRA) in 1980 removing the term "environment injurious" from the definition of neglected child. Reinsertion of the term in July 2012 allows the Department to investigate and indicate #60 effective July 13, 2012.

[5] According to Section 8 records, Ms. Lee had been on a waiting list for section 8 housing in City B since August 2007. Ms. Lee had applied for Section 8 housing in City B because their wait list was shorter than City A's. (conversation between maternal grandmother and Kappa Services supervisor January 2009).

[6] Ms. Gills had approximately 17 years of child welfare experience when she was assigned this case.

[7] The assessment took longer than the usual 45 days and the parents' interviews were difficult to schedule because they lived in City B; they were conducted in February 2009 during a last-minute trip to City A to visit their children.

month old Deonte Wesby had been brought to the emergency room by his parents because they had concerns about his being constipated. When examined by medical staff, Deonte was found to have a "complete break" of his left femur (large bone in the thigh). Neither of Deonte's parents had any explanation as to how this injury occurred and both stated they had no knowledge he was injured. Neither parent remembered Deonte falling or having an accident. An initial interview with Deonte's mother, Ms. Stacy Lee, revealed she brought Deonte to the hospital because he had been crying "for the past couple of days" and had not eaten the day before. Deonte's father, Mr. Michael Wesby, was also interviewed, and he noted that "there was not change of the past couple of nights that would make me think something happened to him." Both parents acknowledged Deonte slept with them in their bed every night…. Deonte was transferred to [the] Hospital for further evaluation. The social worker from this hospital contacted the investigative case manager to note concerns that there was no explanation for Deonte's injury, and later indicated that the injury was found to have occurred two weeks prior to him being hospitalized.

Included in the recommendations made were psychological evaluations; individual psychotherapy;[8] parenting classes; parent/child visits; medical appointment to address family planning and contraception; and obtain medical records of Deonte's injuries and share with service providers. The screener also recommended developmental and educational screenings and services for the children.[9] Lamont was already enrolled in and attending a Head Start program at the time of the IA. Deon was enrolled in and began a Head Start program in Fall 2009. The screener expressed concerns about the parents living in City B when their children remained in City A. She recommended that Kappa discuss with the parents their housing needs and the impact that remaining in City B would have on the relationship with their children and on reunification.

### Services

Kappa's initial service plan for the family, dated April 2009, incorporated many of the recommendations from the Integrated Assessment. Both parents completed parenting classes in June, which consisted of six three-hour classes.[10] For visits, Mr. Wesby and Ms. Lee traveled twice a month by train from City B to City A (approximately 180 miles); Kappa paid their fares. The parents generally remained in City A for two or three days, visiting daily with Deon and Lamont in their relative foster homes. They usually saw Deonte, who was in traditional foster care, only once during each visit to City A.

Adjudication was held in August 2009 with the following findings: physical abuse, abuse substantial risk and neglect injurious environment and neglect care necessary for Deonte and abuse substantial risk and neglect injurious environment for Lamont and Deon. The judge found that the perpetrator of the physical abuse was unknown. In September 2009, the court set the parents' goal as return home within 12 months.

---

[8] Therapy was, among other things, to "assess and address the underlying issues that lead to [their] current inability to maintain the safety of [their] children."
[9] Screenings were conducted and the children were found to be on track developmentally.
[10] According to an email from the Executive Director. The classes focused on "Parental Resilience, Knowledge of Parenting & Child Development, Self-Esteem, Family Expectations, Social Connections, Stress/Anger Management, Family Stability, and Family Nurturing."

In November 2009, the parents participated in psychological evaluations.[11] The psychologist, Adam L. Gray, documented that the IA was used as an information source. Ms. Lee's scores fell within the borderline range of cognitive functioning with a Full Scale IQ score of 73, placing her mental age at the rough equivalent of a 12-year-old.[12] Ms. Lee's reading score and math score were at the third grade reading level. She was diagnosed as having an unspecified learning disorder. The psychologist noted that Ms. Lee "does not necessarily look at her past experiences to figure out what she can learn from them."

Mr. Wesby's scores fell between the borderline to average range of cognitive functioning with a Full Scale IQ score of 83 (Verbal 79 and Performance 90), placing his mental age at the rough equivalent of a 13-year-old.[13] Mr. Wesby's reading score was at almost a second grade level and his math score was at a fifth grade level. He was diagnosed as having unspecified depressive and learning disorders. The psychologist wrote:

> He understands why he is involved in the DCFS system and how others can be concerned about his children, even though he himself still does not know where the injuries to his child came from.

When asked how she addressed the parents' cognitive delays, Ms. Gills told Inspector General investigators that she attempted to explain case information and expectations to them multiple times. She stated that needing to constantly restate things to the parents was one of the most significant challenges with the case.

In August 2009, the parents began couples therapy with a Kappa therapist in City A. The worker scheduled sessions for days when the parents were in City A visiting their children. A November 2009 therapy progress report noted that the parents had attended four counseling sessions but missed seven. The parents attended a total of six couple counseling sessions. The therapist, in a February 2010 progress report, wrote that he was no longer able to provide therapy for Mr. Wesby and Ms. Lee and was closing their case.[14] The therapist noted that the parents' initial openness toward therapy had dissipated and they were not attending regularly. They needed further therapy, but he felt they would benefit from participating in individual therapy prior to continuing with couples counseling.[15]

## 2010

### *Individual Therapy*

In January 2010, the parents began individual therapy in City B with Joseph Parker, M.A., LCPC, of Theta Services (Theta). Ms. Gills provided the therapist with a copy of the family's integrated assessment and their most recent service plan. As with the IA, the service plan did

---

[11] According to the referral form, the purpose of the psychological evaluations was to assess the parents' cognitive and emotional functioning; determine whether either parent has an Axis I or Axis II diagnosis; assess for possible depression as well as impulse control problems; determine the parents' ability to benefit from psychotherapy; and assess their empathy and commitment to their children.

[12] To roughly calculate someone's "mental age," some psychologists take the person's IQ, divide by 100 to turn it into a percent, and then multiply by the person's age or 16, whichever is lower (.73 x 16 = 11.68).

[13] .83 x 16 = 13.28.

[14] In a 1/25/10 note, the individual therapist noted that the couples therapist said he was going on medical leave.

[15] The clinical screener also recommended that the parents participate in individual therapy before couple therapy.

not document that both parents had been indicated for bone fractures by abuse (#9) to Deonte. In mid-May, Ms. Gills also sent the therapist the medical records regarding Deonte's broken leg.[16]

The therapist documented in an initial Comprehensive Assessment and Diagnosis that the presenting and primary concern to address in therapy was the parents' lack of insight into what may have caused their son's broken femur. The therapist copied from the IA:

> The current case came to the attention of the child abuse and neglect hotline in December 2008. Nursing staff at North Hospital called and stated that one month old Deonte Wesby had been brought to the emergency room by his parents because they had concerns about his being constipated. While [being] examined by medical staff, Deonte was found to have a [fracture in] his left femur (large bone in the thigh). Neither of Deonte's parents had any explanation as to how this injury occurred and both stated they had no knowledge he was injured. Neither parent remembered Deonte falling or having an accident.

He wrote that an investigation was opened "for allegation #9 – Bone Fractures" and listed "Neglect of Child" as both parents' DSM IV-TR Axis I focus of clinical attention.[17]

The Theta therapist briefly provided individual therapy for Stacy Lee. He documented the presenting concern in the Comprehensive Assessment and Diagnosis:

> Client reports that she is in counseling because "this is the last thing I need to take." Client reports that her children were taken into DCFS custody due to her 1 month old having a broken bone in his leg. Client denies knowing how the bone was broken.

During an April court hearing, the children's GAL voiced concern that the parents sharing the same therapist may make them reluctant to disclose information regarding Deonte's abuse. Accordingly Theta reassigned the mother, who had attended eight sessions with Mr. Parker, to another Theta therapist, but she attended only one session with her new therapist. On April 28, Ms. Lee canceled her upcoming appointment informing the therapist that she had given birth to a daughter and moved to City A.[18] A discharge summary recommended that Ms. Lee continue in therapy in City A as well as couple therapy once her therapist determined it appropriate.

In May 2010, Ms. Gills referred Ms. Lee for individual therapy with Kappa in City A. In June, Ms. Lee told Ms. Gills that she attended her first therapy appointment. In mid-July, Ms. Gills documented a phone message from the therapist saying that Ms. Lee claimed to not know why

---

[16] Although not documented in Kappa Services or therapy records, the Theta therapist likely asked for additional information regarding Deonte's fracture, prompting Ms. Gills to request medical records. Ms. Gills requested medical records on 5/4/10. Around that time, Mr. Wesby's therapist documented several sessions with Mr. Wesby addressing Deonte's broken femur and his intent to obtain more information about femur fractures. Ms. Gills mailed the therapist a copy of the medical records within days of receiving them.

[17] "Abuse of Child" is also an option for a focus of clinical attention.

[18] The move was pursuant to a safety plan for Summer.

she needed to attend therapy. Kappa was unable to locate Ms. Lee's individual therapy records for June through September 2010 so the extent of her participation is unknown.

In a May 2010 quarterly progress report for the father, Mr. Parker reported that Mr. Wesby had attended all of his (10) scheduled appointments and:

> During counseling sessions Michael is genuine and appears to be invested in sessions. Michael has openly discussed his anguish and confusion over how Deonte's femur came to be broken. Michael has been able to provide possibility of the children playing too rough with the infant as what he considers the most plausible scenario for the broken bone. Client has worked on addressing possible safety issues and with becoming more assertive in his relationship with Stacy as well as with friends, family, and co-workers. This writer has indicated to him that he has a great strength in his patience; however, due to his likelihood to not assert his opinions, he could end up becoming overly upset after holding in his thoughts and emotions over a period of time.[19]

According to an August 2010 discharge summary, Mr. Wesby's individual therapy case was closed because he had moved to live with Ms. Lee and Summer. The father had attended all of his (16) scheduled appointments. The therapist summarized Mr. Wesby's progress:

> During the course of therapy client has been able to identify a list of characteristics of a safe caregiver and process how he can ensure the physical safety of his children. As part of this[,] how the type of fracture that was found in his one month old son could have happened and type of force/motion that would be necessary[,] was discussed.[20] Client appeared genuinely upset and confused as to how this would have happened. Client was able to admit that he should have done something different to keep this from happening (more closely monitor his children, monitor others when visiting his children, and more closely screen those who will be around his children). How this type of injury can be avoided (handling of young children, appropriate supervision of children, and how to cope with frustrations) was processed and client has verbalized understanding of[,] and how he would implement[,] these safety measures.

Further counseling was not recommended unless "deemed necessary by his caseworker." In a letter to the worker the therapist stated he believed Mr. Wesby's progress in counseling demonstrated that he was appropriate for unsupervised visits with his children.

*Pregnancy Denial*
Ms. Gills supervised parent/child visits at relatives' homes twice a month. In February 2010, Ms. Gills documented that Ms. Lee appeared to be approximately seven or eight months pregnant. Ms. Gills twice asked Ms. Lee if she was pregnant and she denied it both times. In March, the caseworker again asked Ms. Lee whether she was pregnant and Ms. Lee denied it again. On April 9, 2010, Mr. Wesby admitted to his therapist (who until that week was also Ms.

---

[19] The Theta therapist shared these same observations in a letter to the supervisor of an April 2010 child protection investigation alleging risk of harm by abuse to Summer.

[20] The therapist consulted a radiology website at *http://www.radiologyassistant.nl/en/43c63c41ef792* and Deonte's medical record.

Lee's therapist) that Ms. Lee was pregnant and due in April 2010. Case notes do not indicate that the therapist shared the information with the caseworker.

***April 2010 DCP Investigation (SCR Sequence B)***

In April 2010, 16 months after the initial investigation, the Kappa caseworker notified the hotline that Ms. Lee had given birth in City B earlier that month. The call was taken for substantial risk of physical injury (#10) to the infant based on the parents' history. Matthew Rich was the assigned child protection investigator. Mr. Rich's supervisor spoke with Ms. Gills, who reported that the parents had complied with service, completed parenting classes and psychological evaluations, were in counseling, and that neither parent had substance abuse or domestic violence issues. Ms. Gills voiced concerns that the mother had repeatedly denied being pregnant and neither parent ever admitted to being the one who caused Deonte's broken leg.[21]

Mr. Wesby's Theta individual therapist (also Ms. Lee's former therapist) faxed a letter to the child protection supervisor listing his impressions of the parents. He reiterated his assessment of Mr. Wesby from his May 7 progress report. Regarding the mother, he wrote:

> Stacy has been guarded and superficial in sessions. She has stated at times that DCFS and this writer may be trying to "trick" her into admitting to doing something wrong. Client has been confronted on how her lack of openness in sessions decreases this writer[']s ability to be able to gauge how she is doing in treatment and stagnates treatment all together. Client has continued to be guarded and superficial. Stacy has also lied through [o]mission about her being pregnant to this writer and also outwardly lied about having found section 8 housing in City A, however, her caseworker has reported that the client has not secured such housing. Due to her guarded stance and dishonesty at this time it is unclear how the client is functioning in a positive or negative manner.

Investigator Rich interviewed the parents, who stated that they were complying with their service plan. Ms. Lee said that she hid her pregnancy because she was afraid the Department would take the baby. The investigator accompanied Ms. Lee and newborn Summer to the scheduled one-week well baby appointment, where the doctor assessed Summer to be healthy with no concerns.

Mr. Rich discussed the case with his supervisor who documented in a supervisory note that the parents were involved in services, did not have any substance abuse or domestic violence, and visited their children regularly. However, the supervisor noted that the mother's individual therapist had concerns regarding the mother's guardedness and the father's long work hours, leaving the mother alone with the newborn without support.[22] The supervisor wrote:

> It was decided that the family either help devise a safety plan or that the child is taken into protective custody[.] [D]ue to the age of the minor and the services that have already been completed it was determined by CPM/ARA that a safety plan is in the best interest of the minors.

---

[21] Ms. Gills faxed the child protection supervisor individual counseling assessments and treatment goals for both parents; a couple therapy progress report; psychological assessments; certificates of completion of parenting classes; and a request for extension of individual therapy services from the parents' therapist.

[22] A letter from the parents' therapist was among the attachments in sequence (B).

The child protection supervisor noted that it was DCP's recommendation that the caseworker speak to the County State's Attorney's office about adding the infant to the petition for an order of supervision (to end the safety plan).

Mr. Rich documented that Mr. Wesby became upset when he informed the parents that a safety plan had to be put in place even though he explained that "a safety plan was in lieu of protective custody… and the best option." They agreed upon a safety plan where the parents would reside in the home of Ms. Lee's sister in City A, under the supervision of several relatives. Mr. Rich noted that Mr. Wesby had decided to remain in City B so he could continue earning money at his job as a cook. Mr. Rich requested that a parallel investigator be assigned to monitor the safety plan until the investigation was completed.

On May 3, the parallel supervisor contacted the County B DCP supervisor. According to the supervisor's SACWIS note, they discussed the parallel worker's responsibilities:

> [The parallel supervisor] asked why custody was not taken, PSA [ ] explained the rationale for said safety plan being implemented and that this was a collaborative decision made by myself, DPSW and ARA[.] [S]he stated that [C]ounty A would have taken PC[.] PSA explained that although that would have been their decision it was not the decision of this office who is primary.

The parallel investigator documented that on May 5, he went to the home where the mother and Summer were staying with relatives. He observed Summer who appeared healthy with no evidence of abuse or neglect. The parallel investigator, in accordance with his supervisor's instruction, completed a CERAP marking the safety decision as "safe," ending the safety plan, and did not visit or further monitor the newborn as requested by County B DCP.

On May 12, the County B primary supervisor and the County A parallel supervisor again spoke by phone. The primary supervisor documented in SACWIS that the parallel supervisor seemed to be confused about the request. The note elaborated:

> [County A supervisor] stated that she was still unclear why custody was not taken and why the SFO dumped the investigation on her office. PSA explained that this was not the intention of the SFO[,] but to implement a safety plan to address the safety needs of the family[,] and that this is the determination by the SFO and that it was our decision. [County A supervisor] again stated that custody would have been taken in her county, PSA asked if that would have been her assessment that the child was not safe in the parents['] care[,] and they would not have utilized a safety plan[,] then how did her worker make the assessment safe[,] and she provided her approval for such.

On May 21, the parallel child protection worker returned to the relative's home to "re-enter" the initial safety plan, updating the CERAP to say "unsafe." The reinitiated safety plan noted that upon completion of the investigation, the caseworker and any case aides were responsible for monitoring the safety plan.[23] The plan could be terminated pending:

---

[23] Kappa records did not indicate when they ended the safety plan. However, an active safety plan was last referenced in a contact note on 6/23/10. On 7/27/10, prior to the parents moving into their own apartment, the issue of whether a safety plan should be put in place was to be discussed as part of a child and family team meeting but the meeting did not take place.

> Positive therapy reports
> [C]ompletion of assessment for parenting needs
> Therapeutic assessment to determine appropriateness of unsupervised contact with infant
> Continue[d] cooperation with client service plan
> Commencement of unsupervised visit[s] with other minors who are in care.

On May 28, 2010 Ms. Lee and Mr. Wesby were indicated for substantial risk of physical injury by neglect (#60) with the rationale:

> This report was made to SCR and allegation of risk of harm was alleged as the mother and father have three children currently in care. These children were taken into custody as the youngest at the time was one month old and was discovered by physicians to have a through and through break to his thigh. There was no explanation given and the children were taken into custody. Throughout the placement case the mother has refused to explore the possibilities of hoe (sic) her son suffered a broken leg. Based on the lack of progress in therapy, CPI implemented a safety plan in lieu of protective custody as the mother and father have been cooperative, overall, within their service plan. With the mother's reluctance to expound in therapy CPI is recommending an indicated finding for this allegation as the child remains at risk of harm.

The investigator unfounded the allegation of substantial risk of physical injury by abuse (#10) noting incorrectly that the neglect indication was more appropriate.

### Permanency Hearing
On May 24, 2010, the case was heard in court. In the 16 months since their children entered foster care, both parents had completed psychological evaluations and parenting classes. Mr. Wesby was involved in individual therapy, which he had regularly attended for four months; Ms. Lee attended three months of therapy prior to moving to City A and had recently been referred for individual therapy with Kappa in City A; they had participated in some couple therapy, and they visited their children twice monthly in City A by commuting from City B. Additionally, Ms. Gills had recently referred the parents for parent coaching, to begin in June.

Ms. Gills documented in a court report that Ms. Lee had given birth to a fourth child, Summer Wesby, that the hotline was notified, and that the Kappa worker was monitoring the newborn weekly. Neither Kappa records nor DCFS Legal records indicated that anyone requested a petition be filed. The permanency order documented that both parents had made substantial progress toward the goal of Return Home within 12 months "…but are in need of further reunification services."

### Parent Coaching Begins
On May 12, 2010 Ms. Gills submitted a referral to Counseling Services requesting parent coaching for the children ages one-and-a-half, three-and-a-half, and five years.[24] She described two presenting problems: 1) that the parents needed to be able to properly manage their children's behaviors, which included temper tantrums; and 2) the parents resided in City B and the frequency of visits was an issue, seeing the children only twice a month. She identified the goal of parent coaching to be "For the biological parent[s] to learn more fully about the needs of

---

[24] According to DCFS Legal records, the need for parent coaching was first discussed during a February 2010 staffing. On 3/5/10, the Judge instructed Ms. Gills to refer the parents for parent coaching.

young children." Ms. Gills provided the integrated assessment; the parents' February 2, 2010 couple therapy progress report; parenting class certificates of completion; psychological evaluations; individual therapy comprehensive assessments and an individual therapy progress report. Tina Lewis, MSW, was assigned the case.[25] In her reports, Ms. Lewis repeated the IA information that an investigation had been opened for allegations of a bone fracture to Deonte, not that the parents were indicated as perpetrators of Deonte's broken femur.

On June 8, Ms. Lewis met with the mother, then living in City A with Summer, for an introductory meeting.[26] The parent coaching treatment goals, standard goals used by Counseling Services staff according to Ms. Lewis, remained virtually the same throughout the sessions:

1. Ms. Lee and Mr. Wesby will demonstrate effective parenting skills on a consistent basis.
2. Ms. Lee and Mr. Wesby will use effective motivational incentives to reinforce positive responses with their children.
3. Ms. Lee and Mr. Wesby will demonstrate the following teaching techniques:
   a. Praise statements/encouragement that reinforce positive behaviors
   b. Proactive teaching and planning
   c. Corrective teaching and discipline.
4. Ms. Lee and Mr. Wesby will learn effective ways of developing and maintaining a positive relationship with their children.
5. Ms. Lee and Mr. Wesby will learn to develop and maintain a daily schedule.
6. Ms. Lee and Mr. Wesby will provide a safe, positive, predictable, and nurturing home environment.
7. Ms. Lee and Mr. Wesby will instruct and develop the following social skills with their children:
   a. Listen to and follow her directions
   b. Ask permission
   c. Accept a "no" answer
   d. Accept and make corrections
   e. Rational problem solving

The parent coach worked weekly with Ms. Lee and later Mr. Wesby as well, for two-hour sessions from June through November 2010. Ms. Gills transported the three boys in foster care to and from the sessions. She brought them a half hour to 45 minutes prior to the scheduled parent coaching sessions, so all the siblings could play together. According to Ms. Gills' contact notes and Ms. Lewis's documentation of the parent coaching sessions, the sessions generally took place in the evenings from 4:30pm to 6:30pm during which time the parents prepared a meal and the family ate together. The children assisted in setting the table and cleaning up afterward. Ms. Lewis noted: "Before and after dinner there is a structured family activity. The children either work on educational activities or play a game," in which the parents participate. Ms. Lewis helped the parents develop house rules, reviewed during parent coaching sessions,

---

[25] Ms. Lewis obtained her MSW in 1997. She began working as a Counseling Services parent coach in 2008. For training she shadowed another parent coach and attended child management training classes.
[26] Ms. Gills documented in a contact note that Mr. Wesby, who was residing in City B, was not present for the initial intake because she forgot to notify him of the appointment.

and the parents gave the children stickers on a reward chart for following the rules. At the end of the sessions, the parents reviewed the reward charts with the children.[27]

Ms. Lewis described the parent coaching sessions with the family as "very consistent," generally taking place at the same time in the parents' home. Ms. Lewis stated she has occasionally done parent coaching sessions in the community with other cases, but (other than some one-on-one sessions with Deon and Deonte at the library in 2012) did not do so with the Wesby family. "We never got to go in the community because of the amount of kids they have, I guess, and the [lack of] transportation."

Ms. Gills reported to Inspector General investigators that she observed, listened, and took notes of the parent coaching sessions from the living room, which was open to the kitchen. She recalled the coaching sessions following a general routine: household rules were reviewed and then what they would work on for that session was discussed.

In July, a month after parent coaching began, Ms. Gills asked Ms. Lewis and Mr. Wesby's therapist if the parents were ready for unsupervised day visits with their children; both supported the idea. On August 13, at a Child and Family Team Meeting attended by the worker, her supervisor, the parent coach, and the mother, unsupervised day visits were discussed.[28] Ms. Lewis described her support of the visits in a progress report.[29] She noted that she conducted eight parent coaching sessions during supervised visits at the maternal grandmother's home. Ms. Lee attended seven and Mr. Wesby attended three. Ms. Lewis wrote the parents, who "remain unaware of how their son, Deonte, was harmed"[30], had been cooperative and engaging. She added: "They are capable of providing an emotionally and physically safe home." Ms. Lewis told Inspector General staff that she was unaware the parents were indicated as perpetrators of Deonte's broken femur. She had relied on the integrated assessment for information about the family history and case opening. Ms. Lewis said she addressed safety factors related to Deonte's injury by discussing the importance of not co-sleeping and not allowing older children to handle babies too roughly.[31]

By August, Mr. Wesby moved from City B into a two-bedroom apartment with Ms. Lee and Summer outside City A so he participated more. Kappa provided the parents with bus passes each month to enable them to attend court, ACRs, and therapy. In late September, Ms. Gills wrote in a contact note that the boys were becoming noticeably better behaved with their parents, which she attributed to the family's work with the parenting coach.

On December 1, Ms. Lewis's report covering 13 parent coaching sessions from August 19 to November 23, 2010 stated the parents were both present for all sessions. They praised their children without prompting, demonstrated improved ability to teach expectations to the children and to use effective discipline. She described the parents positively:

> Parenting coaching has been successful with Ms. Lee and Mr. Wesby. Both
> have been cooperative and engaging with this therapist. Both Ms. Lee and Mr.

---

[27] According to Ms. Lewis' preliminary progress report dated December 1, 2010.

[28] Also discussed was Kappa's request for bus passes for Ms. Lee to attend counseling, her job search, and her complaint that Ms. Gills was not returning calls.

[29] The report was dated August 15, 2010

[30] Ms. Lewis would repeat this phrase in a later report as well.

[31] The IA noted that the parents co-slept with Deonte and that Mr. Wesby stated that the injury might have been caused by the older children.

Wesby remain unaware of how their son, Deonte, was harmed, yet they take responsibility for the past event that led to him being placed in foster care. They have both demonstrated that they have good parenting skills and they have both expressed that they want to continue to learn effective parenting techniques from this therapist.

Ms. Lewis recommended that unsupervised visits be increased from two hours per day, five days per week to four hours per day, five days per week, and parent coaching sessions would be decreased to twice monthly.

On October 6, 2010, a motion by the mother's attorney for unsupervised day visits was heard in court. The judge granted Ms. Lee and Mr. Wesby unsupervised day visits with Lamont, Deon, and Deonte, up to four hours per day, five days per week, at Kappa's discretion. Kappa informed the parents they would initially approve unsupervised visits for two hours per day, five days per week.

### Concerns Regarding Parents' Lack of Attachment to Deonte

During a home visit with Deonte and his foster parent in late July 2010, the foster parent told Ms. Gills that the parents had not visited with Deonte at all that month, and inquired whether the parents' goal for Deonte would be changed. "This CWS informed her that the biological parents are cooperating with recommended services."

After the ACR on July 26, 2010, the reviewer emailed a monthly feedback report to Ms. Gills, Supervisor Turner-Johnson, and the APT supervisor:

> ACR HAS SOME CONCERNS RE: BIO MOM AND HER RELATIONSHIP TO AND INTERACTION WITH DEONTE PURSUANT TO PLAN AND CONVERSATION WITH WORKER. MS. LEE MAY HAVE BONDING/ATTACHMENT ISSUES EN RE: DEONTE. ATTENTION SHOULD BE PAID GIVEN THAT DEONTE WAS THE CHILD SUBJECT THAT BROUGHT FAMILY TO ATTENTION OF IDCFS…MS. LEE VISITS LAMONT AND DEON ALMOST DAILY. SHE VISITS DEONTE APPROXIMATELY TWICE PER MONTH. SHE SEEMS NOT TO UNDERSTAND THAT SHE NEEDS TO INVEST MORE IN HER RELATIONSHIP WITH DEONTE.

However, no specific tasks were added to the service plan to address this issue.

### September 2010, DCP Investigation Sequence C

On or around September 2010, an anonymous caller notified the hotline that 5-month-old Summer was being abused. A report was taken for investigation and was unfounded; the report has since been expunged. According to a Kappa contact note, the reporter told SCR that Mr. Wesby beat Ms. Lee and Summer, that Summer had marks from the abuse, and that the parents left her alone in the home when she cried.

On the afternoon of September 9, Ms. Gills went to the Wesbys' apartment and undressed Summer to assess her for bruises. According to her contact note, Ms. Gills did not observe any signs of abuse. The mother told Ms. Gills that child protection investigator Tiffany Jackson had been to their home and instructed them to have Summer assessed for abuse at a hospital. Ms. Lee stated that they intended to take her in.

North Hospital ER records revealed that Summer was seen at the ER for a well-child check that same day. Hospital records noted: "DCFS sent them over for check – Had Report Stating there were bruises – None present[.]" Records indicated Summer had Mongolian spots on her lower back and buttocks but "No bruising."

### Mother's Individual Therapy

In late October 2010, almost two years after the initial investigation, Ms. Lee restarted individual therapy with a new Kappa therapist. Ms. Gills provided the therapist with a referral packet containing the integrated assessment, Ms. Lee's psychological evaluation[32] and an internal Kappa preliminary assessment. None of the records stated that the parents were indicated for causing Deonte's broken femur.

From October 2010 through January 2011, Ms. Lee attended seven therapy sessions and canceled five. A January progress report noted Ms. Lee's counseling addressed "her involvement with DCFS, her relationship with her mother and her parenting capabilities" and described the mother as an "open and an active participant." The therapist said they addressed Ms. Lee's struggle with the parenting style of Deonte's foster mother and the mother's inability to be more involved with Deonte. The therapist wrote that Ms. Lee surmised that his leg might have been fractured when they co-slept with him.[33] Regarding her parenting capabilities, the therapist documented that Ms. Lee discussed the behavior modification techniques she had learned in parent coaching, her increasing ability to successfully utilize time-outs with her children, and her confidence in parenting. As a result, Ms. Lee seemed to have improved in her parenting ability, and recommended continued therapy to support her in managing issues related to involvement with the Department and to provide additional support toward preparing for reunification.

The case was in court on November 30 for a permanency planning hearing. The goal of Return Home was continued. The worker reported that Kappa planned to increase the parents' unsupervised hours with the boys to four hours starting in December.[34]

### 2011

In the January 2011 service plan, both parents were cited as actively participating in parent coaching, Mr. Wesby had successfully completed individual therapy, and Ms. Lee was attending individual therapy. Mr. Wesby's service plan tasks were to continue cooperating with parent coaching and to secure employment or enroll in vocational training. Ms. Lee was to continue participating in therapy and follow any recommendations, continue with parent coaching, secure employment or enroll in vocational training, and continue allowing Kappa to monitor Summer monthly. Both parents were to continue visiting with their children in placement to aid in reunification. The service plan noted that Kappa would staff the case in the next 30 days to consider unsupervised overnight visits. No tasks addressed the actual behavior of the parents with the children or the mother's prior deceit toward Kappa, hiding her pregnancy.

---

[32] According to Kappa's Counseling Referral Checklist.
[33] Medical records noted Deonte's break required excessive force. According to the Kappa Counseling Referral Checklist, Deonte's medical records were not provided to Ms. Lee's Kappa therapists.
[34] According to Ms. Gills' 12/3/10 contact note.

*Birth of Byron*
On January 19, 2011, Ms. Gills delivered bus passes the parents' apartment. Ms. Gills documented in a contact note that Ms. Lee was holding Summer, who appeared happy and well cared for. When Ms. Lee left the room Mr. Wesby told the worker that Ms. Lee was pregnant. Two months earlier, according to a November 2010 contact note, the mother had denied being pregnant when the worker asked. After the father reported the pregnancy, the mother admitted she was due in March but was ashamed. "This CWS told her that if she and Michael are happy with their situation then this CWS doesn't have anything to do with it. Michael stated that 'I'm not happy[']." Both parents expressed their intent to use birth control to prevent further pregnancies. Byron was born two months later, in March 2011. Ms. Gills notified the hotline of Byron's birth. The call was taken as information only.

*Individual Therapy Ends*
In early February 2011, a little more than three months after starting, the mother's therapist notified Ms. Gills that Ms. Lee was doing well and she would likely close Ms. Lee's case soon. On February 28, Ms. Lee was successfully terminated from individual counseling with Kappa.

*Kappa Services & DCFS Clinical Case Staffing Regarding Unsupervised Overnight Visits*
On February 10, 2011, Ms. Gills, Supervisor Lisa Turner-Johnson, and Senior Supervisor Janet Ian staffed the Wesby case to determine whether Kappa was in agreement with Ms. Lee's attorney's motion for unsupervised overnight visits that was to be heard in court on April 4. Ms. Gills completed a case staffing form documenting the reason for case opening.[35] She attached two parent coaching reports; Mr. Wesby's closing individual therapy report; and a report from Ms. Lee's therapist. Ms. Gills wrote that Ms. Lee was to continue attending therapy, the parents were to continue participating in parent coaching, to ensure unsupervised day visits remained safe and appropriate, and Kappa would continue monitoring Summer each month. Ms. Gills wrote in a SACWIS note, "It was agreed that the family would visit from Friday through Sunday." The mother's pregnancy was not noted.

Deon, Lamont, and Deonte's GAL requested a DCFS clinical staffing prior to the April 4 court hearing on the motion for unsupervised overnight visits. DCFS Clinical deferred the request for a staffing, advising that the GAL and Kappa first attempt to staff concerns amongst themselves. A second internal staffing took place at Kappa on February 28 to discuss the GAL's concerns, which, according to the clinical staffing summary, included: 1) the parents concealing two pregnancies, 2) the father's therapy ending without the GAL being tendered a report of his progress, 3) the mother's inconsistency in therapy attendance and unwillingness to explore Deonte's injury, and 4) the parents not completing couple therapy. The GAL requested that a DCFS Clinical staffing be scheduled.

According to clinical staffing notes, the staffing was convened by Clinical Services Coordinator Emily Doss, on March 30. The parents, Deonte's foster mother, Ms. Lee's therapist, the maternal grandfather, Parent Coach Tina Lewis, GAL Joan Baker, caseworker Misty Gills, and Kappa Senior Supervisor Janet Ian attended the staffing. The mother's bar attorney and Kappa Supervisor Lisa Turner-Johnson participated via phone. The GAL questioned whether the parents' services were appropriate. Ms. Doss noted that the parents had completed all services except parent coaching, which was ongoing and described by the parent coach as "successful." Additional therapy was not recommended by either parent's former individual therapist. The summary noted that Ms. Lee's former Kappa therapist supported unsupervised overnight visits.

---

[35] The reason for case opening written on the form appeared to be copied from the Integrated Assessment. The fact that both parents were indicated as perpetrators was not noted.

Ms. Doss noted that during Ms. Gills' weekly contact with the family she had not observed any concerns and Kappa staff supported overnight visits and the eventual return of the children to the parents' care. It was recommended that 1) Child and Family Team Meetings take place quarterly, 2) Kappa continue to monitor the parents to determine whether they need to re-engage in therapy, 3) parent coaching continue and Kappa continue to assess the visitation plan, 4) Kappa continue to monitor Summer and Byron for risk and safety, and 5) Kappa be cognizant of the parents' cognitive deficits and work with the parents to ensure they understand their children's needs and the Department's expectations.

### Parent Coaching Ends

Parent Coach Lewis wrote a progress report dated March 25, 2011. She documented that both parents, the children, and Ms. Gills were present for the seven parent coaching sessions held at their home from December 2010 through March 2011. Ms. Lewis described the sessions:

> During visits Ms. Lee and Mr. Wesby always have a cooked meal. Both of them take turns in preparation. They also have the children participate in setting the table and cleaning up. Before and after dinner there is a structured family activity. The children either work on educational activities or play a game. Ms. Lee and Mr. Wesby both participate in the activities with the children. Sometimes they take turns and will switch off working with a child. They also take turns tending to the needs of their [children] Summer and Byron. They continue to show that they can actively participate in age appropriate educational/fun activities with their children as well as show that they are able to parent as a team.

Ms. Lewis recommended that parent coaching continue twice monthly until the children were returned home. She also recommended unsupervised day visits be increased and unsupervised weekend overnight visits begin.

In her final parent coaching report, dated May 1, 2011, Ms. Lewis documented that during the last two sessions, occurring during overnight weekend visits, the parents appeared to care for the children appropriately. She wrote the parents had made "excellent progress toward the treatment goals" and demonstrated the ability to apply learned parenting techniques. She described Mr. Wesby and Ms. Lee as "nurturing and loving parents who provide love, structure and necessary boundaries for their children," and who have successfully completed parent coaching.

### Court Hearing on Motion for Unsupervised Overnights

The motion for unsupervised overnight visits was heard on April 4, 2011. All parties were in agreement with allowing the visits. Mr. Wesby and Ms. Lee, who had given birth two weeks earlier, were granted unsupervised overnight visits at the Department's discretion. Ms. Gills told Inspector General staff that the parents' ability to care for five young children, one a newborn, was not addressed as a concern in court. Kappa used Norman funds to have a set of bunk beds and a twin bed for the three boys delivered to the parents' home in May.

The parents began with weekly, unsupervised visits from Friday to Sunday, caring for their children ages one month, one year, two-and-a-half years, four-and-a-half years, and six years. When Ms. Gills asked how things went after the first two weekends, the parents reported no problems. Ms. Gills separately asked Deon and Lamont about the overnight visits, and both responded positively. On June 6, Ms. Gills had a phone conversation with the maternal grandmother about apparent increasing tension between the grandmother and Ms. Lee. The

grandmother stated the mother became upset with her because she would not buy Ms. Lee a new cell phone. Later that afternoon, Ms. Gills met with Lamont and his maternal grandmother for a home visit. Ms. Gills documented:

> [The maternal grandmother] stated that she wanted to "tell the truth" about what's going on with Stacy. She stated in her opinion that Stacy is not ready to "get these kids back because she's going to mistreat them." This CWS asked her why did she say that? She stated that when she gets upset with her or any other family member she will take out her frustration on the kids. This CWS asked did she think she was the one who harmed Deonte when this case came into care. She said "oh no, I don't think she or Michael hurt him." She stated that Stacy is spoiled and "that's a lot of it." She stated that she and her ex-husband spoiled her [and] she still thinks she [is] suppose[d] to get what she wants when she wants it.

No specific tasks were added to the service plan to address this, and as the mother had completed therapy, it was not addressed in that venue either.

### *Increase in Overnight Visits*
On June 14, approximately two months after overnight visits commenced, Ms. Gills staffed the case to discuss the parents' request to extend unsupervised overnight visits. Present for the staffing was Kappa program director Pamela Holt; Kappa supervisor Lisa Turner-Johnson; Ms. Gills; consulting psychologist Amanda Love, M.D.; and both parents. Ms. Gills noted in SACWIS that the group approved for the visits to be extended from Thursday to Sunday. Ms. Gills documented asking the foster parents, the boys, and the parents how the first extended weekend visit went and all responded positively. However, that same month, Ms. Gills offered to make Deonte available for overnights visits during the week because the foster family was taking him away on the weekend for vacation, and the mother declined the alternate visits. On June 29, Ms. Lee notified Ms. Gills that they had canceled the children's visits for the upcoming weekend. No explanation for the cancelation was given in the contact note.

Within a month, some concerns arose. On July 12, the mother told the worker that since the visits were extended to Thursday, two-and-a-half-year-old Deonte had begun withdrawing, and was not talking or playing during the overnight visits. On July 19, Deonte's foster mother expressed concern to Ms. Gills that Deonte told a little girl at daycare that he was going to "beat her ass."[36] The foster mother stated that she did not use that type of language. She told Ms. Gills that on Mondays after Deonte's visits with his parents, he was temperamental and easily upset. However his brother, Deon, said during a foster home visit in mid-July that he liked the visits and his great grandmother said he looked forward to them. On August 2, 2011, approximately four months after unsupervised overnight visits began and seven weeks since extending the visits, the parents asked to again extend the visits to Wednesdays and Kappa agreed. However, that same afternoon, Ms. Gills documented receiving a phone message from the mother canceling that week's visit. No reason was noted. On August 3, Ms. Gills received a message from GAL Sarah Coffman, who stated that she needed to discuss what four-and-a-half-year-old Deon had disclosed to the GAL's child interviewer.

### *First Corporal Punishment Outcry*
The GAL notified Ms. Gills that four-and-a-half-year-old Deon had disclosed to an Office of the Public Guardian interviewer that he was spanked "hard" by his parents with a plastic

---

[36] According to a 7/19/11 contact note of the home visit.

baseball bat, and that Deonte and Lamont also received spankings. On August 5, Supervisor Turner-Johnson contacted the parents and addressed the allegations with them. According to her SACWIS note she notified the parents of the following:

> It was reported f[ro]m the GAL Sarah Coffman that Deon reported he did not want to live with his parents. He also reported that he was hit by his parents on two separate occasions. He reported that he was hit on his head 6x with a plastic green and blue bat, because he crossed the street with DJ and was not supposed to. He also reported that one time he was playing the Wii game his parents slapped him.

The parents told Ms. Turner-Johnson that a couple weeks earlier Deon was trying to get away from a neighbor's dog and ran into the street toward an oncoming car. Ms. Lee stated that Deon had to stand in the corner for 5 minutes for running into the street, and then he was sent to his room for a nap. They denied ever slapping Deon.

Deon was consistent when he disclosed the incidents of corporal punishment to Ms. Gills. On August 5, Ms. Gills went to the paternal great grandparents' home and asked Deon about his allegations. She documented the conversation in a SACWIS contact note:

> This CWS asked does he get hit? He said "yes." This CWS asked with what? He said "a plastic baseball bat." This CWS asked did it hurt? He said "yeah because my daddy hits hard." This CWS could hear Mrs. Wesby in the kitchen said "oh no." This CWS asked where was he hit? He said "on my head." This CWS asked did his brothers; Lamont and Deonte, get hit too? He said "yes they get a spanking too."

Ms. Gills wrote that Deon's allegations seemed credible.

Ms. Gills followed up with Lamont and Deonte three days later. The worker first met with the maternal grandmother and Lamont for a home visit. The maternal grandmother stated that she and the paternal great grandmother had discussed Deon's allegations of corporal punishment and noted that Lamont, who attended summer camp, had been at the parents' home less than Deon. The maternal grandmother stated that she took Ms. Lee to the store earlier that day and Ms. Lee stated, in front of Lamont, that Deon was lying about being hit. Lamont initially told Ms. Gills that Deon was lying and denied that either parent hit him or his siblings. However, Lamont then said that when he gets into trouble, his mother "pops" him two or three times and demonstrated using his finger, and that she "hit us on o[ur] head." According to Ms. Gills' contact notes, she also visited Deonte and his foster mother on August 8. Ms. Gills asked two-and-a-half-year-old Deonte what his parents hit him with, and he replied "nothing" then hid his face against his foster mother. The foster mother also asked Deonte if his parents hit him, and Deonte buried his face against her and would not answer. Ms. Gills asked Deonte whether he liked going to his parents' home; he replied: "I don't want to go."

On August 9, the next morning the father contacted Ms. Gills, asking if she had spoken with Lamont about Deon's allegation. Ms. Gills declined to disclose her conversation with Lamont. Ms. Gills wrote in a contact note that Mr. Wesby denied ever using corporal punishment and told her that Deon did not know "the difference between hit on the head or pop."

Later that day, Kappa staffed the Wesby case and determined that all visits needed to be supervised until further notice and the parents, who were not currently involved in any services,

would be referred for additional parent coaching. Ms. Gills would notify the hotline of Deon's allegations, a Child and Family Team Meeting would be scheduled to address the allegations with the parents, and Ms. Gills would complete a reunification checklist.[37] Following the staffing, Ms. Gills notified the hotline of Deon's allegation, she documented in a SACWIS note that SCR staff told her that although foster parents could not use corporal punishment, biological parents could, and took the report as information only.[38]

Ms. Gills notified the parents that unsupervised visits were being suspended. Ms. Lee responded that Deon was lying. A week later, the parents asked the worker if they had to attend the upcoming Child and Family Team Meeting, and if there were ramifications of the corporal punishment allegations. The parents said they would not participate in any additional services. On August 17, Ms. Gills supervised a two-hour parent/child visit and sibling visitation at the parents' home. According to Ms. Gills' contact note, Ms. Lee told Lamont to watch 5-month-old Byron, and talked on her phone during most of the visit. When Byron began crying, Mr. Wesby told Ms. Lee, who was on the balcony talking on the phone, to tend to Byron. When she did not, Mr. Wesby handed Byron to Lamont and left the room. Ms. Gills noted that Lamont seemed accustomed to supervising his younger siblings. Both parents pointedly ignored Deon throughout the visit; Ms. Lee did not respond to Deon when he spoke to her, and both parents gave Lamont and Deonte freeze pops but did not give Deon one. Prior to the conclusion of the visit, Ms. Lee angrily told Ms. Gills that Deon was a liar.

The parents again refused to participate in additional services during the Child and Family Team Meeting held on August 23 to discuss the allegations of corporal punishment.[39] Mr. Wesby stated that Deon could remain in his placement since he did not want to return home anyway. Ms. Lee acknowledged that her behavior toward Deon had changed but blamed it on Deon. Both parents then loudly and angrily left the meeting. It was agreed that Deon and Deonte should be referred for individual play therapy.

In her referral for individual play therapy, the caseworker noted that Deon recently alleged that his father used corporal punishment on him and in response his parents called him a liar and treated him differently than his siblings. Ms. Gills wrote that Deonte was being referred for therapy because he had begun withdrawing during visits with his parents.[40]

The case was heard in court for status and a permanency planning hearing on August 29. Ms. Lee's attorney had entered a motion for return home. The GAL filed a motion asking the court to revoke unsupervised parent/child visits; the motion described Deon's report to the GAL interviewer that his parents hit him on the head multiple times with a bat for crossing the street. The July 2011 service plan was also entered, which documented the parents' return home goal as "Satisfactory Progress/Maintain Goal." The judge entered a permanency order of Return

---

[37] The form meant likely was the Home Safety Checklist.

[38] An 8/26/11 contact note indicated that a GAL notified Ms. Gills that she spoke with an SCR supervisor, who agreed to reassess the allegations if Ms. Gills contacted the SCR supervisor, and provided the SCR supervisor's number. Kappa records do not indicate that Ms. Gills contacted the SCR supervisor. Because no one alleged that the children had injuries as a result of the corporal punishment, it is unlikely the hotline would have accepted the call for investigation.

[39] Present at the meeting were both parents with Summer and Byron, Ms. Gills, Ms. Turner-Johnson, consulting psychologist Amanda Love, and GAL via phone.

[40] Although Ms. Gills made the referral in late September, the boys did not begin meeting with a therapist until January 2012. Mental health assessments were conducted over several sessions and completed in February 2012. Deon was recommended for ongoing individual therapy, which he attended weekly until October 2012. Deonte was determined to not require therapy at that time, and his case was closed.

Home within 5 months for all three boys and left the parent/child visitation to Kappa's discretion. The boys had been in care for two years, seven months at that time.

### Re-initiation of Parent Coaching

The parents were re-referred for parent coaching five months after initially completing. Kappa contact notes indicated that both parents were very resistant to re-engaging in parent coaching. On September 21, 2011, parent coach Tina Lewis completed an intake with the parents at their home. Also present were Ms. Gills, Summer and Byron. Ms. Gills documented in a contact note that both parents were verbally combative and openly resentful throughout the meeting, writing "The home appeared safe and appropriate. However, this CWS is concerned with the ANGER the biological parents displayed towards this CWS." Ms. Lewis scheduled parenting sessions to occur from 5:00 to 7:00pm in their home, beginning on September 29.

Ms. Gills documented that on September 29, she brought Lamont, Deon, and Deonte to the home for their parent coaching session and sibling visit. Deonte had not visited with his parents since August 17 because his parents had not requested it. He sat very close to Ms. Gills and declined to play with his siblings.[41] Ms. Lee, whom Ms. Gills noted appeared pregnant, arrived about 20 minutes into the sibling visit and did not greet anyone, beyond a whispered response when Deonte told her hello. Deon, who was playing with Lamont, commented that his mother was angry. Parent coaching sessions were changed to one hour, from 6:00 to 7:00pm.[42]

According to her October 6 contact note, Ms. Gills went to Deonte's daycare to transport him for a sibling visit and parent coaching session. The daycare director told Ms. Gills that Deonte had begun crying more on days he knew he was going to his parents' home.[43] During their second parent coaching session, Ms. Gills wrote that the parents were again hostile and uncooperative:

> Once again, [Mr. Wesby] did not say anything to this CWS or the children. This CWS asked him was he coming to unbuckle Deonte from his car seat and he did so. Once inside the apartment, [Lamont] and [Deon] ran to their room and started to play. Deonte sat REALLY close to this CWS on the couch. This CWS encouraged him to play with his siblings and he declined and stayed by this CWS playing with his toy car that he brought with him. [Parent Coach] Tina arrived shortly after this CWS. Stacy arrived with Summer and Byron, children in their care, around 5:50pm. She [c]ame in the home and did not greet ANYONE. Michael started making hot dogs for the children. Tina sat down with the family to begin their session. Tina instructed Stacy and Michael to 'model the behavior you want from the children.' Stacy stated that 'I'm not modeling anything.' Michael stated that once again Deonte does not want to eat. Tina instructed him to fix him a hotdog and put it in front of him. Stacy

---

[41] Kappa records suggest that the parents continued to see Lamont and Deon who were with relatives.

[42] The parents told Ms. Gills that they had both found jobs. Ms. Lee stated that she had begun working at a daycare center from 8:30-5:00 Monday-Friday and that Summer and Byron attended the daycare while she worked. Mr. Wesby stated that he was employed and did not get home from work until 5:45pm. Neither parent would disclose where Mr. Wesby was employed. Ms. Lee provided a copy of her pay stub. After approximately three months, Ms. Lee stated that she was let go from her position. After Jamal's death, Mr. Wesby told police he was unable to secure employment in City A.

[43] Ms. Gills told Inspector General staff that Deonte had outgrown his newborn fussiness and was not fussy across settings.

stated that 'I'm not wasting my food on him.' Tina attempted to explain regression etc. However, she and Michael w[ere] not responsive.

Ms. Gills documented in contact notes for the October 12 and the October 27 parent coaching sessions that both parents remained uncooperative and confrontational with Ms. Lewis. On October 12 she noted that Mr. Wesby did not greet the boys when they arrived at the apartment and of their session wrote: "It is obvious that they do not want to re-engage in this process." Ms. Gills told Inspector General staff that she believed that the parents were just "going through the motions" with parent coaching and discussed her concerns with her supervisor as well as with Ms. Lewis, but Ms. Lewis believed that the parents were making progress.

Ms. Lewis told Inspector General staff that she was accustomed to working with resistant parents and considered the Wesby family to be typical. She explained that even though the parents considered parent coaching sessions "stupid" they eventually participated and complied with the sessions. Ms. Lewis stated that she attributed the parents' negativity and resistance to their extreme dislike of Ms. Gills, whom she described as a very dedicated caseworker, and the parents' overall frustration with the system, rather than toward their children or parent coaching.

Ms. Gills, who generally brought the boys to the parents' home early to allow the siblings to play together before parent coaching sessions, documented in a November 10 contact note that when she arrived with the three boys, music was blaring, the TV was on, and Ms. Lee was on the phone. After a while, Ms. Lewis arrived to start their parent coaching session:

> This CWS turned down the music so that she could hear the session in the kitchen. Michael came into the living room and told this CWS "not to turn my music down." He turned the music even higher than it was. Stacy YELLED "I don'[t] go in your car touching your stuff." This CWS stated that she could[n't] hear the session in the kitchen. Tina sent the children into the living room with this CWS while she talked to Stacy and Michael alone for about thirty minutes. After the talk she told this CWS that she think[s] the both of them may need a bonding assessment. She went on to say that "they are not getting it."

Ms. Gills' contact notes indicated that by December, the parents began engaging with and cooperating more with Ms. Lewis, though they continued to resist addressing the allegations of corporal punishment. Mr. Wesby was increasingly interactive and communicative with the boys. Ms. Gills wrote that on December 7, Mr. Wesby prepared pizza for dinner and engaged with the boys; Ms. Lee talked on the phone until Ms. Lewis arrived for the parent coaching session. At the end of the session Deonte hugged Mr. Wesby goodbye. Again on December 15, Ms. Gills documented that Mr. Wesby engaged Deonte and the other boys and played Wii with them; Ms. Lee talked on the phone while preparing dinner. On December 22, Mr. Wesby prepared dinner, played with and engaged the children; Ms. Lee talked on the phone, making negative comments about having to participate in the parent coaching. During the parent coaching session, the parents became oppositional when Ms. Lewis attempted to address the corporal punishment allegations.

Ms. Gills documented that on the evening of December 29, when she arrived with the boys for their sibling visit and parent-coaching session, Ms. Lee was in the kitchen holding Byron, and Summer was walking around nearby. Mr. Wesby greeted Deonte and began setting up a racetrack for the boys and Summer to play with and changed the TV channel to cartoons for the children to watch. When Ms. Lewis arrived, she met with the parents and Deon to discuss a recent incident in which Deon had stolen candy from a store. According to Ms. Gills' contact

note, Ms. Lewis asked Deon whether he wanted to return to live with his parents. Deon stated that he did not want to return home. Ms. Lewis asked him why. Ms. Gills wrote: "He said that she knew why and picked up a bat and start[ed] hitting himself with it." After further discussion, Deon stated that he did want to return to his parents.

Almost five months after Deon made the outcry, Ms. Lewis addressed the allegation in her February 29, 2012 progress report. She noted that during a December 29 session:

> …this parent coach spoke to Deon one-on-one and asked him if his father hit him with a plastic bat. Deon told this parent coach that his father did not hit him and that he lied about the incident. This parent coach asked him why he would lie about something like that, and he stated that he did not want to leave his great-grandmother's home. It is noted that Deon receives a lot of special treatment with his great-grandmother and he is not disciplined in a strict manner.

Ms. Lewis added that after Deon recanted, she walked to the living room, where Ms. Gills was, and informed her that Deon admitted he had lied about the corporal punishment with a bat. Ms. Lewis wrote that after telling Ms. Gills, she brought Deon and his parents together for a "discussion:"

> Deon admitted to his parents that he lied about the incident and he told both of his parents that he was sorry for lying. Both paren[ts] hugged Deon and told him that they loved him and that they forgave him. The parent coach then talked with both parents and Deon about the importan[ce] of telling the truth and the consequences of lying.

Ms. Gills' contact notes of the session, written the next day, did not indicate that Deon recanted his allegation of corporal punishment, and did not indicate that Ms. Lewis told Ms. Gills that Deon recanted.[44] Ms. Gills told Inspector General staff that she did not hear Deon recant nor did she recall Ms. Lewis telling her that Deon had recanted.

## 2012

### *Second Corporal Punishment Outcry*
On January 5, 2012, Ms. Gills met with Lamont's maternal grandmother. The grandmother told Ms. Gills that Lamont had disclosed to her that sometime while the boys had unsupervised overnight visits with their parents (April to August 2011), Mr. Wesby whipped Deon with a belt for wetting the bed. Ms. Gills asked Lamont about the bedwetting incident while transporting him to a sibling visit and parent coaching session at his mother and Mr. Wesby's home. Lamont stated that Mr. Wesby had whipped Deon with a belt for wetting the bed during an overnight visit. Lamont stated that he did not tell anyone at the time because he was afraid of his mother and Mr. Wesby. Lamont also reported that the parents had treated Deonte unkindly during visits, teasing him and calling him names. Ms. Gills and Lamont then picked up Deon for the visit. En route, she asked Deon what happened when he wet the bed at his parents' home, and Deon disclosed that his father had "whipped" him. Both boys told Ms. Gills that they did not want to return to live with their parents and that their mother was angry with them for having said that they did not want to return home. On January 9, Ms. Gills notified the parent coach

---

[44] Ms. Gills documented in later contact notes that she was unaware that Deon had recanted his allegation of corporal punishment and she had no recollection of Ms. Lewis informing her that Deon had recanted.

that Lamont disclosed that Mr. Wesby whipped Deon for wetting the bed during an overnight visit, and that Lamont stated that he did not want to live with his mother and Mr. Wesby.[45]

### Administrative Case Review

An ACR took place on January 9, 2012. Ms. Gills evaluated the family's progress toward the return home goal as satisfactory. Both parents' service plan tasks included: secure employment or engage in vocational training, allow Kappa to monitor the children in their care, "cooperate with the parent coach," and "[parent] will not be verbally combative during the parent-child coaching sessions." The reviewer emailed feedback to Ms. Gills and supervisor Turner-Johnson:

> PERMANENCY:
> ACCORDING TO WORKER AND PLAN PRESENTED[,] PROGRESS TOWARDS COURT SET GOAL (RETURN HOME IN 5 MONTHS) IS "SAT". ACR DOES NOT CONCUR. THE GOAL WAS ESTABLISHED 8/29/11. REUNIFICATION IS NOT IMMINENT[.] PLAN REPORTS THAT MR. WESBY HAS BEEN UNCOOPERATIVE WITH THE DISCUSSION OF SERVICE PLAN RECOMMENDATIONS. BOTH PARENTS HAD AT FIRST REFUSED TO PARTICIPATE IN RECOMMENDED PARENTING COACHING DURING THE PAST SERVICE PLAN PERIOD AND HAVE BEEN REQUESTED TO CONTINUE DURING UP[C]OMING SERVICE PLAN PERIOD. PROGRESS IS MINIMAL AS THEIR PARTICIPATION IS RELUCTANT…LESS THAN ENTHUSIA[S]TIC…

The reviewer wrote elsewhere in her feedback:

> SAFETY:
> IN AUGUST DEON TOLD THE GAL THAT MR. WESBY SPANKED HIM DURING AN UNSUPERVISED OVERNIGHT VISIT. HE REPEATED THE STORY TO HIS KAPPA WORKER. PARENTS VEHEMENTLY DENIED THAT THE CHILD WAS SPANKED AND INSISTED THAT HE "LIES". THEY BECAME ANGRY WITH WORKER AND AT FIRST DECLINED PARTICIPATION IN RECOMMENDED INTERVENTION. CONSEQUENTLY UNSUPERVISED VISITATION WAS SUSPENDED. (REPORT WAS MADE TO SCR. IT WAS TAKEN AS INFORMATION ONLY). LAMONT WAS QUESTIONED ABOUT INCIDENT AND DENIED KNOWLEDGE OF IT. LAST WEEK LAMONT TOLD WORKER THAT HE HAD SEEN DEON BE SPANKED; AND HIS ORIGINAL DENIAL WAS DUE TO HIS FEAR OF HIS MOTHER AND FATHER.

### Ms. Lee's Pregnancy

Ms. Gills documented in a January 5, 2012 contact note that she asked Ms. Lee, who appeared very pregnant, if she was pregnant. Ms. Lee stated that she was not. Ms. Lewis also asked Ms. Lee if she was pregnant, and Ms. Lee again denied it. The Kappa worker continued to ask Ms. Lee if she was pregnant over the coming weeks, but Ms. Lee repeatedly denied. In February, two months prior to Ms. Lee giving birth to twins, Kappa Supervisor Turner-Johnson confronted Ms. Lee about her apparent pregnancy informing her that according to the parent coaching progress report they just received Ms. Lee told Ms. Lewis that she was pregnant.[46]

---

[45] According to her January 9 contact note.
[46] This was the third pregnancy the mother denied.

***Visits between Deonte & his Parents***

In December 2011, the parents asked Ms. Gills for visits with Deonte apart from his siblings. From December 12, 2011 until March 5, 2012 Ms. Gills transported Deonte for five visits with his parents separate from Lamont and Deon.[47] Ms. Gills documented that during the parents' initial visit with Deonte on December 12, Mr. Wesby immediately engaged him working on a puzzle together and playing Wii. The mother held Byron and talked with Summer but did not even speak to Deonte during the visit. Ms. Gills informed Ms. Lewis that Ms. Lee did not acknowledge Deonte during the visit.[48] The mother also canceled a December 19 visit.

Ms. Gills transported Deonte for visits with his parents apart from his siblings on January 3 and 30, February 6 and March 5. On January 3, Mr. Wesby engaged Deonte and played appropriately with him. Ms. Lee, beyond responding to Deonte's greeting, did not speak to or interact with Deonte. Instead Ms. Lee called her mother and asked her to take her shopping. Ms. Lee left before the visit ended and without saying goodbye to Deonte. Ms. Gills wrote: "This CWS will continue to inform Tina; parent-child coach about the lack of communication with Stacy." On January 30, Ms. Gills documented that Mr. Wesby put in a Disney movie for Deonte to watch while he and Ms. Lee discussed amongst themselves the service plan that Ms. Gills provided. Ms. Gills wrote:

> Stacy made three separate calls on her cell phone while Deonte was there. She would talk and play with Summer and Byron. However, little attention was paid to Deonte…The conversation/interaction with Deonte was minimum compared to that of Summer and Byron.

On February 6, Ms. Lee was home alone with Byron having forgotten about Deonte's visit. Ms. Lee turned the TV on for Deonte while she talked on the phone:

> Stacy did not engage Deonte at all during the entire visit and only [said] bye to him and she took Byron['s] hand and waved bye as well…The conversation/interaction with Deonte did not exist today with the biological mother.

On March 5, Ms. Gills documented that upon arrival, both parents greeted Deonte and Ms. Lee offered him a snack. Both parents communicated and interacted more with Deonte during this visit than they had previously. Mr. Wesby told Ms. Gills that they no longer wanted to continue the extra visits with Deonte now that they had to participate in one-on-one parent coaching sessions with him.[49] She observed that the parents had what appeared to be a recent portrait of all the children except Deonte.

Ms. Lewis told Inspector General staff that she was concerned about how the parents, especially Ms. Lee, treated Deonte. She recalled that Ms. Lee, who seemed "detached" from Deonte, blamed him for their family's involvement with the Department. Ms. Lewis added that Ms. Lee

---

[47] Contact notes indicated that a 1/9/12 visit between the parents and Deonte did not occur because the family's ACR was on that day; a 1/16/12 visit did not occur because the office was closed for a holiday; and on 1/24/12, Ms. Gills had a scheduling conflict. Ms. Lee declined Ms. Gills' offer of extra time with Deonte to make up for the missed dates.

[48] According to a 12/15/11 contact note.

[49] In late February, one-on-one parent coaching sessions began between the parents and Deonte out of Kappa's concern regarding the parents' apparent lack of attachment and behavior toward Deonte.

would become irritated by Deonte's withdrawn behaviors and could not understand his lack of attachment to them.

### Sibling & Parent/Child Visits

The parents continued to display concerning behaviors with the other children as well. Ms. Gills wrote that at a January 5, 2012 sibling visit at the parents' home prior to parent coaching, Mr. Wesby asked the boys if they wanted hotdogs, which they initially declined. Mr. Wesby yelled at them when they later changed their minds and requested hotdogs. Ms. Lee called Deon, who was playing with his siblings, and made him take his shirt off and then put it back on, stating that he did not know how to put a shirt on. She then made him sit on the floor alone for several minutes before letting him return to play. Ms. Gills documented that Deon had not done anything to prompt Ms. Lee's criticism or a time-out.

For a January 19 sibling visit, Ms. Gills transported the three boys to the parents' home prior to their parent coaching session. She documented that Mr. Wesby was watching a slasher horror movie when they arrived, and allowed the children watch with him while Ms. Lee prepared a snack.

Ms. Gills' contact notes regarding the combined sibling and parent/child visits in February indicated that on February 2, Lamont and Deon played together while Summer followed them around; Deonte remained on the couch beside Ms. Gills. Mr. Wesby, who was not feeling well, did not greet the children. Ms. Lee talked on the phone, and then looked at photos with Lamont and Deon but did not include Deonte in their conversation. During a February 9 visit between Mr. Wesby, Lamont and Deonte,[50] Lamont played Wii while Summer and Deonte watched. Mr. Wesby prepared hotdogs for the children and attempted to engage Deonte, who remained beside Ms. Gills throughout the visit. During a February 16 visit between Ms. Lee, Lamont and Deonte,[51] Ms. Lee gave snacks to Lamont, Deonte and Summer. Ms. Lee only talked with Lamont and Summer while they ate their snacks. For the rest of the visit, Lamont played X-box while Deonte and Summer watched; Ms. Lee mopped the kitchen floor and did not interact with the boys. When Lamont and Deonte were preparing to leave, Ms. Lee only said goodbye to Lamont. Ms. Gills wrote: "It is obvious that the biological mother is ignoring Deonte and is so blatant when she does it."

### Unsupervised Day Visits Resume

On February 22, Ms. Gills staffed the Wesby case with Supervisor Turner-Johnson and Senior Supervisor Janet Ian to discuss 1) whether unsupervised visits should resume; 2) concern that Ms. Lee was pregnant with twins and the parents' ability to manage seven children; and 3) the parents' lack of bonding with Deonte. Ms. Gills wrote on the case staffing form, in part:

> Parent coach, Lewis reports they are cooperative and able to demonstrate good parenting skills and willingness to learn. Overall, coach reports positive progress and recommends unsup. day visitation.

It was decided that a Child and Family Team Meeting would be scheduled to discuss permanency issues as well as family planning; parent coaching would be requested to work with Deonte and his parents apart from the other siblings; and Kappa would approve two hours of

---

[50] Ms. Lee and Deon were having a one-on-one parent coaching session with Ms. Lewis at the local library.
[51] Mr. Wesby and Deon were having a one-on-one parent coaching session with Ms. Lewis at the local library.

unsupervised parent child visits a week. The parents would only be permitted unsupervised visits, however, if they participated in parent coaching with Deonte. Ms. Gills told Inspector General staff that she and her supervisor relied heavily on Ms. Lewis's recommendations.

The parents continued to resent parent coaching. On February 23, Kappa Supervisor Turner-Johnson returned a call from Ms. Lee. The supervisor documented that the mother questioned the need for participating in parent coaching and why they were only having two hours of unsupervised visits. The mother told the supervisor that she did not learn anything from parent coaching other than how to put her children in time-outs. The supervisor explained:

> …the recommendation stands that the visits are unsupervised for two hours with the parenting coaching being in place for Deonte (sic). Again she reported that she is not doing the parenting coaching and she also reported "I can just get my other two kids back I don't care about Deonte (sic)". Supervisor was s[h]ocked that NM reported this and asked her how could she say that, about her son and reminded her that she has two other children at home as well as she is pregnant with two children and it is important that she comply with all services. She went on to say that she has lost her job because of Misty [Gills] the worker, and she knows it was because of her because she asked her for her check stubs and when she gave them back she got fired. Supervisor explained to her the above again about visitation and also expressed that she should not make those above type of statements. Stacy then proceeded to hang up on supervisor.

Both Ms. Gills and the supervisor told Inspector General staff that they believed Ms. Lee was simply angry and not really meaning it when she stated that she did not want Deonte. Ms. Gills stated that for much of her work on the case, she assumed that the parents and Deonte had not bonded because he was so young when he was removed from their care, not accounting for the mother blaming Deonte for the family's involvement with the Department. Ms. Gills and Ms. Turner-Johnson acknowledged that they never explored whether the parents would have been willing to allow Deonte to be adopted.

On February 23, shortly after Ms. Lee's phone conversation, Ms. Gills supervised a parent/child and sibling visit involving Mr. Wesby, Lamont, Deon, Summer and Byron.[52] Ms. Gills spoke with Mr. Wesby apart from the children about the statements Ms. Lee had made regarding Deonte earlier in the day. Mr. Wesby stated that Ms. Lee was feeling frustrated when she said she did not want Deonte. Ms. Gills spoke with Mr. Wesby regarding Ms. Lee's minimal interactions with Deonte:

> This CWS stated that she brought Deonte for a visit on a Monday, when [Mr. Wesby] wasn't there, and for the ENTIRE visit she said absolutely NOTHING to him. [Mr. Wesby] put his hand over his mouth and grinned. This CWS stated that was NOT appropriate/acceptable behavior for a biological parent.

On February 27, 2012, Kappa held a Child and Family Team Meeting which included Mr. Wesby and Ms. Lee, a Kappa senior supervisor, Ms. Turner-Johnson, the mother's bar attorney, and Ms. Gills. The parents were informed that Kappa agreed to allow unsupervised visits with

---

[52] Ms. Lee and Deonte had their first scheduled one-on-one parent coaching session at the library with Ms. Lewis.

JAMAL WESBY

the boys for two hours weekly if they complied with one-on-one parent coaching with Deonte. Ms. Lee again stated that she had not learned anything from Ms. Lewis.

On February 28, the case was scheduled in court for a permanency planning hearing. The children had been in foster care almost three years, two months at that point. Ms. Gills documented in a contact note that Mr. Wesby told parenting coach Lewis that he could not attend the one-on-one session with Deonte, scheduled for the next day, March 1 because it was his birthday. Ms. Lewis offered to do the session with the mother instead but "She stomped her feet and appeared to be having an adult tantrum because she did not want to do the session this Thursday." Ms. Gills wrote that she provided the assistant state's attorney and the GAL with a copy of the parent child coaching report, which recommended unsupervised day visits. Ms. Gills also gave them a verbal update on the family's case and expressed her concern regarding Ms. Lee's lack of interaction with Deonte. The GAL suggested the family be referred to the County Juvenile Court Clinic for an assessment to determine whether additional services were needed for the family. Ms. Gills stated that she would discuss it with Kappa staff. The judge was unable to hear the case, and it was continued to April 23.

The day after court, Ms. Lee called Ms. Lewis to cancel her one-on-one session with Deonte. Ms. Lewis notified Ms. Gills, who staffed the case with her supervisor and senior supervisor. They determined that because the parents canceled the session with Deonte, their unsupervised visits that weekend would be canceled. On March 10, the parents began unsupervised day visits for two hours, twice per week, on Saturdays and Sundays. On April 1, the parents canceled their visit saying Ms. Lee had to go to the hospital for a swollen eye. Ms. Gills documented that she frequently asked the boys as well as their caretakers how visits with their parents were going. Neither the boys nor the foster parents reported problems.

### Parent Coaching
In January 2012, Ms. Lewis conducted parent coaching sessions with both parents and all the children on the 5th and the 19th. Ms. Lewis conducted her last parent coaching session with the whole family on February 2. Ms. Lewis's assessment of the family's progress contrasted significantly with Ms. Gills' documented observations and concerns.

At Kappa's request, Ms. Lewis began one-on-one parent coaching sessions between the parents and Deonte, in an attempt to strengthen their relationship with him. On February 23, Ms. Gills transported Deonte to the local library for the first of four one-on-one parent coaching sessions. Ms. Gills wrote in a contact note that when Ms. Lee arrived at the library with Ms. Lewis, she greeted Lamont and Deon, who were also in the car with Ms. Gills, and gave them candy rings. She did not acknowledge Deonte or give him a candy ring. Ms. Lewis wrote that Ms. Lee would not initially interact with Deonte.[53] Ms. Lewis documented discussing this behavior with Ms. Lee and the mother "changed her attitude" engaging in activities with Deonte.

Ms. Lewis completed a February 24, 2012 parent coaching progress report covering five months, from September 2011 when parent coaching was reinitiated through February 2012.[54] Regarding Deon's outcry that prompted additional parent coaching, Ms. Lewis wrote that Mr. Wesby denied that he hit four-and-a-half-year-old Deon with a bat. She noted that Deon had been "lying profusely as of late," and documented:

---

[53] According to her parent coaching progress report dated February 24.
[54] Records obtained by the Inspector General revealed that the only documentation of parent coaching services from September 2011 to March 2012 was the February 24 progress report and a May 2012 termination letter. There was no documentation of individual sessions or of conversations with Ms. Gills.

This parent coach recalls from parent coaching with this family in the past, that Deon would often lie to his parents or to this parent coach about countless things.

And elsewhere:

There have been a lot of issues stemming around Deon's inability to tell the truth.

Ms. Lewis told Inspector General staff that she surmised that perhaps Mr. Wesby had lightly and playfully tapped Deon on the head with a toy bat, but "I never thought that Mr. Wesby, like, hit him hard with the bat or, like, beat him with the bat." She stated that she was unaware whether Ms. Gills believed Deon's outcry and she never discussed it with Deon's paternal great grandparents. Ms. Gills told Inspector General staff that she was unaware of Deon having a history of lying and that neither the paternal great grandparents nor Deon's school had ever mentioned it as a concern.

Ms. Lewis addressed this further documenting that on February 9 and February 16 she held one-on-one sessions with each parent and Deon:

During both sessions, this parent coach observed each parent[']s interaction with Deon, and discussed the discipline methods Mr. Wesby allegedly used toward Deon. When this parent coach asked Deon if his father had hit him with a plastic bat, he responded by saying, "no". Deon again admitted that he had lied about the incident.

Ms. Lewis used puppets to "put on a skit about telling the truth and how lying is not good:"

Deon enjoyed the skit and was able to verbalize again that he should always tell the truth because it is the right thing to do. During those sessions, Mr. Wesby, Ms. Lee and this parent coach talked to Deon about the consequences of lying and how he needs to tell the truth all the time to adults and children."

Ms. Lewis's progress report did not mention Lamont's recent disclosure that Mr. Wesby had whipped Deon for bedwetting during an unsupervised visit, although Ms. Gills documented telling her in early January. Elsewhere in the progress report, Ms. Lewis wrote: "Both parents have worked through the issues that caused them to be re-referred for parent coaching." She documented:

Ms. Lee and Mr. Wes[b]y continue to demonstrate their ability to successfully parent their children and provide a safe home. Both Ms. Lee and Mr. Wesby remain unaware of how their son, Deonte, was harmed, yet they take responsibility for the past event that led to him being placed in foster care. Parent coaching was effective initially, and during this reporting period, it has proved to help them build a strong family unit. Both parents show that they can provide love, structure and necessary boundaries for their children.

Ms. Lewis noted that the parents "struggle in their attachment with Deonte" and noted that Ms. Lee took Deonte's withdrawn behavior personally, but both wanted to improve their relationship with him. She recommended:

- Begin unsupervised day visits in the home. Unsupervised visits will help this family prepare themselves for reunification that is forthcoming.
- Observe parents in public/community setting with specific children. This parent coach will observe both parents with Deonte in a public setting.

Deonte had his three final one-on-one parent coaching sessions on March 10, 15, and 29.[55] Ms. Lewis did not record any details of these sessions. Ms. Gills referred to the March 15 session in her notes that described Ms. Lee reading Deonte a book and noting that Deonte was more talkative and relaxed than usual. On March 29, Ms. Gills wrote that Mr. Wesby took Deonte for a walk prior to their session starting and Deonte smiled frequently while with his father. That was the last parent coaching session Ms. Lewis had with any of the family members, two weeks before Ms. Lee gave birth to twins.

Ms. Lewis documented in her May 1, 2012 termination letter that the parents made "excellent progress," successfully completing parent coaching and were able to apply the parenting techniques they had been taught. The parents had completed 20 sessions since the reinstatement of parent coaching in September 2011. She noted that both parents demonstrated their attachment toward Deon and Deonte during one-on-one sessions. Ms. Lewis wrote that the parents had initially struggled with Deonte's lack of attachment, but she had helped them understand his responses and develop nurturing and empathy, improving their ability to express their love to Deonte. Parenting Coach Lewis documented her continued support for reunification.

### Birth of Jamal and James

In April 2012, Ms. Lee gave birth to twins, James and Jamal, but did not inform Kappa for three weeks. Three days after their birth, she left Ms. Gills a message canceling Deonte's two-hour unsupervised visit. Five days later, Ms. Lee emailed Ms. Gills that she and Mr. Wesby would not be able to attend court three days later. She told the worker about the twins in May, when Ms. Gills tried to schedule a visit to see Summer and Byron. When Ms. Gills inquired why the parents had not told her earlier, Ms. Lee responded, "because it's my business not yours." The effect of the birth was minimal as Ms. Gills told Ms. Lee they had decided to extend visits:

> The CWS informed her that the Supervisor agreed to have she and Michael, biological father of Deon and Deonte, begin their 4 hrs. per day on Saturday and Sunday beginning this Saturday.

Ms. Gills notified the hotline of the births, which was taken as information only. Kappa records did not indicate when Ms. Gills informed court personnel of the twins' births but the GAL noted the births in their May 31, 2012 motion for a County Juvenile Court Clinic Evaluation.

On May 4, 2012, Ms. Gills visited the parents' home to monitor the children in their care and see the newborn twins. When she arrived, Ms. Lee was sitting on the floor playing video games, which she continued to do throughout much of Ms. Gills' visit. Jamal was asleep in a car seat next to her, and James was sleeping in the crib. Ms. Gills also observed two-year-old Summer and one-year-old Byron. She noted that the four children appeared to be free of abuse or neglect. Ms. Gills documented:

---

[55] Ms. Gills was unable to attend the March 10 one-on-one parent coaching session between Deonte and his father. Ms. Gills arranged for his foster mother to transport him.

Stacy was more involved/distracted with the video game or something else totally different when this CWS was there. It appears that Michael is the primary caregiver for ALL the children while Stacy tells him what to do.

Ms. Gills documented in a June 13 contact note that she transported Deonte for a four-hour unsupervised visit with his parents. When they arrived, he began crying and begging Ms. Gills not to leave him. The mother came outside and told the worker they did not have a visit scheduled. Ms. Gills reminded her they did but Ms. Lee was unwilling to visit with Deonte and Ms. Gills returned him to his daycare:

It was OBVIOUS that the biological mother was not concerned about Deonte's feelings in that she said in front of him that she didn't have a visit with him in an angry voice. She never took into consideration that her child was crying as this CWS took him out of her car.

A few days later, Ms. Lee left a phone message canceling their unsupervised parent/child visits that weekend and stated that they would not be home.

*Court*

On April 23, 2012, the goal of Return Home in Five Months was upheld. In early May, the GAL notified Ms. Gills that she intended to file a motion in court to require the parents to participate in the County Juvenile Court Clinic. Ms. Gills stated that Kappa was in agreement.[56] On June 28, the case was in court for a permanency hearing and to consider the GAL's motion. The parents, without prior notice, told their attorneys that they had decided to sign specific consents allowing Deon and Lamont to remain with their relative caregivers under subsidized guardianship, and to allow Deonte's traditional foster parent to adopt him. The parents' attorneys told the judge that the parents wanted to end the return home goal and would decide what they wanted to do by the next court date, which was set for August 20. The GAL withdrew her motion for an assessment.[57]

On July 6, the worker noted she discussed the parents' unexpected decision with Lamont's grandmother. Lamont's grandmother stated that the parents' lease was up in July and she suspected that Mr. Wesby convinced Ms. Lee to end the pursuit of return home because he wanted to seek employment elsewhere. According to a July 16 contact note, Ms. Gills met with the parents at their home to discuss the service plan for the upcoming ACR. When she arrived, Ms. Lee was feeding James and Mr. Wesby was feeding Jamal; Byron and Summer were nearby. She noted that none of the children appeared abused or neglected. Ms. Gills asked the parents about their request at court to change the goal. Mr. Wesby explained that he wanted to move because he believed that he could find a job in City B and Ms. Lee added that they needed employment to provide for their four children.

*July ACR & 14 Day Notice*

During the July ACR, the permanency goal of Return Home within Five Months was rated as unsatisfactory. The parents' tasks to secure employment or vocational training were both

---

[56] A court date was set for May 31 to hear the motion. On May 31, the motion was continued until June 28. According to Ms. Gills' contact note, a lengthy contested case was being heard. Additionally, Mr. Wesby's attorney was not present.

[57] On August 20, the case was continued until October 29, 2012 because the father's attorney was not available.

evaluated as unsatisfactory. Their tasks to cooperate and not be "verbally combative" during parent coaching sessions were evaluated as satisfactory/discontinued. Ms. Lee's task to allow the Kappa worker to monitor the children in her care at least monthly and to refrain from negative comments about the maternal grandmother in the presence of Lamont were evaluated as satisfactory. The tasks of securing employment or vocational training, allowing the placement worker to monitor the non-ward children, and refraining from negative comments about Lamont's grandmother were maintained.

In late July, Deon's paternal great grandparents submitted a 14 day notice. Deon's great grandmother, who was ill, explained to Ms. Gills that she had to focus on her health. Deon's paternal great grandparents told Ms. Gills that they and Deon's maternal grandmother had previously agreed that if Deon needed a long-term placement, it would be best that he live with his maternal grandmother and he moved there with Lamont in August.

### Third Outcry of Corporal Punishment
On September 6, 2012, a GAL contacted supervisor Lisa Turner-Johnson. The supervisor documented that the GAL's child interviewer had spoken with seven-year-old Lamont and five-and-a-half-year-old Deon, and that Lamont reported "Michael hits his mother, busted his two-year-old sister['s] lip, kicked Deonte, and slapped him and Deon on the back of his head." The GAL stated that she was unaware that unsupervised day visits had been reinstated, though Ms. Turner-Johnson stated she would suspend the visits in light of the new allegations.

Ms. Turner-Johnson informed the maternal grandmother and Deonte's foster mother that the parents were not to have any contact with the boys until the allegations were investigated. Deonte's foster mother stated Deonte had not seen his parents since August 18, which was 19 days prior to the GAL interviewer's conversation with Lamont and Deon. Ms. Turner-Johnson also informed the parents that visits had been suspended. Ms. Turner-Johnson documented: "NM reported it does not matter because she has not been visiting with the kids any way (sic). She reported the last time she seen (sic) them was this past Saturday for 20 minutes."

On September 7, Ms. Lee contacted Ms. Turner-Johnson, and handed the phone to Tiffany Jackson, the assigned child protection investigator. Ms. Turner-Johnson documented:

> [Tiffany Jackson] reported that she check[ed] all of the kids and none of them have any marks on them. She reported the report stated that Summer was push[ed] down the stairs by NF and hit her mouth on a television and had a busted lip. She reported that is impossible due to the parents not having any stairs in their home and there is no lower level and no television in the hallway. She reported that she had this case before.[58]

On September 11, Ms. Gills visited the maternal grandmother. According to her contact note she spoke with Lamont alone about the allegations:

> He stated that he said [to the GAL child interviewer] Michael, biological father of all his siblings/paramour of his biological mother, kicked his sister, Summer, and she fell into the t.v. and bust her lip. This CWS asked was there anything else that happen[ed] that he needs/wants to tell this CWS? He said that Michael hung him by his arms over the balcony and let his legs dangled [sic] when he was playing with him. He said that Michael kicked Deonte when he wouldn't

---

[58] The narrative did not allege anything about stairs, nor did it state that the TV was in the hallway.

eat or play with he and his brother. He said that "I told you when Michael hit Deon when he had a accident in the bed." This CWS stated that she did remember him telling her that in the past. This CWS asked was there anything else he wanted to tell this CWS? He stated that his biological mother, Stacy, "slaps us for no reason." He also reported when they got into trouble, Stacy would make them stand in the corner on one leg, and he demonstrated for this CWS. He stated that Michael would pick up the twins by their shirts and throw them on the bed. This CWS asked him does he want to continue visiting with his biological mother and Michael? He said "no, I don't want to go back over there."

During the home visit, Ms. Gills also spoke with Deon and asked if his parents hit him or his siblings. Deon denied that they did. Ms. Gills asked Deon if he would tell her if his parents did hit them, and Deon stated "no." Ms. Gills asked Deon if his dad had ever kicked Summer, and Deon initially denied it, and then stated that his dad had kicked Summer. Ms. Gills notified the GAL that Deon and Lamont also told her that Mr. Wesby kicked Summer and caused her to fall against the TV and cut her lip.

***Specific Consents Signed***
On September 17, 2012, while the (D) sequence investigation was pending, Ms. Gills was notified that the parents were at juvenile court and wanted to sign specific consents for Deon, Lamont and Deonte to be adopted. Ms. Gills documented that she went to court, the parents went before the judge who explained the process, and they signed specific consents for the three boys' adoptions.[59] While at court, Ms. Lee stated that she and Mr. Wesby intended to move to City B and were not going to tell her family when they moved. On October 5, Ms. Gills informed the maternal grandmother that the parents had signed specific consents allowing her to adopt Deon and Lamont. The grandmother responded: "[O]h that's why she told L[a]mont she's not his mother anymore."

***DCP Investigation (SCR Sequence D)***
The hotline was notified of Lamont's allegation. The narrative reads:

> Reporter stated that her client reported today, that dad (Michael) kicked Summer in the bottom causing her to hit the tv and splitting her lip. Reporter also stated that both mom and dad have a significant history of domestic violence in front of their children putting all of the children at risk of harm. At least two of the parents other children are in DCFS custody. Leads requested. No known aka's, disabilities or known safety issues to worker going to the home.[60]

An investigation was assigned to Tiffany Jackson the next day. Ms. Jackson interviewed Mr. Wesby and Ms. Lee, who denied the incident and alleged that the maternal grandmother was causing problems so that she could keep the boys. The investigator observed two-year-old

---

[59] On 10/29/12, the goal of substitute care pending court determination on termination of parental rights was entered at court. On 11/19/2012, Ms. Gills completed a case transfer summary to prepare the case for transfer to a Kappa adoption worker.
[60] LEADS did not reveal any domestic violence for Mr. Wesby or for Ms. Lee. No history of domestic violence between the parents was noted in prior investigations or in Kappa's integrated assessment. The GAL told the investigator that she thought the parents had a history of domestic violence.

Summer, one-year-old Byron, and five-month-old twins James and Jamal documenting that she did not observe any injuries. She completed a body chart on Summer, noting "no marks."

On September 11, Ms. Jackson's supervisor, Keith Stuart, discussed the Wesby investigation with her. He documented that that there were no stairs in the family's apartment for the child to fall down (though no allegation involving stairs was made), and that the apartment did not have a TV. Mr. Stuart wrote that, according to investigator Jackson, Summer had no marks, that the mother and maternal grandmother had a recent falling out, and the mother accused the grandmother of coaching Lamont. Mr. Stuart wrote: "CPS stated that Stacy wants her daughter [sic] removed due to her mother's interference." Mr. Stuart directed Ms. Jackson to find out if the police were aware of any domestic violence in the home.

Mr. Stuart had another supervisory conference on October 10. Mr. Stuart wrote that Kappa was unaware of any history of domestic violence between the parents and police had no records of calls to the address for domestic violence. He wrote that Summer did not have any injuries when the investigator observed her. The supervisor noted that the maternal grandmother was caring for two children; one of whom made the outcry. He directed Ms. Jackson to interview the child who made the allegation and to speak with Summer's physician.

On October 23, 46 days after the case was assigned to her, Ms. Jackson interviewed seven-year-old Lamont. Her contact note of her interview reads:

> CPI Jackson completed a visit at the home of the maternal grandmother Myrtle Lees and spoke with Lamont West [sic]. This is the oldest son for Stacy Lees [sic]. It was explained that this worker was from DCFS and we received a call stating that something took place with Summer in her home and if he knew anything about it. He stated yes. He stated he was visiting in his mom's home and the father of that dude there as he pointed to hi[s] little brother, took his feet and kicked Summer backwards as he demonstrated and she fell into the TV and she busted her lip. He stated her lip was bleeding and he told his grandmother about it. He state[ed] once Michael [Mr. Wesby] took him and held him upside down over the balcony and he almost fell and busted his head. This child stated she [sic] is 8 years old and he attends the School and is in the 2nd grade.

On October 24, Ms. Jackson called the paternal great grandmother, whom Mr. Wesby had provided as a collateral contact. According to the investigator's note, Mrs. Wesby said she saw the family about once a week and denied having seen Summer with an injured lip. Ms. Jackson wrote in an October 24 SACWIS note that she spoke with Kappa worker Misty Gills, who informed her that the parents signed specific consents on September 17, and Ms. Lee now stated that she only had four children. Ms. Gills denied having seen Summer with an injured lip and acknowledged that the mother and grandmother had a strained relationship. Ms. Gills also documented their conversation in SACWIS indicating investigator Jackson believed Lamont was "coached" by his maternal grandmother, and she intended to unfound the allegation.

Ms. Jackson and Mr. Stuart met for final supervision of the case that same day. Mr. Stuart documented that Ms. Jackson believed Lamont was coached by his grandmother, the paternal great grandmother saw the family weekly and had not observed Summer with an injured lip, and police had no knowledge of any domestic violence in the home. He directed Ms. Jackson to

contact the children's primary physician. Investigator Jackson documented that the physician reported examining the children earlier in the day and had no concerns.[61]

The allegation against the parents of substantial risk of physical injury (#60) to the four children in the home was unfounded, as was the allegation against Mr. Wesby of cuts, bruises, welts by abuse (#11) to Summer. Ms. Jackson documented her rationale to unfound:

> Based on the information received it is recommended that this case be unfounded and closed. There is no supporting information. There were no witnesses that has seen this child with a busted lip. The CPI spoke with the child's Dr and there are no concerns for the children. There are no police records that support the allegation of domestic violence. The Dr. has no concerns and the children were seen on 10/24/12.

The investigation contained no SACWIS notes to indicate that the investigator interviewed Deon or Deonte or the maternal grandmother regarding the allegations. The investigation was closed in November 2012.

Ms. Jackson told Inspector General staff that she was carrying over 30 cases around the time she was assigned the Wesby investigation.[62] She stated that she generally reviewed either prior investigation summaries or entire investigations, depending what was occurring on the case, but could not recall whether she reviewed the priors in this case. Ms. Jackson stated that she was unaware that Lamont made the allegations to the GAL's child interviewer. She stated that if she had known this, she would have talked with the interviewer, as it was another person with information.

Ms. Jackson told Inspector General staff that she was unsure whether she asked the date the placement worker last saw the children or the date of the children's last unsupervised visit with their parents. She acknowledged that she did not complete a timeline in this case. Ms. Jackson recalled the parents accused the grandmother of making things up because she wanted their children though she did not find evidence to corroborate their claims. Ms. Jackson stated that she assessed the CERAP as safe because she did not find any marks on the children in the parents' care, the parents denied the allegations, and the placement worker visited weekly never seeing any injuries to the children. Investigator Jackson was unsure where the information about Summer falling down stairs came from.

Ms. Jackson stated that she was unsure why she did not interview Lamont, the outcry witness, until seven weeks after the report was taken or why she did not interview the maternal grandmother or Deon. She recalled interviewing Lamont outside the home, apart from his grandmother and brother. While she was interviewing Lamont, he kept looking back toward his grandmother, which Ms. Jackson interpreted as "am I saying what you told me to say." Ms. Jackson stated that she believed the grandmother had coached him.

---

[61] Ms. Jackson told Inspector General investigators that she had instructed the parents to take the children to the doctor. She stated that she explained the allegation and asked the doctor if the children had ever had any unexplained marks. Ms. Jackson stated that she did not inform the doctor of the prior indicated finding.
[62] According to the protective service teams by-worker reports, Ms. Jackson was assigned five cases in July, 10 cases in August, 12 cases in September, 15 cases in October, and 11 cases in November.

***December 2012, DCP Investigation (SCR Sequence E)***

In December 2012, five weeks after the (D) sequence was closed, a hospital social worker notified SCR that eight-month-old Jamal was taken by ambulance to the emergency room of South Community Hospital unresponsive. Hospital staff placed Jamal on a respirator and planned to airlift him to another hospital, but he was not expected to live. According to the hospital social worker, Mr. Wesby told emergency room staff that he had been bathing Jamal that afternoon and briefly left the bathroom to retrieve his cell phone. When he returned to the bathroom, he reportedly found Jamal underwater. Mr. Wesby told hospital staff that he picked Jamal up out of the water and thought he was fine, and laid the baby down for a nap. Mr. Wesby stated that after Jamal's nap, he noticed that Jamal's abdomen appeared bloated. Jamal then began turning blue and became unresponsive, so he called 911. The social worker stated that Jamal did not have any outward signs of abuse. The social worker called back later that evening reporting that Jamal had died. The reporter stated that Michael Wesby was the child's caretaker at the time of the incident as the mother, Stacy Lee, was out shopping with her mother. A child protection investigator contacted the reporter. "[The reporter] said that the father won't sit down long enough to answer the questions."

The assigned after hours investigator went to the hospital and spoke with the charge nurse on duty who stated doctors found Jamal had a skull fracture and a healing rib fracture. The nurse said the father became very upset when he learned that Jamal had died, and then became calm. She said the mother had shown no emotion, spent very little time in the room with Jamal, and was on her cell phone. The nurse reportedly overheard the mother say, "yeah he's dead" with no sadness or feeling. The attending physician also found it noteworthy that the mother spent most of her time on her cell phone, did not spend time with Jamal, and never cried or showed any emotion, even when she was told that he died.

At the hospital, Mr. Wesby made consistent statements to the police and the child protection investigator about the events of the day. Mr. Wesby reported that Ms. Lee went shopping with her mother and James, and he stayed home with Jamal, Byron and Summer. Mr. Wesby stated that he was bathing Jamal in a baby bathtub in the family tub when he went to retrieve his phone. When he returned, he found Jamal under the water. He lifted Jamal out and Jamal appeared to be fine. However, while dressing him, he noticed Jamal felt like he had a fever. He said the twins had seemed ill and had been crying a lot. He called the mother and asked her to purchase some ibuprofen, which he gave to Jamal when she got home. Mr. Wesby stated that Jamal seemed okay, but then refused a bottle despite not having eaten much that day. He laid Jamal down for a nap. Jamal awoke gagging like he was vomiting and had a hard, distended stomach. Mr. Wesby stated that he then went to Walgreen's to get some Gas-x, gave some of it to Jamal, and laid him back down. When he checked on him, the baby's breathing was shallow and he told Ms. Lee to call 911. Ms. Lee denied any knowledge of Jamal's injuries when questioned by the child protection investigator the next day. She said she was not home when Jamal got hurt and it was not fair to take her children away from her.

An autopsy was completed the day after Jamal's death. The pathologist who performed the autopsy told the child protection supervisor that Jamal had multiple head injuries; bruises on the spine and stomach; a massive infection consistent with peritonitis; and a healing rib fracture estimated to be one month old. He said there was nothing in the history given to explain the child's injuries and that the child's death was a possible homicide.

The Department took protective custody of Summer, Byron, and James that day and doctors examined the children. Jamal's twin, James, was discovered to have bilateral parietal skull

fractures with subgaleal hematoma on both sides of his head that were believed to be recent because of swelling over them on exam. James was admitted overnight to the Hospital and discharged the next day. The investigator interviewed the paternal great-grandmother, who recalled that when the family had been to her home a few days before, she noticed a large knot on the side of James's head. The father said James fell while he and the children were playing. She said that she had seen the children with marks and bruises and felt the mother knew what was going on and did not protect the children. One-and-a-half-year-old Byron had a healing right lateral 10th rib fracture, which was estimated to be from one to three weeks old. Two-and-a-half-year-old Summer did not have any injuries. Temporary custody was granted two days after Jamal's death, and the judge issued a court order denying the parents visits with their surviving children. Summer and Byron were placed together with a paternal great aunt, and James was placed with a maternal aunt.

Five days after Jamal's death, the child protection investigator met with the mother at the DCFS office to establish a timeline for the day of his death. The investigator documented that the mother "appeared to find the visit amusing. CPI asked her if she thought this was funny and she stopped smiling and stated no." Ms. Lee recalled that Mr. Wesby had cared for Jamal most of the day. In the morning, Jamal seemed fine and was not fussy. She told the investigator that Jamal was sleeping when she left with James at around 3:15 p.m. to go shopping with her mother. Mr. Wesby called her to remind her to bring home some ibuprofen. Ms. Lee stated that after she got home and fed the older children, Mr. Wesby asked her to come into the bedroom to look at Jamal's stomach, which looked bloated. She said aside from that Jamal was ok. Mr. Wesby went out to get Gas-X and gave it to Jamal. Ms. Lee stated that she was washing dishes when Mr. Wesby told her to come into the bedroom to see Jamal, whose heart seemed to be beating slowly, and then they called 911. Ms. Lee wanted to know when she would get her children back because she did not do anything wrong.

That same day, the investigator documented that Ms. Turner-Johnson emailed her SACWIS notes of contacts with Ms. Lee dated the two days after Jamal's death. According to Ms. Turner-Johnson's SACWIS notes, Ms. Lee phoned her the day after her son died and stated that she was being punished for something she did not do; she did not hurt her child and she was not there when he was hurt. Ms. Lee stated that the father primarily cared for Jamal and she was responsible for James. Ms. Lee told the Kappa supervisor that Mr. Wesby kept telling her he was sorry, which was making Ms. Lee think that he did something to Jamal. According to Ms. Turner-Johnson's SACWIS note from the next day, she spoke with both parents at juvenile court; Mr. Wesby said he had fallen down some stairs with Jamal, but Jamal had been fine. He stated that both twins had fallen off the couch previously but were fine.[63] Ms. Turner-Johnson wrote that Ms. Lee asked to speak with Ms. Turner-Johnson alone. Ms. Lee told her that Mr. Wesby had never previously mentioned falling down stairs with Jamal. Ms. Lee went on to say that Mr. Wesby had repeatedly said he was sorry and that he had destroyed her life, making her wonder if he did something to Jamal. Ms. Lee said that Mr. Wesby became overwhelmed when he had to care for all four children alone so she always tried to take one child with her. She denied that she had ever seen Mr. Wesby hit the children.

The doctor who performed Jamal's autopsy documented Jamal's cause of death as cerebral edema due to (intermediate cause) cerebral contusion due to (intermediate cause) fracture of the skull due to (proximate cause) multiple blunt force injuries, with contributing factors of blunt

---

[63] Five days after Jamal's death, Ms. Lee told the investigator that the twins had fallen off the couch when they were less than five months old.

force injuries of varying ages. The Coroner ruled his death a homicide. On March 18, the child protection investigator contacted the medical examiner and inquired about Jamal's peritonitis:

> Left untreated, peritonitis can rapidly spread into the blood (sepsis) and to other organs, resulting in multiple organ failure and death. He stated that if you develop any of the symptoms of peritonitis, the most common symptom would be severe abdominal pain and inability to have a bowel movement. CPI asked him if the symptoms were onset on the day of death and he stated no. He stated that the child was so infected he had puss in his stomach. He stated that the symptoms would have been lingering and that the symptoms would not have occurred at the day of death but at least 7 to 10 days before and the child victim would have exhibited discomfort, as well as had the distended stomach and lack of urination.

According to police records obtained by Inspector General staff, Mr. Wesby walked into the police station and asked to talk about Jamal's case with the detective assigned to the baby's death four days after Jamal died. Mr. Wesby admitted to police that he punched the children when he became frustrated with their crying. Mr. Wesby told police that four days before Jamal's death, he was alone with the twins while Ms. Lee attended a Christmas party with Summer and Byron. He punched both James and Jamal approximately three times in the head and punched Jamal in the stomach because they would not stop crying. He stated that he slapped Jamal with an open hand on the eight-month-old's head and his back two days later because Jamal urinated on him during a diaper change. Mr. Wesby stated that on that date he also punched Byron in the back with his fist and whipped him with a belt. Mr. Wesby stated that the day before Jamal's death, he was home alone with the child. Mr. Wesby stated that he had a migraine and Jamal was crying, so he punched him several times; Mr. Wesby told police that he could not recall where on Jamal's body he punched him. He stated that Ms. Lee was unaware of any of the incidents. Police arrested Mr. Wesby and charged him with Jamal's murder as well as aggravated battery of a child under 13 years of age.

In March 2013, Mr. Wesby was indicated for death by abuse (#1) and head injuries by abuse (#2) to Jamal; inadequate supervision (#74) to Jamal and James; bone fractures by abuse (#9) to Byron; and substantial risk of physical injury by neglect (#60) to Summer. Ms. Lee was indicated for death by neglect (#51) to Jamal; head injuries by abuse (#2) to James; bone fractures by abuse (#9) to Byron; and substantial risk of physical injury by neglect (#60) to Summer.

In April 2013, the juvenile court judge denied Ms. Lee's request for supervised visits with Summer, Byron, and James. On Father's Day, June 16, three days before he was scheduled to appear in criminal court on the charges, Mr. Wesby hung himself in the County Jail.

A no contact order was issued for both parents. The children's maternal grandfather died in January 2013. Shortly after James's placement with his maternal aunt, he was enrolled in daycare. Byron and Summer were evaluated for early intervention services in February 2013. Byron was recommended for and began speech, physical and developmental therapy. Summer was recommended for attendance in an early childhood program, and she began a half day early childhood program. In March of 2013, Deon and Deonte's goals were changed to adoption in court, and Lamont's biological father signed specific consents allowing his grandmother to adopt him; Lamont's goal was changed to adoption in April 2013. Deon began individual counseling; after his father's suicide, he was referred for trauma therapy. Byron and Summer began trauma therapy at North Gate Hospital in the summer of 2013. In November 2013, the

children's paternal great grandmother died. On October 20, 2014, Deon and Lamont were adopted by their maternal grandmother. Deonte's goal remains adoption and his traditional foster parent hopes to adopt him. Summer, Byron and James's court-entered goal remains return home in one year but the mother was rated unsatisfactory on the last service plan.

**ANALYSIS**

In 2008, seven-week-old Deonte's femur (the largest and hardest to break bone) suffered a viscous blow causing a transverse fracture (complete break separating the bone) by one of his parents. The parents, who were his only caretakers, had no explanation for the fracture and doctors determined not only that the infant had been abused, but that the child's severe injury had been ignored for one to two weeks – despite the fact that his injury would have caused demonstrable pain. Given these facts, the case presented a poor prognosis for return home. This Office knows of no research that supports a treatment modality for parents who engage in severe abusive behaviors to an infant which induce suffering to the child over a relatively long period of time. There is currently no known therapy or set of services that will assure that the abuser will not harm again, yet Jamal and his two very young siblings were still placed on a return home track. In the four years following Deonte's abuse, of the four children who were never taken into custody, one was killed, his eight-month-old twin brother had bilateral parietal skull fractures, and the 18-month-old sibling, Byron, suffered a rib fracture. The father confessed to causing the fatal injuries to Jamal.

An unexplained transverse fracture of a femur is highly indicative of abuse because an infant cannot exert the force necessary to cause the injury. According to a major study of 118 patients with femur fractures, 79% of fractures in children less than two years of age were attributed to abuse. The study determined that femoral fractures in children without a clear history of major trauma appeared to be the result of abuse. (W.A. Anderson, M.D. The Significance of Femoral Fractures in Children. *Ann Emerg Med* 11:174-177, April, 1982.) When abuse has occurred, "there is significant risk for reoccurring and escalating inflicted injury" when the precise mechanism of the abuse remains unknown. (Pierce, M.C., et al, Evaluating long bone fractures in children: a biomechanical approach with illustrative cases. *Child Abuse & Neglect 28* (2004) 505-524.) Thankfully, indicated cases of severe abuse to infants are relatively rare. In fiscal year 2013, only 8% of all indicated child protection investigations were indicated for physical abuse.[64] Of that 8%, only a small portion of those were based on serious physical abuse.

In 2012, the Office of the Inspector General issued a report on a sample of 211 DCFS child protection abuse and neglect investigations with allegations of bone fractures of children three years old and younger from FY 2009-2011. Infants between the ages of zero to six months accounted for 31% of the investigations, the largest age category. Deonte Wesby was the only infant in the Office of the Inspector General bone fracture study with a transverse femur fracture. Despite the uniquely serious nature of the violence inflicted on Deonte, and no one having taken responsibility for it, four siblings born after Deonte were allowed to stay in the parents' care. The unexplained nature of the event that resulted in serious harm to Deonte made the risk for him and his siblings even greater. There is a dangerous tendency in the field to treat unexplained serious harm in a benign fashion as though it did not occur and to return the child or children home, without addressing the abuse that occurred.[65]

---

[64] According to the FY13 Annual Statistical Summary Report's child abuse and neglect statistics.
[65] See Office of the Inspector General investigations 11-1127; 95-225; and 08-0225.

The groundwork for the poor risk assessment was first laid by the Integrated Assessment, which, though completed after the parents had been indicated for abuse, included only the allegations known at intake. Because of this, the recommendations failed to take into account that one or both of the parents had severely abused the infant. As a result, the parents were referred for the generic services of parenting classes, psychological evaluations, therapy, and mentoring which never addressed the underlying problem of abuse to their child. Compounding the problem was a parenting coach from Counseling Services who was ineffectual, lacked credibility and ignored significant inappropriate behavior of the parents and misrepresented information from the children. (See section on *Counseling Services Parenting Coach* below.)

With a service plan that failed to address the abuse, the Department became locked into a return home goal once the parents minimally complied with the plan. The parents were repeatedly rated as satisfactory on their service plan tasks despite minimal progress. Concerning behaviors such as canceling visits, hiding pregnancies, the mother's practice of ascribing adult intentions to toddler behaviors, and refusing to engage in activities were minimized and at times positively reframed.

While the case was open, the Department missed opportunities to protect the children. Given Deonte's history of severe abuse, the allegations of corporal punishment in the home should have caused serious concern. The parents' behavior toward the children, especially the mother's behavior and repeated lies about her pregnancies should have raised red flags.

### Service Provision Failures

DCFS' Integrated Assessment (IA) steers service planning and is relied on as a comprehensive source of information by service providers. In this case, the clinical screener relied on a partial pending child protection investigation to complete the IA, even though the full investigation had finished several months earlier. The IA suggested Deonte's injury was the result of an accident, and never documented the fact that the child protection investigation had resulted in indicated abuse findings against the parents as perpetrators of Deonte's broken femur. Subsequently, Kappa provided this misleading IA to service providers, including a psychologist, therapists, and a parent coach. Each assessed and serviced the family with inaccurate and incomplete information. None of the service providers requested or reviewed the completed child protection investigation nor was it attached to the referrals. Previous Office of the Inspector General investigations have found the same critical error of not attaching the relevant indicated child protection investigations to therapy or psychological referrals. Without the pediatric radiologist's opinion of abuse and information from the completed investigation, three of four service providers considered and accepted as credible the parents' explanations that Deonte's leg may have been accidentally broken while they co-slept or by his siblings playing with him too roughly.

A review of the records by Inspector General investigators found that during the four years between Deonte's broken femur and Jamal's death, the involved professionals ignored the high-risk nature and seriousness of Deonte's abuse and the implications that such serious injury had for the possible future abuse of the children. Moreover, the service interventions were devoid of the scientific rigor that should accompany such high-risk cases. With the exception of the Theta therapist who warned against the mother's lack of honesty, all the professionals involved with the family failed to critically compare facts presented by the parents against existing information in order to question the parents accordingly.

The Theta therapist who provided 16 counseling sessions with the father over an eight month period provided an initial "comprehensive" assessment that listed "Neglect of a Child" as the

father's diagnosis and noted that the father provided the possibility of the children "playing too rough with the infant [sic]" as the most plausible scenario of the broken bone. Prior to the father's move, the therapist requested Deonte's medical records. He then attempted to address with the father what really may have happened to Deonte because of the significant force the radiologist reported that was required to cause such an injury. The therapist adjusted the father's goal –but only to have the father acknowledge that he would be more careful with whom he left his child – and concluded that the father was appropriate for unsupervised visits with his children without ever seeing the father's interactions with the children. Notably, the therapist cited the father's patience but further added the caveat that the father could end up becoming overly upset after holding in his emotions.

Not one of the service providers asked for or received a copy of the completed child protection investigation to use as an information source for their service provision.

### Failure to Critically Assess New Information
The parents' visiting pattern showed an ongoing lack of empathy and interest toward Deonte. The parents made minimal visits with Deonte while they spent three to six days each month visiting with the two older children, three-year-old Lamont and two-year-old Deon. Concerns over the parents' attachment to Deonte arose. Those concerns would continue throughout the next several years: Deonte, who remained in a traditional foster home, was shy and appeared leery of his parents.

### Decrease in Support & Oversight & Increase in Childcare Responsibilities
In early 2011, multiple significant changes occurred within a short period of time. The family's support and oversight were reduced at the same time that the parents' childcare responsibilities were significantly and rapidly increasing. In March 2011, Ms. Lee gave birth to her fifth child, Byron, and the parents became responsible for a newborn in addition to their 11-month-old daughter, Summer. Within a two-month time span (February to April 2011), the two remaining services the family was involved in ended (parent coaching and individual therapy for Ms. Lee). Only 15 days after Byron was born, at the mother's attorney's motion, all parties agreed in court to begin unsupervised overnight visits for the three children in care, ages two-and-a-half, four and six. Kappa was given the discretion to determine the number of consecutive nights of the visits. Significant reasons for the parties' agreement to begin unsupervised overnight weekend visits were the parents' completion of most of their services; the positive reports from the parent coach and Ms. Lee's therapist; and belief the services would provide continued support and monitoring. However, parent coaching ended weeks after overnight visits began.

### Counseling Services Parent Coach
The court and placement agency gave significant weight to the parent coach's assessments of the parents. The assessments were developed without an identification of problems to address, development of a baseline, or a realistic appraisal of change. There is no indication that the parent coach recognized the case as one presenting high risk of future abuse. The notes were replete with conclusory terms, such as describing the parents as "nurturing and family oriented," providing little insight into the parents' actual behavior during visits to support the conclusions. The assessments effectively ignored the parents' demonstrated lack of interest in Deonte and the mother's emotional distance during the visits. At the time of the motion for unsupervised overnight visits, the family had concluded 28 coaching sessions from June 2010 through April 2011. The coach, Ms. Lewis, described the parents as nurturing and loving and able to provide appropriate structure and boundaries for their children.

When parent coaching was reinitiated (September 2011 through March 2012), the parent coach completely discounted Deon's report of corporal punishment, despite Lamont's later corroboration and without recognition for the danger that corporal punishment with a plastic bat portended in a family with such a violent history. The parent coach, anchored to a naïve belief that Deon made up the allegation, never contemplated the alternative explanation that the parents' reports might not be trustworthy. After six-year-old Lamont disclosed that Mr. Wesby had whipped Deon with a belt during an unsupervised visit, the parent coach still continued to accept, without critically questioning, the parents' denial of corporal punishment. Although Ms. Lewis was notified of Lamont's outcry in January, she did not incorporate this new and critical information into her February progress report, nor did she reevaluate her beliefs in light of this significant information. She recommended unsupervised weekend visits begin.

Ms. Lewis did not include negative parenting information, such as the numerous signs that the parents did not care about Deonte, and reported to the Court that one of Deonte's siblings had recanted his claim of corporal punishment – a report that the caseworker, who was present when the four-year-old sibling allegedly recanted, contradicted. Even if the sibling had recanted, a child welfare professional is expected to understand that children may recant allegations against parents for many reasons, unrelated to the veracity of the original allegation. Instead of applying a professional and objective assessment of competing hypotheses, Ms. Lewis was so anchored to her belief that the four-year-old was lying that she created and performed a puppet show to warn him of the dangers of lying.

The parent coach maintained a limited routine within the family home, which occurred at the same approximate time each session, early evening, with the parents usually fixing the children supper. Ms. Lewis did not observe or work with the family outside the home, explaining that there were too many children in the family and transportation was an issue. However, if the children in foster care were returned home, Mr. Wesby and Ms. Lee would have to manage appointments, school, and numerous other routines while caring for the children. Observing them managing their children while performing every day and various life skills was critical to assessing whether they would be able to manage the children on a daily basis. There was no measured analysis of whether the parents had gained an understanding of child development or developmental issues.

The Kappa caseworker accompanied the children to all of the family sessions. There were concerning and seminal discrepancies between the Kappa worker's observations and those of the parent coach regarding the events prior to and during the sessions. The Kappa caseworker noted that during the sibling and parent/child visits that occurred before the parent coaching sessions, the father showed frustration because his wife was on the phone during the visits, leaving him to tend to the children. At one point, the father handed Byron to Lamont in frustration because Ms. Lee wouldn't assist him. Ms. Lee demonstrated a pattern of immature and intentionally spiteful behaviors towards Deon and Deonte, including not speaking to them and purposively giving treats to the other children. The mother's words and behaviors belied any conclusion that she was a nurturing caretaker capable of separating her needs from the needs of her young children. Rather, she remained consistent in her lack of sensitivity and empathy toward the children and the needs of her three oldest children. The father appeared to be the one who provided the bulk of caretaking and interactions with the children. Despite the multitude of concerns documented by the Kappa caseworker and the frequent communication the caseworker and parent coach stated that they shared, the parent coach portrayed the parents as making progress in her sessions. She described her coaching interventions as successful.

In her May 1, 2012 parent coach termination letter, the coach wrote that the parents had made "excellent progress toward the treatment goals." She documented that the parents' relationship with Deonte, which she described as "nurturing," had improved and that the parents understood that his lack of attachment and confusion behaviors were because "he is a toddler;" Deonte was a three-and-a-half-year-old preschooler at the time. The termination letter did not mention the parents' refusal to participate in one-on-one sessions with Deonte only two months earlier.

Parenting assessments for Southern Illinois University's Project 12 Ways, an evidence-based parent coaching program developed for neglectful families, include targeted observations of the parents during stressful times, before and after treatment interventions, to judge whether parents can integrate and maintain learned parenting strategies. Such assessments are critical to obtain an accurate picture of how the parents respond to stressful real-world situations and an accurate assessment of parents' ability to implement skills taught. While evidence-based interventions exist for neglect, there is scant evidence that parent coaching can remedy serious inflicted abuse. Society can ill afford to risk children with doubtful interventions when a child has been seriously injured by abuse.

### *September 2012 DCP Investigation*

Child protection investigator Tiffany Jackson and supervisor Keith Stuart conducted an inadequate investigation. Ms. Jackson did not interview Lamont, the outcry witness, until almost seven weeks (46 days) after the case was opened for investigation and then, only after being directed to do so by her supervisor. Ms. Jackson failed to interview an available collateral (maternal grandmother) and possible witness (Deon) although they were present in the home when she interviewed Lamont. Ms. Jackson never attempted to interview Deonte, another possible witness. Ms. Jackson, without apparent basis, believed Lamont (whose outcry was consistent over time to the GAL's child interviewer, his Kappa worker and Ms. Jackson) had been coached based on Ms. Lee's statement that the maternal grandmother must have coached him. Ms. Jackson supported her belief with her subjective and ambiguous observation that Lamont looked back toward his maternal grandmother when Ms. Jackson was interviewing him. Ms. Jackson never asked Lamont whether anyone else was present during the incident to learn whether Deon and Deonte were also visiting the parents' home and might have information. Ms. Jackson never completed a timeline nor did she attempt to determine when the alleged incident she was investigating occurred. Finally, the fact that both Ms. Jackson and her supervisor documented inaccurate case information (regarding Summer being pushed down the stairs and a TV in the hallway) and neither seemed to realize it, at any point during the investigation, suggests a lack of attention to basic facts.

### RECOMMENDATIONS

1. The Department must develop written policy regarding whether and under what circumstances there are effective services that can protect children following a finding of severe abuse. Standard parenting coaching should never be used to address severe abuse and violence.

2. The Service Plan for any case that comes to the Department as a result of severe abuse, must be subject to DCFS clinical review within the first 60 days. The review must focus on whether the Service Plan addresses the parenting problems that caused the harm to the child. The case should continue to be clinically reviewed every 6 months.

3.  Program plans for parenting classes, coaching and mentoring must require rigorous standards for developing a baseline of behavior and goals and measurement of change.

4.  The Department should pursue legislative change to permit expedited termination for severe abuse cases in which DCFS Clinical has determined that no services can correct the presenting problem.

5.  *This recommendation addresses personnel issues.*

6.  *This recommendation addresses personnel issues.*


**- END OF REPORT -**

# OFFICE OF THE INSPECTOR GENERAL
## Department of Children and Family Services

<div style="border">

*REDACTED REPORT*

</div>

*This report is being released by the Office of the Inspector General for teaching/training purposes. To ensure the confidentiality of all persons and service providers involved in the case, identifying information has been changed. All names, except those of professional references, are fictitious.*

**File No:** 15-2385

**Subjects:** Cook County Runaways and Shelter Care Facilities

## SUMMARY OF COMPLAINT

In January 2015, the Office of Inspector General received a complaint that in December 2014, a 14-year-old DCFS ward was refused re-admittance to Alpha Shelter on two occasions after returning from run. The complaint also referenced another 14-year-old girl who was left in lockup overnight after being sexually assaulted while on the run from Alpha Shelter in July 2014.

## INVESTIGATION

### I. The Shelter Care System

The Department currently has a shelter system in Cook County composed of:
- Alpha Shelter
- Bravo Shelter
- Charlie Shelter
- Delta Shelter
- Echo Shelter
- Foxtrot Shelter

Alpha Shelter is for females between the ages of 14 and 16 who are not pregnant or parenting. Charlie Shelter serves only pregnant and parenting females between the ages of 14 and 21. Delta Shelter and Echo Shelter provide services to males between the ages of 15-21 and 14-18 respectively. Foxtrot Shelter works with infants and young children as well as sibling groups between the ages of 0-3. Finally, Bravo Shelter provides care to youth from infancy to age 21, both male and female.

The only emergency foster care available in the Cook County shelter system is the Foxtrot Shelter program. Foxtrot Shelter accepts children ages 0-3 and older if part of a sibling group.

Other than by broad age categories and gender, Cook County shelters are not programmatically specialized by populations, such as youth with serious mental health diagnoses, youth with violent histories and involvement with the criminal justice system, or developmentally disabled youth.[1]

**Alpha Shelter**

Alpha Shelter is located in a suburb of Chicago and served a female population of DCFS wards ages 14-16 with a capacity for 15 girls.  The Department closed Alpha shelter in January 2015. The shelter operated under the auspices of the Omega Agency, a not for profit agency that also operated the Alpha Mental Health Clinic located about five miles from Alpha Shelter in another suburb of Chicago. The Alpha Mental Health Clinic is not funded by DCFS and received funding from Healthcare and Family Services.

Under the FY 15 Contract with DCFS, Alpha Shelter received a rate of $395 per girl per day, with a guaranteed monthly payment of $130,712 each month regardless of the number of girls in residence. This translates to guaranteed compensation based on occupancy of 11 girls. [According to Department data, the actual daily population was under seven.]

*Arson Incident*
In August 2013, two DCFS wards, who were residents at Alpha Shelter, were arrested for the offenses of Aggravated Arson, Criminal Damage to Property, and Assault. The first two charges stemmed from the girls being accused of starting a fire in the second floor bathroom of the facility, the latter from alleged verbal threats conveyed to a staff member.

The two girls involved in this case were arrested and placed in the Juvenile Detention Center. Both girls pled guilty to one count of Arson and received probation for five years in Juvenile Court. They remain wards of DCFS and are currently in foster placements. One of the girls has a history of several psychiatric hospitalizations and, at the time of this incident, had been at Alpha Shelter for several months. Monitoring notes during this period noted serious deficiencies at Alpha Shelter in delivery of therapeutic services.

The arson was preceded by verbal aggression to a staff person who locked herself in the second floor office for protection. There is no documentation of which other staff members were on duty at the time and what their response was to the resulting chaos. After the incident, the local Fire Department identified numerous fire code violations, including the need for a sprinkler system. The other residents had to be moved to a motel on an emergency basis, for several weeks, while repairs were completed on the facility.

*The Department's Monitoring of Alpha Shelter*
The Department's Agency Performance Team monitor, Micah Lloyd, monitors Alpha Shelter's performance. She was supervised by Harper Cottam and later by Raven Parsons. In response to various incidents and complaints from child welfare professionals, Agency Performance Team monitors put Alpha Shelter on a Corrective Action Plan in September 2013. Alpha Shelter management consultant, Jude Grainger, authored the plan (See Table Below). Although the

---

[1] Note however, that in Bravo's description of the Children's Reception Center, Bravo claims to have "*clinically matched 369 children and youth*" in calendar year 2014 "*to specialty shelters, ensuring that each youth referred to a shelter in Cook County offers programming to advance their skill sets ad secure permanent placement*."

Corrective Action Plan was put in place the month after the arson incident, the Plan did not address the arson incident. When questioned by Inspector General staff, Monitor Micah Lloyd stated that she did not make any inquiry at the time of the arson incident regarding staffing levels and responsibility.

Table:  Alpha Agency Corrective Action Plan September 2013

| IDENTIFIED PROBLEM | IDENTIFIED SOLUTION | STATUS of IMPLEMENTATION |
|---|---|---|
| Girls remain in bed till noon | 1. Make the facility less inviting;<br>2. Retrain staff on engaging youth;<br>3. Institute daily incentive program for girls;<br>4. Alpha Shelter Management would explore TIER System and visit other shelters to see what new practices could be incorporated. | 1. No Update Provided<br>2. No Update Provided<br>3. No Update Provided, but the DCFS monitor documented in a January 2015 memo that the facility had implemented an incentive program.<br>4. There is no management report generated from visiting other facilities. |
| Poor documentation of required medicals | 1. Arrangement with local doctor to take girls without appointments.<br>2. Train staff to document girls' refusals. | In a memo dated January 2015, the monitor noted that compliance with medicals had gone from 33% to 60%. |
| Lack of Required Therapy | Have the Program Manager (Dr. Moran Hudson) take over provision of therapy; increase therapeutic session compliance from 41% to 60%. | Dr. Moran Hudson became the therapist. In January 2015, the monitor documented that this change seemed to have improved therapeutic compliance. |
| Lack of Computers | Purchase additional computers. | Never accomplished. |
| Only 21.5% of girls attending school | Increase school attendance by 25% and decrease absences by 10%;<br>Use online learning systems. | School attendance was increased by 25%. Since the lack of computers was never addressed, it is assumed that online learning systems were not implemented. |
| No supervision on 1st shift | Identify supervisor | Completed |
| Poor overall documentation | *No Solution Identified* | No documentation or analysis of whether this was addressed. |
| Common areas dark and depressing − not cleaned. | 1. Spruce up living room and dining room with new paint and furniture;<br>2. Have local church adopt girls' bedrooms to sponsor redecorating;<br>3. Have bathrooms and sinks cleaned every day. | Dining and Living areas painted and redecorated, according to Corrective Action Plan updates, however, when Alpha Shelter was closed in January 2015, Cook County Sheriff's staff noted the dark and depressing nature of the furniture in the shared areas. |

Ironically, one of the solutions in the Corrective Action Plan for the girls staying in bed till noon was to make the common areas less attractive – while the plan later called for sprucing the place up because it was so depressing.

In order to monitor the Corrective Action Plan and address other ongoing concerns – Department monitors visited Alpha Shelter **90 times** in 2014.

*Other Monitoring Concerns*
In addition to the Corrective Action Plan, monthly monitoring reports in 2013 and 2014 identified other issues at the facility:

- There were over 1600 run episodes in 2013 and 2014. The monitoring reports for 2014 contain several references of girls being observed leaving the facility unnoticed by staff. The first reference in the monitoring notes addressing the need to alarm the doors, through which girls can exit the living area and the building, occurs in September of 2013. In November 2014 a note by the Monitor states, "The agency has not yet made a determination on rather (sic) or not to install an alert system on the upper, lower and front entry doors." There is no explanation as to why the agency was reluctant to accomplish this, despite hundreds of runaway episodes. When interviewed, Gracie Moran Hudson, the Program Manager, stated that this was a decision made by the CEO Russell Wagner.

- There are frequent references to staff using security cameras instead of in person room checks. When in-person room checks were conducted they were often at predictable times. When interviewed, the Program Director, Gracie Moran Hudson, admitted that adherence with room check policy was a continuing problem.

- Girls returning from run were frequently not being searched.

- There were several complaints about the lack of hot water and the necessity of having a male staff member open a valve on the heater to provide it. There is no mention that a repair was accomplished to alleviate this problem.

*Staffing and Ratio Requirements*
According to the Program Plan for Alpha Shelter, the required child-to-staff ratio is 4:1 and this must be maintained 24/7. DCFS monitoring reports that ratios are appropriate only due to youth being AWOL. In other words, if those youth currently on census (girls gone less than 24 hours) returned to the facility, staffing would not be appropriate. In this regard, it is important to note that Alpha Shelter was compensated by the Department at a guaranteed rate to support a daily population of 11 girls. The actual average daily population, however, was 7 girls. In an interview with Dr. Gracie Moran Hudson in April 2014, she reported that her facility often used interns to meet the child-to-staff ratio of 4:1. In an interview with Inspector General investigators, the program monitor believed use of interns to meet staffing ratios is acceptable and never had questioned why paid staff was not present.

When the number of staff was listed, the reports frequently did not specify who they were and whether they should be included when calculating ratio compliance. Twenty monitoring reports completed in 2014 described the facility as being out of staff/ratio compliance. It was also noted that Alpha Shelter included interns in the staff-to-client ratio. The Monitor confirmed to Inspector General investigators that Alpha Shelter included interns in their ratio. The Monitor

stated her belief that using interns to meet ratio requirements was acceptable, but never questioned where the money for paid staff was going.

Alpha Shelter staff did not provide transportation to school for the residents. Some attended school in Chicago and in order to get to school would have to take a suburban bus to a Chicago transit hub, an 80 to 90 minute bus ride, and then proceed by bus or train to their schools. This is a very time consuming trip. The Alpha Shelter did not have an Educational Coordinator to monitor the attendance of the residents and their school performance. There were no in-house ancillary educational programs.

*Concerns of Other Professionals*
In addition, local police and other professionals voiced complaints about Alpha Shelter:

- According to the local Fire Department, the agency made no progress in addressing safety concerns identified in September 2013 after the fire. Because of continued non-compliance, the facility was closed and forced to make these repairs between late April and mid June 2014.

- The local Police Department complained frequently about the number of calls to the facility and the voluminous missing person reports and the lack of documentation of runaway returns within 24 hours. Officer Bethany Alvarez told Inspector General investigators that the police responded to 386 calls to the facility in the first three months of 2014, the majority of which were for runaway residents. However, the police also responded for calls because fighting between the residents and other issues. She further indicated that the staff was slow to call the police and frequently did not provide adequate information such as the license plate number of the automobile into which runaway girls had entered upon absconding from the facility. She stated that girls who were arrested in the community for Theft frequently were caught shoplifting personal items such as toothpaste, soap, and feminine products. Officer Alvarez related that the girls, with whom she spoke, complained of a lack of activities at Alpha Shelter and that when she visited the facility, the staff was frequently in the office and not interacting with the residents.

- In 2014, the Cook County Public Guardian, his Deputy in charge of the Juvenile Division, and the Cook County Sheriff, wrote several letters to the DCFS Directors regarding concerns they had with Alpha Shelter. In August 2014, the Cook County Public Guardian's Office sent a letter to the then-Director of DCFS complaining that 14-year-old Hazel Bauer was forced to spend a night in lockup, after being sexually assaulted, because no one was available to pick her up from the police station (see discussion below). The letter also expressed concern about the high number of runs from the facility. In December 2014, the Cook County Public Guardian wrote again to complain about the facility's inability to control girls' eloping from Alpha Shelter and engaging in sex trafficking. On December 31, 2014, the Cook County Sheriff wrote a letter to the then Director of DCFS in which he complained about the treatment of Hazel Bauer, Viola Norton (see discussion below), the high number of runs, and the poor physical condition of the facility. The Cook County Sheriff stated that his staff, "…was stunned by the facility's accommodations for these girls." He stated that the computer lab had four computers that looked like they were a decade old. He described the furniture as "beaten and stained."

- In February 2015, the Office of the Cook County Public Guardian recommended to the Director of DCFS that Alpha Shelter not be allowed to re-open at a new location.

None of these additional concerns were included in the pending Corrective Action Plan.

*Transportation Issues*

According to Department Procedure 329, when a youth has been absent without permission for more than 24 hours, the facility must complete a 906 Form, which discharges the youth from the program. After discharge, according to Procedures, the youth must go to the CRC for intake before returning to a shelter. Prior to 2012, the CRC had transporters who could pick up any identified youth who had been on run and bring them to the CRC for intake. In 2012, these positions were eliminated from the CRC. Since the elimination of the transporter positions, responsibility for transporting youth who had been on run was an unresolved problem.

According to Leah Estes, Statewide Shelter Coordinator, she and CRC Administrator Abby Conway partially addressed the transportation problem in April 2014 by arranging for telephone intake by the CRC for youth returning for run who had been discharged from the program (gone more than 24 hours). Ms. Estes acknowledged that the new practice was never put in writing. She stated that the practice was orally communicated to Shelter staff in April 2014. Ms. Estes had prepared a written document to reflect the new policy but it was never transmitted to shelter staff. The draft document prepared by Ms. Estes in April 2014 states the following:

- If the youth has been on run for less than 24 hours, they can be readmitted without CRC intake;
- If the youth has been on run more than 24 hours *but less than 48 hours*, CRC will complete intake over the phone.

The draft document is silent regarding procedure for youth returning who have been gone longer than 48 hours.

Ms. Estes stated that she never shared the draft document because her manager, Dean Young, told her to communicate it orally only. Mr. Young confirmed to Inspector General staff that he gave instructions *not* to put the policy in writing. He stated to Inspector General staff that he does not like to put policy in writing because he believes that oral instructions should be sufficient.

When interviewed for this Report, Dr. Lloyd stated that to her knowledge, youth were still required to physically go to the CRC before they could be readmitted after discharge. Staff at Echo Shelter also told Inspector General staff that as of June 2015, it was still their understanding that once discharged, youth had to go to the CRC before they could be readmitted.

An incident in July 2014 involving a ward who had run from Alpha Shelter brought the transportation problems to a head. In July 2014, local police contacted Alpha Shelter after 11 p.m. to alert them that they had a 14-year-old ward, Hazel Bauer, and requested that Alpha shelter staff pick her up.  Hazel had been on run from Alpha Shelter for three days. The police had picked her up from the hospital, where she had been treated as a victim of sexual assault.

According to UIRs and emails completed by Alpha Shelter staff, the local police contacted Alpha Shelter and were told that they needed to call the CRC to pick her up. When the police called the CRC, the CRC had no transporters available. No one arrived to pick Hazel up and she

wound up spending the night in lockup. The next day, the local police brought Hazel to Alpha Shelter and Alpha Shelter staff transported her to the CRC for intake.

Five days later, Alpha Shelter asked the Department to clarify in writing the appropriate procedure for girls returning from run who had been gone longer than 48 hours.

Department monitor Micah Lloyd stated that Alpha Shelter was orally informed in September 2014 that youth returning from run should never be turned away, regardless of how long they had been gone. In December 2014, this policy was put in writing and issued.

*Media Coverage*
Beginning in early December 2014, the Chicago Tribune published a series of articles highly critical of the Department's residential facilities, including Alpha Shelter. The article noted that in 2013, the facility had contacted the police for assistance 2000 times, including 994 run incidents. In addition, the article noted that the facility was shut for 2 months in the summer of 2014 after the local Fire Department declared it unsafe.

*Viola Norton*
In December 2014, the Department received complaints about Alpha Shelter after it turned away, on two occasions, a girl who was returning from run. In November 2014, 17-year-old Viola Norton was placed at Alpha Shelter from the CRC. She had been a ward of DCFS since 2007. Her mother had been murdered by her father. There were allegations that she had been the victim of physical and sexual abuse in that home. She moved to Illinois to live with her great aunt and while in that home there were allegations of incestuous sexual contact between Viola and her siblings.

Subsequent to her placement in DCFS custody, Viola was hospitalized for psychiatric treatment on a number of occasions. These inpatient stays took place at three hospitals in Chicago and at one hospital in a town over three hours away. Viola received multiple diagnoses, including Major Depressive Disorder and PTSD. She had several failed foster home placements and in each one the foster parents complained of sexualized behavior. As early as age 12, Viola admitted to engaging in sex with adult men while on the run.

Prior to her arrival at Alpha Shelter, Viola was placed in the Victory Residential Treatment Facility, in a town over two hours from Chicago, in June 2013. Her stay there was characterized by frequent runaways during which she engaged in prostitution, alcohol and drug abuse, and other dangerous behaviors. She was hospitalized twice while at Victory because of suicidal behavior. She was on a prescribed psychotropic medication regimen for the entire time she was in placement. During one of her runaways from Victory, she was arrested in Chicago for Prostitution and returned to that facility through the CRC. In April 2014, Viola went on run from Victory after she had been returned to the facility by the local police department the previous day. She remained at large until November 2014. In September 2014, her caseworker was notified by the FBI that Viola had been identified as a potential victim in a child prostitution investigation.[2]

On November 18, 2014, the police brought Viola to the CRC. She was then placed at Alpha Shelter, from which she promptly ran away. The court issued a Child Protection Warrant on November 21. A hand written note in the file indicates that Viola was at CRC on November 22

---

[2] The Victory Residential Facility closed in April 2015, after being the subject of ongoing negative reports in the Chicago Tribune.

and that it was decided that she needed to go to Charlie Shelter "for safety reasons." It is unclear from the file but apparently she ran away before that placement could be effected. There is also a note in the file that contended she had a SASS evaluation at Alpha Shelter and had been deemed in need of hospitalization but had run before that could be arranged.

On December 4, 2014, Viola presented herself at Alpha Shelter and was not allowed inside the facility. She was told to go to the CRC in Chicago and was not transported there by staff. She reported this incident by phone, on December 10, to her Guardian *ad Litem* (GAL). The Guardian *ad Litem* arranged for her return to Alpha Shelter. There is a hand written note in the file referencing a conference call between the caseworker, the GAL, Celine Ingram (DCFS Legal), Leah Estes (DCFS Statewide Shelter Coordinator), Elaina Joyce (Cook County Assistant Public Guardian), and Dr. Gracie Moran Hudson (Program Manager at Alpha Shelter). The call indicates that concerns were raised over the safety of Viola in the area surrounding Alpha Shelter. The note indicates that the GAL thought Viola would be safe at Alpha Shelter. It was decided that she should be returned to that facility.

Dr. Moran Hudson stated that they objected to the placement of Viola in their program because they were aware that she had been involved in illicit sexual activity in the area in which their facility was located. She described the 14-year-old girl as looking like a "grown woman" when she entered the shelter. Dr. Moran Hudson complained that she was only placed with them because the GAL insisted. The GAL stated that she only wanted the girl placed at Alpha Shelter because she hoped she would not run from there.

Staff from the Office of the Cook County Public Guardian claimed to Inspector General investigators that at the mid-December meeting, it was decided that the staff at Alpha Shelter would never again turn away a child who had been on run. However, this agreement was never put in writing and Dr. Moran Hudson denies that there ever was such an agreement. She stated that the only outcome of the meeting was that the Department instructed her to readmit Viola on that occasion.

Once returned to Alpha Shelter in early December, Viola eloped again. She traveled to Minnesota and an Interstate Child Protective Warrant was issued on December 24, 2014.

On December 27, 2014, Viola once again returned to Alpha Shelter and was not allowed to enter the facility. She contended that on both occasions she was not physically allowed inside the premises. She was instructed, as before, to make her way to the CRC by herself, which, as with the previous occurrence, did not happen. Dr. Moran Hudson stated that Viola arrived in a car driven by an adult woman. Without any staff at Alpha Shelter having any conversations with the driver, Dr. Moran Hudson insisted that the woman would drive the girl to the CRC. She based this judgment on the unsupported belief that the GAL knew the driver because Viola was on the phone with her GAL when she arrived at Alpha Shelter. The Public Guardian's office categorically denied that the girl's attorney had any knowledge of the driver. Dr. Moran Hudson admitted that the staff made no attempt to ascertain who this woman was or to record the license plate of the vehicle.

There is no indication that the staff of Alpha Shelter, at any time, contacted the local police department, CIRU, or anyone regarding this child attempting to return to their facility, despite the fact that she had an active Child Protective Warrant on both occasions and had a significant mental health history and a history of being a victim of sexual trafficking.

A case note, dated December 31, 2014, indicated that Viola had called the police and identified herself as a runaway and requested help getting back into DCFS custody. The note states that from the CRC, she was placed at a transitional living and treatment program 50 miles from Alpha Shelter on that date.

*Department Response*
DCFS closed intake to Alpha Shelter in January 2015. On January 15, 2015, the Department held a meeting to discuss the status of the program. Micah Lloyd, the DCFS monitor assigned to Alpha Shelter, prepared notes from that meeting. The notes indicated that six DCFS administrators, including Raven Parsons and Harper Cottam, Micah Lloyd's supervisors, were present. Russell Wagner, the CEO of Omega Agency, Gracie Moran Hudson, and consultant Jude Grainger represented Alpha Shelter. The notes stated, "It was determined that the agency's location is no longer conducive for the population that it served i.e. the community does not support agency – village and law enforcement." The notes further stated that DCFS was asking the agency to consider relocating their shelter and to submit a plan to DCFS within two weeks.

The monitoring notes from the staff meeting of January 15, 2015 indicate that Alpha Shelter conducted an internal review of the two incidents involving Viola Norton. The monitoring notes also indicate that "a copy of an internal report was shared with today's participants." Inspector General staff interviewed staff from monitoring, the GAL's office, and Alpha Shelter. No one interviewed had a copy of the internal review document. Dr. Gracie Moran Hudson stated that she deleted all documents and files related to the shelter from her laptop after intake was closed.

**Management Staffing**
*Salaries for Lobbying and Fundraising*
Russell Wagner, the Executive Director of Omega Agency, is paid an annual salary of $100,355. Irene Dillon Moran, President and Clinical Director, is paid an annual salary of $84,000. According to the IRS 990 for the Omega Agency, d/b/a Alpha Shelter, Mr. Wagner, Ms. Moran, and Gracie Moran Hudson are full-time employees of Alpha Shelter and in FY 13 drew the following salaries: $100,373, $84,829 and $82,246, respectively. Gracie Moran Hudson also worked as the Clinical Manager for Alpha Mental Health Clinic, which is funded by the Department of Healthcare and Family Services.

In 2013, a Field Audit by the Department noted that Alpha Shelter did not have a cost allocation system. In response to the Field Audit, Alpha Shelter prepared and submitted a cost allocation system. There is no indication that the auditors tested the validity of the new cost allocation system. There is no indication, either through program or financial monitors that anyone inquired about Dr. Moran Hudson's allocation of time between the two Alpha facilities (the Shelter and the Mental Health Clinic).

Neither Mr. Wagner nor Ms. I. Dillon Moran were documented as being present for any of the numerous monitoring visits that occurred between June and December 2014. When Office of the Inspector General staff interviewed the Clinical Director of Alpha Shelter, Dr. Gracie Moran Hudson (Ms. I. Dillon Moran's daughter), she stated that neither Ms. I. Dillon Moran nor Mr. Wagner was at the Shelter on a day-to-day basis. She stated that both of them are largely tasked with development, fundraising, and lobbying activities on behalf of Omega Agency. The program monitor for the Department, Micah Lloyd confirmed that both Mr. Wagner and Ms. I. Dillon Moran served purely administrative functions. Rule 356 Rate Setting sets out disallowable expenses. 89 Ill.Adm.Code 356. Section 356.60 sets out disallowable costs. Included in Disallowable Costs are the following:

f) compensation to non-working owners and officers; . . .
i) fund-raising; . . .
j) revenue producing expenses; . . .
s) expenses relating to the development of bids or proposals; . . . and
x) other costs not reasonably related to services.

Since some portion of Mr. Wagner and Ms. Moran's time appear to have been spent on disallowable activities, the Department should determine what portion needs to be recovered in excess revenue.

*Salaries for Administrative Expenses in Excess of 20% Program Costs*
Rule 356 Rate Setting, governs reasonable reimbursement rates for services. 89 Ill.Adm.Code 356. Rule 356.50 provides that an agency cannot be reimbursed for administrative costs that exceed 20% of program costs. It is an important Rule to ensure that State funds are being used to benefit children and families and not to support a top-heavy administration. If an agency is paying higher than 20% for administrative costs it is reasonable to believe that the children are getting short-changed.

According to a Staff Roster that Omega Agency provided to Department auditors in FY 13, the Shelter supported the following full or partial management/administrative salaries:

| | |
|---|---|
| Director, Russell Wagner | $100,355 |
| I. Dillon Moran | $ 84,000 |
| Operations Manager | $ 72,000 |
| Account Technician | $ 61,000 |
| Management Consultant, Jude Grainger | unknown |

Each of the above salaries could have associated fringe benefits of up to 25% of the salaries. In addition, the agency contracted with a management consultant. These costs would exceed the 20% administrative cap.

Inspector General staff asked financial audit staff whether they had reviewed administrative costs and learned that financial audit considers the question of administrative costs to be purely the responsibility of the program monitor. Inspector General staff questioned the program monitor, Micah Lloyd and her supervisor Raven Parsons. Both reported that the question of administrative versus direct costs was purely for financial audits.

*Related Party Transactions*
The Department is limited in the amount of reimbursement it can provide for rent when the owner of the rented facility is related to the contracting entity. Rule 356. 89 Ill.Admin.Code 356. Omega Agency owns Alpha Shelter. Because of that affiliation, the Shelter could only be reimbursed for actual costs incurred (mortgage fees and taxes). According to the FY 2013 Consolidated Financial Report, the Committee claimed $185,311 for "occupancy expenses." The Department needs to ensure that Related Party expenses of Alpha Shelter were not paid in excess of Department Rules.

The 2013 Field Audit did not address the ownership of the facility and whether Omega Agency was getting reimbursed in excess of what is allowable for related parties.

**Bravo Shelter Children's Reception Center**

Bravo Shelter CRC is the main temporary shelter for DCFS wards in the Chicago area. Of the 22 police districts in Chicago, the district in which the shelter is located is ranked 14th for Index crimes, an FBI classification system. It is designated as the facility through which children pass on their way to other shelters, residential treatment, and group homes. Some have come from disrupted placements and failed adoptions. Bravo staff handles the admissions functions and do a clinical and health assessment of all youths entering the program. The entire age range of DCFS wards is represented by residents at Bravo Shelter, namely ages 0 to 20 years. This presents a unique set of issues relative to programming, safety, and security.

The facility is located in Chicago. At the time the Inspector General investigators visited, the facility itself was clean and well kept. The living areas were attractively furnished and well supervised. The furnishings and décor were appropriate for the age ranges for which they were designated. There were adequate areas for recreation and other programming. The computer room had up to date equipment.

The program is staffed and licensed for 50 residents. The staff-to-client ratio is one staff person for every four residents. There are three security staff on duty at all times. Security staff and supervisors are not included in the staff-to-client ratio. The ratio is determined on the maximum capacity of the facility, not on the actual population. Consequently, it is unlikely the facility would be out of compliance in its staff-to-client ratio due to population fluctuation.

During the calendar year 2014, 589 youths were processed through Bravo. Of these, 369 youth were sent to other shelters. Abby Conway, Senior Vice President for Foster Care and Shelter Services and Norah Oliver, Program Director, told Inspector General investigators that on a daily basis they deal with the daunting issues of caring for a population characterized by a wide range in age. The percentages of their population, by age range, broke down as follows during 2014; 0-6: 28%, 7-13: 32%, 14-16: 21%, 17 and older: 19%. The first floor of the facility is designated for residents age 0-6. These include infants who have been taken into protective custody. The staff on this unit is trained specifically to work with children in this age range. The children on this wing are awaiting appropriate foster home placement.

Upstairs, one floor is devoted to female and the other to male residents. Each floor is divided into two wings. One wing is devoted to residents age 7-13, and the other for residents ages 13-21. The wings are separated by a common area that contains a control center that is staffed, according to the administration, at all times. Policy requires room checks every 15 minutes during hours in which residents are on the unit.

Meeting the goal of protecting all residents can be difficult using this model. Housing wards ages 7-20 on the same floor presents significant security and safety issues. A Chicago Tribune article, dated 1-8-13, indicated that the police were called to the facility 2063 times over three years. The majority of these calls were for residents who had run away, although there were 80 calls for fights between residents. The article indicated that more than two dozen youths sheltered at Bravo Shelter were arrested between 2010 and 2013. In the spring and early summer of 2014, several critical events brought more public scrutiny on the Shelter. In 2014, Bravo Shelter had a total of 1088 runaway incidents; 90% (982) of these runaways occurred between January and July of that year. In May, over 300 runs were reported; in June, 224 runs were reported. In June, three residents of the shelter were out in front of the Shelter without supervision after curfew when they were shot. One child was an 11-year-old girl. Later in the summer of 2014, a local State Senator filmed a 13-year-old girl who was in front of the Shelter

at midnight. A young boy was also with her. Gunshots could be heard in the background. In response to these continuing problems, a runaway prevention protocol was developed in consultation with UIC Department of Psychiatry. Subsequently, Bravo Shelter installed 15-second time-delay locks on all exit doors, including the internal exit doors from the units, and stationed staff at the exit doors between the hours of 8 PM and 6 AM. Security is stationed at the main entrance. The system was designed to give staff the opportunity to intercede when a resident is attempting to exit the building. Bravo Shelter staff may use restraint techniques on a resident who is considered to be a risk to themselves or others to keep them from leaving the premises.[3] They are unique amongst the four shelters which were evaluated for the utilization of this restraint to prevent wards as those described above from running. Ms. Conway stated that restraints are very rarely used to prevent a runaway. The agency had a drop of reported runs in subsequent months. By November of 2014, the majority of reported runs (under 50) occurred while residents were on community pass or at school.

Ms. Conway and Ms. Oliver contend they have addressed community concerns aggressively in the last year. In addition to three security staff on duty at all times, they have a security coordinator, who like the rest of the security staff is an off duty Chicago police officer. They maintain contact with the local police district and the Special Victims Unit regarding the status of residents for whom they have filed missing person reports. They also keep up with developments in the community surrounding the facility. There is an extensive security camera system and the control room where the monitors are located is staffed by security 24 hours a day. Ms. Conway and Ms. Oliver stated their belief that their recreational and clinical programming meets the individual needs of these residents. Similar to all shelters, the residents of Bravo Shelter attend various schools throughout the area, usually in their community of origin. According to the administration, staff transport the residents to the schools and back to the facility at the end of the school day. The staff includes an education specialist who addresses the individual educational needs of each resident and coordinates with their assigned school to attempt to ensure that their educational needs are being met.

Nevertheless, the difficulties presented by having this age range of residents were demonstrated by an incident that occurred in February 2015 at Bravo Shelter. A 20-year-old DCFS ward, Titus Sweeney, was released from the Cook County Jail in January 2015 after being given a sentence of probation on a Robbery charge. He presented himself to Bravo Shelter and was admitted on the day of his release. On February 4, 2015, he was acting in an aggressive and threatening manner on the wing designated for older boys and was confronted by one of the security staff on duty. Titus attacked the security staff and caused him bodily harm. The youth was arrested and charged with Aggravated Battery on a Peace Officer. Several weeks later, he was convicted and sentenced to five years in the Illinois Department of Corrections. The Staff contend that this ward was given the option of leaving the facility but he seemed bent on acting violently. There is no indication that anyone at this shelter acted improperly or imprudently in regards to this incident but it clearly highlights the difficulties posed by having this range of age populations housed in one facility.

Bravo Shelter and other shelters must contend with varying ranges of mental health status among their residents and the dearth of pertinent information available to the staff upon entry; information on previous psychiatric hospitalizations and psychotropic medication is not available. Bravo Shelter has three clinicians and a Clinical Manager. There was an Art Therapist on staff until recently and they are attempting to find a replacement. Administrative staff believes that regular guided activity is key to discouraging both runaways and aggressive

---

[3] Staff is trained in TCI, the restraint protocol which they employ.

behavior toward peers and staff. Therapeutic groups are conducted three times weekly and individual therapy is offered for all residents, although some refuse. There is a physician on duty daily and a dentist available weekly in the medical wing. Every child entering the shelter is required to have a medical assessment. Some have been on run from other shelter care facilities and need medical triage before they can be returned or placed in a different program.

Relative to educational and mental health needs as well as run risk, the administration of Bravo Shelter complained that pertinent information does not accompany youths who are entering the program. This is especially true of children who have been recently taken into protective custody and are awaiting assignment of a caseworker. They contended that 25% of the information with which they are provided is inaccurate. They complete the ISPA (Initial Screening) within 24 hours but are unable to do so accurately without complete background information. This is especially crucial for Bravo Shelter because they are attempting to match the wards in their care to other shelters and placements. They are not given access to SACWIS, which would allow them immediate access to medical and educational information and support system.

The staff interviewed voiced complaints about the caseworkers assigned to the wards housed at the shelter. They contended that an attentive worker was an outlier, the exception rather than the rule. They complain that this heightens their residents' anxiety, especially those who are waiting for information to arrive so that they can complete intake into the program. They complained that workers, as a rule, do not visit their assigned wards on a weekly basis, as required.

Ms. Conway and Ms. Oliver explained staff attempts to differentiate between impulse runs and planned runs. Residents frequently run because their caseworkers refuse them a community pass and they might want to do something as mundane as go to the local convenience store. Staff may offer to accompany the youth on this outing but wish they had more latitude and discretion in granting community passes. They believe that the assigned caseworkers are frequently unduly risk averse in this regard. They would like to link this privilege to appropriate behavior on the unit and would also like to eliminate the need to file a missing person report on an older ward whose whereabouts are known and who will probably be returning to the program within a reasonable period of time. If credible information is available as to the whereabouts of a resident on run, staff will go to that location and attempt to return the ward to the facility. Failing that, that information will be shared with law enforcement.

Bravo Shelter administration believes that staff's compassionate "welcome back" of runaway youth lowers runaway episodes. Upon the youth's return, staff ascertains the reason the resident ran and assures them that staff is not only glad to have them back but that they will try and ameliorate any concerns that may have contributed to the run. The shelter staff completes the CFS 680-A debriefing form with the youth. However, the form is infrequently requested by DCFS. This underscores the deficiency alluded to in the Auditor General's Report (See discussion below). If designated staff at Bravo Shelter had SAWCIS access, their staff could electronically fill out the debriefing form, making the information immediately available for caseworkers, Child Intake and Recovery Unit (CIRU), and other shelter staff.

**Charlie Shelter**

Charlie Shelter is a shelter designed to serve a specific population of 20 pregnant, parenting wards and older adolescent girls ages 14-20. For the parenting wards, the shelter can accommodate 15 of their infants/children. Of the 22 police districts in Chicago, the district in which the shelter is located is ranked 7th for Index crimes. According to the Director of Charlie

Shelter, the Program Manager, and the Family Services Division Director of Charlie Shelter, Yasmin Li, 75% of the population is either pregnant or parenting, although not all of the parenting youth have their children with them. At the time of the Inspector General visit, the facility was very clean and well furnished. There were adequate areas designated for recreation. The computer room had up-to-date equipment. The area of the facility designated for mothers and their children was appropriately decorated for that purpose.

Statewide TPSN data shows most wards are 19 at the time of their first pregnancy. Because of their unique population, most of the programming at Charlie Shelter targets the special needs of pregnant and parenting teens. The staff reported that they did their best to individualize their treatment plans to fit the needs of each resident. Parenting wards and their children are kept in a separate wing. The average length of stay for these residents is 90 days. The persons interviewed for this report complained that caseworkers were generally not in regular communication with wards and rarely met the weekly visiting requirement. They stated this made their job more difficult because the wards were more likely to feel neglected and prone to oppositional and runaway behavior.

The staff interviewed reported that girls entering the shelter come with little or no documentation regarding run history, mental health background, etc. This makes it difficult to prepare individualized treatment plans. The program maintains a 1:5 staff-to-client ratio; only regular child care staff are included in that calculation. The staff-to-client ratio is based on maximum capacity, not on the current census.

Similar to other shelters, the girls at Charlie attend school off campus for the most part. They take public transportation to school and return to the shelter in the same manner. Charlie Shelter also has a unique on-grounds school alternative. They utilize an online learning program for residents who have difficulty at their regularly assigned school or who have been out of school for a significant period of time and need to adjust to being back in a learning environment.

During 2014, there were 867 run episodes from Charlie Shelter. There were as few as 17 that January and as many as 124 in July. In January 2015, six former residents of Alpha Shelter were transferred to Charlie Shelter. Yasmin Li indicated that they immediately became run risks. One of the girls who transferred from Alpha Shelter remains at Charlie Shelter as of this writing. The staff reported that mothers almost always run with their children. If a parenting teen absconds from the shelter and leaves her infant/ child behind, that young mother can be cited in a Neglect petition for abandonment. The shelter considers not only the ward on the run at risk, but also her child. Charlie Shelter utilizes a crisis nursery in order to avoid the abandonment charge for the runaway ward and discourages residents from running with their child.

Charlie Shelter utilizes incentives to discourage residents who are chronic runners from absconding. They state that they try to individualize the incentives to have the optimal effect for any given ward. They also have written action plans for girls with significant run histories.

Charlie Shelter did not have a detailed run prevention protocol such as that recently put in place by Bravo Shelter. The Charlie Shelter administration stated that their run statistics are distorted by the fact that many of the run episodes are precipitated by the inability of the resident or staff to obtain a community pass. For example, a resident wishes to go a local store but the caseworker is unavailable to authorize a community pass. Staff reported it is not uncommon for the girls in this circumstance to phone the facility and apprise the staff of their whereabouts. The facility Director explained that very few girls "sneak" out of the facility, rather they announce that they are doing so. If a resident leaves, staff can only watch her leave and report

her missing to law enforcement. Charlie Shelter does not utilize any restraint techniques to stop girls from leaving the program, even if they feel they have potential to harm themselves or others. They do not believe it would be safe to do so due to the physical size of many of the girls in the program and the fact that a number of them are pregnant. As far as physical impediments to running are concerned, while Charlie Shelter does have alarms on every door, they are not currently operable, since administration decided that alarms were unnecessary because staff and clients are all on the same floor and the clients are always in sight of staff.

**Delta Shelter**

Delta Shelter is licensed and designed to serve male wards ages 14-20 with 16 beds. The agency's Director and Associate Director indicated that in the recent past they have frequently been operating at capacity. The entire facility is on one floor. The facility was clean and well-kept when visited. The living area was somewhat sparse, but adequate. There were areas designated for recreation and a computer room with up to date equipment.

The shelter is located in Chicago. Of the 22 police districts in Chicago, the district in which Delta Shelter is located is ranked 11th for Index crimes. There are three off-duty Chicago police officers on staff to provide security. Residents of the shelter come from all parts of the city and suburban Cook County, as this is the only shelter that serves this population. As of the initial time of this report, the facility's management was seeking to move to a new location in a different police district in Chicago in September 2015, pending city zoning approval. The shelter has since moved.

The administration states that they maintain a staff-to-client ratio of 1:4, including the on duty security staff. The administrators interviewed for this report contend that their security personnel do more than just passive security functions. They also interact with the clients and do their best to stay abreast of situations in the immediate community that pose safety issues for the residents of the shelter. Because they are Chicago police officers, they have access to that Department's information relative to these issues.

The staff interviewed estimated that between 50% and 90% of Delta Shelter's population is dually involved with the Cook County Juvenile Probation Department and DCFS. Just as the safety of the residents in the community is an issue, peer-to-peer violence within the program is also a potential problem. The management at Delta Shelter contends they keep these types of incidents to a minimum by employing a behavior management point system that promotes conflict resolution through group activities. Participation in activities and outings are approved based on a point system. The maximum allowance that a resident can earn per week is $9. All staff is trained in CPI restraint techniques. Security staff is not involved until activated by the childcare staff. Ninety-eight percent of the staff is male.

The Clinical Director of the program stated that there are a number of residents with mental health issues in the program. Some have dual diagnoses of mental health and substance abuse. She related they try to address these issues individually as best they can, noting they are not actually equipped to do so. In a fashion similar to all the other shelters, the staff at Delta complained that wards frequently enter their program without the necessary documentation regarding their run history, mental health interventions and diagnoses, and history of aggressive behavior. They complained, as did the other programs, that this is especially problematic when protective custody has been taken of the youth and the DCP worker has relinquished control of the case prior to the assignment of a caseworker. The failure to provide these records rendered them not as effective as they could be in planning for each individual resident. The Clinical

Director expressed the opinion that a shelter specifically designed to house youth with mental health issues and dual diagnoses would be effective provided the facility is properly staffed with mental health professionals.

The administrators interviewed stated that the wards in Delta do not all come from the CRC. Because of the large population of dually involved residents, youths are frequently transported directly from the Juvenile Detention Center. Occasionally, youths in the program are under the restriction of electronic monitoring. The representatives of the program who were interviewed echoed the complaint of other programs relative to inattentive caseworkers. They stated that the residents were rarely visited weekly. They felt that the caseworkers' lack of attention elevated the residents' anxiety because it exacerbated the uncertainty they felt relative to future plans for their placement. This anxiety had the potential to lead to aggressive behavior and runaways.

Most of the residents at Delta Shelter were housed at this facility beyond 30 days. The length of stay is 30 to 90 days. Staff stated it was not unusual for a ward to be there for as many as 180 days and one was with them for one year before being placed elsewhere. Most of the population have had multiple placements and are in a shelter because of a placement disruption. Some have come from failed permanencies.

Delta Shelter has a significant problem with runaways. In 2014, there were 628 runaways. In the first three months of 2015 they experienced 263 separate run incidents. Twelve of the 263 incidents involved 14-year-olds; 17-year-old residents, who are the largest group in the program, accounted for 130, or 49.4%, of the run incidents; 15- and 16-year-olds accounted for 33% of the run incidents. During that same period, there were 34 run episodes involving 18- and 19-year-old residents. Delta Shelter has alarms on all the facility doors that egress outside the premises. They do not have time delay locks on the doors. A run prevention protocol is in place. It is, for the most part, reactive in nature. There are two separate protocols designed to deal with youths who are threatening to run and those whose elopement has been signaled by the alarms on the exit doors. They both involve staff attempting to redirect the resident away from his intent to leave the facility. It also involves the staff informing the resident to call the program if he is in trouble or needs assistance returning. The protocols direct the staff to shadow the resident outside of the building for as long as possible, continuing the attempt to convince him to return. The rest of the protocol addresses the need to follow procedures relative to the filing of a missing persons report with the Chicago Police Department and notifying the Child Intake and Recovery Unit of the ward's AWOL status.

While the staff is trained in physical restraint techniques, they do not employ them to prevent youths who present a danger to themselves or others from leaving the program. Staff asserts that given the size and age of their residents, physical restraints should be restricted to incidents of aggressive behavior on the unit that put either residents or staff at risk of injury. The administrators interviewed stated that there are a number of chronic runners who abscond from the facility two or more times per week. They frequently know where these residents are going. They claimed they tried to secure community passes for some of them but these were rarely forthcoming from the caseworker. They contended that some of the youths were aware of the 24 hour requirement, relative to payment being stopped to the program, and make it a point to return within that time frame.

Delta Shelter administrators also noted that the authority to grant community passes and to link that authority to their behavior program would decrease the instances of youth leaving their program without permission. They pointed to the example of one of their older wards frequently going on run to be with his child. They stated they have the address and the youth always calls

them to confirm his whereabouts. They believe his behavior is motivated by a desire to spend time with his child and to be responsible in that regard. Nevertheless, every time he leaves the program for this purpose, they are required to report him missing, even though they know where he is. They stated that there are other youths who maintain contact when they are away from the program but are technically "missing." Some of the youths who are reported missing leave the shelter while on an activity or at school.

Residents who return within 48 hours of their departure are immediately processed back into the facility. Delta Shelter has the ability to do medical triage in the community and avoids the need to transport returning residents to the CRC for that purpose only. Returning wards who were missing beyond 48 hours are processed through the CRC. Delta Shelter staff transports them to that facility.

The program staffing includes an educational coordinator responsible for arranging school placements of residents and monitoring their progress and attendance. Transportation to and from school for 14- and 15-year-old residents is provided. All others take public transportation. Staff reported they have problems securing public transit passes for the older youth from their caseworkers and that obtaining funds for school related needs is a continuing issue. Staff commented that the program could be strengthened by increased funding for more employees per shift, optimally five line staff. They would also like to have a funded position specifically for transportation. Similar to all the programs analyzed for this report, designating staff for transportation after hours is a continuing issue.

**Echo Shelter**

Echo Shelter is designated for males, ages 14 to 18, located in Chicago with a maximum capacity of eight youths. There were 49 unique clients placed there during 2014. The facility has five bedrooms: two singles and three double rooms. Because they have the two single rooms, Echo Shelter can accommodate residents who have a safety plan, which may require such sleeping arrangements.

The bedrooms are located on the second floor of this two-floor facility. There is a large living room area that can be utilized for group meetings and recreational activities. There are two computers in the living room that are up to date and available for resident use. The staff monitors residents' computer usage. There is also a recreational area and laundry facilities in the basement of the building. In the outside rear of the building there is a concrete pad with a basketball net. This area is enclosed by a fence.

The staff interviewed reported that the wards who come to the program are almost exclusively funneled through the CRC. They have youths, on occasion, who are placed from other parts of the state. Some of the youths come to this facility directly from Child Protection and some are from failed placements and disrupted permanencies. They complained that residents frequently are admitted to the program without adequate background information. Staff commented that read-only access to SACWIS for designated staff would alleviate this problem of inadequate background information.

During 2014, this shelter operated at close to capacity. The average length of stay was 72 days. The longest length of stay for a resident in 2014 was 220 days. The staff reported that behavioral problems are exacerbated in those youths who have lengthy stays in the shelter. Behavioral incentive programs are incorporated to discourage this type of behavior. Each client

earns $15 per week for an allowance and they have the opportunity to earn extra money through behavioral incentives.

Echo Shelter does not accept wards who are developmentally disabled. They do accept youth who have a mental health profile and a history of psychiatric hospitalization. Some of their residents are being maintained on psychotropic medication. The staff is not trained in restraint techniques and do not utilize restraint. The staff interviewed indicated that they attempt to be proactive in preventing aggressive interactions between residents. They have a full time clinical social worker who conducts both individual and group therapy.

It was also reported that they attempt to be proactive in preventing inappropriate interactions between the residents and youth in the community. They reported that most of the residents attend a nearby high school. They are transported to and from school and other activities, including extra-curricular activities at school, by the staff. The on-duty childcare staff manages this transport in the agency's van under the supervision of the Case Manager. Staff also interact on a regular basis with the local branch of the Ceasefire program and have, by their account, positive relationships with the local District Commander and the local Alderman.

According to the staff interviewed, some residents are parents or purport to be prospective parents. These residents are offered the services of TPSN but some do not opt to avail themselves of these services. Echo Shelter does provide some educational materials around this issue.

In 2014, this facility experienced a total of 536 Unusual Incident Reports; 405 of the reports (76%), were run incidents. To demonstrate how one or two chronic runners can impact runaway statistics, Echo Shelter noted that in March 2014, one client accounted for 42% of the runaways that month. In June, July, and August, two clients were responsible for 45%, 65%, and 65% of the runaways respectively. In September through December, one client accounted for 73%, 44%, 61%, and 54% of the elopements each month. This demonstrates the need to delineate between these types of run episodes: the return of the client that is very predictable and more prolonged absences. Their contract does not give them discretion to grant community passes without the approval of the caseworker.

Security staff is on duty from Thursday through Sunday night. Echo Shelter does not employ alarms or time-delay locks on their exit doors. In fact, an alarm on the rear door was disabled because it is a door frequently used by residents to get to the basketball court. The staff claimed that this was not an issue because they have line-of-sight surveillance of these doors at all times. During the overnight hours, one staff is stationed on the upper floor. If residents leave the facility against the advice of the staff, they will follow them outside to attempt to convince them to return. The facility is staffed for a 1:4 staff-to-client ratio at all times. This is based on full capacity and means that two childcare staff are in the facility at all times. No other staff is included in the ratio.

If a runner returns to Echo Shelter within 48 hours, they transport him to the CRC for medical clearance and accept him back into the program. If he returns after 48 hours and they have an opening, they do likewise. If a resident returns to the program after 48 hours and there is no opening, Echo Shelter staff also transport him to the CRC. Staff reported that most youths present themselves when returning from runs. Few are returned by the police or other parties such as a caseworker. Staff believe that many of their residents are aware of the 48 hour rule and return before that threshold is reached so as not to trigger their discharge.

**Foxtrot Shelter**

Foxtrot Shelter operates this program out of a six-flat building located in Chicago. Foster care is provided in each apartment by licensed foster parents earning $36,000 to $40,000 annually. Age range is 0 to 3, male and female. Older children up to 17 that are part of a sibling group are also accepted. Capacity is 24-36. Expected stay is 8-10 days, but some children stay as long as 90 days.

## II.    SYSTEMIC PROBLEMS WITH RUNAWAY/MISSING YOUTH

A missing or runaway ward is defined as a child or youth for whom the Department is legally responsible, who leaves his or her place of residence without the consent of the person or entity given responsibility for his or her care and custody. 89 Ill. Adm. Code 329.2. The Procedures further define "child or youth" to include wards aged 18 to 21. According to the Auditor General's Report, the Department processes approximately 15,000 reports of runaway youth each year. According to CIRU data, the majority of missing wards on a given day (49-55%) are adult wards (18- to 21-year-olds) who choose to be absent. Additionally, according to the Auditor General's Report, two-thirds (66%) of the 15,000 reports appear to be children who are gone less than 24 hours. Some are gone for only an hour. "Missing wards" include wards who violate pass or curfew policy of a residential facility – youth who ask to go off campus to visit family or friends and go without permission or return late.

At the same time, buried within the 15,000 reports are the few high-risk children who are suspected of being abducted. CIRU data confirms that missing children under the age of 6 are few in number (between one and three are reported per day) and missing children between the ages of 7 and 13 average between four to six per day. The younger children are more likely abducted. Both groups of children comprise less than 5% of the DCFS category of "missing children." Despite a slew of forms, DCFS does not structure its data collection so that one can easily and immediately access information on youth ages 14 through 17-years-old for whom the missing status is unusual, who may be involved in human trafficking, or who suffer from developmental disabilities or severe mental illness.

Table:  Forms completed or updated when a DCFS youth is reported missing

| Form | Basic Information | Comments |
|---|---|---|
| Law Enforcement Missing Persons Report | Date and Time of Run; probable area of run, description of child including clothing and other info specific to finding child. | |
| CFS  680  - Child Identification Form + Photo | Child's physical description, including identifying marks or tattoos, vehicle information, phone, friends and relatives, birth parents, school, interests, employment, medications, height and weight; family contacts, run history, relevant mental health history, medical conditions, special needs. | Completed at intake, updated annually and when child is missing. Cook County Sheriff staff stated that it is frequently not fully completed or updated. |
| CFS  1014  – | CIRU sends form to worker after | No information about contextual |

| | | |
|---|---|---|
| Child Runaway Form | child reported missing. Physical Description of Youth, Checklist of when various forms have been filed. | issues such as staffing issues or precipitating events; does not distinguish between children who predictably and frequently run and return and those for whom the run is unusual; includes wards over 18 without disabilities, who choose to be absent. |
| Unusual Incident Report-CFS 119 | Narrative description of run event. | Part of a system that reports over 50 different types of events. Information critical to analyze run behavior or recover missing youth is not captured. In the shelter system, accounts for the great majority of UIRs. |
| Consent and Release to NCMEC[4] (wards under 18) | Permits the website to display and distribute the youth's picture | |
| CFS 906 Change of Placement Form | | To be completed when youth have been missing for 24 hours. |
| CFS UIR Disposition | To explain youth's return | None found in Inspector General's six-month sample. |
| CFS 680A Run Debriefing Form | To explore reason for run and where child went. | Often not completed – never analyzed. |

DCFS Procedures 329 requires all residential facilities are required to keep annually updated digital photos of wards to assist law enforcement in their recovery. While the youth remains missing, the worker must make and document weekly contact with extended family, school staff, and others who may have information of the youth's whereabouts. The worker is responsible for updating all parties (DCFS, Law Enforcement, Family and Juvenile Court) throughout the time that the youth remains missing and will be responsible for requesting a Juvenile Protection Warrant be issued for wards under 18.

***Child Intake Recovery Unit (CIRU)***
The Department created the Child Intake Recovery Unit (CIRU) in August 2013 to address growing concern regarding the number of wards on run. The unit is staffed with 20 workers, including six supervisors. Six shifts provide 24-hour coverage. Each CIRU worker is assigned a Department Team or an agency, and handles 13-15 missing youth. The majority of youth on their caseloads are, as reported above, over the age of 18 (47-55%). There are no special CIRU units devoted to the less common but especially concerning missing children – those under 13, some of whom have been abducted (under 5%); trafficked youth; or disabled youth. The salary range for CIRU workers is $4377-$6581 per month. Presently, CIRU's function is to support and document workers' efforts to locate and return missing DCFS wards. It serves as a central location for the collection of data and the coordination of the data's dissemination for these

---

[4] National Center for Missing and Exploited Children.

missing children. When a missing child returns, the shelter or facility must notify CIRU. CIRU workers remain in the office, and only contact workers when a task regarding a missing ward has not been done. They have no outreach component even for the very young and vulnerable.

Once the Missing Persons report is filed, the caseworker or agency is required to notify CIRU. CIRU reminds workers of tasks needed to be completed and monitors location efforts. CIRU staff communicates with the caseworker and the supervisor to ensure the timeline is followed and that the CFS 680 (Child Identification Form) has been completed on each runaway. They contact the Program Monitor of the facility, LEADS, NCMEC, residential workers, and foster parents. Locator checks are done on a weekly basis and a report is generated weekly on all runaways.

The Director of CIRU stated that 250 DCFS wards, on average, are missing on a daily basis. He contended that caseworkers are required to actively look for missing wards but he believes they frequently complete the same tasks as his workers – phone checks and monitoring various databases. The CIRU Director told Inspector General investigators "more social work needs to be done" to effectively and timely locate missing wards.

### Law Enforcement

The Cook County Sheriff has a unit specially designed to locate DCFS wards for whom Child Protection Warrants have been issued. The unit is commanded by Deputy Zane Frasier. There are four deputies, with 10 to 12 years of experience each. They work one shift, 8AM to 4PM. Deputy Frazier stated that once the warrant is issued, they receive a packet that includes a copy of the warrant and the 680 form. A recent picture of the ward is supposed to be included but is sometimes missing. Deputy Frazier also remarked that the 680 form is sometimes filled out in such an incomplete manner as to be of little value. He also stated that he rarely sees a copy of the 680-A debriefing form which would be helpful in the attempt to locate repeat runners. He emphasized that a recent picture of the missing child is especially helpful in their effort to locate the child.

The deputies assigned to this unit attempt to communicate with the caseworker and their supervisor. Deputy Frazier stated that he meets with the Director of CIRU, on a monthly basis. He related that they have a good working relationship. He complained that wards active on CPWs are rarely reported to the National Center for Missing and Exploited Children. He claimed that of 85 active warrants that he surveyed, only 24 had been so reported.

Deputy Frazier stated that the Illinois Safe Children's Act requires law enforcement to treat juveniles involved in prostitution as victims. He said they want to do so and that they would like to conduct educational programs in the shelters for youths at risk for this activity.

Officers from the local Police District were very familiar with the issues of missing DCFS wards because the CRC is located in their area. They were familiar with operation of the CIRU. They do coordinate with NCMEC. Law enforcement does not treat all reports of missing youth equally. Any child who is under 12, possibly abducted, or a child for whom run behavior was unexpected, will get special attention. A missing person who is labeled "endangered" by the CPD is someone whose physical safety is at risk. DCFS wards who are victims of trafficking could be included in this category. Any child under the age of 10 would be considered to be in this category. Any missing person under the age of 21 is considered a juvenile.

Detectives from both Districts agreed that timely dissemination of information regarding the missing ward is crucial.

The Chicago Police Department would like authorization to create flyers and disseminate information, including pictures, to assist in the location of missing wards. Neither Detective Unit was aware of the Cook County Sherriff's Child Protection Warrant Unit.

### Unusual Incident Reporting

In the review of the Shelter system, Inspector General investigators reviewed runaway incidents including Unusual Incident Reports (UIRs) for runaways from April 2014 through November 2014. Unusual Incident Reporting is required for a broad range of events (47 categories). Runaway behavior is required to be reported whenever a ward's whereabouts are unknown and they are absent from placement without permission. Within the shelter system, UIRs reporting run incidents dominate the types of reported incidents. For instance, at Alpha Shelter in September 2014, the facility filed approximately 120 UIRs and 108 of the UIRs filed documented runs. Other shelters[5] reported similarly high ratios of runs for UIRs.

The UIRs on runs do not provide any information that could not be provided in the Runaway Report Form (CFS 1014) and Child Identification Form (CFS 680). For example, UIR runaway reports summarize that a youth had run away on a particular date and time and that staff had attempted to dissuade them from this behavior; the reports fail to provide information regarding the precipitating factors, such as child's affect, recent contact with a family member, suspicion of delinquent behavior, or contributing factors such as inadequate staffing patterns. The forms also do not prompt retrieval of contextual information, such as staffing levels or other problems at the facility at the time the child ran. The UIRs fail to convey a storyline of events but rather record a series of disjointed facts.

Additionally, due to the design of the UIR form, it is impossible to distinguish severity amongst runaway behaviors. For example many reported runaways were actually shelter care youth leaving the premises for a brief period of time in which their whereabouts were known to staff. These incidents usually took place after a caseworker denied a community pass, or could not be reached in order to provide one, and the child then chose to leave the shelter for their original intended destination after which time they would return to the shelter of their own accord after a few short hours. Situations such as these and other scenarios that involve the youth missing from the shelter with known whereabouts should be distinguished from the more severe and dangerous scenarios in which the child's whereabouts are unknown, delinquent behavior is suspected, or sex trafficking is a potential factor. Similarly, like the Runaway Report, the UIR does not distinguish between wards who are adults and choose to be absent from the program and wards who are children.

Although a disposition form is required per the policy in order to record the outcome of unusual incidents, Inspector General staff reviewed the Department's UIR Database and noted that there were no UIR Disposition Forms. Without inclusion of a disposition, each UIR reads like an unresolved, ongoing issue.

An older youth who has a pattern of absenting himself from a program for short periods of time could well be considered non-compliant with the program; a DCFS youth who absents himself from school should be categorized as a truant, not a runaway. Presently, DCFS does not track truants nor youth noncompliance with programming. Under the present system, these youth are simply considered missing.

---

[5] With the exception of the CRC just after instituting their runaway protocol.

*Auditor General's Report*

In response to a legislative mandate, the Illinois Office of the Auditor General released a report [the "AG Report"] in December of 2014 on the manner in which DCFS handled the search for missing children during the calendar years 2011 and 2012. The House Resolution had asked the Auditor General to determine three things: The number of missing children, whether the missing children were reported in a timely manner, and what steps were taken to recover missing children. The AG Report found that on any given day, during the period of the audit, there was an average of 230 wards missing. Over the two-year period, there were approximately 26,500 to 29,200 run incidents, involving 2,800 to 3,100 wards. The AG Report noted, however, that these numbers included wards who were absent for less than 24 hours. The AG Report noted Department policy to issue 906 Change of Placement forms when wards are missing for more than 24 hours. There were over 10,000 Change of Placement forms for wards that were missing during the audit period.

One 17-year-old youth in the AG's sample had 129 run incidents from his placement at Gamma Shelter in a year. 72% of his runs are under 23 hours, including 24 that were four hours or less. Although he remained at the same placement, there were nine placement change forms completed during the same time period. However, for every two-and-a-half days he was in placement, he was reported missing for one day. This is illustrative of the thin line between non-compliance with program rules and youth who are actually missing.

The AG Report could not determine whether the missing wards were timely reported because the date that the caseworker learned that the ward was missing was not identified anywhere. Without this date, the Representatives' second question could not be answered.

Once the wards were missing, the AG Report documented between 47% and 96% *non-compliance* with Department policies. A number of inadequacies were documented relative to the adherence to DCFS Policy, **P.T. 2014 Section 329.10,** which states that, "Children who are missing are at great risk of victimization and exploitation." The policy continues with the following stipulation, "Because of the potential dangers to the child, the child's worker is to consider a missing or abducted child a major event that requires intensive intervention." The findings of the Auditor General and this investigation underscore that this requirement is frequently not followed.

The audit revealed that amongst the 240 wards reported missing on 5-14-14, the greatest number, 122 were missing for between 10 to 99 days. This statistic raises the question of whether or not current procedures are adequate for locating runaway wards in a timely manner. It also raises strong doubt that procedures currently in place are followed effectively.

The Auditor General report indicated there were many instances uncovered where documentation by caseworkers was not in compliance with DCFS policy but was also so inadequate as to make a careful examination of the effectiveness of these policies impossible. Some examples follow:

1. Frequently, no date was recorded as to when a worker was first notified of a missing ward, making it impossible to determine the timeliness of the individual workers' responses
2. The date of notification to the Child Location and Support Unit (now Child Intake and Recovery Unit) was missing in 39% of the cases.

3. The Missing Child Report (680) was not completed within the required two days in 47% of the cases.
4. 76% of the cases audited lack documentation that a photo of the missing ward had been provided to law enforcement.
5. The required debriefing form (680-A) was not completed in 78% of the cases audited.
6. In a sample of 100 cases of runaway wards there was no documentation of supervisory review in 95% of them.

The final (9th) AG's recommendation directed the Department to review its search procedures for missing children for possible modifications and to give CIRU (or another unit within DCFS) additional responsibilities to monitor and *locate* (emphasis added by Inspector General's Office) missing children.

*Recommendations from Chapin Hall*
In recent testimony to a joint Committee of the Illinois Senate and House, Chapin Hall Executive Director and former DCFS Director, Bryan Samuels presented data on DCFS shelter placements and runaway events. Director Samuels noted in his data report the profound heterogeneity of the DCFS population served by shelter providers. He recommended structuring child welfare systems to develop setting specific prevention and response strategies to ensure programs are well suited to manage the needs and strengths of the youths they serve. In Cook County, with the exception of pregnant and parenting wards, the shelter system does not serve targeted populations. The settings serve generic age and sex groups. The Inspector General's investigative team found that the heterogeneous mixing of youth does not well serve the individual with targeted problems. For example, youth with mental illnesses and substance abuse problems are at increased risk of running away but there is no shelter setting that has childcare staff with specialized training and staff ratios that can effectively serve them. A model similar to mental health programs serving homeless mentally ill individuals would be better suited to help stabilize these special needs wards. Such a specialized shelter should also include a proactive mobile unit for outreach to youth who have a pattern of running.

## ANALYSIS

*Current Practice Regarding Runs/Missing Youth*
A runaway/missing child is defined as a child or youth for whom the Department is legally responsible, who leaves his or her place of residence without the consent of the person or entity given responsibility for his or her care and custody. 89 Ill. Adm. Code 329.2. According to the Auditor General's Report, the Department processes approximately 15,000 reports of runaway youth each year. The population however includes adult wards who choose to be absent (up to 55%); wards who are only considered missing because they violated a facility's pass policy, and youth who are gone less than 24 hours (roughly 66%) including some gone a few hours. A definition this broad makes meaningful analysis and solutions unlikely. DCFS policy states "Because of the potential dangers to the child, the child's worker is to consider a missing or abducted child's a major event that requires intensive intervention." The Department should adopt standards similar to law enforcement to determine if an adult is a "missing person" requiring intensive interventions. A capable young adult ward who chooses to exercise his/her right to freedom of movement from voluntary placement is different from a bona fide missing adult whose absence is a departure from ordinary habits or has disabilities. The existing missing procedures require the caseworker to document on a weekly basis all efforts to find an adult ward, who is not high risk, and may have been voluntarily absent for a year or more. The public is unaware of the Department's over-inclusive missing children categorization and narrowly

equates missing children with Amber Alerts and exploited children. It is not an unreasonable assumption. Adult wards not suffering from disabilities or exploitation and whose absence is not unusual should not be treated the same as children who run away.

The Chicago Police Department reported that the Department often does not provide the police with a current photo of the missing child/youth. Both the Cook County Sherriff's Office and Chicago Police reported that the Department rarely provides police with copies of De-Briefing forms on chronic runners. For youth 13 through 17 who are chronic runners the De-Briefing forms may contain information that would be useful in finding the youth. The Child Identification Forms (CFS 680), the Runaway Report (CFS 1014) with attached photos, and the De-Briefing Forms (CFS 680-A) should be electronically available to law enforcement. The 1014 should include an information field so workers can describe any statement by the child or precursor to the run i.e. child stated he missed his brother the day before the run. The Department should also ensure that Chicago law enforcement is authorized to distribute flyers with pertinent information and pictures of abducted or highly vulnerable children such as children with medical problems or developmental disabilities. It is unclear why this continues to be a problem when the Department routinely consents to such distribution by NCMEC.

With the assistance of expertise from the Cook County Sheriff's Unit, the Department should develop an intensive CIRU field unit to locate high risk children such as those who are abducted or at risk of being trafficked. CIRU could be an effective intermediary for police because of their 24 hour capability and the fact that caseworkers are often hard to reach. Presently CIRU receives a daily Excel report of missing children. To support the field, CIRU should have a database that is structured for the purpose of assisting in locating and analyzing the runaway population. CIRU should be the repository of the critical information necessary for locating youth including analysis of the previous debriefing information for chronic runners. For high risk cases CIRU staff should be the primary staff conducting database searches for the caseworker. If not Bona Fide missing, older wards could be removed from the CIRU caseload. Staff could then be assigned to a high risk CIRU field unit that provides intensive interventions to locate vulnerable or abducted missing children. This effort would be in line with the Auditor General's recommendations.

The UIR for runaways does not capture information critical for runs and recovery, resulting in pointless paperwork. Rather than this duplicative function the Department needs to use the UIR system to track truancy and curfew violations. A sentinel is needed for these behaviors. Anchoring a child to a school leads to stability and maintaining curfews protect youth from the harms of the street. Removing runaways from the UIR system and creating a separate tracking system devoted to run/missing children will permit the Department, through CIRU, to focus on finding and analyzing patterns with respect to bona fide runaway/ children.

*The Need for Specialized Shelter Placements*
When the Department dissipated its system of emergency foster homes, it accepted the dire consequence of emergency first time placements of young children and their siblings into a group shelter setting. Such an unsound decision was both ethically and clinically questionable but once established it continues to operate. The Department must expand its system of emergency foster homes to care for our very young children and their siblings. Such a system would be a more protective nurturing setting than a shelter, and would afford the child protection investigator more time to explore the availability of suitable relatives for these children. Child protection should have a real time availability database for these homes.

While a 2015 Cook County Children's Reception Report stated the Center matched youth to specialty shelters that offered programming to advance their skill sets and secure permanent placements, outside of the Charlie Shelter for pregnant and parenting youth, the remaining Cook County Shelters serve a heterogeneous population separated only by ages and gender. There is no specific shelter for children who have been sexually exploited by trafficking. Mixing youth with serious delinquent behavior, criminal behavior, or serious mental illness with children first coming into care or younger populations is not only unacceptable but borders on negligence.

*Shelter Policy*

A common complaint from shelter administrators is that children come into their facilities without adequate background information. The missing information included mental health histories, runaway records, substance abuse histories and histories of aggressive behavior. Shelters need this information and any other pertinent information that will help them plan individually for the wards placed in their facilities. Granting access to SACWIS for designated staff would enhance the ability of shelter staff to plan for new residents on intake and when necessary to fill out the De-Briefing (CFS 680 A) Form if a child on run returns to their facility. Department policy and procedure should clarify after-hours responsibility for retrieving youth on run, and whose responsibility it is to complete the De-Briefing Form.

Shelters that house more than 17 youth can and should, in accordance with fire codes, be equipped with an electronic alarm security system with 15 second delay locks so that staff can be proactive in run prevention strategies. Staff should be stationed by the doors, especially after hours. These measures were successfully employed at Bravo Shelter after a barrage of negative press about children being harmed while being outside after midnight with no supervision.

All shelters concurred that the incidence of run episodes could be lowered if shelter care staff had more discretion to grant community passes for those wards who wanted to leave the facility for a short period of time for a specific purpose, such as to go to the store. Universally, the program administrators, who were interviewed, stated that they had to obtain permission from the assigned caseworker to grant these passes. They claimed that this authorization was frequently not forthcoming, either because the worker could not be contacted or were not inclined to grant the permission. The wording in these contracts regarding this issue is as follows, "The amount and duration of passes from the shelter for reasons other than visits with family, fictive kin, or significant adults shall be determined by the shelter staff in consultation with the youth's assigned caseworker and child and family team. However, the final decision making authority related to these passes shall rest with shelter administration." Intake planning between caseworkers and shelter staff can alleviate the need to get caseworker approval for each pass. This plan should be in writing at the outset. Residents who attend school have a greater sense of stability and security and when they are transported to and from school are more likely to attend. Education options should be available for older youth who have dropped out of school. Charlie Shelter utilizes online educational software as an alternative to off-grounds schools and a transition tool for re-acclimating older shelter residents, who may have been out of school for a period of time, to the school environment.

The Department contracts should allow Shelters to be proactive in locating residents who come in and out of their shelter, including providing transportation to pick up former residents. The completion of the De-Briefing Form is critical in these situations and the shelter staff may be in the best position to complete it with the youth. Bravo Shelter is routinely doing so as a part of its runaway prevention process.

*Department Monitoring*

Beginning in 2011 and continuing through 2014, stories appeared in local papers about poor conditions and experiences of youth at residential facilities, including Alpha Shelter. The Corrective Action Plan developed for Alpha Shelter failed to include some of the most egregious problems (*i.e.* lack of a written reward, education or run prevention programs; failure to address staffing shortages), was internally inconsistent (provided both to make the shelter's living areas less inviting so that girls would go to school and at the same time the shelter had to be redecorated to make it more inviting), failed to enforce compliance with easily correctable elements in the Plan (*e.g.* Alpha Shelter never purchased adequate computers). The Corrective Action Plan was in place from September 2013 through January 2015, when media attention forced the closure of the facility. During that period, the Department spent untold resources to "monitor" the plan, visiting the facility **90 times** in 2014 alone. Monitors never questioned why Alpha Shelter did not maintain the level of frontline staff that their monthly guaranteed funding supported and never questioned the top-heavy administrative staff that was rarely present at the facility.

Since 2013, Department administrators have been aware that transportation responsibilities for youth returning from run is a continuing problem. The Department addressed the issue only partially, and then only orally, adding to the confusion. Shelters were reportedly told not to turn youth away and to conduct intake with CRC over the phone, but written procedure was never corrected to address this (Procedure 329 still requires that returning youth go to the CRC for intake). The results were the interpretation of the new instructions was divergent among shelters, since it was never put in writing. Even when asked to clarify the policy by email, the Department remained silent. This method of management was confirmed by Dean Young, who stated that he did not believe in putting such requirements in writing. Moreover, Department administrators never addressed the practical problems accompanying such changes in policy – such as whether shelters are required to have 24 hour transportation available and how to address shelters' concerns about liability in transporting youth for whom they have no contractual or legal authority.

## RECOMMENDATIONS

1. The Department should redefine its search procedure including the following:
   a. The Department should amend Rules to eliminate adult wards, who are not high risk (developmental disabilities, human trafficking, in critical need of medication or Bone Fide missing) from Rules and Procedures 329.
   b. Adult wards without disabilities who chronically absent themselves from voluntary placements should be transitioned out of Department responsibility.
   c. The Department should add a narrative field to the CFS 1014 to include relevant information, including what the child was wearing, who they were last seen with, the license plate of any vehicles they left in, and of child's statements prior to the run and precipitating events.
   d. The Department should cease using UIRs for reporting runaways since other DCFS forms can be adapted to be more relevant to finding the youth and remedying precipitating factors. UIRs should however track truancy and curfew violations since early intervention on these behaviors can stabilize youth and prevent future harm. Likewise, an older ward who is absent from scheduled programming for short periods of time (from one to several hours) should be

classified as non-compliant, not missing. An individual ward's chronic non-compliance in residential programs should trigger a clinical consultation.

e. Cook County Shelters/Centers should establish individualized Community Pass Authorizations with caseworkers at a youth's intake, so that shelter staff does not need to consult with caseworkers for every pass request. Shelter/centers should have the ability to alter agreements with good cause.

f. The Department should issue written policy concerning the conditions under which law enforcement can distribute information including pictures to assist in locating missing children. A streamlined process for securing DCFS Guardian consent should also be developed.

2. CIRU duties for tracking and locating missing children should be limited to those children under 18 and disabled or Bona Fide missing adults. With lower caseloads, the Unit can provide more technical assistance searching databases and assist in contacting extended family and friends.

g. The Department should ensure that CIRU has a database structure that enables it to track and provide analysis on frequent runners. CIRU should be the electronic repository of all critical information on frequent runners: Child Identification Form (CFS 680), all De-Briefing Forms (CFS 0680-A) and an updated digital photo of the youth.

h. CIRU should develop an outreach recovery unit for highly vulnerable children that works closely with the Cook County Sheriff and other law enforcement. The Unit operations should include an afternoon and evening schedule.

i. For frequent runners, shelter staff in consultation with CIRU should complete the De-Briefing Form CFS 680 –when a ward returns to the shelter system

3. The Statewide Shelter Care Coordinator must centrally track all significant failures and problems of shelters. All Corrective Action Plans, Licensing and other complaints about shelters must be shared with the Statewide Shelter Coordinator. The Coordinator must review all existing Rule, Policy and Procedure and ensure that it is consistent and addresses responsibility for transportation in all foreseeable circumstances.

4. The Shelter System should be revamped to include the following:

j. The Department should expand its existing system of emergency foster homes to accommodate children 13 years and younger, and their sibling groups, coming into care for the first time.

　　i. All emergency foster homes should be on a centralized database to reliably track available homes for matching;

　　ii. All emergency foster homes should be required to transport children to their schools of origin to help stabilize and lower the trauma to the children.

k. The Department should determine the number of older Cook County shelter youth with histories of serious mental illness who cycle in and out of the

present Shelter system. The Department should develop a specialized stabilization center for this population of youth.

    i. In addition to clinical services, this stabilization center should have an outreach unit that functions similarly to homeless mental health delivery services.

    ii. The stabilization center should host supportive NAMI (or similar) groups for relatives or other child centered collateral of the youth who are willing to partner with stabilization efforts.

    iii. The Center should tightly coordinate educational services to assure the residents' educational rights are secured. This is crucial for those youth who are eligible or up for redetermination for SSI benefits. The center should also provide alternative educational programming similar to the online education program at Charlie Shelter.

l. The Department should determine the annual number of Cook County shelter youth 15 years old or older who are involved with the Juvenile Justice System or adult probation and who cycle through its Shelter system. The Department should develop a restorative justice stabilizing center for this targeted population, working closely with Juvenile Court personnel and Probation. The staff of the shelter should have the ability to network with the various Detention Alternative programs including Electronic Monitoring and Evening Reporting Centers and substance abuse programs. Clinical services should be provided for those youth who have mental health or adjustment problems.

m. The Department should develop a violence-free stabilizing center for the older youth (over 17) involved with the criminal court system or dually involved with adult and juvenile courts. The programming of the shelter should model a Safer Foundation approach. The staff should work with Cook County Sheriff, Criminal Court personnel and Probation. The stabilizing shelter should clearly define a no violence contract with each youth who enter the program. If the terms of the shelter's non- violence contract are violated the Department should immediately inform the Juvenile Court and Adult probation of the violation and the intention of the Department to request termination of the youth's wardship.

n. The Department should develop a specialized clinical and educational stabilization/shelter program for female youth who have or are at high risk of being victims of trafficking. The Department should consider the Cook County Sheriff's Office offer of prevention work with potential trafficking victims.

5. All shelters should be required to have transportation available 24/7 and children should be transported to their schools of origin to help stabilize and lower the trauma to the children unless clinically determined that the child has the ability and motivation to self-transport and attend.

6. Child protection should inform the school the child is attending that protective custody has been taken and ensure that the school's counselor and nurse are notified.

7. The Cook County Shelter system must have designated staff at each shelter who have access to SAWCIS. All shelters/centers, if permitted by fire codes, should have alarms and delayed locks at each exit with designated staff responsible for responding to alarms at all times and for timely crisis interventions to youth contemplating running from the facility. Each shelter shall have a written run protocol with training approved by the Department.

8. TPSN clinical staff should interview and arrange non-violent parenting training for any parenting youth in the Shelter/Center system.

9. The current monitoring system is ineffective to solve persistent and serious issues. Whenever a facility demonstrates continued failures to comply with serious issues identified in writing that concern child safety and welfare – the Deputy Director over the program must be notified. The Deputy Director must approve a Corrective Action Plan, with identified sanctions and timelines, for serious unresolved issues.

10. The Department must provide a written reminder to all program monitors that monitoring duties include reporting to licensing violations that impact child safety, such as the use of interns to meet staffing ratios. In addition monitors need to be proficient in direct vs. administrative expenses (review of any annual audits and consolidated financial reports) and staff allocation to provide a check and balance system that the program is complying with the program plan.

11. The Department's Office of Field Audits should issue written policy that requires consultation with program monitoring staff during any Field Audit to ensure that expenses self-reported by the facility conform with the Program Monitor's understanding of the program.

12. *This recommendation addresses personnel issues.*


**- END OF REPORT -**