# OFFICE OF THE INSPECTOR GENERAL
## ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES

# REPORT TO THE GOVERNOR AND THE GENERAL ASSEMBLY

## JANUARY 2015

**DENISE KANE, PH.D.**
**INSPECTOR GENERAL**

# OFFICE OF THE INSPECTOR GENERAL
## ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES

January 1, 2015

To the Governor and Members of the General Assembly:

A parent's right to their child is derived from their duty to protect the child. If the parent seriously harms the child, or threatens such harm, the State intervenes. When the State takes a child into its care, it assumes the duty to protect. When harm comes to the child while in State care, each of the involved institutions and agencies must reflect on their actions or lack of action while engaging each other to determine if critical protective factors were in place. Each institution – law enforcement, child protection, state's attorneys, mental health, advocacy, education, social services and the courts – serves a part in society's efforts to prevent harm to children.

This year, a young girl was murdered and her brother seriously injured by their father while in State care. Systemic failures occurred throughout the involved agencies and institutions. These failures contributed to the continuing risk to the children who came into care after their mentally ill and substance abusing father held the children hostage with lethal accelerants. A redacted investigation of this child's death is attached to this year's report. It is hoped that this investigation can be used to avoid similar tragedies in the future.

2014 also ended with the conviction of a foster mother for the murder of her young foster daughter. Our investigation into the death of the child was disheartening. The investigation found a mental health therapist had handed the distressed foster mother a controversial, junk-science treatment book. The author, a former dog groomer, promoted radical, aggressive, and pathological methodologies to be used on foster or special needs children. The young foster mother overwhelmed with the care of six young children, including the stress of caring for a newborn, appeared to scapegoat the four-year-old. While the Coroner's jury ruled the child's death a homicide, it was only through the valiant efforts of a newly elected state's attorney that charges were brought forward and successfully prosecuted.

Included in this year's annual report is a special report on sleep-related infant deaths where parents were investigated by child protection despite the absence of either drug or alcohol abuse or other blatant disregard. This report was distributed to the Governor, the Director of DCFS, state and national public health officials, the child death review teams and the Senate Subcommittee for DCFS Oversight.

Some children who have been exploited or who have been deprived of stable nurturing and protective relationships face a greater risk of becoming victims of future exploitative relationships or may become exploitative themselves. Some are calloused by environments of violence, gangs, guns, and exploitative sex. Ten years ago, the murder of eleven-year-old "Yummy" Sandifer provided us with a cruel reminder of the harsh realities and dangers of these influences and the shared failures of our juvenile justice and child welfare systems. Counterinfluences to such stark realities need to include effective violence

reduction interventions, as referenced in the Surgeon General's Report on Youth Violence, and the development of a moral and caring community among the children, ideally with a viable family member who can support the child upon his or her return to the home community. The recommendations implementation section in this year's report includes a section on past Inspector General recommendations directed towards decreasing violence among high risk wards.

Respectfully,

Denise Kane, Ph.D.
Inspector General

# OFFICE OF THE INSPECTOR GENERAL
# REPORT TO THE GOVERNOR AND THE GENERAL ASSEMBLY

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

    INVESTIGATION CATEGORIES .............................................................................. 1

    INVESTIGATIVE PROCESS ................................................................................... 3

    REPORTS ............................................................................................................ 4

    ADDITIONAL RESPONSIBILITIES .......................................................................... 5

INVESTIGATIONS ................................................................................................. 7

    DEATH AND SERIOUS INJURY INVESTIGATIONS ................................................... 7

    CHILD DEATH REPORT ..................................................................................... 37

        SUMMARY .................................................................................................. 38

        HOMICIDE ................................................................................................. 44

        SUICIDE .................................................................................................... 55

        UNDETERMINED ......................................................................................... 56

        ACCIDENT ................................................................................................. 68

        NATURAL ................................................................................................. 77

    FIFTEEN-YEAR DEATH RETROSPECTIVE .............................................................. 92

    INVESTIGATING AND INDICATING PARENTS FOR CO-SLEEPING ............................. 97

    GENERAL INVESTIGATIONS .............................................................................. 119

PROJECTS AND INITIATIVES .............................................................................. 161

    ERROR REDUCTION ......................................................................................... 161

    EDUCATION TRAINING .................................................................................... 165

    OLDER CAREGIVERS ....................................................................................... 165

    ETHICS ....... ................................................................................................... 166

SYSTEMIC RECOMMENDATIONS ........................................................................ 173

RECOMMENDATIONS FOR DISCIPLINE AND CONTRACT TERMINATION ................. 179

CHILD WELFARE EMPLOYEE LICENSES ............................................................... 183

COORDINATION WITH LAW ENFORCEMENT ........................................................ 185

AN INTEGRATED APPROACH TO MANAGEMENT OF HIGH RISK DCFS WARDS ........ 187

DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS ...................................... 199

UNRESOLVED RECOMMENDATIONS IMPACTING CHILD SAFETY ........................... 273

APPENDIX ....................................................................................................... 283

        A.   MAYA SCHAUER ....................................................................A-1

        B.   RACHEL LAWRENCE ...............................................................B-1

# INTRODUCTION

The Office of the Inspector General of the Department of Children and Family Services was created by unanimous vote of the Illinois General Assembly in June 1993 to reform and strengthen the child welfare system. The mandate of the Office of the Inspector General (OIG) is to investigate misconduct, misfeasance, malfeasance, and violations of rules, procedures, or laws by Department of Children and Family Services (DCFS) employees, foster parents, service providers and contractors with the Department. *See* 20 ILCS 505/35.5 – 35.7. To that end, this Office has undertaken numerous investigations and initiated projects designed to uncover wrongdoing, improve practice, and increase professionalism within the Department.

## INVESTIGATION CATEGORIES

*Death and Serious Injury Investigations*

The Office of the Inspector General investigates deaths and serious injuries of Illinois children whose families were involved in the child welfare system within the preceding 12 months. The Inspector General is an *ex officio* member of the Child Death Review Team Executive Council. The OIG receives notification from the Illinois State Central Register (SCR) of all child deaths and serious physical injuries where the child was a ward of DCFS, the family is the subject of an open investigation or service case, or the family was the subject of a previous investigation or closed case within the preceding 12 months. The notification of a child death or serious injury generates a preliminary investigation in which the death report and other reports are reviewed and computer databases are searched. When further investigation is warranted, records are impounded, subpoenaed or requested and a review is completed. When necessary, a full investigation, including interviews, is conducted. The Inspector General's Office created and maintains a database of child death statistics and critical

information related to child deaths in Illinois. The following chart summarizes the death cases reviewed in FY 2014:

**FY 14 CHILD DEATH CASES REVIEWED**

| | |
|---|---|
| CHILD DEATHS IN FY 14 MEETING THE CRITERIA FOR REVIEW | 99 |
| INVESTIGATORY REVIEWS OF RECORDS | 80 |
| FULL INVESTIGATIONS | 19 |

Summaries of death investigations, with a full investigative report submitted to the Director, are included in the Investigations Section of this Report beginning on page 7. Summary of all child deaths reviewed by the Office of the Inspector General in FY 14 can be found on page 37 of this report.

*General Investigations*

The Office of the Inspector General responds to and investigates complaints filed by the state and local judiciary, Department employees, foster parents, biological parents and the general public. Investigations yield both case-specific recommendations, including disciplinary recommendations and recommendations for systemic changes within the child welfare system. The Inspector General's Office monitors compliance with all recommendations.

*Child Welfare Employee Licensure Investigations*

In 2000, the General Assembly mandated that the Department of Children and Family Services institute a system for licensing direct service child welfare employees. The Child Welfare Employee License (CWEL) permits centralized monitoring of all persons providing direct child welfare services, whether they are employed with the Department or a private agency. The employee licensing system seeks to maintain accountability, integrity and honesty of those

entrusted with the care of vulnerable children and families.

A child welfare employee license is required for both Department and private agency investigative, child welfare and licensing workers and supervisors. The Department, through the Office of Employee Licensure, administers and issues Child Welfare Employee Licenses.

A committee composed of representatives of the Office of the Inspector General, the Child Welfare Employee Licensure Board and the Department's Office of Employee Licensure screens referrals for CWEL Investigations. The committee reviews complaints to determine whether the allegations meet one or more grounds for licensure action as defined in Department Rule 412.50 (89 Ill. Adm. Code 412.50). The OIG investigates and prosecutes CWEL complaints and hearings.

When a CWEL Investigation is completed, the Office of the Inspector General, as the Department's representative, determines whether the findings of the investigation support possible licensure action. Allegations that could support licensure action include conviction for specified criminal acts, indicated findings of child abuse or neglect, egregious acts that demonstrate incompetence or a pattern of deviation from a minimum standard of child welfare practice. Department Rule 412.50 (89 Ill. Adm. Code 412.50) specifies the grounds for licensure action. When licensure action is appropriate, the licensee is provided an opportunity for a hearing. An Administrative Law Judge presides over the hearing and reports findings and recommendations to the Child Welfare Employee Licensure Board. The CWEL Board makes the final decision regarding licensure action.

In FY 2014, 20 cases were referred to the OIG for Child Welfare Employee License investigations. In addition, the Inspector General's Office provided research and technical assistance to the Office of Employee Licensure in six evaluations of CWEL applicants and

investigated and opposed one request for reinstatement.

**FY 2014 CWEL Investigation Dispositions**

| CASES OPENED FOR FULL INVESTIGATION | 20 |
| --- | --- |
| INVESTIGATIONS COMPLETED/NO CHARGES | 9 |
| REVOCATION | 2 |
| LICENSE SUSPENSION | 2 |
| LICENSES VOLUNTARILY RELINQUISHED | 4 |
| PENDING ADMINISTRATIVE HEARING | 3 |

**Resolution of Prior Investigations**

| CASES PENDING | 5 |
| --- | --- |
| REVOCATION | 2 |
| LICENSE SUSPENSION | 2 |
| PENDING FINAL DECISION | 1 |

*Criminal Background Investigations and Law Enforcement Liaison*

The Inspector General's Office provides technical assistance to the Department and private agencies in performing and assessing criminal history checks. In FY 14, the Inspector General's Office opened 2,783 cases requesting criminal background information from the Law Enforcement Agencies Data System (LEADS). Each case may involve multiple law enforcement database searches. For the 2,783 cases opened in FY 14, the OIG conducted 9,105 searches for criminal background information.

In addition, in the course of an investigation, if evidence indicates that a criminal act may have been committed, the Inspector General may notify the Illinois State Police, and the OIG may investigate the alleged act for administrative action only.

The Office of the Inspector General assists law enforcement agencies with gathering necessary documents. If law enforcement elects to investigate and requests that the administrative investigation be put on hold, the Office of the Inspector General will retain the case on monitor status. If law enforcement declines to prosecute, the Inspector General will determine whether

further investigation or administrative action is appropriate.

# INVESTIGATIVE PROCESS

The Office of the Inspector General's investigative process begins with a Request for Investigation or notification by the State Central Register of a child's death or serious injury or a referral for a Child Welfare Employee License investigation. Investigations may also be initiated when the OIG learns of a pending criminal or child abuse investigation against a child welfare employee.

In FY 2014, the Office of the Inspector General received 3,141 Requests for Investigation or technical assistance.[1] Requests for Investigation and notices of deaths or serious injury are screened to determine whether the facts suggest possible misconduct by a foster parent, Department employee, or private agency employee, or whether it suggests a need for systemic change. If an allegation is accepted for investigation, the Inspector General's Office will review records and interview relevant witnesses. The Inspector General reports to the Director of the Department and to the Governor with recommendations for discipline, systemic change, or sanctions against private agencies. The Office of the Inspector General monitors the implementation of accepted recommendations.

The Office of the Inspector General may work directly with a private agency and its board of directors to ensure implementation when recommendations pertain to a private agency. In rare circumstances, when the allegations are serious enough to present a risk to children, the Inspector General may request that an agency's intake for new cases be put on temporary hold, or that an employee be placed on desk duty, pending the outcome of the investigation.

The Office of the Inspector General is mandated by statute to be separate from the Department.

OIG files are not accessible to the Department. The investigations, investigative reports and recommendations are prepared without editorial input from either the Department or any private agency. Once a Report is completed, the Inspector General will consider comments submitted by the Department and the involved private agency and the Report may be revised accordingly.

If a complaint is not appropriate for full investigation by the Office of the Inspector General, the OIG may refer the complaint to law enforcement (if criminal acts appear to have been committed), to the Department's Advocacy Office for Children and Families, or to other state regulatory agencies, such as the Department of Financial and Professional Regulation.

*Administrative Rules*

Rules of the Office of the Inspector General are published in the Illinois Register at 89 Ill. Admin. Code 430. The Rules govern intake and investigations of complaints from the general public, child deaths or serious injuries and allegations of misconduct. Rules pertaining to employee licensure action are found at 89 Ill. Admin. Code 412.

*Confidentiality*

A complainant to the Office of the Inspector General, or anyone providing information, may request that their identity be kept confidential. To protect the confidentiality of the complainant, the OIG will attempt to procure evidence through other means, whenever possible. At the same time, an accused employee needs to have sufficient information to enable that employee to present a defense. The OIG and the Department are mandated to ensure that no one will be retaliated against for making a good faith complaint or providing information in good faith to the OIG.

Reports issued by the Office of the Inspector General contain information that is confidential pursuant to both state and federal law. As such, Inspector General Reports are not subject to the

---

[1] This includes requests for investigation, notice of child deaths and serious injuries, notification of arrests or pending abuse investigations, and requests for technical assistance and information.

Freedom of Information Act. Annually, the Office of the Inspector General prepares several reports deleting confidential information for use as teaching tools for private agency and Department employees.

*Impounding*

The Office of the Inspector General is charged with investigating misconduct "in a manner designed to ensure the preservation of evidence for possible use in a criminal prosecution." 20 ILCS 505/35.5(b). In order to conduct thorough investigations, while at the same time ensuring the integrity of records, investigators may impound files. Impounding involves the immediate securing and retrieval of original records. When files are impounded, a receipt for impounded files is left with the office or agency from which the files are retrieved. Critical information necessary for ongoing service provision may be copied during the impound in the presence of the OIG investigator. Impounded files are returned as soon as practicable. However, in death investigations, the Office of the Inspector General forwards original files to the Department's Division of Legal Services to ensure that the Department maintains a central file.

# REPORTS

Inspector General Reports are submitted to the Director of DCFS. Specific reports are also shared with the Governor. An Inspector General Report contains a summary of the complaint, a historical perspective on the case, including a case history, and detailed information about prior DCFS or private agency contact(s) with the family. Reports also include an analysis of the findings, along with recommendations.

The Office of the Inspector General uses some reports as training tools to provide a venue for ethical discussion on individual and systemic problems in child welfare practice. The reports are redacted to ensure confidentiality and then distributed to the Department or private agencies as a resource for child welfare professionals.

Redacted reports are available on the OIG website: http://www.state.il.us/DCFS/library/ com_communications_inspector.shtml or by request from the Office of the Inspector General by calling (312) 433-3000.

*Recommendations*

In investigative reports, the Inspector General may recommend systemic reform or case specific interventions. Systemic recommendations are designed to strengthen the child welfare system to better serve children and families.

Ideally, discipline should have an accountability component as well as a constructive or didactic one. It should educate an employee on matters related to his/her misconduct while also functioning to hold employees responsible for their conduct. Without the accountability component, there is little to deter misconduct. Without the didactic component, an employee may conclude that s/he has simply violated an arbitrary rule with no rationale behind it.

The Inspector General presents recommendations for discipline to the Director of the Department and, if applicable, to the director and board of the involved private agency. Recommendations for discipline are subject to due process requirements. In addition, the OIG will determine whether the facts suggest a systemic problem or an isolated instance of misconduct or bad practice. If the facts suggest a systemic problem, the Inspector General's Office may investigate further to determine appropriate recommendations for systemic reform.

When recommendations concern a private agency, appropriate sections of the report are submitted to the agency director and the board of directors of that agency. The agency may submit a response. In addition, the board and agency director are given an opportunity to meet with the Inspector General to discuss the report and recommendations.

In this Annual Report, systemic reform recommendations are organized into a format

that allows analysis of recommendations according to the function within the child welfare system that the recommendation is designed to strengthen. The Inspector General's Office is a small office in relation to the child welfare system. Rather than address problems in isolation, the Inspector General's Office views its mandate as strengthening the ability of the Department and private agencies to perform their duties.

The Office of the Inspector General monitors implementation of recommendations made to the Director of DCFS and private agencies. Monitoring may take several forms. The Office of the Inspector General will monitor to ensure that Department or private agency staff implement the recommendations made. The OIG may consult with the Department or private agency to assist in the implementation process. The OIG may also develop accepted reform initiatives for future integration into the Department.

# ADDITIONAL RESPONSIBILITIES

*Office of the Inspector General Hotline*

Pursuant to statute, the Office of the Inspector General operates a statewide, toll-free telephone number for public access. Foster parents, guardians *ad litem*, judges and others involved in the child welfare system have called the hotline to request assistance in addressing the following concerns:

- Complaints regarding DCFS caseworkers and/or supervisors ranging from breaches of confidentiality to failure of duty;
- Complaints about private agencies or contractors;
- Child Abuse Hotline information;
- Child support information;
- Foster parent board payments;
- Youth in College Fund payments;
- Problems accessing medical cards;
- Licensing questions;
- Ethics questions; and

- General questions about DCFS and the Office of the Inspector General.

The Office of the Inspector General's Hotline is an effective tool that enables the OIG to communicate with concerned persons, respond to the needs of Illinois children, and address day-to-day problems related to the delivery of child welfare services. The phone number for the Office of the Inspector General Hotline is (800) 722-9124.

The following chart summarizes the Office of the Inspector General's response to calls received in FY 14:

### CALLS TO THE OIG HOTLINE IN FY 14

| | |
|---|---|
| INFORMATION AND REFERRAL | 1088 |
| REFERRED TO SCR HOTLINE | 132 |
| REFERRED FOR OIG INVESTIGATION | 109 |
| TOTAL CALLS | 1329 |

*Ethics Officer*

The Inspector General is the designated Ethics Officer for the Department of Children and Family Services. As required by the State Officials and Employees Ethics Act (5 ILCS 430/20-23), the Ethics Officer reviews all Statements of Economic Interest completed by Department employees and also by members of the Children and Family Services Advisory Council.

In 2014, the Ethics Officer reviewed all 660 Statements of Economic Interest that were filed with the Secretary of State. After review of the 660 Statements, 32 letters were issued to individual employees and their supervisors addressing potential conflicts of interest. In two additional instances, the Ethics Officer individually contacted employees after determining that a conflict did exist between the employees' state and private employment. Disclosures made by members of the Children and Family Services Advisory Council were also reviewed for potential conflicts, but members were not contacted individually regarding

private/other employment because they are not DCFS employees.

### ACTION ON FY 14 STATEMENTS OF ECONOMIC INTERESTS

| | |
|---|---|
| STATEMENTS OF ECONOMIC INTERESTS FILED | 660 |
| LETTERS ISSUED TO EMPLOYEES ADDRESSING POTENTIAL CONFLICTS OF INTEREST | 32 |

The Office of the Inspector General Ethics staff also coordinated and monitored DCFS compliance with the statewide ethics training mandated under the Illinois State Officials and Employees Ethics Act of 2003. In 2014, the Office of the Inspector General ensured that 2,700 DCFS employees completed the training. In addition to DCFS employees, DCFS board and commission members were asked to have their members complete off-line training. In FY 2014, 390 DCFS board and commission members were required to complete the off-line ethics training.

*Consultation*

The Office of the Inspector General staff provides consultation to the child welfare system through review and comment on proposed rule changes.

In addition, the Office of the Inspector General provides consultation to Department and private agency employees concerning their ethical duties and responsibilities under both the Child Welfare Employee Ethics Code and the State Officials and Employees Ethics Act of 2003. For a full discussion of ethics consultations, see page 166.

*Projects and Initiatives*

Informed by the Office of the Inspector General's investigations and practice research, the Project Initiatives staff assist the Department in the development of practice training models for caseworkers and supervisors. The model initiatives are interdisciplinary and involve field-testing of strategies. The initiatives are evaluated to ensure the use of evidence-based practice and to determine the effectiveness of the model. See page 161 of this Report for a full discussion of the current projects and initiatives.

# INVESTIGATIONS

This annual report covers the time from July 1, 2013 to June 30, 2014.  The Investigations section has three parts.  Part I includes summaries of child death and serious injury investigations reported to the Department Director and the Governor.  Part II contains aggregate data and case summaries of child deaths in families who were involved with the Department in the preceding 12 months.  Part III contains general investigation summaries conducted in response to complaints filed by the state and local judiciary, foster parents, biological parents and the general public.

Investigation summaries contain sections detailing the allegation, investigation, OIG recommendations and Department response.  For some recommendations, OIG comments on the Department's responses are included in italics in the "OIG Recommendation/Department Response" section of each case.

## DEATH AND SERIOUS INJURY INVESTIGATIONS

**DEATH AND SERIOUS INJURY INVESTIGATION 1**

**ALLEGATION**  An eight year-old girl died of strangulation and blunt force trauma as a result of severe physical abuse.  Two child protection investigations of reported sexual abuse of the girl were unfounded one month prior to her death.

**INVESTIGATION**  The girl's involvement with the Department began three months prior to her death after it was reported that the girl, who resided with her father, a quadriplegic, in her paternal grandmother's home, had previously been sexually molested by her mother's boyfriend during the time the girl was living with her mother.  After a child protection investigation was initiated, an additional allegation of sexual abuse was made.  During the concurrent investigations the girl participated in two forensic interviews with staff from a Children's Advocacy Center (CAC) and underwent a medical examination.

Child protection investigators visited the home describing it as cluttered but not unsanitary.  The investigator met two cousins who lived in the home, but they were not extensively interviewed as they had never lived in the home where the alleged abuse took place.  During her first forensic interview, the girl stated that she was made to do "squats" or stand in a corner with her arms in the air as a form of punishment while living in the home of her father and paternal grandmother.  Despite the strong correlation between the punishment of children involving physical or emotional measures and the potential for physical abuse, the girl's disclosure prompted no further inquiry.  The OIG conducted two prior death investigations in which children who were subjected to "military-style" discipline faced harsher punishment when the tasks were not completed satisfactorily.  The World Health Organization and the International Society for Prevention of Child Abuse and Neglect have distinguished acts of physical punishment from discipline as being rooted in asserting power and dominance rather than developing a strategy to modify behavior.  The presence of these tactics in a home environment should serve as a warning indicator of potential abuse.

The medical examination of the girl identified bilateral linear marks on her thighs and possible loop marks on her buttocks.  Such injuries are frequent indicators of possible physical abuse. When the physician asked the

girl, in front of her grandmother, how the injuries occurred the paternal grandmother answered for the girl saying the child injured herself. The girl was not questioned separately. The physician did not photograph the injuries or prepare a body chart, but did note the marks in the record. Though the girl was found to have a urinary tract infection and was provided a prescription for medication to treat the infection, the information was not shared with the CAC family advocate to ensure the girl received follow up medical attention. This was especially important as the grandmother reported the girl did not have a primary care physician. Since no concrete evidence of sexual abuse was discovered, the physician designated the girl's exam as "normal". The records of the medical examination were not provided to staff that conducted a second CAC interview with the girl just three days later. OIG investigators learned it was not protocol for the CAC to receive medical records, despite the benefit additional information could provide.

OIG investigators learned that the girl had been in counseling which was terminated by the paternal grandmother after counseling staff raised concerns that the girl was made to provide care for her father far in excess of what was appropriate for her age. The CAC staff had not asked about prior counseling as this is not part of their protocol and was unaware of the girl's anxiety regarding her caretaking responsibilities.

Neither law enforcement nor child welfare personnel were unable to substantiate the allegations of sexual abuse and the reports against both perpetrators were unfounded.

One month after the reports were unfounded, paramedics responded to the home of the girl's paternal grandmother where the girl was found dead. Police who arrived on the scene reported the girl's body was covered with burns and bruises which her grandmother claimed the girl had inflicted upon herself. An autopsy performed by the medical examiner found the girl had suffered blunt force trauma, lacerations to her face, multiple bruises, and puncture wounds to her back, chest and abdomen. The medical examiner also identified other lacerations and fractures on her body as well as ligature marks on her wrists and ankles. The girl's two male cousins, ages 12 and 9, who also lived in the home but were out of town at the time of her death, described to investigators how the children were routinely subjected to "military-style" discipline including doing squats, push-up and being made to stand while holding their hands above their heads for an extended period of time. The boys stated that while they received beatings as punishment and generally complied with the discipline forced upon them in order to bring it to an end, the girl often could not perform the physical tasks and, as a result, was severely abused as additional punishment. The boys stated the girl's failure or refusal to perform the acts of discipline led to her being denied sleep, food or water. They boys also reported that the girl, whose urinary tract infection had potentially gone untreated, was frequently punished for wetting the bed, which included being made to sleep on the floor of her father's room. The grandmother told the boys the girl was "bad" for not finishing her chores and stated the girl intended to kill them.

The boys reported the grandmother frequently bound the girl's limbs and often tied her to stationary objects in the home, sometimes enlisting the boys to assist in restraining the girl, either simply as another means of punishment or in order to restrict her movement to facilitate further physical abuse.

The grandmother and father were both arrested and charged with first-degree murder. The grandmother is currently awaiting trial. The father died of natural causes while in jail. The boys were taken into protective custody and placed in a traditional foster home.

An OIG review of the actions of child welfare professionals during the investigation of the allegations of sexual abuse of the girl found an absence of an integrated effort between those involved which prevented the development of a comprehensive assessment of the girl's home environment and potential risks to her safety. The Illinois Child Advocacy Statute created CACs in order to provide an inter-disciplinary and integrated approach to child sexual abuse allegations. The purpose of this approach is to provide involved child welfare, medical and law enforcement personnel with an opportunity to engage in collaborative decision-making,

problem solving, system coordination and information sharing.  Although various personnel were privy to certain aspects of the case, the sum of all pertinent information obtained during the course of the investigation was never compiled or shared with all those involved.

The primary child protection investigator assigned to the case failed to enter notes into the case record in a timely manner, entering almost all of her documentation on the day the reports were unfounded.  In an interview with OIG investigators, the investigator's supervisor who approved the case closure stated she was aware the investigator regularly entered her notes into the record at the end of the investigations often requiring corrective supervisory intervention.  While the investigator spoke with the doctor who reported the exam was normal, the investigator failed to request the girl's forensic medical records until the day she closed the case.  Upon receiving the records, the investigator looked at the physician's conclusion that the girl's exam was normal, not noting information suggestive of inflicted injuries.  Furthermore, OIG investigators found the investigator's notes documented contact with a school counselor; however, the name provided was that of a counselor from a different school with which the girl had no association.  Both the girl's school counselor and the counselor from the other school denied ever having been contacted by the investigator.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES |
|---|

**1.  The child protection investigator should be disciplined for falsifying a contact note documenting that she spoke with the school counselor about the girl.**

The employee was discharged.

**2.  The child protection supervisor should be disciplined for failing to correct the investigator's pattern of failing to enter case notes in a timely manner.**

The employee received a 5-day suspension.

**3.  The Child Advocacy Center's consent forms should include the Advocacy Center's Family Advocate.**

The Department has discussed this recommendation with the Child Advocacy Centers (CAC) in this county and they agree.  The CACs did, however, assert that the CACs are not responsible for collecting the actual medical evaluation nor are they responsible for ensuring the information is received by DCFS.  The Inspector General is currently in continued meetings with the Child Advocacy Centers Advisory Board regarding the acceptance of this recommendation.

**4.  The Child Advocacy Center Advisory Committee should request that medical clinics that are co-located within Child Advocacy Centers include body charts or photographs to document any observed injuries and if the injuries may be suggestive of abuse, will ensure that the child is questioned separately from caretakers.**

The Inspector General is currently in continued meetings with the Child Advocacy Centers Advisory Board regarding the acceptance of this recommendation.

**5.  The Child Advocacy Protocol should be amended to include questions determining whether the child victim is, or has recently been involved in counseling.  Intake procedures should include verbal contact with ongoing or recent counselors to learn all information that may be helpful in assisting criminal or child protection investigators or medical personnel, advocates and mental health professionals in their treatment of the child or adolescent.**

The Inspector General is currently in continued meetings with the Child Advocacy Centers Advisory Board regarding the acceptance of this recommendation.

**6. As a member of the Child Advocacy Advisory Board, the Department should support implementation of the above procedural recommendations.**

The Department agrees.  The Department's member of this county's CAC will support implementation of the recommendations.

**7. The cousins' current therapist should contact the previous counselor. The Department should explore using the previous counselor as a continuing resource for the cousins as they continue to attend school.**

The children have been returned to their mother's home.  The new caseworker and supervisor were contacted and made aware of this recommendation.  The previous counselor's contact information has been provided to the children's current therapist, with consents secured.  The therapist agreed to contact and consult with the previous counselor regarding both children.

**8. The Inspector General reiterates the prior recommendation from the OIG death investigation, #11-2542:**

> **The Department should use this Report and OIG Report #09-0231 as training tools for management to address with child protection supervisors the risks associated with harsh punishment and the need for thorough investigation of such punishment.**

This training will be incorporated into the training scheduled to begin in January 2015 on the revisions to Procedures 300, *Reports of Child Abuse and Neglect*.   This training will be conducted between January 2015 and June 30, 2015.

**9. The Child Advocacy Center director should implement a corrective action plan with the involved physician for (1) failing to interview the child or ensure she was interviewed separately from the caretaker upon observation of suspicious marks; and (2) failing to document the dimensions of injuries in the medical record and complete a body chart or photograph the injuries.**

The Office of the Inspector General shared a redacted copy of the report with the involved Child Advocacy Center. The involved medical providers were advised of the findings made in the report.

**DEATH AND SERIOUS INJURY INVESTIGATION 2**

| ALLEGATION |
|---|

A three year-old girl died and her nine year-old brother was severely injured after their father doused himself, the children and the children's mother with gasoline and lit them on fire. The father and mother were also killed in the blaze. At the time of the fire, the children were in foster care with their maternal aunt following a previous threat made by the father to the mother to kill himself and the children in the same manner.

| INVESTIGATION |
|---|

The family's involvement with the Department was initiated three months prior to the deaths following a life-threatening event at the family's home. The mother contacted police to report the father had demanded she not leave to go to work and threatened that if she did he would set himself and the couple's two children on fire. The mother said she calmed the father down and went to work, but after arriving and informing her superiors of the father's behavior they advised her to contact the authorities. Police responded to the home and detected a strong smell of gasoline emanating from the apartment and heard children crying and coughing inside. Officers attempted to force entry and a hostage situation ensued. Police then evacuated the 20-unit building, established a perimeter and began negotiating with the father in the hostage situation. After several hours the father was persuaded to release the children and was ultimately taken into custody. Upon entering the apartment firefighters found the bathtub filled with gasoline. The boy told authorities their father had put him in the tub during the ordeal and police noted his socks were wet with gasoline. The father had been observed smoking cigarettes while at the window speaking with police during negotiations and fire officials stated that given the four gallons of gasoline they drained from the bathtub, a single spark could have ignited the entire building. The mother reported to authorities the father had serious mental health issues, had stopped taking his prescribed medication and had been regularly using PCP.

The father was hospitalized for psychiatric treatment and assessment, and the children were taken into protective custody by the Department and placed in relative foster care. A child protection investigation was opened against the father and the mother for leaving the children with the father in the wake of his threatening behavior and her knowledge of his drug use. The mother told the assigned child protection investigator the father had threatened her life during the previous year but she believed, "he was just talking," and stated he was a good father and would never hurt the children. The investigator also spoke with the maternal aunt who reported a domestic abuse incident between the couple six years earlier but stated she had never observed any abuse or neglect towards the children. In an interview with the OIG, the child protection investigator stated she believed the maternal aunt was a good placement choice for the children because the aunt had a negative opinion of the father and the investigator did not believe she would allow him unsupervised contact with them after he was released from the hospital. The investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) determining the children to be unsafe and a subsequent court order required the parents to be supervised by Department personnel or their designee when they visited with the children.

Despite the severity of the father's threats to his family and his actions that resulted in a massive response from police and fire department personnel, prosecutors declined to pursue criminal charges against him. The involved legal professionals were subsequently disciplined.

On the date the mother first appeared in court the father was not present as he had been transferred to a state-operated psychiatric hospital from the facility where he had initially been taken following the incident. The father's hospitalization prevented him from appearing at criminal court proceedings scheduled the same day to face charges of Aggravated Assault of a Police/Sheriff Employee related to an earlier confrontation with law enforcement personnel. Two weeks after the hostage situation, the father was discharged from the hospital. Upon discharge, the father received a prescription for a two-week supply of medication and

instructions to obtain aftercare services from a local mental health center.

Illinois Administrative Code requires state-operated facilities to coordinate discharge planning with aftercare providers and to take patients' known substance abuse into consideration.  Facility staff were unable to secure a community aftercare appointment until after the father was discharged and were unsuccessful in attempts to contact him by phone.  Neither the Department nor the private agency providing services to the family participated in the father's discharge planning and neither entity was aware of his referral to the local mental health clinic for aftercare.  In addition, no coordination occurred between the Department and the Illinois Division of Mental Health to ensure the father complied with his aftercare program.  In an interview with the Inspector General staff, an administrator with the Division of Mental Health stated that since the father's participation in services had not been ordered by the court they were powerless to compel him to comply with the discharge plan.  The father never participated in aftercare services.

Two days after the father was released from the hospital he made his first appearance in Juvenile Court.  An order was entered for the father's mental health records from his post-hostage incident hospitalization to be provided to the court, however they were only to be used by attorneys involved in the Juvenile Court proceedings.  The child protection investigator was present in court but did not interview the father or secure his consent to obtain his mental health records.  Although the father had threatened the lives of his family members and held his children hostage in a volatile and dangerous situation, the court granted him supervised visitation with the children rather than prohibiting contact or ensuring it took place in a controlled environment.  Any contact between the father and the children was to be supervised by Department personnel.

Two months after the hostage situation occurred, the child protection investigator indicated the hotline report against the father for Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Abuse.  The mother was also indicated for risk of harm.  The investigator closed the case without ever having obtained the father's mental health records, so she was unaware he had been referred to aftercare services and had failed to attend.  An Inspector General review of records from the state-operated hospital and a counseling center where the children were interviewed following the incident identified notes the organizations had attempted to contact the investigator but were unable to leave messages because her voice message mailbox was full.

The private agency caseworker assigned to provide services to the family monitored the father's visits with the children, which initially took place in a local restaurant.  The father requested for visits to take place at the home of the children's paternal grandmother where he lived, however the caseworker documented she did not feel comfortable conducting visits in that environment.  Eventually the father's visits with the children were held at the home of the paternal grandmother.  In an interview with Inspector General investigators, the caseworker stated the children's maternal aunt, their foster parent, was aware the father resided in the paternal grandmother's home.

Upon having the children placed in her home the maternal aunt requested daycare assistance through the County Office of Child Development, however a period of 87 days elapsed before even partial approval of services was granted.  During the course of conducting this investigation the Inspector General identified the approval process as an outdated system requiring duplicative efforts by multiple levels of staff and an absence of coordination between workers.  The unwieldy bureaucracy of the daycare approval system virtually guaranteed services would be greatly delayed.

While the Department is legally responsible for ensuring children in its care are provided with educational services, the three year-old girl was never enrolled in an early childhood program after being taken into temporary custody.  Furthermore, there was no communication between involved child welfare professionals and staff at the school the nine year-old boy attended.  In an interview with the OIG, the boy's teacher stated

that his mother usually picked him up from school unaccompanied by another adult, despite the requirement her contact with the children be supervised by a designee of the Department.  The teacher stated she had never had any contact with the maternal aunt or the caseworker and had been unaware of any restrictions regarding parental contact with the children.

Three and-a-half months after the father had threatened the mother's life and taken the children hostage, a fire broke out at the home of the paternal grandmother.  While the mother and the children were staying with the father at the home, in violation of the court visitation order, he doused all four of them with an accelerant and lit the family on fire.  The father, mother and three year-old girl all died as a result of their injuries.  The nine year-old boy survived the blaze despite suffering burns to 35% of his body.  During the subsequent investigation, the maternal aunt stated she understood the provisions of the parental visitation order required the mother to be supervised by an adult while with the children and that she believed the paternal grandmother was suitable to perform that function.  After spending five months hospitalized for treatment of his burns the boy was released and placed with his paternal aunt.

---

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.  As part of the temporary custody screening process, child protection will notify DCFS Office of Legal Services and DCFS Clinical of high risk cases such as those where a parent has demonstrated dangerous behavior as abduction; torture; threats to kill with plan; or taking children hostage and cases involving severe mental illness.**

> **a.  Upon notification, DCFS Clinical will initiate an emergency clinical staffing within 5 working days, including all relevant parties and records, and**

> **b.  Authorize a specialized integrated assessment.**

Department Procedures 300, *Reports of Child Abuse and Neglect*, is on target to issue final policy by December 31, 2014.  Procedures 300 policy training is planned for the period January 1, 2015 to June 30, 2015.  This training will reinforce caseworker and supervisor compliance with the policy revisions.

DCFS Clinical will provide an emergency clinical meeting within 5 working days upon notification from Child Protection (CFS 399-1 *Clinical Referral Form*).  The meeting will include all available relevant parties and records.  It will also include authorization for a specialized integrated assessment.  A follow up meeting with all relevant parties and records will occur within 30 days of the commencement of the specialized integrated assessment. The specialized integrated assessment will be completed by an LCSW, LCPC or PhD that has a minimum of 3 years of mental health experience and the screener will be supervised by a PhD or LCSW who has a minimum of 3 years of mental health experience.

**2.  When a parent has exhibited such dangerous behavior as abduction; torture; threats to kill with plan; or taking the children hostage, and the Department has made a Critical Decision to substantially restrict visitation, the Department shall file a Visitation Plan with the Court and Parties within 10 days of the Department being named as Temporary Custodian in accordance with 705 ILCS 405/2-10(2). The Visitation Plan shall comply with the requirements of Appendix A to Procedures 301 and shall clearly state the reasons for the restriction and shall include 1) supporting documentation such as police reports, psychological or psychiatric reports or case notes documenting observations and 2) a statement that the Department intends to share information on the restriction with necessary persons, such as school, daycare and the child's pediatrician.**

Department Procedures 300, *Reports of Child Abuse and Neglect*, is on target to issue final policy by

December 31, 2014.  Procedures 300 policy training is planned for the period January 1, 2015 to June 30, 2015.  This training will reinforce caseworker and supervisor compliance with the policy revisions.

Department Procedures 315, *Permanency Planning*, is underway and still in the content development stages. Anticipated training and procedure roll out is July 2015.

**3.  The Department shall train front-line staff on the creation and use and filing of the restricted Parent-Child Visitation Plan above including the use of visitation centers when necessary and procedures for accessing and reviewing any restrictions imposed by criminal court as a condition of bond.**

Department Procedures 315, *Permanency Planning*, is underway and still in the content development stages. Anticipated training and procedure roll out is July 2015.

**4.  If any Party objects to any part of the Visitation Plan filed in the Juvenile Court, DCFS Office of Legal Services shall request that the matter be referred to the Juvenile Court Clinic.**

Department Procedures 315, *Permanency Planning*, is underway and still in the content development stages. Anticipated training and procedure roll out is July 2015.

**5.  When a parent has exhibited such dangerous behavior as abduction; torture; threats to kill with plan; or taking the children hostage and the court permits visitation, such visitation should always be in a DCFS office, court or a visitation center.**

Department Procedures 315, *Permanency Planning*, is underway and still in the content development stages. Anticipated training and procedure roll out is July 2015.

**6.  Court ordered restrictions on parental contact, such as supervised visitation, with children in foster care must be communicated to children's schools or day care programs.  The Department should develop procedures for notification and include them in the parent/child visitation and education procedures.**

Department Procedures 315, *Permanency Planning*, is underway and still in the content development stages. Anticipated training and procedure roll out is July 2015.

**7.  Quality Assurance should review the Office of Child Development's process for approving daycare to make it more efficient.**

Quality Assurance has initiated the pre-planning phase of this review.  Scheduling conflicts necessitated pushing this review into the 3rd quarter of FY15.

**8.  The child protection investigator's current supervisor should determine if her having a full voicemail box is a chronic problem and if so, she should be counseled.**

The employee's voice mail was reset and is functioning.

**9.  Consistent with the intent and spirit of the Division of Mental Health discharge planning (IL Administrative Code Title 59, Section 125.50), Department Rules and Procedures should require DCFS workers to contact staff at psychiatric facilities prior to the discharge of any involved family members to communicate concerns or issues known to the Department and to monitor compliance with discharge**

**recommendations.  In cases in which the patient has already been discharged, the Division of Child Protection must obtain complete psychiatric records, including any discharge recommendations, and follow-up with community providers identified.  If the facility becomes involved during the pendency of a placement or intact case, the worker should seek the consent of the involved family member in order to receive records and monitor compliance with discharge recommendations.**

Department Procedures 300, *Reports of Child Abuse and Neglect,* is on target to issue final policy by December 31, 2014.  Procedures 300 policy training is planned for the period January 1, 2015 to June 30, 2015.   This training will reinforce caseworker and supervisor compliance with the policy revisions. Department Procedures 315, P*ermanency Planning*, is underway and still in the content development stages. Anticipated training and procedure roll out is July 2015.

**10. DCFS Clinical should consult with the Division of Mental Health to develop a system of coordination with DCFS and DMH for identifying whether a patient is DCFS involved, and, if so, contact information for discharge staffing coordination.**

DCFS Clinical Deputy Director and Executive Director for Region One Central for the Division of Mental Health have developed an initial process of coordination between DCFS and the Division of Mental Health (DMH) in situations in which a DMH patient is also DCFS involved.  However, that process has not yet been institutionalized.

**11. This report should be shared with the private agency that provided services to the family for management of future cases involving parents with severe mental illness.**

The Office of the Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors. The Inspector General met with agency management and a representative from the Board of Directors to discuss the findings in this report and the agency's management of future cases involving parents with severe mental illness.

**12.  This report should be shared with the Judge and officers of the court involved with this case.**

DCFS Office of Legal Services shared this report with the Judge.  The Judge will share the report with the officers of the court involved in this case.

**DEATH AND SERIOUS INJURY INVESTIGATION 3**

| ALLEGATION | A 19 year-old girl died of undetermined causes while placed in a residential facility. The girl had medical diagnoses of Type 1 diabetes, asthma, left dysplastic kidney hypertension and a faint heart murmur.  The girl was a ward of the Department at the time of her death. |
|---|---|

| INVESTIGATION | After having been removed from her family's home at age two following the sexual abuse of her two older brothers by a member of the household, the girl moved through multiple foster homes over the course of five years before being returned to the custody of her father. |
|---|---|

Following her return to the family home in a rural area, the girl began exhibiting behavioral problems including physical attacks against her brothers.  At age 10 she was diagnosed with Type 1 diabetes.  After beginning treatment for the disease, the girl intentionally overdosed on insulin and continued to demonstrate disruptive and injurious behavior that resulted in her being psychiatrically hospitalized four times within one year.  Following a fifth psychiatric hospitalization when she was 11, her father stated he was unable to protect his other children from her behavior in the home and refused to accept her upon her discharge.  The Department accepted guardianship and placed her in the home of her aunt, however she was removed after three days in response to her destroying furniture in the home and refusing to eat or take her insulin.

The then 11 year-old girl was placed in a residential facility under a waiver granting her acceptance into the program designed for children over the age of 12.  The girl lived at the center for four years and continued to exhibit the same pattern of behaviors resulting in more than 30 hospitalizations during that period.  When the facility closed when she was 16, the girl spent 1 year in a similar placement where she was aggressive towards other residents and frequently cut herself with sharp objects.  The girl also displayed suicidal behavior through attempts at self-strangulation and repeated self harming via insulin either by refusing to take her insulin or intentionally overdosing.  The girl's ongoing behavior necessitated a change in placement to a more structured environment. She was transferred at age 17 to a residential treatment center.

During the year the girl lived at the treatment center she was the subject of 125 Unusual Incident Reports (UIRs), of which almost half were related to her refusal to comply with her insulin treatments.  Her aggressive behavior also continued, resulting in numerous instances of serious physical attacks on staff members, suicidal gestures and attempts to run away from the facility. Seven months after the girl was placed at the treatment center, the girl and another female resident who was not diabetic intentionally overdosed on the girl's insulin while on a group outing.  During the subsequent child protection investigation of the incident it was learned the staff member supervising the outing had improperly allowed the girl to hold her insulin in violation of center policy.  Although some residents were permitted to be responsible for their own medications the girl was not allowed to possess or administer her insulin unsupervised because of her volatility and extensive history of intentionally overdosing.  The resident who took the insulin along with the girl told investigators the two injected themselves after the resident told the girl she felt like killing herself.  In the aftermath of the incident, the center fired the staff member who supervised the outing.

Within months following the suicide attempt, treatment center staff observed slow improvement in the girl's behavior, noting greater engagement in counseling sessions and an absence of psychiatric hospitalizations.  While she was frequently absent from school, which was located within the same building where she lived, for behavioral reasons, teachers were able to meet with her and conduct lessons in the residential area of the center.  Staff noted that even with highly individualized support the girl performed poorly in school and that she would require assistance dealing with a situation involving larger class sizes and increased educational demands.

As a result of the girl's improving behavior, she was transitioned to a less restrictive environment. Due to the girl's extensive history of misuse of her insulin, particularly as a means to harm herself, and the bond she had maintained with her father and one of her brothers, it was recommended she be transferred to a placement closer to her family's home that could provide on-site medical care and supervision. Ultimately, however, the girl was placed in a residential facility approximately 120 miles from her home in an urban area that did not have medical personnel on site. In an interview with the OIG, a Department placement administrator stated there was only one facility in the area closer to the girl's family home that met the ideal criteria and was contracted by the Department to provide care to female wards. The placement administrator stated the facility refused to accept the girl based on the high level of supervision her medical care required. The OIG identified two other facilities approximately the same distance from the girl's family home that provided similar services for females, though they did not have existing contracts with the Department. In correspondence with the OIG, executives from both facilities stated their organizations had experience providing care to older teens experiencing similar circumstances as the girl.

Following her transfer to the new facility the girl's modest behavioral improvements reversed. The girl was either hospitalized or on run from the facility approximately 70% of the time during the 8 months she resided there. In contrast to the highly structured environment she had left, the new facility required residents to leave the building during daytime hours on weekdays with the understanding they would travel on their own to school or work. Because the new facility had no on site medical staff the girl was responsible for management of her diabetes management. Staff relied upon the girl to monitor her own blood sugar levels and provided her with insulin when she asked for it, which she was then allowed to administer to herself without supervision. Because of frequent hospitalizations and being on run, the girl was enrolled in a public school pending her IEP evaluation. At the public school the girl was without any additional support or allowances being made for her educational or behavioral limitations.

Two days after the girl began classes at her new school, her caseworker attempted to transport her to school following a medical appointment. The girl expressed anxiety about attending and stated that if she was dropped off there she would run away or, "I will overdose." The caseworker spent time with the girl deescalating and calming her. After talking the girl decided to go the library. Later that afternoon the case worker again met with the girl. They made plan to visit the girl's father. The worker told IG investigators that the girl appeared happy and invested in future plans. That evening the worker sent an email to staff at the new facility describing the girl's behavior and suicidal statements. Later that evening, the girl made more self harming statements to staff at the facility regarding anxiety, depression related to her situation with her family and insulin related-suicide plans. In interviews with the OIG, staff from the new facility stated they had made notes in the internal electronic system regarding the girl's statements, however there was no collaboration between workers on the overnight shift to discuss their observations of the girl's behavior and no effort was made to contact medical professionals.

The next morning, a staff member found the girl unresponsive in her bed and she was pronounced dead on the scene. Results of an autopsy performed by the county Medical Examiner were inconclusive and a cause of death could not be established. Toxicology tests did not show the girl had an elevated insulin level, however it was noted that insulin is a hormone and does not maintain measurable levels post-mortem. The girl's death was ruled undetermined.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The Department, the Division of Mental Health and the Illinois State Board of Education should collaborate to share local community focused resources for Illinois children and adolescents requiring intensive psychiatric services including outpatient, in-home and residential care.** |
|---|---|

Coordination of work continues within the Governor's Office Health Innovation & Transformation (GOHIT) multi-agency committee composed of representatives from DCFS, the Department of Mental Health (DMH), and the Department of Health and Family Services (HFS).

**2.   The Department should utilize the resources identified through the interagency collaboration in recommendation 1 (above) to develop individualized contracts or amend existing contracts when necessary.**

The Department agrees.  Appropriate staff have been informed and will ensure individualized contracts are developed on a case by case basis in conjunction with the Department of Mental Health (DMH), Illinois State Board of Education (ISBE) and other agencies.

**3.   The new residential facility must implement a more efficient and effective communication system to convey critical information to residential staff.  Any such information should result in a supervisory plan of action.**

The Office of the Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors. The Inspector General met with agency management and a representative from the Board of Directors to discuss the findings in this report and the agency's implementation of a more efficient and effective communication system to convey critical information to residential staff.

**DEATH AND SERIOUS INJURY INVESTIGATION 4**

| ALLEGATION | An eight month-old boy drowned after his father left him and his two year-old brother unattended in the bathtub in their home.  A child protection investigation involving the family was opened five months prior to the boy's death and an intact family services case was still open at the time of the drowning. |

| INVESTIGATION | The initial child protection investigation was opened after the mother reported being punched in the face repeatedly by the father during an argument.  The father |
fled the home before police arrived and officers were unable to locate him.  Police issued a warrant for the father's arrest, which included an alert he was to be considered "armed and dangerous."  The mother filed for an Order of Protection which was granted by the court, barring the father from having any contact with her. When visited by a mandate investigator the day the Order of Protection was entered, mother stated she had been holding her infant son when she was struck by the father and related three previous incidents of domestic violence when he had physically abused her.  The following day, the mandate investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) determining the children to be unsafe due to the father's volatility and history of violence toward the mother in their presence.  He developed a safety plan centered upon enforcement of the Order of Protection and the mother's commitment not to allow the father to reside in the home.  The case was then assigned to a child protection investigator to conduct further assessment of the children's safety and the overall suitability of their home environment.

Although the Department requires unsafe CERAPs to be reevaluated every five working days until all involved children are assessed safe or taken into custody, the child protection investigator had no contact with the mother or the children until one month after the hotline report was made.  When the investigator did finally meet with the mother, she focused solely on the incident that brought police to the family home and did not inquire about the previous incidents of domestic violence the mother had reported.  The mother informed the investigator the Order of Protection against the father had expired because she had missed the court date when it was to be renewed but stated her intention to have it extended.  The mother said the father had only come to the home once since the hotline report was made and that he dropped off clothes for the children but she did not permit him inside.  The investigator completed a new CERAP determining the children to be safe and told the mother she wanted to speak with the father prior to the mother allowing him to have any contact with the children and noted the possibility of arranging supervised visitation for him.

Five days later the investigator spoke to the father and arranged to meet with him the following week.  On the day they were to meet, the father called the investigator and told her he was at the family home.  The investigator went to the home and met with both parents as well as the children who were also present.  The father acknowledged striking the mother during the argument that prompted the hotline report but denied she was holding the baby at the time and stated it was the first incident of domestic violence between them.  The mother told the investigator she intended to reconcile with the father and would not pursue an extension of the Order of Protection.  The investigator completed another CERAP determining the children to be safe.  The same day, the investigator requested a Law Enforcement Agency Database System (LEADS) check of the father.  The results of the LEADS check showed the father had an extensive criminal history including convictions for assault and weapons charges and included the "armed and dangerous" alert issued when his warrant for domestic violence was outstanding.  The investigator did not include information regarding the warrant or the alert in the case record.  In an interview with the OIG, the investigator stated she observed the father to be an appropriate caretaker and had no concerns regarding his care of the children.  The investigator said she did not pursue the issue of supervised visitation for the father since the couple planned to reconcile and the mother did not intend to extend the Order of Protection.

Two months after the hotline call was made, the investigator indicated the report against the father.  In her interview with the OIG, the investigator stated that although she had consulted with the Department's domestic violence specialist in the past, she did not do so in this case.  The investigator stated she did not deem it necessary since the couple would be referred to intact family services as a result of the indicated report.  The investigator closed the case without making any collateral contacts and the investigator's supervisor waived the Department requirement to do so.  The investigator told the OIG the parents declined to provide any collateral contacts and the children's paternal grandmother, whom she had spoken to briefly, did not seem receptive to conversation.  The investigator stated she believed it would be a breach of confidentiality to speak to any of the family's neighbors, although Department Rule allows for neighbors to be used as collateral contacts in the interest of obtaining necessary or pertinent information.

Although a case for intact family services was opened in the wake of the indicated report, the couple did not receive a referral until six weeks after the child protection investigation was closed, 14 weeks after the initial hotline report was made.  After the referral was made the parents avoided and ultimately refused to participate in the domestic violence, anger management or couples' counseling that had been recommended.  Two weeks after the intact family services case was opened, the mother began attending classes four days a week, leaving the father home alone to care for two children under the age of two.  Staff from the private agency designated to provide intact services failed to adequately assess safety and risk concerns inherent in the new childcare arrangement or identify means to provide the father with supplementary instruction or support.  In addition, all involved child welfare professionals were aware the family did not have a crib for the baby, however no one ever availed themselves of those provided by the Department to ensure the baby had a safe place to sleep.

Two months after the intact family services case was opened, the mother returned home from class to find the father in the living room while the two children were in the bathtub together.  The mother entered the bathroom and discovered the baby floating in the tub.  The baby was taken to a hospital emergency room in cardiac arrest and was later pronounced dead.  The father told police that after the baby soiled his diaper he decided to bathe both children, ran water and put them in the tub.  After checking on them once the father estimated he left the children unattended for 15 to 20 minutes before the mother arrived home.  The father was subsequently convicted of Endangering the Life or Health of a Child and sentenced to 30 months in prison.  The two year-old was removed from his parents' home and placed in the custody of his maternal grandmother.  The mother has participated in counseling services and parenting training.  She continues to have visitation with the boy with the goal of him being returned to her custody.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The child protection investigator and the child protection investigator's supervisor should be disciplined for their failure to (a) immediately access a pack-n-play for a 16 week-old infant; (b) failure to conduct collateral interviews in a domestic violence case; (c) failure to monitor the safety plan; and (d) for terminating the safety plan without obtaining the police report and conducting a timely LEADS history check, which would have informed them there was an outstanding warrant for the father.** |
|---|---|

Both employees received a 3 day suspension.

**2.  This report should be shared with the former private agency intact family services caseworker, who is now a DCFS child protection investigator, and her current manager for supervision purposes.**

The manager reviewed the report with the investigator.

**3.  The child protection investigator's supervisor and her team should meet with the Domestic Violence**

**Coordinator for training purposes.**

The domestic violence program within Clinical provided the recommended training to the supervisor and her team.

**4.  This report should be shared with the private agency for the purpose of developing a system of ensuring that intact family services workers (a) have immediate access to pack-n-plays for their clients and (b) have a more immediate service referral process when domestic violence is present.**

The Office of the Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors. The Inspector General met with agency management and a representative from the Board of Directors to discuss the findings in this report.

**5.  Private child welfare agencies providing intact family services should have at least one pack-n-play on hand that can be distributed to families on an emergency basis until a crib can be accessed.**

Language has been incorporated into the draft revisions of Department Procedures 302.388, *Intact Family Services*.

**DEATH AND SERIOUS INJURY INVESTIGATION 5**

| | |
|---|---|
| **ALLEGATION** | A five month-old girl died of asphyxiation after being smothered by her father in the presence of her mother.  Two weeks prior to the girl's death, a child protection investigation involving the family had been unfounded. |

**INVESTIGATION**  The family's involvement with the Department was initiated after the girl's six year-old half brother transferred to a new school.  On his third day of class, the boy drew images with a red crayon on white paper and stated it was an image of blood he had to clean up at home.  The boy also reported he had previously broken his collarbone and was urinating blood.  Three days later, the boy was observed to have bruises and abrasions to his face, neck and arm.  The next day the boy became ill at school and when he was informed he would be able to go home he expressed fear and stated he did not want to go.  A hotline report was made and a mandate investigator attempted to visit the family at their home but found no one present.  A second mandate investigator placed a call to the reporter but did not reach them.  The second mandate investigator also documented that a search was conducted in the State Automated Child Information System (SACWIS) database and noted that neither parent had a history of involvement with the Department, when in fact the step-father did have prior involvement with a different child. The report was then transferred to a child protection investigator to pursue the allegations.

Despite the safety factors apparent in the boy's outcry and the fact the mandate investigator was unable to establish contact with the family, the child protection investigator did not observe the boy or meet with the parents until two months after the hotline report was made.  During that time period, the investigator made two unsuccessful attempts to visit the family at their home and mailed a letter to the residence.  Later in the day of the investigator's second unsuccessful attempt, after almost two months had elapsed since the hotline call was made, the mother called the investigator and reported the family was visiting family in another state.  The mother stated the boy had psychological issues and had been saying "crazy things" and that he had been put on a waiting list for counseling services.  The mother denied the allegations of physical abuse and provided the name of the children's physician.

The investigator contacted the children's physician who stated she had not seen the family in two years and had never examined the baby girl.  The physician requested that the investigator ask the mother to schedule an appointment for all three of the couple's children.  An OIG review of the child protection case file found no medical records or requests for medical records.  In an interview with the OIG, the investigator stated that medical records are usually only requested in cases of medical neglect and she could not recall attempting to obtain them in this case.  An OIG review of the children's medical records found that one month prior to the hotline report, the six year-old boy had been brought to a hospital emergency room and found to have a broken collarbone.  The boy was accompanied by his maternal grandfather who reported he had been injured while playing with a friend.  The medical records also showed the then 18 week-old baby girl had only been seen by a doctor once since her birth.

Two months after the hotline call, the investigator visited the family's home and made her first in-person contact with the parents and children.  Both parents denied any physical abuse of the children as well as any substance abuse or domestic violence issues.  The parents stated they had been visited by police officers shortly after the hotline report was made but that they found nothing and informed them the case would be closed.  The mother again told the investigator the six year-old boy had behavioral issues that involved describing and depicting frightening imagery.  Later that day the investigator contacted the children's maternal grandmother who reported no concerns about the children's care by their parents and said she traveled from out of state every weekend to provide respite.

The following day, the investigator unfounded the report against the parents and closed the case. The day the investigation was closed the investigator unsuccessfully attempted to contact the police officer who had been involved with the law enforcement investigation of the allegations but was told the police officer would not be in until the next day. The investigator learned that the police had unfounded its investigation a month earlier. Also the day the investigation closed, the investigator completed a Law Enforcement Agency Database System (LEADS) check of the parents. The LEADS check found the father, who was not the boy's biological parent, had an extensive criminal history including convictions for assault, invasion of privacy and obstruction of justice. On the day the case was closed the investigator also made her first attempt to contact personnel from the boy's school, but was unsuccessful. While the investigation was still pending, had school personnel been contacted, the investigator would have learned that the boy again came to school with new marks on his face and an ear bruise, which school personnel had photos of and a detailed timeline of events. In addition, the investigator would have learned that the boy was fearful of his step-father. In approving the unfounded report, the investigator's supervisor granted multiple waivers allowing the case to be closed without required contacts having been made.

Two weeks after the report was unfounded, paramedics were called to the family's home and found the eight month-old girl stiff and unresponsive. Upon arriving at the hospital, the mother offered conflicting accounts of what had occurred in the home while the father stated he had no memory of the previous 24-hour period. The girl was found to have multiple head injuries including skull fractures and severe brain swelling due to prolonged lack of oxygen. The baby girl was unable to recover from the trauma and died as a result of her injuries. A SACWIS check conducted in conjunction with the baby's hospitalization found the father had been indicated for Burns by Neglect five years earlier to a then two year-old son with another woman. In an interview with the OIG, the child protection supervisor who performed the positive SACWIS check explained she had utilized a "person" search rather than the general name and birth date method to obtain the information.

The mother and father eventually confessed to police that, after a night of heavy drinking by both parents, the father had held his hand over the baby's mouth repeatedly until she lost consciousness. The couple then ignored the baby until finding her unresponsive in the morning but delayed in contacting paramedics for medical assistance. The parents were arrested and charged with murder. The six year-old boy and his two year-old brother were taken into custody and initially placed with their maternal aunt, however they were removed from her custody after she received death threats from the maternal grandparents and other relatives. The boys were placed in a shelter, however the six year-old, who reported having witnessed the father smother the baby girl, was removed after attempting to suffocate his younger brother. The six year-old was psychiatrically hospitalized and was later moved to a residential treatment program. The two year-old was placed in a traditional foster home.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The child protection investigator should be disciplined for her failure to interview the child, who was accessible at school, in a reasonable time period; and for waiting to request a criminal history (LEADS) check until the day the investigation was closed.** |

Discipline of the employee is pending as the employee is on a leave of absence.

**2. The child protection investigator's supervisor should be disciplined for her failure to ensure that the six year-old boy was seen in a reasonable time period and for her failure to ensure that the mandated reporter was interviewed prior to closing the investigation.**

The employee received a 5-day suspension.

**3.   The Department should clarify in its Procedures how investigators should complete "person" data checks in SACWIS. This information should be incorporated into training.**

The recommendation has been incorporated into revisions to Department Procedures 300, *Reports of Child Abuse and Neglect*, which is on target to issue final policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**4.   This report should be used as a case study with DCFS Chicago Police Department liaisons and the Chicago Police Department coordinators to address future collaborative efforts between the Chicago Police Department and DCFS.**

The Department's quarterly meeting with the Chicago Police Department Coordinators was attended by CPD Commanders from each area and area coordinators from areas south and central.  The redacted Inspector General report was reviewed with emphasis on better outcomes and decision-making for both entities when there is clear and consistent communication.  The Department, through its liaisons and SCR, will assist CPD in determining if a family has open involvement with DCFS.

*OIG Update:  According to the DCFS Chicago Police Department Liaisons, while communication has improved with Detectives investigating major crimes, Child Protection Investigators continue to have difficulty accessing patrol officers to obtain information about open investigations.  The Inspector General is coordinating with the CPD Chief of Patrol to facilitate communication between patrol officers and child protection investigators.*

**DEATH AND SERIOUS INJURY INVESTIGATION 6**

| ALLEGATION | A two month-old boy suffered a broken leg determined by physicians to be the result of physical abuse. Department child protection staff failed to fully assess all caretakers of the boy and his two year-old brother while conducting their investigation. |
|---|---|

| INVESTIGATION | The two month-old baby boy was brought to a hospital emergency room by his mother who reported swelling and redness in his left leg. X-rays of the baby found |
|---|---|

a "corner" fracture to his left femur and a bruise to his left knee as well as healing fractures to two of his ribs. While the femoral fracture and bruise were new injuries the rib fractures were estimated to have occurred two weeks earlier. The mother was unable to provide any explanation for the baby's injuries and told hospital staff that she and the children's father were the primary caretakers for the boys but that their maternal grandmother, who lived in the same building, sometimes provided care for them as well.

Later the same day, the mandate investigator assigned to the report observed the baby at the hospital and took the two year-old into protective custody, placing him in the home of his maternal aunt. When the baby was discharged from the hospital two days later he was also placed in the maternal aunt's home.

Two weeks after the hotline report was made, the mother requested that the children be placed with their maternal grandmother, who lived in the same building as the mother and had been the primary caretaker for the two year-old since his birth. The investigator and her supervisor agreed to the change in placement, however medical staff from the hospital objected, noting that the grandmother could not be ruled out as a perpetrator of the injuries to the baby since she had occasionally provided care for him. When the family was informed by the supervisor of the hospital staff's objections, the grandmother said she had never previously provided care to the baby, contradicting what the family had told the investigator. The children remained in the custody of the aunt.

After the Department's Regional Medical Consultant report found the baby's injuries were non-accidental and likely the result of physical abuse, the Department decided to take protective custody of the children. Three days later, after the family had been informed of that decision but prior to the children having been taken into custody, the supervisor received a call from the maternal aunt informing her that the grandmother reported the mother had signed a guardianship agreement granting custody of both children to the grandmother. After speaking with the mother's attorney over the phone, the aunt relinquished physical custody of the baby to the grandmother. The investigator and supervisor responded to the aunt's report by allowing the children to stay with the grandmother and indicating a report against the mother for Risk of Harm for violating the safety plan that placed the boys with maternal aunt.

In an interview with OIG investigators, the supervisor stated she was confused by the document presented by the grandmother but did not contact the Department's Office of Legal Services for consultation. Short-term guardianship orders are out-of-court documents that do not supersede Department Rule and Procedure. The original child protection investigation was indicated against both parents for Bone Fractures.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The investigative field should be trained that in cases with abusive injuries and multiple caretakers, the investigator must develop a timeline of caretakers during the critical period of time in which the injuries could have been inflicted.** |
|---|---|

A pilot training session is completed.  The Department is planning for a statewide roll out in the first quarter of 2015.

**2.   The Department should overturn the mother's indicated finding for violating the unwritten safety plan by signing a short term guardianship document.**

The Department does not agree to voluntarily overturn the indicated finding.  The Department does agree to amend Rule 300 and/or Procedures 300, *Reports of Child Abuse and Neglect*, whichever is necessary, to include a provision that will allow the Director to permit a late expungement appeal for good cause.

**3.   The investigator and supervisor should review this case, specifically with regard to their handling of the short term guardianship document.**

The report has been reviewed with the employees.

**4.   At the next Supervisor/Management Cook Child Protection Meeting, the field should receive a training surrounding the legal effect of Short Term Guardianship as well as a reminder regarding the importance of developing a 72 hour timeline around inflicted injuries.**

The Department's Office of Legal Services has conducted trainings statewide.

**5.   The Department should develop a training to focus on honing interviewing skills for child protection, identifying critical facts and developing information early on regarding critical facts.**

A pilot training session is completed.  The Department is planning for a statewide roll out in the first quarter of 2015.

**DEATH AND SERIOUS INJURY INVESTIGATION 7**

| ALLEGATION | A four month-old girl died of undetermined causes after being found unresponsive in the bed of her mother.   At the time of the baby's death, a child protection investigation of inadequate supervision by the mother of her four children was pending. |
|---|---|

| INVESTIGATION | Three months after the baby was born, the State Central Register (SCR) received a report alleging the mother routinely left her four daughters, ages 10, 3, 2 and 3 |
|---|---|

months, home alone.   The report also alleged the home was unsanitary and that the children frequently complained of being hungry and that there was no food available in the house.   The case was assigned to a child protection investigator who had recently been transferred to the position from a non-investigative unit of the Department.   The investigator contacted the reporter and was told the mother repeatedly left the children alone inside the home while she was outside drinking alcohol and socializing with neighbors.   The investigator then went to the home but found no one present and was unable to reach the mother on the phone. The investigator did not document any attempt to leave a written message for the mother at the residence.

The investigator did not make another visit to the home until two weeks later.   Department Procedure mandates that investigators make a "good faith attempt" to establish contact with families who are the subjects of hotline calls within 24 hours and to continue their efforts every 24 hours until contact is made. Furthermore, investigators must pursue whatever steps are necessary in order to establish contact and to meet with and observe potential victims of abuse and neglect.   Although the investigator was aware of the school the oldest daughter attended and had spoken by phone with the father of the youngest two girls, she did not utilize either of these resources to see the children.

One week after the investigator's initial visit to the family's home, the investigator's supervisor instructed her to conduct searches of the Child Abuse and Neglect Tracking System (CANTS) and the Law Enforcement Agency Database System (LEADS) to determine if the mother had any history of involvement with the child welfare or criminal justice systems.   Despite the fact the mother had been the subject of an unfounded hotline report seven months prior to the current allegation, an OIG review of the case record found no documentation of the previous investigation.   The supervisor also advised the investigator to send a letter to the mother's home informing her of the Department's need to locate her, however no such correspondence was present in the case file.

Six days after the investigator's second attempt to visit the mother and her children at their home, the supervisor reiterated the need for the investigator to send a letter to the residence.   In an interview with the OIG, the supervisor stated that although he conducted weekly meetings with his staff he was unaware whether the investigator ever completed her required tasks and did not address her failure to comply with his directives.

Eight days after the investigator's second attempted visit to the family's home, SCR received a call from the County Medical Examiner reporting the baby's death.   The mother stated she had awoken and found the baby unresponsive after the two had been sleeping together in the same bed.   Police who responded to the home found it to be in "deplorable" condition with empty liquor bottles, garbage, dirty diapers and cigarette butts strewn about the house.   The only furniture present in the home was mattresses on the floor.   There was no crib or separate sleeping apparatus for the baby.   During the course of the subsequent child protection investigation it was learned the mother always co-slept with the baby and that the baby had never been taken to a physician since leaving the hospital following her birth.   Although the mother provided the name of a doctor she said was the children's primary physician, the doctor had no record of having seen or treated any of

the children.

An autopsy found the baby suffered from congenital heart disease which was identified as a contributing factor in her death; however, the manner of death was classified as undetermined because the child had been subjected to an unsafe sleeping condition (sharing the bed with her mother).  The child protection investigation initiated prior to the baby's death was ultimately indicated against the mother and the father of the youngest two girls for Environmental Neglect.  The investigation arising from the baby's death resulted in the mother being indicated for Death by Neglect, Medical Neglect, Substantial Risk of Physical Injury and Environmental Neglect.  The three older girls were removed from the mother's custody and placed in the relative foster home of their maternal aunt.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | |
|---|---|

**1.  The child protection investigator should be disciplined for failing to timely assess the minors in accordance with Procedures 300.50 (c), *Initiation of the Investigation*.  The discipline should be mitigated by the fact the investigator had transferred to the Division of Child Protection two weeks prior to the case being assigned.**

The employee received a 7-day suspension.

**2.  The child protection investigator's supervisor should be disciplined for failing to ensure that the investigator timely assessed the minors in accordance with Procedures 300.50 (c), *Initiation of the Investigation*.**

The employee was discharged.

**DEATH AND SERIOUS INJURY INVESTIGATION 8**

| ALLEGATION | A nine month-old girl died as a result of massive brain swelling due to blunt head trauma. Six months prior to the girl's death, her parents were the subjects of an indicated report for physical abuse of the girl and risk of harm to her one and a half year-old brother. |
|---|---|

| INVESTIGATION | The family's involvement with the Department was initiated when the girl was three months-old after she was brought to a hospital by her mother and father for |
|---|---|

an evaluation of unexplained bruising and had demonstrated difficulty moving her right arm. The mother stated the girl suffered from "spontaneous" bruises that continually appeared and receded and reported the couple had taken the girl to another hospital one week earlier to address the same condition. Upon examination, doctors found that in addition to bruising the girl presented with multiple leg fractures. The parents also reported the previous hospital had identified an injury to the frenulum inside the girl's mouth. Given the improbability of self-inflicted femoral fractures and oral injuries in a non-ambulatory infant, as well as the girl's history of bruising, low weight and apparent failure-to-thrive, treating physicians determined her injuries were most likely the result of physical abuse and a child protection investigation was opened.

While the girl was hospitalized the mother presented staff with numerous theories as to the cause of the girl's injuries which were rooted in a host of diseases and maladies. The girl received hematology, neurology, ophthalmology, radiology and genetic consultations, all of which failed to identify any biological cause for her injuries. Doctors noted that the unexplained bruising did not occur in the hospital despite the administration of multiple, sometimes invasive, tests. A skeletal survey found two healing rib fractures which the parents were unable to explain. The girl's brother had no injuries.

The children were taken into protective custody by the Department and the boy was placed in the relative foster home of his paternal great aunt while the girl was hospitalized. The court granted the parents supervised visitation at the discretion of the private agency assigned to provide services. Following the girl's release from the hospital after one week, both children were placed in the care of the father's step-sister. The parents were both indicated for Bone Fractures and Cuts, Welts and Bruises to the girl and Substantial Risk of Physical Injury to both children.

An Integrated Assessment of the family was prepared while the child protection investigation was completed and the screener relied heavily upon the parent's self-reports to construct her understanding of the family's status. The screener did not obtain any of the girl's medical records, nor did she have access to the information being compiled by the Department's Regional Medical Consultant. In the absence of objective medical opinions and observations, the screener accepted the parents' accounts of various diagnoses they claimed to have received from doctors providing biological explanations for the girl's injuries. The Integrated Assessment identified counseling for the parents to help them cope with the stress and disruption of their involvement with the Department and their uncertainty over their daughter's health as a primary focus of services. Though both parents had been indicated for abuse by the Department, that fact was not reflected in the Integrated Assessment or the service plan.

The Department's Regional Medical Consultant report was completed, three months after the girl was first admitted to the hospital and one month after the child protection investigation was closed, finding no biological explanation for the infant's fractures and bruising. The report was sent to the child protection investigator but was not forwarded to private agency staff or other involved professionals.

One week after the Department's Regional Medical Consultant's report was completed, but without

knowledge of its findings, the court held a hearing on the State's petition for adjudication.  The court was informed the parents had reached an agreement with the State's Attorney stipulating the girl was an abused minor and the boy was a neglected minor based on the non-accidental nature of his sister's injuries.  An Order of Protection was entered and the parents were permitted to return to the family home, though the step-sister was required to remain in residence for 30 days and the parents were to cooperate with services.

Three months after the parents moved back into the home, paramedics responded to an emergency call the girl was unresponsive at the residence.  She was transported to a hospital in critical condition and doctors subsequently learned she had severe swelling of the brain and bilateral retinal hemorrhaging.  The girl was also found to have bilateral bruising to her thighs which her parents attributed to an infant seat; however, physicians determined the injuries were inconsistent with that explanation.  The parents asserted the girl had a genetic condition that caused her to bruise easily but it was noted that neither chest compressions from CPR nor the insertion of intravenous needles left any marks.  Four days after the girl was transported to the hospital she was removed from life support and she died the following day.  The medical examiner ruled the girl's death a homicide.  The boy was taken into custody and placed in the home of his maternal grandparents.  His case is pending in juvenile court.

---

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.  If a Regional Medical Consultant report is pending when custody is taken of a child, the child protection investigator and medical program coordinator should arrange for a phone conference to review their preliminary findings with the placement agency supervisor.  The Coordinator should ensure that the agency receives a copy of the report upon completion.**

The recommendation has been incorporated into revisions to Department Procedures 300, *Reports of Abuse and Neglect*, which is on target to issue final policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions. Relevant language will also be incorporated into Department Procedures 301, *Placement and Visitation Services*.

Regional Medical Consultant Programs will be advised to implement by February, 2015 and Department Operations and Contract staff will work to incorporate recommendations into the FY16 program plans for each medical resource program.

**2.  If the child does not come into custody but an intact family case is opened while a Regional Medical Consultant report is pending, the Department should develop a mechanism for the medical program coordinator to convene a phone conference with Intact Family Services when a child remains in the home.  The Coordinator should ensure that intact family staff receive a copy of the report upon completion.**

The recommendation has been incorporated into revisions to Department Procedures 300, *Reports of Abuse and Neglect*, which is on target to issue final policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions. Relevant language will also be incorporated into Department Procedure 302.388, *Intact Family Services*.

Regional Medical Consultant Programs will be advised to implement by February, 2015 and Department Operations and Contract staff will work to incorporate recommendations into the FY16 program plans for each medical consultant program.

**3.  The clinical screener completing the Integrated Assessment should be part of the case conference in order to integrate the information into the assessment.**

As part of the intake process for open placement cases, Integrated Assessment (IA) intake will inquire as to whether there are any outstanding Regional Medical Consultant reports to ensure that this documentation is incorporated into the Integrated Assessment. In cases in which a Regional Medical Consultant case conference is pending, the IA screener will arrange to participate in the case conference in order to integrate this information into the IA assessment.  These additions will be made part of the Integrated Assessment intake protocol.

**4.  The Regional Medical Consultant Coordinator should ensure that child protection investigators and supervisors are notified of the date and time of staffings held in the partner hospitals that pertain to their assigned investigations.**

The Department agrees.  This process will be written into FY16 program plans.

**DEATH AND SERIOUS INJURY INVESTIGATION 9**

| **ALLEGATION** | A one year-old boy died after suffering seizures related to low blood-sodium levels. The boy's mother was indicated for death by neglect and malnutrition, and she never received notice of the indicated finding against her. |
|---|---|

| **INVESTIGATION** | Two years after her two children were removed from her custody, the mother gave birth to her third son. |
|---|---|

Prior to the boy's birth, the mother had been involved with pre-natal care and was participating in counseling and parent coaching while working towards reunification with her older children; therefore, the mother maintained custody of the third child.  An OIG review of the boy's medical records found that while he presented as generally healthy he was small in stature and very low weight for his age.  The boy was routinely recorded as being between the second and tenth percentile for height and ranged between the second and fifth percentile for weight.  In an interview with the OIG, the mother's placement worker stated that during her interactions with the mother she often saw her sharing her own food with the baby or feeding him the same items as his older siblings. The worker reported she had spoken with the mother about providing the boy with foods geared specifically towards his dietary needs and on one occasion purchased groceries for the mother to feed the baby in order to illustrate what he should be eating and help her identify which of those foods he would consume.  The placement worker told OIG investigators she never observed the boy to be unhealthy or sick and was not concerned with his development as she was aware he was being seen regularly by his pediatrician.  The mother had reported to the pediatrician that the boy could not drink regular milk and sought and obtained authorization to provide him with soy milk instead.  The mother was accessing resources provided by the local Women, Infants and Children (WIC) clinic, which monitored well-baby care and knew the mother had missed the 12-month check-up.  This information was never shared with the caseworker

One month after the mother's most recent visit to the pediatrician with the boy she found him crying in his bed.  After she picked him up he lost consciousness and she called paramedics who transported him to a hospital.  Attending physicians determined his sodium count was low and administered a saline bolus to raise his levels.  While being transferred to a second hospital for treatment he developed hypotension and required intravenous fluids.  The mother told hospital staff the boy regularly drank "a lot of water" and that she gave it to him interchangeably with soy milk and juice depending on what was available in the home or what he seemed to prefer.  The boy did not regain consciousness and was pronounced dead the day after being brought to the hospital.  The boy's cause of death was determined to be hyponatremia, a not uncommon electrolyte abnormality in children resulting when sodium concentration in the blood falls below the minimum normal level.  The hyponatremia had led to swelling in his brain resulting in seizures which proved fatal.  While hyponatremia is a dangerous condition, most parents are unaware giving an infant too much water can result in death.  The medical examiner ruled the death a homicide due to child neglect.

Following the child's death, the Department opened an investigation into the death.  The assigned child protection investigator accepted information contained in the initial report suggesting the boy had been malnourished but did not obtain his medical records or seek a definitive diagnosis of his cause of death.  The investigator indicated the report against the mother for Death by Neglect and Malnutrition and her conclusion was approved by her supervisor.  The OIG investigation disclosed that neither the medical examiner nor any other medical professional made a finding the boy had been malnourished.

An OIG review of the medical examiner's report found their determination of his percentile length compared him with children three months younger, making it seem he was in the 75th percentile when in fact he was in the 10th to 25th percentile for length for his age.

Fifteen months after the death of the boy, the mother gave birth to her fourth child. Following an altercation with the baby's father while in the hospital after giving birth a hotline report was made and another child protection investigation was opened. It was during this investigation the mother learned she had been indicated for the death of her son the previous year. An OIG review of State Automated Child Welfare Information System (SACWIS) records found that during the course of the prior investigation the mother's address had been erroneously changed to that of the medical examiner's office. The Notice of Indicated Finding had been sent to the medical examiner's office in the mother's name.

As a result of the child protection investigation following the birth of the mother's fourth child, the baby was removed from her custody and placed in the relative foster home of his paternal great-grandmother. The OIG learned the paternal great-grandmother had an extensive history of involvement with the Department which included having her own children removed from her custody and having foster children placed in her care removed from her home. The foster children had been placed with the paternal great-grandmother while she was using another name and the Department had been unaware of her history at the time. The OIG informed Department administrators of the great-grandmother's history with child welfare; however, it was determined a great deal of time had passed since the incidents occurred and the baby was allowed to remain in her care.

Two months after the baby was placed with the paternal great-grandmother the court ordered him returned to the custody of his parents while the Department maintained wardship. The mother is considering relinquishing her parental rights to her two oldest children in order to allow them to be adopted by the foster parent they have resided with for eight years.

---

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. A redacted copy of this report should be shared with the child protection investigator's supervisor for discussion of her failure to ensure that medical records and a definitive medical diagnosis regarding the allegation of malnutrition were obtained and her failure to ensure that the mother received verbal notification that she was being indicated for death by neglect.**

The report was shared with the supervisor.

**2. The Department should consider unfounding the Malnutrition allegation against the mother. (This recommendation would not affect the indicated finding of Death by Neglect.)**

The allegation was unfounded.

**3. The notification letter generated for the mother during the death investigation should be sent to her correct address.**

The mother's address has been corrected and the notification letter was issued.

**4. The Inspector General will share a redacted copy of this report with the County Medical Examiner's Office and request that a correction to the length for age growth chart in the Medical Examiner's File for the boy be changed to reflect the correct length for his age at the time of his death.**

The Inspector General shared the report with the Medical Examiner's Office.

**5. Given the paternal great-grandmother's history, the Department should not place children in her care or exercise extreme caution if the decision is made to place children in her care. The paternal**

great-grandmother's aliases should be added to SACWIS (Statewide Automated Child Welfare Information System) and her history with the Department should be linked in SACWIS.

The Department agrees.  The home was placed on hold and aliases were entered into the system.

**6.  Given the circumstances surrounding the boy's death, current workers involved in the mother's case should closely monitor the family and maintain communication with service providers including medical doctors and WIC staff to ensure that the infant is receiving proper medical and nutritional care.**

Staff were notified of the needs indentified in this recommendation, as well as the need to exercise this practice in all cases.   Staff will continue to perform the tasks on an ongoing basis.

**7.  To ensure that alleged perpetrators of abuse and neglect receive notification of the investigative findings and their right to appeal, the Department must develop a system to ensure that at the close of an investigation the address for the alleged perpetrator(s) listed in SACWIS is accurate.  This report should be shared with the State Central Register for the purpose of developing a system of checking the address in death cases when there are multiple reporters calling the hotline regarding the same report.**

The recommendation has been incorporated into revisions to Procedures 300, *Reports of Child Abuse and Neglect*, which is on target to issue final policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

An Enterprise Service Request (CFS 822) was created and approved by the Office of Information and Technology Services for investigations that cannot close without a verified address for the perpetrator.

**8.  The Department should ensure that placement workers require that caregivers sign consents for the worker to follow-up with medical providers and Women, Infant and Children (WIC) for a non-ward child that remains in the home of the parent when there is an open case involving other children in care. The follow-up with medical providers and WIC should be included in the service plan.**

Department Procedures 315, *Permanency Planning*, is underway and still in the content development stages. Anticipated training and procedure roll out is July 2015.

**9.  The Manager of the local Department Field Office should discuss this case with the local Women, Infant and Children (WIC) clinic to encourage supportive communication in future DCFS involved cases.**

The Area Administrator discussed this case with the local Women, Infant, and Children (WIC) clinic.

**DEATH AND SERIOUS INJURY INVESTIGATION 10**

| | |
|---|---|
| **ISSUE** | In 2008, the Illinois Child Death Review Teams recommended that the Department investigate all deaths of babies who died while sharing a bed with a parent. Since that time, Office of the Inspector General investigative child death staff noted an increase in indicated death findings against parents in the absence of autopsy findings that the child died because of co-sleeping – and in the absence of other factors that would support a finding of Death by Neglect or Abuse, such as substance abuse or a prior infant death. OIG staff also noted that it appeared the indicated Death findings were not being upheld on administrative appeal.  In response, the Inspector General initiated an in-depth study of *Investigating and Indicating Parents for Co-Sleeping.* |

| | |
|---|---|
| **INVESTIGATION** | Coroners and Medical Examiners call the State Central Register for two reasons: 1) to report a child death that may have been caused by Abuse or Neglect;  and 2) to report child deaths solely for database tracking purposes, where there is no belief that the child died as a result of abuse or neglect. The Abused and Neglected Child Reporting Act (325 ILCS 5/7.8) gives the Department legal authority to investigate allegations of abuse or neglect after receiving a call of suspected abuse or neglect. The Department had begun, sometime in 2010, to accept for investigation all calls reporting infant deaths involving co-sleeping regardless of whether the reporter alleged abuse or neglect. |

Infants should sleep alone, on their backs and in cribs.  Co-sleeping, the practice of adults and/or older siblings sharing beds with infants, while promoted among some groups such as breast-feeding proponents and others, is an unsafe sleep practice. It is especially unsafe to sleep with an infant if the parent is impaired by drugs or alcohol or is sleeping on poor quality bedding as is commonly found in low-income homes.  A review of relevant literature revealed that as many as 65% of parents report having slept with their child during the first three months of the child's life.  Another study found that the incidence of frequent bed-sharing among low-income families approached 50%.  Because of the persistent prevalence of the practice, most experts support a Public Health Educational response to the problem rather than indicating parents for the practice.

An indicated finding for Allegation 51, Death by Neglect, requires a determination that a perpetrator exercised a "*blatant disregard of parental (or other person responsible for the child's welfare) responsibilities)"* which resulted in the death. (89 Ill. Adm. Code 300 Appendix B)  Under the Abused and Neglected Child Reporting Act, *blatant disregard* is defined as a "*real, significant, and imminent risk of harm would be so obvious to a reasonable parent or caretaker that it is unlikely that a reasonable parent or caretaker would have exposed the child to the danger without exercising precautionary measures to protect the child from harm"* (325 ILCS 5/3) An indicated finding of Death by Neglect will be retained on the State Central Register for 50 years, during which time, indicated perpetrators may not be employed as teachers or anywhere in the childcare system.

An indicated finding can be overturned through the administrative appeal process. OIG staff tracked indicated findings for Death by Neglect where the parents sought administrative review and the facts did not include substance abuse or other factors suggesting a neglectful environment. In all appealed cases, the indicated finding was overturned on appeal. Some parents stated that they never intended to fall asleep with their infant, but had misjudged how exhausted they were.

The OIG investigation found that the Department's change in practice, to begin investigating and indicating co-sleeping deaths in the absence of allegations of neglect or abuse, was a departure from statute and rule and wasteful of resources, since the findings were likely to be overturned on appeal. The practice also had the

potential to have an unfair impact on low-income parents, because families without resources are less likely to appeal indicated findings and are more likely to be indicated because they have poor quality bedding or be in situations in which they believe sleeping with their baby is safer than not (e.g., rodents and stray bullets).

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.  This Report will be shared with the Secretary of the Illinois Department of Human Services and the Director of the Illinois Department of Public Health to address co-sleeping as a public health issue, including a focus on the reduction of infant mortality rates among minority populations.**

The Inspector General shared the report with the Secretary of the Illinois Department of Human Services and the Director of the Illinois Department of Public Health.

**2.  The Department of Children and Family Services should reinstate its historical practice of investigating co-sleeping deaths only when the report discloses circumstances suggesting possible abuse or neglect, such as an intoxicated parent or a previous co-sleeping death in the same family.  In the alternative, the Department should immediately convene public hearings toward adopting Rules governing investigating and indicating co-sleeping deaths.**

The State Central Register (SCR) no longer takes a death report based solely on an unsafe sleep practice. Training was provided to staff.

**3.  The Inspector General will share this Report with the Senate Human Services Subcommittee.**

The Inspector General shared this report with the Senate Human Services Subcommittee.

**4.  The Inspector General will share this Report with the Illinois Child Death Review Teams' Safe Sleep Subcommittee.**

The Inspector General shared this report with the Illinois Child Death Review Teams' Safe Sleep Subcommittee.

**As a follow-up to the Safe Sleep Report, the Inspector General made an additional recommendation:**

> **Once the policy and procedures are finalized in accordance with ANCRA, the Office of the Inspector General recommends the Department undertake a review of all the sleep-related deaths indicated for Allegation #51 (Death by Neglect) during the period in which all sleep-related infant deaths were investigated to decide whether the findings should stand or be overturned, applying the factors identified in the revised policy and procedures. [Although many parents were indicated for #60 (Risk of Harm) related to sleep practice during this same time period, the OIG recommends the Department limit its review to cases indicated for #51, recognizing that an indicated finding of #60 has a 5-year retention (unlike #51 which has a 50-year retention) and the review of these cases would require a great amount of resources.]**

The Department's response and is pending.

## CHILD DEATH REPORT

Office of the Inspector General (OIG) staff investigate the deaths of Illinois children whose families were involved in the child welfare system within the preceding twelve months. OIG staff receive notification from the Illinois State Central Register (SCR) when a child dies, when the death is reported to SCR.[1] OIG staff investigate the Department's involvement with the deceased and his or her family when (1) the child was a ward of DCFS; (2) the family is the subject of an open investigation or service case at the time of the child's death; or (3) the family was the subject of an investigation or service case within the preceding twelve months. If OIG investigators learn of a child death meeting this criteria that was not reported to the SCR, staff will still investigate the death.

Notification of a child's death initiates a preliminary investigation in which the death report is reviewed, databases are searched and results reviewed, autopsy reports are requested, and a chronology of the child's life, when available, is reviewed. The next level of investigation is an investigatory review of records in which records may be impounded, subpoenaed, or requested, and reviewed. When warranted, OIG investigators conduct a full investigation, including interviews. A full investigation usually, but not always, results in a report to the Director of DCFS. The majority of cases are investigatory reviews of records, often including social service, medical, police and school records, in addition to records generated by the Department or its contracted agencies.

In Fiscal Year 2014 OIG staff investigated **99** child deaths meeting criteria for review, as compared to 93 deaths in FY 2013 and 106 deaths in FY 2012. A description of each child's death and DCFS involvement is included in the annual report for the fiscal year in which the child died. This year's annual report includes summary information for children who died between July 1, 2013 and June 30, 2014. There was an increase in natural deaths this year, including deaths caused by asthma. Two pending full investigations involve asthma deaths. Comprehensive summaries of death investigations reported to the Director in FY 14 are included in the Investigation section of this annual report.

Individual cases may not rise to a level necessitating a full investigation, but collectively can indicate systemic patterns or problems that require attention. OIG staff may address systemic issues through a variety of means, including cluster reports, initiatives, and trainings. Four pending full investigations are to be included in a cluster report. Last year's cluster of sleep related deaths resulted in a comprehensive report to the Director about investigating and indicating parents for co-sleeping. See full report on page 97.

---

[1] SCR relies on coroners, hospitals, and law enforcement in Illinois to report child deaths, even when the deaths are not suspicious for abuse or neglect. The deaths are not always reported. Therefore, true statistical analysis of child deaths in Illinois is difficult because the total number of children that die in Illinois each year is unknown. The Illinois Child Death Review Teams have requested that individual county registrars forward child death certificates to SCR to compile a list of all the children who die in Illinois. It is not known whether this is regularly occurring; in addition, some death certificates are sent to the Child Death Review Team Coordinator well after the fiscal year in which the death occurred. The Cook County Medical Examiner's policy is to report the deaths of all children autopsied at the Medical Examiner's office. The OIG acknowledges all the county coroners and the Cook County Medical Examiner's Office for responding to our requests for autopsy reports.

**Summary**

Following is a statistical summary of the 99 child deaths investigated by OIG staff in FY 14, as well as summaries of the individual cases. The first part of the summary presents child deaths by age and manner of death, case status and manner of death, county and manner of death, and substance exposure status and manner of death. The second part presents a summary of deaths classified in five manners: homicide, suicide, undetermined, accident, and natural.[2]

*Key for Case Status at the time of OIG investigation:*

Ward . . . . . . . . . . . . . . . . . . . . .    Deceased was a ward.

Unfounded DCP . . . . . . . . . . .    Family had an unfounded DCP investigation within a year of child's death.

Pending DCP . . . . . . . . . . . . . .    Family was involved in a pending DCP investigation at time of child's death.

Indicated DCP . . . . . . . . . . . .    Family had an indicated DCP investigation within a year of child's death.

Child of Ward . . . . . . . . . . . . .    Deceased was a ward's child, but not a ward themselves.

Open/Closed Intact . . . . . . . . .    Family had an open intact family case at time of child's death / or within a year of child's death.

Open Placement/Split Custody    Deceased, who never went home from hospital, had sibling(s) in foster care or child in care of parent with other children in foster care.

Return Home . . . . . . . . . . . . . .    Deceased or sibling(s) was returned home to parent(s) from foster care within a year of child's death.

Child Welfare Services Referral    A request was made for DCFS to provide services, but no abuse or neglect was alleged.

Preventive Services/
Extended Family . . . . . . . . . . . . . . . .    Intact family services case was opened to assist family, but not as a result of an indicated DCP investigation.

Former Ward . . . . . . . . . . . . . . . . . . . .    Child was a ward within a year of his/her death.

---

[2] The causes and manners of death are determined by hospitals, medical examiners, coroners and coroners' juries.

**Table 1: Child Deaths by Age and Manner of Death**

| | CHILD AGE | HOMICIDE | SUICIDE | UNDETERMINED | ACCIDENT | NATURAL | TOTAL |
|---|---|---|---|---|---|---|---|
| Months of Age | At birth | | | | | 2 | 2 |
| | 0 to 3 | 2 | | 9 | 6 | 10 | 27 |
| | 4 to 6 | 2 | | 5 | 2 | 2 | 11 |
| | 7 to 11 | 1 | | 4 | | 3 | 8 |
| | 12 to 24 | 2 | | 2 | | 3 | 7 |
| Year of Age | 2 | 1 | | 2 | 3 | 2 | 8 |
| | 3 | | | 1 | 4 | 1 | 6 |
| | 4 | | | | | | |
| | 5 | 1 | | | | 1 | 2 |
| | 6 | 1 | | | | 2 | 3 |
| | 7 | | | | | | |
| | 8 | 1 | | | 1 | | 2 |
| | 9 | | | | 1 | 3 | 4 |
| | 10 | | | | | | |
| | 11 | | | | | 1 | 1 |
| | 12 | | | | 1 | | 1 |
| | 13 | | | | | | |
| | 14 | 1 | | | | 1 | 2 |
| | 15 | 1 | | | | | 1 |
| | 16 | 1 | 1 | | 1 | 1 | 4 |
| | 17 | 2 | 2 | | 1 | 1 | 6 |
| | 18 or older | 3 | | | | 1 | 4 |
| | TOTAL | 19 | 3 | 23 | 20 | 34 | 99 |

**Table 2: Child Deaths by Case Status and Manner of Death**

| REASON FOR OIG INVESTIGATION* | | HOMICIDE | SUICIDE | UNDETERMINED | ACCIDENT | NATURAL | TOTAL |
|---|---|---|---|---|---|---|---|
| DCP | Pending | 1 | | 8 | 2 | 5 | 16 |
| | Unfounded | 6 | 1 | 7 | 9 | 5 | 28 |
| | Indicated | 1 | | 4 | 1 | | 6 |
| Ward | | 4 | 1 | 2 | 4 | 8 | 19 |
| Former Ward | | 2 | 1 | | | 1 | 4 |
| Return Home | | | | | | | |
| Open Placement/Split Custody | | 2 | | | 1 | 10 | 13 |
| Open Intact | | 2 | | 1 | 3 | 4 | 10 |
| Closed Intact | | 1 | | | | 1 | 2 |
| Child of a Ward | | | | | | | |
| Child Welfare Services Referral | | | | 1 | | | 1 |
| Preventive Services/Extended Family | | | | | | | |
| TOTAL | | 19 | 3 | 23 | 20 | 34 | 99 |

* When more than one reason existed for the OIG investigation, it was categorized based on primary reason.

**Table 3: Child Deaths by County of Residence and Manner of Death**

| COUNTY | HOMICIDE | SUICIDE | UNDETERMINED | ACCIDENT | NATURAL | TOTAL |
|---|---|---|---|---|---|---|
| Bureau | | | | 1 | | **1** |
| Champaign | 1 | | | | 3 | **4** |
| Clay | | | 1 | | | **1** |
| Cook | 10 | 2 | 15 | 4 | 13 | **44** |
| DeKalb | | | 1 | | | **1** |
| DeWitt | | | | 1 | | **1** |
| Kane | | | | | 1 | **1** |
| Kankakee | | | | 2 | | **2** |
| Knox | | | 1 | | | **1** |
| Lake | 1 | | 1 | 1 | | **3** |
| Madison | 1 | | 1 | | 1 | **3** |
| Marion | | | | 1 | | **1** |
| McHenry | | | | | 1 | **1** |
| McLean | | | | | 1 | **1** |
| Mercer | | | | 2 | | **2** |
| Peoria | | 1 | 1 | | 4 | **6** |
| Richland | | | | | 1 | **1** |
| Rock Island | 1 | | 1 | | | **2** |
| St. Clair | 1 | | | 3 | 1 | **5** |
| Sangamon | | | | 2 | 1 | **3** |
| Shelby | | | | | 1 | **1** |
| Tazewell | 1 | | | | | **1** |
| Vermillion | | | | 2 | 2 | **4** |
| Will | | | | | 1 | **1** |
| Williamson | | | | 1 | | **1** |
| Winnebago | 3 | | 1 | | 3 | **7** |
| **TOTAL** | **19** | **3** | **23** | **20** | **34** | **99** |

**Table 4: Child Death by Substance Exposure and Manner of Death**

| SUBSTANCE EXPOSURE | HOMICIDE | UNDETERMINED | ACCIDENT | NATURAL | TOTAL |
|---|---|---|---|---|---|
| Child exposed at birth*** | 2 | 3 | 1 | 8 | **14** |
| Mother has history of substance abuse | 0 | 1 | 0 | 2 | **3** |

*** This includes children who tested positive for a substance at birth or whose mother tested positive for a substance at birth.  Others may have been exposed to drugs during the pregnancy, but the drug usage was not recent enough to cause the newborn or mother to test positive.

**FY 2014 DEATH CLASSIFICATION BY MANNER OF DEATH**

### HOMICIDE

*Nineteen deaths were classified homicide in manner.\**

| CAUSE OF DEATH | NUMBER |
|---|---|
| Gunshot wound(s) | 7 |
| Abusive head trauma | 2 |
| Suffocation | 3 |
| Malnutrition due to starvation | 1 |
| Blunt force injuries | 3 |
| Stab wounds | 1 |
| Strangulation | 1 |
| Sudden unexpected death of infant (SUDI) with history of co-sleeping | 1 |
| **TOTAL** | **19** |

### PERPETRATOR INFORMATION:*

| PERPETRATOR | NUMBER |
|---|---|
| Mother | 2 |
| Father | 5 |
| Mother's Boyfriend | 3 |
| Step-mother | 1 |
| Foster father | 1 |
| Caretaker | 1 |
| Unrelated Peer | 2 |
| Unknown/Unsolved | 6 |

*Some deaths have more than one perpetrator

| PERPETRATOR GENDER | PERPETRATOR AGE RANGE | CHARGES |
|---|---|---|
| Males | 15 years-39 years | 7 charged with murder (one died in jail), 1 charged with involuntary manslaughter, 1 charged with felony child endangerment |
| Females | 18 years- 51 years | 3 charged with murder, 1 charged with involuntary manslaughter, 2 charged with child endangerment |

## SUICIDE
*Three children committed suicide this fiscal year.  Two of the children hung themselves, and one died of a gunshot wound.*

## UNDETERMINED
*Twenty-three deaths were classified undetermined in manner.*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Undetermined | 13 |
| Sudden Unexpected/Unexplained Death in Infancy (SUDI) | 5 |
| Cause pending | 3 |
| Substance misuse/Overdose | 1 |
| Medical conditions complicated by injuries | 1 |
| **TOTAL** | **23** |

## ACCIDENT
*Twenty deaths were classified accident in manner.*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Asphyxia/Suffocation/Overlay/sleep related | 8 |
| Drowning | 5 |
| Motor vehicle accidents | 4 |
| Injuries from Fire | 3 |
| **TOTAL** | **20** |

### NATURAL
***Thirty-four deaths were classified natural in manner.***

| CAUSE OF DEATH | NUMBER |
|---|:---:|
| Complications of prematurity | 7 |
| Cardiac conditions | 7 |
| Congenital abnormalities | 6 |
| Progressive Disease | 2 |
| Asthma | 4 |
| Pneumonia | 1 |
| SIDS | 1 |
| Cerebral Palsy | 3 |
| Liver Dysfunction | 1 |
| Cancer | 2 |
| **TOTAL** | **34** |

## HOMICIDE

| Child No. 1 | DOB 4/99 | DOD 7/13 | Homicide |
|---|---|---|---|
| Age at death: | 14 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Fourteen-year-old boy was riding his bike home from a friend's house around 12:45 a.m. when he was shot multiple times. The boy had been at the friend's house playing video games. He had called his mom to let her know he had arrived safely. Often he would stay overnight at the friend's house if it became late, but on this evening he decided to go home. He was approximately a mile from his house when he was shot. The boy had just graduated from 8th grade. He was looking forward to starting high school and planned to try out for the football, basketball, and debate teams.

Prior History:     In August 2012 a school employee called the hotline to report that the boy's mother had abandoned him. DCFS investigated and learned that the boy and his family had recently moved to a new neighborhood, but the boy was commuting to his old school so that he could graduate with his friends. After hearing that the boy was living with his mother in a new home, the school employee had no other concerns. The child protection investigation was unfounded. The teen had three juvenile arrests, all of which were adjusted at the station by police. A station adjustment is an action by police to attempt to correct a juvenile's behavior without going to court.

| Child No. 2 | DOB 7/04 | DOD 7/13 | Homicide |
|---|---|---|---|
| Age at death: | 8-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Strangulation and multiple blunt force injuries | | |
| Perpetrator: | Father and paternal grandmother | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Full investigation, Report to Director | | |

Narrative:      Eight-year-old girl, who lived with her 27-year-old father and 51-year-old grandmother, was found dead on arrival, covered with injuries, by police who were called to the home. The grandmother told police that the child caused her own injuries, intentionally running into furniture and hurting herself because her mother was not visiting regularly. At autopsy the child was found to have fractures, puncture wounds, and ligature marks. The father and grandmother were arrested and charged with first degree murder. They were denied bail. The father has since died from natural causes. The grandmother is in jail awaiting trial. **See Death and Serious Injury Case 1.**

Prior History:    The father had gained temporary custody of the child through domestic relations court in November 2012. The Department was not involved with the family at that time. In April 2013, the father reported that the 8-year-old had disclosed that her mother's boyfriend had molested her. During the investigation of that allegation, the child disclosed that another boyfriend of the mother's had molested her earlier, prompting a second concurrent investigation. The child participated in two forensic interviews and a medical exam. The investigation was not well-coordinated despite the involvement of a child advocacy center. Though the child reported military style discipline at the grandmother's house to a child advocacy center interviewer, there was no further investigation into that practice. A doctor at a clinic located in a child advocacy center noted the child had faded linear marks, but when the doctor asked the child about them in front of the grandmother, the grandmother answered for the child. The doctor verbally informed the child protection investigator that the exam was normal, not adding the information about the observation of marks or the grandmother's explanation that the child self-inflicted the injuries. The child protection investigator did not read the full medical report and never asked follow-up questions. In addition, though the father reported the child was seeing a counselor, the counselor was not contacted.  The reports were unfounded because no concrete evidence of sexual abuse was found and the timeframes for when the abuse allegedly occurred did not fit.

| Child No. 3 | DOB 3/13 | DOD 8/13 | Homicide |
|---|---|---|---|
| Age at death: | 5 months | | |
| Substance exposed: | No | | |
| Cause of death: | Suffocation | | |
| Perpetrator: | Mother's boyfriend | | |
| Reason For Review: | Split custody (siblings in foster care) | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Five-month-old infant was killed by his mother's 26-year-old boyfriend. The 25-year-old mother had recently separated from the father and moved in with a new boyfriend. The boyfriend confessed to police that he placed his hand over the baby's mouth while the baby was crying, then put him in a backpack and disposed of his body in a garbage dumpster. The boyfriend pleaded guilty to first degree murder and was sentenced to 30 years in prison. He was indicated for death by abuse to the infant. At the time of the infant's death, the infant's 17-month-old brother was with the father. Both parents had limited intellectual functioning. The couple had four older children who were in foster care. The mother and father were indicated for substantial risk of physical injury by neglect to the surviving 17-month-old. The toddler entered foster care in December 2013. A sibling born in March 2014 is also in foster care. The four oldest children have goals of substitute care pending court determination on termination of parental rights and the two youngest have goals of return home.

Prior History:    The Department first became involved with the family four years earlier when the parents were indicated for bone fractures by neglect and medical neglect to one of their children, then 2 years old. The family refused services. Between 2009 and 2011 three reports were investigated and unfounded and were unavailable for review. Toward the end of 2011 the couple's four children entered foster care following indicated allegations of environmental neglect. A fifth child, born in March 2012, was allowed to remain in the couple's custody. A year later the mother and father were indicated for substantial risk of physical injury by neglect to the child because of unresolved issues and allegations of domestic abuse. By April 2013 police determined the mother fabricated the allegations of domestic violence against the father. The newborn sixth child was allowed to remain at home with the toddler sibling. The investigator determined the parents were meeting minimum parenting standards and a private agency was involved with the family as they were monitoring the placement case as well as the two siblings at home.   The Office of the Inspector General has made previous recommendations regarding services to developmentally disabled parents and the inadequacy of placement workers also being responsible for monitoring children left in the parents' care.

| Child No. 4 | DOB 9/08 | DOD 9/13 | Homicide |
|---|---|---|---|

| | |
|---:|:---|
| Age at death: | 5 years |
| Substance exposed: | No |
| Cause of death: | Cardiac rhythm disturbances precipitated by blunt force injury to the chest |
| Perpetrator: | Mother's boyfriend |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Full investigation pending |

Narrative:      Five-year-old boy became unresponsive while in the care of his mother's 24-year-old boyfriend. It was the boy's fifth birthday and his 27-year-old mother was out shopping for birthday presents. The boyfriend admitted to striking the boy in the chest with his fist. The boy's 7-1/2-year-old brother was taken into custody and found to have multiple marks, lacerations, and bruises from abuse. The boyfriend was charged with first degree murder and aggravated battery of a child. The mother was charged with endangering the life or health of a child because she was aware of her boyfriend's treatment of her children. The boyfriend was indicated for death by abuse to the boy and for cuts, bruises, welts by abuse and substantial risk of physical injury by abuse to his brother. The mother was indicated for death by neglect to the boy and for cuts, bruises, welts by neglect to his brother. The brother is placed in the care of a relative. He has a permanency goal of return home. The mother gave birth to a third boy in March 2014; the father is the boyfriend. The mother was allowed to keep the infant pursuant to a one year court order of supervision. The OIG is conducting a full investigation of this child's death.

Prior History:   In February 2013 a teacher at the brother's school called the hotline to report the 6-1/2-year-old child had disclosed that his stomach hurt because he was hit with a belt buckle in the stomach by his mother's boyfriend. The teacher said he had no visible injury and she had talked to the mother about it. A report was taken for investigation of substantial risk of physical injury by abuse to the child by his mother's boyfriend. While that report was pending, in March 2013, the principal at the child's school called to report the child had a bump on his head, and he was afraid if he told what happened his mother would hurt him. A report was taken for investigation of cuts, bruises, welts by abuse to the child by his mother. Both investigations were unfounded after talking to the child, her mother and boyfriend, the maternal grandmother, and a nurse at the primary care physician's office. Both the mother and maternal grandmother characterized the child as a liar.

| Child No. 5 | DOB 12/97 | DOD 12/13 | Homicide |
|---|---|---|---|

| | |
|---:|:---|
| Age at death: | 16 years |
| Substance exposed: | No |
| Cause of death: | Gunshot wound to head |
| Perpetrator: | unknown |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:      Sixteen-year-old boy died one day after being shot in the head. The teen had been walking down the street with two teenage girls around 10:30 p.m. when he told the girls to cross to the other side of the street because something didn't feel right. A van pulled over and a man got out, fired several shots at the teen, got back in the van and fled the scene. The teen was the father of a 16-month-old child. A police investigation of the teen's murder remains unsolved but open.

Prior History:    Early in 2012 a school social worker called the hotline twice requesting child welfare services because of the deceased's behavior. The Department provided service referrals to the mother. In October 2012 the social worker called the hotline alleging the deceased's 13-year-old sister had been punched in the head by their 19-year-old brother. The brother was unfounded for substantial risk of physical injury by abuse. Investigation showed that the brother and sister had gotten into an argument; the brother hit his sister in the head; the mother was home and intervened; the sister had no injuries; and the brother moved out of the home. The teen had nine prior juvenile arrests, all of which were adjusted by police. A station adjustment is an action by police to attempt to correct a juvenile's behavior without going to court.

| Child No. 6 | DOB 9/13 | DOD 1/14 | Homicide |
|---|---|---|---|
| Age at death: | 3-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Suffocation | | |
| Perpetrator: | Step-mother | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:    Three-and-a-half-month-old infant was reportedly found unresponsive on the floor in the early morning by her 27-year-old step-mother. Her 30-year-old father was at work. The step-mother reported that she placed the swaddled baby in her swing between 9 and 9:30 p.m. She checked on her at midnight and she appeared fine. The step-mother said she awoke at 3:50 a.m. and found the baby face down on the ground, still swaddled, but not breathing. At autopsy the infant was found to have multiple fractures of the ribs and extremities, healing and recent appearing. A police investigation is ongoing. The DCFS investigation is completed. The infant's 2-1/2-year-old sister and 6-1/2-year-old half-sister were taken into custody and are placed in relative foster care. DCFS indicated the step-mother for death by abuse to the infant and for substantial risk of physical injury to the infant's sisters. The father was indicated for bone fractures by abuse. The OIG is conducting a full investigation of this child's death.

Prior History:    In March 2013, while pregnant with the infant, the 23-year-old mother and her 24-year-old boyfriend were investigated and indicated for cuts, bruises, welts to the infant's 1-1/2-year-old sister and an intact family services case was opened while the investigator sought the filing of a petition for court involvement. In June 2013 the court awarded custody and guardianship of the sister to the father. When the infant was born in September 2013, the mother was indicated for substantial risk of physical injury by neglect and the infant went to live with her father when she was discharged from the hospital. In October 2013 the father took the infant to the hospital with a spiral femur claiming her 2-year-old sister fell on top of the infant's leg. The infant had bruising on her head, face, and chest. The step-mother was at work at the time. While the emergency room doctor felt the explanation was plausible, the admitting doctor, experienced in child abuse and neglect, did not.  The father, when questioned and confronted by police, admitted he lied and that he actually fell asleep three times while holding the infant, with her falling out of his arms each time. The final time he grabbed her by the leg as she fell, causing the break. The child abuse doctor then opined that it could not be determined whether the injuries were inflicted or accidental given the father's second explanation, as it could explain the infant's injuries. The father was indicated for bone fractures by neglect. The court was made aware of the injuries and the children were allowed to remain in the father's care.

| Child No. 7 | DOB 5/13 | DOD 1/14 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 7 months |
| Substance exposed: | No |
| Cause of death: | Malnutrition from starvation |
| Perpetrators: | Mother and father |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

<u>Narrative</u>:      Seven-month-old infant was found unresponsive by her father. She weighed only eight pounds and had starved to death. Her twin sister was taken into custody; she was severely malnourished and also weighed only eight pounds. Neither infant had been to a doctor in over five months. The surviving twin is in a foster home where her special needs are being met, after spending time in the hospital and a rehabilitation facility. Her 18-year-old mother and 21-year-old father were charged with involuntary manslaughter and child endangerment. The parents remain in jail awaiting trial. They were indicated for death by neglect to the deceased twin and failure to thrive and malnutrition to the surviving twin.

<u>Prior History</u>:      In April 2013 police called the hotline to report a domestic dispute between the teen, then 31 weeks pregnant, and her mother. The hotline took a report for investigation of substantial risk of physical injury by abuse to the teen by her mother. The teen turned 18 years old seven days after the report was made. The investigation was unfounded. The teen moved out of her mother's home and into a place with her boyfriend, the father of the unborn twins (the family lived elsewhere at the time of the infant's death). The investigator tried to contact the teen after she moved, but was unsuccessful.

| Child No. 8 | DOB 6/07 | DOD 3/14 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 6-1/2 years |
| Substance exposed: | No |
| Cause of death: | Blunt force trauma to the head and abdomen, scalding burns |
| Perpetrator: | Father |
| Reason For Review: | Child was a ward within a year of child's death |
| Action Taken: | Full investigation pending |

<u>Narrative</u>:      Six-year-old boy was beaten to death by his mother's 39-year-old husband (who was listed as his father on an amended birth certificate though he was not the biological father). The 30-year-old mother was present in the home at the time of the beating. The mother pleaded guilty to child abuse and has been sentenced to four to ten years. The father pleaded guilty to second degree murder and has been sentenced to 100 to 150 years. The OIG is conducting a full investigation of this child's death.

Prior History:  The deceased was the mother's fourth of seven children. She gave birth to her first child as a teen in 1999 and made a plan for her parents to raise the child. Her first contact with the Department was in April 2006 when her then 17-month-old child was taken into custody after she left the child with relatives without a care plan. The maternal grandparents' health problems prevented them from being able to take the child so the toddler was placed in traditional foster care. The mother was inconsistent in maintaining contact with her worker and participating in services. In June 2006 the mother gave birth to a baby she was allowed to keep because she had stable housing and was visiting her child in care consistently. In October 2006 a report of medical neglect on the baby was unfounded after the mother took the baby to the doctor. In June 2007 the mother gave birth to the deceased. She left the violent boyfriend she had been involved with, sought an order of protection, and moved into a domestic violence shelter. The mother participated in services, but her counselor noted that she was not making progress in counseling. The mother again became less consistent in services, though the children in her care appeared healthy. In June 2008 the mother stopped visiting her child in care. The case was taken to legal screening and the mother's parental rights were terminated and the child was later adopted. In June 2012, four years later, relatives of the mother's husband, with whom the family was living, reported that the husband had whipped the mother's six-year-old child and left marks. The six-year-old and then five-year-old (the deceased) confirmed the report. The two children and their six-month-old sibling were taken into protective custody. The court awarded custody of the five and six-year-old children to the Department but returned the six-month-old child to the parents, saying there was no indication of abuse to the baby. The older children initially remained with relatives but were later moved to traditional foster care when questions arose about the appropriateness of the caretakers. In November 2012 the parents moved out of state without informing the worker until after moving. The worker advised the parents that they needed to locate services in their new state in order to complete their service plan. The worker made a call to the neighboring state's hotline but the report was taken as information only. In August 2013 the worker noted that the parents had visited the children only once since moving, had not kept in touch with the worker, and had not completed several elements of their service plan. When the worker found out the mother had given birth to another baby in the other state she informed the parents that the case would be taken to legal screening. In September 2013, the adjudicatory hearing was held. The case was dismissed on a motion from the State and the children were ordered returned home to the parents. The worker transported the children to the neighboring state and the case was closed.  Following the child's death the mother gave birth to a seventh child. The parents' rights have been terminated on all of the children.

| Child No. 9 | DOB 1/93 | DOD 3/14 | Homicide |
|---|---|---|---|
| Age at death: | 21 years | | |
| Substance exposed: | No | | |
| Cause of death: | Stab wound to the left breast and chest | | |
| Perpetrator: | Acquaintance | | |
| Reason For Review: | Deceased was a ward within a year of her death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:  Twenty-one-year-old former ward died after being stabbed by a 28-year-old acquaintance with whom she got into an argument at a train station. The woman has been charged with murder and is in jail awaiting trial.

Prior History:  The deceased was first a ward from 1997-1999. She was in foster care again from 2002 until 2006 when she was placed in the subsidized guardianship of an aunt and uncle. In 2009 she reentered care after an aunt, with whom she had been living by private arrangement, was no longer able to care for her. The deceased's wardship ended on her 21st birthday. At that time she was living in a DCFS/DMH funded transitional living program for young adults and participating in therapy and other services offered by the agency.

| Child No. 10 | DOB 8/12 | DOD 3/14 | Homicide |
|---|---|---|---|
| Age at death: | 19 months | | |
| Substance exposed: | No | | |
| Cause of death: | Subdural hematoma due to closed head injury due to assault | | |
| Perpetrator: | Mother's boyfriend | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:     Nineteen-month-old toddler was discovered deceased in the woods with burns covering 80% of her body. Approximately two days prior, the child's 23-year-old mother reported the toddler missing after arriving to her 23-year-old boyfriend's home and finding him outside searching for the girl. The mother had left her daughter with the boyfriend while she went to work. An autopsy revealed that the toddler's death resulted from abusive head trauma and the burns were post-mortem. The boyfriend admitted he caused the injuries that resulted in the child's death and he was charged with murder. He also was indicated for death by abuse. The mother was not investigated. The OIG is conducting a full investigation of this child's death.

Prior History:     A month prior to the toddler's death, a daycare worker called the hotline to report that the toddler had bruising and scratches to her face. The investigator interviewed the reporter, the mother, and the maternal grandmother and was informed that what appeared to be injuries to the child were symptoms of an allergic reaction. The mother had taken the child to the emergency room on the day the bruising was noted and the child was diagnosed with gingivitis and oral thrush. The investigation was pending at the time of the child's death and has since been unfounded.

| Child No. 11 | DOB 8/11 | DOD 3/14 | Homicide |
|---|---|---|---|
| Age at death: | 2-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple blunt force injuries due to child abuse | | |
| Perpetrator: | Father | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death; child's father was a ward within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:     Two-and-a-half-year-old child was reportedly found unresponsive in the afternoon lying on an air mattress by her 21-year-old father who called 911. The father reported that the child had fallen off of a chair that morning and hit her head and was fine except for wanting to lie down. First responders found the child covered in bruises and already deceased. The child had been living with her father and his 28-year-old girlfriend for about three weeks. The father was her only caregiver that day; his girlfriend was at work. The father was charged with first degree murder. He was indicated for death by abuse. The child's 24-year-old mother was indicated for substantial risk of physical injury by neglect to the child. The OIG is conducting a full investigation of this child's death.

Prior History:    The father was a ward of the Department from March 2010 until he was emancipated in August 2013. In March 2013, a hospital social worker called the hotline to report that the mother and maternal grandmother had brought the child to the hospital with bruising to her face and buttocks and scratches to her back. The child had been staying with her father when she sustained the injuries. The doctor who examined the child said that in her best medical opinion, the child's injuries were the result of physical abuse. The father was indicated for cuts, bruises, welts by abuse to the child, who returned home with her mother and grandmother who lived in a neighboring state. The father's caseworker was advised of the indicated finding against the father. Five days before he was emancipated, the father told his caseworker that his daughter was staying with him and that he had been her caretaker for two-and-a-half-weeks. The caseworker did not see the child or call the hotline.

| Child No. 12 | DOB 1/97 | DOD 4/14 | Homicide |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Split custody (sibling in foster care) | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Seventeen-year-old girl, whose twin brother is a ward, was shot and killed in the afternoon while standing on a porch with two friends. The offender had gotten out of a vehicle at the corner, walked up to the porch and fired shots at the teen and her two male friends. The friends were both shot, but they survived their injuries. According to newspaper accounts, law enforcement sources believed that the teen was an assassin for a gang; she was a suspect in multiple shootings. The teen is believed to have been the intended victim. The teen had three delinquent petitions filed on her: two were dismissed by way of motion by the prosecution; and for the third the teen received a year of supervision.

Prior History:    The girl's twin brother is in the guardianship of DCFS. In March 2011 a delinquency court judge ordered that the 14-year-old boy, who has a history of delinquency, emotional trauma and mental health issues, be committed to the care of DCFS and be placed in a locked treatment facility. The order for a locked facility was later amended because Illinois does not have locked treatment facilities and the boy would have had to be sent out of state making visits from his family difficult. The boy remains in the guardianship of DCFS; he is in a juvenile detention center.

| Child No. 13 | DOB 12/95 | DOD 4/14 | Homicide |
|---|---|---|---|
| Age at death: | 18 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Deceased was a ward | | |
| Action Taken: | Cluster investigation pending | | |

Narrative:      Eighteen-year-old boy died in surgery after being shot multiple times. He was at his girlfriend's sister's house when he was shot in the afternoon.  Police responded to the scene and found the ward lying face down in a driveway. A police investigation remains unsolved but open.

Prior History:    The ward came into foster care in 2004 at age ten, with a delinquency record starting at the same age.  He had been placed at numerous group homes; had a long history of running away from many of his placements; was in and out of juvenile detention; and was uncooperative with offered services. He was on run from April 2012 to January 2013 when he was picked up on a warrant for his arrest. He was committed to DOC and while incarcerated the ward passed his GED test. He was released in May 2013 and was placed with his 21-year-old sibling in another part of the state. It was the only placement at which the ward was willing to stay. Attempts to transfer his case to the appropriate region were unsuccessful until February 2014 because the receiving region refused to accept the case, resulting in a nine month delay in providing the ward with services. The ward had requested that his case remain open. He had a permanency goal of independence and was in the process of enrolling in college.

| Child No. 14 | DOB 3/14 | DOD 4/14 | Homicide |
|---|---|---|---|
| Age at death: | 6 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Subdural hemorrhage | | |
| Perpetrator: | Foster father | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Six-week-old infant was found unresponsive in his crib by his 35-year-old foster father. The child was taken by ambulance to the hospital where he was found to have severe head injuries and non-displaced fractures to two of his right ribs. Medical professionals determined the trauma occurred within two hours prior to the foster father's call for emergency services. The infant was in the foster father's sole care during that time period. The baby's foster mother was at work and the infant's agency supervised visit with his mother earlier that day was uneventful. The foster father, who had no criminal history and no prior child abuse history, was charged with first degree murder.  He also was indicated for death by abuse.

Prior History:    In 2012 the infant's sibling entered foster care following an indicated finding against the mother for leaving the sibling, then 6 months old, home alone in the care of the sibling's father, a registered sex offender. The father had been found guilty of aggravated criminal sexual abuse of a victim under age 13 and aggravated criminal sexual abuse of a victim between the ages of 13 and 16. The mother had previously been informed by the Department and local police that the sibling was not to be left alone with the father. The sibling was placed in a home of relative with her paternal uncle, his wife, and their 1-year-old son. After his birth, the infant was removed from his mother's care because of her finding of unfitness regarding the sibling and her failure to participate in services. The infant was placed with his 2–year-old sibling, who was in the process of being adopted by her relative foster parents, who also had their own 3-year-old son.  Following the infant's death, the sibling was removed from the home and placed in a traditional foster home. The foster parents' son was also removed from the home because of concerns raised about the foster mother's continued support of her husband. He is placed with his maternal grandmother.

| Child No. 15 | DOB 10/98 | DOD 5/14 | Homicide |
|---|---|---|---|
| Age at death: | 15 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Unrelated peer | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Cluster investigation pending | | |

CHILD DEATH REPORT

Narrative:      Fifteen-year-old boy was acting as a "look-out" across the street from two friends. The teen pointed out a passing vehicle and one of the friends fired multiple shots at the vehicle, with two shots striking the teen. The shooter, also fifteen years old, was charged as an adult with first degree murder.

Prior History:    In June 2013, eleven months before his death, the teen's mother called the hotline alleging that her son was staying at a friend's house that should be condemned and that the mother, whose last name she did not know, provided little supervision. She wanted help getting her son to return home. DCFS took a report for investigation of inadequate shelter to the teen and his friend by the friend's mother. The investigator went to the home, but no one answered. She left a note asking for a call, but the friend's mother did not respond. On a second visit, the investigator discovered the home had been boarded up and was empty. The investigator spoke with the teen's mother who reported that the teen had returned home and was living with her. The mother did not know (and the teen denied knowing) the friend's or his mother's last names, where they moved, or how to reach them. Because the investigator could not locate them, the investigation was unfounded. The teen had five delinquency petitions filed in 2013 and 2014. The first petition, filed in February 2013, was stricken on leave. The second petition was not filed until after the child protection investigation. The teen was placed on electronic monitoring from November 2013 until the case was terminated in January 2014.

| Child No. 16 | DOB 12/12 | DOD 5/14 | Homicide |
|---|---|---|---|
| Age at death: | 16 months | | |
| Substance exposed: | No | | |
| Cause of death: | Complications of asphyxia due to suffocation | | |
| Perpetrator: | Family friend/caretaker | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Sixteen-month-old child died three weeks after being suffocated by his mother's 24-year-old best friend. The child, his 24-year-old mother and her 25-year-old boyfriend were spending the night at the friend's home. The boy awoke during the night and the friend got up to tend to him and became frustrated because the mother and her boyfriend were sleeping while she was caring for the child. The friend said the boy grabbed her shirt and bit her breast and she responded by squeezing his head and neck in the crook of her arm for 10 to 12 minutes until he went limp. The friend has been charged with first degree murder. She was also indicated for death by abuse.

Prior History:    In December 2013 an intact family services case was opened after the mother was indicated on a report of environmental neglect because of the condition of her home. The mother cleaned her home and maintained its condition.  At the time of the child's death, the mother was participating in services including counseling, parenting training, and early intervention services for her child.

| Child No. 17 | DOB 7/95 | DOD 5/14 | Homicide |
|---|---|---|---|
| Age at death: | 18 | | |
| Substance exposed: | Yes | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Deceased was a ward | | |
| Action Taken: | Cluster investigation pending | | |

Narrative:      Eighteen-year-old ward was shot and killed outside his transitional living program around 1:15 a.m. Video surveillance outside the facility showed the ward had just rung the doorbell to his placement when an unknown assailant approached him and shot him multiple times. A staff member, approaching the door to let the ward in, called 911. The ward was pronounced dead at the scene.

Prior History:    The teen was involved with the Department his entire life beginning when he was born substance-exposed. In 1999 he was removed from his mother's care because of her substance abuse and he was placed with a maternal uncle. The teen was primarily cared for by his maternal grandmother and she adopted him in 2007. As a teen, the ward had behavioral issues that the maternal grandmother felt were negatively affecting her health. Various relatives tried to help care for the teen without success. In 2011 he reentered the Department's care on a dependency basis. After a failed foster home placement, he had two group home placements. The ward had a permanency goal of independence. He was uncooperative with offered services, used drugs and alcohol, often left the facility, was hospitalized, and was arrested and detained in jail. The teen had multiple juvenile arrests all of which were adjusted by police. A station adjustment is an action by police to attempt to correct a juvenile's behavior without going to court. Arrests as an adult included no driver's license, retail theft, battery, domestic battery which led to an order of protection against him, and criminal trespass to land which resulted in the teen spending time in county jail.

| Child No. 18 | DOB 1/14 | DOD 6/14 | Homicide |
|---|---|---|---|
| Age at death: | 4-1/2 months | | |
| Substance exposed: | Yes, marijuana | | |
| Cause of death: | Sudden Unexpected Death in Infancy with history of co-sleeping | | |
| Perpetrators: | Parents | | |
| Reason For Review: | Unfounded and indicated child protection investigations within a year of child's death; closed intact family services case within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:    Four-and-a-half-month-old infant was found unresponsive around 9:30 a.m. by his mother. The infant had been co-sleeping in a king-sized bed with his 30-year-old mother and 23-year-old father. He was last seen alive at 2:30 a.m. when he was fed a bottle. The mother and father admitted to smoking marijuana and drinking alcohol before going to sleep. The mother's BAC was .10 ten hours after going to bed. There was a crib in the home. The parents were charged with felony endangering a child causing death. They were indicated for death by neglect. An intact family services case is open to provide services to the mother and her three daughters. Since the infant's death, the Department referred the case to the State's Attorney's Office for a petition to be filed for an order of supervision, but the State's Attorney has not done so.

Prior History:    Between April 2012 and the infant's death, there were four child protection investigations on the mother involving physical abuse; substantial risk of physical injury due to gang activity by the mother's boyfriend, the infant's father; and substantial risk of physical injury because of the mother's alcohol problem. An intact family services case was open from February 2013 to October 2013 when it was closed for non-cooperation. In January 2014, the Department met with the State's Attorney's Office requesting a petition be filed for an order of supervision after one of the mother's daughters reported the mother was drinking and passing out while caring for the infant. The State's Attorney's Office did not feel there was enough evidence to file a petition.

| Child No. 19 | DOB 8/96 | DOD 6/14 | Homicide |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Cluster investigation pending | | |

Narrative:     Seventeen-year-old boy was shot and killed around 10:30 p.m. He and his 15-year-old foster brother were about a block away from home when a van drove up with unidentified individuals who demanded money from the teens and someone in the van fired shots. The teen was shot in the chest and pronounced deceased on the scene. His foster brother was shot in the arm and survived. A police investigation of the teen's murder is unsolved but remains open.

Prior History:     The teen and his three sisters entered foster care in April 2012 because of continuing neglect by their mother. The teen was placed with his godmother after he ran from two other relative placements. The teen was stable in her home. He graduated high school in June 2014; he had a job; and he was hoping to start junior college in the Fall. The children's mother, who had a chronic health condition, died in 2013. His sisters are placed with their maternal grandmother and have permanency goals of guardianship. The teen had three juvenile arrests, all of which were adjusted by police. A station adjustment is an action by police to attempt to correct a juvenile's behavior without going to court.

## SUICIDE

| Child No. 20 | DOB 6/97 | DOD 1/14 | Suicide |
|---|---|---|---|
| Age at death: | 16 years | | |
| Substance exposed: | No | | |
| Cause of death: | Hanging | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 21 | DOB 1/97 | DOD 5/14 | Suicide |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | No | | |
| Cause of death: | Gunshot wound of the face | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 22 | DOB 11/96 | DOD 12/13 | Suicide |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxiation due to hanging | | |
| Reason For Review: | Child was a ward within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

## UNDETERMINED

| Child No. 23 | DOB 7/13 | DOD 8/13 | Undetermined |
|---|---|---|---|
| Age at death: | 3 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Unexplained Death in Infancy | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Three-week-old infant was found unresponsive by her 27-year-old mother. The mother had fed the infant around midnight and placed her to sleep in her bassinette. The baby awoke around 5:30 a.m. and the mother fed her again and laid the baby on her chest and they fell asleep. Around 9:00 a.m. the mother awoke to the phone ringing and discovered the baby wasn't breathing.

Prior History:    Prior to the baby's birth, in March 2013, a relative called the hotline alleging the mother had abandoned a child for whom she was the guardian by dropping him off with the relative and not returning. Investigation showed that the relative had agreed to care for the child while the mother was moving. The child went back to the mother/guardian's care while the investigation was pending and the investigation was unfounded for inadequate supervision.

| Child No. 24 | DOB 6/13 | DOD 8/13 | Undetermined |
|---|---|---|---|
| Age at death: | 2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Two-month-old infant was found unresponsive by her 18-year-old mother. The mother had fed the infant at about 3:00 a.m. After feeding her the mother laid on the couch with the baby on her chest and they both fell asleep. When mother awoke, they were both on the floor. The mother and her children were staying at a relative's home. DCFS investigated the infant's death. Mother was indicated for death by neglect and substantial risk of physical injury by neglect to the one-year-old sibling. The sibling was taken into protective custody but the case did not pass legal screening. An intact family services case was opened. The mother was not compliant with services and the sibling eventually entered foster care and is in a relative foster placement.

Prior History:    In June 2013, just prior to the infant's birth, an anonymous report contacted the hotline and reported that the teen-age mother was homeless and often walked the streets at night with her child because she had nowhere to live. It was also reported that the mother would call relatives begging for money because she had no food. Allegations of inadequate food and inadequate shelter were taken for investigation. The report was unfounded three days prior to the infant's death. Mother denied being homeless. She and an aunt reported that mother was in the process of moving to Wisconsin and had been staying with family and friends.

| Child No. 25 | DOB 1/13 | DOD 9/13 | Undetermined |
|---|---|---|---|
| Age at death: | 7 months | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Unexpected Death in Infancy | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Seven-month-old baby was found by his 29-year-old father unresponsive during a nap. The father had laid the baby on his back on the parents' bed, covered him with a blanket, and propped a bottle on a pillow next to him. When he went to check on the baby, the father found him face down under the blanket. The father picked up the baby and he started to throw up formula. The father called 911 and the baby was taken by ambulance to the hospital where he died a short time later. The father had been caring for his three children: the infant; a 2-1/2-year-old son; and a 4-1/2-year-old daughter while their 22-year-old mother was at work.

Prior History:      In February 2011 the mother and father were indicated for medical neglect of their 3-week-old son when he failed to gain weight and the parents had missed a doctor's appointment. The family received intact family services for almost one year. During that time the parents participated in services. Both children received early intervention therapies in the home and the school district provided weekly services. The baby was also medically monitored by four medical specialists. Six months after the family's case was closed, in August 2012, a school bus driver discovered the parents' 3-1/2-year-old daughter walking down a street by herself. The investigator discovered that the two children had been napping with the father. The girl said she woke up from her nap and left her house "to go to school" while her father and brother were still sleeping. The family child-proofed their doors and an investigation of inadequate supervision was unfounded.

| Child No. 26 | DOB 7/13 | DOD 9/13 | Undetermined |
|---|---|---|---|
| Age at death: | 2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Closed preventive services case and unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Two-month-old infant was found unresponsive in a bouncy seat by her 17-year-old mother who reported placing her in the seat 25 minutes earlier. The mother and her two children, the infant and a one-year-old, were visiting the home of a maternal aunt who had assisted the family in the past. The aunt's home was found to be dirty and cluttered with pathways blocked. In addition, the infant was observed to have a bruise on her face that the parents reported could have occurred when the baby rolled off the couch onto the wood floor or when the 18-year-old father stumbled while carrying the baby and hit her face against the wall. DCFS investigated the child's death. The parents were unfounded for death by abuse, but indicated for inadequate shelter, environmental neglect, and cuts, bruises, welts by neglect. The parents' 14-month-old son entered foster care and was placed with his paternal grandfather.

Prior History:  The couple lived in the home of the 37-year-old maternal grandmother along with the mother's three younger siblings, ages 15, 9, and 6 years. The maternal grandmother has a history of child protection investigations. The grandmother's involvement with DCFS began in March 2010 when a police officer took protective custody of the four children, then ages 13, 12, 6, and 3, because of the deplorable conditions of her trailer. Custody was allowed to lapse when a maternal aunt agreed to let the family live with her. During an intact family services case the grandmother explained she recently moved to Illinois. The father of the two oldest was in the military and suffered from PTSD and the father of the two youngest children had been arrested on a sex offense and she was divorcing him. She worked an overnight retail job to afford the trailer. The family moved back into the trailer six months later after it was repaired. The family also completed a Multi-Systemic Therapy program before their case was closed in May 2011. A year later the grandmother was unfounded for burns by neglect to her 5-year-old child. A teen friend of the older children was smoking a cigarette outside and the child accidently ran into him. The investigator spoke with collaterals including the doctor and the former caseworker. In Spring 2012 the Department unfounded two investigations for allegations of environmental neglect. Investigators observed the home to be cluttered but without health or environmental hazards. The grandmother admitted the home is not always clean as she works long hours. Infant safety was discussed with the mother as she, her boyfriend, and their infant son lived in the home. Referrals were made to community agencies for assistance. In May 2013 the hotline received a report about unsupervised children. The mother was at work and the 15-year-old, who was supposed to be watching the younger children, was asleep when the children came home after a half-day of school. A neighbor came over, began arguing with the teen, and called the police. The investigator visited the home; interviewed the mother at work; obtained the police report; and spoke with the pediatrician before unfounding the report. In June 2013 a preventive services case was opened to provide Norman Funds for utility bills. A visit to the home in July 2013 found no hazards. The mother, father, and their children were not seen during the last investigation or preventive services case. Five months after the death another report of environmental neglect was called in on the grandmother. The investigation was indicated. The mother was seeking a new residence and the children lived with relatives while the transition occurred.

| Child No. 27 | DOB 8/13 | DOD 10/13 | Undetermined |
|---|---|---|---|
| Age at death: | 7 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Seven-week-old infant was found unresponsive around 7:00 a.m. by her 28-year-old mother in a play pen on her back on top of soft pillows and covered by a blanket. She was last seen alive at 11:30 p.m. when her mother put her to sleep. The mother called 911. Paramedics discovered the child was cold with rigor mortis and some lividity.

Prior History:   In August 2013 an anonymous reporter called the hotline alleging environmental neglect to the mother's 8-year-old daughter. The investigation was pending at the time of the infant's death and was ultimately unfounded. A similar report by an anonymous reporter had been made and unfounded in September 2012.

| Child No. 28 | DOB 10/13 | DOD 11/13 | Undetermined |
|---|---|---|---|
| Age at death: | 5 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined, cannot exclude overlay or suffocation | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Five-week-old infant was found unresponsive around 5:00 a.m. by his 28-year-old parents. The infant had been sleeping on a queen-sized bed between his parents while his 2-1/2 year-old sibling slept at the bottom of the mattress which was placed on the floor. An autopsy could not determine the cause of the infant's death. The report noted that overlay or suffocation could not be excluded. Despite the undetermined cause of death, the parents were indicated for death by neglect because they had received information about safe sleep. An intact family services case was opened after the baby's death. When they learned they were indicated for causing their baby's death, the parents expressed their grief and guilt to their caseworker as well as the emotional stress they were under since learning about the indication. They reported their belief that they were being extra caring by having their son sleep in their bed.

Prior History:    In April 2013, prior to the infant's birth, DCFS and police investigated a report that the father's 4-year-old son had suffered partial thickness burns to his body while in the care of his step-mother (the deceased's mother). Investigation showed that the step-mother left the child in the shower unattended, and he turned on the hot water faucet, burning himself. The hot water temperature measured 130 degrees. A doctor specializing in burns opined that the family's explanation for the burns was consistent with the boy's injuries. DCFS indicated the step-mother for inadequate supervision and the police closed their investigation as an accident. The step-mother was also indicated for cuts, bruises, welts by abuse to her 9-year-old son after she admitted to hitting him with a belt and leaving marks on his leg and arm when he dropped a perfume bottle he was not supposed to touch.

| Child No. 29 | DOB 8/13 | DOD 11/13 | Undetermined |
|---|---|---|---|
| Age at death: | 2-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Two-and-a-half-month-old infant was found unresponsive by his 24-year-old mother around 7:30 a.m. The infant was lying in his own vomit on his stomach on a sofa. The baby was last seen alive at 2:00 a.m. when the mother's 20-year-old girlfriend changed the baby's diaper, swaddled him, and placed him on his side to sleep on the couch. The couple did not have a crib for the baby. Despite the undetermined cause of death, the mother and her girlfriend were indicated for death by neglect.

Prior History:    The night before the infant died, a social service agency called the hotline to report concerns about possible domestic violence and the mother's parenting skills. A report was taken for investigation of substantial risk of physical injury by neglect. When an investigator went to the home the next afternoon to see the family, she learned the baby had died. Both the mother and her girlfriend were indicated for substantial risk of physical injury to the infant.

| Child No. 30 | DOB 12/11 | DOD 12/13 | Undetermined |
|---|---|---|---|
| Age at death: | 2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined (pending) | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Full investigation pending | | |

CHILD DEATH REPORT

<u>Narrative</u>:     Two-year-old child was pronounced dead at the hospital where her 30-year-old mother took her, stating she had stopped breathing. The child had multiple injuries over multiple planes of her body and hair loss at the time of her death. A police investigation is pending as is a child protection investigation for death by abuse by the mother and her 30-year-old boyfriend and substantial risk of physical injury by abuse to the boyfriend's 8-year-old daughter who was visiting her father, but is now in the care of her mother. The OIG is conducting a full investigation of this child's death.

<u>Prior History</u>:   One week before the child's death, paternal relatives called the hotline concerned that they had witnessed injuries and hair loss on the child while she was visiting the previous weekend. A report was taken against the mother for investigation of cuts, bruises, welts by abuse; it was pending at the time of the child's death. An investigator had seen the child and spoken with the mother, her boyfriend, the father, paternal relatives, daycare provider, and a nurse at the child's doctor's office where the child was seen the day before she died. She had been diagnosed with a viral infection, reactive airway disease and alopecia.

| Child No. 31 | DOB 5/13 | DOD 12/13 | Undetermined |
|---|---|---|---|
| Age at death: | 6-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

<u>Narrative</u>:       Six-and-a-half-month-old medically complex infant was found unresponsive at home by his 31-year-old mother around 8:00 p.m. Emergency services transported him to the local emergency room where he was assessed and transferred to a hospital with a pediatric intensive care unit. He died there a few hours later. The baby had a history of Down syndrome and congenital heart defects. He had been in the hospital for his first five months of life and had only been home for one month before his death. A child protection death investigation was conducted and the mother was unfounded for death by neglect: two visiting nurses reported the mother was properly caring for the infant; the mother was taking him to his medical appointments; and the baby's doctor believed the mother did the best she could given how sick the baby was.

<u>Prior History</u>:   In May 2013 the mother was investigated and indicated for medical neglect to her 2-year-old daughter who had been hospitalized for severe eczema with skin breakdown and infection. The child was discharged from the hospital to her father's care. The father, who lived in a neighboring state, followed up with a doctor there, and the investigator and hospital social worker spoke with the doctor about the child's hospitalization. Two older children were living with an aunt in another neighboring state and the investigator checked on their welfare.

| Child No. 32 | DOB 2/11 | DOD 2/14 | Undetermined |
|---|---|---|---|
| Age at death: | 3 years | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:      Three-year-old boy was found unresponsive in bed just before midnight by his 29-year-old mother. She reported that he had been tired all day and slept most of the evening after 4:00 p.m. until she took him to her 34-year-old boyfriend's home where they planned to spend the night. The mother reported the boyfriend was picking up his son with her car when she found her own son unresponsive. She called him to return home and they took the boy to the hospital where he was cold to the touch and pronounced deceased. At autopsy the boy was found to have two healing rib fractures; healing human bite marks to his back (possibly adult or child); and bruising to his arms, back, testicles, and abdomen. The boy had been seen by his pediatrician three days earlier for cellulitis (bacterial skin infection), but the doctor did not conduct a full body exam. Police and DCFS investigated. Police suspended their investigation without any charges. DCFS indicated the mother for death by neglect; cuts, bruises, welts by neglect; and human bites by neglect. The boy was an only child. His 33-year-old father was not involved in his care. The OIG is conducting a full investigation of this child's death.

Prior History:    In July 2013 a hospital nurse called the hotline reporting the child had bruises on his forehead, his palms, and his chest; and he was pale and lethargic. His mother reported that he had been hit by a swing at the park three days earlier and had been vomiting ever since. She also reported he played rough and had hit his head on a table. The Department opened an investigation for cuts, bruises, welts by neglect against the boy's mother. The boy was transferred to another hospital for an enlarged liver and elevated enzymes. The second hospital was not concerned about abuse or trauma, but treated the boy for anemia. The maternal grandparents, with whom the mother and child lived, reported the child was very active and that the mother would never harm him. The investigation was unfounded. The investigator offered services, but the mother refused them.

| Child No. 33 | DOB 4/12 | DOD 2/14 | Undetermined |
|---|---|---|---|
| Age at death: | 22 months | | |
| Substance exposed: | No | | |
| Cause of death: | Acute methadone toxicity | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Twenty-two-month-old toddler was found unresponsive on the living-room sofa by her 22-year-old mother. The mother reported she last saw her child alive at approximately midnight when the child was on the sofa watching television. The mother initially reported that she went to bed leaving the child on the sofa and her two siblings, ages 4 and 5, in the living room asleep. The mother awoke around noon to find the toddler lifeless on the sofa with a bottle of methadone- without a childproof cap- next to the child. The methadone had been prescribed for the mother's bedridden husband's palliative care. The mother called an ambulance and the child was pronounced dead at the scene. The mother later recanted her account of going to bed and leaving the child on the sofa and admitted that she left the home to party with a boyfriend, leaving the children in the care of her bedridden husband. The mother was arrested and charged with child endangerment. She is being electronically monitored while the charges are pending. The mother was indicated for death by neglect to the toddler and for substantial risk of physical injury by neglect to the surviving siblings. The surviving siblings, who were initially placed in a safety plan with relatives, are at home and an intact family services case is open.

<table>
<tr><td>

Prior History:     In September 2013 the mother's 3-year-old daughter went to school with a red and swollen eye. The school counselor contacted the hotline with an allegation of cuts, bruises, welts after the child reported her mother hit her in the face a belt. The child told a child protection investigator that her cousin hit her and did not state she was hit by her mother. The mother took the child to the doctor at the request of the investigator. The investigation was unfounded. In February 2014 the same child, went to school with a bruise under her eye and stated that her mother hit her in the eye. When the child was questioned by a child protection investigator, she gave several explanations for the injury, including being hit by her mother and being hit by her 5-year-old sister. The investigation was pending at the time of the child's death. It was subsequently unfounded.

</td></tr>
</table>

| Child No. 34 | DOB 9/13 | DOD 2/14 | Undetermined |
|---|---|---|---|
| Age at death: | 5-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Unexpected Infant Death | | |
| Reason For Review: | Pending child protection investigations at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Five-and-a-half-month-old infant was found unresponsive around 3:00 a.m. by his 26-year-old mother. The infant was last seen alive around 2:00 a.m. when the mother breast-fed him and laid him down on his back on the floor next to her. Her 26-year-old husband, the infant's father, was lying on the other side of her. The infant, who had been diagnosed with failure to thrive, was being seen weekly by his doctor to have his weight checked. At his last visit, the infant's weight was up almost a half of a pound from the previous visit. The doctor also referred the infant to a pediatric cardiologist who saw the infant at 3 weeks old and ruled out a possible cardiac anomaly suggested prenatally by an ultrasound.

Prior History:     Prior to the infant's birth, a June 2013 investigation of environmental neglect was unfounded based on an investigator's observation of the children and the environment and interviews with the developmentally delayed parents, the manager of their apartment complex, and the 1-1/2 and 2-1/2-year-old children's physician. In January 2014 another investigation of environmental neglect was initiated along with allegations of inadequate supervision and inadequate food. Fifteen days later, while that investigation was pending, police called the hotline to report that the mother and 28-year-old father of the two older children had sex under a blanket in front of the children. A report was taken for investigation of sexual exploitation. Both investigations were pending when the infant died. The investigator had made three attempts to see the family at their home and had made an appointment with the mother, but the baby died two days before the scheduled meeting. Both investigations were ultimately unfounded. The mother and the infant's father denied their home (from which they had moved three days earlier) was dirty. The manager of the apartment complex where they had lived said the home was cluttered, but never dirty to the point of needing to call DCFS; she also did not find the children ever unsupervised or inappropriately dressed. Early intervention providers, who were in the home weekly to provide speech and developmental therapy to the two older children, denied seeing the home in an unsanitary or unsafe condition and reported no concerns for the children's safety. While the mother and the older children's father engaged in a sexual act in the same room as the children, they did so in a sleeping bag while the children played and the children were not believed to have witnessed it.

| Child No. 35 | DOB 10/13 | DOD 3/14 | Undetermined |
|---|---|---|---|
| Age at death: | 4-1/2 months | | |
| Substance exposed: | Yes, marijuana | | |
| Cause of death: | Sudden Unexplained Infant Death | | |
| Reason For Review: | Closed child welfare services referral within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

CHILD DEATH REPORT

Narrative:      Four-and-a-half-month-old baby girl was found unresponsive around 8:00 a.m. by a 35-year-old friend of his mother's who was caring for her and her 8-year-old sibling while their mother was in jail. The friend left the children and her own three children with two 13-year-old babysitters while she went out drinking. The baby had been left to sleep on her back on the friend's bed. When the friend returned home around midnight, she fed the baby a bottle and laid her on her stomach wrapped in a comforter on the floor, which is where she found her in the morning. The friend was indicated for inadequate supervision to all the children because she admitted to being intoxicated when she returned home and her level of intoxication would have prevented her from hearing any of the children if they woke. The baby girl's mother was released from jail the day after the baby's death and the surviving sibling was returned to her care. An intact family services case was opened to provide services to the friend and her children.

Prior History:   In November 2013 the Department received a child welfare services referral from the infant's pediatrician's office. The doctor was concerned because the infant, who was born exposed to marijuana, had missed her initial doctor visit. A worker visited the mother and infant at home. The mother explained that she had missed the appointment because she didn't have transportation, but that she already rescheduled the appointment and arranged to get there. The mother agreed to allow the doctor's office to confirm that the appointment was kept. The worker observed the baby and discussed sleep, fire, and water safety with the mother. The baby was seen at the doctor's office three days later and the referral was closed.

| Child No. 36 | DOB 8/13 | DOD 3/14 | Undetermined |
|---|---|---|---|
| Age at death: | 7 months | | |
| Substance exposed: | No | | |
| Cause of death: | Complications of hypoxic encephalopathy (brain not getting enough oxygen) | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Seven-month-old baby died six months after suffering brain injury from a lack of oxygen. When she was 15 days old, her 33-year-old foster mother laid the baby on her back next to her on an adult bed because the baby had cried after being put back in her bassinette following an early morning feeding. About an hour after they fell asleep, the foster mother's alarm went off and she found the baby unresponsive. The foster mother called 911 and the baby survived, but was severely compromised and lived in a nursing care facility until her death. Doctors thought the foster mother may have rolled over the baby, but could not rule out that the baby simply stopped breathing on her own. The baby's manner of death was undetermined with the notation that "external/environmental factors cannot be excluded as contributing to death." Following the injury, the foster mother was indicated for head injuries, internal injuries, and substantial risk of physical injury by neglect. After the baby died, the foster mother was indicated for death by neglect which caused her to surrender her foster care license and resign from her job as a preschool teacher at a licensed day care center where she had worked for over 12 years.

Prior History:   The baby entered foster care right after her birth because of a substantial risk of physical injury. The baby's 23-year-old mother had a 3-year-old child in foster care for over two years and she had not been consistent in participating in services to regain custody of him. The child remains in foster care with a relative.

| Child No. 37 | DOB 12/13 | DOD 3/14 | Undetermined |
|---|---|---|---|
| Age at death: | 3 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Three-month-old infant was found unresponsive by her 20-year-old mother around 2:00 a.m. The infant's 21-year-old father was at work. The mother reported placing the infant on her back in her infant carrier/car seat on top of a playpen turned on its side. There was a blanket under the baby, another under the baby's head and one covering the baby up to her waist. The mother placed a fleece blanket over the entire carrier to block the light and cold air. When the infant was found, she was on her side.  A child protection investigation of the baby's death was unfounded.

Prior History:    The Department's involvement with the family occurred prior to the infant's birth. In April 2013, a relative of the infant's father alleged that she had been sexually abused by him two years earlier when she was 11. A DCFS investigation was unfounded because of an inability to substantiate the allegation. Police also investigated and closed their investigation without pursuing charges.

| Child No. 38 | DOB 4/11 | DOD 3/14 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2-1/2 years |
| Substance exposed: | No, however, mother reportedly used alcohol and marijuana during pregnancy |
| Cause of death: | Undetermined |
| Reason For Review: | Child was a ward |
| Action Taken: | Full investigation pending |

Narrative:    Two-and-a-half-year-old ward was found unresponsive lying face down around 6:30 a.m. by his 46-year-old foster mother's 50-year-old boyfriend. The foster mother reported seeing the boy alive at 2:45 a.m. when she went to check on him and found him awake watching television and told him to go to bed. Following the child's death, the boy's twin brother and their 1-1/2-year-old sister were removed from the home. They are in a foster home where they are doing well and the foster parent is pursuing adoption. The Department did not conduct a child protection investigation of the child's death. A foster home licensing investigation was conducted and the agency is recommending revocation of the foster parent's license. The OIG is conducting a full investigation of this child's death.

Prior History:    The child and his twin brother were removed from their 24-year-old mother's care and placed with the foster parent in August 2011. The mother had been receiving intact family services for two months but became overwhelmed and did not want to care for her sons any longer. The mother visited the children irregularly. Their sister joined them in foster care in January 2013 when their mother was indicated for inadequate food and inadequate clothing for the child.

| Child No. 39 | DOB 3/14 | DOD 4/14 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 1 month |
| Substance exposed: | Yes, marijuana |
| Cause of death: | Undetermined |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:    One-month-old infant born prematurely with sepsis and respiratory issues was found unresponsive around 8:20 a.m. by her mother. The infant was last seen alive around 3:00 a.m. when she was fed and changed. The infant's 23-year-old father smoked marijuana around 1:30 a.m. The couple was staying overnight in a motel with the infant. The family slept together in a king-sized bed with the infant on one end of the bed and the father lying on the other, with the mother lying in the middle. The infant was found lying face up. The infant had been delivered by cesarean section at 33 weeks because of placenta previa. She spent the first three weeks of her life in the hospital and had been discharged weighing five pounds only five days before her death. The parents were indicated for death by neglect. The mother was also indicated for substantial risk of physical injury by neglect to her other two children, ages 2-1/2 and 4 years, who were already living with maternal relatives by private agreement.

Prior History:   Hospital staff called the hotline while the infant was hospitalized because of concern that the mother smoked marijuana while she was pregnant and the parents appeared to be under the influence of marijuana on two occasions when they visited the infant. A report was taken against the parents for substantial risk of physical injury by neglect. The investigation was pending when the infant died; it was subsequently indicated. When the baby was discharged from the hospital, he was living with his mother in his maternal grandparents' home. The investigator observed a bassinette in the home, discussed safe sleep with the mother, and received the assurance of the maternal grandparents that they would help care for the infant. The investigator had documented his plan to refer the mother for a substance abuse assessment and for intact family services.

| Child No. 40 | DOB 12/13 | DOD 5/14 | Undetermined |
|---|---|---|---|
| Age at death: | 5 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined (with co-sleeping) | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Five-month-old infant who was born prematurely at 32 weeks gestation was found unresponsive by his 43-year-old father around 10:15 p.m. The father had laid on his back on a couch with the infant lying face down on a pillow on the father's chest. The father fell asleep. The infant was the thirty-two year old mother's eleventh child, but the first for the couple.

Prior History:   An intact family preventive services case was open from December 2011 to March 2012. The mother had called the hotline asking for help with her 10 and 13-year-old daughters whom she felt were out of control. The case closed when mother told her worker she no longer wanted services. In March 2013 a nurse contacted the hotline with allegations of sexual penetration to the mother's 8-year-old and 9-year old daughters by their 11-year-old brother. The sexual abuse report was indicated against the 11-year-old who went to live with his grandmother, and an intact family services case was opened. The mother was compliant with services: she had completed parenting classes, and the children were involved in counseling. The Department provided the mother with two infant cribs for her young children. While the intact family services case was open, a school counselor contacted the hotline in February 2014 with an allegation of cuts, bruises, welts by neglect to the 10-year-old child after she arrived at school with a 2-inch laceration below her eye that she said a cousin caused. The investigation was unfounded. The intact family services case remained open until August 2014.

| Child No. 41 | DOB 1/14 | DOD 5/14 | Undetermined |
|---|---|---|---|
| Age at death: | 4-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:     Four-and-a-half-month-old infant was found unresponsive lying on her side by her 25-year-old caretaker cousin around 1:45 in the afternoon. The infant had been napping in her makeshift crib which was a gardening wagon lined with blankets. The OIG is conducting a full investigation of this child's death.

Prior History:   In February 2014 the Department investigated a report that the 19-year-old mother was homeless and not properly caring for the infant, then 7 weeks old. The Department put a safety plan into place for the infant to stay with the mother's cousin until an intact family services case was opened, however, the case was never opened and the infant remained in the cousin's care at the time of her death.

CHILD DEATH REPORT                                                      65

| Child No. 42 | DOB 4/14 | DOD 6/14 | Undetermined |
|---|---|---|---|
| Age at death: | 7 weeks | | |
| Substance exposed: | Yes, opiates | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Pending child protection investigation at time of child's death; unfounded child protection investigations within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:     One-and-half-month-old infant was found unresponsive around 2:00 p.m. by his 28-year-old mother. The mother had stayed overnight in a motel with her boyfriend, her 1-1/2-year-old daughter, and the baby. The mother reported that she last fed the baby at 2:00 a.m. and went to sleep with him in the bed at 4:00 a.m. Her boyfriend, who slept on the couch, woke her up at 7:00 or 8:00 a.m. because he noticed milk coming out of the baby's nose; the mother wiped it away and went back to bed until 1:00 p.m. when she woke up and left to run errands with her daughter, asking her boyfriend to stay with the baby. When she returned around 2:00 p.m. the baby was cold to the touch. The mother was indicated on a pending investigation for substance misuse by neglect to the deceased and for substantial risk of physical injury by neglect to her surviving children. Two of the children are with their father and two are in foster care with their paternal grandparents. The OIG is conducting a full investigation of this child's death.

Prior History:     There was a pending child protection investigation at the time of the infant's death because he tested positive for opiates at birth. DCFS allowed the baby to be discharged to the mother, who was staying at a shelter with two of her children, while her other two children were staying with their father. Before a case was opened to provide intact family services, the mother left the shelter. August and December 2013 investigations of neglect to the children by their mother were unfounded.

| Child No. 43 | DOB 7/13 | DOD 6/14 | Undetermined |
|---|---|---|---|
| Age at death: | 11 months | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Unexpected Death in Infancy with a history of co-sleeping | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Eleven-month-old infant was found face down in a queen-sized bed around 10:15 a.m. by his 20-year-old mother and 23-year-old father. He was last seen alive at 3:00 a.m. when the mother fed him and laid him back in bed with her, the father, and a 1-1/2-year-old sibling. The infant had not seen a doctor since he was one month old despite being told to follow up for risks associated with prematurity, as he had been born at 29 weeks gestation. The 1-1/2-year-old sibling also had not seen a doctor since she was two months old. The parents were indicated for death by abuse (apparently an error as the rationale for the indication described neglect and recommended the report be indicated for death by neglect) and substantial risk of physical injury to the sibling. An intact family services case was opened and a court order of supervision was entered.

Prior History:   In May 2011 the Department investigated a report that the mother, then 17 years old, was not properly caring for her 6-month old child. The investigation was unfounded, but a case was opened for preventive services. That child later went to live with relatives. The family's next involvement with DCFS was in July 2013 when a hospital social worker called to report no one had been to the hospital to visit the deceased until eleven days after his birth. Once the parents visited, they had loud arguments causing security to be called. The father was indicated for substantial risk of physical injury by neglect. DCFS provided the family with a pack and play and a car seat. The family was offered services but they refused them. The State's Attorney's Office refused to file for an order of supervision and DCFS had no further involvement with the family until the baby's death.

| Child No. 44 | DOB 4/13 | DOD 6/14 | Undetermined |
|---|---|---|---|
| Age at death: | 14 months | | |
| Substance exposed: | No | | |
| Cause of death: | Pending | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:       Five-month-old twin baby girl was discovered unresponsive by her 19-year-old mother around 10:00 a.m. The mother and twins had spent the night at a relative's home. The mother, who was 7 months pregnant, slept on a blanket on the floor with the twins. The mother last saw the baby girl alive around 5:00 a.m. when the baby woke her with her movement. She placed the baby back on the blanket next to her and went back to sleep. She awoke around 9:30 a.m. and her twin baby boy was awake. She made a phone call, brushed her teeth, and fed the baby boy a bottle. Around 10:30 a.m. she realized she didn't hear the baby girl breathing, picked her up, and learned she was unresponsive. A child protection investigation of the infant's death is pending. The surviving twin entered foster care in July 2014. A baby born in August entered care following her birth.

Prior History:    A May 2013 report of substantial risk of physical injury by neglect to the mother's twin infants, who were hospitalized at the time, was unfounded. The mother was offered services but refused them. A June 2014 report of medical neglect to the infant was pending at the time of her death.

| Child No. 45 | DOB 11/13 | DOD 8/14 | Undetermined |
|---|---|---|---|
| Age at death: | 8 months | | |
| Substance exposed: | No | | |
| Cause of death: | Pending | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Pending | | |

Narrative:       Eight-month-old infant died in the hospital a few days after being removed from life support. In June 2014 the infant was taken to a hospital in critical condition and was admitted to the Pediatric Intensive Care Unit where he was placed on life support. The infant was diagnosed with multiple intracranial hemorrhages. CT scans showed both old and new brain bleeding. The mother's 23-year-old boyfriend, who was babysitting the infant and two of his three siblings (4-year-old twin boys), reported that he heard the baby crying and found one of the twins in the crib with the infant. He said he picked up the infant and took him into another room where he lapsed into unconsciousness. Autopsy and coroner findings are pending and police and DCFS investigations are pending. The infant's three siblings, who were initially in a safety plan, entered foster care in July. They are placed with relatives.

Prior History:    In March 2014 a caseworker called the hotline to report that her 19-year-old client, who had untreated mental health issues and had lost custody of her own child, was living in the home and babysitting the children while their 24-year-old mother went out all night. The reporter said the home was filthy and smelled of marijuana. A report was taken for substantial risk of physical injury and environmental neglect. The report was unfounded because the investigation showed that the babysitter had not been left unsupervised with the children and while the home was cluttered, it was not unsafe.

## ACCIDENT

| Child No. 46 | DOB 9/10 | DOD 7/13 | Accident |
|---|---|---|---|
| Age at death: | 2-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Drowning due to probable febrile seizure | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Two-and-a-half-year-old boy drowned in the bathtub while he and his 4-year-old sister were in the care of their mother's 21-year-old boyfriend while their 22-year old mother was at school. Investigation showed that the boy had urinated in his clothes so the boyfriend ran a bath and put him in the bathtub. The boy's sister called from another room and the boyfriend went to check on her; she said she had to use the bathroom so he brought her back into the bathroom with him and was helping her onto the toilet when they noticed the boy flailing in the bathtub. The boyfriend was indicated for inadequate supervision and death by neglect for leaving the 2-1/2-year-old unattended in the bathroom. Relatives and an early intervention provider described the boyfriend as a loving caregiver to the children.

Prior History:    In October 2012 a relative called the hotline to report that the mother, who lived with her children in an apartment in a building with other relatives, locked her children in their bedrooms several nights a week and went out until 3 or 4 in the morning. An investigator went to the home and found that the mother and children lived on the upper floor of a two-story home. There were no locks on the children's bedroom doors. The mother denied she left the home during the night and an aunt who lived in the home said she would have heard the mother if she was coming or going. The investigation was unfounded for inadequate supervision.

| Child No. 47 | DOB 5/13 | DOD 7/13 | Accident |
|---|---|---|---|
| Age at death: | 2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Positional asphyxia due to abnormal sleeping position in an infant car seat | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Two-month-old infant was found unresponsive in his car seat by his 32-year-old father. The father and 23-year-old mother were sleeping on a couch in the same room as the infant. The family was homeless and had been staying with various friends. The baby was last seen alive when he was fed at 3:00 a.m. DCFS investigated and the parents were unfounded for death by neglect.

Prior History:   In July 2012 a relative called the hotline to report that the couple's 1-year-old daughter had a black eye and knot on her forehead. The relative took the child to the emergency room where a CT scan was performed and showed no other injuries. The child's mother reported the child had fallen out of her high chair, the type that straps to a regular chair. While the child was secured in the high chair, the high chair was not strapped to the adult chair. Emergency room staff opined that falling from the chair could account for the injuries. The parents and grandparents reported that the child lived primarily with her grandparents and the parents were going to give them guardianship, a process that was started before the investigation was closed. The mother was unfounded for cuts, bruises, welts, but both parents were indicated for environmental neglect based on the condition of the home in which the accident took place.

| Child No. 48 | DOB 6/04 | DOD 7/13 | Accident |
| 49 | 9/00 | 7/13 | |

| | |
| --- | --- |
| Age at death: | 9 and 12 years |
| Substance exposed: | No |
| Cause of death: | Drowning |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:      Nine and 12-year-old brothers drowned while wading during the day in a river with their 7-year-old brother and 17-year-old cousin. The river was shallow but had many drop offs and it is believed the boys walked into a drop off. The cousin was able to save the 7-year-old boy and then ran for help. The brothers, neither of whom could swim, were recovered later that day by rescue workers. The two surviving children received counseling.

Prior History:   In the year prior to their deaths, four reports were made to the hotline by school personnel because of concerns about the children's behavior and the parenting skills of their parents. The investigations were unfounded for inadequate supervision and substantial risk of physical injury because of insufficient evidence. The children were engaged in services to address their behavior.

| Child No. 50 | DOB 10/95 | DOD 7/13 | Accident |
| --- | --- | --- | --- |

| | |
| --- | --- |
| Age at death: | 17 years |
| Substance exposed: | No |
| Cause of death: | Multiple injuries due to automobile mishap |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:      Seventeen-year-old ward was killed in a traffic accident. The ward was returning to his group home following a visit with his mother and grandmother in a neighboring state. He was being driven by a group home employee who was unharmed. A woman driving another car ran a red light while reading a text; she crashed into the passenger side of the automobile at approximately 60 miles per hour. The woman was charged with reckless homicide and criminal recklessness with a vehicle. In June 2014 she pleaded guilty to reckless driving and received a sentence of six months electronic home monitoring.

Prior History:   The teen became a ward in January 2012 after he was locked out of his home by his mother because she and the child's three siblings did not feel safe with him in the home. Because of his behavior, the teen was placed in a group home where he lived until his death. The teen was doing well in his group home and his relationship with his family had improved.

| Child No. 51 | DOB 6/13 | DOD 9/13 | Accident |
|---|---|---|---|
| Age at death: | 2-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Anoxic brain injury due to positional asphyxia | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Two-and-a-half-month-old infant, born prematurely at 30 weeks gestation, was found unresponsive after being placed to sleep on his back on an air mattress with his 7-year-old brother. His 30-year-old father slept on the floor next to the mattress. The 23-year-old mother, who had been sleeping elsewhere, awoke at 4:00 a.m., checked on the baby and found him unresponsive. He had rolled over onto his stomach with his face in one of the air mattress grooves, leaving him unable to breathe. The family had a crib in the home, but the parents reported the baby had not been sleeping in it because of bed bugs. Both parents were indicated for death by neglect to the infant and unfounded for substantial risk of physical injury to the 7-year-old sibling.

Prior History:    In May 2013, the 7-year-old suffered a burn on his leg that he reported he got while ironing his school clothes at his aunt's direction. The boy was staying with his aunt while his mother was in the hospital for bed rest because of preterm labor. DCFS investigated and discovered that the aunt brought the boy to the hospital to show his mother the burn. The investigator verified that the mother had hospital staff look at the burn and give instructions to treat it. The aunt was indicated for inadequate supervision and burns by neglect. The mother was unfounded for medical neglect.

| Child No. 52 | DOB 3/11 | DOD 9/13 | Accident |
|---|---|---|---|
| Age at death: | 2-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple injuries due to vehicle striking pedestrian | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Two-and-a-half-year-old child was struck and killed by a hit and run drunk driver who ran a stop sign. The girl had been walking to daycare with her 58-year-old great grandmother and her one-year-old brother. After hitting the child the car slammed into parked vehicles. The 27-year-old driver tried to run, but was apprehended by police officers who were in the area. The driver was charged with reckless homicide and aggravated DUI. The driver remains in custody pending trial.

Prior History:    The deceased entered foster care following her birth and had lived with her great-grandmother her entire life. Her two older sisters and her younger brother also lived in the home. While the parents visit the children, they have not successfully participated in services to address one of the older children suffering three fractured ribs at the age of 4 months. The parents have a history of domestic violence and substance abuse.  The Department is pursuing permanency for the children with the great-grandmother.

| Child No. 53 | DOB 12/04 | DOD 10/13 | Accident |
| 54 | 8/11 | 10/13 | |
|---|---|---|---|
| Age at death: | 8 years & 2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Spinal injuries due to blunt force trauma; | | |
| | Massive head injuries due to blunt force trauma | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Eight and 2-year-old siblings were killed in a car crash on a highway. Their 27-year-old mother was also killed; their 5 and 6-year-old siblings were seriously injured; and their 31-year-old father was injured. A van crashed into the family's vehicle while it was stopped in a lane of traffic on the highway around 5:30 in the morning. The children were not properly restrained in the vehicle. The father, who was driving, had a blood alcohol content of .10. A police investigation did not find anything wrong with the vehicle to explain why it stopped on the highway. The father was charged with driving under the influence. He was indicated for death by neglect to the two deceased children and head injuries by neglect to the two surviving children, who are in foster care. One child is placed with a paternal great-aunt and the other is in a licensed placement with a foster parent trained to manage her special needs as a result of the accident. The father is participating in services and the girls have a court set permanency goal of return home in five months.

Prior History:    The parents were indicated in 2010 for death by neglect after their 2-month-old son died from asphyxiation from co-sleeping in an adult bed with them after the father drank alcohol and the mother smoked marijuana. A 2-year-old was also in the bed. The baby's death followed an incident of domestic violence between the parents two days earlier in which the mother was arrested. The children entered foster care and three months later, in January 2011, the court returned them home under a supervision order. After completing assessments and services requested of them, the parents regained guardianship of their children in July 2011 and the case was closed. At the time of the children's and mother's deaths, there was a pending investigation, initiated in September 2013, when the parents brought their 2-year-old son to the emergency room with scratches and bruises to his face that they alleged occurred that day at day care. They also filed a police report. Following the child's death, the investigation was unfounded because it could not be determined how the child obtained the injuries or who was responsible for them.

| Child No. 55 | DOB 9/13 | DOD 11/13 | Accident |
|---|---|---|---|
| Age at death: | 6 weeks | | |
| Substance exposed: | Yes, marijuana | | |
| Cause of death: | Asphyxia due to overlay | | |
| Reason For Review: | Open intact family case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Six-week-old infant, born prematurely with medical complications, was found unresponsive in the morning by his 22-year-old mother. They had spent the night at a female friend's home and slept together on a twin mattress on the floor along with the friend and her 20-month-old toddler.

Prior History:    The infant was the mother's first child. The mother used heroin and marijuana during her pregnancy. The infant spent the first three weeks of his life in the hospital. The mother was investigated and indicated for substantial risk of physical injury and an intact family services case was opened to engage the mother in substance abuse treatment. The mother and infant were living with the mother's grandmother and DCFS had provided a pack and play for the child to sleep in.

| Child No. 56 | DOB 7/13 | DOD 12/13 | Accident |
|---|---|---|---|
| Age at death: | 4-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to face down in soft bedding | | |
| Reason For Review: | Split custody (sibling in foster care) | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Four-and-a-half-month-old infant was found unresponsive by his 36-year-old father around 7:00 p.m. At 5:00 p.m. the 34-year-old mother had laid the baby down for a nap on an adult bed propped up on a pillow, supported by two other pillows on each side of him and a comforter over him. The baby had been to the doctor earlier in the day because of trouble breathing. He was diagnosed with bronchitis, given a breathing treatment, and prescribed an antibiotic.

Prior History:    In June 2013 the mother locked her 15-year-old son out of the home because of violent and criminal behavior and fear for the safety of her 5 and 8-year-old children. During the investigation the mother consented to the teen returning home with community services in place and an investigation of lock out was unfounded. In September 2013 the mother locked the teen out again when his actions placed her younger children in danger; he was not participating in services; and she was at risk of losing her housing because of his behavior. The teen was placed in the Department's custody on a dependency petition and the mother was unfounded for lock out.

| Child No. 57 | DOB 11/13 | DOD 12/13 | Accident |
|---|---|---|---|
| Age at death: | 5 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to overlay due to co-sleeping | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Five-week-old infant was found unresponsive around 3:00 a.m. by her 26-year-old mother. The infant was last seen alive around 10:30 p.m. when she was fed. The baby had been put to sleep on her back on her mother's stomach in bed with the mother and father. The mother awoke to find the baby on the bed face down lying in vomit. There was no crib or heat in the home (the family had moved since the prior investigation). The mother tested positive for marijuana and the 41-year-old father refused to take a drug test. The infant had not been taken to the doctor since her birth. The parents were indicated for death by neglect and inadequate shelter to the infant and for substantial risk of physical injury and inadequate shelter to the mother's two surviving children who were placed in the temporary custody of the Department. The mother engaged successfully in services and her children were returned to her care in November 2014. The court case remains open and a caseworker is monitoring the family.

Prior History:    In May 2013 paternal relatives of the infant's 2-1/2 year-old and 4-year-old half-siblings called the hotline alleging substantial risk of physical injury to the 4-year-old child who had been staying with the relatives for a couple of weeks, but whose mother wanted him to come home. An investigator spoke with a paternal aunt, the mother, and her paramour (the unborn infant's father), and observed the children who appeared to be in good health. The investigation was unfounded.

| Child No. 58 | DOB 1/11 | DOD 2/14 | Accident |
|---|---|---|---|
| Age at death: | 3 years | | |
| Substance exposed: | No | | |
| Cause of death: | Carbon monoxide toxicity due to inhalation of products of combustion due to a house fire | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Three-year-old child was found unresponsive in a bedroom in his family's home around 8:00 p.m. by fire department personnel who responded to a fire in the residence. The child was taken by emergency personnel to the hospital where emergency room staff were unable to revive him. A 14-year-old sibling was babysitting the child while their mother was at a hair appointment. Fire and police investigation revealed that there were no smoke detectors in the home. A lighter was found on a mattress and investigators could not rule out a child playing with the lighter as the cause of the fire.

Prior History:   In November 2013 a friend/neighbor called the hotline to report that the mother had a drinking problem and sold her LINK card to buy alcohol leaving little to no food in the home. She also alleged that the mother allowed her 14-year-old son to smoke marijuana in the home. A report was taken for investigation of substantial risk of physical injury by neglect. The mother denied the allegations and showed the investigator food in the home. The 14-year-old boy admitted to smoking marijuana occasionally, but did not believe his mother knew. He denied smoking in the home. The report was unfounded and the investigator mailed the mother a list of community resources, including substance abuse services that could benefit her son.

| Child No. 59 | DOB 11/13 | DOD 2/14 | Accident |
|---|---|---|---|
| Age at death: | 3 months | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to co-sleeping with an adult on a couch | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Three-month-old girl was found unresponsive by her 31-year-old mother around 1:30 p.m. The mother went to sleep with the infant on a couch around 4:00 a.m. after a night of drinking and playing cards. The mother had a bassinette upstairs in her residence, but reported that she, the infant, and her 4-year-old daughter regularly slept on the sectional couch downstairs because of shots fired in the neighborhood that had entered the upstairs of her home. DCFS investigated and the mother was indicated for death by neglect because she admitted to drinking alcohol prior to sleeping with the baby and when the police responded she had a blood alcohol content of .035. The mother was referred to community services and engaged in substance abuse treatment and grief counseling.

Prior History:   In December 2012, the mother's 5-month-old son died while sleeping in bed with his 26-year-old father and his father's 27-year-old girlfriend. The baby's cause of death was asphyxia due to prone position and co-sleeping with adults. The father was caring for the baby boy while the mother was at the hospital with her daughter who was having outpatient surgery. DCFS investigated and unfounded the father and his girlfriend.

| Child No. 60 | DOB 10/10 | DOD 3/14 | Accident |
|---|---|---|---|
| Age at death: | 3 years | | |
| Substance exposed: | No | | |
| Cause of death: | Thermal injuries due to apartment fire | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Three-year-old child died in an apartment fire. The child and her twin were in their bedroom playing when the child set a mattress on fire with a lighter. The twin alerted her 39-year-old mother to the fire and the mother ran into the bedroom and tried to push the mattress out of the window, but opening the window caused the flames to spread. The mattress had been propped up near the window because it had bed bugs. The mother, the twin, the mother's 18-year-old daughter, and 8-month-old grandson made it out of the residence, but the mother could not find the child, who was later found by firefighters on the floor near the window in the room where the fire originated. The mother's 12-year-old daughter was at school at the time of the fire. There was a smoke detector in the hallway of the apartment building, but it was not working. DCFS investigated the child's death. The mother was indicated for death by neglect. She reported that she had repeatedly admonished the child not to play with lighters. However, she left the child unattended in a room with access to a lighter. She also was indicated for substantial risk of physical injury to the surviving twin. The children were removed from the mother's custody; they are placed in a foster home together and have a goal of return home.

Prior History:    In April 2013 an anonymous reporter called the hotline to report that she had found the 2-year-old twin girls outside unattended around 5:00 p.m. A report was taken for investigation of inadequate supervision. The mother was unaware that the children were outside because everyone in the home had been napping. The mother agreed to install safety chains in the residence to which they were soon moving. The mother was indicated for inadequate supervision and was referred to community services. In December 2013, the non-custodial father of the twins called the hotline alleging the children were inadequately fed and supervised. The investigator observed food in the home and talked to 17 and 19-year-old siblings who reported caring for their younger siblings when their mother was not home. The father admitted to making up the allegations because he was mad that he wasn't getting enough visitation with his children. The report was unfounded.

| Child No. 61 | DOB 2/14 | DOD 3/14 | Accident |
|---|---|---|---|
| Age at death: | 4 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Unexplained Death in Infancy while co-sleeping | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Twenty-eight-day-old baby was found face up, unresponsive at 8:00 a.m. in her 31-year-old parents' bed. The baby had been sleeping in her bassinette until she awoke at 3:00 a.m. to feed. After the 31-year-old father fed the infant, he handed her to the mother who placed the baby face up in the bed between herself and her 6-year-old daughter, who was visiting overnight. The baby's father was also in the bed. The mother reported that while she normally placed the baby to sleep in her bassinet, she was tired that night so she placed the baby next to her. The forensic pathologist who conducted the baby's autopsy noted "asphyxia due to the soft bedding of an adult bed, or asphyxia due to overlay cannot be completely ruled out." Both parents were indicated for death by neglect because they slept with the baby after receiving a handout from the baby's pediatrician about safe sleep practices. The baby was the mother's second child to die. A 6-month-old son died in 2003 from myocarditis, a natural death.

Prior History:    The mother has a history with DCFS dating to June 2011. In July 2011 her 3-1/2-year-old daughter and 6-year-old son entered foster care because of drug use by her and the children's father. The children were returned to their father's care and the case was closed in March 2012. In June 2013 the mother and the father's girlfriend got into a verbal altercation during a transfer of the children for visitation. DCFS investigated and unfounded the mother for substantial risk of physical injury by neglect.

| Child No. 62 | DOB 8/10 | DOD 4/14 | Accident |
|---|---|---|---|
| Age at death: | 3-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Smoke inhalation and thermal burns | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:          Three-year-old girl died from smoke inhalation and thermal burns sustained in a fire in her family's home at approximately 12:00 a.m. A boarder in the home was able to rescue the girl's twin sister from the first floor living room where the twins slept. The girl could not be located because of the intense smoke and fire emanating from the room. The girl's 32-year-old mother, whom the boarder reported was intoxicated, escaped through a second floor window. The 34-year-old father was not home, the girl's 13-year-old sister was out of town visiting her grandmother, and her older brother lived with his maternal grandparents. At the time of the fire the home had been without electricity for two weeks. The boarder reported that the parents were using the stove to heat the home and a lit candle was in use on the first floor. A fire department investigation was unable to determine the origin of the fire. The mother was indicated for death by neglect and substantial risk of physical injury to the surviving children. They are in relative foster care.

Prior History:    In July 2012 an intact family services case was opened after the mother and her husband were indicated for substance misuse and inadequate supervision to the mother's 12-year-old son and his 12-year-old friend because they allowed them to consume alcohol and joined the youths in using crack cocaine. While the intact family services case was open, four additional hotline calls were accepted for investigation. In August 2013 the parents were investigated for burns to their 3-year-old daughter. The case was unfounded after the investigation determined that the child suffered from an infection and was receiving medical care. In September 2013 the mother was investigated for inadequate supervision. She was indicated after an investigation revealed that her 3-year-old daughter was left unattended in the family's backyard and was found wandering three blocks away. In January 2014 the parents were investigated for allegations of inadequate food and substance misuse. The investigation determined that there was adequate food and the 13-year-old child denied that her parents had provided her with alcohol. The family's caseworker saw the family in the month before the girl's death. The parents had not been participating in services and three days before the fire the caseworker had completed the paperwork to request a petition for a temporary custody hearing.

| Child No. 63 | DOB 11/13 | DOD 5/14 | Accident |
|---|---|---|---|
| Age at death: | 5-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Overlaying due to co-sleeping in an adult bed | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:          Five-month-old baby was found unresponsive by his 26-year-old mother who reported that the grandmother, who was spending the night, had brought the infant to her in bed with a bottle at 5:30 a.m. She fed the baby and fell back to sleep. When she awoke, she found her son cold and hard. Law enforcement and DCFS investigated the death. Investigation revealed that the mother's husband, the infant's 32-year-old father, was in the home despite a no contact order due to a prior domestic violence incident; the husband was in the twin bed with the mother and infant; and the mother and husband had engaged in drug use. The mother was indicated for death by neglect to the infant and substantial risk of physical injury to her 2-year-old son. The husband was indicated for substantial risk of physical injury to the deceased and his 2-year-old step-son. The boy was initially placed in a safety plan with his father, but then was removed and placed in a traditional foster home. The family's caseworker had provided the mother with cribs for both children.

Prior History:    The hotline was called in October 2013 when the mother was eight months pregnant with the deceased. Her husband beat her nearly unconscious. He was arrested and mother cooperated with criminal proceedings. The husband pleaded guilty to aggravated domestic battery and was in jail until January 2014. He also was indicated for substantial risk of physical injury by neglect to his step-son. An intact family services case was opened. The mother and her child moved in with the grandfather until she secured her own housing. The mother lied to her worker about her contact with her husband.

| Child No. 64 | DOB 4/11 | DOD 6/14 | Accident |
|---|---|---|---|
| Age at death: | 3 years | | |
| Substance exposed: | No | | |
| Cause of death: | Drowning | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Three-year-old ward was found floating face down in a swimming pool in his foster family's backyard. He was placed on life support and died twelve days later. The boy and his foster mother's adopted children, ages 8 and 9, were playing in the front yard where she left them to use the bathroom in the house. When she got out of the bathroom she talked to her husband, who had just gotten home from work, for a few minutes and then realized she didn't hear the boy. She and the family looked for him and her 8-year-old daughter found him in the 4 foot pool that had been put up since a worker's visit five days earlier. A ladder to the pool had been left in place. The 37-year-old foster father pulled the child out of the pool and the couple's 17-year-old foster daughter, who was being trained as a CNA, performed CPR on the boy until an ambulance arrived. The foster mother was indicated for death by neglect to the boy and inadequate supervision of the boy and her two young children. She has appealed the findings. The foster mother had been licensed for over six years and had adopted three children through DCFS.

Prior History:    The boy was placed in the foster home in January 2012. He had been removed from his 19-year-old parents' care in November 2011 following a police raid at the home where the family was living. A machine gun was found on the floor of a room where the boy was crawling. Drugs and ammunition were also discovered. The father was arrested and the mother was uncooperative. Both parents were indicated for substantial risk of physical injury by abuse. The child had a permanency goal of substitute care pending court determination on termination of parental rights. His foster parents wanted to adopt him.

| Child No. 65 | DOB 11/97 | DOD 6/14 | Accident |
|---|---|---|---|
| Age at death: | 16 | | |
| Substance exposed: | No | | |
| Cause of death: | Drowning | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Sixteen-year-old ward left his group home without permission and went to the local beach with friends. He dove into deep water in a rock-lined area of the beach and did not resurface. Two friends dove into the water and pulled the teen out. They called 911 and conducted CPR. Emergency personnel responded but were unable to revive the teen who was pronounced dead upon arrival at the hospital. The teen's caseworker had seen him the day before to give him a bus card to visit his sister that day at her father's home.

CHILD DEATH REPORT

Prior History:    The ward entered the custody of DCFS in April 2014 after being abandoned by his mother, who moved out of their apartment without telling him where she was relocating. The pair had a history of altercations with each other dating to at least August 2013 in which the police and DCFS were called. The mother was indicated for cuts, bruises, welts and human bites to the teen and substantial risk of physical injury to her 10-year-old daughter. The integrated assessment completed a month before the teen's death noted a poor prognosis for the mother who did not make herself available for the assessment and could not be located by caseworkers. The mother had stated that she did not want male children and did not want to raise the deceased. In June 2014 the mother was charged with abandonment and the boy's 10-year-old sister went to live with her father. At the time of case closing in August 2014, the girl lived with her father and visited weekly with her mother.

## NATURAL

| Child No. 66 | DOB 10/12 | DOD 8/13 | Natural |
|---|---|---|---|
| Age at death: | 10 months | | |
| Substance exposed: | Yes, cocaine | | |
| Cause of death: | Myocarditis | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Ten-month-old baby died in the NICU after being admitted to the hospital. The baby's foster parents had taken her to the emergency room the day before because of a possible ear infection. She was treated and sent home. They returned to the emergency room the next day because the baby was having trouble breathing. At autopsy the baby was found to have Myocarditis: inflammation of the heart muscle, usually caused by a virus. Symptoms of Myocarditis may be subtle, making diagnosis difficult and it can lead to sudden death. The foster parents wanted to adopt the baby.

Prior History:    The infant was her mother's fifth child and the third to be born substance-exposed. She was taken into custody right after her birth. Three siblings had already been adopted and the mother surrendered her parental rights to the fourth sibling. The State's Attorney had filed a petition for expedited termination of the mother's parental rights to the baby because she was her mother's third substance-exposed infant. Her foster parents wanted to adopt her.

| Child No. 67 | DOB 9/98 | DOD 8/13 | Natural |
|---|---|---|---|
| Age at death: | 14-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Bronchial asthma | | |
| Reason For Review: | Pending child protection investigation; closed preventive service case | | |
| Action Taken: | Full investigation pending | | |

Narrative:     Almost fifteen-year-old boy was taken to the hospital by ambulance and became unresponsive in the emergency room where he died. Earlier that day the teen had been having trouble breathing and gave himself a nebulizer treatment. According to his 40-year-old mother, he did not finish the treatment, saying he felt better. He left to go play basketball with a friend, but the friend's mother called the teen's mother ten minutes later to let her know that he could not breathe. The mother was indicated for death by neglect to the teen because of a documented history of not following through with aftercare treatment for her son's asthma, including being indicated on two prior occasions when she was unavailable to pick up her son after he was hospitalized from asthma attacks. She also was indicated for medical neglect of one of the teen's siblings and for substantial risk of physical injury by neglect to all four surviving siblings. The mother was offered intact family services, but she refused them. DCFS took protective custody of the children and the court awarded the Department temporary custody. The OIG is conducting a full investigation of this child's death.

Prior History:     The family has a history with DCFS dating to 2006 when the Department indicated the mother for burns by neglect to her 4-year-old child.  Eight child protection investigations occurred between May 2012 and August 2013, with seven of them being indicated against the mother for neglect allegations. The mother consistently refused to participate in intact family services, but voluntarily made arrangements for her children to stay with family members for extended periods of time.

| Child No. 68 | DOB 12/06 | DOD 8/13 | Natural |
|---|---|---|---|
| Age at death: | 6-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Complications of cerebral palsy | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Six-and-a-half-year-old medically complex girl died in the hospital after being taken there by ambulance with symptoms of diarrhea, vomiting, and a high fever. DCFS conducted an investigation for death by neglect and substantial risk of physical injury to the girl's twin sister. Medical personnel reported that the mother had been attending appointments for the girl who appeared well-cared for at death despite her being ill. The investigator verified that the girl and her twin, who was also medically complex, were last seen at the doctor two weeks before the girl's death and that both had gained weight. The investigation was unfounded.

Prior History:     In May 2013 one of the sisters' medical providers called the hotline to report that the sisters were underweight and had missed several doctor appointments. The 32-year-old mother reported having transportation issues, though she had been offered transportation assistance. The mother was indicated for medical neglect and the investigator referred the family for intact family services which the mother was participating in at the time of the girl's death.

| Child No. 69 70 | DOB 8/13 | DOD 8/13 | Natural |
|---|---|---|---|
| Age at death: | 16 days | | |
| Substance exposed: | No | | |
| Cause of death: | Complications from surgery to separate conjoined twins | | |
| Reason For Review: | Open placement case (siblings in foster care) | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Sixteen-day-old conjoined twins, born at 33 weeks gestation, died due to complications from surgery to separate them. The twins were very sick and the only hope for one to survive was to attempt separation. The parents were unfounded for substantial risk of physical injury by neglect because the twins had never left the hospital.

Prior History:    The 26-year-old mother and 31-year-old father had their four children removed from their custody in November 2010 because of neglect. The children, who are placed together, have permanency goals of substitute care pending court determination on termination of parental rights. Their foster parents would like to adopt them. A fifth child entered foster care after his birth in November 2012 because of the parents' failure to make progress in services. This child is placed in a separate foster home; he also has a goal of substitute care pending court determination on termination of parental rights.

| Child No. 71 | DOB 1/08 | DOD 9/13 | Natural |
|---|---|---|---|
| Age at death: | 5-1/2 years | | |
| Substance exposed: | No, however, mother has a history of substance abuse | | |
| Cause of death: | Bronchial asthma | | |
| Reason For Review: | Child was a ward within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Five-and-a-half-year-old boy died in the emergency room while being treated for an asthma attack. His adoptive mother reported he had been playing normally prior to the attack, which she attempted to treat with nebulizer treatments before taking him to the emergency room.

Prior History:    The boy entered foster care on a dependency petition when he was 6 months old. He had only one placement while in foster care and his foster mother adopted him in February 2013, seven months before his death. She was attentive to the boy's medical, developmental, and educational needs.

| Child No. 72 | DOB 6/12 | DOD 9/13 | Natural |
|---|---|---|---|
| Age at death: | 15 months | | |
| Substance exposed: | Yes, morphine | | |
| Cause of death: | Acute asthmatic reaction and acute bronchopneumonia due to chronic reactive airway disease | | |
| Reason For Review: | Pending child protection investigations at time of child's death; child returned home within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Fifteen-month-old toddler was found unresponsive around 9:45 a.m. by his 37-year-old father, who called 911. The toddler was last seen alive at 6:00 a.m. when his father administered a breathing treatment to him, which he did every four hours. The father was indicated for death by neglect and for medical neglect to the toddler because he had not been giving him a recently prescribed preventive medication on a daily basis as prescribed and because he had missed a follow-up appointment to have the child's lungs re-checked. He was also indicated for substantial risk of physical injury by neglect to the toddler's 3-year-old brother. The brother was placed in relative foster care with a maternal aunt. In September 2014 both parents signed specific consents to allow the aunt to adopt him.

Prior History:    The toddler was in foster care following his substance-exposed birth until he was 7 months old when his father was awarded custody and guardianship by the court. The father was already caring for his older brother because of the mother's substance abuse. In August 2014, an anonymous individual called the hotline and an investigation was opened for allegations of inadequate food and environmental neglect. While that investigation was pending, a second call was made to the hotline, twelve days before the toddler's death, with concerns about drug use by the father. The father showed the investigator the prescription medication he was taking and admitted to using marijuana two weeks earlier. The investigator called the local police who denied any contact with the father or his home; and spoke to the father's former caseworker and a community professional working with the father, who described the children as well-cared for by their father. Fifteen days before the toddler's death, the investigator spoke with the child's primary care physician who reported the father had brought the child in for a visit two weeks earlier because of concerns about his breathing. At that visit the toddler was diagnosed with bronchialitis, but was not yet diagnosed with asthma. He was prescribed albuterol, a nebulizer, and Singulair to be taken every day. The doctor reported that the father seemed concerned about the boys and that the child was due for a one year checkup, but did not tell the investigator that the father had not returned to have the child's lungs rechecked one to two days after his last appointment as recommended. Both investigations were unfounded after the child's death.

| Child No. 73 | DOB 1/11 | DOD 10/13 | Natural |
|---|---|---|---|
| Age at death: | 2-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Endocardial fibroelastosis (congenital heart defect) | | |
| Reason For Review: | Pending child protection investigation at time of child's death; indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Two-and-a-half-year-old child was found unresponsive by his 32-year-old mother. The two had laid down for a nap together and when the mother awoke she found her son unresponsive and called 911. The child died from a heart condition associated with heart arrhythmia, endocardial fibroelastosis, which has very few visible symptoms except perhaps wheezing or coughing, which could have been attributed to the child's diagnosed asthma.

Prior History:    The family's first contact with DCFS was in February 2013 when the mother was indicated for environmental neglect to the child and his two half siblings, ages 7 and 12. The home the mother and children were living in was in very poor condition. The mother agreed to have the children stay with their fathers until she moved. Seven months later, the mother called the hotline to report that the child had bruises on his back when she picked him up from his 30-year-old father's home for a visit. A child protection investigator who responded the next morning saw no bruises on the child. The father, when interviewed, said the boy had a mark on his back earlier from falling backward into bleacher-style seating at a dolphin show while in Florida. The couple was engaged in a custody dispute. The investigator spoke with both parents and the child's pediatrician who checked the child for injuries and found none. The investigation for cuts, bruises, welts by abuse by the father was eventually unfounded.

| Child No. 74 | DOB 10/13 | DOD 10/13 | Natural |
|---|---|---|---|
| Age at death: | 0 | | |
| Substance exposed: | Yes, mother tested positive for cocaine and opiates | | |
| Cause of death: | Placenta abruption | | |
| Reason For Review: | Open placement case (siblings in foster care) | | |
| Action Taken: | Investigatory review of records | | |

| | |
|---|---|
| Narrative: | Baby girl born at 23 weeks gestation died a few minutes after birth. Her 29-year-old mother gave birth to her at home. A child protection death investigation was unfounded against the mother for death by neglect and indicated for substance misuse by neglect. |
| Prior History: | The family's first involvement with DCFS was in March 2006 when the mother was indicated for inadequate supervision of one of her children. In June 2010 the mother was indicated for environmental neglect of three of her children, and she was required to clean up her home. A series of unfounded investigations followed and in May 2011 DCFS opened an intact family services case. In November 2011 the mother's four children, ages 10 months, 3, 8, and 10 years, entered foster care because of substance abuse and accompanying neglect. The parents' rights were terminated in January 2014 and the children have goals of adoption with their current foster parents. |

| Child No. 75 | DOB 5/13 | DOD 10/13 | Natural |
|---|---|---|---|
| Age at death: | 5 months | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Infant Death Syndrome | | |
| Reason For Review: | Open intact family case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

| | |
|---|---|
| Narrative: | Five-month-old twin infant born prematurely at 31 weeks gestation was discovered in her car seat blue and unresponsive by her 17-year-old father. The 22-year-old mother called 911 while the father attempted CPR; she was pronounced deceased at the hospital. The mother reported that the infant had slept in her car seat the night before because she had a cold and it allowed her to sleep upright. The father fed the infants around 6:00 a.m. and they went back to sleep. They awoke again around 8:00 a.m. and the mother fed the one twin and when she went to feed the infant, she had fallen back asleep, so she didn't disturb her. Around 10:00 a.m. the father went to check on the infant and discovered her unresponsive. In addition to the surviving twin, the mother has two children, who were 2-1/2 and 4-1/2 years at the time of the infant's death. |
| Prior History: | An intact family services case was opened in January 2013 following four child protection investigations conducted within one year, one of which was indicated for substantial risk of physical injury by neglect because of domestic violence between the mother and her boyfriend, the unborn infants' father. Three more investigations took place in 2013 before the infant's death, all of which were unfounded. Intact family services remained involved because of concern about domestic violence and the mother's mental health. The worker had seen the family three days before the infant's death and had spoken with the twins' physician four days earlier. The babies had been seen by their doctor eleven days before the infant's death and the infant was diagnosed with an ear infection. |

| Child No. 76 | DOB 10/13 | DOD 11/13 | Natural |
|---|---|---|---|
| Age at death: | 3 weeks | | |
| Substance exposed: | Yes, cocaine and opiates | | |
| Cause of death: | Prematurity | | |
| Reason For Review: | Open placement case (siblings in foster care) | | |
| Action Taken: | Investigatory review of records | | |

| | |
|---|---|
| Narrative: | Three-week-old infant born substance-exposed at 24 weeks gestation died while still hospitalized after birth. The infant was his 40-year-old mother's seventh child, the third to be born substance-exposed and the second to die before being discharged from the hospital. The mother was indicated for substance misuse and substantial risk of physical injury by neglect. |

Prior History:   The mother has a history with DCFS dating to when she was 14 years old and gave birth to her first child. Over the years, each of her children entered foster care or were placed in the care of relatives. The mother did not engage in services. Two children have been adopted; one is in subsidized guardianship; and two are in private living arrangements with relatives.

| Child No. 77 | DOB 3/94 | DOD 11/13 | Natural |
|---|---|---|---|
| Age at death: | 19 years | | |
| Substance exposed: | No | | |
| Cause of death: | Lymphocytic myocarditis | | |
| Reason For Review: | Deceased was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Nineteen-year-old ward collapsed while visiting his 16-year-old niece in Texas. At autopsy he was diagnosed with Lymphocytic myocarditis. The autopsy report noted that the most common cause of Lymphocytic myocarditis is viral infection, though the underlying cause of the teen's was unknown.

Prior History:   The teen, who had a history of trauma and aggressive behavior, became a ward in 2011 when he was 17. His mother locked him out of the home because of concern that he would be killed if he returned to the neighborhood. She failed to make an alternative care plan for him, and she was indicated for lock out. At the time of his trip to Texas, the teen was living with his father in another part of Illinois.

| Child No. 78 | DOB 11/07 | DOD 12/13 | Natural |
|---|---|---|---|
| Age at death: | 6 years | | |
| Substance exposed: | No | | |
| Cause of death: | Cardiorespiratory failure due to probable sepsis due to upper respiratory infection | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Six-year-old boy was discovered not breathing by his 48-year-old mother. About an hour earlier, the mother had administered a nebulizer treatment to the boy because his breathing was labored. The child suffered from a seizure disorder and Rett syndrome, a rare, genetic, neurodevelopmental disorder.

Prior History:   In February 2012 and November 2012 the Department investigated the mother for medical neglect. Both investigations were unfounded. In September 2013, an anonymous caller to the hotline alleged that the mother provides her 14-year-old son with marijuana and leaves her 6-year-old son in the car while she gets drunk and high. A report was taken for investigation of substance misuse by abuse and inadequate supervision. The mother and her teenage son denied the allegations. The investigator talked to the boy's teacher, a neighbor, the maternal grandmother, a family friend, the teen's father, and the boy's doctor's office and none of them were concerned that the mother was providing drugs to her son or using drugs or alcohol or neglecting her children. The investigation was unfounded six days before the boy's death.

| Child No. 79 | DOB 12/13 | DOD 12/13 | Natural |
|---|---|---|---|
| Age at death: | 16 days | | |
| Substance exposed: | No | | |
| Cause of death: | Pulmonary atresia due to Triploidy 69 | | |
| Reason For Review: | Open placement case (siblings in foster care) | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Sixteen-day-old infant born at 32 weeks gestation died in the hospital where she had remained since birth.  The infant was born with an extremely rare chromosomal disorder in which she had an entire extra set of chromosomes, making 69 in all instead of the usual 46. The condition is fatal in infancy; it normally results in miscarriage.

Prior History:     The infant's 27-year-old mother had four children removed from her custody in May 2012 when the children and their two young cousins were discovered in an environmentally unsafe home without adult supervision. The children are in foster care and their prognosis for reunification is guarded.

| Child No. 80 | DOB 8/13 | DOD 1/14 | Natural |
|---|---|---|---|
| Age at death: | 4-1/2 months | | |
| Substance exposed: | Yes, alcohol, PCP, opiates | | |
| Cause of death: | Multiple congenital anomalies, congenital heart disease | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Four-and-a-half-month-old medically complex infant, who was born at 37 weeks gestation with fetal alcohol syndrome, died in the hospital where he had received around the clock medical care since his birth. The ward was scheduled to have heart surgery, but contracted the flu in mid-December and was never strong enough for surgery before he died.

Prior History:    The infant's 23-year-old mother drank throughout her pregnancy and showed little interest in the infant after his birth. The mother was indicated for substance misuse by neglect to the infant and substantial risk of physical injury by neglect to the infant and her two older children, ages 4 and 5-1/2. All three children entered the care of the Department. The mother had a fourth child in August 2014 that was taken into custody. All three surviving children are in the same foster home. The mother and the 23-year-old father of the infant are participating in services toward return home of the children.

| Child No. 81 | DOB 4/04 | DOD 2/14 | Natural |
|---|---|---|---|
| Age at death: | 9-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Cardiorespiratory arrest due to seizure disorder/cerebral palsy | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Nine-year-old medically complex ward was found unresponsive in the afternoon by her siblings' foster mother's adult daughter, who was caring for the girl and her siblings (the foster families are related). The girl had had a seizure that morning before the foster mother left for church, but she appeared fine afterward. The girl had lived with her foster parents for 2-1/2 years. Her biological parents had signed specific consents for the foster parents to adopt the girl and they were working toward the adoption.

Prior History:     An intact family services case was opened in October 2008 following an indicated report of failure to thrive to the girl; she entered foster care in March 2009 when she failed to improve while in her parents' care. The girl's four siblings entered foster care in September 2010 because of neglect and the parents' failure to participate in services. One of the siblings has a goal of independence and the others have goals of guardianship.

| Child No. 82 | DOB 11/11 | DOD 2/14 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 years |
| Substance exposed: | No |
| Cause of death: | Neuroblastoma |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:    Three-year-old girl diagnosed at 10 months of age with neuroblastoma (a cancer that develops from immature nerve cells) died at home two days after leaving the hospital to be at home among family when she died.

Prior History:    In June 2013 the Department was awarded temporary custody of the little girl after her 19-year-old parents refused to consent to surgery to remove a tumor and to administer medications prescribed by her physician citing religious beliefs. The child was placed with her maternal grandparents and her parents were allowed liberal visitation. In September the child was returned to her parents' care, but remained in the temporary custody of the Department.

| Child No. 83 | DOB 10/13 | DOD 2/14 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3-1/2 months |
| Substance exposed: | No |
| Cause of death: | Congenital heart disease |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:    Three-and-a-half-month-old medically complex infant was found unresponsive around 8:00 a.m. by his 31-year-old foster mother who had cared for him for two months. The infant had a congenital heart defect and organic failure to thrive and a history of hospitalizations and heart surgeries. The infant was gaining weight in his foster mother's care and she was keeping all of his medical appointments.

Prior History:    The infant was his 23-year-old mother's fourth child to enter DCFS care. Her first child entered foster care when the mother was 19 years old and the child was 2 months old. The mother, who had a history of abuse and neglect and DCFS involvement as a child, believed her children were better off raised by others; her second child is being raised by his father and her third child was in foster care until he was adopted by the foster parent who adopted her first child.

| Child No. 84 | DOB 06/96 | DOD 04/14 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 17 years |
| Substance exposed: | No |
| Cause of death: | Liver transplant with rejection and an underlying cause of biliary atresia |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:    Seventeen-year-old boy died at a hospital in a neighboring state because of complications of a liver transplant rejection. The teen had been in the hospital for four weeks before his death. He had had two prior transplants and was not a candidate for another because of non-compliance with medication.

Prior History:    The teen's first contact with the Department was in August 2011 when the teen's father was unfounded for substantial risk of physical injury to his girlfriend's 10-year-old son after the 10-year-old, the teen, and the teen's 12-year-old sibling denied any abuse. In April 2012 the 37-year-old father was indicated for cuts, bruises, welts to the teen following an incident in which the father became angry and threw a jar of mayonnaise that hit the teen in the chest. The father said he was aiming at the wall, not his son and was remorseful. The teen said his father had never hit or thrown anything at him before. The family was offered intact family services but they refused them. The father was indicated again in September 2012 after he called the hotline himself stating that he and his children were homeless after he left his three teenage children home alone for a couple of weeks while he went to look for work. He reported that the teen ran up all the utility bills, refused to take his medication and now was in the hospital. They had moved in with friends, but could not stay there any longer. The investigator spoke with the hospital social worker and the physician who reported knowing the family for several years as the deceased was born with liver dysfunction and a heart valve problem. They stated the father tried hard but the teen's complicated medical problems and his refusal to comply with his own treatment had been hard for the father to handle. The father was reluctant to ask the paternal grandparents for help but the investigator assisted and the children went to live with them. The investigator referred the grandparents to the extended family support program. The father was indicated for inadequate supervision. At the time of the teen's death, there was a pending investigation that listed the teen as the alleged perpetrator. A social worker had reported that the 17-year-old reportedly hit his 33-year-old step-mother while she was holding his 3-month-old half-brother. The step-mother, the teen, and the teen-age siblings reported that there had been an altercation, but the baby was not in the home at the time. The investigator had recommended that the investigation be unfounded and it was awaiting approval at the time of the teen's death.

| Child No. 85 | DOB 2/14 | DOD 4/14 | Natural |
|---|---|---|---|
| Age at death: | 6 weeks | | |
| Substance exposed: | No, however, mother has a history of cocaine abuse | | |
| Cause of death: | Extreme prematurity and chronic lung disease | | |
| Reason For Review: | Open placement (siblings in foster care) | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Six-week-old twin baby girl born prematurely at 23 weeks gestation died in the hospital where she had been treated in the neonatal intensive care unit since birth. The twins' 23-year-old mother had been getting inpatient substance abuse treatment until she left the facility approximately one month before going into labor. After the infants were born, the mother left the hospital and did not return to visit them, telling the hospital social worker that she knew DCFS was going to take them away. The mother was indicated for death by neglect, abandonment/desertion, and substantial risk of physical injury by neglect to the deceased baby and abandonment/desertion and substantial risk of physical injury by neglect to the surviving twin. The twin baby boy entered the Department's custody on a dependency petition. He is still hospitalized. When he is released he will be placed in the foster home of one of his siblings.

Prior History:    The twins were the mother's fifth and sixth children. Two of her children were born substance-exposed and all four children were removed from her custody because of neglect related to her substance abuse. The children have goals of adoption.

| Child No. 86 | DOB 12/12 | DOD 4/14 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 16 months |
| Substance exposed: | No |
| Cause of death: | Complications of cerebral palsy |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:      Sixteen-month-old medically complex boy was found unresponsive in the morning by his 28-year-old mother. He was last seen alive around 5:00 a.m. when his mother fed him via his gastrostomy tube.

Prior History:     In November 2013, the father of the boy's half-siblings called the hotline to report that he had picked up his 3-year-old daughter and 6-year-old son from their mother's home and his son's ear, forehead, and back of head were swollen and he was taking him to the emergency room. DCFS investigated the mother for substantial risk of physical injury by abuse. The investigation was unfounded based on the treating doctor's opinion that the child suffered an allergic reaction to bug bites for which she prescribed oral and topical medication.

| Child No. 87 | DOB 03/14 | DOD 04/14 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 27 days |
| Substance exposed: | No |
| Cause of death: | Congenital heart defects |
| Reason For Review: | Open Placement Case (siblings in foster care) |
| Action Taken: | Investigatory review of records |

Narrative:      Twenty-seven-day-old baby died in the hospital where she had remained since her premature birth. The baby had severe cardiac problems and would have required heart surgery had she survived. Her 36-year-old mother had received prenatal care throughout her high-risk pregnancy.

Prior History:     In October 2012 a relative reported that the mother and her 27-year-old boyfriend had hit her 11-year-old daughter. The boyfriend admitted to spanking the child. A month later, while the investigation was pending, police reported that the boyfriend had been arrested for hitting the mother while she was holding their 3-week-old infant. The 11-year-old was visiting her father at the time of the incident. The mother agreed to a safety plan where the boyfriend resided outside of the home and did not see the baby unsupervised. The mother was referred for intact family services and obtained an order of protection against the boyfriend. On Christmas day the hotline received a third call; the father of the 11-year-old reported the child had a bruise on her back from the mother hitting her. The mother admitted to hitting her daughter, explaining the bruise occurred when the child moved while getting spanked. While the investigation was pending, investigators found the mother allowed the boyfriend to live with her and the children and the children were taken into custody. In October 2013 the mother reported that she was 14 weeks pregnant. With the children in foster care, the mother completed all recommended services including family counseling and parenting training; she did well while visiting with the children, progressing to unsupervised visits. The boyfriend was incarcerated and did not participate in services. The two children were returned to the mother's custody in January 2014, but the Department retained guardianship. One day before the infant's death, the court released guardianship of the older child to both the mother and father and guardianship of the younger child to the mother. The court case closed in October 2014.

| Child No. 88 | DOB 04/14 | DOD 04/14 | Natural |
| 89 | 04/14 | 04/14 | |

| | |
|---|---|
| Age at death: | 0; 1 day |
| Substance exposed: | Mother tested positive for cocaine |
| Cause of death: | Prematurity |
| Reason For Review: | Open Placement Case (siblings in foster care) |
| Action Taken: | Investigatory review of records |

**Narrative:**      Two newborn infants died shortly after birth. Their 37-year-old mother, who was pregnant with triplets, gave birth to them prematurely starting at approximately 23 weeks gestation. The mother had been admitted to the hospital three days before the birth of the first baby, at which time she tested positive for cocaine. She admitted to smoking crack and snorting cocaine shortly before her water broke. The mother reported that she did not realize she was pregnant until about a month earlier and had no prenatal care. She gave birth to the first triplet who lived for about an hour. The second triplet, born three days later lived for a day; the third triplet, born two weeks after the first baby, has survived and is in foster care. A child protection investigation for death by neglect and substantial risk of physical injury, the mother's ninth child protection investigation, is pending.

**Prior History:**      The mother has eight living children from thirteen reported pregnancies: five children were taken from her custody and have been adopted; one child lives with his father; one child lives with a relative; and the surviving triplet is in foster care. The mother's involvement with DCFS dates to 1994 when she gave birth to a substance-exposed infant. An intact family services case was opened, but after giving birth to a second substance-exposed infant thirteen months later, the children were placed into care. The mother gave birth to a third substance-exposed baby in 1997. The mother's parental rights were terminated to the first and third babies, and the second child lives with his father. A baby born in December 1998 was stillborn. The mother's fourth living child, born in 2001, is in guardianship with a relative. In 2004 the mother gave birth while she was incarcerated. A relative cared for this fifth baby until the mother was released to a substance abuse treatment program where the baby resided with her. In 2007 the mother was indicated for inadequate supervision for leaving the child, then three years old, with an inappropriate caretaker. The child was taken into custody and later adopted. The mother has two other children with the 52-year-old father of the triplets. The first child, born in January 2011, tested positive for cocaine at birth and was taken into custody. The parents were minimally cooperative with services and a second child, born in February 2012, also was taken into custody. Parental rights were terminated on the two children a month before the birth of the triplets, and the children were adopted in August 2014. The parents have had no contact with the worker about the surviving triplet and the worker has submitted a request for expedited termination of parental rights.

| Child No. 90 | DOB 04/14 | DOD 05/14 | Natural |

| | |
|---|---|
| Age at death: | 22 days |
| Substance exposed: | No |
| Cause of death: | Infection, complication of prematurity |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**      Twin infant girl born prematurely at 23 weeks gestation developed an infection while still hospitalized and died.

Prior History:   A child protection investigation, initiated after the twins' birth, was pending for substantial risk of sexual injury to the twins by their parents. The 22-year-old mother is a registered sex offender and the 20-year-old father is a former registered sex offender, both because of incidents of molestation of younger relatives. The mother was indicated in November 2009. She was charged and convicted of two counts of indecent solicitation of an adult and sexual exploitation of a child. She went to prison in 2011-2012 for violations of parole by being around children. She has not completed any treatment. The mother also reported that she has been diagnosed with mental illness but has not taken her prescribed medication. She did report seeking prenatal care. The father, a former ward, was arrested as a juvenile at age 14 for criminal sexual assault. He was indicated in June 2007, though the investigation has since been expunged. The father completed programs at residential treatment centers. He reported that he is homeless. The surviving twin was taken into custody in July 2014 and is placed in a specialized foster home because of her medical needs. The parents have been visiting consistently at the DCFS office. An assessment to determine what services are needed is ongoing.

| Child No. 91 | DOB 12/04 | DOD 5/14 | Natural |
|---|---|---|---|
| Age at death: | 9 years | | |
| Substance exposed: | No | | |
| Cause of death: | Bronchial asthma | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Full investigation pending | | |

Narrative:       Nine-year-old ward died of an asthma attack in the emergency room. The boy had visited relatives earlier in the day and played at a local park. Upon return to his grandmother's home, where he had been moved as a foster child a month earlier, he had difficulty breathing so his grandmother administered two breathing treatments to him. At approximately 10:40 p.m., the child went to the bathroom and vomited, had shortness of breath, and collapsed. His grandmother called 911 and the boy was transported by ambulance to the emergency room where attempts to resuscitate him were unsuccessful. The boy, who had been in foster care since 2012, had a history of poorly controlled asthma despite following his asthma therapy and asthma monitoring by a pulmonologist and his primary care physician. The OIG is conducting a full investigation of this child's death.

Prior History:    In the second half of 2010 the mother was indicated on two reports involving the child and his two siblings. The first was indicated for inadequate supervision after the mother left the children with a neighbor and didn't return. The second was indicated for medical neglect when the child's school called the mother to pick up the child because he had had an asthma attack and his mother refused, causing school staff to call an ambulance. The mother refused services. In November 2011 the child went to school with a black/swollen eye and scratch/scabs on his cheek under the injured eye. He said that his mother whipped him because he had not cleaned his room well enough. The mother was arrested and charged with battery. She was indicated for cuts, bruises, welts and an intact family services case was opened. In January 2012 the child's 4-year-old sibling was burned. The mother was indicated for burns by neglect and the children entered DCFS custody. At the time of his death, the child and two of his four siblings were residing with their grandmother.

| Child No. 92 | DOB 2/05 | DOD 5/14 | Natural |
|---|---|---|---|
| Age at death: | 9 years | | |
| Substance exposed: | No | | |
| Cause of death: | Intracranial hemorrhage due to ruptured arteriovenous malformation | | |
| Reason For Review: | Split custody (sibling in foster care) | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Nine-year-old girl died in the hospital from a brain hemorrhage. Two days earlier she awoke complaining of a headache, vomited, and collapsed into unconsciousness. Her 40-year-old mother called 911 and she was taken to the local hospital and then transferred to another hospital by helicopter. Two days later she was declared brain dead and her mother donated her organs.

Prior History:   Four years earlier the girl's 15-year-old brother entered the custody of DCFS on a dependency petition. He lives in a residential facility and has a goal of independence. The girl and a brother, three years older than her, remained in the custody of their mother.

| Child No. 93 | DOB 10/12 | DOD 5/14 | Natural |
|---|---|---|---|
| Age at death: | 19 months | | |
| Substance exposed: | No | | |
| Cause of death: | Hypoplastic left heart syndrome | | |
| Reason For Review: | Closed intact family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Nineteen-month-old child died in the hospital where he was being treated for a rare congenital heart defect.

Prior History:    In July 2013 the 25-year-old mother and 32-year-old father got into an argument. The mother left the house and the father went after her, leaving the child and his 3-year-old brother home alone. Police and DCFS were called. Both parents were indicated for inadequate supervision and the father was indicated for substantial risk of physical injury. The parents separated and the mother and children moved in with her mother. From July to October 2013, the Department provided intact family services to the family which included ensuring that the child's medical needs were met.

| Child No. 94 | DOB 8/13 | DOD 5/14 | Natural |
|---|---|---|---|
| Age at death: | 8-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Myocarditis | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Eight-and-a-half-month-old baby was taken to the hospital by his 29-year-old mother because he seemed to be breathing heavier than normal. After assessment in the emergency room, the baby was transferred to another hospital where he was admitted to the pediatric intensive care unit in an alert, but lethargic state. The baby's condition deteriorated rapidly and he died that night.

Prior History:   In November 2013 the mother and her boyfriend, the infant's 30-year-old father, were unfounded for substantial risk of physical injury by abuse after the mother's 6-year-old child was shot in the forehead with a BB gun. DCFS and police investigation showed that after the mother put her 6-year-old son to bed, she and her boyfriend were in the living room folding laundry when they saw the curtains moving behind a couch. They thought it might be a raccoon, which they had seen on their back porch. The boyfriend went and retrieved his BB gun and fired one shot behind the couch which grazed the 6-year-old boy's forehead. The boy told DCFS and the police that he had snuck out of his room and hid behind the couch to jump up and scare his parents. The boy was not seriously injured and the mother sought medical treatment immediately.

| Child No. 95 | DOB 10/13 | DOD 5/14 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 7 months |
| Substance exposed: | No |
| Cause of death: | Trisomy 18 |
| Reason For Review: | Open intact family services case at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:        Seven-month-old medically complex infant born with Trisomy 18 and multiple congenital anomalies passed away at home. Trisomy 18, also known as Edwards Syndrome, is a condition caused by an error in cell division. It has a high infant mortality rate. The infant spent the first six weeks of her life in the hospital. When she was 5-1/2 months old, she was readmitted to the hospital where she remained for one month until she was sent home with 24-hour hospice care.

Prior History:    The infant was her 17-year-old mother's and 18-year-old father's only child. At the end of January 2014 the infant was hospitalized with an upper respiratory infection and low weight. Hospital staff were worried the parents were not following care instructions at home. They were also concerned because the parents had missed several follow-up appointments since the infant's discharge from the hospital after birth. The parents were indicated for medical neglect and an intact family services case was opened. The mother and infant lived with the maternal grandparents and the maternal grandmother took over primary responsibility for the infant's care.

| Child No. 96 | DOB 3/14 | DOD 5/14 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2-1/2 months |
| Substance exposed: | Yes, marijuana |
| Cause of death: | Complications of premature birth |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:        Two-and-a-half-month-old infant born prematurely at 27 weeks gestation, weighing 2 pounds, 7 ounces and exposed to marijuana, was found unresponsive in the morning by his mother's 35-year-old boyfriend, his siblings' father. The infant had been sleeping on a queen-sized bed with his 31-year-old mother and his 7 and 9-year-old siblings. The infant was the mother's third child to die from complications of prematurity: one baby died before ever leaving the hospital and the other baby died at 18 days old. A child protection investigation of the infant's death was unfounded.

Prior History:    In March 2014 the hotline was called with a report alleging that the newborn infant's father was a registered sexual offender who was living with the mother and her three older children. The report was unfounded for substantial risk of sexual injury when the investigation uncovered that the mother, who did not know the father was a sexual offender, lived with her boyfriend (the father of her three older children) and the infant's father actually lived elsewhere, but had registered the mother's address without her permission.

| Child No. 97 | DOB 9/10 | DOD 6/14 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 years |
| Substance exposed: | Unknown (born in another state) |
| Cause of death: | Complications of Dandy-Walker syndrome |
| Reason For Review: | Unfounded child protection investigation within a year |
| Action Taken: | Investigatory review of records |

Narrative:          Three-year-old medically complex child died at home with hospice care in place. The child was born with congenital health difficulties and spent much of his life in hospitals. His diagnoses included Dandy-Walker syndrome (a congenital brain malformation involving the cerebellum and the fluid-filled spaces around it), hydrocephalus, shunt placement, seizure disorder, spastic quadriplegia, and hypertension.

Prior History:     In July 2013 the child was transferred to a transitional care facility for children with complicated health care needs. In October 2013 the facility called the hotline and a report was taken for substantial risk of physical injury by neglect; the mother was arrested for disorderly conduct for making a statement to a staff member at the facility that was perceived as a threat. The investigation was unfounded because the conduct did not involve the child or the mother's ability to care for the child.

| Child No. 98 | DOB 1/98 | DOD 6/14 | Natural |
|---|---|---|---|
| Age at death: | 16 years | | |
| Substance exposed: | No | | |
| Cause of death: | Alexander Disease | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:          Sixteen-year-old girl died in the hospital while receiving palliative care. She suffered from Alexander Disease, a rare, slowly progressing, and fatal neurodegenerative disease.

Prior History:     In the year prior to the girl's death, DCFS investigated three reports alleging medical neglect of the teen by her 43-year-old mother. All of the investigations were unfounded based on her primary care physician and other treating physicians' opinions that the mother was doing her best to care for the teen with the limited resources available to her and that she was not medically neglecting the teen. While the third child protection investigation was pending, the mother agreed to an intact family services case being opened to provide support to herself and her three minor children.

| Child No. 99 | DOB 8/02 | DOD 6/14 | Natural |
|---|---|---|---|
| Age at death: | 11-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | High grade glioma brain tumor | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:          Eleven-and-a-half-year-old girl died from a brain tumor in a respite and transitional living facility for children with medical complexities, where she had resided for three months. Her parents visited her at the facility and her mother was with her when she died.

Prior History:     In January 2014 the 48-year-old mother and 53-year-old father were indicated for substantial risk of physical injury by neglect to the girl because of domestic violence. An intact family services case was opened. In February 2014 the child entered foster care because her doctors did not believe she was safe at home any longer because of her parents' escalating domestic violence and alcohol abuse fueled by their grief. The mother engaged in services while the child was in the medical facility.

92

FIFTEEN-YEAR DEATH RETROSPECTIVE

## 15-YEAR DEATH RETROSPECTIVE

**TOTAL DEATHS BY CASE STATUS FY 2000 TO FY 2014**

| FISCAL YEAR | 2000 | | 2001 | | 2002 | | 2003 | | 2004 | | 2005 | | 2006 | | 2007 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASE STATUS** | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| Ward | 29 | 30.2% | 42 | 40.8% | 23 | 23.7% | 28 | 22% | 31 | 22.3% | 37 | 26.6% | 17 | 19.8% | 24 | 21.6% |
| Unfounded DCP | 7 | 7.3% | 14 | 13.6% | 7 | 7.2% | 21 | 16.5% | 29 | 20.9% | 29 | 20.9% | 25 | 29.1% | 35 | 31.5% |
| Pending DCP | 10 | 10.4% | 6 | 5.8% | 8 | 8.2% | 15 | 11.8% | 12 | 8.6% | 15 | 10.8% | 7 | 8.1% | 16 | 14.4% |
| Indicated DCP | 8 | 8.3% | 14 | 13.6% | 9 | 9.3% | 12 | 9.4% | 6 | 4.3% | 1 | 0.7% | 1 | 1.2% | 6 | 5.4% |
| Child of Ward | 5 | 5.2% | 4 | 3.9% | 6 | 6.2% | 12 | 9.4% | 2 | 1.4% | 2 | 1.4% | 1 | 1.2% | 4 | 3.6% |
| Open Intact | 9 | 9.4% | 12 | 11.7% | 20 | 20.6% | 19 | 15% | 15 | 10.8% | 31 | 22.3% | 20 | 23.3% | 13 | 11.7% |
| Closed Intact | 5 | 5.2% | 3 | 2.9% | 7 | 7.2% | 7 | 5.5% | 13 | 9.4% | 0 | 0% | 1 | 1.2% | 2 | 1.8% |
| Open Placement/Split Custody | 13 | 13.5% | 4 | 3.9% | 9 | 9.3% | 3 | 2.4% | 17 | 12.2% | 5 | 3.6% | 4 | 4.7% | 2 | 1.8% |
| Closed Placement/ Return Home | 3 | 3.1% | 1 | 1% | 4 | 4.1% | 2 | 1.6% | 2 | 1.4% | 0 | 0% | 0 | 0% | 5 | 4.5% |
| Others | 7 | 7.3% | 3 | 2.9% | 4 | 4.1% | 8 | 6.3% | 12 | 8.6% | 19 | 13.7% | 10 | 11.6% | 4 | 3.6% |
| **TOTAL** | **96** | **100%** | **103** | **100%** | **97** | **100%** | **127** | **100%** | **139** | **100%** | **139** | **100%** | **86** | **100%** | **111** | **100%** |

FIFTEEN-YEAR DEATH RETROSPECTIVE

| FISCAL YEAR | 2008 | | 2009 | | 2010 | | 2011 | | 2012 | | 2013 | | 2014 | | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CASE STATUS | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| Ward | 19 | 19.2% | 21 | 23.6% | 19 | 22.9% | 25 | 22.1% | 19 | 17.9% | 15 | 16.1% | 19 | 19% | 368 | 23% |
| Unfounded DCP | 18 | 18.2% | 19 | 21.3% | 17 | 20.5% | 23 | 20.4% | 32 | 30.2% | 19 | 20.4% | 28 | 29% | 323 | 21% |
| Pending DCP | 13 | 13.1% | 14 | 15.7% | 14 | 16.9% | 17 | 15% | 12 | 11.3% | 12 | 12.9% | 16 | 16% | 187 | 12% |
| Indicated DCP | 12 | 12.1% | 4 | 4.5% | 7 | 8.4% | 8 | 7.1% | 12 | 11.3% | 10 | 10.8% | 6 | 6% | 116 | 7% |
| Child of Ward | 3 | 3% | 2 | 2.2% | 7 | 8.4% | 4 | 3.5% | 1 | 0.9% | 0 | 0.0% | 0 | 0% | 53 | 3% |
| Open Intact | 18 | 18.2% | 12 | 13.5% | 9 | 10.8% | 21 | 18.6% | 14 | 13.2% | 7 | 7.5% | 10 | 10% | 230 | 15% |
| Closed Intact | 2 | 2% | 6 | 6.7% | 2 | 2.4% | 3 | 2.7% | 2 | 1.9% | 8 | 8.6% | 2 | 2% | 63 | 4% |
| Open Placement/Split Custody | 4 | 4% | 6 | 6.7% | 1 | 1.2% | 8 | 7.1% | 1 | 0.9% | 10 | 10.8% | 13 | 13% | 100 | 6% |
| Closed Placement/ Return Home | 1 | 1% | 1 | 1.1% | 5 | 6% | 2 | 1.8% | 1 | 0.9% | 4 | 4.3% | 0 | 0% | 31 | 2% |
| Others | 9 | 9.1% | 4 | 4.5% | 2 | 2.4% | 2 | 1.8% | 12 | 11.3% | 8 | 8.6% | 5 | 5% | 109 | 7% |
| TOTAL | 99 | 100% | 89 | 100% | 83 | 100% | 113 | 100% | 106 | 100% | 93 | 100% | 99 | 100% | 1580 | 100% |

93

94

**CHILD DEATHS BY DCFS CASE STATUS AND MANNER OF DEATH 2000 THROUGH 2014**

FIFTEEN-YEAR DEATH RETROSPECTIVE

| FISCAL YEAR | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Deaths | 96 | 103 | 97 | 127 | 139 | 139 | 86 | 111 | 99 | 89 | 83 | 113 | 106 | 93 | 99 | 1580 |
| **Ward** | **29** | **42** | **23** | **28** | **31** | **37** | **17** | **24** | **19** | **21** | **19** | **25** | **19** | **15** | **19** | **368** |
| Natural | 13 | 20 | 14 | 18 | 16 | 28 | 10 | 13 | 11 | 9 | 16 | 10 | 8 | 6 | 8 | 200 |
| Accident | 6 | 9 | 3 | 3 | 3 | 1 | 2 | 6 | 5 | 4 | 1 | 3 | 2 | 2 | 4 | 54 |
| Homicide | 7 | 9 | 3 | 6 | 8 | 5 | 4 | 3 | 3 | 4 | 1 | 8 | 7 | 3 | 4 | 75 |
| Suicide | 0 | 0 | 3 | 1 | 2 | 3 | 0 | 0 | 0 | 3 | 0 | 2 | 2 | 1 | 1 | 18 |
| Undetermined | 3 | 4 | 0 | 0 | 2 | 0 | 1 | 2 | 0 | 1 | 1 | 2 | 0 | 3 | 2 | 21 |
| **Unfounded Investigation** | **7** | **14** | **7** | **21** | **29** | **29** | **25** | **35** | **18** | **19** | **17** | **23** | **32** | **19** | **28** | **323** |
| Natural | 0 | 5 | 2 | 9 | 16 | 17 | 8 | 9 | 6 | 7 | 4 | 9 | 6 | 3 | 5 | 106 |
| Accident | 2 | 6 | 0 | 6 | 8 | 8 | 8 | 16 | 7 | 7 | 4 | 7 | 13 | 7 | 9 | 108 |
| Homicide | 4 | 2 | 3 | 5 | 2 | 1 | 7 | 5 | 3 | 2 | 4 | 2 | 7 | 3 | 6 | 56 |
| Suicide | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 4 | 2 | 0 | 0 | 1 | 11 |
| Undetermined | 1 | 1 | 1 | 1 | 3 | 3 | 2 | 4 | 1 | 1 | 1 | 3 | 6 | 6 | 7 | 41 |
| **Pending Investigation** | **10** | **6** | **8** | **15** | **12** | **15** | **7** | **16** | **13** | **14** | **14** | **17** | **12** | **12** | **16** | **187** |
| Natural | 0 | 1 | 7 | 6 | 6 | 4 | 3 | 8 | 3 | 6 | 0 | 4 | 4 | 2 | 5 | 59 |
| Accident | 5 | 1 | 1 | 3 | 1 | 5 | 2 | 2 | 1 | 4 | 7 | 9 | 4 | 3 | 2 | 50 |
| Homicide | 3 | 3 | 0 | 5 | 3 | 3 | 2 | 4 | 3 | 2 | 2 | 0 | 3 | 3 | 1 | 37 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 3 |
| Undetermined | 2 | 1 | 0 | 1 | 2 | 3 | 0 | 2 | 4 | 2 | 5 | 3 | 1 | 4 | 8 | 38 |
| **Indicated Investigation** | **8** | **14** | **9** | **12** | **6** | **1** | **1** | **6** | **12** | **4** | **7** | **8** | **12** | **10** | **6** | **116** |
| Natural | 1 | 4 | 7 | 7 | 3 | 1 | 0 | 2 | 4 | 1 | 4 | 2 | 3 | 1 | 0 | 40 |
| Accident | 4 | 7 | 0 | 4 | 3 | 0 | 0 | 4 | 2 | 3 | 1 | 2 | 4 | 6 | 1 | 41 |
| Homicide | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 3 | 3 | 1 | 1 | 15 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 2 |
| Undetermined | 2 | 2 | 1 | 1 | 0 | 0 | 1 | 0 | 2 | 0 | 1 | 1 | 2 | 1 | 4 | 18 |

FIFTEEN-YEAR DEATH RETROSPECTIVE

| FISCAL YEAR | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Child of Ward*** | **5** | **4** | **6** | **12** | **2** | **2** | **1** | **4** | **3** | **2** | **7** | **4** | **1** | **0** | **0** | **53** |
| Natural | 3 | 1 | 1 | 6 | 1 | 2 | 1 | 2 | 1 | 0 | 3 | 2 | 0 | 0 | 0 | 23 |
| Accident | 1 | 1 | 2 | 3 | 1 | 0 | 0 | 0 | 1 | 1 | 2 | 0 | 0 | 0 | 0 | 12 |
| Homicide | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 8 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 1 | 2 | 1 | 1 | 0 | 0 | 0 | 2 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 10 |
| **Open Intact** | **9** | **12** | **20** | **19** | **15** | **31** | **20** | **13** | **18** | **12** | **9** | **21** | **14** | **7** | **10** | **230** |
| Natural | 6 | 6 | 6 | 4 | 8 | 23 | 12 | 5 | 6 | 5 | 5 | 12 | 4 | 1 | 4 | 107 |
| Accident | 0 | 5 | 7 | 10 | 1 | 5 | 3 | 4 | 4 | 4 | 1 | 3 | 5 | 4 | 3 | 59 |
| Homicide | 1 | 1 | 5 | 1 | 1 | 2 | 4 | 2 | 4 | 2 | 0 | 4 | 1 | 0 | 2 | 30 |
| Suicide | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Undetermined | 2 | 0 | 2 | 4 | 4 | 1 | 1 | 2 | 3 | 1 | 3 | 2 | 4 | 2 | 1 | 32 |
| **Closed Intact** | **5** | **3** | **8** | **7** | **13** | **0** | **1** | **2** | **2** | **6** | **2** | **3** | **2** | **8** | **2** | **64** |
| Natural | 2 | 2 | 2 | 3 | 3 | 0 | 0 | 1 | 2 | 2 | 1 | 0 | 1 | 1 | 1 | 21 |
| Accident | 2 | 0 | 4 | 1 | 5 | 0 | 1 | 1 | 0 | 1 | 0 | 3 | 1 | 3 | 0 | 22 |
| Homicide | 1 | 0 | 0 | 3 | 4 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 2 | 1 | 13 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 0 | 1 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 2 | 0 | 8 |
| **Open Placement/Split Custody** | **13** | **4** | **9** | **3** | **17** | **5** | **4** | **2** | **4** | **6** | **1** | **8** | **1** | **10** | **13** | **100** |
| Natural | 6 | 4 | 6 | 3 | 12 | 3 | 3 | 1 | 4 | 1 | 1 | 2 | 0 | 5 | 10 | 61 |
| Accident | 1 | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 2 | 0 | 4 | 0 | 3 | 1 | 15 |
| Homicide | 1 | 0 | 1 | 0 | 3 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 1 | 2 | 11 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 5 | 0 | 2 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 2 | 0 | 1 | 0 | 12 |
| **Closed Placement** | **3** | **1** | **4** | **2** | **2** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **12** |
| Natural | 3 | 0 | 3 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| Accident | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Homicide | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

96

FIFTEEN-YEAR DEATH RETROSPECTIVE

| FISCAL YEAR | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Adopted | 0 | 2 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| Former Ward | 5 | 1 | 0 | 1 | 1 | 0 | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 2 | 2 | 18 |
| Return Home | 0 | 0 | 0 | 1 | 0 | 3 | 0 | 4 | 1 | 1 | 5 | 2 | 1 | 4 | 0 | 22 |
| Homicide by a ward** | 1 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| Interstate compact | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Preventive services | 0 | 0 | 1 | 3 | 4 | 13 | 5 | 2 | 3 | 2 | 0 | 0 | 1 | 1 | 0 | 35 |
| Subsidized Guardianship | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Child of former ward*** | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 5 |
| Extended family support | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 1 | 0 | 1 | 0 | 0 | 5 | 0 | 0 | 11 |
| Child Welfare Referral | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1 | 5 | 1 | 1 | 1 | 5 | 5 | 1 | 23 |

*In FY 01 a child of a ward was also a ward and was only counted once in the total.
**In FY 00, FY 02 and FY 03 the victims of the homicide by a ward were either not involved with DCFS and therefore not included in the total or the victims were involved with DCFS and had been included in another category.
***In FY14 the child of a former ward was counted in the indicated DCP category instead of the child of a former ward category.

# INVESTIGATING AND INDICATING PARENTS FOR CO-SLEEPING

## OFFICE OF THE INSPECTOR GENERAL
### Department of Children and Family Services

### Investigating and Indicating Parents for Co-Sleeping
### in the Absence of Drug or Alcohol Use With No Other Evidence of Neglect[1]

**Introduction**

In 2008, the Illinois Child Death Review Teams recommended DCFS develop a protocol for indicating parents whose children die while bed sharing when the parent was under the influence of alcohol or drugs (Illinois Child Death Review Teams, 2010).[2]  In the same year, the Illinois Child Death Review Teams recommended DCFS develop guidelines for SCR (State Central Register/the DCFS hotline) to accept for investigation calls about babies who died while co-sleeping.  The practice of bed sharing, also known as co-sleeping, refers to a parent sleeping with an infant in an adult bed, on a mattress, couch, armchair or other "unsafe" sleep environment.  "Co-sleeping" can also refer to the practice of "room sharing"—having an infant's crib in the same bedroom as the parent, but not sharing the adult bed with the infant. In this report, however, "co-sleeping" is meant to be synonymous with "bed sharing."

A 2009 survey of Illinois parents found that nearly 18% reported their infant "usually" co-slept with another person (Illinois Pregnancy Risk Assessment Monitoring System, 2009, p. 39).  Occasional co-sleeping may be even more prevalent: according to a more detailed survey in another state, when parents were asked whether their infant had "ever" co-slept with them during the first three months of life, 65% said "yes." (*See section entitled "The Prevalence of Co-Sleeping"*).

In 2009 and 2010, the Illinois Child Death Review Teams expanded on their previous position on co-sleeping, including a recommendation that:

> If DCFS determines, during the investigation of a child's death due to unsafe sleep practices, that the caregiver of the child at the time of death or at the time the child was placed in the unsafe sleep environment, has received prior information, education, [or] documentation regarding safe sleep recommendations from hospital staff, schools, [or] DCFS and knowingly did not follow the safe sleep recommendations, the case shall be indicated for [Allegation] 60 Risk of Harm [Substantial Risk of Physical Injury by Neglect] at a minimum (Illinois Child Death Review Teams, 2012, p. 105).

---

[1] January 9, 2014

[2] In response to these 2008 recommendations, DCFS stated:

> It is important that DCP staff not just accept/rely on a coroner's report that finds the death to be accidental but look at blatant disregard which is defined as incidents where the risk of harm to the child was so imminent and apparent that it is unlikely that a parent or caretaker would have exposed the child to such obvious danger without exercising precautionary measures to protect the child from harm (Illinois Child Death Review Teams, 2010).

DCFS responded to the CDRT recommendation, stating that procedures would be amended to instruct investigative staff to indicate for Allegation 60, Substantial Risk of Physical Injury by Neglect, in situations where a child died while in an unsafe sleep environment and the caregivers had received prior education or documentation about safe sleep.  The Department also agreed to instruct investigative staff that if the caregiver had consumed alcohol or drugs prior to the child's death in an unsafe sleep environment, the death could be indicated for Allegation 51, Death by Neglect (Illinois Child Death Review Teams, 2012, pp. 96-97, 101-102, 105).   Allegation 60, Substantial Risk of Physical Injury by Neglect, has a five year retention; Allegation 51, Death by Neglect, has a 50 year retention.[3]  To date, the Department has not issued procedures, policy, or rules instructing investigative staff regarding indicating for co-sleeping.

Historically, coroners and the Cook County Medical Examiner called infant deaths into the hotline for record keeping purposes only (though they could also allege abuse or neglect).  SCR recorded the deaths as information-only/unusual incident reports. In 2011, the hotline began taking calls involving co-sleeping for investigation of neglect.

In its review and investigation of child deaths, the Office of the Inspector General has noted inconsistencies in investigations in terms of who is indicated or why. Cases in which the cause of death was accidental overlay have been unfounded for Death by Neglect, while cases in which the child's cause of death was undetermined have been indicated for Death by Neglect. This paper will limit its review to the Department's current practice of investigating parents whose child has died while co-sleeping in the absence of drug or alcohol use or other factors suggesting abuse or neglect, and address whether the practice is advisable and whether it is being administered fairly and consistently.

**The Shift in Classifying Co-Sleeping Infant Deaths**
Until 1969, the sudden and unexpected death of an infant was classified as a crib death. The term Sudden Infant Death Syndrome (SIDS) was introduced at that time to describe the "sudden death of any infant following a post-mortem which fails to adequately identify a cause of death" (Krous, 2010, p. 7).  For thirty years, unexplained infant deaths were categorized as SIDS, a natural manner of death.[4]

In 1999, the Centers for Disease Control (CDC), which collects data on infant deaths, began using the term Sudden Unexpected Infant Death (SUID) to describe any death of an infant less than one year of age that occurs suddenly and unexpectedly, and whose cause of death is not immediately obvious prior to a coroner or medical examiner's investigation (Centers for Disease Control and Prevention, 2013). The CDC did this after recognizing in the late 1990s

---

[3]In 2011, the Illinois Child Death Review Teams again recommended that DCFS:

> Have a protocol in place for consistent findings for unsafe sleeping conditions where DCFS previously agreed to indicate for allegation 60 when it was documented that the parents/caregivers have been told of the safety hazards of unsafe sleeping and allegation 51 when the parents/caregiver have been drinking or using drugs" (Illinois Child Death Review Teams, 2013).

The Department responded that it was "re-writing procedure 300 and will include what will be indicated" (Illinois Child Death Review Teams, 2013).  The Child Death Review Teams also recommended the Department utilize safe sleep brochures and partner with public health organizations to educate the public about the risks of unsafe sleep practices:

> [The] team would like DCFS to send brochures to [the] University of Illinois & Southern Illinois University Pediatric residency programs.  The team would like DCFS to work with DHS and IDPH and local health departments to educate on safe sleep (Illinois Child Death Review Teams, 2013).

The Department agreed with the recommendations and stated the Department would work with "DHS, IDPH and local health departments to educate families on safe sleep" and "look at the Public Service Announcement for safe sleep" (Illinois Child Death Review Teams, 2013).

[4] There are five manners of death: natural, accident, suicide, homicide, and undetermined.

that coroners and medical examiners were attributing different causes of death (e.g., accidental suffocation or unknown) to infant deaths previously categorized as SIDS.

The CDC noted that inconsistent practices in investigations and cause-of-death determinations hamper the ability to monitor national trends, ascertain risk factors, and design and evaluate programs to prevent child deaths. In an effort to standardize practice, the CDC's Division of Reproductive Health (DRH) launched the Sudden Unexpected Infant Death Initiative (Centers for Disease Control and Prevention, 2011). The goals of the SUID Initiative are to standardize and improve data collected at the death scene; promote consistent classification and reporting of cause of death; improve national reporting of SUID; and reduce SUID by using improved data to identify those at risk. To accomplish these objectives, in 2006 the SUID Initiative revised the existing (1996) CDC Sudden Unexplained Infant Death Investigation Reporting Form; developed a training curriculum and materials for investigators of infant deaths, and; trained medicolegal professionals and child advocates to conduct comprehensive infant death investigations. By 2012, the CDC developed a state-based SUID Case Registry (SUID-CR) pilot program to supplement current vital statistics-based surveillance methods (currently, Arizona, Colorado, Louisiana, Michigan, Minnesota, New Jersey, New Mexico, New Hampshire, and Wisconsin are participating in the pilot).[5]

The term Sudden Unexpected Infant Death (SUID) may be thought of as a cause of death classification used before a thorough investigation assists a coroner or medical examiner in determining a cause of death.



**Figure 1: Classification of Infant Deaths**

Both Sudden Infant Death Syndrome (SIDS) and Sudden Unexplained Death in Infancy (SUDI) are causes of death attributed to the sudden death of an infant less than one year of age in which a thorough investigation, including a complete autopsy, scene investigation, review of the medical/clinical history, and appropriate laboratory testing fails to identify a specific cause of death (Centers for Disease Control and Prevention, 2013; The National Association of Medical Examiners Ad Hoc Committee on Sudden Unexplained Infant Death, 2007, p. 4). A death should be classified as SUDI, not SIDS, when one of the following situations is present:

---

[5] The CDC's Funding Opportunity Announcement for the Sudden Death in the Young Registry (formerly SUID-CR) will be released in the spring of 2014.  State health departments are encouraged to create teams of child death review experts and apply to participate.

1. The case meets the criteria for SIDS, but there is evidence of a disease condition whose contribution to the death is unknown or cannot be excluded as a causative or contributing factor.

2. The case meets the criteria for SIDS, but there is evidence of an external condition or risk factor (such as bed sharing with adults, sleeping face down on a soft pillow or sleeping on an adult mattress) whose contribution to the death is unknown or cannot be excluded as a causative or contributing factor.

3. Something in the investigation precludes a diagnosis of SIDS, but the cause and manner of death have not been determined.

A case would be properly classified as SIDS when there is no other cause of death identified after a complete autopsy, including toxicology and other laboratory tests, scene investigation, and review of the medical/clinical history, and there are no unusual scene findings or sleeping conditions identified (The National Association of Medical Examiners, 2002).

The National Association of Medical Examiners (NAME) recommends using the CDC's Sudden Unexplained Infant Death Investigative Report Form or a similar checklist to conduct a scene investigation, and also recommends that coroners/medical examiners identify and record conditions called "gray zone findings" which may or may not have contributed to the death but are included on the death certificate because their connection to the death cannot be ruled out  (The National Association of Medical Examiners Ad Hoc Committee on Sudden Unexplained Infant Death, 2007, p. 12).  In response to these recommendations, the Cook County Medical Examiner and coroners in Illinois began including more conditions such as "bed sharing" or "possible overlay" when officially reporting causes of infant deaths.

When investigating an infant death, the scope of a medical examiner or coroner's scene investigation should include: determining the original position of the infant when first found unresponsive, conducting interviews, obtaining a medical and social history, and whether the family had any previous unexplained infant or childhood deaths (The National Association of Medical Examiners Ad Hoc Committee on Sudden Unexplained Infant Death, 2007, pp. 4-6, 12).  The information that must be obtained before an investigation is considered complete is attached to this report as Appendix A.

Because the criteria for classifying an infant death as SIDS or SUDI are so similar, there is variability within counties in Illinois about what circumstances result in a finding of SIDS (a natural manner of death), versus SUDI (an undetermined manner of death). For example, in some counties the otherwise unremarkable death of an infant co-sleeping in an adult bed might be called a SIDS death. Because SIDS is considered natural, the death would not be indicated by DCFS. In many counties, the same death would be called a SUDI death, an undetermined manner of death. Because the death involved co-sleeping, it would be investigated by the Department, and might be indicated for Substantial Risk of Physical Injury by Neglect or Death by Neglect.

**Reasons for the Change in SIDS and SUDI Mortality Rates**
Over the past 20 years, the rate of infant mortality attributed to SIDS has decreased while the rate of infant deaths attributed to accidental asphyxiation or unknown causes has increased.[6]  In part, this is due to the reclassification of some unexplained infant deaths that historically would have been classified as SIDS, but whose cause was determined after a thorough investigation (Shapiro-Mendoza, 2009, p. 538).  In addition, the national Back to Sleep campaign which promoted education and public awareness of SIDS risk factors is credited with the precipitous drop in SIDS deaths over the past few decades (Kinney, 2009, p. 795).

---

[6] A 2004 study looked at 20 years of infant mortality data and concluded infant mortality rates attributable to accidental suffocation and strangulation in bed quadrupled between 1984 and 2004 (Shapiro-Mendoza, 2009, p. 536).

*Success of the Back to Sleep Campaign*

The Back to Sleep public education campaign has been credited with significantly reducing the actual incidence of SIDS[7] while increasing the public's awareness of unsafe infant sleep environments (Shapiro-Mendoza, 2009, pp. 537-538).  One study suggests that if parents were made as aware of the risks of sleeping with their baby as Back to Sleep made them aware of the risks of babies sleeping on their stomachs, a substantial further reduction in infant deaths could be achieved (Carpenter R., 2013, p. 10).

Public health campaigns that promote education about safe sleep have been revised several times since the early 1990s to accommodate new information.  In 2000, the American Academy of Pediatrics (AAP) amended the Back to Sleep campaign to include information regarding the hazards of bed sharing under certain conditions; in 2005, the AAP amended their recommendations to include a supine sleep position, a firm sleep surface with no loose bedding or blankets, and a separate sleep area for baby (National Institute of Child Health and Human Development, 2013).[8] Currently, the AAP's Back to Sleep campaign includes the "ABC" campaign to address bed sharing—the campaign educates parents about placing their infant to sleep (A)lone, on their (B)ack, and in a (C)rib (Task Force on Sudden Infant Death Syndrome, 2011).[9]

Although public health organizations like the AAP that championed the Back to Sleep movement have now expanded their safe sleep guidelines and recommend against co-sleeping,[10] public acceptance of this information has not been widespread, and there are barriers that impede widespread acceptance of the recommendation.

**Risks Associated With Co-Sleeping**

A 2013 British study titled *Bed Sharing When Parents Do Not Smoke: Is There a Risk of SIDS?* found that bedsharing is especially dangerous when combined with known risk factors such as smoking, drug or alcohol use, and low birth weight (Carpenter R., 2013, p. 10).[11]  The study reported a slightly increased risk of unexplained death for all infants under three months of age who co-slept with an adult, regardless of whether or not the infants were breastfed, exposed to maternal tobacco smoking, or if their mothers consumed "2 or more units of alcohol in the past 24 hours" (Carpenter R., 2013, p. 8).  The study also found that bottle feeding increases the risk of unexplained infant death (Carpenter R., 2013, p. 8).

The American Academy of Pediatrics (AAP) does not recommend co-sleeping with infants because of research suggesting it "might increase the risk of overheating, rebreathing or airway obstruction, head covering, and exposure to tobacco smoke, which are all risk factors for SIDS," and because co-sleeping "exposes the infant to additional risks for accidental injury and death, such as suffocation, asphyxia, entrapment, falls, and strangulation" (Task Force on Sudden Infant Death Syndrome, 2011).

---

[7] SIDS mortality rates in the United States declined almost 50% between 1992 and 2004 (Shapiro-Mendoza, 2009, p. 535).

[8] Other Recommendations "warn[ed] against letting baby get too warm during sleep and suggest[ed] using a pacifier to help reduce SIDS risk."

[9] A 2013 JAMA editorial titled *Bed Sharing per se Is Not Dangerous* questions whether the data used to support the AAP's recommendation against bedsharing is accurate in light of the "nonuniform and unverifiable" data available on causes of infant death (Bergman, 2013).

[10] In 2012, the National Institute of Child Health and Human Development (NICHD) rebranded the "Back to Sleep" campaign as the "Safe to Sleep" campaign, which continues to promote awareness that "safe sleep environments and back sleeping [are] ways to reduce the risk of SIDS and other sleep-related causes of infant death" (National Institute of Child Health and Human Development, 2013).

[11] The Carpenter study was criticized in a 2013 Praeclarus Press White Paper that found the conclusions to be unsubstantiated because the analysis used "faulty and missing data and did not account for confounding criteria used to define bedsharing and risks"–while the Carpenter analysis did include major risk factors associated with SIDS [sleep position, parent smoking, alcohol use, drug use, birthweight and infant age, the study did not discuss other factors that "influence breathing and arousability" like bedding (sleep surface) or temperature (Praeclarus Press White Paper, 2013).

Unsafe sleeping environments, such as an adult bed or couch, increase the likelihood of an overlay suffocation where the person (adult or child) sleeping with the infant rolls over and unintentionally smothers the infant.  Unsafe sleeping environments also increase the likelihood of accidental positional asphyxia when an infant's face becomes trapped in soft bedding or wedged in a small space such as between the mattress and a wall or between couch cushions. Excessive or heavy bedding on an adult bed can cause an infant to overheat and increases the likelihood of accidental suffocation, asphyxiation or entrapment in loose bedding materials.

The Consumer Product Safety Commission and the National Institute of Child Health and Human Development now report that infants sleeping in adult beds are 20 times more likely to suffocate than infants who sleep alone in cribs (National Maternal and Child Health Bureau Center for Child Death Review).  The National Infant Sleep Position Study found "infants who bed shared were 2.9 times more likely…to usually sleep beneath more than two bed covers, and they were almost twice as likely to be covered with a quilt" regardless of room temperature (Willinger, 2003, p. 46).

**The Prevalence of Co-Sleeping**
*The Pregnancy Risk Assessment Monitoring System (PRAMS)*
The Pregnancy Risk Assessment Monitoring System (PRAMS) is a surveillance project of the Centers for Disease Control and Prevention (CDC) and state health departments. It collects state-specific, population-based data about maternal behaviors and experiences before, during and after pregnancy that may be associated with adverse pregnancy outcomes.  Illinois is one of forty states[12] representing approximately 78% of all U.S. live births that currently participate in the PRAMS surveillance project (Centers for Disease Control and Prevention, 2013). Every month in Illinois, approximately 200 mothers who gave birth that month are contacted and asked to complete written surveys.[13]

The PRAMS questionnaire has two parts:  a set of core questions asked by all states and a second set of questions from a pretested list of standard questions developed by the CDC or developed by states on their own. As a result, each state's PRAMS questionnaire is unique. Among the second set of questions surveyed by PRAMS are parental behaviors related to their  infant's  sleep.

Because each state can develop supplemental questions, some states have developed specific questions targeting patterns of co-sleeping. For example, Maryland 2009-2011 PRAMS surveys included the following question:[14]

> How often does your new baby sleep in the same bed with you or anyone else:
> ☐ Always
> ☐ Often
> ☐ Sometimes
> ☐ Rarely
> ☐ Never

---

[12] New York City also participates in the Pregnancy Risk Assessment Monitoring System.
[13] The 200 mothers represent a "stratified systematic sample" of eligible birth certificates.
[14] Prior to 2009, the Maryland PRAMS survey did not ask this question.



**Figure 2 Prevalence of Co-Sleeping, Maryland 2009-2011
(Maryland Pregnancy Risk Assessment Monitoring System, 2011)**

Maryland was able to determine and report on the prevalance of women reporting co-sleeping (see Chart above). PRAMS collects data not available from other sources about pregnancy and the first few months after birth. The data gathered by PRAMS is "used to identify groups of women and infants at high risk for health problems, to monitor changes in health status, and to measure progress towards goals in improving the health of mothers and infants" (Centers for Disease Control and Prevention, 2013).

Maryland used its data to focus on specific campaigns to raise awareness among its minority population to prevent sleep-related deaths.  In Baltimore City, most of the infant deaths were not from natural causes but were deaths with risk factors of co-sleeping, objects in the crib, and stomach sleeping.[15] Baltimore's "B'more for Healthy Babies" Sleep Initiative targeted education about the dangers of co-sleeping to minority communities, and developed a video presentation about safe sleep.[16] In 2012 Baltimore's infant mortality rate dropped for the third year in a row after the initiation of "B'more for Healthy Babies" in 2009.

Illinois' 2009 PRAMS infant sleep survey question was limited to a true or false statement:

My new baby sleeps with another person .................... T     F

In 2009, 17.9% of the Illinois  mothers who participated in the Illinois PRAMS survey reported their infant "usually" sleeps with another person (Illinois Pregnancy Risk Assessment Monitoring System, 2009, p. 39). The Illinois Department of Public Health has not published its PRAMS survey results since 2009.[17]

*Co-Sleeping and Infant Mortality in Minority and Low Income Families*
The Illinois Violent Death Reporting System analyzed sleep related deaths in Illinois from 2003 through 2005 and determined that in Cook County, African American infants are 12 times more likely than White infants to die from sleep-related causes (Child Health Data Lab at Children's Memorial Hospital, 2010, p. 1).[18]  The incidence of infant deaths due to unsafe sleep is significantly higher in certain parts of Cook County, and "infant deaths are clustered in

---

[15] Personal communication with Jana Goins, Epidemiologist, Maternal and Child Health, Baltimore City Health Department, December 11, 2013.
[16] The B'more for Healthy Babies Safe Sleep Video can be found online at http://www.youtube.com/watch?v=yBBiG6e4xRw.
[17] Staff shortages have limited the ability to produce new reports; personal communication December 2013.
[18] Only data from Cook County was analyzed for this report.  There is only one Medical Examiner system in the State of Illinois; the Cook County Medical Examiner's jurisdiction includes ½ the State's population.

the middle portion of the south side and on the west side. In the suburbs, the deaths are roughly clustered in the Harvey/Dolton area, the Oak Park/Cicero area and the Streamwood and Des Plaines areas" (Child Health Data Lab at Children's Memorial Hospital, 2010, p. 2). An analysis of "the geographic dispersion of undetermined infant deaths in Chicago strongly suggests an association with race and low income" (Child Health Data Lab at Children's Memorial Hospital, 2010, p. 2).

In her introduction to the 2010 Reduction of Infant Mortality in Illinois Report, Secretary of Illinois Department of Human Services Michelle R.B. Saddler stated, "While we continue to make progress, there is a persistent racial disparity in infant mortality that must be eliminated.  An African-American infant born in Illinois is still more than two and a half times as likely as a Caucasian infant to die before reaching one year of age.  Our current efforts are commendable, but they are not enough" (Illinois Department of Human Services, 2011, letter).  Currently, the rate of infant mortality deaths among Caucasians and Hispanics in Illinois are close to the Healthy People national goal of six deaths per 1,000 live births; the rates among African-Americans, however, are at a high level of 13.4 deaths per 1,000 live births (Illinois Department of Human Services, 2011, p. 23).  Illinois will not be successful in reducing its infant mortality rate until the ratio of African-American to Caucasian infant deaths is improved (Illinois Department of Human Services, 2011, p. 25).

The National Infant Sleep Position Study found the number of infants "routinely sharing an adult bed or mattress" more than doubled, from 5.5% to 12.8%, between 1993 and 2010. (Willinger, 2003, pp. 44-45)  The 17-year National Infant Sleep Position Study conducted annual telephone interviews with families of infants less than eight months of age in order to "examine trends in bed sharing…and the factors that influence this behavior" (Willinger, 2003, p. 43). The study found that bed sharing with infants was more common than researchers predicted: 13% of infants usually slept in adult beds; about 20% of infants slept in an adult bed at least half of the time; and almost 50% of infants slept in an adult bed at some point during the two weeks before being surveyed (Willinger, 2003, pp. 46-48).

The study used a "three-year moving average calculation" to determine whether the rates of bed sharing rose across all ethnic groups.  This study found "it was more common for infants of nonwhite mothers to sleep on an adult bed for half or more of the time than infants of white mothers" (Willinger, 2003, p. 44).  Between 1993 and 2010, the percentage of white families bed sharing increased from 4.9% to 9.1%; during the same period, the percentage of Hispanic families bed sharing increased from 12.5% to 20.5% and the percentage of African-American families bed sharing increased from 21.2% to 38.7% (National Institutes of Health, 2013).



**Trends in Infant Bed Sharing in the United States, 1993-2010**
http://www.nih.gov/news/health/sep2013/nichd-30.htm

The National Infant Sleep Position Study also found an increased likelihood of an infant routinely bed sharing when there is a low household income (Willinger, 2003, p. 45).[19]  A 2008 study in *Pediatrics* found 14% of women surveyed who bed shared "felt the practice was safer than not bringing the infant to bed with them" (Hauck, 2008, p. s113). A 2006 study surveyed 671 mothers of infants at Women, Infants, and Children (WIC) program centers[20] and found 29% of the mothers believed that having their infant sleep with an adult helped to prevent SIDS (Colson, 2006, p. e248).

The incidence of bed sharing in low income households has not been extensively researched, although data from a study of low-income families living in the District of Columbia between 1995 and 1997 concluded "bed sharing was normative behavior" in that community, with "almost 50% of 3 to 7-month-old-infants, predominantly low-income, inner city infants routinely sharing a bed with a parent or other adult" (Brenner, 2003, p. 39). The data also suggested that bed sharing occasionally occurred even in families where the infant usually slept alone.[21]

*Some Literature Supports Co-Sleeping*
Co-sleeping is championed by some academics because it is perceived as increasing parent-child bonding and the likelihood of breastfeeding, both of which are associated with more positive outcomes for children.  There is disagreement in the scientific and medical communities about whether bed sharing, in the absence of increased risk factors—such as intoxication, smoking, use of illegal drugs or obesity—does in fact increase the risk of infant death. Because studies have found "little or no independent association between bed sharing and SIDS," proponents of co-sleeping like James J. McKenna[22] take the stance that "among parents who do not use tobacco, alcohol, or other drugs, sleeping with their infant is a perfectly reasonable and potentially beneficial option" (Gessner, 2006, p. 990).

Proponents of bed sharing fear an anti-co-sleeping campaign for non-smoking mothers "would seemingly have little if any effect on the SIDS rates but could deny these mothers and infants any potential advantages in co-sleeping, including accessibility to the breast" (P. Flemming, 2006, p. 1). They point to its cultural and historical acceptability, and note that co-sleeping (including skin-to-skin care, or "kangaroo care") is "accepted as normal human practice by anthropologists and infant physiologists," and there are "consistently low rates of unexpected infant deaths in some societies in which bed sharing is a routine cultural practice" (P. Flemming, 2006, p. 2).  In addition, proponents claim that co-sleeping with infants can lead to "improved breastfeeding, less infant crying, improved parent and child sleep, and improved parent-child bonding," all of which "may relate directly to a decreased risk of child abuse" (Gessner, 2006, p. 990).

Breastfeeding advocates fear recommendations against co-sleeping could place more infants at risk for unexplained death by causing a decrease in the number of infants that are breastfed—some experts worry "any action leading to reduced rates or duration of breastfeeding may increase infant mortality" (P. Flemming, 2006, p. 2).

*Reasons Parents Choose to Bed Share*
A 2003 study in *Clinical Pediatrics* examined the way parents are educated about safe sleep practices and concluded a parent's knowledge about safe sleep practices does not predict whether or not they will choose to co-sleep, and found many parents chose to bed share because of a "parental preference" (Forlwer, 2003, p. 1049).  In this study, 60% of parents practiced bed sharing regularly—these parents reported they "…'feel safer with the baby in bed with me' and that it is 'better for the baby to be closer to me'" (Forlwer, 2003, p. 1049).  Although the majority of parents co-slept because of parental preference, 16% of the parents who practiced bed sharing in this study did so because they did not have a crib (Forlwer, 2003, p. 1049).  The study also found that some parents who regularly use a crib "revert to bed sharing" if their infant wakes up in the middle of the night (Forlwer, 2003, p. 1049).

---

[19] The study also found a higher incidence of co-sleeping when a mother is less than 18 years old.
[20] WIC program centers in Boston, Massachusetts, Dallas, Texas, Los Angeles, California, and New Haven, Connecticut were included in this study
[21] 4% of the families who responded their infant usually slept alone admitted their infant did not sleep alone the night prior to the interview.
[22] Professor of Biological Anthropology and Director of the Mother-Baby Sleep Laboratory at the University of Notre Dame.

The rates of bed-sharing are highest when an infant is youngest: one study found 59% to 65% of mothers lay down or slept with their infant at night during the first three months after birth (Hauck, 2008, p. s113). Rates of co-sleeping declined as infants aged, with 42% of infants bed sharing at two weeks, 34% bed sharing at three months, and 27% bed sharing at 12 months (Hauck, 2008, p. s115). The three most common reasons given for bed sharing were to "calm a fussy infant, to help the infant and/or the mother sleep and to facilitate breastfeeding" (Hauck, 2008, p. s115).

Pop culture may reinforce beliefs that sleeping with an infant is an acceptable practice. A 2013 Christmas Pandora TV commercial portrayed a caring husband leaning over his wife, who was sleeping in bed with their infant. A 2011 episode of *Parenthood,* a fictional TV series, showed a father falling asleep on a couch while holding and bonding with his newborn daughter. These portrayals are intended to convey tender or empathetic moments of parents sleeping with or nodding off from exhaustion while holding their newborn infants.

*What or How Much Education About Safe Sleep Works?*
After giving birth at a hospital, new parents "receive a folder with a variety of information about caring for a newborn," however, studies have found "infant sleep position was not affected by receiving or reading a Back to Sleep brochure" (Forlwer, 2003, pp. 1049-1050). To better educate new parents, it has been suggested that "instruction, reinforcement and demonstration" of safe sleep practices should be done "in the presence of both parents and other potential caregivers," and that education about safe sleep should be more direct and interactive (Forlwer, 2003, p. 1050). It is also recommended that "pediatricians, family physicians, and other clinicians who care for infants need to be comfortable bringing up bed sharing with parents…especially in the early months of life, in a way that is nonjudgmental…but that conveys the evidence about the risks associated with this practice" (Forlwer, 2003, p. 1049).

Research has shown parents' attitudes about safe sleep practices are strongly influenced by the information they receive from nurses and physicians, and "the personal education parents receive regarding SIDS prior to discharge is highly nurse and physician dependent" (Forlwer, 2003, p. 1049). Despite how influential physicians can be in helping parents learn about safe sleep practices, one study that analyzed parents' education about safe sleep practices found that only "10%-15% of mothers [surveyed] responded that a doctor or nurse had advised them not to take the infant to bed with them" (Hauck, 2008, p. s118).

The Illinois Child Death Review Teams recommended that parents or caregivers be indicated for Substantial Risk of Physical Injury by Neglect if before their baby died in an unsafe sleep environment they had received information about safe sleep and chose not to follow it. Child protection investigators seek to determine whether parents or caregivers of an infant who died while co-sleeping have been "educated" about the dangers of co-sleeping. It is thought if parents know about the risks of co-sleeping and decide to co-sleep anyway, they are consciously disregarding a substantial and unjustifiable risk that their child will suffer death or serious injury.

Determining whether parents received sufficient education about safe sleep can be difficult to assess. Literature about adult learning suggests an adult's ability to learn and retain new information is limited, and is especially compromised during periods of stress, exhaustion, anxiety, or depression. Merely talking to a new parent one time about the risks of co-sleeping (or providing them with a brochure about safe sleep practices) does not necessarily equate to educating that parent, and it is important to consider barriers that prevent a parent from fully understanding the risks of co-sleeping when they are presented. In addition, differences in language and culture, as well as the "use of jargon and scientific language" can make it difficult for new information to be absorbed (Rzepnicki, 2004, pp. 273-290).

New information must be processed and not merely "accepted." Specific barriers to effective communication and "accurate understanding" can "include information overload, stress and illness, and language differences," and there are limits to how much new information can be processed—research suggests "people can only retain about seven 'chunks' of new information at any one time" (Rzepnicki, 2004, pp. 273-290). The stress new parents experience and their exposure to an overwhelming amount of new information undoubtedly impedes their ability to retain and process new information.

Furthermore, it is hard to measure how much a person understands the many ways in which they must change their daily behavior as a result of new information (Rzepnicki, 2004, pp. 273-290). This means that while a parent might truthfully tell a doctor or nurse they will not co-sleep with their infant, they may not consider the numerous actual changes they must make in their daily routines to adhere to this standard. A person's ability to truly change their daily behavior in response to new information can be compromised by "stress, depression, or anxiety," all of which can be common emotions for new parents (Rzepnicki, 2004, pp. 273-290). Newborn infants may need to be fed every hour and a half to two hours, and that combined with the increased stress of parents being sleep-deprived during the first weeks of adjusting to a new infant leads to parental exhaustion.

**DCFS Investigation of Co-Sleeping Deaths**
Prior to the Illinois Child Death Review Teams' recommendations, the Department did not accept infant deaths for investigation unless abuse or neglect in the death was specifically alleged. After the Department began taking for investigation calls that were previously reported for information-only purposes, the number of infant deaths investigated and indicated by the Department increased. The Department has not yet promulgated rules and procedures regarding the investigation of sleep-related deaths which would include requirements for investigation and what evidence is needed to support a finding. Consequently, investigative tasks performed and the rationales for findings are inconsistent among child protection investigators.

*Definitions of Neglect*
An indicated finding for Allegation 51, Death by Neglect, requires a determination that a perpetrator exercised a "*blatant disregard of parental (or other person responsible for the child's welfare) responsibilities*" which resulted in a death (89 Ill. Admin. Code §300 Appendix B). Under the Abused and Neglected Child Reporting Act, a parent or caretaker exercises "blatant disregard" when a "*real, significant, and imminent risk of harm would be so obvious to a reasonable parent or caretaker that it is unlikely that a reasonable parent or caretaker would have exposed the child to the danger without exercising precautionary measures to protect the child from harm*" (325 ILCS 5/3).

An indicated finding for Allegation 60, Substantial Risk of Physical Injury by Neglect, requires a determination that "*the child's environment creates a likelihood of harm to the child's health, physical well-being, or welfare and the likely harm to the child is the result of a blatant disregard of parent or caretaker responsibilities*" (325 ILCS 5/3).

*Inconsistent Investigation and Findings in Co-Sleeping Deaths*
The Office of the Inspector General has noted in its death reviews and investigations that the practice of indicating parents for neglect allegations based on a co-sleeping death is inconsistent. In FY 2009, the Office of the Inspector General reviewed three death cases in which a parent was indicated for Death by Neglect because an infant died in an unsafe sleep situation; all three cases involved parents drinking or using drugs. In FY 2010, the Office of the Inspector General reviewed two cases in which a parent was indicated for Death by Neglect but neither case involved parental alcohol or drug use. In FY 2011, there were seven cases in which a parent was indicated for Death by Neglect; only three of those cases involved parental alcohol or drug use. In FY 2012, there were ten cases where a parent was indicated for Death by Neglect; only three of those cases involved parental alcohol or drug use.

In FY 2013 the Office of the Inspector General reviewed 93 child deaths that fit its criteria of children whose families were involved in the child welfare system within the preceding twelve months. Of the 93 child deaths reviewed, 25 (27%) of the deaths involved unsafe sleeping arrangements. Twenty-two of the unsafe sleeping arrangements involved co-sleeping. In 15 (68%) of the 22 investigations, the caretaker was indicated. Twelve of the caretakers were indicated for Death by Neglect, a finding which is retained for 50 years and three were indicated for Substantial Risk of Physical Injury by Neglect, which carries a five year retention. Only 2 of the 12 cases indicated for Death by Neglect involved the caretaker being under the influence of drugs or alcohol at the time of death. Six (27%) of the co-sleeping investigations were unfounded.[23]

---

[23] One investigation was still pending at the time of review.



**Number of Parents Indicated After Co-Sleeping Infant Death**

The following case descriptions illustrate the inconsistent findings being made in investigations involving co-sleeping:

- A two-month-old infant was discovered unresponsive in bed after being put to sleep in an adult bed with her mother and two siblings (aged 2-1/2 years and 1-1/2 years).  The family had a play pen, but the mother stated the infant liked to sleep with her.  At the time the infant died, the play pen was not full of clothing or anything else that would pose a barrier to its use.  The two older children did not want to sleep in their own beds where they normally slept[24, 25]—the mother and infant slept on the right side of the bed and the two other children laid across the foot of the bed.  A substance abuse screen was conducted and neither alcohol nor drug use was disclosed. The hotline was contacted by police, who reported there were no signs of abuse, trauma or medical issues, and that the doctor believed the death was caused by rollover.  The family was maintained in a safety plan for nine months, where the mother was not allowed to live with her children.  The children stayed with their grandmother, who lived in the apartment below the mother.  As a result of a backlog in the medical examiner's office, the official autopsy results were not available until nine months after the infant's death.  The medical examiner ruled the manner of death was accident and the cause was asphyxia resulting from probable overlay.  Once the Department received the autopsy, the mother was indicated for Death by Neglect, which carries a 50 year retention.  As the mother is in school to become a nurse, the indicated finding threatens her future career (<u>J.S.</u>, Cook County, 2013).

- A six-week-old infant died and the mother self-reported that she had found the infant dead in her arms after falling asleep with the child.  The Department indicated the mother for Allegation #60,

---

[24]  The Department had contact with this family less than one year before the infant's death due to an unfounded allegation of inadequate supervision against the mother.  Despite the fact the allegation was unfounded, the family was referred for Norman services to purchase toddler beds.  Although the investigation aftercare plan documented that the family was referred, further investigation revealed that they may not have received these funds.

[25]  In May 2006 the Office of the Inspector General began distributing portable cribs to child protection workers throughout Illinois.  The Office of the Inspector General started purchasing the cribs from the non-profit organization Cribs for Kids in May 2010—prior to that time, portable cribs were obtained from a variety of other sources.  In FY 2011, the Department assumed responsibility for the purchase and distribution of portable cribs.

Substantial Risk of Physical Injury by Neglect, after an investigation showed that the mother had been educated about safe sleep practices and the need to place the child in a crib to sleep. The mother appealed the finding which was overturned on administrative appeal because the administrative law judge found that the Department failed to show that the mother intended to fall asleep with the child. At the hearing, the mother admitted that she knew better than to sleep with the infant, but claimed that she had not intended to fall asleep, but was apparently more exhausted than she realized when she laid down with the baby. Under these conditions, the administrative review determined that she could not be indicated for Allegation # 60, Substantial Risk of Physical Injury by Neglect (A.G., Lake County, 2011).

- A one-month-old infant was found unresponsive after sleeping with his father on a couch and being placed face-down on the father's chest. Prior to the death, the family was given information about not co-sleeping with their infant; the family had a crib and bassinet, and the infant usually slept in the bassinet unless not feeling well. The father reported he had been sleeping with the infant on the couch for two weeks because the infant was not feeling well and would not sleep unless someone was holding him. The father drank two beers on the evening the infant died, but did not report feeling intoxicated or buzzed. When the mother discovered the infant positioned between the father and a couch cushion, she began performing CPR. The father was unfounded for Allegation #51, Death by Neglect, and Allegation #60, Substantial Risk of Physical Injury by Neglect with the rationale that the infant died of SUDI due to co-sleeping; there were no reported concerns of trauma or evidence of blatant disregard; although the parents were educated about co-sleeping, it is culturally common for this type of co-sleeping to occur; and the father was sleeping with the child on the couch for several days because the child would not sleep without being held (M.F., Crawford County, 2012).

- A two-month-old infant was discovered unresponsive around 7:00 a.m. by her father. The infant had slept between her parents in two twin beds pushed together. The family resided in a shelter, and there was no crib or bassinet in their room. The father reported smoking marijuana and staying awake until 4:00 a.m. playing video games. The infant, who had a cold and was congested, was last seen alive at that time. No signs of abuse or neglect were observed on any of the other five children residing at the shelter, who were removed under a safety plan. The medical examiner ruled the cause and manner of death undetermined, and noted the infant "was found by the father on a bed, unresponsive, and face up." Both parents were indicated for allegation #51 Death by Neglect, and unfounded for Allegation #60, Substantial Risk of Physical Injury by Neglect (H.J., Cook County, 2013).

- A two-month-old infant was found unresponsive in an adult bed. The previous evening, the infant had slept in the same bed as her mother. In the morning, the mother awoke and left to pick up the infant's father from work. The mother believed the infant was sleeping when she left the home; while she was gone, her brother checked on the infant and found her sleeping on her back in the bed. When the mother returned, she discovered the baby unresponsive in the bed. The mother had found a bug in the infant's crib, and that was why she had placed her infant to sleep with her in bed. The mother was indicated for Allegation #51, Death by Neglect and for Allegation #60, Substantial Risk of Physical Injury by Neglect, to her two surviving children. The father was indicated for Allegation #60, Substantial Risk of Physical Injury by Neglect, because he allowed the mother to sleep with the infant (M.R., LaSalle County, 2012).

- A seven-month-old infant, who was born two months prematurely and needed a feeding tube, was discovered unresponsive in an adult bed after her mother fell asleep while feeding her and accidently left the feeding tube running. There was a crib/bassinet in the corner of the bedroom. No signs of abuse or neglect were observed on any of the four other children living in the home, who were removed under a safety plan. The medical examiner ruled the cause and manner of death undetermined, "in consideration of the circumstances surround[ing] her death, autopsy examination,

ancillary studies and scene investigation which indicate an unsafe sleep environment (co-sleeping/bed sharing)."   Allegations #51, Death by Neglect, and #60, Substantial Risk of Physical Injury by Neglect, against the infant's mother were unfounded. In making this decision, the investigator noted the medical examiner did not classify the death as a rollover; the parents responded immediately upon noticing their child was in distress; and no arrests or criminal charges were filed against either parent (S.A., Cook County, 2013).

*Review of Indicated Findings*

The Office of the Inspector General reviewed all first sequence allegations of Death by Neglect related to unsafe sleep practices in FY 2011, FY 2012, and FY 2013. Some of the unfounded investigations were unavailable for review because they have been expunged.   Between FY 2011 and FY 2013, the number of cases indicated for Death by Neglect based on co-sleeping alone, with no evidence of other neglect, increased four-fold.

In FY 2011, the Department investigated 41 allegations of Death by Neglect related to unsafe sleep practices.[26]  Eleven (27%) of the 41 investigations were indicated.  In six of the 11 indicated reports, the parent(s) had abused alcohol or drugs prior to the co-sleeping death.  In another, the investigation disclosed a chaotic household.  In the four remaining indicated investigations, the parents were indicated for Death by Neglect based on co-sleeping alone, with no evidence of other neglect.

In FY 2012 the Department investigated 66 allegations of death by neglect related to unsafe sleep practices. Twenty-one (32%) of the sixty-six investigations were indicated. In six of the indicated the parents(s) had used drugs or alcohol prior to the co-sleeping death. Another six investigations had other identified risk factors including chaotic household, environmental neglect, physical abuse and a prior death of another child. In nine investigations the parents were indicated for death by neglect based on co-sleeping with no evidence of other neglect.

In FY 2013 the Department investigated 65 allegations of death by neglect related to unsafe sleep practices[27]. Thirty-three (51%) of the investigations were indicated. In eight of the indicated reports the parent(s) had used drugs or alcohol prior to the co-sleeping deaths. Another three reports involved other identified risk factors. Six investigations involved accidental positional asphyxia or entrapment with no other identified risk factors. In sixteen investigations the parents were indicated for death by neglect based on co-sleeping with no evidence of other neglect.

The Office of the Inspector General's review of indicated reports for sleep-related death by neglect found only one report where protective custody was taken of a surviving sibling. A 28-year-old mother was indicated after she co-slept with her three month old twins and one of the twins died. There was no indication during the investigation that the mother used drugs or alcohol, nor any other reports of neglect.  The mother reported that she was not sure if she had rolled over on the baby or not but she was indicated for death by neglect.  The mother's surviving three month old twin was taken into custody and placed with a relative. During an extended shelter care hearing, the judge found that the State failed to meet its burden of proof to substantiate risk of harm to the surviving sibling. The judge returned custody to the mother and dismissed the case.

*Safety Plans*

Once a child death is accepted for investigation, a mandatory safety plan is put into place until the autopsy report is obtained. Most of the surviving siblings that are separated from their families through a safety plan are of an age where they are no longer at risk of harm from co-sleeping.  Because it can take several months to obtain an autopsy report, parents who already lost one child and children who have lost a sibling may be separated for long periods of time,

---

[26] This number does not include investigations that were overturned on appeal.
[27] Three investigations are pending, two of those pending are sleep related deaths.

adding to the grief they are already experiencing.[28]  In its review and investigation of child deaths in FY 2013, the Office of the Inspector General found that in three of the co-sleeping child protection death investigations with surviving siblings, the surviving children were placed in safety plans outside the care of their parents during the pendency of the investigations for seven, eight and nine months, while the Department awaited completion of the infants' autopsy reports.  A parent was indicated for Death by Neglect in only one of the investigations (see J.S. case example above).

**Case Law Involving Co-Sleeping Infant Deaths**
The Office of the Inspector General has reviewed case law to identify cases where parents have been held criminally liable for the death of a child due to bed sharing or have had an indicated finding of child abuse or neglect upheld in court.  Nine states, including Illinois, have cases in which parents were held liable for co-sleeping deaths.

In 1997, the Illinois courts addressed whether risk of harm to surviving siblings was demonstrated after an infant died while co-sleeping with his mother on a couch, after she had consumed "two shots" of eggnog with brandy.  The appellate court affirmed the trial court's finding that the State had failed to prove the child died from negligence or that the mother had failed to exercise a reasonable degree of care.  In support of its finding, the court noted that the medical examiner had determined that the infant's death was accidental and that an expert had testified that co-sleeping was "not detrimental and, in some cases, was beneficial to an infant" In re K.G., D.G., 288 Ill.App.3d 728, 682 N.E.2d 95 (Ill.App.1997).

In two cases in Utah, families were held criminally responsible because the co-sleeping death was the second co-sleeping infant death in the same family.  Georgia, Florida, Tennessee, Arizona, Minnesota, Indiana and California have found liability because of parental misuse of drugs or alcohol.

Two recent cases in California examined parental culpability when infants died while co-sleeping and their mothers were intoxicated at the time.  In one case, the mother was found guilty of felony child endangerment and sentenced to eight years in prison based on the facts that she habitually co-slept and habitually abused alcohol.  In the other case, the court found that the State had not proven that the mother presented a risk of harm to surviving siblings when an infant died while co-sleeping with her while she was intoxicated.  The court found that risk of harm could not be shown unless the State established that she had a habit or pattern of alcohol or other drug abuse.[29]

**Analysis of Findings of Administrative Appeals of Indicated Findings for Co-Sleeping**
The Office of the Inspector General reviewed available Illinois administrative appeals involving co-sleeping or other unsafe sleep practice.  There were three in FY 12, two in FY 13 and one in FY 14.  The six appeals were decided by six different administrative law judges (ALJs).

*Findings Overturned Based on Failure to Sustain Burden of Proof*
Five of the cases examined whether the Department had sustained its burden of proof to indicate the appellant for Death by Neglect (Allegation #51 – 50 year retention) in cases of co-sleeping or other unsafe sleep practice.  In all five cases, the ALJ determined that a finding of Death by Neglect was not supported.  In four of the five cases, the ALJ found that the autopsy finding of "Undetermined" created a barrier to indicating an alleged perpetrator for Death by Neglect.  In the fifth case, the ALJ simply determined that although the child died of asphyxia and the parents were aware that co-sleeping presented risks, the parents did not act with blatant disregard for the infant's safety, because they only co-slept "when the child needed extra care or comfort."

---

[28]  The prolonged separation of children from their parents seems to contradict the legislative intent of the statute that requires the Cook County Medical Examiner and Illinois coroners to provide preliminary reports of autopsy within 5 days of a child's death, when the child is under 2 and has died suddenly and unexpectedly (55 ILCS 5/3-3016).
[29]  Arizona, Florida, Georgia, Indiana and Tennessee have sustained criminal findings against parents after co-sleeping deaths where the parents abused drugs or alcohol prior to engaging in co-sleeping.  Utah, in two separate cases, upheld criminal liability to parents whose infants died while co-sleeping when each family had lost a previous child to co-sleeping.

In the other four appeals, the ALJ found that the act of lying down with the infant to nurse or comfort the child did not create an environment injurious or demonstrate blatant disregard for the infant's safety. One appeal involved a family with nine children. The parents had received recommendations about safe sleep but chose not to use a crib because a younger child had gotten caught in the slats and injured. The ALJ determined that the parents' decision was based on their experience and culture, and did not demonstrate blatant disregard for the infant's safety.

*Finding Overturned Based on Failure to Show Substantial Impairment*

In two of the appeals that were overturned, the co-sleeping parent had consumed several alcoholic drinks but there was no showing of substantial impairment.

*The Relevance of Safe Sleep Education*

Five of the six appeals addressed whether the parents had received education about safe sleep. In three of the appeals, the finding was overturned despite the parents' admission to having been educated about safe sleep. In one case, a parent's indicated finding of Inadequate Supervision was upheld for placing the infant in a bed and co-sleeping with knowledge that the practice was risky.[30] In the fifth case, the indicated finding was overturned after the parent denied having received education about the risks of co-sleeping and testified that the lactation specialist at the hospital had told her about the benefits of breast-feeding in bed.

*Expungement Based on Exhaustion and the Failure to Show Blatant Disregard*

In one appeal, the ALJ noted that the mother was tired after a full day of work. The ALJ examined whether the mother's decision to lay down in bed to breastfeed her infant created either an environment injurious to the child's safety or demonstrated blatant disregard for the child's safety. The ALJ determined that it did neither. The ALJ's determination was similar to the unpublished determination of the court in *Ramos and Gonzalez v. DCFS* (12 MR 251 Lake County Circuit Court 2012). In *Ramos*, the Department indicated a mother whose infant had died while in bed with her. The indicated finding was based on the mother's admission that she had received information that co-sleeping was dangerous for infants. The mother filed an administrative appeal in which her indicated finding was upheld. The mother appealed her indicated finding to the circuit court. The circuit court overturned the administrative finding. The mother testified that she misjudged how exhausted she was and had laid down with the child, not intending to fall asleep. The court noted that the Department had failed to show that the act of lying down with an infant—without sleeping—showed a blatant disregard for the child's safety. The court found that even assuming the mother knew that the practice of sleeping with her child was dangerous, the Department had not shown that by lying down with the infant, the mother had *intended* to fall asleep and overturned the Department's indicated finding as *clearly erroneous*.[31]

---

[30] Although not cited as the basis for upholding the finding, the ALJ noted that on the evening in question, the father had consumed ten alcoholic "shooters."

[31] Child welfare systems in Louisiana and Wisconsin will not substantiate a finding against the parents unless there is suspected or actual abuse/neglect that exists apart from the bed sharing (Telephone conversations with Linda Hale, Wisconsin Department of Health Services and Linda Carter, LCSW-BACS, ACSW, CPI Section Administrator, Louisiana Department of Children & Family Services). If the death is attributable purely to co-sleeping, including death attributable to possible overlay, and cause undetermined, they do not substantiate findings against the parents for neglect.

Louisiana's child welfare policy states:

> If the child was co-sleeping with another child or an adult at the time of death and the initial suspicion/diagnosis is SIDS, the information is not a report unless there is also a suspicion of abuse/neglect. An example of a suspicious circumstance is an impaired adult sleeping with a child. If at a later date there is toxicology or other evidence indicating a cause of death other than SIDS, the report may need to be accepted at that time. The reporter shall be advised to contact the department, if any later evidence indicates a possibility of abuse/neglect

*Diversion of Investigative Resources*

Intensive investigative resources and training will need to accompany any attempt to consistently indicate parents for co-sleeping.  Even then, the Department may lose an administrative or judicial appeal because the parent may successfully argue that there is insufficient scientific proof that co-sleeping—in the absence of alcohol or drug use —is blatantly dangerous.

In order to support an indicated finding for Allegation 60, Substantial Risk of Physical Injury by Neglect, for co-sleeping, the Investigator will have to be able to prove the following facts:

1. That the caregivers were *sufficiently* educated about the dangers of co-sleeping;
2. That the caregiver *intended* to ignore the risks of co-sleeping;
3. That the practice of co-sleeping, in the absence of ingestion of drugs or alcohol by the caretaker, presents a significant risk of harm to an infant.

In addition, while awaiting receipt of the infant's autopsy report, the family will be subject to a safety plan and the Department will have to monitor that safety plan. Autopsy reports, including toxicology results, may take several months or more to be completed.

**Conclusion**

Infants should sleep alone, on their backs, and in cribs.  Sleep-related deaths are a preventable public health issue that should be addressed as such.  Indicating parents for co-sleeping with infants is ill-advised until such time as either the legislature recognizes it as negligent or the scientific community is less divided on the question.  Illinois law defines negligence as acting with blatant disregard for a child's safety or well-being.  Blatant disregard is defined as an action which is so inherently dangerous that a reasonable parent would not subject their child to it.  When surveys disclose that as many as 65% of parents admit to co-sleeping with their infant at some time, a single act of co-sleeping cannot meet the definition of blatant disregard in the absence of other complicating factors suggesting negligence – such as substance abuse, or a child whose medical needs make co-sleeping extraordinarily dangerous (assuming the parents have been adequately advised).

The Department's decision to begin investigating and indicating co-sleeping deaths in the absence of allegations of neglect or abuse (such as intoxicated parents) is a departure from existing statute and rule.  Mandated reporters are not currently instructed that a parent's disclosure of co-sleeping requires a call to the hotline.  Administrative law judges have recognized the dissonance and have refused to uphold indicated findings for parents who co-slept in a misguided effort to comfort or nurse their child.

In addition, the decision to indicate for co-sleeping ignores other sleep-related risks – such as parents smoking, and placing the child to sleep on their stomach.  Whether the decision to co-sleep with an infant demonstrates blatant disregard for a child's safety is an issue for public debate, and should therefore go through rule-making and review by the Joint Committee on Administrative Rules.

The Department's current practice is especially ill-advised because it unfairly burdens poor families.  Low quality adult bedding (sagging mattresses and couches with gaps) may result in accidental asphyxiation more frequently than new bedding – suggesting that poorer families will more frequently be indicated.  Studies have shown that minorities

---

(11/27/13 email from Linda Carter, LCSW-BACS, ACSW, CPI Section Administrator, Louisiana Department of Children & Family Services).

Both Louisiana and Wisconsin have public education programs that address co-sleeping, and have adopted strong public health campaigns that work to reduce co-sleeping within minority populations.

are more likely to co-sleep – also contributing to the disparate impact on already vulnerable families that indicated findings may have.

In addition, lack of sleep and exhaustion can result in unintended co-sleeping; the exhaustion factor also affects the ability of new parents to process the quantity of information they receive after birth – especially when that information is contradicted by loved ones.

An indicated finding of Death by Neglect remains in the State Central Register for 50 years.  One reason the State Central Register exists is to flag individuals who are unsuitable to care for or work with children (e.g., daycare workers, teachers, nurses).  It is inconceivable that the legislature intended to bar individuals from such employment because they unintentionally fell asleep with their baby or slept with their child in an effort to feed or comfort them.

**Recommendations**

1. This Report will be shared with the Secretary of the Illinois Department of Human Services and the Director of the Illinois Department of Public Health to address co-sleeping as a public health issue, including a focus on the reduction of infant mortality rates among minority populations.

2. The Department of Children and Family Services should reinstate its historical practice of investigating co-sleeping deaths only when the report discloses circumstances suggesting possible abuse or neglect, such as an intoxicated parent or a previous co-sleeping death in the same family.  In the alternative, the Department should immediately convene public hearings toward adopting Rules governing investigating and indicating co-sleeping deaths.

3. The Inspector General will share this Report with the Senate Human Services Subcommittee.

4. The Inspector General will share this Report with the Illinois Child Death Review Teams' Safe Sleep Subcommittee.

**Appendix A**

It is recommended that the following conditions, if present in a specific case, be reported on the death certificate:

- Bedsharing
- Unsafe or soft sleep surface (if found face down)
- Previous unexplained infant death of sibling
- Excessive blanketing or wrapping
- Face down position when found
- Intoxication (defined as detection of a substance in infant's system)
- Prenatal exposure to tobacco smoke
- Abrupt change in sleep position
- Abrupt change in sleep location
- Abrupt change in sleep surface
- Injuries of unknown significance (specifying the type)

(The National Association of Medical Examiners Ad Hoc Committee on Sudden Unexplained Infant Death, 2007, p. 12)

## Works Cited

Bergman, A. B. (2013 . November). Editorial: Bed Sharing per se Is Not Dangerous. *JAMA Pediatrics Volume 167, Number 11*, 998-999.

Brenner, R. e. (2003). Infant-Parent Bed Sharing in an Inner-City Population. *Arch Pediatr Adolesc Med., 157*, 33-39.

Carpenter R., M. C. (2013). Bed Sharing When Parents Do Not Smoke: Is There a Risk of SIDS? An Individual Level Analysis of Five Major Case-Control Studies. *BMJ Open*, 8-10.

Centers for Disease Control and Prevention. (2011). Retrieved 2013 12-December from CDC's Sudden Unexpected Infant Death Initiative: http://www.cdc.gov/sids/SUIDAbout.htm.
*Centers for Disease Control and Prevention*. (2013). Retrieved 2013 12-December from Sudden Unexpected Infant Death (SUID): http://www.cdc.gov/sids/.

Centers for Disease Control and Prevention. (2013). *About PRAMS*. Retrieved 2013 12-December from Centers for Disease Control and Prevention: http://www.cdc.gov/prams/AboutPRAMS.htm.

Centers for Disease Control and Prevention. (2013). *About the SUID Initiative*. Retrieved 2013 12-December from http://www.cdc.gov: http://www.cdc.gov/sids/SUIDAbout.htm

Centers for Disease Control and Prevention. (2013). *Sudden Unexpected Infant Death and Sudden Infant Death Syndrome*. Retrieved 2013 12-December from www.cdc.gov: http://www.cdc.gov/SIDS/index.htm.

Child Health Data Lab at Children's Memorial Hospital. (2010). Understanding Sleep-Related Infant Deaths. *Illinois violent Death Reporting System, Volume 1, Issue 4*, 1-4.

Colson, E. e. (2006). Barriers to Following the Supine Sleep Recommendation Among Mothers at Four Centers for the Women, Infants, and Children Program. *Pediatrics, Volume 118, Number 2*, e243-e250.

Forlwer, A. J. (2003). Safe Sleep Practices and Sudden Infant Death Syndrome Risk Reduction: NICU and Well-Baby Nursery Graduates. *Clinical Pediatrics 52*, 1044-1050.

Fu, L. Y. (2010). Bed Sharing Among Black Infants and Sudden Infant Death Syndrome: Interactions with Other Known Risk Factors. *Academic Pediatrics Vol. 10 Number 6*, 376-382 at 381.

Gessner, B. (2006). Letter to the Editor. *Archives of Disease in Childhood*, 990-991.

Hauck, F. R. (2008). Infant Sleeping Arrangements and Practices During the First Year of Life. *Pediatrics, Volume 122, Supplement 2*, s113-s120.

Illinois Child Death Review Teams. (2010). *Annual Report on Child Deaths in 2007 and 2008.*

Illinois Child Death Review Teams. (2012). *Annual Report on Child Deaths in 2009 and 2010.*

Illinois Child Death Review Teams. (2013). *Annual Report on Child Deaths in 2011.*

Illinois Department of Children and Family Services. (2011). *Administrative Procedures 300, Appendix K.*

Illinois Department of Human Services. (2011 . 18-March). *The Reduction of Infant Mortality in Illinois - Fiscal Year 2010*. Retrieved 2014 . 2-January from Illinois Department of Human Services: http://www.dhs.state.il.us/OneNetLibrary/27897/documents/CHP/Reports/AnnualReports/FY10_Annual_IMR_report_WIC_and_FCM_Final.pdf.

Illinois Pregnancy Risk Assessment Monitoring System. (2009). *2009 Report: Illinois Pregnancy Risk Assessment Monitoring System.* Retrieved 2013 . 12-December from http://www.idph.state.il.us/: http://www.idph.state.il.us/health/prams_rpt_09.pdf.

Kinney, H. a. (2009). The Sudden Infant Death Syndrome. *N Engl J Med 361(8)* , 795-805.

Krous, H. F. (2010). Sudden Unexpected Death in Infancy and the Dilemma of Defining the Sudden Infant Death Syndrome. *Current Pediatric Review Vol. 6, No. 1*, 5-12.

National Institute of Child Health and Human Development. (2013). *Key Moments in Safe to Sleep History: 1994-2003*. Retrieved 2013 . 12-December from http://www.nichd.nih.gov/sts/campaign/moments/Pages/1994-2003.aspx.

National Institute of Child Health and Human Development. (2013). *Key Moments in Safe to Sleep History: 2004–2013*. Retrieved 2013 . 12-December from National Institute of Child Health and Human Development: http://www.nichd.nih.gov/sts/campaign/moments/Pages/2004-2013.aspx.

National Institutes of Health. (2013 . 30-9). *Roughly 14 Percent of Infants Share Bed With Adult or Child.* Retrieved 2013 . 12-December from http://www.nih.gov: http://www.nih.gov/news/health/sep2013/nichd-30.htm.

P. Flemming, P. B. (2006). Infant Death: New Knowledge, New Insights and New Recommendations. *Archives of Disease in Childhood* , 1-3.

Praeclarus Press White Paper. (2013). *SIDS: Risks and Realities, A Response to Recent Findings on Bedsharing and SIDS Risk.* Amarillo: Praeclarus Press, LLC.

Rzepnicki, T. (2004). Informed Consent and Practice Evaluation: Making the Decision to Participate Meaningful. In H. a. Briggs, *Using Evidence for Social Work Practice: Behavioral Perspectives* (pp. 273-290). Chicago: Lyceum Books, Inc.

Schnitzer, P. C. (2012). Sudden Unexpected Infant Deaths: Sleep Environment and Circumstances. *Am J Public Health 102(6)* , e1-e9.

Shapiro-Mendoza, C. K. (2009). US Infant Mortality Trends Attributable to Accidental Suffocation and Strangulation in Bed from 1984 Through 2004: Are Rates Increasing? *Pediatrics 123 (2)* , 533-539.

*SIDS Fact Sheet*. (n.d.). Retrieved 2013 . 12-December from http://www.idph.state.il.us: http://www.idph.state.il.us/sids/sids_factsheet.htm.

Task Force on Sudden Infant Death Syndrome. (2011). SIDS and Other Sleep-Related Infant Deaths: Expansion of Recommendations for a Safe Infant Sleeping Environment. *Pediatrics, 128* , e1349-e1351.

The National Association of Medical Examiners Ad Hoc Committee on Sudden Unexplained Infant Death. (2007). *A Functional Approach to Sudden Unexplained Infant Deaths.*

The National Association of Medical Examiners. (2002). *A Guide For Manner of Death Classification.*
Willinger, R. e. (2003). Trends in Infant Bed Sharing in the United States, 1993-2010:The National Infant Sleep Position Study. *Arch Pediatr Adolesc Med., 157* , 43-49.

118

# GENERAL INVESTIGATIONS

**GENERAL INVESTIGATION 1**

**ALLEGATION**    After a serious incident of domestic abuse, which was witnessed by five children, the investigator failed to take protective custody of the children even though the father had a history of four indicated findings, three for substantial risk of physical harm due to domestic violence and one for physical abuse of a toddler.

**INVESTIGATION**    The father had three children from a previous relationship who were removed because of serious domestic violence against the mother. The father became involved with a second woman who had a two year-old daughter. The father was indicated for Cuts, Welts, Bruises and Abrasions of the two year-old and was initially not permitted to live with them. The girlfriend was pregnant and the father was permitted contact after the birth of the new baby, because he became compliant with services, including domestic violence and anger management.  The three children from the previous relationship, who had been in foster care were also returned to the father.

Approximately one year later, the hotline was called after the father threw a coffee table at the television, picked the girlfriend up and shoved her against the wall then to the ground and choked her. The father threw bricks at the family car, breaking the windshield.  The children who witnessed the incident ran to the neighbors to call 911. The police observed injuries to the girlfriend.

According to court records the father was held in jail for three days. After posting bail, the Court ordered the father to have no contact with the girlfriend and children throughout the adjudicatory hearing that took place seven months later. He ignored the order and moved back in after being released from jail. Child protection investigators never obtained the court records and the investigator and supervisor assumed a 72 hour no contact order. IG investigators contacted pretrial services and learned that within the last year standard bail conditions for domestic violence in the county changed from 72 hour no contact to no contact through adjudication.

The children were not seen by child protection investigators for forty-six days after the hotline call. After a failed attempt to see the children the day after the hotline call, the primary investigator went on vacation believing that the father was still in jail and presented no risk to the children. The supervisor, who was intermittently on leave during the time as well, was aware that no one had seen the children and twice asked parallel investigators to go to the home. No one called the police for a well-being check. The primary investigator, who returned from vacation, contacted the girlfriend by phone.

When the children were seen, the two eldest children (nine and seven years-old) told the investigators details of the domestic violence incident and said they witnessed it, though the nine-year-old said she was not supposed to talk about it. The five year-old boy said his dad hits him in the head and jaw so hard it knocks him down. The four year-old girl asked the investigator if they could move to a different location to talk because she was afraid the parents would hear her talking to the investigator. She reported that "Daddy Punch Mommy." The family denied any other instances of violence in the home since the hotline call and refused any recommended services.

The child protection investigator told Inspector General investigators she worried the children were being

coached. She also felt the mother was minimizing the violence in the home. Though neither supervisor nor investigator documented the conversation in SACWIS, the investigator called the on-call supervisor after interviewing the family. She told Inspector General investigators that she wanted to take protective custody but the supervisor felt that since there had been no incident since the hotline call they would not be able to demonstrate "urgent and immediate" necessity to remove the children. Protective custody was not taken and the children remained in the home.

The supervisor told Inspector General investigators he did not recall the conversation but said that had the investigator requested protective custody he would have approved it. He said while on call he would have had no information on the family during the call because he does not carry his DCFS issued laptop that has access to the Statewide Automated Child Welfare Information System. He said he is not required to have the laptop while on call because the internet system is intermittent in his area. He said he relies on the investigator for the family history and current status.

The father was indicated for risk of harm related to domestic violence in the home. The court allowed the family to remain intact with a protective order for the children and an order of cooperation for the girlfriend and father. The court order stated, among other things, that the girlfriend and father were to remain drug and alcohol free and complete drug drops. An intact family case was opened through a private agency.

The father completed some services but the worker never required the parents to complete drug drops as ordered by the court. That worker left the private agency. Prior to the intact worker leaving the agency, the father was arrested for Driving Under the Influence (DUI). According to the police report the father and girlfriend were visibly intoxicated and arguing. The father failed the field sobriety test. The information was never reported to the Court.

## Reporting of the DUI

Inspector General investigators requested the case file from the agency and on the following day spoke with the supervisor about the DUI charge of which she was unaware. After the new intact worker confronted the family about the DUI, the family initially said they had not informed the former worker of the DUI. Days later however, when the new worker chided the girlfriend about keeping that from the agency she confessed that they had actually told the former worker about the DUI within days of the arrest, but added that the former worker recently contacted the father and asked them to deny that they told him about the DUI. The Inspector General investigator retrieved phone records that confirmed that the former intact worker called the father the same day that the Inspector General informed the agency of the father's DUI.

The former worker had learned about the Inspector General investigation when an outreach worker, still employed at the agency who was assisting in gathering records in response to the Inspector General request, contacted the former worker and alerted him to the investigation by the Inspector General's Office.

## The Former Intact Worker

The Office of the Inspector General referred the former intact worker to the Department's Child Welfare Employee Licensure Division (CWEL) for an investigation. During the CWEL investigation, the former intact worker relinquished his CWEL. The worker had been investigated 13 years earlier before by the Inspector General's Office. At that time, he was investigated for falsifying an entire child protection investigation. During the investigation he resigned and signed a letter relinquishing any reinstatement rights. The Department coded the former employee as someone who could not be rehired by DCFS or any other state agency. Despite this, he was hired by the private agency, a contracted DCFS agency, just five months after his departure from DCFS. Inspector General investigators learned that it is not the practice of DCFS Human Resources to inform DCFS contracted private agencies that a former employee has no reinstatement rights even when the agency asks for employment verification.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  Given the former intact worker's history of falsification and his unethical behavior in this case, the private agency should review cases still open where he was the assigned worker.** |

The Office of the Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors. The Inspector General met with agency management and a representative from the Board of Directors to discuss the findings in this report.  Other than the case identified in this report, there were no other open cases for which this former employee had been the assigned worker.

**2.  The private agency should request a DCFS Clinical consultation for the family because of three risk factors involved, physical abuse, substance abuse and domestic violence.**

Clinical consultation was provided to the private agency team through the domestic violence specialty service program.  Physical violence issues were addressed within the domestic violence consultation.  It was stressed within the consultation that the father's addiction issues needed to be addressed to ensure child safety.  The Division's Alcohol and other Drugs administrator provided consultation to the private agency team regarding identified substance abuse issues and also requested modification of the Department's drug testing contract to test for suspected steroid abuse by the father.

**3.  The private agency should discipline the outreach worker for alerting the former employee to the pending Inspector General investigation.**

The employee submitted her resignation and is no longer employed by the private agency.

**4.  If child protection investigators cannot meet their obligation to assess child(ren) in a timely manner the supervisor should assure that the police are contacted for a welfare check.**

Department Procedures 300, *Reports of Child Abuse and Neglect*, is on target to issue final policy by December 31, 2014.  Procedures 300 policy training is planned for the period January 1, 2015 to June 30, 2015.  This training will reinforce caseworker and supervisor compliance with the policy revisions.

**5.  On-call supervisors should be required to have a DCFS issued laptop with them while on call. In situations where an on call supervisor does not have access to the internet and the air card signal is not adequate, that supervisor should be required to locate the closest point to their home where the air card functions. On-call supervisor SACWIS notes should be entered contemporaneously. The supervisor in this case should receive discipline for not entering any notes.**

Department Procedures 300, *Reports of Child Abuse and Neglect,* is on target to issue final policy by December 31, 2014.  Procedures 300 policy training is planned for the period January 1, 2015 to June 30, 2015.  This training will reinforce caseworker and supervisor compliance with the policy revisions.  The child protection supervisor received a 1-day suspension.

**6.  The Department's employee services should provide 'do not rehire' information to contracted child welfare agencies that require employment verification on any employee who met requirements for separation due to an egregious act.**

The Department agrees and will implement.

*Addendum:*

**1.  The new bail conditions standard should be disseminated to the county's Child Protection Investigators.**

The new bail conditions standard were disseminated to the child protection investigators in this county.

**2.  When child protection investigations involve an arrest for domestic violence, investigators should contact pretrial services to obtain bail conditions.**

Department Procedures 300, *Reports of Child Abuse and Neglect*, is on target to issue final policy by December 31, 2014.  Procedures 300 policy training is planned for the period January 1, 2015 to June 30, 2015.  This training will reinforce caseworker and supervisor compliance with the policy revisions.

**3.  The Department should expeditiously amend the drug testing laboratory's contract to include steroid testing.**

The contract with the drug testing laboratory was amended to include the two steroid tests.

**4.  Upon amending the drug testing laboratory's contract, the agency's supervisor should be informed of the availability of steroid testing and be advised to contact the Administrator for Substance Abuse Services for further information on obtaining an anabolic steroid screen for the father.**

The contract amendment is complete and the father has been tested for anabolic steroids multiple times.  Information on accessing drug testing for steroids was added to the substance abuse section of the D-Net resources tab.

**5.  When a DCFS worker has a case involving a caretaker who is suspected of anabolic steroid use, the worker should contact the Administrator for Substance Abuse Services for information on the appropriate anabolic steroid screen.**

Department Procedures 300, *Reports of Child Abuse and Neglect*, is on target to issue final policy by December 31, 2014.  Procedures 300 policy training is planned for the period January 1, 2015 to June 30, 2015.  This training will reinforce caseworker and supervisor compliance with the policy revisions.

**6.  The drug testing laboratory information on the D-Net should be amended to include steroid testing once the laboratory's contract amendment is completed.**

The Department published a notice of the availability of steroid testing through a D-Net announcement.  Additionally, information on accessing drug testing for steroids was added to the substance abuse section of the D-Net resources tab.

**GENERAL INVESTIGATION 2**

**ALLEGATION**   A private agency placed two sisters, classified with special needs, in a specialized foster home which was also a licensed daycare home. When the Court found that the girls were not receiving needed attention, the agency moved the sisters from their specialized foster care home to an unapproved placement in an unlicensed home. The agency submitted paperwork many months later to get a placement waiver which made it appear that the girls were in an authorized placement. The private agency is a for-profit company that does not contract with the Department. The Department contracts with a not-for-profit agency that is affiliated with and subcontracts with the for-profit company for casework services.

**INVESTIGATION**   The sisters, ages 12 and 11, required specialized foster care to address their diagnosed mental health issues. The 12 year-old experienced anxiety and sleep disturbance and was suspected of being a victim of past violence. The 11 year-old exhibited aggression and struggled to express her emotions. Both girls demonstrated difficulties with adjustment and were unable to manage their personal hygiene. The girls' cases were transferred to the private agency after their placement disrupted due to conflict with their caretakers and the transferring agency had no available specialized foster homes available. The private agency accepted the girls' case and placed them in the home of a foster mother licensed to accept specialized placements.

The foster mother also operated a licensed day care out of her home and prioritized the needs of her business over the care of the girls. Six of the eight children the foster mother provided day care for were under the age of five and the girls' caseworker transported them to the majority of their appointments while the foster mother remained home with the children. Workers documented concerns regarding the absence of structure for the girls in the home and the foster mother's lack of involvement with them. The workers noted that the girls essentially followed their own rules in the home. The workers noted that they frequently appeared dirty and unkempt, and the 12 year-old told a worker at one point she could not remember the last time she had brushed her teeth. The older girl, whose performance in school had improved in their previous placement, regressed academically as the foster mother was not engaged in assisting them with their assignments. At a permanency hearing five months after the girls had been placed in the home, the presiding judge requested that the private agency identify a new home for the girls as quickly as possible and expressed a preference that their next placement be with relatives.

An Inspector General review of the foster mother's licensing history identified a pattern of poor judgment and a lack of commitment to children entrusted to her care with few attempts by the private agency licensing staff to hold her accountable. The foster mother and her husband had engaged in fraud, adopting two daughters and sending them to live with other relatives while affirming the children still lived with them in order to receive payments for their care. The foster mother had also previously abandoned a nine year-old boy with special needs placed in her home, dropping the boy off at the private agency's office without notice or explanation. Although the worker involved in that case recommended the foster mother's license be terminated for her behavior there was no indication in the case record the private agency took any action. Throughout the time she was licensed the foster mother over relied on  workers to perform functions for the children in her care, such as ensuring they attended medical appointments. The private agency failed to comprehensively assess the foster mother's suitability as a dedicated and proactive specialized caretaker, particularly in light of how her engagement was impacted by the operation of her day care services.

The private agency identified the girls' godparents as a placement option. The girls' caseworker placed the girls with them before getting the required placement clearance. After placing the girls, the worker called for

clearance which was denied because there were too many children in the home, considering the girls' special needs. As the godparents had three children, placement of the girls who both had special needs would exceed capacity in the home.  Department Rules and Procedures provides for waivers to be granted under certain circumstances on a case-by-case basis.  The girls were left in the godparents' home while the agency tried to get a waiver.  It took the agency almost five months to submit a legitimate waiver request. Additionally, since the girls' placement in the godparents' home was unauthorized, private agency staff could not complete payment authorization forms to provide them with funds for the girls' care.  As a result, payments continued to be delivered to the foster mother for months after the girls were removed from her home for a total of almost $4,800 and the relatives were not getting paid.

Agency staff asked the godparents to identify a family member where the girls could stay until the waiver request was approved.  The godparents named their adult son. There was no evidence any private agency staff ever met with the godparents' son and the girls never moved, but documentation was provided to the Department that he was the girls' new foster parent and payments for their care were processed in his name.  Throughout, the girls continued to remain in an unauthorized placement with the godparents.  In the meantime, the agency submitted a waiver request that made it appear that the girls were in an authorized placement. Eventually, the older girl was reclassified as not requiring specialized care and the girls were allowed to remain with their godparents, who were committed to their care.

Although it was functionally one organization, the private agency was actually a partnership between two entities.  The first, a non-profit entity, contracted with the Department for specialized foster care and provided administrative services.  The first entity then sub-contracted to the second group, a for-profit entity, to provide direct services.  This convoluted system acted to further muddle the chain of command and add unnecessary complications to the delivery of services to clients.

Rather than ensuring their actions were in the best interest of the children and families they are enlisted to serve, agency staff cultivated a culture of incompetence and lack of forthrightness in direct opposition to the principles upon which they are supposed to base their operations.  The absence of good faith demonstrated by the private agency undermined any faith the Department or the public would be able to place in the organization.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The Department should transition the Department wards and foster homes assigned to the private agency to reputable, contracted child welfare agencies.** |

**1.  The Department should transition the Department wards and foster homes assigned to the private agency to reputable, contracted child welfare agencies.  Once the transition is complete, the Department should cease contracting with the agency.  In the future, the Department should prohibit foster care contracts with agencies where the majority of work is performed by a subcontracted entity.**

The private agency has been placed on an intake hold and a Corrective Action Plan has been initiated.  Forty-seven cases have been transferred to other agencies.

The Department does not agree to prohibit foster care contracts with agencies where the majority of work is performed by a subcontracted entity.  A determination will be made on a case by case basis only.

**2.  In light of the agency's actions, the Department should reconsider the current approval of the specialized administrative rate to the private agency for the 12 year-old girl for the periods her specialized care designation was reclassified.**

This was corrected.  The DCFS system no longer indicates the additional specialized administrative payments

for those time periods.  The Central Office of Licensing has verified no such payments were made for the time periods in question.

**3.   The Department should share this report with the Central Office of Licensing Enforcement Unit for determination of the foster mother's suitability for future foster home licensure.**

The redacted Inspector General report has been hand-delivered and placed in the closed licensing file of this foster parent.  If the foster parent applies for licensure in the future, the previous file is required to be secured and reviewed as part of the initial licensing assessment.

**4.   DCFS Clinical Practice and Development should complete the clinical placement review of the girls' placement in the godparents' home, as required.   DCFS Clinical should make a formal determination about the 12 year-old's level of care prior to the completion of her adoption by the godparents.**

A clinical staffing was convened by regional clinical staff with the case managing agency. Written recommendations were provided to the agency including recommended level of care.

**5.   The Department should formalize a process wherein the Placement Clearance Desk notifies the appropriate Day Care Home Licensing personnel of any foster placements in dual license homes moving forward.**

Revisions are being incorporated into Department Procedures 301, *Placement and Visitation Services*, Appendix E, *Placement Clearance Process*.

**6.  The Department should share this report with the DCFS Division of Clinical Practice and Professional Development to resolve training and CWEL requirements for licensing/recruitment staff at the private agency.**

All private agency staff that conduct foster home licensing studies completed training and met requirements for issuance of a Child Welfare Employee License and the Licenses have been issued. An investigation of the complaint against present and former employees was completed.  One employee does not have a Child Welfare Employee License, so her case could not be taken to the CWEL Board.  The Board did hear the cases of two employees and determined that they would not suspend or revoke their licenses until further investigation by the OIG.  The OIG has determined that charges will not be filed against these licenses.

**GENERAL INVESTIGATION 3**

| ALLEGATION | A four year-old boy with cerebral palsy died of natural causes while residing in a traditional foster home.  During the investigation of the boy's death, the OIG identified concerns regarding the foster mother's suitability as a caretaker for children with special needs. |
| --- | --- |

| INVESTIGATION | Six years prior to becoming a foster parent, the foster mother had relinquished her parental rights to her 14 year-old adoptive daughter after being indicated as the subject of a child protection investigation. |
| --- | --- |

The investigation was initiated after it was reported the mother locked the girl out of the house and forced her to stay in the yard and garage of the home all day while the mother was at work.  The child protection investigator who responded to the allegation arrived at the home and found the girl lying in the garage in a dog pen.  The girl told the investigator her mother locked her out of the house when she left for work at 6am and the girl, who was developmentally delayed and had a history of physical and sexual abuse, was required to pull weeds in the yard until sometime after her mother returned home.  The girl reported she was allowed to make four peanut butter sandwiches in the morning to serve as her sustenance for the day and that she drank water from a hose and used a bucket in the garage as a toilet.  The girl reported that when she was allowed inside the house she was restricted to the living room as all other rooms were padlocked.  The girl also reported she did not have a bed but slept on the floor with a sheet and was not allowed a pillow.

Upon returning to the home the mother spoke with the investigator and confirmed the girl's report, though she justified her actions saying the girl was being punished for lying and stealing food from the cupboards.  The mother additionally stated she often required the girl to do up to 100 push-ups as a form of punishment.  The investigator took the girl into protective custody and noted that when she asked the mother if she would like to say goodbye, the mother stated the girl disliked closeness and displayed no emotion at being separated from her daughter.  The report against the mother was eventually indicated for Inadequate Supervision, Inadequate Food, Inadequate Shelter and Substantial Risk of Physical Injury by Neglect.

The mother surrendered her parental rights but appealed the indicated finding.  Following an administrative hearing the findings of Inadequate Food, Inadequate Shelter and Substantial Risk of Physical Injury by Neglect were overturned and expunged.  In her opinion, the Administrative Law Judge (ALJ) noted the situation the girl had been placed in by the mother was inappropriate but that the Department had failed to meet its burden of proof.  The indicated finding for Inadequate Supervision was upheld.

After she relinquished her parental rights to the foster child she adopted, the woman applied to the same agency to become a foster parent again. The boy's goal was ultimately changed to adoption, but he died before the adoption was completed.

The foster mother disclosed the indicated finding in her application.  However, she stated in an attached letter of explanation that she did not understand the basis for the finding, and she misrepresented the facts of the case, saying she had never left the girl unsupervised. Staff from the private agency evaluating licensure did not obtain consent from the foster mother to obtain records from the expungement hearing to accurately assess the circumstances of the case or verify her account of events. Although staff familiar with the initial incident were still at the agency, licensing staff failed to identify the false statement made by the foster mother in her application and recommended that she be granted a foster care license.

Three months after the foster mother was licensed, a two year-old medically complex girl was placed in her home.  The two year-old girl had suffered severe brain injuries prior to her placement as a result of being

shaken when she was three months-old and required a gastrointestinal tube to assist in feeding.  The foster mother was trained on how to feed the two year-old girl and was given specific instructions that she was only to be fed a specialized diet and could not eat regular table food.  Throughout her time caring for the two year-old girl, the foster mother fed the girl table food despite being repeatedly admonished by workers and physicians not to do so.  Seven months after being placed in the home, the two year-old girl was hospitalized for fecal impaction as a result of being fed table food.  The two year-old was immediately removed from the foster mother's custody.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.  The Inspector General reiterates the recommendation that the Department should cease contracting with the private agency that issued the foster care license to the foster mother. This case is another example of inadequate monitoring by the private agency and unknown risks with their foster homes.  (See General Investigation 2 in this Annual Report.)**

The private agency has been placed on an intake hold and a Corrective Action Plan.  Forty-seven cases have been transferred to other agencies.

**2.  The Department should require licensing entities to get a consent and review the child protection investigation as part of the enforcement process for recommending a waiver of a Child Abuse and Neglect Tracking System (CANTS) indicated finding.**

A policy guide will be issued and shall include the requirement for licensing staff to gain a written consent from the applicant (for licensure) in order to review the indicated and redacted child protection report, before making a request for a waiver for an indicated perpetrator who resides in the household.  Department Rules & Procedures 383, *Licensing Enforcement*, are open for review and the policy guide directives shall be incorporated into them at time they are adopted.

## GENERAL INVESTIGATION 4

**ALLEGATION**   While fulfilling an out of state criminal history request as part of a child protection investigation, the OIG identified concerns regarding the assessment of the subject, a man with multiple prior convictions for physical abuse of children.

**INVESTIGATION**   The OIG received the request to perform an out of state criminal history check of the man in conjunction with an ongoing child protection investigation.  The OIG learned the man had previously been convicted of Assault on A Child Under 16 while serving in the military in another state.  The conviction was based on evidence the man had systematically abused his girlfriend's two year-old son including punching him in the genitals, using him as a target for shooting practice with his BB gun and forcing him to hit his mother after the man had tied his girlfriend to a chair while physically abusing her.

During the course of conducting the criminal history check, OIG investigators reviewed the pending child protection investigation which involved the man's ongoing contact with the mother of his nine month-old son and her seven year-old son from a previous relationship.  The man had been released from prison on parole after being convicted of Aggravated Battery of a Child Causing Bodily Harm against the seven year-old boy (who was five years-old at the time the battery occurred) as well as Domestic Battery and other drug-related charges.  A condition of the man's probation following his release was that he have no contact with the woman or the seven year-old boy.  The child protection investigation was initiated after police stopped the man's car for a traffic violation and found the mother traveling with him.

The man's battery of the then five year-old boy had been extreme and sadistic.  The man had been arrested after the mother fled their home and asked neighbors to call police following a 20-hour period of abuse against herself and the boy.  The mother provided police with a detailed written account of abuse inflicted against the boy which included the man repeatedly punching and kicking the boy in his head and chest and pulling on his genitals.  The man also wrapped a cord around the boy's neck and used it to pick him up and sling him onto the floor.  When the abuse inflicted upon the boy caused him to lose control of his bladder, the man stuffed the soiled underwear in the boy's mouth.  At one point, the man drove the mother and the boy to a nearby lake and threatened to kill them there.  While in the car, the man grabbed the boy by the neck and threw him from the front seat into the back.  Throughout the ordeal the man threatened the mother that the abuse would escalate if she attempted to intervene.  Eventually the mother, who was also physically abused during the episode and was three months pregnant with the man's child at the time, claimed she was exiting the home to have a cigarette and escaped to the home of a neighbor who called police.

Police and medical personnel documented injuries to the boy and his mother and the mother told law enforcement the man had been physically abusive to both she and the boy in the past.  Ultimately the man pled guilty to Aggravated Battery of a Child Causing Bodily Harm and was sentenced to two years in prison on the charge.  After one year of imprisonment the man was paroled and a condition of his probation prohibited any contact with the mother and the boy as well as the man's previous girlfriend and her son he had abused, who also resided in the area.  The son of the mother and the man, who had been born during the man's incarceration, was not included on the list of protected persons. Six months after the man was released from prison he was stopped by police who found the mother in the car, prompting the child protection investigation.

During the course of the child protection investigation the mother offered contradictory and misleading information, claiming various degrees of ignorance of the requirement of probation that the man have no contact with her or the boy.  The mother also continued to deny the man lived in her home despite reports

from the boy and others that he did.  When presented with irrefutable evidence of his presence the mother would concede the man spent some time in the home but expressed her belief he was no longer a threat to her or the children and minimized his history of violence and threatening behavior.

Involved child welfare professionals and local law enforcement expressed concerns regarding the man's contact with the children given his propensity for abuse, and the man continued to display volatile behavior and make threats against those he believed might interfere with his access to the family.  After the mother failed to comply with services the children were taken into protective custody by the Department; however, the court returned the children to the mother the following day.  The local State's Attorney's Office was reluctant to become involved in the case beyond reaffirming the terms of the protective order requiring the man not to have contact with the mother and the boy and stated their position that the Department should have taken greater action at the time the man abused the boy during the incident that resulted in his incarceration. Both the Court and the State's Attorney's Office focused on technical faults in the probation order, which the mother cited as her reason for permitting the man access to the boy, without noting that the man's actions themselves should have caused the mother not to have contact with the abuser.

The Illinois State Police maintains a Murderer and Violent Offender Against Youth Registry.  An OIG review of the Registry found the man was not included in the database despite his prior conviction for Aggravated Battery of a Child Causing Bodily Harm.  The OIG contacted the local Sheriff's Office to ensure the man's information was added to the Registry.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES |
|---|

**1.   When there has been a prior serious indicated abuse finding or a prior conviction for serious battery to a child, and a parent is permitting continued access to the child by the abuser, the Department must secure the full investigative file from law enforcement prior to closing the CA/N investigation.**

The recommendation has been incorporated into revisions to Department Procedures 300, *Reports of Child Abuse and Neglect*, which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**2.   The Integrated Assessor must be provided with a copy of the Police Report, the mother's statement to police following the 20-hour incident and the chronology prepared by the Inspector General's Office. The next Integrated Assessment must address whether the mother has the capacity to protect her children in light of her current minimization and continued lack of honesty with professionals.**

The domestic violence specialty service program provided a clinical consult with then-assigned private agency team.   The domestic violence specialty program subsequently provided the family's new case managing agency recommended documentation including a copy of the clinical consultation report.

**3.   The Department should confirm the seven year-old boy's correct date of birth and ensure it is correctly entered in the Department's database (SACWIS/CYCIS).**

The child's correct date of birth has been entered.

**4.   The Inspector General's Office will share this Report with the County State's Attorney's Office.**

The Inspector General shared the report with the State's Attorney's Office.

**GENERAL INVESTIGATION 5**

| ALLEGATION | A private agency case manager assigned to provide intact family services to a couple solicited the father to pose for nude pictures in exchange for money. |
|---|---|

**INVESTIGATION**

The case manger was assigned to provide intact family services to the couple after they were ordered by the court to participate in counseling following an indicated report against them for Inadequate Food for their three children.  The father reported the case manger had suggested that the father and case manager could make money by posing for nude pictures and that the case manager had referred him to a talent agent.  The father provided photographs of text message exchanges between himself and the case manager discussing the parameters of the arrangement and expressing that nudity would be a requirement in order to receive compensation.  The father also presented text messages he exchanged with a number given to him by the case manager in their communications with an individual who referred to the case manager by name and negotiated terms of the proposal.

In an interview with the OIG, the case manager acknowledged the phone number used to send and receive the text messages with the father was his but initially denied any knowledge of their content.  When presented with further information the case manager eventually admitted offering the father the opportunity to receive money in exchange for posing for nude photos.

The OIG issued charges to revoke the case manager's Child Welfare Employee License.  The employee agreed to relinquish his license.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.  The private agency should discharge the case manager.**

The Office of the Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors.  The private agency discharged the employee.

## GENERAL INVESTIGATION 6

| | |
|---|---|
| **ALLEGATION** | A therapist providing court-ordered services to the foster parents of a Department ward who had died as a result of physical abuse misrepresented her credentials and maintained inadequate documentation of her work with the couple. |

**INVESTIGATION**     During the course of investigating the death of a four year-old female ward, the OIG reviewed all mental health records relating to the girl's family as well as her foster parents.  The therapist providing services to the foster parents presented herself as a clinical psychologist, licensed clinical social worker and licensed marital family therapist on her letterhead, in the biography that appeared on her website and on forms used for professional purposes.  The OIG determined the therapist was not licensed in any of those fields.  In an interview with the OIG, the therapist claimed ignorance as to some of the licensing requirements as well as to why the credentials were included on billing statements provided to the Department.

A review of the therapist's billing records found numerous errors in payment requests submitted to the Department.  The therapist's billing practices violated provisions of her contract with the Department and she submitted requests for payment for sessions reported to have occurred on dates while she was on vacation.  The therapist's practice was to enter information regarding appointments and services into an automated billing system operated by a company located in another state.  In her interview with the OIG, the therapist stated she did not see or review billing statements prior to them being submitted to the Department nor did she obtain a copy after payment was received.

The therapist's records of work with Department clients provided no evidence or documentation of sessions actually having occurred.  Progress notes and quarterly notes were missing in all of the case files involving Department clients and none contained a case closing or termination report.  Although a Department contract representative had completed a Contract Review Summary/Action Plan after reviewing her case files and found they lacked substantive documentation, no improvement had been made since the review had taken place.

In an interview with OIG investigators, the therapist's supervisor stated he was unaware the therapist was not able to hold herself out as a clinical psychologist, though he was familiar with the Illinois Clinical Psychology Licensing Act.  The supervisor expressed his belief that the therapist's notes were her "personal property" and as such were beyond his authority to review.  The supervisor acknowledged that in his position he was required to review and sign all reports completed by the therapist and stated that he did so, however, after being presented with questionable documentation showing a facsimile of his signature, conceded a rubber stamp of his signature had been affixed to many of them.  The supervisor stated he was unaware why his stamped signature would have appeared on the reports.

In court testimony related to the death of the four year-old girl, the therapist made statements based upon information provided to her by the foster parents that contradicted police reports, medical information and court findings.  Although the foster mother had been indicated for Death by Abuse for the girl's death, the therapist testified the girl herself had caused her own fatal injuries.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  The Department should discontinue contracting with the counseling center and its proprietor, the supervisor, because the organization lacks adequate and proper oversight of services** |

**delivered and billings for payment by the department.  Consequently, the Department has paid for services that were billed for but not delivered by the therapist.**

The agency's counseling contract with the Department was not renewed for FY15.

**2.  The Department should ensure that Department clients are not serviced by the therapist.**

The Department has placed the therapist on the Barred Vendor's list.

GENERAL INVESTIGATIONS

## GENERAL INVESTIGATION 7

**ALLEGATION**   The Inspector General received a complaint alleging that a Department caseworker had falsified four case notes documenting visits with the foster family and had included that false information in interstate compact reports submitted to the court.   Because of the seriousness of the allegations, the Child Welfare Employee Licensure Board voted to temporarily suspend the employee's Child Welfare Employee License while the OIG investigation proceeded.   The Temporary Suspension was upheld at an administrative hearing.

**INVESTIGATION**   The Department had accepted the responsibility of monitoring a pre-adoptive relative placement in Illinois of special needs children who were wards of the State of Wisconsin. During one of the visits that the worker documented, the family had been on vacation. When this was brought to the workers' attention, she stated that she had written the wrong date, and that the visit had actually occurred the week before. The OIG learned that the week before, the worker had attended an all day training. While the worker submitted a letter documenting that she had left the training early, she received credit for full attendance at the training.

Both the relative foster mother and father stated unequivocally that the four disputed visits had not occurred. The relative foster mother kept meticulous and detailed notes concerning medical and casework appointments for the three severely disabled children in her care. The OIG reviewed her documentation and noted no caseworker visits for the dates in question. Moreover, on the date the worker had claimed to leave the training early to see the foster parents, the family was on their way to Florida, a claim which was supported by a gas receipt en route to Florida.

On another disputed date, the worker had written that all family members were present and that it was one of the boys' birthdays. While it is true that the date in question was one of the boys' birthdays, the foster mother and the girl had left the day prior to attend a family reunion in southern Illinois and the foster father, who recalled the day because of the birthday celebration, was adamant that the worker had not visited.

On the date of the third disputed visit, the foster parents noted that the day before, the girl had been admitted to a hospital out of state (several hours' drive) and had not been discharged until 2:00 the following afternoon. In addition, the foster mother's log showed a phone call that day with an  investigator in which the investigator stated she would call the following week to set up a date for the visit.  The fourth visit was also not noted on the foster mother's calendar and both foster parents specifically recalled that the worker had not visited in December.

All four of the disputed visits had been noted in quarterly reports to the court for compliance with the Interstate Placement Compact. An Interstate Compact Administrator had noted that the dates in the Reports were not supported by casenotes in SACWIS, the computerized child welfare casenote system. When the worker was questioned about her lack of notes, she claimed that the visits had been completed and entered casenotes onto SACWIS at that point in time, which was 5 and 11 months after the visits purportedly occurred.

**OUTCOME**   The Inspector General filed charges to revoke the worker's Child Welfare Employee License for falsification. The worker was discharged from the Department for falsification and grieved her discharge. During the grievance process, her Union representative signed an agreement on her behalf not to contest any of the facts that formed a basis for the discharge. The Administrative Law Judge recommended that she be prohibited from contesting the facts that formed the basis of the Child Welfare Employee Licensure charges based on the agreement signed during her grievance with the Department. The Administrative Law Judge's recommendation is pending with the Child Welfare Employee Licensure Board.

**GENERAL INVESTIGATION 8**

| ALLEGATION | A Department voucher clerk submitted fraudulent payment vouchers listing herself as the recipient. |
|---|---|

**INVESTIGATION**   Department voucher clerks are responsible for initial processing of requests for goods and services provided to clients.  Clerks ensure the payment requests have been completed correctly and contain the signature of the contract monitor, designated as the receiving officer, before forwarding them to their supervisors for review.  The supervisors review the vouchers and submit them to the Department's Authorized Agent who approves the request and authorizes payment to the recipient.

The voucher clerk's supervisor identified a voucher request in the amount of $6,000 that did not contain the signature of the receiving officer.  The supervisor was instructed by the Authorizing Agent to return the request to the clerk to obtain the necessary signature, however the clerk urged her supervisor to allow the request to go through without the signature.  After the supervisor refused to allow the request to proceed without the required signature, the clerk never resubmitted the voucher request.  The supervisor and the Authorizing Agent then reviewed the record of voucher requests submitted by the clerk and found a previous request for $2,000 that had been approved for payment without the signature of a receiving officer.

In an interview with the OIG, the voucher clerk admitted submitting both payment requests to herself fraudulently, payable in her maiden name.  The clerk stated she had experienced financial hardship and had submitted the second, larger request after the first one was approved.  The clerk said she later regretted the decision and removed the record of the vouchers from the log, however her action would have had no effect on the payments being made.  The first voucher for $2,000 had not yet been paid out to the clerk at the time the fraud was discovered and instruction was sent from the Office of Budget and Finance to the Comptroller's Office to stop payment.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**   **1.  The voucher clerk should be disciplined by the Department up to and including discharge.**

The employee was discharged and then through a grievance resolution was able to resign with no reinstatement rights.

**GENERAL INVESTIGATION 9**

| | |
|---|---|
| **ALLEGATION** | The Inspector General received a complaint that an agency providing in-home counseling services for post-adoptive families had billed for services that the adoptive parent said had not occurred. |

| | |
|---|---|
| **INVESTIGATION** | An adoptive parent contacted the Department to request counseling services for her daughter and was told that her daughter was already receiving therapy.  All of the disputed billing was supported by documentation from a particular therapist at the agency.  While the adoptive mother acknowledged that the therapist had been providing therapy services, she stated that counseling had ended almost a year earlier. The agency continued to bill for services, based on the documentation provided to it by the therapist. |

After the mother alerted the Department to the lack of therapy, the therapist was removed from the case and told what the mother had alleged.  Once the therapist was removed she went to the adoptive mother's home for three consecutive days to try to get her to sign a statement recanting her allegation about the lack of therapy provided. The adoptive mother refused to sign the statement. The therapist explained her actions by stating that she had no knowledge of the fraud allegation and had initially gone to the adoptive mother's home only to process closure and transition to a new therapist. The therapist never discussed with the girl's new therapist her belief that the girl had lied.

Both the daughter and mother confirmed that therapy had not occurred in the prior year. The counselor stated that counseling had occurred, but that the mother was not present.  She stated that the daughter was lying about lack of therapy because she wanted a different therapist. She never told her supervisor that the adoptive mother was frequently absent during sessions.

The Inspector General's review of billing records found that for the disputed visits, the therapist had represented in her billing documentation that the adoptive mother was present at all disputed sessions. Many of the sessions had attached narratives that specifically discussed the mother's participation in the sessions.

| | |
|---|---|
| **OUTCOME** | The Inspector General filed charges against the therapist's Child Welfare Employee License. Her license was suspended for 85 days for submitting false invoices. |

**GENERAL INVESTIGATION 10**

| ALLEGATION | A child protection investigator included false information and failed to verify facts in an indicated report of Sexual Molestation against a teacher. |
|---|---|

| INVESTIGATION | The child protection investigation was initiated after the State Central Register (SCR) received a report that a 12 year-old girl had alleged improper physical contact by a teacher at her school. The assigned child protection investigator observed a forensic interview of the girl along with a local police detective. During the interview the girl reported the teacher had touched her inappropriately and propositioned her to share nude photos. The girl also stated the teacher had given her gifts of clothing. The investigator learned from staff at the Children's Advocacy Center (CAC) where the interview was conducted that the girl had previously made similar allegations of sexual molestation against her uncle but later recanted. |
|---|---|

Two weeks after the forensic interview the investigator spoke with the detective who had also been present. The investigator documented he was informed by the detective that two witnesses had corroborated the girl's account, telling detectives they had seen the teacher place his hands on the girl underneath her clothes. The investigator further documented that the local State's Attorney was prosecuting the case. The investigator also recorded in the case record an agreement between the teacher and the State's Attorney for the teacher to plead to lesser charges, resign his position and forfeit his teaching license. A supervisory note contained in the case file documented that the investigator stated the teacher had been arrested and charged and had agreed to relinquish his teaching certificate. The investigator recommended indicating the report against the teacher for Sexual Molestation and the decision was approved by his supervisor. In fact, the State's Attorney had refused to pursue charges against the teacher. The teacher had never been arrested and did not surrender his teaching certificate. The investigator stated he did not attempt to speak with the witnesses out of deference to law enforcement. The investigator insisted he had been informed of the teacher's intention to accept a plea agreement and relinquish his license, though he could not identify who had provided him with the information.

The teacher appealed the indicated finding against him and during the expunction hearing witnesses refuted virtually all of the information provided by the investigator as the basis for his decision. The detective denied the witnesses he interviewed had claimed to have seen the teacher touch the girl under her clothes. The detective also stated he never told the investigator the State's Attorney intended to prosecute the case or that the teacher had agreed to a plea deal. A staff member from the teacher's school stated the teacher had given her clothing he had obtained from his younger female relative and given it to the staff member to distribute to students at the school. The staff member testified she had informed the students who had received the clothes that they had been donated by the teacher. The Administrative Law Judge presiding over the hearing recommended expunging the indicated finding against the teacher. In the recommendation the ALJ expressed outrage at the false statements contained in the child protection investigation. In his interview with the OIG, the investigator maintained he would have reached the same conclusion to indicate the report against the teacher even if he had been aware of the facts presented during the hearing.

The OIG filed charges against the investigator's Child Welfare License.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The child protection investigator should be disciplined for gross negligence, up to and including discharge, for documenting in the investigative file without basis and** |
|---|---|

**representing to his supervisor, that the States Attorney had charged the teacher and that the teacher had been arrested and pled guilty and relinquished his teaching certificate – as well as his failure to critically review the information provided by the witnesses in the police report.**

The employee was discharged.

**2.   The child protection investigator's supervisor should be counseled regarding the need to verify information that is critical to an indicated finding.**

The employee was counseled.

**GENERAL INVESTIGATION 11**

| ALLEGATION | A private agency caseworker assigned to provide services to a family engaged in an inappropriate relationship with the mother. |
|---|---|

| INVESTIGATION | The mother had an extensive history of involvement with the Department including multiple indicated reports and the ongoing intervention of law enforcement and |
|---|---|

child welfare personnel regarding her ability to provide adequate care to her three children. Although the mother's substance abuse issues and inability or unwillingness to modify her behavior were routinely documented, the private agency caseworker reported no concerns. The mother's case for services was eventually closed by the private agency for non-compliance.

After questions were raised regarding the nature of the caseworker's relationship with the mother, private agency administrators addressed allegations of an improper relationship between the caseworker and the mother. The caseworker denied engaging in anything other than a professional relationship with the mother and the private agency accepted his denial. An OIG review of the caseworker's phone records found hundreds of texts messages between the caseworker and the woman during times generally considered outside work hours (10pm to 6am on weekdays, all day on weekends). The phone records also showed 54 phone calls from the caseworker to the woman between the hours of 12am to 6am. None of these contacts between the caseworker and the mother were reflected in case notes.

In an interview with the OIG, the caseworker alternately stated he either did not recall or could not explain the late night calls, at one point acknowledging he, "wouldn't talk to [the woman] after midnight about a case." In a separate interview with the OIG the woman stated she did not know why the caseworker had called her at those times and denied the two had engaged in a personal relationship. A second OIG review of the caseworker's phone records subsequent to his OIG interview found that the caseworker had called the woman twenty-two minutes after leaving his meeting with the OIG and again twice more later that day.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | 1. The caseworker should be discharged from the private agency. |
|---|---|

The Office of the Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors with the recommendation that the employee be discharged. After an internal review, the private agency counseled the employee. The employee continues to be employed by the private agency.

Subsequent to the employee's counseling, the OIG issued charges to revoke the caseworker's Child Welfare Employee License (CWEL). The Administrative Law Judge (ALJ) who presided over the license revocation hearing ruled to suspend the worker's CWEL for 30 days.

**GENERAL INVESTIGATION 12**

| | |
|---|---|
| **ALLEGATION** | A child protection investigator and private agency caseworker failed to consider the father of three girls taken into protective custody when considering potential caretakers for them. |

| | |
|---|---|
| **INVESTIGATION** | The family's involvement with the Department was initiated after it was alleged the three girls, ages 15, 7 and 6, had been left home alone by their mother for two days. |

It was additionally reported the mother had substance abuse issues, a history of leaving the girls unattended after receiving her aid check and not returning until the funds had been exhausted. Three weeks after the hotline report was made, a child protection investigator met with the girls at the home of their maternal grandmother where they were residing at the time. The oldest girl confirmed the girls had been left home alone by their mother for several days and the investigator asked the maternal grandmother, who resided in senior housing, to continue caring for them.

Later that day, the child protection investigator documented the mother's consent to a safety plan calling for the girls to remain in the maternal grandmother's care; however, no evidence of a written safety plan was contained in the case file. The following day the investigator received a call from the girls' paternal grandmother who stated she and the girl's father wanted them to be placed in their care. Believing the girls would only be in their current placement for a short time while their mother participated in substance abuse treatment, the investigator and his supervisor decided to leave the girls in the home of the maternal grandmother. After the mother provided the investigator with proof of her enrollment in an outpatient treatment program, he informed the maternal grandmother the girls could return to the mother's home. The mother was indicated for Inadequate Supervision and a case was opened for intact family services.

The mother failed to complete the outpatient substance abuse treatment plan and did not attend required counseling sessions or make herself and the girls available to intact services staff. After four months, the intact family services case was closed unsuccessfully. Five months later, the State Central Register (SCR) received a report the mother had delivered her fourth daughter and the baby had tested positive for cocaine at birth. The mother was indicated for substance misuse and a second intact family services case was opened. The mother agreed again to allow her children to be placed with their maternal grandmother while she entered a substance abuse treatment program. Although the mother informed workers the father of the three oldest girls lived nearby and was not substance involved, there was no evidence he was considered as a placement option. Three weeks later, after the mother failed to enter the program, a hotline call was made. The intact caseworker then contacted the father of the oldest three girls who agreed to care for the girls.

The mother had signed a short-term guardianship agreement giving custody of the three oldest girls to their maternal grandmother. The Short Term Guardianship statute contains conflicting directions concerning consent of the child's other parent. Section 5.4(b) prohibits a parent from appointing a Short Term Guardian:

> *If the minor has another living parent, . . . , whose parental rights have not been terminated, whose whereabouts are known, and who is willing and able to make and carry out day-to-day child care decisions concerning the minor, unless the non-appointing parent consents to the appointment by signing the written instrument of appointment.*

However, the statutory form contains the following Note:

*The signature of a consenting parent is not necessary if one of the following applies: (i) the child's other parent has died; or (ii) the whereabouts of the child's other parent are not known; or (iii) the child's other parent is not willing or able to make and carry out day-to-day child care decisions concerning the child; or (iv) the child's parents were never married and no court has issued an order establishing parentage.*

While the father had been a consistent presence in the lives of the three oldest girls and was willing and able to care for them, he was not named on their birth certificates, he and the mother had never been married and no court order had ever been entered establishing his parentage. The Short Term Guardianship form itself suggests that known fathers need not consent when the parents were never married and there is no existing court order.

Regardless of the ambiguities of the Probate Act, consistent with Department policy and practice and the best interests of children, the Department and private child welfare agencies should always explore the extent to which involved fathers can be placement resources for their children.

---

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The Department's form CFS 444-2 (*Appointment of Short-Term Guardian*) should include instructions requiring consent of identified fathers, whose whereabouts are known in compliance with the Parentage Act.**

Department Procedures 300, *Reports of Child Abuse and Neglect*, is on target to issue final policy by December 31, 2014. Procedures 300 policy training is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**2. The Department should require private child welfare agencies to secure consents of identified fathers whose whereabouts are known, whenever the Appointment of Short-Term Guardian Form is used.**

The Department notified all Child Welfare Agencies with foster care contracts, as well as all DCFS foster care and agency/institution monitoring supervisors and administrators of the requirement to only use the CFS 444-2, *Appointment of Short-term Guardian*, for the purpose of appointing short-term guardians and that both legal parents or guardians must sign the CFS 444-2 in order for it to be legal. The CFS 444-2 was also sent with the notification of this requirement.

**GENERAL INVESTIGATION 13**

| **ALLEGATION** | A 20 year-old female ward and her three year-old son resided in a transitional living program.  As the girl approached emancipation from the Department, the facility failed to adequately assess the suitability of her new living environment, support her post-secondary educational aspiration or provide adequate support to assist her independence. |

| **INVESTIGATION** | Prior to her involvement with the Department, the girl had experienced a difficult and disrupted childhood marked by trauma, physical abuse and multiple caretakers of starkly contrasting levels of investment in her well-being.  When she was six years-old, the girl's mother was killed by the girl's grandmother's boyfriend when she intervened in a knife fight between the two. Following her mother's murder, the girl and her siblings continued to reside with their grandmother for three years before moving in with their father, who had substance abuse issues and chronically physically abused the children.  After two years in his care, the girl and her siblings moved back into the home of the grandmother, where the grandmother's boyfriend who killed her mother had returned following his release from prison.  At age 14, the girl and her siblings again moved in with their father.  After he was evicted from his home the following year, she moved in with her father's ex-girlfriend in order to continue attending the same high school. |

The girl gave birth to her son when she was 17.  When he was three months old  the baby was hospitalized for respiratory issues.  While the girl and her son were in the hospital, staff identified concerns the girl was unable to provide appropriate care to her son based on her improper feeding practices and failure to adhere to medical advice.  A child protection investigation was initiated and it was learned the girl and her son were homeless as her father had been evicted again and had not secured alternative housing for her.  The girl was indicated for Medical Neglect as her baby's immunizations were not up to date.  The girl was taken into protective custody by the Department as a neglected minor, though her baby remained in her care.  After guardianship of the girl was established by the Department, the girl and her baby were placed in a specialized foster home.

During the two years the girl participated in the specialized foster care program she demonstrated progress both academically and in developing her parenting skills.  Program staff proactively worked to connect the girl with educational support, family planning, counseling and parenting training.  The girl's caseworker documented frequent contact with the girl and monitored her successes and difficulties in school.  At age 20, the girl was transferred to a transitional living program in order to prepare for emancipation from guardianship.

In contrast to the attention and involvement exhibited by child welfare professionals with the specialized foster care program, services from the transitional living program were substandard and intervention from staff was transient and inconsistent.  During the 11 months the girl participated in the program she had 3 different caseworkers, none of whom established a relationship with her or created a strategy to guide her towards successful emancipation.  While certain mandatory tasks were performed in a perfunctory manner, a comprehensive understanding of the girl's needs was never developed.  Contact with the girl's son was minimal and no consideration was given to his educational progress, as he was never enrolled in an early education program.  As her time in the transitional living program went on the girl was frequently absent from the facility and her engagement with available services diminished.  After the girl was the victim of a physical attack by a ward who was let into the facility by another resident, the girl essentially moved out and began spending the majority of her time at the home of her boyfriend's family.  Although staff from the transitional

living facility was aware the girl and her son were effectively residing in the boyfriend's family's home, no attempt was made to visit the house, assess the suitability of the living situation or speak with the boyfriend or his family until shortly before she was to be emancipated.  Although the girl expressed an interest in attending college, no meaningful efforts were made to help her enroll.

In anticipation of the girl achieving independence, transitional living program staff identified a subsidized housing complex in an unfamiliar area and secured an apartment there for the girl and her son.  Upon moving into the apartment the girl was given a folder of general information regarding available services in the area but was given no direction or assistance on how to obtain them.  In addition, although the girl had steadfastly maintained a relationship with her father's ex-girlfriend with whom she had lived during high school, staff from the transitional living program failed to recognize the woman as a potential source of support and never had any contact with her until the day before the girl emancipated.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.  Colleges and universities offer an orientation week for all incoming students. Similarly, the transitional living program should provide a two-week orientation period for all teen parents.  The orientation should focus on building family and community support using a task-centered/ecological approach.**

**During this orientation period, the transitional living program case manager and family support worker will jointly introduce a young parent to community-based resources in the area and begin building the foundation of a support system.**

> **a)  Family support worker duties include: introducing a youth and her child to local Head Start programs and supporting progress through monthly visits; introducing a young parent and her child to libraries, WIC offices, park districts; establishing a pediatric medical home for a young parent's child;**

> **b)  Case manager duties include: supporting the youth in their educational setting through monthly visits to the young parent's school or job to assist the youth to overcome obstacles that hinder achievement. If the young parent is without a medical home, accompanying them to a local Title X Clinic/medical home; and exploring recreational, physical fitness and arts programs in the community with the youth. The case manager should diligently assist the young parent in maintaining and strengthening their extended support system, including inviting a young parent's family or friends to an orientation meal and visiting with a young parent's emergency caretaker.**

The Department is currently working on a revision to the teen parenting procedures and will review this recommendation for incorporation into the draft.

**2.  When a young parent transitions into a transitional living program, the receiving case manager shall introduce themselves to school staff within the first ten days and ask to be notified via email of any absences.  To support the case managers efforts to sustain attendance, case managers must arrange to have access to the applicable education notification system portals for absences or cuts.   If the school does not have a portal system (such as the Alternative School Network), the case manager should arrange notification through available mentors or teachers. If a young parent has two consecutive absences from school, the case manager must immediately make in-person contact.  The Teen Parent Support Network Education Support Department shall be consulted before absenteeism becomes a chronic issue.**

A program redesign for Independent Living and Transitional Living programs is in process.  This will be integrated into the design and an appropriate orientation program will be developed.  The program model and orientation should be completed in early 2015.

**3.  During the transitional living program pre-placement process, the sending case manager will assist the young parent in identifying the names, addresses and phone numbers of individuals whom the youth wants on their visiting list.  The receiving case manager will amend this list as the young parent's supports change over time.**

The Department is currently working on a revision to the teen parenting procedures and will review this recommendation for incorporation into the draft.

**4.  The Department should incorporate the two-week orientation period and pre-placement process as a model for all teen parent transitional living programs.**

The Department is currently working on a revision to the teen parenting procedures and will review this recommendation for incorporation into the draft.

**5.  To increase communication and collaborations among the transitional living program system of care, a young parent's case manager and family support worker should meet with day-shift community support staff to review progress and enhance opportunities for the young parent and their child's successful engagement in education, and to strengthen the mother and child support system.  Shift summaries should be reviewed before this meeting.  These meetings should occur every four to six weeks.**

The Office of the Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors. The Inspector General met with agency management and a representative from the Board of Directors to discuss the findings in this report.  The private agency will create opportunities for all staff members to participate in team meetings a minimum of once per month.  These meetings are in addition to the quarterly individual client staffings.

**6.  The transitional living program must immediately cease requiring Social Security Numbers for visitors.  Similar to college and university dormitory policy, transitional living programs should require visitors to produce a state-issued (including drivers license or state ID) or school photo identification.**

The agency's management team reviewed their current visitor policy and acknowledges that balancing the home-like environment with the safety concerns is a continuous challenge.  The agency notes that through the use of background checks many people with serious criminal histories were not allowed in the buildings.  The agency will continue to review for alternative methods for ensuring a safe environment.

**7.  The transitional living program must increase Head Start Enrollment within their programs to 80% within the next fiscal year.**

The Department agrees that the private agency should work with pregnant and parenting youth in their transitional living programs (TLP) to increase the percentage of children ages 3 to 5 of teen parents that are enrolled in Head Start programs.

The private agency will establish a tracking system to monitor Head Start enrollment and participation levels with the goal of increasing these levels to 80%.

**8.   Whenever a violent incident occurs, transitional living program staff must ensure the safety of the involved youth and other youth living in the transitional living program.   The transitional living program should review the incidence of violence and staff compliance with the policies of providing therapy and mediation.**

The private agency will review their existing crisis protocols and modify as necessary.  Any modifications made will be reviewed with transitional living program staff.

**9.   Anticipating college enrollment, a case manager should assist a young parent in beginning the application process for grants and federal aid when high school graduation or high school equivalency testing (GED) completion is imminent. Wards should not have to confront the daunting and complicated process of applying for Pell grants and federal aid (FAFSA) without hands-on assistance. The Teen Parent Support Network Education Support Department or Youth In College should assist any parenting youth who has completed high school or earned a GED in completing these required applications.**

The Department is currently working on a revision to the teen parenting procedures and will review this recommendation for incorporation into the draft.

**10. A GED test or college entrance exam should be considered a "critical appointment," requiring that the case manager transport the youth.**

Department procedures will be revised to reflect this. Department Procedures 314, *Educational Services*, is expected to be issued for comment in the 3rd Quarter of FY15 and Department Procedures 315, *Permanency Planning*, is expected to be issued in August 2015.

**11. Recommendations 2, 3, 4, 5, 9 and 10 should be incorporated into the amended Procedures 302, *Services Delivered by the Department*, Appendix J, *Pregnant and/or Parenting Program*.**

The Department is currently working on a revision to the teen parenting procedures and will review this recommendation for incorporation into the draft.

**12. This Report will be used to structure a future Error Reduction Plan for the Hill-Erickson class.**

The Inspector General and the Department, through the Hill-Erikson Class Monitor, have been developing training and implementing an Error Reduction Plan on an ongoing basis.

**13. The private agency should prepare a report by the close of fiscal year 2015, tracking compliance of their transitional living programs on: 1) ensuring young parents' children are enrolled in and attending Head Start programs; 2) ensuring young parents are enrolled in secondary and post-secondary education programs and that attendance problems are remedied; 3) utilizing community resources to support young parents; 4) providing transportation to facilitate education and parent training attendance; and 5) establishing care plans when young parents and their children are granted visits with members of their extended support system (see OIG investigation, 2010-IG-0297).**

The agency agrees to establish a monitoring system.

**GENERAL INVESTIGATION 14**

| | |
|---|---|
| **ALLEGATION** | A Department employee was under the influence of marijuana while in the office. |

**INVESTIGATION**    In response to an allegation the employee had been repeatedly suspected of being under the influence of marijuana while on the job, the OIG interviewed several of the employee's co-workers. All of the co-workers denied suspecting the employee was frequently under the influence while at work; however, they cited one instance when he was asked to come into the office to fill out his timesheet on a day off. In an interview with OIG investigators his supervisor reported that when he came into the office that day, he appeared to be under the influence of marijuana. The office supervisor contacted a Department administrator for guidance, and the administrator instructed the employee to leave the office. The supervisor gave the directive to the employee and the employee complied. Neither the supervisor nor other staff made an evaluation as to whether the employee, who had driven to the office, was in a reasonable condition to operate a motor vehicle.

In an interview with the OIG, the employee denied being under the influence of marijuana in that instance or at any other time. The employee stated he complied with the request to leave the office because he was following the instruction of his supervisor. The employee said he received a call from the administrator a few days after the incident and was told to behave in a professional manner at all times. The employee denied to the administrator he had been under the influence of marijuana when he was in the office.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**    **1.   As previously recommended, the Department should amend Rules and Procedures, including a requirement for compliance with reasonable suspicion drug testing in Rule 412,** *Licensure of Direct Child Welfare Workers and Supervisors,* **and develop protocol and contracts to provide an infrastructure for prompt determination of allegations of employees being under the influence while at work.   The protocol should include identifying available testing facilities for reasonable suspicion testing; a definition of reasonable suspicion; procedure for training for management and supervisors for corroboration in support of reasonable suspicion determinations.**

A policy to address Suspected Substance Abuse would need to be negotiated as a part of the Master Contract Agreement.   Contract negotiations are scheduled to begin in December 2014 as the contract expires June 30, 2015.   The current language in Rule 412.50(a)(8), *Licensure of Direct Child Welfare Workers and Supervisors*, *Grounds for Suspension, Revocation or Refusal to Reinstate License*, states that a license may be suspended or revoked for: Habitual or excessive use or addiction to alcohol, narcotics, stimulants, or any other chemical agent or drug that results in a worker's inability to practice with reasonable judgment, skill or safety (This shall not include any person who has sought, will seek or is receiving substance abuse treatment if it does not impact on their ability to practice with reasonable judgment, skill or safety).

**2.   This report should be reviewed with the Department administrator to ensure that whenever there is a suspicion that an employee is impaired and ordered to leave, management must address the employee's ability to get home safely.**

The Report was shared with the employee.  The Department does not agree that management address the employee's ability to get home safely.

**GENERAL INVESTIGATION 15**

| DISCUSSION |
|---|

The Department maintains a Lending Library network with learning resources for use by foster and adoptive parents.  Jointly sponsored by the Illinois Child Welfare Training Institute and the Department, there are eight libraries statewide.  The materials in the libraries are available to be loaned out on request.

While there is a committee and an administrator responsible for overseeing the Lending Library network, there is not an existing procedure for ensuring that resources selected are subjected to critical review to ensure that resources are evidence-based or in compliance with Department Rules and Procedures.  The OIG contacted the administrator in charge of the Lending Library, who stated that no new materials have been added since a review conducted in 2012.  The administrator stated that standards or a review process for determining what materials are placed in the Lending Library has never been established.

The importance of critically reviewing literature in the Lending Library has been demonstrated in two previous OIG child death investigations in which foster parents relied on questionable parenting advice provided to them by child welfare professionals. In one case, a foster parent utilized a training tape offered by a private agency that advocated extended "time outs" in locked rooms to control bad behavior, in violation of DCFS Rules and Procedures.  The girl in their care died of heat exhaustion while locked in a tiny cabinet in a "time out."

In the second case, a girl died from a subdural hematoma and cerebral injuries due to blunt trauma of the head.  The head injuries and the extent and locations of multiple impact injuries to her head, face, back and extremities were more consistent with inflicted rather than accidental blunt trauma.  Her death was ruled a homicide and her foster mother was charged with her murder.  The foster mother had stated the girl had been diagnosed with Reactive Attachment Disorder.  According to the American Academy of Child and Adolescent Psychiatry (AACAP, 2003), Reactive Attachment Disorder (RAD) is a serious and fortunately relatively rare clinical condition. The Academy cautions that a child should never be given the label or diagnosis of Reactive Attachment Disorder without a comprehensive psychiatric assessment and any child with a RAD diagnosis requires an individualized treatment plan.

The girl had never been diagnosed with Reactive Attachment Disorder, however, the OIG investigation found that in response to the foster mother's claims, a SASS specialist, contracted by the Department to determine whether the girl needed to be psychiatrically hospitalized, provided the foster parent with a book self-published by a woman who is a former dog groomer with no relevant academic credentials. The book, which purports to give parents advice for addressing "Attachment Disorders," assigns psychopathic traits to young children. The OIG investigation noted that the foster mother appeared to embrace the book, and had adopted some of the techniques championed by the book, such as "power sitting," which requires the child to sit upright and perfectly still for an extended period of time. This book as well nine other books and videos by this author were also available in the DCFS Lending Library.

In 2006, the American Professional Society on the Abuse of Children (APSAC) convened an expert Task Force to look closely at attachment therapy, RAD, and attachment problems as these terms had increasingly been used to describe children who have been victims of abuse or neglect, specifically in foster care or adoptive homes.  Some children were lethally harmed by unproven and coercive attachment treatment techniques.  The author of the book provided to the foster mother was one of the individuals cited by the Task Force who promoted unproven treatment methods used by many attachment therapists and foster/adoptive parents.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.  The Lending Library should be limited to peer-reviewed publications that have passed the review procedures of the national *Child Welfare Information Gateway*.  Other books should be subject to an internal review process, staffed with *ad hoc* specialists in the appropriate fields, who will certify to having reviewed the material and that it comports with existing DCFS Rules and Procedures.**

The review of all existing Child Welfare Lending Library Books, Journals and DVD continues, and is expected to be completed by June 30, 2015.  The Lending Library has been discontinued pending the complete review of all existing items, and that all existing items comport with Department Rules and Procedures.  No new items will be added to the Library until the review of all existing items have been reviewed and certified by ad hoc subject matter experts. The review process will also cover all future submissions to the Lending Library.

**2.  An *ad hoc* committee of child development specialists should review publications in the Lending Library to ensure that those portions that may be harmful to our foster children or contrary to DCFS Rules and Procedures are removed.**

The review of training publications from this author resulted in the permanent removal from the Library.

**GENERAL INVESTIGATION 16**

| | |
|---|---|
| **ALLEGATION** | The Inspector General sought to identify which Department advisory groups are required to complete annual ethics training in order to clarify timekeeping procedures |

for Department advisory groups and to address necessary revisions to the "Advisory Groups" subsection of the Department's website.

| | |
|---|---|
| **INVESTIGATION** | The State Officials Employee Ethics Act (5 ILCS 430) requires appointees to State boards and commissions to complete annual ethics training, which is administered |

by the Ethics Officer.  As Ethics Officer, the Inspector General identified which Department advisory groups had members that are either appointed by the Department Director or Governor, and are thereby required to complete the trainings.

During the course of the Inspector General's review of the Department's advisory groups, it was discovered that there was an advisory group that was unknown to the Ethics Officer that the Department identified as having appointed members.  This group had long been in existence, but had never been listed on the Department's website, which the Ethics Officer relies to get information about membership and appointment status.  This discovery highlighted the problems already noted about a lack of complete and accurate information being listed about advisory groups on the website, and also regarding a lack of communication between advisory group liaisons and the Ethics officer regarding membership status.  Because the Ethics Officer office was never notified or aware of this council's existence, it has never administrated or tracked this group's required ethics training.  Ultimately, it was determined that the group was not statutory and did not have appointed members and thereby was not out of compliance with ethics training.

The Inspector General also clarified that to be in compliance with timekeeping requirements established in the Ethics Act, and for clarification and accuracy, meeting minutes should be required to include the start time and end time.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  In order to accurately reflect the meeting duration of DCFS advisory group meetings, the Department should amend** |

**Procedures 428.17, *Department Advisory Council*, *Minutes*, to require that in addition to the date and location of Council, Commission, or Committee meetings, the minutes filed with the Director of the Department also include the start-time and end-time of each meeting.  (Note: this recommendation did not pertain to the Child Death Review Team for which meetings and minutes are not available for public inspection, pursuant to the Child Death Review Team Act. 20 ILCS 515/30.**

Department Procedures 428, *Department Advisory Council*, is currently under revision.  The Department will incorporate this language into that revision.

**2.  The Department should confirm that all advisory groups are adhering to the timekeeping policies as outlined in Rules and Procedures 428.**

Approximately 90% of the Advisory Councils are in compliance at this time.  The remaining groups have either not met or have had only one meeting.

3.   On the DCFS website section for "Advisory Groups, the Department should clearly identify which advisory groups are statutory and which are non-statutory, and include the following information for each group:

      a.      Statutory citation, if applicable
      b.      Identify who appoints group members, and length of appointment
      c.      Identify Chair and DCFS Staff or Liaison
      d.      Annually updated member list
      e.      Appointment terms of all members, if applicable

The Department continues to work with Advisory Groups to update all information on the web.   The information requested in the recommendation is included on the advisory group site.

4.   *Advisory Groups with DCFS Director Appointees:* The DCFS Liaison for each advisory group that has members appointed by the DCFS Director should notify the Ethics Officer by email of any changes to the group membership within 15 calendar days of the change, to ensure compliance with ethics training (which must occur within 30 days of new membership).

The Department agrees.

5.   For transparency to the public, as well as to provide the Department and Ethics Officer with timely and accurate membership information, the advisory group information on the DCFS website should be updated within 30 calendar days of any change to the group membership and/or to the DCFS Liaison. The individual page for each advisory group should always include an accurate "last updated" date.

The Department agrees.

6.   On the DCFS website section for "Advisory Groups," the *Child Day Care Licensing Advisory Council* should be relocated to the "Non-Statutory" group section, as it has no statutory basis.

The website has been modified in accordance with this recommendation.

**GENERAL INVESTIGATION 17**

**ALLEGATION**  The Inspector General received a complaint alleging improper conduct in the investigation of allegations of sexual molestation of a four year-old girl. According to the allegations, after a child protection investigation had been indicated and the notification of indicated finding letters had been issued to the two alleged perpetrators, a Department regional administrator directed the investigation to be recalled and for the involved parties to be told to disregard the letters informing them of the findings.

**INVESTIGATION**  A child protection investigation was initiated after a four year-old girl disclosed to her parents that she was molested by church staff during a church event the family attended. During the course of the investigation, the girl was interviewed by the Child Advocacy Center but failed to make any outcry during the forensic interview. She did, however, make disclosures during the medical exam that followed the forensic interview. Also, during the medical examination, the mother told the doctor that there were other sexual abuse victims of the same perpetrators. There was no additional evidence discovered beyond the girl's statements.

The child protection investigation was indicated based on the child's disclosures to the doctors and the opinion of a therapist who had recently begun working with the child. Although there was a simultaneous police investigation, the police report was never retrieved. The alleged perpetrators were not interviewed because of the ongoing police investigation. The Department issued a letter to both alleged perpetrators stating that credible evidence had been found to indicate them for sexual molestation and sexual penetration of the girl.

At approximately the same time that the investigation was indicated, a former Department administrator, who knew the alleged perpetrators, contacted a current administrator to complain about deficiencies in the investigation. The two administrators previously had a close social relationship. As a result of the former administrator's complaint, the current administrator requested another administrator review the content of the investigation. The second administrator identified deficiencies in the investigation. The current administrator directed that the investigation be recalled. The regional administrator never disclosed to anyone involved that she had a personal relationship with the complainant, but stated to Inspector General investigators that she involved the second administrator in an attempt to avoid a conflict of interest. She stated that she never actually read the investigation but based her decision on the second administrator's review.

After the child protection investigation was reopened, additional investigative tasks were conducted including interviews with the alleged perpetrators. Several weeks after reopening, the case was re-indicated for the same allegations and closed. The rationale for indicating the alleged perpetrators did not include evidence corroborating the child's statements nor did it include information from interviews of the alleged perpetrators (either by child protection or police). The findings were appealed administratively and the findings were reversed because the child did not testify and there was no corroboration of her hearsay statements.

**OIG RECOMMENDATIONS /
DEPARTMENT RESPONSES**  **1. The Department should review the circumstances in this case and determine whether the regional administrator should receive ethics counseling or disciplinary action for her creation of an appearance of a conflict of interest by failing to remove herself from the decision-making process after receiving a complaint from a person with whom she had or once had a close relationship.**

The employee was disciplined.

**2.   Ensure that the need to have corroboration of time, place or circumstances for hearsay statements of young children is the subject of a child protection manager/supervisor monthly meeting.**

The report was reviewed in all staff meetings.

**3.   Ensure that child protection investigations are not approved for closure when alleged perpetrators have not been interviewed by child protection because of a police investigation without retrieving and reviewing a copy of the police investigation, including interview reports.**

Department Procedures 300, *Reports of Child Abuse and Neglect*, is on target to issue final policy by December 31, 2014.  Procedures 300 policy training is planned for the period January 1, 2015 to June 30, 2015.  This training will reinforce caseworker and supervisor compliance with the policy revisions.

**4.   The Child Advocacy Center should institute procedures or protocol to ensure that critical information learned by the Medical Clinic is collaboratively shared with members of the interdisciplinary team.**

The Inspector General is currently in continued meetings with the Child Advocacy Centers Advisory Board regarding the acceptance of this recommendation.

**GENERAL INVESTIGATION 18**

| ALLEGATION | A child protection investigator had a relationship with a father who was the alleged perpetrator in two investigations she had conducted. |
|---|---|

| INVESTIGATION | The father and mother had an intermittent relationship involving domestic violence and drug abuse that resulted in department and local law enforcement involvement. |
|---|---|

While separated the mother was indicated twice for allowing a registered sex offender contact with her two children (five and seven-years-old). Following a domestic violence incident the mother moved out and obtained an order of protection barring the father from contact with the mother and two children for a period of two years. One month later the father called the hotline alleging that the mother was again allowing the registered sex offender access to the children (now 13 and 15-years-old). The investigator was unable to find evidence to support the allegations and unfounded the report.  In separate interviews with OIG investigators, the investigator and the father stated that following the close of the investigation the father began consulting the investigator for personal advice and a friendship between the two developed.

Two years after the report was unfounded, the State Central Register (SCR) received a report the father had punched his son and hit him with a belt.  The case was assigned to the same investigator who had handled the previous hotline report.  In an interview with the OIG, the investigator's supervisor stated that case assignments were made on a rotating basis and the investigator was next in line. The supervisor stated the investigator told her she had previously handled a case involving the family but never disclosed she had a relationship with the father outside of her professional capacity.  The supervisor stated if she had been aware of an existing relationship between the investigator and the father she would have had the case transferred to another region.  The supervisor said she had previously taken such action and provided documentation of her prior efforts to transfer cases involving potential conflicts of interest.   The investigator ultimately recommended the report against the father be unfounded.

Six weeks after the child protection investigation was closed, Department personnel were informed that the investigator had accompanied the father on a trip to visit his friends in another state and had introduced the investigator to them as his girlfriend.  One of the friends of the father later related the story to a Department employee during a casual conversation.  The friend later contacted the employee again and stated he, "guessed he wasn't supposed to tell," the employee he had met the investigator under those circumstances.

In an interview with the OIG, the father stated he only contacted the investigator at work and never called her personal phone.  The OIG subpoenaed personal phone records for the investigator and the father and identified 331 phone calls between the two that occurred after the child protection investigation had been closed.  In a separate interview, the investigator acknowledged having a friendship with the father that began when she conducted her first investigation of the family two years prior.  The investigator stated she had accompanied the father on the trip out of state, covering 280 miles round trip, so the father could listen to the engine because she was having car trouble.  The investigator said it never occurred to her that conducting an investigation involving someone she had a personal relationship with would constitute a conflict of interest; however, she also claimed to have informed her supervisor that she had a prior personal relationship with the father prior to accepting the second investigation.

During the course of the OIG's investigation of the child protection investigator for conflict of interest, the Department of Children and Family Services discharged the investigator for falsification and performance of duties, unrelated to the OIG investigation. The OIG was sent a Child Welfare Employee Licenses investigation referral and investigated the allegations. IG investigators found that the investigator documented

speaking to reporter of a hotline call however, it was later learned that she actually spoke with the co-worker of the reporter. The investigator explained her actions by saying that she assumed the woman she spoke with was the reporter as she had met her before and thought she knew who she was speaking with. She acknowledged she did not ask for her name or if she was the reporter. By falsely documenting that she spoke to the reporter of the investigation she caused the Department to voluntarily unfound the investigation on appeal.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.   Given the nature and the credible source of the allegation, the Inspector General recommended that the investigator be placed on desk duty pending the completion of the Inspector General investigation.**

The employee has been on desk duty since June 2, 2014 due to allegations unrelated to this report.  A pre-disciplinary meeting has been conducted to address the allegations.

**2.  The Office of the Inspector General will issue charges against the child protection investigator's Child Welfare Employee License.**

Charges were issued against the employee's CWEL.

**3.  This report should be shared with DCFS Labor Relations.**

The employee has been discharged for conduct unrelated to this report and is grieving the discharge.  This report will be shared with Labor Relations in the event the employee is reinstated.

**GENERAL INVESTIGATION 19**

| ALLEGATION | A Department employee wrote a letter of complaint to a police chief on Department letterhead regarding traffic tickets she received while on personal business. |
|---|---|

| INVESTIGATION | The day after receiving two traffic tickets from a patrol officer, the employee composed a letter of complaint addressed to the local chief of police on Department letterhead while at work. The employee had not been engaged in any work-related activities at the time she was issued the tickets. The employee stated in her letter that she required her driver's license to perform her duties for the state and provided her work telephone number as her contact information. |
|---|---|

In an interview with Inspector general staff, the employee stated she had discussed her desire to write a letter to the police chief on Department letterhead with her supervisor and had been granted permission to do so. In her interview with the Inspector General staff, the supervisor that the employee had identified stated she did not have supervisory authority over the employee at that time and never spoke with her about the incident. In a separate interview with the Inspector General staff, the employee's actual supervisor at the time the letter was written also denied ever having discussed the traffic stop or writing a letter of complaint with her.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. Discipline is recommended for the Department employee for her misuse of state resources and her unprofessional conduct.** |
|---|---|

The employee received a 3-day suspension.

**GENERAL INVESTIGATION 20**

**ISSUE**    In her role as DCFS Ethics Officer, the Inspector General manages the review and filing of annual Statements of Economic Interests required to be filed by DCFS employees, pursuant to the State Officials and Employees Ethics Act. (5 ILCS 430/20-23).   After the 2014 filing period concluded, the Inspector General reported on overall compliance and also noted problems related to the process by which the Department identifies which employees are required to file a Statement.

**DISCUSSION**    In 2014, the Department identified 660 individuals who were required to file an annual Statement of Economic Interest form, which included 646 Department employees and the 14 members of an advisory council with members appointed by the Governor.  As part of the filing process, the Department requires that all original and completed forms be submitted to the Ethics Officer, who then reviews each form and files each with the Secretary of State. (Please see section entitled *Ethics* in this Report for 2014 statistics about the types of disclosures made in 2014.)  The Ethics Officer drafts the specific instructions that are provided to each filer and ethics staff fields questions from many employees regarding the type and nature of disclosures to be made on the Statement itself and to make sure that all forms are properly completed to avoid being rejected by the Office of the Secretary of State.

**Non-Compliance Statistics:**  Beginning in 2011, any employee who failed to follow the Department's filing instructions and sent their Statement directly to the Secretary of State for filing (rather than the Ethics Officer for required review) received a non-compliance letter that was added to his/her personnel file.  This letter notified the employee of the error and outlined the proper filing procedures.  The letter further stated that failure to properly file in the future could result in discipline.  Between 2011 and 2014, the number of non-compliant employees decreased from 16% to 5%.  In 2014, only two DCFS employees repeated the same error they made in 2013 of failing to submit their Statement to the Ethics Officer prior to filing with the Secretary of State.

**Concerns about DCFS' Process for Identifying Employees Required to File a Statement of Economic Interests:**  In recent years, significant problems have been noted regarding the consistency and accuracy of the list of employees identified by the Department as required to file a Statement of Economic Interest. For example, there have been inconsistencies within divisions and confusion has been created by the removal of employees who were required to file in recent years but were not identified in the current filing year, without explanation.

In an effort to improve the identification process, in 2014 the Inspector General initiated a work group with Department administrators to consider ways to further improve the identification process.  The result of the work group was development of a 2-phased process of review, involving Deputy Directors, of 1) the *types* of job functions that should be required to file; and 2) the *individual names* of employees required to file.  As a result, beginning in Spring 2014, the list of positions and employees who were identified for 2014 filing will be forwarded to each Deputy Director for his/her review.  Each Deputy will be asked to submit necessary modifications to the list in order to capture both job positions that should always be required to file as well as employees who may have relevant authority such that they should file, even if it is not tied to their specific job title.  This work group also developed a list of types of job functions and categories of functions that will assist Deputies in determining who, within their respective divisions, should be required to file.  Thereafter, positions will be coded by the Department to facilitate identification of these individuals.  By having each Deputy review the list for his/her division, the hope is that the identification process will have improved accuracy in 2015 and thereafter.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.   Two DCFS employees should be disciplined for improperly sending their Statements of Economic Interests to the Office of the Secretary of State in 2013 and 2014, after receiving a written** |

**warning with specific instructions in 2013.**

One of the employees was on a leave of absence and is now deceased.

The supervisor met with the second employee and developed an action plan to ensure proper filing of the Statement of Economic Interest.

**2.   The 26 employees who improperly sent their 2014 Statement of Economic Interests directly to the Office of the Secretary of State should receive written notice of their error which outlines the proper process and states that failure to properly file in the future could result in further discipline.  This non-compliance letter should be added to the personnel file of each of these 26 employees. (Note:  This list did not include the 2 DCFS employees who made this error in consecutive years, and did not include 8 members of the advisory council who also failed to follow filing instructions, but who are not DCFS employees.)**

Notification letters were issued to 23 employees.  Two employees are retired and 1 employee is deceased.

**3.   The 2-phased review process involving Deputy Directors in compilation of the Statements of Economic Interests list should be implemented annually.  Generally, this process should include:**

>   **A)  Each Deputy Director should review the list of positions/functions required to file a SOEI and submit necessary modifications so the list can be updated and used as a tool to assist in compiling the list;**

>   **B)  *Prior*  to certifying the final SOEI list to the Secretary of State, each Deputy Director should review the employee list and provide input to the Department regarding employees who should be added or removed from the final certified list provided to the Secretary of State and Ethics Officer. This review of names on the list is intended to capture employees who have had a change in employment status and/or to add employees who have relevant job functions such that they should be required to file, even if their specific job title is not coded as one required to file.**

The Office of Employee Services will send out the list of employees required to file Statements of Economic Interests to the Deputy Directors in December of each year to begin the process.  The Department will utilize the suggestions in the recommendation to enhance this process.

GENERAL INVESTIGATIONS

**GENERAL INVESTIGATION 21**

| | |
|---|---|
| **ALLEGATION** | A worker alleged that she had been disciplined in retaliation for having openly discussed problems she perceived with the new phone system in use by the State Central Register. |

| | |
|---|---|
| **INVESTIGATION** | The employee had been disciplined twice within the prior year. The first time was for letters she wrote to the Director of the Department and the Inspector General concerning complaints about the new phone system. Six months later, she was disciplined after having been quoted in a newspaper article about calls to the hotline. |

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. Considering US law and Illinois law and the recent US Supreme Court decision, the Department should consider removing the discipline for the Breach of Confidentiality charge that was administered in November 2013 from the personnel record of the worker and reconsider going forward with the pending discipline suspension, which is still in the grievance process, for talking with the press.**

The Department does not agree. The 2 day paper suspension remains on the employee's record due to this being a negotiated 3rd level grievance resolution. Any potential resolution for the 7 day suspension grievance will be determined at an upcoming arbitration.

**2. The Department should revise its Procedure 431.40 (d),** *Release of Information to the General Public or Media***, to provide for exceptions to conform to National Labor Relations Act (NLRA), 1st Amendment rights and Illinois Whistleblower and other statutory protections.**

This information will be included in revisions to Procedures 431, *Confidentiality of Personal Information of Persons Served by the Department of Children and Family Services*. These procedures will be posted for comment early in 3rd Quarter FY 15.

**GENERAL INVESTIGATION 22**

| | |
|---|---|
| **ALLEGATION** | A Department employee wrote a personal character reference letter on Department letterhead in support of a tenant convicted of a narcotics crime. |

| | |
|---|---|
| **INVESTIGATION** | The employee composed the letter at the request of a tenant in a building he owned. The employee wrote the letter and forwarded it to his work email account before printing it out at his office on Department letterhead. The employee included the title of his position with the Department in the letter, which was sent to a Federal Judge for consideration in advance of sentencing following her conviction for possession of 280 grams of crack cocaine with intent to distribute. |

In an interview with OIG investigators, the employee acknowledged that he had erred in writing a character reference letter in his official capacity for an individual who was not a client of the Department. The employee stated he was unaware of the ethics and state equipment violations at the time, and he did not consult with his supervisor prior to composing or sending the letter.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.   The employee should be disciplined for his violation of Department Rule 437.40,** *Employee Conflict of Interest* **and Administrative Procedure 20,** *Electronic Mail/Internet Usage/SACWIS Search Function*, **Appendix A,** *Distribution Certificate of Understanding*. |

The employee received a 7-day suspension.

**GENERAL INVESTIGATION 23**

| | |
|---|---|
| **ALLEGATION** | A Department call floor operator became the foster parent of a child who was taken into Department custody following a hotline call accepted by the operator. |

| | |
|---|---|
| **INVESTIGATION** | The operator has been the foster parent for 20 months of a boy who was placed in her home at 16 days-old following an SCR report.  An OIG review of SCR records found the operator was the SCR worker who received the hotline call that initiated the Department's involvement with the baby's family as well as the subsequent reports that led to his being taken into custody.  The baby was placed in foster care with the operator on the same day that she had accepted the subsequent reports.  The OIG filed an interim report recommending that the operator's State Automated Child Welfare Information System (SACWIS) access be suspended while the OIG investigated whether she had interfered in any way to have the child placed with her.  After reviewing records and interviewing all persons involved in the placement process, the OIG was unable to identify any intervention by the operator in the placement decision. |

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.   The call floor operator's access to SACWIS should be reinstated.** |

The Department agrees.  The employee was placed on desk duty without access to the Statewide Automated Child Welfare Information System (SACWIS).  The employee's access to SACWIS was restored when the OIG investigation determined that the allegation regarding misuse of confidential information could not be substantiated.

**GENERAL INVESTIGATION 24**

**ALLEGATION**  The Department sought consultation from the ethics officer about how to ensure that a high-level Department administrator married to an executive staff member of a private agency that contracts with the Department was appropriately screened-off from involvement with the private agency.

**INVESTIGATION**  The Department administrator's job duties required him to be privy to confidential investigative information about many private agencies, including information about his spouse's employer that should be kept confidential within the Department.  While not uncommon that spouses are employed in the same or similar field, the OIG recognized that when one spouse is employed by the Department at an executive level and the other is a private agency executive, a unique dynamic exists. Further, even if no improper sharing of restricted information occurred, the circumstances could foreseeably lead to an appearance of a conflict to the public and others within the child welfare community.

The OIG determined that to avoid actual conflicts of interest, the potential for a conflict of interest to occur, or the appearance of impropriety, the Department had to create an ethical wall between the administrator and the private agency.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**  **1.  The Department administrator was directed not to receive or respond to inquiries regarding the private agency that employed his spouse.**

The employee is no longer employed by the Department.

**2.  The Department must identify another individual to take over the administrator's duties as they pertained to the private agency who employed his spouse.**

The employee is no longer employed by the Department.

**3.  An ethical wall must be established to prevent the DCFS administrator from any involvement with programmatic issues, cases, investigations or contract issues involving the private agency who employed his spouse.**

The employee is no longer employed by the Department.

# PROJECTS AND INITIATIVES

## ERROR REDUCTION

**Young Parent Training**
The Office of the Inspector General and the Teen Parent Services Network (TPSN) designed the Young Parent Training in 2011 to help lower the mortality rate among DCFS young parents' children (See FY 11 Office of the Inspector General Report, *10-Year Review of Deaths of Children of DCFS Parenting Teens*). The interactive, discussion-driven training aimed to educate young parents on how to:

- understand the importance of always placing their child to sleep in a safe environment (alone, on its back, in a crib, without any heavy blankets/bedding/toys/bumpers);

- develop non-violent and soothing responses to infant crying;

- develop appropriate and supportive responses to challenging developmental behaviors of toddlers and preschoolers;

- understand the mechanics of abusive head trauma; and

- recognize warning signs for potential domestic violence to a child and/or a parent.

The Teen Parent Services Network (TPSN) has the responsibility to coordinate Young Parent Trainings statewide.  In FY 14, TPSN coordinated 31 trainings (6 trainings for young fathers and 25 trainings for young mothers).  TPSN invited 218 young parents to participate, and 145 (66.5%) young parents were trained (18 fathers and 127 mothers).  Eighteen (72%) of the young fathers invited to participate attended a training.  However, the number of fathers trained represented only a small proportion of young ward fathers within DCFS. TPSN must increase the attendance rate for its fathers.

*Train the Trainers*
In FY 14, Young Parent Training was enhanced to educate young parents on how they can promote their infant's brain development through talking, touching, reading or playing with their child.  In addition, parents learned about the effect of trauma or neglect on an infant's brain development. Parents were also taught how to discern the difference between accidental and non-accidental bruising in infants and toddlers.  Staff from the Office of the Inspector General and the Teen Parent Services Network provided two enhanced "Train the Trainer" events.  Thirty-nine previously-certified trainers attended the enhanced training and an additional 15 caseworkers and supervisors became certified training facilitators.  The 54 participants can now provide training to young parents served by their respective agencies.

*On-Going Monitoring of Young Parent Trainings*
Through the continuous efforts of the Office of the Inspector General and the Teen Parent Services Network, young parent trainings are tracked and monitored to ensure attendance and consistency with the trainings' methodology.

During a review of attendance and participation at young fathers trainings, Office of the Inspector General staff found that although there was success in replicating young mothers trainings, TPSN failed to adhere

to the model of the young fathers trainings by not encouraging the fathers to take home infant simulator dolls, which resulted in their underutilization.

The original model for young fathers trainings included an overnight training activity where young fathers took home a "robotic" infant doll for 24 hours.  A computer chip in the doll tracked the youth's responses to the everyday stresses of a caring for an infant, and recorded how the youth responded to the infant doll's needs.  When the doll was returned, the data collected on the young father's performance was reviewed, and each father received individualized feedback about his parenting responses.  In the past, young fathers favorably evaluated the infant simulator exercise and felt it helped prepare them for parenthood.  Presently, the Office of the Inspector General and TPSN are exploring more effective strategies to increase full participation in the training; the Office of the Inspector General is working with TPSN to increase fathers' attendance, re-integrate the infant simulator activity back into young fathers trainings, and encourage young fathers to participate in this aspect of the training.

**Community Map Training**
Over ten years ago, the Office of the Inspector General and the Teen Parent Services Network (TPSN) trained  staff working with pregnant and parenting wards on the use of  an Eco-map—a working tool that identifies both formal and informal support systems within the young parents' community.  The case manager and the young parent were expected to collaborate to identify resources and also through the caseworker's modeling establish in-person relationships with the young parents' community providers. The introductory half-day trainings took place at state-of-the-art Head Start programs (Carole Robertson Center for Learning and El Valor).  The training activities required workers to walk through the neighborhood and visit community resources such as settlement houses, title X clinics, local libraries, park districts, and early childhood education centers.  The threefold intent of the training was to 1) give the case workers knowledge of existing community-based agencies; 2) understand the importance of developing personal relationships with community-based agencies that enrich a young family's well-being; and 3) model for the young parent how to utilize services for his/her family.  A young parent should not be expected to seek out services in isolation, and as was stated often during the training, *a referral should never be a blind date.*

Although TPSN incorporated Eco-map training as part of their annual multi-day specialty trainings for all pregnant and/or parenting case managers, a 2014 Office of the Inspector General investigation determined that these case managers were unaware of community resources and had not introduced or modeled how to utilize community-based resources.

A review of the training methodology revealed the trainings had deteriorated to become only classroom exercises rather than a hands-on event of workers walking and learning about the community with the young parent.  Workers had been directed to contact community providers and complete the Eco-map as part of a homework assignment.  The map was then to be submitted for training credit to TPSN.  Despite this requirement, a review of the FY 14 training data revealed that of the 32 workers who attended this classroom training, 87.5% never returned a map for training credit.  Of the maps that were returned, none noted personal contacts with community-based providers.

It is hard to change a culture when workers are entrenched in an office approach and view a young parent's community as being only her apartment and the staff office.  A community-based approach requires diligent efforts by the caseworkers to build a supportive village around a young parent and their child. An institutional approach has failed in the past and will continue to fail.  Securely rooting a young person and their child in their community is the first step toward building a supportive environment.

Because there was no fidelity to the original training model developed by the Office of the Inspector General, Community Map training was re-instituted.  To remedy the training deficits, staff from Office of

the Inspector General and TPSN jointly conducted revitalized community map trainings, with the original approach of emphasizing in-person contacts with neighborhood service providers. To demonstrate the process of "getting out into the community," the training was held at four different neighborhood service providers in the Roseland community of Chicago. Each of the community providers described the services that they offer to young families.

Eighteen caseworkers visited Rev. Dr. Jeremiah A. Wright, Jr. Trinity United Church of Christ Child Care Center, a nationally-recognized leader in providing quality early childhood education. They learned about the benefits of enrolling children in Early Head Start and Head Start, and had an opportunity to take a tour of the facility. For some of the caseworkers, this was their first contact with a Head Start program. Caseworkers then visited Carter G. Woodson Regional Library, where they met with the Children's Librarian and learned about education and recreation options that public libraries offer young families. Caseworkers visited Abbott Park, where the park supervisor discussed the park's recreation programs geared for young children and young adults. The training concluded with a visit to Olive Harvey Middle College, a school that is part of the Alternative Schools Network and is located on the campus of the Olive Harvey College, part of City Colleges of Chicago. The school principal and a school mentor gave presentations about the importance of supporting a young person's education. Caseworkers were able to walk to three of these resources, but drove 2.7 miles to Olive Harvey Middle College. One cannot serve a family if one does not know that family's community.

A community map training was also conducted in Springfield for 23 caseworkers. Like the training held in Chicago, this community map training demonstrated the process of "getting out into the community," by taking workers to community-based providers in the Springfield area. The training began at the Springfield Urban League, where workers heard a presentation about the benefits of early childhood education and learned about enrollment in Head Start. Then training continued at the Springfield Lincoln Library with a presentation from a Youth Services Librarian about programs targeted to young parents and their children.

The caseworkers were to return to their agencies and visit community resources with one of their young parents. There will be an objective review of the completed community maps to ascertain if the caseworkers used a community-based and task-centered approach. Community map training will be adapted for use in rural areas. The Hill-Erikson consultant is advising the Department on revising DCFS procedure for young parents. The new procedure will require community mapping for all DCFS young parents.

**Multi-Subject Error Reduction Training**
In FY 14, the Office of the Inspector General conducted five Multi-System Error Reduction Trainings for 64 private agency staff. An additional 16 staff from DCFS' training department also attended. The training provided an overview of three Error Reduction Initiatives:

1. Young Parent Training
   - Intact and placement staff received an overview of Young Parent Training, and learned how to adapt the training model for all parents who are on their caseload—whether DCFS involved or not. This training emphasized the importance of engaging in interactive, discussion-driven interventions with young parents.

2. Bruising Training
   - While DCFS child protection investigators, supervisors and managers were trained on Error Reduction practices in investigations of cuts, welts, and bruises, private agency staff never trained on this material. At this training, private agency were trained on how to differentiate between accidental and non-accidental bruising in infants and toddlers. All attendees received

copies of a bruising poster developed by the Office of the Inspector General, to bring back to their agencies.  The poster provided illustrations that 1) showed the prevalence and distribution of accidental bruising in infants; 2) contrasted high-suspicion and low-suspicion bruising in infants; and 3) presented autopsy findings of non-accidental bruising in injured children. Attendees also received a guide that accompanied the poster and provided additional information to help them effectively utilize the illustrations as teaching tools. To better inform parents, agencies requested additional posters to distribute in offices and visiting rooms.

3. Grief and Loss Training
   - This final portion of the training educated workers on ways to support youth and families experiencing loss.  Participants viewed two films developed by the Office of the Inspector General.  The first video presented an ethics panel—made up of a state's attorney, two ethicists, a caseworker, and a private agency director—with the dilemmas and disagreements between foster parents and a caseworker trying to decide whether or not to tell a soon-to-be-adopted seven-year-old foster child about the possible imminent death of his biological mother. The panel explored the ethical challenges in this case scenario, and discussed whether the child should be told of his biological mother's terminal illness and be permitted to see her before she dies. The second video—developed in collaboration with Kristen James, LCSW of Lurie Children's Hospital Heartlight project—presented a hospital social worker discussing the continuing process of grief and mourning facing young children in state care. A revised publication, *Grief and Loss, Spiritual Support and Child Welfare: A Handbook for Hospital Chaplains and Child Welfare Professionals* was distributed to trainees.  This publication, developed through a joint project by the Office of the Inspector General and the University of Chicago School of Social Service Administration, was designed to give guidance to DCFS and private agency staff, and explores children's responses to loss by providing a developmentally-appropriate lens to understand children's sorrow. Different religious responses to death and grief are highlighted, to promote religious sensitivity around a family's grief and mourning practices. The handbook includes a statewide list of children's hospitals with chaplains, and other grief and loss resources that can offer assistance to caseworkers and families.

**Judicial Education Conferences**
In January and April 2014, the Inspector General of the Department of Children and Family Services, Dr. Mary Clyde Pierce, Professor of Pediatrics, Northwestern University Feinberg School of Medicine, and Diane Baird, Senior Instructor for the Kempe Foundation for the Prevention and Treatment of Child Abuse and Neglect, gave presentations on *Understanding and Interpreting Evidence in Child Abuse and Neglect Cases* at the Administrative Office of the Courts Judicial Education Conferences. The Honorable John R. Kennedy led the session's panel discussion.   Seventy-eight family law judges attended the sessions.

## EDUCATION TRAINING

**Education Training**
A recent Office of the Inspector General investigation determined: 1) many eligible youth do not enroll in a post-secondary education program; and 2) those youth that do enroll often drop out before completing a degree.  Many of these students are struggling academically and rarely receive the support they need to succeed.  Often, youth and workers are uninformed about the eligibility requirements for financial aid,

and operate under the misconception that because the student is a ward, the Department will pay for their college education.

In FY 15, the Office of the Inspector General, the Cook County Office of the Public Guardian and the DCFS Office of Education and Transitional Services will conduct training for Guardians Ad Litem and private agency staff.  Representatives from the City Colleges of Chicago,  the DCFS Office of Education and Transitional Services, the Illinois Student Assistance Commission, the DCFS Education Liaisons, and the UCAN Education Mentor Program will discuss supportive resources available to post-secondary wards.

Two "frequently asked question" resource guides—one for youth and one for professionals—are being created to address issues around paying back loans, dropping classes, and losing financial aid. Staff from the Office of the Inspector General, the Cook County Office of the Public Guardian, and the DCFS Office of Education and Transitional Services are collaborating to develop the guides, which will be distributed at the training.

## OLDER CAREGIVERS

The Older Caregiver's Project has made substantial progress in 2014 with its collaboration with the Department on Aging. This cooperative project produced specific guidelines for workers in both agencies to refer to when working with older caregivers who are raising wards in their homes. The changes that were made will enable families to receive help from both agencies that will act in concert to support both populations, and guide them to and through the various sources of help that are available.

The training for this new partnership was conducted for groups that contained workers from both agencies. This allowed the workers to begin to know one another in anticipation of working together, and provided opportunities for multiple points of view during discussions. On those occasions when workers from either agency notice that an older caregiver is struggling in some area they will be prepared to act upon their concerns in ways that will cause the least amount of disruption.  Referral forms have in some cases been streamlined when it was helpful and maintained when they performed well in their current version.

In working with the Department to implement the Older Caregiver Program, the Office of the Inspector General and Department staff noted many areas of joint responsibility between the work of the Department, the Office of the Inspector General and the Department of Aging. Many caregivers and grandparents are raising children. In FY 2014, in addition to the Department's and Office of the Inspector General's work and crossover training concerning issues relevant to older caregivers, the DCFS, in conjunction with the Office of Inspector General, began working with the Department on Aging to develop an intergovernmental agreement to facilitate work between the two agencies. The Intergovernmental Agreement between the two agencies was executed in October 2014 and permits greater sharing of resources and knowledge to better serve families and caregivers.

The DCFS funded Extended Family Support Program (EFSP) offers interventions that help keep placements stable. It can assist with guardianship, medical and educational issues, mental health services, help with food and other benefit programs, and in some cases limited cash assistance. It can also refer families to the Illinois Department on Aging so that families can take advantage of the programs administered by the Area Agencies on Aging throughout the state.

The Office of the Inspector General is proud to have contributed to this important, and historic, partnership. We have found no other program in the United States that has integrated the services of these agencies in quite the same way. DCFS and the Department on Aging are optimistic that these important changes will benefit the clients of both agencies, and help protect both the older caregivers and their children.

## ETHICS

**ETHICS OFFICER**

The Inspector General is the appointed Ethics Officer for the Department of Children and Family Services under the *State Officials and Employees Ethics Act.* 5 ILCS 430/20-23. In this role, the Ethics Officer assists Department and private agency administrators and employees in interpreting the Ethics Act, the Child Welfare Code of Ethics and Rule 437—*Employee Conflicts of Interest.*

A primary function of the DCFS Ethics Officer is to address inquiries and concerns from the field. Additionally, the Ethics Officer monitors the mandated annual ethics training; reviews all Statements of Economic Interest submitted by over 650 Department employees and council members annually; and provides a revolving door analysis to the Office of the Executive Inspector General for certain employees leaving Department employment.  A member of the ethics staff sits on the Department's Conflict of Interest Committee, which responds to Department employee inquiries regarding secondary employment and other issues covered by Rule 437.  Additionally, in 2014, the Ethics Officer took on the added responsibility of assisting the Department in certain aspects of its contracting process.

**Ethics Inquiries from the Field**

During fiscal year 2014, the Ethics Officer responded to inquiries from both Department and private agency employees.  While the DCFS Conflict of Interest Committee reviews most inquiries related to secondary employment of DCFS employees and contractors, inquiries that pertain to private agency employees or which are otherwise outside the scope of Rule 437 – *Employee Conflicts of Interest* are generally referred to the Ethics Officer for review.  Apart from secondary employment, inquiries during fiscal year 2014 generally fell into the following categories, including: conflicts arising from multiple relationships; conflicts involving ethical boundaries and/or confidentiality; conflicts involving gifts and honorarium, sales or solicitation; conflicts related to board membership and professional affiliations; and conflicts related to use of state resources.

*Conflicts of Interest Involving Secondary Employment*
- A private agency employee inquired to the Ethics Officer about whether it was a violation of DCFS policy for a DCFS administrator to have a private counseling practice.  The Ethics Officer advised that having a private practice would not be a violation of DCFS rules provided the DCFS employee did not work with DCFS clients as a private therapist.

*Conflicts of Interest Arising from Multiple Relationships*
- A DCFS Licensing Representative who is also a licensed foster parent with a private agency requested an ethics consultation.  Nine years earlier she had been a caseworker for a ward.  The ward now has a child.  The licensing representative was inquiring if there would be a conflict if the infant was placed in her care.  The Ethics Officer advised that since it had been over three years since the DCFS employee had been in a position of authority over the biological mother, having the child placed with her was not an abuse of authority and did not create a conflict.

- An Administrative Case Reviewer had a friend who asked to use her as a reference in her application to become licensed as a day care home provider. The Case Reviewer had not worked professionally with the potential licensee, but inquired whether her position within the Department created an appearance of a conflict if she were to submit a recommendation for the licensee. The Ethics Officer advised that it would not create a conflict of interest for the Case Reviewer to submit a personal recommendation, provided that she do so in her private capacity only, and not include information about her DCFS employment.

- A DCFS employee asked the Ethics Officer for clarification about restrictions on working with family members. The employee wanted to apply for a transfer to a DCFS field office located closer to his home, however, two supervisors in that office were close relatives. The Ethics Officer advised that although Rule 437.40(m) (which prohibits hiring, supervision or evaluation of an immediate family member as defined by the Rule) did not include his relatives who were not immediate family, but given the small size of the field office, his transfer there would at the least, create an appearance of an impropriety that would be a difficult if not irresolvable appearance of a conflict.

- A DCFS employee reported she was a witness when a friend's adult daughter and her paramour were involved in a domestic dispute. The police were called and interviewed everyone who witnessed the altercation, including asking employment information. The employee contacted the Ethics Officer regarding how to respond if the State's Attorney required her to make an official statement, specifically so as not to have it appear that she was providing a professional opinion as a child welfare employee. The Ethics Officer advised that she could make a statement of her observations and clarify that her statement was as a private citizen and not a DCFS employee. The Ethics Officer further clarified that if she was asked to testify in court, she was not in any way prohibited from answering a direct question about her place of employment.

- A DCFS licensing representative was invited to the wedding of a day care provider for whom she was the licensing representative, and inquired about whether it would be improper for her to attend. The employee felt that because the provider was not up for license renewal and had no outstanding licensing issues, that accepting the wedding invitation was permissible. The Ethics Officer advised that because the licensing representative was in a position of authority over the provider, it would be a conflict of interest for her to have a social relationship with the provider, including attending her wedding. The Ethics Officer discussed portions of the Code of Ethics for Child Welfare Professionals (regarding multiple relationships) and DCFS Rule 437 and advised the employee that she should not engage with the provider beyond their professional relationship, but that if they already had a social relationship she should request that the provider's license be transferred to another licensing representative.

- A DCFS licensing supervisor contacted the Ethics Officer upon learning that a licensing representative whose home was for sale had received an offer on the home from a provider whose license she monitored. Neither the licensing representative nor the provider had knowledge of the identity of the other party when the purchase offer was made and they did not contact each other during the negotiation. The supervisor reported that the regional licensing administrator had already determined to transfer the provider's license to another representative to avoid any conflict of interest. The Ethics Officer reviewed the facts and the action already taken by the regional licensing administrator and advised that because the licensing representative had no previous knowledge of the provider's interest in purchasing the home, and since monitoring of

the license was going to be transferred to another licensing representative, there was no basis for the Department to prevent the home sale from going forward.

*Conflicts of Interest Involving Ethical Boundaries and Confidentiality*

- A private agency administrator contacted the Ethics Officer with concerns reported to her by agency staff about a former agency case manager who had been observed inappropriately sharing private client information and anecdotes in a social setting.  Because the case manager was no longer employed by the private agency and did not hold a Child Welfare Employee License, the administrator was unsure about how to address the situation.  The Ethics Officer advised that although disciplinary action could not be taken against the former employee, the administrator should have a frank discussion with current staff about their own ethics responsibilities to address that type of situation if it should arise again, and specifically the concepts of personal integrity, the importance of not exploiting clients and of maintaining professional trustworthiness.

- A former private agency employee contacted the Ethics Officer for clarification about whether it would be improper for her to contact foster parents she previously worked with to provide her letters of reference.  She further inquired about whether it was improper to engage in a social relationship with any of the foster parents, since she no longer had any influence over their respective cases.  The Ethics Officer discussed different aspects of ethical social work that are addressed within the *Code of Ethics for Child Welfare Professionals*, specifically focusing on issues of multiple relationships and the importance of a child welfare professional managing his or her own private interests.  The Ethics Officer advised that above all it was most important that the former private agency employee refrain from any activity with former clients or foster parents that could be interpreted as exploitative for her own personal private gain.

*Conflicts of Interest Involving Gifts & Honorarium, Sales or Solicitation*

- A DCFS administrator was approached by a state university to speak about a high profile case she worked on prior to her DCFS employment, including the offer of an honorarium for her participation.  The Ethics Officer clarified that the administrator had no involvement with any contracts or ongoing projects involving the university in her DCFS capacity, and that she would use personal benefit time for the presentation.  The ethics office advised that she could complete the presentation and accept the honorarium but must clarify to the university that her participation was entirely unrelated to her current employment with DCFS.

- A Department administrator contacted the Ethics Officer for clarification about how to respond to community businesses who ask to make donations to DCFS during the holiday season, either with supplies, gifts or monetary contributions.  The Ethics Officer referred the administrator to the *Children's Benefit Fund* which is a charitable trust administered by the Department used to meet the needs of children at risk for abuse and neglect throughout the year.

- A DCFS employee contacted the Ethics Officer regarding whether a group of co-workers could collect money for the family of a colleague who had recently passed away and specifically if they could hold a fundraiser for the family.  The Ethics Officer discussed some of the problems that have arisen in the past regarding collecting charitable funds, and advised that they would need to carefully maintain a separation of functions between collecting donations, storing donations and the dispersal of funds.  The Ethics Officer also clarified that solicitation of donations are permissible only in a lunch/break room and during break times only.  Employee Handbook, Section 3.1, *Professional Conduct*.

- A DCFS employee and her supervisor were invited by a DCFS contractor to a private charitable event for which tickets were valued at $500 each. The DCFS employee disclosed that she was the program monitor for the DCFS contractor and inquired as to whether it was a conflict for her and her supervisor to accept the invitation. The Ethics Officer advised that accepting the invitation would create an actual conflict and would also be a violation of DCFS Rule 437.40(g) which states:

  > No employee shall solicit or accept any payment, gift, favor, service, discount, loan, entertainment or other consideration from any entity or child care facility as defined in Section 437.20 or any entity that has a grant, contract, or purchase of service agreement, or adoption assistance agreement with the Department over which the employee has decision-making authority.

- A DCFS employee contacted the Ethics Officer for clarification about the Department's policy on soliciting gifts for foster children and families during the Christmas season. The Ethics Officer advised that in 2014 the DCFS Office of Communications undertook management of this activity and interested parties should contact Andy Martinez in the Office of Communications to coordinate efforts.

- A supervisor at the State Central Register received a gift of food from a private agency supervisor as a "thank you" for agreeing to review a hotline call that had previously been taken as an information only report. The Ethics Officer advised that in accordance with Rule 437 the supervisor was prohibited from keeping the gift, however, since the gift was perishable he could resolve the conflict by donating the item to a local church or shelter. The Ethics Officer also agreed to address the prohibition against gifts with the private agency.

- A private agency placement worker received a bouquet of flowers from a foster parent. Because the flowers were perishable, the Ethics Officer advised that in lieu of returning the flowers the worker should write the foster parent a letter thanking her for the kind gesture and explaining that she is prohibited from accepting gifts from clients or providers. The Ethics Officer also highlighted for the worker the specific provisions of DCFS Rule 437 – Employee Conflicts of Interest that address the prohibition against accepting gifts.

- A DCFS employee received movie tickets from a private agency as a token of thanks for his assistance and contacted the Ethics Officer about how to respond to the agency. In accordance with DCFS Rule 437 – Employee Conflicts of Interest, the Ethics Officer advised that the tickets had to be returned to the agency.

_Conflicts of Interest Related to Board Membership and Professional Affiliations_

- A DCFS administrator contacted the Ethics Officer about identifying a DCFS employee for participation on a county board which has historically had a DCFS representative and which was beneficial to the Department in terms of forging relationships with community partners such as police and public defenders, and receiving important training opportunities. The Ethics Officer consulted with the administrator about the duties of being on the board and how it would positively influence the employee's work in child welfare while also considering any potential negative effects of the participation. The Ethics Officer agreed with the administrator that the board participation would benefit both the employee and the Department overall.

- A DCFS licensing supervisor advised the Ethics Officer that she participated on a community fiscal board, and was recently introduced to a new board member who identified herself as a

foster parent licensed by a private agency.  The licensing supervisor reported she could foreseeably be in a position to make an enforcement decision regarding the private agency, and inquired about whether she needed to step down from the board due to the new member's affiliation with the community board.  The Ethics Officer advised that since the foster parent had no current placements in her home and therefore was unlikely to have any complaints be registered against her or by her, there was no actual conflict of interest, however, if those circumstances changed in the future the supervisor should recuse herself from oversight of any child welfare matters involving the foster parent.

*Conflicts of Interest Related to Use of State Resources*

- A DCFS employee inquired about whether it was permissible to use his state computer to contact his retirement coordinator with questions about pending retirement.  The Ethics Officer advised that it was a permissible use of state resources because it was related to his state employment.

- A DCFS employee on a committee dedicated to providing staff with health awareness resources inquired about whether the Department could engage a vendor (at no cost to the Department and who had no Department contract) who would offer products and event tickets to Department employees at a discounted rate.  The Ethics Officer advised that the use of State of Illinois property for a sales or promotional event, even if the Department incurred no cost, would have to be reviewed by DCFS Office of Legal Services regarding any liability issues, and the Department of Central Management Services regarding potential violations of the State's property management policies.

## Consultation on Department Contracts and Contract Disclosures

The Ethics Officer assisted Department management with review of certain types of contracts disclosures made by potential service providers to identify conflicts of interest that might prevent the Department from pursuing the contract.  This assistance included:

- Review of 71 contracts, both regarding specific disclosures and as part of coordination with the Department to revamp the DCFS contract boilerplate disclosures sections;

- Development of a detailed roadmap to direct Department staff on the needed level of review depending on the type of disclosure made by a provider on a contract;

- Revisions to the Department's Related Party Procedures.

## Revolving Door Prohibition of the Ethics Act

Ethics staff responded to many inquiries by department and private agency employees and administrators regarding the details of the prohibition, to whom it applies and how to complete the waiver request process.  During fiscal year 2014, the Ethics Officer provided seven full revolving door analyses to the Office of the Executive Inspector General regarding DCFS employees leaving state employment.

## Reports of Ex Parte Communications

Pursuant to the requirements of the State Officials and Employees Ethics Act, the Ethics Officer is required to file with the Executive Ethics Commission reports that include material oral or written communications made to an agency during a rulemaking period or related to a regulatory, quasi-adjudicatory, investment, or licensing matters pending before or under consideration by the agency. (5

ILCS 430/5-50).  In fiscal year 2014, the Ethics Officer made three reports of *ex parte* communications to the Executive Ethics Commission.

**Statements of Economic Interest Reviews**
Review of each Statement of Economic Interest by the Ethics Officer prior to filing is statutorily mandated under the State Officials and Employees Ethics (5 ILCS 430/20-23).  In 2014, the Office of the Inspector General reviewed 660 Statements of Economic Interest that were required to be filed by persons in the Department who:

> (1) are, or function as, the head of a department, commission, board, division, bureau, authority or other administrative unit within the government of this State, or who exercise similar authority within the government of this State;

> (2) have direct supervisory authority over, or direct responsibility for the formulation, negotiation, issuance or execution of contracts entered into by the State in the amount of $5,000 or more;

> (3) have authority for the issuance or promulgation of rules and regulations within areas under the authority of the State;

> (4) have authority for the approval of professional licenses;

> (5) have responsibility with respect to the financial inspection of regulated nongovernmental entities;

> (6) adjudicate, arbitrate, or decide any judicial or administrative proceeding, or review the adjudication, arbitration or decision of any judicial or administrative proceeding within the authority of the State;

> (7) have supervisory responsibility for 20 or more employees of the State;

> (8) negotiate, assign, authorize, or grant naming rights or sponsorship rights regarding any property or asset of the State, whether real, personal, tangible, or intangible; or

> (9) have responsibility with respect to the procurement of goods or services.  5 ILCS 420/Art. 4A-101.

To meet the requirements imposed by the Ethics Act and to prevent Statements of Economic Interests (SOEI) with technical errors from being rejected for filing, the Department and Ethics Officer requires that *every* SOEI to be filed by a Department employee or by a member of the Children and Family Services Advisory Council be sent first to the Ethics Officer.  To achieve this goal, the Department contacts each employee and Council member required to file, on multiple occasions, and provides specific instructions about how to complete the form.  Every SOEI that is received by the Ethics Officer undergoes two layers of review; the first is a preliminary review for technical errors and the second is a substantive review for conflicts of interest.   After preliminary review, all properly completed SOEIs are forwarded to the Secretary of State for filing.  The Ethics Staff personally contact any individual who sent in a form with technical errors, to assist them in completing a new or revised form.

Once a properly completed SOEI is received by the Ethics Staff and forwarded to the SOS for filing, the Ethics Officer conducts a second level of review for any SOEI with a response on the form other than

"no," "none" or "n/a".  This substantive review is intended to address any disclosures that may create a conflict of interest, both under the Ethics Act and DCFS Rule 437 – *Employee Conflict of Interest*.

Of the total 660 SOEIs filed in 2014, the Ethics Officer conducted the second, substantive review for 92 (14%) Statements. Of the 92 SOEIs that underwent a second level of review, there were 35 (38%) instances where a disclosure indicated that the employee engaged in secondary employment or business ownership requiring daily/weekly activities within the preceding calendar year.  The Ethics Officer sent a letter to 32 employees (and their respective supervisors) who made these types of disclosures, reminding each of the potential for a conflict of interest that always exists between State employment and outside work, and the importance of maintaining clear boundaries between State employment and any secondary employment.[1]   In two additional instances, the Ethics Officer individually contacted employees after determining that a conflict did exist between the employees' state and private employment.  Disclosures made by members of the Children and Family Services Advisory Council were also reviewed for potential conflicts, but were not contacted individually regarding private/other employment because they are not DCFS employees.

The breakdown of filing is illustrated below.



- 92 (14%) to Ethics Officer for "further review"

- 35 (38%) of the 92 SOEIs that were "further reviewed" involved secondary employment or business ownership.

- 32 employees were sent letters regarding their disclosures of secondary employment (including business ownership likely to require day-to-day management).

Disclosures apart from those detailed above generally included real estate ownership, gifts, prior employment, a spouse's business interests and personal investments.

Please see General Investigation 20 for more detailed information about 2014 Filing Non-Compliance Statistics and the Ethics Officer's initiation of a Department work group to improve the Department's process for accurately and consistently identifying employees required to file a Statement.

---

[1] Letters were sent to any employee who was still engaged in the secondary employment reported, or who had a business ownership that could require day-to-day management activities.  Letters were not sent in instances where Ethics staff confirmed that the information listed pertained to former employment, military service or if the reporting employee was no longer employed with the Department.

# SYSTEMIC RECOMMENDATIONS

The Inspector General's investigative reports contain both systemic and case specific recommendations. The systemic reform recommendations for Fiscal Year 2014 have been categorized below according to the function that the recommendation is designed to strengthen within the child welfare system.  The Office of the Inspector General (OIG) is a small office in relation to the child welfare system.  Rather than address problems in isolation, the OIG views its mandate as strengthening the ability of the Department and private agencies to perform their duties. Recommendation categories are as follows:

- **CHILD PROTECTION INVESTIGATIONS**
- **ETHICS**
- **LICENSING**
- **PERSONNEL**
- **RESOURCES**
- **SERVICES**

## CHILD PROTECTION INVESTIGATIONS

- If child protection investigators cannot meet their obligation to assess child(ren) in a timely manner the supervisor should assure that the police are contacted for a welfare check.

- The Department should ensure that the need to have corroboration of time, place or circumstances for hearsay statements of young children is the subject of a Cook DCP Manager/Supervisor monthly meeting.

- On call supervisors should be required to have a DCFS issued laptop with them while on call. In situations where an on call supervisor does not have access to the internet and the air card signal is not adequate, that supervisor should be required to locate the closest point to their home where the air card functions. On-call supervisor SACWIS notes should be entered contemporaneously.

- The investigative field should be trained that in cases with abusive injuries and multiple caretakers, the investigator must develop a timeline of caretakers during the critical period of time in which the injuries could have been inflicted.

- At the next Supervisor/Management Child Protection Meeting, the field should receive a training surrounding the legal effect of Short Term Guardianship as well as a reminder regarding the importance of developing a 72 hour timeline around inflicted injuries.

- The Department should develop a training to focus on honing interviewing skills for child protection, identifying critical facts and developing information early on regarding critical facts.

*Child Advocacy Centers*

- The Child Advocacy Centers Consent Forms should include the Child Advocacy Center's Family Advocate.

- The Child Advocacy Advisory Committee should request that medical clinics that are co-located within Child Advocacy Centers will include body charts or photographs to document any observed

injuries and if the injuries may be suggestive of abuse, will ensure that the child is questioned separately from caretakers.

■ The Child Advocacy Protocol should be amended to include questions determining whether the child victim is, or has recently been involved in counseling.  Intake procedures should include verbal contact with ongoing or recent counselors to learn all information that may be helpful in assisting criminal or child protection investigators or medical personnel, advocates and mental health professionals in their treatment of the child or adolescent.

■ The Child Advocacy Center should institute procedures or protocol to ensure that critical information learned by the Medical Clinic, which is co-located at the Child Advocacy Center, is collaboratively shared with members of the interdisciplinary team.

*Database*

■ The Department should clarify in its Procedures that a database search on an alleged perpetrator will not give full information about a person's prior abuse/neglect history unless the alleged perpetrator's birthdate is included in a Person Search.  This information should be incorporated into training.

■ To ensure that alleged perpetrators of abuse and neglect receive notification of the investigative findings and their right to appeal, the Department must develop a system to ensure that at the close of an investigation, the address for the alleged perpetrator(s) listed in SACWIS is accurate. This report should be shared with the Department's State Central Register Administrator for the purpose of developing a system of checking the address in death cases when there are multiple reporters calling the hotline regarding the same report.

*Domestic Violence*

■ When child protection investigations involve an arrest for domestic violence, investigators should contact pretrial services to obtain bail conditions.

*High Risk*

■ As part of the temporary custody screening process, child protection will notify DCFS Legal and DCFS Clinical of high risk cases such as those where a parent has demonstrated dangerous behavior as abduction; torture; threats to kill with plan; or taking children hostage and cases involving severe mental illness.   Upon notification, DCFS Clinical will initiate an emergency clinical staffing within 5 working days, including all relevant parties and records, and will authorize a specialized integrated assessment.

*Law Enforcement Coordination*

■ When there has been a prior serious indicated abuse finding or a prior conviction for serious battery to a child, and a parent is permitting continued access to the child by the abuser, the Department must secure the full investigative file from law enforcement prior to closing the child protection investigation.

■ The Department should ensure that investigations are not approved for closure when alleged perpetrators have not been interviewed by child protection investigators when there was a pending police investigation without retrieving and reviewing a copy of the police investigation, including interview reports.

- The OIG has previously made recommendations concerning the need for collaboration between child protection investigators and police in Chicago, including specific recommendations to develop regional law enforcement liaisons within the Department to facilitate coordination. DCFS Chicago Police Department liaisons and the Chicago Police Department coordinators should conduct a case review to address future collaborative efforts between the Chicago Police Department and the Department.

*Medical Coordination*

- If a Statewide Medical Resource Program report is pending when custody is taken of a child, the Child Protection Investigator and medical program coordinator should arrange for a phone conference to review their preliminary findings with the placement agency supervisor. The Coordinator should ensure that the agency receives a copy of the child protection investigation report upon completion.

- If an intact family case is opened before a Statewide Medical Resource Program report is completed, the Department should develop a mechanism for the medical program coordinator to convene a phone conference with Intact Family Services when a child remains in the home. The Coordinator should ensure that intact family staff receive a copy of the Medical report upon completion.

*Safe Sleep*

- The Department should reinstate its historical practice of investigating co-sleeping deaths only when the report discloses circumstances suggesting possible abuse or neglect, such as an intoxicated parent or a previous co-sleeping death in the same family. In the alternative, the Department should immediately convene public hearings toward adopting Rules governing investigating and indicating co-sleeping deaths.

- The Department should undertake a review of all the sleep-related deaths indicated for Allegation #51 (Death by Neglect) during the period in which the Department initiated sleep-related infant deaths investigations regardless of whether the reporter reasonably believed the child may have been the subject of abuse or neglect. The review should determine whether the findings should stand or be overturned, applying the factors identified in the revised policy and procedures.

ETHICS

- In order to accurately reflect the meeting duration of DCFS advisory group meetings, the Department should amend Procedures to require recording the start time and end time for all advisory group meetings.

- Under the "Advisory Groups" tab on the DCFS website, the Department should create two sub-groups – one for statutory advisory groups and one for non-statutory advisory groups. For each individual advisory group, the DCFS website should include the following information:
  - Statutory citation, if applicable
  - Identify who appoints group members, and length of appointment
  - Identify Chair and DCFS Staff or Liaison
  - Annually updated member list
  - Appointment terms of all members, if applicable

- In developing  the list of Department employees who are required to complete Statements of Economic Interest (SOEI) pursuant to 5 ILCS 420, the Department should implement a two-tiered review process annually involving Deputy Directors. This process should include:

- Each Deputy Director reviewing the current list of positions/functions required to file a SOEI under his/her purview and submitting necessary modifications so the list can be updated and used as a tool to assist in compiling the list;

- Prior to certifying the final SOEI list to the Secretary of State, each Deputy Director should review the employee list and provide input to the Department's Office of Employee Services and the Director regarding employees who should be added or removed from the final certified list provided to the Secretary of State and DCFS Ethics Officer. This review of names on the list is intended to capture employees who have had a change in employment status and/or to add employees who have relevant job functions such that they should be required to file, even if their specific job title is not coded as one required to file.

## LICENSING

- The Department should formalize a process wherein the Placement Clearance Desk notifies the appropriate Day Care Home Licensing personnel of any foster placements in dual licensed homes.

- The Department should require licensing entities to secure a consent and review the child protection investigation as part of the enforcement process for recommending a waiver of an indicated Child Abuse Neglect finding.

## PERSONNEL

- The Department's employee services should provide do not rehire information to contracted child welfare agencies that require employment verification on any employee who met requirements for separation due to an egregious act.

### *Allegations of Substance Abuse*

- As recommended by the OIG since 1997, the Department should amend Rules and Procedures and develop protocol and contracts to provide an infrastructure for prompt determination of allegations of employees being under the influence while at work. The protocol should include identifying available testing facilities for reasonable suspicion testing; a definition of reasonable suspicion; procedure for training for management and supervisors for corroboration in support of reasonable suspicion determinations.

## RESOURCES

- The Department's Lending Library, a resource developed to share educational material with foster parents, should be limited to peer-reviewed publications that have passed the review procedures of the Child Welfare Information Gateway. Other books should be subject to an internal review process, staffed with *ad hoc* specialists in the appropriate fields, who will certify to having reviewed the material and that it comports with existing DCFS Rules and Procedures.

- An *ad hoc* committee of child development specialists should review specific existing publications in the Lending Library to ensure that those portions that may be harmful to our foster children or contrary to Department Rules and Procedures are removed.

## SERVICES

- Private child welfare agencies providing intact family services should have at least 1 portable crib on hand that can be distributed to families on an emergency basis until a crib can be accessed.

- The Department should ensure that placement workers require that caregivers sign consents for the worker to follow-up with medical providers and the Illinois Women, Infants and Children public

benefit program [WIC] for a non-ward child that remains in the home of the parent when there is an open case involving other children in care. The follow-up with medical providers and WIC should be included in the service plan.

*Fathers*

■ The Department's Appointment of Short-Term Guardian Form should include instructions requiring consent of identified fathers, whose whereabouts are known, in compliance with The Illinois Parentage Act.

■ The Department should require private child welfare agencies to secure consents of identified fathers whose whereabouts are known, whenever the Appointment of Short-Term Guardian Form is used.

*Integrated Assessment*

■ The clinical screener completing the Integrated Assessment should be part of the transition case conference to ensure that information learned subsequent to the completion of the Integrated Assessment is integrated into the Assessment.

*Mental Health*

■ The Department, the Division of Mental Health of the Department of Human Services (DHS-DMH) and the Illinois State Board of Education (ISBE) should collaborate to share local community focused resources for Illinois children and adolescents requiring intensive psychiatric services including outpatient, in-home and residential care.  This collaboration should inform development of individualized contracts or amendment of existing contracts as necessary.  In the case at issue, a ward with mental illness from rural Illinois was placed in Chicago, far from her family because of a lack of Department contracted services in her area, even though appropriate services were available through both ISBE and DHS-DMH contracts and funding.

*Substance Abuse*

■ When a DCFS worker has a case involving a caretaker who is suspected of anabolic steroid use, the worker should contact the Department's Substance Abuse expert for information on the appropriate anabolic steroid screen to test for presence of the drug.

*Teen Parents*

■ Teen parents joining a transitional living program should be provided with a two-week orientation program.  The orientation program should focus on building family and community support using a task-centered/ecological approach.  The program case manager and caseworker should jointly introduce the young parent to community-based resources in the area, including:

a) introducing the youth and child to local Head Start programs and supporting progress through: 1) making monthly visits to libraries, local government offices providing public benefits for Women, Infants and Children, park districts; and 2) establishing a medical care provider for the child;

b) supporting the youth in their educational setting through monthly visits to the young parent's school or job to assist the youth overcome obstacles that hinder achievement. If the young parent is without a medical home, accompanying them to a local Title X Clinic/medical home; and exploring recreational, physical fitness and arts programs in the community with the youth. The case manager should diligently assist the young parent in maintaining and strengthening their extended support system by inviting a young parent's family or friends to an orientation meal and visiting with a young parent's emergency caretaker.

- When a young parent transitions into a transitional living program, the receiving case manager shall introduce themselves to school staff within the first ten days and ask to be notified via email of any absences. To support the case manager's efforts to sustain attendance, case managers must arrange to have access to the applicable education notification system portals for absences or cuts.   If the school does not have a portal system (such as the Alternative School Network), the worker should arrange notification through available mentors or teachers. If a young parent has two consecutive absences from school, the case manager must immediately make in-person contact. The Teen Parent Service Network Education Support Department shall be consulted before absenteeism becomes a chronic issue.

- During the transitional living pre-placement process, the sending case manager will assist the young parent in identifying the names, addresses and phone numbers of persons the youth wants on their visiting list. The receiving case manager will amend this list as the young parent's supports change over time.  Visitors should be required to provide state-issued identification, but should not be required to provide social security numbers.

- To increase communication and collaborations among the transitional living system of care for teen parents, a young parent's case manager and case worker should meet with day-shift community support staff to review progress and enhance opportunities for the young parent and their child's successful engagement in education, and to strengthen the mother and child support system. Shift summaries should be reviewed before this meeting. These meetings should occur every four to six weeks.

- Head Start Enrollment for children of young parents in a transitional living program must increase to 80% within next fiscal year.

- Anticipating college enrollment, a case manager should assist a young parent in beginning the application process for grants and federal aid when high school graduation or GED completion is imminent. Teen wards should not have to confront the daunting and complicated process of applying for Pell grants and federal aid (FAFSA) without hands-on assistance. The Teen Parent Service Network Education Support Department or Youth In College should assist any parenting youth who has completed high school or earned a GED to complete these required applications.

- A GED test or college entrance exam should be considered a "critical appointment," requiring that the case manager transport the youth.

# RECOMMENDATIONS FOR DISCIPLINE AND CONTRACT TERMINATION

In FY 2014, the Inspector General recommended discipline of Department and private agency employees and termination of Department contracts for the conduct detailed below. Discipline recommendations ranged from counseling to discharge.

## DISCIPLINE RECOMMENDATIONS

- A child protection investigator should be disciplined for gross negligence, up to and including discharge, for documenting in the investigative file without basis and representing to his supervisor, that a teacher had been arrested, charged and had pled guilty to a criminal charge involving inappropriate touching of young student, and that the teacher relinquished his teaching certificate – none of which was correct -- as well as his failure to critically review the information provided by the witnesses in the police report, which would have cast doubt on the credibility of the alleged victim. The investigation was overturned on appeal.

- A child protection investigator and supervisor should be disciplined for their failure to ensure that the investigator (a) immediately accessed a pack-n-play for a 16-week-old infant; (b) conducted collateral interviews in a domestic violence case; (c) monitored the safety plan; and (d) for permitting the safety plan to be terminated without obtaining the police report and conducting a timely LEADS history check, which would have informed them that there was an outstanding warrant for the alleged perpetrator

- A private agency should discharge a caseworker for soliciting a client to pose nude with him for cash.

- The Department should discharge a voucher clerk for creating, submitting and approving false vouchers to herself.

- A private agency should discharge a caseworker who was found to have an unprofessional relationship with a client based on phone records showing hours of phone contact between them, often after midnight, none of which was recorded in case records.

- A child protection investigator should be disciplined for falsely documenting in a Contact Note that she spoke with a school counselor.

- A child protection supervisor should receive disciplinary counseling for failing to correct an investigator's pattern of failing to enter the majority of contact notes until the day before presenting the investigation for closure.

- A private agency should discipline staff who contacted a former employee to warn him that the OIG had requested a copy of a case file on which he had worked.

- An on-call supervisor should receive discipline for failing to enter any notes documenting the decision made with the investigator not to take protective custody.

- A child protection supervisor should be counseled for failing to verify information that was critical to an indicated finding. After noting that the investigator could not state what criminal charges a teacher had pled guilty to, he failed to follow-up to ensure that the information was verified.

- Two department employees should be disciplined in two separate incidents for using a Department computer and preparing a letter on Department letterhead for personal matters.

- Two Department employees who were required to file a Statement of Economic Interest should be disciplined for improperly sending their Statement of Economic Interest directly to the Office of the Secretary of State in 2014 for the second consecutive year, after receiving a written warning with specific instructions in December 2013.

- A child protection investigator and supervisor should be disciplined for failing to interview the child, who was accessible at school, in a reasonable time period; and for waiting to request a criminal history check until the day the investigation was closed.

- A child protection investigator and supervisor should be disciplined for failing to timely assess the minors in accordance with *Procedures 300.50(c), Initiation of the Investigation*. The discipline should be mitigated by the fact that the investigator had transferred to the Division of Child Protection 2 weeks prior to the case assignment.

- The Department should review the actions of a child protection manager who recalled an indicated investigation in response to a complaint she received from a former Department employee who had been a close friend. While the manager involved others to review the investigation, the manager failed to disclose the conflict of interest and remained involved in the decision-making process.

## CONTRACT TERMINATION RECOMMENDATIONS

- The Department contracts with a not for profit child welfare agency that subcontracts all of its casework to an affiliated for profit agency. An OIG investigation found that the agency had placed two special needs children in a foster home, that was also a daycare home, and maintained the children there, despite their needs not being met, until a court directed them to move the children. The agency then moved the children to an unlicensed relative without securing placement clearance and kept them there for several months without alerting the Department to the move, as required. As a result, the unlicensed foster home received no assistance for the children, while the former foster parent continued to receive undeserved funding. The agency then submitted documentation to the Department that falsely represented that the children had been moved to the home of the son of the unlicensed relatives, in order to serve placement clearance. All of this occurred from the office of the for-profit subcontracted agency in which the regional administrator was also functioning in the position of program manager and handling the loads of two supervisors because of attrition and turnover. In another investigation during this fiscal year, the same agency relicensed a foster home that had been indicated for inadequate supervision after leaving a special needs child locked out of the home for several hours each day. Prior Inspector General investigations involving the two agencies had identified high turnover and severe lack of coordination of services and communication. The OIG recommended that the Department cease contracting with either of the affiliated agencies and that in the future, the Department should prohibit foster care contracts with agencies where the majority of work is performed by a subcontracted entity.

- The Department should discontinue contracting with a counseling agency that used an unlicensed psychologist to perform services without providing adequate and proper oversight of services and

billings delivered to the Department and for permitting her to represent herself as a Clinical Psychologist in violation of the Clinical Psychologists Licensing Act.

- The Department should ensure that DCFS clients are not serviced by an unlicensed psychologist, who represented herself as a Clinical Psychologist, in violation of the Clinical Psychologists Licensing Act and who wrongfully treated a ward for Reactive Attachment Disorder for a Department ward based only on the verbal report of the foster mother that child had received that diagnosis.

# CHILD WELFARE EMPLOYEE LICENSES

The following cases represent action taken against Child Welfare Employee Licenses in FY 2014.

**License Revocations**

- A former department employee had her CWEL License revoked after being convicted of Felony Wire Fraud in connection with wrongful use of state adoption assistance funds intended for the benefit of her adopted son.

- A former department employee had her CWEL License revoked for failing to support the criminal prosecution of a man who she knew had sexually abused her daughter, including providing false information in an affidavit to court and for providing false information during the CWEL investigation.

- A private agency worker had her CWEL License revoked after providing false information in case notes and court reports regarding visitation with a family.

- A former department employee had her CWEL License revoked after failing to respond to CWEL allegations.

**License Relinquishments**

- A private agency worker relinquished her license during an investigation of allegations that she had falsified casenotes documenting home visits.

- A private agency worker relinquished his license during an OIG investigation of allegations that he had solicited a client to pose nude with him for money.

- A private agency worker relinquished her license after after an OIG investigation found that she had falsified several casenotes documenting home visits.

- A private agency worker relinquished his license during an OIG investigation of charges that he advised clients not to inform juvenile court of a pending DUI charge and later asked the couple not to tell anyone that he had so advised them.

**License Suspensions**

- A former department employee had her CWEL License suspended for 90 days for entering an investigative Contact Note wrongfully documenting having spoken to a school counselor.

- A private agency therapist had her CWEL License suspended for 84 days for billing the Department for family sessions which included the foster mother, while maintaining that the foster mother was not present at the sessions.

- A private agency employee had his CWEL License suspended for 30 days after an OIG investigation showed hours of late night telephone conversations with a client, none of which were reflected in case notes.

**Pending Charges**

- The OIG issued charges against a Department investigator who falsely documented that the states attorney was pursuing charges against the alleged perpetrator.

- The OIG issued charges against a Department employee who conducted two investigations of the family of a friend without disclosing the nature of her relationship.  Charges were also issued based on another investigation, in which the investigator falsely documented that she spoke to the reporter.

- The OIG issued charges against a private agency employee who had a non-professional relationship with a foster parent.

- The OIG issued charges against a private agency employee who was found to have had a non-professional relationship with a client on his caseload.

# COORDINATION WITH LAW ENFORCEMENT

- In FY2013, the Inspector General met with a County State's Attorney and shared information obtained during the OIG investigation of the 2011 death of a ward in a foster home. While the Department had indicated that foster mother for the death, and the autopsy determined that the manner of death was homicide, the foster mother had not been charged for nearly two years. The newly elected State's Attorney successfully presented the charges to the grand jury and prosecuted the foster parent who was convicted of murder and of endangering the life and health of a child. The caretaker is awaiting sentencing on the conviction.

- The Inspector General referred an investigation to the Internal Revenue Service involving a therapist at a private agency who fraudulently claimed wards as dependents on his personal income taxes.

- The Inspector General referred an investigation to the Attorney General's office involving a contracted agency that used Department funds to pay the monthly fee on the Private Agency Director's personal condominium and the leasing fees for the Private Agency Director's personal car. While the Agency Director claimed that both items were used for agency business, there was no documentation to support the claim. The Inspector General also ensured that the Department audited the agency and sought to recover excess funds.

- The Inspector General referred for criminal prosecution the case of an adoptive mother who accepted the adoption subsidy for her son for years when he was not living with her. The Attorney General filed charges against the mother who pled guilty to Wire Fraud, was sentenced to 30 months probation and ordered to pay full restitution to the Department.

- The Inspector General referred for criminal prosecution a case of adoptive parents who accepted the adoption subsidy for years after the death of their adopted child. While the referral was pending, the adoptive mother died and the States Attorney determined not to charge the adoptive father.

- The Inspector General referred to and assisted the Illinois State Police in investigating allegations that workers were misappropriating toys and gift cards donated to DCFS-involved children for the holidays. The criminal investigation closed without charges. The Inspector General made recommendations for property and financial control in the future to ensure the donations reach their intended recipients.

- The Inspector General received an anonymous complaint that a day care provider and her family were using the Social Security numbers of the children for whom day care was provided to defraud the IRS. The investigation was referred to the IRS.

## AN INTEGRATED APPROACH TO MANAGEMENT OF HIGH RISK DCFS WARDS

**Introduction**

When the State takes children into care, we must be able, at a minimum, to provide a safe harbor. Youth in care who exhibit violent or criminal behavior can threaten the safety of other wards and the communities at large. The child welfare system must provide an integrated response to youth with these behaviors that includes safety/prevention, evidence-based interventions and accountability. Accountability must be two-pronged and address both involved youth and the facilities where they reside. First, we must proactively monitor the youth who violate social norms through coordination with the juvenile justice system and impose a structure of graduated sanctions so that youth are held accountable for their actions, enabling them to become productive adults. Second, we must proactively monitor residential facilities to ensure that responses to dangerous behavior effectively protect all children.

Prior Inspector General investigations presented to previous Department Directors have yielded recommendations that address Department and private agency responses to youth in care with violent behavior. These recommendations have been presented to the current Director who has taken them under advisement. Below are prior Inspector General recommendations with portions of the original accompanying analyses, presented here to facilitate a discussion about an integrated system of response. In general, Inspector General recommendations are targeted to the facts and location of the investigation referred. Although a portion of these recommendations were addressed to two specific residential programs which have since closed, the Inspector General believes that the recommendations have broader implications and should be extended to the system of residential programs.

## I.    EVIDENCE-BASED INTERVENTIONS TO PROMOTE SAFETY

A.    Therapeutic Interventions for Youth With Violent Behaviors

Even for the most violent youth, the Department is invested with parental responsibility. Such responsibility includes the need to promote accountability for the youth's actions and to limit their opportunity to harm themselves or others. The Department is not acting in the best interest of a minor if it does not choose a placement with sufficient protections when it has notice that a minor may harm others.

In 2003, the Inspector General submitted a report on youth violence citing the 2002 Surgeon General Report on Youth Violence calling attention to the problem as a national public health concern. Prior Inspector General reports regarding cases of wards with violent and/or sexually aggressive behaviors, including similar behavior of youth who have developmental disabilities, have addressed evidence-based interventions such as restorative justice, targeted therapy/intervention for specified populations and program needs for vulnerable children. In a prior Inspector General report of the rape of an 11 year old girl at a licensed facility (since closed), it was noted:

It is incumbent that DCFS fund training programs specifically targeted to the development of empathy, moral reasoning, and social skills in the areas of sexuality and violence for its young adolescent and adolescent population. Residential staff need

training on how to foster a caring and civil community among the children they serve. (January 2003, 02-IG-1136).

Multi-Systemic Therapy (MST), Aggression Replacement Training (ART) and Multi-Dimensional Family Approach (which includes Multi-Dimensional Treatment – Foster Care and Multi-Dimensional Family Therapy), were recently cited as effective, evidence-based methods for juvenile justice and youth prevention, intervention and reentry programs in the 2014 *Model Programs Guide* issued by the U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention.  The Inspector General's prior recommendations identified MST and ART as evidence-based prevention and intervention options to treat youth with violent behaviors and delinquency.  In a 2003 report, the Inspector General noted:

> Low accountability, lack of supervision, isolation, truancy, and idleness are factors that Multi-Systemic Therapy (MST) research associate with delinquency. The basic clinical features and nine principles of MST interventions while used with delinquents in their communities can be adapted to placement settings. Relevant interventions should include targeting sequences of behavior within and between multiple systems promoting responsible behaviors and discouraging irresponsible behaviors, decreasing associations with deviant peers and increasing affiliations with prosocial peers. Intervention effectiveness should be evaluated continuously from multiple perspectives to promote treatment generalization.  (January 2003, #02-IG-1136 and #02-IG-0558).

> Research on aggressive adolescents shows that socio-environmental protective factors include close supervision and monitoring of the adolescent, school attendance, knowing where the adolescent is at night, curfews, and conventional and pro-social activities such as school, work or sports (Heide 1995, 1997, 1999; Bailey 1996). In addition, research also shows that some aggressive youth may experience distortions and deficiencies in social cognition such as attributing to others hostile intentions, paying attention to aggressive cues and poor problem solving skills (Kendall, 1993).  For youth with observed cognitive distortions such as distorted viewpoint, lack of remorse and those who perceive events from their own perspective and therefore feel justified in their actions, anger management intervention strategies that do not address cognitive distortions but rather ask the client "to walk away" are generally ineffective. (January 2003, #02-IG-1136 and #02-IG-0558).

A Multi-Dimensional Family approach has also been cited as an effective treatment intervention for violent adolescents and children who are being reintegrated back into the community. Group homes and residential treatment facilities should use a Multi-Dimensional Family approach when relative foster homes have been identified as a step-down placement for a youth leaving a residential treatment facility.  Prior to discharge, there should be gradual extended visitations with the relative foster placement using a Multi-Dimensional Family Approach. In addition, therapeutic systems must hold youth accountable for their actions and provide predictable consequences.  Evening Reporting Centers provide such a system, by creating an infrastructure that permits graduated therapeutic sanctions and containment for inappropriate behavior.  The infrastructure for Evening Reporting Centers already exists in the juvenile justice system.  These centers present the opportunity for coordination and sharing of county and state resources that is critical to service provision for this population.

**The Inspector General's recommendations regarding MST, ART and a Multi-Dimensional Family approach include:**

1. **Multi-Systemic Therapy and intensive case management for delinquent wards with repeated psychiatric hospitalizations:**   The Inspector General asked that the Department, *implement a multi-systemic therapy (MST) approach and an intensive case management program for the 12-13% of hospitalized wards with multiple yearly psychiatric hospitalizations and wards who are involved in both delinquency and adult courts.* (Recommended January 2003, #02-IG-1136 and #02-IG-0558).

2. **Aggression Replacement Training (ART):**   *The program should implement anger replacement therapy (ART combines anger control training (emotional), psychological skill stream training and moral reasoning).* (Recommended January 2003, #02-IG-1136 and #02-IG-0558).   [Also see recommendation regarding Evening Reporting Centers below, Section II.1)

3. **Multi-Dimensional Family Approach for reintegrating wards with violent behavior back into the community:**   The Inspector General asked that a specific residential facility incorporate into *its treatment intervention for youth whose anticipated discharge plan is a return to parents or relatives,* [and to] *adopt a multi-dimensional family approach (Chamberlain, 1998). One of the goals of this family treatment should be to assist viable members of the child/ren's extended family in building a caring and civil community of empathy and moral reasoning in areas of sexuality and violence. The family group sessions should take place* [in a location] *to be inclusive of multiple extended family members by avoiding taxing transportation while reinforcing realistic community safety planning. Extended family visits and three-month aftercare therapeutic services should be incorporated as part of the treatment intervention to help the family transition the child into his family's community. As part of the multi-dimensional services the children's caretakers should receive a transitional consultation from the children's medical provider and the children's schools.* (Recommended September 2003, #03-IG-0851).

Additionally, the Inspector General previously addressed the known higher risk of sexual assault for youth with developmental disabilities and recommended specific types of interventions targeted educational programs and pro-social skills training for those youth as well as youth in the general population.  In 2003, the Inspector General noted:

> Children and young adolescents with developmental disabilities in the mild mental retardation range face increased risk for acquaintance and date rape.[36]   Because knowledge deficits contribute to the risk for abusive or exploitative sexual activity, targeted programming is essential for younger adolescents who have developmental delays.  Social skills research[37] demonstrates that for mentally retarded persons,

---

[36] Quint, 1999.

[37] Soto, G. W. Toro-Zambrana and P.J. Belfiore (1999) "Comparison of two instructional strategies on social skills acquisition and generalization among individuals with moderate and severe mental retardation in a vocational setting: A meta-analytic review."  *Education and Training in Mental Retardation and Developmental Disabilities* December 307-320; McFall, Richard M. (1982). "A Review and Reformulation of the Concept of Social Skills" *Journal of Behavioral   Assessment* 4, 1-33; Gumpel, Tom. (1994) "Social Competence and Social Skills Training for Persons with Mental Retardation: An Expansion of a Behavioral Paradigm" *Education and Training in Mental Retardation and Developmental Disabilities* September, 194-201; Foss, Gilbert., William P. Auty and Larry K. Irvin (1989). "A Comparative Evaluation of Modeling, Problem-Solving, and Behavior Rehearsal for Teaching Employment-Related Interpersonal Skills to Secondary Students with Mental Retardation" *Education and Training*

interpersonal skills and social competence have strong bearings on an individual's ability to live successfully and safely in a community. Community training for mildly retarded children should focus not only on the needs and characteristics of the child but also on the relevant environmental characteristics. The American Academy of Pediatrics and the United States Surgeon General suggest violence and sexual prevention efforts be routinely begun in the fifth and sixth grades. (September 2003, #03-IG-0851).

4. **Pro-social skills training:** In a set of OIG Reports addressing the Child Welfare System's responses to sexually aggressive behavior, the Inspector General noted that the appropriate emphasis of therapy and accountability requires an emphasis on empathy and pro-social skill development. *Sexually Aggressive Children and Youth (SACY) Reports (dated June 30, 1999 and June 13, 2000).*

5. **Interventions for Substance-Abusing Youth:** [For] *an adolescent whose behavior is self destructive and uncooperative, but is also using drugs, the Department should consider filing a petition on the minor as an Addicted Minor (ILCS 705, 405/4-1 et sec) to make use of the authority of the court in servicing such youth.* (Recommended May 1999, 97-IG-1520).

6. **Establishment of a multi-disciplinary panel to assess placements and treatment options for high-risk wards:** *The Guardian's Office has to proactively meet its responsibility, "to assure a permanent, secure and nurturing living arrangement for each child the Department serves." The Guardian's Office should assemble a panel to examine the present population of high-risk wards, recommend placement / treatment options, make recommendations about how to sustain an on-going effort to review high-risk cases and examine which may need court review for compliance with mental health services. The panel should include: the guardian, psychologists, psychiatrists, a pharmacologist, adolescent health experts, ethicists and selected independent examiners. The panel should designate a smaller group available to the Guardian for on-going consultation in these extreme cases.* (Recommended January 2003, #02-IG-1136 and #02-IG-0558).

7. **Developing Evidence-Based Interventions:** The Inspector General asked that the *Department concentrate the* [funding for the University of Illinois'] *Child Family Research on assisting residential and foster care providers in developing evidenced based interventions for violence prevention and response and transitional services for the return home of younger adolescent and adolescent wards.* (Recommended September 2003, #03-IG-0851). [The Department will need to provide supports, in the form of ongoing training of workers and supervisors and consultation, to assure continuous fidelity to the intervention model in group

*in Mental Retardation and Developmental Disabilities* March 1-27; Collet- Klinenberg, Lana and Janis Chadsey-Rusch. (1991) "Using a Cognitive-Process Approach to Teach Social Skills" *Education and Training in Mental Retardation and Developmental Disabilities* September 258-317; Vlenti-Hein, Denise and Kim T. Mueser (1990) The Dating Skills Program: Teaching Social-Sexual Skills to Adults with Mental Retardation; Browning, Philip and Gary Nave (1993) Teaching Social Problem Solving to Learners with Mild Disabilities *Education and Training in Mental Retardation and Developmental Disabilities* December 309-317; O'Reilly Mark F. and Janis Chadsey-Rusch (1991) "Teaching a Social Skills Problem-Solving Approach to Workers with Mental Retardation: An Analysis of Generalization" *Education and Training in Mental Retardation and Developmental Disabilities* December 324-334; Schloss, Patrick J. and Cynthia N. Schloss (1985) "Contemporary Issues in Social Skills Research with Mentally Retarded Persons" *The Journal of Special Education* Vol. 19/No. 3. 269-282; Sundram Clarence J. and Paul F. Stavis (1994) "Sexuality and Mental Retardation: Unmet Challenges" *Mental Retardation* August 255-264; Lumley Vicki A. And Raymond G. Miltenberger (1997) "Sexual Abuse Prevention for Persons with Mental Retardation" *American Journal on Mental Retardation* Vol.101 No. 5 459-472.

homes, residential facilities and successful reintegration of youth into their home communities.]

## II.   INTERVENTIONS TO PROMOTE ACCOUNTABILITY FOR WARDS AND FACILITIES

Youth who engage in dangerous behavior or behavior that threatens or harms others must be held accountable for their actions in ways that facilitate and encourage pro-social behavior.  In the 2003 analysis of an investigation involving a ward in independent living who killed another ward, the Inspector General stated:

> When basic rules of civility are undermined, youth attempting to be compliant and accountable feel their freedoms and safety compromised, and discipline is unjust. Risks increase in any residential setting when delinquent peers gravitate towards each other, are oblivious to curfew or rules, and consume alcohol. Grouping together high-risk youth in this unintentional manner can increase the cohesiveness of delinquent peers (Paterson & Yoerger, 1997; Elliot & Menard, 1996).  Bandura's classic analysis of aggression (1973) offers some insight, "when people respond approvingly or even indifferently to the actions of assailants, they convey the impression that aggression is not only acceptable but expected in similar situations." The antisocial few gain more fuel in these situations. (January 2003, #02-IG-1136 and  #02-IG-0558).

**The following recommendations were made in earlier Inspector General reports submitted to prior directors:**

1. **Evening Reporting Centers:** [For youth who are dually involved in the Juvenile Justice system and the Department], *the Department should* [promote use of] *evening* [reporting] *centers [...] similar to the current models utilized by* [the Cook County] *Juvenile Court.* [The Department should request] *a court order for supervision . . .* [incorporating reporting to the center as part of the court order] *and involve separate facilities for youth ages 13-16 years old and young adults 17-18 years old. The evening* [reporting] *center should have the capacity to supervise court ordered community service and time spent in the center should be scaled to a youth's progress at the evening* [reporting] *center, community, and school. Residential facilities should arrange for transportation of their clients. Following the balanced and restorative justice model, adult mediators can be used for conflict resolution between the delinquent and their victim.* [The three-fold intervention described in Section I.(A)(2), above, for Aggression Replacement Training should be utilized with youth in Evening Reporting Centers.] (Recommended January 2003, #02-IG-1136 and  #02-IG-0558).

With respect to Evening Reporting Centers, the Inspector General further noted:

> Social development training should take place in regular classrooms with intensive training at the evening reporting centers to enhance generalization to other settings. Likewise coordinated efforts for enhanced and compensatory learning opportunities across the school and evening reporting centers should occur for a multi-systemic approach to reduce the likelihood of re-offense and violence.  Attendance hours should be flexible from 3:00 pm to 9:00 pm depending on the youth's ability to successfully generalize targeted pro-social behaviors at the school and residential campuses. Transportation should be provided by the residential programs with funding for designated staff from the residential programs to ensure consistent and coordinated responses. [Evening Reporting Centers could also provide] academic and computerized

individualized tutoring for educational enhancements. (January 2003, #02-IG-1136 and #02-IG-0558).

2. **Identification of possible sexual assault in residential facilities:**  The Inspector General asked to meet with the Clinical Director of a specific residential facility to: ... *review proposed changes to its clinical protocols and training to address the failure to identify initial reports as possible sexual assault with an immediate referral to law enforcement; and failure to respond to the confirmed information regarding sexual activity between youths of such tender ages with immediate medical and clinical interventions (through the Children's Advocacy Center).* (Recommended September 2003, #03-IG-0851).

3. **Secure facilities for youth with foreseeably dangerous behavior:**  *The Department has been remiss in its fiduciary duty by not establishing secure facilities for youth whose behavior poses an established pattern of foreseeable serious risk of bodily harm to self or others (as specified in DCFS Rule 411).* (Recommended January 2003, #02-IG-1136 and #02-IG-0558).

4. **Half-Way Houses:** The Inspector General asked that t*he Department develop a placement model similar to halfway houses for high-risk wards (17 years and older) who have been released from the Juvenile Division of the Department of Corrections or are violating probation orders. The ward should be held strictly accountable for school, work, curfew, etc. The Department should consult with programs such as Safer Foundation or Isaac Ray regarding the development of secure halfway houses.* (Recommended January 2003, #02-IG-1136 and #02-IG-0558).

5. **Restorative justice model:**  The Inspector General asked that t*he Department and the Cook County State's Attorney discuss how to set up a restorative justice model for DCFS wards.* (Recommended September 2003, #03-IG-0851).

6. **Weekend emergency responses for youth-on-youth sexual assault:**  The Inspector General asked that: [t]*he Department secure the assistance of* [a local child advocacy center] *in developing a system of weekend emergency responses for alleged child on child sexual assault evaluations for DCFS wards that reside in* [DCFS] *residential programs.* (Recommended September 2003, #03-IG-0851).

7. **Contracting with Youth:** *The Department should develop housing contracts (for rent subsidies) with wards and enforce regulations addressing the use of drugs, alcohol, firearms, and violence.  Institutional sanctions should be consistent across programs and the juvenile court should be immediately notified when a ward is violating housing contracts that threaten the safety or the well-being of the ward.  Housing contracts should make clear that funding for the apartment will stop and the court will be informed of transgressions involving criminal activity.* (Recommended June 2011, #09-IG-2951).

A. <u>Effective Monitoring of Residential Facilities</u>

The Department contracts with residential facilities to perform its parental responsibilities toward wards. The Unusual Incident Reporting (UIR) System is one of the main ways that the Department seeks to hold residential facilities accountable. Residential facilities are required to file a written form with the Department whenever a ward engages in or is the victim of any one of the 36 enumerated events in Rule 331.40, ranging from medication dispensing errors to murder.   In prior death and serious injury investigations, when Inspector General staff reviewed applicable UIRs, we found a lack of critical review by the Department of the Reports that had been submitted. The volume of UIRs had created a system which became, over the years, a bureaucratic event, in which residential facilities

were monitored for whether they submitted UIRs, but there was little oversight to ensure that the response of the facility was sufficient and appropriate for the youth. The Department must actively monitor residential placements and UIRs to ensure that private agencies' responses to incidents of concern are appropriate, timely and sufficient.

In a 2003 report of a specific residential facility, the Inspector General analyzed the functional use of the UIR system and noted:

> The use of the Unusual Incident Report Form was never intended to become a substitute for needed action.  The purpose of Unusual Incident Reports (both for the Department and private agency management) is to:
>
> 1. Communicate quickly about critical incidents or circumstances that present risks to children and youth, staff and others;
>
> 2. Alert others of events and/or actions that may be required; and
>
> 3. Track incidents for trend analysis and to determine whether modifications are needed to improve the quality of services.  (Rule 331)
>
> Presently, the UIR system fails to target the most serious incidents and is a rough and imprecise reporting tool.  It is imprecise because the determination of what needs to be reported and what facts are relevant to such reports is, ultimately, a highly subjective determination. Most institutions require supervisory review over Unusual Incident Reports prior to submission to the Department.  Management within private agencies may legitimately want to review information before it is submitted to ensure that information is accurate and complete.  Conversely, since Unusual Incident Reports can be used by the Department to assess the quality of services provided by the agency, there is a potential for either the reporters or management to edit information that would put them in a bad light.  In addition, components of the process make meaningful analysis of UIR data impossible.  The current system, which requires each staff involved to file incident reports may result in multiple questioning sessions of children involved in traumatic episodes and several written versions that could compromise future prosecutions.
>
> These competing concerns raise two separate issues: First, are the Unusual Incident Reports received by the Department concordant with the actual events as internally recorded by the agency?  Second, is the agency's recorded version of the events a true and accurate description of all relevant information?  (September 2003, #03-IG-0851).

The Inspector General previously issued the following recommendation regarding accountability for a residential facility which was charged with care of high-risk youth.  While the facility is no longer operational, major deficiencies with the UIR reporting system remain, especially with regard to the validity and reliability of information reported and whether the responses to reported incidents are sufficient and appropriate.  **In the prior Report pertaining to the specific facility identified, the Inspector General recommended hands-on review of UIRs by the Department until future reliability and response could be assured:**

1. **"Action taken" on Unusual Incident Reports:**   *The Department should continue to monitor implementation of a single reporting system for UIRs.  In addition, for a six-month validity and reliability trial period, the agency must institute a streamlined UIR reporting*

*process. During the pilot period, the agency should assign a numbering system to UIRs so that one incident is reported one time. Future clarifications or corrections would be filed under the same number so that it becomes possible to track number of incidents. In addition, the agency should prohibit supervisory additions, deletions, edits or rejections of UIRs. Supervisory corrections and clarifications can be filed with the Department through supplementary clarifying or correcting reports. During the six-month trial period, both the Department and agency management should review the original and supplemental UIRs to inform them on the validity and reliability of the contents in UIR reporting categories and the need for additional training regarding UIR preparation. Further, both the Department and agency management should review and monitor the "Action Taken" section of UIRs, both to ensure that appropriate action is taken and to again inform the need for future training. During this validity and reliability trial period precautions should be taken for the potential of over reporting by staff.* (Recommended September 2003, #03-IG-0851).

## III.    DEPARTMENT RESPONSE TO CHRONIC RUNAWAY BEHAVIOR

Runaway children are an especially vulnerable population, and Department wards may run away from a placement for a range of reasons. In 1999 and 2003 respectively, the Inspector General conducted two investigations involving Department youth with consistent runaway behavior, and examined the Department's procedures regarding wards known to be missing or with whereabouts unknown. The 1999 investigation pertained to a teenage girl with an extensive history of running away who was murdered while on run from shelter care. Because a child's vulnerability varies by age and capacity, in 2003 the Inspector General developed the following flow chart to help direct the Department's response to a youth on run taking into account the child's age and vulnerability.

(See following Chart)

[This Page Left Blank Intentionally]

**RESPONSE TO RUNAWAY YOUTH BASED ON RISK**



Police/Sheriff picks up child. Child has missing person report and is subject of child protection warrant. Child has not been abducted.

Law Enforcement transports child to Emergency Service Center. Center should notify caseworker. Agency visits child and determines if run and risks are 1A, 1B, 1C.

**OR**

Child returns to former placement or unauthorized placement and child or adult caregiver notifies worker.
Worker notifies police, Agency visits child and determines if run and risks are 1A, 1B, 1C.

**1A – LOW RISK**

Child has low frequency of runs and no history of behaviors that threatens child or other's well being

**1B – INTERMEDIATE RISK**

Child is over 12. Child has moderate pattern of run (frequency +3) with long durations between runs and moderate intensity of problems that may pose a threat to child's well-being if not remedied or lowered by interventions.

**1C – HIGH RISK**

Child is over 12.
Child has patterns of runs, high frequency with short durations between runs (high instability)
And/or
Long duration during runs with high intensity of problems that threaten child's well being or well being of others: High risk substance abuse problems
And/or
Severe emotional problems with little to no compliance with mental health treatment
And/or
Developmental disabilities compromising youth's judgments and safety in community
And/or
History of violence episodes
And/Or
Sexual exploitations
And/or
High risk medical condition that untreated threatens youth's life

## 2A – LOW RISK

Child is returned to former placement or temporally placed with a caregiver who the child trusts while assessments and staffing are completed. If child is temporarily placed outside of previous community school, transportation to child's former school will be arranged.

If needed, contact Crisis Team for family conference.
(Family Conference Model involves the youth extended informal support system—the caregivers, extended family and trusted persons selected by the youth in problem solving. The extended support system and youth meet with a community mediator. Together the youth child welfare agency and family members make decisions about the future living arrangements. This approach allows the family and youth to maintain some degree of neutrality and confidentiality. A care and protection plan is presented to the GAL and child welfare agency for approval or suggestions of revisions. If all parties agree, the final plan is presented to the court as a mediated solution to the running and risk behaviors.

## 3A – LOW RISK

Child's caseworker and agency supervisor notify GAL and biological parents of child's return. Caseworker and supervisor with clinical consultation complete an assessment, prepare report for court and transport child to court. Consult Crisis Team as needed.

## 2B – INTERMEDIATE RISK

Child returned to former placement if child comfortably voices trust of former caregivers,
And
Caregivers are willing to cooperate with assessments and a family conference,
Or
Child is placed in a specialized crisis intervention foster home. If child is temporarily placed outside of previous community school transportation to child's former school will be arranged.
Or
Child is temporarily placed at shelter to transportation to previous school.

## 3B – INTERMEDIATE RISK

Child's caseworker and agency supervisor notify GAL and biological parents of child's return. If child is in foster home, Crisis Team provides in=home crisis services and assists caseworkers in assessment resources. Arranges for family conference and transportation for viable members of youth's informal support system including extended family members. Presents mediated family's plan to all parties. Assists caseworkers in preparing court report. Caseworker transports child to court.

## 2C – HIGH RISK

Child is place at Shelter for 48 hours until Child Protection Court Hearing with individual's treatment plan that allows extended restrictions in accordance with DCFS Rule 384, and Juvenile Court Act, 705 ILCS 405/2-9, and 705 ILCS 405/4-8.

("Extended Restriction" means periods of touching or holding by direct person-to person contact for a period of less than five minutes. Physical restriction shall not constitute manual restrain if it is accomplished with minimum force and is used to prevent a child from completing an act that is likely to result in harm to self or others or to escort a child to a quieter environment. Extended restriction must be documented in the child's record, i.e. progress notes.)

## 3C – HIGH RISK

Shelter notifies child's caseworker and agency, GAL, previous caretaker, and biological parents of child's return. Shelter Crisis Team coordinates appropriate services and assessments (nursing, substance abuse, mental health, medical). Arranges for family conference and transportation for viable members of youth's informal support system including extended family members. Presents mediated family's plan to all parties. Assists caseworker in preparing court report.

AN INTEGRATED APPROACH TO MANAGEMENT OF HIGH RISK DCFS WARDS        197

## DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS

The Inspector General made the following recommendations in previous Fiscal Years, but the recommendations were not fully implemented before the Annual Report was issued.  The current implementation status of these recommendations is detailed below in the following categories.

- Child Protection
- Child Welfare Employee Licensure (CWEL)
- Contract Monitoring
- Domestic Violence
- Foster Home Licensing
- Law Enforcement
- Legal
- Medical
- Personnel
- Services
- Teen Issues

**CHILD PROTECTION**

**The Department should require that investigators request that the treating hospital physician or nurse complete a body diagram when a child victim is initially seen in a hospital setting. The treating physician or nurse can utilize a body diagram provided by their institution or one provided by the Department (CANTS 2A/2B) (from OIG FY 13 Annual Report, General Investigation 2).**

> *FY 13 Department Response:* The Department agrees to require investigators to request completion of a body diagram/chart from treating hospital physicians or nurses with corresponding documentation in the SACWIS file.  A Policy Alert detailing expectations will be issued to investigation staff and will be included in revisions to Procedures 300, Reports of Child Abuse and Neglect.

> *FY 14 Department Update:*  The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**The following language should be added to Procedures 300 – Appendix B, *Allegation Substantial Risk of Physical Injury* (#60):  If the alleged child victim has a Special Health Care Need as defined in Procedures 302 – Appendix O a) or b), a referral for nursing consultation services shall be made by completing the DCFS Regional Nurse Referral Form, CFS 531 (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 12).**

*FY 13 Department Response:* Recognizing the complex nature of this recommendation, the Inspector General's Office and the Department will be reviewing the issues presented in this case to develop appropriate policy and procedure.

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**In child protection investigations involving medically complex children whose home health care is at issue (medical neglect OR substantial risk of physical injury), the child protection investigator should convene a telephone or in-person conference with relevant parties (e.g., parents, nursing care agency, Division of Specialized Care for Children, child's primary care physician, other medical providers) to facilitate communication, establish facts and design a plan of action. DCFS Nursing staff should be utilized to help coordinate such a staffing (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 12).**

*FY 13 Department Response:* Recognizing the complex nature of this recommendation, the Inspector General's Office and the Department will be reviewing the issues presented in this case to develop appropriate policy and procedure.

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**A copy of this report should be shared with the current area administrator, the first child protection investigator and her supervisors. The area administrator should facilitate a discussion with staff regarding errors in the investigation (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 4).**

*FY 13 Department Response:* The report has been shared with the Area Administrator and the child protection supervisor. The report will be shared with the child protection investigator upon the employee's return from leave.

*FY 14 Department Update:* The child protection investigator remains on leave at this time.

**When SCR receives a report from hospital staff of injuries to a child three years and under and there has been a previous report of serious injury within the last six months, SCR should code the report as requiring an "Emergency Response" to see the child victim immediately (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 4).**

*FY 13 Department Response:* A memo was issued to SCR staff. This recommendation will be included in revisions to P300, *Reports of Child Abuse and Neglect*.

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**The Department should use this report and OIG Report #09-0231 as training tools for management to address with child protection supervisors the risks associated with harsh punishment and the need for thorough investigation of such punishment (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 2).**

*FY 13 Department Response:* These reports will be sent to Regional Administrators to address with the Area Administrators who will discuss in their all-staff meetings.

*FY 14 Department Update:* Revised child Protection in-service training courses will include these reports.

**The Department must address and remedy its continuing violation of a consent decree which dictates appropriate caseload standards for the number of investigations assigned to child protection investigators (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 2).**

*FY 12 Department Response:* The Office of Employee Services is working with Operations to fill vacancies.

*FY 13 Department Update:* Overall DCFS is meeting the caseload requirements for investigative staff as set forth in the consent decree and meets regularly with the plaintiffs' counsel in the case to address caseloads and other issues.

*FY 13 OIG response: The OIG notes that the consent decree fails to account for actual caseloads in specific regions where caseloads exceed reasonable investigative standards. Such pockets of excessive investigative caseloads put the children in those communities at risk.*

*FY 14 Department Update:* The Department continually monitors investigative caseload assignment and is currently staffing at 10 to 1 case ratio for investigators. Reports are received regularly from budget and finance staff that document assignment caseload and staffing levels. The report also documents if particular offices are understaffed based on case ratio, overstaffed or at correct level. Bureau of Operations staff monitor this report and use it in communicating with Office of Employee Services to ensure positions are requested to be filled to maintain a 10 to 1 ratio. The Bureau Chief discusses caseloads of all specialties with DCFS legal staff on a monthly basis.

**The Department must track, and supervisors and management must respond to, failure to actually see the child that is the subject of the investigation (from OIG FY 12 Annual Report, General Investigations 14).**

*FY 12 Department Response:* This recommendation will be included in revisions being made by the Procedures 300, *Reports of Child Abuse and Neglect*, workgroup.

*FY 13 Department Update:* The Department will issue a Policy Alert to inform staff of the necessary changes in practice while working to incorporate the changes into Procedures 300, Reports of Child Abuse and Neglect.

*FY 14 Department Update:*  The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**Child Protection supervisors should be trained to manage and triage SACWIS alerts for their teams. Any alerts indicating that a child has not been seen within five days must be immediately addressed to insure the child's safety (from OIG FY 12 Annual Report, General Investigations 8).**

*FY 12 Department Response:* This recommendation will be included in revisions being made by the Procedures 300, *Reports of Child Abuse and Neglect*, workgroup.

*FY 13 Department Update:* The Department will issue a Policy Alert to inform staff of the necessary changes in practice while working to incorporate the changes into Procedure 300.

*FY 14 Department Update:*  The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**If the Department determines that suspicion of risk, rather than evidence of risk, are sufficient criteria to accept a report, the Department should request the assistance of Children's Advocacy Centers to train State Central Register (SCR) staff on red flags that warrant investigation of sexual abuse (from OIG FY 12 Annual Report, General Investigations 4).**

*FY 12 Department Response:* The Department is converting the call floor manual into procedures and will review this information for possible inclusion.

*FY 13 Department Update:* The SCR call floor manual is being converted into procedures and contained within procedures 300.  The appropriate standards for sexual risk of harm are included in procedures 300 revisions.  Through staff meetings, SCR Administration has ensured that hotline workers are applying this standard.  Additionally, SCR has developed foundations training for all staff which includes the allegation system, CERAP certification, and assessment skill training.

*FY 14 Department Update:*  The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**Procedures 300, Appendix B:** *Reports of Child Abuse and Neglect*, **The Allegations System should be amended to add the following instruction to all allegations of physical abuse:** *Ask the child if there is an extended family member, another adult or caretaker that he or she feels safe with, important or special to. Persons identified by the child victim shall be interviewed* (**from OIG FY 12 Annual Report, General Investigations 1**).

> *FY 12 Department Response:* The recommendation will be included in revisions being made by the Procedure 300, *Reports of Child Abuse and Neglect*, workgroup.

> *FY 13 Department Update:* The Department will issue a Policy Alert to inform staff of the necessary changes in practice while working to incorporate the changes in Procedure 300.

> *FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**A redacted copy of this report and Bone Fractures in Infants: A Review of the Literature should be made available as a resource to direct line staff (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 15).**

> *FY 12 Department Response:* The report was shared with workers and will be made available on the D-net.

> *FY 13 Department Update:* The redacted OIG report and literature will be put on the D-Net under Resources.   In addition, DCFS Training is currently updating their on-line catalog on bone fractures including resources from Multidisciplinary Physician Education and Consulting Training content.

> *FY 14 Department Update:  A* redacted copy of the report has been posted to the D-net.

**DCFS Cook Regional Managers need to develop a system of quarterly meetings with each of their corresponding police department's Child Abuse Coordinators to facilitate communication, coordination and timely retrieval of relevant information, including arrest reports (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 2).**

> *FY 12 Department Response:* A meeting did occur and although invited, none of the police coordinators identified attended.  However, higher ranking personnel did participate and stated there has been a geographical reorganization.  It was stated that approval to release police reports must come from a higher administrative level.  All agreed a working relationship (MOU) needs to be developed but no one participating in the meeting had authority to enter into an agreement. Child Protection will continue to use subpoenas to access information.  Information about barriers to proceeding will be forwarded to the Deputy and Chief.

> *FY 13 Department Update:* The Department, with medical resource providers and Children's Advocacy Centers, is undertaking new efforts to develop a working relationship with the Chicago Police and establish liaisons and information sharing between the two departments.

*FY 14 Department Update:*   Department liaisons are conducting meetings with the Chicago Police Department coordinators.

**The Department database currently only automatically prompts management approval for death and facility reports. The automatic prompt for management approval should include allegations of burns, head injuries, internal injuries and children under six with allegations of cuts, bruises, welts, abrasions and oral injuries (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 2).**

*FY 12 Department Response:* The Department is currently considering significant changes in its supervisory structure and will look further into how best to integrate this recommendation as a result of those modifications.  Additional considerations include discussions regarding feasibility and timeframe for coding into the database.

*FY 13 Department Update:* Until the change is implemented in SACWIS, public service administrators alert their area administrator to review all investigations involving burns, head injuries, and internal injuries and investigations involving children under six with allegations of cuts, bruises, welts, abrasions and oral injuries.

*FY 14 Department Update:*   The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**The Office of the Inspector General reiterates the recommendation made in a prior OIG Report that any time a child who is the subject of a child protection investigation is hospitalized during the course of a child protection investigation, the Division of Child Protection should convene a case conference with the treating medical and social work team to address child safety and discharge planning (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 3).**

*FY 12 Department Response:* This recommendation will be included in revisions being made by the Procedures 300, *Reports of Child Abuse and Neglect*, workgroup.

*FY 13 Department Update:* The Department will issue a Policy Alert to inform staff of the necessary changes in practice while working to incorporate the changes in Procedure 300.

*FY 14 Department Update:*   The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**Any time a child who is the subject of a child protection investigation is hospitalized during the course of a child protection investigation, the Division of Child Protection should convene a case conference with the treating medical and social work team to address child safety and discharge planning (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 4).**

*FY 12 Department Response:* This recommendation will be included in revisions being made by the Procedure 300, *Reports of Child Abuse and Neglect*, workgroup.

*FY 13 Department Update:* The recommendation will be incorporated into the revisions to procedures and a process established for developing the plan.

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**The Department should develop an effective consultation process and procedures specific to failure to thrive investigations and the provision of intact family services in cases with a failure to thrive child (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 4).**

*FY 12 Department Response:* This recommendation will be included in revisions being made by the Procedure 300, *Reports of Child Abuse and Neglect*, workgroup.

*FY 13 Department Update:* The division of Child Protection will work with the Clinical and Training divisions to create procedures and a consultation process that accurately reflects current medical literature regarding failure to thrive children.

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**The Department should revise the procedures for investigating an allegation of failure to thrive (FTT, Allegation 81) so that they are consistent with current medical literature that FTT is at times a multifactorial condition and the existence of an organic component of the FTT does not rule out a non-organic component as well (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 4).**

*FY 12 Department Response:* This recommendation will be included in revisions being made by the Procedure 300, *Reports of Child Abuse and Neglect*, workgroup. Information on failure to thrive and use of growth charts was also included as a part of the nurses training.

*FY 13 Department Update:* Failure to Thrive and use of Growth Charts was also included as a part of the nurses training in October 2012. The division of Child Protection will work with the Clinical and Training divisions to create procedures and a consultation process that accurately reflects current medical literature regarding failure to thrive children.

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**From OIG FY 12 Annual Report, Death and Serious Injury Investigation 6: The Department should amend procedures to reflect the importance of contact with the involved non-custodial parent, to include, but not be limited to, the following:**

A) **Section 300.60(c) Required Investigative Contacts should be revised to state:**

> **If all of the subjects and other adults and children who are regular members of the alleged child victim's household _as well as the involved, non-custodial parent_, are not listed on the SACWIS intake summary at the time the report is taken, the Investigation Specialist shall add them to the SACWIS investigation.**
>
> **During the formal investigation, investigative staff shall have direct, in-person contact with all children in the child victim's household, alleged perpetrators and other adults in the household, if these contacts have not already occurred. _During the formal investigation, Investigative staff shall also interview the non-custodial parent, if involved in the child's life, if this interview did not already occur, as there is a presumption that involved non-custodial parents have relevant information._ Since contact with the alleged child victim(s) is required during the initial investigation, it need not be repeated during the formal investigation, unless the Investigation Specialist determines further contact is necessary or additional contacts are necessary due to the existence of a safety plan/unsafe safety assessment.**

B) **Section 300.60(c) subsection (4) should be added to state:**

> _**4) The Non-Custodial Parent Who Is Involved in their Child's Life**_
>
> _**The Investigation Specialist is required to interview the involved non-custodial parent. There is a presumption that involved non-custodial parents have relevant information and therefore should be interviewed during the child protection investigation.**_

C) **Section 300.60(g) Other Required Investigative Contacts should be revised to state:**

> **In addition to the required contacts with the subjects of the report, other persons in the household, _the involved non-custodial parent,_ law enforcement agencies, and the State's Attorney's Office, the Department has established other minimum investigative contacts for each allegation that are required before the investigation can be considered completed. See Appendix B, The Allegations System, for specific investigative standards for each allegation.**

D) **Section 300.100(d) Notify Subjects of the Report should be revised to state:**

> **The Investigation Specialist shall make reasonable efforts to verbally notify the parent/guardian of the alleged child victim, and/or the alleged perpetrator if different from the child's parent/guardian, of the Investigation Specialist's recommended determination (indicated or unfounded). _Additionally, the Investigation Specialist shall make reasonable efforts to verbally notify the involved, non-custodial parent of the recommended determination. The Investigation Specialist shall make reasonable efforts to notify non-involved non-custodial parents of indicated reports, and make reasonable efforts to notify non-involved non-custodial parents of unfounded reports when they are aware of the report._ The Investigation Specialist**

shall communicate with limited/non-English speaking or hearing impaired persons as well as persons with other disabilities, using a method by which they can understand the notice, e.g., interpreters, TDD/TTys etc. The Investigation Specialist shall document all efforts to make such verbal notification and the method used on a SACWIS contact note.

*FY 12 Department Response:* A memorandum was issued.  The recommendation will be included in revisions being made by the Procedure 300, *Reports of Child Abuse and Neglect*, workgroup.

*FY 13 Department Update:* The CERAP revisions of May 2013 addressed these issues and strengthened language regarding non-custodial parents.  The SCR script now includes questions regarding non-custodial parents.  This was instituted in November 2012.  In addition, the Department will issue a Policy Alert to inform staff of the necessary changes in practice while working to incorporate the changes into Procedures 300.

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**The State Central Register's notification letters of final findings to Mandated Reporters should list each final finding (indicated/unfounded) by allegation, and the identity of the perpetrator. The notification should also provide information regarding the Mandated Reporter's right to request an additional review of the findings (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 1).**

*FY 11 Department Response:* The Division of Child Protection and the Office of Legal Services are working to implement this recommendation.

*FY 12 Department Update:* The mandated reporter notification letters have been revised and the Office of Information Technology Services is in the process of incorporating the forms into the Statewide Automated Child Welfare Information System (SACWIS).

*FY 13 Department Update:* The notification letters have been revised. The projected implementation date is January 2014.

*FY 14 Department Update:* The revised notification letters were implemented on 02/09/14.

**The Department must ensure that notifications of investigation findings to mandated reporters from the State Central Register conform to Rule 300.130, *Notices Whether Child Abuse or Neglect Occurred*, and include the name of the child victim (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 3).**

*FY 08 Department Response:* The Department agrees.  Implementation of this recommendation is in progress.

*FY 09 Department Update:* This requires a change to the Statewide Automated Child Welfare Information System (SACWIS), since the letter is generated in SACWIS.  Several notification

letters will need to be changed and all changes will be made at the same time.  A meeting will be convened in January 2010 between the Office of Legal Services, the Division of Child Protection and the State Central Register to make revisions.

*FY 10 Department Update:* The Office of Legal Services is reviewing the definition of "involved parent" in conjunction with other changes to the Abused and Neglected Child Reporting Act (ANCRA) required by the DuPuy Federal Lawsuit.  Litigation is currently in the final stages.  The anticipated completion date is summer 2011.

*FY 11 Department Update:* The Office of Legal Services is working with the Administrator of State Central Register to revise all notification letters.

*FY 12 Department Update:* The mandated reporter notification letters have been revised and the Office of Information Technology Services is in the process of incorporating the forms into the Statewide Automated Child Welfare Information System (SACWIS).

*FY 13 Department Update:* The notification letters have been revised and will be incorporated into SACWIS.

*FY 14 Department Update:*  The revised notification letters were implemented on 02/09/14.


**The Department should train investigators and issue policy to require that when investigating injuries that occurred during babysitting, the investigator should determine the names of all other children that the babysitter provides care for, and interview them when appropriate and add children as additional alleged victims when appropriate.  Parents, including non-custodial involved parents, of all children who are added as additional alleged victims should be notified of pending and completed investigations as required by the Abused and Neglected Child Reporting Act (ANCRA) and existing Rule and Procedure (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 3).**

*FY 09 Department Update:* A policy/information transmittal is being developed to notify staff.

*FY 10 Department Update:* The DCFS Office of Legal Services is reviewing the definition of "involved parent" in conjunction with other changes to the Abused and Neglected Child Reporting Act (ANCRA) required by the DuPuy Federal Lawsuit.  Litigation is currently in the final stages.  The anticipated completion date is summer 2011.

*FY 11 Department Update:* The Office of Legal Services is working with the Administrator of State Central Register to revise all notification letters.

*FY 12 Department Update:* The notification letters have been revised and the Office of Information Technology Services is in the process of incorporating the forms into the Statewide Automated Child Welfare Information System (SACWIS).  The recommendation will be included in revisions to Procedures 300, *Reports of Child Abuse and Neglect*.

*FY 13 Department Update:* Training is being developed for child protection staff to review the need to determine the names of all children cared for by an independent babysitter or facility, interview when deemed appropriate, and added to the investigation as victims when appropriate. This training will include procedures regarding various types of field notifications needed and guidelines for notification which will include and ensure parents of child victims and subjects are

notified of the outcome of the investigation. A memo was previously sent to Operations Management staff February 9, 2013 to share with their staff; reminding them to ensure parents are added properly to the investigation in order to receive required notice.

*FY 14 Department Update:*   The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**As previously recommended by the Office of the Inspector General in FY 2007, Department procedures should be amended to require that in child protection investigations in which the plan is for a family member to obtain private guardianship of the child/ren, the family should be referred to the Extended Family Support Program (EFSP) for assistance in securing private guardianship (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 11).**

*FY 08 Department Response:* The Service Intervention Deputy has reviewed and approved the draft procedure.  The procedure has been sent to the Office of Child and Family Policy for the revision process.

*FY 09 Department Update:* The Department studied the Procedure and determined that the change could increase the Extended Family Support Program budget by as much as $400,000 per year.  The Division of Service Intervention is currently determining where the money can be found for this change.

*FY 09 OIG Response: The Department should explain how it arrived at the projected additional cost of $400,000, including a line item breakdown of projected expenses by Region.  The projected cost of assisting family members to obtain private guardianship of a child must be weighed against potential savings created by assisting and strengthening families to prevent them from entering the system.*

*FY 10 Department Update:* The recommendation has been incorporated into draft Procedures 302.385, *Extended Family Support Program*.  Once the draft procedures are approved the Division of Service Intervention will begin training on the referral process.

*FY 11 Department Update:* The recommendation has been incorporated into draft Procedures 302.385, *Extended Family Support Program*.  Once the draft procedures are approved the Division of Service Intervention will begin training on the referral process.

*FY 12 Department Update:* The recommendation will be incorporated into the intact family and child welfare intake redesign.

*FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years.   The Department will issue a Policy Alert to inform staff of the necessary changes in practice while working to incorporate the changes into Procedure.

*FY 14 Department Update:*   The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is

planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**The Abused and Neglected Child Reporting Act (ANCRA) should be amended to clarify that the Department can share unfounded investigative information during a subsequent child protection or criminal investigation with any persons named in Section 11.1, Disclosure of Information for purposes consistent with the Abuse and Neglect Child Reporting Act or criminal prosecution (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 4).**

*FY 07 Department Response:* The Office of Legal Services has assigned an attorney to draft amendments to the Abused and Neglected Child Reporting Act (ANCRA), which address the above issue, as well as other proposed changes to ANCRA, and will submit as a single legislative package.  The targeted date of completion is May 2008.

*FY 08 Department Update:* The Office of Legal Services has assigned an attorney to draft amendments to the Abused and Neglected Child Reporting Act (ANCRA), which address the above issue, as well as other proposed changes to ANCRA, and will submit as a single legislative package.  The anticipated date of completion is February 2009.

*FY 09 Department Update:* Draft amendments to the Abused and Neglected Child Reporting Act addressing this issue will be submitted as part of the legislative package for the Fall Session 2010.

*FY 10 Department Update:* Amendments to the Abused and Neglected Child Reporting Act addressing this issue will be submitted as part of the legislative package for the Spring Session 2011.

*FY 11 Department Update:* The Office of Legal Services will work with Legislative Affairs to incorporate language into the Abused and Neglected Child Reporting Act pertaining to sharing unfounded reports during a criminal or child protection investigation.

*FY 12 Department Update:* DCFS Legal has determined that Rule 431 can be amended without pursuing legislation. Revisions to Rule 431, Confidentiality of Personal Information, are being drafted.  The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* OCFP will work with the respective Division to review this recommendation and determine if it can be included in current revisions to Rule 431.

*FY 14 Department Update:*  This recommendation is included in a revision of Rule 431, *Confidentiality of Personal Information of Persons Served by the Department of Children and Family Services*.  We anticipate filing the 1st Notice in the third quarter of FY 15.

**The Department should ensure that available fathers be explored as potential placements.  If a safety plan is likely to last longer than six months, the Department should facilitate a legal relationship between the child and the caretaker (from OIG FY 06 Annual Report, General Investigations 11).**

*FY 06 Department Response:* A committee has been formed to revise the safety assessment process. The committee continues to work on the safety assessment framework protocol. Targeted completion date is June 2007.

*FY 07 Department Update:* The Child Endangerment Risk Assessment Protocol (CERAP) draft, currently being field tested, directs the attention of the worker to consider available fathers as potential placements.

*FY 08 Department Update:* The Child Endangerment Risk Assessment Protocol draft provides that non-custodial parents should be identified and assessed first for potential out-of-home placement when a safety plan is needed.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 09 OIG Response: According to the most recent data, just over 100 families have been referred statewide to agencies that the Department contracts with to provide services to fathers. The Department needs to encourage broader participation for fathers of DCFS involved children.*

*FY 10 Department Update:* The recommendation has been incorporated into the draft Safety Enhancement Protocol (Procedure 300, Appendix G). The estimated date of implementation is July 2011.

*FY 11 Department Update:* The training for Enhanced Safety Model began in the Fall of 2011 and will be completed in Spring 2012. The Enhanced Safety Model includes prompts to be sure that available fathers are considered as placement options. However, the Enhanced Safety Model does not include facilitating a legal relationship with substitute care givers should the safety plan last longer than 6 months. This facilitation of a legal relationship between the substitute caregiver and the children will be considered by the incoming Director in consultation with the Office of Legal Services.

*FY 12 Department Update:* The Department will incorporate the clarification into Procedures 300, *Reports of Child Abuse and Neglect*.

*FY 13 Department Update:* The new safety model has been implemented and staff trained to assess non-custodial parents as resources to ensure child safety. The recommendation has been incorporated into Procedures 300, Appendix G (j).

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**The State Central Register should revise the Notice of Indicated Finding sent to parents to ensure that parents know the identity of the indicated perpetrator or whether the allegation was indicated to an unknown perpetrator (from OIG FY 05 Annual Report, Death and Serious Injury Investigation 6).**

*FY 05 Department Response*:  This recommendation is under review by the DCFS Office of Legal Services because of the impact it may have on the DuPuy Federal lawsuit.

*FY 06 Department Update*:  Revisions are on hold pending implementation of the changes required by the DuPuy Federal lawsuit.  Changes will be implemented as soon as possible, but no later than July 17, 2007.

*FY 07 Department Update:* Revisions were placed on hold by the Office of Legal Services due to changes required by DuPuy Federal Lawsuit.  As of November 2007, litigation is ongoing and it appears additional changes to the notice form may be required.  The Office of Legal Services will continue to monitor and will draft an updated form when legal issues have been resolved.  The anticipated implementation date is May 2008.

*FY 08 Department Update:* Revisions to the notification letter are in process and will be completed by June 2009.

*FY 09 Department Update:* Recommendation in progress. Estimated completion date: Summer 2010.

*FY 10 Department Update:* Implementation was delayed due to ongoing litigation now in final stages.  The estimated completion date is Summer 2011.

*FY 11 Department Update:* The Office of Legal Services is working with the Administrator of State Central Register to revise all notification letters.

*FY 12 Department Update:* The notification letters have been revised and the Office of Information Technology Services is in the process of incorporating the forms into the Statewide Automated Child Welfare Information System (SACWIS).

*FY 13 Department Update:* The notification letters have been revised and will be incorporated into SACWIS.  The anticipated completion date is January 2014.

*FY 14 Department Update:*  The revised notification letters were implemented on 02/09/14.


**A third box should be added to each safety factor in the Child Endangerment Risk Assessment Protocol (CERAP), acknowledging that information for that factor may be "unknown" or "uncertain" and add a section at the conclusion of the factors list for identifying information that needs to be gathered in the future to further assess safety (from OIG FY 06 Annual Report, General Investigations 16).**

*FY 07 Department Response:* The current draft Child Endangerment Risk Assessment Protocol (CERAP) that is being field-tested provides two assessment tools. The first is used at the outset and permits workers to note that more information is needed before the question can be answered.

*FY 08 Department Update:* The current draft of the initial CERAP acknowledges the option that more information is needed to assess safety.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 10 Department Update:* The recommendation has been incorporated in the draft Safety Enhancement Protocol, *Procedure 300, Appendix G: Child Endangerment Risk Assessment*. The estimated date of implementation is July 2011.

*FY 11 Department Update:* The training for Enhanced Safety Model began in the fall of 2011 and will be completed in spring 2012.

*FY 12 Department Update:* The Department and the Office of the Inspector General are continuing to review this recommendation toward maximizing child safety.

*FY 13 Department Update:* The Inspector General and the new Acting Director will discuss this recommendation and the OIG investigation on which it was based to determine whether its implementation will enhance child safety.

*FY 14 Department Update:* The Director has approved the plan to move forward with developing enhancements to CERAP. The CERAP work group will convene to address changes or enhancements to CERAP as well as training development of safety planning.

**The Child Endangerment Risk Assessment Protocol (CERAP) should be amended to require that workers note when a risk factor cannot be answered because of insufficient information. Under such circumstances, workers should be required to perform diligent inquiry into relevant facts for assessment within 48 hours. The Department should develop procedures to ensure that there is follow-up and resolution of unknown variables (from OIG FY 05 Annual Report, Death and Serious Injury Investigation 9).**

*FY 07 Department Update:* The draft Child Endangerment Risk Assessment Protocol, currently being piloted, addresses this recommendation.

*FY 08 Department Update:* The recommendations resulting from the pilot were submitted to the Safety Workgroup, which is meeting regularly to incorporate these recommendations. There is a possibility of some additional slight modifications to incorporate the recent Department focus on Trauma-Informed practices. Procedures 300, Appendix G: Safety Assessment Enhancement, has been revised and will be implemented when changes to SACWIS are completed. The anticipated date of implementation is July 2009.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 10 Department Update:* The recommendation has been incorporated in the draft Safety Enhancement Protocol, *Procedure 300, Appendix G: Child Endangerment Risk Assessment*. The estimated date of implementation is July 2011.

*FY 11 Department Update:* The training for Enhanced Safety Model began in the fall of 2011 and will be completed in spring 2012. The Enhanced Safety Model allows the investigator to complete an initial Safety Assessment that includes gathering additional information before completing the assessment.

*FY 12 Department Update:* The Department and the Office of the Inspector General are continuing to review this recommendation toward maximizing child safety.

*FY 13 Department Update:* The Inspector General and the new Acting Director will discuss this recommendation and the OIG investigation on which it was based to determine whether its implementation will enhance child safety.

*FY 14 Department Update:* The Director has approved the plan to move forward with developing enhancements to CERAP. The CERAP work group will convene to address changes or enhancements to CERAP as well as training development of safety planning.

## CHILD WELFARE EMPLOYEE LICENSURE (CWEL)

**The Department should amend procedures to require the CWEL Division to notify the Department of Professional and Financial Regulation of any revocation of a CWEL license (from OIG FY 11 Annual Report, General Investigation 5).**

*FY 11 Department Response:* The requirement to notify the Department of Professional and Financial Regulation has been included in the draft of the amendments to Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors*. The amendments will be submitted to the Joint Commission on Administrative Rules (JCAR).

*FY 12 Department Update:* The Department is in the process of revising Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors*.

*FY 13 Department Update:* The Department of Professional Regulations does not regulate CWEL licenses, so this recommendation cannot be implemented.

*FY 14 Department Update:* Draft revisions to Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors,* includes the language that if an employee's CWEL license is suspended or revoked and they have a LCSW or LCPC, the Department will notify the Department of Financial and Professional Regulations.

**The OIG recommended that Rule 412,** *Licensure of Direct Child Welfare Services Employees and Supervisors***, be revised:**

- **To permit the Department to refuse to issue a license with knowledge that the applicant had committed a violation that would warrant licensure revocation or if the applicant had engaged in behavior that would pose a risk to children or state resources;**

- **To expand the list of criminal pending charges or convictions that would warrant a refusal to issue a license to include any crime of which dishonesty is an essential element;**

- **To permit the Department to refuse to issue a license if the applicant provides false information during the licensing process;**

- **To provide guidelines for assessing whether certain unbarred criminal convictions and abuse or neglect findings should prevent licensure because of the characteristics of the crime;**

- **To permit the Division of Child Welfare Employee Licensure to refer applications for investigation to verify facts presented (from OIG FY 06 Annual Report, General Investigations 26).**

*FY 07 Department Update:* The Clinical Division, through the Child Welfare Employee Licensure (CWEL) staff, has drafted proposed changes to Rules 412, *Licensure of Direct Child*

*Welfare Service Employees and Supervisors*. The draft of the proposed amendment incorporates input from the OIG, and the appointed Board members of the Child Welfare Employee Licensure (CWEL) program. The text of the proposed amendment will be submitted to the Director for review, approval, and transmittal to the Joint Committee on Administrative Rules (JCAR).

*FY 08 Department Update:* The revisions to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* were submitted to the Office of Child and Family Policy on November 21, 2008 and will begin the revision/comment process. The anticipated date of completion is June 2009.

*FY 09 Department Update:* The amended Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors,* has been submitted to the Joint Committee on Administrative Rules for review. The anticipated completion date is Fall 2010.

*FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License*, was filed in October 2009. The second Notice was never filed. The Office of Child and Family Policy will resubmit the first notice again by January 2011, subject to approval.

*FY 11 Department Update:* The Department will resubmit the amendments to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* with the Joint Committee on Administrative Rules.

*FY 12 Department Update:* Revisions to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors,* have been distributed for comment.

*FY 13 Department Update:* Draft was sent to JCAR in June 2013 and in November 2013 the edited draft was submitted to DCFS Legal for review and facilitation of review by the Governor's Office.

*FY 14 Department Update:* The recommendation is included in draft revisions to Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors*. JCAR had questions on this revision after 1st Notice. Negotiations on language are complete. 2nd Notice documents are being prepared. The Department will seek Governor's office fiscal note and policy approval to file 2nd Notice. The Department will file 2nd Notice as soon as all approvals to do so are secured.

**The Department should amend Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors*, to provide specific provisions for voluntary relinquishment of a Child Welfare Employee License:**

- **A licensee may voluntarily relinquish his or her license at any time.**
- **The voluntary relinquishment of a CWEL during a pending licensure or disciplinary investigation or proceeding shall be recorded in the CWEL files as "*relinquished during licensure or disciplinary investigation or proceeding.*"**
- **Voluntary relinquishment of a license must be filed with the Child Welfare Employee License Division on a form prescribed by the CWEL Division. The form must contain an acknowledgment that reinstatement will be subject to consideration of the facts disclosed in any pending licensure investigations or proceedings. Voluntary relinquishment does not divest the OIG of the jurisdiction to complete a pending investigation.**

- **An Application for License from a licensee who previously relinquished his or her license shall be considered a Request for Reinstatement rather than an Application for License. (from OIG FY 08 Annual Report, General Investigation 30).**

*FY 08 Department Response:* The Department agrees.  The Office of Child and Family Policy has begun the revision process.

*FY 09 Department Update:* Revisions to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisor,* is currently being reviewed by the Joint Committee on Administrative Rules.

*FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License*, was filed in October 2009. The second Notice was never filed due to failure to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first Notice again by January 2011, subject to approval.

*FY 11 Department Update:* The Department will resubmit the amendments to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors,* with the Joint Committee on Administrative Rules.

*FY 12 Department Update:* Revisions to Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* have been distributed for comment.

*FY 13 Department Update:* Draft was sent to JCAR in June 2013 and in November 2013 the edited draft was submitted to DCFS Legal for review and facilitation of review by the Governor's Office.

*FY 14 Department Update:*  The recommendation is included in draft revisions to Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors*. JCAR had questions on this revision after the 1st Notice.  Negotiations on language are complete. 2nd Notice documents are being prepared. The Department will seek Governor's office fiscal note and policy approval to file the 2nd Notice. Due to delays within the reviews completed by the Governor's office, it is anticipated that we may not be able to file 2nd Notice before 12-31-14. The Department will file the 2nd Notice as soon as all approvals to do so are secured.

**Section 412.100, *Restoration of Revoked or Suspended License*, should be amended as follows: Section 412.100, *Restoration of Revoked, Suspended or Relinquished License*: A licensee may request the restoration of his or her license by submitting a written request to the Board providing specific reasons to support the request.  In considering an application to reinstate or grant a license that was relinquished during a pending licensure investigation or administrative proceeding, the Board shall consider any charges filed along with a report or sworn statement by the Office of the Inspector General regarding the evidence developed in the investigation.  For the purpose of considering a Request for Reinstatement, the Board shall presume that the facts developed during the investigation or the pending charges are true, when the license was surrendered during a pending investigation or licensure proceeding; the licensee may rebut the presumption for good cause shown.  The Board may not reinstate a license where it has been shown by investigation and administrative hearing that it is not in the best interest of the public to do so.  Considerations that will be reviewed when making a finding of "in the best interest of the public" include, but are not limited to:  the nature of the offense for which the license was revoked; the period of time that has**

**elapsed since the revocation; evidence of rehabilitation; and character references (from OIG FY 08 Annual Report, General Investigation 30).**

*FY 08 Department Response:* The Department agrees.  The Office of Child and Family Policy has begun the revision process.

*FY 09 Department Update:* Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* is currently being reviewed by the Joint Committee on Administrative Rules.

*FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License,* was filed in October 2009. The second Notice was never filed due to failure to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first Notice again by January 2011, subject to approval.

*FY 11 Department Update:* The Department will resubmit the amendments to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* with the Joint Committee on Administrative Rules.

*FY 12 Department Update:* Revisions to Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* have been distributed for comment.

*FY 13 Department Update:* Draft was sent to JCAR in June 2013 and in November 2013 the edited draft was submitted to DCFS Legal for review and facilitation of review by the Governor's Office.

*FY 14 Department Update:*  The recommendation is included in draft revisions to Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors*.  JCAR had questions on this revision after the 1st Notice. Negotiations on language are complete. 2nd Notice documents are being prepared. The Department will seek Governor's office fiscal note and policy approval to file the 2nd Notice. Due to delays within the reviews completed by the Governor's office, it is anticipated that we may not be able to file the 2nd Notice before 12-31-14.  The Department will file the 2nd Notice as soon as all approvals to do so are secured.

**The Department should amend Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors*  to add "failure to timely comply with an order for drug or alcohol testing after a finding of reasonable suspicion" as a basis for licensure action under Rule 412.50, *Misconduct* (from OIG FY 10 Annual Report, General Investigation 21 and OIG FY 08 Annual Report, General Investigation 32).**

*FY 10 Department Response:* Management will seek to negotiate reasonable suspicion testing with the Union in the future.

*FY 10 OIG Response:   The Office of the Inspector General has been continuously recommending this critical change in policy for 11 years.   The lack of a reasonable suspicion testing policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk. The policy change sought by the Office of the Inspector General would have minimal budgetary impact.*

*FY 11 Department Update:* Management fully supports reasonable suspicion testing for direct child welfare service employees and supervisors.  Direct child welfare service employees and

supervisors are bargaining unit members.  As such implementation of reasonable suspicion drug/alcohol testing, unless legislatively mandated, must be negotiated with the collective bargaining units.  Management routinely proposes to CMS Labor Relations that reasonable suspicion testing be included in collective bargaining agreements.  Management also routinely proposes that reasonable suspicion testing be added to supplemental collective bargaining agreements.  Without a reasonable suspicion testing policy in place amendment of Rules and Procedures is futile.  The State will be involved in contract negotiations with AFSCME in 2012 and the Department intends to continue pressing this point.

*FY 11 OIG Response: The OIG notes that the City of Chicago and both the Illinois State Police and the Department of Corrections have had Reasonable Suspicion Testing for several years.  The City of Chicago and the Department of Corrections employees are represented in large part by the same union as most employees with the Department of Children and Family Services.  Moreover, Direct Child Welfare employees and supervisors at DCFS must possess Child Welfare Employee Licenses.  The OIG has urged since 2005 that Reasonable Suspicion Testing be added as a requirement for Child Welfare Licensure.  The Department has failed to act on the recommendation.*

*FY 12 Department Update:* A workgroup has been formed to review all OIG drug/alcohol related recommendations to determine implementation steps.

*FY 13 Department Update:* The Department will reconvene the workgroup to address this recommendation.

*FY 14 Department Update:*  A policy to address Suspected Substance Abuse would need to be negotiated as a part of the Master Contract Agreement.  Contract negotiations are scheduled to begin on 12/10/14 as the contract expires on 6/30/15.  The Department cannot order an employee to be drug tested unless there is an agreement made in the Master Contract.

## CONTRACT MONITORING

**The Department should conduct a review of the private agency's compliance with educational requirements in light of their failure to enroll a three-year-old foster child in an early childhood education program, and failure to visit a four-year-old pre-school as required in Department Procedures (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 1).**

*FY 13 Department Response:* The Department has drafted a request to the private agency to provide a status report on all children ages 3 to 5 in care between July 1 and December 31, 2013, including the pre-school in which enrolled. If a child is not enrolled, the report requires explanation for the failure to enroll, corrective action plan, and anticipated enrollment date.

*FY 14 Department Update:*  The private agency was required to submit a report on the pre-school status of children assigned to them for the first half of fiscal year 2014 (7/1/13 to 12/31/13). The report was completed in January of 2014 and tendered to Bobbie Gregg who at that time was Deputy Chief, Support Services.  School information was completed as per the request, only two children were identified as not being enrolled and the report addressed the reason-both cases closed. The school information was verified in SACWIS.

**The Department needs to take action with the mental health agency for violations of their contract with the Department (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 1).**

*FY 13 Department Response:* Due to the fact that the mental health agency's contract is shared with the Departments of Healthcare and Family Services and Human Services/Division of Mental Health as well as DCFS, the downstate DCFS Behavioral Health Services Administrator consulted with those two state agencies regarding an appropriate plan of corrective action for the involved mental health agency employees.

*FY 14 Department Update:* DCFS and the Department of Healthcare and Family Services conducted (DHFS) an on-site review of the agency. Administrative compliance was found to be acceptable.  Clinical issues were found and brought to the agency's attention, which the agency intends to dispute.  Significant billing issues were discovered, and these were referred to the DHFS OIG for direction on how to proceed. It was our expectation that further interaction with the agency would occur, once a decision was made by the agency about how to address billing irregularities.  At that point, we expect the agency to respond to all of the issues identified by the review team.

**The Department's licensing division should change its practices so that it critically evaluates the facts in each substantiated complaint, even in first-time complaints, to determine what kind of action to take (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 11).**

*FY 13 Department Response:* Twice monthly supervision protocols have been established statewide.  A review of substantiated licensing complaints will be conducted to insure that appropriate actions are taken as indicated.

*FY 14 OIG Explanation:* The Inspector General investigation involved an unlicensed facility in which the Department investigated and found that the facility was operating illegally. Rule 383 requires that, "If the Department finds that the child welfare agency or child care facility is being, or has been, operating without a license or permit, the Department shall report the results of its investigation to the Attorney General and to the appropriate State's Attorney for investigation and, if appropriate, prosecution [225 ILCS 10/11]."  The Inspector General investigation found that Department practice, however, was to request that no prosecution occur for first time offenders as stated in the following language which was added to the letter, "The Department is not seeking prosecution of the above-named owner/operator by your office at this time. However, I may contact you in the future to request prosecution if the facility continues to operate or resumes operation without a valid license or permit."

*FY 14 Department Update:* The Department has consulted with Legal Counsel and the above language will be removed from the letters that are sent out in these cases.

**The Department should review all mentoring contracts to ensure that mentoring program plans include a requirement for articulation of goals and clear plans toward achievement of goals (from OIG FY 13 Annual Report, General Investigation 13).**

*FY 13 Department Response:* The Department agrees.  The Department is currently reviewing all contracts to ensure program plans have clear objectives and outcomes.

*FY 14 Department Update:* Fiscal Year 2015 mentoring contract program plans include objectives and outcomes.

**The Department's Division of Quality Assurance should review the Agency's service provision, concentrating on communication between divisions, documentation of counseling and therapeutic services and turnover.  The review should also ensure that the Agency's Child and Family Team meetings include a meaningful assessment of the child's safety, permanence and well-being through review of all necessary information and involvement of all relevant professionals (from OIG FY 13 Annual Report, General Investigation 14).**

> *FY 13 Department Response:* The Department agrees.  Quality Assurance will conduct a review of the agency's service provision, inter-divisional communication, and overall documentation around therapeutic services, Child and Family Team Meetings and assessment processes.

> *FY 14 Department Update:*  Quality Assurance completed a review of the agency's specialized and therapeutic foster care cases in Spring 2014.  A Preliminary Executive Summary report of findings was submitted to the Director's office in July 2014.  A final comprehensive report of findings including recommendations was submitted to the Director's office in August 2014.

**The Department should conduct a Field Audit of the Agency and determine the following: (a.) actual administrative/direct expenses of Department programs through a programmatic analysis of functional job duties; (b.) identify consultants to ensure that all consultants have passed the required background checks and to verify that their costs are appropriately allocated; (c.) whether using staff allocated on a full-time basis to perform work for other contracts violates the Grant; (d.)  the extent to which complaining employees performed additional duties for which they were to be compensated beyond their stated annual salary; (e.) when the additional counseling took place and whether it resulted in double billing to the Department; (f.) whether personnel and consultants in both programs have the required educational credentials and have passed the required background checks; (g.) whether billings are supported by timesheets, signature sheets of the party receiving services and progress or clinical notes; (h.) what rental or mortgage payments are being made, to whom and for what property.  Copies of any leases or other documentation of rental or mortgage payments should be secured.  Any automobile expense and payments should be analyzed, and logs reflecting any business use of the car should be secured.  Any disbursements that do not appear related to the Program Plan should be analyzed; (i.) whether more than 33% of billing is for indirect costs; and (j.) when travel time has been billed to the Department, whether the travel time billed is supported by corresponding travel documentation from staff (from OIG FY 13 Annual Report, General Investigation 10).**

> *FY 13 Department Response:* Field Audits has completed their review.  The Department is finalizing its contract with the forensic auditor to conduct a review of the agency.

> *FY 14 Department Update:*  The Department anticipates the forensic audit being completed by January 31, 2015.

**The Department should amend Section 3.1 of the private agency's Program Plan to require that the agency use the DCFS *Appointment of Short Term Guardianship* Form CFS 444-2 and ensure that the form is legally executed in accordance with 755 ILCS 5/11-5.4 (from OIG FY 13 Annual Report, General Investigation 5).**

> *FY 13 Department Response:* The program has been informed that the Appointment of Short Term Guardian form must be utilized.  Revisions will be made to the program plan for FY15 contracts.

*FY 14 Department Update:*  The program plan was revised and adopted in fiscal year 2014.

**The Department should amend its 2013 audit of the private agency to clarify that costs for the Founder/CEO's condo and for her personal vehicle are entirely disallowable expenses.   In addition, the Department should identify those expenditures for the two years preceding the audit as disallowable costs (from OIG FY 13 Annual Report, General Investigation 12).**

*FY 13 Department Response:* The Auditors will issue an Addendum to the Final Audit Report that will clarify that the costs for the Executive Director's condominium and personal vehicle are disallowable.  The agency, however, no longer has a contractual relationship with the Department and it will be difficult to determine excess revenue and recover funds.

*FY 14 Department Update:* The agency requested an Exit Conference and it was held on October 16, 2014.  They did not present any documentation that would change the findings and recommendations.  They received an Exit Conference Summary letter to this effect.  They requested an Administrative Hearing on Friday, November 28, 2014.  Once the Administrative Hearings Department schedules a date, we will proceed.

**The Department should amend the Program Plan with the private agency to clarify that families using Short Term Guardianship do *not* "retain full legal custody." (from OIG FY 13 Annual Report, General Investigation 5).**

*FY 13 Department Response:* The Department agrees. Revisions will be made to the program plan for FY15 contracts.

*FY 14 Department Update:* The program plan was revised and adopted in fiscal year 2014.

**The Department should immediately initiate the review of the unit with an expectation of a written report no later than January 2014 (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 3).**

*FY 13 Department Response:* The Department has contracted for an independent review of psychiatric hospital programs for Department wards.

*FY 14 Department Update:* The Department anticipates the review to begin the third quarter of FY15.  The delay was due to the reviewer waiting for another review to be complete to utilize their review as a guide for completing the review of this provider.

**The Office of Field Audits should evaluate the private agency's program and personnel expenditures given the rate of staff turnover in fiscal year 2011 (from OIG FY 12 Annual Report, General Investigations 2).**

*FY 12 Department Response:* The Office of Field Audits conducted an onsite audit June 18-22, 2012. OFA evaluated the Agency's program and personnel expenditures given the rate of staff turnover in fiscal year 2011. The Program Monitor sent the OFA Auditor a report dated May 24, 2012, which stated that although the Agency had a turnover of staff in 2011, at the date of this

report, the Agency was fully staffed.  (The turnover in 2011 was 2 workers in March, 2 in May and a supervisor in November.) The Agency's CFR for fiscal year 2011 did not show any excess funds, in fact the Agency had a deficit at that time, which means any funds that were not used for salaries were used for other allowable costs.

*FY 12 OIG Response:* The field audit did not cover the first 6 months of FY 2011 as identified in the report in which the Agency experienced a high staff vacancy.

> *FY 13 Department Update:* The new Deputy over Field Audits will review the report and this recommendation to work towards implementation of the recommendation.

> *FY 14 Department Update:*  The agency closed on 02/07/14.

**The current agency monitoring system fails to ensure safety of children, address noted agency deficiencies and problems and enforce contractual and other requirements.  The Department should replace the existing monitoring system with a single coordinated system designed to competently evaluate agencies' performance, define the problem and develop solutions, and react to child safety concerns based on fact-gathering confirmatory measures.  An effective monitoring system must combine and integrate programmatic, financial, licensing and contractual monitoring functions (from OIG FY 12 Annual Report, General Investigations 2).**

> *FY 12 Department Response:* Implementation of this recommendation will be a component of the new monitoring design.

> *FY 13 Department Update:* The non-substitute care monitoring system has been developed and will be distributed initially as an Action Transmittal in 12/13.  This essentially incorporates these recommendations and is in alignment with the substitute care monitoring system developed by Regulation and Monitoring.

> *FY 14 Department Update:*  In December 2013, Policy Guide 2013.07, *Procedures 302.360 and 315.310*, was issued to provide instructions regarding the monitoring of non-substitute care service contracts.  The Contract Charter group is charged with completing the draft procedures, which will incorporate all of the elements of Policy Guide 2013.07 and expand to include all contract monitoring requirements.

**The Department should review the Agency's allocation of salaries to the Program, including a review of whether staff performs direct or administrative services.  [The Department cannot pay more than 20% of direct costs for administrative costs.]  Based on the results of the review and the issues identified in this report, the Department should determine whether to continue contracting with the Agency (from OIG FY 12 Annual Report, General Investigations 28).**

> *FY 12 Department Response:* The Department is currently planning this audit including a workplan/audit program.  The Department should have a request of materials out to the Agency in December 2012.

> *FY 13 Department Update:* The Department's Office of Internal Audits issued an audit initiation letter to the agency in May 2013 for a 906 review, Time and Attendance Records, Personnel Direct or Indirect Service Activities, and Cost Allocation Review for the audit period of July 1, 2007 through June 30, 2010.  The audit entrance conference was held on June 12, 2013, on site

audit field work continued through July 12, 2013, and an outstanding financial and personnel records request was provided at that time.  The agency did not provide outstanding records until August 2013. Internal Audits is currently completing audit procedures for the agency and plans to issue a draft audit report to the agency by December 31, 2013.

*FY 14 Department Update:*  Following the loss of staff in the Office of Internal Audits which required re-assignment of several projects, a revised issuance date of prior to 12/31/14 was developed.  Final work regarding the Management Letter is almost complete and issuance of both the draft audit report and Management Letter will occur prior to the revised deadline.


**From OIG FY 11 Annual Report, General Investigation 1: The Illinois Department of Children and Family Service should implement the following safeguards to their training and procedures:**

  ➢ **Vendors, grantees and contractors should be required to disclose all public contracts held by related parties in the Consolidated Financial Report (CFR). Instructions to the CFR should require contractors to report public funding of affiliates and related entities. Vendors, grantees and contractors should also be obligated to provide a description of programs supported by the public funding.**

  ➢ **Grants, contracts, program plans and independent audits should be electronically scanned, stored in a central location and made accessible to program and financial monitors for review.**

  ➢ **DCFS contract and financial monitoring training must be required for all DCFS program and financial monitors, as well as those reviewing annual audits, within three months of receipt of a contract monitoring assignment and every two years thereafter. Training should emphasize that the Program Monitor's *chief duty* is to verify, by personal knowledge, the receipt of goods and services provided.**

  **Any training should address, at minimum:**
  - **General grant monitoring responsibilities;**
  - **Audits including comparison of audit figures with approved budgets and related responsibilities;**
  - **Approval of Quarterly Reports and related responsibilities;**
  - **Rules and procedures regarding under spending and related responsibilities;**
  - **Rules and procedures regarding disallowable costs and related responsibilities;**
  - **Rules and procedures regarding reduction in grant amounts responsibilities;**
  - **Rules and procedures regarding excess revenue and allowable offset and related responsibilities; and**
  - **Rules and procedures involving inquiries into expenses to related entities and related responsibilities.**

  ➢ **In addition, all DCFS Program Monitors should be required to certify that:**
  - **the report of direct versus administrative expenses have been verified and is appropriately allocated;**
  - **the Program Monitor has considered whether to reduce future contract or grant amounts based on under-spending or disallowable costs;**
  - **the quarterly reports have been reviewed and compared to the budget; and**
  - **the Program Monitor has reviewed and approved leases supporting rental costs.**

> ➢ **On a biannual basis, each DCFS Deputy Director must submit to the DCFS Director and the DCFS Division of Finance, Technology and Planning, a list of each contract monitored by his or her division and listing the program monitor assigned to each individual contract. The DCFS Division of Finance, Technology and Planning should be required to cross-check the list to ensure that all contracts are assigned a Program Monitor, and also to ensure that all Program Monitors receive the required Contract Monitoring Training. Every six months the DCFS Division of Finance, Technology and Planning should be required to forward to the DCFS Office of the Inspector General a list of any unmonitored contracts.**

*FY 11 Department Response:* Vendors, grantees and contractors will be required to disclose all public contracts held by related parties and public funding of affiliates and related entities as well as a description of the programs supported by the public funding in the Consolidated Financial Report ("CFR") to the DCFS Divisions of Finance, Technology, and Planning and Monitoring, which receive and analyze CFRs.  These requirements will be incorporated into requests to vendors, grantees, and contractors for their CFR submissions for annual contract budget and financial desk audit activities.  Estimated completion date and recommendations for compliance is 4th Qtr FY12.

Evaluation of the existing DCFS Division of Procurement and Contracts/Office of Contract Administration Access database, used to determine if grants, contracts, program plans and independent audits can be electronically scanned, stored in a central location and made accessible to monitors, is currently underway.   Estimated completion date and recommendations for compliance is 3rd Qtr FY12.

The current contract and financial monitoring training program for grants will be updated by Division of Procurement and Contracts/Office of Contract Administration in conjunction with Divisions of Finance, Technology and Planning and Support Services.  This effort will be coordinated and/or led by staff of the newly formed Office of Contract Compliance.  Estimated completion date and recommendations for compliance is 3rd Qtr FY12.

Interim process controls include the tracking of monitors' visits to grantees and the tracking of metrics (i.e. number of clients and cost per client served) of all grantees.  Tracking of metrics for all grantees awarded over $10,000 should be complete by the end of 2nd Qtr FY12.

A DCFS Administrative Procedure is being developed by the Division of Finance, Technology and Planning.   This effort will be coordinated with staff of the Office of Contract Compliance once hired.  Estimated completion date and recommendations for compliance is by 3rd Qtr FY12.

Subject to Senate confirmation, Richard Calica will become the Director of DCFS on December 15, 2011. He will be undertaking a comprehensive review of DCFS, including contracts, grants, and controls relating to the same. Under Mr. Calica, the processes above may be modified and/or added to.

*The following is the Department's Update for FY 12:*
- For FY13, DCFS requires all vendors, grantees and contractors (collectively, "contracting entities") with whom DCFS does business, to disclose all public contracts, pending contracts, bids, proposals and procurements held or done by the contracting entities. In FY 14, DCFS also will require contracting entities to provide a description of those programs funded by other public entities or related parties in order to identify instances where multiple public agencies are funding similar (or identical) programs.  For certain contracts over $150,000,

contracting entities must also submit to the DCFS Division of Finance, Technology and Planning a Consolidated Financial Report ("CFR"). The Division of Finance, Technology and Planning reviews each submitted CFR to ensure that costs are appropriately allocated and that funding is not duplicated. DCFS has revised the instructions for reporting on the CFR form to include, reinforce and make clear that all funding, including public funds received by the contracting entity, must be reported. Those instructions will be sent to contracting entities beginning January 2013. The Department is also developing procedures to facilitate appropriate information-sharing and coordination with the Office of Field Audits regarding identifying and recovering disallowed costs. The estimated completion date for finalizing such procedures is the fourth quarter of FY13.

- The Department completed an evaluation of the existing DCFS Division of Procurement and Contracts/Office of Contract Administration Access database to determine if grants, contracts, program plans and independent audits can be electronically scanned, stored in a central location and made accessible to monitors. DCFS concluded that use of the contract Access database for this purpose is not feasible. Thus, the Department is developing a separate platform for such information including program, fiscal, license and performance information. This information will be accessible to all Department monitoring staff, regardless of their monitoring function. The estimated completion date is the fourth quarter of FY13.

- In the third quarter of FY12, the Department reviewed all its contracts to identify the responsible DCFS monitoring staff for each contract and the type of monitoring provided. In addition, to the extent there were contracts to which no monitoring staff had been assigned, the Department made necessary assignments.

- With regard to training, the programs described below reflect all of the training-related recommendations. Each monitor will attend the training program appropriate to his or her duties, and DCFS will train any new monitoring staff.

- Training for Contract and Fiscal Monitoring Staff: The Department, through its Offices of Procurement and Contracts, Training, and Division of Finance, Technology and Planning, has updated the training program for contract and fiscal monitoring staff. DCFS held the initial updated training, led by the staff of the Office of Contract Compliance, in the second quarter of FY12. The Department will conduct the training annually. Two sessions are scheduled for January and February of 2013.

- Training for Program Monitoring Staff: DCFS has revised its program monitoring model and training for program monitors. All Department staff responsible for monitoring agency programs will follow the same model regardless of the type of service purchased. The Department began training all program monitors on the new model in the second quarter of FY13. Estimated completion date is the fourth quarter of FY13.

- Fraud Prevention and Detection Training (for all Monitoring Staff): The Office of the Illinois Attorney General and the DCFS Office of Inspector General developed fraud prevention and detection training. The DCFS Inspector General and representatives of the Attorney General conducted two fraud prevention and detection training sessions for all DCFS leadership in November 2012. This training will be rolled out to all contract, fiscal and program monitoring staff in the third quarter of FY13.

- The Department amended its audit instructions for FY13 to require a vendor's auditor to certify the vendor's fraud prevention and detection program.

- For grants, the Department implemented a centralized database to track budgeted costs, quarterly program costs, payroll tax and fringe benefit costs of all grantees (regardless of funding amount) and to record service quantity and quality metrics. The database allows staff to identify and address deviations from budgeted costs. The database is designed to assist staff in identifying and recovering any unspent funds at the end of the contract period.

- DCFS is developing administrative procedures and policies concerning the following: requirements for approval of a new provider; grant reconciliation procedures; program monitoring criteria; and criteria for identifying financially and otherwise troubled vendors. The estimated completion date for these policies and procedures is the second quarter of FY 14.
- The Department established a work group in FY13 to develop additional strategies and to collaborate on overall contract monitoring, management, and fraud prevention and detection. Membership of the group includes Department management and the DCFS Office of the Inspector General.  The work group, among other things, is developing a new vendor orientation packet that will detail provider responsibilities around reporting, allowable costs and excess revenue.  This packet also will include information on where the vendor may go to find additional help and technical assistance.  The workgroup meets regularly.
- The Department is revising its Monitoring Protocol and Training. All Department staff who are Program Monitors will be required to attend the training and follow the Monitoring Protocol.

*The following is the Department's response for FY 2013:* In FY 13, the Department has:
- Provided fraud prevention/detection training conducted for DCFS executive, contract and program monitoring staff;
- Instituted annual training for all current and new contract and program monitoring staff;
- Assigned monitors to all department contracts;
- Segregated duties between people who issue contracts and people who monitor contracts  to provide for appropriate checks and balances and eliminate potential conflicts;
- Implemented a new contract monitoring model with four levels of compliance and corrective action;
- Developed an automated provider profile to track programmatic, fiscal, and regulatory health of contracted providers;
- Required all contracts to have measurable outcomes;
- Required providers to disclose third party transactions and ownership interests;
- Required vendors to identify actual location where services are provided;
- Required providers to identify contracts that were received from other state agencies and entities and a description of the work funded by that contract;
- Revised Audit Instructions requiring independent auditors to certify that vendor has a fraud prevention and detection program;
- Contracted with Dun and Bradstreet to identify financially vulnerable vendors on a more timely basis;
- Required program monitors to conduct a sample and verification of bills;
- Developed a red flag process to identify problems regarding, among other things, non-payment of staff and others as required in the contact;
- Issued an Request For Proposal for forensic auditing services;
- Developed a new vendor approval process and updated Requirements for Decision Memos to enter into new or modified contracts;
- Begun to develop an automated vendor billing system to reduce errors and include additional verification of services provided;
- Begun to develop a technical assistance program for new and struggling providers'
- Begun to align all FY15 purchasing decisions to the Department's strategic goals of safety, permanency, well-being and accountability.

*FY 14 Department Update:* The Request For Proposal for forensic auditing services has been completed. The contract has been awarded to a vendor and they have initiated work at DCFS direction.

The automated vendor billing system has been included in the Department's submission of requirements to the Enterprise Resource Planning (ERP) committee. The goal of ERP is to move Illinois towards upgrading to a single, unified system that will replace antiquated software developed independently by state agencies over many years.

A draft Administrative Procedure for addressing troubled providers and offering technical assistance has been developed. The purpose of the Administrative Procedure is to establish clear criteria for identification, monitoring and administrative actions with troubled purchase of service providers who contract with the Department. The Procedure also identifies department staff responsible for oversight of troubled providers and guidelines by which identified troubled providers are dispositioned by the Department. Estimated completion is June 30, 2015.

Beginning with the FY15 contract planning process the Department's strategic goals of safety, permanency, well-being and accountability were identified and factored into the decision making by Department Executive staff. In addition, work continues in relation to the Governor's Budgeting for Results or Illinois Performance Reporting System. The development, tracking and use of outcome metrics with benchmarks, continues to progress both in performance contracting as well as across all contracts.

*FY 14 OIG Update:* In the wake of the Inspector General's 2010 investigation which uncovered $18 million in fraud committed by a Department service provider, the Inspector General worked with the Office of the Attorney General to develop and present a comprehensive training for Department contract/program monitoring staff on fraud detection and prevention.

**When reviewing audits of grantees, line items in the audits should be compared to approved Budget line items. Deviations from the Budget must be approved by Program Monitors before the audit is approved. Unapproved expenses should be referred for overpayment recoupment (from OIG FY 12 Annual Report, General Investigations 27).**

*FY 12 Department Response:* The rate setting unit within the Division of Finance, Technology and Planning is currently comparing costs reported in the audit reports for the years ending on June 30, 2012 or later, as they are received from providers, with the fiscal years 4th quarter reports to see whether the reported costs match. The audits are then forwarded to the Office of Field Audits for desk review. Reports from providers will continue to be reviewed and compared throughout the current fiscal year.

Prior to conducting an audit, the Office of Field Audits contacts the program monitor to discuss the agency, and provides a copy of the audit when it is complete. Procedures will be amended to require the program monitor to follow-up on findings as well as to refer the agency to the Department's Troubled Vendor Committee for action if warranted.

*FY 13 Department Update:* The Department has developed a draft monitoring protocol to better integrate monitoring functions and ensure that grant monitors review and compare budgets and audits.

*FY 14 Department Update:* The Department has constructed additional capabilities into the shared grant monitoring tool that automatically highlight material variances between budgeted costs and projected spending by line item. This additional functionality is designed to allow contract monitors to quickly determine instances where projected spending is expected to materially differ from budgeted levels. Contract monitors are trained on the importance of identifying and resolving conditions where spending levels by line are, or will be expected to be, materially different from budgeted values.

**Subcontractors under Department contracts should be subject to the same transparency as contractors. All subcontracts to Department contracts should be listed and available for public viewing on the internet (from OIG FY 10 Annual Report, General Investigation 2).**

*FY 10 Department Response:* The Department agrees. The Finance, Technology and Planning Division will work with the Office of Communication to determine if this is possible through the current system developed for public viewing of contracts on the internet. An initial discussion was held and anticipated resolution is in 2011.

*FY 11 Department Update:* Contract Administration and Office of Information Technology Services staff will meet to determine how to implement this recommendation utilizing the Department's current technological systems.

*FY 12 Department Update:* The subcontract Agreement boilerplate was updated for Fiscal Year 2013 to reflect the same disclosures/transparency requirements as are required for primary contracts. Implementation is still pending for appropriate technology to house and make all subcontracts available for public viewing. This will also be a component of the new monitoring design.

*FY 13 Department Update:* Subcontracts are not yet available on the internet for public viewing.

*FY 14 Department Update:* Subcontracts are not available on the internet for public viewing, nor are the primary contracts. Contracts and subcontracts are available to those within DCFS via the Budget and Finance Share-Point site. Subcontracts are now logged, which they were not in FY10 and are subject to the same monitoring protocol as the primary vendor contracts. They are also required to use the DCFS subcontract agreement that contains the same disclosures as the primary vendor contracts. It is not feasible at this time to make contracts and subcontracts available via the internet as the Share point posting has been a huge undertaking as some vendors have as many as 50 subcontracts. We have implemented new measures to track, document, review and monitor subcontractors. They are, in fact, subject to nearly the same scrutiny as the primary vendor.

**The Department must develop a reliable Contract Monitoring process that would provide checks and balances and separation of functions to prevent the abuses. The process must include (from OIG FY 06 Annual Report, General Investigation 12):**

- **Quarterly review of expenditures to ensure that expenditures were related to the Contract**;
- **Quarterly review of services, to ensure that the goods or services were provided;**
- **Contractual and Rule requirement that any contractual spending for services or items not specifically covered under the Contract must be approved, in writing, by the Contract Division;**

- **Lapsed funds and obligation of funds must be approved in writing by the Contract Division.**

  *FY 11 Department Update:* Standards for each contract and responsibilities are in place.  Training for Fiscal Year 2012 started in October and will be completed this year. The OIG is continuing to work with the Attorney General to develop targeted monitoring and fraud detection training.

  *FY 12 Department Update:* This will be incorporated into the Department's new monitoring design.

  *FY 13 Department Update:* Project Charter was signed by the Director on 8/22/13 formalizing the contracting principals for the Department and establishing a workgroup to develop written policies/procedures governing the execution, utilization and monitoring of contracts.  Project Charter incorporates all of these recommendations.  The Action Transmittal will be issued in December 2013 and the procedure manual will be completed in January 2014.

  *FY 14 Department Update:*  In December 2013, Policy Guide 2013.07, *Procedures 302.360 and 315.310,* was issued to provide instructions regarding the monitoring of non-substitute care service contracts.  The Contract Charter group has drafted procedures for all contract monitoring.  The group is charged with completing the draft procedures, which will incorporate all of the elements of Policy Guide 2013.07 and expand to include all contract monitoring requirements.

**The Department must monitor and enforce contract compliance of POS agencies with Department contracts to acknowledge and include fathers and paternal family members as an integral part of case management services.  Department monitors must ensure that Department Procedures 302: *Services Delivered by the Department* and Appendix J, *Pregnant and/or Parenting Program*, is followed (OIG FY 07 Annual Report, General Investigation 22).**

  *FY 07 Department Response:* The Department agrees.  A memorandum is being drafted to DCFS and private agency staff.  Target completion date:  December 2007.

  *FY 08 Department Update:* The newly appointed Deputy for Monitoring is reviewing this recommendation and will address this issue by February 2009.

  *FY 09 Department Update:* The Fatherhood Initiative addresses this issue.

*FY 09 OIG Response: The Fatherhood Initiative expresses an important goal of the Department but does not provide practical means of monitoring or assessing the adherence to that policy. Moreover, only 104 cases statewide have been referred to the Fatherhood Initiative Programs, according to the most recent data. The Department needs to secure broader participation for father of DCFS involved children.*

  *FY 10 Department Update: No update provided.*

  *FY 11 Department Update:* The Learning Collaborative on Father Involvement was held in the spring of 2011 for DCFS and POS placement staff.  In addition, Field Operations staff will provide information on the current Fatherhood Initiative to Agency Performance Team monitoring staff, which will in turn be shared with POS providers during Fiscal Year 2012.

  *FY 12 Department Update:* The recommendation will be incorporated into the Department's new monitoring design.

*FY 13 Department Update:* The implementation of the Monitoring Levels monitors agency performance relative to engagement and reunification of fathers and paternal family members. Tracking of caseworker visits with parents and the facilitation of visits between parents and children contributes to the overall performance and level assignment for monitoring activities.

*FY 14 Department Update:* There are three questions that are part of the SACWIS review tool used for Home of Relative, Traditional and Specialized foster care reviews: Question #14 is related to the father's involvement in visitation with his children: Question #16 refers to parental involvement; and Question #21 is about diligent search, which includes the father. Applicable questions that guide monitors in reviewing POS placement cases directly relates to fathers and paternal relatives.

## DOMESTIC VIOLENCE

**The Department should examine the continued utility of the Domestic Violence Screen and determine whether the Screen assists in assessing safety and risk to children (from OIG FY 12 Annual Report, General Investigations 1).**

*FY 12 Department Response:* SACWIS 5.0 was not released as scheduled, thus the newly revised Domestic Violence Screen was not released.   The enhanced screening questions will be incorporated into the paper version of the Domestic Violence Screen and also included in updated Domestic Violence Policy and Domestic Violence Practice Guide.   The Department will work with the Office of the Inspector General to ensure that issues raised in this report are incorporated into the new Domestic Violence Screen.

*FY 13 Department Update:* An update to the Statewide Automated Child Welfare Information System (SACWIS) was released in Spring 2013 and the updated, child-focused screening questions were incorporated into the Domestic Violence screen in SACWIS. As there is another scheduled SACWIS update in March 2014, additional screening questions will be added.  This will correspond with the evidence based, trauma focused practice recommendations identified to be added to the Domestic Violence Policy Guide.

*FY 14 Department Update*:  Revisions to Appendix J, *Domestic Violence*, are being reviewed and decisions will be made to incorporate the language into the revisions to Procedures 300 due out 12/31/14.

**The Department should consider requesting the assistance of Child Advocacy Centers to interview children in investigations where there is chronic violence in the home and parents have failed in the past to cooperate with services (from OIG FY 12 Annual Report, General Investigations 1).**

*FY 12 Department Response:* Training and/or procedures will be amended to remind investigators that the Child Advocacy Centers are a potential resource and may be helpful to families with chronic violence.  Parents have to consent to allow their child to be interviewed at a Child Advocacy Center and if they have been uncooperative, it is not likely they would agree.  DCFS will explore the efficacy of pursuing more court orders in homes with prevalent violence to compel parents to comply, and then seek use of CACs to interview those children.

*FY 13 Department Update:* The recommendation will be incorporated into the revisions to procedures and a process established for developing the plan. Training and/or procedures will also be amended to remind investigators that the Children's Advocacy Center is a potential resource and may be helpful for families where chronic violence is present.

*FY 14 Department Update*:  Revisions to Appendix J, *Domestic Violence*, are being reviewed and decisions will be made to incorporate the language into the revisions to Procedures 300 due out 12/31/14.

**The Department should explore the use of court-ordered service compliance with intact families where there is a high level of risk of future violence and lack of cooperation with Department services (from OIG FY 12 Annual Report, General Investigations 1).**

*FY 12 Department Response:* Training and/or procedures will be adopted to ensure that the field is aware that court-ordered service compliance should be considered for families suffering from chronic violence who are non-compliant with services.

*FY 13 Department Update:* The recommendation will be incorporated into the revisions to procedures and a process established for developing the plan. The Department will also explore the efficacy of pursuing more court orders in homes with prevalent violence to compel parents to comply and then seek use of Children's Advocacy Centers to interview those children.

*FY 14 Department Update*:  Revisions to Appendix J, *Domestic Violence*, are being reviewed and decisions will be made to incorporate the language into the revisions to Procedures 300 due out 12/31/14.

**Policy Transmittal 2010.23, which issues revisions to Procedures 302.260, *Domestic Violence Practice Guide*, and Procedures 300, Appendix J: *Domestic Violence*, provides for batterers to remain in the home with a domestic violence safety plan.   This policy should be amended to clarify that when domestic violence has occurred in the home, it is presumed that the home environment is too dangerous for the child to remain, unless the perpetrator of violence is out of the home.  Policy Transmittal 2010.23 should make clear that establishing a domestic violence safety plan for children should not preclude taking protective custody (from OIG FY 12 Annual Report, General Investigations 1).**

*FY 12 Department Response:* The Department will clarify this language in the Policy Transmittal.

*FY 13 Department Update:* Procedure 300 Appendix G, CERAP, was revised and a policy transmittal was issued on 5-17-13. Procedures 300 Appendix J, Domestic Violence, will also be revised to omit the language that a safety plan can be developed if the batterer remains in the home. The revisions will be outlined in a new Policy Transmittal when the revisions are complete.

*FY 14 Department Update*:  Revisions to Appendix J, *Domestic Violence*, are being reviewed and decisions will be made to incorporate the language into the revisions to Procedures 300 due out 12/31/14.

**This case, along with two other OIG investigative reports, should be used as a teaching tool in domestic violence training (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 11).**

> *FY 11 Department Response:* The Division of Clinical Services and Specialty Services will work with the Office of Training to update the Domestic Violence Policy Training curriculum to include the referenced reports. The reports will be reviewed.

> *FY 12 Department Update:* The redacted report has been reviewed.  The Specialty Services Unit has collaborated with the Office of Training to update the Domestic Violence policy training curriculum.  Approval is pending from the Office of Training on the implementation of the final materials, which was put on hold pending the release of SACWIS 5.0. Given the current status of layoffs and personnel changes, the Office of Training has been engaging in discussions about the implementation of training in the field and the work involved in updating training curriculums.

> *FY 13 Department Update:* The Clinical Division has incorporated discussion regarding the updated screening tool in Domestic Violence policy training sessions. The redacted reports from the OIG will be incorporated as concrete teaching examples in training.  The identified training modifications will be reviewed with the Office of Training to best address the use of the tools and to determine the length of training to fully address the OIG case issues.

> *FY 14 Department Update:*  The cases have been incorporated as teaching tools in the Domestic Violence Training.


**The Domestic Violence protocol should be revised to address the cumulative effect of domestic violence and strategies for addressing cases of chaotic family life in which the victim/abuser dynamic results in an incalculable emotional toll to the children, including collaboration with DCFS Clinical and the Office of Legal Services (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 11).**

> *FY 11 Department Response:* Statewide Administrator of Specialty Services and the Administrator of Domestic Violence Intervention Program will schedule a series of meetings with Cook and Downstate Deputy Legal Counsel to review the Domestic Violence protocol, to assess the efficacy of current protocol, review current research as well as evidence-based practice recommendations and revise the existing protocol.  A redacted copy of this investigation and the recommendation will be shared with participants at the meeting.

> *FY 12 Department Update:* The enhanced Domestic Violence Screen in SACWIS 5.0 offers investigative and casework staff additional questions in screening and interviewing for domestic violence. The Department is in the process of revising the Domestic Violence Practice Guide.

> *FY 13 Department Update:* The Clinical Division is in the process of revising the Domestic Violence Practice Guide.  The guide will be updated to include evidence based, trauma-focused research that addresses the cumulative effect of domestic violence on children.  The guide will also offer practice recommendations for the field and is anticipated to be completed in March 2014.

> *FY 14 Department Update*:  Revisions to Appendix J, *Domestic Violence*, are being reviewed and decisions will be made to incorporate the language into the revisions to Procedures 300 due out 12/31/14.

**The Department should integrate into its Domestic Violence protocol the need for increased scrutiny and heightened risk when a person suspected of being a victim of domestic violence has provided false information to protect an abuser of his or her child (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 12).**

*FY 11 Department Response:* This case was presented as an in-service training at the regular Regional Clinical Managers meeting. The managers were provided guidance as to what actions to take in the future on similar case situations. Specifically, if such a situation happens again where Clinical staff in the process of staffing a case have safety concerns they are to take proactive action. The Regional Clinical Manager will make sure that the worker's supervisor, POS and DCFS Agency executive casework staff and APT monitor (for POS) are made aware of the concerns and seek action. If the manager is not able to resolve this at their level they are to immediately inform (both by phone and in writing) their immediate supervisor and the Associate Deputy of Clinical. The Associate Deputy will intervene and seek to resolve the issue(s). If needed he/she will seek the intervention of the Deputy Director to assure that safety concerns are addressed at the highest level warranted.

The Administrator of the Specialty Services Unit and the Administrator of the Domestic Violence Intervention Program will update and revise the Domestic Violence Practice Guide to reflect the practice dynamics of this case. The dynamics of this case are indicative of power and control that occurs in domestic violence cases, and will be incorporated as examples in the training on the Domestic Violence Practice Guide.

*FY 12 Department Update:* The Department is in the process of revising the Domestic Violence Practice Guide.

*FY 13 Department Update:* The Domestic Violence Practice Guide has been developed and will be incorporated into SACWIS for use by the field.

*FY 14 Department Update*: Revisions to Appendix J, *Domestic Violence*, are being reviewed and decisions will be made to incorporate the language into the revisions to Procedures 300 due out 12/31/14.

**In rural areas where there is suspicion of drug involvement or domestic violence, the Department should consider requiring investigators to include the local sheriff's department when requesting incident reports (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 11).**

*FY 10 Department Response:* The Department agrees. The recommended language is being added to Department Procedure 300.60 (g), *Other Required Investigative Contacts*.

*FY 11 Department Update:* This information was incorporated into a draft policy transmittal concerning law enforcement involvement in child abuse investigations and includes the Child Abuse Law Enforcement Notification form developed by the OIG. All documents have been forwarded to the Office of Child and Family Policy. The targeted implementation date is June 2012.

*FY 12 Department Updat*e: The recommendation has been incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification*. The recommendation will be included in revisions being made to Procedures 300, *Reports of Child Abuse and Neglect.*

*FY 13 Department Update:* The recommendation was incorporated into Policy Guide 2012.02 and will be included in revisions to Procedures 300, *Reports of Child Abuse and Neglect.*

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

## FOSTER HOME LICENSING

**The Department's Division of Clinical Services should review the private agency's clinical trainings for foster parents and staff to revise the clinical content of their trainings to ensure use of evidence based practice (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 1).**

*FY 13 Department Response:* The Department will meet with the private agency. The Department will share updates required for the Foster PRIDE curriculum and training, including the evidence based DCFS On-Line PRIDE training for staff and foster parents.

*FY 14 Department Update:* The Department's Office of Training met with private the agency staff. Department on-line PRIDE and classroom PRIDE courses are offered to foster and adoptive parents of the private agency.

**The Department should review clinical training curricula of foster care agencies to ensure evidence based practice (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 1).**

*FY 13 Department Response:* The Office of Training will obtain and complete a review of the curricula used by foster care agencies. The Office of Training will also provide each foster care agency Director with a copy of the DCFS training curricula used for Foster Care casework which incorporates the DCFS Evidence-based Model of Casework Practice.

*FY 14 Department Update:* Upon review there were no private child welfare agencies using any curriculum other than DCFS PRIDE to conduct training for the licensing of foster parents.

**In order to educate foster parents on evidence based practice, the Department should make available legitimate websites that reference evidence based treatment, such as Parent Child Interaction Therapy (PCIT) and the National Alliance on Mental Illness (NAMI) family guide (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 1).**

*FY 13 Department Response:* The Office of Training will place hyperlinks to evidence based internet sites for foster parents on the DCFS training system (www.dcfstraining.org). The list of hyperlinks will also be included in the On-Line Foster PRIDE training course. In addition, the Office of Training and Clinical Division staff will provide each foster care agency director with a list of internet sites that reference evidence based treatment models including Inspector General recommended sites and those used through the DCFS Permanency Improvement Initiative Grant and the Title IV-E Waiver program for the care of infants through age three.

*FY 14 Department Update:*  The updates to the DCFS Foster PRIDE curriculum are ready for use and will be introduced beginning January 1, 2015.  The evidence-based reference in the form of on-line links to the learning resources of the National Alliance on Mental Illness (NAMI) Family Guide and the Parent Child Interaction Therapy resources are included in the PRIDE updates.

**In FY 14, the Office of the Inspector General revised the recommendation made in the OIG FY 09 Annual Report, Death and Serious Injury Investigation 11, to state: Rule and Procedure and Training should be amended to clarify that in any Department Licensed facility, dogs must be observed to ensure that there are no outward and obvious signs of abuse or neglect of the animal and to observe whether the dog is socialized with family member(s) at the initial licensing visit and every monitoring licensing visit to ensure that any dogs in the home do not present a danger to children.**

*FY 14 Department Update:* Rule and Procedure 402, *Licensing Standards for Foster Family Homes*, are currently open and these recommendations have been incorporated into the revision. It is anticipated that Rule would be filed in 3rd quarter FY 15.  Revisions to the CFS 597-FFH (Family Foster Home Licensing Monitoring Record) & CFS 506-I (Initial Foster Home Licensing Assessment) are in process.  Expected implementation date is 12/15/14.

**The Department should amend Procedures 301, Appendix E, *Placement Clearance Process*, to provide guidelines for the monitoring and resolution of involuntary placement holds. These guidelines should include instructions for requesting the removal of an involuntary placement hold. The guidelines should also require that when an involuntary placement hold is placed on a foster home, the licensing worker and licensing supervisor should re-evaluate the placement hold every six months (from OIG FY 10 Annual Report, General Investigation 4).**

*FY 10 Department Response:* A Department committee is drafting revisions regarding involuntary placement holds.

*FY 11 Department Update:* Revisions to Procedures 301, Appendix E, *Placement Clearance Process* have been drafted and submitted to the Office of Child and Family Policy for further review.

*FY 12 Department Update:* Placement Hold procedures are being drafted. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* A workgroup is working on the implementation of this recommendation.

*FY 14 Department Update:*  The workgroup continues to draft revised procedures.

**The Department should amend Department Rule and Procedure 402, *Licensing Standards for Foster Family Homes*, to require that licensing workers identify alternate caregivers, determine where the alternate care will take place and perform background checks in accordance with Rule 385, *Background Checks*, of all adults and those over 13 years of age residing in the alternate care home when the care will take place other than in the foster parent's home (from OIG FY 09 Annual Report, General Investigation 3).**

*FY 09 Department Response*: Revisions to Rule 402, *Licensing Standards for Foster Family Homes*, are being drafted that would require that licensing staff identify alternative caregivers and perform background checks in accordance with Rule 385, *Background Checks*, of all adults and those over 13 years old residing in the alternate care home.

*FY 09 OIG Response: The critical information that needed to be gathered in this case was where the care was being provided.  Unless the Department requires information about where the care is being provided, the harm that the children were subjected to in this case could be repeated.*

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* The Department will be further reviewing this recommendation before amending Rule and Procedure 402, *Licensing Standards for Foster Family Homes*, to determine if Part 301, *Placement and Visitation Services*, also needs amending, with regards to children not in a licensed home receiving care or placement with an alternate caregiver.

*FY 12 Department Update:* The Department will conduct further review of this recommendation.

*FY 13 Department Update:* The Bureau of Operations, the Office of Child & Family Policy, and DCFS Legal are currently developing procedures regarding alternate caregivers for foster children and the legalities in conducting background checks for such caregivers.

*FY 14 Department Update*: Rule 385, *Background Checks,* revisions include language addressing babysitters (non-licensed service providers). The Department is waiting for approval from the Governor's Office to file second notice on Rule 385. We anticipate adopting this Rule amendment in the third quarter of FY 15.

**The Department should issue a policy memorandum that states that whenever possible, each foster home should have a single entity that monitors placement of foster children and foster home licensing. The Department may grant waivers to the policy based on individual children's needs but must ensure that the guidelines stated above are in place whenever a waiver is granted (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:*  The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* The Deputy Director of Monitoring will co-chair a subcommittee with Agency Performance Team, Licensing, private agency and Department staff to address these issues.  The anticipated start date is January 2012.

*FY 12 Department Update:* This will be included in the new monitoring design.

*FY 13 Department Update:* The policy statement is being developed for distribution in fiscal year 2015.

*FY 14 Department Update:*  Agency Performance Team (APT) Monitoring Tools shall be revised and access to the PR04 screen for APT staff shall be provided by 12/1/14.

**Whenever a waiver is granted, and case responsibility is transferred to a single agency, the relinquishing agency should not be penalized, but should be moved up for case rotation assignment of a new case (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:*  The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* Agencies are not penalized when case responsibility is transferred to a single agency.

*FY 11 OIG Response: When shared cases are transferred, the agency loses funding. The agency transferring the children should receive immediate consideration for new placements.*

*FY 12 Department Update:* The agencies loss of such cases is taken into account in terms of the percentage of referral opportunity to replace the case that was transferred.  The child's geography and the other agencies in the area with lower percentage of referrals are factored in terms of when the agency that transferred such a case would meet the criteria for a replacement intake.

*FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years. The Director's Office and Operations will collaborate when there is a waiver request to ensure agencies are not penalized.

*FY 14 Department Update:* Department staff are meeting to discuss implementation of this recommendation.

## LAW ENFORCEMENT

**For the safety of the worker and child, the State Central Register should notify local police when allegations include information about a large quantity of illegal drugs (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 15).**

*FY 11 Department Response:* If during a child protection investigation, a DCP investigator observes large quantities of drugs, they will notify law enforcement.  The Department plans to issue a Law Enforcement Notification Policy Guide to implement this practice.

*FY 12 Department Update:* The recommendation was incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification*, and distributed in January 2012.  The recommendation will be incorporated into procedures.

*FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years.

*FY 14 Department Update:*  The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**When a child is hospitalized for injuries or conditions that are suspected to be the result of abuse or neglect by a primary caregiver and there is a concurrent law enforcement and child protection investigation, there must be a safety planning conference between law enforcement and child protection before the child is discharged (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 8).**

*FY 10 Department Response:* The Department agrees.  Department Procedure 300.50, *Reports of Child Abuse and Neglect, Initial Investigation,* will be amended to include the recommended language.

*FY 11 Department Update:* This information was incorporated into a draft policy transmittal concerning law enforcement involvement in child abuse investigations and includes the Child Abuse Law Enforcement Notification form developed by the OIG. All documents have been forwarded to the Office of Child and Family Policy.

*FY 12 Department Update:* The recommendation was incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification*, and distributed in January 2012.  The recommendation will be incorporated into procedures.

*FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years.

*FY 14 Department Update:*  The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**In cases where police have a pending criminal investigation, Division of Child Protection investigators should not reveal a preliminary finding of unfounded to the family prior to a supervisory conference to explore whether another conference with law enforcement should take place (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 8).**

*FY 10 Department Response:* A practice memo will be distributed to child protection staff.

*FY 11 Department Update:* This information was incorporated into a draft policy transmittal concerning law enforcement involvement in child abuse investigations and includes the Child

Abuse Law Enforcement Notification form developed by the OIG. All documents have been forwarded to the Office of Child and Family Policy.

*FY 12 Department Update:* The recommendation was incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification*, and distributed January 2012. The recommendation will be incorporated into procedures.

*FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years.

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**The Department should pursue an interagency agreement with the Illinois Law Enforcement Alarm System to identify the local law enforcement agency with jurisdiction to provide written notification of the Hotline reports required by statute and Department Rule (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 10).**

*FY 10 Department Response:* A letter was sent to the Illinois Law Enforcement Alarm System (ILEAS) Director requesting access to the ILEAS System. Upon receipt of access to the system, State Central Register staff will be trained.

*FY 11 Department Update:* The meeting with the Illinois Law Enforcement Alarm System and State Central Register (SCR) occurred and determined it is not possible to develop the interface as recommended. It was determined SCR is not the most efficient unit to pinpoint the law enforcement office of jurisdiction. Rather, the Division of Child Protection team supervisor is responsible for ensuring notification to the local law enforcement and following up for their decision. This information was incorporated into a draft policy transmittal detailing the Child Abuse Law Enforcement Notification process, including the notification form drafted by the OIG. The policy transmittal and notification form have been submitted to the Office of Child and Family Policy for review and the targeted implementation date is June 2012.

*FY 11 OIG Response: The State Central Register (SCR) is the best unit for first response. The critical importance of such notifications, along with the harm that can result from failure to notify, warrants a two-pronged approach that would allow SCR to coordinate with the Illinois Law Enforcement Alarm System and also allow child protection staff to follow-up with local law enforcement. The Illinois Law Enforcement Alarm System is an emergency response system that coordinates federal disaster response with State agencies. The Department should take advantage of this coordinated System.*

*FY 12 Department Update:* The recommendation was incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification*, and distributed January 2012. The recommendation will be incorporated into procedures.

*FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years.

*FY 14 Department Update:*   The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.  The CANTS 14 form is used by field staff for this notification.

**The State Central Register should adopt a form to provide written notification to local law enforcement of the Hotline reports required by statute and Department Rule (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 10).**

*FY 10 Department Response:* The form is currently being developed.

*FY 11 Department Update:* Notification to local law enforcement in child abuse investigations has been developed and all documents, including the notification form have been submitted to the Office of Child and Family Policy. Procedures 300, *Reports of Child Abuse and Neglect*, will be revised to incorporate these changes. The targeted implementation date is June 2012.

*FY 12 Department Update:* The recommendation has been incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification* and CANTS-14 form, *Child Abuse Law Enforcement Notification.* The recommendation will be included in revisions being made to Procedures 300, *Reports of Child Abuse and Neglect.*

*FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years.

*FY 14 Department Update:*   The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.  The CANTS 14 form is used by field staff for this notification.

**Department Procedure 300.70, *Special Types of Reports,* should be amended to include second-degree burns as injuries requiring referrals to local law enforcement and the State's Attorney (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 5).**

*FY 07 Department Response:* Language regarding this recommendation is being drafted and will be submitted to the Office of Child & Family Policy for approval.

*FY 08 Department Update:* The OIG's recommendation was based on a request by the Children's Advocacy Center (CAC). The Department continues to review the feasibility of the recommendation.

*FY 09 Department Update:* In Procedures 300, *Reports of Child Abuse and Neglect* (Appendix B, Allegations, Burns 5/55), the Department will add "notification to State's Attorney on 2[nd], 3rd, and 4th degree burns" in order to implement the recommendation.

*FY 10 Department Update:* Procedure 300, *Reports of Child Abuse and Neglect*, Appendix B-*The Allegation System*, Allegation #5-Burns will be amended to include notification to State's Attorney in cases of 2nd, 3rd, and 4th degree burns.  The Department is awaiting approval from the Joint Committee on Administrative Rules (JCAR) to move forward.

*FY 11 Department Update:* The Office of Child and Family Policy is currently drafting amendments to 300.70, *Special Types of Reports,* to include the new law enforcement child abuse notification form and referrals to law enforcement for second degree burns. The estimated completion date is December 2011.

*FY 12 Department Updat*e: The recommendation has been incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification*. The recommendation will be included in revisions being made to Procedures 300, *Reports of Child Abuse and Neglect.*

*FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years.  Policy Guide 2012.02 was distributed to staff and will be incorporated into Procedure 300 revisions.

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

## LEGAL

**The Department should revise Rule 336, *Appeals of Indicated Abuse/Neglect Findings*, to include the following: (a). It is presumed that physicians and other professional testimony by phone is permitted unless for good cause shown.  When good cause is shown, the ALJ's Recommendation shall note that testimony by phone was disallowed and why; (b.) Whenever a critical piece of evidence is excluded, the ALJ's Recommendation shall so state and include an explanation of the reasons therefore; and (c.) Grounds for dismissal (Rule 336.190) should include: "The appellant has admitted in a court of law to the facts supporting the Rationale for the indicated finding." (from OIG FY 13 Annual Report, General Investigation 19).**

*FY 13 Department Response:* The recommendations have been implemented in practice. Department Rules will be revised to reflect these recommendations.

*FY 14 Department Update:*  Revisions to draft of Rule 336, *Appeals of Indicated Abuse/Neglect Findings,* required additional edits to comply with ANCRA definitions.  The Department will seek fiscal note and policy approvals from the Governor's office in order to file the 1st Notice.

**The Department's Office of Legal Services must correct the misperceptions in the field regarding a recent court decision in which the Department was held liable for wrongly retaining custody of a child (*Hernandez v. Foster*, 657 F.3d 463). (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 7).**

*FY 13 Department Response:* The Department will issue a Policy Alert to inform staff of the necessary changes in practice while working to incorporate the changes into Procedure. Language addressing this recommendation was incorporated into Procedures 300, Appendix G, *Child Endangerment Risk Assessment*.

*FY 14 Department Update:*  The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**The Department's Office of Legal Services should have quarterly discussions of new case law with managers and supervisors so the field has an adequate understanding of their effect on practice. The Office of Legal Services must translate the legal opinions into practical guidelines that can be implemented into practice (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 7).**

*FY 13 Department Response:* The Office of Legal Services will update Operations staff on new case law that impacts practice.

*FY 14 Department Update:*  The Office of Legal Services will update Operations staff will update Operations staff on the case law that impacted the issues in the investigation.

**When there is a pending criminal investigation involving the same victims with similar allegations in a Child Protection (DCP) investigation, the DCP supervisor and investigator should consult with the Department's Office of Legal Services for an opinion or case conference with the State's Attorney to determine a course of action to ensure protection of the child without jeopardizing the criminal investigation (from OIG FY 13 Annual Report, General Investigation 8).**

*FY 13 Department Response:* Child protection will work closely with the Office of Legal Services to ensure compliance with this recommendation. This recommendation will be included in revisions to Procedures 300, *Reports of Child Abuse and Neglect.*

*FY 14 Department Update:*  The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**In intact family services cases with a pending criminal investigation, the involved Child Advocacy Centers must convene a multi-disciplinary case conference with the Family Advocate, law enforcement and the agency providing intact family services to provide information critical to managing the case while protecting the integrity of the criminal investigation and the safety of involved children (from OIG FY 13 Annual Report, General Investigation 8).**

*FY 13 Department Response:* The Department agrees. The Inspector General's Office will address this recommendation with the Cook County Child Advocacy Advisory Board.

*FY 14 OIG Update:* The Inspector General's Office is continuing ongoing discussions with the Cook County Child Advocacy Advisory Board in order to implement the recommendation.

**The Department should develop guidelines for when it is appropriate to refer a family to the Extended Family Support Program for consideration of guardianship of a minor through Probate Court and also train them on the differences of guardianship through Probate Court versus referring a case to Juvenile Court.  The Short-Term Guardianship Form should never be used when it appears that the problem requiring guardianship will not be resolved within one year (from OIG FY 10 Annual Report, General Investigation 9).**

> *FY 10 Department Response:* This recommendation and the redacted report are currently under review by a Department contractor responsible for review of guardianship and extended family support service issues.

> *FY 11 Department Update:* The recommendation has been incorporated in draft Procedures 302.385, *Extended Family Support Program*.  Once the draft procedures are approved the Division of Service Intervention will begin training on the referral process.

> *FY 12 Department Update:* This is a component of the intact family and child welfare intake redesign.

> *FY 13 Department Update:* The recommendation will be incorporated into the revisions to Procedures 300, *Reports of Child Abuse and Neglect*.

> *FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**Child Protection managers, supervisors and investigators and intact family services workers should be trained on the guidelines for referring a family to the Extended Family Support Program (from OIG FY 10 Annual Report, General Investigation 9).**

> *FY 10 Department Response:* This recommendation and the redacted report are currently under review by a Department contractor responsible for review of guardianship and extended family support service issues.

> *FY 11 Department Update:* The recommendation has been incorporated in draft Procedures 302.385, *Extended Family Support Program*.  Once the draft procedures are approved the Division of Service Intervention will begin training on the referral process.

> *FY 12 Department Update:* This is a component of the intact family and child welfare intake redesign.

> *FY 13 Department Update:* Procedures for the Extended Family Support Program have been drafted as Rule 302.385 and are being reviewed. The procedures should be finalized and distributed by June 2014. Training on the procedures will be scheduled to coincide with release.

*FY 14 Department Update:*  The Department incorporated Extended Family Support Program practice guidelines into Foundations training for all investigators, supervisors, and intact family staff.  The recommendation has also been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**The Department should pursue state legislation to formalize a preference for relative placement when such placement is safe and does not delay permanency (from OIG FY 10 Annual Report, General Investigation 11).**

*FY 10 Department Response:* The Director will consult with the Legislature.

*FY 11 Department Update:* A new Director will be starting on December 15, 2011 and he will be consulted thereafter about this recommendation.

*FY 12 Department Update:* The Department and the Office of the Inspector General are continuing to review this recommendation toward maximizing child safety.

*FY 13 Department Update:* The Department has designated a point person to work with the DCFS legislative liaison to pursue this legislative change.

*FY 14 Department Update:*  The Department will not pursue state legislation to formalize a preference for relative placements. The Child & Family Services Act (20 ILCS 505/7 Sec. 7 (b)) requires the Department to make reasonable efforts in locating relative placements at the initial placement and for any subsequent moves where a home environment is appropriate.  DCFS must document its efforts in the case file.

**The Department should amend Rule 431.60,** *Subject Access to Records of Child Abuse and Neglect Investigations* **to reflect current practice mandated by a federal court order in the** *Dupuy* **decision (from OIG FY 10 Annual Report, General Investigation 7).**

*FY 10 Department Response:* An initial draft of the revisions is complete; however, further review is required in order to guard against improper disclosures.

*FY 11 Department Update:* Office of Legal Services is in the process of revising Rule 336, *Appeal of Child Abuse and Neglect Investigation Findings,* and reviewing related rules which may need to be amended.

*FY 12 Department Update:* The Committee continues to meet and revise Rule 336 *Appeal of Child Abuse and Neglect Investigation Findings*.  Once Rule 336 is completed, Rule 431.60 will be revised to conform to the provisions in Rule 336.

*FY 13 Department Update:* The draft revisions to Rule 336 *Appeal of Child Abuse and Neglect Investigation Findings* has been completed and is currently under review by the workgroup for edits. A Policy Guide will be issued that will contain the elements of this draft rule to bring the Department into compliance with statute that becomes effective January 1, 2014.

*FY 14 Department Update:*  The language in Rule 431.60 has been changed and will be released in the next draft for 431.

**Child protection managers should track and maintain data on cases presented to the State's Attorney's Office for filing of petitions and the State's Attorney's Office's response.  Child protection offices should share this information with DCFS Office of Legal Services (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 7).**

*FY 10 Department Response:* The Department issued a memorandum to child protection staff instructing staff to refer cases of critical parental non-compliance in which the State's Attorney has refused to file a petition to the Office of Legal Services.  Child protection managers will track such responses monthly.

*FY 11 Department Update:* The Division of Child Protection is currently refining a process implemented in 2010 to track juvenile court petitions.  The division is also exploring the development of shared drives specifically dedicated to screening results and subsequent activities and decision-making by the assigned child protection investigator and supervisor.

*FY 12 Department Update:* The Department is exploring tracking and reporting capabilities in SACWIS.

*FY 13 Department Update:* The Department continues to examine the need to bring the CYCIS functionality (which includes the PC legal capture) into the SACWIS application.

*FY 14 Department Update:*  A request to make the necessary changes/additions to SACWIS in order to capture this data on the decision tab of the investigation was submitted on December 9, 2014.

**The Department's Interstate Compact Procedures should be revised to require:**
- **When an interstate compact is denied, the Interstate Compact Unit shall notify the Office of Legal Services.  The Office of Legal Services will then monitor the case to ensure that the interstate compact is neither violated or circumvented in a manner that compromises the safety of children;**

- **If an interstate compact is disputed or violated, the Office of Legal Services will notify DCFS Clinical and DCFS Clinical will convene a staffing with the agency caseworker and supervisor, and the GAL;**

- **Notification of the Interstate Compact Unit, by the agency, if an interstate compact placement request is pending and the children are sent to the placement under consideration (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 4).**

*FY 09 Department Response:* Revisions are being made to Procedure 328, *Interstate Placement of Children*, in order to incorporate these requirements.  The Interstate Compact Office has been directed to report all such situations immediately to DCFS Office of Legal Services who then monitors the case to ensure that the Interstate Compact Agreement is not violated or circumvented in a manner that compromises the safety of children.  Copies of that notification are sent to an Associate Deputy Director to verify that direction is being carried out.

*FY 10 Department Update:* Revisions to Procedure 328, *Interstate Placement of Children*, are still in process. In the event an interstate compact is disputed or violated the Department's Office of Legal Services notifies the DCFS Division of Clinical Services. The Office of Legal Services receives and monitors notifications received from the Interstate Compact Unit.

*FY 11 Department Update:* Revisions to Procedure 328, *Interstate Placement of Children*, are still in process.

*FY 12 Department Update:* The Department is revising Procedures 328, *Interstate Placement of Children*. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* Procedures 328 workgroup has launched the revision process; there have been many barriers getting all stakeholders to the table to revise these procedures; it is believed many of the barriers have been removed and the work can move forward.

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 328, *Interstate Placement of Children*, which was posted for comment on 11/06/14.

## MEDICAL

**The Department should ensure timely development of a web portal for HealthWorks physicians to directly access their patients' (wards) medical, mental health and prescription medication data from OIG FY 13 Annual Report, Death and Serious Injury Investigation 1).**

*FY 13 Department Response:* The Department Health Policy Administrator has made a formal request to the Office of Information and Technology Services (OITS) for development of a web portal to permit Health Works physicians to directly access wards' medical records. OITS accepted the request for development of the web portal project and has placed it on their list for development.

*FY 14 Department Update:* Health Policy Administrator met with Office of Information and Technology Services (OITS) and the DCFS Medical Director regarding physician access to health care information on Department wards via the Illinois Healthcare and Family Services Medical Electronic Data Interchange System (MEDI). Legal issues and concerns have been cleared with DCFS Legal. Department of Health and Family Services has informed OITS staff that they will need to complete web application development before there can be connectivity to MEDI. It is anticipated that OITS can begin web development for connected with MEDI after completion of their current psychotropic med work/interagency agreement with DHS.

**The Department should ensure that when a ward is hospitalized, the treating hospital is provided Integrated Assessments (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 1).**

*FY 13 Department Response:* A representative from the Office of Legal Services will provide legal advice and counsel to the Guardianship Administrator regarding consents for the sharing of the reports.

*FY 14 Department Update:*  There is a SACWIS functionality that allows workers to print out the Child Section of the Integrated Assessment for any issues related to confidentiality.  A Tips & Tricks sheet with instructions on securing the Child Section of the Integrated Assessment will be created by early December. Revisions to Procedures 315, *Permanency Planning*, will include the process for ensuring that the treating hospital is provided the Integrated Assessments when a ward is hospitalized.

**The educational report on Childhood Obesity should be immediately disseminated to the field (from OIG FY 13 Annual Report, General Investigation 20).**

*FY 13 Department Response:* The Department agrees and is determining the best method for dissemination to the field.

*FY 14 Department Update:*  The educational report on Childhood Obesity was posted on the D-Net on 9/25/14 and staff were notified of its availability.

**Information from the report on Childhood Obesity should be incorporated into the Department's Foundation training curriculum, which now includes children's chronic health conditions (from OIG FY 13 Annual Report, General Investigation 20).**

*FY 13 Department Response:* The Department agrees. The Educational Report on Childhood Obesity and A Guide for Caseworkers and Caregivers: Caring for Children with Chronic Health Conditions will be added to the Foundation Core Curriculum update on Child Health training course for DCFS and POS agency caseworkers.  The information will also be included in the PRIDE training course for foster and adoptive parents.

*FY 14 Department Update:*  The Foundation course for new caseworkers includes the Obesity subject matter content starting with the November 2014 schedule for both Intact Family Services and Permanency-Placement.  The PRIDE course for new foster parents will implement the Obesity content for new foster parents starting in January 2015.

**In January 2014, the report on Childhood Obesity will be added as a chapter to the next revision of *A Guide for Caseworkers and Caregivers: Caring for Children with Chronic Health Care Conditions* (from OIG FY 13 Annual Report, General Investigation 20).**

*FY 13 Department Response:* The report on Childhood Obesity will be added as a chapter to the next revision of A Guide for Caseworkers and Caregivers: Caring for Children with Chronic Health Care Conditions.

*FY 14 Department Update:* The report on Childhood Obesity was added as a chapter in the Guide for Caseworker and Caregivers.

**The Department should inform child welfare staff of the availability of the DentaQuest Member Service History report, which provides a listing of previous dental services provided to Illinois Medicaid patients (from OIG FY 13 Annual Report, General Investigation 24).**

*FY 13 Department Response:* A D-Net announcement is being drafted to inform staff of this information.

*FY 14 Department Update:* Information on accessing the DentaQuest information was posted to the D-net on 09/25/14.

**The Department and HealthWorks of Illinois should amend the Initial Health Screening in order to prompt the examiner to complete a body diagram. HealthWorks providers can utilize a body diagram provided by their institutions or one provided by the Department (CANTS 2A/2B) (from OIG FY 13 Annual Report, General Investigation 2).**

*FY 13 Department Response:* The revised form, including a body diagram, has been reviewed by the Department's medical director and submitted to the Office of Child and Family Policy for approval.

*FY 14 Department Update:* The HealthWorks encounter form has been revised to include a body diagram. The Office of Child & Family Policy are currently finalizing the revision process. This will amend the Initial Health Screening requirements to include a body diagram to be completed by a medical professional at the time of the initial HealthWorks exam, ensuring a body chart is completed for all children as they enter substitute care. Some children may have a body chart completed as the result of procedure 300 requirements dependent on allegations taken, but this process will ensure a body chart is completed for all children and the chart completed by HealthWorks will be part of their permanent case record.

**This report should be shared with contracted medical resource providers to ensure that they consider the importance of body diagrams in child abuse evaluations as they develop education and training for medical professionals statewide (from OIG FY 13 Annual Report, General Investigation 2).**

*FY 13 Department Response:* The Department agrees and will share the report with contracted medical resource providers.

*FY 14 Department Update:* The Report has been shared with medical resource providers. Liaisons will share the report with the other providers by 12/05/14.

**Procedures 302 – Appendix O, *Services Delivered by the Department – Referral for Nursing Consultation Services*, should be rewritten so that it clearly states which children with special health care needs are required to be referred for nursing consultation services and to what types of pending investigations children with special health care needs must be added as alleged victims. The requirements should be cross-referenced to the appropriate allegations in Procedures 300 – Appendix B, *Reports of Child Abuse and Neglects – The Allegation System* (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 12).**

*FY 13 Department Response:* Recognizing the complex nature of this recommendation, the Inspector General's Office and the Department will be reviewing the issues presented in this case to develop appropriate policy and procedure.

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**The Office of the Guardian should adopt a policy for the review of Restriction of Rights forms that includes a review for compliance with the Mental Health Code (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 3).**

*FY 13 Department Response:* The Department agrees. Policy is being developed.

*FY 14 Department Update:* Restriction of Rights Forms are reviewed and recorded at the Guardian's Office. Each Restriction of Right Form of children in Cook County where the Department has guardianship is forwarded to the Legal Advocacy Services. If there are any trends or possible safety concerns the Guardian's Office contacts Legal Advocacy Services directly to request a review. All Restriction of Rights forms are forwarded to the caseworkers to be placed in the child's file.

**When there is a question about a ward having seizures or whether to discontinue a ward's seizure medication, the Department should assure that a sleep deprived EEG has been conducted as part of the evaluation (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 3).**

*FY 13 Department Response:* The Department will review this recommendation with the Inspector General.

*FY 14 Department Update:* The Department does not agree. It is not standard medical protocol to have a sleep deprived EEG conducted as part of the evaluation. The requirement for sleep deprived EEGS before discontinuing anti seizure medication should be made by the involved medical professionals treating the child. Specific to this individual case, the physicians should have obtained all records including those from other hospitals.

**The Department and the Guardian should determine how many wards with developmental delays are dually diagnosed with a mental illness. The Department should partner with the Institute on Human Disability and Development to better serve these wards with timely and effective interventions (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 3).**

*FY 13 Department Response:* The Guardian's Office will work with Operations to implement this recommendation.

*FY 14 Department Update:* The Adolescents with Mental Health Issues Transitioning to Adult Service (AMHITAS) work group has partnered with the University of Illinois at Chicago's Department of Disability and Human Development and the Chicago Child Advocacy Center to identify better ways of serving this dually diagnosed population.

The DCFS Developmental Disabilities administrator, DCFS Medical director and Health Policy administrator are now receiving listings of all youth in DCFS care who are dually diagnosed within SACWIS. The first report identifying wards with developmental disabilities who are also

diagnosed with a mental illness was distributed on October 10, 2014, to the above parties with follow up reports to occur each quarter.

**The specialized medical center is required to provide training to professionals.  Training should target medical staff at the six hospitals affiliated with the specialized medical centers and include pediatricians in their network.  The training should include guidelines for skeletal surveys (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 4).**

*FY 13 Department Response:* The Department agrees and is currently reviewing the provider's program plan.

*FY 14 Department Update:*  The Pediatric Resource Center received a copy of the recommendation from the OIG and subsequently shared and reviewed the report and recommendations with the Hospital. The Pediatric Resource Center met with the Hospital's training advisory group and the advisory group indicated a willingness to allow the Pediatric Resource Center to provide training to medical staff and pediatricians in the Hospital's network as outlined in the OIG recommendation. The Pediatric Resource Center agreed to develop and deliver the training by 6/30/15.

**The Department should initiate a policy that whenever the hotline is notified by a physician that protective custody has been taken of a minor because the parents' religious beliefs do not permit them to consent to necessary medical procedures, the information should be transmitted to the State's Attorney's Office without an intervening investigation, unless additional information in the report suggests abuse or neglect (from OIG FY 12 Annual Report, General Investigations 6).**

*FY 12 Department Response:* Revisions to Department procedures are pending.

*FY 13 Department Update:* This recommendation will be included in revisions to Procedures 300. The DCFS Office of the Inspector General has also submitted guidelines to the Illinois Emergency Medical Services for Children training. DCFS Office of Legal Services shall train the DCFS State Central Registry on this process. Additionally, when contacted by the local State's Attorney's Office, DCFS Regional Counsel shall offer legal technical support in drafting of a petition for a juvenile court proceeding.

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 300 which is on target to issue permanent policy by December 31, 2014. The recommendation will also be incorporated into the Procedures 300 policy training which is planned for the period January 1, 2015 to June 30, 2015. This training will reinforce caseworker and supervisor compliance with the policy revisions.

**Access to means, specifically firearms, is predictive of suicide completion. Research has shown and as noted in two adolescents' deaths, those at risk of suicide will break into locked rooms and locked cabinets to access the firearms.  When the Department is placing an adolescent at risk of suicide in a foster home or facilitating a return to the biological home where there is a gun, the Department should conduct a clinical staffing to educate the parents (biological and foster) that the risk of suicide doubles if there is a firearm in the house, even if the gun is locked up. The staffing should utilize the materials developed by The University of Illinois at Chicago Institute for Juvenile Research for their Youth Suicide Prevention program. If the family has firearms, they should be**

asked to store the guns outside of the home. If the parent will not store the firearm elsewhere they must store firearms with a trigger lock in a lockbox. The keys should be kept in a secure or supervised setting. In return home situations of a suicidal youth, where the biological parent refuses to store the gun with a trigger lock in a lock box, the caseworker should contact DCFS Legal for assistance in presenting the case in Juvenile court for purpose of obtaining a court order (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).

> *FY 12 Department Response:* The Department will revise policy to indicate that trigger locks are required for all gun safes/cabinets in foster homes and in biological parent homes when a child has signs of depression and/or suicidal ideation and will return home.

> *FY 13 Department Update:* OCFP and the licensing division are determining the necessary revisions in rule and procedure to implement the recommendation.

> *FY 14 Department Update:* The recommendation has been incorporated in the Draft revision of Procedures 315.100, *Assessment.*

The Department should assure via the service plan that biological or foster families of children with mental illness are linked to psycho-education programs such as National Alliance on Mental Illness' Family-to-Family Education Program, which is a free 12-week course for family caregivers of individuals with mental illness. There are Family to Family programs located throughout Illinois (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).

> *FY 12 Department Response:* The Department will revise policy to include this recommendation. Clinical's newsletter (referenced in recommendation #2) will include a treatment reference to the use of psycho-education programs for youth and families, such as NAMI's free, 12-week Family to Family Education Program.

> *FY 13 Department Update:* Procedure 301.60 (a) and Procedures 315.100 (a) and (b) are being revised to implement this recommendation.

> *FY 14 Department Update:* The Department anticipates issuing Procedures 301.60, Procedures 315.100 and Procedures 315.350 as permanent policy by 12-31-14.

The Department should consider adopting an integrative family approach in addition to individual therapy for any ward with mental illness (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).

> *FY 12 Department Response:* The Department agrees.

> *FY 13 Department Update:* The Department's Integrated Assessment Program will provide recommendations, as well as specific information to foster parents, about the NAMI Family to Family Education Program in cases in which a ward's mental illness is identified as a presenting concern including situations in which youth are brought into DCFS custody as a result of a psychiatric lock out. In addition, the Clinical Division will include the learning resources of the NAMI Family to Family Education program in the updates to the Foundation core training courses for new Child Protection and Child Welfare caseworkers, and into the updates to the Foster PRIDE 2014 curriculum and training for foster parents.  The updates (including the NAMI

learning resources) to both the Foster PRIDE and Foundation training courses are expected to be completed by March 30, 2014.

*FY 14 Department Update:*  The NAMI Family to Family Education Program on-line learning resources was added to the Foundation training and the PRIDE curriculum.

**HealthWorks should obtain the results of newborn genetic metabolic screens on all children, regardless of their age, upon entering Department care.  If the results of the genetic screen are unavailable, the Department should ensure that the screen is completed during the HealthWorks comprehensive exam or by the child's primary care physician (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 9).**

*FY 11 Department Response:* With the signed Inter-Agency Agreement between DCFS and the Department of Public Health (IDPH) for the Exchange of Health Information, the Division of Service Intervention has requested the Office of Information Technology Services (OITS) to complete the task of "mapping" the IDPH data to be included in the weekly electronic interface with the Department's database, SACWIS.  For those children for whom there is no match in the IDPH database for results of Neonatal Screening for Genetic and Metabolic Disorders, HealthWorks Lead Agencies are instructed to follow-up with the child's primary care physician for the appropriate follow-up screening and testing.

*FY 12 Department Update:* The Department continues to work with the Department of Healthcare and Family Services to obtain the Illinois Department of Public Health data.  Even though the data is from IDPH the Department must access it through the HFS warehouse.  HFS has an internal process that needs to be completed in order to add the data to the Department's data-feed.  The Department will obtain the IDPH data as soon as HFS adds it to the weekly feed.

*FY 13 Department Update:* OITS has scheduled the work to complete the electronic interface with the DHFS Medical Data Warehouse for the IDPH data. The requests from DCFS to DHFS for the IDPH data had to be re-submitted several times.

*FY 14 Department Update:*  The Department is now in the process of mapping and testing the Department of Public Health data for inclusion in the SACWIS e-health.

**The Multidisciplinary Pediatric Evaluation and Education Consortium (MPEEC) will conduct a child abuse training for the hospital's child protection team and appropriate pediatric and emergency room staff.**

**Physicians of Medical Resource Providers should also target education and training efforts to best assist child protection. Each medical resource provider should identify and prioritize training of:**
- **Medical personnel of emergency departments approved for pediatrics by the Illinois Emergency Medical Services for Children (EMSC)**
- **Medical personnel at hospitals affiliated with partner hospitals of the medical resource providers**
- **Medical personnel at hospitals that serve as a resource for Children's Advocacy Centers (from OIG FY 10 Annual Report, Systems Investigation 2 and OIG FY 10 Annual Report, Death and Serious Injury Investigation 9).**

*FY 10 Department Response:* The Department will discuss this with the Medical Resource Providers and develop a training schedule for 2011.

*FY 11 Department Update:* The Medical Resource Providers reported that the physicians would be willing to conduct training to better assist child protection however the hospitals and medical facilities would have to initiate the request for Medical Resource providers to train their personnel.

*FY 11 OIG Response: The OIG recommends that the Medical Resource Providers develop and disseminate to community hospitals information regarding the availability of the training curriculum.*

*FY 12 Department Update:* A new liaison with the Medical Resource Providers was recently assigned and plans to assess all related recommendations to address with the physicians. This should be addressed by Spring 2013.

*FY 13 Department Update:* Due to staff changes, new liaisons were appointed for each medical resource provider.  The providers were determining on a standard training for consistency.  Work is still ongoing.

*FY 14 OIG Update:*   The Office of the Inspector General is working with the Illinois Department of Public Health which maintains the website for the Illinois Emergency Medical Services for Children [EMS]. The site includes a section for educational resources. The Office of the Inspector General will ensure that the availability to request specialized training from Statewide Medical Consultant Resources, with which the Department contracts statewide, will be displayed on the website.

**The Department should pursue an interagency agreement with the Department of Healthcare and Family Services (DHFS) allowing DCFS Division of Child Protection staff access to Recipient Claim Detail information (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 11).**

*FY 08 Department Response:* The Department of Healthcare and Family Services (DHFS) notified DCFS that the 2004 interagency agreement allows for the necessary access. Representatives from DCP and the Guardianship Administrator's Office will coordinate with the Department of Healthcare and Family Services to implement this recommendation.

*FY 09 Department Update:* Representatives of the Guardianship Administrator's Office have continued to request access from DHFS.  While no one has denied access to the Department, access has not been authorized.  Efforts to gain access will continue.

*FY 09 OIG Response: The recommendation concerned access by child protection staff.   Any access arranged must be available to child protection staff.*

*FY 10 Department Update:* The Department continues to work with the Department of Healthcare and Family Services to obtain needed access to Recipient Claim Detail information.

*FY 11 Department Update:* The Department is now receiving Department of Healthcare and Family Services (DHFS) Medicaid Claims information on a weekly electronic interface with the DHFS Medical Data Warehouse which goes directly into SACWIS E-Health screens. However, this is only for children for whom DCFS has legal custody.  The Department has been unable to reach an agreement with DHFS to allow child protection staff access to the Recipient Claim Detail information and DHFS has informed the Department that they cannot share information

from their Recipient Restriction Program. The Department is convening a meeting among the Division of Service Intervention, Child Protection, Legal Services, and Office of Information Technology staff to address child protection's need for access for children and subjects for whom the Department does not have legal custody.

*FY 12 Department Update:* The Office of Health Services is continuing to work with DHFS on securing access to Medicaid claims history by child protection staff. In the meantime child protection staff can access Medicaid claims through the administrative subpoena process.

*FY 13 Department Update:* The Department, DCFS Inspector General and Healthcare and Family Services Inspector General continue to work on implementation of this recommendation.

*FY 14 Department Update:*  The Department of Healthcare and Family Services (DHFS) has notified the Department and the Inspector General's Office that it believes it cannot allow DCFS access under the current law.

**Training for child protection staff should incorporate information about the availability and benefit of recipient claim details from the Department of Healthcare and Family Services and their Recipient Restriction Unit (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 7).**

*FY 10 Department Response:* The Office of Training will update training modules to reflect the use and benefit of the Recipient Claim Detail. In addition the Office of Training, Service Intervention and the Division of Child Protection will incorporate the information from these divisions to develop one coordinated training module.

*FY 11 Department Update:* The Department is now receiving Department of Healthcare and Family Services (DHFS)  Medicaid Claims information on a weekly electronic interface with the DHFS Medical Data Warehouse which goes directly into SACWIS E-Health screens. However, this is only for children for whom DCFS has legal custody.  The Department has been unable to reach an agreement with DHFS to allow child protection staff access to the Recipient Claim Detail information and DHFS has informed the Department that they cannot share information from their Recipient Restriction Program. The Department is convening a meeting among the Division of Service Intervention, Child Protection, Legal Services, and Office of Information Technology staff to address child protection's need for access for children and subjects whom the Department does not have legal custody.

*FY 12 Department Update:* The Office of Health Services is continuing to work with DHFS on securing access to Medicaid claims history by child protection staff. In the meantime child protection staff can access Medicaid claims through the administrative subpoena process.

*FY 13 Department Update:* The Department, DCFS Inspector General and Healthcare and Family Services Inspector General continue to work on implementation of this recommendation.

*FY 14 Department Update:*  The Department of Healthcare and Family Services (DHFS) has notified the Department and the Inspector General's Office that it believes it cannot allow DCFS access under the current law.

**Department Procedures should be amended to include that any time a foster child is hospitalized or taken to the emergency room complete medical records should be obtained and placed in the child's file.  Procedure should also require that the records are shared with the foster child's pediatrician (from OIG FY 09 Annual Report, General Investigation 7).**

> *FY 09 Department Response:* A Department form is being prepared for a procedural change to amend Procedure 402, *Licensing Standards for Foster Family Homes*, in case of a foster child's hospitalization.  The revised procedure will require that complete emergency room medical records be obtained and placed in the child's file and the record shared with the child's pediatrician.

> *FY 10 Department Update: No update provided.*

> *FY 11 Department Update:* Licensing staff will work with the Office of Child & Family Policy to draft procedures by June 2012.

> *FY 12 Department Update:* The Department is reviewing Rules and Procedures to determine the appropriate place to include this information.  The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

> *FY 13 Department Update:* The recommendation will be incorporated into Rules and Procedures 302.

> *FY 14 Department Update:*  This recommendation was included in revisions to Procedures 302.360, *Healthcare Services*, which were distributed on 09/23/14.

## PERSONNEL

**Given the Department's recent reorganization, the Department should review and clarify its process for determining which employees are required to file a Statement of Economic Interest (from OIG FY 13 Annual Report, General Investigation 27).**

> *FY 13 Department Response:* The Department agrees.  Review and clarification of the process is in process.

> *FY 14 Department Update:*  The process has been clarified.

**The Department should establish procedures limiting use of Department facilities after-hours to ensure that there is no access to confidential information (from OIG FY 13 Annual Report, General Investigation 31).**

> *FY 13 Department Response:* Revisions to Department Rule 433, *Use of Department's Facilities and Grounds*, is pending approval for submission to the Joint Committee on Administrative Rules. The Office of Legal Services and the Office of the Inspector General have approved the draft.

> *FY 14 Department Update:*  The Department anticipates having Rule 433, *Use of Department's Facilities and Grounds*, adopted by 12-31-14.

**The Department should determine whether to require the presence of a Department staff person or if the presence of security is sufficient for after-hours use of Department facilities (from OIG FY 13 Annual Report, General Investigation 31).**

> *FY 13 Department Response:* Revisions to Department Rule 433, *Use of Department's Facilities and Grounds*, is pending approval for submission to the Joint Committee on Administrative Rules. The Office of Legal Services and the Office of the Inspector General have approved the draft.

> *FY 14 Department Update:* The Department anticipates having Rule 433, *Use of Department's Facilities and Grounds*, adopted by 12-31-14.

**If the Department continues to permit after-hours use of Department facilities by non-Department groups, the Department should determine whether to apply through Central Management Services (CMS) and use the CMS liability waiver for use of Department facilities after hours (from OIG FY 13 Annual Report, General Investigation 31).**

> *FY 13 Department Response:* Revisions to Department Rule 433, *Use of Department's Facilities and Grounds*, is pending approval for submission to the Joint Committee on Administrative Rules.  The Office of Legal Services and the Office of the Inspector General have approved the draft.

> *FY 14 Department Update:* The Department anticipates having Rule 433, *Use of Department's Facilities and Grounds*, adopted by 12-31-14.

**The Department should formalize the policy for overtime with regards to commute time and distribute it to management with notice to staff (from OIG FY 13 Annual Report, General Investigation 33).**

> *FY 13 Department Response:* This policy will be formalized and included in Administrative Procedure 12, *Travel Guide for DCFS Employees*.

> *FY 14 Department Update:* Administrative Procedure 12, *Travel Guide for DCFS Employees*, has been revised and submitted to the Office of Child & Family Policy for implementation to include language regarding commute time and mileage.

**DCFS must establish guidelines for professional ride-alongs with DCFS staff.  Guidelines for medical professionals (e.g., medical residents) should address what are permissible and impermissible tasks (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 12).**

> *FY 13 Department Response:* Procedures were established with the Medical Director of Child Protective Services at the University of Chicago Comer's Children's Hospital, the Cook County Regional Administrator, and the Office of Legal Services to include a "Release and Waiver of Liability Agreement", "Medical Residents Confidentiality Agreement" and "Criteria for Medical Residents Shadowing Investigators."  These documents and process are used when residents shadow DCFS child protection investigators.  The Office of Child and Family Policy will review Part 431, *Confidentiality of Personal Information of Persons Served by the Department of*

*Children and Family Services* to determine revision requirements to meet this recommendation. The forms will be formally approved and assigned in this process.

*FY 14 Department Update:* The Department continues to work on draft Administrative Procedures for ride-alongs, shadowing, and internships.  Projected completion date is the end of 3rd quarter fiscal year 2015.

**Department Rule 401.380, *Personnel Records*, should be amended to require that in addition to verifying work history, child welfare agencies should also contact previous employers to verify work performance by asking if the employee would be eligible for rehire. Verification should be completed by contacting an official source at the agency such as human resources, management or a supervisor knowledgeable about the employee's work performance. The Rule should also include that any employment offer to a currently employed person should be contingent upon contacting the current employer to verify their work performance prior to hire (from OIG FY 12 Annual Report, General Investigations 18).**

*FY 12 Department Response:* The Department's Division of Licensing and the Office of Child and Family Policy are drafting amendments to the Rule.

*FY 13 Department Update:* CFS 508-1, *Information on Person Employed in a Child Care Facility*, was revised December 2013 and Procedures 401, *Licensing Standards for Child Welfare Agencies*, is being revised to implement the recommendation.

*FY 14 Department Update:* Rule 401.80 does stipulate when the CFS 508-1 is to be completed (prior to hire) and Procedure 401.380 does as well.  The Department will revise Procedure 401 to specify that the CFS508-1 is to be completed for all prospective employees. This will include the language "is the employee eligible for rehire."

**The Department should develop policy to address suspected substance abuse in the workplace (from OIG Recommendations made in 2005, 2001 and 1999).**

*FY06 Department Response:* The Department developed a definition and procedure for Reasonable Suspicion testing. The Department agrees to amend the Employee Manual and the Employee Licensure Rule to address Reasonable Suspicion of substance abuse and will also engage in discussions with the union.

*FY 07 Department Update:* The Department's workgroup addressing the need for incident-based reasonable suspicion drug or alcohol testing is currently developing protocol for pre-employment drug testing. Reasonable suspicion testing has been put on hold temporarily.

*FY 08 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 08 OIG Response: The OIG has been continuously recommending this critical change in policy for nine years. The policy change sought by the OIG would have a minimal budgetary impact. The lack of reasonable suspicion policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk.*

*FY 09 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 10 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 10 OIG Response: The OIG has been continuously recommending this critical change in policy for nine years. The policy change sought by the OIG would have a minimal budgetary impact. The lack of reasonable suspicion policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk.*

*FY 11 Department Update:* Management fully supports reasonable suspicion testing for direct child welfare service employees and supervisors. Direct child welfare service employees and supervisors are bargaining unit members. As such implementation of reasonable suspicion drug/alcohol testing, unless legislatively mandated, must be negotiated with the collective bargaining units. Management routinely proposes to CMS Labor Relations that reasonable suspicion testing be included in collective bargaining agreements. Management also routinely proposes that reasonable suspicion testing be added to supplemental collective bargaining agreements. Without a reasonable suspicion testing policy in place amendment of Rules and Procedures is futile. The State will be involved in contract negotiations with AFSCME in 2012 and the Department intends to continue pressing this point.

*FY 11 OIG Response: The OIG notes that the City of Chicago and both the Illinois State Police and the Department of Corrections have had Reasonable Suspicion Testing for several years. The City of Chicago and the Department of Corrections employees are represented in large part by the same union as most employees with the Department of Children and Family Services. Moreover, Direct Child Welfare employees and supervisors at DCFS must possess Child Welfare Employee Licenses. The OIG has urged since 2005 that Reasonable Suspicion Testing be added as a requirement for Child Welfare Licensure. The Department has failed to act on the recommendation.*

*FY 12 Department Update:* A workgroup has been formed to review all drug/alcohol related OIG recommendations to determine implementation steps. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* The Department will reconvene the workgroup to address this recommendation.

*FY 14 Department Update:* A policy to address suspected substance abuse would need to be negotiated as a part of the Master Contract Agreement. Contract negotiations are scheduled to begin on 12/10/14 as the contract expires on 6/30/15.

**The Department should amend Rules and Procedures and develop protocol and contracts to provide an infrastructure of testing facilities for reasonable suspicion testing; definition of reasonable suspicion; procedure for developing a finding of reasonable suspicion and training for management and supervisors as necessary concerning reasonable suspicion determinations. Private**

**agencies with Department contracts should also be required by contract or licensing rule to have policies at least as stringent as Department policies regarding training, testing and response to reasonable suspicion of drug or alcohol use on the job (from OIG FY 10 Annual Report, General Investigation 21).**

*FY 10 Department Response:* Management will seek to negotiate reasonable suspicion testing with the Union in the future.

*FY 10 OIG Response:   The Office of the Inspector General has been continuously recommending this critical change in policy for 11 years. The lack of a reasonable suspicion testing policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk. The policy change sought by the Office of the Inspector General would have minimal budgetary impact.*

*FY 11 Department Update:* Management fully supports reasonable suspicion testing for direct child welfare service employees and supervisors.  Direct child welfare service employees and supervisors are bargaining unit members.  As such implementation of reasonable suspicion drug/alcohol testing, unless legislatively mandated, must be negotiated with the collective bargaining units.  Management routinely proposes to CMS Labor Relations that reasonable suspicion testing be included in collective bargaining agreements.  Management also routinely proposes that reasonable suspicion testing be added to supplemental collective bargaining agreements.  Without a reasonable suspicion testing policy in place amendment of Rules and Procedures is futile.  The State will be involved in contract negotiations with AFSCME in 2012 and the Department intends to continue pressing this point. Management agrees that private agencies should be required by contract or licensing rule to have policies at lease as stringent as Department policies. If a reasonable suspicion policy is promulgated the Office of Employee Services will convene the Reasonable Cause Workgroup and ensure that private agencies are held to the same standard.

*FY 11 OIG Response: The OIG notes that the City of Chicago and both the Illinois State Police and the Department of Corrections have had Reasonable Suspicion Testing for several years.  The City of Chicago and the Department of Corrections employees are represented in large part by the same union as most employees with the Department of Children and Family Services.  Moreover, Direct Child Welfare employees and supervisors at DCFS must possess Child Welfare Employee Licenses.  The OIG has urged since 2005 that Reasonable Suspicion Testing be added as a requirement for Child Welfare Licensure.  The Department has failed to act on the recommendation.*

*FY 12 Department Update:* A workgroup has been formed to review all drug/alcohol related recommendations to determine implementation steps.  The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* The Department will reconvene the workgroup to address this recommendation.

*FY 14 Department Update:* A policy to address suspected substance abuse would need to be negotiated as a part of the Master Contract Agreement. Contract negotiations are scheduled to begin on 12/10/14 as the contract expires on 6/30/15.

**Rule 437, *Employee Conflict of Interest*, should be amended to clarify that secondary employment must always be reported to one's supervisor. The supervisor should determine (if necessary, with consultation from management and/or the Conflict of Interest Committee) whether the secondary employment creates a conflict. The employee must be told to update the supervisor whenever their secondary employment duties change and a notation of the secondary employment should be maintained in a supervisory file, which is transferred each time supervision changes (from OIG FY 09 Annual Report, General Investigation 25).**

*FY 09 Department Response:* The conflict of interest workgroup is in the process of finalizing the proposed changes to Rule 437, *Employee Conflict of Interest.*

*FY 10 Department Update:* The anticipated completion date for submission of draft Rule 437, *Employee Conflict of Interest,* for internal and external comment is the first quarter of 2011.

*FY 11 Department Update:* Revisions to Rule 437, *Employee Conflict of Interest*, have been drafted. It is anticipated that the first notice will be published in Fiscal Year 2012.

*FY 12 Department Update:* Revisions to Rule 437, *Employee Conflict of Interest* is being prepared for JCAR. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* Revisions to draft Rule 437, *Employee Conflict of Interest,* is ready for policy review.

*FY 14 Department Update:* The Department is waiting for fiscal note approval for Rule 437, *Employee Conflict of Interest*. We will then have to secure approval to file the 1st Notice from the Governor's policy office.

**The Department's Certification of License and Automotive Liability Coverage form for employee's signature should be amended to state "by the Illinois Secretary of State or other State _____" to address Department employees who live in states contiguous to Illinois (from OIG FY 09 Annual Report, General Investigation 8).**

*FY 09 Department Response:* The Finance, Technology and Planning Division will review the current form, modify the form and require use of the revised form for the next reporting period.

*FY 10 Department Update:* Revisions to the Auto Liability Coverage form is in process.

*FY 11 Department Update:* A revised form has been drafted and scheduled to be used starting in 2012. The revised form requires the employee to state that he/she is licensed to drive in Illinois (either directly by the Secretary of State or another State that is recognized by the Secretary of State of Illinois). Additionally, each employee is currently required to certify on each travel reimbursement request that "I am a duly licensed driver and carry minimum coverage as required by Illinois Vehicle Code." Management will address failure to file the required insurance form through the existing supervisory and disciplinary processes.

*FY 12: Department Update:* The Auto Liability Form is now a DCFS form (CFS 731). The form includes the revisions requested in the above recommendation. AP 12, *Travel Guide for DCFS Employees*, is currently being revised and the CFS 731 will be included in the revised procedure.

*FY 13 Department Update:* Form CFS 731 has been updated and updates to Administrative Procedures 12 are in progress.

*FY 14 Department Update:*  Revisions to Administrative Procedures 12 were distributed in June 2014.

**A task group should be assembled to revise Rule 437, *Employee Conflict of Interest*, and draft related Procedures. Procedural additions should include:**

    **a.  If an employee takes secondary employment where there is the potential for contact with DCFS clients, a wall needs to be built between the DCFS employee and any DCFS clients being serviced by the secondary employer.  In this case, the employee's supervisor should call the secondary employer to verify the wall is in place.**

    **b.  The supervisor should review secondary employment at the time of the annual review to see if a conflict has developed that was not present when the employee accepted the secondary employment.**

    **c.  Instructions on how to contact the Conflict of Interest Committee.**
    **All DCFS employees should receive training on the revised Rule and Procedures 437, *Employee Conflict of Interest* (from OIG FY 07 Annual Report, Employee Conflict of Interest).**

*FY 07 Department Response:* A task group was assembled, but is currently in abeyance, and the Director is currently reviewing possible changes to Rule 437.

*FY 08 Department Update:* The conflict of interest workgroup has reconvened and is in the process of finalizing the proposed changes to Rule 437, *Employee Conflict of Interest*, and in drafting new procedures that support the revised rule.  The anticipated completion of revised Rule 437, *Employee Conflict of Interest*, is March 2009.

*FY 09 Department Update:* The workgroup has reconvened to address outstanding issues, including fire walls and secondary employment.  We have contacted the chair of the Secondary Employment Subcommittee to initiate further deliberations with the subcommittee. The anticipated completion date for submission of the draft of Rule 437, *Employee Conflict of Interest,* for internal and external comment is January 2010.

*FY 10 Department Update:* The anticipated completion date for submission of draft Rule 437, *Employee Conflict of Interest,* for internal and external comment is the first quarter of 2011. A copy will be sent to the OIG upon completion. Draft procedures will follow once the rule has been adopted.

*FY 11 Department Update:* Revisions to Rule 437, *Employee Conflict of Interest*, have been drafted. It is anticipated that the first notice will be published in Fiscal Year 2012.

*FY 12 Department Update:* Revisions to Rule 437, *Employee Conflict of Interest* is being prepared for JCAR.  The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* The Office of Child and Family Policy is working on final revisions to draft Rule 437 and will be sending Rule 437 out for first notice.

*FY 14 Department Update:*  This recommendation is incorporated into a revision to Rule 437, *Employee Conflict of Interest*.  The Department is waiting for approval of the fiscal note from the Governor's office.  Once we receive fiscal note approval, we will seek approval to file the first notice from the policy office within the Governor's office.

**The Department's Conflict of Interest Committee should establish procedures for building walls between private agencies and DCFS Administrators who have decision-making power over agencies that they previously worked for (from OIG FY 06 Annual Report, General Investigations 28).**

*FY 06 Department Response:* The procedures have been drafted by the Conflict of Interest Committee.

*FY 07 Department Update:* The Director is considering the recommended changes.

*FY 08 Department Update:* A Conflict of Interest workgroup is in the process of finalizing the proposed changes to Rule 437, *Employee Conflict of Interest,* and is drafting new procedures that support the revised rule.  The anticipated date of completion is March 2009.

*FY 09 Department Update:* The workgroup has been reconvened to address outstanding issues, including fire walls and secondary employment.  We have contacted the chair of the Secondary Employment Subcommittee to initiate further deliberations with the subcommittee.  The Conflict of Interest workgroup is in the process of finalizing the proposed changes to Rule 437, *Employee Conflict of Interest*.  The anticipated completion date for submission of the draft of Rule 437, *Employee Conflict of Interest,* for internal and external comment is January 2010.

*FY 10 Department Update:* Anticipated completion date for submission of draft Rule 437, *Employee Conflict of Interest,* for internal and external comment is the first quarter of 2011.

*FY 11 Department Update:* Revisions to Rule 437, *Employee Conflict of Interest*, have been drafted. It is anticipated that the first notice will be published in Fiscal Year 2012.

*FY 12 Department Update:* Rule 437, *Employee Conflict of Interest*, is being prepared for JCAR. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* The Department will incorporate the recommendation into Rule 437.

*FY 14 Department Update:*  This recommendation is incorporated into a revision to Rule 437, *Employee Conflict of Interest*.  The Department is waiting for approval of the fiscal note from the Governor's office.  Once we receive fiscal note approval, we will seek approval to file the first notice from the policy office within the Governor's office.

**SERVICES**

**In collaboration with Illinois Department of Human Services, Division of Alcohol and Substance Abuse (DASA) providers, the Department should develop a Parent Training module that addresses the unsafe practices of mixing and splitting methadone dosages (from OIG FY 13 Annual Report, Death and Serious Injury Investigation 8).**

*FY 13 Department Response:* A collaborative training module on the use and dangers of mixing doses of methadone with DASA will be developed.

*FY 14 Department Update:* The initial round of training was completed on October 2. Due to increased demand, a second round of training was scheduled for November and December 2014. An additional 26 sessions are scheduled across all DCFS Regions between November 6 and December 11.

**The Department must develop capacity for bilingual sexual offender evaluations and treatment. The requirements of the Burgos Consent Decree can be met by providing for specialized translation services for these complex evaluations as effective bilingual resources are developed (from OIG FY 13 Annual Report, General Investigation 8).**

*FY 13 Department Response:* The Clinical Division will work to develop resources to provide bilingual sexual offender evaluations and treatment services.

*FY 14 Department Update:* There are two resources for bilingual sexual offender evaluations and treatment services within the Cook region. These Cook resources also serve Northern region. Central region has two bilingual provider resources that are also available to serve the Southern region if needed. The Southern region Sexual Behavior Problems coordinator (SBP) has been meeting with that region's SBP providers regarding need to hire a bilingual therapist. The Southern Region is utilizing translation services until a bilingual therapist is procured.

**Whenever a case manager submits the Special Immigrant Referral Form (CFS 1016) to the Immigration Services Unit, the Immigration Coordinator should convene an immigration conference with the eligible ward, their case manager and an invested adult such as a foster parent or concerned relative (from OIG FY 13 Annual Report, General Investigation 3).**

*FY 13 Department Response:* The DCFS Guardianship Administrator discussed this recommendation with the Assistant Guardian and the Immigration Unit. This information has been included in the recommended revisions to Procedures 327, Appendix F, *Guardianship Services, Immigration/Legalization Services of Foreign Born DCFS Ward*.

*FY 14 Department Update:* The Department continues to work to finalize the draft of Procedures 327, *Guardianship Services*. The Department anticipates having the draft out for comment by 12-31-14.

**During the immigration conference the Immigration Coordinator will provide the ward and the worker with copies of *Immigration 101* and *Immigration Resource and Practice Guide*. These materials will be reviewed and special emphasis will be placed on the risks and responsibilities of adolescent wards in the process of status adjustment. All USCIS forms requiring the ward's signature, forms that are pre-populated by the Immigration Coordinator, will be reviewed with the ward and worker during the conference (from OIG FY 13 Annual Report, General Investigation 3).**

*FY 13 Department Response:* Requirements to provide the worker and ward with copies of the Immigration 101 and the Immigration Resource Guide has been included in the recommendations for revisions to Procedures 327, Appendix F, *Guardianship Services, Immigration/Legalization Services of Foreign Born DCFS Ward*.

*FY 14 Department Update:*  The Department continues to work to finalize the draft of Procedures 327, *Guardianship Services*.  The Department anticipates having the draft out for comment by 12-31-14.

**OIG staff and the Immigration Services Unit should update the *Immigration 101* and *Immigration Resource and Practice Guide*.  This material should be reviewed annually and revised as needed by Immigration Services Unit staff (from OIG FY 13 Annual Report, General Investigation 3).**

*FY 13 Department Response:* The Immigration Unit is in the process of updating Immigration 101 and the Immigration Resource and Practice Guide.

*FY 14 Department Update:*  The Immigration 101 and the Immigration Resource and practice Guide have been updated and posted to the D-net.

**The Department should revise Procedures 327, Appendix F, *Immigration/Legalization Services for Foreign Born DCFS Wards* to include the requirement that case management staff notify the Immigration Services Unit of any arrest or detainment of a non-citizen ward for consultation/instruction about notification of the ward's public defender(from OIG FY 13 Annual Report, General Investigation 3).**

*FY 13 Department Response:* Procedures 327, Appendix F, *Guardianship Services, Immigration/Legalization Services of Foreign Born DCFS Ward* is currently being revised to include the recommended instructions to case management staff about how to proceed when there is an arrest or detainment of a non-citizen ward.

*FY 14 Department Update:*  The Department continues to work to finalize the draft of Procedures 327, *Guardianship Services*.  The Department anticipates having the draft out for comment by 12-31-14.

**The Department should revise Procedures 327, Appendix F, *Immigration/Legalization Services for Foreign Born DCFS Wards* to reflect the recommendations from this report (from OIG FY 13 Annual Report, General Investigation 3).**

*FY 13 Department Response:* Procedures 327, Appendix F, *Guardianship Services, Immigration/Legalization Services of Foreign Born DCFS Ward* is currently being updated to reflect the recommendations in this report.

*FY 14 Department Update:*  The Department continues to work to finalize the draft of Procedures 327, *Guardianship Services*.  The Department anticipates having the draft out for comment by 12-31-14.

**The Department should incorporate Policy Transmittal 96.1, *Verification of Relationship for Relative Home Placement*,  into Procedures 301, *Placement and Visitation Services* (from OIG FY 13 Annual Report, General Investigation 5).**

*FY 13 Department Response:* The Department agrees. These recommendations will be considered by the workgroups addressing sibling placement/visitation and fictive kin care.

*FY 14 Department Update:* Language addressing this recommendation was incorporated into multiple procedures through the sibling contact/placement project.  Policy Transmittal 2014.15, *Out-of-State Fingerprints for Adoption and Subsidized Guardianship Cases*, was released  on 7-31-14 which issued these permanent procedures.

**The Department should include the definition of "godparent" in Procedures 301, *Placement and Visitation Services*, and clarify that the godparent/godchild relationship must have a historical basis, preceding immediate involvement with the Department (from OIG FY 13 Annual Report, General Investigation 5).**

*FY 13 Department Response:* The Department agrees. These recommendations will be considered by the workgroups addressing sibling placement/visitation and fictive kin care.

*FY 14 Department Update:*  Procedures 315, *Permanency Planning*, is under complete revision and Fictive Kin language will be included.  The anticipated issue date is June 2015.

**The DCFS *Affidavit of Relationship* form [CFS 458-A] should be amended to require the following: (a.) Signature of the biological parents to affirm that the person claiming to be a child's godparent has been entrusted by parents with "a special duty that includes assisting in raising the child if the parent cannot." (DCFS Rule 304.2) and (b.) Affirmation from the biological parent(s) that the child's relationship with these relatives has a historical basis, and preceded their child coming into the care of the above-named relatives (from OIG FY 13 Annual Report, General Investigation 5).**

*FY 13 Department Response:* The Department agrees. These recommendations will be considered by the workgroups addressing sibling placement/visitation and fictive kin care.

*FY 14 Department Update:*  Procedures 315, *Permanency Planning*, is under complete revision and Fictive Kin language will be included.  The anticipated issue date is June 2015.

**DCFS *Affidavit of Relationship* form [CFS 458-A] must be accompanied by a statement of supporting facts articulating the historic basis/pre-existing relationship between the godparent(s) and the child, prior to the case being screened into court (from OIG FY 13 Annual Report, General Investigation 5).**

*FY 13 Department Response:* The Department agrees. These recommendations will be considered by the workgroups addressing sibling placement/visitation and fictive kin care.

*FY 14 Department Update:*  Procedures 315, *Permanency Planning*, is under complete revision and Fictive Kin language will be included.  The anticipated issue date is June 2015.

**When Clinical Consultants note a critical parenting issue during an Integrated Assessment or a clinical consult, the consultants must provide written recommendations to amend the Service Plan if necessary to address critical risk or safety issues (from OIG FY 12 Annual Report, General Investigations 1).**

*FY 12 Department Response:* The Department will ensure that managers are aware of clinical recommendations that impact child safety and that the issues are incorporated into service plans.

*FY 13 Department Update:* There are current discussions with OITS regarding moving Clinical referral, consultation and staffing documentation into SACWIS. IAs are already embedded in SACWIS. Provisions can be made to either have Clinical recommendations automatically populate service planning and assessment tools or utilize a checklist similar to one that already exists in investigations (waivers would have to be part of a supervisory function). Until the SACWIS updates are completed, Clinical staff can continue to send copies of reports with their recommendations to workers and their supervisors. The Administrator of Social Work Practice will contact Senior Administration in Operations to help determine the best manner to ensure clinical recommendations that impact child safety are incorporated into service plans. This will be initiated by 12-06-13.

*FY 14 Department Update:* This issue will be reviewed with operations senior staff on 12/15/14 and Regional Administrators will be expected to ensure all direct service staff receive this direction in verbal and written communication by 1/15/15. The recommendation will also be incorporated into Procedures.

**The Department should share a redacted version of this report with all DCFS placement workers as an educational tool (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).**

*FY 12 Department Response:* The report will be placed in a resource library on the D-Net. The Bureau of Operations and Quality Assurance and Monitoring Division Divisions will notify DCFS and private agency staff of their need to review the report when it is available.

*FY 13 Department Update:* The Division is developing a shared drive for Operations staff and will utilize it to disseminate the redacted report to DCFS placement workers.

*FY 14 Department Update:* The redacted report has been shared by placing it on the D-Net for staff to review.

**The Department should develop and document a plan for children ages 9-14, who enter the child welfare system following the loss of a parent or significant caretaker, and any child who experiences the death or loss of a parent or significant caretaker while in care. In developing this plan, the child should be asked to identify individuals who can be part of the child's social support system (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).**

*FY 12 Department Response:* The Department agrees and will incorporate the recommendation into policy.

*FY 13 Department Update:* Procedure 301.60 (a) and Procedures 315.100 (a) and (b) are being revised to implement this recommendation.

*FY 14 Department Update:* The Department anticipates issuing Procedures 301.60, Procedures 315.100 and Procedures 315.350 as permanent policy by 12-31-14.

**Workers should be educated that because children do not experience grief in a linear fashion, that grief therapy may have to be accessed at different times during a child/adolescent's development. In addition, pastoral counseling resources should be made available to the youth (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).**

*FY 12 Department Response:* The Department will review the Crisis Response Administrative Procedure along with other resources to determine the most efficient way to make this information available to our workers. The Department's Clinical Division will release a newsletter for all child welfare staff, discussing the symptoms and impact of depression, loss and grief on adolescent development.  The newsletter will emphasize suicide prevention and alert workers to symptoms and behavior associated with depression, grief and suicidal ideation.  The newsletter will also identify various evidence-based treatments and strategies for workers and family members.

*FY 13 Department Update:* From 2009-2011, all case carrying DCFS and POS staff received ongoing trauma training through the learning collaborative.  In addition, Trauma 201 has been incorporated into both Foundation and Pride training for new child welfare workers and for caregivers, which provides information and clinical guidance regarding traumatic grief including information about seeking out treatment services. In addition, Clinical will revise and enhance the Department's Crisis Response section of Administrative Procedure to include information pertaining to the trajectory of acute versus chronic grief following a traumatic event and when/where to seek therapeutic assistance, including pastoral counseling.

*FY 14 Department Update:* The Department is revising administrative procedures for crisis response to more clearly identify methods of addressing the needs of youth dealing with issues of grief including referral to pastoral counseling. Targeted date for completion of revisions is January 2015.

**The Department should assure that when wards turn 16 years of age they obtain state-issued identification cards (from OIG FY 11 Annual Report, General Investigation 22).**

*FY 11 Department Response:* Department procedures will be drafted to require the obtaining of State Identification Cards for wards.

*FY 12 Department Update:* Department procedures will be drafted to require the obtaining of State Identification Cards for wards.

*FY 13 Department Update:* The recommendation will be incorporated into Procedures 302, Appendix M.

*FY 14 Department Update:*  Revisions to Procedures 302 Appendix M are still being drafted. The Department anticipates posting for comment by 12/31/14.

**Pre-adoptive Home Studies of wards or former wards must require children's collaterals and professional collaterals, especially school personnel to objectively ensure the accuracy of information provided (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 2).**

*FY 09 Department Response:* Child protection investigators make this determination as they go through the investigative process.

*FY 09 OIG Response: The Department response does not address pre-adoptive home studies, which need to inform the courts of direct information from collaterals in the child's life, such as teachers.*

*FY 10 Department Update:* Rule and Procedure will be revised as well as the template outline for the information included in the adoption study.

*FY 11 Department Update:* The template outlined for the adoption home study as well as Rule and Procedures are still in the process of being revised.

*FY 12 Department Update:* The recommendation was incorporated into Policy Guide 2012.05, *Adoption Collateral Contacts*, and issued April 2012. The revisions to procedures are in process.

*FY 13 Department Update:* Procedure 309 will be revised to incorporate the collateral requirements related to pre-adoptive placements.

*FY 14 Department Update:* As required in Procedures 309.130, the CFS 486A & G, *Adoption Conversion Assessment forms*, now include a section explaining the collateral interview requirements which are being carried out by the field for adoptions and guardianships.

**The Department should review and update the Emergency Reception Center (ERC) Manual to include expectations of follow-up workers bringing children to the Emergency Reception Center (from OIG FY 06 Annual Report, General Investigations 4).**

*FY 07 Department Update:* The updated ERC Protocol/Manual (Transmittal) has not been finalized and is on hold with the Office of Child and Family Policy awaiting information resolution regarding shelter transportation issues. When it is completed the informational transmittals will go out to DCFS and private agency staff. Also, training will take place for all staff regarding protocol on how CWS or DCP can make an Emergency Shelter referral and intake guidelines for bringing children and youth into ERC for an emergency temporary shelter care placement.

*FY 08 Department Update:* The Emergency Reception Center Protocol has been drafted and is awaiting approval to be sent out for comment. The anticipated date for distribution/implementation is January 2009.

*FY 09 Department Update:* Referral forms for the Emergency Reception Center (CFS 1900 and CFS 1901) were issued in February 2009. The referral form does not address procedures for admission to the Emergency Reception Center. Emergency Reception Center protocol is on hold at this time.

*FY 10 Department Update:* At the request of the Division of Child Protection (DCP), the ERC Protocol was placed on hold due to a planned reorganization and remains on hold as of November 2010.

*FY 11 Department Update:* Restructuring of the Emergency Reception Center (ERC) is still planned therefore the implementation of the ERC Protocol is still on hold at this time.

*FY 12 Department Update:* Standardized procedures for utilizing the Emergency Reception Center are being drafted. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* Shelter care procedures are currently being drafted.

*FY 14 Department Update:* The recommendation has been incorporated into revisions to Procedures 301 Appendix G, *Temporary Placement to the Statewide Emergency Shelter System*, which were posted for comment on 11-06-14.

**Substance affected and dually diagnosed clients should be referred to child welfare teams with expertise in working with these clients and families.  Programs such as the Intact Family Recovery program (IFR) have expertise with both populations and successfully enroll 70% of the eligible children they serve in Head Start and state pre-K programs (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 10).**

*FY 09 Department Response:* There is no policy or protocol for referring substance exposed infants to the Intact Family Recovery program.  However, the Division of Service Intervention gets a weekly report from Quality Assurance on Cook County substance exposed infant cases.  The Division of Service Intervention then contacts the assigned child protection staff to inform them that the case may be appropriate for the Intact Family Recovery program and how to make the referral.

*FY 09 OIG Response: Referrals to the Intact Family Recovery program should be required in specific circumstances and incorporated into written policy.*

*FY 10 Department Update:* Revisions to Policy Guide 99.13, *Services for DCFS Substance Affected Families*, are currently being drafted.

*FY 11 Department Update:* The Divisions of Service Intervention, Child Protection and Monitoring will form a committee to review policy and resources to address this issue.

*FY 12 Department Update:* The Division of Clinical Practice, Specialty Services Unit provides consultation to caseworkers on a variety of complex cases including dually diagnosed clients.

*FY 13 Department Update:* The joint consultation process for dually involved (mentally ill/substance abuse) cases has been implemented within the Specialty Services unit of the Clinical Division.  Staff from the substance abuse services unit now jointly provide consultation to caseworkers and staff cases with DCFS mental health and other specialty staff when needed.  The DCFS substance abuse unit has been attempting to obtain a listing from DASA of providers capable of providing dual diagnosis (MI/SA) services to DCFS involved families.  DASA staff have not completed the list yet; their latest report was they are 75% complete with the list.

*FY 14 Department Update:*  The Clinical Division, through the Specialty Services Unit, responds to any requests for consultations or staffings on cases with substance abuse or dual diagnosis issues.  The Department has also made resources available on the D-Net for workers to use and access DASA funded treatment programs for potential substance affected families and/or dual diagnosis cases.  In Cook County the IFR program staff receives a report s on new SEI cases.  IFR staff contact assigned workers if the case has not been referred to the IFR program.  All IFR cases are assessed for co-occurring mental health issues. Also, for placement cases in Cook County, IV-E waiver staff monitors new temporary custody cases and follow up with workers on any cases that have not been screened for substance abuse and mental health by the JCAP program.  JCAP staff will reach out to any parents and conduct assessments at their homes or other locations if they are unable to come to the JCAP office.

**TEEN ISSUES**

**The Department should develop housing contracts with wards and enforce regulations addressing the use of drugs, alcohol, firearms, and violence. Institutional sanctions should be consistent across programs and the juvenile court should be immediately notified when a ward is violating housing contracts that threaten the safety or the well being of the ward. Housing contracts should make clear that funding for the apartment will stop and the court will be informed of transgressions involving criminal activity (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 4).**

*FY 11 Department Response:* Amendments to the Independent Living (ILO) and Transitional Living Program (TLP) plans are being developed.

*FY 12 Department Update:* Independent Living (ILO) and Transitional Living Program (TLP) contract language is in the process of being reviewed and updated.

*FY 13 Department Update:* The following requirements are in place: Section 6.4.15 of the ILO/TLP program plan requires providers to have written protocols with respect to weapons, illegal substance, domestic violence, and dangerous behaviors. In addition, DCFS Procedure requires providers to promptly submit an Unusual Incident Report whenever such an incident occurs, and those reports are distributed to the GAL, among others. The language regarding stopping funding and informing the court of transgressions involving criminal activity will be included in the FY 15 ILO and TLP Program Plans.

*FY 14 Department Update:* Language will be included in FY 2016 ILO and TLP program plans that are being prepared for review by the Legal Department.

**The Department should require that wards sign a release of information for the Department to receive information from the educational institutions on the student's academic problems. With a ward's signed consent, DCFS should arrange to be notified of any of the following (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 4):**

- **When a student has voluntarily withdrawn from the university or has been required by the university to withdraw;**
- **When a student has been placed on academic warning;**
- **When the student's academic good standing or promotion is at issue;**
- **When a student engages in alcohol or drug-related behavior that violates school policies;**
- **When a student has been placed on disciplinary probation or restriction;**
- **In exceptional cases when a student otherwise engages in behavior calling into question the appropriateness of the student's continued enrollment in the university.**

*FY 11 Department Response:* Amendments to the Independent Living (ILO) and Transitional Living Program (TLP) plans are being developed.

*FY 12 Department Update:* DCFS Policy Transmittal 2011.29, Procedures 302, Appendix G for Youth In College/Vocational Training Program was issued November 2011. Applicants are now required to sign the CFS 600-3, *Consent for Release of Information*, as part of the Youth in College/Vocational Training Program Application.

*FY 13 OIG Response: While students are required to sign the CFS 600-3, Consent for Release of Information, the OIG learned that the consent is not used for the purposes outlined in the recommendation and is not shared with the educational institution.*

*FY 13 Department Update:* The Inspector General and the new Acting Director will discuss this recommendation and the OIG investigation on which it was based to determine whether its implementation will enhance child safety.

*FY 14 Department Update:* The recommendation was revised in November 2014 and discussed at the next meeting with the Department and the Inspector General.

**The Department and the Teen Parent Services Network should ensure that children of parenting teen wards with a history of mental illness, substance abuse, violence or developmental delays who are not eligible for school or employment related daycare services be enrolled at least two days a week in protective daycare (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 8).**

*FY 11 Department Response:* TPSN is able to identify and track clients meeting this criteria. A TPSN staff member will review daycare enrollment status of children's whose parent meets these criteria and assess the need for daycare. We will also have workers encourage these clients to enroll their child(ren) in protective daycare and secure consents from the client to contact the daycare facility. TPSN will generate a quarterly report on the clients who meet these criteria and notify workers of clients whose children are not enrolled in daycare.

*FY 12 Department Update:* TPSN tracks high risk cases through their clinical services department and staffing process. They provide DCFS with monthly clinical updates as part of the Hill v. Erickson reporting requirements. All reports are submitted to DCFS-Legal, the Teen Parent Consultant and the DCFS Pregnant and Parenting Teen Coordinator.

*FY 13 Department Update:* The children of parenting wards with current substance abuse, domestic violence, mental illness and developmental delays are eligible for protective day care. The Department will direct TPSN to include as part of their specialty training instructions for obtaining protective day care for these at risk children. Specialty training will include a policy clarification to ensure that a ward's worker identifies the need for protective day care as a service plan task; and that the service plan task is completed prior to submitting a day care services application.

*FY 14 Department Update:* This is current practice with TPSN and is monitored via the Hill consent decree. This information has been incorporated into the TPSN specialty training curriculum. The Department began using the updated curriculum in Spring 2014.

272

## UNRESOLVED RECOMMENDATIONS IMPACTING CHILD SAFETY

The following Office of the Inspector General's recommendations impact child safety and have been either rejected by the Department or pending for at least 4 years without resolution.

**The Department should pursue an interagency agreement with the Department of Healthcare and Family Services (DHFS) allowing DCFS Division of Child Protection staff access to Recipient Claim Detail information (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 11).**

*Historical information regarding the implementation of this recommendation:* Resolving difficult allegations of Medical Neglect or Failure to Thrive often requires retrieving and analyzing a myriad of medical records. In recognition of this, the Abused and Neglected Child Reporting Act [ANCRA] requires the Department of Children and Family Services to:

*enter into an inter-agency agreement with the Department of Healthcare and Family Services and the Department of Human Services (acting as successor to the Department of Public Aid under the Department of Human Services Act) to establish a procedure by which employees of the Department may have immediate access to records, files, papers, and communications (except medical, alcohol or drug assessment or treatment, mental health, or any other medical records) of the Department of Healthcare and Family Services, county departments of public aid, the Department of Human Services, and local governmental units receiving State or federal funds or aid to provide public aid, if the Department determines the information is necessary to perform its duties under the Abused and Neglected Child Reporting Act, the Child Care Act of 1969, and the Children and Family Services Act.* 325 ILCS 5/7.20

In FY 2008, the Office of the Inspector General recommended that the Department work with Healthcare and Family Services to access the database containing Medicaid Claim Detail to facilitate child protection investigations involving medical questions and to implement the statutory mandate. The Inspector General made the recommendation after investigating the death of a medically complex 18 month-old whose parent had been indicated for medical neglect for failing to administer his medication appropriately. At the time of the child protection investigation, the investigators did not have access to Medicaid data that would have assisted in identifying the child's numerous medical providers.

In FY 2009, the OIG reiterated the recommendations for obtaining Medicaid data in two separate death investigations. Two children drowned while unattended in their mother's car after the car rolled into a retention pond. The mother had two prior indicated child protection investigations in the preceding year that involved allegations of inadequate supervision. The mother had a history of prescription drug abuse that included being denied medication refills 23 times in the four months between child protection investigations. Department staff was unaware of any resource to assist with issues of prescription drug abuse. In the second OIG investigation, a mother of two children veered into on-coming traffic, killing herself and both of her children. The mother and both children were receiving Intact Family Services at the time of their deaths related to issues of child abuse and neglect. The mother had significant mental health issues and demonstrated a

pattern of doctor shopping and medication seeking in order to obtain multiple prescriptions for numerous psychotropic drugs, anti-depressants and pain killers.

In FY 2013, the Department asked the Inspector General to work directly with the Inspector General of Healthcare and Family Services to implement the recommendation of developing an interagency agreement allowing DCFS child protection staff access to Medicaid Claim Detail information.

*FY 14 Department Update:*  Unfortunately, in November 2014, the Department of Healthcare and Family Services (DHFS) notified the Department and the Inspector General's Office that it had determined that current Federal Medicaid Confidentiality law prohibited permitting access to Medicaid Claim Detail for the purpose of conducting a child abuse/neglect investigation.

**The Abused and Neglected Child Reporting Act (ANCRA) should be amended to clarify that the Department can share unfounded investigative information during a subsequent child protection or criminal investigation with any persons named in Section 11.1, Disclosure of Information for purposes consistent with the Abuse and Neglect Child Reporting Act or criminal prosecution (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 4).**

*FY 07 Department Response:* The DCFS Office of Legal Services has assigned an attorney to draft amendments to ANCRA, which address the above issue, as well as other proposed changes to ANCRA, and will submit as a single legislative package.  The targeted date of completion is May 2008.

*FY 08 Department Update:* The DCFS Office of Legal Services has assigned an attorney to draft amendments to ANCRA, which address the above issue, as well as other proposed changes to ANCRA, and will submit as a single legislative package.  The anticipated date of completion is February 2009.

*FY 09 Department Update:* Draft amendments to the Abused and Neglected Child Reporting Act addressing this issue will be submitted as part of the legislative package for the Fall Session 2010.

*FY 10 Department Update:* Amendments to ANCRA addressing this issue will be submitted as part of the legislative package for the spring 2011 session.  The estimated date of completion is spring 2012.

*FY 11 Department Update:* The Office of Legal Services will work with Legislative Affairs to incorporate language into the Abused and Neglected Child Reporting Act pertaining to sharing unfounded reports during a criminal or child protection investigation.

*FY 12 Department Update:* DCFS Legal has determined that Rule 431 can be amended without pursuing legislation. Revisions to Rule 431, *Confidentiality of Personal Information*, are being drafted.  The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* OCFP will work with respective Division to review this recommendation and determine if it can be included in current revisions to Rule 431, *Confidentiality of Persons Served by the Department*.

*FY 14 Department Update:*  This recommendation is included in a revision of Rule 431, *Confidentiality of Personal Information of Persons Served by the Department of Children and Family Services*.  We anticipate filing the 1st Notice in the third quarter of fiscal year 2015.

**The Department should issue a policy memorandum that states that whenever possible, each foster home should have a single entity that monitors placement of foster children and foster home licensing. POS may grant waivers to the policy based on individual children's needs but must ensure that the guidelines stated above are in place whenever a waiver is granted (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:*  The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* The Deputy Director of Monitoring will co-chair a subcommittee with Agency Performance Team, Licensing, private agency and Department staff to address these issues.  The anticipated start date is January 2012.

*FY 12 Department Update:* This will be included in the new monitoring design.

*FY 13 Department Update:* Policy statement is being developed for distribution in the beginning of FY15.

*FY14 Department Update:*  Agency Performance Team (APT) Monitoring Tools shall be revised and access to the PR04 screen for APT staff shall be provided by 12/1/14.

**Whenever a waiver is granted, and case responsibility is transferred to a single agency, the relinquishing agency should not be penalized, but should be moved up for case rotation assignment of a new case (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:*  The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* Agencies are not penalized when case responsibility is transferred to a single agency.

*FY 11 OIG Response: The recommendation did not concern assignment of cases but rather transfer of existing cases. To level the playing field, the agency transferring the children should receive immediate consideration for new placements.*

*FY 12 Department Update:*  The agencies' loss of such cases is taken into account in terms of the percentage of referral opportunity to replace the case that was transferred.  The child's geography

and the other agencies in the area with lower percentage of referrals are factored in terms of when the agency that transferred such a case would meet the criteria for a replacement intake.

*FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years. The Director's Office and Operations will collaborate when there is a waiver request to ensure agencies are not penalized.

*FY 14 Department Update:* Department staff are meeting to discuss implementation of this recommendation.

**The Department should review and update the Emergency Reception Center (ERC) Manual to include expectations of follow-up workers bringing children to the Emergency Reception Center (from OIG FY 06 Annual Report, General Investigations 4).**

*FY 07 Department Update:* The updated ERC Protocol/Manual (Transmittal) has not been finalized and is on hold with the Office of Child and Family Policy awaiting information resolution regarding shelter transportation issues.  When it is completed the informational transmittals will go out to DCFS, POS, CWS, and DCP staff. Also, training will take place for all staff regarding protocol on how CWS or DCP can make an Emergency Shelter referral and intake guidelines for bringing children and youth into ERC for an emergency temporary shelter care placement.

*FY 08 Department Update:* The ERC Protocol has been drafted and is awaiting approval to be sent out for comment. The anticipated date for distribution/implementation is January 2009.

*FY 09 Department Update:* Referral forms for the Emergency Reception Center (CFS 1900 and CFS 1901) were issued in February 2009. The referral form does not address procedures for admission to the Emergency Reception Center. Emergency Reception Center protocol is on hold at this time.

*FY 10 Department Update:* At the request of the Division of Child Protection (DCP), the ERC Protocol was placed on hold due to a planned reorganization and remains on hold as of November 2010.

*FY 11 Department Update:* Restructuring of the Emergency Reception Center (ERC) is still planned therefore the implementation of the ERC Protocol is still on hold at this time.

*FY 12 Department Update:* Standardized procedures for utilizing the Emergency Reception Center are being drafted.

*FY 13 Department Update:* Shelter care procedures are currently being drafted.

*FY14 Department Update:*  FY 14 Department Update:  The recommendation has been incorporated into revisions to Procedures 301 Appendix G, *Temporary Placement to the Statewide Emergency Shelter System*, which were posted for comment on 11-06-14.

**The Department should develop an expedited process for distributing proposed decisions to all parties in expungement appeals, with opportunity to file written objections, prior to the issuance of**

**final administrative decisions in expungement appeals (from OIG FY 11 Annual Report, General Investigation 23).**

> *FY 11 Department Response:* The Department rejected the recommendation based on case law that interprets the section of the Administrative Procedure Act not to include the final administrative decision by a Director.

*FY 12 OIG Response: The OIG maintains that implementation of this recommendation would strengthen the Administrative Process while assuring fairness and more reliable decision making.*

**The OIG recommended that Rule 412,** *Licensure of Direct Child Welfare Services Employees and Supervisors***, be revised:**

- **To permit the Department to refuse to issue a license with knowledge that the applicant had committed a violation that would warrant revocation or if the applicant had engaged in behavior that would pose a risk to children or state resources;**

- **To expand the list of criminal pending charges or convictions that would warrant a refusal to issue to include any crime of which dishonesty is an essential element;**

- **To permit the Department to refuse to issue a license if the applicant provides false information during the licensing process;**

- **To provide guidelines for assessing criminal convictions and abuse or neglect findings that are not bars to licensure;**

- **To permit the Division of Child Welfare Employee Licensure to refer applications for investigation to verify facts presented (from OIG FY 06 Annual Report, General Investigations 26).**

*FY 07 Department Update:* The Clinical Division, through the Child Welfare Employee Licensure (CWEL) staff, has drafted proposed changes to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors*. The draft of the proposed amendment incorporates input from the OIG, and the appointed Board members of the Child Welfare Employee Licensure (CWEL) program. The text of the proposed amendment will be submitted to the Director for review, approval, and transmittal to the Joint Committee on Administrative Rules (JCAR).

*FY 08 Department Update:* The revisions to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* were submitted to the Office of Child and Family Policy on November 21, 2008 and will begin the revision/comment process. The anticipated date of completion is June 2009.

*FY 09 Department Update:* The amended Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors,* has been submitted to the Joint Committee on Administrative Rules for review. The anticipated completion date is Fall 2010.

*FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License*, was filed in October 2009. The second Notice was never filed due to failure

to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first notice again by January 2011, subject to approval.

*FY 11 Department Update:* The Department will resubmit the amendments to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* with the Joint Committee on Administrative Rules.

*FY 12 Department Update:* Revisions to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors,* have been distributed for comment.

*FY 13 Department Update:* Draft was sent to JCAR in June 2013 and in November 2013 the edited draft was submitted to DCFS Legal for review and facilitation of review by the Governor's Office.

*FY14 Department Update:*  The recommendation is included in draft revisions to Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors*.  JCAR had questions on this revision after 1st Notice.  Negotiations on language are complete.  2nd Notice documents are being prepared.  The Department will seek Governor's office fiscal note and policy approval to file 2nd Notice.  The Department will file 2nd Notice as soon as all approvals to do so are secured.

**The Department should amend Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors*, to provide specific provisions for voluntary relinquishment of a child welfare employee license (from OIG FY 08 Annual Report, General Investigation 30).**

- **A licensee may voluntarily relinquish his or her license at any time.**

- **The voluntary relinquishment of a CWEL during a pending licensure or disciplinary investigation or proceeding shall be recorded in the CWEL files as "*relinquished during licensure or disciplinary investigation or proceeding.*"**

- **Voluntary relinquishment of a license must be filed with the Child Welfare Employee License Division on a form prescribed by the Division.  The form must contain an acknowledgment that reinstatement will be subject to consideration of the facts disclosed in any pending licensure investigations or proceedings.  Voluntary relinquishment does not divest the OIG of the jurisdiction to complete a pending investigation.**

- **An Application for License from a licensee who previously relinquished shall be considered a Request for Reinstatement rather than an Application for License.**

*FY 08 Department Response:* The Department agrees.  The Office of Child and Family Policy has begun the revision process.

*FY 09 Department Update:* Revisions to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisor,* is currently being reviewed by the Joint Committee on Administrative Rules.

*FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License*, was filed in October 2009. The second Notice was never filed due to failure

to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first Notice again by January 2011, subject to approval.

*FY 11 Department Update:* The Department will resubmit the amendments to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors,* with the Joint Committee on Administrative Rules.

*FY 12 Department Update:* Revisions to Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* have been distributed for comment.

*FY 13 Department Update:* Draft was sent to JCAR in June 2013 and in November 2013 the edited draft was submitted to DCFS Legal for review and facilitation of review by the Governor's Office.

*FY 14 Department Update:*  The recommendation is included in draft revisions to Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors*. JCAR had questions on this revision after the 1st Notice.  Negotiations on language are complete. 2nd Notice documents are being prepared. The Department will seek Governor's office fiscal note and policy approval to file the 2nd Notice. Due to delays within the reviews completed by the Governor's office, it is anticipated that we may not be able to file 2nd Notice before 12-31-14. The Department will file the 2nd Notice as soon as all approvals to do so are secured.

**Section 412.100, *Restoration of Revoked or Suspended License*, should be amended as follows: Section 412.100, *Restoration of Revoked, Suspended or Relinquished License*: A licensee may request the restoration of his or her license by submitting a written request to the Board providing specific reasons to support the request.  In considering an application to reinstate or grant a license that was relinquished during a pending licensure investigation or administrative proceeding, the Board shall consider any charges filed along with a report or sworn statement by the Office of the Inspector General regarding the evidence developed in the investigation.  For the purpose of considering a Request for Reinstatement, the Board shall presume that the facts developed during the investigation or the pending charges are true, when the license was surrendered during a pending investigation or licensure proceeding; the licensee may rebut the presumption for good cause shown.  The Board may not reinstate a license where it has been shown by investigation and administrative hearing that it is not in the best interest of the public to do so.  Considerations that will be reviewed when making a finding of "in the best interest of the public" include, but are not limited to:  the nature of the offense for which the license was revoked; the period of time that has elapsed since the revocation; evidence of rehabilitation; and character references (from OIG FY 08 Annual Report, General Investigation 30).**

*FY 08 Department Response:* The Department agrees.  The Office of Child and Family Policy has begun the revision process.

*FY 09 Department Update:* Rule 412 *Licensure of Direct Child Welfare Services Employees and Supervisors* is currently being reviewed by the Joint Committee on Administrative Rules.

*FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License*, was filed in October 2009. The second Notice was never filed due to failure to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first Notice again by January 2011, subject to approval.

*FY 11 Department Update:* The Department will resubmit the amendments to Rule 412 *Licensure of Direct Child Welfare Services Employees and Supervisors* with the Joint Committee on Administrative Rules.

*FY 12 Department Update:* Revisions to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisor,* have been distributed for comment.

*FY 13 Department Update:* Draft was sent to JCAR in June 2013; JCAR returned the draft to DCFS requesting changes; on 11-7-13, the edited draft was submitted to DCFS Legal for review and facilitation of review by the Governor's office.

*FY 14 Department Update:* The recommendation is included in draft revisions to Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors*. JCAR had questions on this revision after the 1st Notice. Negotiations on language are complete. 2nd Notice documents are being prepared. The Department will seek Governor's office fiscal note and policy approval to file the 2nd Notice. Due to delays within the reviews completed by the Governor's office, it is anticipated that we may not be able to file the 2nd Notice before 12-31-14. The Department will file the 2nd Notice as soon as all approvals to do so are secured.

**The Department should amend Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* to add "failure to timely comply with an order for drug or alcohol testing after a finding of reasonable suspicion" as a basis for licensure action under Rule 412.50, *Misconduct* (from OIG FY 10 Annual Report, General Investigation 21 and OIG FY 08 Annual Report, General Investigation 32).**

*FY 10 Department Response:* Management will seek to negotiate reasonable suspicion testing with the Union in the future.

*FY 10 OIG Response:  The Office of the Inspector General has been continuously recommending this critical change in policy for 11 years.  The lack of a reasonable suspicion testing policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk. The policy change sought by the Office of the Inspector General would have minimal budgetary impact.*

*FY 11 Department Update:* Management fully supports reasonable suspicion testing for direct child welfare service employees and supervisors.  Direct child welfare service employees and supervisors are bargaining unit members.  As such implementation of reasonable suspicion drug/alcohol testing, unless legislatively mandated, must be negotiated with the collective bargaining units.  Management routinely proposes to CMS Labor Relations that reasonable suspicion testing be included in collective bargaining agreements.  Management also routinely proposes that reasonable suspicion testing be added to supplemental collective bargaining agreements.  Without a reasonable suspicion testing policy in place amendment of Rules and Procedures is futile.  The State will be involved in contract negotiations with AFSCME in 2012 and the Department intends to continue pressing this point.

*FY 11 OIG Response: The OIG notes that the City of Chicago and both the Illinois State Police and the Department of Corrections have had Reasonable Suspicion Testing for several years.  The City of Chicago and the Department of Corrections employees are represented in large part by the same union as most employees with the Department of Children and Family Services.  Moreover, Direct Child Welfare employees and supervisors at DCFS must possess Child Welfare Employee Licenses.  The OIG*

*has urged since 2005 that Reasonable Suspicion Testing be added as a requirement for Child Welfare Licensure.  The Department has failed to act on the recommendation.*

> *FY 12 Department Update:* A workgroup has been formed to review all OIG drug/alcohol related recommendations to determine implementation steps.

> *FY 13 Department Update:* The Department will reconvene the workgroup to address this recommendation.

> *FY 14 Department Update:*  A policy to address Suspected Substance Abuse would need to be negotiated as a part of the Master Contract Agreement.  Contract negotiations are scheduled to begin on 12/10/14 as the contract expires on 6/30/15.  The Department cannot order an employee to be drug tested unless there is an agreement made in the Master Contract.

**The Department should develop policy to address suspected substance abuse in the workplace (from OIG Recommendations made in 2005, 2001 and 1999).**

> *FY 06 Department Response:* The Department developed a definition and procedure for Reasonable Suspicion testing. The Department agrees to amend the Employee Manual and the Employee Licensure Rule to address Reasonable Suspicion of substance abuse and will also engage in discussions with the union.

> *FY 07 Department Update:* The Department's workgroup addressing the need for incident-based reasonable suspicion drug or alcohol testing is currently developing protocol for pre-employment drug testing. Reasonable suspicion testing has been put on hold temporarily.

> *FY 08 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 08 OIG Response: The OIG has been continuously recommending this critical change in policy for nine years. The policy change sought by the OIG would have a minimal budgetary impact. The lack of reasonable suspicion policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk.*

> *FY 09 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

> *FY 10 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 10 OIG Response: The OIG has been continuously recommending this critical change in policy. The policy change sought by the OIG would have a minimal budgetary impact. The lack of reasonable suspicion policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk.*

*FY 11 Department Update:* Management fully supports reasonable suspicion testing for direct child welfare service employees and supervisors. Direct child welfare service employees and supervisors are bargaining unit members. As such implementation of reasonable suspicion drug/alcohol testing, unless legislatively mandated, must be negotiated with the collective bargaining units. Management routinely proposes to CMS Labor Relations that reasonable suspicion testing be included in collective bargaining agreements. Management also routinely proposes that reasonable suspicion testing be added to supplemental collective bargaining agreements. Without a reasonable suspicion testing policy in place amendment of Rules and Procedures is futile. The State will be involved in contract negotiations with AFSCME in 2012 and the Department intends to continue pressing this point.

*FY 11 OIG Response: The OIG notes that the City of Chicago and both the Illinois State Police and the Department of Corrections have had Reasonable Suspicion Testing for several years. The City of Chicago and the Department of Corrections employees are represented in large part by the same union as most employees with the Department of Children and Family Services. Moreover, Direct Child Welfare employees and supervisors at DCFS must possess Child Welfare Employee Licenses. The OIG has urged since 2005 that Reasonable Suspicion Testing be added as a requirement for Child Welfare Licensure. The Department has failed to act on the recommendation.*

*FY 12 Department Update:* A workgroup has been formed to review all drug/alcohol related OIG recommendations to determine implementation steps. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* The Department will reconvene the workgroup to address this recommendation.

*FY 14 Department Update:* A policy to address Suspected Substance Abuse would need to be negotiated as a part of the Master Contract Agreement. Contract negotiations are scheduled to begin on 12/10/14 as the contract expires on 6/30/15. The Department cannot order an employee to be drug tested unless there is an agreement made in the Master Contract.

# APPENDIX

## APPENDIX A:

MAYA SCHAUER (FICTITIOUS NAME)


## APPENDIX B:

RACHEL LAWRENCE  (FICTITIOUS NAME)

# OFFICE OF THE INSPECTOR GENERAL
### Department of Children and Family Services

---

**REDACTED REPORT**

---

*This report is being released by the Office of the Inspector General for instructional purposes.  To ensure the confidentiality of all persons and service providers involved in the case, identifying information has been changed.  All names, except those of professional references, are fictitious.*

---

**File:**          11-2976

**Minors:**       Maya Schauer, DOB 2/07, DOD 5/11
                  Larisa Schauer, DOB 1/08
                  Ryan Schauer, DOB 9/09
                  Shane Tischer, DOB 12/10

**Subject:**      Death of a Ward

## INTRODUCTION

In May 2011, Emergency Medical Services was called to Maya Schauer's foster home in Westfield.  Maya's foster mother had called 911 to report Maya had a seizure.  Maya was taken by ambulance to Grace Hospital in Hamlin.  Maya was found to have severe head injuries and was flown from Grace to Robins Hospital in Castleton.  Maya had bleeding on the brain and multiple bruises on her body.  Surgery was performed to relieve pressure from brain swelling.

The following day, four-year-old Maya was pronounced brain dead at Robins Hospital.  An autopsy was performed at the Office of the County Coroner. Cause of death was a subdural hematoma and cerebral injuries due to blunt trauma of the head.  The subdural and subarachnoid hematomas, in combination with the bilateral retinal hemorrhages, and the large number and locations of multiple impact injuries of the head, face, back and extremities were more consistent with inflicted rather than accidental blunt trauma, evidence supporting the closing opinion statements of the forensic pathologist.  At a Coroner's inquest in August 2011, the jury ruled Maya's death a homicide.

Upon review of the autopsy reports and autopsy pictures the following conclusions were drawn to a reasonable degree of medical and scientific certainty:[1]

---

[1]A review of the forensic pathologist's autopsy was conducted by another Forensic Pathologist who is a retired Deputy Chief Medical Examiner and a consultant for the OIG.

1. The majority of the injuries on this child's body found at autopsy were inflicted.
2. The cause of death of Maya Schauer is blunt head trauma due to being battered.
3. The manner of death is homicide.

Maya Schauer was a 4-year-old female child, who at autopsy was well developed, well nourished and displayed no evidence of congenital malformations or pre-existing disease conditions. Autopsy was significant for numerous blunt force injuries to different parts of her body. Some of the injuries were old, majority of them were recent, with underlying subcutaneous and intramuscular hemorrhages. Autopsy showed evidence of medical treatment as well.

The blunt force injuries noted at autopsy were multi-focal; to the back and sides of the head, inside the mouth, on the eyelids, on the back, shoulders, upper arm, elbows, knees, hand and the frenulum. In a child of Maya's age, the majority of the injuries seen were in areas not usually injured during normal activity and play.

Injuries to the eyes, the torn frenulum, massive and multifocal cerebral injuries resulting in bilateral subdural hemorrhages, multiple injuries to the back, shoulders and hand cannot be adequately explained as being accidental in nature.

Head banging and seizures were some detractors put forth to explain the genesis of these injuries. Neither head banging nor seizures would result in the constellation of injuries noted, particularly torn frenulum and subdural hemorrhages.

Considering the circumstances surrounding her death and the autopsy findings, the manner of death is homicide.

The OIG investigated Maya's death pursuant to its mandate to investigate the deaths of children who were involved with DCFS within a year of their deaths. Maya was a ward at the time of her death. Maya lived with her three siblings Larisa (age 3), Ryan (20-months-old), and Shane (4-months-old) in the foster home of 27-year-old Carrie and 30-year-old Todd Tobias and their two daughters, 8-year-old Alexis and 5-year-old Megan.


**INVESTIGATION**

Schauer/Tischer Family Background
Beginning in January 2010, the Department investigated and indicated three separate investigations against 20-year-old Brooke Jorgenson, which culminated in her children, Maya (then 3½), Larisa (then 2) and Ryan (almost 1) being removed (SCR# A, B and C). The first indicated finding was for Medical Neglect after Ms. Jorgenson failed to bring 3-month-old Ryan in for medical appointments for a spinal tap and well-baby checks. The second indicated finding was for Risk of Harm when Ms. Jorgenson allowed her paramour, Kevin Tischer, who had been convicted of Domestic Battery in May of 2010, to care for her children. During the investigation, the mother had provided false information to the investigators in an apparent attempt to protect Mr. Tischer. While the second investigation was pending, the investigator and intact worker observed multiple facial bruises on Ryan and all three children were removed in August 2010. The third investigation indicated Ms. Jorgenson and Mr. Tischer for Cuts Bruises, Welts to Ryan, and Substantial Risk of Physical Injury/Environment Injurious by Neglect to Maya and Larisa.

**The following 48-hour chronology of events is based on Maya's foster care and mental health records; court transcripts on the case of Alexis and Megan Tobias in the Circuit Court, Carter County, Illinois; Carter County Sheriff's police interviews; DCFS child protection investigation of Maya's death (SCR#6568-A); OIG interviews; foster parents Carrie and Todd Tobias's phone records and employee time sheets; and victim sensitive interviews of Larisa Schauer, and Alexis and Megan Tobias.**

<u>May 2011, two days before Maya's death</u>
On this morning, foster father Todd Tobias signed in at work at 5:45 a.m. at the plant, about a one-hour commute from home. According to foster mother Carrie Tobias, the morning was like every other morning to get everyone ready for school. Ms. Tobias tended to the younger children. The other children got dressed, had breakfast, and did their hair. Ms. Tobias loaded all the children in the family vehicle to take Maya, Megan and Alexis to the school bus stop.

At school, Maya played, talked with her peers appropriately, "used her listening ears," ate her snack, stayed in her seat, and sang "nice and loud." During work time Maya did her work without complaint and did a good job. Maya was given a pink pride point ticket for her good behavior. Maya and Megan left for home on the school bus at about 11:00 a.m. Foster mother Carrie Tobias picked them up from the school bus stop between 11:20 and 11:30 a.m.

Maya was scheduled to see her outpatient therapist, Liz Norquist, at 1:30 p.m. at the Alpha Agency in Hamlin. At 1:25 p.m. the foster mother, Ms. Tobias, left a voicemail message for the Omega Agency worker, Leila Ryman, stating that Maya had had a good weekend but had a tantrum this day when told they had to leave for Maya's therapy appointment. The foster mother stated in her message to the worker,

> Maya threw herself to the floor and refused to get up. [The foster mother] lifted Maya from the floor and Maya collapsed again out of her arms…Maya will likely have a bruise on the left side of her face.

Ms. Tobias stated in her court testimony in 9/2011, that when Maya threw herself to the floor, she hit either the table or chair leg. Within a few seconds of throwing herself to the ground, a bruise started on Maya's right side above her eye.

At 1:30 p.m. at Alpha Agency, the therapist, Liz Norquist, went to the waiting room to bring Maya back to her office. She found Maya lying face down on the floor and crying. According to Ms. Norquist, Ms. Tobias stated that Maya had had three good days, but today she threw herself down on the kitchen floor and cried that she did not want to come to the appointment. The foster mother told the therapist there was bruising and scrapes on the right side of Maya's temple. *In her court testimony, Ms. Tobias stated the therapist noticed the bruise on Maya's face and Ms. Tobias had Maya tell the therapist what happened.* According to the therapist, Ms. Tobias also reported that Maya stole a breakfast from another girl at school; not because she wanted to eat but because she wanted to throw it out. The foster mother also told the therapist that yesterday Maya put dog feces in her mouth in front of her foster mother after she was told to put it down.[2]

---

[2] Ms. Tobias did not report the alleged incident involving dog feces to anyone else, including the Carter County Sheriff's police, Omega Agency, Alpha Agency or to the court.

According to Ms. Norquist, Ms. Tobias told the therapist that during the car ride to Alpha Agency Maya did not want to wear her seatbelt. The foster mother pulled the vehicle over and had Maya get out of the vehicle. Maya walked in the field while the foster mother drove next to her slowly until Maya agreed to put her seatbelt on. In her court testimony, Ms. Tobias stated that during the car ride Maya took off her shoes and threw them and whatever else she could, through the car. Ms. Tobias pulled the car over and Maya got out of the car with Ms. Tobias and the two stood there until Maya regained her composure. Just as they arrived at Alpha Agency Maya unbuckled herself, and was put out of the vehicle again. Maya walked to the bench in front of the office and flopped down on it while her foster mother parked the car. Inside the waiting room Maya asked where she could throw a fit and the foster mother replied "right here." Maya lay on the floor with her head in her arms and sobbed.

The therapist wrote in her notes that during the session, Maya was quiet and tearful. Maya told the therapist she had a bad day because she was bad. She said she was upset because she missed her mother and father and some other people whose names were not audible. Prior to the session, the foster mother had given the therapist a hair tie and asked her to put Maya's hair up. When the therapist put Maya's hair in a ponytail she observed that the top of the right ear was bruised; there was a red line on the top of the cartilage. The therapist also observed a little bruise on Maya's right temple; it was not dark, but faint with a little bit of redness like she had been scratching it. The therapist asked Maya what happened and Maya just shook her head and did not say anything. At the end of the session, the therapist showed the foster mother the bruise on the top of Maya's right ear. The foster mother told the therapist she believed the bruise may have been caused when Maya threw herself down on the kitchen floor earlier that day.

Ms. Tobias stated in court that the therapist came out with Maya and that Maya was playing with her ear. It was then they noticed Maya had a bruise on the tip of her ear and a little bit behind her ear. Ms. Tobias helped get Maya's hair pulled back and that was when the therapist noticed the ear bruise.

At 2:57 p.m., the foster mother left a second voice mail message for Omega Agency worker Leila Ryman,

> [A]fter Maya came out of her therapy appointment, she noticed her ear had a purple bruise on it as well.

At about 3:30 p.m. Ms. Tobias and the five children picked up Alexis at the school bus stop on the way home from Alpha Agency.

According to Ms. Tobias' court testimony (9/2011), at home, the children had snacks, Alexis did homework, and then Alexis, Megan and Larisa went out to play. Maya wanted to go outside, but Ms. Tobias told her no because Ms. Tobias could not leave the house to supervise Maya. Maya was not safe to be outside without Ms. Tobias who had just put Ryan and Shane down to nap. Maya got upset and threw herself down on the kitchen floor kicking, screaming, pounding her head, arms, her feet, and rolling around. After the tantrum, Ms. Tobias picked Maya up and sat her down at the table and she calmed down for awhile. Ms. Tobias fed Shane and left the room to put him down. When she returned she found Maya had ripped one of the girl's pictures into little pieces. Maya said she was angry. Ms. Tobias decided that a power sit might be a good thing to regain her composure. Maya was power sitting in the dining room while Ms. Tobias was in the living room. [See section of this report on Power Sitting.] Ms. Tobias did not have a clear view of Maya and did not see Maya hurt herself but Ms. Tobias heard thumping.

Ms. Tobias went to Maya. Ms. Tobias testified that Maya had smacked her head against the wall. Ms. Tobias also testified on 10/2011 that Maya was facing the wall on this day. She observed that Maya had re-busted her lip;[3] her lip was bleeding even more this time and a little blood was on her shirt. The foster mother got a cold washrag and had Maya sit with her and they talked; then Ms. Tobias started getting dinner ready.

Todd Tobias signed out from work at 6:30 p.m. When he arrived home, the foster parents spoke for a few minutes and then Mr. Tobias sat down with Maya to talk. Mr. Tobias recorded the conversation,[4] which his wife asked him to do because of an upcoming meeting.[5] Maya did not have a "fit" that night. *Mr. Tobias stated in court (9/2011) that he never saw Maya having fits;[6] he only heard them on the phone.* That night, Maya brushed her teeth and went to bed. According to Ms. Tobias, "Maya showed signs of being tired, but did not sleep well, which was odd because on Sunday at a family gathering, Maya was full of energy, playful, and looked nice all dressed up."[7]

<u>May 2011, the day before Maya's death</u>
On this morning, Mr. Tobias left home for work and clocked in at 5:45 a.m. Around 6-6:30 a.m., Ms. Tobias woke Maya up. Maya climbed down the ladder of the bunk bed and told Ms. Tobias that her leg hurt. Ms. Tobias looked at Maya's leg and did not see anything. The foster mother stated in court she thought the leg was asleep and told Maya to walk on it for a while and let her know if the leg still hurt; she walked around fine. The family had Cheerios for breakfast. Maya did not want her hair brushed so Ms. Tobias sent her to school with hair bows. Ms. Tobias transported all of the children in the family van to the school bus stop less than a mile away from the foster home at about 7:35 a.m. According to Ms. Tobias' court testimony (9/2011), Maya was walking to the bus and was fine; then about 10 feet from the bus she started to limp again. Ms. Tobias did not do anything about this. According to the school bus driver, Maya looked at the vehicle that dropped her off and Maya would not board the bus, which was unusual for her. Maya had trouble boarding the school bus; her older foster sister [Alexis] came to her and helped Maya get onto the bus, and the bus driver helped her up the last step. The foster sister said to the bus driver that Maya was fine and only wanted attention. Maya said that her leg hurt; the driver did not lift her jeans to look at her leg.[8]

Upon arrival, at about 7:55 a.m., at Bristols Elementary School in Flagstone, Maya was crying and could not get off the bus. The bus driver assisted her off the bus. A staff member carried Maya to the classroom because Maya was crying and complaining that her leg hurt. The preschool's parent volunteer carried Maya from one part of the classroom to another and let

---

[3] Ms. Tobias stated to the Carter County Sheriff's police that she thought Maya had first injured her lip during a fit at Alpha Agency earlier that day; however, Alpha Agency therapist, Liz Norquist, did not observe an injury to Maya's lip or mouth and Ms. Tobias did not report this particular injury to Ms. Norquist or in her voice mail messages to the Omega Agency worker.

[4] Mr. Tobias testified in court that the recording stopped and started more than once. An audio recording was presented in court.

[5] A DCFS Child and Youth Investment Team (CAYIT) meeting was scheduled to determine whether Maya required specialized services and/or a more restricted living environment. CAYIT Teams provide multidisciplinary planning and streamlined decision-making, and is required before a child/youth can be referred to or placed in a more intensive level of substitute care [Policy Guide 2006.04].

[6] In an interview with the Carter County Sheriff's police the day before Maya's death, Ms. Tobias described a "fit" as Maya "bangs her head on walls and the floor, kicks, rolls around, thrashes and flails around."

[7] Ms. Tobias's statement to the Carter County Sheriff's police the day before Maya's death.

[8] The bus driver's statement to the Carter County Sheriff's police.

Maya sit in her lap.  The parent volunteer testified in court (8/2011), she observed "bruising that pretty much covered the whole side of her face from about the temple to the jaw line, from about the corner of the eye back to about the ear, and three deep scratches by the corner of her eye, starting at the corner of her eye and going back towards the temple."  Maya would not tell the parent volunteer how she got her injuries and would only cry harder.  Maya was not energetic or bubbly, she was just there and crying.

Maya's pre-school teacher telephoned Ms. Tobias after she saw Maya limping and observed bruising near the child's right eye and an injury to her lip.  Maya was crying a little and did not look herself.  According to the teacher, the foster mother told her during the phone call that Maya had thrown several fits the day before, one when she did not want to go on a visit and another regarding a therapy session.  The foster mother also stated that Maya got herself really good behind the ear too.  The teacher moved Maya's hair back and could see a bruise behind her right ear. The foster mother told the teacher that she would come for Maya if needed.  The teacher asked Maya if she wanted to go home; Maya said no, she wanted to stay and play.  The teacher asked Maya what happened; Maya said she threw a fit and hit her head on a chair.  The parent volunteer carried Maya to the playground at recess and put her on the swing.  Maya did not want to be pushed on the swing and just sat there.  Maya did not play with the children.

The foster father (FF) and foster mother (FM) texted each other as follows:

      8:18 FF:   Hows today going so far. Is she soar? [sic]
      8:22 FM:  Yes teacher just called
      8:23 FF:   What!? About her bruising?
      8:25 FM:  No she is limping
      8:26 FF:   She said her leg hurt yesterday. Probably when she through herself
              to the floor. [sic]
      8:27 FM:  Yes im sure it is

      8:38 FM:   Sorry was feeding the baby, had to text one handed. She just wanted
              to see if Maya was doing that this am.  If she doesn't come around
              at school and stop I'll go get her.  She is doing it for the attention.
              She started laying it on thick at the bus stop

While three children (Maya, Megan and Alexis) were in school, the foster mother was home caring for Larisa, Ryan and Shane and doing laundry.  At 10:25 a.m. she texted her husband "Finally got those clothes folded. I have about 4-5 loads to wash still…" and again at 10:28 she texted "…there were about 6 loads in this living room."

At 10:59 a.m., the foster mother sent a text message to Maya's foster care caseworker Leila Ryman stating,

      Maya had another fit last night.  My husband was able to talk to her about it; he recorded it if you want it.  She was thrashing around, so I sat her down to gather herself.  She calmed down but a few minutes later she was pounding her head on the wall.  She spoke with my husband about how angry she was, her teacher called and she is having a rough day at school, she has been by herself sobbing.

Maya boarded the school bus at about 11 a.m. and arrived in Westfield about 15 minutes later.  The bus driver did not remember anything about Maya that day.  The foster mother had Larisa,

Ryan and Shane with her when she drove to the bus stop to pick up Maya and Megan.  Maya went to the foster mother 'normal' and the family returned home.

The foster father (FF) and foster mother (FM) texted each other as follows:

> 11:24 FM:  Maya had the teachers and mother carry her around all day
> 11:25 FF:  You got to be kidding me.  If she hurts that bad she can go to bed
> 11:27 FM:  We have Shane's visit today
> 11:28 FF:  She can go to bed as soon as y'all get back
> 11:30 FM:  I plan on that

The foster mother was home alone with Maya, Larisa, Ryan, Shane and Megan.  They were getting ready to leave for Shane's visit with his father scheduled for 2 p.m.  Maya did not want to leave home for the visit.  Maya wet herself.  The foster mother told Maya to get into the shower and remove her clothes; the foster mother left the room.

The foster father (FF) and foster mother (FM) texted each other as follows:

> 11:35 FM:  She was doing it again.  I can't wait for u to have off.  Its just been
>             a tough day yesterday & I think again today
> 11:36 FF:   Ill have her for the next three days.  Sorry she gives you such a hard time
>
> 11:38 FM   its ok its not your fault its just hard to keep things in perspective sometimes.
>             i picked her up and put her in a shower and yes it is kind of cold
>             her brain needs as much stimulation as it can get right now.
> 11:39 FF:  Well.  She's about to stimulate an ass wiping.

The mean temperature outside that day was 47 degrees Fahrenheit.[9]  The shower is in a bathroom on the first floor just off the kitchen.  Ms. Tobias returned to the bathroom after getting the diaper bags ready and Maya had started to take off her clothes; the foster mother took the clothes from her and put them in the washing machine.  The foster mother went into another room of the house to finish getting the other children ready. Ms. Tobias returned to the bathroom and shut off the water and gave Maya a towel.  Maya flopped down on the bottom of the shower and was on her hands and knees sobbing and saying she did not want to go. Megan saw Maya in the shower, covering her eyes and laying down. The foster mother left to tend to the children and when she returned Maya was still on all fours with the towel on her.  The foster mother phoned her husband who then talked to Maya.  Maya told her foster father that she was not going and she wanted to go to bed.  While Maya was on the phone with her foster father, her foster mother was in another room.  After the phone call Maya remained in the bathroom.

The foster mother returned to Maya.  Maya got out of the shower and flopped on the floor.  The foster mother left Maya to get Shane his pacifier; Shane was in his swing and Ryan was in his pack n play or high chair, and Megan and Larisa were in the general vicinity.

The foster mother (FM) and foster father (FF) texted each other:

> 12:26 p.m. FM:  Oh my goodness, i still don't have her under control,

---

[9] Per Weather Underground website, the weather history for Hamlin, IL also applies to Westfield, IL. On that day, the maximum temperature was 55 degrees; the minimum temperature was 39 degrees Fahrenheit.

|  |  |
|---|---|
| 12:29 FF: | and very soon I'm going to have to cave because we have to leave Beat her ass!" |
| 12:30 FM: | At this point I don't think that would be a good idea. im angry and it wouldn't just hurt her feelings. Not a good idea at the moment. Im still good. But caving is going to make me even more mad. |

Maya got up and started to dry herself and put on underwear.  The foster mother heard the dog food scatter across the floor and she texted her husband:

| 12:40 FM: | She just threw the dog food everywhere!" |
|---|---|

After she finished with the children, Ms. Tobias entered the kitchen with the baby and she saw Maya on the floor.  She set the baby down and rolled Maya to her side. She called 911 and told Megan to unlock the back door.  She then called Omega Agency workers Leila Ryman and Becca DeMarco, and Mr. Tobias.

Ms. Tobias called 911 at 12:47 p.m., seven minutes after the text message to her husband at 12:40.[10]  The Westfield Fire Department's Emergency Medical Services (EMS) received a call at 12:48 to respond to child with seizures. The EMS was on the scene at 12:52 p.m., and found Maya was "postictal"[11] on the floor near the bathroom, clothed and mostly dry.  According to the EMS narrative report,

> Mother states child is a foster child & she doesn't know of any seizure hx. Child unresponsive to verbal or pain. Child had been in shower very cool to touch.[12] Child wrapped in blanket & moved to ambulance…Pt. also has bruises on her R (right) eyebrow & R (right) ear area.  Mother stated child had been being tx. for a head banging disorder. [sic]

At 12:58 p.m., EMS took Maya to Grace Hospital in Hamlin.  A seizure was witnessed during transport.

The emergency medical services worker stated to the Carter County Sheriff's police that Maya was lying right inside the shower room door on her back in a typical seizure position.  She was not seizing at the time.  Maya was wearing a shirt and underwear and was damp as though she had recently gotten out of the shower.  The foster mother told him she put Maya in the shower because she soiled herself.  Ms. Tobias left Maya alone to get dressed and after she heard a noise she found Maya on the floor.  When asked, the foster mother said she did not know a lot about Maya's history except Maya was a head banger.

Maya arrived at Grace at 1:21 p.m. and presented with unequal pupils, which is one of a number of symptoms indicating head trauma.  When Maya was admitted to the ICU her pupils were unresponsive although some brainstem function was still present.[13]  The brainstem is responsible for the basic automatic functions of the brain; among other things, it controls

---

[10] At 1:20 p.m. Leila Ryman returned the foster mother's call. The foster mother told the worker what had happened and stated she was worried that the seizure was brought on by the tantrum Maya had the night before.

[11] Postictal: drowsiness following epileptic episode.

[12] No temperature was taken on scene by EMS.

[13] Pediatric consult note from Robins hospital.

MAYA SCHAUER

breathing and blood pressure, temperature and heart rate.  Her body temperature was 84°F[14] and her liver enzymes were elevated which is consistent with trauma and decreased oxygen.[15]  A CT scan showed blood collecting in the brain and the doctor treating Maya at Grace arranged for emergency transport to Robins Children's Hospital in Castleton.  They gave her medication to stabilize her abnormally low blood pressure en route.

Maya was admitted to Robins Hospital at 3:45 p.m.  On arrival Maya's pupils were still unresponsive and her brain stem showed no activity.  She was immediately sent to an operating room to relieve the pressure on her brain from the swelling and to remove the blood that was accumulating.  The operative report states that Maya's brain was quite swollen and there was evidence of early infarction.[16] No pulsations (evidence of pumping blood) were noted which is consistent with a nonviable brain.  After surgery, Maya was cared for in the pediatric intensive care unit.  The pressure in her brain was aggressively managed with artificially induced deep breathing and fluid reduction.  Her kidney's showed evidence of malfunctioning and she continued to show signs of brain death.[17]

Around 9 a.m. the following day, nurses noticed a sudden change in vital signs and increased generalized lack of muscle tone, a finding highly suspicious of brain herniation (when the brain changes position due to swelling).  Maya was totally unresponsive without any spontaneous movements.  Her pupils were dilated and fixed without detectable brain stem activity.  A CT of the head showed damage to the brain due to lack of oxygen and movement due to swelling.  A nuclear medicine study at 11 a.m. demonstrated no blood flow in the cerebrum, the largest part of the brain, where functions such as thought and action take place.  This is a confirmatory sign of brain death.  At 12 p.m. an ophthalmologist confirmed that there was swelling and massive bleeding in both of Maya's eyes, consistent with significant non- accidental trauma.  At 1 p.m. an EEG confirmed no brain activity.  The doctors met with the biological family and explained the poor prognosis.  Brain death was diagnosed and Maya was pronounced dead at 2:35 p.m.

Zitelli and Davis' *Atlas of Pediatric Physical Diagnosis* (Sixth Edition) is a compendium of pediatric conditions, both common and uncommon diseases of children, as well as physical manifestations of child abuse and neglect.  The authors note that bruises are the most common clinical finding in cases of physical abuse, seen in up to 75% of victims. Inflicted bruises and welts may be the result of direct blows or of impacts with firm objects when pushed, shoved, thrown, or swung into them. They frequently involve more than one plane of an extremity, the torso, and/or head, and are often found in places that are unusual sites for accidental injury; these include the back, buttocks, upper arms, thighs, abdomen, perineum, and feet, all of which are typically covered by clothing and, thereby, hidden from public view. When due to slaps or blows, these locations suggest some forethought in site selection. Among other unusual sites are the face (including the periorbital area and eyelids, cheeks, sides of the forehead, lateral aspects

---

[14] Hypothermia is common in trauma victims and associated with an increase in mortality. (Lapostolle et.al., 2012). Cold water removes heat from a body 25 times faster than cold air and most of the body heat is lost through the head (Seidel, 2012). This is important to note considering cell phone text documentation of the cold shower at 11:38a.m. that Maya was placed in prior to her initial reported seizure.

[15] According to the Mayo Clinic, elevated Alantine transaminase (ALT) and Aspartate Transaminase (AST) can be a result of inflammation and/or damaged cells in the liver. Liver disease/infection was ruled out in Maya's case.

[16] Infarction implies an inadequate blood supply to an area of the brain that results in tissue death.

[17] Maya's vital signs: pulse 116, temp 88.1°F, Resp 18, Wt. 35lb. 4.4oz. (16kg), oxygen saturation 100%. Time not specified, weight from last encounter (not specified date/time of last encounter). 5/3 @ 1602, wt=16kg, indicates scale used, though not specified.

of the chin and mouth), ears, neck, hands, and aspects of the forearms. Being more exposed, bruises in these areas may reflect greater impulsivity on the part of the perpetrator. Bruises involving the head, face, mouth, neck, and ears are seen in a substantial percentage of physical abuse victims: approximately 50% of infants and 38% of toddlers. Surface injuries involving more than one place of the head or face are highly suspicious for abuse (pp 186-188).

Carrie and Todd Tobias

Twenty-seven-year-old Carrie Tobias and her 30-year-old husband Todd Tobias applied in the spring of 2010 to become DCFS foster parents. The couple, both from Illinois, was married in 2001 when Carrie was 17 and Todd was 20-years-old. He was in the military and she was in high school. Carrie stayed with Todd's family during high school joining him at military bases in other states. Mr. Tobias served eight years in the U.S. Marine Corps, including three deployments (twice in Iraq). The family returned to Illinois in 2006. At the time of their licensing application, they had two children, seven-year-old Alexis and four-year-old Megan, four dogs including two pit bulls, one German shepherd, and one beagle, one cat, and a python.[18]

Ms. Tobias reported to the licensing representative that she worked in child care "most of my adult life"[19], listing that she worked at a military childcare facility in another state from 2002-03 and at a child care facility elsewhere from 2004-06. Additionally, Ms. Tobias reported she was a Certified Nursing Assistant (CNA) and worked as a CNA for one to two years.[20] She provided the licensing representative with a copy of a Nursing Assistant diploma issued in 2004. A homemaker at the time of licensing, Ms. Tobias reported her most recent job was retail manager of a men's store. At the time of licensing, Todd Tobias was employed as an armed security guard at a plant, working 12 hour shifts from 6 p.m. to 6 a.m., but often worked overtime with alternating days off. He normally left for work at 4 p.m. returning at 7:15 a.m. The couple's background checks cleared in May 2010.[21] The couple requested to be licensed for five to six children including adolescents, but was informed that caring for that many children would require a waiver. In a case note (4/2010), licensing representative Marco Bassani wrote that Carrie Tobias stated she was an at home mom "but used to be a CNA for approx 1-2 years." [sic] In the foster home assessment, Mr. Bassani wrote that "*Carrie has a great deal of experience through working in day care and as a CNA*." Their foster home license was effective in July 2010, for four foster children. Mr. Bassani found the couple to be smart and articulate; the foster mother was young and energetic, and an 'at home mom' was a positive for foster parenting. He observed a good marital relationship, a good team with a very supportive husband.

In addition to criminal and CANTS background checks, DCFS licensing procedure requires verification of the family's income, driver's license and vehicle insurance. License applicants are required to submit three letters of reference and medical reports. There are no requirements

---

[18] Omega Agency case manager, Leila Ryman told OIG investigators she did not know how many dogs the Tobiases owned, but she saw dog cages outside next to the house.

[19] DCFS Foster Home Licensing Assessment, 7/2010.

[20] Licensing Case Entry, 4/2010, by licensing representative Marco Bassani.

[21] DCFS licensing representative Marco Bassani did not ensure that the Tobiases listed all previous addresses for the past five years as requested in the Authorization for Background Check form; therefore, an out-of-state CANTS check was not completed on Carrie or Todd Tobias. Licensing supervisor Laura Karbel told OIG investigators she did not check the Tobias' application before it was sent to the Central Office of Licensing (COoL). The OIG found the Tobiases had no child abuse/neglect history in other states.

to verify the applicant's educational or employment history.  The reliability of the information that Ms. Tobias provided regarding her work experience in child care and as a CNA is questionable.

A Family Advocacy Program Manager at the Marine Base in another state confirmed to OIG investigators that Ms. Tobias worked at their childcare facility with limited responsibilities for only two months in 2002.[22]  She had to clear their background requirements before assuming child care responsibilities.  The clearance process normally takes two months and Ms. Tobias left the facility prior to clearance.  The Human Resources Department at the U.S.M.C. base in a third state, told the OIG investigator they have no record of employment of any kind for Carrie Tobias.  Ms. Tobias worked as a classroom aide in a day care facility for less than a month at the end of 2003.  The daycare facility was located about 2.5 miles from the Tobias' address at the time they lived in the third state.  The day care director told the OIG investigator she had no memory of Carrie Tobias.  OIG investigators contacted all the childcare facilities in that area, only that daycare had a record of Ms. Tobias' employment.

The foster care caseworker Leila Ryman stated to OIG investigators that Ms. Tobias had informed Ms. Ryman that she previously worked in day care on a military base and was trained in restraints – "hug and hold."  Ms. Ryman stated to OIG investigators that use of restraints is against Omega Agency's policy.  Ms. Ryman also stated that shortly before Maya died, Ms. Tobias said she held Maya down and they held her down during tantrums.  Ms. Ryman did not document Ms. Tobias' statements about restraints nor did she bring Ms. Tobias' statements to the attention of her supervisor.

Illinois CNA licensing requirements include that the individual must have completed a certified/accredited course approved by Public Health and pass a CNA test.  Georgia has similar requirements.  Ms. Tobias was never licensed or registered as a CNA in either state.  The Institute where Carrie received her diploma, a correspondence school, is neither accredited nor recognized by the U.S. Department of Education.  It does not have the authority to certify an individual in nursing or nursing assistance.[23]  In regards to her managerial experience, after Maya's death, the Carter County Sheriff's Police interviewed Ms. Tobias' former employer.  Ms. Tobias was an employee in 2009 and the first quarter of 2010.  The employer stated to the police that Carrie Tobias was a good employee but she began taking a considerable amount of time off and after being questioned on the issue, she stated she had cancer and resigned.[24]

In her court testimony in September 2011, Ms. Tobias stated that she had early childhood educational credentials through a Community College.  According to the Records Department of the Community College, Carrie Tobias attended the College in the spring of 2004.  Ms. Tobias took a four-hour course in Early Childhood Credentials, which was the introductory course in a 32-hour certification program.   This was the only course Ms. Tobias took at the Community College and she did not finish the certification program.

---

[22] While in California, Ms. Tobias attended a 1.5 hour workshop, *Managing Children's Challenging Behaviors* at the YMCA Childcare Resource Service.  Ms. Tobias provided licensing worker Marco Bassani with a certificate for attending the 1.5 hrs. workshop. This document is not attached to any certification program.

[23] U.S. Department of Education.

[24] Ms. Tobias' DCFS medical report did not document she was being or had recently been treated for cancer.

<u>Placement of the Schauer/Tischer Children</u>

In late August 2010, a month after issuing the Tobiases a foster home license, the Department placed Maya (age 3½), Larisa (2½), and Ryan (1) Schauer in their home. The children's case became a "split case" between the Department which maintained licensing responsibility for the Tobias foster home, and the Omega Agency which had responsibility for placement services.[25] Four months later the Department took protective custody of the children's half-sibling, Shane Tischer.[26] Shane's maternal grandmother was willing to care for him; however, when Ms. Ryman said the mother could only see Shane two hours a week, the grandmother said it would be difficult to keep her daughter from seeing the baby.[27] It was not clear from the records as to why Shane was not placed with his grandmother with responsibility for supervision of parent-child visits, or why supervised visits were limited to two hours a week for an infant. Omega Agency requested the newborn be placed with his half-siblings and with Department approval, the two-day-old infant was placed with the Tobiases in late December 2010. Shane's placement required approval of DCFS Clinical Services and Licensing because his placement exceeded the allowable number of (four) children under the age of six in a foster home (Rule 402.15 Number and Ages of Children Served). A Clinical Services Supervisor's approval consisted of an email to the Placement Clearance Desk and the licensing supervisor, in which she wrote, "I see no clinical issues barring the placement, and it actually allows for placement with siblings." She told the OIG investigator that she did not review records or other documentation pertaining to the Tobias and Schauer children before giving approval, but went along with licensing approval. Licensing Supervisor Laura Karbel wrote in a letter to the Placement Clearance Desk, "I am giving permission to place the baby in the home with his siblings…" Ms. Karbel stated to OIG investigators that she gave approval based on recommendations by the licensing worker and Omega Agency who were making home visits. Ms. Karbel considered compliance with sleeping arrangement requirements and foster parent capability and experience caring for the children already in the home. Ms. Karbel stated that priority is given to placing siblings together.

Because of agency vacancies, the Omega Agency intact worker Becca DeMarco, MSW initially serviced the placement case. Ms. DeMarco had provided intact services to the children's mother, Brooke Jorgenson, and her three children for nine months from January to August 2010. Ms. DeMarco provided placement services to the children until September 2010, when the case was temporarily assigned to Omega Agency case manager Dirk Renke. In October, the family's case was transferred to Leila Ryman; however, Ms. DeMarco would continue to assist with parent-child visits and was referenced in Omega Agency records as a co-worker on the family's case because she assisted in the Integrated Assessments. In 2009 Ms. Ryman completed a Bachelor's degree in Criminal Justice and had worked part-time in the agency's residential program before being promoted to a full time child welfare specialist position. The Schauer children were one of her first assigned cases in October 2010. Ms. Aniyah Kennedy was the assigned supervisor during the placement case. Ms. Kennedy earned a Master's degree in Criminal Justice. She was a placement services supervisor for 15 years at Omega Agency when her responsibilities were expanded in August 2010 to include supervision of intact workers.

---

[25] The Department initially had responsibility for placement services until the team supervisor reported a conflict of interest because she knew the birth family. The case was given to Omega Agency because the agency was familiar with the biological family having provided Intact Family Services.

[26] The Department was granted temporary custody of Shane Tischer in December 2010.

[27] When the older siblings were placed with their grandmother she reported being overwhelmed with three children; the children were sick with colds, the family was living in a small trailer and she had no support.

Ms. DeMarco completed the initial Intact Family's Integrated Assessment. She described Maya as an intelligent verbal three-year-old who was outgoing, articulate and curious. She noted that when Maya was upset, she would throw a fit, stomp, and slam a door. Maya would carry on conversations with her mother and even argue with her when she disagreed. Maya was seen as confident in her interactions, independent and assertive. In regards to siblings, Maya and Larisa got along with each other but would sometimes fight over clothes. The children neither exhibited nor had a history of behavior problems. Maya separated easily from her mother and was somewhat indiscriminate in her affection with adults. She had a particular affinity for babies. Her mother was affectionate towards Maya and Maya responded to her mother's directions. The mother was described as nurturing and gentle with her children. She hugged them, dealing appropriately with any misbehavior.

Early Evaluations and Requests for Counseling and Services

During the first weeks of the three siblings' coming into foster care, their foster mother Carrie Tobias took them for dental and comprehensive medical exams. The foster parent reported to Ms. DeMarco that during Maya's first dental appointment, she threw such a fit that the dentist believed Maya needed "conscious sedation" to fill her cavities. However, in an interview with OIG investigators, the examining dentist stated Maya's visit was routine; he did not recall any incidents although crying and fear in young children is a common experience. Because these behaviors are considered normal they are not entered into the chart. The dentist stated that he did not remember saying anything about Maya needing sedation to fill cavities and would not have said that at a first visit. If there appears to be a serious problem the dentist has the patient return at least two times to try to overcome the obstacle before referring the young patient to another facility for sedation. In Maya's case, her cavities were filled on the scheduled date without incident and there were no notes in the child's chart to suggest there were any unusual problems. Maya returned in March 2011 for a routine six month check up without incident.

In early September 2010, the foster mother told Ms. DeMarco that Maya was like a little mother always looking out for her brother and sister, but she had several concerns. She was concerned that Ryan was head banging, Larisa had blank stares and Maya was touching herself-masturbating.[28] She further reported that she had discussed these concerns at the children's comprehensive (HealthWorks) exam. Dr. Monica Quincy, the children's HealthWorks physician told OIG investigators that she recalled the foster mother commented that Ryan was banging his head but stopped. Dr. Quincy stated that Ms. Tobias never reported that any of the other children were head banging**.**

Three weeks later in September 2010, Ms. Tobias took Maya for a developmental screen.[29] Claire Shelton, a developmental therapist at Grace Hospital, tested Maya using the Denver II Developmental Screening instrument. Maya presented with delays in language/learning domains; social-emotional concerns were noted. Later, Ms. Tobias would tell Omega Agency

---

[28] During the DCFS (sequence B) investigation of the Schauer children's mother and her paramour, Kevin Tischer, for risk of physical injury (#60) and environmental neglect (#82), Ms. Tobias reported to Becca DeMarco that Maya alleged Kevin Tischer touched her and Larisa's "cooters." The same day, Ms. DeMarco informed the DCFS investigator of the allegation. The investigator said she would pass the information on to the CAC interviewers. A victim sensitive interview was conducted in September 2010. In the CAC interview, Maya stated that Mr. Tischer touched her "cooter" with a sponge in the bath tub when he was washing her.

[29] The record indicates that Ms. Tobias took Maya for the developmental screen to determine her eligibility for preschool services and that Maya was found eligible for Headstart preschool programming. However, as a ward Maya would have been eligible for Head Start/PreK.

case manager Leila Ryman, DCFS Family Support Specialist Shelby Chase and Maya's outpatient therapist, Liz Norquist, at the Alpha Agency that the developmental specialist found that Maya's facial features indicated a strong possibility that she was born with Fetal Alcohol Syndrome (FAS).[30]  Ms. Shelton, the developmental therapist, clarified in an interview with OIG investigators that she would not have made even a comment on an FAS diagnosis because FAS must be diagnosed by a physician and that she did not recall FAS as being an issue at the screening.  Ms. Shelton stated that Maya had some language/learning delay but Ms. Shelton did not observe social or emotional problems.  She included social/emotional concerns based entirely on the foster parent's concerns.

During this same period in September, weekly parent-child visits began.  It is not clear how the children's transportation arrangement came about, but the foster mother was given the additional responsibility to drive the children half way to and from the visits (two round trips=128 miles).  The Omega Agency can assist with transportation with the use of case aides; however, they did not do so in this case. Once a week usually on Thursdays Ms. Tobias, with her four-year-old, transported her foster children to a weekly parent-child visit; leaving her home before 1 p.m., driving to a drop off point for the children's 2 p.m. visit, returning home to pick up her seven-year-old at 3 p.m., then return to the drop off point with her two children to pick up her foster children.[31]  The drop off point was in Silverton, about thirty miles from the Tobias' home. The visits took place in Orchard Valley from 2 to 4 p.m.  Omega Agency supervisor Aniyah Kennedy stated to OIG investigators that the Tobiases would have been asked what they could handle.  Silverton was a compromise; if the Tobiases were willing, "we let it happen."  Ms. Kennedy stated she did not know what was discussed between the caseworker and the Tobiases, or whether the number and ages of the children would have made it more difficult for the foster parent to transport the children.

Prior to the children's placement, Ms. Tobias's routine was to wake up her two children at 6 a.m. Ms. Tobias' daily schedule now included getting five children up in the morning, driving and dropping off her two children and Maya each morning to catch a school bus at 7:30 a.m., returning to the bus stop to pick up Maya and Megan at 11 a.m., prepare lunch and pick up her daughter at 3 p.m.  For the majority (69%) of weekdays in September, Mr. Tobias worked an evening shift 5:45 p.m. to 6:30 a.m.[32]

The family's case was transferred to Dirk Renke at the end of September.  Mr. Renke conducted a foster home visit in October 2010, at which time the foster mother first reported that she was having problems with Maya:  Maya had lifted up her sister to a countertop where there was a knife and on an earlier occasion had kicked her younger brother. She requested counseling for Maya. Mr. Renke wrote that he needed to look in the area for counseling resources for Maya.

---

[30] Fetal alcohol syndrome refers to a variable group of birth defects including mental retardation, deficient growth, central nervous system dysfunction, and malformations of the skull and face that tend to occur in the baby when a mother consumes large amounts of alcohol during pregnancy.  Behavioral problems (e.g., poor concentration, impulsivity) are sometimes the only obvious symptoms.  A person with FAS might have slow growth, poor coordination, hyperactive behavior, difficulty paying attention, poor memory, learning disabilities, speech and language delays (Centers for Disease Control and Prevention (CDC); National Institutes of Health (NIH).  FAS children might qualify for an individualized education plan (IEP) and be eligible for various services/therapies to help improve outcomes.
[31] Omega Agency worker Ms. Ryman confirmed to OIG investigators the transportation arrangement and that Ms. Tobias had all the children with her. Once a month Ms. Ryman would drive the foster children from the parent visit to Westfield and conduct a home visit with the foster family.
[32] Mr. Tobias was off two Thursdays in September.

According to DCFS Family Support records (see section on Family Support Specialist), one day after Mr. Renke's visit, the foster mother told the DCFS Support Specialist that when she requested counseling services from Mr. Renke, he suggested that the foster mother bring Maya to Omega Agency for 30 minute sessions once a week.  Ms. Tobias pointed out that it was more than one hour to Omega Agency (approximately 53 miles one way).

In December 2010, the Tobiases accepted the placement of Shane, their foster children's two-day-old infant brother.[33]  The couple was now parenting six children; five of whom were ages four and younger, including an infant.  Omega Agency staff did not offer the Tobiases supportive services including a case aide to assist with transportation or respite services. Rather, Ms Tobias' requests for respite assistance were continually denied.[34]  Traditional Foster Care contracts (Administrative Payments section) provide an allotment for respite.[35]

Except for Christmas Eve, Mr. Tobias worked from 5:45 p.m. to 6:30 a.m. Tuesday through Friday with some 12-hour weekend shifts after Shane was placed. In January 2011, his schedule changed: he would arrive at work at 5:45 a.m. logging out at between 5:45 to 6:15 p.m. for three to four weekdays a week with some weekend shifts. Mr. Tobias stated in court testimony that it was an hour commute to his worksite. For most weekdays Ms. Tobias had primary responsibility for Shane's night feedings. Ms. Tobias reported that Shane had night feedings at 2 a.m. and 5:30 a.m. She reported that when she got up to feed the baby, she noticed that Maya was awake. She later reported that she thought Maya only slept two hours a night.[36] Over the next several months (January-March 2011) Ms. Tobias had additional stress because Shane had a persistent bacterial skin infection and a bronchiolitis-viral infection. He was hospitalized overnight in March for RSV (respiratory infection), the same day Maya was discharged from Rosewood Hospital for in-patient psychiatric care.

At the end of January, Omega Agency requested that the Tobiases drive Shane to a drop off point for visits with his father.[37]  Mr. Tobias' work schedule remained consistent until March when he was off for 18 days. The couple arranged for a babysitter in March and took a few days vacation. Maya was hospitalized for one week in mid March.

### Second Request for Services
Ms. Tobias made a second request for counseling for Maya in early November 2010. She reported to Ms. Ryman that Maya had hit her sister in the face causing a nose bleed.  Earlier, in mid-September, Ms. Tobias had reported to the Omega Agency that Larisa had nose bleeds, and in January 2011, Ms. Tobias reported it was not uncommon for Larisa to have heavy nose bleeds "because she tends to pick it a lot."  Ms. Ryman told the foster mother that the paperwork for a counseling referral would be started; however, the counseling agency's records, Alpha Agency, indicate that the referral was not received until three months later, February 2011.  (See section on Alpha Agency Counseling and SASS Services.)

---

[33] The Tobiases received a total of $1,560 a month in foster care payments for the four children.

[34] The Tobias' last request for respite was in February 2011 when the couple wanted to get away for one or two nights during spring break in March.

[35] The payment rate is $4.57 per child per month (there were four foster children in this home). According to the Tobias' license file, the couple liked to go out one day a month.

[36] Ms. Tobias made this report to Dr. Stewart Fraser at the time of his psychiatric evaluation of Maya in April 2011.

[37] Shane had one visit in January; three in February, one in March and one in April 2011.The foster parent received a travel allowances for helping to transport her foster children to their parental visits.

In an OIG interview, Leila Ryman attributed the delay in making a counseling referral to the demands of her caseload. She talked about dealing with placement disruptions, and required supervision of parent-child visits, home visits, and documenting case activities.  Supervisor Aniyah Kennedy stated to OIG investigators that she directed Ms. Ryman to arrange for therapy and Ms. Kennedy knew it had taken too long to get the referral in place.[38] The February Administrative Case Review (ACR) noted that a referral for Maya's counseling had been made and that the foster parent would transport Maya for counseling.

Ms. Kennedy wrote a supervisory note in February that Alpha Agency could not begin therapy sessions until March and could only see Maya twice monthly. Ms. Kennedy wrote that Ms. Ryman "will explore with foster parents other possibilities such as bring her to Omega Agency for therapy, but transportation and distance could be difficult."

Head Start/ Prekindergarten
The Department requires that all children for whom the Department is legally responsible shall be enrolled in an early childhood education program. Young children who the Department is legally responsible qualify for Head Start and State PreK and the services are free (Procedure 314.70 Educational Services).  Additionally, DCFS Procedures require a school visit every six months and that the caseworker, in collaboration with early childhood education program personnel, review the child's developmental progress.

In September, Maya who would be four-years-old in February, was enrolled in the morning pre-K class at Bristols Elementary school, the same school the Tobiases' children attended in Flagstone. She began school in late October.[39] School started at 8 am. The school served breakfast beginning at 7:15 a.m.,[40] but preschool children were allowed an extra 10 minutes to finish breakfast and could come to their classrooms by 8:10 a.m.  Bristols's pre-K program was a blended program of three to five year old students. Maya attended preschool for six months until May 2011. Although Maya's younger sister, Larisa turned three years-old in January 2011 Omega Agency never arranged for her to attend a Head Start/PreK program, contrary to DCFS policy on early childhood education.

Prior to each six month Administrative Case Review, caseworkers are required to meet with the child's early childhood education program personnel to assess the child's developmental and educational progress.  The Schauer children's ACR was held in February, Maya had been attending the PreK program for four months. Maya's Education Profile (Assessment) [CFS407] submitted for the ACR required an interview with the classroom teacher or other preschool personnel. Omega Agency's case managers never visited Maya's preschool nor asked for a conference with Maya's preschool personnel.[41] Ms. Ryman completed the form without the required interview. Ms. Ryman's supervisor Aniyah Kennedy told OIG investigators she did not remember if Ms. Ryman went to the school, but recalled there was some communication between her and school.  Ms. Kennedy stated that there was not much of an assessment, but "we

---

[38]  Omega Agency's Quality Assurance staff conducted an internal review of the agency's Schauer/Tischer case records. In a preliminary report, it was recommended that the agency "Develop method of expedited mental health services when counseling referrals are delayed."
[39] Omega Agency staff, Dirk Renke.
[40] Breakfast varied: cereal, French toast or pancakes and sausage on a stick, biscuits and gravy, milk and juice.
[41] Rule and Procedures 315 Permanency Planning require case managers visit a foster child's school twice per year.

were aware of behavioral problems at school."  Although Larisa was eligible for preschool her ACR's educational assessment made no reference to preschool education.

The pre-school parent volunteer informed OIG investigators that when Maya first came to school Maya had extensive bruising to her face.[42]  Because she was a foster child, the volunteer assumed the bruises were the reason she was in foster care.  While Omega Agency worker Leila Ryman documented that she saw Maya at a parent-child visit in late October, no injuries to Maya's face were noted.[43]  In December 2010 Ms. Tobias emailed Ms. Ryman a chronology of events (8/2010 to 10/2010) that included an October incident where Maya suffered a facial injury: Maya was placed in timeout for "pushing several times." While Maya was in her fourth timeout she called her foster sister a bitch.  Maya was told to go to bed and on her way up Ms. Tobias "heard a few thuds and then crying. Maya had taken a bad fall down a few stairs resulting in "a pretty big bruise that looked bad."  Ms. Tobias put an ice pack on the bruise but the bruise was still pretty bad.  Mr. Tobias's work records show that he was at work at 5:45 p.m. that evening.  Rule 402.17 requires in case of an accident immediate medical care should be secured for the child in accordance with the supervising agency's direction.[44]  There was no contemporaneous notice of the injury to either licensing or Omega Agency at the time of the injury.

Ms. Ryman stated to OIG investigators she recalled that at one point Maya had a bruise on her face.  She described it as a linear mark that ran sideways across one check.  She stated that Ms. Tobias told her Maya fell on the stairs when she was walking up.  Ms. Ryman told OIG investigators she accepted the foster parent's explanation and she did not ask Maya about the incident.  Ms. Ryman said she did not request medical attention for Maya.

Supervisor Aniyah Kennedy told OIG investigators that Ms. Ryman did not report all of the children's injuries to Ms. Kennedy; however, Ms. Kennedy also confirmed to OIG investigators that her initials on all of Ms. Ryman's contact notes indicate that Ms. Kennedy reviewed the notes. Ms. Kennedy stated that she and the worker never discussed the question of medical attention for any of the children's injuries. She stated that the children's injuries were discussed in the context of Maya's aggressive behaviors.

### School breakfast

In January 2011, Ms. Tobias emailed Ms. Ryman upset that Maya was eating breakfast at school. A little girl who Ms. Tobias was giving a ride informed her that Maya ate breakfast at school:

> [Maya] had been eating breakfast at school against my wishes. She gets up in plenty of time to eat at home, I asked that they don't serve her anymore unless I sent money for her to eat…I remind her every morning not to go to the cafeteria & to go to the gym to play until school starts. She has breakfast every morning at home, how much she eats is up to her. So she has been taking another girls breakfast and eating that…I didn't know this was going on until today because Megan goes to the gym, Maya has been following this other little girl to the cafeteria and eating her breakfast.  Maya will be apologizing to this little girl.

---

[42] In court testimony 8/2011, Ms. Willis explained the bruise was on the cheek.

[43] Mr. Renke was to supervise a parent-child visit three days earlier, but it was cancelled because the worker was ill. Ms. Ryman supervised a visit in late October.

[44] The UIR (unusual incident report) reporting requirements for physical injuries to foster children only require a report be filled out if medical attention is sought for the injury.

And I'm going to speak with the mother and see if she would like me to cover the cost of the breakfasts…So I feel a little bit deceived right now…They [school staff] will talk to her [Maya] in the morning about this, but if she keeps this up she will have to sit in the principal's office until school starts.

In an interview with OIG investigators, Bristols principal and superintendent Richard Walker stated he remembered Carrie Tobias had asked him to keep Maya from eating breakfast at school so that she would eat at home.  He stated that he agreed to give it a week but if Maya wanted to eat breakfast they would not stop her.  Maya was eligible for a free school breakfast.[45] Rather than clearing up Ms. Tobias's misconception that she had to pay for Maya's breakfast, the following day at the family's parent child visit, Ms. Ryman chastised Maya in front of her mother telling her she had to apologize for eating the breakfast.

At the end of January, Maya's preschool teacher sent a note home to the foster parent stating that Maya had to use her listening ears and follow directions, and they were working on these skills that needed to improve.  Maya often played or talked to the teacher aide when it was time to get ready to leave school and she had been putting toys in her mouth.

In early April 2011, Maya's pre-school teacher sent an email to Ms. Ryman.[46] The teacher wrote that since October 2010, Maya had made steady progress in some pre-readiness skills, especially in the areas of fine and gross motor skills. Maya did need improvement in academic areas such as recognizing and naming numbers and letters.  The teacher reported that on one occasion Maya pushed a classmate when he took a piece of play food from Maya.[47]  Maya appeared to like school and enjoyed playing with her friends and foster sister. During court testimony Maya's teacher and the school volunteer described her as a bubbly talkative, sometimes too talkative little girl.

The day after the teacher's email regarding Maya's progress, Ms. Tobias phoned Maya's Screening Assessment and Support Services (SASS) worker Katrina Redding and told her that she thought Maya going to school may be a trigger for the child's aggressive behavior at home because she did not see any of these behaviors until Maya started school. Ms. Redding who had had no contact with the school recommended the foster parent keep a log of times that Maya acts out, and if the foster mother "believes it is school maybe not pulling her out right away, maybe going three days without school and back for two days."  Ms. Redding stated to OIG investigators that she did not recall stating this and thought "maybe my notes were incorrect" as she did not believe this is what she said or that it was her intention to have Maya removed from school. (See Alpha Agency- SASS section below).

Ms. Tobias followed up with Maya's teacher requesting her to log Maya's behaviors. The foster mother warned the teacher to keep a close eye on Maya because "we have had a couple of violent episodes this week."  One week later, Ms. Tobias reported to Maya's therapist that Maya was doing well at home but having problems at school such as throwing fits.  During the month

---

[45] DCFS wards are eligible for free lunch and breakfast in Illinois schools that participate in federally assisted meal programs: National School Lunch, Breakfast, or Special Milk Program. Foster parents' personal income is not to be considered and need not be reported [Subchapter c: Fiscal Administration, Procedures 351 Federal Benefits and Other Public Funds].

[46] Ms. Ryman told OIG investigators that she never spoke to the teacher.  It is likely that Ms. Ryman asked Ms. Tobias to request the teacher send a progress report to Ms. Ryman.

[47] In court testimony, Maya's teacher stated that the boy who took the toy away from Maya was a five-year-old and bigger than Maya. Maya pushed him after he took her toy.

of April, Maya's teacher logged Maya's school behavior. The logs showed a normal preschooler who on most days received smiley faces. Omega Agency and the Alpha Agency therapists' records did not contain the school's behavioral logs. According to Maya's school record and interviews of the school's preschool teacher, principal and volunteer parent, Maya did not exhibit aggressive behaviors, self injurious behaviors (head banging) or sexualized behaviors (masturbating).[48]

Health Care

In late January 2011,[49] Ms. Tobias reported to Omega Agency that Larisa had peed on herself twice and was pulling out quite a lot of her hair. She found clumps of Larisa's hair on the bed. The foster mother reported she knew it was a way of coping since her daughter Megan had done the same thing when they first took in the foster children. She also noted that Larisa had bloody noses "because she tends to pick it a lot", but she was concerned about the amount of blood and was going to talk to the children's doctor about it and take pictures for the doctor. The foster mother requested counseling for Larisa because she was crying a lot at home. By early April, Ms. Tobias expressed safety concerns to Omega Agency "now that she knows that Larisa has aggressive tendencies."

The Schauer children had a HealthWorks appointment in February 2011. Dr. Monica Quincy saw the children for their well-child appointment. While the foster mother reported that Maya bruised easily, she never reported her concerns that Maya was excessively masturbating or had sleep problems. Nor did she report any concerns with Larisa's nose bleeds, hair loss or sleep problems. Dr. Quincy ordered blood work on Maya because of the foster parent's report of the child bruising easily; the lab results were negative.[50] [51] Dr. Quincy stated to OIG investigators that the foster mother never showed the doctor any photos of children's injuries. According to Dr. Quincy's records Maya and Larisa were healthy with no preexisting medical conditions.[52] Maya weighed 30 pounds and was 36 inches in height. Shane, however, required frequent medical visits for a skin infection. He was treated for pustular lesions on his stomach (1/2011) and again for impetigo in the diaper area (2/2011).[53] Culture results identified Methicillin Resistant Staphylococcus Aureus (MRSA) on 2/2011. Neither Shane's HealthWorks file nor medical record contained the lab report or notation identifying MRSA as the test result.[54] Five weeks later, Shane had bronchiolitis-viral infection in the lungs that required an overnight hospitalization on (3/2011).[55] Ms. Tobias reported to Ms. Ryman that she had been giving

---

[48] Carter County Sheriff's police, DCFS and OIG interviews of Maya's teacher, volunteer parent, and school principal/superintendent.

[49] SAWCIS note 1/2011.

[50] Maya's lab report indicated that three components were elevated (Red Blood Cell (RBC) count, Hemoglobin and Hematocrit; however, the reference ranges listed on the report are typical for adult females. Pediatric lab values for these markers tend to be within a higher range; therefore, Maya's results were within normal limits for her age group (females between 3-5 years old).

[51] Ms. Ryman wrote in Maya's Education Profile that a blood panel had been ordered (2/2011) "to check thyroid due to bruises not going away."

[52] According to the Omega Agency's case records, Ms. Ryman never contacted the children's primary care physician, Dr. Monica Quincy, to discuss any of the children's injuries or behaviors. Ms. Ryman told OIG investigators that she did not attempt to contact the children's physician, and her supervisor did not instruct her to do so. Ms. Ryman stated, "I did not feel that I was required to analyze the injury history of the children."

[53] A doctor saw Shane in 2/2011 at which time she noted cultures were taken.

[54] HealthWorks of Illinois located the lab results at the request of the OIG investigator.

[55] Centers for Disease Control and Prevention recommends standard and contact precautions to control the spread of MRSA. For hospitalization, priority is given to single-patient rooms to patients with known

Shane more formula because his doctor said he needed to gain more weight. Ms. Tobias reported she noticed that Shane appeared to be gaining weight since increasing the formula. (Contact note, 3/2011.)  Ryan required medical visits to treat ear infections.

In February 2011, Ms. Tobias reported to Ms. Ryman injuries to Larisa's neck (scratches and pinch marks) and that the child said Maya caused the injuries. Less than a month earlier, January 2011, Maya and Larisa told Ms. Ryman that the Tobias' cat sleeps with them. The injuries to Larisa's neck were not reported to Dr. Quincy and medical attention was not sought for Larisa.

Ms. Tobias testified in court that when the children were placed in her home, Ryan was banging his head into things. She informed Dr. Quincy at his September 2010 comprehensive medical evaluation.  Ms. Tobias stated that the doctor told her that head banging was something they usually grow out of and it is a soothing, comforting behavior.  Ms. Tobias stated that Dr. Quincy advised her to keep an eye on Ryan's head banging, and if it occurred more often, more severe or with any pain, Ms. Tobias was to contact the doctor.  During the Department's investigation of Maya's death, Dr. Quincy confirmed to the child protection investigator that Ms. Tobias stated Ryan initially banged his head, but had stopped.

Dr. Quincy had no information in her record regarding Maya's psychiatric admission. Dr. Quincy informed OIG investigators that the foster mother told her that Maya had been hospitalized in a psychiatric hospital, but she did not tell the doctor the reason for Maya's admission. Dr. Quincy said that had Ms. Tobias not told her, the doctor would not have known about the child's hospitalization at Rosewood.  Dr. Quincy stated that she does not access HealthWorks records and HealthWorks does not inform her of other health-related encounters.

The Carter County Health Department's Healthworks record for Maya recorded the dates of admission and discharge from Rosewood hospital; however, the file had no information regarding reason for admission, diagnosis, or discharge plan because the DCFS Guardian's consent form for release of information excludes mental health information.  A case note in the HealthWorks file indicated that a HealthWorks nurse[56] phoned Ms. Tobias in early April 2011, to see how things were since Maya's hospital discharge at which time Ms. Tobias reported improvement in Maya's behavior.  Two days later, Maya and Ms. Tobias were seen in the WIC program for certification. At that time, Ms. Tobias informed the Healthworks nurse that Maya "had a couple of psychiatric episodes this week…will discuss with counselor." Ms. Tobias told another nurse that "she [Maya] makes herself physically vomit when offered something to eat that she does not like. This started after inpatient psychiatric hospitalization. She was given to eat whatever she wanted to eat while in hospital…" (HealthWorks case entry, 4/2011.)

Alpha Agency Services/SASS Program
In February 2011, the Alpha Agency, a Carter County mental health agency located in Hamlin received Omega Agency's referral for Maya to receive counseling services. In addition to clinical counseling services, Alpha Agency has a crisis program Screening Assessment and

---

or suspected MRSA colonization or infection. In recent years MRSA has become a major public-health problem because this bacterium has become resistant to antibiotics called beta-lactams, which include methicillin and other commonly prescribed antibiotics such as penicillin and amoxicillin. Among the most common MRSA-related challenges for pediatricians is that the bacterium tends to cause repeated and recurrent infections (MRSA treatment guidelines endorsed by the American Academy of Pediatrics).
[56] HealthWorks assigns a medical case manager to state wards ages three and under to track and monitor the child's health status.

Support Services (SASS) with three full time staff that provides assessments, brief supportive therapy and linkage to appropriate services.[57] The objective of Alpha Agency's crisis services is to focus on stabilization, decreasing client's symptoms and avoiding harm to self or others. The agency has three consulting psychiatrists.  Maya was scheduled to see Alpha Agency outpatient therapist, Liz Norquist in early March. However, five days after receiving the referral, Omega Agency's case manager Ms. Ryman contacted the agency requesting that Maya's appointment be moved up. Ms. Ryman reported that "Maya was 'ripping' hair out of her sister Larisa's head leaving bald spots, and slamming her little brother's head into the wall the previous weekend." Ms. Norquist replied that she had no openings but if there continued to be concerns SASS's crisis line should be contacted.

In late February, Ms. Tobias called the CARES crisis line[58] reporting that Maya had woke up in the middle of the night in early February, attacked her sister pulling out her hair and Maya was displaying inappropriate sexual behaviors.  The Alpha Agency on-call SASS crisis worker went to the Tobias' foster home, following SASS protocol.  During her interview with the SASS crisis worker, Ms. Tobias reported problems with Maya's behavior, including aggression toward siblings, sleep disturbance, and masturbation in front of other children.  While in the foster home the SASS crisis worker reported that the home was very organized and clean and the children were exceptionally well dressed.  She noted that Maya and her siblings sat around the dining room table; with Maya and her sister sitting next to each other.  She noted that Maya and Larisa were getting along and specifically noted that Larisa did not appear to be afraid of Maya. No marks were observed on any of the children.  Maya was deflected from hospitalization to SASS services for therapy, case management and resource linkage.  Maya was given a diagnosis of Adjustment Disorder with Mixed Disturbance of Emotions and Conduct and a CGAS score of 40.[59] The SASS crisis worker noted a therapy appointment had been previously scheduled with Ms. Norquist. Katrina Redding was identified as the SASS case manager and crisis therapist: The foster mother signed consent for the assigned Alpha Agency crisis therapist, Katrina Redding, to have access to Maya at school.

In an interview with OIG investigators Alpha Agency therapist, Ms. Norquist reported that her first encounter with the Tobias family was with Ms. Tobias in early March 2011, at the Alpha Agency office.  It was at this appointment that Ms. Norquist began a Comprehensive Mental Health Assessment of Maya. Maya did not come to this appointment. The Assessment was based solely on the foster mother's report with no information from collaterals.  Ms. Norquist did not recall if she saw the late February SASS screen prior to her appointment.   The Assessment noted the extent, nature, and severity of Maya's presenting problems (i.e. aggressive behavior toward younger children, including siblings) in the past six months. The

---

[57] DCFS contracts for SASS services.

[58] The *Children's Mental Health Act of 2003* requires that any child at risk of psychiatric hospitalization for whom public payment may be sought must be referred to the Crisis and Referral Entry Service (CARES) phone line. CARES will determine whether the crisis situation meets the clinical criteria for Screening, Assessment and Support Services (SASS).  CARES is a statewide toll-free number to which referral may be made by parents, staff of the Department and purchase of service providers, caregivers, school personnel and others who believe a child or youth is in a psychiatric crisis which may require hospitalization.

[59] Defined as - Major impairment of functioning in several areas and unable to function in one of these areas i.e., disturbed at home, at school, with peers, or in society at large, e.g., persistent aggression without clear instigation; markedly withdrawn and isolated behavior due to either mood or thought disturbance, suicidal attempts with clear lethal intent; such children are likely to require special schooling and/or hospitalization or withdrawal from school (but this is not a sufficient criterion for inclusion in this category).

foster mother also reported that Maya would often say things that are "patently untrue," for example, reportedly Maya came home from school stating her substitute teacher pushed her into a desk and left bruises and that Ms. Tobias kicked her.[60]  However, according to Ms. Tobias, neither of these incidents took place.[61]  Ms. Tobias reported that Maya and Larisa no longer were able to share a room due to this aggression and as such, an alarm was placed on Maya's door.  School problems were noted for crying fits and limited attention.

Per the foster mother, Maya allegedly experienced both physical and sexual abuse by her biological mother's boyfriend and was reported "to get nervous easily, reluctant to eat healthier foods, does not seem to enjoy anything, does not sleep well, has a fear of the bathtub and water, is aggressive toward siblings, and throws self down and smacked head on table."  She was reported to bruise easily, overeat "to the point of vomiting," and will often masturbate excessively and in inappropriate places.  Ms. Norquist told OIG investigators that all ratings on the Assessment are "subjective."  Ms. Norquist scheduled their next appointment for late March; however, Ms. Tobias and Maya failed to attend this appointment.

Three days after Ms. Tobias saw Ms. Norquist, Alpha Agency SASS worker, Katrina Redding went to the Tobias foster home to complete the Comprehensive Mental Health Assessment that Ms. Norquist started.  In an interview with investigators from OIG Ms. Redding described the Tobias home as organized, clean, neat, and things seemed very put together.  She noted Maya's siblings were at school and that she and Ms. Tobias met at the dining room table and did not go through the home.

The SASS worker's written direct observations of Maya included "poor judgment, poor concentration, and avoidant behavior."  Ms. Redding also noted a score of 3 on the sexual aggression scale on the CSPI (Child Severity of Psychiatric Illness).[62]  When asked by OIG investigators why Maya was given a score of 3 on the CSPI of sexual aggression, Ms. Redding stated it was due to reports that Maya excessively masturbated.  However, when it was pointed out to the SASS worker that masturbation is not at a level 3 on the CSPI and was asked to describe or define sexual aggression, Ms. Redding was unable to define it except to say it is "when you are aggressive sexually."  When further probed on how masturbation would be clinically considered sexually aggressive the SASS worker replied, "Because you are acting sexually aggressive toward your self."[63] Ms. Redding also reported that she could not "pinpoint why she documented that Maya had poor judgment and concentration; however, she believed that she noted avoidant behavior because Maya "may have been avoiding" her questions but was unable to recall "exactly why I marked it."

The day after her meeting with the foster mother, Ms. Redding received a call from Maya's caseworker, Ms. Ryman, who was concerned about Maya's physical aggression toward her younger sister.  Maya was reported to have "snuck out of her room knowing how to avoid the alarm system they put in place and went into her sister's room while she was sleeping and

---

[60]  In court testimony, Ms. Norquist repeated what Ms. Tobias had reported to her; Ms. Norquist documented Ms. Tobias' statements.

[61]  Ms. Tobias denied in court on 9/2011 that she reported these incidents to Liz Norquist.

[62]  A score of 3 on the sexual aggression scale means the child has engaged in sexually aggressive behavior in the past 24 hours.

[63]  At this time, Maya's AXIS I diagnosis continued to be Adjustment Disorder with Mixed Disturbance of Emotion and Conduct.  Ms. Redding also rated a score of 40 on the CGAS AXIS V scale; however, Ms. Redding was not aware of the criteria for this rating or why she rated Maya at this extreme level of dysfunction.

pulled chunks of her hair out, tried choking her, and left bruises on her chin." [64] It was reported that Maya's sister did not fight back this time and told the Tobiases about the incident.  Ms. Ryman wanted Maya's June appointment with Alpha Agency's consulting psychiatrist Dr. Fraser moved up as soon as possible; however, the SASS worker reported that "that is where we are at with appointments" and if there was a cancellation that Maya would be able to take that spot.

The SASS worker discussed with Ms. Ryman hospitalization for Maya regarding these behaviors as an alternative.  Ms. Redding asked Ms. Ryman to let the foster mother know that she would contact her in the morning to discuss the different options.  There is no documentation that this call took place or that further contact was made with the foster mother until two days later (Thursday) when Ms. Redding received a SASS crisis call from Ms. Tobias.

That Thursday, at 2:30 in the afternoon Ms. Tobias contacted SASS in regard to Maya's "escalating behaviors."  The SASS screen took place at 3:00 p.m. via phone.  In the SASS Referral Form it was noted that Maya was located at the Tobias home and that the foster parents were present and assisted in the screen. However, at 3 p.m. Mr. Tobias was still at work and Ms. Tobias was the sole caretaker.[65]  The foster parents drove Maya to Rosewood later that evening.

Ms. Redding told OIG investigators that Ms. Tobias sounded very upset as Maya reportedly cut her arm with a large knife.  The SASS worker spoke to Maya via phone and was told by Maya that she was "mad and cold" and that "the little one didn't work so I got the big one."  There was no documented discussion about the specific injury (i.e., was it bleeding? how big was it? was it a scratch or cut?).  Ms. Redding reported in her SASS evaluation that the past month's behaviors, including aggression and masturbation were additional reasons to hospitalize.  On interview Ms. Redding reported that seeing a patient/client face-to-face is required for a SASS screen; however, she felt that given the information provided to her from Ms. Tobias regarding Maya's previous behaviors and her alleged cutting of self, this was enough to warrant a hospitalization without the face-to-face screening.  She also reported that she did not meet Maya at the hospital nor did she ever see the "cut" to her arm.  Maya's diagnosis at the time of the March SASS screen remained Adjustment Disorder with Mixed Disturbance of Emotion and Conduct.

Psychiatric Hospitalization (March 2011)
On Thursday, Ms. Tobias phoned Maya's SASS worker, Katrina Redding, to report that Maya allegedly attempted to harm herself with a knife.  The foster mother stated she discovered Maya with a knife in the kitchen and that Maya had gotten into the child-locked drawer and made minor "cuts" to her arms.  Ms. Tobias reported that when asked why she tried to hurt herself, Maya said "because I'm angry."  The SASS worker screened Maya over the phone and arranged for the child's admission to Rosewood's Advanced Child Treatment (ACT) program.[66]

Maya was admitted due to aggression, danger to others, and self-injurious behavior; however, a high risk factor of "sexual perpetration" was also checked off in a High Risk Notification Alert indicating that Maya "was sexual aggressor toward her sibling."  In the Rosewood Integrated

---

[64] Ms. Ryman and SASS worker stated to OIG investigators that they never saw the door alarms.

[65] Mr. Tobias signed out at 4:45 p.m. per employee time records.

[66] Rosewood's ACT program provides acute inpatient care to children (age 3-12) and adolescents (12-17). Comprehensive multi-disciplinary diagnostic evaluation; individual, group and family counseling; behavioral therapy; expressive therapies; parent training and support sessions are among the services offered.

Assessment it was also noted that "per foster family [Maya] may have fetal alcohol syndrome;" however, no documentation was provided to support this claim.  The Tobiases also reported behavioral difficulties at school.

A body chart completed at Rosewood indicated scratches to her left wrist and noted "accident and self-mutilation."   In Section 8, Social Skills/Coping Mechanism, of the Integrated Assessment – Nursing Assessment, it was noted per the foster parent that Maya "will throw herself on floor or smash head against table" and "bang self against the wall."  It was also documented that Maya believed she was admitted to the hospital because she had a "cough." She reportedly shook her head no when asked if she was there for hurting herself or others.

Admitting diagnoses was Intermittent Explosive Disorder and Post Traumatic Stress Disorder with a CGAS score of 30.[67]  As such, Maya was recommended to receive the following therapies: group, individual, milieu treatment, psychiatric contact/medication management, and applied behavioral analysis.

Maya met with Rosewood hospital therapist Rita Boling on Friday, for her first individual therapy session.  Ms. Boling documented that Maya did talk about hurting her sister when upset as she becomes "angry" but was unable to explain why she gets angry.  Ms. Boling reported seeing "cuts on [Maya's] arm" and when asked Maya reportedly responded that she "cut herself with a knife because she was so angry."  No further discussion about the injury was noted. When OIG investigators asked Ms. Boling if she recalled details of the "cut," Ms. Boling stated that it was "on her wrist on the top side of the arm."  She described it as "it almost looked like a small scab, like a paper cut, one scratch, no gash."

Ms. Boling told OIG investigators that she had two individual sessions with Maya; however, the hospital record contained notes for one session only.  The hospital therapist was unsure why the note from the second session was not part of the record.  She could not recall the day of the second session but recalled that Maya "played appropriately."  Ms. Boling confirmed to OIG investigators that when she spoke to the principal at Maya's school (progress note 3/2011) she only asked whether a school counselor was available to the school and she did not inquire about Maya's behaviors or academic performance.

Ms. Boling did not recall anyone ever telling her that Maya was a head banger, nor does she believe this issue was ever discussed.  Ms. Boling documented that "not once did I observe any aggression" during her hospitalization.  She did not recall seeing any other injuries on Maya. According to Ms. Boling, Maya was the youngest child on the unit.

### Case Staffing Conference at Rosewood
Four days after Maya's admittance, Rosewood psychiatrist Dr. Stewart Fraser and hospital therapist Rita Boling conducted a case staffing conference.  Participants via phone included Omega Agency staff Leila Ryman and Aniyah Kennedy; Alpha Agency SASS counselor Katrina Redding; a DCFS Clinical worker; and Carrie and Todd Tobias.  The staffing note stated that Maya was admitted "due to self-injury and aggression" and Maya "has a long hx (history) of trauma/abuse, physical, sexual."  During the staffing there was discussion of the possibility of the diagnoses of Intermittent Explosive Disorder, PTSD, and Reactive Attachment

---

[67] A score of 30 on the Children's Global Assessment Scale (CGAS) is defined as being unable to function in almost all areas e.g., the child stays at home, in ward, or in bed all day without taking part in social activities or severe impairment in reality testing or serious impairment in communication, e.g., sometimes incoherent or inappropriate.

Disorder. Dr. Fraser later ruled out Intermittent Explosive Disorder and Reactive Attachment Disorder.  Hospital records indicated that hospital staff had not seen any aggressive behavior and Dr. Fraser's notes reflected Maya was cooperative and attentive.  No other information was documented regarding the change in diagnoses or the criteria used to make these diagnoses.  Ms. Boling reported at the staffing that Maya was open and verbal and that her expressiveness may help to reduce negative behaviors over time.  No medications were indicated or needed at this time.

A family session took place an hour prior to the staffing.  The hospital therapist wrote in a progress note that the "therapist spoke with foster father prior to the family session.  [Mr. Tobias] stated that he loved [Maya] very much but was unsure how to help her."  They discussed the importance of stability and predictability, and safety issues at home; however, no details regarding their conversation were noted in the progress note.    The therapist recommended outpatient play therapy for Maya.  After a brief meeting with Mr. Tobias, Maya was asked to join the session; however, it was noted that Maya was afraid to go with the therapist and asked that the "staff" go with her.  Progress note indicates that Maya became more "comfortable and talked to foster father."  Maya stated she was "afraid of the dark."  According to the progress note,

> [Maya] stated that this therapist would hurt her if she would make bad choices.  Therapist reassured [Maya] that she would never hurt [Maya]…Maya then said 'darn' couple of times looking at the therapist, and threw a Lego in a very controlled fashion and again watched how this therapist would react. Therapist continued to reassure her. [Maya] was able to follow limits when asked not to throw Legos.

The therapist's progress note reflected no discussion as to why Maya felt this way.  There was no documentation as to the interaction between Mr. Tobias and Maya.  This family session was not discussed in the case staffing.  However, the nurse's progress notes following this session described Maya to be "hyperactive" as she had difficulties sitting still and staying focused.  She had difficulties following directions and needed multiple redirections.  She continued to have these difficulties at 7:00 p.m. that evening.  (It is important to note that these are the only negative behaviors that Maya displayed during her hospitalization and they occurred immediately following a family session.  These behaviors were not discussed with Maya at the time or during any following therapy sessions).

According to Rosewood's Physician's Inpatient Discharge Summary, during Maya's hospital stay of one week, she participated in group, individual, and milieu therapies.  It was noted that hospital staff had not seen any of the behaviors reported by Maya's foster parents as she was cooperative and appropriate, but had "poor judgment and insight."  Overall, she was receptive to staff feedback and had positive and appropriate interactions with peers.  She was assessed not to be a danger to others or herself. Maya was discharged to the Tobiases.[68]

---

[68] The director of the Carter County Health Department informed the Carter County Sheriff's police that on 3/2011 Ms. Tobias told WIC coordinator that "she didn't want to take Maya back after she was admitted to Rosewood." The WIC coordinator stated to the police (7/2011 interview) that Ms. Tobias told her, "Maya's problems were big and she was hesitant about wanting to take Maya back because she wasn't sure she could handle her."  It is important to note that there is no evidence that Mr. or Mrs. Tobias voiced unwillingness to have Maya return to their home at time of the case staffing or discharge from Rosewood.

In an OIG interview, Dr. Fraser explained that Maya was described as having poor judgment relating to what she was doing before hospitalization. He acknowledged that four-year-olds are typically not insightful and that Maya would need help in "making better decisions for [her] self."

### Dr. Stewart Fraser—Rosewood and Alpha Agency Psychiatrist

While hospitalized, Dr. Fraser saw Maya on three occasions. His first session took place just after admit. He documented reports of masturbation in public, choking her sister, pulling chunks of sister's hair out, and cutting herself with a knife. Their next session occurred four days later, and they discussed how she could handle conflicts with her sister in the future. Dr. Fraser noted that Maya was doing "generally well on unit according to staff." She was playful and engaging. Their final session was the day before Maya's discharge, in which it was noted that he had "no concerns regarding anger, frustration nor aggression with peers." He noted "poor boundaries but not too bad." No specific information was given as to why he thought she had poor boundaries.

With respect to contacting the Tobiases and gathering information Dr. Fraser noted he spoke with foster parents on one occasion during the phone staffing and primarily received information regarding Maya's past behaviors from her SASS worker, Caseworker, and foster parents. He was not aware that all information was based on foster mom's report and her report alone, as none of Maya's behaviors were witnessed by anyone else. Dr. Fraser noted that sometimes the child's school will be involved with the hospital staffing, as all collaborative information is helpful. Dr. Fraser reported that Maya was one of the youngest children on the unit. She was quite verbal and had a "good interchange" with everyone.

On interview with OIG Investigators in December 2012, Dr. Fraser could not recall what Maya's injuries looked like upon admission to Rosewood. He did not recall being informed that Maya was a "head banger." He reported that it is common for a 4-year-old to express anger in a physical way as they sometimes get overwhelmed with anger and do not have the words to express themselves. However, he noted that the typical injuries one would see from a head banger would be contusions to the forehead and back of the head. When shown the photographs taken by Robins Hospital of Maya's injuries to her right ear (i.e. bruise on ear cartilage and behind the ear) he reported these injuries are not what one would expect to see from head banging. He also noted that the injury to her right temple just above her eye was not typical injury of a head banger. He did not believe these injuries were the result of head banging.

Maya was discharged after one week with a diagnosis of Mood Disorder, NOS and PTSD. No mention of RAD was noted on the final Discharge Summary. Her CGAS score was reported to be 55.[69] Her clinical aftercare plan included: 1 hr/wk outpatient therapy with Liz Norquist beginning one week after discharge and 1 hr/wk SASS services with Katrina Redding beginning the day after Maya's session with Ms. Norquist, to help alleviate behavioral symptoms. The foster mother did not bring Maya to Alpha Agency for the outpatient appointment; no explanation was given for the failed appointment-Maya's first outpatient session since her hospitalization. Ms. Norquist reported that she did not follow-up on why the appointment was not kept and that her "notes don't always indicate why a client missed their appointment."

---

[69] A CGAS score of 55 is defined as - Variable functioning with sporadic difficulties or symptoms in several but not all social areas; disturbance would be apparent to those who encounter the child in a dysfunctional setting or time but not to those who see the child in other settings.

Approximately ten days later in April 2011, the foster mother reported via phone to the SASS worker that "things are going okay," although Maya attempted to make herself vomit the night before. Ms. Redding stated she would address this in therapy later that day. Approximately two hours after the call Maya and Ms. Tobias arrived for their appointment. Ms. Redding documented that Maya presented as happy. She noted they worked on expressing emotions. When asked during the OIG interview as to whether vomiting was addressed the SASS worker responded, "I can't remember anything about vomiting."

According to Ms. Redding's progress note, after her session with Maya, Ms. Redding met with Ms. Tobias to "provide support." At this time, it was reported by Ms. Tobias that Maya had another aggressive episode with her brother this time. Ms. Redding noted that the foster mother would continue to monitor Maya closely and she would not let Maya be alone around the small children. The SASS worker posed no questions as to when this episode took place as Ms. Tobias stated hours earlier that things were going okay.

Immediately following her meeting with the SASS worker, Ms. Tobias telephoned case manager Ms. Ryman to report Ryan's bruise on his face including broken blood vessels on his cheeks. The foster mother also reported that while at Maya's appointment with Ms. Redding, Maya denied hurting Ryan and Larisa said, "I did it" demonstrating "a squeezing motion with her hands that indicated that she has also choked him." Ms. Tobias stated that the SASS worker felt that Ryan's broken blood vessels were likely caused by choking. The foster mother expressed safety concerns now that Larisa was showing aggressive tendencies. On interview, Ms. Redding told the OIG investigator that she recalled that Ms. Tobias stated that Larisa said she hurt Ryan, but she could not recall Larisa demonstrating what she did to her brother. The SASS worker said she did not talk to Larisa and she did not recall telling the foster mother that the broken blood vessels were likely caused by choking. Ms. Redding stated that she should have added the new information to her progress note and could not explain why she did not.

Three days later, Ms. Redding staffed Maya's case with Alpha Agency out-patient therapist Ms. Norquist. Ms. Redding's progress note reflected only that a staffing took place; there was nothing in the note to show what was discussed. Ms. Redding told the OIG investigator she could not remember what was discussed that day. When asked if she was required or expected to document points of discussion during a case staffing, the SASS worker replied "I don't know that it's required."

One day prior to the aforementioned staffing, Ms. Tobias phoned the SASS worker and told her that she thought Maya going to school may be a trigger for the child's aggressive behavior at home because she did not see any of these behaviors until Maya started school. Ms. Redding recommended the foster parent keep of log of times that Maya acted out, and if the foster mother "believes it is school maybe not pulling her out right away, maybe going three days without school and back for two days." The SASS worker made this suggestion without any contact with the school or other professionals. Ms. Redding told OIG investigators that she did not recall stating this and thought "maybe my notes were incorrect" as she did not believe this is what she said or that it was her intention to have Maya removed from school. During this same phone call the foster mother reported that she would begin keeping a log of the times Maya acted out aggressively to identify any possible triggers.

Ms. Norquist's first session with Maya in early April 2011. The foster mother brought Maya to Alpha Agency's office and reported that Maya had become increasingly aggressive toward her 18-month-old sibling and that if "we are unable to get [Maya's] aggressive behavior under control, we may need to look at residential placement for her." The foster mother further

reported that she was feeling overwhelmed and when she accepted the Schauer children she did not know that an infant would also be placed in her home.  The foster mother did not tell Ms. Norquist that she was considering pulling Maya from preschool. There was no communication between the SASS worker Ms. Redding and Ms. Norquist.  During the same session Ms. Norquist noted that Maya was happy and very friendly.  She reported no aggression during play in the session and that they discussed playing with Larisa.  Maya reportedly stated that sometimes she is "bad" and makes "bad choices."  When asked if she was angry with her sister when she hurts her, Maya replied, "No, I was cold."  Ms. Norquist did not further explore this statement, although she noted that apparently Maya had answered similarly when the foster mother and SASS worker asked the same question.

According to records in the following week, Ms. Redding staffed this case with Alpha Agency supervisor Veronica Ceaser.  Records indicate that the SASS worker wanted assistance in regards to Maya and "thinking of different opportunities to help [Maya] with Reactive Attachment Disorder."  The supervisor reportedly suggested having the Tobiases recommend chores for Maya to do to help.  She also suggested keeping a log to narrow down some triggers.  Ms. Redding stated she would recommend these strategies at their next appointment.  It is important to note that this is first mention of a diagnosis of Reactive Attachment Disorder since the staffing at Rosewood one month earlier.  Prior to the staffing with Ms. Ceaser there was no documented mention of this diagnosis or that the SASS worker's conceptualization of Maya's case had changed from Adjustment Disorder to Reactive Attachment Disorder.

On the same day Ms. Redding spoke to Ms. Tobias via phone stating that she needed to reschedule their appointment.  The foster mother reported Maya was doing well at home but was having problems at school such as throwing fits and "stuff, but other than those, things have been okay."  However, the teacher's daily logs that began in early April did not support the statement that there were "problems at school."  During the OIG interview the SASS worker stated she did not know why she did not reach out to the school to discuss and/or confirm the problems reported.

Ms. Redding saw Maya at the Tobias home; 10 days had passed since her last home visit.  The SASS worker noted Maya was doing well and continued to discuss expression of emotions.  Maya reportedly stated that she had been getting into trouble lately at school as she had been "giving dirty looks and don't listen."  Again, the SASS worker did not reach out to the school nor did she ask about the log the teacher was keeping.  Maya reported to her missing her sister when she is at school and that she sometimes gets "mad" when her biological parents leave after a visit.

Immediately following the above session, the SASS worker met with Ms. Tobias.  Ms. Redding reported that they discussed Reactive Attachment Disorder and that a book was given to the foster mother regarding different techniques and information regarding RAD.  Ms. Tobias reported that things have been okay but still dealing with some "smaller behavior issues."  No other discussion regarding this diagnosis was noted nor was the name of the book.  When asked during the OIG interview about this book (*When Love is Not Enough: A Guide to Parenting Children with RAD-Reactive Attachment Disorder*, by Nancy Thomas) Ms. Redding stated she had never read the book and did not know what techniques were suggested in this book.  When asked what her perception of RAD was she responded, "It is when you are easily attached with her being in foster care."  The SASS worker also stated she did not know the DSM-IV TR criterion needed to meet the diagnosis of RAD nor was she to state what course of treatment she would recommend/utilize for a child with RAD.

Omega Agency worker, Leila Ryman, stated to the Carter County Sheriff's police and to OIG investigators that the Tobiases researched reactive attachment disorder on their own. Ms. Ryman told OIG investigators that the foster mother did a lot of researching.

Four days later, Ms. Redding met Maya at the Tobias home. During this session, the SASS worker continued to work on expressing feelings and noted Maya was "happy, good mood." Maya reported that she had been letting her foster mother know when she feels angry and that Ms. Tobias helps her with "different coping skills, such as dancing, hitting a pillow" etc. After this session, while meeting with Ms. Tobias, there was no discussion about the book that the SASS worker had given the foster mother at the prior session or about the diagnosis of RAD, nor was there any discussion about Maya's appointment with Dr. Fraser. The foster mother did report that things are "going okay" with the exception of an incident at a birthday party where Maya allegedly pulled a little girl by the shirt. Ms. Tobias did report that Maya had a bad day at school that day and stole another child's snack. Maya reportedly was being defiant and would not listen to the teachers. Again, the SASS worker did not corroborate any of this information with the school or what was written in the teacher logs. Ms. Redding did not believe she knew teacher logs existed.

Maya's last session with the SASS worker took place at the end of April. This session continued to focus on expression of feelings. After the session the foster mother reported that Maya had a "tough time" at school on Monday and Tuesday but had a great day on Wednesday. Ms. Tobias reported "seeing improvements" in Maya's behavior. There was no documentation as to what improvements were seen or how these improvements came about. The SASS worker documented going "over some other coping skills to help Maya with her RAD." During the OIG interview Ms. Redding stated she does not recall going into detail about coping skills nor did she remember any coping skills that she may have suggested.

Two days prior to Maya's death, Ms. Norquist met with Maya for the second time. This would be the last time that Maya was seen by a mental health professional. Upon entering the waiting room at Alpha Agency, Ms. Norquist reported that Maya was lying face down on the floor. Ms. Tobias reported that Maya did not want to go to therapy and threw herself down on the kitchen floor prior to leaving for the appointment. The foster mother also reported that while on their way to the appointment Maya unbuckled herself twice while the car was in motion and that she told Maya that if she couldn't stay belted she would not be able to stay in the car. Consequently, Maya had to get out the car on both occasions and walk in the field next to the car while Ms. Tobias drove next to her slowly.

Ms. Norquist asked Maya to join her in her office and that on the way to the office Maya was still crying saying that she "miss[ed] my mommy and daddy." Maya was described as being very quiet and tearful and stated she was having a bad day because she was "bad." She further reported that she did not listen and was sad because of missing her parents. The therapist normalized her feelings of sadness and told her that it was okay to cry when sad. No discussion regarding how she was "bad" or did not listen was noted. At the end of the session, when returning to the waiting room, Ms. Norquist reported that she showed Ms. Tobias a bruise on the top of Maya's right ear**.** The foster mother believed this bruising occurred when Maya threw herself down on the kitchen floor prior to their appointment. Ms. Norquist did not question the validity of this information.

During the OIG interview Ms. Norquist reported that during her session with Maya they were playing a game and she asked Maya if she would like her hair pulled back. Upon doing so, she noticed a bruise on her ear and temple. The therapist also noted that she was not aware that ear

bruising is not "typical" bruising of a young child or that it is highly suspicious of inflicted child abuse.  The therapist did not question Maya or the foster mother about how the bruising occurred and stated, she "did not have any reason to suspect that Carrie wasn't being truthful; I took her at face value."  Ms. Norquist reported that she did not "think much about the incident" with regard to Maya walking in the road and did not discuss this incident further with Maya or Ms. Tobias.

Ms. Norquist report that she did not have any formal Alpha Agency staffings with Maya's SASS worker, Katrina Redding nor did she have any supervisory staffings regarding Maya with her supervisor, Veronica Ceaser, until six days following Maya's death.

OIG investigators interviewed Alpha Agency supervisor Veronica Ceaser to discuss her role as a supervisor of Liz Norquist and Katrina Redding.  On interview Ms. Ceaser discussed protocol for SASS crisis workers as well as the outpatient therapists.  She noted that a SASS case would take precedence over an outpatient case as SASS has intervened due to an immediate need for at risk children.  She reported that typically SASS does not "delve into issues" as they typically try to help increase coping skills, support the foster parents (i.e. emotional support; ideas for services).  She noted that Liz Norquist likely continued to see Maya to work on building rapport with her as she would see Maya once discharged from SASS.  More specifically, Ms. Ceaser noted the role of a SASS crisis worker was to help kids stay out of the hospital; address short-term, intensive concerns; identify appropriate age-level coping skills; and provide support systems.

Ms. Ceaser was asked about standards of practice at Alpha Agency regarding assessment and documentation. The supervisor stated that it is not usual practice to have two different clinicians complete the Comprehensive Mental Health Assessment.  She was unclear as to why this occurred.  She also reported that face-to-face screens for SASS are required.  She noted they typically occur at the home or the school but can also be done at the hospital.  She reported not being aware that Ms. Redding had completed the March SASS screen while on the phone with the Tobias family and that she did not see Maya until after hospital discharge.  The supervisor volunteered that the SASS worker may have decided to do the screen on the phone so as to decrease further stress and trauma for the child, although she repeated that face-to-face screening is required.

Ms. Ceaser reported that she met with the SASS worker once a week for supervision; however, Maya's case was only addressed on two occasions.  In mid April 2011, the SASS worker discussed the diagnosis of RAD; however, Ms. Ceaser did not have any specific notation on what was discussed.  The supervisor believed that Ms. Redding had a good grasp on the symptoms of RAD and how to help treat this diagnosis, although this diagnosis was not discussed in detail.  Ms. Ceaser did not recall discussing the book "*When Love is Not Enough*" with Ms. Redding nor did she know that the SASS worker gave the book to Ms. Tobias.

There was no discussion noted as to how to help the foster mother, although during the OIG interview Ms. Norquist reported that Ms. Tobias had several support systems: SASS, Alpha Agency's Family Resource Developer Gina Raven, and Omega Agency caseworker – Ms. Ryman.  Again, no discussion with Ms. Tobias as to whether these support systems were utilized was noted.

Maya's Psychiatric Evaluation

Four weeks after Maya's discharge from Rosewood Hospital, Dr. Stewart Fraser evaluated Maya and noted a Provisional Diagnosis of Disruptive Disorder/NOS; rule out ADHD; rule out

PTSD and also sexual abuse focus on victim.  On interview with OIG investigators Dr. Fraser stated there was no plan at discharge from Rosewood that he would follow-up with Maya as she was not prescribed any medication during her hospitalization.  He was not clear as to why she was brought in for a psychiatric evaluation approximately one month later.  During the evaluation, Ms. Tobias continued to report difficulties with aggression at home and at school and being defiant at school with staff.  The foster mother reported that Maya fell asleep during the day or in the car as she believed Maya was only sleeping "about two hours a night."  Reportedly, Maya had to be coaxed to eat meals at times.  The foster mother noted distractibility, poor frustration tolerance, anxiety surrounding visits with biological mother, and masturbation in front on other people.  Upon completion of the evaluation Dr. Fraser wrote that more information would be gathered from DCFS and the Omega Agency to determine if early history and family history could contribute to understanding what was occurring; information would be gathered from Maya's preschool for feedback regarding her behaviors; and consult with the DCFS psychiatrist as to possible medication options for a child Maya's age and given her symptom presentation.  Dr. Fraser told OIG investigators that the therapist working with Maya at Alpha Agency would be gathering the information for him.  He also stated it would have been quite useful to have had the Integrated Assessment as sometimes these behaviors could be genetic.  He stated his "work was still cut out for me" at the end of the psychiatric evaluation and would have thought he would have been kept in the loop from all those involved in her case.  Dr. Fraser stated to OIG investigators that he was not surprised by any of the foster mother's reports as he had heard some of her reports during Maya's hospitalization.

Reactive Attachment Disorder (RAD)
Maya's diagnosis in the hospital discharge summary (3/2011) was Mood Disorder, NOS and Post-traumatic Stress Disorder.  In Dr. Fraser's psychiatric evaluation (4/2011) of Maya, he assigned a provisional diagnosis of Disruptive Disorder/NOS; rule out ADHD; rule out PTSD and also sexual abuse focus on victim.[70]  According to the American Academy of Child and Adolescent Psychiatry (AACAP; 2003), Reactive Attachment Disorder (RAD) is a serious and fortunately relatively rare clinical condition. The Academy cautions that a child should never be given the label or diagnosis of Reactive Attachment Disorder without a comprehensive psychiatric assessment and any child with a RAD diagnosis requires an individualized treatment plan. The essential feature of Reactive Attachment Disorder is markedly disturbed and developmentally inappropriate social relatedness in most contexts that begins before age 5 years.  Grossly pathogenic care is a defining feature of RAD and should only be diagnosed when specific criteria are met. (See Appendix A for criteria of Reactive Attachment Disorder in the *Diagnostic and Statistical Manual of Mental Disorders* [DSM-IV-TR].)

RAD is one of the least researched and most poorly understood disorders in the DSM as there is little systematic epidemiologic information on RAD.  Its course is not well established and it appears difficult to diagnose accurately (Chaffin et al. 2006).  Epidemiological data are limited, but Reactive Attachment Disorder appears to be very uncommon (DSM-IV-TR).  The prevalence of RAD is unclear but has been estimated at 1% of all children under the age of five, other than in populations of children being reared in the most extreme, deprived settings such as some orphanages. A cohort study of a general population of 211 18-month-old Copenhagen children found only a 0.9% prevalence (Skovaard, Houmann, Christiansen et al. 2007).

---

[70] On interview with OIG investigators, Dr. Fraser stated that he often recommends intensive family treatment for children with Reactive Attachment Disorder, but did not in this case as he believed Maya's behaviors were related to mood and aggression disorders.

RAD can often be confused with other psychological disorders, such as conduct disorders, oppositional defiant disorder, anxiety disorders, post traumatic stress disorder and social phobia (Chaffin et al. 2006). These disorders share many symptoms and are often comorbid with or confused with RAD, leading to over and under diagnosis. Any assessment of RAD requires evidence directly obtained from serial observations of the child interacting with his or her primary caregivers and history (as available) of the child's patterns of attachment behavior with these caregivers. It also requires observations of the child's behavior with unfamiliar adults and a comprehensive history of the child's early caregiving environment including, for example, pediatricians, teachers, or caseworkers.

### *The Dangers of Unvalidated [71] Treatments of RAD: Nancy Thomas, When Love is Not Enough*

In 2006, the American Professional Society on the Abuse of Children (APSAC)[72] convened an expert Task Force to look closely at attachment therapy, Reactive Attachment Disorder, and attachment problems as these terms had increasingly been used to describe children who have been victims of abuse or neglect, specifically in foster care or adoptive homes. Some children were lethally harmed by unvalidated and coercive attachment treatment techniques. Very few young children who are abused and neglected develop attachment disorders (Boris & Zeanah, 2005); even among institutionalized children, most do not develop attachment disorders (O'Connor & Rutter, 2000) but the diagnostic label has proliferated among commercial-based attachment therapists.[73] RAD does not underlie most of the behavioral and emotional problems seen in foster children, adoptive children or children who are maltreated, and rates of child abuse and/or neglect or problem behaviors are not a benchmark for estimates of RAD (Chaffin et al. 2006).

In the absence of a standardized diagnosis system, many popular, informal classification systems or checklists, outside the DSM and the International Statistical Classification of Diseases and Related Health Problems (ICD-10), were created within the field known as attachment therapy. These unvalidated classifications/lists and therapy techniques are found on the websites of attachment therapists. Most are inaccurate, too broadly defined or applied by unqualified persons (Chaffin et al. 2006). The Task Force reviewed several of these controversial attachment therapy techniques. Nancy Thomas was one of the individuals cited by the Task Force who promoted unvalidated treatment methods used by many attachment therapists and foster/adoptive parents. Ms. Redding, Alpha Agency's SASS worker, gave Ms. Thomas' book, *When Love is Not Enough,* to Ms. Tobias.

The Task Force found Ms. Thomas' techniques especially troubling because of her extreme assignment of psychopathic traits to young children. Her descriptions of behaviors, many of which either overlap with other disorders like conduct disorder and oppositional defiant

---

[71] Mercer (2001) defines unvalidated as unconventional, unsupported approaches without established validity.

[72] In 1987 the American Professional Society on the Abuse of Children (APSAC) was formed as a nonprofit national organization in order to help professionals who are "engaged in all aspects of services for maltreated children and their families." The APSAC distributes best practice guidelines and research to all professionals who are involved with children and/or families affected by child abuse and neglect. "As a multidisciplinary group of professions, APSAC achieves its mission in a number of ways, most notably through expert training and educational activities, policy leadership and collaboration, and consultation that emphasizes theoretically sound, evidence-based principles."

[73] Although severe parenting deficiencies or abnormalities seem to be necessary factors for emotionally withdrawn/inhibited RAD to develop, they are clearly not sufficient, as many children who experience severe maltreatment do not develop clinical disorders (DSM-IV; Chaffin).

disorder, or are not related to attachment difficulties.  Ms. Thomas argues that children with RAD have the potential to grow to become violent psychopaths unless "treatments" as she describes are implemented.  In *When Love is Not Enough* Ms. Thomas even goes so far as to liken these children to Saddam Hussein, Jeffrey Dahmer, and Adolf Hitler, who reportedly suffered from RAD but did not receive the appropriate treatment.  Fundamentally, Thomas, like other attachment therapists, holds that the child's character flaws must be "broken" before attachment can occur.  As part of the attachment parenting, children may be barred from social contact including keeping the child from school (Chaffin et al., 2006).  Ms. Thomas' methods demand compliance starting as young as 18-months-old,  "*The basic skills*-come, go, sit, stay-should be mastered, according to Dr. Foster Cline, by 18 months of age" (Thomas, 2005, p.76).[74]  Prior to being a therapeutic parenting specialist, Ms. Thomas was a professional dog trainer. Omega Agency's foster parent trainings include two training curricula on Reactive Attachment Disorders.[75]  Both trainings recommend Foster Cline's M.D. line of commercial products *Love and Logic*. Dr. Cline was one of the first promoters of rage reduction therapy and "holding therapies."  He and Nancy Thomas' controversial interventions are popular on the Internet.

According to the Progress Notes of outpatient therapist Liz Norquist, Ms. Tobias stated that during the car ride to the counseling session (two days prior to Maya's death), Maya did not want to wear her seatbelt. The foster mother pulled the vehicle over and had Maya get out of the vehicle. Maya walked in the field while Ms. Tobias drove next to her slowly until Maya agreed to put her seatbelt on.  In her book, Nancy Thomas writes that when an out of control child begins to escalate in the vehicle, the driver needs to halt the vehicle immediately.  She writes further, "A mature enough child in good weather and a safe area might need to walk home.  It is safest to follow in the car." (Thomas, 2005, p. 65)

*Power Sitting*
Thomas, who claims that "90% of the children placed in her care had killed," suggests a coercive model of therapeutic parenting from controlling the child's eating to prescribing "power sitting." Mercer's (2001) review of Ms. Thomas' work noted that Ms. Thomas claims that (RAD) children occasionally "have a depletion of oxygen to their brain that causes them to stare at parents and answer and say 'What?'" These children, she claims, need "power sitting to stimulate their brains."  Ms. Tobias' text to her husband on the day of Maya's collapse referenced Maya's brain needing stimulation:

> 11:38 FM:  its ok its not your fault its just hard to keep things in perspective
>             sometimes.  i picked her up and put her in a shower and yes it is kind of
>             cold her brain needs as much stimulation as it can get right now.
> 11:39 FF:   Well. She's about to stimulate an ass wiping.

Ms. Thomas advised parents to teach a child self control by means of "power sitting." However, Mercer (2001) noted Thomas never makes it clear how the child is forced or persuaded  to carry out some of the required actions -- only that the child is given the choice between the prescribed

---

[74] In her bibliography, Ms. Thomas references four works authored by Foster Cline, M.D.: *Hope for High Risk and Rage Filled Children: Reactive Attachment Disorder* (1994); *Parent Education Text* (1982); *Understand and Treating the Severely Disturbed Child* [sic] (1979); *Understanding and Treating the Difficult Child* (1979).
[75] Reactive Attachment Disorder:  "BAD kind of RAD" and Reactive Attachment Disorder, Rob Rusk, Ph.D.

period of power sitting or two hours of "wimpy sitting for lack of compliance with the power sitting rules" (Thomas 2000 in Mercer 2001).

Carrie Tobias described power sitting to the court (9/2011). She stated power sitting was not a punishment and not like a time-out; it was a preventative measure when Maya started to feel angry. Power sitting was supposed to calm her down; it gave her time to regain composure. Ms. Tobias stated that the child sat cross legged, hands down just kind of relaxed, and back straight; it gave her time to regain herself before she lost control and made a bad choice. Ms. Tobias stated that Maya power sat wherever Ms. Tobias could see her; usually Maya power sat in the dining room up against a wall to keep straight. However, Ms. Tobias testified that in May, two days prior to Maya's death, while Maya was power sitting, Ms. Tobias heard thumping. Ms. Tobias stated that Maya smacked her head against the wall and reinjured her lip. Ms. Tobias also testified that she did not have a clear view of Maya at that time.[76]

In her 2005 edition of *When Love Is not Enough,* while Ms. Thomas describes "holding therapy" to be a highly effective powerful tool used by attachment therapists (p.22), she later, on page 54, gives the following paradoxical instruction to her readers:

> In the old days we would hold the child until they calmed down and then rock and nurture them after they vented. This was the safest place for an out of control child and the best way to handle their big feelings when they went wild. Now, I DO NOT RECOMMEND THIS. Legally it is extremely dangerous and you cannot bond and help a child heal from prison. In the old days I would recommend that a parent get training in safe restraint methods. There is an excellent one from Cornell University or Crisis Prevention Intervention used in most residential facilities and psychiatric hospitals. Now in some states it is against the law to hold your own child. The safest way to handle it, even though it is not the best for the child, is to call the police when your child is a danger to themselves or others, rather than restrain them.

Todd Tobias stated in court (9/2011) that Maya's SASS worker Katrina Redding felt that Maya had Reactive Attachment Disorder and gave the Tobiases a book on it. After reading the book, they started Maya with power sitting. He described power sitting as she would sit Indian style with her hands on her knees and her back straight for the blood to circulate everywhere; and it gave her time to think and to go through her emotions, and give her time to collect herself. Mr. Tobias stated to the Carter County Sheriff's police (5/2011) that he never had to restrain Maya, but his wife had to restrain Maya by bear hugging her when Maya started head butting the wall.

In a victim sensitive interview on the day of Maya's death,[77] Alexis Tobias (age 8) stated that the children received the same punishment except Maya was the only one who power sits [which was], "When you cross your legs, back straight and look at the wall and think about what she's done, think about what better thing you should do." Alexis also stated that some of Maya's punishments were "washing the floor, going to bed, doing power sitting." Alexis stated

---

[76] Ms. Tobias' court testimony suggests Maya was facing the wall, not her back to the wall, when in the power sitting position. Ms. Tobias also testified that on several other occasions, Maya smacked her head against the wall while power sitting. The day before Maya's death, Ms. Tobias also told the Carter County Sheriff's police that when in time out, Maya was to stand against the wall. She would bang her head against the wall and hit her knees into it.
[77] Child Advocacy Center.

that Maya did not take baths; like power sitting, showers helped Maya calm down; you had to stand up, so a shower was good because it helped her calm down.

When asked whether she ever saw Maya hurt herself, Alexis stated, "No but sometimes it always happens when I'm at school…she didn't want to go to the visit or appointment so she threw herself on the ground and was screaming and kicking and all over…and she got it right on her ear with the kitchen table …and uh, I think she scratched it…but that's all I saw her do to herself."[78]  Alexis stated, "I have seen her like have a scratch…like when she falls I've seen her have a real bruise right here [Alexis makes a circle motion on her right knee]. We get warnings, but Maya does not get warnings…We get to go in the corner or we have to go to bed and not see Daddy. We don't get any hitting or smacked."  When asked if she ever saw anybody hurt Maya in any way, Alexis stated, "Well, mama lets her do…Larisa, she [Maya] was stealing stuff and she lied to mom…so Larisa got to pick what she did and she just kind of hit her in the stomach, it's like hitting like a sissy fight, [Alexis motions with her hands out in front of her] and Maya just stood there and mama kind of taught her how to punch real good and after she did some of those, Maya went upstairs to get her own (pajamas)."  The interviewer asked, "And your mom showed Larisa how to hit Maya? Alexis replied, "Just sort of…you have to make a fist and you just go like you're mad [Alexis moves her fists through the air in front of her]. Larisa didn't really want to hurt her so she just went like this really gentle and mama said 'you're lucky cause she doesn't want to hurt you.'"  When asked if all the kids do that kind of thing, Alexis stated, "It depends on what she did, like if she hit somebody in the face then we get to smack her back…if she pushed us we get to push her until we feel like we are ok, like it's fair…Maya is the only one that we get to do that to because mom said she needs to learn her lesson…" Alexis stated further that if Maya smacked "you in the face, we get to smack her in the face, but it has to be really light, and not like really hard…like I'm older and I'm stronger than her. Mommy says do it like you're angry but not that hard…that's what she said because she said when she gets hurt I have to report it to Miss Leila."

In a victim sensitive interview of Megan on that same day, she stated that her father punished Maya by having her stand at the wall and put her hands on the wall (Megan demonstrated by bending her legs and putting her feet on a cushion and putting her arms up over her head with her hands meeting).  Megan described Maya throwing a fit as "She like cries in her bed" and "The first time she cried in the living room."  Megan said "No" when asked if she ever saw Maya hit her head on anything.

Omega Agency worker, Leila Ryman stated to the Carter County Sheriff's police that the foster mother told her about the "strong sitting" method and described "sitting cross legged, back erect, facing the wall, with no time limits on how long someone can stay like this."

<u>Family Support Specialists</u>

***DCFS***
Ms. Shelby Chase[79] is a Foster Parent Support Specialist contracted with DCFS to provide services, identification of resources, and advocacy for DCFS licensed foster parents. The primary focus of the program is to improve the quality of foster care in meeting the needs of children in placement, to reduce placement disruptions, and to reduce the number of

---

[78] Alexis was in school at the time that Ms. Tobias claimed Maya threw herself and hit the kitchen table or chair, causing bruising to her ear.

[79] Ms. Chase has an Associates degree in early childhood development. She is a licensed foster parent for 24 years and was a licensed day care home provider for 10 years. She is also a PRIDE trainer.

resignations of experienced foster parents. Monthly home visits to foster homes that have children placed in them are a priority.

The foster parent support specialist never went to the foster home or met the Tobiases in person. She and Ms. Tobias exchanged emails in September, October, December, February, March and May.  Ms. Chase entered only two contact notes in the Tobias' license file and none of the emails were on file.[80]  Initially Ms. Tobias wrote that she was confused as to who, DCFS or the Omega Agency, handled needs or issues, i.e., clothing voucher, approval for medical care, financial questions, etc. Ms. Chase directed the Tobiases to the Omega Agency's supervisor Aniyah Kennedy for clarification and assistance.

In October, Ms. Chase wrote that she was in need of "my monthly update" that included any problems the family was having. Ms. Tobias described the children's problem behaviors in the home but assured Ms. Chase that despite the tone of her email, the family was doing well.  Ms. Chase wrote back the same day, "Sorry to hear…but thanks for the update :) call me if you ever need anything."

In emails exchanged in December 2010, the foster parent support specialist asked how things were going. Ms. Tobias responded that she was doing good and things were getting better, but the children still had their issues following parent-child visits: bed wetting, nightmares, and loss of appetite. She also wrote about Maya's learning struggles at school.  Ms. Chase entered a note) in the licensing file that there were "no real issues except after the visits but they are handling them one day at a time."  When Ms. Chase heard about Shane's placement she wrote Ms. Tobias asking how everyone was adjusting. Ms. Tobias responded, "It was a surprise…Thankfully, we have great friends and family! Everyone loves him."

In late February 2011, the foster parent support specialist entered a note in the licensing file stating that Shane had MRSA in the diaper area; SASS was called in on Maya for violent behavior – she was attacking her sister [Larisa] in the night. Maya was to start therapy in March and receive SASS services. Ryan, Larisa and Shane were doing well developmentally. Shane had visits with his father and attended visits with his siblings and mother.

Ms. Chase and Ms. Tobias exchanged emails at the end of March. Ms. Chase checked in with Ms. Tobias for an update. Ms. Tobias reported that Shane had been hospitalized overnight for observation with RSV [respiratory virus].  Issues they had with Maya were minimized; Maya was attending weekly therapy. Shane's visits with his father would start up again since he will soon be out of jail. Ms. Chase thanked the foster mother for the update and asked if they did something fun on spring break.  Ms. Tobias wrote that she and her husband went away for a few days.

The next and final emails were sent in May.  On the day of Maya's death, Ms. Tobias asked Ms. Chase to call on Mr. Tobias' cell phone on a matter of great importance.  Ms. Chase responded "I cannot talk to you as your support specialist and it is driving me crazy…I really do want you to know I do care and I am thinking of you…hang in there!" (Dated the day after Maya's death.)

In an OIG interview of Shelby Chase, the foster parent support specialist stated that she never visited the foster home.  Initially she and the foster parent had a scheduling conflict. Ms. Chase said that when she knew she would be in the family's area she tried to schedule a home visit,

---

[80] Shelby Chase provided the OIG investigator with copies of emails.

but Ms. Tobias was always too busy to schedule.[81]  Ms. Chase offered to make home visits, but "Carrie said her schedule was chaotic." Ms. Chase stated that the foster parents were frustrated with the Omega Agency and that the foster father said the agency was not treating his wife properly. Ms. Chase said she attempted to contact the Omega Agency staff but she did not document her effort. Ms. Chase said she was aware that the Tobiases were new foster parents and she did not know why she did not contact the worker when she became aware that the foster mother was overburdened.  Ms. Chase stated that what she knew about the family and foster children came from Ms. Tobias.

Ms. Chase told OIG investigators she did not know if the Tobiases needed respite and she did not know the Omega Agency's policy on respite. She did not think the agency provided respite care because she knew of another foster family who told her this; she could not recall the family's name. Ms. Chase stated that she developed a resource file but it is for another area, and there is not much in Carter County. Ms. Chase identified available resources consisting of trainings provided at the Omega Agency and foster parent support groups. When asked what types of trainings are available to help foster parents deal with children with behavioral issues, Ms. Chase stated RAD (Reactive Attachment Disorder) training.

### Alpha Agency

As part of Maya's March 2011 treatment plan,[82] Alpha Agency's Family Resource Development Specialist, Gina Raven, was assigned to provide case management up to one hour per month, "To communicate with other providers or helpers to alleviate or reduce symptoms; to provide support and advocacy; and to assist in accessing additional services."  Ms. Raven's involvement with the Tobiases consisted of two phone contacts and a consult with SASS worker Katrina Redding.

In March, Ms. Raven phoned Carrie Tobias; they discussed how the foster parents and children were doing with Maya's hospitalization. The foster mother described Maya as a very sweet, helpful, adorable little girl who started acting out fairly recently. Ms. Tobias said that Maya did very well for the first couple of months after placement and then there seemed to be an abrupt change. Ms. Raven assured the foster mother that Maya's behaviors were "due to trauma and not anything the foster parents have or have not done."  The foster mother expressed concern that "Maya would behave perfectly [in the hospital] so that staff do not see any problem." Ms. Raven assured her they were aware of the 'honeymoon syndrome' with kids. Ms. Tobias also stated that she was reluctant to give children psychiatric medication but she could understand medication may help Maya get through this.

In April, Ms. Raven wrote that during a phone conversation, the foster mother "shared that transportation is becoming a challenge due to all of the appointments Maya has and needs." Ms. Raven discussed the challenges of meeting the needs of a traumatized child in the context of foster care and discussed other supports such as foster parent support group. A CAYIT meeting was scheduled in May 2011 and Ms. Raven encouraged the foster mother to advocate for Maya as well as for the Tobias family "regarding the costs involved in meeting her needs, need for respite, etc." Also, during this conversation, Ms. Tobias told Ms. Raven that Maya was doing pretty well and that the "book that Katrina Redding provided (*When Love is Not Enough*) has been extremely helpful."

---

[81] Ms. Chase stated that all but one or two of the 40 families assigned to her have declined a home visit; she visits about 10 foster homes per month.  She reported that starting fiscal year 2013, foster parent support specialists are required to make quarterly home visits.
[82] The Alpha Agency staff, Katrina Redding and Liz Norquist, developed the Treatment Plan for Maya.

On the morning before Maya's death, Ms. Raven consulted with Maya's SASS worker Katrina Redding regarding the upcoming CAYIT meeting with DCFS. Ms. Raven shared her concerns regarding appropriate child welfare services not being provided in the following areas:

    1) Spec rate for foster care in place,
    2) Assistance with transportation to family visits,
    3) Financial assistance with transportation to medical/psych appointments,
    4) Respite for foster family,
    5) Other supports for foster family, i.e., foster family support group, foster parent support specialist, etc.

Ms. Raven did not make a home visit while assigned to Maya. At least one home visit should have occurred in April 2011, according to the Individual Treatment Plan.

<u>Court Testimony of Stacey McGovern in September 2011</u>
Stacey McGovern is the godmother of Alexis and Megan Tobias.  Ms. McGovern testified that she would visit the Tobias' home at least twice a month for the entire time that the foster children were placed. She visited approximately five hours or so. Ms. McGovern spent an overnight on the weekend before Maya's death.   Ms. McGovern stated that she never saw Maya throw any fits or head bang or throw herself down.

<u>Hand Injuries</u>
Following Maya's death, her surviving siblings were medically evaluated. Two days after Maya's death, a skeletal survey revealed that Ryan had an unusual healing fracture of the 3rd metacarpal bone in his left hand that appeared to be about three-four weeks old.  The radiologist called it odd. This is not the kind of fracture one could get from falling down, but it could be from an accidental incident. It would have hurt and been swollen.

Ms. Tobias reported to Omega Agency that in January 2011, Larisa had a bruise on the back of her hand.  She reported that while playing with the cat, Larisa fell backwards and hit her hand on the edge of the steps in the house; it turned purple right away and actually swelled up a little bit (Ms. Tobias' email, January 2011).

At autopsy, Maya showed a similar injury to her right hand.  The back of her hand was bruised and swollen with extensive hemorrhage in the underlying soft tissues.

Findings of DCFS investigation of the death of Maya Schauer (SCR# 6568-A):

    The Department indicated Carrie Tobias for Death by Abuse (#1) and Head Injuries (#2) to Maya.
    Both Carrie Tobias and Todd Tobias were indicated for Cuts Bruises Welts Abrasions and Oral Injuries (#11) and Medical Neglect (#79) to Maya.
    The Department indicated Todd Tobias for Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect (#60) to Maya.
    Carrie Tobias and Todd Tobias were indicated for Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect (#60) to Larisa and Ryan Schauer, Shane Tischer, and Alexis and Megan Tobias.

329 of 371

Findings of DCFS investigation of bone fracture to Ryan Schauer (SCR# 6568-B):

>  The Department indicated Carrie Tobias for Bone Fractures by Abuse (#9) to Ryan; and both Carrie Tobias and Todd Tobias for Medical Neglect (#79) to Ryan.

Ajudicatory Hearing
The Judge in the Circuit Court of Carter County, Illinois, found that the state proved by a preponderance of the evidence the allegations of death by abuse, abuse and environment injurious.

The former State's Attorney in Hamlin chose not to prosecute Carrie Tobias.  The Inspector General spoke with the current State's Attorney who is reviewing the case for possible prosecution.

Birth Parents
In April 2012, Ben Schauer surrendered his parental rights to Larisa and Ryan Schauer.  In August 2012, Brooke Jorgenson surrendered her parental rights to Larisa and Ryan Schauer and Shane Tischer. In August 2012, Kevin Tischer surrendered his parental rights to Shane Tischer.


**ANALYSIS**

The cause of Maya's death was a subdural hematoma and cerebral injuries due to blunt force trauma of the head due to being battered.  The majority of the injuries on Maya's body found at autopsy were inflicted. The subdural and subarachnoid hematomas, in combination with the bilateral retinal hemorrhages, and the large number and locations of multiple impact injuries of the head, face, back and extremities were more consistent with inflicted rather than accidental blunt trauma.  Injuries to the eyes, the torn frenulum, massive and multifocal cerebral injuries resulting in bilateral subdural hemorrhages, multiple injuries to the back, shoulders and hand cannot be adequately explained as being accidental in nature.  Some of the injuries were old; a majority of them were recent, with underlying subcutaneous and intramuscular hemorrhages. The blunt force injuries noted at autopsy were multi-focal; to the back and sides of the head, inside the mouth, on the eyelids, on the back, shoulders, upper arm, elbows, knees, hand and the frenulum.  The majority of the injuries seen were in areas not usually injured during normal activity and play in a child of Maya's age.  The foster parents proffered head banging and seizures to explain the genesis of these injuries; however, neither head banging nor seizures would result in the constellation of injuries noted.  Maya, who weighed 30 pounds and was 36 inches tall, was simply not big enough to generate the force necessary to cause these injuries.[83] The alleged episodes that caused these mass injuries were not witnessed by any one other than the foster mother. At a Coroner's inquest in August 2011, the jury ruled Maya's death a homicide.

Carrie Tobias appeared to be an ideal foster parent with a supportive husband. The couple had two young daughters, ages seven and three and expressed interest in fostering four children. Although not apparent, there were troubled waters running beneath the surface. Ms. Tobias' veracity was strongly questionable.  She misrepresented in her licensing application that she had years of experience as a child care worker and a certified nurse assistant. She had a pattern of

---

[83] Testimony of two doctors in August 2011 and September 2011, respectively, in the Circuit Court of Carter County, Illinois.

amplifying situations including pathologizing four-year-old Maya.  Shortly after the three young Schauer siblings (aged three and under) were placed in the Tobiases' home, the foster mother relayed that she had been told by a professional that the oldest child, Maya, had Fetal Alcohol Syndrome. No such diagnosis had ever been given by any healthcare provider. However, Ms. Tobias was discriminating on what information she would give to different professionals.

Ms. Tobias never sought medical attention for physical injuries that she reported regarding Maya, Larisa and Ryan. In the vast majority of cases of significant accidental injury, the patient is brought in promptly for care by appropriately concerned parents who give a clear history of mechanism that fits the findings (Zitelli and Davis 2012).  The caretaker, who is also the perpetrator will likely delay or not seek medical attention.

The Omega Agency assigned the children's case to a relatively inexperienced caseworker. The caseworker optimistically overlooked the increasing environmental and ecological demands that were placed on this new foster parent.  Within months of the three children's placement, the foster children's newly born infant brother was placed in the Tobiases' home.  Ms. Tobias' picture-perfect foster home began to crack under the increased stress and demands with six children.  The foster mother complained about her lack of sleep, at times feeling overwhelmed. Although the foster care agency was aware that Mr. Tobias worked 12 hour shifts and often worked overtime, the caseworker and her supervisor never evaluated the everyday realties that his work hours and their sleep needs placed on the foster mother.  Instead, the agency increased demands on her, having her transport the foster children, weekly and sometimes twice weekly, to a drop off site for family visits.  Although the agency had case aides and respite funds, they refused to relieve Ms. Tobias.  Early on, the foster mother requested counseling services for Maya and Larisa but the requested services were delayed except for a proposed solution that involved Ms. Tobias driving Maya 50 miles to Omega Agency for 30 minute counseling sessions; a solution she found nonsensical since she was already over-taxed.

Ms. Tobias relayed this quagmire to her assigned DCFS foster parent support specialist who noted it but did nothing to advocate for some practical assistance.  The negligible value of the foster parent support specialist's role in this case raises questions about the specialist's actual supportive functions.  The case was a split case with the foster family's license monitored by DCFS and case management services provided by Omega Agency. The lack of communication and integration between DCFS licensing, the DCFS support specialist and Omega Agency contributed to inadequate services[84] to a home that had obtained a waiver to care for four siblings. The waiver process in this case could only be described as automatic with no critical analysis of the foster father's work schedule, the foster mother's support system and her ability to care for a seven-year-old, a newborn, a toddler, a three-year-old, and two four-year-olds. Although Omega Agency was not the foster family's licensing agency, Omega Agency had an obligation to assess Ms. Tobias' parenting capacity, her attributional style, her problem solving skills, her resources and Maya's  behaviors in the home and across settings in order to establish a home-based program that would fit the needs of this family.

Over time Ms. Tobias increasingly reported more and more character and behavior flaws with Maya, who appeared to act out only in the presence of her foster mother.  Her husband did not observe any of the destructive behaviors his wife reported.  The fact that Maya, who was described as talkative and bubbly acted developmentally appropriately at school and was also appropriate during her hospitalization and in her therapy sessions, further frustrated her foster

---

[84] The Inspector General's Office has historically objected to splitting cases except in extraordinary circumstances. See OIG reports: #03-116, 7/03; #04-0679, 12/04; #06-0339, 6/06; #06-0420, 9/06.

mother to the point that she wanted to keep Maya from going to school, blaming her school experiences for her home behaviors. Although Maya was eligible for breakfast at school her foster mother forbade her from participating in the program. She saw the now four-year-old as being manipulative and described her as violent and self destructive. In victim sensitive interviews, Ms. Tobias' biological children said they never saw Maya violently harm herself but reported that their mother showed them and allowed them to punch Maya in the stomach or slap her face. The girls complained that Maya would pinch them but that they never saw Maya hurt herself with the exception of child knee bruises or scrapes.

In addition to violating DCFS education policy regarding contact with Maya's preschool, when Larisa turned three, Omega Agency also violated DCFS procedures by not ensuring that Larisa was registered for preschool. The foster parent support specialist never inquired about early education programs and the Omega Agency caseworker or supervisor never intervened to assure the child received early education services.

Ms. Tobias' Omega Agency caseworker knew the foster parent often relied on the internet for information. She also was aware that the foster mother wanted Maya removed; the worker brought up residential placement to the foster mother prior to Maya's hospitalization. However, there was no timely System of Care service referral made to alleviate the foster mother's distress and potential placement disruption. A recipe for disaster was completed when an inexperienced Alpha Agency SASS worker, rather than promoting effective clinical practices, endorsed the dire conceptualizations and interventions of radical attachment parenting therapist Nancy Thomas. Foster Cline and Nancy Thomas, who are professional colleagues, are proponents of radical attachment treatments. Chaffin's 2006 Attachment Task Force Report noted that these radical treatments transform parenting into a battle which can only be won by defeating the child. Ms. Thomas' coercive techniques to gain control and power over the child include "power sitting" with the demand that the child properly execute the technique. The child is made to stay in the power sitting position until she does it right. Thomas also advises taking control over talkative children which she describes as "jabbering" by making the child hold his hand over his mouth for periods of time. Both she and Cline use paradoxical logic with their readers claiming some of their techniques such as holding are effective but unfortunately they are put in a position of legally not being able to recommend the techniques. Maya's psychiatrist, Dr. Stewart Fraser did not give her a diagnosis of Reactive Attachment Disorder. However, as Barth (2005) points out, attachment theory offers some substitute parents what they believe is a scientific basis for their lack of a close relationship. Additionally, several authors have noted that foster parents and adoptive parents frequently express high need for support and that these needs go unrecognized and are unmet in generic mental health services.

Contrary to scientific evidence and inconsistent with ethical standards, Omega Agency implicitly endorses radical perspectives by promoting the commercial and self published works of Foster Cline in Omega Agency's "RAD BAD" training modules. While the specific publication recommended by Omega Agency, _Love and Logic_ is part of Cline's later less radical work, one only has to go to his *Love and Logic* website to find recommendations in his online store for his earlier more radical works such as *Hope for High Risk and Rage Filled Children*, repackaged as *Uncontrollable Kids from Heartbreak to Hope* and Nancy Thomas' books, *When Love is Not Enough* and *Healing Trust*. In his website, Foster Cline tells the readers that *Love and Logic* materials, tools and techniques have nothing to do with the treatment of severely disturbed children. He goes on to say that while there is understandable disagreement on how to best reach and change severely disturbed children, there is a general agreement that traditional and safe methods are often ineffective. "The problem is, it is legally dangerous to advocate the holding of children and it is understandable that no one sticks out their necks to

recommend it."  No matter how the detractors of holding decry it, "I continue to believe that it is necessary to hold some children, look them in the eye and work through their anger and rage and help them reach loving conclusions if they are to be successfully reached."

While Ms. Tobias did not attend any of Omega Agency's "RAD BAD" trainings, there are systematic concerns that need to be addressed because a Central Illinois mental health clinic and a Central Illinois child welfare agency present these authors in favorable light to vulnerable parents despite the fact they are outside mainstream scientific and professional communities. Additionally, the SASS worker, Katrina Redding, and her supervisor, Veronica Ceaser, did not have sufficient knowledge themselves regarding Reactive Attachment Disorder and yet counseled Ms. Tobias on how to manage and cope with a child with this disorder.

Neither Omega Agency nor Alpha Agency staff attempted a functional analysis to identify environmental or ecological variables that may have contributed to or maintained the problematic behaviors identified by the foster mother.  Based on a review of over 70 studies, Chaffin's Task Force found that the interventions that most increased parental sensitivity were also the most effective in improving attachment security.  In these types of interventions, the focus is primarily on the parent-child relationship and teaching positive parenting skills rather than on the individual child's pathology.[85]  Both Omega Agency and Alpha Agency failed to consider, provide or arrange for home-based services including family therapy and other community supports, and include these services in the treatment plan.

Well-documented and research-supported behavioral parent training programs exist for caregivers of children with oppositional and defiant behavior.[86] Parent Child Interaction Therapy (PCIT), a parent training program originally created by Sheila Eyberg, is readily available on the internet. This two-part program first teaches parents how to interact with their children. Specifically, parents are taught to praise, describe and reflect upon their child's verbalizations. They are taught to withhold questions and instructions. Following mastery of these skills, parents are then taught how to deliver effective instructions. Parents are taught how to respond when children comply and when children engage in noncompliant behavior.

<u>Screening Assessment and Support Services (SASS)</u>
SASS worker Katrina Redding failed to provide Maya with even the minimum of SASS mandated services as delineated in the SASS contract.  More specifically, Ms. Redding did not conduct a face-to-face SASS assessment nor was it documented why the face-to-face did not occur. Ms. Redding failed to contact Omega Agency or the Department for obtaining information of available resources for community stabilization.  Ms. Redding documented Maya's past behaviors as a reason to hospitalize and did not solely assess the current event.  As a MHP level staff member Ms. Redding was required to consult with her supervisor prior to the final determination for hospitalization and note this in the clinical record; there was no record of this occurring.  Ms. Ceaser did not sign the SASS screening until March 18, 2013; eight days after Maya was hospitalized.  While the SASS screening did include the CSPI decision support tool and although Ms. Redding is certified as an administrator of the tool, she did not display

---

[85] Report of the APSAC Task Force, 2006.
[86] Zisser, A., & Eyberg, S.M. (2010). Treating oppositional behavior in children using parent-child interaction therapy. In A.E. Kazdin & J.R. Weisz (Eds.) *Evidence-based psychotherapies for children and adolescents* (2nd *ed.*, pp. 179-193). New York: Guilford. McNeil, C.B., Herschell, A.D., Gurwitch, R.H., & Clemens-Mowrer, L. (2005). Training foster parents in parent-child interaction therapy. *Education and Treatment of Children, 28*, 182-196.

adequate knowledge of several of the ratings (i.e. sexual aggression). Had Ms. Redding gone out to the home and assessed the situation herself and spoke with Ms. Ceaser prior to her decision, Maya may not have had to be hospitalized.

Omega Agency Supervision

While Omega Agency staff provided appropriate and sufficient services to the biological parents of the Schauer/Tischer children, they consistently failed to provide commensurate services to the foster family. In addition, Omega Agency supervisor, Aniyah Kennedy, failed to adequately supervise a case manager who was new to child welfare and foster care when assigned to this case. Case manager Leila Ryman's lack of knowledge and experience was apparent throughout the life of this case. (Ms. Ryman resigned from employment to return to school and move out of state.) Ms. Kennedy had an obligation to not only provide close supervision, but also to teach and model critical inquiry and proactive intervention. Ms. Kennedy failed to ensure that the children's educational requirements were met (Rule 314.70 Educational Services and Rule and Procedures 315 Permanency Planning), including a visit to Maya's school and enrollment of Larisa in a pre-school program. Ms. Kennedy should have ensured communication between the worker and Maya's primary care physician given the reported child injuries and behaviors. Ms. Kennedy requested and accepted placement of the infant sibling in the foster home without determining what services were necessary to assist the foster family. Ms. Kennedy should have recognized the burden and stress placed on the foster mother given the number and ages of the children, their alleged problem behaviors, a spouse out of the home at least 14 hours per work day, and the daily needs of a large family. Ignoring the family's need for respite and transportation assistance was irresponsible. There was no reason for the delay in referring Maya for mental health assessment and services; a supervisor's role is to help expedite referrals when delayed.

HealthWorks

This case raised questions regarding limitation in the collection of health data by HealthWorks. The Carter County Health Department's Healthworks record for Maya did not contain mental health information per exclusion of mental health information in the Guardian's consent form. In order to promote a wholistic approach to a child's well being, HealthWorks must have access to wards' mental health information, which is critical to ensuring a well-informed primary care physician. The DCFS HealthWorks Administrator informed OIG investigators that the Department with the DCFS Office of Information Technology Service (OITS) is in the process of designing a web portal that will allow HealthWorks physicians direct electronic access to a ward's medical, mental health, and prescription medication data. Although these physicians can currently access medical information from HealthWorks, the process is time consuming. For children ages six and over, the physician can request information from the placement services agency that collects the medical and mental health data. It was also noted that Shane's HealthWorks file did not contain the results of a lab report identifying he had MRSA, a serious condition that requires precautions for care in and outside the home, and in health care settings.

**RECOMMENDATIONS**

The Omega Agency
1. *This recommendation addresses personnel issues.*

Alpha Agency
2. *This recommendation addresses personnel issues.*

3. The management of Alpha Agency must train clinical staff on signs of physical abuse.

4. The management of Alpha Agency must ensure communication and coordination between treating therapists and psychiatrist.

DCFS
5. The Department's Clinical Services should review the Omega Agency's clinical trainings for foster parents and staff to revise the clinical content of their trainings to ensure use of evidence based practice.

6. The Department should review clinical training curricula of foster care agencies to ensure evidence based practice.

7. In order to educate foster parents on evidence based practice, the Department should make available legitimate websites that reference evidence based treatment, such as Parent Child Interaction Therapy (PCIT) and the National Alliance on Mental Illness (NAMI) family guide.

8. The Department should conduct a review of the Omega Agency's compliance with educational requirements in light of their failure to enroll a three-year-old foster child in an early childhood education program, and failure to visit a four-year-old pre-school as required in Department Procedures.

9. The Department needs to take action with the Alpha Agency for violations of their SASS contract.

10. The Department should ensure timely development of a web portal for HealthWorks physicians to directly access their patients' (wards) medical, mental health and prescription medication data.

11. The Department should ensure that when a ward is hospitalized, the treating hospital is provided Integrated Assessments.

12. *This recommendation addresses personnel issues.*

13. The Department should review the functional value of Shelby Chase's foster parent support specialist (FPSS) contract.

**APPENDIX A**

<u>**REACTIVE ATTACHMENT DISORDER**</u>

According to the Diagnostic and Statistical Manual of Mental Disorders, fourth edition text revised, *DSM-IV-TR,* Reactive Attachment Disorder (RAD) includes the criteria of pathogenic care and is diagnosed when the following criteria are met:

**A.** Markedly disturbed and developmentally inappropriate social relatedness in most contexts, beginning before 5 years of age, as evidenced by (1) or (2):

> **(1)** Persistent failure to initiate or to respond in a developmentally appropriate fashion to most social interactions, as manifest by excessively inhibited, hypervigilant, or highly ambivalent and contradictory responses (e.g., the child may respond to the caregiver with a mixture of approach, avoidance, and resistance to comforting or may exhibit frozen watchfulness).

> **(2)** Diffuse attachments as manifest by indiscriminate sociability with marked inability to exhibit appropriate selective attachments (e.g., excessive familiarity with relative strangers or lack of selectivity in choice of attachment figures).

**B.** The disturbance in Criterion A is not accounted for solely by developmental delay (as in mental retardation) and does not meet criteria for a pervasive developmental disorder.

**C.** Pathogenic care as evidenced by at least one of the following:

> **(1)** Persistent disregard of the child's basic emotional needs for comfort, stimulation, and affection.

> **(2)** Persistent disregard of the child's basic physical needs.

> **(3)** Repeated changes of primary caregiver that prevent formation of stable attachments (e.g., frequent changes in foster care).

**D.** There is a presumption that the care in Criterion C is responsible for the disturbed behavior in Criterion A (e.g., the disturbances in Criterion A began following the pathogenic care in Criterion C).

*Specify type:*
> **Inhibited type:** if Criterion A1 predominates in the clinical presentation.
> **Disinhibited type:** if Criterion A2 predominates in the clinical presentation.

**REFERENCES**

American Academy of Child and Adolescent Psychiatry. (2003). Policy Statement: Coercive Interventions for Reactive Attachment Disorder. Retrieved March 2013: http://www.aacap.org/cs/root/policy_statements/coercive_interventions_for_reactive_attachment_disorder

American Psychiatric Association. (2000). Diagnostic and Statistical Manual of Mental Disorders (4th ed. text revision: DSM-IV-TR). Washington, DC.

Barth, R.P., Crea, T. M., John, K., Thoburn, J. & Quinton, D. (2005). Beyond attachment theory and therapy: Towards sensitive evidence-based interventions with foster and adoptive families in distress. *Child and Family Social Work*, 10, 257-268.

Boris, N.W. & Zeanah, C.H. (2005). Practice parameter for the assessment and treatment of children and adolescents with reactive attachment disorder of infancy and early childhood. *Journal of the American Academy of Child and Adolescent Psychiatry*, 44 (11), 1206-1209.

Chaffin, M., Hanson, R., Saunders, B.E., Nichols, T., Barnett, D., Zeanah, C., Berliner, L., Egeland, B., Newman, E., Lyon, T., LeTourneau, E., & Miller-Perrin, C. (2006). *Report of the APSAC Task Force on Attachment Therapy, Reactive Attachment Disorder, and Attachment Problems*.

O'Connor, T.G. & Rutter, M. (2000). Attachment Disorder behavior following early severe deprivation: Extension and longitudinal follow-up. *Journal of the American Academy of Child and Adolescent Psychiatry*, 39 (6), 703-712.

Mercer, J. (2001). Warning: Are you aware of 'holding therapy'? *Pediatrics*, 107, 1498.

Skovgaard A.M., Houmann, T., Christiansen, E., Landorph, S., & Jorgensen, T. (2007). The prevalence of mental health problems in children 1(1/2) years of age -- the Copenhagen Child Cohort 2000. *Journal of Child Psychology and Psychiatry,* 48(1), 62-70.

Thomas, N.L. (2005). When love is not enough. A guide to parenting children with RAD-Reactive Attachment Disorder. Glenwood Springs, Colorado: Families by Design.

World Health Organization. (2008). ICD-10: International statistical classification of diseases and related health problems (10th Rev. ed.). New York, NY: Author.

Zitelli, B.J., Mcintire, S.C., Nowalk, A.J. (2012). Atlas of Pediatric Physical Diagnosis.

1. Langlois JA, Rutland-Brown W, Thomas KE. Traumatic Brain Injury in the United States: Emergency Department Visits, Hospitalizations, and Deaths, Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, Atlanta 2004.

2. Jenny C, Hymel KP, Ritzen A, Reinert SE, Hay TC.Analysis of missed cases of abusive head trauma. JAMA. 1999 Feb 17;281(7):621-6. Erratum in: JAMA 1999 Jul 7;282(1):29.

3. Dunning J, Daly JP, Malhotra R, Stratford-Smith P, Lomas JP, Lecky F, Batchelor J, Mackway-Jorgenson K; Children's Head injury Algorithm for the Identification of significant Clinical Events Study (CHALICE Study). The implications of NICE guidelines on the management of children presenting with head injury. Arch Dis Child. 2004 Aug;89(8):763-7.

4. Kuppermann N, Holmes JF, Dayan PS, Hoyle JD Jr, Atabaki SM, Holubkov R, Nadel FM, Monroe D, Stanley RM, Borgialli DA, Badawy MK, Schunk JE, Quayle KS, Mahajan P, Lichenstein R, Lillis KA, Tunik MG, Jacobs ES, Callahan JM, Gorelick MH, Glass TF, Lee LK, et al. Identification of children at very low risk of clinically-important brain injuries after head trauma: a prospective cohort study.Lancet. 2009 Oct 3;374(9696):1160-70. doi: 10.1016/S0140-6736(09)61558-0. Epub 2009 Sep 14.

5. Schutzman SA, Greenes DS.Pediatric minor head trauma.Ann Emerg Med. 2001 Jan;37(1):65-74. Review.

6. Baptist, Errol C., MD. *Pediatric Lecture Notes for Medical Students*. 16th ed. Rockford, IL: n.p., 2012. Print

7. Administration for Children & Families. Child Maltreatment 2010. Annual Report, US Government Printing Office; US Department of Health and Human Services, Washington, DC 2010 available at http://www.acf.hhs.gov/programs/cb/pubs/cm10/cm10.pdf

8. Christian CW, Block R; Committee on Child Abuse and Neglect; American Academy of Pediatrics. Abusive head trauma in infants and children. Pediatrics. 2009 May;123(5):1409-11. doi: 10.1542/peds.2009-0408.

9. Duhaime AC, Christian CW, Rorke LB, Zimmerman RA. Nonaccidental head injury in infants--the "shaken-baby syndrome". N Engl J Med. 1998 Jun 18;338(25):1822-9. Review.

10. Keenan HT, Runyan DK, Marshall SW, Nocera MA, Merten DF.A population-based comparison of clinical and outcome characteristics of young children with serious inflicted and noninflicted traumatic brain injury. Pediatrics. 2004 Sep;114(3):633-9.

11. Hettler J, Greenes DS. Can the initial history predict whether a child with a head injury has been abused? Pediatrics. 2003 Mar;111(3):602-7.

12. Starling SP, Patel S, Burke BL, Sirotnak AP, Stronks S, Rosquist P. Analysis of perpetrator admissions to inflicted traumatic brain injury in children. Arch Pediatr Adolesc Med. 2004 May;158(5):454-8.

13. King WJ, MacKay M, Sirnick A; Canadian Shaken Baby Study Group. Shaken baby syndrome in Canada: clinical characteristics and outcomes of hospital cases. CMAJ. 2003 Jan 21;168(2):155-9.

14. Morad Y, Kim YM, Armstrong DC, Huyer D, Mian M, Levin AV. Correlation between retinal abnormalities and intracranial abnormalities in the shaken baby syndrome. Am J Ophthalmol. 2002 Sep;134(3):354-9.

15. Ng WS, Watts P, Lawson Z, Kemp A, Maguire S. Development and validation of a standardized tool for reporting retinal findings in abusive head trauma. Am J Ophthalmol. 2012 Aug;154(2):333-339.e5. doi: 10.1016/j.ajo.2012.02.007. Epub 2012 Apr 28.

16. Adams G, Ainsworth J, Butler L, Bonshek R, Clarke M, Doran R, Dutton G, Green M, Hodgkinson P, Leitch J, Lloyd C, Luthert P, Parsons A, Punt J, Willis D, Tehrani N, Willshaw H; Child Abuse Working Party. Update from the ophthalmology child abuse working party: Royal College ophthalmologists. Eye (Lond). 2004 Aug;18(8):795-8. Review.

17. Wygnanski-Jaffe T, Levin AV, Shafiq A, Smith C, Enzenauer RW, Elder JE, Morin JD, Stephens D, Atenafu E. Postmortem orbital findings in shaken baby syndrome. Am J Ophthalmol. 2006 Aug;142(2):233-40.

18. Tung GA, Kumar M, Richardson RC, Jenny C, Brown WD. Comparison of accidental and nonaccidental traumatic head injury in children on noncontrast computed tomography. Pediatrics. 2006 Aug;118(2):626-33.

19. Sugar NF, Willis JA, Feldman KW. Bruises in infants and toddlers: those who don't cruise rarely bruise. Puget Sound Pediatric Research Network. Arch Pediatr Adolesc Med. 1999 Apr;153(4):399-403.

20. Labbé J, Caouette G. Recent skin injuries in normal children. Pediatrics. 2001 Aug;108(2):271-6.

21. Adamo MA, Drazin D, Smith C, Waldman JB. Comparison of accidental and nonaccidental traumatic brain injuries in infants and toddlers: demographics, neurosurgical interventions, and outcomes. J Neurosurg Pediatr. 2009 Nov;4(5):414-9. doi: 10.3171/2009.6.PEDS0939.

22. Bechtel K, Stoessel K, Leventhal JM, Ogle E, Teague B, Lavietes S, Banyas B, Allen K, Dziura J, Duncan C. Characteristics that distinguish accidental from abusive injury in hospitalized young children with head trauma. Pediatrics. 2004 Jul;114(1):165-8.

23. Feldman KW, Bethel R, Shugerman RP, Grossman DC, Grady MS, Ellenbogen RG. The cause of infant and toddler subdural hemorrhage: a prospective study. Pediatrics. 2001 Sep;108(3):636-46.

24. Wells RG, Vetter C, Laud P. Intracranial hemorrhage in children younger than 3 years: prediction of intent. Arch Pediatr Adolesc Med. 2002 Mar;156(3):252-7.

25. Raghupathi R, Mehr MF, Helfaer MA, Margulies SS. Traumatic axonal injury is exacerbated following repetitive closed head injury in the neonatal pig. J Neurotrauma. 2004 Mar;21(3):307-16.

26. Case ME, Graham MA, Handy TC, Jentzen JM, Monteleone JA; National Association of Medical Examiners Ad Hoc Committee on Shaken Baby Syndrome. Position paper on fatal abusive head injuries in infants and young children. Am J Forensic Med Pathol. 2001 Jun;22(2):112-22.

27. Geddes JF, Hackshaw AK, Vowles GH, Nickols CD, Whitwell HL. Neuropathology of inflicted head injury in children. I. Patterns of brain damage. Brain. 2001 Jul;124(Pt 7):1290-8.

28. Berger RP, Kochanek PM, Pierce MC. Biochemical markers of brain injury: could they be used as diagnostic adjuncts in cases of inflicted traumatic brain injury? Child Abuse Negl. 2004 Jul;28(7):739-54. Review.

29. Berger RP, Dulani T, Adelson PD, Leventhal JM, Richichi R, Kochanek PM. Identification of inflicted traumatic brain injury in well-appearing infants using serum and cerebrospinal markers: a possible screening tool. Pediatrics. 2006 Feb;117(2):325-32.

30. American Academy of Pediatrics: Committee on Child Abuse and Neglect. Shaken baby syndrome: rotational cranial injuries-technical report. Pediatrics. 2001 Jul;108(1):206-10. Review.

31. Section on Radiology; American Academy of Pediatrics. Diagnostic imaging of child abuse. Pediatrics. 2009 May;123(5):1430-5. doi: 10.1542/peds.2009-0558.

32. Demaerel P, Casteels I, Wilms G. Cranial imaging in child abuse. Eur Radiol. 2002 Apr;12(4):849-57. Epub 2001 Nov 8. Review.

33. Datta S, Stoodley N, Jayawant S, Renowden S, Kemp A. Neuroradiological aspects of subdural haemorrhages. Arch Dis Child. 2005 Sep;90(9):947-51.

34. Foerster BR, Petrou M, Lin D, Thurnher MM, Carlson MD, Strouse PJ, Sundgren PC. Neuroimaging evaluation of non-accidental head trauma with correlation to clinical outcomes: a review of 57 cases. J Pediatr. 2009 Apr;154(4):573-7. doi: 10.1016/j.jpeds.2008.09.051. Epub 2008 Nov 22.

35. Barnes PD, Robson CD.CT findings in hyperacute nonaccidental brain injury. Pediatr Radiol. 2000 Feb;30(2):74-81. No abstract available.

36. Rubin DM, Christian CW, Bilaniuk LT, Zazyczny KA, Durbin DR. Occult head injury in high-risk abused children. Pediatrics. 2003 Jun;111(6 Pt 1):1382-6.

37. American College of Radiology. ACR appropriateness criteria. Suspected physical abuse - child.
http://www.acr.org/~/media/ACR/Documents/AppCriteria/Diagnostic/SuspectedPhysicalAbuseChild.pdf

38. Morad Y, Kim YM, Mian M, Huyer D, Capra L, Levin AV. Nonophthalmologist accuracy in diagnosing retinal hemorrhages in the shaken baby syndrome. J Pediatr. 2003 Apr;142(4):431-4.

39. Kivlin JD, Simons KB, Lazoritz S, Ruttum MS.Shaken baby syndrome. Ophthalmology. 2000 Jul;107(7):1246-54.

40. Davis RL, Mullen N, Makela M, Willis JA, Cohen W, Rivara FP. Cranial computed tomography scans in children after minimal head injury with loss of consciousness. Ann Emerg Med. 1994 Oct;24(4):640-5.

41. Marcin JP, Pollack MM. Triage scoring systems, severity of illness measures, and mortality prediction models in pediatric trauma. Crit Care Med. 2002 Nov;30(11 Suppl):S457-67. Review.

**- END OF REPORT -**

# OFFICE OF THE INSPECTOR GENERAL
## Department of Children and Family Services

> ### *REDACTED REPORT*

> *This report is being released by the Office of the Inspector General for instructional purposes.  To ensure the confidentiality of all persons and service providers involved in the case, identifying information has been changed.  All names, except those of professional references, are fictitious.*

**File No:**   2013-1567
**Subject:**   Child Death & Serious Injury
**Child:**     Rachel Lawrence (DOB: 8/09; DOD: 12/12)
               Victor Lawrence (DOB 3/03; DOI: 12/12)

## SUMMARY OF COMPLAINT

Three-year-old Rachel Lawrence died in December 2012 as a result of injuries sustained two days earlier when her biological father, Samuel Lawrence,[1] set the family on fire. She sustained burns over 90% of her body. Her nine-year-old brother, Victor Lawrence, sustained burns over 35% of his body. He was hospitalized in Alpha Hospital's burn unit for approximately two months and then was transferred to a rehabilitation center for approximately three months. In May 2013, Victor was discharged to the relative foster home of a paternal aunt. The children's father and mother both died in the fire. At the time of the fire, Rachel and Victor were DCFS wards who were placed with their maternal aunt. The aunt violated court orders regarding visitation on the night of the fire by allowing the mother to take the children overnight to the paternal grandmother's home where the father lived and where the fire was set. Three-and-a-half months earlier, in September 2012, the children had been removed from their parents' custody after their father filled the bathtub in their apartment with gasoline and threatened to kill the children and himself.

The Office of the Inspector General was copied on a letter to the Director from the Chief of the Child Protection Division of the local county State's Attorney's Office which alleged mishandling of the Lawrence case by Gamma Agency and its assigned case manager, Ellen Ross. The letter was critical of the failure to provide financial daycare assistance to the maternal aunt. The letter also criticized Ms. Ross for failing to ascertain where the children went for daycare. Ms. Ross resigned from Gamma Agency in April 2013. Ms. Ross's supervisor, Richard Walker, left the agency in September 2013.

---

[1] Lawrence is sometimes spelled Laurence in reports.

## INVESTIGATION

### Family Composition

Nita Black (DOB 8/79) and Samuel Lawrence (DOB 9/83) never married but were in a relationship for twelve years and had two children together: Victor Lawrence (DOB 3/03) and Rachel Lawrence (DOB 8/09).  They were living together as a family when they first came to the attention of the Department of Children and Family Services (DCFS) in September 2012.

### September 2012 Incident Leading to DCFS Involvement

In September 2012, Nita Black contacted 911 alleging that Mr. Lawrence threatened to kill himself along with their two children.[2] The local police department responded to the call and notified the Department of Children and Family Services of the incident the following day.

*Police Response*

The local police officers were dispatched to the family's home at approximately 4:17 pm. The police report stated in part:

> In Summary: On the above listed date and time R/O [Officer Bannon] along with Ofc. Hamilton #223 were radio dispatched to 789 Yellow Cove, Apt 5A in reference to a suicidal subject.  While R/O's were in route to the said address, local dispatch advised R/O's the 911 caller (RP) was the spouse of the suicidal subject (Laurence Jr, Samuel) who had made threats to Black via telephone that he would kill himself along with his two kids who were also inside the apartment.  At which time R/O requested a supervisor to also be dispatched to R/O's destination.  Upon R/O's arrival, R/O's approached Apt 5A knocked and announced R/O's office.  R/O's received no response at this time.  Lt. Thomas #923 arrived on scene where R/O's continue to knock with negative results.  R/O's were notified by local dispatch that the 911 caller (RP)/key holder was in route to R/O's location with an E.T.A. of 30-40 minutes.  At which time Ofc. Hamilton noticed a bed sheet wedged in the bottom of the door.  R/O crouched down where R/O smelled a strong odor of gasoline coming from the apartment.  Due to the nature of the call and circumstances, R/O's along with Lt. Thomas made the determination to make force entry to the apartment.  At which time Ofc. Hamilton began kicking the door but was unable to make entry due to reinforcement (Unknown type) at the bottom of the door.  R/O's then heard a male subject state, "If you come in here I'm gonna blow this shit up!"  R/O's also heard children screaming inside the apartment.  R/O's then started to evacuate the building and Lt. Thomas notified the detectives along with FD via

---

[2] In a later interview with Detectives Clark and Nicholas, Ms. Black related that while she was getting ready for work, she and Mr. Lawrence got into a heated argument because Mr. Lawrence was not taking his medication and was highly depressed and paranoid. Ms. Black said that Mr. Lawrence made threats that he would kill himself along with their two children by pouring gasoline on them and lighting a match.  She told detectives that she calmed Mr. Lawrence down and convinced him to allow her to leave the apartment and go to work.  She arrived at work at approximately 4:00 pm. When she informed her supervisor and the store director of Mr. Lawrence's threats, she was urged to call the police.

radio of the situation.   Once R/O's safely evacuated the tenants from the building a perimeter was formed around the building by other responding units in the area.   Local FD engine 1 along with F-15 and F-12 arrived on scene. Detectives Hardman #383 and Nicholas #675 arrived on scene as well.   R/O's secured the area and after a brief negotiation with Laurence and Lt. Thomas who were communicating from Laurence's window, Laurence decided to let both his kids leave the apartment.   Both children (V1 + V2) were taken out of harms way by R/O's where their mother Black refused medical attention for them at that time.   R/O's along with Sgt. Whitfield #477 and officers of the G.C.T.U. made force entry to the apartment where Laurence was taken into custody without further incident (1710 Hrs).   R/O observed the bath tub filled with gasoline along with 2 empty gasoline containers near the kitchen area. Sgt. Whitfield photographed the scene which was turned over to detectives.

In a supplemental report, Lieutenant Edward Thomas wrote in part:

R/Lt. Attempted a force entry of the apartment and was advised by Samuel Lawrence (sic) that he had put gasoline throughout the apartment and would kill himself and children, if we attempted to come in.  I then ordered evacuation of the whole building and requested for FD and the Detectives to the scene on a bonafide hostage situation.  After clearing all apartments I was able to speak with Samuel through the front apartment window from my position on the street.  He related to R/Lt that he wanted to kill himself.  I then asked if anyone else was in the apartment with him, and related that his daughter and son where (sic).  That is when his son showed up at the window crying and stating, "Are you coming for me!"  I was able to calm him down and began talking to Samuel again, advising him to calm down and work with me in releasing the children.  He (sic) daughter, Rachel then showed up at the window but she was calm.  Samuel kept speaking to me and stated that he only wanted to talk to his wife.  I then got him to release his son, Vector (sic) to show us good faith in getting his wife to the location.  Samuel then opened the door and released his son as I waited for him at the doorway at the bottom of the stairway.

Shortly after Victor was released, his mother arrived at the scene and was allowed to speak to Samuel by phone. Rachel was subsequently released. Mr. Lawrence remained in the apartment at the window. Lt. Thomas wrote in the supplemental report, "He began smoking a cigarette and looking more distraught and less responsive to my conversation." Officers forced entry while Lt. Thomas kept Samuel occupied. Samuel was taken into custody and transported to Beta Hospital.

The local fire department ambulance transported Mr. Lawrence to Beta Hospital ED (emergency department) for a psychiatric evaluation. The attending physician documented:

Awaiting word from police if pt is going to be formally charged. If so will dc to police under suicide watch, if not will proceed to transfer to Delta.

The following day the attending physician noted:

Per police it has been decided that pt is not being charged with anything, not under arrest. Appears medically stable for further eval and treatment at

psychiatric facility, eval[uat]ed by b[ehavioral]h[ealth]s[ervices]. Will transfer
to Delta. A petition and certificate were completed.

According to a local police report, an assistant state's attorney interviewed Mr. Lawrence at
Beta Hospital. After returning to the local police department, she informed police that she was
issuing a continuing investigation until an interview with the mother and victim sensitive
interviews with the children were conducted. According to the report, six days later, another
assistant state's attorney cited a "lack of evidence" and Ms. Black's lack of cooperation as
reasons why he could not approve felony charges. The local police closed the case by felony
rejection.[3] After the deadly fire, the county State's Attorney's office reviewed the decisions not
to charge and suspended two attorneys.[4]

### DCFS Investigation Child Protection Investigation, Reported 9/12; Indicated 11/12

Local police contacted the hotline at 2:15 pm the day following the hostage incident.  Mr.
Lawrence was still at Beta. The narrative reads:

> Reporter said yesterday Samuel told Nita he wanted to kill himself and their
> children.  Nita left and went to work.  When she got to work she told her boss
> what Samuel said.  Nita's boss urged her to call the police.  When the police
> arrived on the scene they encountered a hostage situation.  Samuel had
> barricaded himself in the apartment.  He had filled the bathtub with gas and
> threatened to set it on fire.  A hostage negotiator was called.  Samuel released
> the children at the urging of the negotiator.  About a half hour later Samuel
> gave up.  He was taken to Beta Hospital in Westchester.  The fire department
> was called the (sic) clean the apartment of gas and fumes.  Nita and the children
> returned to the apartment.

An allegation of substantial risk of physical injury/environment injurious to health and welfare
by abuse (#10) to Victor and Rachel by their father was taken for investigation. Cynthia Bailey,
supervised by Anita Bowles, was the assigned investigator.

Later that afternoon, the Public Service Administrator spoke to the reporter, Detective Daryl
Clark, who confirmed the information contained in the hotline narrative. In addition, Detective
Clark told the Administrator that, according to the children's mother, Mr. Lawrence was
schizophrenic and bi-polar; was not taking his psychotropic medication; and was using PCP.
He also reported that mother was aware that Mr. Lawrence had purchased gasoline and brought
it back to the apartment. Detective Clark said that when police arrived at the family's apartment
they could smell gas and fumes and could hear the children crying and coughing in the
apartment.  It took about 30 minutes to convince Mr. Lawrence to let the first child go and
another 1-1/2 hours to let the second child go. He said the children's socks were soaked in
gasoline. Detective Clark said the police had no prior contact with the family.

The following morning, Investigator Bailey talked to Detective Nicholas who added that Mr.
Lawrence had poured two cans of gas in the bath tub and the fire department got 4 gallons of

---

[3] The local police prepared a misdemeanor arrest warrant but never had it signed by a judge. According to
the local police superintendant, police issued a stop order, which would have resulted in Mr. Lawrence's
detention had police stopped him on the street.

RACHEL LAWRENCE

gas out of the tub. They were told that a little spark would have lit the whole building on fire.[5] He said the mother definitely feared the father. Ms. Bailey obtained the police reports of the incident.

### Child Advocacy Interviews

Two days after the hostage incident, the Lawrence children had Victim Sensitive Interviews (VSIs) at the Child Advocacy Center.[6] The children were accompanied by their mother. The interviews were conducted by Carl Ingersoll, LCSW. Rachel was reportedly difficult to engage. She had a short attention span and was unable to provide information about the events at her house.  According to Victor's interview summary:

> C[hild] described through verbal narrative and responses to follow-up questions events that happened when his mom went to work.  C said earlier in the dad (sic) his dad and mom were arguing, and were telling each other "you started it."  C denied seeing his parents hit each other.  C said his mom went to work and he was on the computer.  His sister was asleep on the couch.  C described police banging on the door, his father putting a chair in front of the door, and putting him in the bathtub and telling him to hide.  C said he was wearing only his boxers.  When asked if he smelled anything in the house, C said he smelled the tacos his dad had made.  C said the police took him out, he went into an ambulance, and that is when he saw his mom.  C said his dad did not hurt him, and that his mom told him his dad didn't mean to act all crazy.  C said his dad acts crazy like when C talks to him his dad is singing and then asks him what he said.  C said he has seen his dad smoke cigarettes but nothing else.  C said his dad has some pills to take.  C said his dad is in the hospital now.

Investigator Bailey observed both children's interviews at the Child Advocacy Center and interviewed the mother.[7] Ms. Black stated that she and Mr. Lawrence had been dating for twelve years and living together for eleven. She told the investigator that a year ago, Mr. Lawrence [had serious mental health issues].  In November 2011, he turned a gun in to the police and they had him admitted to the hospital. Ms. Black acknowledged that she knew Mr. Lawrence smoked PCP, having found out last year when he was admitted to the hospital and a blood test came back positive.  She denied any current domestic violence incidents; however, told the investigator that about six or seven years ago Mr. Lawrence was "hitting me" and she got an order of protection and he had to go to classes. Ms. Black told the investigator that on the morning of the incident everything was fine. She started getting ready for work about 2:30 pm and Mr. Lawrence said, "you not going to work." She asked him why and he said, "this is it, I am tired of living like this, I can't keep living like this. I can't keep leaving my family behind." Ms. Black was not sure what he meant by that. She said he kept saying he was in another world and was acting like he had died before and came back. Ms. Black reported that Mr. Lawrence went to the closet and pulled out two cans of gasoline. She told the investigator that she had no idea they were in the house and the house didn't smell like gas. Ms. Black said she was trying to calm him down and eventually he said "I'm going to let you go to work." Mother left at approximately 3:00 pm. Mr. Lawrence and the kids walked her downstairs and he said "don't

---

[5] Police evacuated residents of the 20-unit condominium building.

[6] Summaries of both interviews were in attachments to the child protection investigation.

[7] The children's interviews were also observed by the Assistant State's Attorney and Detective Nicholas from the local police department.

worry nothing is going to happen." Mr. Lawrence called Ms. Black to see if she made it to work. After hanging up with him "something struck her" and she informed her supervisor and director of her situation and was instructed by them to call the police and return home because her kids were not safe.

Ms. Black told the investigator that she no longer wanted to be with Mr. Lawrence and that "my plans are my kids first." She said she was looking for a different apartment because she could not afford the rent by herself. Ms. Black admitted to being afraid of Mr. Lawrence to a certain extent. She said that the first time he threatened to kill her was last year.  She told the investigator "that she thought that he was just talking." Ms. Black described Mr. Lawrence as a good father and stated, "he'll never hurt the kids." Investigator Bailey completed a Domestic Violence Screen and documented the reported abuse from six years earlier. The investigator discussed protective custody and temporary custody processes with the mother. Ms. Black requested that the children be placed with her sister, Vivian Black.

***Protective Custody and Relative Placement***

The same day, Investigator Bailey completed a CERAP that was marked UNSAFE. The Lawrence children were taken into protective custody and placed with maternal aunt Vivian Black.[8] Ms. Bailey conducted CANTS and LEADS checks on Vivian which were negative.

Investigator Bailey interviewed the maternal aunt, who told the investigator that on the day of the incident, her sister called her crying and said she was on her way home because "Samuel threatened to kill himself."  Vivian described her sister, who she saw that evening, as "upset and trying to get herself together." Vivian told the investigator that about six years ago, Mr. Lawrence and her sister had a fight and both of them went to jail. She said she didn't think her sister took Mr. Lawrence serious when he said he wanted to kill himself. Vivian denied ever observing any signs of abuse or neglect to the children. She said that her sister was very private about her business and never complained much, except she would say Mr. Lawrence kept her up all night. Vivian reported that she heard through "the grapevine that Mr. Lawrence was doing PCP."

Investigator Bailey told OIG investigators that she and Vivian discussed her need for childcare. Ms. Bailey provided Vivian with the number to the Office of Child Development and recommended that she get started immediately because the process could be lengthy. Ms. Bailey told OIG investigators that Vivian said she had a lot of family support.

Investigator Bailey told OIG investigators she believed that relative placement with Vivian was perfect. Ms. Black wanted her children placed with Vivian and Ms. Bailey did not think Vivian would allow unsupervised contact with Mr. Lawrence since she did not care for him because of how he treated her sister. In addition, Vivian worked and had a car.

Investigator Bailey conducted a telephone interview with paternal grandmother Lisa Lawrence. She described Ms. Black as a good mother who took good care of her children. She told the investigator that "Nita made a bad call when she left and went to work, she could have called me, I live 5 minutes from them, I could have come over and talked to my child and took him to the hospital." Mrs. Lawrence said she had been trying to get her son help but said it was hard without a medical card. Mrs. Lawrence told the investigator that Samuel was seeing a psychiatrist once a month but in her opinion he needed to see someone 2-3 times a week. She

---

[8] The maternal aunt is referred to as Vivian in this report to distinguish her from Ms. Nita Black.

said with the loss of his job, arguments with Ms. Black, and babysitting the kids, he was having a hard time.

According to a contact note Investigator Bailey telephoned Alpha Hospital and had Dr. Frances Hamblin paged twice, at 3:15 pm and 4:11 pm, three days following the hostage incident. There were no further attempts by DCP to speak with the father's psychiatrist.

CANTS and LEADS checks were completed on both parents three days following the hostage incident. Both were negative for CANTS and positive on LEADS.[9]

Beta Hospital prepared a certificate and petition and transported Mr. Lawrence by ambulance to Delta Mental Health Facility, a state operated psychiatric facility. Mr. Lawrence had refused to consent to his transfer to Delta.[10] Mr. Lawrence was hospitalized at Delta for fourteen days (see Hospitalization at Delta section below). Mr. Lawrence had no insurance and was not on Medicaid at the time of his admission.

---

[9] OIG staff also ran a LEADS on Mr. Lawrence and Ms. Black.  Mr. Lawrence's LEADS revealed a lengthy criminal history dating to 1999.  He had been arrested over twenty-one times as an adult, as well as had several arrests as a juvenile.  Mr. Lawrence was incarcerated twice as an adult and once as a juvenile.  From 1999 until 2012, he was charged with seven violent crimes, including: armed robbery three times; domestic battery twice; aggravated assault and aggravated battery.  He was arrested and charged with drug-related offenses six times.  Mr. Lawrence's domestic battery charges occurred in October 2004 and July 2007 and both incidents involved Nita Black. In October 2004 Mr. Lawrence was arrested when police responded to a call of a person with a gun and observed Mr. Lawrence strike Ms. Black in the face with a closed fist. In July 2007 Mr. Lawrence was arrested after Ms. Black signed a complaint stating that Mr. Lawrence began an argument and then choked her and struck her in the head and face. Ms. Black filed an emergency order of protection against Mr. Lawrence.  A plenary order of protection was issued in August 2007. Ms. Black's LEADS revealed that she was charged and convicted of retail theft in 2002 (sentenced to 6 months conditional discharge); charged with battery in 1999 (withhold judgment, and sentenced to 1 year supervision); and charged in 1998 with retail theft (withhold judgment and sentenced to 6 months supervision).

[10] The Illinois Mental Health and Disabilities Act allows for involuntary emergency admission to a psychiatric facility. When a person is asserted to be subject to involuntary admission on an inpatient basis and in such a condition that immediate hospitalization is necessary for the protection of such person or others from physical harm, any person 18 years of age or older may present a petition to the facility director of a mental health facility in the county where the respondent resides or is present. Amongst other things, the petition shall include a detailed statement of the reason for the assertion that the respondent is subject to involuntary admission on an inpatient basis, including the signs and symptoms of a mental illness and a description of any acts, threats, or other behavior or pattern of behavior supporting the assertion and the time and place of their occurrence. 405 ILCS 5/3-601. The petition shall be accompanied by a certificate executed by a physician, qualified examiner, psychiatrist, or clinical psychologist which states that the respondent is subject to involuntary admission on an inpatient basis and requires immediate hospitalization. The certificate shall indicate that the physician, qualified examiner, psychiatrist, or clinical psychologist personally examined the respondent not more than 72 hours prior to admission. 405 ILCS 5/3-602. Once admitted under the certificate and petition, a psychiatrist at the facility to which the person was admitted, must complete a second certificate within 24 hours. A person may be held on an involuntary basis for 72 hours (excluding weekends and holidays) before continued involuntary admission must be approved by the court.

*Samuel Lawrence's History of Mental Health Problems and Violence*[11]

In November 2011, 28-year-old Samuel Lawrence walked into ABC police station with a loaded gun and told police that he declared martial law. After police removed the gun from Mr. Lawrence, he told police he found the gun in a dumpster and wanted to give it to them. Police noticed that Mr. Lawrence was acting bizarrely and after questioning him, took him to Alpha Hospital. Ms. Black told hospital staff that Mr. Lawrence had been acting strangely, had not slept for days, kept talking about the world coming to an end, and had been cutting himself on his forehead.

Mr. Lawrence was admitted to a state operated psychiatric facility. Upon admission, he tested positive for PCP and cannabis.

In April 2012 Mr. Lawrence was arrested by the ABC Police and charged with aggravated assault of a peace officer and resisting or obstructing a peace officer.[12] According to the arrest report:

> WHILE ON ROUTINE PATROL BT 1132R OBSERVED A VEHICLE PARKED ILLEGALLY IN OPENING OF PARKING LOT TO ABOVE LOCATION, R/OS WENT INTO WEST SIDE FOOD AND LIQUOR 473 NEW ORLEANS TO INQUIRE ABOUT VEHICLE WHILE SPEAKING WITH SECURITY PERSONEL AND STORE MANAGEMENT R/OS WERE APPROACHED BY SAMUEL LAWRENCE (OFFENDER) WHO WALKED INTO THE STORE AFTER R/OS AND STATED "WHY ARE YOU MOTHERFUCKERS WORRIED ABOUT WHO CAR THAT IS, YOU MOTHERFUCKERS CAN GET SHOT TOO. OFFENDER REPEATED STATEMENT WHILE HOLDING HIS ARM BEHIND HIS BACK LEADING R/OS TO BELIEVE THAT HE HAD A WEAPON. R/OS ORDERED OFFENDER TO SHOW HIS HANDS AT WHICH TIME OFFENDER STATED TO R/OS THAT "YOU BLEED TOO MOTHERFUCKERS AND FUCK YOU!!" R/OS PULLED WEAPONS, AND REPEATED DEMAND TO SHOW HIS HANDS. SAMUEL LAWRENCE (OFFENDER) BACKED OUT OF STORE FOLLOWED BY R/OS. P.O Z. MONTGOMERY (VICTIM AND COMPLAINANT) ATTEMPTED TO SUBDUE OFFENDER AND WAS MET WITH RESISTANCE. AT THIS TIME P.O. MONTGOMERY USED HIS TASER (DRY STUD) TO GAIN CONTROL OF OFFENDER WHO WAS CONTINUING TO RESIST.

In April 2012, Ms. Black called Epsilon Health Center stating that Mr. Lawrence's medication was stolen while he was on the el train and he was beginning to decompensate.

*Court Involvement*

A shelter care hearing was held in September 2012 in the County Juvenile Court. The petition alleged that Rachel and Victor were neglected minors, pursuant to 705 405/2-3(1)(b), in that

---

[11] Compiled from Delta Mental Health Center records, Alpha Hospital records, Beta Hospital records, and ABC Police Department records.

[12] This case was before the Judge in September 2012 (the same day as a shelter care hearing in Juvenile Court regarding Mr. Lawrence's children). Mr. Lawrence was psychiatrically hospitalized at the time and the case was continued for status in November 2012.

their environment was injurious to their welfare and pursuant to 705 405/2-3(2)(ii) in that there was a substantial risk of physical injury.  The following facts were given in support of the allegations:

> On or about September 2012, putative father threatened to kill this minor and this minor's sibling. Mother was aware of putative father's threats, but left the minors with him and went to work. Police were called and a hostage situation developed.  Putative father held this minor and this minor's sibling in an apartment with gasoline in the bath tub while he was smoking. Putative father has a recent history of mental illness [as well as a chronic history of serious mental health]. Putative father is currently hospitalized in a psychiatric facility. Mother was aware of putative father's history of mental illness and stated that he had been increasingly angry over the preceding two weeks. Putative father admits using illegal substances. Mother admits knowledge of putative father's drug abuse. Paternity has not been established.[13]

In an Affidavit Documenting DCFS Efforts, Investigator Bailey documented that she believed placement of the Lawrence children was necessary because their mother went to work and left the children in the care of their father who had threatened to kill himself and the children. She noted that no efforts would prevent placement because:

> Mr. Laurence has [serious mental health issues], he has not taken his medication in 2 weeks. He admitted to the Police that he was using PCP and that he hear[s] voices telling him to kill people. He is the children['s] baby sitter.

Present in the court room for the hearing were the: Assistant State's Attorney (ASA); Assistant Public Guardian (APG); Assistant Public Defender (APD) on behalf of the mother; mother Nita Black; Rachel; Rachel's godmother; paternal grandmother Lisa Lawrence; maternal grandmother; mother's sister and foster parent Vivian Black; three of mother's cousins; and DCFS Child Protection Investigator Cynthia Bailey. Father was not present in court on that date because he remained hospitalized at Delta Mental Health Facility.[14] The Public Guardian's Office was appointed to represent the children and the Public Defender's Office was appointed to represent the mother. Ms. Black stipulated[15] to paragraph 5 of the petition (neglect environment injurious) for purposes of the temporary custody motion.

An order was entered that placed the children in the temporary custody of DCFS with prejudice to the mother and without prejudice to the father.[16] The court found there was probable cause; urgent and immediate necessity; and that reasonable efforts could not be made. Pursuant to the assistant state's attorney's request, the court ordered the release of the minors' medical records and the father's mental health records from Delta to be used only by the attorneys in the court case. The court also entered a visitation order that the mother was allowed day visits with her children and that her visits must be supervised by either a DCFS/private agency case manager or a person designated by such. The case was continued to mid September.

---

[13] Findings of paternity were entered at a later court hearing.

[14] Mr. Lawrence's criminal case for the April 2012 Aggravated Assault/Police/Sheriff Employee was also heard in September 2012.

[15] A stipulation is a written agreement as to what evidence the Court would consider.

[16] Orders are usually entered without prejudice until a parent appears in court.

**Placement Case**

In September 2012, the Lawrence case was accepted by Gamma Agency of ABC for placement services. Ellen Ross was assigned as the case manager on that date.[17] Her supervisor was Richard Walker.[18] The placement case was open for approximately three and a half months before the fatal fire, during which Ms. Ross made regular visits to the relative foster home.

At the next court date,[19] the Judge was told that Mr. Lawrence was still hospitalized at Delta Mental Health Facility. The judge appointed an attorney to represent the father. The judge also entered an order for mediation pursuant to the presiding judge's general order that all new cases go to mediation.[20] He continued the order that placed the children in the temporary custody of DCFS, without prejudice to the father until the next court date. The case was continued to the end of September.

In September, Ms. Ross conducted an initial home visit with Vivian and the children.  In her case note, Ms. Ross noted that Vivian worked part time as a cashier at a grocery store;[21] nine-year-old Victor attended The Academy; and the foster parent was considering pre-school/daycare for three-year-old Rachel. Ms. Ross and Vivian completed an application for employment related daycare (see attached Daycare Assistance Timeline).[22] Ms. Ross told OIG investigators that this was her first case in which childcare assistance was needed so she was not familiar with the process. The following day, Ms. Ross submitted a request for two twin beds and initial clothing vouchers for both children.

### *Mr. Lawrence's Hospitalization at Delta Mental Health Facility*

Following the life threatening event, Mr. Lawrence was psychiatrically hospitalized at a state-operated facility.

Section 125.50 b) Illinois Administrative Code Title 59 Section 125.50 provides for state operated facilities' discharge planning. According to 125.50 b):

> Prior to making the decision to discharge and refer a recipient, the recipient's readiness for that move must be assessed as well as the recipient's desire and agreement to participate. In this assessment, consideration must be given, not

---

[17] Ms. Ross, who has a BA in psychology, told OIG staff that she had worked in child welfare for approximately one year prior to receiving the Lawrence case.

[18] Mr. Walker, who has a master of divinity degree and a BA in liberal arts, told OIG staff that he was promoted to supervisor seven months earlier, in February 2012.  He had approximately two and a half years of foster care casework experience prior to becoming a supervisor.

[19] Present in the court room were: the ASA; APG; APD; mother; foster parent; Rachel; paternal grandmother; godmother; and Child Protection Investigator.

[20] Mediation was scheduled for November 7 to address issues of placement, visitation, court process and services.  The Judge is not present at mediation as opposed to the court family conference, which is conducted in court with the Judge present.

[21] In a phone conversation two days later with Ms. Ross's supervisor, Vivian reported that she worked the swing shift at the grocery store from Thursday to Sunday and went to school Monday to Wednesday from 9 am to 12:50 pm.

[22] Ms. Ross obtained the application from a co-worker. It was an old application with a revision date of July 1999.  The current daycare services application was revised in August 2003.

RACHEL LAWRENCE

> only to the desires of the recipient and the recommendations of State-operated facility treatment/habilitation staff, but also the desires and recommendations of the recipient's guardian, family, follow-up monitoring staff, community agency staff previously involved with the recipient or likely to provide services after discharge, and staff of other involved State agencies (such as Department of Public Aid, Department of Children and Family Services, State Board of Education and the Department of Corrections).
>
> Agency note:  Recipients who are drug abusers shall be referred to the state Office of Planning and Program Development, Dangerous Drugs Commission. The Commission shall participate in DLA (discharge/linkage/aftercare) planning and shall be responsible for assuring the treatment/habilitation services, placement and/or follow-up are provided to meet the individual recipient's aftercare needs.

The designated aftercare agency is expected to actively participate in the patient's discharge planning. Discharge planning includes executing consents for release of information between the hospital and the aftercare facility, and obtaining an initial appointment for the patient with the aftercare agency. The secured appointment should include the "day, time, location, and the name of the staff person the recipient is to see (Section 125.110 a)2)C)."

Delta's discharge plan for Mr. Lawrence detailed that aftercare would be provided at Zeta Mental Health Center. A nurse documented that she discussed the discharge plan with Mr. Lawrence. Mr. Lawrence's mother, with whom he would be living, picked him up. Zeta is 2 ½ to 3 miles from Mrs. Lawrence's home and has a day treatment program.

While Delta tries to schedule an appointment with the community aftercare provider prior to a patient's discharge, it does not always happen.[23] At the time of his discharge, Delta's social worker noted she was confirming the first available appointment for Mr. Lawrence at Zeta and would contact him with appointment information. According to Delta's record, the day after his discharge, the hospital social worker attempted to contact Mr. Lawrence with information about his aftercare appointment but his phone was not accepting calls.

Zeta Mental Health Center had no records on Mr. Lawrence.[24] Zeta may have received a fax of Mr. Lawrence's discharge summary, but if Mr. Lawrence did not follow through on the referral, the center would have shredded it. If Mr. Lawrence had gone to Zeta in September or October 2012 he would have been seen as a walk-in for intake and received an assessment by a psychiatrist.[25]

Neither DCFS nor Gamma Agency participated in the discharge plan nor were they aware that Mr. Lawrence was linked to Zeta for aftercare services.

According to the Associate Director of Decision Support, Research and Evaluation with the Department of Mental Health, DMH does not track patients' rate of compliance with referrals for community-based aftercare services or the rate of community agencies' attendance at

---

[23] OIG interview with Delta Mental Health Center Social Worker.

[24] The OIG issued Zeta Mental Health Center a subpoena for records on Mr. Lawrence. It was returned with a statement that they searched their files and found no records for Mr. Lawrence.

[25] OIG interview with M.D. at  Zeta Mental Health Center.

discharge staffings. The data she collects at the state level is on the rate of readmission. The DMH Associate Director for Region Services and the Executive Director for Region DEF told OIG investigators that community agencies used to actively participate in discharge planning, but because of funding cuts to DMH, the practice has largely ended.

The case was before the judge in late September. Mr. Lawrence was present for the first time.[26] Investigator Bailey met Mr. Lawrence at the court hearing, but she did not interview him or ask him to sign consents for release of his mental health records. Ms. Bailey explained that her role in the case was almost over. She introduced Mr. Lawrence to the case manager and said she expected that she would take over from there. The court made a finding of paternity for both children based on the father's admission of paternity and the mother's previous testimony. All parties stipulated for purposes of temporary custody only and the court entered an order that the temporary custody order previously entered was now with prejudice to all parties.

The following exchange occurred after Mr. Lawrence's attorney inquired about visitation:

> **Father's attorney:** Judge, a second before we go off the record, I don't know if there was a visitation order entered on the last court date.

> **The Court:** Not for the father. I don't believe there was. I entered one for the mother on the first court date. So I would enter a visitation order now.
> I know the case came into court where there was, you know, for the reason that there was essentially an issue where the police were involved. And I assume at this point there wouldn't be any objection to the Court entering an order that would limit the father's visits to supervised visits. And then it's just a question of who would supervise the visits.
> I don't know if DCFS has had any type of chance to assess the father yet at this point. Have you, Ms. Ross?

> **Ms. Ross:** No, we are supposed to do that Wednesday of this coming week.

> **The Court:** What I'm going to do is this. I'm going to limit the father's visits to those supervised by the DCFS caseworker at this time. And then after he's had the assessments and recommended services are, you know, referred, I'd be glad to relax the restriction and allow the assigns of DCFS also to be able to supervise his visits.

> **Father's attorney:** Judge, would the Court consider putting in the order that they be DCFS until the assessment and then allow for the assigned after the assessment?

> **The Court:** You know, I imagine that they're going to have to be – I think the assessment is going to involve probably several meetings, and so I'm going to keep it – I'm not going to give the agency, DCFS, the ability to assign supervision of visits like to a foster parent or somebody until the next court date

---

[26] Also present in the court room were: ASA; second APG standing in for the APG; second APD stepping up for the APD, representing mother, who was present; APD Child Protection Conflicts Unit representative, representing Samuel Lawrence, DCP Investigator  Cynthia Bailey, Ellen Ross from Gamma Agency of ABC; and paternal grandmother  Mrs. Lawrence.

after I know that the assessments have been done, and it's not believed that Mr. Lawrence would be a risk to the children without a DCFS personnel present.

So I'm just going to be a little more restrictive only because of the allegations that brought the case in and just because Mr. Lawrence is just out of the hospital. I want him to visit with his children. That's what I want.

But initial visits, under DCFS regulations, the first visit has to be supervised by the caseworker. And I just want the caseworker to supervise several visits before I would allow somebody else to supervise the visits. And that way, I can get the caseworker to come into court and testify that, hopefully, Mr. Lawrence is very appropriate with the kids and the kids enjoy the visits, and there isn't a problem.

And, if that's the case, then I would think that I can give DCFS more discretion to allow for perhaps relatives or other people to supervise the father's visits. All right. I'm just going to be conservative on that just initially here. And I will set another date in the not too distant future.

On this day the court entered orders for Alpha Hospital and Delta Mental Health Facility to release Samuel Lawrence's mental health records to the Offices of the County Public Guardian, County State's Attorney, County Public Defender, and DCFS Legal only for use by the attorneys in the court case. The case was continued to December 2012.

Samuel Lawrence was indicated in November 2012, for substantial risk of physical injury/environment injurious to health and welfare by abuse (#10) to Rachel and Victor. The rationale reads:

> Based on the interview with the mother, Mr. Laurence informed her that he was going to kill his self, her and the children.
> She state (sic) that he had 2 cans of gasoline hide (sic) in the closet.
> The Bomb Squad and a Hostage Negotiator had to be called to convince Mr. Laurence to allow the children out of the home.
> Mr. Laurence was admitted to Delta Mental Health Hospital due to being a danger to his self and others.

***Integrated Assessment and Service Plan***

An integrated assessment (IA) was developed with IA clinical screener Cleo Jackson, LCPC. The screener reviewed the pending child protection investigation and LEADS results on SACWIS, and the police reports regarding the hostage incident. She did not have Mr. Lawrence's mental health records. Ms. Jackson explained to OIG investigators that because the completed IA and service plan must be submitted to the court within 45 days, screeners can use only what records are available to them at the time and are reliant to a "moderate" extent on self-report. With the case manager, the screener conducted interviews with the father, mother, foster mother, and children.

Ms. Jackson and Ms. Ross interviewed the father in October 2012 in his mother's home where he was living. Ms. Jackson incorrectly documented that Mr. Lawrence had been hospitalized at Beta for two weeks. Mr. Lawrence reported that he was compliant with taking his medication and that he would like to participate in weekly outpatient psychotherapy to "talk about everything that is happening." Mr. Lawrence's mother, who was present for the interview, did not inform the screener and case manager that Delta had prepared a discharge plan for her son,

which the Delta social worker had discussed with her, or that Mr. Lawrence had not attended his aftercare at Zeta Mental Health Center.

The screener and case manager interviewed the mother, the foster mother, and the children in Vivian's home a week later. Three-year-old Rachel was screened for early childhood services as part of the integrated assessment. Results indicated that she struggled with articulation as well as verbal expression and reasoning and was near the cut-off range for a service referral for early childhood services.

The assessment was completed at the end of October 2012. Recommended services for the parents included: monthly psychotropic medication monitoring for Mr. Lawrence; random drug screens for Mr. Lawrence; a substance abuse evaluation for Mr. Lawrence; and weekly individual psychotherapy for both parents. Recommended services for the children included: weekly individual psychotherapy for Victor; and enrollment in preschool or Head Start for Rachel. The screener also recommended that the case manager obtain Mr. Lawrence's mental health records to guide service planning. Regarding Mr. Lawrence's visits with his children, the screener wrote:

> Vivian should ensure that the children attend scheduled visits with their father Mr. Lawrence. These visits should occur in a public space and be supervised by the Permanency Worker or another supervisor until further assessment of the safety risk that may be posed by Mr. Lawrence can be established through his participation in therapy services.

An initial service plan was also completed at the end of October. The services recommended for the family in the integrated assessment were incorporated into the service plan.

Ms. Ross told OIG staff that she and Vivian discussed enrolling Rachel in Head Start. Ms. Ross said that she was aware Head Start was free and she had enrolled other children on her caseload into Head Start programs. Ms. Ross stated that she encouraged Vivian to enroll Rachel in Head Start, but Vivian wanted Rachel to attend The Learning Center, which was close to her home. She liked that the daycare could provide after school care for Victor. There were three Head Start programs within a half mile of Vivian's new apartment.[27] Two of the three Head Start programs were full day programs.

### Daycare

Although the daycare application was filled out during the case manager's initial foster home visit in late September and was subsequently faxed to the Office of Child Development (OCD) in early October, it wasn't approved until almost three months later. At the end of December the OCD partially approved the foster parent's childcare assistance application for Rachel to attend The Learning Center on Thursdays and Fridays, beginning in January 2013. The OCD worker noted: "Upon further documentation approval can be revised (school verification)." The school, where Vivian was enrolled in a GED program Monday – Thursday, had actually faxed verification to the OCD in December. The Child Care Coordinator, from the OCD, explained that although Vivian worked Thursday – Sunday, the OCD only approved Thursday and Friday because The Learning Center was not open on the weekend.

---

[27] According to http://eclkc.ohs.acf.hhs.gov/hslc/HeadStartOffices.

Ms. Ross acknowledged she had problems getting the OCD to approve daycare assistance for Vivian. In an effort to get the daycare approved, Ms. Ross was in regular contact with several individuals from the OCD. Ms. Ross also told OIG staff that she communicated with The Learning Center staff on at least two occasions. She stated that she asked them if Rachel could start daycare prior to the Department's approval of daycare assistance with retroactive payment, but they were unwilling to allow Rachel to attend until payment from the Department was ensured.

Over the three months it took to get approval, the foster parent voiced her concern regarding the wait for childcare assistance to several individuals, including the case manager, her supervisor, and the Guardian *ad litem*. Ms. Ross said she discussed with Vivian the possibility of finding another relative placement for the children, but despite expressing her frustration with the childcare situation, Vivian insisted she wanted Victor and Rachel to remain with her. Ms. Ross told OIG investigators that Vivian assured her that she was working out issues with her job so that she could stay home with Victor and Rachel pending daycare approval.[28] It was her understanding from their discussions that Vivian was taking time off of work and using paid vacation days because she lacked childcare. Vivian had also reported to the case manager and IA screener that her aunt provided childcare when she worked evenings or weekends and that several family members were willing and able to provide childcare should the need arise.[29] In December Ms. Ross submitted an application for employment related daycare so that her aunt could be paid for babysitting the children Thursday through Sunday when she worked. Ms. Ross stated that Vivian was always home when she went to the foster home. She stated she went to Vivian's home unannounced twice and both times Vivian was home with the kids.[30]

Ms. Ross expressed uncertainty as to why it took such a long time to receive childcare assistance approval. She suspected that the wait before the application was even processed combined with her unfamiliarity with the application requirements and her failure to submit the necessary supporting documents with the application, contributed to the long wait for approval. She told investigators that she informed her supervisor of the delay. Mr. Walker did not recall being told but said to OIG investigators, "from personal experience having to deal with that department, I know it takes an awful long time to get it approved."

### Parent/Child Visitation

While the children were placed with her, Vivian reported to the case manager that Ms. Black saw Victor and Rachel almost daily under her supervision. In compliance with the court order, Mr. Lawrence initially visited with his children weekly supervised by the case manager. The visits took place at a local fast food restaurant. In October, during one of the visits, a man, who later identified himself as a friend of Mr. Lawrence's, approached Ms. Ross and asked her "in a hostile manner," if she would take Mr. Lawrence home. Ms. Ross explained that she was only responsible for transporting the children, and the man left. Shortly thereafter, Mr. Lawrence

---

[28] Following the fire, the case was before the Judge in March 2013 for adjudication and disposition. In response to questioning by the Assistant State's Attorney regarding daycare assistance, Ms. Ross testified that the minors were not in daycare and that the foster parent, who was employed, actually made her work schedule more flexible so she could spend time with the kids until daycare took effect. She said that the foster parent would switch her hours so that she could watch the kids all the time. Ms. Ross stated every time she went to the home, the foster parent was home with the kids.

[29] According to records, Vivian informed others, including a Healthworks nurse, that relatives helped her with childcare.

[30] None of Ms. Ross's contacts with Vivian were identified as unannounced in SACWIS.

began talking with another man for approximately ten minutes. Ms. Ross documented that the father had come to the visit with two friends and that she informed Mr. Lawrence that he needed to attend future visits alone. The following day, Ms. Ross told her supervisor about what had occurred during the parent/child visit and her discomfort with the men accompanying Mr. Lawrence. Ms. Ross stated that Mr. Lawrence repeatedly asked to have the visits with his children in his mother's home, where he lived, rather than in the community, but she did not feel comfortable doing so. Mr. Walker directed her to "follow her best judgment" regarding when she felt it appropriate to begin supervising visits in the father's residence.

In November, Ms. Ross and Mr. Walker spoke again about the father's visits. Mr. Walker's supervisory note reads in part:

> Worker wanted to know if the parent child visits should be occurring in the home of [paternal grandmother] where bio father is currently residing. Worker and supervisor met previously and it was determined that due to the nature and reason this case came into the system, P[arent]C[hild]V[isits] should first be done in the community and gradually move towards having the visits in the home where bio father resides. Worker expressed feeling pressured by attorneys and family members to have the PCV in the bio father's residence although she doesn't feel ready.

In his OIG interview, Mr. Walker described Ms. Ross as a conscientious worker who "gave her all to her cases" and worked "far beyond regular hours."

The Lawrence children first visited with their father at the paternal grandmother's home in late November. En route to the home, Victor told Ms. Ross that he was not excited to see either his father or his grandmother, but he would not elaborate. Ms. Ross conducted a walk-through of Mrs. Lawrence's home, and advised her "that smoke detectors should always be fully functioning with working batteries. Mrs. Lawrence stated that she would take care of it."[31]

Ms. Ross told OIG staff that she could not recall informing Vivian that the father resided with his mother. However, she said Vivian knew that the father's visits with the children occurred in his mother's home because Ms. Ross transported Victor and Rachel to the visits each week and informed Vivian of where she was taking the children. Ms. Ross told OIG staff that she informed both Vivian and Mrs. Lawrence that no one other than herself was permitted to supervise the father's visits with Victor and Rachel.[32]

*Services*

Gamma Agency records indicate that while some referrals were made, services were not yet in place at the time of the fire. Ms. Ross documented that in mid-October, she referred Mr. Lawrence and Ms. Black to New Medical Center and Theta Hospital for individual therapy.[33] In a November case note, she documented that she had also referred Victor for individual therapy at Theta Hospital.

---

[31] Ms. Ross wrote this addendum to a 11/2012 parent/child visitation note in 1/2013.

[32] Ms. Ross could not recall specific dates when these conversations with Mrs. Lawrence and Vivian occurred.

[33] Contact note dated 1/2013.

RACHEL LAWRENCE

While the Child Advocacy Family Advocate had tried to contact Ms. Ross in September they never spoke. Ms. Ross was unaware that the CAC had offered to provide therapy to Ms. Black and the children.[34]

The case was before the Juvenile Court in early December 2012[35] for the case management conference and court family conference.[36] The Delta Mental Health records were the only requested records still outstanding. According to the Assistant State's Attorney, they had received all other requested records.[37] The case was continued until January to complete the court family conference, giving DCFS a month to get necessary services in place. The DCFS Attorney suggested a clinical staffing on services. Mr. Lawrence's attorney noted that at the last court date, a visitation order was entered that visits could only be supervised by DCFS or the private agency. She asked that a new order be entered allowing the paternal grandmother to supervise visits between Mr. Lawrence and the children over the holidays. The GAL objected to the request on the basis that there was not enough mental health information available. Father's attorney reported that father was on his medication; he was more stable; and he was visiting with his children in their grandmother's home, where Mr. Lawrence was living. The Court entered an order giving the agency discretion to allow a family member, who was familiar with the father's mental health needs and who was capable of supervising the minors during visits, to supervise only after a clinical staffing occurred and documentation of the father's mental health services was available.[38] Specifically, the order reads in part: "visit can't be supervised by anyone other than the agency until a clinical staffing is held regarding the father's mental health, all parties must be invited and documentation of the father's compliance with mental health services and medication must be provided to parties."

Three days after the juvenile court hearing, the DCFS Attorney referred the Lawrence case to DCFS Clinical. She wrote in the clinical referral under the issues to be addressed:

> Father has diagnosis of Bipolar disorder, Schizophrenia. Agency has not enrolled parents in mental health services citing lack of clinical resources. Father would like paternal grandmother to supervise visitation, however court has stated this cannot begin until the case has been clinically staffed.

She summarized the clinical issues:

---

[34] In October, Ms. Black told the CAC family advocate that her case manager wanted her to begin therapy but did not mention whether the children required any services. The advocate informed her that the YAC offered therapy. The advocate documented: "Mom will have worker contact Adv." In November, the advocate documented that she spoke with the mother, who informed her that she was going to begin individual therapy at Purple and the children would probably receive therapy at Kappa.

[35] Present in the court room were: the ASA; APG; second APD on behalf of the mother, who was also present; third APD on behalf of the father, who was also present; Ms. Ross, case manager; and paternal grandmother. Also present was the DCFS regional counsel.

[36] Only the judge and the attorneys are involved in a case management conference. The conference is for the judge and attorneys to schedule a trial date and for the attorneys to disclose witnesses. A court family conference is for the parties to discuss what services are in place for the family and what services still need to be put in place so that family reunification can be accomplished. Parents, their attorneys, and the case manager participate in the court family conference.

[37] December 2012 Court Transcripts.

[38] Ms. Ross offered to bring Victor and Rachel to Mrs. Lawrence's home to supervise a Christmas Eve visit with him, but Mr. Lawrence declined. Ms. Ross documented: "The family wanted to supervise the children themselves, however, this was not permissible by the court or the agency."

1) Agency hasn't properly verified if father is taking his psychotropic medications
2) Agency hasn't properly verified if father is consistently seeing his psychiatrist
3) Parents are not engaged in mental health services
4) Case cannot move forward without clinical recommendations for services
5) Case cannot move forward without clinical reports from service providers
6) Father wants supervised visitation conducted by his mother, however, issues regarding father's mental health stability and the family's understanding of the serious nature of his illness are still in question.

The day of the court hearing, Ms. Ross referred Mr. Lawrence for substance abuse services and urinalysis. Mr. Lawrence signed several consents for release of information allowing Ms. Ross to receive information about Mr. Lawrence from: 1) Gamma Agency's substance abuse treatment program; 2) Gamma Agency's therapy division regarding individual therapy; and 3) Dr. Hamblin, Mr. Lawrence's psychiatrist at Alpha Hospital. A consent for release of information was faxed to Dr. Hamblin[39] as were consents for release of information and a request for individual therapy for both parents to Iota Counseling. Ms. Ross followed up with a voicemail message for the psychiatrist, but did not receive a response. Ms. Ross stated that, when asked, Mr. Lawrence assured her that he was seeing his psychiatrist and taking his medication.

Approximately one week after the court hearing, supervisor Walker and Ms. Ross discussed the Lawrence case. Mr. Walker documented in a supervisory note that the Lawrence family members had not begun individual therapy. Ms. Ross told him that their agency therapists had a waiting list, so she had to refer the parents to a community based provider.[40] Ms. Ross notified Mr. Walker that the judge was not satisfied with the agency's efforts and ordered DCFS Clinical to intervene. Mr. Walker spoke with the supervisor of the agency's in-house therapists, who agreed to make it a high priority to get the Lawrence family members assigned to a therapist. Ms. Ross submitted a counseling referral for both parents and Victor to Gamma Agency's counseling department.

In late December, Gamma Agency Child Welfare Director emailed Gamma Agency's clinical therapist requesting immediate therapy services for Victor, his father and mother, and asked that an appointment be made for the first week of January. The therapist agreed to accept the case as a high priority. Later that afternoon, Ms. Ross provided the therapist with contact information for the family members.

**The Academy**

After the children entered foster care, Nita Black continued to drop off and pick up Victor from school. OIG staff spoke with Victor's fourth grade teacher who stated that Victor's mother usually picked up Victor at school dismissal, although occasionally, an older woman whom the teacher did not know picked him up. The teacher stated that Nita Black was not accompanied by another adult, but she sometimes had Victor's younger sister with her. School staff knew Ms.

---

[39] The fax was sent to Alpha Hospital's medical records department. The consent requested release of medical, rather than mental health, information.

[40] Mr. Walker told OIG staff that the Gamma Agency's foster care division had three or four therapists, however, around November one went on maternity leave and another resigned, leaving a deficit.

RACHEL LAWRENCE

Black, as Victor had attended previous school years there and Ms. Black was an involved parent. The teacher occasionally saw Victor's mother drop him off before school, although she did not always see the children at drop-off to know how frequently his mother brought him to school in the morning.

Victor's teacher stated that prior to the fire in December she did not have any contact with either Victor's foster parent or his case manager, and was unaware of any restrictions on parental contact.[41] She became aware that the family was involved with the Department sometime around September, when she noticed that Victor seemed quiet and withdrawn and was not himself. The teacher asked his mother about the changes in Victor, and Ms. Black told her that Victor's father had mental health problems and disclosed that there had been a recent incident, which led to DCFS involvement. Shortly thereafter, Victor's behavior returned to normal and his grades remained stable. The teacher described Victor as a student who always had his homework completed, was punctual and had good attendance, and appeared clean and well cared for. He was an intelligent, fun-loving student, whose mother was attentive to him and involved with his education. His teacher added that Victor's mother had accompanied the class on a field trip shortly before the December fire.

Ms. Ross told OIG staff that she left a message with the receptionist in an attempt to set-up a meeting with Victor's teacher but did not hear from his teacher. She attempted to make an unscheduled visit to the school once, but arrived after school was dismissed. She acknowledged that she did not inform staff of the parents' visitation restrictions. Presently, Department Procedures only require that the case manager have in-person contact with school personnel at least twice per year and communicate with them on an as needed basis about educational and developmental services.[42]

**Investigator Voice Mail**

Both CAC records and Delta Mental Health records referenced attempts to reach Investigator Bailey only to receive a message that her voicemail box was full. CAC staff noted multiple attempts to contact Investigator Bailey, but her voicemail box was full. A CAC advocate was able to email Ms. Bailey who called the advocate back the same day. A Delta social worker documented two attempts to return a call from Ms. Bailey: one to her office phone and one to her cell phone. The social worker noted that she could not leave a message because both mailboxes were full. During her investigation, Ms. Bailey paged Mr. Lawrence's psychiatrist twice. She told OIG investigators that she did not hear back from Dr. Hamblin. The psychiatrist may have been unable to leave a return message. According to the DCFS Division of Budget and Finance, DCFS First cell phones can hold up to 5 minutes (up to 40 messages as long as combined they don't add up to more than 5 minutes) and Second phones will hold up to 2 minutes (up to 20 messages as long as combined they don't add up to more than 2 minutes).

**December 2012, The Fire**

On a Saturday in December 2012 at approximately 4:30 am, Samuel Lawrence used an accelerant believed to be gasoline, to set himself, Ms. Black, and their two children on fire. The

---

[41] The Academy provided OIG staff with the most recent school pick up permission form completed for Victor, dated August 2011. The form authorized Samuel Lawrence, the paternal and maternal grandmothers, and four aunts (one of whom was Vivian Black) to pick up Victor. Ms. Black, listed as the legal parent/guardian, had signed the permission form.

[42] Procedure 314.80(c).

family was in Mr. Lawrence's bedroom at his mother Lisa Lawrence's home. Mrs. Lawrence told police she heard yelling, discovered the family on fire, and was able to help Mr. Lawrence and Victor out of the home. Mrs. Lawrence's brother, who lived in the home, escaped through his bedroom window.

At 9:30 am, Ms. Ross received a voice mail message from Vivian Black asking Ms. Ross to return her call. Ms. Ross documented in a contact note her conversation with Vivian:

> Caseworker returned the call and Vivian sounded as if she was crying. Caseworker asked, 'what is wrong?' Vi[v]an replied, 'Nita is dead.' Caseworker replied, 'Oh my God, what happened?' Vivian replied, 'She was at Samuel's house and there was a fire, and she died.' Caseworker asked, 'what was she doing there?' Vivian replied, 'I don't know. The kids are hurt also.' 'You need to come down here.' Caseworker asked 'what were the kids doing there?' Vivian replied, 'I left them at Samuel's mom's house.' Caseworker asked 'why.' Vivian continued to cry. Caseworker asked which hospital they were at and she replied 'Alpha Hospital.'

An Alpha Hospital social worker met with the extended family to gather information about the family's social situation:

> Per maternal aunt of children (Vivian Black) DCFS has been involved with family since September 2012. Police and DCFS became involved because per aunt father called mother at work and told her he was going to set the children on fire. Mother called the police and DCFS took custody of father's children. DCFS also assessed mother was unable to protect the children. Children were placed with aunt who states parents could have supervised visits with children. The children were taken to the paternal grandmother's house to stay the night on Friday [the evening before the fire]. Per the aunt the children had stayed several times with the grandmother and DCFS was aware of this. The next morning aunt received a call stating the house had caught fire and mother/children had been burned. As of this note the mother of father has not been available to interview.

Immediately after the phone call, Ms. Ross notified the Gamma Agency Child Welfare Director and supervisor Richard Walker of the unfolding incident. The Agency Director and Ms. Ross went to the ICU. Upon arriving at the hospital and speaking with Ms. Black, Ms. Ross documented in a contact note:

> Caseworker asked foster parent again, 'why were the children at Samuel's home?' Foster parent replied, 'I left them there because I had to work today and I needed someone to watch them.'[43]

At 12:32 pm, a hospital social worker notified the hotline that Mr. Lawrence had poured gasoline on his children and their mother and set them on fire, and the children were being treated at Alpha Hospital. A Child protection investigation was initiated.

---

[43] The store's weekly schedule for Vivian did not indicate that Vivian was scheduled to work the day of the fire.

RACHEL LAWRENCE

The ABC police investigated the fire and documented information about how the children had come to be in the home with their father. A detective interviewed Mrs. Lawrence at the scene; she reported that her son had resided with her since his release from Delta Hospital, and that Ms. Black, Victor, and Rachel were visiting him. Mr. Lawrence's sister, Grace Leland, was interviewed the following morning at 1:22 am. She told detectives that Ms. Black could have supervised visits with the children and that Mr. Lawrence could visit with the children with a DCFS worker present. She said that Ms. Black basically lived with the children and Vivian and "on the night of the fire Nita Black and the children were visiting at 123 Blue Cove and that to her knowledge, this was not the first visit." According to Ms. Leland, her brother always seemed mentally unstable, but that when he was using drugs the change in his personality was dramatic.

Police interviewed Vivian at her home at 456 Red Cove at 8:00 am the day after the fire. She reported:

> Nita Black was permitted supervised visits with the children. She related that Black was practically homeless when she moved out of the 789 Yellow Cove home after the incident. She related that Black would stay with different relatives. She related that Nita Black was visiting Lisa Lawrence on the night of the incident. Black related that supervised visits meant that another adult had to be present with Nita Black and the children. She related that Lisa Lawrence had babysat for the children on other occasions. She related that she dropped Nita Black and the children off at Lawrence's for a visit with plans to pick them up, but that Nita Black told her that they could just stay the night. She related that, had she been aware that Samuel Lawrence was living there, she would not have allowed the children to go and would not have driven them there.

Police did not interview the case manager, Ellen Ross.

Child protection investigators also interviewed family members to ascertain why the children were in the Lawrence home. A child protection investigator interviewed Vivian at the hospital on Saturday, the day of the fire, at 2:10 pm. Vivian said she took the children over to the paternal grandmother's home last night about 9:00 pm. She said she had spoken with the case manager who told her it would be just fine for them to visit with her. When asked why her sister was in the home with the father she said she had no idea. She stated she didn't know if they were trying to get back together.

In an interview two days later with Child Protection Investigator Renee Parker, Vivian said that her understanding was that her sister could visit with the children as long as she was supervised by an adult. She said Ms. Black would visit the children at her home, at her mother's home, at her god-sister's home, and when she picked the children up from school. Her sister had also visited the children at their paternal grandmother's home on about two occasions. Ms. Black stated that she allowed the children to visit their paternal grandmother on several occasions. She stated she was not sure and had not discussed with the case manager if she could allow the children to visit their paternal grandmother, but she let them anyway because she felt the grandmother was a good support person. Vivian said that Ms. Black told her that Mr. Lawrence was living at his sister's home on the south side. Vivian said that Mr. Lawrence had weekly visits with the children that were supervised by the case manager and she believed the visits took place at a fast food restaurant. Vivian said that the paternal grandmother was a back-up babysitter for her and the children had visited her home about 10 times beginning in October. She denied ever having observed Mr. Lawrence in the grandmother's home. She said her

mother, her other sister and her god-sister also babysat the children whenever she had to work. Vivian reported that on Friday, she agreed to allow the children to stay overnight at the paternal grandmother's home. She dropped the children off at around 8:00 or 9:00 pm and denied seeing the father in the home.

Investigator Parker questioned Vivian again in February 2013 about how the children came to be at Mrs. Lawrence's home. Vivian stated that she made arrangements with her sister to drop the kids off there. She stated that she got out of the car and walked the kids to the door. Her sister came to the door and Mrs. Lawrence was getting out of her car walking to the door. She stated that she spoke to Mrs. Lawrence to make sure she would be in the home for the visit and agreed to allow the children to spend the night with Mrs. Lawrence, not her sister. Vivian denied that her sister was residing in her home or that she was allowing her sister to have access to the children without any supervision.  Ms. Black repeated that her understanding of her sister's visitation was that her sister could visit with the children as long as an adult supervised, and she allowed her sister to visit the children at Mrs. Lawrence's home because the case manager supervised visits with the children in Mrs. Lawrence's home. She denied that she had any contact with Mr. Lawrence and said she never would have allowed the children to be in the home if she knew he was there.

The paternal aunt, Ms. Leland, and the maternal grandmother both told Investigator Parker that they babysat the children while they were in Vivian's care. Ms. Leland said that she had kept the children for a week prior to Christmas.

In early January 2013 Investigator Parker interviewed case manager Ellen Ross who reported having spoken to Vivian on September 25, 2012 (her first visit to Vivian's home) about visitation and that she specifically informed her that no visits would take place at the grandmother's home. Ms. Ross said that she talked to the mother who reported visiting the children in Vivian's home and having no contact with the father or paternal grandmother. Ms. Ross stated that the father was living at the grandmother's home and she supervised his visits with the children there. When asked about babysitters for the children when Vivian worked, Ms. Ross said that Vivian had only named her aunt as a babysitter. In a follow-up interview, Ms. Ross said she had no knowledge of the maternal grandmother being involved with the children in any way.

The paternal grandmother, Lisa Lawrence, was interviewed in February 2013. Mrs. Lawrence said that she had nothing to do with the children being in her home on the day of the fire. She said the last time she watched the children was in September 2012. She said she thought Ms. Black had gotten the children back and was residing with them at Vivian's home. On Friday afternoon, Ms. Black called her to ask if she needed anything because she was coming over with the children. They arrived around 6:00 pm. She said that Ms. Black had brought the kids over four times or more. Mrs. Lawrence stated that Vivian knew her son was living in her home because it was reported to the court. Mrs. Lawrence stated that on one occasion, she came home and observed Vivian and her mother getting the kids from her son who apparently had been caring for the kids. Mrs. Lawrence said that Ms. Black and the children had spent the night at her home at least 2 or 3 times while the kids were in Vivian's care and they would always sleep in her son's room. Mrs. Lawrence said that she did not believe the children were at any risk because her son was taking his medication and behaving normally.

In February 2013, Investigator Parker spoke with the investigator of the A sequence. Ms. Bailey reported that she had warned Vivian against letting her sister have any unsupervised contact with the children.

Autopsy results for Nita Black revealed evidence of multiple stabbing injuries. The autopsy found that Ms. Black "died as a result of thermal injuries due to assault with an ignition of accelerant. Multiple sharp force injuries are significant contributing condition." Rachel's autopsy determined that her cause of death was also due to thermal injuries due to assault with an ignition of accelerant. The manner of both their deaths was homicide. Mr. Lawrence, whose autopsy results determined that he died by self immolation (setting himself on fire), was indicated for abuse allegations (1) Death to Rachel; (5) Burns to Rachel and Victor; and (10) Substantial Risk of Physical Injury to Rachel and Victor. Ms. Black was indicated for neglect allegations (55) Burns to Rachel and Victor; and for (74) Inadequate Supervision to Rachel and Victor. In a companion case (SCR #2A) Vivian Black was indicated for (51) Death by Neglect to Rachel; (55) Burns by Neglect to Victor; (74) Inadequate Supervision and (60) Substantial Risk of Physical Injury by Neglect to both children. In a second companion case Lisa Lawrence was indicated for (51) Death by Neglect to Rachel and for (60) Substantial Risk of Physical Harm by Neglect to Victor. The grandmother appealed the findings and the Department conceded prior to administrative hearing.

**ANALYSIS**

The life-threatening event that brought the Lawrence family to the attention of the Department made this an extraordinary, high risk case. Mr. Lawrence had a history of violence and two psychiatric hospitalizations. His subsequent failure post-discharge to comply with the discharge plan should have caused immediate concern for the safety of the Lawrence children by all professionals involved. However, his mental health records, including his latest discharge plan, were never obtained and the family's case was treated in an ordinary manner.

Mental illness in combination with co-occurring substance abuse poses heightened risk to child and family safety. The MacArthur Violence Risk Assessment Study provided strong evidence that a mentally ill individual who is also a substance abuser is significantly more likely to commit violence; at highest risk are family members and friends who are in their own home or the patient's home.[44] The prevalence rate for violence within a year of discharge from a mental health facility for patients diagnosed with both substance abuse and a mental health disorder was as high as 43%.[45] PCP abuse is associated with a high rate of violence and unpredictable psychotic reactions.[46] Mr. Lawrence had already demonstrated violence in his own home by holding his children hostage, increasing the likelihood of further violence.

Intervening effectively in the lives of abused and neglected children and their families can never be the sole responsibility of a single agency or professional group, but rather is a community effort. Many professionals – including child protection, law enforcement, social service, education institutions, mental health, and court are involved in society's efforts to prevent, identify, investigate, and ameliorate the effects of child abuse and neglect. In this case, there were multiple system failures to the detriment of the Lawrence children.

---

[44] Steadman, H.J., Mulvey, E.P., Monaham, J., Robbins, P.C., Appelbaum, P.S., Grisso, T., Roth, L.H., & Silver, E. (1998). Violence by people discharged from acute psychiatric inpatient facilities and by others in the same neighborhoods. *Archives of General Psychiatry,* 55, 393-401.

[45] Id.

[46] Boles, S.M. & Miotto, K. (2003). Substance abuse and violence, A review of the literature. *Aggression and Violent Behavior,* 8, 155-174.

**Systemic Failures**

The most critical failure occurred when state prosecutors refused to file criminal charges against Mr. Lawrence following the September 2012 homicidal/suicidal incident. No felony criminal or misdemeanor case was filed. Thus, rather than the frequently evoked criminal/domestic violence no contact orders to protect victims, the case was filed in Juvenile Court where the courts are inclined to immediately order supervised or unsupervised visitation.

The second failure was that child welfare professionals and court personnel alike operated without Mr. Lawrence's mental health records. Child protection had an obligation to immediately access Mr. Lawrence's mental health records for a valid Integrated Assessment and ameliorative service plan. Mr. Lawrence had been certified as a danger to himself or others and was involuntarily committed when transferred to Delta. Although discharged as stable, the status of his mental health and his compliance with treatment post-discharge were critical to the children's protection and potential effectiveness of services offered to the family. The child protection investigator/supervisor correctly immediately sought temporary custody of the children placing the children with an aunt, but failed to obtain Mr. Lawrence's mental health records. In cases in which it is learned that a parent/caregiver has a serious mental health problem, child protection is required to obtain mental health records by first asking the affected parent/caregiver to consent for Release of Information authorizing the Department to obtain his/her mental health records from the identified hospitals, physicians, and therapists. If the parent/caregiver refuses to sign the consent, the investigator must issue an administrative subpoena for the records within two business days of the refusal.[47] The Illinois Mental Health and Developmental Disabilities Code (740 ILCS 110/11(i)) authorizes the Department to obtain mental health records. Child protection investigations in which mental health is a significant issue are not to be closed until mental health records are obtained. Once the records are obtained, the investigator and his or her supervisor are to meet to review the information contained within the records to assess its impact on child safety. The records become part of the investigation file which is shared with the follow-up case manager to further assess risk and safety and determine what services are necessary for the family.[48] If followed, this process ensures that those involved in decision-making have the parent/caregiver's mental health records at the onset of the case.

At the time of the initial shelter care hearing there was a pending criminal investigation and the father was hospitalized in a state hospital. The Child Protection Investigator delivered the notice of the temporary custody hearing to the state hospital. She did not attempt to speak to a treating professional at that time. She believed the father would remain hospitalized. When Ms. Bailey met Mr. Lawrence at the late September hearing, the private agency caseworker was present. The investigator introduced Mr. Lawrence to the caseworker and assumed that she would take over from there. Because the investigator did not seek to obtain Mr. Lawrence's mental health records before closing the investigation, the private agency and court operated without them. While the juvenile court ordered the father's mental health records, the Delta records were still outstanding at the last court date (December) before the fire, and pursuant to protective orders,

---

[47] Policy guide 2011.07, September 15, 2011.  Pursuant to Section 11(i) of the Illinois Mental Health and Developmental Disabilities Code (740 ILCS 110/11(i)), the disclosure of mental health records to the Division of Child Protection without a consent is allowed, in accordance with the provisions of the Abused and Neglected Child Reporting Act, subsection (u) of Section 5 of the Children and Family Services Act, or Section 7.4 of the Child Care Act of 1969.

[48] Policy guide 2011.07, September 15, 2011

the records were only to be used by the attorneys in court so they could not be shared with the private agency for case planning.

The third systemic failure was the lack of coordination between the Department of Mental Health (DMH) and DCFS. See section entitled *Department of Mental Health and DCFS*.

*Juvenile Court*

A parent's right to visit with his children is so entrenched in our collective belief system that the judge in this case granted Mr. Lawrence supervised visitation with his children two days after he was released from a two-week psychiatric hospitalization precipitated by a hostage situation in which he threatened with the means (three to four gallons of gasoline) to kill his children. The judge believed he was being conservative in ordering that only a DCFS/private agency case manager could supervise the father's visits. Neither the assistant state's attorney; the assistant public guardian; nor the mother's assistant public defender objected to the father's receiving visitation. At the time of the visitation order, the court did not have Mr. Lawrence's mental health records to know the extent of Mr. Lawrence's mental health or substance abuse problems or his history of compliance with medication and treatment. The court could not make an informed decision about the likelihood that Mr. Lawrence would take his psychotropic medication or refrain from using PCP without those records. Given the severity of the presenting issue, the prudent approach to Mr. Lawrence's visitation would have been to deny it until the parties received and reviewed Mr. Lawrence's mental health records and devised a course of action.

Throughout the case, the case manager felt uncomfortable supervising Mr. Lawrence's visits with the children. The father had previously taken the children hostage and threatened to kill them. The integrated assessment recommended that the visits be held in a neutral public place. During a visit in October at a local fast food restaurant, the father brought two "friends" with him. Ms. Ross would have had little recourse, in a public place, if the father and his friends had chosen to leave with the children. Some weeks later, in an unrelated case, a toddler was abducted from a local fast food restaurant during a supervised visit with his father. In that case, the father had abducted the child from the hospital at birth, but was permitted supervised visits in a public place when he abducted the child for a second time, giving rise to a multi-state law enforcement hunt for the father and child before the toddler was found unharmed in Tennessee and returned to Illinois.

Mr. Lawrence had been using PCP daily for two weeks when he threatened to kill himself and his children in September 2012. He did not attend follow-up appointments as instructed, ran out of medication frequently, and utilized the emergency department to get his medication. When admitted to Delta in September, Mr. Lawrence had been off his medication for two weeks. The Delta social worker discussed with the children's mother the possibility of Mr. Lawrence attending day treatment after his discharge. Mr. Lawrence's assigned aftercare community mental health agency, Zeta Community Mental Health Center, had a day treatment program. Mr. Lawrence's mother picked him up at discharge and a nurse went over his discharge plan. Mr. Lawrence was given a prescription for two weeks of medication. He never contacted Zeta, and he did not go back to the psychiatrist at Epsilon.

There was no request by the officers of the Court to ask the assistance of the Court Clinic to determine the father's mental health status and any safety risks that he may pose in regard to visitation with the children. Despite the high risk nature of this case there was no call for a DCFS clinical staffing until the DCFS attorney suggested it in December. At the December hearing, three weeks before Mr. Lawrence's suicide and his daughter and her mother's

homicides, the Court ordered that a clinical staffing occur and that documentation of the father's compliance with mental health services be obtained before allowing a family member to supervise the father's visits with the children. The judge wanted the family member to be familiar with the father's mental health issues. The father wanted his mother with whom he lived to supervise the visits.

### Department of Mental Health and DCFS

The third systemic failure in this case was the lack of coordination between the Department of Mental Health (DMH) and DCFS. Although DCFS and DMH are to coordinate their services when a patient is involved with both systems, no such coordination took place. Presently, DMH community services is a collapsed system. Community agencies that are to provide aftercare seldom if ever attend a discharge staffing. Community outreach is negligible. The system aftercare and monitoring of aftercare have been decimated from budget cuts. The consequences of such cuts strongly affected the outcome in this case, putting the Lawrence children and society at risk.

When the Department is involved in a case in which an individual is psychiatrically hospitalized in a state operated facility, DCFS must have a role in the discharge planning. Since a parent's hospitalization in a state operated facility is a rare event, most child protection workers and their supervisors are unaware of the operations, including discharge planning, within the state facility. Delta staff, used to the isolation and deprivation that has been created from drastic budget cuts, no longer operates with an expectation of a vibrant aftercare system.

### Integrated Assessment

DCFS screened this case for temporary custody because Mr. Lawrence's suicidal/homicidal behaviors placed his children at grave risk of harm. His actions and subsequent psychiatric hospitalization at a state operated facility fell outside of the scope of DCFS standard process for an initial integrated assessment. Assessment of cases with severe mental illness and dangerous behaviors should be based on working knowledge of the mental disorders, co-morbid substance abuse (in this case PCP), a working knowledge of DMH and the client's current treatment records. The Licensed Clinical Professional Counselor assigned to the assessment interviewed Mr. Lawrence in his mother's home where he was living. The clinical screener operated under the incorrect perception that Mr. Lawrence was hospitalized at Beta for two weeks. She did not ask to see his discharge plan. By the time the integrated assessment was completed (10/2012), Mr. Lawrence was already non-compliant with his aftercare plan. The screener accepted Mr. Lawrence's statements that he was compliant with his medications and would like to "participate in weekly outpatient psychotherapy to talk about everything that is happening." Relying on Mr. Lawrence's self report after this life threatening situation was dangerously naïve. In actuality, Mr. Lawrence had already chosen not to cooperate with his aftercare plan to attend Zeta outpatient mental health services and had not returned to Epsilon Clinic for his medication.

### Gamma Agency

The Gamma Agency case manager and her supervisor lacked the experience needed to service this high-risk dual diagnosis case. They never obtained Mr. Lawrence's mental health records or asked him whether he had a discharge plan from his psychiatric hospitalization. They were not aware that the Child Advocacy Center, where the children were interviewed after the hostage situation, could provide therapy for the mother and children or that they had offered it to the mother. Three months after the case was opened, the case manager had not verified that Mr. Lawrence was seeing his psychiatrist and taking his medication. Neither the parents nor the children were engaged in any services. The case manager made a flurry of referrals in

December without critical review. She left out of a referral the father's use of PCP, his psychiatric hospitalizations, and the violent incident that led to his children's removal. Iota Counseling is a preventive program not a tertiary intervention for mental health problems especially mental health problems with co morbid substance abuse. Iota Counseling provides support groups for parents; a personality disordered individual could wreak havoc on a prevention support group.

***Walk-In Assessments for High Risk Cases***

The private agency worker referred Mr. Lawrence to Theta for a psychiatric assessment where a woefully inadequate walk-in referral that depended on the father's self report was completed. This echoed another Inspector General investigation where a similar fatal error occurred.

In 2011, the Office of the Inspector General investigated the death of a two year-old girl who had been killed during unsupervised visits with her mother and her mother's boyfriend, who was a convicted murderer. The girl's family had first become involved with the Department five years earlier, when her brother, then two months old, was found to have a broken thigh bone. At the time of her brother's serious injury, the mother was living with a man who had seriously abused another child and who had a violent criminal history. There were serious concerns about the mother's ability to protect her children. An Integrated Assessment of the mother noted that the mother knowingly brought a violent man into her children's lives and then lied to child welfare professionals in an effort to protect him over her children. The clinical screener determined that it was unlikely that the mother would be able to address her severe parenting deficits on a timeline consistent with her children's need for permanency. The Integrated Assessment was followed by a full psychological assessment which also noted a lack of honesty and parenting deficits and recommended a psychiatric assessment to determine whether any of the mother's problems were the result of an underlying psychiatric disorder. The mother married the violent paramour, but he left her a few years after. With the departure of the violent paramour, the juvenile court began to entertain motions to return the children to their mother. In preparation for a possible return home, the mother was asked to complete a psychiatric evaluation. The evaluation was performed at the mother's request at a local community mental health facility, and was based on the mother's self-report without any clinical history. The community mental health facility determined that the mother was doing well and showed no signs of acute psychiatric symptoms. The psychiatrist determined that "no psychiatric medication was indicated at this time as patient is asymptomatic." The psychiatric report by the community mental health facility was used in court to support continued movement toward returning the children home. In the meantime, the mother had become involved with a new paramour who was a convicted murderer. Both the mother and the new paramour are facing murder charges (OIG # 2011 IG 1127).

The Theta assessment on Mr. Lawrence could likewise have been used in court. The practice of obtaining such superficial evaluations for child abuse hearings must cease.

***Head Start***

Children for whom the Department is legally responsible must be enrolled in an early childhood education program (Procedure 314.70) and the integrated assessment recommended that Rachel be enrolled in preschool or Head Start. Rachel should have been enrolled in a full-day Head Start program. Head Start is free and all children for whom the Department is legally responsible qualify (Procedure 314.70a). There were several full day Head Start programs located near the foster parent's home. Head Start would have alleviated the ongoing wait for

week-day daycare approval and been a good education plan for Rachel, who was near the cutoff range for a referral for early intervention services.

*Victor*

Neither the investigator nor the Gamma Agency worker talked to Victor's teacher or school counselor to warn them of the danger the father posed. School staff remained unaware that the child could not be released to his parents. His mother picked him up from school while he was in relative care and even chaperoned a field trip. The mother informed the school of some facts but the school was unaware of the risk of his father taking Victor hostage and harming him. While statute requires DCFS to notify schools of indicated findings, SCR reports that such notices rarely are sent. There was neither a court order nor any prohibition given to the school by child protection or the case manager barring Victor's father from coming to the school to take him.  Victor's school was never notified of the court order prohibiting the parents from having unsupervised contact with Victor. The lack of giving such precautionary notification to schools places children at risk of being taken by an angry, disturbed or dangerous parent.

Although Victor was interviewed at a CAC, no supportive therapy-based services resulted. During the CAC interview, Victor avoided recalling the trauma of being held hostage in a home with accelerants while the police and fire department negotiated for his and his sister's release from their father. There was no multidisciplinary coordination, leaving the CAC family advocate to rely on the mother for information regarding counseling for Victor. It was apparent from the Gamma Agency case manager and supervisor's haphazard search for individual therapy that they were unaware the CAC could have provided it. In November 2012, the mother rejected the CAC family advocate's offer of counseling services for Victor stating the child would be going to Kappa, a local mental health counseling agency.[49]

---

[49] The case manager attempted to get consent for counseling from the DCFS Guardian's Office only to learn that because the Department only had temporary custody of Victor, and mental health is not considered ordinary and routine, the mother's consent was necessary.

**RECOMMENDATIONS**

1.   As part of the temporary custody screening process, child protection will notify DCFS Legal and DCFS Clinical of high risk cases such as those where a parent has demonstrated dangerous behavior as abduction; torture; threats to kill with plan; or taking children hostage and cases involving severe mental illness.

        a.   Upon notification, DCFS Clinical will initiate an emergency clinical staffing within 5 working days, including all relevant parties and records, and

        b.   Authorize a specialized integrated assessment.

2.   When a parent has exhibited such dangerous behavior as abduction; torture; threats to kill with plan; or taking the children hostage, and the Department has made a Critical Decision to substantially restrict visitation, the Department shall file a Visitation Plan with the Court and Parties within 10 days of the Department being named as Temporary Custodian in accordance with 705 ILCS 405/2-10(2).  The Visitation Plan shall comply with the requirements of Appendix A to Procedures 301 and shall clearly state the reasons for the restriction and shall include 1) supporting documentation such as police reports, psychological or psychiatric reports or casenotes documenting observations and 2) a statement that the Department intends to share information on the restriction with necessary persons, such as school, daycare and the child's pediatrician.

3.   The Department shall train front-line staff on the creation and use and filing of the restricted Parent-Child Visitation Plan above including the use of visitation centers when necessary and procedures for accessing and reviewing any restrictions imposed by criminal court as a condition of bond.

4.   If any Party objects to any part of the Visitation Plan filed in the County Juvenile Court, DCFS Legal shall request that the matter be referred to the County Juvenile Court Clinic.

5.   When a parent has exhibited such dangerous behavior as abduction; torture; threats to kill with plan; or taking the children hostage and the court permits visitation, such visitation should always be in a DCFS office, court or a visitation center.

6.   Court ordered restrictions on parental contact, such as supervised visitation, with children in foster care must be communicated to children's schools or day care programs. The Department should develop procedures for notification and include them in the parent/child visitation (P 301) and education (P 314) procedures.

7.   Quality Assurance should review the County Office of Child Development's process for approving daycare to make it more efficient.

8.   *Personnel Issue*.

9.   Consistent with the intent and spirit of the Division of Mental Health discharge planning (IL Administrative Code Title 59, Section 125.50), Department Rules and Procedures should require DCFS workers to contact staff at psychiatric facilities prior to the

discharge of any involved family members to communicate concerns or issues known to the Department and to monitor compliance with discharge recommendations.  In cases in which the patient has already been discharged, the Division of Child Protection must obtain complete psychiatric records, including any discharge recommendations, and follow-up with community providers identified.  If the facility becomes involved during the pendency of a placement or intact case, the worker should seek the consent of the involved family member in order to receive records and monitor compliance with discharge recommendations.

10. DCFS Clinical should consult with the Executive Director for Region DEF for the Division of Mental Health, to develop a system of coordination with DCFS and DMH for identifying whether a patient is DCFS involved, and, if so, contact information for discharge staffing coordination.

11. This report should be shared with Gamma Agency for management of future cases involving parents with severe mental illness.

12. This report should be shared with the Judge and officers of the court involved with this case.

RACHEL LAWRENCE

| DAYCARE ASSISTANCE TIMELINE | NO. OF DAYS UNTIL TASK COMPLETION |
|---|---|
| Daycare application filled out by foster parent and caseworker | 0 |
| Application forms faxed to the Office of Child Development (OCD) | 14 |
| Office of Child Development staff enters application into CYCIS | 21 |
| OCD staff documents that they faxed rate certification forms to The Learning Center | 27 |
| Foster parent tells caseworker that she has not been approved for daycare services. Caseworker informs foster parent it will reportedly take 30—45 business days to get the application approved. | 27 |
| Copy of Foster Parent's earning statement faxed to the OCD | 28 |
| Worker writes, "daycare assistance taking too long!" | 62 |
| Worker faxes The Learning Center the employment related daycare application for completion of their section. | 65 |
| Foster parent's request for daycare services is denied because OCD documents that they do not have foster parent's check stubs or the daycare's rate certification information. | 69 |
| Foster Parent goes to the daycare and completes an enrollment application for foster child. | 72 |
| Foster parent tells worker that she phoned DCFS directly about problems with daycare assistance and was told to re-submit a current pay stub, a letter verifying that she is in school, and a letter verifying how many hours she works. Foster parent completes an application for employment related daycare so a relative can be paid for watching the children Thursday evenings and weekends while foster parent worked. The GED program faxes documentation to OCD verifying the foster parent's participation in their GED program, and that classes are held Monday through Thursdays. | 76 |
| Worker re-faxes foster parent's day care and the babysitting applications along with pay stub to the OCD | 77 |
| Worker faxes W-9 of relative selected to babysit to the OCD. OCD staff documents that a new application is received. | 79 |
| OCD staff documents that they are still waiting on a W-9, and note that Rachel will start daycare January 7, 2013. | 80 |
| OCD approves foster parent's child care assistance application for Rachel's attendance at The Learning Center on Thursdays and Fridays only. OCD worker notes: "Upon further documentation approval can be revised. (school verification)." | 87 |

**- END OF REPORT -**

RACHEL LAWRENCE