# OFFICE OF THE INSPECTOR GENERAL
## ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES

# REPORT TO THE GOVERNOR AND THE GENERAL ASSEMBLY

## JANUARY 2014

**DENISE KANE, PH.D.**
**INSPECTOR GENERAL**

# OFFICE OF THE INSPECTOR GENERAL
# ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES

January 1, 2014

To Governor Quinn and Members of the General Assembly:

During the 20th Century, local, state, and federal public health agencies joined to control infectious diseases, leading to a sharp drop in infant and child mortality. Public health recognized that those who worked in their field needed a sociological imagination with technological and scientific means and methods capable of detecting, diagnosing, and monitoring infectious diseases. Society has benefited from this approach. In the case of HIV, public health targeted community programs to educate at-risk populations about HIV prevention. Addressing asthma, public health developed and distributed asthma action plans and strategically educated minority communities about using the plans to proactively treat their asthma. These approaches required collaboration among multiple disciplines to develop successful practical programs. The Inspector General's Office has advocated that, so too, the Department engage in pragmatic problem solving with its community partners.

At the close of the 1990s, Illinois led the nation in fire related deaths. The deaths involved the very young and very old and occurred more often in our poorer communities. The Department had a series of deaths where children, both wards and community children, died in house fires. By 2003, the Inspector General's Office, working with the Department, initiated a home safety checklist for child welfare investigators and workers to introduce families to home safety education, including how to exit in case of a fire. In cooperation with the Chicago Fire Department, the State Fire Marshall, local municipalities and volunteer fire departments, Illinois firefighters and DCFS distributed smoke detectors throughout our communities. By 2010, the Illinois fire death rate of 8.5 per million residents was below the national average of 11.1.

Several years after this fire prevention effort, the Inspector General's Office began distributing portable cribs/"pack 'n plays" as part of an effort to prevent infant deaths from unsafe sleep practices. Today, the Department supplies "pack 'n plays" to each child protection office and is working to develop community-friendly distribution centers. Preventive efforts have to be rooted in communities. Like fire deaths, infant sleep-related mortality disproportionately affects minority families. With the increased number of sleep related deaths now being investigated by the Department, we need to ask the assistance of legislators to fund Public Health infant sleep initiatives. A public health intervention that can adapt an epidemiologic approach to lower the rate of sleep-related infant deaths in our minority communities would serve Illinois families far better than the Department indicating them without any other evidence of child neglect.

Following several tragic outcomes, the Inspector General's Office has repeatedly recommended that the Department redesign Intact Family Services to include specialized teams and targeted services to address the category of problems that brought the family to the Department's attention. We fought to have a model of service delivery for substance abusing families where a cadre of child welfare and substance abuse case managers was cross-trained in a collaborative intervention model that required each discipline to recognize that welfare of the parent included the welfare of children during the parent's treatment/recovery.

Similarly, the Department needs specialized interventions when a parent has a serious mental illness. We have found that timely, consistent, and fruitful exchanges between the fields of mental health and child welfare seldom occur. Each field often operates independently of the other to the detriment of children and their parents.  Such divides are inefficient and dangerous.

Communication between child protection and police, doctors, hospitals or schools also has to be mutual and collaborative to best serve the public. Statutes specifically allow such communication during a child protection investigation for the sake of child safety. We need to start talking to each other and sharing information now. Together we have a better chance of keeping our children safe and serving the public good.

Respectfully,

Denise Kane, Ph.D.
Inspector General

# OFFICE OF THE INSPECTOR GENERAL
# REPORT TO THE GOVERNOR AND THE GENERAL ASSEMBLY

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

    INVESTIGATION CATEGORIES ............................................................. 1

    INVESTIGATIVE PROCESS .................................................................... 3

    REPORTS ............................................................................................. 4

    ADDITIONAL RESPONSIBILITIES ........................................................ 5

INVESTIGATIONS .................................................................................................................. 7

    DEATH AND SERIOUS INJURY INVESTIGATIONS ................................ 7

    CHILD DEATH REPORT ...................................................................... 49

        SUMMARY ................................................................................. 50

        HOMICIDE ................................................................................. 57

        SUICIDE .................................................................................... 65

        UNDETERMINED ....................................................................... 65

        ACCIDENT ................................................................................. 77

        NATURAL .................................................................................. 90

    FOURTEEN-YEAR DEATH RETROSPECTIVE ........................................ 99

    GENERAL INVESTIGATIONS ............................................................. 105

PROJECTS AND INITIATIVES ............................................................................................. 163

    ERROR REDUCTION .......................................................................... 163

    ERROR REDUCTION: REDUCING RISK OF INFANT MORTALITY
    AMONG PARENTING WARDS ............................................................. 165

    OLDER CAREGIVERS ........................................................................ 167

    ETHICS ……. .................................................................................... 168

SYSTEMIC RECOMMENDATIONS .................................................................................... 173

RECOMMENDATIONS FOR DISCIPLINE AND CONTRACT TERMINATION .................. 179

CHILD WELFARE EMPLOYEE LICENSES ....................................................................... 183

COORDINATION WITH LAW ENFORCEMENT ............................................................... 185

DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS…………………………………189

UNRESOLVED RECOMMENDATIONS IMPACTING CHILD SAFETY ........................... 251

APPENDIX ............................................................................................................................. 263

    A.    YOLONDA BRADSHAW………………….……………….....………….………...A-1

# INTRODUCTION

The Office of the Inspector General of the Department of Children and Family Services was created by unanimous vote of the Illinois General Assembly in June 1993 to reform and strengthen the child welfare system. The mandate of the Office of the Inspector General (OIG) is to investigate misconduct, misfeasance, malfeasance, and violations of rules, procedures, or laws by Department of Children and Family Services (DCFS) employees, foster parents, service providers and contractors with the Department. *See* 20 ILCS 505/35.5 – 35.7. To that end, this Office has undertaken numerous investigations and initiated projects designed to uncover wrongdoing, improve practice, and increase professionalism within the Department.

## INVESTIGATION CATEGORIES

### Death and Serious Injury Investigations

The Office of the Inspector General investigates deaths and serious injuries of Illinois children whose families were involved in the child welfare system within the preceding 12 months. The Inspector General is an *ex officio* member of the Child Death Review Team Executive Council. The OIG receives notification from the Illinois State Central Register (SCR) of all child deaths and serious physical injuries where the child was a ward of DCFS, the family is the subject of an open investigation or service case, or the family was the subject of a previous investigation or closed case within the preceding 12 months. The notification of a child death or serious injury generates a preliminary investigation in which the death report and other reports are reviewed and computer databases are searched. When further investigation is warranted, records are impounded, subpoenaed or requested and a review is completed. When necessary, a full investigation, including interviews, is conducted. The Inspector General's Office created and maintains a database of child death statistics and critical information related to child deaths in Illinois. The following chart summarizes the death cases reviewed in FY 2013:

### FY 13 CHILD DEATH CASES REVIEWED

| | |
|---|---|
| CHILD DEATHS IN FY 13 MEETING THE CRITERIA FOR REVIEW | 93 |
| INVESTIGATORY REVIEWS OF RECORDS | 68 |
| FULL INVESTIGATIONS | 25 |

Summaries of death investigations, with a full investigative report submitted to the Director, are included in the Investigations Section of this Report on page 7. Summary of all child deaths reviewed by the Office of the Inspector General in FY 13 can be found on page 50 of this report.

### General Investigations

The Office of the Inspector General responds to and investigates complaints filed by the state and local judiciary, Department employees, foster parents, biological parents and the general public. Investigations yield both case-specific recommendations, including disciplinary recommendations and recommendations for systemic changes within the child welfare system. The Inspector General's Office monitors compliance with all recommendations.

### Child Welfare Employee Licensure Investigations

In 2000, the General Assembly mandated that the Department of Children and Family Services institute a system for licensing direct service child welfare employees. The Child Welfare Employee License (CWEL) permits centralized monitoring of all persons providing direct child welfare services, whether they are employed with the Department or a private agency. The employee licensing system seeks to maintain accountability, integrity and honesty of those

entrusted with the care of vulnerable children and families.

A child welfare employee license is required for both Department and private agency investigative, child welfare and licensing workers and supervisors. The Department, through the Office of Employee Licensure, administers and issues Child Welfare Employee Licenses.

A committee composed of representatives of the Office of the Inspector General, the Child Welfare Employee Licensure Board and the Department's Office of Employee Licensure screens referrals for CWEL Investigations. The committee reviews complaints to determine whether the allegations meet one or more grounds for licensure action as defined in Department Rule 412.50 (89 Ill. Adm. Code 412.50). The OIG investigates and prosecutes CWEL complaints and hearings.

When a CWEL Investigation is completed, the Office of the Inspector General, as the Department's representative, determines whether the findings of the investigation support possible licensure action. Allegations that could support licensure action include conviction for specified criminal acts, indicated findings of child abuse or neglect, egregious acts that demonstrate incompetence or a pattern of deviation from a minimum standard of child welfare practice. Department Rule 412.50 (89 Ill. Adm. Code 412.50) specifies the grounds for licensure action. When licensure action is appropriate, the licensee is provided an opportunity for a hearing. An Administrative Law Judge presides over the hearing and reports findings and recommendations to the Child Welfare Employee Licensure Board. The CWEL Board makes the final decision regarding licensure action.

In FY 2013, 23 cases were referred to the OIG for Child Welfare Employee License investigations.

**FY 2013 CWEL Investigations**

| | |
|---|---|
| NEW INVESTIGATIONS | 23 |
| CARRY OVER FROM PREVIOUS YEARS | 10 |
| **TOTAL RESOLVED IN FY 13** | **33** |

| | |
|---|---|
| **CLOSED – NO CHARGES** | **9** |
| **CLOSED WITH CHARGES** | **24** |
| REVOCATIONS | 6 |
| RELINQUISHED | 7 |
| SUSPENSIONS | 3 |
| CHARGES WITHDRAWN | 4 |
| PENDING ADMIN  HEARING | 1 |
| PENDING CWEL BOARD | 2 |
| PENDING INVESTIGATION | 1 |
| **TOTAL RESOLVED IN FY 13** | **33** |

### Criminal Background Investigations and Law Enforcement Liaison

The Inspector General's Office provides technical assistance to the Department and private agencies in performing and assessing criminal history checks. In FY 13, the Inspector General's Office opened 2,529 cases requesting criminal background information from the Law Enforcement Agencies Data System (LEADS). Each case may involve multiple law enforcement database searches. For the 2,529 cases opened in FY 13, the OIG conducted 10,058 searches for criminal background information.

In addition, in the course of an investigation, if evidence indicates that a criminal act may have been committed, the Inspector General may notify the Illinois State Police, and the OIG may investigate the alleged act for administrative action only.

The Office of the Inspector General assists law enforcement agencies with gathering necessary documents.  If law enforcement elects to investigate and requests that the administrative investigation be put on hold, the Office of the Inspector General will retain the case on monitor status.  If law enforcement declines to prosecute, the Inspector General will determine whether further investigation or administrative action is appropriate.

# INVESTIGATIVE PROCESS

The Office of the Inspector General's investigative process begins with a Request for Investigation or notification by the State Central Register of a child's death or serious injury or a referral for a Child Welfare Employee License investigation.  Investigations may also be initiated when the OIG learns of a pending criminal or child abuse investigation against a child welfare employee.

In FY 2013, the Office of the Inspector General received 3,298 Requests for Investigation or technical assistance.[1] Requests for Investigation and notices of deaths or serious injury are screened to determine whether the facts suggest possible misconduct by a foster parent, Department employee, or private agency employee, or whether it suggests a need for systemic change.  If an allegation is accepted for investigation, the Inspector General's Office will review records and interview relevant witnesses. The Inspector General reports to the Director of the Department and to the Governor with recommendations for discipline, systemic change, or sanctions against private agencies.

The Office of the Inspector General monitors the implementation of accepted recommendations.

The Office of the Inspector General may work directly with a private agency and its board of directors to ensure implementation when recommendations pertain to a private agency.  In rare circumstances, when the allegations are serious enough to present a risk to children, the Inspector General may request that an agency's intake for new cases be put on temporary hold, or that an employee be placed on desk duty, pending the outcome of the investigation.

The Office of the Inspector General is mandated by statute to be separate from the Department. OIG files are not accessible to the Department. The investigations, investigative reports and recommendations are prepared without editorial input from either the Department or any private agency.  Once a Report is completed, the Inspector General will consider comments received and the Report may be revised accordingly.

If a complaint is not appropriate for full investigation by the Office of the Inspector General, the OIG may refer the complaint to law enforcement (if criminal acts appear to have been committed), to the Department's Advocacy Office for Children and Families, or to other state regulatory agencies, such as the Department of Financial and Professional Regulation.

### Administrative Rules

Rules of the Office of the Inspector General are published in the Illinois Register at 89 Ill. Admin. Code 430.  The Rules govern intake and investigations of complaints from the general public, child deaths or serious injuries and allegations of misconduct. Rules pertaining to employee licensure action are found at 89 Ill. Admin. Code 412.

### Confidentiality

A complainant to the Office of the Inspector General, or anyone providing information, may request that their identity be kept confidential.

---

[1] This includes requests for investigation, notice of child deaths and serious injuries, notification of arrests or pending abuse investigations, and requests for technical assistance and information.

To protect the confidentiality of the complainant, the OIG will attempt to procure evidence through other means, whenever possible. At the same time, an accused employee needs to have sufficient information to enable that employee to present a defense. The OIG and the Department are mandated to ensure that no one will be retaliated against for making a good faith complaint or providing information in good faith to the OIG.

Reports issued by the Office of the Inspector General contain information that is confidential pursuant to both state and federal law. As such, Inspector General Reports are not subject to the Freedom of Information Act. Annually, the Office of the Inspector General prepares several reports deleting confidential information for use as teaching tools for private agency and Department employees.

### Impounding

The Office of the Inspector General is charged with investigating misconduct "in a manner designed to ensure the preservation of evidence for possible use in a criminal prosecution." 20 ILCS 505/35.5(b). In order to conduct thorough investigations, while at the same time ensuring the integrity of records, investigators may impound files. Impounding involves the immediate securing and retrieval of original records. When files are impounded, a receipt for impounded files is left with the office or agency from which the files are retrieved. Critical information necessary for ongoing service provision may be copied during the impound in the presence of the OIG investigator. Impounded files are returned as soon as practicable. However, in death investigations, the Office of the Inspector General forwards original files to the Department's Division of Legal Services to ensure that the Department maintains a central file.

# REPORTS

Inspector General Reports are submitted to the Director of DCFS. Specific reports are also shared with the Governor. An Inspector General Report contains a summary of the complaint, a historical perspective on the case, including a case history, and detailed information about prior DCFS or private agency contact(s) with the family. Reports also include an analysis of the findings, along with recommendations.

The Office of the Inspector General uses some reports as training tools to provide a venue for ethical discussion on individual and systemic problems in child welfare practice. The reports are redacted to ensure confidentiality and then distributed to the Department or private agencies as a resource for child welfare professionals. Redacted reports are available through the OIG link on the State website: http://www.state.il.us or by request from the Office of the Inspector General by calling (312) 433-3000.

### Recommendations

In investigative reports, the Inspector General may recommend systemic reform or case specific interventions. Systemic recommendations are designed to strengthen the child welfare system to better serve children and families.

Ideally, discipline should have an accountability component as well as a constructive or didactic one. It should educate an employee on matters related to his/her misconduct while also functioning to hold employees responsible for their conduct. Without the accountability component, there is little to deter misconduct. Without the didactic component, an employee may conclude that s/he has simply violated an arbitrary rule with no rationale behind it.

The Inspector General presents recommendations for discipline to the Director of the Department and, if applicable, to the director and board of the involved private agency. Recommendations for discipline are subject to due process requirements. In addition, the OIG will determine whether the facts suggest a systemic problem or an isolated instance of misconduct or bad practice. If the facts suggest a systemic problem, the Inspector General's Office may investigate further to determine

appropriate recommendations for systemic reform.

When recommendations concern a private agency, appropriate sections of the report are submitted to the agency director and the board of directors of that agency. The agency may submit a response. In addition, the board and agency director are given an opportunity to meet with the Inspector General to discuss the report and recommendations.

In this Annual Report, systemic reform recommendations are organized into a format that allows analysis of recommendations according to the function within the child welfare system that the recommendation is designed to strengthen. The Inspector General's Office is a small office in relation to the child welfare system. Rather than address problems in isolation, the Inspector General's Office views its mandate as strengthening the ability of the Department and private agencies to perform their duties.

The Office of the Inspector General monitors implementation of recommendations made to the Director of DCFS and private agencies. Monitoring may take several forms. The Office of the Inspector General will monitor to ensure that Department or private agency staff implement the recommendations made. The OIG may consult with the Department or private agency to assist in the implementation process. The OIG may also develop accepted reform initiatives for future integration into the Department.

# ADDITIONAL RESPONSIBILITIES

### Office of the Inspector General Hotline

Pursuant to statute, the Office of the Inspector General operates a statewide, toll-free telephone number for public access. Foster parents, guardians *ad litem*, judges and others involved in the child welfare system have called the hotline to request assistance in addressing the following concerns:

- Complaints regarding DCFS caseworkers and/or supervisors ranging from breaches of confidentiality to failure of duty;
- Complaints about private agencies or contractors;
- Child Abuse Hotline information;
- Child support information;
- Foster parent board payments;
- Youth in College Fund payments;
- Problems accessing medical cards;
- Licensing questions;
- Ethics questions; and
- General questions about DCFS and the Office of the Inspector General.

The Office of the Inspector General's Hotline is an effective tool that enables the OIG to communicate with concerned persons, respond to the needs of Illinois children, and address day-to-day problems related to the delivery of child welfare services. The phone number for the Office of the Inspector General Hotline is (800) 722-9124.

The following chart summarizes the Office of the Inspector General's response to calls received in FY 13:

### CALLS TO THE OIG HOTLINE IN FY 13

| | |
|---|---|
| INFORMATION AND REFERRAL | 1088 |
| REFERRED TO SCR HOTLINE | 132 |
| REFERRED FOR OIG INVESTIGATION | 109 |
| TOTAL CALLS | 1329 |

### Ethics Officer

The Inspector General is the Ethics Officer for the Department of Children and Family Services. The Inspector General reviews Statements of Economic Interest for possible conflicts of interest of those employees of the Department of Children and Family Services who are required to file a Statement of Economic Interest.

For FY 13, 669 Statements of Economic Interest were submitted to the Ethics Officer. For the 669 statements submitted, 33 letters were issued

to individual employees and supervisors addressing potential conflicts of interest.

### ACTION ON FY 13 STATEMENTS OF ECONOMIC INTEREST

| | |
|---|---|
| **ECONOMIC INTEREST STATEMENTS FILED** | **669** |
| **STATEMENTS INDICATING POSSIBLE CONFLICTS** | **33** |

The Office of the Inspector General Ethics staff also coordinated and monitored DCFS compliance with the statewide ethics training mandated under the Illinois State Officials and Employees Ethics Act of 2003. In 2013, the Office of the Inspector General ensured that 2,757 DCFS employees completed the training. In addition to DCFS employees, DCFS board and commission members were asked to have their members complete off-line training. In FY 2013, 373 DCFS board and commission members were required to complete the off-line ethics training.

### *Consultation*

The Office of the Inspector General staff provides consultation to the child welfare system through review and comment on proposed rule changes.

In addition, the Office of the Inspector General provides consultation to Department and private agency employees concerning their ethical duties and responsibilities under both the Child Welfare Employee Ethics Code and the State Officials and Employees Ethics Act of 2003. For a full discussion of ethics consultations, see page 168.

### *Projects and Initiatives*

Informed by the Office of the Inspector General's investigations and practice research, the Project Initiatives staff assist the Department in the development of practice training models for caseworkers and supervisors. The model initiatives are interdisciplinary and involve field-testing of strategies. The initiatives are evaluated to ensure the use of evidence-based practice and to determine the effectiveness of the model. See page 163 of this Report for a full discussion of the current projects and initiatives.

# INVESTIGATIONS

This annual report covers the time from July 1, 2012 to June 30, 2013.  The Investigations section has three parts.  Part I includes summaries of child death and serious injury investigations reported to the Department Director and the Governor.  Part II contains aggregate data and case summaries of child deaths in families who were involved with the Department in the preceding 12 months.  Part III contains general investigation summaries conducted in response to complaints filed by the state and local judiciary, foster parents, biological parents and the general public.

Investigation summaries contain sections detailing the allegation, investigation, OIG recommendations and Department response.  For some recommendations, OIG comments on the Department's responses are included in italics in the "OIG Recommendation/Department Response" section of each case.

## DEATH AND SERIOUS INJURY INVESTIGATIONS

### DEATH AND SERIOUS INJURY INVESTIGATION 1

**ALLEGATION**  A four year old-girl died as a result of severe, inflicted head injuries.  At the time of her death, the girl was a ward of the Department and was residing in a traditional foster home.

**INVESTIGATION**  The girl and her two siblings, a three year-old girl and one year-old boy, had been removed from their mother's custody after a series of child protection investigations determined the children had been physically abused and neglected while in her care.  The siblings were placed together in the home of a couple with two children, girls ages eight and five.  The couple had been newly licensed as foster parents four months earlier and the siblings were the first children placed in their home.  In the couple's foster care licensing application, the foster mother had cited her extensive professional experience as a certified nurse and child care provider as assets to her ability to care for children.  An OIG review of the foster mother's work history found she had worked in child care on two occasions for less than three months total and had never been certified as a nurse.

The foster father worked overnight shifts lasting at least 12-hours at a worksite located a 1-hour drive away from the family home and devoted much of his time in the home to sleeping.  The foster mother served almost exclusively as caretaker for all five children.

Four months after the siblings were placed in the home their mother gave birth to another boy.  The infant was immediately removed from her custody and placed in the foster home two days later after the private agency requested and received a waiver to exceed the number of children the license permitted to be placed in the foster home.  In an interview with the OIG, the Department clinician who approved the baby's placement in the home stated she granted the waiver without reviewing any records.  The clinician stated she acted upon the recommendation of the Department's foster home licensing supervisor, who in turn had based her decision on the observations of workers from the private agency providing services to the foster family in conjunction with the Department.  The private agency caseworker who managed the family's case was a recently hired employee with relatively little experience in the field.

Soon after beginning to care for six children, five of whom were age five and younger, the foster mother began requesting respite services from the private agency to relieve some of her caretaking responsibilities. She also requested transportation assistance or other considerations from the agency, as she was required each week to drive extensively throughout the area to ensure the children attended their various appointments and meetings.  Although the private agency had funds available to provide respite services, the foster mother's requests were denied.  Neither the caseworker nor her supervisor recognized the strain placed on the foster mother by serving as the children's primary caretaker or identified her increasing frustration with the demands placed upon her.

During her contacts with child welfare professionals, the foster mother routinely described the girl as having behavioral problems that manifested themselves through self-injurious actions and violence towards her siblings.  The foster mother regularly related to workers and counselors incidents of the girl's poor behavior in school to illustrate her ongoing struggles to manage her in the home.  An OIG review of school records found the girl's teachers maintained a log of her performance which did not document any significant behavioral issues.  Despite the foster mother's frequent reports to involved workers, her portrayal of the girl as a disruptive presence at her school was not supported by the documentation compiled by school personnel.

Similarly, the foster mother relayed inaccurate accounts of diagnoses and conclusions supposedly made by mental health professionals that supported her representation of the girl as volatile and aggressive.  The caseworker consistently entered the mother's accounts of the girl's alleged inappropriate and violent behavior into the case record as fact without verifying her statements.  As part of the family's case, a screening assessment of the child was provided by a mental health agency through a contract with the Department.  The mental health agency worker completed an assessment of the girl as having poor control over her behavior and determined the girl demonstrated elevated levels of sexual aggression.  In an interview with the OIG, the mental health agency worker was unable to explain how she had arrived at her conclusions and was unfamiliar with the criteria for assigning a designation of sexual aggression.  After the foster mother made repeated reports of the girl's escalating behavior in the home, culminating in an allegation she had cut herself with a kitchen knife, the girl was admitted for psychiatric hospitalization.  Although the screening assessment requires in-person contact, the mental health agency worker did not visit the home and only spoke to the foster mother and the girl over the phone prior to approving the hospitalization.  In her interview with the OIG, the mental health worker expressed her belief she had obtained sufficient information through the conversation with the foster mother to proceed with the four year-old girl's psychiatric hospitalization.

None of the involved medical or child welfare professionals witnessed evidence of the behaviors described by the foster mother but failed to reevaluate how the girl was characterized.  Although the girl's therapist observed bruises to the girl's face and ear, she accepted the foster mother's explanation that they were self-inflicted.  The injuries as described by the therapist are unlike those that could be self-inflicted by a four year-old child but were consistent with those typically found in cases of abuse.

An OIG review of the case record found that after the girl was discharged from the hospital, her mental health diagnosis changed from Adjustment Disorder to Reactive Attachment Disorder (RAD) following a meeting between the mental health agency worker and her supervisor.  In her interview with the OIG, the worker stated she was unfamiliar with the criteria for a diagnosis of RAD or the appropriate course of treatment. Research widely accepted among professionals has found that RAD is a rare condition identified in only one percent of children under the age of five years-old.  While clinically uncommon, a proliferation of for-profit individuals and entities have embraced RAD as a blanket designation for wide-ranging behaviors, generating familiarity with terminology and techniques that have yet to be validated by scientific study.  A commercial

author of multiple books on RAD whose methodology has not been validated includes recommendations for dealing with behavior which the author concedes might violate laws regarding child abuse. The author pathologizes foster children, likening them to Jeffrey Dahmer and Sadam Hussein. A book by this author was provided to the foster mother by the mental health agency worker. In her interview with the OIG, the worker stated she had never read the book she provided to the foster mother and was unfamiliar with the techniques espoused by the author. In a separate interview with the OIG, the mental health worker's supervisor stated that typically workers seek to identify short-term solutions to immediate problems and do not "delve into issues" with clients.

A foster parent support specialist contracted by the Department was also assigned to provide assistance to the family, however the support specialist never went to the family home or met any members in person. In an interview with the OIG, the support specialist said she had exchanged emails with the foster mother and offered her encouragement in response to the foster mother's concerns. The support specialist developed a case record of the family based entirely upon the communications she received from the foster mother. The support specialist stated she had attempted to serve as an advocate for the foster mother with the private agency but had not documented any of her efforts. The support specialist said she was unfamiliar with the extent of services provided by the private agency but identified the organization's RAD training as an offering available to the foster mother.

Six weeks after the girl was released from her psychiatric hospitalization, paramedics were called to the family's home after the foster mother reported the girl had a seizure. After being transported to a local hospital, the girl was found to have severe head injuries and bleeding in her brain. Doctors also identified numerous bruises at various stages of healing. The girl was airlifted to a regional hospital for further treatment but was later pronounced dead. An autopsy determined the cause of death to be subdural hematoma and cerebral injuries as a result of blunt force trauma. Multiple impact injuries were found on the girl's head, face, back and extremities as well as underlying subcutaneous and intramuscular hemorrhages of varying ages. The location and extent of the injuries was consistent with inflicted abuse and the coroner ruled the girl's death a homicide.

During subsequent investigations by law enforcement and the Department, other children in the home reported being instructed by the foster mother to strike the girl in retaliation for her misbehavior. The children reported that the girl was punished differently than the other minors in the home and was the only one required to perform an act of physical discipline, called "power-sitting," outlined in the book on RAD provided to the foster mother. The foster mother's eight year-old daughter stated the children were encouraged to hit the girl because the foster mother told them the girl needed "to learn her lesson." The children denied ever seeing the girl engage in the self-injurious behaviors that had been reported by the foster mother. Two of the children were found to have unusual hand injuries identical to one found on the girl during autopsy. The Department's child protection investigation resulted in an indicated finding against the foster mother for Death by Abuse and Head Injuries to the girl. Both foster parents were indicated for multiple allegations of abuse and neglect against all the children in their care. The outgoing State's Attorney in the area declined to pursue criminal charges against the foster parents. OIG addressed the case with the incoming State's Attorney who agreed to review the case for possible prosecution.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES |
|---|

**The Private Agency**

**1. In accordance with agency personnel guidelines, the private agency should discipline the supervisor for failure to provide adequate supervision on this case; this deficiency was exacerbated by an inexperienced case manager assigned to this case. The supervisor failed to ensure compliance with Department Rules and Procedures for educational services (Rule**

**314.70 and Rule and Procedures 315) to the girl and her three year-old sister. She failed to assess the needs of this foster family and ensure delivery of supportive services, specifically respite and assistance transporting children to appointments. When the supervisor first became aware that a referral for mental health services for the girl was not completed, she failed to intervene to expedite the referral. Given the foster parent's multiple reports of injuries to the children, the supervisor had an obligation to ensure communication with the children's primary care physician; short of this, the supervisor should have directed the foster parent to seek medical attention for the more serious injuries reported.**

The Office of the Inspector General shared a redacted report with the private agency and the agency's Board of Directors. The Inspector General met with agency administrators and a representative of the board of directors to discuss the findings and recommendations made in the report. The agency, however, determined that this was an isolated instance of inadequate supervision and discipline was not warranted. Agency management reviewed the report with supervisor. The agency provided the Inspector General with a corrective action plan addressing deficiencies identified in the Report, including timely referrals for counseling, required in-person visits to schools, and supervisory tools. The agency removed all references to materials published by Nancy Thomas and Foster Cline from their website.

**The Mental Health Agency**

**2. The management of the mental health agency should consider discipline for the mental health agency worker and her supervisor for their clinical deficiencies in the treatment of the girl.**

The Office of the Inspector General shared a redacted report with the private agency and the agency's Board of Directors. The Inspector General met with agency administrators and a representative of the board of directors to discuss the findings and recommendations made in the report. The report has been reviewed and discussed with the counselor and supervisor.

**3. The management of the mental health agency must train clinical staff on signs of physical abuse.**

The agency will re-train all staff on the signs of physical abuse. Trainings will be conducted on an annual basis.

**4. The management of the mental health agency must ensure communication and coordination between treating therapists and psychiatrist.**

The agency will ensure that all mental health counselors will confirm the possible diagnosis with their supervisor and the treating psychiatrist. The consultation will take place prior to any discussion with the client and or/parents. All counselors will thoroughly read informational material and review with their supervisor prior to distributing it to a family member.

**The Department**

**5. The Department's Division of Clinical Services should review the private agency's clinical trainings for foster parents and staff to revise the clinical content of their trainings to ensure use of evidence based practice.**

The Department will meet with the private agency. The Department will share updates required for the Foster PRIDE curriculum and training, including the evidence based DCFS On-Line PRIDE training for staff and foster parents.

**6.  The Department should review clinical training curricula of foster care agencies to ensure evidence based practice.**

The Office of Training will obtain and complete a review of the curricula used by foster care agencies.  The Office of Training will also provide each foster care agency Director with a copy of the DCFS training curricula used for Foster Care casework which incorporates the DCFS Evidence-based Model of Casework Practice.

**7.  In order to educate foster parents on evidence based practice, the Department should make available legitimate websites that reference evidence based treatment, such as Parent Child Interaction Therapy (PCIT) and the National Alliance on Mental Illness (NAMI) family guide.**

The Office of Training will place hyperlinks to evidence based internet sites for foster parents on the DCFS training system (www.dcfstraining.org).  The list of hyperlinks will also be included in the On-Line Foster PRIDE training course.  In addition, the Office of Training and Clinical Division staff will provide each foster care agency director with a list of internet sites that reference evidence based treatment models including Inspector General recommended sites and those used through the DCFS Permanency Improvement Initiative Grant and the Title IV-E Waiver program for the care of infants through age three.

**8.  The Department should conduct a review of the private agency's compliance with educational requirements in light of their failure to enroll a three-year-old foster child in an early childhood education program, and failure to visit a four-year-old pre-school as required in Department Procedures.**

The Department has drafted a request to the private agency to provide a status report on all children ages 3 to 5 in care between July 1 and December 31, 2013, including the pre-school in which enrolled. If a child is not enrolled, the report requires explanation for the failure to enroll, corrective action plan, and anticipated enrollment date.

**9.  The Department needs to take action with the mental health agency for violations of their contract with the Department.**

Due to the fact that the mental health agency's contract is shared with the Departments of Healthcare and Family Services and Human Services/Division of Mental Health as well as DCFS, the downstate DCFS Behavioral Health Services Administrator consulted with those two state agencies regarding an appropriate plan of corrective action for the involved mental health agency employees.

**10.  The Department should ensure timely development of a web portal for HealthWorks physicians to directly access their patients' (wards) medical, mental health and prescription medication data.**

The Department Health Policy Administrator has made a formal request to the Office of Information and Technology Services (OITS) for development of a web portal to permit Health Works physicians to directly access wards' medical records. OITS accepted the request for development of the web portal project  and has placed it on their list for development.

**11.  The Department should ensure that when a ward is hospitalized, the treating hospital is provided Integrated Assessments.**

A representative from the Office of Legal Services will provide legal advice and counsel to the Guardianship Administrator regarding consents for the sharing of the reports.

**12.   The Department licensing worker should be disciplined for her lack of substantive review of the waiver request for placement of the siblings' newborn brother in the foster home.**

The employee was disciplined.

**13.   The Department should review the functional value of the foster parent support specialist's contract.**

The Department has completed a comprehensive review of the Foster Parent Support Specialists (FPSS) programs.  FPSS program plans have been modified to ensure geographical coverage, consistent supervision, outcome reporting, standardized reporting and billing, as well as ongoing monthly group supervision with the lead FPSSs for all programs.

**DEATH AND SERIOUS INJURY INVESTIGATION 2**

| ALLEGATION | A three year-old girl died as a result of physical abuse inflicted by her mother and her mother's boyfriend.  The family was the subject of two unfounded child protection investigations during the year prior to the girl's death. |
|---|---|

| INVESTIGATION | The family, which consisted of the mother, her boyfriend, and her three daughters, ages three, four and ten, had their first involvement with the Department after |
|---|---|

police contacted the State Central Register (SCR) to report injuries to the four year-old.  The father of the three and four year-olds told authorities he had observed marks on the four year-old's face and shoulder he believed had been inflicted by their mother.  A child protection investigation was opened and assigned to an investigator who had just returned from a six-month maternity leave.  Upon her return to work, the investigator had been assigned 32 pending investigations.  At the time, the investigator had only eight months of experience in her position.

The investigator began her work on the case by speaking to a police officer.  The officer informed her he had observed a "red mark" on the four year-old's shoulder as well as a mark on the child's face he had not noticed until the mother brought it to his attention.  The investigator did not obtain a copy of the police report of the incident.  An OIG review of the police report found statements from the father of the two youngest girls stating the four year-old was regularly hit by her mother.

The investigator then proceeded to the family's home, where all members of the household were present.  The mother acknowledged having caused the marks on the four year-old and claimed they were caused when the child moved while being spanked with a belt. The mother stated she routinely employed various methods of discipline, including requiring the girls to stand with their hands over their heads or while holding phone books, and that she relied upon those as precursors to corporal punishment.  The mother told the investigator that she and the two youngest girls' father were involved in a custody battle and that he had come to the home earlier in the day before police arrived.  The mother said the father was upset after seeing the marks on the four year-old and became physically aggressive towards her.  The mother stated the father was ejected from the home after the altercation and claimed the abuse accusations were an act of retaliation.

The investigator spoke with the 10 year-old who stated all three girls were being punished that day and that she had been standing in a corner and did not see what happened with the four year-old.  The investigator conducted a visual examination of the four year-old and found only the mark on the girl's face, surmising the mark on the child's shoulder had dissipated.  The investigator did not examine the other two girls.  In an interview with the OIG, the investigator stated she had arrived at the home unannounced and found what appeared to be a "happy, loving family," with adequate food and clothing.  The investigator completed a Home Safety Checklist and a Child Endangerment Risk Assessment Protocol (CERAP) assessing the home as "safe."  In her interview with the OIG, the investigator stated she interpreted the mother's description of her methods of discipline as appropriate and not a potential indicator of abuse.  The investigator did not ask the mother to detail how she implemented her alternative methods of punishment, such as how long she required the girls to stand holding phone books, and did not assess whether the punishments were appropriate for the girls given their ages.

After interviewing the family, the investigator consulted with her supervisor who agreed with her assessment of the home as safe and advised her to recommend the mother for community-based parenting instruction.  In his interview with the OIG, the supervisor stated that the mother's methods of discipline were "bizarre and unusual" and that, in hindsight, he should have instructed the investigator to learn more about the practices.  The supervisor stated that at the time his field office was inundated with open cases and was "farming cases

out" to other offices for completion.  After the family was assessed as safe, the case was transferred to another office.  A supervisor in the receiving office assigned the case to a recently hired worker.  The receiving supervisor instructed the worker to contact the family's pediatrician in addition to performing other tasks.  Two days later, the receiving supervisor completed a final supervisory consultation incorrectly asserting that neither the investigator nor police had observed any injury to the four year-old and recommending the case be closed.  At the time, no contact had been made with the family's pediatrician.  The case was then returned to the original office for closure.

Five days after the final supervisory consultation, a second child protection investigation was opened after SCR received a report that the mother had disclosed accusations of sexual molestation of the two youngest girls by their father.  The mother told a caseworker from a domestic violence agency she had found the girls engaged in sexualized behavior following a weekend visit to their father's home.  As the first child protection investigation was still pending, the case was assigned to the same child protection investigator.  The investigator spoke to the mother who stated she had related the information to a caseworker while in the process of filing for an order of protection against the father.  The investigator conducted separate interviews with all three girls who denied having been touched inappropriately by anyone.  Following the interviews, the investigator contacted her supervisor for consultation and determined the children to be safe.  In her interview with the OIG, the investigator stated she suspected the mother had manufactured the allegation against the father as retribution for him initiating police involvement, based on the fact the mother had not previously told the investigator of any possible abuse and the denials of the girls that any abuse had occurred.  The investigator did not interview the two youngest girls' father at the time the report was made and could not recall why she had neglected to do so.  The investigator unfounded the physical abuse report and, four days later, unfounded the report of sexual abuse.  Although the initial report involved alleged physical abuse and observed marks on the three year-old, the investigator never ensured the girl was seen by her physician or other health care professional for assessment.  The investigator's interaction with medical personnel consisted of a single phone call to a nurse employed by the family's primary physician.  An OIG review of the case file found no record the investigator informed the nurse of the reported abuse or the physical tasks the mother utilized as punishment for the girls.  The substandard work performed by the investigator was mitigated by the volume of her caseload and the Department's lack of established Procedures to address the dangers of task-based punishment that are beyond the physical capabilities of a child.

Four months after the reports were unfounded, police contacted SCR to report the three year-old girl's death.  Paramedics had been called to the family home and were told the girl had been found unresponsive in the morning after falling down stairs the day before.  The other two sisters were removed from the home and taken to the regional Child Advocacy Center for interviews.  The four year-old disclosed to workers that severe, ongoing physical abuse had been inflicted upon her and the three year-old by the mother and her boyfriend.  Both sisters described punishment involving the performance of physical tasks and challenges that lasted for several hours a day for weeks at a time.  In a study published in 2006, the World Health Organization and the International Society for Prevention of Child Abuse and Neglect distinguished acts of punishment from methods of discipline.  The report found that punishments involving physical or emotional measures, "often reflects the caregiver's anger or desperation, rather than a thought out strategy intended to encourage the child to understand expectations of behaviour."  The report also noted that such punishments were often based in assertions of power and dominance and frequently did not take into account the age and development level of the children involved.

The girls said they were often required to hold books over their heads and walk around the house for hours at a time or had to hold a push-up position with books tied to their backs.  The 10 year-old stated the boyfriend would often wake the two youngest girls up in the morning to begin their punishment and that they would still be performing the tasks when the 10 year-old arrived back home from school at the end of the day.  The 10 year-old said both her mother and the boyfriend would frequently whip the girls with leather belts if they

faltered in their tasks and that she was made to whip them to ensure they did not fall asleep while being punished. The 10 year-old stated she had heard the three year-old screaming and crying several nights earlier and that the girl had not moved for three days prior to paramedics being called. Medical examinations of both girls found numerous bruises and scars of various ages consistent with physical abuse, including possible cigarette burns on the inside of the four year-old's thigh. The mother and her boyfriend were arrested and charged with murder, concealing a homicidal death, aggravated battery with a weapon, intimidation and aggravated battery of a child. The girls were placed with the 10 year-old's paternal aunt.

Six months after the three year-old's death, the mother gave birth to her fourth child, a boy. A paternity test established the mother's boyfriend as the father of the baby, who was placed in the custody of his maternal grandfather. The mother surrendered her parental rights to all four of her children. Investigation by law enforcement resulted in criminal charges against the mother and her boyfriend. The boyfriend was convicted of Murder and sentenced to 62 years in prison. His conviction provided a basis for the Department to pursue expedited termination of his parental rights to the baby. The mother pled guilty to Aggravated Battery to a Child and Child Endangerment Causing Death. She was sentenced to 22 years in prison.

*A redacted copy of this full report has been included as an appendix. It can be found beginning on page A-1.*

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The child protection investigator and her supervisor should be counseled regarding their insufficient investigation and failure to ensure that a child reported to have an injury was seen by her physician.** |

The employees were counseled.

**2. The Department should use this report and OIG Report #09-0231 as training tools for management to address with child protection supervisors the risks associated with harsh punishment and the need for thorough investigation of such punishment.**

These reports will be sent to Regional Administrators to address with the Area Administrators who will discuss in their all-staff meetings.

**DEATH AND SERIOUS INJURY INVESTIGATION 3**

| ALLEGATION | A 17 year-old boy died as a result of a seizure while residing in hospitalized care. The boy was a ward of the Department at the time of his death. |
|---|---|

| INVESTIGATION | The boy had been in the care of the Department his entire life. His mother's |
|---|---|

extensive and ongoing substance abuse issues had resulted in her three older children being removed from her care and at birth the boy was placed in the foster home where one of his siblings already lived. At age two the boy moved into another placement in a traditional foster home and became a Department ward three years later after his biological parents' rights were terminated. The boy's foster family considered adoption but could not arrive at an agreement with the Department regarding subsidies and concerns involving the boy's future care. The boy had been diagnosed with multiple mental health issues including bipolar disorder, schizophrenia, Post Traumatic Stress Disorder (PTSD) major depression and minor mental retardation. The boy remained in the same foster home until he was 17 when a violent outburst directed at his foster sister resulted in his removal from the home and placement in a residential facility. While at the facility the boy continued to act aggressively toward residents and staff and was twice admitted for psychiatric hospitalization after exhibiting paranoid and delusional behavior. Following his second admission, the boy was transferred to a second hospital's specialized treatment unit in an attempt to stabilize his behavior.

The second hospital's specialized treatment unit has a long-standing professional relationship with the Department and is contracted to provide care only to Department wards. During the six months prior to his admission to the unit, the boy had experienced two episodes of seizures which required hospitalization. Upon his transfer to the unit, involved care providers conducted an assessment of the boy to determine the cause of his escalating behavioral problems. The unit's psychiatric team identified a drug that had been prescribed to address his seizures as a possible contributing factor and advocated discontinuing its use, pending a review of his complete medical history and consultation with his previous mental health care providers. However, the unit's request to obtain necessary medical records from the hospital where the boy had previously been treated was denied. In an interview with the OIG, an administrator from the first hospital explained that the records request submitted by the unit contained insufficient documentation to support the release of the boy's confidential mental health records. The OIG found no evidence in the case record the unit made another attempt to secure the required releases or the medical records after the initial request was refused. In an interview with the OIG, the Department liaison assigned to work with the unit stated she had never been notified the unit could not obtain the boy's medical records and that she could have assisted in the process. The liaison also stated that the unit engaged in regular interaction with the Department's Office of the Guardian, which could also have facilitated acquiring releases.

Neither the Department nor staff from the unit ever obtained the boy's emergency room records, preventing a complete analysis of his two previous seizure events. Following the discontinuation of his seizure medication, the boy's treatment plan included a provision that staff conduct checks of his status every 15 minutes while he was in his room. Physicians and psychiatrists involved with the boy's care struggled to determine the relationship between his mental health issues, behavioral problems and seizures as they intersected with the numerous medications he was prescribed to deal with these conditions. Electroencephalography (EEG) tests were performed both prior to and following the boy's admission to the unit, however the results were inconclusive (three abnormal, two normal). Through consultation with an expert in the field of epilepsy research, the OIG learned that in order to ensure the most reliable results, EEGs should be performed when the subjects are sleep deprived. The OIG obtained consents to allow a sample of the boy's blood to be provided to the epilepsy researcher for inclusion in her ongoing study of the disease.

Three months after the boy was transferred to the unit, he was found unresponsive in his room early in the morning.  The unit's emergency personnel responded to the scene but efforts to resuscitate the boy were unsuccessful.  An autopsy performed by the medical examiner determined the boy's death to be a result of seizure disorder.  Emergency personnel reported that when the boy was found his body was cold and rigid to a degree they were unable to intubate.  Through an analysis of available records conducted at the request of the OIG, a forensic pathologist concluded the boy had been deceased for at least two hours prior to being found in his room.  Records maintained by the unit documented that scheduled checks of his room had been conducted at 15 minute intervals.

During the inquiry into the boy's death, the Department learned that one year earlier the unit had been the subject of an investigation by a state commission into allegations of the misuse of physical restraints with a 16 year-old male ward.  The commission substantiated the complaint against the unit and determined the ward had been restrained in violation of the State's mental health code as well as unit policy.  The Department had been notified when the incident occurred, however Department administrators were unaware of the circumstances of the incident or that it had led to an investigation resulting in a ruling against the unit.  In any instance when either physical restraints or emergency medications are used to control a ward's behavior, Department Procedure requires a Restriction of Rights form to be completed and provided to the Office of the Guardian.  Although the boy had been subjected to being physically restrained numerous times while being treated at the unit, none of the instances were documented and no notification was made to the Department.

During the course of this investigation, the OIG learned the Department intended to conduct an overall review of the unit.  The OIG agreed to defer its death investigation pending the outcome of the Department review.  Two years after the boy's death, the Department's review of the unit had not yet been initiated.  The Department has an FY14 contract with an independent panel of experts to review the functioning of this unit and other psychiatric hospitals where problems have been identified.

This is a summary of an interim report.  The OIG will submit a full report following the completion of the independent panel's review of psychiatric units.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The Office of the Guardian should adopt a policy for the review of Restriction of Rights forms that includes a review for compliance with the Mental Health Code.** |
|---|---|

The Department agrees.  Policy is being developed.

**2.  The Guardianship Administrator should assure that a copy of the Restriction of Rights form is forwarded to the child's Guardian *ad Litem* (GAL).**

The Guardian's Office will forward the Restriction of Rights form to the child's GAL.

**3.  The Department should require the unit to notify the Guardianship Administrator whenever it is investigated or audited by an outside authority.**

The agency director will email the DCFS Guardianship Administrator on the first Monday of every month to advise of any outside investigations/audits that are in process or have been completed.

**4.  The Department should immediately initiate the review of the unit with an expectation of a written report no later than January 2014.**

The Department has contracted for an independent review of psychiatric hospital programs for Department wards.

**5.  When there is a question about a ward having seizures or whether to discontinue a ward's seizure medication, the Department should assure that a sleep deprived EEG has been conducted as part of the evaluation.**

The Department will review this recommendation with the Inspector General.

**6.  The Department and the Guardian should determine how many wards with developmental delays are dually diagnosed with a mental illness.  The Department should partner with the Institute on Human Disability and Development to better serve these wards with timely and effective interventions.**

The Guardian's Office will work with Operations to implement this recommendation.

**7.  On medication consent forms returned by the Guardian's Office, the approving physician should advise the provider to watch for the side effects of medications that have black box warnings.  The black box warnings should be included in the consent.**

The black box warning has been included on the consent form.

## DEATH AND SERIOUS INJURY INVESTIGATION 4

| | |
|---|---|
| **ALLEGATION** | A six month-old baby boy died as a result of severe head trauma caused by physical abuse.  A child protection investigation involving the infant's family was indicated for abuse by an unknown perpetrator seven weeks before his death. |

| | |
|---|---|
| **INVESTIGATION** | The family's involvement with the Department was initiated after the State Central Register (SCR) received a report the infant, then three months-old, had been |

brought to a hospital with unexplained bruises on his legs and buttocks.  The parents were unable to provide any explanation for the bruises and said they had appeared within the previous day or two.  The mother stated the baby had presented with similar bruising on his hands and feet two weeks earlier and the family's pediatrician suggested the baby might have a low blood count, though he had not been examined or tested. Medical professionals expressed concern the marks could have been caused by fingers applying pressure and might be indicative of abuse.

A mandate worker was assigned to the case and began by speaking with a nurse from the hospital who described the parents as concerned and appropriate caregivers who did not appear to be "the type" to abuse their baby.  The mandate worker also spoke with the emergency room physician who treated the infant.  The physician stated that the marks on the infant were too ill defined to determine whether they were caused by hands or fingers, but did inform the mandate worker that testing found, "no medical reason for the bruising." The following day, the case was turned over to a child protection investigator who contacted the office of the baby's pediatrician.  A nurse told the investigator the pediatrician had examined the infant that morning because the mother had called three days earlier asking about the bruises, not two weeks prior as the mother had told hospital staff.  The investigator then spoke to the pediatrician who stated that while the bruises were a cause for concern she could not say they were a clear sign of abuse, and that she had never had a reason to question the parents' care of the baby.

The investigator then interviewed the parents at the hospital, where the baby was still being held.  Both denied any history of domestic violence or substance abuse issues.  The parents shared their belief their son had a blood disorder and said they had intended to contact the pediatrician two weeks earlier when bruises appeared, but chose not to when the marks soon dissipated.  The parents did not bring the infant in for examination after calling the pediatrician's office a few days earlier, despite their pediatrician's request to do so, because the father needed the family car to go to work and they did not believe it had been, "an order to do so right away."  After the mother saw new, darker bruises on the baby's leg, she decided to take him to the hospital.  The parents stated they lived with the baby, their only child, at the home of his maternal great-grandparents.  The parents said the great-grandmother suffered from dementia and that they had been told by the hospital social worker they could not return to the home with the baby because the great-grandmother's condition might put him at risk.  The mother speculated the great-grandmother might have caused the bruises unintentionally by handling the infant while unsupervised, though she was not allowed to act as a caretaker. The mother told the investigator she had once found the great-grandmother holding the baby over his crib and that he was slipping from her grasp when the mother entered the room.

The investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) designating the baby as unsafe, citing the unknown origin of his bruises.  The investigator then spoke with the infant's maternal aunt, who corroborated the parent's statement the great-grandmother had dementia.  The aunt also said the first-time parents might not be aware how to properly handle a baby.  The investigator also spoke to the great-grandfather who stated the parents were too young and treated the baby too roughly.  The great-grandfather then told the investigator he did not want her to visit the family home and hung up on her.  The next day, the investigator again spoke to the pediatrician who said a skeletal survey of the infant had returned negative for any broken or fractured bones.  The pediatrician stated that while she could not explain the baby's bruises she

did not, "see them as abusive."  In an interview with the OIG, the pediatrician stated she had never received any formal training on identifying child abuse and was unaware of any options for consultation.  Although the Department has a contract with a specialized medical center that exists for the express purpose of providing support and expert assessment in such cases, the investigator never made the pediatrician aware the center could be utilized as a resource.  The investigator developed a safety plan requiring the parents to stay at the home of the infant's paternal grandfather and have all contact with the baby supervised.  The parents agreed to the plan and the boy was released from the hospital into their custody.

One month later, the investigator went to the great-grandparent's home and spoke with the great-grandmother.  The great-grandmother stated she had never seen the parents mistreat the baby, but that she had once seen the father pick him up from his crib by his hands.  The great-grandmother stated she corrected the father at the time and that he had resented her doing so.  In her interview with the OIG, the investigator said she thought the great-grandmother may have presented some signs of dementia, "but did not admit to it."  The investigator stated that although she had contacted the Department on Aging in previous cases, she did not avail herself of their resources in this instance.  Since the baby was no longer living in the home, the investigator did not pursue the issue of the great-grandmother's possible dementia.

One week later, the investigator contacted the pediatrician's office.  The nurse stated the infant had been seen recently for a check-up and the pediatrician had no concerns regarding his care.  The investigator and her supervisor ultimately indicated the report for Cuts, Welts and Bruises against an unknown perpetrator.  The decision was based upon the recognition the bruises to a non-ambulatory baby, "pretty much had to be inflicted," while involved medical personnel had been uniformly positive in their impressions of the parents and their caretaking abilities.  The investigator and her supervisor gave particular weight to the suggestion offered by the mother that the maternal great-grandmother was cognitively compromised and often sought physical contact with the baby while the family lived in her home, despite reports of her dementia being unconfirmed.  In her interview with the OIG, the investigator said the family was not referred for intact services because there had been no presenting problems other than finding alternative housing, which the parents had secured on their own.

Two months after the case was closed, law enforcement received a report the then six month-old baby had been left at home alone by his parents.  A request was forwarded to local police to conduct a well-child check and an officer located the father at a neighbor's home.  The father admitted the baby was in the house unattended at that time and had been for approximately 30 minutes.  Police informed the father the Department would be notified and a child protection investigation was opened.  While police faxed a copy of their report to the local Department field office, police did not make a report to the hotline.  In an interview with the OIG, the investigator assigned to the original report of bruises to the baby stated she had received the fax from police regarding the incident and that she had showed it to her supervisor.  In his interview with the OIG, the supervisor could not recall having seen the report.  The investigator did not pursue the report with police and was not instructed to do so by her supervisor.  The investigator told the OIG she held onto the report in anticipation of a request for follow-up from SCR.

One week later, SCR received a call reporting the infant had been brought to an emergency room with a laceration to his upper lip.  The parents told hospital staff the baby had fallen off the couch and landed face-first on a tile floor.  The report was accepted and a second child protection investigator was assigned to the case.  The second investigator began her work the following morning by interviewing a nurse from the hospital.  The nurse stated that while the injury was consistent with the parents' explanation, the baby had emitted an odd, "high pitched" cry while being treated and continued to wail loudly for an extended period of time.  The second investigator then contacted the specialized medical center and an assessment of the infant was scheduled for later that day.  The second investigator then traveled to the family's home in order to observe the baby and ensure he was transported to the appointment at the specialized medical center.

The second investigator arrived at the home but received no response to her efforts to locate anyone inside.

The second investigator went to the office of the housing complex and made several phone calls in an attempt to locate the parents. Approximately one hour later, police and paramedics arrived at the home in response to an emergency call made by the parents from inside the residence. The infant was taken to the hospital in full cardiac arrest and was later transported via helicopter to another facility for specialized emergency treatment. Physicians were unable to reverse the baby's condition and he died early the next morning. A post-mortem examination found the infant had extensive injuries consistent with shaken baby syndrome, including a healing rib fracture that had not been identified during the previous skeletal survey. As the investigation into the baby's death proceeded, the parents ceased cooperating with the Department or law enforcement.

Eight months after the infant's death, the mother gave birth to a baby boy. A child protection investigation was opened and the newborn was removed from the parents' custody and placed in a traditional foster home. The report related to the newborn's birth was indicated against both parents for risk of injury and against the father for risk of injury by abuse based on the circumstances surrounding the death of their six month-old son. The child protection investigation regarding the first baby's death was subsequently indicated against both parents for multiple allegations of abuse and neglect. The father was additionally indicated for Death by Abuse and Cuts, Welts and Bruises by abuse and neglect. A criminal investigation of the infant's death resulted in the father's indictment on charges of murder. He is currently being held in jail awaiting trial.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The specialized medical center is required to provide training to professionals. Training should target medical staff at the six hospitals affiliated with the specialized medical centers and include pediatricians in their network. The training should include guidelines for skeletal surveys.**

The Department agrees and is currently reviewing the provider's program plan.

**2. A redacted copy of this report should be shared with the specialized medical center.**

The Office of the Inspector General shared a redacted copy of the report with the provider.

**3. A redacted copy of this report should be shared with the family's pediatrician.**

The pediatrician no longer practices at this hospital and has moved out of state.

**4. A copy of this report should be shared with the current area administrator, the first child protection investigator and her supervisors. The area administrator should facilitate a discussion with staff regarding errors in the investigation.**

The report has been shared with the Area Administrator and the child protection supervisor. The report will be shared with the child protection investigator upon the employee's return from leave.

**5. When SCR receives a report from hospital staff of injuries to a child three years and under and there has been a previous report of serious injury within the last six months, SCR should code the report as requiring an "Emergency Response" to see the child victim immediately.**

A memo was issued to SCR staff. This recommendation will be included in revisions to P300, *Reports of Child Abuse and Neglect*.

**DEATH AND SERIOUS INJURY INVESTIGATION 5**

| ALLEGATION | A two year-old boy died as a result of physical abuse inflicted by his mother. The family had been involved in services through the Department until their case was closed four months prior to the boy's death. |
|---|---|

**INVESTIGATION**    The boy was the mother's sixth child, though her five older children had all been removed from her custody, and three of her children had been born substance exposed. At birth, both the boy and his mother tested positive for cocaine and marijuana, with the mother also testing positive for opiates. The boy also had bleeding in his brain requiring the insertion of shunts into both sides of his head and required the assistance of a respirator to breathe. The mother admitted to hospital staff she had consumed alcohol and cigarettes during her pregnancy and had used illegal substances at least twice, most recently two days before the boy's birth. Medical staff determined that the boy, who had been born prematurely, was not ready for discharge and he was admitted for treatment. A call was made to the State Central Register (SCR) and a child protection investigation was opened.

During the course of the child protection investigation, the mother disclosed an extensive history of substance abuse, violent behavior and high-risk lifestyle. The mother engaged in prostitution and her three youngest children, including the boy, had been the result of liaisons with clients. The mother reported having been a victim of ongoing sexual abuse inflicted when she was a teenager by a family friend that had resulted in her pregnancy with her oldest child. The mother stated she had attacked the individual years later with a razor in an act of retribution for the abuse. The mother also related an incident in which she had struck her drug dealer with her car in response to a dispute, but that the drug dealer had declined to press charges in order to avoid interaction with law enforcement. The mother had previously been convicted of arson after setting fire to her family's home after being asked to leave the residence. At the time the mother set the fire, her brother was bedridden and immobile in the home after having portions of his legs amputated due to complications from diabetes. An Integrated Assessment of the mother recommended she receive substance abuse treatment, domestic violence screening, psychiatric evaluation, individual psychotherapy and anger management training. The assessment concluded it was unlikely the mother would be able to address her myriad issues to a degree that would allow her to care for the boy and his complex medical issues. The child protection investigation was indicated against the mother for Substance Misuse by Neglect. Following the boy's release from the hospital, he was placed in a traditional foster home while the mother was engaged in services through the Department.

Two months after the boy was born the mother informed workers she was pregnant with her seventh child. The mother was unsure of the child's parentage but believed it was one of two men with whom she had engaged in prostitution. The mother participated in drug screening, and while her first test returned positive for marijuana, subsequent tests provided negative results. A child protection investigation related to the birth of the baby, a girl, was initiated but later unfounded. One year after the boy was born, the mother was awarded unsupervised visitation and nine months later he was returned home to his mother's custody. Five months after the boy was placed in the mother's care her case with the Department was closed.

Three months after the case was closed, the State Central Register (SCR) received a report the mother had brought the boy to a hospital with bruises to his forehead, swelling to his face and scratches at various stages of healing on his chest. The mother stated the boy had fallen off a bed in the home two days earlier, however medical personnel determined the injuries were inconsistent with the mother's explanation. A child protection investigation was opened and, after a mandate worker made initial contact with the family, an investigator was assigned to the case. The investigator spoke with service providers involved with the family

and received positive reports regarding the mother's engagement with services.  The investigator also spoke with the mother's former caseworker from her previous involvement with the Department.  The former caseworker reinforced the investigator's perception the mother had been serving as an appropriate caretaker and stated the mother had been continuing to follow the provisions of her service plan even after her case with the Department had been closed.

The mother told the investigator she had made a determined effort to be allowed to care for her children and did not want to lose custody of them.  The mother told the investigator the bruises on the boy's head were the result of him jumping on a bed and falling while playing with older cousins.  The mother attributed the scratches to her youngest daughter, then 18 months-old, grasping at the boy as she learned to walk.  In her case notes, the investigator recorded that the boy's speech was limited and he could not converse, but had stated "I fall" while the investigator met with the family.  In consultation with her supervisor, the investigator decided to terminate the safety plan enacted in response to the allegation of abuse.  In an interview with the OIG, the investigator's supervisor said the decision was based on the boy's acknowledgement of having fallen and the absence of concerns of abuse on the part of the family's pediatrician, despite the conclusions of physicians who treated the boy at the hospital and determined his injuries were suspicious for abuse.  The supervisor stated that the potential actions of taking the children into protective custody or implementing another safety plan were never considered.  Discipline of the investigator and supervisor could not be pursued because of time constraints.

Within two weeks after the safety plan was terminated, two of the mother's close relatives died.  Two days after the second relative's death, the boy was taken to a hospital emergency room with a swollen arm.  Physicians also noted scarring and a bite mark on the boy's stomach.  Despite the presence of the injuries and the mother's disclosure to staff she had recently been involved with the Department, no report of the visit was made to the hotline.  Five days later, the boy was transported to another hospital from the mother's home in critical condition.  Doctors determined the boy had no brain function and he was pronounced dead the following day.  The mother reported to authorities she had been in the kitchen when she heard the boy collapse in the other room and entered to find him foaming at the mouth.  The mother's youngest daughter was removed from the home and placed in the custody of her biological father.  A subsequent criminal investigation by law enforcement resulted in the mother being charged with first degree murder for the boy's death.  Her prosecution is currently pending.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES |
| --- |

**1.  This report should be used as a platform to develop a mechanism for a clinical and legal review for expedited termination of reasonable efforts where the parent has had their parental rights terminated as to a previous child and the parent has a history of violence, mental illness, substance abuse and/or a "highly guarded" prognosis in an Integrated Assessment.**

In accordance with the direction put forth in Rule 309.80, *Termination of Parental Rights*, the Integrated Assessment Administrators and Associate Deputy for Behavioral Health Services worked with Integrated Assessment partners, Office of Legal Services and Operations to develop a protocol for the Integrated Assessment screener and assigned DCFS/POS caseworker that ensures that the caseworker/supervisor consult with Office of Legal Services at the completion of the initial Integrated Assessment when the parent or legal guardian has had parental rights terminated previously and/or a "highly guarded" or "poor" prognosis due to history of parental violence, mental illness, and/or substance use.

**2.  The child protection investigator should receive non-disciplinary counseling for determining, with her supervisor, to end the safety plan, despite the doctor's unwavering determination that the multiple injuries were suspicious for abuse.**

The child protection investigator was counseled.

**3.    The child protection investigator's supervisor should receive non-disciplinary counseling for determining to end the safety plan despite the doctor's unwavering determination that the multiple injuries were suspicious for abuse.**

The child protection supervisor was counseled.

**4.  This report should be shared with the hospital where the boy was brought for his swollen arm for internal review of the decision not to contact the hotline and share related information when mother had self-disclosed such recent involvement with the Department.**

The Office of the Inspector General shared a redacted report with the hospital.

**DEATH AND SERIOUS INJURY INVESTIGATION 6**

| | |
|---|---|
| **ALLEGATION** | A one year-old girl with multiple physical injuries died while in the care of her mother and her mother's boyfriend.  Efforts by medical professionals to establish a precise cause of death were inconclusive.  A child protection investigation of possible physical abuse of other children by the mother's boyfriend was pending at the time of the girl's death. |

| | |
|---|---|
| **INVESTIGATION** | The mother, who also had a seven year-old son and a five year-old daughter, had recently entered into a relationship with the boyfriend.  Prior to this relationship, |

the boyfriend had been romantically involved with the children's maternal aunt.  The aunt and her two daughters, ages two and four, had been living with the boyfriend at his home.  A child protection investigation was initiated after the State Central Register (SCR) received a report the aunt's daughters had numerous bruises on their legs from being struck by the boyfriend as discipline.  The aunt had moved out of the home and left the girls in the boyfriend's care. During the course of the investigation, the girls' maternal grandmother stated the aunt had returned to the home and taken the children away because the boyfriend had been, "spanking the girls too much."  The grandmother stated the aunt had asked the boyfriend not to spank the children.  The girls' father and paternal grandfather also reported being told by the aunt the boyfriend disciplined the girls too harshly.  In an interview with the OIG, the aunt stated the boyfriend would hit the girls on the bottom "full force" with his hand and that he struck both girls multiple times despite her requests for him to stop.  The aunt enlisted the paternal grandfather to care for the girls after she returned to remove them from the home.  The boyfriend moved to a new residence shortly thereafter.  Neither the aunt nor the paternal grandfather was interviewed during the course of the child protection investigation.

When the assigned child protection investigator met with the boyfriend in his new home, the boyfriend admitted to having regularly spanked the aunt's daughters.  The boyfriend stated he stopped using such discipline after leaving a bruise on the two year-old and being asked by the aunt and the maternal grandmother to stop spanking the girls.  Although both police and the investigator conducted cursory physical examinations of the aunt's daughters, no bruises were found on either girl.  However, neither girl was observed until several days after the injuries were reported to have been inflicted, an amount of time that could have allowed marks to have faded away.  Despite statements from multiple relatives the boyfriend's treatment of the girls was excessive and his own admission he had left a bruise on the two year-old, the report against him was ultimately unfounded.  The rationale for the decision was based on the absence of observable injuries and the fact the girls no longer resided with the boyfriend.  During his meeting with the investigator, the boyfriend had stated he was living in his new home with his new girlfriend and her children.  The investigator did not inquire as to the family's identity, but it was later learned during the investigation into the girl's death that the woman in the home was the mother (the aunt's sister) who had moved in with her three children.

Nine days after the boyfriend spoke to the investigator at the home, emergency personnel responded to the residence after receiving a call the one year-old girl was not breathing.  Paramedics arrived to find the girl unresponsive and she was pronounced dead at the scene by the county coroner, who had also traveled to the residence.  The mother and the boyfriend stated the girl had fallen off their bed onto the floor the night before, but that she had seemed fine other than a bump on her head and had gone to sleep without incident.  The county coroner scheduled an autopsy, however since the forensic pathologist the coroner usually called upon to perform autopsies was unavailable, the coroner enlisted a second forensic pathologist recommended by the Illinois State Police.  The second pathologist performed the autopsy and identified numerous injuries to the girl, including multiple abrasions to her face and mouth, hemorrhaging in her eyelids and bleeding in her brain.  The pathologist noted the injuries were inconsistent with those commonly associated with the normal

activity of a one year-old and found the abrasions to her nose and mouth indicative of possible forcible asphyxiation.  In the absence of a conclusive cause of death, the pathologist recommended the manner of death be ruled undetermined.  Following his own review of the autopsy report, the coroner certified the girl's cause of death as blunt force trauma and the manner of death as "accident."  Although the coroner was trained in mortuary science, he does not have a medical background and is not certified as a medical or forensic professional.  The case record of the child protection investigation noted that while the pathologist was troubled by the presence of the eyelid hemorrhaging, the coroner determined it was minor and likely a result of the fall from the bed.  In an interview with the OIG, the coroner stated the second pathologist had taken much longer to complete his work than the coroner was used to and the delay in receiving his findings impacted the coroner's efforts.

During the subsequent investigations into the girl's death conducted by law enforcement and the Department, the mother and the boyfriend claimed the girl had frequently injured herself and reported at least three incidents when she had fallen off their bed.  A scene investigation found the couple's bedroom to have wall-to-wall carpeting and that their bed was of average height from the floor.  The mother stated that on the night preceding her death, after her fall, the girl's stomach felt "hard" after she went to the bathroom and she surmised the girl might have been constipated.  The mother also stated that the following morning she had attempted to resuscitate the girl after finding her unresponsive while the boyfriend summoned paramedics to the home.

While the investigation was ongoing, a pediatric specialist in cases of child abuse was asked by the Department to conduct an independent review of the case and provide a medical opinion.  The pediatric specialist found that the intra-cranial injuries suffered by the girl were inconsistent with the typical causes of death in similar situations and identified marks on her face that suggested abuse.  Based on her review of the record, the pediatric specialist concluded the girl's death was suspicious for inflicted abuse.  After receiving the pediatric specialist's findings, which was not completed until after the coroner's final report had been issued, involved Department personnel forwarded the information to local police and the State's Attorney's Office.  Both entities responded that the coroner's determination the girl's death was accidental precluded their agencies from taking any further action in the absence of new evidence or testimony.  Department personnel also made the pediatric specialist's report available to the coroner, however he stated that unless the mother or boyfriend confessed to harming the girl, he would not reopen the case.  Ultimately, the child protection investigation of both the mother and the boyfriend was unfounded.  The mother subsequently left her two children in the care of their father and moved to another state.

The OIG requested an additional review of the case by a third forensic pathologist with an extensive history of involvement with the Department.  After considering all available information pertaining to the girl's death, the third pathologist concluded the injuries were suspicious for inflicted injury.  The second pathologist noted that the intra-cranial injuries were inconsistent with the description of the girl having fallen a short distance onto a carpeted floor and that it was unlikely such an incident would result in death.  The third pathologist also found the girl's facial injuries to be highly suspicious for possible suffocation, but recommended further examination of the mother's attempts at resuscitation to determine whether that may have been the cause.  While none of the medical professionals who reviewed the girl's case were able to establish a definitive cause and manner of death, all identified unanswered concerns regarding the girl's treatment and care.  While an undetermined manner of death would allow for the possibility of additional scrutiny, the official certification of the death as accidental prevented such efforts from proceeding.  The coroner subsequently asked the forensic pathologist who regularly conducts autopsies in the area to review the case.  The pathologist concurred with the conclusions reached by the other pathologists and the coroner amended the certified cause of the girl's death to undetermined.

DEATH AND SERIOUS INJURY INVESTIGATIONS

| OIG RECOMMENDATION / DEPARTMENT RESPONSE | **The Inspector General is sharing this report with the county coroner for consideration, in light of the new information provided in this report, of amending the girl's cause and manner of death to undetermined.** |
| --- | --- |

The Coroner amended the cause and manner of death to undetermined, undetermined.  The Coroner discussed the amended death certificate with the State Police.  There is a pending child protection investigation involving this family.

**DEATH AND SERIOUS INJURY INVESTIGATION 7**

ALLEGATION    A child protection investigation was indicated against an unknown perpetrator for serious head injuries inflicted against a one year-old boy.  The boy remained in his parent's custody while the family received intact services and the Department did not attempt to screen the case into court.

INVESTIGATION    The family's involvement with the Department was initiated after paramedics were called to their home in response to a report the boy was unconscious after falling against the floor.  The boy was transported to a hospital in critical condition where physicians identified a subdural hematoma requiring emergency surgery.  A craniotomy was performed and swelling to the boy's brain was so severe doctors left part of his skull detached for an extended time in order to relieve pressure.  The boy's parents stated the boy had fallen backward while the mother was dressing him to leave the house and hit his head against the carpeted floor.  The State Central Register (SCR) was contacted and a child protection investigation was opened.

During the course of the child protection investigation it was universally reported by relatives that the mother was the boy's primary caretaker and would not allow anyone to care for him outside of her presence.  The family home was comprised of a total of 12 relatives who lived together in the residence.  The relatives present at the time of the boy's injury were consistent in their accounts supporting the mother's report of how the injury occurred.  Further medical examination of the boy identified the presence of an older subdural hematoma as well as retinal hemorrhaging consistent with injuries found in children who have been violently shaken.  Medical professionals concluded the boy's injuries could not have been accidental and had to have been inflicted upon him.  Furthermore,  physicians concluded the head injury which prompted the boy being hospitalized could not have occurred as the family described, as the boy was too small to generate the force required to cause such a serious injury on his own.

Ultimately, the child protection investigation was indicated for Head Trauma – Subdural Hematoma against an unknown perpetrator.  The investigator concluded that although medical professionals were in agreement the injuries had been inflicted, the number of relatives who resided in the household prevented the identification of the individual responsible.  As the case was closed, a safety plan requiring the parents interaction with the boy to be supervised at all times was terminated.  The parents and the boy moved into a new apartment and their case was referred for intact family services.

In an interview with the OIG, the child protection investigator's supervisor stated that the decision to refer the family for intact services rather than screen the case into court for temporary custody was based on a newly enacted Department protocol.  The supervisor explained that a recent court ruling prohibited the Department from taking protective custody, implementing a safety plan or opening intact services if the case had been screened for temporary custody with the State's Attorney's Office but was not accepted.  The supervisor stated that while it had been established the boy had been abused, it was her belief the case would be rejected for screening by the State's Attorney because the perpetrator was unknown.  It was the supervisor's understanding that a rejection by the State's Attorney precluded the possibility of a referral for intact services, so a decision was made to forgo screening and open the case for intact services to ensure contact with the family was maintained.

The OIG identified a widespread misinterpretation among child protection personnel of the court ruling as it pertained to the ability of the Department to assume temporary custody or screen cases into court.  The ruling prohibited extending protective custody of a child or seeking a voluntary safety plan after concerns of abuse

or neglect had been resolved.  The ruling was misinterpreted to restrict seeking temporary custody when there were legitimate concerns of child safety.  The OIG found the Department's Legal Division had not issued a definitive opinion on the ramifications of the court ruling to guide Department personnel, leaving child protection workers to determine for themselves how the decision affected their practices in the field.  Although attempts were made to address uncertainty arising from the court's ruling, the efforts occurred outside the purview of the Department's Legal Division and were not based in an accurate interpretation of the law.

<table>
<tr><td>

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

</td><td>

**1.  The Department's Office of Legal Services must correct the misperceptions in the field regarding a recent court decision in which the Department was held liable for wrongly retaining custody of a child. (*Hernandez v. Foster*, 657 F.3d 463)**

</td></tr>
</table>

The Department will issue a Policy Alert to inform staff of the necessary changes in practice while working to incorporate the changes into Procedure.  Language addressing this recommendation was incorporated into Procedures 300, Appendix G, *Child Endangerment Risk Assessment*.

**2.  The Department's Office of Legal Services should have quarterly discussions of new case law with managers and supervisors so the field has an adequate understanding of their effect on practice.  The Office of Legal Services must translate the legal opinions into practical guidelines that can be implemented into practice.**

The Office of Legal Services will update Operations staff on new case law that impacts practice.

**DEATH AND SERIOUS INJURY INVESTIGATION 8**

| ALLEGATION | A two year-old boy died of accidental poisoning after ingesting methadone that had been prescribed to his mother. The family had an open case with the Department and was receiving intact services at the time of the boy's death. |
|---|---|

**INVESTIGATION**        Both the baby and his mother had tested positive for methadone at the time of his birth and the boy presented signs of Fetal Alcohol Syndrome (FAS). The mother had three older children who had all been removed from her custody as a result of her extensive history of substance abuse issues. A child protection investigation was initiated in response to the baby's birth and an unsuccessful attempt was made to screen the case into court in order to assume temporary custody. Instead, a case was opened for intact services and referred to the Intact Family Recovery (IFR) program, which provides specialized services to mothers with substance exposed infants.

Throughout her involvement with IFR, the mother consistently completed her required activities. The mother made herself and the baby available for scheduled home visits and followed through with referrals for service. She ensured the baby received necessary medical attention as well as required therapy. For a period of time following the death of two of the mother's relatives, involved workers experienced difficulty maintaining contact with her as she traveled to attend to family issues. Workers determined the mother's lack of availability was reasonable and she remained in regular contact by phone. The mother continued to submit to drug tests and consistently posted negative results. The mother also successfully completed an outpatient methadone treatment program and earned the opportunity to utilize take-home dosages of the drug.

After the family's case had been open for almost two years, including an extension following the death of the mother's relatives, involved workers discussed with the mother preparing for case closing. The family continued to be free from any new concerns or risk factors and workers began preparing for case closure.

Two weeks later, the boy's mother found him unresponsive in her bed. The mother and her adult male cousin had been caring for the boy in the cousin's home. The boy was transported to a hospital where he was pronounced dead. The mother told police the cousin had placed the boy in bed with her while she slept. The mother had risen to eat and then returned to the bed where she found the boy. The cousin stated he had given the boy a bottle of water shortly before placing him in bed with the mother. The mother showed police and child protection investigators where she kept her methadone supply in an inaccessible locked box. The mother also directed authorities to a bottle of methadone mixed with water in a plastic bottle located on a low shelf in the refrigerator. The mother stated she felt the methadone mixture was secure in the refrigerator because she did not believe the boy could open the door. An autopsy performed on the boy concluded his cause of death to be poisoning by accidental ingestion of methadone.

In an interview with the OIG, an administrator from the substance abuse treatment center where the mother received services stated that clients accepted into the methadone take-home program participated in safe-storage education on five separate occasions to ensure understanding of the importance of responsible handling. As described by the administrator, the education addressed storing methadone in a locked container in a location inaccessible to children. Methadone was provided to clients in pre-measured doses within sealed, childproof bottles.

In her interview with the OIG, the treatment center administrator stated that the education provided to clients assumed clients consumed their methadone directly from the provided bottles. The administrator acknowledged the training did not address the practice of transferring methadone to other containers.

Substance abuse providers should recognize that client's personal practices might deviate from clinical standards. Poisoning by accidental ingestion of pharmaceuticals is a leading cause of injury and death among young children. The often fluid, sometimes volatile living and childcare situations encountered by clients utilizing methadone to treat their substance addiction must be taken into account when preparing them to safely store and use the drug in their homes.

| | |
|---|---|
| **OIG RECOMMENDATION / DEPARTMENT RESPONSE** | **In collaboration with Illinois Department of Human Services, Division of Alcohol and Substance Abuse (DASA) providers, the Department should develop a Parent Training module that** |

**addresses the unsafe practices of mixing and splitting methadone dosages.**

A collaborative training module on the use and dangers of mixing doses of methadone with DASA will be developed.

**DEATH AND SERIOUS INJURY INVESTIGATION 9**

| ALLEGATION | A one month-old baby boy died of undetermined causes while residing with his mother and her boyfriend in the home of family friends. A child protection investigation of the mother and her boyfriend was closed two days prior to the baby's death. |
| --- | --- |

| INVESTIGATION | One month prior to the baby's birth, local police raided the home the mother shared with her boyfriend and her three year-old son to execute a warrant. Upon entering |
| --- | --- |

the home officers located significant amounts of crack cocaine and marijuana as well as equipment and accessories related to the manufacture and distribution of the drugs. The police report noted that some drugs were found next to the couple's bed where they would have been accessible to the three year-old boy, who was in pre-school at the time. During their investigation, police also determined the boyfriend was listed on the state sex offender registry. Police questioned the mother, who denied knowledge of the presence of drugs in the home. However, the boy's maternal aunt, who was present in the home at the time of the raid, told officers the boyfriend did not have a "real job" and derived his only income from selling drugs out of the home, and that the mother was aware of the illicit activity. The mother and her boyfriend were arrested and a hotline call was made to the State Central Register (SCR) to report the drug raid on a home where a child lived and a registered sex offender resided. A report was opened for Substantial Risk of Injury against the mother and Substantial Risk of Sexual Abuse against the boyfriend.

The following day, the child protection investigator assigned to the case contacted the maternal grandmother, whom police had arranged to care for the three year-old boy following the arrests. The grandmother informed the investigator she had returned the boy to the family's home following the mother's release from custody. The grandmother stated she was aware of the raid on the home but denied any knowledge of drug involvement by the mother or her boyfriend. The investigator then went to the home and met with the mother and the three year-old boy. The mother, who was nine months pregnant, told the investigator that because of her pregnancy she did not use drugs and had been unaware any narcotics were present in the home. She confirmed her boyfriend was listed on the sex offender registry but stated his inclusion stemmed from a relationship he had with another teenager when he was a minor that had continued after he reached the age of majority. The mother told the investigator the couple had received approval from the local police department for the boyfriend to live in the home. The investigator did not conduct a walk-through while in the home to assess the suitability of the residence or perform a scene investigation to determine the reliability of the mother's account. The investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) concluding the environment was safe for the three year-old based on the mother's self-reports denying drug use or knowledge of illegal activities.

The investigator did not request a copy of the police report of the raid on the home, which detailed the presence of drugs accessible to the boy and the aunt's statement the mother was aware of drug activity, until almost two months after beginning work on the case. Additionally, although Department Procedures require investigators to contact the reporters of hotline calls within 14 days of opening a case, the investigator did not attempt to reach the officer who made the call until a few days after requesting the police report. The investigator never spoke to the officer but left a message stating his intention to unfound the report.

Following the investigator's initial work on the case, no other activity was performed for almost one month. In an interview with the OIG, the investigator stated that due to his high number of assigned cases he would allow cases to become dormant after making an initial safety assessment an ensuring a child's immediate welfare. An OIG review of the investigator's caseload found he was well above the investigative case limit during the months encompassing the investigation, in violation of a federal consent decree limiting caseloads.

The investigator's work on the case resumed after his interim supervisor instructed him to contact the boyfriend and have the mother submit to a drug screen.   The investigator went to the family's current residence, the home of a friend, where he found the friend caring for the three year-old boy.  The friend stated the couple was in court dealing with charges stemming from the drug arrest.  While in the home the investigator did not obtain the last name of the friend or any other identifying information.  In his interview with the OIG, the investigator described the home as "crowded" and stated he observed the mother's new baby as well as three other youths he believed to be the children of the friend, but he did not confirm their identities.  The investigator explained he was in the home for "two minutes" and was there primarily to assess the three year-old boy's immediate safety.   The investigator completed a closing CERAP determining the home to be safe despite failing to do a background check on the family friend or identify all members of the household.   The investigator did not see the mother to instruct her to complete a drug screen.  The next day, following a meeting with and approval from his interim supervisor, the investigator unfounded the reports against both the mother and boyfriend and closed the case.

Two days after the case was closed, paramedics were called to the home of the family friend after the baby boy was found unresponsive in his crib.  The child was pronounced dead at the scene and a subsequent autopsy found no signs of trauma and concluded the cause and manner of death as undetermined.  A Child Abuse and Neglect Tracking System (CANTS) check of the family friend conducted by the OIG found she had previously been involved with the Department and had twice been the subject of indicated reports for Substantial Risk of Physical Injury related to cases of domestic violence and illegal drugs being sold from her home.

---

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.   The child protection investigator should be disciplined for accepting the mother's self report without verification, failing to conduct a background check on adult members of the family's home, failing to contact the reporter and make a timely request for a police report, failing to assess the three year-old's access to the couple's bedroom and failing to complete a scene investigation.  Discipline should be mitigated by his high investigative caseload.**

The Director met with the Regional Administrator, Area Administrator, supervisor and investigator and utilized this report as an educational tool for non-disciplinary counseling.

**2.   Child protection supervisors in the Region should be reminded of the importance of issuing subpoenas in a timely manner when necessary.**

The Area Administrator addressed this with the supervisors in the region.

**DEATH AND SERIOUS INJURY INVESTIGATION 10**

| ALLEGATION | A 13 year-old girl with developmental disabilities died of complications of hyperglycemia related to her juvenile diabetes. A child protection investigation was indicated against the girl's guardian for medical neglect one month prior to her death. |

| INVESTIGATION | The girl's mother, who also had four other children, had a history of serious substance abuse issues and extensive involvement with the Department. The girl had been removed from her mother's custody when she was five years-old and, after residing with her maternal aunt for three years, was placed with a family friend through a guardianship agreement.

The girl had been diagnosed with Type 1 Diabetes when she was three years-old and struggled throughout her childhood to manage the disease. Throughout her years in school her blood sugar levels required monitoring and an OIG review of school records found multiple instances when she was hospitalized for hyperglycemia when her glucose levels exceeded the safe range. The girl had a history of blurred vision, bed wetting, insomnia and seizures brought on by elevated glucose levels. A student accommodation plan had been developed for the girl when she was in third grade to ensure that while in school she received the support necessary to manage her diabetes and the plan had been regularly updated and revised.

Five months prior to the girl's death she was hospitalized for Diabetic Ketoacidosis (DKA), a condition resulting from the body burning fatty acids and producing ketone in response to a shortage of insulin. While DKA is considered a potentially life-threatening illness it is readily correctable with adequate and timely treatment. DKA often occurs in people with diabetes whose insulin treatments are inconsistent. Nausea, dehydration and an elevated heart rate are common symptoms of DKA. The girl's guardian told medical personnel the girl had exhibited vomiting and a rash for two days before she was admitted. The girl told hospital staff she had a glucometer, an electronic meter used to measure blood sugar levels, but acknowledged not always being compliant with her insulin schedule. The guardian told medical personnel she checked the girl's glucometer "occasionally." A hospital nutritionist conducted an informational meeting with the girl and the guardian and recorded in her notes the girl was uncertain how to monitor her carbohydrate intake, an important aspect of diabetes management, and documented a need for ongoing education. A physician also counseled the girl and the guardian, emphasizing the importance of frequent interaction with the girl's pediatrician and endocrinologist.

Following the girl's discharge from the hospital she attended her first follow-up appointment but failed to appear for her next two appointments and never visited her endocrinologist prior to being hospitalized again 10 weeks after the previous episode. The girl's 19 year-old sister had arrived at the guardian's home and found the girl alone, lethargic and disoriented. Testing conducted at the hospital found the girl's blood sugar count to be extraordinarily high and concluded it would have taken days to reach such an elevated level. A child protection investigation of medical neglect was opened and an investigator assigned to the case. The investigator went to the girl's home and spoke with the guardian who stated that while she was involved in the girl's treatment regimen and reminded her to take her medicine, she could not monitor her all the time. The guardian said she used the glucometer in the home to check the girl's blood sugar levels three times during the day before she was hospitalized, however the investigator checked the machine and found it had last been used two months earlier. The guardian stated she had left the girl alone for only a brief time before the sister arrived and took her to the hospital and that she had been in no distress. The guardian told the investigator she could no longer care for the girl and that she would be going to court the following week to return custody of the girl to her mother. |

The investigator then spoke to hospital staff who informed her the girl had recently been admitted for, "the same thing." Staff also stated the girl had told them her guardian did not check her blood sugar levels. In an interview with the OIG, the investigator stated she did not specifically ask physicians treating the girl about medical neglect because she believed the allegation had already been established through the girl's hospitalization and the unreliable statements made by the guardian. The investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) designating the girl as unsafe and identifying hospital staff as being responsible for implementing the safety plan. The girl remained in the hospital for 11 days, during which time she met with a doctor from the hospital's protective services team. The doctor reviewed the girl's medical history at the facility and noted she had lost 19 pounds since her previous admission just two months earlier and had not been seen by her endocrinologist for a significant amount of time. In contrast to what she had said to other staff, the girl told the doctor she was not responsible for her insulin intake and that the guardian controlled management of her medicine. The doctor also spoke to the guardian who stated she was overwhelmed by the requirements of the girl's dietary and medicinal needs. In her notes, the doctor identified the girl as being at high risk of recurrent DKA and emphasized the need for her to be in the custody of a caretaker who would be diligent in overseeing her diabetes management and treatment. While in the hospital the girl also met with a pediatric psychologist who concluded the girl had little to no support in addressing her disease and would require a carefully developed protocol upon her discharge.

While the investigator had obtained the girl's medical records after her first two days of hospitalization, she did not secure records pertaining to the remaining nine days of her stay. In her interview with the OIG, the investigator stated she believed she had requested the records but was uncertain if she had received them and acknowledged they were not included in the case file. The investigator stated she was not informed of the involvement of the hospital's protective services team and said she was unaware of its existence. The investigator stated she had frequent interaction with hospital social workers for the duration of the girl's hospitalization but admitted she had no further contact with any medical personnel after her initial contact. Furthermore, though Department Procedure requires minors with significant health issues who are involved in cases of possible medical neglect to be referred for assessment by the Department's Division of Nursing, the girl's case was never forwarded by the investigator.

As the hospital prepared the girl for discharge the investigator prepared to place the girl with her mother, who lived in another part of the state. The investigator requested assistance and a parallel investigation was opened in the region where the mother lived in order to assess her as a caretaker. The parallel investigator visited the mother's home and determined the environment to be safe. The mother told the parallel investigator she had successfully overcome her substance abuse issues and stabilized her life in the years since she had relinquished custody of the girl. The investigator accepted the parallel investigator's assessment and the parallel investigation was closed. Three days after the mother was assessed, the hospital informed the investigator the girl was ready to be discharged. The investigator contacted the mother, who stated she could not afford to travel to pick up the girl for several days. The investigator then informed the guardian that she would have to accept the girl upon discharge and remain responsible for her care until the mother arrived. The investigator then contacted the hospital to notify them the girl could be released to the guardian. Hospital staff rejected the plan, citing the girl's need for diligent monitoring of her treatment, the guardian's repeated failure to do so and the mother's lack of experience managing diabetes in a juvenile. The hospital agreed to keep the girl at the hospital until the mother could arrive and eventually provided funds to allow the mother to travel to the hospital sooner. Hospital staff then assisted in having the girl transferred to another hospital to provide the mother with training on how to monitor the girl's treatment. Prior to the girl's discharge from the second hospital the mother returned to her home and the girl was ultimately released into the custody of her sister. The girl remained with her sister for one week before her mother returned to transport her to her residence.

In her interview with the OIG, the investigator stated she was unaware at the time the girl was discharged that

she had been released into the custody of her sister.  The investigator claimed it had never been her intention to return the girl to the guardian's custody until the mother was available.  The investigator was unable to explain why she had entered information detailing the arrangement into SACWIS.  In a separate interview, the investigator's supervisor also denied the girl had been scheduled to be released to the guardian but that the guardian was supposed to develop a care plan for the girl.  An OIG review of the case record found no activity was conducted by the investigator from the time she was released from the first hospital until she was transported to the mother's home two weeks later.  Although Department Procedure requires any CERAP designated as unsafe to be updated every five days, the investigator never completed another CERAP or created an additional safety plan.  It was not until the mother contacted the hospital to complain she had received no information or assistance from the Department that the investigator resumed her efforts on the case.

One week after the girl entered her mother's home, paramedics were called to the residence.  The mother told the paramedics the girl had been nauseous for two days and had been attempting to drink water but could not keep it down.  The mother also stated the girl's blood sugar levels were high.  Paramedics tested the girl's vital signs and found her heart rate to be elevated but did not check her blood sugar level.  The mother and paramedics jointly decided not to transport the girl to the hospital but to allow the mother to monitor her in the home.  Less than 30 minutes after paramedics left the home, the girl experienced a seizure and the mother again called for assistance.  Another team of paramedics arrived and found the girl had an extremely high blood sugar count and that her heart rate had increased since the previous measurement.  The girl was transported to a regional hospital and medical personnel administered rehydration therapy in conjunction with an infusion of insulin, which resulted in a rapid decrease in her blood sugar levels.  The American Diabetes Association and relevant medical literature caution that the risk of cerebral edema can be increased by an accelerated drop in blood glucose levels.  Following the treatment, the girl experienced cerebral edema and lapsed into a coma, necessitating her being placed on life support.  The girl remained on life support for two weeks as testing repeatedly failed to identify any cortical activity.  The mother and the guardian subsequently consented to the removal of life support measures.

While the girl had been hospitalized, an organization of pediatric physicians was enlisted to evaluate whether the girl's condition could be related to medical neglect by the mother.  A representative of the organization contacted the parallel investigator who had conducted the assessment of the mother's home.  The parallel investigator fulfilled a request from the organization to obtain records and share information, despite the fact the parallel investigation was closed and he was not authorized to provide confidential information to an outside agency.  In an interview with the OIG, the parallel investigator stated he had frequent interactions with the organization in the course of his work and assisted them as a professional courtesy.  Despite the helpful intentions of the parallel investigator, the Abused and Neglected Child Reporting Act (ANCRA) which governs the disclosure of confidential information exists to ensure the privacy of families serviced by the Department and should not be compromised.

---

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  The child protection investigator should receive discipline for poor documentation, failure to monitor the unsafe CERAP, failure to obtain sufficient medical documentation and failure to complete timely nursing and intact family services referrals.** |
| --- | --- |

The child protection investigator was disciplined.

**2.  The child protection supervisor should receive discipline for failing to ensure that subsequent CERAPs and safety plans were completed.**

The Department determined that discipline of the child protection supervisor was not warranted.

**3.  This report should be shared with the parallel investigator and his supervisor for non-disciplinary counseling concerning performing investigative tasks on a closed investigation.**

The child protection investigator and supervisor were counseled.

**4.  A redacted copy of this report should be shared with the risk management department of the regional hospital where the girl was transported from the mother's home.**

The Office of the Inspector General shared a redacted copy of the report with the involved hospital.

**5.  A redacted copy of this report should be shared with administrators from the emergency response unit that dispatched paramedics to the mother's home to review the actions of the responding paramedics/emergency medical technicians.**

The Office of the Inspector General shared a redacted report with the involved fire department.

**DEATH AND SERIOUS INJURY INVESTIGATION 11**

| | |
|---|---|
| **ALLEGATION** | A two year-old girl drowned in a swimming pool while at the home of her unlicensed day care provider.  The babysitter's family had been the subject of two child protection investigations within the year prior to the girl's death. |

**INVESTIGATION**

The babysitter, who had four children of her own, ages 13, 11, 8 and 5, regularly provided in-home day care services for a number of children from the area.  The babysitter's family came to the attention of the Department four months prior to the girl's death after the State Central Register (SCR) received a report of inadequate supervision of children in the home.  It was alleged the babysitter had been found asleep in the home while serving as the sole caretaker to four children under the age of two and had a visible facial injury she attributed to being assaulted by her husband the night before.  Police had gone to the home to assess the minor's safety and upon their arrival found the babysitter awake and feeding the children.  A child protection investigation was initiated and the assigned investigator began by consulting with local law enforcement.  Police confirmed they had responded to a disturbance at the home the night before the report was made.  At the time, the babysitter reported physical abuse inflicted by her husband and officers observed a bruise near her eye and a human bite mark on her hand.  The investigator was informed by police the family had an extensive history of domestic violence requiring intervention by law enforcement dating back several years.

The investigator then went to the family's home where he encountered the babysitter's husband and their five year-old son, who had been present during the well-child check by police.  The investigator was told the babysitter had left town on a planned trip with her 11 year-old daughter.  The five year-old boy denied the babysitter had been asleep prior to the officers' arrival.  The babysitter's husband informed the investigator the couple was in the process of separating and that he would be moving out of the home.  A few days later following the babysitter's return, the investigator scheduled a meeting with her at her home for the early evening.  During the meeting, the babysitter recounted the recent domestic violence incident and estimated police had been called to the residence 10 times since the family had lived in the home to respond to similar episodes.  The babysitter stated she had been accepting children for in-home day care for approximately eight months.  The babysitter acknowledged she was not licensed by the Department as a day care provider and expressed interest in beginning the process.  The investigator provided the babysitter with an application and reference materials and informed her that until she completed licensure she was restricted in the number of children she could care for in the home.  The babysitter stated she was only caring for three children that day, a number the investigator incorrectly told her was acceptable.  Since the babysitter regularly had two children of her own under the age of 12 at home during the day, Department Rule would only permit her to accept 1 additional non-relative child.  The babysitter also provided the investigator with the names and contact information for the parents of other children she routinely cared for in her home.

After communicating with several of the families who utilized the babysitter's services, the investigator contacted a Department day care licensing supervisor.  The investigator informed the supervisor the babysitter had been caring for a significantly greater number of children than she had led him to believe.  The investigator also learned the babysitter had misled parents and asked them to pick up their children early on the day the investigator interviewed her at her home in order to conceal the number of children she was accepting in the home.  Furthermore, the babysitter had misrepresented herself to parents by claiming to be a licensed day care provider in the online advertisement many had used to find her.  While the investigator made the licensing supervisor aware of issues directly related to daycare, he did not share information regarding the reported domestic violence and its relationship to the potential risk posed to any children in the home.

One month later, the investigator conducted a surprise visit at the home and found the babysitter caring for five young, non-relative children.  At the same time, the babysitter's five children and two other minor friends were playing in the family's swimming pool unsupervised.  In response, the investigator filed a formal licensing compliant regarding the babysitter's repeated violations of Department Rules for in-home day care.  The investigator ultimately unfounded the initial child protection investigation alleging inadequate supervision against the babysitter, based on his inability to decisively establish whether she had been asleep while caring for children in her home and the fact she was alert and appropriate when police arrived.

The day after the investigator registered the licensing complaint, a licensing worker went to the home and found the babysitter caring for three non-relative children, all age four and under, in addition to her own.  The licensing worker advised the babysitter once again of the restrictions regarding the allowable number of children in unlicensed day care.  The babysitter claimed to be confused about the requirements and reviewed them with the worker.  The worker informed the babysitter a report would be substantiated against her for operating an unlicensed day care.  The mother stated she understood and expressed her desire to obtain licensure.  Ten days later the babysitter received a letter from the Department informing her she had been operating her day care service in violation of the Child Care Act.  The letter explicitly stated the necessity of obtaining a license and barring her from providing any in-home day care services until she had done so.  Four days after receiving the letter the babysitter submitted an application for licensure, however the application was incomplete.

Two months after the licensing worker's unannounced visit, the two year-old was found floating face down in the swimming pool at the babysitter's home.  The girl was transported by ambulance to a hospital where she was pronounced dead.  At the time of the girl's death, the babysitter was providing day care to seven non-relative children in her home, five of whom were age two and younger.  In addition, three of the babysitter's children were also present in the home.  The babysitter told police she was about to serve the children a snack when she realized the two year-old girl was not present.  After a brief search, the babysitter located her in the pool.  The babysitter was criminally charged with child endangerment and operating a child care facility without a license.  Charges against her were later dismissed.

In an interview with the OIG, a Department licensing administrator stated that when a licensing investigation identifies an unlicensed daycare operation, the Department notifies the Central Office of Licensing as well as the local State's Attorney's Office.  The purpose of the notification is either to advise the entities of the violation or to seek corrective action and prosecution.  In this case, the notification included a statement that the Department did not intend to seek prosecution.  The administrator said that prosecution is infrequently sought against first-time licensing offenders and that in almost all cases the Department works in conjunction with those seeking licensure to bring their homes into compliance.  If a provider is operating in violation of the Child Care Act, the Department has the option to pursue an Administrative Order of Closure.  Such Administrative Orders are intended to provide the Department with a means of taking immediate action against the continued operation of a day care facility which, "jeopardizes the health, safety, morals or welfare of children served by the facility."  In her interview with the OIG, the administrator stated that Administrative Orders are rarely used and require the approval of the Department's legal division.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.   The Department's licensing division should change its practices so that it critically evaluates the facts in each substantiated complaint, even in first-time complaints, to determine what kind of action to take.** |

Twice monthly supervision protocols have been established statewide.  A review of substantiated licensing

complaints will be conducted to insure that appropriate actions are taken as indicated.

**2.  When a licensing investigation is concurrent to a child protection investigation, the licensing division should have read-only access to the child protection investigation.**

The recommendation has been implemented.

**3.  This report should be shared with the Department's licensing division.**

The report has been shared with administrative staff in the licensing division.

DEATH AND SERIOUS INJURY INVESTIGATIONS

**DEATH AND SERIOUS INJURY INVESTIGATION 12**

| | |
|---|---|
| **ALLEGATION** | A two year-old, medically complex girl died as a result of accidental asphyxiation.  A child protection investigation regarding the girl's health care was unfounded six months prior to her death. |

**INVESTIGATION**  The girl was born with significant medical issues including Down Syndrome, a congenital heart defect and multiple organ deformities.  The girl's respiratory problems necessitated the insertion of a tracheostomy tube and utilization of a ventilator to assist and control her oxygen intake.  After spending the first 13 months of her life in hospital care, the girl was moved into her family's home.  The girl's mother was trained by hospital staff on the monitoring and use of the equipment required for her care.  In addition, the girl received 112 hours per week of in-home care provided by a rotating staff of nurses from a nursing agency.

Two months after the girl was discharged from the hospital to the family's home, the State Central Register (SCR) received a report the girl's care was not being properly implemented by her mother and that the mother was altering the settings on the girl's medical equipment.  The report was accepted for Substantial Risk of Physical Injury and a child protection investigator was assigned to the case.  During the course of his work on the case, the investigator identified an interpersonal conflict between the mother and one of the in-home nurses as the primary basis of the allegation.  Both the mother and the nurse reported disagreements between the two regarding details of the girl's treatment and made calls to the nursing agency to register complaints involving the other's behavior.  An OIG review of the nursing agency case file found that of 12 reports to the nursing supervisor regarding concerns from involved personnel about the girl's care, 11 were made by the nurse with whom the mother had a conflict.  The majority of the allegations made by the nurse in the reports were unsupported by her own notes.  Relatives and others involved with the family uniformly described the mother to the investigator as a devoted parent and attentive caretaker.  The mother eventually requested the nursing agency remove the nurse from the rotation providing care to the girl in the home.

Despite being made aware of the escalating tension between the mother and the nurse, the nursing agency supervisor did not address the situation directly with either party.  Furthermore, the supervisor did not discuss with the nurse her allegations the mother was disrupting and disconnecting equipment vital to ensuring the girl's well-being.  The situation in the home deteriorated to the point of a child abuse/neglect report being made to SCR without a comprehensive examination of the circumstances having taken place.  A joint staffing amongst family members, involved medical providers and relevant child welfare workers might have developed an understanding of the girl's ongoing care and identified any conflicts or concerns.

On the day the investigator first visited the family home he was accompanied by a pediatric resident participating in a ride-along program which allowed her to "shadow" a child welfare worker in the field.  While in the home, the investigator asked the pediatric resident to check the girl's oxygen saturation levels and the settings on her medical equipment.  In his case notes, the investigator identified the pediatric resident as the girl's "primary care physician."  Although the investigator was instructed by his supervisor to speak with the family's regular pediatrician as part of his efforts, the investigator never contacted the regular pediatrician prior to closing the case.  Given the complex medical issues surrounding the girl's health and the centrality of her medical care to the allegations made against her mother, a consultation with the family's regular pediatrician would have been essential to assessing the situation in the home.  The investigator also never made a referral for nursing consultation to obtain additional input on the girl's ongoing health care needs.  Department Procedure requires nursing consultation under certain circumstances and allows for it in others, however existing language regarding these situations is unclear as currently written.

Based on his determination that the allegation against the mother was rooted in the conflict between the mother and the nurse regarding the girl's treatment rather than the treatment itself, the investigator unfounded the report of Substantial Risk of Physical Injury.  Six months after the case was closed, the girl died of accidental asphyxiation after her tracheostomy tube became dislodged.  In response to the girl's death, a second child protection investigation was opened.  The investigation found no evidence of abuse or neglect and the report was unfounded.

**OIG RECOMMENDATIONS /
DEPARTMENT RESPONSES**

**1.   Procedures 302 – Appendix O,** *Services Delivered by the Department – Referral for Nursing Consultation Services***, should be rewritten so that it clearly states which children with special health care needs are required to be referred for nursing consultation services and to what types of pending investigations children with special health care needs must be added as alleged victims.  The requirements should be cross-referenced to the appropriate allegations in Procedures 300 – Appendix B,** *Reports of Child Abuse and Neglects – The Allegation System***.**

Recognizing the complex nature of this recommendation, the Inspector General's Office and the Department will be reviewing the issues presented in this case to develop appropriate policy and procedure.

**2.  The following language should be added to Procedures 300 – Appendix B,** *Allegation Substantial Risk of Physical Injury* **(#60):  If the alleged child victim has a Special Health Care Need as defined in Procedures 302 – Appendix O a) or b), a referral for nursing consultation services shall be made by completing the DCFS Regional Nurse Referral Form, CFS 531.**

Recognizing the complex nature of this recommendation, the Inspector General's Office and the Department will be reviewing the issues presented in this case to develop appropriate policy and procedure.

**3.  In child protection investigations involving medically complex children whose home health care is at issue (medical neglect OR substantial risk of physical injury), the child protection investigator should convene a telephone or in-person conference with relevant parties (e.g., parents, nursing care agency, Division of Specialized Care for Children, child's primary care physician, other medical providers) to facilitate communication, establish facts and design a plan of action.  DCFS Nursing staff should be utilized to help coordinate such a staffing.**

Recognizing the complex nature of this recommendation, the Inspector General's Office and the Department will be reviewing the issues presented in this case to develop appropriate policy and procedure.

**4.   DCFS must establish guidelines for professional ride-alongs with DCFS staff.  Guidelines for medical professionals (e.g., medical residents) should address what are permissible and impermissible tasks.**

Procedures were established with the Medical Director of Child Protective Services at the University of Chicago Comer's Children's Hospital, the Cook County Regional Administrator, and the Office of Legal Services to include a "Release and Waiver of Liability Agreement", "Medical Residents Confidentiality Agreement" and "Criteria for Medical Residents Shadowing Investigators."  These documents and process are used when residents shadow DCFS child protection investigators.  The Office of Child and Family Policy will review Part 431, *Confidentiality of Personal Information of Persons Served by the Department of Children and Family Services* to determine revision requirements to meet this recommendation.  The forms will be formally approved and assigned in this process.

**5.  The child protection investigator should be counseled about communicating with children's primary care physicians.**

The investigator was counseled.

**6.  Portions of this report applicable to nursing should be shared with the medical services coordinating agency and the home health care provider.**

The Office of the Inspector General shared a redacted copy of the report with the coordinating agency and the home health care provider.

**DEATH AND SERIOUS INJURY INVESTIGATION 13**

| ALLEGATION | A three week-old girl died of undetermined causes while sleeping in a bed with her maternal grandparents. The baby's mother had been the subject of a child protection investigation which was closed 10 days before the infant's death. |
|---|---|

**INVESTIGATION**     The family's involvement with the Department was initiated after police were called to the grandparent's home where the mother resided with her 14 year-old son. Officers arrived to find the mother and grandmother in the doorway of the home and the grandmother bleeding from her hand. The mother did not comply with police and had to be physically restrained. After being handcuffed, the mother continued to be verbally aggressive towards the officers, making repeated threats to kill them. The grandmother told police the mother, who was seven months pregnant, had threatened to kill all members of the family before taking her own life. The grandmother stated she had been bitten on the hand by the mother while attempting to prevent her from leaving the home. She told police the mother was diagnosed with bi-polar disorder but had not been taking her regular medication due to her pregnancy. The grandmother was transported to a hospital for medical attention while the mother was involuntarily committed for psychiatric evaluation. The State Central Register (SCR) was contacted alleging Risk of Physical Injury to the mother's 14 year-old son and a child protection investigation was opened.

The child protection investigator assigned to the case began her work by attempting to visit the family at their home the following day. As no family members were present upon her arrival, the investigator left a business card and a written request for the family to contact her. After that effort, the investigator had no contact with the family and performed no other work on the case until almost two months later, following the birth of the baby girl. Department Procedures require child protection investigators to see and assess minors alleged to be victims of abuse or neglect within 24 hours, or to make repeated attempts every 24 hours until the requirement is met. In an interview with the OIG, the investigator stated that at the time she was assigned the case she had a high number of active cases and was forced to "prioritize and triage" investigations based on perceived degrees of risk to the involved children. Since the mother's son was 14 years-old and her violence had not been directed towards him, the case was given a low priority. The investigator's supervisor confirmed to the OIG that the field office was understaffed at the time and workers were overwhelmed by the volume of cases coming in. The supervisor stated all workers were under a great deal of pressure to identify and deal with the most volatile and imminently dangerous cases, restricting the attention they could provide to the entirety of their caseloads.

The BH Consent Decree requires that Department child protection investigators be assigned no more than 12 new abuse or neglect cases per month during nine months of a calendar year and no more than 15 during the other three months. An OIG review of assignments in the field office found the investigator was given 27 new cases during the month the report regarding the family was taken. The investigator had also received a combined total of 42 cases during the two months prior and was assigned a combined total of 64 new cases in the three months following. In all, the investigator was assigned 133 new child abuse and neglect cases during the six-month period surrounding her acceptance of the family's case, far in excess of the limits established by the BH Consent Decree.

Five days after the mother gave birth to the baby girl, the investigator went to the family's home and interviewed all members. The baby was still at the hospital as a hold had been placed on her release until the investigator could assess the family. The investigator spoke with the mother, who attributed her behavior to the change in her medication and said she had scheduled an upcoming appointment with her psychiatrist. The grandparents stated the mother and her children would continue to live with them and that since the

grandmother was unemployed, she would be available to assist with the baby's care.  The grandmother stated the 14 year-old boy was not home at the time of the domestic violence incident with the mother; however, in her interview with the OIG, the investigator expressed her belief the boy had been present at the time, based on her understanding of the initial hotline report.  The investigator did not raise her suspicions with the family or confront them about her perception they were being untruthful.  The investigator completed a safety plan prohibiting the mother from having unsupervised contact with the baby and designating the grandmother as being responsible for ensuring oversight.

The following day, a supervisory meeting was held, at which time it was determined the baby could be released into the mother's custody without a safety plan or a referral for intact services.  The decision was based on the conclusion the mother's behavior had been triggered by the change in her medication, that she had resumed her regular prescription and her history of compliance with her pharmaceutical schedule.  Two days later, the investigator returned to the family's home and observed the baby in the environment.  The investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) determining the home to be safe.  Later that day, the investigator made unsuccessful attempts to contact the mother's psychiatrist and the officer who initially responded to the home during the mother's altercation with the grandmother.  The investigator did submit a request to local law enforcement for any history of contact with the household.  Although police informed the investigator that officers had been called to the home on two occasions, she was only provided with a written report of the known incident of domestic violence.  The investigator did not follow up with police to receive information regarding the second occurrence.  An OIG review of police records found the other incident, which had occurred eight months earlier, involved the mother physically assaulting the grandmother.  The mother told police she had been having suicidal thoughts and was angry at the grandmother for forcing her to take her medication.  The next day, the investigator unfounded the report against the mother.

Ten days later, SCR received a hotline call reporting the baby girl's death.  Paramedics had been called to the family's home after the grandparents awoke to find the baby, who had been sleeping in bed with them, unresponsive with blood coming from her mouth.  The infant was transported to a hospital where she was pronounced dead.  An autopsy performed by the local medical examiner was inconclusive and the baby's cause of death of death was designated as undetermined.  A second child protection investigator was assigned to the report and he began his work on the case by interviewing the mother and grandparents.  The grandparents stated that while there was a crib in the home, it was their usual practice to have the baby sleep in their bed between pillows used as braces to ensure she remained on her back.  The grandparents and the mother were all aware of the potential dangers of co-sleeping but stated they were concerned about the risk of SIDS since the baby was low-weight and had been born prematurely.  Having the baby sleep with the grandparents allowed them to monitor her more closely at night.

The second investigator ultimately unfounded the reports of Death by Neglect to the baby and Risk of Harm to the 14 year-old against the mother and grandparents.  The rationale for the decision was based on the incorrect assumption that since the medical examiner classified the baby's death as undetermined, it must have been the result of SIDS.  Deaths are designated as SIDS only after an exhaustive review of all possible contributing factors.  A diagnosis of exclusion, such as SIDS, can only be made after all other potential causes have been ruled out.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  This report should be shared with the first child protection investigator and her supervisor as a teaching tool regarding the importance of communicating with a mentally ill client's psychiatrist/therapist.** |
| --- | --- |

The report was shared with the investigator and supervisor.

**2.  This report should be shared with the second child protection investigator and his supervisor as a teaching tool regarding the difference between an undetermined death and a SIDS death.**

The report was shared with the investigator and supervisor.

DEATH AND SERIOUS INJURY INVESTIGATIONS

**DEATH AND SERIOUS INJURY INVESTIGATION 14**

| ALLEGATION | The Department failed to conduct the child protection investigation of possible medical neglect of a two year-old boy with significant health issues in a timely manner. |
|---|---|

**INVESTIGATION**    The boy had suffered a serious brain injury as a result of an accidental choking and required the use of a tube inserted into his nose to receive food and medicine. Six months after the boy was released from the hospital into the custody of his parents, the State Central Register (SCR) received a report raising concerns regarding his care as well as possible domestic violence in the home. The boy's weight had been falling and his parents were inconsistent in their descriptions of his medical care, which necessitated diligence and accuracy. It was also reported the boy's mother had been observed with numerous visible bruises at various stages of healing. The report was accepted and assigned to the Division of Child Protection for investigation.

Within the first two months of investigation, the case was transferred between three different child protection investigators whose work was overseen by four separate supervisors. The first investigator initiated her efforts on the case by going to the family home and speaking with the mother, who identified Spanish as her primary language. The first investigator attempted to utilize an interpreter through the Department's language line to conduct the interview, but noise inside the home created insurmountable interference. The first investigator informed the mother the case would be transferred to a bilingual worker and entered it into the Department's Spanish Rotation Log for reassignment, without performing any other work on the case.

The case was reassigned to a second investigator who was bilingual, however he performed no work on the case whatsoever. The second investigator's caseload at the time was in excess of the threshold established by the BH consent decree, which sets limits for appropriate investigative caseloads. The day after the case was reassigned to the second investigator, he was transferred to another regional office through a "shift bump," a process allowing employees with seniority to move into positions already filled by other workers. In an interview with the OIG, the second investigator stated he was unaware he would continue to be responsible for cases assigned to him prior to being shifted until he began his new assignment one month later. The second investigator stated he had never spoken with his supervisor regarding his transfer or the status of his cases prior to being shifted. In her interview with the OIG, the second investigator's supervisor confirmed she had not discussed the transfer with him and expressed her belief he would have been informed by either his new supervisor or a Department administrator. An OIG review of the second investigator's records found that at the time he was shifted he had 31 pending cases and was assigned 19 additional cases in his first month at the new office.

The OIG eventually received a complaint outlining concerns regarding the Department's handling of the ongoing case. Department Rule prohibits the OIG from becoming involved in a pending investigation, so the concerns were related to the Division of Child Protection. The case was again reassigned to a third investigator who was forced to initiate work on the case as if it were a new report, two months after the initial SCR call was made. The third investigator made contact with the family's pediatrician, other medical professionals and law enforcement, however her efforts were hampered by the time that had elapsed since the initial report. While the case was still pending, the mother alleged to police the father had inflicted severe physical abuse upon her on two occasions. The father admitted to the incidents and subsequently pled guilty to felony aggravated domestic battery and was sentenced to five years in prison.

The third investigator ultimately indicated the report against the father for Medical Neglect and Failure to

Thrive based on information from medical providers he had actively interfered with and resisted the requirements of the boy's treatment. The same allegations were unfounded against the mother. Although the third investigator was aware the father was incarcerated at the time the case was closed, notification that a report of child neglect had been indicated against him was sent to his last known address.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.   The Department should develop guidelines for Division of Child Protection staff clarifying responsibilities for pending investigations of investigators affected by the annual shift bump.**

A process was established in Cook County that included an assessment of pending caseloads and plan to restrict new assignments for any investigators impacted by the recent 2013 bump, so there would be no investigations assigned from multiple geographic areas. There are no issues with this bump.

**2.  The Department should review the use of the Spanish Rotation Log to determine if the monthly rate of assignments is above BH levels and in compliance with the Burgos Consent Decree.**

There are many more Cook County Spanish-speaking investigators due to the reorganization. The Regional Administrator is monitoring this issue closely.

**3.   Spanish language notification of the investigative findings should be mailed to the father at the correctional facility where he is currently being held.**

A Spanish language notification was issued.

## CHILD DEATH REPORT

Office of the Inspector General (OIG) staff investigate the deaths of Illinois children whose families were involved in the child welfare system within the preceding twelve months. OIG staff receive notification from the Illinois State Central Register (SCR) when a child dies, when the death is reported to SCR.[1] OIG staff investigate the Department's involvement with the deceased and his or her family when (1) the child was a ward of DCFS; (2) the family is the subject of an open investigation or service case at the time of the child's death; or (3) the family was the subject of an investigation or service case within the preceding twelve months.[2]  If OIG investigators learn of a child death meeting this criteria that was not reported to the SCR, staff will still investigate the death.

Notification of a child's death initiates a preliminary investigation in which the death report is reviewed, databases are searched and results reviewed, autopsy reports are requested, and a chronology of the child's life, when available, is reviewed.  The next level of investigation is an investigatory review of records in which records may be impounded, subpoenaed, or requested, and reviewed. When warranted, OIG investigators conduct a full investigation.  A full investigation usually, but not always, results in a report to the Director of DCFS.  The majority of cases are investigatory reviews of records, often including social service, medical, police and school records, in addition to records generated by the Department or its contracted agencies.

In Fiscal Year 2013 OIG staff investigated **93** child deaths meeting criteria for review, a decrease (of 13) from 106 deaths in FY 2012 and a decrease (of 20) from 113 deaths in FY 2011.[3] A description of each child's death and DCFS involvement is included in the annual report for the fiscal year in which the child died. This year's annual report includes summary information for children who died between July 1, 2012 and June 30, 2013. During this fiscal year investigatory reviews of records were conducted in 68 cases and full investigations were opened in 25 cases. Four of the full investigations have been completed with reports to the Director; 21 investigations are pending. Comprehensive summaries of death investigations reported to the Director in FY 13 are included in the Investigation section of this annual report.

Individual cases may not rise to a level necessitating a full investigation, but collectively can indicate systemic patterns or problems that require attention. OIG staff may address systemic issues through a variety of means, including cluster reports, initiatives, and trainings. Four of the pending full investigations in this annual report are to be included in a cluster report regarding referrals for child

---

[1] SCR relies on coroners, hospitals, and law enforcement in Illinois to report child deaths, even when the deaths are not suspicious for abuse or neglect.  The deaths are not always reported.  Therefore, true statistical analysis of child deaths in Illinois is difficult because the total number of children that die in Illinois each year is unknown.  The Illinois Child Death Review Teams have requested that individual county registrars forward child death certificates to SCR to compile a list of all the children who die in Illinois.  It is not known whether this is regularly occurring; in addition, some death certificates are sent to the Child Death Review Team Coordinator well after the fiscal year in which the death occurred.  The Cook County Medical Examiner's policy is to report the deaths of all children autopsied at the Medical Examiner's office.  The OIG acknowledges all the county coroners and the Cook County Medical Examiner's Office for responding to our requests for autopsy reports.

[2] Prior to August 2010, some unfounded investigations were expunged from the Department's computer system in less than one year. Therefore, not all child deaths meeting the criteria for review were brought to the attention of the OIG. In July 2010 Governor Quinn signed legislation to maintain unfounded reports for 12 months following the date of the final finding.

[3] FY 2011 saw the first increase in the number of child deaths reviewed since 2007. Child deaths meeting criteria for review: 86 in FY 2006; 111 in FY 2007; 99 in FY 2008; 89 in FY 2009; 84 in FY 2010; 113 in FY 2011. There has been a decrease since FY 2011: 106 in FY 2012 and 93 in FY 2013.

welfare services. Another is to be included in a cluster report regarding the psychiatric hospitalization of young children.

Twenty-five of the 93 deaths (27%) reviewed this fiscal year involved unsafe sleeping arrangements for 24 babies 3 days to 12 months old and one developmentally delayed 2 year old child. "Unsafe sleeping arrangements" included 22 children co-sleeping on a bed, mattress, or floor with one or more parents, siblings, or other relatives; 1 baby whose mother fell asleep with him on a couch while feeding him; 1 baby who was placed for a nap on a couch on her stomach; and 1 baby who was placed in a crib filled with multiple items.

In the 22 cases involving co-sleeping, caretakers were indicated for death by neglect in 12 of the children's deaths; in only 2 of the deaths was the caretaker confirmed to have used an illegal or prescription drug or alcohol just prior to co-sleeping. In 3 cases a caretaker(s) was indicated for substantial risk of physical injury by neglect. In 6 cases, no one was indicated for the child's death. One case is still pending. In 3 of the cases surviving siblings were placed in safety plans for 7 months,  8 months and 9 months, outside of the care of their parents, while the Department awaited completion of the infants' autopsy reports.

There is much variability in the cases in terms of who was indicated or why. Cases in which the cause of death was accidental overlay were unfounded for death by neglect while cases in which the child's cause of death was undetermined were indicated for death by neglect. A finding of death by neglect remains in the Department's Child Abuse and Neglect Tracking System for 50 years and bans caretakers from many professions working with children. The OIG is addressing the issue of sleep-related deaths in a forthcoming report.

**Summary**

Following is a statistical summary of the 93 child deaths investigated by OIG staff in FY 13, as well as summaries of the individual cases. The first part of the summary presents child deaths by age and manner of death, case status and manner of death, county and manner of death, and substance exposure status and manner of death. The second part presents a summary of deaths classified in five manners: homicide, suicide, undetermined, accident, and natural.[4]

*Key for Case Status at the time of OIG investigation:*

Ward . . . . . . . . . . . . . . . . . . . .   Deceased was a ward.

Unfounded DCP . . . . . . . . . .   Family had an unfounded DCP investigation within a year of child's death.

Pending DCP . . . . . . . . . . . . .   Family was involved in a pending DCP investigation at time of child's death.

Indicated DCP . . . . . . . . . . . ..   Family had an indicated DCP investigation within a year of child's death.

Child of Ward . . . . . . . . . . . . …   Deceased was a ward's child, but not a ward themselves.

---

[4] The causes and manners of death are determined by hospitals, medical examiners, coroners and coroners' juries.

Open/Closed Intact . . . . . . . . . .   Family had an open intact family case at time of child's death / or within a year of child's death.

Open Placement/
Split Custody…………………   Deceased, who never went home from hospital, had sibling(s) in foster care or child in care of parent with other children in foster care.

Return Home . . . . . . . . . . . . …   Deceased or sibling(s) was returned home to parent(s) from foster care within a year of child's death.

Child Welfare
Services Referral……………...   A request was made for DCFS to provide services, but no abuse or neglect was alleged.

Preventive Services/
Extended Family……………..…   Intact family services case was opened to assist family, but not as a result of an indicated DCP investigation.

Former Ward………………..…Child was a ward within a year of his/her death.

**Table 1: Child Deaths by Age and Manner of Death**

| | Child Age | Homicide | Suicide | Undetermined | Accident | Natural | Total |
|---|---|---|---|---|---|---|---|
| Months of Age | At birth | | | | 3 | 3 | 6 |
| | 0 to 3 | 2 | | 12 | 4 | 3 | 21 |
| | 4 to 6 | 2 | | 4 | 4 | 3 | 13 |
| | 7 to 11 | 3 | | 4 | 1 | | 8 |
| | 12 to 24 | 2 | | | 4 | 1 | 7 |
| Year of Age | 2 | 1 | | | 3 | 1 | 5 |
| | 3 | 2 | | | 2 | 1 | 5 |
| | 4 | | | 1 | | 1 | 2 |
| | 5 | | | 2 | 1 | | 3 |
| | 6 | | | | | | |
| | 7 | | | | | 1 | 1 |
| | 8 | | | | | 2 | 2 |
| | 9 | | | | | | |
| | 10 | | | | 1 | | 1 |
| | 11 | | | | 2 | | 2 |
| | 12 | | | | | 1 | 1 |
| | 13 | | | | | | |
| | 14 | 1 | 1 | 1 | 1 | 3 | 7 |
| | 15 | | | | 1 | | 1 |
| | 16 | 1 | 1 | | 2 | | 4 |
| | 17 | 1 | | 1 | | | 2 |
| | 18 or older | 1 | | 1 | | | 2 |
| | TOTAL | 16 | 2 | 26 | 29 | 20 | 93 |

**Table 2: Child Deaths by Case Status and Manner of Death**

| Reason for OIG investigation* | | Homicide | Suicide | Undetermined | Accident | Natural | Total |
|---|---|---|---|---|---|---|---|
| DCP | Pending | 3 | | 4 | 3 | 2 | 12 |
| | Unfounded | 3 | | 6 | 7 | 3 | 19 |
| | Indicated | 1 | 1 | 1 | 6 | 1 | 10 |
| Ward | | 3 | 1 | 3 | 2 | 6 | 15 |
| Former Ward | | 1 | | | | 1 | 2 |
| Return Home | | 1 | | 2 | 1 | | 4 |
| Open Placement/Split Custody | | 1 | | 1 | 3 | 5 | 10 |
| Open Intact | | | | 2 | 4 | 1 | 7 |
| Closed Intact | | 2 | | 2 | 3 | 1 | 8 |
| Child of a Ward | | | | | | | 0 |
| Child Welfare Services Referral | | 1 | | 4 | | | 5 |
| Preventive Services/Extended Family | | | | 1 | | | 1 |
| TOTAL | | 16 | 2 | 26 | 29 | 20 | 93 |

\* When more than one reason existed for the OIG investigation, it was categorized based on primary reason.

CHILD DEATH REPORT

**Table 3: Child Deaths by County of Residence and Manner of Death**

| COUNTY | HOMICIDE | SUICIDE | UNDETERMINED | ACCIDENT | NATURAL | TOTAL |
|---|---|---|---|---|---|---|
| Brown | | | | 1 | | 1 |
| Champaign | | | | 2 | | 2 |
| Clay | | | | | 1 | 1 |
| Cook | 10 | | 18 | 8 | 13 | 49 |
| DeKalb | | | 1 | | | 1 |
| Du Page | 1 | | | 1 | | 2 |
| Franklin | | | | | 1 | 1 |
| Gallatin | | | | 1 | | 1 |
| Jackson | | | 1 | | | 1 |
| Jefferson | | | 1 | | | 1 |
| Kane | | | | 1 | | 1 |
| Kankakee | | | | 1 | | 1 |
| LaSalle | 1 | 1 | 2 | | | 4 |
| Logan | | | | | 1 | 1 |
| Madison | 1 | | | 2 | | 3 |
| Marion | | 1 | | | | 1 |
| McLean | | | | 1 | | 1 |
| Peoria | 1 | | | 1 | | 2 |
| Randolph | 1 | | | 1 | | 2 |
| St. Clair | | | 1 | 4 | 1 | 6 |
| Sangamon | | | | 2 | | 2 |
| Union | 1 | | | | 1 | 2 |
| Wabash | | | | | 1 | 1 |
| White | | | | 1 | | 1 |
| Whiteside | | | 1 | | | 1 |
| Will | | | | 1 | | 1 |
| Williamson | | | 1 | 1 | | 2 |
| Winnebago | | | | | 1 | 1 |
| **TOTAL** | **16** | **2** | **26** | **29** | **20** | **93** |

**Table 4: Child Death by Substance Exposure and Manner of Death**

| SUBSTANCE EXPOSURE | HOMICIDE | UNDETERMINED | ACCIDENT | NATURAL | TOTAL |
|---|---|---|---|---|---|
| Child exposed at birth*** | 1 | 6 | 7 | 4 | **18** |
| Mother has history of substance abuse | 0 | 0 | 0 | 2 | **2** |

*** This includes children who tested positive for a substance at birth or whose mother tested positive for a substance at birth.  Others may have been exposed to drugs during the pregnancy, but the drug usage was not recent enough to cause the newborn or mother to test positive.

**FY 2013 DEATH CLASSIFICATION BY MANNER OF DEATH**

<u>HOMICIDE</u>
*Sixteen deaths were classified homicide in manner.*\*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Gunshot wound(s) | 3 |
| Abusive head trauma | 7 |
| Suffocation | 3 |
| Malnutrition due to neglect | 1 |
| Thermal injuries due to fire | 1 |
| Stab wounds | 1 |
| TOTAL | 16 |

*One of the deaths of wards was a delayed death

**PERPETRATOR INFORMATION:**\*

| PERPETRATOR | NUMBER |
|---|---|
| Mother | 6 |
| Father | 8 |
| Mother's Boyfriend | 1 |
| Father's Girlfriend | 1 |
| Guardian's boyfriend | 1 |
| Caretaker | 1 |
| Boyfriend's mother | 1 |
| Unknown/Unsolved | 3 |

*Some deaths have more than one perpetrator

| PERPETRATOR GENDER | PERPETRATOR AGE RANGE | CHARGES |
|---|---|---|
| Males | 19 years-43 years | Four have been charged with murder (one committed suicide in jail); one charged with involuntary manslaughter |
| Females | 14 years- 50 years | Juvenile received 5 years probation; one received 4 year sentence for child endangerment; five charged with murder; one charged with involuntary manslaughter |

CHILD DEATH REPORT

## SUICIDE
*Two children committed suicide this fiscal year. One 14 year-old shot himself, and one 16 year-old overdosed. One child was a ward; the other one's family was part of an indicated DCP investigation.*

## UNDETERMINED
*Twenty-six deaths were classified undetermined in manner.*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Undetermined | 13 |
| Sudden Unexpected Death in Infancy (SUDI) | 5 |
| Drowning | 1 |
| Cause pending | 3 |
| Substance misuse/Overdose | 2 |
| Medical conditions complicated by injuries | 1 |
| Chronic lung disease from prematurity | 1 |
| TOTAL | 26 |

## ACCIDENT
*Twenty-nine deaths were classified accident in manner.*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Asphyxia/Suffocation/Overlay/sleep related | 11 |
| Drowning | 4 |
| Motor vehicles striking children | 4 |
| Injuries from Fire | 2 |
| Stillborn/prematurity | 3 |
| Ingestion of bleach | 1 |
| Sepsis due to injuries from fall | 1 |
| Choking | 1 |
| Multiple drug toxicity | 1 |
| Hanging | 1 |
| TOTAL | 29 |

## <u>NATURAL</u>

*Twenty deaths were classified natural in manner.*

| CAUSE OF DEATH | NUMBER |
|---|:---:|
| Complications of prematurity | 7 |
| Cardiac conditions | 2 |
| Congenital abnormalities | 3 |
| Neurological disease | 2 |
| Asthma | 1 |
| Sepsis due to pneumonia | 1 |
| DiGeorge Syndrome | 1 |
| Cerebral Palsy | 1 |
| Viral infection | 1 |
| Cancer | 1 |
| **TOTAL** | **20** |

CHILD DEATH REPORT

**HOMICIDE**

| Child No. 1 | DOB 2/10 | DOD 7/12 | Homicide |
|---|---|---|---|
| Age at death: | 2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Extensive non-accidental traumatic head injuries with complications | | |
| Perpetrator: | Father | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Two-year-old medically complex child became unresponsive while being fed by his foster mother of one year. He was taken by ambulance to the hospital where he was pronounced dead.

Prior History:   When he was two months old, the child was the victim of massive head injuries by his 26-year-old father who had been caring for the child and his 3-1/2-year-old brother while their mother worked. The father was indicated for head injuries by abuse and for substantial risk of physical injury to the two children, who entered foster care. Following the child's death, the father was indicated for death by abuse. The surviving child remains in foster care and has a goal of guardianship with a maternal aunt who is his foster parent. No charges have been filed against the father related to the child's injuries or death; a police investigation remains open.

| Child No. 2 | DOB 6/11 | DOD 7/12 | Homicide |
|---|---|---|---|
| Age at death: | 13 months | | |
| Substance exposed: | No | | |
| Cause of death: | Blunt head trauma due to child abuse | | |
| Perpetrator: | Father's girlfriend | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Thirteen-month-old girl was found unresponsive by her 22-year-old father's 25-year-old girlfriend. The girlfriend reported that ten minutes after feeding the toddler chicken, she found her breathing funny and gurgling. At autopsy the toddler was found to have massive head trauma. The little girl had lived with her father and his girlfriend for 3-1/2 months prior to her death. The father last saw his daughter eight hours earlier when he left the house. The girlfriend was charged with first-degree murder. She was indicated by DCFS for death by abuse and for substantial risk of physical injury by neglect to her 3-year-old son, who is now in foster care. She subsequently gave birth to a baby in April 2013; that child is also in foster care.

Prior History:   Twenty-four days prior to her death the hotline was called by an anonymous reporter alleging that the father had left his daughter with an ex-girlfriend overnight and two days later had still not picked her up or answered his phone. The reporter said that the ex-girlfriend had contacted the mother who lived in another part of the state, who said she would come get her daughter. There was too little information and misinformation provided by the reporter to locate the toddler before her death. The father's first name and birth date were incorrect; the mother's last name was incorrect; the child's first name was misspelled and her birth date was incorrect; and the one cell phone number provided (the phone number of a friend of the mother's) continually went to a busy signal after one ring. DCFS investigators in two parts of the state attempted to locate the family by searching public aid, calling numbers in the telephone directory, and sending a letter to a woman with the same name as the reported name of the mother.

| Child No. 3 | DOB 7/12 | DOD 8/12 | Homicide |
|---|---|---|---|
| Age at death: | 3-1/2 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Suffocation | | |
| Perpetrator: | Mother & boyfriend's mother | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Three-and-a-half-week old baby died in the hospital two days after being suffocated by her mother's boyfriend's 39-year-old mother (who was not the paternal grandmother). The 14-year-old mother had run away from home with her baby and went to her 17-year-old boyfriend's house. When the maternal grandmother and police showed up at the house to look for the baby, the boyfriend's mother hid with the mother and baby in a basement crawlspace. When the baby cried, the boyfriend's mother placed her hands over the baby's mouth. After the police left and they exited the crawlspace, the baby was unresponsive. The mother was found delinquent of endangering the life and health of a child and was sentenced to 5 years probation. The boyfriend's mother was convicted of endangering the life and health of a child and was sentenced to four years in a correctional facility. Both were indicated for death by abuse.

Prior History:   In January 2012 the Department indicated a report of abuse to the 14-year-old by her 17-year-old brother, who was a ward. The abuse occurred while the siblings were staying with a sister.

| Child No. 4 | DOB 2/12 | DOD 8/12 | Homicide |
|---|---|---|---|
| Age at death: | 6-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Cerebral injuries due to subdural and subarachnoid hemorrhage due to blunt trauma to the head | | |
| Perpetrator: | Father | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death; pending child protection investigation at time of child's death | | |
| Action Taken: | Full investigation, Report to Director June 20, 2013 | | |

Narrative:      Six-and-a-half-month-old infant became unresponsive while in the care of his 19-year-old father. The father called 911 and the infant was taken by ambulance to the hospital where he was airlifted to a second hospital with massive head injuries. The infant was pronounced dead the following day. The father and 18-year-old mother had taken the infant to the emergency department the evening before he became unresponsive. They reported that the infant had fallen and cut his lip after he was propped on a couch by the father, who was watching the child while the mother was at work. The infant was observed with no neurological deficits; hospital staff recommended blood tests and x-rays, but the parents refused and left with the baby.  A nurse called the hotline and a DCFS investigator went to the home the next morning. The father did not answer the door and the DCFS investigator was still on the premises when 911 responded to the father's call. The father was indicated for death by abuse and multiple other abuse allegations. The mother was indicated for death by neglect and multiple other neglect allegations. The father was indicted by a grand jury for aggravated battery to a child and involuntary manslaughter. He is in custody awaiting trial. A second child born to the couple in March 2013 is in traditional foster care.  **See** Death & Serious Injury Investigation 4.

Prior History:   The teen parents first came to the attention of DCFS in May 2012 when they brought the baby, then 3 months old, to an emergency department with bruises they could not explain and which they believed might be caused by a bleeding disorder. A nurse called the hotline and the Department initiated an investigation of cuts, bruises, welts by abuse. Following investigation, the Department indicated an "unknown perpetrator" for the infant's bruising, recognizing that bruises on a non-mobile infant were likely inflicted. Medical professionals did not believe the parents were responsible for the injuries leading the Department to believe that another family member may have inflicted them and that no services were needed.

| Child No. 5 | DOB 12/10 | DOD 9/12 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 20 months |
| Substance exposed: | Yes, medication prescribed to mother |
| Cause of death: | Blunt head trauma due to abuse, pending |
| Perpetrator: | Mother's boyfriend |
| Reason For Review: | Closed intact family services case within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:      Twenty-month-old toddler was found unresponsive by his 67-year-old grandmother when she returned home from volunteering. The 30-year-old mother had left the toddler in the care of her 39-year-old boyfriend while she went to school. The boyfriend was charged with first degree murder and was indicated for death by abuse. The boyfriend had previously been convicted and indicated for head injuries to a 1-year-old child. The mother was unaware of her boyfriend's history. Neither the mother nor the grandmother had ever seen the boyfriend mistreat the boy. The boyfriend did not normally babysit the child, but it was the mother's first day of school and the maternal grandmother was not available. An investigation of death by neglect was unfounded against the mother.

Prior History:   Hospital staff called the hotline after the boy's birth because they learned the mother had two children in foster care in another state. A third child was in the custody of his father. The mother was indicated for substantial risk of physical injury by neglect and an intact family services case was opened. The mother and infant lived with the maternal grandmother who helped care for the child. The intact family services case was closed in June 2012. The mother began dating the boyfriend in April 2012, but the worker did not know that the mother was dating anyone.

| Child No. 6 | DOB 10/11 | DOD 9/12 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 11 months |
| Substance exposed: | No |
| Cause of death: | Suffocation |
| Perpetrator: | Mother |
| Reason For Review: | Closed child welfare services referral within a year of child's death |
| Action Taken: | Full investigation pending |

Narrative:      Eleven-month-old infant girl was taken to the hospital by her 39-year-old mother who reported she found the infant not breathing. The mother later confessed to holding her hand over the baby's mouth and nose in order to resuscitate her to get attention. The mother was charged with first degree murder. She was indicated for death by abuse and for substantial risk of physical injury by neglect to her 3-year-old child who is in the care of his father. Six weeks earlier the infant was seen in the emergency department for respiratory distress for which the mother used rescue breathing. The infant was hospitalized for 2-3 days following that incident. The OIG is conducting a full investigation of this child's death.

Prior History:   The family first came to the attention of DCFS in May 2009 following the birth of the couple's first child. Hospital staff were concerned about the parents' mental health and a request for child welfare services was made. The Department ensured that the parents were linked with services and the case was closed. In June 2010 the hotline was called after the mother was psychiatrically hospitalized for the second time in one month. The mother was indicated for substantial risk of physical injury and an intact family services case was open until February 2011. The mother participated in services and her extended family was supportive and helped care for the child. In January 2012 the mother's mental health provider called the hotline requesting support services for the family. The referral remained open for one month.

| Child No. 7 | DOB 1/12 | DOD 11/12 | Homicide |
|---|---|---|---|
| Age at death: | 9 months | | |
| Substance exposed: | No | | |
| Cause of death: | Blunt head trauma by abuse | | |
| Perpetrator: | Mother and father | | |
| Reason For Review: | Children returned home within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:      Nine-month-old reportedly became unresponsive after being given a bottle by her 36-year-old father. The father called 911 and began CPR. During transport to the hospital, emergency responders noted bilateral bruising to the infant's thighs. An MRI revealed bilateral retinal hemorrhages, massive swelling of the brain, and brain herniation. Neither the father nor the 29-year-old mother could provide an explanation for the infant's extensive brain injuries. The family elected to remove the infant from life support four days later. The Department indicated both parents for death by abuse and cuts, bruises, welts by abuse to the 9-month-old and substantial risk of physical injury by neglect to the 2-year-old sibling. The sibling was placed in relative foster care. Police investigation of the child's death remains pending and no charges have been filed. The OIG is conducting a full investigation of this child's death.

Prior History:   At the age of three months the infant sustained bilateral corner femur fractures and unexplained bruises. The parents and five relatives had provided care for the infant and the infant's 18-month-old sibling during the time when the injuries could have been inflicted. Both parents were indicated for bone fractures by abuse and cuts, bruises, welts by abuse to the infant and substantial risk of physical injury by abuse to the sibling. The children were placed in relative foster care. The parents participated in counseling and visited daily with their children. At the end of July 2012 the court returned both children home under a pre-adjudication supervision order. The Department was providing services to the family and monitoring the children at home.

| Child No. 8 | DOB 11/12 | DOD 12/12 | Homicide |
|---|---|---|---|
| Age at death: | 1 month | | |
| Substance exposed: | No | | |
| Cause of death: | Malnutrition due to neglect | | |
| Perpetrator: | Mother and father | | |
| Reason For Review: | Closed intact family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** One-month-old twin infant was taken to the hospital already deceased. He was emaciated and died from malnutrition. His 26-year-old mother and 24-year-old father were charged with felony child endangerment and involuntary manslaughter. Their criminal trials are pending. The child protection investigation remains open at the request of the state's attorney. The parents' two surviving children together, a one-month-old twin boy and a 3-year-old developmentally delayed boy, were taken into custody. The surviving twin was hospitalized and diagnosed with failure to thrive, malnutrition, and dehydration. The boys were placed in a traditional foster home together. In September 2013 the mother gave birth to an infant who was taken into custody and placed with his siblings.

**Prior History:** In November 2009 the father was indicated for environmental neglect and inadequate supervision with his then-wife to their two children. An intact family services case was opened. The father, who was noted to be cognitively delayed, moved out of the home after almost a year of services. He did not visit his children and had no contact with the worker until February 2012 when he requested visits with his children. The worker visited the father's home where he lived with his girlfriend, the deceased's mother, and found no concerns. The twins were born three months after the intact family services case was closed and DCFS had no involvement with the twins before the death.

| Child No. 9 | DOB 4/12 | DOD 12/12 | Homicide |
|---|---|---|---|
| Age at death: | 8 months | | |
| Substance exposed: | No | | |
| Cause of death: | Cerebral edema due to cerebral contusion due to fracture of the skull due to multiple blunt force injuries, with blunt force injuries of varying ages contributing | | |
| Perpetrator: | Father | | |
| Reason For Review: | Split custody (siblings in foster care) | | |
| Action Taken: | Full investigation pending | | |

**Narrative:** Eight-month-old infant became unresponsive while being cared for by his father. The father called 911 and the infant was pronounced dead in a hospital that evening. In the hospital the infant was discovered to have a skull fracture and healing rib fracture. His three surviving siblings who resided with the 26-year-old parents were medically assessed. The infant's twin brother was found to have head injuries and a 1-1/2-year-old brother was found to have a healing rib fracture. The third child, a 2-1/2-year-old sister, did not have any injuries. At autopsy the infant was found to have multiple injuries and peritonitis (painful infection of the peritoneum) likely caused from being punched in the stomach. The father was indicated for death by abuse and for the abuse of the other children. The mother was indicated for death by neglect and for the abuse of the other children. All three children entered foster care and were placed with relatives. The father was charged with murder. While in jail awaiting trial the father hung himself. His death was ruled a suicide. The OIG is conducting a full investigation of this child's death.

**Prior History:** In December 2008 the parents brought their 1-month-old son into the emergency department complaining he was constipated. Examination revealed that the infant had a complete break of his femur bone. The parents had no explanation for the injury. They were indicated for bone fractures by abuse and for substantial risk of physical injury by neglect. The baby and his two older siblings entered foster care. The parents participated in services and the four subsequently born children were allowed to remain in their custody while they worked for the return home of their other children.

| Child No. 10 | DOB 8/09 | DOD 12/12 | Homicide |
|---|---|---|---|
| Age at death: | 3 years | | |
| Substance exposed: | No | | |
| Cause of death: | Thermal injuries due to assault with an ignition of accelerant | | |
| Perpetrator: | Father | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Full investigation pending | | |

Narrative:    Three-year-old girl died in the hospital two days after her 29-year-old mentally ill father set his family on fire. Her 33-year-old mother and the father also died. Her 9-year-old brother sustained burns over 35% of his body and survived. He is in foster care with a paternal aunt. On the night of the deadly fire, the children's maternal aunt/relative foster mother permitted the mother to take the children overnight to the paternal grandmother's home where the father was living, in violation of a court order that allowed the mother day visits with the children supervised by the aunt. She also violated a court order that allowed the father to see the children only when supervised by the caseworker. The aunt was indicated for death by neglect to the deceased; burns by neglect to the surviving child; and inadequate supervision and substantial risk of physical injury by neglect to both children. The paternal grandmother was indicated for death by neglect and substantial risk of physical injury by neglect, but the findings were unfounded on appeal. The OIG is conducting a full investigation of this child's death.

Prior History:    In September 2012 the two children were taken into protective custody and placed with the maternal aunt after their father filled a bathtub with gasoline and threatened to kill himself and the children.

| Child No. 11 | DOB 6/93 | DOD 1/13 | Homicide |
|---|---|---|---|
| Age at death: | 19 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Deceased was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Nineteen-year-old ward was walking through an alley on his way to a fast food restaurant when a gunman in an SUV pulled into the alley and shot him multiple times, killing him. The teen had been on his way to pick up food for himself and his pregnant girlfriend. He was the father of a 6-month-old son. He was not believed to be gang-involved. A police investigation of the teen's murder remains unsolved but open.

Prior History:    The teen entered foster care in 2004 after being abandoned by his mother. In September 2012 he entered a transitional living program. He was enrolled in college and was receiving teen parenting services. He was visiting family at the time of his death. His worker last saw him the day before his death.

| Child No. 12 | DOB 3/10 | DOD 3/13 | Homicide |
|---|---|---|---|
| Age at death: | 3 years | | |
| Substance exposed: | No | | |
| Cause of death: | Blunt force trauma due to child abuse | | |
| Perpetrator: | Legal guardian's boyfriend | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:     Three-year-old girl was pronounced dead at the hospital after her legal guardian/aunt and her aunt's boyfriend called 911 because she was gasping for air. The aunt had been the girl's legal guardian since the girl was eight months old. The boyfriend was charged with first degree murder and is in custody awaiting trial. He was indicated for death by abuse. The aunt was indicated for death by neglect. The OIG is conducting a full investigation of this child's death.

Prior History:   In October 2010 the Department investigated the girl's mother for medical neglect. Instead of her child entering the foster care system, the mother wanted her aunt and her aunt's husband to adopt the girl. In November 2010 the aunt was granted legal guardianship for one year and the Department monitored the child in her custody for six months. The aunt contacted the Department for help when the guardianship was due to expire. The Department re-assessed the aunt and her husband; assisted them with obtaining guardianship; and monitored the family until March 2012.  In March 2013, eight days before her death, the Department received a hotline call alleging that the girl was being mistreated by her aunt's boyfriend. A child protection investigation was pending at the time of her death.

| Child No. 13 | DOB 12/95 | DOD 4/13 | Homicide |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | No | | |
| Cause of death: | Gunshot wound to the head | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Deceased was a ward within a year of his death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Seventeen-year-old former ward was shot and killed on the street at approximately 6:00 p.m. A second victim was wounded but survived. They were with a group of people who had gathered outside a party to witness a fight in the street. A semi-automatic rifle was fired into the crowd. Two brothers, 22 and 24 years old, have been charged with murder and are in custody awaiting trial.

Prior History:   The teen entered foster care in 2007 because of his mother's criminal activity. In 2010 he was given a goal of independence and in December 2012, on his 17th birthday, the court terminated the teen's wardship. He was living with his maternal grandmother at the time of his death.

| Child No. 14 | DOB 11/12 | DOD 4/13 | Homicide |
|---|---|---|---|
| Age at death: | 5 months | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to suffocation | | |
| Perpetrator: | Mother and father | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:     Five-month-old infant was taken off life support and pronounced dead four days after being brought to the emergency department with multiple head injuries including a skull fracture and severe brain swelling. The 21-year-old mother and 29-year-old father confessed that the father put his hand over the baby's mouth and nose until the child went limp and then they left the baby in the crib until they checked on her later and found her unresponsive. Both parents are charged with murder. They were indicated for death by abuse and for substantial risk of physical injury by neglect to their two surviving children, who are now in the care of the Department. The OIG is conducting a full investigation of this child's death.

Prior History:   Three months prior to the infant's death, school personnel called the hotline to report concerns about her 6-year-old sibling, who was new to the school. Staff reported that the boy had marks and bruises on his face, neck and arms and after getting sick, he expressed fear of going home early. During the investigation of cuts, bruises, welts, the child denied being mistreated and said the marks were from his 2-year-old brother. The parents denied any abuse to the boy and both the children's maternal grandmother and doctor reported good care of the children, and the investigation was unfounded.

| Child No. 15 | DOB 12/98 | DOD 6/13 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 14 years |
| Substance exposed: | No |
| Cause of death: | Multiple stab and incised wounds and combined drug intoxication |
| Perpetrator: | Mother and caretaker |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Full investigation pending |

Narrative:      Fourteen-year-old autistic boy was found in his bed stabbed to death. His 50-year-old mother and 44-year-old live-in caretaker were unconscious next to him having taken pills and left a letter explaining their actions. Both women survived and have been charged with first degree murder. They were indicated for death by abuse and for substantial risk of physical injury by abuse to the teen's 17-year-old sister who is in the care of her father. The OIG is conducting a full investigation of this child's death.

Prior History:   In January 2013 the Department opened an investigation of medical neglect to the boy by his mother because she was refusing medical treatment for the boy. During the investigation the mother caused the hotline to be called at least six times alleging misconduct by medical personnel at three different hospitals. The child was released from the hospital to the mother's care with a medical action plan and an agreement that the family would participate in home-based services. The mother was unfounded for medical neglect. DCFS offered the mother intact family services but she refused.

| Child No. 16 | DOB 10/96 | DOD 6/13 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 16 years |
| Substance exposed: | No |
| Cause of death: | Gunshot wound |
| Perpetrator: | Unknown |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:      Sixteen-year-old boy was shot and killed in an alley around 11:45 p.m. Police believe the shooting was gang-related; an investigation of the teen's murder remains unsolved but open.

Prior History:   In May 2012 the hotline received a call from a neighbor alleging that the 41-year-old mother's children went from neighbor to neighbor asking for food. An investigator observed food in the home and the 10 and 13-year-old children reported having enough to eat. The 16-year-old was in detention and the 2-year-old was too young to be interviewed. The investigation was unfounded and the family was referred to community services.

CHILD DEATH REPORT

## SUICIDE

| Child No. 17 | DOB 3/98 | DOD 9/12 | Suicide |
|---|---|---|---|
| Age at death: | 14 years | | |
| Substance exposed: | No | | |
| Cause of death: | Gunshot wound | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 18 | DOB 2/97 | DOD 4/13 | Suicide |
|---|---|---|---|
| Age at death: | 16 years | | |
| Substance exposed: | No | | |
| Cause of death: | Opiate intoxication | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

## UNDETERMINED

| Child No. 19 | DOB 4/12 | DOD 7/12 | Undetermined |
|---|---|---|---|
| Age at death: | 2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Open child welfare services referral at time of child's death | | |
| Action Taken: | To be included in a child welfare services referral cluster report | | |

Narrative:    Two-month-old infant was found unresponsive in the morning by her 56-year-old maternal grandmother. The infant had been sleeping on an adult bed with her 3 and 9-year-old siblings. This was the usual sleeping arrangement. The grandmother reported the baby never wanted to sleep in her crib. The grandmother and the baby's 24-year-old mother were indicated for death by neglect and for substantial risk of physical injury by neglect to the 2, 3, and 9-year-old siblings.

Prior History:    In late May 2012 the grandmother called the hotline to report that her daughter and four grandchildren lived with her and the mother often went out for days at a time without asking the grandmother to watch the children. The grandmother requested child welfare services, specifically counseling and housing for the mother and beds for the children. The child welfare services referral was pending at the time of the infant's death.

| Child No. 20 | DOB 8/12 | DOD 8/12 | Undetermined |
|---|---|---|---|
| Age at death: | 13 days | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Unexplained Death in Infancy (SUDI) | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Thirteen-day-old infant was found unresponsive around 8:00 in the morning by her 25-year-old mother and 24-year-old father. The baby was last seen alive by her mother who fed her a bottle around 5:00 a.m. and then placed her to sleep between herself and the father in their adult bed. A child protection death investigation was conducted and the parents were indicated for substantial risk of physical injury to the deceased and the mother's three older children because the parents had co-slept with the infant. A case was opened to provide intact family services.

Prior History:    The family has a history with DCFS dating to 2009 when the mother was indicated for substantial risk of physical injury after she and her 11-month-old son were in a car accident and the infant was discovered to be unrestrained. In October 2011 the family's landlord called the hotline to report that the building in which the family lived was unsafe for habitation because of a fire, but the family refused to leave. Investigation showed that there had been a fire but the Department of Buildings had determined the family's apartment was livable, the utilities were working, and the family was behind on their rent payments. The report was unfounded and no services were recommended.

| Child No. 21 | DOB 3/12 | DOD 8/12 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 5-1/2 months |
| Substance exposed: | No |
| Cause of death: | Undetermined |
| Reason For Review: | Indicated child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:      Five-and-a-half-month-old infant girl was found unresponsive around 4:00 a.m. by her 13-year-old cousin. The infant had been sleeping with her twin sister in a pack 'n play at their aunt's home. The cousin heard one of the twins crying and got up to check on her and found the other twin unresponsive. The twins were spending the night at the aunt's home; the mother's six other children were at the maternal grandmother's home and the mother was staying with the twins' father. The aunt's husband, who had previously been incarcerated for domestic violence against the aunt and her oldest child and indicated for the sexual abuse of another of her children, was residing in the home. The mother was indicated for inadequate supervision of the twins and for substantial risk of physical injury by neglect to two of her children. The aunt was indicated for death by neglect and for substantial risk of physical injury by neglect to her five children and the surviving twin. The mother's seven surviving children and the aunt's five children were placed in foster care where they remain.

Prior History:    In June 2012 the 35-year-old mother and the 34-year-old aunt were indicated for inadequate supervision of the deceased's twin sister. The mother went to get her hair done and took the deceased, leaving the other twin with the aunt. The aunt left the baby in the care of the 13-year-old cousin who took the baby to the beach with the baby's 7 and 11-year-old siblings who took turns watching the baby while they swam. Both the mother and the aunt were indicated for inadequate supervision of the baby five days before the baby's death. The mother was engaged in community services.

| Child No. 22 | DOB 7/12 | DOD 9/12 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 months |
| Substance exposed: | No |
| Cause of death: | Undetermined |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

CHILD DEATH REPORT

Narrative:     Two-month-old infant was found unresponsive in the morning by her 24-year-old mother. The mother had been sleeping in the same bed as the infant. The mother got up at 6:00 a.m. to get ready to take her father to work and pick up the baby's father who worked a night shift. She left around 6:30 a.m. Her 23-year-old brother stayed at home with the children. The mother believed the baby was sleeping when she left the home. When she returned the baby was unresponsive. The mother called 911 and the baby was taken to the hospital where she was pronounced dead at 7:45 a.m. An officer responding to the call described the baby as warm with blue lips. The brother reported that he checked on the baby and her 2-1/2-year-old sister while the mother was gone. The baby was sleeping in the bed on her back. Her 2-1/2-year-old sibling was sleeping on a mattress on the floor alongside the bed. The mother reported that she had found a bug in the baby's crib so she had been putting the baby to sleep in her bed. The mother was indicated for death by neglect and for substantial risk of physical injury by neglect to her two surviving children. The father was indicated for substantial risk of physical injury by neglect because he allowed the mother to sleep with the infant. A short-term intact family services case was open from January to September 2013.

Prior History:   In June 2012, prior to the infant's birth, the hotline was called with a report of a 4-year-old child outside unsupervised at almost 10:00 p.m. Investigation showed that the mother had gone out with her 2-year-old and had left her 4-year-old in the care of the child's maternal grandmother, with whom the family lived. The maternal grandmother dozed off. The child said she couldn't sleep so she went outside, but she didn't tell her grandma. The child had not previously gone outside unsupervised and police did not have any prior contact with the family. The investigator talked to the family about putting an additional lock high up on the door, and the investigation was unfounded for inadequate supervision.

| **Child No. 23** | **DOB 9/12** | **DOD 9/12** | **Undetermined** |
|---|---|---|---|
| Age at death: | 13 days | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Open child welfare services referral at time of child's death | | |
| Action Taken: | To be included in a child welfare services referral cluster report | | |

Narrative:     Thirteen-day-old baby girl was found unresponsive by her 24-year-old father and uncle when they returned home in the late afternoon. The baby was lying in bed with her 22-year-old sleeping mother. According to police, the mother said that she and the baby were sleeping at opposite ends of the bed with the baby's feet next to her head. The family moved after the baby's death and could not be located to complete a scene investigation. The baby's cause of death was undetermined. An investigation of death by neglect against the mother was unfounded.

Prior History:   Two days after the baby's birth a hospital social worker called the hotline requesting services for the mother, including parenting classes and housing assistance. The referral was pending at the time of the child's death. A child welfare services worker had attempted to call the mother, but she did not answer the phone. A visit to the home had not yet occurred.

| **Child No. 24** | **DOB 1/12** | **DOD 9/12** | **Undetermined** |
|---|---|---|---|
| Age at death: | 8 months | | |
| Substance exposed: | No | | |
| Cause of death: | Drowning | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Full investigation, Report to Director October 4, 2013 | | |

Narrative:      Eight-month-old baby was found unresponsive and floating in the bathtub by his 24-year-old mother when she returned home from school. The baby's 30-year-old father had left him and his 2-year-old sibling unattended in approximately 6 inches of water.  The father was indicated for death by neglect to the baby and both parents were indicated for substantial risk of physical injury by neglect to the sibling. The father was convicted of endangering the life or health of a child and sentenced to 2-1/2 years in prison. The sibling is in foster care with his maternal grandmother; he has a goal of return home to his mother who is progressing in services.

Prior History:      Five months prior to the baby's death, in April 2012, court personnel called the hotline to report an incident of domestic violence to the mother by the father while she was holding their almost three-month-old son. The mother obtained an order of protection against the father, but failed to renew it while the investigation was still pending. The father was indicated for substantial risk of physical injury by neglect and an intact family services case was opened. The parents were referred for domestic violence services, but had not followed through with the referrals before the baby died.

| Child No. 25 | DOB 11/06 | DOD 10/12 | Undetermined |
|---|---|---|---|
| Age at death: | 5-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Tramadol poisoning | | |
| Reason For Review: | Open child welfare services referral at time of child's death | | |
| Action Taken: | To be included in a child welfare services referral cluster report | | |

Narrative:      Five-and-a-half-year-old boy was found unresponsive around 11:30 a.m. by his 32-year-old mother. An autopsy and toxicology results from the boy's autopsy revealed the boy died from Tramadol poisoning. Tramadol is a pain reliever used to treat moderate to severe pain. It was prescribed to the boy's 44-year-old father and it was present in the home at the time of the boy's death. Police and child protection investigations of the boy's death are pending. The boy's 14-year-old siblings are in relative foster care and are placed with a paternal uncle.

Prior History:      In September 2012 a school social worker called the hotline requesting services for the family because of poverty. A worker attempted to visit the family in October but had an incorrect address. The worker had not yet seen the family when the boy died. The parents were previously indicated for environmental neglect in 2009.

| Child No. 26 | DOB 11/97 | DOD 10/12 | Undetermined |
|---|---|---|---|
| Age at death: | 14 years | | |
| Substance exposed: | Unknown | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Full investigation pending | | |

Narrative:      Almost 15-year-old ward was found unresponsive in his bed when staff at his residential treatment center went to wake him. At autopsy the ward had no injuries. Toxicology results did not reveal any unexpected substances in his system. The OIG is conducting a full investigation of this child's death.

Prior History:      In April 2011 the boy's 44-year-old father struck the boy in the face and threatened to do so again in the future. The father was arrested and jailed. Following treatment for his facial injury, the boy's mother refused to let him back in the home because of his behavior. The father was indicated for substantial risk of physical injury by abuse. The mother was indicated for lock out. The boy entered the Department's care on a dependency petition and was placed in the residential treatment facility where he remained until his death. He and his parents were working toward his return home.

| Child No. 27 | DOB 10/08 | DOD 10/12 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 years |
| Substance exposed: | No |
| Cause of death: | Congenital hydrocephalus with injuries of varying ages a significant contributing factor |
| Reason For Review: | Child returned home within a year of child's death |
| Action Taken: | Full investigation pending |

Narrative:    Four-year-old medically complex ventilator-dependent boy with a history of seizures was found unresponsive around 10:00 p.m. on the floor after his 23-year-old mother and 22-year-old father heard him fall out of bed. His parents called 911 and the boy was pronounced dead at the hospital. The boy had multiple bruises, abrasions, and scars on his body and a laceration on his inner lower lip. The parents reported that he had fallen out of bed three or four times throughout the day on the day of his death. The police did not pursue an investigation of the child's death. The Department indicated the parents for death by neglect, cuts, bruises, and welts by abuse, and for substantial risk of physical injury by neglect to the surviving 2-year-old sibling. The Department took protective custody of the sibling, but the court denied temporary custody, instead ordering the family to participate in intact family services. The court case and intact family services case were closed in March 2013. The OIG is conducting a full investigation of this child's death.

Prior History:    A preventive services case was open from January 2011 until April 2011 when the Department investigated and indicated a report of medical neglect against the parents. The deceased was placed in a children's hospital where he remained for one year. Upon his release from the hospital, he was returned home under an order of protection. His parents were involved in his medical care and he was receiving in-home nursing services. His court case was closed two weeks before his death.

| Child No. 28 | DOB 9/12 | DOD 11/12 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 7 weeks |
| Substance exposed: | No |
| Cause of death: | Sudden Unexplained Death in Infancy |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:    Seven-week-old infant was found unresponsive around 7:30 a.m. when her 28-year-old mother awoke to feed her. The mother last saw the infant alive around 3:15 a.m. when she placed the baby to sleep in her car seat. The baby was placed on her back in an upright sitting position with a receiving blanket and a fleece blanket over her up to her waist. The mother slept on a mattress next to her. The baby was found in the same position as when she was placed to sleep.

Prior History:    In April 2012 the hotline was called by a hospital concerned that the mother had driven herself and three of her children to the emergency department while she was intoxicated. Investigation uncovered that the mother had been celebrating Easter with her family when she started experiencing abdominal pain and vaginal bleeding. Her god-brother drove her to the hospital and her mother came later with the children. The mother found out that she was pregnant with the deceased. The investigation was unfounded for inadequate supervision and substantial risk of physical injury by neglect.

| Child No. 29 | DOB 10/12 | DOD 11/12 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 1 month |
| Substance exposed: | No, however, mother tested positive for cocaine at time of birth |
| Cause of death: | Undetermined |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:     One-month-old infant was found unresponsive around 3:15 in the morning by her 27-year-old mother. The mother had placed the baby to sleep in her car seat in the living room around midnight after feeding her. She and the baby's maternal grandfather sat together on the couch in the living room watching TV and fell asleep. No cause of death could be determined. The mother was unfounded for death by neglect but was indicated for substantial risk of physical injury because of her substance abuse. A case was opened to provide intact family services including substance abuse treatment because the mother wanted to get clean and resume care of her children. The mother successfully participated in treatment and the case was closed in July 2013.

Prior History:    An investigation of substantial risk of physical injury/environment injurious to health and welfare was initiated when the baby was born. The mother tested positive for cocaine at the time of the baby's birth. While the baby did not test positive, she appeared to be exhibiting withdrawal symptoms. The investigation was pending at the time of the baby's death. The child protection investigator had put a safety plan in place whereby the mother was not to have any unsupervised contact with the newborn until the mother was engaged in substance abuse treatment. The maternal grandmother and maternal grandfather, who lived in separate homes, were responsible for the care of the baby under the safety plan. The maternal grandfather was already the primary caregiver for two of the mother's older children and two other children lived with paternal relatives.

| Child No. 30 | DOB 10/12 | DOD 11/12 | Undetermined |
|---|---|---|---|
| Age at death: | 1 month | | |
| Substance exposed: | Yes, marijuana | | |
| Cause of death: | Sudden Unexplained Death in Infancy (SUDI) | | |
| Reason For Review: | Open child welfare services referral at time of child's death; unfounded child protection investigation within a year of child's death | | |
| Action Taken: | To be included in a child welfare services referral cluster report | | |

Narrative:     One-month-old infant was found unresponsive around 10:00 a.m. by her mother. The infant had slept most of the night in her car seat but in the early morning she became fussy and the father placed her next to the mother in a king-sized bed and went to sleep in the living room. The mother got up around 10:00 a.m. to take a shower and the father laid down in the bed. When the mother got out of the shower, the baby was unresponsive. The baby was on her back, swaddled, in the same position she had been left. Both parents denied overlaying the baby. The parents were unfounded for death by neglect. They were indicated for substantial risk of physical injury by neglect to the mother's surviving six children. An intact family services case was opened. Both parents participated in services and the case will be closed soon.

Prior History:     The mother has a history with DCFS dating to 2008 when she was indicated for inadequate supervision, inadequate shelter, and environmental neglect to three of her four children. The two fathers of the four children took custody of the children; one of the fathers had already been trying to get custody at the time of the report. In May 2012 the children were back in the mother's custody when she was accused by an anonymous reporter of leaving her children home alone while she worked and allowing them to play outside unsupervised until 4:00 a.m. The mother, who was unemployed, denied the allegations. She believed the report was by her landlord. During the investigation the mother moved with her six children, ages 11 months to 12 years, to the children's maternal grandmother's home. The verbal children denied the allegations. The maternal grandmother vouched for the mother's good care of the children and said she was responsible for them when the mother went out. In October 2012 the mother gave birth to her seventh child. The infant tested positive for marijuana and a hospital nurse requested services for the family. A child welfare services referral was pending at the time of the baby's death.

| Child No. 31 | DOB 8/12 | DOD 11/12 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 months |
| Substance exposed: | Yes, marijuana |
| Cause of death: | Sudden Unexplained Death in Infancy (SUDI); co-sleeping with an adult was noted to be a significant condition |
| Reason For Review: | Sibling returned home within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:    Three-month-old infant was found unresponsive around 6:00 a.m. by her 33-year-old father. The father had gone to sleep with the baby on an adult mattress on the living room floor around 2:30 a.m. The baby was placed to sleep on her back on the side of the mattress pushed up against the wall. The father reported she rolled to her side and touched his face. The father, who was living with his sister and was a regular caregiver of the baby, was indicated for death by neglect to the baby. The baby's mother reported advising the father not to sleep with the baby; the father's sister had provided a pack 'n play for the baby and advised the father to use it; and the mother of the father's older child said she had warned him of the dangers of co-sleeping when he slept with their child. The father reported that he was not aware of the dangers of co-sleeping. He denied being under the influence of drugs at the time of the baby's death, but he tested positive for cocaine, marijuana, and prescribed benzodiazepines so it could not be ruled out.

Prior History:    The baby's half-sister entered foster care in August 2011 when she was 5 months old because the mother had failed to take the child to several scheduled appointments to assess her for sickle cell disease. The mother engaged in services and the child was returned to her mother's custody in March and to her guardianship in November, five days prior to the baby's death. The family's caseworker discussed safe sleep practices with the mother and provided her with a pack 'n play. A caseworker saw the baby with the mother in August and October.

| Child No. 32 | DOB 10/12 | DOD 11/12 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 7 weeks |
| Substance exposed: | Yes, cocaine & marijuana |
| Cause of death: | Undetermined |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Full investigation, referral to Child Welfare Employee Licensure Board |

Narrative:    Seven-week-old infant was found unresponsive around 7:00 a.m. by her 23-year-old mother. The mother last saw the infant alive around 2:00 a.m. when she fed her. The family spent the night at a relative's home and the mother slept with the infant in a twin-sized bed. The baby was placed to sleep on her side; she was found on her stomach. At autopsy the infant was found to have bronchopneumonia. The surviving sibling was placed in a safety plan with his father for 9 months until completion of the infant's autopsy report. The mother was unfounded for death by neglect and for substantial risk of physical injury to her 2-year-old son.

Prior History:    When the mother was 8 months pregnant with the deceased she was unfounded for inadequate supervision of her 2-year-old son. There was a pending child protection investigation at the time of the infant's death because the infant was born substance exposed. The investigator assigned to the case had not yet seen the mother or infant when the infant died. The Department discharged the employee for negligent performance of duties. The employee had prior discipline for the same offense. The OIG investigated and filed charges to revoke the investigator's Child Welfare Employee License. In July 2013 the administrative law judge issued a recommendation of abandonment to the CWEL Board.

| Child No. 33 | DOB 4/12 | DOD 11/12 | Undetermined |
|---|---|---|---|
| Age at death: | 7 months | | |
| Substance exposed: | Yes, opiates | | |
| Cause of death: | Severe chronic lung disease due to prematurity due to intrauterine growth retardation | | |
| Reason For Review: | Open placement case | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Seven-month-old substance-exposed infant died in the hospital. She was born at 24-1/2 weeks gestation and had never left the hospital.

Prior History:     The infant's 34-year-old mother has a history with DCFS dating to 1995 when she was indicated for failure to thrive and medical neglect of her first child. The infant was the mother's seventh child. None of the mother's children are in her care. Five have been adopted and the sixth is in residential treatment.

| Child No. 34 | DOB 7/12 | DOD 12/12 | Undetermined |
|---|---|---|---|
| Age at death: | 4 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Closed intact family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Four-month-old baby born prematurely at 29 weeks gestation was found unresponsive around 8:00 a.m. Her 9-year-old sister heard her crying during the night and took her into bed with her. The infant had been diagnosed with a heart condition and sleep apnea for which she was supposed to be on a monitor. The children were being babysat by the maternal grandfather while the parents were out. The 27-year-old mother and 25-year-old father were indicated for substantial risk of physical injury by neglect to the three surviving siblings because they did not ensure that the infant was connected to her apnea monitor before leaving for the night and because of concerns of domestic violence and substance abuse. The surviving siblings were placed in the care of relatives for seven months pursuant to a safety plan until the autopsy report was received in May 2013. A case was opened to provide intact family services. In August 2013 the family moved to Indiana. The intact family services worker notified Indiana Child Protective Services and closed the Illinois case.

Prior History:     A March 2012 child protection investigation was indicated against both parents for substantial risk of physical injury because of an incident of domestic violence for which the father was arrested and placed in jail. An intact family services case was opened and the family was provided with resources for health, early intervention, and domestic violence services. The father remained out of the home and the case was closed in September 2012.

| Child No. 35 | DOB 12/12 | DOD 12/12 | Undetermined |
|---|---|---|---|
| Age at death: | 4 days | | |
| Substance exposed: | No | | |
| Cause of death: | Pending | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Four-day-old baby was found unresponsive around 7:30 p.m. by her 15-year-old mother who went to wake her for a feeding. The mother had placed the baby to sleep on an adult mattress at approximately 4:30 p.m. and reported checking on her intermittently. There was a crib in the room. The mother had taken the baby to the emergency department the day before her death because of concern that the baby was not urinating. The baby was seen by a physician who did not detect any problems and sent the mother and baby home.

**Prior History:**    In April 2012 a social worker called the hotline to report that the pregnant 14-year-old girl refused to return home to her father with whom she had lived for the past year. The girl alleged that her father was a drug dealer. She said she wanted to live with her mother. The father was unfounded for substantial risk of physical injury. He let his daughter go back to her mother. At the time of the baby's death, the girl was living with her adult sister and her sister's boyfriend and their son.

| Child No. 36 | DOB 10/95 | DOD 2/13 | Undetermined |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | Unknown | | |
| Cause of death: | Adverse effects of non-prescribed medication | | |
| Reason For Review: | Closed intact family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**    Seventeen-year-old girl was found unresponsive in a bathtub in a motel room where she had spent the night with a 35-year-old registered sexual offender. The offender called 911 and the teen was taken by ambulance to a hospital where she died four days later. The teen had large amounts of alcohol, marijuana, and insulin in her system. The teen is diabetic, she was not. The offender was charged with and convicted of violating the sexual offender registration act and sentenced to two years imprisonment.

**Prior History:**    The teen has a long history of sexual victimization from about the age of 10. As a teenager, she lived primarily with her maternal grandparents. In 2010 she miscarried a baby. In 2012 she injected herself with a relative's insulin and required hospitalization. An intact family services case was recommended following that incident. The grandparents initially agreed to services, but withdrew after several weeks.

| Child No. 37 | DOB 6/12 | DOD 2/13 | Undetermined |
|---|---|---|---|
| Age at death: | 8 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Closed preventive services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**    Eight-month-old medically complex twin who was born prematurely at 28 weeks was found unresponsive at approximately 4:30 a.m. when her 48-year-old father checked on her. At about 11:00 p.m. the previous night, the 31-year-old mother laid down with the baby on her queen-sized bed and began feeding the baby through her feeding tube. The mother fell asleep while feeding the baby. When the father found the baby she had milk all over her face. He reported that the baby was on one side of the bed while the mother was on the other side. The mother was unfounded for death by neglect to the baby and unfounded for substantial risk of physical injury by neglect to her four surviving children.

**Prior History:**    In August 2012 the mother contacted the hotline at the suggestion of a hospital social worker. The family had to move to a larger apartment with the birth of twins in June and the mother requested assistance obtaining beds for her three children and cribs for her infant twins. A preventive services case was open for one month. The Department provided the family with bunk beds and portable cribs for the infant twins. The worker discussed safe sleep with the mother, including the risks of co-sleeping.

| Child No. 38 | DOB 12/12 | DOD 2/13 | Undetermined |
|---|---|---|---|
| Age at death: | 2-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Closed child welfare services referral within a year of child's death | | |
| Action Taken: | Investigatory review of records, referral to Chicago Department of Family Support Services | | |

Narrative:    Two-and-a-half-month-old infant was found by her father unresponsive on her back around 7:00 a.m. when he awoke to go meet a friend. The family of eight was staying in a room at a shelter and the baby slept between her 29-year-old mother and 28-year-old father in two twin beds pushed together. Her 1-1/2-year-old brother slept in a car seat. There was no crib in the room. The father reported smoking marijuana and staying awake until 4:00 a.m. playing video games. The infant, who had a cold and was congested, was last seen alive at 4:00 a.m. when the mother fed her and laid her back down to sleep. Both parents were indicated for death by neglect. They were unfounded for substantial risk of physical injury by neglect to their surviving children.

Prior History:    In December 2012 a hospital social worker called the hotline to advise that the mother had just given birth and the family, who lived in a shelter, was in need of baby items including a crib and a car seat. A DCFS worker called the shelter to speak with the family, but got a call back from the family's shelter caseworker who wanted to talk to her client first because she thought they might be upset that DCFS was calling. Three days later the shelter caseworker told the DCFS worker that the family was not interested in receiving DCFS assistance.

| Child No. 39 | DOB 10/12 | DOD 2/13 | Undetermined |
|---|---|---|---|
| Age at death: | 4 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:    Four-month-old baby was found unresponsive around 8:00 a.m. by her 31-year-old mother. The baby was found face up in the mother's queen-sized bed where she regularly slept. There was no crib in the home. At autopsy the infant was found to have congenital heart disease which likely contributed to her death, but because overlay could not be excluded, the cause and manner of death were undetermined. At death the baby had severe untreated eczema. The mother was indicated for death by neglect and medical neglect and for substantial risk of physical injury by neglect and environmental neglect to the three surviving siblings. The father was indicated for substantial risk of physical injury by neglect to the surviving siblings who are in foster care with a maternal aunt. The OIG is conducting a full investigation of this child's death.

Prior History:    There was a child protection investigation pending for three weeks at the time of the infant's death. In January 2013, the father of the youngest child and the unborn infant called the hotline to report the mother left the children, ages 10, 2 and almost 2, at home alone while she visited him; that her home was filthy; and that the children complained of being hungry. Despite phone attempts and in-person visits to the home, the child protection investigator had gotten no response from the mother and had not seen the children or been in the home when the baby died. After the baby's death the investigation was indicated for environmental neglect.

| Child No. 40 | DOB 8/12 | DOD 3/13 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 7 months |
| Substance exposed: | No |
| Cause of death: | Undetermined |
| Reason For Review: | Open intact family services case at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:      Seven-month-old infant was found unresponsive around 9:30 a.m. by his father. The infant had been sleeping on his stomach between his 26-year-old mother and 34-year-old father on a full-sized bed. He was last seen alive around 7:30 a.m. when he was given a bottle. There was a bassinet in the home. The infant had been diagnosed with RSV (respiratory syncytial virus) two months prior. The parents were indicated for death by neglect and for substantial risk of physical injury by neglect to the mother's surviving children, ages 10 and 11. The two surviving siblings were placed with one of the children's fathers under a safety plan while DCFS awaited the autopsy report. The family decided it was best for him to continue to care for both children. DCFS provided the father with intact family services while he sought full custody of his child and guardianship of the other. The case was closed in December 2013.

Prior History:    In June 2012 an intact family services case was opened after the mother was indicated for substantial risk of physical injury by neglect to her two children because of an incident of domestic violence between her and the deceased's father. The couple was participating in services at the time of the infant's death. The intact family services worker had discussed safe sleep with the mother.

| Child No. 41 | DOB 12/07 | DOD 3/13 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 5 years |
| Substance exposed: | No |
| Cause of death: | Pending |
| Reason For Review: | Child was a ward |
| Action Taken: | Full investigation pending |

Narrative:      Five-year-old boy died in the hospital after becoming unresponsive in his foster home. His 22-year-old maternal aunt/foster parent reported that she heard a loud noise in the bathroom and found the boy on the floor vomiting and having what appeared to be a seizure. The 5-year-old did not have a previously diagnosed seizure disorder. At the time of his death, the boy had numerous bruises on him that the aunt said were self-inflicted and inflicted by the boy's 9-year-old brother. The boy's autopsy report, police and child protection investigations are pending. Following the boy's death, the foster parent's two children, ages 5 months and 2-1/2 years, were placed in foster care, but returned to their parents' care in August 2013 pursuant to a court order that the mother have no unsupervised contact with the children. The boy's two siblings remain in foster care; one is with his paternal grandmother and the other is in a non-relative foster home. The OIG is conducting a full investigation of this child's death.

Prior History:    The boy and his two older brothers entered foster care in January 2012 after an incident of domestic violence to the middle brother by the mother. The 25-year-old mother and 37-year-old father have a history of substance abuse and domestic violence.

| Child No. 42 | DOB 3/94 | DOD 4/13 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 19 years |
| Substance exposed: | Unknown |
| Cause of death: | Pending |
| Reason For Review: | Deceased was a ward |
| Action Taken: | Full investigation pending |

Narrative:      Nineteen-year-old Type I diabetic ward was found deceased in her bed early in the morning at her residential treatment facility. The OIG is conducting a full investigation of this child's death.

Prior History:   The teen entered foster care for the first time in 1996 when she was two years old. She lived in four traditional foster homes before returning to her father's care in 2001. Her siblings remained in foster care until 2004 when they were placed in the subsidized guardianship of a paternal relative. The teen reentered foster care in 2006 at the age of 11 when, following a hospitalization, her father refused to allow her to return home.

| Child No. 43 | DOB 12/12 | DOD 5/13 | Undetermined |
|---|---|---|---|
| Age at death: | 5 months | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Unexplained Death in Infancy (SUDI) | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:  Six-month-old infant who was born prematurely was found unresponsive in bed with his 35-year-old mother and 5-year old sibling. The mother had breastfed the infant around 9:00 p.m. and laid him between herself and the sibling. She woke up around 3:00 a.m. and found the baby not breathing. She placed the baby in his crib and called 911. The mother was indicated for death by neglect. She reported that she had been advised by the baby's primary care physician and child protection investigators that she should not co-sleep with the baby. During the investigation the father of the sibling sought and was awarded custody of the child in domestic relations court. The OIG is conducting a full investigation of this child's death.

Prior History:   The mother has a history with the Department dating to 2008 when an investigation was unfounded for environmental neglect. A 2009 investigation was unfounded for a bruise on her four-year-old son's face. A witness said the child fell while jumping on the couch. This child later went to live with his father. In 2011 the mother reported that her then four-year-old daughter had been molested. The report was unfounded after the child denied being molested during a forensic interview. Shortly after the birth of the deceased, hospital staff called the hotline reporting that the mother was acting strangely and threatening to take the premature baby out of the hospital against medical advice. The mother voluntarily underwent two mental health assessments and was not considered to be a risk to the infant. The maternal grandfather assisted the mother in the care of the infant and his sibling and the investigation was unfounded. A month prior to the infant's death, a pizza delivery man called emergency services to report the mother was passed out on a couch with the baby. Police released the baby and his 5-year-old sibling to the care of their grandfather. The report was pending at the time of the infant's death. The mother was subsequently indicated for inadequate supervision. She has no children in her care; both surviving children are in the custody of their fathers.

| Child No. 44 | DOB 4/13 | DOD 6/13 | Undetermined |
|---|---|---|---|
| Age at death: | 1-1/2 months | | |
| Substance exposed: | Yes, opiates | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      One-and-a-half-month-old infant died in the hospital several hours after being discovered unresponsive by his 34-year-old mother. The mother fed the baby at 4:00 am and laid him face up on top of a pillow with a pacifier in his mouth, next to her on a queen-sized mattress. When the mother awoke at 9:00 am the baby was lying between her and the pillow and was unresponsive. The mother was indicated for death by neglect to the infant and for environmental neglect to her surviving eight children. A short-term intact family services case was opened to help the mother secure appropriate housing.

Prior History:   There was one unfounded child protection investigation involving the family. When the deceased was born in April 2013, he and the mother tested positive for opiates and the Department opened an investigation for substance misuse. The investigation was unfounded after the investigator verified that the mother had a valid prescription for opiate-based pain medication for a broken finger she suffered while pregnant. During the investigation, the investigator provided the mother with a portable crib for the baby.

## ACCIDENT

| Child No. 45 | DOB 12/11 | DOD 7/12 | Accident |
|---|---|---|---|
| Age at death: | 6-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to prone sleeping position on a couch | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:   Six-and-a-half-month-old infant died in the hospital 10 days after being found unresponsive during a nap by her 27-year-old foster mother. The 27-year-old foster father had come home from work for lunch. The infant was tired and fussy, so he placed her on her stomach on the sofa to take a nap. The sofa was an L shape and she was placed in the corner with her face facing the back of the sofa. The foster father pushed the ottoman up against the sofa with some cushions to prevent the infant from rolling off the sofa while she slept. The foster father then made a sandwich and went back to work. The foster mother checked on her about a half hour later and found her in the same position unresponsive. The foster mother started CPR and called 911. The baby suffered brain injury related to a lack of oxygen. She was placed on life support which was removed 10 days after the incident. The baby died a little over an hour later. Her mother and grandmother were with her. The foster parents were indicated for death by neglect and for substantial risk of physical injury by neglect to their 2-1/2-month-old infant. The couple's foster home license is pending revocation because of the indicated findings against them.

Prior History:   The baby girl's biological parents had three children removed from their custody in January 2010; those children were adopted by foster parents in July 2012. A fourth child, born in December 2010, was placed with the foster parents with whom the deceased was later placed. The biological parents surrendered their rights to the baby boy so the foster parents could adopt him. The adoption was finalized a couple of weeks prior to the baby girl's death. The biological parents were engaged in services and were making progress toward regaining custody and guardianship of their daughter.

| Child No. 46 | DOB 12/10 | DOD 7/12 | Accident |
|---|---|---|---|
| Age at death: | 1-1/2 years | | |
| Substance exposed: | Yes, cocaine | | |
| Cause of death: | Multiple injuries due to minivan striking pedestrian | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      One-and-a-half-year-old toddler died after she was struck by a minivan driven by her 40-year-old mother. The mother's children were playing outside and the mother was backing up the minivan to move it to the other side of the driveway. She did not see the toddler behind the van. A blood test following the accident revealed the mother had been drinking and her blood alcohol concentration level was over the legal limit. The mother was charged with felony aggravated DUI leading to the death of another. She was indicated for death by neglect and for substantial risk of physical injury by neglect to her surviving children. The family already had an intact family services case open. The surviving elementary school-aged children participated in a grief therapy group at school; the high school-aged child attended counseling with her school social worker; and the family received supportive services from their church. The Department continued to provide services including substance abuse treatment and parenting education until the case was closed in July 2013.

Prior History:      The family first came to the Department's attention when the mother gave birth to her first substance-exposed infant, her fifth child, in March 2006. An intact family services case was open until January 2007 when the mother stopped participating in services. The children were cared for by their father and paternal grandmother. In December 2010 the deceased was born substance-exposed and a second intact family services case was opened. Both parents participated in services. In the month prior to the toddler's death, the mother was noted to have completed treatment and been sober for over a year; drug testing that included screening for alcohol had been negative.

| Child No. 47 | DOB 12/01 | DOD 7/12 | Accident |
|---|---|---|---|
| Age at death: | 10 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple injuries sustained from a motor vehicle striking a bicyclist | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Ten-year-old boy died at the hospital where he was taken after being hit by a car. The boy was riding his bicycle with a friend on a weekend afternoon when a 17-year-old driver of a car going in the opposite direction lost control of the car and hit the boy.

Prior History:      In June 2011 the boy's 27-year-old mother and her 38-year-old boyfriend engaged in an act of domestic violence in front of the boy and his 4-year-old sibling. The police were involved and the mother sought an order of protection. Both the mother and her boyfriend were indicated for substantial risk of physical injury by neglect and the mother, who was pregnant, was referred for domestic violence counseling services.

| Child No. 48 | DOB 4/96 | DOD 7/12 | Accident |
|---|---|---|---|
| Age at death: | 16 years | | |
| Substance exposed: | No | | |
| Cause of death: | Drowning | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Sixteen-year-old boy drowned while swimming in a large river. The boy, who was on an outing with family members and was described as an excellent swimmer, had tried to swim across the river. About halfway across, he screamed for help after being pulled under by a current. The boy's father and 15-year-old brother tried to rescue him but were unsuccessful. His body was found by a boat crew.

Prior History:      In May 2012 while he had his children for a weekend visit, the father hit his 11-year-old daughter and left bruises on her lower back and buttocks. The girl, who had been exhibiting some behavioral problems, yelled profanity at her father. The girl and her two older brothers lived with their mother, but had visitation with their father. The father was indicated for cuts, bruises and welts by abuse. He agreed to attend anger management classes and a case was opened to provide short-term intact family services.

| Child No. 49 | DOB 12/00 | DOD 7/12 | Accident |
|---|---|---|---|
| Age at death: | 11 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple injuries due to automobile striking a pedestrian | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Eleven-year-old boy died in the hospital eight days after being struck by an SUV on the Interstate. The boy was with his 15-year-old brother and an 11-year-old cousin walking along the highway when he decided to try crossing the highway instead of going over the bridge. His brother and cousin had asked him not to do it. The driver of the SUV stopped and was not charged or cited.

Prior History:      The boy and his two older brothers were in the guardianship of their maternal aunt who had cared for them since the boy was two years old. Their mother died in the summer of 2011. In April 2012, three months before the boy's death, the hotline took a report alleging sexual abuse to the aunt's 5-year-old granddaughter by the boy's 13-year-old brother during a visit in the home. The investigation was unfounded because the 13-year-old boy had never been in a caretaker role of the granddaughter and did not live in her home, making him an ineligible perpetrator by DCFS standards. DCFS referred the allegation to police and the local child advocacy center. The teen was charged with aggravated criminal sexual assault and aggravated criminal sexual abuse. His case is pending. In August 2013 he was adjudicated dependent.

| Child No. 50 | DOB 2/11 | DOD 8/12 | Accident |
|---|---|---|---|
| Age at death: | 17 months | | |
| Substance exposed: | No | | |
| Cause of death: | Pulmonary edema and congestion due to drowning | | |
| Reason For Review: | Open intact family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Seventeen-month-old girl drowned in an Illinois river while a passenger in her mother's boyfriend's truck. The 18-year-old mother and her 20-year-old boyfriend had taken the toddler with them to go fishing. When they arrived at the fishing site, the boyfriend left the car running with the mother and toddler in it while he got out to look for worms. The mother was in the front seat and the toddler was in the middle of the back seat strapped in her car seat. While in her car seat, the toddler kicked the gear shift and the car rolled downhill toward the water. The boyfriend tried to stop the truck by jumping in front of it and was run over. The mother tried to unlatch the car seat buckles, but was only successful on one. When the truck filled up with water the mother exited through the window. The boyfriend swam into the water to try to save the girl, but the truck was too far submerged. A witness to the incident called 911. Police and coroner investigation revealed the girl's legs were long enough to have kicked the manual transmission gear shift, one car seat buckle was unlatched as the mother reported, and the witness's account of events matched the couple's. A child protection investigation of the girl's death was unfounded.

Prior History:      In November 2011 the mother and the child's maternal grandfather left the child, then 9 months old, in an unlocked truck in a parking lot while they shopped in a store. A concerned citizen called the police. The mother was charged with endangering the life and health of a child. DCFS indicated the mother for inadequate supervision of her daughter and opened an intact family services case. Within three weeks of the case opening, the mother and daughter moved across the border to Kentucky to live with the baby's maternal grandmother. The Illinois worker transitioned services to Kentucky and continued to check on the safety of the child until services were in place.

| Child No. 51 | DOB 11/08 | DOD 8/12 | Accident |
|---|---|---|---|
| Age at death: | 3-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple injuries due to truck striking a pedestrian | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Three-and-a-half-year-old girl was struck by a truck and killed while crossing the street with her 21-year-old mother. The mother thought the truck had waved them across the street. Her daughter let go of her hand and ran and the truck "jack-knifed" with the side of the truck hitting the girl. The mother was investigated and unfounded for death by neglect and for substantial risk of physical injury to her two younger children.

Prior History:     An anonymous reporter called the hotline in July 2012 alleging drug activity and a lack of food in the home the mother shared with her siblings and her siblings' guardian. DCFS and criminal history checks on the household members were negative and the investigator observed food in the home. The investigator provided the family with resource information about food, housing, and social services and unfounded the investigation.

| Child No. 52 | DOB 4/12 | DOD 9/12 | Accident |
|---|---|---|---|
| Age at death: | 5 months | | |
| Substance exposed: | No | | |
| Cause of death: | Suffocation due to entrapment under a pillow | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Five-month-old baby was found unresponsive around 6:45 a.m. by his 29-year-old aunt with whom his family lived. He was found lying on his back on the floor, wedged between a couch cushion and couch pillows. There was a bed pillow covering him. The aunt reported that she fed the infant around 1:00 a.m. and placed him on his stomach on a couch cushion with couch pillows pushed up next to it. His 8-year-old sister slept next to him and it was her pillow that ended up on top of the infant. There was not a crib in the home. The aunt was indicated for death by neglect and for substantial risk of physical injury by neglect to the other children in the home. The mother was indicated for substantial risk of physical injury by neglect to her surviving children because she stayed out overnight the night of her son's death and had not left a number where she could be reached. A case was opened for short-term intact family services.

Prior History:     In June 2012 hospital personnel called the hotline to report that the infant's newborn screen was unreadable and the infant needed to be retested. Hospital staff made multiple outreach attempts, including sending a public health nurse to the home. Despite mother's assurances that she would have the screen completed, and hospital staff advising they would call the hotline if she did not, the mother did not take the baby to be retested until after DCFS became involved. An investigation of medical neglect was indicated against the 27-year-old mother. The infant tested positive for the sickle cell trait and the mother was referred to community services.

| Child No. 53 | DOB 9/96 | DOD 9/12 | Accident |
|---|---|---|---|
| Age at death: | 15 years | | |
| Substance exposed: | Unknown | | |
| Cause of death: | Pulmonary edema and congestion due to multiple drug toxicity | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Fifteen-year-old girl was found "passed out" by her 55-year-old mother around 10:00 p.m. The mother called 911 and the girl was taken to the hospital where she was pronounced dead. The mother reported the girl had been withdrawn and lethargic and did not leave the house in the two days prior to her death. Toxicology results after autopsy revealed multiple drugs in her system. She had a history of self-harm dating to age 10.

Prior History:    Both of the girl's parents, who are divorced, have extensive criminal histories. In 2006, when she was 10 years old, the girl spent four months in relative foster care after her mother was indicated for cuts, bruises, welts by abuse to her. In 2010 and 2012 the girl was the victim of domestic violence by her father. The father was arrested for domestic battery and indicated for substantial risk of physical injury by abuse. The mother reported that she kept the father from seeing the girl as much as possible.

| Child No. 54 | DOB 8/10 | DOD 9/12 | Accident |
|---|---|---|---|
| Age at death: | 2 years | | |
| Substance exposed: | No, however, mother has a history of substance abuse | | |
| Cause of death: | Asphyxia due to entrapment between mattress and wall due to co-sleeping | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death (later unfounded on appeal) | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Two-year-old girl was found trapped between the bed and the wall by her 55-year-old grandmother with whom she was sharing the bed. The child had been diagnosed with cerebral palsy, viral disease and sleep disturbances a month before her death. The grandmother was indicated for death by neglect, cuts, bruises, and welts, failure to thrive and inadequate food. An investigator had previously talked to the grandmother about sleep safety with the deceased because of her developmental delays. A sibling who was also in the care of the grandmother was placed in a safety plan with an adult sister. Following assessment, the girl was released to her mother's custody.

Prior History:    In June 2011 the mother left the children with an acquaintance who took the children to the police station saying he could not care for them. The children's grandmother took physical custody of the children and requested assistance from the Extended Family Support Program which helped her to obtain public assistance and medical cards for the children. At a doctor's appointment in February 2012, a doctor noted bruises and a lack of weight gain. The hotline was called and an investigation was indicated for medical neglect and cuts, bruises, and welts by the grandmother. The grandmother appealed the indicated findings and they were overturned in September 2012 following a hearing in which early intervention therapists and the child's treating physician testified.

| Child No. 55 | DOB 1/01 | DOD 10/12 | Accident |
|---|---|---|---|
| Age at death: | 11 years | | |
| Substance exposed: | No | | |
| Cause of death: | Sepsis due to craniocerebral injuries due to fall downstairs | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Eleven-year-old boy died in the hospital where he was being treated for complications from severe head injuries from a fall. Five months earlier, the boy was found unconscious on a tile floor at the bottom of 14 stairs in the apartment complex in which he lived. Police investigation showed that the boy had run into his apartment to ask his grandmother for a pair of flip-flops for his 13-year-old sister who was outside with friends. A few minutes after he left with the flip-flops a neighbor knocked on the grandmother's door telling her to come quick because he had discovered the boy lying at the bottom of the stairs. The flip-flops were present as were the boy's own shoes which had come off his feet. The boy was severely compromised following the fall and spent two months in the hospital on life support. He was moved to a pediatric short-term care facility for medically fragile children, but was re-hospitalized on two occasions and died while in the hospital.

Prior History:     There was a pending investigation on the family alleging sexual abuse to the deceased by a 13-year-old relative. Victim sensitive interviews of the children identified normal sexually curious behavior and the investigation was unfounded.

| Child No. 56 | DOB 7/98 | DOD 11/12 | Accident |
|---|---|---|---|
| Age at death: | 14 years | | |
| Substance exposed: | No | | |
| Cause of death: | Bronchopneumonia resulting from quadriplegia occurring due to anoxic encephalopathy sustained from an apartment fire | | |
| Reason For Review: | Closed intact family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Fourteen-year-old medically complex boy was found unresponsive in his bed around 11:00 p.m. by his 58-year-old maternal grandmother who was his guardian.

Prior History:     The boy and two of his siblings were victims of a house fire in March 2001. While hospitalized for his injuries, the boy received an incorrect dosage of morphine that caused him profound and irreparable cognitive impairment. Eight months after the fire, the mother gave birth to a substance-exposed infant. An intact family services case was opened. The mother participated in services and the case was closed in November 2003. In August 2011 the mother was arrested and charged with child endangerment after she left the boy alone in a hotel room. The boy's court-appointed guardian (who managed his financial trust from settlement of a lawsuit of the overdose), successfully sought to have the boy placed in the guardianship of his maternal grandmother. The mother was indicated for inadequate supervision and an intact family services case was opened on the mother and her two daughters. The case was closed a few months later when the girls also went to live with their grandmother.

| Child No. 57 | DOB 5/11 | DOD 12/12 | Accident |
|---|---|---|---|
| Age at death: | 19 months | | |
| Substance exposed: | No | | |
| Cause of death: | Complications of ingestion and aspiration of bleach | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Nineteen-month-old girl died in the hospital two days after drinking bleach from an open bleach bottle. The child was at her maternal aunt's home with her four siblings for a holiday party with three cousins and a second aunt. Her parents were not present. The aunt had left an uncapped bleach bottle out in the open where the child had access to it. The second aunt screamed when she saw the child pick up the bottle and drink from it. The first aunt grabbed a bottle of water and squirted it into the child's mouth and nose and stuck her finger down the child's throat to force her to throw up. 911 was called. The child had actually ingested a small amount of bleach; it was the aunt's panicked effort to induce vomiting that led to the child's aspiration of bleach, and the vomiting contributed to the child's difficulty breathing which led to her death. Most lay people do not know that vomiting is contraindicated with bleach ingestion. DCFS investigated the child's death and indicated the aunt for poison – noxious substances by neglect. The aunt was devastated by her niece's death. DCFS arranged grief counseling for all the family members.

**Prior History:** There was a pending investigation involving the child's family at the time of the child's death. Earlier that month a school social worker called the hotline with a report of inadequate shelter to the family's five children, ages 1-1/2 to 12 years, and cuts, bruises, welts to the 12-year-old. The social worker said that she had never witnessed the 12-year-old with injuries; rather the child told her that she was spanked with a switch from a tree because she did not do her chores. Investigation revealed that the 12-year-old wanted to go live with her paternal grandmother who could provide her with things her mother could not and where she would not have to do chores. The family had bought a fixer-up house that needed a lot of repairs; the father was working on them while he also worked odd jobs to make ends meet. The investigator observed the home and found it to meet minimum standards. The investigation was ultimately unfounded.

| Child No. 58 | DOB 12/12 | DOD 12/12 | Accident |
|---|---|---|---|
| Age at death: | 0 | | |
| Substance exposed: | Yes, methamphetamine | | |
| Cause of death: | Stillborn due to placental abruption likely due to methamphetamine use | | |
| Reason For Review: | Open placement case (siblings in foster care) | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Baby was stillborn at 36 weeks gestation. His 25-year-old mother's placenta abrupted, likely due to her use of methamphetamine. The Department does not investigate stillbirths.

**Prior History:** The deceased was the mother's fifth child and the third to be born substance-exposed. The mother has a long history of substance abuse, including heroin, methamphetamine, prescription drugs, and alcohol, and has been involved with the Department since 2004. None of her children are in her care. Three have been adopted and the youngest is in foster care with a goal of adoption.

| Child No. 59 | DOB 11/10 | DOD 12/12 | Accident |
|---|---|---|---|
| Age at death: | 2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Complications of anoxic brain injury due to choking on a deflated balloon | | |
| Reason For Review: | Closed intact family services case within a year of child's death | | |
| Action Taken: | Full investigation, Report to Director 6/24/13 | | |
| | *Investigation initiated by complaint prior to child's death* | | |

**Narrative:** Two-year-old medically complex child was pronounced dead in the hospital after his 23-year-old mother brought him there in respiratory distress. In June 2011 at the age of 7 months the child aspirated (inhaled) a deflated balloon leaving him unable to breathe for approximately 5 to 7 minutes resulting in anoxic (without oxygen) brain injury. **See** Death & Serious Injury Investigation 14.

Prior History:   A child protection investigation of neglect in the aspiration of the balloon was unfounded.  In December 2011 the hotline was called with concerns that the child was losing weight, the father was not following the child's medical treatment plan, and the mother was abused by the father. During the investigation the father was arrested for felony aggravated domestic battery to the mother and subsequently sentenced to five years in prison. The father was indicated for medical neglect and failure to thrive to the child. An intact family services case was opened on the mother and her two children. It was closed in September 2012 after the mother participated in domestic violence services and demonstrated that she took good care of her children.

| Child No. 60 | DOB 1/12 | DOD 12/12 | Accident |
|---|---|---|---|
| Age at death: | 11 months | | |
| Substance exposed: | No | | |
| Cause of death: | Complications of asphyxia due to unsafe sleeping position | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Eleven-month-old baby died one day after being taken by ambulance unresponsive to the hospital. The baby had been sleeping in a playpen on his stomach in the living room. His 25-year-old mother picked him up to move him to his crib upstairs and discovered him unresponsive. During a scene investigation police discovered that a blanket, pillow, stuffed animal, play mobile, plastic toy, four articles of clothing, three disposable diapers, and a package of diaper wipes had been in the playpen with the baby. A child protection investigation of the baby's death was unfounded against the mother.

Prior History:    In March 2012 police notified the hotline that the 29-year-old father of the baby had assaulted the mother while she was holding the baby. The father reportedly threw the baby onto a couch and continued to batter the mother. The police reported that the mother had sought an order of protection against the father. The mother left the father, moved in with her parents, and filed for divorce. The father, who was undocumented, fled the country. He was indicated for substantial risk of physical injury to the baby. The mother was referred to community services.

| Child No. 61 | DOB 11/12 | DOD 1/13 | Accident |
|---|---|---|---|
| Age at death: | 2-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to probable overlay | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Two-and-a-half-month-old infant was found unresponsive by her 31-year-old mother around 6:00 a.m. The mother last saw the infant alive at approximately 2:00 a.m. when she fed and changed the baby and put her to sleep next to her in a full-sized bed. The mother's 22-month-old and 3-year-old children, who normally slept in their own beds, slept at the foot of the mother's bed that night. There was a bassinet in the home. Pursuant to a safety plan, the surviving children were placed with their maternal grandmother for eight months while the Department waited for the infant's autopsy report to be completed. The mother was indicated for death by neglect and for substantial risk of physical injury by neglect to her surviving children.

Prior History:    There was an unfounded investigation involving this family prior to the infant's death. In February 2012, a paternal relative called the hotline to report the mother was an alcoholic and drug addict who left her children home alone for days. The child protection investigator interviewed a paternal aunt, the children's godmother, and the maternal grandmother. All reported seeing the family regularly and denied the veracity of the allegations. The maternal grandmother, who lived in the same building as the family, reported babysitting the children when the mother went out. The investigation of inadequate supervision was unfounded.

| Child No. 62 | DOB 5/96 | DOD 2/13 | Accident |
|---|---|---|---|
| Age at death: | 16 years | | |
| Substance exposed: | No | | |
| Cause of death: | Carbon monoxide asphyxiation due to smoke inhalation due to house fire | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Sixteen-year-old teenager died in a house fire in his adult brother's home where he and his parents were living. The teen was found in the basement of the home where he slept and where the fire originated. The cause of the fire could not be determined but it may have involved a space heater found in the basement. The teen's parents and brother escaped the fire and tried to rescue him but were forced back by heavy smoke.

Prior History:    In March 2012 an anonymous reporter called the hotline to report that the teen had bruises all over his body and was afraid of his mother. An investigator saw and interviewed the teen the following day. He denied that his mother hit him or that he was afraid of his mother, father or older brother. The family members all denied the teen was abused. The investigator did not observe any bruises on the teen and police had not had any contact with the family. The investigation was unfounded.

| Child No. 63 | DOB 11/12 | DOD 3/13 | Accident |
|---|---|---|---|
| Age at death: | 4 months | | |
| Substance exposed: | No | | |
| Cause of death: | Overlaying | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Four-month-old infant was found unresponsive on his stomach around 3:00 a.m. by his 21-year-old mother. The mother had been sleeping on the floor on a makeshift bed of blankets with her three children. The baby had been placed on his back on a pillow towards the head of the makeshift bed; the mother laid beside him; and the baby's 1 and 3-year-old siblings slept at the foot of the bed. A 5-year-old sibling slept on a couch. The family was living with extended family and the mother did not have a crib. The mother last saw the baby alive around 1:00 a.m. when she fed him a bottle. She denied rolling over on him. A child protection investigation of the child's death was unfounded. The mother was offered DCFS services which she declined. She participated in grief counseling through her church and accepted a referral to community services from the investigator.

Prior History:    There was one prior unfounded child protection investigation involving this family. In May 2012 a woman called the hotline to report that the family was homeless and the mother wasn't feeding or bathing her children. A second caller alleged the mother was a prostitute. An investigation was conducted. The evening of the report an investigator visited the family at the home of the children's maternal grandmother where the family was staying. The 3-year-old was eating and the 1-year-old was drinking a bottle. The children were clean and dressed appropriately. There was food in the home.  The 5-year-old reported that she ate every day and never went to bed hungry. The mother described being harassed by her ex-boyfriend's sisters who she believed had made the allegations. The grandmother vouched for the mother's good care of the children. The investigator spoke to the mother, who was six months pregnant, about safe sleep practices for infants.

| Child No. 64 | DOB 7/09 | DOD 3/13 | Accident |
|---|---|---|---|
| Age at death: | 3-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Hanging | | |
| Reason For Review: | Child returned home within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      3-1/2-year-old child was found unresponsive with a jungle gym climbing rope around his neck. The boy and his 23-year-old father were visiting a farm where the father and three men were working on some cars. The boy played outside the garage where the men were working, first riding a big wheel, then jumping on a trampoline and playing on a jungle gym. The men could see the child from where they worked. One of the men reported that he had cautioned the boy about playing on the trampoline only a few minutes before they found him with the rope around his neck. There was a loop (hand-made) at the end of the rope, which was around the boy's neck. The incident was believed to be a tragic accident. The boy had a witnessed history of putting electric cords and other things around his neck. A child protection investigation was unfounded and no criminal charges were brought against the father.

Prior History:   The boy was removed from his mother's care in August 2011 after investigation of a report by a nurse who observed a ligature mark on the boy's neck during a WIC (the supplemental nutrition program for women, infants, and children) appointment. In February 2012 the boy was placed in the care of his father. DCFS monitored the father and child until July 2012 when their court case was closed. The boy was involved in early intervention services. The father was aware of the child's history of putting things around his neck and had taken precautions in his home.

| Child No. 65 | DOB 3/12 | DOD 4/13 | Accident |
|---|---|---|---|
| Age at death: | 12 months | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxiation by overlay due to co-sleeping with adult | | |
| Reason For Review: | Closed intact family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Twelve-month-old boy was found unresponsive by his mother in the morning. The 33-year-old mother had brought the infant into bed with her around 5:00 a.m. when he began crying. Approximately an hour later her 3-year-old daughter went into the room and was flicking the lights on and off waking the mother who discovered she was laying on the baby. When the infant was 6 months old he had an episode in which he stopped breathing and was placed on an apnea monitor for six weeks. A drug screen on the mother was negative and she was unfounded for death by neglect. The mother was indicated for substantial risk of physical injury by neglect because of concerns about the mother's mental health, especially following the death of her baby; and truancy issues regarding her 14-year-old daughter and concerns about her mental health in dealing with the loss of her sibling. Following two months of minimal cooperation with intact family services the 3 and 14-year-old children were taken into custody and placed with their maternal grandmother where they remained for four months before being returned to their mother's care.

Prior History:   In May 2012 the mother called the hotline to inquire whether anyone had called the hotline on her and then proceeded to tell the call-taker that she lived in a trailer in which the ceiling was falling down and in which she fell through the floor. The Department investigated and indicated the mother for inadequate shelter and opened an intact family services case. The Department put a safety plan into place for the family to stay with the maternal grandmother until housing became available. In July the family moved into an apartment. The mother received homemaker services and referrals and support from the intact family services worker.

| Child No. 66 | DOB 5/13 | DOD 5/13 | Accident |
|---|---|---|---|
| Age at death: | 0 | | |
| Substance exposed: | Yes, cocaine & opiates | | |
| Cause of death: | Placenta abruptia | | |
| Reason For Review: | Open placement case (siblings in foster care) | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Newborn baby born prematurely at 36 weeks died less than an hour after birth. The 28-year-old mother admitted to using drugs and alcohol during her pregnancy, and she did not obtain prenatal care. The mother was indicated for death by neglect.

Prior History:    The mother has a history with DCFS dating to 2008 when she gave birth to her second child, the first to be born substance-exposed. She went on to have three more children, including the deceased, all of whom were born substance exposed. Two of the children are in the guardianship of a relative. The other two children are in relative foster care. They have goals of substitute care pending court determination on termination of parental rights.

| Child No. 67 | DOB 4/13 | DOD 5/13 | Accident |
|---|---|---|---|
| Age at death: | 5 weeks | | |
| Substance exposed: | Yes, benzodiazepines, opiates, oxycodone | | |
| Cause of death: | Asphyxia due to prone co-sleeping on a couch with an adult | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:       Five-week-old infant was found unresponsive by his mother's friend. The 23-year-old mother had fallen asleep while feeding the infant on a couch. When the friend walked into the home, she found the infant face down on a blanket on the couch and the mother sitting up sleeping. The mother was under the influence of pain and anti-anxiety medication that was not prescribed to her. She was indicated for death by neglect and substantial risk of physical injury by neglect. The OIG is conducting a full investigation of this child's death.

Prior History:    The child came to the attention of the Department when he was born substance-exposed. He was his mother's first child. The mother was indicated for substance misuse and agreed to participate in intact family services, including substance abuse treatment. The mother and baby lived with the mother's boyfriend who was not the father of the baby. There was a bassinet in the home.

| Child No. 68 | DOB 1/13 | DOD 5/13 | Accident |
|---|---|---|---|
| Age at death: | 4-1/2 months | | |
| Substance exposed: | Yes, methadone & marijuana, & mother admitted to opiate use | | |
| Cause of death: | Asphyxia due to overlay due to co-sleeping with adults | | |
| Reason For Review: | Split custody (sibling in foster care) | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Four-and-a-half-month-old substance-exposed infant was found unresponsive by her 20-year-old paternal aunt. The aunt had fed the baby around 3:30 a.m. and placed her back in the bed in which she was sleeping with her 20-year-old boyfriend. The aunt awoke to find her boyfriend lying on the baby. Both the aunt and her boyfriend are large individuals and the boyfriend was a heavy sleeper. They were investigated and unfounded for death by neglect.

Prior History:    The deceased was her 34-year-old mother's ninth child and her 25-year-old father's first child. The mother has a history of substance abuse and at the time of the infant's birth was in a methadone maintenance program. None of the mother's children were in her care. One had been adopted, and the others were living with relatives. The youngest, who was born substance exposed in 2011, was placed in relative foster care and had a goal of adoption. The mother was indicated for substantial risk of physical injury by neglect to the baby. The father wanted to parent the baby and she was placed in his custody. The child protection investigator assessed the father by talking to relatives; observing his home environment and supplies for the baby, including a bassinet; and conducting DCFS and criminal history checks. He had the support of his mother and sister who were willing to help him raise the baby.

| Child No. 69 | DOB 5/13 | DOD 5/13 | Accident |
|---|---|---|---|
| Age at death: | 0 | | |
| Substance exposed: | Yes, cocaine and marijuana | | |
| Cause of death: | Extreme prematurity due to placental infarct | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Baby boy born substance exposed at 20 weeks gestation lived less than two hours. The 29-year-old mother was indicated for death by neglect and for substantial risk of physical injury by neglect to her three surviving children, ages 15 months, 4 and 6 years. An intact family services case was opened and remains open.

Prior History:    In April 2013 the Department took a report alleging environmental neglect and inadequate shelter against the mother and 36-year-old father. The reporter was the landlord who planned to evict the family. An investigator visited the apartment and found it to be free of unsanitary or hazardous conditions. The family was behind on the rent. Collateral contacts with the child welfare department of the State in which the family used to live, the children's doctor, and the oldest child's school were made without concern. The family said they would go to a shelter if necessary and accepted a referral for community services.

| Child No. 70 | DOB 5/13 | DOD 5/13 | Accident |
|---|---|---|---|
| Age at death: | 3 days | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to co-sleeping and prone position on an adult bed | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Three-day-old infant was found unresponsive by his father at approximately 9:30 am. The baby had been sleeping on his stomach between his 24-year-old mother and 21-year-old father on a full-sized adult bed. A bassinet was next to the bed and the parents had been educated about safe sleep. Both parents were indicated for death by neglect. While the investigation of the baby's death was pending, a domestic violence incident occurred and the parents violated a safety plan for the mother's 10-month-old daughter. The mother was indicated for substantial risk of physical injury by neglect and the baby girl entered foster care and is placed with her maternal great-grandmother.

Prior History:    In March 2013 the mother's boyfriend (father of the deceased baby) called the hotline to report that his girlfriend threw a can opener across the room and it hit her 8-month-old baby's foot causing a cut. When interviewed by the child protection investigator, the boyfriend said he made the report because he was mad at his girlfriend. He said his girlfriend had actually tossed the can opener onto the bed and it bounced off, hitting the baby on the foot. The mother, who was interviewed separately, told the same story. The investigator observed a small, superficial scratch on the baby's foot. The investigator completed a home safety checklist and discussed safe sleep practices, and the mother was unfounded for cuts, bruises, and welts by abuse.

| Child No. 71 | DOB 9/07 | DOD 6/13 | Accident |
|---|---|---|---|
| Age at death: | 5-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Drowning with ADHD, developmental delay & possible seizure disorder significant contributing conditions | | |
| Reason For Review: | Ward | | |
| Action Taken: | Full investigation pending, to be included in a cluster report | | |

Narrative:       Five-year-old ward drowned in the bathtub while his foster mother was in an adjoining bedroom combing his sister's hair. The boy is believed to have had a seizure while in the bath tub. The foster mother reported both doors were open and she was conversing with the boy while he bathed. The boy had been evaluated for a seizure disorder one month earlier because of symptoms similar to those of his younger sister who had been diagnosed with a seizure disorder six months earlier. The Department unfounded allegations of death by neglect and substantial risk of physical injury by the foster parents because the foster parents had not yet received the results of the boy's testing and were not told to take any supervisory precautions regarding his possible seizure disorder. During the investigation the sister was removed from the home. She was returned four months later and the foster parents intend to adopt her.

Prior History:       The boy and his infant sibling entered foster care in October 2008 after their mother failed to obtain medical care for the infant. Over the next 3 years, the boy had five foster care placements. In 2012 he was psychiatrically hospitalized three times for aggressive and threatening behavior, spending 117 days hospitalized. After his third hospitalization, he was discharged to his seventh foster home, where his sister was later placed. The foster parents were committed to the children's care and planned to adopt the siblings.

| Child No. 72 | DOB 8/10 | DOD 6/13 | Accident |
|---|---|---|---|
| Age at death: | 2-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Drowning | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Two-and-a-half-year-old boy drowned in a creek. He was in a car with his 51-year-old father driving over the creek when the car was swept off the road into the water by a flash flood. The father broke a window and was attempting to get the boy out of his car seat but was unable to do so before the car was swept away.

Prior History:       In September 2012 the boy's mother called the hotline complaining about the condition of the father's home when the boy went there for visits. A report was taken for investigation of environmental neglect. A child protection investigator observed the father's home which was cluttered but not dirty. The investigator completed a home safety checklist with the father and the paternal grandfather who lived in the home and educated them about home safety. The child was observed in his mother's home and appeared healthy. The investigation was unfounded. In May 2013 the mother's boyfriend was investigated and indicated for substantial risk of physical injury to his 15-year-old son for directing him to commit a crime. The deceased was listed as a member of the boyfriend's household.

| Child No. 73 | DOB 3/13 | DOD 6/13 | Accident |
|---|---|---|---|
| Age at death: | 3 months | | |
| Substance exposed: | Yes, amphetamines | | |
| Cause of death: | Probable overlay due to co-sleeping on an adult mattress | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:       Three-month-old baby was found unresponsive around 9:00 a.m. He was sleeping in an adult bed with his 34-year-old mother and 5-year-old brother. An 11-year-old sister is in the custody of her father and was not present. The baby was last seen alive around 2:00 a.m. when his mother fed him. There was a bassinet in the home. A child protection investigation of death by neglect and substantial risk of physical injury to the two surviving siblings is pending. An intact family services case is open and the 5-year-old is being cared for by his grandparents. The OIG is conducting a full investigation of this child's death.

Prior History:   There was a pending child protection investigation when the infant died. Two-and-a-half-weeks earlier the police called the hotline to report the mother had been arrested for battering her boyfriend while holding the infant. The family lived with the maternal grandparents who agreed to care for the children. After the baby's death, the investigation was indicated for substantial risk of physical injury by neglect. The mother has a history of substance abuse and domestic violence. She was indicated for substance misuse after she gave birth to the deceased who tested positive for amphetamines.

## NATURAL

| Child No. 74 | DOB 12/99 | DOD 7/12 | Natural |
|---|---|---|---|
| Age at death: | 12 years | | |
| Substance exposed: | No | | |
| Cause of death: | Bronchial asthma | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Twelve-year-old boy was found unresponsive around 5:00 p.m. by his paternal grandmother at her home. He had undergone a breathing treatment for his chronic asthma at 10:00 a.m. that morning.

Prior History:    In September 2011 the boy's 28-year-old mother was investigated for substantial risk of physical injury to his 14-year-old sister. The children's school called the hotline reporting that the mother had allegedly threatened her daughter with a knife. The mother reported getting into an argument with her daughter over her cell phone while she was cutting up hot dogs and denied threatening her daughter with the knife she was using. The maternal grandmother, with whom the family lived, witnessed the argument and corroborated the mother's version of events. During the investigation the school voiced concern that the mother did not have an asthma action plan on file for her son. Prior to the investigation being unfounded, the investigator confirmed that the boy was receiving regular treatment for his asthma and that his mother submitted his asthma action plan to the school.

| Child No. 75 | DOB 8/98 | DOD 8/12 | Natural |
|---|---|---|---|
| Age at death: | 14 years | | |
| Substance exposed: | Yes | | |
| Cause of death: | Oromotor dysfunction, sepsis, aspiration pneumonia | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Fourteen-year-old medically complex child died in the hospital two days after being admitted for respiratory distress. The child's diagnoses included hypoxic encephalopathy, spastic quadriparesis, seizure disorder, asthma, cortical blindness, and gastric reflux with aspiration syndrome. He was non-verbal and non-mobile and required 24 hour care. He lived in a residential treatment facility and had a DNR order in place since the latter part of 2011.

Prior History:    The child's mother has a history with DCFS dating to 1994 when she gave birth to her fourth child, her first substance-exposed infant. Intact family services were provided, but the mother continued to use drugs. She gave birth to a second substance exposed infant in 1995 and her five children entered foster care in 1996. Two more substance exposed infants, including the deceased, were born in 1998 and 2002 and entered foster care following their births. The mother participated in services sporadically. Because of his special needs, the deceased always lived in residential care facilities. Five of his siblings were adopted by their maternal grandmother; the sixth sibling is in the subsidized guardianship of a paternal aunt.

CHILD DEATH REPORT

| Child No. 76 | DOB 9/12 | DOD 9/12 | Natural |
|---|---|---|---|
| 77 | | | |

| | |
|---|---|
| Age at death: | 0 |
| Substance exposed: | No |
| Cause of death: | Stillborn due to prematurity with twin gestation a significant contributing factor |
| Reason For Review: | Open placement case |
| Action Taken: | Investigatory review of records |

Narrative:      Twin babies were delivered stillborn at home at 33 weeks gestation.  The 29-year-old mentally ill mother had reportedly received prenatal care. She called 911 following the births, which occurred quickly and without notice. DCFS does not investigate stillbirths absent alleged risk to surviving siblings.

Prior History:     In March 2011 the mother was indicated for head injuries by neglect to her daughter who at 13 months old was diagnosed with a detached retina. The girl was taken into custody because the mother had no reasonable explanation for the injury, which in a young child is typically caused by shaking, and because of the mother's mental illness. The girl is placed in a relative foster home. She has a permanency goal of adoption by her foster parents.

| Child No. 78 | DOB 4/12 | DOD 10/12 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 5 months |
| Substance exposed: | No |
| Cause of death: | Prematurity |
| Reason For Review: | Pending child protection investigation at time of child's death; closed preventive services case within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:      Five-month-old twin born prematurely at 27 weeks gestation died in the hospital. The baby, who had chronic lung disease and was ventilator dependent, spent her entire life in the hospital.

Prior History:     In July 2012 the 21-year-old mother's sister called the hotline to report the mother was homeless and taking her 14-month-old daughter around town with only a diaper, and that one of the mother's twins, who were hospitalized in another part of the state, was going to be released to her in a week. The child protection investigator worked with the mother to allow her sister to assume short-term guardianship of the children until she could obtain stable housing. The investigation was unfounded and a case was opened for preventive services until the mother secured housing and community service referrals could be made. In October 2012 the mother's sister called the hotline again to report environmental neglect of the mother's apartment in which the children were supposed to live when short-term guardianship ended the following week. The hospitalized infant died while the investigation was pending. The mother was subsequently indicated for substantial risk of physical injury by neglect and an intact family services case was opened. The case remains open and the family is under court supervision.

| Child No. 79 | DOB 9/11 | DOD 11/12 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 13 months |
| Substance exposed: | No |
| Cause of death: | Multiple congenital cardiac anomalies due to DiGeorge syndrome |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:      Thirteen-month-old medically complex child with DiGeorge syndrome, a disorder caused by a defect in chromosome 22 which results in the poor development of several body systems, was found unresponsive during the night by her 25-year-old mother. The child had a medical history of heart defects, lung disease, and feeding through a nasogastric tube.

<u>Prior History</u>:    There was one prior investigation involving this family that was unfounded. In September 2012 a school counselor called the hotline alleging the mother's 5-year-old daughter spent most of the day crying because her 71-year-old great-grandmother hit her. The investigator learned that the 5-year-old and her 6 and 10-year-old siblings lived with the great-grandmother during the week so they could attend a better school and their mother could attend to the needs of their sister. The children's mother and grandmother provided support. The 5-year-old child was hit with an open hand because she did not do her homework. She did not have any injuries. The children admitted they were sometimes spanked, but denied that their great-grandmother left bruises. School personnel reported the great-grandmother appeared caring and communicated with school as needed.

| Child No. 80 | DOB 10/04 | DOD 11/12 | Natural |
|---|---|---|---|
| Age at death: | 8 years | | |
| Substance exposed: | No | | |
| Cause of death: | Neurodegenerative disorder resulting in a terminal seizure | | |
| Reason For Review: | Closed intact family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

<u>Narrative</u>:       Eight-year-old special needs boy was found deceased in his bed by his 29-year-old mother around 7:00 a.m. He was last seen alive around midnight when he woke up and his 28-year-old father put him back to bed. The boy had met his early developmental milestones. He was able to walk, talk, and run until 3 or 4 years of age when he began having seizures and experienced regression of development. He lost the ability to speak; developed gait instability with frequent falls; and was unable to maintain weight without near constant feeding efforts. He was diagnosed with a neurodegenerative disorder. The etiology of the disorder was unknown in spite of an extensive clinical neuropathologic examination.

<u>Prior History</u>:    In November 2011 the boy's father hit his eight-year-old step-daughter in the face so hard that he left bruises. The girl's mother was not home at the time. The father was charged and convicted of domestic battery. He was indicated for cuts, bruises, welts by abuse. The father cooperated with his probation and intact family services. He underwent anger management sessions and he and the mother attended therapy and worked with a homemaker on parenting techniques. Their case was closed in August 2012.

| Child No. 81 | DOB 6/12 | DOD 11/12 | Natural |
|---|---|---|---|
| Age at death: | 4 months | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxiation due to aspiration of gastric content due to gestational prematurity | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

<u>Narrative</u>:    Four-month-old medically complex infant was found unresponsive by her 21-year-old mother at approximately 3:30 a.m. when the infant's equipment monitors alarmed. The infant was born five weeks prematurely with multiple medical problems. She was hospitalized for six weeks after her birth and was in and out of the hospital during her short life. Two days before her death the infant was seen by her pediatrician for a post-hospitalization appointment.

<u>Prior History</u>:    A couple of weeks after the infant's birth the hospital called the hotline alleging the infant was abandoned because the mother had visited the infant only once since leaving the hospital after giving birth. The report was indicated for substantial risk of physical injury because the mother had not demonstrated willingness or ability to care for the child's medical needs. An intact family services case was opened. The caseworker assisted the mother with scheduling and keeping appointments, developing skills necessary to care for the infant, and building a support system. The mother cared for the infant appropriately and sought medical care when necessary.

| Child No. 82 | DOB 7/98 | DOD 11/12 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 14 years |
| Substance exposed: | No |
| Cause of death: | Cardiac arrhythmia due to congenital heart defects |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

**Narrative:**      Fourteen-year-old ward was found unresponsive around 6:30 a.m. when his maternal grandmother/foster parent went to wake him up. The teenager was born with congenital heart defects and had undergone multiple heart surgeries. The teen's pacemaker revealed he experienced cardiac arrhythmia between 1:00 and 2:00 a.m. He was last seen by his pediatric cardiologist in June 2012 and was found to be doing well.

**Prior History:**      The teen entered foster care in 2008 at the age of 9, along with seven siblings, after his mother gave birth to her third substance-exposed infant. The mother went on to have two more children, one of whom was born substance-exposed. Both were taken into custody. The nine surviving siblings remain in foster care. One has a goal of independence and the others have goals of adoption.

| Child No. 83 | DOB 7/05 | DOD 11/12 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 7 years |
| Substance exposed: | No |
| Cause of death: | Multiple congenital anomalies with bronchial asthma a contributing factor |
| Reason For Review: | Indicated child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**      Seven-year-old medically complex child died while her step-father attempted to help her breathe. The girl was playing with her 9 and 4-year-old siblings when she began pointing at her tracheostomy tube indicating she needed it suctioned. The step-father responded by suctioning the tube, then replacing it, then placing the pump over the tracheostomy when she still had trouble breathing. The 9-year-old called 911. A child protection investigation of the child's death was unfounded. The child's medical providers reported that the mother and step-father had taken excellent care of the child and the step-father responded appropriately to her difficulty breathing.

**Prior History:**   In April 2012 the girl's step-father was indicated for substantial risk of physical injury to his 10-year-old son. The son was visiting his father on his father's day off of work when the son remembered he had a therapy appointment that he did not want to miss. The father had been drinking beer and drove his son to the appointment. A staff member noticed he smelled like alcohol and believed he was intoxicated. She called the boy's mother to pick him up and offered the father a taxi which he refused. The boy's step-mother reported that she saw her husband before he left and he did not seem intoxicated. She reported that he drank on his days off and sometimes drank a lot. The step-father was indicated and agreed to complete a substance abuse evaluation for which the investigator referred him. There was no suspicion at the time of the girl's death that her step-father had been drinking.

| Child No. 84 | DOB 12/08 | DOD 12/12 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 years |
| Substance exposed: | No |
| Cause of death: | Central apnea leading to hypoxia due to encephalomoloria |
| Reason For Review: | Child was a ward |
| Action Taken: | Full investigation pending |

**Narrative:**      Four-year-old medically complex boy was found unresponsive around 4:00 a.m. by his foster mother of three years who was awakened by an alarm on one of the boy's monitoring devices. The boy had awakened agitated around 2:00 a.m. and the foster mother calmed him down and he went back to sleep. The boy had been doing well following a tonsillectomy two weeks earlier. The OIG received a request for investigation of this case.

Prior History:    The boy and his three older siblings entered foster care in July 2009 after the 3 and 4-year-old siblings were found around 9:00 a.m. wandering the street unsupervised while their 25-year-old mother was home sleeping. A registered sexual offender was living in the home and the mother had previously been told that she could not have a sexual offender living in the home with her children.

| Child No. 85 | DOB 11/10 | DOD 1/13 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 years |
| Substance exposed: | No, however, mother admitted to daily crack cocaine use until 5th/6th month of pregnancy |
| Cause of death: | Multiple congenital anomalies |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:    Two-year-old medically complex ward became unresponsive when her 37-year-old foster mother began her noon g-tube feeding. The foster mother noted that the child had seemed lethargic that morning. The child, whose diagnoses included hypoplastic left heart syndrome, cleft lip and palate, and Von Willebrand disease, spent the first three months of her life in the hospital. After her release she lived with the same foster parents until her death.

Prior History:    The child's mother has a history with DCFS dating to when she was a child. As an adult, the mother's first child was removed from her care in 2005 when he was 2 years old because of concerns about the mother's mental health and substance abuse. Her second child entered foster care in 2008 following birth because of the same concerns for which the mother had not engaged in services. Both children have been adopted.

| Child No. 86 | DOB 7/98 | DOD 2/13 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 14 years |
| Substance exposed: | No |
| Cause of death: | Cerebral palsy |
| Reason For Review: | Open placement case (sibling was a ward) |
| Action Taken: | Investigatory review of records |

Narrative:    Fourteen-year-old girl with cerebral palsy was found unresponsive in her wheelchair by her mother shortly after being given some Pedialyte through her g-tube. The girl had appeared dehydrated that morning, but was otherwise stable. The girl's 18-year-old brother was home at the time and called 911. A child protection death investigation was unfounded against the mother.

Prior History:    The 39-year-old mother of six has been involved with the Department on and off since 1996. Most recently, in May 2011, a preventive services case was opened to assist the mother in managing her 16-year-old son's behavior. In June 2012 the boy was committed to the guardianship of the Department by a juvenile delinquency court with a request that the boy be placed in a residential treatment facility. In March 2013 the boy violated his probation. The Department's guardianship was vacated and the boy was placed in juvenile detention.

| Child No. 87 | DOB 8/12 | DOD 3/13 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 6 months |
| Substance exposed: | Yes |
| Cause of death: | Congenital heart defect |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:    Six-month-old medically complex ward died in the hospital. He had been hospitalized since his birth.

Prior History:   The deceased was his 43-year-old mother's tenth child. He was the fourth to be born substance-exposed. His mother has a long history of substance abuse. Her first three children entered foster care in 1995 and subsequently born children were placed in foster care following their births. The Department offered the mother services after each child's birth, but she refused. Seven children have been adopted; one is with his biological father; and another died in the hospital six weeks after birth.

| Child No. 88 | DOB 4/13 | DOD 4/13 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 12 minutes |
| Substance exposed: | Yes, cocaine & marijuana |
| Cause of death: | Fetal demise due to premature delivery caused by acute chorioamnionitis |
| Reason For Review: | Open placement case (sibling in foster care) |
| Action Taken: | Investigatory review of records |

Narrative:       Baby boy born substance-exposed around 22 weeks gestation died 12 minutes after birth. His 23-year-old mother's water broke two days before she went to the hospital, but she did not seek medical care until she began bleeding and experiencing stomach pain. The mother was indicated for substance misuse.

Prior History:   The baby was the mother's fourth child, the third to be born substance-exposed. The mother has not parented any of her children.  The first baby was adopted by her maternal grandmother; the second baby (who was born substance-exposed in another state) was adopted by her paternal grandmother. In May 2012 the mother gave birth to her second substance-exposed infant. The mother was indicated for substance misuse and the baby was placed in foster care with the maternal grandmother. The child's case recently passed screening for expedited termination of parental rights. The grandmother plans to adopt her.

| Child No. 89 | DOB 8/09 | DOD 4/13 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3-1/2 years |
| Substance exposed: | No |
| Cause of death: | Arrhythmia due to acute respiratory distress syndrome due to human metapneumo virus infection |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:       Three-and-a-half-year-old medically complex ward died in the hospital 12 days after being taken there with a high fever from a virus. Doctors were not able to get the virus under control and a DNR (do not resuscitate) order was put into place two days before the child's death.

Prior History:   The child entered foster care after his release from the hospital following his birth because his 19-year-old mother and 20-year-old father were unwilling or unable to take care of his extraordinary medical needs. His medically complex 2-year-old sister also entered foster care at that time because her parents were not ensuring that her medical needs were being met despite intensive services provided by her medical provider. The children were placed with their paternal grandmother with whom the surviving sibling remains.

| Child No. 90 | DOB 4/13 | DOD 5/13 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 weeks |
| Substance exposed: | Yes, K2 & marijuana |
| Cause of death: | Prematurity |
| Reason For Review: | Open placement case (sibling in foster care) |
| Action Taken: | Investigatory review of records |

Narrative:      Two-week-old baby born at 28 weeks gestation died in the hospital where he had been treated since birth. His mother used marijuana and K2 (synthetic marijuana) throughout her pregnancy. She received little prenatal care. Both parents were indicated for substantial risk of physical injury by neglect.

Prior History:      The 19-year-old parents' first child entered foster care in February 2013 following an incident of domestic violence during which the mother attempted to punch the father who was holding their 15-month-old daughter and ended up hitting the baby. The baby entered foster care and was placed with a paternal aunt. Both parents were found to have substance abuse problems. The mother was charged with domestic battery. She pled guilty and was sentenced to two years of supervision. The mother was indicated for substantial risk of physical injury by abuse and cuts, bruises, welts by abuse. The father was indicated for substantial risk of physical injury by neglect. The mother is currently engaged in services, including substance abuse treatment. The father is not participating in services. The girl has a goal of return home to mother.

| Child No. 91 | DOB 11/04 | DOD 5/13 | Natural |
|---|---|---|---|
| Age at death: | 8 years | | |
| Substance exposed: | No | | |
| Cause of death: | Pancreatic neuroendocrine carcinoma | | |
| Reason For Review: | Child was a ward within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Eight-year-old former ward died from pancreatic cancer in the hospital where he had been treated for the past two weeks. The boy was diagnosed with stage IV cancer in April 2012 and had been receiving treatment for the cancer since that time.

Prior History:      The boy and his three siblings entered foster care in October 2010 after their parents were seriously injured in a fire believed to have been caused by cooking methamphetamine. The parents surrendered their parental rights to the children in December 2012. The boy was adopted by his maternal aunt in March 2013. His siblings are in the process of adoption by other relatives.

| Child No. 92 | DOB 5/13 | DOD 6/13 | Natural |
|---|---|---|---|
| Age at death: | 16 days | | |
| Substance exposed: | No | | |
| Cause of death: | Extreme prematurity | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Sixteen-day-old infant died in a children's hospital where she had been transferred after birth. The infant was born at 23 weeks gestation weighing less than 1-1/2 pounds.

Prior History:      In October 2012 an anonymous reporter contacted the hotline alleging that the 30-year-old mother sold drugs and prostituted from her home and had no food or gas in the home she shared with her 5 and 7-year-old children. The report was unfounded because there was no evidence to support the allegations. The investigator observed food in the home and saw that the heat was working. Local police had no reports suggesting the mother was selling drugs or prostituting. An earlier report in May 2012 alleging inadequate supervision of her 5-year-old daughter was also unfounded for a lack of evidence.

| Child No. 93 | DOB 5/13 | DOD 6/13 | Natural |
|---|---|---|---|
| Age at death: | 2-1/2 weeks | | |
| Substance exposed: | No (testing not completed), however, mother admitted to using cocaine and alcohol during pregnancy | | |
| Cause of death: | Congenital anomalies | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

<u>Narrative</u>:        Two-and-a-half-week-old medically complex baby died in the hospital where she had been treated since birth. The baby was born with congenital anomalies and had multiple medical problems. Her 22-year-old mother was indicated for substantial risk of physical injury by neglect because of her drug use and her failure to seek prenatal care during her pregnancy.

<u>Prior History</u>:    The family has a history with DCFS dating to May 2007 when the mother was indicated for substance misuse after giving birth to her first substance-exposed infant. The infant's maternal grandmother obtained private guardianship of her. In April 2012 the mother gave birth to her second substance-exposed infant and was indicated again for substance misuse. An intact family services case was opened but the mother was not interested in services and the case was closed three months later, when the maternal grandmother obtained private guardianship of the baby.

98

## 14-YEAR DEATH RETROSPECTIVE

**TOTAL DEATHS BY CASE STATUS FY 2000 TO FY 2013**

| FISCAL YEAR | 2000 | | 2001 | | 2002 | | 2003 | | 2004 | | 2005 | | 2006 | | 2007 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CASE STATUS | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| Ward | 29 | 30.2% | 42 | 40.8% | 23 | 23.7% | 28 | 22% | 31 | 22.3% | 37 | 26.6% | 17 | 19.8% | 24 | 21.6% |
| Unfounded DCP | 7 | 7.3% | 14 | 13.6% | 7 | 7.2% | 21 | 16.5% | 29 | 20.9% | 29 | 20.9% | 25 | 29.1% | 35 | 31.5% |
| Pending DCP | 10 | 10.4% | 6 | 5.8% | 8 | 8.2% | 15 | 11.8% | 12 | 8.6% | 15 | 10.8% | 7 | 8.1% | 16 | 14.4% |
| Indicated DCP | 8 | 8.3% | 14 | 13.6% | 9 | 9.3% | 12 | 9.4% | 6 | 4.3% | 1 | 0.7% | 1 | 1.2% | 6 | 5.4% |
| Child of Ward | 5 | 5.2% | 4 | 3.9% | 6 | 6.2% | 12 | 9.4% | 2 | 1.4% | 2 | 1.4% | 1 | 1.2% | 4 | 3.6% |
| Open Intact | 9 | 9.4% | 12 | 11.7% | 20 | 20.6% | 19 | 15% | 15 | 10.8% | 31 | 22.3% | 20 | 23.3% | 13 | 11.7% |
| Closed Intact | 5 | 5.2% | 3 | 2.9% | 7 | 7.2% | 7 | 5.5% | 13 | 9.4% | 0 | 0% | 1 | 1.2% | 2 | 1.8% |
| Open Placement/Split Custody | 13 | 13.5% | 4 | 3.9% | 9 | 9.3% | 3 | 2.4% | 17 | 12.2% | 5 | 3.6% | 4 | 4.7% | 2 | 1.8% |
| Closed Placement/ Return Home | 3 | 3.1% | 1 | 1% | 4 | 4.1% | 2 | 1.6% | 2 | 1.4% | 0 | 0% | 0 | 0% | 5 | 4.5% |
| Others | 7 | 7.3% | 3 | 2.9% | 4 | 4.1% | 8 | 6.3% | 12 | 8.6% | 19 | 13.7% | 10 | 11.6% | 4 | 3.6% |
| **TOTAL** | **96** | **100%** | **103** | **100%** | **97** | **100%** | **127** | **100%** | **139** | **100%** | **139** | **100%** | **86** | **100%** | **111** | **100%** |

FOURTEEN-YEAR DEATH RETROSPECTIVE

99

100

FOURTEEN-YEAR DEATH RETROSPECTIVE

| FISCAL YEAR | 2008 | | 2009 | | 2010 | | 2011 | | 2012 | | 2013 | | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CASE STATUS | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| Ward | 19 | 19.2% | 21 | 23.6% | 19 | 22.9% | 25 | 22.1% | 19 | 17.9% | 15 | 16.1% | 349 | 23.6% |
| Unfounded DCP | 18 | 18.2% | 19 | 21.3% | 17 | 20.5% | 23 | 20.4% | 32 | 30.2% | 19 | 20.4% | 295 | 19.9% |
| Pending DCP | 13 | 13.1% | 14 | 15.7% | 14 | 16.9% | 17 | 15% | 12 | 11.3% | 12 | 12.9% | 171 | 11.5% |
| Indicated DCP | 12 | 12.1% | 4 | 4.5% | 7 | 8.4% | 8 | 7.1% | 12 | 11.3% | 10 | 10.8% | 110 | 7.4% |
| Child of Ward | 3 | 3% | 2 | 2.2% | 7 | 8.4% | 4 | 3.5% | 1 | 0.9% | 0 | 0.0% | 53 | 3.6% |
| Open Intact | 18 | 18.2% | 12 | 13.5% | 9 | 10.8% | 21 | 18.6% | 14 | 13.2% | 7 | 7.5% | 220 | 14.9% |
| Closed Intact | 2 | 2% | 6 | 6.7% | 2 | 2.4% | 3 | 2.7% | 2 | 1.9% | 8 | 8.6% | 61 | 4.1% |
| Open Placement/Split Custody | 4 | 4% | 6 | 6.7% | 1 | 1.2% | 8 | 7.1% | 1 | 0.9% | 10 | 10.8% | 87 | 5.9% |
| Closed Placement/ Return Home | 1 | 1% | 1 | 1.1% | 5 | 6% | 2 | 1.8% | 1 | 0.9% | 4 | 4.3% | 31 | 2.1% |
| Others | 9 | 9.1% | 4 | 4.5% | 2 | 2.4% | 2 | 1.8% | 12 | 11.3% | 8 | 8.6% | 104 | 7.0% |
| TOTAL | 99 | 100% | 89 | 100% | 83 | 100% | 113 | 100% | 106 | 100% | 93 | 100% | 1481 | 100% |

**CHILD DEATHS BY DCFS CASE STATUS AND MANNER OF DEATH 2000 THROUGH 2013**

| FISCAL YEAR | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Deaths | 96 | 103 | 97 | 127 | 139 | 139 | 86 | 111 | 99 | 89 | 83 | 113 | 106 | 93 | 1481 |
| **Ward** | 29 | 42 | 23 | 28 | 31 | 37 | 17 | 24 | 19 | 21 | 19 | 25 | 19 | 15 | 349 |
| Natural | 13 | 20 | 14 | 18 | 16 | 28 | 10 | 13 | 11 | 9 | 16 | 10 | 8 | 6 | 192 |
| Accident | 6 | 9 | 3 | 3 | 3 | 1 | 2 | 6 | 5 | 4 | 1 | 3 | 2 | 2 | 50 |
| Homicide | 7 | 9 | 3 | 6 | 8 | 5 | 4 | 3 | 3 | 4 | 1 | 8 | 7 | 3 | 71 |
| Suicide | 0 | 0 | 3 | 1 | 2 | 3 | 0 | 0 | 0 | 3 | 0 | 2 | 2 | 1 | 17 |
| Undetermined | 3 | 4 | 0 | 0 | 2 | 0 | 1 | 2 | 0 | 1 | 1 | 2 | 0 | 3 | 19 |
| **Unfounded Investigation** | 7 | 14 | 7 | 21 | 29 | 29 | 25 | 35 | 18 | 19 | 17 | 23 | 32 | 19 | 295 |
| Natural | 0 | 5 | 2 | 9 | 16 | 17 | 8 | 9 | 6 | 7 | 4 | 9 | 6 | 3 | 101 |
| Accident | 2 | 6 | 0 | 6 | 8 | 8 | 8 | 16 | 7 | 7 | 4 | 7 | 13 | 7 | 99 |
| Homicide | 4 | 2 | 3 | 5 | 2 | 1 | 7 | 5 | 3 | 2 | 4 | 2 | 7 | 3 | 50 |
| Suicide | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 4 | 2 | 0 | 0 | 10 |
| Undetermined | 1 | 1 | 1 | 1 | 3 | 3 | 2 | 4 | 1 | 1 | 1 | 3 | 6 | 6 | 34 |
| **Pending Investigation** | 10 | 6 | 8 | 15 | 12 | 15 | 7 | 16 | 13 | 14 | 14 | 17 | 12 | 12 | 171 |
| Natural | 0 | 1 | 7 | 6 | 6 | 4 | 3 | 8 | 3 | 6 | 0 | 4 | 4 | 2 | 54 |
| Accident | 5 | 1 | 1 | 3 | 1 | 5 | 2 | 2 | 1 | 4 | 7 | 9 | 4 | 3 | 48 |
| Homicide | 3 | 3 | 0 | 5 | 3 | 3 | 2 | 4 | 3 | 2 | 2 | 0 | 3 | 3 | 36 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 1 | 0 | 0 | 3 |
| Undetermined | 2 | 1 | 0 | 1 | 2 | 3 | 0 | 2 | 4 | 2 | 5 | 3 | 1 | 4 | 30 |
| **Indicated Investigation** | 8 | 14 | 9 | 12 | 6 | 1 | 1 | 6 | 12 | 4 | 7 | 8 | 12 | 10 | 110 |
| Natural | 1 | 4 | 7 | 7 | 3 | 1 | 0 | 2 | 4 | 1 | 4 | 2 | 3 | 1 | 40 |
| Accident | 4 | 7 | 0 | 4 | 3 | 0 | 0 | 4 | 2 | 3 | 1 | 2 | 4 | 6 | 40 |
| Homicide | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 3 | 3 | 1 | 14 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 2 |
| Undetermined | 2 | 2 | 1 | 1 | 0 | 0 | 1 | 0 | 2 | 0 | 1 | 1 | 2 | 1 | 14 |

102

FOURTEEN-YEAR DEATH RETROSPECTIVE

| FISCAL YEAR | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Child of Ward*** | **5** | **4** | **6** | **12** | **2** | **2** | **1** | **4** | **3** | **2** | **7** | **4** | **1** | **0** | **53** |
| Natural | 3 | 1 | 1 | 6 | 1 | 2 | 1 | 2 | 1 | 0 | 3 | 2 | 0 | 0 | 23 |
| Accident | 1 | 1 | 2 | 3 | 1 | 0 | 0 | 0 | 1 | 1 | 2 | 0 | 0 | 0 | 12 |
| Homicide | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 8 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 1 | 2 | 1 | 1 | 0 | 0 | 0 | 2 | 0 | 0 | 1 | 1 | 1 | 0 | 10 |
| **Open Intact** | **9** | **12** | **20** | **19** | **15** | **31** | **20** | **13** | **18** | **12** | **9** | **21** | **14** | **7** | **220** |
| Natural | 6 | 6 | 6 | 4 | 8 | 23 | 12 | 5 | 6 | 5 | 5 | 12 | 4 | 1 | 103 |
| Accident | 0 | 5 | 7 | 10 | 1 | 5 | 3 | 4 | 4 | 4 | 1 | 3 | 5 | 4 | 56 |
| Homicide | 1 | 1 | 5 | 1 | 1 | 2 | 4 | 2 | 4 | 2 | 0 | 4 | 1 | 0 | 28 |
| Suicide | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Undetermined | 2 | 0 | 2 | 4 | 4 | 1 | 1 | 2 | 3 | 1 | 3 | 2 | 4 | 2 | 31 |
| **Closed Intact** | **5** | **3** | **8** | **7** | **13** | **0** | **1** | **2** | **2** | **6** | **2** | **3** | **2** | **8** | **62** |
| Natural | 2 | 2 | 2 | 3 | 3 | 0 | 0 | 1 | 2 | 2 | 1 | 0 | 1 | 1 | 20 |
| Accident | 2 | 0 | 4 | 1 | 5 | 0 | 1 | 1 | 0 | 1 | 0 | 3 | 1 | 3 | 22 |
| Homicide | 1 | 0 | 0 | 3 | 4 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 | 12 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 0 | 1 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 2 | 8 |
| **Open Placement/Split Custody** | **13** | **4** | **9** | **3** | **17** | **5** | **4** | **2** | **4** | **6** | **1** | **8** | **1** | **10** | **87** |
| Natural | 6 | 4 | 6 | 3 | 12 | 3 | 3 | 1 | 4 | 1 | 1 | 2 | 0 | 5 | 51 |
| Accident | 1 | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 2 | 0 | 4 | 0 | 3 | 14 |
| Homicide | 1 | 0 | 1 | 0 | 3 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 1 | 9 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 5 | 0 | 2 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 2 | 0 | 1 | 12 |
| **Closed Placement** | **3** | **1** | **4** | **2** | **2** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **12** |
| Natural | 3 | 0 | 3 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| Accident | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Homicide | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| FISCAL YEAR | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Adopted | 0 | 2 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| Former Ward | 5 | 1 | 0 | 1 | 1 | 0 | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 2 | 16 |
| Return Home | 0 | 0 | 0 | 1 | 0 | 3 | 0 | 4 | 1 | 1 | 5 | 2 | 1 | 4 | 22 |
| Homicide by a ward** | 1 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| Interstate compact | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Preventive services | 0 | 0 | 1 | 3 | 4 | 13 | 5 | 2 | 3 | 2 | 0 | 0 | 1 | 1 | 35 |
| Subsidized Guardianship | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Child of former ward | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| Extended family support | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 1 | 0 | 1 | 0 | 0 | 5 | 0 | 11 |
| Child Welfare Referral | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1 | 5 | 1 | 1 | 1 | 5 | 5 | 22 |

*In FY 01 a child of a ward was also a ward and was only counted once in the total.
**In FY 00, FY 02 and FY 03 the victims of the homicide by a ward were either not involved with DCFS and therefore not included in the total or the victims were involved with DCFS and had been included in another category.

104

## GENERAL INVESTIGATIONS

### GENERAL INVESTIGATION 1

**ISSUE**  Subsequent to an OIG investigation of a Department contractor which uncovered large scale fraud across multiple state agencies, major deficiencies were noted in the Department's contract and program monitoring processes.  The OIG recognized the need for revised and enhanced monitoring procedures, training and fraud detection within the Department.  As a follow up to the investigation of the private contractor, the Inspector General identified key issues to be addressed in policy and training for Department contract and program monitors.

**DISCUSSION**  Throughout FY 2012, the Inspector General's Office and the Attorney General's Office jointly conducted training throughout the State for Department Management Staff, Contract and Program Monitors, Contract Liaisons, Department Private Agency Audit Staff and Financial Monitors and Reviewers to strengthen the Department's monitoring functions and assist in identifying ongoing fraud by Contractors.  The immediate need for the Training became apparent after the OIG issued its joint Report and Findings in the fraud investigation concerning Diversified Behavioral Comprehensive Care.  That Report found several million dollars of funds provided to a private agency with ties to the former Director of the Department, which had been allowed to operate without little functional monitoring of accountability for the funds.

The training curriculum included:
- Monitoring contracts to identify potential fraud and misspending;
- Verifying salary allocation within and among different programs;
- Identifying Red Flags in billings and quarterly reports that may signify fraud;
- Reminding monitors of disallowable costs;
- How to examine Related Party Transactions;
- Corrective Action Plans;
- Ensuring the Services are Provided and Related to Department Goals.

In preparing for the Training, the OIG identified the following policy changes that needed to occur to support the training:

1. Require contracts and grants to specify location of services to be provided
2. Require contractors and grantees to disclose all other public funding that they or their affiliates receive.
3. Require auditors to inquire into related party transactions at time of audit review.
4. Require program monitors to verify allocation of administrative vs. direct expenses.  Program monitors should question direct expenses to consultants to ensure that they are not consulting for management services.
5. Require DCFS financial auditors to compare audits with any quarterly reports or billings.
6. Require DCFS financial auditors to recoup excess revenue even when other non-substitute care programs of the grantee/vendor have overspent.
7. Ensure that program monitors verify that quarterly reports reflect actual spending and not simply a bill for ¼ of total contract/grant.

8.  Require Contractors/vendors to certify with quarterly reports that all funds have been expended as represented.
9.  Require personnel matrices for each program funded by the Department.
10. Require monitors to verify allocation of salary among staffers with any responsibilities other than the particular DCFS Program.
11. Require program monitors to verify that personnel matrix is in line with documentation provided (billings, sign-in sheets, quarterly reports, etc.) and in line with the breakdown of administrative vs. direct expenditures.
12. Require program monitors to verify specific expenditures that exceed 10% of budget, e.g. $260,000 for "consultants."  Program monitors should be required to verify that consultants are related to program plan.
13. DCFS should prohibit agencies from paying consultants when the consultants are dually employed/contracted by the agency and the consulting company.  Require program monitors to ensure that consultants are not related entities to principals of agency.
14. Disallow the practice of permitting not-for-profits to subcontract with for profits to perform bulk of services or to provide bulk of management of agency.

In making the above recommendations, the Inspector General  noted that the existing problems created by lax monitoring have existed within the Department for several years and that the current administration had been working diligently to address the monitoring failures of the past.

**GENERAL INVESTIGATION 2**

| **ALLEGATION** | The Inspector General's Office surveyed common practices of Emergency Departments Approved for Pediatrics (EDAP) in Illinois on the use of body diagrams/charts for children where physical abuse is suspected. |
|---|---|

| **INVESTIGATION** | Department Procedure requires that body charts be completed in child protection investigations of physical injuries of cuts, welts, bruises, abrasions and oral |
|---|---|

injuries. Documentation of medical findings is critical, not only for medical personnel but for other professionals in the child welfare or legal fields. In cases of physical child abuse, body diagrams can supplement a narrative description of an injury and provide a permanent visual depiction to professionals of all fields who come into contact with a child victim after injuries have disappeared. The American Academy of Pediatrics Committee on Child Abuse and Neglect stated that, "complete documentation of visible injuries on body diagrams and with photographs is strongly urged and facilitates peer review as well as court testimony." Body diagrams also enhance the collection of evidence by way of prompting a full body examination. The use of structured clinical forms has been shown to increase the information obtained and documented in the medical record of children evaluated for abuse.

As hospital emergency departments can often serve as a point of entry into systems of care for child victims of abuse and neglect, the OIG reviewed common practices of hospitals in the state with Emergency Departments Approved for Pediatrics (EDAP). Personnel from 63 of 90 (70%) EDAP hospitals responded to the OIG request for information. Seventeen hospitals (27%) reported that body diagrams are completed in cases where physical child abuse is suspected. Another 31 hospitals (49%) indicated that body diagrams are completed at the discretion of medical professionals. In total, these responses indicate that at least 48 hospitals (76%) have access to a body diagram to complete when documenting possible child abuse injuries. The remaining 15 hospitals (24%) reported that body diagrams are not utilized to document injuries.

HealthWorks of Illinois is the product of a collaboration between DCFS and the Illinois Department of Human Services, operating to provide quality health care to children in DCFS custody. Lead Agencies throughout the state coordinate networks of providers to ensure availability and access to medical care during a child's time in substitute care. Two key components of the HealthWorks framework are the Initial Health Screening, completed within 24 hours of initiating custody, and the Comprehensive Health Evaluation, completed within the next 21 days. According to the Lead Agency Program Manual, the requirements of the Initial Health Screening include the identification and documentation of evidence of child abuse or neglect. The Comprehensive Health Evaluation is meant to be an in-depth evaluation to follow up on previous health concerns from the initial assessment and to make future health plans. The Health Services Encounter Form provides a format for documentation and is completed at both the initial and comprehensive evaluations. The form does not include a body chart to be completed at either assessment

Body diagrams are also valuable in the assessments of children who come into care. The current Health Services Encounter Form provides little room to thoroughly document by illustration all possible injuries sustained by abuse. Completion of a body diagram by HealthWorks providers at the time of the Initial Health Screen would serve to protect relative caregivers and foster parents by establishing a baseline of injuries that a child has at the onset of care. It may also be prudent to consider completing an additional body diagram at the time of the Comprehensive Health Evaluation when injuries and/or marks are observed on the child.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.   The Department should require that investigators request that the treating hospital physician or nurse complete a body diagram when a child victim is initially seen in a hospital setting. The treating physician or nurse can utilize a body diagram provided by their institution or one provided by the Department (CANTS 2A/2B).**

The Department agrees to require investigators to request completion of a body diagram/chart from treating hospital physicians or nurses with corresponding documentation in the SACWIS file. A Policy Alert detailing expectations will be issued to investigation staff and will be included in revisions to Procedures 300, Reports of Child Abuse and Neglect.

**2.   The Department and HealthWorks of Illinois should amend the Initial Health Screening in order to prompt the examiner to complete a body diagram. HealthWorks providers can utilize a body diagram provided by their institutions or one provided by the Department (CANTS 2A/2B).**

The revised form, including a body diagram, has been reviewed by the Department's medical director and submitted to the Office of Child and Family Policy for approval.

**3.   This report should be shared with contracted medical resource providers to ensure that they consider the importance of body diagrams in child abuse evaluations as they develop education and training for medical professionals statewide.**

The Department agrees and will share the report with contracted medical resource providers.

**GENERAL INVESTIGATION 3**

| | |
|---|---|
| **ALLEGATION** | The DCFS Immigration Services Unit did not provide information as to the consequences a criminal conviction might have on the immigration status of a foreign born ward prior to or during the time the ward was in jail awaiting trial. |

| | |
|---|---|
| **INVESTIGATION** | Neither the ward nor worker knew to advise the public defender of the ward's immigration status. The ward pled guilty to one count of class 2 felony robbery. |

While the offense is not an aggravated felony under Illinois law, robbery is treated as an aggravated felony under the immigration law. Under 8 U.S.C. 1227 (§237), people convicted of aggravated felonies are permanently ineligible for naturalization, and are subject to deportation.

The current practice of the Immigration Services Unit reflects that the Department has not fully implemented the OIG 2006 recommendations regarding the critical function to educate wards and child welfare staff about the status adjustment process and behaviors/penalties that could jeopardize immigration status. In 2007 the OIG in close collaboration with the Immigration Services Unit developed materials for both case managers and wards that provided a step-by-step guide to the complex USCIS adjustment process. Except for revisions to the material necessitated by recent changes in immigration law, the important core content pertaining to the process and risks youth need to understand remains accurate and relevant. Additionally, in 2007 the OIG and Immigration Services Unit developed and provided an in-depth training for workers and undocumented wards providing them with vital knowledge regarding the legal status adjustment process; this training included an emphasis on the risks and consequences youth faced if they committed criminal acts. Neither the materials developed in 2007 nor the training is currently in use by the Immigration Services Unit.

Current Immigration Services Unit practice overly emphasizes the use of emails and phone calls as the primary route to provide information to workers regarding the adjustment process. The worker is then expected to explain the process to the youth. Neither this ward nor the worker understood the status adjustment process or the affect a criminal conviction would have on the ward's immigration status. This ward's case highlights the failings of such a piecemeal approach. Status adjustment is a significant milestone in an undocumented ward's life. An immigration conference conducted by the Department's Immigration Coordinator at the beginning of the adjustment process is needed to provide all parties involved (ward, case manager and immigration coordinator) with the necessary information.

Currently, the Immigration Services Unit relies upon the case manager to initiate contact regarding a ward in need of immigration services. This approach places the responsibility to act on the worker, who may have limited immigration knowledge, while the Immigration Coordinator who has organizational knowledge, is restricted in her ability to work proactively. A review of wards identified by the Office of Budget and Finance as undocumented captures youth who may eventually qualify for Special Immigrant Juvenile status but who are not listed in the Immigration Services Unit database. Quarterly contact with the Office of Budget and Finance would ensure timely identification of wards eligible for status adjustment.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. Whenever a case manager submits the Special Immigrant Referral Form (CFS 1016) to the Immigration Services Unit, the Immigration Coordinator should convene an immigration** |

**conference with the eligible ward, their case manager and an invested adult such as a foster parent or concerned relative.**

The DCFS Guardianship Administrator discussed this recommendation with the Assistant Guardian and the Immigration Unit.

This information has been included in the recommended revisions to Procedures 327, Appendix F, *Guardianship Services, Immigration/Legalization Services of Foreign Born DCFS Ward*.

**2.  During the immigration conference the Immigration Coordinator will provide the ward and the worker with copies of *Immigration 101* and *Immigration Resource and Practice Guide*.  These materials will be reviewed and special emphasis will be placed on the risks and responsibilities of adolescent wards in the process of status adjustment.  All USCIS forms requiring the ward's signature, forms that are pre-populated by the Immigration Coordinator, will be reviewed with the ward and worker during the conference.**

Requirements to provide the worker and ward with copies of the Immigration 101 and the Immigration Resource Guide has been included in the recommendations for revisions to Procedures 327, Appendix F, *Guardianship Services, Immigration/Legalization Services of Foreign Born DCFS Ward.*

**3.  OIG staff and the Immigration Services Unit should update the *Immigration 101* and *Immigration Resource and Practice Guide*.  This material should be reviewed annually and revised as needed by Immigration Services Unit staff.**

The Immigration Unit is in the process of updating Immigration 101 and the Immigration Resource and Practice Guide.

**4.  The Department should revise P327, Appendix F, *Immigration/Legalization Services for Foreign Born DCFS Wards* to include the requirement that case management staff notify the Immigration Services Unit of any arrest or detainment of a non-citizen ward for consultation/instruction about notification of the ward's public defender.**

Procedures 327, Appendix F, *Guardianship Services, Immigration/Legalization Services of Foreign Born DCFS Ward* is currently being revised to include the recommended instructions to case management staff about how to proceed when there is an arrest or detainment of a non-citizen ward.

**5.  The Department should revise P327, Appendix F, *Immigration/Legalization Services for Foreign Born DCFS Wards* to reflect the recommendations from this report.**

Procedures 327, Appendix F, *Guardianship Services, Immigration/Legalization Services of Foreign Born DCFS Ward* is currently being updated to reflect the recommendations in this report.

**6.  The Immigration Services Unit should have a visible link on the D-Net with hyperlinks to P327, Appendix F, *Immigration/Legalization Services for Foreign Born DCFS Wards*, SIJS Referral Form (CFS 1016), the *Immigration 101* (CFS 1050-66-1), *Inmigracion 101* (CFS 1050-66-1-S), and *Immigration Resource and Practice Guide* (CFS 1050-66-2).  Content on this link should be reviewed annually and revised as needed by Immigration Services Unit staff.**

The requested link is on the D-Net.

**7.  The Department should incorporate P327, Appendix F, *Immigration/Legalization Services for Foreign Born DCFS Wards* and all related materials into Core training.**

Procedures 327, Appendix F, *Guardianship Services, Immigration/Legalization Services of Foreign Born DCFS Ward* has been added to the Core Foundation Course for new DCFS and private agency Intact Family Services and Permanency-Placement caseworkers.  The On-Line Burgos training course will be updated to include this information.

**8.  In order to ensure the timely identification of wards eligible for status adjustment, the Immigration Services Unit will on a quarterly basis request a list of wards ineligible for Title IV-E reimbursement due to immigration status from the Office of Budget and Finance.  At minimum the list will include the wards' names, DCFS ID, dates of birth, Region-Site-Field, date of Temporary Custody, current goal, and assigned case manager.  A key explaining relevant Medical Assistance No Grant (MANG) codes should also be included.**

The Division of Budget & Finance, through the Federal Financial Participation Unit, now sends the report to the Immigration Services Unit quarterly.

**9.  Utilizing the list obtained from the Office of Budget and Finance, Immigration Services Unit staff will contact the case manager or supervisor of any ward identified as eligible for status adjustment to initiate referral.**

The recommendation has been implemented.

**10.  The Immigration Services Unit should keep a ward's file active until emancipation or naturalization, whichever occurs first.**

The recommendation has been implemented.

**11.  The Department should collaborate with Loyola University Chicago School of Law Street Law Program to offer immigrant youth a forum to discuss Street Law and immigration issues.**

The Department agrees.  Loyola University Law School Street Law Program presented an initial forum to immigrant youth. Trainings will be offered twice a year.

**12.  The Immigration Services Unit should also track the region of the ward's case and the ward's country of origin.**

This information has been added to the Special Immigrant Juvenile Referral Form (CFS 1016) and the DCFS Immigration Unit database.

## GENERAL INVESTIGATION 4

**ALLEGATION**   A hotline report was made regarding the death of a two month-old infant.  The mother admitted killing her infant and had no prior history with the Department.  However, the mother and infant were living with a woman and her three month-old baby.  The woman had an extensive history with the Department.  The Inspector General's Office investigated the circumstances around the baby living with her mother given that she had surrendered her parental rights to three older children five months earlier.

**INVESTIGATION**   The woman had an extensive history of involvement with the Department which began five years earlier when her third child was born substance exposed.  The woman had long-standing substance abuse issues centered upon alcohol and cocaine use and acknowledged continuing her lifestyle despite being pregnant.  The woman later admitted during a mental health assessment she had not wanted to give birth to her third child and had, "tried everything [she] could to get rid of it," and "did a line" immediately before going into labor. Throughout the time she was involved with the Department the woman exhibited combative behavior with child welfare workers, medical personnel and other professionals attempting to provide services to her family.  She was also a participant in numerous incidents of physical violence with relatives, associates and strangers resulting in multiple interactions with law enforcement.  The woman was consistently non-compliant with the provisions of her service plan resulting in her three children being removed from her custody several times prior to her surrendering her parental rights.  When the woman did surrender her parental rights, she did so after having failed a court-ordered drug test and recognizing that if she did not relinquish her rights voluntarily they would be terminated by the court.

At the parental rights hearing, the woman denied being pregnant at the time in response to a direct question from the bench.  The judge informed the woman she would be found in contempt of court if it was later determined she was in fact pregnant.  The court also instructed the caseworker to contact the State Central register (SCR) if the woman's claim she was not pregnant was found to be untrue.  The caseworker then contacted several hospitals throughout the area and informed them of the need to notify the hotline if the woman delivered a baby at their institution.

Five months prior to the parental rights hearing, the caseworker responsible for the woman's case referred her for a psychological evaluation administered by a clinical psychologist.  The psychologist diagnosed the woman with depressive disorder and antisocial personality disorder and identified her narcissism as the primary motivation for her actions.  The psychologist cited the woman's minimal concern for the needs of others and her significant history of substance abuse as major risks to any children in her care.  The psychologist concluded the woman was unlikely to be capable of independently caring for her children.

Two months after the hearing, the woman delivered a premature baby at an area hospital.  A hotline call was made and a child protection investigator was assigned to the case.  The investigator spoke with the social worker from the hospital who stated the woman and her baby, a girl, had both tested negative for drugs upon the delivery, approximately two weeks earlier.  The social worker told the investigator the woman had been present at the hospital daily since the birth while the infant was in the neonatal intensive care unit, and that while she had been verbally abusive towards staff she behaved appropriately towards the baby and appeared to be an engaged caretaker.  The social worker stated she was aware the woman did not like the caseworker assigned to her and expressed her belief a personality conflict existed between the two.  The investigator did not inform the social worker of the court order that the hotline be contacted if the woman gave birth or the standing order she would be held in contempt of court if it was determined she had been lying about being pregnant just two months earlier.  On the day the caseworker learned the woman had given birth, the woman

called the caseworker and stated, "If you cherish your life, you will back the fuck up." The following day, the caseworker was contacted by the physician treating the woman and her baby at the hospital. The physician informed the caseworker the woman had stated that if the caseworker attempted to remove the baby from her custody, she would kill the caseworker and her family. The caseworker informed police and the investigator of the threat.

The physician conducted an assessment of the woman and concluded she had a mood disorder. In her records, the physician noted that, "without further collateral information it is difficult to comment on the patient's past psychological history, which would be needed to formulate a more definitive diagnosis." Although the woman had undergone an extensive psychological evaluation seven months earlier that concluded she was unable to care for her children, the evaluation was never shared with hospital staff. In an interview with the OIG, the investigator stated he never reviewed the psychological evaluation and did not obtain the woman's previous medical records. The investigator stated he believed the hospital would secure the records and address the woman's mental health issues. The investigator was unable to explain how the hospital would have been aware of the existence of the psychological evaluation without assistance from the Department. Although the investigator was aware of the court orders regarding notification if the woman gave birth, he did not take any action to ensure the information was conveyed.

Based on the hospital social worker's positive impression of the woman's ability to serve as a caretaker and the absence of a positive drug screen, the investigator and his supervisor unfounded the report against the woman and approved the release of the baby from the hospital into her custody. In her interview with the OIG, the investigator's supervisor stated she was familiar with the woman from her previous involvement with the Department. The supervisor was able to recall portions of the psychological assessment, including the conclusion the woman could not serve as a viable caretaker, but said she had not read the document and did not review it with the investigator. The supervisor acknowledged closing the case without instructing the investigator to obtain the woman's medical records, as required by Department procedure, or ensuring hospital staff had received the prior psychological findings.

Three months after the baby was born, police were called to the home in response to a medical emergency involving another infant in the home. The infant's mother admitted to police she had choked the infant and thrown him to the floor. The woman had taken her three month-old infant girl and fled the home prior to the police's arrival, resulting in the initiation of a child protection investigation. Two weeks later, the woman arrived at the courthouse and provided authorities with the baby girl's location. The baby girl was taken into protective custody and placed in a traditional foster home.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. The child protection investigator should be disciplined for failing to retrieve and review the psychological assessment, for a faulty risk assessment prior to determining the baby girl could safely be discharged to the woman and for failing to share medical records with the hospital physician.** |

The Department disagreed with discipline and instead counseled the child protection investigator. The child protection investigator was counseled.

**2. The child protection supervisor should be disciplined for failing to ensure that medical records were obtained and shared with medical professionals, that the recent psychological was reviewed prior to determining whether the baby girl could safely go home with her mother, for unfounding the investigation and for completing an inadequate risk assessment.**

The Department disagreed with discipline and instead counseled the supervisor. The child protection supervisor was counseled.

**3.  The caseworker should be commended for her work on this case.**

The Office of the Inspector General shared a redacted report with the private agency highlighting the high quality casework conducted by the case manager.

**4.  This report should be shared with the woman's current case manager and supervisor.**

The Office of the Inspector General shared a redacted report with the private agency to inform continuing services to the family.

**5.  A redacted copy of this report should be shared with the hospital.**

The Office of the Inspector General shared a redacted report with the hospital.

**GENERAL INVESTIGATION 5**

| COMPLAINT | The Inspector General received two complaints about the misuse of the godparent designation as a path to unlicensed placement of children. |
|---|---|

| INVESTIGATION | In Illinois, when a child comes into the Department's care and needs placement, the Department must make reasonable attempts to locate a relative who can care |
|---|---|

for the child, at least on a temporary basis. Despite a common misperception in the field, there is no Departmental policy requiring a placement with a relative over a traditional foster care placement.

In an effort to recognize the importance and value of significant non-blood relationships in a child's life, in 2002 the Department expanded the definition of relative to include godparents. Department rules require the worker "to verify the godparent/godchild relationship by contacting the parents to confirm the fact that they did, in fact, designate the person as the godparent. If the parents are unavailable, the worker should contact other close family members to verify the relationship." Apart from this verification, relatives seeking caregiver placement status are required to establish their relationship to the child needing placement by completing the DCFS *Affidavit of Relationship* form. The form requires that a relative affirm his or her relationship to the children being placed in their home by asking them to explain how they are related to the child. The *Affidavit of Relationship* form asks for the name of the children being placed, the name of the relatives who will be caring for the children, and the date the placement will begin. The form does not require the parents of the child being placed to sign the affidavit or otherwise verify the relative status of the person seeking to be declared a relative caregiver.

Whether or not an individual is identified as a relative of a child needing placement is important because it dictates the stringency of licensing requirements for the home, and frequently plays a role in court in terms of later custody decisions. Whereas a non-relative placement requires that the home have undergone the Department's full licensing process, a relative-placement has less stringent licensing requirements and can often be used as an immediate placement resource. The Inspector General reviewed three cases where individuals with little to no historical relationship with the family were submitted as "godparent(s)" in an apparent effort to provide a preference for that care provider or to circumvent the licensing process. This practice frustrates the purpose of relative placement, and allows placement with persons who may have the technical designation, but who lack the historical family connection upon which godparent status is built.

The Inspector General's investigation revealed that the ease with which an individual could be designated as a godparent, elevating him or her to relative status, allows workers and caregivers alike to manipulate the system in their favor for placement purposes.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The Department should incorporate Policy Transmittal 96.1 ("Verification of Relationship for Relative Home Placement") into Procedures 301, *Placement and Visitation Services*.** |
|---|---|

The Department agrees. These recommendations will be considered by the workgroups addressing sibling placement/visitation and fictive kin care.

**2. The Department should include the definition of "godparent" in Procedures 301, *Placement and Visitation Services*, and clarify that the godparent/godchild relationship must have a historical basis, preceding immediate involvement with Department.**

The Department agrees. These recommendations will be considered by the workgroups addressing sibling placement/visitation and fictive kin care.

**3.  The DCFS *Affidavit of Relationship* form [CFS 458-A] should be amended to require the following:**

> **a.  Signature of the biological parents to affirm that the person claiming to be a child's godparent has been entrusted by parents with "a special duty that includes assisting in raising the child if the parent cannot." (DCFS Rule 304.2)**

> **b.  Affirmation from the biological parent(s) that the child's relationship with these relatives has a historical basis, and preceded their child coming into the care of the above-named relatives.**

The Department agrees. These recommendations will be considered by the workgroups addressing sibling placement/visitation and fictive kin care.

**4.  DCFS *Affidavit of Relationship* form [CFS 458-A] must be accompanied by a statement of supporting facts articulating the historic basis/pre-existing relationship between the godparent(s) and the child, prior to the case being screened into court.**

The Department agrees. These recommendations will be considered by the workgroups addressing sibling placement/visitation and fictive kin care.

**5.  The Department should amend Section 3.1 of the private agency's Program Plan to require that the agency use the DCFS *Appointment of Short Term Guardianship* Form CFS 444-2 and ensure that the form is legally executed in accordance with 755 ILCS 5/11-5.4.**

The program has been informed that the Appointment of Short Term Guardian form must be utilized. Revisions will be made to the program plan for FY15 contracts.

**6.  The Department should amend the Program Plan with the private agency to clarify that families using Short Term Guardianship do *not* "retain full legal custody."**

The Department agrees. Revisions will be made to the program plan for FY15 contracts.

GENERAL INVESTIGATIONS

**GENERAL INVESTIGATION 6**

ALLEGATION   A one year-old boy died as a result of physical abuse.  Although the child protection investigation of the boy's death concluded with an indicated finding against the husband of the boy's babysitter, the finding was expunged by an Administrative Law Judge (ALJ) upon appeal and amended to an unknown perpetrator.

INVESTIGATION   On the morning the boy died, his mother dropped him off at the home of his babysitter before continuing on to work.  The babysitter, who resided with her husband and the couple's two year-old daughter, left the home approximately three hours after the child was dropped off, leaving the children in the care of her husband.  Less than an hour later, the husband called the babysitter saying the boy was gagging and vomiting in a playpen where he had been placed a short time before.  The husband contacted 911 and emergency personnel transported the boy to a hospital.

Upon arrival at the hospital, the boy was found to have a massive subdural hematoma, a skull fracture and swelling of his brain.  He was taken to emergency surgery in critical condition and part of his skull was removed to relieve pressure.  Following the procedure he was placed on life support, however the next day life support was removed and the boy was later pronounced dead.  An autopsy concluded the boy died from craniocrebral injuries due to blunt force trauma.  The cause of death was determined to be child abuse and the manner of death was ruled to be homicide.

The subsequent child protection investigation of the boy's death focused on determining the party responsible for inflicting the abuse.  The boy's mother, the babysitter and her husband all denied harming the boy and were in agreement about the timeline of his being handed over from his mother to the babysitter.  While the babysitter and her husband were compliant with the investigation, the mother did not make herself available to the Department and did not participate in the inquiry.  Much of the assigned child protection investigator's work on the case centered on establishing a time frame for the occurrence of the boy's injuries in order to establish a perpetrator.  The investigator relied upon the observations and opinions of the surgeon who operated on the boy after he arrived at the hospital and the medical examiner who performed the autopsy.  Both concluded that the boy's injuries were so severe he would have gone into distress shortly after they were inflicted.  Since the boy was in the sole care of the babysitter's husband for approximately one hour before the emergency call for an ambulance was made, the surgeon and the medical examiner surmised the husband must have been the perpetrator of the abuse.  Based on these opinions, the husband was indicated for Death, Head Injuries and Bone Fractures to the boy and Substantial Risk of Physical Injury to his two year-old daughter.

The husband filed an appeal to expunge all of the indicated findings against him.  During the appeal process, the Department requested additional consultation from a pediatrician considered an expert on child abuse issues.  After reviewing the medical records and conferring with the surgeon, the pediatrician testified at the administrative hearing of the appeal that she concurred with the conclusion reached in the child protection investigation.  The pediatrician stated that the severity of the boy's injuries would have caused him to become symptomatic "within minutes to an hour" after they were inflicted and, given the accepted timeline of when the boy was brought to the home and the babysitter left, the boy would have been in the husband's custody during the period when the injuries occurred.

The medical examiner provided testimony that the injuries had been inflicted one to three days prior to the onset of symptoms.  The husband's defense presented testimony from a pediatric neurosurgeon who stated it was impossible to determine with accuracy the time frame when the abuse occurred.  The neurosurgeon said it

is possible for "asymptomatic subdurals" to go unrecognized for an extended period of time after injuries are inflicted, and that the boy's uncompromised appearance when he was brought to the babysitter's home could not be construed as evidence of his health at that time.  The neurosurgeon also concluded that it could not be established the boy had been injured during the three hours before the 911 call was made.

As a result of the administrative hearing, the ALJ expunged the finding against the husband.  The reports were amended and indicated to an unknown perpetrator.  In issuing her finding, the ALJ noted she gave greater credence to the testimony of the neurosurgeon over the pediatrician.  The ALJ further stated she found the testimony of the pediatrician to be "inconsistent and self-contradictory" in regards to establishing the time the injuries were inflicted and the onset of observable symptoms.  While the divergent medical opinions offered by recognized experts necessitated a decision as to which theory to accept, an OIG review of the case record found nothing to support the ALJ's conclusion the pediatrician's testimony was inherently flawed.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  This report should be shared with child protection managers as a teaching tool demonstrating the complexity of evidence in abuse cases with multiple prior caretakers.** |
|---|---|

The Acting Director and Bureau Chief will meet with child protection managers.

**2.  This report should be shared with the Administrative Law Judge.**

The report has been shared with the employee.

GENERAL INVESTIGATIONS

**GENERAL INVESTIGATION 7**

| | |
|---|---|
| **ALLEGATION** | A child protection investigator indicated a report of sexual abuse against two children without interviewing them or completing other required investigative tasks. |

| | |
|---|---|
| **INVESTIGATION** | The children were the two oldest of a group of siblings, girls ages 12, 11 and 5 and an 8 year-old boy.  Following the death of the children's mother, they were |

separated by their father and sent to live in two new households.  The two oldest girls went to live with relatives in another state while the two younger children remained with relatives in Illinois.

Two years after the children had been separated, the younger two siblings made allegations to relatives that the two older girls had forced them to engage in sexualized behaviors when the four were still living together.  A child protection investigation was initiated and the two younger children participated in interviews with law enforcement and child welfare counselors during which they repeated their claims of abuse.  The assigned investigator was not present during the interviews with the two younger children but received reports from a parallel worker who was in attendance at an interview conducted by police.  The investigator never obtained police records regarding the case or attempted to contact the relatives who had custody of the two oldest girls who were the subjects of the abuse allegations.  The investigator also never spoke with the two oldest girls, in violation of Department Rule.  The investigator ultimately indicated the report for Sexual Penetration and Sexual Molestation against both of the oldest girls.

In an interview with the OIG, the investigator stated the decision to indicate the reports was based on the report from the parallel worker that the younger children's accounts were credible.  The investigator said she had never been provided with contact information for the relatives with custody of the two oldest girls and had no means of speaking with them.  An OIG review of police records found contact information for the out-of-state relatives.  Additionally, police records contained documentation of an interview with the two oldest girls conducted by local law enforcement in the state where the family resided.  During the interview, both girls denied any inappropriate conduct with their siblings and notes entered by detectives suggested the girls were confused by the nature of the allegations made against them and the police found their denials to be credible.  The investigator stated she had been unaware an interview had been conducted with the two oldest girls by any law enforcement agency prior to being informed by the OIG.  A recommendation for discipline was not made in this case because the investigator's caseload was in excess of allowable limits.  Additionally, the investigator is no longer a Department employee.

| | |
|---|---|
| **OIG RECOMMENDATION / DEPARTMENT RESPONSE** | **The Department should review the child protection investigation and determine whether to expunge the indicated findings against the two oldest girls.** |

The Department reviewed the child protection investigation and unfounded the indicated findings.

## GENERAL INVESTIGATION 8

**ALLEGATION**   The father of a 15 year-old girl was indicated for sexual abuse against her and her 13 year-old female friend.  The daughter had made numerous previous allegations of sexual abuse against her father, however all reports had been unfounded.  After the father was indicated, he had been allowed to have unsupervised contact with the girl while receiving intact family services through a private agency.  A sex offender assessment completed by a contractual psychologist concluded the father was low risk to re-offend.

**INVESTIGATION**   During five child protection investigations since 2008, the girl disclosed sexual abuse by her father. In three of those investigations, a second alleged child victim was involved.  The children recanted each time and criminal investigations were closed for lack of physical evidence of sexual abuse.  In 2012, the girl, age 14 at the time, and her 12-year-old friend alleged sexual penetration and molestation against the girl's father. The child protection investigator placed the girl and her two brothers, ages 15 and 11, with a godparent under a Safety Plan.  The girls corroborated each other's accounts during victim sensitive interviews. Medical findings on the girl were inconclusive but there was physical evidence of sexual abuse of the friend. The girl began individual counseling at a children's advocacy center. The Department indicated the father for Sexual Abuse of both girls and Risk of Sexual Abuse-Siblings of the Victim to the girl's brothers. The police had an open investigation on the father.  When the child protection investigation closed, the investigator referred the family for short-term intact family services by a private agency.

In their interviews with the OIG, the child protection investigator and the supervisor stated they did not have enough evidence to screen the girl's case into court for custody. They needed corroboration by someone, like a witness, who had nothing to gain or lose. They stated that at that time there was a management decision not to extend investigations, in this case, until the police investigation was completed.  By opening the case for intact services, the family would be monitored while the police had time to collect evidence.

The child protection investigator handed off the family case to the private agency worker for services to include monitoring the children's safety and care with their godparent under a Safety Plan, a sex offender assessment of the father, supervised parent-child contact until the father was determined low risk for re-offending, and continued counseling for the girl.  The agency worker was informed of the pending police investigation.

A licensed clinical psychologist and subcontractor of the agency completed a sex offender assessment of the father.  The psychologist is on the Approved Provider List of the state's Sex Offender Management Board (SOMB).  The psychologist's sex offender assessment of the father was sorely inadequate and non-comprehensive.  The assessment heavily relied upon the father's self report. Only one clinically relevant tool was used for the assessment despite numerous recommended research-based assessment instruments generally used in this specialized field. As a clinician in the field of sexual offender assessment, the psychologist did not adhere to minimum standards of assessment. The assessment and recommendations played a critical role in the determination that the girl would begin unsupervised visits that would lead to her return home. When contracting for sex offender evaluations, the Department and its private agencies must have assurances that accepted standards of practice in the assessment and treatment of sexual abusers are followed.

A third child victim came forward. The father was indicted on October 25, 2012 on 8 counts of Predatory Criminal Sexual Assault, 4 counts of Criminal Sexual Assault on Family Member, 5 counts of Aggravated Criminal Sexual Abuse and 4 counts of Sexual Relations within Family.  The criminal case is pending.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES |
|---|

**1.  When there is a pending criminal investigation involving the same victims with similar allegations in a Child Protection (DCP) investigation, the DCP supervisor and investigator should consult with the Department's Office of Legal Services for an opinion or case conference with the State's Attorney to determine a course of action to ensure protection of the child without jeopardizing the criminal investigation.**

Child protection will work closely with the Office of Legal Services to ensure compliance with this recommendation. This recommendation will be included in revisions to Procedures 300, *Reports of Child Abuse and Neglect.*

**2.  The Department should remove the psychologist from their approved clinical provider list for sex offender assessment and/or treatment services.**

The Department has barred the provider from completing any sexual offender evaluations.

**3.  The private agency should discontinue subcontracting with the psychologist for sex offender assessment and/or treatment services.**

The Office of the Inspector General shared a redacted report with the private agency and the agency's Board of Directors.  The Inspector General met with agency administrators and a representative of the board of directors to discuss the findings and recommendations made in the report.  The private agency will no longer contract with this provider.

**4.  In intact family services cases with a pending criminal investigation, the involved Child Advocacy Centers must convene a multi-disciplinary case conference with the Family Advocate, law enforcement and the agency providing intact family services to provide information critical to managing the case while protecting the integrity of the criminal investigation and the safety of involved children.**

The Department agrees. The Inspector General's Office will address this recommendation with the Cook County Child Advocacy Advisory Board.

**5.  The Department must develop capacity for bilingual sexual offender evaluations and treatment.  The requirements of the Burgos Consent Decree can be met by providing for specialized translation services for these complex evaluations as effective bilingual resources are developed.**

The Clinical Division will work to develop resources to provide bilingual sexual evaluations and treatment services.

**GENERAL INVESTIGATION 9**

| ALLEGATION | A 16 year-old male Department ward sexually assaulted a female staff member at the residential facility where he was placed. The facility had inadequate staff to monitor residents and failed to assess supervision policy following a previous incident involving the boy. |
|---|---|

**INVESTIGATION**

The boy entered Department care when he was five years old and was accepted into guardianship two years later. The boy had an extensive history of aggressive behavior, violent outbursts and threats of self-injurious behavior, at one point reporting hearing children's voices instructing him to kill himself. The boy was diagnosed with Bipolar disorder, oppositional defiant disorder and psychosis. The boy's ongoing issues resulted in multiple psychiatric hospitalizations and, following an admission when he was 12 year-old, he remained as an inpatient. While hospitalized, the boy reported previous incidents of sexual abuse and was additionally diagnosed with Post Traumatic Stress Disorder. The boy continued to exhibit volatile behavior during the two years he remained in hospital care, including instances when he made threats to rape staff involved in his care. Despite ongoing concerns regarding the boy's behavior, hospital staff determined he had made progress managing his impulsivity and sought his transfer to a less restrictive setting in order to help him work towards independence. The boy was accepted into a residential facility for males between 15 and 21 years of age with diagnoses of mild to severe mental retardation.

In interviews with the OIG, residential facility staff stated they did not believe the facility was an appropriate placement for the boy. Staff noted the boy functioned at a higher cognitive level than other residents and was more readily able to take advantage of the relative freedoms afforded by the facility. The boy frequently moved throughout his home and around the campus without permission and often went on run from the facility altogether. Staff reported to the OIG that because of staffing shortages, conducting searches for the boy often prevented workers from monitoring other residents. While on campus, the boy regularly demonstrated disruptive behavior, engaging in conflicts with staff and other residents. The boy's outbursts were further complicated by his large stature. The boy was the subject of numerous reports of entering unauthorized areas or acting in defiance of staff directives. On one occasion, the boy obtained a kitchen knife from a locked drawer in the facility and brandished it towards staff.

One year after the boy had been placed at the facility, he unexpectedly entered the office of a lone female facility administrator and closed the door. The boy made specific requests of the administrator but kept both of his hands down the front of his pants. The boy remained in the administrator's office for approximately five minutes until she was able to call for assistance. The administrator reported the incident to facility management and stated that she "instinctively" felt uncomfortable upon the boy's arrival in her office, in part because of his imposing physical stature. The administrator said she was familiar with his history of unstable behavior and was frightened by his sudden, unsupervised presence in her office. The administrator was not invited to participate in the critical incident review conducted to address the issue.

The critical incident review conducted by the facility identified the boy's lack of supervision as the primary issue, but made assumptions that minimized the threatening nature of the encounter. The boy's therapist failed to share with the team her knowledge of the boy's sexual aggression toward others while in a previous placement. Following the review, the team failed to explore or address with the boy his behaviors either in therapy or through the modification of his treatment plan.

Six weeks after the incident in the administrator's office, the boy cornered a female staff member inside a

bathroom in a facility building.  The boy sexually assaulted the woman, choking her and issuing threats against her family.  The boy was arrested following the assault and charged.  His case is currently pending.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.   The Inspector General will share this report with the residential facility's Board of Directors.** |
|---|---|

The Inspector General shared a redacted report with the private agency and the agency's Board of Directors.

**2.   The residential facility should develop a corrective action plan to address the failures of the critical review team including the failure to adequately investigate the facts of the incident in the administrator's office; failure to interview the victim or include the victim in the critical review meeting; failure to address the specific behaviors identified in the critical incident report directly with the boy in individual therapy or through the modification of his treatment plan; and failure to enact a safety plan to ensure work place safety following a critical incident.**

The Inspector General met with agency administrators and a representative of the board of directors to discuss the findings and recommendations made in the report.  In response to this report, the private agency has included clinical staff as part of its residential teams and has implemented monthly in-service trainings and mandatory team meetings for each residential home.

**GENERAL INVESTIGATION 10**

| | |
|---|---|
| **ALLEGATION** | The Inspector General received allegations concerning a for profit post-adoption counseling agency contracting with the Department.   The allegations were that the agency was billing for services not provided and had failed to pay its employees. |

| | |
|---|---|
| **INVESTIGATION** | The Agency had an annual $400,000 grant from the Department, for which it received a set amount each month, without having to provide names and dates of counseling services provided. |

The Agency also had a "fee for service" contract with the Department for which it would receive compensation based on monthly billings, listing names and dates of children and families served.   The description of services to be provided through the grant overlapped with the services that were to be provided pursuant to the fee for service contract. In addition to its FY 12 and FY13 Department contracts, the counseling agency acted as a subcontractor for several of the Department's Purchase of Service Providers.

The Department had not required accounting for the Grant in a manner that allowed the OIG to determine whether grant-funded employees were providing services during the same hours for other contracts of the Agency.  When the OIG sought to retrieve records directly from the Agency to substantiate all billing, the Executive Director claimed that timesheets of counselors had been lost or accidentally deleted from the system.  A preliminary audit of the Agency by the Department disclosed other irregularities, such as payments to a trucking company owned by the Executive Director.  Office of the Inspector General recommended a full audit of the Agency.

There was a discrepancy between the Agency's budgeted Administrative Expenses and the Administrative Expenses identified in the Certified Independent Audit provided to the Department.   The Certified Independent Audit appeared to identify the Executive Director's salary as a Direct Expense, even though he did not participate in either administering or supervising counseling services.   Since Administrative Costs are capped at 20% of Direct Costs, this might have resulted in an overpayment.

In addition, the Agency did not appear to have a reliable allocation system to ensure that staff allocated to the Grant were not performing other work on Grant time.  In addition to salaried employees, the FY 11 audit identifies almost $250,000 in payments to consultants.   Many staff alleged that while they were salaried employees, there was an arrangement by which they could get paid additional funds as independent contractors to handle counseling work outside of grant funding.

An OIG review also found billings that were not supported by clinical notes and travel time that was billed for in excess of actual travel time expended.  It also appeared that the Agency's billing for indirect costs (preparation of reports and administrative expenses) exceeded the allowable cap of indirect expenses. Some of the Purchase of Service Agencies with which the Agency separately contracted also reported that they found the Agency would sometimes bill for counseling that had not occurred.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  The Department should conduct a Field Audit of the Agency and determine the following:** |

**a. actual administrative/direct expenses of Department programs through a programmatic analysis of functional job duties;**

**b. identify consultants to ensure that all consultants have passed the required background checks and to verify that their costs are appropriately allocated;**

**c. whether using staff allocated on a full-time basis to perform work for other contracts violates the Grant;**

**d.  the extent to which complaining employees performed additional duties for which they were to be compensated beyond their stated annual salary;**

**e. when the additional counseling took place and whether it resulted in double billing to the Department;**

**f. whether personnel and consultants in both programs have the required educational credentials and have passed the required background checks;**

**g. whether billings are supported by timesheets, signature sheets of the party receiving services and progress or clinical notes;**

**h. what rental or mortgage payments are being made, to whom and for what property.  Copies of any leases or other documentation of rental or mortgage payments should be secured.  Any automobile expense and payments should be analyzed, and logs reflecting any business use of the car should be secured.  Any disbursements that do not appear related to the Program Plan should be analyzed;**

**i. whether more than 33% of billing is for indirect costs; and**

**j. when travel time has been billed to the Department, whether the travel time billed is supported by corresponding travel documentation from staff.**

Field Audits has completed their review.  The Department is finalizing its contract with the forensic auditor to conduct a review of the agency.

**GENERAL INVESTIGATION 11**

**COMPLAINT**   The Inspector General received a complaint that the Board of a private agency had recently terminated its Chief Executive Officer after discovering that he misappropriated agency funds for his personal use. The Board had duly reported its discoveries to the Department's Monitoring Division and had also filed complaints with the state's attorney's office and the Illinois Attorney General for criminal investigation.

A few months after the CEO had been dismissed, a former ward was stopped by police for driving a car registered in the name of the agency's former CEO. While in police custody, the ward stated that the car she was driving had been given to her by the former CEO. After the agency verified the ward's account of how she came into possession of the car, they assisted her with expenses relating to the car. Two years earlier, the former ward's foster mother had alleged that the ward was engaged in an inappropriate relationship with the Director of Foster Care Services. Because the girl was over 18 at the time, the hotline did not accept the allegation for investigation, but referred it for a Licensing Investigation against the agency. The licensing allegation was unsubstantiated when both the former ward and the Director denied the allegations and the foster mother was not able to provide any information to substantiate her claims.

While discussing the incident involving the CEO giving her a car, the former ward claimed to agency representatives that she had lied to Department investigators two years earlier when she had denied she was involved in an inappropriate relationship with the agency's director of foster care. The agency contacted the hotline and the Department's Licensing Division interviewed the former ward again. The Licensing Investigation was again unfounded, however, because the Director of Foster Care was no longer employed at the Agency. He did, however, hold a Child Welfare Employee License, issued by the Department. This case was referred to the Inspector General both to assist law enforcement with criminal prosecution of the former CEO and to investigate charges against the Child Welfare Employee License of the former Director of Foster Care.

In addition, the Board learned that the former CEO had been hired by an out of state not-for-profit foster care agency to develop a contract with the Department and was recruiting the agency's foster parents to become foster parents for the new entity from another state.

**INVESTIGATION**   Fiscal Integrity Issues
The Inspector General investigated the allegation of misuse of public funds after learning that 97% of the private agency's annual funding was awarded by the Department. An examination of the federal 990 Not for Profit Tax Forms filed by the agency revealed that in 2010, the former CEO reported an annual salary of nearly $160,000. In 2011, the CEO's reported annual salary increased by 44% ($70,618) to a reported $230,000 even though the CEO only worked in three quarters of that fiscal year due to his abrupt termination by the agency Board.

The Office of the Inspector General also reviewed whether the agency had sufficient management and fiscal controls, in light of the gross misspending by the former CEO. According to the IRS Form 990, an organization must disclose the name, physical address, and telephone number of "*the person who possesses the books and records for the organization.*" While the former CEO was misspending agency funds, the CEO became the holder of the financial books and records for the agency. The OIG noted that even after the misspending was discovered, the tax forms listed the CEO as holder of the financial records.

The Out of State Child Welfare Agency

Shortly after the CEO left the agency, an out of state based agency attempted to become licensed in Illinois. A licensing examination by the Illinois Child Welfare Agency revealed that the former CEO had become the Executive Vice-President of the out of state organization and was now in communication with Department administrators to become a licensed Child Welfare Agency in Illinois. The Inspector General reviewed communications between the former CEO and Department administrators assisting him through the licensing process in Illinois.

The Inspector General discovered that one of the Department administrators who was involved in contract negotiations submitted a personal recommendation to the former CEO when he asked for suggestions in hiring personnel for the new agency.

In addition, the Inspector General learned that another Department administrator, in charge of the Department's Monitoring Division, had received the complaint from the Board alleging gross misappropriation of agency funds, but had taken no action and had only filed the complaint. He did not advise the new Director of its contents. Once the Department's new Director was alerted to the allegations against the former CEO, negotiations with the out of state Agency were suspended. This Administrator is no longer with the Department.

The Inspector General also found that the Former CEO owned a for-profit film company, to which he may have diverted some of the Agency funds. The Inspector General's Office worked cooperatively with the Attorney General's Office throughout this investigation.

Allegations Against the Former Director of Foster Care

The Office of the Inspector General investigated the allegations against the former Director of Foster Care. The former ward refused to cooperate with the investigation. In addition, there were indications that the former ward was associated with the former CEO and another staff person in the agency stated that the former CEO had contacted them just prior to the discovery of the missing funds to induce them to place blame on the former Director of Foster Care. The foster mother was interviewed and stated that she had no basis for her earlier suspicions of an inappropriate relationship and no longer suspected the former Director of Foster Care.

Prosecution

In 2012, the former CEO was criminally indicted by a grand jury on 10 felony counts of Theft, Forgery, and Wire Fraud for criminal acts exerted between 2008 and 2011 while CEO of the private agency. After his indictment, the former CEO fled the United States, but was captured and extradited back to the U.S. in 2013 by federal authorities.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. To help prevent the opportunity for financial misconduct and mismanagement of publicly administered funds, the Inspector General recommended that the** |

**agency Chief Financial Officer (CFO) be the person in possession of the financial books and records of a private, non-for-profit agency, as proscribed in IRS Form 990,** *Return of Organization Exempt From Income Tax*.

The agency's Chief Financial Officer possesses the books and records of the organization.

**2. To preserve objectivity in contract development and prevent potential conflicts of interest, the Inspector General recommended:**

    **a. Disciplinary counseling to administrator who submitted a personal reference, and,**

    **b. That the Department should clarify through policy that no one involved in the development or monitoring of a contract should submit resumes for specific personnel to agencies with which they are involved, absent extraordinary circumstances with the approval of the Director.**

The Administrator is no longer employed by the Department, and the Department agrees and will include in appropriate policy.

## GENERAL INVESTIGATION 12

**ALLEGATION**    The Office of the Inspector General received a referral from the DCFS Office of Field Audits as a result of findings from a field audit conducted of private agency in May 2012. Many of the concerns related to use of funds by the Agency's recently semi-retired Founder/CEO as well as that the private agency had been operating at a significant deficit since 2001, which between 2004-2012 had increased 43% to a deficit of over $575,000, with no signs of improvement.

**INVESTIGATION**    In 2004 the Inspector General submitted an interim report alerting the Department to information that raised serious questions about the private agency's viability and mismanagement of DCFS funds. In that report, the Inspector General recommended that Department terminate the agency's contracts if, after the 2004 audit, the agency remained financially insolvent. The report also recommended that the Department verify any plan the agency offered regarding how it would reduce its deficit.

The Inspector General's 2013 investigation revealed that prior recommendations made to the Department regarding this agency had not been followed and as a result the agency had persisted with substantial mismanagement and misuse of DCFS funds with little to no Board oversight, in addition to an ever increasing agency deficit. The investigation revealed that DCFS funds were being used for:

1. The Founder/CEO's personal residence, which was identified by the agency as a "satellite office" despite no evidence of any agency work being performed there;
2. Funding of a generous pension for the Founder/CEO that, according to the former Chief Financial Officer was not to be funded until the agency had emerged from its substantial deficit;
3. Monthly payments of over $500 for the Founder/CEO's personal vehicle which was identified as a company vehicle despite no evidence of use by anyone other than the Founder/CEO and without a log documenting business use;
4. Payment of the Founder/CEO's personal purchases such as payment of parking tickets, prescription medications, services at a day spa and several ATM withdrawals at a riverboat casino;
5. Ongoing deficit spending without a sustainable plan for recovery.

Additionally, significant discrepancies were identified between the Founder/CEO's reported income on federal and state tax returns and the agency's state income tax forms.

The issue of the Founder/CEO's personal vehicle had been a prior Departmental audit finding and the agency had been instructed that all such expenditures would be disallowed if there was no vehicle log maintained, given that the Founder/CEO previously failed to maintain such a log even though she possessed the vehicle during non-business hours. Despite the agency's contention that the vehicle expenses were paid from fundraising revenue, there was no evidence that the agency had raised sufficient funds to cover the expenses.

The Inspector General noted that while the private agency was to blame for excessive mismanagement of public funds, the Department stood by for nearly a decade noting the agency's substantial deficit, lack of Board oversight, failure to timely provide requested documentation and failure to comply with prior audit findings. The Department repeatedly accepted the agency's unverified explanations that disallowable costs were funded by outside sources. Despite knowledge gained from prior DCFS audits, the Department continued to provide the majority of the agency's funding and in 2013 elected to recoup an arbitrary 15% of the costs of the Founder/CEO's personal car without any evidence of the fundraising revenue that the agency claimed was the source of the car payments.

During the course of the Inspector General's investigation, the agency voluntarily relinquished its DCFS foster care contract.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**     **1.  The Department should amend its 2013 audit of the private agency to clarify that costs for the Founder/CEO's condo and for her personal vehicle are entirely disallowable expenses.   In addition, the Department should identify those expenditures for the two years preceding the audit as disallowable costs.**

The Auditors will issue an Addendum to the Final Audit Report that will clarify that the costs for the Executive Director's condominium and personal vehicle are disallowable.  The agency, however, no longer has a contractual relationship with the Department and it will be difficult to determine excess revenue and recover funds.

**2.  Although the Founder/CEO has partially retired, the Department should prohibit her from any future business dealings with DCFS, including as a subcontractor or service provider.**

The Department will not contract with this provider.

## GENERAL INVESTIGATION 13

| ALLEGATION | A private agency billed the Department for mentoring services that were not performed. |
|---|---|

**INVESTIGATION**  While performing a routine review, the Department's Post-Adoption Unit identified inconsistencies between the billing submitted to the Department for mentoring services and the accounts of clients purported to have received the services.  The Post-Adoption Unit forwarded the information to the OIG for further review.

The OIG interviewed the family, which included three adopted children: boys ages 16 and 17 and a 19 year-old girl.  All three children had been eligible to receive mentoring services in accordance with a post-adoption subsidy agreement between the adoptive parents and the Department.  The Department designated the private agency to provide the services and the agency assigned three mentors to work with the children.  In interviews with the OIG, the children and the adoptive parents stated the mentors maintained sporadic contact with the family over a year.  In addition they noted that the activities never addressed existing issues such as academic performance.  After being provided with case notes completed by the mentors of interactions with the children, the children denied many of the interactions had occurred and disputed the content of others.  The children stated the notes misreported basic facts about their interests and endeavors and falsely claimed the mentors had assisted them with tasks they had never engaged in.  Additionally, all three children stated none of the mentors had had any contact with the family during the previous three years.  Over that period of time, the private agency had billed the Department over $84,000 for providing mentoring services to the family.  An OIG review of the billing record and other relevant records found numerous inconsistencies including records of sessions alleged to have occurred when the children were out of town and others that took place while the mentors were at work at other jobs.

In an interview with the OIG, the president of the private agency stated the individuals employed as mentors did not complete written contracts.  Although the Department requires criminal background checks on employees engaged in providing services to minors, the agency did not perform checks on the mentors.  The president stated he was unaware of the provision in the agency's contract with the Department requiring background checks.  In a separate interview with the OIG, a consultant employed by the agency stated the mentors were allowed to perform their activities without oversight and described supervision of the billing process as being minimal.

The OIG interviewed the Department contract liaison responsible for monitoring the agency's contract.  The contract liaison stated she did not realize private agency employees must undergo criminal background checks, despite having received training from the Department on the requirement.  The contract liaison stated that although she had requested copies of the mentors' contracts with the agency, as required by the Department, she had never received them or acted to ensure they were submitted by the agency.

The Inspector General referred the matter to the State's Attorney's Office and a determination regarding charges is pending.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The contract liaison should be disciplined for failure to ensure that the private agency mentors had criminal background checks.** |
|---|---|

The employee was disciplined.

**2.  The Department should terminate its contract with the private agency.**

The contract has been terminated.

**3.  The Department should review all mentoring contracts to ensure that mentoring program plans include a requirement for articulation of goals and clear plans toward achievement of goals.**

The Department agrees.  The Department is currently reviewing all contracts to ensure program plans have clear objectives and outcomes.

**GENERAL INVESTIGATION 14**

| | |
|---|---|
| **ALLEGATION** | An Agency failed to provide court ordered therapy to a 13 year-old and misrepresented to the Court that the minor was receiving the therapy. |

| | |
|---|---|
| **INVESTIGATION** | After being made a ward of the State, a 12 year-old girl was placed in a traditional foster home.  A month later she was moved to a relative foster placement with her paternal aunt.  By the age of 14, the girl's father had surrendered his parental rights, and her mother's parental rights were terminated. |

Throughout her placements, the minor exhibited extreme mood swings and violent behavior.  She also exhibited behavior characteristic of deep sadness or depression.  She would isolate herself from all social interaction and completely close herself off from everyone by refusing to answer questions or acknowledge a person who was speaking with her.  Early in her first placement, her behavior resulted in her admission to a behavioral health center where she was diagnosed with depression and prescribed Depakote, Tegretol, and Celexa.

Upon placement with her aunt, the family's case was transferred from DCFS to an Agency.  An Agency therapist was not assigned until 4 months later.  The day after assignment, the therapist met with the minor for her first individual session where she began a mental health assessment.  The Mental Health Assessment Report and Initial Treatment Plan were then completed 10 days later.  According to the Plan, the minor had a diagnosis of: Axis I: oppositional defiant disorder; Axis III, disease of the nervous system; and Axis IV: separation from biological parents, academic problems resulting in frequent absences from school, incomplete homework assignments, several failing grades, and medical problems.  The Plan called for the minor to receive 60 minutes of individual therapy/counseling once a week for six months, 60 minutes of family therapy/counseling once a week for six months, and 30 minutes of client-centered consultation once a week for six months.

The therapist only documented seeing the minor twice, both times were during the preparation of the mental health assessment.  The therapist reported problems with contacting the foster mother and scheduling therapy sessions, which eventually resulted in the therapy services being closed.

Approximately three months after the initial services were closed out, the minor was referred a second time for therapy services, and a new therapist was assigned.

Ten months after the first Mental Health Assessment was prepared, a second Assessment was drafted.  The new therapist did not have a supervisor at the time, and the new assessment was not approved until two months later by the Agency's clinical manager. The Assessment contained a diagnosis of: Axis I: Major Depressive Disorder, Single Episode; Axis IV: Psychosocial Stressors: Problems with primary support group. According to this assessment, it was recommended that the girl receive individual therapy/counseling, family therapy/counseling, and case management – client-centered consultation.  Although the assessment was based on visits with the minor over the course of about 6 weeks, the therapist only documented two visits, the date of the only therapy note written by the therapist and the date of the Assessment, as days she met with the minor.  As with the previous therapist, this therapist also appeared to have problems scheduling therapy sessions with the foster parents.

Two months after the second assessment was prepared, the second therapist was terminated for lack of documentation.  A third therapist was assigned to the minor, but was unable to make contact with the foster

family in the two weeks she was employed with the Agency. Eighteen months after being placed with her aunt and 14 months after her first individual session, the minor was assigned her fourth therapist who she was actively engaged in therapy with at the close of the Inspector General investigation.

Over the course of the 13 months following the assignment of the first therapist, the Agency submitted five Permanency Hearing Reports to the Court discussing the therapeutic services being provided. The first and second reports were written by the minor's first worker. In the first report, the Court was informed that the minor had begun therapy, but that she had not been actively attending. The second report informed the Court that the minor's failure to attend sessions resulted in the services being terminated. The third report to the Court was written by the first supervisor. In this report, the Court was informed that the supervisor had referred the minor for new services which were scheduled to begin the date of the report. The fourth and fifth reports were written by the third worker. The fourth report informed the Court that the minor was attending individual therapy intermittently and that her (second) therapist was addressing symptoms of depression, separation, loss and anger issues. The unapproved draft of the second Mental Health Assessment was attached to this report.

The agency's fifth permanency hearing report was filed with the Court ten months after the first report. It informed the Court that the minor was referred to and received weekly individual therapy through the Agency. The report also stated that the services had been received over the course of the prior 3 months not including the month the report was prepared and that a new therapist, the fourth, would be identified by the end of the month. The report made no reference to the services provided by the first therapist.

Around the same time in response to a request from the worker for therapy reports, a newly hired Agency clinical specialist submitted a letter to the Court stating that the minor had never received therapy services from the Agency. The clinical specialist had been with the Agency for one month. The Agency's clinical manager stated that the clinical specialist may have supervised the second therapist for a week prior to the therapist being terminated and was unaware that, while the therapist failed to document her activities, she did provide services to the minor. The manager was unaware of the specialist's letter until a clinical staffing 7 months later. The clinical specialist who drafted the letter is no longer with the agency.

At the hearing, the worker was asked to clarify the discrepancy between the fifth report she authored and the letter written by the clinical specialist. The worker provided testimony in regards to services provided after the second referral only. The worker testified that the minor and the second therapist had told her that they had seen each other. That the worker knew that the therapist had been seeing the minor, but could not testify as to how many times.

Earlier in the year, the girl's Guardian *ad litem* (GAL) had filed a Motion to Compel based on the first two permanency reports. The Motion to Compel had been continued until ultimately at this fifth hearing, the Court determined that the Agency had not provided the girl with the therapy as ordered and a finding of No Reasonable Efforts was entered.

The Agency experienced high turn-over during the time period in which services were being provided to the minor. Over the course of the two years and two months reviewed by the Inspector General's Office, the minor had been assigned 3 workers and 4 therapists. There had also been 4 supervisors, 2 managers, 2 clinical specialists (including at least two extended periods where this position was vacant), 2 clinical managers and 2 executive director changes.

The Agency's turnover in staff, poor documentation and poor communication between therapeutic and case management staff all contributed to the inability of the agency to provide effective and cohesive services to the minor. These factors also contributed to the conflicting testimony and reports during the last hearing.

During the OIG investigation, the Agency demonstrated a disturbing inability to provide historical information regarding the girl's services.

**OIG RECOMMENDATION / DEPARTMENT RESPONSE**

**The Department's Division of Quality Assurance should review the Agency's service provision, concentrating on communication between divisions, documentation of counseling and therapeutic services and turnover. The review should also ensure that the Agency's Child and Family Team meetings include a meaningful assessment of the child's safety, permanence and well-being through review of all necessary information and involvement of all relevant professionals.**

The Department agrees. Quality Assurance will conduct a review of the agency's service provision, inter-divisional communication, and overall documentation around therapeutic services, Child and Family Team Meetings and assessment processes.

**GENERAL INVESTIGATION 15**

**ISSUE**    In 2012 the Inspector General completed a Ten-Year Review of Deaths of Children of DCFS Parenting Teens.  Based on results from this review, and in an ongoing effort to reduce the risk of infant mortality and to prepare young parenting wards for the challenges of raising an infant, the Inspector General collaborated with the Teen Parent Services Network (TPSN) to develop the Young Parent Training.

**DISCUSSION**    The interactive and discussion-driven training model assists wards parenting infants 18-months or younger in developing strategies for 1) non-violent responses to infant crying and other challenging developmental behaviors; 2) creating non-violent approaches to parenting; 3) implementing safe sleep practices.

Beginning in March 2011, the Inspector General's Office in collaboration with TPSN began training young parents in Rockford, Rend Lake, Champaign and Peoria.  In 2012 the training was expanded throughout Cook County and in 2013 additional training was conducted in Granite City, IL.  Overall, by March 2013, 230 pregnant and parenting wards throughout Illinois who were parenting children 18-months or younger had received the training.

In order to develop a pool of certified trainers to efficiently reach as many parenting youth as possible, in 2013 the Inspector General's Office and TPSN partnered to train child welfare staff through "Train the Trainer" sessions.  By training the child welfare professionals who work directly with parenting teen wards, the information could better be disseminated at a range of agencies.  This also helped prepare child welfare staff to facilitate trainings at their respective agencies, as well as to familiarize staff with the training content so it could be reinforced in a case management setting.

In addition to the Young Parent Training, Office of the Inspector General developed the Young Parent Mediation Program, designed to enhance young parents' negotiation skills, and develop methods to facilitate a nonviolent, shared-parenting relationship.  Young parents who participated in the mediation program committed to creating a parenting plan to demonstrate their own expectations for themselves and their partners, and their commitment to nonviolence and cooperation.  Three young couples completed the Young Parent Mediation Program, while four couples remain in process.  In order to address the biggest challenge trainers faced of keeping contact with young parents to engage them in the program, the Inspector General's Office is collaborating with the Alternative School Network's YS3 Program which provides supportive services to wards via a mentorship program.

In FY2014, the Inspector General's Office will continue to provide supportive services to TPSN in their efforts to disseminate the Young Parent Training and continue to certify trainers.

## GENERAL INVESTIGATION 16

**ALLEGATION**   The Department's Division of Child Protection failed to act in a timely manner to dispatch a worker to a police station where a four year-old boy was transported after witnessing his father murder his mother.  It was further alleged that when a worker did arrive, the worker behaved in an unprofessional manner towards the officers.

**INVESTIGATION**   The four year-old boy and his three siblings were transported to the police station after the children's father murdered their mother in the family home.  A call was made to the State Central Register (SCR) requesting assistance to manage the children at the station and identify appropriate placements.  The OIG reviewed a recording of the SCR call and the report generated from the contact.  Upon acceptance of hotline calls, SCR operators apply one of three codes to each report in descending order of urgency; Emergency, Action Needed or Normal.  The report requesting a worker to respond to the police station was coded Action Needed by the SCR operator who received the call.

In an interview with the OIG, the SCR operator stated it was her understanding the Emergency code was only to be applied in cases where a child was at immediate risk of harm.  Since the children were in the custody of officers at the police station, the SCR operator felt the Action Needed designation was appropriate.  In a separate interview with the OIG, an SCR administrator stated it was her opinion the report should have been coded as an Emergency given the extreme circumstances of the situation and the potential emotional trauma to the four year-old who witnessed his mother's murder.  The SCR administrator acknowledged that inconsistencies existed between Department Rules and Procedures and the SCR Call Floor Manual.  The SCR administrator stated the SCR operator had acted in accordance with the manual when she coded the report as Action Needed.

In an interview with the OIG, the worker who responded to the police station stated he had been in the field and was unable to respond to the station immediately when the case was assigned to him.  The worker also cited the designation of the report as Action Needed as factoring into his rationale for completing other tasks prior to traveling to the station.  The worker stated that upon his arrival he was assisted in his efforts by police and denied any disruptive or confrontational behavior.  In an interview with the OIG, the police officer leading the investigation stated the worker was professional throughout his interactions with officers and family members and provided assistance that was appreciated by police.  The OIG found no evidence to support the allegation the worker had behaved unprofessionally towards law enforcement.

During the course of conducting its investigation, the OIG identified significant deficiencies with a previous child protection investigation involving the family that had been unfounded five months prior to the mother's murder.  After a call was made to SCR alleging the couple's five year-old daughter reported a violent fight between her parents, the child protection investigator assigned to the case failed to complete several required tasks.  The investigator documented in the case file she had contacted local police and been informed there was no history of law enforcement activity at the family's home.  An OIG review of police records found officers had been called to the residence 17 times during the previous 13 years with 6 calls stemming from accusations of domestic violence.  Six months prior to the mother's murder, while the child protection investigation was pending, the father was arrested after police responded to the home following a report the father had beaten the mother in front of their children.  One month after his arrest, the father had been convicted of battery and sentenced to 12 months supervision.

The OIG also found the case file contained documents completed by the investigator containing contradictory information.  A domestic violence screen on the father conducted by the investigator recorded that a Law

Enforcement Agency Database System (LEADS) had been completed showing the father had no history of domestic violence, while a substance abuse screen confirming a previous arrest of the father for domestic battery was also included.  Records documenting no previous contact with law enforcement were also present in the case file.  The investigator received approval from her first supervisor not to interview a relative of the family reported to have left the country, but documented the relative was present at a meeting with the family. The investigator's second supervisor approved the decision to unfound the report and close the case without ensuring the investigator had interviewed the individual who made the report to SCR.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.  The child protection investigator should receive disciplinary counseling for her deficient investigation; for failing to obtain and review a police report regarding the prior domestic violence incident; for failing to interview the mandated reporter and for faulty completion of the Domestic Violence Screens.**

Discipline of the child protection investigator is in process.

**2.  The child protection investigator's second supervisor should receive non-disciplinary counseling for signing off on an investigation that contained inconsistencies that should have been apparent on review: the inclusion of the relative in the list of persons present during an interview, while requesting a waiver for interviewing the grandmother; and failing to ensure that the investigator retrieved the police reports.**

The child protection supervisor was counseled.

**3.   The child protection investigator's first supervisor should receive non-disciplinary counseling for approving the Domestic Violence and Substance Abuse Screens with discrepancies that should have been questioned.**

The child protection supervisor will be counseled.

**4.  The Department should review policy and procedure regarding Hotline Response Codes.  In cases in which children have been traumatized through severe violence, an "Emergency" coding should be used even if the children are safe.**

State Central Register (SCR) staff have been informed they are to follow Procedures 300, *Reports of Abuse and Neglect* as it relates to the coding of emergency responses which includes the coding of children held by law enforcement or physicians as "emergency response required" regardless if it is determined they are safe at the time.

**GENERAL INVESTIGATION 17**

| **ALLEGATION** | The mother of a 14 year-old female Department ward used a voucher from the Department to fraudulently obtain goods. |

**INVESTIGATION**   The 14 year-old girl and her 15 year-old brother resided in an unapproved placement with their mother after repeatedly running away from a residential facility and returning to her home. The mother and the girl met with the family's caseworker in order to obtain a voucher for school supplies for the girl's upcoming academic year and received a Purchase Authorization Form. The Department's Purchase Authorization Form is a document produced in quadruplicate. The form must be presented to retailers in full and retailers are required to complete the document and retain the bottom copy, while the top three copies are returned to the Department. A voucher was completed designating the mother as the recipient of the funds.

The Department's Division of Vouchering identified irregularities with the voucher provided to the mother when it was submitted by a retailer. Further investigation by the Division found the same voucher number had been redeemed at two separate stores and that several of unapproved items had been included in both transactions. In an interview with the OIG, a manager from the vouchering unit stated it appeared the retailers had accepted a copy of the voucher rather than the original and allowed the transactions to proceed without contacting the unit to confirm the purchases were approved. The Purchase Authorization Form does not include instructions to retailers to contact the Department for approval prior to completing a transaction. The form also does not provide a phone number to facilitate communication with the vouchering unit.

The Department submitted payment to the retailers for the items purchased with the vouchers related to appropriate supplies for the 14 year-old girl. The Department did not honor the purchases of unapproved items.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**   **1. Purchase Authorization Forms (CFS 932) should be amended to include a statement warning that the Department will not honor copied vouchers, and that the presenter must have and present the entire quadruplicate form for the transactions to be valid. In addition, vouchers should include contact information for anyone with questions about whether a voucher is valid. All calls regarding vouchers should be tracked.**

Department Procedures were amended to require a phone number and contact name on Department Purchase Authorization Forms (CFS 932). The following statement will also be added to the voucher: "Vendor should not accept copies of this form, as it will not be honored for payment."

**2. This report should be shared with the family's caseworker and her supervisor.**

The report was shared with the employees.

## GENERAL INVESTIGATION 18

| **ALLEGATION** | A backlog of over 900 pending child protection investigations in a sub-region of the state were not completed within the 60-day period required by law. The OIG received a complaint that the Department's attempt to perform work on the cases beyond the expiration of 60 days was illegal. |
| --- | --- |

| **INVESTIGATION** | An OIG review of pending child protection investigations in the sub-region found a huge volume of incomplete abuse and neglect cases. |
| --- | --- |

Management was aware of the backlog and attributed its existence to a combination of poor management, staff vacancies and a consistently increasing level of new cases. A plan had been developed and implemented which led to a significant reduction in the number of open cases. The plan temporarily increased staff to the sub-region. Investigators would complete paperwork on cases that had been investigated and for the remaining cases, investigators would visit the children. If any sign of abuse or ongoing risk was apparent, a new hotline call would be initiated. With the support of employees from around the state, the crisis in the sub-region was brought under control.

The Abused and Neglected Child Reporting Act (ANCRA) requires child protection investigations to be completed within 60 days. A provision exists allowing investigations to be extended with supervisory approval in cases where specific conditions are met. The OIG found that while the Department had implemented efforts to reduce the backlog of open cases, additional work had been conducted on many cases after expiration of the 60-day time frame without approvals for extension being requested or granted. Furthermore, in many instances workers assuming responsibility for cases did not perform new tasks but relied solely upon older information contained within case files. While the Department's efforts to address the backlog of cases was well-intentioned, all child protection investigations must be managed in such a manner that accuracy is not sacrificed in the interest of expediency.

Child welfare professionals, administrators and direct practitioners have a fiduciary duty to society to provide quality services and to handle their tasks in a competent and responsible manner. The ethical obligation to respond to clients in a timely manner demands that administrators create an environment where those obligations can be met. At the point that administrators detect significant, ongoing issues, they must be responsive and proactive in developing quick and effective strategies that put an end to deleterious practices that prevent children and families from receiving timely, quality intervention from the Department.

The Inspector General's investigation did not substantiate the complaint that Department administrators acted unethically or illegally in executing a crisis plan to address the backlog of pending cases in the sub-region. By advocating for full staffing in the sub-region, the Department not only corrected the backlog but initiated measures to prevent another child protection crisis from developing.

| **OIG RECOMMENDATION / DEPARTMENT RESPONSE** | **Should the number of overdue pending investigations in a sub-region surpass a specified level, the Department should implement emergency response procedures that include utilizing** |
| --- | --- |

**the statutory options allowed by Rule 300.80, *Delegation of the Investigation*, to negotiate greater delegation of investigative contact responsibilities to law enforcement, especially well child checks, in order to ensure the safety of children.**

The Department agrees.

**GENERAL INVESTIGATION 19**

| **ALLEGATION** | The General Counsel for the Department of Children and Family Services requested that the Office of the Inspector General participate on an existing *ad hoc* committee that has been examining the existing Administrative Rule 336 governing Appeals of Indicated Abuse/Neglect Findings (89 Ill.Adm.Code 336) and recommending changes to the Rule.   The Office prepared a memorandum detailing investigations and complaints relevant to the consideration of the *ad hoc* committee. |

**INVESTIGATION**   In the last three years, the Office of the Inspector General has received numerous complaints regarding issues of concern that arise during the Department's Administrative Review of indicated abuse or neglect findings.   Many of the complaints allege that the Administrative Law Judge has excluded evidence or otherwise acted in a way contrary to the concerns of the Department's Representative.

When the Department Representative is aggrieved by an evidentiary ruling, the existing structure of the appeals process provides few avenues to challenge the Administrative Law Judge's ruling.   First, the Department Representative is prohibited from having *ex parte* conversations with the Director and anyone involved in the decision-making process concerning any case that is before the Director.   If the Recommendation from the Administrative Law Judge does not discuss the evidentiary disagreement, the Director will not have any understanding that evidence was, in fact, excluded.

In reviewing the Recommended Findings of the Administrative Law Judges associated with the complaints, we found that it is often not apparent from a Recommended Finding that there was an evidentiary dispute during the hearing.   For instance, if the Department proffered a DVD of a Victim Sensitive Interview and the administrative law judge did not admit it as evidence, the Recommended Finding to the Director may simply say: *the Department failed to meet its burden of proof.*

Once the Director has approved a finding to expunge, the Department Representative cannot appeal.   In most administrative hearing processes, these problems are handled by a comment period:  the Administrative Law Judge's Recommended Order is distributed to all parties, who have an opportunity to comment on the Recommended Order and the decision-maker will have the benefit of any comments in addition to the Recommended Order.   However, because of the tight deadlines imposed on expunction hearings in the Department, the parties have no opportunity to file a comment or response to the Proposed Recommendation of the Administrative Law Judge.   Because of these two structural factors, Department lawyers handling expunction cases often find themselves without an avenue to contest what they perceive as unfair evidentiary rulings that may result in children being placed in unsafe situations.   As a result, our Office has received several complaints about the process.

Several of the complaints arise from common evidentiary problems that are not explicitly addressed in Rule.   The purpose of this memo is to provide information and suggestions to the Department's *ad hoc* 336 Committee to address the most common and recurring issues that our Office has identified.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **The Department should revise Rule 336,** *Appeals of Indicated Abuse/Neglect Findings***, to include the following:** |

**a.  The Department is in compliance with the Exchange of Information Rule with regard to Recordings of Victim Sensitive Interviews (VSI) when the appellant is provided an opportunity to view or listen to**

the Recording at a reasonable time and place prior to hearing.  If an Administrative Law Judge (ALJ) determines a party requires a copy of the VSI and the ALJ determines necessary, the Department will subpoena the States Attorney's Office on behalf of the requesting party for a copy of the VSI.

The Department does not agree.

**b.  It is presumed that physicians and other professional testimony by phone is permitted unless for good cause shown.  When good cause is shown, the ALJ's Recommendation shall note that testimony by phone was disallowed and why.**

The recommendation has been implemented in practice.  Department Rules will be revised to reflect this recommendation.

**c.  The ruling of an Administrative Law Judge on the admissibility of evidence, whether a witness may testify by phone and other interlocutory orders, may be immediately appealed to the Chief Administrative Law Judge or his designee.**

The Department does not agree.

**d.  Whenever a critical piece of evidence is excluded, the ALJ's Recommendation shall so state and include an explanation of the reasons therefore.**

The recommendation has been implemented in practice.  Department Rules will be revised to reflect this recommendation.

**e.  Grounds for dismissal (Rule 336.190) should include: "The appellant has admitted in a court of law to the facts supporting the Rationale for the indicated finding."**

The recommendation has been implemented in practice.  Department Rules will be revised to reflect this recommendation.

**GENERAL INVESTIGATION 20**

**ALLEGATION**   In providing training for agencies with pregnant teens, the OIG observed that many of the teams struggled with obesity.

**INVESTIGATION**   During the OIG Training a girl came to the attention of the OIG when she experienced difficulty performing basic tasks due to her compromised physical condition.  The OIG later learned the girl had gone into cardiac arrest while undergoing a c-section to deliver her baby.  The girl was diagnosed with congestive heart failure and required the development of an extensive medical regimen to address her condition following her release.

The OIG identified instances when events sponsored by the private agency for clients served pizza, Cheetos, soda and Oreo cookies.  The OIG contacted administrators with the private agency who acknowledged having recognized the need to assess the food choices provided to clients at informational meetings.  The administrators agreed to offer healthier food options at gatherings held for clients.

Childhood obesity is a complex problem that requires intervention and prevention education to the field on assisting children and adolescents with this health issue.  The OIG developed educational materials regarding the health implications of obesity, and guidelines for workers and caretakers to address this issue when an obese child or teenager has been identified

In response to previous OIG investigations which found that child welfare investigators and workers were insufficiently informed about children's chronic medical conditions such as sickle cell anemia, diabetes and cerebral palsy, the OIG collaborated with the University of Illinois at Chicago's College of Nursing to produce a reference workbook, *A Guide for Caseworkers and Caregivers: Caring for Children with Chronic Health Care Conditions*.  It was updated and disseminated to the field in January 2012 through the Department's website.  An educational section on childhood obesity will be added to the *Guide* in the next revision in January 2014.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.   The educational report on Childhood Obesity should be immediately disseminated to the field.**

The Department agrees and is determining the best method for dissemination to the field.

**2.  Information from the report on Childhood Obesity should be incorporated into the Department's Foundation training curriculum, which now includes children's chronic health conditions.**

The Department agrees. The Educational Report on Childhood Obesity and A Guide for Caseworkers and Caregivers: Caring for Children with Chronic Health Conditions will be added to the Foundation Core Curriculum update on Child Health training course for DCFS and POS agency caseworkers.  The information will also be included in the PRIDE training course for foster and adoptive parents.

**3.  In January 2014, the report on Childhood Obesity will be added as a chapter to the next revision of *A Guide for Caseworkers and Caregivers: Caring for Children with Chronic Health Care Conditions*.**

The report on Childhood Obesity will be added as a chapter to the next revision of A Guide for Caseworkers and Caregivers: Caring for Children with Chronic Health Care Conditions.

**GENERAL INVESTIGATION 21**

| | |
|---|---|
| **ALLEGATION** | In FY 2012, the OIG noted increasing numbers of referrals for falsification of casenotes. |

| | |
|---|---|
| **INVESTIGATION** | Each year, the Office of the Inspector General receives allegations concerning falsification of casenotes or contact notes, false testimony in court or failure to inform the court or court personnel of critical information concerning the child and the family. In addition to investigating the allegations and recommending appropriate discipline, the OIG will also review all such investigations or allegations for possible revocation of the individual's Child Welfare Employee License. The OIG will then issue charges and administratively prosecute the cases to revoke or suspend the individual's Child Welfare Employee License. In other investigations, even where no falsification is found, it is clear that workers too often view the juvenile court process as an interference rather than a partnership in executing the public trust. While there is no excuse for falsification, the Inspector General determined that the field would benefit from symbolic reminders about the importance of sharing full and honest facts with the court and the dangers of creating false case records. |

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The Department should develop a ceremony, in conjunction with juvenile courts throughout the State, to administer oaths of accountability and public trust to new hires (both Department and POS) in which workers would affirm their duty to act as the eyes and ears of the courts and to provide full relevant facts to the courts and courtroom personnel and to uphold the standards set forth in the Illinois Code of Ethics for Child Welfare Professionals.**

The Department does not agree. A ceremony to administer an oath of accountability is unnecessary. Each worker takes an oath to tell the truth each time s/he testifies. However, court testimony training was conducted in all regions for both private child welfare agency and Department staff that emphasizes the need to provide full and honest testimony. The curriculum has been incorporated as part of the Foundation Training courses for DCFS and private child welfare agency staff.

**2. CORE Training should include a particular caveat that providing knowingly false information in casenotes, contact notes or courtroom testimony could result in revocation of their Child Welfare Employee License and is a violation of the public trust.**

All new Department and private agency staff completing their initial Core Training are issued DCFS Rule, Part 412, *Licensure of Direct Child Welfare Services Employees and Supervisors*, and informed of action that can be taken against their license for falsification under Section 412.50, *Grounds for Suspension, Revocation or Refusal to Reinstate License*.

## GENERAL INVESTIGATION 22

| ALLEGATION | The OIG received a complaint that a foster care case manager, who had previously been employed by a private agency, falsified case notes regarding foster home visits on her caseload while employed at the agency. |
|---|---|

| INVESTIGATION | The foster care case manager began working at a private agency in March 2011, obtaining her Child Welfare Employee Licensure the same month. She carried a |
|---|---|

caseload of 16 foster care families during the eight months she was employed at the agency. She resigned from the agency in December 2011 to take a foster care case management position at another private agency. The worker was currently employed at the new agency at the time the OIG investigated the complaint.

*Family 1*
The foster care worker was assigned Family 1 in September 2011. According to the worker's notes she visited the home once in September, October and November 2011. The worker documented that during the November visit the worker and foster parent met in the dining room of the foster parent's home and that the children were playing in their bedrooms during the meeting.

A new worker was assigned Family 1's case following the previous workers resignation. Upon the new worker's first visit to Family 1's home, the foster mother informed the new worker that the November visit, documented by the previous worker, did not take place. The foster mother also informed OIG staff that the in person visit was canceled but they spoke on the phone.

In the OIG interview of the worker, she admitted to falsifying that she was at the home for the November visit with Family 1. She said that on the day of the visit she instead called the foster mother. She said only the location and details about the home were falsified, the details about issues discussed about the family were not. The worker said she wanted to give the appearance that she was compliant with seeing the children in person per DCFS procedures. The worker said she told the supervisor that she made a phone call instead of an actual visit and the supervisor told her document the phone call. She denied that the supervisor told her to document it as an in person visit. The supervisor denied to OIG investigators that the worker told her about calling the foster mother instead of making an in person visit.

*Family 2*
The worker was assigned Family 2 in September 2011 and the same month documented the transition visit. She documented two more in person visit to the home prior to December 2011. When the new worker took over the case the foster mother told the new worker that the prior worker never returned to her home after the transition visit in September 2011.

The worker admitted to OIG investigators that she did not make in person home visits in October and November 2011. She said she was overwhelmed with her caseload and that she did not have time to make all required visits. She said she was again attempting to give the appearance that she was making in person visits with the children.

*Child and Family Team Meeting Falsification*
During the OIG interview, the worker also told OIG investigators that she falsified Child and Family Team Meeting ("CFTM") notes to say that her supervisor was present during the meeting when in fact the supervisor was not. The worker said her supervisor instructed her to falsify the notes as such in order for the meeting to be classified as one of the quarterly required CFTMs. The worker was able to identify one such family case but was unable to recall the date of the CFTM. The worker said typically when she conducted a CFTM out in the community without her supervisor, she would use her cell phone to put the supervisor on speaker phone.

A review of the Statewide Automated Child Welfare Information System ("SACWIS") notes for the family case shows there were two CFTMs documented by the worker, one in June 2011 and the second in September 2011. Both notes indicated that the supervisor participated via phone. However, in the September 2011 note the worker wrote that she would have to get back to the family about a decision regarding visitation as she would need to consult with her supervisor. The supervisor told OIG investigators that she did not recall any of the CFTMs with the family as the dates were more than a year prior to the OIG interview. She denied telling the worker to falsify that she was present or on the phone at a CFTM when she was not. OIG investigators subpoenaed cell phone records and found no record of a phone call between the worker and supervisor for the September CFTM.

*Additional Supervisor Directed False Documentation at the Agency*

Following the OIG interview of the supervisor, the supervisor informed the agency's director of the OIG investigation. The supervisor then informed the director that when she was a foster care worker, her supervisor at the time, who was no longer working at the agency, asked her to falsify CFTM notes to say that her supervisor attended the meeting when she had not. She complied with the supervisor's directive out of fear of retaliation. The supervisor said that since becoming a supervisor herself she has never treated her supervisees like that and reaffirmed that she has never asked them to falsify any notes.

An OIG review of the supervisor's performance evaluations indicated that the supervisor's team completed the quarterly CFTMs at a rate of 100% in the third and fourth quarters in 2011. The agency director told OIG investigators that not all foster care cases are eligible for the quarterly CFTM's and that at the time the supervisor was in charge of five foster care workers who each had five to seven families that were eligible for quarterly CFTMs (25- 35 CFTMs per quarter). When asked about 100% completion of quarterly CFTMs, the director said that it is not unheard of but rare because not all families that are eligible for CFTMs will cooperate or can be located.  The inflated CFTM rate should have been questioned by management.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The Office of the Inspector General has issued charges against the foster care worker's CWEL license.** |

The employee's Child Welfare Employee License was revoked.

**2.  The report should be shared with the worker's current employer for the purposes of supervision.**

The Inspector General shared a redacted report with the case manager's current employer.

**3.  The agency should discipline the supervisor in accordance with the agency's personnel policies and procedures.**

The Inspector General shared a redacted report with the private agency.  The private agency terminated the supervisor.

**4. The agency's child welfare managers, in consultation with the agency's Ethics Board, should conduct round table ethics seminars with their staff focusing on the ethical issues raised in Chapters 6, "Ethical Issues Related to Competence" and Chapter 9 "When Others Act Unethically" of the *Ethical Child Welfare Practice A Companion Handbook to the Code of Ethics for Child Welfare Professionals*, Volume I Clinical Issues.**

The private agency's Regional Director issued a memorandum to all staff regarding ethical issues and the utilization of technology.  The Regional Director met with each supervisory team to discuss child welfare ethics and agency wide training sessions were conducted on critical thinking, decision making, and ethics.

**GENERAL INVESTIGATION 23**

| | |
|---|---|
| **ALLEGATION** | A former Department intact family services worker whose employment had been terminated for falsifying records continued to hold a Child Welfare Employee License (CWEL). |

**INVESTIGATION**   The former intact services worker had been terminated by the Department for falsely reporting to his supervisor that he had visited a family with an open case for services. In addition, he had failed to enter case notes or perform any work on a number of cases for months at a time. The OIG conducted interviews with the former worker, the supervisor who had overseen his duties and the mother of the involved families. The OIG also reviewed the case record as well as documents pertaining to the worker's discharge proceedings. The OIG determined to seek suspension of the worker's Child Welfare Employee License.

An OIG review of the former worker's personnel file found he had been employed by the Department for 17 years without any instances of discipline prior to engaging in a pattern of substandard effort which resulted in his termination. In an interview with the OIG, the former worker attributed the deterioration in the performance of his duties to significant personal issues that arose and continued over time. In a separate interview with the OIG, the supervisor acknowledged being aware of the former worker's personal issues and emotional instability at the time his work performance declined. The supervisor stated the former worker was frequently visibly distressed during the time period and had often had difficulty maintaining his composure in the office. The supervisor did not take any steps to encourage the former worker to avail himself of Department resources dedicated to providing assistance to employees experiencing emotional distress.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**   **1.   The OIG issued charges for suspension of the former worker's Child Welfare Employee License.**

Charges were issued against the employee's child welfare employee license and a hearing was conducted. The matter is pending with the Administrative Law Judge.

**2. The supervisor should receive non-disciplinary counseling from the Department's Division of Labor Relations concerning appropriate response to the former worker's distress in the office.**

The employee was counseled.

**GENERAL INVESTIGATION 24**

| ALLEGATION | A private agency caseworker falsified a dental report of a 9 year-old Department ward and presented it during an Administrative Case Review (ACR). |
|---|---|

| INVESTIGATION | The caseworker was responsible for ensuring services were provided to a 9 year-old boy who was a Department ward residing in the home of his maternal aunt. In |

advance of an Administrative Case Review (ACR) to evaluate the status of the case, the caseworker realized she had not obtained records pertaining to the child's annual dental care. In an interview with the OIG, the caseworker stated she had been in contact with the maternal aunt who verbally confirmed the child had received his annual dental care; however, the caseworker was unable to coordinate a meeting to receive documentation prior to the review. In order to present a complete medical record at the ACR, the caseworker altered the prior year's dental form. The caseworker presented the falsified document at the ACR as a representation of current care.

The private agency terminated the caseworker immediately upon learning of her actions shortly after the ACR concluded. An OIG review of records maintained by DentaQuest, the state benefit provider for Medicaid patients, confirmed that the boy had received the dental care reported by the maternal aunt.

The Office of the Inspector General filed charges for suspension of the worker's Child Welfare Employee License.

| OIG RECOMMENDATION / DEPARTMENT RESPONSE | **The Department should inform child welfare professionals involved with the family of the DentaQuest member service history report.** |
|---|---|

A D-Net announcement is being drafted to inform staff of this information.

**GENERAL INVESTIGATION 25**

| | |
|---|---|
| **ALLEGATION** | A Department child welfare specialist disclosed confidential information regarding a child protection investigation to a member of the public. |

| | |
|---|---|
| **INVESTIGATION** | In an interview with the OIG, the specialist stated she had contacted the State Central Register (SCR) to report an allegation of abuse to a child. The specialist acknowledged having later accessed the State Automated Child Welfare Information System (SACWIS) to view the report of her hotline call and the disposition of the case. The specialist denied ever disclosing any information contained in the SACWIS report to a member of the public. The OIG found no evidence the specialist had shared confidential information outside the Department. The specialist stated she was aware she had violated Department Rule by accessing the SACWIS database. |

| | |
|---|---|
| **OIG RECOMMENDATION / DEPARTMENT RESPONSE** | **The child welfare specialist should be disciplined for violation of Department Rule 437, Conflict of Interest, and for using state resources for activities other than state business.** |

The employee retired prior to implementation of discipline.

## GENERAL INVESTIGATION 26

| **ALLEGATION** | A private agency administrator continued to perform duties requiring her to have a current Clinical Social Work license (LCSW) despite having allowed her professional license to lapse several years earlier. |
|---|---|

| **INVESTIGATION** | While reviewing Division of Professional Regulation (DPR) records, the administrator learned her LCSW had expired seven years earlier. Despite |
|---|---|

becoming aware of her lack of licensure, the administrator did not inform the agency and continued to carry out functions of her position, such as worker supervision and document approval, requiring the oversight of an LCSW. In an interview with the OIG, the administrator stated that while she was not required to have a LCSW to hold her position with the agency, she was asked to perform specific duties because she had one. The administrator said she contacted DPR after learning her license expired and attempted to initiate the reinstatement process, but was unsuccessful. The administrator stated she had not performed any duties requiring a LCSW for the agency after learning her license expired. After OIG investigators presented the administrator with a document she had signed as a LCSW holder after learning her license had lapsed, the administrator said she may have done so believing her license would be reinstated retroactively.

After the administrator's superiors at the agency learned she did not have a current LCSW she was instructed to immediately cease performing duties that required the professional license and rectify the situation. After consulting with DPR, the administrator learned the amount of time that had elapsed since her license had expired exceeded the limit for reinstatement and she would have to go through the testing process again. The private agency decided to terminate the administrator's employment as a result of her lack of licensure and her handling of the situation. An OIG review of agency records found the administrator had signed off on 287 documents requiring the authorization of a LCSW holder since the time her license expired, including 16 she completed after learning her license was invalid. This report was shared with the Medicaid Unit.

| **OIG RECOMMENDATION / DEPARTMENT RESPONSE** | **The Inspector General filed charges against the employee's Child Welfare Employee License (CWEL).** |
|---|---|

The employee relinquished her CWEL.

**GENERAL INVESTIGATION 27**

| | |
|---|---|
| **ISSUE** | In her role as DCFS Ethics Officer, the Inspector General manages the review and filing of annual Statements of Economic Interest required to be filed by DCFS employees, pursuant to the State Officials and Employees Ethics Act. (5 ILCS 430/20-23). After the 2013 filing period, the Inspector General reported on overall compliance and also noted problems related to the process by which the Department identifies which employees are required to file a Statement. |

| | |
|---|---|
| **DISCUSSION** | In 2013, the Department identified 669 employees who were required to file an annual Statement of Economic Interest form. As part of that process, the Department requires that all original and completed forms be submitted to the Ethics Officer, who then reviews each form and files each with the Secretary of State. (Please see section entitled "Ethics" for 2013 statistics about the types of disclosures made in 2013.) |

**Non-Compliance Statistics:** Beginning in 2011, any employee who failed to follow the Department's filing instructions and sent their Statement directly to the Secretary of State for filing (rather than the Ethics Officer for required review) received a non-compliance letter that was added to his/her personnel file. This letter notified the employee of the error and outlined the proper filing procedures. The letter further stated that failure to properly file in the future could result in discipline. In 2011 this amounted to 120 (16%) of the employees required to file. In 2012 the number of non-compliant employees decreased by almost half, to 62 (8%) and the decline continued into 2013 where the number of non-compliant employees decreased further to 28 (4%).

**Concerns about DCFS' Process for Identifying Employees Required to File a Statement of Economic Interests:** In past years, Ethics Staff have noted problems with the integrity of the list generated by the Department which identifies the universe of employees required to file a SOEI. Some of these concerns include persons who appear to fit the statute's definition who are not on the list, persons on the list who do not appear to have relevant job duties, persons who were on the list one year but not the next (without change in job duties) as well as new hires and retirees who are not added or removed upon change in status. This year, Ethics Staff again noted discrepancies in terms of persons who, for the first time in several years, were inexplicably *not* required to file, without having had a change in job duties. Simultaneously, some individuals who should be required to file, such as the DCFS Chief Financial Officer, were not included on the list.

According to information provided by the Office of Legal Services, the Department's process for identifying which employees are required to file was automated in 2006 and is managed by the Office of Employee Services. There is no information that suggests this process has been revisited since 2006 despite several Departmental reorganizations.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. A DCFS employee who failed to follow the Department's specific filing instructions in 2011, 2012 and 2013, (after receiving a written warning with specific instructions in December 2011 and an oral reprimand in July 2012), should be disciplined.** |

Discipline of the employee is pending.

**2. A DCFS employee should be disciplined for improperly sending her Statement of Economic Interest to the Office of the Secretary of State in 2012 and 2013, after receiving a written warning with specific**

**instructions in 2012.**

The employee was disciplined.

**3.  The 28 employees who improperly sent their 2013 Statement of Economic Interests directly to the Office of the Secretary of State should receive written notice of their error which outlines the proper process and states that failure to properly file in the future could result in discipline.  This non-compliance letter should be added to the personnel file of each of these 28 employees.**

The employees received written notification of their non-compliance with Department procedures.

**4.  Given the Department's recent reorganization, the Department should review and clarify its process for determining which employees are required to file a Statement of Economic Interest.**

The Department agrees.  Review and clarification of the process is in process.

**GENERAL INVESTIGATION 28**

| ISSUE | The Office of the Inspector General referred to the Illinois State Medical Board a case in which a doctor failed to alert the DCFS Hotline as mandated. |
|---|---|

| DISCUSSION | |
|---|---|

The doctor was the treating pediatrician for a 2 ½ year old boy who presented with an ear infection after he had been treated at the Emergency Room for abuse.  The Emergency Room had noted multiple bruises in circular patterns on the head, upper extremities and the trunk area and a few more elongated bruises noticed on the sides bilaterally.  Some of the bruising looked like it could have been from bite marks.  The Emergency Room physician had diagnosed the injuries as *"child abuse most likely done by the patient's father resulting in multiple bruises."*  The hospital conducted a pediatric skeletal survey which was negative for acute and old fractures.  The Department of Children and Family Services had permitted the Emergency Room to discharge the child to his mother and the mother was instructed to follow-up with the pediatrician in four to five days.

The pediatrician saw the boy 3 months after the ER visit, and noted a knot on the boy's sternum and a laceration on his lip, which had developed a lesion.  The pediatrician documented that the lesion "appeared to be painful" and that the boy "would not close his mouth."  The pediatrician ordered a chest x-ray which disclosed a fracture of the mid-sternum.

Approximately one week later, the mother contacted the pediatrician and reported that the boy had been vomiting and had not been able to keep any food down.  The pediatrician instructed the mother to give the boy clear fluids and bland foods and bring the child in if the symptoms worsened.

The boy died that day from a closed head injury and the manner of death was homicide.  The pathologist found contusions on his head, face, lips, legs, right upper arm, left hand and abdomen, an old fracture of the sternum and burn injuries to the left chest and both hands.  The Coroner's Inquest determined that the boy had been the victim of chronic abuse and the cause of death was a closed head trauma due to a subdural hematoma.

A fractured sternum occurs from a direct blow or violent compression of the thorax with sternal displacement.  When present, fractures of the sternum are pathognomonic of abuse.  Given the boy's history of injury and his mother's inability to explain his fractured sternum, the Office of the Inspector General referred the pediatrician's failure to call the hotline for prosecution by the Illinois State Medical Board.

| ACTION TAKEN | The pediatrician was successfully prosecuted; her license was suspended for one year and she was required to pay a $5000 fine for failure to report child abuse. |
|---|---|

**GENERAL INVESTIGATION 29**

**ALLEGATION**  The Inspector General received a request from DCFS Management to render a decision regarding whether the Department could pay a private contractor for work performed without a valid contract and during a period where the DCFS Conflict of Interest Committee had determined she could not simultaneously engage in her DCFS responsibilities and work as a therapist to DCFS wards through a private agency that also had DCFS contracts.

**INVESTIGATION**  The private contractor, who had performed the same or similar contract during the previous year, disclosed on her fiscal year 2014 contract that she was also employed as a therapist at a private agency. The Department had unrelated contracts with this agency.  As a result of this disclosure, the Department inquired to the DCFS Conflict of Interest Committee as to whether it was a conflict of interest for the private contractor to engage in both positions.

As part of the Conflict of Interest Committee's evaluation process, it was discovered that in her role with the private agency, the contractor provided therapy to DCFS wards. The Committee rendered a decision that under Department rules the private contractor was considered an "employee" and as such could not provide services to DCFS wards through an entity other than DCFS, to the extent that it caused a conflict of interest. In an effort to resolve the issue, the Committee suggested that the private contractor end her therapeutic relationship with the wards she counseled through the private agency and work with the agency's management to build an ethical wall in the future to avoid working directly with DCFS wards.

As a result of the Committee's determination, the contractor chose to end her private employment with the agency, and notified her DCFS supervisor and the DCFS contracts liaison of her decision. In her notice to DCFS, she outlined a timeline by which her work with the private agency would be completed. Based on this timeline, the DCFS Director signed her fiscal year 2014 contract to be effective on the date she identified that her private agency work would be entirely concluded.  Between the time of her notice to DCFS of her plans to leave the private agency employment and the effective date of her contract (approximately six weeks) the private contractor continued to be assigned DCFS work which she preformed. Her DCFS supervisor later explained that he continued to assign her work, not understanding that she was working without a contract. The issue came to light when the contractor contacted DCFS because she had not been paid for her work during this time.

Although the Conflict of Interest Committee notified the relevant DCFS administrators and supervisors of its determination, the individuals who supervised the private contractor failed to understand and communicate to her that she could not continue Department work until she was entirely separated from the private agency. Instead, they misinterpreted the Committee's response to mean that upon giving notice of separation to the agency, the conflict was instantly resolved.  This did not take into account that during her transition from the agency, she would be engaged in the very activity that the Conflict of Interest Committee determined was a conflict.

Because of this miscommunication, the Department had assigned work to the private contractor, and she performed that work while without a valid contract, through no fault of her own.  She relied in good faith on the Department by accepting assignments, on the assumption that those who communicated the problem to her were satisfied with her resolution of the conflict.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The Department should compensate the private contractor for 255.5 hours of work she performed between July 1 – August 16, 2012 by use of a waiver for payment for services performed prior to the existence of a written contract, pursuant to 30 ILCS 500/20-80.** |

Payment was made.

**2.  The DCFS administrators and supervisor who misinterpreted the Committee's determination and continued to assign work to the private contractor without a valid contract should receive non-disciplinary counseling.**

The employees were counseled.

**3.  This report should be shared in full with the DCFS administrators and supervisor to enhance their understanding about secondary employment conflicts and communication with the Conflict of Interest Committee.**

The report was shared.

**4.  This report should be shared with the Conflict of Interest Committee to strengthen their understanding of practical considerations when a mental health or child welfare professional may be terminating secondary employment involving counseling services, which will ethically include a transition period.**

The report was shared with the Conflict of Interest Committee.

**GENERAL INVESTIGATION 30**

| ALLEGATION | The Department included an employee's personal information in an email distributed to a number of fellow workers. |
|---|---|

| INVESTIGATION | The employee received an email from the Department's Division of Labor Relations pertaining to an upcoming pre-disciplinary meeting. In the email, which |
|---|---|

was copied to several Department workers, Labor Relations had included the employee's full social security number. In an interview with the OIG, a Labor Relations administrator stated the employee's social security number was included in the email to ensure the message was delivered to the correct employee. Since it is possible for multiple Department workers to share the same first and last names, social security numbers are included as an additional identifier. Several co-workers were copied because the Department was unsure which Union Steward was responsible.

Given the heightened sensitivity towards identity theft and the dissemination of personal information, the Department should use great discretion when determining what information to include in electronic transmissions and the appropriateness of all recipients.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. Only the last four digits of the social security number should be used by Labor Relations when sending notice to an employee of a pre-disciplinary matter.** |
|---|---|

The Department's Division of Labor Relations now uses only the last four digits of an employee's social security number on Statements of Charges and Notices of Discipline.

**2. Distribution of a notice of a pre-disciplinary matter should be limited to the employee, the person expected to conduct the pre-disciplinary interview and the local union president.**

The Department's Labor Relations will send notification to the identified local steward. If the local steward does not respond, assistance will be sought from the local union president.

## GENERAL INVESTIGATION 31

| ALLEGATION | A Department administrator permitted Department facilities to be used after hours for community activities unrelated to work. |
|---|---|

| INVESTIGATION | The field office where the events took place regularly made conference rooms available to workers and community members for small parties and |

informational meetings during and after work hours.  In interviews with the OIG, the administrator stated that opportunities to utilize the conference room were offered in order to foster connections between the Department and the community.  The administrator stated that the areas of the building where events were held were separate from workstations and that any locations where confidential client information was kept were secure.  The administrator stated that although groups using the rooms were aware of the rules of use governing the facility, including the prohibition of any alcohol on the premises, there was no documentation of any existing regulations or written agreements with the community groups.  There was no requirement Department staff be present during events.  The administrator stated that since Department security personnel were present at the facility around the clock additional security was unnecessary and additional costs were not incurred by the Department.  The administrator did note that some groups opted to provide their own additional security.

An OIG review of scheduled use of the conference rooms during work hours found a significant amount of time dedicated to non-work events.  Conference rooms were reserved for two to three-hour blocks for retirement parties and several hours of work time were devoted to trainings on coping with menopause.  While the administrator claimed the trainings had been approved for Continuing Education Units, they had not.  Continuing Education Units are intended to be awarded to recognize ongoing efforts to bolster knowledge pertaining to providing child welfare services.

In an interview with the OIG, an attorney from the state's Central Management Services (CMS) confirmed that state agencies are not required to seek prior approval to allow use of their facilities.  The attorney stated, however, that if agencies did seek approval from CMS they would be advised to utilize a License and Access agreement governing terms of use and indemnifying the state against any possible claims arising from events.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The Department should establish procedures limiting use of Department facilities after-hours to ensure that there is no access to confidential information.** |

Revisions to Department Rule 433, *Use of Department's Facilities and Grounds*, is pending approval for submission to the Joint Committee on Administrative Rules. The Office of Legal Services and the Office of the Inspector General have approved the draft.

**2.  The Department should determine whether to require the presence of a Department staff person or if the presence of security is sufficient for after-hours use of Department facilities.**

Revisions to Department Rule 433, *Use of Department's Facilities and Grounds*, is pending approval for submission to the Joint Committee on Administrative Rules. The Office of Legal Services and the Office of the Inspector General have approved the draft.

**3.  This report should be shared with the Department's Clinical Division to ensure that Continuing Education Units are not issued for events that are unrelated to client service provision or other work issues.**

The Department agrees.  No DCFS Continuing Education Units were issued for this event.

**4.  If the Department continues to permit after-hours use of Department facilities by non-Department groups, the Department should determine whether to apply through CMS and use the CMS liability waiver for use of Department facilities after hours.**

Revisions to Department Rule 433, *Use of Department's Facilities and Grounds*, is pending approval for submission to the Joint Committee on Administrative Rules.  The Office of Legal Services and the Office of the Inspector General have approved the draft.

**GENERAL INVESTIGATION 32**

| ALLEGATION | The OIG received a request from the Department's Division of Labor Relations regarding whether a Department employee had submitted an inquiry for his |
|---|---|

secondary employment at a community hospital.  Simultaneously, the employee submitted an inquiry to the Department's Conflict of Interest Committee regarding the same. The employee indicated to Labor Relations and the Conflict of Interest Committee that he had received approval from the Committee for this employment 10-12 years prior. The OIG opened this investigation because while the employee reported to the Department that he had secondary employment, he failed to disclose the employment on his annual Statement of Economic Interests.  Labor Relations also requested that the OIG investigate whether the employee had a pattern of leaving his Department job early for his secondary employment.

| INVESTIGATION | The employee was engaged in secondary employment at a community mental health hospital where there was potential for him to engage in a service capacity |
|---|---|

with Department wards, in violation of Department policy.  Although the employee stated that he had brought his secondary employment to the Conflict of Interest Committee approximately 12 years prior, the Committee found no record of such an inquiry.  The Committee reviewed the details of the employee's secondary employment and determined that in order for the employee to continue in the secondary employment he would have to adhere to a set of measures intended to prevent any conflicts between his work at the hospital and his position with the Department.

Because Department management had concerns that the employee was leaving his Department job early to get to his secondary employment, after the Committee's determination, the supervisor and employee met to discuss the details of his secondary employment.  During that meeting it became clear that the employee failed to recognize any of the potential or apparent conflicts between his two sources of employment.  Based on information received from Department management, the Committee thereafter revised its earlier determination and issued a revised opinion stating unless and until the employee recognized the conflicts and took the required steps to alleviate the conflicts of interest, it was not possible for him to simultaneously continue his Department and secondary employment.

In response to the Committee's revised determination, the employee responded stating that he *did* recognize the conflict and *had* taken measures to ensure separation between his two positions.  In order to verify that the steps had been taken, Department management contacted the hospital administration for independent verification, which revealed that the administration understood the ethical walls that needed to be instituted.  Thereafter, the Committee issued a third determination stating that the secondary employment could continue provided that certain points continue to be monitored by the Department supervisor.  Unrelated to his secondary employment, the employee was terminated for cause before the arrangement could begin.

The OIG did not find evidence to suggest that the employee was leaving his Department position early for his secondary employment.  During the investigation, however, it was discovered that the employee had failed to disclose his secondary employment on his annual Statement of Economic Interests filing.  This matter was referred to the Cook County State's Attorney.  The State's Attorney, however, indicated that the office would not pursue the misdemeanor offense.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  If the employee returns to employment with the Department in the future, the parameters placed on his secondary employment by the Conflict of Interest Committee, including** |
|---|---|

**the information that Department management confirmed with the hospital regarding the details of employment, should be timely shared with the employee's assigned Department supervisor.**

The employee was discharged prior to this report being issued.  The employee lost his appeal at arbitration.

**2.  This report should be shared with the Department's Division of Labor Relations.**

The report was shared with Labor Relations.

**GENERAL INVESTIGATION 33**

| ALLEGATION | A Department employee submitted a claim for overtime payments for which she was not eligible. |

| INVESTIGATION | The employee had traveled to a meeting of Department workers held to schedule work assignments. |

The employee had traveled to a meeting of Department workers held to schedule work assignments.  The employee was also acting as a proxy for a fellow worker who had given permission for the employee to represent her at the meeting.  While the employee was able to complete her business at the meeting in a short amount of time, her opportunity to address her co-worker's interests did not arise until much later in the meeting.  Attendance at the meeting was required, either in person or by proxy, and workers were permitted to bill for the time they devoted to participating.  The employee later submitted a claim for overtime payment for the entirety of the time she was at the meeting as well as her travel time home.

In reviewing the Department's process for approval of overtime claims related to the meeting, the OIG found instruction pertaining to the eligibility of claims varied greatly and was inconsistently applied by supervisors present at the event.  One supervisor denied overtime approval for workers acting as proxies while another accepted their requests.  In addition, the OIG found that Department policy regarding overtime claims for travel time are not standardized and subject to interpretation by whomever is evaluating the claim.  The OIG found no evidence the employee attempted to deceive the Department by submitting the claim for overtime pay.

| OIG RECOMMENDATION / DEPARTMENT RESPONSE | **The Department should formalize the policy for overtime with regards to commute time and distribute it to management with notice to staff.** |

This policy will be formalized and included in Administrative Procedure 12, *Travel Guide for DCFS Employees*.

# PROJECTS AND INITIATIVES

## ERROR REDUCTION

In 2008, legislation was enacted requiring the Office of Inspector General (OIG) to remedy patterns of errors or problematic practices that compromise or threaten the safety of children as identified in OIG death and serious injuries investigations and by Child Death Review Teams (20 ILCS 505/35.7). When the Office of Inspector General initiated its Error Reduction effort, one of the basic tenets of the trainings was to offer lessons learned from the Inspector General's investigations and Death Review Teams' evaluations.

The initial set of Error Reduction lessons addressed child protection investigations focusing on bruising of infants and young children. The Office of the Inspector General developed the Cuts, Welts and Bruises Error Reduction training for investigators after noting that many child homicides had had prior contact with the Department involving a problematic cuts, welts and bruises investigation. The training emphasized the importance of obtaining objective information to confirm self-reports. Objective information should include relevant medical and law enforcement records as well as interviews of child-centered collaterals.[1] In addition, the training emphasizes the importance and mechanics of exchanging information with medical professionals. All Illinois child protection investigators, supervisors, and managers were trained on Error Reduction principles in investigations of cuts, welts and bruises in 2010 and 2011. The training curriculum has been incorporated into Core Training for new Child Protection Investigators.

In 2010, a second phase of Error Reduction was initiated when Office of the Inspector General investigations involving intact families with mentally ill parents revealed patterns of practice errors similar to those identified in cuts, welts and bruising investigations. As with child protection investigators, intact family services workers had not been routinely obtaining relevant records, and had been reluctant or did not share relevant facts with the treating psychiatrist, therapist, or other medical professionals. Inspector General staff developed the Error Reduction/Mental Health Training for Intact Family Services Workers to address this need. While workers could often identify concerns about the parents or family, they faced barriers in specifically articulating risks and obtaining specific information from mental health professionals. The training was rolled-out in 2010 and 2011, and focused on effective communication with mental health professionals; informing those professionals when the parents had a history of domestic violence or substance abuse, and understanding the intersection between a mentally ill parent's behavior and the impact of that behavior has on their child's safety and well-being. The training curriculum was incorporated into training for new Intact Family Service Workers.

As of 2012, the Inspector General's staff had trained DCFS and private agency intact family services staff in the Southern, Central, and Cook Regions. The scheduled 2012, Mental Health Training for Northern Region DCFS intact workers was postponed because of budget cuts, which led to the elimination of DCFS Intact Family Teams.

---

[1] Existing practice was to interview only collaterals identified by the caregivers or alleged perpetrators.

# BRUISING – ACCIDENTAL vs. NON-ACCIDENTAL



Low Suspicion
High Suspicion

Johnson C. F. (2002). Physical Abuse: Accidental Versus Intentional Trauma in Children. In J. Meyers, L. Berliner, J. Briere, C. T. Hendrix, C. Jenny, & T. A. Reid (Eds.). The APSAC Handbook on Child Maltreatment (pp. 249-266). California: Sage Publications, Inc.

## The Prevalence and Distribution of Bruising in Babies



*Figure 1  Illustration of the approximate sizes of all the observed bruises.*

This figure illustrates the location of accidental bruises found on infants ages 5-12 months in a study of 177 subjects.

The bruises were all well accounted for and the majority of them were on boney prominences. They were all less than ½" in size and the majority was less than ¼".

**Babies Who Don't Cruise Rarely Bruise**

*Table 1  Mobility of babies with bruises*

| Mobility | n | With bruises (r) |
|---|---|---|
| Sits | 101 | 4 |
| Crawls | 52 | 9 |
| Walks | 24 | 9 |
| Total | 177 | 22 |

*Table 2  Other findings that could mimic abuse*

| Finding | n | Comment |
|---|---|---|
| Haemangioma | 11 | One baby had 3 (total 13) |
| Pigmented naevus | 6 | One baby had 2 (total 7) |
| Café au lait | 5 | One baby had 3 (total 7) |
| Mongolian blue spot | 9 | One baby had 3 discrete spots |
| Rash | 2 | One allergic, one "heat" rash |

Carpenter RF, The Prevalence and Distribution of Bruising in Babies. Arch Dis Child. 1999; 80:363-6.

## Autopsy Findings of Non-Accidental Bruising in Injured Children







Fig. 3  Head and neck areas with composite bruising for all 24 cases.
Fig. 4  Frontal areas with composite bruising for all 24 cases.
Fig. 5  Back areas with composite bruising for all 24 cases.

Atwal G. S., Rutty G. N., Green M.A. (1998). Bruising in non-accidental head injured children, a retrospective study of the prevalence, distribution and pathological association in 24 cases.  Forensic Science International 96, 215-230.

**Illinois Department of Children and Family Services - Office of Inspector General**

In response to deep budget cuts in 2012, the Department reorganized and realigned staff to meet statutory requirements and critical direct service needs. To address the training needs of realigned staff assigned to child protection, staff from the Division of Training and the Inspector General's Office trained all newly assigned investigators, supervisors and managers in Error Reduction investigation principles in 2012. Additionally, a poster depicting the prevalence, distribution, and location of accidental and non-accidental bruising in infants, toddlers, and young children was distributed statewide to DCFS field offices in 2012 and 2013; poster distribution was expanded to include private agencies in 2013. The poster is a visual reminder to child protection, placement and licensing workers of the pediatric research regarding inflicted trauma.

In 2013, the Department's reorganization/realignment also resulted in the creation of High Risk Intact Specialists. This new class of workers prompted the Division of Training to request assistance from the Inspector General's Office in training the High Risk Specialists in Mental Health Error Reduction principles. Inspector General staff provided an overview of the mental health training and facilitated discussions on communication with mental health professionals, getting relevant documents, and working with families with parental mental illness. Ninety-three Trainees received copies of the Mental Health/Error Reduction training manual and bruising posters. Supervisors received two additional resources, *Assessment of Parenting Competency in Mothers with Mental Illness* (2008), by Teresa Ostler and *The Task Planner: An Intervention Resource for Human Service Professionals* (2000), by William J. Reid.

## ERROR REDUCTION: REDUCING RISK OF INFANT MORTALITY AMONG PARENTING WARDS

Using the Inspector General's report, "Ten-Year Review of Deaths of Children of DCFS Parenting Teens"[1], the Inspector General's Office, the Teen Parent Services Network (TPSN), and the DCFS's Hill-Erikson consultant Mary Sue Morsch developed an interactive and discussion-driven training model that assists Teen Parents in developing strategies for:

- non-violent responses to infant crying and other challenging developmental behaviors

- creating non-violent approaches to parenting

- implementing safe sleep practices

This training was designed to reduce the risk of infant mortality and prepare inexperienced parenting wards for the challenges of caring for a vulnerable infant.

The training, first piloted in March 2011, has since become a mandatory training for parenting wards with children younger than 18 months. In FY 2013, TPSN identified 261 parenting wards, 194 mothers and 67 fathers with children 18 months or younger who resided in Cook County. Between October and December 2012, the Office of Inspector General conducted fourteen trainings throughout Cook County. One hundred and sixty-two parents, (19 fathers and 143 mothers) were trained. Overall, 62%, of Cook County's target population were trained (74% of mothers and 28% of fathers).

---

[1] Ten-Year Review of Deaths of Children of DCFS Parenting Teens, File No. 11-3380, Appendix A, Office of the Inspector General Illinois, Department of Children and Family Services, Report to the Governor and General Assembly, January 2012.

Agency directors, supervisors, and case managers were directed that this training was mandatory for the youth, and that transportation and childcare were required to support the wards participation. Field experience has demonstrated that a lack of transportation and childcare are major barriers for young parents.

While many agencies provided transportation and child care, some agencies failed to provide these services. A third of the agency's young parents did not attend the training.  Had all agencies supported their youth with transportation and child care it is estimated that an additional 15-20% would have attended the trainings. Another ten percent of non-attending teen parents expressed discomfort in either participating in group settings, or simply refused to participate. While the training curriculum was developed for group work, certified trainers can modify the curriculum to meet the needs of individual young parents who may be resistant to group work or otherwise disengaged from services.

### Transition to Teen Parent Network Services (TPSN)

TPSN assumed responsibility for coordinating Young Parent Trainings in 2013 and coordinated twenty-one trainings. Ninety-six young parents were trained in Cook and Cook's collar counties, and eleven parents were trained in Granite City.

### Enhanced Young Parent Training

Since 2011, Inspector General Staff has trained and certified one hundred thirty nine supervisors and case managers as Young Parent Training facilitators statewide. The Office of Inspector General and TPSN have partnered to provide four "Train the Trainer" events that equip child welfare staff who serve young parents with the necessary tools to facilitate the training at their respective agencies.  TPSN will utilize this current pool of staff to identify facilitators for future Young Parent Trainings. The Inspector General's Office collaborated with TPSN conducting a Fall 2013 follow-up training for thirty-nine of the certified trainers. The trainers received enhanced training on group activities to help young parents strengthen their child's brain development. These enhancements introduced research on infant brain development and its application for parenting young children through various parent child activities.

A can of condensed soup was used to demonstrate the fragility of an infant's brain. To demonstrate young parents' ability to support their child's brain development, trainers introduced the parents to the Tennessee Urban Child Institute's, *Touching, Talking, Reading and Playing* material that provides practical supports for positive brain growth in a young child.

Using play-doh to simulate a newborn's brain development the trainer forms a model of an infant's brain while the young parents discuss *Touch, Talk, Read, Play* and identify activities that they can do to encourage their child's brain development.  Each young parent demonstrated helping their infant's brain "grow" by adding play-doh to the brain model during the activity.

Trainers also explained the effects of abusive head trauma and discussed accidental and non-accidental bruising in infants and toddlers.  A bruising poster developed by the Office of Inspector General was given to each parent.   The first group of young parents who were trained with the enhanced curriculum endorsed the activity-based learning process and the additional education on infant brain development.

### Young Parent Mediation Program

A Young Parent Mediation Program was piloted in FY13 with parenting wards. The program is designed to teach young parents to identify potential areas of conflict, and develop negotiation skills. The Young Parent Mediation Program targeted both young mothers and young fathers.  Many young fathers want to play an active role in their child's growth and development but sometimes lack the skills to negotiate how to remain involved in their child's life when the parents no longer are in a relationship.

Sixty parents from Young Parent Trainings expressed interest in mediation. Seven couples participated in mediation. Four couples attended a single mediation session and three couples asked for continuing sessions, and completed three mediation sessions.  The participants' evaluations were overwhelmingly positive and described the process as meeting their individualized needs in a non-judgmental way.

The Office of the Inspector General collaborated with the Alternative School Network's (ASN) Youth Scholars Skills Service Program and piloted mediation over the summer session at two ASN high schools. Each of the schools had at least five young parents who actively attended school, had a good relationship with their ASN mentor, and maintained positive and supportive shared-parenting arrangements.  One young parent from the ASN high school and their partner participated in two mediation sessions.

## OLDER CAREGIVERS

Over 13% of DCFS foster, adoptive or subsidized guardians are age 60 or older.  The vast majority are adoptive and/or subsidized guardians. The Department has endorsed a life-span perspective in evaluating permanency to assure the long-term care stability of children, their older relative and or foster caretakers. This perspective provides a family approach with the older caregiver naming a back-up person; hopefully, an involved extended family member or other supportive person to assume responsibility of the child/ren if the adoptive parent or guardian's health fails or other incapacities strike. It is DCFS' intent that the back-up individual will remain close to the children and their adoptive parent or guardian making any foreseen or unforeseen situation less traumatizing to the children. [2]  As a part of this continuing effort to support the families, DCFS Legal, Adoption staff , state and private Intact and Placement staff,  and private agencies contracted to provided older caregiver services were trained. These training took place in regions of the State with a high population of DCFS' older caregivers (Cook, East St. Louis Aurora, and Champaign). The Department Division of Operations requested that the Office of Inspector General collaborate with them to embed these targeted Older Caregivers supports into DCFS Policies and Procedures.

The Department of Children and Family Services and Illinois Department of Aging joined in a collaborative effort that recognizes that older caregivers and their children in both agencies are best served when the families receive coordinated services from both agencies. The Department of Children and Family Services and the Department of Aging are currently working on an Intergovernmental Agreement that supports an exchange of information between agency case managers and a system for service referrals and assessments. The Office of Inspector General commends the Department of Aging and the Department of Children and Family Service' efforts to better serve Illinois older caregivers and their children.

---

[2] The Alzheimer's Association (AA) predicts that by 2025 the number of people in the United States age 65 and older who have Alzheimer's Disease will increase by 2,000,000 (approximately 40% of the current number of  over 5,000,000) to 7,000,000.  It also projects that by 2050 this number will more than double to 16,000,000.  In Illinois the number by 2025 is expected to be 250,000 people, a 14% increase since 2000. Using the same projection number used by the national AA, the number of adults with Alzheimer's disease living in Illinois in 2050, will increase to 350,000.

## ETHICS

**ETHICS OFFICER**

The Inspector General is the appointed Ethics Officer for the Department of Children and Family Services under the *State Officials and Employees Ethics Act*. 5 ILCS 430/20-23.  In this role, the Ethics Officer assists Department and private agency administrators and employees in interpreting the Ethics Act, the Child Welfare Code of Ethics and Rule 437, *Employee Conflicts of Interest*.

A primary function of the DCFS Ethics Officer is to address inquiries and concerns from the field. Additionally, the Ethics Officer monitors the mandated annual ethics training; reviews all Statements of Economic Interest submitted by over 650 Department employees annually; and, when requested, provides a revolving door waiver analysis to the Office of the Executive Inspector General (OEIG) for certain employees leaving Department employment.  A member of the ethics staff sits on the Department's Conflicts of Interest Committee, which responds to Department employee inquiries regarding secondary employment and other issues covered by Rule 437.

**Ethics Inquiries from the Field**

During fiscal year 2013, the Ethics Officer responded to inquiries from both Department and private agency employees. While the DCFS Conflict of Interest Committee reviews most inquiries related to secondary employment of DCFS employees and contractors, inquiries that pertain to private agency employees or which are otherwise outside the scope of Rule 437 are generally referred to the Ethics Officer for review.  Apart from secondary employment, inquiries during fiscal year 2013 generally fell into the following categories: conflicts arising due to multiple relationships; prohibited gifts; sales/solicitation; professional licensure; and issues related to case management. Some of the inquiries that the Ethics Officer received during fiscal year 2013 are detailed below:

*Conflicts of Interest Arising from Multiple Relationships*
- A DCFS employee contacted the Ethics Officer when a member of his extended family became involved with the Department.  The employee wished to be considered a placement resource for his family member, but was told by the private agency managing the case that it was a conflict of interest for him to be involved in the case because he was a DCFS employee. The Ethics Officer advised that it was not a conflict of interest for the employee to be involved, but that he needed to build a wall between his personal and private involvement with the agency.  More specifically, in order to avoid any conflicts of interest, the employee would be unable to work on any cases where the private agency was involved in the allegations.

- A DCFS employee who was a contract monitor had an adult daughter who had applied for a position with a local agency monitored by the DCFS employee.  If the daughter began employment with the agency, she would be working on a DCFS contract monitored by her mother – the DCFS employee.  The Ethics Officer advised that if the daughter accepted the position with the agency, the mother/DCFS contract monitor would no longer be able to serve as the monitor for the contract involving her daughter.

- The Office of the Governor inquired about whether or not it would be a conflict to appoint an attorney to the DCFS Advisory Council who was the attorney of record for a Department-involved family.  The attorney had represented a foster family in a permanent guardianship case that had not been active in over 12 years, and in which the attorney had not been in a position adverse to the Department.  Although the case was inactive, it would remain

technically open until the minor reached age 18.  Based on the length of time that had elapsed since the attorney's active representation, the Ethics Officer advised that there was no conflict of interest in appointing the attorney to the DCFS Advisory Council.

*Conflicts of Interest Arising in Case Management*
- A private agency contacted the Ethics Officer regarding the potential sale of property from a foster family to a ward in their care.  Specifically, a teenage DCFS ward in foster care received an inheritance from the estate of her biological mother.  The ward was preparing to start college and her foster parents offered to sell her their car which they had been permitting her to use while in their care.  The Ethics Officer consulted with the placement worker who confirmed that the amount the ward would pay for the car amounted only to the remaining amount due to the bank, which correlated with the Blue Book value of the car, and the ward would personally receive the car title.  Based on the facts, the Ethics Officer determined that the arrangement would benefit the ward and did not appear to disproportionately benefit the foster parents, and therefore did not create a conflict of interest.  The Ethics Officer additionally advised that the car be assessed by an independent mechanic to ensure there were no known issues before completing the sale, and to evaluate foreseeable maintenance in order to assist the ward in planning for upcoming costs.

- A DCFS employee contacted the Ethics Officer regarding a request from a private organization for an endorsement of a product being developed to assist wards aging out of the DCFS system.  The DCFS employee's wife was employed by the organization.  The Ethics Officer determined that, even though the product could benefit DCFS wards, given the DCFS employee's level of authority, that his wife was an employee of the private organization, and that the Department would have had no knowledge of the product without the employee's spousal connection to the agency, it was a conflict for the employee to use his position or relationship with DCFS to benefit his wife's employer.

- A DCFS Supervisor contacted the Ethics Officer regarding whether it was a violation of ethics rules for a non-DCFS state employee to be a home of relative placement for a ward.  The Ethics Officer advised the supervisor that while home of relative placements do not require traditional licensure, the spirit of the licensing rules go to ensuring that a home is monitored and supervised by an entity that is different than the licensee's employer, which would be the case whether a relative or traditional placement.  Therefore, whether or not the foster parent is a relative, if he or she is a state employee, placement cannot be monitored by DCFS and must be transferred to a private agency.

*Gifts & Sales/Solicitation*
- A DCFS employee contacted the Ethics Officer regarding a fundraiser for a co-worker who had been diagnosed with a terminal illness.  According to the employee, a group of co-workers wanted to have a fundraiser for the family of the ill co-worker and wondered about constraints on such an activity.  The Ethics Officer counseled the employee on the difficulties inherent with soliciting money at a State workplace and highlighted the importance of separation of functions (different people collecting and depositing money).  The Ethics Officer advised that the employees could post a general flyer in a neutral area such as the lunchroom and could accept donations only during break times.  Further, the Ethics Officer stated that there could be no solicitation of an employee by his or her supervisor.

- A DCFS administrator consulted the Ethics Officer when a community organization (without contractual ties to the Department) approached an employee about making a monetary

donation to the local DCFS field office. The Ethics Officer consulted with the Office of Budget and Finance which manages such donations. Ultimately, the entity was instructed that donations can be made to the DCFS Children's Benefit Fund – a charitable trust held by DCFS which helps meet the needs of at-risk children that are not covered by state tax dollars.

*Professional Licensure*
- The Department inquired about whether it was appropriate for a private agency that contracts with DCFS to subcontract with a therapist who had disciplinary action taken against his license due to allegations of a personal relationship with a former client. The Ethics Officer consulted the Illinois Department of Financial and Professional Regulations (IDPFR) regarding the therapist's prior discipline, and also discussed the disclosures with the private agency. After gathering additional information from a variety of sources, the Ethics Officer was able to determine that the therapist had self-disclosed the discipline to the private agency, had fully complied with a 3-month probationary period imposed by the IDPFR, the alleged violation had occurred more than 7 years prior, the agency was very happy with his services and he counseled only one DCFS client with whom he had been working for over 2 years. Based on the information obtained, the Ethics Officer determined that there were not sufficient ethical concerns to prohibit the private agency from continuing to contract with the therapist.

- The Department inquired about whether it was appropriate for a private agency that contracts with DCFS to subcontract with a psychologist with a history of licensure discipline due to allegations of unprofessional and unethical behavior. It was alleged that the psychologist allowed his girlfriend to act as a co-therapist in group therapy sessions when she lacked the education, training and experience to do so, as well as holding himself out as a doctor when he lacked the required credentials. The Ethics Officer consulted with the Illinois Department of Financial and Professional Regulations (IDPFR) regarding the therapist's prior discipline as well as with the private agency that planned to facilitate the subcontract. Ultimately, it was determined that the private agency was unaware of the details of the IDPFR's findings against the candidate or the extent of his misconduct, and the private agency elected not to pursue the subcontract.

**Revolving Door Prohibition of the Ethics Act**
Ethics staff responded to many requests from the field regarding the details of the prohibition, to whom it applies and how to begin the waiver request process. During fiscal year 2013, the Ethics Officer provided 1 full revolving door analysis to the Office of the Executive Inspector General for an employee seeking to leave state employment.

**Statements of Economic Interest Reviews**
Review by the Ethics Officer prior to filing is statutorily mandated under the State Officials and Employees Ethics Act. (5 ILCS 430/20-23). In 2013, the Office of the Inspector General reviewed 669 Statements of Economic Interest that were required to be filed by persons in the Department who:

(1) are, or function as, the head of a department, commission, board, division, bureau, authority or other administrative unit within the government of this State, or who exercise similar authority within the government of this State;

(2) have direct supervisory authority over, or direct responsibility for the formulation, negotiation, issuance or execution of contracts entered into by the State in the amount of $5,000 or more;

(3) have authority for the issuance or promulgation of rules and regulations within areas under the authority of the State;

(4) have authority for the approval of professional licenses;

(5) have responsibility with respect to the financial inspection of regulated nongovernmental entities;

(6) adjudicate, arbitrate, or decide any judicial or administrative proceeding, or review the adjudication, arbitration or decision of any judicial or administrative proceeding within the authority of the State;

(7) have supervisory responsibility for 20 or more employees of the State;

(8) negotiate, assign, authorize, or grant naming rights or sponsorship rights regarding any property or asset of the State, whether real, personal, tangible, or intangible; or

(9) have responsibility with respect to the procurement of goods or services.  5 ILCS 420/Art. 4A-101.

*2013 SOEI Compliance Statistics*

OIG Ethics Staff preliminarily reviewed each Statement to ensure that the technical requirements (i.e. each item answered, form signed and dated in blue ink) were met.  The Ethics Officer conducted an additional layer of review of any Statement which included a substantive response, which amounted to 78 (11%) Statements.  The purpose of the additional review was to ensure that the there was no conflict of interest indicated by the employee's response, particularly in the case of an employee engaged in secondary employment or who had a private business ownership.  Of the 78 SOEIs that underwent additional review, there were 42 (53%) instances where an employee's answer indicated that he or she engaged in secondary employment or had a business ownership interest within the preceding calendar year.  In 33 (78%) of those 42 instances, the Ethics Officer sent a letter to the employee and supervisor reminding each of the potential for a conflict of interest that always exists between State employment and outside work, and the importance of maintaining clear boundaries between State employment and any secondary employment.  Letters were sent to any employee who was still engaged in the secondary employment reported, or who had a business ownership that could require day-to-day management activities.  Letters were not sent in instances where ethics staff confirmed that the information listed pertained to former employment, military service or if the reporting employee was no longer employed with the Department.  The breakdown is illustrated below.



PROJECTS AND INITIATIVES

Apart from secondary employment, the Ethics Officer reviewed:

- 14 reports involving real estate ownership (of which the ownership interest exceeded $5,000 or from which dividends exceeding $1,200 were derived during 2012) or the sale of a capital asset resulting in a capital gain of greater than $5,000;
- 11 reports of a business interest or ownership (of which the ownership interest exceeded $5,000 or from which dividends exceeding $1,200 were derived during 2012);
- 16 reports involving business interests or employment by a spouse or family member of the reporter;
- 19 reports of gifts received valued (in aggregate) of greater than $500 [Note: None of the gifts disclosed were received from DCFS contractors.]

# SYSTEMIC RECOMMENDATIONS

The Inspector General's investigative reports contain both systemic and case specific recommendations. The systemic reform recommendations for Fiscal Year 2013 have been categorized below according to the function that the recommendation is designed to strengthen within the child welfare system. The Office of the Inspector General (OIG) is a small office in relation to the child welfare system. Rather than address problems in isolation, the OIG views its mandate as strengthening the ability of the Department and private agencies to perform their duties. Recommendation categories are as follows:

- CHILD PROTECTION INVESTIGATIONS
- LEGAL
- LICENSING
- MEDICAL
- MENTAL HEALTH
- MONITORING
- SERVICES
- TRAINING

CHILD PROTECTION INVESTIGATIONS

- The Department should require that investigators request that the treating physician or nurse complete a body diagram when a child victim is initially seen in a hospital setting. The treating physician or nurse can utilize a body diagram provided by their institution or one provided by the Department (CANTS 2A/2B).

- Child Protection supervisors in the Northern Region should be reminded of the importance of issuing subpoenas in a timely manner in order to obtain relevant information for decisions involving child safety.

- The Department should implement emergency response procedures when the number of overdue pending investigations in a sub-region surpasses a specified level determined by management. Procedures should include utilizing the statutory options allowed by Rule 300.80, *Taking Children into Protective Custody*, to negotiate greater delegation of investigative contact responsibilities to law enforcement, especially well child checks, in order to ensure the safety of children.

- The Department should add the following language to Procedures 300 – Appendix B, *Reports of Child Abuse and Neglect – The Allegation System*, Allegation Substantial Risk of Physical Injury (#60): If the alleged child victim has a Special Health Care Need as defined in Procedures 302 – Appendix O a) or b), a referral for nursing consultation services shall be made by completing the Department Regional Nurse Referral Form, CFS 531.

- In child protection investigations involving medically complex children whose home health care is at issue (medical neglect OR substantial risk of physical injury), the child protection investigator should convene a telephone or in-person conference with relevant parties (e.g., parents, nursing care agency, Division of Specialized Care for Children, child's primary care physician, other medical providers) to facilitate communication, establish facts, and design a plan of action. Department Nursing staff should be utilized to help coordinate such a staffing.

- The Department should review policy and procedure regarding Hotline Response Codes.  When a caller reports situations in which children have been traumatized through severe violence, an "Emergency" coding should be used even if the children are safe.

- When there is a pending criminal investigation involving the same victims with similar allegations in a child protection investigation, prior to closing the investigation, the child protection supervisor and investigator should consult with the Office of Legal Services for an opinion or case conference with the State's Attorney to determine a course of action to ensure protection of the child without jeopardizing the criminal investigation.

- The Department should develop guidelines for child protection staff clarifying responsibilities for pending investigations of investigators affected by the annual shift bump.

- The Department should review the use of the Spanish Rotation Log to determine if the monthly rate of assignments is above BH levels and in compliance with the Burgos Consent Decree.

- The Department should establish guidelines for professional ride-a-longs with Department staff. Guidelines for medical professionals (e.g., medical residents) should address what are permissible and impermissible tasks.

## LEGAL

- The Department's Office of Legal Services should correct the misperceptions in the field surrounding a recent *Hernandez* court decision which involves obtaining protective custody without concerns of child safety.

- The Department's Office of Legal Services should convene quarterly discussions of new case law with managers and supervisors to provide the field with an adequate understanding of their effect on practice. The Office of Legal Services should translate the legal opinions into practical guidelines that can be implemented into practice.

## LICENSING

- The Department's Licensing Division should amend practice to critically evaluate the facts in each substantiated complaint, even in first-time complaints, to determine what type of action to take.

- During the course of a concurrent licensing investigation, the Licensing Division should have read-only access to the child protection investigation on the Department database (SACWIS).

## MEDICAL

- The Department and HealthWorks of Illinois should amend the Initial Health Screening to prompt the examiner to complete a body diagram. HealthWorks providers can utilize a body diagram provided by their institutions or one provided by the Department (CANTS 2A/2B).

- The Department should ensure timely development of a web portal for HealthWorks physicians to directly access their patients' (wards) medical, mental health and prescription medication data.

- The Department should inform child welfare staff of the DentaQuest Member Service History report.

- The Department's contractual medical consultants are required to provide training to professionals. Training should target medical staff within the consultants Hospital's medical network, including network pediatricians. The training should include guidelines for skeletal surveys.

- The Inspector General's educational report on Childhood Obesity should be immediately disseminated to the field. Information from the report should be incorporated into the Department's Foundation training curriculum, which now includes children's chronic health conditions.

- The report on Childhood Obesity will be added as a chapter to the next revision of *A Guide for Caseworkers and Caregivers: Caring for Children with Chronic Health Care Conditions.*

- When there is a question about a ward having seizures or whether to discontinue a ward's seizure medication, the Department should ensure that a sleep deprived EEG has been conducted as part of the evaluation.

## MENTAL HEALTH

- The Department, through the Guardianship Administrator, should determine how many wards with developmental delays are dually diagnosed with a mental illness. The Department should partner with the Institute on Human Disability and Development to better serve these wards with timely and effective interventions.

- When the Guardianship Administrator consults with the psychiatrist for consent regarding medication, the consulting physician should provide information on the side effects of medications that have black box warnings. The black box warnings should be included in the consent.

- The Guardianship Administrator should adopt a policy for the review of Restriction of Rights forms in situations where a ward is physically restrained that includes a review for compliance with the Mental Health Code.

- The Guardianship Administrator should assure that a copy of the Restriction of Rights form is forwarded to the ward's Guardian ad Litem.

## MONITORING

- A Private Agency's Chief Financial Officer (CFO) should be the person who possesses the financial books and records of the organization in fact and as listed on the agency IRS Form 990.

- The Department should clarify through policy that no one involved in the development or monitoring of a contract should submit resumes for specific personnel to agencies with which they are involved, absent extraordinary circumstances with the approval of the Director.

- The Department should review all mentoring contracts to ensure that Mentoring Program Plans include a requirement for articulation of goals and clear plans toward achievement of goals.

## PERSONNEL

- The Department should establish procedures limiting use of Department facilities after-hours to ensure that there is no access to confidential information.

- The Department should determine whether to require the presence of a Department staff person or if the presence of a security is sufficient for after-hours use of Department facilities.

- If the Department continues to permit after-hours use of Department facilities by non-Department groups, the Department should determine whether to apply through CMS and use the CMS liability waiver for use of Department facilities after-hours.

- The Department should formalize the policy for overtime with regards to commute time and distribute it to management with notice to staff.

- The Department should ensure that only the last four numbers of an employee's social security number are used by Labor Relations when sending notice to an employee of a pre-disciplinary matter.

- The Department should ensure that distribution of a notice of a pre-disciplinary matter be limited to the employee, the person expected to conduct the pre-disciplinary interview, and the local union president.

- Given the Department's recent reorganization, the Department should review and clarify its process for determining which employees are required to file a Statement of Economic Interest.


SERVICES

- The Department should develop a mechanism for a clinical and legal review of cases in which the parent has had their parental rights terminated as to a previous child and the parent has a history of violence, mental illness, substance abuse and/or a "highly guarded" prognosis in an Integrated Assessment.

- The Department should ensure that Vouchers include a statement noting the presenter must provide the entire form in quadruplicate for the transaction to be valid.   The Department will not honor copied vouchers.  In addition, vouchers should include Department contact information for anyone with questions about the validity of a voucher. The Department should track all calls received.

- The Department should incorporate Policy Transmittal 96.1, Verification of Relationship for Relative Home Placement, into Procedures 301, *Placement and Visitation Services*.

- The Department should include the definition of "godparent" in Procedures 301, *Placement and Visitation Services*, and clarify that the godparent/godchild relationship must have a historical basis, preceding immediate involvement with the Department.

- The Department *Affidavit of Relationship* form [CFS 458-A] should be amended to require the following: a) Signature of the biological parents to affirm that the person claiming to be a child's godparent has been entrusted by parents with "a special duty that includes assisting in raising the child if the parent cannot; b) Affirmation from the biological parent(s) that the child's relationship with these relatives has a historical basis, and preceded their child's involvement with the Department.

- The Department's  *Affidavit of Relationship* form [CFS 458-A] must be accompanied by a statement of supporting facts articulating the historic basis/pre-existing relationship between the godparent(s) and the child, prior to the case being screened into court.

▪ The Department must develop capacity for bilingual sexual offender evaluations and treatment. The requirements of the Burgos Consent Decree can be met by providing for specialized translation services for these complex evaluations as effective bilingual resources are developed.

▪ In Intact Family Services cases with a pending criminal investigation, the involved Child Advocacy Centers must convene a multi-disciplinary case conference with the Family Advocate, law enforcement and the agency providing Intact Family Services to provide information critical to managing the case while protecting the integrity of the criminal investigation and the safety of involved children.

▪ The Department should ensure that when a ward is psychiatrically hospitalized, the treating hospital is provided Integrated Assessments.

▪ Procedures 302, Appendix O, *Services Delivered by the Department of Children and Family Services*, –*Referral for Nursing Consultation Services* Section b) should be rewritten so that it clearly states which children with special health care needs are required to be referred for nursing consultation services and when children with special health care needs must be added as alleged victims. The requirements should be cross-referenced to the appropriate allegations in Procedures 300 – Appendix B, *Reports of Child Abuse and Neglect – The Allegation System*.

*Services - Immigration*

▪ Whenever a case manager submits the CFS 1016 (Special Immigrant Referral Form) to the Immigration Services Unit, the Immigration Coordinator should convene an immigration conference with the eligible ward, their case manager and an invested adult such as a foster parent or concerned relative.

▪ During the immigration conference the Immigration Coordinator should provide the ward and the case manager with copies of *Immigration 101* and *Immigration Resource and Practice Guide*. These materials should be reviewed and special emphasis should be placed on the risks and responsibilities of adolescent wards in the process of status adjustment. All USCIS forms requiring the ward's signature, forms that are pre-populated by the Immigration Coordinator, should be reviewed with the ward and worker during the conference.

▪ The *Immigration 101* and *Immigration Resource and Practice Guide* should be updated. This material should be reviewed annually and revised as needed by Immigration Services Unit staff.

▪ The Department should revise Procedure 327, Appendix F, *Immigration/Legalization Services for Foreign Born Department Wards* to include the requirement that case management staff notify the Immigration Services Unit of any arrest or detainment of a non-citizen ward for consultation/instruction about notification of the ward's public defender.

▪ The Immigration Services Unit should have a visible link on the D-Net with hyperlinks to Procedure 327, Appendix F, *Immigration/Legalization Services for Foreign Born Department Wards*, SIJS Referral Form (CFS 1016), the *Immigration 101* (CFS 1050-66-1), *Inmigracion 101* (CFS 1050-66-1-S), and *Immigration Resource and Practice Guide* (CFS 1050-66-2). Content on this link should be reviewed annually and revised as needed by Immigration Services Unit staff.

▪ In order to ensure the timely identification of wards eligible for status adjustment, the Immigration Services Unit will on a quarterly basis request a list of wards ineligible for Title IV-E reimbursement due to immigration status from the Office of Budget and Finance. At minimum the list will include the wards' names, Department ID, dates of birth, Region-Site-Field, date of Temporary Custody,

current goal, and assigned case manager.  A key explaining relevant Medical Assistance No Grant (MANG) codes should also be included.

- Utilizing the list obtained from the Office of Budget and Finance, Immigration Services Unit staff will contact the case manager or supervisor of any ward identified as eligible for status adjustment to initiate referral.

- The Immigration Services Unit should keep a ward's file active until emancipation or naturalization, whichever occurs first.

- The Department should collaborate with Loyola University Law School Street Law Program to offer immigrant youth a forum to discuss immigration issues.

- The Immigration Services Unit should also track the region of the ward's case and the ward's country of origin.

- The Department should develop a ceremony, in conjunction with juvenile courts throughout the State, to administer oaths of accountability and public trust to new hires (both Department and POS) in which case managers would affirm their duty to act as the eyes and ears of the courts and to provide full relevant facts to the courts and courtroom personnel and to uphold the standards set forth in the Illinois Code of Ethics for Child Welfare Professionals.


## TRAINING

- The Department should review clinical training curricula of foster care agencies to ensure evidence based practice.

- The Department should make available legitimate websites that reference evidence based treatment, such as Parent Child Interaction Therapy (PCIT) and the National Alliance on Mental Illness (NAMI) family guide to provide foster parents with education on evidence based practice.

- The Department should incorporate Procedure 327, Appendix F, *Immigration/Legalization Services for Foreign Born Department Wards* and all related materials into Core training.

- In collaboration with DASA providers, the Department should develop a Parent Training module that addresses the unsafe practices of mixing and splitting methadone dosages.

- CORE Training should include a particular caveat that providing knowingly false information in case notes, contact notes or courtroom testimony could result in revocation of their Child Welfare Employee License and is a violation of the public trust.

# RECOMMENDATIONS FOR DISCIPLINE AND CONTRACT TERMINATION

In FY 2013, the Inspector General recommended discipline of Department and private agency employees and termination of Department contracts for the conduct detailed below. Discipline recommendations ranged from counseling to discharge.

## RECOMMENDATIONS FOR DISCIPLINE

### *Failure to Properly Asses Risk*

- In a case where a one month old boy died while in a home which had recently been the subject of a police drug raid, a child protection investigator accepted the mother's self reports without verification, failed to conduct a background check on adult members of the family's home, failed to contact the hotline reporter and make a timely request for a police report, failed to assess the three-year-old's access to the parent's bedroom which reportedly contained illicit drugs, and failed to complete a scene investigation. Discipline should be mitigated by the investigator's high investigative caseload.

- In a case where a DCFS-involved mother who had previously lost parental rights to three children and had a known history of violence, substance abuse, and mental illness, gave birth to her fourth child, a child protection investigator and supervisor failed to retrieve and review the mother's recent psychological assessment which determined she could not parent her four children; failed to share the recent psychological report with the psychiatrist evaluating her parenting function; and conducted an inadequate risk assessment prior to determining that the mother and her infant could safely be discharged from the hospital.

- In a case where a 13-year old developmentally disabled, diabetic girl died because of complications of hyperglycemia, a child protection investigator failed to monitor an unsafe risk assessment (Child Endangerment Risk Assessment Protocol); failed to obtain sufficient medical documentation; and failed to complete timely nursing and intact family services referrals, despite a known history of the girl suffering medical neglect by her guardian.

  The child protection supervisor failed to ensure that subsequent child endangerment risk assessments (CERAPs) and safety plans were completed.

### *Failures in Service Provision/Investigative Work*

- In a case where a four-year-old girl in foster care died as a result of severe, inflicted head injuries, a private agency supervisor failed to assess the needs of the foster family and ensure delivery of supportive services, specifically respite and assistance transporting children to appointments, when those services had been specifically requested by the foster mother who was caring for six young children. When the supervisor first became aware that there was a pending referral for mental health services for the child, she failed to intervene to expedite the referral. Given the foster parent's multiple reports of injuries to the children, the supervisor had an obligation to ensure communication with the children's primary care physician; short of this, the supervisor should have directed the foster parent to seek medical attention for the more serious injuries reported. The supervisor also failed to ensure compliance with rules and procedures for educational services (Rule 314.70 and Rule and Procedures 315) by failing to visit one child's school and enroll another in a pre-school program.

In the same case, a private agency mental health worker and her supervisor failed to ensure a face-to-face evaluation prior to admitting a child for psychiatric hospitalization as required by contract and obtain information concerning available resources for community stabilization.  The worker failed to consult with the supervisor prior to the final decision to hospitalize the four-year-old girl and the supervisor failed to sign the mental health screening until eight days after the child was hospitalized.

- A Department employee failed to complete a substantive review of a waiver request for placement of an infant in a home with five other young children, where the foster mother was the primary caretaker.

- In the investigation of a family with an extensive history of domestic abuse and other issues requiring police involvement, a child protection investigator failed to obtain and review a police report regarding a prior domestic violence incident; failed to interview the mandated reporter; and inadequately completed the Domestic Violence Screens.

- A Department contract liaison failed to ensure that criminal background checks were completed on mentors working for a private agency who, it was later discovered, had billed the Department for approximately $84,000 of mentoring services for a single family, which did not occur.

*Ethics*
- A private agency supervisor failed to adhere to the Illinois Child Welfare Code of Ethics for Child Welfare Professionals when she neglected to timely inform agency management when her former supervisor coerced subordinates to falsify foster care records to appear in compliance with DCFS rules and procedures.

- A Department employee violated Rule 437, *Conflict of Interest*, for accessing information in SACWIS involving her own family.

- A Department administrator violated Rule 437, *Employee Conflicts of Interest*, by recommending a personal friend for employment at a private agency whose contract the Administrator negotiated.

- In violation of the State Officials and Employees Ethics Act which requires review by the Department's Ethics Officer of all annual Statements of Economic Interest filed by DCFS employees, two Department employees improperly sent their Statements of Economic Interest directly to the Office of the Secretary of State after receiving written warning in 2012 with specific instructions.


## CONTRACT TERMINATION

- The Inspector General's Office recommended terminating a contract with a post adoption counseling agency which billed the Department for over $84,000 for mentoring services that had not been provided and where the investigation revealed that the agency failed to supervise the activities of the contracted mentors.

- The Inspector General's Office recommended the removal of an approved clinical provider from the list for sex offender assessment and/or sexual offender treatment services.  In the case of one sex offender assessment, there was physical evidence of sexual abuse to his teenage daughter's friend and DCFS had indicated the offender for sexual abuse of the teenage daughter (who had made repeated outcries of sexual abuse by the father over four years) and her friend, the clinician failed to adequately evaluate sexual interest, analyze collateral information, and develop a sufficient risk assessment. The clinician failed to contact an alleged sex offender's therapist or review statements of the alleged victims. The clinician heavily relied on self-report and one clinically relevant tool (the

Wilson Sexual Fantasy Questionnaire) despite the numerous recommended research-based assessment instruments that are generally used in this specialized field.

- The Inspector General's Office recommended prohibiting future contracts with the Founder/CEO of a formerly contracted agency because of the CEO's extensive history of mismanagement of state funds that included using the funds to pay for her condo and car while the private agency's deficit rose to over a half million dollars over a twelve year span.

# CHILD WELFARE EMPLOYEE LICENSES

The following cases represent action taken against Child Welfare Employee Licenses in FY 2013.

**License Revocations**
- Two private agency workers (at two separate agencies) had their Child Welfare Employee Licenses revoked for falsely documenting foster home visits that did not occur.

- A private agency worker had his Child Welfare Employee License revoked after engaging in a romantic relationship with a mother on his caseload and inducing the mother to supply false information concerning the relationship to the Office of the Inspector General.

- A Department employee had his Child Welfare Employee License revoked for providing false information on his employment application concerning a criminal conviction for Battery.

- A Department employee had her Child Welfare Employee License revoked for falsely documenting a visit with the children and their grandmother    The employee also testified in court to a conversation with a States Attorney, which did not occur.  In addition, the investigator concealed critical information from her supervisor concerning the child's return to his mother.  In an unrelated case, the same employee documented an in-person visit with a father at the office, which had not occurred.  In a third investigation, the same worker falsely documented interviewing the alleged perpetrator at his home.

- A private agency worker had her Child Welfare Employee License revoked for failing to provide information during the investigation of complaints against her license.

**License Suspensions**
- A private agency therapist was suspended for 83 days for submitting false billing claiming family therapy visits that did not occur.

- A private agency worker was suspended for 5 days for forging a date on a dental form submitted during an Administrative Case Review.

- A Department supervisor was suspended for 221 days for forging a worker's signature on a form that purported to document the worker's meeting with the foster mother and explanation of a protective licensing plan.

**License Relinquishments**
- A worker relinquished his Child Welfare Employee License during an investigation that alleged that he had failed to complete a required background check and then provided false information to court regarding whether the background check had been completed.

- Two workers relinquished her license during investigations of allegations that they had falsified documentation of home visits.

- A worker relinquished her license during an investigation of providing false information in court.

- A worker relinquished her license during an investigation of falsification of investigative interviews.

- A worker relinquished her license during an investigation that she continued to represent herself as a Licensed Clinical Social Worker years after her license had expired.

- An employee relinquished her Child Welfare Employee License during an investigation of charges that she had falsified time sheets and forged her supervisor's for approval of overtime.

# COORDINATION WITH LAW ENFORCEMENT

### REFERRALS FOR FURTHER INVESTIGATION

- While investigating the death of a ward in foster care that had been ruled a homicide, the Inspector General learned that criminal charges had never been filed against the foster mother. The foster mother had claimed that the child had died of self-inflicted "head-banging," a claim that medical experts agreed was improbable. The Inspector General met with the county State's Attorney and Law Enforcement personnel and shared information uncovered during the Office of the Inspector General investigation. The State's Attorney has since brought charges of Murder, and Endangering the Life and Health of a Child against the foster parent. The criminal case is pending.

- A child had been the victim of shaken baby syndrome and suffered catastrophic injuries as a result. The perpetrator was successfully prosecuted for Aggravated Battery. Nine years after the incident, and as a result of the original injuries, the child died in a different county. The Office of the Inspector General provided the autopsy and legal research to support subsequent murder charges against the perpetrator to the State's Attorney of the original venue. The case is under review.

- The Office of the Inspector General investigated a post-adoption counseling agency for fraudulent billing practices. The agency has been referred to the Attorney General's office for review for possible prosecution.

- The Office of the Inspector General is investigating allegations that a post-adoption counseling provider billed for services that were not provided.

- A post-adoption counseling agency billed the Department for over $84,000 for mentoring services that had not been provided. The Office of the Inspector General conducted interviews and retrieved all relevant records and referred the case to the State's Attorney's Office for prosecution.

- The Office of the Inspector General investigated a Department employee who created vouchers in her own name for substantial amounts of money. The Office of the Inspector General stopped payment on the vouchers and the employee received no money and referred the case for criminal prosecution. The worker was terminated. As the employee received no money, the State's Attorney's Office declined to prosecute.

- The Office of the Inspector General referred an employee to the Office of the State's Attorney for failure to report additional income on his Statement of Economic Interest for several years, despite being instructed to report such income. The State's Attorney's Office declined to prosecute.

- The Office of the Inspector General investigated two complaints that a childcare provider had been billing the Department for children not actually in care. The Office of the Inspector General obtained the relevant records and conducted interviews and is preparing the cases to refer for possible prosecution.

- The Office of the Inspector General received an anonymous complaint originally filed with the City of Chicago Inspector General alleging that a service agency contracting with the Department was engaging in Medicaid fraud.  There was insufficient information to investigate the complaint.

## REQUESTS FOR ASSISTANCE

- The Office of the Inspector General assisted law enforcement in another state retrieve Illinois licensure information.

- The Office of the Inspector General assisted law enforcement in determining the identity of an entity designated as "DCFS."  The Office of the Inspector General determined that it was not the Department, but rather the Financial Services of an automobile corporation.

- The Office of the Inspector General provided linkage for an individual concerned about fraudulent use of her Social Security Number.

- The Office of the Inspector General assisted law enforcement in investigating alleged theft of toys by Department personnel intended for wards.

- The Office of the Inspector General assisted the Department of Corrections of another state in investigating an inmate's use of the mails to distribute pornographic materials.

- A 2 year-old child died as a result of abuse.  His death was ruled a homicide.  The Office of the Inspector General assisted the local police in obtaining medical records and copies of the original x-rays.  The homicide is still under investigation by local police.

- The FBI requested assistance from the Office of the Inspector General in obtaining records of a Contractor related to an investigation of billing fraud.

- The Social Security Administration, Disability Investigations Unit, requested assistance in their investigation of possible fraud involving a foster parent who claimed disability.

- The Office of the Inspector General obtained records and information to assist the State's Attorney's Office in prosecution and recoupment efforts for adoptive parents who continued to receive adoption assistance for years after their adopted child died.

- A transitional living program reported that one of its employees was possibly stealing from client funds.  Police were notified. The employee was terminated. The Office of the Inspector General assisted law enforcement in obtaining records and information on the victims.

- The Office of the Inspector General provided information to the US Marshall's Office regarding the location of a person wanted by the Marshall's Office on a warrant for tax evasion.

## UPDATE ON PENDING CASES

- The Office of the Inspector General had initiated new autopsy findings regarding a child who had been killed.  The coroner had determined, based on findings from a doctor who was not a certified forensic pathologist, that the child had died of natural causes, from a rare and undiagnosed cancer.   The new autopsy findings, issued by a certified forensic pathologist,

confirmed that the child had been murdered.  As a result of the Office of the Inspector General investigation, the State's Attorney filed charges against the mother's paramour, who had been with the child when the fatal blows were delivered.  In a plea bargain, the mother's paramour pled guilty to Aggravated Battery of a child, resulting in his death and received a 20 year sentence in the Department of Corrections.

- An adoptive  mother who accepted adoption subsidies for years during which time her son did not live with her or receive financial assistance from her was criminally charged and prosecuted by the Illinois Attorney General's Office. She pled guilty and was sentenced to 30 months probation and ordered to pay $55,448 in restitution, with credit for funds expended.

# DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS

The Inspector General made the following recommendations in previous Fiscal Years, but the recommendations were not fully implemented before the Annual Report was issued. The current implementation status of these recommendations is detailed below in the following categories.

- Child Protection
- Child Welfare Employee Licensure (CWEL)
- Contract Monitoring
- Domestic Violence
- Foster Home Licensing
- Law Enforcement
- Legal
- Medical
- Personnel
- Services
- Teen Issues

## CHILD PROTECTION

**The Department must address and remedy its continuing violation of a consent decree which dictates appropriate caseload standards for the number of investigations assigned to child protection investigators (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 2).**

>*FY 12 Department Response:* The Office of Employee Services is working with Operations to fill vacancies.

>*FY 13 Department Update:* Overall DCFS is meeting the caseload requirements for investigative staff as set forth in the consent decree and meets regularly with the plaintiffs' counsel in the case to address caseloads and other issues.

*FY 13 OIG response: The OIG notes that the consent decree fails to account for actual caseloads in specific regions where caseloads exceed reasonable investigative standards. Such pockets of excessive investigative caseloads put the children in those communities at risk.*

**The Department must track, and supervisors and management must respond to, failure to actually see the child that is the subject of the investigation (from OIG FY 12 Annual Report, General Investigations 14).**

>*FY 12 Department Response:* This recommendation will be included in revisions being made by the Procedures 300, *Reports of Child Abuse and Neglect*, workgroup.

*FY 13 Department Update:* The Department will issue a Policy Alert to inform staff of the necessary changes in practice while working to incorporate the changes into Procedures 300, Reports of Child Abuse and Neglect.

**Child protection investigators must be required to complete itineraries (from OIG FY 12 Annual Report, General Investigations 14).**

*FY 12 Department Response:* The Department will instruct field staff to utilize the Outlook calendar to document their itineraries. Supervisors will be given authorization to view their staffs' calendars. The Regional Administrators will notify staff to implement use of the calendar.

*FY 13 Department Update:* Directive was given to management staff at an Operations Management Staff meeting. Information was passed down to all staff through staff meetings.

**Child Protection supervisors should be trained to manage and triage SACWIS alerts for their teams. Any alerts indicating that a child has not been seen within five days must be immediately addressed to insure the child's safety (from OIG FY 12 Annual Report, General Investigations 8).**

*FY 12 Department Response:* This recommendation will be included in revisions being made by the Procedures 300, *Reports of Child Abuse and Neglect*, workgroup.

*FY 13 Department Update:* The Department will issue a Policy Alert to inform staff of the necessary changes in practice while working to incorporate the changes into Procedure 300.

**The Department should determine if the State Central Register's (SCR) operating interpretation of applying a standard that a hotline caller must give evidence that behavior was committed for sexual gratification before a hotline call is accepted for risk of sexual harm is correct (from OIG FY 12 Annual Report, General Investigations 4).**

*FY 12 Department Response:* The Department is converting the call floor manual into procedures and will review this information for possible inclusion.

*FY 13 Department Update:* The SCR call floor manual is being converted into procedures and contained within procedures 300. The appropriate standards for sexual risk of harm are included in procedures 300 revisions. Through staff meetings, SCR Administration has ensured that hotline workers are applying this standard.

**If the Department determines that suspicion of risk, rather than evidence of risk, are sufficient criteria to accept a report, the Department should request the assistance of Children's Advocacy Centers to train State Central Register (SCR) staff on red flags that warrant investigation of sexual abuse (from OIG FY 12 Annual Report, General Investigations 4).**

*FY 12 Department Response:* The Department is converting the call floor manual into procedures and will review this information for possible inclusion.

*FY 13 Department Update:* The SCR call floor manual is being converted into procedures and contained within procedures 300.  The appropriate standards for sexual risk of harm are included in procedures 300 revisions.  Through staff meetings, SCR Administration has ensured that hotline workers are applying this standard.  Additionally, SCR has developed foundations training for all staff which includes the allegation system, CERAP certification, and assessment skill training.

**Procedures 300, Appendix B:** *Reports of Child Abuse and Neglect*, **The Allegations System should be amended to add the following instruction to all allegations of physical abuse:** *Ask the child if there is an extended family member, another adult or caretaker that he or she feels safe with, important or special to. Persons identified by the child victim shall be interviewed* **(from OIG FY 12 Annual Report, General Investigations 1).**

*FY 12 Department Response:* The recommendation will be included in revisions being made by the Procedure 300, *Reports of Child Abuse and Neglect*, workgroup.

*FY 13 Department Update:* The Department will issue a Policy Alert to inform staff of the necessary changes in practice while working to incorporate the changes in Procedure 300.

**A redacted copy of this report and Bone Fractures in Infants: A Review of the Literature should be made available as a resource to direct line staff (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 15).**

*FY 12 Department Response:* The report was shared with workers and will be made available on the D-net.

*FY 13 Department Update:* The redacted OIG report and literature will be put on the D-Net under Resources.  In addition, DCFS Training is currently updating their on-line catalog on bone fractures including resources from Multidisciplinary Physician Education and Consulting Training content.

**The Department should integrate into its Safety Assessment Protocol the following question: If the caregiver has ever been indicated for abusing, neglecting or failing to protect a child, or has previously been assessed to lack protective capacity, please state reasons, other than the self-report of the caregiver, which led you to believe the Protective Caregiver's capacity has changed (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 1).**

*FY 12 Department Response:* Implementation of The Enhanced Safety Model is on hold.  Compositions of teams will change due to staff realignment and layoffs. The recommended language will be included in policy.

*FY 13 Department Update:* The recommendation was incorporated into Procedure 300, Appendix G.

**DCFS Cook Regional Managers need to develop a system of quarterly meetings with each of their corresponding police department's Child Abuse Coordinators to facilitate communication,**

coordination and timely retrieval of relevant information, including arrest reports (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 2).

*FY 12 Department Response:* A meeting did occur and although invited, none of the police coordinators identified attended.  However, higher ranking personnel did participate and stated there has been a geographical reorganization.  It was stated that approval to release police reports must come from a higher administrative level.  All agreed a working relationship (MOU) needs to be developed but no one participating in the meeting had authority to enter into an agreement.  Child Protection will continue to use subpoenas to access information.  Information about barriers to proceeding will be forwarded to the Deputy and Chief.

*FY 13 Department Update:* The Department, with medical resource providers and Children's Advocacy Centers, is undertaking new efforts to develop a working relationship with the Chicago Police and establish liaisons and information sharing between the two departments.

**The Department database currently only automatically prompts management approval for death and facility reports. The automatic prompt for management approval should include allegations of burns, head injuries, internal injuries and children under six with allegations of cuts, bruises, welts, abrasions and oral injuries (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 2).**

*FY 12 Department Response:* The Department is currently considering significant changes in its supervisory structure and will look further into how best to integrate this recommendation as a result of those modifications.  Additional considerations include discussions regarding feasibility and timeframe for coding into the database.

*FY 13 Department Update:* Until the change is implemented in SACWIS, public service administrators alert their area administrator to review all investigations involving burns, head injuries, and internal injuries and investigations involving children under six with allegations of cuts, bruises, welts, abrasions and oral injuries.

**The Office of the Inspector General reiterates the recommendation made in a prior OIG Report that any time a child who is the subject of a child protection investigation is hospitalized during the course of a child protection investigation, the Division of Child Protection should convene a case conference with the treating medical and social work team to address child safety and discharge planning (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 3).**

*FY 12 Department Response:* This recommendation will be included in revisions being made by the Procedures 300, *Reports of Child Abuse and Neglect*, workgroup.

*FY 13 Department Update:* The Department will issue a Policy Alert to inform staff of the necessary changes in practice while working to incorporate the changes in Procedure 300.

**Any time a child who is the subject of a child protection investigation is hospitalized during the course of a child protection investigation, the Division of Child Protection should convene a case conference with the treating medical and social work team to address child safety and discharge planning (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 4).**

*FY 12 Department Response:* This recommendation will be included in revisions being made by the Procedure 300, *Reports of Child Abuse and Neglect*, workgroup.

*FY 13 Department Update:* The recommendation will be incorporated into the revisions to procedures and a process established for developing the plan.

**The Department should develop an effective consultation process and procedures specific to failure to thrive investigations and the provision of intact family services in cases with a failure to thrive child (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 4).**

*FY 12 Department Response:* This recommendation will be included in revisions being made by the Procedure 300, *Reports of Child Abuse and Neglect*, workgroup.

*FY 13 Department Update:* The division of Child Protection will work with the Clinical and Training divisions to create procedures and a consultation process that accurately reflects current medical literature regarding failure to thrive children.

**The Department should revise the procedures for investigating an allegation of failure to thrive (FTT, Allegation 81) so that they are consistent with current medical literature that FTT is at times a multifactorial condition and the existence of an organic component of the FTT does not rule out a non-organic component as well (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 4).**

*FY 12 Department Response:* This recommendation will be included in revisions being made by the Procedure 300, *Reports of Child Abuse and Neglect*, workgroup. Information on failure to thrive and use of growth charts was also included as a part of the nurses training.

*FY 13 Department Update:* Failure to Thrive and use of Growth Charts was also included as a part of the nurses training in October 2012. The division of Child Protection will work with the Clinical and Training divisions to create procedures and a consultation process that accurately reflects current medical literature regarding failure to thrive children.

**From OIG FY 12 Annual Report, Death and Serious Injury Investigation 6: The Department should amend procedures to reflect the importance of contact with the involved non-custodial parent, to include, but not be limited to, the following:**

**A) Section 300.60(c) Required Investigative Contacts should be revised to state:**

**If all of the subjects and other adults and children who are regular members of the alleged child victim's household *as well as the involved, non-custodial parent*, are not listed on the SACWIS intake summary at the time the report is taken, the Investigation Specialist shall add them to the SACWIS investigation.**

**During the formal investigation, investigative staff shall have direct, in-person contact with all children in the child victim's household, alleged perpetrators and other adults in the household, if these contacts have not already occurred. *During the formal investigation, Investigative staff shall also interview the non-custodial parent, if involved in the child's life, if this interview did not already occur, as there is a***

*presumption that involved non-custodial parents have relevant information.* **Since contact with the alleged child victim(s) is required during the initial investigation, it need not be repeated during the formal investigation, unless the Investigation Specialist determines further contact is necessary or additional contacts are necessary due to the existence of a safety plan/unsafe safety assessment.**

B) **Section 300.60(c) subsection (4) should be added to state:**

*4) The Non-Custodial Parent Who Is Involved in their Child's Life*

*The Investigation Specialist is required to interview the involved non-custodial parent. There is a presumption that involved non-custodial parents have relevant information and therefore should be interviewed during the child protection investigation.*

C) **Section 300.60(g) Other Required Investigative Contacts should be revised to state:**

**In addition to the required contacts with the subjects of the report, other persons in the household,** *the involved non-custodial parent,* **law enforcement agencies, and the State's Attorney's Office, the Department has established other minimum investigative contacts for each allegation that are required before the investigation can be considered completed. See Appendix B, The Allegations System, for specific investigative standards for each allegation.**

D) **Section 300.100(d) Notify Subjects of the Report should be revised to state:**

**The Investigation Specialist shall make reasonable efforts to verbally notify the parent/guardian of the alleged child victim, and/or the alleged perpetrator if different from the child's parent/guardian, of the Investigation Specialist's recommended determination (indicated or unfounded).** *Additionally, the Investigation Specialist shall make reasonable efforts to verbally notify the involved, non-custodial parent of the recommended determination. The Investigation Specialist shall make reasonable efforts to notify non-involved non-custodial parents of indicated reports, and make reasonable efforts to notify non-involved non-custodial parents of unfounded reports when they are aware of the report.* **The Investigation Specialist shall communicate with limited/non-English speaking or hearing impaired persons as well as persons with other disabilities, using a method by which they can understand the notice, e.g., interpreters, TDD/TTys etc. The Investigation Specialist shall document all efforts to make such verbal notification and the method used on a SACWIS contact note.**

*FY 12 Department Response:* A memorandum was issued.  The recommendation will be included in revisions being made by the Procedure 300, *Reports of Child Abuse and Neglect*, workgroup.

*FY 13 Department Update:* The CERAP revisions of May 2013 addressed these issues and strengthened language regarding non-custodial parents.  The SCR script now includes questions regarding non-custodial parents.  This was instituted in November 2012.  In addition, the Department will issue a Policy Alert to inform staff of the necessary changes in practice while working to incorporate the changes into Procedures 300.

**The Department should revise the State Central Register Call Floor Manual to provide procedures for notification to the appropriate law enforcement agency of reports of sexual abuse to minors by ineligible perpetrators that do not qualify for child protection investigation but may constitute a criminal act against a minor (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 7).**

*FY 12 Department Response:* The Department is developing procedures for the SCR Call Floor.

*FY 13 Department Update:* Reports of sexual abuse to a minor that do not meet the criteria for DCFS are referred to the local Child Advocacy Center for further action and police notification as necessary. This is done via notification to the local field office and coded as a "CAC referral."

**The State Central Register's notification letters of final findings to Mandated Reporters should list each final finding (indicated/unfounded) by allegation, and the identity of the perpetrator. The notification should also provide information regarding the Mandated Reporter's right to request an additional review of the findings (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 1).**

*FY 11 Department Response:* The Division of Child Protection and the Office of Legal Services are working to implement this recommendation.

*FY 12 Department Update:* The mandated reporter notification letters have been revised and the Office of Information Technology Services is in the process of incorporating the forms into the Statewide Automated Child Welfare Information System (SACWIS).

*FY 13 Department Update:* The notification letters have been revised. The projected implementation date is January 2014.

**The Department must ensure that notifications of investigation findings to mandated reporters from the State Central Register conform to Rule 300.130,** *Notices Whether Child Abuse or Neglect Occurred***, and include the name of the child victim (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 3).**

*FY 08 Department Response:* The Department agrees. Implementation of this recommendation is in progress.

*FY 09 Department Update:* This requires a change to the Statewide Automated Child Welfare Information System (SACWIS), since the letter is generated in SACWIS. Several notification letters will need to be changed and all changes will be made at the same time. A meeting will be convened in January 2010 between the Office of Legal Services, the Division of Child Protection and the State Central Register to make revisions.

*FY 10 Department Update:* The Office of Legal Services is reviewing the definition of "involved parent" in conjunction with other changes to the Abused and Neglected Child Reporting Act (ANCRA) required by the DuPuy Federal Lawsuit. Litigation is currently in the final stages. The anticipated completion date is summer 2011.

*FY 11 Department Update:* The Office of Legal Services is working with the Administrator of State Central Register to revise all notification letters.

*FY 12 Department Update:* The mandated reporter notification letters have been revised and the Office of Information Technology Services is in the process of incorporating the forms into the Statewide Automated Child Welfare Information System (SACWIS).

*FY 13 Department Update:* The notification letters have been revised and will be incorporated into SACWIS.

**The Department should train investigators and issue policy to require that when investigating injuries that occurred during babysitting, the investigator should determine the names of all other children that the babysitter provides care for, and interview them when appropriate and add children as additional alleged victims when appropriate. Parents, including non-custodial involved parents, of all children who are added as additional alleged victims should be notified of pending and completed investigations as required by the Abused and Neglected Child Reporting Act (ANCRA) and existing Rule and Procedure (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 3).**

*FY 09 Department Update:* A policy/information transmittal is being developed to notify staff.

*FY 10 Department Update:* The DCFS Office of Legal Services is reviewing the definition of "involved parent" in conjunction with other changes to the Abused and Neglected Child Reporting Act (ANCRA) required by the DuPuy Federal Lawsuit. Litigation is currently in the final stages. The anticipated completion date is summer 2011.

*FY 11 Department Update:* The Office of Legal Services is working with the Administrator of State Central Register to revise all notification letters.

*FY 12 Department Update:* The notification letters have been revised and the Office of Information Technology Services is in the process of incorporating the forms into the Statewide Automated Child Welfare Information System (SACWIS). The recommendation will be included in revisions to Procedures 300, *Reports of Child Abuse and Neglect*.

*FY 13 Department Update:* Training is being developed for child protection staff to review the need to determine the names of all children cared for by an independent babysitter or facility, interview when deemed appropriate, and added to the investigation as victims when appropriate. This training will include procedures regarding various types of field notifications needed and guidelines for notification which will include and ensure parents of child victims and subjects are notified of the outcome of the investigation. A memo was previously sent to Operations Management staff February 9, 2013 to share with their staff; reminding them to ensure parents are added properly to the investigation in order to receive required notice.

**As previously recommended by the Office of the Inspector General in FY 2007, Department procedures should be amended to require that in child protection investigations in which the plan is for a family member to obtain private guardianship of the child/ren, the family should be referred to the Extended Family Support Program (EFSP) for assistance in securing private guardianship (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 11).**

*FY 08 Department Response:* The Service Intervention Deputy has reviewed and approved the draft procedure. The procedure has been sent to the Office of Child and Family Policy for the revision process.

*FY 09 Department Update:* The Department studied the Procedure and determined that the change could increase the Extended Family Support Program budget by as much as $400,000 per year. The Division of Service Intervention is currently determining where the money can be found for this change.

*FY 09 OIG Response: The Department should explain how it arrived at the projected additional cost of $400,000, including a line item breakdown of projected expenses by Region. The projected cost of assisting family members to obtain private guardianship of a child must be weighed against potential savings created by assisting and strengthening families to prevent them from entering the system.*

*FY 10 Department Update:* The recommendation has been incorporated into draft Procedures 302.385, *Extended Family Support Program*. Once the draft procedures are approved the Division of Service Intervention will begin training on the referral process.

*FY 11 Department Update:* The recommendation has been incorporated into draft Procedures 302.385, *Extended Family Support Program*. Once the draft procedures are approved the Division of Service Intervention will begin training on the referral process.

*FY 12 Department Update:* The recommendation will be incorporated into the intact family and child welfare intake redesign.

*FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years. The Department will issue a Policy Alert to inform staff of the necessary changes in practice while working to incorporate the changes into Procedure.

**The Abused and Neglected Child Reporting Act (ANCRA) should be amended to clarify that the Department can share unfounded investigative information during a subsequent child protection or criminal investigation with any persons named in Section 11.1, Disclosure of Information for purposes consistent with the Abuse and Neglect Child Reporting Act or criminal prosecution (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 4).**

*FY 07 Department Response:* The Office of Legal Services has assigned an attorney to draft amendments to the Abused and Neglected Child Reporting Act (ANCRA), which address the above issue, as well as other proposed changes to ANCRA, and will submit as a single legislative package. The targeted date of completion is May 2008.

*FY 08 Department Update:* The Office of Legal Services has assigned an attorney to draft amendments to the Abused and Neglected Child Reporting Act (ANCRA), which address the above issue, as well as other proposed changes to ANCRA, and will submit as a single legislative package. The anticipated date of completion is February 2009.

*FY 09 Department Update:* Draft amendments to the Abused and Neglected Child Reporting Act addressing this issue will be submitted as part of the legislative package for the Fall Session 2010.

*FY 10 Department Update:* Amendments to the Abused and Neglected Child Reporting Act addressing this issue will be submitted as part of the legislative package for the Spring Session 2011.

*FY 11 Department Update:* The Office of Legal Services will work with Legislative Affairs to incorporate language into the Abused and Neglected Child Reporting Act pertaining to sharing unfounded reports during a criminal or child protection investigation.

*FY 12 Department Update:* DCFS Legal has determined that Rule 431 can be amended without pursuing legislation. Revisions to Rule 431, Confidentiality of Personal Information, are being drafted.  The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* OCFP will work with the respective Division to review this recommendation and determine if it can be included in current revisions to Rule 431.

**The Department should ensure that available fathers be explored as potential placements.  If a safety plan is likely to last longer than six months, the Department should facilitate a legal relationship between the child and the caretaker (from OIG FY 06 Annual Report, General Investigations 11).**

*FY 06 Department Response:* A committee has been formed to revise the safety assessment process.  The committee continues to work on the safety assessment framework protocol. Targeted completion date is June 2007.

*FY 07 Department Update:* The Child Endangerment Risk Assessment Protocol (CERAP) draft, currently being field tested, directs the attention of the worker to consider available fathers as potential placements.

*FY 08 Department Update:* The Child Endangerment Risk Assessment Protocol draft provides that non-custodial parents should be identified and assessed first for potential out-of-home placement when a safety plan is needed.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 09 OIG Response: According to the most recent data, just over 100 families have been referred statewide to agencies that the Department contracts with to provide services to fathers. The Department needs to encourage broader participation for fathers of DCFS involved children.*

*FY 10 Department Update:* The recommendation has been incorporated into the draft Safety Enhancement Protocol (Procedure 300, Appendix G). The estimated date of implementation is July 2011.

*FY 11 Department Update:* The training for Enhanced Safety Model began in the Fall of 2011 and will be completed in Spring 2012. The Enhanced Safety Model includes prompts to be sure that available fathers are considered as placement options. However, the Enhanced Safety Model does not include facilitating a legal relationship with substitute care givers should the safety plan last longer than 6 months. This facilitation of a legal relationship between the substitute caregiver

and the children will be considered by the incoming Director in consultation with the Office of Legal Services.

*FY 12 Department Update:* The Department will incorporate the clarification into Procedures 300, *Reports of Child Abuse and Neglect*.

*FY 13 Department Update:* The new safety model has been implemented and staff trained to assess non-custodial parents as resources to ensure child safety. The recommendation has been incorporated into Procedures 300, Appendix G (j).

**The State Central Register should revise the Notice of Indicated Finding sent to parents to ensure that parents know the identity of the indicated perpetrator or whether the allegation was indicated to an unknown perpetrator (from OIG FY 05 Annual Report, Death and Serious Injury Investigation 6).**

*FY 05 Department Response*:  This recommendation is under review by the DCFS Office of Legal Services because of the impact it may have on the DuPuy Federal lawsuit.

*FY 06 Department Update*:  Revisions are on hold pending implementation of the changes required by the DuPuy Federal lawsuit.  Changes will be implemented as soon as possible, but no later than July 17, 2007.

*FY 07 Department Update:* Revisions were placed on hold by the Office of Legal Services due to changes required by DuPuy Federal Lawsuit.  As of November 2007, litigation is ongoing and it appears additional changes to the notice form may be required.  The Office of Legal Services will continue to monitor and will draft an updated form when legal issues have been resolved.  The anticipated implementation date is May 2008.

*FY 08 Department Update:* Revisions to the notification letter are in process and will be completed by June 2009.

*FY 09 Department Update:* Recommendation in progress. Estimated completion date: Summer 2010.

*FY 10 Department Update:* Implementation was delayed due to ongoing litigation now in final stages.  The estimated completion date is Summer 2011.

*FY 11 Department Update:* The Office of Legal Services is working with the Administrator of State Central Register to revise all notification letters.

*FY 12 Department Update:* The notification letters have been revised and the Office of Information Technology Services is in the process of incorporating the forms into the Statewide Automated Child Welfare Information System (SACWIS).

*FY 13 Department Update:* The notification letters have been revised and will be incorporated into SACWIS.  The anticipated completion date is January 2014.

**A third box should be added to each safety factor in the Child Endangerment Risk Assessment Protocol (CERAP), acknowledging that information for that factor may be "unknown" or**

**"uncertain" and add a section at the conclusion of the factors list for identifying information that needs to be gathered in the future to further assess safety (from OIG FY 06 Annual Report, General Investigations 16).**

*FY 07 Department Response:* The current draft Child Endangerment Risk Assessment Protocol (CERAP) that is being field-tested provides two assessment tools. The first is used at the outset and permits workers to note that more information is needed before the question can be answered.

*FY 08 Department Update:* The current draft of the initial CERAP acknowledges the option that more information is needed to assess safety.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 10 Department Update:* The recommendation has been incorporated in the draft Safety Enhancement Protocol, *Procedure 300, Appendix G: Child Endangerment Risk Assessment.* The estimated date of implementation is July 2011.

*FY 11 Department Update:* The training for Enhanced Safety Model began in the fall of 2011 and will be completed in spring 2012.

*FY 12 Department Update:* The Department and the Office of the Inspector General are continuing to review this recommendation toward maximizing child safety.

*FY 13 Department Update:* The Inspector General and the new Acting Director will discuss this recommendation and the OIG investigation on which it was based to determine whether its implementation will enhance child safety.

**Devise a supervisory form to accompany the safety assessment that would allow a supervisor to determine the source of information that formed the basis of the particular safety factor decision and provide a check that basic available objective sources (such as the hotline report, prior child protection investigations, police reports and interviews with police, and criminal history information) as required by Administrative Procedure 6 (from OIG FY 06 Annual Report, General Investigations 16).**

*FY 08 Department Update:* The current draft CERAP identifies the source of the information.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 10 Department Update:* The recommendation will be incorporated in the draft Safety Enhancement Protocol *Procedure 300, Appendix G: Child Endangerment Risk Assessment.* The estimated date of implementation is July 2011.

*FY 11 Department Update:* The training for the Enhanced Safety Model began in the Fall of 2011 and will be completed in Spring 2012. The ability of the supervisor to review and approve the source of the information has been incorporated into the Enhanced Safety Model in SACWIS.

*FY 12 Department Update:* The revised CERAP includes a specific section to indicate the source of information for the assessment of each safety threat. Staff have been trained to complete the

source of information section and should seek information other than self reported information whenever possible in making safety determinations. The new safety model will be fully implemented with SACWIS support in early 2013.

*FY 13 Department Update:* The new safety model has been fully implemented and staff trained.

**The Child Endangerment Risk Assessment Protocol (CERAP) should be amended to require that workers note when a risk factor cannot be answered because of insufficient information.  Under such circumstances, workers should be required to perform diligent inquiry into relevant facts for assessment within 48 hours.  The Department should develop procedures to ensure that there is follow-up and resolution of unknown variables (from OIG FY 05 Annual Report, Death and Serious Injury Investigation 9).**

*FY 07 Department Update:* The draft Child Endangerment Risk Assessment Protocol, currently being piloted, addresses this recommendation.

*FY 08 Department Update:* The recommendations resulting from the pilot were submitted to the Safety Workgroup, which is meeting regularly to incorporate these recommendations. There is a possibility of some additional slight modifications to incorporate the recent Department focus on Trauma-Informed practices. Procedures 300, Appendix G: Safety Assessment Enhancement, has been revised and will be implemented when changes to SACWIS are completed. The anticipated date of implementation is July 2009.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 10 Department Update:* The recommendation has been incorporated in the draft Safety Enhancement Protocol, *Procedure 300, Appendix G: Child Endangerment Risk Assessment*. The estimated date of implementation is July 2011.

*FY 11 Department Update:* The training for Enhanced Safety Model began in the fall of 2011 and will be completed in spring 2012. The Enhanced Safety Model allows the investigator to complete an initial Safety Assessment that includes gathering additional information before completing the assessment.

*FY 12 Department Update:* The Department and the Office of the Inspector General are continuing to review this recommendation toward maximizing child safety.

*FY 13 Department Update:* The Inspector General and the new Acting Director will discuss this recommendation and the OIG investigation on which it was based to determine whether its implementation will enhance child safety.

**The Department should amend Rule 431 pertaining to unfounded reports made by non-mandated reporters and involving licensed foster homes/parents – to extend the 30-day retention to six (6) months after the final finding is entered (from OIG FY 08 Annual Report, Death and Serious Injury 9).**

*FY 12 Department Update:* The Department and the OIG jointly sponsored a legislative bill to permit the retention of unfounded reports for twelve months. The legislation passed and Public

Act 96-1164 was signed into law. The Department is in the process of amending Rule 431 to conform to the new legislation.

*FY 13 Department Update:* This recommendation has been addressed through a joint effort by the Department and OIG to amend ANCRA to retain unfounded investigations for 12 months.

**The procedures for completing a Child Endangerment Risk Assessment Protocol (CERAP) and the decision tree for mentally ill parents should be amended so that the guidelines note the need to assess risk to the child when a parent incorporates a child into their delusional system, even in the absence of overt negative statements (from OIG FY 06 Annual Report, Death and Serious Injury 2).**

*FY 06 Department Response:* The committee revising the safety assessment continues to work on the safety framework protocol.  Targeted completion date is June 2007.

*FY 08 Department Update:* Department procedures require a rule out of dependency. Revised safety enhancement factors have been expanded.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 10 Department Update:* The recommendation has been incorporated in the draft Safety Enhancement Protocol (Procedure 300, Appendix G). The estimated date of implementation is July 2011.

*FY 11 Department Update:* The training for Enhanced Safety Model began in the fall of 2011 and will be completed in spring 2012. The Enhanced Safety Model alerts staff to the dangers associated with a mentally ill parent who incorporates the child into their delusional system.

*FY 12 Department Update:* Training staff on the Enhanced Safety Model began in the Fall of 2011. The new safety model will be fully implemented with SACWIS support in early 2013.  The Enhanced Safety Model alerts staff to the dangers associated with a mentally ill parent who incorporates the child into their delusional system.

*FY 13 Department Update:* Procedures 300, Appendix G (f), (14) alerts staff to the dangers associated with a mentally ill parent who incorporates the child into their delusional system.

## CHILD WELFARE EMPLOYEE LICENSURE (CWEL)

**The Department should amend Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors,* to require that all counselors and therapists subcontracted or employed to provide services through a DCFS contract possess a CWEL license (from OIG FY 11 Annual Report, General Investigation 5).**

*FY 11 Department Response:* The draft amendments to Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors,* require that all counselors and therapists subcontracted or employed to provide services through a DCFS contract possess a CWEL license.

*FY 12 Department Update:* The Department continues to discuss this recommendation with the Office of the Inspector General, Office of Legal Services and the Office of Clinical Services.

*FY 13 Department Update:* Due to budgetary constraints the Department was unable to incorporate this recommendation into Rule 412.

**The Department should amend procedures to require the CWEL Division to notify the Department of Professional and Financial Regulation of any revocation of a CWEL license (from OIG FY 11 Annual Report, General Investigation 5).**

*FY 11 Department Response:* The requirement to notify the Department of Professional and Financial Regulation has been included in the draft of the amendments to Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors.* The amendments will be submitted to the Joint Commission on Administrative Rules (JCAR).

*FY 12 Department Update:* The Department is in the process of revising Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors.*

*FY 13 Department Update:* The Department of Professional Regulations does not regulate CWEL licenses, so this recommendation cannot be implemented.

**The OIG recommended that Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors,* be revised:**

- **To permit the Department to refuse to issue a license with knowledge that the applicant had committed a violation that would warrant licensure revocation or if the applicant had engaged in behavior that would pose a risk to children or state resources;**
- **To expand the list of criminal pending charges or convictions that would warrant a refusal to issue a license to include any crime of which dishonesty is an essential element;**
- **To permit the Department to refuse to issue a license if the applicant provides false information during the licensing process;**
- **To provide guidelines for assessing whether certain unbarred criminal convictions and abuse or neglect findings should prevent licensure because of the characteristics of the crime;**
- **To permit the Division of Child Welfare Employee Licensure to refer applications for investigation to verify facts presented (from OIG FY 06 Annual Report, General Investigations 26).**

*FY 07 Department Update:* The Clinical Division, through the Child Welfare Employee Licensure (CWEL) staff, has drafted proposed changes to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors.* The draft of the proposed amendment incorporates input from the OIG, and the appointed Board members of the Child Welfare Employee Licensure (CWEL) program. The text of the proposed amendment will be submitted to the Director for review, approval, and transmittal to the Joint Committee on Administrative Rules (JCAR).

*FY 08 Department Update:* The revisions to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* were submitted to the Office of Child and Family Policy on November 21, 2008 and will begin the revision/comment process. The anticipated date of completion is June 2009.

*FY 09 Department Update:* The amended Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors,* has been submitted to the Joint Committee on Administrative Rules for review. The anticipated completion date is Fall 2010.

*FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License,* was filed in October 2009. The second Notice was never filed due to failure to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first notice again by January 2011, subject to approval.

*FY 11 Department Update:* The Department will resubmit the amendments to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* with the Joint Committee on Administrative Rules.

*FY 12 Department Update:* Revisions to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors,* have been distributed for comment.

*FY 13 Department Update:* Draft was sent to JCAR in June 2013 and in November 2013 the edited draft was submitted to DCFS Legal for review and facilitation of review by the Governor's Office.

**The Department should amend Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors*, to provide specific provisions for voluntary relinquishment of a Child Welfare Employee License (from OIG FY 08 Annual Report, General Investigation 30).**

- **A licensee may voluntarily relinquish his or her license at any time.**

- **The voluntary relinquishment of a CWEL during a pending licensure or disciplinary investigation or proceeding shall be recorded in the CWEL files as "*relinquished during licensure or disciplinary investigation or proceeding.*"**

- **Voluntary relinquishment of a license must be filed with the Child Welfare Employee License Division on a form prescribed by the CWEL Division.  The form must contain an acknowledgment that reinstatement will be subject to consideration of the facts disclosed in any pending licensure investigations or proceedings.  Voluntary relinquishment does not divest the OIG of the jurisdiction to complete a pending investigation.**

- **An Application for License from a licensee who previously relinquished his or her license shall be considered a Request for Reinstatement rather than an Application for License.**

*FY 08 Department Response:* The Department agrees.  The Office of Child and Family Policy has begun the revision process.

*FY 09 Department Update:* Revisions to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisor,* is currently being reviewed by the Joint Committee on Administrative Rules.

*FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License*, was filed in October 2009. The second Notice was never filed due to failure

to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first Notice again by January 2011, subject to approval.

*FY 11 Department Update:* The Department will resubmit the amendments to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors,* with the Joint Committee on Administrative Rules.

*FY 12 Department Update:* Revisions to Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* have been distributed for comment.

*FY 13 Department Update:* Draft was sent to JCAR in June 2013 and in November 2013 the edited draft was submitted to DCFS Legal for review and facilitation of review by the Governor's Office.

**Section 412.100,** *Restoration of Revoked or Suspended License***, should be amended as follows: Section 412.100,** *Restoration of Revoked, Suspended or Relinquished License***: A licensee may request the restoration of his or her license by submitting a written request to the Board providing specific reasons to support the request.  In considering an application to reinstate or grant a license that was relinquished during a pending licensure investigation or administrative proceeding, the Board shall consider any charges filed along with a report or sworn statement by the Office of the Inspector General regarding the evidence developed in the investigation.  For the purpose of considering a Request for Reinstatement, the Board shall presume that the facts developed during the investigation or the pending charges are true, when the license was surrendered during a pending investigation or licensure proceeding; the licensee may rebut the presumption for good cause shown.  The Board may not reinstate a license where it has been shown by investigation and administrative hearing that it is not in the best interest of the public to do so.  Considerations that will be reviewed when making a finding of "in the best interest of the public" include, but are not limited to:  the nature of the offense for which the license was revoked; the period of time that has elapsed since the revocation; evidence of rehabilitation; and character references (from OIG FY 08 Annual Report, General Investigation 30).**

*FY 08 Department Response:* The Department agrees.  The Office of Child and Family Policy has begun the revision process.

*FY 09 Department Update:* Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* is currently being reviewed by the Joint Committee on Administrative Rules.

*FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License,* was filed in October 2009. The second Notice was never filed due to failure to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first Notice again by January 2011, subject to approval.

*FY 11 Department Update:* The Department will resubmit the amendments to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* with the Joint Committee on Administrative Rules.

*FY 12 Department Update:* Revisions to Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* have been distributed for comment.

*FY 13 Department Update:* Draft was sent to JCAR in June 2013 and in November 2013 the edited draft was submitted to DCFS Legal for review and facilitation of review by the Governor's Office.

**Rule 412,** *Licensure of Direct Child Welfare Service Employees and Supervisors***, should be amended to provide for automatic suspension or denial of license application after a licensee or applicant has failed a drug test required by Administrative Procedure 24,** *Drug Testing of Employment Applicants* **(from OIG FY 08 Annual Report, General Investigation 32).**

*FY 08 Department Response:* The Department agrees.  The Department convened a task force that has developed language to amend Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors.*

*FY 09 Department Update:* Pre-employment drug testing (Administrative Procedure 24) was suspended indefinitely due to budget constraints.

*FY 10 Department Update:* The Department began pre-employment drug testing in February 2008, but had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 11 Department Update:* Management fully supports reasonable suspicion testing for direct child welfare service employees and supervisors.  Direct child welfare service employees and supervisors are bargaining unit members.  As such implementation of reasonable suspicion drug/alcohol testing, unless legislatively mandated, must be negotiated with the collective bargaining units.  Management routinely proposes to CMS Labor Relations that reasonable suspicion testing be included in collective bargaining agreements.  Management also routinely proposes that reasonable suspicion testing be added to supplemental collective bargaining agreements.  Without a reasonable suspicion testing policy in place amendment of Rules and Procedures is futile.  The State will be involved in contract negotiations with AFSCME in 2012 and the Department intends to continue pressing this point.

*FY 11 OIG Response: The OIG notes that the City of Chicago and both the Illinois State Police and the Department of Corrections have had Reasonable Suspicion Testing for several years.  The City of Chicago and the Department of Corrections employees are represented in large part by the same union as most employees with the Department of Children and Family Services.  Moreover, Direct Child Welfare employees and supervisors at DCFS must possess Child Welfare Employee Licenses.  The OIG has urged since 2005 that Reasonable Suspicion Testing be added as a requirement for Child Welfare Licensure.  The Department has failed to act on the recommendation.*

*FY 12 Department Update:* A workgroup has been formed to review all OIG drug/alcohol related recommendations to determine implementation steps.

*FY 13 Department Update:* The Department will reconvene the workgroup to address this recommendation.

**The Department should amend Rule 412,** *Licensure of Direct Child Welfare Service Employees and Supervisors*  **to add "failure to timely comply with an order for drug or alcohol testing after a**

finding of reasonable suspicion" as a basis for licensure action under Rule 412.50, *Misconduct* **(from OIG FY 10 Annual Report, General Investigation 21).**

*FY 10 Department Response:* Management will seek to negotiate reasonable suspicion testing with the Union in the future.

*FY 10 OIG Response: The Office of the Inspector General has been continuously recommending this critical change in policy for 11 years. The lack of a reasonable suspicion testing policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk. The policy change sought by the Office of the Inspector General would have minimal budgetary impact.*

*FY 11 Department Update:* Management fully supports reasonable suspicion testing for direct child welfare service employees and supervisors. Direct child welfare service employees and supervisors are bargaining unit members. As such implementation of reasonable suspicion drug/alcohol testing, unless legislatively mandated, must be negotiated with the collective bargaining units. Management routinely proposes to CMS Labor Relations that reasonable suspicion testing be included in collective bargaining agreements. Management also routinely proposes that reasonable suspicion testing be added to supplemental collective bargaining agreements. Without a reasonable suspicion testing policy in place amendment of Rules and Procedures is futile. The State will be involved in contract negotiations with AFSCME in 2012 and the Department intends to continue pressing this point.

*FY 11 OIG Response: The OIG notes that the City of Chicago and both the Illinois State Police and the Department of Corrections have had Reasonable Suspicion Testing for several years. The City of Chicago and the Department of Corrections employees are represented in large part by the same union as most employees with the Department of Children and Family Services. Moreover, Direct Child Welfare employees and supervisors at DCFS must possess Child Welfare Employee Licenses. The OIG has urged since 2005 that Reasonable Suspicion Testing be added as a requirement for Child Welfare Licensure. The Department has failed to act on the recommendation.*

*FY 12 Department Update:* A workgroup has been formed to review all OIG drug/alcohol related recommendations to determine implementation steps.

*FY 13 Department Update:* The Department will reconvene the workgroup to address this recommendation.

## CONTRACT MONITORING

**The Department should incorporate into its contract with attorneys a certification and disclosure section regarding prior attorney discipline or licensure action in Illinois or other states (from OIG FY 12 Annual Report, General Investigations 24).**

*FY 12 Department Response:* The CMS Administrative Services Unit is taking the recommendation under advisement.

*FY 13 Department Update:* As of fiscal year 2014 any professionals hired as contractual employees must answer the following, "Have you had any professional licensure discipline?" under the contract they enter into with DCFS. In addition, direct service contractors providing legal services to DCFS agree in their program plan that:

(a) Each Attorney performing services required by this Contract/Program Plan/Scope of Services shall provide a summary resume to the DCFS General Counsel prior to performing any services.

(b) Attorneys working on DCFS matters must submit proof of good standing with the Illinois Attorney Disciplinary Commission or applicable state attorney licensing authority to DCFS each calendar year. Each Attorney performing any services pursuant to this Contract/Program Plan/Scope of Services shall submit copies of the current Illinois Attorney Registration and Disciplinary Commission cards or registration cards issued by the applicable state attorney licensing authority to the DCFS General Counsel at the beginning of the Term of the Contract and by January 30 of the next calendar year.

(c) Prior to performing any services pursuant to the Contract/Program Plan/Scope of Services, each Attorney shall also submit a duly executed Statement of Good Standing on the form attached hereto the DCFS General Counsel.

**The Office of Field Audits should evaluate the private agency's program and personnel expenditures given the rate of staff turnover in fiscal year 2011 (from OIG FY 12 Annual Report, General Investigations 2).**

*FY 12 Department Response:* The Office of Field Audits conducted an onsite audit June 18-22, 2012. OFA evaluated the Agency's program and personnel expenditures given the rate of staff turnover in fiscal year 2011. The Program Monitor sent the OFA Auditor a report dated May 24, 2012, which stated that although the Agency had a turnover of staff in 2011, at the date of this report, the Agency was fully staffed. (The turnover in 2011 was 2 workers in March, 2 in May and a supervisor in November.) The Agency's CFR for fiscal year 2011 did not show any excess funds, in fact the Agency had a deficit at that time, which means any funds that were not used for salaries were used for other allowable costs.

*FY 12 OIG Response:* The field audit did not cover the first 6 months of FY 2011 as identified in the report in which the Agency experienced a high staff vacancy.

*FY 13 Department Update:* The new Deputy over Field Audits will review the report and this recommendation to work towards implementation of the recommendation.

**The current agency monitoring system fails to ensure safety of children, address noted agency deficiencies and problems and enforce contractual and other requirements. The Department should replace the existing monitoring system with a single coordinated system designed to competently evaluate agencies' performance, define the problem and develop solutions, and react to child safety concerns based on fact-gathering confirmatory measures. An effective monitoring system must combine and integrate programmatic, financial, licensing and contractual monitoring functions (from OIG FY 12 Annual Report, General Investigations 2).**

*FY 12 Department Response:* Implementation of this recommendation will be a component of the new monitoring design.

*FY 13 Department Update:* The non-substitute care monitoring system has been developed and will be distributed initially as an Action Transmittal in 12/13. This essentially incorporates these recommendations and is in alignment with the substitute care monitoring system developed by Regulation and Monitoring.

The Department should review the Agency's allocation of salaries to the Program, including a review of whether staff perform direct or administrative services. [The Department cannot pay more than 20% of direct costs for administrative costs.] Based on the results of the review and the issues identified in this report, the Department should determine whether to continue contracting with the Agency (from OIG FY 12 Annual Report, General Investigations 28).

*FY 12 Department Response:* The Department is currently planning this audit including a workplan/audit program. The Department should have a request of materials out to the Agency in December 2012.

*FY 13 Department Update:* The Department's Office of Internal Audits issued an audit initiation letter to the agency in May 2013 for a 906 review, Time and Attendance Records, Personnel Direct or Indirect Service Activities, and Cost Allocation Review for the audit period of July 1, 2007 through June 30, 2010. The audit entrance conference was held on June 12, 2013, on site audit field work continued through July 12, 2013, and an outstanding financial and personnel records request was provided at that time. The agency did not provide outstanding records until August 2013. Internal Audits is currently completing audit procedures for the agency and plans to issue a draft audit report to the agency by December 31, 2013.

**From OIG FY 11 Annual Report, General Investigation 1: The Illinois Department of Children and Family Service should implement the following safeguards to their training and procedures:**

➢ **Vendors, grantees and contractors should be required to disclose all public contracts held by related parties in the Consolidated Financial Report (CFR). Instructions to the CFR should require contractors to report public funding of affiliates and related entities. Vendors, grantees and contractors should also be obligated to provide a description of programs supported by the public funding.**

➢ **Grants, contracts, program plans and independent audits should be electronically scanned, stored in a central location and made accessible to program and financial monitors for review.**

➢ **DCFS contract and financial monitoring training must be required for all DCFS program and financial monitors, as well as those reviewing annual audits, within three months of receipt of a contract monitoring assignment and every two years thereafter. Training should emphasize that the Program Monitor's *chief duty* is to verify, by personal knowledge, the receipt of goods and services provided.**

**Any training should address, at minimum:**
✓ **General grant monitoring responsibilities;**
✓ **Audits including comparison of audit figures with approved budgets and related responsibilities;**
✓ **Approval of Quarterly Reports and related responsibilities;**
✓ **Rules and procedures regarding under spending and related responsibilities;**
✓ **Rules and procedures regarding disallowable costs and related responsibilities;**
✓ **Rules and procedures regarding reduction in grant amounts responsibilities;**
✓ **Rules and procedures regarding excess revenue and allowable offset and related responsibilities; and**

- ✓ **Rules and procedures involving inquiries into expenses to related entities and related responsibilities.**

- ➢ **In addition, all DCFS Program Monitors should be required to certify that:**
  - ✓ **the report of direct versus administrative expenses have been verified and is appropriately allocated;**
  - ✓ **the Program Monitor has considered whether to reduce future contract or grant amounts based on under-spending or disallowable costs;**
  - ✓ **the quarterly reports have been reviewed and compared to the budget; and**
  - ✓ **the Program Monitor has reviewed and approved leases supporting rental costs.**

- ➢ **On a biannual basis, each DCFS Deputy Director must submit to the DCFS Director and the DCFS Division of Finance, Technology and Planning, a list of each contract monitored by his or her division and listing the program monitor assigned to each individual contract. The DCFS Division of Finance, Technology and Planning should be required cross-check the list to ensure that all contracts are assigned a Program Monitor, and also to ensure that all Program Monitors receive the required Contract Monitoring Training. Every six months the DCFS Division of Finance, Technology and Planning should be required to forward to the DCFS Office of the Inspector General a list of any unmonitored contracts.**

*FY 11 Department Response:* Vendors, grantees and contractors will be required to disclose all public contracts held by related parties and public funding of affiliates and related entities as well as a description of the programs supported by the public funding in the Consolidated Financial Report ("CFR") to the DCFS Divisions of Finance, Technology, and Planning and Monitoring, which receive and analyze CFRs. These requirements will be incorporated into requests to vendors, grantees, and contractors for their CFR submissions for annual contract budget and financial desk audit activities. Estimated completion date and recommendations for compliance is 4th Qtr FY12.

Evaluation of the existing DCFS Division of Procurement and Contracts/Office of Contract Administration Access database, used to determine if grants, contracts, program plans and independent audits can be electronically scanned, stored in a central location and made accessible to monitors, is currently underway. Estimated completion date and recommendations for compliance is 3rd Qtr FY12.

The current contract and financial monitoring training program for grants will be updated by Division of Procurement and Contracts/Office of Contract Administration in conjunction with Divisions of Finance, Technology and Planning and Support Services. This effort will be coordinated and/or led by staff of the newly formed Office of Contract Compliance. Estimated completion date and recommendations for compliance is 3rd Qtr FY12.

Interim process controls include the tracking of monitors' visits to grantees and the tracking of metrics (i.e. number of clients and cost per client served) of all grantees. Tracking of metrics for all grantees awarded over $10,000 should be complete by the end of 2nd Qtr FY12.

A DCFS Administrative Procedure is being developed by the Division of Finance, Technology and Planning. This effort will be coordinated with staff of the Office of Contract Compliance once hired. Estimated completion date and recommendations for compliance is by 3rd Qtr FY12.

Subject to Senate confirmation, Richard Calica will become the Director of DCFS on December 15, 2011. He will be undertaking a comprehensive review of DCFS, including contracts, grants, and controls relating to the same. Under Mr. Calica, the processes above may be modified and/or added to.

*The following is the Department's Update for FY 12:*

- For FY13, DCFS requires all vendors, grantees and contractors (collectively, "contracting entities") with whom DCFS does business, to disclose all public contracts, pending contracts, bids, proposals and procurements held or done by the contracting entities. In FY14, DCFS also will require contracting entities to provide a description of those programs funded by other public entities or related parties in order to identify instances where multiple public agencies are funding similar (or identical) programs. For certain contracts over $150,000, contracting entities must also submit to the DCFS Division of Finance, Technology and Planning a Consolidated Financial Report ("CFR"). The Division of Finance, Technology and Planning reviews each submitted CFR to ensure that costs are appropriately allocated and that funding is not duplicated. DCFS has revised the instructions for reporting on the CFR form to include, reinforce and make clear that all funding, including public funds received by the contracting entity, must be reported. Those instructions will be sent to contracting entities beginning January 2013. The Department is also developing procedures to facilitate appropriate information-sharing and coordination with the Office of Field Audits regarding identifying and recovering disallowed costs. The estimated completion date for finalizing such procedures is the fourth quarter of FY13.

- The Department completed an evaluation of the existing DCFS Division of Procurement and Contracts/Office of Contract Administration Access database to determine if grants, contracts, program plans and independent audits can be electronically scanned, stored in a central location and made accessible to monitors. DCFS concluded that use of the contract Access database for this purpose is not feasible. Thus, the Department is developing a separate platform for such information including program, fiscal, license and performance information. This information will be accessible to all Department monitoring staff, regardless of their monitoring function. The estimated completion date is the fourth quarter of FY13.

- In the third quarter of FY12, the Department reviewed all its contracts to identify the responsible DCFS monitoring staff for each contract and the type of monitoring provided. In addition, to the extent there were contracts to which no monitoring staff had been assigned, the Department made necessary assignments.

- With regard to training, the programs described below reflect all of the training-related recommendations. Each monitor will attend the training program appropriate to his or her duties, and DCFS will train any new monitoring staff.

- Training for Contract and Fiscal Monitoring Staff: The Department, through its Offices of Procurement and Contracts, Training, and Division of Finance, Technology and Planning, has updated the training program for contract and fiscal monitoring staff. DCFS held the initial updated training, led by the staff of the Office of Contract Compliance, in the second quarter of FY12. The Department will conduct the training annually. Two sessions are scheduled for January and February of 2013.

- Training for Program Monitoring Staff: DCFS has revised its program monitoring model and training for program monitors. All Department staff responsible for monitoring agency

programs will follow the same model regardless of the type of service purchased.  The Department began training all program monitors on the new model in the second quarter of FY13.  Estimated completion date is the fourth quarter of FY13.

- Fraud Prevention and Detection Training (for all Monitoring Staff): The Office of the Illinois Attorney General and the DCFS Office of Inspector General developed fraud prevention and detection training.  The DCFS Inspector General and representatives of the Attorney General conducted two fraud prevention and detection training sessions for all DCFS leadership in November 2012.  This training will be rolled out to all contract, fiscal and program monitoring staff in the third quarter of FY13.

- The Department amended its audit instructions for FY13 to require a vendor's auditor to certify the vendor's fraud prevention and detection program.

- For grants, the Department implemented a centralized database to track budgeted costs, quarterly program costs, payroll tax and fringe benefit costs of all grantees (regardless of funding amount) and to record service quantity and quality metrics.  The database allows staff to identify and address deviations from budgeted costs.  The database is designed to assist staff in identifying and recovering any unspent funds at the end of the contract period.

- DCFS is developing administrative procedures and policies concerning the following: requirements for approval of a new provider; grant reconciliation procedures; program monitoring criteria; and criteria for identifying financially and otherwise troubled vendors.  The estimated completion date for these policies and procedures is the second quarter of FY14.

- The Department established a work group in FY13 to develop additional strategies and to collaborate on overall contract monitoring, management, and fraud prevention and detection.  Membership of the group includes Department management and the DCFS Office of the Inspector General.   The work group, among other things, is developing a new vendor orientation packet that will detail provider responsibilities around reporting, allowable costs and excess revenue.  This packet also will include information on where the vendor may go to find additional help and technical assistance.  The workgroup meets regularly.

- The Department is revising its Monitoring Protocol and Training. All Department staff who are Program Monitors will be required to attend the training and follow the Monitoring Protocol.

*The following is the Department's response for FY 2013:* In FY 13, the Department has:
- Provided fraud prevention/detection training conducted for DCFS executive, contract and program monitoring staff;
- Instituted annual training for all current and new contract and program monitoring staff;
- Assigned monitors to all department contracts;
- Segregated duties between people who issue contracts and people who monitor contracts  to provide for appropriate checks and balances and eliminate potential conflicts;
- Implemented a new contract monitoring model with four levels of compliance and corrective action;
- Developed an automated provider profile to track programmatic, fiscal, and regulatory health of contracted providers;
- Required all contracts to have measurable outcomes;

- Required providers to disclose third party transactions and ownership interests;
- Required vendors to identify actual location where services are provided;
- Required providers to identify contracts that were received from other state agencies and entities and a description of the work funded by that contract;
- Revised Audit Instructions requiring independent auditors to certify that vendor has a fraud prevention and detection program;
- Contracted with Dun and Bradstreet to identify financially vulnerable vendors on a more timely basis;
- Required program monitors to conduct a sample and verification of bills;
- Developed a red flag process to identify problems regarding, among other things, non-payment of staff and others as required in the contact;
- Issued an Request For Proposal for forensic auditing services;
- Developed a new vendor approval process and updated Requirements for Decision Memos to enter into new or modified contracts;
- Begun to develop an automated vendor billing system to reduce errors and include additional verification of services provided;
- Begun to develop a technical assistance program for new and struggling providers'
- Begun to align all FY15 purchasing decisions to the Department's strategic goals of safety, permanency, well-being and accountability.

**When reviewing audits of grantees, line items in the audits should be compared to approved Budget line items. Deviations from the Budget must be approved by Program Monitors before the audit is approved. Unapproved expenses should be referred for overpayment recoupment (from OIG FY 12 Annual Report, General Investigations 27).**

*FY 12 Department Response:* The rate setting unit within the Division of Finance, Technology and Planning is currently comparing costs reported in the audit reports for the years ending on June 30, 2012 or later, as they are received from providers, with the fiscal years 4th quarter reports to see whether the reported costs match. The audits are then forwarded to the Office of Field Audits for desk review. Reports from providers will continue to be reviewed and compared throughout the current fiscal year.

Prior to conducting an audit, the Office of Field Audits contacts the program monitor to discuss the agency, and provides a copy of the audit when it is complete. Procedures will be amended to require the program monitor to follow-up on findings as well as to refer the agency to the Department's Troubled Vendor Committee for action if warranted.

*FY 13 Department Update:* The Department has developed a draft monitoring protocol to better integrate monitoring functions and ensure that grant monitors review and compare budgets and audits.

**Subcontractors under Department contracts should be subject to the same transparency as contractors. All subcontracts to Department contracts should be listed and available for public viewing on the internet (from OIG FY 10 Annual Report, General Investigation 2).**

*FY 10 Department Response:* The Department agrees. The Finance, Technology and Planning Division will work with the Office of Communication to determine if this is possible through the

current system developed for public viewing of contracts on the internet. An initial discussion was held and anticipated resolution is in 2011.

*FY 11 Department Update:* Contract Administration and Office of Information Technology Services staff will meet to determine how to implement this recommendation utilizing the Department's current technological systems.

*FY 12 Department Update:* The subcontract Agreement boilerplate was updated for Fiscal Year 2013 to reflect the same disclosures/transparency requirements as are required for primary contracts. Implementation is still pending for appropriate technology to house and make all subcontracts available for public viewing. This will also be a component of the new monitoring design.

*FY 13 Department Update:* Subcontracts are not yet available on the internet for public viewing.

**Drug and alcohol toxicology contracts should be competitively bid (from OIG FY 07 Annual Report, General Investigation 1).**

*FY 07 Department Response:* The Department agrees. This will be implemented with Fiscal Year 2009 contracts.

*FY 08 Department Update:* Due to the program plan and protocol changes, this service was not bid in FY 2009. It is anticipated that the service will be out for bid in Fiscal Year 2010.

*FY 09 Department Update:* Due to retirement and staff changes and the new committee that developed recommendations, it is still anticipated that services will be put out for bid for Fiscal Year 2011.

*FY 10 Department Update:* The Procurement Office is preparing to release the request for proposals (RFP) in February 2011 and the award is expected in Fiscal Year 2011.

*FY 11 Department Update:* The Procurement Office posted the Invitation For Bid for toxicology contracts but the Invitation for Bid was cancelled by the State Procurement Officer. The Office of Contract Administration and the Procurement Office are working to resolve questions received from potential vendors before reposting the Invitation for Bid.

*FY 12 Department Update:* Final review of updated Invitations for Bid for Toxicology Specimen Collection Site Services and Specimen Testing Laboratory is in process by the State Purchasing Officer. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* Toxicology vendors were awarded by request for proposal (RFP) effective with the fiscal year 2014 contract.

**The Department must develop a reliable Contract Monitoring process that would provide checks and balances and separation of functions to prevent the abuses. The process must include (from OIG FY 06 Annual Report, General Investigation 12):**

■ **Quarterly review of expenditures to ensure that expenditures were related to the Contract**;

- **Quarterly review of services, to ensure that the goods or services were provided;**
- **Contractual and Rule requirement that any contractual spending for services or items not specifically covered under the Contract must be approved, in writing, by the Contract Division;**
- **Lapsed funds and obligation of funds must be approved in writing by the Contract Division.**

*FY 11 Department Update:* Standards for each contract and responsibilities are in place. Training for Fiscal Year 2012 started in October and will be completed this year. The OIG is continuing to work with the Attorney General to develop targeted monitoring and fraud detection training.

*FY 12 Department Update:* This will be incorporated into the Department's new monitoring design.

*FY 13 Department Update:* Project Charter was signed by the Director on 8/22/13 formalizing the contracting principals for the Department and establishing a workgroup to develop written policies/procedures governing the execution, utilization and monitoring of contracts. Project Charter incorporates all of these recommendations. The Action Transmittal will be issued in December 2013 and the procedure manual will be completed in January 2014.

**The Department must develop specific guidelines for disbursement when Fiscal Agents are used. The guidelines must include checks and balances to ensure that Fiscal Agents ascertain that the services or goods for which they issue checks have been provided. The use of Fiscal Agents must also be monitored by the Contracts division to ensure separation of functions. Fiscal Agents must understand that their role is not limited to check-writing and that they maintain fiduciary responsibility for expenditure of public funds (from OIG FY 06 Annual Report, General Investigation 12).**

*FY 11 Department Update:* The Department will add the following language to the program plan of each fiscal agent agreement effective July 1, 2012 as part of the Fiscal Year 2013 contracts, "If the contract is an agreement that allows for a fiscal agent, the program plan must reflect that all disbursements must be to or on behalf of the private agency for which the fiscal agent acts and all disbursements must be evidenced by signed certifications that the services or goods were delivered and used for the fulfillment of the program plan. This must be reflected in the program plan and completed by signing the contract that includes this certification." In addition the Department will add similar language to the boiler plate and sub-contract agreements to ensure that each agreement has been completed and both fiscal agent and sub-contractor are required to certify that funding and disbursements made are evidenced by signed certifications that the services or goods were delivered and used for the fulfillment of the contracted program.

*FY 12 Department Update:* This will be incorporated into the Department's new monitoring design.

*FY 13 Department Update:* Specific, standardized Fiscal Agent contract incorporating these recommendations was developed and implemented with all fiscal year 2014 contracts. Fiscal Agent procedures have been drafted.

**The Department needs to systematically track public monies spent by contractors through subcontracts. The Department must be able to track who is ultimately responsible for providing**

**services and who is ultimately receiving DCFS funds, in order to guard against conflicts of interest and double-billing (from OIG FY 06 Annual Report, General Investigation 12).**

*FY 11 Department Update:* The Department will attempt to implement this recommendation if/when funding is available for additional staff to manage the subcontractors' funding.

*FY 12 Department Update:* This will be incorporated into the Department's new monitoring design.

*FY 13 Department Update:* Specific declarations regarding subcontracting are now required beginning with the Fiscal year 2014 contracts; Subcontractor tracking system is under development with completion expected in the next 6 months.

**The Department must monitor and enforce contract compliance of POS agencies with Department contracts to acknowledge and include fathers and paternal family members as an integral part of case management services.  Department monitors must ensure that Department Procedures 302: *Services Delivered by the Department* and Appendix J, *Pregnant and/or Parenting Program*, is followed (OIG FY 07 Annual Report, General Investigation 22).**

*FY 07 Department Response:* The Department agrees.  A memorandum is being drafted to DCFS and private agency staff.  Target completion date:  December 2007.

*FY 08 Department Update:* The newly appointed Deputy for Monitoring is reviewing this recommendation and will address this issue by February 2009.

*FY 09 Department Update:* The Fatherhood Initiative addresses this issue.

*FY 09 OIG Response: The Fatherhood Initiative expresses an important goal of the Department but does not provide practical means of monitoring or assessing the adherence to that policy. Moreover, only 104 cases statewide have been referred to the Fatherhood Initiative Programs, according to the most recent data. The Department needs to secure broader participation for father of DCFS involved children.*

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* The Learning Collaborative on Father Involvement was held in the spring of 2011 for DCFS and POS placement staff.  In addition, Field Operations staff will provide information on the current Fatherhood Initiative to Agency Performance Team monitoring staff, which will in turn be shared with POS providers during Fiscal Year 2012.

*FY 12 Department Update:* The recommendation will be incorporated into the Department's new monitoring design.

*FY 13 Department Update:* The implementation of the Monitoring Levels monitors agency performance relative to engagement and reunification of fathers and paternal family members. Tracking of caseworker visits with parents and the facilitation of visits between parents and children contributes to the overall performance and level assignment for monitoring activities.

**DOMESTIC VIOLENCE**

**The Department should examine the continued utility of the Domestic Violence Screen and determine whether the Screen assists in assessing safety and risk to children (from OIG FY 12 Annual Report, General Investigations 1).**

*FY 12 Department Response:* SACWIS 5.0 was not released as scheduled, thus the newly revised Domestic Violence Screen was not released.  The enhanced screening questions will be incorporated into the paper version of the Domestic Violence Screen and also included in updated Domestic Violence Policy and Domestic Violence Practice Guide.  The Department will work with the Office of the Inspector General to ensure that issues raised in this report are incorporated into the new Domestic Violence Screen.

*FY 13 Department Update:* An update to the Statewide Automated Child Welfare Information System (SACWIS) was released in Spring 2013 and the updated, child-focused screening questions were incorporated into the Domestic Violence screen in SACWIS. As there is another scheduled SACWIS update in March 2014, additional screening questions will be added.  This will correspond with the evidence based, trauma focused practice recommendations identified to be added to the Domestic Violence Policy Guide.

**The Department should consider requesting the assistance of Child Advocacy Centers to interview children in investigations where there is chronic violence in the home and parents have failed in the past to cooperate with services (from OIG FY 12 Annual Report, General Investigations 1).**

*FY 12 Department Response:* Training and/or procedures will be amended to remind investigators that the Child Advocacy Centers are a potential resource and may be helpful to families with chronic violence.  Parents have to consent to allow their child to be interviewed at a Child Advocacy Center and if they have been uncooperative, it is not likely they would agree.  DCFS will explore the efficacy of pursuing more court orders in homes with prevalent violence to compel parents to comply, and then seek use of CACs to interview those children.

*FY 13 Department Update:* The recommendation will be incorporated into the revisions to procedures and a process established for developing the plan. Training and/or procedures will also be amended to remind investigators that the Children's Advocacy Center is a potential resource and may be helpful for families where chronic violence is present.

**The Department should explore the use of court-ordered service compliance with intact families where there is a high level of risk of future violence and lack of cooperation with Department services (from OIG FY 12 Annual Report, General Investigations 1).**

*FY 12 Department Response:* Training and/or procedures will be adopted to ensure that the field is aware that court-ordered service compliance should be considered for families suffering from chronic violence who are non-compliant with services.

*FY 13 Department Update:* The recommendation will be incorporated into the revisions to procedures and a process established for developing the plan. The Department will also explore the efficacy of pursuing more court orders in homes with prevalent violence to compel parents to comply and then seek use of Children's Advocacy Centers to interview those children.

**Policy Transmittal 2010.23, which issues revisions to Procedures 302.260,** *Domestic Violence* *Practice Guide***, and Procedures 300, Appendix J:** *Domestic Violence***, provides for batterers to remain in the home with a domestic violence safety plan.   This policy should be amended to clarify that when domestic violence has occurred in the home, it is presumed that the home environment is too dangerous for the child to remain, unless the perpetrator of violence is out of the home.  Policy Transmittal 2010.23 should make clear that establishing a domestic violence safety plan for children should not preclude taking protective custody (from OIG FY 12 Annual Report, General Investigations 1).**

> *FY 12 Department Response:* The Department will clarify this language in the Policy Transmittal.

> *FY 13 Department Update:* Procedure 300 Appendix G, CERAP, was revised and a policy transmittal was issued on 5-17-13. Procedures 300 Appendix J, Domestic Violence, will also be revised to omit the language that a safety plan can be developed if the batterer remains in the home. The revisions will be outlined in a new Policy Transmittal when the revisions are complete.

**This case, along with two other OIG investigative reports, should be used as a teaching tool in domestic violence training (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 11).**

> *FY 11 Department Response:* The Division of Clinical Services and Specialty Services will work with the Office of Training to update the Domestic Violence Policy Training curriculum to include the referenced reports. The reports will be reviewed.

> *FY 12 Department Update:* The redacted report has been reviewed.  The Specialty Services Unit has collaborated with the Office of Training to update the Domestic Violence policy training curriculum.  Approval is pending from the Office of Training on the implementation of the final materials, which was put on hold pending the release of SACWIS 5.0. Given the current status of layoffs and personnel changes, the Office of Training has been engaging in discussions about the implementation of training in the field and the work involved in updating training curriculums.

> *FY 13 Department Update:* The Clinical Division has incorporated discussion regarding the updated screening tool in Domestic Violence policy training sessions. The redacted reports from the OIG will be incorporated as concrete teaching examples in training.  The identified training modifications will be reviewed with the Office of Training to best address the use of the tools and to determine the length of training to fully address the OIG case issues.

**The Domestic Violence protocol should be revised to address the cumulative effect of domestic violence and strategies for addressing cases of chaotic family life in which the victim/abuser dynamic results in an incalculable emotional toll to the children, including collaboration with DCFS Clinical and the Office of Legal Services (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 11).**

> *FY 11 Department Response:* Statewide Administrator of Specialty Services and the Administrator of Domestic Violence Intervention Program will schedule a series of meetings with Cook and Downstate Deputy Legal Counsel to review the Domestic Violence protocol, to assess the efficacy of current protocol, review current research as well as evidence-based practice

recommendations and revise the existing protocol. A redacted copy of this investigation and the recommendation will be shared with participants at the meeting.

*FY 12 Department Update:* The enhanced Domestic Violence Screen in SACWIS 5.0 offers investigative and casework staff additional questions in screening and interviewing for domestic violence. The Department is in the process of revising the Domestic Violence Practice Guide.

*FY 13 Department Update:* The Clinical Division is in the process of revising the Domestic Violence Practice Guide. The guide will be updated to include evidence based, trauma-focused research that addresses the cumulative effect of domestic violence on children. The guide will also offer practice recommendations for the field and is anticipated to be completed in March 2014.

**The Department should integrate into its Domestic Violence protocol the need for increased scrutiny and heightened risk when a person suspected of being a victim of domestic violence has provided false information to protect an abuser of his or her child (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 12).**

*FY 11 Department Response:* This case was presented as an in-service training at the regular Regional Clinical Managers meeting. The managers were provided guidance as to what actions to take in the future on similar case situations. Specifically, if such a situation happens again where Clinical staff in the process of staffing a case have safety concerns they are to take proactive action. The Regional Clinical Manager will make sure that the worker's supervisor, POS and DCFS Agency executive casework staff and APT monitor (for POS) are made aware of the concerns and seek action. If the manager is not able to resolve this at their level they are to immediately inform (both by phone and in writing) their immediate supervisor and the Associate Deputy of Clinical. The Associate Deputy will intervene and seek to resolve the issue(s). If needed he/she will seek the intervention of the Deputy Director to assure that safety concerns are addressed at the highest level warranted.

The Administrator of the Specialty Services Unit and the Administrator of the Domestic Violence Intervention Program will update and revise the Domestic Violence Practice Guide to reflect the practice dynamics of this case. The dynamics of this case are indicative of power and control that occurs in domestic violence cases, and will be incorporated as examples in the training on the Domestic Violence Practice Guide.

*FY 12 Department Update:* The Department is in the process of revising the Domestic Violence Practice Guide.

*FY 13 Department Update:* The Domestic Violence Practice Guide has been developed and will be incorporated into SACWIS for use by the field.

**In rural areas where there is suspicion of drug involvement or domestic violence, the Department should consider requiring investigators to include the local sheriff's department when requesting incident reports (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 11).**

*FY 10 Department Response:* The Department agrees. The recommended language is being added to Department Procedure 300.60 (g), *Other Required Investigative Contacts.*

*FY 11 Department Update:* This information was incorporated into a draft policy transmittal concerning law enforcement involvement in child abuse investigations and includes the Child Abuse Law Enforcement Notification form developed by the OIG. All documents have been forwarded to the Office of Child and Family Policy. The targeted implementation date is June 2012.

*FY 12 Department Update*: The recommendation has been incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification*. The recommendation will be included in revisions being made to Procedures 300, *Reports of Child Abuse and Neglect.*

*FY 13 Department Update:* The recommendation was incorporated into Policy Guide 2012.02 and will be included in revisions to Procedures 300, *Reports of Child Abuse and Neglect.*

## FOSTER HOME LICENSING

**The Department should pursue a voluntary surrender of the foster mother's day care home license. If the foster mother refuses to surrender her license, the Department should deny the renewal of the day care license (from OIG FY 12 Annual Report, General Investigations 10).**

*FY 12 Department Response:* The Department will encourage withdrawal of the pending day care home renewal application. If the applicant does not agree to withdraw the renewal application, Day Care Licensing will initiate enforcement.

*FY 13 Department Update:* The foster mother surrendered her foster home license, her daycare license expired and she withdrew her daycare license renewal.

**The Department should prioritize its daycare licensing responsibilities to focus on allocating resources to monitor daycare homes that are currently operating (from OIG FY 12 Annual Report, General Investigations 10).**

*FY 12 Department Response:* This will be a component of the new monitoring design.

*FY 13 Department Update:* Monitoring visits are prioritized based on day care homes currently serving children. The Department is in the process of posting and filling vacancies to resolve this issue until these vacancies are filled the Department will continue to prioritize monitoring visits.

**The Department should amend Procedures 301, Appendix E, *Placement Clearance Process*, to provide guidelines for the monitoring and resolution of involuntary placement holds. These guidelines should include instructions for requesting the removal of an involuntary placement hold. The guidelines should also require that when an involuntary placement hold is placed on a foster home, the licensing worker and licensing supervisor should re-evaluate the placement hold every six months (from OIG FY 10 Annual Report, General Investigation 4).**

*FY 10 Department Response:* A Department committee is drafting revisions regarding involuntary placement holds.

*FY 11 Department Update:* Revisions to Procedures 301, Appendix E, *Placement Clearance Process* have been drafted and submitted to the Office of Child and Family Policy for further review.

*FY 12 Department Update:* Placement Hold procedures are being drafted. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* A workgroup is working on the implementation of this recommendation.

**The Department should amend Department Rule and Procedure 402, *Licensing Standards for Foster Family Homes*, to require that licensing workers identify alternate caregivers, determine where the alternate care will take place and perform background checks in accordance with Rule 385, *Background Checks*, of all adults and those over 13 years of age residing in the alternate care home when the care will take place other than in the foster parent's home (from OIG FY 09 Annual Report, General Investigation 3).**

*FY 09 Department Response*: Revisions to Rule 402, *Licensing Standards for Foster Family Homes*, are being drafted that would require that licensing staff identify alternative caregivers and perform background checks in accordance with Rule 385, *Background Checks*, of all adults and those over 13 years old residing in the alternate care home.

*FY 09 OIG Response: The critical information that needed to be gathered in this case was where the care was being provided.  Unless the Department requires information about where the care is being provided, the harm that the children were subjected to in this case could be repeated.*

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* The Department will be further reviewing this recommendation before amending Rule and Procedure 402, *Licensing Standards for Foster Family Homes*, to determine if Part 301, *Placement and Visitation Services*, also needs amending, with regards to children not in a licensed home receiving care or placement with an alternate caregiver.

*FY 12 Department Update:* The Department will conduct further review of this recommendation.

*FY 13 Department Update:* The Bureau of Operations, the Office of Child & Family Policy, and DCFS Legal are currently developing procedures regarding alternate caregivers for foster children and the legalities in conducting background checks for such caregivers.

**The Department should develop guidelines for shared monitoring responsibilities when a single foster home has children monitored by different agencies or when the case monitoring and license monitoring functions are split between agencies. The guidelines should include the following requirements:**
    **a.  a staffing of all involved case and licensing workers;**
    **b.  written agreement of roles and responsibilities of each worker;**

c. **written guidelines concerning the responsibility to share information and the process for sharing information (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:* The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* The Deputy Director of Monitoring will co-chair a subcommittee with Agency Performance Team, Licensing, private agency and Department staff to address these issues. The anticipated start date is January 2012.

*FY 12 Department Update:* This will be included in the new monitoring design. Rule 301 will be revised to include this information.

*FY 13 Department Update:* Procedures 315.110, (C) (D) (E) currently requires that when multiple workers are involved in one foster home, each worker to should (1) know each child in the home, regardless of the child's caseworker assignment, (2) briefly interview each child in the foster home regardless of the caseworker assignment, (3) ensure that care giving information is shared with other involved workers, and (4) document all foster home visits in SACWIS. As written, this would include circumstances where multiple workers are from different agencies. Additionally, these procedures (d) (1) require a twice annual staffing of all assigned caseworkers with the foster parent at the home of the foster parent. Monitoring will work to develop specific supplements to these procedures to address (1) a written agreement of roles/responsibilities among assigned workers, to be completed as soon as possible, but no later than at the initial twice-annual staffing, and (2) the inclusion of licensing staff from the licensing agency at the twice-annual staffing. Additionally, the Monitoring Division will work to include a twice-annual staffing requirement when the assigned caseworker is from an agency different from the licensing agency.

**The Department should issue a policy memorandum that states that whenever possible, each foster home should have a single entity that monitors placement of foster children and foster home licensing. The Department may grant waivers to the policy based on individual children's needs but must ensure that the guidelines stated above are in place whenever a waiver is granted (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:* The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* The Deputy Director of Monitoring will co-chair a subcommittee with Agency Performance Team, Licensing, private agency and Department staff to address these issues. The anticipated start date is January 2012.

*FY 12 Department Update:* This will be included in the new monitoring design.

*FY 13 Department Update:* The policy statement is being developed for distribution in fiscal year 2015.

**Whenever a waiver is granted, and case responsibility is transferred to a single agency, the relinquishing agency should not be penalized, but should be moved up for case rotation assignment of a new case (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:* The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* Agencies are not penalized when case responsibility is transferred to a single agency.

*FY 11 OIG Response: When shared cases are transferred, the agency loses funding. The agency transferring the children should receive immediate consideration for new placements.*

*FY 12 Department Update:* The agencies loss of such cases is taken into account in terms of the percentage of referral opportunity to replace the case that was transferred.  The child's geography and the other agencies in the area with lower percentage of referrals are factored in terms of when the agency that transferred such a case would meet the criteria for a replacement intake.

*FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years. The Director's Office and Operations will collaborate when there is a waiver request to ensure agencies are not penalized.

## LAW ENFORCEMENT

**For the safety of the worker and child, the State Central Register should notify local police when allegations include information about a large quantity of illegal drugs (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 15).**

*FY 11 Department Response:* If during a child protection investigation, a DCP investigator observes large quantities of drugs, they will notify law enforcement.  The Department plans to issue a Law Enforcement Notification Policy Guide to implement this practice.

*FY 12 Department Update:* The recommendation was incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification*, and distributed in January 2012.  The recommendation will be incorporated into procedures.

*FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years.

**When a child is hospitalized for injuries or conditions that are suspected to be the result of abuse or neglect by a primary caregiver and there is a concurrent law enforcement and child protection investigation, there must be a safety planning conference between law enforcement and child protection before the child is discharged (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 8).**

> *FY 10 Department Response:* The Department agrees.  Department Procedure 300.50, *Reports of Child Abuse and Neglect, Initial Investigation,* will be amended to include the recommended language.

> *FY 11 Department Update:* This information was incorporated into a draft policy transmittal concerning law enforcement involvement in child abuse investigations and includes the Child Abuse Law Enforcement Notification form developed by the OIG. All documents have been forwarded to the Office of Child and Family Policy.

> *FY 12 Department Update:* The recommendation was incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification*, and distributed in January 2012.   The recommendation will be incorporated into procedures.

> *FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years.

**In cases where police have a pending criminal investigation, Division of Child Protection investigators should not reveal a preliminary finding of unfounded to the family prior to a supervisory conference to explore whether another conference with law enforcement should take place (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 8).**

> *FY 10 Department Response:* A practice memo will be distributed to child protection staff.

> *FY 11 Department Update:* This information was incorporated into a draft policy transmittal concerning law enforcement involvement in child abuse investigations and includes the Child Abuse Law Enforcement Notification form developed by the OIG. All documents have been forwarded to the Office of Child and Family Policy.

> *FY 12 Department Update:* The recommendation was incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification*, and distributed January 2012.  The recommendation will be incorporated into procedures.

> *FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years.

**The Department should pursue an interagency agreement with the Illinois Law Enforcement Alarm System to identify the local law enforcement agency with jurisdiction to provide written notification of the Hotline reports required by statute and Department Rule (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 10).**

*FY 10 Department Response:* A letter was sent to the Illinois Law Enforcement Alarm System (ILEAS) Director requesting access to the ILEAS System.  Upon receipt of access to the system, State Central Register staff will be trained.

*FY 11 Department Update:* The meeting with the Illinois Law Enforcement Alarm System and State Central Register (SCR) occurred and determined it is not possible to develop the interface as recommended.  It was determined SCR is not the most efficient unit to pinpoint the law enforcement office of jurisdiction. Rather, the Division of Child Protection team supervisor is responsible for ensuring notification to the local law enforcement and following up for their decision. This information was incorporated into a draft policy transmittal detailing the Child Abuse Law Enforcement Notification process, including the notification form drafted by the OIG. The policy transmittal and notification form have been submitted to the Office of Child and Family Policy for review and the targeted implementation date is June 2012.

*FY 11 OIG Response: The State Central Register (SCR) is the best unit for first response. The critical importance of such notifications, along with the harm that can result from failure to notify, warrants a two-pronged approach that would allow SCR to coordinate with the Illinois Law Enforcement Alarm System and also allow child protection staff to follow-up with local law enforcement. The Illinois Law Enforcement Alarm System is an emergency response system that coordinates federal disaster response with State agencies. The Department should take advantage of this coordinated System.*

*FY 12 Department Update:* The recommendation was incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification*, and distributed January 2012.  The recommendation will be incorporated into procedures.

*FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years.

**The State Central Register should adopt a form to provide written notification to local law enforcement of the Hotline reports required by statute and Department Rule (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 10).**

*FY 10 Department Response:* The form is currently being developed.

*FY 11 Department Update:* Notification to local law enforcement in child abuse investigations has been developed and all documents, including the notification form have been submitted to the Office of Child and Family Policy. Procedures 300, *Reports of Child Abuse and Neglect*, will be revised to incorporate these changes. The targeted implementation date is June 2012.

*FY 12 Department Update:* The recommendation has been incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification* and CANTS-14 form, *Child Abuse Law Enforcement Notification.* The recommendation will be included in revisions being made to Procedures 300, *Reports of Child Abuse and Neglect.*

*FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years.

**Department Procedure 300.70, *Special Types of Reports,* should be amended to include second-degree burns as injuries requiring referrals to local law enforcement and the State's Attorney (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 5).**

*FY 07 Department Response:* Language regarding this recommendation is being drafted and will be submitted to the Office of Child & Family Policy for approval.

*FY 08 Department Update:* The OIG's recommendation was based on a request by the Children's Advocacy Center (CAC). The Department continues to review the feasibility of the recommendation.

*FY 09 Department Update:* In Procedures 300, *Reports of Child Abuse and Neglect* (Appendix B, Allegations, Burns 5/55), the Department will add "notification to State's Attorney on 2nd, 3rd, and 4th degree burns" in order to implement the recommendation.

*FY 10 Department Update:* Procedure 300, *Reports of Child Abuse and Neglect*, Appendix B-*The Allegation System*, Allegation #5-Burns will be amended to include notification to State's Attorney in cases of 2nd, 3rd, and 4th degree burns. The Department is awaiting approval from the Joint Committee on Administrative Rules (JCAR) to move forward.

*FY 11 Department Update:* The Office of Child and Family Policy is currently drafting amendments to 300.70, *Special Types of Reports*, to include the new law enforcement child abuse notification form and referrals to law enforcement for second degree burns. The estimated completion date is December 2011.

*FY 12 Department Updat*e: The recommendation has been incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification*. The recommendation will be included in revisions being made to Procedures 300, *Reports of Child Abuse and Neglect.*

*FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years. Policy Guide 2012.02 was distributed to staff and will be incorporated into Procedure 300 revisions.

## LEGAL

**The Department should develop guidelines for when it is appropriate to refer a family to the Extended Family Support Program for consideration of guardianship of a minor through Probate Court and also train them on the differences of guardianship through Probate Court versus referring a case to Juvenile Court. The Short-Term Guardianship Form should never be used when it appears that the problem requiring guardianship will not be resolved within one year (from OIG FY 10 Annual Report, General Investigation 9).**

*FY 10 Department Response:* This recommendation and the redacted report are currently under review by a Department contractor responsible for review of guardianship and extended family support service issues.

*FY 11 Department Update:* The recommendation has been incorporated in draft Procedures 302.385, *Extended Family Support Program*. Once the draft procedures are approved the Division of Service Intervention will begin training on the referral process.

*FY 12 Department Update:* This is a component of the intact family and child welfare intake redesign.

*FY 13 Department Update:* The recommendation will be incorporated into the revisions to Procedures 300, *Reports of Child Abuse and Neglect.*

**Child Protection managers, supervisors and investigators and intact family services workers should be trained on the guidelines for referring a family to the Extended Family Support Program (from OIG FY 10 Annual Report, General Investigation 9).**

*FY 10 Department Response:* This recommendation and the redacted report are currently under review by a Department contractor responsible for review of guardianship and extended family support service issues.

*FY 11 Department Update:* The recommendation has been incorporated in draft Procedures 302.385, *Extended Family Support Program.* Once the draft procedures are approved the Division of Service Intervention will begin training on the referral process.

*FY 12 Department Update:* This is a component of the intact family and child welfare intake redesign.

*FY 13 Department Update:* Procedures for the Extended Family Support Program have been drafted as Rule 302.385 and are being reviewed. The procedures should be finalized and distributed by June 2014. Training on the procedures will be scheduled to coincide with release.

**The Department should pursue state legislation to formalize a preference for relative placement when such placement is safe and does not delay permanency (from OIG FY 10 Annual Report, General Investigation 11).**

*FY 10 Department Response:* The Director will consult with the Legislature.

*FY 11 Department Update:* A new Director will be starting on December 15, 2011 and he will be consulted thereafter about this recommendation.

*FY 12 Department Update:* The Department and the Office of the Inspector General are continuing to review this recommendation toward maximizing child safety.

*FY 13 Department Update:* The Department has designated a point person to work with the DCFS legislative liaison to pursue this legislative change.

**The Department should amend Rule 431.60, *Subject Access to Records of Child Abuse and Neglect Investigations* to reflect current practice mandated by a federal court order in the *Dupuy* decision (from OIG FY 10 Annual Report, General Investigation 7).**

*FY 10 Department Response:* An initial draft of the revisions is complete; however, further review is required in order to guard against improper disclosures.

*FY 11 Department Update:* Office of Legal Services is in the process of revising Rule 336, *Appeal of Child Abuse and Neglect Investigation Findings,* and reviewing related rules which may need to be amended.

*FY 12 Department Update:* The Committee continues to meet and revise Rule 336 *Appeal of Child Abuse and Neglect Investigation Findings.* Once Rule 336 is completed, Rule 431.60 will be revised to conform to the provisions in Rule 336.

*FY 13 Department Update:* The draft revisions to Rule 336 *Appeal of Child Abuse and Neglect Investigation Findings* has been completed and is currently under review by the workgroup for edits. A Policy Guide will be issued that will contain the elements of this draft rule to bring the Department into compliance with statute that becomes effective January 1, 2014.

**Child protection managers should track and maintain data on cases presented to the State's Attorney's Office for filing of petitions and the State's Attorney's Office's response. Child protection offices should share this information with DCFS Office of Legal Services (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 7).**

*FY 10 Department Response:* The Department issued a memorandum to child protection staff instructing staff to refer cases of critical parental non-compliance in which the State's Attorney has refused to file a petition to the Office of Legal Services. Child protection managers will track such responses monthly.

*FY 11 Department Update:* The Division of Child Protection is currently refining a process implemented in 2010 to track juvenile court petitions. The division is also exploring the development of shared drives specifically dedicated to screening results and subsequent activities and decision-making by the assigned child protection investigator and supervisor.

*FY 12 Department Update:* The Department is exploring tracking and reporting capabilities in SACWIS.

*FY 13 Department Update:* The Department continues to examine the need to bring the CYCIS functionality (which includes the PC legal capture) into the SACWIS application.

**The Department's Interstate Compact Procedures should be revised to require:**
- **When an interstate compact is denied, the Interstate Compact Unit shall notify the Office of Legal Services. The Office of Legal Services will then monitor the case to ensure that the interstate compact is neither violated or circumvented in a manner that compromises the safety of children;**

- **If an interstate compact is disputed or violated, the Office of Legal Services will notify DCFS Clinical and DCFS Clinical will convene a staffing with the agency caseworker and supervisor, and the GAL;**

- **Notification of the Interstate Compact Unit, by the agency, if an interstate compact placement request is pending and the children are sent to the placement under consideration (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 4).**

*FY 09 Department Response:* Revisions are being made to Procedure 328, *Interstate Placement of Children*, in order to incorporate these requirements.  The Interstate Compact Office has been directed to report all such situations immediately to DCFS Office of Legal Services who then monitors the case to ensure that the Interstate Compact Agreement is not violated or circumvented in a manner that compromises the safety of children.  Copies of that notification are sent to an Associate Deputy Director to verify that direction is being carried out.

*FY 10 Department Update:* Revisions to Procedure 328, *Interstate Placement of Children*, are still in process.  In the event an interstate compact is disputed or violated the Department's Office of Legal Services notifies the DCFS Division of Clinical Services. The Office of Legal Services receives and monitors notifications received from the Interstate Compact Unit.

*FY 11 Department Update:* Revisions to Procedure 328, *Interstate Placement of Children*, are still in process.

*FY 12 Department Update:* The Department is revising Procedures 328, *Interstate Placement of Children*.  The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* Procedures 328 workgroup has launched the revision process; there have been many barriers getting all stakeholders to the table to revise these procedures; it is believed many of the barriers have been removed and the work can move forward.

## MEDICAL

**The Department should initiate a policy that whenever the hotline is notified by a physician that protective custody has been taken of a minor because the parents' religious beliefs do not permit them to consent to necessary medical procedures, the information should be transmitted to the State's Attorney's Office without an intervening investigation, unless additional information in the report suggests abuse or neglect (from OIG FY 12 Annual Report, General Investigations 6).**

*FY 12 Department Response:* Revisions to Department procedures are pending.

*FY 13 Department Update:* This recommendation will be included in revisions to Procedures 300. The DCFS Office of the Inspector General has also submitted guidelines to the Illinois Emergency Medical Services for Children training. DCFS Office of Legal Services shall train the DCFS State Central Registry on this process. Additionally, when contacted by the local State's Attorney's Office, DCFS Regional Counsel shall offer legal technical support in drafting of a petition for a juvenile court proceeding.

**Access to means, specifically firearms, is predictive of suicide completion. Research has shown and as noted in two adolescents' deaths, those at risk of suicide will break into locked rooms and locked cabinets to access the firearms.  When the Department is placing an adolescent at risk of suicide in a foster home or facilitating a return to the biological home where there is a gun, the Department should conduct a clinical staffing to educate the parents (biological and foster) that the risk of suicide doubles if there is a firearm in the house, even if the gun is locked up. The staffing should utilize the materials developed by The University of Illinois at Chicago Institute for Juvenile Research for their Youth Suicide Prevention program. If the family has firearms, they should be asked to store the guns outside of the home. If the parent will not store the firearm elsewhere they**

**must store firearms with a trigger lock in a lockbox. The keys should be kept in a secure or supervised setting. In return home situations of a suicidal youth, where the biological parent refuses to store the gun with a trigger lock in a lock box, the caseworker should contact DCFS Legal for assistance in presenting the case in Juvenile court for purpose of obtaining a court order (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).**

*FY 12 Department Response:* The Department will revise policy to indicate that trigger locks are required for all gun safes/cabinets in foster homes and in biological parent homes when a child has signs of depression and/or suicidal ideation and will return home.

*FY 13 Department Update:* OCFP and the licensing division are determining the necessary revisions in rule and procedure to implement the recommendation.

**The Department should assure via the service plan that biological or foster families of children with mental illness are linked to psycho-education programs such as NAMI's Family-to-Family Education Program, which is a free 12-week course for family caregivers of individuals with mental illness. There are Family to Family programs located throughout Illinois (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).**

*FY 12 Department Response:* The Department will revise policy to include this recommendation. Clinical's newsletter (referenced in recommendation #2) will include a treatment reference to the use of psycho-education programs for youth and families, such as NAMI's free, 12-week Family to Family Education Program.

*FY 13 Department Update:* Procedure 301.60 (a) and Procedures 315.100 (a) and (b) are being revised to implement this recommendation.

**The Department should consider adopting an integrative family approach in addition to individual therapy for any ward with mental illness (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).**

*FY 12 Department Response:* The Department agrees.

*FY 13 Department Update:* The Department's Integrated Assessment Program will provide recommendations, as well as specific information to foster parents, about the NAMI Family to Family Education Program in cases in which a ward's mental illness is identified as a presenting concern including situations in which youth are brought into DCFS custody as a result of a psychiatric lock out. In addition, the Clinical Division will include the learning resources of the NAMI Family to Family Education program in the updates to the Foundation core training courses for new Child Protection and Child Welfare caseworkers, and into the updates to the Foster PRIDE 2014 curriculum and training for foster parents. The updates (including the NAMI learning resources) to both the Foster PRIDE and Foundation training courses are expected to be completed by March 30, 2014.

**The Department should share a redacted copy of this report with the Children's Medical Resource Network and inform the Network that the Department will be sharing *Bone Fractures in Infants: A Review of the Literature* with HealthWorks providers (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 15).**

*FY 12 Department Response:* A new DCFS liaison has been assigned to the Children's Medical Resource Network and will address this issue.  All discussions should be complete by April 2013.

*FY 13 Department Update:* The report was shared.

**The Department should include intact family services workers as primary users of Policy Guide 2002.01:** *Case Management Guidelines for Children's Asthma Management* **(from OIG FY 11 Annual Report, General Investigation 2).**

*FY 11 Department Response:* The Division of Child Protection, DCFS Monitoring and DCFS Nurses formed a committee to review and revise policies related to the recommendation. A draft has been developed and is in review by the committee.

*FY 12 Department Update:* Revisions are currently being made to Procedures 302.360, *Health Care Services*, to include language serving intact families. Asthma related information will also be included Procedures 302.388, *Intact Family Services.*

*FY 13 Department Update:* Procedures 302.360 and Procedures 302.388 have both been updated to reflect the changes to asthma case management requirements.  Procedures 302 Appendix Q outlines asthma-related case management activities.

**The Department's Agency Performance Team (APT) monitors should ensure that POS Intact Family Services Managers review this report, Policy Guide 2002.01:** *Case Management Guidelines for Children's Asthma Management***, and the guide on chronic health care conditions with intact services supervisors and workers (from OIG FY 11 Annual Report, General Investigation 2).**

*FY 11 Department Response:* The private agency Intact Family Services Managers will be provided this information, including the redacted report, once the draft is finalized.

*FY 12 Department Update:* Revisions are currently being made to Procedures 302.360, *Health Care Services*, to include language serving intact families. Asthma related information will also be included in Procedures 302.388, *Intact Family Services.*

*FY 13 Department Update:* Procedures 302.360 and Procedures 302.388 have both been updated to reflect the changes to asthma case management requirements.  Procedures 302 Appendix Q outlines asthma-related case management activities.

**HealthWorks should obtain the results of newborn genetic metabolic screens on all children, regardless of their age, upon entering Department care.  If the results of the genetic screen are unavailable, the Department should ensure that the screen is completed during the HealthWorks comprehensive exam or by the child's primary care physician (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 9).**

*FY 11 Department Response:* With the signed Inter-Agency Agreement between DCFS and the Department of Public Health (IDPH) for the Exchange of Health Information, the Division of Service Intervention has requested the Office of Information Technology Services (OITS) to complete the task of "mapping" the IDPH data to be included in the weekly electronic interface

with the Department's database, SACWIS.  For those children for whom there is no match in the IDPH database for results of Neonatal Screening for Genetic and Metabolic Disorders, HealthWorks Lead Agencies are instructed to follow-up with the child's primary care physician for the appropriate follow-up screening and testing.

*FY 12 Department Update:* The Department continues to work with the Department of Healthcare and Family Services to obtain the Illinois Department of Public Health data.  Even though the data is from IDPH the Department must access it through the HFS warehouse.  HFS has an internal process that needs to be completed in order to add the data to the Department's data-feed.  The Department will obtain the IDPH data as soon as HFS adds it to the weekly feed.

*FY 13 Department Update:* OITS has scheduled the work to complete the electronic interface with the DHFS Medical Data Warehouse for the IDPH data. The requests from DCFS to DHFS for the IDPH data had to be re-submitted several times.

**The Multidisciplinary Pediatric Evaluation and Education Consortium (MPEEC) will conduct a child abuse training for the hospital's child protection team and appropriate pediatric and emergency room staff.**

**Physicians of Medical Resource Providers should also target education and training efforts to best assist child protection. Each medical resource provider should identify and prioritize training of:**
- **Medical personnel of emergency departments approved for pediatrics by the Illinois Emergency Medical Services for Children (EMSC)**
- **Medical personnel at hospitals affiliated with partner hospitals of the medical resource providers**
- **Medical personnel at hospitals that serve as a resource for Children's Advocacy Centers (from OIG FY 10 Annual Report, Systems Investigation 2 and OIG FY 10 Annual Report, Death and Serious Injury Investigation 9).**

*FY 10 Department Response:* The Department will discuss this with the Medical Resource Providers and develop a training schedule for 2011.

*FY 11 Department Update:* The Medical Resource Providers reported that the physicians would be willing to conduct training to better assist child protection however the hospitals and medical facilities would have to initiate the request for Medical Resource providers to train their personnel.

*FY 11 OIG Response: The OIG recommends that the Medical Resource Providers develop and disseminate to community hospitals information regarding the availability of the training curriculum.*

*FY 12 Department Update:* A new liaison with the Medical Resource Providers was recently assigned and plans to assess all related recommendations to address with the physicians. This should be addressed by Spring 2013.

*FY 13 Department Update:* Due to staff changes, new liaisons were appointed for each medical resource provider.  The providers were determining on a standard training for consistency.  Work is still ongoing.

**The Department should follow up with development of a curriculum for emergency department medical professionals (from OIG FY 10 Annual Report, Systems Investigation 2).**

> *FY 10 Department Response:* The curriculum has been developed.

> *FY 12 Department Response:* The Department and the Office of the Inspector General are continuing to review this recommendation toward maximizing child safety.

> *FY 13 Department Update:* Medical Resource Providers are assisting with the development and training of child protective teams at a hospital's request.

**The Department should pursue an interagency agreement with the Department of Healthcare and Family Services (DHFS) allowing DCFS Division of Child Protection staff access to Recipient Claim Detail information (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 11).**

> *FY 08 Department Response:* The Department of Healthcare and Family Services (DHFS) notified DCFS that the 2004 interagency agreement allows for the necessary access. Representatives from DCP and the Guardianship Administrator's Office will coordinate with the Department of Healthcare and Family Services to implement this recommendation.

> *FY 09 Department Update:* Representatives of the Guardianship Administrator's Office have continued to request access from DHFS. While no one has denied access to the Department, access has not been authorized. Efforts to gain access will continue.

*FY 09 OIG Response: The recommendation concerned access by child protection staff. Any access arranged must be available to child protection staff.*

> *FY 10 Department Update:* The Department continues to work with the Department of Healthcare and Family Services to obtain needed access to Recipient Claim Detail information.

> *FY 11 Department Update:* The Department is now receiving Department of Healthcare and Family Services (DHFS) Medicaid Claims information on a weekly electronic interface with the DHFS Medical Data Warehouse which goes directly into SACWIS E-Health screens. However, this is only for children for whom DCFS has legal custody. The Department has been unable to reach an agreement with DHFS to allow child protection staff access to the Recipient Claim Detail information and DHFS has informed the Department that they cannot share information from their Recipient Restriction Program. The Department is convening a meeting among the Division of Service Intervention, Child Protection, Legal Services, and Office of Information Technology staff to address child protection's need for access for children and subjects for whom the Department does not have legal custody.

> *FY 12 Department Update:* The Office of Health Services is continuing to work with DHFS on securing access to Medicaid claims history by child protection staff. In the meantime child protection staff can access Medicaid claims through the administrative subpoena process.

> *FY 13 Department Update:* The Department, DCFS Inspector General and Healthcare and Family Services Inspector General continue to work on implementation of this recommendation.

**Training for child protection staff should incorporate information about the availability and benefit of recipient claim details from the Department of Healthcare and Family Services and their Recipient Restriction Unit (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 7).**

*FY 10 Department Response:* The Office of Training will update training modules to reflect the use and benefit of the Recipient Claim Detail. In addition the Office of Training, Service Intervention and the Division of Child Protection will incorporate the information from these divisions to develop one coordinated training module.

*FY 11 Department Update:* The Department is now receiving Department of Healthcare and Family Services (DHFS) Medicaid Claims information on a weekly electronic interface with the DHFS Medical Data Warehouse which goes directly into SACWIS E-Health screens. However, this is only for children for whom DCFS has legal custody. The Department has been unable to reach an agreement with DHFS to allow child protection staff access to the Recipient Claim Detail information and DHFS has informed the Department that they cannot share information from their Recipient Restriction Program. The Department is convening a meeting among the Division of Service Intervention, Child Protection, Legal Services, and Office of Information Technology staff to address child protection's need for access for children and subjects whom the Department does not have legal custody.

*FY 12 Department Update:* The Office of Health Services is continuing to work with DHFS on securing access to Medicaid claims history by child protection staff. In the meantime child protection staff can access Medicaid claims through the administrative subpoena process.

*FY 13 Department Update:* The Department, DCFS Inspector General and Healthcare and Family Services Inspector General continue to work on implementation of this recommendation.

**Department Procedures should be amended to include that any time a foster child is hospitalized or taken to the emergency room complete medical records should be obtained and placed in the child's file. Procedure should also require that the records are shared with the foster child's pediatrician (from OIG FY 09 Annual Report, General Investigation 7).**

*FY 09 Department Response:* A Department form is being prepared for a procedural change to amend Procedure 402, *Licensing Standards for Foster Family Homes*, in case of a foster child's hospitalization. The revised procedure will require that complete emergency room medical records be obtained and placed in the child's file and the record shared with the child's pediatrician.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* Licensing staff will work with the Office of Child & Family Policy to draft procedures by June 2012.

*FY 12 Department Update:* The Department is reviewing Rules and Procedures to determine the appropriate place to include this information. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* The recommendation will be incorporated into Rules and Procedures 302.

## PERSONNEL

**DCFS and the Department of Human Services should determine together how much personnel and operations costs DHS will fund on a regular basis to prevent such a large backlog from reoccurring (from OIG FY 12 Annual Report, General Investigations 17).**

*FY 12 Department Response:* Based on a recent audit finding at the Department of Human services (DHS), DHS is now requesting that DCFS also include the sexual offender registry in its background checks. The Department is currently determining how to implement the recommendation with the budget cuts at DHS and DCFS.

*FY 13 Department Update:* Utilizing temporary employees the backlog was cleared up by January 2013. There has not been a backlog since that time to indicate additional staff are needed. DHS has determined that they will facilitate the address based checks and DCFS will continue to do the Sex Offender Registry as part of the regular background check.

**Department Rule 401.380, *Personnel Records*, should be amended to require that in addition to verifying work history, child welfare agencies should also contact previous employers to verify work performance by asking if the employee would be eligible for rehire. Verification should be completed by contacting an official source at the agency such as human resources, management or a supervisor knowledgeable about the employee's work performance. The Rule should also include that any employment offer to a currently employed person should be contingent upon contacting the current employer to verify their work performance prior to hire (from OIG FY 12 Annual Report, General Investigations 18).**

*FY 12 Department Response:* The Department's Division of Licensing and the Office of Child and Family Policy are drafting amendments to the Rule.

*FY 13 Department Update:* CFS 508-1, *Information on Person Employed in a Child Care Facility*, was revised December 2013 and Procedures 401, *Licensing Standards for Child Welfare Agencies*, is being revised to implement the recommendation.

**The Department should develop policy to address suspected substance abuse in the workplace (from OIG Recommendations made in 2005, 2001 and 1999).**

*FY06 Department Response:* The Department developed a definition and procedure for Reasonable Suspicion testing. The Department agrees to amend the Employee Manual and the Employee Licensure Rule to address Reasonable Suspicion of substance abuse and will also engage in discussions with the union.

*FY 07 Department Update:* The Department's workgroup addressing the need for incident-based reasonable suspicion drug or alcohol testing is currently developing protocol for pre-employment drug testing. Reasonable suspicion testing has been put on hold temporarily.

*FY 08 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 08 OIG Response: The OIG has been continuously recommending this critical change in policy for nine years. The policy change sought by the OIG would have a minimal budgetary impact. The lack of reasonable suspicion policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk.*

*FY 09 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 10 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 10 OIG Response: The OIG has been continuously recommending this critical change in policy for nine years. The policy change sought by the OIG would have a minimal budgetary impact. The lack of reasonable suspicion policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk.*

*FY 11 Department Update:* Management fully supports reasonable suspicion testing for direct child welfare service employees and supervisors.  Direct child welfare service employees and supervisors are bargaining unit members.  As such implementation of reasonable suspicion drug/alcohol testing, unless legislatively mandated, must be negotiated with the collective bargaining units.  Management routinely proposes to CMS Labor Relations that reasonable suspicion testing be included in collective bargaining agreements.  Management also routinely proposes that reasonable suspicion testing be added to supplemental collective bargaining agreements.  Without a reasonable suspicion testing policy in place amendment of Rules and Procedures is futile.  The State will be involved in contract negotiations with AFSCME in 2012 and the Department intends to continue pressing this point.

*FY 11 OIG Response: The OIG notes that the City of Chicago and both the Illinois State Police and the Department of Corrections have had Reasonable Suspicion Testing for several years.  The City of Chicago and the Department of Corrections employees are represented in large part by the same union as most employees with the Department of Children and Family Services.  Moreover, Direct Child Welfare employees and supervisors at DCFS must possess Child Welfare Employee Licenses.  The OIG has urged since 2005 that Reasonable Suspicion Testing be added as a requirement for Child Welfare Licensure.  The Department has failed to act on the recommendation.*

*FY 12 Department Update:* A workgroup has been formed to review all drug/alcohol related OIG recommendations to determine implementation steps.  The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* The Department will reconvene the workgroup to address this recommendation.

**The Department should amend Rules and Procedures and develop protocol and contracts to provide an infrastructure of testing facilities for reasonable suspicion testing; definition of reasonable suspicion; procedure for developing a finding of reasonable suspicion and training for management and supervisors as necessary concerning reasonable suspicion determinations. Private agencies with Department contracts should also be required by contract or licensing rule to have policies at least as stringent as Department policies regarding training, testing and response to reasonable suspicion of drug or alcohol use on the job (from OIG FY 10 Annual Report, General Investigation 21).**

> *FY 10 Department Response:* Management will seek to negotiate reasonable suspicion testing with the Union in the future.

*FY 10 OIG Response:   The Office of the Inspector General has been continuously recommending this critical change in policy for 11 years. The lack of a reasonable suspicion testing policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk. The policy change sought by the Office of the Inspector General would have minimal budgetary impact.*

> *FY 11 Department Update:* Management fully supports reasonable suspicion testing for direct child welfare service employees and supervisors.  Direct child welfare service employees and supervisors are bargaining unit members.  As such implementation of reasonable suspicion drug/alcohol testing, unless legislatively mandated, must be negotiated with the collective bargaining units.  Management routinely proposes to CMS Labor Relations that reasonable suspicion testing be included in collective bargaining agreements.  Management also routinely proposes that reasonable suspicion testing be added to supplemental collective bargaining agreements.  Without a reasonable suspicion testing policy in place amendment of Rules and Procedures is futile.  The State will be involved in contract negotiations with AFSCME in 2012 and the Department intends to continue pressing this point. Management agrees that private agencies should be required by contract or licensing rule to have policies at lease as stringent as Department policies. If a reasonable suspicion policy is promulgated the Office of Employee Services will convene the Reasonable Cause Workgroup and ensure that private agencies are held to the same standard.

*FY 11 OIG Response: The OIG notes that the City of Chicago and both the Illinois State Police and the Department of Corrections have had Reasonable Suspicion Testing for several years.  The City of Chicago and the Department of Corrections employees are represented in large part by the same union as most employees with the Department of Children and Family Services.  Moreover, Direct Child Welfare employees and supervisors at DCFS must possess Child Welfare Employee Licenses.  The OIG has urged since 2005 that Reasonable Suspicion Testing be added as a requirement for Child Welfare Licensure.  The Department has failed to act on the recommendation.*

> *FY 12 Department Update:* A workgroup has been formed to review all drug/alcohol related recommendations to determine implementation steps.  The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

> *FY 13 Department Update:* The Department will reconvene the workgroup to address this recommendation.

**Rule 437, *Employee Conflict of Interest*, should be amended to clarify that secondary employment must always be reported to one's supervisor.  The supervisor should determine (if necessary, with consultation from management and/or the Conflict of Interest Committee) whether the secondary employment creates a conflict.  The employee must be told to update the supervisor whenever their secondary employment duties change and a notation of the secondary employment should be maintained in a supervisory file, which is transferred each time supervision changes (from OIG FY 09 Annual Report, General Investigation 25).**

*FY 09 Department Response:* The conflict of interest workgroup is in the process of finalizing the proposed changes to Rule 437, *Employee Conflict of Interest.*

*FY 10 Department Update:* The anticipated completion date for submission of draft Rule 437, *Employee Conflict of Interest,* for internal and external comment is the first quarter of 2011.

*FY 11 Department Update:* Revisions to Rule 437, *Employee Conflict of Interest*, have been drafted. It is anticipated that the first notice will be published in Fiscal Year 2012.

*FY 12 Department Update:* Revisions to Rule 437, *Employee Conflict of Interest* is being prepared for JCAR.  The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* Revisions to draft Rule 437, *Employee Conflict of Interest,* is ready for policy review.

**The Department's Certification of License and Automotive Liability Coverage form for employee's signature should be amended to state "by the Illinois Secretary of State or other State _____" to address Department employees who live in states contiguous to Illinois (from OIG FY 09 Annual Report, General Investigation 8).**

*FY 09 Department Response:* The Finance, Technology and Planning Division will review the current form, modify the form and require use of the revised form for the next reporting period.

*FY 10 Department Update:* Revisions to the Auto Liability Coverage form is in process.

*FY 11 Department Update:* A revised form has been drafted and scheduled to be used starting in 2012.  The revised form requires the employee to state that he/she is licensed to drive in Illinois (either directly by the Secretary of State or another State that is recognized by the Secretary of State of Illinois). Additionally, each employee is currently required to certify on each travel reimbursement request that "I am a duly licensed driver and carry minimum coverage as required by Illinois Vehicle Code." Management will address failure to file the required insurance form through the existing supervisory and disciplinary processes.

*FY 12: Department Update:* The Auto Liability Form is now a DCFS form (CFS 731).  The form includes the revisions requested in the above recommendation.  AP 12, *Travel Guide for DCFS Employees*, is currently being revised and the CFS 731 will be included in the revised procedure.

*FY 13 Department Update:* Form CFS 731 has been updated and updates to Administrative Procedures 12 are in progress.

**A task group should be assembled to revise Rule 437, *Employee Conflict of Interest*, and draft related Procedures. Procedural additions should include:**

    **a. If an employee takes secondary employment where there is the potential for contact with DCFS clients, a wall needs to be built between the DCFS employee and any DCFS clients being serviced by the secondary employer. In this case, the employee's supervisor should call the secondary employer to verify the wall is in place.**

    **b. The supervisor should review secondary employment at the time of the annual review to see if a conflict has developed that was not present when the employee accepted the secondary employment.**

    **c. Instructions on how to contact the Conflict of Interest Committee.**
    **All DCFS employees should receive training on the revised Rule and Procedures 437, *Employee Conflict of Interest* (from OIG FY 07 Annual Report, Employee Conflict of Interest).**

*FY 07 Department Response:* A task group was assembled, but is currently in abeyance, and the Director is currently reviewing possible changes to Rule 437.

*FY 08 Department Update:* The conflict of interest workgroup has reconvened and is in the process of finalizing the proposed changes to Rule 437, *Employee Conflict of Interest*, and in drafting new procedures that support the revised rule. The anticipated completion of revised Rule 437, *Employee Conflict of Interest*, is March 2009.

*FY 09 Department Update:* The workgroup has reconvened to address outstanding issues, including fire walls and secondary employment. We have contacted the chair of the Secondary Employment Subcommittee to initiate further deliberations with the subcommittee. The anticipated completion date for submission of the draft of Rule 437, *Employee Conflict of Interest,* for internal and external comment is January 2010.

*FY 10 Department Update:* The anticipated completion date for submission of draft Rule 437, *Employee Conflict of Interest,* for internal and external comment is the first quarter of 2011. A copy will be sent to the OIG upon completion. Draft procedures will follow once the rule has been adopted.

*FY 11 Department Update:* Revisions to Rule 437, *Employee Conflict of Interest*, have been drafted. It is anticipated that the first notice will be published in Fiscal Year 2012.

*FY 12 Department Update:* Revisions to Rule 437, *Employee Conflict of Interest* is being prepared for JCAR. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* The Office of Child and Family Policy is working on final revisions to draft Rule 437 and will be sending Rule 437 out for first notice.

**The Department's Conflict of Interest Committee should establish procedures for building walls between private agencies and DCFS Administrators who have decision-making power over agencies that they previously worked for (from OIG FY 06 Annual Report, General Investigations 28).**

*FY 06 Department Response:* The procedures have been drafted by the Conflict of Interest Committee.

*FY 07 Department Update:* The Director is considering the recommended changes.

*FY 08 Department Update:* A Conflict of Interest workgroup is in the process of finalizing the proposed changes to Rule 437, *Employee Conflict of Interest,* and is drafting new procedures that support the revised rule.  The anticipated date of completion is March 2009.

*FY 09 Department Update:* The workgroup has been reconvened to address outstanding issues, including fire walls and secondary employment.  We have contacted the chair of the Secondary Employment Subcommittee to initiate further deliberations with the subcommittee.  The Conflict of Interest workgroup is in the process of finalizing the proposed changes to Rule 437, *Employee Conflict of Interest.* The anticipated completion date for submission of the draft of Rule 437, *Employee Conflict of Interest,* for internal and external comment is January 2010.

*FY 10 Department Update:* Anticipated completion date for submission of draft Rule 437, *Employee Conflict of Interest,* for internal and external comment is the first quarter of 2011.

*FY 11 Department Update:* Revisions to Rule 437, *Employee Conflict of Interest*, have been drafted. It is anticipated that the first notice will be published in Fiscal Year 2012.

*FY 12 Department Update:* Rule 437, *Employee Conflict of Interest*, is being prepared for JCAR. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* The Department will incorporate the recommendation into Rule 437.


## SERVICES

**The Department should either amend Rules and Procedures or conduct training to provide instructions on appropriate use of the CFS-151 Notice of Decision (from OIG FY 12 Annual Report, General Investigations 22).**

*FY 12 Department Response:* Revisions to Department procedures are pending.

*FY 13 Department Update:* Rules and Procedures provide clear direction to staff regarding placement, visitation, critical decisions, and the use of the Notice of Decision form.


**The Department should ensure that Chicago intact workers use the Chicago Public Schools' Early Childhood Program Locator to help families enroll their children in early education programs (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 9).**

*FY 12 Department Response:* POS Monitoring will advise/remind all intact providers at upcoming CWAC Front-End meetings to utilize this locator service. Monitors will be advised to look for documentation of such agency efforts as part of ongoing intact case record reviews.

*FY 13 Department Update:* The Statewide Provider Database, available to workers on the D-Net, contains a listing of early childhood programs in the Chicago area.

**When Clinical Consultants note a critical parenting issue during an Integrated Assessment or a clinical consult, the consultants must provide written recommendations to amend the Service Plan if necessary to address critical risk or safety issues (from OIG FY 12 Annual Report, General Investigations 1).**

> *FY 12 Department Response:* The Department will ensure that managers are aware of clinical recommendations that impact child safety and that the issues are incorporated into service plans.

> *FY 13 Department Update:* There are current discussions with OITS regarding moving Clinical referral, consultation and staffing documentation into SACWIS. IAs are already embedded in SACWIS. Provisions can be made to either have Clinical recommendations automatically populate service planning and assessment tools or utilize a checklist similar to one that already exists in investigations (waivers would have to be part of a supervisory function).  Until the SACWIS updates are completed, Clinical staff can continue to send copies of reports with their recommendations to workers and their supervisors.  The Administrator of Social Work Practice will contact Senior Administration in Operations to help determine the best manner to ensure clinical recommendations that impact child safety are incorporated into service plans.  This will be initiated by 12-06-13.

**The Department should share a redacted version of this report with all DCFS placement workers as an educational tool (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).**

> *FY 12 Department Response:* The report will be placed in a resource library on the D-Net.  The Bureau of Operations and Quality Assurance and Monitoring Division Divisions will notify DCFS and private agency staff of their need to review the report when it is available.

> *FY 13 Department Update:* The Division is developing a shared drive for Operations staff and will utilize it to disseminate the redacted report to DCFS placement workers.

**The Department should develop and document a plan for children ages 9-14, who enter the child welfare system following the loss of a parent or significant caretaker, and any child who experiences the death or loss of a parent or significant caretaker while in care.  In developing this plan, the child should be asked to identify individuals who can be part of the child's social support system (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).**

> *FY 12 Department Response:* The Department agrees and will incorporate the recommendation into policy.

> *FY 13 Department Update:* Procedure 301.60 (a) and Procedures 315.100 (a) and (b) are being revised to implement this recommendation.

**Workers should be educated that because children do not experience grief in a linear fashion, that grief therapy may have to be accessed at different times during a child/adolescent's development. In addition, pastoral counseling resources should be made available to the youth (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 14).**

> *FY 12 Department Response:* The Department will review the Crisis Response Administrative Procedure along with other resources to determine the most efficient way to make this

information available to our workers. The Department's Clinical Division will release a newsletter for all child welfare staff, discussing the symptoms and impact of depression, loss and grief on adolescent development.  The newsletter will emphasize suicide prevention and alert workers to symptoms and behavior associated with depression, grief and suicidal ideation.  The newsletter will also identify various evidence-based treatments and strategies for workers and family members.

*FY 13 Department Update:* From 2009-2011, all case carrying DCFS and POS staff received ongoing trauma training through the learning collaborative.  In addition, Trauma 201 has been incorporated into both Foundation and Pride training for new child welfare workers and for caregivers, which provides information and clinical guidance regarding traumatic grief including information about seeking out treatment services. In addition, Clinical will revise and enhance the Department's Crisis Response section of Administrative Procedure to include information pertaining to the trajectory of acute versus chronic grief following a traumatic event and when/where to seek therapeutic assistance, including pastoral counseling.

**The Department's Division of Operations should share a redacted copy of this report with direct line staff in the sub-region.  Managers from this region should adapt the report as needed for case conferences and training (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 11).**

*FY 12 Department Response:* Implementation of this recommendation will be completed once staff impacted by the realignment/layoff have been placed in their permanent positions. A redacted copy has been sent to the Region's Regional Administrator.

*FY 13 Department Update:* The redacted report has been shared and reviewed with the region's direct line staff. The Inspector General, Denise Kane conducted additional review and training on bone fractures with the region's Supervisors, Administrators and direct line staff on  February, March and June 2013.

**The Department should assure that when wards turn 16 years of age they obtain state-issued identification cards (from OIG FY 11 Annual Report, General Investigation 22).**

*FY 11 Department Response:* Department procedures will be drafted to require the obtaining of State Identification Cards for wards.

*FY 12 Department Update:* Department procedures will be drafted to require the obtaining of State Identification Cards for wards.

*FY 13 Department Update:* The recommendation will be incorporated into Procedures 302, Appendix M.

**Pre-adoptive Home Studies of wards or former wards must require children's collaterals and professional collaterals, especially school personnel to objectively ensure the accuracy of information provided (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 2).**

*FY 09 Department Response:* Child protection investigators make this determination as they go through the investigative process.

*FY 09 OIG Response: The Department response does not address pre-adoptive home studies, which need to inform the courts of direct information from collaterals in the child's life, such as teachers.*

*FY 10 Department Update:* Rule and Procedure will be revised as well as the template outline for the information included in the adoption study.

*FY 11 Department Update:* The template outlined for the adoption home study as well as Rule and Procedures are still in the process of being revised.

*FY 12 Department Update:* The recommendation was incorporated into Policy Guide 2012.05, *Adoption Collateral Contacts*, and issued April 2012. The revisions to procedures are in process.

*FY 13 Department Update:* Procedure 309 will be revised to incorporate the collateral requirements related to pre-adoptive placements.

**Procedures for Child And Youth Investment Teams (CAYIT) should be amended to include situations in which a move is requested for any reason other than a ward's best interest (OIG FY 07 Annual Report, General Investigations 14).**

*FY 07 Department Response:* The Child and Youth Investment Teams (CAYIT) Policy is currently under review.  Target completion date:  February 28, 2008.

*FY 08 Department Update:* The Child and Youth Investment Teams (CAYIT)  procedures, *Policy Guide 2006.04,* have been revised to clarify and differentiate the referral process for placement changes through CAYIT, Clinical Placement Staffing Review and Residential Transition Discharge Planning Protocol.  The revised procedure will be sent to the Office of Child and Family Policy for review and then sent out for comment.

*FY 09 Department Update:* Draft revisions to the Child and Youth Investment Teams (CAYIT) policy have been completed and submitted to the Office of Child & Family Policy for review and completion of revision process.

*FY 10 Department Update:* The Child and Youth Investment Teams (CAYIT) Policy was amended March 2010 which clarified the referral processes.

*FY 10 OIG response: The amended Child and Youth Investment Teams (CAYIT) policy does not address this referral issue.*

*FY 11 Department Update:* The Child and Youth Investment Teams (CAYIT) policy has been submitted to the Office of Child and Family Policy for revision. The revised CAYIT policy will address the OIG recommendation by requiring that any request to move a youth deemed other than in the ward's best interest will be referred to the assigned caseworker's supervisor and Regional Administrator or private agency Director for follow-up.

*FY 12 Department Update:* The Child and Youth Investment Teams (CAYIT) process is under revision.  The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* Child Intervention for Placement Preservation (CIPP) replaced CAYIT as of January 2013. Per CIPP program policy, the decision to move a youth via CIPP will only be approved when it has been determined by the team to be in the best interests of the individual child.

**The Department should review and update the Emergency Reception Center (ERC) Manual to include expectations of follow-up workers bringing children to the Emergency Reception Center (from OIG FY 06 Annual Report, General Investigations 4).**

*FY 07 Department Update:* The updated ERC Protocol/Manual (Transmittal) has not been finalized and is on hold with the Office of Child and Family Policy awaiting information resolution regarding shelter transportation issues. When it is completed the informational transmittals will go out to DCFS and private agency staff. Also, training will take place for all staff regarding protocol on how CWS or DCP can make an Emergency Shelter referral and intake guidelines for bringing children and youth into ERC for an emergency temporary shelter care placement.

*FY 08 Department Update:* The Emergency Reception Center Protocol has been drafted and is awaiting approval to be sent out for comment. The anticipated date for distribution/implementation is January 2009.

*FY 09 Department Update:* Referral forms for the Emergency Reception Center (CFS 1900 and CFS 1901) were issued in February 2009. The referral form does not address procedures for admission to the Emergency Reception Center. Emergency Reception Center protocol is on hold at this time.

*FY 10 Department Update:* At the request of the Division of Child Protection (DCP), the ERC Protocol was placed on hold due to a planned reorganization and remains on hold as of November 2010.

*FY 11 Department Update:* Restructuring of the Emergency Reception Center (ERC) is still planned therefore the implementation of the ERC Protocol is still on hold at this time.

*FY 12 Department Update:* Standardized procedures for utilizing the Emergency Reception Center are being drafted. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* Shelter care procedures are currently being drafted.

**In split custody cases with a history of substance abuse and relapse, the Department should require random drug drops to assist the Department in securing necessary services for the children and family. In cases of alcoholism, random urine testing is not reliable. Breathalyzers are preferable. The OIG reiterates its prior recommendation that DCFS acquire breathalyzers and train on their use (from OIG FY 04 Annual Report, Death and Serious Injury Investigation 21).**

*FY 07 Department Update:* The Department has implemented new substance affected family policies that include drug testing requirements. Staff are being trained on the procedures as part of the Reunification training. An inter-division work group is developing additional guidelines for drug testing DCFS clients and monitoring DCFS drug testing contracts. The work group is

developing standards for frequency and duration of drug testing, use of breathalyzers, and the panel of drugs for which to test.  Anticipated completion date is the fourth quarter of FY 08.

*FY 08 Department Update:* The recommendation is in progress and the anticipated date of completion is March 2009.

*FY 09 Department Update*: A drug testing protocol was developed in November 2008 which addressed frequency of testing, random testing, drugs to be tested, and custody and control procedures.  A list of review criteria identifying potential red flags was developed for DCFS contract monitors reviewing drug testing vouchers. A revised Program Plan for DCFS toxicology testing contracts was developed.  The Program Plan incorporates the requirements and procedures of the drug testing protocol by reference and also adopts the random testing requirements of the protocol.  The new Program Plan is expected to be implemented for the FY11 contracts.

*FY 10 Department Update:* The Department and the OIG agreed to train workers to use the urine screen technology and contractors in cases of suspected alcohol abuse. Alcohol will be one of the 10 substances tested and workers will be trained on special procedures relevant to suspicions of alcohol abuse. The Procurement Office is preparing to release the request for proposal (RFP) by the end of February 2011 and the award is expected for FY 2012.

*FY 11 Department Update:* The Request for Proposals from potential vendors for toxicology services is due November 2011. The solicitation includes provisions for random drug testing and testing for alcohol.

*FY 12 Department Update:* The Request for Proposal for toxicology testing is currently under review.  The anticipated implementation date is February 2013. The Department will utilize a paper referral process until OITS is able to develop a computer program.  The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* Effective July 1, 2013, the Department implemented drug testing services through a single statewide laboratory testing contract.  The contract provides a standard 7 and 10 drug test panel.  In addition to the standard drug test panels, workers can also request alcohol testing on a one-time and/or ongoing random basis.  Both urine alcohol and breathalyzer tests are available.  To date, over thirty breathalyzers tests have been approved since the start of the fiscal year.

**Substance affected and dually diagnosed clients should be referred to child welfare teams with expertise in working with these clients and families.  Programs such as the Intact Family Recovery program (IFR) have expertise with both populations and successfully enroll 70% of the eligible children they serve in Head Start and state pre-K programs (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 10).**

*FY 09 Department Response:* There is no policy or protocol for referring substance exposed infants to the Intact Family Recovery program.  However, the Division of Service Intervention gets a weekly report from Quality Assurance on Cook County substance exposed infant cases. The Division of Service Intervention then contacts the assigned child protection staff to inform them that the case may be appropriate for the Intact Family Recovery program and how to make the referral.

*FY 09 OIG Response: Referrals to the Intact Family Recovery program should be required in specific circumstances and incorporated into written policy.*

> *FY 10 Department Update:* Revisions to Policy Guide 99.13, *Services for DCFS Substance Affected Families*, are currently being drafted.

> *FY 11 Department Update:* The Divisions of Service Intervention, Child Protection and Monitoring will form a committee to review policy and resources to address this issue.

> *FY 12 Department Update:* The Division of Clinical Practice, Specialty Services Unit provides consultation to caseworkers on a variety of complex cases including dually diagnosed clients.

> *FY 13 Department Update:* The joint consultation process for dually involved (mentally ill/substance abuse) cases has been implemented within the Specialty Services unit of the Clinical Division.  Staff from the substance abuse services unit now jointly provide consultation to caseworkers and staff cases with DCFS mental health and other specialty staff when needed. The DCFS substance abuse unit has been attempting to obtain a listing from DASA of providers capable of providing dual diagnosis (MI/SA) services to DCFS involved families.  DASA staff have not completed the list yet; their latest report was they are 75% complete with the list.

## TEEN ISSUES

**The Department should develop housing contracts with wards and enforce regulations addressing the use of drugs, alcohol, firearms, and violence. Institutional sanctions should be consistent across programs and the juvenile court should be immediately notified when a ward is violating housing contracts that threaten the safety or the well being of the ward. Housing contracts should make clear that funding for the apartment will stop and the court will be informed of transgressions involving criminal activity (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 4).**

> *FY 11 Department Response:* Amendments to the Independent Living (ILO) and Transitional Living Program (TLP) plans are being developed.

> *FY 12 Department Update:* Independent Living (ILO) and Transitional Living Program (TLP) contract language is in the process of being reviewed and updated.

> *FY 13 Department Update:* The following requirements are in place: Section 6.4.15 of the ILO/TLP program plan requires providers to have written protocols with respect to weapons, illegal substance, domestic violence, and dangerous behaviors. In addition, DCFS Procedure requires providers to promptly submit an Unusual Incident Report whenever such an incident occurs, and those reports are distributed to the GAL, among others. The language regarding stopping funding and informing the court of transgressions involving criminal activity will be included in the FY 15 ILO and TLP Program Plans.

**DCFS and POS agencies should educate caseworkers who are serving wards, 14 and older on the sexual health text messaging service, "Sexedloop" so that wards can be instructed on how to access the service (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 10).**

*FY 12 Department Response:* Due to an unanticipated delay, the use of the social media Sexedloop texting service to the training curriculum is delayed. The next step following the full completion of the curriculum is to train the trainers with implementation of the training for caseworkers and foster parents beginning January 2013, and continuing through the term of the DCFS-DHS Sexual Health Training Grant, June 30, 2014.

*FY 13 Department Update:* The Department completed the Sexual Health Training curriculum for parents, foster parents and caseworkers in December 2012. This curriculum includes information regarding the use of social media. Training was conducted for both DCFS and Private Agency caseworkers and foster parents using the Sexual Health curriculum beginning January 2013 and continues through June 2014.  A total of 657 staff and foster parents have completed the training through October 2013. Additionally, a new policy on use of social media by DCFS wards is under development and is expected to be completed by January 2014.

**Whenever a ward gives birth to a premature or medically complex infant the New Birth Assessment worker should, with the consent of the mother, convene a case conference at the hospital involving the case manager, foster parent, hospital staff and family to discuss the needs of the infant and support the mother in her care of the infant at discharge (from OIG FY 12 Annual Report, Death and Serious Injury Investigation 10).**

*FY 12 Department Response:* The Department does not agree with assigning this responsibility to the New Birth Assessment worker as they are often assigned the case after the youth has been discharged from the hospital.  After consultation with the Office of the Inspector General staff, it is agreed that Teen Parent Service Network (TPSN) clinical would assist in coordinating the case conference to assure the assigned case manager convenes this meeting when indicated.  Also, TPSN clinical staff will be available to attend in-person or via teleconference any hospital based case conferences.

*FY 13 Department Update:* When TPSN is notified of a medically complex infant/child, the case is assessed for service team assignment and a clinical consultant will attend necessary staffings and any hospital based case conference.

**The Department should require that wards sign a release of information for the Department to receive information from the educational institutions on the student's academic problems. With a ward's signed consent, DCFS should arrange to be notified of any of the following (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 4):**

- **When a student has voluntarily withdrawn from the university or has been required by the university to withdraw;**
- **When a student has been placed on academic warning;**
- **When the student's academic good standing or promotion is at issue;**
- **When a student engages in alcohol or drug-related behavior that violates school policies;**
- **When a student has been placed on disciplinary probation or restriction;**
- **In exceptional cases when a student otherwise engages in behavior calling into question the appropriateness of the student's continued enrollment in the university.**

*FY 11 Department Response:* Amendments to the Independent Living (ILO) and Transitional Living Program (TLP) plans are being developed.

*FY 12 Department Update:* DCFS Policy Transmittal 2011.29, Procedures 302, Appendix G for Youth In College/Vocational Training Program was issued November 2011. Applicants are now required to sign the CFS 600-3, *Consent for Release of Information*, as part of the Youth in College/Vocational Training Program Application.

*FY 13 OIG Response: While students are required to sign the CFS 600-3, Consent for Release of Information, the OIG learned that the consent is not used for the purposes outlined in the recommendation and is not shared with the educational institution.*

*FY 13 Department Update:* The Inspector General and the new Acting Director will discuss this recommendation and the OIG investigation on which it was based to determine whether its implementation will enhance child safety.

**Teen Parent Services Network (TPSN) must maintain statistics on pre-natal and post-partum care visits and Women, Infants and Children (WIC) participation (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 6).**

*FY 11 Department Response:* The Division of Service Intervention/Office of Health Services will provide to TPSN and the Teen Parent Consultant youth-specific reports on prenatal and post-partum visits completed which will come from Medicaid claims information in State Automated Child Welfare Information System (SACWIS). Department of Human Services will provide to DCFS information on WIC participation by these youth and DCFS will provide this information to the Teen Parent Consultant.

*FY 12 Department Update:* TPSN currently shares this information with the teen parent consultant.

*FY 13 Department Update:* TPSN keeps and maintains data on pre-natal and post-partum care visits based on results from the new birth assessments and WIC participation from a DCFS data exchange agreement with DHS and provides periodic reports of the same to the DCFS Pregnant and Parenting Teen (PPT) Program Coordinator and court appointed Teen Parent consultant.

**Expectant fathers who are wards should be required to participate in training to reduce infant mortality by helping them recognize the stress and anger that can be provoked by an inconsolably crying child, and identify resources that can be immediately used to deescalate a stressful parenting experience. The training should include the participation of the Fussy Baby Network (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 6).**

*FY 11 Department Response:* Office of the Inspector General and TPSN staff will conduct a training for expectant fathers in an effort to reduce infant mortality and recognize stress and anger that can be provoked by an inconsolable crying child.

*FY 12 Department Update:* The Office of the Inspector General began the training in September 2012. TPSN will be providing this training in the future on an ongoing basis.

*FY 13 Department Update:* Risk reduction Training for pregnant and young parents is ongoing with the last TPSN coordinated training in November 2013.

**The Department and the Teen Parent Services Network should ensure that children of parenting teen wards with a history of mental illness, substance abuse, violence or developmental delays who are not eligible for school or employment related daycare services be enrolled at least two days a week in protective daycare (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 8).**

*FY 11 Department Response:* TPSN is able to identify and track clients meeting this criteria. A TPSN staff member will review daycare enrollment status of children's whose parent meets these criteria and assess the need for daycare. We will also have workers encourage these clients to enroll their child(ren) in protective daycare and secure consents from the client to contact the daycare facility. TPSN will generate a quarterly report on the clients who meet these criteria and notify workers of clients whose children are not enrolled in daycare.

*FY 12 Department Update:* TPSN tracks high risk cases through their clinical services department and staffing process. They provide DCFS with monthly clinical updates as part of the Hill v. Erickson reporting requirements. All reports are submitted to DCFS-Legal, the Teen Parent Consultant and the DCFS Pregnant and Parenting Teen Coordinator.

*FY 13 Department Update:* The children of parenting wards with current substance abuse, domestic violence, mental illness and developmental delays are eligible for protective day care. The Department will direct TPSN to include as part of their specialty training instructions for obtaining protective day care for these at risk children. Specialty training will include a policy clarification to ensure that a ward's worker identifies the need for protective day care as a service plan task; and that the service plan task is completed prior to submitting a day care services application.

**The Department and the Teen Parent Services Network should require a well being check, with consent, when a child of a teen ward misses daycare two consecutive scheduled days (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 8).**

*FY 11 Department Response:* TPSN is able to identify and track clients meeting this criteria. A TPSN staff member will review daycare enrollment status of children's whose parent meets these criteria and assess the need for daycare. We will also have workers encourage these clients to enroll their child(ren) in protective daycare and secure consents from the client to contact the daycare facility. TPSN will generate a quarterly report on the clients who meet these criteria and notify workers of clients whose children are not enrolled in daycare.

*FY 12 Department Update:* TPSN does not have the ability to identify and track the daycare attendance of client's children, however, TPSN encourages all caseworkers to obtain a consent for release of information from the client so they have the ability to receive attendance information from the day care facility. When they are notified that a child has missed two consecutive days, they are to complete a well-being check.

*FY 12 OIG Response:* To clarify, the Inspector General notes that this recommendation pertains only to high risk cases of parenting teen wards with a history of mental illness, substance abuse, violence or

developmental delays who are not eligible for school or employment related daycare services.  In FY 11 the Department agreed to implement this recommendation.

> *FY 13 Department Update:* If a TPSN service team member is notified of an absence they will ask the ward's caseworker to conduct a well being check.

**The Department and the Teen Parent Services Network should ensure that service providers develop a child care plan with the teen parent when the ward's child is on an "extended visit" or "out of state" (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 8).**

> *FY 11 Department Response:* TPSN will develop a training module in conjunction with the Teen Parent Consultant on developing a childcare plan with teen parents who authorize their child(ren) to be on extended or out of state visits. The training will note that if a client's non-ward child is on an extended or out of state visit, an Unusual Incident Report (UIR) should be completed. TPSN will review any UIRs on any client's non ward child who is on an extended or out of state visit. TPSN staff will contact the worker to ensure an appropriate child care plan is established as well as staff the case as appropriate.

> *FY 12 Department Update:* TPSN has a policy on informal living arrangements that TPSN workers are encouraged to follow which entails creating a child care plan when the client's child is out of state or on an extended visit. This policy is discussed during Specialty Training's Home Safety and Risk Reduction Module. The training occurs twice yearly at the TPSN specialty trainings.

> *FY 13 Department Update:* This policy is included in the TPSN specialty training on Safety and Risk Reduction, during this training workers are reminded that the home safety checklist must be completed whenever a ward's child is on an extended visit.

# UNRESOLVED RECOMMENDATIONS IMPACTING CHILD SAFETY

The following Office of the Inspector General's recommendations impact child safety and have been either rejected by the Department or pending for at least 4 years without resolution.

**The Department should pursue an interagency agreement with the Department of Healthcare and Family Services (DHFS) allowing DCFS Division of Child Protection staff access to Recipient Claim Detail information (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 11).**

> *FY 08 Department Response:* The Department of Healthcare and Family Services (DHFS) notified DCFS that the 2004 interagency agreement allows for the necessary access. Representatives from DCP and the Guardianship Administrator's Office will coordinate with the Department of Healthcare and Family Services to implement this recommendation.

> *FY 09 Department Update:* Representatives of the Guardianship Administrator's Office have continued to request access from DHFS. While no one has denied access to the Department, access has not been authorized. Efforts to gain access will continue.

*FY 09 OIG Response: The recommendation concerned access by child protection staff. Any access arranged must be available to child protection staff.*

> *FY 10 Department Update:* The Department continues to work with the Department of Healthcare and Family Services to obtain needed access to Recipient Claim Detail information.

> *FY 11 Department Update:* The Department is now receiving Department of Healthcare and Family Services (DHFS) Medicaid Claims information on a weekly electronic interface with the DHFS Medical Data Warehouse which goes directly into SACWIS E-Health screens. However, this is only for children for whom DCFS has legal custody. The Department has been unable to reach an agreement with DHFS to allow child protection staff access to the Recipient Claim Detail information and DHFS has informed the Department that they cannot share information from their Recipient Restriction Program. The Department is convening a meeting among the Division of Service Intervention, Child Protection, Legal Services, and Office of Information Technology staff to address child protection's need for access for children and subjects for whom the Department does not have legal custody.

> *FY 12 Department Update:* The Office of Health Services is continuing to work with DHFS on securing access to Medicaid claims history by child protection staff. In the meantime child protection staff can access Medicaid claims through the administrative subpoena process.

> *FY 13 Department Update:* The Department, DCFS Inspector General and HFS Inspector General continue to work on implementation of this recommendation.

**The Abused and Neglected Child Reporting Act (ANCRA) should be amended to clarify that the Department can share unfounded investigative information during a subsequent child protection or**

**criminal investigation with any persons named in Section 11.1, Disclosure of Information for purposes consistent with the Abuse and Neglect Child Reporting Act or criminal prosecution (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 4).**

> *FY 07 Department Response:* The DCFS Office of Legal Services has assigned an attorney to draft amendments to ANCRA, which address the above issue, as well as other proposed changes to ANCRA, and will submit as a single legislative package.  The targeted date of completion is May 2008.

> *FY 08 Department Update:* The DCFS Office of Legal Services has assigned an attorney to draft amendments to ANCRA, which address the above issue, as well as other proposed changes to ANCRA, and will submit as a single legislative package.  The anticipated date of completion is February 2009.

> *FY 09 Department Update:* Draft amendments to the Abused and Neglected Child Reporting Act addressing this issue will be submitted as part of the legislative package for the Fall Session 2010.

> *FY 10 Department Update:* Amendments to ANCRA addressing this issue will be submitted as part of the legislative package for the spring 2011 session.  The estimated date of completion is spring 2012.

> *FY 11 Department Update:* The Office of Legal Services will work with Legislative Affairs to incorporate language into the Abused and Neglected Child Reporting Act pertaining to sharing unfounded reports during a criminal or child protection investigation.

> *FY 12 Department Update:* DCFS Legal has determined that Rule 431 can be amended without pursuing legislation. Revisions to Rule 431, *Confidentiality of Personal Information*, are being drafted.  The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

> *FY 13 Department Update:* OCFP will work with respective Division to review this recommendation and determine if it can be included in current revisions to Rule 431, *Confidentiality of Persons Served by the Department*.

**Contracts should require quarterly reports from mentoring and counseling agencies on progress toward achievement of program plan goals, both in relationship to individual clients and, in the aggregate, for all clients served under the contract (from OIG FY 08 Annual Report, General Investigation 24).**

> *FY 08 Department Response:* The Department agrees.  Revised requirements will be included in FY10 contracts.

> *FY 09 Department Update:* The Department continues to include revised requirements in contracts.  The estimated date of completion is July 2010.

> *FY 10 Department Update:* Implementation of the recommendation is still in progress.

> *FY 11 Department Update:* The standardized counseling program plans are currently under review for inclusions of changes to program plan goals and submittal requirements. In addition the Office of Contract Administration will continue to work with other Divisions to make needed

changes to their non-standardized program plans to meet this requirement. Fiscal year 2013, (effective July 1, 2012) counseling and mentoring contracts should reflect this recommendation.

*FY 11 OIG Response: The OIG reviewed the standardized program plan submitted by the Department and determined that it contained many of the same problems identified in two recent OIG fraud investigations. Specifically, the program plan does not require that the agency serve DCFS-involved families (such as intact families, subsidized guardianship families, teen parents and their significant others). The quarterly reports required in the program plan fail to provide objective measures of services provided, such as number of DCFS clients served, hours and type of services provided, progress toward achieving set goals. In addition, the program plan promises counseling and casework services, but provides for staff without the credentials to offer such services. While mediation is an offered service, the program plan does not specify training or certification for mediators.*

*FY 12 Department Update*: The Program Plan templates updated for fiscal year 2013 include specific outcomes and metrics for services provided, which are the basis for monitoring progress and compliance, as well as verification/reconciliation of quarterly expenditures against contract funding. This will also be a component of the Department's new monitoring design.

*FY 13 Department Update:* This recommendation has been implemented with the FY14 contract program plans.

**Drug and alcohol toxicology contracts should be competitively bid (from the OIG FY 07 Annual Report, General Investigation 1).**

*FY 07 Department Response:* The Department agrees. This will be implemented with fiscal year 2009 contracts.

*FY 08 Department Update:* Due to the program plan and protocol changes, this service was not bid in FY 2009. It is anticipated that the service will be out for bid in fiscal year 2010.

*FY 09 Department Update:* Due to retirement and staff changes and the new committee that developed recommendations, it is still anticipated that services will be put out for bid for fiscal year 2011.

*FY 10 Department Update:* The Procurement Office is preparing to release the request for proposals (RFP) in February 2011 and the award is expected in fiscal year 2011.

*FY 11 Department Update:* The Procurement Office posted the Invitation For Bid for toxicology contracts but the Invitation for Bid was cancelled by the State Procurement Officer. The Office of Contract Administration and the Procurement Office are working to resolve questions received from potential vendors before reposting the Invitation for Bid.

*FY 12 Department Update:* Final review of updated IFBs for Toxicology Specimen Collection Site Services and Specimen Testing Laboratory is in process by the State Purchasing Officer. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* Toxicology vendors were awarded by request for proposal (RFP) effective with the fiscal year 2014 contract.

In order to satisfy Department Rule 402.8, *General Requirements for the Foster Home*, the Department should incorporate into a licensing safety assessment the guidelines set forth by the American Humane Society regarding the observation of family pets in their natural environment. These guidelines, detailed below, should also be incorporated into Part 300, *Reports of Child Abuse and Neglect* and Part 406, *Licensing Standards for Day Care Homes* (From OIG FY 09 Annual Report, Death and Serious Injury Investigation 11).

*Guidelines from the American Humane Society*
*In a publication entitled "A Common Bond: Maltreated Children and Animals in the Home" published by the American Humane Society, authors Mary Lou Randour and Howard Davidson propose that a child welfare safety assessment of animals and children should include animal related questions and observation of interactions between family members and family pets. The Humane Society recommends observation of the animal in its daily environment, and that when making a home visit the observer can incorporate the following questions into the interview:*

- *Do you have any family pets or other animals in your home?*
- *May I see them, or can you bring them out?*
- *What can you tell me about your pets?*
- *Who takes care of them?*
- *What happens when one of them is disobedient?*
- *Who disciplines them? How do they do that?*
- *Have you had any other pets? What happened to them?*

*When observing interactions between the family members and their pets, the following should especially be considered:*

- *Are there any family pets that might be classified as a breed that is associated with animal fighting or other crimes? The presence of a high-risk pet could place children and other family members in danger.*
- *Do the animals seem relaxed around all family members, or do they seem to avoid, or appear anxious around, one or two particular family members?*
- *How does the presence of the animals affect the family interactions?*
- *If there is a dog in the home, does the child have access to the area where the dog is kept?*
- *If the child is near the dog, how is s/he supervised?*
- *How much time does the dog spend interacting with family members?*
- *What socialization has the dog had with children?*
- *Has the dog received obedience training?*
- *Does the dog have a history of aggressive behaviors?*

*FY 09 Department Response:* The Office of Child and Family Policy and the Licensing Unit are developing a form to be signed by the foster parent responding to several questions about dangerous pets listed in the American Humane Society guide. Once this language is drafted, similar language will be drafted for Department Procedures 406 and 408 *Licensing Standards for Daycare Homes*. In addition, new legislation requires cross-reporting between child abuse investigators and animal abuse investigators.

*FY 10 Department Update:* After further review, the Licensing Division has determined that responsibility to determine whether a pet is aggressive or not is beyond the scope and expertise of

the licensing workers.  Procedures 300 *Reports of Child Abuse and Neglect* and the Safety Checklists have been drafted.

*FY 10 OIG Response: After a child was viciously mauled and killed by dangerous animals in a foster home, the OIG recommended that Licensing address this clear safety hazard. The Child Death Review Team supported the OIG's recommendation. It is unconscionable that the Department refuses to recognize its responsibility to address this safety issue in licensed foster homes.*

*FY 11 Department Update:* On July 8, 2010, the Department issued Policy Transmittal 2010.11, *Revised Procedures 300.50 (j) and the Home Safety Checklist*.  The Policy Transmittal addresses the expectations for Child Protection Investigation Specialists.   After further review, the Licensing Division has determined that responsibility to determine whether a pet is aggressive is beyond the scope and expertise of the licensing workers.

*FY 12 OIG Response: The Office of the Inspector General maintains that Licensing should address this clear safety hazard when assessing the safety of a home in which a child for whom the Department is responsible to protect, may reside.*

*FY 13 Department Update:* The Inspector General and the new Acting Director will discuss this recommendation and the OIG investigation on which it was based to determine whether its implementation will enhance child safety.

**The Department should develop guidelines for shared monitoring responsibilities when a single foster home has children monitored by different agencies or when the case monitoring and license monitoring functions are split between agencies. The guidelines should include the following requirements:**
    **a.  a staffing of all involved case and licensing workers;**
    **b.  written agreement of roles and responsibilities of each worker;**
    **c.  written guidelines concerning the responsibility to share information and the process for sharing information (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:*  The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* The Deputy Director of Monitoring will co-chair a subcommittee with Agency Performance Team, Licensing, private agency and Department staff to address these issues.  The anticipated start date is January 2012.

*FY 12 Department Update:* This will be included in the new monitoring design. Rule 301 will be revised to include this information.

*FY 13 Department Update:* Procedures 315.110, (C) (D) (E) currently require, where multiple workers are involved in one foster home, for each worker to 1) know each child in the home, regardless of child's caseworker assignment, 2) briefly interview each child in the foster home regardless of caseworker assignment, 3) ensure that caregiving information is shared with other

involved workers, and 4) document all foster home visits in SACWIS. As written, this would include circumstances where multiple workers are from different agencies. Additionally, these procedures (d) (1) require a twice annual staffing of all assigned caseworkers involved in the foster home, to include the foster parent, and in the foster home. Monitoring will work to develop specific supplements to these procedures to address 1) a written agreement of roles/responsibilities among assigned workers, to be completed as soon as possible, but no later than at the initial twice-annual staffing, and 2) the inclusion of licensing staff from the licensing agency at the twice-annual staffing. Additionally, Monitoring will work to include a twice-annual staffing requirement where the assigned caseworker is from an agency different from the licensing agency.

**The Department should issue a policy memorandum that states that whenever possible, each foster home should have a single entity that monitors placement of foster children and foster home licensing. POS may grant waivers to the policy based on individual children's needs but must ensure that the guidelines stated above are in place whenever a waiver is granted (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:*  The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* The Deputy Director of Monitoring will co-chair a subcommittee with Agency Performance Team, Licensing, private agency and Department staff to address these issues.  The anticipated start date is January 2012.

*FY 12 Department Update:* This will be included in the new monitoring design.

*FY 13 Department Update:* Policy statement is being developed for distribution in the beginning of FY15.

**Whenever a waiver is granted, and case responsibility is transferred to a single agency, the relinquishing agency should not be penalized, but should be moved up for case rotation assignment of a new case (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:*  The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* Agencies are not penalized when case responsibility is transferred to a single agency.

*FY 11 OIG Response: The recommendation did not concern assignment of cases but rather transfer of existing cases. To level the playing field, the agency transferring the children should receive immediate consideration for new placements.*

*FY 12 Department Update:*  The agencies loss of such cases is taken into account in terms of the percentage of referral opportunity to replace the case that was transferred.  The child's geography and the other agencies in the area with lower percentage of referrals are factored in terms of when the agency that transferred such a case would meet the criteria for a replacement intake.

*FY 13 Department Update:* The current administration is diligently working to incorporate recommendations and changes in practice that were not memorialized in policy over the past several years. The Director's Office and Operations will collaborate when there is a waiver request to ensure agencies are not penalized.

**Substance affected and dually diagnosed clients should be referred to child welfare teams with expertise in working with these clients and families.  Programs such as the Intact Family Recovery program (IFR) have expertise with both populations and successfully enroll 70% of the eligible children they serve in Head Start and state pre-K programs (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 10).**

*FY 09 Department Response:* There is no policy or protocol for referring substance exposed infants to the Intact Family Recovery program.  However, the Division of Service Intervention gets a weekly report from Quality Assurance on Cook County substance exposed infant cases. The Division of Service Intervention then contacts the assigned child protection staff to inform them that the case may be appropriate for the Intact Family Recovery program and how to make the referral.

*FY 09 OIG Response: Referrals to the Intact Family Recovery program should be required in specific circumstances and incorporated into written policy.*

*FY 10 Department Update:* Revisions to Policy Guide 99.13, *Services for DCFS Substance Affected Families*, are currently being drafted.

*FY 11 Department Update: FY 11 Department Update:* The Divisions of Service Intervention, Child Protection and Monitoring will form a committee to review policy and resources to address this issue.

*FY 12 Department Update:* The Division of Clinical Practice, Specialty Services Unit provides consultation to caseworkers on a variety of complex cases including dually diagnosed clients.

*FY 13 Department Update:* The joint consultation process for dually involved (mentally ill/substance abuse) cases has been implemented within the Specialty Services unit of the Clinical Division.  Staff from the substance abuse services unit now jointly provide consultation to caseworkers and staff cases with DCFS mental health and other specialty staff when needed. The DCFS substance abuse unit has been attempting to obtain a listing from DASA of providers capable of providing dual diagnosis (MI/SA) services to DCFS involved families.  DASA staff have not completed the list yet; their latest report was they are 75% complete with the list.

**The Department should review and update the Emergency Reception Center (ERC) Manual to include expectations of follow-up workers bringing children to the Emergency Reception Center (from OIG FY 06 Annual Report, General Investigations 4).**

> *FY 07 Department Update:* The updated ERC Protocol/Manual (Transmittal) has not been finalized and is on hold with the Office of Child and Family Policy awaiting information resolution regarding shelter transportation issues.  When it is completed the informational transmittals will go out to DCFS, POS, CWS, and DCP staff. Also, training will take place for all staff regarding protocol on how CWS or DCP can make an Emergency Shelter referral and intake guidelines for bringing children and youth into ERC for an emergency temporary shelter care placement.

> *FY 08 Department Update:* The ERC Protocol has been drafted and is awaiting approval to be sent out for comment. The anticipated date for distribution/implementation is January 2009.

> *FY 09 Department Update:* Referral forms for the Emergency Reception Center (CFS 1900 and CFS 1901) were issued in February 2009. The referral form does not address procedures for admission to the Emergency Reception Center. Emergency Reception Center protocol is on hold at this time.

> *FY 10 Department Update:* At the request of the Division of Child Protection (DCP), the ERC Protocol was placed on hold due to a planned reorganization and remains on hold as of November 2010.

> *FY 11 Department Update:* Restructuring of the Emergency Reception Center (ERC) is still planned therefore the implementation of the ERC Protocol is still on hold at this time.

> *FY 12 Department Update:* Standardized procedures for utilizing the Emergency Reception Center are being drafted.

> *FY 13 Department Update:* Shelter care procedures are currently being drafted.

**The Department should develop an expedited process for distributing proposed decisions to all parties in expungement appeals, with opportunity to file written objections, prior to the issuance of final administrative decisions in expungement appeals (from OIG FY 11 Annual Report, General Investigation 23).**

> *FY 11 Department Response:* The Department rejected the recommendation based on case law that interprets the section of the Administrative Procedure Act not to include the final administrative decision by a Director.

*FY 12 OIG Response: The OIG maintains that implementation of this recommendation would strengthen the Administrative Process while assuring fairness and more reliable decision making.*

**Rule 412 Recommendations:**
**(1) The OIG recommended that Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors*, be revised:**

- **To permit the Department to refuse to issue a license with knowledge that the applicant had committed a violation that would warrant revocation or if the applicant had engaged in behavior that would pose a risk to children or state resources;**

- **To expand the list of criminal pending charges or convictions that would warrant a refusal to issue to include any crime of which dishonesty is an essential element;**

- **To permit the Department to refuse to issue a license if the applicant provides false information during the licensing process;**

- **To provide guidelines for assessing criminal convictions and abuse or neglect findings that are not bars to licensure;**

- **To permit the Division of Child Welfare Employee Licensure to refer applications for investigation to verify facts presented (from OIG FY 06 Annual Report, General Investigations 26).**

**(2) The Department should amend Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors*, to provide specific provisions for voluntary relinquishment of a child welfare employee license (from OIG FY 08 Annual Report, General Investigation 30).**

- **A licensee may voluntarily relinquish his or her license at any time.**

- **The voluntary relinquishment of a CWEL during a pending licensure or disciplinary investigation or proceeding shall be recorded in the CWEL files as "*relinquished during licensure or disciplinary investigation or proceeding.*"**

- **Voluntary relinquishment of a license must be filed with the Child Welfare Employee License Division on a form prescribed by the Division. The form must contain an acknowledgment that reinstatement will be subject to consideration of the facts disclosed in any pending licensure investigations or proceedings. Voluntary relinquishment does not divest the OIG of the jurisdiction to complete a pending investigation.**

- **An Application for License from a licensee who previously relinquished shall be considered a Request for Reinstatement rather than an Application for License.**

**(3) Section 412.100, *Restoration of Revoked or Suspended License*, should be amended as follows: Section 412.100, *Restoration of Revoked, Suspended or Relinquished License*: A licensee may request the restoration of his or her license by submitting a written request to the Board providing specific reasons to support the request. In considering an application to reinstate or grant a license that was relinquished during a pending licensure investigation or administrative proceeding, the Board shall consider any charges filed along with a report or sworn statement by the Office of the Inspector General regarding the evidence developed in the investigation. For the purpose of considering a Request for Reinstatement, the Board shall presume that the facts developed during the investigation or the pending charges are true, when the license was surrendered during a pending investigation or licensure proceeding; the licensee may rebut the presumption for good cause shown. The Board may not reinstate a license where it has been shown by investigation and administrative hearing that it is not in the best interest of the public to do so. Considerations that will be reviewed when making a finding of "in the best interest of the public" include, but are not limited to: the nature of the offense for which the license was revoked; the period of time that has elapsed since the revocation; evidence of rehabilitation; and character references (from OIG FY 08 Annual Report, General Investigation 30).**

*FY 08 Department Response:* The Department agrees.  The Office of Child and Family Policy has begun the revision process.

*FY 09 Department Update:* Rule 412 *Licensure of Direct Child Welfare Services Employees and Supervisors* is currently being reviewed by the Joint Committee on Administrative Rules.

*FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License*, was filed in October 2009. The second Notice was never filed due to failure to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first Notice again by January 2011, subject to approval.

*FY 11 Department Update:* The Department will resubmit the amendments to Rule 412 *Licensure of Direct Child Welfare Services Employees and Supervisors* with the Joint Committee on Administrative Rules.

*FY 12 Department Update:* Revisions to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisor,* have been distributed for comment.

*FY 13 Department Update:* Draft was sent to JCAR in June 2013; JCAR returned the draft to DCFS requesting changes; on 11-7-13, the edited draft was submitted to DCFS Legal for review and facilitation of review by the Governor's office.


**Recommendations regarding substance abuse in the workplace:**
**(1) Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors*, should be amended to provide for automatic suspension or denial of license application after a licensee or applicant has failed a drug test required by Administrative Procedure 24, *Drug Testing of Employment Applicants* (from OIG FY 08 Annual Report, General Investigation 32).**

**(2) The Department should develop policy to address suspected substance abuse in the workplace (from OIG Recommendations made in 2005, 2001 and 1999).**

*FY06 Department Response:* The Department developed a definition and procedure for Reasonable Suspicion testing. The Department agrees to amend the Employee Manual and the Employee Licensure Rule to address Reasonable Suspicion of substance abuse and will also engage in discussions with the union.

*FY 07 Department Update:* The Department's workgroup addressing the need for incident-based reasonable suspicion drug or alcohol testing is currently developing protocol for pre-employment drug testing. Reasonable suspicion testing has been put on hold temporarily.

*FY 08 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 08 OIG Response: The OIG has been continuously recommending this critical change in policy for nine years. The policy change sought by the OIG would have a minimal budgetary impact. The lack of reasonable suspicion policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk.*

*FY 09 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 10 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 10 OIG Response: The OIG has been continuously recommending this critical change in policy for nine years. The policy change sought by the OIG would have a minimal budgetary impact. The lack of reasonable suspicion policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk.*

*FY 11 Department Update:* Management fully supports reasonable suspicion testing for direct child welfare service employees and supervisors. Direct child welfare service employees and supervisors are bargaining unit members. As such implementation of reasonable suspicion drug/alcohol testing, unless legislatively mandated, must be negotiated with the collective bargaining units. Management routinely proposes to CMS Labor Relations that reasonable suspicion testing be included in collective bargaining agreements. Management also routinely proposes that reasonable suspicion testing be added to supplemental collective bargaining agreements. Without a reasonable suspicion testing policy in place amendment of Rules and Procedures is futile. The State will be involved in contract negotiations with AFSCME in 2012 and the Department intends to continue pressing this point.

*FY 11 OIG Response: The OIG notes that the City of Chicago and both the Illinois State Police and the Department of Corrections have had Reasonable Suspicion Testing for several years. The City of Chicago and the Department of Corrections employees are represented in large part by the same union as most employees with the Department of Children and Family Services. Moreover, Direct Child Welfare employees and supervisors at DCFS must possess Child Welfare Employee Licenses. The OIG has urged since 2005 that Reasonable Suspicion Testing be added as a requirement for Child Welfare Licensure. The Department has failed to act on the recommendation.*

*FY 12 Department Update:* A workgroup has been formed to review all drug/alcohol related OIG recommendations to determine implementation steps. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

*FY 13 Department Update:* The Department will reconvene the workgroup to address these recommendations.

# APPENDIX

**APPENDIX A:**

**YOLANDA BRADSHAW (FICTITIOUS NAME)**

# OFFICE OF THE INSPECTOR GENERAL
## Department of Children and Family Services

---

### *REDACTED REPORT*

---

*This report is being released by the Office of the Inspector General for teaching/training purposes. To ensure the confidentiality of all persons and service providers involved in the case, identifying information has been changed. All names, except those of professional references, are fictitious.*

---

**File No:**   112542
**Subject:**   Child Death
**Child:**   Yolonda Bradshaw (DOB: 1/08, DOD: 3/11)

## SUMMARY OF COMPLAINT:

In March 2011, police were called to the home of Nora Thompson, where three-year-old Yolonda was found dead. Police took protective custody of Yolonda's four-year-old and ten-year-old sisters and charged their mother and mother's paramour with the child's murder. The OIG investigated Yolonda's death pursuant to its mandate to investigate the deaths of children whose families were involved with the Department of Children and Family Services within a year of their deaths. There had been two unfounded child protection investigations involving the family within a year of Yolonda's death.

## INVESTIGATION:

### Family Composition

At the time of her death, 3-year-old Yolonda Bradshaw (DOB: 1/08) resided with her 29-year-old mother, Nora Thompson; her mother's 37-year-old paramour, Victor Hughes; her 4 ½ -year-old sister, Elaine Bradshaw (DOB: 6/06); and 10-year-old half-sister, Sarah Thompson-Nelson (DOB: 9/00). Elaine and Yolonda's father is Greg Bradshaw. Sarah's father is Charles Nelson.

### *History*

Nora Thompson and Victor Hughes met at a party in June 2010, while Ms. Thompson and her three daughters were visiting relatives in Butte.[1] When the mother and the girls returned home to Whitefish on June 27, Mr. Hughes went with them and moved into their home. Within days of their return home, all three children were seen by their primary care physician. On June 29, two days after returning to Whitefish, the mother took Elaine and Yolonda to their pediatrician because both had bug bites and Yolonda was congested. The mother told the pediatrician that they recently were exposed to bed bugs while on vacation. The pediatrician prescribed a topical cream for the bug bites and advised the mother to give Yolonda, who was diagnosed with an upper respiratory infection, extra fluids and rest. The pediatrician conducted a 4-year-old well child exam of Elaine, and documented that she was an active and alert child who had "no skin

---

[1] According to DCP SACWIS notes.

lesions." On July 1, the mother returned to the pediatrician with Sarah and Yolonda because Sarah was also experiencing irritation from bug bites and Yolonda had developed a congested cough. The pediatrician prescribed medication for Yolonda's cough and topical cream for Sarah's bites. Their medical exams, which included a check of their arms, legs, and abdomen, revealed no concerns other than evidence of bed bug bites. On August 24, the mother brought Sarah and Yolonda back to the clinic. Yolonda had developed a rash on her face over the last several days. The mother told the physician that Yolonda had been playing in the toilet "a lot lately." Yolonda was diagnosed with impetigo and prescribed Amoxicillin.[2] Sarah, who had contracted a cold, was advised to drink extra fluids and get increased rest.

**September 19, 2010 DCP Investigation**

Approximately three months after the mother's paramour, Mr. Hughes, moved into the home, police contacted the hotline on Sunday, September 19, 2010, reporting that four-year-old Elaine Bradshaw had a bruise on her left shoulder blade and a red mark on her left cheek from her mother hitting her with a belt.[3] The officer stated that Elaine's father, called the police department regarding her injuries. Intake staff ran a LEADS on the mother at the time the call was accepted and found she did not have a criminal history. A report was taken for investigation of #11 Cuts, Bruises, Welts, Abrasions and Oral Injuries by abuse. The case was assigned to the team of Child Protection Supervisor Carl Fisher who had been promoted from a child protection investigator nineteen days earlier. He was still carrying a caseload. Mr. Fisher assigned the Thompson investigation to Child Protection Investigator Debra Morgan the next morning on September 20, 2010. Ms. Morgan had returned from a six-month maternity leave in August. Upon her return, the investigator was assigned thirty-two undetermined cases and was put on rotation. The investigator had approximately eight months of child protection experience when she received the Thompson investigation.[4]

Investigator Morgan contacted the reporting detective, who stated that Elaine had a "1 ½ inch skinny red mark" on her left shoulder blade, not a bruise as stated in the intake narrative, and a "pea size" mark on her left cheek. The detective stated that he did not notice the mark on Elaine's cheek until her mother pointed it out. He said the home was clean, the children appeared well cared for, the mother did not have any criminal history, and he did not have any concerns regarding their safety. An OIG investigator obtained a copy of the police report, which noted:

> Mr. Bradshaw stated that Thompson is always abusing Elaine, and Thompson does not take care of her…Ms. Thompson advised her eldest daughter, Sarah Thompson-Nelson, and Elaine were being "disobedient and disrespectful," toward her. Ms. Thompson retrieved a belt, and began to spank Elaine, in the process of the spanking Elaine was attempting to avoid getting struck, and Ms. Thompson miscalculated her aim, and accidently struck Elaine on the left cheek, and her left shoulder…I observed a small red mark on the shoulder of Elaine, I looked at her left cheek and observed a pea sized red mark on her cheek.

---

[2] According to the Mayo Clinic's website (www.mayoclinic.com/health/impetigo/DS00464), impetigo is a contagious bacterial skin infection that generally affects young children, who are often infected through scrapes, cuts and bug bites.
[3] The officer's incident report revealed that he observed Elaine at 5:00pm on 9/19/10.
[4] Mr. Fisher and Ms. Morgan both had Masters in Social Work. Mr. Fisher has been employed with the Department since 1994.  Ms. Morgan was hired by the Department in July 2009.

The officer documented in the report that both Elaine and Sarah denied being afraid of their mother. The child protection investigator did not obtain the police report.

At approximately 4:00 in the afternoon on Monday, September 20, 2010, the investigator went to the family's home and interviewed the mother, Elaine and her two sisters, nine-year-old Sarah and two-year-old Yolonda. The mother told investigator Morgan that all three of her daughters were being punished when the incident occurred. She attempted to hit Elaine with a belt across her buttocks, but Elaine moved and the belt accidentally struck her shoulder and cheek. The mother said that she did not attempt to use the belt on her further; instead, she made Elaine sit in a chair in the corner. She stated that she only uses a belt when the girls have really misbehaved. Investigator Morgan wrote:

> Reports that she makes them take a time out-then stand in the corner-then stand with hand in the air-then a small phone book-then ["]woop[ing"] if continued misbehavior.

The mother stated that Elaine's father, Greg Bradshaw, and she had been fighting for custody of their two children, Elaine and Yolonda, and were currently in mediation. She said that Mr. Bradshaw came to her home Saturday and they argued so she told him to leave. He returned to the home on Sunday and saw Elaine's injury and became upset. They argued again which escalated to a physical altercation and the mother again told Mr. Bradshaw to leave her home. Later Sunday, police came to her home inquiring about Elaine's injuries. The mother told the investigator about her involvement with her thirty-seven-year-old paramour Victor Hughes, who resided in the home with her. She provided the investigator with the name of the children's pediatrician and a relative as a collateral source.[5]

Investigator Morgan noted her interview in the Statewide Automated Child Welfare Information System ("SACWIS) and observation of four-year-old Elaine the day following the hotline call:

> Worker observed the minor to have no injuries and was appropriately dressed. The minor did have a small brown mark just below her left eye. The mother reports that this mark has always been there.[6] The minor is verbally limited and shy. The minor [stated] that she did not remember the events that had occurred the previous day.

Sarah told the investigator that she was standing in a corner when Elaine was spanked and could not see what happened. Sarah stated that she was rarely spanked; usually she had to stand in a corner as discipline. She denied being afraid of her mother. The investigator observed two-year-old Yolonda and documented that all three girls appeared appropriately dressed with no observable injuries. The paramour told the investigator that he did not see the incident involving Elaine, but stated that he did hear Mr. Bradshaw and the mother arguing. He said he did not have any children, had never had DCFS involvement, had no history of substance abuse, mental illness, domestic violence, and was not on SSI. The investigator noted that the paramour was

---

[5] The relatives relationship to the mother is unknown. No information about her was found in the Thompson case record, and the current placement worker did not know of any relative with that name associated with the family.

[6] The police report revealed that the mother told the officer that the marks to Elaine's shoulder *and cheek* were from being hit with the belt.

negative for CANTS/LEADS.[7] The investigator completed the Home Safety Checklist and noted that the home was clean and had food.

Investigator Morgan told OIG staff that her visit to the Thompson residence was unannounced. She recalled what appeared to be a "happy, loving family." One of the girls was playing dress-up, another was putting puzzles together with the paramour, and dinner was cooking on the stove. She said that she observed Elaine undress down to her underwear with Elaine's mother present and she did not observe any evidence of injuries other than the small brownish mark below her eye. She did not see any injury to Elaine's shoulder and believed it must have dissipated. The investigator acknowledged that she did not complete a body chart on Elaine but was unable to explain the reason. She did not observe the other two girls for injuries.

Investigator Morgan contacted her supervisor, Carl Fisher, after interviewing the family. Supervisor Fisher noted in the supervisory consultation in SACWIS, that Elaine and Yolonda's father had called the police because Elaine had "a belt mark." He also wrote that the investigator spoke with the police officer who made the report and he saw a faint red mark, not a bruise, on Elaine's shoulder, but that the investigator observed Elaine and did not see any marks on her. He noted that the parents were in a custody dispute and that the father had shoved the mother during an argument over the weekend and the paramour intervened. Investigator Morgan told the supervisor that all three children were being disciplined for standing on a window ledge.[8] The supervisor wrote:

> The 9 year old reported that for discipline, they get time-outs, have to hold their hands up and have to hold a phone book. [T]he 9 year old said they only get the belt if it is serious.[9]

Supervisor Fisher consulted with the acting child protection manager who agreed with the assessment of "safe." The supervisor documented that the mother should be referred for community based parenting instruction. Supervisor Fisher acknowledged to OIG staff that the reported discipline was "bizarre and unusual" and stated that, in hindsight, he should have learned more about it.

Investigator Morgan informed OIG staff that she interpreted the mother's description of discipline to be a progression and did not consider it to be a red flag for abuse. The investigator acknowledged that she did not explore how long any of the disciplinary methods occurred. She could not recall if she asked to see the belt. She explained that as a new investigator, she was learning on the job and said that now she would ask the girls and the adults in the home more exploratory questions, such as how long they stood in time out, as well as gather more information about what the girls had to hold during discipline. She said that she also might do a scene reenactment.[10]

---

[7] A child protection investigator requested a LEADS on Mr. Hughes on September 25. The LEADS report documented in SACWIS was negative. OIG staff ran a LEADS and found the paramour had several old drug-related charges from 1991 and 1992 but no convictions.

[8] Ms. Thompson told police the discipline was because Sarah and Elaine were being "disobedient and disrespectful," toward her.

[9] The mother actually reported this information to the investigator, not the 9-year-old.

[10] OIG staff reviewed all cases investigator Morgan completed in January 2012 and found that her SACWIS contact notes in those cases were detailed, and that she asked more exploratory, in-depth questions.

On September 20, the investigator interviewed Elaine and Yolanda's father, Greg Bradshaw by phone. He stated that on Sunday, he went to the mother's home and found Elaine in a chair crying and noticed that she had a mark on her shoulder. When he asked what happened, the mother said that she was trying to whip Elaine with a belt and she moved. The father stated that he was in a custody dispute with the mother and he wanted the children to live elsewhere with a relative.

Supervisor Fisher told OIG staff that around the time of the A-sequence investigation, the Whitefish field office was overwhelmed with cases for investigation and the office was "farming cases out" to other areas for completion.[11] Investigator Morgan told OIG staff that she was directed to identify cases that could be completed by a detail worker and the Thompson case was one. Investigator Morgan stated that it felt as though she was on a mandate team and explained that they were struggling to keep their heads above water.[12] Supervisor Fisher stated that the Thompson investigation was one of the hundreds of cases that were sent to other field offices for completion. The Thompson investigation was transferred to the central region and assigned to another child protection investigator, Larry Washington in Helena.

### Central Region
On September 23, Child Protection Supervisor Dennis Smartt from the Helena office wrote a supervisory consultation in SACWIS, directing investigator Washington to interview the children's primary care physician, input LEADS into SACWIS, and complete the allegation rationale to unfound the report. Two days later, on September 25, supervisor Smartt wrote a final supervisory consultation in which he noted that neither the investigator nor the police detective observed any injuries to Elaine and that he agreed with the investigator's recommendation to unfound the report. The case was returned to Whitefish. Supervisor Fisher told OIG staff that he saw that the Helena team supervisor had completed a final supervisory consultation but never closed the case, so supervisor Fisher may have taken it back for completion.[13]

### Completion of the Investigation
On October 7, investigator Morgan made one unsuccessful phone attempt to reach the collateral relative provided by the mother and one unsuccessful phone attempt to talk to the pediatrician. On November 18, after forty two days with no documented work on the A-sequence investigation, investigator Morgan spoke with a registered nurse at the doctor's office and learned that all three children had been to the doctor in the last six months: in August Yolonda was seen for a rash and Sarah for a cold, and in June Elaine had been seen for an annual exam. The nurse did not have any concerns regarding the girls.[14] Investigator Morgan's documentation with the nurse does not indicate whether she informed the nurse of the reported discipline the mother used with her daughters or the allegation of physical abuse to Elaine. After speaking with the nurse, the investigator recommended that the mother be unfounded for Cuts, Bruises, Welts, Abrasions and Oral Injuries (11). As her rationale for unfounding the report, the investigator wrote:

---

[11] An Area Administrator set parameters for which cases could not be detailed. These included protective custody and serious injury cases.

[12] The Department's Protective Service Teams by Worker Report indicated that investigator Morgan went over BH in January 2010. She was assigned twenty cases in September, twenty-one in October, and twelve in November.

[13] The (B) sequence had just been assigned to investigator Morgan, which also may have prompted the return. Neither supervisor Fisher nor investigator Morgan could recall with certainty the reason.

[14] Investigator Morgan used this same contact note in the pending (B) sequence investigation.

> This allegation is unfounded. While reporter did observe a red mark to the child initially, this was not present nor were any other bruises indicative of abuse when the child was seen by CPI 24 hours later. There is a current custody dispute between the parents based on statements from each of them. This likely was Greg's reason for causing this report to be called in.

Supervisor Fisher stated that he signed off on the investigation based on the final supervision note that the supervisor from the Helena office had written.

## September 28, 2010 DCP Investigation

While the A-sequence investigation was pending, a mandated reporter from a domestic violence agency contacted the hotline on September 28, 2010. The worker reported that the mother disclosed that in early July 2010, shortly after the girls returned from a visit with their father, she had witnessed her 4-year-old and her 2-year-old daughters engaging in sexualized behaviors. The mother told the reporter that Yolonda was sitting on a toddler chair with her nightgown up and underwear down and Elaine was touching her vaginal area. The mother told the reporter that about the time she witnessed this incident, the girls began bedwetting. The report was taken and the investigation was again assigned to Debra Morgan.

On the afternoon she was assigned the case, investigator Morgan went to the Thompson apartment and interviewed the three girls, the mother and her paramour, Mr. Hughes, regarding the allegation. The mother told investigator Morgan that the incident of sexual behavior she observed and Elaine and Yolonda's bedwetting began shortly after they returned from a visit with their father, Greg Bradshaw, around late June. The mother relayed the incident she witnessed of Elaine touching Yolonda's vagina and stated that she asked the girls whether anyone had touched them in a sexual way, but they did not disclose anything to her. The mother said she mentioned the incident to legal advocacy staff while she was filing for an order of protection against the girls' father, Greg Bradshaw. Investigator Morgan separately interviewed Elaine and Yolonda. Neither disclosed any abuse. Sarah also denied anyone had touched her inappropriately and stated she had not seen anyone inappropriately touch her sisters. The investigator interviewed the paramour, Victor Hughes, whom she noted had been living at the residence "for several months." He denied witnessing the incident or any other sexualized behaviors by the girls. Investigator Morgan noted that the girls appeared well-groomed with no visible injuries, the home was clean, and the family had food and working utilities.

Investigator Morgan phoned her supervisor after interviewing the household members. Supervisor Fisher documented that Ms. Thompson had not previously disclosed this allegation to investigator Morgan during their contacts regarding the investigation of the A-sequence report. Supervisor Fisher also noted that the children did not make any disclosures, and that the mother did not think the girls were sexually abused.[15] He noted that the mother's "boyfriend [who] lives in the house" was negative for CANTS and LEADS.[16] The supervisor deemed the children to be safe.

---

[15] Supervisor Fisher told OIG staff that he probably got that information from Ms. Morgan, but could not recall specifically.

[16] Investigator Morgan and supervisor Fisher did not implement the paramour policy (Procedures 300, Appendix H). The supervisor said that they probably did not discuss it because the paramour was not the alleged perpetrator in either report and was not identified as the disciplinarian for the girls.

Investigator Morgan told OIG staff that she suspected that the mother had made a false report against the father in retaliation for Mr. Bradshaw contacting the police. She could not recall why she did not attempt to interview Mr. Bradshaw.

The legal advocate who made the hotline report completed a Written Confirmation of Suspected Child Abuse/Neglect Report (CANTS 5). The reporter wrote that the mother suspected that her daughters were sexually abused during a weekend visit with their father. The advocate identified Greg Bradshaw as the possible perpetrator and provided his address.  She noted that there was a history of domestic violence. OIG staff obtained the petition for order of protection that was filed on September 28, 2010. Two incidents were described as the reasons Ms. Thompson was seeking  the order of protection: the September 18 altercation between Mr. Bradshaw and the mother, which precipitated the initial hotline call, and an incident two months prior in which Mr. Bradshaw allegedly broke into her house in anger and made derogatory statements about her in front of their children.  The court granted an emergency order of protection effective for fifteen days.[17]

About a week later, investigator Morgan spoke with staff at the Whitefish Child Advocacy Center about the allegation. The Center declined to conduct a victim sensitive interview with the girls because there was no disclosure. The investigator contacted the reporter who had assisted the mother in obtaining an order of protection against the children's father. The reporter did not have any additional information to provide, but noted that the mother's statements seemed credible. The reporter added that the mother disciplined the girls for the incident so they would understand that their behavior was inappropriate.

On November 22, four days after closing the A-sequence investigation, Investigator Morgan met with her supervisor for a final supervisory consultation for the B-sequence investigation. Supervisor Fisher noted that the mother never mentioned to the investigator during the pending A-sequence any of the concerns that she made to the reporter of the B-sequence. He noted that the girls' bedroom did not have an odor of urine suggestive of bedwetting, that none of the children made an outcry, that the nurse at the children's clinic did not have any concerns, that the Child Advocacy Center declined the case, and that the mother was negative on CANTS/LEADS. Supervisor Fisher agreed with Investigator Morgan's recommendation to unfound the case for Substantial Risk of Sexual Abuse (22c) to Yolonda and Elaine against an unknown perpetrator and closed the investigation.

### March  2011 DCP Investigation of the Death

On a morning of the second week of March, Whitefish police contacted the State Central Registrar ("SCR") and reported the death of 3-year-old Yolonda. The officer stated that police were currently at the home and information regarding the child's death was sketchy, but noted that the adults in the home stated that Yolonda had fallen down some stairs yesterday and when the family awoke this morning, she was unresponsive. The paramedic who responded to the call contacted the hotline with related information that Yolonda appeared injured and that the mother told him that Yolonda had fallen down the stairs and had not seemed quite right after her fall.

Police took protective custody of Sarah and Elaine and took them to the Whitefish Child Advocacy Center ("CAC") for forensic interviews. At the Child Advocacy Center, Elaine

---

[17] Mr. Bradshaw was prohibited from being within 300 feet of the mother, Elaine, and Yolonda as well as their apartment and school.

disclosed severe and ongoing physical abuse to Yolonda and herself by her mother and paramour. She described punishment that lasted for hours a day and for weeks at a time. Sarah demonstrated the various methods of discipline her mother and the paramour used as punishment. "Walking it out" consisted of holding books over their heads and walking for long periods of time. "Stretching it out" was a push-up formation they had to maintain. Elaine disclosed that her mother and the paramour whipped them with a belt, sometimes while naked, on their stomachs, backs, feet, hands, thighs and buttocks. She stated that Yolonda was whipped if she fell asleep during punishments. She also disclosed being sexually abused by her father, Greg Bradshaw at his home.

During their forensic interviews, both Sarah and Elaine disclosed that Greg Bradshaw had sexually abused them. Sarah reported that Mr. Bradshaw had touched her genitalia over her clothing several years earlier. Elaine reported that in June, Mr. Bradshaw had taken her clothes off and touched her genitalia with a phone while he was also unclothed. The hotline was notified and a report of sexual molestation by Mr. Bradshaw against Sarah and Elaine was taken for investigation.

Sarah told the police detective that her mother and her paramour frequently whipped Sarah and her younger sisters, sometimes while unclothed, with a leather belt. She described being forced to hold books over their heads for hours and having books tied to their backs while "stretching it out." She noted that the paramour would wake Elaine and Yolonda up for punishment in the morning and they would still be performing their punishment when she returned from school. Sarah stated that she would begin her punishment, which she had been on since February, when she returned from school. Their punishments would continue until they were sent to bed. While on punishment, they were only permitted to eat Ramen noodles. Sarah told the detective that Elaine and Yolonda were being punished for wetting the bed several days earlier. Her sisters were not allowed to drink water or the broth in the noodles because they wet the bed. Her mother and mother's boyfriend made them sleep on the floor and hold books or maintain the aforementioned positions for hours at a time. If they could not continue the position, or dropped a book, they were whipped with the belt. Sarah stated that the paramour would not allow Yolonda to fall asleep. They made Sarah whip Yolonda if she fell asleep while being punished and Sarah explained that she would be whipped if Yolonda did not continue her punishment. Sarah described ongoing physical abuse to Yolonda over a period of days. Several nights ago, Sarah heard Yolonda screaming and crying like she was in pain. Sarah told the detective that Yolonda had not moved for three days.

Sarah was examined by a physician, who noted old scars on her arms, back and legs consistent with Sarah's description of being whipped with a belt. The physician who examined Elaine documented that Elaine had an old scar on her back, several old small round marks on her inner thigh that could be cigarette burns, a couple of bruises on her upper right thigh, and very dry lips.

The police arrested the paramour and mother and charged them with two counts of murder, concealing a homicidal death, two counts of aggravated battery with a weapon, intimidation, and aggravated battery of a child. Temporary custody was taken of Sarah and Elaine. The mother was prohibited from any contact with the girls. Mr. Bradshaw was prohibited from visiting with Elaine. The girls were placed together with Sarah's paternal aunt in Butte.

While the investigation was pending, a nurse with the Flathead Health Department contacted the SCR. She expressed concern that the mother was approximately four months pregnant and that

the father was believed to be the paramour, Victor Hughes. The call was taken as related information.

The coroner's office determined that the cause of Yolonda's death was due to multiple physical abuse. The mother was indicated for: (16) Torture against Yolonda, Elaine, and Sarah; (11) Cuts, Bruises, Welts, Abrasions and Oral Injuries against Elaine and Sarah; and (1) Death against Yolonda. The mother was unfounded for allegations of (10) Risk of Physical Injury/Environment Injurious against Sarah and Elaine. The paramour, Victor Hughes, was indicated for (1) Death against Yolonda.

### March  2011 DCP Sexual Abuse Investigation

On April 1, 2011, following Sarah and Elaine's outcry of sexual abuse by Greg Bradshaw during the March forensic interviews, they underwent another victim sensitive interview at the Whitefish CAC. Sarah disclosed that on one occasion several years ago while Mr. Bradshaw lived with them, he entered her bedroom and fondled her over her clothes. She did not disclose the incident to her mother for several years, until 2009. Sarah told the interviewer that last year, Elaine told their mother that Mr. Bradshaw had touched her, too. Sarah asked the interviewer to not place her or her sister with Mr. Bradshaw because she did not want him to touch them anymore. The investigator interviewed Mr. Bradshaw, who denied engaging in any sexualized behaviors with the girls. Sarah's great aunt stated that she was unaware the children were being abused sexually or physically until Yolonda's death in March. The maternal grandfather also denied any suspicions of the alleged sexual abuse to the girls or knowledge that the children were being physically abused. A physician completed a sex abuse exam on Elaine, which did not confirm or rule out evidence of sex abuse. The police closed their criminal investigation without pressing charges against Mr. Bradshaw. The allegation of sexual molestation (21) was unfounded for lack of evidence.

### September 8, 2011 DCP Investigation

On September 8, 2011, Nora Thompson gave birth to a healthy baby boy, whom she named Victor Hughes Jr. A hospital nurse notified the hotline. The report was investigated and Ms. Thompson and Mr. Hughes were indicated for risk of harm (60) to the newborn. The investigator contacted Placement Clearance, and was informed that the newborn's maternal grandfather, Felix Thompson, was negative for CANTS.[18] The grandfather had a substantial criminal history, but none of his convictions, which were over fifteen years ago, were a bar to placement. The Department placed the infant with the grandfather.

### November 9, 2011 DCP Investigation

In November, Elaine's therapist contacted the hotline and reported that Elaine had made a detailed disclosure of sexual penetration by her father, Greg Bradshaw. Elaine reportedly

---

[18] Mr. Thompson has a history with the Department that has been expunged in SACWIS. Nora Thompson's old case record revealed that in 1987, Mr. Thompson was indicated for risk of harm after hitting his 4-year-old son, Mitchell, and that there was domestic violence and both parents were using drugs. Later in 1987, the hotline was called after Mr. Thompson and his wife left 5-year-old Nora and her younger siblings with a relative for four days without a care plan. The State took guardianship, and Nora and her siblings were placed in foster care for the next six years. In 1993, the children were briefly returned to their mother, who relapsed on drugs, and the children returned to foster care. Mr. Thompson participated in services and 14-year-old Nora and her siblings were returned to his care in 1996.

disclosed that her mother discovered Mr. Bradshaw on top of Elaine, who was bleeding, made him stop and took her to a hospital. The therapist stated that Elaine and Sarah's relative foster parent recently witnessed Elaine "grinding" on top of a three-year-old peer. Sarah also disclosed to the therapist that Mr. Bradshaw had touched her vagina when she was six years old. A check of local hospitals and clinics revealed no evidence that Elaine had been seen for a sexual assault. A VSI was completed with Elaine and Sarah. Elaine did not make an outcry of sexual penetration. Sarah told the interviewer that she never witnessed Mr. Bradshaw touching Elaine, although she stated that Elaine and Yolonda had told their mother that Mr. Bradshaw had touched them. Mr. Bradshaw did not respond to the investigator's attempts to contact him. The investigation was unfounded for insufficient evidence.

**Case Update**

In July 2012, Sarah's paternal aunt issued a 14-day notice for the girls' removal from her home; and in early August, both girls moved to their maternal great aunt's home.[19] The girls seem to be adjusting well to their new placement. Both continue participating in weekly therapy through Kappa Agency. Sarah and Elaine continue to enjoy visits with Victor Jr. and now live closer to him and their maternal grandfather. Elaine's father, Greg Bradshaw, has not completed a sex offender assessment as recommended and his whereabouts are currently unknown. Sarah's father occasionally visits, but has not engaged in services. The mother surrendered her parental rights to Sarah, Elaine, and her newborn. Ms. Thompson and Mr. Hughes remain incarcerated in Whitefish. Their criminal case is pending.

Victor Jr. remains in the care of his 54-year-old maternal grandfather, who hopes to adopt the boy. Victor Hughes Sr. participated in a paternity test that confirmed him as the baby's father. The courts are proceeding toward termination of his parental rights. Victor Jr. is cared for by his maternal aunt during the day, while the grandfather is at work. SACWIS notes indicate that Victor Jr. is on track developmentally and appears to be thriving. OIG staff spoke with Lisa Jones, placement supervisor for the case manager assigned to the Thompson family case, regarding Mr. Thompson's history with the Department. Mr. Thompson is not currently in a relationship.[20]

**ANALYSIS**

A recent study using national data on hospitalizations of children with serious injuries found a small statistically significant increase in the incidence of serious injuries due to physical abuse in U.S. children from 1997 to 2009 ( Leventhal & Gaither, 2012). Often incidents of physical abuse have their origins in disciplinary encounters that escalate into harsher and harsher physical punishments (Strauss, 2001).

The World Health Organization and the International Society for Prevention of Child Abuse and Neglect (2006) distinguish punishment from discipline noting that:

---

[19] The paternal aunt complained that Sarah was becoming increasingly disrespectful. In late June, Sarah disclosed to her therapist that the aunt's adult daughter slapped her, prompting a hotline call. An investigation into the allegation was pending when the aunt asked that the girls be removed from her home. The report was later unfounded.

[20] OIG staff obtained a check of police contacts to Mr. Thompson's residence, which did not reveal any domestic disputes or other police contacts of concern.

Punishment involving either physical or emotional measures often reflects the caregiver's anger or desperation, rather than a thought-out strategy intended to encourage the child to understand expectations of behaviour. Such punishment uses external controls and involves power and dominance. It is also frequently not tailored to the child's age and developmental level. (p. 12).

According to U.S. and U.K. studies, a young child's act that presents a danger to the child or others, as well as aggressive behavior in a young child, elicits higher levels of the use of physical punishment (Durrant, 1996; Ghate et al, 2003; Holden et al, 1999 as cited in Halpenny, Nixon & Watson, 2010). When a parent's initial response to a misdeed fails, anger may be exacerbated, leading to harsher punishments. Studies have found that younger children tend to experience physical punishment more than older children (Dietz, 2000; Ghate et al, 2003 as cited in Halpenny, Nixon & Watson, 2010). In the Bradshaw investigation, the mother admitted to using both the physical punishments of hitting with an instrument and having her children ages two, four and nine years old stand holding a book with their arms over their heads.

When Whitefish child protection investigator Debra Morgan was assigned to investigate an allegation of physical abuse to 4-year-old Elaine Bradshaw, investigator Morgan had less than a year of investigative experience; had recently returned from maternity leave; was assigned 32 undetermined investigations; and was put on rotation to receive new investigations. The Bradshaw investigation was assigned as part of her rotation.  When she arrived at the child's residence, she observed what appeared to be a tranquil household: dinner cooking on the stove, and three young children happily playing and putting together puzzles with their mother's paramour, who had moved into the home three months before the report. The investigator knew that the mother was in a custody dispute with the children's father and that he was the source of the report to the hotline.

The mother confirmed with the investigator that she had struck the child with a belt, but had accidently hit the child on the shoulder and face and that the child's father had seen the injuries. The mother further explained to investigator Morgan that she only used the belt on her children when they really misbehaved and after she has disciplined them by making them stand with their hands in the air and then standing holding a small phone book. The investigator wrote that she did not observe any injuries on Elaine, but that the child had "a small brown mark just below her left eye" that her mother reported had always been there. The incident leading to the punishment was the children had been standing on a window ledge. The police officer who had been to the mother's home the day before, noted in a police report that the mother had hit the child with a belt and the officer observed a small red mark on the child's left shoulder and a red mark on the left cheek. The mother told the officer that she was disciplining the children because they were disobedient and disrespectful to her and that the four-year-old had attempted to avoid getting hit and the mother had miscalculated her aim with the belt.  Ms. Morgan reported to her supervisor that when the children got time-outs, they had to hold their hands up and hold a phone book.

Within four days of case opening, the supervisor decided that the investigation could be detailed to another office for completion, and the investigation was transferred for detail to Helena. However, like the welt on Elaine's shoulder that had dissipated, the fact that injuries had been observed also dissipated with the transfer. Helena supervisor Dennis Smartt documented, incorrectly, in a supervisory note that neither the investigator nor the police detective observed any injuries to Elaine.

Neither investigator Morgan nor the subsequent investigator in Helena pursued sufficient details on the children's punishments. Neither questioned the weight of the phone book the young children had to hold over their heads, the duration or frequency of the punishments, or the mother's unrealistic perception that her younger children had the developmental ability to bear weight with out- stretched arms. They did not ask the mother how long she had been using these types of punishments or how often the children's failure to comply with one punishment led to additional punishment, such as being hit with a belt.

The use of weights or "burden" (free weights, books, back packs, or other objects), as well as calisthenics in the physical discipline of young children, has been reported in American and international studies.[21] Children under the age of eight do not have the physical ability or maturity to do strength training.[22] They lack the balance and postural control skills that mature to adult levels by approximately seven to eight years of age (Harris, 2010). The American Academy of Pediatrics Committee on Sports Medicine and Fitness (2008) recommends a medical evaluation to identify possible risk factors for injuries before a child embarks on strength training. In the Bradshaw investigation, the mother admitted to making two-, four- and nine-year-old children hold a phone book over their heads as punishment.  The weight of the Whitefish neighborhood phone book is 1 lb and 13 oz.  A larger one-and-a-half-inch phone book weighs over two pounds. The children's failure to comply with the demands of posturing with their arms held up over their heads holding books or extended at 90 degree angles could exasperate the punishing parent, a recipe for escalating harshness.

Research shows that while some abusive parents have incomplete or distorted knowledge and understanding of normal child development, others possess adequate child development knowledge, but may not apply the knowledge to their childrearing practices (Chalk, 2000).  In either situation, calling in the child's primary care physician to discuss the matter with the parent, as well as examining the child/ren, offers third party endorsement that harsh punishments only escalate, posing undue risks to children. It also creates an opportunity for the physician to provide anticipatory guidance to improve parenting practices. Elaine was not taken to her primary care physician, nor was information about the parent's punishments shared with the doctor. The investigator would need to provide the physician with the basic investigative facts of duration, intensity and frequency of the punishment events.

---

[21] The World Health Organization's World report on violence and health (2002) included data on rates of harsh or moderate forms of physical punishment used on children. Included in the study was a WorldSAFE study that defined forms of severe and moderate physical punishment. Hitting a child outside of the buttocks area with an instrument was classified as both moderate and severe physical punishment. Forcing a child to kneel or stand in an uncomfortable position was classified as moderate physical punishment.  A limitation to the study was that the length of time the child was forced to be in the uncomfortable position was not part of the measurement. WorldSAFE included forcing the child to carry a burden while in an uncomfortable position as a form of physical punishment. Similarly, however, measurement such as the weight of the burden (object) or age of the child was not taken into consideration before classifying this type of punishment as moderate or harsh (Runyan et al, 2010). Variables such as the age of the child, the developmental capacity of the child, the length (duration), intensity and frequency of the punishment should be considered when determining if the punishment is overly harsh.

[22] Strength training is defined by the AAP as "the use of resistance methods to increase one's ability to exert or resist force." The training may include use of free weights, the individual's own body weight, machines, and/or other resistance devices to attain this goal.

The Bradshaw case shares similarities to a prior OIG investigation (2009 IG 0231). In both cases, the initial call to the hotline was to report a relatively mild injury: in the Bradshaw case, two small marks on a 4-year-old; in the other, a "scratch" on a developmentally delayed child's face. In the present case, the mother and children admitted that a belt, as well as burdens were used for discipline; in the other, both the caretakers and children admitted use of a paddle and boot camp-type exercise involving weights with a developmentally delayed boy and his siblings. Investigative staff in both cases mistakenly assumed that the adults' discipline arose from benign but misguided intent. After the deaths of both 2-½-year-old Yolonda and a 12-year-old in the other case, it was learned that the caretakers made the older siblings administer punishment to the younger and that the caretakers restricted food as punishment. [23] In both cases, child welfare investigators failed to recognize the risks of harsh punishments and never consulted with the children's primary doctors. In an early OIG investigation (1997 IG 3881), child protection investigators found it unusual that a 14-year-old boy was made to sleep in a cage (with a bucket for elimination) because of alleged sleep-walking behaviors, but did not believe the behavior was abusive.

In January 2010, eight months prior to the report of physical abuse to 4-year-old Elaine, investigator Morgan attended a Cuts, Bruises and Welts Error Reduction Training, which addressed the importance of consultation with the children's primary care physician, not only for an opinion about current injuries, but to share information from the investigation that would enable the physician to provide guidance about presenting problems, such as inappropriate discipline, domestic violence, and substance abuse. Eleven months following the investigation of abuse to Elaine, the Deputy Director of Child Protection, issued a memorandum reminding DCFS management that children reported or suspected to have an injury as a result of abuse or neglect must be seen by their primary care physicians and a Referral Form for Medical Evaluation of a Physical Injury to a Child (CANTS 65-A) be completed. [24] The memo noted that investigators cannot independently determine whether a child needs to be seen by a physician, but that it is a critical decision requiring managerial approval. The memo also noted that discussions with physicians are to be a two-way dialogue with the investigator sharing information with the physician.

The Cuts, Bruises and Welts Error Reduction Training also addressed the importance of talking to child centered collaterals. In August 2008, the procedures for an investigation of cuts, bruises, and welts were amended to include asking children if there is an extended family member or other adult who they feel safe with or important or special to and interviewing those persons. Ten-year-old Sarah was more than capable of telling the investigator who she and her sisters felt safe with, who worried about them, and who she trusted to take care of them. After Yolonda's death, extended family told police that they had been concerned about the mother's new paramour, and that her relationship with her extended family had broken down after the paramour moved into the household.

The investigation of cuts, bruises, welts to 4-year-old Elaine was unfounded with the faulty rationale that whatever marks were seen initially by the police were not seen by the investigator 24 hours later and the report lacked credibility because it was made by the father in the context of a custody dispute. The investigation rose to the level of abuse: the mother used an instrument

---

[23] After the 12-year-old's death, it was revealed that for discipline he was made to hold weights; wear a weighted helmet; stand for long periods on his tiptoes with his arms up against a wall; perform backwards pushups; was tied to his bed; was given a "dungeon diet;" and was repeatedly whipped with a paddle.

[24] The memorandum was issued to Child Protection Regional Administrators, Assistant Regional Administrators and Investigation Managers.

on the child with enough force that she left injuries on multiple planes. The injuries were observed by the father and police and the mother admitted to causing them.

**RECOMMENDATIONS**

1.  Investigator Morgan and Supervisor Fisher should be counseled utilizing this report, regarding their insufficient investigation and failure to ensure that a child reported to have an injury was seen by her physician.

2.  The Department should use this report and the prior OIG report (2009 IG 0231) as training tools for management to address with child protection supervisors the risks associated with harsh punishment and the need for thorough investigation of such punishment.

# REFERENCES

Chalk, R. (2000). Remarks to OIG-DCFS Workshop on Family Violence, Butte, IL, October 10, 2000.

Committee on Sports Medicine and Fitness (2008). "Strength Training by Children and Adolescents." *Pediatrics* DOI: 10.1542/peds.2007-3790. Can be found at: http://pediatrics.aappublications.org/content/121/4/835.full.html.

Halpenny, A.M., Nixon, E. & Watson, D. (2010). "Parents' Perspectives on Parenting Styles and Disciplining Children." Office of the Minister for Children and Youth Affairs. Can be found at: http://www.tcd.ie/childrensresearchcentre/assets/pdf/Publications/Parents'_Perspectives_on_parenting_styles.pdf.

Harris, S.S. (2010). "Readiness to participate in sports." In Harris, S.S., Anderson, J.S., Gregory, A. eds. *Care of the Young Athlete (2d edition).* Elk Grove Village, IL: American Academy of Pediatrics, 2010. p. 37.

Krug, E.G., Dahlberg, L.L., Mercy, J.A., Zwi, A.B., & Lozano, R. eds. (2002). *World report on violence and health.* Geneva, World Health Organization, 2002. Can be found at: http://whqlibdoc.who.int/hq/2002/9241545615.pdf.

Leventhal, J.M. and Gaither, J.R. (2012). "Incidence of Serious Injuries Due to Physical Abuse in the United States: 1997 to 2009." *Pediatrics* DOI 10.1542/peds.2012-0922. Can be found at: http://pediatrics.aappublications.org/content/early/2012/09/26/peds.2012-0922.

Runyan, D.K., Shankar, V., Hassan, F., Hunter, W.M., Jain, D., Paula, C.S., Bangdiwala, S.I., Ramiro, L.S., Munoz, S.R. Vizcarra, B. & Bordin, I.A. (2010). "International Variations in Harsh Child Discipline." *Pediatrics* DOI 10.1542/peds.2008-2374. Can be found at: http://www.pediatricsdigest.mobi/content/126/3/e701.full.pdf+html.

Strauss, M.A. (2001). Beating the devil out of them: corporal punishment in American families and its effects on children. New Brunswick, NJ: Transaction Publishers. p. 92-97.

World Health Organization and International Society for Prevention of Child Abuse and Neglect (2006). "Preventing Child Maltreatment: a guide to taking action and generating evidence." Can be found at: http://whqlibdoc.who.int/publications/2006/9241594365_eng.pdf.

**- END OF REPORT -**