# OFFICE OF THE INSPECTOR GENERAL
## ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES

# REPORT TO THE GOVERNOR AND THE GENERAL ASSEMBLY

## JANUARY 2013

## DENISE KANE, PH.D.
### INSPECTOR GENERAL

# OFFICE OF THE INSPECTOR GENERAL
# ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES

January 1, 2013

To Governor Quinn and Members of the General Assembly:

There are three special investigative reports in this year's annual report. These investigations explore violence in the home, bone fractures in suspected abuse of infants and suicide deaths of youth involved with the Department in the year before their death. The complex nature of these problems required a broader examination of these issues in the context of child welfare practice. The first investigative report examines child protection responses when children are in a home with a violent adult. While parents are asked who should be involved in a safety plan, children are not routinely asked about whom they would like to be involved in their safety plans. When there is violence in the home and the child identifies a protective relative, child welfare should be obligated to involve that concerned adult in the safety plan. The second investigative report examined a sample of child protection investigations of bone fractures in young infants, some of whom were court involved. The Inspector General's investigators who wrote this report also co-authored an article on differentiating abusive from accidental fractures that was recently published in the Journal of Clinical Pediatric Emergency Medicine. The third report is a 10-year review of 35 Illinois children who committed suicide and who had been involved with the Department in the year prior to their suicide. Seventeen of these children were wards including a ward who had recently returned home. Two of these youth accessed guns in their homes to commit suicide. Considering the increased hardships and risks inherent when children enter state care, the number of wards' deaths by suicide may appear almost unavoidable. However, the report suggests some precautions that may help lower these fatal outcomes.

In addition to these special investigations, the Office of the Inspector General and the Illinois Attorney General's Office of Public Integrity presented Fraud Detection and Prevention trainings to DCFS management. Two apparent problems necessitated the trainings: the Department had drifted away from a logical approach to the verification of services, and responsibilities for accountability became muddled between bureaucratic divisions. Citizens would never tolerate an educational institution that failed to have valid attendance records, yet child welfare grants were awarded to some providers who could only produce strongly questionable records. The Department is reorganizing its program and contract monitoring functions across divisions in response to these problems.

Similar to errors found in child protection when a child protection investigator relies solely on self reports rather than interviewing key informants and gathering support documents, some DCFS program monitors and contract monitors were not verifying grant based services. To avoid fraud, monitors should visit the service setting to assure that services are being delivered in accordance with the contract. A series of basic questions that program and contract monitors should be asking of service providers was included in the fraud training.

With the slaughter of the innocent at Newtown, the citizens of Illinois and the rest of the nation meet the New Year with heavy hearts. Our prayers and wishes this year are simple. May you, your families, and all the children of Illinois be kept from harm's way.

Respectfully,

Denise Kane, Ph.D.
Inspector General

# OFFICE OF THE INSPECTOR GENERAL
# REPORT TO THE GOVERNOR AND THE GENERAL ASSEMBLY

## TABLE OF CONTENTS

INTRODUCTION ................................................................. 1
    INVESTIGATION CATEGORIES ............................................ 1
    INVESTIGATIVE PROCESS ................................................. 3
    REPORTS ....................................................................... 4
    ADDITIONAL RESPONSIBILITIES ......................................... 5

INVESTIGATIONS .............................................................. 7
    DEATH AND SERIOUS INJURY INVESTIGATIONS ..................... 7
    CHILD DEATH REPORT .................................................... 52
        SUMMARY ........................................................... 53
        HOMICIDE ........................................................... 60
        SUICIDE .............................................................. 73
        UNDETERMINED ................................................... 74
        ACCIDENT ........................................................... 81
        NATURAL ............................................................ 97
    THIRTEEN-YEAR DEATH RETROSPECTIVE ............................ 108
    SPECIAL REPORTS............................................................ 113
    GENERAL INVESTIGATIONS ............................................. 181

PROJECTS AND INITIATIVES ............................................. 223
    ERROR REDUCTION ....................................................... 223
    ERROR REDUCTION/PROBLEMATIC PRACTICE PLANS (20 ILCS 505/35.7) ...... 224
    OLDER CAREGIVERS ...................................................... 250
    ETHICS ....................................................................... 250

SYSTEMIC RECOMMENDATIONS ........................................ 255

RECOMMENDATIONS FOR DISCIPLINE AND CONTRACT TERMINATION ............ 261

CHILD WELFARE EMPLOYEE LICENSES................................... 263

COORDINATION WITH LAW ENFORCEMENT ........................... 265

LAW ENFORCEMENT REVIEW (FY 2000-2011)........................... 267

CONTRACT FRAUD AND FINANCIAL MISMANAGEMENT................ 281

DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS................ 285

UNRESOLVED RECOMMENDATIONS IMPACTING CHILD SAFETY ......... 343

APPENDIX ................................................................... 355
    A.   PATRICK GEORGE................................................ A-1
    B.   GREGORY DRABIN................................................ B-1

# INTRODUCTION

The Office of the Inspector General of the Department of Children and Family Services was created by unanimous vote of the Illinois General Assembly in June 1993 to reform and strengthen the child welfare system. The mandate of the Office of the Inspector General (OIG) is to investigate misconduct, misfeasance, malfeasance, and violations of rules, procedures, or laws by Department of Children and Family Services (DCFS) employees, foster parents, service providers and contractors with the Department. *See* 20 ILCS 505/35.5 – 35.7. To that end, this Office has undertaken numerous investigations and initiated projects designed to uncover wrongdoing, improve practice, and increase professionalism within the Department.

## INVESTIGATION CATEGORIES

### Death and Serious Injury Investigations

The Office of the Inspector General investigates deaths and serious injuries of Illinois children whose families were involved in the child welfare system within the preceding 12 months. The Inspector General is an *ex officio* member of the Child Death Review Team Executive Council. The OIG receives notification from the Illinois State Central Register (SCR) of all child deaths and serious physical injuries where the child was a ward of DCFS, the family is the subject of an open investigation or service case, or the family was the subject of a previous investigation or closed case within the preceding 12 months. The notification of a child death or serious injury generates a preliminary investigation in which the death report and other reports are reviewed and computer databases are searched. When further investigation is warranted, records are impounded, subpoenaed or requested and a review is completed. When necessary, a full investigation, including interviews, is conducted. The Inspector General's Office created and maintains a database of child death statistics and critical information related to child deaths in Illinois. The following chart summarizes the death cases reviewed in FY 2012:

### FY 12 CHILD DEATH CASES REVIEWED

| | |
|---|---|
| CHILD DEATHS IN FY 12 MEETING THE CRITERIA FOR REVIEW | 106 |
| INVESTIGATORY REVIEWS OF RECORDS | 92 |
| FULL INVESTIGATIONS | 12 |
| CASES INCLUDED IN SUICIDE REVIEW | 2 |

Summaries of death investigations, with a full investigative report submitted to the Director, are included in the Investigations Section of this Report on page 7. Summary of all child deaths reviewed by the Office of the Inspector General in FY 12 can be found on page 52 of this report.

### General Investigations

The Office of the Inspector General responds to and investigates complaints filed by the state and local judiciary, Department employees, foster parents, biological parents and the general public. Investigations yield both case-specific recommendations, including disciplinary recommendations and recommendations for systemic changes within the child welfare system. The Inspector General's Office monitors compliance with all recommendations.

### Child Welfare Employee Licensure Investigations

In 2000, the General Assembly mandated that the Department of Children and Family Services institute a system for licensing direct service child welfare employees. The Child Welfare Employee License (CWEL) permits centralized monitoring of all persons providing direct child welfare services, whether they are employed with the Department or a private agency. The employee licensing system seeks to maintain accountability, integrity and honesty of those

entrusted with the care of vulnerable children and families.

A child welfare employee license is required for both Department and private agency investigative, child welfare and licensing workers and supervisors. The Department, through the Office of Employee Licensure, administers and issues Child Welfare Employee Licenses.

A committee composed of representatives of the Office of the Inspector General, the Child Welfare Employee Licensure Board and the Department's Office of Employee Licensure screens referrals for CWEL Investigations. The committee reviews complaints to determine whether the allegations meet one or more grounds for licensure action as defined in Department Rule 412.50 (89 Ill. Adm. Code 412.50). The OIG investigates and prosecutes CWEL complaints and hearings.

When a CWEL Investigation is completed, the Office of the Inspector General, as the Department's representative, determines whether the findings of the investigation support possible licensure action. Allegations that could support licensure action include conviction for specified criminal acts, indicated findings of child abuse or neglect, egregious acts that demonstrate incompetence or a pattern of deviation from a minimum standard of child welfare practice. Department Rule 412.50 (89 Ill. Adm. Code 412.50) specifies the grounds for licensure action. When licensure action is appropriate, the licensee is provided an opportunity for a hearing. An Administrative Law Judge presides over the hearing and reports findings and recommendations to the Child Welfare Employee Licensure Board. The CWEL Board makes the final decision regarding licensure action.

In FY 2012, 23 cases were referred to the OIG for Child Welfare Employee License investigations. In addition, the Inspector General's Office provided technical assistance to the Office of Employee Licensure in 14 evaluations of CWEL applicants.

**FY 2012 CWEL Investigation Dispositions**

| | |
|---|---|
| CASES OPENED FOR FULL INVESTIGATION | 23 |
| INVESTIGATIONS COMPLETED/NO CHARGES | 6 |
| CHARGES ISSUED | 15 |
| FINAL REVOCATION | 4 |
| LICENSE SUSPENSION | 1 |
| LICENSES VOLUNTARILY RELINQUISHED | 2 |
| INVESTIGATIONS PENDING | 2 |
| PENDING ADMINISTRATIVE HEARING | 6 |
| PENDING DECISION OF CWEL BOARD | 2 |

### Criminal Background Investigations and Law Enforcement Liaison

The Inspector General's Office provides technical assistance to the Department and private agencies in performing and assessing criminal history checks. In FY 12, the Inspector General's Office opened 2,639 cases requesting criminal background information from the Law Enforcement Agencies Data System (LEADS). Each case may involve multiple law enforcement database searches. For the 2,639 cases opened in FY 12, the OIG conducted 8,419 searches for criminal background information.

In addition, in the course of an investigation, if evidence indicates that a criminal act may have been committed, the Inspector General may notify the Illinois State Police, and the OIG may investigate the alleged act for administrative action only.

The Office of the Inspector General assists law enforcement agencies with gathering necessary documents. If law enforcement elects to investigate and requests that the administrative investigation be put on hold, the Office of the Inspector General will retain the case on monitor status. If law enforcement declines to prosecute, the Inspector General will determine whether further investigation or administrative action is appropriate.

# INVESTIGATIVE PROCESS

The Office of the Inspector General's investigative process begins with a Request for Investigation or notification by the State Central Register of a child's death or serious injury or a referral for a Child Welfare Employee License investigation.    Investigations may also be initiated when the OIG learns of a pending criminal or child abuse investigation against a child welfare employee.

In FY 2012, the Office of the Inspector General received 3,107 Requests for Investigation or technical assistance.[1] Requests for Investigation and notices of deaths or serious injury are screened to determine whether the facts suggest possible misconduct by a foster parent, Department employee, or private agency employee, or whether it suggests a need for systemic change.  If an allegation is accepted for investigation, the Inspector General's Office will review records and interview relevant witnesses.  The Inspector General reports to the Director of the Department and to the Governor with recommendations for discipline, systemic change, or sanctions against private agencies.  The Office of the Inspector General monitors the implementation of accepted recommendations.

The Office of the Inspector General may work directly with a private agency and its board of directors to ensure implementation when recommendations pertain to a private agency.  In rare circumstances, when the allegations are serious enough to present a risk to children, the Inspector General may request that an agency's intake for new cases be put on temporary hold, or that an employee be placed on desk duty, pending the outcome of the investigation.

The Office of the Inspector General is mandated by statute to be separate from the Department.  OIG files are not accessible to the Department.  The investigations, investigative reports and recommendations are prepared without editorial input from either the Department or any private agency.   Once a Report is completed, the Inspector General will consider comments received and the Report may be revised accordingly.

If a complaint is not appropriate for full investigation by the Office of the Inspector General, the OIG may refer the complaint to law enforcement (if criminal acts appear to have been committed), to the Department's Advocacy Office for Children and Families, or to other state regulatory agencies, such as the Department of Financial and Professional Regulation.

### Administrative Rules

Rules of the Office of the Inspector General are published in the Illinois Register at 89 Ill. Admin. Code 430.  The Rules govern intake and investigations of complaints from the general public, child deaths or serious injuries and allegations of misconduct. Rules pertaining to employee licensure action are found at 89 Ill. Admin. Code 412.

### Confidentiality

A complainant to the Office of the Inspector General, or anyone providing information, may request that their identity be kept confidential.  To protect the confidentiality of the complainant, the OIG will attempt to procure evidence through other means, whenever possible.    At the same time, an accused employee needs to have sufficient information to enable that employee to present a defense.  The OIG and the Department are mandated to ensure that no one will be retaliated against for making a good faith complaint or providing information in good faith to the OIG.

Reports issued by the Office of the Inspector General contain information that is confidential pursuant to both state and federal law.  As such, Inspector General Reports are not subject to the Freedom of Information Act.   Annually, the Office of the Inspector General prepares several reports deleting confidential information for use

---

[1]This includes requests for investigation, notice of child deaths and serious injuries, notification of arrests or pending abuse investigations, and requests for technical assistance and information.

as teaching tools for private agency and Department employees.

### *Impounding*

The Office of the Inspector General is charged with investigating misconduct "in a manner designed to ensure the preservation of evidence for possible use in a criminal prosecution." 20 ILCS 505/35.5(b). In order to conduct thorough investigations, while at the same time ensuring the integrity of records, investigators may impound files. Impounding involves the immediate securing and retrieval of original records. When files are impounded, a receipt for impounded files is left with the office or agency from which the files are retrieved. Critical information necessary for ongoing service provision may be copied during the impound in the presence of the OIG investigator. Impounded files are returned as soon as practicable. However, in death investigations, the Office of the Inspector General forwards original files to the Department's Division of Legal Services to ensure that the Department maintains a central file.

# REPORTS

Inspector General Reports are submitted to the Director of DCFS. Specific reports are also shared with the Governor. An Inspector General Report contains a summary of the complaint, a historical perspective on the case, including a case history, and detailed information about prior DCFS or private agency contact(s) with the family. Reports also include an analysis of the findings, along with recommendations.

The Office of the Inspector General uses some reports as training tools to provide a venue for ethical discussion on individual and systemic problems in child welfare practice. The reports are redacted to ensure confidentiality and then distributed to the Department or private agencies as a resource for child welfare professionals. Redacted reports are available on the OIG website: http://www.state.il.us/DCFS/library/

com_communications_inspector.shtml or by request from the Office of the Inspector General by calling (312) 433-3000.

### *Recommendations*

In investigative reports, the Inspector General may recommend systemic reform or case specific interventions. Systemic recommendations are designed to strengthen the child welfare system to better serve children and families.

Ideally, discipline should have an accountability component as well as a constructive or didactic one. It should educate an employee on matters related to his/her misconduct while also functioning to hold employees responsible for their conduct. Without the accountability component, there is little to deter misconduct. Without the didactic component, an employee may conclude that s/he has simply violated an arbitrary rule with no rationale behind it.

The Inspector General presents recommendations for discipline to the Director of the Department and, if applicable, to the director and board of the involved private agency. Recommendations for discipline are subject to due process requirements. In addition, the OIG will determine whether the facts suggest a systemic problem or an isolated instance of misconduct or bad practice. If the facts suggest a systemic problem, the Inspector General's Office may investigate further to determine appropriate recommendations for systemic reform.

When recommendations concern a private agency, appropriate sections of the report are submitted to the agency director and the board of directors of that agency. The agency may submit a response. In addition, the board and agency director are given an opportunity to meet with the Inspector General to discuss the report and recommendations.

In this Annual Report, systemic reform recommendations are organized into a format that allows analysis of recommendations according to the function within the child

welfare system that the recommendation is designed to strengthen. The Inspector General's Office is a small office in relation to the child welfare system. Rather than address problems in isolation, the Inspector General's Office views its mandate as strengthening the ability of the Department and private agencies to perform their duties.

The Office of the Inspector General monitors implementation of recommendations made to the Director of DCFS and private agencies. Monitoring may take several forms. The Office of the Inspector General will monitor to ensure that Department or private agency staff implement the recommendations made. The OIG may consult with the Department or private agency to assist in the implementation process. The OIG may also develop accepted reform initiatives for future integration into the Department.

# ADDITIONAL RESPONSIBILITIES

### Office of the Inspector General Hotline

Pursuant to statute, the Office of the Inspector General operates a statewide, toll-free telephone number for public access. Foster parents, guardians *ad litem*, judges and others involved in the child welfare system have called the hotline to request assistance in addressing the following concerns:

- Complaints regarding DCFS caseworkers and/or supervisors ranging from breaches of confidentiality to failure of duty;
- Complaints about private agencies or contractors;
- Child Abuse Hotline information;
- Child support information;
- Foster parent board payments;
- Youth in College Fund payments;
- Problems accessing medical cards;
- Licensing questions;
- Ethics questions; and
- General questions about DCFS and the Office of the Inspector General.

The Office of the Inspector General's Hotline is an effective tool that enables the OIG to communicate with concerned persons, respond to the needs of Illinois children, and address day-to-day problems related to the delivery of child welfare services. The phone number for the Office of the Inspector General Hotline is **(800) 722-9124**.

The following chart summarizes the Office of the Inspector General's response to calls received in FY 12:

#### CALLS TO THE OIG HOTLINE IN FY 12

| | |
|---|---|
| INFORMATION AND REFERRAL | 1182 |
| REFERRED TO SCR HOTLINE | 166 |
| REFERRED FOR OIG INVESTIGATION | 142 |
| TOTAL CALLS | 1490 |

### Ethics Officer

The Inspector General is the Ethics Officer for the Department of Children and Family Services. The Inspector General reviews Statements of Economic Interest for possible conflicts of interest of those employees of the Department of Children and Family Services who are required to file a Statement of Economic Interest.

For FY 12, 746 Statements of Economic Interest were submitted to the Ethics Officer. For the 746 statements submitted, 34 letters were issued to individual employees and supervisors addressing potential conflicts of interest.

#### ACTION ON FY 12 STATEMENTS OF ECONOMIC INTEREST

| | |
|---|---|
| ECONOMIC INTEREST STATEMENTS FILED | 746 |
| STATEMENTS INDICATING POSSIBLE CONFLICTS | 34 |

The Office of the Inspector General Ethics staff also coordinated and monitored DCFS compliance with the statewide ethics training mandated under the Illinois State Officials and

Employees Ethics Act of 2003. In 2012, the Office of the Inspector General ensured that 2,829 DCFS employees completed the training. In addition to DCFS employees, DCFS board and commission members were asked to have their members complete off-line training. In FY 2012, 337 DCFS board and commission members were required to complete the off-line ethics training.

### Consultation

The Office of the Inspector General staff provided consultation to the child welfare system through review and comment on proposed rule changes.

In addition, the Office of the Inspector General provides consultation to Department and private agency employees concerning their ethical duties and responsibilities under both the Child Welfare Employee Ethics Code and the State Officials and Employees Ethics Act of 2003. For a full discussion of ethics consultations, see page 250.

### Projects and Initiatives

Informed by the Office of the Inspector General's investigations and practice research, the Project Initiatives staff assist the Department in the development of practice training models for caseworkers and supervisors. The model initiatives are interdisciplinary and involve field-testing of strategies. The initiatives are evaluated to ensure the use of evidence-based practice and to determine the effectiveness of the model. See page 223 of this Report for a full discussion of the current projects and initiatives.

# INVESTIGATIONS

This annual report covers the time from July 1, 2011 to June 30, 2012. The Investigations section has three parts. Part I includes summaries of child death and serious injury investigations reported to the Department Director and the Governor. Part II contains aggregate data and case summaries of child deaths in families who were involved with the Department in the preceding 12 months. Part III contains general investigation summaries conducted in response to complaints filed by the state and local judiciary, foster parents, biological parents and the general public.

Investigation summaries contain sections detailing the allegation, investigation, OIG recommendations and Department response. For some recommendations, OIG comments on the Department's responses are included in italics in the "OIG Recommendation/Department Response" section of each case.

## DEATH AND SERIOUS INJURY INVESTIGATIONS

### DEATH AND SERIOUS INJURY INVESTIGATION 1

**ALLEGATION**    A two-year-old girl was found dead in the home of her mother from injuries of extreme physical abuse she suffered during a court-sanctioned unsupervised weekend overnight visit. The girl and her older two siblings were wards of the Department at the time of her death. During the visit, the mother had called the placement/intact services agency to report the child had a bruise on her stomach. During the course of the OIG investigation, it was learned that the girl's father, who was not in the home when the girl was killed, had an extensive history as the subject of numerous child abuse and neglect investigations that were not accurately reflected in Department records.

**INVESTIGATION**    The mother's initial involvement with the Department began four years earlier after she brought her then two month-old son to a hospital emergency room. The boy presented with a fractured right femur and the mother was unable to provide any explanation for how his injuries occurred. After the family was transferred to another hospital for treatment, the mother stated the boy had been injured as a result of being dropped by his three year-old sister. Physicians noted that the short fall described by the mother was unlikely to have caused such a severe injury. Further examination found the boy had multiple skeletal injuries of various ages. A report was taken by the State Central Register for Bone Fractures and Substantial Risk of Injury and a child protection investigation was opened.

Throughout the child protection investigation of the two month-old with the broken femur, the mother maintained she lived alone with her two children, that she had ended her relationship with the boy's father prior to the child's birth and that he had never been alone with the infant. However, hospital staff reported the father was frequently present at the hospital and the mother stated he had been present at the boy's birth. A Child Abuse and Neglect Tracking System (CANTS) check found the father had an open case with the Department from six years earlier stemming from his physical abuse of his then three-month-old daughter. A Law Enforcement Agency Database System (LEADS) check found the father also had an extensive criminal history of multiple arrests and convictions under several aliases. After police first came to the hospital to interview the family, the father was not seen at the facility again and did not make himself available for questioning by law enforcement or the Department. The boy's maternal aunt told investigators the father lived with the mother and her children at her home and that the couple was engaged to be married. The

mother was arrested and charged with misdemeanor neglect of a child. Police were unable to locate the father and no charges were pursued against him.

The mother was indicated for Bone Fractures to the boy and substantial risk of harm to his older sister. The father was not included in the report and was not indicated by the Department. The two children were placed in the home of their maternal grandmother and the Department was awarded temporary custody; however, the mother was granted supervised day visits.

Five weeks after the children were placed in the grandmother's home, the father was named as a subject in a child protection investigation involving injuries to the face and head of his eight-month-old son with another woman. Skeletal surveys revealed that in addition to bruising, the boy had suffered two skull fractures that were the result of inflicted blows to the head. The woman told investigators the father had frequently cared for the boy alone in the days prior to his injuries being discovered. The father and the woman were indicated for Head Injuries and local authorities became involved; however, police could not locate the father and the woman would not provide his whereabouts.

One year after the children of the first mother had been taken into protective custody, the mother married the father. As a result of the indicated report regarding the boy's broken leg, the family had an open case for services through the Department. Throughout her involvement with the Department, the mother altered the information she provided to child welfare and mental health professionals in order to suit her needs at a given time. The mother consistently denied being in an ongoing relationship with the father and minimized concerns he might be a negative influence in the lives of her and her children. The mother was persistent in her denials the father had been responsible for her son's broken leg and clung to the assertion her three-year-old daughter had caused the injury. The mother stated she was aware of the previous report indicated against the father for abusing his son, but that she believed him when he blamed the abuse on that child's mother.

After further investigating the father's history with the Department, the OIG learned that over a nine-year period, either the father or one of his children (from three different families) were involved in seven investigations of abuse and neglect although the investigations were located under two separate, unlinked SACWIS IDs. Although a thorough review of the investigations confirmed the single identity of the father, an investigator would not be alerted to his full history with the Department because the investigations were "unlinked." In four of the seven investigations, the father was indicated for serious abuse and neglect to four of his biological children. Two of the indicated findings involved Head Injuries/Skull Fractures; one to his then 29 day-old daughter and the other to his then 9-month old son. The other two indicated reports against father were for Substantial Risk of Physical Injury to his other children. As mentioned above, although another one of his sons sustained a serious bone fracture when the child was two-years old, the father was not named in that investigation because that mother denied being in a relationship with him and persisted in her denials that the father was responsible for their son's broken leg.

The Integrated Assessment completed when the service case was opened questioned the mother's capacity to be truthful and concluded the prognosis for reunification with the children was poor. The Integrated Assessment noted the father's refusal to participate in services and the mother's unwillingness to recognize the threat the father posed to the family. The Assessment cited the mother's willingness to bring a violent man into her family and protect him at the expense of her children as an indicator of her inability to function as a "minimally adequate" parent. Eventually, the father filed for divorce and the Department and private agency, with the involvement of the Juvenile Court, began moving toward returning the children to their mother. The court granted unsupervised overnight visits to the mother.

Just prior to the hearing on the motion to return the children home, it was learned that the mother had a new boyfriend who had been convicted of murder. The private agency caseworker and her supervisor became advocates for the mother and argued that the new relationship should not alter plans to return the children home. The caseworker failed to recognize the mother's history of abuse and the possibility that she had lied to protect her former husband. In therapy, the mother was encouraged to cast herself as a victim of domestic violence, despite the fact that she had never been physically abused by the husband.

The Court requested that the Juvenile Court Clinic (JCC) assess the case. The JCC was determined to present questions to the mother's therapist to assess the potential risk posed by her inclusion of a convicted murderer in her family's lives. The therapist assessed the mother in positive, but vague and unquestioning terms. As the involved child welfare and mental health professionals considered how to address the situation, a determination was made to postpone a final decision and maintain unsupervised visits. The court entered an order that the mother was to ensure that the new boyfriend could not be in the home while the children visited.

In the interim, the mother called the caseworker and reported that she had found unexplained bruises on the two-year-old's abdomen. The caseworker told the mother to monitor the injury and that if the girl continued to exhibit discomfort she should take her to the hospital. The caseworker reported the mother's call to her supervisor, who concurred with her course of action.

Two days after the mother reported the bruising to the girl's stomach, paramedics were called to the family's home after the girl was found unresponsive on the floor. The girl was pronounced dead at the scene and an autopsy found the girl had died as a result of multiple injuries from blunt force trauma to the head. Following a formal investigation, the mother and the boyfriend were each charged with Murder in the First Degree and Endangerment to a Child. The Department indicated reports against the mother and the boyfriend for Death by Abuse to the girl and Substantial Risk of Injury to the other two children.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | |
|---|---|

**1. The Department should integrate into its Safety Assessment Protocol the following question: If the caregiver has ever been indicated for abusing, neglecting or failing to protect a child, or has previously been assessed to lack protective capacity, please state reasons, other than the self-report of the caregiver, which led you to believe the Protective Caregiver's capacity has changed.**

Implementation of The Enhanced Safety Model is on hold. Compositions of teams will change due to staff realignment and layoffs. The recommended language will be included in policy.

**2. The private agency that provided services should discipline the caseworker for failing to ensure the girl's abdominal bruise was examined by a doctor and for failing to ensure that unannounced visits were conducted in a manner to determine the extent of the boyfriend's involvement with the family, such as conducting visits on late nights and weekends.**

The Office of the Inspector General shared a redacted copy of the report with the private agency and the agency's board of directors. The Inspector General met with agency administrators and a representative of the board of directors to discuss the findings and recommendations made in the report. The employee was suspended. Following her suspension, the employee will be required to consult with the agency's clinical director on her cases.

**3. The private agency should discipline the caseworker's supervisor for failing to provide adequate supervision to ensure the caseworker adequately assessed risk to the mother's children, ensure that the girl's abdominal bruise was examined by a doctor, and resolve factual issues regarding the extent of the mother's relationship with the boyfriend.**

The supervisor was suspended.  Following his suspension, the supervisor is required to have twice weekly supervision.

**4.  The private agency should conduct training to ensure appropriate response to bruises in young children and to address the need to integrate information available from all sources and not to over-rely on self-reports.**

The private agency has developed the training for inclusion in their annual professional development training. The agency has also developed protocols addressing: critical decision making, return home cases, notification of the clinical director when a case is contested by the GAL, supervisory staffings, and clinical review of referrals.

**5.  This report should be shared with the Department Attorney and Guardian *ad Litem* involved in this case.**

The report was shared with the involved Department attorney. The Office of Legal Services determined that a redacted report should not be shared with the Guardian *ad Litem* in this case.  The report should be reviewed only on a "need to know" basis and when doing so is necessary for child protection.  Neither is applicable in this case.

**6.  This report should be shared with the agency providing mental health services for consideration of their existing intake and psychiatric assessment policies pertaining to clients who are involved or have a history of being involved with the Department.**

The report has been shared.

**7.  This report should be shared with the Juvenile Court Clinic for review of the decision to not accept the family for a parenting assessment and for review of the sufficiency of the questions drafted to assist the court.**

The report was provided to the Cook County Juvenile Court Clinic.

**8.  The Department should enter the correct date of birth for the father in SACWIS.**

The Department agrees and SACWIS has been updated.

**9.  All abuse/neglect investigations involving the father should be merged into one SACWIS Identification Number so that all investigations are linked to one another.**

The Department agrees.  There are three different identification numbers for investigations involving this perpetrator and three of the four should retain those numbers.  The two reports concerning the same family have been merged and as a result any soundexing will display all sequences involving this perpetrator.

DEATH AND SERIOUS INJURY INVESTIGATIONS

## DEATH AND SERIOUS INJURY INVESTIGATION 2

**ALLEGATION**     A four year-old boy died of blunt force trauma to the head as a result of physical abuse inflicted by his mother and her boyfriend. Three months prior to his death, the Department opened a child protection investigation after the mother took the then three year-old boy to the hospital reporting he fell. Doctors stated that the numerous injuries were not consistent with the explanation and believed he was abused. The mother was charged with domestic battery and later convicted. However, the child protection investigation was unfounded for abuse and indicated for the neglect allegation of inadequate supervision.

**INVESTIGATION**     The family's involvement with the Department began when the mother brought the boy to a hospital emergency room stating his left eye had been injured in a fall the previous day. In addition to observing swelling and bruises to his face, doctors identified a laceration to his chin as well as bruising to his shoulders, back, buttocks and thighs at various stages of healing. It was noted that many of the bruises present on his upper body appeared to have been caused by pressure applied by fingers. The mother offered a variety of explanations for the marks on her son's body, stating that some were actually birthmarks while attributing others to negative reactions to bug bites and his generally active behavior. Medical personnel found the mother's explanations to be inconsistent with the presentation of his bruises and deemed his injuries to be suspicious in nature. Additional testing found the boy also had a blood-filled bruise beneath the surface of his scalp. The boy was admitted to the hospital and both local law enforcement and the Department were notified of possible physical abuse of the child. The mother was taken into police custody and a Department mandate investigator devised a safety plan after determining the boy to be unsafe. In conjunction with hospital staff, the mandate investigator secured an agreement the boy would remain in the hospital for 72 hours.

In an Inspector General interview, the primary investigator stated she developed a safety plan permitting the boy to be released from the hospital into the care of his maternal grandmother and prohibiting the mother from having any contact with the boy for 72 hours. The investigator stated that the prohibition had been implemented by police against the mother, who had just been released from jail. The safety plan was not present in the case file and did not appear in any records until the investigator gave it to OIG staff during the interview. The case record was woefully incomplete and contained a dearth of information related to the complex case. The investigator stated she had found the plan while preparing for the interview but had not been able to locate any other documents related to the case. An OIG review of the child protection investigator's work on the case found gross negligence in her efforts to service the family, a failure to perform her duties and a willful attempt to deceive her superiors as well as the court.

Throughout her work on the case, the investigator failed to document her activities, relied upon self-reports from the family, failed to contact police as required by the Department, and neglected to engage in meaningful communication with the boy's medical providers or obtain his hospital records. In addition, the investigator did not complete a scene investigation in the family's home to determine the credibility of the mother's account of events or critically assess the mother's reports about the boy's behavior, which she blamed in part for his injuries, or her family's history. The investigator documented contacts with the family that directly contradicted her timesheets, which showed her to be in her field office at times she purported to have been visiting the family in their home. The investigator also documented contacts with involved parties that were not supported either by case records or the individuals themselves.

Although the hospital where the boy was treated was unequivocal in its diagnosis the boy had suffered physical abuse and had extensively documented his severe injuries, the investigator never availed her self of the resources and expertise of involved medical professionals. Furthermore, after the mother was charged with criminal battery, the investigator was required to consult with the State's Attorney prior to closing the

case.  Not only did the investigator fail to contact the State's Attorney, she testified in juvenile court she had consulted with the State's Attorney.  The investigator incorrectly recorded in the case file that no charges would be pursued against the mother, purportedly based on a conversation she had had with a probation officer.  The OIG has referred its findings to the State's Attorney for possible criminal prosecution for perjury.

In overseeing the investigator's work on this case, the investigator's supervisor failed to verify her accounts of her work performed on the case and relied almost entirely upon her reports she had completed required duties.  The supervisor neglected to recognize the absence of critical materials such as hospital records and documentation of contacts with law enforcement from the case file.  By not requiring the investigator to produce required documentation of her work on the case, he allowed the investigator's fictional account of events to become the narrative of what had occurred.  While the supervisor could have easily undertaken independent steps to verify the investigator's work and ensure minimum Department standards of investigative procedure were met, he failed to do so.  Furthermore, the child protection manager responsible for reviewing the supervisor's work also neglected to ensure he complied with directives to complete tasks that could have uncovered the investigator's deceptive behavior earlier.

In an interview with the OIG, the investigator's supervisor acknowledged numerous shortcomings in his oversight of the case.  Ultimately the investigator reached a decision to unfound the report of abuse against the mother and the supervisor approved her conclusion.

An OIG review of the investigator's caseload found she had been assigned an extraordinarily high volume of cases and was responsible for servicing an unreasonable amount of clients.  The number of investigations assigned to the investigator exceeded the maximum allowed annually during just the third month of the year.  While there is a desire within the Department to close pending investigations swiftly, overloading investigators and their teams with an amount of cases they could not reasonably be expected to address greatly compromises their ability to provide meaningful services to clients.

Three months after the report was unfounded, the State Central Register (SCR) received a report the mother had admitted striking her son in the face causing a black eye.  The mother had stated she hit her son because he was restless and would not settle down.  The investigator assigned to the report arrived at the family's home later the same day to find police cordoning off the location with crime scene tape.  The worker learned the boy had been transported to the hospital where he was pronounced dead.  An autopsy determined the boy's cause of death to be blunt force trauma to the head and identified multiple injuries in various stages of healing.  Both the mother and her boyfriend were arrested and charged with murder.  They are currently awaiting trial.  (*See full investigative report in Appendix A of this Report*.)

---

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. The child protection investigator should be disciplined up to and including discharge for providing false testimony at a court hearing, falsifying obtaining supervisory approval for the** |

**written safety plan, failing to share critical information with her supervisor, failing to retrieve critical documents, failing to adequately assess safety in the this investigation, and for falsifying a casenote in another investigation.**

The child protection specialist was discharged.

**2. The child protection supervisor should be disciplined for failing to critically review an investigation involving a head injury and cuts, bruises, welts to a three-year-old; approving the unfounding of the physical abuse allegations to a child under the age of seven without obtaining managerial approval; failing to follow administrative and managerial instructions to review error reduction findings on cuts, bruises, welts investigations with his team.**

The employee was discharged.  The employee grieved the discharge and the discharge was reduced to a 30 day actual suspension.

**3. The child protection manager should be disciplined for failing to put in place a proactive managerial system to ensure review of high–risk investigations.**

The employee received a 5 day suspension.

**4. The Department must address and remedy its continuing violation of a consent decree which dictates appropriate caseload standards for the number of investigations assigned to child protection investigators.**

The Office of Employee Services is working with Operations to fill vacancies.

**5. Child protection must hold a case conference with the criminal state's attorney when a child who is the subject of a child protection investigation is also the victim in a criminal proceeding involving the same incident.**

A memorandum with this directive was issued to child protection staff.

**6. DCFS Cook Regional Managers need to develop a system of quarterly meetings with each of their corresponding police department's Child Abuse Coordinators to facilitate communication, coordination and timely retrieval of relevant information, including arrest reports.**

A meeting did occur and although invited, none of the police coordinators identified attended.  However, higher ranking personnel did participate and stated there has been a geographical reorganization.  It was stated that approval to release police reports must come from a higher administrative level.  All agreed a working relationship (MOU) needs to be developed but no one participating in the meeting had authority to enter into an agreement.  Child Protection will continue to use subpoenas to access information.  Information about barriers to proceeding will be forwarded to the Deputy and Chief.

**7. The Department database currently only automatically prompts management approval for death and facility reports. The automatic prompt for management approval should include allegations of burns, head injuries, internal injuries and children under six with allegations of cuts, bruises, welts, abrasions and oral injuries.**

The Department is currently considering significant changes in its supervisory structure and will look further into how best to integrate this recommendation as a result of those modifications.  Additional considerations include discussions regarding feasibility and timeframe for coding into the database.

**8. Given the violation of the consent decree concerning caseloads, the Department should evaluate whether there can be valid research comparisons between the investigative control group and the differential response experimental group.**

*OIG Update: Given the Department's reorganization and realignment and the Department's efforts to address excessive caseload of child protection staff, the Inspector General recognizes that this recommendation is now moot.*

**9. After discipline is imposed this investigation should be redacted and distributed among child protection staff. Managers should review this investigation with supervisors and investigators similar to a Grand Rounds case study.**

The report has been shared with Child Protection staff.

The report was shared with the Department's Courtroom Attorney. A redacted copy of the report was shared with Juvenile Court staff, the courtroom lawyer and courtroom supervisor, and the additional unfounded Cuts, Welts, Bruises and Oral Injuries Allegation investigations were reviewed as educational tools for Cook County.

## DEATH AND SERIOUS INJURY INVESTIGATION 3

| | |
|---|---|
| **ALLEGATION** | A one-year-old boy died as a result of severe physical abuse inflicted by his mother's boyfriend. A child protection investigation of the family was closed two days before the boy's death and a case was open for intact family services. |

**INVESTIGATION**   The family had been the subject of two child protection investigations involving serious health issues with the boy. The first investigation was initiated after the boy, who was seven months old at the time, was brought to a hospital emergency room with a fractured femur. Treating physicians identified the injury as being highly uncommon in a patient the boy's age. During the subsequent investigation, the mother's boyfriend stated he had accidentally tripped and fallen onto the boy, causing the injury. The Department, the Department's contracted medical specialists and local police concluded the boyfriend's story was plausible and that the injury had not been intentionally inflicted. No charges were filed against the mother or her boyfriend and the child protection investigation was unfounded.

Eight months later, a second child protection investigation was opened after the boy was brought to a second hospital emergency room with a fever and a distended stomach. The mother told doctors the boy had been displaying the symptoms intermittently for several weeks and that she had originally sought care for him at the hospital where his broken leg had been treated. After his condition did not improve, she brought him to the second hospital for further evaluation. In addition to his presenting issues, treating physicians at the second hospital identified bruises to both of the boy's cheeks and abrasions on his mouth. The second hospital's child protection team was notified and an on-call pediatrician was dispatched for a consultation. The mother informed the pediatrician of the boy's fractured femur and the family's ongoing involvement with the Department through intact services. The mother told the pediatrician the boy was unsteady on his feet and attributed the marks on his face to his frequent falls in their home.

In a joint interview with the Inspector General staff, a senior member and a child abuse fellow of the second hospital's child protection team stated that the injuries to the boy's face, combined with the mysterious nature of his stomach inflammation and his past broken leg, raised significant concerns of ongoing child abuse. As a result, the second hospital performed extensive testing in an attempt to determine the nature of the boy's condition. A wide array of tests and evaluations were performed and the hospital determined the boy had suffered a ruptured appendix. The senior team member, who was the on-call pediatrician when the boy was admitted, told the Inspector General investigators that ruptured appendixes are difficult to diagnose in patients so young, especially if the rupture seals itself, which doctors believed had occurred in the boy's case.

An Inspector General review of the State Automated Child Welfare Information System (SACWIS) found the child protection investigator assigned to the case had noted a conversation with the child abuse fellow who had examined the boy and interviewed the family upon admittance to the second hospital. The investigator recorded the child abuse fellow informed her that the boy had suffered from an infection and tests had been unable to conclude that the facial bruises were the result of abuse. The child protection investigator ultimately based her decision to unfound the report against the family on her understanding of the hospital's child protection team's conclusion regarding the boy's condition. Although the State Central Register (SCR) recorded the bruises on the boy's face as being in the shape of a fingerprint, both child protection team members denied the injuries were so well defined. The child abuse fellow stated that while he took photos of the boy's injuries with his cell phone, he did not preserve the photos and had since lost the phone. The senior team member informed the Inspector General investigators that it is not the practice of the second hospital to complete body charts to document injuries to children.

The OIG reviewed the boy's medical records and found no documentation that the concerns of possible child abuse were resolved prior to the boy's discharge from the second hospital.  In the joint interview, the senior team member stated that since child abuse could never fully be ruled out, members of the child protection team would not enter such a statement into a medical record.  Although it was thoroughly documented in the boy's medical record he was not to be discharged without approval from the Department, the second hospital's social worker and the hospital's child protection team, there was no evidence of any consultation having taken place prior to his release.  The hospital's child protection team confirmed, however, that the boy was released only after abuse issues had been fully resolved.

Seven weeks after the boy was discharged from the second hospital and two days after the child protection investigation was unfounded the mother returned home to find her boyfriend locked in the bathroom with the boy.  When he emerged, the boyfriend was holding the boy's unresponsive body.  The boy was transported by ambulance to the first hospital's emergency room with severe physical injuries.  He was pronounced brain dead and removed from life support the following day.  During the subsequent criminal investigation, the boyfriend confessed to beating the boy, causing his death.  The boyfriend was sentenced to twenty-five years in prison, and after his release he will be required to spend three years under supervised parole.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  This report should be shared with the second hospital to illustrate the need for better documentation, including use of body charts, and resolution of abuse concerns.** |

The Inspector General has shared the report.

**2.  The Office of the Inspector General reiterates the recommendation made in a prior OIG Report that any time a child who is the subject of a child protection investigation is hospitalized during the course of a child protection investigation, the Division of Child Protection should convene a case conference with the treating medical and social work team to address child safety and discharge planning.**

This recommendation will be included in revisions being made by the Procedures 300, *Reports of Child Abuse and Neglect*, workgroup.

## DEATH AND SERIOUS INJURY INVESTIGATION 4

| ALLEGATION | A two year-old child died as a result of severe head trauma inflicted by his mother. The family had been the subject of an indicated report one month prior to the child's death. |
| --- | --- |

| INVESTIGATION | The boy had been born prematurely at 27 weeks gestation and presented multiple complex health issues at birth. The boy suffered from an intestinal perforation |
| --- | --- |

which required surgical intervention and received intubation in a neonatal intensive care unit. Throughout his early development he demonstrated low body weight and at eight months he was admitted to a hospital for chronic projectile vomiting and poor weight gain. The boy was diagnosed with gastric esophageal reflux disorder (GERD), a condition which affects the ability to retain and digest food. Doctors also documented the boy had significant developmental delays which prevented him from being able to sit upright on his own or fix upon or follow moving objects.

The family's involvement with the Department was initiated just prior to the boy's second birthday after the State Central Register (SCR) received a report he was dangerously underweight. The report further alleged the boy's mother resisted seeking medical attention for his condition and that his father obstructed attempts by others to intervene in the situation. The report further alleged domestic violence in the home perpetrated by the father. In addition to the boy, the couple had two other children, girls aged four years and seven months.

The child protection investigator assigned to the case interviewed the mother, who attributed the boy's low weight to his persistent medical conditions. The mother detailed the boy's medical history and provided contact information for his nutritionist. The mother also denied any domestic violence in the home but acknowledged the father had received counseling one year earlier for a previous domestic violence incident that occurred when the family lived in another state. The father admitted a history of alcohol-related issues and stated he had participated in substance abuse treatment and anger management training. The investigator referred the family for an assessment by a Department nurse who diagnosed the boy as having Failure To Thrive (FTT) and scheduled him for a follow-up visit at a hospital for further evaluation.

While the investigation was pending, the boy was admitted to a second hospital after his maternal grandmother brought him to an emergency room citing concern over his decreasing weight. An OIG review of medical records from his admission found hospital staff was aware of the family's involvement with the Department and sought consultation with hospital social workers after learning the boy had not been taken to the first hospital for his FTT evaluation. Treating physicians at the second hospital believed the boy's failure to gain weight was likely a combination of organic factors (his pre-existing health complications) and non-organic factors (inadequate feeding practices by his caretakers). Hospital staff documented accounts from the maternal grandmother and maternal uncle that the mother did not fully comprehend the boy's feeding requirements and was unable to properly manage his care. The boy remained in the hospital for two weeks, during which time he demonstrated moderate weight gain, offset by his recurrent GERD. The boy's medical record showed no contact between the Department and hospital staff during his admission, despite the ongoing child protection investigation. No consultation was conducted prior to the boy's discharge into his parent's care. Child protection staff was unaware the boy had not attended his follow-up FTT appointment and had been admitted to the hospital until four days after he was released.

The child protection investigator ultimately unfounded the report against the parents for Failure To Thrive. The investigator's rationale was based on the conclusion of medical professionals that there were organic reasons for the boy's inability to gain weight, despite the presence of non-organic factors identified as a significant contributing factor to the boy's condition. Under the Department's existing allegation system, a

finding of Failure to Thrive can only be indicated if an expert determines the causes are *solely* non-organic. Current medical literature recognizes that in the majority of cases, both organic and non-organic causes of FTT are likely to be present and that chronic health problems are often exacerbated by insufficient treatment and care. In an effort to acknowledge the family's deficiencies, the investigator indicated both parents for Substantial Risk of Injury/Environment Injurious to health and welfare for the conditions in the home that contributed to the boy's inability to gain weight.

Five days after the child protection investigation was closed, the boy was brought to a hospital emergency room by his mother unresponsive with massive head trauma. The mother gave multiple conflicting accounts of how the boy had sustained his injuries, stating he had been dropped and kicked by his older sister and that the mother had fallen on him while running with him to get help. Doctors found the mother's descriptions to be inconsistent with the extent of his injuries. During the subsequent investigation, the mother admitted drinking alcohol and playing with her children by swinging them around inside the family's home. The mother stated that as she was swinging the boy she accidentally hit his head against a radiator and that when he would not stop crying, she slapped him multiple times. As the boy continued to cry, she shook him vigorously until he stopped. The mother was arrested and charged with first-degree murder. The couple's two other children were taken into protective custody by the Department. The mother was convicted of involuntary manslaughter, and was sentenced to serve 79 months.

---

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. Any time a child who is the subject of a child protection investigation is hospitalized during the course of a child protection investigation, the Division of Child Protection should convene a case conference with the treating medical and social work team to address child safety and discharge planning.**

This recommendation will be included in revisions being made by the Procedure 300, *Reports of Child Abuse and Neglect*, workgroup.

**2. The Department should develop an effective consultation process and procedures specific to failure to thrive investigations and the provision of intact family services in cases with a failure to thrive child.**

This recommendation will be included in revisions being made by the Procedure 300, *Reports of Child Abuse and Neglect*, workgroup.

**3. The Department should revise the procedures for investigating an allegation of failure to thrive (FTT, Allegation 81) so that they are consistent with current medical literature that FTT is at times a multifactorial condition and the existence of an organic component of the FTT does not rule out a non-organic component as well.**

This recommendation will be included in revisions being made by the Procedure 300, *Reports of Child Abuse and Neglect*, workgroup. Information on failure to thrive and use of growth charts was also included as a part of the nurses training.

## DEATH AND SERIOUS INJURY INVESTIGATION 5

| ALLEGATION | An eight month-old girl died of drowning after being left with her 18-month-old sister unattended in a plastic tub filled with water. The girl's mother had been the subject of two prior indicated reports and the family had an open case for intact services at the time of the girl's death. |

| INVESTIGATION | The mother had been involved with the Department since she was 14 years-old after she disclosed she had been sexually abused by a family acquaintance. It was learned during the course of the investigation the mother had been diagnosed with mild mental retardation and was cognitively low-functioning. An OIG review of Social Security records found the mother had been receiving SSI benefits since she was five years-old. The mother attended special education classes and school records showed her full scale IQ of 64 ranked in the lower one percentile. |

The mother gave birth to her first child, a girl, seven months after graduating from high school. Three months later, while residing in a shelter for teen mothers, she was observed yelling at her baby and giving the infant a five-day course of antibiotics in a single day. A child protection investigation was opened to address the allegation of overmedication and inappropriate behavior. During the investigation, the mother stated she read the instructions provided with the medication but did not understand them. Unable to determine the proper dosage, the mother gave the baby all the medicine at once. The baby was later treated and released from the hospital. The mother identified the baby's maternal grandmother as a source of support and stated she only moved into the shelter because she had was told she could receive additional federal funds and housing location assistance by doing so. Although the mother provided the maternal grandmother's address, there was nothing in the case record to suggest any attempt was made to contact her. The report was indicated for risk of harm and a case was opened to provide intact family services. The intact worker made two initial visits with the mother then, after agreeing to accept a placement in another shelter, the mother was not seen again prior to the case closing five months later. While workers made attempts to locate the family there was no indication any effort was made to contact the maternal grandmother.

One month after the intact case was closed the mother gave birth to a baby girl, her second child. Two months after the baby was born, the State Central Register (SCR) received a report the mother had left her two children unattended while she bought beer at a store. During the subsequent child protection investigation the mother contended she had not left the children unsupervised as their father, who had recently been released from prison, was home at the time. The father had been the reporter. The report was unfounded and the family was again referred to receive intact services through a private agency. Although the case was referred for services, the Division of Child Protection provided the private agency only with the narrative of the previous indicated report against the mother for overmedicating her older daughter, rather than the entire case record. While the narrative did contain information regarding the concerns of physicians who treated the older sibling that the mother had cognitive delays, private agency staff were unaware of the circumstances of the mother's initial involvement with the Department or the extent of her mental impairment. Private agency staff were also denied the information pertaining to the maternal grandmother who had been identified as a potential resource and whose address was contained in the original report. In an interview with the OIG, a Department administrator confirmed that private agencies do not have access to child protection investigations through the State Automated Child Welfare Information System (SACWIS) and are only provided with superficial information contained in the reports completed by investigators.

Upon opening the case for intact services, the private agency obtained consents from the mother to access her medical history and other pertinent records. Despite gaining her approval, the agency never sought information related to the mother's federal disability benefits or determined the basis for her receiving disability payments. In the absence of this information, private agency staff were unable to develop a comprehensive understanding of the mother's ability to serve as a caretaker or the limitations of her cognitive functioning. In addition, during the eight months the second intact case was open, the caseworker assigned to

the family's case never documented any contact with the children's primary physician even though there were two child protection investigations called in by medical staff for malnutrition and failure to thrive.  In an interview with the OIG, the caseworker confirmed she had not spoken with the physician despite having been instructed by her supervisor to do so and receiving the necessary consents from the mother.

Due to concerns for the youngest child's lack of growth, the child's case was referred to a family support worker who was tasked with helping mom keep up with medical appointments and relay the doctor's instructions and concerns. During the case the family support worker relied heavily upon the mother's self-reports and failed to critically evaluate her accounts of the reasons for the youngest girl's failure to gain weight.  The worker did not accept the doctor's diagnosis and failed to confirm doctor instructions relayed to the worker by the mother. The worker ultimately served as an advocate for the mother rather than an objective resource.

A month and a half after the last child protection investigation for failure to thrive was closed, paramedics were called to the home and found the girl unresponsive.  She was transported to a hospital where she was pronounced dead.  The mother told investigators she had placed her two children in a plastic tub filled with water in order to give them a bath.  The mother stated she had left the children unattended for a maximum of five minutes.  However, the family friend contended the elapsed time was more likely twenty minutes, and the mother was smoking marijuana at the time.  Both the mother and the family friend were arrested and charged with endangering the life and health of a child, however neither was ever prosecuted.  A child protection investigation resulted in an indicated finding against the mother for Death by Neglect and Inadequate Supervision.  The older child was taken into protective custody by the Department and placed in the home of her paternal great aunt.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  When the Division of Child Protection refers a family for intact family services, Child Protection should include a hard copy file of all indicated investigations that were closed within 12 months of the date of the referral.** |

Cases are now linked together by family and individual, so Intact Family Services workers have read-only capability for all investigations attached to the child/family.  The Office of Information Technology Service (OITS) plans to re-train hotline staff on this function.

**2.  The private agency should obtain Social Security disability benefit information when there is knowledge that a client is a recipient.  The private agency's intact family supervisors should review procedures to obtain Social Security disability benefit information.  The consent for release of information forms should check boxes for "medical records" as well as specify that they are seeking "mental health records" on the "other records" options line.**

The Office of the Inspector General shared a redacted copy of the report with the private agency and the agency's board of directors.

**3.  The Department should request that a Department physician train Department nurses and intact managers on the use and benefits of an individualized growth chart in interventions with Failure to Thrive and Malnutrition families.  This case should be used as a case study as part of the training.**

The Department held a video in-service conference training which included information on failure to thrive and the use of growth charts. The training was held simultaneously in Chicago, Rockford, and Springfield. The training was mandatory for all of the DCFS nursing staff and all did attend. The training was also open to all of the private agency nurses.

## DEATH AND SERIOUS INJURY INVESTIGATION 6

| | |
|---|---|
| **ALLEGATION** | A one-year-old boy suffered serious injuries as a result of physical abuse and neglect. The boy's family had been the subject of an unfounded child protection investigation six weeks earlier as a result of other injuries he had suffered. |

| | |
|---|---|
| **INVESTIGATION** | The first child protection investigation was initiated after the boy was brought to a hospital emergency room with a broken clavicle. The boy's mother stated he had |

fallen to the floor after crawling out of his crib. Attending physicians and hospital staff found the mother and her boyfriend, who lived in the family's home, to be appropriately concerned with the boy's welfare and accepted their account of events as plausible. Medical personnel did not identify any concerns of abuse or neglect.

The child protection investigator assigned to the case went to the family's home and interviewed the mother and her boyfriend. The couple described the incident and demonstrated how they had lowered the base of the boy's crib to place it closer to the floor as a preventative measure. The mother told the investigator that while the boy resided in her home, he was allowed periodic visits with his father, who lived nearby. The mother asked the investigator to temporarily halt the boy's visits with his father in light of his injuries; however, the investigator refused her request. The investigator was informed by one of the boy's treating physicians the mother had similarly requested his assistance in preventing the boy from going to his father's home, and described her as being emphatic in her opposition to the visits. Although the mother provided the investigator with the father's name and address, the investigator never made any attempt to contact him. The investigator and her supervisor ultimately determined there was insufficient evidence to support the allegation of abuse and the report was unfounded.

An OIG review of statewide data of child protection investigations found that oftentimes non-custodial fathers were not interviewed during abuse and neglect investigations involving their children. The OIG determined that fathers were interviewed by investigators only 63% of the time in cases where the fathers either did not live in the family home or were not identified as the alleged perpetrator. While parents who live outside the family home are routinely involved in their children's lives, Department Procedures do not currently require child protection investigators to conduct interviews with non-custodial parents. Furthermore, Department Procedures are unclear regarding interviews with non-custodial parents during formal investigations and do not reflect the importance of utilizing them as additional sources of vital information.

Three weeks after the first child protection investigation was closed, the mother brought the boy back to the same hospital emergency room. Physicians noted the boy's head was visibly swollen and a CT scan found he had a skull fracture and bleeding on his brain, as well as bruises to his head. Hospital staff noted the mother had brought the boy into the emergency room the previous day stating the boy was vomiting and had been lethargic and eating infrequently. The boy had been examined and discharged in his mother's custody. The severity of the boy's injuries upon his return to the hospital required him to be airlifted to another facility for treatment and a second child protection investigation was initiated.

During the course of the investigation, both the mother and her boyfriend denied any abuse of the boy. The mother was unable to provide an explanation for the boy's injuries, but reported he had visited with his father just over one week earlier. The mother made numerous conflicting statements to hospital staff, law enforcement and the assigned child protection investigator regarding the time and place she became aware of the boy's serious injuries. In an interview with police, the boy's father stated he had found the mother's previous explanation of his broken clavicle, "kind of suspicious," at the time it occurred. The mother and boyfriend acknowledged to police the boyfriend abused and sold prescription medication and, while the case

was pending, he was arrested for Driving Under the Influence and Possession of a Controlled Substance.  One month later, the boy's paternal grandfather told police the boyfriend had called the father while intoxicated and admitted putting his foot against the boy's torso and pulling his arm at the time his clavicle was broken.

The Department requested a medical consultation of the boy's case, which concluded he had suffered his injuries within three to four days of his admission to the hospital, a period of time he was in the care of his mother and her boyfriend.  The consultant found the nature of the injuries, in combination with the inconsistencies of the mother's account of events, to be highly predictive of potential future physical abuse.  The second investigation was subsequently indicated against the mother and her boyfriend for physical injuries by neglect, while the allegations of physical injuries by abuse were indicated against an unknown perpetrator.

One month after the second investigation was closed, the mother filed for an order of protection against her boyfriend.  Following the boy's release from the hospital, he was placed in the care of his father.  Since being placed in his father's home, the severity of his pre-existing medical conditions has diminished and he has presented as being healthy and well-adjusted.

| OIG RECOMMENDATION/ DEPARTMENT RESPONSE | **The Department should amend procedures to reflect the importance of contact with the involved non-custodial parent, to include, but not be limited to, the following:** |
|---|---|

**A)  Section 300.60(c) Required Investigative Contacts should be revised to state:**

> **If all of the subjects and other adults and children who are regular members of the alleged child victim's household *as well as the involved, non-custodial parent*, are not listed on the SACWIS intake summary at the time the report is taken, the Investigation Specialist shall add them to the SACWIS investigation.**

> **During the formal investigation, investigative staff shall have direct, in-person contact with all children in the child victim's household, alleged perpetrators and other adults in the household, if these contacts have not already occurred. *During the formal investigation, Investigative staff shall also interview the non-custodial parent, if involved in the child's life, if this interview did not already occur, as there is a presumption that involved non-custodial parents have relevant information.* Since contact with the alleged child victim(s) is required during the initial investigation, it need not be repeated during the formal investigation, unless the Investigation Specialist determines further contact is necessary or additional contacts are necessary due to the existence of a safety plan/unsafe safety assessment.**

**B)  Section 300.60(c) subsection (4) should be added to state:**

> **_4) The Non-Custodial Parent Who Is Involved in their Child's Life_**

> **_The Investigation Specialist is required to interview the involved non-custodial parent. There is a presumption that involved non-custodial parents have relevant information and therefore should be interviewed during the child protection investigation._**

**C)  Section 300.60(g) Other Required Investigative Contacts should be revised to state:**

**In addition to the required contacts with the subjects of the report, other persons in the household, *the involved non-custodial parent,* law enforcement agencies, and the State's Attorney's Office, the Department has established other minimum investigative contacts for each allegation that are required before the investigation can be considered completed. See Appendix B, The Allegations System, for specific investigative standards for each allegation.**

**D)  Section 300.100(d) Notify Subjects of the Report should be revised to state:**

**The Investigation Specialist shall make reasonable efforts to verbally notify the parent/guardian of the alleged child victim, and/or the alleged perpetrator if different from the child's parent/guardian, of the Investigation Specialist's recommended determination (indicated or unfounded). *Additionally, the Investigation Specialist shall make reasonable efforts to verbally notify the involved, non-custodial parent of the recommended determination. The Investigation Specialist shall make reasonable efforts to notify non-involved non-custodial parents of indicated reports, and make reasonable efforts to notify non-involved non-custodial parents of unfounded reports when they are aware of the report.* The Investigation Specialist shall communicate with limited/non-English speaking or hearing impaired persons as well as persons with other disabilities, using a method by which they can understand the notice, e.g., interpreters, TDD/TTys etc. The Investigation Specialist shall document all efforts to make such verbal notification and the method used on a SACWIS contact note.**

A memorandum was issued.  The recommendation will be included in revisions being made by the Procedure 300, *Reports of Child Abuse and Neglect*, workgroup.

**DEATH AND SERIOUS INJURY INVESTIGATION 7**

| | |
|---|---|
| **ALLEGATION** | A five month-old boy suffered severe physical abuse while in the care of his father. The father had been the subject of a child protection investigation seven months earlier involving children unrelated to the infant. |

| | |
|---|---|
| **INVESTIGATION** | The father's initial involvement with the Department began after police were called to his home in response to a domestic disturbance. |

Officers ascertained the father and his girlfriend had been arguing while the girlfriend's three children, the oldest of whom was six years old, were present in the home. The oldest child directed police to the trunk of the father's car where they found several knives and a BB gun. A child protection investigation was opened alleging Substantial Risk of Physical Injury/Environment Injurious by Neglect.

Two months after the investigation was opened, the State Central Register (SCR) received a report regarding the birth of a baby boy to his 15 year-old mother and the father, who was 19 years-old. The ages of the father and mother suggested the possibility a sexual crime had been committed against the mother. The SCR intake worker who took the call determined the father did not meet the criteria of an eligible perpetrator of sexual abuse as defined by Department Procedure. The father was not a relative of the mother, did not live in her home and he was not serving in a role as her caretaker. The report was not accepted for investigation, but the new information was added as Related Information to the original investigation, which should not have occurred since the mother and the newborn had no relationship to the father's girlfriend and her family. The SCR worker did not notify law enforcement or the local Child Advocacy Center (CAC) of the report or advise the caller to notify police. Although the child protection investigator had the additional information regarding the boy's birth, the investigator and his supervisor disregarded the information since the subjects were unrelated to the mother and her children involved in the open investigation. Neither the investigator nor his supervisor notified local law enforcement of the birth of the baby to the 15 year-old mother. The report of substantial risk against the father was unfounded.

Procedures in the SCR Call Floor Manual require hotline staff to notify law enforcement only in instances of emergency when a child-victim is at risk of immediate harm or there is a risk of flight. While there is no protocol for notifying law enforcement in non-emergency situations, the SCR procedures allow for referral to the local CAC to address reports of sexual abuse against minors involving ineligible perpetrators; however, such reports are only advanced for referral when designated as Information Only (not as related information). The CAC, in turn, notifies law enforcement.

Five months after the report against the father was unfounded, the boy was brought to a hospital emergency room. Upon examination, the boy was found to have a subdural hematoma, retinal hemorrhaging, cuts and bruises to his face, head and torso and internal injuries including a lacerated liver. The boy's maternal grandmother told police the father, who had arrived for a visit three days earlier, had been the boy's sole caretaker for several hours prior to his injuries being discovered. The grandmother stated she had left the home to run errands and the mother had been at high school while the father was home alone with the boy. The father was unable to provide an explanation for the boy's injuries. Following further investigation, the father was charged with Aggravated Battery of a Child and Neglect of a Child. The child protection investigation was indicated against the father for physical abuse.

| | |
|---|---|
| **OIG RECOMMENDATION / DEPARTMENT RESPONSE** | **The Department should revise the State Central Register Call Floor Manual to provide procedures for notification to the appropriate law enforcement agency of reports of sexual abuse** |

**to minors by ineligible perpetrators that do not qualify for child protection investigation but may constitute a criminal act against a minor.**

The Department is developing procedures for the SCR Call Floor.

## DEATH AND SERIOUS INJURY INVESTIGATION 8

| **ALLEGATION** | A two-year-old child died of natural causes while in the care of his mother.  Four months prior to the boy's death, he and his three siblings had been removed from their mother's custody and placed in a non-licensed relative foster home. |
|---|---|

**INVESTIGATION**     The boy's family became involved with the Department seven months prior to his death, after his parents were detained for allegedly selling heroin to a confidential source.  At the time of their detention during a traffic stop, the boy was with the parents in their car.  Although the parents were arrested, they were released shortly thereafter; and the boy, as well as their other children, three girls ages ten, nine and six, remained in their care in their home.  A child protection investigator assigned to the family's case interviewed the mother in the home the day after the traffic stop.  The mother told the investigator the father was a regular heroin user and was undergoing treatment for cancer.  The mother denied using heroin, but admitted occasionally smoking marijuana and agreed to submit to a drug screen.  The investigator observed the boy, who was the only child present in the home at the time, and found him to be healthy with no visible signs of abuse or neglect.

Later the same day, the investigator spoke with police and was informed that no drugs had been found in the parent's vehicle or during the execution of a search warrant in the family's home.  The officer told the investigator there had been "a miscommunication" between police and the Department and that no charges would be filed.  In an interview with the OIG, the investigator stated she asked the officer to clarify the nature of the "miscommunication," but he refused to elaborate.  The investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) finding the children to be safe.

One month later, the investigator conducted an unannounced visit to the parent's home and found police present in response to a report of the children being left unsupervised.  During her conversation with the father, which was her first contact with him since the case was opened, she cautioned him about leaving the children unattended.  The father admitted to the investigator he had sold a small amount of heroin to an undercover officer.  Despite the father's admission of his use and sale of heroin, and his arrest for possession of crack cocaine six days prior to the unannounced visit, the investigator and her supervisor ultimately reached a conclusion to unfound the report against the parents.  The investigator's rationale was based on an inability to substantiate the initial report, as the police stated no drugs had been found in the parent's possession and no arrests had been made.

One month after the report was unfounded, a second hotline call was made after the parents were arrested in their home for engaging in the sale of heroin.  The four children, who were all present at the time, were taken into protective custody.  The investigator spoke with the children, who identified their maternal uncle and his girlfriend, who they referred to as their "aunt," as their desired placement.  While the uncle and his girlfriend agreed to care for the children, a Law Enforcement Agency Database System (LEADS) check found the uncle had two previous charges for possession of marijuana.  Following consultation with her supervisor, the investigator agreed to place all four children in the home of the uncle and his girlfriend, who had three young children living with them.  It was stipulated the uncle would not reside in the home until he completed a drug screen, leaving the girlfriend to care for seven children under the age of 11.  Since the girlfriend was not a relative to the boy and his siblings, she was named as a "godparent" in order to designate the home as a relative placement.  A waiver was also requested and received to allow the placement of four children in an unlicensed home where three young children already resided.  As a result of the charges against the parents, the mother was sentenced to 45 days in jail and probation while the father, who had a history of drug-related crimes, received a six-year term.

In an interview with the OIG, the investigator stated she and her supervisor identified the uncle and girlfriend's home as the best available placement option at the time.  The investigator stated that concerns

regarding the size of the home and the number of children present were shared with the follow-up worker during the shelter care hearing. The investigator stated she believed the follow-up worker had the ability to move the children if it was deemed necessary. The parents were ultimately indicated for substantial risk of physical injury/environment injurious related to their admitted involvement in the sale of illegal narcotics from their home. Following the children's placement with the girlfriend, a case was opened with a private agency to provide services.

Both the uncle and the girlfriend struggled to maintain employment and had difficulty maintaining operating utilities in the home. Personnel from the children's school reported the girls were often tardy or absent, failed to complete assignments and often demonstrated substandard hygiene. After it was learned the home was infested with bed bugs, the family threw out all their furniture and slept in sleeping bags on the floor. Involved professionals often received conflicting reports from the couple as to the status of their relationship, with the girlfriend reporting on more than one occasion that she and the uncle had separated, although he continued to reside in the home. Although the caseworker learned from a homeless outreach worker the girlfriend had requested rent assistance in order to avoid foreclosure, and that she and the uncle would be living apart after they found a new residence, she never discussed the issue with the couple or confirmed their plans. In an interview with the OIG, the private agency supervisor responsible for overseeing the family's case described the household as a "marginal relative placement" and conceded that while it was not an ideal setting, it was best for the children to be placed with family. The supervisor stated that as placement workers, they are encouraged to do what they can to maintain relative placements. The supervisor further stated that in order to give a 14-day notice to move the children, the agency would have to provide grounds for the decision that could withstand an appeal by the couple. The supervisor did not believe such a decision at that time would have met those criteria, as there had been no evidence of abuse or neglect in the home.

Six weeks after the children were placed in the home, the mother was released from jail. Shortly thereafter, she moved into an apartment directly below the residence of the uncle and his girlfriend. As a condition of the safety plan enacted as part of the placement agreement, the mother was not allowed to have unsupervised contact with the children. Ten weeks after the mother was released from jail, the boy collapsed and fell off a chair in her home. At the time, the mother was the only adult present. The boy was transported to a local hospital where he was pronounced dead. An autopsy found the boy had an enlarged heart and had died of natural causes. A subsequent child protection investigation found the girlfriend had left the children in the care of the uncle, who then allowed them to go to their mother's apartment unsupervised. The mother and uncle were indicated for substantial risk of physical injury/environment injurious to all four children. Although the children were removed from the home of the uncle and his girlfriend and placed in traditional foster homes, the mother continued to participate in services and progress toward reunification. One year after the boy's death, the three girls were returned to their mother's custody. Medical tests performed on the girls following the boy's death found the nine-year-old had a heart condition that could be corrected with surgery. It was determined the surgery could be delayed until after the children were returned home. Three months after the siblings were returned to their mother's custody, the family's case was closed. At that time, the surgical procedure on the nine-year-old girl had not yet been performed.

| OIG RECOMMENDATION / DEPARTMENT RESPONSE | In this case, the private agency allowed the children to remain in an unsuitable relative placement. This report should be reviewed by the private agency and its Board of Directors. The agency should develop a corrective action plan in response to the findings identified in this report. |

The Office of the Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors. The Inspector General will meet with agency management and a representative from the Board of Directors to discuss the findings and recommendations made in the report.

## DEATH AND SERIOUS INJURY INVESTIGATION 9

| ALLEGATION | Three siblings, boys aged nine and four and a two year-old girl, died as a result of a fire in their home.  The family had a history of involvement with the Department, including an intact services case that was closed seven months prior to the fire. |

| INVESTIGATION | The family, which consisted of a couple and their 10 children, had an extensive |

history of involvement with both the Department and local law enforcement.  Over the course of a decade, the family experienced instability and upheaval as a result of persistent domestic violence, unsuitable housing, inadequate supervision and care of the children and an absence of effective support systems.  The family first came into contact with the Department following an incident in which the mother's arm was broken in two places when she used it to deflect a brick the father had thrown at her head. Relatives, police officers and involved child welfare professionals routinely reported either witnessing violent behavior by the father or being informed of it by the mother.  A Law Enforcement Agency Database Systems (LEADS) check of the father found six arrests for domestic battery and seven for assault.  On one occasion, police responding to a domestic disturbance call at the family's residence saw the father repeatedly stab the children's maternal grandfather in the back with a knife.

The family was the subject of eight child abuse and neglect investigations, five of which were indicated.  The Department opened three separate cases to provide intact services to the family at various times following indicated reports against the parents; however, the central issue of domestic violence in the home was never adequately addressed.  Although the family's history of exposure to violence in the home was well documented, the mother's reluctance to cooperate with authorities and the father's unwillingness to participate in services routinely stymied attempts to provide meaningful assistance or intervention.  In addition, domestic violence issues were often minimized by involved Department workers, while efforts to stabilize their housing situation took precedence.  Workers failed to recognize that the family's volatile home life was a central factor in destabilizing their living arrangements and frequently caused them to be asked to leave their residences.  Additionally, although physical abuse of the children was not reported, the effect on them of the violence in their environment went unaddressed.  A voluntary host parent, who was caring for the three year-old while the family was homeless, reported the child cried inconsolably at the mention of the word "belt" and regularly played with blocks by slamming them against the floor and saying, "shut up bitch."

The family's third Intact Services case was opened after police, responding to a domestic dispute, found the family's home to be filthy to the point of being uninhabitable.  Following a call to the State Central Register (SCR), the child protection investigator assigned to the report struggled to establish and maintain contact with the family.  After almost a month of minimal cooperation from the parents, the investigator was instructed by her supervisor to take protective custody of the eight children the couple had at the time, citing the family's history of domestic violence and prior indicated reports as well as the parents' non-compliance during the investigation.  At a temporary custody hearing one week later, the judge ordered the five youngest children to be returned to the mother under the provision that the father not reside with the family.  The father was to be provided with services including domestic violence counseling and the family was to undergo an Integrated Assessment conducted by the Department.  Upon opening the Intact Services case, the intact worker was informed by the child protection investigator that the family was already in violation of the court order as both parents and the children were living in a motel after having been asked to leave their most recent residence.

In an interview with the OIG, the intact worker's supervisor stated that during the first meeting with the family she was concerned by the father's hostility toward the mother and feared he might become violent towards her.  The father's behavior prompted the supervisor to instruct the intact worker not to conduct home visits by herself.  Although the Department conducted an Integrated Assessment of the family, the parents

were never interviewed and did not take part in the process. The parents were unable to attend their Assessment meeting because the mother was in the hospital at the time delivering the couple's ninth child. In an interview with the OIG, the intact worker said she could not recall why the meeting was not rescheduled. In a separate interview, the intact worker's supervisor said the meeting was never rescheduled because the father refused to participate. In the Integrated Assessment, the screener noted the maternal grandparents' concern regarding the abusive nature of the couple's relationship and the father's willingness to lash out at the mother in public. The Assessment also detailed the father's criminal history and his failure to follow through with previous referrals for anger management and domestic violence services. The Assessment recommended that the children participate in early childhood education services to address deficits in their development and two of the children receive specialized therapy. It was also recommended that the mother be referred for a mental health and social/emotional assessment, individual psychotherapy and a parenting group and that the father be assessed for mental health and possible substance abuse issues.

Despite the conclusions of the Integrated Assessment, neither specialized therapy nor educational services for the children were obtained. In her interview with the OIG, the intact worker stated she made an effort to enroll the preschool aged children in their local school, but there were no available openings. The intact worker could not recall attempting to place the children in another early education program. An OIG review of the Chicago Public Schools' Early Childhood Program Locator identified 24 early education programs located within one mile of the family's home, including one just five doors down on the same block. The intact worker acknowledged the children would have benefitted from the educational services recommended in the Integrated Assessment. Neither of the two children singled out for specialized therapy received those services. The intact worker did refer the parents for marriage counseling, which they participated in minimally, but mischaracterized the sessions as being a vehicle for confronting their domestic violence issues. The intact worker told the OIG she had not seen any signs of violence during her visits, and since domestic violence had been an issue during the family's previous intact cases, she believed it had already been addressed.

Throughout her handling of the case, the intact worker neglected to document much of her work with the family or other involved professionals. Although the intact worker testified in court on multiple occasions that she conducted frequent visits to the family home, an OIG review of the State Automated Child Welfare Information System (SACWIS) found only seven documented in-person contacts during the first seven months she was assigned the case. There was no documentation to support any visits during the final four months she was involved with the family. The intact worker told the OIG she conducted frequent visits as the family's home was near her field office; however, she could not explain why she had failed to document the activity as required. In addition, there was no indication in the case record that a home safety checklist, a domestic violence screen or an adult substance abuse screen were ever conducted in accordance with Department Procedure. The intact worker told the OIG she had conducted the activities and did not know why they were not documented in the case record. The absence of documentation in the case record prevents it from being a meaningful resource and could impede future efforts by workers who might become involved with the family to develop an accurate view of their history.

The family's intact services case was closed one year after it had been opened. At a final court hearing, the intact worker, who had been transferred from the case one month earlier, testified the parents had participated in services and made satisfactory progress despite the parents failure to make progress and the family's domestic violence problems had not been adequately addressed. Three weeks after the hearing, which terminated Department involvement with the family, the mother gave birth to the couple's tenth child. Six months later, emergency personnel responded to a fire at the family's home. Three of the children were killed, two boys, aged nine and four, and a two year-old girl. The family reported that the deceased four year-old boy liked to play with fire and his surviving seven year-old sister told fire investigators he had lit a piece of paper with a lighter and threw it into the deceased two year-old girl's bed.

During a child protection investigation conducted subsequent to the fire, the mother stated that following the closing of the family's intact case the father had continued to be verbally and physically abusive toward her, including an incident in which he "beat her up bad" and broke her toe one week prior to the fire.   An OIG review of police records found that during the seven months between the closing of the intact services case and the fire, there had been nine calls to police requesting assistance for domestic violence.   The mother further stated to the child protection investigator that since the charitable donations the family received in the wake of the fire had been exhausted, the father had begun blaming her for the children's death and threatening to kill her.   The mother obtained an order of protection against the father; however, they later reconciled and he moved back into the family's new home.   The house fire was ultimately ruled to be accidental in nature and the related child protection investigation was unfounded.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The intact worker who handled the third intact services case should be disciplined for violation of Procedures 302.388 and for her failure to diligently pursue needed services for the children.** |
|---|---|

Discipline is pending.

**2.  The Department should ensure that Chicago intact workers use the Chicago Public Schools' Early Childhood Program Locator to help families enroll their children in early education programs.**

POS Monitoring will advise/remind all intact providers at upcoming CWAC Front-End meetings to utilize this locator service. Monitors will be advised to look for documentation of such agency efforts as part of ongoing intact case record reviews.

**DEATH AND SERIOUS INJURY INVESTIGATION 10**

| **ALLEGATION** | A four month-old boy died of dehydration and failure to thrive stemming from ongoing medical conditions.  The boy's mother was an 18 year-old ward of the Department at the time of his death. |

**INVESTIGATION**   The mother's family had an extensive history of involvement with the Department that began prior to her birth.  During the mother's childhood, both of her parents were the subjects of indicated reports for abuse and neglect of the mother and her siblings and the children were removed from their parent's custody on multiple occasions.  Following an indicated report for physical abuse, environmental neglect and risk of sexual injury, the mother, then age seven, and her siblings were taken into Department custody.  The mother remained a Department ward thereafter.

At age 17, the mother reported to staff at her high school that she was pregnant.  In response, her case was transferred to a private agency that operated a program specifically designed to provide services to teen mothers.  The mother was placed in a traditional foster home through the program and private agency staff was assigned to manage her case.  While assigned staff continued to monitor the mother's progress in school and living arrangements, little effort was made to assist her in planning for the birth of her baby.  At 33 weeks the mother went into premature labor and delivered a boy, her first child.  The boy experienced bleeding on the brain at birth and remained in the hospital for five weeks.  During that time, private agency staff never visited the baby in the hospital or discussed with the mother how she would provide for his care following his release.  An OIG review of the case record found that in the first documented contact with the baby, two days after his discharge from the hospital, private agency staff spoke with the mother regarding her relationship with her foster parent but did not address the changes or challenges inherent in bringing her new baby into the home.  Staff also neglected to ascertain the mother's willingness or ability to obtain necessary follow-up services for the baby or post-partum care for herself.  While the mother complied with the majority of the baby's required medical appointments, she never returned to the hospital for her post-discharge appointment and was minimally compliant in participating in services for herself.

Four months after the baby was born, the mother reported to private agency staff she believed she was pregnant again and wanted to terminate the pregnancy.  The mother stated she was unable to obtain a free pregnancy test and could not afford to purchase one.  One week later, private agency staff provided the mother with an at-home pregnancy test.  The test was positive and staff instructed the mother to make a medical appointment to determine how far along the pregnancy had advanced.  Two weeks later, staff met with the mother and her foster parent to discuss their living arrangement, however no arrangements were made to ensure the mother scheduled a medical appointment.  Three weeks later, more than a month after the mother had taken the at-home pregnancy test, the mother informed the private agency her pregnancy had advanced too far to consider termination and that she intended to deliver the child.  While agency staff encouraged the mother to avail herself of pre-natal care, they did not facilitate her efforts to obtain treatment or document her medical care in the case record.  Workers instead consistently relied upon the mother's self-reports of her compliance with health services.  Eleven months after the birth of her fist child, the mother delivered a baby boy at 34 weeks, her second premature baby born within the year.

In an interview with the OIG, the private agency supervisor responsible for overseeing the mother's case acknowledged involved workers did not adequately assess the mother's medical care or establish contact with her physicians to obtain vital information regarding the status of her pregnancies.  The supervisor stated she was unaware that teenagers are more prone to premature deliveries or that women who have previously given birth to premature babies are at greater risk of subsequent premature deliveries.  The supervisor told the OIG it is the agency's practice to encourage clients to schedule post-partum appointments and that staff only

intervenes if it is learned the client has not complied. The supervisor conceded that such an approach could leave clients in the interim without the information and support that could help prevent another pregnancy. The supervisor stated that in the mother's case, workers focused on her education, her living situation and her relationship with the father of her second child rather than her medical needs or the circumstances of her pregnancies.

The 18 year-old father of the second child frequently served as the primary caretaker for the mother's older son and assumed greater responsibility following the second boy's birth. While the mother's foster parent frequently complained to private agency staff that the mother was often absent from her home for extended periods of time while staying with the father, staff focused on the mother's compliance with the terms of her placement without fully assessing the father's ability to serve as a caretaker. A Child Abuse and Neglect Tracking System (CANTS) check found the father had been indicated four years earlier for the sexual abuse of two younger children who had resided in his family home. In her interview with the OIG, the private agency supervisor stated she should have required involved workers to contact the father and conduct a thorough assessment of his home and his suitability as a caretaker. After learning of the prior indicated reports against him, agency staff routinely referred to the father as a "registered sex offender," although he had never been convicted of any crime and had not received that designation from the courts.

Four months after the second baby was born, paramedics were called to the father's home after he found the boy unresponsive in bed. The boy was transported to a hospital where he was pronounced dead. An autopsy found the boy to be dehydrated and "marginally malnourished." The examination also identified four healing rib fractures located near the baby's spine. The medical examiner found the injuries to be consistent with squeezing and determined them to be approximately one month old. The manner of death was homicide. During the subsequent investigation of the death, the boy's paternal aunt acknowledged having given the baby approximately seven ounces of water because he appeared thirsty, despite being instructed by the father not to give him water at all. The baby's pediatrician told police that if newborns are given water they should not receive more than three ounces, as greater amounts could lead to the depletion of sodium in the body. Such a deficit could lead to the elimination of other elements and cause internal organs to shut down, potentially resulting in death.

Following his birth, the younger boy had exhibited frequent expectoration, which was alternately described by caretakers as "spitting up" or "throwing up" after feeding. While these terms are often used interchangeably, they involve different physiological processes and can be indicative of separate medical conditions. The boy had been diagnosed with Gastric Esophageal Reflux Disorder (GERD), a specific condition identified in a small percentage of infants, for which he had been prescribed medication. Although babies may demonstrate similar actions during or after feeding, it is crucial these behaviors are correctly identified and addressed by medical professionals.

The Department investigation into the baby's death was ultimately unfounded against the mother and father. Despite the presence of the rib fractures, the absence of any medical evidence of previous abuse and the inability to determine who among the boy's multiple caretakers might have been responsible for his injuries resulted in an indicated finding of death by neglect and bone fractures against an unknown perpetrator. Criminal charges against the father were rejected by the State's Attorney's Office. Ten months after the baby's death, the mother delivered her third child. Private agency staff was engaged with the mother's pre-natal care and she delivered a healthy baby, her third son, after carrying him to full term.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The private agency's teen parent program staff failed to proactively monitor and ensure medical services for the ward mother during her first two pregnancies and the post-partum** |
| --- | --- |

period. While the case managers assigned to the ward are no longer employed by the private agency, the agency should review this report with the private agency supervisor for failing to ensure that the case managers adequately serviced this case at the time of the first two pregnancies.

The Office of the Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors. The Inspector General met with agency administrators and a representative of the Board of Directors to discuss the findings and recommendations made in the report.  The report was reviewed with the private agency supervisor.

**2.  This report should be shared with the private agency to be used as a training tool with the teen parent program.**

The agency will use this report as a training tool with its Teen Moms' program to reduce risk and enhance outcomes.  The agency has enhanced the teen program through structured visitation plans, caseworker visitation of the homes of relatives and paramours, tracking the teens' medical care and follow-up, and close monitoring of the well-being of children born to the teen mothers.

**3.  The private agency's teen parent program must have a supply of pregnancy tests always available for their clients.**

The agency will always have home pregnancy tests available to program youth who suspect they may be pregnant.  Understanding birth control options is standard conversation with the youth to ensure their awareness.  In the event that a youth becomes pregnant, more formal family planning options are offered to the teen.

**4.  DCFS and POS agencies should educate caseworkers who are serving wards, 14 and older on the sexual health text messaging service, "Sexedloop" so that wards can be instructed on how to access the service.**

Due to an unanticipated delay, the use of the social media Sexedloop texting service to the training curriculum is delayed.  The next step following the full completion of the curriculum is to train the trainers with implementation of the training for caseworkers and foster parents beginning January 2013, and continuing through the term of the DCFS-DHS Sexual Health Training Grant, June 30, 2014.

**5.  Whenever a ward gives birth to a premature or medically complex infant the New Birth Assessment worker should, with the consent of the mother, convene a case conference at the hospital involving the case manager, foster parent, hospital staff and family to discuss the needs of the infant and support the mother in her care of the infant at discharge.**

The Department does not agree with assigning this responsibility to the New Birth Assessment worker as they are often assigned the case after the youth has been discharged from the hospital.  After consultation with the Office of the Inspector General staff, it is agreed that Teen Parent Service Network (TPSN) clinical would assist in coordinating the case conference to assure the assigned case manager convenes this meeting when indicated.  Also, TPSN clinical staff will be available to attend in-person or via teleconference any hospital based case conferences.

**6.  The New Birth Assessment worker should communicate with the caseworker to ensure that all parenting wards attend their 6 week post-partum appointment. Caseworkers should transport their parenting ward to this appointment and ensure that the ward is knowledgeable regarding birth control options.**

The 6-week post partum appointment is an item in the New Birth Assessment and documentation.  The New Birth Assessment staff have been instructed to follow-up with the caseworker on this issue.  Teen Parent Service Network is tracking this information.

**7.  Workers and pregnant/parenting wards should receive information regarding medical conditions of pregnancy and infancy, specifically, they should receive information about populations at risk of delivering a premature infant, and the medical differences between GERD, spitting up and vomiting. This information could be presented as part of the New Birth Assessment, providing this and other pertinent medical information to both the client and worker.**

A copy of the Nursing Notes were emailed to the Teen Parent Service Network and the Pregnant and Parenting Teen Specialty providers for ongoing distribution to their clients in conjunction with the New Birth Assessment.

**8.  The Department should clarify its record to reflect that the father, although indicated for sexual abuse, has never been convicted of sexual abuse and is not a "registered sex offender".**

The Department is working with the Office of the Inspector General to determine what case record(s) need clarification.

## DEATH AND SERIOUS INJURY INVESTIGATION 11

| ALLEGATION | A five month-old boy with multiple bone fractures who was the subject of an open child protection investigation was returned to his parents' custody while the investigation was ongoing. |
|---|---|

**INVESTIGATION**  The boy was brought to a hospital emergency room by his father who reported the infant was having difficulty moving his leg that morning.  An x-ray found the boy had a fracture of his right tibia and he was admitted for treatment.  The child protection investigator assigned to the report interviewed the parents at the hospital the same day.  The mother stated that the day before, the boy had squirmed out of her arms while she was changing him and fell into his crib, hitting his leg against the rail on the way down.  The father confirmed the mother's account and said he had witnessed the fall and heard a snapping sound when the boy landed.  The parents stated the boy did cry at the time but he had been fussy all day after receiving immunization shots that morning, which they believed to be the cause of his discomfort.  Medical professionals who initially treated the boy told the investigator they doubted the injury could have resulted from the fall described by the parents.

The following day, the investigator requested a consultation by a physician with expertise in child-abuse injuries.  After completing her assessment, the physician recommended additional testing to determine the existence of any other injuries.  A radiographic bone survey found that the boy had fractures on each side of his skull and, in addition to his lower leg injury, also had fractures just above both knees as well as to one of his ribs.  When questioned by the investigator, the parents stated they believed the skull fractures may have been caused by the boy's difficult birth, which required the use of forceps to assist in his delivery.  When questioned by police about the boy's initial leg fracture, both parents maintained he had been injured in a fall from his mother's arms, however each contradicted their earlier statements to the investigator by saying the father was not present in the room at the time.

While involved medical personnel continued to express their concerns the boy had been abused, none were willing to make a definitive conclusion until all tests had been completed and his medical history, particularly pertaining to the circumstances of his birth, had been reviewed.  While these tasks were still being performed, the investigator took the boy into protective custody and he was placed in a traditional foster home, five days after he had been brought to the emergency room.  The hospital where the boy was first seen and treated did not have a child protection team and was not prepared to conduct an in-depth assessment of his injuries.  In an interview with the OIG, a doctor who initially treated the boy stated that in retrospect she wished he had immediately been transferred to a regional hospital with a specialized child abuse team for evaluation.

The day after the Department took custody of the boy, a hearing was held to address the juvenile petition.  Just prior to the hearing, the father spoke with a police officer involved in the investigation and offered new possible explanations for the boy's injuries.  The father told the officer he had lied about the fall and that he believed the boy's leg had been fractured when his unsecured car seat was thrown forward when the father stopped suddenly in the family's car.  The father also offered that the boy's head injuries might have occurred when the father accidentally dropped the boy against the bathtub while bathing him.  The father said the boy hit his head and bled from the mouth at the time, but since he did not cry much the parents did not take him to the hospital.  A review of the boy's medical records found he had been brought to an emergency room for redness to the side of his face and head around the time the father said the incident had occurred.  At the time, the mother offered hospital staff no explanation for the boy's condition.

At the hearing, the Assistant State's Attorney told the court that based on available evidence, the State did not believe adequate evidence existed to proceed with a shelter care petition.  The Guardian *ad Litem* supported

the conclusion and the court ordered the boy be returned to his parents' custody.  An adjudicatory hearing to follow-up with the case was scheduled for six weeks later.  In the interim, the parents were required to comply with monitoring by the Department and to participate in services.

As the boy underwent further examination and his medical history became available for further review, involved medical professionals became increasingly convinced the boy's injuries were the result of physical abuse.  The possibility of the skull fractures being a result of the use of forceps during the boy's birth was ruled out because of the time that had elapsed before the injuries were found.  The physician with expertise in child abuse who was originally asked to consult on the case concluded the boy's injuries were "classic signs of Shaken Baby Syndrome and non-accidental trauma."  Following a separate evaluation, an attending physician from the regional hospital's specialized child abuse team submitted a medical affidavit stating, "reasonable cause to suspect [the boy] was the victim of child maltreatment…and is at risk for future injury if he remains in the same environment(s) in which the above injuries were sustained."  Both doctors cited the multiple injuries to a non-ambulatory child, the nature of the injuries themselves and the parents' conflicting and changing stories as to how the injuries occurred as factors in reaching their conclusions.  The medical opinions were shared with the State's Attorney's office.

At the adjudication hearing, which was presided over by a second judge, the Assistant State's Attorney asked for the case to be continued and for the child to remain in his parents' custody.  The Assistant State's Attorney recommended that since the parents had been compliant with services and Department monitoring since the previous hearing, the existing plan should remain in place.  The Guardian *ad Litem* supported the recommendation and the court continued the case without a finding.  A status hearing was scheduled for four months later.  The case was continued a second time for another four months so that it could take place after the mother delivered the couple's second child.  One month after the second child, a girl, was born, the child protection investigator responded to a complaint the father had left the girl unattended on an adult bed.  The investigator and the family's caseworker went to the home and addressed the issue with the parents.  They identified no other concerns at that time.  Three weeks later the initial child protection investigation of the boy's lower leg fracture was indicated against both parents for Bone Fractures by Abuse, Bone Fractures by Neglect, Head Injuries by Neglect and Substantial Risk of Physical Injury by Neglect.

The court case was ultimately closed three months later at the conclusion of a final status hearing.  The Assistant State's Attorney, a new Guardian *ad Litem* who had taken over the case, and a representative of the Department's Legal Division concurred the family had complied with all required services.  The judge ordered the case closed with the understanding the Department would provide aftercare services to the family.

This case was included in the Office of Inspector General's review of court involvement in cases involving multiple fractures to infants.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The Department's Division of Operations should share a redacted copy of this report with direct line staff in the sub-region.  Managers from this region should adapt the report as needed for case conferences and training.** |

Implementation of this recommendation will be completed once staff impacted by the realignment/layoff have been placed in their permanent positions. A redacted copy has been sent to the Region's Regional Administrator.

**2.  A redacted copy of this report should be shared with the Region's Office of Legal Services to better enable them to provide support to direct line staff.**

The redacted report was shared with the Region's Office of Legal Services.

**3.   A redacted copy of this report should be shared with the following County court officers:   The presiding judge of the shelter care hearing, the presiding judge of the adjudicatory hearing, the State's Attorney, and the new Guardian *ad Litem*.**

The Inspector General is coordinating with the Administrative Office of the Illinois Courts, Judicial Education Division to present this report and related materials at the judicial educational conference slated for 2014. The Inspector General will also share the report with the local State's Attorney and the Guardian *ad Litem*.

## DEATH AND SERIOUS INJURY INVESTIGATION 12

| ALLEGATION | A neglect petition involving a three-month old boy whose parents were indicated for physically abusing him was dismissed by the court and the case closed without the Department being notified.  The Department had originally objected to the boy being returned to his parents' custody. |

| INVESTIGATION | The parents brought the boy to a hospital emergency room stating the infant had been crying and was not moving his right leg.  Doctors found the leg was swollen |

and that the boy cried whenever it was touched or moved.  Following an initial examination which included a blood culture that tested positive for staphylococcus, the boy was transferred to a regional hospital that specialized in pediatric patients.  At the regional hospital, x-rays showed the boy had metaphyseal fractures to his femurs in his left and right legs.  A subsequent skeletal survey identified additional metaphyseal fractures to his tibias and fibulas in both legs as well as the humerus in his right arm.  When questioned by hospital staff, the parents stated they had no knowledge of the boy's multiple fractures and were unable to provide any explanation for how the injuries might have occurred.  The case was referred to the hospital's specialized child abuse team and a child protection investigation was opened by the Department.

Two days after the boy was brought to the hospital, the assigned child protection investigator spoke with each of the parents separately, accompanied by a detective and an interpreter as the parents were Spanish speaking. Both the mother and father insisted they had no knowledge of how the boy could have been injured. Although the family lived in the home of the boy's paternal grandfather, the parents said they were the boy's only caretakers and that he had not been left alone with any other people.  The parents denied the existence of any substance abuse or domestic violence issues in their home.  The father offered several possibilities as to how the boy might have been injured, including getting his leg caught in a baby swing or banging it against a cabinet.  Each parent stated they had never witnessed the other behave in an abusive or aggressive manner toward their son.

Six days later, the hospital's child abuse team completed a medical affidavit summarizing their assessment of the boy's injuries.  The finding noted that the metaphyseal fractures, also known as "corner" or "bucket handle" fractures, are highly specific for abuse as they occur either when a severe jerking motion is applied to the extremities or when a child is shaken.  In the affidavit, the team's medical director stated that amount of force required to cause such injuries could not be created by a non-ambulatory child and would be of a magnitude far in excess of that necessary to perform child care duties.  The medical director stated that any reasonable caretaker would recognize that applying such force to an infant would likely result in injury.  The affidavit also cited the presence of multiple injuries, the absence of any pre-existing health condition and the parents' inability to provide any plausible explanation for how they might have occurred.  Further blood tests discounted the earlier positive result for staphylococcus as erroneous and doctors concluded the swelling in the boy's leg was related to his physical injuries.  Based on their examination of the boy and review of the case, the child abuse team concluded there was reasonable cause to suspect the boy had been the victim of physical abuse.  The affidavit was provided to the child protection investigator.

The following day, a temporary custody hearing was held and the Assistant State's Attorney requested the boy be placed with the Department following his impending discharge from the hospital.  The order was granted and the boy was placed in a traditional, non-Spanish speaking foster home.  Ten days later, the case was re-heard, at which time the Department reiterated its case to maintain custody.  Attorneys for the parents argued that since it had not been proven that the parents were responsible for the abuse, the boy should be returned to their custody, provided the Department provided services to the family and supervision of their home.  The presiding judge flatly rejected the argument of the parents' attorneys, stating that the extent and severity of the injuries as assessed in the affidavit, coupled with the parents' inability to provide any explanation for their occurrence or a possible alternate perpetrator, cast doubt on their ability to safely care for the child.  The judge also deemed it unrealistic to believe the Department could provide the level of

supervision necessary to ensure the boy's welfare, concluding such an effort would essentially require 24-hour monitoring. The court ordered the boy to remain in the Department's custody and a date for an adjudicatory hearing was set. In the interim, the parents were to be allowed visitation and the family was to receive services from the Department.

Two weeks after the hearing, the parents participated in an Integrated Assessment of their family for the Department, conducted by a sub-contracted clinician. In separate interviews with the clinician and an interpreter, each parent related their personal histories as well as the overall family timeline. The clinician identified certain areas of concern, particularly regarding the parents' lack of a support system despite having relatives in the area and their isolation from the community at large. The clinician also noted the father's acknowledgement of his limited parenting skills and the mother's self-reported feelings of depression. The clinician recommended both parents receive individual counseling to address issues in their pasts that influenced their ability to parent and for the boy to be referred for a global assessment of his development. The clinician stressed the importance of respecting and maintaining the family's culture while noting the inherent difficulty of obtaining Spanish-language services in the area. In her conclusion, the clinician stated the prognosis for the family was, "compromised by the fact it was unknown who had harmed [the boy]…which raised concerns for his safety in the future."

At the adjudicatory hearing, held six weeks after the Integrated Assessment was conducted, the Assistant State's Attorney asked the court for a continuance in order to conduct a review of recently obtained medical records, which he said offered various opinions as to the possible nature of the boy's injuries. The information cited by the ASA was related to the initial concern the boy might have been suffering from an infection, a possibility which had later been ruled out by further testing. The ASA also told the court it was the opinion of the attorneys involved and the boy's Guardian *ad Litem* that the boy should be returned home to his parents at that time. The ASA stated the decision was based on the Department's failure to provide any services to the family since the previous hearing. The Department caseworker, who objected to the boy being returned home, informed the court that parent/child visits had taken place, and that while referrals had been made for counseling and homemaker services, they had not been implemented because of the dearth of Spanish speaking providers in the area. No representative of the Department's Legal Division was present in court. Although the Integrated Assessment was in the possession of the Department, the case record did not indicate whether it had been provided to the court prior to the adjudicatory hearing. Based on the recommendation offered by the ASA and the assertion the Department had not provided any services, the judge ordered the boy to be returned to his parents' custody. The day prior to the hearing, the Department had closed its child protection investigation with a final finding of indicated against both parents for Bone Fractures by Abuse.

Three months later, the ASA and the boy's GAL deposed the medical director of the regional hospital's child abuse team. During questioning, the medical director restated his opinion that the boy's injuries were most likely the result of physical abuse. The medical director also clarified the initial reports regarding a possible infection and explained how that possible diagnosis had been eliminated. Despite being provided with this direct testimony, the ASA did not request for the case to be returned to court.

Five months later, during a status hearing, the ASA moved to dismiss the petition. The case was heard by a new judge and the boy's interests were represented by a second GAL who had been assigned the case only one month earlier. The ASA stated the boy had been in his parents' custody for eight months without incident, although no hearing on the case had been conducted during that time and involved workers had noted concerns, including the mother leaving the family home with the boy for a week to live in a women's shelter. The ASA told the court the family wished to move to another state where the father believed he could pursue employment. The boy's new GAL offered no response to the ASA's motion. The court granted the motion and the Department's involvement with the family was terminated. In an interview with the OIG, the Department's Regional Counsel stated he had not been notified of the hearing despite having requested to be informed of any court dates involving the case.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.   While the Spanish speaking population in the Region is low (approximately 4%), the language barrier presents formidable obstacles to service provision.  The Department should work with Project 12 Ways to develop bi-lingual resources for this underserved population.**

Under the current reorganization, the Department has created Resource and Recruitment Specialist positions statewide. The specialists will conduct an analysis to determine the needs of this population and will work with all resource providers to provide needed services.

**2.  A redacted copy of this report should be shared with the Region's Office of Legal Services to better enable them to provide support to direct line staff.  Additionally, the Office of Legal Services should design a strategy to inform the Officers of the Court that the Integrated Assessment is a contracted Department service that provides for an in-depth clinical assessment of families.**

A redacted copy of the report was shared with Southern region attorneys.

DCFS Legal has informed the Officers of the Court on the Integrated Assessment program by distributing the Integrated Assessment brochure provided by DCFS Clinical to the Courts, GALs, and State's Attorneys in the Southern Region.

**3.  A redacted copy of this report should be shared with the following County court officers:  The original presiding judge, the presiding judge of the final status hearing, the State's Attorney, and the new Guardian *ad Litem*.**

The Inspector General is coordinating with the Administrative Office of the Illinois Courts, Judicial Education Division to present this report and related materials at the judicial educational conference slated for 2014. The Inspector General will also share the report with the local State's Attorney and the Guardian *ad Litem*.

**4.  The Department's Division of Operations should share a redacted copy of this report with direct line staff in the sub-region.  Managers from this region should adapt the report as needed for case conferences and training.**

The information was shared with the entire Southern Region.

## DEATH AND SERIOUS INJURY INVESTIGATION 13

| ALLEGATION | A three-month-old boy died of Sudden Unexpected Death in Infancy while in the care of an unlicensed day care provider. |
|---|---|

| INVESTIGATION | Four months prior to the boy's birth, his mother was the subject of an indicated report for Substantial Risk of Physical Injury to her two older children, girls ages |

six and three. The mother had substance abuse problems and continued to seek, obtain and use drugs during her pregnancy with the boy. An intact family services case was opened; however, the parents were reluctant to comply with their obligations. A second child protection investigation related to both parents' ongoing substance abuse was pending at the time the boy was born. At birth, the infant tested positive for opiates, as did his mother, who tested positive for benzodiazapines, for which she did not have a prescription. As a result of the positive drug results, the mother's ongoing substance abuse and the father's failure to engage in services, the mother was again indicated for Substantial Risk of Physical Injury, and all three children were taken into protective custody. The Department was unable to find a home to accept the sibling group and the boy was placed in a traditional licensed foster home.

An Employment Related Child Supervision Plan contained in the foster mother's licensing file indicated her need to obtain day care for the boy while she was at work. The Department assumes the cost of day care for working foster parents, who are free to select their own providers with the assistance of their caseworker or regional day care personnel. Foster parents are not required to utilize licensed day care providers. A home can serve as an unlicensed day care center in accordance with the Child Care Act, provided there are not more than three unrelated children present at a time. Whenever foster parents select day care providers, their caseworkers are expected to complete a Home Safety Checklist to assess the suitability of the location, as well as the caregivers. While the Home Safety Checklist is routinely completed by workers and contains instructions to conduct visits before children are placed, Department Procedure does not contain an explicit requirement for workers to do so.

Following the boy's placement in the foster home, the foster mother secured day care in two unlicensed homes, utilizing the first until identifying the second, which was closer to her home. One month after the boy began attending day care at the second home, he was found unresponsive in his crib by the day care provider. He was transported to the hospital, where he was pronounced dead. His cause of death was ruled to be Sudden Unexpected Death in Infancy (SUDI). No connection to his treatment by the foster mother or the day care provider or the effects of his drug-exposed birth was found.

In an interview with the OIG, the foster mother stated the boy experienced reflux and frequent expectoration. The foster mother also noted he had been able to roll over from his stomach to his back and vice versa for some time prior to his death. This combination of factors prompted the foster mother to place the boy on his stomach to sleep and she had instructed the day care provider to do the same. The American Academy of Pediatrics' Task Force on Sudden Infant Death Syndrome recommends that infants be placed on their backs to sleep until they have reached one year old. The Academy only recommends placing infants on their stomach to sleep if they suffer from gastroesophageal reflux so severe that the risk of death exceeds the risk of death from SIDS or SUDI. Although the foster mother had discussed the boy's reflux with his pediatrician, she had not consulted with her regarding positioning him on his stomach during sleep.

An OIG review of the case file found the boy's caseworker had not completed Home Safety Checklists for either of the day care homes prior to his death. During a subsequent licensing investigation, the day care provider acknowledged routinely caring for a number of children in excess of the three allowed without licensure. The day care provider stated she had previously been licensed; however, she had been unable to

care for enough children for licensure to be financially viable and had not sought renewal after it expired several years earlier.  The day care provider said she would continue to operate her business, but opted to reduce the number of children she provided care for rather than pursue licensure.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES |
| --- |

**1.  Procedure 359, Appendix E, *Employment Related Daycare for Foster Parents*, should be amended to direct workers to complete a Home Safety Checklist on an unlicensed day care home in which a child for whom the Department is legally responsible is going to be placed and that the assessment be completed prior to implementation of the child care plan.**

The Department revised Procedures 359, *Authorized Child Care Payments; Appendix E, Employment Related Day Care for Foster Parents*, to require completion of the home safety checklist prior to approval of License - Exempt day care. (See Policy Transmittal 2012.20.)

**2.  The Department should advise HealthWorks doctors who should remind caretakers of infants with gastroesophageal reflux that they should continue to follow Back to Sleep recommendations, except in those cases where medically contraindicated.**

Information regarding safe sleep practices, including the brochure "Safe Sleep for Your Baby-Reduce the risk of SIDS" and "SIDS and Other Sleep-Related Infant Deaths: Expansion of Recommendations for a Safe Infant Sleep Environment" published in Pediatrics has been provided to the HealthWorks lead agencies which cover all counties of Illinois. The materials provided include recommendations for infants with gastroesophageal reflux.  Information provided to the HealthWorks Lead Agencies included instructions to provide this information to Health Works medical providers.

**3.  Day Care Home Licensing should conduct two to three unannounced visits to the day care provider's home over the next six months.  The visits should occur during after school hours and at least one visit should occur on a day that is a school holiday.  If the day care provider is found to be caring for more than three children, the Department should refer her to the State's Attorney's Office for prosecution.**

The Department disagrees. The Department's process only requires one visit which was conducted. The day care provider was in compliance at that time.  Unless there is a new complaint, the Department can not go back to the home. The Department does not monitor unlicensed day care homes.

**DEATH AND SERIOUS INJURY INVESTIGATION 14**

| SUBJECT | The Office of the Inspector General (OIG) receives notification from the State Central Register of child deaths and serious physical injuries in Illinois, where the |

family has been involved with the Department in the year prior to death or injury. During years 2000 through 2011, 35 Illinois children who committed suicide had been involved with the Department in the year prior to their suicide.

| INVESTIGATION | **Review of Literature on Youth Suicide** |

In 2006, the suicide rate among youth aged 10 to 19 years in the U.S. was 4.16 per 100,000 persons, making suicide the third leading cause of death in this age group, with approximately 4500 lives lost each year (Centers for Disease Control, 2007; 2008). In 2007, 14.5% of the 9th to 12th grade students in the U.S. reported suicidal ideation, with 6.9% reporting at least one suicide attempt during the previous year (Centers for Disease Control, 2007).   According to the Illinois Violent Death Reporting System (IDVRS), from 2005-2008, 121 adolescents in the state of Illinois, between the ages of 10-19, committed suicide. Fourteen were children between the ages 10-14 years; 107 were ages 15-19 years.

A recent study conducted by the Juvenile Protective Association (JPA) found that histories of physical and psychological abuse, especially during adolescence, can lead to a higher risk of thoughts of suicide in teenagers (Thompson, 2012).  This study, following the outcomes of 740 teenagers nationwide between the ages of 12 and 16, found that physical abuse during the teenage years more than doubled the risk of suicidal thoughts, and psychological abuse more than tripled the risk.

Firearms have traditionally been the leading suicide method among U.S. youth, followed by hanging/suffocation, and self-poisoning (Bridge, Goldstein, and Brent, 2006).  According to the CDC, in 1990, the most common method of suicide among young females was with a gun, accounting for approximately half of the suicides.  By 2004, over 70% of suicides by girls aged 10-14 were completed by hanging or suffocation.  According to IVDRS, hanging is the most common method of completing suicide in Illinois.

Suicidal behavior emerges from a convergence of biological, developmental, and environmental factors, and is typically activated by acute or chronic stress.  Youth who have particular vulnerabilities based on environmental and constitutional factors are at heightened risk as they enter adolescence.  Numerous risk factors are associated with youth suicide.  Major risk factors for suicide among adolescents are as follows: previous suicide attempt; psychiatric disorder, especially major depressive disorder, bipolar disorder, conduct disorder, and substance use disorders; psychiatric co-morbidity; personality disorders; impulsive aggression; availability of lethal means; feelings of hopelessness and worthlessness; family history of depression or suicide; loss of a parent to death or divorce; family discord; physical and/or sexual abuse; lack of a support network; dealing with homosexuality in an unsupportive environment.

*State of Illinois Child Welfare Population*
While no empirical studies of suicide or suicide risk among youth in child welfare systems in the United States were found in the course of this literature review, the social circumstances that often lead to child welfare involvement may be similar to those circumstances that put youth in general at risk.  Of the 35 suicide cases between 2000 and 2011 of children involved with the Department, 17 of the children were wards (with one being a former ward): one was an open intact case, one was a closed intact case, one was adopted, and 15 were unfounded, indicated, or pending Division of Child Protection cases.

*Wards*

Eighty-two percent (14) of the 17 ward cases were male and 18% (3) were female. Of the 17 ward suicide cases, twenty-four percent (4) were 14 years and younger.  All of the children ages 14 and younger committed suicide by hanging; 75% (3) had prior psychiatric hospitalizations, and one ward was psychiatrically hospitalized when he committed suicide.  Seventy-five percent (3) of those 14 and under had a history of suicidal ideation. All 17 of the wards were receiving mental health services at the time of their death.  Four of the 17 were prescribed psychotropic medication.

## Wards 2000-2011 Suicide Death by Cause



*Non-wards*

Of the 34 suicide cases, 44% (15) involved cases that had been investigated by DCP in the year prior to the child's death; however, none of these cases were investigated due to suspected mental illness.  Of these 15 DCP investigations, 71% (10) were unfounded; one was indicated; and four were pending.  Thirty-eight percent (3) were male and 62% were female.

Of the 15 cases involved with DCP in the year prior to their suicide, 53% (8) were 14 years and younger.  All of these younger children committed suicide by hanging. Of the eight children, 38% (3) had prior psychiatric hospitalizations, with one being discharged one week prior to their suicide.  Fifty percent (4) were receiving mental health services at the time of their death and the other four had no documented history of mental illness.

Of the remaining child cases, one was a closed intact case, one was an open intact case, and one child had been adopted.  Of these three, all were female, two were 14 years and one was 15 years.  The 15-year-old died by hanging.  The two younger children committed suicide by hanging and by drowning/slitting her wrists.



## Non-Wards 2000-2011 Suicide Death by Cause

Drowning; 6%
Firearm; 6%

- Hanging
- Firearm
- Drowning

Hanging; 88%

*Findings*

According to Illinois Violent Death Reporting System data, between 2005 and 2008, 121 Illinois children and adolescents between the ages of 10-19 committed suicide. Three percent of these children were wards of the State of Illinois. From 2000-2011, 17 wards between the ages of 12 and 20 years old died by suicide. Considering the increased hardships and risks of children and adolescents who come into State care, the number of wards' deaths by suicide may appear almost unavoidable. However, there are some precautions that may help lower these fatal outcomes.

Three of seventeen wards killed themselves with guns. Two of the three wards accessed guns that were in their biological and foster homes. In the foster home, the gun was in a locked gun cabinet and in the parent's home, the gun was in the parent's bedroom, the bedroom door locked with a deadbolt lock. These two youths had histories of depression, psychiatric hospitalizations and suicidal ideations. Biological and foster parents may be able to reduce this means of suicide of their high risk youth by getting firearms out of the house. The University of Illinois at Chicago Institute for Juvenile Research produced a suicide prevention program to educate parents that "The risk of suicide doubles if a firearm is in the house, even if the firearm is locked up."

Special care must be taken with vulnerable younger wards that faced the deaths of their parents or significant relative caretaker and have come into state care. Several DCFS youth who committed suicide had lost loved ones or faced the impending deaths of loved ones. Support groups are increasingly available in the community. Community programs help youth connect with other youth who have suffered losses. Being a ward should not exclude the youth from these supportive connections. The Department needs to build a nurturing informal emotional support system for these vulnerable wards by assisting the youngsters in identifying child-centered collaterals who can serve as a consistent supportive figure.

Some of the wards who committed suicide came into the Department's care because of their mental illnesses and behavioral problems. Their family or caretakers could not manage them. Unfortunately, with cutbacks in

Illinois public mental health programs, the Department becomes the back-up system for nuclear and extended families with mentally ill or emotionally disturbed children/adolescents. The National Alliance on Mental Illness has developed a program called the Family to Family Education Program that appears to be underutilized by the Department.  A broad family approach (i.e. foster family, biological family, extended family) should be considered, along with individual therapy for the child. Integrative family approaches permit a great range of choices in treatment and, therefore, greater flexibility and treatment acceptability among the children and their families. Further, integrative methods are easily tailored to the strengths of the child and family and are readily augmented.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The Department should develop and document a plan for children ages 9-14, who enter the child welfare system following the loss of a parent or significant caretaker, and any child who experiences the death or loss of a parent or significant caretaker while in care.  In developing this plan, the child should be asked to identify individuals who can be part of the child's social support system.**

The Department agrees and will incorporate the recommendation into policy.

**2. Workers should be educated that because children do not experience grief in a linear fashion, that grief therapy may have to be accessed at different times during a child/adolescent's development. In addition, pastoral counseling resources should be made available to the youth.**

The Department will review the Crisis Response Administrative Procedure along with other resources to determine the most efficient way to make this information available to our workers.

The Department's Clinical Division will release a newsletter for all child welfare staff, discussing the symptoms and impact of depression, loss and grief on adolescent development.  The newsletter will emphasize suicide prevention and alert workers to symptoms and behavior associated with depression, grief and suicidal ideation.  The newsletter will also identify various evidence-based treatments and strategies for workers and family members.

**3. The Department should assure via the service plan that biological or foster families of children with mental illness are linked to psycho-education programs such as NAMI's Family-to-Family Education Program, which is a free 12-week course for family caregivers of individuals with mental illness. There are Family to Family programs located throughout Illinois.**

The Department will revise policy to include this recommendation.

Clinical's newsletter (referenced in recommendation #2) will include a treatment reference to the use of psycho-education programs for youth and families, such as NAMI's free, 12-week Family to Family Education Program.

**4. Integrated Assessors must screen adolescents for depression during the initial assessment.**

The Department agrees.  The Integrated Assessment screens for symptoms, signs and behaviors of depression and suicidal ideation, past or present.  Items from standardized clinical screens and inventories for depression and suicidal ideation have been incorporated into the interview tools for children, their parents and their caregivers.

**5. The Department should consider adopting an integrative family approach in addition to individual therapy for any ward with mental illness.**

The Department agrees.

**6. Access to means, specifically firearms, is predictive of suicide completion. Research has shown and as noted in two adolescents' deaths, those at risk of suicide will break into locked rooms and locked cabinets to access the firearms.  When the Department is placing an adolescent at risk of suicide in a foster home or facilitating a return to the biological home where there is a gun, the Department should conduct a clinical staffing to educate the parents (biological and foster) that the risk of suicide doubles if there is a firearm in the house, even if the gun is locked up. The staffing should utilize the materials developed by The University of Illinois at Chicago Institute for Juvenile Research for their Youth Suicide Prevention program. If the family has firearms, they should be asked to store the guns outside of the home. If the parent will not store the firearm elsewhere they must store firearms with a trigger lock in a lockbox. The keys should be kept in a secure or supervised setting. In return home situations of a suicidal youth, where the biological parent refuses to store the gun with a trigger lock in a lock box, the caseworker should contact DCFS Legal for assistance in presenting the case in Juvenile court for purpose of obtaining a court order.**

The Department will revise policy to indicate that trigger locks are required for all gun safes/cabinets in foster homes and in biological parent homes when a child has signs of depression and/or suicidal ideation and will return home.

**7. The Department should share a redacted version of this report with all DCFS placement workers as an educational tool.**

The report will be placed in a resource library on the D-Net.  The Bureau of Operations and Quality Assurance and Monitoring Division Divisions will notify DCFS and private agency staff of their need to review the report when it is available.

**8. The Office of the Inspector General will share a redacted version of this report with private child welfare agencies as an educational tool.**

The report will be shared.

**9. The report should be shared with the Clinical Service in Psychopharmacology Consulting Group.**

The report has been shared.

**DEATH AND SERIOUS INJURY INVESTIGATION 15**

| ISSUE | The Office of the Inspector General received a complaint involving a five-month old infant with six fractures who was returned to the care of his parents by a court in the Southern Region. |
|---|---|

The Assistant State's Attorney cited insufficient evidence to proceed with temporary custody despite Department recommendations and a medical opinion that the injuries were abusive. In order to gain an understanding of outcomes for other children with bone fractures, the OIG reviewed all bone fracture investigations in this county for children ages three and younger over a three year period. This review revealed a second infant with similar injuries who was also returned home by the court, despite the Department's recommendations that the infant remain in foster care. The OIG expanded this review to three additional counties from the Southern Region and one county each from the Central and Northern Regions. Data from a previous OIG report regarding bone fracture allegations from a separate county in FY 2009 of children ages birth to three years was also used. A total of 211 investigations were reviewed.

| DISCUSSION | Of the 211 bone fracture investigations reviewed, 70% of the children birth to three years had a single fracture, with infants representing 27% of these children. |
|---|---|

Among the children with multiple bone fractures, 19 (8%) had four or more fractures, with infants (0-6 months) accounting for 16 or 83% of these children. Infants (0-6 months) had the highest number of investigations (66) involving all number of fractures (31%). Conversely, three-year-old children had the lowest number of investigations representing 10% of the total population (See Table One).

**Table 1:  Number of Bone Fractures by Age**

| Age | Number of Children | | | | | TOTAL | |
|---|---|---|---|---|---|---|---|
| | 1 Fracture | 2 Fractures | 3 Fractures | 4 Fractures | 5+ Fractures | | |
| 0-6 months | 40 | 9 | 1 | 2 | 14 | 66 | 31% |
| 7-12 months | 26 | 8 | 3 | -- | 1 | 38 | 18% |
| 1 year | 44 | 7 | 4 | 1 | -- | 56 | 27% |
| 2 years | 22 | 5 | 1 | -- | 1 | 29 | 14% |
| 3 years | 15 | 6 | 1 | -- | -- | 22 | 10% |
| TOTAL | 147 (70%) | 35 (17%) | 10 (5%) | 3 (1%) | 16 (8%) | 211 | |

*Child Protection Investigative Findings*

Sixty-two percent (130) of the child protection investigations of bone fractures in children across all age ranges were unfounded for abuse and neglect. Infants (0-6 months) had the highest number of bone fracture investigations and represented the highest percentage of indicated findings totaling 51% of the 81 total indicated findings. Three-year-olds had the lowest number of investigations for bone fractures. While one year-olds had the second highest number of investigations for bone fractures, they had the lowest indication rate at 23%. (See Table Two).

**Table 2: Age Distribution by Investigation Findings**

| Age | Investigative Finding | | | | Total |
|---|---|---|---|---|---|
| | Indicated | | Unfounded | | |
| | # | %[1] | # | %[2] | |
| 0-6 months | 41 | 62% | 25 | 38% | 66 |
| 7-12 months | 13 | 32% | 28 | 68% | 41 |
| 1 Years | 12 | 23% | 41 | 77% | 53 |
| 2 Years | 8 | 28% | 21 | 72% | 29 |
| 3 Years | 7 | 32% | 15 | 68% | 22 |
| Total | 81 | 38% | 130 | 62% | 211 |

*Infants with Four or More Fractures*
In the OIG sample of 66 infants (0-6 months), sixteen (24%) of the investigations involved infants with four or more fractures. Two infants died from their injuries while the child protection investigation was pending. Injuries to 15 (94%) of the 16 infants were determined to be abusive by the evaluating physician. In the sixteenth investigation the physician attributed a two-month-old foster child's six rib fractures to co-sleeping on a sofa with an adult caregiver. The injuries were considered accidental by the physician.

*Fracture Type in Infants with Four or More Fractures*
The 16 infants with four or more fractures had a combined total of 105 fractures. Rib fractures were the most common with a total of 59 fractures in 13 infants. Only three infants in the investigations reviewed did not have a rib fracture. The second most common fracture was the tibia fracture with ten fractures in six infants followed by nine femur fractures in seven infants.

*Outcomes of Investigations involving Infants (birth to six months)*
The OIG reviewed the outcomes for the 66 infants with bone fractures at the close of the DCP investigation.

- Two infants died during the DCP investigation: a five month old with a clavicle fracture and 11 rib fractures and a three-month-old with ten fractures (8 rib, healing humerus, and cheek).
- One six week old foster child with six rib fractures remained in their relative placement.
- Three families had an open intact case at the time of the bone fracture investigation: A five-month-old with a tibia fracture, a two-month-old with a tibia fracture and a three-month-old with five fractures (2 skull and 3 rib).
- Twenty-two of the 66 investigations were closed without any further services warranted. Of these six were indicated for abuse or neglect.
- Three families were referred for community services: a two-month-old with transverse tibia fracture, a five-month-old with a metaphyseal humerus fracture and a six-month-old with a spiral humerus fracture and skull fracture.
- Fifteen families were referred for Intact Family Services. In four investigations that were unfounded the infant had four or more fractures.
- Twenty children were placed in foster care as a result of the bone fracture investigation. In 18 of the 20 investigations, or in 90% of the investigations a perpetrator was indicated for bone fracture by abuse. In the remaining two investigations, a perpetrator was indicated for bone fractures by neglect. Eight of the 20 (40%) infants who were taken into protective custody had four or more fractures. Three of those infants were returned home by the courts within 60 days.

---
[1] Percentage of Indicated Findings by age group.
[2] Percentage of Unfounded Findings by age group.

*Perpetrator Findings*

In 47 of the 66 (71%) investigations involving infants (0-6 months) with bone fractures a perpetrator was indicated for abuse or neglect.

- Thirty-five (74%) were indicated of bone fractures by abuse.
- Six were indicated for bone fractures by neglect.
- Two were indicated for inadequate supervision.
- Two were indicated for medical neglect
- Two were indicated for substantial risk of physical injury.

In eleven (17%) investigations involving infants (0-6 months), a parent was arrested by local law enforcement. Of the eleven parents arrested, four have been convicted.

*Prior Department Involvement*

Nine of the 66 families (14%) had prior investigative involvement with the Department. In five of the nine investigations, the infant with the bone fracture was also the alleged victim in the prior investigation. Four of the five prior investigations involved reports of domestic violence between the parents. One of the five investigations involved a parent with substance abuse issues.

*Families Reported to the Department after the Initial Bone Fracture Investigation*

In the OIG sample of 66 investigations of infants (0-6 months) with bone fractures, 48 infants (73%) remained or returned to the home where they received the initial bone fracture. Eight (17%) of the 48 families where the infant remained or returned to the home had subsequent hotline reports within 24 months of the initial hotline report. In three families reported after the initial bone fracture investigation, a sibling was the alleged victim. In the remaining five investigations the infant with the initial bone fracture was the alleged victim of the subsequent report.

### Findings

In the OIG review of young children's bone fracture child protection investigations infants 0-6 months accounted for 31% of child protection investigations, the largest age category. In comparison, children three years old represented 11% of the investigations. When investigating bone fracture allegations in infants, it is critical to understand the seriousness of the injuries in light of their limited mobility and vulnerability. Distinguishing abusive fractures from accidental injuries is a complex process that involves physical examination, radiographic findings and history of the injury (Hilton, 2006). Diagnosis should address whether the explanation adequately correlates with the severity, age, pattern and distribution of injuries and the likelihood of non-accidental causes of the injury (Kellogg, 2007).

Infants with rib fractures require additional scrutiny given the injury's association with abuse. Massive force is required to account for accidental injury in infants with rib fractures (Cadzow & Armstrong, 2000). In the OIG review, 18 of the 19 child protection investigations involving infants with rib fractures a perpetrator was indicated for abuse. In the 19th investigation the doctor believed the six rib fractures to a two month old to be accidental. However, the medical opinion was not supported by the literature. Additionally, Cadzow and Armstrong (2000) wrote that "in the absence of witnessed massive trauma or underlying metabolic bone disease, even a single rib fracture must be considered to be indicative of abuse."

As the number of fractures in an infant increases, so does the likelihood that the injuries are abusive. Leventhal (2008) found that infants with multiple fractures are 4 to 6 times more likely to have been abused then those infants with a single fracture. In the OIG review, fifteen (23%) of the 66 investigations involved infants with four or more fractures, with two infants dying during the child protection investigation from their

injuries.  The remaining 13 infants and their families received services from the Department: 1 Open Foster Care Case, 4 Intact Family Services, 8 Placed in Foster Care.  In one investigation where the family received intact family services, the infant died two months later from abusive injuries.  Among the eight infant removed from the home and placed in foster care, three were returned by the courts within 90 days.  In two of the situations, the injuries remained unexplained and the alleged perpetrators had not been removed from the home.  Returning vulnerable infants with unexplained injuries placed the children at further risk.

---

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

*This summary should be reviewed in conjunction with Death and Serious Injury Investigations 11 and 12 in this Report.  The Office of the Inspector General will work with the Administrative Office of the Illinois Courts for utilization in court improvement training.*

**1.  The Department should share a redacted copy of this report and the attachment *Bone Fractures in Infants: A Review of the Literature* with HealthWorks providers.**

The report was shared with HealthWorks providers.

**2.  The Department should share a redacted copy of this report with the Children's Medical Resource Network and inform the Network that the Department will be sharing *Bone Fractures in Infants: A Review of the Literature* with HealthWorks providers.**

A new DCFS liaison has been assigned to the Children's Medical Resource Network and will address this issue.  All discussions should be complete by April 2013.

**3.  A redacted copy of this report and *Bone Fractures in Infants: A Review of the Literature* should be made available as a resource to direct line staff.**

All workers have received this information. The information will also be made a part of a new Resource Library that will be placed on the D-Net.

**4.  A redacted copy of this report and *Bone Fractures in Infants:  A Review of the Literature* should be shared with the involved Emergency Department Directors.**

The report has been shared.

## CHILD DEATH REPORT

Office of the Inspector General (OIG) staff investigate the deaths of Illinois children whose families were involved in the child welfare system within the preceding twelve months. OIG staff receive notification from the Illinois State Central Register (SCR) when a child dies, when the death is reported to SCR.[1] OIG staff investigate the Department's involvement with the deceased and his or her family when (1) the child was a ward of DCFS; (2) the family is the subject of an open investigation or service case at the time of the child's death; or (3) the family was the subject of an investigation or service case within the preceding twelve months.[2]  If OIG investigators learn of a child death meeting this criteria that was not reported to the SCR, staff will still investigate the death.

Notification of a child's death initiates a preliminary investigation in which the death report is reviewed, databases are searched and results reviewed, autopsy reports are requested, and a chronology of the child's life, when available, is reviewed.  The next level of investigation is an investigatory review of records in which records may be impounded, subpoenaed, or requested, and reviewed. When warranted, OIG investigators conduct a full investigation, including interviews.  A full investigation usually results in a report to the Director of DCFS.  The majority of cases are investigatory reviews of records, often including social service, medical, police and school records, in addition to records generated by the Department.

In Fiscal Year 2012 OIG staff investigated 106 child deaths meeting criteria for review, a decrease (of 7) from 113 deaths in FY 2011, but still an increase (of 23) from 83 deaths in FY 2010.[3] A description of each child's death and DCFS involvement is included in the annual report for the fiscal year in which the child died. This year's annual report includes summary information for children who died between July 1, 2011 and June 30, 2012. During this fiscal year investigatory reviews of records were conducted in 92 cases; and full investigations were opened in 12 cases, 2 of those investigations have been completed with reports to the Director, and 10 investigations are pending. Out of 3 cases in which children committed suicide, 2 were included in a special report reviewing suicides, see page 132.  Comprehensive summaries of death investigations reported to the Director in FY 12 are included in the Investigation section of this annual report.

Individual cases may not rise to a level necessitating a full investigation, but collectively can indicate systemic patterns or problems that require attention. OIG staff may address systemic issues through a

---

[1] SCR relies on coroners, hospitals, and law enforcement in Illinois to report child deaths, even when the deaths are not suspicious for abuse or neglect.  The deaths are not always reported.  Therefore, true statistical analysis of child deaths in Illinois is difficult because the total number of children that die in Illinois each year is unknown.  The Illinois Child Death Review Teams have requested that individual county registrars forward child death certificates to SCR to compile a list of all the children who die in Illinois.  It is not known whether this is regularly occurring; in addition, some death certificates are sent to the Child Death Review Team Coordinator well after the fiscal year in which the death occurred.  The Cook County Medical Examiner's policy is to report the deaths of all children autopsied at the Medical Examiner's office.  The OIG acknowledges all the county coroners and the Cook County Medical Examiner's Office for responding to our requests for autopsy reports.

[2] Prior to August 2010, some unfounded investigations were expunged from the Department's computer system in less than one year. Therefore, not all child deaths meeting the criteria for review were brought to the attention of the OIG. In July 2010 Governor Quinn signed legislation to maintain unfounded reports for 12 months following the date of the final finding.

[3] FY 2011 saw the first increase in the number of child deaths reviewed since 2007. Child deaths meeting criteria for review: 86 in FY 2006; 111 in FY 2007; 99 in FY 2008; 89 in FY 2009; 83 in FY 2010; 113 in FY 2011; 106 in FY 2012.

variety of means, including cluster reports, initiatives, and trainings. This fiscal year, the OIG issued a report addressing suicides of DCFS-involved children from 2000 to 2011.

Twenty-seven of the 106 deaths (25%) reviewed this fiscal year involved unsafe sleeping arrangements for babies 10 months of age and younger. "Unsafe sleeping arrangements" included 16 babies co-sleeping in a bed with one or more parents, siblings, or other relatives; 6 babies whose parents fell asleep with them on a couch or futon; twins who were placed in a crib together filled with multiple blankets and other items; two infants placed face down in bassinets on top of blankets; and one infant who was placed on top of a standard sized pillow in a car seat.

In the 23 of 27 cases in which the infant was not in a crib or bassinet, 18 (78%) had a crib or bassinet in the home on the day of the infant's death. In one case the mother did not have a crib; in two cases it is unknown if there was a crib; and in two cases the family had a crib or bassinet in their own home, but were spending the night at the grandparents' home.

In 14 of the 22 cases (64%) in which a baby was sleeping with someone, records provide evidence that the family was aware of the risks of co-sleeping through education by a health care provider or DCFS investigator/worker. In 7 cases it is unknown if the family had been educated. In one case, a father who slept with his baby on the couch denied being aware of the risks of co-sleeping.

The use of illegal or prescription drugs or alcohol just prior to co-sleeping, a factor known to increase the risk of death from co-sleeping, was confirmed in only 4 of the 22 deaths involving co-sleeping and two of those children were also born substance-exposed. Indications that substance abuse may have played a role, by the substance-exposed birth of the child, was present in only one of the remaining 18 cases.

**Summary**

Following is a statistical summary of the 106 child deaths investigated by OIG staff in FY 12, as well as summaries of the individual cases. The first part of the summary presents child deaths by age and manner of death, case status and manner of death, county and manner of death, and substance exposure status and manner of death. The second part presents a summary of deaths classified in five manners: homicide, suicide, undetermined, accident, and natural.[4]

*Key for Case Status at the time of OIG investigation:*

Ward . . . . . . . . . . . . . . . . . . . . . . .   Deceased was a ward.

Unfounded DCP . . . . . . . . . . . . .   Family had an unfounded DCP investigation within a year of child's death.

Pending DCP . . . . . . . . . . . . . . .   Family was involved in a pending DCP investigation at time of child's death.

Indicated DCP . . . . . . . . . . . . . .   Family had an indicated DCP investigation within a year of child's death.

Child of Ward . . . . . . . . . . . . . .   Deceased was a ward's child, but not a ward themselves.

---

[4] The causes and manners of death are determined by hospitals, medical examiners, coroners and coroners' juries.

Open/Closed Intact . . . . . . . . . .      Family had an open intact family case at time of child's death / or within a year of child's death.

Open Placement/
Split Custody. . . . . . . . . . . . . . .      Deceased, who never went home from hospital, had sibling(s) in foster care or child in care of parent with other children in foster care.

Return Home . . . . . . . . . . . . . . .      Deceased or sibling(s) was returned home to parent(s) from foster care within a year of child's death.

Child Welfare
Services Referral . . . . . . . . . . . .      A request was made for DCFS to provide services, but no abuse or neglect was alleged.

Preventive Services/
Extended Family. . . . . . . . . . . . .      Intact family case was opened to assist family, but not as a result of an indicated DCP investigation.

Former Ward. . . . . . . . . . . . . . .      Child was a ward within a year of his/her death.

**Table 1: Child Deaths by Age and Manner of Death**

| | CHILD AGE | HOMICIDE | SUICIDE | UNDETERMINED | ACCIDENT | NATURAL | TOTAL |
|---|---|---|---|---|---|---|---|
| Months of Age | At birth | 1 | | | | 3 | 4 |
| | 0 to 3 | 2 | | 9 | 10 | 6 | 27 |
| | 4 to 6 | | | 4 | 3 | 1 | 8 |
| | 7 to 11 | 2 | | | 4 | 2 | 8 |
| | 12 to 24 | 4 | | 2 | 3 | 2 | 11 |
| Year of Age | 2 | 4 | | | 3 | 2 | 9 |
| | 3 | | | 1 | 2 | 3 | 6 |
| | 4 | 3 | | | 1 | | 4 |
| | 5 | 2 | | | | | 2 |
| | 6 | | | | | | |
| | 7 | 2 | | | 1 | | 3 |
| | 8 | 1 | | | | | 1 |
| | 9 | | | | 1 | 1 | 2 |
| | 10 | | | | | | |
| | 11 | 1 | 1 | | 2 | | 4 |
| | 12 | | | | 1 | 1 | 2 |
| | 13 | | | | | 2 | 2 |
| | 14 | 1 | | | | 2 | 3 |
| | 15 | | 1 | | 1 | 1 | 3 |
| | 16 | | | | | | |
| | 17 | 2 | 1 | | | | 3 |
| | 18 or older | 3 | | | | 1 | 4 |
| | TOTAL | 28 | 3 | 16 | 32 | 27 | 106 |

**Table 2: Child Deaths by Case Status and Manner of Death**

| | REASON FOR OIG INVESTIGATION* | HOMICIDE | SUICIDE | UNDETERMINED | ACCIDENT | NATURAL | TOTAL |
|---|---|---|---|---|---|---|---|
| DCP | Pending | 3 | | 1 | 4 | 4 | 12 |
| | Unfounded | 7 | | 6 | 13 | 6 | 32 |
| | Indicated | 3 | | 2 | 4 | 3 | 12 |
| Ward | | 7 | 2 | | 2 | 8 | 19 |
| Former Ward | | 1 | | | | | 1 |
| Return Home | | | | | 1 | | 1 |
| Open Placement/Split Custody | | 1 | | | | | 1 |
| Open Intact | | 1 | | 4 | 5 | 4 | 14 |
| Closed Intact | | | | | 1 | 1 | 2 |
| Child of a Ward** | | | | 1 | | | 1 |
| Child Welfare Services Referral | | 2 | | 1 | 2 | | 5 |
| Preventive Services/Extended Family | | 3 | 1 | 1 | | 1 | 6 |
| TOTAL | | 28 | 3 | 16 | 32 | 27 | 106 |

* When more than one reason existed for the OIG investigation, it was categorized based on primary reason.

** Includes children of a ward who aged out of the system within the year prior to the death.

**Table 3: Child Deaths by County of Residence and Manner of Death**

| COUNTY | HOMICIDE | SUICIDE | UNDETERMINED | ACCIDENT | NATURAL | TOTAL |
|--------|----------|---------|--------------|----------|---------|-------|
| Adams | | 1 | | | | 1 |
| Alexander | | | | | 1 | 1 |
| Boone | | | | 1 | | 1 |
| Champaign | 1 | | | 1 | | 2 |
| Clark | | | | 1 | | 1 |
| Coles | | | | 1 | 1 | 2 |
| Cook | 11 | 1 | 7 | 10 | 12 | 41 |
| Douglas | | | 1 | | | 1 |
| Du Page | | | | | 2 | 2 |
| Fulton | | | | 2 | | 2 |
| Grundy | | | | 1 | | 1 |
| Jackson | 1 | | | | | 1 |
| Kane | 2 | | 1 | 2 | 1 | 6 |
| Knox | | | | | 1 | 1 |
| Lake | | | 3 | | 1 | 4 |
| LaSalle | | | | 1 | 1 | 2 |
| Livingston | 3 | | | 1 | 1 | 5 |
| Macon | | | | 2 | 1 | 3 |
| Macoupin | 1 | | | | | 1 |
| Madison | | | | | 1 | 1 |
| Peoria | 1 | | | | 1 | 2 |
| Rock Island | | | | 1 | 1 | 2 |
| St. Clair | 3 | | | 1 | | 4 |
| Sangamon | | | | 1 | | 1 |
| Union | 1 | | | | | 1 |
| Vermillion | | | | 1 | | 1 |
| Wayne | | | 1 | | | 1 |
| Whiteside | | | 2 | | | 2 |
| Will | 1 | 1 | 1 | 1 | 1 | 5 |
| Williamson | 1 | | | | | 1 |
| Winnebago | 2 | | | 3 | 1 | 6 |
| Tazewell | | | | 1 | | 1 |
| **TOTAL** | **28** | **3** | **16** | **32** | **27** | **106** |

**Table 4: Child Death by Substance Exposure and Manner of Death**

| SUBSTANCE EXPOSURE | HOMICIDE | UNDETERMINED | ACCIDENT | NATURAL | TOTAL |
|--------------------|----------|--------------|----------|---------|-------|
| Child exposed at birth*** | 2 | 3 | 4 | 6 | **15** |
| Mother has history of substance abuse | 1 | | 2 | 1 | **4** |

*** This includes children who tested positive for a substance at birth or whose mother tested positive for a substance at birth.  Others may have been exposed to drugs during the pregnancy, but the drug usage was not recent enough to cause the newborn or mother to test positive.

## FY 2012 DEATH CLASSIFICATION BY MANNER OF DEATH

### HOMICIDE
*Twenty-eight deaths were classified homicide in manner.*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Gunshot wound(s) | 12 |
| Abusive head trauma | 9 |
| Multiple injuries due to child abuse | 3 |
| Asphyxia due to foreign body in the pharynx | 1 |
| Cold Exposure | 1 |
| Death due to parental neglect | 1 |
| Cause Pending | 1* |
| **TOTAL** | **28** |

*Likely result of respiratory complications from abusive head trauma 8 years earlier.

### PERPETRATOR INFORMATION:

| PERPETRATOR | NUMBER |
|---|---|
| Mother | 11 |
| Father | 6 |
| Mother's Boyfriend | 4 |
| Father's Girlfriend | 1 |
| Stepmother | 1 |
| Maternal Grandmother | 1 |
| Brother | 1 |
| Unrelated Peer | 1 |
| Unrelated Adult | 1 |
| Unknown/Unsolved | 5 |
| **TOTAL** | **32** |

| PERPETRATOR GENDER | PERPETRATOR AGE RANGE | CHARGES |
|---|---|---|
| Males | 18 - 40 (one 7 year-old) | 8 |
| Females | 19 - 48 (one 13 year-old) | 7 |

## SUICIDE
*Three children committed suicide this fiscal year. One 11 year-old and one 17 year-old hung themselves, and one 15 year-old killed herself by getting hit by a train.  Two of the children were wards; the other was a subject in an open preventive services case.*

## UNDETERMINED
*Sixteen deaths were classified undetermined in manner*.

| CAUSE OF DEATH | NUMBER |
|---|---|
| Undetermined | 7 |
| Sudden Unexpected Death in Infancy (SUDI) | 6 |
| Asphyxia due to smothering | 1 |
| Cause pending | 2 |
| **TOTAL** | **16** |

## ACCIDENT
*Thirty-two deaths were classified accident in manner.*

| CAUSE OF DEATH | NUMBER |
|---|---|
| Asphyxia/Suffocation/Overlay | 14 |
| Drowning | 4 |
| Motor vehicle accident related injuries | 4 |
| Sudden Unexpected Death in Infancy (SUDI) | 3 |
| Injuries from Fire | 2 |
| Hypoxia/Asphyxia due to dislodged tracheal tube | 2 |
| Blunt trauma | 1 |
| Trapping | 1 |
| Methadone intoxication | 1 |
| **TOTAL** | **32** |

## NATURAL
*Twenty-seven deaths were classified natural in manner.*

| CAUSE OF DEATH | NUMBER |
|---|:---:|
| Pneumonia or respiratory illness (including asthma) | 4 |
| Congenital conditions | 4 |
| Sudden Infant Death Syndrome (SIDS) | 3 |
| Cancer | 3 |
| Hypoxic encephalopathy | 3 |
| Cardiac disease or complications from heart problems | 2 |
| Sepsis/Septic shock | 2 |
| Placenta abruption | 2 |
| Seizure Disorder | 1 |
| Complications of anorexia and bulimia | 1 |
| Intracerebral hemorrhage | 1 |
| Cause pending | 1 |
| **TOTAL** | **27** |

## HOMICIDE

| Child No. 1 | DOB 1/09 | DOD 7/11 | Homicide |
|---|---|---|---|
| Age at death: | 2-1/2 years | | |
| Substance exposed: | Yes, cocaine, marijuana, opiates | | |
| Cause of death: | Multiple blunt force injuries as a result of child abuse | | |
| Perpetrator: | Mother | | |
| Reason For Review: | Pending child protection investigation at time of child's death and | | |
| | Child returned home within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:     Two-and-a-half-year-old child died in the hospital one day after being taken there in full cardiac arrest. His 36-year-old mother told medical staff that while she was at home cooking in the kitchen she heard a loud thud from the room where the child and his 18-month-old sister were playing. She said that she found her son lying in the middle of the floor foaming at the mouth and she believed he was having a seizure. An autopsy revealed head injuries and multiple other injuries caused by abuse. The mother was charged with first degree murder and is in jail awaiting trial. DCFS indicated her for death by abuse and took her 18-month-old daughter into protective custody. The girl is placed with a relative and has a goal of return home to her father. *The OIG is conducting a full investigation of this child's death.*

Prior History:     The deceased entered foster care following his premature substance-exposed birth. He was his mother's sixth child and the third to be born substance-exposed. None of his siblings were in their mother's care. After his birth the mother participated in services including substance abuse treatment, counseling and parenting classes. While the deceased was in foster care, his mother gave birth, in December 2009, to a substance-free baby girl and was allowed to take the baby home. The deceased was returned home to his mother's care in October 2010 and his court case was closed in March 2011. In June 2011 the boy was taken to the emergency department with bruising, scratches, and swelling. His mother reported that he had fallen off a bed two days prior. The hospital called the hotline and a child protection investigation was pending at the time of the child's death. The boy and his younger sister were in the care of their mother during the investigation; a safety plan was not in place. The boy's maternal grandmother died fifteen days before the boy's death and his maternal uncle died eleven days before. Seven days before his death the child was seen in a second emergency department and two days before he was seen by a medical specialist for an issue related to his prematurity.

| Child No. 2 | DOB 9/96 | DOD 8/11 | Homicide |
|---|---|---|---|
| Age at death: | 14 years | | |
| Substance exposed: | Unknown, mother has a history of substance abuse | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Fourteen-year-old boy was shot and killed execution style while walking home around 2:00 in the afternoon after playing basketball. There is an open police investigation of the child's murder.

Prior History:    The deceased was the youngest of six children removed from his mother's care because of neglect due to her drug abuse. When he was four years old the boy and three of his siblings were adopted by a maternal aunt. In December 2010 the Department investigated and unfounded an allegation of medical neglect to the boy by his 40-year-old adoptive mother. A school social worker had called the hotline with an allegation that the mother was not administering the boy's psychotropic medication to him; the investigation revealed that the boy refused to take his medication. In July 2011 the hotline was called when the mother locked the boy out of their home. The boy went on run from home confinement and the mother called his juvenile probation officer. She refused to allow him back home because she was afraid of his gang affiliation and drug dealing. The boy's probation officer placed the boy in a transitional youth home while other living arrangements were explored. The boy was living in the youth home at the time of his death.

| Child No. 3 | DOB 3/10 | DOD 8/11 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 17 months |
| Substance exposed: | No |
| Cause of death: | Bronchopneumonia due to cerebral injuries due to blunt head trauma |
| Perpetrator: | Mother and father |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:    Seventeen-month-old ward, who was medically compromised because of abuse she suffered when she was three months old, was found unresponsive in her crib by her paternal grandmother/foster mother. The grandfather called 911 and the child was taken to the hospital where she was pronounced dead. After the child died, the parents were indicated for her death by abuse because the injuries she suffered at 3 months compromised her body's immune response, resulting in a deadly respiratory infection.

Prior History:    The Department's first contact with the family was in October 2008 when the 28-year-old mother gave birth to a substance-exposed infant. An intact family services case was open from December 2008 until December 2009. The deceased was born three months later. In June 2010, when she was 3 months old, the deceased was brought to a hospital with complaints that she was not eating and was less alert. The baby was diagnosed with bilateral subdural hematomas and a fractured rib. The mother and 26-year-old father's explanation that the baby had fallen off a bed weeks earlier was inconsistent with her injuries and she and her four older siblings entered foster care. The parents were indicated for head injuries by abuse to the deceased and substantial risk of physical injury to her siblings. The surviving siblings are in the subsidized guardianship of their maternal grandmother.

| Child No. 4 | DOB 5/06 | DOD 8/11 | Homicide |
|---|---|---|---|
| 5 | 5/07 | 8/11 | |

| | |
|---|---|
| Age at death: | 4 and 5 years |
| Substance exposed: | No |
| Cause of death: | Shotgun wounds |
| Perpetrator: | Mother |
| Reason For Review: | Open extended family support services case at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:    Four and five-year-old siblings were shot and killed by their 25-year-old mother. Their 8-year-old brother was spared. The mother planned to kill all three of her children and herself, but the 8-year-old tried to wrestle the gun away and it jammed. She told the boy to get in the car and drove and dropped him off at a relative's house. The mother was charged with two counts of murder, but was found unfit to stand trial. She was remanded to the Division of Mental Health for psychiatric treatment until she can be found fit to stand trial. DCFS indicated her for the deaths of her children. The surviving boy is in the care of his maternal grandmother.

Prior History:   An intact family services case was open on the family from February 2008 through April 2009. The mother participated in services minimally and requested that her case be closed. The children appeared well-cared for and there were no signs of abuse or neglect. In August 2011 the maternal grandmother called the hotline to request help in obtaining guardianship of her three grandchildren whom she was caring for since their mother was arrested and jailed 13 days earlier for battery, driving while intoxicated, and driving on a revoked license without insurance. The children's father was in prison. The grandmother was referred to Extended Family Support Services, but when a worker contacted her, she declined assistance. Five days before she killed the children, the mother was released on probation from county jail and resumed the care of her children from the grandmother.

| Child No. 6 | DOB 7/06 | DOD 10/11 | Homicide |
|---|---|---|---|
| Age at death: | 5 years | | |
| Substance exposed: | No | | |
| Cause of death: | Gunshot wound to head | | |
| Perpetrator: | Unrelated adult | | |
| Reason For Review: | Open child welfare services referral at time of child's death and Closed intact family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:   Five-year-old boy was shot and killed while he was a passenger in a car backing out of his family's driveway. The car was driven by his aunt and the boy's 24-year-old mother, 30-year-old father, and two younger siblings were passengers in the car. The boy's father, who is a gang member with a criminal history of firearm offenses, is believed to have been the intended victim. A 27-year-old distant cousin of the mother has been charged with first degree murder and is in jail awaiting trial. He also is a gang member with a criminal history of attempted murder and firearm offenses.

Prior History:   An intact family services case was opened in September 2009 following an incident of domestic violence by the father to the mother in the presence of the deceased; the mother already had an order of protection against the father but had allowed him to come over to see and help with the children. The father was in and out of jail while the intact family services case was open. The mother denied seeing him as did her family members. She and the children lived with the maternal grandmother. The mother engaged in counseling that addressed domestic violence and the case was closed in October 2010. In June 2011, while still living with the maternal grandmother, the mother called the hotline requesting help because her family was having difficulty paying their bills and their gas and electric services were going to be shut off. A worker helped the mother identify resources that might be able to provide assistance.

| Child No. 7 | DOB 11/09 | DOD 10/11 | Homicide |
|---|---|---|---|
| Age at death: | 23 months | | |
| Substance exposed: | Yes, marijuana | | |
| Cause of death: | Abusive head trauma | | |
| Perpetrator: | Maternal grandmother | | |
| Reason For Review: | Closed extended family support services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

CHILD DEATH REPORT

Narrative:      Twenty-three-month-old became unresponsive while in the care of her 48-year-old maternal grandmother. She died the following day. The child had massive head injuries and bruises on multiple places of her body. The grandmother reported that her pit bull dog ran into the child and caused her to fall down three wooden steps onto a cement landing. The grandmother reported slapping, shaking, and hitting the child to revive her. A physician specializing in child abuse gave the opinion that the child's injuries were not consistent with the grandmother's explanation and her described resuscitation techniques were unlikely. The grandmother was the sole caretaker of the child for the three days prior to the incident. The 25-year-old mother reported that for months prior to her daughter's death she had suspected the grandmother was physically abusing the child but she continued to allow the girl and her younger brother to stay with the grandmother for extended visits. She also allowed the grandmother to remain the guardian of the mother's two older children. The grandmother was indicated for the child's death by abuse and the mother was indicated for death by neglect. Both were indicated for substantial risk of physical injury to the three surviving siblings who are now in foster care.

Prior History:      The deceased was the third of four children. In April 2011 the maternal grandmother called the hotline requesting assistance to obtain guardianship of the mother's two older children, ages 6 and 9-years, who had been living with the grandmother for two months. The two younger children stayed with their mother. An extended family support services case was opened to assist the grandmother to obtain guardianship. The case was closed in June 2011 when the grandmother was awarded guardianship of the children.

| Child No. 8 | DOB 3/93 | DOD 11/11 | Homicide |
|---|---|---|---|
| Age at death: | 18 years | | |
| Substance exposed: | No | | |
| Cause of death: | Gunshot wound to face | | |
| Perpetrator: | Unknown male | | |
| Reason For Review: | Deceased was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Eighteen-year-old ward was on his way to school and was standing at the bus stop talking to friends when an unknown male offender walked up to the teen, pulled out a handgun and shot the teen in the face, and fled on foot. The teen was pronounced dead at the hospital. Police released a surveillance photo of the suspect in a community alert two days after the teen's death. No one has been apprehended.

Prior History:      The deceased was the middle of five children. His father is unknown. The children entered foster care in 2000 because of their mother's substance abuse. The teen was placed in a teen living program in February 2011. He lived in a group home and was doing well in the program. He attended school, participated in an after school program in which he earned money, and was learning life skills such as laundry and grocery shopping. He had sickle cell disease and took his medication. His caseworker spoke to him the morning of his death to remind him about an appointment.

| Child No. 9 | DOB 10/04 | DOD 11/11 | Homicide |
|---|---|---|---|
| Age at death: | 7 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple medical problems resulting from blunt head trauma | | |
| Perpetrator: | Step-mother and father | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Seven-year-old medically compromised ward died in the hospital twelve days after being admitted for cold symptoms. Ten months earlier he suffered massive head injuries at the hands of his step-mother. He spent eight months in the hospital and a rehabilitation center and then was placed with his maternal grandparents. When the ward died, his 35-year-old step-mother was charged with murder after earlier being charged with aggravated battery to a child. The ward's 40-year-old father has been charged with aggravated domestic battery for throwing another son down the stairs and breaking his arm in October 2009, an event that came to light during the investigation of the ward's injuries. Both parents are awaiting trials. They were indicated for the ward's death by abuse.

Prior History:   The Department's first contact with the family was for the injuries that ultimately led to the boy's death. In December 2010, the 7-year-old boy was taken to the emergency department where medical personnel discovered massive bruising, new and old head injuries, and old spinal fractures. Family members consisted of the father, step-mother, the 7-year-old boy, his 10 and 15-year-old brothers, the step-mother's 10-year-old son, and their 1-1/2-year-old half-brother. The three boys' mother had died in 2005. Police and DCFS investigations revealed that the boy and his 10-year-old brother were victims of excessive, abusive punishment by both parents, including standing against a wall for hours at a time, being given cold showers, being made to run stairs and do jumping jacks, and having food and drink restricted. The parents were indicated for torture to the two boys and substantial risk of physical injury to all of their children. The father's children and the child he and the step-mother had together are in foster care with their paternal grandparents. The step-mother's child is with his father.

| Child No. 10 | DOB 10/94 | DOD 11/11 | Homicide |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | No | | |
| Cause of death: | Gunshot wound to the chest | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Seventeen-year-old old ward was found by a citizen around 5:30 a.m. unresponsive lying on the street with a gunshot wound to the chest. The citizen called 911 and the ward was taken to the hospital where he was pronounced dead. The teen had been on run for 11 days from his placement with a relative. A missing persons report had been filed and local police were asked to watch out for the teen. Police believed the teen was the intended victim of the shooting because he had been witnessed shooting up a house 3-4 days prior to his death. An investigation of the teen's murder remains unsolved but open.

Prior History:     The deceased became a ward in March 2011 when his mother could not be located and his godmother could no longer care for him. The family's home burned down in Summer 2010. The mother decided to move out of state with her children but when the time came to leave the deceased was on run. The mother filed a missing persons report and moved with her other children.

| Child No. 11 | DOB 8/11 | DOD 11/11 | Homicide |
|---|---|---|---|
| Age at death: | 3-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to foreign body in the pharynx due to it being pushed down the mouth | | |
| Perpetrator: | Father | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Three-and-a-half-month-old baby girl was left in the care of her 26-year-old father and her maternal grandmother while her 19-year-old mother went to school. The baby stopped breathing while with her father in the basement. The father reported that the baby inhaled a piece of a baby wipe while he was wiping off her face. The maternal grandmother called 911 and the baby was taken by ambulance to the emergency department where a doctor worked on her but was unable to save her or find a baby wipe. At autopsy a full-sized balled up baby wipe was found in the baby's pharynx, making the father's story of what happened implausible. The father was charged with involuntary manslaughter and is awaiting trial. The Department indicated him for death by abuse. The deceased was an only child.

Prior History:    There was one prior unfounded child protection investigation involving this family. In October 2011, a month before the child died, the parents got into an argument because the mother believed the father was being unfaithful to her. The mother hastily left the residence with the baby and allegedly did not buckle the baby in her car seat. The maternal grandmother reported that the mother put the child in the car seat without affixing the straps, but the maternal grandmother insisted the mother strap the baby in before she left the house. The mother agreed to allow the baby to be cared for by someone more appropriate if she became angry. The family was offered intact family services but they refused.

| Child No. 12 | DOB 11/07 | DOD 11/11 | Homicide |
|---|---|---|---|
| Age at death: | 4 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple blunt force injuries as a result of child abuse | | |
| Perpetrator: | Mother and mother's boyfriend | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Full investigation, Report to Director on February 16, 2012 | | |

Narrative:      Four-year-old child was pronounced dead on arrival at the hospital on his 4th birthday. He had numerous bruises in various stages of healing on his body. Earlier that day an anonymous reporter called the hotline to report that the day before the boy was observed with a black eye that his 28-year-old mother said she caused when the boy wouldn't settle down. Within hours a child protection investigator went to the family's residence, but was informed by police officers there that the child was dead. The mother and her 34-year-old boyfriend admitted to striking the boy. Both have been charged with murder and are in jail awaiting trial. The Department indicated the pair for the boy's death by abuse.

Prior History:      Three months earlier the hotline was called when the mother took the child to a hospital emergency department reporting that he had fallen. Doctors reported that the child's numerous injuries were not consistent with the mother's explanation. The mother was arrested and charged with domestic battery (for which she was later convicted in October 2011) but the child protection investigation was unfounded for abuse and indicated for inadequate supervision in allowing the boy to sustain multiple injuries. **See** Death & Serious Injury Investigation 2.

| Child No. 13 | DOB 10/07 | DOD 12/11 | Homicide |
|---|---|---|---|
| Age at death: | 4 years | | |
| Substance exposed: | No | | |
| Cause of death: | Craniocerebral injuries due to blunt trauma of the head | | |
| Perpetrator: | Father's girlfriend | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:    Four-year-old boy was discovered unresponsive on the floor of his bedroom by his babysitter around 8:00 a.m. The boy's 30-year-old father was out of town for work; his father's 29-year-old girlfriend, with whom they lived, had left for work earlier that morning. The girlfriend has been charged with first-degree murder, aggravated battery of a child and concealment of homicidal death. She is awaiting trial. The Department indicated the girlfriend for the boy's death by abuse and for substantial risk of physical injury to her own two children, ages 8 and 12, who were with their father at the time of the boy's death and are with him now. The boy's father was indicated for death by neglect because he left his son in his girlfriend's care despite concern about her previous discipline of the boy. *The OIG is conducting a full investigation of this child's death.*

Prior History:    Eleven days prior to his death, the hotline was called with an allegation that the boy had a bruised and swollen eye and that he had had prior facial injuries as well. The child was seen by his pediatrician who diagnosed pink eye. The investigation was pending at the time of the boy's death and no safety plan was in place. Ten months prior to the boy's death an investigation was conducted for substantial risk of physical injury based on an allegation that the girlfriend had stabbed the father in the hand. The father denied being stabbed and the children denied seeing him get stabbed and the investigation was unfounded.

| Child No. 14 | DOB 7/94 | DOD 12/11 | Homicide |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | Unknown | | |
| Cause of death: | Gun shot wound to the back | | |
| Perpetrator: | Unrelated male | | |
| Reason for Review: | Former Ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Seventeen-year-old boy was standing on the sidewalk talking with friends about 7:45 p.m. when an unknown male ran up to the group and fired shots from a handgun, killing the boy and seriously injuring a sixteen-year-old girl. Police believe the shooting was gang related; an investigation of the teen's murder remains unsolved but open.

Prior History:    The deceased was an only child and the father of a 2-year-old boy. In May 2010, when he was fifteen, the teen was placed in the guardianship of DCFS by a judge hearing his juvenile delinquency case. The teen was placed at a residential treatment facility from which he regularly left without permission. He was arrested in December 2010 and sent to juvenile temporary detention. In February 2011 he was sentenced to the Illinois Department of Corrections and the judge vacated the Department's guardianship of the teen. The teen was killed following his release from the Department of Corrections.

| Child No. 15 | DOB 3/11 | DOD 12/11 | Homicide |
|---|---|---|---|
| 16 | 5/04 | 12/11 | |
| 17 | 5/03 | 12/11 | |
| Age at death: | 9 months, 7-1/2 years, 8-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Gun shot wounds | | |
| Perpetrator: | Mother | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Nine-month, 7-year and 8-year-old children were shot and killed by their 30-year-old mother after she shot and killed her boyfriend, the nine-month-old baby's 29-year-old father. She then shot and killed herself. The family had recently moved to a new town. The baby's father was a security guard and had several guns, but kept them locked up. The mother reportedly suffered from post-partum depression after the birth of the baby, but a family member reported she had recently seemed happy.

Prior History:   One year earlier, the younger child's therapist called the hotline to report domestic violence in the home. The investigator interviewed the two children, their mother and their mother's boyfriend and all agreed that the mother and her boyfriend sometimes argued but there was no physical violence. The children's father, who had the kids on weekends, was not aware of any domestic violence; the police had never been called to the home; and the children's school had no concerns about the children's care. The investigation was unfounded.

| Child No. 18 | DOB 8/09 | DOD 12/11 | Homicide |
|---|---|---|---|
| Age at death: | 2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Confluent pneumonia with chronic encephalopathy consistent with medical history of non-accidental traumatic head injuries with secondary complications | | |
| Perpetrator: | Father | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:        Two-year-old ward, who was medically complex because of injuries inflicted on her when she was three months old, was found unresponsive by her paternal grandmother. The ward and her twin sister had just returned home from a court-sanctioned unsupervised two-day visit with their mother who was working toward their return home. The ward was sick with a high fever and had been coughing and vomiting. The grandmother called 911 and the child was taken to the hospital where she was pronounced dead. The father was indicated for the child's death because he had been indicated for the injuries that were previously inflicted.

Prior History:    In November 2009 the ward was taken to the emergency department and found to have bilateral subdural hematomas. Her twin sister was evaluated and discovered to have five rib fractures and a broken left femur. Their two older brothers did not have any injuries. The twins were born prematurely at 33 weeks gestation and spent one month in the hospital. At the time they were discharged from the hospital, their 28-year-old mother was halfway through a week-long incarceration and a maternal aunt helped the 25-year-old father care for the babies. Police investigated the twins' injuries and the father changed his statements to police multiple times, but no one was charged because there were multiple caretakers of the children. The Department indicated the father for abuse to the twins because he was their primary caretaker and he gave conflicting statements to the police. The four children were removed from the home. The father of the 6-year-old boy obtained custody of him; the 1-year-old boy was placed with his maternal grandmother; and the twins were placed with their paternal grandmother. The two surviving children in foster care have a goal of return home but the parents are not making satisfactory progress toward the goal.

| Child No. 19 | DOB 1/12 | DOD 1/12 | Homicide |
|---|---|---|---|
| Age at death: | Hours | | |
| Substance exposed: | No | | |
| Cause of death: | Cold exposure with prematurity a significant contributing factor | | |
| Perpetrator: | Mother | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Baby boy was discovered by police deceased on top of a dumpster after his 13-year-old mother presented at the hospital complaining of vaginal bleeding and she was discovered to have given birth. The girl admitted to hospital staff that she gave birth at home. Her mother came home and found her standing in a pool of blood in the bathroom and contacted the maternal grandmother to come take the girl to the hospital. The girl had earlier wrapped the baby in clothing and placed her on the dumpster; she said the baby never moved or cried. The 13-year-old had not told anyone about her pregnancy because she did not want her mother to find out that she had sex with a 15-year-old boy. The girl was charged with misdemeanor counts of obstruction of justice and disorderly conduct. She was indicated for death by neglect. Her mother sought counseling for her.

Prior History:   In September 2011 the Department investigated and unfounded a report of inadequate supervision against the grandmother. A neighbor called the hotline to report that the children, ages 4, 8, and 13, were left unsupervised while their maternal grandmother worked nights. The maternal grandmother, mother and children denied that the children were left unsupervised. The mother and maternal grandmother worked different shifts so that one of them was always available to supervise the children. Staff at the 8-year-old boy's school was contacted and there were no concerns about his attendance or care.

| Child No. 20 | DOB 11/11 | DOD 1/12 | Homicide |
|---|---|---|---|
| Age at death: | 4 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Blunt head trauma | | |
| Perpetrator: | 7 year-old brother | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:      Four-week-old baby died in the hospital one day after being admitted with a skull fracture, head trauma, and injuries to his face. The 28-year-old mother had fed the baby around 3:30 a.m. and placed him in his bassinet. She then laid down on her bed and fell asleep. She awoke to find her 7-year-old autistic son in the kitchen with a bottle in his hand, crouching over the baby, who was bleeding from the nose and mouth. The mother was unfounded for neglect in the baby's death. She reported that she normally slept on a couch in front of her 7-year-old son's bedroom so she could hear him get up, but after feeding the baby she laid down on her bed next to the bassinet and fell asleep. The boy is in foster care; he is placed in a residential treatment program to address his special needs. *The OIG is conducting a full investigation of this child's death.*

Prior History:   In February 2011, police found the boy, then age 6, wandering around outside a hotel one night. Protective custody was taken of the boy, but the local state's attorney's office refused to file a petition and the boy was returned to his mother's care. The mother was indicated for inadequate supervision. Three months later, in May 2011, the police found the boy, who had sleep problems, again wandering around outside. The mother was indicated for inadequate supervision and an intact family services case was opened. The mother was not participating in all recommended services and the father who was in and out of the home was in jail at the time of the baby's death. Professionals involved with the family were concerned about the baby's safety in the home with his sibling.

| Child No. 21 | DOB 2/11 | DOD 1/12 | Homicide |
|---|---|---|---|
| Age at death: | 11 months | | |
| Substance exposed: | No | | |
| Cause of death: | Sepsis and bronchopneumonia due to traumatic encephalopathy | | |
| Perpetrator: | Father | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Eleven-month-old baby was found unresponsive in the morning by staff at the residential care facility where he lived. The baby died from complications from severe head injuries inflicted when he was two months old by his 18-year-old father. The father, who was caring for the baby by himself, was upset with and fighting on the phone with the baby's 16-year-old mother who he suspected of cheating on him. The baby would not stop crying and the father admitted to violently shaking him. The father pled guilty to aggravated battery of a child and received a sentence of 15 years in the Illinois Department of Corrections. The Department indicated the father for head injuries by abuse and after the baby died he was indicated for death by abuse.

Prior History:     The baby's abusive head trauma was the couple's first contact with DCFS. The incident left the baby profoundly disabled with severe respiratory problems. Following a month of treatment in the hospital, the baby's 16-year-old mother decided to place him in a residential care facility, fearing that she would not be able to care for him at home. Six months later, in November 2011, the hotline was called with an allegation of medical neglect against the mother because the baby needed a medical procedure and the mother failed to show up for two appointments to give her consent. An investigation was conducted and the mother was indicated for medical neglect because she missed two appointments for the baby to have a medical procedure which if he did not have could lead to a life-threatening breathing event. During the investigation, the mother decided to give her parents power of attorney to make health care decisions for the baby.

| Child No. 22 | DOB 12/10 | DOD 3/12 | Homicide |
|---|---|---|---|
| Age at death: | 14 months | | |
| Substance exposed: | No | | |
| Cause of death: | Cerebral injuries due to blunt head trauma | | |
| Perpetrator: | Mother and mother's boyfriend | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Fourteen-month-old toddler was found unresponsive in her bed in the morning by her mother's boyfriend. She died in the hospital the following day. The 19-year-old mother and 25-year-old boyfriend reported placing the toddler in her bed the night before. The toddler was crying because she didn't want to go to sleep, but she normally cried herself to sleep. The mother left the residence for an hour and when she returned the girl was asleep. Only the mother and mother's boyfriend cared for the toddler in the two days prior to her death. At autopsy, in addition to head trauma, the toddler had a healing fracture of the left lower leg estimated to be between two and six weeks old that was never treated and was believed to be from abuse. The mother's three-week-old daughter was taken into protective custody and is in foster care. The mother and boyfriend were indicated for the girl's death by abuse and substantial risk of physical injury to the surviving sibling. Police arrested the mother and her boyfriend on charges of felony child endangerment, but the local state's attorney's office declined to pursue the charges.

Prior History:     In January 2012 an anonymous reporter called the hotline and stated that the mother and the deceased were living in an apartment with two other women and there was constant partying with drugs and alcohol; the apartment had no running water, no working stove, and no food; and the toddler looked malnourished. A report was taken for investigation of substantial risk of physical injury and inadequate food. The report was unfounded after investigation and was believed to be a false report made to create trouble for one of the residents of the home. The child was observed to be healthy and she and her mother never lived at the reported residence.

| Child No. 23 | DOB 7/09 | DOD 4/12 | Homicide |
|---|---|---|---|
| Age at death: | Two-and-a-half-years old | | |
| Substance exposed: | No | | |
| Cause of death: | Closed head injury with blunt chest and abdominal injuries significant conditions | | |
| Perpetrator: | Mother's boyfriend | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Two-and-a-half-year-old boy became unresponsive while being cared for by his mother's 24-year-old boyfriend. The 23-year-old mother was at work. The boyfriend reported that the boy had fallen in the bathroom and then laid down in the living room and would not wake up. At the hospital the boy was discovered to have a severe head injury as well as bruises to his chest, arms, and scalp. The boy was transferred to a children's hospital for treatment where he died the following day. The boyfriend has been charged with first degree murder and is in jail awaiting trial. The boy's younger brother was taken into protective custody and is placed with a paternal aunt. The Department's death investigation is pending because the county state's attorney's office will not allow the Department to conduct interviews and will not give access to police interviews of relevant witnesses until after the criminal trial.

Prior History:   In July 2008 the mother was indicated for substantial risk of physical injury to her first son who was one month old; she gave guardianship of the baby to the maternal grandmother and the investigation was closed. In October 2011 the mother and her 29-year-old husband were investigated and unfounded for inadequate supervision of the mother's two-year-old son (the deceased) and the couple's 7-month-old son. An anonymous reporter alleged the children were often left with the husband's grandparents who were unable to care for the children because of poor health. Investigation revealed that the family lived with the husband's grandparents who did not have health problems that prevented them from caring for the children. In January 2012 the Department investigated and unfounded a report of substantial risk of physical injury against the mother. The mother and her husband had separated and the mother was living on her own with the two children going back and forth between the couple. The investigator observed the children in the care of their mother in her home on two occasions. The home was appropriate and the children appeared well cared for. The mother reported that the children were cared for by her husband, grandparents, great-grandparents and her sister when she needed child care. The maternal grandmother and the mother's sister vouched for the mother's good care of the children. The mother is not believed to have been involved with the boyfriend at the time of the January investigation.

| Child No. 24 | DOB 9/00 | DOD 4/12 | Homicide |
|---|---|---|---|
| Age at death: | 11 years | | |
| Substance exposed: | No | | |
| Cause of death: | Pending | | |
| Perpetrator: | Mother's Boyfriend | | |
| Reason For Review: | Open child welfare services referral at time of child's death & unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Eleven-year-old child, who was medically complex as a result of head injuries inflicted on him when he was 3 years old, died in the hospital where he had been treated for the past two months for respiratory problems. When he was 3 years old the child was the victim of abusive head trauma by his mother's 19-year-old boyfriend. He was charged and convicted of aggravated battery of a child and received a sentence of seven years. The Department indicated him for abuse for the child's injuries. The mother was indicated for medical neglect because she had been told by her boyfriend that the child fell walking home from the store and the child was complaining of head pain, but she waited over 24 hours before seeking medical care. The mother retained custody of the boy and they moved to another city to be closer to family.

Prior History:     In February 2012 a hospital social worker called the hotline requesting child welfare services for the mother, the child, and her 4-year-old son. The social worker reported that the mother was a very good mother but she was overwhelmed caring for the medically complex child and his younger brother. The child received home health care 8 hours a day, 5 days a week. The building in which the family lived was infested with roaches and the mother needed help relocating. A child welfare services case was open at the time the child died and the mother was thinking about moving to another city. A November 2011 hotline report by the mother's landlord was investigated and unfounded. The landlord reported the mother was dealing drugs out of her apartment, but the mother and home health care nurse denied any drug activity.

| Child No. 25 | DOB 6/91 | DOD 5/12 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 20 years |
| Substance exposed: | No |
| Cause of death: | Multiple gunshot wounds |
| Perpetrator: | Unknown |
| Reason For Review: | Deceased was a ward |
| Action Taken: | Investigatory review of records |

Narrative:     Twenty-year-old ward and his 26-year-old brother were shot dead around 5:00 p.m. during an argument with someone. No one has been apprehended; a criminal investigation remains open.

Prior History:     The ward first entered foster care in 1994 at the age of three. He was placed in the subsidized guardianship of a relative in 2000, but reentered foster care in 2007 because of runaway behavior. The ward was going to be emancipated in June 2012. He had two children with two different women and was receiving services through the Teen Parent Services Network. The ward hoped to be an involved father to his infant son. A couple of months prior to his death, the ward attended a young fathers training conducted by the Office of the Inspector General and the Teen Parent Services Network. He responded to a request for volunteers and is featured in a promotional video encouraging young fathers to attend the training.

| Child No. 26 | DOB 2/10 | DOD 5/12 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 years |
| Substance exposed: | No |
| Cause of death: | Hemorrhagic shock due to multiple hepatic lacerations due to blunt force abdominal trauma |
| Perpetrator: | Father |
| Reason For Review: | Indicated child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:     Two-year-old boy became unresponsive while in the care of his 25-year-old father. The father reported the child had a normal day, eating and playing until he became tired and laid down on the couch to watch TV. A short while later he stopped breathing and his eyes rolled back. The boy's mother left the child with his father three months earlier and moved out of state. At autopsy the child had healing rib fractures that were less than three months old.  The father was indicated for death by abuse. The father and the boy's 26-year-old step-mother were indicated for substantial risk of physical injury to their children, ages 2, 5, 7, and 9 years. The children are in the temporary custody of the Department and are placed with their maternal grandmother. No criminal charges have been filed. An OIG investigator is assisting police in obtaining information.

Prior History:     The deceased's step-mother was indicated in July 2011 for medical neglect of her then 4-year-old daughter. The mother left the children with their grandmother while she went out of town and she did not ensure the grandmother had sufficient medication for the girl's epilepsy. The grandmother ran out of medication after she told her daughter she needed more and the girl had a seizure and had to be taken to the emergency department for treatment. The deceased was not a member of the household at the time of the report.

| Child No. 27 | DOB 5/94 | DOD 5/12 | Homicide |
|---|---|---|---|
| Age at death: | 18 years | | |
| Substance exposed: | No | | |
| Cause of death: | Gunshot wound to head | | |
| Perpetrator: | Unrelated 18 year old peer | | |
| Reason For Review: | Deceased was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Ward died in the hospital on her 18th birthday three days after being shot twice in the head. At the time of the shooting the girl had been on run from her foster care placement for six weeks. She was staying at a 16-year-old friend's house and she and another girl snuck out of the home to visit an 18-year-old male peer. An argument occurred and the peer pulled a gun and shot both girls. The friend survived. The peer, who reportedly was upset over a break-up and a Facebook post, has been charged with first degree murder and is in jail awaiting trial.

Prior History:     In late 2009 the ward's mother gave guardianship of the teen to a friend because she was unable to care for her. In April 2011 the teen ran away from her guardian. When she was found she refused to return to the guardian's home and she was placed in foster care. The teen had a goal of independence. She ran away from all three of her foster care placements. The teen's worker last saw her four weeks before the teen's death when she took the teen to an orthodontist appointment. The worker tried to convince the ward to go back to her foster home or a shelter, but the ward refused. They were supposed to meet the following week to go over the ward's options but the ward did not show up and did not respond to her worker's calls. The worker made attempts to locate the teen including contacting her former guardian, checking with local police, and filing a missing persons report.

| Child No. 28 | DOB 5/11 | DOD 6/12 | Homicide |
|---|---|---|---|
| Age at death: | 13 months | | |
| Substance exposed: | No | | |
| Cause of death: | Seizure disorder due to hyponatremia resulting from child neglect | | |
| Perpetrator: | Mother | | |
| Reason For Review: | Split custody, siblings in foster care | | |
| Action Taken: | Full investigation pending | | |

Narrative:      Thirteen-month-old boy died in the hospital one day after his 23-year-old mother observed him having a seizure and called 911. Hospital staff found the child to be suffering from hyponatremia (low level of sodium in the blood), acute cerebral herniation (swelling and shifting of the brain, because of the seizures), and low weight (the infant weighed approximately 15 pounds; a 13-month-old boy at the 50th percentile weighs 19 pounds). The mother was indicated for death by neglect and malnutrition. *The OIG is conducting a full investigation of this child's death.*

Prior History:      The mother has two other children, ages 3 and 4, who entered foster care in February 2009 when the mother was indicated for medical neglect because she was not giving her then 2-month-old baby breathing treatments as prescribed. At the time of the baby's death, the mother was working toward return home of her two children in foster care. She was participating in therapy and parent coaching. The family's worker saw the baby one to two times per month. The mother took him for pediatric well-child check-ups according to the recommended schedule. In May the worker brought the mother baby spoons and appropriate toddler-aged food after the mother reported feeding the toddler primarily noodles.

## SUICIDE

| Child No. 29 | DOB 7/94 | DOD 9/11 | Suicide |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | No | | |
| Cause of death: | Hanging | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Included in Suicides 2000-2011 Report to Director June 28, 2012 | | |

| Child No. 30 | DOB 12/95 | DOD 10/11 | Suicide |
|---|---|---|---|
| Age at death: | 15 years | | |
| Substance exposed: | No | | |
| Cause of death: | Hit by train | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Included in Suicides 2000-2011 Report to Director June 28, 2012 | | |

| Child No. 31 | DOB 12/00 | DOD 2/12 | Suicide |
|---|---|---|---|
| Age at death: | 11 years | | |
| Substance exposed: | No | | |
| Cause of death: | Hanging | | |
| Reason For Review: | Open preventive services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

## UNDETERMINED

| Child No. 32 | DOB 12/09 | DOD 7/11 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 18 months |
| Substance exposed: | No |
| Cause of death: | Asphyxia due to smothering |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:       Eighteen-month-old toddler was reportedly found by her mother's 34-year-old boyfriend unresponsive with the family cat on top of an adult pillow that was on top of the child's head. The 21-year-old mother and the boyfriend were cooperative with police and DCFS investigation of the toddler's death. The boyfriend said that about three hours earlier he had bathed the toddler and wrapped her in a blanket and then placed her in her crib to sleep. The 21-year-old mother reported that it was not unusual for the girl to sleep with a pillow over her head. Days earlier she and the boyfriend noticed that the cat was jumping in the crib and they would remove it. The boyfriend's three children, ages 4, 7, and 11, who were sleeping over in the same room as the toddler, corroborated events of the day and reported they and the girl were treated well. The girls' mother did not believe he had harmed the toddler. After investigation and consultation with physicians, it was believed the incident could have occurred as reported, but that non-accidental trauma could not be ruled out. Consideration was given to a previous injury the toddler had suffered. No charges were filed and the DCFS investigation of the toddler's death was unfounded.

Prior History:   A month earlier, a hospital nurse called the hotline to report that the toddler had been treated for a spiral fracture to her left humerus (the long bone of the upper arm extending from shoulder to elbow). A bone scan was negative for other injuries. The mother and her boyfriend reported that they were putting the toddler to bed with the boyfriend holding the girl over the crib when she jerked and started to fall and he grabbed her left arm above her elbow. The toddler continued to fall and they heard a popping sound. She was unable to grasp anything so they took her to the emergency department. After investigation, including a scene reenactment and consultation with the treating physician, the investigation was unfounded.

| Child No. 33 | DOB 2/11 | DOD 7/11 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 5 months |
| Substance exposed: | No |
| Cause of death: | Undetermined |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:       Five-month-old infant was found unresponsive by her 28-year-old mother. The mother had laid down on her back on a futon placing the baby girl on the mother's stomach. They both fell asleep. The mother had last seen the baby alive approximately three hours earlier when she fed her. The mother had just moved to the one room apartment with the baby two days earlier and did not yet have a crib as she planned to get one from a friend. The baby was an only child. The mother was unfounded for death by neglect, but was indicated for substantial risk of physical injury because she slept with the baby on a futon. The mother left the residence after the baby's death and a scene investigation could not be completed.

Prior History:     The hotline was called six days prior to the baby's death by an anonymous reporter who alleged the mother regularly left the baby in the house when she went out drinking and that she didn't bathe the baby or take care of her. An investigator saw the mother and baby the following day and the baby was clean and appeared to be well-cared for. The mother denied the allegations; she believed the report was made by another resident of the home with whom she did not get along. The investigator did not note whether there was a crib in the home.

| Child No. 34 | DOB 5/11 | DOD 8/11 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 months |
| Substance exposed: | No |
| Cause of death: | Undetermined |
| Reason For Review: | Child of a ward |
| Action Taken: | Investigatory review of records |

Narrative:     Three-month-old infant was found unresponsive at 9:00 a.m. by his 22-year-old uncle laying on the couch unresponsive in between the couch cushion and his 17-year-old mother's back. The baby was last seen alive around 4:00 a.m. when his mother fed him and laid him down on the couch next to her and they both fell asleep. The mother is a DCFS ward and the deceased was her only child. There was a crib in the home and the ward's worker and guardian ad litem had both talked to the ward about the dangers of co-sleeping. The Department unfounded an investigation of death by neglect against the mother.

Prior History:     The mother has been a ward of DCFS since 1998. At the time of the baby's death, she and the baby were living with the mother's brother. The mother was receiving services through the Teen Parent Services Network. The week of the baby's death she had registered for high school and submitted an application for her school's day care.

| Child No. 35 | DOB 9/11 | DOD 9/11 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 weeks |
| Substance exposed: | No |
| Cause of death: | Sudden Unexplained Death in Infancy (SUDI) |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:     4-week-old infant was found unresponsive around 7:00 in the morning by his 24-year-old mother. The mother fed the infant around 2:30 a.m. and they went back to sleep with the mother placing the infant on her back cradled in the mother's arm on a queen-size bed. The 24-year-old father fell asleep on the couch. While there was a crib in the home, the infant usually slept in her parents' bed. Both parents were advised of the Back to Sleep program when the baby was born, before the baby's discharge from the hospital. DCFS investigated and unfounded the baby's death.

Prior History:     In March 2011 the Department investigated an allegation of cuts, bruises, welts to the couple's 5-year-old son by the father. The boy told his preschool teacher that his father hit him with a belt for being bad at school and the teacher discovered bruising on the boy's thigh. The investigator interviewed the mother, who worked at the preschool, and the father. Both said that the boy was warned that the next time he got in trouble at school, he would get hit. The boy squirmed while being hit on his buttocks and the belt hit his thigh. The parents said they were unaware the boy had a bruise and that physical discipline was rarely used in their home. Interviews with the boy, his 6-year-old sister, their paternal grandmother and the boy's teacher indicated the children were well-cared for and not abused.

| Child No. 36 | DOB 1/10 | DOD 10/11 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 21 months |
| Substance exposed: | No |
| Cause of death: | Undetermined |
| Reason For Review: | Indicated child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:       Twenty-one-month old boy was found unresponsive in the morning when his grandmother went to wake him for breakfast. The boy lived with his mother, his two siblings, and his maternal grandparents. The evening before, after an uneventful day of play, the toddler was given a bath, ate some cereal, and was put to bed around 9:00 p.m. The child had a history of breathing problems for which he took medication and used a nebulizer. He was last seen by his pediatrician a month earlier. There were no significant findings at autopsy, but a toxicology report noted that the child's urine was presumptive positive for opiates (codeine present at a level below the reporting limit). The presence of codeine was not explained. The pathologist noted, "Although the level of codeine is not fatal, it is not an appropriate treatment for a 21-month-old child. Consequently, the cause of death ... is undetermined."

Prior History:    The family was investigated in August 2011 when the police called the hotline after responding to an incident of domestic violence by the 24-year-old father to the 23-year-old mother. The oldest of their three children, a 3-1/2-year-old boy, was able to describe how his father went after his mother with a knife and how his mother locked him, his siblings and herself in a bedroom and hid in the closet while she called police. The mother and father had been married for five years and lived in another state until the mother moved back to Illinois with the children to live with her parents. The father was visiting after a long absence and the grandparents were out of town. After the incident, the mother got an order of protection and planned to file for divorce. The father fled the state. He was indicated by DCFS for substantial risk of physical injury to his children. The child protection investigator referred the mother to community services.

| Child No. 37 | DOB 9/11 | DOD 11/11 | Undetermined |
|---|---|---|---|
| Age at death: | 7 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Unexpected Death in Infancy in a setting of co-sleeping | | |
| Reason For Review: | Open intact family services case at time of child's death and pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Seven-week-old baby was found unresponsive around 9:00 a.m. by his 23-year-old father. The parents were staying overnight at the paternal grandparents' home and the baby slept on the floor between his father and his 21-year-old mother. He was last seen alive around 4:00 a.m. The father woke up to find the mother's leg on top of the baby. The parents were unfounded for death by neglect.

Prior History:    About a month after the baby's birth a friend called the hotline concerned about the mother's care of the baby given her age and inexperience. During the child protection investigation of substantial risk of physical injury, which was later unfounded, the mother agreed to accept intact family services and a case was opened. The mother lived with a friend and had a crib in the home.

| Child No. 38 | DOB 10/11 | DOD 11/11 | Undetermined |
|---|---|---|---|
| Age at death: | 6 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Unexpected Death in Infancy (SUDI) with co-sleeping | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Six-week-old baby was found unresponsive around 7:45 a.m. by his 15-year-old mother. The baby had been sleeping on his back on a pillow between the mother and the 20-year-old father in a queen size bed. The mother last saw the baby alive around 3:30 a.m. when she put him back to sleep after feeding him. Both parents were indicated for death by neglect to the infant because they had recently moved from the paternal grandparents' home to the maternal grandparents' home and did not bring their bassinet or crib with them and they slept with the baby despite being educated about safe sleep. They were also indicated for environmental neglect because of the extremely cluttered condition of the home.

Prior History:    When the infant was 24 days old a physician called the hotline concerned that the baby was being medically neglected by the young parents. The baby had been diagnosed with galactosemia (a disorder in which the body is unable to break down a type of sugar found in milk) shortly after birth and needed to be seen by a geneticist but the parents had not yet made an appointment. After the baby's diagnosis, the parents moved to a new city with the paternal grandparents and were in the process of getting the baby's medical card transferred which they needed to get an appointment with the geneticist. The investigator unfounded the report of medical neglect after he ensured that the baby was linked to and seen by a pediatrician, referred the baby for early intervention services, and verified the family was enrolled in the WIC (Women, Infants, and Children) food assistance program. He completed a home safety checklist, observed a crib in the home, and discussed safe sleep.

| Child No. 39 | DOB 6/11 | DOD 12/11 | Undetermined |
|---|---|---|---|

|  |  |
|---|---|
| Age at death: | 6 months |
| Substance exposed: | Yes, marijuana |
| Cause of death: | Pending |
| Reason For Review: | Closed child welfare services referral within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:      Six-month-old infant died while being airlifted to a children's hospital. She had been taken by ambulance to the emergency department in cardiac arrest from the homeless shelter where she was residing with her 20-year-old mother and three older siblings. A three-year-old half-sibling (different mother, same father) died five months later. Child protection death investigations are pending because of on-going criminal investigations. The deceased's three siblings entered foster care following their sibling's death.  See Child No. 47.

Prior History:    In May 2011 police called the hotline after responding to a domestic battery call in which the responding officer observed physical injuries to the mother. The 23-year-old father fled the home before police arrived. The child protection investigator advised the mother to seek an order of protection and indicated the father for substantial risk of physical injury because the domestic violence altercation occurred in the presence of the children. One month later, mother gave birth prematurely to the deceased, who remained in the hospital until August 2011. Prior to the infant's discharge, hospital staff contacted the hotline with concerns that the mother had not visited often and had yet to be trained on the infant's special needs resulting from her prematurity. A child welfare services referral was initiated; the mother was referred to a high risk infant program and the referral was closed.

| Child No. 40 | DOB 9/11 | DOD 1/12 | Undetermined |
|---|---|---|---|

|  |  |
|---|---|
| Age at death: | 3-1/2 months |
| Substance exposed: | Yes, cocaine |
| Cause of death: | Sudden Unexplained Death in Infancy (SUDI) |
| Reason For Review: | Indicated child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:      Three-and-a-half-month-old infant was found unresponsive by his 38-year-old mother who checked on him around 1:30 a.m. The infant had been placed to sleep in a bassinet on his stomach with his head turned to the side. He had one baby blanket under him and one on top of him. He was found face down on his stomach. The infant was born at 32 weeks gestation and tested positive for cocaine. He and his mother lived with his maternal grandparents. According to the autopsy report, "based on the position that the decedent was found, asphyxia cannot be definitively ruled out."

Prior History:   When the baby was born the hospital called the hotline to report that both the mother and newborn had tested positive for cocaine. The mother admitted to selling drugs, carrying up to ten packets of cocaine in her mouth during delivery of the drugs. She denied using drugs, but was willing to participate in services and an intact family services case was going to be opened. The mother and baby lived with the maternal grandparents who agreed to help care for the infant. During a visit to the home, the investigator observed the infant sleeping on his back in his bassinet.

| **Child No. 41** | **DOB 12/11** | **DOD 2/12** | **Undetermined** |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 months |
| Substance exposed: | No |
| Cause of death: | Sudden unexpected death in infancy |
| Reason For Review: | Open intact family services case and |
| | Indicated child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:      Two-month-old baby was found unresponsive around 8:40 p.m. by her 21-year-old cognitively delayed mother. The mother had laid the baby down on her stomach on a bed to assist an older sibling in the bathroom and when she returned the baby was unresponsive.

Prior History:   The family has a history of environmental neglect dating to March 2009; an intact family services case was open until February 2010 and then reopened in September 2010 because of unstable housing. In November 2010 the Department investigated and indicated another report of environmental neglect against the mother and the 21-year-old father. In July 2011 the mother and her 40-year-old boyfriend were indicated for inadequate shelter because they were living in a U-Haul truck with the mother's one and two-year-old children. The children were placed in a safety plan with the maternal grandparents until their mother secured an adequate home to rent.

| **Child No. 42** | **DOB 9/11** | **DOD 2/12** | **Undetermined** |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4-1/2 months |
| Substance exposed: | No |
| Cause of death: | Undetermined, cannot rule out asphyxia |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:      Four-and-a-half-month-old infant was found unresponsive in the morning by his 40-year-old cousin. The infant had spent the night at his cousin's home. He had been placed to sleep in a crib on his stomach on top of two fleece blankets covering a firm crib mattress. He was found face down in the bedding. The infant normally slept on his stomach in bed with his 28-year-old mother, who did not recall being informed of the Back to Sleep program at the time of the infant's birth. The infant was able to lift his head/chest up off a surface and turn his head from side to side. He was beginning to roll and scoot.

Prior History:   There were two unfounded child protection investigations in October 2011 involving the mother and her six children, aged 1 month to 13 years. Both investigations involved allegations of inadequate supervision which were unsubstantiated. While the investigations were pending, the family was evicted from their apartment for non-payment of rent. The child protection investigator told the mother to consider going to a shelter where staff would help her find housing, but the mother declined.

| **Child No. 43** | **DOB 1/12** | **DOD 2/12** | **Undetermined** |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 5 weeks |
| Substance exposed: | No |
| Cause of death: | Undetermined |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Full investigation pending |

Narrative:    Five-week-old infant was found unresponsive in his crib around 1:00 a.m. by his father. The 24-year-old mother and 23-year-old father reported that they had placed the infant to sleep on his back in his crib the night before around 8:30 p.m. *The OIG is conducting a full investigation of this child's death.*

Prior History:    In December 2011, before the birth of the deceased, the police called the hotline with a report of substantial risk of physical injury after they raided the parents' home and discovered marijuana, cocaine, and pills, some of which were accessible by the mother's 3-year-old son. The state's attorney's office charged the parents with multiple unlawful possession charges. The Department unfounded the parents for substantial risk of physical injury.

| Child No. 44 | DOB 2/12 | DOD 3/12 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 19 days |
| Substance exposed: | No |
| Cause of death: | Undetermined |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Full investigation pending |

Narrative:    Nineteen-day-old infant was found unresponsive around 8:30 a.m. by her 53-year-old maternal grandmother. The grandmother reported that she last fed the baby around 4:30 a.m. and then laid the baby to sleep between her and the 68-year-old grandfather. The grandparents reported that while the baby had a crib in their room, it was their practice to co-sleep because of concern about the risk of SIDS due to the baby's premature birth at 36 weeks gestation. They reported using pillows to prop the baby up to sleep. The grandparents and the baby's 33-year-old mother had been educated by medical personnel and a child protection investigator that the baby should be placed to sleep on her back in her crib. The grandparents said the baby would not stop crying when she was placed in her crib to sleep. The mother and grandparents were indicated for substantial risk of physical injury to the baby because of the sleeping arrangement. *The OIG is conducting a full investigation of this child's death.*

Prior History:    A child protection investigation was pending at the time of the baby's birth and unfounded 10 days before her death. The investigation was for substantial risk of physical injury to the mother's 14-year-old son who was alleged to have witnessed an incident of domestic violence by his mother toward his grandmother.

| Child No. 45 | DOB 11/11 | DOD 3/12 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 months |
| Substance exposed: | Yes, opiates and cocaine |
| Cause of death: | Sudden Unexplained Death in Infancy (SUDI) |
| Reason For Review: | Open extended family support program case at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:    Four-month-old baby boy was found unresponsive on his back around 8:00 a.m. by his 30-year-old paternal cousin who had been caring for him for three months. The cousin had last fed the baby around 3:00 a.m. and placed him to sleep on his back next to her in a full-size bed that she also shared with her partner. There was a bassinet in the home and the cousin was informed of the Back to Sleep Program before the baby was discharged from the hospital.

Prior History:    The baby was born substance-exposed and spent three weeks in the hospital being treated for symptoms of drug withdrawal. The hospital called the hotline with a report of substance misuse by neglect. After the 30-year-old mother was discharged, she never returned to see the baby. The 56-year-old father visited the baby and expressed his desire to care for the infant. The father's house was in foreclosure, however, so he asked his niece to care for the baby until he could get back on his feet. The Department opened a case to provide extended family support services which are stabilization services to support kinship care and avoid disruption of the family placement. They include assistance to obtain legal guardianship.

| Child No. 46 | DOB 2/12 | DOD 4/12 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 7 weeks |
| Substance exposed: | No |
| Cause of death: | Undetermined |
| Reason For Review: | Open intact family services case at time of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**     Seven-week-old infant was found unresponsive around 10:00 a.m. by his 19-year-old mother. He was last seen alive around 4:00 a.m. when the mother fed him a bottle and put him back to sleep. The baby was sleeping in a car seat in which the mother had placed a standard size pillow. The mother was unfounded for death by neglect, but she was indicated for substantial risk of physical injury to the deceased and his one-year-old brother because she had not yet engaged in services recommended by her intact family services worker and she had been the only caretaker of the two children at the time of the infant's death in violation of a care plan she made. The surviving one-year-old sibling entered foster care and was placed with a maternal aunt.

**Prior History:**     Hospital personnel called the hotline following the infant's birth because of concerns that the mother had expressed fear that she might hurt the baby, scored high on a depression assessment, and left the hospital against medical advice. The mother was indicated for substantial risk of physical injury and an intact family services case was opened. A care plan was put into place whereby the maternal grandmother, with whom the family lived, would be the short-term guardian of the children and the mother would not care for the children alone until she was engaged in services.

| Child No. 47 | DOB 3/09 | DOD 5/12 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 years |
| Substance exposed: | No |
| Cause of death: | Pending |
| Reason For Review: | Open intact family services case at time of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**     Three-year-old boy was found unresponsive on the living room floor around 10:30 a.m. by a paternal aunt who had been caring for him for several days while his twenty-three-year-old mother prepared to move. The boy was last seen alive around 2:00 a.m. He lived with his mother and his two-year-old sibling. An older sibling was in the guardianship of his paternal grandmother because of his mother's young age at the time he was born. A 6-month-old half-sibling (different mother, same father) died five months earlier in the care of her mother. Another paternal aunt, who reportedly was not present at the time of the 3-year-old boy's death, may have been involved in two child deaths both occurring over ten years ago. Child protection death investigations are pending because of on-going criminal investigations. See Child No. 39.

**Prior History:**     In March 2011 an anonymous reporter called the hotline alleging that the mother smoked marijuana; the reporter expressed concern about the care of her one-year-old child who had been born prematurely. An intact family services case was opened after the mother was indicated for substantial risk of physical injury and inadequate supervision of her two children. The intact family services case was open at the time of the boy's death.

## ACCIDENT

| Child No. 48 | DOB 5/04 | DOD 7/11 | Accident |
|---|---|---|---|
| Age at death: | 7 years | | |
| Substance exposed: | No | | |
| Cause of death: | Drowning in a swimming pool | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Seven-year-old boy drowned in a swimming pool while on a field trip with his daycare. While there were lifeguards on duty, the area in which the boy was found was covered by a shadow and difficult to see from the lifeguard's perch. The boy was noticed missing during a head count at the end of the swim time. When he was discovered, lifeguard staff performed CPR on the boy and called 911. He was taken to the hospital where he was pronounced dead. DCFS's Divisions of Child Protection and Daycare Licensing investigated. Child Protection indicated three staff members for inadequate supervision but the findings were changed to unfounded on appeal. Daycare Licensing cited the daycare for several licensing violations related to swimming and supervision and a corrective action plan was implemented.

Prior History:     The deceased was a ward who was placed in a foster home with his two younger siblings. The foster parents were interested in adopting all three children. The children attended daycare because both of their foster parents worked. The children had been in foster care since 2008 because of their mother's neglect. The surviving siblings remain with the foster parents with a goal of adoption.

| Child No. 49 | DOB 5/10 | DOD 7/11 | Accident |
|---|---|---|---|
| Age at death: | 14 months | | |
| Substance exposed: | No | | |
| Cause of death: | Blunt force trauma | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:     Fourteen-month-old toddler was found unresponsive in her crib in the morning by her mother's 29-year-old boyfriend who called 911. Paramedics responded and found the toddler deceased. Police called the hotline because the child had bruises on both sides of her head that appeared inconsistent with the mother and boyfriend's explanation that the child had fallen off her mother's bed onto the carpeted floor the previous evening but was unharmed, playing and eating before being put to sleep. At autopsy the little girl had abrasions on the left side of her head, on the tip of her nose, on her right forearm, on the front of her upper lip, and the front of her lower lip. She had a large subgaleal hematoma on the front of her head, a smaller subgaleal hematoma on the right side of her head, and an epidural hematoma at the back of her head. The pathologist who completed the toddler's autopsy indicated that the child's cause of death was undetermined, noting, "The qualities of the injuries sustained are inconsistent with asphyxia due to position or bedding. Additionally, the apparent varying ages of the injuries to the scalp, the recent nature of the hemorrhage within the skull, and lack of cerebral edema or cerebellar herniation are inconsistent with injuries typically associated with normal childhood activities. Furthermore, the findings of cyanosis of the fingernails, abrasions of the lips and nose, and petechial hemorrhages within the eyelids may indicate forcible suffocation. In light of the inconsistent nature of the injuries found, the best classification for the cause of death is undetermined. Should further investigation yield additional information, the diagnosis may later be amended to reflect those findings." The county coroner certified the child's cause of death as blunt force trauma and classified the manner of death as accident. Because it was ruled an accident, the police investigation was closed and the local state's attorney's office declined to pursue charges. The Department's child protection investigation was unfounded for insufficient information. *The OIG is conducting a full investigation of this child's death.*

Prior History:    Between March 2011 and June 2011 there were three unfounded investigations involving the mother or her boyfriends, with whom she and her children lived. The first investigation was unfounded against the mother's then boyfriend for abuse to his 6-year-old daughter. The second investigation was unfounded against the mother for medical neglect of her 7-year-old son who suffered from constipation. The third investigation was unfounded for bruises to the mother's 2 and 4-year-old nieces by the mother's boyfriend (the same boyfriend at the time of the toddler's death). The boyfriend admitted to spanking the girls but said he quit after he left a bruise on the 2-year-old girl's buttocks and the girl's mother and maternal grandmother made him agree to stop spanking the girls.

| Child No. 50 | DOB 1/99 | DOD 7/11 | Accident |
|---|---|---|---|
| Age at death: | 12 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple injuries due to automobile crash | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Twelve-year-old ward died at the hospital after the minivan he stole and was driving ran off the road and crashed, ejecting him and his 14-year-old passenger. The 14-year-old boy survived but was hospitalized in critical condition. Earlier on the day of his death, the boy had stolen a truck and crashed it but was able to run away from the scene.

Prior History:    Three weeks earlier the Department was granted guardianship of the boy and his three siblings. The boy went on run from his foster placement and on the day of his death had been picked up in the early morning by police who turned him over to DCFS. The boy ran from a DCFS worker while waiting for a medical exam at the emergency department. The children had been subjects of an intact family case since February 2011 and were court ordered into placement because of their parents' failure to make progress in services.

| Child No. 51 | DOB 7/09 | DOD 8/11 | Accident |
|---|---|---|---|
| Age at death: | Two years | | |
| Substance exposed: | No | | |
| Cause of death: | Drowning | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:    Two-year-old girl drowned in a swimming pool at the home of her 36-year-old unlicensed home day care provider. The provider was caring for 3 of her own children as well as 7 day care children who were between the ages of 6 months and 8 years. The day care provider found the 2-year-old unresponsive in the pool when she discovered her missing. The gate to the above ground pool was not locked. The provider was charged with felony child endangerment and operating a child care facility without a license, a misdemeanor. She is awaiting trial. The provider was indicated for death by neglect and for substantial risk of physical injury to her four children who were placed in foster care because there was an order of protection prohibiting contact between the father and the children. *The OIG is conducting a full investigation of this child's death.*

Prior History:    In April 2011 the hotline was called with an allegation of inadequate supervision against the home day care provider. While investigating, the child protection investigator learned that the provider was caring for four children without a home day care license. She was told she could not care for more than three children without a license, and she was provided with information about how to begin the licensing process. During a subsequent visit the investigator observed multiple children at the home and made a complaint to the day care licensing division. A licensing complaint investigation was substantiated and the provider was ordered to stop operating her home day care. She subsequently submitted an application for a license which was pending at the time of the girl's drowning (and consequently withdrawn). In June 2011 the hotline was called with an allegation of substantial risk of physical injury to the provider's four children by their father because of an incident of domestic violence in the home. The mother/provider obtained an order of protection and the investigation was indicated against the father.

| Child No. 52 | DOB 5/08 | DOD 8/11 | Accident |
|---|---|---|---|
| Age at death: | 3 years | | |
| Substance exposed: | No | | |
| Cause of death: | Hypoxia due to dislodgment of tracheal tube due to multiple congenital anomalies | | |
| Reason For Review: | Closed intact family services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Three-year-old medically complex child became unresponsive while in the care of her home health care nurse. She was taken to the hospital by ambulance in full cardiac arrest and was pronounced dead at the hospital.

Prior History:    The deceased was the youngest child in a sibling group of four. Their 31-year-old father has a history of domestic violence to their 26-year-old mother. In December 2008, in the presence of the deceased and a home health care nurse, the father beat up the mother. The father was indicated for substantial risk of physical injury to his children, the mother obtained an order of protection against him, and an intact family case was opened. The mother participated in services and the intact family case was closed in December 2010.

| Child No. 53 | DOB 6/11 | DOD 9/11 | Accident |
|---|---|---|---|
| Age at death: | 2-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Possible suffocation in a setting of co-sleeping | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Two-and-a-half-month-old infant was found unresponsive around 6:45 a.m. by her 27-year-old mother with whom she was sleeping. The mother, who had taken prescription pain medication for a hernia and back injury, said that she last saw the baby alive when she fed her at 3:00 a.m. and placed her on her back to sleep in the mother's bed. The baby's one-year-old sibling was also sleeping in the bed. The mother had a crib in the home for the baby, but it was full of clothes and was not being used. Police responding to the infant's death called the hotline to report the home was filthy. The mother was indicated for environmental neglect of her six surviving children and death by neglect to the infant. The children, ages one to 12, entered foster care. They are placed with relatives and their mother, who is pregnant, is participating in services for their return home.

Prior History:    The deceased was the mother's seventh child. In May 2011 a staff member from a mentoring program called the hotline to report that the eldest child, then 11, had a mark over her eye from a belt buckle. The mother admitted that she caused the mark while disciplining the girl with a belt. The mother said she had been hitting the girl on her behind over her clothes, but the girl moved and was hit in the face. She was disciplining her daughter for being suspended from school. The mother was indicated for cuts, bruises, and welts. The mentoring program agreed to continue working with the family. In July 2011 the 11-year-old girl alleged that the father of the three youngest children whipped the children. The father admitted to spanking the children over their clothes but never hard enough to leave marks. The children were observed and interviewed. None were afraid of the father and none had injuries. The 11-year-old girl conceded that the father did not injure them. She also reported that her mother had not hit her since the first investigation. The investigation was unfounded with the mentoring program agreeing to continue to provide mentoring and to link the family to any other service needs.

| Child No. 54 | DOB 8/11 | DOD 9/11 | Accident |
|---|---|---|---|
| Age at death: | 4 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to co-sleeping | | |
| | with congenital heart disease a significant contributing factor | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Four-week-old infant was found unresponsive around 6:00 a.m. by his mother. The infant was sleeping between his 34-year-old mother and 33-year-old father in their bed. He was last seen alive around 2:30 a.m. when his mother fed and changed him. There was a bassinet in the home and the parents were advised during a pending child protection investigation that they should not sleep with the baby. A child protection investigation of the infant's death was unfounded, but an intact family case was opened to provide the family with services including grief counseling.

Prior History:    Seven days prior to the infant's death the mother took the baby to the emergency department stating he was not moving his left arm. An x-ray revealed a spiral fracture of the left humerus; a long bone survey did not reveal any other injuries. DCFS and the police investigated. The mother reported that she awoke in the middle of the night to the baby crying, got up and picked up the baby to go make a bottle, and tripped and fell against the door frame with the baby in her arms. The physician treating the injury thought the explanation was possible. There was concern that the injury may have been caused by someone rolling over the baby, but both parents denied sleeping with the baby. A safety plan for the infant and his 3, 10, and 13-year-old siblings ended four days prior to the baby's death and the investigation was completed and unfounded after the baby's death.

| Child No. 55 | DOB 12/10 | DOD 9/11 | Accident |
|---|---|---|---|
| Age at death: | 9 months | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to overlay due to co-sleeping | | |
| Reason For Review: | Sibling returned home within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Nine-month-old baby was found unresponsive by her 32-year-old father around 3:00 a.m. The father, who admitted he and the mother were high on heroin, recalled lying in bed with the baby feeding her a bottle. He passed out and when he awakened, he found the baby unresponsive lying between him and the 25-year-old mother. There was a crib in the home. The Department indicated the mother and father for death by neglect, bruises by abuse (because the autopsy revealed two small bruises on the baby's buttocks which the parents could not explain), and inadequate supervision of the mother's 4-year-old son who had been returned home to the mother only five months prior. After the baby's death the boy went to live with his father who obtained legal custody and guardianship of him.

Prior History:   The deceased's four-year-old brother was in foster care with his maternal grandmother from December 2009 when he was 2 years old until April 2011 when he was returned home to his mother under a court order and monitoring by the private agency assigned to his case. While the child was in foster care, the mother and the deceased's father had participated in services, including substance abuse evaluations, random drug screens, parenting classes and counseling.

| Child No. 56 | DOB 7/11 | DOD 10/11 | Accident |
|---|---|---|---|
| Age at death: | 2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to overlaying | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Two-month-old infant was found unresponsive around 4:00 a.m. by his 28-year-old mother. The mother placed the infant to sleep on his side on top of 3 pillows on the parents' bed which was up against the wall. The mother slept in the middle of the bed with the baby next to the wall and the baby's father on the other side of her. The baby had been born five weeks prematurely and spent his first three weeks of life in the hospital. The mother reported that as babies all four of her children slept with her. She admitted she had been educated by WIC (Women, Infants and Children food assistance program) about the dangers of co-sleeping. She had a bassinet for the baby but did not use it. The mother was indicated for death by neglect to the infant because she admitted she knew it was dangerous for her to sleep with him.

Prior History:     In August and October 2010, the Department investigated allegations of sexual abuse to two of the mother's three children by their maternal grandparents. Both investigations were initiated by the father of the oldest child who was in an ongoing custody battle with the mother. The local child advocacy center and police were involved in investigating the allegations. The Department unfounded its investigations and the police declined to pursue charges against either grandparent.

| Child No. 57 | DOB 9/11 | DOD 10/11 | Accident |
|---|---|---|---|
| Age at death: | 1 month | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to overlaying | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Thirty-seven-day-old infant was found unresponsive by her 24-year-old mother at 9:00 a.m. The mother took her newborn and four-year-old son to the maternal grandfather's home to babysit her 10-year-old sister while the grandfather and his girlfriend attended a wedding. The mother initially placed the baby to sleep in a bouncy seat, but sometime after 3:00 a.m. she brought the baby into bed with her. The mother had taken xanax and ambien prescribed to her and drank a beer before going to sleep. A toxicology screen showed the medications to be within normal limits. The mother had been advised about safe sleep practices at the hospital where she delivered her baby as well as by the baby's pediatrician. She said that she had a bassinet in her home, but she normally slept with the baby. The mother was unfounded for death by neglect to the infant because there was insufficient evidence that she was incapacitated the night she slept with the infant.

Prior History:   In June 2011 the mother called the hotline to report that her 4-year-old son was engaging in sexualized behavior (playing with his penis and talking about his private parts) which escalated after every other weekend visits with his 26-year-old father. An investigation of substantial risk of physical injury against the father and his parents was unfounded; they denied the boy was exposed to any sexual behavior in their home and the boy denied that anyone had touched him inappropriately. In July 2011 the pregnant mother filed for an order of protection alleging her boyfriend threw a power strip cord at her while she was holding her 4-year-old son. DCFS initiated an investigation of substantial risk of physical injury which was unfounded because the mother and her son denied that anything was thrown at them and the mother said she filed for the order of protection to move out of the home she shared with her boyfriend without him being present.

| Child No. 58 | DOB 10/09 | DOD 11/11 | Accident |
|---|---|---|---|
| Age at death: | 2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to displaced tracheostomy tube with Down Syndrome a contributing factor | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:   Two-year-old medically complex girl was found unresponsive by her 24-year-old mother around 11:30 a.m. The mother had taken the girl off her ventilator which was part of her daily schedule and was playing with her when she needed to use the restroom. She left the door open. When she returned she saw her daughter face down with her tracheostomy tube out of place. She put the tracheostomy tube back in and plugged her daughter to the ventilator, but no oxygen came out. She removed her from the ventilator, began CPR and called 911. A child protection death investigation was unfounded. *The OIG is conducting a full investigation of this child's death.*

Prior History:   In February 2011 a home health care nurse called the hotline alleging that the mother was trying to sabotage the girl's medical care by changing the settings on her medical equipment. A report was investigated and unfounded for substantial risk of physical injury. Investigation showed that the girl had spent the first 13 months of her life in the hospital. The nurse who called the hotline had worked with the family in the two months since the child was released from the hospital. The mother had raised concerns with her Division of Specialized Care for Children caseworker about the nursing staff who went to her home. The mother explained to the child protection investigator that she corrected the equipment settings whenever she reconnected her daughter to the equipment. A pediatric resident accompanying the child protection investigator found the child to be stable. The girl's father and maternal aunt had no concerns about the mother's care of her. A new nurse was assigned to the home and no further reports by nursing staff were made.

| Child No. 59 | DOB 2/07 | DOD 11/11 | Accident |
|---|---|---|---|
| Age at death: | 4-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Drowning | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Four-and-a-half-year-old girl drowned in a pond in her apartment complex. The girl's 26-year-old mother was not feeling well so she put a movie on for her daughter and lay down. About an hour after last hearing her daughter move about, the mother got up to check on her and found the front door open. Apartment complex security video footage showed the mother searching for her daughter forty minutes after the girl left the apartment. The mother called police 10 minutes after discovering her daughter missing. When police arrived they discovered that a resident of the apartment complex had rescued the girl from the pond and another resident was performing CPR. The girl was taken to the hospital where she was pronounced dead. A death by neglect investigation was unfounded. The girl easily could have let herself out of her apartment, had never previously left the apartment on her own, and had shown no prior interest in the pond. The mother acted appropriately when she discovered her daughter was missing. The girl was her only child.

Prior History:     There were two prior unfounded investigations for medical neglect. In August 2010 an express care clinic called the hotline to report medical neglect and malnourishment after seeing the girl who was constipated and iron deficient. The investigation was unfounded; the girl's primary care physician reported that the child had a history of constipation and iron deficiency and the mother always treated her as directed. In January 2011 the primary care physician called the hotline stating she had seen the girl that day and she was extremely anemic and did not appear to be getting her iron supplement. The investigation was unfounded because the mother and grandmother reported giving the child her prescribed supplements and the child's pediatric hematologist said that he was seeing the girl regularly and had to change her supplement several times to find one that she absorbed well and did not cause stomach irritation.

| Child No. 60 | DOB 3/11 | DOD 12/11 | Accident |
|---|---|---|---|
| Age at death: | 9 months | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to overlaying | | |
| Reason For Review: | Open child welfare services referral at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Nine-month-old baby was found unresponsive around 5:00 a.m. by her 15-year-old mother. The teen initially stated that the baby had been sleeping in her pack and play, but later confessed to falling asleep with the baby in her arms. A child protection investigation for death by neglect was unfounded on the teen.

Prior History:     The teen and her baby lived with the teen's 42-year-old mother, 55-year-old step-father, and three half-siblings. In October 2011 police called the hotline requesting child welfare services for the family. They had arrested the 15-year-old for domestic battery to her mother. The mother and daughter had gotten into an argument about the teen sneaking boys into the home. The teen hit her mother and pushed her to the floor. The mother felt her daughter was out of control, drinking and running away from home. A caseworker had not yet met with the family at the time of the infant's death because of the high volume of pending child welfare services referrals.

| Child No. 61 | DOB 5/11 | DOD 12/11 | Accident |
|---|---|---|---|
| Age at death: | 6 months | | |
| Substance exposed: | No | | |
| Cause of death: | Positional asphyxia due to prone sleeping position within the back and lower cushion of a futon bed | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Six-month-old infant was found unresponsive laying face down on a futon couch by his 22-year-old mother around 7:00 a.m. She last saw the baby alive at 5:00 a.m. when he cried and she gave him his pacifier. The mother had moved in with her boyfriend and the baby regularly slept on the futon couch. There was an unassembled crib in the home that the mother said she did not use because there was mold in it. The mother was indicated for neglect because she had been educated about safe sleep practices by DCFS and the baby's pediatrician.

Prior History:    There were two prior investigations involving this family. The first hotline report was made after the baby's birth because of concern that the mother used drugs. Both she and the baby tested negative for drugs; she and the baby were going to live with the maternal grandmother who was not concerned about the mother's care of the baby; and there was a crib in the home. The investigation was unfounded for substantial risk of physical injury. Two months later the hotline was called with an allegation that the mother's 32-year-old boyfriend was a registered sexual offender who cared for the baby. Investigation revealed that the boyfriend was a registered sexual predator because he had sex with a 15-year-old girl when he was 19 years old. The report was unfounded for substantial risk of sexual injury to the baby.

| Child No. 62 | DOB 7/10 | DOD 1/12 | Accident |
|---|---|---|---|
| 63 | 10/08 | 1/12 | |

| | |
|---|---|
| Age at death: | 3 years and 1-1/2 years |
| Substance exposed: | Unknown, mother has a history of inhalant abuse |
| Cause of death: | Carbon monoxide intoxication due to inhalation of smoke and soot due to apartment fire |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:      One-and-a-half and three-year-old siblings died in an apartment fire started by their 6-year-old sibling who was attempting to cook pizza in a box on the stove at 3:00 a.m. while his 38-year-old mother slept. The child had behavioral issues and had previously played with fire. He was psychiatrically hospitalized for 18 days a month earlier. It is not known how the boy started the stove because the mother had removed the knobs from the stove to keep the children from playing with them. The mother reported to the fire marshal that she heard the smoke detector and put it under her pillow. When she realized there was a fire in the apartment, she ran outside to get a breath of air and was unable to get back in to save the 1-1/2 and 3-year-old children. The 6-year-old boy had already run out of the house. The mother was indicated for inadequate supervision and substantial risk of physical injury to all three of the children and death by neglect to the deceased children. The boy is in foster care placed with a maternal great-aunt. A 5-year-old daughter remains with her grandmother with whom she has always lived.

Prior History:    The family has had involvement with the Department since 2006 when the mother gave birth to her second child who demonstrated signs of withdrawal. The mother was addicted to huffing mothballs. The mother had neurological impairment because of the huffing and had been followed by a hospital neurology department for the past five years. The maternal grandmother was already caring for the mother's one-year-old and was willing to care for the new baby as well. Extended family members were willing to help as the mother needed care as well. The family received intact family services from September 2006 through August 2007 and again from November 2008, when the 3-year-old child was born, until June 2009. The mother participated in numerous services and had a large support system. At the time of the children's deaths there was a pending child protection investigation that alleged that an injury to the 6-year-old boy's arm was from being hit by his mother. The investigation was ultimately unfounded; the injury was a swollen pulled muscle that was not consistent with being hit.

| Child No. 64 | DOB 1/12 | DOD 2/12 | Accident |
|---|---|---|---|
| Age at death: | 1 month | | |
| Substance exposed: | Yes, opiates and benzodiazepines | | |
| Cause of death: | Asphyxia due to overlay | | |
| Reason For Review: | Open intact family services case at time of child's death and pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Four-week-old infant was found unresponsive in bed between his parents. The 23-year-old mother last saw the baby alive between 1:00 and 2:00 a.m. when she put the baby between herself and her husband and fell asleep. There was a crib next to the bed. The mother and the 29-year-old father admitted to sleeping with the baby on multiple occasions despite being warned against the practice by multiple professionals and the maternal grandmother. The parents were indicated for death by neglect and the mother was indicated for substantial risk of physical injury to her two older children because she and the baby's father admitted to relapsing after the baby died. The children entered foster care and were placed with their maternal grandmother.

Prior History:   An intact family case was opened in October 2011 following three reports in seven months alleging neglect to the mother's two children. The third report, which was made by law enforcement after a traffic stop, was indicated for environmental neglect and substantial risk of physical injury. The mother, who was pregnant at the time, admitted to using heroin. Her boyfriend (the infant's father) also used heroin and was in an inpatient treatment program at the time of the report by police. The mother engaged in substance abuse treatment and a drug test taken weeks before the infant's birth was negative. An anonymous reporter called the hotline the day after the infant was born alleging neglect and continued drug use by the mother. The baby tested positive for opiates and benzodiazepines at the time of his birth.

| Child No. 65 | DOB 3/96 | DOD 2/12 | Accident |
|---|---|---|---|
| Age at death: | 15 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple injuries sustained as a pedestrian struck by a mini van | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Fifteen-year-old girl ran into the street and was struck by a mini van traveling at a high rate of speed around 9:00 p.m. The driver stopped briefly but then fled the scene. The teenager was taken by ambulance to the hospital where she was pronounced dead. The driver has not been identified.

Prior History:     The teenager was the youngest of five siblings. Her father is deceased. Six months prior to her death, an investigation was unfounded for cuts, bruises, and welts to the teenager by her 40-year-old mother. The investigation showed that the teen had been missing for several days and when her grandmother found her and brought her home, the mother hit her. The police were called and took the teen to a psychiatric hospital for a mental health evaluation. The mother admitted to hitting her daughter because the girl was out of control. She was not injured. The teen spent several days in the hospital and was discharged to her mother's care with a discharge plan for outpatient counseling.

| Child No. 66 | DOB 12/11 | DOD 3/12 | Accident |
|---|---|---|---|
| Age at death: | 3 months | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Unexpected Death in Infancy (SUDI) with co-sleeping | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Three-month-old baby was found unresponsive around 6:00 a.m. by his 21-year-old father. The father had fed the baby around 1:00 a.m. and placed him to sleep on one end of the couch on a pillow on his back. The father then laid down on the other end of the couch and put his legs on either side of the baby.  It is unknown whether there was a crib in the home. A child protection investigation for death by neglect was unfounded on the father with the support of the coroner who did not believe the father was neglectful.

Prior History:    The 23-year-old mother has two surviving children who were three and five at the time their brother died. The mother had an intact family services case open for six months in 2009 because of domestic violence between herself and the younger child's father. In February 2012 the police called the hotline to advise that the mother had called the police to report that the father shoved her into a wall, broke a lamp and her cell phone, and kicked her car leaving dents in it. The mother was given instructions for obtaining an order of protection. A report of substantial risk of physical injury was investigated and unfounded because the couple denied any physical violence, with the mother stating they got into an argument and she was mad so she called the police; the mother did not have any injuries; and the children were upstairs in the residence asleep during the incident. Because of the mother's history the investigator offered the parents services but they refused them.

| Child No. 67 | DOB 10/00 | DOD 3/12 | Accident |
|---|---|---|---|
| Age at death: | 11 years | | |
| Substance exposed: | No | | |
| Cause of death: | Injuries due to auto accident | | |
| Reason For Review: | Closed child welfare services referral at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Eleven-year-old girl jumped out of a van being driven by her 33-year-old mother at 20-25 miles per hour and was run over by the van before her mother could stop. The incident which occurred around 5:00 p.m. was witnessed by a police officer who was following the mother and daughter to make sure they got home safely. The officer had helped the mother track down her daughter when she didn't return home from school.

Prior History:    In December 2010 the girl alleged that her mother hit her in the head with a belt buckle. The allegation was investigated and unfounded. In March 2011 an intake worker at a mental health agency requested DCFS services for the family. The mother had initiated therapy for her daughter because she was having behavior problems at school and had run away from home three times in the past month. The daughter alleged that her mother hit her in the past and that she was afraid of her. A child welfare services worker met with the family in April 2011 and closed the referral because the child denied physical discipline and was engaged in services, and her four siblings reported there were no problems at home.

| Child No. 68 | DOB 3/12 | DOD 3/12 | Accident |
|---|---|---|---|
| Age at death: | 12 days | | |
| Substance exposed: | Yes, marijuana | | |
| Cause of death: | Hypoxic ischemic encephalopathy due to co-sleeping with an adult on a couch | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Twelve-day old infant was found unresponsive in his 27-year-old mother's arms around 2:45 a.m. when his 29-year-old father got up to use the bathroom. The parents smoked marijuana and fell asleep on their sectional couch shortly after midnight. The mother fell asleep sitting on the recliner end of the sectional with the baby lying against her chest. The parents called 911 and the infant was taken to the hospital where he died three days later. There was a bassinet in the home. The Department took protective custody of the baby's 2 and 8-year-old siblings. Three days later the children were returned to the parents under a court order that the parents cooperate with weekly drug screens and DCFS recommendations.

Prior History:     In August 2011 the mother took her 23-month-old daughter to the emergency department with a left proximal humerus fracture. The mother explained the child had fallen off a slide at the playground three days earlier, but was not in a lot of discomfort until the day before. An orthopedic specialist opined this was possible and the allegation of bone fractures by abuse was unfounded. The investigation uncovered concerns about domestic violence and substance abuse, however, and the parents were indicated for substantial risk of physical injury to the 23-month-old old and her 7-year-old brother. An intact family services case was opened to provide the parents with services including substance abuse assessments; drug screens; substance abuse treatment; mental health assessments and counseling.

| Child No. 69 | DOB 3/12 | DOD 4/12 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 weeks |
| Substance exposed: | Yes, morphine prescribed to mother |
| Cause of death: | Asphyxia due to prone sleeping position and co-sleeping with adults in an adult bed |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:     Two-week-old infant was found unresponsive around 10:00 a.m. by her 34-year-old father. The 26-year-old mother had breast fed the infant around 6:00 a.m. and placed her to sleep between herself and her husband in their king-sized bed. The infant had a crib, but because the mother was breast-feeding, the baby often slept in her parents' bed. The mother was on numerous pain medications because of a failed back surgery during which she experienced nerve damage. Her pain doctor prescribed the medication in consultation with the mother's doctor, a neonatologist and a lactation specialist. Drug testing revealed the mother took the medications as prescribed. The baby had spent a week in the hospital following her birth for treatment of morphine withdrawal symptoms. A child protection investigation for death by neglect was unfounded.

Prior History:     The mother has two children, ages 5 and 7, and the father has one child, age 12, from prior relationships. In May 2011 the Department investigated a report alleging sexual abuse of the 5-year-old boy by the 12-year-old boy. The child advocacy center was involved and the report was unfounded because the 5-year-old was inconsistent in his statements about what happened and the 12-year-old was credible in his denial that anything sexual had occurred. Prior to that, the mother had a case open with the Department from January 2008 through November 2010 because of substance abuse. The maternal grandparents cared for the children while the mother attended treatment. The grandparents continue to provide support to the family and will assume care of the children if necessary.

| Child No. 70 | DOB 1/12 | DOD 4/12 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3-1/2 months |
| Substance exposed: | No |
| Cause of death: | Sudden Unexpected Death in Infancy with co-sleeping |
| Reason For Review: | Indicated child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative: Three-and-a-half-month-old baby girl was found unresponsive around 6:00 a.m. She was last seen alive around 11:00 p.m. when her mother fed her a bottle. The baby had been sleeping on her back in an adult bed between her 26-year-old mother and the wall. Her 4-year-old sibling was laying across the foot of the bed. The mother and her children were staying with the maternal grandparents. The mother reported that she did not normally sleep with the baby, but she was preparing to move out of state with her children and had been gathering things to pack and was placing them in the baby's playpen/bassinet. The Department unfounded an investigation of death by neglect against the mother.

Prior History: Ten months earlier, in July 2011, police called the hotline with an allegation of substantial risk of physical injury to the mother's son, then age 3, by the mother and her boyfriend because of domestic violence. While the investigation was pending, the mother made her boyfriend move out and she obtained an emergency order of protection; the investigator interviewed the 3-year-old child who said his mother's boyfriend didn't live with him anymore and it made him sad; and the mother's sister moved in with the family. The investigator indicated the mother and boyfriend for substantial risk of physical injury because the child was present and witnessed an incident of domestic violence that was not the first incident. Before closing the investigation the investigator checked with police to make sure there had been no further reports. The investigator referred the mother to community-based services.

| Child No. 71 | DOB 8/11 | DOD 4/12 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 8 months |
| Substance exposed: | No |
| Cause of death: | Sudden Unexpected Death in Infancy (SUDI) in a setting of co-sleeping, with sleep apnea a significant contributing factor |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative: Eight-month-old baby was found unresponsive around 11:30 a.m. when the maternal grandmother woke the 19-year-old mother to take a phone call. The baby awoke around 9:00 a.m. that morning and the mother fed and changed him, but he was fussy so she lay down in her bed with him on her chest and they fell back asleep. She awoke to find him lying on the bed next to her unresponsive. The mother did not have a crib, but she had a pack and play in her bedroom which the baby had slept in until he awoke fussy in the morning. An investigation of death by neglect against the mother was unfounded.

Prior History: At the time of the baby's death there was a pending child protection investigation against the mother for substantial risk of physical injury to the baby. In March 2012 a hospital nurse called the hotline to report she believed the mother suffered from Munchausen by Proxy Syndrome, a mental illness in which a caregiver deliberately exaggerates, fabricates, or induces physical, psychological, behavioral, or mental health problems in a person in their care. The nurse claimed that the mother had taken the baby to the emergency department 55 times. Investigation revealed that the baby had been seen at area urgent care centers and hospitals less than 10 times for breathing issues and vomiting. Both parents were concerned the baby had sleep apnea and the baby was scheduled to undergo a sleep study a week after his death. The baby's pediatrician believed the mother sought appropriate medical care and did not believe she suffered from Munchausen by Proxy Syndrome. The investigation was unfounded following the baby's death. Eight days before the baby's death the mother and 22-year-old father broke up and the mother and baby moved out of the paternal grandparents' home and into the maternal grandmother's home.

| Child No. 72 | DOB 11/11 | DOD 5/12 | Accident |
|---|---|---|---|
| 73 | DOB 11/11 | DOD 5/12 | |

| | |
|---|---|
| Age at death: | 5-1/2 months |
| Substance exposed: | No |
| Cause of death: | Asphyxia due to unsafe sleeping conditions |
| Reason For Review: | Open intact family services case at time of child's death and |
| | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:**     Six-month-old twins were found unresponsive around 8:30 a.m. by their 19-year-old mother. They were found face down side by side with a large fleece blanket covering their entire bodies. The parents tried to revive the babies and called 911. Police and DCFS investigated. The mother reported that she had fed both babies bottles and placed the baby boy in his car seat and the baby girl in a swing around 11:00 p.m. The twins awoke around 1:30 a.m. and the mother changed diapers and laid the baby girl on her stomach in the crib and the baby boy in the swing. At 3:30 a.m. the baby boy awoke and the mother changed him and fed him a bottle before laying him down on his stomach in the crib with his sister. The mother placed a large fleece blanket on top of the babies. In the crib with the infants was a second large fleece blanket, two crib size comforters, one crib bumper pad, one large plush toy, a toddler size outerwear coat, and two car seat/carrier covers. The mother, who was exhausted, said that she sometimes laid the twins down together on their stomachs despite being warned of the dangers because they slept better that way. At the time of the twins' deaths, the mother and the 26-year-old father were caring for six children: the twins, 1 and 3-year-old children of the mother's, and 3 and 4-year-old children of the father's. The Department placed the mother's children in relative foster care and the father's children went to live with their mother. The Department indicated the mother for death by neglect and substantial risk of physical injury to the surviving children. The father was indicated for substantial risk of physical injury.

**Prior History:**     In March 2011 the Department investigated a hotline report of bruising to the mother's second child, then 7 months, while she was in the care of her father (who was not the twins' father). The father was indicated for bruises to the baby and substantial risk of physical injury to her older sibling, then age 2. An intact family services case was opened on the young mother who needed domestic violence counseling (because of her history with the father), parenting instruction, and support. At the time the case was opened, the mother was living with her new boyfriend and her two children. Two months after the case was opened, in June 2011, the boyfriend's 2 and 4-year-old children unexpectedly joined the family when their mother dropped them off and left town. In September 2011 the mother informed her worker that she was six months pregnant with twins and had begun prenatal care. The mother and boyfriend were overwhelmed, but tried to participate in services including parenting classes, homemaker services, and early intervention services for the children. The mother gave birth prematurely in November 2011. The Department provided two pack n play cribs and two car seats for the twins. They were seen for medical appointments in December, January, and February. The parents missed three appointments in March despite reminders and rescheduling, and clinic staff called the hotline with an allegation of medical neglect against the parents. Following the hotline report, in April 2012, the parents took the twins to the doctor. The parents reported difficulty keeping the appointments because of child care and transportation difficulties. The investigation was pending at the time of the twins' deaths, but was subsequently indicated. The twins were last seen by their worker in April 2012.

| Child No. 74 | DOB 5/11 | DOD 5/12 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 12 months |
| Substance exposed: | No |
| Cause of death: | Hypoxic ischemic encephalopathy due to compression of the neck as his head and neck were entrapped between the lid and side edge of a wooden wicker wrapped trunk |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:     Twelve-month-old boy died in the hospital when life support was withdrawn two days after he was found by his mother with his head trapped in a wooden wicker wrapped trunk used as a toy box. The boy's 31-year-old father was watching TV in the living room while the 12-month-old crawled around and back and forth to his bedroom with his toys. The mother was in the kitchen and when she walked out to the living room and didn't see the boy, she checked the bedroom and found him on the side of the trunk (with the lid hinge) with the lid on his neck.

Prior History:   In November 2011 the hotline was called with an allegation that the 6-year-old half-sister of the deceased was afraid to be with her step-father because he walks in on her when she showers. The 6-year-old, who was the subject of a custody dispute, denied her step-father entered the bathroom when she showers. She denied any problems with her mother or step-father and the investigation of substantial risk of physical injury was unfounded.

| Child No. 75 | DOB 4/12 | DOD 6/12 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 months |
| Substance exposed: | No |
| Cause of death: | Asphyxia due to overlaying |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:     Two-month-old infant was found by his 29-year-old mother partially beneath his 27-year-old father with whom he was sleeping. The mother was not in bed with them because she had slept on the couch. There were a crib and bassinet in the home. The couple's 2-year-old child slept in the crib and sometimes the infant would sleep in the bassinet, but other times with her husband in the bed. The couple knew the baby should have slept in the bassinet but he was a colicky baby and cried a lot; sometimes the only way to get him to sleep was to lay next to him. The father had wrapped a blanket in a horseshoe around the infant to keep him from rolling. The Department indicated the father for death by neglect because he was aware of the danger of co-sleeping.

Prior History:    In June 2011 the father's 4-year-old son, who was a ward, was taken to the emergency department by his foster parent-maternal grandmother with bruises to his buttocks that the father explained were caused when the boy got a "wedgy." The hospital called the hotline because the child was a ward. An investigation of the bruises was unfounded. The father explained that he was playing with children on a trampoline throwing them up in the air and he threw his son up at his son's request, but the boy changed his mind so the father tried to catch him mid-air and grabbed his shorts which caused the "wedgy" as the boy fell. The treating physician found the explanation consistent with the linear bruises and the maternal grandmother was not concerned about the boy's safety in his father's care. The boy was returned to his father, instead of his mother, from foster care in August 2011.

| Child No. 76 | DOB 2/01 | DOD 6/12 | Accident |
|---|---|---|---|
| Age at death: | 11 years | | |
| Substance exposed: | No | | |
| Cause of death: | Craniocerebral injuries due to a fall out of a moving vehicle | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Eleven-year-old boy died in the hospital one day after falling out of a car window. The father's 30-year-old girlfriend was driving the boy and his four brothers, ages 3 to 12, when the car malfunctioned. Everyone got out of the car until the girlfriend could restart it. One of the brothers decided to walk the 1/10 of a mile to their destination. The 11-year-old said he also wanted to walk, but the girlfriend told him to stay in the car. While she was driving he sat on the window ledge and fell out of the car before the girlfriend could stop it. Police and DCFS investigated. Witnesses were interviewed, including the children. There was no evidence of alcohol or drug use by the girlfriend. The police investigation was closed with no charges filed and the Department unfounded the girlfriend for death by neglect.

Prior History:    There were five unfounded child protection investigations involving the family in the year prior to the child's death. Several of the reports were by neighbors who reported the children were regularly left home alone. On multiple visits to the home, however, child protection investigators found the children in the care of their father and/or his girlfriend.

| Child No. 77 | DOB 8/11 | DOD 6/12 | Accident |
|---|---|---|---|
| Age at death: | 10 months | | |
| Substance exposed: | No | | |
| Cause of death: | Overlaying | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Ten-month-old infant with spina bifida was found unresponsive around 10:00 a.m. by his 21-year-old mother. The mother fed the infant around 5:30 a.m. and then placed him on his back to sleep between herself and the 20-year-old father, both of whom were developmentally disabled and received SSI. When the mother awoke, she found the baby face down on the memory foam mattress against the father's back. The family lived with the paternal grandparents. There was a crib in the home next to the parents' bed. The grandparents had warned the parents, who were described as large, not to sleep with the baby and the maternal grandmother often moved the baby from the parents' bed. The mother reported that the father had previously rolled over on the baby's leg. Both parents were indicated for death by neglect.

Prior History:    In September 2011 a worker from a home visiting program called the hotline with concern about the parents' ability to care for the infant who had just had spine surgery and did not seem to be gaining weight. She was also concerned about the condition of the home. Allegations of failure to thrive and environmental neglect were investigated and unfounded. The infant's primary care physician reported the baby was consistently gaining weight and the parents and grandparents were making and keeping medical appointments. The infant was seen weekly by early intervention physical and developmental therapists. The parents appeared capable of caring for the infant with the help of the grandparents. The investigator conducted a home safety checklist, observed a bassinet and crib for the baby, and determined that the condition of the home did not rise to the level of neglect. The investigator offered services to the family but they refused them.

| Child No. 78 | DOB 7/11 | DOD 6/12 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 11 months |
| Substance exposed: | No |
| Cause of death: | Drowning |
| Reason For Review: | Indicated child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:    Eleven-month-old baby drowned in the bathtub. His 21-year-old mother placed him in the bath and then went to her room where she laid down and "passed out." She woke up one to two hours later and found the baby unresponsive in the bathtub. She admitted to police that she uses heroin and may have been under the influence when she put the baby in the bath. The mother was charged with manslaughter and felony endangerment of a child causing death. The Department indicated her for death by neglect.

Prior History:   In April 2012 the mother's 23-year-old boyfriend, with whom she and her son lived, was investigated for cuts, bruises and welts to his 2-year-old daughter. The girl was visiting her father for the weekend and had been in the care of multiple caregivers. During the weekend she got a black eye and scratches on her face. The father could not account for the black eye, but thought the scratches might be from a cat. The parents took the girl to the emergency department. Hospital staff described the parents as appropriate. The investigation was indicated for cuts, bruises, welts by neglect against an unknown perpetrator.

| Child No. 79 | DOB 12/09 | DOD 6/12 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2-1/2 years |
| Substance exposed: | Yes, methadone |
| Cause of death: | Methadone intoxication |
| Reason For Review: | Open intact family services case at time of child's death |
| Action Taken: | Full investigation pending |

Narrative:    Two-and-a-half-year-old boy was found unresponsive by his 41-year-old mother who checked on him during a lengthy nap. The mother called 911 and the child was taken to the hospital where he was pronounced dead on arrival. Police talked to the mother who reported she was in a methadone treatment program. She said she kept her methadone out of the child's reach on a high shelf in her bedroom closet. When questioned about whether it was possible the child drank methadone, the mother went into the refrigerator and retrieved a plastic water bottle with a small amount of pink liquid in it that was methadone. The mother said she mixed the methadone with water but she did not think the child could get into the refrigerator. A cousin had been in the home that day and reported to police that he filled a water bottle with tap water for the child to drink. A child protection investigation of the child's death is pending. *The OIG is conducting a full investigation of this child's death.*

Prior History:   The mother and infant tested positive for methadone at the infant's birth. The mother admitted using heroin two months prior to the infant's birth. The infant was the mother's fourth child; her other three children were being raised by relatives because of her history of substance abuse and criminal activities. Hospital staff called the hotline with a report of substantial risk of physical injury. The report was indicated and the Department took protective custody of the infant, but the case failed to pass screening with the local state's attorney's office which recommended community services. The mother was referred to an intact family services program specializing in services to substance-affected families. At the time of the child's death, the mother was participating in a methadone treatment program.

## NATURAL

| Child No. 80 | DOB 11/07 | DOD 7/11 | Natural |
|---|---|---|---|
| Age at death: | 3-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Sepsis due to Myocarditis | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Three-and-a-half-year-old child collapsed at home in the evening. His 29-year-old mother performed CPR while his 27-year-old father called 911. The boy was taken by ambulance to the hospital where he was pronounced dead. His mother reported that he had not been feeling well for the past week.

Prior History:     In October 2010 the family was evicted from their apartment for non-payment of rent. The landlord called the hotline after the family moved alleging environmental neglect based on the condition in which the family left the apartment. The investigator saw the parents and their four children in their new apartment which was appropriate. The two older children, ages 14 and 16 were interviewed at their schools and both reported they and their siblings were safe. The investigation was unfounded for environmental neglect.

| Child No. 81 | DOB 7/11 | DOD 8/11 | Natural |
|---|---|---|---|
| Age at death: | 25 days | | |
| Substance exposed: | No | | |
| Cause of death: | Trisomy Eighteen | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Full investigation, Report to Director April 27, 2012 | | |

Narrative:      Twenty-five-day-old baby died in the hospital where he had remained since birth. He was born with Trisomy 18, also known as Edwards Syndrome, which is a condition caused by an error in cell division and has a high infant mortality rate.

Prior History:     During the 25 days of this infant's life, hospital staff called the hotline on three occasions to notify the Department that physicians had taken protective custody of the infant, twice to administer blood transfusions and once to perform cardiac surgery. The infant's parents were Jehovah's Witnesses so they refused to consent to the medical treatments. Despite physicians making no allegations of abuse or neglect to the infant or his 6-year-old brother, the Department initiated child protection investigations against the parents, subjecting the family to needless trauma and intrusion and wasting Department and hospital time and resources. **See General Investigation #6**

| Child No. 82 | DOB 7/11 | DOD 8/11 | Natural |
|---|---|---|---|
| Age at death: | 4 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Infant Death Syndrome (SIDS) | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Four-week-old infant was found unresponsive by his 25-year-old mother. The infant was visiting his grandmother's home with his mother and six siblings. The mother fed him around 12:30 a.m. and placed him face up on the couch to sleep while she sat on the couch watching TV. The mother fell asleep and awoke at 5:30 a.m.; her son was unresponsive in the same position in which she laid him.

Prior History: In August 2010 the mother was indicated for environmental neglect because of the deplorable condition of her apartment which included roaches crawling everywhere. An intact family services case was opened on the mother and her six children, ages 7 months to 10 years. The intact family worker advocated for the family to move into a different three-bedroom apartment and assisted the family in getting new beds. The home appeared in good condition during visits. The mother was attending school and the children were enrolled in daycare or school. The case was closed in April 2012.

| Child No. 83 | DOB 8/09 | DOD 10/11 | Natural |
|---|---|---|---|
| Age at death: | 26 months | | |
| Substance exposed: | No | | |
| Cause of death: | Bronchopneumonia | | |
| Reason For Review: | Unfounded child protection investigations within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Two-year-old child was found unresponsive by her 16-year-old mother a couple of hours after she was put to bed. The child had had a normal day. A child protection investigation of the girl's death was unfounded. The girl died from bronchopneumonia, a serious respiratory tract infection which can go unrecognized in young children. The child's teenaged father was not involved in her life.

Prior History: The teen mother and her child lived with the teen's 45-year-old mother. In May 2011 the teen told a counselor that her mother had hit her. The teen had no injuries and recanted the allegation and a child protection investigation of the incident was unfounded. In August 2011 the teen attacked an old boyfriend of her mother's in a store. After the man filed a police report against her, the teen said the reason she attacked him was because of a flashback she had to sexual abuse he inflicted upon her seven years earlier. A child protection investigation of sexual abuse was unfounded because of insufficient evidence to support the allegation.

| Child No. 84 | DOB 11/11 | DOD 11/11 | Natural |
|---|---|---|---|
| Age at death: | 1 day | | |
| Substance exposed: | No | | |
| Cause of death: | Congenital abnormalities | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Baby boy born at 34 weeks gestation died in the hospital at one day old. He was born with severe birth defects, including his internal organs being located outside his body and his limbs not being fully formed. His 28-year-old mother did not have any prenatal care.

Prior History: Four months prior to the baby's birth and death, the mother was investigated and unfounded for inadequate shelter and substantial risk of physical injury to her four children, ages 1, 10, 11, and 12. A neighbor called the hotline to report that the family was living in a condemned building with no electricity or water. The next morning an investigator went to the home, found it being boarded up, and learned that the family had moved out. The investigator located the children at school. They and school officials denied any concerns about the children's care. The investigator contacted the children's pediatrician who saw no indications of abuse or neglect. The investigator also met with the children's mother and father who reported the family had moved and the children were well-cared for.

| Child No. 85 | DOB 11/11 | DOD 11/11 | Natural |
|---|---|---|---|
| Age at death: | 20 minutes | | |
| Substance exposed: | Yes, cocaine, opiates, marijuana | | |
| Cause of death: | Placenta abruption due to cocaine use | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Baby boy born substance exposed at 32 weeks gestation died 20 minutes after birth. The 29-year-old mother had no prenatal care. She was indicated for death by neglect to the baby and substantial risk of physical injury to three of her surviving children, ages 3, 6, and 11, who were staying with a relative, but entered foster care after the baby's death. Three other children are in the guardianship of their paternal grandmothers.

Prior History:    In November 2010 the mother was indicated for substantial risk of physical injury to her children after she failed to pick up one of her children from school. Investigation showed that the maternal grandmother, who helped care for the children, had recently passed away and the mother was using drugs and alcohol to cope. The mother gave her sister temporary guardianship of the children until she could pull herself together. In August 2011 the mother left two of her children and three of her roommate's children home alone. Another of mother's sisters found the children alone and took care of them until the roommate returned. The aunt took her nieces with her and called police. The mother could not be found; she was indicated for inadequate supervision.

| Child No. 86 | DOB 9/11 | DOD 12/11 | Natural |
|---|---|---|---|
| Age at death: | 2-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Sepsis | | |
| Reason For Review: | Open extended family support program case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Two-and-a-half-month-old baby was found unresponsive around 9:00 in the morning by her 57-year-old maternal grandfather. The baby had been sleeping with her 18-year-old maternal aunt who last saw the baby alive in the middle of the night when she placed the baby back to sleep on her stomach on a comforter in the middle of the full-size bed. The aunt was caring for the baby while the 50-year-old maternal grandmother was working an overnight shift. There was a crib in the home. The baby had not appeared ill. An investigation for death by neglect by the aunt was unfounded.

Prior History:    Two months before the baby's death, the grandmother called the hotline to report that her adopted daughter had left the baby in her care two weeks earlier and she wanted assistance getting guardianship of the baby. She and her husband were already guardians of the mother's one-year-old child. The Department provided the family with a portable crib; reviewed safe sleep practices and left a safe sleep brochure; shared information about what services might be available to the family; and was helping the family with the paperwork to file a petition for legal guardianship of the baby.

| Child No. 87 | DOB 10/10 | DOD 12/11 | Natural |
|---|---|---|---|
| Age at death: | 13 months | | |
| Substance exposed: | No, however, mother admitted to cocaine use during her pregnancy | | |
| Cause of death: | Hypoxic encephalopathy due to cardiac arrhythmia due to multiple congenital heart defects | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Thirteen-month-old toddler died in the hospital two days after being rushed there by ambulance when his foster grandmother discovered him unresponsive during a nap. The toddler had been exhibiting flu-like symptoms for one to two days.

Prior History:    The deceased entered foster care following his birth and was placed with the foster parent who had adopted one of his six older siblings and had another sibling as a foster placement. The children's 43-year-old mother has a history with DCFS dating to 2006; she has a history of substance abuse and has given birth to two substance-exposed infants. The mother has not participated in services and does not have any children in her care.

| Child No. 88 | DOB 5/11 | DOD 12/11 | Natural |
|---|---|---|---|
| Age at death: | 7 months | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple congenital anomalies (believed) | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Seven-month-old infant born with multiple congenital anomalies with medical complications died in the hospital. The infant had been living in a facility for medically complex children who are unable to be cared for in a home environment. Staff at the facility called for an ambulance when the baby's vital signs suddenly dropped. She was taken to the hospital where she died.

Prior History:    In October 2011 a hospital social worker called the hotline and a report was taken for investigation of environmental neglect and substantial risk of physical injury to the baby and her 1-1/2-year-old brother. The baby had been hospitalized after birth for several months, was discharged home and then returned to the hospital six weeks later when she needed a tracheostomy. Hospital staff were worried about the baby returning to the family's home which needed many repairs and was under construction by the father. The 22-year-old mother visited the baby every day in the hospital and was appropriate with her. Hospital staff helped the parents arrange for the baby to stay at a facility for medically complex children until the home was fit for her to live there. After the baby's death, the investigation was unfounded. The family was offered services including grief counseling but they declined them.

| Child No. 89 | DOB 11/11 | DOD 12/11 | Natural |
|---|---|---|---|
| Age at death: | 4 weeks | | |
| Substance exposed: | Yes, cocaine and opiates | | |
| Cause of death: | Sudden Infant Death Syndrome (SIDS) | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Four-week-old substance-exposed infant was found unresponsive around 11:30 a.m. on his back in his bassinet by his 63-year-old foster mother. The foster mother reported that she fed the baby, swaddled him in a baby blanket, and placed him in the bassinet so that she could prepare food for the other two children in her home.

Prior History:    The baby entered foster care following his substance-exposed birth. Four and 9-year-old siblings also entered foster care and were placed with their maternal grandparents. The mother has a history of substance abuse dating to July 2007 when she gave birth to a substance-exposed infant. An intact family services case was opened at that time and the 39-year-old mother participated in services. The mother's adult daughter helped to care for her two younger siblings and the case was closed in May 2010. Subsequent to the baby's death, in October 2012, the mother gave birth to another substance exposed infant who has been placed in the temporary custody of DCFS. The mother is not participating in services.

| Child No. 90 | DOB 10/96 | DOD 12/11 | Natural |
|---|---|---|---|
| Age at death: | 15 years | | |
| Substance exposed: | No | | |
| Cause of death: | Intracerebral hemorrhage due to aneurysm | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Fifteen-year-old boy was visiting his maternal grandmother when he complained of a headache and was told to go lay down. When his younger sister later checked on him, she found him unresponsive. The boy had a history of a brain tumor that was surgically removed as well as a previously ruptured cerebral aneurysm.

Prior History:    At the time of the boy's death there was a pending child protection investigation for bruises to the boy and substantial risk of physical injury to his three siblings ages 7, 9, and 10. When interviewed the reporter said that his girlfriend told him the boy had bruises he said were caused by his step-father. The uncle did not see any bruises on the boy. The investigation was unfounded following the boy's death because the siblings denied any abuse to themselves or their brother, their 30-year-old mother and 28-year-old step-father denied abuse, the children received regular medical care, and collateral contacts, including a neighbor and school principal, had no concerns.

| Child No. 91 | DOB 3/11 | DOD 1/12 | Natural |
|---|---|---|---|
| Age at death: | 9 months | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Infant Death Syndrome (SIDS) | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Nine-month-old baby was found unresponsive during a nap at her foster mother's sister's home. She had been placed to sleep on the floor.

Prior History:    The baby entered foster care three months earlier because of substantial risk of physical injury to her. The baby's 26-year-old mother was convicted in August 2011 of battery of a 5-year-old child she was babysitting. The mother did not enroll in court ordered services and she was observed being aggressive toward the baby.

| Child No. 92 | DOB 3/97 | DOD 1/12 | Natural |
|---|---|---|---|
| Age at death: | 14 years | | |
| Substance exposed: | No | | |
| Cause of death: | Malignant peripheral nerve sheath tumor | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Fourteen-year-old ward born with neurofibromatosis (a genetic disorder that causes tumors to grow on nerves) died in the hospital from a tumor pressing on her lungs. Her foster mother, caseworker, parents and sisters were able to visit with her before her death. Since July 2010 the ward had been battling tumors with surgery, chemotherapy and radiation. Her mother and one of her three siblings also have neurofibromatosis.

Prior History:    The girl and her three siblings entered foster care in June 2003 because of sexual abuse by a relative and their cognitively disabled mother's refusal to follow through on medical appointments related to the abuse. The girl and her two sisters lived with a paternal cousin who had cared for them since June 2009. The sisters have a goal of subsidized guardianship with the cousin. The girl's brother is in an independent living program and has a goal of independence.

| Child No. 93 | DOB 2/02 | DOD 2/12 | Natural |
|---|---|---|---|
| Age at death: | 9 years | | |
| Substance exposed: | No | | |
| Cause of death: | Neuroblastoma | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Nine-year-old ward, 9 days shy of her 10th birthday, died in her foster home where she was receiving hospice care. The ward had been diagnosed with stage IV neuroblastoma (cancer that forms in nerve cells) in 2004. Her foster parents, with whom she and her two siblings had lived since May 2009, were with her when she died.

Prior History:    The ward and her two younger siblings entered foster care in April 2009 after receiving intact family services from the Department for five months. The mother had mental health issues and both the mother and father abused alcohol. The parents initially visited the children and the father participated in some services, but over time visitation and participation waned and the parents' rights were terminated the month before the ward's death. The ward's two siblings were adopted by their foster parents in September 2012.

| Child No. 94 | DOB 3/12 | DOD 3/12 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 0 |
| Substance exposed: | Yes, cocaine |
| Cause of death: | Intrauterine hypoxia resulting from abruptio placentae with cocaine abuse a significant contributing factor |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:    Infant was stillborn at 39 weeks gestation. The mother tested positive for cocaine and prescription pain medication at birth. She had no prenatal care. The mother was indicated for death by abuse to the deceased and substantial risk of physical injury to her two surviving children who are now in foster care with their paternal grandmother.

Prior History:    At the time of the infant's stillbirth there was a pending child protection investigation for substantial risk of physical injury to the 36-year-old mother and 37-year-old father's 7 and 10-year-old children. The mother was arrested after a routine traffic stop led to the discovery of drug use and drug selling behavior by the parents. The children were placed in a safety plan with the paternal grandmother where they remained at the time of the infant's stillbirth. A prior investigation was unfounded for inadequate supervision in July 2011 after it was confirmed that an uncle watched the children while the mother worked an overnight shift.

| Child No. 95 | DOB 2/10 | DOD 3/12 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 years |
| Substance exposed: | No |
| Cause of death: | Hypoxic ischemic encephalopathy due to febrile seizures brought on by sepsis and bronchopneumonia |
| Reason For Review: | Indicated child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:    Two-year-old boy with a history of seizure disorder died in the emergency department after having seizures. He was being taken to the emergency department by his 22-year-old mother at the request of hospital staff because of laboratory results the hospital had gotten back from blood work four days earlier. The boy had seizures on the way to the hospital and upon arrival went into full cardiac arrest and died. While the boy died because of a bacterial infection, the mother was indicated for medical neglect because of recent missed medical appointments and laboratory work. The boy's father was not involved in the boy's life. In July 2012 the mother gave birth to a second child who also has a seizure disorder. He was placed in foster care in October 2012.

Prior History:    The mother was involved in two child protection investigations within a year of her son's death. In November 2011, a clinic physician called the hotline saying he needed to locate the boy to provide necessary medical care and he was unable to locate the mother. DCFS located the family and the child was seen by the physician without incident. In December 2011 police called the hotline after responding to a domestic disturbance. While her son was present, the mother was punched and kicked by her boyfriend after she told him she was pregnant. The mother moved out of her boyfriend's home and she and her son went to stay with a friend. The boyfriend was indicated for substantial risk of physical injury to the boy.

| Child No. 96 | DOB 7/98 | DOD 3/12 | Natural |
|---|---|---|---|
| Age at death: | 13 years | | |
| Substance exposed: | No | | |
| Cause of death: | Hypoxic ischemic encephalopathy as a result of diabetic ketoacidosis | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:      Thirteen-year-old girl died in the hospital 19 days after having a seizure and being taken to the hospital by ambulance with a blood sugar level over 700 mg/dl (normal is between 70 and 120 mg/dl) and suffering from diabetic ketoacidosis (untreated high blood glucose). One day before being taken to the hospital the girl began experiencing flu-like symptoms. Upon arrival at the hospital, staff rapidly corrected her glucose which may have contributed to the complications that led to her death. The girl was life flighted to a second hospital where she went into a coma and was placed on life support which was subsequently withdrawn. *The OIG is conducting a full investigation of this child's death.*

Prior History:   When she was 3 years old the girl was placed in the guardianship of her aunt by her mother who was using drugs. When the girl was 8 years old her aunt transferred guardianship to a family friend because the girl's diabetes, which she had since she was 4 years old, had become too difficult for the aunt to manage. In January 2012 a child protection investigation was initiated against the guardian for medical neglect of the girl's diabetes which had recently required two hospitalizations. After her discharge from the second hospitalization the guardian made a care plan for the girl to live with her mother, who had been through treatment and wanted to care for her daughter. An intact family services case was opened three days prior to the girl's hospitalization to help with the transition and ensure the girl's diabetes was appropriately managed.

| Child No. 97 | DOB 1/99 | DOD 3/12 | Natural |
|---|---|---|---|
| Age at death: | 13 years | | |
| Substance exposed: | No | | |
| Cause of death: | Acute respiratory failure | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Thirteen-year-old medically complex ward died in the hospital where she had been taken hours earlier because of respiratory distress. The girl became a ward in 2009 when her parents died. She had lived in a children's nursing care facility for the past six years.

Prior History:   When the girl was 5 years old and living with her family, a hotline report was made alleging the parents were failing to follow doctor's orders, neglected to properly maintain essential medical equipment, and allowed the girl's hygiene to deteriorate to the point she showed signs of infection. The family had four prior unfounded investigations and a history of ongoing disagreements between the parents and home health care professionals. The Department took protective custody of the girl and a series of errors occurred including the use of an ambulance service that was not equipped to accommodate a technology-dependent child, transport to a hospital that did not have a pediatric unit and was not equipped to treat the girl's medical needs, and transfer to another hospital where the girl suffered second and third degree burns after hospital staff placed heated bags on her body to raise her body temperature which had plummeted. The court denied temporary custody of the girl and she returned home. The Department indicated the parents for medical neglect but the finding was reversed on appeal. The girl was the subject of a full investigation and a report to the Director on March 10, 2005. The Department has since established a medically complex children's protocol which among other things addresses the needs of medically fragile children during child protection investigations.

| Child No. 98 | DOB 3/12 | DOD 3/12 | Natural |
|---|---|---|---|
| Age at death: | 22 days | | |
| Substance exposed: | Yes, alcohol | | |
| Cause of death: | Cardiopulmonary arrest due to multi-organ system failure due to congenital heart disease with fetal alcohol syndrome a significant contributing factor | | |
| Reason For Review: | Open intact family services case at time of child's death and Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Twenty-two-day-old infant died one day after heart surgery when he was taken off life support devices. The child was born with severe fetal alcohol syndrome and had been in the hospital since birth. The mother was indicated for neglect in the infant's death as well as substantial risk of physical injury and inadequate supervision of her three other children who entered DCFS care and are placed with their maternal great-grandparents.

Prior History:   An intact family case was opened in November 2011 because of the mother's alcohol abuse. The mother and her three children lived with the maternal grandmother who helped care for the children while the mother underwent detoxification and participated in substance abuse treatment. She was alcohol free for more than three months prior to relapsing approximately one week before giving birth.

| Child No. 99 | DOB 2/94 | DOD 4/12 | Natural |
|---|---|---|---|
| Age at death: | 18 years | | |
| Substance exposed: | No | | |
| Cause of death: | Complications of anorexia and bulimia | | |
| Reason For Review: | Closed intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Eighteen-year-old girl was found lying on the floor unresponsive by her 54-year-old mother. The mother last saw her daughter alive three hours earlier when the mother left for work.

Prior History:   The girl was diagnosed with anorexia and bulimia around the age of twelve and had received inpatient and outpatient treatment numerous times over the years. A February 2009 hotline report alleging medical neglect of her condition by her 59-year-old father was unfounded. In January 2010 school personnel called the hotline to report medical neglect of the girl by both parents. The report was indicated based on a medical provider's statement that the girl was suffering from chronic malnutrition and weight loss secondary to an eating disorder with a lack of consistent prescribed medical treatment. The girl participated in a two-month intensive outpatient treatment program and the investigation was closed. In January 2011 the mother contacted DCFS and requested services to help her deal with her daughter's illness. An intact family services case was opened and the caseworker made extensive efforts to help the mother and daughter cope with the girl's illness. The girl made progress but due to the cyclical nature of the illness she also had instances of relapse. The case was closed when the girl turned 18 with the family's agreement to continue with health and counseling treatment plans.

| Child No. 100 | DOB 12/97 | DOD 4/12 | Natural |
|---|---|---|---|
| Age at death: | 14 years | | |
| Substance exposed: | No | | |
| Cause of death: | Leukemia | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Fourteen-year-old girl died in the hospital where she was being treated for leukemia that was diagnosed in May 2011. The child had been in the hospital since receiving a stem cell transplant in November 2011. She subsequently had three surgeries on her brain. After the last surgery she developed complications and her mother agreed to a do not resuscitate order. Her godmother and a friend were with her when she died.

Prior History:    The hotline was called a month after the girl was diagnosed with leukemia. Hospital staff were concerned about how the parents were going to care for the girl once she was discharged because they were homeless, had visited the hospital intoxicated, and had two incidents of domestic violence in the girl's hospital room. Three other children were staying with their godmother. The Department opened an intact family services case and provided housing assistance and other services. The case was closed three months after the girl's death.

| Child No. 101 | DOB 10/11 | DOD 4/12 | Natural |
|---|---|---|---|
| Age at death: | 6 months | | |
| Substance exposed: | Yes, prescription opiates | | |
| Cause of death: | Bronchopneumonia | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Six-month-old baby was found unresponsive in her crib around 11:45 a.m. by her 26-year-old father. The father and 25-year-old mother reported that the baby fell asleep at approximately 9:00 p.m. and they placed her in her crib. The baby was last seen alive by her father who checked on her before going to bed at 3:00 a.m. The baby was taken to the hospital where she was pronounced dead. The Department investigated and indicated the parents for death by neglect to the baby and for environmental neglect to all their children. The mother was also indicated for substantial risk of physical injury by neglect to the surviving siblings. The five surviving siblings, all under the age of 7, entered foster care.

Prior History:    The family has a history with the Department dating to March 2007 when a preventive services case was opened to assist the family with various appointments, housing and childcare needs. The case was closed in September 2007. In March 2011 a second case was open for preventive services because the mother, who was low functioning and recently gave birth to another child, lacked basic skills and knowledge of infant care. While the intact family services case was open, the Department conducted three child protection investigations. In October 2011 the Department investigated and unfounded an allegation of substance misuse against the mother. In November 2011 the parents were investigated and unfounded for bruises. In December 2011, the Department investigated and unfounded a report of inadequate shelter. The family had numerous services in place at the time of the infant's death.

| Child No. 102 | DOB 9/99 | DOD 5/12 | Natural |
|---|---|---|---|
| Age at death: | 12 years | | |
| Substance exposed: | Yes | | |
| Cause of death: | Bronchopneumonia due to quadriplegia due to | | |
| | a cerebral neoplasm (brain tumor) | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Twelve-year-old ward died in the nursing care facility where he had lived since being declared brain dead five months earlier.

Prior History:    The ward and his three siblings entered foster care in 2003 after their substance-exposed 6-month-old sister died while co-sleeping with their mother who was not in substance-abuse treatment. In 2008 the ward was diagnosed with a brain tumor. In 2009 he had brain surgery with complications, but through rehabilitation he was able to live with a paternal aunt. In December 2011 the ward suffered a brain herniation (when brain tissue, fluid and vessels are moved from their usual position in the skull) and underwent surgery but had complications and was declared brain dead.

| Child No. 103 | DOB 3/09 | DOD 5/12 | Natural |
|---|---|---|---|
| Age at death: | 3 years | | |
| Substance exposed: | No | | |
| Cause of death: | Pending, believed to be natural | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Three-year-old girl died four days after being taken to the emergency department unresponsive by her 21-year-old babysitter. The babysitter reported that the girl had a normal day and was playing outside in the backyard when she called her over to the back door to drink some water. The girl was smiling and laughing but within seconds her face turned blank and she passed out. The babysitter tried to wake the girl by calling her name, shaking her lightly, and tapping her feet, but the girl was unresponsive. The babysitter called the 25-year-old mother at work who told her to take the girl to the hospital. The girl's 8-year-old brother was present during the incident and corroborated the babysitter's description of what happened. The girl is believed to have died from a blood clot in her brain, but the results of her autopsy are still pending. The Department's child protection investigation of the girl's death is pending, but neither abuse nor neglect is suspected.

Prior History:    In January 2012 the parents brought their 2-1/2-year-old daughter to the emergency department after the mother noticed a bloody discharge while bathing the girl after she had a messy bowel movement. The girl's diaper area was red and she said her privates hurt. The hotline was called with an allegation of sexual penetration against an unknown perpetrator. A sexual abuse exam was conducted through the local child advocacy center and no evidence of sexual abuse was found. The girl's babysitter (different from the one at the time of her death) reported that the girl had had diarrhea that afternoon. The girl did not exhibit any signs of sexual abuse and neither her caregivers nor her pediatrician suspected abuse. The child protection investigation was unfounded.

| Child No. 104 | DOB 6/08 | DOD 5/12 | Natural |
|---|---|---|---|
| Age at death: | 3-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Congenital brain defects | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Three-and-a-half-year-old medically complex child was found unresponsive by his 62-year-old foster mother in the morning. The boy awoke crying and coughing a few times in the night and the foster mother was able to soothe him back to sleep. The foster mother, who is a retired nurse, had cared for the boy since he was one year old and the boy's mother had signed specific consents for the foster mother to adopt him.

Prior History:    The boy was born prematurely at 24 weeks gestation to a 24-year-old mother who is severely developmentally delayed because of fetal alcohol syndrome. The baby remained in the hospital for three months and then was placed in the care of DCFS because of his mother's inability to parent him. The mother has a guardian and had a tubal ligation after the birth of her youngest child in August 2011. That boy and an older brother are placed together in a foster home and the mother has consented to their adoption. An older sister is in the guardianship of a relative.

| Child No. 105 | DOB 4/12 | DOD 5/12 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 5 weeks |
| Substance exposed: | No |
| Cause of death: | Hypoplastic Left Heart Syndrome with Cardiomegaly |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:     Five-week-old infant was found unresponsive in the morning by his temporary guardian who had last seen him alive two hours earlier when she fed and changed him. The infant was born with a congenital heart defect and underwent heart surgery before his discharge from the hospital. The infant had been staying with temporary guardians, one of whom was a pediatric nurse, since his release from the hospital five days earlier.

Prior History:     A child protection investigation was pending at the time of the infant's death because hospital staff were worried that the mother was not retaining information necessary for the care of the infant. They were also concerned about possible domestic violence between the mother and father. The infant was an only child and the investigation was unfounded after the infant's death.


| Child No. 106 | DOB 5/10 | DOD 5/12 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 23 months |
| Substance exposed: | No |
| Cause of death: | Seizure disorder |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:     Twenty-three-month-old child was found unresponsive around 6:15 a.m. in his bed by his mother's 29-year-old boyfriend. The child's 27-year-old mother was in the hospital being prepared for surgery to have gallstones removed. The child had a seizure disorder for which he took medication. A blood drug screen at autopsy detected anti-seizure medicine within a therapeutic range.

Prior History:     There were two prior unfounded child protection investigations involving this family. In April 2011 an anonymous call was made to the hotline alleging that the home of the deceased and his 4-year-old sibling was dirty and the mother was leaving the children for long hours with different people. The home was found to be clean and the mother's care plan for the children was appropriate. In November 2011 the hotline was called because the mother reported being depressed one month after the birth of her third child and she was having thoughts of harming herself and her children. The mother began taking medication and her depression and thoughts of harm subsided.

THIRTEEN-YEAR DEATH RETROSPECTIVE

## 13-YEAR DEATH RETROSPECTIVE

**TOTAL DEATHS BY CASE STATUS FY 2000 TO FY 2011**

| FISCAL YEAR | 2000 | | 2001 | | 2002 | | 2003 | | 2004 | | 2005 | | 2006 | | 2007 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CASE STATUS | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| Ward | 29 | 30.2% | 42 | 40.8% | 23 | 23.7% | 28 | 22% | 31 | 22.3% | 37 | 26.6% | 17 | 19.8% | 24 | 21.6% |
| Unfounded DCP | 7 | 7.3% | 14 | 13.6% | 7 | 7.2% | 21 | 16.5% | 29 | 20.9% | 29 | 20.9% | 25 | 29.1% | 35 | 31.5% |
| Pending DCP | 10 | 10.4% | 6 | 5.8% | 8 | 8.2% | 15 | 11.8% | 12 | 8.6% | 15 | 10.8% | 7 | 8.1% | 16 | 14.4% |
| Indicated DCP | 8 | 8.3% | 14 | 13.6% | 9 | 9.3% | 12 | 9.4% | 6 | 4.3% | 1 | 0.7% | 1 | 1.2% | 6 | 5.4% |
| Child of Ward | 5 | 5.2% | 4 | 3.9% | 6 | 6.2% | 12 | 9.4% | 2 | 1.4% | 2 | 1.4% | 1 | 1.2% | 4 | 3.6% |
| Open Intact | 9 | 9.4% | 12 | 11.7% | 20 | 20.6% | 19 | 15% | 15 | 10.8% | 31 | 22.3% | 20 | 23.3% | 13 | 11.7% |
| Closed Intact | 5 | 5.2% | 3 | 2.9% | 7 | 7.2% | 7 | 5.5% | 13 | 9.4% | 0 | 0% | 1 | 1.2% | 2 | 1.8% |
| Open Placement/Split Custody | 13 | 13.5% | 4 | 3.9% | 9 | 9.3% | 3 | 2.4% | 17 | 12.2% | 5 | 3.6% | 4 | 4.7% | 2 | 1.8% |
| Closed Placement/ Return Home | 3 | 3.1% | 1 | 1% | 4 | 4.1% | 2 | 1.6% | 2 | 1.4% | 0 | 0% | 0 | 0% | 5 | 4.5% |
| Others | 7 | 7.3% | 3 | 2.9% | 4 | 4.1% | 8 | 6.3% | 12 | 8.6% | 19 | 13.7% | 10 | 11.6% | 4 | 3.6% |
| **TOTAL** | **96** | **100%** | **103** | **100%** | **97** | **100%** | **127** | **100%** | **139** | **100%** | **139** | **100%** | **86** | **100%** | **111** | **100%** |

| Fiscal Year | 2008 | | 2009 | | 2010 | | 2011 | | 2012 | | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Status | # | % | # | % | # | % | # | % | # | % | # | % |
| Ward | 19 | 19.2% | 21 | 23.6% | 19 | 22.9% | 25 | 22.1% | 19 | 17.9% | 334 | 24.1% |
| Unfounded DCP | 18 | 18.2% | 19 | 21.3% | 17 | 20.5% | 23 | 20.4% | 32 | 30.2% | 276 | 19.9% |
| Pending DCP | 13 | 13.1% | 14 | 15.7% | 14 | 16.9% | 17 | 15% | 12 | 11.3% | 159 | 11.5% |
| Indicated DCP | 12 | 12.1% | 4 | 4.5% | 7 | 8.4% | 8 | 7.1% | 12 | 11.3% | 100 | 7.2% |
| Child of Ward | 3 | 3% | 2 | 2.2% | 7 | 8.4% | 4 | 3.5% | 1 | 0.9% | 53 | 3.8% |
| Open Intact | 18 | 18.2% | 12 | 13.5% | 9 | 10.8% | 21 | 18.6% | 14 | 13.2% | 213 | 15.3% |
| Closed Intact | 2 | 2% | 6 | 6.7% | 2 | 2.4% | 3 | 2.7% | 2 | 1.9% | 53 | 3.8% |
| Open Placement/Split Custody | 4 | 4% | 6 | 6.7% | 1 | 1.2% | 8 | 7.1% | 1 | 0.9% | 77 | 5.5% |
| Closed Placement/ Return Home | 1 | 1% | 1 | 1.1% | 5 | 6% | 2 | 1.8% | 1 | 0.9% | 27 | 1.9% |
| Others | 9 | 9.1% | 4 | 4.5% | 2 | 2.4% | 2 | 1.8% | 12 | 11.3% | 96 | 6.9% |
| TOTAL | 99 | 100% | 89 | 100% | 83 | 100% | 113 | 100% | 106 | 100% | 1388 | 100% |

**CHILD DEATHS BY DCFS CASE STATUS AND MANNER OF DEATH 2000 THROUGH 2011**

| FISCAL YEAR | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Deaths | 96 | 103 | 97 | 127 | 139 | 139 | 86 | 111 | 99 | 89 | 83 | 113 | 106 | 1388 |
| **Ward** | **29** | **42** | **23** | **28** | **31** | **37** | **17** | **24** | **19** | **21** | **19** | **25** | **19** | **334** |
| Natural | 13 | 20 | 14 | 18 | 16 | 28 | 10 | 13 | 11 | 9 | 16 | 10 | 8 | 186 |
| Accident | 6 | 9 | 3 | 3 | 3 | 1 | 2 | 6 | 5 | 4 | 1 | 3 | 2 | 48 |
| Homicide | 7 | 9 | 3 | 6 | 8 | 5 | 4 | 3 | 3 | 4 | 1 | 8 | 7 | 68 |
| Suicide | 0 | 0 | 3 | 1 | 2 | 3 | 0 | 0 | 0 | 3 | 0 | 2 | 2 | 16 |
| Undetermined | 3 | 4 | 0 | 0 | 2 | 0 | 1 | 2 | 0 | 1 | 1 | 2 | 0 | 16 |
| **Unfounded Investigation** | **7** | **14** | **7** | **21** | **29** | **29** | **25** | **35** | **18** | **19** | **17** | **23** | **32** | **276** |
| Natural | 0 | 5 | 2 | 9 | 16 | 17 | 8 | 9 | 6 | 7 | 4 | 9 | 6 | 98 |
| Accident | 2 | 6 | 0 | 6 | 8 | 8 | 8 | 16 | 7 | 7 | 4 | 7 | 13 | 92 |
| Homicide | 4 | 2 | 3 | 5 | 2 | 1 | 7 | 5 | 3 | 2 | 4 | 2 | 7 | 47 |
| Suicide | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 4 | 2 | 0 | 10 |
| Undetermined | 1 | 1 | 1 | 1 | 3 | 3 | 2 | 4 | 1 | 1 | 1 | 3 | 6 | 28 |
| **Pending Investigation** | **10** | **6** | **8** | **15** | **12** | **15** | **7** | **16** | **13** | **14** | **14** | **17** | **12** | **159** |
| Natural | 0 | 1 | 7 | 6 | 6 | 4 | 3 | 8 | 3 | 6 | 0 | 4 | 4 | 52 |
| Accident | 5 | 1 | 1 | 3 | 1 | 5 | 2 | 2 | 1 | 4 | 7 | 9 | 4 | 45 |
| Homicide | 3 | 3 | 0 | 5 | 3 | 3 | 2 | 4 | 3 | 2 | 2 | 0 | 3 | 33 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 1 | 0 | 3 |
| Undetermined | 2 | 1 | 0 | 1 | 2 | 3 | 0 | 2 | 4 | 2 | 5 | 3 | 1 | 26 |
| **Indicated Investigation** | **8** | **14** | **9** | **12** | **6** | **1** | **1** | **6** | **12** | **4** | **7** | **8** | **12** | **100** |
| Natural | 1 | 4 | 7 | 7 | 3 | 1 | 0 | 2 | 4 | 1 | 4 | 2 | 3 | 39 |
| Accident | 4 | 7 | 0 | 4 | 3 | 0 | 0 | 4 | 2 | 3 | 1 | 2 | 4 | 34 |
| Homicide | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 3 | 3 | 13 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| Undetermined | 2 | 2 | 1 | 1 | 0 | 0 | 1 | 0 | 2 | 0 | 1 | 1 | 2 | 13 |

THIRTEEN-YEAR DEATH RETROSPECTIVE

| FISCAL YEAR | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Child of Ward*** | **5** | **4** | **6** | **12** | **2** | **2** | **1** | **4** | **3** | **2** | **7** | **4** | **1** | **53** |
| Natural | 3 | 1 | 1 | 6 | 1 | 2 | 1 | 2 | 1 | 0 | 3 | 2 | 0 | 23 |
| Accident | 1 | 1 | 2 | 3 | 1 | 0 | 0 | 0 | 1 | 1 | 2 | 0 | 0 | 12 |
| Homicide | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 8 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 1 | 2 | 1 | 1 | 0 | 0 | 0 | 2 | 0 | 0 | 1 | 1 | 1 | 10 |
| **Open Intact** | **9** | **12** | **20** | **19** | **15** | **31** | **20** | **13** | **18** | **12** | **9** | **21** | **14** | **213** |
| Natural | 6 | 6 | 6 | 4 | 8 | 23 | 12 | 5 | 6 | 5 | 5 | 12 | 4 | 102 |
| Accident | 0 | 5 | 7 | 10 | 1 | 5 | 3 | 4 | 4 | 4 | 1 | 3 | 5 | 52 |
| Homicide | 1 | 1 | 5 | 1 | 1 | 2 | 4 | 2 | 4 | 2 | 0 | 4 | 1 | 28 |
| Suicide | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Undetermined | 2 | 0 | 2 | 4 | 4 | 1 | 1 | 2 | 3 | 1 | 3 | 2 | 4 | 29 |
| **Closed Intact** | **5** | **3** | **8** | **7** | **13** | **0** | **1** | **2** | **2** | **6** | **2** | **3** | **2** | **54** |
| Natural | 2 | 2 | 2 | 3 | 3 | 0 | 0 | 1 | 2 | 2 | 1 | 0 | 1 | 19 |
| Accident | 2 | 0 | 4 | 1 | 5 | 0 | 1 | 1 | 0 | 1 | 0 | 3 | 1 | 19 |
| Homicide | 1 | 0 | 0 | 3 | 4 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 10 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 0 | 1 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 6 |
| **Open Placement/Split Custody** | **13** | **4** | **9** | **3** | **17** | **5** | **4** | **2** | **4** | **6** | **1** | **8** | **1** | **77** |
| Natural | 6 | 4 | 6 | 3 | 12 | 3 | 3 | 1 | 4 | 1 | 1 | 2 | 0 | 46 |
| Accident | 1 | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 2 | 0 | 4 | 0 | 11 |
| Homicide | 1 | 0 | 1 | 0 | 3 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 8 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 5 | 0 | 2 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 2 | 0 | 11 |
| **Closed Placement** | **3** | **1** | **4** | **2** | **2** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **12** |
| Natural | 3 | 0 | 3 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| Accident | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Homicide | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| FISCAL YEAR | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Adopted | 0 | 2 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| Former Ward | 5 | 1 | 0 | 1 | 1 | 0 | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 14 |
| Open Return Home | 0 | 0 | 0 | 1 | 0 | 3 | 0 | 4 | 1 | 1 | 5 | 2 | 1 | 18 |
| Closed Return Home | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Homicide by a ward** | 1 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| Interstate compact | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Preventive services | 0 | 0 | 1 | 3 | 4 | 13 | 5 | 2 | 3 | 2 | 0 | 0 | 1 | 34 |
| Subsidized Guardianship | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Child of former ward | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| Extended family support | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 1 | 0 | 1 | 0 | 0 | 5 | 11 |
| Child Welfare Referral | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1 | 5 | 1 | 1 | 1 | 5 | 17 |

*In FY 01 a child of a ward was also a ward and was only counted once in the total.
**In FY 00, FY 02 and FY 03 the victims of the homicide by a ward were either not involved with DCFS and therefore not included in the total or the victims were involved with DCFS and had been included in another category.

| SPECIAL REPORTS |
|---|

## OFFICE OF THE INSPECTOR GENERAL
### Department of Children and Family Services

**File:**          2012-0917

**Subject:**          Violence in the Home and Child Safety

### INTRODUCTION

The Office of the Inspector General (OIG) of the Illinois Department of Children and Family Services investigates serious injuries and deaths of children whose families were involved with the Department within twelve months prior to the children's serious injuries or deaths.  This Report reviews a cluster of serious injury and death OIG investigations in which children's exposure to violence in the home was not adequately addressed.

Violence in the Home

The Department recognizes in Procedures that the best predictor associated with future violence is prior violence.[1]  Therefore, whenever a child protection investigator or specialist learns of violence in the home, they must examine whether the situation presents a risk of future harm.  This analysis is reflected in the Child Endangerment Risk Assessment Protocol (CERAP).  Under CERAP, if violence is present in the home, the protocol requires either a mitigating factor (e.g., abuser has left the home) or implementation of a safety plan.

In response to problems identified in abuse investigations of infants six months and younger, the Department also issued a Memorandum dated July 1, 2010, which dictates a presumption in favor of protective custody when infants have unexplained bruising above the neck (see attached Memorandum).

Domestic Violence

Domestic violence, often referred to as intimate partner violence, is a broad heading that serves as an umbrella for a wide range of behaviors.  Different disciplines within the child welfare field may be operating from different definitions of domestic violence ranging from a clinical perspective to a legal context.  Clinical definitions focus on the pattern of assaults or behaviors displayed against the victim ranging from physical, verbal, psychological, sexual, and economic assault. Legal definitions vary from state to state and distinguish between whether domestic violence is viewed as a civil or criminal matter in that state. The Illinois Domestic Violence Act [750 ILCS 60/101 *et seq.*] defines domestic violence as "a crime in which physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation is perpetrated by one family or household member against another."

---

[1] Administrative Procedure 6.1; *See also*, Assessing Dangerousness: Violence by Batterers and Child Abusers, Jacquelyn Campbell (crediting the research of Convit [1988]; Janofsky, Spears & Neubauer [1988]; Lewis, Lovely, Yeager & Femina [1989]; and McNeil, et al. [1988]).

The Department defines domestic violence as

> involving the establishment of power and control through a pattern of coercive behaviors that include physical, sexual, verbal, and emotional assaults perpetrated by one intimate partner against another.

The Department narrowly distinguishes domestic violence from other forms of partner violence, explaining that domestic violence is about power, control, and intimidation, and that domestic violence is not caused by an anger issue or substance abuse issue.  Unlike a person with anger issues, domestic violence perpetrators have the ability to stay in control of their behaviors and behave appropriately in social settings and may not have a trigger.  (Domestic Violence Practice Guide).[2]  Some domestic violence experts, however, include "inter-partner violence" or "situational couple violence" as another form of domestic violence. This form of partner violence does not contain clear power differentials. Violent incidents range from innocuous equally initiated incidents, such as shoving or arm grabbing, to potentially lethal mutually combative exchanges.  Some couples have a recurring pattern of incidents escalating into violence, and this type of violence is almost as likely to be perpetrated by women as by men. Situational couple violence is the most common form of intimate partner violence (Center for Law and Social Policy, 2006).  This form of partner violence can occur as a result of stress, anger, and lack of appropriate relationship conflict resolution tactics (Ver Steegh, 2005). Situational couple violence is more appropriately addressed through couples counseling, mediation and anger management services (Ver Steegh, 2005) – rather than separate services, i.e., separate domestic violence counseling for the victim and perpetrator (Domestic Violence Practice Guide).

While the distinction between classic domestic violence and inter-partner violence is well accepted within the domestic violence treatment community and is very useful in identifying appropriate services,[3] the dichotomy may be less useful in determining child safety:  inter-partner or situational couple violence can create just as dangerous a living environment for children, both in terms of long-term effects and immediate risk of harm. For the purpose of this report "domestic violence" includes violent incidents carried out in inter-partner or situational couple violence.

Investigative Case Example:

> *This family came to the attention of the Department when the mother and father got into an argument as he was moving out and attempting to remove the washing machine.[4]   The mother who was pregnant at the time and holding their 11-month-old baby was injured and the baby had a bruise on his thigh.  While the family remained involved with the Department for the next two years, and many investigations were initiated, this would be*

---

[2] In October 2005, the Department released a domestic violence training curriculum that included a *Domestic Violence Practice Guide*. The Guide consists of information child protection investigators can use when conducting an investigation where domestic violence is suspected. Batterer types and level of risk are explained for the worker to deduce the level of danger the victim(s) face. Domestic violence safety planning and effects of domestic violence on children are described for the worker to better understand how to proceed with the case. Appendix E of the Guide, offers a list of service providers, categorized by region, for both victims and perpetrators.  Information regarding available resources is kept current by the domestic violence Specialists. The Department requires all investigators, intact workers, permanency workers, placement workers, private agency staff, and supervisors to complete training on domestic violence policy and the *Domestic Violence Practice Guide*. Trainings began in October 2005 and are held monthly via a three hour statewide teleconference.  To date, 3,556 DCFS and private agency staff completed the training. (Source: DCFS Office of Training.)  The *Domestic Violence Practice Guide* is not available on the Department's D-Net.

[3] Anger management therapy, couples therapy, family therapy, and court/divorce mediation are not recommended as effective forms of treatment for the perpetrator and adult victim of domestic violence. Domestic violence counseling, shelters, and legal assistance are recommended as appropriate forms of intervention for domestic violence victims.

[4] OIG File No. 2011-0034, June 30, 2011.

*the only indicated finding until two years later, when the mother stated that the father threatened her with a knife in front of the children and raped her. Throughout the Department's service provision to the family, the mother made and recanted allegations against the father and at times fabricated allegations in an attempt to get his attention when he was dating other women. The children were raised in a chaotic environment which included frequent visits by the police and court intervention to address the threats of violence in the home. The mother was non-compliant with services until the Department was about to remove the children after the rape allegation. The mother then agreed to get an order of protection against the father, but recanted in court three months later. When the mother recanted, the worker immediately contacted the assistant state's attorney to screen the case into court. The assistant state's attorney was reluctant to file a petition for removal, however, because of the mother's well-known history for false allegations and recantations. Four months later, the 3-month-old daughter was brutally beaten in the home.*

**Child Welfare Challenges Particular to Families Plagued by Violence in the Home**

Domestic and inter-partner violence present challenges particular to child welfare. First, in most cases child welfare service plans and safety plans are more effective when the resources of an extended family can be harnessed to strengthen the family and keep the children safe. Families with domestic violence issues often operate in isolation from extended families and community supports. Second, interim measures, such as offering services and protective daycare while keeping the family intact, may be difficult since parents suffering from domestic or inter-partner violence often refuse voluntary services. Third, the emotional harm inflicted on children from chronic exposure to violence in the home and the chaotic lifestyle it creates is difficult to measure or prove and may require resources specific to this population. Fourth, domestic and inter-partner violence is frequently underreported and may be more so in the child welfare field where the parent may also fear having their children removed. Lastly, while the adult victim of domestic violence may be faultless, at times the situation may still require removal of the children because of the danger of abuse to the children.

Investigative Case Example:

*The father of a four-year-old boy[5] had been convicted of domestic battery and there were multiple third party reports of chronic domestic violence from both family members and community professionals. In the space of a single year, the hotline had been called five times, initiating five separate child protection investigations. Teachers described the four-year-old as violent and assaultive toward other children. On two occasions, he 'joked' about killing himself. He told the teacher that "mommy got beaten by daddy and he peed on her." When asked during a class exercise what he was thankful for, he stated that he was thankful that "dad beats mom because she deserves it." The children's exposure to domestic violence was never addressed because the five investigations were unfounded.*

The Importance of Child Interviews

Mullender et al. (2002) noted the current widespread recognition that children living in households where their mothers are being abused by partners or ex-partners experience considerable distress (Jaffe et al., 1990) and frequently display adverse reactions (Wolfe et al., 1986).[6]  The authors suggest that part of the

---

[5] OIG File No. 2010-2469, June 1, 2011.

[6]  It has been estimated that 15.5 million American children live in two-parent households in which partner violence has occurred within the past year (McDonald, Jouriles, Ramisetty-Mikler, Caetano, & Green, 2006).  The authors describe 11 acts of partner

problem is that the children and young people who live with violence in the home are not being listened to and that their own understanding of their situation is overlooked, as are the ways in which they attempt to deal with it.  There are dangers in adults making assumptions about children's needs rather than basing policy and practice on evidence from child-centered research (Abrahams, 1994; McWilliams and McKiernan, 1993). The authors opine that while professionals and policy makers now recognize that they should be responding to children who live with violence, these professionals are often confused as to what to do.

Speaking with the children, independent from their parents, can provide the opportunity to better understand a child's life in the midst of hostility (Overlien & Hyden, 2009).  Faller (2003) argues that methods employed in interviewing children about child maltreatment can be applied to interview children about exposure to violence in the home.  Child interview strategies that may elicit information about a type of child maltreatment may also yield useful data when children are otherwise endangered, including by being witnesses to violence.[7]

Finkelhor, Ormrod, Turner, & Hamby (2005) examined multiple forms of violence and the victimization experiences of children to better understand the correlations between the different forms of violence they may have experienced.  One of the forms of violence that the researchers examined was domestic violence, an area that may at times be overlooked by child welfare agencies and workers charged with investigating abuse and neglect of children.  The researchers point out that studies have a tendency to focus on one or few forms of victimization, failing to identify factors associated with children who experience multiple forms of violence.  For example, exposure to both domestic violence and child abuse is often viewed as separate traumas rather than from a holistic approach.[8]  Citing Duncan, 1999; Edelson, 1999; Perry et al., 2201; Shields & Cicchetti, 2001, the researchers noted, "Violent parents frequently attack multiple family members, and this means that children exposed to domestic violence are also often victims of child abuse." Public policy drawn from comprehensive and integrated studies that consider many forms of child victimization, including exposure to domestic violence, can better benefit the field of child welfare in regard to child maltreatment.

In the Finkelhor survey, the children were asked questions regarding violence they had experienced.[9]  More than half of the children sampled stated that they had experienced violence during the year the study was occurring. The researchers found that most of the violence experienced was from a family member or acquaintance; one third of the sample experienced witnessing another person being victimized, most commonly witnessing assault with or without a weapon by an adult perpetrator.  They also found that through multiple screening questions, more incidents of violence towards the children came to light than were previously disclosed.

---

violence ranging from less offensive acts such as pushing to severe violence such as choking or use of a weapon. Other studies and advocacy and prevention education organizations have cited this statistic, including the Family Violence Prevention Fund now known as Futures Without Violence.

[7] Faller discusses recommended interview strategies, questioning techniques and suggested questions for consideration.

[8] A review of research by Herrenkohl, Sousa, and Tajima (2008) regarding the overlap in physical child abuse and domestic violence, found relatively strong evidence that the direct abuse of children and their exposure to domestic violence occur together and that both increase the likelihood of a full range of psychosocial problems for youth and young adults.

[9] The study was conducted over a one year period with a nationally representative sample of 2,030 children ages 2-17.  The sample selection procedures were based on a list-assisted random-digit dial (RDD) telephone survey design that decreases the rate of dialing business and nonworking numbers. Specially trained staff with experience interviewing children conducted phone interviews. For children under 10 years old, the interview was conducted with the primary caregiver who was most familiar with the child's daily routine. Data was collected with a computer assisted telephone interview system. Clinical and legal concepts, such as neglect and sexual harassment were translated into language that children could understand. The use of simple language and behaviorally specific questions defined the types of incidents that children should report. All procedures were approved by the Institutional Review Board of the University of New Hampshire.  See Appendix A for children's interview questions.

**THE DEPARTMENT'S PROTOCOL**
*The Safety Decision*
*CERAP*
Child welfare safety and risk determinations are governed by the Child Endangerment Risk Assessment Protocol (CERAP), Appendix G to Procedures 300. The CERAP requires that all children in the home must be seen, and if verbal, interviewed out of the presence of the alleged perpetrator. The following CERAP Safety Factors may be relevant when there is violence in the home:

- Any member of the household's behavior is violent and out of control.
- Any member of the household describes or acts toward child in predominantly negative terms or has extremely unrealistic expectations.
- There is reasonable cause to suspect that a member of the household caused moderate to severe harm or has made a plausible threat of moderate to severe harm to the child.
- Caretaker has not, will not, or is unable to provide sufficient supervision to protect child from potentially moderate to severe harm.
- Any member of the household has previously or may have previously abused or neglected a child, and the severity of the maltreatment, or the caretaker's or other adult's response to the prior incident, suggests that child safety may be an urgent and immediate concern.
- Child is fearful of people living in or frequenting the home.
- The presence of domestic violence which affects caretaker's ability to care for and/or protect child from immediate, moderate to severe harm.
- Other – serious allegations with significant discrepancies or contradictions by caretaker or between caretaker and collateral contacts.
- Other – caretaker refuses to cooperate or is evasive.
- Other – criminal behavior occurring in the presence of the child, or the child is forced to commit a crime or engage in criminal behavior.

If any of the CERAP Safety Factors are checked "yes," the worker must determine whether sufficient family strengths mitigate the Safety Factors. For instance, when domestic violence is present in a home, if the non-offending caretaker takes steps, on his or her initiative to remove the abuser from the home or to move the children to a safe place, the Safety Factor will be considered to have been mitigated. If the Safety Factor is not mitigated, a Safety Plan must be put into place.

Department Procedures 300, Appendix J addresses Domestic Violence. Its purpose is defined as providing "guidance to child protective service workers (CPSW) when assessing safety and risk to children in cases where domestic violence is present or suspected as an underlying condition of abuse and neglect." Appendix J informs workers that:

- Child abuse is 15 times more likely to occur in families where domestic violence is present;
- Perpetrators sometimes use physical, emotional or sexual abuse of children to maintain or establish power or control over the victim; and
- Domestic violence is often linked to severe and fatal cases of child abuse.

Appendix J also alerts workers to trauma-based behavior in children that may be the result of exposure to domestic violence. Appendix J requires the investigator to complete the Domestic Violence Screen (CANTS 17A) in assessing safety and risk in a home where domestic violence is suspected.

*The Domestic Violence Screen*

The Domestic Violence Screen contains a set of Significant Indicators of Domestic Violence[10] and a set of Verbal Indicators.  The Verbal Indicators are four questions designed to be asked of the alleged victim/parent regarding whether their partner has ever behaved in ways that signify domestic violence concerns.  The Significant Indicators include both subjective and objective factors.  The objective factors concern whether there are third party reports or criminal history of domestic violence or orders of protection.  The remaining Significant Indicators are more subjective and may be based on the worker's observations or information from the parent.  The Screen does not require accessing specific sources nor does it identify the source of information used.   For instance, while the screen asks for a description of police interactions, it does not require the worker to retrieve and review any arrest or police reports – so the information may be unreliable.  Similarly, the Domestic Violence Screen does not prompt the worker to interview the children in the household or collaterals for information relevant to the Screen.  Although both Appendix J and CERAP note that children in the household must be interviewed, the Domestic Violence Screen does not prompt integrating information from children and appears to rely heavily, and often in practice, solely, on the self-report of the victim/parent.  In OIG investigations of death and serious injury, OIG investigators could not identify an investigation in which the Domestic Violence Screen contributed to assessing level of risk and safety to a child.

Because children usually do not seek help on their own for the violence they are exposed to, specific inquiry may be needed to uncover violence in the home and associated traumas (Faller, 2003).  The Department's *Domestic Violence Practice Guide* includes a set of child interview questions.  The *Guide* is provided in training but is not available on the D-Net and the Domestic Violence Screen does not prompt questioning of children or their collaterals.  The OIG has not found a child protection investigation in which the Child Interview Questions appeared to have been used.  The questions are as follows:

---

### Domestic Violence Practice Guide: Child Interview Questions[11]

**Child's Account of What He/She Saw**
1. What kind of things does mom and dad (or name of partner) fight about?
2. What happens when they fight?
3. Do they yell at each other?
4. Do they hit each other?
5. What do you do when this is going on?
6. How do you feel when this is happening?
7. Do you ever get hit or hurt when mom and dad are fighting?

**Assessment of Impact of Exposure to Violence**
1. Do you find that you think about your parents fighting a lot?
    a. When do you think about it?
    b. What do you think about?
2. Do you have these thoughts when you are at school or while you are playing?
3. Do you ever have trouble sleeping at night?
    a. Why?
    b. Do you have nightmares?

---

[10] Indicators of domestic violence are physical signs of abuse, criminal history of assault, property damage, isolation of children or victim, abuse of animals or pets, and history of domestic violence. Some violent behaviors such as choking/strangulation is a precursor to homicide, and the lethality of such acts is communicated to the field by the Department's Domestic Violence specialists.

[11] The child interview questions are adapted from the Domestic Violence Initiative for Child Protective Services, Massachusetts Department of Social Services.

---

**Child's Worries about Safety**

1. What do you do when mom and dad are fighting?
   - ☐ Stay in the same room
   - ☐ Go to older sibling
   - ☐ Leave/hide
   - ☐ Ask parents to stop
   - ☐ Phone someone
   - ☐ Other
   - ☐ Run out/get someone
2. When mom and dad are fighting, what do you worry about the most?
3. Have you talked to any other grown-ups about this problem?
4. Who would you call in an emergency?
5. What is their telephone number?
6. What would you say?

---

The investigator or worker is expected to determine if the violence in the home rises to the level of abuse or neglect or poses a threat to the safety of the children. When determining appropriate interventions in cases where there is reasonable cause to believe there is ongoing violence in the home and/or that the alleged batterer has a history of domestic violence, the worker is required to consider child-related risk factors as to whether:

- The child(ren) will place themselves at substantial risk of harm by intervening during an incident of domestic violence; or
- The child's ability to function on a daily basis has been substantially impaired due to incidents of domestic violence

Interviews of children can help to minimize the investigator or worker's reliance on parents' self reports, especially in cases where the parent reports a domestic or inter-partner violent incident, but minimizes frequency and/or severity of abuse or recants disclosure. Children's interview responses can directly contribute to an assessment of risk, safety planning, and whether service interventions are needed. The field must be cautioned, however, that a single child interview may not reveal the whole picture. Therefore it may not be realistic to expect that child protection investigators will be able to gather sufficient or complete information during a time-limited investigation. Training to the field, however, should include trauma-based research which supports the presumption that children living with chronic domestic violence are likely to be substantially impaired emotionally or psychologically.

The Domestic Violence Screen also contains Assessment Questions designed to assist the worker in assessing the level of risk and safety. The Assessment Questions are as follows:

- Was or is there physical danger posed to the child from the batterer?
- Does the physical, developmental, or emotional impact of the domestic violence on the children rise to the level of suspected abuse or neglect?
- Are there strategies the adult victim has used in the past that can be supported or strengthened to protect the children?
- Has the batterer ever used or threatened to use weapons of any kind?
- In consultation with the supervisor, what if any action is required to address safety and/or risk?

The first two questions are nothing more than a restatement of the ultimate questions that must be answered by the full investigation. While the other questions are useful to answer, the over-reliance on a single source of information results in a lack of objective information to inform the answers.

Investigative Case Example:

> *In this family's case, the hotline was called because of head injuries to a child and the mandated reporter stated that the home suffered from chronic domestic violence.* [12]  *The family had had five prior investigations within the past year, all of which were unfounded but identified chronic domestic violence as an issue in the home.  Law enforcement had been involved in domestic violence incidents in the home on three separate occasions. There was a live protective order on the family.  Father had a conviction for domestic violence and was court-ordered to attend a men's anti-violence group and had never completed it.  The maternal grandmother told one of the investigators that the mother's black eye was from the father punching her.  After interviewing the mother, who denied domestic violence, the child protection investigator determined that the grandmother was not credible.  During the second investigation, teachers reported multiple statements from the four-year-old about his father beating his mother.  There were five Domestic Violence Screens in the file from five investigations.  None identified domestic violence.*

An Office of the Inspector General death investigation found that the presence of objective factors (criminal history, third party reports) was overshadowed by the parents' denial of violence.

Investigative Case Example:

> *In this death investigation,* [13] *the family had come to the attention of the Department when they entered a WIC Office and staff noted that the child had two black eyes and that the mother's arms were covered with bruises.  Staff overheard the father whisper to the child that if anyone asked her about her black eyes, she should tell them she fell down the stairs.  The child protection investigation was closed because the family fled and the Department was unable to locate them until one month later when police had to intervene during a knife fight in the home between the father and his brother.  When the police intervened, they noted several injuries on the child, which the mother tried to claim was make-up.  The maternal grandfather, who had helped care for the child when the mother first arrived, told the investigator that the father beats the child and his daughter. The investigator determined that the grandfather was not credible after interviewing the mother and hearing her denials of domestic violence.  The child was killed two months later.  The Domestic Violence Screen did not find that domestic violence was a concern.*

**Child-Selected Collaterals**

In 2008, as part of the Error Reduction Plan submitted by the Inspector General it was recommended (and the Department accepted) that the instructions for investigating a Cuts, Bruises, Welts Allegation be amended to include the following:

> Ask child if there is an extended family member, other adult or caretaker who the child feels safe with or who the child is important or special to.

Whenever there are abuse allegations and violence in the home is suspected, children should always be consulted both as to their knowledge concerning the level of violence present and also to identify child-centered collaterals to provide further information for safety and risk assessment.

---

[12] OIG File No. 2010-2469, June 1, 2011.
[13] OIG File No. 03-0992, June 5, 2003.

The questions are important as they serve two purposes. First, the questions allow the child to identify an adult (collateral) who can be interviewed for information, i.e., indicators of violence in the family, and secondly, the adult collateral can contribute to safety planning, participate in a safety net, report observations or concerns, or serve as an alternative caregiver. Obtaining addresses and phone numbers for child-centered collaterals is equally important.

Extended family members face dilemmas in trying to maintain protective relationships with young victims. Safety plans are often dictated by the preference of the parent, not what is the best safety plan for the child.

Investigative Case Example:

> *The grandparents of a three-year-old boy described how they struggled with involving DCFS out of fear that their contact with their grandson and his mother would be cut off.[14] The grandmother resorted to making an anonymous call to the hotline. The grandmother was not included in the child's safety plan which could have helped to create a support system and prevent the child from being isolated from those he trusted.*

> *The boy's aunt had provided daycare for him since he was born. She noted a bruise on his cheek soon after his mother had moved in with a new boyfriend. Sometime later, she noted that the boy was covered with bruises, but believed his mother's story that he had fallen out of bed. Three weeks later, when the boy showed up with a new set of bruises, the aunt called the hotline. She noted that the boy never used to have bruises before his mother began living with her new boyfriend. While the child protection investigation was pending, the aunt called the hotline again, noting new bruises on the boy's scrotum. The mother, through her attorney, successfully advocated for the boy to be moved to a new daycare, characterizing the aunt as making unnecessary hotline calls that were creating problems for the family. The three-year-old boy was killed by his mother's boyfriend four months later.*

In most instances, extended family is a valued resource that should always be considered when children are found to be living in homes of domestic violence. The social system that surrounds a child generally has a strong commitment to the child's future. Extended family may be able to provide insight into the best options for the child. The family conference model, originating in New Zealand, allows for families to plan and resolve issues regarding the child, as the family, with the help of the worker, implements the family's plan. In cases of partner violence, the child welfare worker invites the family to conference with the battered partner to develop a nonviolent support system for the victims, specifically the children. The worker will be involved in providing additional resources, formal or informal, identified as needed by the family. The process includes the element of cultural competency because extended families know best the practices of their culture and community (Sheets et al., 2009). Family group conferencing has been found to create a bond and unify family members. Group conferencing is important because oftentimes victims of violence in the home are kept isolated from their social networks (Pennell & Burford, 2000). Involvement of extended family may provide the mother with aid until she is able to become self sufficient. The alliance with extended family creates a shared responsibility for the child victimized by domestic abuse and in some cases, maltreatment as well.

---

[14] See OIG Report dated June 16, 2009, File No. 09-1607.

**Policy Transmittal 2010.23, Procedures 302.260 and Appendix J**

In 2010, the Department issued Policy Transmittal 2010.23 which further confuses safety and risk determination (see attached Policy Transmittal).[15]  Policy Transmittal 2010.23 amends Procedures 300 and 302 to:

- *Require as a possible alternative to taking protective custody when the batterer does not leave the home, development of a safety and protection plan with the non-offending adult victim that identifies actions that can be taken to protect the adult victim and children.*

Policy Transmittal 2010.23 should not apply when a child has been injured.  Application of this policy suggests that children in homes with domestic violence are entitled to fewer protections than children in other violent homes. The policy requirement, as stated, is misleading child protection investigators to consider that a child is safe in the home with the perpetrator of domestic violence when a DV safety plan is established. In some situations, this could lead to a conflict with the Department's directive [July 1, 2010 Memorandum] regarding protective custody of infants six months and younger presenting with any injury above the neck. The July 2010 directive creates a presumption in favor of protective custody in violent homes and provides three critical criteria that must be assessed before ruling out protective custody, and states further, "It is not acceptable to rule out Protective Custody based upon self-reporting by the primary caregiver."

*Clinical Consultation*

For cases involving domestic violence, Policy Transmittal 2010.23 requires that private agency and DCFS workers and child protection investigators consult with Clinical Domestic Violence (DV) Specialists in the Domestic Violence Intervention Program under the Division of Clinical Services.  The Department employs two domestic violence experts to provide, in addition to clinical case consultation, technical assistance, referrals, resources and support on domestic violence cases.  The OIG reviewed 320 domestic violence consultations to investigators and child welfare workers in the Central and Southern regions in fiscal year 2011.[16]  In line with Policy 2010.23, the consultants consistently advised DV safety planning for children when maintaining the children in the home with the perpetrator of domestic violence; workers were advised to speak with children about not attempting to stop the violence; getting to a safe place, in or outside the home; creating "escape routes" and calling 911.

**Integrating Clinical Information in Violence in the Home Cases**

Once a family case is opened for intact services or placement services, the field must integrate clinical information into the service plan.  Clinical consultations should include a review of the Client Service Plan to ensure that critical issues are being addressed.  In the following OIG death investigation, clinical consultations, the Integrated Assessment and a HELP Unit staffing noted serious parenting concerns regarding the mother.  Yet the case advanced in court, year after year, without requiring the mother to undergo a parenting assessment or address serious deficiencies in her counseling.

Investigative Case Example

> *When this girl's[17] older brother was an infant, he had been brutally beaten, but the Department was unable to determine whether the mother or her boyfriend had beaten the child.  The mother had provided false information during that child protection investigation in an attempt to protect her boyfriend.  The mother was indicated for*

---

[15] Policy Transmittal 2010.23 is not on the D-Net and although it states that it amends Appendix J and Procedures 302.60, neither the appendix nor the procedure reflect the changes on the D-Net versions.

[16] The OIG investigated cases from these two regions.

[17] OIG File No. 2010-1127, Interim Report dated June 30, 2011 and Final Report dated September 9, 2011.

*abuse/bone fractures and substantial risk of physical injury by abuse after the boyfriend reportedly left the home. A few months after her children were removed, the mother married the boyfriend. Two Clinical Integrated Assessments identified mother's propensity for lying and lack of responsibility toward her children. After the case languished for several years, the Department began to explore return home. Rather than address the mother's abuse toward her son, the mother was encouraged to view herself as a victim of domestic violence even though there were no instances in which she had been physically injured by her former boyfriend/husband, and there was no pattern of coercive control and violence. She was never forced to confront whether she had perpetrated child abuse or failed to protect her children. The girl was killed in the care of her mother and her mother's new boyfriend (who had been convicted of an earlier murder) during a court-ordered unsupervised extended overnight visit.*

**Assessing Long-Term Harm to Children**

Child exposure to domestic violence can be defined as hearing the abuse, witnessing the violence, being abused during the event, or being used as a manipulation tool against the adult victim (Faller, 2003).

Investigative Case Example:

*This four-year-old's mother reported to a mental health professional that her son had a history of hitting, biting, kicking, throwing things, emotional isolation, and uncontrollable crying since the age of two. The child's daycare teacher reported that he was the most violent child in the room, assaultive towards others and hard to control. The teacher also reported that the child made a gun out of Legos, put it to his chin and said he was going to kill himself. The child told his teacher that his father told him he would "put him through the wall" if he talked again.*

The effect of the children's experience of violence may vary by type of violence to which they are exposed (Ver Steegh, 2005). The long-term effects on children who have experienced violence in the home are well documented in research. Child exposure to partner violence is associated with significantly greater behavioral, emotional, and cognitive functioning problems among children, as well as adjustment difficulties that continue into young adulthood (Edelson et al., 2007). Experiencing intimate partner violence in one's family of origin (e.g. father was abusive toward mother) significantly increases the risk of that child using force in future adult intimate relationships or becoming a victim of partner violence (Coker, 2005).

Exposure to violence in the home has adverse effects on child functioning, produces different effects at different ages, increases the risk for child abuse, and is associated with other risk factors such as parental substance abuse and poverty (Fantuzzo & Mohr, 1999). Reviews of the research indicate that children exposed to partner violence demonstrated both more externalizing and internalizing negative behaviors than did children from nonviolent homes. Internalizing behavior problems included anxiety, depression, withdrawal, suicidal behaviors, fears, phobias, insomnia, bed-wetting, and low self-esteem. Children exposed to violence in the home tended to be more aggressive and to exhibit behavior problems in their schools and communities ranging from temper tantrums to fights. As adolescents, they may adopt the same dynamic of violence in their own dating or peer relationships (Thackeray et al., 2010). Thompson et al. (2011) noted there is some evidence that exposure to witnessed violence is associated with suicidal ideation (as cited in Thompson et al., 2005). Not surprisingly, children experience considerable anxiety not only when violence is occurring, but when they perceive certain triggers which signal that it might be imminent. Domestic violence impacts children's sense of their own safety, security, fear and dread that it instills in them (Buckley, Holt, & Whelan, 2007).

The few studies that assessed problems related to cognitive and academic functioning found children exposed to domestic violence demonstrated impaired ability to concentrate, difficulty in their schoolwork, and significantly lower scores on measures of verbal, motor, and cognitive skills (Fantuzzo & Mohr). Many of the children exposed to domestic violence employ passive coping tactics, which has proven to put them at risk for mental health problems (Ayers et al., 1996; Kerig, 2003; Sandler et al., 1997).

Children exposed to psychological trauma including violence in the home, are in need of emotional, psychological and social supports to help them overcome the effects of exposure to domestic violence. When the child is under acute threat, the typical "fight" response to stress may change from crying (because crying did not elicit a response) to temper tantrums, aggressive behaviors, or inattention and withdrawal. The child, rather than running away (the "flight" response), may learn to become psychologically disengaged, leading to detachment, apathy, and excessive daydreaming. Some abused and neglected children learn to react to alarm or stresses in their environment reflexively with immediate cessation of motor activity ("freeze" response). Older children who have been repeatedly traumatized often suffer from posttraumatic stress disorder and automatically freeze when they feel anxious, and therefore are considered oppositional or defiant by others.

### Addressing Isolation and Failure to Cooperate
Many families experiencing domestic violence will refuse voluntary services, fail to cooperate or offer inconsistent cooperation with services.

### Investigative Case Example

> *This family was well-known to professionals in the area. There were frequent requests for law enforcement and child welfare assistance because of domestic violence allegations. The family, however, refused services except under the threat of removal of the children. Because of a history of recanting allegations, the mother was an unreliable witness for court. In addition, her desire to reconnect with the abuser caused her to make false allegations at times. The workers were aware of the potential for harm to the children but were stymied in their attempts to address the problems through court intervention or through working with the family because of the lack of a reliable witness to the abuser's potential for harm.*

In families where cooperation with the Department is inconsistent or non-existent, and the children remain at risk because of unaddressed concerns, the field should explore the use of protective orders compelling cooperation with services. Some families respond more positively to court involvement than casework alone. The court and casework services should focus not only on the potential for violence, but also on the chaotic lifestyle resulting from the mother's consistent decision to put the relationship ahead of care for her children. For example, court ordered family counseling may have assisted service provision in a case where the parents refused services from the Department.

The Department needs to educate and engage local state's attorneys to determine facts that meet the threshold to screen a domestic violence case into court for a risk of harm finding or to compel acceptance of services. Workers also need to be trained to work with families and educate them on the long-term effects that violence in the home and chaotic lifestyles may have on their children. Evidence and assessment of the impact of the child's exposure to family violence is critical for presenting to the State's Attorney a more complete picture of harm to the child that indicates a need for protection.

**CONCLUSION**

Investigators and supervisors must presume that a child cannot safely be left in a home with a violent adult. Policy Transmittal 2010.23 *requires* investigators to consider leaving children in a dangerous environment if unproven "safety" supports are put into place. This Policy is at odds with CERAP principles and other Department protocol when there is violence in the home.

Presently, the Domestic Violence Screen does not require accessing available objective information or integrating this information to assist the investigator in assessing risk using the CERAP. In the OIG reviews, the domestic violence screening process did not depend on the compilation or discovery of relevant information. Instead, the Screen seemed to facilitate an over-reliance on self-report of the parent to the point of ignoring information from the police, school or third parties. Rather than assisting the investigator in assessing safety and risk to the child, the Domestic Violence Screen appears to shift the focus of inquiry to the needs of the non-offending caretaker. The first two Assessment Questions in the Screen restate ultimate CERAP and investigative questions that cannot be reliably answered in an initial screen. The faulty screening process does not appear to assist in informing child safety decisions.

Children should be consulted both to enhance information relevant to a safety and risk decision and also to inform service provision. Exposure to family violence has a devastating impact on children whether they are direct victims of abuse or witnesses to it. Children who live with violence form views about why it occurs, whose fault it is, and whether anyone from outside should intervene. Research suggests that children experience considerable anxiety not only when violence is occurring, but when they perceive certain triggers which signal that it might be imminent. Domestic violence impacts children's sense of their own safety and security, instilling fear and dread in them. Some children internalize and some externalize behavior problems. "Not talking to children may perpetuate their confusion and isolation and lead to misunderstandings" (Gorin, 2004).

Children have a right to have people who had protected them in the past, be involved in their life when a safety threshold has been crossed causing DCFS to be involved in the family's life. A positive relationship that the child may have with a caring, non abusive adult is a protective factor in the child's life. Most children older than four years have the insight and capacity to identify persons to whom they are special and persons they can trust. Asking a child to identify their collaterals validates their insights and beliefs about who has their best interest at heart. Child selected collaterals can be good candidates to gather information, monitor a safety plan, provide mentorship, keep eyes and ears on the child and if needed, be a placement option. By ignoring or overlooking child-centered collaterals, opportunities are missed to keep children safe. Information gathered from child interviews and child-centered collateral interviews should contribute to determining the relevance of CERAP Safety Factors when there is violence in the home.

Because of the complexity of issues involved in families with multiple and repetitive allegations of abuse or risk of physical harm and domestic violence, the Department may need to request the assistance of Child Advocacy Centers (CAC).[18] CAC staff performs child sensitive interviews when there are allegations of sexual or severe physical abuse. In investigations where there is chronic violence in the home and parents' past failure to cooperate with services, a CAC can interview the children and coordinate with local law enforcement and the State's Attorney.

---

[18] Since 1995, child advocacy centers are available to the Department to provide a coordinated multidisciplinary approach to the identification, treatment, and legal aspects of sexual abuse in accordance with the Children's Advocacy Center Act [55ILCS 80/1 *et seq.*]. Currently, the Department also refers cases of serious physical injury allegations to the CACs.

The service assessment stage of a case must incorporate information from the children, the Domestic Violence Screen and any clinical consultations.  Clinical consultations should include a review of the Client Service Plan to ensure that critical issues are being addressed.

## RECOMMENDATIONS

1. Department Policy 2010.23, which provides for batterers to remain in the home with a domestic violence safety plan, should be amended to clarify that when domestic violence has occurred in the home, it is presumed that the home environment is too dangerous for the child to remain, unless the perpetrator of violence is out of the home.  Policy 2010.23 should make clear that establishing a domestic violence safety plan for children should not preclude taking protective custody.

2. Department Procedures 300, Appendix B: Reports of Child Abuse and Neglect, The Allegations System should be amended to add the following instruction to all allegations of physical abuse. This requirement should not be limited to Allegation #11-Cuts, Bruises, Welts, Abrasions and Oral Injuries.

   *Ask the child if there is an extended family member, another adult or caretaker that he or she feels safe with, important or special to. Persons identified by the child victim shall be interviewed.*

3. The Department's Domestic Violence Specialists should always encourage investigators and child welfare workers to retrieve and review available information, such as police reports, and to access multiple sources to accumulate sufficient information about the degree of violence in the home.  The consultants should stress the importance of obtaining child-centered collaterals.

4. The Department should consider requesting the assistance of Child Advocacy Centers to interview children in investigations where there is chronic violence in the home and parents have failed in the past to cooperate with services.

5. The Department should explore the use of court-ordered service compliance with intact families where there is a high level of risk of future violence and lack of cooperation with Department services.

6. When Clinical Consultants note a critical parenting issue during an Integrated Assessment or a clinical consult, the consultants must provide written recommendations to amend the Service Plan if necessary to address critical risk or safety issues.

7. The Department should examine the continued utility of the Domestic Violence Screen and determine whether the Screen assists in assessing safety and risk to children.

**Attachment**

## MEMORANDUM
### Revision of 6/1/10 original memo

TO:　　　　Statewide Child Protection Staff

FROM:　　　George Vennikandam
　　　　　　Deputy Director Child Protection

DATE:　　　　　July 1, 2010

RE:　　　　PROTECTIVE CUSTODY-INFANTS 6 MONTHS and YOUNGER

Effective:　IMMEDIATELY

_____

**Effective immediately, this memo replaces the related memo dated 6/1/10, Protective Custody must be "ruled-out" on all infants 6 months of age or younger who are alleged victims presenting with any injury above the neck.**

Injury(s) can be minor to serious i.e. red mark, bruise, swelling, scratch, laceration, and any head trauma, et. al.

*Supervisors and Investigation Specialists must begin from the premise protective custody of children 0-6 months presenting with injuries above the neck will be taken or a safety plan immediately implemented unless ruled out.*

*It is not acceptable to rule out Protective Custody based upon self reporting by the primary caregiver.*

**There are 3 critical areas that must be assessed in the "rule-out" decision:**

NOTE:  A thorough scene investigation must be conducted and documented.

　1)　**Corroborated proof that the infant is mobile through:**
- ❖ direct observation of crawling, pulling up, sitting up, rolling over, etc; or
- ❖ medical confirmation of child's ability to ambulate; or
- ❖ collateral statements of adults *not sharing the household* of the child and caretaker;

### AND/OR

　2)　**The infant received the injury while under the supervision and care of a secondary caregiver such as a non-custodial parent, paramour, babysitter, day care provider AND does not reside with the infant.**
- ❖ There must be corroboration that the injury occurred while under supervision and care of the secondary caregiver, **and** the primary caregiver was not present at the time of injury;

❖ A full assessment of the primary caregiver's protective capacities is required

**AND/OR**

3) **A Physician has confirmed the injury was likely caused by or has made a medical finding it is ACCIDENTAL in nature.**

❖ If the infant has not been examined by a physician for the current injury, steps must be taken for the child to be immediately assessed by a doctor.

❖ Investigation Specialists must interview the doctor to determine if caregiver explanation is consistent, and share findings of scene investigation, and other facts to assist the physician in rendering an informed opinion;

If Protective Custody <u>is being ruled out,</u> the following must occur:

❖ A safety plan has to be implemented

❖ If the safety plan is with the primary caregiver, the primary caregiver must agree that the secondary caregiver, or alleged perpetrator, will not have any access to the infant.

❖ The safety plan **MUST** be monitored, in compliance with timeframes and other requirements specified in Procedures 300, Appendix G, *Child Endangerment Risk Assessment Protocol*

❖ If the safety plan is violated, then protective custody *must* be taken immediately**.**

***The safety plan must be authorized by Supervisor, and approved by the Investigation Manager***

An immediate staffing of all information obtained to date must occur with Investigation Manager to discuss the decision NOT to take Protective Custody.

❖ The Investigation Manager is to thoroughly document the conference including participants, information discussed, further instructions with timeframes, custody decision, next conference date (if required), etc.

❖ It is ultimately the Investigation Manager's responsibility to ensure all staffing instructions are completed within specified timeframes.

The Investigation Supervisor must immediately schedule the conference with the ARA or RA in the absence of the Manager.

Any questions concerning the content of this Memorandum should be forwarded to your respective Regional Administrator or Assistant Regional Administrator.

**Attachment**

## DEPARTMENT OF CHILDREN AND FAMILY SERVICES

Distribution: X and Z

### POLICY TRANSMITTAL 2010.23

### PROCEDURES 302.260 AND PROCEDURES 300.APPENDIX J
### DOMESTIC VIOLENCE

**RELEASE DATE:**        December 14, 2010

**TO:**        DCFS and Purchase of Service (POS) Child Welfare and
Child Protection Staff and Rules and Procedures Bookholders

**FROM:**        Erwin McEwen, Director

**EFFECTIVE**:        Immediately

## I.  PURPOSE

The purpose of this Policy Transmittal is to issue revisions to Procedures 302.260 and Procedures 300.Appendix J.

## II.  PRIMARY USERS

The primary users of these procedures are Department and POS child welfare and child protection staff.

## III.  SUMMARY

Procedures 302.260 and Procedures 300.Appendix J have been amended to:

- clarify that, for cases involving domestic violence, Department and POS child welfare and child protection staff must consult with a Clinical Domestic Violence Specialist in the DCFS Clinical Division's Domestic Violence Intervention Program. Specialists in this program provide clinical case consultation, technical assistance, referrals, resources and support on domestic violence cases;

- cite additional examples of controlling behavior that often occur in tandem with domestic violence;

- require workers to use the CANS assessment tool when assessing safety and risk related to domestic violence in the home. When domestic violence is suspected or identified in certain CANS categories, the worker must complete the Domestic Violence Screen.

- require differential response specialists to complete the Domestic Violence Screen in accordance with guidelines required for investigation specialists; and

- require as a possible alternative to taking protective custody when the batterer does not leave the home, development of a safety and protection plan with the non-offending adult victim that identifies actions that can be taken to protect the adult victim and children.

## IV.    QUESTIONS

Questions regarding this Policy Transmittal may be directed to the Office of Child and Family Policy at 217/524-1983 or e-mail through Outlook at OCFP Mailbox or cpolicy@idcfs.state.il.us for non-Outlook users.

## V.    FILING INSTRUCTIONS

Remove Procedures 300.Appendix J in its entirety and replace with the attached revised Procedures 300.Appendix J.

Remove pages 3 & 4 of Procedures 302, Table of Contents and replace with the attached revised pages 3 & 4.

Remove pages 1 – 10 of Procedures 302.260 and replace with the attached revised pages 1 – 8.

## References

Abrahams, C. (1994). *The Hidden Victims: Children and Domestic Violence.* London: NCH Action for Children.

Buckley, H., Holt,S., & Whelan, S. (2007). Listen to Me! Children's Experiences of Domestic Violence. *Child Abuse Review,* 16 p. 296-310.

Coker, A.L. (2005) Opportunities for Prevention: Addressing IPV in the Health Care Setting. Family Violence Prevention Fund, Family Violence Prevention and Health Practice, Vol. 01, January 2005.

Edleson, J.L., Ellerton, A.L., Seagren, E.A., Kirchberg, S.L., Schmidt, S.O., Ambrose, A.T.  Assessing child exposure to adult domestic violence. *Children and Youth Services* Review 29 (2007) 961-971.

Faller, K.C., (2003) Research and Practice in Child Interviewing: Implications for Children Exposed to Domestic Violence. *Journal of Interpersonal Violence*, 18(4) p.377-388.

Fantuzzo, J.W., Mohr, W.K.  Prevalence and Effects of Child Exposure to Domestic Violence. *The Future of Children DOMESTIC VIOLENCE AND CHILDREN* Vol. 9, No. 3-Winter 1999.

Finkelhor, D., Ormrod, R., Turner, H. & Hamby, S.L. (2005). The Victimization of Children and Youth: A Comprehensive, National Study. *Child Maltreatment* 10(1). P.5-25.

Herrenkohl, T.I., Sousa, C., Tajima, E.A. Herrenkohl, R.C., Moylan, C.A. Intersection of child abuse and children's exposure to domestic violence. *TRAUMA, VIOLENCE, & ABUSE*, Vol. 9, No. 2, April 2008 84-99.

McDonald, R., Jouriles, E.N., Ramisetty-Mikler, S., Caetano, R., and Green, C.E. Estimating the Number of American Children Living in Partner-Violent Families. *Journal of Family Psychology* 2006, Vol. 20, No. 1, 137-142.

McWilliams, M. and McKiernan, J. (1993). *Bringing it Out in the Open: Domestic Violence in Northern Ireland.* Belfast: HMSO.

Mullender, A., Hague, G., Imam, U., Kelly, L., Malos, E., and Regan, L. (2002). <u>Children's Perspectives on Domestic Violence</u>. Sage Publications, London.

Overlien, C. & Hyden, M. (2009). Children's Actions when Experiencing Domestic Violence. *Childhood,* 16(4) p.479-496.

Sheets, J., Wittenstrom, K., Fong, R., James, J., Tecci, M., Baumann, D.J., Rodriguez, C.
(2009) Evidence-Based Practices in Family Groups Decision-Making for Anglo, African American and Hispanic Families. *Children and Youth Services Review*. 31 (1187-1191)

Thompson, R., Proctor, L.J., English, D.J., Dubowitz, H., Narasimhan, S., & Everson, M. (2012). Suicidal Ideation in Adolescence: Examining the Role of Recent Adverse Experiences. *Journal of Adolescence* 35 (2012) 175-186.

Thackeray, J., & Randell, K. (2011) Epidemiology of Intimate Partner Violence. In *Child Abuse and Neglect: Diagnosis, Treatment, and Evidence* (p.23-26). Edited by C. Jenny. St. Louis, Mo.: Elsevier, Inc.

Ver Steegh, N. (2005) *Differentiating Types of Domestic Violence: Implications for Child Custody.* Louisiana Law Review. 65 La. L. Rev. 1379

**- END OF REPORT -**

# OFFICE OF THE INSPECTOR GENERAL
## Department of Children and Family Services

<div style="border">

**REDACTED REPORT**

</div>

*This report is being released by the Office of the Inspector General for educational purposes. To ensure the confidentiality of all persons and service providers involved in the case, identifying information has been changed. All names, except those of professional references, are fictitious.*

## A REVIEW OF CHILD SUICIDES 2000 - 2011

### INVESTIGATION

The Office of the Inspector General (OIG) receives notification from the State Central Register of child deaths and serious physical injuries in Illinois where the family has been involved with the Department in the year prior to death or injury. During years 2000 through 2011, 35 Illinois children who committed suicide had been involved with the Department in the year prior to their suicide.

This report:
- Describes the prevalence, trends, trajectories, and risk factors associated with youth suicide in the general population, and discusses implications for the child welfare population.
- Describes current primary prevention programs, including risk assessment, and reviews their effectiveness.
- Describes treatments targeting persons at high risk for suicide and reviews their effectiveness.
- Summarizes suicide cases in DCFS between years 2000 and 2011.
- Makes recommendations regarding services to DCFS children or system modifications to reduce risk factors for youth suicide and increase protective factors.

### Review of Literature on Youth Suicide

Suicide among children is considered to be a rare event, although it is still one of the leading causes of death in children younger than 15 years of age worldwide (Pelkonen & Marttunen, 2003; Vajani, Annest, Crosby, Alexander, & Mille, 2007). Compared to other age groups, the prevalence of suicide in children is more likely to be underestimated (Beautrais, 2001; Crepeau-Hobson, 2010; Fortune & Hawton, 2007). Possible reasons for this underestimation may include the social stigma and shame surrounding suicide in general, the reluctance by officials or coroners to determine a verdict of suicide in a child, disparities in death classification systems, and/or the misconception that children are precluded from engaging in suicidal acts due to cognitive immaturity (Crepeau-Hobson, 2010; Schmidt, Muller, Dettmeyer, & Madea, 2002; Shaw, Fernandes, & Rao, 2005; Pritchard & Hansen, 2005). However, research has indicated that, from the age of eight, children understand the concept of suicide (Mishara, 1998; Fortune & Hawton, 2007) and are capable of carrying it out.

In 2006, the suicide rate among youth aged 10 to 19 years in the U.S. was 4.16 per 100,000 persons, making suicide the third leading cause of death in this age group, with approximately 4500 lives lost each year (Centers for Disease Control, 2007; 2008). In 2007, 14.5% of the 9th to 12th grade students in the U.S. reported suicidal ideation, with 6.9% reporting at least one suicide attempt during the previous year (Centers for Disease Control, 2007). According to the Illinois Violent Death Reporting System

(IDVRS), from 2005-2008, 121 adolescents in the state of Illinois, between the ages of 10-19, committed suicide. Fourteen were children between the ages 10-14 years; 107 were ages 15-19 years.

Research in adolescent and youth suicide is growing.  While previous suicide studies provided a broad overview of the phenomenon, few focused specifically on suicide in children.  There appears to be some empirical support for the notion that children may be less exposed to common suicide risk factors, such as mental illness and substance abuse, and less likely to display predictive factors, such as prior suicidal behavior (Beautrais, 2001; Groholt, Ekeberg, Wichstrom, & Haldoresen, 1998; Pelkonen & Marttunen, 2003).  However, a recent study conducted by the Juvenile Protective Association (JPA) found that histories of physical and psychological abuse, especially during adolescence, can lead to a higher risk of thoughts of suicide in teenagers (Thompson, 2012).  This study, following the outcomes of 740 teenagers nationwide between the ages of 12 and 16, found that physical abuse during the teenage years more than doubled the risk of suicidal thoughts, and psychological abuse more than tripled the risk.

While suicide affects all youth groups, some groups are at higher risk than others.  That the rate of suicide and suicide-related behaviors increase with age is well established; however, a gender paradox exists with regard to youth suicidal behavior.  That is, whereas suicide rates are higher among boys than girls, girls have higher rates of suicidal ideation and attempted suicide (Beautrais, Joyce, & Mulder, 1998).  Of the reported suicides in the 10 to 24 age group, 83% of the deaths were males and 17% were females (CDC, 2008).  Among Ethnic groups in the U.S., rates of attempted and completed suicide are highest among Native American youth; white youth traditionally have had higher suicide rates than non-whites, but the gap has been decreasing due to an increase in suicide among African-American males (Shaffer, Gould, & Hicks, 1994).  Compared with non-Hispanic youth, Hispanic youth in the U.S. show higher rates of suicidal ideation and attempted suicide (CDC, 2007), but are not disproportionately represented among suicide completers.

Firearms have traditionally been the leading suicide method among U.S. youth, followed by hanging/suffocation, and self-poisoning (Bridge, Goldstein, and Brent, 2006).  Case-control studies reveal that firearms are more likely to be in the homes of suicide completers; and, if a gun is in the home, it is highly likely to be used as the method of suicide (Brent & Bridge, 2003).  Recently, the CDC indicated that substantial changes have occurred in suicide methods of young people in the U.S., most notably among young women (Mann, Apter, & Bertolote, 2005). According to the CDC, in 1990 the most common method of suicide among young females was with a gun, accounting for approximately half of the suicides.  By 2004, over 70% of suicides by girls ages 10-14 were completed by hanging or suffocation.[1]  By the ages of 15 to 19, suicides completed by hanging or suffocation decreased to 49%.

*Etiology*
Suicidal behavior emerges from a convergence of biological, developmental, and environmental factors, and is typically activated by acute or chronic stress. Youth who have particular vulnerabilities based on environmental and constitutional factors are at heightened risk as they enter adolescence and begin to experience the psychological challenges associated with the biological, cognitive, social, and emotional changes that come with puberty. There are often sudden stressful or chaotic events that act as triggers of latent suicidal tendency in a child. Examples of these factors include loss of a parent or important person in the child's life, a sudden humiliating event, divorce of parent, break-up with boyfriend or girlfriend, witnessing someone's suicide, being diagnosed with a rare disease, etc.

Numerous risk factors are associated with youth suicide.  Major risk factors for suicide among adolescents are as follows: previous suicide attempt; psychiatric disorder, especially major depressive disorder, bipolar disorder, conduct disorder, and substance use disorders; psychiatric co-morbidity;

---

[1] According to IVDRS hanging is the most common method of completing suicide in Illinois.

personality disorders; impulsive aggression; availability of lethal means; feelings of hopelessness and worthlessness; family history of depression or suicide; loss of a parent to death or divorce; family discord; physical and/or sexual abuse; lack of a support network; dealing with homosexuality in an unsupportive environment.

Co-morbidity of psychiatric disorders, particularly of mood, disruptive, and substance abuse disorders, significantly increases the risk for youth suicide and suicidal behavior (Shaffer, Gould, & Fisher, 1996). Psychiatric disorders are present in up to 80 to 90% of adolescent suicide victims and attempters from both community and clinical settings (Bridge, Goldstein, & Brent, 2006). Both in completed and attempted suicide, the most common psychiatric conditions are mood, anxiety, conduct, and substance abuse disorders. Psychological autopsy studies have shown a substantial link between clinical depression and suicide in adolescents, with up to 60% of adolescent suicide victims having a depressive disorder at the time of death (Brent, Baugher, & Bridge, 1999). Similarly, between 40 and 80% of adolescents meet diagnostic criteria for depression at the time of the attempt (Gould, King, & Greenwald, 1998). In clinically referred samples, up to 85% of patients with major depressive disorder or dysthymia have suicidal ideation; 32% will make a suicide attempt sometime during adolescence or young adulthood; 20% will make more than one attempt; and by young adulthood, 2.5 to 7% will commit suicide (Harrington, Brenkamp, & Groothues, 1994). The association of prior suicidal behavior and depression has been shown to increase the risk for a repeated suicide attempt and suicide (Brent, Baugher, & Bridge, 1999).

A recent Finnish longitudinal population-based study found that, among boys, the strongest predictor of completed suicide or making a serious suicide attempt by age 24 years was co-morbid conduct and emotional disorders at 8 years of age (Sourander, Klomek, & Niemela, 2009). One in 20 boys with co-morbid conduct and emotional disorders completed suicide or made a serious suicide attempt during adolescence or early adulthood, compared with only one in 250 boys without such problems. Self-reported depression symptoms at age 8, however, did not predict suicidal outcome. Among females, no predictors of suicide outcome at the age of 8 were found. A recent prospective cohort study found that anxious-disruptive girls and disruptive boys were more likely than their peers to attempt suicide by early adulthood, suggesting that gender-based differences in risk for suicidal behavior should be considered both from a clinical perspective and in future research (Brezo, Barker, & Paris 2008).

*Alcohol and Drug Use*
Substance abuse disorders contribute substantially to the risk of suicide, especially in older adolescent males when co-occurring with mood disorder or disruptive disorder. Recently, Aseltine, Schilling, & James (2009) examined the relationship between heavy episodic drinking (HED) and adolescent suicide attempts. They found that adolescents who were 13 years or younger, and who participated in HED, were at 2.6 times greater risk of reporting a suicide attempt as compared to those who did not participate in heavy episodic drinking. For those who were 18 years and older, HED increased their suicide attempt risk by 1.2 times as compared to young adults of this same age who did not participate in HED. Schilling et al. (2009) found that drinking while feeling down resulted in a three-fold increase in the risk of self-reported suicide attempts.

*Family Factors*
Family factors, including parental psychopathology, family history of suicidal behavior, family discord, loss of a parent to death or divorce, poor quality of the parent-child relationship, and maltreatment, are associated with an increased risk of adolescent suicide and suicidal behavior.
There is strong and convergent evidence that suicidal behavior is familial and, perhaps, genetic, and that the susceptibility to suicidal behavior is transmitted in families independently of psychiatric disorder (Brent & Mann, 2005).

A growing body of research indicates that the risk of child and adolescent suicide and attempted suicides increases when family psychopathology is involved, such as parental mental health problems or a history of suicidal behavior (King, 2009). After controlling for youth and parental psychopathology, a low level of parent-child communication was also found to be a risk factor for suicide (Gould, Fisher, Parides, Flory, & Shaffer, 1996). Samm et al. (2010) showed that school children may be protected against suicidal ideation when they believe it is easy to talk about their worries with their mother and father.

Interpersonal family conflicts, especially parent-child conflicts, are important suicide risk factors in children and younger adults and appear more frequently as suicide risk factors compared to older adults. Beautrais (2001) reported that 70.5% of child suicides aged 9 to 14 years had family conflict as a triggering factor. Furthermore, it has been reported that parental divorce or a stepparent in the family increases the risk of suicidal behaviors in children and adolescents (Pelknonen & Marttunen, 2003). When conflict includes abuse, the odds increase more. Exposure to child sexual abuse and child physical abuse leads to a significant increase in the occurrence of a variety of poor mental health outcomes, including suicidal ideation and behavior problems between the ages of 16 and 25 (Gould, Fisher, Parides, Flory, & Shaffer, 1996). As noted in OIG Report# 2012-0917, Violence in Home & Child Safety March 9, 2012, exposure to domestic violence is also associated with increased suicidal ideation (Thompson et al. 2011). This is especially important to highlight given the population of children involved in child welfare.

*Change of residence*
Adolescents aged 11 to 17 years, who frequently moved during childhood, were more likely to attempt suicide during adolescence, even after controlling for potential confounders at birth and during upbringing (Qin, Mortensen, Pedersen, 2009). There was a dose-response relationship between the number of moves and risk of attempted suicide. Youth who moved three to five times were 2.3 times as likely to have attempted suicide compared with those who had never changed residences; those who moved more than 10 times were 3.3 times as likely to attempt suicide, controlling for birth order, birthplace, and paternal and maternal factors. Analyses of suicide completers revealed a similar association between change of residence and suicide.

*Sexual orientation*
Youth who report same-sex sexual orientation are at greater risk than their heterosexual peers to attempt suicide, and this risk persists even after controlling for other suicide risk factors, including alcohol abuse, depression, family history of suicide attempts, and prior victimization (Russell & Joyner, 2001). A recent study of family response to an adolescent's "coming out process" reported that family rejection or negative family reaction to an adolescent who is gay, lesbian, or bisexual was associated with eight-fold greater likelihood of attempted suicide, compared to adolescents who experienced minimal or no family rejection (Russell & Joyner, 2001).

*Bullying*
A study completed by Klomek *et al*. (2009) found that boys who were both bullies and victims of bullying had a higher likelihood of suicidal behavior, as compared with those who did not exhibit bullying behaviors or who were only victims. For girls, the effect of bullying differed; girls who were bullied were more likely to exhibit suicidal behaviors, as compared to those who were neither bullies nor victims. Barker et al. (2008) examined the developmental trajectories of bullying and victimization during adolescence on delinquency and self-harm in late adolescence. Both boys and girls in the bully-victim trajectory showed significantly higher levels of self-harm than their same-sex counterparts in all of the other trajectories. The girls in the bully-victim trajectory had higher rates of self-harm than their male counterparts.

Cyber bullying, which occurs through e-mails, texting on cell phones, and posts on internet social sites, has been recently reported (Barker *et al*., 2008).  Though research involving traditional bullying and suicide is plentiful, empirical research involving cyber bullying and suicide is sparse. However, one study by Hinduja & Patchin (2009) focused on the phenomenon of "cyberbullicide, which [they] defined as "*suicide indirectly or directly influenced by experiences with online aggression*."  The study indicated that youth who experienced traditional or cyber bullying, as either an offender or a victim, scored higher on a well-validated suicidal ideation scale than those who had not experienced those two forms of peer aggression.  Moreover, traditional and cyber bullying victimization was a stronger predictor of suicidal thoughts and behaviors than bullying and cyber bullying offending.  It was also found that traditional (face to face) bullying victims were 1.7 times more likely and traditional bullying offenders were 2.1 times more likely to have attempted suicide than those who were not traditional victims or offenders. Similarly, cyber bullying victims were 1.9 times more likely and cyber bullying offenders were 1.5 times more likely to have attempted suicide than those who were not cyber bullying victims or offenders.

*Internet and adolescent suicide*
The internet can be both detrimental and helpful in relation to suicide.  Two studies examined the extent to which information on methods of committing suicide and pro-suicide websites could be found, using different search engines (Recupero, Harms, & Noble, 2008; Biddle, Donovan, & Hawton, 2008).  Biddle and colleagues found that 240 of the 480 suicide sites provided some information on how to commit suicide.  Recupero and colleagues (2008) reviewed 373 web pages and found 11% to contain pro-suicide information, 30.8% contained both pro-suicide and anti-suicide information, 29.2% contained anti-suicide information, and 9.1% could not be evaluated.  Approximately 20% of the sites that did not contain suicide-specific information had a hyperlink or advertisement for online pharmacies selling medications used for committing suicide.

*Prison and Jail Populations*
According to the U.S. Department of Justice, Bureau of Justice Statistics, *Prison and Jail Death in Custody Report 2000-2009*, suicide rates in jail decreased annually from 2001-2007, but began increasing by 2009. The report indicated that suicide is the third leading cause of death in jails, after natural causes and AIDS, and the leading cause of death in prisons, clearly showing this to be a high risk population. The report also notes that suicide rates in jail are higher than in prison, and often suicides are attempted within days of entering jail.

*Traditional Youth Suicide Prevention Efforts*
While research has shown that social, cultural, and environmental factors can exacerbate or mitigate existing personal suicide risk factors in children (King, 2009; Greening, Stoppelbein, and Luebbe, 2010), little is known about children's specific pathways, the developmental process that influences suicide in them, and which issues need to be addressed in future suicide prevention programs. Traditionally, youth suicide prevention efforts have focused on school-based education programs and teen suicide hotlines. Unfortunately, these methods have not had a significant impact on lowering teen suicide rates (Shaffer & Pfeffer, 2001, as cited in Zametkin, Alter, & Yemini, 2001).

- School-based education programs seek to raise awareness of the problem of adolescent suicide, train participants to identify adolescents at risk, and educate participants about community mental health resources and referral techniques.  These programs are typically presented by mental health professionals to secondary school students, their parents, and their teachers.  Most programs portray suicide as a reaction to extreme psychosocial or interpersonal stress and minimize the link to mental illness so that students feeling suicidal will be more likely to identify themselves and seek help.  The tendency to magnify the incidence of adolescent suicide to increase awareness and concern, and the common technique of presenting case histories to teach students how to

identify friends who might be at risk, may invoke the "contagion" or social imitation factor (Garland & Zigler, 1993).

In a study that reviewed more than 300 programs (Price, Cowen, Lorion, & Ramos-McKay, 1989, in Garland & Zigler, 1993), the authors concluded that the most effective programs are based on empirical knowledge, including a clear understanding of the risks and problems confronting the target population. Another essential element is the collection of evaluative data to assess program effectiveness and make appropriate modifications. Most programs fall short on both accounts. Finally, because those most at risk are not regular school attendees, such programs often never reach the target population (Memory, 1989; Stiffman, 1989; in Garland & Zigler, 1993).

- Teen Suicide Hotlines. More than 1,000 suicide hotlines are now available in the United States to offer services to adolescents.  The rationale for such services has been that suicidal behavior is often associated with a crisis situation stimulating the need for interpersonal communication, often expressed in a last-minute "cry for help." Research shows that teen hotlines are primarily used by females, rather than males, thus having little effect on the group with the highest risk for suicide completion (Grossman, 1992, in Moskos et al, 2004). Furthermore, hotlines yield only slightly lower rates of completed suicide among young Caucasian women only (Shaffer, Garland, Fisher, Bacon, & Vieland, 1990, as cited in Garland & Zigler, 1993).

Current empirical evidence suggests that more efficient and effective strategies exist. Some of these strategies are highlighted in the following sections.

*Media Guidelines*
The Centers for Disease Control and Prevention (CDC) have developed guidelines for the reporting of suicide in the media in the United States. This measure is in response to the belief that approximately 5% of all teen suicides are "contagion" suicides, based on the way media describes suicide.  Similar recommendations have been shown to correlate with a decrease in suicide rates in Europe, though the level of their effectiveness warrants continued examination (Etzersdorfer & Sonneck, 1998; Sonneck, Etzersdorfer, & Nagel-Kuess, 1994, in Moskos, 2004).

*Adolescent Depression and Suicide Screens*
Screening programs for identifying suicidal youth have been developed especially for use among middle and high school students.  Two of the most widely used options for assessing high risk adolescents are the *Columbia TeenScreen* (Columbia TeenScreen Program, 2007) and the *Signs of Suicide* Program (Aseltine & DeMartino, 2004).  Both programs have been evaluated by the Substance Abuse and Mental Health Services Administrations (SAMHSA) and have supporting materials, as well as being standardized.

The *Columbia Teenscreen Progam* is a 14-item, self-completion questionnaire designed to identify the risk factors of teen suicide. It is used to screen youths ages 11 to 19, who read at a 6th grade level. The screen includes questions about depression, suicidal ideation and attempts, anxiety, alcohol and drug use, and general health problems.  The majority of questions refer to the previous three months.  For example, "During the past three months, how much of a problem have you had with feeling nervous or afraid; During the past three months, how much of a problem have you had with feeling unhappy or sad; and During the past three months, have you had thoughts of killing yourself? "

The *Signs of Suicide* Program utilizes a four-pronged approach to youth suicide prevention, combining a curriculum that teaches youth to recognize signs of depression or suicide and teaches them how to respond effectively. The program engages parents and school staff as partners in youth suicide prevention and educates them as natural gatekeepers in ensuring youth safety. It also encourages schools to partner with community-based providers to gain broad-based support for their youth suicide prevention efforts.

The program teaches students how to identify the symptoms of depression and suicidality in themselves or their friends, and encourages help-seeking through the use of the ACT (Acknowledge, Care, Tell) technique.

Another screening tool is the *Brief Screen for Adolescent Depression (BSAD)* created by the University of Columbia DISC Development Group.  There are parent and student versions, with scoring instructions for each version.  The Brief Screen for Adolescent Depression (BSAD) student version is a brief seven-question screening assessment tool for depression.  The parent/caretaker version is an optional tool that schools/communities can distribute to parents (caregivers) of students participating in the SOS Signs of Suicide Prevention program.  It engages parents to be partners in prevention by assessing their son or daughter for possible suicide/depression risk factors.

However, it is important to note that results from the BSAD are not diagnostic, but merely indicate the presence, or absence, of symptoms that are consistent or inconsistent with depression or suicide. Negative responses to the questionnaire do not rule out depression/suicidality, and positive responses do not conclusively establish depression/suicidality.  A thorough diagnostic evaluation by a healthcare professional is always necessary to determine whether or not there is the presence/absence of depression/suicidality.  The following questions can be found on the BSAD:

**1** Age:_____

**2** Gender: ☐ Female   ☐ Male

**3** Grade in school:
☐ 8   ☐ 9   ☐ 10
☐ 11   ☐ 12   ☐ GED Program

**4** Ethnic/Racial Group *(check all that apply)*:
☐ African American   ☐ Caucasian (white)
☐ American Indian   ☐ Hispanic
☐ Asian   ☐ Other_____

**5** Are you currently being treated for Depression?
☐ Yes   ☐ No

### Brief Screen for Adolescent Depression (BSAD)*

These questions are about feelings that people sometimes have and things that may have happened to you. Most of the questions are about the LAST FOUR WEEKS.

Read each question carefully and answer it by circling the correct response.

| | | | |
|---|---|---|---|
| 1 | In the last four weeks, has there been a time when nothing was fun for you and you just weren't interested in anything? | No | Yes |
| 2 | Do you have less energy than you usually do? | No | Yes |
| 3 | Do you feel you can't do anything well or that you are not as good-looking or as smart as most other people? | No | Yes |
| 4 | Do you think seriously about killing yourself? | No | Yes |
| 5 | Have you tried to kill yourself *in the last year*? | No | Yes |
| 6 | Does doing even little things make you feel really tired? | No | Yes |
| 7 | In the last four weeks has it seemed like you couldn't think as clearly or as fast as usual? | No | Yes |

* Columbia DISC Development Group, 1051 Riverside Drive, New York, NY 10032. Copyright 2001. Christopher P. Lucas, MD, MPH  Do not reproduce without permission.

### Additional questions regarding alcohol use

| | | | |
|---|---|---|---|
| a | In the past year, have you used alcohol because you were feeling down? | No | Yes |
| b | In the past year, has there been a time when you had five or more alcoholic drinks in a row (by "drinks" we mean any kind of beer, wine, or liquor)? | No | Yes |

*Treatment of Suicidal Behavior and Underlying Mental Health Risk Factors*
According to a 2002 study (Gray et al, 2002, in Moskos et al, 2004), government agency data revealed that only 1% of youth who died by suicide were in community or public mental health treatment at the time of their suicide, and only 3% of youth who died by suicide had detectable levels of psychotropic medication in their blood sample at autopsy. In the same year, SAMHSA reported that only 36% of youths at risk for suicide during the past year received mental health treatment or counseling. An estimated 77% of adolescent suicide attempters do not attend or fail to complete treatment after their attempt. (Trautman, in Linehan et al; 1993).

*Treating Depressive Symptoms*
For adults or youth with severe symptoms, often the best treatment offered for affective disorders combines psychotherapy and psychopharmacology. The combination is more efficacious than either alone, especially in the case of major depression (Beutler *et al*, 2003, in (Bertolote *et al*, 2004)). While antidepressants can correct or help to ameliorate chemical imbalances in the brain, which contribute to depressive symptoms, in the case of long-standing disorder, many patients have not learned effective coping strategies for day-to-day problems or means for eliciting positive experiences from their environment.  Psychotherapy helps to correct this deficiency, but medications may be necessary to provide adequate symptom relief and stability to benefit from therapy.

Our knowledge of antidepressant treatments in youth, though growing substantially, is limited, compared to what we know about treating depression in adults (NIMH, 2011).  Certain types of psychological therapies have been shown to be effective, but there are growing concerns about using psychotropic medications on children, due to adverse and potentially dangerous side effects. Certain antidepressant medications, called selective serotonin reuptake inhibitors (SSRIs), can be beneficial to children and adolescents with Major Depressive Disorder; yet, there has been some concern that the use of antidepressant medications themselves may induce suicidal behavior in youths. Following a thorough and comprehensive review of all the available published and unpublished controlled clinical trials of antidepressants in children and adolescents, the U.S. Food and Drug Administration (FDA) issued a "public warning" in October 2004 about an increased risk of suicidal thoughts or behavior in children and adolescents treated with SSRI antidepressant medications.  More recently, results of a comprehensive review of pediatric trials conducted between 1988 and 2006 suggested that the benefits of antidepressant medications likely outweigh their risks to children and adolescents with major depression and anxiety disorders (NIMH, 2011).  The study, partially funded by NIMH, was published in the April 18, 2007 issue of the Journal of the American Medical Association (Bridge, Iyengar, Salary, et al. 2007).

In the FDA review, no completed suicides occurred among nearly 2,200 children treated with SSRI medications.  However, about 4 percent of those taking SSRI medications experienced suicidal thinking or behavior, including actual suicide attempts—twice the rate of those taking placebo, or sugar pills (Bridge, Iyengar, Salary, et al. 2007).  In response, the FDA adopted a "black box" label warning, indicating that antidepressants may increase the risk of suicidal thinking and behavior in some children and adolescents with Major Depressive Disorder (MDD).  The warning also notes that children and adolescents taking SSRI medications should be closely monitored for any worsening in depression, emergence of suicidal thinking or behavior, or unusual changes in behavior, such as sleeplessness, agitation, or withdrawal from normal social situations (Bridge, Iyengar, Salary, et al. 2007).  Close monitoring is especially important during the first four weeks of treatment. SSRI medications usually have few side effects in children and adolescents; but, for unknown reasons, they may trigger agitation and abnormal behavior in certain individuals.

*Psychodynamic therapy*, which evolved from the psychoanalytic tradition, remains prominent in many hospitals and mental health centers. It focuses on surfacing and expressing unconscious thoughts,

feelings, and fantasies to gain insight into how one's emotions influence current behavior. This "processing" of emotions is thought to be therapeutic, resulting in the freedom to behave and interact in more adaptive ways. In certain circumstances, it can actually have the opposite effect. Unless the patient has developed adequate coping skills to handle the thoughts and feelings that surface when revisiting past trauma, the patient can decompensate and engage in maladaptive behaviors to avoid experiencing the adversity of being exposed to it.

*Cognitive Behavioral Therapy* (CBT), developed by Aaron T. Beck and modified for children by Maria Kovacs, is a structured approach to changing feelings and behavior through a rational examination of distorted ideas or "schemas" that the patient has developed about themselves and their environment. For persons with depression, patterns of negative self-esteem, negative views of the past and present (without recognition of positive elements), and hopeless outlook for the future prevails. Through a process of logical examination and challenge, typically in the form of homework assignments, CBT attempts to correct this disturbance by teaching the patient how to recognize negative thoughts, reevaluate the events that trigger them and see them in a different, more positive light. This enables patients to replace automatic, self-defeating response patterns with more rational, optimistic ones, improving feeling and behavior.

*Treating Behavior Problems*
For intact families where preservation is being sought, a number of evidence-based therapies exist, targeting children with diagnoses like conduct disorder, oppositional defiant disorder, or bipolar disorder, who are at risk of getting suspended from school or of breaking laws.  Generally, they are not widely available beyond the clinics where they were developed. They are pragmatic, curriculum-based means of teaching new behaviors, to both children and their parents. Three of the most well-known programs are:

- *Parent Management Training*, developed by Alan Kazdin of Yale University over 20 years ago. Treats children 2-13 who display aggressive and antisocial behavior by teaching parents techniques for managing and shaping their child's behavior. Length: 5-15 weeks.
- *The Incredible Years*, developed by Carolyn Webster-Stratton of University of Washington over 20 years ago. Intended for parents with children ages 2-8 who have conduct problems. The component targeting parents is about 3 months of group sessions structured around videos teaching how to handle difficult situations with children. The section targeting children uses a character called Dina Dinosaur to teach anger management, practice conversational skills, and behave appropriately in class. A component for teachers also exists to train teachers to handle disruptive children in class.
- *Multi-Systemic Therapy*, developed at Medical University of South Carolina. Used primarily for juvenile offenders ages 12-17. Adolescents are usually referred to treatment by the court because of high risk of incarceration or being sent to residential or foster care. Therapy lasts 3-5 months, and focuses on changing factors that make adolescents prone to risky behavior. The therapist comes to the home or school, often multiple times a week, and is available by phone 24 hours per day, 7 days per week. MST also trains parents, much as PMT does, but also addresses parents' problems, such as substance abuse, psychiatric condition, or other stress. This therapy is expensive ($4500 on average), but proponents say that the savings are significant, by keeping teens out of jail or psychiatric facilities, and from committing crime.

*Treating Suicidal and Parasuicidal Behaviors*
As of 1997, there was no empirically-validated psychotherapy specifically developed for suicidal and parasuicidal adolescents (Miller, Rathus, Linehan, Wetzler, & Leigh, 1997). A six-session cognitive-behavioral treatment for adolescent suicide attempters and their families (Rotheram-Borus, Piacentini, Miller, Graae, & Castro-Blanco as cited in Miller *et al*, 1997) was under investigation. This treatment is initiated in the ER, and focuses exclusively on the current suicidal crisis. It does not address the

parasuicidal behaviors that often accompany suicidal behavior or the problems underlying these behaviors.

*Dialectical Behavior Therapy (*DBT) was developed by Marsha Linehan in 1993.  However, the program was modified for adolescents by Miller *et al.* by incorporation of family members, shortening length of treatment to 12 weeks, adding optional 12-week follow-up patient consultation group, and simplifying language in handouts and lectures.  DBT incorporates "change" strategies (Emotion Regulation, Interpersonal Effectiveness) with "acceptance" strategies (Core Mindfulness, Distress Tolerance). It differs from cognitive-behavioral therapy, where the emphasis is on eliminating one's distress by changing or challenging one's thoughts, by emphasizing tolerating distress through acceptance of thoughts and feelings as "just thoughts and feelings" rather than reality, and developing means of regulating emotions, which drive behavior.

*Psycho-Education*
A study of family preservation programs that included looking at programs geared toward family members with mental illness indicated that using a psycho-educational approach helped reduce relapse, hospitalization and symptoms.  The study stated:  "These services educate family members about the etiology of mental illnesses…the structure of the mental health system and the use of medications. Moreover, they include problem solving and communications skills training for working with people who have mental illnesses…and with others within the family system*.*" (Fraser, M.W., Nelson, K.E., and Rivard, J.C 1997.)

In addition, there are several credible sources of information available for caretakers or caseworkers to recognize warning signs and how to react to someone expressing suicidal ideation.

**Warning signs of suicide:**

- Feelings of sadness or hopelessness, often accompanied by anxiety
- Rage, uncontrolled anger, seeking revenge
- Acting reckless or engaging in risky activities, seemingly without thinking
- Feeling trapped – like there's no way out
- Increased alcohol or drug use
- Withdrawing from friends, family and society
- Declining school performance
- Sleeping too little or too much
- Dramatic mood changes
- No reason for living, no sense of purpose of life
- Changes in weight or appetite

*Source: American Foundation for Suicide Prevention and American Association of Suicidology*

**Helping someone who is threatening suicide:**

- Be direct. Talk openly and matter-of-factly about suicide
- Be willing to listen. Allow expressions of feelings. Accept the feelings
- Be non-judgemental. Don't debate whether suicide is right or wrong, or whether it is good or bad. Don't lecture on the value of life
- Get involed. Become available. Show interest and support
- Don't dare him or her to do it
- Don't act shocked. This will put distance between you
- Don't be sworn to secrecy. Seek support

- Offer hope that alternatives are available, but do not offer glib reassurance
- Take action. Remove means, such as guns or stockpiled pills
- Get help from persons or agencies specializing in crisis intervention and suicide

*Source: American Association of Suicidology*

*Primary Care Physician Involvement*

Primary care physicians may be the first medical professional to note the presence of depression in an adolescent. A scarcity of mental health specialists in some areas may mean that the primary care physician plays a significant role in the mental health treatment of adolescents.

Though the mental health issues presented by many DCFS wards often require specialty mental health care, primary care physicians may be an important part of initial screening. Further, for those children in treatment, the primary care physician should be aware of the mental health treatment they are receiving, including diagnosis and medication. A *Pediatrics* article describing Guidelines for Treatment of Adolescent Depression in Primary Care indicates that primary care physicians can provide psychoeducation, supportive counseling, facilitate parental and patient self-management, refer for peer support, and regularly monitor for depressive symptoms and suicidality.  (Cheung, A; Zuckerbrot, R; Jensen P; Ghalib, K; Laraque, D. and Stein, R. 2007)

### *State of Illinois Child Welfare Population*

While no empirical studies of suicide or suicide risk among youth in child welfare systems in the United States were found in the course of this literature review, the social circumstances that often lead to child welfare involvement may be similar to those circumstances that put youth in general at risk.

Of the 35 suicide cases between 2000 and 2011 of children involved with the Department, 17 of the children were wards (with one being a former ward): one was an open intact case, one was a closed intact case, one was adopted, and 15 were unfounded, indicated, or pending DCP cases.

*Wards*

Of the 17 wards, more specific information regarding their circumstances is detailed below:[2] For information on prescribed psychotropic medication, see Appendix A.

**JJ** was 12 years of age when he committed suicide by hanging; he had been a ward for two years at the time of his death. He had been in the foster home for about five months.  He reportedly became upset earlier in the day after being told that he could not go outside.  He had been diagnosed with ADHD, bipolar disorder, exhibited symptoms of anxiety, depression, and PTSD, and had participated in therapeutic services. He was prescribed Ritalin for the ADHD.

JJ's mother was indicated for neglect of his older sibling five years before his birth. The mother, who was a teenager suffering from mental illness at the time, allowed a relative to raise the older child.  In August 1994, when JJ was a year old, his mother was indicated after giving birth to a substance-exposed infant. In May 1995, his mother and her boyfriend were indicated for cuts, welts, and bruises and sexual molestation of his younger sibling.  The mother had another indicated report in May 1997.  During the course of the investigation, the mother engaged in substance abuse treatment and the case was referred for intact family services.  In August 2003, JJ, age 10, and his younger sibling were placed in foster care after being sexually abused by their mother's boyfriend. The mother was psychiatrically hospitalized at the time and had left the children in the care of their grandmother.  The grandmother allowed the children to

---

[2] While OIG investigators attempted to include as much specific information as possible, the amount of information, such as types of medication, varies with each ward, depending on available records.

go to the boyfriend's home. In addition, the children, though prescribed psychotropic medication, were not taking their medication; instead, the mother had been giving them hers inconsistently.

JJ entered foster care at age 10; he was in third grade, behind in school after being held back.  At the age of 11, he was moved to a specialized foster placement. Though JJ looked forward to seeing his mother, she rarely visited, and was often verbally abusive and inappropriate during visits. The mother was also inconsistent with her mental health treatment. Six days before his suicide, his mother missed a scheduled visit.  Though he progressed academically, he exhibited problems at school, often getting into fights. After one altercation, he was re-evaluated by a psychiatrist and diagnosed with bipolar disorder.  JJ did attend weekly therapy sessions.  He saw his therapist four days prior to his suicide.

*Risk factors: sexual and physical abuse history; mental illness diagnosis; conflict with peers; mother with mental illness and substance abuse issues.*

**RH** was 12 years old at the time of his death.  He had only been in DCFS custody for approximately five months prior to his suicide**.**  He died by hanging while psychiatrically hospitalized for the second time. Prior to his first psychiatric hospitalization, less than a month earlier, he reported homicidal ideation towards his brother, as well as escalating suicidal ideation**.** He had gotten into physical fights with his brother.  RH had been diagnosed with major depression.

As a toddler, RH and his siblings were victims of neglect, not only by their mother, but also physical abuse and neglect at the hands of other caretakers including aunts, babysitters and the father of his oldest brother.  They were taken into custody when RH was three years old and placed with their maternal grandparents.  They were removed a year later, after being sexually abused by their step-grandfather, and were moved to traditional foster care.  Their mother entered substance abuse treatment and counseling. The children were returned to her care when RH was five years old.

Over the next several years, the mother continued to engage in violent relationships and often relapsed on alcohol. RH and his brother came back into DCFS care after RH called the police during a domestic violence incident to report that his mother's boyfriend was physically assaulting her.  His mother chose to remain with her boyfriend, so RH and his sibling were placed in foster care.  RH was angry with his mother for choosing her boyfriend over him and his brother.  On the day of his suicide, he was informed that his foster mother was not willing to take him back into her home and he was uncertain as to where he would go.  Despite RH voicing feelings of hopelessness and despair, hospital staff did not closely monitor the 12-year-old for suicide risk. That evening, RH had asked the floor nurse for a pillow because he could not sleep; however, the nurse did not respond to his request for approximately 30 minutes.  When she did attend to his need, RH had already committed suicide.  RH was prescribed psychotropic medications at the time of his suicide.

*Risk Factors: Major depression; loss of biological mother; suicidal and homicidal ideation; witness of domestic violence; loss of current foster family; prior psychiatric hospitalization.*

**CD** died at the age of 13 due to hanging. CD had been a ward since the age of eight years.  CD's family has an extensive history with the Department beginning in June 1990, five years prior to his birth his mother was indicated for inadequate supervision. From 1990 through 2002, his parents were investigated 14 times, mainly for allegations of substantial risk of harm; an intact family case opened in 1998. In 2002 there was an investigation involving domestic violence between the parents. The children were not harmed; however, they were present during the altercation.  The family was referred for community services and a preventative service case was opened until March 2004.

In July 2004, four months after the preventative service case was closed, the hotline was contacted. At the time, the mother was on probation for illegal possession of a controlled substance. The investigator determined that CD's mother's use of illegal drugs and her unwillingness to follow through with treatment voluntarily exposed the children to an environment that significantly affected their health. Additionally, the mother's Probation Officer informed DCFS that she had been ordered to complete drug/alcohol treatment and had tested positive for cocaine. The report was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect, and the children were taken into custody. Initially, CD was placed with his aunt in Missouri for a short time before moving to his paternal grandparents, where he lived for close to two years until October 2006.

The grandparents had difficulties caring for CD because of his mental health and behavior problems. At the age of ten, he was psychiatrically hospitalized for the first time in March of 2006. He had been making suicidal comments for two days, and threatening his peers, using racial slurs. In his initial assessment, it stated "his thought process and content show no delusions, hallucinations, suicidal or homicidal ideations." He was admitted for aggression and uncontrollable behavior. He was placed on suicidal, assault, self-injury and sexual precautions and received psychotherapy five times a week, as well as group counseling. CD told his therapist that he was having difficulties with being away from his family. Also, his grandmother had recently been diagnosed with cancer (liver and lung) and started chemotherapy. His initial diagnoses were intermittent explosive disorder, oppositional defiant disorder (ODD), r/o ADHD, antisocial disorder at childhood, and r/o bipolar disorder. He was discharged to the home of his grandparents.

About six months later, the grandparents asked that ten-year-old CD be removed from their home because of his mental illness and behavior. They reported that CD was having visual hallucinations of seeing the devil, was acting out, being verbally and physically aggressive and burglarizing neighbors. He was hospitalized for aggression for three weeks before returning to his grandparents. He was hospitalized again six months later due to decompensation, increasing frustration intolerance, and impulse control. He denied suicidal or homicidal ideations, but was placed on suicide, self-harm, and assault precautions. His grandmother had died three weeks earlier. Also around this time, at a permanency hearing, he learned he would not be returning home, though his sister would be.

Following his hospitalization, CD went to a residential program. His initial mental health assessment stated that CD's suicidal and homicidal ideation has made a residential placement necessary. CD attended the therapeutic day school, participating in the emotionally disturbed program. He struggled in school with behavior problems and not doing homework. Five and a half months after entering the residential program, CD was hospitalized for aggressive behavior and self-harm. Closer to his time of death, he had a number of escalated incidents, most in which safety assessments were completed: he ran away from his residential placement three times in June and twice in July 2008. He tested positive for cocaine on one of his returns from run, but denied having done any drugs. Following his elopements, CD was placed on run precaution and a special program. Due to curfew violations, his caseworker placed him on probation at the facility, but he remained on the least restrictive level at the facility until November 4, 2008. He was placed on a more restricted level after he began to bite his lip, causing it to bleed, and bang his head on the ground after another situation escalated. However, shortly after being placed on a more restrictive level, he was reevaluated and once again placed at the least restrictive level. His mother visited him at the end of November and told him she was moving to Georgia.

Less than a month after his mother told him she was moving, CD stated he did not feel like living and that he wanted to go to the hospital because he was having flashbacks. He was later released back to his residential program. In December 2008, a week after his fourteenth birthday, CD hanged himself in the shower with a belt. He was transported to the hospital and pronounced dead. At the time of his death, CD was on several prescription medications; Seroquel 400mg every night, Prozac 15mg every morning, and

Focalin XR 20mg every morning. He was compliant with his medication.  The toxicology analysis done at autopsy found all three of the drugs in his bloodstream.

*Risk Factors: Mental illness; suicidal ideation; multiple psychiatric hospitalizations; death of grandmother; cocaine use; familial mental illness; parental separation; father incarcerated; aggression; impulsivity.*

**VP** died at the age of 14, due to hanging while in placement a residential placement.[3] She had been a ward for about a year. She was one of three female wards who committed suicide. She had lived at the residential placement for approximately 10 months prior to her death.  VP initially came into DCFS care at the age of one month.  She was adopted with her older brother by a couple that moved to Missouri. VP's adoptive parents and maternal grandmother died within a three‐year period. When VP was 10 years old, she was in a fatal car accident with her father.  Her father was med-a-vaced from the scene and died from complications after surgery.  A year later, her grandmother, who lived with the family, died; and, in the following year, her adoptive mother died of cancer. Her mother never told the children when she was diagnosed with cancer, believing that they had suffered enough from their father's death.  According to a psychological evaluation, "VP seems to have unrealistic fears that          she was somehow, magically, responsible for their deaths, ad(sic) that she failed to be a good enough daughter… ."

Missouri authorities moved VP and her brother to the care of her biological grandmother in Illinois, despite not knowing her. Both VP and her brother expressed suicidal thoughts after their grandmother made it clear she did not want them. They were brought back into the system under a dependency petition.  VP's brother returned to Missouri to live with a family of a high school teammate; however, due to VP's acting out, she was not moved with her brother. She was subsequently hospitalized for suicidal ideation and struggled with not being able to return to Missouri to be with her brother.  She was caught drinking while on a visit to Missouri and was caught drinking in Illinois.

During the summer of her placement at the residential program, VP seemed to become more depressed as shown through isolating herself, increased apathy and increasing confrontations with staff. Beside her continuing grief and placement issues, she was depressed about not having any family members around on her birthday in late July.  After VP began visits to her brother in September 2001, five months before her suicide, she expressed increased sadness about her losses and her placement situation. She continued to engage in therapy, though she became less consistent after admitting she used marijuana on a visit to Missouri.

Though she consistently denied thoughts of suicide, she was routinely monitored for suicide. On October 28, 2001, a residential program employee observed a handwritten note on VP's bulletin board in her room, titled "The Secret of Suicide." It read: "We don't want to die.  We just want to sleep forever and wake up to a place we want to be ... where we'll be happy."  It was signed, VP.  The note was removed, and the Program manager, Program consultant and therapist were notified.  VP was monitored even more closely for symptoms of depression. The psychiatrist noted VP's interest in suicide literature and from then on attempted to monitor her interest.  VP's psychiatrist saw her a few days before her suicide.

Three days before her suicide, VP's attorney informed her that she could not move to Missouri, as no placements were available to her at that time. The day of the suicide her boyfriend in Missouri had ended their relationship.  She laid out her prom dress that she was to wear at her boyfriend's prom before hanging herself in the bathroom.  Staff was aware of the call VP received from her attorney and spoke with her about it, but not that her boyfriend had called ending their relationship.

---

[3] See OIG Reports #021045 and #030395.

Though she participated in weekly therapy, she was not on medication at the time of her death because of her psychiatrist's fear of the possible lethal combination of alcohol and psychiatric medications while on run.

*Risk Factors: deaths of parents and grandparent; loss of brother through separate placements; recent breakup with boyfriend; alcohol use; rejection/loss of anticipated placement; suicidal ideation; depression.*

**CL** died at the age of 15, after being hit by a train. She had been a ward for less than two years at the time of her suicide. At the age of 12, CL entered DCFS as a dependent minor and guardianship was given to the Department because of her aggressive behavior and her maternal grandparents' inability to care for her. Her behaviors included hiding a SASS worker's cell phone and then taking out a knife and stabbing a wall and physically restraining her grandmother. She had threatened to hurt both herself and her grandparents. By the age of 12, she had four psychiatric hospitalizations.

CL was in care for six months and was subsequently returned to her maternal grandparents in Alabama and the case was closed. She returned to Illinois and the care of her mother in July 2009. Her mother reported that CL had psychiatric hospitalizations in Alabama and when she returned to Illinois. Also, she had been diagnosed with a sexually transmitted disease while in Alabama. The mother was unable to manage CL's escalating problems, and in December 2009, at the age of 13, CL was once again declared a dependent minor and guardianship was awarded to DCFS. Her behaviors included running away, stealing, drug use and sexual activity with adult men.

She was placed in a group home, where she was living at the time of her death. However, several family members did not believe this placement was appropriate, as CL continued to express suicidal threats. During CL's three-month stay at the group home, she ran away 17 times. In the nine days prior to her death, she ran away six times. On the night of her suicide, CL left her group home at 7:00 pm, following an altercation with another member of the home. She reportedly made threats to hurt herself when leaving. She returned two hours later, only to leave the home again at 9:00 pm. CL's caseworker reported that she left every day, but always returned. After leaving the home for the second time, she went and sat on the tracks and was hit by a train at approximately 11:40 pm. At autopsy, CL was found to have marijuana and a non-prescribed benzodiazepine in her system.

CL's parents divorced when she was four years old and she was raised primarily by her maternal grandparents. CL's family had a significant history of mental illness. Her mother was diagnosed with Bipolar Disorder and ADHD; a maternal uncle suffered from depression; and a maternal aunt and uncle had been diagnosed with Schizophrenia. She also had a paternal aunt with severe mental health issues, possibly schizophrenia.

CL began having behavior problems in second grade, becoming defiant and aggressive. She was hospitalized for the first time at age nine. CL had problems with substance abuse. Seven months before her death, it was reported that she was huffing on a regular basis and needed substance abuse treatment. Less than two weeks before her death, it was reported that she was running from her placement every other day and using drugs heavily.

*Risk Factors: suicidal ideation; aggressiveness; impulsivity; delinquent behavior; promiscuity; prostitution; familial mental illness; mental illness; multiple psychiatric hospitalizations; substance abuse.*

**NR** died at the age of 15, due to hanging three weeks after his birthday, while in his fifth foster home placement. He had just moved into this home after a short stay in another foster home. Prior to these two

recent placements, the ward had lived with a foster family for two years.  He did not want to leave this foster family, a two-parent family with three older biological children.

NR came to the attention of DCFS when he was three years of age, after being severely burned in a house fire in which his mother and infant sister died.  The initial plan was for NR to go to live with his grandmother, but a dependency petition was filed when the staff in the burn unit determined that his grandmother could not adequately care for him because of her cognitive disabilities.  Following discharge from the burn unit, he was placed in a specialized foster home for six months. He then was placed in the care of his grandmother, but remained under DCFS guardianship. The youngster was in special education classes and his grandmother received homemaking and transportation services from the Department of Rehabilitative Services.  In addition, DORS assisted the grandmother by helping her grandson with his schoolwork. During his preteen years, NR spent a week during the summer at the Illinois Firemen's Camp.   In the fifth grade, he missed school when he underwent surgery to repair stretching skin graphs and muscle tissue and developed an infection following the surgery.  His grandmother's intellectual limitation and her difficulties in assessing problems and making appropriate decisions became a hindrance to the ward's care when she refused services or became hostile to the provider agencies.  In August 2000, the reluctant twelve-year-old was removed from the custody of his grandmother.  He was behind in school and had poor social skills.  At the time, NR was still sleeping in the same bed as his grandmother.  Shortly after the placement, the youth was discovered to have used "Pokemon" cards to bribe a four-year-old foster child to engage in oral sexual contact.  Twelve-year-old NR admitted the sexual behavior and was charged with criminal sexual abuse.  He was placed on 18 months probation and attended court ordered sexual offender services.  He was not allowed to attend his burn camp, was prohibited from attending junior high and high school functions without additional supervision and lost the opportunity to join his older foster brothers in weekend night activities because of an early curfew.  He grew more and more isolated.  Simultaneously, the foster parents were asked to consider adoption or guardianship of the ward.  The family felt pressured by the agency, requesting these permanency goals.  The ward's school was informed of his sexual behavior, and the foster mother voiced exhaustion with all of the restrictions placed on her and her family because of his SACY (Sexually Aggressive Children and Youth) requirements.[4]  In addition, her mother became terminally ill.  The family asked for the ward's removal.  NR often reported missing his grandmother and had heard that the court ruled that he could not return to her.  A few weeks before his suicide, his grandmother told him about a young girl's suicide.  He had drawings and writings expressing hatred, hopelessness and violence.

*Risk Factors: mother and sister died in fire; burn victim in house fire; separation from grandmother; separation from foster family; problematic sexual behaviors; SACY label; unable to participate in camp and other age appropriate activities.*

**WP** died at the age of 16 due to hanging. He had been a ward for five years at the time of his death.  The worker received a call from the local police department that WP had been found hanging.  WP had spent the prior day with his half-brother and his half-brother's father.  When he did not return home in the evening, WP's foster mother called the half-brother, who said they had dropped WP off at a friend's house and the friend said he was going to bring WP to his foster home. The teen had last seen his therapist nine days earlier.  WP had been psychiatrically hospitalized a month before his death.  He was placed in a new foster home and was reportedly happy with the placement.

---

[4] The Office of the Inspector General submitted a report entitled "An Investigation of Current Practices with Very Young Children Designated as Sexually Aggressive" on June 30, 1999 and a report entitled "An Investigation of Current Practice in Cook County with State Wards (Eight to Twenty) Who Are Designated Sexually Aggressive" on June 13, 2000.

WP became a ward of the state at age 11 on a dependency petition, following the death of his mother in 2005.  Per records, WP's mother died of cervical cancer, but never discussed her illness with WP, believing she would recover from the cancer.  He had been in therapy at the time of her death.  WP had been under the impression that he would be able to live with his half-brother's father, whom he thought of as a father.  WP's biological father was incarcerated.  Per records, his "step-father" was not willing to care for him after his wife's death.  As such, several days after his mother's death, WP went to live with neighbors.  However, the neighbors he went to live with were not on the list of people his mother had created of people who could care for WP.  Three weeks after arriving in their home, he was taken to his pediatrician, due to his hearing voices and acting out.  A hotline call was made and WP was found to be dependent and placed in the home of his maternal cousin.  He was hospitalized again later, as he was described by his cousin to have gone into a rage for several hours, stomping his feet, screaming, and being defiant.  This was reportedly precipitated by a conflict with his two-year-old cousin.  He lost control to the point where he could no longer calm himself and talked about fire.  Two days prior, he required several hours to calm down after the family cat knocked over his cereal bowl.  He denied suicidal and homicidal ideation, but        admitted to hearing voices and seeing shadows of people.  In December 2007, his placement was disrupted, due to his cousin feeling she could no longer meet his needs; he had already been hospitalized on four different occasions at this time.  It was continually noted that he was attached to his "step-father" and his biological grandparents.  Beginning December 2007, WP experienced four moves, including another hospitalization before his death in September 2010.  In August 2010, WP again changed placements due to his negative behavior.  He had been in the home for over a year and a half when he was caught stealing a bike; and then, a week later, chased home for stealing a cell phone while intoxicated.  He reportedly showed no remorse.  His foster mother felt that WP's behavior was endangering himself and everyone in her home.  He was again hospitalized.

WP was discharged from the hospital to a new foster home.  WP expressed how much he liked his new placement and that his new foster mother was very good to him. He was going to therapy every other week and was reportedly compliant with his medication. He had been previously diagnosed with major depression, bipolar and ADHD. He was seeing a psychiatrist on a monthly basis for medication management.

*Risk Factors: mental illness; alcohol use; emotional abuse; separation from brother and step-father; death of mother; delinquent behaviors; impulsivity; multiple placements; multiple psychiatric hospitalizations.*

**GB** died at the age of 16, due to a gunshot wound to his head.  He had been returned to the care of his biological parents approximately three weeks prior to his death, after being a ward for approximately three years.  He first entered DCFS custody in May 1997, at the age of 13, after his parents locked him out of their home because of problems dealing with his behaviors and mental health issues.  While in DCFS custody, he had numerous psychiatric hospitalizations and threatened to commit suicide on several occasions.  He was diagnosed with Major Depressive Disorder and Conduct Disorder.  Three weeks after returning home, he broke a deadbolt lock on his parents' bedroom door to get the gun they kept in a drawer.  He was found by his father in the bathroom. [This is one of the earliest cases reviewed by the OIG and information available for a more recent review was limited.]

*Risk Factors: mental illness; suicidal ideation; gun in the home; multiple psychiatric hospitalizations; substance abuse.*

**KH** died at the age of 17, due to hanging. He had been a ward for three years. KH had been staying with his grandmother in Alabama. His grandmother had come home from work in the early evening and found him. The grandmother informed the caseworker of the death. She also shared that she believed KH had been doing better over the past two weeks, even painting houses for extra income.  The grandmother

reported that recently KH had received a letter from his mother, who was in prison on drug related charges.  The letter stated that the mother no longer wanted to have anything to do with KH.  The grandmother said KH became angry and distant. He appeared to be somewhat disoriented, as if he was on drugs; but she was not sure whether or not KH was using or drinking alcohol. He did not appear to be acting like himself, but KH insisted he was fine. KH left a suicide note, but his grandmother was so upset she was unable to read it and just gave the note to the police.

KH had been on run since the end of April 2011, four months before his suicide in September 2011. He had just gotten out of detention and stole his foster parents' car to get to Alabama. The car was found in Alabama. KH had already been on probation for retail theft.  The caseworker believed him to be with his biological mother. The caseworker contacted the mother, who denied having any contact with him and refused to provide her address.  The caseworker had filed a missing persons report and listed KH with the Center for Missing and Exploited Children.  KH was picked up by police in August 2011. The caseworker was contacted, but the police did not have reason to hold him. KH had a pending juvenile warrant in Illinois for a number of delinquent charges, including breaking and entering, but it was not enforceable in Alabama. The caseworker, DCFS Legal and the State's Attorney were working with the Alabama State's Attorney to try and get KH back to Illinois.   The caseworker did talk to the grandmother in Alabama in July, who informed her that KH was living with her and her daughter. The grandmother said she wanted to have KH stay with her. The worker explained that was possible, if KH turned himself in.

KH became a ward at age fourteen, when his mother left him and his sister in the care of a friend and did not return and did not leave a care plan. The children reported that they had often moved around living in Illinois, Missouri and Alabama.   The children were taken into custody and sent to two different foster homes. Caseworkers located his mother, but she was uncooperative with DCFS, and difficult to communicate with, moving back and forth between Missouri and Alabama.  His father reportedly was deceased.

When KH was initially placed, he did well, getting above average grades in school and participating in school sports. He remained in one foster home for the first year and a second for eight months before he began a pattern of running away. KH was placed in several different homes before running to Alabama to live with his maternal grandmother.  He was known to be a chronic runner and marijuana user. He had been seeing a psychiatrist in Illinois prior to running and was reportedly compliant with his medication, though he continued to feel depressed.  KH had reported a brief psychiatric hospitalization before being taken into custody.

*Risk Factors: mental illness; separation from sister; abandonment of mother; father deceased; multiple placements; substance abuse; delinquent behavior.*

**KC** died at the age of 17, due to a gunshot wound to the head, after finding the keys to the locked gun cabinet in his foster parents' rural home. He had a history of depression.  He had seen his therapist the night before and had not voiced any suicidal ideation.  It was suspected that the break-up with his girlfriend contributed to his death.  On the day of his death, he had stayed home sick from school.

KC had been a ward since the age of six. The family came to the attention of DCFS in 1992, when KC and his older sister arrived at school with multiple bruises.  Their stepfather and mother were indicated for abuse. Approximately two years later, the children were returned home.  However, a little over a year later, they were again taken into custody because of numerous allegations of abuse and neglect.  Almost three years later the children were again returned, but removed in less than two years, due to abuse.

Upon coming back into care, KC was hospitalized for suicidal ideation.  Upon his discharge, he was placed in a foster home, where he lived until his death.  He had been diagnosed with Oppositional Defiant

Disorder, Conduct Disorder, PTSD, Major Depressive Disorder, ADHD, and enuresis. He had significant behavior problems at school. He attended weekly therapy and reportedly liked his foster home. In the year prior to his death, the ward's behavior had improved.

*Risk Factors: mental illness; prior suicidal ideation; recent break-up with girlfriend.*

**DL** died at the age of 17, due to hanging within 24 hours of being detained at a county jail for obstructing justice, obstructing police, and consumption of alcohol by a minor. He had been on the run for two weeks from his independent living program. On the evening of his death, the ward was reportedly acting normally and requested a pair of socks. Twenty minutes later during a check, he was found hanging by a bed sheet from the bunk bed. He left a brief suicide note, but did not express any reason for committing suicide.

DL came to the attention of DCFS in 1985, at age two, when he and his two siblings were removed from their mother because of inadequate supervision. He and his siblings were removed from their mother on three other occasions. By 1992, when DL was eight years old, he had experienced more than 13 moves, including 11 placements and two hospitalizations. His mother moved out of state and had limited contact with her children. His mother had been a DCFS ward with an extensive substance abuse and criminal history background. DL had an extensive history with juvenile justice. Charges included: obstructing a police officer, retail theft, criminal damage to property, criminal trespass to state supported land, and resisting a peace officer. DL was remanded to the Illinois Department of Corrections when he was 14 years old. He was released to an inpatient substance abuse center six months after he turned 15 years old. He was discharged from the inpatient substance abuse center after seven months and placed in foster care. He ran away from his placement after a month and was arrested for parole violations. He subsequently returned to the Illinois Department of Corrections and was later re-admitted to the inpatient substance abuse center for inpatient substance abuse treatment. He ran from placement and was re-arrested for parole violation.

DL had no history of suicidal or homicidal ideations. He had one known episode of depression while committed to Department of Corrections. He was prescribed Zoloft and was compliant with taking it, though he said he did not need it. He was released on parole. At the time he entered independent living, he reportedly did not appear depressed and was not on medication. He was enrolled in a community college, expecting to start in the Fall; however, with the arrest, his parole had been revoked.

*Risk Factors: mental illness; substance abuse; familial substance abuse; emotional abuse; aggression; delinquent behavior; 13 moves in seven years.*

**DD** died at the age of 17, due to hanging while being detained in a county jail in Missouri for approximately three days. He had been on the run from his placement for approximately a year. He had been staying with family members in Missouri when he was arrested for stealing a gun. He had been given Paxil for his depression through a family health clinic. He requested and was given the Paxil in jail. He left a suicide note expressing grief over the death of his mother, loss of contact with his father, his sister, and girlfriend, stating he did not feel there was a reason to live anymore. He wrote that his mother's family uses drugs and his father's family was tired of helping him. Two months prior to his suicide, the police were called to an overpass, where DD was threatening to jump. He was able to be talked down. He reported that he had argued with his aunt and girlfriend that day and then used crystal meth. Police took him to a psychiatric hospital.

DD was nine years old when his parents whipped him with a belt and an intact case was opened. A little more than a year later, he and his sister were taken into custody, after his mother left marks on his face. The parents participated minimally in services. His father had been in prison. While in placement, DD

had substance abuse problems and a history of chronic elopement. He suffered from recurrent depression, including suicidal ideation and suicidal gestures, and he had been hospitalized for suicide attempts and prescribed psychotropic medication. He had had multiple placements and spent time in juvenile detention. When DD was 15, his mother was murdered. His father had several arrests for domestic battery and larceny and was incarcerated at the time of DD's death.

DD had a long history of family, mental health, learning and behavior problems, including running away. DD could do well under intense adult supervision, but often was aggressive with his peers and disruptive in class. He had previously been jailed for charges of battery, after attacking a teacher and for several incidents of theft.

DD had several placements throughout his time as a DCFS ward. For the first year and a half, he was placed in foster homes, staying 16 months in one placement. He was removed from that home because of aggression towards his sister and his severe emotional and behavior problems. His sister was adopted by those foster parents. DD was described as being very personable, lovable and bright when not confronted with conflict. From ages 12 to 13, DD was placed in various group homes until he was placed in detention for the first time. Over the coming years, he was either in detention or group homes when not on run. DCFS started the interstate compact process with Missouri so DD could be placed with his aunt. The aunt decided not to pursue the placement, in light of DD's runaway behavior.

About 18 months before his death, DD had been released from the Department of Corrections to a transitional living center. DD got a job while in the placement and reportedly enjoyed working. He also was in therapy to address his emotional problems and learn alternate coping skills. He stayed there for five to six months before going on run for the year prior to his death. DCFS workers took proactive steps to locate the ward after he went on run, including contacting the police, the Center for Missing and Exploited Children, and family members. DD called his caseworker five months before his death, indicating that he was living with his fiancé in Missouri and asked to be emancipated. He requested a birth certificate and social security card to be mailed to a friend's address. He stated he had no intention of returning to DCFS custody. He called again two months later, but refused to give an address or a phone number. He agreed to contact his worker again, but never did. One week prior to his death, the supervisor noted the need to check the status on the missing child protocol, contact Missouri authorities to determine if they knew where DD was, and, if possible, ask DD for permission to contact his fiancé's mother.

*Risk Factors: mental illness; suicidal ideation; substance abuse; death of his mother; father's whereabouts unknown; loss of sister; fight with significant other; delinquent behavior; and multiple placements.*

**RM** died at the age of 18, due to asphyxia, after placing a plastic bag over his head. RM was a ward incarcerated for less than two weeks, at the time of his death. A corrections officer discovered him. His feet were tied with torn bed sheets and his hands were tied with a torn sheet behind his back in a slipknot. He was alone in his cell when the incident occurred. Earlier that morning, the ward had eaten breakfast with his cellmate, who was transferring to another institution that day. After the ward's death, the cellmate was interviewed. He said he knew the ward because they were from the same neighborhood. He did not know the ward planned to commit suicide, but he remembered the ward looking up at the light fixture and saying it was going to be the fourth summer in a row that he was in jail. The ward was in his bunk when the cellmate said goodbye. The internal investigations division of the Illinois Department of Corrections investigated the ward's death and there was a coroner's inquest to determine manner.

RM entered foster care in September 1983, when the police found eight-year-old RM wandering the streets without supervision. His mother admitted to hitting him and was arrested for battery. His mother has a history of drug use and arrests for possession of cocaine.

During the 10 years he was a ward, RM had numerous placements, including foster homes, group homes, and private institutions. He was frequently on run. In April 2001, when he was 16 years old, RM was arrested and charged as an adult with armed robbery. According to the report, RM acted as the look-out, while two other youth robbed an 80-year-old man at gunpoint. He pleaded guilty and served time in IDOC. Two months after he was paroled, he was arrested for aggravated possession of a stolen vehicle and detained. After a parole violation hearing, he transferred to IDOC approximately eight days before his death. DCFS was not immediately notified of his death. A month after his death, his caseworker contacted the Illinois Department of Corrections, trying to locate the ward. At that time she was told of his death.

*Risk Factors: delinquent behaviors; past incarcerations; mother's mental illness and substance abuse; physical abuse; 10 different foster placements in seven years.*

**IL** died at the age of 18 years, due to an overdose of prescription medications of unknown type, while at her paternal grandmother's home. The family reported that she had received a citation for involvement in a car accident the previous day and was upset about it. Empty medication bottles that were over a month old were found on her dresser. The family reported that the bottles had not been there the day before. She had been a ward for four years at the time of her death. IL had a history of depression and bipolar disorder. She was often non-compliant with her medication.

IL first came into contact with DCFS in March 1999, when her mother was indicated for cuts, welts, and bruises to her younger sibling. An intact family case was opened, although in September 1999, her mother voluntarily allowed IL to move in with her grandmother. In January 2000, she reported that her mother's boyfriend had sexually molested her and the children were formally taken into custody. IL remained in the care of her grandmother.

In March 2000, she was arrested for aggravated battery, after assaulting a teacher twice. She was sentenced to the Department of Corrections (DOC), where she remained until April 2004. She was not cooperative with therapy or treatment for her bipolar disorder during her four-year DOC confinement. She reported that DOC staff sexually abused her on two separate occasions. Upon release from DOC at the age of 18, she returned to her grandmother's home and was linked to psychiatric services. In June 2004, IL was hospitalized after she told her parole officer that she had taken a bottle of her medication. After the hospitalization, she engaged in therapy and appeared to be doing well.

*Risk Factors: bipolar disorder and depression; non-medication compliant; prior suicide attempt; delinquent behaviors; physical and sexual abuse; arrested and incarcerated for four years; substance abuse; aggressiveness; impulsivity.*

**JB** died at the age of 18, due to hanging; he had been a ward for six years. In October 2008, on the day of his death, approximately between 7:30 pm and 11:00 pm, JB hung himself in the backyard of his foster home. Earlier that day, at 10:30 am, JB met with his probation officer. His mother dropped him off at work at 2:00 pm and his girlfriend picked him up at 5:00 p.m. He spoke with his girlfriend and mother later in the day. JB reportedly told his mother that he was planning on killing himself. JB was not on any prescribed medication at the time of his death, due to noncompliance; however, the toxicology report detected Ritalin and alcohol in his system. JB had a history of mental health problems. JB was first hospitalized in 2003, at the age of 12, due to behavior problems and was prescribed medication, but refused to take it.

The family first came to the attention of DCFS in late 2003, when JB was 12 years old, after a babysitter was indicated for cuts, welts, and bruises of a sibling. Three months later, DCFS was notified by the FBI that the four B children were in danger. The father, EB, was in federal prison for bank robbery. He had spent several months in a psychiatric hospital after being arrested for the robbery. Conversations were being taped between the parents, in which they discussed a suicide pact. The mother stated that she had purchased a gun, was keeping it in the house and was planning on killing the four children, as well as herself. Mr. B proceeded to state "no, honey, wait and let me do it." Protective custody was taken.

The boys reported their father was incarcerated and their mother had been depressed. JB's mother noted that he was physically and verbally aggressive and that the police were called frequently. All four boys were placed in foster care and moved to another home one month later. Due to continued behavioral problems, JB was separated from his brothers and moved to a treatment foster home two months later. He reported use of marijuana and cigarettes, but it was determined that he was not in need of substance abuse services. A psychiatric evaluation in 2005 noted he had been hospitalized three times and was diagnosed with bipolar disorder and oppositional defiant disorder. He was prescribed medication, but refused to take it. He also had a history of brittle diabetes and was not compliant with his diabetic management as well.

In June 2005, at the age of 14, he was hospitalized a fourth time after taking pills. JB was enrolled in a residential program and day treatment program. Overnight visits between his mother and three siblings began in August 2005. His brothers were returned to their mother in October 2005, but JB was unable to return home, due to his severe behaviors. After progressing well at the residential program, he returned to his mother's care in June 2006. However, four months later, his mother called the caseworker, informing her she could not control JB. She stated he had been arrested for illegal consumption by a minor, possession of drug paraphernalia, and burglary of a motor vehicle. JB was placed on probation and several referrals were made. In November 2006, JB's mother asked for him to be removed, due to continued problematic behavior. An emergency placement was made at a shelter. A CAYIT took place in which it was determined JB needed a group home placement. He was placed at a residential home in December 2006, while awaiting placement elsewhere.

At a permanency hearing in January 2007, his goal of return home was changed to independence, due to age and JB's behavior. JB was placed at a residential program, from where he frequently ran. He was admitted to the hospital and was diagnosed with a mood disorder in May 2007. He was discharged back to the residential program. He continued to run, was non-compliant with taking his insulin, stole Seroquel and gave it to his peers at the group home.

While at the residential program he had regular phone calls with his mother and brother, but visits were inconsistent, due to his mother's work schedule, his running and hospitalizations. A CAYIT meeting took place. The team recommended a more structured placement because JB was not able to comply with the rules at the residential program. At the time of the CAYIT, JB was in detention for an outstanding warrant. JB pleaded guilty to a Class IV felony for possession of a controlled substance (Clonazepam). JB was detained several times over the next two months for outstanding warrants, domestic battery, and illegal drug consumption (marijuana). He had frequent parole violations, and in September 2007, he was returned to an adult detention facility. He was discharged from detention back to the residential program. In October 2007 he was placed with his paternal aunt.

JB was removed from his paternal aunt's care because she was not keeping appointments with the supervising agency, not attempting to complete fostering classes, and JB reported she was not providing food. He was placed at a specialized foster home. His foster parent reported periods of truancy, profanity, inability to get along with foster siblings, and legal consequences, as he often missed appointments with

his probation officer. JB was given a drug test, failed, and was sentenced to five days in jail.  A plan was in motion for his permanency goal of independence, but his pending juvenile delinquent cases and parole violation were jeopardizing his progress.  JB was again arrested in July 2008 for an outstanding warrant related to drug paraphernalia.  He was released on and placed on 24 months probation and 30 hours of community service. JB's foster father noted in September JB's unwillingness to follow rules and use of profanity.

A quarterly report from October 2008 noted that JB, at that time, was interacting more positively with his foster parent and other children in the home.  He was taking positive steps toward employment and education and had fewer episodes of curfew violations.  This was a significant change from the review done in July, in which JB had marked episodes of verbal aggression, run-ins with the law, and frequent curfew violations.

*Risk Factors: Bipolar disorder; substance abuse; suicidal ideation; parent suicide pact; multiple psychiatric hospitalizations; prior suicide attempt by overdose; familial mental illness; father incarcerated; multiple arrests and jail time; several different foster placements.*

**TH** died at the age of 19, due to a gunshot wound to the head. He was living in a transitional living program at the time of his suicide. TH became a ward when he was 10 years old. He was the second youngest of four siblings whose parents had a seven-year history of neglect and abuse towards their four children prior to the children coming into custody. Both parents had histories of substance abuse and the mother had a reported history of mental illness. TH reported that when he was eight years old, he saw his friend killed. TH was psychiatrically hospitalized four times prior to his suicide. His first hospitalization occurred within months of coming into DCFS care, when the ten-year-old was found hanging from a window ledge. At discharge, he was prescribed Zoloft and Thorazine and placed with his grandmother. However, he was removed from her home when she tested positive for amphetamines and refused to cooperate with family services. Later, when he was a teenager, he reported that his DCFS worker set up his grandmother by planting drugs on her. During his teenage years, he was described as having psychotic breaks, burning himself, being delusional and hearing voices that told him to hurt himself. He regularly used marijuana. TH was hospitalized three more times, including a hospitalization at a state operated facility, when he was eighteen years old. The police brought him to the mental health center after he reported feeling suicidal and being found disorientated on railroad tracks. Later, he reported he was meditating and he wanted to see his grandmother. His medication regime included Depakote and Risperdal. A year before his suicide, when his grandmother became terminally ill with lung cancer, he verbalized, "If my granny dies I'll kill myself, she's all I got." He later recanted this suicide ideation. He was arrested for armed robbery in January 2008.  The charge was reduced to aggravated assault and robbery.  He was placed on probation until August 2008.  His grandmother died in February 2008, while he was in jail.  He could not attend the funeral because it was out of state.  Prior to her death, he was allowed to visit his grandmother on weekends.

TH's eight-year placement history included over 17 foster homes, many homes of different relatives, residential programs and self placements. At the age of 17, he struck a fellow program resident on the forehead with a gun. He was found with guns several times. In July 2008, a residential advisor reported to the case manager and the residential program director that TH appeared to have an outline of a gun print in the back of his pants. He denied having a gun and no gun was found at the time. His probation officer was notified.  The Program Manager decided that he was to be searched upon entering or exiting the transitional living program.  His room would also be searched.  On July 7, 2008 a staff member at found TH in his room.  A piece of paper found in his room listed several goals: get a job/G.E.D., open a bank account, get a crib and stop smoking weed and cigarettes.  The note also had other statements, such as: "July 7, 2008 is the day I lean to da lord's said I surrender, Satan had a grip on me-n disguise a female lie-

n-steal…Dear God I'm tired of feel-n nobody care so please help me…, My goals to achieve is independent eternal exist-n- & peace itself"

*Risk Factors: Recent death of grandmother who had been his caretaker; physical, verbal, and emotional abuse; familial substance abuse; witness to a friend's death as a child; suicidal attempt and ideations; aggression; past arrests; impulsivity; delinquent behavior; multiple psychiatric hospitalizations; substance abuse.*

**MQ** died at the age of 20, due to hanging. He had been a ward for seven and a half years, since the age of 11. He was found hanging from a tree, while spending the night at a friend's house. His friend's mother found him at 3:00 AM, attempted to resuscitate him, and called 911. MQ had been diagnosed with bipolar disorder and prescribed mood stabilizers in early adolescence. At the time of his death, he was refusing to take his medication and abusing marijuana.

MQ's family had been involved with the Department since he was age three, when an intact case was opened following an abuse investigation. MQ's mother was known to be a substance abuser and a prostitute, and he was exposed to sexually explicit behavior and pornography at a young age. The intact case remained open for eight months. Two years later, the Department initiated a neglect investigation and MQ was taken into foster care for just over a year.

MQ returned to the care of DCFS in December 2003 on dependency, due to sexually acting out with younger children in the home. MQ spent two years at Reagan Academy for sexual behavior treatment. His mother initially visited, but staff therapists felt she lacked appropriate boundaries. MQ's maternal grandmother visited regularly and participated in family therapy. Upon release from the treatment center, MQ went into foster care with his maternal grandmother.

His mother did not engage in services, due to substance abuse issues she could not resolve and the father was not consistently cooperative. MQ had an arrest record, including drug paraphernalia and marijuana, criminal damage to property, two arrests for violating an order of protection, and an arrest and charge for battery for the sexual acting out that brought the case to the attention of DCFS. MQ had completed high school and had started at community college. He was seen by his caseworker five days prior to his suicide. MQ had told his caseworker that he had stopped using marijuana two weeks earlier and was hoping that he would pass a drug test for a job he had applied for. MQ also indicated that he was spending time with his aunt and was learning how to play the guitar. He reported that his grandmother had warned him he could not continue to stay with her if he was going to get arrested again.

*Risk Factors: problematic sexual behaviors at a young age; bipolar disorder; delinquent behaviors; substance abuse; perpetrator of domestic abuse.*

## Wards 2000-2011 Suicide Death by Cause



*Wards*

Eighty-two percent (14) of the 17 ward cases were male and 18% (3) were female. Of the 17 ward suicide cases, 24% (4) were 14 years and younger. All of the children ages 14 and younger committed suicide by hanging; 75% (3) had prior psychiatric hospitalizations, and one ward was psychiatrically hospitalized when he committed suicide. Seventy-five percent (3) of those 14 and under had a history of suicidal ideation. One hundred percent were receiving mental health services at the time of their death. One child was prescribed psychotropic medication only and three were prescribed medication, as well as engaging in therapy. Two of the children were living in residential treatment centers; one was living in a non-relative foster home, and one was hospitalized and had been living in foster care at the time of his death.

Among the wards' significant family histories: eight wards had a history of parental substance abuse; five wards had parents with a history of mental illness. In addition, four children lost parents through death and two lost grandparents who had been their caretakers. and one child had been rejected when his mother chose her violent boyfriend over him, despite his attempts to protect her. This common history of significant loss serves to highlight the need for all parties involved in the child's life (i.e. caseworker, biological family, foster family, teachers) to comprehend the scope and impact death and loss have on a child and differentiate "complicated" mourning from a normal developmental grieving process. In May 2008, it was noted that children who had a parent who died suddenly have three times the risk of depression (Science Daily; May 5, 2008). Research indicates that these younger children may see suicide as a way of joining loved ones, as their sense of connection appears to be stronger to those they have lost than any of their available support system. This suggests a strong need for a blended therapeutic approach for these younger more vulnerable children that includes the biological family and/or foster parents strengthening the relationships.

When younger children come into the system, familial death makes them more vulnerable. One child's re-entrance into the system at age 13 was prompted by the death of her parents, who had adopted her as an infant.

## Non-Wards 2000-2011 Suicide Death by Cause



*Non-wards*
Of the 34 suicide cases, 44% (15) involved cases that had been investigated by DCP in the year prior to the child's death; however, none of these cases was investigated, due to suspected mental illness.  Of these 15 cases, 71% (10) were unfounded DCP investigations; one indicated investigation; and four were pending investigations.  Thirty-eight percent (3) were male and 62% were female.

*DCP*
Of the 15 cases involved with DCP in the year prior to their suicide, 53% (8) were 14 years and younger.  All of these younger children committed suicide by hanging.  Of the eight children, 38% (3) had prior psychiatric hospitalizations, with one being discharged one week prior to their suicide.  Fifty percent (4) were receiving mental health services at the time of their death, and the other four had no documented history of mental illness.  All of the children, except one, were living in their biological home at the time of their death.  The one child that was not living in her biological home had been living with her maternal grandmother for the past five years.

One child had a history of substance abuse.  One child had a history of substance abuse in his family, and one had a history of mental illness in his family.  Three cases involved the death of a family member or parental separation.  Two involved the break-up of a significant other.  Three had a history of physical abuse, and one had a history of sexual abuse.  One case involved domestic violence in the home.

Fifty percent (4) of the children aged 14 and younger had a history of suicidal ideation.  Twenty-five percent (2) had past suicidal ideation, but no past mental health services and no past hospitalizations.  At the time of their suicide, two children were prescribed psychotropic medication only; however, one reportedly was non-compliant with their medication and one had only been on medication for approximately one week.  One was involved in therapy only; and one was prescribed medication, as well

as engaging in therapy.  Three of the four children were not receiving any mental health services at the time of their suicide, although two of them had expressed suicidal ideation in the past.

*Other*

Of the remaining child cases, one was a closed intact case, one was an open intact case, and one child had been adopted.  Of these three, all were female, and two were 14 years and one was 15 years.  The 15-year-old died by hanging.   The two younger children committed suicide by hanging and by drowning/slitting her wrists.

All three children had several risk factors. All had a history of parental substance abuse and two had a history of parental mental illness. One had a history of physical abuse. One case involved the child being bullied.  One of the 14-year-olds had a history of suicidal ideation and a hospitalization, but there is no record of mental health services at the time of her death.  The 15-year-old had a history of cutting.  At the time of their suicide, only one child was involved in mental health therapy.



## ANALYSIS

According to IVDRS[5] data, between 2005 and 2008, 121 Illinois children and adolescents between the ages of 10-19 committed suicide.  Three percent of these children were wards of the State of Illinois. From 2000-2011, 17 wards between the ages of 12 and 20 years old died by suicide.  Considering the increased hardships and risks of children and adolescents who come into State care, the number of wards' deaths by suicide may appear almost unavoidable. However, there are some precautions that may help lower these fatal outcomes.

---

[5] Illinois Violent Death Reporting System

Three of 17 wards killed themselves with guns. Two of the three wards accessed guns that were in their biological and foster homes. In the foster home, the gun was in a locked gun cabinet and in the parent's home, the gun was in the parent's bedroom, the bedroom door locked with a deadbolt lock.  These two youths had histories of depression, psychiatric hospitalizations and suicidal ideations.  Biological and foster parents may be able to reduce this means of suicide of their high risk youth by getting firearms out of the house. The University of Illinois at Chicago Institute for Juvenile Research produced a suicide prevention program with specific interventions for caretakers to educate parents that "The risk of suicide doubles if a firearm is in the house, even if the firearm is locked up." Increased availability of firearms is associated with an increase in adolescent suicide rates. In Canada, legislative gun control has correlated with a decrease in suicide rates, implying more than a coincidental relationship (Leenaars, Moksony, Lester, & Wenckstern, 2003, in Moskos et al 2004). Current efforts of mental health providers to encourage removal or safe storage of firearms in the homes of at-risk youth go largely unheeded.  Past studies have shown that only 25% of gun owners removed firearms from their home when repeatedly asked to do so by their teenager's mental health provider (Brent, Baugher, Brimaher, Koko, & Bridge, 2000, in Moskos et al 2004).  Options include removing the gun from the home and storing elsewhere, locking guns in a lockbox and using trigger locks. However, it is important to store keys elsewhere in a secure manner.

Special care must be taken with vulnerable younger wards who faced the deaths of their parents or significant relative caretaker and have come into state care. In the future, children involved with DCFS through placement or intact cases, with signs of overt or covert depressive feelings, past suicidal ideation, or death of parent or other significant family member, should be appropriately referred for therapeutic grief services.  Despondent youngsters have less resiliency to life's other setbacks, such as romantic break-ups, separations from siblings and placement losses.  They often feel helpless and hopeless; displaying intense concern for their own continued well being. Young children and adolescents experience recognizable grief symptoms, but their overt behavior differs in some way from grieving adults.  Children may approach grief in doses they can tolerate, interspersed with periods of avoidance. They may appear unemotional in the face of a loss, thereby complicating what may be the best course of treatment. Children may also view suicide as a solution to their grief or depression; in their view, they are joining their lost loved ones.

Several DCFS youth who committed suicide had lost loved ones or faced the impending deaths of loved ones. Support groups are increasingly available in the community. The American Cancer Society can provide assistance in finding psychosocial support services for children and adolescent who have caregivers with cancer or who died from cancer. Gilda's Clubs in Chicago and Quad Cities have support groups for kids and teens grieving the loss of a loved one from cancer. Hospitals have non-denominational pastoral counseling programs that can offer assistance to grieving youngsters;[6] several hospices throughout the state offer support groups for children and teens who have experienced loss of parents and caretakers. Rainbow Kids programs offer children's support groups throughout Illinois. These community programs help youth connect with other youth who have suffered losses. Being a ward should not exclude the youth from these supportive connections.

The Department needs to build a nurturing informal emotional support system for these vulnerable wards by assisting the youngster in identifying child-centered collaterals who can serve as a consistent supportive figure. While not a placement resource, the child-centered collateral can monitor the

---

[6] "The role of DCFS as a state agency is not to promote spirituality and religion, but to protect the rights and provide access to religious resources for those who want them." (Illinois Department of Children and Family Services Office of Inspector General: Pastoral Care and Child Welfare: A Handbook for Hospital Chaplains & Child Welfare Professionals, 2003).

"emotional pulse" of the youth, enhancing the child's personal support system during the trying and difficult vicissitudes of adolescence. It is equally important to reach out to the child's teachers, as the child spends a significant portion of their day in school.

Child-centered collateral contacts are key informants; as such, the child's caseworker should periodically convene case conferences that include both the child's informal and formal support systems. The formal support system includes the child's physicians, parents/foster parents, and treatment providers. When caseworkers have concerns about a child's depression, they should directly discuss and address those concerns with the youth.

Some of the wards who committed suicide came into the Department's care because of their mental illnesses and behavioral problems. Their family or caretakers could not manage the youth. Unfortunately, with cutbacks in Illinois public mental health programs, the Department becomes the back-up system for nuclear and extended families with mentally ill or emotionally disturbed children/adolescents. Many times, mental health providers instruct the caretakers to "lock out" the youth. Psycho-education for their parents, foster parents or relative caretakers should be integrated into the family's service plans.  The National Alliance on Mental Illness has developed a program called the Family to Family Education Program that appears to be underutilized by the Department.  This 12-week free course for family caregivers of individuals with mental illness is taught by trained family members. In situations where the family is overburdened by the youth's mental illness, a blended model of trauma-symptom and family therapy would be most helpful.  A broad family approach (i.e. foster family, biological family, extended family) should be considered, along with individual therapy for the child. Integrative family approaches permit a great range of choices in treatment; and, therefore, greater flexibility and treatment acceptability among the children and their families. Factors that may lead to increased treatment efficacy.  Further, integrative methods are easily tailored to the strengths of child and family and are readily augmented. For example, Multi-dimensional Family Therapy is a treatment modality that seeks to significantly reduce or eliminate the adolescent's substance abuse and other problem behavior, and to improve overall family functioning.

Table 1. Key Information for Wards 14 years and younger (N=4)

| | Male | Female |
|---|---|---|
| **Means of Suicide** | | |
| Hanging | 3 | 1 |
| Firearm | | |
| Overdose | | |
| Asphyxiation | | |
| | | |
| **Location of Suicide** | | |
| Natural Home | | |
| Foster Home-NR | 1 | |
| Foster Home-HMR | | |
| Residential Facility | 1 | 1 |
| Correctional Facility | | |
| Transitional Living | | |
| Psychiatric Hospital | 1 | |
| | | |
| **Length of Stay-Current Placement** | | |
| < 1 week | | |
| < 1 month, >1 week | | |
| < 3 months, > 1 month | | |

| | | |
|---|---|---|
| < 6 months, > 3 months | 1 (5 mos) | |
| > 6 months | 1 (1 ½ years) | 1 (10 mos) |
| | | |
| **Presence of Risk Factors*** | | |
| Mental Illness | 3 | 1 |
| Substance Abuse | | |
| Family History of Mental Illness | 2 | |
| Family History of Substance Abuse | 1 | |
| Physical Abuse | 1 | |
| Sexual Abuse | 2 | |
| Domestic Violence | 1 | |
| Death of a Family member (i.e. parent or  grandparent) | 2 | 1 |
| Break-up/fight with significant other | | 1 |
| Previous Hospitalization(s) | 2 | 1 |
| Suicidal Ideation | 2 | 1 |
| Previous Suicide Attempt(s) | 2 | |
| Delinquent Behavior | | |
| | | |
| **Mental Health Treatment at time of Suicide** | | |
| Medication only | | |
| Therapy only | | |
| Medication and Therapy | 3 | 1 |

*Not mutually exclusive (will not equal 4)

Table 2. Key Information for Wards 15 years and older (N=12)

| | Male | Female |
|---|---|---|
| **Means of Suicide** | | |
| Hanging | 7 | |
| Firearm | 3 | |
| Overdose | | 1 |
| Asphyxiation | 1 | |
| | | |
| **Location of Suicide** | | |
| Natural Home | 1** | |
| Foster Home-NR | 3*** | 1 |
| Foster Home-HMR | 2*** | 1 |
| Residential Facility | 1 | |
| Correctional Facility | 3 | |
| Transitional Living | | |
| Psychiatric Hospital | | |
| | | |
| **Length of Stay-Current Placement** | | |
| < 1 week | 2 (1 day; 3 days) | |
| < 1 month, >1 week | 5 ((2) 2 wks; (3) 3 wks) | |
| < 3 months, > 1 month | | |
| < 6 months, > 3 months | | 1 (5 mos) |
| > 6 months | 3 (8 mos; 3 yrs;  4 yrs) | |

| Presence of Risk Factors* | | |
|---|---|---|
| Mental Illness | 8 | 2 |
| Substance Abuse | 7 | |
| Family History of Mental Illness | 2 | |
| Family History of Substance Abuse | 5 | |
| Physical Abuse | 3 | 1 |
| Sexual Abuse | 1 | 1 |
| Domestic Violence | | |
| Death of a Family Member (i.e. parent or grandparent) | 3 | |
| Break-up/Fight with Significant Other | 1 | |
| Previous Hospitalization(s) | 7 | 2 |
| Suicidal Ideation | 4 | |
| Previous Suicide Attempt(s) | 2 | 1 |
| Delinquent Behavior | 7 | 1 |
| | | |
| **Mental Health Treatment at time of Suicide** | | |
| Medication only | 1 | 1 |
| Therapy only | | |
| Medication and Therapy | 4 | |

\* Not mutually exclusive (will not equal 12)
\*\* This child was a former ward and had only been living in his natural home for approximately three weeks
\*\*\* Two children were living in foster care at the time of their suicide; however, both committed suicide while at a friend's home.


## RECOMMENDATIONS

1.   The Department should develop and document a plan for children ages 9-14 who enter the child welfare system following the loss of a parent or significant caretaker, and any child who experiences the death or loss of a parent or significant caretaker while in care. In developing this plan, the child should be asked to identify individuals who can be part of the child's social support system.

2.   Workers should be educated that because children do not experience grief in a linear fashion, that grief therapy may have to be accessed at different times during a child/adolescent's development. In addition, pastoral counseling resources should be made available to the youth.

3.   The Department should assure via the service plan that biological or foster families of children with mental illness are linked to psycho-education programs, such as NAMI's Family-to-Family Education Program, which is a free 12-week course for family caregivers of individuals with mental illness. There are Family to Family programs located throughout Illinois.

4.   Integrated Assessors must screen adolescents for depression during the initial assessment.

5.   The Department should consider adopting an integrative family approach, in addition to individual therapy, for any ward with mental illness.

6.   Access to means, specifically firearms, is predictive of suicide completion. Research has shown and, as noted in the deaths of GB and KC, adolescents at risk of suicide will break into locked rooms and

locked cabinets to access the firearms.  When the Department is placing an adolescent at risk of suicide in a foster home, or facilitating a return to the biological home where there is a gun, the Department should conduct a clinical staffing to educate the parents (biological and foster) that the risk of suicide doubles if there is a firearm in the house, even if the gun is locked up. The staffing should utilize the materials developed by The University of Illinois at Chicago Institute for Juvenile Research for their Youth Suicide Prevention program. If the family has firearms, they should be asked to store the guns outside of the home. If the parent will not store the firearm elsewhere, they must store firearms with a trigger lock in a lockbox. The keys should be kept in a secure or supervised setting. In return home situations of a suicidal youth, where the biological parent refuses to store the gun with a trigger lock in a lock box, the caseworker should contact DCFS legal for assistance in presenting the case in Juvenile court for purpose of obtaining a court order.

7.    The Department should share a redacted version of this report with all DCFS placement workers as an educational tool.

8.    The Office of the Inspector General will share a redacted version of this report with private child welfare agencies as an educational tool.

9.    The report should be shared with the Clinical Service in Psychopharmacology Consulting Group.

## APPENDIX A   Psychotropic Medication [7]

**Wards not prescribed psychotropic medication within a year prior to death**
NR (age 15)
KC (age 17)
DD (age 17)
RM (age 18)
JB (age 18)
TH (age 19)
MQ (Age 20)

**Wards Prescribed Psychotropic Medication within a year prior to death.**
*JJ (age 12) Prescribed Psychotropic Medications*

| Medication | Purpose |
|---|---|
| Risperdal[8] | Anti-psychotic |
| Tenex | ADHD |
| Concerta | ADHD |

The risperdal prescription had been last filled two months prior to his death. The tenex prescription was a new request, but HFS did not show the prescription as being filled.

*RH (age 12) Prescribed Psychotropic Medications*

| Medication | Purpose |
|---|---|
| Celexa * | Anti-depressant |

RH was psychiatrically hospitalized and given medication at the time of his death

*CD (age 13) Prescribed Psychotropic Medications*

| Medication | Purpose |
|---|---|
| Focalin | ADHD |
| Seroquel | Anti-psychotic |
| Prozac[9] | Anti-depressant |
| Concerta | ADHD |

The prozac prescription was last filled four months prior to his death.

* This drug is not approved for use in pediatric patients. The warning indicates that anyone considering the use of the drug in a child or adolescent must balance the risk with the clinical need.

*VP (age 14) Prescribed Psychotropic Medications*

| Medication | Purpose |
|---|---|
| Paxil * | Anti-depressant |

---

[7] According to Healthcare and Family Services and the Clinical Service in Psychopharmacology Consulting Group information obtained from the Office of the DCFS Guardian.
[8] Indicated for treating schizophrenia in adolescents and bipolar disorder and aggression for autistic children in pediatric populations.
[9] Prozac is an SSRI that it has a warning about a possible increase in suicidal ideation in children and adolescents is approved for use in a pediatric population for the treatment of major depression and obsessive compulsion disorder.

The prescription for Paxil had last been filled two months prior to her death. The psychiatrist had taken her off the medication before her death because she had been running from placement and had been drinking.

*CL (age 15) Prescribed Psychotropic Medications*

| Medication | Purpose |
| --- | --- |
| Lamictal | Mood stabilizer |
| Seroquel | Anti-psychotic[10] |
| Concerta | ADHD |

The Seroquel prescription was last filled three months prior to her death. The Lamictal and Concerta prescriptions were last filled four months prior to her death.

*GB (age 16) Prescribed Psychotropic Medications*

| Medication | Purpose |
| --- | --- |
| Celexa* | Anti-depressant |
| Wellbutrin* | Anti-depressant |
| Zyprexa | Anti-psychotic[11] |

The prescription for Celexa had last been filled ten months prior to his death, the prescription for Wellbutrin was last filled three months prior to his death and the prescription for Zyprexa was last filled four months prior to his death.

*WP (age 16) Prescribed Psychotropic Medications*

| Medication | Purpose |
| --- | --- |
| Lexapro[12] | Anti-depressant |

WP had been psychiatrically hospitalized in the month before his death.

*DL (age 17) Prescribed Psychotropic Medications*

| Medication | Purpose |
| --- | --- |
| Zoloft[13] | Anti-depressant |
| Wellbutrin* | Anti-depressant |

The prescription for Zoloft was last filled eight months prior to his death. The Wellbutrin prescription was last filled nine months prior to his death.

> * This drug is not approved for use in pediatric patients. The warning indicates that anyone considering the use of the drug in a child or adolescent must balance the risk with the clinical need.

*IL (age 18) Prescribed Psychotropic Medications*

| Medication | Purpose |
| --- | --- |
| Risperdal | Anti-psychotic |
| Carbatrol | Mood-stabilizer |
| Seroquel | Anti-psychotic |
| Zoloft | Anti-depressant |

The prescriptions for Carbatrol, Seroquel and Zoloft were last filled in the month before her death.  The Risperdal was last filled a year before her death.

---

[10] Medication can also be used in the treatment of bipolar disorder.

[11] Medication can also be used in the treatment of bipolar disorder.

[12] Lexapro is an SSRI and though it has a warning about a possible increase in suicidal ideation in those younger than 24 years it is indicated for treatment of major depressive disorder in adolescents ages 12-17 years.

[13] Zoloft is an SSRI and though it has a warning about a possible increase in suicidal ideation in those younger than 24 years it is indicated for treatment of obsessive compulsive disorder in children.

*KH (age 18)      Prescribed Psychotropic Medications[14]*

| Medication | Purpose |
| --- | --- |
| Trazadone | Anti-depressant |
| Prozac[15] | Anti-depressant |
| Invega | Anti-psychotic[16] |
| Abilify | Anti-psychotic[17] |

The Trazodone and Prozac prescriptions were last filled five months prior to his death. The Abilify prescription was last filled eight months before his death. The HFS data does not indicate a fill date for the Invega, though he was receiving treatment from a physician in St. Louis, Missouri.

**- END OF REPORT -**

---

[14] Guardian's Office notes that these were new prescriptions without consent.

[15] Prozac is an SSRI that is approved for use in a pediatric  population for the treatment of major depression and obsessive compulsion disorder

[16] Medication can also be used in the treatment of bipolar disorder.

[17] Medication can also be used in the treatment of bipolar disorder.

# OFFICE OF THE INSPECTOR GENERAL
## Department of Children and Family Services

## *Bone Fractures in Infants:*
## *A Review of the Literature*

An excerpt from this report was included in the following article: Pierce, M.C., MD, Kaczor, K., MS, Lohr, D., MSW, Richter, K, RN, Starling, S.P., MD (2012).  A Practical Guide to Differentiating Abusive from Accidental Fractures:  An Injury Plausibility Approach. *Journal of Clinical Pediatric Emergency Medicine 13(3)*:166-177

## Introduction

Bone fractures are the second most common presentation of physical child abuse following soft-tissue injuries.[1] Fractures caused by abuse predominantly occur in infants and toddlers and are less common in older children.[2] Kemp et al. (2008) performed a systematic review of the literature on patterns of abusive fractures, and found that 25% - 56% of fractures in children under one year of age were due to child abuse. Leventhal, Martin and Asnes (2008) reviewed fracture data from the Kids' Inpatient Database, which contains discharge data for 80% of acute pediatric hospitalizations in the United States, and found that the proportion of fractures attributed to abuse was highest in infants less than one year at 24.9%. The proportion decreased to 7.2% in children 12 to 23 months of age and 2.9% in children 24 to 35 months of age.

## Process of Diagnosis

Distinguishing abusive fractures from accidental injuries is a complex process that involves physical examination, radiographic findings, and history of the injury.[3] The physical examination should include detailed documentation with the use of photographs or body diagrams. Diagnostic tests may be performed to rule out other causes of the injury and screen for additional injuries. The need for testing depends on the severity and type of injury, the age of the child, and examination findings.[4] The American Academy of Pediatrics recommends that detailed images of each anatomic region of the body be obtained if abuse is suspected.[5] After initial x-rays, it is recommended that repeat x-rays be completed 10-14 days later in order to identify additional fractures, clarify ambiguous findings, and help determine the age of fractures.[6] Accurate identification of child abuse is important in order to facilitate appropriate evaluation, referral, investigation, and outcomes for children and families.[7] One study found that child abuse recurs 35% of the time without appropriate detection and intervention.[8]

### Differential Diagnosis

Diseases that affect bone strength should also be considered when distinguishing between abuse and other causes. However, the presence of a bone disease does not rule out the possibility of abuse, as bone disease and abuse may coexist. Osteogenesis imperfecta (OI) is a disease characterized by increased bone fragility and should be considered when an infant presents with multiple fractures.[9] Diagnosis of OI is based on signs and symptoms including blue sclera, short stature, hearing loss, wormian bones,[10] and easy bruising.[11] Laboratory tests are 90% to 95% sensitive in identifying OI.[12] It is estimated that the occurrence of OI with the absence of blue sclera, family history, or progressive deformity is 1 in 3 million.[13] Therefore, it is very unlikely that a child will have OI if additional features of the disease are not present. Other differential diagnoses include metabolic bone diseases such as rickets and copper deficiency. Laboratory testing and radiological imaging can be used to rule out these considerations.[14]

---

[1] McMahon, Grossman, Gaffney, & Stanitski, 1995
[2] Kemp et al., 2008
[3] Hilton, 2006
[4] Ibid
[5] American Academy of Pediatrics, 2009
[6] Kemp, 2008
[7] Kellogg, 2007
[8] Skellern, Wood, Murphy, & Crawford, 2000
[9] Dwek, 2011
[10] Extra skull bones completely surrounded by a suture line. Semler, Cheung, Glorieux, & Rauch, 2010
[11] Bennett & Pierce, 2011
[12] Dwek, 2011
[13] Bennett & Pierce, 2011
[14] Carty, 1993

## Incidence of Fractures in Infants

In children under one year, skull fractures are the most common fracture and extremity fractures are the second most common. Of the extremity fractures, femur fractures are the most common followed by humerus fractures.[15] Leventhal et al. (2008) found that 17.1% of skull fractures, 30% of femur fractures, and 43% of humerus fractures in children birth to eleven months were attributed to abuse. These fractures are common in both accidental and abusive trauma, and therefore are not specific for abuse. Some fractures such as metaphyseal and rib fractures are specific for abuse, meaning that they are more commonly caused by abuse than accidental means. However, no fracture is completely diagnostic of abusive trauma.[16]



**Location of Abusive Fractures in Infants birth to 11 months**
Adapted from Leventhal et al (2008)

**Skull Fractures**
- Most common fracture in infants birth to 11 months.
- 17% attributed to abuse in infants birth to 11 months

**Rib Fractures**
- Third most common fracture in infants birth to 11 months
- 69% attributed to abuse in infants birth to 11 months

**Humerus Fractures**
- Extremity fractures second most common in infants birth to 11 months.
- Second most common fracture of the extremities.
- 43% attributed to abuse in infants birth to 11 months

**Femur Fractures**
- Extremity fractures second most common in infants birth to 11 months.
- Most common fracture of the extremeties
- 30% attributed to abuse in infants birth to 11 months

**Radius & Ulna Fractures**
- Extremity fractures second most common in infants birth to 11 months.
- 62% attributed to abuse in infants birth to 11 months.

**Tibia & Fibula Fractures**
- Extremity fractures second most common in infants birth to 11 months.
- 58% attributed to abuse in infants birth to 11 months.

### Skull Fractures

A parietal linear fracture is the most common skull fracture type in both abusive and accidental injuries.[17] Although it may be difficult to determine the cause of the skull fracture, certain factors raise suspicion for abuse. Multiple skull fractures and bilateral skull fractures have been found more frequently as a result of abuse rather than accidental injury.[18] Growing fractures,[19] depressed fractures, and associated

---

[15] Leventhal et al., 2008
[16] Kaczor & Pierce, 2011
[17] Kemp et al., 2008
[18] Ibid
[19] Enlarged linear fractures. Hobbs, 1984

intracranial injury are other factors that should also raise suspicion for abuse.[20]  In cases where the fracture results from abuse, infants usually present with a symptom such as swelling on the head or vomiting. A history of trauma is often absent, and the caregiver may construct a history of trauma after identification of the fracture.[21]

Because skull fractures are not specific for abuse, the history given by the caregiver becomes particularly important when identifying the cause.  If a fall is offered as an explanation, the type of fall should be discussed with the caregiver to determine injury compatibility with the history provided.   When accidental skull fractures do occur, they are typically caused by falling from a distance of 3 to 6 feet, such as falls from baby chairs placed on tables and from standing adults' arms.[22]  Most falls from short distances do not result in skull fractures in infants. A study of 3357 falls in infants under 6 months found that serious injury, defined as a concussion or fracture, occurred in less than 1% of the falls.[23]  There are several reports of fractures resulting from bed falls or other short distances less then 3 feet, but in each case the infant hit a hard surface, such as a radiator, table corner, or toy while falling.[24]

Birth trauma is another explanation that may be offered for skull fractures in young infants; however, skull fractures at birth are rare. A history of a difficult delivery, such as large head or the use of vacuum extraction or forceps, should be present in order to consider birth trauma as a cause of the fracture. Rubin studied 15,435 births and found a single skull fracture.[25]  Bhat et al. (1994) studied 35,000 births and found 4 skull fractures.  Vacuum extraction or forceps use at birth increases the chance of head injuries including cephalhematoma[26] and skull fracture.  Skull fractures are also found in approximately 5% of infants who undergo vacuum extraction.[27]

Most skull fractures that result from birth trauma are uncomplicated linear fractures of the parietal bone and are often not detected at birth.[28]  Therefore x-rays may not be completed and fractures may go undiagnosed.  When a child presents with skull fractures in the first months of life, it can be difficult to determine if the fracture was caused by birth trauma or abuse, because skull fractures cannot be dated.[29]  Kleinman (1998) wrote that an uncomplicated linear skull fracture caused by birth trauma is indistinct by two months of age and no longer visible on x-rays at six months.

*Femur Fractures (Thigh Bone)*
Femoral fractures are the most common of the extremity fractures in infants, and 30% of femoral fractures in this age range are caused by abuse.  Smaller studies have found between 17% and 60% of femur fractures in children younger than one year were caused by abuse.[30]   Abuse becomes an uncommon cause of femur fractures once the child begins walking.[31]   Loder, O'Donnell, and Feinburg

---

[20] Hobbs, 1984
[21] Kaczor & Pierce, 2011
[22] Hobbs, 1984
[23] Warrington & Wright, 2001
[24] Kaczor & Pierce, 2011
[25] as cited in Bilo et al., 2010, p.26
[26] A cephalhematoma is a collection of blood under the scalp of the newborn.  The occurrence of cephalhematoma is 4% in forceps deliveries, as compared to 1-2% in spontaneous vaginal deliveries (Doumouchtsis and Arulkumaran, 2008), and in up to 5% of cephalhematomas, an underlying skull fracture will be present (Towner and Ciotti, 2007).
[27] Simonson, et al., 2007
[28] Bilo et al., 2010
[29] Bilo et al., 2010
[30] Thomas, Rosenfield, Leventhal & Markowitz, 1991; Shwend et al., 2000; Hui et. al, 2008
[31] Shwend, Werth, & Johnson, 2000

(2006) analyzed almost 10,000 pediatric femur fractures and found that nearly all of the fractures attributable to abuse occurred in children less than two years of age.

The femur is the largest bone in the body, and it can be fractured by both high and low energy mechanisms. Common accidental causes include motor vehicle collisions and falls.[32] Femur fractures are rarely caused by birth trauma, with a reported incidence of 0.13 per 1,000 live births.[33] In children younger than three years, the most common cause of femur fracture is a fall, followed by abuse.[34]  No specific fracture site or pattern has been found that allows differentiation between accidental and abusive femoral fractures.[35]  However, spiral fractures in non-ambulatory infants are highly suspicious for abuse because an infant cannot generate the twisting mechanism necessary to cause a spiral fracture.[36]  Rewers et al. (2005) found that 55% of children with abusive femur fractures also had additional injuries, including injuries to the head and neck, chest, abdomen, and face.

*Humerus Fractures (Upper Arm Bone)*
Leventhal et al. (2008) found that the humerus was the second most common extremity fracture in children under one year of age, and that 43% of humerus fractures in children in this age range were attributed to abuse.  However, 60% of spiral humerus fractures are attributable to abuse in children under 15 months.[37]  Farnsworth, Silva, & Mubarek (1998) found that falls are the most common cause of humerus fractures, and in children younger then 3 years, humerus fractures occurred after the child fell from a bed, couch, or other object 3-6 feet high. Humerus fractures are rarely caused by birth trauma, with a reported incidence of 0.2 per 1,000 deliveries.[38]  When abuse is the cause, children often present with unknown mechanisms of injury and histories that change.[39]

**Fractures Specific for Abuse**
Certain fractures increase the likelihood that abuse occurred, although no single fracture type alone can distinguish those children who have been victims of abuse from those who have suffered accidental trauma.[40]  Fractures that are specific for abuse because they are more often caused by abuse than accidental trauma include metaphyseal, rib, scapular, sternal, and pelvic fractures.[41]  Radius, ulna, tibia, and fibula fractures are also more likely to have been caused by abuse than accidental injury among children 0-11 months.[42]

*Metaphyseal Fractures*
The term "classic metaphyseal lesion," also called a "corner fracture" or "bucket-handle fracture," refers to a fracture that occurs when the extremity is pulled or twisted, or the child is shaken.[43]  The classic metaphyseal lesion occurs most often in children under one year[44] and is highly specific for abuse when it occurs in children of this age group.[45]  Worlock et al. (1986) compared fracture patterns in 35 children

---

[32] Kaczor & Pierce, 2011

[33] Morris, Cassidy, Stephens, McCormack, & McManus, 2002

[34] Rewers et al., 2005

[35] Rex & Kay, 2000; Kaczor & Pierce, 2011

[36] Kaczor & Pierce, 2011

[37] Shaw, Murphy, Shaw, Oppenheim, & Myracle, 1997

[38] Bhat, Kumar, and Oumachigui, 1994

[39] Shaw et al., 1997

[40] Nirav, P.K. et al. (2009) & Pressel, D.M. (2000).

[41] Kaczor and Pierce, 2011

[42] Leventhal et al., 2008

[43] Scherl & Endom, 2010

[44] Kleinman, Marks, Richmond, & Blackbourne, 1995

[45] Kaczor & Pierce, 2011

who had abusive fractures with fracture patterns in 116 children who had accidental fractures.  Eleven percent (11%) of the abusive fractures were metaphyseal, whereas none of the fractures found in the accidental injuries group were metaphyseal. Metaphyseal fractures are also the most frequently found long bone fracture in infants who die with evidence of abuse.[46]   A study of 31 infants under 11 months who died of inflicted injuries found 72 fractures of the long bones, of which 64 (89%) were classic metaphyseal lesions.[47]

Classic metaphyseal lesions occur in the metaphysis of a long bone, which is the wider part of the bone toward the end of the bone.  The most common long bone sites for the classic metaphyseal lesion are the distal femur (end of the thigh bone further from the center of the body), proximal tibia (end of a lower leg bone closer to the center of the body), distal tibia (end of a lower leg bone further from the center of the body), and proximal humerus (end of the upper arm bone closer to the center of the body).[48]



Retrieved from the Merriam Webster Dictionary at www.visualdictionary.com.

In an infant, the metaphysis is the area where maximum growth occurs. Although the metaphyseal region is highly functional in a normal infant, the growth process makes this area particularly vulnerable to injury caused by tensile or shearing forces.[49]   Tensile forces are those that result in stretching instead of compression, while shearing forces cause a part of the body to slide past another part.[50]  These types of forces act on the metaphysis of the bone when a child is forcefully yanked by an extremity and/or shaken violently,[51] causing the bone in the vulnerable metaphyseal area to separate.[52]



Metaphyseal fracture. Adapted from Kleinman, P. K (1987). *Diagnostic imaging of child abuse.* Baltimore: Williams & Wilkins.

---

[46] Kleinman et al., 1995
[47] Kleinman et al., 1995
[48] Kleinman, 2008
[49] Kaczor & Pierce, 2011
[50] Pierce, Bertocci, Vogeley, & Moreland, 2004
[51] Pierce et al., 2004
[52] Kaczor & Pierce, 2011

The classic metaphyseal lesion is highly specific for child abuse in infants because the tensile and shearing forces necessary to cause this injury are unlikely to occur from accidental causes. Dwek (2011) wrote that "children who are not toddling or walking generally cannot exert this type of force by themselves to cause this type of fracture" and "this fracture does not result from falls and has never been reported as a result of falls in infants in multiple studies."[53]

Although metaphyseal fractures in infants are highly specific for child abuse, other causes should be taken into account before confirming the diagnosis. A study that reviewed 22 years of records for an obstetrics practice that delivered 8,500 babies per year found three reports of babies with distal femoral metaphyseal fractures identified on radiographs after uncomplicated caesarean section.[54] Classic metaphyseal lesions have also been reported to occur during casting for repair of clubfoot.[55] After the age of one year, accidental trauma should be considered as a possible diagnosis.[56]

Imaging studies are essential in diagnosing metaphyseal fractures because there is usually no outward physical evidence of these fractures. There is ample data from autopsies and clinical studies that metaphyseal fractures are not associated with bruising and only cause pain when severe.[57] For these reasons, metaphyseal fractures are usually not detected until found on x-rays. Kleiman et al (1986) recommends follow-up x-rays two weeks after the initial study as additional metaphyseal fractures may be found at this time.[58]

Metaphyseal fractures heal by gradual bone absorption across the metaphyseal margin, and many have healed by six weeks.[59] The quick healing time and lack of treatment required can make these fractures seem less serious than they really are. However, their importance should not be overlooked because of their strong correlation with child abuse. Carty (1993) wrote that "metaphyseal fractures usually heal without long-term consequences and in that sense are not important, but they must be regarded as sinister because of their associations."

*Rib fractures*

Rib fractures are commonly seen in cases of abusive trauma and have a high specificity for abuse when found in young children.[60] Leventhal et al. (2008) found that rib fractures were the third most common fracture in children under 1 year, and that 69% of rib fractures in this age range were attributed to abuse. A systematic review of seven studies of abusive fractures found that after controlling for motor vehicle crashes, violent trauma, and post-surgical cases, there was a 71% probability that a rib fracture was caused by abuse.[61] A second study found that a rib fracture in a child less than three years of age had a positive predictive value of 95% for the diagnosis of non-accidental trauma.[62]

---

[53] Dweck, 2011
[54] O'Connell and Donoghue, 2006
[55] Grayev, Boal, Wallach, & Segal, 2001
[56] Kleinman, 2008; Dwek, 2011
[57] Kleinman, 2008; Carty, 1993
[58] Research indicates a link between radiation exposure and an increased risk of cancer. Guidelines to minimize the risk associated with exposure include imaging when there is a clear medical benefit, using the lowest amount of radiation based on the size of the child, imaging the indicated area, avoiding multiple scans, and using alternative diagnostic studies when possible. (American Academy of Pediatrics) Medical professionasl weigh the risks associated with radiation exposure against the benefits of accurate medical diagnosis.
[59] Kraft, 2011
[60] Pierce and Bertocci, 2006
[61] Kemp et al., 2008
[62] Barsness et al., 2003

The low incidence of accidental rib fractures can be explained by the fact that infants' chests are more malleable than those of older children.  As a result, their ribs will deform rather than break unless major force is exerted.[63]  Most rib fractures in infants are thought to occur by anterior-posterior (front to back) compression, the type of force exerted by shaking, and are often associated with intracranial injuries.[64] This mechanism of injury most commonly results in rib fractures in the posterior and lateral regions.[65]

Often children with rib fractures do not present with a history of trauma, but instead have respiratory complaints, gastrointestinal problems, irritability, or mental status changes related to intracranial injury. Therefore the fractures are usually clinically unsuspected until detected on x-ray.[66]  When there is no displacement of bone fragments, acute rib fractures are often hard to diagnose and may go undetected on x-ray until callus formation 7-10 days after the injury. For this reason it is recommended to have follow-up x-rays taken within two weeks of the suspected abuse.[67] Barsness et al suggests to increase sensitivity, specificity, and accuracy in detecting rib fractures, standard chest x-rays along with right and left oblique views are recommended.[68]

Caregiver explanations may include that the fractures were caused by birth trauma or falls, but a literature review indicates that these incidents rarely result in rib fractures.  One study screened for birth injuries in 35,000 infants and found no rib fractures.[69]  Falls from heights and complex falls can cause rib fractures, but posterior and lateral rib fractures are more likely to be attributed to child abuse.[70]

*Tibia/Fibula (Lower Leg Bones)*
Leventhal et al. (2008) found that 58% of tibia/fibula fractures in children birth to 11 months were caused by abuse.  In the non-ambulating infant this fracture location is concerning.  Abusive fractures can occur when the child is grabbed by the leg or when the leg is twisted.[71]  As the child begins to walk, accidental tibia and fibula fractures become relatively common skeletal injuries.[72]

*Radius/Ulna (Forearm Bones)*
Leventhal et al. (2008) found that 62% of radius/ulna fractures in children birth to 11 months are caused by abuse.  Radius and ulna fractures are uncommon in infants because of the conditions necessary to cause this fracture.  In an older child, forearm fractures most often occur from falling onto an arm that is outstretched to break the fall.  However, infants lack this reflex, termed the "parachute reflex," until 8 to 9 months of life.[73]  Therefore fractures in a young infant do not occur by this mechanism, making fractures of the radius and ulna suspicious for abuse.[74]  Abusive fractures can result when a caregiver grabs or yanks the child by the arm.[75]

---

[63] Bilo et al., 2011
[64] Bulloch et al., 2000
[65] Ibid
[66] Kaczor & Pierce, 2011
[67] As noted earlier, additional imaging studies present an increased risk of radiation exposure and the risks and benefits should be weighed by the treating physician.
[68] Barsness et al., 2003
[69] Bhat et al., 1994
[70] Chadwick, Bertocci, & Guenther, 2011
[71] Kaczor & Pierce, 2011
[72] Kaczor & Pierce, 2011
[73] Lehman & Schor, 2011
[74] Kaczor & Pierce, 2011
[75] Kaczor & Pierce, 2011

**Risk Factors that are Suggestive of Abuse**

Radiographic findings, physical examination, and history of the injury are used to distinguish accidental from non-accidental injury.[76]  Common indicators of abuse include incompatible or inconsistent history, unreasonable or unexplained delay in presentation, and unwitnessed injuries.  Certain factors increase the likelihood that injuries occurred from abuse including age, multiple injuries, and frequent hospital visits.  A delay in seeking care may also indicate the possibility of child maltreatment.[77]  A history of previous injuries and multiple emergency department visits raises the possibility of abuse.[78]

*Age*

The probability that a fracture occurred from abuse is much higher in children under 18 months than in older children. Worlock and colleagues (1986) found that 80% of abusive fractures occurred in children less than 18 months of age, and estimated that 12.5% of children with abusive fractures in this age group may be victims of child abuse. Kemp et al. (2008) performed a systematic review of the literature on patterns of abusive fractures, and found that 25% - 56% of fractures in children under one year of age were due to child abuse.

*Multiple Fractures*

The likelihood of abuse increases when a greater number of fractures are sustained.[79] While it is often assumed that falls or other accidental injuries frequently cause multiple fractures, Pierce and Bertocci (2006) emphasized that "A common misconception is that if the trauma was bad enough to cause 1 fracture, it could cause a second fracture or additional injuries.  Short of a motor vehicle crash or a pedestrian being hit by a vehicle, more than 1 fracture and/or additional injuries are uncommon, *except in the case of inflicted trauma.*"[80]  (*Emphasis added by the OIG*).  Leventhal et al. (2008) utilized the Kids Inpatient Database (KID), which contains discharge data for 80% of acute pediatric hospitalizations in the United States.  Their study of 13,870 children birth to 36 months found that the likelihood of abuse increased 4 to 6 times in children who had three or more fractures as compared to one fracture.[81]  Infants 0-11 months represented 42% of the study and the table below illustrates the occurrence of fractures in this age group.

*Proportion of Abusive Fractures in Infants from the KID*

| Age in Months | One fracture | | Two Fractures | | Three or More Fractures | |
|---|---|---|---|---|---|---|
| | Number of Infants | % from Abuse | Number of Infants | % from Abuse | Number of Infants | % from Abuse |
| 0-11 | 5076 | %18.5 | 477 | %55.1 | 298 | %85.4 |

Fractures in various stages of healing are also suspicious for abuse, as it suggests that the child was injured on more than one occasion.[82]  Loder and Bookout (1991) found that 13% of abused children less than six years had old and new fractures in various stages of healing.

---

[76] Hilton, 2006
[77] Snyder et al., 2011
[78] Snyder, Currie, & Stockhammer, 2011
[79] Kaczor and Pierce, 2011
[80] Pierce &Bertocci, 2006
[81] Leventhal, Martin, & Asnes, 2008
[82] Kaczor & Pierce, 2011

*Observational Cues*

The interactions between the caregiver and the child can be indicators of abuse.  These include:[83]

- Caregiver does not appear to appreciate the severity of child's condition
- Caregiver does not attempt to comfort child
- Caregiver speaks harshly to child
- Child appears fearful of caregiver
- Caregiver blames child for injuries
- Caregiver seems annoyed that child is requiring medical care
- Caregiver treats one child in the room differently than others
- There is tension between adult caregivers in room

*Symptoms*

In infants, bruising, vomiting without diarrhea, unexplained fussiness, a bulging fontanelle, rapidly increasing head circumference, failure to thrive, and developmental delay are symptoms that raise suspicion for abuse.  In any age child, bruising in areas that are relatively protected such as the ears, neck, flank, genitals, or buttocks, is suspicious for abuse (Snyder et al., 2011), as is bruising on the chest and abdomen (Sugar, Taylor, & Feldman, 1999; Dunstan, Guildea, Kontos, Kemp, & Sibert, 2002). Patterned injury such as handprints or bite marks, weight loss, multiple healed injuries, and poor hygiene are also red flags that raise the possibility that abuse occurred (Synder et al., 2011)

*Incompatible or Inconsistent History*

If the explanation provided by the caregiver is implausible, the concern for abuse increases.  Explanations that are concerning for abuse include (Kellogg, 2007):

- No explanation or vague explanation for a significant injury
- An important detail of the explanation changes dramatically
- An explanation is inconsistent with the pattern, age, or severity of the injury or injuries
- An explanation is inconsistent with the child's physical and or developmental capabilities
- Different witnesses provide markedly different explanations for the injury or injuries

Diagnosis should address whether the explanation adequately correlates with the severity, age, pattern, and distribution of injuries and the likelihood of nonaccidental causes for the injury (Kellogg, 2007).  The assessor must determine injury plausibility, which includes assessing if the history and injury are compatible, how the injury is described by the caregiver, if signs and symptoms are consistent with the details provided, and whether other injuries are present (Kaczor & Pierce, 2011).  Information regarding the child's behavior before, during, and after the incident, including feeding times and levels of responsiveness, should be gathered in a non-accusatory manner (Kellogg, 2007).

---

[83] Snyder, Currie, & Stockhammer, 2011

<u>References</u>

American Academy of Pediatrics. (2009). Diagnostic imaging of child abuse. Section on Radiology. *Pediatrics, 123*(5), 1430-1435.

Barsness, K. A., Cha, E. S., Bensard, D. D., Calkins, C. M., Patrick, D. A., Karrer, F. M., & Strain, J. D. (2003).  The positive predictive value of rib fractures as an indicator of nonaccidental trauma in children.  *The Journal of Trauma: Injury, Infection, and Critical Care, 54*(6), 1107-1110.

Bennett, B. L. & Pierce, M. C. (2011). Bone health and development. In C. Jenny (Ed.), *Child abuse and neglect* (pp. 260-274). St. Louis, MO: Saunders Elsevier.

Bertocci, G. & Pierce, M. C. (2006). Applications of biomechanics aiding the diagnosis of child abuse. *Clinical Pediatric Emergency Medicine, 7,* 194-199.

Bilo, R., Robben, S., Rijn, R. R. (2010).  *Forensic aspects of pediatric fractures*: *differentiating accidental trauma from child abuse.* Berlin, Germany: Springer-Verlag.

Bhat, B. V., Kumar, A., & Oumachigui, A. (1994). Bone injuries during delivery. *Indian Journal of Pediatrics, 61,* 401-405.

Bulloch, B., Schubert, C., Brophy, P., Johnson, N., Reed, M. H., Shapiro, R. A. (2000). Cause and clinical characteristics of rib fractures in infants. *Pediatrics, 105*(4), e48.

Carty, H. M. (1993). Fractures caused by child abuse. *Journal of Bone and Joint Surgery, 75-B*(6), 849-857.

Chadwick, D. L., Bertocci, G., & Guenther, E. (2011). Injuries resulting from falls. In C. Jenny (Ed.), *Child abuse and neglect* (pp. 570-578). St. Louis, MO: Saunders Elsevier.

Doumouchtsis, S. K., & Arulkumaran, S. (2008.) Head trauma after instrumental births. *Clinics in Perinatology, 35*(1), 69-83.

Dunstan, F. D., Guildea, Z. E., Kontos, K., Kemp, A. M., & Silbert, J. R. (2002). A scoring system for bruise patterns: A tool for indentifying abuse. *Archives of Disease in Childhood, 86*(5), 330-333.

Dwek, J. R. (2011). The radiographic approach to child abuse. *Clinicical Orthopaedics and Related Research, 467*(3), 776-789.

Farnsworth, C. L., Silva, P. D., Mubarek, S. J. (1998). Etiology of supracondylar humerus fractures. *Journal of Pediatric Orthopaedics, 18*(1), 38-42.

Grayev, A. M., Boal, D. K., Wallach, D. M., Segal, L. S. (2001). Metaphyseal fractures mimicking child abuse during treatment for clubfoot.  *Pediatric Radiology, 31*(8): 559-563.

Hobbs, C. J. (1984). Skull fracture and the diagnosis of abuse. *Archives of Disease in Childhood, 59,* 246-252.

Hui, C., Joughin, E., Goldstein, S., Cooper, N., Harder, J., Kiefer, G., Parsons, D., Howard, J. (2008). Femoral fractures in children younger than three years: The role of nonaccidental injury. *Journal of Pediatric Orthopedics, 28*(23), 297-301

Hilton, S. V. (2006).  Differentiating the accidentally injured from the physically abused child. In S. V. Hilton &  D. K. Edwards (Eds.), *Practical pediatric radiology* (3rd ed.) (pp. 576-629). Philadelphia, PA: Saunders Elsevier.

Kaczor, K., & Pierce, M. C. (2011). Abusive fractures. In C. Jenny (Ed.), *Child abuse and neglect* (pp. 275-295). St. Louis, MO: Saunders Elsevier.

Kellogg, N. D. & the Committee on Child Abuse and Neglect. Evaluation of suspected child physical abuse. *Pediatrics, 119*(6), 1232-1241.

Kemp, A. M. (2008). Fractures in physical child abuse. *Pediatrics and Child Health, 18*(12), 550-553.

Kemp, A. M., Dunstan, F., Harrison, S., Morris, S., Mann, M., Rolfe, K., Datta, S., Thomas, D. P., Sibert, J., & Maguire, S. (2008). Patterns of skeletal fractures in child abuse: systemic review.  *British Medical Journal,* 337, a1518.

Kleinman, P. K. (1998). *Diagnostic imaging of child abuse*. St. Louis, MO: Mosby.

Kleinman, P. K. (2008). Problems in the diagnosis of metaphyseal fractures. *Pediatric Radiology, 38* (Suppl 3), S388-S-394.

Kleinman, P. K., Marks, S. C., Richmond, J. M., Blackbourne, B. D. (1995). Inflicted skeletal injury: A postmortem radiologic-histopathologic study in 31 infants. *American Journal of Roentgenology, 165*(3), 647-650.

Kleinman, P.K., Nimkin, K., Spevak, M. R., Rayder, S. M., Madansky, D. L., Shelton, Y. A., Patterson, M. M. (1996). Follow-up skeletal surveys in suspected child abuse. *American Journal of Roentgenology, 167*(4), 893-896.

Kleinman, P. L., Kleinman, P. K., & Savageau, J. A. (2004). Suspected infant abuse: Radiographic skeletal survey practices in pediatric health care facilities. *Radiology, 233,* 477-485.

Kraft, J. K. (2011). Imaging of non-accidental injury. *Orthopaedics and Trauma, 25*(2), 109-188. doi: 10.1016/j.mporth.2011.01.008

Lehman, R. K. & Schor, N. F. (2011). Neurologic evaluation. In In R. M. Kliegman, B. F. Stanton, J. W. St. Geme, N. F. Schor, & R. E. Behrman (Eds.), *Nelson textbook of pediatrics* (19th ed., Ch. 584).

Leventhal, J. M., Martin, K. D., & Agnes, A. G. (2008). Incidence of fractures attributable to abuse in young hospitalized children: results from analysis of a United States database. *Pediatrics, 122*(3), 599-604.

Loder, R. T. & Bookout, C. (1991). Fracture patterns in battered children. *Journal of Orthopaedic Trauma, 5*(4), 428-233.

Loder, R. T., O'Donnell, P. W., Feinburg, J. R. (2006). Epidemiology and mechanisms of femur fractures in children. *Journal of Pediatric Orthopedics, 26*(5), 561-566.

Morris, S., Cassidy, N., Stephens, M., McCormack, D., & McManus, F. (2002). Birth-associated femoral fractures: Incidence and outcome. *Journal of Pediatric Orthopaedics, 22*(1), 27-30.

McMahon, P., Grossman, W., Gaffney, M., & Stanitski, C. (1995). Soft-tissue injury as an indication of child abuse. *The Journal of Bone and Joint Surgery, 77-A*(8), 1179-1183.

Nirav, P.K., Baldwin, K., Wolfgruber, H., Christian, C.W., Drummond, D.S., & Holsalkar, H.S. (2009). Child abuse and orthopaedic injury patterns: Analysis at a Level I Pediatric Trauma Center. *Journal of Pediatric Orthopaedics, 29*(6), 618-625.

O'Connell, A. M. & Donoghue, V.B. (2006). Can classic metaphyseal lesions follow uncomplicated caesarean section? *Pediatric Radiology, 37, 488-491.*

Pierce, M. C., & Bertocci, G. (2006). Fractures resulting from inflicted trauma: Assessing injury and history compatibility. *Clinical Pediatric Emergency Medicine,* 7(3), 143-148.

Rewers, A., Hedegaard, H., Lezotte, D., Meng, K., Battan, F. K., Emery, K., & Hamman, R. F. (2005). Childhood femur fractures, associated injuries, and sociodemographic risk factors: A population-based study. *Pediatrics, 115*(5), e543-e552.

Scherl, S. A., & Endom, E. E. (2010). Orthopedic aspects of child abuse. In D. S. Basow (Ed.), *UpToDate*. Waltham, MA: UpToDate.

Semler, O., Cheung, M. S., Glorieux, F. H., & Rauch, F. (2010). Wormian bones in osteogenesis imperfecta: Correlation to clinical findings and genotype. *American Journal of Medical Genetics Part A. 152A*(7), 1681-1687.

Shaw, B. A., Murphy, K. M., Shaw, A., Oppenheim, W. L., & Myracle, M. R. (1997). Humerus shaft fractures in young children: Accident or abuse? *Journal of Pediatric Orthopaedics, 17*(3), 293-297.

Simonson, C., Barlow, P., Dehennin, N., Sphel, M., Toppet, V., Murillo, D., & Rozenberg, S. (2007). Neonatal complications of vacuum-assisted delivery. *Obstetrics & Gynecology, 109*(3), 626-633.

Skellern, C. Y., Wood, D. O., Murphy, A., & Crawford, M. (2000). Nonaccidental fractures in infants: risk of further abuse. *Journal of Paediatric Child Health, 36,* 590-592.

Snyder, K. R., Currie, M. L., & Stockhammer, T. F. (2011). Interviewing caregivers of suspected child abuse victims. In C. Jenny (Ed.), *Child abuse and neglect,* (pp. 51-59). St. Louis, MO: Saunders Elsevier.

Sugar, N. F., Taylor, J. A., & Feldman, K. W. (1999). Bruises in infants and toddlers: Those who cruise rarely bruise. *Archives of Pediatric Medicine, 153,* 399-403.

Thomas, S. A., Rosenfield, N. S., Leventhal, J. M., Markowitz, R. I. (1991). Long-bone fractures in young children: Distinguishing accidental injuries from child abuse. *Pediatrics, 88*(3), 471-476.

Towner, D.R., & Ciotti, M. C. (2007). Operative vaginal delivery: A cause of birth injury or is it? *Clinical Obstetrics and Gynecology, 50*(3), 563-581.

Warrington, S. A., & Wright, C. M. (2001). Accidents and resulting injuries in premobile infants: Data from the ALSPAC study. *Archives of Disease in Childhood, 85*(2), 104-107.

Worlock, P., Stower, M., & Barbor, P. (1986). Patterns of fractures in accidental and non-accidental injury in children: A comparative study. *British Medical Journal, 293*(6539) 100-102.

**- END OF REPORT -**

# GENERAL INVESTIGATIONS

**GENERAL INVESTIGATION 1**

| ALLEGATION | The Office of the Inspector General reviewed a number of serious injury and death investigations in which children's exposure to violence in the home was not adequately addressed. |
|---|---|

| INVESTIGATION | The Department recognizes in Procedures that the best predictor of future violence is prior violence. Therefore, whenever a child protection investigator learns of |

violence in the home, they must examine whether the situation presents a risk of future harm. This analysis is reflected in the Child Endangerment Risk Assessment Protocol (CERAP). Under CERAP, if violence is present in the home, the protocol requires either a mitigating factor (e.g., abuser has left the home) or implementation of a safety plan.

The Department distinguishes domestic violence from other forms of partner violence, explaining that domestic violence is about power, control, and intimidation, and that domestic violence is not caused by anger or substance abuse issues. Unlike a person with anger issues, domestic violence perpetrators have the ability to stay in control of their behaviors, behave appropriately in social settings and may not have a trigger. "Inter-partner violence" is a broader category that does not require clear power differentials, and is the most common form of intimate partner violence. Inter-partner violence ranges from innocuous equally initiated incidents, such as shoving or arm grabbing, to potentially lethal mutually combative exchanges. Some couples have a recurring pattern of incidents that escalate into violence, and this type of violence is almost as likely to be perpetrated by women as by men.

While the distinction between classic domestic violence and inter-partner violence is well accepted within the domestic violence treatment community and is very useful in identifying appropriate services, the dichotomy may be less useful in determining child safety: inter-partner or situational couple violence can create just as dangerous a living environment for children, both in terms of long-term effects and immediate risk of harm.

Domestic and inter-partner violence present challenges particular to child welfare. First, in most cases child welfare service plans and safety plans are more effective when the resources of an extended family can be harnessed to strengthen the family and keep the children safe. Families with domestic violence issues often operate in isolation from extended families and community supports. Second, interim measures, such as offering services and protective daycare while keeping the family intact, may be difficult since parents suffering from domestic or inter-partner violence often refuse voluntary services. Third, the emotional harm inflicted on children from chronic exposure to violence in the home and the chaotic lifestyle it creates is difficult to measure or prove and may require resources specific to this population. Fourth, domestic and inter-partner violence is frequently underreported and may be more so in the child welfare field where a parent may also fear having their children removed. Lastly, while the adult victim of domestic violence may be faultless, at times the situation may still require removal of the children because of the risk of abuse to the children.

Speaking with the children, independent from their parents, can provide the opportunity to better understand a child's life in the midst of hostility. Child interview strategies that may elicit information about a type of child maltreatment may also yield useful data when children are otherwise endangered, including by being

witnesses to violence.  Researchers have noted that studies have a tendency to focus on one or few forms of victimization, and fail to use a holistic approach to identify factors associated with children who experience multiple forms of violence.  For example, a child exposed to both domestic violence and child abuse is often viewed as experiencing separate traumas.

The Department's Domestic Violence Screen contains a set of Verbal Indicators and a set of Significant Indicators of Domestic Violence.  The Verbal Indicators are questions designed to be asked of the alleged victim/parent regarding whether their partner has ever behaved in ways that signify domestic violence concerns.  The Significant Indicators include both subjective and objective factors.  The objective factors concern whether there are third party reports or criminal history of domestic violence or orders of protection.  The remaining Significant Indicators are more subjective and may be based on the worker's observations or information from the parent.  The Screen does not require accessing specific sources nor does it identify the source of information used.   For instance, while the screen asks for a description of police interactions, it does not require the worker to retrieve and review any arrest or police reports – so the information may be unreliable.

Presently, the Domestic Violence Screen does not require integrating information to assist the investigator in assessing risk using the CERAP.  In the OIG reviews, the domestic violence screening process did not depend on the compilation or discovery of relevant information.  Instead, the Screen seemed to facilitate an over-reliance on self-report of the parent to the point of ignoring information from the police, school or third parties.  Rather than assisting the investigator in assessing safety and risk to the child, the Domestic Violence Screen appears to shift the focus of inquiry to the needs of the non-offending caretaker.  The first two Assessment Questions in the Screen restate ultimate CERAP and investigative questions that cannot be reliably answered in an initial screen.  The faulty screening process does not appear to assist in informing child safety decisions.  In OIG investigations of death and serious injury, OIG investigators could not identify an investigation in which the Domestic Violence Screen contributed to assessing level of risk and safety to a child.

Although both Procedures and CERAP note that children in the household must be interviewed, the Domestic Violence Screen does not prompt integrating information from children and appears to rely heavily, and often in practice, solely, on the self-report of the victim/parent. Interviews of children can help to minimize the investigator or worker's reliance on parents' self-reports.  This is especially true in cases where the parent reports a domestic or inter-partner violent incident, but minimizes frequency and/or severity of abuse or recants disclosure.  Children's interview responses can directly contribute to an assessment of risk, safety planning, and whether service interventions are needed. The field must be cautioned, however, that a single child interview may not reveal the whole picture. Therefore it may not be realistic to expect that child protection investigators will be able to gather sufficient or complete information during a time-limited investigation.  Training for the field, however, should include trauma-based research which supports the presumption that children living with chronic domestic violence are likely to be substantially impaired emotionally or psychologically.

Whenever there are abuse allegations and violence in the home is suspected, children should always be consulted, both as to their knowledge concerning the level of violence present and also to identify child-centered collaterals to provide further information for safety and risk assessment.  The questions are important as they serve two purposes.  First, the questions allow the child to identify an adult (collateral) who can be interviewed for information, *i.e.*, indicators of violence in the family.  Second, the adult collateral can contribute to safety planning, participate in a safety net, report observations or concerns, or serve as an alternate caregiver.

Children should be consulted both to enhance information relevant to a safety and risk decision and also to inform service provision. Exposure to family violence has a devastating impact on children whether they are direct victims of abuse or witnesses to it. Children who live with violence form views about why it occurs, whose fault it is, and whether anyone from outside should intervene. Research suggests that children experience considerable anxiety not only when violence is occurring, but when they perceive certain triggers which signal that it might be imminent. Domestic violence impacts children's sense of their own safety and security, instilling fear and dread in them. Some children internalize and some externalize behavior problems.

Children have a right to have people who had protected them in the past be involved in their life when a safety threshold has been crossed causing DCFS to be involved in the family's life. A positive relationship that the child may have with a caring, non abusive adult is a protective factor in the child's life. Most children older than four years have the insight and capacity to identify persons to whom they are special and persons they can trust. Asking a child to identify their collaterals validates their insights and beliefs about who has their best interest at heart. Child-selected collaterals can be good candidates to gather information, monitor a safety plan, provide mentorship, keep eyes and ears on the child and if needed, be a placement option. By ignoring or overlooking child-centered collaterals, opportunities are missed to keep children safe. Information gathered from child interviews and child-centered collateral interviews should contribute to determining the relevance of CERAP Safety Factors when there is violence in the home.

Investigators and supervisors must presume that a child cannot safely be left in a home with a violent adult. Policy Transmittal 2010.23 *requires* investigators to consider leaving children in a dangerous environment if unproven "safety" supports are put into place, such as an escape route for the child. This Policy is at odds with CERAP principles and other Department protocol when there is violence in the home.

Because of the complexity of issues involved in families with multiple and repetitive allegations of abuse or risk of physical harm and domestic violence, the Department may need to request the assistance of Child Advocacy Centers (CAC). CAC staff perform child sensitive interviews when there are allegations of sexual or severe physical abuse. In investigations where there is chronic violence in the home and parents have failed to cooperate with services, CAC staff can interview the children and coordinate with local law enforcement and the State's Attorney.

The service assessment stage of a case must incorporate information from the children, the Domestic Violence Screen and any clinical consultations. Clinical consultations should include a review of the Client Service Plan to ensure that critical issues are being addressed.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.   Policy Transmittal 2010.23, which issues revisions to Procedures 302.260, *Domestic Violence Practice Guide*, and Procedures 300, Appendix J: *Domestic Violence*, provides for batterers to remain in the home with a domestic violence safety plan. This policy should be amended to clarify that when domestic violence has occurred in the home, it is presumed that the home environment is too dangerous for the child to remain, unless the perpetrator of violence is out of the home. Policy Transmittal 2010.23 should make clear that establishing a domestic violence safety plan for children should not preclude taking protective custody.**

The Department will clarify this language in the Policy Transmittal.

**2.  Procedures 300, Appendix B: *Reports of Child Abuse and Neglect*, The Allegations System should be amended to add the following instruction to all allegations of physical abuse.**

> ***Ask the child if there is an extended family member, another adult or caretaker that he or she feels safe with, important or special to. Persons identified by the child victim shall be interviewed.***

The recommendation will be included in revisions being made by the Procedure 300, *Reports of Child Abuse and Neglect*, workgroup.

**3.  The Department's Domestic Violence Specialists should always encourage investigators and child welfare workers to retrieve and review available information, such as police reports, and to access multiple sources to accumulate sufficient information about the degree of violence in the home.  The consultants should stress the importance of obtaining child-centered collaterals.**

The Department's Clinical Domestic Violence Specialists will continue to offer guidance in screening for indicators of domestic violence, and guidance in interviewing.  Through case consultation, Clinical Domestic Violence Specialists will encourage workers to gather pertinent information on the history of domestic violence in the case.

**4.  The Department should consider requesting the assistance of Child Advocacy Centers to interview children in investigations where there is chronic violence in the home and parents have failed in the past to cooperate with services.**

Training and/or procedures will be amended to remind investigators that the Child Advocacy Centers are a potential resource and may be helpful to families with chronic violence.  Parents have to consent to allow their child to be interviewed at a Child Advocacy Center and if they have been uncooperative, it is not likely they would agree.  DCFS will explore the efficacy of pursuing more court orders in homes with prevalent violence to compel parents to comply, and then seek use of CACs to interview those children.

**5.  The Department should explore the use of court-ordered service compliance with intact families where there is a high level of risk of future violence and lack of cooperation with Department services.**

Training and/or procedures will be adopted to ensure that the field is aware that court-ordered service compliance should be considered for families suffering from chronic violence who are non-compliant with services.

**6.  When Clinical Consultants note a critical parenting issue during an Integrated Assessment or a clinical consult, the consultants must provide written recommendations to amend the Service Plan if necessary to address critical risk or safety issues.**

The Department will ensure that managers are aware of clinical recommendations that impact child safety and that the issues are incorporated into service plans.

**7.  The Department should examine the continued utility of the Domestic Violence Screen and determine whether the Screen assists in assessing safety and risk to children.**

SACWIS 5.0 was not released as scheduled, thus the newly revised Domestic Violence Screen was not released.  The enhanced screening questions will be incorporated into the paper version of the Domestic Violence Screen and also included in updated Domestic Violence Policy and Domestic Violence Practice Guide.  The Department will work with the Office of the Inspector General to ensure that issues raised in this report are incorporated into the new Domestic Violence Screen.

**GENERAL INVESTIGATION 2**

| **ALLEGATION** | An Office of the Inspector General investigation of a private agency's handling of a foster care case prompted a review of the Department's private agency monitoring protocol. |
|---|---|

| **INVESTIGATION** | The Department's Private Agency Monitoring Division is responsible for ensuring that the agencies that are awarded contracts by the state to provide services to clients fulfill their obligations and perform their responsibilities ethically and in the best interest of the families they serve. The duties of the Monitoring Division are divided between three units; Agency Performance Teams (APT), Agency and Institution Licensing (A&I) and the Office of Financial Audits (OFA). In addition, the Department had designated a Deputy Director as the Contract Monitor, to ensure that the Agency complied with the Program Plan. The OIG review of the Department's overall monitoring functions found an absence of communication between these units that prevented the Department from developing a comprehensive evaluation of agencies' institutional health and efficacy. |
|---|---|

The Agency Performance Team (APT) staff reviewed children's records and prepared written quarterly reports. The reports consistently noted chronic caseworker turnover, which resulted in a lack of required home and school visits, failures of documentation, high caseloads and lack of supervision, since the supervisor was carrying a significant caseload. To confirm the APT staff person's findings, the APT supervisor conducted a special review of 45 foster care cases, which confirmed the findings documented in the quarterly reports. Seven children's cases had been opened for four years with a turnover of 8-11 workers per case. One family case file had no court orders, no current service plans or integrated assessments, and no school visits or school reports.

Regarding a lack of caseworkers' contact notes, the APT worker and supervisor accepted the agency management's verbal assurance that home visits had occurred, and that the lack of notes was only a reflection of the failure to document completed visits. The APT staff did not initiate a corrective action plan with the agency or recommend intake hold in accordance with monitoring procedures. After a year of knowing that the private agency had serious service delivery deficiencies, and after an A&I licensing report noted safety concerns of children in the agency's foster homes, the monitoring division allocated extensive resources (12 staff) to conduct yet another review of all of the agency's case records, which again confirmed the findings in the previous year's quarterly reports.

While the private agency seriously struggled with program instability (a foster care staff vacancy of 40% at the end of fiscal year 2011) and service deficiencies, the Department continued to assign children and their families to the agency and the agency continued to accept cases that it was not equipped to service and manage. The Department's monitoring system failed to ensure the safety of children, address identified agency deficiencies and problems, and enforce contractual and other requirements.

Although the agency had experienced long-term issues with administration, poor hiring practices and staff turnover, APT workers simply documented the instability rather than evaluate how it affected service provision. Workers routinely relied upon the self-reports of agency staff without verifying their claims and functioned more as affiliated advocates rather than as independent, unbiased evaluators. By performing perfunctory reviews of the agency's output without critical assessment, chronic shortcomings were allowed to continue unabated for an extended period of time. In an interview with the OIG, an APT worker responsible for overseeing the agency said he did not follow-up with staff about ongoing staffing issues because his, "job is to monitor, not micro-manage."

In addition, the APT supervisor provided a letter of recommendation to the agency on behalf of an individual who was later hired to a senior staff position. In an interview with the OIG, the supervisor stated he had only "suggested" the individual to the agency and had no influence over the decision to hire her. The supervisor failed to recognize the conflict of interest inherent in his advocacy on behalf of the applicant to secure a position with an agency whose contracts with the Department he monitored, which is a violation of Department Rule 437, *Conflicts of Interest*.

The continued reliance upon the agency's assertions without verification allowed fundamental issues to remain unaddressed for years. By taking a passive approach, monitoring workers failed to identify problems that directly affected the agency's ability to provide meaningful services. When contacted by the OIG, the Deputy Director designated as the Contract Monitor stated that she did not perform any monitoring function separate from APT and relied on their reports. The monitoring was characterized by a lack of coordination between units and failure to respond to identified agency problems.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The current agency monitoring system fails to ensure safety of children, address noted agency deficiencies and problems and enforce contractual and other requirements. The Department should replace the existing monitoring system with a single coordinated system designed to competently evaluate agencies' performance, define the problem and develop solutions, and react to child safety concerns based on fact-gathering confirmatory measures. An effective monitoring system must combine and integrate programmatic, financial, licensing and contractual monitoring functions.**

Implementation of this recommendation will be a component of the new monitoring design.

**2. The Office of Field Audits should evaluate the private agency's program and personnel expenditures given the rate of staff turnover in fiscal year 2011.**

The Office of Field Audits conducted an onsite audit June 18-22, 2012. OFA evaluated the Agency's program and personnel expenditures given the rate of staff turnover in fiscal year 2011. The Program Monitor sent the OFA Auditor a report dated May 24, 2012, which stated that although the Agency had a turnover of staff in 2011, at the date of this report, the Agency was fully staffed. (The turnover in 2011 was 2 workers in March, 2 in May and a supervisor in November.) The Agency's CFR for fiscal year 2011 did not show any excess funds, in fact the Agency had a deficit at that time, which means any funds that were not used for salaries were used for other allowable costs.

*OIG Response:* The field audit did not cover the first 6 months of FY 2011 as identified in the report in which the Agency experienced a high staff vacancy.

**3. The Department should counsel the APT supervisor for submitting a personnel recommendation to an agency he monitors.**

The employee has been counseled.

**GENERAL INVESTIGATION 3**

| | |
|---|---|
| **ALLEGATION** | The Office of the Inspector General received a complaint alleging the Department's plan to reunite a seven-year-old child with her father in Mexico violated her mother's parental rights. |

| | |
|---|---|
| **INVESTIGATION** | The mother had brought the child to the United States four years earlier without the father's permission. Upon arrival in the United States, the mother arranged for the |

child to reside with a family unknown to the mother, so that the mother could travel with her boyfriend. The child remained with the unrelated family until the age of six, when the mother resumed primary care.

A year later, a school social worker called the hotline to report the mother was taking so much pain medication she was unable to care for her daughter. The seven-year-old child spent days in front of the TV and cooked her own meals because the mother slept all day. The child confirmed the allegations. The investigator observed the mother to be incapacitated by pain and in possession of a large bag of prescription medication. The mother reported taking medication every two hours. She told the investigator the child would be better off with her father in Mexico and provided the investigator with the father's contact information. The investigator did not document the mother's medication or obtain medical records from any health care providers. The investigator assessed the child's situation as safe based on the mother's promise that she would arrange alternate care for the child over the weekend. The investigator failed to reassess her decision when she returned days later and learned that the girl had remained with her incapacitated mother. The child remained in her mother's care unmonitored for most of the investigation. The child's father told the investigator he was able to care for her in Mexico. The mother was indicated for inadequate supervision and referred to Intact Family Services.

At some point, the mother left the child with an aunt. The mother refused to disclose her whereabouts, did not engage in services, and did not maintain regular contact with her child. The intact worker contacted the father and coordinated a study of the father's home by Mexico's Agency for Integral Family Development, through the Mexican Consulate. While the intact worker waited for word from the Mexican Consulate, the aunt was unable to continue the child care arrangement because she was unable to afford the cost of babysitting while she worked. The mother was unwilling to resume care of her child and orally agreed with the intact worker's plan to seek voluntary substitute care for the child through a private agency. The mother failed to attend a meeting to complete the intake forms for the program, which required the signature of the child's parent/guardian to appoint a short-term legal guardian with power of attorney for health care. The intact worker facilitated the form being signed by the aunt, who was not the child's legal guardian. The form was in English, while the aunt's primary language was Spanish.

The child lived with the voluntary host family for two weeks before the program received notice of adult family members' background clearances. Her stay with the host family lasted several months while the study of her father's home was completed. The entire process, from obtaining the home study to securing a travel visa to the United States, took six months. The father arrived in the United States and took the child back to his family in Mexico.

During the course of the child abuse/neglect investigation and the intact family case, questions about the mother's prescription drug abuse went unresolved. The mother's medical record indicated she had been seen by several doctors for a variety of complaints. She suffered from depression, generalized anxiety disorder, and a sedative addiction. She had obtained prescriptions from several providers for pain and anxiety medication. According to her medical record, she was experiencing side effects, such as sleepiness, mental confusion, and memory impairment around the time of the investigation which interfered with her ability to care for her daughter.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The private agency must develop policy and procedure to comply with its Contract and ensure that host families have passed all necessary background checks prior to a child's arrival.**

The Office of the Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors. The Inspector General will meet with agency management and a representative from the Board of Directors to discuss the findings and recommendations made in the report.

**2. The intact worker and supervisor must be counseled regarding their improper use of the program's form and having the aunt sign as guardian and the failure to ensure that the form was completed and filed in the aunt's primary language - Spanish.**

The intact family services worker and supervisor were counseled.

**3. The child protection investigator and supervisor should be counseled for the faulty safety assessment.**

Counseling is pending for the child protection investigator and supervisor.

**4. The Department should announce that DCFS Nurses can be a resource for assistance during child protection investigations where prescription drug abuse is suspected.**

An announcement has been placed on the D-Net. All training sessions relative to the centralized nursing referral process are placed on the D-Net with applicable dates and training dates are included in the Monthly Nursing Notes Newsletter.

**GENERAL INVESTIGATION 4**

| ALLEGATION | The State Central Register (SCR) failed to initiate an investigation regarding a 13-year-old girl who disclosed sexual abuse to a mandated reporter. |
|---|---|

| INVESTIGATION | The mandated reporter contacted SCR after the girl confided to her that on two occasions while he was intoxicated, the girl's father had engaged in physical |
|---|---|

behavior towards her that made her uncomfortable.  The girl stated her father had pressed his body against hers while the two were in the same bed; and, on another occasion, had entered her bedroom and rubbed her leg, while "looking at her weirdly."  The girl was distraught while speaking with the mandated reporter and relied upon the assistance of a friend to convey her account of events.  Following her conversation with the girl, the mandated reporter called the hotline and was told by the operator who received the call that the report would be accepted and that a child protection investigator would conduct an interview with the girl the same day.  At the end of the day, after no interview had taken place, a second call was made to the hotline, at which time it was learned the report had in fact not been accepted for investigation.

In an interview with the OIG, the SCR supervisor on duty at the time the initial call was received stated she had denied the operator's request to assign the report for investigation.  The supervisor stated that since there was no information in the narrative of the call that was explicitly sexual, the report did not meet the standard for opening an investigation.  In explaining her decision, the supervisor allowed that, while such behavior under some circumstances could be construed as being sexual in nature, it had not been established that it was the father's intent to derive sexual gratification from his actions.  The supervisor stated that given the girl's age, she was old enough to identify sexual behavior; and, since she had not expressly described the events to the mandated reporter as such, the call could not be accepted for investigation.  The supervisor stated that while the girl, according to the mandated reporter, was upset and crying at the time she related her account, it was common for girls her age to be uncomfortable with their parent's behavior, particularly when they were expressing their feelings.  The supervisor also said that she did not identify the father's intoxication on both occasions the incidents allegedly occurred as a concern, because people who are drinking alcohol are more likely to be affectionate towards others.

The supervisor instructed the SCR operator to reclassify the hotline call in the category of Mandated Caller No Report Taken (MCNRT) and resubmit it for approval.  After being reclassified, the hotline call was resubmitted and accepted by the acting SCR supervisor as an MCNRT while the primary supervisor was away from the call floor.  In a separate interview with the OIG, the acting supervisor stated she had the authority to accept the revised submission as a full report, but did not do so, as she concurred with the supervisor's original conclusion.  The acting supervisor stated that an allegation of behavior that might be inappropriate and possibly sexual in nature is insufficient to prompt an investigation.

The OIG enlisted the assistance of professionals from three Child Advocacy Centers (CAC) to assess the allegations made in the initial call by the mandated reporter.  Based on redacted copies of the SCR narrative submitted to the supervisor, representatives from all three CACs expressed their professional opinions that the issues raised in the call warranted full investigation and that a Victim Sensitive Interview (VSI) of the girl could have helped determine what risk factors, if any, were present in the home.

Although SCR purports to record all incoming calls, "for purposes of quality assurance," the OIG learned during its investigation that the system for recording calls had begun failing one year earlier and had been completely inoperative for the previous nine months.  The OIG was informed by Central Management Services (CMS) that the cost of repairing the system was prohibitive and a decision had been made to wait until an expected transition to a system utilizing new technology was implemented.  The new system was

anticipated to be in place in another eight months, bringing the total time the call recording system was either dysfunctional or defunct to twenty months.  As the recording and preservation of SCR calls is a crucial element in ensuring the needs of the public are met, the absence of a functioning monitoring system for an extended period of time compromises the integrity of the hotline and puts both callers and operators at risk.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.    The Department should determine if the State Central Register's operating interpretation of applying a standard that a hotline caller must give evidence that behavior was committed for sexual gratification before a hotline call is accepted for risk of sexual harm is correct.**

The Department is converting the call floor manual into procedures and will review this information for possible inclusion.

**2.  If the Department determines that suspicion of risk, rather than evidence of risk, are sufficient criteria to accept a report, the Department should request the assistance of Child Advocacy Centers to train SCR staff on red flags that warrant investigation of sexual abuse.**

The Department is converting the call floor manual into procedures and will review this information for possible inclusion.

**3.  The Department should make it a priority to expedite the start-up date of the SCR recording system.**

The new State Central Register telephone system has been installed and is operational.

**GENERAL INVESTIGATION 5**

| **ALLEGATION** | A Child Protection Investigator falsified contacts with the subjects of a report of physical abuse of a 16 year-old developmentally disabled boy. |
|---|---|

| **INVESTIGATION** | The investigator was assigned to a report regarding a physical altercation in the family's home between the boy and his 19 year-old brother. |
|---|---|

In her case notes, the investigator documented that she went to the family's home and interviewed the 16 year-old who told her he had intervened in an argument between his mother and his older brother, who was intoxicated. The investigator recorded quotes she attributed to the boy regarding the incident and noted she observed an injury to the 16 year-old's eye. The investigator ultimately indicated the report against the brother for risk of physical injury/environment injurious to health. She also documented an interview with the boy's father, brother and a school counselor.

The brother appealed the finding, and in court the 16 year-old denied ever having spoken with the investigator. During her testimony, the investigator maintained she had spoken with the boy but stated she had recorded the contact incorrectly and had actually interviewed him at his school. In interviews with the OIG, school personnel denied the investigator had met the boy at the facility and contradicted her description of her process of locating the boy. School personnel stated that all contacts between students and Department workers are recorded and must follow a protocol, in opposition to the investigator's account of being directed to the boy by an unidentified employee and speaking with him privately. In an interview with the OIG, the boy's father stated that on the day in question he had picked the boy up from school prior to the time the investigator said she spoke with the boy at that location. An OIG review of photos taken of the boy's injuries on the day of the altercation found no evidence he had suffered any damage to his eye. The father and brother also denied having been interviewed. The school counselor recalled speaking with the investigator about a different student, and noted she would never have provided information about the victim because he was not a student she had responsibility for.

| **OIG RECOMMENDATION / DEPARTMENT RESPONSE** | **The child protection investigator should be discharged from the Department for falsification of investigative notes.** |
|---|---|

The employee was discharged. The employee relinquished her Child Welfare Employee License.

## GENERAL INVESTIGATION 6

| ALLEGATION | Multiple child protection investigations were initiated in response to a hospital's care of a newborn boy whose parents' religious beliefs prevented them from consenting to treatment. |
|---|---|

| INVESTIGATION | The infant was born with Trisomy Eighteen, a genetic disorder which included a detached esophagus requiring immediate surgery. |
|---|---|

While the parents consented to the surgery, doctors later determined the infant needed a blood transfusion, and his parents refused to consent to the procedure on the grounds of their religious beliefs. Based on the medical opinion of treating physicians who concluded the boy would die without the procedure, hospital staff took protective custody of the newborn in order to administer the procedure.

In accordance with the Abused and Neglected Child Reporting Act (ANCRA), hospital staff contacted the State Central Register (SCR) to report the boy had been taken into protective custody because of the religious beliefs of the parents, but did not raise any other concerns regarding the boy's safety or care. Although the Department is required to investigate allegations of abuse and neglect, ANCRA provides a specific exception for cases where the sole reason for protective custody being taken is to provide necessary medical care for children whose parents will not consent because of their religious beliefs. Despite the absence of any other concerns regarding the parents' care of the child, the Department opened three full child protection investigations of the family in response to the three occasions SCR was notified when the hospital took protective custody in order to perform necessary medical procedures. The boy died just three weeks after his birth, as a result of his complex medical issues.

During the course of the multiple child protection investigations, hospital staff expressed concern that the Department's involvement in the situation constituted an intrusion upon the family and was a hardship during a difficult time. Staff also stated the Department's approach was a departure from previous practice. Hospital staff said that previous cases had been referred by the hotline directly to the State's Attorney's Office for petitions without the initiation of child protection investigations.

In an Inspector General's interview, an SCR administrator stated it was Department policy to initiate full investigations whenever a physician has taken protective custody of a child citing the parents' refusal to consent to treatment for religious reasons. An Inspector General review of the three child protection investigations, including two parallel investigations in the family's home county, found that members of the boy's immediate family were interviewed a total of five times. Two of those interviews were conducted with the boy's six-year-old brother, who was consistently reported to be well cared for. Investigators also conducted numerous interviews with hospital physicians and staff and held 13 internal supervisory or managerial consultations. All three investigations were unfounded based on an absence of any information suggesting abuse or neglect of the infant or his brother.

In an interview with the OIG, an Assistant State's Attorney from the county where the hospital is located stated it is standard practice in that office to pursue a petition for custody on the basis of physicians' testimony and that a child protection investigation is unnecessary.

| OIG RECOMMENDATION / DEPARTMENT RESPONSE | **The Department should initiate a policy that whenever the hotline is notified by a physician that protective custody has been taken of a minor because the parents' religious beliefs do not** |

**permit them to consent to necessary medical procedures, the information should be transmitted to the State's Attorney's Office without an intervening investigation, unless additional information in the report suggests abuse or neglect.**

Revisions to Department procedures are pending.

## GENERAL INVESTIGATION 7

| ALLEGATION | A child protection investigator placed a one-week-old infant in the home of her paternal grandmother without properly assessing the living environment or ensuring the presence of adequate sleeping arrangements. |

| INVESTIGATION | The infant girl's family had an extensive history of involvement with the Department. |

The infant girl's family had an extensive history of involvement with the Department.  The girl's mother had been the subject of multiple indicated reports, including inadequate supervision and wounds by neglect, and her parental rights had been terminated as to her three oldest children.  A fourth child had died of natural causes nine years earlier.  At the time of the girl's premature birth, the mother tested positive for cocaine and the baby required immediate treatment for respiratory complications.  The girl's birth prompted a call to the State Central Register (SCR) and a child protection investigator was assigned to the case.

The child protection investigator spoke with hospital staff and was informed the girl's low birth weight prevented her from being discharged at that time.  Hospital staff anticipated the girl would be released the following week.  The investigator identified the girl's paternal grandmother as a possible placement and went to the grandmother's home to conduct an assessment.  Although the investigator completed a Home Safety Checklist documenting the visit, she did not review the document with the grandmother or obtain her signature affirming her understanding of the document.  In an interview with the OIG, the investigator stated she did not have a Home Safety Checklist with her at the time of the visit.  On the Checklist, the investigator noted the absence of a crib in the home and that she had instructed the grandmother to have the premature infant sleep in an unoccupied adult bed until a crib could be obtained.

Although the lack of adequate sleeping arrangements was immediately identified as an issue in the home, a crib was not acquired for the girl until two months after she had been placed.  In her Inspector General interview, the investigator stated that her Department field office had exhausted its allotment of cribs; therefore, none were available to offer to clients.  The Inspector General investigator learned from an administrator at the field office that once the initial supply of cribs had been distributed, no more were provided to the facility until the following fiscal year. The investigator's supervisor confirmed there had been no cribs available for clients and that he had approved the decision to allow the premature infant to sleep in an adult bed.  The supervisor stated he was able to provide a crib to the home, two months after the girl was placed, when another client returned one to the field office.  Earlier the same day the crib was delivered, the girl's Guardian *ad litem* had observed the infant in the home, lying on her stomach in a plastic drawer surrounded by blankets and pillows, an unsafe sleeping environment.

The report against the mother arising from the girl's birth was ultimately indicated for Risk of Injury by Neglect.  During the one-week period before the report was closed, the investigator completed four electronic Child Endangerment Risk Assessment Protocol (CERAP) Safety Determination Forms documenting her assessments of the girl's safety throughout her work on the case.  An OIG review of the case file found no hard copies of any of the CERAPs.  All of the electronic CERAPs had been approved by the investigator's supervisor during the week they were created.  In an interview with an Inspector General investigator, the grandmother denied ever receiving or signing any of the CERAP plans.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  The child protection investigator should be disciplined for failing to follow Procedure 300, Appendix G: *Child Endangerment Risk Protocol*.** |

The employee received a 7-day suspension.

**2.  The child protection investigator should receive non-disciplinary counseling for permitting inappropriate sleeping arrangements.**

The employee received a 7-day suspension.

**3. The child protection investigator's supervisor should receive non-disciplinary counseling for failing to ensure the girl had safe sleeping arrangements.**

The employee was counseled.

**4.  The Department needs to maintain a centralized system of reserve cribs in each region for emergency situations when crib supplies have been depleted in a particular office.**

The Division of Child Protection has a centralized system of reserve cribs.  A reminder memo was issued to investigative staff and posted as an announcement on the D-Net.

**GENERAL INVESTIGATION 8**

| ALLEGATION | A six-year-old girl was not seen or assessed for safety for three months following a hotline report from the police alleging that they found child pornography on her father's computer. |
| --- | --- |

**INVESTIGATION**   The father of the six-year-old brought a computer to a retail store to have files backed up. While transferring files, the retail store employee noticed files containing child pornography and contacted law enforcement. The hard drive was impounded for forensic evaluation. Over one year later, the results of forensic analysis were made available and the police contacted the hotline. Though the police investigator documented telling the SCR operator that the father had a six year-old child, the operator did not record the name or age of the child. The parents' names and address were provided.

Child protection records indicate there was one attempted contact with the alleged victim one day after the hotline call was made, but no one was home. Department procedure requires that after a failed attempt to see the victim, the investigator should continue daily attempts until the alleged victim is seen.  Two days after the first attempt, the child protection supervisor documented an investigative plan and noted that the minor remained unidentified. The alleged victim was not seen and assessed for safety until three months after the hotline call.  According to caseload data, the child protection investigator was over allowable caseload limits for the entire time the case was open.

Though no investigative activity had been conducted, 60 days after the hotline call, an extension request was approved for the investigation by both the supervisor and manager. The supervisor and manager told Office of the Inspector General investigators that they thought the child had been seen, but the activity had not yet been documented. The supervisor and manager explained that the child protection investigator had a history of completing tasks but failing to document investigative activities in a timely manner, attributing the failure to poor computer skills.

During the three months that no investigative activity took place, police records indicate that the father was in the home with his daughter all but one day, when he was arrested and released on bail the following day. A safety plan was initiated three months after the hotline call. The family agreed the mother and child would stay with the maternal grandparents. Almost a year and a half after the police were alerted to the father's child pornography and eighty-eight days after the hotline call, the alleged victim participated in a victim sensitive interview. The child denied any sexual abuse. The father was indicated for substantial Risk of Sexual Injury and Intact Family Services were opened while the safety plan remained in place. The criminal trial for the father is pending.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**   **1. The Department should counsel the Child Protection Investigator for failing to see and assess the safety of the alleged victim in a timely manner. Her counseling should be mitigated by the fact that she was assigned 53 cases in a three month period.**

The counseling is pending.

**2.  The Department should discipline the supervisor for approving and requesting an extension without establishing that the child was seen and a safety assessment completed. The supervisor's discipline should be mitigated as she supervises eight investigators with high caseloads.**

The discipline is pending.

**3.  The Department should discipline the manager for failing to provide a check and balance system by not questioning whether the child had been seen prior to approving the extension. The manager's discipline should be mitigated by the fact that she regarded the supervisor and investigator as hard working, trusted employees who were committed to their job, coming in on their days off without compensation in an attempt to discharge their duties.**

The child protection manager retired from DCFS.

**4.  In situations when the hotline reporter does not know the specific age of the child victim, the SCR operators should attempt to determine an age range and document this questioning.**

State Central Register call floor staff will ask pertinent questions such as the child's grade in school in efforts to pinpoint an age range of the child victim.  The Reporter's responses will be documented in the intake narrative.

**5.  Child Protection supervisors should be trained to manage and triage SACWIS alerts for their teams. Any alerts indicating that a child has not been seen within five days must be immediately addressed to insure the child's safety.**

This recommendation will be included in revisions being made by the Procedures 300, *Reports of Child Abuse and Neglect*, workgroup.

**GENERAL INVESTIGATION 9**

**ALLEGATION**    The Inspector General received a complaint from an adoptive mother regarding reimbursement for the special needs summer camp that her 15-year-old medically complex son attended. The mother stated that her son's DCFS adoption subsidy contract specified reimbursement for the camp, and that in past years DCFS had provided the reimbursement, but that DCFS refused to provide reimbursement for the 2011 fees because she failed to get pre-authorization for the cost.

**INVESTIGATION**    A now 15-year-old boy who suffers from numerous medical complexities, including cerebral palsy and spastic dystonic quadriplegia, was taken into DCFS custody at birth when he was born premature at 29 weeks, was drug exposed and was diagnosed with both Respiratory Distress Syndrome and Fetal Alcohol Syndrome. He was adopted at age five into the family that had previously adopted two of his siblings. A six-page addendum to his adoption subsidy agreement explains his vast and complicated medical history and also speculates about future medical and therapeutic treatments he would likely need. The addendum specifically stated that he would need "summer camp/day camp at a facility that is equipped to meet his special needs and medical requirements." This need is further articulated in a 2002 physician's report. The Adoption Addendum states: "All medical psychiatric, psychological, behavioral, assessment, treatments, medical equipment, medicines, hardware/software, therapies, individual, group and family counseling needed due to pre-existing conditions/adoption related issues will be covered by the department [sic] if not covered by the medical card."

The teen attended the same two-week summer camp in 2009 and 2010 and received reimbursement from the Department. The Department refused, however, to provide reimbursement for the summer camp expense in 2011 because the family failed to receive pre-authorization for the cost from the DCFS Post Adoption Unit. DCFS Management contended that under Department Rule 302.310(c)(4), pre-authorization was required for any cost not specifically written into the adoption agreement.

A review of the teen's adoption agreement and addendum revealed that the cost of special needs summer camp *was* written in the agreement, and as such the family was not required to seek preauthorization for the cost of the summer camp. The Inspector General further found that if pre-authorization requirements did apply in this case, the Department should have notified the adoptive parents in writing that this requirement would be enforced in the future, as there is no such language in the adoption agreement or related paperwork that would advise them of the requirement and how it differed from prior practice.

**OIG RECOMMENDATION / DEPARTMENT RESPONSE**    **The Department should reimburse the family for the $800 cost of the summer camp session.**

The adoptive parents have been reimbursed.

**GENERAL INVESTIGATION 10**

| ALLEGATION | A private agency permitted a two-year-old foster child to be cared for primarily by the unlicensed adult daughter of the foster mother. |
|---|---|

| INVESTIGATION | A three-month-old infant was placed with a private agency foster mother who had recently adopted another child. |
|---|---|

Within three months of the infant's placement, an integrated assessment clinician warned that there were significant concerns with the foster mother. The foster mother was not the primary attachment figure for the infant. Rather, the foster mother left the infant with her unlicensed adult daughter. The adult daughter lived in another household and cared for the child in her home more than half of the time. The private agency had high caseworker turnover; seven case managers were assigned to this child's case over a twenty month period. All of the child's case managers and supervisors were aware of the arrangement, but no one remedied the situation despite the early alert of the dereliction of the foster parent's duty to raise the child. Only one caseworker provided consistent documentation and visits. She was removed from the case for sharing too much information with the Assistant Guardian *ad Litem*.

The adult daughter's home was not licensable because her live-in son had a criminal felony conviction that was a bar to licensure. The agency management stated they were unaware that the son used the home as his legal residence and presumed that the adult daughter's home was licensable. They considered the situation a technical violation of a licensing procedure. The private agency was in violation of the Child Care Act that requires private agencies to report to the Department when a child it has placed in a foster home no longer resides in that home.

While the child was placed in the foster home, her biological mother gave birth to a sibling. Just prior to the birth, there had been an incident of domestic violence in the birth parents' home. In addition, the mother had serious mental health issues and the father had felony convictions that included weapons offenses. Despite these factors, when contacted by a child protection investigator, a manager at the agency stated that there would be no risk to the baby if allowed to return home with the mother.

The Office of the Inspector General issued an interim report before its final report to alert the Department that the toddler was actually living in a non-licensed home where a convicted felon resided and that the child could no longer be cared for in this home.

OIG investigators also learned that the foster mother maintained an active daycare license, but never operated a daycare.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The agency must address its failure to respond to the known license violations resulting from the child staying in a non-licensed home and the agency's failure to determine the composition of the daughter's household, and, specifically, whether her son lived there.** |
|---|---|

The Office of the Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors. The Inspector General will meet with agency management and a representative from the Board of Directors to discuss the findings and recommendations made in the report.

**2. Managers at the agency should be disciplined for failing to respond to child safety concerns, ignoring information that the foster mother and her daughter were violating licensing Rules by having the child stay in a non-licensed non-relative home, and that case managers were not visiting the foster home on a monthly basis.**

The Inspector General will meet with agency management and a representative from the Board of Directors to discuss the findings and recommendations made in the report.

**3.   The manager should be disciplined for advising a caseworker not to share information with a child's attorney (GAL) and for the decision to remove the caseworker and for mischaracterizing the risk factors as they applied to the new child when interviewed by the child protection investigator.  One caseworker provided the only consistent case management to the family.  The decision to remove the worker set into motion another stretch of failure to provide services.**

The Inspector General will meet with agency management and a representative from the Board of Directors to discuss the findings and recommendations made in the report.

**4.  The license of the foster mother should be revoked.**

Application for renewal of her foster home license has been denied.

**5.  The Department should pursue a voluntary surrender of the foster mother's day care home license. If the foster mother refuses to surrender her license, the Department should deny the renewal of the day care license.**

The Department will encourage withdrawal of the pending day care home renewal application.  If the applicant does not agree to withdraw the renewal application, Day Care Licensing will initiate enforcement.

**6.   The Department should prioritize its daycare licensing responsibilities to focus on allocating resources to monitor daycare homes that are currently operating.**

This will be a component of the new monitoring design.

**From the Interim Report:**

**The agency should immediately ensure that the child no longer goes to the home of the daughter. With the assistance of the agency, the licensed foster parent must arrange appropriate day care for the child. The child should be prohibited from the home of the daughter; however, the daughter should be permitted to have contact with the child in the home of the foster mother pending the outcome of a full investigation.  The Department should deny the foster home license application of the daughter.**

The adult daughter was notified that her application for licensure would be denied.  The agency initially submitted a supervision plan to address these issues, but then determined that the plan was not workable and the child was removed from the licensed foster home by the agency and placed with a sibling.

**GENERAL INVESTIGATION 11**

| | |
|---|---|
| **ALLEGATION** | A woman who held a contract with the Department misrepresented herself as a Department employee and utilized Department resources to facilitate work she performed for a secondary employer. |

**INVESTIGATION**

The woman had been a Department employee for over two decades prior to her retirement twelve years earlier. Following her retirement, the woman contracted with the Department to serve as a facilitator for the Child And Youth Centered Investment Team (CAYIT), which required her to report to Department field offices three days a week in order to perform her duties. In addition to her work for the Department, the woman engaged in secondary employment completing home studies for couples seeking adoptions through private agencies. Although the woman's work on behalf of these families was outside the scope of her work for the Department, she conducted business from the Department field offices and used the Department's information infrastructure in order to complete tasks for her outside clients. The woman routinely submitted the Department's CFS 718 Authorization for Background Checks form to cause the Department to run background checks for her private business.

In an interview with the OIG, the woman acknowledged using Department resources to conduct background checks on behalf of her clients pursuing private adoptions. The woman stated she had utilized the Department system because she was familiar with it and did not know how else to obtain the necessary information. Despite her years of experience in the field, the woman stated she was unaware of other means of obtaining background checks and fingerprint records until she was instructed how to do so by a Department employee. An OIG review of the woman's records found that since her retirement she had made 24 requests for background checks for private adoption clients using the Department's CFS 718 form. The woman stated she was aware her use of the forms to facilitate private adoptions was wrong.

**OIG RECOMMENDATION / DEPARTMENT RESPONSE**          **The Department should cease contracting with the woman.**

The contract was terminated.

**GENERAL INVESTIGATION 12**

| | |
|---|---|
| **ALLEGATION** | The Office of the Inspector General investigated a complaint that parents were not allowed visitation with their infant son for two months without their agreement or a court order. |

**INVESTIGATION**    Hospital staff contacted the hotline after noting bilateral subdural hematomas to the skull of a two-month-old child. The next day, hospital staff contacted the hotline to report additional healing fractures found from a skeletal survey of the infant as well as bilateral retinal hemorrhages, indicating that the infant may have been abusively shaken. Rather than taking Protective Custody of the infant, the investigator developed a safety plan, by which the infant would be cared for by unrelated family friends. The safety plan prohibited all contact with the infant's parents. The plan was to last for two weeks. The parents orally agreed to the plan, but never signed it. The plan continued, without visitation from the parents and without their consent for 43 days after the expiration of the agreed upon two-week period. When questioned by the parents' attorney, the investigator falsely claimed that her supervisor had required her to institute the overly restrictive plan. While there was a legitimate reason to require supervised visitation, it was not in the best interests of the infant to prohibit even supervised visitation with the parents. The investigator failed to monitor the invalid safety plan and had never disclosed to her supervisor that the plan prohibited all contact with parents. The OIG investigation also discovered incorrect information entered on the DCFS database (SACWIS) system.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**    **1.  The investigator should be disciplined for implementing a safety plan that prohibited the parents from any visitation with their infant for 57 days; for not explaining the voluntary nature of the safety plan to the parents and obtaining their agreement signatures on the safety plan and giving them a copy; for failing to obtain supervisory approval for prohibiting all contact between the parents and their infant; for misleading their attorney to believe that the prohibition of contact was at the direction of her supervisor; for failing to reassess the infant's safety every five working days; and for failing to personally monitor weekly the infant's safety in the other home.**

The child protection investigator received a 10-day suspension.

**2.  SACWIS should be amended to correctly identify the father in this case.**

The amendment has been completed.

## GENERAL INVESTIGATION 13

| | |
|---|---|
| **ALLEGATION** | The Inspector General received a complaint that a DCFS employee was not performing his job duties. |

**INVESTIGATION**   The employee's job description required him to hold either a Masters degree in Social Work and three years of professional child welfare experience or a Masters degree in a related field and four years of professional child welfare experience. The employee did not have a Masters degree. In reviewing his personnel file, OIG investigators noted that on the employee's CMS Employment Application under "Technical/Professional License," he listed himself as a "Social Worker" with a license number issued by the State of Illinois. In order to hold a social work license, one must first hold a Masters degree in Social Work. The employee confirmed to OIG investigators that he did not hold any Masters Degree. The license number listed was the Department's license for providing training.

Since the complaint alleged that he was not performing his job duties, OIG investigators reviewed the employee's DCFS email records for a 3.9-year period. Prohibited uses of electronic mail and internet are outlined in Section 20.5 of Administrative Procedure #20 and DCFS employees are asked to confirm their understanding of the restrictions by signing the "Electronic Mail/Internet Usage/SACWIS Search Function Certificate of Understanding." Among the regulations detailed in Administrative Procedure #20, it is a violation to "Sen[d] electronic mail that is considered offensive to any individual or group or accessing Internet websites for non-business purposes" and further that "Unauthorized use of Internet access is not limited to business hours. DCFS equipment cannot be used for non-business purposes." In his OIG interview, the employee confirmed his signature on the "Electronic Mail/Internet Usage/SACWIS Search Function Certificate of Understanding." The investigation disclosed that the employee had used DCFS documents, email, and his official position for his personal benefit, and he frequently spent time during the day writing and responding to hundreds of lewd and inappropriate emails. The OIG's review of the employee's state email account revealed hundreds of non-work related emails that included highly sexualized content; were demeaning towards women; were related to a personal romance or relationship; or were regarding miscellaneous personal business.

Additionally, the employee used DCFS resources to help a friend engaged in a custody battle. The employee also used DCFS letterhead to issue a personal letter to the private employer of his daughter's mother, which made it appear that the Department was requesting the woman's presence in Illinois.

| | |
|---|---|
| **OIG RECOMMENDATION/ DEPARTMENT RESPONSE** | **The employee should be discharged for his violations of DCFS Rules and Regulations including:** |

    a. **Falsifying his CMS Employment Application;**
    b. **Using DCFS letterhead for personal use (abuse of authority);**
    c. **Using DCFS resources to draft a legal motion for a friend; and**
    d. **Repeatedly using his assigned DCFS computer and state email account for personal and inappropriate purposes.**

The employee was discharged.

**GENERAL INVESTIGATION 14**

| ALLEGATION | A child protection investigator appeared intoxicated while performing her duties and behaved in an unprofessional manner. |
|---|---|

| INVESTIGATION | The child protection investigator was assigned to a report of possible physical |
|---|---|

abuse of a 14-year-old girl by her mother.  The investigator learned the girl was at school and arranged an interview with her to meet the 24-hour period mandated by law within which to see the alleged victim.  In an interview with Inspector General investigators, the school administrator, who first spoke with the investigator over the phone, described her as being combative and dismissive of the girl's claims.  The administrator stated the investigator pursued a line of questioning that seemed focused on blaming the girl.  Although the administrator stated she conveyed a positive opinion of the girl's conduct, and mentioned a minor disciplinary infraction in passing, the investigator documented in the case record that the girl had a history of disruptive behavior and anger control issues.  Later the same day, following the phone call, the investigator went to the girl's school.

The administrator, the girl's teacher and other school staff who were present described the investigator as arriving at the school visibly intoxicated, smelling of alcohol, having an unsteady gait and slurring her speech. School staff described the investigator's behavior as confrontational from the outset as she demanded to interview the girl in private and ordered school personnel out of the room.  The investigator relented after staff protested that the girl had asked the school administrator to remain with her during the interview, and she had the right to have a person of her choosing present.  School staff had an ongoing relationship with the family and had previously arranged for the girl to spend nights in the home of her teacher with the consent of her mother, in effort to provide respite from stress factors present in the home.  Although the mother and school staff had agreed that the girl could stay with the teacher that night, the investigator opposed the plan.

The investigator documented that she performed a body check of the girl to observe her injuries; however, the girl complained to her teacher that the investigator, "didn't even look at her marks."  When the girl's mother arrived at the school, she acknowledged to the investigator having struck her daughter with an extension cord. The mother also informed the investigator of her desire to have the girl spend the night at the teacher's home, and expressed her belief that if the girl was returned to her that night, she would likely suffer further physical abuse.  Despite the mother's admissions, the investigator documented the girl only received minor scratches to her arm and that her story of being whipped with an extension cord was not plausible.  Photos of the girl's injuries taken by her teacher at the time of the incident, and obtained by the Inspector General's Office clearly showed injuries more extensive than those recorded by the investigator.  The investigator hypothesized that poor lighting in the room where she examined the girl might have prevented her from identifying the extent of the injuries.  The investigator stated she was informed upon her arrival at the school that the girl would be spending the night at the teacher's home and that the teacher needed to leave in order to pick up her son from day care.  The investigator felt school staff was attempting to usurp her authority and restrict her ability to perform her duties.

In response to concerns regarding the investigator's conduct, the school administrator contacted the State Central Register (SCR) alleging the investigator was behaving inappropriately while performing her duties. SCR informed the administrator that their complaint would have to be made to the child protection manager who oversaw the investigator's team.  After an initial unsuccessful attempt, the administrator spoke with the manager who stated the complaint would have to be made to the investigator's supervisor.  The administrator was unable to reach the supervisor and left her a message apprising her of the situation.  As the conflict with the investigator worsened, the administrator asked the teacher to contact local police to report the investigator was attempting to make professional decisions regarding the welfare of a child while intoxicated.  A second

call was made to the investigator's supervisor to report the request for police intervention; however, the call again went unanswered.

After learning from school staff that police had been called, the investigator made multiple calls from her cellular phone before forcing her way past school staff to the parking lot.  School staff reported the investigator entered a vehicle driven by a man who shouted obscenities at them before pulling away.  The investigator initially denied making any calls prior to leaving the school and stated she had driven herself to the location.  The investigator later amended her account, acknowledging she had called a male friend prior to leaving the school and that he arrived in possession of a set of keys to her car.  The investigator identified the man who drove the car she left the school in as the friend she had spoken with on the phone, but denied he had been abusive towards school staff.  Neither the supervisor nor the manager investigated the allegation that the investigator had been intoxicated or followed up with school staff, law enforcement or the investigator.

A review of the investigator's work history found a pattern of failing to follow-up to see the victim after a first failed attempt to see the victim.  Inspector General investigators were unable to verify the investigator's documentation of her attempted "good faith" contacts, as she did not complete travel itineraries or submit travel vouchers for reimbursement.

The report of the mother's abuse of the girl was transferred to a second investigator.  Five days after the case was transferred, the girl went to live with her father in another state.  The report against the mother was ultimately unfounded.  The girl has since returned to Illinois and resides in her mother's home.

---

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.   The State Central Register should have a protocol of immediately and proactively connecting a mandated reporter to the child protection manager on duty when the mandated reporter alleges that an investigator is currently behaving inappropriately.**

Call floor staff will take the telephone number and name of the mandated reporter alleging DCFS staff misbehavior and immediately transmit it to the Area Administrator, who will respond to the mandated reporter's concerns.

**2.  The child protection manager and the investigator's supervisor should be counseled for their failure to respond to the allegations made by school staff.**

The child protection supervisor and manager have been counseled.

**3.  The child protection investigator should be counseled for conducting a biased investigation.**

Counseling is pending.

**4.  The Regional Child Protection Administration should convene a meeting with the investigator, her supervisor and the child protection manager to discuss how the investigation could have been conducted in a manner that was respectful toward school staff and less likely to engender the distrust that accompanied this investigation.**

The Regional Administrator discussed the report with the investigator and her supervisor.  The Regional Administrator is scheduling a separate meeting with the manager.

**5.  The Department must track, and supervisors and management must respond to, failure to actually see the child that is the subject of the investigation.**

This recommendation will be included in revisions being made by the Procedures 300, *Reports of Child Abuse and Neglect*, workgroup.

**6.  Child protection investigators must be required to complete itineraries.**

The Department will instruct field staff to utilize the Outlook calendar to document their itineraries. Supervisors will be given authorization to view their staffs' calendars.  The Regional Administrators will notify staff to implement use of the calendar.

## GENERAL INVESTIGATION 15

**ALLEGATION**    A Department employee, who was also an adoptive mother, utilized Department resources to contact the adoptive parents of her daughter's biological siblings.

**INVESTIGATION**    After learning that the biological mother of her adopted daughter had given birth to another child, the Department employee contacted the private agency handling the family's case and inquired about adopting the younger sibling. After being informed the child was going to be placed in another home, the employee accessed the Child and Youth Centered Information System (CYCIS) to identify the younger child's adoptive family. The employee learned the child was to be placed in the home of a family that had previously adopted another of the children's siblings. After locating the placement information, the employee called the family from her office phone and left a message identifying herself as a representative of the Department. In an interview with the OIG, the family member said the employee's message stated that she was the mother of the younger children's biological sister and that she hoped to arrange a meeting between the siblings. The family member was upset and concerned by the call from the employee, as it was her understanding her child's case with the Department had been closed and that the records were under seal.

In her interview with the OIG, the employee acknowledged using CYCIS to identify and contact the adoptive family. The employee said she had done so in order to facilitate a meeting between her daughter and the biological siblings and did not see how her actions were problematic. An OIG review of the employee's personnel file found a signed copy of the Information Technology Certificate of Understanding, which restricts use of the Department's electronic resources to business conducted on behalf of the State. The employee told the OIG that prior to attempting to locate the adoptive family, she had spoken to the private agency about her desire to initiate sibling visitation between the children and had been informed such a plan could easily be enacted. The employee was unable to identify the private agency representative she said she had spoken with. In an interview with the OIG, the private agency worker who had handled the adoptive family's case stated she had received an unexpected call from a woman identifying herself as a Department employee who had a child who was a sibling of the other children. The worker denied offering any approval to pursue visitation between the siblings or encouraging the employee to contact the family. The worker stated she was surprised by the amount of information the employee possessed about the adoptive family.

**OIG RECOMMENDATION / DEPARTMENT RESPONSE**    **The Department employee should be disciplined for the violation of confidentiality and for misuse of the Department's information systems.**

The employee received a 5 day suspension.

**GENERAL INVESTIGATION 16**

**ALLEGATION**    The Office of the Inspector General noted that in child death investigations, where there had been prior Department contact with the family through the Differential Response Pilot Program, notes reflecting the prior contact were not accessible for review on the Department's SACWIS database.

**INVESTIGATION**    The Differential Response Pilot Program permitted the Department to identify less serious hotline allegations and provide immediate services to families rather than investigating the family for neglect. The Office of the Inspector General investigation disclosed that the Department had restricted access to notes entered by Differential Response workers so that they were not accessible by the Inspector General's Office when investigating subsequent harm to a child. The OIG report noted that the restriction prevented the Inspector General's office from complying with its mandate to:

> *conduct investigations into allegations of or incidents of possible misconduct, misfeasance, malfeasance, or violations of rules, procedures, or laws by any employee, foster parent, service provider, or contractor of the Department of Children and Family Services . . . (20 ILCS 505/35.5)*

**OIG RECOMMENDATION / DEPARTMENT RESPONSE**    **The Department should ensure that the Office of the Inspector General has immediate access to records and documentation of Differential Response.**

The Office of the Inspector General has been given access to the records.

**GENERAL INVESTIGATION 17**

| **ALLEGATION** | The Office of the Inspector General received a complaint alleging that there was sometimes as long as six months delay in processing background checks of those providing license-exempt daycare and receiving state subsidies. |
|---|---|

| **INVESTIGATION** | The Department of Human Services oversees the state program that provides compensation to low-income families needing childcare.  As part of the program, DHS is required to ensure that providers have criminal and Child Abuse and Neglect background checks. DHS and DCFS entered into an agreement whereby DCFS agreed to conduct needed background checks for DHS providers and DHS agreed to fund the additional staff needed in the existing DCFS background check unit. |
|---|---|

The OIG investigation found that while recent legislative changes had greatly increased the workload for DHS background checks, the Department had decreased the staff detailed to handle DHS background checks. The Department had only billed DHS for 19% of the agreed upon funding from DHS in the agreement.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.   DCFS and DHS should determine together how much personnel and operations costs DHS will fund on a regular basis to prevent such a large backlog from reoccurring.** |
|---|---|

Based on a recent audit finding at the Department of Human services (DHS), DHS is now requesting that DCFS also include the sexual offender registry in its background checks.  The Department is currently determining how to implement the recommendation with the budget cuts at DHS and DCFS.

**2.  DCFS must hire a reasonable number of temporary staff to resolve the DHS backlog.**

There is no longer a backlog of employee background checks.

**3.  DCFS should determine appropriate production goals for staff doing background checks for DHS and DCFS and include that number in personnel evaluations in the future.**

Production goals have been determined and implemented.

GENERAL INVESTIGATION 18

| ALLEGATION | A private agency failed to perform an adequate background check prior to hiring a worker whose employment had recently been terminated by another agency. |

| INVESTIGATION | In completing her application to be hired by the agency, the worker listed three professional references.  In listing her previous work experience, the worker identified an agency where she had most recently been employed, however, in the space designated for "Reason for Leaving," the worker left the answer blank. |

During the course of its work on another case, the OIG learned the worker's employment had been terminated by the previous agency for her, "continuous failure to follow the directive of her immediate supervisor and the policies of the agency," and her, "failure to execute specific tasks in a professional timely manner relating to her clients."  The worker applied for her position with the new agency five days after being informed of her termination.

In interviews with the OIG, staff from the hiring agency stated it was not standard practice to contact a prospective employees' most recent workplace for verification of employment or references, as required by Department Licensing standards.  Agency staff only contacted the professional references named by the prospective employee and relied upon their assessments to evaluate the hire.  An OIG review of the professional contacts named by the worker found that none of the individuals supervised the worker.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. Department Rule 401.380, *Personnel Records*, should be amended to require that in addition to verifying work history, child welfare agencies should also contact previous employers to** verify work performance by asking if the employee would be eligible for rehire. Verification should be completed by contacting an official source at the agency such as human resources, management or a supervisor knowledgeable about the employee's work performance. The Rule should also include that any employment offer to a currently employed person should be contingent upon contacting the current employer to verify their work performance prior to hire. |

The Department's Division of Licensing and the Office of Child and Family Policy are drafting amendments to the Rule.

**2.  As a result of the private agency's violation of DCFS Licensing Standards (Rule 401.380) a redacted copy of this report should be shared with DCFS Licensing to ensure future compliance by the agency.**

The redacted report has been shared with appropriate licensing staff.

**3.  The Office of Inspector General will share a redacted copy of this report with the hiring agency. The Inspector General will meet with the agency and its Board of Directors to discuss:**

**a.  The agency's procedures should require that former supervisors or management are contacted to verify job performance (last 3 years) prior to hire.**

**b.  The agency should provide training to human resources staff to ensure that when a prospective employee does not complete all sections of an application, the applicant is asked to complete any blank sections.**

c.  **Hiring practices as outlined in the Office of the Inspector General brochure entitled:** *Establishing Effective Hiring Practices*.

d.  **A redacted copy of the Office of the Inspector General's report concerning the employee should be shared with the agency to ensure appropriate supervision pursuant to 89 Ill Admin Code 430.**

The Office of the Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors. The Inspector General met with agency administrators and a representative of the Board of Directors to discuss the findings and recommendations made in the report. The agency has hired an on-site human resources manager to provide oversight to the agency's hiring process.  The manager will ensure that professional references are obtained from former supervisors and that dates of employment are verified.  The agency terminated the employee identified in this investigation.

## GENERAL INVESTIGATION 19

| **ISSUE** | In 2009, the OIG reviewed the final outcomes for prior discipline and discharge recommendations from 2005-2009. |
|---|---|

The review, which included only cases that had reached full resolution, was designed to assess the effectiveness of the recommendations, the Department's implementation of those recommendations, and to identify factors impeding appropriate discharge. In part, the 2009 review was initiated because of the perception in the field that recommendations for discipline and discharge were frequently overturned. The perception was fueled in part by the reinstatement of two employees who the Department had discharged (one based on the OIG's recommendation, and one based on an Executive Inspector General recommendation). One of the employees was reinstated through the decision of an arbitrator and the other through the decision of the Civil Service Commission. The 2009 review determined that out of 21 OIG recommendations for discharge, 16 (76%) employees ultimately separated from the Department; and out of 34 CWEL licensure revocation actions, 33 (97%) resulted in either CWEL relinquishment or revocation. In 2011, the Inspector General updated this data as part of an ongoing effort to recognize the obligation of issuing appropriate discipline and discharge recommendations.

| **DISCUSSION** | In Fiscal Years 2009 through 2011, the OIG recommended discharge, discipline or disciplinary counseling for 37 employees and took action against an employee's |
|---|---|

CWEL License in 17 cases, as follows:

- The OIG made *12 recommendations for discharge*. Those recommendations resulted in 6 employees being discharged; 4 voluntary resignations; and in 2 cases the recommendation was reduced to discipline.
- The OIG made *28 recommendations for discipline*. Those recommendations resulted in 5 employees being discharged rather than disciplined (typically because of progressive discipline); 21 employees being disciplined; 1 resignation; and 1 instance in which no discipline was imposed.
- The OIG sought *revocation* of 17 *Child Welfare Employee License (CWEL)*. Those charges resulted in 13 CWEL revocations; 2 voluntary relinquishments; and 2 instances in which no licensure action was imposed.

**GENERAL INVESTIGATION 20**

**ALLEGATION**   On an annual basis, Department employees in certain positions are required to file a Statement of Economic Interests (SOEI).  The Department requires all such employees to send their SOEI to the Office of the Inspector General for review by the Ethics Officer, who then forwards each Statement to the Secretary of State for filing.  The Ethics Officer reviews all SOEIs for potential conflicts.  The Department receives negative audit findings when a Statement is filed with the Secretary of State without review by the Ethics Officer.

**INVESTIGATION**   2011 SOEI Non-Compliance and Resulting Discipline:  In 2011, 120 (16%) of 754 employees failed to submit their SOEI for review by the Ethics Officer before filing with the Secretary of State.  In an effort to prevent such high non-compliance in the future, in December 2011 the Department sent a letter to each of the 120 "non-compliant" employees notifying them of their error, outlining the proper process, and stating that failure to properly file in the future could result in discipline. These letters were also placed in the personnel file of each of those 120 employees.

2012 SOEI Non-Compliance:  Although there was marked improvement in compliance from 2011 to 2012, 59 (8%) of the 746 DCFS employees required to file in 2012 failed to submit their SOEI for review by the Ethics Officer before filing with the Secretary of State.  Of those non-compliant employees, 11 were "repeat offenders" who made the same error in 2011.  In accordance with the Ethics Act, individuals who file their SOEI with the Secretary of State between May 1 and May 15 receive a fine of $15.  Any filings received after May 16 are fined $100/day.  According to the Office of the Secretary of State, four DCFS employees will receive fines for late filing in 2012.

Additionally, in 81 instances the Ethics Officer had to return a 2012 SOEI to the employee due to technical errors in the completion of the SOEI that would have either violated the Secretary of State's rules or resulted in negative audit findings against the Department. This number of technical errors that required an employee to complete a new SOEI further underscores the importance of the Ethics Officer's review.

| EMPLOYEES | 2012 | 2011 |
|---|---|---|
| **Required to File a SOEI:** | 746 | 754 |
| **Sent SOEI Directly to SOS** (no Ethics Officer review prior to May 1, 2012): | 59 (8%) | 120 (16%) |
| **"Repeat Offenders"** (i.e. sent to SOS in 2011 and 2012): | 11 | unavailable |
| **Employees who had to be contacted due to a problem with their form, after review by Ethics Officer** | 81 (11%) | unavailable |
| **Received fine for late filing** | 4 | 2 |

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. The employee who failed to file his required 2012 Statement of Economic Interest until over a month after the deadline should be disciplined for his failure to timely file.** |

Employee received an oral reprimand.

**2. The 11 employees who improperly sent their Statements of Economic Interest to the Office of the Secretary of State in both 2011 *and* 2012, after receiving a written warning with specific instructions in December 2011, should be disciplined.**

Nine employees received oral reprimands; one received a written reprimand; and one employee retired prior to receipt of report.

**3. The 47 employees who improperly sent their 2012 Statement of Economic Interests directly to the Office of the Secretary of State should receive written notice of their error which outlines the proper process and states that failure to properly file in the future could result in discipline. This non-compliance letter should be added to the personnel file of each of these employees.**

Letters were provided to employees and a copy sent to Human Resources for employees' files.

**GENERAL INVESTIGATION 21**

| | |
|---|---|
| **ISSUE** | Because of a series of complaints to the Inspector General about DCFS employees soliciting sales of products and/or displaying items for sale on state property during the workday, the Inspector General revisited its previous recommendations regarding the promulgation of a Solicitation Policy to provide a clearly articulated policy about what types of sales/solicitations are permissible. |

| | |
|---|---|
| **DISCUSSION** | In 2010, the Inspector General worked with DCFS Labor relations to draft a Sales/Solicitation policy for Department employees to be incorporated into the DCFS Employee Handbook: Section 3.1 – Professional Conduct.  The agreed upon language reads: |

> Employees shall not conduct any outside business for profit on state property or during work time.  For example, employees are prohibited from canvassing for sales, taking orders or selling any article (including but not limited to food, kitchenware or other home furnishings, paper products, or cosmetic products) in person, or by distributing or posting literature, advertising matter or any other graphic matter in or on state-owned or occupied property or while otherwise engaged in state business.

> Employees may solicit donations from or sell merchandise to fellow employees for recognized charitable organizations and local fundraising efforts during break times and only in break rooms.  However, supervisors should never solicit such donations or purchases from their subordinates.

> Employees shall never conduct business for profit with, or accept or solicit anything from clients, clients' close associates or relatives or from anyone who has or expects to have business dealings with the Department or entities over whom they have decision-making authority, except as otherwise provided in the State Officials and Employees Ethics Act (see Section 3.12, attachment 3.12a).

| | |
|---|---|
| **OIG RECOMMENDATION / DEPARTMENT RESPONSE** | **The Department should issue the agreed upon Solicitation Policy, to be effective immediately.** |

The solicitation policy was distributed and added to the Employee Handbook.

### GENERAL INVESTIGATION 22

| | |
|---|---|
| **ALLEGATION** | Visitation rights were terminated between three siblings and their maternal grandmother. The grandmother was informed by the Department she could appeal the decision, though she had no legal standing to do so because parental rights had been terminated. |

**INVESTIGATION**

The oldest of the siblings, a 13 year-old girl, was born when her mother was just 14 years-old. The girl and her two younger brothers, ages 10 and 7, had been raised primarily in their grandmother's home where their mother also resided. Both the mother and grandmother had histories of involvement with the Department. The grandmother had been the subject of multiple indicated reports related to her care of both her daughter and her grandchildren. Although the family was referred for intact services, the mother was frequently absent from the home and her whereabouts were often unknown while the grandmother was habitually non-compliant. Involved child welfare professionals noted concerns regarding the grandmother's possible substance abuse, as well as her eviction from the family's home and the children's frequent truancy from school.

After the grandmother was convicted and imprisoned for domestic violence against her boyfriend, the children were placed in the home of another relative. Following the grandmother's release, the children's case was screened into court. The grandmother was required to participate in drug testing, however the grandmother failed to comply with the court's order and the children were taken into protective custody by the Department. The Department was awarded temporary custody of the children and ultimately the parental rights of the mother and the children's fathers were terminated.

Following the termination of rights, the Department allowed supervised visitation to continue between the children and the grandmother. Over time, however, involved child welfare professionals noted concerns regarding the grandmother's behavior during visits and her refusal to comply with rules and directives. Based on the grandmother's ongoing conduct, a decision was reached to suspend visitation. The grandmother was informed in writing through the use of a Department CFS-151 Notice of Decision Form. Contained within the form was a statement informing the grandmother of her right to appeal the Department's decision. After the grandmother attempted to initiate the appeals process, she was informed by the Department she had no legal standing to do so.

According to Department Rule, the grandmother was unable to appeal the suspension of visitation because at the time the decision was made her intact services case had already been closed. As parental rights had also been terminated, the grandmother had no legal relationship to the children and therefore possessed no legal standing to appeal the decision.

| | |
|---|---|
| **OIG RECOMMENDATION / DEPARTMENT RESPONSE** | **The Department should either amend Rules and Procedures or conduct training to provide instructions on appropriate use of the CFS-151 Notice of Decision.** |

Revisions to Department procedures are pending.

### GENERAL INVESTIGATION 23

**ALLEGATION**     The Inspector General received a complaint alleging that an independently contracted Child and Youth-Centered Investment Team (CAYIT) Facilitator had a conflict of interest with his DCFS employment because he owned a private social service agency that provided mental health services and assessments to DCFS clients, and his agency solicited business from agencies that contract with the Department.

**INVESTIGATION**     The CAYIT Facilitator was an independent contractor with the Department whose job was to manage the CAYIT staffing.

In addition to his contract with DCFS, the CAYIT Facilitator owned and operated a not-for-profit counseling and training agency, which provided services through contracted therapists.  The agency maintained a contract for counseling and parent coaching with a private agency that contracted with the Department.

Department Rule 437 governs employee conflicts of interest, including employment other than a contractor's work with the Department, also known as "secondary employment."  Independent contractors are included within the Rule 437 definition of "employee."  The Conflict of Interest Committee, which was established to assist DCFS employees in interpreting Rule 437, reviewed the facts and determined that there was an inherent conflict in a DCFS employee providing services to DCFS clients under the auspices of another entity, regardless of whether the DCFS clients are voluntary or otherwise.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**     **1. The decision of the Conflict of Interest Committee should be shared with the independent contractor, CAYIT Manager and Statewide CAYIT Coordinator.**

The decision has been shared.

**2. The contractor should be directed to immediately notify the private agency of the restrictions, as outlined by the Conflict of Interest Committee, and the employee should amend the language of any future contracts with the private agency, or any entity with whom DCFS contracts, to specifically identify that the employee's agency will work with non-DCFS clients only.**

The CAYIT facilitator no longer has any contracts with private agencies involved with the Department and/or any direct contracts with the Department, other than the current CAYIT contract. He has no involvement with any Department clients and/or sub services of the Department, i.e., intact counseling, mentoring, etc. outside of his CAYIT duties.

**3. At the time of hiring, a hard copy of DCFS Rule 437, *Employee Conflict of Interest,* should be provided to all DCFS contractors for personal service.**

DCFS Rule 437, *Employee Conflict of Interest*, is provided at time of hire to all DCFS contractors for personal services.

**GENERAL INVESTIGATION 24**

| ALLEGATION | An Administrative Law Judge (ALJ), who had previously been disciplined by the Illinois Attorney Registration and Disciplinary Commission (IARDC), used Department resources to conduct his secondary business, and violated Department rules regarding conflict of interest. |

| INVESTIGATION | In addition to his work for the Department, the ALJ also maintained a private law practice. Ten years earlier, the attorney had been disciplined by the IARDC for the improper handling of funds he accepted on behalf of a client as part of a settlement. The IARDC found that while the attorney had violated rules pertaining to the transfer and disbursement of the funds, it was concluded he had acted in good faith and had not engaged in willfully deceptive behavior. The attorney was required to serve a probationary period, which he completed successfully. The OIG found no evidence to suggest the ALJ's prior discipline by the IARDC affected his ability to serve the Department. |

An OIG review of the ALJ's private law practice found no evidence he had utilized Department resources to conduct work for his secondary employment or had performed outside work on Department time. The OIG did find the ALJ had been a named attorney in an appeal on behalf of an out-of-state client opposing the Department's termination of parental rights of a ward. In an interview with the OIG, the ALJ stated he had become involved in the case through his sponsorship of *pro hac vice* motions on behalf of another attorney. *Pro hac vice* motions allow an attorney not licensed in Illinois to practice law in the state through the sponsorship of a member of the Illinois Bar. The ALJ stated he had agreed to sponsor the appellant's out-of-state counsel, a personal friend, and had been unaware of the Department's involvement in the case until late in the appeal process. The ALJ stated he performed no work on the case beyond his initial filing of the *pro hac vice* motions and had received no compensation for his work on the case. He had, however, filed the Notice of Appeal and Notice of Filing. In a separate interview, the out-of-state attorney supported the ALJ's account of events. The ALJ had not determined whether the Department had any standing in the case, despite learning it involved the adoption of a minor in Illinois.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The ALJ should be disciplined for violating the Department's Conflict of Interest Rule 437.40 *Prohibition of Employee Interests and Conduct Creating Impropriety or the Appearance of Impropriety*.** |

The employee was counseled.

**2. The Department should incorporate into its contract with attorneys a certification and disclosure section regarding prior attorney discipline or licensure action in Illinois or other states.**

The CMS Administrative Services Unit is taking the recommendation under advisement.

**GENERAL INVESTIGATION 25**

| | |
|---|---|
| **ALLEGATION** | A child protection investigator testified in court she was denied access to vital records because the technology company contracted by the State to provide access had refused her request due to non-payment of bills by the Department. |

| | |
|---|---|
| **INVESTIGATION** | The child protection investigator had been assigned to a case involving allegations of serious abuse of two sisters, ages 11 and 9, by a woman who had been designated their legal guardian. |

The girls had been placed in the woman's guardianship in another state three years earlier. After obtaining some background information about the girls' mother and learning the sisters were not wards of the other state, the investigator screened the case into court and a date was set to hear the case.

At the initial court appearance, the investigator stated she had learned the mother had left the country and that she was attempting to obtain information about the girls' father. After the case was continued for 10 days, the investigator testified during the second court session that she had made several attempts through the family's home state and the parents' native country to determine the father's identity, but that all efforts had proved unsuccessful. The investigator stated that without the father's birth date, she was unable to conduct a diligent search.

The investigator was asked if she had utilized the Putative Father Registry, which lists men who were identified as likely parents of children in the database, but are not legally recognized as their fathers. A search of the Putative Father Registry is required prior to a child becoming eligible for adoption. The Registry can be searched using only the child's name and does not require the father's birth date. The investigator stated she had not checked the Registry and the case was continued until later that day to allow her an opportunity to do so.

Upon returning to court, the investigator testified she had attempted to conduct a search using the Putative Father Registry but had been denied access because the Department had failed to pay its bill to the technology company that managed the service. In an interview with the OIG, the investigator stated that after her initial attempts to access the Registry were unsuccessful, she contacted the technology company's customer assistance division by phone and was told the account was past due and she would have to pay $25 for the search to be conducted. The investigator stated she was told she could bypass the charges by supplying a reference number for Department-related business, but she was not in possession of one at the time and returned to court. The investigator stated she had never utilized the Putative Father Registry before, but believed she had been trained in its use and been assigned a password several years earlier.

The OIG interviewed the help-desk technician who received the investigator's call. He stated that the investigator told him of her belief she could not access the system because the Department had failed to pay its bill to the company. The technician stated he informed the investigator that her account was active and that her inability to access the Registry was likely a result of not entering the correct password she had been assigned. The technician stated the investigator then asked him for the correct password, but that when he tried to assist her in establishing a new one in order to access the Registry, she terminated the call. In an interview with the OIG, an administrator from the technology company confirmed the technician could have assisted the investigator in gaining access to the system and that her account had not been disabled for non-payment by the Department or any other reason.

| | |
|---|---|
| **OIG RECOMMENDATION / DEPARTMENT RESPONSE** | **This report should be used as a teaching/supervision tool with the child protection investigator to assure both that she is aware of proper procedures with the use of the Putative Father** |

**Registry and that she should exercise far more caution in future court testimony.**

This report has been shared with this employee.

**GENERAL INVESTIGATION 26**

| | |
|---|---|
| **ALLEGATION** | A Department employee was elected to a position in local government.  Federal law prohibits state employees from seeking office in partisan elections. |

**INVESTIGATION**   The Department employee was alleged to have violated the Hatch Act, which prohibits state employees, whose work is funded in any part with federal funds, from being candidates for public office in partisan elections.

The employee had run unopposed and declared an affiliation with a minor party.  The Hatch Act excludes candidates for public office who run in "non-partisan" elections.  The Act's definition of "non-partisan" includes local parties that did not receive an electoral vote in the most recent presidential election.

The OIG contacted the United States Office of Special Counsel (USOSC) for a determination on the status of the political party the employee had claimed by affiliation.  The OIG was informed by the USOSC the political party was considered "non-partisan," as defined by the Hatch Act.  As a result, the employee had not violated the Hatch Act.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.  Management should ensure that the Department employee did not use state resources or time to conduct political work or to engage in secondary employment.**

The Department conducted an investigation and found no evidence of improper use of state equipment or time to conduct political work or to engage in secondary employment.

**2.  The Department employee should consult with her supervisor and the Department's Conflict of Interest Committee to ensure that she avoids conflicts of interest in her secondary employment.**

The employee has complied with the rules regarding secondary employment and conflicts of interest.

### GENERAL INVESTIGATION 27

**ALLEGATION**   During the Joint Investigation of an agency that received over $18 million in Department funds, Inspector General staff learned that it was the practice of the Department's Purchase of Service Monitoring Division, when reviewing audits of agencies with multiple Department grants, to examine only the reported "bottom line" expense amount and not review each program individually for under and overspending.  Because this practice is in conflict with Department Rules, the Inspector General issued an addendum to the Joint Investigation.

**INVESTIGATION**   The agency received seven separate grants from the Department each year.  It was required to file a certified independent audit which showed that in one of the programs for which the Department had issued a grant of $500,000, the agency only spent $750.  The Department auditors who reviewed the certified independent audit, did not view the $499,250 of unspent funds as excess revenue to be recovered.  Instead, the Department auditors noted that another of the seven programs had overspent by $500,000 and viewed the excess revenue in one program and the underspending in the other program as "a wash."  The additional $500,000 was for "Consultants."  No one within the Department sought to determine who the consultants were or why the amount had jumped significantly from the prior year.

By law, the Department is prohibited from expending state funds for an activity not within the scope of the agency's powers and duties."  30 ILCS 105/35  As such, it is incumbent on the Department to monitor expenditure of funds and ensure that only approved, allowable spending is reimbursed.  The current practice of reviewing only the bottom line with agencies with multiple programs may permit a vendor to be reimbursed for expenses that are disallowable.  Department auditors should not approve expenses other than those specifically approved in each program budget, for non-substitute care programs.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**   **1.  When reviewing audits of grantees, Financial Monitors must cease the practice of approving payment for overspending in non-substitute care programs, based on the same vendor underspending in other programs.**

Under current policy, financial contract monitors are not authorized to approve offsets, payment for overspending in non-substitute care programs based on underspending in other programs.  Offsets can only be approved by the Director of the Department.

**2.  When reviewing audits of grantees, line items in the audits should be compared to approved Budget line items.  Deviations from the Budget must be approved by Program Monitors before the audit is approved.  Unapproved expenses should be referred for overpayment recoupment.**

The rate setting unit within the Division of Finance, Technology and Planning is currently comparing costs reported in the audit reports for the years ending on June 30, 2012 or later, as they are received from providers, with the fiscal years 4th quarter reports to see whether the reported costs match.  The audits are then forwarded to the Office of Field Audits for desk review.  Reports from providers will continue to be reviewed and compared through out the current fiscal year.

Prior to conducting an audit, the Office of Field Audits contacts the program monitor to discuss the agency, and provides a copy of the audit when it is complete.  Procedures will be amended to require the program monitor to follow-up on findings as well as to refer the agency to the Department's Troubled Vendor Committee for action if warranted.

**GENERAL INVESTIGATION 28**

**ALLEGATION**     In the last fiscal year, the Office of the Inspector General issued a report that identified serious deficiencies and breaches of fiduciary and contractual duties at a private agency that administered an Independent Living Program for Department wards. Specifically, the Office of the Inspector General determined that the Agency's practice of reporting placement changes was suspect and possibly fraudulent, and resulted in excess funding from the Department. The Office of the Inspector General recommended a full review and audit of the Agency's placement reporting and a determination of whether excess funds should be recovered. After completing the Report, the Office of the Inspector General learned that the Agency's Executive Director had been arrested in a state prison parking lot and charged with a weapons offense.

**INVESTIGATION**     The Office of the Inspector General noted that the Executive Director was arrested during normal work hours. He was not performing any functions related to the contract with the Department at the time of his arrest. Because of the size of the Agency's contract with the Department, it was required to file a Consolidated Financial Report. The Consolidated Financial Report disclosed that 77% of the Executive Director's time and salary were allocated to the Department's Independent Living Program. When questioned about his time allocation, during an interview with the Office of the Inspector General, the Executive Director disclosed that neither he nor the Director nor the Supervisor of the Independent Living Program kept timesheets. The Contract with the Department requires that all staff funded by the Contract shall maintain timesheets in accordance with generally accepted business practice. In addition, when the Office of the Inspector General reviewed the Executive Director's duties, records failed to support that the Executive Director performed any direct work for the Program, despite the fact that his salary had been allocated as a direct cost of the Program.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**     **1. The Department should review the Agency's allocation of salaries to the Program, including a review of whether staff perform direct or administrative services. [The Department cannot pay more than 20% of direct costs for administrative costs.] Based on the results of the review and the issues identified in this report, the Department should determine whether to continue contracting with the Agency.**

The Department is currently planning this audit including a workplan/audit program. The Department should have a request of materials out to the Agency in December 2012.

**2. A copy of this report should be shared with Department employees conducting the Placement Reporting Review of the Agency.**

The Report was shared with the Department auditors who are planning to conduct the review.

# PROJECTS AND INITIATIVES

## ERROR REDUCTION

### *Cuts, Welts and Bruises Training for Investigators*

The Office of the Inspector General developed the Cuts, Welts and Bruises Error Reduction training for investigators after noting that many child homicides had had prior contact with the Department involving a problematic cuts, welts and bruises investigation. The training emphasized the importance of obtaining objective information to confirm self-reports. Objective information should include relevant medical and law enforcement records as well as interviews of child-centered collaterals.[1]  In addition, the training emphasizes the importance and mechanics of exchanging information with medical professionals.

To assess the effectiveness of the training, the Department's Quality Assurance and the Inspector General's staff reviewed a weighted sample of cuts, welts and bruises investigations at least ninety days after the region had been trained. The sample consisted of three investigations from each team throughout the state (focusing on children ages three and under when available). Staff conducted the evaluation using a questionnaire designed by Quality Assurance, the Inspector General's staff and University of Chicago staff.  Evaluation and discussion of the review of cuts, welts and bruises investigations have been completed. Each sub-region received feedback on evaluation findings relevant to that specific team and community. Staff from the Inspector General's Office met with administrators and managers for in-person discussion of regional data and findings. Regional Administrators and managers agreed to work with supervisors to disseminate Error Reduction findings to the field.

As of FY 2011, all child protection investigators, supervisors, and managers had received Cuts, Welts and Bruises Error Reduction Training. The training curriculum has been incorporated into Core Training for new Child Protection Investigators.

In 2012, in response to deep budget cuts, the Department reorganized and realigned staff to meet statutory requirements and critical direct service needs. To address the training needs of realigned staff assigned to child protection, staff from the Division of Training and the Inspector General's Office trained 140 newly assigned investigators, supervisors and managers in the investigative principles of Error Reduction when investigating allegations of cuts, welts, and bruises. A poster depicting the prevalence, distribution, and location of accidental and non-accidental bruising in infants, toddlers, and young children will be distributed statewide to DCFS field offices and private agency offices. The poster is a visual reminder to child protection, placement and licensing workers of the pediatric research regarding inflicted trauma.

### *Mental Health Training for Intact Family Workers*

As of 2012, the Inspector General's staff has trained DCFS and private agency intact family services staff in the Southern and Central Regions, and private agency staff in the Cook County Region.  DCFS Cook County Regional intact staff were trained in 2011.

---

[1] Existing practice was to interview only collaterals identified by the caregivers or alleged perpetrators.

In 2012, the Mental Health Trainings for DCFS Intact Family workers were postponed because of budget cuts, which led to the elimination of DCFS Intact Family Teams.

The training of private agency staff will resume in 2013.

| ERROR REDUCTION/PROBLEMATIC PRACTICE PLANS (20 ILCS 505/35.7) |
| --- |

### *Training for Pregnant and Parenting Wards*

As part of its statutory mandate to identify problematic practices that impact child safety, the Office of the Inspector General developed training for young parents to address preventable precursors associated with child death.

> *At the beginning of Young Parent Training, a young mother, frustrated at being required to attend yet another training asked, "Why do I need to be here? My baby is alive." The presenter acknowledged the youth's skepticism, but explained that the Inspector General's Office had recently conducted a ten-year review of deaths of children of DCFS parenting teens and learned that 56% of the child deaths were the result of potentially modifiable risks factors, such as overlay, asphyxia from trapping, and accidental suffocation. The trainer also explained that the ten-year report provided useful information about ten infants who were the victims of homicide. Four of the infants were killed by their fathers, and three of these fathers were wards. In all of these deaths, the fathers' inability to cope with their baby's crying contributed to their child's death. The young mother was informed that this training was specifically developed to ensure that all parenting wards become aware of these risk factors, and are provided with the tools and knowledge necessary to keep their children safe.*
>
> *After hearing the purpose of the training, the young mother actively participated in the training.*
>
> *This young woman's experience is not unique. The Young Parent Training has generated active participation from youth who otherwise thought they were attending "just another boring parenting class." The reality that some parenting wards had lost a child to unsafe sleep practices or violence facilitated critical discussions. Participant evaluations overwhelmingly indicated that the young parents found the training relevant, and intended to change their parenting behavior as a result. Several participants, who admitted to co-sleeping with their infants, stated they would no longer do so. Other participants enjoyed the fact that the training was not a lecture, but rather, a discussion providing important safety information in a way that encouraged the young parents to learn from each other.*

**Young Parent Training**
In response to the Inspector General's 2011 ten-year review of deaths of children of DCFS wards[2], the Inspector General's Office and the Teen Parent Service Network (TPSN) continued the rollout of the

---

[2] Ten-Year Review of Deaths of Children of DCFS Parenting Teens, File No. 11-3380, Appendix A, Office of the Inspector General Illinois, Department of Children and Family Services, Report to the Governor and General Assembly, January 2012.

Young Parent Trainings. This rollout is a part of an ongoing effort to reduce the infant mortality rate of the children of parenting wards.

The Inspector General's Office and TPSN are in the process of training young parents with children under 18 months of age who live in Cook County. Approximately 250 parents have been identified. To respect the young parents' school/work schedules, trainings are conducted in the late afternoon or early evening. The training locations were chosen with an eye toward familiarizing the youth with quality early childhood development centers (Carole Robertson Center for Learning), comprehensive adolescent Title X clinics (Rush Adolescent Clinic and Erie Teen Health Clinic), community-based service providers (Illinois Action for Children, Project Brotherhood), as well as enabling larger child-welfare agencies to sponsor the training for their young parents.

In addition, the Inspector General's Office and TPSN conducted a "Train the Trainers" event to prepare a core group of fifty-seven private agency and DCFS staff to be co-trainers. As the Young Parent Trainings are replicated, this core group will act as co-facilitators. In the future, these trainers will be called on to facilitate Young Parent Trainings at their respective agencies.

**Young Parent Training Curriculum**
The Young Parent Training is designed to foster small group discussions through interactive and engaging activities. The training is divided into two sections: 1) Safe sleep practices; and 2) Creating a nonviolent home environment. Each addresses modifiable risk factors.

*Safe Sleep Practices*
The first section, focusing on establishing safe sleep practices, has the young parents engage in activities on common safe or unsafe sleep situations. Together, they create a visual display that becomes a focal point for the groups' continued discussion about safe sleep practices. The youth also work together to set up a portable crib. Afterward, they discuss what constitutes a safe sleep environment (e.g. no pillows, heavy blankets, bumpers, toys, or stuffed animals inside the crib with the infant).

The centerpiece of the safe sleep section of this training is a booklet of scenarios that portray real-life cases investigated by Inspector General's Office. Youth volunteers read aloud a scenario for discussion among the participants. One scenario describes a situation where a young parent abruptly left her home after an argument and ended up at a friend's home without a crib for her child. Unprepared for a night away from home, the young mother decided to place her child to sleep on a mattress that was pushed up against a wall. During the night, the infant became trapped between the mattress and wall and suffocated. After reading this scenario, the young parents discuss how this death might have been avoided, and identify what they can do to ensure their child's safety if faced with a similar situation. (See attachment *Safe Sleep for Our Baby*)

The safe sleep section concludes with *B'More for Healthy Babies*,[3] a video that depicts young mothers discussing the loss of their infants because of unsafe sleep practices. This profound video effectively reinforces the content of the training. After viewing the video, many participants reaffirmed their commitment not to co-sleep. Because many young parents asked for copies of the video to educate their friends and family about the risks of co-sleeping, copies are provided at the training.

*Creating a Nonviolent Home Environment*
The second section emphasizes nonviolent parenting and strategies for young parents to keep their child safe while in someone else's care. This portion of the training begins with a discussion of the qualities that make someone a good caretaker for their child. As in the safe sleep section, scenarios that are based

---

[3] © 2010, Johns Hopkins University

on real-life cases investigated by the Inspector General's Office were used to promote group discussion. These scenarios discuss how to keep children safe while in their parents' care, or while in the care of someone else.

One scenario describes an incident in which a mother came home from work to find her child badly bruised. The child told his mother that her boyfriend hit him because he cried. In this situation the mother chose to disregard her child's injury, and failed to seek medical help because she feared losing her boyfriend.  After reading this scenario, the young parents discuss how they think the mother should have handled the situation, and why they think the mother placed more importance on her relationship with her boyfriend than on her child's safety. (See attachment *Taking Care of Our Baby.)*

Through discussions of these scenarios, the young parents formulate their own criteria for evaluating the qualities of an appropriate caregiver. They also learn how to recognize behaviors that can put their child at risk (e.g. a boyfriend who is impatient, intolerant of normal infant behavior like crying, or is an inexperienced or overwhelmed young father).

Each young parent receives a youth-friendly version, illustrated by a Chicago Public High School student,[4] of Dr. Barton Schmitt's seminal pediatric article, "The Seven Deadly Sins of Childhood."[5] (See Attachment) This adapted version identifies seven challenging developmental stages or situations[6] in which an infant is at high risk of being abused by an unprepared or overwhelmed parent or caregiver, and offers ways to cope.

The training concludes with a discussion of Abusive Head Trauma and with how susceptible an infant's brain is to injury.  During this discussion, a RealCare[©] Shaken Baby infant simulator is used to demonstrate the damage that can be caused by abusively shaking an infant. The infant simulator cries uncontrollably, and when shaken violently, LED lights activate to show potential damage to specific areas of the brain.

**Recruiting and Training Young Fathers**
A short video of four young fathers who attended a Young Parent Training is used as a recruiting tool for the young fathers' trainings. The video was produced by the Inspector General's Office. In it the fathers described their initial apprehension and subsequent enthusiasm regarding the training. The fathers encourage other young fathers to attend this training.  The video is made available to caseworkers whose male parenting clients are reluctant to attend a Young Parent Training. It is also shown at the beginning of the fathers' training to encourage active participation.  This video will be available on the Inspector General's Office D-Net link.

*RealCare[©] Infant Simulator*
Many young fathers have little experience caring for an infant before their own child is born.  To help prepare them for the challenges of raising an infant, during the training young fathers are invited to practice caring for an infant by taking care of a RealCare[©] Infant Simulator doll for 24 hours.

The infant simulators are programmed so that the young fathers must care for their infant around the clock, just as they would when caring for their own child.  The young fathers must wake up in the middle

---

[4]  "Seven Frustrating Child Developmental Stages…and how to handle them."
[5]  Schmitt, B. (1987). Seven Deadly Sins of Childhood: Advising parents about difficult developmental phases. *Journal of Child Abuse & Neglect*, *11*(3), 421-432.
[6]  Colic, trained night crying, normal exploratory behavior, toilet training resistance, separation anxiety, normal changes in appetite, and normal negativism.

of the night to soothe the infant when it cries, feed it when it is hungry, and change its diaper. The simulators record the extent to which these tasks are performed, and when the dolls are collected, the fathers receive individual feedback on their care of the infant.

## Young Parent Mediation

At times, misunderstandings and disagreements between young parents may lead to violent encounters. To lower the incidences of these violent encounters, the young parent project is piloting a teen parent mediation program. Young Parent Mediation encourages young mothers and fathers to work together to share and manage the challenges and responsibilities of being a parent.

This mediation program is introduced during Young Parent Training. The goal is to get a core group of young parents with infants under 3 months of age to pilot the program. To date, 36 young parents have expressed an interest in participating in mediation with their partners. The mediation coordinator is in the process of scheduling sessions for these couples.

### *Program Structure*

The young parents are offered an opportunity to sit down together to talk with mediators trained at the Center for Conflict Resolution for a series of mediation sessions designed to help them resolve conflicts and make a proactive plan for shared parenting. One technique used to help young parents think about their future is the creation of a "parenting plan" for their child's future. This plan helps them to define their own expectations for themselves and their partners as they approach or manage parenthood. These parenting plans keep the parents focused on their goals, and contain specific information about what they want their child's life to be like in the future.

## Sharing the Young Parent Training

On November 30, 2011, The National Resource Center for In-Home Services asked the Inspector General's Office to present the training curriculum as part of a Pregnant and Parenting Teen Webinar. After this presentation, the Inspector General's Office received requests from agencies around the country for Young Parent Training activity materials, which were distributed electronically.

# Safe Sleep for Our Baby

*Real-life situations where a safe sleep position meant the difference between life and death*



**Produced by the Office of the Inspector General – Department of Children and Family Services and the Teen Parenting Service Network (TPSN)**

**Produced by the Office of the Inspector General – Department of Children and Family Services and the Teen Parenting Service Network (TPSN)**

© Copyright, 3/1/2011 Office of the Inspector General, Illinois Department of Children and Family Services. Revised 9/1/2012



# **Contents**

## *Mother's Scenarios*

Regina         ………………………………..        1

Felicia        ………………………………..        2

J & C          ………………………………..        3

Annabel        ………………………………..        4

Stacy          ………………………………..        5

## *Father's Scenarios*

Justin         ………………………………..        6

J & C          ………………………………..        7

Ricardo        ………………………………..        8

Felicia        ………………………………..        9

PROJECTS AND INITIATIVES

229

---

| Mother's |
|---|

# Regina      1

Regina, a 20-year-old parenting ward, is the mother of 4-month-old Lucy. They live in an independent living program. Regina and her grandmother, Helen, have a great relationship, so one evening during finals week when Regina really had to study Grandma Helen offered to care for Lucy. Regina arrived at her grandmother's home with an overnight bag for Lucy, as well as a portable crib.

A couple of hours later Regina realized that she had Lucy's favorite pacifier in her purse. Knowing Lucy doesn't calm down unless she has it, Regina decided to drop it off. When Regina returned to her grandmother's house, she found Grandma Helen sleeping in a recliner while holding Lucy, who was also asleep.

Regina knew the possible dangers of having a child sleeping in this position. She knew that Lucy could accidently get trapped between the recliner and Grandma Helen, or could accidently get smothered. Still, Regina was a little afraid to talk to her because in the past when she had tried to talk to her about safety, Grandma Helen would remind Regina that she had cared for a lot of kids over the years without harming any of them.

*Discussion Questions*

***You are Regina.***

1.  How would you approach Grandma Helen?

2.  Describe how you would explain your concern to her.

3.  What if she wasn't willing to hear what you said?

4.  What solution would you propose to her?

230

PROJECTS AND INITIATIVES

Mother's
2

# Felicia

Felicia, age 16, is a parenting ward with a 6-month-old son, Tyler. Recently, Felicia has been staying with her son's father, Elijah. Elijah is not a ward and lives with his family. Over the past weekend, Felicia and Elijah got into it, so Felicia left with Tyler and went to stay with a friend for the night.

Felicia left Elijah's house in such a rush that she hadn't packed his portable crib, so when bedtime rolled around the only place for Tyler to sleep was on a mattress on the floor with her. Although she knew it wasn't the safest place for Tyler to sleep, Felicia pushed the mattress up against the wall and put Tyler down to sleep. She placed him near the wall so that he wouldn't roll off and fall on the floor. Also, to make sure that she didn't roll over Tyler while she was asleep, Felicia tried to stay at the edge of the mattress.

*Discussion Questions*

1.  What is the potential danger of having Tyler sleep with his mother on a mattress that has been pushed up against the wall?

2.  Discuss any other potential dangers you observe in this situation.

3.  What could Elijah or Felicia have done to prevent this unsafe situation?

Mother's
3

# Jeremy and Chloe

Jeremy and Chloe are both wards who recently emancipated at age 21. They have a son, Charlie, who is 7 months old. They are totally committed to their child and to being a family. Jeremy and Chloe work opposite shifts so that one of them is always home with the baby. Chloe is an office assistant, and Jeremy takes classes and then works the night shift as a security guard at a nearby mall.

One afternoon, Chloe walked into their bedroom to find baby Charlie asleep in bed with his father instead of in his crib, which was in the same room. Chloe knew that they were in a dangerous situation because Jeremy is a heavy sleeper, and Charlie moves around in his sleep. Immediately, Chloe picked up Charlie and placed him in his crib.

When Jeremy woke up, he told Chloe that Charlie prefers to be in bed with him and cries when he is placed in the crib. Jeremy also said that sometimes he's so tired from school and work that when Charlie gets fussy before naptime, he doesn't have the energy to do anything but place Charlie in bed with him.

*Discussion Questions*

1.  What are the potential dangers to baby Charlie in this situation?

*You are Chloe:*

2.  When Jeremy woke up, he asked you to explain why you had moved the baby. What would you say to him?

3.  What suggestions could you make to Jeremy about ways in which he can calm Charlie before he goes to sleep?

PROJECTS AND INITIATIVES

Mother's

# Annabel

**4**

Annabel is a 17-year-old ward living in a transitional living program. She recently gave birth to her first child, Juliet, who is now 1 month old.

Over the course of her pregnancy, Annabel would save money to buy baby stuff on sale. By the time Juliet was born, her crib was completely filled with cute stuffed animals, and brightly colored pillows and blankets.

One day Annabel's friend Jackie came over to visit her and the baby. Annabel took Jackie to see the baby, and was really excited to show off Juliet's beautiful crib.

Jackie was happy to see Juliet was sleeping on her back, but she was concerned that baby Juliet's crib was filled with items that could endanger her life. She was particularly concerned about a heavy wool blanket that covered Juliet. Jackie knew that it would be very easy for the baby to get tangled in any of those items and suffocate or become overheated.

*Discussion Questions*

*You are Annabel's friend, Jackie, and one of the few friends that she has, so you do not want to hurt her feelings or burst her happy bubble:*

1. How would you let Annabel know of the potential dangers for the baby?

2. Annabel shrugged you off, telling you that her case worker also had concerns about all of the things in the crib, but that so far nothing had happened. How would you respond?

3. Does this mean that Annabel has to get rid of all the beautiful things she bought for her baby?

---

Mother's

# Stacy

**5**

Stacy, age 21, is the mother of three children. William, who is 5 months old, is the only child currently in her care. Stacy's two older children live with their grandmother. Stacy emancipated nine months ago.

When Stacy visits her grandmother or friends, she always takes food for William and his stroller. Sometimes having to take all of this stuff is a hassle, especially if she is going on the bus. But it's worth it if she can get out of the house to see her other children. Stacy works hard at being a good parent and is determined to regain custody of her children.

Unfortunately, Stacy has not always managed her money well. She often skips a month's rent, or only pays part of it. Eventually, this pattern caught up with her. This morning, Stacy was kicked out of her apartment for not paying her rent, so she and William are staying in a motel tonight.

The motel room they are staying in has two double beds. Stacy knows that sleeping in an adult bed can be dangerous for an infant, so at bedtime she tries different sleeping arrangements for William, including placing him in his stroller to sleep. After an hour sleeping in the stroller William wakes up crying. Stacy decides to place William in the other bed. She places him on his back on top of the blankets. Also, to prevent an injury in case William rolls off of the bed later, Stacy places several large plastic bags filled with clothes on the floor around the bed.

*Discussion Questions*

1. What potential sleeping dangers can you see in this situation?

2. What might be some safer sleep alternatives for William?

Father's                                                                 6

# Justin

Justin, age 20, is a parenting ward and father of Devin, who is 3 months old. Justin lives in a transitional living program. Devin's mother, Chastity, is also a ward. They are both in school.

Last week during final exams, Justin and Chastity really had to study, so they asked Justin's grandmother to care for Devin to give them a break. Justin arrived at Grandma Helen's home with an overnight bag for Devin as well as a portable crib.

A couple of hours later Justin realized that he still had Devin's favorite pacifier in his pocket. When Justin returned to Grandma Helen's house to drop off the pacifier, he found Grandma Helen sleeping in a recliner while holding Devin, who was also asleep.

Justin knew the possible dangers of such a sleeping position, so he gently woke Grandma Helen.  Justin explained to her that no matter where he is, Devin always sleeps in a crib on his back, and that babies sleep safer that way. He also explained that sleeping while holding Devin in a recliner increased the chances of Devin suffocating in his sleep, either wedged against the recliner, or against Grandma Helen.

After hearing this, Grandma Helen was skeptical. She told Justin that she had cared for many children in her lifetime and had never injured any of them.

*Discussion Questions*

1.  What are some things that Justin did well to ensure safe sleeping arrangements for his son?

2.  How would you tell someone that you respect (and who is caring for your child for free) that you do not agree with the way they are caring for your child?

3.  In general, when leaving your child to be cared for by someone, what are some things that you think you should tell them?

---

Father's                                                                 7

# Jeremy and Chloe

Jeremy and Chloe are both wards who recently emancipated at age 21. They have a son, Charlie, who is 7 months old. They are totally committed to their child and to being a family. Jeremy and Chloe work opposite shifts so that one of them is always home with the baby. Chloe is an office assistant, and Jeremy takes classes and then works the night shift as a security guard at a nearby mall.

One afternoon, Chloe walked into their bedroom to find baby Charlie asleep in bed with his father instead of in his crib, which was in the same room. Chloe knew that they were in a dangerous situation because Jeremy is a heavy sleeper, and Charlie moves around in his sleep. Immediately, Chloe picked up Charlie and placed him in his crib.

When Jeremy woke up, he told Chloe that Charlie prefers to be in bed with him. Jeremy also said that it helps him feel more bonded to his son.

*Discussion Questions*

1.  What are the potential dangers to baby Charlie in this situation?

2.  When Jeremy woke up, he asked Chloe to explain why she moved the baby. What do you think she might say in response?

3.  What are some other ways that Jeremy can feel close to his child, without putting him in danger?

Father's                                                                          8

# Ricardo

Ricardo is a 17-year-old ward living in a foster home. His girlfriend recently gave birth to Tony, who is now 4 months old. Ricardo's girlfriend has some mental health issues, so he currently has custody of Tony.
+
Although finding out that his girlfriend was pregnant was unexpected, Ricardo was happy to have a son. Over the course of the pregnancy, Ricardo would save money to buy baby items.  By the time Tony was born, the crib was filled with Chicago Bulls crib sheets, stuffed animals, blankets and pillows.

One day Ricardo's case worker came over to see how things were going with the baby. Tony was asleep, but Ricardo really wanted to show his worker the crib, so they went upstairs to go look at it.

Although Ricardo's worker was happy that Ricardo was embracing fatherhood, and that Tony was sleeping on his back, the worker was concerned that Tony's crib was filled with stuffed animals, bumpers, pillows and blankets. The worker was especially concerned about the heavy wool blanket that covered Tony. The worker knew that it would be very easy for Tony to get tangled in any of those items and suffocate or become overheated.

*Discussion Questions*

*You are Ricardo's friend. You have seen the crib and know that there are a lot of problems with it, but you don't want to hurt your friend's feelings.*

1.  How would you let Ricardo know of the potential dangers for the baby?

2.  After telling Ricardo, he shrugs you off, telling you that his case worker also had concerns about all of the things in the crib, but that so far nothing had happened to the baby. How would you respond?

---

Father's                                                                          9

# Felicia

Felicia, age 16, is a parenting ward with a 6-month-old son, Tyler. Recently, Felicia has been staying with her son's father Elijah. Elijah is not a ward and lives with his family. Over the past weekend, Felicia and Elijah got into it, so Felicia left with Tyler and went to stay with a friend for the night.

Felicia left Elijah's house in such a rush that she hadn't packed Tyler's portable crib, so when bedtime rolled around the only place for Tyler to sleep was on a mattress on the floor with her. Although she knew it wasn't the safest place for Tyler to sleep, Felicia pushed the mattress up against the wall and put Tyler down to sleep. She placed him near the wall so that he wouldn't roll off and fall on the floor. Also, to make sure that she didn't roll over Tyler while she was asleep, Felicia tried to stay at the edge of the mattress.

*Discussion Questions*

1.  What is the potential danger of having Tyler sleep with his mother on a mattress that has been pushed up against the wall?

2.  Discuss any other potential dangers you observe in this situation.

3.  What could Elijah or Felicia have done to prevent this unsafe situation?

234

PROJECTS AND INITIATIVES

# Taking Care of Our Baby

*Real-life situations to help you to react non-violently to challenging childhood behaviors*



**Produced by Office of the Inspector General –
Department of Children and Family Services and
Teen Parenting Service Network (TPSN)**

**Produced by the Office of the Inspector General –
Department of Children and Family Services and the Teen
Parenting Service Network (TPSN)**

© Copyright, 3/1/2011 Office of the Inspector General, Illinois
Department of Children and Family Services. Revised 9/1/2012



# Contents

### *Mother's Scenarios*

Paola        …………………………...        1

Ira          …………………………...        3

Charlene     …………………………...        4

Susan        …………………………...        6

Debra        …………………………...        8

### *Father's Scenarios*

Ira          …………………………...        11

Marcus       …………………………...        12

Miguel       …………………………...        14

Gretchen     …………………………...        16

**1**

## Paola

Paola is an 18-year-old parenting ward who moved into a Transitional Living Program (TLP) with her 2-year-old son, Ivan. During the day she attends an alternative high school that she enjoys. Ivan is in daycare while she is in class. After school she spends her evenings taking care of her son and doing her homework. If Paola has to work or run an errand in the afternoon, her neighbor Michelle, who is also a parenting ward, watches Ivan.

Last Thursday night, Paola went to a study group meeting. Michelle agreed to watch Ivan for a couple of hours, as she planned to stay home for the rest of the evening to do laundry and study for an exam.

While Michelle was making dinner, Ivan became entangled in the cord of a hot iron, which fell off the ironing board and burned his leg. Michelle took care of Ivan's injury right away and called Paola on her cell phone soon after, to tell her about the incident.

Paola immediately returned home, and she and Michelle informed the TLP night staff. The staff decided that Ivan should be taken to the emergency room so that his burns could be examined. Paola and Michelle were very upset when they later learned that someone had called the hotline about Ivan's burn.  Paola and Michelle were worried that they could lose custody of their children. The incident was investigated and it was determined that neither Paola nor Michelle had done anything wrong.

While Paola was relieved, she continues to be anxious about future dealings with DCFS.



236

PROJECTS AND INITIATIVES

*Discussion Questions*  2

1. How do you think Paola and Michelle handled Ivan's injury?

2. If you were Paola, would you allow Michelle to care for your child again?

3. What are qualities that you should look for in the person that is caring for your child?

4. When looking over the home of the person caring for your child, what do you look for/pay attention to?

5. When leaving your child in someone's care, what instructions should you provide to the caretaker about your child's safety?

# Ira  3

Ira is a 20-year-old parenting ward. He currently lives in an independent living program. He is attending junior college full time and working. When he isn't going to school or working, he is taking care of his 4-month-old son, Malachi. Malachi lives with his mother Judith, who is 19 years old and works full time. Ira and Judith take turns caring for their baby.

Lately, Ira has been having a hard time balancing his busy schedule with his responsibilities as a dad. He has been having a hard time sleeping and concentrating, and is very irritable with Judith and the baby. One day, Judith walked in on Ira yelling at Malachi because the baby refused to sleep. That same day, Judith decided to talk to Ira about the tough time he seemed to be having. She encouraged him to talk to his caseworker about enrolling in counseling or parenting classes to help deal with the stress he is feeling.

Initially Ira said no, stating that he couldn't even find time to sleep, much less make appointments and see counselors. Fortunately, at their next meeting, Ira's worker asked him how he was dealing with being a new parent. At first Ira didn't admit that he was under a great deal of stress. But after awhile, Ira told the truth and talked about how juggling so many demands was becoming too much for him. He also said that every time Malachi refuses to stop crying, he feels like he is going to snap.

The worker acknowledged Ira's feelings and the two had a discussion about ways to reduce Ira's stress, and find healthy ways to manage the everyday challenges of being a young parent.

Although these days Ira is still very busy, he is doing better at managing his stress. He has joined a young fathers' program where he has learned some new skills that have helped him in caring for Malachi.

*Discussion Questions*

1. Have you ever felt like Ira? If so, what did you do?
2. What lessons can you learn from Ira's situation?
3. What are resources that you know of to help you when you are feeling overwhelmed and stressed out?

# Charlene

**4**

**5**

Charlene is 20 years old, and the mother of Amy, age 3. Despite numerous placement changes and periods of depression throughout her high school years, Charlene was a motivated student. After graduating from high school, Charlene obtained her CNA license, and then enrolled in a nursing program at a local community college. In preparation for her first semester, she placed her daughter into the day care program offered at the college which Amy could attend while Charlene went to class. Charlene was also able to move into her own apartment.

A few weeks after Charlene started college, she began to experience stress over balancing school and her responsibilities for Amy's care so she started drinking to help her cope. Charlene felt depressed, so she went to a doctor that she had seen in the past. The doctor agreed that she was depressed and prescribed anti-depressant medication. He reminded Charlene that even with the medication, it would take time to improve her mood. After starting the medication, Charlene continued drinking regularly. Her caseworker noticed beer bottles in the garbage during a visit, but Charlene denied that the bottles were hers.

Early one evening, Charlene had gone to see her new boyfriend in the park near her apartment where they had an argument. When she returned home, she was frustrated, sad, and angry, and she began to drink. It was late, so Charlene told her daughter to get ready for bed. As children tend to do at this age, Amy did not obey, and when Charlene placed her in the bed, Amy refused to lie down.

Already intoxicated and in a rage, Charlene spanked Amy. Amy then started to cry very loudly. Charlene was afraid that the neighbors would hear Amy and call the police, so Charlene placed her hand over Amy's mouth and nose, thinking that doing so would silence

her. Amy struggled and squirmed, still crying, but after a while she went limp.

*Discussion Questions*

1. What do you think happened to the child in this situation?

2. What was something positive that Charlene did to help her cope with her depression and stress? What are some things she did that made the situation worse?

3. What suggestions would you have for Charlene about ways in which she could manage her stress?

4. Charlene was mixing prescription medication with alcohol. In what ways can that be dangerous?

238

PROJECTS AND INITIATIVES

# Susan                                              6                                              7

Susan is a 17-year-old parenting ward who has a 3-year-old son, Cameron. A few weeks ago, Susan started dating Logan. Susan had not been in a serious relationship with anyone since Cameron was born, so she was excited that Logan was so interested in her.

When Susan's friend, Miranda, heard they were together, she told Susan that one of her friends had been with him last year and she ended it because Logan was violent. Susan immediately got angry, telling Miranda to stop being jealous and getting in her business.

When Logan, Susan and Cameron were together, Logan wasn't really interested in spending time with her son. He would often ask Susan to leave Cameron with a babysitter so that he and Susan could spend time alone.  He also often told Susan that she spoiled Cameron and that her son needed to toughen up.

One evening, Susan couldn't find a sitter and took Cameron with her to Logan's apartment to hang out. When Susan arrived she saw that there was no food that Cameron would eat, so decided to go to the store. Thinking that she would only be gone for about 30 minutes, Susan asked Logan to get Cameron ready for bed while she was out.

Once Susan was gone, Cameron refused to change for bed. Logan became angry with Cameron, so he grabbed and spanked him.  Cameron started to scream and cry for his mom. This only caused Logan to become angrier, so he punched Cameron in the stomach hard and told him to 'shut up.'

When Susan returned she saw Cameron clutching his stomach. When she asked her son about why he was holding his tummy, Cameron said that Logan had hit him in the stomach. Susan confronted Logan, and he said that he only gave Cameron a little spanking and that Susan needs to stop babying him. Susan didn't want to believe that Logan would hurt her child, so she tucked Cameron back into bed.

In the middle of the night, Cameron woke Susan, complaining of severe stomach pain. Susan knew that she should call a doctor, but was afraid that Logan would get in trouble and end their relationship; so she gave Cameron some water and told him to go back to sleep.

The next morning, Susan saw that Cameron was pale and breathing strangely. At this point Susan knew that she should get medical help, so she wrapped Cameron in a blanket and carried him to a nearby clinic. While Susan was waiting for him to see a doctor, Cameron died.

*Discussion Questions*

2.  Were there any clues that suggested Logan might not be the best person to care for Cameron?

3.  What are signs or signals to look out for when selecting someone to care for your child?

4.  Logan was Susan's first boyfriend in a long time and she felt that she loved him. What advice would you give Susan to help her realize that her child should come first?

5.  Why do you think Susan believed Logan and didn't believe her son?

# Debra

Debra is a 17-year-old parenting ward, who has an 11-month-old daughter, Eliana. They live with Debra's aunt. Last month, Debra started dating Shawn. Debra didn't tell her case worker much about him, other than his name. Although she didn't know him well, Debra started to regularly spend the night at Shawn's apartment.  She stayed there, even though she knew her case worker would not approve.

One evening, Debra decided to take Eliana with her to Shawn's place to watch a movie. As she usually did whenever she took Eliana with her, Debra took a portable crib in case Eliana got sleepy and some toys to hold her attention while she was awake. When the movie ended, it was after midnight. Eliana was already asleep and Debra was tired, so she decided they would spend the night at Shawn's. When she woke up the next morning, Debra realized that she hadn't packed enough formula, so she ran to the store.

While Debra was at the store, Eliana woke up hungry and wet. Her crying woke Shawn, so he picked the baby up trying to get her to stop. Shawn, however, had never had any experience taking care of an infant and as Eliana's crying got louder and louder, he became frustrated and angry. When he couldn't take the crying any longer, he shook Eliana hard and slammed her against a door frame. Eliana became quiet, so he put her back in the crib.

When Debra returned from the store she checked on Eliana and noticed that her head was swollen. She immediately went to Shawn and asked him what happened. He denied having anything to do with Eliana's injuries and he begged Debra not to call the police, confessing that he had recently been placed on probation for a battery offense.

Debra felt really torn. Although she really liked Shawn, she was more concerned about Eliana's condition. At this point, she was not thinking about what might happen to Shawn.  She immediately called 911 for emergency assistance.  While hospitalized, Eliana was

diagnosed with Abusive Head Trauma. Debra was told that her child might have died without immediate medical help.

*Discussion Questions*

1.  How do you feel Debra handled this situation? Would you do anything differently?

2.  Have you ever felt torn between a romantic relationship and your baby? How did you handle that situation?

3.  What are some qualities that you look for in someone who will care for your child?

240

PROJECTS AND INITIATIVES

# Taking Care of Our Baby

*Real-life situations to consider when you or someone else is caring for your child*

## *Father's Edition*



**Produced by Office of the Inspector General –
Department of Children and Family Services and
Teen Parenting Service Network (TPSN)**

## Ira

11

Ira is a 20-year-old parenting ward. He currently lives in an independent living program. He is attending junior college full time and working. When he isn't going to school or working, he is taking care of his 4-month-old son, Malachi. Malachi lives with his mother Judith, who is 19 years old and works full time. Ira and Judith take turns caring for their baby.

Lately, Ira has been having a hard time balancing his busy schedule with his responsibilities as a dad. He has been having a hard time sleeping and concentrating, and is very irritable with Judith and the baby. One day, Judith walked in on Ira yelling at Malachi because the baby refused to sleep. That same day, Judith decided to talk to Ira about the tough time he seemed to be having. She encouraged him to talk to his caseworker about enrolling in counseling or parenting classes to help deal with the stress he is feeling.

Initially Ira said no, stating that he couldn't even find time to sleep, much less make appointments and see counselors. Fortunately, at their next meeting, Ira's worker asked him how he was dealing with being a new parent. At first Ira didn't admit that he was under a great deal of stress. But after awhile, Ira told the truth and talked about how juggling so many demands was becoming too much for him. He also said that every time Malachi refuses to stop crying, he feels like he is going to snap.

The worker acknowledged Ira's feelings and the two had a discussion about ways to reduce Ira's stress, and find healthy ways to manage the everyday challenges of being a young parent.

Although these days Ira is still very busy, he is doing better at managing his stress. He has joined a young fathers' program where he has learned some new skills that have helped him in caring for Malachi.

### *Discussion Questions*

1. Have you ever felt like Ira? If so, what did you do?
2. What lessons can you learn from Ira's situation?
3. What are resources that you know of to help you when you are feeling overwhelmed and stressed out?

# Marcus

**12**

Marcus is a 19-year-old parenting ward. He currently lives in an independent living program. Two months ago, Marcus and Melody had their first child, Asia. Melody and Marcus aren't "together" anymore, but they are both committed to being friends and being good parents.

Melody, age 20, is not a ward and has custody of Asia. She and Asia live with her boyfriend, Dennis. When Melody is working, she either leaves baby Asia with her mom or with her boyfriend Dennis. She does not usually leave the baby with Marcus because he goes to school and works.

One day Melody asked Marcus to pick up Asia from Dennis' apartment. When he got there, the door was cracked open, so Marcus let himself in and found Dennis lounging on the couch getting high and listening to loud music.

 "Oh, so is my daughter not here then?" Marcus asked from the doorway.

"What?" Dennis answered.

Yelling over the music this time, Marcus responded, "My daughter, Asia. Is she here?"

Dennis turned the music down and with a slightly dazed look, replied: "Huh? Yeah, she's in the bedroom. Can't you hear her? She won't stop crying."

Marcus, worried asked: "What? My daughter is crying and you're in here smoking? Why is she crying?"

"Yeah, I am. I don't know why she's crying! Your daughter makes me crazy when she cries all the time. Look, I couldn't deal with it. I put her in her crib, made sure she was safe, closed the door and lit up. What's the problem?" Dennis answered.

**13**
.

Marcus tried to calm himself down, and continued, saying "Dennis, I don't know you and I don't care what you do on your own time, but when you're around my daughter, smoke outside or don't smoke at all."

Dennis was on his feet and in Marcus' face in a flash. In an aggressive tone he responded: "First of all, don't come in my house telling me what to do. *I* pay the rent here. Melody's with *me*. *I* buy diapers for YOUR daughter. If you don't like how I do things..."

Although Dennis looked ready to fight and Marcus felt irritated enough to fight back, Marcus was more concerned about his crying daughter in the next room. So instead of fighting, he said: "Look Dennis, whatever. I'm not trying to get into it with you. I just came for my daughter. I'm gonna go get her, and leave. Melody can pick her up from me later."

*Discussion Questions*

1. Who do you identify with in this story? Dennis or Marcus?

2. Does Dennis seem like a good role model? What about Marcus?

3. What do you think Dennis did well in this situation? What about Marcus?

4. Clearly, Dennis should not have been getting high around Asia, no matter how much she was crying. What would *you* do if your young child would not stop crying? What suggestions would you give someone who was caring for your child who might be crying?

5. What type of a person do you want watching your child? When looking over the home of the person caring for your child, what do you look for/pay attention to?

6. Do you think it is important to get to know who is watching your child when you aren't there? When leaving your child in someone else's care, what instructions should you provide to the caretaker about your child's safety?

# Miguel

**14**

Miguel is a 20-year-old ward who plans to emancipate soon. He currently works during the day and attends college at night. Miguel has a 2-month-old baby named Miguel Jr. Junior lives with his mother Blanca, who is not a ward. Miguel cares for Junior every Saturday and Sunday. He loves any opportunity to spend time with his son, and everyone can see how happy he is when he is caring for Junior.

One Sunday afternoon Miguel was taking care of Junior. It was a normal day. Junior was asleep in his crib while Miguel was watching the game and catching up on some homework. Right on schedule, Junior woke up crying for his bottle so Miguel paused the game and got up to warm the bottle on the stove. While it was warming, Junior continued to cry, so Miguel went to console him.

Miguel picked the baby up and began to rock and gently bounce him, but it wasn't doing much good. When Junior's crying turned into full-out screaming, Miguel placed Junior back in the crib and rushed to the kitchen for the bottle, which had been warming in a pan of water on the stove. When he returned, Miguel picked up Junior (who was still wailing) and placed the bottle in his mouth. Junior quieted for a second but then began spitting the formula out, getting it all over himself.

Miguel was frustrated. No matter how hard he tried, Junior refused to stop crying, refused to drink his bottle, and now he needed a bath. Putting the bottle down, Miguel started to walk back and forth while rocking Junior, hoping that he would just stop screaming. Over Junior's screaming, Miguel suddenly heard the smoke detector go off! He instantly remembered that he had left the pan of water on. Miguel put Junior down and ran into the kitchen which was filled with smoke and smelled like the burning pan. Miguel put the pan in the sink and opened the windows. Meanwhile, Junior was still screaming at the top of his lungs. Beyond frustrated, Miguel picked up Junior and tried to feed him the bottle again. Just like before, Junior spit up the formula.

**15**

Suddenly, something inside of Miguel snapped. Miguel threw the bottle against the wall, and forcefully slammed Junior into his bouncy seat.

*Discussion Questions*

1.  What do you think happened next?

2.  According to all of his friends and family, Miguel is a great father to his son.  Unfortunately, at this moment, he has lost his temper. Miguel is alone and freaking out. What could Miguel have done differently to avoid hurting his child?

3.  Sometimes babies cry for a reason and sometimes they cry for no reason at all. What are some tips to keep parents from responding in a non-violent way when their children won't stop crying?

## Gretchen and Elena

16

Gretchen is 16 years old and lives in foster care with her 3-month-old daughter, Elena. Gretchen attends an alternative school full-time, so while Gretchen is at school during the day, she usually places Elena in daycare.

Today, Gretchen woke up late. Gretchen takes public transportation and she knew she would not have time to drop Elena at daycare *and* make it to school on time, so she called Elena's father, Ron. Ron is 20 years old, also a ward, and he lives with his aunt and uncle. Their home is a block away from Gretchen's school, so every once in a while when Gretchen needs a last minute caregiver before school, she takes Elena there. Ron's aunt is retired, so when Ron is caring for Elena, she helps him out.

Gretchen dropped Elena off at Ron's house, and was able to get to school on time. Gretchen had a good day at school, and at 3 p.m, she left to pick up Elena. When she arrived at Ron's home he was already waiting by the door with their baby. Elena was sleeping in her carrier. Gretchen noticed that Ron looked frazzled and stressed, so she asked if Elena had been too much trouble. Ron only replied that as soon as his aunt left to have lunch with her church group at 12, Elena had started to cry non-stop. Ron then said that he was tired and wanted to sleep, so Gretchen left with the baby.

Elena slept through the entire bus ride home. When Gretchen got into the house, Elena was still sleeping and Gretchen didn't want to wake her, so Gretchen left her in the carrier. Gretchen ate a snack and soon got busy with her homework.

By the time she finished it was 8 o'clock. At this point Gretchen suddenly remembered that Elena still hadn't woken up, or eaten anything so she went to pick her up from the carrier. Elena was still asleep so Gretchen tried to wake her up. Elena didn't move, and Gretchen noticed that Elena was breathing very quick and shallow. Gretchen called 911.

*Discussion Questions*

17

1. What do you think is wrong with Elena?

2. What might have happened to Elena while in her father's care?

While at the hospital, Gretchen found that her daughter had Abusive Head Trauma syndrome, caused by severe shaking. Upon finding out, she called Ron from the hospital. Ron confessed and said:

*"I don't know what happened! At first when you dropped her off everything was fine. Me and my auntie were playing with her, and Elena seemed happy. At around noon, my auntie put Elena down to sleep and left for her church group. Everything was cool until she woke up. When she woke up, she was crying but she didn't want me. I think she wanted my auntie. She was screaming so loud! I told her, 'What are you crying for? I'm your dad!' But she wouldn't listen. I changed her diaper or whatever, but she just cried more. I picked her up again and she screamed right in my ear, so I shook her to get her to calm down. Then I shook her more until she stopped crying. Her face looked funny but I figured that's just how babies look, so I put her back down and then gave her back to you."*

3. Ron was in a situation where his child wouldn't stop crying. What are some things that he could have done to try and get her to stop? What if those suggestions don't work? What should a parent do when they have tried to soothe their baby in every way possible but the baby still will not calm?

PROJECTS AND INITIATIVES

# Seven Frustrating
**(annoying / funny / tiring / crazy)**
# Child Developmental Stages
# ...and how to handle them!



Adapted from Seven *Deadly Sins of Childhood: Advising Parents About Difficult Developmental Phases*
by Barton D. Schmitt, M.D.

© Copyright, 03/1/2011
Office of the Inspector General, Illinois Department of Children and Family Services

PROJECTS AND INITIATIVES

Seven of the more difficult developmental phases for any parent to deal with are colic, awakening at night, separation anxiety, normal exploratory behavior, normal negativism, normal poor appetite, and toilet training resistance.  For the child living in a high-risk family, these innocent acts can trigger dangerous or even deadly abuse.  (Schmitt, 421). *Seven Frustrating (annoying / funny / tiring / crazy) Child Developmental Stages...and how to handle them!* was created to reduce instances of this type of abuse.

The information in this booklet is based on Dr. Barton D. Schmitt's article: *Seven Deadly Sins of Childhood: Advising Parents About Difficult Developmental Phases.* A copy of this article can be found in the Journal of Child Abuse & Neglect, Volume 11, Issue 3, 1987, Pages 421-432.

---

Artwork created by Alex De La Cruz of Whitney Young College Preparatory High School. Go Dolphins!

---

© Copyright, 03/01/2011

Office of the Inspector General, Illinois Department of Children and Family Services

Revised 9/2012

---

# COLIC

**From the age of a few weeks to 3 months, some babies are very fussy and cry for no reason. They may act like this for as little as 20 minutes or as much as 2 hours (or more) non-stop. You may find yourself asking "why won't s/he just STOP CRYING??"**

**WHY?** No one knows exactly. Even when the caregiver has met a baby's basic needs (being fed, diaper being dry, etc), a baby may cry for no obvious reason. Don't take it personally; your baby is just being fussy and cranky. Think about when *you* feel cranky. Babies get cranky too, but the only way that they know how to express themselves at this point in their development is to cry.

**IS THIS NORMAL?**
　　**YES!** 10 to 15% of babies are colicky.

**WHAT CAN I DO?** Help your baby fall asleep with soothing, comforting, rhythmic activities like rocking, or a windup swing. If you feel overwhelmed, go into a different room and let your baby cry. While doing this, try to relax and rest. Talk to people in your support system. Remind yourself that your baby's crying is completely normal, and that you are doing a great job!



**WHAT SHOULDN'T I DO?** The problem can be made worse when the parent is anxious, yells, or handles the baby roughly. Again, don't take the crying personally; your baby is just being fussy and cranky.  Don't overfeed your baby. A crying baby is not always a hungry baby. A baby that is too full is just as uncomfortable as an adult that is too full (think about how you feel after a large, filling meal where you don't even have room for dessert!).

1

245

246

PROJECTS AND INITIATIVES

# Trained Night Crying



**At the age of 4 months or older some babies that have been put down to sleep for the night wake up crying for no apparent reason. When you are trying to rest and you wake up in the middle of the night to the sound of your baby crying, you may feel a little (or a lot) crazy!**

**WHY?** Before the age of 4 months, babies are fed every 2 hours. This is a routine they become used to. As you know (or will find out!), after the age of 4 months, babies do not need to eat as often. However, waking up every two hours to eat is a hard routine to break, so they continue to wake up.

**IS THIS NORMAL? YES!** Babies often have difficulty adjusting to a new routine. But this stage, like the others, will eventually pass.

**WHAT CAN I DO?** Place your baby in the crib while awake, so that s/he gets used to falling asleep in the crib. Interact with your baby as little as possible between 10 p.m. and 6 a.m. This means that you shouldn't pick your baby up during these times, if possible. If s/he wakes up crying during these hours: 1. Wait five minutes. 2. If after five minutes, your baby is still crying, go in for one minute or less to comfort him/her, but do not pick the child up from the crib.

**WHAT SHOULDN'T I DO?** Do not put your baby down for a long nap during the day. As with Colic, the problem gets worse when the parent is anxious, yells, or handles the baby roughly - so be gentle and calm.

2

# Separation Anxiety



**Between the ages of 6 months to 2.5 years, some toddlers may be intensely clingy. Between 6 and 16 months they may throw a fit whenever their parent is out of sight - even when the parent is still in the house! Up until 2.5 years old, a child may throw tantrums when left with a new or unfamiliar caregiver. This behavior can be exhausting and a little annoying for a parent to deal with.**

**WHY?** Before about 6 months, when an infant doesn't see their parent, they don't complain because anything an infant doesn't see doesn't exist for them. After about 6 months, the opposite happens. At this point in their development, babies understand that their parent (who is usually with them at all times) is not there. This makes them feel scared and anxious.

**IS THIS NORMAL?** YES!

**WHAT CAN I DO?** If possible, play separation games like peek-a-boo and hide and seek. Practice separations. Leave your baby with someone s/he knows, likes, and sees a lot. When you have to leave your child, explain to him/her that you are going out, but will return.

**WHAT SHOULDN'T I DO?** Don't punish your child for his/her feelings. This may make them feel more afraid. When you leave your child with a caregiver, don't sneak out! Take your time, so they can see you go.

3

# Normal
## Exploratory
### Behavior

**Children around 1 year old and older sometimes crawl or walk around, touching and playing with everything possible. They just can't seem to stay still! It can be challenging for you to have to pay attention to your child's every move to keep him/her safe.**

**WHY?** At this age, babies are just curious! They have seen their parents freely walk around and now they are able to do it themselves.  They are learning that there is an entire world for them to discover!

**IS THIS NORMAL? Yes!** It is completely normal for your child to want to wander around touching and playing with everything within reach.

**WHAT CAN I DO?** Baby proof! Lock up things that could be dangerous. Block off areas that could cause injury - like the kitchen, a space heater, or a flight of stairs. Try creating a safe environment for your child to explore, and then let him/her loose!  When you are doing something that doesn't allow you to closely monitor your child (like cooking or taking a shower), place your child in their playpen.

**WHAT SHOULDN'T I DO?**  Try not to lose your temper when your child explores.  Don't leave out items that may injure your child, like items used for smoking, cleaning chemicals, candles, and glass.

4



*How did she even get up there???*

5

PROJECTS AND INITIATIVES

247

248

PROJECTS AND INITIATIVES

# Normal Changes in Appetite



**Appetite in many children normally falls off between ages 18 months and 3 years. Some children at this age may want to have small snacks throughout the day, or may suddenly be very picky. Sometimes an item that was their favorite last week is 'yucky' this week. Trying to keep up with your child's mood changes can be tiring.**

**WHY?**  By age 2, normal children eat less than when they were babies. This is because at age 2 they are not growing as quickly as they were before, and as a result, do not need to eat as often.

**IS THIS NORMAL? YES!**

**WHAT CAN I DO?** Make meal time fun. Listen to your child and see what foods they prefer to eat. Try giving your child finger foods or table foods they can feed to themselves, like slices of banana or small pieces of toast. If you feel like your child is looking too thin, talk to your doctor for advice.

**WHAT SHOULDN'T I DO?**  Don't take your child's behavior personally. Your child is not refusing to eat because s/he doesn't like you. Don't force or bribe your child to eat when s/he is not hungry.  Once your child knows how to feed him/herself, don't feed them. If you try providing food for your child and they don't take it, just put the food away and try again later.

6

# Toilet Training Resistance



**Sometimes it can be a pain to get your toddler to use it. When a child is fully trained, s/he uses the bathroom without any help-start to finish. Some children love using the potty, while others refuse to even sit on it. This resistance can happen between the ages of 18 months and 3 years old.**

**WHY?**  Using the potty is a big change, and children have a hard time changing to a new routine. Throughout your child's entire life, s/he has used diapers. Your child needs time to process this new change.

**IS THIS NORMAL?  YES!** There is no fixed age for when a child is going to be comfortable using the potty. As a rule of thumb, a child is usually trained by age 3.

**WHAT CAN I DO?**  Help your child practice using the potty. Make using the potty fun. All cooperation with the practice session should be praised. Be sympathetic about accidents. Give rewards for success.  Pay attention to the times that your child usually relieves him/herself. When close to those times, walk your child over to the potty and encourage them to use it.  Explain to your child that it is better to have dry pants and to use the potty.

**WHAT SHOULDN'T I DO?**   Don't begin to train your child if s/he is in the middle of their 'No' phase - It won't work.  Don't think that accidents are your child's way of 'getting back at you' or being rude. They aren't. Accidents are just accidents. Don't scold or punish your child when s/he has an accident, even if the accident is annoying for you to clean up.

7



PROJECTS AND INITIATIVES



# No!rmal Negativism

**Between the age of 16 months and 3 years old, many children say 'No!' a lot. Like, a lot. They do this so much that it feels like they say 'No' to every question, no matter who is asking or what is being asked.**

**WHY?**   At this age, your child is beginning to understand that s/he is his/her own person, and can have an opinion.

**IS THIS NORMAL?  YES!** This is a healthy phase that is important in your child's attempts at self-determination and doesn't always mean 'No.' Sometimes, to a child 'No' means 'Do I have to? Or 'Why?'

**WHAT CAN I DO?**  Give your child extra choices and alternatives to increase his/her sense of freedom and control. For example, at bed time, let your child choose the book that is read; or at snack time, give your child snack options to choose from.   Try wording your requests positively. For example, if you want your child to change for bed, say 'Let's get changed for bed!' instead of saying something like, 'You better get changed for bed, or else!'

**WHAT SHOULDN'T I DO?**   Don't take your child's behavior too seriously or personally. Your child isn't saying 'No' to be rude or disrespectful. Your child is just trying to practice his/her independence. Also, don't punish your child for saying 'No.' Punishment should be for what your child does, not what s/he says.

## NOTES

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

8

9

## OLDER CAREGIVERS

The Inspector General investigated the tragic death of a four year-old and his grandfather who both perished in a house fire. The 72 year-old grandfather who suffered from chronic obstructive pulmonary disease and congestive heart failure was identified by Intact Family Services providers as the alternative caretaker for the four year-old boy, his nine year-old brother and three month-old sister because of his daughter's drug addiction. The grandfather requires daily oxygen and a walker for mobility. The oxygen canister exploded during the fire. The Department on Aging providers, of which the Intact Family Services providers were unaware, determined the grandfather's condition represented a safety risk to him evacuating the home and he should not be left alone. When the lethal fire broke out in the home, the four year-old, who had exited the home, re-entered the home to help his grandfather get out of the house. The children's mother, who was not in treatment for her drug problems, had left him in the care of the grandfather. The cause of the fire was a cigarette that the mother had left burning. In response to these deaths, the Office of Inspector General and the Illinois Department on Aging collaborated in the development and filming of a three hour training video for case managers and supervisors who provide in-home services to the elderly through the Community Care Program. The training focuses on identifying situations that should prompt child welfare interventions for impaired elderly recipients of Department on Aging services.

In 2012, 5,251 adoptive/foster parents over the age of sixty were caring for 8,663 children; 6,754 of the children live in adoptive or subsidized guardianship placements; the remaining 1,909 children are in foster care placements. Adoptive/foster parents, sixty and older, represent approximately 21% of DCFS involved adoptive/foster parents.

During 2012, the Inspector General's staff conducted 13 trainings on the revised 60+ Subsidy Checklist (CFS 1800-U)[1] used to support a "life-span approach" to permanency planning when children are in the care of older foster parents. The Checklist assesses the older caregivers, the child, and the backup plan related to the long term stability of the adoption or guardianship. Staff from the Inspector General's Office and the Illinois Department on Aging also presented the Illinois Older Caregiver Model at the National Foster Parents Association Conference.

In FY 2013, The Office of Inspector General will work with the DCFS Division of Policy and Advocacy to incorporate the above protocols into DCFS Policy and Procedure. Additionally, DCFS and the Illinois Department on Aging will continue interagency cross trainings.

## ETHICS

**ETHICS OFFICER**

The Inspector General is the Ethics Officer for the Department of Children and Family Services under the *State Officials and Employees Ethics Act*. 5 ILCS 430/20-23 (2011). One important role of the Ethics Officer is to provide guidance to Department officers and employees in interpreting the Ethics Act, the Child Welfare Code of Ethics and Rule 437, *Employee Conflicts of Interest*.

---

[1] The form received a Child and Family Services (CFS) number in May 2012.

The Ethics Officer answers questions from the field; monitors the mandated annual ethics training; reviews all Statements of Economic Interest submitted by over 700 specified Department employees annually; and, when requested, provides a revolving door waiver analysis to the Office of the Executive Inspector General (OEIG) for certain employees leaving Department employment.  A member of the ethics staff sits on the Department's Conflicts of Interest Committee, which responds to Department employee inquiries that fall under the purview of Rule 437.

## Ethics Inquiries from the Field
During fiscal year 2012, the Ethics Officer responded to inquiries from both Department and private agency employees. Inquiries generally fell into the following categories: secondary employment; gifts and honoraria; conflicts arising due to multiple relationships; political activity; sales/solicitation; confidentiality; contracts and placement issues.  Some of the inquiries that the Ethics Officer received during fiscal year 2012 are detailed below:

### Secondary Employment
The Ethics Officer fielded several questions related to an employee engaged in secondary employment. Some of the secondary employment inquiries were referred by the Conflict of Interest Committee in instances when the Committee received an inquiry that was outside the scope of the Committee's review:

- A DCFS employee who was involved in a national organization inquired about whether she could send a letter to the Illinois Governor about budget cuts for mental health services on behalf of the organization.  The Ethics Officer advised her that there was no impropriety in sending the letter as long as it was clear that it was on behalf of the organization and not DCFS and did not use state resources.
- A DCFS employee was offered compensation for a training she had been invited to present (which was not part of her DCFS job duties) to an agency with a Department contract.  The Ethics Officer advised that while presenting the training was acceptable, she could not accept any compensation from the private agency because they had a contract with the Department.
- A DCFS Supervisor inquired about whether his supervisee's secondary employment was allowable under the Department's Conflict of Interest Rule 437.  The employee was a part-time instructor at a community college.  The Ethics Officer advised that there was no conflict.

### Gifts and Honoraria
- A day care licensing representative inquired about whether she could accept free office supplies from a client.  The Ethics Officer advised that although the client obtained the supplies at no cost to herself, it was improper for the licensing representative to accept any type of gift from a client over whom she has regulatory authority.

- A deputy director inquired about whether it was improper to accept a complimentary invitation to a private agency event, valued at $250.  The Ethics Officer advised that the Ethics Act provided an exception for gifts from a "prohibited source" valued under $100 per year and that if she attended, she would need to pay for the amount of the ticket value that exceeded the excepted amount.  The employee was also advised that Department Rule 437 – *Employee Conflicts of Interest* might provide additional restrictions related to her accepting something of value. The employee determined not to accept the invitation.

### Conflicts of Interest Arising from Multiple Relationships
- A former DCFS employee who is now a counselor at a private agency (with no Department contract) contacted the Ethics Officer about whether it was a conflict for her to counsel a DCFS ward of whom she took protective custody eight years earlier, when the ward was a young child.  After evaluating the facts, the Ethics Officer advised that given that protective custody was taken

so many years earlier, and the child is now in a pre-adoptive placement, there was not a conflict in her providing the counseling.

- A DCP supervisor contacted the Ethics Officer because her son was invited to the birthday party of a classmate who she later learned was the subject of an investigation being handled by another team in the region. The supervisor had already consulted with the investigative team's supervisor as well as the region manager. She determined the most prudent course of action was to disclose her position to the mother of the classmate and establish that she would not be able to discuss any details about the pending investigation. The Ethics Officer determined that the actions the supervisor had already taken were appropriate and sufficient.

### Political Activities

- A DCFS employee inquired whether it was improper for her to display a political bumper sticker on her personal vehicle. The Ethics Officer advised her that displaying a partisan bumper sticker was not a violation of the Ethics Act; however, given that the employee regularly visited the homes of DCFS clients, she should consider the appearance of the bumper sticker and whether it could potentially make some clients uncomfortable.

- A DCFS employee inquired about whether there was a conflict of interest between her public employment and her husband running for elective office in the same county where she worked. The Ethics Officer advised that because of the employee's specific duties, which involved supporting several countywide boards throughout the state which included appointed members of the general and elected community, the employee would need to disclose the fact of her spouse's campaign and, in the event that her spouse was elected into office, would not be able to work with any individuals appointed to serve the Department who also reported to her spouse. To avoid the appearance of a conflict of interest, the employee voluntarily recused herself from participating with the board in the county where her spouse was campaigning.

### Sales/Solicitation

- A DCFS employee inquired about whether she could distribute flyers around her DCFS workplace for a salon where she was employed on the weekends. The Ethics Officer advised that it is improper for the employee to solicit business for the salon while on state property or during state time. Since this employee worked in a building where there were non-state businesses on the first floor, however, the Ethics Officer advised that there was no prohibition against her distributing flyers to those businesses either before/after work or during her lunch break.

- A DCFS employee complained to the Ethics Officer that one of her co-workers regularly displayed bath and body products for sale at her desk, and that other employees often stopped by to sample the products and chat about her business. The Ethics Officer contacted the supervisor of the employee who allegedly displayed the products for sale, and counseled that such activities were in violation of the DCFS Sales and Solicitation Policy included in the DCFS Handbook.

### Confidentiality

- An intact services worker inquired about confidentiality restrictions because, based on a publicized police photo, she believed that one of her DCFS clients was a sought after criminal. The Ethics Officer advised the worker that Department Rule 431.90(a)(1)(A) permitted the disclosure of personal information without consent in certain circumstances, and that she should contact the police with the individual's location.

*Contracts*
- The Department inquired about whether it was improper to contract with a private agency when the spouse of the private agency's Executive Director had an independent contract with the Department. The Ethics Officer advised that under the relevant provisions of the Illinois Procurement Code, the Executive Director had met the disclosure requirements and the potential contract was not improper.

*Placement*
- An APT Liaison inquired as to whether it was a conflict of interest for a private agency to place and monitor wards in the foster home of an employee of that private agency. The Ethics Officer advised the liaison that it is improper for a private agency to license and monitor the foster home of one of its own employees. To avoid a conflict, the Ethics Officer advised that the licensure and monitoring of the foster home should be conducted by the Department or a different private agency.

## Revolving Door Prohibition

The "Revolving Door" provisions of the State Employees & Officials Ethics Act (5 ILCS 430/5-45) prohibit former DCFS employees who, within one year of leaving state employment, accept employment (or receive compensation) from an entity who has contracts with DCFS, *if* that individual participated personally and substantially in the award of state contracts to the entity they now seek to be employed by.

The statute requires DCFS to compile a list of individuals who, by their job titles, may have participated personally and substantially in the award of state contracts or regulatory/licensing decisions. If an individual is on this list, he or she needs to seek special approval from the Office of the Executive Inspector General (OEIG), and the DCFS Ethics Officer provides the OEIG an analysis relating to a specific employee's job duties and interactions with his/her prospective employer.

During fiscal year 2012, the Ethics Officer provided one revolving door analysis for an employee seeking to leave state employment. Ethics staff responded to numerous inquiries from the field about the revolving door waiver process.

## Statements of Economic Interest Reviews

The Office of the Inspector General received and reviewed 746 Statements of Economic Interest that were required to be filed by persons in the Department who:

> (1) are, or function as, the head of a department, commission, board, division, bureau, authority or other administrative unit within the government of this State, or who exercise similar authority within the government of this State;

> (2) have direct supervisory authority over, or direct responsibility for the formulation, negotiation, issuance or execution of contracts entered into by the State in the amount of $5,000 or more;

> (3) have authority for the issuance or promulgation of rules and regulations within areas under the authority of the State;

> (4) have authority for the approval of professional licenses;

(5) have responsibility with respect to the financial inspection of regulated nongovernmental entities;

(6) adjudicate, arbitrate, or decide any judicial or administrative proceeding, or review the adjudication, arbitration or decision of any judicial or administrative proceeding within the authority of the State;

(7) have supervisory responsibility for 20 or more employees of the State;

(8) negotiate, assign, authorize, or grant naming rights or sponsorship rights regarding any property or asset of the State, whether real, personal, tangible, or intangible; or

(9) have responsibility with respect to the procurement of goods or services.       5 ILCS 420/Art. 4A-101.

OIG Ethics Staff preliminarily reviewed each Statement to ensure that the technical requirements (i.e. each item answered, form signed and dated in blue ink) were met.  Of the 746 Statements filed, the Ethics Officer further reviewed every Statement which included a response other than "none" or "n/a," which amounted to 112 (15%) Statements.  Of those 112 Statements that were further reviewed, there were 50 instances in which an answer provided on the SOEI indicated that the employee engaged in some form of secondary employment or other government employment within the preceding calendar year.  In 34 (68%) of those 50 instances, the Ethics Officer sent a letter to the employee and supervisor reminding each of the potential for a conflict of interest that always exists between State employment and outside work, and the importance of maintaining clear boundaries between State employment and any secondary employment.  The breakdown is illustrated below.



- 112 (15%) Ethics Officer "further review"
- 50 (44%) of the SOEIs that were "further reviewed" involved secondary employment
- 34 (68%) of the 50 employees who had some form of secondary employment were sent secondary employment letter.

Apart from secondary and government employment, the Ethics Officer reviewed:

- 20 reports involving real estate ownership (of which the ownership interest exceeded $5,000 or from which dividends exceeding $1,200 were derived during 2011) or the sale of a capital asset resulting in a capital gain of greater than $5,000;
- 25 reports of a business interest or ownership (of which the ownership interest exceeded $5,000 or from which dividends exceeding $1,200 were derived during 2011);
- 16 reports involving business interests or employment by a spouse or family member of the reporter;
- 14 reports of gifts received valued (in aggregate) of greater than $500

# SYSTEMIC RECOMMENDATIONS

The Inspector General's investigative reports contain both systemic and case specific recommendations. The systemic reform recommendations for Fiscal Year 2012 have been categorized below according to the function that the recommendation is designed to strengthen within the child welfare system.  The Office of the Inspector General (OIG) is a small office in relation to the child welfare system.  Rather than address problems in isolation, the OIG views its mandate as strengthening the ability of the Department and private agencies to perform their duties. Recommendation categories are as follows:

- BACKGROUND CHECKS
- CHILD PROTECTION INVESTIGATIONS
- CLINICAL CONSULTATION
- CONTRACTORS
- DOMESTIC VIOLENCE/INTACT SERVICES
- JUVENILE COURT/LEGAL SERVICES
- LICENSING
- MEDICAL
- PERSONNEL
- SERVICES
- SERVICES – EDUCATION

## BACKGROUND CHECKS

- DCFS and DHS should determine the number of personnel and operations costs needed to complete background checks of license-exempt childcare providers to prevent the large backlog from recurring.

- DCFS must hire a reasonable number of temporary staff to resolve the backlog of background checks for license-exempt childcare providers.

- DCFS should determine appropriate production goals for staff doing background checks for licensed and license-exempt providers and include that number in personnel evaluations in the future.

## CHILD PROTECTION INVESTIGATIONS

### Safety Assessments

- The Department should integrate into its Safety Assessment Protocol the following:  *If the caregiver has ever been indicated for abusing, neglecting or failing to protect a child or has previously been assessed to lack Protective Capacity, please state reasons, other than the self-report of the caregiver, which lead you to believe that the caregiver's Protective Capacity has changed.*

### Coordination with Law Enforcement

- Child protection must hold a case conference with the criminal state's attorney when a child who is the subject of a child protection investigation is also the victim in a criminal proceeding involving the same incident.

- DCFS Cook Regional Managers need to develop a system of quarterly meetings with each of their corresponding Chicago Police Department's Child Abuse Coordinators to facilitate communication, coordination and timely retrieval of relevant information, including arrest reports.

*Child Protection Management*
- SACWIS currently only automatically prompts management approval for death and facility reports. The automatic prompt for management approval should include allegations of burns, head injuries, internal injuries and children under six with allegations of cuts, bruises, welts, abrasions and oral injuries.

- Child Protection supervisors should be trained to manage and triage database alerts for their teams. Any alerts indicating that a child has not been seen within five days, must be immediately addressed to insure the child's safety.

- The Department must track, and supervisors and management must respond to, failure to actually see the child that is the subject of the investigation.

*Rules and Procedures*
- Procedures 300, Appendix B: Reports of Child Abuse and Neglect, The Allegations System should be amended to add the following instruction to all allegations of physical abuse. This requirement should not be limited to Allegation #11-Cuts, Bruises, Welts, Abrasions and Oral Injuries. *Ask the child if there is an extended family member, another adult or caretaker that he or she feels safe with, important or special to. Persons identified by the child victim shall be interviewed.*

- The Department should amend procedures to reflect the importance of contact with the involved non-custodial parent, to include, but not be limited to, the following:

  B) Section 300.60(c) Required Investigative Contacts should be revised to state:

    If all of the subjects and other adults and children who are regular members of the alleged child victim's household *as well as the involved, non-custodial parent,* are not listed on the SACWIS intake summary at the time the report is taken, the Investigation Specialist shall add them to the SACWIS investigation.

    During the formal investigation, investigative staff shall have direct, in-person contact with all children in the child victim's household, alleged perpetrators and other adults in the household, if these contacts have not already occurred. ***During the formal investigation, Investigative staff shall also interview the non-custodial parent, if involved in the child's life, if this interview did not already occur, as there is a presumption that involved non-custodial parents have relevant information.*** Since contact with the alleged child victim(s) is required during the initial investigation, it need not be repeated during the formal investigation, unless the Investigation Specialist determines further contact is necessary or additional contacts are necessary due to the existence of a safety plan/unsafe safety assessment.

    B) Section 300.60(c) subsection (4) should be added to state:

        ***4) The Non-Custodial Parent Who Is Involved in their Child's Life***

        ***The Investigation Specialist is required to interview the involved non-custodial parent. There is a presumption that involved non-custodial parents have relevant information and therefore should be interviewed during the child protection investigation.***

C)  Section 300.60(g) Other Required Investigative Contacts should be revised to state:

In addition to the required contacts with the subjects of the report, other persons in the household, ***the involved non-custodial parent,*** law enforcement agencies, and the State's Attorney's Office, the Department has established other minimum investigative contacts for each allegation that are required before the investigation can be considered completed. See Appendix B, The Allegations System, for specific investigative standards for each allegation.

E)  Section 300.100(d) Notify Subjects of the Report should be revised to state:

The Investigation Specialist shall make reasonable efforts to verbally notify the parent/guardian of the alleged child victim, and/or the alleged perpetrator if different from the child's parent/guardian, of the Investigation Specialist's recommended determination (indicated or unfounded). ***Additionally, the Investigation Specialist shall make reasonable efforts to verbally notify the involved, non-custodial parent of the recommended determination. The Investigation Specialist shall make reasonable efforts to notify non-involved non-custodial parents of indicated reports, and make reasonable efforts to notify non-involved non-custodial parents of unfounded reports when they are aware of the report.*** The Investigation Specialist shall communicate with limited/non-English speaking or hearing impaired persons as well as persons with other disabilities, using a method by which they can understand the notice, e.g., interpreters, TDD/TTys etc. The Investigation Specialist shall document all efforts to make such verbal notification and the method used on a SACWIS contact note.

### *Medical Issues*

- Any time a child who is the subject of a child protection investigation is hospitalized during the course of a DCP investigation, DCP should convene a case conference with the treating medical and social work team to address child safety and discharge planning.

- The Department should develop an effective consultation process and procedures specific to failure to thrive investigations and the provision of intact family services in cases with a failure to thrive child.

- The Department should revise the procedures for investigating an allegation of failure to thrive (Allegation 81) so that they are consistent with current medical literature that FTT is at times a multifactorial condition and the existence of an organic component of the FTT does not rule out a non-organic component as well.

- The Department should announce that DCFS Nurses can be a resource for assistance during child protection investigations where prescription drug abuse is suspected.

- The OIG reiterated a prior recommendation that any time a child who is the subject of a child protection investigation is hospitalized during the course of a DCP investigation, DCP should convene a case conference with the treating medical and social work team to address child safety and discharge planning.

### *Staffing*

- The Department must address and remedy its continuing violation of BH consent decree standards for the number of investigations assigned to child protection investigators.

- Given the violation of the BH consent decree, the Department should evaluate whether there can be valid research comparisons between the investigative control group and the differential response experimental group.

## CLINICAL CONSULTATION

- When Clinical Consultants note a critical parenting issue that threatens the safety of the child during an Integrated Assessment or a clinical consult, the consultants must provide written recommendations to amend the Service Plan, if necessary, to address critical risk or safety issues.

## CONTRACTORS

- At the time of hiring, a hard copy of the Department Rule covering Conflicts of Interest should be provided to all DCFS contractors for personal service.

- The current agency performance monitoring system fails to ensure safety of children, address noted agency deficiencies and problems, and enforce contractual and other requirements.  The Department should replace the existing monitoring system with a single coordinated system designed to competently evaluate agencies' performance, define the problem and develop solutions, and react to child safety concerns based on fact-gathering confirmatory measures.  An effective monitoring system must combine and integrate programmatic, financial, licensing and contractual monitoring functions.

## DOMESTIC VIOLENCE / INTACT SERVICES

- Policy 2010.23, which provides for batterers to remain in the home with a domestic violence safety plan, should be amended to clarify that when domestic violence has occurred in the home, it is presumed that the home environment is too dangerous for the child to remain, unless the perpetrator of violence is out of the home.  Policy 2010.23 should make clear that establishing a domestic violence safety plan for children should not preclude taking protective custody.

- The Department's Domestic Violence Specialists should always encourage investigators and child welfare workers to retrieve and review available information, such as police reports, and to access multiple sources to accumulate sufficient information about the degree of violence in the home.  The consultants should stress the importance of obtaining child-centered collaterals.

- The Department should consider requesting the assistance of Child Advocacy Centers to interview children in investigations where there is chronic violence in the home and parents have failed in the past to cooperate with services.

- The Department should explore the use of court-ordered service compliance with intact families where there is a high level of risk of future violence and lack of cooperation with Department services.

- The Department should examine the continued utility of the Domestic Violence Screen and determine whether the Screen assists in assessing safety and risk to children.

## LICENSING

- The Department should prioritize its daycare licensing responsibilities to focus on allocating resources to monitor daycare homes that are currently operating.

## MEDICAL

- The Department should advise HealthWorks doctors that they should remind caretakers of infants with gastroesophageal reflux that they should continue to follow Back to Sleep recommendations except in those cases where medically contraindicated.

- DCFS should train DCFS nurses and intact Managers on the use and benefits of an individualized growth chart in interventions with Failure to Thrive and Malnutrition families. The OIG investigative report should be used as a case study as part of the training.

- The Department should share a redacted copy of the Office of Inspector General Report: *Bone Fractures in Infants: A Review of the Literature* with HealthWorks providers, the Children's Medical Resource Network, and DCFS direct line staff.

## PERSONNEL

- The DCFS Employee Handbook must be amended to include a clearly articulated Departmental policy on when employees may solicit donations or other solicitation from co-employees.  Employees should have a clearly articulated policy of what is permissible. The Inspector General urges the Department to issue the agreed upon Solicitation Policy, to be effective immediately.

- Department Rule 401.380, *Personnel Records*, should be amended to require that in addition to verifying work history, child welfare agencies should also contact previous employers to verify work performance by asking if the employee would be eligible for rehire. Verification should be completed by contacting an official source at the agency such as human resources, management or a supervisor knowledgeable about the employee's work performance. The Rule should also include that any employment offer to a currently employed person should be contingent upon contacting the current employer to verify their work performance prior to hire.

## SERVICES

### Daycare

- Procedure 359, Appendix E should be amended to direct workers to complete a Home Safety Checklist on an unlicensed day care home in which a child for whom the Department is legally responsible is going to be placed and that the assessment be completed prior to implementation of the child care plan.

### Administrative Review Process

- The Department should either amend Rules and Procedures or conduct training to provide instructions on appropriate use of the Notice of Decision form, which informs foster parents that they have a right to appeal the Department's decision to remove a ward.

### General

- The Department needs to maintain a centralized system of reserve cribs in each region for emergency situations when crib supplies have been depleted in a particular office.

- While the Spanish speaking population in Southern Illinois is low (approximately 4%) the language barrier presents formidable obstacles to service provision.  The Department should work with local providers to develop bi-lingual resources for this underserved population.

*State Central Register/Hotline*
- The Department should determine if SCR's operating interpretation of applying a standard that a hotline caller must give evidence that behavior was committed for sexual gratification before a hotline call is accepted for risk of sexual harm is correct.

- If the Department determines that suspicion of risk, rather than evidence of risk, are sufficient criteria to accept a report the Department should request the assistance of Child Advocacy Centers to train SCR staff on red flags that warrant investigation of sexual abuse.

- The Department should make it a priority to expedite the start-up date of the SCR recording system.

- The Department should revise the SCR Call Floor Manual to provide procedures for notification to the appropriate local law enforcement agency of reports of sexual abuse to minors by ineligible perpetrators, which do not qualify for child protection investigation, but may constitute a criminal act against a minor.

- The Department should initiate a policy that whenever the hotline is notified by a physician that protective custody has been taken of a minor because the parents' religious beliefs do not permit them to consent to necessary medical procedures, the information should be transmitted to the States Attorney's Office without an intervening investigation – unless the additional information in the report suggests abuse or neglect.

- In situations when the hotline reporter does not know the specific age of the child victim, the SCR operators should attempt to determine an age range and document this questioning.

- SCR should have a protocol of immediately and proactively connecting a mandated reporter to the child protection manager on duty when the mandated reporter alleges that an investigator is currently behaving inappropriately.


## SERVICES - EDUCATION
- The Department should ensure that Chicago intact workers use the Chicago Early Childhood Program locator to help families enroll their children in early education programs.

# RECOMMENDATIONS FOR DISCIPLINE AND CONTRACT TERMINATION

In FY 2012, the Inspector General recommended discipline of Department and private agency employees and termination of Department contracts for the conduct detailed below. Discipline recommendations ranged from counseling to discharge.

## RECOMMENDATIONS FOR DISCIPLINE

### *Failure to Properly Assess Risk*

- A private agency foster care worker and supervisor failed to properly assess risk when a mother called to report finding an unexplained abdominal bruise on her two-year-old child. The mother had unsupervised overnight visits with her children but there was a court order that her new boyfriend, a convicted murderer, could not be present in the home with the children. The mother had a history of providing false information to child welfare professionals. The worker failed to ensure the child was examined by a doctor, and had not conducted unannounced visits to determine the extent that the mother's male friend was involved with the family.

### *Failures in Service Provision/Investigative Work*

- A private agency program director and licensing worker failed to respond to child safety concerns when a licensed foster parent allowed her adult daughter, who was a non-relative and unlicensed, to be the primary caretaker for a Department ward. The unlicensed caretaker's live-in adult son had a felony conviction which was a bar to licensure. The program director also failed to ensure case managers were visiting the child in the foster home on a monthly basis. The program director also advised a caseworker not to share information with the child's attorney.

- In an investigation of a child with extensive bruising called in by hospital staff because of the parent's shifting explanations, a child protection investigator failed to document and share information with her supervisor concerning the extent of the bruising, retrieve critical documents, and failed to adequately assess the safety of a child, provided testimony at a court hearing that she knew to be false, and falsified a case note.

- A child protection supervisor failed to critically review an investigation involving a head injury and cuts, extensive bruises and welts to a three-year-old; approved the unfounding of physical abuse allegations to a child under the age of seven without obtaining managerial approval; failed to follow administrative and managerial instructions to review error reduction findings on cuts, bruises, and welts investigations with the team.

- In a child protection investigation involving serious unexplained injuries to an infant, the investigator implemented a safety plan that prohibited the parents from visitation with their infant for 57 days without notifying the supervisor. While the parents orally agreed to no visitation for two weeks, the safety plan continued without the parents' agreement. The investigator failed to explain the voluntary nature of the safety plan, obtain the parents signatures and provide them with a copy of the safety plan. The investigator failed to assess the safety of the infant by conducting in-person visits to the foster home every 5 working days.

- A child protection investigator developed a safety plan in which a premature infant was discharged to a relative that did not have a crib for the baby. The investigator was aware that the baby was sleeping in an adult bed or a plastic bin with blankets and pillows.

- A Department intact worker failed to document and respond to domestic violence in the home and complete the Home Safety Checklist, Substance Abuse and Domestic Violence screens. The intact worker also failed to pursue needed early education services for the children living in the home.

- A child protection manager and supervisor approved an extension of a child protection investigation without reviewing the case. Had the case been reviewed, the manager and supervisor would have found that the six-year-old child in the case had never been seen by the assigned investigator. The hotline had been called 60 days earlier.

- A child protection investigator falsely documented interviews with the alleged perpetrator, the alleged perpetrator's father, and a school counselor.

- A Department manager failed to put in place a proactive managerial system to ensure review of high–risk investigations.

### Unprofessional Conduct
- A Department employee accessed the Department's Child and Youth Centered Information System (CYCIS) to locate information on her adopted child's biological siblings and then used the information to contact the adoptive parents of the biological siblings.

### Misuse of State Resources
- A public service administrator did not have the educational credentials required for his job; used DCFS letterhead for personal use; used DCFS resources to draft a legal motion for a friend; and repeatedly used his assigned DCFS computer and state email account for personal and highly inappropriate and sexually explicit emails.

### Ethics
- An Administrative Law Judge violated the DCFS Conflict of Interest Rule 437.40 *Prohibition of Employee Interests and Conduct Creating Impropriety or the Appearance of Impropriety* by filing legal documents on behalf of an adverse party to DCFS in a legal matter involving a DCFS ward.

- A Department employee failed to submit his 2012 Statement of Economic Interest by the statutorily required deadline despite numerous reminders by both email and telephone.

- Eleven employees improperly sent their Statements of Economic Interest directly to the Office of the Secretary of State in both 2011 and 2012, after receiving a written warning with specific instructions in December 2011 to send the Statements to the Office of the Inspector General.

## CONTRACT TERMINATION

The Inspector General's Office recommended terminating contractual services with an individual who used state resources to facilitate secondary employment, conducting secondary business from her Department office and submitting background checks for clients associated with her secondary employment.

# CHILD WELFARE EMPLOYEE LICENSES

The following cases represent action taken against Child Welfare Employee Licenses in FY 2012.

**License Revocations**
In the following cases, the Child Welfare Employee Licensure Board voted to revoke Child Welfare Employee Licenses.

- A private agency employee who was charged with returning a child home against court orders.

- A Department employee who was charged with forging a father's name on a safety plan.

- A Department employee who falsified information on a form for Norman funds so that a friend would receive the funds.

- A private agency employee who engaged in a sexual relationship with a client on his caseload.

**License Revocations Pending Board Decision**
In the following cases, an Administrative Law Judge has recommended Revocation, but there has not been a final Decision by the Child Welfare Employee Licensure Board.

- A private agency employee who was involved in an incident of violence against a foster child.

- A Department employee who was charged with falsifying a casenote.

**License Suspensions**
- A Department employee received a 15 day license suspension for gross misconduct associated with failing to terminate a safety plan for several months after it became clear that it was no longer necessary.

**Pending Charges**
- A former DCFS Employee was charged with failing to respond to requests for information pertaining to her CWEL license.

- A private agency employee was charged after she was indicated for Child Abuse.

- A private agency employee was charged for falsifying casenotes of home visits that occurred by telephone.

- A private agency employee was charged with providing false testimony in court.

- A Department employee was charged with forging a caseworker's signature on a form.

- A Department employee was charged with falsifying a casenote to make it appear that she was at work, when she was not.

# COORDINATION WITH LAW ENFORCEMENT

**REFERRALS FOR FURTHER INVESTIGATION**

- The Office of the Inspector General investigated a private agency that had billed for counseling services that were never provided.  The investigation determined that a counselor, with a previous criminal record for Felony Theft, had submitted the falsified billing documents that the agency relied on in submitting their billing to the Department.  The Office of the Inspector General referred the counselor for criminal prosecution to the Cook County State's Attorney's Office.  The counselor pled guilty in FY12 to a charge of theft and was sentenced to 15 months in the Illinois Department of Corrections.

- The Office of the Inspector General provided information to the Attorney General's Office, who was investigating a former Executive Director of a private agency for financial misconduct and financial mismanagement.  The Board of Directors removed the CEO and the Attorney General's Office filed criminal charges against the former Executive Director.

- The Office of the Inspector General referred a case for criminal investigation of an intact worker who allegedly made improper advances toward a client. The Illinois State Police concluded their investigations and found no basis for charges.

- The Office of the Inspector General referred a former administrator to the State's Attorney's Office who had failed to disclose material information on his required Statement of Economic Interest.

- The Office of the Inspector General referred a case to the Illinois State Police of possible fraud concerning receipt of adoption subsidies.

- A letter containing possible threats was left at an administrator's workstation.   The Office of the Inspector General referred the case for criminal investigation.

**REQUESTS FOR ASSISTANCE**

- An FBI agent contacted the Office of the Inspector General for assistance in locating a ward who had critical information in a criminal investigation.  The Office facilitated contact between the FBI agent and the Guardianship Administrator's Office.

- The Office of the Inspector General for the Social Security Administration requested assistance from the Office of the Inspector General in two pending federal fraud cases.

- The Office of the Inspector General provided assistance to the DuPage State's Attorney's Office by locating a witness in an aggravated battery to a child criminal case.

- The Office of the Inspector General provided assistance to the Illinois State Police in a pending fraud investigation.

- The Office of the Inspector General provided assistance to the Illinois Attorney General's Office in a pending fraud investigation.

- The Office of the Inspector General provided assistance to the Illinois State Police as part of a pending criminal investigation.

- The Office of the Inspector General provided assistance to the Cook County Sheriff's Office as part of a pending fraud investigation.

- The Office of the Inspector General assisted the Division of Child Protection by locating information pertaining to an individual who had posted an internet picture of his young daughter bound with tape.

## LAW ENFORCEMENT AND DCFS INSPECTOR GENERAL CHILD HARM/RISK OF HARM CASES ELEVEN YEAR REVIEW (FY 2000- FY 2011)

The DCFS Office of Inspector General was created following the homicide of a three-year-old child who was returned to the care of a violent mentally ill parent. The Illinois State Police, local law enforcement and the Inspector General's Office investigated the case.

In the course of an investigation, the Office of the Inspector General may discover facts suggesting criminal activity. The Inspector General refers these cases to law enforcement. In addition to referrals to law enforcement, the OIG receives requests for assistance from law enforcement. Often, the investigative efforts between law enforcement and the Office of the Inspector General are collaborative. Law enforcement investigations and prosecution may take a number of years before disposition. The monitoring unit of the Inspector General's Office follows the law enforcement referral and action until conclusion.

From FY 2000 through FY 2011, the Inspector General's Office coordinated with law enforcement in 38 investigations involving child harm or risk of harm. Fourteen of the cases were successfully prosecuted. Of the 38 investigations, 7 involved homicides, 15 involved pornography, sexual exploitation, solicitation, abuse, or molestation of a child, and 16 involved kidnapping, runaways, children without legal relationship to their caretakers, or immigration.

| Case 1 | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | Referral to local law enforcement |
| **ISSUE** | Homicide |
| **ACTION TAKEN** | During an Intact Family Recovery staffing, the OIG learned that a mother new to the program previously had a child who died. The OIG investigated the circumstances of the child's death to ensure that there was no risk to the infant and other children currently in the mother's care. The OIG obtained information from the County Medical Examiner's Office that the nine-month-old infant died 11 years earlier from a subdural hematoma due to blunt trauma. His death was classified as a homicide. The infant had been hospitalized for three months with the injuries that eventually caused his death. The OIG contacted the local police department and learned that a full investigation of the infant's death was never conducted. The local police expressed interest in investigating the case and OIG staff met with investigators from the "cold case" division. The OIG shared information it obtained and provided assistance in locating witnesses from DCFS who had been involved in investigating the alleged perpetrator of the infant's death. |
| **OUTCOME** | The mother's boyfriend at the time of the infant's injuries confessed to killing the infant. He was charged with first-degree murder, pled guilty, and was sentenced to 22 years in the Illinois Department of Corrections. |

| Case 2 | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | Referral to local law enforcement and State's Attorney |
| **ISSUE** | Alleged sexual abuse of a minor |

| ACTION TAKEN | The OIG learned that an older caregiver was having problems keeping a 71 year-old minister away from her 14 year-old granddaughter, whom she adopted.    The granddaughter had been pregnant and the minister arranged an abortion.  The OIG was able to identify the minister who was exploiting the girl. A hotline report was made and indicated for sexual abuse.  The OIG solicited the assistance of the Child Advocacy Center and the local police department to bring charges against the minister.  The minister was initially charged with contributing to the delinquency of a minor, but the case was dismissed because the girl did not appear.  The minister was later arrested and charged with kidnapping, aggravated criminal sexual assault, aggravated criminal sexual abuse and unlawful restraint and released on bail.  The OIG also informed law enforcement that the minister carried a police badge and regularly impersonated a police officer.  On a court date regarding the above charges, law enforcement set up surveillance at the criminal courts building and watched as the minister arrived for his court appearance, produced his badge, and told the sheriff's deputies that he was an active police officer on duty.<br><br>During the course of the sexual assault case against the minister, the OIG became aware that he was seeing the girl in direct violation of a Judge's order.  The OIG notified the Chicago Police and the State's Attorney's Office.  The Judge revoked the minister's bond and he was jailed. |
|---|---|
| OUTCOME | The indicated DCP finding was appealed and the Department held the appeal in abeyance pending the outcome of the criminal charges. The criminal charges were dismissed three years later and the child protection appeal was reinstated, but the finding was overturned on appeal because the child victim was now 18 and refused to testify.<br><br>The minister was convicted on the charge of impersonating a police officer and placed on one-year conditional discharge. |

| Case 3 | |
|---|---|
| CATEGORY | Harm/risk of harm to a child |
| NATURE OF INVOLVEMENT | Referral to local police department |
| ISSUE | Sexual molestation |
| ACTION TAKEN | A teacher was indicated for sexual molestation of his 10 year-old daughter. The child protection worker never inquired as to the father's employment and, as a result, the school was never notified of the indicated finding.  The father informed the school that the report against him had been unfounded and he continued his employment as a teacher. The local police department had not taken any action against the father. OIG investigators met with the Deputy Chief of Detectives of the local police department. |
| OUTCOME | Based on the information supplied by the OIG, the police revisited the case and arrested the father.  He pled guilty to one count of Aggravated Criminal Sexual Abuse and was sentenced to 30 months of probation.  The local school board terminated him as a teacher and the State Board of Education withdrew his teaching certificate. He is listed as a sexual predator on the Illinois sex offender website maintained by the Illinois State Police. |

| Case 4 | |
|---|---|
| CATEGORY | Harm/risk of harm to a child |
| NATURE OF INVOLVEMENT | Request for assistance from the U.S. Customs Service |
| ISSUE | Exploitation of a child in drug trafficking |

| ACTION TAKEN | The U.S. Customs Service suspected that a Department ward in an independent living program was "renting" her child as cover for drug runners traveling between the U.S. and Central America.  The Customs Service suspected the couriers were smuggling cocaine inside baby formula containers.  The Customs Service required the OIG's assistance to locate the mother.  The OIG verified the mother's address and put the Customs Service in touch with the ward's caseworker. |
|---|---|
| OUTCOME | The mother pled guilty in Federal Court.  She was sentenced to 10 months in Federal prison and four years of supervised release. |

| Case 5 | |
|---|---|
| CATEGORY | Harm/risk of harm to a child |
| NATURE OF INVOLVEMENT | Referral to the State's Attorney's Office |
| ISSUE | Homicide |
| ACTION TAKEN | A 17 year-old ward, who had been incarcerated for approximately 30 days on a domestic battery charge, was released when the battery charge was dropped because the victim failed to appear in court.  The 17 year-old was in an independent living program. She had a long history of psychiatric hospitalizations, numerous placements and violent behavior.  She was not attending school.  The day she was released from jail, she attacked a 21 year-old former ward she knew from a prior group home placement, stabbing him several times. (Twenty-four stitches were required to close his neck wounds.)  The 17 year-old was arrested shortly after the stabbing incident, but charged with a simple battery and released on a personal recognizance bond.  Later that night or early the next morning the 17 year-old allegedly murdered a 20 year-old female Department ward in her apartment.  Subsequently, the police asked the 21 year-old to assist them in apprehending the 17 year-old on the murder investigation.  The OIG contacted the State's Attorney's Office to inform them of the attack the evening before the murder on the 21 year-old and the fact that the 17 year-old had been charged with a simple battery. |
| OUTCOME | The 17 year-old was indicted on charges of first degree murder of the 20 year-old and attempted first degree murder, aggravated battery of the 21 year-old, and aggravated battery on a peace officer.  After numerous attempts to prosecute, the 17 year old was found unfit to stand trial and determined to be mentally incompetent.  The case is still pending. |

| Case 6 | |
|---|---|
| CATEGORY | Harm/risk of harm to a child |
| NATURE OF INVOLVEMENT | Request for assistance from the Division of Child Protection<br>Referral to law enforcement |
| ISSUE | Children without legal relationship to their caretakers |
| ACTION TAKEN | A child protection investigator requested the assistance of the OIG when she was unable to verify basic biographical information about three, 13 year-old subjects of a child protection investigation, including place of birth, birth date, biological siblings and parentage.  The OIG investigated an allegation that the children had no legal relationship with their caretakers. |
| OUTCOME | The OIG located the biological mother of two of the children.  She was living in Michigan and had been searching for her children for 13 years.  The OIG shared the information with child protection and juvenile court. The juvenile court ordered visits between the biological mother and the children.  The OIG located the mother of the third child in Iowa. The OIG referred the results of the investigation to the appropriate state, local and federal law enforcement authorities. |

| Case 7 | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | Request for assistance from the State of Indiana authorities |
| **ISSUE** | Death investigation |
| **ACTION TAKEN** | The OIG assisted the police in their investigation into the death of a 12 year-old ward placed with his grandmother in Indiana. |
| **OUTCOME** | The grandmother and her adult son were charged with criminal neglect of the boy. The grandmother was found guilty of criminal neglect and sentenced to seven years in prison.  The charges against the uncle are pending. |

| Case 8 | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | Request for assistance from the Department of Homeland Security |
| **ISSUE** | Child pornography |
| **ACTION TAKEN** | The Department of Homeland Security contacted the OIG requesting assistance in their investigation into the trafficking of child pornography.  There were indications that a DCFS employee, who was also a foster parent, used his credit card to purchase child pornography.  The OIG conducted a full investigation. |
| **OUTCOME** | The employee resigned and relinquished his child welfare and foster care licenses. No criminal charges were filed. |

| Case 9 | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | Request for assistance from the Guardian *ad Litem* |
| **ISSUE** | Protection for a federal informant |
| **ACTION TAKEN** | A 15-year-old ward was in need of protection, as she was a federal informant.  The child was in a psychiatric hospital and needed to be discharged to a safe environment. |
| **OUTCOME** | The OIG provided intervention to assure that the ward was discharged from the hospital into a safe environment. |

| Case 10 | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | Request for assistance from a local police department |
| **ISSUE** | A caseworker took a 5 year-old boy, who was placed in a traditional foster home, to visit his relatives out of state. The worker noticed that the boy had difficulty manipulating his fingers and had marks on his wrists.  The worker took the boy for a medical exam when they arrived in the visiting state.  The boy explained that he had been tied up by his foster father and hung on a door by his t-shirt; an explanation the doctor determined was consistent with his injuries.  The worker called the abuse and neglect hotline and notified the local police in the city where the foster father lived.  The boy remained with the relatives out of state and was recently adopted by that family. |
| **ACTION TAKEN** | The local police department requested assistance from the OIG in securing the boy's medical records and preparing a case against the foster father. |
| **OUTCOME** | The local police did not seek prosecution of the foster father. |

| Case 11 | |
|---|---|
| CATEGORY | Harm/risk of harm to a child |
| NATURE OF INVOLVEMENT | Referral to Parole Department |
| ISSUE | Convicted sexual offender |
| ACTION TAKEN | During a child protection investigation, the OIG was contacted for technical assistance with an out-of-state criminal history of a registered sex offender living in a home with three young girls.  A criminal history evaluation conducted by the OIG revealed that the man had a substantial criminal history in Illinois and Tennessee, including a conviction for sexual battery against a 15 year-old girl.  There were also outstanding warrants in the state of Tennessee.   The OIG notified Tennessee authorities of the man's whereabouts but they declined to extradite.  Because he was on parole in Illinois, the OIG notified the parole supervisor that he was living in a home and acting as caretaker to three young girls, one of whom was the age of his victim in Tennessee. |
| OUTCOME | The parole supervisor dispatched an officer to the home and notified the parolee that he must cease all contact with the girls and that future contact would be considered a parole violation. The man was placed on electronic monitoring.  The OIG noted that the law enforcement database only listed the man as a sexual offender, not a *child* sex offender.  After notification by the OIG, the man is now listed as a child sex offender. |

| Case 12 | |
|---|---|
| CATEGORY | Harm/risk of harm to a child |
| NATURE OF INVOLVEMENT | Request for assistance from a local police department |
| ISSUE | Kidnapping |
| ACTION TAKEN | The Chicago Police Department requested assistance in their investigation regarding the kidnapping of a 3 year-old child by a ward of the Department.  The 3 year-old was found the next day in the company of the 14 year-old female ward and an adult male.  The child was not harmed. The 14 year-old was developmentally delayed and prior to the kidnapping had been in a state facility in Central Illinois for several years.  DCFS had moved the ward into a foster home in Chicago, but she ran away within a week.  The ward had been missing for several months when she took the 3 year-old from her mother. |
| OUTCOME | The adult was charged with a misdemeanor contributing to the delinquency of a minor, pled guilty and was placed on probation for a year. The 14 year-old was charged with kidnapping in a delinquency petition.  She was returned to the state facility. Several months later, the State moved to dismiss the delinquency petition. |

| Case 13 | |
|---|---|
| CATEGORY | Harm/risk of harm to a child |
| NATURE OF INVOLVEMENT | Referral to local police department |
| ISSUE | A group home employee allegedly impregnated a 15 year-old Department ward |
| ACTION TAKEN | By the time the OIG was notified, the employee had resigned from the group home and was employed. The OIG contacted law enforcement and the former employee was arrested and charged with criminal sexual assault. |
| OUTCOME | The employee was convicted on the charge of Criminal Sexual Assault of a victim between the ages of 13 and 16.  He was sentenced to 4 years in the Illinois Department of Corrections and must register as a sex offender. |

| Case 14 | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | Referral to local police department |
| **ISSUE** | Sexual assault |
| **ACTION TAKEN** | In the process of investigating a case in which foster parents were alleged to have sexually and physically abused their foster and adoptive children, the OIG noted that the brother of one of the foster parents was a registered sex offender and that he was living in the foster home at the time that the sexual abuse by the foster father was disclosed. The OIG conducted a criminal background check of the maternal uncle and learned that he was convicted of felony burglary, was charged with 1st degree sexual assault of a child, which had been pled down to 4th degree sexual assault, was convicted of possession of a firearm by a felon, and was arrested for domestic abuse, disorderly conduct and 3rd degree sexual assault. The OIG contacted local law enforcement to alert them to the presence of another possible perpetrator in the home. |
| **OUTCOME** | The foster father was convicted on three counts of Predatory Criminal Sexual Assault to a Child and sentenced to serve three consecutive 20-year sentences.  The foster mother was convicted of aggravated battery/great bodily harm.  The foster mother was also indicated for physical abuse.  The children were removed and the foster license was revoked. |

| Case 15 | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | Referral to the Illinois State Police |
| **ISSUE** | Solicitation of minors over the internet |
| **ACTION TAKEN** | A preliminary investigation by the OIG revealed a file on a Department computer technician's work computer that contained sexually explicit internet chat room conversations with females identifying themselves as under age 18. The OIG referred the employee to the Illinois State Police (ISP) for investigation of solicitation of minors over the internet.  The state police investigation confirmed that at least one of the participants in the chat room was a female under the age of 18 and the Department employee had identified himself to her as also being under 18. The state police referred the investigation to the State's Attorney's Office which declined prosecution because the employee did not arrange to meet with any of the minors. |
| **OUTCOME** | After the ISP completed their investigation and the State's Attorney declined to prosecute, the OIG conducted a full administrative investigation.  The worker was terminated from Department employment. |

| Case 16 | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | Referral to the State's Attorney's Office |
| **ISSUE** | A 5 month-old child was seriously injured in her home.  The case was investigated by the Division of Child Protection (DCP) and indicated to an unknown perpetrator because of the number of people in the home at the time of the abuse.  Protective custody of the child and another sibling was taken and a Petition for Adjudication of Wardship was filed in Juvenile Court.  The State's Attorney of the county requested that the petition be dismissed without adjudication because he did not believe he could prove allegations against the parents. |

| | |
|---|---|
| **ACTION TAKEN** | The OIG advocated with the State's Attorney to determine alternate protective plans that would ensure the child's safety. |
| **OUTCOME** | The State's Attorney filed a petition for temporary custody.  DCFS was granted guardianship of the child and placed her in a specialized foster home.  The child was adopted. |

| **Case 17** | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | Referral to Immigration and Naturalization Services |
| **ISSUE** | Convicted felon wanted for deportation |
| **ACTION TAKEN** | During the course of an investigation involving a private agency where the Executive Director of that agency was also a foster parent of two wards, the OIG learned that the Executive Director's live-in boyfriend was a known drug dealer and a convicted felon wanted by the Immigration and Naturalization Service (INS) for deportation. The foster parent had concealed the boyfriend's live-in status from Department staff. |
| **OUTCOME** | The OIG obtained all the information and documentation regarding the convicted felon and referred the matter to INS.  The foster children were removed and the foster parents' license was revoked. |

| **Case 18** | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | Request for assistance from the State's Attorney's Office |
| **ISSUE** | Employee charged with DUI |
| **ACTION TAKEN** | A Department caseworker was arrested and charged with Driving Under the Influence when the worker became involved in an accident while transporting a minor child for whom the Department was responsible. The Office of the State's Attorney was unable to locate the minor child, a primary witness for the trial.  The OIG located the child and made her available to the State's Attorney. |
| **OUTCOME** | The worker was acquitted on the criminal charge.  She resigned from the Department and surrendered her child welfare employee license. |

| **Case 19** | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | Joint investigation with the Illinois State Police |
| **ISSUE** | False information presented to court |
| **ACTION TAKEN** | The OIG conducted a joint investigation with the Illinois State Police (ISP) of a worker who claimed to have obtained criminal background information on a potential foster parent through a State Trooper.  The worker falsely informed the court that the potential placement was cleared by a Law Enforcement Agencies Data System (LEADS) check, when in reality he was a convicted child sex offender and the child placed with him was consequently placed at risk. |
| **OUTCOME** | The child was removed from the placement.  The worker resigned and surrendered her child welfare license. |

| Case 20 | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | Referral to the Illinois State Police |
| **ISSUE** | Sexual abuse in a group home |
| **ACTION TAKEN** | The OIG investigated a group home for allegations of female staff members engaging in sexual relations with the young men in the program.  The OIG referred the results of the investigation to the Illinois State Police. |
| **OUTCOME** | The group home was closed.  Two staff members were charged criminally and found guilty of Criminal Sexual Assault.  Both must register as sex offenders. |

| Case 21 | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | Request for assistance from a local police department |
| **ISSUE** | Sexual molestation |
| **ACTION TAKEN** | The OIG received a request for assistance from police investigating an allegation that a Department child welfare specialist had molested his daughter's friends while they were in his home. |
| **OUTCOME** | The State's Attorney's Office declined prosecution. The child welfare specialist's employment with the Department was terminated. |

| Case 22 | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | Request for assistance from the State Central Register |
| **ISSUE** | Inappropriate conduct by employee |
| **ACTION TAKEN** | A DCFS Licensing worker was arrested and charged with contributing to the delinquency of a minor and harboring a runaway, after it was discovered that a 16 year-old girl had been living in her home.  The girl was involved in sexual relations and drug use with the investigator's 34 year-old brother, who also lived in the home.   The licensing worker told the police she was aware of the behavior, but that it was confined to her brother's room.   The OIG obtained all police information related to the investigation. |
| **OUTCOME** | The criminal charge was dismissed. The licensing investigator was discharged.  She grieved her termination, but the termination was upheld. |

| Case 23 | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | Request for assistance from local police commander |
| **ISSUE** | Sexual molestation |
| **ACTION TAKEN** | A teenage girl accused her stepfather of molesting her.  The stepfather had previously been convicted of molesting her in 1995.  The stepfather was living with the teenager and her mother, who had stated to police that she did not believe the charges.  The police were concerned about the mother's willingness to protect her daughter.  The OIG forwarded the information regarding the stepfather's previous conviction to the Division of Child Protection (DCP) investigator assigned to the case. |

| | |
|---|---|
| **OUTCOME** | The girl was subsequently removed from the home and remained in placement for two years before returning to her mother.  The step-father was found guilty of Criminal Sexual Assault of a family member and sentenced to 15 years in the Illinois Department of Corrections and received a concurrent 15 year sentence for violation of probation from the earlier sexual assault. |

| **Case 24** | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child) |
| **NATURE OF INVOLVEMENT** | Referral to Wisconsin authorities and Chicago Police Department Extradition Unit |
| **ISSUE** | Convicted sexual offender |
| **ACTION TAKEN** | During the course of a pending investigation, the OIG learned of an individual who was receiving state payments for babysitting a five year-old girl.  This individual had an extensive criminal past including a conviction and subsequent imprisonment for raping a five year-old girl.  He was currently wanted for a parole violation in Wisconsin.  The OIG notified the Wisconsin authorities and the Chicago Police Department Extradition Unit. |
| **OUTCOME** | The individual was apprehended. The office of the Inspector General also advocated for the Department of Human Services to require criminal background checks of anyone seeking to be compensated by the State for childcare.  New legislation was passed and DHS now requires criminal background checks. |

| **Case 25** | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | Joint investigation with the local police department |
| **ISSUE** | Allegations of sexual abuse of minors |
| **ACTION TAKEN** | The OIG assisted the Chicago Police in a sexual abuse investigation of a licensed foster parent, who was also a police officer, who allegedly sexually abused several department wards who were placed with him.  The States Attorney declined to prosecute, but the Police Board removed him from duty.  Federal prosecutors later contacted the OIG when the man, who was on an airplane with an unrelated child, was forcibly removed from the airplane for threatening behavior. |
| **OUTCOME** | All of the children were removed from the home.  The foster parent lost his foster home license. |

| **Case 26** | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | Joint investigation |
| **ISSUE** | Missing Department wards |
| **ACTION TAKEN** | The Department requested the OIG's assistance in coordinating the Missing Children's Project.  The OIG investigated and interfaced with local law enforcement statewide and federal agencies to help the Department locate missing wards. |
| **OUTCOME** | Over 100 wards were located. |

| Case 27 | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | Request for assistance from a local police department |
| **ISSUE** | Runaway |
| **ACTION TAKEN** | A local police department requested the assistance of the OIG in assessing the risk involved for children who had fled from a foster home.  The OIG provided information to the police department to assist in determining if an Amber Alert for the children should be issued. |

| Case 28 | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | Request for assistance from the State's Attorney's Office |
| **ISSUE** | Runaway |
| **ACTION TAKEN** | An Assistant State's Attorney at Juvenile Court requested assistance in locating a 12 year-old chronic runaway. The OIG obtained addresses of key locations where the child had ties. |
| **OUTCOME** | The girl was located. |

| Case 29 | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | Joint investigation with Illinois State Police |
| **ISSUE** | Criminal sexual abuse/force and aggravated sexual abuse |
| **ACTION TAKEN** | The OIG conducted a joint investigation with the Illinois State Police that resulted in the indictment of a former department employee. |
| **OUTCOME** | The former employee was convicted of aggravated sexual abuse and is registered as a child sex offender/sexual predator. |

| Case 30 | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | The OIG referred foster parents to the local Police Department for consideration of criminal prosecution. |
| **ISSUE** | Investigation into severe harm to wards. |
| **ACTION TAKEN** | The OIG after completing an investigation into the history of children in a foster home, and concluding that the physical abuse of children by the foster parents was extensive, ongoing, and involved several children referred the foster parents to the local Police Department. |
| **OUTCOME** | The foster parents' foster home license was revoked. However, the State's Attorney's Office declined prosecution. |

| Case 31 | |
|---|---|
| CATEGORY | Harm/risk of harm to a child |
| NATURE OF INVOLVEMENT | The OIG assisted the Federal Bureau of Investigation and the United States Secret Service with an investigation. |
| ISSUE | Child pornography from international sources |
| ACTION TAKEN | The Federal Bureau of Investigation and the United States Secret Service requested OIG assistance in the investigation of a Department employee who was allegedly accessing child pornography from international sources. |
| OUTCOME | The employee was discharged from the department. |

| Case 32 | |
|---|---|
| CATEGORY | Harm/risk of harm to a child |
| NATURE OF INVOLVEMENT | The OIG investigated an allegation that a computer used by an Administrator at a private child welfare agency contained pornographic images. |
| ISSUE | Child Pornography |
| ACTION TAKEN | The OIG impounded the computer and coordinated with the Attorney General's High Tech Crimes Unit. The analysis by High Tech Crimes failed to reveal any evidence of pornography. A subsequent allegation was made about a second computer at the same facility. This computer was the property of the Chicago Board of Education. |
| OUTCOME | The OIG notified the Inspector General's Office of the Board of Education and they took possession of the second computer. |

| Case 33 | |
|---|---|
| CATEGORY | Harm/risk of harm to a child |
| NATURE OF INVOLVEMENT | The OIG referred the case to the State's Attorney's office and local law enforcement. |
| ISSUE | Homicide |
| ACTION TAKEN | An 11-year-old boy died of blunt force trauma to the head while in the home of his adoptive mother. In the 3 years following his adoption the child was the subject of 6 child abuse investigations. A 7th child abuse investigation was pending at the time of his death. The adoptive mother and brother were subsequently indicated for child abuse and death by abuse; however, no one was criminally charged. After completing an investigation, the OIG referred the case to the State's Attorney's office for reexamination of the death as a homicide and to recover the subsidy that the adoptive mother continued to receive for almost a year after the boy's death. |
| OUTCOME | The State's Attorney did not proceed with charges against the adoptive mother and brother for the child's death. The adoptive mother was not charged with fraud. Law enforcement closed the case as an accidental death. |

| Case 34 | |
|---|---|
| CATEGORY | Harm/risk of harm to a child |
| NATURE OF INVOLVEMENT | The OIG shared expert findings of two board certified forensic pathologists who are experts in child abuse with the Sangamon County State's Attorney's Office and the Illinois Attorney General's Office for consideration of charges being brought against the perpetrator. |
| ISSUE | Homicide |

| **ACTION TAKEN** | A two year-old boy died two months after his family was indicated for abusing another child in the household. The OIG raised questions about the integrity of the autopsy of the boy which ruled his death to be the result of natural causes. The OIG asked two board certified forensic pathologists who are experts in child abuse to review the autopsy materials and findings. Independently, both experts determined the boy's death was the result of physical abuse suffered while he was alive and that his death should be ruled a homicide. |
|---|---|
| **OUTCOME** | The OIG shared the experts' findings with the State's Attorney's Office, the Illinois Attorney General, and local law enforcement for prosecution. The perpetrator was charged with murder.  The expert's findings and other relevant materials were shared with the Child Death Review Team (CDRT). The CDRT recommended the following legislative changes: (1) requiring autopsies by board certified forensic pathologists for all children under the age of 18 who die under suspicious, obscure, mysterious, or otherwise unexplained circumstances; (2) legislation requiring a blind peer review of autopsy reports for children under the age of 18 who die under circumstances that are suspicious, obscure, mysterious, or otherwise unexplained. The perpetrator's murder trial is scheduled to begin in January 2013. |

| **Case 35** | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | The OIG after reviewing the investigation provided the State's Attorney with significant information which led to a murder conviction. |
| **ISSUE** | Homicide |
| **ACTION TAKEN** | A two year–old boy died as a result of multiple internal injuries caused by physical abuse. A child protection investigation of burns and other injuries the boy had previously suffered was unfounded three months prior to his death. The OIG found that the earlier investigations should have been indicated. The death was ruled a homicide. The OIG shared its investigative report with the State's Attorney's Office. |
| **OUTCOME** | The State's Attorney's Office charged the mother's boyfriend with the murder.  He was found guilty and sentenced to 25 years in prison. |

| **Case 36** | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | The OIG provided the State's Attorney office with information leading to a murder conviction. |
| **ISSUE** | Homicide |
| **ACTION TAKEN** | A three year-old boy died as a result of inflicted head injuries. An intact family case was open at the time of the child's death and three child protection investigations had been conducted in the previous four months, one of which was pending. The Office of the Inspector General assisted the local State's Attorney's Office by sharing the Inspector General's report of the death investigation with them. |
| **OUTCOME** | Criminal charges were brought against the mother and her boyfriend three months after the injuries. The mother was convicted of child endangerment causing death, obstruction of justice, and conspiracy to obstruct justice and to provide false information.  The boyfriend was convicted of murder. |

| Case 37 | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | The OIG assisted the State's Attorney's Office with information leading to a murder conviction. |
| **ISSUE** | Homicide |
| **ACTION TAKEN** | A 12-year old boy died from injuries by severe physical abuse. A private agency had closed an intact family services case five months earlier and the family had been the subject of two child protection investigations prior to his death. An adoption home study was pending at the time of the boy's death. The OIG assisted local law enforcement with access to the death investigation to support criminal charges. |
| **OUTCOME** | The perpetrator was arrested and charged with murder. The case is pending. |

| Case 38 | |
|---|---|
| **CATEGORY** | Harm/risk of harm to a child |
| **NATURE OF INVOLVEMENT** | The OIG assisted a local sheriff who requested assistance after learning that a man, identified as a pedophile, was in the process of becoming a licensed foster parent. |
| **ISSUE** | Risk of sexual abuse of minors |
| **ACTION TAKEN** | The OIG conducted an investigation that included a review of the man's online identities and participation in several chat rooms frequented by pedophiles. The investigation disclosed the man's unfitness to become a foster parent and the OIG shared that information with Licensing. His foster parent license application was denied. |

# CONTRACT FRAUD AND FINANCIAL MISMANAGEMENT

The Department is required to ensure that all taxpayer funds are spent for legitimate state services to children and families.  Since its inception, the Office of the Inspector General has investigated allegations of financial fraud and mismanagement.  While misappropriation of state funds is serious, the vast majority of private agencies and staff providing services to our families do so with integrity.

The following summaries represent significant financial fraud investigations of the Office of the Inspector General.  Financial fraud falls into two broad categories:

- *Receipt of Funds for Services not Delivered*
- *Financial Fraud by Department Employees*

**Receipt of Funds for Services not Delivered**

- In 2011, the Office investigated an agency that received seven separate grants from the Department totaling over $18 million over 3 years.  For several of the grants, the Agency claimed that it spent more Department funds than were actually expended.  For instance, in support of one of the grants, the agency submitted cost reports purporting to show that it employed three therapists for the program.  The Inspector General's investigation found that only two therapists actually worked for the program.  In addition, the Director of the Agency also operated a for profit entity that provided similar services.  The Inspector General investigation found that the Director was using Department funds to pay contractors who furnished services for the for profit entity.  The Agency also appeared to be double and sometimes triple billing for a single service or cost to different governmental agencies.  Many of the documents submitted to support the provision of services contained forged signatures.  Since multiple state agencies were involved, the Office of the Inspector General investigated jointly with the Office of the Executive Inspector General for the Governor's Agencies.  The Report included recommendations for discipline of Department staff for lax monitoring.

- In 2011, the Office investigated a complaint that an agency billed the Department for in-home post-adoption counseling services that were not delivered.  The agency was run by an Executive Director that lived outside the country.  The agency's counselor who had billed for undelivered counseling services had been convicted of Felony Theft of childcare funds in 2005 and had disclosed the conviction prior to being hired by the counseling agency, but had been hired anyway.  The Inspector General investigation also found that the counselor's direct supervisor had been convicted of felony drug charges and did not have the educational credentials to be a supervisor.  The Office of the Inspector General recommended and the Department agreed to cease contracting with the agency and agreed to discipline staff for failure to ensure that background checks were completed.  The counselor was later convicted a second time for theft of state funds.

- In 2010, the Inspector General investigated an agency that was receiving federal foster care funding for after-school male mentoring services provided in Chicago area schools.  The agency had received approximately $1.5 million dollars in the 3 years prior to the investigation.  The investigation found that the agency could not identify a single foster child or Department client among the students served.  Further investigation disclosed that at one school, all the children served were members of the school basketball team, and that many of the "mentoring" sessions appeared to coincide with team practice and games.  Some documentation of the mentoring sessions demonstrated such a low academic level

on the part of the instructor as to be nearly unreadable.[1]  In addition, the investigation found that one of the subcontractors whose fee was paid by the Department was actually providing lobbying services to the organization, which is a disallowable cost under Department Rules.

■ In 2008, the Inspector General's Office investigated a counseling agency that had billed the Department for counseling services that had not been delivered.  The investigation found that two of the counselors billed the agency, which in turn billed the Department, for counseling services that were not delivered.  The investigation also found that the Department compensated the agency at a rate of $75 per hour while the agency subcontracted for counseling services, paying out between $15 and $25 per hour and provided no supervision to the subcontractors.

■ In 2007, The Inspector General's Office investigated an agency that supplied drug testing for Department clients.  The Department had been contracting with the lab since 1997, when it received just under $400,000 per year.  Beginning in FY 2000, the amount that the lab claimed jumped to $600,000 and increased steadily until FY 02, when it began to receive approximately $700,000 each year.  The Inspector General noted the incongruity of the increasing contract amounts compared to the Department's decreasing numbers of clients served during the same years.  The investigation disclosed that in one year, 70% of the agency's billing was fictitious.  The Inspector General referred the investigation for criminal prosecution to the Cook County States Attorney's Office which successfully prosecuted the principal of the agency.  The Attorney General's Office sought a civil recovery of the funds that were misappropriated on behalf of the Department.

■ In 2006, the Office of the Inspector General investigated an agency (actually a single individual) that had a grant from the Department to visit incarcerated wards in Cook County.  The Department paid the agency approximately $332,000 over a period of two years.  The agency had no records regarding how state funds had been expended and was unable to document that services had actually been delivered.  The Office recommended and the Department agreed to cease contracting with the agency and the individual.  The investigation was referred for criminal prosecution.  The Report included a recommendation for staff discharge based on failure to monitor the contract.

■ In 2001, the Office investigated an agency that operated both a child welfare agency and a private adoption agency that facilitated foreign adoptions.  The investigation found that the agency underspent its DCFS program budget and provided end-of-year bonuses to staff from the unspent funds.  Staff were then told that it was the agency's expectation that they donate ½ of the bonus to the private adoption agency.

**Financial Fraud by DCFS Employees**

In addition to several investigations for misuse of time or use of state equipment for personal purposes, the Office of the Inspector General has completed the following investigations of major financial fraud by employees of the Department.

■ In 2006, the Office of the Inspector General investigated a lump-sum contract to a Transportation Company for over $60,000 to assist with a Breakfast that the Department offered for community leaders.  None of the documentation of the event or the preparation showed any input or services from the transportation company.  The Office of the Inspector General found that the agency had written a check for $35,000 to the Deputy Director who had recommended the contract.

---

[1] On a Report form, in answer to the question about whether anyone had shown marked improvements during the program, the mentor wrote: "not this *mounth* its just the *begainig*." (emphasis provided)

- In 2005, the Office of the Inspector General investigated a Department Deputy Director who diverted over $200,000 of Department funds for his own use.  The Deputy would cause vendors to write checks from Department funds to a company which he owned.  The investigation was referred for criminal prosecution and the former deputy director was convicted for the crimes in federal court in 2011.

- In 2004, the Office of the Inspector General investigated a Department employee who was in charge of Local Area Network (LAN) funding for some of the most poverty-stricken neighborhoods in Chicago. LAN funding was joint funding (DCFS and Department of Human Services) and was to be used to support needed services to Department wards and clients within their communities.  The Office of the Inspector General found that the employee was diverting significant LAN funds to pay a relative's mortgage payments.  The employee was criminally prosecuted, convicted and ordered to pay restitution.  Three additional individuals that benefited from the employee's actions were also successfully prosecuted.

- In 2001, the Office of the Inspector General reviewed 2300 vouchers submitted for payment on which the authorizing signature had been forged and the client names and identification numbers were fictitious.  The Department issues vouchers to children and families served by the Department to purchase needed clothing, furniture or other necessities.  The investigation identified seven individuals who had cashed the fraudulent vouchers, one of whom was a Department employee.  The investigation was referred for criminal prosecution and several persons were convicted in the scheme.  The Office of the Inspector General also worked with the Department to develop procedures to track, monitor and restrict access to vouchers.

**Inspector General Recommendations**

In all the above examples, the Inspector General used a three prong approach in response to the identified fraud.  First, the agencies were referred for both criminal prosecution and civil recovery.  The Office of the Inspector General worked with both local State's Attorneys' Offices and the Office of the Attorney General and Federal Authorities for prosecution and recovery.

Second, the Inspector General's Office analyzed procedure and practice within the Department that had contributed to the fraud.  The Inspector General's Office collaborated with the Office of the Attorney General to develop training for contract monitors within the Department to tighten oversight to avoid future fraud.

Third, the Inspector General's Office worked with the Department to create and amend procedures to require greater accountability both from Department staff and vendors and to facilitate prosecution when fraud occurs.

284

## DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS

The Inspector General made the following recommendations in previous Fiscal Years, but the recommendations were not fully implemented before the Annual Report was issued. The current implementation status of these recommendations is detailed below in the following categories.

- Child Protection
- Child Welfare Employee Licensure (CWEL)
- Contract Monitoring
- Domestic Violence
- Foster Home Licensing
- Law Enforcement
- Legal
- Medical
- Personnel
- Services
- Teen Parent Services

**CHILD PROTECTION**

**The State Central Register's notification letters of final findings to Mandated Reporters should list each final finding (indicated/unfounded) by allegation, and the identity of the perpetrator. The notification should also provide information regarding the Mandated Reporter's right to request an additional review of the findings (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 1).**

> *FY 11 Department Response:* The Division of Child Protection and the Office of Legal Services are working to implement this recommendation.

> *FY 12 Department Update:* The mandated reporter notification letters have been revised and the Office of Information Technology Services is in the process of incorporating the forms into the Statewide Automated Child Welfare Information System (SACWIS).

**The Department should develop and incorporate into its trainings and rules and procedures information for child protection staff regarding polygraphs used by law enforcement (from OIG FY 10 Annual Report, Systems Investigation 1).**

> *FY 10 Department Response:* The Department agrees. Procedure 300, *Reports of Child Abuse and Neglect*, is being revised to incorporate procedures regarding polygraph examinations. The Department's Office of Training has begun training staff on the proper procedure and protocol for the use of polygraphs.

*FY 11 Department Update:* The recommendation has been incorporated into draft Procedures 300, *Reports of Child Abuse and Neglect.*  The targeted implementation date is June 2012.

*FY 12 Department Update:* Procedures 300.60, *Use of Polygraphs,* has been revised and incorporated into training child protection workers.

**The Department must review investigative caseload levels on a quarterly basis to determine whether there is substantial compliance with the caseload Consent Decree and whether there are pockets of areas or offices where non-compliance levels put children at risk (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 2).**

*FY 09 Department Response:* The review is currently being conducted.

*FY 10 Department Update:* DCFS Legal continues to work with DCP on this issue.

*FY 11 Department Update:* DCFS Legal continues to work with DCP on this issue.

*FY 12 Department Update:* A caseload report has been implemented for DCFS Legal and Child Protection to review caseloads on a quarterly basis.  The Department plans to address this issue with the reorganization.

**The Department must ensure that notifications of investigation findings to mandated reporters from the State Central Register conform to Rule 300.130, *Notices Whether Child Abuse or Neglect Occurred*, and include the name of the child victim (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 3).**

*FY 08 Department Response:* The Department agrees.  Implementation of this recommendation is in progress.

*FY 09 Department Update:* This requires a change to the Statewide Automated Child Welfare Information System (SACWIS), since the letter is generated in SACWIS.  Several notification letters will need to be changed and all changes will be made at the same time.  A meeting will be convened in January 2010 between the Office of Legal Services, the Division of Child Protection and the State Central Register to make revisions.

*FY 10 Department Update:* The Office of Legal Services is reviewing the definition of "involved parent" in conjunction with other changes to the Abused and Neglected Child Reporting Act (ANCRA) required by the DuPuy Federal Lawsuit.  Litigation is currently in the final stages. The anticipated completion date is summer 2011.

*FY 11 Department Update:* The Office of Legal Services is working with the Administrator of State Central Register to revise all notification letters.

*FY 12 Department Update:* The mandated reporter notification letters have been revised and the Office of Information Technology Services is in the process of incorporating the forms into the Statewide Automated Child Welfare Information System (SACWIS).

**The Department should train investigators and issue policy to require that when investigating injuries that occurred during babysitting, the investigator should determine the names of all other children that the babysitter provides care for, and interview them when appropriate and add children as additional alleged victims when appropriate.  Parents, including non-custodial involved parents, of all children who are added as additional alleged victims should be notified of pending and completed investigations as required by the Abused and Neglected Child Reporting Act (ANCRA) and existing Rule and Procedure (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 3).**

> *FY 09 Department Update:* A policy/information transmittal is being developed to notify staff.

> *FY 10 Department Update:* The DCFS Office of Legal Services is reviewing the definition of "involved parent" in conjunction with other changes to the Abused and Neglected Child Reporting Act (ANCRA) required by the DuPuy Federal Lawsuit.  Litigation is currently in the final stages.  The anticipated completion date is summer 2011.

> *FY 11 Department Update:* The Office of Legal Services is working with the Administrator of State Central Register to revise all notification letters.

> *FY 12 Department Update:* The notification letters have been revised and the Office of Information Technology Services is in the process of incorporating the forms into the Statewide Automated Child Welfare Information System (SACWIS).  The recommendation will be included in revisions to Procedures 300, *Reports of Child Abuse and Neglect.*

**As previously recommended by the Office of the Inspector General in FY 2007, Department procedures should be amended to require that in child protection investigations in which the plan is for a family member to obtain private guardianship of the child/ren, the family should be referred to the Extended Family Support Program (EFSP) for assistance in securing private guardianship (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 11).**

> *FY 08 Department Response:* The Service Intervention Deputy has reviewed and approved the draft procedure.  The procedure has been sent to the Office of Child and Family Policy for the revision process.

> *FY 09 Department Update:* The Department studied the Procedure and determined that the change could increase the Extended Family Support Program budget by as much as $400,000 per year.  The Division of Service Intervention is currently determining where the money can be found for this change.

*FY 09 OIG Response: The Department should explain how it arrived at the projected additional cost of $400,000, including a line item breakdown of projected expenses by Region.  The projected cost of assisting family members to obtain private guardianship of a child must be weighed against potential savings created by assisting and strengthening families to prevent them from entering the system.*

> *FY 10 Department Update:* The recommendation has been incorporated into draft Procedures 302.385, *Extended Family Support Program.*  Once the draft procedures are approved the Division of Service Intervention will begin training on the referral process.

*FY 11 Department Update:* The recommendation has been incorporated into draft Procedures 302.385, *Extended Family Support Program.* Once the draft procedures are approved the Division of Service Intervention will begin training on the referral process.

*FY 12 Department Update:* The recommendation will be incorporated into the intact family and child welfare intake redesign.

**The Abused and Neglected Child Reporting Act (ANCRA) should be amended to clarify that the Department can share unfounded investigative information during a subsequent child protection or criminal investigation with any persons named in Section 11.1, Disclosure of Information for purposes consistent with the Abuse and Neglect Child Reporting Act or criminal prosecution (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 4).**

*FY 07 Department Response:* The Office of Legal Services has assigned an attorney to draft amendments to the Abused and Neglected Child Reporting Act (ANCRA), which address the above issue, as well as other proposed changes to ANCRA, and will submit as a single legislative package. The targeted date of completion is May 2008.

*FY 08 Department Update:* The Office of Legal Services has assigned an attorney to draft amendments to the Abused and Neglected Child Reporting Act (ANCRA), which address the above issue, as well as other proposed changes to ANCRA, and will submit as a single legislative package. The anticipated date of completion is February 2009.

*FY 09 Department Update:* Draft amendments to the Abused and Neglected Child Reporting Act addressing this issue will be submitted as part of the legislative package for the Fall Session 2010.

*FY 10 Department Update:* Amendments to the Abused and Neglected Child Reporting Act addressing this issue will be submitted as part of the legislative package for the Spring Session 2011.

*FY 11 Department Update:* The Office of Legal Services will work with Legislative Affairs to incorporate language into the Abused and Neglected Child Reporting Act pertaining to sharing unfounded reports during a criminal or child protection investigation.

*FY 12 Department Update:* DCFS Legal has determined that Rule 431 can be amended without pursuing legislation. Revisions to Rule 431, Confidentiality of Personal Information, are being drafted. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

**The Department should ensure that child protection investigations, both unfounded and indicated, are not expunged while a subsequent investigation, involving the same family, is pending (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 5).**

*FY 07 Department Response:* The Department is considering whether to pursue a change in legislation to implement this recommendation.

*FY 08 Department Update:* The Department is continuing to examine this and other legislative amendments to ANCRA.

*FY 09 Department Update:* The Department has drafted proposed legislation to be submitted as part of the legislative package for the Fall Session 2010.

*FY 10 Department Update*: The Department is continuing to examine this and other legislative amendments to the Abused and Neglected Child Reporting Act (ANCRA).

*FY 11 Department Update*: Proposed changes to the Abused and Neglected Child Reporting Act have been drafted and will be submitted during the Spring 2012 legislative session.

*FY 12 Department Update:* Senate Bill 3544, addressing this recommendation was signed into law August 24, 2012. The appropriate changes have been made to the Statewide Automated Child Welfare Information System (SACWIS).

**The Department should ensure that available fathers be explored as potential placements. If a safety plan is likely to last longer than six months, the Department should facilitate a legal relationship between the child and the caretaker (from OIG FY 06 Annual Report, General Investigations 11).**

*FY 06 Department Response:* A committee has been formed to revise the safety assessment process. The committee continues to work on the safety assessment framework protocol. Targeted completion date is June 2007.

*FY 07 Department Update:* The Child Endangerment Risk Assessment Protocol (CERAP) draft, currently being field tested, directs the attention of the worker to consider available fathers as potential placements.

*FY 08 Department Update:* The Child Endangerment Risk Assessment Protocol draft provides that non-custodial parents should be identified and assessed first for potential out-of-home placement when a safety plan is needed.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 09 OIG Response: According to the most recent data, just over 100 families have been referred statewide to agencies that the Department contracts with to provide services to fathers. The Department needs to encourage broader participation for fathers of DCFS involved children.*

*FY 10 Department Update:* The recommendation has been incorporated into the draft Safety Enhancement Protocol (Procedure 300, Appendix G). The estimated date of implementation is July 2011.

*FY 11 Department Update:* The training for Enhanced Safety Model began in the Fall of 2011 and will be completed in Spring 2012. The Enhanced Safety Model includes prompts to be sure that available fathers are considered as placement options. However, the Enhanced Safety Model does not include facilitating a legal relationship with substitute care givers should the safety plan last longer than 6 months. This facilitation of a legal relationship between the substitute caregiver and the children will be considered by the incoming Director in consultation with the Office of Legal Services.

*FY 12 Department Update:* The Department will incorporate the clarification into Procedures 300, *Reports of Child Abuse and Neglect*.

**The State Central Register should revise the Notice of Indicated Finding sent to parents to ensure that parents know the identity of the indicated perpetrator or whether the allegation was indicated to an unknown perpetrator (from OIG FY 05 Annual Report, Death and Serious Injury Investigation 6).**

*FY 05 Department Response*:  This recommendation is under review by the DCFS Office of Legal Services because of the impact it may have on the DuPuy Federal lawsuit.

*FY 06 Department Update*:  Revisions are on hold pending implementation of the changes required by the DuPuy Federal lawsuit.  Changes will be implemented as soon as possible, but no later than July 17, 2007.

*FY 07 Department Update:* Revisions were placed on hold by the Office of Legal Services due to changes required by DuPuy Federal Lawsuit.  As of November 2007, litigation is ongoing and it appears additional changes to the notice form may be required.  The Office of Legal Services will continue to monitor and will draft an updated form when legal issues have been resolved.  The anticipated implementation date is May 2008.

*FY 08 Department Update:* Revisions to the notification letter are in process and will be completed by June 2009.

*FY 09 Department Update:* Recommendation in progress. Estimated completion date: Summer 2010.

*FY 10 Department Update:* Implementation was delayed due to ongoing litigation now in final stages.  The estimated completion date is Summer 2011.

*FY 11 Department Update:* The Office of Legal Services is working with the Administrator of State Central Register to revise all notification letters.

*FY 12 Department Update:* The notification letters have been revised and the Office of Information Technology Services is in the process of incorporating the forms into the Statewide Automated Child Welfare Information System (SACWIS).

**A third box should be added to each safety factor in the Child Endangerment Risk Assessment Protocol (CERAP), acknowledging that information for that factor may be "unknown" or "uncertain" and add a section at the conclusion of the factors list for identifying information that needs to be gathered in the future to further assess safety (from OIG FY 06 Annual Report, General Investigations 16).**

*FY 07 Department Response:* The current draft Child Endangerment Risk Assessment Protocol (CERAP) that is being field-tested provides two assessment tools. The first is used at the outset and permits workers to note that more information is needed before the question can be answered.

*FY 08 Department Update:* The current draft of the initial CERAP acknowledges the option that more information is needed to assess safety.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 10 Department Update:* The recommendation has been incorporated in the draft Safety Enhancement Protocol, *Procedure 300, Appendix G: Child Endangerment Risk Assessment*. The estimated date of implementation is July 2011.

*FY 11 Department Update:* The training for Enhanced Safety Model began in the fall of 2011 and will be completed in spring 2012.

*FY 12 Department Update:* The Department and the Office of the Inspector General are continuing to review this recommendation toward maximizing child safety.

**Devise a supervisory form to accompany the safety assessment that would allow a supervisor to determine the source of information that formed the basis of the particular safety factor decision and provide a check that basic available objective sources (such as the hotline report, prior child protection investigations, police reports and interviews with police, and criminal history information) as required by Administrative Procedure 6 (from OIG FY 06 Annual Report, General Investigations 16).**

*FY 08 Department Update:* The current draft CERAP identifies the source of the information.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 10 Department Update:* The recommendation will be incorporated in the draft Safety Enhancement Protocol *Procedure 300, Appendix G: Child Endangerment Risk Assessment*. The estimated date of implementation is July 2011.

*FY 11 Department Update:* The training for the Enhanced Safety Model began in the Fall of 2011 and will be completed in Spring 2012. The ability of the supervisor to review and approve the source of the information has been incorporated into the Enhanced Safety Model in SACWIS.

*FY 12 Department Update:* The revised CERAP includes a specific section to indicate the source of information for the assessment of each safety threat. Staff have been trained to complete the source of information section and should seek information other than self reported information whenever possible in making safety determinations. The new safety model will be fully implemented with SACWIS support in early 2013.

**The Child Endangerment Risk Assessment Protocol (CERAP) should be amended to require that workers note when a risk factor cannot be answered because of insufficient information.  Under such circumstances, workers should be required to perform diligent inquiry into relevant facts for assessment within 48 hours.  The Department should develop procedures to ensure that there is follow-up and resolution of unknown variables (from OIG FY 05 Annual Report, Death and Serious Injury Investigation 9).**

*FY 07 Department Update:* The draft Child Endangerment Risk Assessment Protocol, currently being piloted, addresses this recommendation.

*FY 08 Department Update:* The recommendations resulting from the pilot were submitted to the Safety Workgroup, which is meeting regularly to incorporate these recommendations. There is a possibility of some additional slight modifications to incorporate the recent Department focus on Trauma-Informed practices. Procedures 300, Appendix G: Safety Assessment Enhancement, has been revised and will be implemented when changes to SACWIS are completed. The anticipated date of implementation is July 2009.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 10 Department Update:* The recommendation has been incorporated in the draft Safety Enhancement Protocol, *Procedure 300, Appendix G: Child Endangerment Risk Assessment.* The estimated date of implementation is July 2011.

*FY 11 Department Update:* The training for Enhanced Safety Model began in the fall of 2011 and will be completed in spring 2012. The Enhanced Safety Model allows the investigator to complete an initial Safety Assessment that includes gathering additional information before completing the assessment.

*FY 12 Department Update:* The Department and the Office of the Inspector General are continuing to review this recommendation toward maximizing child safety.

**DCFS Procedure 300, *Reports of Child Abuse and Neglect*, should be amended to provide that the decision to take protective custody of a child whose parent is receiving services from the Department (e.g., intact family, independent living, or residential programs) must include consideration of the degree of the parent's cooperation with services and the extent to which services provided address the allegation (from OIG FY 04 Annual Report, Death and Serious Injury 19).**

*FY 04 Department Response*:   The Child Endangerment Risk Assessment Protocol (CERAP) Advisory Council is currently reviewing the CERAP.  The OIG recommendations will be shared with the group at their next meeting, January 2005.

*FY 05 Department Update*:  Procedure 300.80, *Delegation of the Investigation*, has been revised and the draft includes this consideration.  The Office of Legal Services is currently reviewing Procedures 300, *Reports of Child Abuse and Neglect*, and it is projected all related tasks will be complete by Spring 2006.

*FY 06 Department Update*:  The Division of Child Protection Committee has not completed its review and final revisions to Procedures 300, *Reports of Child Abuse and Neglect*.  Once completed, these will be returned to the Office of Child and Family Policy to begin the process of approval from the Joint Commission on Administrative Rules (JCAR).  Implementation date: Spring 2007.

*FY 07 Department Update:*  The Office of Child and Family Policy has forwarded the final draft of Procedures 300, *Reports of Child Abuse and Neglect,* to the Division of Child Protection.  The Procedures 300 workgroup is reviewing the final draft and expects completion by December 2007.

*FY 08 Department Update:* The internal and external review of Procedures 300, *Reports of Child Abuse and Neglect,* has been completed and comments were forwarded to the Associate Deputy for review. The revisions to Procedures 300, *Reports of Child Abuse and Neglect* are expected to be finalized by January 2009.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 10 Department Update:* The recommendation will be incorporated in the draft Safety Enhancement Protocol, *Procedure 300, Appendix G: Child Endangerment Risk Assessment.* The estimated date of implementation is July 2011.

*FY 11 Department Update:* The training for Enhanced Safety Model began in the fall of 2011 and will be completed in spring 2012.

*FY 12 Department Update:* The recommendation has been incorporated into revised Procedure 300.80(b)(1), *What Must be Considered in Taking Protective Custody.*

**The Department should amend Rule 431 pertaining to unfounded reports made by non-mandated reporters and involving licensed foster homes/parents – to extend the 30-day retention to six (6) months after the final finding is entered (from OIG FY 08 Annual Report, Death and Serious Injury 9).**

*FY 12 Department Update:* The Department and the OIG jointly sponsored a legislative bill to permit the retention of unfounded reports for twelve months. The legislation passed and Public Act 96-1164 was signed into law. The Department is in the process of amending Rule 431 to conform to the new legislation.

**The procedures for completing a Child Endangerment Risk Assessment Protocol (CERAP) and the decision tree for mentally ill parents should be amended so that the guidelines note the need to assess risk to the child when a parent incorporates a child into their delusional system, even in the absence of overt negative statements (from OIG FY 06 Annual Report, Death and Serious Injury 2).**

*FY 06 Department Response:* The committee revising the safety assessment continues to work on the safety framework protocol.  Targeted completion date is June 2007.

*FY 08 Department Update:* Department procedures require a rule out of dependency. Revised safety enhancement factors have been expanded.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 10 Department Update:* The recommendation has been incorporated in the draft Safety Enhancement Protocol (Procedure 300, Appendix G). The estimated date of implementation is July 2011.

*FY 11 Department Update:* The training for Enhanced Safety Model began in the fall of 2011 and will be completed in spring 2012. The Enhanced Safety Model alerts staff to the dangers associated with a mentally ill parent who incorporates the child into their delusional system.

*FY 12 Department Update:* Training staff on the Enhanced Safety Model began in the Fall of 2011. The new safety model will be fully implemented with SACWIS support in early 2013.  The Enhanced Safety Model alerts staff to the dangers associated with a mentally ill parent who incorporates the child into their delusional system.

**OIG FY 04 Annual Report, Death and Serious Injury Investigation 24 included the following six recommendations (labeled below a-f).  The responses and updates follow the six recommendations.**

**a) The Procedure for the allegation of Poisoning (#6/56) should include information from literature:**

- **Common sources of intentional poisoning of children include:  ipecac, laxatives, black and red pepper, salt, water (intoxication), acetaminophen and aspirin, insulin, adult prescription drugs (e.g. barbiturates, antidepressants, diuretics), alcohol and illicit drugs, and arsenic;**

- **Common symptoms associated with intentional poisoning include: chronic diarrhea, vomiting, lethargy, dehydration, and seizures;**

- **Intentional poisoning has an extremely high mortality rate and when found, children who are intentionally poisoned should not be left with the perpetrator.**

**b) The Department should establish guidelines for the investigation of abusive poisoning cases and suspected Factitious Disorder by Proxy cases in accordance with the published literature. Allegations should be amended to provide that in cases where intentional poisoning is suspected, the investigator should also suspect and investigate Factitious Disorder by Proxy.**

**c) Department Procedures should acquaint workers with the following critical information necessary to investigate Factitious Disorder by Proxy:**

- **Critical to any investigation of poisoning, and especially Factitious Disorder by Proxy, is a detailed determination of who provides care for the child when;**

- **Investigators must retrieve all available medical records for the affected child and siblings; an affidavit of history care, completed by the parents, will be a useful first step in attempting to get all available records;**

- **While not dispositive, the typical perpetrator is a mother who has some medical background;**

- **Typically, perpetrators of Factitious Disorder by Proxy appear particularly bonded with their children and are particularly adept at convincing professionals of their sincerity and abiding interest in their children;**

- **Most victims of Factitious Disorder by Proxy are infants and toddlers;**

- **As much as 98% of the time, the perpetrator continues victimizing the child in the hospital;**

- **The most common presentation of Factitious Disorder by Proxy is apnea.  Other common presenting conditions include seizures, bleeding, central nervous system depression, diarrhea, vomiting, fever (with or without sepsis or other localized infection), and rash.  Probably the most common cause of death in homicidal Factitious Disorder by Proxy is suffocation, but there are many causes of death, among which are poisoning with various drugs, inflicted bacterial or fungal sepsis, hypoglycemia, and salt or potassium poisoning;**

- **Factitious Disorder by Proxy is not limited to directly causing conditions (e.g. poisoning and suffocation); it may also include, over and under reporting signs or symptoms (e.g. exaggeration of symptoms), creating a false appearance of signs and symptoms (e.g. tampering of specimens) and/or coaching the victim or others to misrepresent the victim as ill (Ayoub, et al., 2002).  The presence of valid illness does not preclude exaggeration or falsification (Ayoub, et al., 2002).**

**d) A Factitious Disorder by Proxy investigation should include a thorough review of available medical records for all children in the family.  If a child abuse team is available at the treating hospital, they should conduct the review.  If a child abuse team is not available, this review should be conducted by DCFS nurses and should be subject to the following procedures:**

- **Interview medical personnel regarding symptoms.  If intentionally caused, how long after administration would symptoms be expected to occur?  How long would symptoms be expected to last per dose?**
- **Determine context of onset of symptoms.  Who is present prior to onset of symptoms?**
- **Prepare a medical chronology of symptoms, charting the onset of symptoms and the access of possible perpetrators;**
- **Do siblings' records contain evidence of false pediatric reporting?**
- **Interview treating doctor to determine whether appropriate laboratory tests have been ordered to detect the presence of poisons or emetics.**

**e) Whenever investigators suspect intentional poisoning or Factitious Disorder by Proxy, an immediate referral must be made to law enforcement and the State's Attorney.**

**f) Whenever investigators suspect intentional poisoning or Factitious Disorder by Proxy, investigators must employ a multi-disciplinary approach that includes sharing of information and frequent contact with law enforcement and any child abuse team at the hospital.  If no child abuse team is available, the investigator and DCFS nurse must maintain an open dialogue throughout with treating medical professionals to ensure sharing of all information.**

*FY 04 Department Response*:  A workgroup was convened to revise and update Procedures 300, *Reports of Child Abuse and Neglect*.  Reference to allegations 5/56, 15/65 and 10/60 will be included in the draft protocol for conducting investigations when Factitious Disorder by Proxy is suspected.  The workgroup decided not to limit Factitious Disorder by Proxy to the poison allegation. Completion date:  April 2005.

*FY 05 Department Update*:  The draft policy is complete.  It was reviewed with the OIG for final comments and subsequent revisions.  Distribution to staff is expected within the first quarter of 2006.

*FY 06 Department Update*:  The Division of Child Protection Committee has not completed its review and final revisions to Procedures 300, *Reports of Child Abuse and Neglect*.  Once completed, these will be returned to the Office of Child and Family Policy to begin the process of approval from the Joint Committee on Administrative Rules (JCAR).  Implementation date: Spring 2007.

*FY 09 Department Update*: Rule 300 is currently being reviewed by the Joint Committee on Administrative Rules and Procedures 300, *Appendix B, Child Abuse and Neglect Allegations*, is being revised.

*FY 10 Department Update:* This information has been incorporated into draft Procedures 300, *Reports of Child Abuse and Neglect, Appendix K- Factitious Disorder by Proxy.* The anticipated date of completion is July 2011.

*FY 11 Department Update:* The draft policy on Factitious Disorder by Proxy/Medical Child Abuse is still under review. Upon completion the policy will be incorporated into Procedure 300, Appendix B, Allegation #10-*Substantial Risk of Physical Injury/ Environment Injurious to Health and Welfare by Abuse* and #60-*Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect,* as well as issued as a separate Policy Transmittal.

*FY 12 Department Update:* Policy Transmittal 2012.07, *Procedures 300, Appendix L, Factitious Disorder by Proxy* and revised Appendix B, *Allegation of Harm #10/60,* were distributed in May 2012.


## CHILD WELFARE EMPLOYEE LICENSURE (CWEL)

**The Department should amend Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors,* to require that all counselors and therapists subcontracted or employed to provide services through a DCFS contract possess a CWEL license (from OIG FY 11 Annual Report, General Investigation 5).**

*FY 11 Department Response:* The draft amendments to Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors,* require that all counselors and therapists subcontracted or employed to provide services through a DCFS contract possess a CWEL license.

*FY 12 Department Update:* The Department continues to discuss this recommendation with the Office of the Inspector General, Office of Legal Services and the Office of Clinical Services.


**The Department should amend procedures to require the CWEL Division to notify the Department of Professional and Financial Regulation of any revocation of a CWEL license (from OIG FY 11 Annual Report, General Investigation 5).**

*FY 11 Department Response:* The requirement to notify the Department of Professional and Financial Regulation has been included in the draft of the amendments to Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors.* The amendments will be submitted to the Joint Commission on Administrative Rules (JCAR).

*FY 12 Department Update:* The Department is in the process of revising Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors.*


**The Department should pursue a legislative change to the Child Care Act to include felony financial crimes on the list of barrable offenses (from OIG FY 11 Annual Report, General Investigation 5).**

*FY 11 Department Response:* The Department agrees. DCFS Office of Legal Services and legislative staff will work together to propose legislation for next year's legislative session.

*FY 12 Department Update:* The Governor signed Senate Bill 3517, which amended the child care act by including felony financial crimes as barrable offenses.

**The OIG recommended that Rule 412,** *Licensure of Direct Child Welfare Services Employees and Supervisors***, be revised:**

- **To permit the Department to refuse to issue a license with knowledge that the applicant had committed a violation that would warrant licensure revocation or if the applicant had engaged in behavior that would pose a risk to children or state resources;**

- **To expand the list of criminal pending charges or convictions that would warrant a refusal to issue a license to include any crime of which dishonesty is an essential element;**

- **To permit the Department to refuse to issue a license if the applicant provides false information during the licensing process;**

- **To provide guidelines for assessing whether certain unbarred criminal convictions and abuse or neglect findings should prevent licensure because of the characteristics of the crime;**

- **To permit the Division of Child Welfare Employee Licensure to refer applications for investigation to verify facts presented (from OIG FY 06 Annual Report, General Investigations 26).**

*FY 07 Department Update:* The Clinical Division, through the Child Welfare Employee Licensure (CWEL) staff, has drafted proposed changes to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors*. The draft of the proposed amendment incorporates input from the OIG, and the appointed Board members of the Child Welfare Employee Licensure (CWEL) program. The text of the proposed amendment will be submitted to the Director for review, approval, and transmittal to the Joint Committee on Administrative Rules (JCAR).

*FY 08 Department Update:* The revisions to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* were submitted to the Office of Child and Family Policy on November 21, 2008 and will begin the revision/comment process. The anticipated date of completion is June 2009.

*FY 09 Department Update:* The amended Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors,* has been submitted to the Joint Committee on Administrative Rules for review. The anticipated completion date is Fall 2010.

*FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License*, was filed in October 2009. The second Notice was never filed due to failure to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first notice again by January 2011, subject to approval.

*FY 11 Department Update:* The Department will resubmit the amendments to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* with the Joint Committee on Administrative Rules.

*FY 12 Department Update:* Revisions to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors,* have been distributed for comment.

**The Department should amend Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors*, to provide specific provisions for voluntary relinquishment of a Child Welfare Employee License (from OIG FY 08 Annual Report, General Investigation 30).**

- **A licensee may voluntarily relinquish his or her license at any time.**

- **The voluntary relinquishment of a CWEL during a pending licensure or disciplinary investigation or proceeding shall be recorded in the CWEL files as "*relinquished during licensure or disciplinary investigation or proceeding.*"**

- **Voluntary relinquishment of a license must be filed with the Child Welfare Employee License Division on a form prescribed by the CWEL Division.  The form must contain an acknowledgment that reinstatement will be subject to consideration of the facts disclosed in any pending licensure investigations or proceedings.  Voluntary relinquishment does not divest the OIG of the jurisdiction to complete a pending investigation.**

- **An Application for License from a licensee who previously relinquished his or her license shall be considered a Request for Reinstatement rather than an Application for License.**

*FY 08 Department Response:* The Department agrees.  The Office of Child and Family Policy has begun the revision process.

*FY 09 Department Update:* Revisions to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisor,* is currently being reviewed by the Joint Committee on Administrative Rules.

*FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License*, was filed in October 2009. The second Notice was never filed due to failure to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first Notice again by January 2011, subject to approval.

*FY 11 Department Update:* The Department will resubmit the amendments to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors,* with the Joint Committee on Administrative Rules.

*FY 12 Department Update:* Revisions to Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* have been distributed for comment.

**Section 412.100, *Restoration of Revoked or Suspended License*, should be amended as follows: Section 412.100, *Restoration of Revoked, Suspended or Relinquished License*: A licensee may request the restoration of his or her license by submitting a written request to the Board providing specific reasons to support the request.  In considering an application to reinstate or grant a license that was relinquished during a pending licensure investigation or administrative proceeding, the Board shall consider any charges filed along with a report or sworn statement by the Office of the Inspector General regarding the evidence developed in the investigation.  For the purpose of considering a Request for Reinstatement, the Board shall presume that the facts developed during the investigation or the pending charges are true, when the license was surrendered during a pending investigation or licensure proceeding; the licensee may rebut the presumption for good cause shown.  The Board may not reinstate a license where it has been shown by investigation and**

administrative hearing that it is not in the best interest of the public to do so.  Considerations that will be reviewed when making a finding of "in the best interest of the public" include, but are not limited to:  the nature of the offense for which the license was revoked; the period of time that has elapsed since the revocation; evidence of rehabilitation; and character references (from OIG FY 08 Annual Report, General Investigation 30).

> *FY 08 Department Response:* The Department agrees.  The Office of Child and Family Policy has begun the revision process.

> *FY 09 Department Update:* Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* is currently being reviewed by the Joint Committee on Administrative Rules.

> *FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License,* was filed in October 2009. The second Notice was never filed due to failure to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first Notice again by January 2011, subject to approval.

> *FY 11 Department Update:* The Department will resubmit the amendments to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* with the Joint Committee on Administrative Rules.

> *FY 12 Department Update:* Revisions to Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* have been distributed for comment.

**Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors*, should be amended to provide for automatic suspension or denial of license application after a licensee or applicant has failed a drug test required by Administrative Procedure 24, *Drug Testing of Employment Applicants* (from OIG FY 08 Annual Report, General Investigation 32).**

> *FY 08 Department Response:* The Department agrees.  The Department convened a task force that has developed language to amend Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors.*

> *FY 09 Department Update:* Pre-employment drug testing (Administrative Procedure 24) was suspended indefinitely due to budget constraints.

> *FY 10 Department Update:* The Department began pre-employment drug testing in February 2008, but had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

> *FY 11 Department Update:* Management fully supports reasonable suspicion testing for direct child welfare service employees and supervisors.  Direct child welfare service employees and supervisors are bargaining unit members.  As such implementation of reasonable suspicion drug/alcohol testing, unless legislatively mandated, must be negotiated with the collective bargaining units.  Management routinely proposes to CMS Labor Relations that reasonable suspicion testing be included in collective bargaining agreements.  Management also routinely proposes that reasonable suspicion testing be added to supplemental collective bargaining agreements.  Without a reasonable suspicion testing policy in place amendment of Rules and

Procedures is futile.  The State will be involved in contract negotiations with AFSCME in 2012 and the Department intends to continue pressing this point.

*FY 11 OIG Response: The OIG notes that the City of Chicago and both the Illinois State Police and the Department of Corrections have had Reasonable Suspicion Testing for several years.  The City of Chicago and the Department of Corrections employees are represented in large part by the same union as most employees with the Department of Children and Family Services.  Moreover, Direct Child Welfare employees and supervisors at DCFS must possess Child Welfare Employee Licenses.  The OIG has urged since 2005 that Reasonable Suspicion Testing be added as a requirement for Child Welfare Licensure.  The Department has failed to act on the recommendation.*

*FY 12 Department Update:* A workgroup has been formed to review all OIG drug/alcohol related recommendations to determine implementation steps.

**The Department should amend Rule 412,** *Licensure of Direct Child Welfare Service Employees and Supervisors* **to add "failure to timely comply with an order for drug or alcohol testing after a finding of reasonable suspicion" as a basis for licensure action under Rule 412.50,** *Misconduct* **(from OIG FY 10 Annual Report, General Investigation 21).**

*FY 10 Department Response:* Management will seek to negotiate reasonable suspicion testing with the Union in the future.

*FY 10 OIG Response:  The Office of the Inspector General has been continuously recommending this critical change in policy for 11 years.   The lack of a reasonable suspicion testing policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk. The policy change sought by the Office of the Inspector General would have minimal budgetary impact.*

*FY 11 Department Update:* Management fully supports reasonable suspicion testing for direct child welfare service employees and supervisors.  Direct child welfare service employees and supervisors are bargaining unit members.  As such implementation of reasonable suspicion drug/alcohol testing, unless legislatively mandated, must be negotiated with the collective bargaining units.  Management routinely proposes to CMS Labor Relations that reasonable suspicion testing be included in collective bargaining agreements.  Management also routinely proposes that reasonable suspicion testing be added to supplemental collective bargaining agreements.  Without a reasonable suspicion testing policy in place amendment of Rules and Procedures is futile.  The State will be involved in contract negotiations with AFSCME in 2012 and the Department intends to continue pressing this point.

*FY 11 OIG Response: The OIG notes that the City of Chicago and both the Illinois State Police and the Department of Corrections have had Reasonable Suspicion Testing for several years.  The City of Chicago and the Department of Corrections employees are represented in large part by the same union as most employees with the Department of Children and Family Services.  Moreover, Direct Child Welfare employees and supervisors at DCFS must possess Child Welfare Employee Licenses.  The OIG has urged since 2005 that Reasonable Suspicion Testing be added as a requirement for Child Welfare Licensure.  The Department has failed to act on the recommendation.*

*FY 12 Department Update:* A workgroup has been formed to review all OIG drug/alcohol related recommendations to determine implementation steps.

## CONTRACT MONITORING

**From OIG FY 11 Annual Report, General Investigation 1: The Illinois Department of Children and Family Service should implement the following safeguards to their training and procedures:**

➢ **Vendors, grantees and contractors should be required to disclose all public contracts held by related parties in the Consolidated Financial Report (CFR). Instructions to the CFR should require contractors to report public funding of affiliates and related entities. Vendors, grantees and contractors should also be obligated to provide a description of programs supported by the public funding.**

➢ **Grants, contracts, program plans and independent audits should be electronically scanned, stored in a central location and made accessible to program and financial monitors for review.**

➢ **DCFS contract and financial monitoring training must be required for all DCFS program and financial monitors, as well as those reviewing annual audits, within three months of receipt of a contract monitoring assignment and every two years thereafter. Training should emphasize that the Program Monitor's *chief duty* is to verify, by personal knowledge, the receipt of goods and services provided.**

**Any training should address, at minimum:**
   ✓ **General grant monitoring responsibilities;**
   ✓ **Audits including comparison of audit figures with approved budgets and related responsibilities;**
   ✓ **Approval of Quarterly Reports and related responsibilities;**
   ✓ **Rules and procedures regarding under spending and related responsibilities;**
   ✓ **Rules and procedures regarding disallowable costs and related responsibilities;**
   ✓ **Rules and procedures regarding reduction in grant amounts responsibilities;**
   ✓ **Rules and procedures regarding excess revenue and allowable offset and related responsibilities; and**
   ✓ **Rules and procedures involving inquiries into expenses to related entities and related responsibilities.**

➢ **In addition, all DCFS Program Monitors should be required to certify that:**
   ✓ **the report of direct versus administrative expenses have been verified and is appropriately allocated;**
   ✓ **the Program Monitor has considered whether to reduce future contract or grant amounts based on under-spending or disallowable costs;**
   ✓ **the quarterly reports have been reviewed and compared to the budget; and**
   ✓ **the Program Monitor has reviewed and approved leases supporting rental costs.**

➢ **On a biannual basis, each DCFS Deputy Director must submit to the DCFS Director and the DCFS Division of Finance, Technology and Planning, a list of each contract monitored by his or her division and listing the program monitor assigned to each individual contract. The DCFS Division of Finance, Technology and Planning should be required cross-check the list to ensure that all contracts are assigned a Program Monitor, and also to ensure that all Program Monitors receive the required Contract Monitoring Training. Every six months the DCFS Division of Finance, Technology and Planning should be required to forward to the DCFS Office of the Inspector General a list of any unmonitored contracts.**

*FY 11 Department Response:* Vendors, grantees and contractors will be required to disclose all public contracts held by related parties and public funding of affiliates and related entities as well as a description of the programs supported by the public funding in the Consolidated Financial Report ("CFR") to the DCFS Divisions of Finance, Technology, and Planning and Monitoring, which receive and analyze CFRs. These requirements will be incorporated into requests to vendors, grantees, and contractors for their CFR submissions for annual contract budget and financial desk audit activities. Estimated completion date and recommendations for compliance is 4th Qtr FY12.

Evaluation of the existing DCFS Division of Procurement and Contracts/Office of Contract Administration Access database, used to determine if grants, contracts, program plans and independent audits can be electronically scanned, stored in a central location and made accessible to monitors, is currently underway. Estimated completion date and recommendations for compliance is 3rd Qtr FY12.

The current contract and financial monitoring training program for grants will be updated by Division of Procurement and Contracts/Office of Contract Administration in conjunction with Divisions of Finance, Technology and Planning and Support Services. This effort will be coordinated and/or led by staff of the newly formed Office of Contract Compliance. Estimated completion date and recommendations for compliance is 3rd Qtr FY12.

Interim process controls include the tracking of monitors' visits to grantees and the tracking of metrics (i.e. number of clients and cost per client served) of all grantees. Tracking of metrics for all grantees awarded over $10,000 should be complete by the end of 2nd Qtr FY12.

A DCFS Administrative Procedure is being developed by the Division of Finance, Technology and Planning. This effort will be coordinated with staff of the Office of Contract Compliance once hired. Estimated completion date and recommendations for compliance is by 3rd Qtr FY12.

Subject to Senate confirmation, Richard Calica will become the Director of DCFS on December 15, 2011. He will be undertaking a comprehensive review of DCFS, including contracts, grants, and controls relating to the same. Under Mr. Calica, the processes above may be modified and/or added to.

*The following is the Department's Update for FY 12:*
- For FY13, DCFS requires all vendors, grantees and contractors (collectively, "contracting entities") with whom DCFS does business, to disclose all public contracts, pending contracts, bids, proposals and procurements held or done by the contracting entities. In FY14, DCFS also will require contracting entities to provide a description of those programs funded by other public entities or related parties in order to identify instances where multiple public agencies are funding similar (or identical) programs. For certain contracts over $150,000, contracting entities must also submit to the DCFS Division of Finance, Technology and Planning a Consolidated Financial Report ("CFR"). The Division of Finance, Technology and Planning reviews each submitted CFR to ensure that costs are appropriately allocated and that funding is not duplicated. DCFS has revised the instructions for reporting on the CFR form to include, reinforce and make clear that all funding, including public funds received by the contracting entity, must be reported. Those instructions will be sent to contracting entities beginning January 2013. The Department is also developing procedures to facilitate appropriate information-sharing and coordination with the Office of Field Audits regarding

identifying and recovering disallowed costs. The estimated completion date for finalizing such procedures is the fourth quarter of FY13.

- The Department completed an evaluation of the existing DCFS Division of Procurement and Contracts/Office of Contract Administration Access database to determine if grants, contracts, program plans and independent audits can be electronically scanned, stored in a central location and made accessible to monitors. DCFS concluded that use of the contract Access database for this purpose is not feasible. Thus, the Department is developing a separate platform for such information including program, fiscal, license and performance information. This information will be accessible to all Department monitoring staff, regardless of their monitoring function. The estimated completion date is the fourth quarter of FY13.

- In the third quarter of FY12, the Department reviewed all its contracts to identify the responsible DCFS monitoring staff for each contract and the type of monitoring provided. In addition, to the extent there were contracts to which no monitoring staff had been assigned, the Department made necessary assignments.

- With regard to training, the programs described below reflect all of the training-related recommendations. Each monitor will attend the training program appropriate to his or her duties, and DCFS will train any new monitoring staff.

- Training for Contract and Fiscal Monitoring Staff: The Department, through its Offices of Procurement and Contracts, Training, and Division of Finance, Technology and Planning, has updated the training program for contract and fiscal monitoring staff. DCFS held the initial updated training, led by the staff of the Office of Contract Compliance, in the second quarter of FY12. The Department will conduct the training annually. Two sessions are scheduled for January and February of 2013.

- Training for Program Monitoring Staff: DCFS has revised its program monitoring model and training for program monitors. All Department staff responsible for monitoring agency programs will follow the same model regardless of the type of service purchased. The Department began training all program monitors on the new model in the second quarter of FY13. Estimated completion date is the fourth quarter of FY13.

- Fraud Prevention and Detection Training (for all Monitoring Staff): The Office of the Illinois Attorney General and the DCFS Office of Inspector General developed fraud prevention and detection training. The DCFS Inspector General and representatives of the Attorney General conducted two fraud prevention and detection training sessions for all DCFS leadership in November 2012. This training will be rolled out to all contract, fiscal and program monitoring staff in the third quarter of FY13.

- The Department amended its audit instructions for FY13 to require a vendor's auditor to certify the vendor's fraud prevention and detection program.

- For grants, the Department implemented a centralized database to track budgeted costs, quarterly program costs, payroll tax and fringe benefit costs of all grantees (regardless of funding amount) and to record service quantity and quality metrics. The database allows staff to identify and address deviations from budgeted costs. The database is designed to assist staff in identifying and recovering any unspent funds at the end of the contract period.

- DCFS is developing administrative procedures and policies concerning the following: requirements for approval of a new provider; grant reconciliation procedures; program monitoring criteria; and criteria for identifying financially and otherwise troubled vendors. The estimated completion date for these policies and procedures is the second quarter of FY14.

- The Department established a work group in FY13 to develop additional strategies and to collaborate on overall contract monitoring, management, and fraud prevention and detection. Membership of the group includes Department management and the DCFS Office of the Inspector General.  The work group, among other things, is developing a new vendor orientation packet that will detail provider responsibilities around reporting, allowable costs and excess revenue.  This packet also will include information on where the vendor may go to find additional help and technical assistance.  The workgroup meets regularly.

- The Department is revising its Monitoring Protocol and Training. All Department staff who are Program Monitors will be required to attend the training and follow the Monitoring Protocol.

**Mentoring program plans for the Department's Youth Stabilization Network should include requirements for the number of contacts with identified youth, the percentage of participating youth and a requirement for open communication with residence staff.  The contracts must be monitored to trigger program audits when the requirements are not met (from OIG FY 10 Annual Report, General Investigation 6).**

*FY 10 Department Response:* The Office of Contract Administration will work with the Division of Service Intervention and the Deputy Director to update program plans for FY 2012.

*FY 11 Department Update:* The Office of Contract Administration staff will continue to work with Division of Service Intervention staff to update the program plans and amend them into contracts during Fiscal Year 2012.

*FY 12 Department Update*: The revised standardized program plan outline/template implemented for Fiscal Year 2013 defines service goals, expected outcomes and metrics, reporting and monitoring requirements for all contracts. This program plan will also be included in the monitoring redesign.

**Subcontractors under Department contracts should be subject to the same transparency as contractors.  All subcontracts to Department contracts should be listed and available for public viewing on the internet (from OIG FY 10 Annual Report, General Investigation 2).**

*FY 10 Department Response:* The Department agrees.  The Finance, Technology and Planning Division will work with the Office of Communication to determine if this is possible through the current system developed for public viewing of contracts on the internet.  An initial discussion was held and anticipated resolution is in 2011.

*FY 11 Department Update:* Contract Administration and Office of Information Technology Services staff will meet to determine how to implement this recommendation utilizing the Department's current technological systems.

*FY 12 Department Update:* The subcontract Agreement boilerplate was updated for Fiscal Year 2013 to reflect the same disclosures/transparency requirements as are required for primary contracts.  Implementation is still pending for appropriate technology to house and make all subcontracts available for public viewing. This will also be a component of the new monitoring design.

**Instructions and training for Consolidated Financial Reports should require agencies to disclose all sources of public financing and allocate accordingly.  Consolidated Financial Reports must be critically reviewed to ensure that costs are appropriately allocated to various programs and that funding is not duplicated (from OIG FY 10 Annual Report, General Investigation 2).**

*FY 11 OIG Update: The Office of the Inspector General is working with the Department to implement this and other FY 11 OIG recommendations to strengthen contract monitoring.*

*FY 12 Department Update:* The Office of the Attorney General and the Office of the Inspector General provided a joint training to Department leadership on Contract Fraud. For FY13, DCFS requires all vendors, grantees and contractors (collectively, "contracting entities") with whom DCFS does business, to disclose all public contracts, pending contracts, bids, proposals and procurements held or done by the contracting entities. In FY14, DCFS also will require contracting entities to provide a description of those programs funded by other public entities or related parties in order to identify instances where multiple public agencies are funding similar (or identical) programs.  For certain contracts over $150,000, contracting entities must also submit to the DCFS Division of Finance, Technology and Planning a Consolidated Financial Report ("CFR").  The DCFS Division of Finance, Technology and Planning reviews each submitted CFR to ensure that costs are appropriately allocated and that funding is not duplicated. DCFS has revised the instructions for reporting on the CFR form to include, reinforce and make clear that all funding, including public funds received by the contracting entity, must be reported. Those instructions will be sent to contracting entities beginning January 2013.  The Department is also developing procedures to facilitate appropriate information-sharing and coordination with the Office of Field Audits regarding identifying and recovering disallowed costs.  The estimated completion date for finalizing such procedures is the fourth quarter of FY13.

**For non-foster care agencies, contract monitors must be required to visit the site where services are being provided to determine which staff provide direct service and to ensure that services are being delivered (from OIG FY 10 Annual Report, General Investigation 2).**

*FY 11 Department Response:* The Office of the Inspector General is working with the Department and the Office of the Attorney General to develop fraud detection training for Contract Monitors.

FY 12 Department Update: The Office of the Attorney General and the Office of the Inspector General provided a joint training to Department leadership on Contract Fraud. The Department is revising its Monitoring Protocol and Training. All Department staff who are Program Monitors will be required to attend the training and follow the Monitoring Protocol.

**Contracts should require quarterly reports from mentoring and counseling agencies on progress toward achievement of program plan goals, both in relationship to individual clients and, in the**

**aggregate, for all clients served under the contract (from OIG FY 08 Annual Report, General Investigation 24).**

*FY 08 Department Response:* The Department agrees.  Revised requirements will be included in FY10 contracts.

*FY 09 Department Update:* The Department continues to include revised requirements in contracts.  The estimated date of completion is July 2010.

*FY 10 Department Update:* Implementation of the recommendation is still in progress.

*FY 11 Department Update:* The standardized counseling program plans are currently under review for inclusions of changes to program plan goals and submission requirements. In addition, the Office of Contract Administration will continue to work with other Divisions to make needed changes to their non-standardized program plans to meet this requirement. Fiscal Year 2013, (effective July 1, 2012) counseling and mentoring contracts should reflect this recommendation.

*FY 11 OIG Response: The OIG reviewed the standardized program plan submitted by the Department and determined that it contained many of the same problems identified in two recent OIG fraud investigations. Specifically, the program plan does not require that the agency serve DCFS-involved families (such as intact families, subsidized guardianship families, teen parents and their significant others). The quarterly reports required in the program plan fail to provide objective measures of services provided, such as number of DCFS clients served, hours and type of services provided and progress toward achieving set goals. In addition, the program plan promises counseling and casework services, but provides for staff without the credentials to offer such services. While mediation is an offered service, the program plan does not specify training or certification for mediators.*

*FY 12 Department Update*: The Program Plan templates updated for Fiscal Year 2013 include specific outcomes and metrics for services provided, which are the basis for monitoring progress and compliance, as well as verification/reconciliation of quarterly expenditures against contract funding. This will also be a component of the Department's new monitoring design.

**Drug and alcohol toxicology contracts should be competitively bid (from OIG FY 07 Annual Report, General Investigation 1).**

*FY 07 Department Response:* The Department agrees. This will be implemented with Fiscal Year 2009 contracts.

*FY 08 Department Update:* Due to the program plan and protocol changes, this service was not bid in FY 2009. It is anticipated that the service will be out for bid in Fiscal Year 2010.

*FY 09 Department Update:* Due to retirement and staff changes and the new committee that developed recommendations, it is still anticipated that services will be put out for bid for Fiscal Year 2011.

*FY 10 Department Update:* The Procurement Office is preparing to release the request for proposals (RFP) in February 2011 and the award is expected in Fiscal Year 2011.

*FY 11 Department Update:* The Procurement Office posted the Invitation For Bid for toxicology contracts but the Invitation for Bid was cancelled by the State Procurement Officer. The Office of

Contract Administration and the Procurement Office are working to resolve questions received from potential vendors before reposting the Invitation for Bid.

*FY 12 Department Update:* Final review of updated Invitations for Bid for Toxicology Specimen Collection Site Services and Specimen Testing Laboratory is in process by the State Purchasing Officer. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

**The Department must separately track all advance payments and ensure they are repaid in a timely manner (from OIG FY 06 Annual Report, General Investigations 13).**

*FY 11 Department Update:* The Department has implemented a new reconciliation program to be utilized for all contracts effective Fiscal Year 2012. The reconciliation program has a field to enter revenue to the vendor and the grantee. After all entries are made the program notifies the Department of any overpayment which in turn results in the Department requesting repayment.

*FY 12 Department Update:* The Division of Finance, Technology and Planning now reviews all new contracts and will centrally track any advance payments to ensure they are accounted for in the contract's overall budget.

**The Department must develop a reliable Contract Monitoring process that would provide checks and balances and separation of functions to prevent the abuses. The process must include (from OIG FY 06 Annual Report, General Investigation 12):**

- **Quarterly review of expenditures to ensure that expenditures were related to the Contract;**
- **Quarterly review of services, to ensure that the goods or services were provided;**
- **Contractual and Rule requirement that any contractual spending for services or items not specifically covered under the Contract must be approved, in writing, by the Contract Division;**
- **Lapsed funds and obligation of funds must be approved in writing by the Contract Division.**

*FY 11 Department Update:* Standards for each contract and responsibilities are in place. Training for Fiscal Year 2012 started in October and will be completed this year. The OIG is continuing to work with the Attorney General to develop targeted monitoring and fraud detection training.

*FY 12 Department Update:* This will be incorporated into the Department's new monitoring design.

**The Department must develop specific guidelines for disbursement when Fiscal Agents are used. The guidelines must include checks and balances to ensure that Fiscal Agents ascertain that the services or goods for which they issue checks have been provided. The use of Fiscal Agents must also be monitored by the Contracts division to ensure separation of functions. Fiscal Agents must understand that their role is not limited to check-writing and that they maintain fiduciary responsibility for expenditure of public funds (from OIG FY 06 Annual Report, General Investigation 12).**

*FY 11 Department Update:* The Department will add the following language to the program plan of each fiscal agent agreement effective July 1, 2012 as part of the Fiscal Year 2013 contracts, "If the contract is an agreement that allows for a fiscal agent, the program plan must reflect that all disbursements must be to or on behalf of the private agency for which the fiscal agent acts and all disbursements must be evidenced by signed certifications that the services or goods were delivered and used for the fulfillment of the program plan. This must be reflected in the program plan and completed by signing the contract that includes this certification." In addition the Department will add similar language to the boiler plate and sub-contract agreements to ensure that each agreement has been completed and both fiscal agent and sub-contractor are required to certify that funding and disbursements made are evidenced by signed certifications that the services or goods were delivered and used for the fulfillment of the contracted program.

*FY 12 Department Update:* This will be incorporated into the Department's new monitoring design.

**The Department needs to systematically track public monies spent by contractors through subcontracts. The Department must be able to track who is ultimately responsible for providing services and who is ultimately receiving DCFS funds, in order to guard against conflicts of interest and double-billing (from OIG FY 06 Annual Report, General Investigation 12).**

*FY 11 Department Update:* The Department will attempt to implement this recommendation if/when funding is available for additional staff to manage the subcontractors' funding.

*FY 12 Department Update:* This will be incorporated into the Department's new monitoring design.

**The Department must monitor and enforce contract compliance of POS agencies with Department contracts to acknowledge and include fathers and paternal family members as an integral part of case management services. Department monitors must ensure that Department Procedures 302:** *Services Delivered by the Department* **and Appendix J,** *Pregnant and/or Parenting Program,* **is followed (OIG FY 07 Annual Report, General Investigation 22).**

*FY 07 Department Response:* The Department agrees. A memorandum is being drafted to DCFS and private agency staff. Target completion date: December 2007.

*FY 08 Department Update:* The newly appointed Deputy for Monitoring is reviewing this recommendation and will address this issue by February 2009.

*FY 09 Department Update:* The Fatherhood Initiative addresses this issue.

*FY 09 OIG Response: The Fatherhood Initiative expresses an important goal of the Department but does not provide practical means of monitoring or assessing the adherence to that policy. Moreover, only 104 cases statewide have been referred to the Fatherhood Initiative Programs, according to the most recent data. The Department needs to secure broader participation for father of DCFS involved children.*

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* The Learning Collaborative on Father Involvement was held in the spring of 2011 for DCFS and POS placement staff. In addition, Field Operations staff will

provide information on the current Fatherhood Initiative to Agency Performance Team monitoring staff, which will in turn be shared with POS providers during Fiscal Year 2012.

*FY 12 Department Update:* The recommendation will be incorporated into the Department's new monitoring design.

## DOMESTIC VIOLENCE

**This case, along with two other OIG investigative reports, should be used as a teaching tool in domestic violence training (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 11).**

*FY 11 Department Response:* The Division of Clinical Services and Specialty Services will work with the Office of Training to update the Domestic Violence Policy Training curriculum to include the referenced reports. The reports will be reviewed.

*FY 12 Department Update:* The redacted report has been reviewed. The Specialty Services Unit has collaborated with the Office of Training to update the Domestic Violence policy training curriculum. Approval is pending from the Office of Training on the implementation of the final materials, which was put on hold pending the release of SACWIS 5.0. Given the current status of layoffs and personnel changes, the Office of Training has been engaging in discussions about the implementation of training in the field and the work involved in updating training curriculums.

**The Domestic Violence protocol should be revised to address the cumulative effect of domestic violence and strategies for addressing cases of chaotic family life in which the victim/abuser dynamic results in an incalculable emotional toll to the children, including collaboration with DCFS Clinical and the Office of Legal Services (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 11).**

*FY 11 Department Response:* Statewide Administrator of Specialty Services and the Administrator of Domestic Violence Intervention Program will schedule a series of meetings with Cook and Downstate Deputy Legal Counsel to review the Domestic Violence protocol, to assess the efficacy of current protocol, review current research as well as evidence-based practice recommendations and revise the existing protocol. A redacted copy of this investigation and the recommendation will be shared with participants at the meeting.

*FY 12 Department Update:* The enhanced Domestic Violence Screen in SACWIS 5.0 offers investigative and casework staff additional questions in screening and interviewing for domestic violence. The Department is in the process of revising the Domestic Violence Practice Guide.

**The Department should integrate into its Domestic Violence protocol the need for increased scrutiny and heightened risk when a person suspected of being a victim of domestic violence has provided false information to protect an abuser of his or her child (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 12).**

*FY 11 Department Response:* This case was presented as an in-service training at the regular Regional Clinical Managers meeting. The managers were provided guidance as to what actions to take in the future on similar case situations. Specifically, if such a situation happens again where Clinical staff in the process of staffing a case have safety concerns they are to take

proactive action. The Regional Clinical Manager will make sure that the worker's supervisor, POS and DCFS Agency executive casework staff and APT monitor (for POS) are made aware of the concerns and seek action. If the manager is not able to resolve this at their level they are to immediately inform (both by phone and in writing) their immediate supervisor and the Associate Deputy of Clinical. The Associate Deputy will intervene and seek to resolve the issue(s). If needed he/she will seek the intervention of the Deputy Director to assure that safety concerns are addressed at the highest level warranted.

The Administrator of the Specialty Services Unit and the Administrator of the Domestic Violence Intervention Program will update and revise the Domestic Violence Practice Guide to reflect the practice dynamics of this case. The dynamics of this case are indicative of power and control that occurs in domestic violence cases, and will be incorporated as examples in the training on the Domestic Violence Practice Guide.

*FY 12 Department Update:* The Department is in the process of revising the Domestic Violence Practice Guide.


**In rural areas where there is suspicion of drug involvement or domestic violence, the Department should consider requiring investigators to include the local sheriff's department when requesting incident reports (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 11).**

*FY 10 Department Response:* The Department agrees. The recommended language is being added to Department Procedure 300.60 (g), *Other Required Investigative Contacts*.

*FY 11 Department Update:* This information was incorporated into a draft policy transmittal concerning law enforcement involvement in child abuse investigations and includes the Child Abuse Law Enforcement Notification form developed by the OIG. All documents have been forwarded to the Office of Child and Family Policy. The targeted implementation date is June 2012.

*FY 12 Department Updat*e: The recommendation has been incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification*. The recommendation will be included in revisions being made to Procedures 300, *Reports of Child Abuse and Neglect*.


**FOSTER HOME LICENSING**

**Rule 383, *Licensing Enforcement*, should be amended to provide that a new License application cannot be filed for 12 months following the Department's refusal to issue a new license following the expiration of a Conditional License (from OIG FY 11 Annual Report, General Investigation 11).**

*FY 11 Department Response:* Rule 383, *Licensing Enforcement*, is being amended to reflect this requirement.

*FY 12 Department Update:* Rule 383, *Licensing Enforcement*, was amended to reflect this requirement.

**The Department should amend Procedures 301, Appendix E, *Placement Clearance Process*, to provide guidelines for the monitoring and resolution of involuntary placement holds. These guidelines should include instructions for requesting the removal of an involuntary placement hold. The guidelines should also require that when an involuntary placement hold is placed on a foster home, the licensing worker and licensing supervisor should re-evaluate the placement hold every six months (from OIG FY 10 Annual Report, General Investigation 4).**

> *FY 10 Department Response:* A Department committee is drafting revisions regarding involuntary placement holds.

> *FY 11 Department Update:* Revisions to Procedures 301, Appendix E, *Placement Clearance Process* have been drafted and submitted to the Office of Child and Family Policy for further review.

> *FY 12 Department Update:* Placement Hold procedures are being drafted. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

**The Department should amend Department Rule and Procedure 402, *Licensing Standards for Foster Family Homes*, to require that licensing workers identify alternate caregivers, determine where the alternate care will take place and perform background checks in accordance with Rule 385, *Background Checks*, of all adults and those over 13 years of age residing in the alternate care home when the care will take place other than in the foster parent's home (from OIG FY 09 Annual Report, General Investigation 3).**

> *FY 09 Department Response*: Revisions to Rule 402, *Licensing Standards for Foster Family Homes*, are being drafted that would require that licensing staff identify alternative caregivers and perform background checks in accordance with Rule 385, *Background Checks*, of all adults and those over 13 years old residing in the alternate care home.

*FY 09 OIG Response: The critical information that needed to be gathered in this case was where the care was being provided. Unless the Department requires information about where the care is being provided, the harm that the children were subjected to in this case could be repeated.*

> *FY 10 Department Update: No update provided.*

> *FY 11 Department Update:* The Department will be further reviewing this recommendation before amending Rule and Procedure 402, *Licensing Standards for Foster Family Homes*, to determine if Part 301, *Placement and Visitation Services*, also needs amending, with regards to children not in a licensed home receiving care or placement with an alternate caregiver.

> *FY 12 Department Update:* The Department will conduct further review of this recommendation.

**The Department should develop guidelines for shared monitoring responsibilities when a single foster home has children monitored by different agencies or when the case monitoring and license monitoring functions are split between agencies. The guidelines should include the following requirements:**
**a.  a staffing of all involved case and licensing workers;**
**b.  written agreement of roles and responsibilities of each worker;**

c. **written guidelines concerning the responsibility to share information and the process for sharing information (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:* The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* The Deputy Director of Monitoring will co-chair a subcommittee with Agency Performance Team, Licensing, private agency and Department staff to address these issues.  The anticipated start date is January 2012.

*FY 12 Department Update:*  This will be included in the new monitoring design.  Rule 301 will be revised to include this information.


**The Department should issue a policy memorandum that states that whenever possible, each foster home should have a single entity that monitors placement of foster children and foster home licensing. The Department may grant waivers to the policy based on individual children's needs but must ensure that the guidelines stated above are in place whenever a waiver is granted (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:*  The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* The Deputy Director of Monitoring will co-chair a subcommittee with Agency Performance Team, Licensing, private agency and Department staff to address these issues.  The anticipated start date is January 2012.

*FY 12 Department Update:* This will be included in the new monitoring design.


**Whenever a waiver is granted, and case responsibility is transferred to a single agency, the relinquishing agency should not be penalized, but should be moved up for case rotation assignment of a new case (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:*  The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* Agencies are not penalized when case responsibility is transferred to a single agency.

*FY 11 OIG Response: When shared cases are transferred, the agency loses funding. The agency transferring the children should receive immediate consideration for new placements.*

*FY 12 Department Update:* The agencies loss of such cases is taken into account in terms of the percentage of referral opportunity to replace the case that was transferred. The child's geography and the other agencies in the area with lower percentage of referrals are factored in terms of when the agency that transferred such a case would meet the criteria for a replacement intake.


## LAW ENFORCEMENT

**For the safety of the worker and child, the State Central Register should notify local police when allegations include information about a large quantity of illegal drugs (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 15).**

*FY 11 Department Response:* If during a child protection investigation, a DCP investigator observes large quantities of drugs, they will notify law enforcement. The Department plans to issue a Law Enforcement Notification Policy Guide to implement this practice.

*FY 12 Department Update:* The recommendation was incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification*, and distributed in January 2012. The recommendation will be incorporated into procedures.


**When a child is hospitalized for injuries or conditions that are suspected to be the result of abuse or neglect by a primary caregiver and there is a concurrent law enforcement and child protection investigation, there must be a safety planning conference between law enforcement and child protection before the child is discharged (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 8).**

*FY 10 Department Response:* The Department agrees. Department Procedure 300.50, *Reports of Child Abuse and Neglect, Initial Investigation,* will be amended to include the recommended language.

*FY 11 Department Update:* This information was incorporated into a draft policy transmittal concerning law enforcement involvement in child abuse investigations and includes the Child Abuse Law Enforcement Notification form developed by the OIG. All documents have been forwarded to the Office of Child and Family Policy.

*FY 12 Department Update:* The recommendation was incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification*, and distributed in January 2012. The recommendation will be incorporated into procedures.


**In cases where police have a pending criminal investigation, Division of Child Protection investigators should not reveal a preliminary finding of unfounded to the family prior to a supervisory conference to explore whether another conference with law enforcement should take place (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 8).**

*FY 10 Department Response:* A practice memo will be distributed to child protection staff.

*FY 11 Department Update:* This information was incorporated into a draft policy transmittal concerning law enforcement involvement in child abuse investigations and includes the Child Abuse Law Enforcement Notification form developed by the OIG. All documents have been forwarded to the Office of Child and Family Policy.

*FY 12 Department Update:* The recommendation was incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification*, and distributed January 2012. The recommendation will be incorporated into procedures.

**The Department should pursue an interagency agreement with the Illinois Law Enforcement Alarm System to identify the local law enforcement agency with jurisdiction to provide written notification of the Hotline reports required by statute and Department Rule (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 10).**

*FY 10 Department Response:* A letter was sent to the Illinois Law Enforcement Alarm System (ILEAS) Director requesting access to the ILEAS System. Upon receipt of access to the system, State Central Register staff will be trained.

*FY 11 Department Update:* The meeting with the Illinois Law Enforcement Alarm System and State Central Register (SCR) occurred and determined it is not possible to develop the interface as recommended. It was determined SCR is not the most efficient unit to pinpoint the law enforcement office of jurisdiction. Rather, the Division of Child Protection team supervisor is responsible for ensuring notification to the local law enforcement and following up for their decision. This information was incorporated into a draft policy transmittal detailing the Child Abuse Law Enforcement Notification process, including the notification form drafted by the OIG. The policy transmittal and notification form have been submitted to the Office of Child and Family Policy for review and the targeted implementation date is June 2012.

*FY 11 OIG Response: The State Central Register (SCR) is the best unit for first response. The critical importance of such notifications, along with the harm that can result from failure to notify, warrants a two-pronged approach that would allow SCR to coordinate with the Illinois Law Enforcement Alarm System and also allow child protection staff to follow-up with local law enforcement. The Illinois Law Enforcement Alarm System is an emergency response system that coordinates federal disaster response with State agencies. The Department should take advantage of this coordinated System.*

*FY 12 Department Update:* The recommendation was incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification*, and distributed January 2012. The recommendation will be incorporated into procedures.

**The State Central Register should adopt a form to provide written notification to local law enforcement of the Hotline reports required by statute and Department Rule (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 10).**

*FY 10 Department Response:* The form is currently being developed.

*FY 11 Department Update:* Notification to local law enforcement in child abuse investigations has been developed and all documents, including the notification form have been submitted to the Office of Child and Family Policy. Procedures 300, *Reports of Child Abuse and Neglect*, will be revised to incorporate these changes. The targeted implementation date is June 2012.

*FY 12 Department Update:* The recommendation has been incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification* and CANTS-14 form, *Child Abuse Law Enforcement Notification.* The recommendation will be included in revisions being made to Procedures 300, *Reports of Child Abuse and Neglect.*

**Department Procedure 300.70, *Special Types of Reports,* should be amended to include second-degree burns as injuries requiring referrals to local law enforcement and the State's Attorney (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 5).**

*FY 07 Department Response:* Language regarding this recommendation is being drafted and will be submitted to the Office of Child & Family Policy for approval.

*FY 08 Department Update:* The OIG's recommendation was based on a request by the Children's Advocacy Center (CAC). The Department continues to review the feasibility of the recommendation.

*FY 09 Department Update:* In Procedures 300, *Reports of Child Abuse and Neglect* (Appendix B, Allegations, Burns 5/55), the Department will add "notification to State's Attorney on 2nd, 3rd, and 4th degree burns" in order to implement the recommendation.

*FY 10 Department Update:* Procedure 300, *Reports of Child Abuse and Neglect*, Appendix B-*The Allegation System*, Allegation #5-Burns will be amended to include notification to State's Attorney in cases of 2nd, 3rd, and 4th degree burns.  The Department is awaiting approval from the Joint Committee on Administrative Rules (JCAR) to move forward.

*FY 11 Department Update:* The Office of Child and Family Policy is currently drafting amendments to 300.70, *Special Types of Reports*, to include the new law enforcement child abuse notification form and referrals to law enforcement for second degree burns. The estimated completion date is December 2011.

*FY 12 Department Updat*e: The recommendation has been incorporated into Policy Guide 2012.02, *Child Abuse Law Enforcement Notification*. The recommendation will be included in revisions being made to Procedures 300, *Reports of Child Abuse and Neglect.*

**LEGAL**

**The Department should develop guidelines for when it is appropriate to refer a family to the Extended Family Support Program for consideration of guardianship of a minor through Probate Court and also train them on the differences of guardianship through Probate Court versus referring a case to Juvenile Court.  The Short-Term Guardianship Form should never be used when it appears that the problem requiring guardianship will not be resolved within one year (from OIG FY 10 Annual Report, General Investigation 9).**

*FY 10 Department Response:* This recommendation and the redacted report are currently under review by a Department contractor responsible for review of guardianship and extended family support service issues.

*FY 11 Department Update:* The recommendation has been incorporated in draft Procedures 302.385, *Extended Family Support Program*.  Once the draft procedures are approved the Division of Service Intervention will begin training on the referral process.

*FY 12 Department Update:* This is a component of the intact family and child welfare intake redesign.

**Child Protection managers, supervisors and investigators and intact family services workers should be trained on the guidelines for referring a family to the Extended Family Support Program (from OIG FY 10 Annual Report, General Investigation 9).**

*FY 10 Department Response:* This recommendation and the redacted report are currently under review by a Department contractor responsible for review of guardianship and extended family support service issues.

*FY 11 Department Update:* The recommendation has been incorporated in draft Procedures 302.385, *Extended Family Support Program*.  Once the draft procedures are approved the Division of Service Intervention will begin training on the referral process.

*FY 12 Department Update:* This is a component of the intact family and child welfare intake redesign.

**The Department should revise procedures to conform to federal requirements and ensure that relatives are advised of their options under state and federal law and the potential consequences of declining placement (from OIG FY 10 Annual Report, General Investigation 11).**

*FY 10 Department Response:* The Department agrees.  Department procedures will be revised as recommended.

*FY 11 Department Update:* Revisions to Rule and Procedure are in progress.

*FY 12 Department Update:* The recommendation has been incorporated into Procedures 301.80, *Placement and Visitation Services,* and the CFS-458 form*, Relative Caregiver Placement Agreement.*

**The Department should pursue state legislation to formalize a preference for relative placement when such placement is safe and does not delay permanency (from OIG FY 10 Annual Report, General Investigation 11).**

*FY 10 Department Response:* The Director will consult with the Legislature.

*FY 11 Department Update:* A new Director will be starting on December 15, 2011 and he will be consulted thereafter about this recommendation.

*FY 12 Department Update:* The Department and the Office of the Inspector General are continuing to review this recommendation toward maximizing child safety.

**The Department should ensure that all family advocacy centers develop expertise in DCFS Rules and Procedures concerning Service Appeals and placement to provide more effective advocacy for families (from OIG FY 10 Annual Report, General Investigation 11).**

*FY 10 Department Response:* The Department agrees.

*FY 11 Department Update:* The training was delayed until all Advocacy Centers were provided access to the Department's intranet.  Once the Advocacy Centers are provided access training will be provided. The planned implantation date is Fiscal Year 2012.

*FY 12 Department Update:* Training was provided to Family Advocacy Centers.

**Caretakers should receive written notice of a Fair Hearing at the same time that the appellant receives written notice that apprises them when placement of the child is at issue (from OIG FY 10 Annual Report, General Investigation 11).**

*FY 10 Department Response:* The Department issued a memorandum requiring written notice to caretakers when an appeal involves placement of the child.  The requirement will be incorporated into Department Rules.

*FY 11 Department Update:* The proposed rule change will be submitted to the Joint Committee on Administrative Rules (JCAR).  The anticipated date of completion is February 2012.

*FY 12 Department Update:* Rule 337, *Service Appeals Process,* was adopted and released on March 7, 2012.

**The Department should amend Rule 431.60, *Subject Access to Records of Child Abuse and Neglect Investigations* to reflect current practice mandated by a federal court order in the *Dupuy* decision (from OIG FY 10 Annual Report, General Investigation 7).**

*FY 10 Department Response:* An initial draft of the revisions is complete; however, further review is required in order to guard against improper disclosures.

*FY 11 Department Update:* Office of Legal Services is in the process of revising Rule 336, *Appeal of Child Abuse and Neglect Investigation Findings,* and reviewing related rules which may need to be amended.

*FY 12 Department Update:* The Committee continues to meet and revise Rule 336 *Appeal of Child Abuse and Neglect Investigation Findings*.  Once Rule 336 is completed, Rule 431.60 will be revised to conform to the provisions in Rule 336.

**Child protection managers should track and maintain data on cases presented to the State's Attorney's Office for filing of petitions and the State's Attorney's Office's response.   Child**

protection offices should share this information with DCFS Office of Legal Services (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 7).

> *FY 10 Department Response:* The Department issued a memorandum to child protection staff instructing staff to refer cases of critical parental non-compliance in which the State's Attorney has refused to file a petition to the Office of Legal Services. Child protection managers will track such responses monthly.

> *FY 11 Department Update:* The Division of Child Protection is currently refining a process implemented in 2010 to track juvenile court petitions. The division is also exploring the development of shared drives specifically dedicated to screening results and subsequent activities and decision-making by the assigned child protection investigator and supervisor.

> *FY 12 Department Update:* The Department is exploring tracking and reporting capabilities in SACWIS.

**The Office of the Inspector General should request that the Administrative Office of Illinois Courts require that Juvenile Courts in substantive matters, such as change of custody or visitations, be required to have such hearings on the record so that a record would be available when necessary (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 1).**

> *FY 09 Department Response:* The Inspector General has contacted the Administrative Office of the Illinois Courts with regards to this matter. The Inspector General will meet with a representative from the Administrative Office of the Illinois Courts to discuss this issue.

*FY 10 OIG Update: The OIG is continuing to work with the Administrative Office of the Illinois Courts to address issues of mutual concern.*

*FY 11 OIG Update: House Bill 3807 was introduced September 2011 and is currently pending legislation.*

*FY 12 OIG Update: House Bill 3807, which requires courts to ensure that the Department's position regarding any change in custody is included in the official court record was introduced in September 2011 by Representative Thomas Holbrook. The Inspector General notified the chair of the Child Death Review Team that the bill did not pass out of the House Rules Committee.*

**The Department's Interstate Compact Procedures should be revised to require:**
- **When an interstate compact is denied, the Interstate Compact Unit shall notify the Office of Legal Services. The Office of Legal Services will then monitor the case to ensure that the interstate compact is neither violated or circumvented in a manner that compromises the safety of children;**

- **If an interstate compact is disputed or violated, the Office of Legal Services will notify DCFS Clinical and DCFS Clinical will convene a staffing with the agency caseworker and supervisor, and the GAL;**

- **Notification of the Interstate Compact Unit, by the agency, if an interstate compact placement request is pending and the children are sent to the placement under consideration (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 4).**

*FY 09 Department Response:* Revisions are being made to Procedure 328, *Interstate Placement of Children*, in order to incorporate these requirements.  The Interstate Compact Office has been directed to report all such situations immediately to DCFS Office of Legal Services who then monitors the case to ensure that the Interstate Compact Agreement is not violated or circumvented in a manner that compromises the safety of children.  Copies of that notification are sent to an Associate Deputy Director to verify that direction is being carried out.

*FY 10 Department Update:* Revisions to Procedure 328, *Interstate Placement of Children*, are still in process.  In the event an interstate compact is disputed or violated the Department's Office of Legal Services notifies the DCFS Division of Clinical Services. The Office of Legal Services receives and monitors notifications received from the Interstate Compact Unit.

*FY 11 Department Update:* Revisions to Procedure 328, *Interstate Placement of Children*, are still in process.

*FY 12 Department Update:* The Department is revising Procedures 328, *Interstate Placement of Children*.  The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.


## MEDICAL

**The Department should provide DCFS and POS intact family workers with a copy of the newly revised *Guide for Caseworkers and Caregivers: Caring for Children with Chronic Health Care Conditions*.  Using the Guide, intact family workers should discuss the section, relevant to the child's health condition, with the family, and the intact services record should reflect the discussion (from OIG FY 11 Annual Report, General Investigation 2).**

*FY 11 Department Response:* The Division of Child Protection, DCFS Monitoring and DCFS Nurses formed a committee to review and revise policies related to the recommendation. A draft has been developed and is in review by the committee.

*FY 12 Department Update:* Revisions are currently being made to Procedures 302.360, *Health Care Services*, to include language serving intact families. Asthma related information will also be included Procedures 302.388, *Intact Family Services.*


**The Department should include intact family services workers as primary users of Policy Guide 2002.01: *Case Management Guidelines for Children's Asthma Management* (from OIG FY 11 Annual Report, General Investigation 2).**

*FY 11 Department Response:* The Division of Child Protection, DCFS Monitoring and DCFS Nurses formed a committee to review and revise policies related to the recommendation. A draft has been developed and is in review by the committee.

*FY 12 Department Update:* Revisions are currently being made to Procedures 302.360, *Health Care Services*, to include language serving intact families. Asthma related information will also be included Procedures 302.388, *Intact Family Services.*

**The Department's Agency Performance Team (APT) monitors should ensure that POS Intact Family Services Managers review this report, Policy Guide 2002.01:** *Case Management Guidelines for Children's Asthma Management***, and the guide on chronic health care conditions with intact services supervisors and workers (from OIG FY 11 Annual Report, General Investigation 2).**

> *FY 11 Department Response:* The private agency Intact Family Services Managers will be provided this information, including the redacted report, once the draft is finalized.

> *FY 12 Department Update:* Revisions are currently being made to Procedures 302.360, *Health Care Services*, to include language serving intact families. Asthma related information will also be included in Procedures 302.388, *Intact Family Services.*

**HealthWorks should obtain the results of newborn genetic metabolic screens on all children, regardless of their age, upon entering Department care. If the results of the genetic screen are unavailable, the Department should ensure that the screen is completed during the HealthWorks comprehensive exam or by the child's primary care physician (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 9).**

> *FY 11 Department Response:* With the signed Inter-Agency Agreement between DCFS and the Department of Public Health (IDPH) for the Exchange of Health Information, the Division of Service Intervention has requested the Office of Information Technology Services (OITS) to complete the task of "mapping" the IDPH data to be included in the weekly electronic interface with the Department's database, SACWIS.   For those children for whom there is no match in the IDPH database for results of Neonatal Screening for Genetic and Metabolic Disorders, HealthWorks Lead Agencies are instructed to follow-up with the child's primary care physician for the appropriate follow-up screening and testing.

> *FY 12 Department Update:* The Department continues to work with the Department of Healthcare and Family Services to obtain the Illinois Department of Public Health data.  Even though the data is from IDPH the Department must access it through the HFS warehouse.  HFS has an internal process that needs to be completed in order to add the data to the Department's data-feed.  The Department will obtain the IDPH data as soon as HFS adds it to the weekly feed.

**The Multidisciplinary Pediatric Evaluation and Education Consortium (MPEEC) will conduct a child abuse training for the hospital's child protection team and appropriate pediatric and emergency room staff.**

**Physicians of Medical Resource Providers should also target education and training efforts to best assist child protection. Each medical resource provider should identify and prioritize training of:**
- **Medical personnel of emergency departments approved for pediatrics by the Illinois Emergency Medical Services for Children (EMSC)**
- **Medical personnel at hospitals affiliated with partner hospitals of the medical resource providers**
- **Medical personnel at hospitals that serve as a resource for Children's Advocacy Centers (from OIG FY 10 Annual Report, Systems Investigation 2 and OIG FY 10 Annual Report, Death and Serious Injury Investigation 9).**

*FY 10 Department Response:* The Department will discuss this with the Medical Resource Providers and develop a training schedule for 2011.

*FY 11 Department Update:* The Medical Resource Providers reported that the physicians would be willing to conduct training to better assist child protection however the hospitals and medical facilities would have to initiate the request for Medical Resource providers to train their personnel.

*FY 11 OIG Response: The OIG recommends that the Medical Resource Providers develop and disseminate to community hospitals information regarding the availability of the training curriculum.*

*FY 12 Department Update:* A new liaison with the Medical Resource Providers was recently assigned and plans to assess all related recommendations to address with the physicians. This should be addressed by Spring 2013.

**The Department should follow up with development of a curriculum for emergency department medical professionals (from OIG FY 10 Annual Report, Systems Investigation 2).**

*FY 10 Department Response:* The curriculum has been developed.

*FY 12 Department Response:* The Department and the Office of the Inspector General are continuing to review this recommendation toward maximizing child safety.

**The Department should determine whether to restrict its contractual agents from using polygraph information when rendering a medical opinion (from OIG FY 10 Annual Report, Systems Investigation 1).**

*FY 10 Department Response:* A representative of the Department met with the contractor to discuss the use of polygraphs. The Department representative will meet again with the contractor to share and discuss the findings from the Office of the Inspector General investigation.

*FY 11 Department Update:* The Department held a meeting with contractor physicians in March 2011, during which time the Department's position on polygraphs was discussed.

FY 12 Department Update: Procedures 300.60, *Use of Polygraphs* has been revised and is being utilized as part of the training curriculum.

**The Department's Medical Director should review this report along with prior Office of the Inspector General reports that address suspected Factitious Disorder by Proxy (OIG 03-0214, OIG 03-0214B) and determine how best to handle investigations involving Munchausen Syndrome by Proxy/Factitious Disorder by Proxy (from OIG FY 10 Annual Report, General Investigation 8).**

*FY 10 Department Response:* The reports were provided to the Department's Medical Director for review.

*FY 11 Department Update:* The draft policy on Factitious Disorder by Proxy/Medical Child Abuse is still under review. Upon completion the policy will be incorporated into Procedure 300, Appendix B, Allegation #10-*Substantial Risk of Physical Injury/ Environment Injurious to Health*

*and Welfare by Abuse* and #60-*Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect*, as well as issued as a separate Policy Transmittal.

*FY 12 Department Update:* Policy Transmittal 2012.07, *Procedures 300, Appendix L, Factitious Disorder by Proxy and revised Appendix B, Allegation of Harm #10/60* were distributed in May 2012.

**The Department should pursue an interagency agreement with the Department of Healthcare and Family Services (DHFS) allowing DCFS Division of Child Protection staff access to Recipient Claim Detail information (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 11).**

*FY 08 Department Response:* The Department of Healthcare and Family Services (DHFS) notified DCFS that the 2004 interagency agreement allows for the necessary access. Representatives from DCP and the Guardianship Administrator's Office will coordinate with the Department of Healthcare and Family Services to implement this recommendation.

*FY 09 Department Update:* Representatives of the Guardianship Administrator's Office have continued to request access from DHFS. While no one has denied access to the Department, access has not been authorized. Efforts to gain access will continue.

*FY 09 OIG Response: The recommendation concerned access by child protection staff. Any access arranged must be available to child protection staff.*

*FY 10 Department Update:* The Department continues to work with the Department of Healthcare and Family Services to obtain needed access to Recipient Claim Detail information.

*FY 11 Department Update:* The Department is now receiving Department of Healthcare and Family Services (DHFS) Medicaid Claims information on a weekly electronic interface with the DHFS Medical Data Warehouse which goes directly into SACWIS E-Health screens. However, this is only for children for whom DCFS has legal custody. The Department has been unable to reach an agreement with DHFS to allow child protection staff access to the Recipient Claim Detail information and DHFS has informed the Department that they cannot share information from their Recipient Restriction Program. The Department is convening a meeting among the Division of Service Intervention, Child Protection, Legal Services, and Office of Information Technology staff to address child protection's need for access for children and subjects for whom the Department does not have legal custody.

*FY 12 Department Update:* The Office of Health Services is continuing to work with DHFS on securing access to Medicaid claims history by child protection staff. In the meantime child protection staff can access Medicaid claims through the administrative subpoena process.

**Training for child protection staff should incorporate information about the availability and benefit of recipient claim details from the Department of Healthcare and Family Services and their Recipient Restriction Unit (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 7).**

*FY 10 Department Response:* The Office of Training will update training modules to reflect the use and benefit of the Recipient Claim Detail. In addition the Office of Training, Service

Intervention and the Division of Child Protection will incorporate the information from these divisions to develop one coordinated training module.

*FY 11 Department Update:* The Department is now receiving Department of Healthcare and Family Services (DHFS)  Medicaid Claims information on a weekly electronic interface with the DHFS Medical Data Warehouse which goes directly into SACWIS E-Health screens. However, this is only for children for whom DCFS has legal custody.  The Department has been unable to reach an agreement with DHFS to allow child protection staff access to the Recipient Claim Detail information and DHFS has informed the Department that they cannot share information from their Recipient Restriction Program. The Department is convening a meeting among the Division of Service Intervention, Child Protection, Legal Services, and Office of Information Technology staff to address child protection's need for access for children and subjects whom the Department does not have legal custody.

*FY 12 Department Update:* The Office of Health Services is continuing to work with DHFS on securing access to Medicaid claims history by child protection staff. In the meantime child protection staff can access Medicaid claims through the administrative subpoena process.

**Department Procedures should be amended to include that any time a foster child is hospitalized or taken to the emergency room complete medical records should be obtained and placed in the child's file.  Procedure should also require that the records are shared with the foster child's pediatrician (from OIG FY 09 Annual Report, General Investigation 7).**

*FY 09 Department Response:* A Department form is being prepared for a procedural change to amend Procedure 402, *Licensing Standards for Foster Family Homes*, in case of a foster child's hospitalization.  The revised procedure will require that complete emergency room medical records be obtained and placed in the child's file and the record shared with the child's pediatrician.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* Licensing staff will work with the Office of Child & Family Policy to draft procedures by June 2012.

*FY 12 Department Update:* The Department is reviewing Rules and Procedures to determine the appropriate place to include this information.  The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

**In cases of severe mental illness of a parent or caretaker, the Department should require child protection investigators and intact family services workers to ask mental health professionals the following three questions:**
**(1) Do the parents' or caretakers' symptoms of mental illness place the child at risk for maltreatment or harm?**
**(2) Are there long-term effects of the parents' or caretakers' mental illness symptoms on the child's well-being that need to be considered in developing a treatment plan?**
**(3) If the parents' or caretakers' current treatment plan is changed, will it likely bring about an improvement in parenting skills? (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 11)**

*FY 10 Department Response:* The Department agrees.

*FY 11 Department Update:* This recommendation will be incorporated into revised Procedures 300, *Reports of Child Abuse and Neglect*. During the interim, a Policy Transmittal will be developed and provided to child protection staff that includes information about obtaining parents' and/or caretakers' mental health records, the recommended questions and the mental health records prompting checklist developed by the OIG. The target implementation date is June 2012.

*FY 12 Department Update:* As part of the error reduction initiative this recommendation was implemented through training and the development of form, CFS-968-90, *Questions for Mental Health Professionals*, which lists the questions to be asked of mental health professionals.

**The Director should issue a letter to the Coroner requesting that she appoint or designate a board certified forensic pathologist to conduct the autopsies of children when there is an open child protection investigation (from OIG FY 10 Annual Report, Death and Serious Injury Investigation1).**

*FY 10 Department Response:* The Department does not agree.

*FY 12 Department Update:* The Region is only using a board certified forensic pathologist to conduct these autopsies.

**PERSONNEL**

**The Department should develop policy to address suspected substance abuse in the workplace (from OIG Recommendations made in 2005, 2001 and 1999).**

*FY06 Department Response:* The Department developed a definition and procedure for Reasonable Suspicion testing. The Department agrees to amend the Employee Manual and the Employee Licensure Rule to address Reasonable Suspicion of substance abuse and will also engage in discussions with the union.

*FY 07 Department Update:* The Department's workgroup addressing the need for incident-based reasonable suspicion drug or alcohol testing is currently developing protocol for pre-employment drug testing. Reasonable suspicion testing has been put on hold temporarily.

*FY 08 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 08 OIG Response: The OIG has been continuously recommending this critical change in policy for nine years. The policy change sought by the OIG would have a minimal budgetary impact. The lack of reasonable suspicion policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk.*

*FY 09 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 10 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 10 OIG Response: The OIG has been continuously recommending this critical change in policy for nine years. The policy change sought by the OIG would have a minimal budgetary impact. The lack of reasonable suspicion policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk.*

*FY 11 Department Update:* Management fully supports reasonable suspicion testing for direct child welfare service employees and supervisors. Direct child welfare service employees and supervisors are bargaining unit members. As such implementation of reasonable suspicion drug/alcohol testing, unless legislatively mandated, must be negotiated with the collective bargaining units. Management routinely proposes to CMS Labor Relations that reasonable suspicion testing be included in collective bargaining agreements. Management also routinely proposes that reasonable suspicion testing be added to supplemental collective bargaining agreements. Without a reasonable suspicion testing policy in place amendment of Rules and Procedures is futile. The State will be involved in contract negotiations with AFSCME in 2012 and the Department intends to continue pressing this point.

*FY 11 OIG Response: The OIG notes that the City of Chicago and both the Illinois State Police and the Department of Corrections have had Reasonable Suspicion Testing for several years. The City of Chicago and the Department of Corrections employees are represented in large part by the same union as most employees with the Department of Children and Family Services. Moreover, Direct Child Welfare employees and supervisors at DCFS must possess Child Welfare Employee Licenses. The OIG has urged since 2005 that Reasonable Suspicion Testing be added as a requirement for Child Welfare Licensure. The Department has failed to act on the recommendation.*

*FY 12 Department Update:* A workgroup has been formed to review all drug/alcohol related OIG recommendations to determine implementation steps. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

**The Department should amend Rules and Procedures and develop protocol and contracts to provide an infrastructure of testing facilities for reasonable suspicion testing; definition of reasonable suspicion; procedure for developing a finding of reasonable suspicion and training for management and supervisors as necessary concerning reasonable suspicion determinations. Private agencies with Department contracts should also be required by contract or licensing rule to have policies at least as stringent as Department policies regarding training, testing and response to reasonable suspicion of drug or alcohol use on the job (from OIG FY 10 Annual Report, General Investigation 21).**

*FY 10 Department Response:* Management will seek to negotiate reasonable suspicion testing with the Union in the future.

*FY 10 OIG Response:   The Office of the Inspector General has been continuously recommending this critical change in policy for 11 years. The lack of a reasonable suspicion testing policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk. The policy change sought by the Office of the Inspector General would have minimal budgetary impact.*

*FY 11 Department Update:* Management fully supports reasonable suspicion testing for direct child welfare service employees and supervisors.  Direct child welfare service employees and supervisors are bargaining unit members.  As such implementation of reasonable suspicion drug/alcohol testing, unless legislatively mandated, must be negotiated with the collective bargaining units.  Management routinely proposes to CMS Labor Relations that reasonable suspicion testing be included in collective bargaining agreements.  Management also routinely proposes that reasonable suspicion testing be added to supplemental collective bargaining agreements.  Without a reasonable suspicion testing policy in place amendment of Rules and Procedures is futile.  The State will be involved in contract negotiations with AFSCME in 2012 and the Department intends to continue pressing this point. Management agrees that private agencies should be required by contract or licensing rule to have policies at lease as stringent as Department policies. If a reasonable suspicion policy is promulgated the Office of Employee Services will convene the Reasonable Cause Workgroup and ensure that private agencies are held to the same standard.

*FY 11 OIG Response: The OIG notes that the City of Chicago and both the Illinois State Police and the Department of Corrections have had Reasonable Suspicion Testing for several years.  The City of Chicago and the Department of Corrections employees are represented in large part by the same union as most employees with the Department of Children and Family Services.  Moreover, Direct Child Welfare employees and supervisors at DCFS must possess Child Welfare Employee Licenses.  The OIG has urged since 2005 that Reasonable Suspicion Testing be added as a requirement for Child Welfare Licensure.  The Department has failed to act on the recommendation.*

*FY 12 Department Update:* A workgroup has been formed to review all drug/alcohol related recommendations to determine implementation steps.  The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

**The Department should promulgate a Solicitation Policy to clarify that permissible solicitation is limited to break-time, in break rooms and only for not-for-profit activities (from OIG FY 10 Annual Report, General Investigation 20).**

*FY 10 Department Response:* The Department agrees. A solicitation policy is being developed.

*FY 11 Department Update:* The Department has drafted a solicitation policy to include in the Employee Handbook. The policy and Employee Handbook revisions are currently under review by management.

*FY 12 Department Update:* The Solicitation policy was included in revisions/additions made to the employee handbook and disseminated to employees in February 2012.

**Rule 437, *Employee Conflict of Interest*, should be amended to clarify that secondary employment must always be reported to one's supervisor.  The supervisor should determine (if necessary, with consultation from management and/or the Conflict of Interest Committee) whether the secondary employment creates a conflict.  The employee must be told to update the supervisor whenever their secondary employment duties change and a notation of the secondary employment should be maintained in a supervisory file, which is transferred each time supervision changes (from OIG FY 09 Annual Report, General Investigation 25).**

> *FY 09 Department Response:* The conflict of interest workgroup is in the process of finalizing the proposed changes to Rule 437, *Employee Conflict of Interest.*

> *FY 10 Department Update:* The anticipated completion date for submission of draft Rule 437, *Employee Conflict of Interest,* for internal and external comment is the first quarter of 2011.

> *FY 11 Department Update:* Revisions to Rule 437, *Employee Conflict of Interest*, have been drafted. It is anticipated that the first notice will be published in Fiscal Year 2012.

> *FY 12 Department Update:* Revisions to Rule 437, *Employee Conflict of Interest* is being prepared for JCAR.  The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

**The Department's Certification of License and Automotive Liability Coverage form for employee's signature should be amended to state "by the Illinois Secretary of State or other State _____" to address Department employees who live in states contiguous to Illinois (from OIG FY 09 Annual Report, General Investigation 8).**

> *FY 09 Department Response:* The Finance, Technology and Planning Division will review the current form, modify the form and require use of the revised form for the next reporting period.

> *FY 10 Department Update:* Revisions to the Auto Liability Coverage form is in process.

> *FY 11 Department Update:* A revised form has been drafted and scheduled to be used starting in 2012.  The revised form requires the employee to state that he/she is licensed to drive in Illinois (either directly by the Secretary of State or another State that is recognized by the Secretary of State of Illinois). Additionally, each employee is currently required to certify on each travel reimbursement request that "I am a duly licensed driver and carry minimum coverage as required by Illinois Vehicle Code." Management will address failure to file the required insurance form through the existing supervisory and disciplinary processes.

> *FY 12: Department Update:* The Auto Liability Form is now a DCFS form (CFS 731).  The form includes the revisions requested in the above recommendation.  AP 12, *Travel Guide for DCFS Employees*, is currently being revised and the CFS 731 will be included in the revised procedure.

**A task group should be assembled to revise Rule 437, *Employee Conflict of Interest*, and draft related Procedures. Procedural additions should include:**
> **a. If an employee takes secondary employment where there is the potential for contact with DCFS clients, a wall needs to be built between the DCFS employee and any DCFS clients being serviced by the secondary employer.  In this case, the employee's supervisor should call the secondary employer to verify the wall is in place.**

     **b.  The supervisor should review secondary employment at the time of the annual review to see if a conflict has developed that was not present when the employee accepted the secondary employment.**

     **c.  Instructions on how to contact the Conflict of Interest Committee.**
        **All DCFS employees should receive training on the revised Rule and Procedures 437, *Employee Conflict of Interest* (from OIG FY 07 Annual Report, Employee Conflict of Interest).**

*FY 07 Department Response:* A task group was assembled, but is currently in abeyance, and the Director is currently reviewing possible changes to Rule 437.

*FY 08 Department Update:* The conflict of interest workgroup has reconvened and is in the process of finalizing the proposed changes to Rule 437, *Employee Conflict of Interest*, and in drafting new procedures that support the revised rule.  The anticipated completion of revised Rule 437, *Employee Conflict of Interest*, is March 2009.

*FY 09 Department Update:* The workgroup has reconvened to address outstanding issues, including fire walls and secondary employment.  We have contacted the chair of the Secondary Employment Subcommittee to initiate further deliberations with the subcommittee. The anticipated completion date for submission of the draft of Rule 437, *Employee Conflict of Interest,* for internal and external comment is January 2010.

*FY 10 Department Update:* The anticipated completion date for submission of draft Rule 437, *Employee Conflict of Interest,* for internal and external comment is the first quarter of 2011. A copy will be sent to the OIG upon completion. Draft procedures will follow once the rule has been adopted.

*FY 11 Department Update:* Revisions to Rule 437, *Employee Conflict of Interest*, have been drafted. It is anticipated that the first notice will be published in Fiscal Year 2012.

*FY 12 Department Update:* Revisions to Rule 437, *Employee Conflict of Interest* is being prepared for JCAR.  The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

**The Department's Conflict of Interest Committee should establish procedures for building walls between private agencies and DCFS Administrators who have decision-making power over agencies that they previously worked for (from OIG FY 06 Annual Report, General Investigations 28).**

*FY 06 Department Response:* The procedures have been drafted by the Conflict of Interest Committee.

*FY 07 Department Update:* The Director is considering the recommended changes.

*FY 08 Department Update:* A Conflict of Interest workgroup is in the process of finalizing the proposed changes to Rule 437, *Employee Conflict of Interest,* and is drafting new procedures that support the revised rule.  The anticipated date of completion is March 2009.

*FY 09 Department Update:* The workgroup has been reconvened to address outstanding issues, including fire walls and secondary employment.  We have contacted the chair of the Secondary Employment Subcommittee to initiate further deliberations with the subcommittee.  The Conflict

of Interest workgroup is in the process of finalizing the proposed changes to Rule 437, *Employee Conflict of Interest*. The anticipated completion date for submission of the draft of Rule 437, *Employee Conflict of Interest,* for internal and external comment is January 2010.

*FY 10 Department Update:* Anticipated completion date for submission of draft Rule 437, *Employee Conflict of Interest,* for internal and external comment is the first quarter of 2011.

*FY 11 Department Update:* Revisions to Rule 437, *Employee Conflict of Interest*, have been drafted. It is anticipated that the first notice will be published in Fiscal Year 2012.

*FY 12 Department Update:* Rule 437, *Employee Conflict of Interest*, is being prepared for JCAR. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.


**SERVICES**

**When new information is received that contradicts information in the Integrated Assessment, the Department should have a mechanism for amending the original Integrated Assessment (from OIG FY 11 Annual Report, General Investigation 8).**

*FY 11 Department Response:* The Department already has in existence a mechanism for amending the original Integrated Assessment report with new information, whether contradictory or corroborating.  The Department views the assessment process for serving cases, both intact and placement, to be an ongoing process. The Integrated Assessment report, by policy and procedure, is continually updated and revised in SACWIS by the assigned DCFS/POS caseworker and supervisor throughout the life of a case.  As with any documentation the Department does, including case notes, service plans, integrated assessments, etc., once a document is completed and approved by the supervisor it is "frozen", locked and cannot be changed.  The way inaccurate or contradictory or even supportive and corroborating information is documented is with new case notes, service plans, integrated assessments, etc.  If the Department were to institute a practice of going back and correcting documents that have been previously completed and approved by the supervisor, the Department would fail to maintain any chain of evidence or accurate historical record of what information the Department had at the time the information was recorded.  The mechanism for documenting new information that is part of the Integrated Assessment is by adding it into a current Integrated Assessment pointing out the discrepancy. Amending an original Integrated Assessment is not practical nor is it allowable under Department practice with SACWIS.

The Department will consider developing procedures and training for clinical staff on recognizing when information is learned that contradicts critical information that forms the basis of decision making.  The Integrated Assessment report by policy and procedure is continually updated and revised in SACWIS.  The revisions and updates are included in the service plan that is shared with all entities that received the initial assessment.

*FY 11 OIG Response:  The Inspector General believes that when newly learned information contradicts critical information, there must be a mechanism that corrects and prevents the original error from being disseminated.*

*FY 12 Department Update:*  The Department can in extreme or rare situations remove narrative from the integrated assessment.  Removal will require Bureau Chief and Deputy Director authorization.

**The Department should assure that when wards turn 16 years of age they obtain state-issued identification cards (from OIG FY 11 Annual Report, General Investigation 22).**

*FY 11 Department Response:* Department procedures will be drafted to require the obtaining of State Identification Cards for wards.

*FY 12 Department Update:* Department procedures will be drafted to require the obtaining of State Identification Cards for wards.

**The Department should explore a remedy that addresses reliance on self-reported information in the Integrated Assessment.  Where there is a self report of out of state child welfare history during an Integrated Assessment, the Intake Coordinator should contact the Office of the Inspector General to request verification (from OIG FY 11 Annual Report, General Investigation 8).**

*FY 11 Department Response:* The Department will consider developing procedures and training for clinical staff on recognizing when information is learned that contradicts critical information that forms the basis of decision making.  The Integrated Assessment report by policy and procedure is continually updated and revised in SACWIS.  The revisions and updates are included in the service plan that is shared with all entities that received the initial assessment.

*FY 12 Department Update:* Integrated Assessment procedures have been revised to ensure that the Integrated Assessment Intake Coordinator contacts the Inspector General's Office for verification when reports of out-of-state involvement are reported during an Integrated Assessment case.  As for reliance of self-reported information, the Department agrees. Completion of the Integrated Assessment report is based on historical documentation as well as client self-report and collateral interview report, including medical, psychiatric, legal records and CANTS/LEADS.

**The Department should prohibit the use of any public funding for youth's enrollment in unaccredited educational institutions (from OIG FY 11 Annual Report, General Investigation 7).**

*FY 11 Department Response:* Office of Education and Transition Services (OETS) does not allow youth to participate in the Youth in College (YIC) or Scholarship program unless they are attending an accredited program, nor does it award Education and Training Voucher (ETV) funds to a youth unless they are in an accredited program. Service Intervention agrees with this recommendation and the Department follows it for Department programs. The Division of Monitoring and the Division of Placement & Permanency will collaborate with the Department's Contract Administrator to include in FY13 contracts: "No department funds may be used to support sending a ward to a non-accredited educational program."

*FY 12 Department Update:* DCFS Policy Transmittal 2011.29, *Procedures 302, Appendix G*, and Policy Transmittal 2011.15, *Procedures 302 Appendix S*, Education and Training Voucher Program (ETV) have been distributed. Eligibility in the Youth In College or the Scholarship program, or be awarded ETV funds, requires enrollment in an accredited program.  Accreditation

is verified prior to approving referrals. This requirement will also be included in Independent Living Only and Transitional Living Program contracts.

**The Department should maintain the Parenting Assessment Team (PAT) program and should develop a funding mechanism to ensure the Parenting Assessment Teams are reimbursed for their work on partial assessments that could not be completed because of lack of parent or case manager follow-through(from OIG FY 11 Annual Report, General Investigation 4).**

*FY 11 Department Response:* The Department agrees.  At the end of FY 11, the Department lost one of the two PAT programs in Cook County.  The Department agrees that the PAT program is a viable assessment option to serving the needs of families with parental mental illness and is therefore working to replace the lost provider and to expand the program geographically in Cook and Downstate.  The Department expects to have a replacement PAT program in place to serve Cook North and Central families by the end of 2011.  To address challenges associated with erratic client compliance and fee-for-service contracting, the Department has developed and implemented a payment mechanism that will compensate PAT providers for partial assessment reports (e.g., contractor begins the assessment process with the client but fails to complete the assessment due to client dropout.)  Agency performance team (APT) monitors will work with the PAT provider to ensure caseworker follow-through during the assessment process.

*FY 12 Department Update:* To address challenges associated with compensating the teams for work completed on reports, that are not fully completed reports due to erratic client compliance and poor worker follow-through, the Department has developed and implemented a three tiered partial payment mechanism.  This fee structure is established in the current FY12 program plan, and will compensate PAT providers for partial work/assessments completed – (e.g., contractor begins the assessment process with the client but fails to complete any one of a number of a portion of the assessment due to client dropout).  Below is the current partial fee structure:
• Partial payment of (66%) will be given for a completed report that includes:  a full record review, collateral interviews and client seen by the team psychiatrist.
• Partial payment of (58%) will be given for a completed report that includes:  a full record review, collateral interviews and client seen by team psychologist.
• Partial payment of (50%) will be given for a completed report that includes:  a full record review, collateral interviews, and client seen by the team social worker.
In addition to the above, the Department has established a replacement PAT provider for the Cook North and Northern Regions with the Juvenile Protective Association (JPA) beginning December 2011.

**The Agency Performance Team for Intact Family Services should measure the performance of Intact Family Services' follow-through regarding Parenting Assessment Team recommendations as part of their monitoring and oversight duties to ensure that all of the Parenting Assessment Team recommendations are incorporated into the family's service plan (from OIG FY 11 Annual Report, General Investigation 4).**

*FY 11 Department Response:* Upon notification, and during (minimum) quarterly intact family services case reviews, the Statewide POS Intact Monitoring Unit will identify, review, document and track PAT recommendations on POS intact family cases.  Regular consultation with POS intact agencies that request PAT involvement and are issued recommendations on those referrals will be monitored and reported to the respective POS intact supervisor and unit manager.

*FY 12 Department Update:* Agency Performance Team monitors will ensure that the Parenting Assessment Team recommendations are incorporated into the family's service plan upon review of the intact cases that are monitored.

**Upon the Parenting Assessment Team accepting a referral, DCFS Clinical must generate a letter to the referring case manager's supervisor stating that the Parenting Assessment Team has accepted the case that the worker referred, that all Parenting Assessment Team recommendations that are made for the family must be incorporated into the family's service plan, and that if the worker or supervisor has any questions or concerns regarding the Parenting Assessment Team evaluations, process, or recommendations, they may contact DCFS Clinical. The letter should be copied to the Agency Performance Team monitor to alert them of the assessment so that they monitor for follow-through regarding the recommendations (from OIG FY 11 Annual Report, General Investigation 4).**

*FY 11 Department Response:* The Department agrees. All referrals will generate a letter to the caseworker and supervisor informing them of the status of the referral and whether or not it has been accepted. The letter, signed by the Department's Division of Clinical Services' PAT Administrator and copied to the agency monitor, will serve to: acknowledge acceptance of the referral, introduce and explain the purpose of the assessment, emphasize the need for timely caseworker/supervisor collaboration, and underscore the urgency for implementing PAT findings and recommendations. The PAT provider will also notify the Department's PAT Administrator of any barriers or obstacles that arise during the clients' assessment process.

*FY 12 Department Update:* The Office of Clinical Services has determined that sending email notifications is more efficient and timely so all referral information is provided to the workers, supervisors and the AP monitors via email.

**The Department should develop housing contracts with wards and enforce regulations addressing the use of drugs, alcohol, firearms, and violence. Institutional sanctions should be consistent across programs and the juvenile court should be immediately notified when a ward is violating housing contracts that threaten the safety or the well being of the ward. Housing contracts should make clear that funding for the apartment will stop and the court will be informed of transgressions involving criminal activity (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 4).**

*FY 11 Department Response:* Amendments to the Independent Living (ILO) and Transitional Living Program (TLP) plans are being developed.

*FY 12 Department Update:* Independent Living (ILO) and Transitional Living Program (TLP) contract language is in the process of being reviewed and updated.

**The Department should require that wards sign a release of information for the Department to receive information from the educational institutions on the student's academic problems. With a ward's signed consent, DCFS should arrange to be notified of any of the following (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 4):**

- **When a student has voluntarily withdrawn from the university or has been required by the university to withdraw;**

- **When a student has been placed on academic warning;**
- **When the student's academic good standing or promotion is at issue;**
- **When a student engages in alcohol or drug-related behavior that violates school policies;**
- **When a student has been placed on disciplinary probation or restriction;**
- **In exceptional cases when a student otherwise engages in behavior calling into question the appropriateness of the student's continued enrollment in the university.**

*FY 11 Department Response:* Amendments to the Independent Living (ILO) and Transitional Living Program (TLP) plans are being developed.

*FY 12 Department Update:* DCFS Policy Transmittal 2011.29, *Procedures 302, Appendix G for Youth In College/Vocational Training Program* was issued in November 2011. Applicants are now required to sign the CFS 600-3, *Consent for Release of Information* as part of the Youth in College/Vocational Training Program Application.

**The Department's Services Coordinators for the Sexual Behavior Problem Program (SBPP) should educate POS service providers regarding registration and reporting requirements of juvenile delinquent sex offenders, and insure the minor's compliance(from OIG FY 11 Annual Report, Death and Serious Injury Investigation 4).**

*FY 11 Department Response:* The Department agrees that education for DCFS and POS staff regarding registration and reporting requirements for juvenile delinquent sex offenders is needed. This is especially true given the many changes that have been made to the registration and reporting requirements in the past several years. DCFS has provided this training in the past with assistance from the Illinois Sex Offender Registration Team (I-SORT) of the Illinois State Police. I-SORT continues to provide Sex Offender Registration and Community Notification training on an ongoing basis throughout the state through the Illinois State Police Mobile Training Units (MTU) which are open to the public. Additionally, the DCFS Acting Statewide Sexual Behavior Problems Program Coordinator has contacted the director of I-SORT and I-SORT has agreed to partner with DCFS and provide training specifically to DCFS and POS child welfare staff in trainings through out the state.

*FY 12 Department Update:* The Illinois Sex Offender Management Board has conducted Sex Offender Registration & Notification Act (SORNA) trainings and will continue to do so. This training is open to the public at no cost.

**Pre-adoptive Home Studies of wards or former wards must require children's collaterals and professional collaterals, especially school personnel to objectively ensure the accuracy of information provided (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 2).**

*FY 09 Department Response:* Child protection investigators make this determination as they go through the investigative process.

*FY 09 OIG Response: The Department response does not address pre-adoptive home studies, which need to inform the courts of direct information from collaterals in the child's life, such as teachers.*

*FY 10 Department Update:* Rule and Procedure will be revised as well as the template outline for the information included in the adoption study.

*FY 11 Department Update:* The template outlined for the adoption home study as well as Rule and Procedures are still in the process of being revised.

*FY 12 Department Update:* The recommendation was incorporated into Policy Guide 2012.05, *Adoption Collateral Contacts*, and issued April 2012. The revisions to procedures are in process.

**Procedures for Child And Youth Investment Teams (CAYIT) should be amended to include situations in which a move is requested for any reason other than a ward's best interest (OIG FY 07 Annual Report, General Investigations 14).**

*FY 07 Department Response:* The Child and Youth Investment Teams (CAYIT) Policy is currently under review.  Target completion date:  February 28, 2008.

*FY 08 Department Update:* The Child and Youth Investment Teams (CAYIT)  procedures, *Policy Guide 2006.04*, have been revised to clarify and differentiate the referral process for placement changes through CAYIT, Clinical Placement Staffing Review and Residential Transition Discharge Planning Protocol.  The revised procedure will be sent to the Office of Child and Family Policy for review and then sent out for comment.

*FY 09 Department Update:* Draft revisions to the Child and Youth Investment Teams (CAYIT) policy have been completed and submitted to the Office of Child & Family Policy for review and completion of revision process.

*FY 10 Department Update:* The Child and Youth Investment Teams (CAYIT) Policy was amended March 2010 which clarified the referral processes.

*FY 10 OIG response: The amended Child and Youth Investment Teams (CAYIT) policy does not address this referral issue.*

*FY 11 Department Update:* The Child and Youth Investment Teams (CAYIT) policy has been submitted to the Office of Child and Family Policy for revision. The revised CAYIT policy will address the OIG recommendation by requiring that any request to move a youth deemed other than in the ward's best interest will be referred to the assigned caseworker's supervisor and Regional Administrator or private agency Director for follow-up.

*FY 12 Department Update:* The Child and Youth Investment Teams (CAYIT) process is under revision.  The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

**The Department should review and update the Emergency Reception Center (ERC) Manual to include expectations of follow-up workers bringing children to the Emergency Reception Center (from OIG FY 06 Annual Report, General Investigations 4).**

*FY 07 Department Update:* The updated ERC Protocol/Manual (Transmittal) has not been finalized and is on hold with the Office of Child and Family Policy awaiting information resolution regarding shelter transportation issues.  When it is completed the informational

transmittals will go out to DCFS and private agency staff. Also, training will take place for all staff regarding protocol on how CWS or DCP can make an Emergency Shelter referral and intake guidelines for bringing children and youth into ERC for an emergency temporary shelter care placement.

*FY 08 Department Update:* The Emergency Reception Center Protocol has been drafted and is awaiting approval to be sent out for comment. The anticipated date for distribution/implementation is January 2009.

*FY 09 Department Update:* Referral forms for the Emergency Reception Center (CFS 1900 and CFS 1901) were issued in February 2009. The referral form does not address procedures for admission to the Emergency Reception Center. Emergency Reception Center protocol is on hold at this time.

*FY 10 Department Update:* At the request of the Division of Child Protection (DCP), the ERC Protocol was placed on hold due to a planned reorganization and remains on hold as of November 2010.

*FY 11 Department Update:* Restructuring of the Emergency Reception Center (ERC) is still planned therefore the implementation of the ERC Protocol is still on hold at this time.

*FY 12 Department Update:* Standardized procedures for utilizing the Emergency Reception Center are being drafted. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

**In split custody cases with a history of substance abuse and relapse, the Department should require random drug drops to assist the Department in securing necessary services for the children and family. In cases of alcoholism, random urine testing is not reliable. Breathalyzers are preferable. The OIG reiterates its prior recommendation that DCFS acquire breathalyzers and train on their use (from OIG FY 04 Annual Report, Death and Serious Injury Investigation 21).**

*FY 07 Department Update:* The Department has implemented new substance affected family policies that include drug testing requirements. Staff are being trained on the procedures as part of the Reunification training. An inter-division work group is developing additional guidelines for drug testing DCFS clients and monitoring DCFS drug testing contracts. The work group is developing standards for frequency and duration of drug testing, use of breathalyzers, and the panel of drugs for which to test. Anticipated completion date is the fourth quarter of FY 08.

*FY 08 Department Update:* The recommendation is in progress and the anticipated date of completion is March 2009.

*FY 09 Department Update*: A drug testing protocol was developed in November 2008 which addressed frequency of testing, random testing, drugs to be tested, and custody and control procedures. A list of review criteria identifying potential red flags was developed for DCFS contract monitors reviewing drug testing vouchers. A revised Program Plan for DCFS toxicology testing contracts was developed. The Program Plan incorporates the requirements and procedures of the drug testing protocol by reference and also adopts the random testing requirements of the protocol. The new Program Plan is expected to be implemented for the FY11 contracts.

*FY 10 Department Update:* The Department and the OIG agreed to train workers to use the urine screen technology and contractors in cases of suspected alcohol abuse. Alcohol will be one of the 10 substances tested and workers will be trained on special procedures relevant to suspicions of alcohol abuse. The Procurement Office is preparing to release the request for proposal (RFP) by the end of February 2011 and the award is expected for FY 2012.

*FY 11 Department Update:* The Request for Proposals from potential vendors for toxicology services is due November 2011. The solicitation includes provisions for random drug testing and testing for alcohol.

*FY 12 Department Update:* The Request for Proposal for toxicology testing is currently under review.  The anticipated implementation date is February 2013. The Department will utilize a paper referral process until OITS is able to develop a computer program.  The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

**Substance affected and dually diagnosed clients should be referred to child welfare teams with expertise in working with these clients and families.  Programs such as the Intact Family Recovery program (IFR) have expertise with both populations and successfully enroll 70% of the eligible children they serve in Head Start and state pre-K programs (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 10).**

*FY 09 Department Response:* There is no policy or protocol for referring substance exposed infants to the Intact Family Recovery program.  However, the Division of Service Intervention gets a weekly report from Quality Assurance on Cook County substance exposed infant cases. The Division of Service Intervention then contacts the assigned child protection staff to inform them that the case may be appropriate for the Intact Family Recovery program and how to make the referral.

*FY 09 OIG Response: Referrals to the Intact Family Recovery program should be required in specific circumstances and incorporated into written policy.*

*FY 10 Department Update:* Revisions to Policy Guide 99.13, *Services for DCFS Substance Affected Families*, are currently being drafted.

*FY 11 Department Update:* The Divisions of Service Intervention, Child Protection and Monitoring will form a committee to review policy and resources to address this issue.

*FY 12 Department Update:* The Division of Clinical Practice, Specialty Services Unit provides consultation to caseworkers on a variety of complex cases including dually diagnosed clients.

**TEEN PARENT SERVICES**

**Teen Parent Services Network (TPSN) must maintain statistics on pre-natal and post-partum care visits and Women, Infants and Children (WIC) participation (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 6).**

*FY 11 Department Response:* The Division of Service Intervention/Office of Health Services will provide to TPSN and the Teen Parent Consultant youth-specific reports on prenatal and post-

partum visits completed which will come from Medicaid claims information in State Automated Child Welfare Information System (SACWIS).  Department of Human Services will provide to DCFS information on WIC participation by these youth and DCFS will provide this information to the Teen Parent Consultant.

*FY 12 Department Update:* TPSN currently shares this information with the teen parent consultant.

**The Department should consider referring all 14-15 year-old female wards to a Title X teen clinic for consultation on reproductive health and contraception education. All 14-15 year old male wards should be referred to a clinic with a community-based approach towards sexual health (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 6).**

*FY 11 Department Response:* Access to a youth's primary care physician and Title X clinics, such as Erie Family Health Center and the Rush Adolescent Clinic, are appropriate resources to meet this recommendation to provide guidance on sexual health issues for female and male youth.

HealthWorks lead agencies will recruit Title X providers serving their counties to participate in the HealthWorks provider networks.  TPSN agrees to provide information about the Title X clinics to the specialty training providers as part of the new birth assessment included in the resource guide.  DCFS will post the Statewide Title X directory on the DNet and the Youth in Care website.  Upon development of the OIG pamphlet, DCFS will ensure the pamphlet will be distributed throughout CAYITS, Administrative Case Reviews and prior to a high school physical.

*FY 12 Department Update:* The Department issued an Information Transmittal regarding Title X Family Planning Services in September 2012. The Information Transmittal includes information on the DHS office locater to locate Title X clinics, as well as the statewide provider database for family planning clinics.

**Expectant fathers who are wards should be required to participate in training to reduce infant mortality by helping them recognize the stress and anger that can be provoked by an inconsolably crying child, and identify resources that can be immediately used to deescalate a stressful parenting experience.  The training should include the participation of the Fussy Baby Network (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 6).**

*FY 11 Department Response:* Office of the Inspector General and TPSN staff will conduct a training for expectant fathers in an effort to reduce infant mortality and recognize stress and anger that can be provoked by an inconsolable crying child.

*FY 12 Department Update:* The Office of the Inspector General began the training in September 2012. TPSN will be providing this training in the future on an ongoing basis.

**This report should be shared with the Teen Parent Consultant (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 7).**

*FY 11 Department Response:* The report has been shared with the Teen Parent Consultant. The Department requests that the OIG look at this agency's organizational practice and deficits,

review past OIG investigations related to the agency and see whether there is any pattern that needs to be addressed by DCFS.

*FY 11 OIG Response: The OIG notes that there have been multiple investigations involving this agency in this Fiscal Year.  The agency response was recently filed.  After review of the response and discussions with the private agency board, the OIG will determine whether further action is needed.*

*FY 12 OIG Update: The Inspector General met twice with this agency in Fiscal Year 2012 to discuss deficiencies in the agency's management structure. The OIG recommends that the Department include this agency in their list of agencies which require close monitoring.*

**The Department and the Teen Parent Services Network should ensure that children of parenting teen wards with a history of mental illness, substance abuse, violence or developmental delays who are not eligible for school or employment related daycare services be enrolled at least two days a week in protective daycare (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 8).**

*FY 11 Department Response:* TPSN is able to identify and track clients meeting this criteria. A TPSN staff member will review daycare enrollment status of children's whose parent meets these criteria and assess the need for daycare. We will also have workers encourage these clients to enroll their child(ren) in protective daycare and secure consents from the client to contact the daycare facility. TPSN will generate a quarterly report on the clients who meet these criteria and notify workers of clients whose children are not enrolled in daycare.

*FY 12 Department Update:* TPSN tracks high risk cases through their clinical services department and staffing process.  They provide DCFS with monthly clinical updates as part of the Hill v. Erickson reporting requirements. All reports are submitted to DCFS-Legal, the Teen Parent Consultant and the DCFS Pregnant and Parenting Teen Coordinator.

**The Department and the Teen Parent Services Network should require a well being check, with consent, when a child of a teen ward misses daycare two consecutive scheduled days (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 8).**

*FY 11 Department Response:* TPSN is able to identify and track clients meeting this criteria. A TPSN staff member will review daycare enrollment status of children's whose parent meets these criteria and assess the need for daycare. We will also have workers encourage these clients to enroll their child(ren) in protective daycare and secure consents from the client to contact the daycare facility. TPSN will generate a quarterly report on the clients who meet these criteria and notify workers of clients whose children are not enrolled in daycare.

*FY 12 Department Update:* TPSN does not have the ability to identify and track the daycare attendance of client's children, however, TPSN encourages all caseworkers to obtain a consent for release of information from the client so they have the ability to receive attendance information from the day care facility. When they are notified that a child has missed two consecutive days, they are to complete a well-being check.

*FY 12 OIG Response:  To clarify, t*he Inspector General notes that this recommendation pertains only to high risk cases of parenting teen wards with a history of mental illness, substance abuse, violence or

developmental delays who are not eligible for school or employment related daycare services.  In FY 11 the Department agreed to implement this recommendation.

**The Department and the Teen Parent Services Network should ensure that service providers develop a child care plan with the teen parent when the ward's child is on an "extended visit" or "out of state" (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 8).**

> *FY 11 Department Response:* TPSN will develop a training module in conjunction with the Teen Parent Consultant on developing a childcare plan with teen parents who authorize their child(ren) to be on extended or out of state visits. The training will note that if a client's non-ward child is on an extended or out of state visit, an Unusual Incident Report (UIR) should be completed. TPSN will review any UIRs on any client's non ward child who is on an extended or out of state visit. TPSN staff will contact the worker to ensure an appropriate child care plan is established as well as staff the case as appropriate.

> *FY 12 Department Update:* TPSN has a policy on informal living arrangements that TPSN workers are encouraged to follow which entails creating a child care plan when the client's child is out of state or on an extended visit. This policy is discussed during Specialty Training's Home Safety and Risk Reduction Module. The training occurs twice yearly at the TPSN specialty trainings.

**In order to assist wards to make informed decisions and educated choices about health care, the Office of the Inspector General's staff will develop a resource guide in conjunction with the Teen Parent Consultant for pregnant and parenting teens which will include information about Title X services and other specialized adolescent clinics/providers. All case workers servicing pregnant wards should receive training on the comprehensive health care services available to teens in order to inform their clients of available resources and provide the ward with an opportunity to visit these specialty clinics (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 6).**

> *FY 11 Department Response:* HealthWorks lead agencies will recruit Title X providers serving their counties to participate in the HealthWorks provider networks.  TPSN agrees to provide information about the Title X clinics to the specialty training providers as part of the new birth assessment included in the resource guide.  DCFS will post the Statewide Title X directory on the D-Net and the Youth in Care website.  Upon development of the OIG pamphlet, DCFS will ensure the pamphlet will be distributed throughout CAYITS, Administrative Case Reviews and prior to a high school physical.

> *FY 12 Department Update:* The Department issued an Information Transmittal regarding Title X Family Planning Services in September 2012. The Information Transmittal includes information on the DHS office locater to locate Title X clinics, as well as the statewide provider database for family planning clinics.

**The Department should develop housing contracts with wards and enforce regulations addressing the use of drugs, alcohol, firearms, and violence. Institutional sanctions should be consistent across programs and the juvenile court should be immediately notified when a ward is violating housing contracts that threaten the safety or the well being of the ward. Housing contracts should make clear that funding for the apartment will stop and the court will be informed of transgressions**

involving criminal activity (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 4).

> *FY 11 Department Response:* Amendments to the Independent Living (ILO) and Transitional Living Program (TLP) plans are being developed.

> *FY 12 Department Update:* Independent Living (ILO) and Transitional Living Program (TLP) contract language is in the process of being reviewed and updated.

**The Department should require that wards sign a release of information for the Department to receive information from the educational institutions on the student's academic problems. With a ward's signed consent, DCFS should arrange to be notified of any of the following (from OIG FY 11 Annual Report, Death and Serious Injury Investigation 4):**

- **When a student has voluntarily withdrawn from the university or has been required by the university to withdraw;**
- **When a student has been placed on academic warning;**
- **When the student's academic good standing or promotion is at issue;**
- **When a student engages in alcohol or drug-related behavior that violates school policies;**
- **When a student has been placed on disciplinary probation or restriction;**
- **In exceptional cases when a student otherwise engages in behavior calling into question the appropriateness of the student's continued enrollment in the university.**

> *FY 11 Department Response:* Amendments to the Independent Living (ILO) and Transitional Living Program (TLP) plans are being developed.

> *FY 12 Department Update:* DCFS Policy Transmittal 2011.29, Procedures 302, Appendix G for Youth In College/Vocational Training Program was issued November 2011. Applicants are now required to sign the CFS 600-3, *Consent for Release of Information*, as part of the Youth in College/Vocational Training Program Application.

**The Department's Services Coordinators for the Sexual Behavior Problem Program (SBPP) should educate POS service providers regarding registration and reporting requirements of juvenile delinquent sex offenders, and insure the minor's compliance(from OIG FY 11 Annual Report, Death and Serious Injury Investigation 4).**

> *FY 11 Department Response:* The Department agrees that education for DCFS and POS staff regarding registration and reporting requirements for juvenile delinquent sex offenders is needed. This is especially true given the many changes that have been made to the registration and reporting requirements in the past several years. DCFS has provided this training in the past with assistance from the Illinois Sex Offender Registration Team (I-SORT) of the Illinois State Police. I-SORT continues to provide Sex Offender Registration and Community Notification training on an ongoing basis throughout the state through the Illinois State Police Mobile Training Units (MTU) which are open to the public. Additionally, the DCFS Acting Statewide Sexual Behavior Problems Program Coordinator has contacted the director of I-SORT and I-SORT has agreed to partner with DCFS and provide training specifically to DCFS and POS child welfare staff in trainings through out the state.

*FY 12 Department Update:* The Illinois Sex Offender Management Board has conducted Sex Offender Registration & Notification Act (SORNA) trainings and will continue to do so.  This training is open to the public at no cost.

**The Department should provide training to Day Care Coordinators in the region on teen parents' rights to education services including daycare allowing the teen to attend school (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 3).**

*FY 10 Department Response:* The training curriculum for Day Care Coordinators has been revised to incorporate specific information about teen parents' rights to education services including providing daycare for their children so that the teen can attend school.  The revised training is scheduled to be conducted by the Day Care Licensing Administrative staff in January, 2011.

*FY 11 Department Update:* DCFS Monitoring staff will collaborate with Teen Parent Service Network program staff and the Teen Parent Consultant to provide training during Fiscal Year 2012.

*FY 12 Department Update:* The Teen Parent Service Network Education provided specialty training regarding teen parent education services including early childhood services for their children. TPSN has been collaborating with the DCFS early childhood unit since March 2012 to provide developmental screenings for children 0-3 which also flags appropriate cases for early intervention services.
.

342

<div style="border:2px solid black;">

# UNRESOLVED RECOMMENDATIONS
# IMPACTING CHILD SAFETY

</div>

The following Office of the Inspector General's recommendations impact child safety and have been either rejected by the Department or pending for at least 4 years without resolution.

**The Department should pursue an interagency agreement with the Department of Healthcare and Family Services (DHFS) allowing DCFS Division of Child Protection staff access to Recipient Claim Detail information (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 11).**

*FY 08 Department Response:* The Department of Healthcare and Family Services (DHFS) notified DCFS that the 2004 interagency agreement allows for the necessary access. Representatives from DCP and the Guardianship Administrator's Office will coordinate with the Department of Healthcare and Family Services to implement this recommendation.

*FY 09 Department Update:* Representatives of the Guardianship Administrator's Office have continued to request access from DHFS. While no one has denied access to the Department, access has not been authorized. Efforts to gain access will continue.

*FY 09 OIG Response: The recommendation concerned access by child protection staff. Any access arranged must be available to child protection staff.*

*FY 10 Department Update:* The Department continues to work with the Department of Healthcare and Family Services to obtain needed access to Recipient Claim Detail information.

*FY 11 Department Update:* The Department is now receiving Department of Healthcare and Family Services (DHFS) Medicaid Claims information on a weekly electronic interface with the DHFS Medical Data Warehouse which goes directly into SACWIS E-Health screens. However, this is only for children for whom DCFS has legal custody. The Department has been unable to reach an agreement with DHFS to allow child protection staff access to the Recipient Claim Detail information and DHFS has informed the Department that they cannot share information from their Recipient Restriction Program. The Department is convening a meeting among the Division of Service Intervention, Child Protection, Legal Services, and Office of Information Technology staff to address child protection's need for access for children and subjects for whom the Department does not have legal custody.

*FY 12 Department Update:* The Office of Health Services is continuing to work with DHFS on securing access to Medicaid claims history by child protection staff. In the meantime child protection staff can access Medicaid claims through the administrative subpoena process.

**The Abused and Neglected Child Reporting Act (ANCRA) should be amended to clarify that the Department can share unfounded investigative information during a subsequent child protection or criminal investigation with any persons named in Section 11.1, Disclosure of Information for purposes consistent with the Abuse and Neglect Child Reporting Act or criminal prosecution (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 4).**

*FY 07 Department Response:* The DCFS Office of Legal Services has assigned an attorney to draft amendments to ANCRA, which address the above issue, as well as other proposed changes to ANCRA, and will submit as a single legislative package.  The targeted date of completion is May 2008.

*FY 08 Department Update:* The DCFS Office of Legal Services has assigned an attorney to draft amendments to ANCRA, which address the above issue, as well as other proposed changes to ANCRA, and will submit as a single legislative package.  The anticipated date of completion is February 2009.

*FY 09 Department Update:* Draft amendments to the Abused and Neglected Child Reporting Act addressing this issue will be submitted as part of the legislative package for the Fall Session 2010.

*FY 10 Department Update:* Amendments to ANCRA addressing this issue will be submitted as part of the legislative package for the spring 2011 session.  The estimated date of completion is spring 2012.

*FY 11 Department Update:* The Office of Legal Services will work with Legislative Affairs to incorporate language into the Abused and Neglected Child Reporting Act pertaining to sharing unfounded reports during a criminal or child protection investigation.

FY 12 Department Update: DCFS Legal has determined that Rule 431 can be amended without pursuing legislation. Revisions to Rule 431, *Confidentiality of Personal Information*, are being drafted.  The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.


**The OIG recommended that Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors*, be revised:**

- **To permit the Department to refuse to issue a license with knowledge that the applicant had committed a violation that would warrant revocation or if the applicant had engaged in behavior that would pose a risk to children or state resources;**

- **To expand the list of criminal pending charges or convictions that would warrant a refusal to issue to include any crime of which dishonesty is an essential element;**

- **To permit the Department to refuse to issue a license if the applicant provides false information during the licensing process;**

- **To provide guidelines for assessing criminal convictions and abuse or neglect findings that are not bars to licensure;**

- **To permit the Division of Child Welfare Employee Licensure to refer applications for investigation to verify facts presented (from OIG FY 06 Annual Report, General Investigations 26).**

*FY 07 Department Update:* The Clinical Division, through the Child Welfare Employee Licensure (CWEL) staff, has drafted proposed changes to Rules 412 *Licensure of Direct Child Welfare Services Employees and Supervisors*. The draft of the proposed amendment incorporates input from the OIG, and the appointed Board members of the Child Welfare Employee Licensure (CWEL) program. The text of the proposed amendment will be submitted to the Director for review, approval, and transmittal to the Joint Committee on Administrative Rules (JCAR).

*FY 08 Department Update:* The revisions to Rule 412 *Licensure of Direct Child Welfare Services Employees and Supervisors* were submitted to the Office of Child and Family Policy on November 21, 2008 and will begin the revision/comment process. The anticipated date of completion is June 2009.

*FY 09 Department Update:* The amended Rule 412 *Licensure of Direct Child Welfare Services Employees and Supervisors* has been submitted to the Joint Committee on Administrative Rules for review. The anticipated completion date is Fall 2010.

*FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License*, was filed in October 2009. The second Notice was never filed due to failure to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first Notice again by January 2011, subject to approval.

*FY 11 Department Update:* The Department will resubmit the amendments to Rule 412 *Licensure of Direct Child Welfare Services Employees and Supervisors* with the Joint Committee on Administrative Rules.

*FY 12 Department Update:* Revisions to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisor,* have been distributed for comment.

**The Department should amend Rule 412,** *Licensure of Direct Child Welfare Services Employees and Supervisors***, to provide specific provisions for voluntary relinquishment of a child welfare employee license (from OIG FY 08 Annual Report, General Investigation 30).**

- **A licensee may voluntarily relinquish his or her license at any time.**

- **The voluntary relinquishment of a CWEL during a pending licensure or disciplinary investigation or proceeding shall be recorded in the CWEL files as "***relinquished during licensure or disciplinary investigation or proceeding.***"**

- **Voluntary relinquishment of a license must be filed with the Child Welfare Employee License Division on a form prescribed by the Division.  The form must contain an acknowledgment that reinstatement will be subject to consideration of the facts disclosed in any pending licensure investigations or proceedings.  Voluntary relinquishment does not divest the OIG of the jurisdiction to complete a pending investigation.**

- **An Application for License from a licensee who previously relinquished shall be considered a Request for Reinstatement rather than an Application for License.**

*FY 08 Department Response:* The Department agrees.  The Office of Child and Family Policy has begun the revision process.

*FY 09 Department Update:* Rule 412 *Licensure of Direct Child Welfare Services Employees and Supervisors* is currently being reviewed by the Joint Committee on Administrative Rules.

*FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License*, was filed in October 2009. The second Notice was never filed due to failure

to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first Notice again by January 2011, subject to approval.

*FY 11 Department Update:* The Department will resubmit the amendments to Rule 412 *Licensure of Direct Child Welfare Services Employees and Supervisors* with the Joint Committee on Administrative Rules.

*FY 12 Department Update:* Revisions to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisor,* have been distributed for comment.

**Section 412.100, *Restoration of Revoked or Suspended License*, should be amended as follows: Section 412.100, *Restoration of Revoked, Suspended or Relinquished License*: A licensee may request the restoration of his or her license by submitting a written request to the Board providing specific reasons to support the request. In considering an application to reinstate or grant a license that was relinquished during a pending licensure investigation or administrative proceeding, the Board shall consider any charges filed along with a report or sworn statement by the Office of the Inspector General regarding the evidence developed in the investigation. For the purpose of considering a Request for Reinstatement, the Board shall presume that the facts developed during the investigation or the pending charges are true, when the license was surrendered during a pending investigation or licensure proceeding; the licensee may rebut the presumption for good cause shown. The Board may not reinstate a license where it has been shown by investigation and administrative hearing that it is not in the best interest of the public to do so. Considerations that will be reviewed when making a finding of "in the best interest of the public" include, but are not limited to: the nature of the offense for which the license was revoked; the period of time that has elapsed since the revocation; evidence of rehabilitation; and character references (from OIG FY 08 Annual Report, General Investigation 30).**

*FY 08 Department Response:* The Department agrees. The Office of Child and Family Policy has begun the revision process.

*FY 09 Department Update:* Rule 412 *Licensure of Direct Child Welfare Services Employees and Supervisors* is currently being reviewed by the Joint Committee on Administrative Rules.

*FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License*, was filed in October 2009. The second Notice was never filed due to failure to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first Notice again by January 2011, subject to approval.

*FY 11 Department Update:* The Department will resubmit the amendments to Rule 412 *Licensure of Direct Child Welfare Services Employees and Supervisors* with the Joint Committee on Administrative Rules.

*FY 12 Department Update:* Revisions to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisor,* have been distributed for comment.

**Contracts should require quarterly reports from mentoring and counseling agencies on progress toward achievement of program plan goals, both in relationship to individual clients and, in the aggregate, for all clients served under the contract (from OIG FY 08 Annual Report, General Investigation 24).**

*FY 08 Department Response:* The Department agrees.  Revised requirements will be included in FY10 contracts.

*FY 09 Department Update:* The Department continues to include revised requirements in contracts.  The estimated date of completion is July 2010.

*FY 10 Department Update:* Implementation of the recommendation is still in progress.

*FY 11 Department Update:* The standardized counseling program plans are currently under review for inclusions of changes to program plan goals and submittal requirements. In addition the Office of Contract Administration will continue to work with other Divisions to make needed changes to their non-standardized program plans to meet this requirement. Fiscal year 2013, (effective July 1, 2012) counseling and mentoring contracts should reflect this recommendation.

*FY 11 OIG Response: The OIG reviewed the standardized program plan submitted by the Department and determined that it contained many of the same problems identified in two recent OIG fraud investigations. Specifically, the program plan does not require that the agency serve DCFS-involved families (such as intact families, subsidized guardianship families, teen parents and their significant others). The quarterly reports required in the program plan fail to provide objective measures of services provided, such as number of DCFS clients served, hours and type of services provided, progress toward achieving set goals. In addition, the program plan promises counseling and casework services, but provides for staff without the credentials to offer such services. While mediation is an offered service, the program plan does not specify training or certification for mediators.*

*FY 12 Department Update*: The Program Plan templates updated for fiscal year 2013 include specific outcomes and metrics for services provided, which are the basis for monitoring progress and compliance, as well as verification/reconciliation of quarterly expenditures against contract funding. This will also be a component of the Department's new monitoring design.

**Drug and alcohol toxicology contracts should be competitively bid (from the OIG FY 07 Annual Report, General Investigation 1).**

*FY 07 Department Response:* The Department agrees. This will be implemented with fiscal year 2009 contracts.

*FY 08 Department Update:* Due to the program plan and protocol changes, this service was not bid in FY 2009. It is anticipated that the service will be out for bid in fiscal year 2010.

*FY 09 Department Update:* Due to retirement and staff changes and the new committee that developed recommendations, it is still anticipated that services will be put out for bid for fiscal year 2011.

*FY 10 Department Update:* The Procurement Office is preparing to release the request for proposals (RFP) in February 2011 and the award is expected in fiscal year 2011.

*FY 11 Department Update:* The Procurement Office posted the Invitation For Bid for toxicology contracts but the Invitation for Bid was cancelled by the State Procurement Officer. The Office of Contract Administration and the Procurement Office are working to resolve questions received from potential vendors before reposting the Invitation for Bid.

*FY 12 Department Update:* Final review of updated IFBs for Toxicology Specimen Collection Site Services and Specimen Testing Laboratory is in process by the State Purchasing Officer. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

**In order to satisfy Department Rule 402.8,** *General Requirements for the Foster Home*, **the Department should incorporate into a licensing safety assessment the guidelines set forth by the American Humane Society regarding the observation of family pets in their natural environment. These guidelines, detailed below, should also be incorporated into Part 300,** *Reports of Child Abuse and Neglect* **and Part 406,** *Licensing Standards for Day Care Homes* **(From OIG FY 09 Annual Report, Death and Serious Injury Investigation 11).**

<u>*Guidelines from the American Humane Society*</u>
*In a publication entitled "A Common Bond: Maltreated Children and Animals in the Home" published by the American Humane Society, authors Mary Lou Randour and Howard Davidson propose that a child welfare safety assessment of animals and children should include animal related questions and observation of interactions between family members and family pets.  The Humane Society recommends observation of the animal in its daily environment, and that when making a home visit the observer can incorporate the following questions into the interview:*

- *Do you have any family pets or other animals in your home?*
- *May I see them, or can you bring them out?*
- *What can you tell me about your pets?*
- *Who takes care of them?*
- *What happens when one of them is disobedient?*
- *Who disciplines them?  How do they do that?*
- *Have you had any other pets?  What happened to them?*

*When observing interactions between the family members and their pets, the following should especially be considered:*

- *Are there any family pets that might be classified as a breed that is associated with animal fighting or other crimes?  The presence of a high-risk pet could place children and other family members in danger.*
- *Do the animals seem relaxed around all family members, or do they seem to avoid, or appear anxious around, one or two particular family members?*
- *How does the presence of the animals affect the family interactions?*
- *If there is a dog in the home, does the child have access to the area where the dog is kept?*
- *If the child is near the dog, how is s/he supervised?*
- *How much time does the dog spend interacting with family members?*
- *What socialization has the dog had with children?*
- *Has the dog received obedience training?*
- *Does the dog have a history of aggressive behaviors?*

*FY 09 Department Response:* The Office of Child and Family Policy and the Licensing Unit are developing a form to be signed by the foster parent responding to several questions about dangerous pets listed in the American Humane Society guide.  Once this language is drafted, similar language will be drafted for Department Procedures 406 and 408 *Licensing Standards for*

*Daycare Homes*. In addition, new legislation requires cross-reporting between child abuse investigators and animal abuse investigators.

*FY 10 Department Update:* After further review, the Licensing Division has determined that responsibility to determine whether a pet is aggressive or not is beyond the scope and expertise of the licensing workers.   Procedures 300 *Reports of Child Abuse and Neglect* and the Safety Checklists have been drafted.

*FY 10 OIG Response: After a child was viciously mauled and killed by dangerous animals in a foster home, the OIG recommended that Licensing address this clear safety hazard. The Child Death Review Team supported the OIG's recommendation. It is unconscionable that the Department refuses to recognize its responsibility to address this safety issue in licensed foster homes.*

*FY 11 Department Update:* On July 8, 2010, the Department issued Policy Transmittal 2010.11, *Revised Procedures 300.50 (j) and the Home Safety Checklist*.  The Policy Transmittal addresses the expectations for Child Protection Investigation Specialists.   After further review, the Licensing Division has determined that responsibility to determine whether a pet is aggressive is beyond the scope and expertise of the licensing workers.

*FY 12 OIG Response: The Office of the Inspector General maintains that Licensing should address this clear safety hazard when assessing the safety of a home in which a child for whom the Department is responsible to protect, may reside.*

**The Department should develop guidelines for shared monitoring responsibilities when a single foster home has children monitored by different agencies or when the case monitoring and license monitoring functions are split between agencies. The guidelines should include the following requirements:**
  **a.   a staffing of all involved case and licensing workers;**
  **b.   written agreement of roles and responsibilities of each worker;**
  **c.   written guidelines concerning the responsibility to share information and the process for sharing information (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:*  The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* The Deputy Director of Monitoring will co-chair a subcommittee with Agency Performance Team, Licensing, private agency and Department staff to address these issues.  The anticipated start date is January 2012.

*FY 12 Department Update:* This will be included in the new monitoring design. Rule 301 will be revised to include this information.

**The Department should issue a policy memorandum that states that whenever possible, each foster home should have a single entity that monitors placement of foster children and foster home**

licensing. POS may grant waivers to the policy based on individual children's needs but must ensure that the guidelines stated above are in place whenever a waiver is granted (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).

*FY 08 Department Update:* The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* The Deputy Director of Monitoring will co-chair a subcommittee with Agency Performance Team, Licensing, private agency and Department staff to address these issues.  The anticipated start date is January 2012.

*FY 12 Department Update:* This will be included in the new monitoring design.

**Whenever a waiver is granted, and case responsibility is transferred to a single agency, the relinquishing agency should not be penalized, but should be moved up for case rotation assignment of a new case (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:* The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* Agencies are not penalized when case responsibility is transferred to a single agency.

*FY 11 OIG Response: The recommendation did not concern assignment of cases but rather transfer of existing cases. To level the playing field, the agency transferring the children should receive immediate consideration for new placements.*

*FY 12 Department Update:* The agencies loss of such cases is taken into account in terms of the percentage of referral opportunity to replace the case that was transferred.  The child's geography and the other agencies in the area with lower percentage of referrals are factored in terms of when the agency that transferred such a case would meet the criteria for a replacement intake.

**Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors*, should be amended to provide for automatic suspension or denial of license application after a licensee or applicant has failed a drug test required by Administrative Procedure 24, *Drug Testing of Employment Applicants* (from OIG FY 08 Annual Report, General Investigation 32).**

*FY 08 Department Response:* The Department agrees.  The Department convened a task force that has developed language to amend Rule 412 *Licensure of Direct Child Welfare Service Employees and Supervisors.*

*FY 09 Department Update:* Pre-employment drug testing *Administrative Procedure 24* was suspended indefinitely due to budget constraints.

*FY 10 Department Update:* The Department began pre-employment drug testing in February 2008, but had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 11 Department Update:* Management fully supports reasonable suspicion testing for direct child welfare service employees and supervisors. Direct child welfare service employees and supervisors are bargaining unit members. As such implementation of reasonable suspicion drug/alcohol testing, unless legislatively mandated, must be negotiated with the collective bargaining units. Management routinely proposes to CMS Labor Relations that reasonable suspicion testing be included in collective bargaining agreements. Management also routinely proposes that reasonable suspicion testing be added to supplemental collective bargaining agreements. Without a reasonable suspicion testing policy in place amendment of Rules and Procedures is futile. The State will be involved in contract negotiations with AFSCME in 2012 and the Department intends to continue pressing this point.

*FY 11 OIG Response: The OIG notes that the City of Chicago and both the Illinois State Police and the Department of Corrections have had Reasonable Suspicion Testing for several years. The City of Chicago and the Department of Corrections employees are represented in large part by the same union as most employees with the Department of Children and Family Services. Moreover, Direct Child Welfare employees and supervisors at DCFS must possess Child Welfare Employee Licenses. The OIG has urged since 2005 that Reasonable Suspicion Testing be added as a requirement for Child Welfare Licensure. The Department has failed to act on the recommendation.*

*FY 12 Department Update:* A workgroup has been formed to review all OIG drug/alcohol related recommendations to determine implementation steps. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

**The Department should develop policy to address suspected substance abuse in the workplace (from OIG Recommendations made in 2005, 2001 and 1999).**

*FY06 Department Response:* The Department developed a definition and procedure for Reasonable Suspicion testing. The Department agrees to amend the Employee Manual and the Employee Licensure Rule to address Reasonable Suspicion of substance abuse and will also engage in discussions with the union.

*FY 07 Department Update:* The Department's workgroup addressing the need for incident-based reasonable suspicion drug or alcohol testing is currently developing protocol for pre-employment drug testing. Reasonable suspicion testing has been put on hold temporarily.

*FY 08 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 08 OIG Response: The OIG has been continuously recommending this critical change in policy for nine years. The policy change sought by the OIG would have a minimal budgetary impact. The lack of reasonable suspicion policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk.*

*FY 09 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 10 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 10 OIG Response: The OIG has been continuously recommending this critical change in policy for nine years. The policy change sought by the OIG would have a minimal budgetary impact. The lack of reasonable suspicion policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk.*

*FY 11 Department Update:* Management fully supports reasonable suspicion testing for direct child welfare service employees and supervisors. Direct child welfare service employees and supervisors are bargaining unit members. As such implementation of reasonable suspicion drug/alcohol testing, unless legislatively mandated, must be negotiated with the collective bargaining units. Management routinely proposes to CMS Labor Relations that reasonable suspicion testing be included in collective bargaining agreements. Management also routinely proposes that reasonable suspicion testing be added to supplemental collective bargaining agreements. Without a reasonable suspicion testing policy in place amendment of Rules and Procedures is futile. The State will be involved in contract negotiations with AFSCME in 2012 and the Department intends to continue pressing this point.

*FY 11 OIG Response: The OIG notes that the City of Chicago and both the Illinois State Police and the Department of Corrections have had Reasonable Suspicion Testing for several years. The City of Chicago and the Department of Corrections employees are represented in large part by the same union as most employees with the Department of Children and Family Services. Moreover, Direct Child Welfare employees and supervisors at DCFS must possess Child Welfare Employee Licenses. The OIG has urged since 2005 that Reasonable Suspicion Testing be added as a requirement for Child Welfare Licensure. The Department has failed to act on the recommendation.*

*FY 12 Department Update:* A workgroup has been formed to review all drug/alcohol related OIG recommendations to determine implementation steps. The current administration recognizes how long this recommendation has languished and is committed to completing implementation by the end of FY 13.

**Substance affected and dually diagnosed clients should be referred to child welfare teams with expertise in working with these clients and families. Programs such as the Intact Family Recovery program (IFR) have expertise with both populations and successfully enroll 70% of the eligible children they serve in Head Start and state pre-K programs (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 10).**

*FY 09 Department Response:* There is no policy or protocol for referring substance exposed infants to the Intact Family Recovery program. However, the Division of Service Intervention gets a weekly report from Quality Assurance on Cook County substance exposed infant cases. The Division of Service Intervention then contacts the assigned child protection staff to inform them that the case may be appropriate for the Intact Family Recovery program and how to make the referral.

*FY 09 OIG Response: Referrals to the Intact Family Recovery program should be required in specific circumstances and incorporated into written policy.*

*FY 10 Department Update:* Revisions to Policy Guide 99.13, *Services for DCFS Substance Affected Families*, are currently being drafted.

*FY 11 Department Update: FY 11 Department Update:* The Divisions of Service Intervention, Child Protection and Monitoring will form a committee to review policy and resources to address this issue.

*FY 12 Department Update:* The Division of Clinical Practice, Specialty Services Unit provides consultation to caseworkers on a variety of complex cases including dually diagnosed clients.

**The Department should review and update the Emergency Reception Center (ERC) Manual to include expectations of follow-up workers bringing children to the Emergency Reception Center (from OIG FY 06 Annual Report, General Investigations 4).**

*FY 07 Department Update:* The updated ERC Protocol/Manual (Transmittal) has not been finalized and is on hold with the Office of Child and Family Policy awaiting information resolution regarding shelter transportation issues. When it is completed the informational transmittals will go out to DCFS, POS, CWS, and DCP staff. Also, training will take place for all staff regarding protocol on how CWS or DCP can make an Emergency Shelter referral and intake guidelines for bringing children and youth into ERC for an emergency temporary shelter care placement.

*FY 08 Department Update:* The ERC Protocol has been drafted and is awaiting approval to be sent out for comment. The anticipated date for distribution/implementation is January 2009.

*FY 09 Department Update:* Referral forms for the Emergency Reception Center (CFS 1900 and CFS 1901) were issued in February 2009. The referral form does not address procedures for admission to the Emergency Reception Center. Emergency Reception Center protocol is on hold at this time.

*FY 10 Department Update:* At the request of the Division of Child Protection (DCP), the ERC Protocol was placed on hold due to a planned reorganization and remains on hold as of November 2010.

*FY 11 Department Update:* Restructuring of the Emergency Reception Center (ERC) is still planned therefore the implementation of the ERC Protocol is still on hold at this time.

*FY 12 Department Update:* Standardized procedures for utilizing the Emergency Reception Center are being drafted.

**The Department should develop an expedited process for distributing proposed decisions to all parties in expungement appeals, with opportunity to file written objections, prior to the issuance of final administrative decisions in expungement appeals (from OIG FY 11 Annual Report, General Investigation 23).**

> *FY 11 Department Response:* The Department rejected the recommendation based on case law that interprets the section of the Administrative Procedure Act not to include the final administrative decision by a Director.

*FY 12 OIG Response: The OIG maintains that implementation of this recommendation would strengthen the Administrative Process while assuring fairness and more reliable decision making.*

# APPENDIX

## APPENDIX A:

**PATRICK GEORGE (FICTITIOUS NAME)**

## APPENDIX B:

**GREGORY DRABIN (FICTITIOUS NAME)**

*This Report was completed in FY 2011, but was not included in the FY 2011 Annual Report to avoid compromising the pending criminal investigation.  The criminal investigation was concluded with homicide charges issued.*

# OFFICE OF THE INSPECTOR GENERAL
## Department of Children and Family Services

> ## *REDACTED REPORT*

> *This report is being released by the Office of the Inspector General for educational purposes. To ensure the confidentiality of all persons and service providers involved in the case, identifying information has been changed. All names, except those of professional references, are fictitious.*

**Subject:**    **Child Death**

**Child:**    **Patrick George (DOB 11/2007; DOD 11/2011)**

## SUMMARY OF COMPLAINT

In November 2011, an anonymous reporter called the State Central Register child abuse hotline (SCR) to report that on the day before, 4 year-old Patrick George was observed with a black eye. The child's mother, Danielle George, told the Reporter that Patrick wouldn't settle down, so she hit him, causing the black eye. The Reporter stated Danielle was often abusive to Patrick. SCR notified the local police department, in addition to the Division of Child Protection (DCP). DCP investigator Victor Stone went to the residence, finding police had already roped off the home. A police officer informed the investigator that Patrick was deceased. Later that afternoon, the county Medical Examiner's office investigator notified SCR that at 3:10 p.m. four-year-old Patrick George was pronounced dead on arrival at the hospital. The preliminary cause of death was blunt force trauma to the head and the child had numerous bruises in various stages of healing on his body. Danielle George and her boyfriend, Norman Winston, admitted to striking the child. Both have been charged with murder and are in county jail awaiting trial.

The Department had a prior child protection investigation closed three months earlier, when the mother took then three-year-old Patrick to the hospital, reporting that he had fallen.[1] Doctors reported that his numerous injuries were not consistent with the explanation given by his mother and the doctors believed he was abused. The mother was arrested and charged with domestic battery. She was found guilty in October 2011. However, the child protection investigation was unfounded for abuse and indicated for the neglect allegation of inadequate supervision.

## Background

Patrick George is the fourth child of Danielle George (DOB 5/1983) and Richard O'Bryan (DOB 8/1978). The couple's older children are Derrick O'Bryan (DOB 4/2000), Nicole

---

[1] In addition to this investigation DCFS had another contact with the mother. In December 2008 an anonymous reporter stated Danielle became angry with eight-year-old Derrick, grabbed him by the arms, and he slipped on the concrete hitting the back of his head. Derrick denied falling and hitting his head. Following investigation, the report was unfounded for head injuries and substantial risk of physical injury. The investigation has been expunged.

O'Bryan (DOB 7/2001), and Gayle O'Bryan (DOB 11/2006).  At the time of Patrick's death, the parents did not live together and Ms. George lived with her paramour, Norman Winston (DOB 6/1977).[2]  Ms. George's mother, Alicia George, told a child protection investigator that she "has been raising Nicole and Derrick since they were babies."  Additionally, she stated that "the two little ones, [Gayle and Patrick], are almost always with her."[3]  Alicia George lives with her husband, Michael George.[4]

**First Child Protection Investigation – July 2011**

Danielle George took her three-year-old son, Patrick, to the emergency room at 8 p.m.  At 10:30 p.m., the ER senior resident called the SCR hotline to report that Patrick had extensive bruising and injuries that were inconsistent with his mother's explanations for the injuries.  According to the hotline narrative:

> Reporter stated that mom brought Patrick to the ER because she stated that yesterday he fell on the patio and hit his head and today when he woke up he had a swollen left eye. Patrick has bruises on the left side of his head but a CT scan shows no intracranial bleeding. Reporter stated that Patrick also has an older 3 centimeter laceration under his chin and spots of bruises on back and buttocks, patches of bruises on both shoulders and upper back that look like finger print bruises and bruises on his thighs at various stages of healing. Mom stated that some of the marks were actually birth marks, others were from bad reactions to bug bites and she had no explanation to other injuries. Reporter has ordered a full skeletal and she stated that the injuries are not consistent with mom's explanations. Mom has other children but they are with the grandma. Reporter stated that mom stated she lives alone with Patrick and he is very active and he falls a lot.

The call was listed as "Action Needed" and the police were notified. SCR took an investigation for an allegation of cuts, bruises, welts, abrasions and oral injuries.[5]   An overnight child protection worker, Ms. Richmont, called the hospital at 10:51 p.m.  The ER senior resident who had called the hotline informed her that Patrick had been admitted; the child presented with head contusions and bruises in other areas of his body, a laceration, bruising to the shoulders, finger print bruises to the thigh and bruising to his flank.  The mother said the child fell the day before while climbing on patio furniture and then he woke up with his left eye swollen shut.  The doctor stated the injuries were not consistent with being accidental.  The results of a CT scan were pending at the time the doctor called the hotline.  After being in the ER for two and a half hours (8:13 p.m. to 10:45 p.m.), Patrick was admitted to the local children's hospital for his safety and further evaluation.  Patrick remained in the hospital for five days.

At 6:30 a.m. Saturday, ten hours after the ER doctor's initial call to SCR, the ER charge nurse, called the hotline to report:

> Last night around 8:13 p.m. Ms. George brought her son Patrick to the Hospital and claimed the child fell off of a patio table onto cement. She also reported that the child fell off of a chair. Reporter said that the child has swelling to the

---

[2] SCR was notified within 24 hours of the abuse call that mother had a boyfriend Norman who lived with her.
[3] Investigation 'A'.
[4] Although Michael George is not mentioned in the investigative file, Ms. Mercer told OIG investigators that she was aware that he lived with Alicia George.
[5] The report was ultimately indicated for inadequate supervision. It is unclear from the SACWIS record at what point the allegation of inadequate supervision was added.

left side of his head and a black eye. A CT was performed and the child has a subgaleal hematoma which is a blood filled bruise. Reporter said that the child also had bruising behind the ear and multiple bruises to his back, thigh, chest, upper arms and legs.

The nurse said that nursing staff had taken photographs of Patrick's injuries. The SCR operator added an allegation of head injury to the cuts, bruises and welts allegation.

At 9:00 a.m. Saturday, SCR received a third call regarding Patrick's injuries. An anonymous reporter stated that Danielle George had told the reporter that the injuries to Patrick were caused when Patrick fell off a table at the laundromat. The reporter also informed the hotline operator that Danielle had a boyfriend named Norman living in the home and had other children who were living with a relative.

In the early afternoon, the assigned mandate investigator observed Patrick in a crib at the hospital and spoke with a treating physician.

**Failure to Conduct Safety Assessments and Oversee Safety Plans**
DCFS's Child Endangerment Risk Assessment Protocol (CERAP) requires a child protection worker to conduct, at a minimum, a safety assessment within 24 hours after the investigator sees the child for the first time, as well as every five days following the determination that any child is unsafe and a safety plan is implemented. Such assessments should continue until all children are assessed safe. In addition, at the conclusion of a formal investigation, a safety assessment must be completed. Complying with this protocol, the mandate investigator completed an initial CERAP (a safety determination and assessment) within 24 hours and initiated a safety plan. On July 2, the mandate investigator determined Patrick was unsafe and created a 72-hour safety plan detailing that Patrick would remain in the hospital for three days. She determined the safety plan was needed because of the unexplained moderate to severe injuries on the three-year-old. Danielle George was unavailable during the first 24 hours of the initial safety plan, because she was in police custody. The mandate investigator noted for the record that the treating physician stated that Patrick was admitted and the hospital would keep the child for three days. Child Protection Investigator Belinda Mercer was assigned the George investigation on the morning the initial safety plan ended and the anticipated date that Patrick was to be discharged.

The George investigation, opened in July, was closed in August 2011. The mandate investigator's safety plan was the only safety plan contained in the George investigative file. With the exception of a closing CERAP completed on August 30, no other safety assessments were noted in the file. During Patrick's five-day hospitalization, the children's hospital medical staff completed several body charts detailing the extensive bruising and injuries on Patrick and the need for him to remain hospitalized until his safety could be assured. Two of the documented body charts specifically showed the following injuries:

*Children's Hospital's Body Charts*



According to the SACWIS system, on the morning of the discharge, Ms. Mercer accessed the electronic file for the George investigation, which had just been assigned to her. The team's supervisor was on vacation and would return in eight days. At 10:30 am, the Temporarily Assigned (TA) supervisor met with Ms. Mercer. The TA supervisor reviewed the investigation with Ms. Mercer and gave her a set of supervisory instructions. Among his instructions, the TA supervisor directed Ms. Mercer to complete a body chart, corroborate the parent's explanation and inquire why there was a delay in seeking medical attention for the child, if he was injured the day before. The TA supervisor entered his supervisory consultation notes at 10:50 the same morning. In an interview with OIG investigators, the TA supervisor described his concerns about Patrick's injuries when he first reviewed what the reporters told the SCR (hotline) operators. The reporting doctor told SCR that Ms. George gave changing explanations for the injuries (the child fell off of a table on a patio; the injuries were bug bites) to hospital staff and an anonymous caller to the hotline described yet another explanation (the child fell off of a table at a laundromat) that the mother had given. The supervisor recalled that during July he had attempted to get a head injury investigation transferred to the DCP unit that specializes in those types of investigations (Priority One); however, he was informed that because the initial call came in as a cuts, bruises, welts allegation with head injury added later, it was denied as a priority one investigation. The TA supervisor could not remember if the George investigation was the one he attempted to transfer. The Priority One supervisor told OIG investigators that the George investigation was not discussed with her; but, in situations where a head injury allegation is added to a pending investigation, she would offer, if requested, guidance to an investigator, if the investigation was not transferred to her team.

According to Child Protection Investigator Ms. Mercer's contact notes, Ms. Mercer interviewed Danielle George. Ms. Mercer documented in her notes that Ms. George stated that she spanks her child on his rear and that he fell on the patio with no one else present when the injuries occurred. Her older two children live with Alicia, the maternal grandmother. Ms. George also informed Ms. Mercer that she had just been released from jail. Ms. Mercer told OIG investigators that she did not ask Danielle George specifically about the conditions of her release from jail but Ms. Mercer stated that during the interview, Ms. Mercer learned that

someone in authority had told Danielle George she could not have any contact with Patrick for 72 hours.  Ms. Mercer stated that she did not have any specific information nor did she inquire about what authority had given the prohibition.  Ms. Mercer explained to OIG investigators that because someone in authority had decided there was to be no contact for 72 hours, Ms. Mercer and the family developed a safety plan.

Following her interview with Danielle George, Ms. Mercer interviewed maternal grandmother Alicia George at her home.  According to Ms. Mercer's contact note, Alicia George informed Ms. Mercer that Danielle George was arrested but "no way does she [Alicia] believe that her baby was beaten."  Alicia George believed her daughter was functional but delayed and twice the family had attempted to get SSI benefits for Danielle.  Ms. Mercer noted that the maternal grandmother stated she would be more than happy to care for the baby after he was discharged from the hospital and "agreed to honor the safety plan" and "not allow the children to go with the mother unsupervised."[6]  Ms. Mercer produced a written safety plan during her interview with OIG investigators that was not in the closed investigative hard file.  Ms. Mercer stated she had the mother sign a safety plan.  Ms. Mercer explained that she had found the safety plan on her desk while she was preparing for the OIG investigative interview.  Ms. Mercer explained that she could not locate any other notes or documents from the George investigation.[7]

The written safety plan that Ms. Mercer produced was effective for one week and stipulated that Patrick was to be released into the care of maternal grandmother Alicia George who was to ensure the care and well-being of all four children.  The safety plan was silent on the prohibition referenced by the mother that she was to have no contact with Patrick for 72 hours and put no restrictions on the mother's contacts with Patrick.  Ms. Mercer told OIG investigators that she had made an error in not writing down that the mother was to have no unsupervised contact.  Ms. Mercer wrote that the Division of Child Protection (DCP) would monitor the plan via in-person contact and telephone.  The plan was signed by Ms. Mercer who provided her office phone number as well as the phone number for her supervisor.  The safety plan had the signatures of Danielle and Alicia George.  The TA supervisor's name was filled in as having given supervisory verbal approval by phone.  Ms. Mercer did not complete a safety assessment or CERAP on paper or in SACWIS for the July safety plan.

In his interview with OIG investigators, the TA supervisor stated that he never saw, signed, or approved a safety plan in the George investigation.  The TA supervisor also stated that he did not receive a phone call from Ms. Mercer requesting his approval of the new safety plan, nor did Ms. Mercer notify him that both Danielle and Alicia told her Danielle had been arrested.

After reviewing the new safety plan during the OIG interview, the TA supervisor observed that the time written on the safety plan was 11:30 a.m., an hour after his supervision with Ms. Mercer.  The TA supervisor stated that an hour was not enough time to assess the situation, and at that time Ms. Mercer had not even interviewed the grandmother.  The TA supervisor provided OIG investigators with his cell and desk phone numbers.  Ms. Mercer's cell phone records do not support that she called the TA supervisor for approval of the safety plan.[8]

---

[6] Ms. Mercer created this note on the same day as her in-person visit with the grandmother.

[7] Ms. Mercer was offered an opportunity to return to her office to locate her notes and calendar.  Ms. Mercer stated that she had believed she was losing her job and had cleared out her office, destroying all of her notes, calendars and other documents.

[8] Ms. Mercer uses her personal cell phone for work. In June 2011 she reported that her state issued cell phone had been stolen.  Ms. Mercer's personal cell phone records do not show calls made to the TA supervisor's work or cell phone on the date alleged.  Patrick was discharged to his grandmother.  The TA supervisor stated to OIG investigators that a safety plan with Alicia George would have likely gained his approval.

**Failure to Conduct a Scene Investigation**

Procedures 300, Section 300.50(g) require completion and documentation of a scene investigation by the Investigation Specialist that includes but is not limited to the following:

> environmental circumstances related to the incident: the sequence of events occurring with 24 to 48 hour sequence leading to the incident; persons in the environment during the time sequence (Identified person must be interviewed.); location of objects/instruments reported to have been used in the incident; times and distances between the room where the child was located at the time of the incident and the room in which the parent/caregiver was located; a mock demonstration of the circumstances or events leading to the injury or incident involving the child; and the general conditions of the home. Interview extended family members or other collaterals that have had contact with the child or children and may have seen the injury. This requirement applies to the initial investigation for all abuse and neglect allegations where specified in the allegation of harm.
>
> **Note**: If the parent/caregiver states that the injury occurred elsewhere, such as the child's school, conduct a scene investigation at the school and interview witnesses at the school to verify the parent's/caregiver's explanation of the incident.

Ms. Mercer documented that Danielle George reported to her that Patrick fell on the patio and that no one else was present when he fell.  While Ms. Mercer described that the apartment appeared clean and that she observed a twin bed that Patrick and his sister, Gayle, share, Ms. Mercer's investigative notes were devoid of basic investigative information as to the circumstances surrounding the alleged incident leading to the multiple injuries on Patrick: what time he allegedly fell, a demonstration of the fall, i.e., from a chair or table, the height of the platform he fell from or why there was a delay in seeking medical attention.  OIG investigators asked Ms. Mercer if she conducted a scene investigation.  Ms. Mercer responded that when she went to Danielle George's home, Ms. Mercer saw a concrete slab in front of the house with a hodgepodge of furniture but she could not recall if she asked what piece of furniture Patrick had fallen from.  Ms. Mercer could not recall if she asked the mother to demonstrate what happened, when the injury took place or why there was a delay in taking him to the doctor.

In regards to the anonymous call to the hotline explaining that Danielle had given the story that Patrick fell at a laundromat, Ms. Mercer stated that she did not think that she knew about the CANTS information in the third call when she interviewed Danielle.[9]   Ms. Mercer did not believe that information on the third call was given to her as part of the printed CANTS.[10]  Ms. Mercer also could not recall if she had seen what the overnight and mandate workers entered in SAWCIS.  All of Ms. Mercer's investigative notes on the George investigation were written on the printed CANTS report that she recalled she had thrown out.  Ms. Mercer did not recall if she ever asked Danielle or Alicia anything about the story Danielle had allegedly told that Patrick had fallen at the Laundromat.

However, in January 2012, Ms. Mercer testified at the Circuit Court of the County Child Protection Division.  On direct examination by the Assistant State's Attorney, Ms. Mercer

---

[9] CANTS refers to Child Abuse Neglect Tracking System; the narratives of calls are referred to as CANTS.

[10] Ms. Mercer told OIG investigators she no longer had the CANTS print out that was given to her and as noted earlier she had accessed the case in SACWIS before going out to the home.

testified that on the date in question, she visited Danielle George who stated to her when asked how her son was injured, "She said he's fallen at the laundry mat (sic)....That he had hurt his face, his eye, she took him to the hospital."[11]

**False Entry**

According to the George investigative file, Ms. Mercer saw Patrick twice in the 55 days between the time he was discharged from the hospital to the closing of the investigation: once at his grandmother's home[12] and once at his mother's home**.**  Ms. Mercer documented that she visited Alicia George's home and saw Patrick and his two sisters on Friday afternoon (1:30 p.m. and 2:00 p.m.), two days after the expiration of the safety plan.  Ms. Mercer could not recall if the mother was at the grandmother's home during the visit.  Ms. Mercer stated to OIG investigators that she was not worried when the safety plan expired because the maternal grandmother seemed to her to be vested in keeping the children safe.  Ms. Mercer stated she did not draw up a new safety plan because she did not have the form with her.  Ms. Mercer recalled the children were playing and went into the basement.  Ms. Mercer's notes described three of the children and made no reference to the mother, the grandmother, or the oldest child, 11-year-old Derrick.  The following Monday, Ms. Mercer took a sick day.  Office of the Inspector General investigators spoke with Alicia George who described Ms. Mercer as a nice person.  She reported that she could not recall a visit from Ms. Mercer from when the safety plan began until the middle of August.  She said she spoke with Ms. Mercer by phone one time, but could not remember if that was in July or August.

*Time Documentation*

Ms. Mercer's time records reflect she was in the office all day with no work away time in the field on a specific day.  Electronic records show that Ms. Mercer was on her computer entering 37 investigative contact notes from 1:23 p.m. to 4:15 p.m. and resumed entering SAWCIS notes from 4:50 p.m. to 5:17 p.m..[13]  During this time Ms. Mercer documented that she made four visits away from the office.

> 1:15 PM In person interview alleged perpetrator at his home on a separate investigation.
> 1:30 PM In person at Patrick's grandmother's home and interviewed Patrick's sister.
> 2:00 PM In person with Patrick at his grandmother's home.
> 2:00 PM Attempted home visit for a second separate investigation

According to SACWIS time records, Ms. Mercer entered her note from the 1:15 pm visit at less then ten minutes after initiating the visit in the field at 1:23 pm. That same day, Ms. Mercer closed the investigation.  Ms. Mercer stated to Office of the Inspector General investigators that she visited the George children at 1:30 p.m. and 2:00 p.m. as she alleged in her SACWIS documentation.

During the 35 minutes between 4:15 and 4:50 when no electronic notes were entered, Ms. Mercer met with her supervisor to review closing another investigation.  Review of her notes on a separate investigation involving a 21-year-old father, Ms. Mercer later created a note that summarized an in person meeting she held with the father at the agency at the same time she was in supervision.  Ms. Mercer wrote:

> CPI met with [father]. He reported that he is the father of [child]. He stated the
> call came from [mother's] crazy family. He stated that the baby is well cared

---

[11] Report of Proceedings, Court Specialist.
[12] Location listed in SAWCIS as other.
[13] Ms. Mercer does not have an air card for laptop use in the field. In the morning from approximately 9:30 a.m. to 10:45 a.m. and 11:50 a.m. to 12:10 p.m. Ms. Mercer was making personal calls on her cell phone.

for and taken care of. He stated that his baby goes to the doctor. He has food, clothes and everything that he needs. He stated that his baby is well loved. [Father] denied any substance abuse, criminal activity, domestic violence, or mental health problems.

Agency sign-in records have no record of the father signing in to the office that day.  In an interview with the father, he stated to an OIG investigator that he never went to the DCFS Office.  When shown Ms. Mercer's Contact Note documenting their discussion Ms. Mercer stated that although the Note stated she met him in person at the agency office she was not sure that was correct: she may have put in the wrong date or it may have been a phone contact.  The father told OIG staff that he recalled receiving a call from someone at DCFS.  Ms. Mercer requested an oral LEADS report on the father and closed the investigation. The LEADS operator indicated there were no LEADS hits. Procedure 300, Section 300.50(g) requires investigators to request social security numbers or one form of photo identification from alleged perpetrators and adult household members in order to run a valid LEADS. Both the spelling of the father's first name and his birth date were incorrect for the LEADS.  The LEADS operator needs the correct spelling and birth date of the individual being run to ensure validity of the information.  LEADS operator supervisor stated that operators do not ask if the investigator asked for identification since they assume that procedures were correctly followed to verify the information. The father did have prior arrests, including three arrests for battery, one for domestic battery involving the mother, in October 2010.

**Date of Patrick's Return to Danielle George**
The date of Patrick's return to his mother's care could not be ascertained by reading Ms. Mercer's contact notes. Ms. Mercer told OIG investigators that she did not know when Patrick left his grandmother to live with his mother.  Ms. Mercer originally stated to OIG investigators that she felt Danielle had violated the safety plan because the family had moved Patrick back with his mother and had not told Ms. Mercer.  Ms. Mercer confirmed that she did not document her concerns nor did she tell her supervisor that Patrick had returned to his mother's care without her knowledge.  Ms. Mercer acknowledged that the safety plan, as written, was to expire in one week.  Although Ms. Mercer's safety plan lapsed, she failed to develop a new CERAP or safety plan for Patrick.  Ms. Mercer explained to OIG investigators that she thought that the grandmother would continue to care for Patrick.  All of Ms. Mercer's contact notes on the George investigation after his hospital discharge were created on the day she closed the investigation. Ms. Mercer documented that she "attempted to see the child victim" on two days, but there was no answer at the Parent/Guardian Home.

However in a second interview with Office of the Inspector General investigators, Ms. Mercer clarified that after giving it some thought since her safety plan never required supervised visits with the mother, the family's not meeting with her did not demonstrate malevolent intent, rather, it was an error on her part not to have specified that visits with the mother be supervised.

Ms. Mercer's SACWIS contact notes on the George investigation referenced an attempted phone call to Danielle but the number was disconnected.  Ms. Mercer also documented two attempts to see Patrick at his grandmother's home.  Ms. Mercer stated she did not call grandmother Alicia George after her failed attempts to reach Danielle because Ms. Mercer did not have her phone number.  However, the safety plan that Ms. Mercer developed stated the plan would be monitored by phone calls and in-person visits.

Ms. Mercer documented that she saw Norman Winston at Danielle's home.  Ms. Mercer stated to the OIG investigators that Mr. Winston was standing inside the house and Danielle was not at

home.  Ms. Mercer did not believe that he lived with Danielle but stated in her interview with the OIG investigators that she never asked him if he lived there nor did she ask him for Danielle's or Alicia's phone numbers.  Ms. Mercer did not recall asking Mr. Winston to have Alicia call her but believed she asked him to have Danielle call her.  At the time of the interview, Ms. Mercer had not seen Patrick in over a month.

Ms. Mercer met with Alicia George[14] who reported that she saw Patrick and his mother every day.[15]  In another note,[16] Ms. Mercer wrote that she observed Patrick at his home, asleep in his bed and his mother woke him from his nap. Ms. Mercer told OIG investigators that Patrick was wearing shorts and she had him lift up his shirt and she saw no marks.

**Violation of Paramour Policy**
According to Department Procedures 300, Section 300.60, the Investigation Specialist, as part of safety assessments, is required to establish in-person contact with adult members of the victims' household.   When a paramour is suspected of being a part of the family, the investigator is to assess the level of risk and safety and consider those factors in safety plan development or implementation. There should be weekly monitoring with involved children during the course of formal investigations (Procedures 300, Appendix H-Paramour Involved Families).  SCR had received the information that Ms. George had a boyfriend, named Norman, who lived with her.[17]

In July 2011, Belinda Mercer completed and signed a paramour assessment checklist for the George investigation, noting, *"No Paramour."* Ms. Mercer believes she did not review the CANTS narrative mentioning the boyfriend at the time she conducted her visit.  Six weeks later, Investigator Mercer documented that she "met mother's paramour, Mr. Norman Winston in the mother's home."  In January 2012, Ms. Mercer stated to OIG investigators that she did not ask Mr. Winston how long he and Ms. George had been in a relationship, but she did not believe he lived in the home because she did not see any signs of a man living in the home.

Ms. Mercer said she asked the grandmother if she had any concerns about Patrick and thought she would have indicated that the boyfriend was a problem if she had concerns about him.  Mr. Winston was listed as Danielle's emergency contact and as living at Danielle's address in Danielle George's jail custody forms (See arrest report information below). Ms. Mercer also stated she did not ask Alicia George who lived in her home[18] or her daughter's household, nor did she specifically ask the grandmother about the mother's paramour.  In a second interview with OIG investigators, Ms. Mercer stated she knew the grandfather, Michael George, lived in the home and she conducted a LEADS check on him.   According to a LEADS Operator supervisor, there was no request for a LEADS on Alicia or Michael George.

**Domestic Violence Screen**
Although Danielle and Alicia George reported to Ms. Mercer that Danielle had been arrested for her son's injuries, Ms. Mercer completed and signed a Domestic Violence screen, checking

---

[14] Location in contact note listed as "other."
[15] Ms. Mercer documented that the family was taking Patrick to the doctor that day for a school physical. According to the medical clinic Patrick was not seen on August 29 (See Medical Section).
[16] Location listed as Parent/Guardian home.
[17] Patrick's mother had initially told hospital emergency room staff that she lived alone, but later the doctor noted that Ms. George lived with her fiancé.
[18] In her first interview, Ms. Mercer told OIG investigators that she did not know that Alicia George's husband, Danielle's father, lived in Alicia's household.

"no" to all questions in the Significant Indicators section,[19] including "no" to the questions of third party reports of domestic violence; prior or current police involvement for domestic violence and an existing order of protection.   The supervisor noted the screen had been completed as part of his closing supervision note.

**Failure to Obtain Complete Hospital Records**

When allegations of head injuries or cuts, bruises, welts are investigated by child protection, the child protection worker is required to obtain medical records during the formal investigation (Procedures 300, Appendix B - Head Injuries, Appendix B - Cuts, Bruises, Welts, Abrasions and Oral Injuries).   Patrick's head injury allegation was added after his admission to the hospital's children's unit.   The ER records were in the child protection Attachments file. Patrick was in the ER for 3½ hours.   The children's hospital medical records were not in the child protection file, yet Patrick was on the children's unit for five days.   In an interview with OIG investigators, Ms. Mercer stated that she obtained hospital records but did not realize they were only the ER records and not the full inpatient hospital records.   Ms. Mercer could not recall who provided her with the ER records and pictures.[20] The child protection supervisor reviewed the non-SACWIS Attachments during an interview with OIG investigators and said he did not recall the ER records being in the file.

Patrick was discharged from the hospital with a diagnosis of physical abuse. The children's hospital medical staff completed several body charts and described Patrick's injuries in detail. Ms. George gave medical staff varying accounts of how the bruising occurred.  Ms. Mercer documented an attempt to phone the reporter, the ER charge nurse, but "in the ER stated she is unaware of the name."[21] OIG investigators interviewed the charge nurse, who stated that Ms. Mercer never spoke to her, nor was a message left for her to call Investigator Mercer.  The next day, Ms. Mercer spoke to a senior resident.  Ms. Mercer recorded that the doctor told her:

> Patrick is medically stable and may be ready for discharge. She stated that there
> was a bruise in the bone of the skull but no brain injury. She stated that it could
> have occurred as the result of a fall but there were multiple bruises that were
> not consistent with one event.[22]

When the TA supervisor assigned the George investigation to Ms. Mercer, he instructed Ms. Mercer to complete a body chart on Patrick; she did not.  ER nurses had taken six pictures of Patrick's injuries.   These pictures were in the investigative file.   Department Procedures 300, Appendix B requires investigators to complete body charts even if photographs were taken. Photographs may never be used as a substitute for completing a body chart.[23]

Several doctors handled Patrick's care during his five day hospitalization.  One doctor noted in the hospital record that Patrick had a large hematoma on the head, multiple bruises 1 cm-3 cm

---

[19] Significant indicators of domestic violence are the physical signs and/or verifiable reports to consider during the assessment.

[20] Health information staff at the hospital told OIG investigators they did not receive a request for the medical records for Patrick George prior to his death.

[21] OIG investigators spoke with the secretary for the day shift at the hospital ER who identified the charge nurse.

[22] The children's hospital's medical social worker reported to SCR that a DCP worker had called the charge nurse and was on the way to the hospital but never arrived.  She reported she had been trying to reach the DCP worker (Belinda Mercer) and her supervisor for two days.  The children's hospital records corroborate that Ms. Mercer called the hospital emergency room around 9:30 a.m. A nurse transferred Ms. Mercer's call to the charge nurse on the second floor.  According to the hospital social worker, Ms. Mercer talked to the senior resident saying she was coming to the hospital that day to see the child, but she did not arrive.

[23] Investigators are to complete CANTS 2A or 2B, Suspected Abuse Injury Note sheets.

encompassing his entire body and that the mother had admitted to hitting the child on the buttocks and grabbing the child's arm leaving bruising.  The doctor further noted that the mother admitted to the police that she hit the child resulting in the eye trauma and she was arrested. Another doctor, the admitting pediatrician, consistently described Patrick as an abused child in progress notes: "Patrick is a 3 yr. old male who suffered from physical abuse."[24]  The children's hospital social work staff held an interdisciplinary plan of care staffing on Patrick's case: "Head hematoma 2nd to abuse, DCFS took custody."[25]  The hospital's final discharge diagnosis for Patrick was physical abuse.

In an interview with OIG investigators, the pediatrician stated that she believed Patrick's injuries were from abuse and throughout her written patient documentation she used the hospital's abuse documentation forms.

Ms. Mercer stated to OIG investigators that she did not ask the pediatrician's professional opinion regarding whether or not Patrick had been abused, rather, she asked the doctor if she thought "the injury" could be accidental.  Ms. Mercer explained she did not have a dialogue with the doctor but believed the doctor said that the injuries were possibly the result of other "instances."  Ms. Mercer stated to OIG investigators that she understood that Patrick's injuries did not occur in one event and since the mother and grandmother stated that he was very active there was no way to say how these injuries occurred.[26]

**Primary Care Provider**
The children's hospital records indicate that Patrick's bruising had dissolved by the time of his discharge.  Investigator Mercer phoned the medical clinic to speak with Patrick's primary care physician. According to Ms. Mercer's notes, the pediatrician reported that the child victim was seen for a physical and that he was current on his immunizations.  There was no evidence of abuse or neglect at that time.  Alicia George brought him in and reported that there had been suspicion of abuse and she provided a copy of the discharge summary from the children's hospital that had a final diagnosis of child abuse.  Ms. Mercer did not ask the doctor if the child had birth marks that could be mistaken for the reported bruises, an explanation the mother had given the ER physicians; or if the child bruised easily or had presented with bruises before.  Ms. Mercer told OIG investigators that she asked the doctor if she had any concerns about abuse or neglect and believed the doctor would have told her if he had presented with suspicious injuries in the past.

Office of the Inspector General investigators subpoenaed Patrick's primary care medical records. There was no indication in Patrick's medical history that he bruised easily.  In the previous year, Patrick was seen in an emergency room for a 2cm scalp laceration caused by a fan blade hitting his head that required stitches, no other bruising or abrasions were seen.  Three months later, Patrick had a well child two-year-old exam at the medical clinic, no bruising was noted.  Patrick fell off of a slide causing leg pain and a limp and was taken to the medical center's Emergency Room.  There was no evidence of trauma: bruising, abrasion, or erythema.  There was no fracture and he ambulated without difficulty.  The diagnosis was muscle strain and pulled muscle.

---

[24] When he initially examined Patrick, the doctor noted the child had multiple echymosis, significant swelling of the left head and brow and he agreed with the resident that Patrick had signs of multiple traumas separated over time and anatomy, highly suspicious for abuse.
[25] DCFS did not actually take custody at this time; rather, a safety plan had been established.
[26] When Ms. Mercer testified at Circuit Court Child Protection Division, she reported that she asked the social worker and the doctor if the injuries were indicative of abuse.

The medical center's records noted the children's hospital called the medical clinic to set up an appointment for "an apparent child abuse case."  Patrick was scheduled for follow-up, but he was not brought in for the appointment.  The clinic's manager documented they had no phone number for Alicia George and that they understood that Danielle George was in custody.  The clinic notified the referring doctor at the children's hospital that the child was not brought in for his appointment.  Patrick was brought in by his grandmother.  She reported to the doctor that Patrick was seen in the ER after he had fallen, and was admitted and an investigation was initiated for possible abuse.  Alicia reported she was the "court appointed guardian."[27]  A well child exam was completed, and Patrick had no signs of abuse.

**Failure to Obtain Law Enforcement and Court Records**
*Legal/Court Involvement*
Local police detective[28] responded to the hotline referral and interviewed Ms. George at the hospital in the early morning.  The detective arrested Ms. George, who was charged with domestic battery – bodily harm,[29] and held in custody.  In the detective's arrest report, Norman Winston was listed as Danielle George's emergency contact; his address was the same as Danielle George's address.  According to the arrest report:

> While conducting a preliminary investigation for a Child Abuse Hotline at Hospital, in which Patrick George, M/1/3yrs old, was found to have a black eye, a swollen injury to his head and bruises about his entire body, the R/D interviewed Danielle George.  While being interviewed, GEORGE began to cry and stated "I punched him.  I have anger issues."  Danielle George was placed under arrest and transported to Area One Detective Division for further investigation.

> After being advised of Miranda Rights, GEORGE waived rights and stated she punched her son Patrick on the head once and on the face once because he would not stop crying.  GEORGE also stated she slaps her son with the back of her hand using her knuckles which led to the other bruising.

> Patrick George is admitted to the Children's Hospital.  A brain survey was completed and did not indicate any internal damage.  Other examinations were completed and no breaks, fractures or permanent disfigurements were located.

The same day Ms. Mercer was assigned to the investigation, Ms. Mercer learned that the mother had been arrested.  Patrick was still in the Children's Hospital.

Department Procedures 300, Appendix B requires investigators investigating reports of Head Injury to document and obtain evidence needed to support a finding:

> If police have conducted an investigation; the final finding must be obtained and documented. If the police report is not available, a case note must be included indicating the report has been requested along with documentation of verbal statements. The supervisor must review the police report when it is

---

[27] The grandmother agreed to care for Patrick as part of a safety plan but had not been appointed guardian through the court.
[28] The detective is from the Homicide, Gang, Sex (HGS) unit.  He works the midnight shift.
[29] 720 ILCS 5.0/12-3.2-A-1, Class A Misdemeanor.

received to ensure findings do not conflict with previously documented information received verbally.

Department Procedures 300, Appendix B requires investigators investigating reports of Cuts, Bruises, Welts, Abrasions and Oral Injuries:

If law enforcement has had contact with involved person of the current report, interview the involved officer by telephone or in person.

Patrick was discharged from the hospital. Medical and social work staff at the Children's Hospital knew his mother had been arrested. Ms. Mercer stated she was familiar with child protection staffings at hospitals but did not request one for the George investigation. In addition Procedures 300, Section 300.50 requires an investigator to initiate and convene a safety case conference with law enforcement before a child is discharged from a hospital: Ms. Mercer stated to Office of the Inspector General investigators that the hospital, not child protection, requests child protection staffings.

Investigator Mercer did not contact the arresting officer in this case, or request his arrest report. Ms. Mercer noted that she contacted the local police: "CPI spoke with Dr. (sic) ████████. He reported that there is no pending police investigation on this family." OIG investigators contacted the Detective.[30] He could not recall having a conversation with Ms. Mercer and told OIG investigators that if he did have contact with the investigator it was because he happened to answer the phone. The Detective referred OIG investigators to a Sergeant, "offense involving children coordinator" for the Special Victim's Unit.[31] The Sergeant explained that although the Special Victims Unit normally handles all domestic violence calls, because of staff shortages, there is only one unit that works the midnight shift, and those detectives respond to all calls that come in and need immediate attention. He further told OIG investigators that DCFS often calls their unit with inquiries and they keep a log to which they refer. This log is what the Detective (or any other detective answering the phone) would have referred to in response to an inquiry by a DCFS investigator. The Sergeant said that it is probable that the George case never made it into their log because the investigation was finished on the Detective's watch. The Detective closed the investigation in less than ten hours with an arrest and domestic battery charge. Even though the George case was not in the log, the Sergeant informed OIG investigators that his unit is capable of pulling up all arrest reports. If the investigator had inquired about the mother's arrest, the detective that answered the phone could have provided her with information and/or a copy of the arrest report.

The child protection supervisor told OIG investigators that they often contact the Special Victims Unit to get information, as most of the arrests involving battery to children or child endangerment get sent to the Special Victims Unit even if the report originated in another unit. The supervisor indicated he has obtained arrest reports with little difficulty. Ms. Mercer told OIG investigators that she asked the Detective if there was a pending investigation on the family, but she did not ask for an arrest report. She did not believe there was a detective assigned to this investigation; rather the arresting officer was a police officer, not a detective. She reported to OIG investigators that in the past it has been difficult to get police reports, but she did not ask the detective if there was an arrest report for Ms. George.

---

[30] The Detective is from the Special Victims Unit.
[31] Each of the five police areas has a Special Victims Unit and a coordinator.

*Domestic Violence Court*

The domestic battery charge was approved by the State's Attorney.[32]  On Sunday, following her arrest, Danielle George appeared at Criminal Court, for her bond hearing.[33]  Her bail was set at $50,000.  She posted the required 10% ($5,000) and was released with an Order of Special Condition of Bond that she was "*not to have contact with complaining witness or members of their immediate family or Patrick George.*"  The order remained in effect for 72 hours.[34]

Danielle George's criminal case was next heard two weeks later.  On that date, the Assistant State's Attorney petitioned the Court for an order of protection on behalf of the child victim, Patrick George, pursuant to the Illinois Domestic Violence Act.[35]  An order was entered prohibiting any *unlawful contact* with the protected person.[36]  Office of the Inspector General investigators learned that at the time of the George hearings, this courtroom was part of a pilot program involving an integrated computer system that allowed for all electronically entered orders to automatically transfer or link immediately to LEADS.  LEADS records include protective orders.

DCFS Legal informed OIG investigators that all DCP supervisors have computerized access to the County Clerk of the Court records and have been trained on how to use the system.  Both the supervisor and Ms. Mercer were aware of a supervisor's access to the Clerk of the Court records but thought it was only to be used for juvenile court screening purposes pursuant to Supreme Court Rule 902.  Supreme Court Rule 902 requires in part that an initial complaint or petition in a child custody hearing state whether the child involved is the subject of any other pending child custody proceeding in another division of the circuit court and whether any order affecting the custody or visitation of the child has been entered by the circuit court or any of its divisions.

The purpose of Rule 902 is to ensure that the trial court is aware of all custody proceedings and orders relating to the child who is before the court.  While Ms. Mercer and her supervisor never considered taking protective custody and screening Patrick's case into court, they were aware of the domestic violence charges and Ms. George's arrest.  There is nothing that prohibits supervisors from accessing the system for other reasons such as checking to see if there are any active orders of protection.  The DCP Manager confirmed to OIG investigators that the supervisors have access to the Clerk of the Court information but believed that it would only provide the court number of the branch and not the name of the state's attorney assigned to the case.  The manager reported there is no formal system for assisting investigators with these issues but she would help if she could or they would use DCFS Legal for assistance.  She reported that she did not know if the state's attorney is a required contact when there is a

---

[32] Since Ms. George had been criminally charged with battery of Patrick, the investigator was required to contact the State's Attorney's Office before closing the investigation (See False Testimony Section).

[33] Most people arrested on misdemeanor offenses are allowed to bond out at the station.  However, Supreme Court Rule 528 requires that bond for violation of order of protection and domestic battery is set by a judge.  In this County, weekend bond hearings are all heard at one location.  During the week, bond hearings for misdemeanor charges of domestic violence are heard at another location.

[34] According to statute (725 ILCS 5/110-10, Conditions of bail bond), when a person is charged with a criminal offense and the victim is a family or household member, certain conditions shall be imposed at the time of the defendant's release on bond that restrict the defendant's access to the victim.  It is standard to require that the defendant refrain from contact or communication with the victim for a minimum period of 72 hours following the defendant's release.  If bond is set by a judge, the amount of time that these conditions will be in effect is discretionary and thus can be more or less than 72 hours.

[35] 750 ILCS 60/101 *et seq.*

[36] The order was in effect until the next court date.  Subsequent orders, prohibiting any unlawful contact, were entered at the court dates.  Orders of protection are entered by a clerk into the Clerk of the Court's system, generally within 24 hours.  Ms. Mercer could not recall if the LEADS operator informed her of the orders of protection.

criminal battery charge with a child victim, believing there may be some confusion as to whether it is the state's attorney in juvenile court or the state's attorney in criminal court.

After three months of continuances where protective orders were issued, Danielle George appeared in court on charges of domestic battery-bodily harm in violation of 720 ILCS 5/12-3.2-A-1.  The case was set for a bench trial and for a motion by the defendant to suppress statements.  The Assistant State's Attorney, the lead attorney in this Branch, answered ready on the motion but not for trial, as she had not yet received subpoenaed records from the Department.  The Judge denied her request for a continuance because the case had been on the call for three months.  Ms. George was found guilty of domestic battery and was sentenced to one year conditional discharge.  A two year order of protection was entered prohibiting any unlawful contact with Patrick.  Other special conditions of Ms. George's probation included completing a mental health evaluation, anger management classes, and parenting classes, as directed by the Social Service Department.

OIG investigators met with this ASA and her supervisor.  They told OIG investigators that receiving subpoenaed documents from the Department in a timely manner is problematic.  The ASA reported that in this one courtroom alone, they get approximately four to five domestic violence cases involving children per month and they never see DCFS.  She also reported that she did not talk with anyone from the Department on the George case.  The supervisor agreed to be a contact person for the Department.

**Misleading entries in contact and case notes**
*Documenting an order of protection*
The day Ms. Mercer and her supervisor closed the George investigation unfounding the abuse allegations and indicating for the neglect allegation of inadequate supervision, Ms. Mercer documented that LEADS indicated Danielle George had one domestic battery charge, no disposition.  Ms. Mercer failed to record that defendant Danielle George had an active order of protection.  Rather than follow the protocol of requesting a LEADS through the SACWIS system, Ms. Mercer requested a verbal LEADS report from SCR.  If a request for LEADS is made to SCR through the SACWIS system, the LEADS operator enters the LEADS information in the SACWIS criminal tab of the Person Management screen.  This information includes arrests, charges and any orders of protection.  If a verbal request is made to the SCR LEADS operator then the entry into the record is made by the person requesting the verbal information.  In this case, Ms. Mercer made the verbal request and had the responsibility to correctly enter the information.  The SCR supervisor stated that the LEADS operator always informs the caller if there is an order of protection.  Danielle George was under a Plenary Order of Protection.  The Order of Protection had replaced a previous Order and was in effect for one month.  In an interview with OIG investigators, Ms. Mercer stated the operator "probably" told her about a protective order but she could not remember.  Because of the integrated system in the courtroom, all his orders of protection were electronically entered at the time of the hearing.

**False Testimony**
Ms. Mercer created a contact note which was coded "State's Attorney" in which she documented:

> CPI spoke with ███████████.  She stated that there is no disposition on the case.  She stated that she has been charged with misdemeanor battery.

When an investigation involves a head injury allegation the investigator is required to contact the State's Attorney before closing the investigation.  SACWIS will automatically populate the

checklist with the required contacts, necessitating a waiver if the contact is not made.  Ms. Mercer's entry identifying the State's Attorney contact fulfilled the automated prompt for a contact, thus no waiver was required.  In January 2012, OIG investigators interviewed Ms. Mercer and informed her that the County State's Attorney's Office has no employee by that name.  Ms. Mercer explained to OIG investigators that she was working with an adult probation officer, on another investigation so she asked her if she could look up the case for her.  Ms. Mercer stated she understood the term "no disposition" to mean there was no other information available.  Ms. Mercer said she did not ask about the next court date, for the name of the State's Attorney prosecuting the case or the name of the arresting officer.  OIG investigators located an adult probation officer with the name given by Ms. Mercer.[37]

After the OIG interview, Ms. Mercer testified at the Circuit Court of County Child Protection Division.[38]  According to the court transcript on recross-examination by the attorney for legal guardians of the other George children, Michael and Alicia George, Ms. Mercer testified to the following:

ATTORNEY:   Thank you, Judge.

RECROSS-EXAMINATION

Q       You closed the case [date]; is that right?  -- of 2011?
A       Case was closed.  Yes.
Q       And on that very date, though, you had spoken to a State's Attorney who told you that the Criminal case was still pending; true?
A       That it was pending. Yes.
Q       So, you knew it hadn't been resolved?
A       Okay.
Q       True?
A       yes.
Q       Nevertheless, you felt comfortable, that you and the Department felt department (sic) with closing the case because the State's Attorney was certainly aware of what was going on and that they could file a petition in this building if they chose to; correct?
ASA:       Objection as to what the State's Attorney was aware of.  Objection as to her basis of knowledge.
ATTORNEY:
Q       Did the State's Attorney tell you that the case was still pending over in domestic violence court?
A       Yes.
ATTORNEY:   Judge, I think it's pretty logical that the State's Attorney is aware that the case is pending as they told her it was pending.
THE COURT:   Might as well keep going. You guys obviously don't need me.

After his questioning about Ms. Mercer's contact with the State's Attorney, the attorney for the legal guardians of the other children proceeded to ask Ms. Mercer about the safety plan.  The Inspector General is referring the perjury allegation to the state's attorney.  The Inspector

---

[37] However, this attorney told an OIG investigator that she had no recollection of any conversation with Ms. Mercer about this case and that she only talks to DCFS if it is regarding a matter on her caseload.
[38] OIG investigators received the court transcripts.

General and DCFS Legal are working to ensure that the Juvenile Court is made aware of the corrected facts of this case.

**Failure to Indicate for Abuse: Closing Rationale and Credibility of Evidence**
Ms. Mercer's closing rationale for unfounding the abuse report declared:

> There was insufficient evidence that the injury was caused by corporal punishment. Child presented to the hospital as a result of a fall. Physician reported that it is conceivable that the injury could have occurred as the result of a fall. The family reports that the child victim fell.

Procedures 300, Section 300.60(m) directs the investigator:

> For purposes of making child abuse and neglect investigation decisions the "credibility of evidence" means the likelihood that the information is accurate….The Investigation Specialist and supervisor must assess the value and relevancy of case information to determine which information will be used as evidence, and which evidence is more or less credible.

Factors affecting the credibility of evidence include: corroborating evidence, the source of the information and direct interest. Investigators are warned:

> Information from a source who has something to lose or gain from a particular investigative outcome is less credible than information from one who has no direct interest in providing an account that may not be accurate….It should not be surprising that adults named as alleged perpetrators of abuse or neglect would want to present themselves in the best possible light during the investigation. Self reports concerning possible CA/N risk indicators such as use of alcohol/drugs; the extent to which they use corporal punishment/instruments in disciplining their children; their involvement in a domestic violence relationship; or the extent and nature of a relationship with a paramour/convicted sexual offender may be denied or minimized by the alleged perpetrators during interviews….*It is imperative that the Investigation Specialist seeks objective corroboration of these self-reports.* Family members and extended family members may even be consistent in denying or minimizing possible CA/N risk indicators (e.g., subject family and extended family members may be substance abusers). The Investigation Specialist must seek out additional collaterals to verify self-reports and consider information developed through personal observation, reports from professionals, or required interviews that will establish the accuracy of self-reports. While information provided by potential perpetrators may be accurate, it must be considered carefully since there is always motivation to present information that will lead to unfounding. *There is no substitute for independent verification of this sort of information. (Emphasis added).*

A critical part of the investigative process in child injury investigations is weighing the credibility of the various explanations for the child's injuries. Ms. George had made various statements to medical, police, and child protection personnel explaining the causes for the multiple injuries on Patrick. The various explanations were documented in the initial call to the hotline, hospital emergency room records, Children's Hospital inpatient records, the arrest report and child protection notes. Ms. Mercer stated her conclusion that the injuries were not

abuse was based on her interactions with and interviews of the family.  Several of Ms. Mercer's entries document her knowledge that police had determined that there was sufficient evidence of abuse to criminally charge Ms. George.  In addition, any attempt to interview hospital personnel or view complete hospital records would have disclosed the discharge diagnosis of abuse.

Among Ms. Mercer's list of evidence to unfound the allegations of cuts, bruises, welts, and head injury were: "family reported child is very active and investigator observed the very active child;" "physician reported that it is 'conceivable' that the injury could have occurred as a result of a fall and family reports the child fell;" "child has a primary care physician; no documentation of concerns of abuse or neglect."  Ms. Mercer had a conversation with Danielle George at her mother's home and informed Danielle that the case would be indicated for lack of supervision (Neglect).[39]  Investigator Mercer completed a safety assessment at the conclusion of the formal investigation noting that Patrick was safe.

Danielle George's varying explanations were contained in the ER record, the Children's Hospital record, the police arrest report, SCR reports and child protection interviews.  Ms. Mercer never conducted the required scene investigation and made a judgment on Danielle's credibility without obtaining the police arrest report and Domestic Violence court documents.

**Supervision**
Child protection supervisor told OIG investigators that he recalled little about the George investigation, but he and Ms. Mercer made the decision to unfound the abuse allegations because they lacked any clear-cut evidence of abuse.[40]  According to the supervisor, Ms. Mercer told him she had spoken with the doctor who said that the head injury could have happened the way the mother said.  In addition, the primary care physician did not voice any concerns, the mother and grandmother said Patrick was a very active child and the older siblings denied abuse.  In reviewing the note documenting Ms. Mercer's conversation with the pediatrician, the supervisor pointed out that it did not indicate the doctor said the injuries were abusive or accidental, just that the injuries were inconsistent with one event.  However, the supervisor conceded that the injuries described, bruises on thighs, behind his ears and back, are more typical of abusive injuries than neglectful injuries.  The supervisor said he did not consider this investigation to be an unusual one, except for the head injury allegation, in that his team often investigates children with bruises and bug bites in various stages of healing.  He conceded that a doctor would likely be able to tell the difference between bug bites and bruises and medical staff did not describe bug bites.

The supervisor did not recall reviewing any supportive or supplemental documentation as part of the investigation.  The supervisor reported that he did not review the hospital records attached to the investigation because, as he recalled, they were not part of the investigative file he reviewed. He thought perhaps the photographs which had been taken at the hospital were part of the file, but he was uncertain and could not remember seeing them.  He reported that generally he would want to obtain hospital records if a child had been hospitalized during an investigation, or at least the discharge summary.[41]  He pointed out that Ms. Mercer's notes indicated Patrick was being kept for safety reasons though he was unaware of what those were. The doctor also told the investigator that Patrick did not have broken bones and was okay.  The

---

[39] Ms. Mercer noted on the same day in a Domestic Violence Screen closing summary: "Mother was arrested for misdemeanor domestic battery when her son was injured."
[40] The supervisor was on vacation for six days in July and nine days in August while this case was pending.
[41] The discharge summary's final diagnosis was child abuse.

supervisor said he also did not remember if Ms. Mercer told him the mother had been arrested, but in reviewing the investigation he noted that she had spoken with a police officer who said there was no pending report which he believed meant there was no case.  The supervisor said not obtaining a police report with a pending domestic battery charge, as confirmed by a LEADS check, was an oversight on both his and the investigator's part.

The supervisor noted other oversights in the investigation, including lack of investigative procedures and not seeking further information.  The supervisor said he believed they discussed the investigation when he came back from vacation but could not recall any specifics. He reflected that a scene investigation should have been done.  In addition to not reading the hospital records or seeing the photographs, a body chart was not done, or obtained by the investigator.  From the hospital Patrick went to stay with the grandmother, which the supervisor noted was part of a safety plan despite no CERAP being done. He recalled that there would be an unsafe CERAP by the mandate worker necessitated by a hospitalization, but another should have been done when Patrick left the hospital.  The supervisor also indicated that Ms. Mercer did not adequately seek out information about the criminal charges, and did not ask about an order of protection which is usually entered in cases with domestic battery.  The supervisor said he could not recall cases where the parents were arrested and thought about orders of protection in terms of violence between adults. He reported that in the past they have gotten copies of the orders from the parents themselves, usually from the parent that filed for an order of protection against someone else.

Despite having resources at his disposal, the supervisor did not utilize them. A head injury allegation, added hours after the first hotline, made this a priority one allegation, an investigation not usually covered by his team. Though he noted he could have sought consultation from priority one supervisor or from a manager, the supervisor confirmed that he did not ask for any consultation on this case.  The supervisor reported that generally a head injury case is one where he should have sought managerial approval. SACWIS does not automatically prompt a manager to sign off on a head injury of a child three and under but it is practice to seek the approval.  The supervisor stated he does not know why he did not bring the case to the attention of the manager.  The supervisor noted that Ms. Mercer only had two cases with safety plans in place at the time of the investigation, the George case and a case whose safety plan was being monitored by the intact worker and involved a burn on the infant.[42]  The infant's case was being reviewed for a medical opinion on the burn. Though the medical specialist also reviews head injury cases, the supervisor said he did not think about using the medical specialist here as he does not usually receive cases with head injuries. Despite this then being an outlier, the supervisor said he did not pay any special attention to the case.

In addition to Child Protection foundations trainings the supervisor and Ms. Mercer both attended training specifically on investigating cuts, bruises, welts in 2008. The training included information on conducting scene investigations, recognizing injuries suspicious for abuse and effective communication with medical professionals. In May 2011 the supervisor's manager instructed the supervisor to discuss with his team a recent quality assurance follow-up on the

---

[42] Ms. Mercer conducted two investigations on a family in the same month she had been assigned 21 investigations. The mother of this family was a mother of 13 children; her eight-month-old infant suffered a severe burn; a Subsequent Oral Report [SOR], sequence L came in on the family regarding cuts, bruises, welts for the two and three-year-old siblings.  The eight-month-old infant was transferred to the Hospital where medical specialists was consulted. The family had an active intact services case before and after the burn allegation. The intact worker helped develop an out of home safety plan which she monitored on a weekly basis. Ms. Mercer's duties included working with the State's Attorney to screen the case into court.

sub-region's investigations on cuts, welts and bruises. The supervisor failed to discuss the findings with his team.

**Managerial Oversight**

On a weekly basis Quality Assurance electronically distributes 15 reports to child protection managers.[43] Six of the generated reports alert the manager of high risk allegations/situations that have been assigned to their teams. The six reports include SEI Reports, new serious reports with an alleged child victim under seven, SOR reports, pending investigations with an unsafe safety indication, allegations of bone fractures and protective custodies with no CYCIS Id. Because of the holiday weekend, the child protection manager received the first weekly report mid-month. Twenty high risk reports on children under seven were assigned to the manager's teams during this period.[44]  Three-year-old Patrick George's report for head injury and cuts, bruises, welts was included in the weekly report for serious injury for a child under seven. In addition to Patrick's allegations, the report included three burn allegations, and one bone fracture allegation. The remaining 15 serious injuries were risk of harm allegations. The manager also received a weekly report detailing that two of the 20 investigations had an unsafe CERAP, one of which was the Patrick George investigation.  Two of the serious injury reports, Patrick's and a one-year-old (allegation cuts, bruises, welts) were assigned to Ms. Mercer. At the time of these assignments, Ms. Mercer was above B.H. investigative caseload levels and her supervisor was on vacation.

Despite the two alerts on a head injury and cuts, bruises, welts allegation and an unsafe CERAP on a three-year-old, there was no managerial oversight of Patrick's investigation for the 60 days the investigation was open. Ms. Gaines communicated by emails with Ms. Mercer with questions about another Priority One investigation with a burn allegation. The case had not passed screening, and during July the manager was regularly e-mailing Ms. Mercer about her progress with the state's attorney.  The only other managerial oversight on Ms. Mercer's investigations were e-mail requests by the manager for Ms. Mercer to have a Differential Response (D-R) control group family complete a D-R survey. D-R investigations are lower risk investigations (neglect); serious injury to younger children allegations are considered high risk investigations. The manager's email correspondence was silent on Patrick's investigation.

Presently, the SAWCIS electronic notification for managerial approval for the closing of an investigation operates only for facility and death investigations. In those situations, the supervisor cannot electronically close the investigation without managerial approval. Managers are, however, expected to approve serious injury investigations for closure. The manager stated in an interview with OIG investigators that she expects her supervisors to seek her approval when closing investigations of serious injuries to young children. E-mail records show that the supervisor of the Priority One team routinely communicated with the manager for approval to close the team's high risk investigations. The supervisor never sent a request for approval for Patrick's investigation. The investigation was closed despite its investigative failures.

Two months before Patrick's investigation was assigned to this team, the Regional Administrator issued a directive for each supervisor to review with their teams the cuts, bruises, welts error reduction quality assurance reviews for the Region.  The Regional Administrator requested verification that the teams had met to discuss the reviews and address the findings,

---

[43] These reports contain information for the whole region requiring the manager to sort through each report for targeted information on each of her assigned teams.
[44] The report includes the name of the assigned investigator.

which included the requirements of completing body charts, communicating effectively with doctors and obtaining medical and law enforcement records.

*Falsification of Records in Another Child Protection Investigation*
During the month, Ms. Mercer had two investigations where the parent faced criminal charges related to child protection, the George investigation and another investigation.  Ms. Mercer was assigned the second investigation mid-month, ten days after being assigned the George investigation. The mother was arrested and charged with child endangerment of her two-year-old son. He had been found wandering the sidewalks without shoes at 6 p.m.  The mother went to the police station two hours after the child was in the police's care. The case was heard at domestic violence court. Ms. Mercer kept the investigation open until the criminal case was resolved and documented that she attended the mother's hearing at domestic violence court. Ms. Mercer described in her contact notes her 10:40 a.m. attendance at Domestic Violence Court:

> CPI went to domestic relations court at ███████.  Mother was arrested and charged with 1 count of child endangerment. Mother explained the circumstances of the case. Her mother was also present. After hearing the testimony, the judge dismissed the case against the mother.

Similar to the George investigative file, the second child protection investigative file contained no police reports or court documents. According to the Circuit Court file, no testimony was given; the complaining witness was not in court and the child endangerment charge was stricken with leave to reinstate. OIG investigators asked Ms. Mercer when she went to the court hearing on the case if she talked to the state's attorney or public defender to inform them that a DCFS representative was in the court. Ms. Mercer explained that she went to court because she had had difficulty seeing the mother who lived out of state. Ms. Mercer stated she never spoke with the state's attorney or the arresting officer.

Ms. Mercer was given her contact notes to review. After reviewing her note about the court hearing, Ms. Mercer stated she "messed up."  Ms. Mercer explained that she went to court but arrived after the case had been called.  She believed she asked the clerk in the court room about the case and was informed that the case had been dismissed. Ms. Mercer stated that she could not explain why she wrote in the child protection file that there was a hearing and that the judge heard testimony.  Ms. Mercer stated that the family had given her details on the court case. Ms. Mercer documented that she saw the children that same day and unfounded the investigation that day.

**Cuts, Bruises, Welts Investigations Active on Ms. Mercer's Caseload in July and August 2011**
Office of the Inspector General investigators reviewed Ms. Mercer's investigative work, including pending investigations, for the period the Patrick George investigation was open and assigned to her.   In addition to the Patrick George investigation, Ms. Mercer had 14 investigations with an allegation #11 (cuts, bruises, welts, abrasions and oral injuries).  The children involved in 13 of the investigations are discussed below. (See footnote 43 for discussion of the 14th case.)

*Failure to Interview Children Ten and Younger at School*
In three of the 13 investigations, Ms. Mercer documented seeing the child victims (ages 6, 13, and 16) the same day she was assigned the investigation.  In 9 of the investigations, three of the

children were seen after one week, one after two and a half weeks, one after six weeks, and four after 8 weeks after Ms. Mercer was assigned to the investigation.[45]

The four alleged child victims that Ms. Mercer did not see for at least eight weeks were a seven-year-old, two ten-year-olds, and a 16-year-old.[46]  Both of the ten-year-olds and seven-year-old were enrolled in and attending local public schools during the first three to four weeks of Ms. Mercer's investigations; however, she did not attempt to interview the children at school.  These investigations are detailed below.

*Investigation # 1*

A domestic violence court state's attorney reported that a seven-year-old boy was injured in a domestic violence incident at his home.  The state's attorney obtained an order of protection for the boy.  Ms. Mercer was assigned the case, but did not see the child for two months.  The child attends school; the school year began August 8, 2011 with its fall break from September 30 to October 14.  There were 33 school days from the time the investigation was initiated until Ms. Mercer saw the child. Ms. Mercer documented a phone call to the school in October.  Ms. Mercer did not interview the reporter/states attorney. The investigation was unfounded.

*Investigation #2*

In this investigation, the hotline was called to report that the mother had beaten her ten-year-old son, leaving bruises on his back.  The mandate worker learned and documented that the child attended elementary school.  Ms. Mercer was assigned the investigation.  Ms. Mercer made her first investigative contacts.  Ms. Mercer had been assigned 21 investigations. According to SAWCIS contact notes, Ms. Mercer spoke to the hotline reporter and unsuccessfully attempted to see the victim at home three times.  Ms. Mercer did not see the ten-year-old until eight and a half weeks after the abuse report. OIG investigators spoke with the principal of the school who stated that the school was in session with students and teachers were at school. Ms. Mercer had missed opportunities to see the child during the three weeks school was in session. The principal explained that the child had been at school from September 2006 through September 2009 when he transferred to a school in another state.[47]  He returned to the original elementary school in March 2010.

Ms. Mercer closed the investigation a day after she interviewed the child and his mother. The mother admitted to Ms. Mercer that she had "spanked" her son with a belt. Ms. Mercer noted that she did not see any marks on the boy when she interviewed him more than eight weeks after the hotline call. Ms. Mercer noted that the police detective who reportedly interviewed the boy did not see any marks. Ms. Mercer did not give a date when the detective interviewed the child. Ms. Mercer unfounded and closed the investigation.

Three months after Ms. Mercer unfounded the investigation,[48] a school social worker called the hotline to report that the child stated he wanted to hurt himself because he was "getting beat all

---

[45] One of the investigations involved an 11-year-old "unknown" victim with bruising to her face; neither the child nor family was located during the investigation.

[46] When Ms. Mercer interviewed the 16-year-old, he informed her that he attended High School; the school was on summer break during the investigation.

[47] The OIG investigator contacted Indiana child welfare, discovered the family had been investigated for child abuse/neglect, and obtained a copy of the investigation. The report documented that the mother had a boyfriend with an extensive LEADS history: 19 arrests including one domestic violence arrest for choking the mother in 2006, and five drug convictions.  The boyfriend was paroled to the mother in December 2009.  The mother admitted to Indiana child welfare workers that she used marijuana on a frequent basis and was indicated in Indiana for substance misuse (marijuana).

[48] The child had transferred to a new school.

the time by his mom and boyfriend."  OIG investigators forwarded Indiana's child protection report to the DCP investigator. The mother was indicated for cuts, bruises, welts to the child.

*Investigation # 3*

The hotline was called to report that a ten-year-old girl came to school with a bloody nose and told the school counselor that her adoptive father (biological uncle) had hit her in the face.  The girl's brother reported to the counselor that his sister was hit because she could not find the tie that went with her school uniform. SCR listed an adoption worker. Ms. Mercer was assigned the investigation on the same day. The elementary school was in session for students**.**  Ms. Mercer made no attempt to see the child at school, documenting four failed attempts to see the child at home. The documentation for the failed visits was all the same: "CPI attempted to see child victim at home. There was no answer."  The times of the documented attempts varied from 8 a.m. to 7 p.m.  Ms. Mercer had a fifth failed attempt to see the child at home.  Eight weeks after the alleged injury, Ms. Mercer saw the child and noted no injuries, documenting that the child stated that her father bumped her and "she does not believe he intentionally hit her to make her nose bleed."

During the course of the two months the investigation was opened, Ms. Mercer phoned the school three times.  Once at 3 p.m. there was no answer.  During the summer, the school clerk informed Ms. Mercer that the girl was not in summer school and she was familiar with the family and "reported no concerns."   Again during the summer, there was no answer.  Ms. Mercer unfounded the investigation without speaking to the reporter or the adoption worker.

**Investigative Caseload**

In FY2011 Belinda Mercer was assigned 173 investigations, the most of any investigator in the region. Ms. Mercer went over B.H. levels for the 2011 calendar year in March 2011, when she was assigned 21 investigations. In April she was assigned 10 investigations. During April, one of three team members on Ms. Mercer's team, went on medical leave. When he returned to work in June 2011, he was assigned 21 pending investigations including older investigations and backlogs.  Pending investigations, even if assigned as a block of investigations, are not counted as part of assigned investigations in the B. H. child protection caseload calculations. Thus, this investigator's investigative caseload was not considered above B.H. in June.  In May, Ms. Mercer was again assigned 21 new investigations.  In June, Ms. Mercer was assigned 14 investigations and in the month the George investigation was assigned to her she was assigned 8 investigations and had 19 investigations pending from her previous assignments. Ms. Mercer stated to OIG investigators that she was overwhelmed, inundated with cases with no help in sight. She explained she never complained nor did she ever ask for help. During FY2011, Ms. Mercer had a 9.2 % indication rate; the county's indication rate for FY2011 was 19.9 %.  By July, 2011, 14 of the 15 investigative teams in the county were above the B.H. standard (50% or higher of the team over B.H.) with eight teams having 100% of investigators above the B.H. standard. Six months remained in the calendar year with these teams already overwhelmed. This county's other region also had high investigative caseloads with nine investigators assigned over 170 investigations in FY2011 and all nine of the investigative teams with caseloads above the B. H. standard, five teams having 100% of the investigators over the B.H. Standard.

Management's pressing for the closing of pending investigations without addressing the deleterious reality of high investigative caseloads is an ineffective remedy, a futile and proverbial putting a finger in the dike without dealing with the flooding water. When the investigation came in the Differential Response [D-R] Pilot Project's detailed workers were only receiving between one and three new cases each month.  During this period of high

investigative caseloads managerial emails prompted supervisors and investigators to attend to turning in D-R survey reports and created an unintended consequence of less attention going to serious injuries of children under seven.   Management needs to address the inequality of workload of delegated D-R assessors and workload of investigators, D-R was not meant to have a higher management priority over child protection investigation.

**Time spent in the Field**
Ms. Mercer stated to OIG investigators that her time sheets accurately recorded her time in the field. Her supervisor concurred that Ms. Mercer's time sheets accurately reflect time she spent in the office and the field. According to Ms. Mercer's daily time sheets for a three week period, Ms. Mercer reported being in the field for a total of 11-½ hours.[49]   In August Ms. Mercer reported being in the field 27-½ hours. Ms. Mercer closed one pending investigation during July.

**ANALYSIS**

In addition to being a violation of a federal consent decree, high investigative caseloads create an error prone child protection environment. Still, professions and professionals are held accountable for their errors; both the system and the individuals have to have enough introspection to not repeat errors. This expectation of accountability holds especially true for those who are to protect children. Patrick was protected by medical professionals who, in their professional judgment, diagnosed Patrick as being physically abused. Dr. Washington's verbal report to the hotline presented a clear textbook description of child abuse and her reiteration to the overnight investigator created an almost perfect prima facie case of child abuse. Paddington's hospital records were replete with descriptions of Patrick's injuries. The hospital's photographs and body charts clearly depicted numerous injuries that could never be explained away by an overactive child. Any reasonable person would have been extremely concerned for the safety of the three-year-old child. Within six hours of Patrick's hospital admission, his mother admitted that his injuries were not accidental. A high investigative caseload cannot be the excuse for the failures in this investigation.

Ms. Mercer failed to discharge basic investigative duties never assessing each injury, mischaracterizing the doctors' statements, demonstrating poor judgment in determining that Patrick was safe and not following the CERAP protocol by failing to do safety assessments. She failed to specify any restrictions on the mother's contact with Patrick in her safety plan (which she did not then include in the attachments).   Ms. Mercer falsified obtaining supervisory approval for the new written safety plan.  The TA supervisor was more credible in his statement that he never gave Ms. Mercer verbal approval for the safety plan as the statement is supported by phone records.  She failed to conduct a scene investigation, a gross oversight considering the changing explanations for the injury.   The information necessary for an abuse finding was readily retrievable within five days of Patrick's hospitalization: an arrest report with statements by the mother, a criminal charge, a domestic violence protective order, the medical opinion of the ER Senior Resident, extensive medical records with a discharge diagnosis of abuse, and the suspicions called in that the mother had been untruthful about a live-in paramour.  She failed to obtain the law enforcement and court records, and did not record an active order of protection in the SACWIS file in violation of Department Procedures 300, Appendix B (c and g) and Section 300.50.

---

[49] According to Ms. Mercer's July time sheets, Ms. Mercer spent 92% of her time in her office during the month. She worked away from the office in the field for 11½  (9%) of her 127.5 hours.

Overextended workers will make errors; such human errors are a by product of a stressed environment. However, while under oath, Ms. Mercer provided false testimony at the Circuit Court hearing. Three weeks before she testified, Ms. Mercer was confronted with the fact that she never talked with the Office of the State's Attorney and Ms. Mercer confirmed during the Office of Inspector General's interview that she had not spoken with the State's Attorney's office. Ms. Mercer's actions appear deliberate.

*Supervision*
Ms. Mercer's supervisor relied on Ms. Mercer to provide him with information about the investigation, never reading the file or requesting more records. He never questioned the investigator on any of her conclusions. He admits to several deficiencies in the case: lack of investigative contacts, lack of a scene investigation and lack of a body chart. He could provide no explanation for these shortcomings or say why he did not correct them. The fact that this was a three-year-old with a head injury should have alerted the supervisor of the need to pay special attention to this case, but it did not raise a red flag for him. Although consultation was available from both the priority one supervisor and/or his manager, the supervisor did not seek their assistance.

Despite information on cuts, bruises, welts investigations being provided to him by his administrator with directions to address cuts, bruises, welts investigations with his team, the supervisor ignored these instructions. He never had case discussions with his investigators on reducing errors in cuts, bruises, and welts investigations. When asked for documentation of his supervisory discussions he failed to provide relevant documentation.

*Managerial Oversight*
Although the Child Protection Manager received a weekly report detailing what Priority One allegations for children under seven had been assigned to her teams, in addition to weekly reports detailing which investigations needed safety plans, there was no managerial oversight on Patrick's investigation. Despite the supervisor not bringing the George investigation to her attention for approval prior to closing, she took no initiative to review a case of a head injury to a three-year-old assigned to a non-priority one team.

The manager allowed the supervisor to fly under the radar. When he did not respond to administrative and managerial instruction on cuts, bruises, welts investigations, she did not follow-up. She relies on proactive supervisors to bring cases to her for approval allowing for the supervisor to continue with subpar supervision of serious physical injury cases.

Management activities appear to be fueled more by the need to close out cases than by a need to ensure that investigations are being completed appropriately. Though the manager receives weekly reports listing serious injury cases to children under the age of seven there was no proactive involvement on this head injury case involving a three-year-old. When shown a copy of the children's hospital body chart, the manager acknowledged the extent of the injuries to Patrick.

*Systems Failures*
Victims of child abuse and neglect need protection from further harm. Often several systems (e.g. child protection agencies, law enforcement, and courts) are involved and all play critical roles in child abuse and neglect cases. No one system can work effectively by itself. When more than one system is involved, intervening effectively cannot be the sole responsibility of

any single agency and communication and the sharing of information between agencies is of paramount importance.

In this case, DCFS' Division of Child Protection and the local police both responded to the initial hotline call.  Based on the mother's admission, the Detective arrested Ms. George; she was charged with domestic battery; and the police investigation was closed.  The domestic battery charge was approved by the State's Attorney's office and a criminal case was pending.  The Department determined not to indicate for abuse before the criminal case went to trial.  Ms. Mercer failed to request arrest reports and made superficial inquiries regarding police and court involvement.  The lack of coordination and communication with law enforcement was a contributing factor to the system's failure to protect Patrick.

When law enforcement is investigating the same incident as the one involved in the child protection investigation, the need to coordinate with law enforcement is critical.  The child protection field has to understand that superficial contacts designed only to check off a contact put children at risk.  The Police Department's Special Victim's Coordinators and the supervising State's Attorney for this area have agreed to and are willing to work with the Department to make the exchange/gathering of information easier between the agencies.


**RECOMMENDATIONS**

1. *This recommendation addresses personnel issues.*

2. *This recommendation addresses personnel issues.*

3. *This recommendation addresses personnel issues.*

4. The Department must address and remedy its continuing violation of BH consent decree standards for the number of investigations assigned to child protection investigators.

5. Child protection must hold a case conference with the criminal state's attorney when a child who is the subject of a child protection investigation is also the victim in a criminal proceeding involving the same incident.

6.  DCFS Regional Managers in this area need to develop a system of quarterly meetings with each of their corresponding Police Department's Child Abuse Coordinators to facilitate communication, coordination and timely retrieval of relevant information, including arrest reports.

7. SACWIS currently only automatically prompts management approval for death and facility reports. The automatic prompt for management approval should include allegations of burns, head injuries, internal injuries and children under six with allegations of cuts, bruises, welts, abrasions and oral injuries.

8. Given the violation of the BH consent decree, the Department should evaluate whether there can be valid research comparisons between the investigative control group and the differential response experimental group.

9. After discipline is imposed this investigation should be redacted and distributed among child protection staff.  Managers should review this investigation with supervisors and investigators similar to a Grand Rounds case study.

**- END OF REPORT -**

# OFFICE OF THE INSPECTOR GENERAL
## Department of Children and Family Services

> ### *REDACTED REPORT*

> *This report is being released by the Office of the Inspector General for educational purposes. To ensure the confidentiality of all persons and service providers involved in the case, identifying information has been changed. All names, except those of professional references, are fictitious.*

**CHILD:**   **Gregory Drabin**
**SUBJECT:**   **Child Death**

## COMPLAINT

Two-and-a-half-year-old Gregory Drabin died in March 2008. He was the child of Esther Sims and Walter Drabin. Gregory had one sibling, Deshanta Paxton, who was six-and-a-half years old at the time of Gregory's death. Gregory and Deshanta lived with their mother and her boyfriend, Dexter Tyler, whom she had been dating for almost a year. Mr. Tyler has two children, seven-year-old Tanya Tyler and four-and-a-half-year-old Misty Tyler, with his ex-wife, Cindy Tyler. Mr. Tyler was caring for Gregory and Misty at home on the day of Gregory's death. He was the only adult present in the home.

The Office of the Inspector General investigated Gregory's death pursuant to its mandate to investigate the deaths of children whose families were involved with DCFS within a year of their deaths. Dexter Tyler was indicated by the Department for cuts, bruises, and welts to his daughter, Tanya, two months prior to Gregory's death. The Office of the Inspector General also received a complaint in this case about the integrity of the findings from Gregory's autopsy.

## INVESTIGATION

*Investigation of Bruises to Tanya – Sequence A Hotline Report*
The local Police Department called the DCFS hotline alleging that Dexter Tyler had abused his daughter, Tanya. Mr. Tyler was separated from his wife, Cindy Tyler, and shared custody of his daughter. According to the hotline narrative:

> Reporter indicates that OPWI (mother) brought [Tanya] (child, 4 yo) to the hospital to be checked. Reporter indicates that [Tanya] has bruising to her buttocks area. Reporter indicates that the marks look similar to finger marks. [Tanya] indicates that [Dexter] (father) spanked her with his hand and a belt. [Tanya] did not state why she was spanked at this time.

The hotline took a report for investigation of cuts, bruises, welts (#11) to Tanya by her father. Lenore Witcomb was assigned to the investigation.

Ms. Witcomb interviewed Dexter Tyler at home.  Mr. Tyler said that he did not remember spanking Tanya on this occasion, but that he does spank her on her bottom with an open hand. He asked the investigator to observe his red, yellow and green light system, which was posted on a bedroom wall.[1]  Ms. Witcomb did not know that Mr. Tyler was living with his girlfriend, Esther Sims, and her two children, Gregory and Misty.  Ms. Witcomb stated to Office of the Inspector General investigators, "I was just there to find out what happened and did the father cause the injury."  She acknowledged that she should have asked Mr. Tyler who else lived in the home with him.

Ms. Witcomb interviewed four-and-a-half-year-old Tanya at her mother's home.  Tanya described her father's traffic light system of discipline for the investigator:  "Red is when you get a spanking on your butt!  Yellow is you get to sit down (time out) and Green is when you get stickers because you have been good!"  Tanya told Ms. Witcomb that she had a bruise on her bottom because she was bad and on red light.  When asked if she had ever seen her father hit her two-year-old sister, Tanya said yes.

Investigator Witcomb spoke with Dexter Tyler and asked him what form of discipline he was currently using.  He stated that he was still using the red, yellow, green light system, but that he was using time outs instead of spanking in red light.  He denied using any form of physical discipline.

Mr. Tyler was indicated for cuts, bruises, welts by abuse to Tanya.  The investigator noted that no services were needed.

*Gregory's Death*
On the day of Gregory's death, at 10:55 a.m. Dexter Tyler called 911 to report that Gregory was having difficulty breathing.  The local Fire Department responded at 11:00 a.m.:

> Upon arrival found unresponsive 2 y/o male patient in arms of father in front yard.  Skin pale cold and dry.  Cyanotic. . . . Patient fully clothed.  Father was giving child a bath when he (the father) turned for a towel and patient fell in bathtub, was under water of 'approx 5 sec picked child up and patted back, child gasping for air, then dressed'.  Event happened no more than 15 min prior to [unit] E6 arrival.  Med history and event stated by father . . . noted bruising on forehead and abdomen.

An ambulance arrived on the scene at 11:03 a.m. and EMS personnel assumed care of the child. Their report noted:  "Dad states pt was getting into the bath fell and hit his stomach and was underwater for about 3 sec when dad pulled him out."  The ambulance took Gregory to Central Hospital.

According to local Police records, Mr. Tyler first explained to police what happened at approximately 1:00 p.m. on that day while at Central Hospital.  He told Sergeant Pickens that he was giving Gregory a bath.

---

[1] Ms. Witcomb recalled for OIG investigators that she asked Mr. Tyler for identification, but only to verify his name, date of birth, and to make sure the picture matched the face she was looking at.  She reported doing this routinely to "make sure I'm talking to the right person."  She said that she does not pay attention to the address because "people move a lot." Ms. Witcomb said that she did not ask Mr. Tyler if the address was his permanent residence, or if anyone else lived in the home.

[He] shampooed [Gregory's] hair, poured water over his head then turned around to grab the towel that was laying on the toilet. [Dexter] advised that he heard a 'rubbery thump' and he believed the child stood up to be dried off then fell. [Dexter] stated that when he turned back around, [Gregory's] face was under water. [Dexter] stated that he pulled [Gregory] out of the water; [Gregory] burped twice and made gagging sounds. [Dexter] stated that [Gregory] was under water three to four seconds. [Dexter] advised that [Gregory] was sitting in the tub with his head bent downward and his face in the water. [Dexter] advised that he set [Gregory] on the floor and dried him off. [Dexter] carried [Gregory] to the couch and [Gregory] made a 'whimpering sound' a 'whining noise'. [Dexter] patted [Gregory] on the back then put him down on the couch. [Dexter] thought [Gregory] might be hungry so [Gregory] (sic) went to the kitchen and cut a grape in half, [Gregory] loves grapes. [Dexter] put the grape in front of [Gregory's] face and [Gregory] did not want it. [Dexter] stated that [Gregory] appeared to drift off to sleep, then he made a jerking motion similar to movement made by a baby that is scared by a sound from the TV according to [Dexter]. [Dexter] stated that [Gregory] screamed so [Dexter] took [Gregory] to his bed and laid him down. [Dexter] returned to the kitchen to make [Esther's] lunch, which took about three minutes to fix since the bacon was already cooked. [Dexter] then returned to the (sic) [Gregory's] room and [Gregory's] head was rolling around and his eyes were open. [Gregory] didn't look like he was breathing and his lips turned a whitish blue color. [Dexter] then called 911. [Dexter] stated that he carried [Gregory] outside and meet (sic) the fire truck as it pulled up.

At 3:24 p.m., a social worker at Central Hospital, called the hotline and reported:

[Gregory Drabin] was transported by ambulance to the hospital today, at 11:23 am and was in respiratory arrest and wasn't breathing but he had a pulse. Reporter states the child was pronounced by [Dr. Reebah Roletto] at 12:03 pm. Reporter states the child was last seen alive by [Dexter Tyler], the mother's boyfriend, who was babysitting the child at the mother's residence. Reporter states [Dexter Tyler] said he was giving [Gregory] a bath and he turned around for about 30 seconds to get a towel and he heard a "rubbery thump". Reporter states [Dexter] said he turned around and [Gregory] was turned over on his back and his head was submerged under water. Reporter said [Dexter] told the police that he turned around to get a towel and when he turned back around he found [Gregory] sitting on his bottom and he was bent over at the waist and his head was under water. Reporter said [Dexter] said when he pulled [Gregory] out of the tub he was making a gagging and whining sound. Reporter said [Dexter] said he patted him on the back and thought he was okay. Reporter states [Dexter] said he went to lay [Gregory] down for a nap and he noticed he was a "funny color" and noticed he was not breathing so he called 911. Reporter states the child had some bruises around his eye, on his arm and on his upper forehead at the hairline. Reporter states the police said that they are old bruises. Reporter states the child had behavior problems and may have been autistic. The child's primary doctor is [Dr Mandreo]. Reporter states the police off[ic]er at the hospital is [Dick Cordova] of the local PD. Reporter states there will be an autopsy later today. Per SACWIS, [Dexter Tyler] has an indicated report for allegation # 11 to [Tanya Tyler]. Reporter said [Dexter Tyler] has a two year old son that he has custody of. It is not known if [Dexter's] 2 yr. old

son lives with him or where the 2 yr. old was during this incident at the mother's home.[2]   Reporter states the mother is a teacher's aid[e] and was at work when this happened.  No known AKA's.  No other known disabilities. LEADS requested. Cycis Neg.

A hotline report was taken (Sequence B) for investigation of death by neglect to Gregory by Dexter Tyler.  Child protection investigator Miriam Hoffman was assigned to the investigation. Her supervisor was Jack Masters.  On the day of Gregory's death, Ms. Hoffman saw Esther Sims's other child, 6-and-a-half-year-old Deshanta Paxton and Dexter Tyler's two children, 5-year-old Tanya Tyler and 2-1/2-year-old Misty Tyler.  She completed a CERAP and put a safety plan into place with the children's respective mothers that they would not allow Dexter Tyler to have any contact with the children while the investigation of Gregory's death was pending.  Mr. Tyler normally kept his daughters every other week.  He also agreed to abide by the safety plan.

On the same day, Investigator Hoffman called the local Police Department and found out that Detective Martin Eckert was assigned to the case and that he was interviewing Dexter Tyler. She left several messages over the next couple of hours asking the detective to call her.  Ms. Hoffman also went to Central Hospital and interviewed the reporter, Sally Rupert.  Ms. Rupert reported that Dexter Tyler was babysitting Gregory and giving him a bath.  Mr. Tyler said he turned around for 3 seconds to get the towel off the toilet when he heard a thump.  Ms. Rupert said that Mr. Tyler told the hospital nurses that when he turned around and saw Gregory, Gregory was laying on his stomach face forward.  Ms. Rupert pointed out that Mr. Tyler told the police that when he turned around, he saw Gregory in a sitting position and he was bent over face forward.  According to Ms. Rupert, Mr. Tyler said he took Gregory out of the bath and laid him down for a nap.  He said Gregory was a funny color and he noticed Gregory was not breathing so he called 911.  Gregory was in respiratory arrest when he came to the hospital which means he had a pulse but was not breathing.  Mr. Tyler's 2-1/2-year-old daughter, Misty, was with him at the hospital.  Ms. Rupert said she did not interact with either Mr. Tyler or Ms. Sims, but the child life specialist did.  The child life specialist later reported that she provided emotional support to Gregory's mother and father, but did not interact with Mr. Tyler.

The following day, Investigator Hoffman spoke with Detective Martin Eckert, who reported that Kimberly Kobar, the doctor who completed Gregory's autopsy, said that there was no foul play in Gregory's death and that his death was being considered a medical death, probably from leukemia.  Detective Eckert further informed the investigator that Gregory's parents stated that Gregory had a tendency to bang his head on the floor or table; Gregory did have a cut on his liver that was consistent with CPR; and Mr. Tyler was consistent in his story stating he was giving Gregory a bath.  Mr. Tyler had reported that Gregory was standing up in the tub and Mr. Tyler turned around for approximately 3 seconds to get the towel and he heard a thump.  He turned around and Gregory was sitting in the tub with his face leaning over in the water.

Investigator Hoffman confirmed the information she received from the detective with the Morgan County Coroner the day after Gregory died.  The coroner told Ms. Hoffman that Dr. Kobar completed the autopsy and Gregory did not die from trauma.  She said there were no signs of smothering; there was no evidence of drowning; there were no concerns or signs of abuse or neglect; there were some old bruises on Gregory that were consistent with a mobile two-year-old; and there was a possibility that Gregory's death was from a medical condition. The coroner said that she would run more tests and let the investigator know when she had a

---

[2] This was incorrect information.  Aside from his two daughters, no other children have been identified.

definite cause of death.   She said that an autopsy report generally takes six weeks to be completed.

The day after Gregory's death, Investigator Hoffman asked Mr. Tyler for two collaterals that she could interview.   He suggested his mother and Gregory's godmother.   Both reported that they had no concerns about Mr. Tyler abusing or neglecting Gregory or the other children.

Investigator Hoffman also spoke with Gregory's primary care physician, Dr. Michael Mandreo, who reported when he last saw Gregory for a routine physical.   He did not recall seeing any unusual marks or bruises on Gregory.   The doctor said that four days prior to Gregory's death his mother called the office and spoke to the nurse about troublesome behaviors of Gregory's, such as hitting his head on the floor and flapping his arms when he gets aggravated.   She was worried he might be autistic.   The doctor said that he was going to refer Gregory for a developmental evaluation and the nurse left a message for the mother to that effect the day before Gregory's death.

The day after Gregory's death, Investigator Hoffman spoke to Cindy Tyler, Dexter Tyler's ex-wife and Tanya and Misty's mother.   When asked about concerns, Ms. Tyler reported that she had been concerned about the prior investigation in which Tanya had bruises and said they were from her dad spanking her.   Ms. Tyler talked to Mr. Tyler after that incident and he said he had not spanked Tanya since.   She had not noticed any bruises on the children since then.   She said that she had been told that Gregory would have bruises on him from fighting with Misty, but she never saw bruises on Misty.   She said that Mr. Tyler had been mentally abusive to her in the past, but not to the children.   She never thought Mr. Tyler would do anything to hurt a child.

The next day, based on the information from the coroner, Investigator Hoffman saw the children and ended the safety plan.   While seeing Deshanta at her paternal aunt's home, the paternal aunt, Erica Drabin, stated that she had had concerns in the past about Deshanta and Gregory because Gregory had bruises on his head and Deshanta had bruises on her buttocks that she stated were from being bad.   The last time Ms. Drabin saw bruises on the children was a couple of months prior because she decided to stop watching them.   She said her brother, Walter Drabin, took pictures of bruises on the children and that she wished she had called DCFS in the past.

Four days later, Central Emergency Department physician Reebah Roletto told Ms. Hoffman that when Gregory arrived at the hospital he had a pulse but was barely breathing and then his heart stopped.   He said he did not want to go on record stating why Gregory died and he would like for the investigator to refer to the hospital records for additional information.

Two and one half weeks after Gregory's death, Ms. Hoffman interviewed Esther Sims and Dexter Tyler separately.   They reported being high school sweethearts who reconnected.   Ms. Sims said that Mr. Tyler did not live with her, but did stay over sometimes and did watch the kids.   Ms. Sims and Mr. Tyler reported using a green, red and yellow light system of discipline with the children.   When the kids were on red, they received time-outs.   Mr. Tyler said that after the investigation of bruises to his daughter, he stopped spanking the children.   Mr. Tyler told the investigator what happened the day Gregory died.   He said that he was watching Gregory and had Misty with him.   He gave Misty a bath and then gave Gregory a bath.   He had Gregory stand up facing the side of the tub and he turned around to get a towel off the toilet seat.   He was not all the way turned around when he heard a thump.   He turned back around and saw Gregory in a sitting position with his head in the water.   He picked Gregory up out of the water and Gregory coughed a couple of times and seemed fine.   He dried Gregory off and put clothes

on him and took him into the living room and laid him on the couch to watch TV.  Mr. Tyler said that Gregory was breathing fine when he laid him down.  Mr. Tyler went to make Misty a sandwich and as he was finishing Gregory jerked and screamed.  He went to check on Gregory and Gregory seemed fine.  He took Gregory and laid him on his bed.  Gregory lifted up his arms like he did when he pulled the blanket over him.  Gregory was laying there and went to sleep.  Mr. Tyler said he was finishing making the sandwich and keeping a watch on Gregory.  Gregory jerked again and screamed.  He went to check on Gregory and picked him up and his head kind of rolled.  He said he thought he tried to call Ms. Sims and then called 911.

Investigator Hoffman spoke with Detective Eckert, who said there was no suspicion of foul play in Gregory's death and that he was just waiting for the lab results to close his case.

The following day, Investigator Hoffman spoke to the County Coroner by phone.  Ms. Hoffman noted:

- Gregory's cause of death was from malignant small round blue cell tumors that invaded his bone marrow
- the exact kind is unknown
- it would have caused fatigue in the child which would have been probably hard to tell with a child and it would have caused the child's immune system to break down and not be able to fight off viruses as easily
- she is willing to go on record stating that Gregory's death was from a medical cause
- the autopsy report is being worked on now and should be completed by next week.

Kimberly Kobar, M.D. conducted the autopsy for the County Coroner.  Dr. Kobar is a board certified pathologist, but is not board certified in *forensic* pathology.  Dr. Kobar's business is called Forensic Pathology and the letterhead at the top of each of her autopsy reports reads:

J.H. KOBAR M.D.,
FORENSIC PATHOLOGY P.C.

Dr. Kobar wrote in her report that Gregory died a natural death from:

a poorly differentiated malignant neoplasm of a group referred to as 'small round blue cell tumors, not otherwise specified.'  These are rare cancers of childhood that include such tumors as peripheral neuroectodermal tumors, Ewing's sarcoma and neuroblastoma.  The latter seldom occurs without involvement of the adrenal gland medulla, not seen in this case.  As the tumor infiltrates the bone, it displaces normal hematopoietic cells, leading to a propensity to bleeding.  This could account for the petechial hemorrhages and excessive bleeding from a minor liver laceration.  There is no sign of trauma that would under normal circumstances be lethal.

The child protection investigation was unfounded.

### *Office of the Inspector General Referrals*

Inspector General investigators contacted a foundation for cancer research to consult regarding Small Blue Cell Cancer. The Inspector General investigators provided the findings of the autopsy, including the cause and manner of death, to the center's executive administrator who noted that the absence of a tumor at the site of the bleeding, along with Gregory's asymptomatic presentation prior to his death, she was skeptical that Gregory could have died from Blue Cell Cancer. The Inspector General requested a second opinion about Gregory's death from a well-respected board certified forensic pathologist who serves as the Chief Medical Examiner of four counties in another state; is a professor of pathology; is involved in numerous professional organizations and committees, many involving children; and has authored over 35 articles and book chapters and given over 300 presentations.

After reviewing Gregory's autopsy report, photographs, and microscopic slides; EMS report; emergency department record; pediatric records; and police report, the consulted pathologist wrote a letter to the Inspector General, in which she stated:

> My opinion about the death of this child is that it is a homicide from asphyxiation by strangulation with another significant contributory factor of blunt abdominal trauma with a large liver laceration and a very large amount of blood in the peritoneal cavity. In my opinion, the liver laceration alone could have also been a lethal injury. [Dr. Kobar] thought the liver laceration was related to resuscitation and that the blood in the abdominal cavity was an amount consistent with a minor laceration. In fact, the liver laceration is far from minor and a large portion of the child's blood volume is in the abdominal cavity. Microscopically, there is vital reaction to the laceration as demonstrated by the presence of neutrophils indicating that this injury was made some period of time prior to the arrest of the child for which the resuscitation was then performed. The findings conclusive of asphyxiation, the petechial hemorrhages and the abrasions of the neck, are very significant findings and indicative of asphyxiation.

> The small blue cell tumor is an entirely incidental findings (sic) and of no significance in the death of the child.

Given the consultant's opinion, the intake coordinator of the Office of the Inspector General called the hotline to report substantial risk of physical injury to Mr. Tyler's biological daughters, Misty and Tanya Tyler, and Gregory's sister, Deshanta Paxton.[3] The Inspector General also referred the matter to the Morgan County State's Attorney and the Illinois Attorney General's Office.

Dr. Kobar amended her opinion about Gregory's death, stating his death was "due to disseminated intravascular coagulation with atypical cells noted in the bone tissue that can not be confirmed or excluded as malignancy due to decomposition of cellular marker S-100. There is no trauma that can not (sic) be explained by resuscitation efforts."[4]

---

[3] Mr. Tyler is now Deshanta's step-father, as he and Esther Sims married.

[4] It should be noted that cardiopulmonary resuscitation (CPR) was not performed by either fire department or ambulance personnel, but was performed by staff in Central' emergency room. Fire department staff noted bruising on Gregory's forehead and abdomen and documented it in their report. Central Hospital emergency room staff also observed "bruising to forehead, LUQ [left upper quadrant], petechia periorbital [around the eye] & around neck" at 11:16 a.m. Resuscitation began at 11:28 and was discontinued at 12:03 p.m.

The Inspector General consulted with DCFS Medical Director who opined that if Gregory had died from disseminated intravascular coagulation, he also would have been septic, which he was not.  The DCFS Medical Director shared her opinion with DCP.

The Inspector General requested another opinion from another board certified forensic pathology who serves on the Board of Directors of the National; Association of Medical Examiners.  Investigators shared records with this second consultant, including Gregory Drabin's autopsy reports, photographs, and microscopic slides; EMS report; emergency department record; pediatric records; and police report.  He was not provided the first expert's letter to the Inspector General nor told the first expert's opinion in the case.  This second expert wrote a letter to the Inspector General in which he stated:

> In summary, the gross autopsy and microscopic findings are compatible and consistent, and indicate a traumatic death.  Therefore, the cause of death of [Gregory Drabin] is hemoperitoneum due to blunt force trauma of the abdomen.  The manner of death is best certified as homicide.  The liver lacerations with associated skin, abdominal wall, liver ligament, and diaphragm contusions are from inflicted blunt trauma of the abdomen sustained while he was alive.  Microscopically and grossly the liver and diaphragm injuries are hours old and preceded his collapse.  The abdominal injuries are not from cardiopulmonary resuscitation.   Abrasions and marks on the neck are consistent with resuscitation.  There is no evidence grossly or microscopically of infection, tumor, natural disease, leukemia, lymphoma or congenital abnormality.

The Tyler and Paxton children are under a safety plan while the investigation of Gregory's death continues.  The autopsy reports and pathology opinions were shared with DCP, the Morgan Police, the Morgan County State's Attorney's Office, and the Illinois Attorney General's Office.  The police have completed their investigation and forwarded it to the State's Attorney's Office for review.


**ANALYSIS**

When Dr. Kobar opined the day after Gregory's death that he died a natural death, the police and child protection investigations of Gregory's death were effectively "shut down."  Later, the legitimacy of the doctor's findings was questioned.  Two forensic pathologists have since agreed that Gregory was murdered.  The Inspector General has forwarded those opinions to the County State's Attorney's Office and the Illinois Attorney General's Office for consideration of charges being brought against Dexter Tyler.

The Department is put in a difficult position to protect children if it cannot be assured of the validity of the manner of death attributed to children.  Elected county coroners have the statutory authority to designate the physicians who perform autopsies in their counties.[5]   The physicians need only be licensed to practice medicine in all of its branches, though "wherever possible by one having special training in pathology."  55 ILCS 5/3-30.14.  Because Dr. Kobar

---

[5] In counties of less than 1,000,000 population, autopsies shall be performed by licensed physicians "appointed or designated by the Director of Public Health upon the recommendation of the advisory board on necropsy service to coroners after the board has consulted with the elected coroner."  55 ILCS 5/3-3014.  The advisory board on necropsy service to coroners was abolished by former Governor Blagojevich in Executive Order No. 7 which abolished various boards, councils, and committees as a means to reduce state spending.

uses letterhead designating her business name, "Forensic Pathology P.C.," the public could be misled into believing that the autopsy was performed by a forensic pathologist.   The Department should  request that the County Coroner designate or appoint a forensic pathologist to conduct the autopsies of children subject to an open child protection investigation, given the public's interest in protecting children from harm and holding those who hurt them responsible for their actions.

During the first investigation involving Mr. Tyler hitting and bruising his daughter, Tanya, the investigator, Lenore Witcomb, failed to ask Mr. Tyler if anyone lived in the home with him. Mr. Tyler lived in the home with his girlfriend, Esther Sims, and her two children, Gregory and Deshanta.  Neither Gregory nor Deshanta were seen or interviewed because Ms. Witcomb did not know they lived in the home.  Consequently, Ms. Witcomb could not assess risk to them. Ms. Witcomb acknowledged during her interview with Office of the Inspector General investigators that she should have asked who lived in the home.

## RECOMMENDATIONS

1.  The Inspector General has referred this case for possible prosecution to the County State's Attorney's Office and to the Illinois Attorney General's Office.

2.    The Director should issue a letter to the involved County Coroner requesting that she appoint or designate a board-certified forensic pathologist to conduct the autopsies of children when there is an open child protection investigation.

3.   *This recommendation addresses personnel issues.*

4.   The Department should request that this case be fully reviewed by the County Child Death Review Team.  The team should receive the initial and the final autopsy and the opinions of the experts consulted by the Inspector General and any other relevant materials.

**- END OF REPORT -**